UNITED STATES OF AMERICA      :

:

vs.                           :         NO. 3:16-cv-00057-RJC

:

:

ALEJANDRO UMAÑA        :

## MOTION FOR LEAVE TO CONDUCT
## DISCOVERY AND SUPPORTING MEMORANDUM

Alejandro Umaña, through counsel and pursuant to Rules Governing § 2255 proceedings, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, files this Motion for Leave to Conduct Discovery and Supporting Memorandum. This request is for the production of records and evidence, which is necessary for the presentation of the constitutional claims that will be raised in Mr. Umaña's 28 U.S.C. § 2255 motion.

Discovery is authorized by Rule 6 of the Rules Governing 28 U.S.C. § 2255 Procedures. The discovery requested in this motion is essential to guarantee Mr. Umaña a full and fair opportunity to present his claims under § 2255, as well as to ensure that this Court reviews and resolves his constitutional claims for relief with the benefit of a fully-developed factual record. Without such discovery, and sufficient time thereafter to fully investigate all possible leads arising from it, Mr. Umaña will be unable to present complete claims and underlying facts in support of a § 2255 motion. For these reasons, Mr. Umaña requests that the Court resolve the issues contained herein, and leave time for Mr. Umaña to incorporate them into his claims for relief, prior to foreclosing a final opportunity for Mr. Umaña to present his § 2255 motion.

1

# INTRODUCTION

Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts gives this Court express authority to order discovery "for good cause . . . under the Federal Rules of Criminal or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) incorporates the United States Supreme Court's directive that federal habeas corpus petitioners are "entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of the relevant facts." *Harris v. Nelson*, 394 U.S. 286, 298, 300 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); *Cf.* Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[1] Mr. Umaña has made a good faith effort to obtain discovery from the Government but has been unable to do so.[2] *See* Appendix A, Informal Discovery Request. Therefore, he respectfully requests an order from the Court, allowing him to obtain and review discovery that may directly support his claims for relief.

## A. The Good Cause Standard

The Court may order discovery when "good cause" for doing so is shown. *See* Rule 6(a) Governing § 2255 Proceedings. According to the Supreme Court, "good cause" for discovery in post-conviction proceedings is established "where specific allegations before the court show

---

[1] The Advisory Committee Notes to the Rules Governing Section 2254 Cases in the United States District Courts are "fully applicable to discovery under [the analogous Rule] for § 2255 motions." Advisory Committee Notes to Rule 6, Rules Governing Section 2255 Proceedings for the United States District Courts.

[2] Specifically, post-conviction counsel has requested that the United States Attorney provide all of the discovery listed in this memorandum pertaining to the unadjudicated murders that occurred in Los Angeles and were used against Mr. Umaña as aggravating factors. He has not asked the Government to produce discovery relating to the social history of Mr. Umaña from El Salvador.

reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).[3]

In *Bracy*, the Supreme Court held that a § 2254 petitioner was entitled to discovery and reversed and remanded a death verdict to allow him to receive and review the items and evidence that he sought. *Id*. In that case, the petitioner was convicted for murder and sentenced to death before a judge who was later found to have accepted bribes from criminal defendants in exchange for arranging for the defendants to be acquitted or convicted of low-grade offenses. *Id*. The petitioner requested discovery under Rule 6(a) in order to try and discover whether the judge was biased against him, because he himself had not made any such bribe. *Id*. at 902. Although his discovery request failed in the district court and on appeal, the Supreme Court unanimously reversed, and rejected the notion that petitioner had not made a sufficient showing of good cause. *Id.* at 905-09. According to the Court, the proper focus for review of the discovery request is whether the petitioner made "specific allegations" that support the discovery request, even if the potential claim for relief is "only a theory at this point" and "speculative." *Id*. If the evidence sought could establish a well-pled claim – "difficulties of proof aside" – the court should authorize discovery. *Id*. at 905. The Supreme Court made clear that "good cause" does not require a movant to conclusively establish he will succeed on the merits of his claims. *Id*. at 909.

**B. Discovery is Especially Warranted in Capital Cases.**

The policies favoring discovery are stronger in capital cases than in noncapital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland, v. Scott,* 512 U.S. 849, 855 (1994). Here, discovery is

---

[3] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's claims are patently frivolous -- i.e. the product of "fantasy which has its basis in the paranoia of prison rather than fact." *Harris*, 394 U.S. at 300.

3

necessary to ensure the extra measure of process which is demanded in capital cases. "[I]f death is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims." *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987).

**C. Due to Factual Circumstances Unique to Mr. Umaña's Case, the Government should Produce Discovery prior to Mr. Umaña Filing his § 2255 Motion.**

At the penalty phase of trial, the government sought to prove several aggravating factors in support of a sentence of death, consistent with its notice of intent to seek the death penalty. 3:08-cr-00134-RJC, E.C.F. Doc. No. 275, pp. 3-4. Having already been convicted of the murders that took place in Greensboro, North Carolina, the most significant and impactful aggravating factors alleged by the government were that Mr. Umaña committed three additional murders in Los Angeles (the "Los Angeles murders"), for which he was neither tried nor convicted; one occurred in Lemon Grove Park (the "Lemon Grove Shooting"), and the other two on Fairfax Avenue (the "Fairfax Shooting"). *Id.* at 4.

Standing alone, the shooting in the restaurant in Greensboro was simply not the type of murder that would justify imposition of the death penalty. *See Kansas v. Marsh*, 548 U.S. 163 (2006) (commenting that "within the category of capital crimes, the death penalty must be reserved for 'the worst of the worst.'") (citation omitted). All twelve jurors unanimously agreed that the Greensboro restaurant shooting was unplanned and emotionally charged. *See* Doc. No. 1048-51, pp 5-6. For that reason, in order to make good on its theory that Mr. Umaña was the "killer among killers" (Penalty Phase Transcript, "PT" at 889), someone who killed "over and over again" (*Id.*), and someone who had the devil "in his heart," (*Id.* at 900) the Government introduced evidence of the Los Angeles murders.

In doing so, the Government relied on frail evidence at trial such as eyewitness identification by a convicted felon and gang member. An identification which the Court found to

be "suspect" (*Id*. at 328) and of "insufficient indicia of trustworthiness." *Id.* at 7. Post-conviction counsel for Mr. Umaña believes that this identification of Mr. Umaña was not merely suspect, but false. As explained in further detail below, paper discovery shows that the same convict, gang-member-witness who identified Mr. Umaña as the Lemon Grove shooter – and the only witness to do so – identified no less than three different people as being the shooter. Yet he testified at trial that he only saw one shooter. At least two of the many interviews that detectives conducted with this witness were recorded, but those recordings were never turned over to the trial attorneys nor made available to the Court. Mr. Umaña respectfully requests that he be given the opportunity now to finally review the missing discovery in order to prevent the possibility that an execution is carried out, having been procured by way of false evidence.

The lack of discovery in Mr. Umaña's case indicates possible violations of *Brady v. Maryland*, 373 U.S. 83 (1965), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Strickland v. Washington*, 466 U.S. 668 (1984). In order to evaluate whether exculpatory evidence was improperly withheld, whether false evidence was presented at trial, and whether Mr. Umaña was prejudiced by inadequate assistance of counsel, he needs to be able to review the missing discovery. Therefore, Mr. Umaña requests that the Court order the government to produce all discovery listed in this motion. *See* Appendix B, Mr. Umaña's List of Specific Discovery Requests.

**II.**
**STATEMENT OF PERTINENT FACTS REGARDING**
**THE REQUESTED DISCOVERY**

**A. Discovery from the Investigation of the Los Angeles Murders is mussing.**

    1. Background on the Lemon Grove Shooting Investigation

5

The Lemon Grove shooting happened on September 28, 2005. Detective Thomas Small of the Los Angeles Police Department was assigned to the case as the primary investigating officer. PT at 94; Appendix C, Lemon Grove Park Homicide Chronological Record of Investigation ("Lemon Grove Chrono") at 1. Detective Small determined that there had been a shooting at Lemon Grove Park with four victims. PT at 94. Of the four victims, Andy Abarca had been killed. Victims Roberto Ramos and Juan Lara each had been injured, and Freddy Gonzalez was uninjured. PT at 97. Detective Small and the three surviving victims would become the Government's primary witnesses with respect to the Lemon grove shooting at the sentencing phase of Mr. Umaña's trial.

a. *The initial investigation.*

On September 29, 2005, several hours after the shooting, Detective Small and his partner organized their first interviews with witnesses to the shooting. Appendix C, Lemon Grove Chrono at 1. That day, the detectives conducted recorded interviews with victim Roberto Ramos and his friend, Elger Barrios. *Id*. Those interviews were recorded on tape and labeled as #376049 A and #376049 B. *Id*. Neither of these recordings was turned over to the defense. The detectives also interviewed victim Juan Lara, other witnesses to the shooting, and people who were in and around the park at the time of the shooting. *Id*.

Based on the interviews, the detectives determined that victim Freddy Gonzalez was a member of a gang known as "TPC," that TPC was a rival of the MS-13 gang, and that Gonzalez was the intended target of the shooting. *Id*. at 2-3.[4] It was later discovered that Gonzalez had robbed an MS-13 member known as Alex Montes, which was the likely motive for the Lemon Grove shooting. *See* PT at 105-06.

---

[4] Freddy Gonzalez also went by the name Carlos Alfredo Dominguez. He is referred to by a combination of those two different names throughout the Lemon Grove Chrono. *See* Appendix C, Lemon Grove Chrono at 3; *see also* PT at 9.

Detective Small promptly tracked down Gonzalez and interviewed him. Appendix C, Lemon Grove Chrono at 3. That interview was recorded on a tape labeled #376050. *Id*. The recorded interview was not turned over to the defense. Nothing was entered into the Lemon Grove Park Chrono regarding Gonzalez's ability to identify the shooter(s) at that time. *Id*. That same day, another detective interviewed an "H. Suarez," who was one of the people in or around Lemon Grove Park at the time of the shooting. *Id*. That interview was recorded on tape #376051. *Id*. This interview was not turned over to the defense either. On October 12, 2005, detectives interviewed Erick Lopez, an employee at Lemon Grove Park. *Id*. at 8. The interview was recorded on tape #376382, but never produced in discovery. *Id*. On October 18, victim Juan Lara provided a second statement to the police in an interview with Detective Small. *Id*. That tape was labeled as #376385, but not produced.

> b. *Shortly after the Lemon Grove shooting, victim Roberto Ramos was confident that he could identify the shooter, but he never recognized the shooter in any of the photographs that Detective Small presented to him, including the photograph of Mr. Umaña.*

On October 25, Detective Small met for a second time with victim Roberto Ramos. *Id*. at 12. He was shown three photographic lineups and did not recognize the shooter in them. *Id*. Nevertheless, Ramos stated he had seen the "primary shooter" at least one time at Lemon Grove Park prior to the night of the shooting and that "he would be able to recognize the suspects if he saw him again." *Id*. Yet Ramos never identified a shooter from the photographs that Detective Small showed him throughout the entire investigation, even though he was shown a photograph of Mr. Umaña. *See Id.* at 15. Victim Ramos told Detective Small that he was willing to meet with a forensic sketch artist as soon as one became available, but it seems that this never took place. *Id*. at 12. According to the Lemon Grove Chrono, Ramos was the only victim who expressed

7

confidence in his ability to identify the shooter, and the only one who was asked and who agreed to meet with a sketch artist.

> c. Three months after the shooting, Freddy Gonzalez made tentative identifications of two people, including Mr. Umaña, who may have been responsible for the shooting, but victims Roberto Ramos and Juan Lara did not corroborate the identification.

On December 29, 2005, detectives met with Freddy Gonzalez for a second time. *Id*. at 15. Gonzalez stated that he was sure he was the intended target of the shooting, and that he had been told not to go to Lemon Grove Park by members of two different gangs. *Id*. Gonzalez made a "strong tentative ID" of MS-13 gang member Alex Montes, and a "tentative ID" of Mr. Umaña. *Id*. Gonzalez made a written statement to accompany each identification. Regarding Alex Montes, Gonzalez said:



Freddy Gonzalez
(In reference to suspect #4)

The night when they killed Andy I remembered the #4 photo was one of the guys that went to the park to shoot at us I saw this guy when I got to the park he saw me and he left in a hurry and he came back with one of his friends and he shot a pistol killing Andy

Appendix D, Gonzalez Identification of Alex Montes.

When Gonzalez identified Mr. Umaña a few minutes later, he wrote that:



Freddy Gonzalez
(In reference to suspect #2)

The photo #2 looks like or resembles the guy who came to the park the day that they killed Andy- I remember seeing this guy but I'm not sure if he is the one that came that day to the park with a pistol and shot at us.

Appendix E, Gonzalez's First Identification of Mr. Umaña, Government Trial Exhibit 507.

8

Gonzalez's identification of Mr. Umaña was weak, both in terms of Mr. Umaña's likeness to the shooter ("looks like or resembles") and whether Gonzalez had seen Mr. Umaña on the night of the shooting or at some other point in time ("I remember seeing this guy but I'm not sure if he is the one that came that day to the park"). *Id*. The December 29th interview was recorded on video and given tape #376898. The video was never given to the defense. *See* Appendix F, Handwritten List of Lemon Grove Audio and Video Tapes.

The next day, detectives met with victim Roberto Ramos again. Appendix C, Lemon Grove Chrono at 15. Victim Ramos was shown the photographic lineup labeled number 118737, which contained Mr. Umaña's photograph, but he did not pick Mr. Umaña out as the shooter. *Id*.; *see also* Appendix E, Gonzalez's First Identification of Mr. Umaña, Trial Exhibit 507 (labeled #118737). Victim Juan Lara was interviewed several days later, was shown the same lineup with Mr. Umaña's photograph, and did not identify anyone as the shooter. *Id*.

On January 16, 2006, Detective Small interviewed a witness by the name of Galo Ramirez. *Id.* at 17. Witness Ramirez explained that Freddy Gonzalez was not only being targeted by MS-13, but that he was in trouble with his own gang. *Id.* Galo Ramirez was shown a photograph of Mr. Umaña, but he did not identify him as the shooter. *Id.*

> d. *Freddy Gonzalez later identified a third person, Geovani Rodas, as the shooter, and Juan Lara indicated Rodas's complexion matched the shooter.*

From January through March of 2006, Detective Small's investigation focused on an MS-13 gang member who went by the moniker of "Sin." *Id*. at 19-23. On February 24, Detective Small learned that "Sin" was MS-13 gang member Geovanni Rodas who, subsequent to the Lemon Grove shooting, was charged for assault with a firearm. Appendix G, Felony Complaint for Geovani Rodas. On March 15, 2006 Detective Small showed Freddy Gonzalez a

photographic lineup containing a photo of Rodas, and Gonzalez identified Rodas as a possible

shooter (*Id*. at 22):[5]

> For me the kid in number 5 the expressions of the face look like the kid the arrived at the park with a gun and shot at us and hit my friend and I remember that the gun he had was chrome.
>
> Freddy Gonzalez



Appendix H, Gonzalez Identification of Rodas. Victim Juan Lara was also shown a photograph

of Rodas, and he noted that he had the same complexion as the shooter, but did not positively

identify him as the shooter. Appendix C, Lemon Grove Chrono at 23.

> ### e. Detective Small shared information with the detectives from the Fairfax shooting and interviewed a Fairfax suspect who exculpated Mr. Umaña.

On April 24, 2006, Detective Small exchanged information with detectives investigating

the Fairfax shooting. Appendix C, Lemon Grove Chrono, at 25. The Fairfax shooting

investigation centered on several MS-13 gang members, including Mr. Umaña, Rene Arevalo,

and Luis Rivera. *Id*. Following his discussion with the Fairfax detectives, Detective Small

created photographic lineups containing Fairfax suspects Rene Arevalo and Luis Rivera. *Id*. He

showed the photos to victim Juan Lara who was unable to positively identify anyone as the

shooter, but who did say that Fairfax suspect Rivera was "most similar in looks to the tall thin

gunman." *Id*. Following that lead, Detective Small met with Fairfax suspect Luis Rivera on April

24, who told him that "the (2) [Lemon Grove] shooters are 'Trivilin' and 'Casper.'" *Id*. at 26.

> ### f. Mr. Umaña was exculpated of the Lemon Grove shooting for a second time by Fairfax suspect Luis Rivera; suspect Rene Arevalo allegedly told a contradictory story in a recorded interview that was not produced.

---

[5] In the Lemon Grove Chrono, Detective Small wrote (section 11) in parentheses, indicating that there are additional notes from this interview. The notes were not provided to the defense.

On July 12, 2006, Detective Small interviewed Fairfax suspect Luis Rivera again and he "remained steadfast" that Trivilin and Casper were the shooters at Lemon Grove and that Geovanni Rodas was there as well. *Id*. at 32. Suspect Luis Rivera implicated Mr. Umaña in the Fairfax shooting, but he exculpated Mr. Umaña in the Lemon Grove shooting. *Id*. at 33.

Detective Small also investigated Fairfax suspect Rene Arevalo. On June 20, 2006, Detective Small submitted a declaration to the California Superior Court in support of a motion to monitor and record the conversations of Fairfax suspect Rene Arevalo. Appendix I, California Superior Court Filing and Declaration from Detective Small. In it, Detective Small stated that Arevalo was allegedly responsible for providing the murder weapon used in the Lemon Grove shooting. *Id*. Detective Small did not indicate how he came across this information. *Id*.

On September 13, 2006 Detective Small met with Rene Arevalo. *Id*. at 35. During that interview Fairfax suspect Arevalo apparently said that Mr. Umaña was "the likely shooter" at Lemon Grove. *Id*. Arevalo's source of information was one of the people arrested for the Fairfax shooting. *Id*. Detective Small wrote in his notes that one should "refer to the audiotape for details." *Id*. That audiotape was never provided to the defense.

> g. *Three years after the Lemon Grove shooting, the investigation appeared to be running cold, but when Mr. Umaña was charged in the Fairfax shooting, Detective Small immediately re-interviewed Freddy Gonzalez and sought a second identification of Mr. Umaña.*

Over the course of the next year and a half there was not a lot of activity on the Lemon Grove shooting investigation. *Id*. at 36-37. On April 14, 2008, Detective Small met with the detectives on the Fairfax shooting and a California Deputy District Attorney to "exchange info and strategy on cases." *Id*. at 37. The District Attorney agreed to file two counts of murder in the Fairfax shooting against Mr. Umaña but did not charge him with the Lemon Grove shooting. *Id*. The very next day, Detective Small went back again to Freddy Gonzalez and showed him

11

another photo display with Mr. Umaña's photo. *Id* at 38. Indicating Mr. Umaña, Gonzalez said:



My first impression was photo number five. The way that he has his hair is looks the same, but everything happened so fast that I'm not 100% sure. He came to the park, he seemed small and what I saw was the gun and after that I began to run.

This is the first and last time that I saw the young man.

Freddy Gonzalez

Appendix J, Government Trial Exhibit 506.

> ### h. Mr. Umaña's arrest in North Carolina.

Detective Small was notified that Mr. Umaña was in custody in North Carolina on April 16, 2008. *Id.* Detective Small learned that "the feds" intended to indict Mr. Umaña within a week or so. *Id.* at 39. Detectives Small made plans to travel to North Carolina and conducted an interview of Mr. Umaña on April 28, 2008, which was recorded and turned over in discovery. *Id.* Mr. Umaña was charged with the Lemon Grove shooting on May 20, 2008. Federal prosecutors and agents came to Los Angeles for a meeting in the middle of January, 2009. *Id.* at 41; Appendix K, FBI Investigation Report Regarding Los Angeles Investigation. The prosecutors and agents conducted interviews in Los Angeles and generated additional notes and 302 reports from interviews with persons in Los Angeles. *Id.* Those interviews apparently included at least Freddy Gonzalez (Appendix C, Lemon Grove Chrono at 41) and Juan Lara (*Id.* at 42). The FBI 302 reports and notes of the agents were not given to the defense. Detective Small made no further notes in the Lemon Grove Chrono. *Id.*

> 2. <u>The evidence regarding the Lemon Grove shooting that was presented at the sentencing phase of trial.</u>

> ### a. Detective Small's testimony at sentencing.

At trial, Detective Small gave an abridged version of the investigative steps he took in regards to the Lemon Grove shooting. PT at 90-119. Among other things, Detective Small

explained that Freddy Gonzalez was the intended target of the shooting because he had robbed MS-13 member Alex Montes several months prior to the shooting. PT at 105-06. Detective Small testified to a hearsay statement of Rene Arevalo. Specifically, he testified that Arevalo looked at a photograph of Mr. Umaña and said "that's your Lemon Grove shooter." PT at 110. Arevalo did not testify himself.

### b. The testimony of Juan Lara and Roberto Ramos.

Victims Juan Lara and Roberto Ramos testified after Detective Small. Each testified to their experiences on the night of the Lemon Grove shooting. PT at 119-48. They essentially stated that they were relaxing on the bleachers in the park after they had been playing basketball, when two Hispanic males approached them, took out guns and started firing at them. *Id*. They were not asked to identify Mr. Umaña in court. *Id*. On cross-examination, they testified that the police had shown them photographs but they had not been able to identify anyone in the photographs as the shooters. PT at 135 and 147. However, it was never presented to the jury that they saw photographs of Mr. Umaña and did not identify him, specifically.

### c. The testimony of Freddy Gonzalez.

Freddy Gonzalez testified after all of the other Lemon Grove witnesses. His testimony was the subject of substantial disagreement between the parties (*see* PT at 7-9, 307-13, and 322-29). The government argued that they should be allowed to have Freddy Gonzalez identify Mr. Umaña in open court and the defense took the opposite point of view because it would be an impermissibly suggestive identification. *Id*. Ultimately, the Court determined that "the prior description of the criminal … is suspect," noted that "[t]he Court does not have confidence in the pretrial identification," and therefore the government would not be allowed to ask Gonzalez to identify Mr. Umaña in open court. The Court made this ruling without hearing about Gonzalez's prior identifications of MS-13 member Alex Montes and Geovanni Rodas as possible shooters.

13

On the witness stand, Gonzalez testified to his own version of what happened at the Lemon Grove shooting. Unlike victims Juan Lara and Roberto Ramos Gonzalez testified that he only saw a single shooter. PT at 341. The government then elicited from Gonzalez that he was "sure" of his pretrial identification of Mr. Umaña as the shooter. PT at 331. Gonzalez denied that he was ever less than 100% sure about his identification of Mr. Umaña. PT at 333-34. On cross-examination Gonzalez was confronted with his less-than-certain statements regarding Mr. Umaña being the shooter, but he was not cross-examined on his specific, written statement that Alex Montes was "one of the guys who came to the park to shoot at us" and that "he shot a pistol killing Andy." *Id*. Similarly, he was not cross-examined at all about his identification of Geovanni Rodas as the shooter. *Id*.

3. <u>Documents from the Lemon Grove shooting are clearly missing.</u>

Post-conviction counsel for Mr. Umaña has determined that there was a wealth of documents and tangible objects that were discoverable at the time of trial, but not turned over to the defense, nor requested or reviewed by Mr. Umaña's trial counsel. An illustrative example is a list, apparently written out by Detective Small that contains both the date and tape number for a series of recorded interviews that were not given to Mr. Umaña. *See* Appendix F, Handwritten List of Lemon Grove Audio and Video Tapes. Post-conviction counsel has determined that the trial attorneys were aware that these items were missing but did nothing to remedy that situation. In a handwritten list entitled "Lemon Grove Park Shooting – Interviews – Do not have," an assistant for the trial attorneys catalogued the same recorded interviews described above. *See* Portion of Appendix L, Trial Attorney Notes of Missing Interviews. Yet the trial attorneys did not request the production of these interviews in their discovery motion (*See* Doc. No. 984).

14

4. <u>There is also missing evidence from the Fairfax shooting.</u>

Fairfax suspect Luis Rivera was interviewed over a period of two days in April, 2006. PT at 206. The interview from the first day was recorded and turned over to the defense, but a recording for the second day is still outstanding. At trial, testimony from government witness Detective Parshall established that Rivera changed his story on the second day. *Id*. at 206-07.

**B. Discovery Relating to Mr. Umaña's Social History and Childhood is Missing.**

Prior to trial, on September 22, 2009, defense counsel informed the Court and the government in a motion to continue that it was unprepared for trial and the *Atkins v. Virginia*, 536 U.S. 304 (2002) pre-trial hearing. Doc. No. 689. The motion indicated that as of the date of filing (two weeks prior to the scheduled trial date) the defense attorneys "ha[d] not spoken with a single member of the defendant's family." *Id*. at 5. The mitigation specialist for the defense had met with only one family member, the defendant's father, and the father was unwilling to cooperate due to perceived intimidation by the local Salvadoran police and the FBI. *Id*. at 3-5. Accordingly, the defense did not have evidence from family members that knew defendant during his developmental years for purposes of the *Atkins* hearing and had very little evidence of defendant's life and background for purposes of mitigation at sentencing. *Id*. at 3, 5-6. The government objected to a continuance, arguing that there was no reason to believe that the additional time requested would assist the defense in finding mitigation witnesses. Doc. No. 1254 at 7-8. The Court granted the motion to continue to March 22, 2010 and set a pretrial hearing to determine Mr. Umaña's eligibility for the death penalty under *Atkins v. Virginia*. *Id*. at 12-13.

The *Atkins* hearing went forward in November of 2009 with no testimony or information from family members other than what the father said to the mitigation specialist prior to his refusal to cooperate. Experts for the defense and the government relied on the assumption that

15

Mr. Umaña was born in 1984 in El Salvador. *See e.g.* Doc. No. 932 at 178. Ultimately, the Court denied the defense's request to strike the death penalty based on *Atkins*.

In March of 2010, on the eve of trial, the Government produced for the first time the Guatemalan birth certificate for Mr. Umaña, a narrative about Mr. Umaña written by the Salvadoran police, and a FBI 302 report indicating that the prosecution team had travelled to El Salvador and interviewed Mr. Umaña's mother. *See* Appendix M, FBI 302 Report Regarding El Salvador Investigation (stating "Interview of UMANAs mother LETICIA DIAZ."). The Government never produced its agents' notes, reports, or any recording of the interview. Instead, the AUSA provided her own one-half-page of handwritten summary notes. Appendix N, Handwritten notes by AUSA. The notes state, in part, (1) "mother lives in Santa Ana – but during war went to Guatemala – came back here" (2) Mr. Umaña was born in Guatemala and (3) "Became involved w/ Mara over papers." *Id*.

The defense sought to introduce some of this evidence to show Mr. Umaña's "life story" as mitigation. *See* PT 589; *See also* Doc. No. 1103 at 16-17 (the narrative "corroborates that his family was displaced by the violence that was going on in El Salvador" and gives a better understanding on the "father's role in [Mr. Umaña's] life."). The government objected, arguing that the evidence was unreliable because it was told to the Salvadoran police and provided no context for why the family moved to Guatemala. Doc. No 1147 at 17-18. The Court agreed with the Government, finding that the narrative "did not shed light on the effect of the civil war in El Salvador on the family, the role of the defendant's father in his life, or the defendant's personal sense of identity." Doc. No. 1165 at 15.

# III.
## DISCISSION OF DISCOVERY REQUESTS

Mr. Umaña has reason to believe that the Government withheld exculpatory evidence from the defense in violation of *Brady v. Maryland*, 373 U.S. 667 (1965). Specifically, the Government failed to turn over material evidence that was helpful to the defense regarding the aggravating factors they alleged at Mr. Umaña's sentencing phase, as well as mitigating social history information. Depending on the content of these items, they could "raise a reasonable probability that [] disclosure would have produced a different result [than death]." *Kyles v. Whitely*¸ 514 U.S. 419, 421 (1995). Also, the prosecution had a duty to not present false evidence nor let false testimony go to the jury uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Mr. Umaña has reason to believe this may have occurred at his trial, but it's only by reviewing the discovery requested herein can Mr. Umaña can sufficiently plead such a claim.

In addition, it appears that Mr. Umaña's trial counsel rendered ineffective assistance of counsel by failing to adequately investigate the unadjudicated offenses that were offered against him in aggravation at sentencing, and by failing to discover mitigating evidence to rebut the Government's argument that he was not intellectually disabled and should be put to death, all in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). Paper discovery shows that counsel was aware of outstanding discovery, but did not act to obtain it from the Government nor review it. The failure to request, review, and use material information was very likely deficient performance that satisfies the first prong of an ineffectiveness of counsel claim under *Strickland*. *See Id.* at 690-91 ("counsel has a duty to make reasonable investigations"). But in order to properly analyze the second prong of *Strickland* – that Mr. Umaña was prejudiced by the failure of trial counsel – it is necessary for him to know what the missing discovery contains.

17

**A. Good Cause Exists for Mr. Umaña to review the missing Discovery from the Los Angeles Murders that Were Used Against Him to Support a Verdict of Death.**

The discovery from the Lemon Grove shooting that Mr. Umaña requests is basic. It encompasses: 1) recorded statements by testifying eyewitnesses to the Lemon Grove shooting; 2) recorded statements by persons who made statements to either implicate or exculpate Mr. Umaña in the shooting; 3) recorded statements by eyewitnesses to the shooting and persons that were at and around Lemon Grove Park at the time of the shooting that the Government chose not to call at trial; 4) the FBI 302 reports that were created after the Government met with testifying witnesses; and 5) true and correct, clear, color copies of the photographic lineups that the Government showed to witnesses in an attempt to identify the shooter, some of which contained Mr. Umaña's photo, some of which did not.

These items were discoverable at the time of trial for a number of reasons. First, some of the items were discoverable because of their tendency to either directly exculpate Mr. Umaña (*Brady* 373 U.S. at 87), or to impeach government witnesses. *Giglio v. United States*, 405 U.S. 150, 154 (1972). Second, the statements of witnesses who testified at sentencing fell within the scope of Federal Rules of Criminal Procedure 26.2 and 32(i)(2), and were discoverable under the Jencks Act. 18 U.S.C. § 3500. Finally, the items were "material to preparing the defense" pursuant to federal rule of Criminal Procedure 16. *See United States v. Tsarnaev*, 2013 WL 6196279 at *4 (W.D. Mass., Nov. 27, 2013) (applying Rule 16 to the penalty phase of a capital trial); *United States v. Catalan Roman,* 376 F.Supp.2d 108, 113-14 (D.P.R., Jun. 7, 2005) (same, citing cases). Since these items were discoverable and likely to assist in Mr. Umaña's defense (as explained below), yet never turned over by the Government, nor requested nor reviewed by Mr. Umaña's trial attorneys, Mr. Umaña is requesting the opportunity to review these items now.

18

Because he bears the burden to prove his § 2255 claims, he respectfully asks that an order be entered directing the Government to produce the discovery.

      1.      <u>Good cause for the recorded interviews of Freddy Gonzalez, "the only witness that identifie[d] the defendant" as the shooter.</u>

Government witness, convict, and gang-member, Freddy Gonzalez, was critical to the Government's presentation of the Lemon Grove shooting evidence. He was the only witness to make any kind of identification of Mr. Umaña as the shooter at Lemon Grove Park. *See* PT at 328. The Court recognized the importance of Gonzalez's testimony noting that "[t]his is a very serious matter" because "[t]his is the only witness that identifies the defendant in some way as the shooter." *Id*. at 328. Gonzalez testified at trial, without equivocation, that he only saw one shooter at Lemon Grove. *Id*. at 341 ("It's only one shooter that I saw with a gun."). He also testified that he was sure the shooter was the same person that he picked out of photographic lineups on two occasions prior to trial (Mr. Umaña). *See* PT at 331-32, 333-34. However, Gonzalez's written statements, taken at the time of his interviews, reveal that he identified no less than three people as possibly being the "one shooter that [he] saw with a gun." *See* Appendices B, C, and E (implicating Mr. Umaña, Alex Montes, and Geovani Rodas to equal degrees). Despite the fact that interviews with Freddy Gonzalez were recorded, the Government has not produced them in discovery, nor did Mr. Umaña's trial attorneys request and review them. Review of the recorded statements of the only witness that identified Mr. Umaña was necessary to a "reasonable investigation." *Strickland*, 466 U.S. at 690-91. The recorded interviews with Gonzalez show him implicating people other than Mr. Umaña as the shooter, impeaching his testimony that the shooter was Mr. Umaña. PT at 332-34 and 341. Therefore, good cause exists to finally permit Mr. Umaña to review these interviews and incorporate them into his claims under *Brady, Napue,* and *Strickland*.

19

2. Good cause for the recorded interviews of testifying eyewitnesses Juan Lara and Roberto Ramos that may contain *Brady* material.

Both Roberto Ramos and Juan Lara testified for the Government and provided the basic factual circumstances that led up to the shooting in the park. Both had previously been interviewed by the Government and those interviews were recorded. Appendix C, Lemon Grove Chrono at 1, 8. Neither one was asked to identify Mr. Umaña in open court, although the discovery makes it clear that both men were shown photographs of Mr. Umaña and neither picked him out as the shooter. *Id*. And this is despite the fact that victim Roberto Ramos stated very shortly after the Lemon Grove shooting that "he would be able to identify the suspects if he saw them again" and he was shown a photo of Mr. Umaña. *Id*. at 12. Thus, any statement along the lines of "the shooter is not in these photographs" would have been exculpatory, material, and would have required disclosure by the Government under *Brady*. The recorded statements of testifying eyewitnesses also should have been requested and reviewed by the trial attorneys pursuant to *Strickland*.

3. Good cause for the recorded interviews of the persons who were in and around the park at the time of the shooting.

Detective Small and his partners interviewed a number of witnesses who were in and around the park at the time of the Lemon Grove shooting. Appendix C, Lemon Grove Chrono at 1, 8-9, 11-12, 16-18, 22. While the witnesses may or may not have had the opportunity to view the faces of the shooters, their interviews are still important to the extent that they would have known about the conditions of the park which could have served to undermine Freddy Gonzalez's identification of Mr. Umaña. *Giglio*, 405 U.S. at 153-54. For example, Gonzalez was inconsistent in his description of the lighting at the park. He testified initially that there were no lights on in the park at the time of the shooting. PT at 319 ("Gonzalez: they turn the lights off at 9:00 … all the lights, the baseball field and the basketball courts."). Then, on cross-examination

20

he stated that the lights were still on at the time of the shooting. PT at 320-21 ("It's still lights [sic] at the park. The field lights are still on."). The other witnesses in the park that night could have provided more reliable testimony concerning the lighting conditions and reduced Gonzalez's credibility with the jury. PT at 328. For this reason, the Government should be compelled to produce all of its recorded interviews with those individuals who were in and around Lemon Grove Park at the time the shooting occurred.

4.     <u>Good cause for the recorded interview of Rene Arevalo and evidence that he supplied the murder weapon for the Lemon Grove shooting.</u>

At the time of trial, the Government was under a Court-imposed mandate to "present to the Court and to the defendant information it intends to introduce as unadjudicated conduct for a determination of reliability." *United States v. Umaña*, 707 F. Supp. 2d 621, 633 (W.D.N.C. 2010) (citations omitted). Detective Small testified for the Government at the sentencing phase and stated that after showing MS-13 gang member, Rene Arevalo, a picture of Mr. Umaña, Arevalo stated "that's your Lemon Grove shooter." PT at 109-110. Arevalo's statement implicating Mr. Umaña in the Lemon Grove shooting was never put through the vetting process envisioned and mandated by the Court. Mr. Umaña's trial attorneys did not object to the statement, which served to corroborate Freddy Gonzalez's suspect identification of Mr. Umaña. *See* PT at 109-10. Thus, review of the video is important to claims that Mr. Umaña received ineffective assistance of counsel.

In addition, the Government was obligated to not offer false testimony, or let such testimony stand uncorrected. *Napue v. Illinois*, 360 U.S. at 269. It appears that Detective Small, at the very least, exaggerated the incriminating nature of Arevalo's comments. *Compare* Appendix C, Lemon Grove Chrono at 25 (Detective Small's notes state that Arevalo "was told [] by one of the arrestee's [sic]" that Mr. Umaña was "the likely shooter in the Lemon Grove Park

21

murder") *with* PT at 109-10 (Detective Small testifies that Arevalo looked at Mr. Umaña's picture and said "that's your Lemon Grove shooter."). Production of the recorded statement will either verify or dispel Detective Small's testimony and serve to ensure that the Government neither offered false testimony nor allowed such to stand uncorrected.

There was also evidence that MS-13 gang member Arevalo was responsible for providing the murder weapon for the Lemon Grove shooting. Appendix I, California Superior Court Filing and Declaration from Detective Small. Detective Small filed an affidavit with the Superior Court of California, requesting electronic surveillance of Rene Arevalo and swearing to the Court that his investigation had revealed that that Arevalo was allegedly responsible for providing a weapon that was used in the Lemon Grove shooting. *Id*. However, at the sentencing phase, the Government argued that Mr. Umaña was the only MS-13 gang member linked to both the Lemon Grove shooting and the Fairfax shooting and therefore a ballistics match between the two crime scenes meant Mr. Umaña had to be the shooter on both occasions. PT at 894. This connection of the gun to Mr. Umaña and no other MS-13 member was a critical component of the government's case. *See United States v. Umaña*, 750 F.3d 320, 348-49 (4th Cir. 2015) (relying upon the ballistics match between the Fairfax shooting and the Lemon Grove shooting to reject Mr. Umaña's argument on appeal). Because the link between Rene Arevalo and the Lemon Grove shooting murder weapon weakens the Government's inference that Mr. Umaña and the ballistics evidence were the only two things in common between the Lemon Grove shooting and the Fairfax shooting, Arevalo's statement should be turned over. PT at 894.

5. <u>Good cause for the exculpatory statements of Luis Rivera who identified other MS-13 members as being responsible for the Lemon Grove shooting.</u>

Fairfax suspect Luis Rivera met with Detective Small on two occasions. Appendix C, Lemon Grove Chrono at 26 and 32. Both times he implicated persons other than Mr. Umaña. *Id.*

22

According to Rivera, MS-13 member Alex Montes was one of the shooters at Lemon Grove Park, an allegation that was substantiated by Freddy Gonzalez's first identification of the shooter. Appendix D, Gonzalez Identification of Alex Montes. That constituted evidence that someone other than Mr. Umaña perpetrated the Lemon Grove shooting, served to impeach the Government's only witness that identified Mr. Umaña as the shooter, and was generally exculpatory under *Brady*. Mr. Umaña requests the ability to review the statement.

6.      Good cause for the FBI reports from the interviews with testifying eyewitnesses.

Federal agents and prosecutors met with witnesses who later testified against Mr. Umaña. Specifically, the Government at least met with Freddy Gonzalez and Juan Lara prior to their testimony. Appendix K, FBI 302 Report Regarding Los Angeles Interviews. Based on those interviews, 302 reports were generated by the agents. *Id.* For the reasons discussed above, disclosure of these 302's is vital to Mr. Umaña's ability to fully litigate his § 2255 motion.

7.      Good cause for true and correct, clear, color copies of the six-pack identification lineups that were used in order to identify the shooter.

The Court mentioned during trial that it had not heard anything to suggest that impermissibly suggestive procedures. PT at 311. The defense attorneys were unprepared to make any kind of proffer that there was such a concern because they had not reviewed the recorded interviews with witnesses (Freddy Gonzalez in particular) or color copies of the photographic lineups. *See e.g.*, Appendices C, D, G, and I (lineups of poor quality and in black and white). Disclosure of true and accurate, clear, color copies is necessary in order to adequately determine whether there was any suggestiveness with respect to the identification of Mr. Umaña and thus, whether the attorneys' failure to request and review the color copies was ineffective, and whether the failure to produce these items violated *Brady*.

23

8.    Good cause for discovery relating to the Fairfax shooting.

As explained above, there are substantial gaps in the production of discovery relating to Lemon Grove Park. This raises questions as to whether the Fairfax shooting discovery is complete. The Government stated that Fairfax suspect, Luis Rivera, provided statements to LAPD regarding the Fairfax Shooting on two separate days. PT at 206-207. The Government produced the video recording of Rivera's statements during the first day but not the second. The discovery contains only a summation by detectives relating to Rivera's second set of statements. At trial, it was established that Rivera changed his story on the second day of interviews. PT at 206-207. Evidence of the recordings and complete statements may have provided additional impeachment and/or exculpatory evidence.

**B. Good Cause Exists for Mr. Umaña to Review Discovery from the El Salvador Investigation into his Background and Social History.**

The Government possessed information that it failed to produce that would have "shed light on the effect of the civil war in El Salvador on the family, the role of the defendant's father in his life, or the defendant's personal sense of identity." *See* Doc. No. 1165 at 15. Specifically, the prosecuting attorneys and federal agents interviewed Mr. Umaña's mother more than a year prior to Mr. Umaña's trial. Then, on the eve of trial in March of 2010, the Government produced, for the first time, a Guatemalan birth certificate, a narrative about Mr. Umaña, and an FBI 302 report with one line stating "Interview of UMANAs mother LETICIA DIAZ." March 2, 2009 FBI 302. Appendix M, FBI 302 Report Regarding El Salvador Investigation.

The late and minimal discovery indicates that before the *Atkins* hearing and trial, the Government knew Mr. Umaña's correct age and place of birth, knew the context as to why the family moved to Guatemala, and knew mitigating reasons for why Mr. Umaña joined the gang, They also were in contact with Mr. Umaña's mother and could have provided means of

24

interviewing additional family members. The Government also knew that Mr. Umaña's trial attorneys were professing their own ineffectiveness because of their inability to contact family in El Salvador, yet it remained silent about their own interviews with Mr. Umaña's family and ability to contact her. This information could have enabled the attorneys to develop a meaningful mitigation strategy. Therefore, Mr. Umaña should be permitted the opportunity to review any agent's notes, reports, or recordings of interviews with Mr. Umaña's mother, father, other family members, friends or associates, any one of whom may have assisted the defense in developing mitigating evidence to present to the jury.

## IV.
## <u>CONCLUSION</u>

In sum, Mr. Umaña has a number of specific requests for discovery for which he has established good cause to review. *See* Appendix B, Mr. Umaña's Specific Discovery Requests. Production of these records and evidence will enable him to fully investigate, develop, and present relevant constitutional claims related to prosecutorial misconduct and/or ineffective assistance of counsel.  Mr. Umaña has demonstrated good cause for this discovery. This is Mr. Umaña's first request for discovery. He anticipates further requests as documents are made available to him and issues are developed.

Respectfully Submitted, this the 27th of April 2016.


| | |
|---|---|
| */s/ Kenneth J. Rose* | */s/ Zandra L. Lopez* |
| Kenneth J. Rose | Zandra L. Lopez |
| Center for Death Penalty Litigation | Federal Defenders of San Diego, Inc. |
| 123 W. Main St., Suite 700 | 225 Broadway, Suite 900 |
| Durham, N.C. 27701 | San Diego, California  92101-5030 |
| Telephone: (919) 956-9545 | Telephone:  (619) 234-8467 |

Attorneys for Defendant Alejandro Umaña

## CERTIFICATE OF SERVICE

I hereby certify that on 27 April 2016, I have electronically filed the foregoing Motion for Leave to Conduct Discovery and Supporting Memorandum with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC  28202
Anthony.enright@usdoj.gov

This the 27th day of April 2016.

/s/ Kenneth J. Rose_____
Kenneth J. Rose

26