# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |  |
|---|---|---|
| ALEJANDRO UMAÑA, | ) | CASE NO.: 3:16-CV-00057-RJC |
|  | ) |  |
| Defendant/Movant, | ) | Hon. Robert J. Conrad |
|  | ) |  |
| v. | ) | **CAPITAL CASE** |
|  | ) |  |
| UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Respondent. | ) |  |
|  | ) |  |

## MOTION UNDER 28 U.S.C § 2255 TO VACATE, SET ASIDE, OR CORRECT CONVICTIONS AND SENTENCES OF A PERSON IN FEDERAL CUSTODY

**KENNETH J. ROSE**
The Center for Death Penalty Litigation
123 West Main Street
Suite 700
Durham, North Carolina 27701-3228
Telephone: 919-956-9545
ken@CDPL.ORG

**ZANDRA L. LOPEZ**
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: 619-234-8467
Zandra_Lopez@fd.org

**Attorneys for Alejandro**

**TABLE OF CONTENTS**

PRELIMINARY MATTERS...........................................................................................................1

STATEMENT OF RELEVANT FACTS.....................................................................................2

PROCEDURAL HISTORY ..........................................................................................................5

I.      AS A RESULT OF THEIR FAILURE TO ADEQUATELY INVESTIGATE OR PRESENT READILY AVAILABLE MITIGATION EVIDENCE AT THE PENALTY PHASE OF HIS TRIAL, TRIAL COUNSEL DEPRIVED MR. UMAÑA OF THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE WAS ENTITLED, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ...........................................................................................7

      A.      Introduction....................................................................................................7

      B.      Trial Counsel's Performance was Deficient ...........................................12

            i.      Trial counsel's preparation to present mitigating evidence at the penalty phase of trial was inadequate and constituted deficient performance. ...................................................................12

            ii.      Despite the fact that trial counsel were aware of the need to conduct a thorough and expeditious investigation, and knew that doing so for a foreign-born defendant would take considerable time, they delayed most of their investigation for months.......................16

            iii.     Trial counsel failed to conduct interviews of family and neighbors who knew Mr. Umaña and his family during his childhood, despite having readily available means to approach them. ...................20

                  a.      Mr. Umaña's mother, Leticia Ramirez, and brother, Saul.............20

                  b.      Neighbors who Knew Mr. Umaña as a Child. ...............................20

                  c.      Other Family Members. .................................................................24

      C.      Trial counsel failed to adequately prepare and present the little information that they did obtain during their mitigation investigation.....................................26

            i.      Trial counsel failed to adequately investigate Mr. Umaña's place and year of birth. .......................................................................28

             ii.      Trial counsel failed to collect readily available records. ...........................28

**D.** Trial counsel failed to file specific, formal discovery requests relating to the Government interviews of Mr. Umaña's family, failed to seek mitigating evidence and information about the whereabouts of potential mitigation witnesses, and failed to use the little they learned from the Government as the impetus to renew and enlarge their own search for mitigating evidence............................................................................................29

    i. Trial Counsel's Failure to Adequately Investigate and present abundant, readily available mitigating evidence resulted in prejudice...................................................................................32

        a. The contrast between the mitigation case the defense did put on and the mitigation case the defense could have put on was stark.................................................................................32

            1. The mitigation evidence presented at trial……………… 32

        b. The case in mitigation the defense could have put on. ..................34

            1. In utero development, exposure to physiological assaults, difficult birth, loss of mother, and early exposure to familial violence……………………………………………….34

            2. Conditions of Poverty…………………………………...38

            3. Loss of Francisca, his protector and second mother figure……………………………………………………..42

            4. Rafael's Physical and Emotional Abuse and Neglect; Mr. Umaña's search for employment and protection…………………………………………………...45

            5. Repeated exposure to traumatic events……………….…49

            6. Evidence of low cognitive functioning and intellectual disability……………………….…………………………53

            7. Other evidence of mental health problems……………..56

            8. The prosecution could not have made the arguments it made in closing had trial counsel presented the full case in mitigation it had available……………………………...57

            9. There is a reasonable likelihood the jury would not have imposed death, had jurors heard this full account of Mr. Umaña's life……………………………………………59

ii

**II.      TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT AVAILABLE LAY WITNESS EVIDENCE BEARING ON MR. UMAÑA'S MENTAL HEALTH; FAILING TO RETAIN ADEQUATE EXPERT ASSISTANCE; AND FAILING TO PREPARE THE EXPERTS THEY DID RETAIN IN SUPPORT OF COMPELLING MENTAL HEALTH MITIGATION THAT INCLUDED TRAUMA, INTELLECTUAL DEFICITS, BRAIN DAMAGE AND MENTAL ILLNESS IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. ..........................................................................62**

A.      Counsel's failure to investigate and present evidence of Mr. Umaña's serious intellectual deficits deprived him of the reliable determination of punishment to which he was entitled. ....................................................64

      i.      The sentencing jury did not learn that Alejandro Umaña has substantial deficits in intellectual functioning. .........................................64

      ii.      Counsel should have presented the jury with the evidence of intellectual impairment available from the pretrial Atkins hearing. ..........65

      iii.      There was other evidence demonstrating that Mr. Umaña has major deficits in functioning indicative of intellectual impairment, but trial counsel's inadequate investigation failed to unearth it.......................66

      iv.      Trial counsel's inadequate investigation of lay witness testimony regarding Mr. Umaña's adaptive behavior deficits prejudiced the defendant................................................................................................68

B.      Trial counsel's failure to investigate and present evidence of trauma deprived Mr. Umaña of a reliable sentencing determination.................................69

      i.      The jurors were not told about the traumas suffered by Mr. Umaña in his own home as a child.....................................................................70

      ii.      The jurors were not told about what Mr. Umaña personally witnessed and suffered on account of the civil war. .................................72

      iii.      Trial counsel failed to provide evidence from an expert on trauma who, properly informed about Mr. Umaña's actual experiences, could have testified about the effects of chronic trauma on his development and state of mind. ...................................................74

      iv.      The failure to provide any evidence much less expert testimony about the trauma he endured prejudiced Mr. Umaña.................................76

**C.** Trial counsel's failure to investigate lay witness testimony supporting a claim of brain damage, to provide that evidence to their experts, to consult with their experts, or to conduct necessary testing deprived Mr. Umaña of a reliable sentencing determination. ...................................................................77

    i. Trial counsel failed to investigate or present available lay witness testimony establishing brain damage .........................................................77

    ii. Trial counsel failed to present to the jury available expert testing and testimony regarding brain damage. ....................................................79

    iii. Trial Counsel's failed to adequately consult with their chosen mental health expert, and unreasonably limited the evaluation and testimony of their only testifying expert who had examined Mr. Umaña. ........................................................................................................83

**D.** Trial Counsel's failure to investigate and present lay witness and expert testimony that Mr. Umaña exhibits behaviors consistent with mental illness deprived Mr. Umaña of a reliable sentencing determination ....................88

**E.** Had counsel properly investigated, developed and presented mitigation about Mr. Umaña's mental health impairments, there is at least a reasonable probability that at least one juror would not have found death to be an appropriate punishment for him. ...............................................................91

**F.** Had counsel properly investigated, developed and presented mitigation about Mr. Umaña's mental health impairments, there is at least a reasonable probability that the jury would have found he lacked the mens rea to be convicted of willful, intentional, deliberate, or premeditated murder. ...............................................................................................................96

**III. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT ALL AVAILABLE EVIDENCE AND TO FULLY PREPARE THEIR EXPERTS AT THE PRETRIAL ATKINS HEARING DEPRIVED THE COURT OF THE FACTS NECESSARY TO A RELIABLE DETERMINATION AND TO A FINDING THAT MR. UMAÑA CANNOT CONSTITUTIONALLY BE EXECUTED PURSUANT TO THE EIGHTH AMENDMENT..........................97**

**A.** Counsel failed to investigate, present and prepare lay witness evidence that would have established that Mr. Umaña meets the criteria for mental retardation as defined by Atkins v. Virginia and thus was ineligible for a sentence of death.................................................................................................97

**B.** Had counsel properly prepared their expert witnesses, the result of the Atkins hearing would have been different..........................................................100

iv

**IV. MR. UMAÑA IS A PERSON WITH INTELLECTUALLY DISABILITY AND HIS EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT IN LIGHT OF THE SUPREME COURT'S RECENT DECISION IN HALL V. FLORIDA**..................................................................**102**

 **A.** This Court's previous findings were made without the guidance of Hall v. Florida and thus do not preclude a determination in 2255 that Mr. Umaña has an intellectual disability...................................................104

  i. Medically-accepted standards.................................................................105

  ii. In light of Hall v. Florida, the Eighth Amendment prohibits Mr. Umaña's execution, notwithstanding the Court's pre-trial findings on his claim of intellectual disability. ......................................................107

**V. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE CHALLENGING THE GOVERNMENT'S ACCOUNT OF MR. UMAÑA'S ROLE IN THE UNADJUDICATED CALIFORNIA MURDERS ALLEGED IN SUPPORT OF NON-STATUTORY AGGRAVATING FACTORS 4(a) AND (b), IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS**....................................................**110**

 **A.** The Record Developed At the Penalty Phase Relating to the California Murders. ..................................................................................................113

  i. The Lemon Grove shooting. .................................................................113

  ii. The Fairfax Avenue Shooting.................................................................116

  iii. The alleged ballistics link between the two shootings............................118

 **B.** The Post-conviction Investigation .........................................................119

 **C.** Trial Counsel's Failure to Investigate and Present Readily Available Evidence Challenging the Government's Account of Mr. Umaña's Role in the Lemon Grove and Fairfax Shootings was Objectively Unreasonable. ..........122

  i. Trial counsel unreasonably failed to conduct an adequate, independent investigation into the California murders...........................122

  ii. Trial counsel failed to obtain readily available records that could have significantly undermined the Government's case. .........................126

iii. Trial counsel unreasonably failed to make use of information they received in discovery to challenge the Government's allegations relating to the Fairfax Avenue and Lemon Grove incidents. ...........................................128

a. Trial Counsel unreasonably failed to use important information relating to the Lemon Grove shooting that was favorable to Mr. Umaña. .................................................................................................128

1. Trial counsel unreasonably failed to present evidence that the only witness who identified Mr. Umaña as the shooter, Freddy Gonzalez, also made prior statements and identifications implicating two others as the one Lemon Grove shooter……………………………………………..128

2. Trial counsel unreasonably failed to present readily available evidence that key Lemon Grove witnesses Roberto Ramos and Juan Lara did not select Mr. Umaña's photograph during a pre-trial photographic lineup……………………………………………..133

3. Trial counsel unreasonably failed to present to the jury additional exculpatory statements regarding the Lemon Grove shooting……………………………………………135

b. Trial Counsel unreasonably failed to use important information relating to the Fairfax shooting that was favorable to Mr. Umaña. .........136

1. Trial counsel completely overlooked the fact that key witness Alex Barrera identified Luis Ramos as the Fairfax Avenue shooter, not Mr. Umaña……………………….136

D. Trial counsel unreasonably failed to present information and adequate arguments establishing that the neutral eyewitnesses who identified the driver of the car as the Fairfax shooter, and not Mr. Umaña, were more reliable than the hearsay of Mr. Umaña's co-defendants. ...................................138

E. Trial counsel did not present information that mitigated the circumstances of the Fairfax shooting .......................................................................................140

i. Trial counsel unreasonably failed to present evidence that ballistics and other evidence provided in discovery linked Alex Barrera to both the Fairfax and Lemon Grove shooting. ...................................................................141

ii. Trial counsel failed to object to foundationless, unreliable, double-hearsay statements that Mr. Umaña was the Lemon Grove shooter.................................142

iii.     Trial counsel failed to present readily available evidence that the LAPD detectives coached the Fairfax co-defendants' statements that implicated Mr. Umaña as the shooter. ...............................................144

iv.     Trial Counsel unreasonably failed to object to Detective Parshall's opinion testimony that he believed Mr. Umaña's co-defendant when he implicated Mr. Umaña even though the Court ruled that the evidence was inadmissible and ordered it redacted. ..........................149

v.     Trial counsel unreasonably failed to object to, and rebut the Government's evidence that the .22 caliber bullet casings were fired from one single firearm in violation of the Fifth, Sixth, and Eighth Amendments.................................................................................152

vi.     Trial counsel were ineffective for failing to request a jury instruction that would have properly explained to the jury how they should regard the "presumptively unreliable" hearsay statements from MS-13 accomplices that were introduced through professional, law enforcement witnesses.................................................157

vii.     Mr. Umaña Was Prejudiced by Trial Counsel's Deficient Performance. ...............................................................................159

        a.     The Prior Unadjudicated Offenses Were Central to The Government's Case. ...................................................................160

        b.     There is a Reasonable Probability That If Trial Counsel Had Presented Readily Available Exculpatory or Otherwise Mitigating Evidence Relating to Mr. Umaña's Role in the Lemon Grove and Fairfax Incidents, At Least One Juror Would Have Voted Differently....................................................163

        c.     Regarding the Lemon Grove shooting, there were numerous failings that resulted in prejudice to Mr. Umaña.........165

        d.     During the presentation of the Fairfax evidence, there were also numerous failings that also resulted in prejudice to Mr. Umaña. ...................................................................................167

**VI.    THE GOVERNMENT FAILED TO DISCLOSE EXCUPLATORY, IMPEACHMENT, AND MITIGATING INFORMATION IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS....................................169**

A.     The Government violated Brady and Giglio in regards to the unadjudicated murders used as non-statutory aggravating factors at the penalty phase................................................................................171

i. The Government violated Brady and Giglio by failing to disclose exculpatory information about one of its testifying eyewitnesses who was prepared to affirmatively exclude Mr. Umaña as the Lemon Grove shooter. ...........................................................171

ii. The Ramos information constituted material exculpatory and impeachment evidence...........................................................173

iii. The nondisclosure of the Ramos information was prejudicial.................174

B. The Government violated Brady and Giglio by failing to turn over numerous recorded interviews that contain exculpatory and/or impeachment statements regarding Mr. Umaña's involvement in the Lemon Grove and Fairfax shootings...................................................177

i. The Government suppressed exculpatory and/or impeachment statements made by witnesses to the Lemon Grove Park Shooting.........177

C. The Government Failed to Disclose Material Mitigation Evidence Obtained from Alejandro Umaña's Mother ...........................................180

i. The Government's suppressed statements made by Mr. Umaña's mother during an interview with the prosecution. ...................................180

ii. The Government has not disclosed statements made by Ms. Ramirez regarding her son's background. ................................182

iii. Ms. Ramirez's statements regarding Mr. Umaña's upbringing and struggles in life were material because they directly contradict the Government's closing remarks that Mr. Umaña "by every account" had a "normal life."...........................................................187

iv. Ms. Ramirez's statements regarding Mr. Umaña's background were material to Mr. Umaña's claims on intellectual disability. .............189

D. The Government's failure to disclose exculpatory information that the "MS" tattoo does not have to be "earned" by killing was a violation of Brady and Giglio...............................................................191

VII. THE GOVERNMENT PRESENTED FALSE AND MISLEADING EVIDENCE, AND ASKED JURORS TO RELY ON THIS EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............192

A. Introduction and Summary of Argument...........................................193

**B.** During the Atkins Hearing, the Government Knew, or Should Have Known, Based on Records and Interviews of Witnesses that the Court was relying on Information that was False or Left a False Impression. ....................193

**C.** At the Guilt and Penalty Phase, the Government Presented and Argued False and Misleading Evidence that Mr. Umaña "Earned" His MS-13 Tattoo by Killing People ..................................................................................197

    i. The Government knew or should have known that the testimony of Granados, that "in order to earn the two letters, you have to kill someone," was false and misleading. ........................................199

    ii. Mr. Umaña was prejudiced by the false and misleading evidence that Mr. Umaña earned his tattoo through killing. ..................203

**D.** During the Penalty Phase, the Government Presented and Argued False and Misleading Evidence Relating to the Lemon Grove and Fairfax Shooting ..............................................................................................205

    i. Lemon Grove Park ..............................................................................206

    ii. Fairfax ..................................................................................................208

**VIII. TRIAL COUNSEL FAILED TO ADEQUATELY OBJECT TO AND MITIGATE EVIDENCE OF JAIL LETTERS IN VIOLATION OF THE FIRST, FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ....................................210**

**A.** Trial counsel's performance was objectively unreasonable. ..............217

    i. Counsel unreasonably failed to request redaction. ..................217

        a. Religiously inflammatory remarks. ...........................................217

        b. Politically inflammatory remarks. ..............................................218

        c. Anti-American or anti-imperialist beliefs. ..................................218

        d. Defiance towards police. ............................................................220

        e. Coarse language and other remarks. ...........................................221

**B.** Trial counsel unreasonably failed to object to the full translations of the letters being released to the jury during deliberations. ......................222

**C.** Trial counsel unreasonably failed to object to the Government reading a letter during closing argument that was never ruled upon, nor introduced at trial. ..............................................................................................224

    i. Counsel unreasonably failed to mitigate the jail letters. ..........225

ix

        a.     The code was unsophisticated and could be written by a child..................................................................................225

        b.     The writing in the letters was poor. ............................................227

        c.     Evidence that Mr. Umaña was not threatening Luis Ramos (aka Chipis). ...................................................................228

        d.     Evidence of Mr. Umaña's belief in God. ....................................229

  **D.**    The failure to adequately object to and mitigate the jail letter evidence was prejudicial. ..................................................................................231

**IX.**   **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT SUBMITTING MR. UMAÑA'S NOTE OF APOLOGY IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS........234**

  **A.**    Trial counsel's failure to introduce Mr. Umaña's apology note was objectively unreasonable.................................................................235

  **B.**    Mr. Umaña was prejudiced by trial counsel's failure to introduce the note. .......237

**X.**    **MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WHEN HIS ATTORNEYS ALLOWED UNRELIABLE AND UNFAIRLY PREJUDICIAL EVIDENCE THAT MR. UMAÑA HAD COMMITTED MURDERS IN EL SALVADOR TO BE CONSIDERED BY THE JURY, EVEN AFTER THE COURT HAD PRECLUDED THE GOVERNMENT FROM INTRODUCING THIS EVIDENCE ..............................................238**

  **A.**    Trial Counsel performed deficiently by not reviewing the transcripts and redacting the precluded, prejudicial information before it was presented to the jury. ..................................................................240

  **B.**    Trial counsel had no reasonable strategy for failing to review the transcripts and prevent the jury from relying on the inadmissibly and highly damaging evidence. ..................................................................242

  **C.**    Mr. Umaña suffered prejudice from the introduction of improperly admitted evidence that he had murdered people in El Salvador.........................242

**XI.**  **Trial counsel was ineffective at all phases of trial for failing to rebut the false and misleading evidence presented by the Government that Mr. Umaña "earned" his MS-13 tattoo by killing people in violation of Mr. Umaña's rights under the Fifth, Sixth, and Eighth Amendments.............................................244**

A.     Trial counsel's failure to adequately challenge Alexander Granados's testimony was objectively unreasonable and constituted deficient performance. ..................................................................................244

B.     Trial counsel's failure to object to the inadmissible and inflammatory testimony was objectively unreasonable. .............................................247

C.     Mr. Umaña was prejudiced by trial counsel's deficient performance. ................248

**XII. THE GOVERNMENT VIOLATED MR. UMAÑA'S RIGHT TO A FAIR TRIAL BY ENGAGING IN A PATTERN OF MISCONDUCT IN WHICH IT REPEATEDLY INTRODUCED INADMISSIBLE EVIDENCE TO THE JURY, IN DIRECT VIOLATION OF, OR BY CIRCUMVENTING THE COURT'S ORDERS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. ............................................................251**

A.     The prosecution's trial exhibits contained various references to evidence that the Court had ruled to be impermissible and therefore inadmissible............252

      i.     Unreliable evidence that Mr. Umaña had killed people in El Salvador went to the jury despite the fact that he was acquitted in El Salvador and the Court had ruled it inadmissible................................252

      ii.     The Government introduced to the jury inflammatory racial remarks in Mr. Umaña's jail letters that the Court precluded..................253

      iii.     The Government introduced improper opinion evidence that Mr. Umaña's accomplices were telling the truth about Mr. Umaña being the shooter in a non-statutory aggravator alleged against him (the Fairfax Avenue shooting), in direct violation of the Court's order. ............................................................254

B.     The Government elicited an unreliable, double hearsay statement that Mr. Umaña was the shooter in the Lemon Grove murder, without proffering the statement to the Court for a reliability finding...............................256

C.     Mr. Umaña was prejudiced by the Government's many foul blows. ..................257

**XIII. TRIAL COUNSEL DEPRIVED MR. UMAÑA OF EFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WHEN THEY FAILED TO ASK FOR A CONTINUANCE OF HIS INTELLECTUAL DISABILITY PRETRIAL HEARING AND THE CAPITAL TRIAL DATE. ............................................258**

Case 3:16-cv-00057-MOC    Document 22    Filed 06/22/16    Page 12 of 418

A. Although trial counsel had an incomplete and inaccurate life history of Mr. Umaña, counsel failed to request an additional continuance of the Atkins hearing and trial. ...................................................................259

    i. The defense was inadequately prepared to present the Atkins claim at the time of the hearing. ........................................................260

    ii. By trial, counsel remained inadequately prepared to present a mitigation case -- and learned new information that showed that their mitigation case was incomplete and inaccurate -- but continued to proceed with trial without further investigation.................262

B. Trial counsel received significant amount of discovery immediately prior to trial. Because of a lack time, they were unable to review and use the discovery in preparation of trial, prejudicing Mr. Umaña. ..................265

XIV. TRIAL COUNSEL'S FAILURE TO OBJECT TO JURORS BEING EXCUSED FOR CAUSE BASED ON ANSWERS TO QUESTIONNAIRES, WITHOUT FURTHER QUESTIONING IN VOIR DIRE, VIOLATED MR. UMAÑA'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS. ..................267

XV. MR. UMAÑA WAS DEPRIVED OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS A RESULT OF MISCONDUCT RELATED TO THE JURY.........................................................................................................275

XVI. TRIAL COUNSEL'S OBJECTIVELY UNREASONABLE AND PREJUDICIAL ACTIONS DURING JURY SELECTION VIOLATED MR. UMAÑA'S RIGHTS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS...........................................................................298

XVII. TRIAL COUNSEL FAILED TO RAISE A TIMELY CHALLENGE TO THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. .......................................................................................305

A. Trial Counsel's Failure to Raise a Timely Challenge to the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance. ...........................................................................................305

B. Trial counsel's failure to challenge the jury selection processes for the grand and petit juries prejudiced Mr. Umaña, because the under-representation of distinct groups violated his Fifth, Sixth, and Eighth Amendment rights.............................................................................306

**XVIII.** **THE PROSECUTION ENGAGED IN RACIAL DISCRIMINATION IN ITS EXERCISE OF PEREMPTORY STRIKES, AND TRIAL COUNSEL UNREASONABLY FAILED TO ADEQUATELY OBJECT TO THESE UNCONSTITUTIONAL STRIKES.**.............................................................**308**

    **A.**    Trial counsel failed to argue that the Government engaged in purposeful discrimination. .................................................................................309

    **B.**    Mr. Umaña suffered prejudice. ..........................................................310

**XIX.** **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT INVESTIGATING AND INTRODUCING AVAILABLE MENTAL HEALTH EVIDENCE TO CONTEST THE ADMISSIBLITY AND CREDIBILITY OF MR. UMAÑA'S STATEMENTS TO LAW ENFORCEMENT OFFICERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**......................................................**312**

**XX.** **MR. UMAÑA WAS DEPRIVED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY THE DENIAL OF HIS RIGHT TO BE PRESENT AT EVERY STAGE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**.............................................................**316**

    **A.**    Mr. Umaña was denied the right to be present and the right to effective assistance of counsel during the jury selection process, in violation of the Fifth, Sixth, and Eighth Amendments..................................................316

        i.    Mr. Umaña's right to be present during jury selection was violated.......318

        ii.    The denial of this right was prejudicial....................................318

        iii.    Mr. Umaña's trial counsel was ineffective. ............................319

    **B.**    Mr. Umaña was denied his right to presence and right to effective assistance of counsel throughout the proceedings because he was not provided with an effective mechanism to participate in his capital trial, to communicate with trial counsel, and to assist in his defense, in violation of the Fifth, Sixth and Eighth Amendments............................................319

**XXI.** **THE OVERWELMING NUMBER OF SECURITY MEASURES DEPRIVED MR. UMAÑA OF A FAIR TRIAL AND SENTENCING, AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**.............................................................**321**

Case 3:16-cv-00057-MOC   Document 22   Filed 06/22/16   Page 14 of 418

XXII.  MR. UMAÑA'S SENTENCE OF DEATH MUST BE VACATED BECAUSE
       HIS CONVICTIONS FOR USE AND POSSESSION OF A FIREARM
       DURING AND IN RELATION TO A CRIME OF VIOLENCE
       RESULTING IN DEATH ARE VOID IN LIGHT OF THE SUPREME
       COURT'S RETROACTIVE DECISION IN JOHNSON. ........................................323

       A.    In light of Johnson, Mr. Umaña's convictions under 18 U.S.C. § 924(c)
             cannot be sustained because racketeering conspiracy and murder in aid of
             racketeering fail to qualify as "crimes of violence"............................................325

             i.     Section 924(c)'s residual clause is unconstitutionally vague. .................327

             ii.    Johnson expressly overruled the "ordinary case" approach to
                    determining whether a felony qualifies as a "crime of violence."...........328

             iii.   Johnson means that § 924(c)(3)(B) is unconstitutionally vague..............330

             iv.    Conspiracy to commit racketeering in violation of § 1962(d)
                    categorically fails to qualify as a crime of violence under the force
                    clause.........................................................................................................334

             v.     The offense of murder in aid of racketeering, in violation of §
                    1959(a)(1) also does not categorically satisfy the force clause. ..............337

       B.    Mr. Umaña's claim is cognizable under § 2255(a).............................................339

             i.     Mr. Umaña's invalid § 924(j) convictions also invalidate his death
                    sentences on Counts 22 and 24. ...............................................................341

XXIII. MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF
       COUNSEL AT THE PRESENTATION TO THE DEPARTMENT OF
       JUSTICE IN OPPOSITION TO THE AUTOHRIZATION OF A CAPITAL
       PROSECUTION, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH
       AMENDMENTS. ..................................................................................................345

XXIV.  TRIAL COUNSEL RENDERED DEFICIENT PERFORMANCE FOR
       FAILING TO ADEQUATELY EXPLAIN TO THEIR INTELLECTUALLY
       IMPAIRED, BRAIN DAMAGED CLIENT FROM EL SALVADOR THE
       RISKS AND BENEFITS OF A PLEA DEAL IN THIS CAPITAL CASE,
       THEREBY VIOLATING RIGHTS GUARANTEED HIM BY THE FIFTH,
       SIXTH AND EIGHTH AMENDMENTS.................................................................348

**XXV. THE IMPOSITION OF THE DEATH PENALTY ON ALEJANDRO UMAÑA WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS. ...................................................351**

    **A.**      The Attorney General's Decision to Seek the Death Penalty Based on Both Mr. Umaña's Race Violates His Constitutional Rights. .............................352

    **B.**      The Attorney General's Decision to Seek the Death Penalty Based on Geographic Location Violates Mr. Umaña's Constitutional Rights. ...................352

**XXVI. THE FAILURE TO PRESERVE MR. UMAÑA'S RIGHTS UNDER THE VIENNA CONVENTION, AND HIS RIGHTS TO CONSULAR ASSISTANCE VIOLATED MR. UMAÑA'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE VI OF THE CONSTITUTION. ....................................................354**

    **A.**      The Law .................................................................................................355

    **B.**      The Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eight and Fourteenth Amendments and Article VI. ............................................359

        i.      The Government Violated its Duty to Inform Mr. Umaña of His Right to Consular Assistance and to Notify the Guatemalan Consulate of His Detention ........................................................360

        ii.      The Government violated Mr. Umaña's right to due process and a fair trial in violation of the Fifth and Sixth Amendments. .......................361

        iii.      The Government violated Mr. Umaña's right to present mitigating evidence under the Fifth and Eighth Amendments. ................................364

        iv.      The Government's violation of its obligation of consular notification under the Vienna Convention and federal law prejudiced Mr. Umaña. ...........................................................365

    **C.**      Counsel's Failure to Notify Mr. Umaña of His Rights Under the Vienna Convention; to Contact the Guatemalan Consulate; and, Counsel's Failure to Raise and Litigate the Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eight and Fourteenth Amendments and Article VI. .........366

    **D.**      Conclusion ...........................................................................................372

Case 3:16-cv-00057-MOC    Document 22    Filed 06/22/16    Page 16 of 418

**XXVII TRIAL COUNSEL FAILED TO ADEQUATELY PRESERVE ISSUES FOR APPEAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.** ...............................................................................................373

**XXVIII. EXECUTING SOMEONE WITH BRAIN DAMAGE AND THE OTHER MENTAL IMPAIRMENTS FROM WHICH MR. UMAÑA SUFFERS WOULD VIOLATE THE EIGHTH AMENDMENT.** ...............................................374

**XXIX. THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS IN MR. UMAÑA'S CASE, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WARRANTS POSTCONVICTION RELIEF.** .................................................................................377

**XXX. THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S BRADY VIOLATIONS, INVIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, UNDERMINE CONFIDENCE IN THE RESULT OF MR. UMAÑA'S TRIAL.** ................................................................................................................379

**PRAYER FOR RELIEF.** ........................................................................................380

**Federal Cases**

*Adams v. Texas*,
448 U.S. 38 (1980)................................................................................................ 269

*Alcorta v. Texas*,
355 U.S. 28 (1957)................................................................................................ 193

*Alexander v. Louisiana*,
405 U.S. 625 (1972).............................................................................................. 306

*Atkins v. Virginia*,
536 U.S. 304 (2002)........................................................................................ *passim*

*Baires v. U.S.*,
707 F. Supp. 2d. 656 (E.D. Va. 2010) ................................................................. 360

*Batson v. Kentucky*,
476 U.S. 79 (1986)........................................................................................ 308, 310

*Bell v. Jarvis*,
236 F.3d 149 (4th Cir. 2000) ................................................................................ 310

*Bennett v. Angelone*,
92 F.3d 1336 (4th Cir.1996) ................................................................................. 231

*Berger v. United States*,
295 U.S. 78 (1935)............................................................................... 251, 253, 363

*Brady v. Maryland*,
373 U.S. 83 (1963)........................................................................................ 165, 180

*Breard v. Greene*,
523 U.S. 371 (1998)........................................................................................ 357, 363

*Brooks v. Dretke*,
418 F.3d 430 (5th Cir. 2005) ................................................................................ 292

*Brown v. Sanders*,
546 U.S. 212 (2006)............................................................................................. 343

*Brown v. Sirmons*,
515 F.3d 1072 (10th Cir. 2008) ........................................................................... 365

Burger v. Kemp,
483 U.S. 776 (1987)............................................................................................... 68

*Burton v. Johnson*,
948 F.2d 1150 (10th Cir. 1991) ........................................................................ 282

*Byrd v. Collins*,
209 F.3d 486 (6th Cir. 2000) ............................................................................ 225

*Caldwell v. Mississippi*,
472 U.S. 320 (1985).......................................................................................... 222

*California v. Brown,*
479 U.S. 538 (1987)............................................................................................ 62

*Castaneda v. Partida*,
430 U.S. 480 (1977) .................................................................................. 306, 307

*Chambers v. United States*,
555 U.S. 122 (2009).......................................................................................... 330

*Clemons v. Mississippi*,
494 U.S. 738 (1990).......................................................................................... 343

*Code v. Montgomery*,
799 F.2d 1481 (11th Cir. 1986) ........................................................................ 264

*Cohen v. California*,
403 U.S. 15 (1971)............................................................................................ 220

*Cohen v. Senkowski*,
290 F.3d 485 (2d Cir. 2002).............................................................................. 317

*Cool v. United States*,
409 U.S. 100 (1972).......................................................................................... 157

*Crane v. Kentucky*,
476 U.S. 683 (1986).......................................................................................... 315

*Cunningham v. Zant*,
928 F.2d 1006 (11th Cir. 1991) ........................................................................ 231

*Darden v. Wainwright*,
477 U.S. 168 (1986).......................................................................................... 211

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).......................................................................................... 154

xix

*Davis v. Baltimore Gas & Elec. Co.*,
  160 F.3d 1023 (4th Cir. 1998) ................................................................................ 309

*Davis v. United States*,
  417 U.S. 333 (1974) ................................................................................................ 340

*Dawson v. Delaware*,
  503 U.S. 159 (1992) ............................................................................................ passim

*Deitz v. Money*,
  391 F.3d 804 (6th Cir. 2004) ................................................................................. 368

*Descamps v. United States*,
  133 S. Ct. 2276 (2013) ........................................................................................... 326

*Diaz v. United States*,
  223 U.S. 442 (1912) ................................................................................................ 316

*Dimaya v. Lynch*,
  803 F.3d 1110 (9th Cir. 2015) ......................................................................... 328, 333

*Dugas v. Coplan*,
  428 F.3d 317 (1st Cir. 2005) .................................................................................. 329

*Duren v. Missouri*,
  439 U.S. 357 (1979) ................................................................................................ 307

*Dusky v. United States*,
  362 U.S. 402 (1962) ................................................................................................ 321

*Dutton v. Brown*,
  788 F.2d 669 (10th Cir.1986) ................................................................................ 269

*Dyer v. Calderon*,
  151 F.3d 970 (9th Cir. 1998) ........................................................................ 282, 283, 294

*Eddings v. Oklahoma*,
  455 U.S. 104 (1982) .................................................................................................... 8

*Estes v. Texas*,
  381 U.S. 532 (1965) ................................................................................................ 322

*Faulder v. Johnson*,
  81 F.3d 515 (5th Cir. 1996) ................................................................................... 360

xx

*Fields v. Brown*,
  503 F.3d 755 (9th Cir. 2007) ............................................................................................... 394

*Garcia v. Gonzales*,
  455 F.3d 465 (4th Cir. 2006) ............................................................................................... 327

*Gardner v. Florida*,
  430 U.S. 349 (1977) ............................................................................................................. 344

*Giglio v. United States*,
  405 U.S. 150 (1972) ........................................................................................... 169, 192, 193

*Gomez v. United States*,
  490 U.S. 858 (1989) ............................................................................................................. 311

*Gonzales v. McKune*,
  247 F.3d 1066 (10th Cir. 2001) ........................................................................................... 379

*Gray v. Mississippi*,
  481 U.S. 648 (1987) .........................................................................................................274-75

*Green v. White*,
  232 F.3d 671 (9th Cir. 2000) ............................................................................................... 294

Gregg v. Georgia,
  428 U.S. 153 (1976) ............................................................................................................. 352

*Griffin v. United States*,
  502 U.S. 46 (1992) ............................................................................................................... 324

*Hall v. Florida*,
  134 S.Ct. 1986 (2014) .......................................................................................................... 102

*Hamblin v. Mitchell*,
  354 F.3d 482 (6th Cir. 2003) ............................................................................................... 369

*Hanna v. Ishee*,
  694 F.3d 596 (6th Cir. 2012) ............................................................................................... 270

*Hicks v. Collins*,
  384 F.3d 204 (6th Cir.2004) ................................................................................................ 231

*Holbrook v. Flynn*,
  475 U.S. 560 (1986) ............................................................................................................. 332

*Hollis v. Davis*,
912 F.2d 1343 (11th Cir. 1990) ....................................................................................... 306

*Hopt v. Utah*,
110 U.S. 574 (1884)................................................................................................. 317, 319

*Hughes v. United States*,
258 F.3d 453 (6th Cir.2001) .................................................................................300-01, 304

*Hurst v. Florida*,
136 S. Ct. 616 (2016) ...................................................................................................... 343

*Illinois v. Allen*,
397 U.S. 337 (1970)......................................................................................................... 316

*In re Hubbard*,
___ F.3d ___, 2016 WL 3181417 (4th Cir. June 6, 2016) .................................................... 333

*Irvin v. Dowd*,
366 U.S. 717 (1961)................................................................................................. 275, 322

*James v. United States*,
550 U.S. 192 (2007)................................................................................................. 326, 332

*Jimenez-Gonzales v. Mukasey*,
548 F.3d 557 (7th Cir. 2008) ........................................................................................... 331

*Johnson v. Mississippi*,
486 U.S. 576 (1988) ........................................................................................................ 343

*Johnson v. United States,*
2015 WL 1284964 (March 30, 2015)................................................................................. 333

*Johnson v. United States*,
135 S.Ct. 2551 (2015)................................................................................................*passim*

*Johnson v. United States*,
559 U.S. 133 (2010)......................................................................................................... 327

*Julian v. Bartley*,
495 F.3d 487 (7th Cir. 2007) ........................................................................................... 367

*Kansas v. Marsh*,
548 U.S. 163 (2006)......................................................................................................... 110

*Kennedy v. Cardwell*,
487 F.2d 101 (6th Cir. 1973) ........................................................................................ 297

*Kennedy v. Louisiana*,
554 U.S. 407 (2008) ...................................................................................................... 376

*Kubat v. Thieret,*
867 F.2d 351 (7th Cir. 1989) ........................................................................................ 379

*Kyles v. Whitley*,
514 U.S. 419 (1995) ...................................................................................................... 170

*Lee v. Illinois*,
476 U.S. 530 (1986) ...................................................................................................... 158

*Lewis v. United States*,
146 U.S. 370 (1892) ...................................................................................................... 317

*Lindstadt v. Keane*,
239 F.3d 191 (2d Cir. 2001) .......................................................................................... 379

*Lockett v. Ohio*,
438 U.S. 586 (1978) ............................................................................................... 302, 364

*Lockhart v. McCree*,
476 U.S. 162 (1986) ...................................................................................................... 269

*Lundgren* v. *Mitchell*,
440 F.3d 754 (6th Cir. 2006) ........................................................................................ 378

*Macias v. Makowski*,
291 F.3d 447 (6th Cir. 2002) ........................................................................................ 225

*Manson v. Brathwithe*,
432 U.S. 98 (1977) ........................................................................................................ 138

*McCleskey v. Kemp*,
481 U.S. 279 (1987) ...................................................................................................... 352

*McCoy v. Goldston*,
652 F.2d 654 (6th Cir. 1981) ........................................................................................ 282

*McDonough Power Equipment, Inc. v. Greenwood*,
464 U.S. 548 (1984) ............................................................................................... 282, 293

*Medellin v. Dretke*,
544 U.S. 660 (2005) ................................................................................................ 358

*Medellin v. Texas*,
552 U.S. 491 (2008) ................................................................................................ 360

*Miller-El v. Dretke*,
545 U.S. 231 (2005) ................................................................................................ 310

*Mooney v. Holohan*,
294 U.S. 103 (1935) ................................................................................................ 193

*Mora v. New York*,
524 F.3d 183 (2d Cir. 2008) ................................................................................... 363

*Morgan v. Illinois*,
504 U.S. 719 (1992) ......................................................................................... 269, 301

*Morse v. Frederick*,
551 U.S. 393 (2007) ................................................................................................ 219

*Murphy v. Netherland,*
116 F.3d 97 (4th Cir. 1997) ........................................................................... 365, 367-68

*Napue v. Illinois*,
360 U.S. 264 (1959) ........................................................................................ 193, 207-08

*Nixon v. Newsome*,
888 F.2d 112 (11th Cir. 1989) ................................................................................ 133

*Old Chief v. United States*,
519 U.S. 172 (1997) ................................................................................................ 192

*Osagiede v. United States,*
543 F.3d 399 (7th Cir. 2008) .......................................................................... *passim*

*O'Bryan v. Estelle*,
714 F.2d 365 (5th Cir. 1983) .................................................................................. 274

*Parker v. Gladden*,
385 U.S. 363 (1966) ................................................................................................ 275

*Pennsylvania v. Ritchie*,
480 U.S. 39 (1987) .................................................................................................. 171

*Penry v. Lynaugh*,
492 U.S. 302 (1989) ....................................................................................... *passim*

*Person v. Miller*,
854 F.2d 656 (4th Cir. 1988) ........................................................................... 294

*Phillips v. Woodford*,
267 F.3d 966 (9th Cir. 2001) ........................................................................... 379

*Porter v. McCollum*,
558 U.S. 30 (2009) ......................................................................................... *passim*

*Ramirez v. State*,
810 So. 2d 836 (Fla. 2001) ........................................................................... 153-54

*Remmer v. United States*,
347 U.S. 227 (1954) ....................................................................................... 275

*Richards v. Quarterman*,
566 F.3d 553 (5th Cir. 2007) ........................................................................... 379

*Roberts v. Holder*,
745 F.3d 928 (8th Cir. 2014) ........................................................................... 330

*Rompilla v. Beard*,
545 U.S. 374 (2005) ....................................................................................... *passim*

*Roper v. Simmons*,
543 U.S. 551 (2005) ....................................................................................... 376

*Rosales-Lopez v. United States*,
451 U.S. 182 (1981) ................................................................................. 269-70, 298

*Salinas v. United States*,
522 U.S. 52 (1997) ......................................................................................... 334

*Sampson v. United States*,
724 F.3d 150 (1st Cir. 2013) ............................................................... 204, 293, 301

*Sanchez-Llamas v. Oregon*,
548 U.S. 331 (2006) ................................................................................. 355-56, 367

*Sears v. Upton*,
561 U.S. 945 (2010) ....................................................................................... 375

Case 3:16-cv-00057-MOC   Document 22   Filed 06/22/16   Page 25 of 418

*Smith v. Phillips*,
455 U.S. 209 (1982)..................................................................................................... 295

*Smith v. Texas*,
543 U.S. 37 (2004) ....................................................................................................... 68

*Snyder v. Louisiana*,
552 U.S. 472 (2008)............................................................................................. 309, 311

*State v. Evangelista*,
319 N.C. 152 (1987) ................................................................................................... 339

*Stewart v. LaGrand*,
525 U.S. 1173 (1999)................................................................................................... 357

*Stewart v. LaGrand,*
526 U.S. 115 (1999)..................................................................................................... 357

*Stitts v. Wilson*,
713 F.3d 887 (7th Cir. 2013) ...................................................................................... 176

*Strickland v. Washington*,
466 U.S. 668 (1984)............................................................................................... *passim*

*Stringer v. Black*,
503 U.S. 222 (1992)..................................................................................................... 343

*Swain v. Alabama*,
380 U.S. 202 (1965)............................................................................................. 295, 298

*Taylor v. Kentucky*,
436 U.S. 478 (1978)............................................................................................. 242, 322

*Taylor v. Louisiana*,
419 U.S. 522 (1975)..................................................................................................... 306

*Tennard v. Dretke*,
542 U.S. 274 (2004)...................................................................................................... 68

*Test v. United States*,
420 U.S. 28 (1975)....................................................................................................... 305

*Tillery v. United States*,
411 F.2d 644 (5th Cir. 1974) ...................................................................................... 157

*Turner v. Louisiana*,
379 U.S. 466 (1965) ................................................................................................ 275, 297

*U. S. ex rel. Negron v. State of N. Y.*,
434 F.2d 386 (2d Cir. 1970) ............................................................................................. 321

*U.S. v. Cardoso-Lopez*,
2009 WL 3198658 (7th Cir. Oct. 5, 2009) ........................................................................ 360

*United States v. Agurs*,
427 U.S. 97 (1976) ............................................................................... 170, 176, 193, 205

*United States v. Antone*,
603 F.3d 566 (5th Cir. 1979) .......................................................................................... 170

*United States v. Aragon*,
983 F.2d 1306 (4th Cir. 1993) ........................................................................................ 330

*United States v. Armstron*g,
517 U.S. 456 (1996) ........................................................................................................ 352

*United States v. Avila*,
770 F.3d 1100 (4th Cir. 2014) .................................................................................. 332, 333

*United States v. Ayala*,
601 F.3d 256 (4th Cir. 2010) ........................................................................................... 333

*United States v. Bagley*,
473 U.S. 667 (1985) ............................................................................................... *passim*

*United States v. Barboa*,
777 F.3d 1420 (10th Cir. 1985) ....................................................................................... 341

*United States v. Bauer*,
990 F.2d 373 (8th Cir. 1993) ........................................................................................... 331

*United States v. Beckford*,
962 F.Supp. 748 (E.D.Va.1997) ...................................................................................... 180

*United States v. Boney*,
68 F.3d 497 (D.C. Cir. 1995) ........................................................................................... 297

*United States v. Boney*,
977 F.2d 624 (D.C. Cir. 1992) .................................................................................. 282, 294

*United States v. Brown*,
752 F.3d 1344 (11th Cir. 2014) ....................................................................... 340

*United States v. Camacho*,
955 F.2d 950 (4th Cir.1992) ........................................................................ 317-18

*United States v. Caro*,
597 F.3d 608 (4th Cir. 2010) ........................................................................... 269

*United States v. Certified Envtl. Servs., Inc.*,
753 F.3d 72 (2d Cir. 2014)............................................................................... 225

*United States v. Chanthadara*,
230 F.3d 1237 (10th Cir. 2000) ..........................................................268-69, 273

*United States v. Colombo*,
869 F.2d 149 (2d Cir. 1989)............................................................................. 282

*United States v. Cornell*,
780 F.3d 616 (4th Cir. 2015) ........................................................................... 334

*United States v. Coronado-Cervantes*,
154 F.3d 1242 (10th Cir. 1998) ....................................................................... 331

*United States v. Corrado*,
286 F.3d 934 (6th Cir. 2002) ........................................................................... 334

*United States v. Curry*,
993 F.2d 43 (4th Cir. 1993) ............................................................................. 305

*United States v. Dado*,
759 F.3d 550 (6th Cir. 2014) ........................................................................... 377

*United States v. David*,
83 F.3d 638 (4th Cir. 1996) ............................................................................. 309

*United States v. Dinkins*,
691 F.3d 358 (4th Cir.2012) ............................................................................ 322

*United States v. Edmundson*,
___ F.Supp.3d___, 2015 WL 9311983 (D. Md. Dec. 30, 2015) ......................... 328, 332, 336

*United States v. Fell*,
372 F. Supp. 2d 766 (D. Vt. 2005)............................................................. 302, 304

xxviii

*United States v. Fleming*,
739 F.2d 945 (4th Cir. 1984) ...................................................................................... 338

*United States v. Fuertes,*
805 F.3d 485 (4th Cir. 2015) ...........................................................................325. 332-33

*United States v. Gagnon,*
470 U.S. 522 (1985)..................................................................................................... 316

*United States v. Gardner*,
___ F.3d ___, 2016 WL 2893881 (4th Cir. May 18, 2016).................................................. 339

*United States v. Gay*,
522 F.2d 429 (6th Cir. 1975) ...................................................................................... 319

*United States v. Gonzalez-Longoria,*
813 F.3d 225 (5th Cir. 2016) ...................................................................................... 328

*United States v. Gonzalez-Longoria*,
815 F.3d 189 (2016)..................................................................................................... 328

*United States v. Gonzalez-Ruiz*,
794 F.3d 832 (7th Cir. 2015) ...................................................................................... 336

*United States v. Gore*,
636 F.3d 728 (5th Cir. 2011) ...................................................................................... 335

*United States v. Green*,
405 F. Supp. 2d 104 (D. Mass. 2005) ...................................................................153-54

*United States v. Hager*,
721 F.3d 167 (4th Cir. 2013) ...................................................................................... 322

*United States v. Hillary*,
106 F.3d 1170 (4th Cir.1997) ...................................................................................... 341

*United States v. Keelan*,
786 F.3d 865 (11th Cir. 2015) ............................................................................. 330, 332

*United States v. Kirk*,
111 F.3d 390 (5th Cir. 1997) ...................................................................................... 331

*United States v. Lattanaphom*,
___ F.Supp.3d___, 2016 WL 393545 (E.D. Cal. 2016) ....................................................... 328

Case 3:16-cv-00057-MOC  Document 22  Filed 06/22/16  Page 29 of 418

*United States v. Lecco*,
    634 F.Supp. 2d 633 (S.D. W. Vir. 2009) ............................................................................ 391

*United States v. Loveland*, __ F.3d __,
    2016 WL 3156308 (9th Cir. June 3, 2016) ......................................................................... 335

*United States v. McNeal*,
    ___ F.3d ___, 2016 WL 1178823 (4th Cir. Mar. 28, 2016) .................................................. 326

*United States v. Melvin*,
    621 Fed. Appx. 226 (4th Cir. 2015) .................................................................................... 336

*United States v. Naughton*,
    621 Fed. Appx. 170 (4th Cir. Sept. 2, 2015) ............................................................... 326, 332

*United States v. Perkins*,
    748 F.2d 1519 (11th Cir. 1984) ......................................................................................... 282

*United States v. Ramos-Medina*,
    706 F.3d 932 (9th Cir. 2012) ............................................................................................. 332

*United States v. Roach*,
    502 F.3d 425 (6th Cir. 2007) ............................................................................................. 231

*United States v. Rolle*,
    204 F.3d 133 (4th Cir. 2000) ...................................................................................... 317, 318

*United States v. Royal*,
    731 F.3d 333 (4th Cir. 2013) ............................................................................................. 326

*United States v. Sampson*,
    820 F.Supp.2d 151 (D. Mass. 2011) ...................................................................... 284, 293, 301

*United States v. Sanchez-Espinal*,
    762 F.3d 425 (5th Cir. 2014) ............................................................................................. 330

*United States v. Sanchez-Garcia*,
    501 F.3d 1208 (10th Cir. 2007) ......................................................................................... 332

*United States v. Socony Vacumm Oil Co.*,
    310 U.S. 150 (1940) ......................................................................................................... 222

*United States v. Stitt*,
    552 F.3d 345 (4th Cir. 2008) ...................................................................................... 341, 342

xxx

*United States v. Tipton*,
90 F.3d 861 (4th Cir. 1996) ........................................................................................... 268

*United States v. Torres-Miguel*,
701 F.3d 165 (4th Cir. 2012) ................................................................................... 326, 339

*United States v. Umaña*,
750 F.3d 320 (4th Cir. 2014) ................................................................................... *passim*

*United States v. Umaña*,
762 F.3d 413 (4th Cir. 2014) ......................................................................................... 164

*United States v. Vinson*,
805 F.3d 120 (4th Cir. 2015) ......................................................................................... 338

*United States v. Vivas-Ceja*,
808 F.3d 719 (7th Cir. 2015) .............................................................................. 328-29, 331, 333

*United States v. Webster*,
639 F.2d 174 (4th Cir. 1981) ......................................................................................... 305

*United States v. White*,
222 F.3d 363 (7th Cir. 2000) ......................................................................................... 225

*United States v. White*,
571 F.3d 365 (4th Cir. 2009) ......................................................................................... 335

*Uttecht v. Brown*,
551 U.S. 1 (2007) ........................................................................................................... 268

*Van Don Nguyen v. Holder*,
571 F.3d 524 (6th Cir. 2009) ......................................................................................... 332

*Wainwright v. Witt*,
469 U.S. 412 (1985) ............................................................................................. 269, 272-73

*Washington v. Murray*,
952 F.2d 1472 (4th Cir. 1991) ....................................................................................... 133

*Welch v. United States*,
136 S. Ct. 1257 ............................................................................................................... 331

*Wiggins v. Smith*,
539 U.S. 510 (2003) ..................................................................................................... *passim*

*Williams v. Norris*,
  612 F.3d 941 (8th Cir. 2010) ................................................................. 364

*Williams v. Taylor*,
  529 U.S. 362 (2000) .................................................................. *passim*

*Wisconsin v. Mitchell*,
  508 U.S. 476 (1993) ........................................................................ 221

*Witherspoon v. Illinois*,
  391 U.S. 510 (1968) ........................................................................ 268

*Wong v. Belmontes*,
  558 U.S 15 (2009) ........................................................................... 243

*Woods v. Dugger*,
  923 F.2d 1454 (11th Cir. 1991) ....................................................... 322

*Woodson v. North Carolina*,
  428 U.S. 280 (1976) .......................................................... 8, 264, 364

   **State Cases**

*Johnson v. United States*,
  860 F.Supp.2d 663 (N.D. Iowa 2012) ........................... 324, 327, 333, 378

*Ledezma v. State*,
  626 N.W.2d 134 (Iowa 2001) ........................................ 361, 365, 367, 368

*Sexton v. State*,
  93 S.W.3d 96 (Tex. Crim. App. 2002) ..................................... 153, 154

*State v. Anderson*,
  4 P.3d 369 (Ariz. 2000) ................................................................. 270

*State v. Johnson*,
  317 N.C. 193 (1983) ...................................................................... 338

*State v. Snyder*,
  311 N.C. 391 (1984) ...................................................................... 338

*State v. Wilkerson*,
  295 N.C. 559 (1978) ...................................................................... 338

**Federal Statutes**

8 U.S.C. § 1962 ................................................................................ 5, 215, 321, 324, 334

18 U.S.C. § 16(b) ............................................................................................ 328, 330-33

18 U.S.C. § 371 ......................................................................................................... 6, 257

18 U.S.C. § 401 ............................................................................................................... 294

18 U.S.C. § 922(g)(5) ......................................................................................................... 5

18 U.S.C. § 924 ........................................................................................................ *passim*

18 U.S.C. § 1512 ............................................................................................................... 24

18 U.S.C. § 1621 ................................................................................................................. 6

18 U.S.C. § 1863(b)(6) ................................................................................... 278, 296, 300

18 U.S.C. § 1951 ................................................................................................................. 5

18 U.S.C. § 1959 ...................................................................................................... *passim*

18 U.S.C. § 1961(1) ....................................................................................................... 337

18 U.S.C. § 1962 .............................................................................................. 5, 324, 334

18 U.S. § 3005 ............................................................................................................... 345

18 U.S.C. § 3592(a)(8) ..................................................................................................... 18

18 U.S.C § 3593(c) .............................................................................................. 214, 218

18 U.S.C. § 3596(c) ........................................................................................................ 197

28 U.S.C. § 1861 ........................................................................................................... 305

28 U.S.C. § 1862 ........................................................................................................... 305

28 U.S.C. § 1863 ........................................................................................................... 305

28 U.S.C. § 1864 ........................................................................................................... 305

28 U.S.C. § 1865 ........................................................................................................... 305

28 U.S.C. § 1866 ........................................................................................................... 305

28 U.S.C. § 1867 ................................................................................................ 305

28 U.S.C. § 1868 ................................................................................................ 305

28 U.S.C. § 2255 .......................................................................................... *passim*

**State Statutes**

N.C. GEN STAT. ANN. § 20-138.1 ......................................................................... 111

NC ST § 49-2 ...................................................................................................... 278

North Carolina General Statute § 14-17 ....................................................... 322, 358

**Federal Rules**

Fed. R. Crim. P. 12(b)(3) ................................................................................... 306

FED. R. CRIM. P. 43(a) ....................................................................................... 317

Fed. R. Evid. 401 .............................................................................................. 245

Fed. R. Evid. 403 .............................................................................................. 246

Fed. R. Evid. 404(b) .......................................................................................... 247

Fed. R. Civil P. 26-37 ........................................................................................ 380

**Federal Regulations**

28 C.F.R. § 50.5 ................................................................................. 356, 359, 360

**United States Constitution**

U.S. CONST. Art. VI ................................................................................... 372, 375

**United States Sentencing Guidelines**

U.S.S.G. § 4b1.2 ................................................................................................ 331

**Other Authorities**

31 Hofstra L. Rev 1049 .............................................................................. 273, 305

39 Am.Jur.2d Habeas Corpus § 43 .................................................................... 365

58 N.Y.U.L. Rev. 299 (1983) .............................................................................. 18

xxxiv

*Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul,*
  18 MICH. J. INT'L L. 565 (1997)....................................................................................... 362

*El Salvador, Guatemala, and Honduras*,
  12 San Diego Int'l L.J. 417 (2011) ................................................................................. 220

*Murphy v. Netherland,*
  92 Am. J. Int'l L. 87............................................................................................................ 365

*Sanchez-Llamas v. Oregon and Article 36 of the Vienna Convention on Consular Relations:*
  *The Supreme Court, The Right to Consul, and Remediation,*
  27 MICH. J. INT'L L. 1185 (2006) ............................................................................ 355, 367

*Strange Land:   The Rights of Non- Citizens Under Article 36 of the Vienna Convention on*
  *Consular Relations,*
  14 GEO. IMMIGR. L.J. 185 (1999) .................................................................................... 361

Substantive Criminal Law § 14.2 (2d ed. 2003) ........................................................................ 337

Case 3:16-cv-00057-MOC   Document 22   Filed 06/22/16   Page 35 of 418

Alejandro Umaña, through undersigned counsel, respectfully request 28 U.S.C. § 2255 and Rule 2 of the *Rules Governing Section 2255 Proceedings in the United States District Courts*, that this Court grant him a new trial, vacate the judgement entered against him, and/or vacate, set aside or correct the sentence. Through counsel, Mr. Umaña states the following grounds for granting this motion:

## PRELIMINARY MATTERS

### A. Statement Regarding Form

In accordance with Rule 2 of the Rules Governing Section 2255 Proceedings in the United States District Courts, this Motion sets forth only the facts and claims entitling Mr. Umaña to relief. It contains minimal legal argument or citation. Mr. Umaña will file separate pleadings regarding discovery, evidentiary development, and legal briefing later in the proceedings.

### B. Statement Regarding Citations

References to prior proceedings are as follows:

- Reference to Voir Dire Transcripts: VDT at x;

- References to Guilt Phase Transcripts: GPT at x;

- References to Penalty Phase Transcripts: PPT at x;

- References to hearing transcripts not consecutively numbered with the trial transcripts: [date] [name of hearing] at x;

- References to documents filed with the court such as pleadings, motions, and orders that cite the docket number: ECF Doc. No. x;

1

- References to Trial Exhibits: Def. Exh. x / Gov. Exh. x

- References to *Atkins* Exhibits: Atkins Def. Exh. x / Atkins Gov. Exh. x;

References to the appendices to this Motion are by the appendix number as "Appx. x." All other references are self-explanatory or based on the Blue Book.

Redactions to this pleading and to the attached exhibits have been made in accordance with the requirements of Rule 49.1 of the Federal Rules of Criminal Procedure. Additionally, references to pleadings, orders, and transcripts that were placed under seal at the time of trial and that remain under seal have also been redacted.

## STATEMENT OF RELEVANT FACTS

Mr. Umaña was convicted of shooting and killing two brothers, Manuel and Ruben Salinas, at a restaurant in North Carolina, following an alcohol-fueled argument over what music should be played on the jukebox. Instead of allowing North Carolina to prosecute this crime under its murder statute, the federal government charged Mr. Umaña with VICAR murder, connecting the shootings to Mr. Umaña's membership in a gang (Mara Salvatrucha, or MS-13) he had initially joined in his home country of El Salvador.

Faced with a primary crime that the jurors unanimously found "did not involve substantial planning" and resulted from an "emotionally charged argument" – *i.e.,* not the typical profile of a crime deserving of death – the foundation for the Government's case at penalty phase were two unadjudicated murders in Los Angeles, California, for which Mr. Umaña had been one of several plausible suspects.

Thus, this is a case in which presentation of a genuine case in mitigation could well have changed the outcome of the penalty phase of trial. Unfortunately, the trial team's entire

2

mitigation investigation centered on a single source – Mr. Umaña's father, Rafael. Rafael is the only person the trial team ever spoke to who had known Mr. Umaña as an infant or child. Rafael told them a gentle story about their family which was poor but caring, about how Mr. Umaña's mother, Leticia, had deserted them when he was still an infant, but how he (Rafael) had protected Mr. Umaña, ensured that he always had a loving female caretaker, and shielded him from the ravages of the El Salvadoran civil war.

Contrary to the relatively rosy story Rafael told, Mr. Umaña's childhood had been tragic and traumatic, with Rafael as a principal architect of his son's misery. Trial counsel, and hence the jury, never got to hear the real truth about Mr. Umaña's childhood because the trial team never sought out other readily available and willing witnesses who had known Mr. Umaña when he was a child.

The true story is that Mr. Umaña was raised in abject poverty, living in filth, and often going hungry. He was an abused child, beaten often and mercilessly by Rafael, who emotionally abused by him as well. He was an abandoned child, who believed his mother had left him when he was an infant (because his father told him it was so, even though Rafael had actually banished her from the household). Mr. Umaña was an ill-clothed, ill-fed and neglected child, whom Rafael liked to torment by withholding food from him and eating in front of him.

Mr. Umaña was also a traumatized child. He was subjected to his father's frequent and unprovoked beatings. As a child, he watched in horror when his father beat his mother, punching her repeatedly in the face. He saw shootings and hangings and decomposing bodies outside his front door. At the age of eight, he watched his great grandmother, his only protector against Rafael, die of stomach cancer in the bed he shared with her.

3

Mr. Umaña was developmentally slow, abnormally forgetful, and unable to learn at home, in school or on the job. If not actually intellectually disabled, he certainly suffers from low intellectual functioning. Even at the age of twelve, he was unable to pass remedial third grade after repeated attempts. His limitations made it impossible for him to advance in the jobs he had as an adolescent. His problems in the workforce in El Salvador were increased exponentially after he turned 18 and, because his parents had never registered his Guatemalan birth properly in El Salvador, left him unable to get the papers adults were required to have to get a job.

Mr. Umaña showed significant evidence of brain damage and mental illness. Aside from his mental slowness, he had blinding migraine headaches. Friends and relatives also report that he saw visions, suffered hallucinations, and heard voices.

Had trial counsel marshalled this evidence through the lay and expert witnesses, the jury would have heard a compelling case for life. This was the very type of evidence the Supreme Court has described as unqualified mitigating evidence.

Not only would this evidence have provided the jurors with general reasons for wanting to spare Mr. Umaña's life, but it would also have provided them with an explanation for why this emotionally-damaged, intellectually limited young man had joined MS-13 in the first place – that is, to find support, protection, and acceptance missing through his childhood and adolescence. This evidence would also have helped counter the Government's characterization of Mr. Umaña as someone with a devil in his heart, a "killer among killers," who needed to be shown "American justice."

4

Moreover, had counsel fully investigated and prepared, they would have been able to seriously undermine the case the Government made that Mr. Umaña was responsible for the two murders that made up most of their case for death.

The defense had available to it a very different portrait of Mr. Umaña to present to this Court and to the jury at all phases of his capital trial and sentencing. Had trial counsel fulfilled their constitutional duty, and the Government stayed within their constitutional limits, it is more than reasonably probable that Alejandro Umaña would not now be under a sentence of death.

## PROCEDURAL HISTORY

Alejandro Umaña was accused of shooting and killing two men on December 8, 2007. The shooting happened in Greensboro, North Carolina, and state charges (pursued as a noncapital case) were initially brought there. Seven months later, on June 23, 2008, federal prosecutors charged Mr. Umaña in the Western District of North Carolina. The Greensboro shooting was charged as overt acts under a RICO conspiracy (8 U.S.C. § 1962(d) (Count 1)).

On September 23, 2008, the Government superseded the indictment adding capital counts under 18 U.S.C. § 1959 (VICAR murder) (Counts 22 and 24), and possession of a firearm in relation to crimes of violence under §§ 924(c) & (j)(1) (Counts 23 and 25). ECF Doc. No. 276. The Government filed a notice of intention to seek the death penalty on the same day. ECF Doc. No. 276.

On April 19, 2010, a jury returned a verdict finding Mr. Umaña guilty of all death eligible counts. They also found Mr. Umaña guilty on Count 1 (RICO conspiracy), Count 27 (illegal alien in possession of firearm, 18 U.S.C. § 922(g)(5), Count 28 (robbery affecting interstate commerce, 18 U.S.C. § 1951), Count 61 (conspiracy to commit witness tampering, 18

5

U.S.C. § 371), and Count 63 (witness tampering, 18 U.S.C. § 1512).

The penalty proceedings were bifurcated into eligibility and selection phases. At the eligibility phase, the Government alleged all four § 3591(a) gateway factors. On the VICAR counts, the jury returned no finding on the first three intent-to-kill aggravators and found only the "grave risk of harm" to exist, ECF Doc. No. 1044, 1046; on the § 924 counts it found intent to kill, ECF Doc. No. 1045, 1047. The jury also found § 3292(c) aggravating factors of creation of a grave risk of death to others and multiple killings to exist. ECF Doc. No. 1044-47.

At the selection phase, the Government alleged four more aggravators: (1) the purpose of the killing was to maintain the name and reputation of MS-13 and advance his position therein; (2) injury, harm, and loss was caused to the victim's family and friends ("victim impact"); (3) involvement in other serious acts of violence including (a) committing two prior unadjudicated murders on Fairfax Avenue, Los Angeles and (b) participating in and aiding and abetting in one additional unadjudicated murder in Lemon Grove park, Los Angeles; and (4) likelihood of committing criminal acts of violence in the future as evidenced by four sub-factors ("future dangerousness"). ECF Doc. No. 1048-51. The Government's selection phase case relied heavily on hearsay evidence of Mr. Umaña's alleged culpability for the earlier unadjudicated murders in Los Angeles. The jury found that the Government established all aggravating factors.

Mr. Umaña alleged thirteen mitigating factors. After deliberation, the jury recommended that Mr. Umaña be sentenced to death on Counts 22-25. On July 27, 2010, this Court entered a judgment sentencing Mr. Umaña to death. The Court also imposed a life sentence on Count 1, and various sentences on the other counts all to run concurrent.

6

Mr. Umaña's appeal to the Fourth Circuit was affirmed by a divided panel. *United States v. Umaña*, 750 F.3d 320 (4th Cir. 2010). Fourth Circuit Judge Gregory dissented, concluding "that it is both wrong and unconstitutional for a death sentence to rest on unconfronted accusatory evidence." *Id*. at 369. Mr. Umaña's petition for rehearing en banc was denied on June 27, 2014, by an eight to five vote. Case No. 10-6, Doc. 143. On June 22, 2015, the United States Supreme Court denied Mr. Umaña's Petition for a Writ of Certiorari.

**I.   AS A RESULT OF THEIR FAILURE TO ADEQUATELY INVESTIGATE OR PRESENT READILY AVAILABLE MITIGATION EVIDENCE AT THE PENALTY PHASE OF HIS TRIAL, TRIAL COUNSEL DEPRIVED MR. UMAÑA OF THE EFFECTIVE ASSISTANCE OF COUNSEL TO WHICH HE WAS ENTITLED, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

**A.      Introduction**

A thorough mitigation investigation into the life of a capital defendant is the cornerstone of any penalty phase proceedings in his or her capital case.   Under the Sixth Amendment, "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all facts relevant to the merits of the case *and the penalty* in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (internal citations omitted).   This duty to investigate is particularly broad in a capital case, where counsel has an "obligation to conduct a thorough investigation of the defendant's background" for "all reasonably available mitigating evidence."   *Wiggins v. Smith*, 539 U.S. 510, 522, 524 (2003).   At the time of Mr. Umaña's trial in 2010, "[i]t is unquestioned that under the prevailing professional norms at the time," that

7

obligation applied to his trial counsel. *See, e.g., Porter v. McCollum*, 558 U.S. 30, 39 (2009).

The purpose for imposing such an obligation on trial counsel in a capital case lies in the fundamental principles underlying Eighth-Amendment jurisprudence, that "the fundamental respect for humanity underlying the Eighth Amendment … requires consideration of the character and record of the individual offender … as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Moreover, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background … may be less culpable," *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), and that such evidence might "influence[] the jury's appraisal of [the defendant's] moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Other factors recognized by the Supreme Court as constituting particularly relevant mitigation evidence include evidence of a defendant's turbulent family history and physical abuse by a parent, *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), dysfunctional upbringing, brain damage, and borderline intellectual disability, *Williams*, 529 U.S. at 395-96.

All of these well-recognized categories of mitigation played a formative role in Mr. Umaña's life and would have provided a compelling case in mitigation. But because trial counsel failed to undertake an adequate investigation into his childhood, the jury never got to hear this evidence.

The Supreme Court has established a two-prong test by which a litigant can establish that trial counsel failed to provide the effective assistance of counsel to which he or she is constitutionally entitled. *Strickland v. Washington*, 466 U.S. 668 (1984). First, one must show

8

that counsel's performance was deficient – that is, that it fell below reasonable professional norms at the time of trial. *Strickland*, 466 U.S. at 688. One must also establish "prejudice" – that is, that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, a standard less demanding than proof by a preponderance of the evidence. *Id*.; *Williams*, 529 U.S. at 405-06. Mr. Umaña can establish both *Strickland* prongs.

Under the first prong, Mr. Umaña's trial counsel performed deficiently in conducting their investigation for the penalty phase of his trial. Despite the availability and willingness of family members and neighbors to talk about Mr. Umaña's childhood, the only family member the trial team interviewed for their life history investigation in Mr. Umaña's case, and the only witness the trial team interviewed who had known Mr. Umaña or his circumstances as a child, was Mr. Umaña's father, Rafael Enrique Umaña (herein after referred to as Rafael).[1] Restricting the investigation of a capital client's childhood to one person, and at that, a person who might have reasons to portray himself and his son's life in unrealistic and self-serving terms, fell well outside the scope of prevailing professional norms at the time of Mr. Umaña's trial in 2010. In

---

[1] The trial team interviewed other witnesses, and presented videos of four of them at penalty phase, but none of these was family members. None of these witnesses had firsthand knowledge of any circumstances or details of Mr. Umaña's childhood. The trial team was not able to get any details about Mr. Umaña's life up until the age of 15 from anyone other than Rafael. Appx. 36 at ¶ 4. Thus, no one was in a position to challenge the comparatively rosy picture Rafael painted of himself as a poor but loving father who cared for and protected his young son after Mr. Umaña's mother deserted the family.

9

fact, in Mr. Umaña's case, trial counsel's self-imposed limitation on the investigation had dire consequences. *See, e.g., Porter*, 558 U.S. at 39.

By failing to seek out and interview other family members, neighbors, or friends, trial counsel failed to discover significant mitigating evidence and therefore never touched upon it at penalty phase. Critically, this evidence included that through the entire course of his childhood, Mr. Umaña had been subjected to brutal, unrelenting physical abuse, inflicted *by Rafael* himself. Likewise, contrary to the story Rafael told the trial team (and had told Mr. Umaña all his life) – that Mr. Umaña's mother, Leticia Ramirez Diaz (Leticia), had abandoned him when he was an infant-- trial counsel failed to learn that Rafael, in fact, had drugged, beaten, and prostituted Leticia while she was pregnant. She was then expelled from his household. Despite her plea, he did not let her see her infant and instead gave her beatings.

Additionally, by relying solely on Rafael as the source of life-history information, the trial team failed to uncover rich details of even those topics the mitigation witnesses at trial talked broadly about – for example, the poverty in which Mr. Umaña was raised, considered extreme even by the standards of the poor neighborhood in which he lived; the tremendous loss he suffered at the age of eight with the death of his great-grandmother, who had been his only protector and source of comfort during his early years; his inability to succeed at school; that Mr. Umaña was two years younger than Rafael told them he was; and the traumatic events Mr. Umaña witnessed, both of a personal nature and as a result of the atrocities from the civil war being waged on the streets in front of his home in El Salvador.

These details of Mr. Umaña's life were powerfully mitigating. Taken alone or combined with the meager mitigating evidence counsel did present at trial, that as a teenager, Mr. Umaña

10

was a respectful, sweet, lonely, generous soul, there is a reasonable probability that the outcome of the *Atkins* or the sentencing hearing would have been different.

These details of Mr. Umaña's life would also have informed and strengthened the opinions of all of the mental-health experts consulted pretrial. Supported by these details of Mr. Umaña's actual life history, the opinions of these experts would have been far more convincing to the Court at the *Atkins* hearing, where information about Mr. Umaña's developmental milestones and intellectual and adaptive functioning was critical, and would likely have altered trial counsel's decisions as to whether and how to use mental-health experts at the penalty phase. Mr. Umaña's significant and specific history of being physically abused and exposed directly to traumatic sights would have informed opinions about his emotional and cognitive development. His history of repeated head trauma, in utero exposure to toxins, and other physiological assaults would have informed opinions about brain damage. Reports of his blinding headaches, episodes of seeing demons on blank walls, dissociating, and hearing voices would have informed opinions about neurological defects and mental illness. The entire picture of his lonely, deprived childhood would have informed an expert's, and the jury's, understanding of why Mr. Umaña ultimately became susceptible to recruitment into MS-13. Thus, trial counsel's failure to conduct a reasonable life-history investigation had a significant impact on the presentation of mental-health mitigation at the penalty phase, as well.

Turning to the second *Strickland* prong, but for trial counsel's deficient investigation into Mr. Umaña's life history, there is a reasonable probability that the outcome of his sentencing would have been different.

11

Trial counsel's deficient performance with regard to mitigation, and the prejudice that stemmed therefrom, extended beyond their failure to investigate. They failed to interview in depth even the witnesses they did locate, and missed significant mitigation those witnesses had to offer.   They failed to come up with a coherent theme for mitigation during the penalty phase that would provide a compelling picture to the jury of Mr. Umaña's unique frailties. Lacking such a picture, they declined even to make an opening statement at the start of the penalty phase. And because they had not adequately prepared their expert witnesses nor thought through the areas on which their witnesses were likely to be cross-examined, or their evidence rebutted, trial counsel opened Mr. Umaña's mitigation up to successful attacks by the prosecution. Had trial counsel been adequately prepared, none of this would have happened.

**B.      Trial Counsel's Performance was Deficient**

   i.     <u>Trial counsel's preparation to present mitigating evidence at the penalty phase of trial was inadequate and constituted deficient performance.</u>

Trial counsel were aware that their client would almost certainly be convicted of the capital crime he had been accused of, and had confessed to, ███████████████████ ████████████████████████████████████████████ █████████████ Nevertheless, trial counsel's performance in investigating Mr. Umaña's case in mitigation was woefully deficient and failed to meet contemporary professional standards in a host of ways.

These included the following:

Despite the fact that counsel appears to have understood the necessity for conducting such a complete and broad-based life history investigation and indicated their plan to do so, they

12

nevertheless failed to expand their efforts to interview people who could provide information about Mr. Umaña's early life beyond one person – his father, Rafael, and confined their investigation about the rest of his life to a narrow set of sources. Many other witnesses, including Mr. Umaña's mother and other close family members and people who knew Mr. Umaña and the family well, were readily available and willing to talk to counsel.

It was unreasonable, and constituted deficient performance, for counsel to fail to instruct their mitigation specialist to search for witnesses and not to rely on Rafael to determine who those witnesses should be or to accept Rafael's representations that other family members and friends would refuse to be interviewed.

It was unreasonable, and constituted deficient performance, for counsel to ignore the advice of their mitigation specialist to the extent he advised that he should continue his efforts to find witnesses, instead of relying on the representations made by Rafael, as to the facts of Mr. Umaña's life and the availability of other witnesses to it.

It was unreasonable, and constituted deficient performance, for counsel to trust that the representations Rafael made about his supportive role in Mr. Umaña's life painted the full story, and to fail to consider that Rafael's historical account might have been self-serving or that his refusal to introduce the defense to any other family member, including refusing access to his wife, might have been to protect the favorable account he had given of himself. To the extent that trial counsel was concerned that Rafael was providing inaccurate information and stymying their efforts to find other family members, it was unreasonable, and constituted deficient

13

performance, for them nevertheless to use him as their only source of information about Mr. Umaña's childhood.[2]

Trial counsel's limiting their investigation of Mr. Umaña's life history to one family member, including no one else who knew Mr. Umaña as a young child, and otherwise depending on such a small group of lay witnesses, fell outside professional norms for a capital penalty phase investigation in 2010.

It was unreasonable, and constituted deficient performance, for trial counsel to delay the start of their life history investigation such that they were unprepared to offer any useful input to convince the Government not to authorize this case to be tried capitally.

It was unreasonable, and constituted deficient performance, that even after authorization, trial counsel took months to get its investigation into Mr. Umaña's childhood underway, losing precious time to find lay witnesses and prepare expert witnesses, so that the mitigation presentation at trial presented a very different impression of Mr. Umaña's life, family circumstances, challenges and hardships, and factors that affected his later mental and emotional health than could have been presented.

It was unreasonable, and constituted deficient performance, that even though trial counsel knew the importance of putting on a case in mitigation based on a thorough life-history investigation and knew there were important facts they were still unclear about and people they had not interviewed but were aware of, and even though they had been alerted by their mitigation

---

[2] During the initial May 2009 trip, counsel had reason to believe that Rafael would be an inadequate resource. PPT 521, 525-526. Although Rafael agreed to assist the investigator in finding non-family members, he would not introduce the investigator to family.

14

specialist of his concerns in this regard, they failed to ask the Court for a continuance so they could complete their investigation.

It was unreasonable, and constituted deficient performance, that trial counsel failed to put in the time necessary to prepare their mitigation case. Trial counsel did not thoroughly interview and prepare the witnesses they did locate, so missed even these opportunities to present a richer case in mitigation to the jury. For example, Monica Reyes, former girlfriend and mother of Mr. Umaña's child was interviewed by the defense mitigation specialist, but primarily around the area of adaptive deficits and thus missed symptomology unearthed by post-conviction regarding potential mental health impairments and the poverty in which Mr. Umaña suffered. Appx. 12.

It was unreasonable, and constituted deficient performance, that trial counsel unreasonably failed to give their experts the materials those experts needed to provide opinions at sentencing that were personalized to Mr. Umaña's life experiences, rather than general assertions about how someone might have been affected by the life conditions and traumatic events that someone *like* Mr. Umaña *might* have experienced. Moreover, trial counsel failed to prepare their expert witnesses by not giving them adequate and available materials to work with or helping them to meet the cross-examination they were most likely to encounter. Post-conviction has interviewed multiple lay witnesses who would have provided information about the trauma, neglect, poverty, and maltreatment Mr. Umaña experienced during his birth, childhood, adolescence, and young adulthood. This, too, constituted deficient performance.

It was unreasonable, and constituted deficient performance, for trial counsel to have waived opening argument at the penalty phase, a critical point at which they could have set the stage for the evidence they were about to present.

15

> ii.   Despite the fact that trial counsel were aware of the need to conduct a thorough and expeditious investigation, and knew that doing so for a foreign-born defendant would take considerable time, they delayed most of their investigation for months.

Trial counsel had no strategic basis for failing to conduct the thorough investigation or seeking additional time to investigate and prepare for the penalty phase of trial that they knew to be necessary here.   As the following chronology demonstrates, counsel were well aware of their obligations, knew they needed time to prepare, and intended to put on a full-scale history of Mr. Umaña's childhood, in recognition that such a history was key to any case in mitigation.

By 2008, professional norms made clear that trial counsel has a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." (ABA Guideline 10.11(A).) *See* ABA Guideline 1.1, History ("it is imperative that counsel begin investigating mitigating evidence ... *well before* the prosecution has actually determined that the death penalty will be sought") (emphasis added); ABA Guideline 10.2, Commentary ("early investigation to determine weaknesses in the State's case and uncover mitigating evidence is a necessity, and should not be put off...."); ABA Guideline 4.1, Commentary ("the presentation to be made at the penalty phase [should be] integrated into the overall preparation of the case rather than being hurriedly thrown together.")

 Initially, trial counsel seemed to understand these obligations.

Mr. Umaña was federally indicted on four death-eligible counts on June 23, 2008.   ECF Doc. No. 3. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

16

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████

In August, 2008, while working on another case in El Salvador, the trial mitigation specialist stopped by to meet with Mr. Umaña's father. The meeting lasted for at most an hour and a half and was the only undertaking the specialist completed for Mr. Umaña's case on this trip. The trial team made its presentation to the Department of Justice, hoping to persuade the Government not to seek death, on August 11, 2008. Counsel had no mitigation information and was unprepared for the meeting with the DOJ.[3] The Notice of Intent to Seek Death was issued on September 23, 2008.[4]

---

[3] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[4] Neither Mr. McGough nor any other member of the defense team met with any other potential mitigation witness again until May 2009, when Mr. McGough interviewed one witness in New York City, and then returned to El Salvador to conduct several additional interviews – none of whom was family members or neighbors, except Rafael.

17

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████ Aside from a brief, introductory meeting with Mr. Umaña's father, no lay witness interviews were attempted or conducted until May 2009. PPT 518, 520.

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████



█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██

Despite recognizing the need to (1) develop a thorough investigation, (2) the unique complications involved in the mitigation investigation abroad, and (3) the need to conduct the investigation expeditiously, trial counsel still delayed, waiting until May of 2009 to do the first in-depth investigation trip to El Salvador and the first trip of any kind to interview witnesses in New York.

Counsel also did not get an expert to evaluate Mr. Umaña for brain functioning and intellectual disability until July of 2009 █████████████████████████████

████████████████████████████████████████████████████████████

███

On September 28, 2009, the Court granted a continuance of the October 9, 2009 trial date, setting a pre-trial *Atkins* hearing on November 30, 2009 and jury trial on April 22, 2010 with jury selection to begin on March 12, 2010. Sept. 28, 2005 Status Hrg at 13-14, 19.

Although repeatedly recognizing their obligation to immediately conduct the mitigation investigation, trial counsel demurred, requesting no further continuances.

What followed was a frantic and unprepared investigation that resulted in a bleak mitigation case. By the start of Mr. Umaña's trial, neither of the attorneys who tried the case, nor the investigator working for them, had interviewed any family member, other than Rafael, or any other person who knew the details of Mr. Umaña's childhood.

This constituted deficient performance.

19

iii. Trial counsel failed to conduct interviews of family and neighbors who knew Mr. Umaña and his family during his childhood, despite having readily available means to approach them.

Trial counsel had several means of finding and contacting lay witnesses in El Salvador.

a. *Mr. Umaña's mother, Leticia Ramirez, and brother, Saul.*

Contact information for Mr. Umaña's mother, Leticia Ramirez, was documented in discovery, produced by the Government early in the case. Appx.'s 37, 47. The neighborhood address provided in this document ("Colonia 5 de Marzo") was one at which Ms. Ramirez had lived for 21 years, and was the same address at which post-conviction counsel located her. Appx. 10. The documents produced in discovery by the Government included biographical information regarding Mr. Umaña, such as his actual date of birth of November 25, 1982, his father's name, mother's name as "Diaz [first surname] Ramirez [second surname] Leticia [name]," and mother's address at "Colonia 5 de Marzo." Appx. 47. Had counsel done a search of Colonia 5 de Marzo, they would have seen that this neighborhood only made up a two block radius in Santa Ana. Appx.'s 41, 42.

Mr. Umaña's full brother, Saul Osvaldo Umaña Ramirez, was incarcerated in a Salvadorian prison during the time of trial. Appx. 36. at 3. Saul was never visited by anyone from the trial defense team. Appx. 22.

b. *Neighbors who Knew Mr. Umaña as a Child.*

Mr. McGough had other ways of finding members of the Umaña family and neighbors who knew Rafael and Mr. Umaña, as a child well. On a four-day investigative trip to El Salvador in August, 2009, Rafael took Mr. McGough to see the two specific locations (*mesónes*) where he had lived with Mr. Umaña, from the time Mr. Umaña was a young child. (Appx. 38); PPT at 535.

20

One *mesón* was located near the hospital in San Juan de Dios in Santa Ana. PPT at 535, 537, 538.

Rafael also took Mr. McGough to the second *mesón* that Mr. Umaña grew up in, located off the bypass next to a propane business called Tropigas. Appx. (Invoice 08-25-2009 (U022261); PPT at 535.[5]

Mr. McGough could have found a number of witnesses at these two locations using basic investigation techniques like knocking on doors and going inside the *mesón*es,[6] the manner by which post-conviction counsel later found these witnesses.[7] Using this simple technique, post-conviction counsel located and was able to interview a number of people who provided detailed information about Mr. Umaña's early life, including the following witnesses:

---

[5] Even if Mr. McGough felt constrained from talking to people at the *mesón* because Rafael was with him the first time, Mr. McGough returned to the *mesón* on a subsequent trip in November 2009 with the expert on intellectual disability, Dr. J. Gregory Olley, without Rafael. Dr. Olley, who testified at Mr. Umaña's *Atkins* hearing, would also have benefited greatly from having the opportunity to speak with people who had known Mr. Umaña as a child. Nov. 20, 2010 Atkins Hrg. Trans at 320 (Dr. Olley stating he went to the *mesón* with the investigator and "saw the outside door of the home").

[6] Although counsel were aware of the fact that Mr. Umaña lived in these two *mesónes* during several years of his childhood, neither the attorneys nor investigator spoke to any of the neighbors. Appx. 39.

[7] It is something of a misnomer to refer to people in the same *mesón* as "neighbors," a term that leaves a misleading impression. The *mesónes* in which Mr. Umaña grew up were one-story buildings with roughly 18 rooms, one room per family, only a few of which open up to the street. Within the *mesón*, all the families shared a bathroom, shower and washing area. Appx. 5. Some of the rooms within these *mesónes* did not even have walls that reached the sheet metal roof. As a result, everyone living in the *mesón* knew everyone else in starkly intimate fashion. The people in Mr. Umaña's childhood *mesónes* were not neighbors in the sense that most Americans would think of them; they all knew Rafael and Mr. Umaña, and the nature of the relationship that existed between them.

21

Zoila Olano lived in the *mesón*, called Danubio Azul, and continues to live on that same street. Appx. 8. She met Mr. Umaña when she was about 12 years old and he was very a young boy who had just come to live in the *mesón* with his family after living in Guatemala. She described the poor living conditions, the poverty, and the violence in the *mesón*. Olano remains in touch with members of the Umaña family and could have helped introduce trial counsel to additional witnesses.

Ana Julia Magaña de Sanabria, an elderly woman who has lived in her home across from the Danubio Azul for 30 years, provided post-conviction counsel with mitigating evidence. Appx. 13.   In addition, Ana Julia continues to have contact with the Umaña family and could have assisted counsel in finding additional witnesses. *Id*.

Zoila Angelica Soriano is a nurse who lives two doors down from the Danubio Azul and has lived in that home for 20 years. Appx. 14. She knew the Umaña family, including Mr. Umaña and his father, and described for post-conviction counsel seeing members of the Umaña family with obvious mental impairments. *Id*.

Vilma Araceli Salazar de Argueta ("Araceli") lived in the *mesón* by the bypass for over 30 years. Appx. 1. For several years, including pretrial, Araceli set up tables outside of the meson facing the street. She is there Monday through Saturday selling breakfast and lunch. Araceli's tables are in the picture that was in trial counsel's possession prior to the November 30, 2009 *Atkins* hearing and yet they inexplicably failed to interview her. Appx. 39 at ¶2. When she was first approached by the post-conviction team, she was sitting outside the *mesón* at one of her tables selling food and when asked if she knew Mr. Umaña, she burst into tears since she had been desperately waiting to hear information about his case. Appx.1. Had someone from the

22

defense approached her, Araceli would have been able to provide a rich history into Mr. Umaña's childhood, including utter neglect by his father, malnutrition, abuse, and his struggles in learning.

Vilma Elizabeth Torres de Cruz ("Vilma"), Araceli's mother, was also available and willing to talk to the post-conviction team about the extreme poverty in the *meson* and the violent and chaotic Umaña family. Appx.'s 4, 5. She reported that Mr. Umaña's father was a drunk and a drug addict, who beat Mr. Umaña and deprived him of food as punishment. *Id*. Rafael also abused his young partner, Yanira, who was approximately five years older than Mr. Umaña. Appx's 1, 4, 36. Vilma could have also helped trial counsel find Mr. Umaña's mother and other family members.

Vilma's son, Melvin Cruz Torres, was born the same year as Mr. Umaña (in 1982), and was a friend. Appx. 2. He, too, was available and willing to talk to the post-conviction team about the store Rafael owned which was within the cramped, approximately eight meters by eight meters, room that Mr. Umaña shared with his father and step-mother. He could have described Mr. Umaña's living conditions. The room stunk of feces from the rabbits the father raised and the pigeons he lured in. When Melvin's mother could, she gave Mr. Umaña a tortilla or some beans to eat because he was constantly without food. Melvin and Mr. Umaña saw horrific war violence, including lined up bodies that were "swollen, inflated, half-eaten by worms, on some of them you could see their ribs, or the bones in their faces." *Id*. at ¶16. Unlike Melvin, who grew up in extreme poverty but nonetheless had a mother who looked after him, Mr. Umaña had no one and was more susceptible to joining a gang in order to survive.

23

Vilma's youngest daughter, Roxana Cruz Torres, also witnessed the physical abuse Mr. Umaña suffered at the hands of his father and was available and willing to talk to post-conviction counsel about what she knew about the Umaña family. Appx. 3. She had also witnessed the father selling drugs out of the *mesón* and being constantly drunk and drugged. *Id*.

Next door to the second *mesón* in which Mr. Umaña grew up, by the bypass, is a tire shop owned by Luis Martir Monroy. Appx. 7. Martir's family has always owned the *mesón* and the tire shop. He was available and willing to talk to post-conviction counsel, and described Mr. Umaña as a neglected child, raised by a man who had a horrible temper and was a drug addict and dealer.

None of these readily available neighbors was contacted by any member of Mr. Umaña's defense team prior to trial. Had they been contacted, they would have been willing to share what they witnessed with the defense, to testify to the matters described above, and to introduce the defense team to family members other than Rafael.

       *c.*    *Other Family Members.*

Several neighbors and Mr. Umaña's mother, Leticia Ramirez, continue to have contact with the Umaña family and would have been willing to put the defense team in contact with them. Had counsel done an adequate investigation they would have been able to talk to several members of his family who could have described multigenerational trauma as well as Mr. Umaña's impaired functioning and childhood rife with poverty, abuse, neglect, and loss. All of

24

these witnesses, and more, were available prior to trial and would have been willing to speak to the defense team. These witnesses include:[8]

- Mr. Umaña's paternal grandmother, Ana Ruth Umaña Gonzalez, who has been selling candies on the street at the corner of Avenida Independencia and 4a Calle Poniente in the center of Santa Ana for the past 20 years. Ana provided the post-conviction team with a generational history of poverty, hunger, abandonment, and violence. Contrary to the evidence reported by Rafael and presented at trial, she did not take responsibility in helping raise Mr. Umaña. Appx. 16.

- Paternal Aunt Reina Umaña provided the post-conviction team with relevant information regarding Mr. Umaña's intellectual deficits, including the fact that although her son, Geovanni, was born the same year as Mr. Umaña, he was several years ahead of him in school because Mr. Umaña repeated grades often. Appx. 19.

- Paternal Aunt Rosa Lilian Umaña Gonzalez described for post-conviction counsel Mr. Umaña's complete sense of bereavement and abandonment after her mother Francisca, Mr. Umaña's great-grandmother, passed away. Appx. 21.

- Paternal Cousin Lilian Tino, lived in the Danubio Azul at the same time as Mr. Umaña, she explained that while the Umaña family was very poor, Mr. Umaña was worse off because, after Francisca passed away, he had nothing. Appx. 15.

- Paternal Cousin Ronal Umaña, who now lives in Los Angeles, lived in the same room with Mr. Umaña in both the Danubio Azul and bypass *mesónes*, and described the abuse and neglect to which Mr. Umaña had been subjected, as well as the abuse Rafael had subjected Mr. Umaña's mother to. He, too, explained how devastating Francisca's death was to Mr. Umaña. Appx. 20.

---

[8] Significantly, and as will be discussed more fully in the discussion of the prejudice prong of this claim below, the accounts given by all of these witnesses would have dramatically changed the picture of Mr. Umaña's childhood from that given by Rafael, and provided a far more compelling case in mitigation.

25

- Paternal Aunt Maria del Carmen Umaña Gonzalez, who now resides in Anaheim, described the her father was an alcoholic who died young from an alcohol related illness. Appx. 17.

- Maternal grandfather Jose Alfredo Ortiz, described his own maternal abandonment and maltreatment. He described that his son Saul was killed as a teenager by the death squads during the civil war and his own alcoholism. Appx. 9.

Trial counsel's failure to talk to these and other readily available and willing witnesses constituted deficient performance.

### C. Trial counsel failed to adequately prepare and present the little information that they did obtain during their mitigation investigation.

Even with the little information that trial counsel was able to find, they failed to adequately interview witnesses and present mitigating evidence.

A video interview of Monica Reyes, Mr. Umaña's girlfriend in El Salvador, and mother of his first child, was presented at trial. Def. Exh. 27. The interview, however, was superficial, describing a young boyfriend-girlfriend relationship. Monica explained that she became pregnant at 16 and that Mr. Umaña helped her financially, but left her soon after the birth of their son to come to the United States. *Id.* For many, such a story might be seen as a sign of Mr. Umaña's failure to take responsibility for his family, rather than as mitigation.

Monica Reyes could have provided real mitigation, however. She could have described the extreme level of poverty in which Mr. Umaña lived at that time, the abuse he suffered, the signs and symptoms of his mental illness he was displaying at the time (seeing and hearing demons, for example), and of his clear intellectual deficiencies – all of which she described to post-conviction counsel and was willing to describe to trial counsel, had they inquired. Appx. 12.

26

She explained, for example, that at the time she knew Mr. Umaña, he was living in a tiny room with at least 10 men where only one bed fit. *Id.* Although she was very poor and barely had food to eat herself, Mr. Umaña had even less, so she gave him rice and beans when she could.

She described Mr. Umaña as unable to learn. *Id.* Although she was younger than him, she tried to teach him to read and write, but he was never any good at it.

Monica witnessed Mr. Umaña seeing things that no one else could see. She stated he "would tell me he saw demons and that they talked to him. I would make fun of him and tell him he was crazy because he had fallen out of a mango tree." *Id*. at ¶13.

Of equal significance, Monica provided the post-conviction team with her son's February 2004 certification of birth that shows that Mr. Umaña was born in Guatemala in 1982. She was able to explain to post-conviction counsel that Mr. Umaña had not been able to register their son's birth initially because he did not have a Salvadoran identification, which was why he had gotten a supplemental birth certificate – to enable him to get the identification card. This would not have only provided context for Mr. Umaña getting a supplemental birth certificate but would have also put counsel on notice that he was born in Guatemala in 1982.[9]

---

[9] The fact that Mr. Umaña was two years older than the trial team realized was important for several reasons, chief among them that his age had real implications in the context of demonstrating his intellectual and adaptive deficits for purposes of proving his intellectual disability. For example, although the trial investigator interviewed a current principal at Centro Escolar Santa Ana California, where Mr. Umaña went to school as a child, about his school records, the principal answered the investigator's questions under the mistaken belief that Mr. Umaña was two years younger than he actually had been when he repeatedly failed to pass the third grade.

27

i. <u>Trial counsel failed to adequately investigate Mr. Umaña's place and year of birth.</u>

Even without contacting any of the above witnesses, many of whom knew that Mr. Umaña was born in Guatemala in 1982, trial counsel knew, or should have known, of this fact. Documents provided to them in discovery suggested Mr. Umaña was born in Guatemala in 1982. Appx. 46 at 4; Appx. 47 at 146 (PNC AU background); Appx. 36 at 2.

Aside from speaking to several of the above lay witnesses, trial counsel could have, but did not, seek the assistance of the Guatemalan Government to confirm the details of Mr. Umaña's birth, which were readily available. Post-conviction counsel received a certified copy of Mr. Umaña's registration of birth in Guatemala on November 25, 1982, leaving no doubt as to where and when he was born. Appx. 43.

Failing to confirm the date and place of Mr. Umaña's birth, given the clues counsel had that existing information about his birth was inaccurate, constituted deficient performance. Given that counsel believed Mr. Umaña was intellectually disabled and intended to (and did) put on an *Atkins* hearing, the failure to track down his actual date of birth was highly prejudicial.

ii. <u>Trial counsel failed to collect readily available records.</u>

Trial counsel's failure to collect readily available records relating to Mr. Umaña's life and childhood constituted deficient performance. Records prepared contemporaneously

---

Post-conviction counsel was then able to go back and speak to a teacher, Ana Gladys Magaña, who has been at the school since Mr. Umaña was there. Appx. 6.  Viewing his school records knowing that he was actually two years older, Magaña was able to explain how highly unusual it was that Mr. Umaña had failed at that age. As Magaña pointed out, it would also have been an embarrassing situation for a 12-year-old child to be trying and failing third grade, surrounded by much younger children.

28

with the events they document typically provide the best, surest, and least questionable means of demonstrating facts. Such documents also often contain information and clues as to other information a defense team will want to pursue.

Some of the many documents trial counsel failed to obtain prior to trial included:

- Mr. Umaña's Guatemalan Registration of Birth (Appx. 43);

- Death records for Great-grandmother Tomasa Gonzalez Chicas (Francisca) that showed she died in 1991 from stomach cancer (Appx. 33);

- Death record of maternal uncle Saul Ramirez that showed he died from bullet wounds at age 14 (Appx. 34);

- Death records of paternal uncle Alejandro Antonio Umaña Cortez (Appx. 35);

- Death record of paternal cousin Henri Geovanni Ayala Umaña (Appx. 32);

- School records of Henry Geovanni Ayala Umaña who was born the same year as Mr. Umaña but was three years ahead of him in the same school (Appx. 30).

Each of these records would have provided information that could have been used in its own right as mitigation at trial. Each of these records would also have opened up a vein of inquiry that would have led to additional mitigating evidence.

**D. Trial counsel failed to file specific, formal discovery requests relating to the Government interviews of Mr. Umaña's family, failed to seek mitigating evidence and information about the whereabouts of potential mitigation witnesses, and failed to use the little they learned from the Government as the impetus to renew and enlarge their own search for mitigating evidence.**

On June 14, 2008, days before the federal indictment was issued, the Government had in its possession Mr. Umaña's birth certificate stating he was born in Guatemala in 1982. Appx. 44;

29

Appx's 46, 47. The prosecutors and the FBI agents involved in the case went to El Salvador in February of 2009 and interviewed Mr. Umaña's mother, Leticia Ramirez, and attempted to interview his father, Rafael. Appx. 48. The Government waited until the eve of trial to produce this information. Specifically, on March 9, 2010, days before jury selection, the Government produced an FBI 302 only stating that they had spoken to Mr. Umaña's mother. *Id*. On April 19, 2010, during trial, the prosecution produced Mr. Umaña's Guatemalan birth certificate and a brief narrative describing the family's move to Guatemala and Rafael's use of false identification to register Mr. Umaña's birth. Appx. 44.

Although counsel knew, or should have known, in advance of trial that the Government had information in its possession that would have assisted the mitigation, they failed to make a specific request for discovery. Trial counsel learned that the prosecution was already conducting their own investigation into Mr. Umaña's life history in El Salvador, sending FBI agents and local police to interview Mr. Umaña's family. ECF Doc. No. 689-1. Trial counsel was aware the FBI had interviewed Mr. Umaña's mother. Even after advising the Court of the interview with the mother and contact with the father, trial counsel did not file a specific discovery motion requesting this information. ECF Doc. No. 689.

Moreover, during the November 30, 2009 *Atkins* hearing, trial counsel suspected that the Government had mitigating evidence regarding Mr. Umaña's family. Specifically, during a break, a prosecutor looked at a picture of Mr. Umaña's father and told trial counsel that the father was a drug dealer. Appx. 49. On December 17, 2009, Counsel emailed the prosecution and asked about this:

30

> [The AUSA] told me that our client's father was a drug dealer in El Salvador. We have not come across any indication of this in our review of discovery. We believe that such information in possession of the Government must be disclosed to the defense as it is potentially mitigating for the sentencing phase. For example, if our client was raised in an environment where his father was dealing drugs or was made to participate in same, this would be mitigating.
>
> The court's discovery order would require disclosure of such information to the defense as it would be "favorable to the accused and material either to guilt or to punishment". Therefore, we request disclosure of any material possessed by or known to the Government tending to show that Defendant's father is or was a drug dealer or was otherwise involved in criminal activity.

*Id*.

In response, one prosecutor stated that she did not "know that we have any evidence of such, more or less talk," but she did know that the father sold trinkets in the center of town and that Mr. Umaña's brother was in prison. *Id*.   Another prosecutor responded that it "was rumored that he had sold drugs and that is the full extent of my knowledge on the subject. You have all discovery and reports that would shed any light on the subject." *Id*.   Despite the Government claiming these were rumors, trial counsel should have filed a specific discovery motion to ensure they had all available documents in the Government's possession and all the information the Government had obtained.

Equally importantly, once the defense team had reason to believe that the Government had located Mr. Umaña's mother and spoken to her; had discovered that Mr. Umaña had been born in 1982 in Guatemala; had raised the specter that Rafael was a drug dealer; and that Mr. Umaña had a brother in prison in El Salvador; the team had a duty to pursue these leads further, and performed deficiently when it failed to do so.   Given that much of this information appeared to undermine Rafael's credibility, the team performed deficiently when it failed to search for additional witnesses who might be able to corroborate or provide a more accurate picture of

31

Mr. Umaña's life than the one Rafael had painted.[10]

E  Trial Counsel's Failure to Adequately Investigate and present abundant, readily available mitigating evidence resulted in prejudice.

   i  *The contrast between the mitigation case the defense did put on and the mitigation case the defense could have put on was stark.*

      a.  The mitigation evidence presented at trial.

During the penalty phase of trial, the defense put on both lay and expert witnesses. The lay testimony consisted of video-recorded interviews of four witnesses. None of them was able to report about Mr. Umaña's daily life until he was about 15 years of age. The trial team mitigation specialist, Richard McGough, also testified. Because Mr. Umaña's father, Rafael, had refused to testify in person at trial or to provide a video-recorded interview, Mr. McGough testified to the information he had learned from Rafael.

Accordingly, the narrative the jury heard about Mr. Umaña's life from birth through the age of about 15 consisted only of the accounts Rafael had provided. See Appx. 36. At ¶4. These were conveyed to the jury by mitigation specialist.

Mr. McGough testified, based on what he had "learned" from Rafael, that Mr. Umaña was born in 1984 in El Salvador. He provided no details about Leticia's physical condition, drug use while pregnant, prenatal nutrition or care, or any of the circumstances of the baby's delivery. He provided no information about the care Mr. Umaña received in the first months after birth.

McGough described the fact that (according to Rafael), Leticia abandoned Rafael and

---

[10] Although the Government knew information about Mr. Umaña's birth, they made no attempt to correct false information presented and relied upon during the *Atkins* hearing and during Mr. Umaña's penalty phase of trial. *See* Claim VII.

32

Mr. Umaña, choosing to raise her other child by Rafael (Saul), but not young Mr. Umaña. According to this account, Rafael had cared for Mr. Umaña and had also ensured that Mr. Umaña had mother-like figures in his life, like Rafael's own grandmother, Francisca, and after her death, other close female relatives. (The latter was not true, according to these female relatives who were later interviewed by post-conviction and confirmed Mr. Umaña was not cared for by any other family member).

Relying on Rafael's descriptions, Mr. McGough told the jury that during Mr. Umaña's childhood, his father owned a small store, but he had been raised in poor conditions, describing those conditions as having been much like the conditions of other people around them.

Relying on Rafael's descriptions, Mr. McGough testified that Mr. Umaña was scared as a child because of the ongoing civil war in El Salvador, because Mr. Umaña had seen a dead body, and because Rafael insisted on locking everyone in his family into their room in the evening to keep them all protected.

Relying on Rafael's descriptions, Mr. McGough testified that Mr. Umaña had suffered two head injuries and that Rafael remembered running to the hospital next door with Mr. Umaña in his arms, and that Mr. Umaña had required stitches and that, after the fall, Mr. Umaña began having very bad headaches. He provided no additional details.

This was the sum and substance of the personal account of Mr. Umaña's entire childhood.

The remaining mitigation witnesses, whose testimony was presented in the form of video-taped interviews, testified that Mr. Umaña had worked diligently as an assistant to Coca Cola delivery men, for a few dollars a week, and later had worked on a construction project,

33

helping to build foundations for cell towers.   Two witnesses, with whom Mr. Umaña lived while working on the cell-tower project, described him as being generous and respectful.

As noted earlier, the video interview with Mr. Umaña's first girlfriend, Monica, focused on the fact that Mr. Umaña and she had been adolescent boyfriend and girlfriend, that she had become pregnant with their child, that he had helped her financially for a period of time, but had then left for the United States and had left her and their child behind.

> ### b.    *The case in mitigation the defense could have put on.*[11]
>
> 1.  In utero development, exposure to physiological assaults, difficult birth, loss of mother, and early exposure to familial violence.

At trial, no witness provided any mitigating evidence about problems that might have affected Mr. Umaña's in utero or early infancy development.   Leticia, and other family members, could have provided the following account of this period of his life:

In 1982, at the time of her pregnancy with Mr. Umaña, his mother, Leticia, was living a life of destitution with Rafael and other members of the Umaña family, in Guatemala. Appx. 10.

---

[11] The mitigation evidence presented below is drawn from the declarations attached Appx.   1-35 including of:   Leticia Ramirez Diaz (Mr. Umaña's mother) – Appx. 10; Saul Osvaldo Umaña (brother) – Appx. 22; Ronal Umaña (paternal cousin– Appx. 20; Zoila Olana (former neighbor) – Appx. 8; Monica Tatiana Reyes (former girlfriend) – Appx. 12; Melvin Cruz Torres (former neighbor) – Appx. 2; Lilian Tino (paternal cousin) – Appx. 15; Ana Julia Magaña de Sanabria (educator)– Appx. 13; Vilma Araceli Salazar de Argueta (former neighbor) – Appx. 1; Rosa Lilian Umaña Gonzalez (paternal aunt) – Appx. 21; Vilma Elizabeth Torres de Cruz (former neighbor) – Appx. 4; and Roxanna Torres Cruz (former neighbor) – Appx. 3. What follows is the case that could have been put on through lay witnesses.   All of this information could also have been used to great advantage to inform the opinions of the *Atkins* and other experts, who could have explained how this compelling life history would have had significant consequences for Mr. Umaña's later mental health. See Claim III, infra.

34

Rafael, then her common-law-husband, beat her at least once a week. *Id.* at ¶ 46.  He took her to the train tracks or nearby fields for the beatings and punched her so much in the face, she looked like a monster.  At Rafael's insistence, she began to prostitute herself during her pregnancy.  *Id.* at ¶ 44. She traveled with Rafael's aunt and mother to Guatemala City, where the aunt found a private house so men could meet them there. Leticia gave all the money she earned to Rafael.

Rafael would not countenance Leticia complaining, even when he brought other women home and had sex with them in front of her. *Id.* at ¶45. If she protested, he yelled and beat her. Rafael kept her drugged much of the time on Rohypnol (date rape) pills. Leticia believed he liked her to be helpless and drugged.

She smoked marijuana regularly. She got to the point where she could not do anything without smoking it – even washing clothes. *Id.* at ¶48. Leticia was constantly hungry, and went hungry during her pregnancy. She ate anything she could find – green bananas from the nearby fields, little fish out of the pond, and cauliflower leaves she gathered in the market. *Id.* at ¶51.

Around the time she became pregnant with Mr. Umaña, she contracted malaria, became very sick, and had a high fever for days. *Id.* at ¶41. She also tried to commit suicide. She was so desperate to get away from Rafael that suicide seemed her only option. After writing on the back of a photograph that someone please tell her mother, she swallowed a poison called *Gamexane*, a type of insecticide, hoping it would kill her, but instead she was taken to the hospital, and her stomach was pumped. Appx. 40.

35

During her pregnancy with Mr. Umaña, Leticia reports having gone through great hardship, anxiety, sadness, and hunger. Appx. 10 at ¶52. After being kicked out of the home by Rafael's family, for several nights she slept on top of a grave in the cemetery. *Id.* at ¶43.

At the time of Mr. Umaña's birth, he was in breach position, head up instead of down. Leticia did not agree to delivery by Cesarean section, so the hospital staff squeezed her abdomen to try and change his position. *Id.* at ¶52-53. He was nevertheless born feet first. Leticia recalls that Mr. Umaña had swallowed liquid in the birth canal that had to be removed with a suction bulb.

Leticia was 18 years old when Mr. Umaña was born. *Id*. at ¶ 53. She breastfed him for only five days, after which Rafael's relatives did not permit her to continue and made her spill her breast milk on the ground rather than saving it for the baby. Instead, Mr. Umaña was fed water mixed with sugar. Appx. 15.

At the age of three months, Mr. Umaña developed a skin condition. Appx. 10 at ¶56. He broke out in red blotches which kept getting bigger until all his skin had turned red. He looked skinned and raw. Leticia took him to the hospital where they took samples of his skin, but when they failed to provide her with any explanation or treatment, she took him to a woman who instead told her the baby had the evil eye. The woman gave her some herbs to bathe Mr. Umaña in, and he eventually improved, but his recovery took months.

During her pregnancy with Mr. Umaña and while he was a baby, they lived in a place Leticia described as "horrible," "dark and scary." *Id.* at ¶ 58. It was a small room, and she and the baby slept in a back partitioned area of the room. The bathroom was outside; there was no

36

running water or electricity, just a ravine next to the building through which a river ran, and a well behind the house.

According to Leticia, Rafael expelled Leticia from the family home when Mr. Umaña was eight months old. *Id.* at ¶ 61. Rafael forbade her from taking young Mr. Umaña with her and says she complied out of sheer terror. Initially, Rafael occasionally brought the baby around to see Leticia, who was pregnant with their second child. After several months, however, Rafael informed her that he would not bring Mr. Umaña around anymore. When she begged Rafael to let her see Mr. Umaña, he would not let her and would instead beat her.

In Leticia's absence, Mr. Umaña was raised by Rafael's elderly maternal grandmother (Mr. Umaña's great grandmother), Tomasa Gonzalez Chicas ("Francisca"). Appx's 10, 18, 20. Mr. Umaña's cousin, Ronal, who was eight years older than him, also lived with them. Appx. 20. Thus, the household, all living in a single room, now consisted of Rafael, Francisca, Ronal, and young Mr. Umaña. Francisca seems to have done her best to take care of her two great grandchildren, but they rarely had enough money for food. When he was an infant, Mr. Umaña was fed mixtures of sugar and water, rice and water, and occasionally, a mixture of flours. Appx. 15.

While still refusing to allow Leticia access to Mr. Umaña, Rafael nevertheless often sought her out when he needed money, bringing Mr. Umaña along. Appx. 20 at ¶20. If Leticia hesitated or refused to give him money, Rafael hit her in the face with closed fists until she relented. Cousin Ronal was present when this happened and recalled the look of terror on Mr. Umaña's face as he tried to shield himself from witnessing these violent beatings. Ronal recalls Mr. Umaña burying his face in his hands, repeating over and over that he did not want to see this.

37

This was powerful mitigation in its own right which would likely have evoked the sympathies of jurors as they came to understand Mr. Umaña's introduction into life.

Armed with this information, trial counsel could also have enlisted the aid of pre- and perinatal experts to explain the likely physical effects of physiological assaults Mr. Umaña suffered in utero and as a young child, and of the emotional and cognitive effects of believing he had been abandoned by his mother, and seeing his father punch her in the face while he watched.

### 2.   Conditions of Poverty

The trial mitigation specialist presented a superficial view of the conditions of poverty in which Mr. Umaña spent his early years, based on Rafael's representations. However, a fuller, detailed account, as described by other family members and neighbors, provides a much more detailed and mitigated story:

The Umaña family left Escuintla, Guatemala to return to Santa Ana, El Salvador around 1985, when Mr. Umaña was about three or four years old. Appx. 10 at ¶ 63; Appx. 8 at ¶3.   At this time, the civil war was still raging in El Salvador and did not officially end for another seven years.   The family reunited with other family members who lived in one of the poorest areas in Santa Ana, in the Danubio Azul *mesón.* Appx's 15, 8. This *mesón* was next to the hospital and the train tracks. Danubio Azul was known for being more run down than any of the other *mesónes* in Santa Ana.   Only poor people live in *mesónes*, and the poorest of the poor lived in Danubio Azul. Appx. 15 at ¶6; Appx. 13 at ¶7-8.

This *mesón* was big, talking up almost an entire block. Danubio Azul contained close to 20 single rooms. Appx's 13, 20. Each room was generally occupied by an entire family. The rooms had roofs made out of sheet metal, adobe walls, and dirt floors, and there was one

38

communal shower and toilet for all the residents to share. Appx. 15 at ¶6. The *mesón* in which the Umañas lived was tiny, dark, damp, decrepit, and infested with rats. Appx. 20 at ¶9. The common area contained a basin where the families did their washing, and metal drums which were used as stoves for cooking food. Some people simply cooked their food over firewood on the ground. Appx. 13. Rooms facing the front of the street were slightly bigger and in better condition than those facing the back, thus costing a bit more. Appx. 8 at ¶4-5. But the Mr. Umaña and his entire family lived in the smallest, most run down, and cheapest rooms located in the back. Aunts Dora, Reina, and Lilian lived in the small rooms near Mr. Umaña.[12]

Mr. Umaña, Rafael, Francisca, and Ronal lived together in one room in the *mesón*. There was little space, so Francisca shared the same bed with Mr. Umaña and Ronal. Appx. 15. The roofs were riddled with holes, and when it rained, the rooms flooded, and the walls started to sink and crumble. Appx. 20. The wall in Mr. Umaña's room began to sink and crumble, and with each rain it got worse. One day the wall completely came crashing down, nearly crushing Ronal. Appx. 20.

Even other poor people looked down on the people who lived in *mesónes*, and many avoided that particular *mesón*. Appx. 14. The Umaña family was part of the lowest class, and neighboring families did not allow their children to play with the Umaña children or any of the children from that *mesón*. *Id.*; Appx. 13.

---

[12] Their monthly rent was about 30 *colones* (one US dollar is currently equivalent to $8.75 *colones*) a month.

Francisca was already elderly and frail when the family moved to the Danubio Azul *mesón*. Appx. 8. Neighbors noticed that Francisca was very ill, unable to speak, and bed-ridden. During this period of time, Rafael completely neglected Mr. Umaña. Francisca's daughter, Carmen, who had moved to the United States, sent small sums of money to her. Appx. 15. When Francisca had any money, she bought the two boys little packages of rice pudding. Appx. 20 Often this was all the boys ate for an entire day. *Id.*.

Mr. Umaña and his family eventually moved from the dilapidated *mesón* Danubio Azul. Mr. Umaña, Rafael, Francisca, and Ronal moved into another *mesón* in Santa Ana located on Final 25th Calle Oriente. Appx. 4. Soon, other members of the Umaña family rented out rooms in the same *mesón*. Mr. Umaña and his family lived in a room that faced the street. They shared a space that was approximately eight by eight meters; it had a dirt floor, two beds, and a table. Rafael kept and bred large numbers of rabbits in the room in which the family lived. Appx. 2 at ¶6-7. He also trapped pigeons and kept chickens in a cage in the corner of the room. The animal excrement covered the floor, filling their small room with a strong, fetid odor.

Although this *mesón* was considered slightly better than the Danubio Azul *mesón*, this was still a place where the poorest people lived. Like the previous *mesón*, many families were packed into single rooms and shared common spaces. According to neighbors, however, even with their level of poverty and hunger, the Umaña family stood out because of the chaotic relationship – especially Mr. Umaña, because Rafael withheld what little food they had from him. Appx's 1-5, 15.

Mr. Umaña and other children in the *mesón* often took to the streets in search of food. Appx. 2. They made slingshots to try and kill small animals, like iguanas, possums, and

40

turtledoves. When they killed one of these tiny animals, they felt fortunate to have a little food to share with their families. *Id.* But many times, Mr. Umaña went without anything. He became so desperate that he asked his neighbors if they could spare some beans or rice. *Id.*; Appx. 4.

Ronal worked for a time at a nearby slaughterhouse. Appx. 20. The bosses and other employees were aware of how poor he was and took pity on Ronal and his family. Ronal's bosses allowed him to take home parts of the animal that did not sell; Ronal took various parts of the cows innards home to his grandmother to cook. Rafael did not contribute financially to his family. When Mr. Umaña was young, Rafael mostly lived off the support his great-grandmother Francisca received from her daughter Carmen, who lived in the United States. Appx. 15.

Descriptions of this extreme level of poverty provided a very different picture of the circumstances in which Mr. Umaña spent his first eight years than the rosier picture Rafael had painted, failing as he did to mention that their homes were crowded, crumbling structures, that their living quarters were filled with animal excrement, and that Mr. Umaña never had adequate food. A jury would almost certainly have found this evidence, which comes from multiple sources close to the situation, credible, humanizing, and mitigating.

Moreover, if this evidence had been supplied to experts in childhood health, development, and trauma, they could have placed the evidence in the context of what it meant for Mr. Umaña's physical, emotional, cognitive and social development, to grow up in circumstances of this sort. This, too, would have aided the jury in understanding Mr. Umaña's later actions.

41

3.   Loss of Francisca, his protector and second mother figure.

At trial, defense counsel presented testimony through their mitigation specialist, indicating that Mr. Umaña had had a close relationship with his great-grandmother, who died when he was about seven or eight years old. Because the details of this relationship between Mr. Umaña and Francisca were supplied only by Rafael, the trial account missed significant mitigating details about the critical role Francisca had played in Mr. Umaña's life, serving not just as a mother-figure but as his protector against Rafael himself, who was a cruel caretaker (see subsection iv, infra) and who did little to ensure that Mr. Umaña was fed, clothed, or otherwise cared for.   Other witnesses could have explained much more than was provided at trial.

For example, when Mr. Umaña was around eight years old, Francisca fell ill and was bedridden for many months before her death. Appx. 18. He and Ronal continued to sleep with Francisca despite her failing health. Appx. 20. The two boys cared for her as best they could, even though they were only children. *Id.* Ronal washed Francisca, emptied her bedpan when she could no longer walk, and tried to feed her. Francisca's abdomen became enlarged and swollen, and she looked neglected.   Appx. 22.   None of the adults cared for Francisca, even though her daughter, Rafael's mother, Ana had to walk through their room of the *mesón* on the way to hers. Appx. 20.

One night in 1991, when Mr. Umaña was nine years old, he was not allowed to sleep with Francisca; the next morning she died. Appx. 20. Ronal describes that Mr. Umaña wailed and threw himself on Francisca's dead body. Appx. 15. Both boys were devastated by the loss. Appx. 20.

42

Francisca's cause of death is listed on her death certificate as stomach cancer. Appx. 33. Francisca may also have had some kind of parasites. Ronal recalled seeing large worms moving in the back of her legs. Appx. 20. Ronal pulled the worms out and was convinced that this was the result of *mal de ojo*, the evil eye. The Umaña family members believed that Mr. Umaña's mother, Leticia, was responsible for Francisca's death, convinced that Leticia attempted to put a curse on Rafael, but that because Francisca was so frail, the curse went into her. *Id.*

After Francisca's death, no one cared for Mr. Umaña, even though members of Rafael's family lived in the same *mesón*. Appx's 1, 4, 5. According to his aunt, Lilian, "Alejandro was left alone, disoriented, and neglected. From then on, Alex was left defenseless, without a stable place to stay." Appx. 21 at ¶14. Soon after Francisca's passing, Ronal left for the United States. Ronal knew a future in Santa Ana without his grandmother was bleak, and his only chance at survival was to immigrate to the United States where his Aunt Carmen already resided. Appx. 20. Ronal believed he would die of starvation and neglect without Francisca's help. Ronal and Mr. Umaña were raised like brothers by Francisca. When she died and Ronal left for the United States, Mr. Umaña was left alone with Rafael.

Once Francisca died and Ronal left, Mr. Umaña was completely on his own. He essentially lived off the land. He ate what he could catch, pick, or find himself. He went through garbage looking for plastic to give to others to be used as firewood. Appx. 15. Mr. Umaña and his older cousin Lilian did whatever they could to earn a little money. They sold water and cold drinks at soccer games and buckets of water at the cemetery for people who wanted to wash their loved ones' graves for five cents. They asked neighbors if they if they needed help taking their trash out. *Id.*

43

Mr. Umaña did not have money to buy clothes and often went shirtless, with shorts so big that he tied a rope around them so they did not fall off. Appx. 15. His clothes were filthy and in desperate need of washing. Appx. 3. When he was able to find shoes in the trash, they typically had large holes, and his toes stuck out of the front. Appx. 15.

Mr. Umaña's cousins and neighbors teased him because of the way he looked. He had long, matted, unkempt hair typically covered in lice. Too poor to buy the medication to get rid of his lice, Mr. Umaña and his friends taught themselves how to pick off the bugs with combs. Appx. 2. But the bugs always came back. Appx. 20. His teeth did not come in correctly; they were separated and pointy teeth stained with "permanent grime." Appx. 2 at ¶ 13. A neighbor recalled his front teeth were missing, and his remaining teeth were "rotten and broken." Appx. 3 at ¶ 11. Neighbors and family called Mr. Umaña *Peluca* (wig) and *vanpirin* (little vampire) because of his crazy hair and bizarre looking teeth. Appx's 1-4, 8, 20.

There is a reasonable probability that at least one juror would have found mitigating the deep sense of loss Mr. Umaña experienced at this young age, particularly in light of the fact that no one stepped in to help this eight-year-old cope with the loss of his protector and sole source of comfort *and food*. While the bare story of losing his great-grandmother that was conveyed at trial likely only reminded the jurors that Mr. Umaña's victims left behind bereaved children, and may have evoked scorn rather than sympathy, this fuller understanding of his loss would have been quite different.

Here, too, these details, in the hands of mental-health experts, could have provided a credible basis for the explanation as to why Mr. Umaña eventually sought protection and survival by joining in a gang.

<div align="center">44</div>

Rafael was described at trial in terms that suggested he was a caring, protective father. This was far from the truth. The rich, detailed, and very different account family and neighborhood witnesses could have told is tragic, and much more highly mitigating. It provides not just a more accurate and painful sense of what Mr. Umaña actually experienced during his childhood, but also provides further bases for understanding why Mr. Umaña may have joined MS-13.

Once Ronal and Francisca were no longer around to protect and help Mr. Umaña, Rafael treated him in sadistic and abusive ways. Rafael beat Mr. Umaña with his hands, a belt, and a switch. Neighbors report having listened helplessly to the sounds of the lashes and Mr. Umaña's screams. Appx. 3. His cousin witnessed the beatings and said that he was beaten for anything – not coming home on time, getting wet in the rain, being dirty. Appx. 15. Rafael beat him as if he were a grown man, hitting with closed fists, and leaving him bloody with bruises all over his body. Appx. 22.

Rafael had additional ways of torturing Mr. Umaña. One tactic was to deprive him of food. Sometimes Rafael ate openly in front of his son without offering him any. Other times, Rafael did not allow him inside the room while Rafael was eating. Appx. 15.

When Rafael was not beating Mr. Umaña, he treated him like a nuisance or ignored him. Appx. 1 at ¶ 1; Appx. 4 at ¶ 12; Appx. 22 at ¶ 22. Neighbors describe how Rafael was more interested in getting drunk and smoking marijuana than caring for his son. Appx. 7. A neighbor described Mr. Umaña as a "forgotten child." Appx. 4 at ¶ 24. After Mr. Umaña stopped attending school (when he was 12), a neighbor in the *mesón* often saw Mr. Umaña alone roaming the

45

streets without anyone paying attention to him. He was completely without guidance. Upset with the way Rafael neglected his son, this neighbor told Rafael that his son needed to be in school; Rafael simply brushed him and his comments off. Mr. Umaña had no caretaker and no protector. Appx. 7.

A young teenager named Yanira who lived in the *mesón* moved in with Rafael and Mr. Umaña. She and Rafael, who was in his 30s at the time, began a romantic relationship. Appx. 3. Despite just being a few years older than Mr. Umaña, she was also abusive to him and set him up to get in trouble with his father. *Id.*

Rafael used the front part of their small room in the *mesón* to operate a little store. During the penalty phase of trial, the Government talked about this store and gave the false impression that Mr. Umaña had access to food because his father was a business owner. In actuality, the store was a partitioned area off their small room. Rafael sold small items like candy, rice, and beverages. Appx's 1, 2, 4, 15. Mr. Umaña was not allowed to touch any items in his father's store. He was beaten if anything was missing. Yanira, who was also hungry and used items from the store to feed her siblings who also lived in the *meson*, frequently blamed Mr. Umaña when she was the one who took food from the store. Appx's 4, 5. Neighbors heard Rafael screaming at him for stealing from his store. Appx's 1-4.

Mr. Umaña wet the bed until he was almost 12 years old. Appx. 15 at ¶ 11. When Francisca was alive and able, she hid Mr. Umaña's soiled beds from Rafael. But without his protector, Rafael humiliated and beat his son for wetting the bed. The scapegoating to which Yanira subjected Mr. Umaña was a far cry from the normal tensions between a brother and sister,

46

as Rafael had euphemistically described the relationship to the trial team and the trial team presented to the jury.

Rafael was well known in the community as a violent and unpredictable man. He drank with friends, sold drugs, started fights and threatened neighbors. Witnesses report that he was loud, offensive and many feared his erratic behaviors. His neighbors did their best to avoid him. Appx's 1, 2, 8.   Rafael sold drugs out of his room even with Mr. Umaña present. Drugs and guns were often in plain view on the bed. Appx. 22.   Rafael's temper, drinking, and inability to pay the rent became so out of hand that the owner of the *mesón* finally kicked him out. Appx's 2, 4, 7.

Mr. Umaña, by then a young teenager, went to live with his grandmother Ana in her room at the *mesón*.   But she did not provide for him, preferring to look after her alcoholic adult son and his baby daughter. Appx. 2.   Ana and Mr. Umaña eventually both left the *mesón*, and Mr. Umaña was once again left entirely to fend for himself. Appx's 4, 5.

Witnesses report that life in El Salvador was bleak for many, and jobs were scarce, especially for young men. Appx. 7.   Mr. Umaña and his brother Saul, who had been raised by Leticia, worked as assistants for Coca Cola drivers.   They had to take a bus early in the morning and wait to see if a driver would pick them up to work for the day. When there was work, they earned very little. If they worked long hours, six days a week, they could earn up to three or four US dollars. Appx. 22.   However, there was no formal contract for the work, and the amount of payment was up to each driver; so sometimes they were paid even less than the three or four dollars a week. *Id.*

47

As learned through post-conviction investigation, on November 1, 2001, El Salvador enacted a policy making it mandatory for every adult citizen, 18 years of age and older, to obtain a personal identification card, known as the *Documento Unico de Identidad*, or DUI. *Changes to and Implementation of the Sole Identity Document (Documento Unico de Identidad, DUI)*, July 10, 2008, https:www.justice.gov/sites/default/files/eoir/legacy/2013/11/07/slv102871.E.pdf (Last Visited on June 21, 2016). To obtain a DUI, one had to submit an original birth certificate, Cedula de Identidad Personal (the former personal identity card used in El Salvador), electoral card, driver's license, and/or passport. *Id*. Having a DUI was a requirement to obtain legitimate employment, conduct business, get married or divorced, obtain a passport, and vote in elections. *Id.* Without the DUI, little could be done in any public sphere. Once Mr. Umaña reached his 18th birthday, he could not get a DUI because he did not have a birth certificate. Appx. 10 at ¶ 78. Mr. Umaña had been born in Guatemala, and his parents had never registered him as a Salvadoran citizen when they returned to Santa Ana. As a result, he could no longer obtain work because employers would not hire someone without a DUI. Appx's 10, 22.

Because Mr. Umaña needed his parents' assistance to get the necessary documentation, Mr. Umaña was unable to obtain this identification card until 2004, after obtaining a birth certificate that stated he was born in El Salvador.

Between 2001 and 2004, without his DUI, Mr. Umaña had trouble obtaining work. As video witnesses at his trial explained, Mr. Umaña found work in construction for a man hired to install telephone towers. Mr. Umaña worked with this man and his son in Metalio, Sonsonate, approximately 60 kilometers from Santa Ana. During the weekends, most of the workers went home to their families, but Mr. Umaña had nowhere to go. A family who lived nearby befriended

48

Mr. Umaña and allowed him to sleep on a hammock outside of their home. They had little means, but Mr. Umaña was so kind and gentle that the family came to adore him. Appx. 36; Def. Ex. 23-24. But after the work project was complete, Mr. Umaña returned to Santa Ana.

Homeless, without money, and with no support from his family, Alejandro joined the gang Mara Salvatrucha when he was 19 years old. Appx's 2, 5. Impaired, and destitute, this seemed Mr. Umaña's only source of protection and companionship with people he knew, including his brother and Cousins Eduardo and Geovanni. Appx's 5, 15, 20. Yet, at trial, absent all this powerful context of Mr. Umaña's depraved childhood and adolescence, the reason the jury heard for Mr. Umaña joining the gang was because of interest in a girl.

Here once again, the details of Mr. Umaña's young life matter in terms of understanding his actions. He did not simply refuse to work or avoid his responsibilities when he turned 18. He faced real and substantial bureaucratic obstacles to gaining legitimate employment that he worked hard to overcome by obtaining day labor work whenever he could. This, too, would have further mitigated his life's account.

### 5. Repeated exposure to traumatic events.

To their credit, trial counsel put some evidence before the jury of the types of traumatic events that Mr. Umaña would have been exposed to as a result of living in Santa Ana during years when the Civil War in El Salvador was raging. However, the evidence presented by the defense was presented by an expert who had never met Mr. Umaña and testified only about the generalized types of trauma anyone living in El Salvador was likely to have encountered, rather than focusing on traumatic events that Mr. Umaña himself witnessed. The Government was therefore easily able to persuade the jury that Mr. Umaña's experience was no different from any

other Salvadoran citizen and did not explain why, or excuse the fact, that Mr. Umaña had "turned bad." The defense did not rebut this.  Had trial counsel done the necessary mitigation investigation, they could have explained to the jury that the combined effect of the multiple forms of trauma Mr. Umaña witnessed at a young age, without the benefit of a caretaker to comfort him or help him, or to be able to put these events into some sort of perspective.

If they had properly investigated, defense counsel could have presented a far more compelling case in mitigation to the jury and could have described for the jury specific traumatic events Mr. Umaña witnessed as a child, not only as a result of the Civil War, but also the traumatic accidents he witnessed on the bypass in front of his home, and the trauma he suffered both by being beaten regularly by this father, and by watching, at a very young age, his father punch his mother in the face with closed fists.[13]

In addition to those personal traumatic events already described above, defense counsel could have presented the following in mitigation, as well:

The *mesón* was located next to a tire shop and across a narrow street from the coffee fields. A bypass was eventually built, a portion of it where the coffee fields were torn up.  Many deceased people, including children, and bones were discovered in those fields, and sometime after the age of eight, Mr. Umaña personally came across a lot of them; the coffee fields had been a place for bodies to be dumped during the war. Appx's 1, 2, 22.

---

[13] Counsel's presentation at trial would also have been greatly enhanced by the testimony of a trauma expert who was actually acquainted with the facts of Mr. Umaña's life, who could have talked about the psychological effects of these multiple traumas on someone like Mr. Umaña.

The bypass itself created a dangerous area, heavy with constant traffic and multiple accidents as a result. Frequent deaths and injury resulted. People drove fast and recklessly. At one point, Mr. Umaña watched as several women were propelled out of cars from the impact of an accident. He and some others ran to try and help the women and pull the women who were still stuck in the car. They were taken away by ambulance. Appx. 2. They also witnessed a man who rolled his pickup. Mr. Umaña and Melvin pulled the man out of the car, bleeding. Melvin later learned that the man died in the hospital. *Id.*

The particular location of Mr. Umaña's *mesón* in the 25th Final Oriente saw a lot of violence during the war. A colonel who lived above the *mesón* not only shot down the street at *guerillas*, but constantly threatened the children that he was going to bomb their *mesón*. Appx's 1, 2, 20.   The guerillas began to think that it was people from the *mesón* that were shooting at them instead of the colonel, so they returned rapid fire to the *mesón*. Appx. 2.

 Once when Mr. Umaña was around eight years old, he and some friends found a male neighbor hanging from a big tree near the bridge; his eyes were bulging. *Id*. They watched as the man's family members cut him down from the tree. *Id.*

Another time Mr. Umaña and his friend, Melvin, found several dead bodies piled in a ditch.   Some of the dead bodies were still gripping their weapons; many were face up, and the bodies remained there for days. Appx. 2 at ¶16. The smell of the decomposing bodies filled the air; their bodies became "swollen, inflated, half-eaten by worms, on some of them you could see their ribs, or the bones in their faces." *Id*. Mr. Umaña and Melvin watched as the authorities finally came to gather what was left of the bodies. Authorities had feared an explosive might be placed nearby as a booby trap, so took their time clearing them out. *Id.*

51

As Mr. Umaña's brother, Saul, explains, "there is no way to avoid the terrible effects of living through a civil war. Whether you like it or not, war affects you. I still have nightmares. If I see something terrifying in a movie, I think about the fact that I have seen much worse things in front of me, real things." Appx. 22 at ¶9. Witnesses who lived near and around Mr. Umaña recalled that it was common practice for the death squads to decapitate people with machetes; heads or headless bodies were left lying in the streets. *Id.* People heard the wails and screams resounding from the victims who were being hacked to death. Appx. 16. Grandmother Ana, with whom Mr. Umaña lived for a time, still recalls the "sounds of gunshots and the people screaming out of fear and pain. Many of these people died. It was horrible. We lived in a constant state of fear." *Id.* at ¶10.

Although trial counsel hired a trauma expert to testify at trial, she never met Mr. Umaña, and trial counsel did not provide her with information about these specific traumatic events Mr. Umaña had personally witnessed. The Government tried to get her testimony excluded altogether on grounds of relevancy because of her lack of personal knowledge. Even though she was allowed eventually to testify, the Government was still able to combat the mitigating nature of her testimony by reminding jurors that what she said applied to virtually everyone living in El Salvador during the Civil War, and she did not have specific knowledge of how the war impacted Mr. Umaña. PPT at 634.

Armed with these specific accounts of the really horrific traumatic sights and events Mr. Umaña experienced as a young child, an expert in trauma could have given a full account of the effects this chronic exposure to *these* events likely had on Mr. Umaña *personally*, and the Government would have had little ammunition to challenge it.

52

6.    Evidence of low cognitive functioning and intellectual disability.

Trial counsel tried to demonstrate at trial that Mr. Umaña was brain-damaged and intellectually disabled. However, they presented little evidence at Mr. Umaña's *Atkins* hearing to support the claim that he had adaptive deficits and low cognitive functioning, despite the availability of this evidence. Evidence was also available to better support a diagnosis of brain damage, including evidence that Mr. Umaña has suffered a number of head injuries throughout his life.

For example, although trial counsel presented the testimony of McGough of what he heard from Rafael regarding one prior head injury [PPT at 537], other witnesses could have corroborated and described the injuries that Mr. Umaña suffered in greater detail.   When Mr. Umaña was about four or five years old, he suffered one of at least three head injuries. The first serious injury occurred as Mr. Umaña was trying to reach an item high up on a cupboard. He lost his balance, and the cupboard fell directly on his head.   The deep laceration on his head was bleeding badly, and he lost consciousness. Appx. 19.   Mr. Umaña's Aunt Reina was present during Mr. Umaña's fall and yelled out for Rafael. Rafael took Mr. Umaña to the hospital, which was located about a block away, where they stitched up his deep head wound. Appx. 18.

Mr. Umaña suffered another serious head injury just a short time later, falling from the top of a tall mango tree. Appx. 20.   His cousin Ronal watched as Mr. Umaña fell to the ground, hitting the tree limb by limb; when he finally hit the ground, Mr. Umaña was disoriented, confused, and slow. Even though Mr. Umaña clearly had a large, open wound on his head and was bleeding profusely, his father did not seek medical attention for him. *Id.*

Mr. Umaña's third known head injury occurred when he was an adult living in Georgia.

53

He was involved in a car accident and hit his head on the dashboard. Hospital records show that he lost consciousness for an unknown duration of time. He was ultimately diagnosed with a closed head injury. Appx. 45.

From the time he was a child, Mr. Umaña suffered (and continues to suffer) from debilitating headaches. Appx. 50. Mr. Umaña often wept from the intense pain. He used rubbing alcohol or Vicks VapoRub on his forehead. When it was available, he was given acetaminophen. Appx's 16, 19. Since his incarceration, Mr. Umaña has been diagnosed with migraine headaches, and has been prescribed Acetaminophen, Ibuprofen, and a daily medication used to help reduce migraines, propanol. Appx. 15.

Mr. Umaña was also unable to advance in school. Mr. Umaña was unable to succeed at school, even in the lowest grades. Mr. Umaña's cousin Lilian, who is five years older than he is, attended the same school as Mr. Umaña. *Id.* Lilian recalled Mr. Umaña repeating grades several times and his overall inability to perform at an acceptable level. Teachers complained to Francisca that his homework was not complete. They worried about Mr. Umaña and wanted him to see a psychologist, because he was "not right." *Id.* at ¶14. His Aunt Reina also recalled that people at the school would tell her mother Francisca that Mr. Umaña was doing poorly in school. Appx. 19. Mr. Umaña did not have the ability to learn and did not understand. *Id*.

While others he grew up with passed the third grade and went on to several more years of school, Mr. Umaña repeated grades often and did not advance past the third grade. Appx's 19, 15, 2. Aunt Reina's son Geovanni was only three months older than Mr. Umaña but advanced in grades, while Mr. Umaña stayed behind. Appx. 19. School records from the Centro Escolar Santa Ana California show that while Cousin Geovanni was in sixth grade, Mr. Umaña was in a

54

remedial third grade class and was three of ten students who failed. Appx. 31; Appx. 30. People made fun of Mr. Umaña, who was not only much older than his years but was physically a bigger child. Appx. 19.

Since childhood, Mr. Umaña has had trouble remembering things. Appx. 19. Rafael explained to post-conviction counsel that when he sent him to the store to purchase an item, Mr. Umaña often forgot what he was there to buy. This made Rafael angry, as he thought his son was not paying attention. Appx. 18. Later, Rafael realized Mr. Umaña simply could not remember. When Rafael tried to explain something to his son, Mr. Umaña appeared lost in thought and was unable to comprehend.

His cousin state that Mr. Umaña frequently forgot to bring little objects for school projects and thus was unable to complete his schoolwork. Mr. Umaña forgot where he put things and even as a young adult, put his shoes on the wrong feet. Appx. 15. He hid money in his shoes, but quickly forgot this and looked all over for his money before finally finding the money when he put his shoes on. Appx. 12. When he was dating Monica, he asked her to read to him and to help him learn how to read and write better than he did, although she was younger than he was. She said he had great difficulty reading and writing and could not learn what she was trying to teach him. *Id.*

Mr. Umaña was unable to dress himself when Francisca was alive. Appx. 15. He put his shirts on backward or inside out; his shoes were often on the wrong feet, or he had two shoes that did not match. He did not appreciate anything was wrong, even when others tried to correct

55

him. Mr. Umaña did not learn how to tie his shoelaces, and instead tucked his laces on the insides of his shoes.

Mr. Umaña acted younger than his age. *Id*. He loved watching cartoons. Appx. 12. He had trouble assessing situations, and did not appreciate when it was time to be serious. Appx's 12, 22. There were times when Mr. Umaña just did not make sense, and he struggled learning simple concepts. His brother Saul and others tried to explain easier ways to do things, but Mr. Umaña was still unable to comprehend and got frustrated. People assumed Saul was the older brother because Mr. Umaña was immature. Appx's 12, 22. When Saul would attempt to have a serious talk with Mr. Umaña about the need to act mature, Mr. Umaña did not appear to understand. Appx. 12.

Again, while this evidence is mitigating in its own right, in the hands of an expert in intellectual disability, it could also have been used to great effect to prove that Mr. Umaña had significant adaptive deficits. He could not succeed in school, he failed the third grade at the age of 12, he had substantial memory problems, he found it difficult to learn, and was unable to engage in age-appropriate self-care.

### 7. Other evidence of mental health problems.

As a child, while living at the Danubio Azul *mesón*, Mr. Umaña told his cousin about things he saw and heard that did not appear to be there. Appx. 15. He believed he had seen a long-haired woman who called out to him in the dark. Mr. Umaña was frightened by the images he saw and voices he heard. He asked his cousin if she saw these images as well. Despite others telling him there was nothing there, he did not believe it. Mr. Umaña heard someone

opening and shutting doors and blowing air on him. His cousin Lilian was frightened because Mr. Umaña truly believed this was happening.

Mr. Umaña continued to see images that were not present to others, and these images terrified him. At times, he seemed to stare off, talking to things that were not visible. Appx. 12. Saul noticed something strange about his brother's behavior. Appx. 22. When others told Mr. Umaña these images were not there, he became insistent and drew what he saw, as if this might convince others it was real. He drew demon-like images with horns and tongues sticking out.

McGough reported to post-conviction counsel that Mr. Umaña would often lose focus, start singing, or begin rapping in the midst of conversations, particularly when discussing a topic likely to cause him stress. Appx. 26.

The lay description of Mr. Umaña's odd behaviors would likely have been received as mitigating by jurors, who would recognize these visions and frightening hallucinations as likely signs of mental illness. A mental health expert could have testified to the jury and they would have understood these to be signs and symptoms of either a neurological disorder, psychotic episodes, or some other form of a break with reality. This, too, would have been highly mitigating.

        8.   The prosecution could not have made the arguments it made in closing had trial counsel presented the full case in mitigation it had available.

Because of trial counsel's failures to investigate, prepare, and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Umaña was simply a cold, calculating, and unrepentant killer whose life experience did not mitigate his

57

crime, nor give the jury reason to impose a sentence less than death. PPT at 889. Without information specific to Mr. Umaña's life, the Government's task was made easy.

The Government was able to argue that the mitigation the defense had presented applied equally to all boys who had grown up in El Salvador at the time same time as Mr. Umaña.

> Sure, grew up in a war torn country. But with a lot of other people at the time. Not all that became murderers and MS 13 members.
>
> [ . . .]
>
> He had the life that other boys in El Salvador had at the time.

PPT at 836, 889.

> The prosecutor repeatedly asked the jury to compare Mr. Umaña to others, including the testifying informants who y "grew up just like he did" but unlike him did not grow up to be killers.

PPT 888.

According to the Government "by every account [. . .] he had a normal life" pointing out: "He had a father. He had women figures in his life. [. . .] And he worked and he was apparently respectful when he worked. Had all these great attributes and all." *Id*. at 836. The Government told the jury that it was not enough that the mitigation specialist wanted them to believe that this was a "terrible life and he was just in a war torn country and let's just make this sort of fit this [ ] square peg in a round hole doesn't make it so." *Id*.

The Government went on to dismiss any evidence of brain damage because Mr. Umaña's life history, as presented at trial, did not corroborate it:

> Ladies and gentlemen, that's irrelevant. What they want you to believe, they want you to make the leap, make the jump. The jump is, well, wait a second. It's this brain that made him do it. There's something wrong there that made him do it. Well, there's no evidence of that. His brain functioned fine when he was growing

58

up. He's working. He's playing soccer. Nothing is wrong with him. All of a sudden his brain went bad? No, he went bad. All right. Ladies and gentlemen, his brain didn't go bad; he went bad.

PPT 838.

None of these arguments would have had any force if placed in the context of the mitigation case defense counsel could have put on, had they conducted a professionally reasonable investigation.

> 9. There is a reasonable likelihood the jury would not have imposed death, had jurors heard this full account of Mr. Umaña's life.

There can be little doubt that the jurors agreed with the Government's evaluation of the defense's case at the penalty phase since the majority rejected most of the mitigation factors:

- 0 found that he had suffered head injuries resulting in brain damage;
- 0 found that his childhood was marked by many factors that increased the risk of criminal activity later in life;
- 1 found that he did not have the benefit of schooling after third grade;
- 2 found that his early life experiences made him more susceptible to recruitment by MS-13;
- 3 found that his childhood was marked by factors that impeded his moral development;
- 4 jurors found that he grew up in poverty;
- 9 found that he was exposed to violence during the civil war;
- 12 found that he was raised without his own mother;
- 0 found any other mitigating factor.

ECF Doc. No. at 1048 at 4-6.

At the same time, the jury unanimously found as mitigating factors that the Greensboro shootings involved no substantial planning and resulted from an emotionally-charged fight. ECF Doc. No. at 1048 at 4-6.

In other words, the jury understood the predicate crime as not being among the worst of the worst. This is exactly the type of situation in which the failure to have put on a genuine case

59

in mitigation is the most prejudicial – because this is a jury to whom this mitigation genuinely is likely to have mattered.

Had defense counsel provided these jurors with the full array of mitigating evidence that was readily available – one that provided the jury with a true picture of Mr. Umaña's childhood and adolescence as sketched out above, it is virtually certain that a majority of jurors would have found as mitigating factors that:

- his childhood was marked by factors that increased the risk of criminal activity in later life;

- he did not have the benefit of schooling after third grade, and did not have the mental capacity to progress beyond the third grade;

- his early life experiences made him more susceptible to recruitment by MS-13;

- his childhood was marked by factors that impeded his moral development;

- he grew up in poverty; and

- he personally was exposed to violence during the civil war.

It is also a virtual certainty that jurors would have found "other mitigating factors," that the defense could have suggested to them.   These would have included:

- a childhood history of physical and emotional abuse;

- complete neglect by his father;

- the belief, fostered by his father, that his mother had abandoned him;

- extreme poverty;

- constant hunger;

- exposure to personal and public traumatic events;

- in utero exposure to toxins;

60

- head injuries;

- brain abnormalities;

- low I.Q. and adaptive deficits amounting to intellectual disability or at least borderline intellectual disability.

All of these are factors the Supreme Court has singled out and identified as mitigating, and all of these could have been proven.

This mitigation testimony that the defense could have presented had trial counsel conducted a reasonable life history investigation turns on its head the self-protective and false assertions of Mr. Umaña's father, which trial counsel relied on and presented at trial. The history developed through adequate investigation dramatically changes the picture of the life Mr. Umaña experienced growing up.

There is a reasonable probably that, hearing this testimony, at least one juror would have been persuaded to vote for life instead of death.

Mr. Umaña's constitutional right to the effective assistance of counsel at the penalty phase was infringed. This Court should vacate his sentence and grant him a new penalty phase trial.

61

**II.** **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT AVAILABLE LAY WITNESS EVIDENCE BEARING ON MR. UMAÑA'S MENTAL HEALTH; FAILING TO RETAIN ADEQUATE EXPERT ASSISTANCE; AND FAILING TO PREPARE THE EXPERTS THEY DID RETAIN IN SUPPORT OF COMPELLING MENTAL HEALTH MITIGATION THAT INCLUDED TRAUMA, INTELLECTUAL DEFICITS, BRAIN DAMAGE AND MENTAL ILLNESS IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Perhaps the most basic tenet in a capital case is that the jury be given the tools necessary to make a reasoned, informed, reliable decision about whether to impose the most serious punishment our law allows. Central to that decision is the consideration of any relevant evidence the defendant can offer in mitigation of punishment. And among mitigating factors, those related to the defendant's mental health have always been understood to be among the most significant he can present and a jury should hear. "If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh,* 492 U.S. 302 (1989) *citing California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). For that reason, courts have long been reluctant to allow a death sentence to stand when the jury was deprived of basic information about the defendant's mental health problems.

This is such a case. Alejandro Umaña had a strong mental health case to present at the penalty phase of his trial. Trial counsel, however, was not properly prepared to present it.

First, even though this Court did not find him to be intellectually disabled within the meaning of *Atkins v. Virginia*, 536 U.S. 304 (2002) (and thus ineligible for any penalty phase whatsoever), Mr. Umaña still has serious intellectual deficits that have marked his life. Although the Supreme Court has made clear that evidence about intellectual limitation is unquestionably mitigating (*see e.g.*, *Penry*, 492 U.S. 302; *Tennard* (evidence of intellectual deficit does not need to reach level of mental retardation to be mitigating)) the jury heard little, to nothing, about his deficits. Second, Mr. Umaña was exposed as a young child and youth to a level of trauma, in both his home and the society at large, that few of us could imagine: poverty, neglect, abuse, violence, a constant fear for safety. Traumatic suffering affected his development and his entire life trajectory, yet the jury learned next to nothing about what he personally experienced or, most critically, how it affected his functioning and behavior. Third, Mr. Umaña is brain damaged. While the sentencing jury heard that physical fact from the defense, it learned nothing of its ramifications in his life – how it has likely affected his judgment, his reasoning, his behavior and the direction his life took.[14]   Finally, Mr. Umaña has long exhibited behaviors that may be symptomatic of the above problems or of other psychological ills.   The jury – tasked with deciding if he was among the "worst of the worst" and thus deserving to die – heard nothing about these either.

Because a person's mental health is integral to who he is and what he has done, the failure by trial counsel to investigate or present even one of the categories of evidence noted

---

[14] That Mr. Umaña is brain damaged was also seriously contested by the prosecution's expert, a circumstance which trial counsel's failures in this arena left them unprepared to respond to.

above could easily prejudice a defendant on trial for his life.   Here those failures were multiplied, and Mr. Umaña has been severely prejudiced as a result.

**A.** **Counsel's failure to investigate and present evidence of Mr. Umaña's serious intellectual deficits deprived him of the reliable determination of punishment to which he was entitled.**

Evidence about a defendant's intellectual impairments are undeniably mitigating in nature. Mr. Umaña's intellectual limitations are directly relevant to his moral culpability and to whether he deserves the death penalty. *See Penry,* 492 U.S. at 322-323 (noting that Penry's intellectual deficits were relevant to the question of whether he was "less able than a normal adult to control his impulses or to evaluate the consequences of his conduct.")

    i.   <u>The sentencing jury did not learn that Alejandro Umaña has substantial deficits in intellectual functioning.</u>

Although this Court ruled pretrial that the evidence before it did not support a finding that Mr. Umaña suffers from mental retardation,[15] there was considerable evidence available that he has significant limitations in intelligence and that remained relevant to mitigation. Indeed, evidence was available to present to the jurors indicating that he is very near one end of the population's IQ bell curve and that his day-to-day functioning suffered. However, this wealth of evidence was not presented, and the little the jury heard that might have been explained in terms of intellectual deficits was not. For example, the jurors heard evidence that Mr. Umaña failed the

---

[15] The term in use now, "intellectual disability," has the same meaning.

  It is possible that Mr. Umaña's jury, hearing the same evidence this Court did, might have found that he was ineligible for the death penalty pursuant to *Atkins*. But even if it did not, or was not given the chance to make such a determination, each juror was entitled to weigh his evidence of intellectual limitation as a mitigating circumstance.

third grade, but there was no evidence about why (they may have thought he was not attending or never tried). Although the school records, admitted as exhibits, showed his attendance rate at above 90 percent for 1991 and 1992, it was never discussed in the testimony, the exhibit was not translated into English, and the attendance portion of the report was cut off. Def. Ex. 18. The records also showed that it was not about disciplinary issues since he did well in areas like cooperation, promotion of customs and beliefs, and practice of moral and civil values but failed in other areas like responsibility, health and protection, initiative, self-confidence, and work habits. *Id.*; Appx. 6 at ¶16-17. The jury did not hear this. Because trial counsel did not adequately investigate available witnesses, who knew Mr. Umaña during different facets of his life, regarding his adaptive behavior, they were not in a position to make an informed decision about whether to present this evidence to the jury. Furthermore, the jury heard from the defense about head injuries that Mr. Umaña suffered as a child, as well as about a Positron Emission Tomography (PET) scan that a defense expert said indicated brain-damage, but neither was offered as a potential reason why Mr. Umaña might have intellectual deficits – a category of evidence that the jurors never explained to jurors.

     ii.    <u>Counsel should have presented the jury with the evidence of intellectual impairment available from the pretrial *Atkins* hearing.</u>

At the pretrial hearing on intellectual disability, trial counsel presented evidence supporting a claim of intellectual disability, including evidence of IQ testing indicating that Mr. Umaña has significant deficits in intellectual functioning. Trial counsel presented evidence of Mr. Umaña's IQ score of 66 on a Weschsler Adult Intelligence Scale-III (WAIS III) (Spanish version published in Mexico) using the US norms, and a non-verbal IQ of 53 on the C-TONI. Testifying at the pretrial hearing about Mr. Umaña's intellectual deficits were (1) Dr. John

<center>65</center>

Gregory Olley, a neuropsychologist and expert on intellectual disability, (2) Dr. Ricardo Weinstein, a neuropsychologist, and (3) Dr. James Merikangas, a neuropsychiatrist. All of these defense experts agreed that Mr. Umaña met the definition of a person with intellectual disability by having significant impairment in intelligence and adaptive functioning that originated in childhood. Appx.'s 70, 72, 73. Even if they were not permitted to offer that expert opinion given the Court's pretrial ruling, the facts indicating poor functioning should have been presented and explained as demonstrative of intellectual impairment in mitigation at sentencing.

This and other evidence could have shown the jury that those who knew Mr. Umaña considered him limited, and that at least one qualified expert found his IQ to be extremely low. Trial counsel did not however present most of this evidence to the jury at the penalty phase, and to the extent it was presented it was not done with an explanation of intellectual deficits.

      iii.    <u>There was other evidence demonstrating that Mr. Umaña has major deficits in functioning indicative of intellectual impairment, but trial counsel's inadequate investigation failed to unearth it.</u>

An adequate investigation would have uncovered evidence of Mr. Umaña's substantial deficits in a range of behaviors which experts have long seen as relevant to intellectual capacity.

For example, his cousin stated that Mr. Umaña had difficulty dressing himself and would go to school with mismatched shoes. Appx. 15. He also wet his bed frequently until he was about 10 or 12 years old. *Id*. at ¶ 11.

Furthermore, the fact that Mr. Umaña did not continue going to school when he was twelve years old and in the third grade has been corroborated by several witnesses during the post-conviction investigation. Appx. 4 at ¶ 23; Appx. 7 at ¶ 5. Family and friends reported that Mr. Umaña went to first grade more than once and repeated third grade but then stopped because

he was embarrassed and struggled. Appx. 19 at ¶16-17; Appx. 21 at ¶21; App. 4 at ¶23. While Mr. Umaña's cousins and friends passed each grade, Mr. Umaña continued to stay behind and was older and bigger than his classmates. Appx. 19 at ¶16-17. The school records show that Mr. Umaña's cousin Geovanni (who was also born in 1982) was in third grade in 1991 while Mr. Umaña was in the first grade and Geovanni was in the sixth grade in 1993, while Mr. Umaña was in a remedial first, second, and third grade in 1994. Appx. 30 at 5, 14; *see also* Appx. 31 (teacher stating that if he was born in 1982, he would have started school in 1989 instead of 1991).

At trial, however, only one juror found the mitigating factor that Mr. Umaña "did not have the benefit of schooling after third grade." ECF Doc. No. at 1048 at 4-6. This is due to the lack of investigation and the wavering and uncertainty of trial counsel about much of Mr. Umaña's life history, even as to the most basic issue as to his age. PPT at 881 ("And then after school, he -- it's *really unclear what happens to him at that age*. Of course, we have the issue of how old he really was at that age. [. . .] Recent evidence *suggests* that perhaps he was actually born in 1982 and was actually older") (emphasis added).

Even if they were not permitted to offer that expert opinion as to findings of intellectual disability given the Court's pretrial ruling, with the information obtained from law witnesses, expert opinion could and should have been presented to the jury to explain Mr. Umaña's intellectual limitations.

Their failures to interview those who knew Mr. Umaña daily functioning during childhood their ability to present evidence of low functioning to the jury.

67

      iv.    <u>Trial counsel's inadequate investigation of lay witness testimony regarding Mr. Umaña's adaptive behavior deficits prejudiced the defendant</u>

Evidence of borderline intellectual functioning can be powerful mitigating evidence which should have been presented to the jury. There was considerable evidence to present about intellectual deficits to Mr. Umaña's jury – from those who saw his daily functioning to experts who tested him -- and it is reasonably likely that it would have tipped the balance at sentencing. The United States Supreme Court has considered evidence of low intelligence that falls short of intellectual disability to be important mitigating evidence that the jury must be permitted to consider. *See Tennard v. Dretke*, 542 U.S. 274, 286-88 (2004) (holding that Tennard's low IQ is relevant mitigating evidence, even if it does not constitute mental retardation, and even if there is no showing of a nexus to the crime); *Smith v. Texas*, 543 U.S. 37 (2004) (finding evidence of 78 IQ to be mitigating evidence that the jury must be allowed to consider); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (observing, with respect to individual with IQ of 79, that "Wiggins['] . . . diminished mental capacitie[s] further augment his mitigation case"); Burger v. Kemp, 483 U.S. 776, 779, 789, n. 7 (1987) (noting evidence that petitioner "had an IQ of 82 and functioned at the level of a 12-year-old child" could not have been excluded by the state court).

Evidence of Mr. Umaña's intellectual deficits would also have given the jury another way to consider his unreasoned and impulsive actions at the time of the crime, and during the pretrial and trial proceedings.   Many of Mr. Umaña's actions which appear threatening in nature can also be seen through the prism of someone not very bright. As someone for example who explains the code at the same time he is purportedly trying to fool the reader. Evidence of Mr. Umaña's low intellectual functioning would have served as a powerful counter to such

68

prosecutorial arguments as Mr. Umaña was playing a "cat and mouse game" with law enforcement officials and was much more "savvy" than he appeared. PPT at 896.

There is at least a reasonable probability that, had trial counsel done a full investigation into their Mr. Umaña's life, and presented the breadth of evidence available indicating compromised intellectual functioning; had they presented the evidence offered at the pretrial hearing on capital exclusion altogether; and had they put on experts who could have told the jury why his particular deficits are relevant and what percentage of the population has scored higher than he on IQ tests, at least one juror would have decided that death was not the appropriate punishment for him.

**B.      Trial counsel's failure to investigate and present evidence of trauma deprived Mr. Umaña of a reliable sentencing determination.**

Trial counsel rendered ineffective assistance of counsel by failing to investigate and present available evidence of Mr. Umaña's exposure to trauma. Trial counsel presented little evidence of traumatic events affecting Mr. Umaña's childhood, offered distorted and often inaccurate evidence of the brutality he witnessed and experienced, and failed to assess and present evidence of the impact of that trauma on Mr. Umaña. Further, trial counsel rendered deficient performance by failing to retain an expert on trauma who could individually assess Mr. Umaña.

Trial counsel presented to the jury an incomplete and misleading account of the trauma Mr. Umaña endured throughout his life in El Salvador. Witnesses testified that Mr. Umaña was raised during the Salvadoran civil war, but there was little to no evidence regarding his personal experiences or the impact that the war had on him. Trial counsel further presented misleading

69

evidence that Mr. Umaña was raised by loving, nurturing caregivers, after his mother voluntarily left him. Perhaps most significantly, trial counsel neither investigated nor presented available evidence of trauma that included significant abuse and neglect within Mr. Umaña's household.

     i.    <u>The jurors were not told about the traumas suffered by Mr. Umaña in his own home as a child.</u>

Richard McGough, the defense mitigation specialist, testified that Mr. Umaña was raised by his father and other women in the family after his mother abandoned him. Mr. Umaña was raised in a primarily "mixed" neighborhood not "exclusively poor or rich…" in Santa Ana, El Salvador. PPT at 537. Because the investigator talked to only a single family member, Mr. Umaña's father Rafael, he gave the jury a skewed and inaccurate picture of Mr. Umaña's life.

Contrary to what Mr. McGough related to the jurors, Mr. Umaña's father Rafael was a brutalizing force who assaulted and controlled those around him, including his son. He beat Mr. Umaña's mother, Leticia Ramirez mercilessly, so much so that she described her life with him as "pure hell." Appx at ¶ 38. Around the time she became pregnant with Mr. Umaña, Ms. Ramirez attempted suicide by ingesting pesticide. When her son was about eight months old, Rafael forced her to leave the home and her baby in Guatemala. Appx. 10. Rafael thereafter told his son that his mother had abandoned.

Neighbors, friends' and girlfriends were available to testify about the effects on Mr. Umaña of the loss of his mother and the narrative he was told about it. They would have told the jury how distraught he was as a youth and adolescent by her purported abandonment. He was raised for a time by his great grandmother Francisca. Mr. Umaña and his cousin Ronal slept with Francisca in the same bed and continued to do so after she was bed ridden and in great pain until she succumbed to stomach cancer in 1991. Appx.'s 20 and 33. After her death, his Aunt Lilian

<div align="center">70</div>

reported, "When my mother died, Alex was little; he was left alone, disoriented, neglected. From then on Alex was left defenseless without a stable place to stay." Appx. 15 at ¶14. Shortly after Francisca died, Ronal, who was raised with him like a brother, left for the United States in order to survive. Appx. 20.

After the death of Francisca, Mr. Umaña was left alone to be raised by Rafael. Rafael was an unstable, alcoholic, with a bad temper. Appx.'s 4, 5 and 1. He carried a weapon and terrorized his neighbors. Appx.'s 4 and 22. He beat Mr. Umaña as if he were an adult, with fists and switches and in plain view of others. Appx.'s 22 and 3. Neighbors saw and heard the severe beatings Rafael inflicted upon his son for minor infractions such as staying out too late, for getting wet when it rained outside, for being dirty, or for wetting the bed which he did until he was around 12 years old. Appx 15's and 4. He was left with marks and bruises. Appx's 1, 3, 22. As punishment Rafael withheld food from Mr. Umaña, sometimes eating right in front of him. Appx.'s 4, 15.

Rafael and Mr. Umaña returned to El Salvador from Guatemala when Mr. Umaña was still very young, Ronal recalled living in Santa Ana and seeing Rafael demanding money from Mr. Umaña's mother and would beat her with closed fists on the face until she handed over the money he demanded. Appx. 20. Ronal recalled that Mr. Umaña was pained by these violent interactions and would hold his head in his hands insisting he did not want to see them. *Id.*

Soon after the death of Francisca, Yanira a young girl who also lived in the meson came to live in the room with Rafael. Yanira was approximately five years older than Alejandro who was about eight or nine at the time. Appx.'s 1, 4, 22. Rafael would also beat her regularly such that neighbors heard the blows and screams coming from their room. Appx. 4.

71

Neighbors also described Mr. Umaña being hungry. One neighbor stated:

> Alex went hungry. He often went without eating. His family did not help him with food. I never heard anyone call him to eat. They just left him alone to find food on his own. He would go out to look for small animals like doves or iguanas or to pick mangos and ice-cream beans. Sometimes he would ask my mother if she could spare a tortilla. Alex broke our hearts.

Appx. 1 at ¶ 14. His cousin said Mr. Umaña had to go looking for food at a very young age. She recalled:

> Alex would hunt pigeons and other birds for food. I would sometimes help him prepare the fire, as did my grandma Paca. Alex would look for a piece of plastic from the trash, and we would set fire to it using the firewood we gathered from the trees. Alex did not even clean the bird before eating it. He also ate iguanas and opossums. Alex would climb trees to pick fruit. He would eat the outsides of almonds, the part other people do not eat. He would climb mango trees and eat mangos to the point where he sometimes had sores in his mouth from the mango sap, or he would boil seeds in water and put ashes on them, "as a condiment," he said. Sometimes Alex also went fishing in the Sapoapa River, carrying off tiny fish to eat.

Appx. 15 at ¶24.

These are but some examples of the abandonment, neglect and abuse Alejandro Umaña endured from the time he was an infant through his teenage years. This kind of brutality affects a child's development, the very wiring of his brain as he grows, the way he responds to the world around him. Although these events were essential to the defendant's individual life history and trajectory, the jury who had to decide his fate learned nothing about them due to the failures of trial counsel.

    ii.    <u>The jurors were not told about what Mr. Umaña personally witnessed and suffered on account of the civil war.</u>

Although Mr. Umaña regularly witnessed atrocities as a child and youth because of the El Salvadoran Civil War, his jury learned neither about these experiences nor about the scars they

left. The testifying mitigation specialist learned from Rafael and related to the jury that the defendant saw a single act of violence, a dead body near a coffee plantation. Rafael reported that he shielded his son from the war violence by ensuring he was inside at sundown whether a mandated curfew was enforced or not. PPT at 540.

Yet this portrait was far from the real one. By the age of eight, Mr. Umaña was regularly witnessing traumatic events from the war. Appx. 2. Multiple bodies lined the nearby roads. The deceased were often left to decompose in the open. Among those willing to testify to these traumatic events was Melvin Cruz Torres, a neighbor and childhood friend. He could have described the multiple deceased bodies he and Mr. Umaña witnessed and the horrors they saw. Among them for example was the sight of a man they knew, hanging from a tree with his eyes bulging, and of his family coming to cut his body down. They saw bodies face up in a ditch decomposing, with some of the dead still holding their weapons. Maggots were eating their flesh, exposing facial and body bones, and the air was filled with the smell of rotting corpses. Appx. 2. The jury should have heard the troubling fact that next to the *mesón* where Mr. Umaña lived was a coffee field where the dead bodies of children and adults were buried. When a bypass was built in that area, Mr. Umaña, who was about eight or nine years old, watched as the bodies and remains were dug up and taken away. Appx.'s 1 and 22.[16]

---

[16] The bypass itself became a dangerous area for cars, leaving Alejandro a witness to numerous serious accidents there.

73

There were numerous such facts that the sentencing jury should have heard about the conditions under which Mr. Umaña lived. The trial team's utter failure to interview those who knew him, along with their failure to tell the jury anything about how the brutal civil war affected Mr. Umaña and his family personally,[17] was a gaping hole in the mitigation case and amounted to constitutionally ineffective lawyering.

    iii.   <u>Trial counsel failed to provide evidence from an expert on trauma who, properly informed about Mr. Umaña's actual experiences, could have testified about the effects of chronic trauma on his development and state of mind.</u>

In addition to failing to present an accurate portrait of what Mr. Umaña lived through in his home and on account of the war, trial counsel failed to perform adequately in not presenting expert testimony on the effects of these traumatic experiences on their client's development and overall functioning.

There is a reasonable probability that, but for the deficient performance of trial counsel in investigating and presenting of evidence of trauma, the result of the sentencing phase of trial would have been different. The evidence would have revealed that Mr. Umaña was exposed to multiple traumatic events starting at a young age within and outside of the home.[18] Mr. Umaña

---

[17] Indeed, the jurors were likely led to believe that while others may have suffered, the young Alejandro did not have it too bad, as his father purportedly "protected" him and he allegedly witnessed a single atrocity in all the years of the war. Unbeknownst to the mitigation specialist and counsel, this was patently false.

[18] The evidence presented below is drawn from the declarations and documents attached as Appendix 1-35, including: Leticia Ramirez Diaz (Mr. Umaña's mother) – Appx 10; Saul Osvaldo Umaña (brother) – Appx 22; Ronal Umaña (paternal cousin– Appx 20; Zoila Olana (former neighbor) – Appx 8; Monica Tatiana Reyes (former girlfriend) – Appx 12; Melvin Cruz Torres (former neighbor) – Appx 2; Lilian Tino (paternal cousin) – Appx 15; Ana Julia Magaña de Sanabria (educator)– Appx 13; Vilma Araceli Salazar de Argueta (former neighbor) – Appx 1; Rosa Lilian Umaña Gonzalez (paternal aunt) – Appx 21; Vilma Elizabeth Torres de Cruz (former neighbor) – Appx 4; and Roxanna Torres Cruz (former neighbor) – Appx 3.

personally witnessed many atrocities from the civil war and was subjected to physical and emotional abuse, poverty, neglect, and malnutrition. This was vastly different from the life history that was presented to the jury.

An expert on trauma could have established that the multiple physical and emotional traumas that Mr. Umaña experienced -- including an absent mother who he believed abandoned him, a father who brutalized him, a war that traumatized him and severe socio-economic deprivation -- would have had profound effects on his psyche and development. A properly prepared expert could have testified that repeated trauma during youth, especially of the kind and duration that Mr. Umaña endured, is likely to have a deleterious impact on both neurobiological and psychological development, literally influencing the development of the brain and ultimately affecting adult behavior. An expert who had become familiar with his history and interviewed Mr. Umaña would have told the jury that he exhibits behaviors consistent with such scars.

The jury also should have heard that Mr. Umaña never received any form of mental health treatment to help mitigate the severity of his traumatic upbringing. An expert could have explained the significance of both the chronic nature of his exposure to trauma and the absence of external support, both leaving him without time or resources to recover from the experiences and develop coping skills. An expert could have testified that individuals enduring such traumas have a greatly increased risk of cognitive and emotional deficits throughout adult life. Additionally, properly prepared experts also could have addressed the interrelation among trauma and Mr. Umaña's other difficulties, including brain damage.

75

As noted above, the jury learned next to nothing about the abuse Mr. Umaña suffered from a violent father or the atrocities he witnessed and the terror he experienced due to the very brutal civil war in El Salvador. Nor did they hear from an expert in trauma about the likely effects of these experiences on his personality or his life. If such evidence had been presented, it is reasonably probable that at least one juror would found relevant mitigating circumstances and determined that life in prison without parole was the more appropriate punishment.

The prejudice becomes more apparent when one looks at what the jury did hear. They were told that Rafael Umaña was a father who looked out for his son and shielded him from most of the violence of the ongoing war. They were given a portrait of an upbringing which, while poor, was not marked by a lack of food or medical care, much less tainted by chronic violence. And the experts the jury did hear from were not able to talk at all to Mr. Umaña's actual experiences as a child or teenager, but rather to general horrors from the war that appeared to have largely passed this client by. Missing from the penalty phase were accounts from those who knew him, his family, and his neighbors of how Mr. Umaña actually lived. The experts they did present relied on the same limited and misleading information provided by the mitigation specialist and never interviewed Mr. Umaña himself.[19] This left the jury with a seriously

---

[19] For example, Dr. Selena Sermeño testified as an expert on risk factors to the moral development of children from exposure to the effects the war in El Salvador. She relied on the social history report prepared by the mitigation specialist (Appx. 36) and thus was limited to the history reported by his father and the few life history witnesses who did not know the client's trauma history. She was not asked by trial counsel to meet or evaluate Mr. Umaña for his

76

distorted picture of what this individual's life was really like.

The effect of counsel's failures is also reflected in the jury verdict form. First, if they had adequately investigated his home life, they would have been able to offer the jurors additional and compelling mitigating factors to consider and weigh. But in addition, very few jurors found his earlier life experiences – as presented – mitigating, and *none* found any other "factor in his background" that might militate against a death sentence. ECF Doc. No. 1048 at 4-6. This would have been highly unlikely if not impossible if trial counsel and their mitigation specialist and investigated had presented evidence of his life and traumatization. Had they done so, there is at least a reasonable probability that the outcome of the penalty phase would have been different.

**C.**      **Trial counsel's failure to investigate lay witness testimony supporting a claim of brain damage, to provide that evidence to their experts, to consult with their experts, or to conduct necessary testing deprived Mr. Umaña of a reliable sentencing determination.**

     i.      <u>Trial counsel failed to investigate or present available lay witness testimony establishing brain damage</u>

The mitigation specialist testified that the father reported Mr. Umaña suffered a head injury as a child. (PPT 537; Appx. 36) Trial counsel failed to investigate or present testimony from lay witnesses who could have provided corroboration for this and a second head injury. Among the available witnesses were Mr. Umaña's Aunt Reina who could have told the jury that

---

personal experiences from the war or any other traumatic events. Dr. Maria Santa Cruz Geralt, a psychologist, testified about a study involving risk factors that made Salvadorans vulnerable to gang recruitment. She was not asked to meet or evaluate Mr. Umaña to determine whether he even possessed the risk factors of which she spoke. Dr. Mark Cunningham and Mark Bezy, experts in Bureau of Prisons (BOP) security procedures, explained that BOP was well equipped to address any security concerns.

she saw her nephew when he was little fall and hit his head after trying to climb to a cupboard, at which point he lost consciousness. Appx. 19. His cousin Ronal could have provided evidence about Mr. Umaña falling from a tree at about the age of five, hitting each limb as he fell, and his head bleeding. Appx. 20 at ¶ 31. Aunt Reina, paternal grandmother Ana Ruth Umaña, and neighbor Vilma Elizabeth Torres de Cruz could all have corroborated that he suffered debilitating headaches as a child, possibly from one of the falls. Appx's 19, 16, at 4. His grandmother also could have provided testimony about the severity of his migraines (both as a child and an adult), the injuries to his head, and the inability of the family to get him to a doctor. Appx. 16 at ¶ 20.

This and similar evidence from those who knew him was available had Mr. Umaña's counsel looked for it. For example, Mr. Umaña was exposed to multiple assaults while he was in utero. His mother ingested drugs and alcohol, suffered from malnutrition, subjected to physical and emotional abuse, forced into prostitution that may have exposed her to sexually transmitted diseases, like syphilis. Post-conviction has interviewed lay witnesses who describe Mr. Umaña's misshapen and separated teeth, rare skin conditions, and high fevers that could be evidence of congenital syphilis. Additionally, Mr. Umaña suffered from his own malnutrition, starting as early as infancy when he was fed a mixture of sugar water instead of milk that has the nutrients necessary for brain proper development. Appx's 10, 15, 16. This information would have been extremely important for Dr. James Merikangas to possess to explain possible etiologies regarding his penalty phase testimony that Mr. Umaña does, in fact, have brain damage. The absence of such testimony to support the expert diagnosis of brain damage was a critical omission at the sentencing phase allowing the prosecution to argue without answer that "There's

78

nothing wrong with his brain. There's a couple experts. And it's not so much." PPT. 837-38, and

"His brain functioned fine when he was growing up." *Id*. In fact this was not the case, as post-conviction has leaned that Mr. Umaña exhibited odd behaviors such as seeing and hearing things that were not there, staring off into a distance, struggling with dressing and grooming himself correctly. Appx's 15, 22, 12. If trial conducted a proper investigation, they could have gleaned this information that would have prepared them to adequately support their case.

ii. <u>Trial counsel failed to present to the jury available expert testing and testimony regarding brain damage.</u>

Trial counsel rendered ineffective assistance of counsel by not presenting available expert testimony regarding Mr. Umaña's brain damage. Counsel first retained Dr. Ricardo Weinstein to conduct neuropsychological testing. Dr. Weinstein's testing showed damage to Mr. Umaña's frontal lobe, the area in the brain responsible for executive functioning which affected his judgment, impulsivity, and ability to make and carry out plans. At Dr. Weinstein's recommendation, counsel retained a neuropsychiatrist, Dr. James Merikangas, to review Dr. Weinstein's findings, to conduct a physical examination of Mr. Umaña, and to conduct a Positron Emission Tomography (PET) scan. Based on his evaluation, which included consideration of Dr. Weinstein's neuropsychological findings, Dr. Merikangas also concluded that Mr. Umaña suffered from brain damage to his frontal lobe.

Although their neuropsychiatrist's analysis included reliance on the neuropsychological testing, counsel did not present Dr. Weinstein's testimony to the jury at sentencing and precluded Dr. Merikangas from discussing Dr. Weinstein's findings; nor did they obtain any other neuropsychological testing. Trial counsel thereby stripped Dr. Merikangas of a substantial basis for his neuropsychiatric opinion regarding Mr. Umaña's brain damage and its consequential

79

effects on behavior, and the jurors were left without the vital information that the damage Dr. Merikangas attested to had serious implications. Consequently, the jury did not learn that Mr. Umaña's frontal lobe damage would severely impair his executive functioning, including his ability to make reasoned choices and to respond to stressful situations.

Dr. Merikangas was the only testifying expert who had actually met and evaluated the defendant, but the utility of his presentation was badly undermined.

> During my testimony at Mr. Umaña's capital trial, I was not permitted to testify about my consideration of the . . . neuropsychological testing. . . ..   I had already performed an evaluation based not merely on my analysis of the PET scan and my neurological examination of the defendant, but also based on my review of Dr. Weinstein's findings.   Although I could draw a few conclusions based solely on the PET scan and my physical evaluation of Mr. Umaña, my opinion regarding brain damage was based on the comprehensive evaluation, including the neuropsychological testing.   I was not permitted to testify that my findings regarding the PET scan were consistent with the neuropsychological test results.

Appx. 27 at¶9. Most significantly, while Dr. Merikangas could identify Mr. Umaña as "brain-damaged," without relying on neuropsychological evidence, "I could not opine on how this damage affected Mr. Umaña's cognition and behavior." Appx. 27 at¶10.

Trial counsel rendered deficient performance by not presenting the neuropsychological testing results, whether through either or both of their chosen experts or a different qualified expert.

The absence of the neuropsychological evidence was seriously prejudicial to the case in mitigation. Without the support of the neuropsychological testing, Dr. Merikangas' testimony regarding the PET scan results was effectively rebutted by the Government's expert, Dr. Helen Mayberg, who testified that the results of the PET scan appeared to be normal. PPT at 762. The Government then fully exploited the minimal evidence of brain damage presented by the

80

defense.  During argument, the Government mocked the defense expert's reliance on the PET

scan, capitalizing on the absence of evidence:

> And then comes the grand finale.   The grand finale of the mitigation.   All the different colors on the screen.   The brain.   Now, we can see what's in his brain. That's the grand finale.   There's the colors.   Oh, boy, look at these colors.   It looks interesting.   There has to be something wrong.   That's what they want you to believe.   Common reaction.   Nobody can just be a murderer the way he is.   There's got to be something wrong.
>
> *There's nothing wrong with him*.   He knows what he's doing.   There's nothing wrong with his brain.   There's a couple experts.   And it's not so much, okay, your brain looks a little bit like this.   My brain looks like this.   Maybe there is some abnormalities.   Whatever you believe on the experts, the government expert said there's nothing wrong with that scan.   Another said, well, there's some abnormalities with the brain.

PPT at 837 -38 (emphasis added).

Without any evidence that his brain damage actually *mattered* to Mr. Umaña's life or

functioning, the Government was able to dismiss it handily:

> What they want you to believe, they want you to make the leap, make the jump. The jump is, well, wait a second. It's this brain that made him do it. There's something wrong there that make him do it. *Well, there's no evidence of that*. His brain functioned fine when he was growing up.   He's working.   He's playing soccer.   Nothing is wrong with him. All of a sudden his brain went bad? No he went bad.   All right. Ladies and gentlemen, his brain didn't go bad; *he went bad.*

PPT at 837-38 (emphasis added). The prosecutor finally contended that the neurological

evidence of brain damage was "irrelevant" because there was no evidence of a

connection to Mr. Umaña's behavior. *Id*

The prejudicial effect of the lack of evidence is found most clearly in the jury's

unanimous rejection of the mitigating circumstance that "Alejandro Enrique Umaña suffered

from head injuries early in life that resulted in damage to areas of the brain related to behavior."

81

ECF Doc. No. 148. A comprehensive presentation of Mr. Umaña cognitive impairment – by an expert or experts relying on all components of an evaluation, including neuropsychological testing, and informed by witnesses to the defendant's behavior – could have supported other mitigating findings as well. An abstract finding that Mr. Umaña suffers from "brain-damage" does nothing to explain the circumstances of his crime, or his irrational or unreasonable behavior prior to and during trial proceedings. An explanation of that behavior required an evaluation that took into account the neuropsychological testing. Properly prepared experts could also have testified that Mr. Umaña's ability to control his behavior and to make and carry out plans when under substantial stress is compromised, and this likely would have been true at the time of the commission of the crime.

A full presentation showing the impact of frontal lobe damage additionally could have been used to rebut the aggravating factor that "the defendant killed Manuel Garcia Salina to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise" ECF Doc. No. 1048.

Evidence of brain damage can be powerful mitigation. Trial counsel clearly thought it important to their case. Yet they undermined their single witness on the issue – and thus the power of the evidence altogether – by failing to explain to the jury all of the neurological insults Mr. Umaña's brain had suffered and, even more importantly, stripping their case of any information of how Mr. Umaña was affected by this abnormality. Had they presented all available lay and expert witnesses, there is a reasonable probability that the jurors would have determined that Mr. Umaña has brain damage and that it has affected his life, and that the outcome of the sentencing would have been different.

82

iii. <u>Trial Counsel's failed to adequately consult with their chosen mental health expert, and unreasonably limited the evaluation and testimony of their only testifying expert who had examined Mr. Umaña.[20]</u>

In July 2009, trial counsel retained Dr. Merikangas to evaluate Mr. Umaña for purposes of providing an answer as to the cause and extent of Mr. Umaña abnormally functioning brain. Dr. Merikangas informed trial counsel in his November 17, 2009 report that he relied on neuropsychological testing as a basis for his opinion:

> Neuropsychological testing by Dr. Weinstein disclosed a full scale I.Q. of 66 with a non-verbal I.Q. of 53 on the C-TONI. Dr. Weinstein concluded that Mr. Umana had a generalized pattern of brain dysfunction with particular compromise to the frontal lobes. . . . He has an abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and an abnormal quantitative EEG.

Appx. 70 at 2, 3. A few weeks later, at the November 30, 2009 pretrial hearing on mental retardation, Dr. Merikangas testified that the relied on the neuropsychological testing of Dr. Weinstein as a part of his comprehensive neuropsychiatrist evaluation.

Prior to and during the capital trial, trial counsel failed to consult with Dr. Merikangas about their decision to limit his testimony at sentencing by not addressing his reliance on the neuropsychological testing of Dr. Ricardo Weinstein. Counsel did not seek Dr. Merikangas' input into this decision. Trial counsel never asked their own expert his opinion about how the exclusion of such evidence might affect his credibility, how the lack of a comprehensive basis for his evaluation might be exposed to the jury, or how their case for establishing brain damage

---

[20] Mr. Umaña restates all facts, claims and allegations stated elsewhere in this motion, and incorporates them on this issue

might be undermined. Nor did they adequately consider tests that could be done to support the evidence he was presenting. (For example, counsel did not pursue an MRI, an omission the prosecution and its expert, Dr. Helen Mayberg, made much of at the sentencing hearing.)

In the sentencing trial, Dr. Merikangas was the only testifying expert who had evaluated the defendant. Pretrial, he had concluded in his report that:

> Mr. Umaña is a brain-damaged man with developmental cognitive impairments in the mentally retarded range. He has abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and abnormal quantitative EEG. These brain impairments, to a reasonable degree of medical probability, render him less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals. These brain impairments stemming from early childhood are not his by choice, but are the result of environmental causes beyond his control.

Appx. 72 at 3. Significantly, however, the jury never saw or heard about this report or the important findings it contained.

Based only on his physical examination and the results from PET scan, Dr. Merikangas acknowledged on cross-examination that you cannot look at a brain scan and tell somebody's IQ, what they are thinking about in this kind of scan, or very much at all about their behavior. PPT at 744-45. Similarly, the Government's expert Dr. Mayberg testified that the PET scan gives no information about someone's behavior, and it would be "impossible" to conclude from the PET scan that the defendant "can't control his conduct" or that he is "controlled by others." PPT at 779.

However, trial counsel's failure to adequately consult with him prior to making their decision interfered with Dr. Merikangas ability to explain to the jury how damage to Mr. Umaña's frontal lobe affected his executive function, judgment and impulse control. This failure

84

to consult with their expert led to decisions that sabotaged a central part of their mitigation case and, as noted above, seriously prejudiced Mr. Umaña. Trial counsel rendered ineffective assistance of counsel by not pursuing quantitative analysis of the PET scan.

There were other ways in which trial counsel failed in adequately presenting a compelling claim of brain damage. In addition to failing to support their claim with neuropsychological testing and the evidence of lay witnesses, trial counsel also rendered deficient performance by failing to investigate or to obtain a quantitative analysis of the PET scan. This analysis compares the results in Mr. Umaña PET scan to a comparison group of healthy people. Without this analysis, Dr. Merikangas' trial testimony was subject to criticism by the Government that it was a reading of a single scan containing colored pictures of the brain, but untethered to any norms or objective standard by which you could measure the brain damage. PPT 766.

There is a reasonable probability that, but for the deficient performance of trial counsel in not seeking a quantitative analysis of the PET scan, the results of the sentencing proceeding would have been different.

This was problematic at sentencing yet also avoidable. Trial counsel could have placed the PET scan in context for the jury with such testimony. For the post-conviction proceedings, Dr. Ruben Gur conducted that analysis. Using the PET scan performed pretrial on Mr. Umaña, he performed a quantitative analysis using a standard regions of interest approach. From this analysis, Dr. Gur drew the following conclusions regarding Mr. Umaña's brain functioning:

> The results of measuring local glucose metabolism with PET show abnormalities in regions that are very important to regulating emotions and behavior. The most relevant finding is the reduced metabolism in the amygdale and

hippocampus, combined with hyper-metabolism in cortical regions.   As the amygdale activates in response to stressful or threatening environmental stimuli, such a pattern of activation indicates that Mr. Umaña has an inappropriately high level of cognitive control over emotion processing and experience while at a resting "default mode" state.   Since regions that are hyperactive during the default mode become activated during a task or challenge, and vice versa. The abnormal resting state profile will compromise his ability to modulate his behavior under stress.

Abnormally low metabolism in the temporo-limbic system, including in the amygdale, hippocampus and parahippocampal gyrus could lead to severe emotional dysregulation.   A damaged amygdale will misinterpret danger signals and can become easily activated.   When excited, the amygdale will issue false alarms that require intact frontal components of the limbic system for modulation. In Mr. Umaña's case, the cortex is already at a hyper-activated state.   When Mr. Umaña's amygdale becomes activated, his frontal lobe is unable to exercise control as a normal frontal lobe would, because his "thinking brain" is already operating at full capacity in its hyper-vigilant state.   *The frontal lobe is compromised in its ability to do its job to regulate the primitive emotional impulses emanating from the amygdala when the limbic system reaches its activated state* (the Kluver-Bucy syndrome).

The corpus callosum is hypometabolic, which can lead to deficits in integrating verbal reasoning and analytic processing modes of the left hemisphere with intuitive, integrative and affect-related processing modes of the right hemisphere. Such white matter dysfunction would greatly impair speed of processing across cognitive and affective domains.

Abnormally high metabolism in cortical regions most likely indicates compensatory hyper-vigilance of the "default mode" brain state, and the increased activity in caudate, thalamus, and hypothalamus likely related to difficulties in controlling input from somatic system.

The etiology of these abnormalities is difficult to determine and require clinical evaluation and integration with history. Mr. Umaña's PET scan shows clear evidence of brain damage that is consistent with several causes, including brain injury.   The reduced metabolism in the corpus callosum is also consistent with fetal exposure to alcohol or other toxins.

Appx. 29. (emphasis added). Dr. Gur's findings are highly significant and explain why Mr.

Umaña is significantly impaired in his ability to exercise "cognitive control over emotion

86

processing and experience" particularly "in response to stressful or threatening environmental stimuli." Further, Dr. Gur plainly states that Mr. Umaña's "amygdala will issue false alarms" which his frontal lobe is unable to "modulate" or to "exercise control as a normal frontal lobe would." *Id*.

Dr. Gur's conclusions regarding Mr. Umaña brain functioning provide necessary and significant support for Dr. Merikangas' testimony that Mr. Umaña suffered from brain damage which, given the failures cited above, was sorely missing. Significantly, Dr. Gur's quantitative analysis of the PET scan enabled him to identify the specific regions of the brain affected by the brain damage and, in turn, make informed conclusions about the likely effects of the brain damage on Mr. Umaña's cognitive and behavioral functions in times of stress. *Id*.

The testimony of Dr. Mayberg, the Government's expert neurological witness, demonstrates additional prejudice from not seeking this testing. Dr. Mayberg testified that the use of quantitative analysis with data from healthy people to which you could quantitatively compare the defendant would be an "unbiased way" to measure whether a scan of the frontal lobe is abnormal. PPT at 772-773. She made this point to emphasize her testimony that without such an analysis, the use of a PET scan alone to identify long-standing damage from head injuries was impossible. *Id*.

Mr. Umaña was convicted of committing an emotional crime in response to an argument in a restaurant over music that was being played on the juke box. In response to this argument, Mr. Umaña responded impulsively and senselessly by firing a gun thereby killing two strangers and wounding a third. None were members of a rival gang. This was precisely the type of crime that cried out for an reasoned explanation about why Mr. Umaña's ability control his behavior at

87

the time of the crime was substantially impaired by his brain damage. Had the jurors heard this evidence, some among them may have found the relevant statutory or nonstatutory mitigating factors. There is a reasonable probability that but for the deficient performance of trial counsel, had evidence derived from lay testimony, neuropsychological testing, or a quantitative analysis of the PET scan been presented to the jury, the results of the proceeding would have been different.

**D.** **Trial Counsel's failure to investigate and present lay witness and expert testimony that Mr. Umaña exhibits behaviors consistent with mental illness deprived Mr. Umaña of a reliable sentencing determination**

Because of their inadequate investigation, as stated above, trial counsel provided no information about Mr. Umaña's history of mental illness to their experts or to the jury. Although several experts testified at Mr. Umaña's trial, none of those that testified were asked by trial counsel to evaluate Mr. Umaña for mental illness. Dr. Merikangas was the only testifying expert who actually interviewed Mr. Umaña, and he saw the defendant once for the specific purpose of a neurological examination. Trial counsel did not retain Dr. Merikangas to evaluate Mr. Umaña for mental illness, but instead asked him to focus on brain damage.

Trial counsel were not prepared to consider whether some of Mr. Umaña's strange behaviors might be indicative of mental illness. As noted above, their mitigation specialist conducted a poor social history investigation, limited in scope and largely dependent on a single family member, father Rafael Umaña, who was not a reliable source. Only one expert who testified at the penalty phase had even met their client. Counsel did not conduct the inquiry necessary to determine why Mr. Umaña may have exhibited odd behaviors and certainly provided no context or explanation for them to the jury.

88

Yet there were red flags that should have alerted counsel to a need to consider mental illness. Although Mr. McGough testified at the sentencing phase of trial, trial counsel did not question him about the behaviors he witnessed in Mr. Umaña that could be consistent with mental illness. Mr. McGough believed that he appeared "slow and paranoid." Appx 29 at ¶8. Mr. McGough was concerned that when he and Mr. Umaña were "… in the middle of discussion about his case, he would suddenly break into songs and rap." Appx 29 at ¶17. These and other behaviors led Mr. McGough to have "serious concerns about his mental illness." Appx 29 at ¶17.

Had trial counsel properly investigated, they would have discovered other behaviors that may be signs or symptoms of mental health impairments. For example, Mr. Umaña's brother, cousin, and the mother of his child all report that Mr. Umaña spoke about seeing images and hearing voices. His cousin Lilian recalled similar comments when she and Mr. Umaña were living in the Danubio Azul *mesón*. Appx. 20. She could have told trial counsel or the mitigation specialist about an incident in which Mr. Umaña insisted that he saw a "long haired woman" beckoning to him and was frustrated when his cousin did not see the same thing. He described hearing noises as if someone was opening and shutting doors and felt that someone was blowing air on him. Appx. 15. His girlfriend, Monica, saw Mr. Umaña staring off and talking to things were not there; not knowing what to make of it, she teased him and said falling from the mango tree must have made him crazy. Appx. 12. Mr. Umaña's brother Saul realized something was off about Mr. Umaña when he told him about demons that he saw and tried to draw the images in an effort to convince him and others that this was real. In his late teens or early twenties, Mr. Umaña drew images of demons with horns and tongues sticking out. He showed these images to his brother and others around him and they told Mr. Umaña he was crazy. Mr. Umaña was

89

insistent that what he saw was real and was not convinced otherwise. Appx. 22.

Had counsel interviewed Mr. Umaña's family and friends, they would have learned that they had longstanding concerns about his behavior. They also would have provided information about a family history of substance abuse and potential mental health impairments in Mr. Umaña's extended family. These include relatives who suffered from depression; drank to excess; exhibited odd behaviors consistent with mental illness, talked to themselves, and had trouble conversing. Appx's 9, 17, 10, 22, 2, 7, 4, 5, 20, 14 and 8 ¶1; Appx.'s 8, ¶1; Appx. 5. As mental illness can sometimes run in families, such evidence should have been shared with an expert.

Mr. Umaña's letters from jail also should have raised red flags for the trial team. Among other things he expressed in these letters was a belief that he could predict natural disasters, that deceased relatives and friends visited him through dreams, and that his visions were real.

Trial counsel's deficient investigation into Mr. Umaña's background and history hamstrung the development of evidence relevant to mental illness from the very beginning. Trial counsel should have investigated Mr. Umaña's behaviors, asked an expert to look into them, and presented this evidence to the jury. Had Mr. Umaña's counsel properly investigated and presented such evidence, there is a reasonable probability that the jury might have decided to spare his life.

90

**E.**   **Had counsel properly investigated, developed and presented mitigation about Mr. Umaña's mental health impairments, there is at least a reasonable probability that at least one juror would not have found death to be an appropriate punishment for him.**

When considering the prejudice from trial counsel's deficient performance, the Court must consider cumulatively the evidence that was presented during the trial and sentencing proceeding in addition to the evidence that has been proffered in post-conviction proceedings. *See Williams v. Taylor.* When the combined evidence of lay and expert testimony is considered as a whole, there is a reasonable probability that at least one juror would have voted to return a sentence of life imprisonment without parole instead of death.

Mr. Umaña's sentencing phase would have looked very different with the mental health evidence and testimony of experts that could have been offered, as described above. The jury heard virtually no lay evidence regarding Mr. Umaña's intellectual and adaptive limitations. But for counsel's ineffective investigation, however, the evidence would have shown that Mr. Umaña without a doubt left school after failing remedial classes in the third grade – at the age of twelve -- after having made at least two prior unsuccessful attempts to master the third grade material and having also repeated first grade more than once. The evidence would further have shown that it was highly unusual for anyone as old as twelve not to have completed the third grade. He was still frequently wetting his bed at the age of 10 or 12. In his later teens, he could still barely read and write, despite his apparent desire to learn and the help he sought from his younger girlfriend. Combined with information the jury did learn at sentencing such as his struggles in his menial jobs, this additional information would have provided the jury with a comprehensive picture of Mr. Umaña's deficits.

91

An expert could have placed that information in context and further explained that Mr. Umaña's IQ score placed him in the bottom two percent of the population in intelligence.

This evidence of Mr. Umaña's intellectual disability, generally low intelligence, and his significant and profound impairments in adaptive functioning would not only have been mitigating in its own right but would have countered the arguments by the government that Mr. Umaña was a savvy and clever schemer who led a notorious international gang. This evidence could have helped to show that the government's overall portrayal of Mr. Umaña was inaccurate and misleading.

While trial counsel did put on testimony at trial from a trauma expert, the evidence of trauma on which that expert relied was not personalized to Mr. Umaña. The only trauma described was that which anyone living through the civil war in El Salvador would have experienced, and opened the defense up to a scathing response by the prosecution that the expert's testimony effectively suggested that any person who had grown up in El Salvador then had reason to kill but the vast majority did not. Armed with an actual history of Mr. Umaña's childhood, however, the expert's testimony about trauma would have been individualized and related not just to the effects of violence from the war, but to the specific violent acts and sights Mr. Umaña had actually witnessed (a neighbor hanging from a tree; decomposing bodies strewn in a ditch; a man who lived nearby shooting at passing militants, and drawing their return fire towards Mr. Umaña's own living quarters; women in an accident being thrown from their car; his father, Rafael, beating his mother in the face with closed fists). The trauma expert could have also described the physical trauma young Mr. Umaña suffered personally, like the frequent beatings Rafael inflicted on him for unpredictable reasons, and the emotional trauma caused by

92

his great grandmother dying when he was eight, by his father withholding food from him, and telling him that his own mother had abandoned him.

With these historical facts about Mr. Umaña's childhood as a backdrop, an expert in trauma could then have described the effects of complex and chronic trauma on Mr. Umaña's emotional and neurological development and functioning. An expert in trauma could also have related these traumatic events and the damage they wreaked on Mr. Umaña to his decision at age 19 to join MS-13, an organization that would have offered him a degree of protection and camaraderie that had been missing from his life.

Mr. Umaña could also have presented a far more compelling case for brain damage, supported by the corroborating testimony of lay witnesses, by the neuropsychological testing results, by the findings of an neuropsychiatrist based on quantitative analysis of his PET scan, and in conjunction with the testimony of the trauma expert on the neurological changes chronic trauma can have on a child's developing brain. The defense could have presented factually supported evidence not just that Mr. Umaña suffered from brain damage, but that the damage had a profound effect on his behavior, resulting in impulsiveness and impaired his control and ability to make reasoned decisions, particularly in times of stress. Appx. 29.

The jury would have heard from lay and expert witnesses and corroborating letters about Mr. Umaña's visions of dead relatives, predictions of natural catastrophes, bizarre dreams, imaginings, paranoia, and other behavior consistent with mental illness. The jury would have heard that Mr. Umaña had what appear to be visual and auditory hallucinations, he saw demons and other images things nobody else could see and heard voices that no one else heard and was so convinced these images were real and drew what he saw as if to prove this was reality.

93

This evidence would have strongly supported the defense claim that Mr. Umaña suffered from brain damage, that left him, *inter alia*, unable to process turbulent, fast-moving events. Such evidence would have helped put his acts at the restaurant in North Carolina into a wholly different context than they were presented at trial. This evidence could have supported a defense at guilt-innocence and a statutory mitigator at sentencing. This evidence would also have helped humanize him in the eyes of the jury in ways that were more broadly mitigating and reduced the jury's perception of his moral culpability.

Evidence that Mr. Umaña had suffered from hallucinations, hearing voices, had visions, and terrifying nightmares would also have supported a claim that he was mentally ill, and exhibited breaks with reality, a symptom consistent with schizophrenia and other serious mental health disorders.

For example, the jury unanimously rejected the mitigating circumstance that "Alejandro Enrique Umaña suffered from head injuries early in life that resulted in damage to areas of the brain related to behavior." This would have been different if trial counsel had presented lay testimony corroborating his head injuries and their adverse effects, the results of neuropsychological testing showing damage to his frontal lobe, and a quantitative analysis of the PET which verified and supported Dr. Merikangas's conclusions.

Only a single juror found as a mitigating circumstance that Mr. Umaña "did not have the benefit of schooling beyond the third grade." If trial counsel had placed this mitigating circumstance in the context of a child repeatedly failing classes because of his intellectual limitations, the jury would have viewed the fact of his failure in school as a mitigating circumstance. Further, had trial counsel presented expert testimony making the connection

94

between Mr. Umaña's problems in school and his adaptive behavior deficits as a child and adult, the jury would have viewed him in a completely different light.

Nine jurors recognized that Mr. Umaña was "exposed to the violence of civil war in El Salvador at an early age," but again there was no individualized expert testimony connecting that exposure to trauma that would have a profound effect on Mr. Umaña as an adult. The absence of such a connection was revealed by the unanimous rejection by jurors of the mitigating circumstance that Mr. Umaña's childhood was "marked by factors that increased the risk of criminal activity later in life."

There is a reasonable probability that had the substantial evidence of the profound complex trauma, intellectual limitations, brain damage and mental illness impacting Mr. Umaña's development and behavior been adequately investigated and presented to the jury, the result of his sentencing proceeding would have been different.

In the sentencing trial, Dr. Merikangas was the only testifying expert who had evaluated the defendant. Dr. Merikangas' report stated:

> Mr. Umaña is a brain-damaged man with developmental cognitive impairments in the mentally retarded range. He has abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and abnormal quantitative EEG. These brain impairments, to a reasonable degree of medical probability, render him less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals. These brain impairments stemming from early childhood are not his by choice, but are the result of environmental causes beyond his control.

Appx. 72. With the lay and expert evidence laid out above, trial counsel could have presented an integrated, full-scale picture of a man whose life and mental health were far different from what the Government would have had the jury believe about him.

95

**F.** **Had counsel properly investigated, developed and presented mitigation about Mr. Umaña's mental health impairments, there is at least a reasonable probability that the jury would have found he lacked the mens rea to be convicted of willful, intentional, deliberate, or premeditated murder.**

The mental health evidence described above, including evidence of Mr. Umaña's brain damage, inability to process information, and lack of executive brain function, taken together with his mental illness and responses caused by exposure to chronic trauma, should have been introduced as evidence in guilt-innocence to demonstrate that he lacked the mens rea – in the highly charged atmosphere of the restaurant in which the shootings took place – to have killed willfully, or with intent, deliberation, or premeditation. Had the defense offered a mental health defense with the evidence they could have developed, there is a reasonable probability that the Government could not have proved the North Carolina crimes beyond a reasonable doubt under either a generic definition of murder or under the North Carolina statutory definition.

This probability is underscored by the jury's unanimous findings of the mitigating factors at penalty phase that the underlying offense was a result of no substantial planning and resulted from an emotionally-charged fight. ECF Doc. No. at 1048 at 4-6. Clearly, even without a mental health defense, the jury harbored doubts that Mr. Umaña's violent reaction in the restaurant was anything other than an emotional response to a highly volatile situation. Placed in the context by expert mental health testimony, those doubts may well have amounted to a different outcome at guilt-innocence.

But for trial counsel's failure to investigate and develop an accurate factual account of Mr. Umaña's tragic childhood and the signs and symptoms he had exhibited all his life of low intelligence, brain damage, and mental illness, which could have:

96

- supported a wide range of mitigating expert mental health evidence,

- explained his decision to join MS-13,

- put into context his impulsive reaction in shooting his two victims in North Carolina, and

- would have insulated the case in mitigation against the Government's attacks.

There is a reasonable probability that the outcome of both the trial and the penalty phase hearing in this case would have been different. This Court should vacate Mr. Umaña's convictions and sentence, and grant him a new trial.

## III. TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT ALL AVAILABLE EVIDENCE AND TO FULLY PREPARE THEIR EXPERTS AT THE PRETRIAL *ATKINS* HEARING DEPRIVED THE COURT OF THE FACTS NECESSARY TO A RELIABLE DETERMINATION AND TO A FINDING THAT MR. UMAÑA CANNOT CONSTITUTIONALLY BE EXECUTED PURSUANT TO THE EIGHTH AMENDMENT.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

### A. Counsel failed to investigate, present and prepare lay witness evidence that would have established that Mr. Umaña meets the criteria for mental retardation as defined by *Atkins v. Virginia* and thus was ineligible for a sentence of death.

Counsel's failure to marshal and present readily available evidence demonstrating Mr. Umaña's intellectual disability deprived this Court from hearing substantial compelling evidence of Mr. Umaña's substantial deficits in intellectual functioning and adaptive behavior. Had trial counsel conducted an adequate investigation, there is a reasonable probability that but for the deficient investigation by trial counsel, the results of the pretrial hearing on mental retardation would have been different.

97

As documented in other sections of this Motion, the post-conviction investigation revealed a wealth of mitigating evidence—never heard by this Court—which would also have supported a showing of adaptive behavior deficits consistent with intellectual disability. *See* Claims II, III and IV.

Trial counsel failed to discover and present critical evidence about Mr. Umaña's inability to learn and his significant problems with memory. According to his Aunt Reina, he tried, but he did not have the ability to learn and did not understand. "Alex was also forgetful. People from the school would tell my mother Alex was doing poorly with his schoolwork, but my mother could not help him." Appx. 19 at ¶ 17. Similarly, his paternal cousin, Lilian Tino, could have informed the Court: "Alex repeated grades many times. Alex did not do well in school. The teachers used to tell my grandma that Alex would eat in class and come without his homework. The complaints were never for fighting with other children. The teacher used to tell my grandma to take Alex to a psychologist, that Alex was not right." Appx. 15 at ¶14.

Lay witnesses also could have explained how Mr. Umaña had difficulty understanding and processing complex information. A neighbor, Vilma Araceli Salazar de Argueta, who is few years older than Alejandro, could have testified:

> I think Alex did not have the ability to learn in school. It was very difficult for him to learn. He would stutter when he tried to read and sometimes even when he spoke; we would bother him. Alex would ask me to help him with his homework. When I tried to explain things to him, he would get confused and did not understand; he did not get it.

Appx. 1 at ¶ 21.

Throughout his childhood, Mr. Umaña struggled with basic academic skills, including reading and writing. Monica Tatiana Reyes, a former girlfriend of Mr. Umaña recalled:

98

Alex had difficulty reading and writing. Alex liked me to read to him and asked me to teach him to write. He told me he had not finished the third grade. He tried to read in front of me, but he became easily frustrated and embarrassed. . . Alex also wrote poorly. Even when I explained things to him, he was still confused. For example, Alex would confuse 'b' and 'd.' I explained to him that it is the same little belly but on the other side. He also confused uppercase and lowercase.

Appx. 12 at ¶9.

Others were able to describe Mr. Umaña as lacking in fundamental academic, social and self-help skills. Ms. Reyes, for example, could have related that "Alex was also forgetful and had trouble with simple things. He would often put each shoe on the wrong foot. Once, he put money for food in his shoe. When the time came to pay, he could not find the money. He told me, 'I gave you the money.' Later, when he took off his shoes, he found the money." *Id*. at 14. Ms. Tino could have offered additional evidence of his deficits: "Alex was very forgetful. He would be asked to bring things like bottle caps or twigs to do projects, and he would forget to bring them. He did very poorly in school. He would forget things and did not understand what he was being taught. He hardly learned to read or write." Appx. 12 at ¶ 14. Ms. Tino further noted that "[i]t frustrated my grandma that Alex could not dress himself. He would put his shirts on backwards [/inside out] and his shoes on the wrong feet. Even though we told him it was wrong, he would argue it was not. Sometimes he would go to school with mismatched shoes. Alex did not know how to tie his shoelaces, either. When my grandma told him to tie them, Alex would not tie them but tuck them inside his shoe." Appx. 12 at ¶ 15.

Mr. Umaña's social skills were also significantly impaired. His brother Saul Osvaldo Umaña is the younger of the two but was much more mature than Mr. Umaña. Saul "gave Alex advice and told him what to do and how to do things." Appx. 22 at ¶ 40. Saul stated that Mr. Umaña "has more trouble understanding things than most people." Id. Ms. Reyes confirmed that Mr.

99

Umaña missed social cues, and that Alejandro "did not realize when people were having serious conversation. Alex would make jokes when it was inappropriate." Appx. 12 at ¶ 11. She also believed that Mr. Umaña's brother "Saul was the older one because he seems more mature than Alex." Id. at ¶12.

Moreover, because of trial counsel's oversights, this Court heard false evidence about Mr. Umaña's birth date, information which was critical to an accurate determination and understanding of Mr. Umaña's intellectual deficits and developmental delays. Mr. Umaña was born in 1982, not 1984, which magnifies how great his developmental delays were. For example, because his birth year was actually 1982, Mr. Umaña was in fact 12 years old in 1994 when he was still struggling to pass the third grade. According to a teacher from the school that Mr. Umaña attended, Ms. Magaña, a 12-year-old third grader was extremely unusual in her experience; "Normally, a child passes third grade by age nine." Appx. 6 at ¶13.

**B.      Had counsel properly prepared their expert witnesses, the result of the *Atkins* hearing would have been different.**

Had this and other similar evidence from lay witnesses been provided to the defense experts, it would have significantly strengthened their findings of intellectual disability. Trial counsel's expert on intellectual disability, Dr. John Gregory Olley, reviewed these new declarations, and found that the witnesses corroborated details of his previous testimony and provided information on factors supporting a diagnosis of intellectual disability that he was unaware of at the time of the pretrial proceedings. Appx. 28. Dr. Olley states that the knowledge that Mr. Umaña was born in 1982 and not in 1984, "strengthens the fact that Alejandro had

100

significant learning struggles in school." *Id*. at ¶12.[21] Overall, Dr. Olley finds that

> These declarations document Mr. Umaña's very significantly limited academic and social skills. They indicate very slow learning of self-care skills. . . . They []describe significant impairment in adaptive behavior that originated in childhood.

*Id*. At ¶18.

Trial counsel also failed to present additional IQ testing to the Court which would have supported a finding of significant deficits in intellectual functioning. Following the pretrial hearing on mental retardation, Dr. Ricardo Weinstein conducted additional IQ and intelligence testing. On December 1, 2009, Dr. Weinstein administered to Mr. Umaña a Batería III, a general comprehensive test of intellectual functioning, and a CTONI 2, a comprehensive test of non-verbal intelligence. This additional testing further supports Mr. Umaña's contention that he has substantial deficits in intellectual functioning.

Dr. Weinstein reported to trial counsel the results of this testing:

On the C-TONI 2, he obtained a Full Scale Score of 53, a Pictoral Score of 57 and a Geometric Score of 57. These scores are very consistent with the scores obtained in the C-TONI that the took in July 2009.

On the Bateria III he obtained a GIA Score (equivalent to Full Scale IQ Score) of 59 at 95% Confidence Interval 55-62. His academic skills in Reading are at the 5th grade level, Spelling at the 3.5 grade and Math at the 3.2 grade.

Appx. 81.

---

[21] It is also possible that the age difference affected the scoring of Mr, Umaña's IQ tests.

101

Dr. Olley has recently reviewed this IQ testing conducted by Dr. Ricardo Weinstein and has concluded that Dr. Weinstein's testing was better suited to Mr. Umaña than the testing conducted by the Government's expert Dr. Enrique Suarez. Appx. 28.

There is a reasonable probability that, but for the deficient performance of counsel in investigating lay evidence of adaptive behaviors, and preparing and presenting expert testimony, the result of the pretrial determination on mental retardation would have been different.

**IV. MR. UMAÑA IS A PERSON WITH INTELLECTUALLY DISABILITY AND HIS EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT IN LIGHT OF THE SUPREME COURT'S RECENT DECISION IN *HALL V. FLORIDA***

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Although the *Atkins* decision "did not provide definitive procedural or substantive guides" for how lower courts should determine intellectual disability the Supreme Court's recent decision in *Hall v. Florida* made clear that the Constitution requires any standard to conform with scientifically- and medically-accepted clinical criteria. *Hall v. Florida*, 134 S.Ct. 1986, 1998 (2014) (internal citation omitted).[22] Because this Court's pre-*Hall* decision denying *Atkins* relief was issued without the guidance of the Supreme Court's *Hall* decision, its findings were inconsistent with current accepted standards. In light of the Supreme Court's decision in *Hall* as

---

[22] The dissent also makes clear that *Hall* represents a clear-cut change in law. *See* 134 S.Ct. at 2002 (Alito, J., dissenting) (noting that *Hall* "overrules" a portion of *Atkins*, "sharply departs" from prior precedent, and marks a "new" turn in Eighth Amendment jurisprudence); *id*. at 2005 (*Atkins* "declined to import" clinical standards into the law and rejected those standards as not dispositive).

102

well as further evidence discovered during the post-conviction investigation, Mr. Umaña can demonstrate that he is a person with intellectual disability and is thus exempt from execution.

The Supreme Court clarified in *Hall* that a state that "seeks to execute a man because he scored a 71 instead of 70 on an IQ test . . . misconstrues the Court's statements in *Atkins*." *Id.* at 2001. The Court deemed unconstitutional a Florida statute containing a "rigid rule" imposing IQ cutoffs for intellectual disability. *Id.* The petitioner in *Hall* scored 71 on an IQ test. He argued he was intellectually disabled under the clinical definitions cited in *Atkins*, which indicated that an IQ score of up to 75 falls within the range of intellectual disability. However, Florida law required an IQ score of 70 or below. The question presented to the Court in *Hall* was which standards governed, clinical standards or the statutory definition. The Court answered that the Constitution requires the determination of intellectual disability to be in accord with clinical standards established by the medical community. 134 S.Ct. at 1999-2001. Under *Hall*, this Court must look to "medical and professional expertise to define and explain how to diagnose the mental condition at issue." *Id.* at 1993. The Court's determination of intellectual disability must be "consistent with the views of the medical community." *Id.* at 1994. If a court "disregards established medical practice" in rejecting Petitioner's claim of intellectual disability, its finding will be deemed unconstitutional. *Id.* at 1995.[23]

---

[23] *Hall,* although addressing the first prong of an intellectual disability analysis (the IQ prong), applies with equal force to the determination of adaptive deficits.

103

**A.** **This Court's previous findings were made without the guidance of *Hall v. Florida* and thus do not preclude a determination in 2255 that Mr. Umaña has an intellectual disability.**

In light of *Hall v. Florida*, much of the evidence this Court relied upon in denying Mr. Umaña's motion on intellectual disability was accorded too much weight or, in some cases, should not even have been considered. As experts in the field of intellectual disability have documented, adaptive strengths and limitations often coexist in persons with intellectual disability. A clinically appropriate determination of intellectual disability focuses on the adaptive deficits, not the strengths that may coexist with those deficits. In fact, persons with mild intellectual disability can function successfully—and independently—in a community by acquiring social and vocational skills adequate for minimum self-support. During middle school, persons with mild intellectual disability develop "complex sentence structure, and their speech is clearly intelligible…By adolescence, normal language fluency may be evident." American Psychological Association, *Manual of Diagnosis and Professional Practice in Mental Retardation* 17-18 (John W. Jacobson and James A. Mulick eds., 1996). Although vocational opportunities may be limited, "these people are generally able to fulfill all expected adult roles." *Id*.

People with mild intellectual disability are capable of living remarkably meaningful and fulfilling lives, including the capacity to live independently, to work, and to marry and have families. One recent British study that surveyed persons with intellectual functioning in the mild intellectual disability range found that, "[a]lthough the mild intellectual impairment group were less likely to attain the following social outcomes than people with normal intellectual functioning, 67% had jobs, 73% were married, 62% had children and 54% owned their own

104

homes. 12% participated in adult education." I. Hall, *et al.*, *Social Outcomes in Adulthood of Children with Intellectual Impairment: Evidence from a Birth Cohort*, 49 J. INTELL. DISABILITY RES. 171 (2005).

Prior to the Supreme Court's *Hall* decision, this Court focused its previous analysis on what it perceived to be Mr. Umaña's strengths, rather than deficits, and based it on Mr. Umaña's self-reports and the testimony of correctional officers. These sources are disavowed among experts in the field and inconsistent with scientifically- and medically-accepted clinical criteria; under *Hall*, they analysis must comport with medical and scientific standards.

     i.    <u>Medically-accepted standards</u>

According to medical community standards, information of a person's functioning in a "highly structured and limited environment of prison is a *poor indicator* of one's functioning." ABAS-II: Clinical Use and Interpretation, Oakland, Thomas and Patti L. Harrison (1st ed. 2008) (ABAS at 392) (citations omitted) (emphasis added). "Many people with mental retardation perform better in the structured prison setting than in less structured settings." *Id*. The restrictive and structured environment of incarceration "makes it *impossible to assess* typical adaptive behavior." (ABAS at 386) (citations omitted) (emphasis added). "Thus, reports from corrections officers or other observations of current functioning in prison are not valid indicators of level of adaptive behavior." *Id*.

The AAIDD Manual also emphasizes that reports of an individual's behavior must be "evaluated in relation to contexts typical of the individual's age peers." AAIDD, Intellectual Disability: Definition, Classification, and Systems of Supports (11th ed. 2010) ("AAIDD 2010 Manual") at 53. When in an "atypical" environment, such as prison, the mental health

105

professional must take into consideration the controlled setting when interpreting adaptive behavior assessments. *Id*. For example, prison guards will likely have only observed an individual in a highly restricted setting, not an ordinary community setting. They may not have any experience interacting with people with intellectual disability. Guards may also be biased or subject to fears of reprisal. "Correctional officers and other prison personnel *should probably never* be sought as respondents to provide information regarding the adaptive behavior of an individual that they've observed in a prison setting…. The main hesitation to involving prison personnel as respondents is related to the nature and contingencies of the prison setting. The prison setting is an artificial environment that offers limited opportunities for many activities and behaviors defining adaptive behavior." Marc Tassé, Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases, 16 J. Applied Psych. 114, 116 (2009);[24] *See also* Appx. 28 at ¶ 21 (Dr. J. Gregory Olley's post-conviction declaration stating that there was no basis for Dr. Suarez's reliance on the jail officers and that the test clinicians and professionals use to determine significant deficits in adaptive behavior is based on adaption in the community, not in prison); *see also U.S. v. Wilson*, 04-CR-1016, U.S.D.C. N.Y. (March 15, 2016 Order granting relief following *Hall* remand) (finding prison evidence has reduced weight because the analysis must focus on whether the person was intellectually disabled at the time of the crime-not the present moment).

_____

[24] More recently, the DSM-V also specifically states that "[a]daptive behavior may be difficult to assess in a controlled setting," such as a prison or detention center. American Psychiatric Association, Diagnostic and statistical manual of mental disorders (5th ed. 2013) ("DSM-V") at 38. Accordingly, the DSM-V calls on practitioners to evaluate adaptive behavior and obtain corroborating information outside of those settings.

106

Similarly, medical community standards warn of the unreliability of relying solely on self-reporting for determining a person's functioning for intellectual disability. *See, e.g.*, Marc J. Tasse, Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases, Applied Neuropsychology 16: 2, 114, 119 (2009) ("Relying solely on the individual's self-report is fraught with problems."); AAIDD Manual at 51–52 ("Self-ratings of individuals ... may contain a certain degree of bias and should be interpreted with caution when determining an individual's level of adaptive behavior.... [T]he authors of this manual caution against relying heavily only on the information obtained from the individual ...."); Kay B. Stevens and J. Randall Price, Adaptive Behavior, Mental Retardation, and the Death Penalty, 6 J. of Forensic Psych. Practice 1, 17 (2006) ("To accept a criminal defendant's self report without skepticism is forensically naïve and constitutes a deviation from acceptable practice that may result in unreliable data." (emphasis added)); *see also* Keith Widaman and Gary Siperstein, Assessing Adaptive Behavior of Criminal Defendants in Capital Cases: A Reconsideration, Am. J. of Forensic Psych., Vol. 27, Issue 2, at 5, 27 (2009) ("Courts should never use [self-report] assessments ... as evidence in a high-stakes court proceeding that determines mental retardation."). In a post-conviction declaration, Dr. Olley also noted that the medical literature on intellectual disability emphasizes the inappropriateness of relying solely on the person's self-reporting of his own accomplishments. Appx. 28 at ¶22.

ii.  <u>In light of *Hall v. Florida*, the Eighth Amendment prohibits Mr. Umaña's execution, notwithstanding the Court's pre-trial findings on his claim of intellectual disability.</u>

On March 19, 2010, the Court denied Mr. Umaña's claim of intellectual disability. ECF Doc. No. 934. Intellectual functioning was not resolved by the Court and the adaptive

107

functioning question "present[ed] particular difficulty." *Id*. at 5-6. The Court found no significant limitations, but in the area of functional academics the Court found the evidence "mixed" and a "closer call" than most others. *Id*. at 13. In making this determination, this Court relied heavily on Mr. Umaña's self-reporting and the reporting by the jail guards.

Although Mr. Umaña presented school records showing he struggled with academics and could not pass the third grade, the Court relied on Mr. Umaña's self-report that he dropped out of school because of lack of supervision by his family. *Id*. at 13. The Court cited to Dr. Suarez's testimony at the *Atkins* hearing where he recounted Mr. Umaña's story that he stopped attending school because he lacked family support following the death of his grandmother. *Atkins* Hrg. at 307. This was interpreted as a willful, deliberate choice rather than an inability to master the content of his schooling. Post-conviction counsel have discovered that rather than leaving school due to his great-grandmother's death, he struggled and had difficulty understanding the material taught. Mr. Umaña's school records corroborate this account showing that his grades were consistently low and he was placed in a remedial class even though he had good attendance. This excuse is also factually inaccurate: Mr. Umaña's great-grandmother died in June of 1991 (Appx. 33) when Mr. Umaña was only eight years old and in the first grade. Appx. 31 at 2-3. Records prove that Mr. Umaña continued to attend school for another three years, finally dropping out in 1994. Appx. 31. His school records also show that Mr. Umaña was, in fact, trying. Mr. Umaña had good attendance in 1991 and 1992. *Id*. He also received good grades in personal relations and cooperation, promotion of customs and beliefs, and practice of moral and civil values but failed in other areas like responsibility, health and protection, initiative, self-confidence, and work habits. *Id*.; Appx. 6 at ¶16-17.

108

The Court also relied on a jail guard's observations of Mr. Umaña's functioning while he was incarcerated as related in the report and testimony of Dr. Enrique Suarez, the Government expert. Dr. Suarez stated that he spoke to three jail officers who observed Mr. Umaña in the jail setting. *Atkins* Gov. Ex. A-3 at 19-22. Each officer reported that Mr. Umaña was able to function while incarcerated because he was able to dress himself independently, speak broken English and ask the guards to speak slowly, ask for supplies, exercise, use the telephone, clean his cell, and order commissary items. *Id*. One non-Spanish speaking officer reported that he witnessed Mr. Umaña teaching another inmate Spanish by putting words on a paper and putting them up to his cell window so the other inmate could read it. *Id*. at 22. Another officer reported that Mr. Umaña was able to communicate that he had headaches and asked for request and grievance forms (but was unaware if Mr. Umaña asked for medical request forms). *Id*. at 21. Mr. Umaña refused to take medication for his tuberculosis because of headaches and nausea, but later changed his mind after being told about the risks and the length of time remaining on the medication. *Id*. at 10, 23. Mr. Umaña was also able to refuse meals in order to fast for Ramadan. *Id*. at 22.

All three officers stated Mr. Umaña was a respectful and cooperative inmate who appeared average compared to other inmates. *Id.* at 19-22. Dr. Suarez asked each of the officers their opinion on whether Mr. Umaña suffered from intellectual impairment and each answered in the negative. *Id*. at 20 (based on Officer McIntyre's observations he "believe[d] that Mr. Umaña does not seem to have any intellectual impairment."); *Id*. at 21 (Officer Farley reported Mr. Umaña had "not exhibited any deficits or impairments in his functioning in jail."). Dr. Suarez emphasized Officer Holley's experience in working as a law enforcement officer at a special education school for children and adults and based on that experience concluded that "Mr.

109

Umaña does not exhibit any of the deficits seen in mentally retarded adults or special needs children." *Id*. at 23. Because these observations are not clinically relevant to a determination of intellectual disability, in light of *Hall* they can no longer vitiate Mr. Umaña's *Atkins* claim.

The officers' reports about his ability to communicate certain needs like getting supplies or letting them know he has a headache does not give any sort of reliable conclusion about Mr. Umaña's functioning outside of the institutional setting. His ability to do the things listed are not beyond the capabilities of someone with mild mental retardation.

As set forth in greater detail in Claim III above, if accepted professional and clinical standards are considered as required by *Hall v. Florida*, Mr. Umaña can demonstrate that he meets the definition of a person with intellectual disabilities with significant impairment in intelligence and adaptive functioning that originated in childhood.   Appx. 28 at ¶23-24.

## V. TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE CHALLENGING THE GOVERNMENT'S ACCOUNT OF MR. UMAÑA'S ROLE IN THE UNADJUDICATED CALIFORNIA MURDERS ALLEGED IN SUPPORT OF NON-STATUTORY AGGRAVATING FACTORS 4(A) AND (B), IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

The Government faced a difficult task in trying to convince the jury that Mr. Umaña's case presented as "the worst of the worst" such that the law required he be sentenced to death. *See Kansas v. Marsh*, 548 U.S. 163, 206 (2006). In fact, the jury unanimously found that his offense of conviction at the guilt/innocence phase was significantly mitigated because it was unplanned and emotionally charged.   *See* ECF Docs. Nos. 1048-51, pp 5-6; *Williams v. Taylor*,

110

529 U.S. 362, 398 (2000) (explaining that whether "violent behavior was a compulsive reaction rather than the product of coldblooded premeditation" affects the assessment of moral culpability). Leading up to the Greensboro murders there was evidence of an escalating altercation between Mr. Umaña's group and the victims. *See* GPT at 381-386. The two groups exchanged words and shoves in the moments prior to the shooting, and the victims of the Greensboro shooting had blood alcohol concentrations of .20 and .17 (GPT at 493 and 497), both of which were more than double the legal limit in North Carolina. *See* N.C. GEN STAT. ANN. § 20-138.1. Suffice to say, the Greensboro killings on their own were not the type of crime that would typically warrant the death penalty. *Marsh*, 548 U.S. at 206 (commenting that "within the category of capital crimes, the death penalty must be reserved for 'the worst of the worst'") (citation omitted).

In order to compensate for what may have otherwise been an underwhelming case for the death penalty, the Government relied heavily on evidence of three additional homicides in California for which Mr. Umaña had never been tried nor convicted. The "California murders" were two separate incidents from a few years prior to the Greensboro murders, in which three people had been killed. One took place on a busy street in Los Angeles, (the "Fairfax Avenue shooting"), and the other took place at a public park in Los Angeles (the "Lemon Grove shooting").

These additional killings were central to the Government's case at the penalty phase. The first eight witnesses the Government called to testify during the penalty phase discussed nothing other than the California murders, and testimony regarding the California murders consumed nearly three quarters of the Government's case for death. The Government used the Fairfax Ave

111

and Lemon Grove shootings to convey to the jury that Mr. Umaña had killed "over and over and over again," (PPT at 889), that he "kills who he wants to kill for his own reasons," (PPT at 834), and that "if it serves his needs he'll do it again." PPT at 835.

As discussed in further detail in the sections that follow, trial counsel were ineffective for failing to investigate and adequately challenge the Government's account of the Fairfax and Lemon Grove shootings.[25] There was information favorable to Mr. Umaña that could have been discovered through independent investigation, as well as readily available exculpatory and mitigating information in the documents turned over to trial counsel in discovery. That information should have been used to undermine the Government's highly damaging allegations that Mr. Umaña was the shooter in the California murders. Counsel's anemic investigation and lack of preparation was objectively unreasonable, and, as discussed in further detail below, the readily available evidence was, for the most part, consistent with the defense theory that trial counsel chose to advance at trial, so they had no reason not to pursue it. Moreover, in light of the central role these unadjudicated incidents played in the jury's decision to sentence Mr. Umaña to death, trial counsel's ineffective assistance was prejudicial.

------

[25] As discussed in Claims VI and VII, trial counsel's ineffective assistance was not the sole constitutional infirmity associated with the Fairfax and Lemon Grove shootings: the Government apparently suppressed exculpatory information and presented false and misleading testimony to the jury relating to the incidents as well.

112

**A.      The Record Developed At the Penalty Phase Relating to the California Murders.**

i.      The Lemon Grove shooting.

The Government essentially advanced four pieces of evidence in its quest to persuade the jury beyond a reasonable doubt that Mr. Umaña was guilty of the unadjudicated Lemon Grove Park murder: 1) two identifications of Mr. Umaña that witness Freddy Gonzalez made using photograph lineups made prior to trial, 2) a double hearsay statement from Rene Arevalo to Los Angeles Police Detective Thomas Small that Mr. Umaña was the Lemon Grove shooter, 3) a ballistics match between the .22 caliber bullet casing found at Lemon Grove Park and two casings recovered from the Fairfax Avenue shooting, that was combined with 4) statements from Mr. Umaña that he was at Lemon Grove Park around the time of the shooting.

Detective Small was the Government's first witness during the selection phase of Mr. Umaña's sentencing trial. PPT at 90. The Government's theory of the Lemon Grove shooting was introduced through Small and three testifying eyewitnesses to the shooting, Roberto Ramos, Juan Lara, and Freddy Gonzalez. The Government's theory of the case was that these three eyewitnesses had been playing basketball in the park at night with another person by the name of Andy Abarca. While they sat relaxing on the bleachers afterward, Mr. Umaña and another person walked up to the basketball players and opened fire on them without warning. PPT at 100-101. Andy Abarca was killed, but the other three victims survived. PPT at 97.

Detective Small explained that Lemon Grove Park was disputed "turf" and the subject of a gang battle involving MS-13, JMK, and a gang known as the "The Perfect Criminals," which also went by "Tree Park Criminals," or "TPC" for short. *Id*. According to Small, the area is "heavily seeded with gang activity" and gang members would "mark [disputed turf] with graffiti

113

… fight for it … and kill for it." PPT at 92-93. Small also testified that he recovered a .22 caliber bullet casing from Lemon Grove Park which was later linked to the Fairfax Avenue shooting. PPT at 107.

Detective Small further testified that he believed the motive for the attack was retaliatory because Freddy Gonzalez had robbed a MS-13 member several months prior to the shooting. *Id*. at 105-06. Therefore, Freddy Gonzalez was the intended target of the shooting. *Id*. at 107. Without providing a specific date, Small explained that at some point, Mr. Umaña and another individual by the name of Geovani Rodas (aka Sin), became the main suspects in his investigation. Small testified about a conversation he had with MS-13 gang member, Rene Arevalo in Los Angeles County Jail.[26] *Id*. at 109. According to Small's testimony, Rene Arevalo looked at a photograph of Mr. Umaña and told Small "that's your Lemon Grove shooter" (*Id*. at 110), even though Mr. Arevalo was not present at the Lemon Grove shooting himself. *Id*. at 117.

The bulk of Roberto Ramos's testimony was as an eyewitness and victim of the Lemon Grove Park shooting. Roberto Ramos explained that Freddy Gonzalez was a member of the TPC gang and discussed his conversations with the LAPD after the shooting. *Id*. at 134-35. He explained that he wanted to assist in the investigation, provided descriptions of the shooters, stated he was willing to meet with a sketch artist, and told the police that he could identify the

---

[26] This interview is one of many that Mr. Umaña's post-conviction team has not been given the opportunity to review. It appears that trial counsel neither reviewed nor requested that this interview be turned over by the prosecution. Post-conviction counsel has made multiple requests to the Government, asking for production of this interview prior to filing Mr. Umaña's §2255 motion, and Mr. Umaña has filed a motion to compel the Government to disclose this interview and others pertaining to the California murders, which is pending ruling. *See* 16-cv-00057, ECF Doc. No. 13.

114

shooters if he was shown their picture. *Id* at 135. He acknowledged that he was shown photographs by the LAPD on at least two occasions and that he never saw the shooter in those photographs, despite believing that he could identify the shooters. *Id*. at 135-36.

Juan Lara testified in a manner that was consistent with Roberto Ramos's testimony. *See id*. at 138-48. He provided a similar narrative as to the shooting that occurred in Lemon Grove Park, and also explained that he wanted to assist in the police investigation, but that he was unable to identify anyone in the photographs that he was shown by the police. *Id*. at 147.

The testimony of Freddy Gonzalez was the subject of substantial disagreement between the parties (*see* PPT at 7-9, 307-13, and 322-29). Freddy Gonzalez was "the only witness that identifi[ed] [Mr. Umaña] in some way as the shooter." PPT at 328. The Government argued for the ability to have Freddy Gonzalez identify Mr. Umaña in open court as the Lemon Grove shooter. *Id.* Ultimately, the Court determined that "the prior description of the criminal … is suspect," noted that "[t]he Court does not have confidence in the pretrial identification," and therefore the Government was not allowed to ask Freddy Gonzalez to identify Mr. Umaña in open court. *Id.* at 327-28. But the Government was allowed to present Freddy Gonzalez's pretrial identifications of Mr. Umaña, leaving any questions of reliability up to the trial counsel to elicit. PPT at 328-29.

On the witness stand, Freddy Gonzalez testified to his own version of what happened at the Lemon Grove shooting, stating that he only saw a single shooter. PT at 341. Freddy Gonzalez admitted to having prior felony convictions that included concealed weapons charges and a robbery of a MS-13 member. *Id*. at 314-15. He further admitted to being a member of the TPC gang and a rival of MS-13. *Id*. at 315.

115

Raffi Djabourian, the medical examiner at the Los Angeles Coroner's office at the time when Andy Abarca was shot and killed, also testified.   Djabourian performed an autopsy of Mr. Abarca's body and determined that the cause of death was multiple gunshot wounds. He was able to recover a bullet from the body of Andy Abarca that was "medium caliber," indicating a nine-millimeter, .357, .38 caliber, or something similar in size. *Id*. at 154. The bullet he recovered was a larger round than a .22 caliber bullet, meaning that it could not have been fired from the gun that same gun that was used in the Fairfax Avenue shooting. *Id.* at 155. The recovery of a medium caliber bullet from Andy Abarca's body suggested that either there were two guns used in the Lemon Grove shooting, or the .22 caliber casing was already in the park prior to the when the shooting occurred. No firearm was ever recovered in connection with the Lemon Grove shooting.

### ii.   The Fairfax Avenue Shooting

With regards to the Fairfax Avenue shooting, the Government alleged that Mr. Umaña was one of five MS-13 affiliates who were in a car on Fairfax Avenue in Los Angeles on July 27, 2005. Mr. Umaña was in the front passenger seat of a gold-colored Nissan Altima, Rene Arevalo was the driver, Luis Rivera was in one of the rear seats, Luis Ramos was in another, and Eddie Ruiz sat in the middle seat. As the MS-13 members drove down the road, two members of a "tagging crew" called "Posted on Fairfax" were on the sidewalk. PPT at 180-81. The taggers began flashing gang signs at Mr. Umaña and the four other people in the Nissan Altima. *Id.* Rene Arevalo pulled the car over to the side of the street, and several of the MS-13 gang members got out of the car to confront or fight them, but Mr. Umaña shot them instead. *Id.* Two .22 caliber bullet casings were found at the scene of the crime, leading the detectives to believe the victims

116

were shot by a .22 caliber handgun. PPT at 174. No firearm was ever recovered in connection with the Fairax Avenue shooting either.

In order to make its case to the jury that Mr. Umaña was the shooter in the Fairfax Avenue incident, the Government relied almost entirely on the testimony of two LAPD detectives, including Detective Gene Parshall, who was in charge of investigating the homicide. PPT at 170. Much of Parshall's testimony was based on his interrogations of the MS-13 gang members who were in the car with Mr. Umaña and also charged with the Fairfax Ave. shooting. Specifically, Parshall testified to his interrogations of Luis Rivera, Luis Ramos, and Rene Arevalo, all three of whom were suspects and all three of whom blamed Mr. Umaña as the triggerman. No other witness identified Mr. Umaña as the shooter, including two neutral eyewitness.

Parshall began investigating the Fairfax Avenue shooting on July 27, 2005. PPT at 170. From the crime scene location he collected two .22 caliber bullet casings. PPT at 174. He discovered later that those .22 caliber casings matched a .22 caliber casing found at the scene of the Lemon Grove shooting. PPT at 178. Parshall recalled speaking with exactly one witness on the day of the shooting who told him that the shooter was the driver of the car (Rene Arevalo). PPT at 196.   Detective Parshall later spoke with someone he referred to only as "an individual" who provided him with information that he had heard about the Fairfax Avenue shooting from Luis Ramos. PPT at 177. This "individual" told Parshall that the shooting was related to MS-13. *Id.*

Parshall later interviewed Luis Rivera who blamed Mr. Umaña as the shooter. PPT at 180-81. Parshall testified that after Luis Rivera, he interviewed Luis Ramos who chose not to

117

speak with him, but instead asked for an attorney. PPT at 182. Parshall decided to put Luis Rivera and Luis Ramos together in a cell over the weekend so that he could record their conversation (PPT at 183), but Luis Rivera and Luis Ramos located and destroyed the recording device. PPT at 206. Later Luis Ramos came forward and "basically said the same thing that Luis Rivera had said." PPT at 184. Parshall testified that he interviewed Rene Arevalo as well, who had a similar story to Luis Ramos and Luis Rivera. PPT at 212-13.

The other LAPD detective who testified about the Fairfax Avenue shooting was Detective Barry Telis. His testimony was substantially the same as Parshall's. One additional fact that was introduced during Telis's testimony was that Rene Arevalo said the gun Mr. Umaña allegedly had during the Fairfax Avenue shooting was big like a "freaking rifle." PPT at 239-40. Detective Telis later testified that Mr. Arevalo had clarified the gun was of a similar size to his service pistol except that it was a revolver rather than a semi-automatic. PPT at 245. All other testimony regarding the Fairfax murder weapon was that it was a semi-automatic pistol, not a revolver. *See* PPT 215, 255-56.

### iii. The alleged ballistics link between the two shootings.

No firearm was ever recovered from either the Lemon Grove shooting or the Fairfax Avenue shooting. The detectives that investigated both the Fairfax Avenue and Lemon Grove crime scenes found .22 caliber casings at each respective location. There were two .22 caliber casings found at Fairfax Avenue and there was one .22 caliber casing found at Lemon Grove Park.[27] PPT at 174, 107. According to Small, "after requesting some analysis on the .22 caliber

---

[27] The .22 caliber casing on the ground at Lemon Grove Park did not match the caliber of bullet recovered from the victim's body. *See* PPT at 154-55.

casing" he found it was linked to the two casings from the Fairfax Avenue shooting. PPT at 108-09. Small further testified "[t]he casings were matched up and linked, one in the same gun." *Id*. at 109. Parshall testified to the same thing, as did Telis. PPT at 177-78, 238. Those casings were also analyzed by criminalist William Moore. Moore testified that the .22 casings "possess individualizing features sufficient to identify them to having been fired in the same firearm." PPT at 259. He further stated that his "opinion based upon the objective evidence presented to [him] as verified and validated by a second examiner." PPT at 259.

## B.     The Post-conviction Investigation

The post-conviction investigation uncovered evidence that strongly calls into question the role of Mr. Umaña in the California murders and which could have been used to show the Court and the jury how unreliable the Government's allegations were. The jury never heard crucial information about the Lemon Grove shooting that undermined evidence the Government put forward to try and hold Mr. Umaña responsible for the killing. Freddy Gonzalez, the only witness who identified Mr. Umaña as the shooter, also testified that he only saw one shooter at Lemon Grove Park. PPT at 341. The jury never heard, however, that Freddy Gonzalez picked out two other people in addition to Mr. Umaña as the one Lemon Grove shooter. Instead of hearing that Freddy Gonzalez's identification of Mr. Umaña was wavering, uncertain, and contradicted by other identifications that Freddy Gonzalez himself had made during conversations with the police, the jury was led to believe that Freddy Gonzalez simply picked out Mr. Umaña, only Mr. Umaña, and that he was "sure" about that identification. PPT at 313.

One of the people that Freddy Gonzalez picked out of a photographic lineup was Geovani Rodas, another suspect in the shooting. PPT at 108. There were many sources of information

119

linking Geovani Rodas to the shooting, in addition to Freddy Gonzalez's identification. Two witnesses who did not testify implicated Geovani Rodas as the Lemon Grove shooter. *E.g.* Appx. 51 at 9. And in the month following the Lemon Grove shooting, Geovani Rodas shot a man within a couple of blocks of Lemon Grove Park and later committed a series of robberies near Lemon Grove Park. *See* appx. 61 at 9-10. When Geovani Rodas was arrested for the robberies, he was in possession of a .357 caliber handgun, the same caliber of bullet that was recovered during the autopsy of the Lemon Grove victim. PPT at 154. In addition, one of the other victims, Juan Lara indicated that Geovani Rodas resembled the shooter. Appx. 51 at 23. Because of their failure to investigate these events that the Government relied on so heavily in aggravation, trial counsel's defense of Mr. Umaña at the penalty phase lacked any of this information.

In addition, the two other testifying eyewitnesses and victims who had expressed confidence in their ability to identify the Lemon Grove shooter (Juan Lara and Roberto Ramos), were shown photographic lineups that included pictures of Mr. Umaña and neither one selected him. PPT at 136, 146, The jury did not hear that these witnesses were ever shown Mr. Umaña's picture. Nor did the jury hear that there were additional witnesses who told LAPD detectives that Mr. Umaña was not the Lemon Grove shooter, or that a number of people in and around Lemon Grove Park at the time of the shooting either blamed someone other than Mr. Umaña or specifically said that Mr. Umaña was not involved.

Likewise, in connection with the Fairfax incident, there was compelling evidence that was never presented to the jury that showed Mr. Umaña was not the shooter. One of Parshall's first leads in the Fairfax shooting investigation was a person named Alex Barrera. Alex Barrera repeatedly told Parshall that Luis Ramos was the shooter in the Fairfax Avenue shooting, not Mr.

120

Umaña. Alex Barrera also told Parshall that Luis Ramos gave him .22 caliber ammunition immediately following the Fairfax Avenue shooting. That .22 caliber ammunition was the same brand as the .22 caliber casings found on the ground at the scene of the Fairfax Avenue shooting. Luis Rivera was the first person to implicate Mr. Umaña as the shooter in the Fairfax Avenue shooting and he was charged as an accomplice in that crime. During Luis Rivera's interview with Parshall, Luis Rivera initially denied any knowledge of the shooting and repeatedly denied knowing Luis Ramos. In fact, he appeared to be trying to protect or cover for Luis Ramos. Regardless, Parshall adopted the theory that Mr. Umaña was the shooter. Parshall in turn fed the story that Mr. Umaña was the shooter to the other two accomplices, Luis Ramos and Rene Arevalo, contaminating their statements. Luis Rivera, Luis Ramos, and Rene Arevalo, the three accomplices in the Fairfax shooting were the only people who implicated Mr. Umaña in the shooting.

Finally, there was information available that was not presented to the jury regarding the ballistics match between the .22 caliber casings at the Lemon Grove and Fairfax Avenue shooting locations. The day after the Fairfax Avenue shooting, Alex Barrera had possession of .22 caliber ammunition that was the same brand as the .22 caliber casings found at the Fairfax Avenue shooting. Alex Barrera told the LAPD detectives that this ammunition was given to him by Luis Ramos. Alex Barrera further told the detectives that Luis Ramos was the Fairfax shooter, not Mr. Umaña. Alex Barrera gave this information to the police right after he was arrested with the ammunition in his pocket. Interestingly, the reason Alex Barrera was arrested is because he was committing robberies in Lemon Grove Park.

121

None of this information was presented to either the Court or the jury. Competent counsel would have presented all of this information because it reveals how unreliable and weak the Government's evidence was against Mr. Umaña. Possessing this information would have made it highly unlikely that the jury could find Mr. Umaña committed non-statutory aggravators 4(a) and (b) beyond all reasonable doubt.

**C.**    **Trial Counsel's Failure to Investigate and Present Readily Available Evidence Challenging the Government's Account of Mr. Umaña's Role in the Lemon Grove and Fairfax Shootings was Objectively Unreasonable.**

Trial counsel's performance in this case fell below the reasonable standard of performance in a capital case. But for trial counsel's deficient performance, a reasonable probability exists that Mr. Umaña would not have been sentenced to death. *Strickland v. Washington*, 466 U.S. 668 (1984). In this case, trial counsel's failures to investigate and present readily available documents and information challenging the Government's evidence relating to the Fairfax Avenue and Lemon Grove Park shootings were so serious that they deprived Mr. Umaña of a reliable result at sentencing. Id. at 687; *Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005).

> i.    Trial counsel unreasonably failed to conduct an adequate, independent investigation into the California murders.

Trial counsel had an obligation to determine whether "unadjudicated prior criminal conduct … is properly admissible at the penalty stage." ABA Guidelines 10.11 commentary; *Rompilla* 545 U.S. at 389. They were aware from very early on in their representation of Mr. Umaña that the Government would be relying on allegations their client had committed three murders in Los Angeles, in addition to the crimes in the federal indictment. Trial counsel was

122

first appointed to represent Mr. Umaña on the federal case on July 10, 2008. *See* Appx. 23, Declaration of Trial Counsel John Bryson.   The notice of intent to seek the death penalty, filed on September 23, 2008, alleged that Mr. Umaña had participated in "uncharged murders and other acts of violence" and alleged the shootings at Fairfax Avenue and Lemon Grove. *See* ECF Doc. No. 273 at 4. By this point in time, the LAPD had already been investigating the California murders for three years. LAPD detective had interviewed witnesses, run records on suspects, developed theories of who committed the shootings and looked into various potential leads of investigation. Trial counsel was already playing catch up when the notice of intent to seek the death penalty was filed.

███████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

██████████████████████████ Despite that recognition, nearly seven months went by before they retained and began using a fact investigator for the California murders. Appx. 25.

In between the filing of the notice of intent to seek death and the hiring of a fact investigator in Los Angeles, trial counsel filed a motion to exclude the Government's non-statutory aggravators, including the California murders. ECF Doc. No 483. That motion was filed on April, 2009. *Id.* Since no factual investigation had been done at that point, the motion was based entirely on legal grounds and offered no factual support whatsoever. *Id.* Trial counsel

123

did not supply any factual information regarding the California murders until two days before the start of trial, when it filed a supplement to its motion to preclude the non-statutory aggravators. *See* ECF Doc. No. 985. Even at that late stage in the game, there were glaring omissions of evidence that was highly favorable to Mr. Umaña and readily available to trial counsel, but not presented on his behalf.[28]

Once retained, investigator Eric Lessard prepared an investigation plan that contained a list of witnesses who should be interviewed, documents that should be obtained, and a list of locations that should be visited. Appx. 25. Based on his substantial experience in investigating homicide cases in Los Angeles, Eric Lessard recognized from the very beginning that there were many documents missing from the very limited set of discovery documents that trial counsel provided him. *Id.* Specifically, Eric Lessard noticed he was missing field interview cards, handwritten notes from detectives, original reports of witness interviews, as well as copies of the recorded interviews themselves. *Id.* In Eric Lessard's experience, those items are normally turned over to the defense in a Los Angeles homicide investigation. *Id.*[29] He believed those items to be "critical to a competent defense investigation" and he was accustomed to receiving them in the many California homicide cases that he had worked on as a defense investigator. *Id.* Eric Lessard informed the attorneys about the missing documents on several occasions and suggested that they serve a subpoena on the LAPD in order to obtain them. *Id.* Ultimately, no

---

[28] The supplemental motion filed by trial counsel indicates they had reviewed a few police reports and the transcript of a preliminary hearing from the Fairfax shooting California State court case, but little else pertaining to the California murders. ECF Doc. No. 985.

[29] In post-conviction, Mr. Umaña has requested these items in both informal and formal discovery. *See* 16-cv-00057, ECF Doc. No. 13, appendices A and B.

124

subpoena was served and Eric Lessard never received the documents he needed to review. *Id.* Instead, trial counsel had Eric Lessard focus most of his time and attention on finding just two witnesses, even though there were dozens of people with knowledge of the shootings at Fairfax Avenue and in Lemon Grove Park and dozens of documents and items to be obtained. *Id.* at 2-3.

It appears that trial counsel may have been hoping that the Court would grant its motion to preclude the non-statutory aggravators and would therefore not be required to do a thorough and competent investigation into the facts of the California murders. Appx. 25. Trial counsel, however, had no plan in place to ensure that the murders would be adequately investigated in the event that that motion was denied. Trial counsel overwhelmed by the amount of discovery and the geographic scope of the case, was additionally carrying a "busy workload" of other state and federal cases as well as appellate work. Appx. 24 at ¶¶3-5. Even on the eve of trial, counsel were ill-prepared to adequately challenge the admissibility of the Fairfax Avenue and Lemon Grove shootings evidence. They had not spoken to or reviewed statements of key witnesses, collected important, readily available records, or thoroughly reviewed the documents that the Government turned over in discovery. Whether it was the massive amount of work this case presented, or commitments to other case, trial counsel went into the penalty phase without having completed a thorough and competent investigation into the facts off the California murders. Appx. 25.

When the issue of the admissibility of the California murders arose on the first day of the penalty phase (PPT at 4), it was imperative that trial counsel carefully review the documents submitted to the Court by the Government *ex-parte*, and submit their own documents and arguments for why the evidence was not reliable. Trial counsel failed in that task, and instead submitted a two-and-a-half page motion asking the Court to preclude five lines of objectionable

125

testimony form the Fairfax Avenue shooting preliminary transcript from the California State case. ECF Doc. No. 1002. Once the evidence was deemed admissible, counsel, having done very little to prepare for this eventuality, were confronted with the task of attempting to undermine the Government's case—through cross examination of Government witnesses, rebuttal of Government testimony, and their closing argument—without having done the foundational investigation and document review to meet the case against Mr. Umaña.

The defense theory that trial counsel ultimately advanced at the penalty phase makes clear that they recognized the import of mitigating the damaging evidence pertaining to the prior unadjudicated murders. Trial counsel contested the California murder aggravators in their closing arguments (PPT at 843-49, 867-73), and they attempted to discredit the Government's evidence against Mr. Umaña as to those shootings, whereas they did not argue against most of the other aggravators. *See e.g.* PPT at 841-42 (trial counsel arguing to the jury that they should go ahead and find the other aggravators but give them either no weight, or give them "some weight but not a lot of weight"). Therefore, challenging the California murders was very much a focal point of trial counsel's defense theory at the penalty phase, and their failure to conduct an adequate investigation to properly mount that challenge cannot be characterized as an objectively reasonable strategy.

ii. Trial counsel failed to obtain readily available records that could have significantly undermined the Government's case.

Trial counsel failed to obtain readily available documents, including, but not limited to, arrest records, court records, transcripts, probation reports, recorded interviews, forensics evidence, scientific evidence and other tangible items that were helpful to Mr. Umaña's defense. One illustrative example, discussed in detail below, pertains to criminal records for Geovani

126

Rodas. Geovani Rodas was identified by the government's best witness, Freddy Gonzalez. Appx. 65. He was implicated by other witnesses as well. Appx. 51 at 9, appx. 69 at 11.

Because Freddy Gonzalez identified Geovani Rodas as shooter in Lemon Grove Park, and because he was allegedly Mr. Umaña's accomplice in that shooting, it was imperative that trial counsel gather as much information as they possibly could on Geovani Rodas. Yet, trial counsel failed to even do a basic criminal background check on Geovani Rodas. Had they done so, they would have discovered several publically available records that cast serious doubt on Mr. Umaña's role in the Lemon Grove shooting. First, trial counsel would have discovered that two weeks after the Lemon Grove shooting, Geovani Rodas shot a man just one block from Lemon Grove Park. *See* appx. 61 at 5-6 and 9-10. Second, trial counsel would have discovered that Geovani Rodas was arrested two weeks following that shooting (one month after the incident at Lemon Grove Park), with a .357 caliber handgun in his possession. Appx. 56.[30] In other words, there was readily available evidence that established that within weeks of the Lemon Grove murder, Rodas engaged in criminal conduct mere blocks away from Lemon Grove Park that was substantially similar to the murder -- he shot at someone, and he was in possession of a handgun that was consistent with the caliber of ammunition that was removed from the body of Abarca. Appx. 67. Gonzalez's prior identification of Rodas as the shooter was a "red flag" that trial counsel ought to investigate Rodas. Had trial counsel done so, they would have

---

[30] Excerpts of the entire transcript are included with this petition due to local rules and file size limitations. A full copy of the transcript is available for review by the Government and the Court upon request.

127

discovered Rodas's convictions for these other offenses. *Id.* Trial counsel's failure to investigate

and obtain this exculpatory evidence of third party culpability was objectively unreasonable.

iii. <u>Trial counsel unreasonably failed to make use of information they received in discovery to challenge the Government's allegations relating to the Fairfax Avenue and Lemon Grove incidents.</u>

Trial counsel had in their possession copious information that could have, and should

have been used to undermine the Government's allegations pertaining to Mr. Umaña's role in the

Fairfax Avenue and Lemon Grove shootings. They missed a variety of critical information that

could have persuasively rebutted the Government's evidence of Mr. Umaña's alleged

participation in both the Lemon Grove and Fairfax Avenue shootings.

a. *Trial Counsel unreasonably failed to use important information relating to the Lemon Grove shooting that was favorable to Mr. Umaña.*

1. Trial counsel unreasonably failed to present evidence that the only witness who identified Mr. Umaña as the shooter, Freddy Gonzalez, also made prior statements and identifications implicating two others as the one Lemon Grove shooter.

Three victims survived the Lemon Grove shooting and testified at Mr. Umaña's trial, but

only Freddy Gonzalez implicated Mr. Umaña in the crime. PPT at 328 (the Court: "[Gonzalez] is

the only witness that identifies the defendant in some way as the shooter."). Although there was

some evidence that there were two shooters at Lemon Grove Park, Freddy Gonzalez

unequivocally testified that he only observed one shooter at Lemon Grove Park. PPT at 341

(Freddy Gonzalez: "I never saw it was two shooters.   It's only one shooter that I saw with a

gun."). Trial counsel completely failed to show that Freddy Gonzalez had identified two people

other than Mr. Umaña as the "one shooter [he] saw with a gun." *Id.* Trial counsel's failure was

objectively unreasonable given that such evidence would have significantly impeached

128

Gonzalez's identification of Mr. Umaña.

On December 29, 2005, Small interviewed Freddy Gonzalez. Appx. 51 at 15. During that interview,[31] Freddy Gonzalez wrote the following identification of Alex Montes being the Lemon Grove shooter:



Freddy Gonzalez
(In reference to suspect

The night when they ki
the guys that went to th
the park he saw me and
his friends and he shot



Appx. 62. Although this written statement accompanied the photographic lineup that was in discovery, trial counsel did not present it on behalf of Mr. Umaña.

Later, Freddy Gonzalez identified Geovani Rodas as the shooter:

For me the kid in number 5 the expressions of the face look like the kid the arrived at the park with a gun and shot at us and hit my friend and I remember that the gun he had was chrome.

Freddy Gonzalez



---

[31] Only the written statement and photographic lineup was presented to trial counsel. The interview where Freddy Gonzalez made the identification was recorded but the recording was not turned over. Suppressing the exculpatory recording was a violation of *Brady* and *Giglio* that prejudiced Mr. Umaña. *See*

129

Appx. 65. Trial counsel also failed to present this identification, despite the fact that trial counsel had received it in discovery, too.

Freddy Gonzalez's identifications of Mr. Umaña, which were provided in discovery and introduced by the Government as exhibits at the penalty phase, were uncertain both in terms of Mr. Umaña's likeness to the shooter, as well as whether Freddy Gonzalez had seen Mr. Umaña on the day of the shooting or at some other time entirely:

Freddy Gonzalez
(In reference to suspect

The photo #2 looks like
day that they killed And
he is the one that came t

 

Gov. Exh. 507.

My first impression was pho
same, but everything happen
seemed small and what I saw

This is the first and last time

Freddy Gonzalez

 

Gov. Exh. 506.

130

As noted by the Court on several occasions, the pre-trial identifications that Mr. Goznalez made of Mr. Umaña raised many concerns that called their reliability into question. *See* PPT at 7, 327-28 (describing Gonzlaez's pre-trial identification of Mr. Umaña as "tentative," lacking "indicia of trustworthiness," "suspect," and so unreliable that the Court stated it "does not have confidence in the pretrial identification."). Ultimately, however, the Court allowed the pretrial identifications to come into evidence and trial counsel did not object to their introduction or move to preclude them from being admitted. PPT at 328.

Trial counsel did make a brief reference to Alex Montes in cross-examination of Freddy Gonzalez, but rather than confront him with his verbatim statements to the police, specifically that Alex Montes "went to the park to shoot at us" (Exhibit *1) and that Alex Montes "shot a pistol, killing Andy" (*Id.*), the defense posed the following questions:

> Q. And so one of the people that you identified as being out there that night was Alex Montez, the same guy you had robbed, correct?
>
> A. That night, no, he wasn't there.
>
> Q. You never told the police he was out there?
>
> A. No not him.
>
> …
>
> Q. Are you sure that you didn't tell Detective Small in a photo line-up on December 29, 2005, that Alex Montez, as somebody you identified in the photo line-up, as being the other person that he was in the park that night with the shooter?
>
> …
>
> Q. Okay.   Isn't it true that you identified Alex Montez as being the second guy that came back with the shooter?

<div align="center">131</div>

A.   Yeah.

PPT at 338-40.

The questions posed by defense counsel exhibit a total miscomprehension of the facts of Freddy Gonzalez's interview. Freddy Gonzalez provided Small with a signed statement that unequivocally stated "[t]he night when they killed Andy I remembered the #4 photo [Alex Montes] **was one of the guys that went to the park to shoot at** us I saw this guy when I got to the park **he saw me and he left in a hurry and he came back with one of his friends and he shot a pistol killing Andy**." Appx. 62. Stating that Alex Montes was merely "out there that night" and that he was "with the shooter" or even that "he came back with the shooter" was not an accurate summary of Freddy Gonzalez's signed statement to the police. *Id*. Gonzalez did not state that Montes was simply present at the shooting; he said was that Alex Montes "went to the park to shoot at us" and that Mr. Montes "shot a pistol killing Andy."[32] *Id*.

Trial counsel's failure to confront Freddy Gonzalez with his actual statement, which explicitly identified Alex Montes as the single shooter and therefore exculpated Mr. Umaña, was objectively unreasonable.   Indeed, trial counsel's cross-examination was particularly deficient (and prejudicial) because it portrayed Freddy Gonzalez's prior inconsistent statement in a light that actually made it seem consistent with his trial testimony, i.e., that he had previously said

---

[32]   The Government may attempt to argue that the "he" in Freddy Gonzalez's statement that "he shot a pistol killing Andy" refers to someone other than Alex Montes. That argument must fail because the original written statement by Freddy Gonzalez, which was in Spanish, does not contain the pronoun "he." When translating the statement, Los Angeles Police Officer Vargas added the pronoun "he" thereby interjecting ambiguity into an otherwise unambiguous statement that Alex Montes was the shooter. *Compare* appx. 62, *with* appx. 64, (Showing the same identification, certified by a United States Courts interpreter).

132

Alex Montes was merely "out there that night" accompanying Mr. Umaña. Trial counsel's deficient performance in cross-examining Freddy Gonzalez about his prior statement turned what should have been a devastating impeachment that exculpated Mr. Umaña into more fodder in support of the Government's case against Mr. Umaña. To make matters worse, trial counsel entirely overlooked Freddy Gonzalez's identification of Geovani Rodas. Trial counsel's performance was therefore deficient for failing to introduce this photo lineup. *See Washington v. Murray*, 952 F.2d 1472, 1476 (4th Cir. 1991) (explaining that a failure of defense counsel to offer available exculpatory evidence to the jury is "obviously" deficient); *see also Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989) (finding prejudicial, ineffective assistance of counsel where defense counsel failed to impeach witness with prior statements that a person other than the defendant killed the victim). There was no legally sound strategy for trial counsel's failure to use available information to exculpate Mr. Umaña and impeach the only witness who testified that Mr. Umaña was the shooter.

> 2. Trial counsel unreasonably failed to present readily available evidence that key Lemon Grove witnesses Roberto Ramos and Juan Lara did not select Mr. Umaña's photograph during a pre-trial photographic lineup.

It is plain from the discovery in trial counsel's possession that both Roberto Ramos and Juan Lara had looked at Mr. Umaña's photograph but did not identify him as the Lemon Grove shooter. On December 30, 2005, Detectives interviewed Roberto Ramos, showed him a photo lineup labeled #118737 (which contained Mr. Umaña's photograph), and Roberto Ramos was "unable to identify" Mr. Umaña as the shooter. Appx. 51 at 15; *see also* Gov. Exh. 507

133

(photographic lineup labeled with number 118737). A few days later, Small interviewed Juan Lara, showed him a photographic lineup (number 118737) and Juan Lara made "no I.D." *Id*.

Trial counsel failed to present readily available evidence to the jury that Roberto Ramos and Juan Lara each looked at Mr. Umaña's photograph and did not pick him out as the shooter. Both Roberto Ramos and Juan Lara were confident they could recognize the shooter if they saw him again. PPT at 135 and 146. Although trial counsel cross-examined Roberto Ramos and Juan Laura about the fact that they had been shown pictures by the investigating officers and did not recognize the shooter among those photographs included in the line-up, trial counsel failed to point out the most critical fact about these line-ups: Mr. Umaña's photograph was included in the line-ups shown to each of them. PPT at 135, 146-57. The discovery made it clear that those witnesses had seen photos of Mr. Umaña and did not identify him as the shooter. Trial counsel unreasonably failed to introduce these crucial facts into evidence. Because trial counsel failed to elicit this information on cross-examination, all they could say about the photo lineups in closing was "I would argue to you … they showed [Ramos and Lara] the same ones they showed to Freddy Gonzalez, [] I would argue to you they're the same that included [Mr. Umaña's] picture on two occasions." PPT at 844. However, the notion that Ramos and Lara were both shown Mr. Umaña's photo did not have to be posed to the jury as a matter of conjecture or as a mere inference to be drawn; it was a demonstrable fact that could have been conclusively established if trial counsel had entered the relevant photo line-ups into evidence.   Thus, the jury was left with the mistaken impression that Roberto Ramos and Juan Lara merely failed to identify the shooter in the photos they were shown, rather than the more accurate – and exculpatory – account of the line-up: that Roberto Ramos and Juan Laura were explicitly shown photographs of

134

Mr. Umaña and that neither of these witnesses identified him as the shooter.

Trial counsel's failure to do so was objectively unreasonable since their cross-examination and argument clearly evinced an effort to try and encourage the jury to rely on the eye-witnesses other than Freddy Gonzalez. *E.g.* PPT at 844.

<div style="margin-left: 2em;">

3. Trial counsel unreasonably failed to present to the jury additional exculpatory statements regarding the Lemon Grove shooting.

</div>

The discovery disclosed to trial counsel contained statements made to LAPD that either directly exculpated Mr. Umaña or implicated persons other than Mr. Umaña in the shooting.

Edgar Gutierrez, was interviewed by Small on October 18, 2005, approximately three weeks after the Lemon Grove shooting. He told Small that he had spoken with a man named Ranferic Vasquez (aka Blast) who "felt responsible for the shooting." Appx. 51, at 9. Vasquez apparently had "direct knowledge" of the shooting. *Id.* at 12. Vasquez said that the shooter lived on Kenmore Avenue, a location where Mr. Umaña was never alleged to have lived. *See* PPT at 112. Furthermore, Vasquez claimed the shooter drove a black Honda Civic, a car that Mr. Umaña was never alleged to have driven.[33] This information was critical; not only was it exculpatory in that it implicated an entirely different third party in the Lemon Grove murder, but it also impeached Freddy Gonzalez's testimony. Consequently, trial counsel was ineffective for not eliciting the information through Small.

On April 24, 2006, Small interviewed Luis Rivera. Luis Rivera told Small that Mr. Umaña was not responsible for the Lemon Grove shooting and that it was done by two different

---

[33] Geovani Rodas, however, did have a dark-colored Honda Civic. *See* Appx. 69, Detective Small follow-up investigation report at 11.

<div style="text-align: center;">135</div>

MS-13 members who went by the names Capser and Trivilin. Appx. 51, at 26. Luis Rivera would later "remain steadfast" in his explanation of the events at Lemon Grove. *Id.* at 32. This evidence would have been particularly helpful to Mr. Umaña at trial since Luis Rivera was blaming Mr. Umaña for the Fairfax Avenue shooting. *See* PPT at 180. Luis Rivera therefore had absolutely no motive to cover for Mr. Umaña and instead had every reason to inculpate him. Trial counsel was ineffective for not presenting this readily available information to the jury; there was no objectively reasonable purpose in failing to present such evidence as it was yet another piece of information that exculpated Mr. Umaña in the Lemon Grove murder.

On January 17, 2006 Small interviewed Alejandro Rodriguez (aka "Chocolate'). Appx. 69, at 11. Alejandro Rodriguez told Small that Mr. Umaña did not do the shooting, but that Geovani Rodas (aka Sin) was involved in the shooting and that he drove a black Honda, corroborating the information of Edgar Gutierrez. *Id*. Given that this evidence cast doubt on Mr. Umaña's involvement in the shooting, trial counsel's failure to present it to the jury constituted deficient performance. Once again, this was readily available, exculpatory information that trial counsel unreasonably failed to utilize at Mr. Umaña's trial.

> *b.*    *Trial Counsel unreasonably failed to use important information relating to the Fairfax shooting that was favorable to Mr. Umaña.*

   1.  Trial counsel completely overlooked the fact that key witness Alex Barrera identified Luis Ramos as the Fairfax Avenue shooter, not Mr. Umaña.

In discovery, there was an audio recording of an interview with MS-13 witness Alex Barrera. In that recording, dated April 18, 2006, Alex Barrera told Parshall repeatedly that his friend Luis Ramos (aka Chipis) was the shooter at Fairfax Avenue. See Appx. 52 at 30-31, 50,

<div align="center">136</div>

54, 57, 77. This interview was vitally important, and trial counsel candidly admitted that they simply did not review it even though it was produced to them in discovery. Appx's. 23, 24

During the interview, Alex Barrera told Parshall that on the day of the July 27, 2005 shooting, he got a call from Luis Ramos, who happened to be one of Alex Barrera's closest friends. Luis Ramos told Alex Barrera that there was a fight with a rival gang (the Fairfax Avenue shooting) and asked Alex Barrera to go to the scene of the crime. Appx. 52 at 12-14; PPT 103-104. Alex Barrera went to Fairfax Avenue and saw the bodies on the ground and the police investigation. *Id*. Afterwards, Alex Barrera met up with some MS-13 gang members where they talked about the murder and the fact that Luis Ramos was the shooter. *Id*. at 30, 50, 54 ("Chipis did that murder"), 57 ("it was him [Chipis] that did that murder"), 77 (the homeboys also told me that he [Chipis] committed the murder"). Alex Barrera went on to confirm that the day after the shooting, he saw Luis Ramos in a gold Altima, which was the same type of car used in the shooting. *Id*. 56-57. In response to questioning by Parshall, Alex Barrera said he knew Mr. Umaña but did not know anything to suggest he was involved in the shooting. Most importantly, Alex Barrera told Parshall that he was willing to testify under oath that Luis Ramos was the shooter. *Id*. at 121.

There was no strategic basis for failing to introduce this exculpatory evidence. It served to undermine the self-serving hearsay statements of Luis Rivera, Luis Ramos, and Rene Arevalo, who were the only people that implicated Mr. Umaña. The audio recording of Alex Barrera was produced in discovery well in advance of trial. The disk was labeled "LAPD Alex Barrera

137

Statement Audio."[34]   Trial counsel never reviewed the recorded interview. Appx. 24. Counsel

candidly admits that they were unaware of the interview at the time of trial and that it would

have been useful to them in their presentation during the penalty phase if they had known its

contents. *Id*.

**D.** **Trial counsel unreasonably failed to present information and adequate arguments establishing that the neutral eyewitnesses who identified the driver of the car as the Fairfax shooter, and not Mr. Umaña, were more reliable than the hearsay of Mr. Umaña's co-defendants.**

Trial counsel failed to use evidence in discovery that showed that the neutral

eyewitnesses consistently provided valid information that the driver of the car in the Fairfax

incident was also the shooter. Trial counsel failed to emphasize the fact that Noe Bautista and

Oscar Santiago saw the shooting in broad daylight and from opposite angles. Oscar Santiago was

in his car driving southbound, in the same direction as the Nissan Altima which the shooter got

out of, and Noe Bautista was on the sidewalk near the passenger side of the Nissan. Despite

different points of view, the two disinterested parties saw the same thing: that the driver was the

person who committed the shooting.

LAPD Officer John Maloney testified that he was the first officer on the scene and took

information from witness Noe Bautista. Trial counsel failed to elicit Noe Bautista's first

statements to police immediately following the crime.[35]   PPT 162. Trial counsel could have

---

[34] In discovery, the Government only produced the audio disk of the Spanish interview. The Government did not provide a transcription of the interview in either English or Spanish. Attached to this motion are portions of a certified English transcription is Appx. 52.

[35] The "time between crime and confrontation" is a significant factor in the reliability of an eyewitness identification. *See Manson v. Brathwithe*, 432 U.S. 98, 114 (1977).

138

used Maloney's crime scene statement form written at 3:07 p.m. which shows that Noe Bautista was clear as to what he had seen. Appx. 57, (Officer's Crime Scene Statement Form). Noe Bautista told Maloney that the victims and suspects were exchanging gang signs and yelling before Suspect #1 exited the car and began shooting. Noe Bautista provided Maloney with a description of the three suspects, and said who exited the car, and told detectives that the driver of the Nissan Altima was the shooter. *Id*. Noe Bautista then repeated these statements to the detectives. On the day of the shooting, detectives also recorded the fact that another witness, Oscar Santiago, stated that the driver was the person who committed the shooting. Appx. 54, (Fairfax Chron at 4) ("Santiago focused on the shooter who was also the driver of the suspect vehicle."). None of this was presented to the jury.

Trial counsel could have also presented the fact that Noe Bautista was so confident he got a good look at the suspect that LAPD requested that he meet with a forensic sketch artist. In fact, Noe Bautista met with a forensic sketch artist, who prepared a composite sketch. Notably, the sketch of the Fairfax Avenue suspect does not resemble Mr. Umaña:



139

Appx. 59.

In other words, trial counsel could have easily rebutted the Government's portrayal of the neutral eyewitnesses as not being confident as to what they saw. Those witnesses, on the day of the shooting and even months afterward, were clear about the fact that they saw the driver commit the shooting. If trial counsel had reviewed this discovery carefully, they would have been able to persuasively rebut the Government's contention that this eyewitness testimony was vague while the other suspect statements were consistent. Doing so would have been entirely consistent with trial counsel's defense strategy at the penalty phase that the "best evidence was against Mr. Arevalo." PPT at 846, 871.

### E. Trial counsel did not present information that mitigated the circumstances of the Fairfax shooting

Had trial counsel used evidence in discovery to their benefit, they could have made a compelling case that the victims were the aggressors in the Fairfax Avenue shooting. According to witness Noe Bautista, the victims not only flashed gang signs and yelled at the suspects, one of the victims threatened to kill the people in the car. Appx. 60. Noe Bautista described the victims running toward the Nissan Altima. *Id*. The car was not going fast as there was a lot of traffic on the street. Noe Bautista then saw victim Gustavo Porras with a knife in his hand. *Id*.

Trial counsel had every incentive to mitigate the circumstances of the Fairfax Avenue shooting but they apparently relied on the police reports rather than the actual statements of the witnesses.[36] The police reports omitted the crucial fact that the victims threatened to actually kill

---

[36] Trial counsel's cross-examination of Freddy Gonzalez regarding the pretrial identification of Mr. Umaña suffered from the same infirmity. *See supra*.

the suspects in the car as they ran to them with a knife. Had trial counsel properly reviewed readily available documents, they would have known that the witness statements to the LAPD contained critical information that would have cast the incident in a much different light – that it was more akin to an act of self-defense against an immediate threat than a drive-by shooting of victims who were caught unawares.

        i.    <u>Trial counsel unreasonably failed to present evidence that ballistics and other evidence provided in discovery linked Alex Barrera to both the Fairfax and Lemon Grove shooting.</u>

The day after the Fairfax Avenue Shooting, July 28, 2005, Alex Barrera was arrested at Lemon Grove Park for multiple armed robberies. He was found with .22 caliber bullets in his pocket that were the same brand of bullets that were found at the Fairfax Avenue murder scene. According to the arrest reports, which were also produced in discovery, Alex Barrera was seen with a gun at Lemon Grove Park by several witnesses. Appx. 58. The bullets led the Fairfax and Lemon Grove Shooting detectives to believe that Barrera had information regarding both cases. *Id.*; See also Appx. 51 at p. 24. Alex Barrera told detectives that after the Fairfax Avenue shooting, Luis Ramos gave him the .22 caliber bullets. Appx. 52, at 105. During the interview, the detectives pointed out the relevance of this information: "he had twenty-two-caliber rounds in his pocket … and his homeboys just did the shooting with a twenty-two-caliber same brand and everything." Id.

Trial counsel failed to present all of the pertinent information pertaining to the bullets, which rebutted the idea that Mr. Umaña and the .22 caliber handgun were uniquely linked to both the Lemon Grove and Fairfax shootings. Similarly, trial counsel did not present the fact that Alex Barrera was in possession of.22 caliber bullets that were consistent with bullets used in the

<p style="text-align:center">141</p>

Fairfax shooting and given to him by Luis Ramos, an accomplice in the Fairfax Avenue shooting. *Id*. At the time of his arrest he pulling off robberies in Lemon Grove Park Appx. 58. Because that the Government used the shell casings evidence to argue that only Mr. Umaña was shown to be linked to both the Lemon Grove shooting and the Fairfax shooting, it was objectively unreasonable for trial counsel not to use the aforementioned evidence to show that the caliber of the shell casings also implicated a different suspect: Alex Barrerra. Having overlooked Alex Barrera's statements in discovery (Appx's 23, 24), trial counsel's failure to do so was not the product of strategy, but rather gross negligence.

      ii.    <u>Trial counsel failed to object to foundationless, unreliable, double-hearsay statements that Mr. Umaña was the Lemon Grove shooter.</u>

On September 13, 2006, Small interviewed MS-13 member Rene Arevalo at the Los Angeles county jail. PPT at 110; Appx. 51 at 35. The interview was recorded. *Id.* (explaining that the reader should "refer to audiotape for more details"). During the interview, Small discussed the Lemon Grove shooting with Rene Arevalo and showed Rene Arevalo a variety of photographs that he had assembled during his investigation. Id. One of the photographs that Small showed Rene Arevalo was a photo of Mr. Umaña. Id. According to Small's notes, when he showed the photograph to Rene Arevalo he said that Mr. Umaña was "the likely shooter." *Id*. Based on his interview, Small testified at the penalty phase as follows:

> Q. And did you also have occasion to interview an MS-13 member about the Lemon Grove Murder?
>
> A. Yes.
>
> Q. And who was that?
>
> A. Rene Arevalo. He's an MS-13 gang member. He was affiliated with Mr.

<div align="center">142</div>

[Umaña] on the [Fairfax] case. And he was in the county jail, Los Angeles County jail. I went over and interviewed Mr. Arevalo.

…

Q. Okay. But you interviewed him yourself; is that right?

A. Yes.

Q. And did you ask him about the Lemon Grove murder?

A. I did. I asked him if he had any information on other MS related shootings. I showed him some photographs. One photograph included Mr. Ramirez Umaña. And he said that's your Lemon Grove shooter.

PPT at 109-10. Trial counsel did not make any objection to the testimony. *Id*.

Detective Small's testimony was highly objectionable. Although the Court had ruled that certain evidence of the Lemon Grove shooting could be presented to the jury, it had laid out a specific vetting process that required the Government to make a "threshold determination that evidence of unadjudicated conduct is reliable." ECF Doc. No. 1000 at 11. Only after the Government "present[ed] to the court and to the defendant information it intends to introduce as unadjudicated conduct for a determination of reliability" would it be allowed to go to the jury. *Id*. The Government never presented Rene Arevalo's statement to the court for this reliability determination and the Court never made a ruling on the testimony. PPT at 6-7. The Court later noted that Rene Arevalo "wasn't present at the time the shooting occurred" and that there was "[n]o real basis for why he made that statement." PPT at 328. There was no objectively reasonable strategy for failing to object to this unfounded, inflammatory statement that directly and improperly implicated Mr. Umaña in the Lemon Grove shooting.

143

iii. <u>Trial counsel failed to present readily available evidence that the LAPD detectives coached the Fairfax co-defendants' statements that implicated Mr. Umaña as the shooter.</u>

At trial, the Government presented evidence through Parshall, that Mr. Umaña's co-defendants, Luis Rivera, Luis Ramos, and Rene Arevalo all corroborated one another and all consistently told police that Mr. Umaña was the Fairfax shooter. PPT at 221-22. The interrogations themselves were not introduced at trial but rather were only summarized by Parshall. What the transcripts show is that Parshall took Luis Rivera's version of what happened, provided it to the other two co-defendants, and then warned the others that they could be blamed as the shooter if they did not provide a statement that was consistent with Rivera's account of the shooting.

Parshall first interviewed Luis Rivera, who said that on the day of the Fairfax shooting, the MS-13 members were on the way to the beach. Appx. 66, at 70. He said that Rene Arevalo was driving, Mr. Umaña was in the front passenger seat, he himself was in the back with crutches, Eddie Ruiz was also in the back seat, and finally that a person named "Unico" was in the car also. *Id*. at 69. Luis Rivera said that Mr. Umaña did the shooting and he was now in New York. *Id.* at 73, 76. Eventually Luis Rivera told Parshall that "Unico" was at his house and was dating his sister. Part 2 of Interrogation of Luis Rivera Transcript at 56. Detectives arrested the person Luis Rivera called "Unico" and determined him to be Luis Ramos (aka Chipis).[37] Luis Ramos was brought in for questioning.

---

[37] Luis Rivera continuously denied knowing anyone who went by the name "Chipis" to Parshall. Appx. 66 at 56, 75.

144

Parshall testified that on the first day of questioning Luis Ramos denied knowledge of the Fairfax Avenue shooting and "clammed up," invoking his right to counsel. PPT of 205; Appx. 55, at 68. What was not brought out in evidence at trial was that during that initial interrogation Parshall provided Luis Ramos with all of the details that Luis Rivera had given the detectives: (1) Luis Ramos was heading to the beach in a Nissan Altima with his friends on Fairfax Street (*Id.* at 28-30); (2) Luis Ramos was in the car with someone who had crutches (Luis Rivera) (*Id.* at 35-36); (3) Luis Ramos got out of the car because he thought maybe there was going to be a fight or something (*Id.* at 41); and (4) Wizard (Mr. Umaña) was the shooter and that he ran away to New York. *Id.* at 49. The lengthy interrogation was nothing more than the detectives' play-by-play of their theory of the case based on what Luis Rivera had told them and ignoring the evidence they had that Luis Ramos was the shooter. *Id* at1- 69); *e.g.* ("Tell him we already know, we already know he was there. We already know he was in the car. We already know that someone else shot, Wizard is the shooter").

Furthermore, the detectives repeatedly threatened Luis Ramos that if he did not talk and corroborate the story, Luis Ramos would be the one blamed for the shooting and spend many years in prison. *Id.* at 32-33 ("We know you were there but I know that information that you, your involvement [. . .] is very minimal. [. . .] So if you want to take all the blame for what happened then you'll go to court and, and there will be a charge of homicide against you. You're going to go to prison for many years. Do I make myself clear?"); *see also* at 51 (Since Mr. Umaña is in New York "and you participated in this homicide -directly or indirectly, then you have to, the, the prosecutor will make [SIC] charges against you.").

145

Parshall testified only that Luis Ramos "clammed up" on the first interview and was not cross-examined on all of the details that he coached to Luis Ramos. He then testified that Luis Ramos fully corroborated Luis Rivera's story, stating:

> Basically [Ramos] said the same thing that Mr. Rivera had said, you know, about the gold [A]ltima. Driving on Fairfax. That Moe was the driver. That Umaña, or Wizard, had gotten out and shot the victims. And he talked about the -- he identified the same people being in the back seat of the car. And he described the confrontation with the two victims.   PPT at 184.[38]

Trial counsel failed to elicit on cross-examination that Luis Ramos merely parroted back to Parshall the same information that Parshall had told Luis Ramos less than a week earlier: they were going to the beach in Nissan Altima (Appx. 55, at 14, 20); Luis Ramos was in the car with Luis Rivera who had crutches (*Id*. at 28); one guy got out of the car with a crutch thinking there would be a fight (*Id.* at 28-29); and that Wizard (Mr. Umaña) did the shooting and was now in New York (*Id*. at 18). Moreover, trial counsel failed to elicit that Luis Ramos had a strong incentive to corroborate the version of the shooting that Parshall told him in order to avoid being charged with the incident himself.

The interrogation of Rene Arevalo -- a month after Luis Rivera and Luis Ramos were arrested -- involved the same type of interrogation. Prior to Rene Arevalo providing any

---

[38] In 2007, Detective Parshall and another detective interrogated Edward Arch, a suspect in a murder, and coerced a confession from Arch that fit the detectives' theory of the case. After being in pre-trial custody for three years, a California judge dismissed the case against Arch, finding, in part, that the confession was coerced by Detective Parshall. During the interrogation, similar to the case here, Detective Parshall told Arch what he believed happened and promised leniency if he corroborated the story. *See* Joel Rubin and Jack Leonard, "Los Angeles Judge Finds Confession Was Coerced, Frees Murder Defendant," L.A. Times (Feb. 11, 2011), available at: http://articles.latimes.com/2011/feb/18/local/la-me-lapd-confess-20110218.

146

information or the detectives even reading him his Miranda rights, during the first 23 pages of transcript, the detectives again provided him with numerous details about what they believed happened during the shooting. Gov. Ex. 518 at 1-23. The detectives were "not saying that [Arevalo] shot anybody" but someone else did it. *Id.* They told Rene Arevalo that he was driving his car down Fairfax Avenue and he was going to the beach with his friends when some "knuckleheads" started throwing hand signs at them. *Id*. at 19-20. They told Rene Arevalo he stopped the car and three guys in his car got out and a confrontation took place and one of them pulled out a gun and shot the victims. *Id.* at 20-21. They told Rene Arevalo that one of the passengers had crutches. *Id*. at 21. And the detectives made it clear that they didn't think Arevalo did the shooting. *Id.* at 22. Parshall told Rene Arevalo that people are saying that the driver was the shooter but the other guys in the car say it was someone else. *Id*. at 25-26.

The detectives went on to narrow who got out of the car and who they suspected of being the shooter. The detectives told Rene Arevalo that two guys are in custody and have already given these details: "they named [Arevalo], they named the shooter, they named the other guy, Negro [aka Eddie Ruiz] that was [in] the car, okay." *Id*. at 30.   Rene Arevalo certainly knew that his two MS-13 friends, Luis Rivera and Luis Ramos were in custody. Parshall told Rene Arevalo the shooter was not in custody and the officers were "trying to find out where he is." *Id*. at 30. Given that Luis Rivera and Luis Ramos were in custody, that Eddie Ruiz was just "the other guy that was in the car" and not the person the police are looking for, and that the police did not believe that Rene Arevalo was the shooter, then that left only one person – Mr. Umaña.   After narrowing all of this down for Rene Arevalo, Parshall pulled out a photograph and said "do we got the right guy?"   *Id*. at 40. Rene Arevalo said yes. *Id.*

147

Again, just like with the Luis Ramos interrogation, trial counsel did not cross-examine the detectives about providing Rene Arevalo with their theory of the case and threatening Rene Arevalo that if he did not corroborate the story of Luis Rivera and Luis Ramos then Rene Arevalo would be blamed as the shooter. Indeed, Telis testified that Rene Arevalo told them the following details, all of which were previously told to Rene Arevalo while he was being held for questioning: Rene Arevalo and his friends were driving down Fairfax; they were on their way to the beach; Rene Arevalo was driving; two people on the sidewalk were flashing gang sings; Mr. Umaña and two other people got out of the car; and Mr. Umaña shot the two victims. PPT at 239-30.

Interestingly, Rene Arevalo himself challenged the validity of his statements during California State Court proceedings. He argued that his statements should be suppressed, in part, because the detectives fed him their theory of the case prior to him even being *Mirandized*. Appx. 68, at 11 (Detectives "coerced him into making a statement by running their case down to him including things stated by others."). Rene Arevalo further claimed that the detectives presented an option to either accept their theory or be blamed as the shooter. *Id*. at 11-12. Parshall testified at the California suppression hearing. Counsel had a transcript of these proceedings but unreasonably failed to cross-examine him on this issue. PPT 216.

There was no reasonable strategic basis for not confronting the testifying detectives about their methods of passing along Luis Rivera's explanation of the events from one witness to another and then testifying under oath that the stories were "consistent among all the interviews" and "those facts never changed." PPT at 222. The defense theory as to the Fairfax Avenue shooting was that the other suspects' statements were unreliable and self-serving. PPT 871 ("So

148

how trustworthy is that? How trustworthy are any of these three statements from Luis Rivera, Luis Ramos, and Rene Arevalo? They're all self-serving. They're all minimizing their own responsibility or completely avoiding any responsibility. It's totally unreliable."). Confronting the detectives with their interrogation techniques would have strengthened the defense that these other suspects were threatened with more severe punishment if they did not place the blame on Mr. Umaña. The transcripts of the interrogations -- which clearly show that the detectives provided Luis Ramos and Rene Arevalo with their theory of the case and supplied them with details from Luis Rivera's statement – was available early on in discovery. Counsel, however, overlooked the obviously suggestive nature of the detectives' interrogation techniques. The failure of counsel to subject the detectives to meaningful adversarial testing regarding their interrogation methods was not a reasonable strategic decision entitled to deference, but rather attributable to their failure to be adequately prepared for trial.

    iv.    <u>Trial Counsel unreasonably failed to object to Detective Parshall's opinion testimony that he believed Mr. Umaña's co-defendant when he implicated Mr. Umaña even though the Court ruled that the evidence was inadmissible and ordered it redacted.</u>

During a side-bar conference, trial counsel brought up an issue about the Government's desire to introduce the transcripts of the Detective Parshall's interrogation of Rene Arevalo where he gave his opinion that Rene Arevalo was telling the truth about Mr. Umaña's involvement in the Fairfax shooting. PPT at 168. Counsel quoted Parshall's comment to the Court: "I believe you because I do this for a living. I interview people. I know when people are lying. I know when people are telling me the truth." *Id*. The Court immediately agreed that the evidence was objectionable and asked the prosecutor to "strike" and "sanitize" that portion of the

149

transcript. *Id.* The prosecutor pledged to the Court that she would make the necessary redaction.

*Id.* at 169. The transcript looked like this prior to the sanitization:

```
DETECTIVE PARSHALL:  I believe you because I do
this for a living, I interview people.  I know when
people are lying.  I know when people are telling me
the truth.  I can see you're a very genuine person.
                                                    142

        LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376
```

```
                                            scanned

    I can tell by your eyes and your mannerisms, okay.  I
    -- I, you know, I regret you being in the situation,
    but you know you got --
```

Appx. 53, Transcript of Arevalo at 142-43.

The Government then "sanitized" the transcript and provided the jury with the following:

```
DETECTIVE PARSHALL:  I believe you because I do
this for a living, I interview people.  I know when
people are lying.
                    I can see you're a very genuine person.
                                                    142

        LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376
```

```
                                                    00

                                            scanned

    I can tell by your eyes and your mannerisms, okay.  I
    -- I, you know, I regret you being in the situation,
    but you know you got --
```

150

Gov. Exh. 518.

The Government redacted exactly one sentence of the improper paragraph and kept the detective's belief that Rene Arevalo was honest because the detective has the experience to know what honest is. The Government redacted "I know when people are telling me the truth" but left the meaning of the objectionable statements undisturbed and allowed the jury to see Parshall's inadmissible statements that he believed Rene Arevalo because Parshall "do[es] this for a living" that Parshall "knows when people are lying" and that he thought Rene Arevalo was a "very genuine person" because of his "eyes and his mannerisms." *Id*. This constituted impermissible vouching for the credibility of a witness and intruded on the jury's role of being the sole judge of credibility. Clearly, there was no reasonable strategy in moving to preclude evidence that trial counsel thought was objectionable and then failing to double-check to make sure the objectionable evidence did not go to the jury.

The transcript of Luis Rivera (Gov. Exhibit 518) and Rene Arevalo (Gov. Exhibit 520) were admitted into evidence. PPT at 230, 221. Those transcripts repeatedly included the detectives' personal belief as to Mr. Umaña's guilt. Counsel did not file a motion *in limine* to exclude, move to strike, or object to this prejudicial information.[39] Thus, the jury was repeatedly exposed to the detectives' personal beliefs that Mr. Umaña was the shooter in Fairfax Avenue. Along with repeatedly telling suspect Rene Arevalo the theory of the case, the detective's tone

---

[39] Although counsel did technically object at the time these transcripts were offered into evidence, that objection apparently referred back to trial counsel's general, continuing objection to the admission of the California murders evidence. PPT at 221, 230.

151

throughout the transcripts that went to the jury was that he believed Mr. Umaña was the shooter and believed in the credibility of the other suspects:

> "I can see what your temperament is. I can see what your personality is all about. You don't seem like the guy that did that."

Gov. Ex 518 at 19.

> "I'm out for the truth here, okay? So I think I got most of the truth from you."

Gov. Ex 518 at 46.

Trial counsel had previously objected to nearly identical statements and actually succeeded in getting a ruling from the judge that precluded them from being admitted into evidence. *See* PPT at 168-69. Therefore, trial counsel did not have any objectively reasonable strategy for not lodging the same objection to other, similar evidence.

> v. <u>Trial counsel unreasonably failed to object to, and rebut the Government's evidence that the .22 caliber bullet casings were fired from one single firearm in violation of the Fifth, Sixth, and Eighth Amendments.</u>

An important piece of evidence in the Government's sentencing case was the alleged ballistics match between a .22 caliber bullet casing found at the scene of the Lemon Grove shooting, with two .22 caliber bullet casings found at the scene of the Fairfax Avenue shooting. The match between the bullet casings, combined with evidence that Mr. Umaña was present at both shooting locations when they occurred, was circumstantial evidence that he was the shooter in both instances—which was one of the greatest issues of dispute between the parties during the penalty phase. *See* PPT at 6. Criminalist William Moore was qualified as an expert in "ballistics firearms analysis" without objection from trial counsel. PPT at 247. He testified that the .22 caliber casings from both locations were fired from the same exact gun based on "the objective evidence presented to me and validated by a second examiner." PPT at 259. After not objecting

152

to his qualification as an expert, trial counsel briefly cross-examined Mr. Moore, confirming his opinion was the casings were fired from the same exact firearm and pointing out some of the criticisms of toolmark identification in general. PPT at 259-60.

Trial counsel should have objected to Mr. Moore's testimony. At the time of Mr. Umaña's trial, the premise underlying firearms and toolmark identification—that firearms leave unique marks on ammunition components—had never been validated.[40] In fact, defendants had successfully challenged similar evidence in courts around the country. *See, e.g., United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005) (Memorandum and order re: Motion to exclude ballistics testimony) (recounting problems inherent in firearm and toolmark identification and prohibiting firearms examiner from testifying that the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) (firearms identification testimony held inadmissible where expert testified that toolmarks on shell casings had been made by the same magazine, even though, because no weapon had been recovered, expert had only compared the toolmarks on the casings and had not examined the suspect magazine); *cf. Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) (toolmarks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others, was unreliable and inadmissible).Trial counsel should have moved to exclude this evidence on the

---

[40] At the time of Mr. Umaña's trial – and in the years since – there was never a firm statistical empirical foundation for the claim that firearms leave unique toolmarks on ammunition components such that a firearms examiner can make a positive "match" based on such toolmarks. See Adina Schwartz, A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) (discussing lack of adequate statistical empirical foundations for firearms and toolmarks identifications).

ground that the field of firearms and toolmarks identification is not based on sufficiently reliable methods to satisfy the threshold requirements for admissibility under Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Government's evidence would not have met the *Daubert* standard, as the underlying premise of firearm and toolmark identification lacks an adequate statistical empirical foundation to be considered scientifically valid. Moreover, at a minimum, there is a reasonable probability that under a *Daubert* analysis, the Government's expert would have been precluded from testifying definitively that the shell casings were fired from the same weapon. *See, e.g., United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. Dec. 20, 2005); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002); *cf. Ramirez*, 810 So. 2d 836 (Fla. 2001).Trial counsel also unreasonably failed to challenge failed to object to Mr. Moore's qualification as an expert in this field. His explanation of qualifications was as follows:

> My training as it relates to the formal education as a firearms examiner took place approximately two years into my assignment to the firearms analysis unit. It was at that time that we received new computer imaging equipment courtesy of the Bureau of Alcohol, Tobacco and Firearms. This equipment, known as the NIBIN equipment, was able to capture digitized images of cartridge cases and bullets, providing them to a national database so they could be compared to like images in that database for a subsequent inclusion as possible candidates of similar origin and perhaps the solution of crimes.
>
> Later on, approximately 2004, my training began in earnest, studying case evidence and bullet evidence, culminating in a series of practical exams which allowed me to begin doing firearms examination in full in January of 2006.

PPT at 246-47. Mr. Moore also testified that his work is reviewed by "others" and that review was "part of the procedure within the laboratory." *Id.* at 247.

154

The Government presented no evidence about whether Mr. Moore's "training in earnest" was consistent with any national standards or practices of certifying organizations, such as the Association of Firearm and Toolmark Examiners (AFTE). *Id.* The Government did not ask whether Mr. Moore had ever attempted certification by the AFTE, or whether his laboratory was certified by any organization. *Id.* Mr. Moore's own testimony was that he was only allowed to begin doing firearms examination "in full" in January 2006 which was the same month and year he analyzed the ballistics in this case. *Id.* There was no evidence that he had ever performed a firearm-toolmark analysis, much less an accurate one, prior to his work in this case. In sum, Mr. Moore was qualified as an expert without the Government having to show any evidence of his expertise and without objection from trial counsel.

Trial counsel also unreasonably failed to cross-examine Mr. Moore about the basis of his expert opinion. While trial counsel did elicit a couple of the criticism of the toolmark analysis field and the fact that Mr. Moore's opinion was subjective (PPT at 259), trial counsel missed the larger point that Mr. Moore presented absolutely no support for his conclusions in this case. Mr. Moore generally discussed firing pin impressions, ejector marks, and chamber marks, as things that can be used to determine a match, but he did not say which, if any, of those characteristics lead to his conclusion in this case. PPT at 259. He did not testify about, nor was he cross-examined on, how many points of agreement he found between the different casings or any other specific findings that he made. His testimony, in its entirety, was a general explanation of the process of toolmark identification, and his conclusion that the bullets in this case matched. His testimony lacked any scientific analysis or bases for that conclusion.

155

Finally, trial counsel failed to retain and present their own expert evidence to rebut Mr. Moore's conclusory testimony. Had trial counsel retained an expert to challenge the (lack of) scientific analysis that led to Mr. Moore's opinion on the ballistics evidence, they could have presented that expert at a *Daubert* hearing, and, if necessary, at trial. Expert testimony that there was no scientific basis for the conclusion that the casings were fired from the same firearm would have enabled trial counsel to prevail at a *Daubert* hearing or in challenging the Government's evidence in front of the jury. Trial counsel's questions on cross-examination demonstrate that their defense theory was consistent with the idea that toolmark identification testimony is not sufficiently supported by empirical data to be reliable, therefore they had no reasonable strategy for not objecting to or properly rebutting the Government's expert testimony.

The evidence of the matching shell casings was vital to the Government's case because it was a major basis upon which the Court relied in permitting the evidence of the California murders to be introduced at sentencing. PPT at 6. It also served to corroborate Freddy Gonzalez's tenuous identifications of Mr. Umaña as the Lemon Grove shooter as well as the presumptively unreliable accomplice testimony that Mr. Umaña was the shooter in the Fairfax Avenue shooting, meaning that Mr. Umaña's presence much more suspicious than it would have otherwise been. The Government argued the importance of the ballistics evidence in both closing arguments by encouraging the jury to adopt the fact as proof of Mr. Umaña's guilt in the Lemon Grove and Fairfax Avenue shootings   PPT at 813, 876. Similarly, the Fourth Circuit used the ballistics evidence as a reason to reject Mr. Umaña's "legitimate arguments" that the evidence against him in relation to the Fairfax Avenue shooting was unreliable. *See United States v. Umaña*, 750 F.2d 320, 348-49. Because the ballistics was so important to the Government's

156

ability to introduce evidence of three additional homicides against Mr. Umaña at the penalty phase, and because the evidence of those three additional homicides undoubtedly played a role in the jury's decision to condemn him to death, Mr. Umaña suffered prejudice.

vi. <u>Trial counsel were ineffective for failing to request a jury instruction that would have properly explained to the jury how they should regard the "presumptively unreliable" hearsay statements from MS-13 accomplices that were introduced through professional, law enforcement witnesses.</u>

Instructions that educate the jury to consider the testimony of the defendant's accomplices with caution and care have long been utilized and approved. *See Cool v. United States*, 409 U.S. 100, 103 (1972). Instructions are most appropriate when the majority of the evidence against the defendant is in the form accomplice testimony. *See e.g. Tillery v. United States*, 411 F.2d 644 (5th Cir. 1974). Where there is minimal evidence to corroborate the accomplice testimony, or the accomplice testimony is weak or contradicted, there exists "a crucial evidentiary situation" in which the instruction has increased legal significance. *Id*. at 648. Because accomplice testimony "often constitutes the decisive influence in a jury's decision . . . the jury must ponder the veracity of an accomplice's damaging testimony in its proper light." *Id.* Therefore, even where the defense did not request an instruction on accomplice testimony, there is plain error if the jury does not receive the instruction. *Id*.

The overwhelming majority of the Government's case against Mr. Umaña, as it pertains to the Fairfax Avenue shooting, came from the testimony of Parshall. PPT 169-221. Parshall's testimony consisted mostly of hearsay, i.e., things that Mr. Umaña's co-defendants in the Fairfax Avenue shooting had said while in Parshall's custody. Those co-defendants, Luis Rivera, Luis Ramos, and Rene Arevalo all made self-serving statements, implicating Mr. Umaña. Their statements were contradicted by the statements of other witnesses. Noe Bautista and Oscar

157

Santiago both saw the driver, Rene Arevalo, do the shooting (PPT at 196, 215), and Alex Barrera (whose statements were never introduced at trial) told Parshall that Luis Ramos had done the shooting and provided him with leftover .22 caliber ammunition from the shooting. Appx. 52, Barrera transcript 105-06. Therefore, even though the statements implicating Mr. Umaña were of a sort that the Supreme Court has determined to be "presumptively unreliable" (*Lee v. Illinois*, 476 U.S. 530, 541 (1986), they were presented to the jury through the filter of a veteran homicide detective with decades of experience in investigations and testifying in front of a jury.

The only instruction given to the jury at the penalty phase as to how they should evaluate witness credibility was a reference back to the original jury instructions from the guilt/innocence phase of the trial. While the Court did instruct on accomplice testimony at the first phase of the trial (GPT at 1146-47), that instruction did not cover the special situation which was presented at the penalty phase. At the penalty phase LAPD detectives testified extensively about the statements that were made to them by Mr. Umaña's accomplices. And in at least one situation, Small testified about a statement that was made to him by accomplice Rene Arevalo, who in turn had heard the statements from another accomplice. *See* PPT at 110 (Detective Small testifies that Rene Arevalo told him "that's your lemon grove shooter."); *and* Appx. 51, at 35 (indicating that Rene Arevalo's statement that Mr. Umaña was the likely shooter was told to him "by one of the arrestees involved with him in the [Fairfax] double homicide."). The jury had absolutely no instruction on how to treat these extensive statements by accomplices that were introduced through professional witnesses. Because there was little evidence tending to show that Mr. Umaña was the shooter in either California murder other than hearsay testimony of accomplices and other unreliable sources, it was objectively unreasonable for trial counsel to fail to ask the

158

Court for a jury instruction that the detectives' testimony about what accomplices told them was to be treated in the same careful and cautious manner as if the accomplice testimony were being given by the accomplices themselves. Given trial counsel's repeated efforts to minimize the reliability and importance of the testimony of the MS-13 accomplices, Luis Rivera, Luis Ramos, and Rene Arevalo, the failure to ask for such an instruction constituted deficient performance.

vii.    <u>Mr. Umaña Was Prejudiced by Trial Counsel's Deficient Performance.</u>

The Fairfax Avenue and Lemon Grove shootings were a central part of the Government's case for death. Not only were they the basis of a two-part non-statutory aggravating factor, they were also the basis of the Government's sentencing theme that Mr. Umaña was deserving of death because he was a relentless killer, someone who had killed "over and over and over again," (PPT at 889), that he "kills who he wants to kill for his own reasons," (PPT at 834), and that "if it serves his needs he'll do it again." PPT at 835. ██████████████████████████ ████████████████████████████████████ ███████████████████████████████ There was readily available discovery that would have called into serious question the admissibility of this evidence, and moreover, painted a substantially different picture from the one presented to the jury – namely, thatMr. Umaña was not a remorseless killer responsible for additional homicides in California, but rather was only culpable for his involvement in the Greensboro offense, which the jurors themselves found to be unplanned and the result of an emotionally charged situation. See Docs. Nos. 1048-51, pp 5-6. If trial counsel had presented this readily available evidence at trial and used what they had in their possession to undermine the Government's witnesses, there

159

is a reasonable probability that at least one juror would have weighed the case differently, and that the outcome of the proceeding would have been different.

> *a. The Prior Unadjudicated Offenses Were Central to The Government's Case.*

The Government devoted nearly three quarters of its penalty phase testimony to the California murders (202 out of 278 pages). Compare PPT at 90-270, 313-323, 329-341 (witness testimony regarding California murders) with PPT at 277-291, 342-404 (witness testimony unrelated to California murders).

In closing argument, when talking about the Greensboro murder, the Government repeatedly and relentlessly tied in the California incidents. The central thrust of the Government's argument was that although the Greensboro murder on its face did not appear to be a particularly aggravated capital murder, it had to be understood in context of the fact that Mr. Umaña had committed multiple prior murders – that is, the Greensboro murder was part of a larger pattern that demonstrated that Mr. Umaña was the type of remorseless killer who would undoubtedly kill again unless the jury sentenced him to death. PPT 832-33 ("And you know the story, ladies and gentlemen, about a dispute over a juke box in a restaurant in Greensboro. A dispute over some music. But what wasn't known at the time was that [Mr. Umaña] had killed before. He had killed before and had earned his respect . . . by killing."); PPT at 825 ("But it didn't matter to [Mr. Umaña]. None of that mattered to [Mr. Umaña] because he had killed before. And he was going to kill again that night and he did kill that night, ladies and gentlemen."); PPT at 826 ("And ladies and gentlemen, what's – what's he automatically do? Well, hey, I've seen – I've done this before. I know what I have to do."); PPT at 828-29 ("And

160

we know he's killed before. We know in July '05 what he did. We know on Fairfax, busy place in Los Angeles …"); PPT at 829 ("we heard the statements from the witnesses. You heard what – the other MS players that were in the car [sic]. Everybody pointed to [Mr. Umaña]."); PPT at 834 ("He kills who he wants to kill for his own reasons, ladies and gentlemen … And he's not going to stop"); PPT at 839 ("He chose to go to LA, join up with the MS and murder people in LA, Fairfax Avenue and Lemon Grove."); PPT at 893-94 ("And it was about a choice to keep killing."); PPT 889 ("[Mr. Umaña]'s a killer. He's shown it over and over and over again."); PPT at 894 ("The facts, as the officer told you, were consistent across the board. This is how we pulled up. This is what happened. And man, he went off. Sound familiar? They flipped off the gang and he went off . . . just like he did in Greensboro. That's a consistency you need to consider. Same thing with [Lemon Grove] park."); PPT at 895 ("So they'd like you to discount that evidence, but let me ask you this. Gustavo Porras, one of those little spray painting tagger guys . . . he was shot between the eyes. His friend Jose Herrera turned to run and he was shot square in the back of the head."); Id. ("And that murder, those murders, all of those murders, whether you want to talk about LA or [Greensboro] a murder transforms a living person . .. into a corpse."); PPT at 896 ("The uncharged murders. You just think about the evidence you heard and about the consistencies between those.").

The Government also repeatedly spoke during closing arguments using a first-person narrative, purporting to share Mr. Umaña's internal thoughts and beliefs. The purpose of this rhetorical device was to contradict Mr. Umaña's statements that he was not the shooter in the California murders (which were introduced into evidence by the Government as trial exhibit 522), by baselessly speculating about Mr. Umaña's intentions and motivations. PPT at 827 ("I

161

know what I did to those two guys. I saw them fall right there. I know they were dead because I know what dead is. I've killed before."); PPT at 829 ("I'm the Wizard. I earned my respect. You can't do this to me. This is the answer. This is the answer (indicating). It's called it's your day for execution. As he walked out of the car, pulled out the gun. Boom, right in the head to Jose. And hey, what's his friend doing? He's running. Gustavo, sure, he's running. Didn't matter. Hey, I'm a good shot. Boom, right in the back of the head."); PPT at 829-30 ("And what happens later? Well, we're in LA with my MS buddies and, hey, there's some business that has to be done … Lemon Grove. Hey what are you telling me? I'm the Wizard. You're telling me Lemon Grove is controlled by some other little gang? I'm Wizard from the MS 13. We need to go out and we need to take care of that park and we need to take care of the people in that park. And that's exactly what he did … it doesn't matter if you're going to run when I pull out that gun because I'm going to hit you. I'm going to hit you and you're going to fall and then I'm going to hit you again, as happened to Andy, right in the back of the head. And hey, I might have missed a couple, but I got somebody that night. And I made them run. I made them fear. I made them see what Wizard is all about.").

These frequent and repeated references to the California murders in the Govenrment's closing demonstrates just how central they were to its case for death. As documented above, however, there was a wealth of readily available information upon which trial counsel could have relied to effectively discredit the Government's evidence of the unadjudicated murders. Had trial counsel properly made use of this evidence, there is a reasonable probability that at least one or more jurors would have rejected the Government's contention that Mr. Umaña was involved in the Fairfax Avenue and Lemon Grove shootings and failed to find the relevant non-

162

statutory aggravating factors beyond a reasonable doubt. Moreover, absent those factors, there is a reasonable probability that one or more jurors would have weighed the case differently and that Mr. Umaña would not have been sentenced to death. As even the Government seemed to implicitly concede, the Greensboro murder did not appear to rise to the level of a crime deserving of a death sentence, which is why it spent its closing argument relentlessly bootstrapping the Fairfax Avenue and Lemon Grove murders to the case and its argument for death. Absent those other unadjudicated murders, there is a reasonable probability that at least one juror would have concluded that the Greensboro murder, judged on its own terms and not as part of a larger pattern of alleged conduct, was not sufficiently aggravated to outweigh the mitigating evidence and justify a death sentence.

> **b.** *There is a Reasonable Probability That If Trial Counsel Had Presented Readily Available Exculpatory or Otherwise Mitigating Evidence Relating to Mr. Umaña's Role in the Lemon Grove and Fairfax Incidents, At Least One Juror Would Have Voted Differently.*

The alleged California murders in all likelihood made the difference between life and death. They effectively presented the sentencing jury with three additional killings whose facts were significantly more aggravated than the unplanned, alcohol-fueled, emotionally charged shootings that were charged in the indictment. *United States v. Umaña*, 750 F.3d 320, 369 (4th Cir. 2014) (J. Gregory, *dissenting*) (explaining the California murders were "in many ways more serious" than the Greensboro ones). For example, the victims in the Fairfax Avenue shooting were teenagers. The shooting took place on a busy street in Los Angeles and called to mind the kind of indiscriminate, gangster drive-by shooting that is frightening for anyone living in a large city. The Lemon Grove shooting was an example of four men relaxing after a game of basketball

163

when all of a sudden they were fired upon by a shooter who was unprovoked and lying in wait for the victims. Andy Abarca, the Lemon Grove victim, had no gang affiliation and no desire to cause problems. He never said a word to the shooter that gunned him down in his neighborhood park.

The California murders, moreover, had not yet been punished. The homicide investigations were wide open and no one had been tried or convicted as the killer in either case. The jury almost certainly reached its sentencing decision in part based on a desire to punish Mr. Umaña for the California shootings as well as the offense that he was actually charged with in Federal court.

The decision of the Fourth Circuit on direct appeal also illustrates how damaging the evidence was and, moreover, how weak the evidence would have been if subjected to adequate adversarial testing. On direct appeal, Mr. Umaña argued that his constitutional rights were violated during the penalty phase of his trial due to the extensive (unreliable) hearsay testimony that was used against him, blaming him for committing the California murders. Although the three-judge panel denied his appeal, there was a lengthy dissent focused squarely on the admission of the hearsay testimony without Mr. Umaña having the ability to challenge that testimony through cross-examination.   *Umaña*, 750 F.3d at 368-369 (J. Gregory, *dissenting*). Mr. Umaña's petition for rehearing *en banc* was voted for by five judges in the Fourth Circuit and there was another lengthy dissent, beseeching the Supreme Court to grant a petition for *certiorari. United States v. Umaña*, 762 F.3d 415 (2014) (J. Gregory, *dissenting*). The dissent correctly pointed out that "the basis for [the California murders] accusation was weak and would have withered under the scorching sunlight of cross-examination). So too, would the evidence

164

have "withered" had Mr. Umaña been effectively represented by counsel.

Trial counsel had the opportunity to investigate and present readily available evidence, and also had in their possession compelling exculpatory and mitigating evidence that should have been used to undermine the Government's allegations pertaining to Mr. Umaña's role in the Fairfax Avenue and Lemon Grove incidents. Had they conducted an adequate, investigation, and had they adequately reviewed the critical information that was turned over to them, they would have been able to effectively challenge the admissibility of the California murders evidence. Even assuming the evidence was admitted, trial counsel could have persuasively and effectively discredited the evidence in the eyes of the jury.

> c. *Regarding the Lemon Grove shooting, there were numerous failings that resulted in prejudice to Mr. Umaña.*

Freddy Gonzalez, by virtue of his pretrial identifications, gave the most compelling evidence that Mr. Umaña was involved in the Lemon Grove shooting. But this is only because the inadequate preparation by trial counsel allowed his testimony to be presented in a vacuum, without any reference to the two other people he had picked out as the shooter, and without the contradictory testimony from more credible witnesses, Juan Lara and Roberto Ramos, who did not select Mr. Umaña as the shooter. Overlooking Freddy Gonzalez's identification of Geovani Rodas was particularly prejudicial because around the time of the Lemon Grove shooting Geovani Rodas was going on a crime spree, shooting and robbing people in Lemon Grove Park, and carrying a handgun that was consistent with the bullets retrieved from the deceased victim of the Lemon Grove shooting. Counsel's failure to avail themselves of the various ways in which Gonzalez's testimony should have been impeached was prejudicial not only because it would

165

have ruined any credibility Gonzalez had with the jury, but because it may have caused this Court to preclude the identifications of Mr. Umaña altogether; in other words, the jury would have heard that none of the three eyewitnesses identified Mr. Umaña as the shooter, and that the Government's argument about "how Freddy picks [Mr. Umaña] out twice," PPT at 830-31, was utterly unreliable and undeserving of any weight.

The decision of the Fourth Circuit on direct appeal provides support for how Mr. Umaña was prejudiced by the Freddy Gonzalez pretrial identification evidence. The Fourth Circuit stated that "Freddie Gonzalez … identified Umaña in open court." *United States v. Umaña*, 750 F.3d 320, 349 (4th Cir. 2014). That never happened; to the contrary, the District Court precluded Freddy Gonzalez from making an in-court identification. PPT at 328. It is insightful, that at least two respected federal appellate judges, with abundant legal training and experience, and an opportunity to carefully review the record, were misled by the testimony in the transcript. It calls into question how the jury perceived Freddy Gonzalez's testimony in real time and lends itself to the conclusion that Freddy Gonzalez's testimony played a central role in its deliberations.

There were dozens of people interviewed by LAPD in the wake of the Lemon Grove shooting. Witnesses Luis Rivera and Alejandro Rodriguez gave statements that Mr. Umaña was not involved in the Lemon Grove shooting. Edgar Gutierrez told police that he had spoken to a person who "felt responsible" for the shooting and who knew the shooter. Trial counsel failed to cross-examine Detective Small on the interactions he had with these witnesses. The combination of Freddy Gonzalez's identifications of people other than Mr. Umaña, with the knowledge that Juan Lara and Roberto Ramos did not pick out Mr. Umaña as the shooter, as well as statements from three additional witnesses saying that Mr. Umaña was not at fault for the killing in Lemon

166

Grove Park, would have carried more weight than the testimony of a twice-felon, rival gang member who could not keep his story straight about who was the shooter.

If the jury had been presented with a full account of the Lemon Grove evidence, or if the Court had decided to preclude Freddy Gonzalez's pretrial identifications, there is a reasonable probability that one or more jurors would have found that the Government failed to prove beyond a reasonable doubt that Mr. Umaña's committed the Lemon Grove murder. Consequently, there is a reasonable probability that one or more jurors would have weighed the case differently and that the outcome of the proceeding would have been different.

> ### d. During the presentation of the Fairfax evidence, there were also numerous failings that also resulted in prejudice to Mr. Umaña.

Alex Barrera's identification of Luis Ramos as the shooter, the fact that he had been given .22 caliber ammunition immediately following the shooting, and the fact that he was willing to testify against Luis Ramos in court was never provided to the Court in support of a motion to preclude the Fairfax Avenue shooting from being introduced at the penalty phase of trial. It would have greatly militated toward exclusion of the Fairfax Avenue evidence, and it would have been solid grounds for requesting an evidentiary hearing on whether the self-serving and contradicted statements of Mr. Umaña's co-defendants could be used against him to put him to death. Combining Barrera's testimony with the two civilian eye-witnesses who both told police that the shooter was not Mr. Umaña would have entirely changed the balance of the evidence concerning the Fairfax Avenue shooting evidence, and there is a reasonable probability that the outcome of the proceeding would have been different.

167

With three contradicting stories about the identity of the shooter, only self-serving accomplice testimony implicating Mr. Umaña, contradictory testimony from neutral eyewitnesses, and the statement of Alex Barrera that he was willing to come to Court to testify that Luis Ramos was the shooter, there is a reasonable probability that the Court would have found the Fairfax evidence too unreliable to justify use in the proceeding where Mr. Umaña's life was at stake. Indeed, Barrera's statements to Parshall that Luis Ramos was the shooter and the fact that he was in possession of the same brand of ammunition that was used in the Fairfax Avenue shooting would have directly undermined the basis of the Court's ruling that the Fairfax Avenue evidence was sufficiently reliable to be admitted. PPT at 6. Even if the Fairfax evidence was allowed in at the penalty phase, the effective use of this information and appropriate jury instruction about how the accomplice testimony introduced through the detectives should be treated, would have significantly undercut the statements of the other MS-13 co-defendants Luis Ramos, Luis Rivera, and Rene Arevalo which was the only direct evidence that Mr. Umaña did the shooting.

Had trial counsel effectively represented Mr. Umaña in his capital sentencing trial, they would have presented a wealth of documentation and information that exculpated him of the California murders, or at the very least thoroughly impeached the Government's account of the incident as one that was solved with a fairly straightforward investigation that quickly identified a clear suspect and perpetrator. But for the grave mistakes on the part of trial counsel there was at least a reasonable probability that one juror may have decided that death was not necessary for Mr. Umaña.

168

The Government's evidence of Mr. Umaña's alleged involvement in the California murders was weak. Trial counsel failed to investigate and present readily available evidence that would have, at best, exculpated Mr. Umaña, and at worst, thoroughly discredited the credibility of the witnesses and the quality of the evidence such that it was reasonably probably that one or more jurors would have found that the Government failed to prove beyond a reasonable doubt that Mr. Umaña committed these other crimes. The unadjudicated murders were at the core of the Government's argument to the jury that Mr. Umaña was deserving of death. But for trial counsel's deficient performance in failing to adequately challenge the California murders, there is a reasonable probability that Mr. Umaña would not have been sentenced to death.

## VI. THE GOVERNMENT FAILED TO DISCLOSE EXCULPATORY, IMPEACHMENT, AND MITIGATING INFORMATION IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Disclosure of exculpatory, impeachment and mitigating information is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of such information when it is "material" to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Evidence material to punishment includes both mitigation evidence related to the charged crimes, aggravation evidence, and other mitigation such as evidence related to the background, character, history, and mental condition of the defendant. Evidence is "material" if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). To

satisfy the "reasonable probability standard," there must be "a probability sufficient to undermine confidence in the outcome." *Id*. Significantly, the materiality of the suppressed evidence must be considered collectively, rather than item by item. *Kyles v. Whitley*, 514 U.S. 419, 435-46 (1995) (a *Brady* violation is demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.").

Because *Brady* and *Giglio* impose constitutional obligations on the prosecution, *Brady* and *Giglio* material must be disclosed regardless of whether the defendant makes an explicit request for the evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-433 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985). In death penalty cases, the undisclosed facts may be material to the punishment phase alone. *See*, *e.g.*, *Jackson v. United States*, Case #:1:09-cv-01039-RC, ECF Doc. Nos. 174 & 175 (E.D.Tex. 5/26/2013) (death sentence vacated where Government inadvertently failed to turn over evidence of client's schizophrenia).

Recognizing that it is sometimes difficult to assess the materiality of evidence, the Supreme Court has counseled that prosecutors should err on the side of disclosure. *Kyles*, 514 U.S. at 439; *see also United States v. Agurs*, 427 U.S. 97, 108 (1976) ("The prudent prosecutor will resolve doubtful questions in favor of disclosure."). Accordingly, the Government has an affirmative duty to disclose exculpatory, impeachment, and mitigating information in the possession of the members of the prosecution team, which includes federal, state, and local law enforcement officers and other Government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles*, 514 U.S. at 437-438.56; *See also United States v. Antone*, 603 F.3d 566, 569 (5th Cir. 1979) (facts known to state law enforcement

170

personnel imputed to federal prosecutors when "the two Governments ... pooled their investigative energies to a considerable extent."). Moreover, "the duty to disclose is ongoing." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).

**A.     The Government violated *Brady* and *Giglio* in regards to the unadjudicated murders used as non-statutory aggravating factors at the penalty phase.**

Based on information learned as part of the postconviction process, Mr. Umaña has a good faith basis to assert that the Government did not comply with its obligation to disclose material exculpatory and/or impeachment information in regards to the unadjudicated murders used at the penalty phase as non-statutory aggravating factors. For example, the Government failed to disclose information that contradicted the account of the 2005 shooting at Lemon Grove Park in Los Angeles, California. Some of the evidence has been discovered during postconviction investigation and other evidence is at issue in a discovery motion filed with the Court by postconviction counsel. *See* 16-cv-00057, ECF Doc. No. 18. The Government's failure to disclose this information was prejudicial because it would have provided compelling evidence that someone other than Mr. Umaña was the shooter and would have revealed that the evidence relating to the California murders was unreliable. Thus there is a reasonable probability that, had the information been disclosed to the defense, the result of the proceeding would have been different

> i.     The Government violated *Brady* and *Giglio* by failing to disclose exculpatory information about one of its testifying eyewitnesses who was prepared to affirmatively exclude Mr. Umaña as the Lemon Grove shooter.

Post-conviction counsel for Mr. Umaña spoke with Government witness and victim Roberto Ramos while preparing to file this § 2225 motion. What Ramos had to say about his

171

participation in Mr. Umaña's sentencing proceedings undermines confidence in the outcome of

the proceedings. Ramos is unequivocal that Mr. Umaña was not one of the persons he saw

commit the shooting at Lemon Grove Park:

> 27. The day I testified, I entered the courtroom and passed by the defendant [Mr. Umaña]. We both looked at each other. When I saw him, I thought that something was wrong because *the defendant was not one of the guys I saw the night of the shooting*. I did not give the prosecutor a sign as he had instructed me because the defendant was not at the park. Since he did not receive a sign from me, the prosecutor did not ask me if I could identify the defendant as the shooter. If I had been asked by the prosecutor if the defendant was one of the shooters, I would have answered that he was not. Even though it had been five years since the shooting, *I was confident that the defendant was not one of the shooters*.
>
> 28. I was then asked questions by the defense attorney. I was waiting for the defense to ask me if the defendant was one of the shooters. If they had asked me, I would have told them the truth that their client was not one of the shooters.
>
> 29. After my testimony, the prosecution wanted to know if the defendant threatened me as I walked by. I told him the truth that I did not feel threatened by the defendant. To me, there was nothing intimidating about the defendant. After my testimony, I expected a follow-up question about whether the defendant was in fact one of the shooters, but he did not ask me that question. *It was strange to me that they did not want to know if they had the right person.*
>
>   [. . .]
>
> 31. After I testified, I talked to Juan about the fact that the defendant in the courtroom in court was not one of the guys who shot at us. But Juan did not want to talk about the case or anything related. He was done. The defendant got a raw deal. Maybe he was doing some other bad stuff, but *he definitely was not one of the Lemon Grove Park shooters. The defendant did not look anything like either one of the shooters.*
>
> 32. The Lemon Grove shooters are still out there somewhere. Maybe they are dead or in jail, but certainly not because of this case. They got away with shooting us, and worst of all with Andy's murder.

Appx. 11, Ramos Dec at 7-8 (emphasis added)

As one can tell from the declaration, prior to calling Roberto Ramos to the witness stand,

the Government met with him in order to prepare his testimony. *Id*. at pp. 6-7. During the meeting, the Government instructed Ramos that if he was able to identify Mr. Umaña in court as the Lemon Grove shooter, he should give some sort of signal to the prosecutor during direct examination. *Id.* at 7. Because Ramos was confident that Mr. Umaña was not one of the shooters, he never gave any such sign to the prosecutor. *Id*. Consequently, it appears that the Government deliberately refrained from asking Ramos to make an in-court identification in order to avoid having its witness testifying to the exculpatory fact that Mr. Umaña was not one of the Lemon Grove Shooters. This prior exchange between Ramos and the prosecution before his testimony, and the fact that upon seeing Mr. Umaña in court Ramos was certain he was not one of the shooters at Lemon Grove Park, was never disclosed to the defense.

      ii.    <u>The Ramos information constituted material exculpatory and impeachment evidence.</u>

The undisclosed exchange between Ramos and the prosecutor was exculpatory. Ramos expressed confidence in his ability to identify the shooters from the very first day he met with police. *See* Appx. 51 at 12 (Detective Small writes that Ramos "would be able to recognize the suspects if he saw them again. Ramos is willing to meet with a forensic sketch artist."); *see also* PPT at 135. Out of more than one dozen witnesses interviewed by Detective Small and other investigating officers, Ramos was the only person who was noted to have confidence in his ability to identify the shooter. Appx. 51 at 12. Because of his confidence and prior familiarity with the shooter, when Ramos failed to give the prosecutor a signal that he could identify Mr. Umaña, the prosecutor learned that Ramos was a vital, exculpatory witness. Appx. 11.

Moreover, Ramos's exculpatory information also constituted critical impeachment information, as it would have materially undermined the testimony of another witness, Gonzalez,

<div align="center">173</div>

who testified that Mr. Umaña was the shooter. *Bagley*, 473 U.S. at 676 ("Impeachment evidence . . . falls within the *Brady* rule."). For those two independent reasons the information was exculpatory and the prosecutor was obligated to turn it over to the defense. ECF Doc. No. 186.

        iii.     <u>The nondisclosure of the Ramos information was prejudicial.</u>

The nondisclosure of the Government's agreement with Ramos, as well as its nondisclosure of the fact that Ramos could not testify that Mr. Umaña was one of the shooters, was prejudicial and undermines confidence in the outcome of Mr. Umaña's case. Ramos was not simply unable to identify Mr. Umaña; instead, Ramos was prepared to affirmatively exclude Mr. Umaña as the Lemon Grove shooter. Appx. 11, Ramos Dec at 7. Had this information not been suppressed, trial counsel would have elicited this exculpatory information and presented it to the jury. Because the prosecutor never disclosed his discussion with Ramos, the defense was unable to demonstrate to the jury that one of the Lemon Grove victims, and one of the Government's principal witnesses, was certain that Mr. Umaña was not the shooter.

Moreover, there is a reasonable probability that if Ramos's exculpatory testimony had been presented to the jury, the outcome of the proceedings would have been different. As noted in Claim V, the Government's case for the death penalty largely relied on the accusation that Mr. Umaña "had killed before." PPT at 823. Knowing that the Greensboro shootings were unplanned and a result of an emotionally charged fight, the Government emphasized to the jury that Mr. Umaña's alleged acts in California were cold and calculated. For example, although Mr. Umaña never claimed to be one of the two shooters at the park, the prosecutor painted a vivid picture of a premeditated and deliberate killing for the jury:

174

Lemon Grove Park where people play basketball. Where Andy Abarca plays and lives and plays basketball. He's not a gang member. He's a real estate broker. And he was very successful at it. And his other friends. You heard from some of his friends who were there that night playing basketball. It didn't matter to Wizard because wait a second, you had not respected me. And I came there to do a job.

And it doesn't matter if you're going to run when I pull out that gun because I'm going to hit you. I'm going to hit you and you're going to fall and then I'm going to hit you again, as happened to Andy, right in the back of the head. And hey, I might have missed a couple, but I got somebody that night. And I made them run. I made them fear. I made them see what Wizard is all about. What the MS 13 is all about.

PPT at 830. The testimony of one of the victims confidently stating that Mr. Umaña did not commit this calculated murder would have changed the outcome of the case.

Moreover, Freddy Gonzalez was the *only* witness to identify Mr. Umaña as the park shooter. PPT 328. Even the Court found Gonzalez's "prior description of the criminal" to be "suspect" and acknowledged that his responses to the six-packs photo identification line-ups were "less than certain." PPT 327-28. ("The Court does not have confidence in the pretrial identification. . . . "). Ramos was clearly the more credible witness: Ramos was an unbiased, civilian, non-gang-member witness who expressed confidence in his ability to correctly identify the shooter from the very first moment he spoke with the police. PPT at 122; Appx. 51 at 12. He indicated that he had seen the shooter on a previous occasion which added to his ability to make a correct identification. Appx. 51 at 12. By contrast, Gonzalez was a two-time convicted felon (PPT at 338), a member of MS-13's rival gang in the Lemon Grove Park area (PPT at 315), he had recently robbed an MS-13 member (PPT at 337), and he believed that he was the intended target of the shooting. Appx. 51 at 15. Gonzalez's felony convictions on their own reduced his credibility (*see* Federal Rule of Evidence 609), but the fact that his conviction was for robbery of an MS-13 gang member and that his own gang (TPC) was a rival of MS-13 made his testimony

175

very likely to be biased against an MS-13 member such as Mr. Umaña. None of these concerns of bias applied to Ramos. Moreover, there is no indication that Gonzalez indicated confidence in his ability to identify the shooter during his initial interview with the police. Thus, there is a reasonable probability that, had the jury learned of Ramos's exculpatory information, one or more jurors would have credited Ramos's testimony affirmatively excluding Mr. Umaña as the shooter in the Lemon Grove incident, and the Government would have failed to prove the relevant aggravating factor beyond a reasonable doubt.

The Government's failure to disclose this exculpatory and impeachment information undermines the confidence in the outcome of Mr. Umaña's trial. Had the Government disclosed that Ramos excluded Mr. Umaña as the Lemon Grove shooter, "the trial would have been transformed from a one-sided presentation of the prosecution's case into a battle between competing eyewitness testimony," meaning there is a "'reasonable probability' that a jury would have reasonable doubt as to [the defendant's] guilt." *Stitts v. Wilson*, 713 F.3d 887, 894 (7th Cir. 2013).

As the Supreme Court itself has recognized: "If … one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness." *United States v. Agurs*, 427 U.S. 97, 113 (1976). Ramos could have affirmatively excluded Mr. Umaña as the shooter at trial, and by not giving a sign to the prosecutor during his testimony, he indicated as much. (At the very least, the prosecution was aware that Ramos could not identify Mr. Umaña as the shooter, which would have constituted material impeachment information.) His testimony would have been

176

substantially more credible than that of Gonzalez, who was the only person that identified Mr. Umaña as the shooter. PPT at 328. No one else made an identification. This evidence was both exculpatory and material; its disclosure was necessary to a fair trial and the failure to turn it over "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

**B.      The Government violated *Brady* and *Giglio* by failing to turn over numerous recorded interviews that contain exculpatory and/or impeachment statements regarding Mr. Umaña's involvement in the Lemon Grove and Fairfax shootings.**

> i.      <u>The Government suppressed exculpatory and/or impeachment statements made by witnesses to the Lemon Grove Park Shooting.</u>

Postconviction counsel has filed a motion for discovery. *See* 16-cv-00057, ECF Doc. No. 18. The motion includes a non-exhaustive list of video/audio recordings by LAPD that were not turned over:

| **Witness** | **Tape #** | **Date** |
|---|---|---|
| Elger Barrios | 376049(A) | 09/29/2005 |
| Roberto Ramos | 376049(B) | 09/29/2005 |
| Freddy Gonzalez | 376050 (audio) | 09/29/2005 |
| Freddy Gonzalez | 376898 (video) | 12/29/2005 |
| German Suarez[41]  and his wife | 376051 | 09/29/2005 |
| Juan Lara | 376385 | 10/18/2005 |
| Erick Lopez | 376382 | 01/07/2006 |
| Alejandro Rodriguez[42] | 371938 | 01/07/2006 |
| Alejandro Rodriguez | 357881 | 04/24/2006 |

*See* 16-cv-00057, ECF Doc. No. 18. Because of the amount of evidence that has been identified as not produced, post-conviction counsel has a good faith basis to believe there is additional

---

[41]   German Suarez is also referred to as H. Suarez.   This is most likely due to the Spanish pronunciation of the letter "G."

[42]   A.k.a. "Chocolate"

177

evidence not produced relating to both the Lemon Grove and Fairfax murders.

Mr. Umaña has a good faith basis to assert that the suppressed evidence contains exculpatory and/or impeachment information. By way of example, documents in discovery indicate that witness Alejandro Rodriguez told LAPD that Mr. Umaña was not in Lemon Grove Park on the night of the shooting. *See* Appx. 69 at 11-12.

Despite a standing order to produce all exculpatory and impeachment material, the Government did not produce the recorded interviews. ECF Doc. No. 186.

> 1. *Video and audio recordings of eye witnesses, in particular testifying witnesses, are material because they rebut the Government's weak case that Mr. Umaña was the park shooter and impeach the only witness that supports the Government's theory of the shooting.*

The Government has suppressed video and/or audio recordings of testifying eyewitnesses Gonzalez, Ramos, and Lara. There is a good faith basis to believe that those interviews contain exculpatory and impeachment material. For example, based on the extant record, it is clear that neither Ramos or Lara picked Mr. Umaña out of a photo line-up prior to the trial, which is particularly significant given that both witnesses had provided police with a detailed description of the shooter and had stated that they would have been able to identify the two men that came to the park and shot at them if they were to see them again. Thus, there is a good faith basis to believe that Ramos and Lara made statements in those recordings that either affirmatively excluded Mr. Umaña, or at the very least cast doubt on his involvement in the shooting. Similarly, there is a good faith basis to believe that the recorded interviews of other witnesses also contain material exculpatory and/or impeachment information.

Mr. Umaña pleads that there is additional exculpatory and/or impeachment information

178

on the undisclosed recordings regarding the unadjudicated murders. The video and audio recordings could provide information that was not disclosed in the documentary evidence. For example, a video of a pre-trial identification would show if the identification was impermissibly suggestive. The records also include the actual statements by witnesses, rather than a summary of the statements by investigating officers. There is a reasonable probability that but for the Government's failure to disclose the recordings, the result of the sentencing phase would have been different.

Although the Government's evidence regarding the unadjudicated murders was weak, those offenses were central to the Government's argument in support of a death sentence. *See* Claim V, supra. The Government's failure to disclose this exculpatory and/or impeachment information undermines the confidence in the outcome of Mr. Umaña's trial. Had the Government disclosed this evidence, trial counsel would have been able to present non-cumulative impeachment evidence of inconsistencies in the Government's case, and even present exculpatory evidence to the jury affirmatively excluding Mr. Umaña as a participant in either of the unadjudicated murders. Either way, there is a reasonable probability that if this information had been presented to the jury, one or more jurors would have concluded that the unadjudicated murders were not proved beyond a reasonable doubt and the outcome of the proceedings would have been different.

179

**C.      The Government Failed to Disclose Material Mitigation Evidence Obtained from Alejandro Umaña's Mother**

Based on information learned as part of the postconviction process, Mr. Umaña has a good faith basis to assert that the Government did not comply with its obligation to disclose material mitigation information for purposes of the penalty phase. Specifically, the Government failed to disclose information provided by Mr. Umaña's mother, Leticia Ramirez, regarding the background, character, and history of Mr. Umaña. The failure to disclose this information was prejudicial because had it been disclosed, there is a reasonable probability that the outcome of the proceeding would have been different.

       i.      The Government's suppressed statements made by Mr. Umaña's mother during an interview with the prosecution.

Defendants are clearly entitled to discovery of mitigating evidence under *Brady*. "Evidence relevant to a statutory mitigating factor would certainly be, for the defendant, 'favorable' evidence pertaining to punishment in that it may justify a sentence of life imprisonment as opposed to death." *United States v. Beckford*, 962 F.Supp. 748, 811 (E.D.Va.1997) (citing *Brady*, 373 U.S. at 87). These mitigating factors include aspects of the defendant's background or character or any other circumstance of the offense that mitigates against imposition of the death sentence. 18 U.S.C. § 3592(a)(8).

In an interview conducted as part of the post-conviction investigation, Ms. Ramirez stated that she was interviewed twice by the Government and provided information regarding the background of Mr. Umaña. Appx. 10. During the course of the interview, the Government came into possession of constitutionally relevant mitigating information about Mr. Umaña's background, including that he was born in a country and a year different than what was presented

180

in Court, the father's criminality, and reasons for Mr. Umaña joining the gang. These are all factors that mitigate against imposition of the death sentence.

According to Ms. Ramirez, the first time she was visited by the Government, she gave them information about the family moving to Guatemala from El Salvador during the civil war and that Mr. Umaña was born in Guatemala. *Id*. ¶81. The next time she was visited, it was by FBI agents who took her to be interviewed by several people with the United States Government. *Id*. at ¶ 82. Leticia describes her contact with the Government:

> 81. One day, a man who spoke Spanish came to talk to me about my son Alejandro. He lied to me and sweet-talked me into talking to him. He talked to me about religion and said he wanted to help Alejandro. The man talked to me about praying and said he wanted to evangelize Alejandro. I told this man many of the things I am including here in this declaration and I gave him a copy of my son's Guatemalan birth certificate. I do not remember that man's name.

> 82. Later on, two people came looking for me. They were a man and a woman who said they were from the FBI. The woman was an interpreter. They took me to a hotel where there were six or seven people who interviewed me; two of them were women. The blond woman asked me several questions about Alejandro's life for about an hour through an interpreter. The woman sat in front of me across the table. It was very formal. I also told her some of the things that are in this declaration, including the fact that [Mr. Umaña's father] sold drugs and that he was the one who got my sons Alejandro and Saul involved in that business. I told them about the fact that Alejandro did not have identification and had nothing here. They also asked me questions about Guatemala. I asked those people if I was going to see my son again and they told me no, probably not. I felt devastated.

> 83. The people from the United States Government tricked me. They led me to think that, by talking to them, I could help my son.

*Id*. at ¶¶ 81-83. Leticia explained that she told the prosecution about Mr. Umaña joining the gang because of the lack of papers. *Id*. As she described it:

181

78. I believe my son Alejandro's problems were the papers. He had no form of identification and he could not get a job to survive. My son wanted to work but he needed a Salvadoran ID card called *Documento Único de Identidad* [Sole Identity Document (*DUI* for the Spanish initials)]. Once he turned 18, they required a form of identification in order for him to get work. For many years he did not have an ID because he was born in Guatemala and we never registered him as a Salvadoran citizen. Years later, I tried to help my two sons, Alejandro and Saul, to obtain their Salvadoran documents and I went to Guatemala to get their birth certificates. In the end, I was unable to help them get their documents because of the many obstacles we had to go through, like obtaining declarations and paying fees. I knew it was very important to Alejandro to obtain proper documentation; I even offered to sell my sewing machine that I use to earn a living so I could help him.

*Id*. at ¶¶ 78. This information was not known by the defense at the time of trial. The Government knew that the defense did not have this information and simply remained silent.

> ii. The Government has not disclosed statements made by Ms. Ramirez regarding her son's background.

Although the Government produced in discovery evidence that they met with Ms. Ramirez on two separate occasions, they have not disclosed any of her statements relating to the father being a drug dealer, the problems that resulted in Mr. Umaña's life as a result of him lacking proper Government documentation of his identity, and other information obtained during the approximately hour-long conversation. The Government has not disclosed agent notes, reports, or recordings of the interviews. What the Government did disclose to the defense was abbreviated information that omitted any information that Ms. Ramirez provided to the Government regarding the mitigating evidence.

In March of 2010, days before jury selection, the Government produced an FBI 302 in discovery that summarized the interview conducted in El Salvador by the prosecutors and agents. Appx. 48. In regards to the interview of Ms. Ramirez, the report only stated "Interview[ed] UMAÑA's mother, LETICIA DIAZ." *Id*. Nothing regarding the contents of the interview was in

182

the report. When trial counsel requested reports regarding the interview, noting that they had not been able to find Ms. Ramirez for purposes of preparing their mitigation case, the prosecutor responded there were no reports and summarized her recollection of the interview that had occurred more than a year prior:

> There is no 302 because it was not a long conversation. I did find my notes which I will send to you. There's not a lot there but she did say something that I didn't write down but which I recall. She said she and Umaña's dad separated shortly after Alejandro's birth and that Umaña's dad took Alejandro with him. She was upset about this and made efforts to see Alejandro as much as possible. She thinks his dad turned Alejandro against her. She continued to keep up with him through family members - someone mentioned a newspaper article about him to her. As I recall she visited he and his brother in jail when they were incarcerated. She cried at some point while we were speaking to her.

Appx. 74.

The prosecutor also provided her own handwritten notes, stating (1) "mother lives in Santa Ana – but during war went to Guatemala – came back here" (2) Alejandro was born in Guatemala and (3) "Became involved w/ Mara over papers." Appx.75. The prosecutor's notes of the one-hour interview are telling:

183

> leticia Ramirez Diaz =    Mo ther of △
>    lives in Santa Ana — but during war
> went to Guatemala — came back here
> "a girl told her about son — newspaper".
> She is here Voluntarily.
> △ born in Guatemala
>    Saul Oswaldo Gonzalez-Ramirez
> Became involved w/ Mara — 20 yrs.
>    Became involved w/ Mara over papers.
> Saul saw Alejandro selling drugs

*Id.* Of particular significance here is not only the information that was omitted by the prosecution regarding Ms. Ramirez's statements, but the ambiguous nature of the statements that were written down. For example, instead of writing that the father sold drugs, the prosecutor wrote that Mr. Umaña's brother, Saul, saw Mr. Umaña selling drugs. *Id.* Instead of explaining that Mr. Umaña endured hardship and could not work because he had no form of identification, the prosecutor simply wrote a cryptic line "[b]ecame involved w/ Mara over papers." *Id.* The notes not only failed to accurately record the information that Ms. Ramirez provided to the Government, but they were also misleading in that they characterized the information in a way that obscured their importance as mitigating facts.[43]

---

[43] It is also notable that the only person from the Government to hand over any notes was the same prosecutor that was asking the questions. Ms. Ramirez recalls approximately six to seven people in the hotel room including an interpreter, an FBI agent, and the prosecutor asking

184

Subsequently, during trial, the Government produced a one-page report dated April 13, 2010 prepared by Carlos Alberto Moreno from the Transnational Anti-Gang Task Force.[44] Appx. 44; *See* Appx. 47 ("We respectfully request through this letter that you provide us with "certified photocopy of the birth certificate of ALEJANDRO ENRIQUE RAMIREZ UMAÑA or UMAÑA RAMIREZ", resident of Barrio San Miguelita, 21 and 23 Avenida Independencia, casa No. 6, Santa Ana, the son of Rafael Enrique Umaña and Leticia Ramirez, born between 01/01/1981and11/25/1985."). In the report, Moreno stated that on June 14, 2008, he interviewed Ms. Ramirez and obtained from her a Guatemalan birth certificate for Mr. Umaña. The report only deals with Ms. Ramirez's statements pertaining to the birth certificate. According to Moreno, Ms. Ramirez said she went to live with Mr. Umaña's father and his family in Guatemala during the civil war before Mr. Umaña's birth. Appx. 47.

Again, the minimal information produced by the Government is devoid of any statements she made to them about the father being a drug dealer, how the father got Mr. Umaña involved in criminal activity, the significance of the lack of identification for Mr. Umaña, and the

---

the questions. Agents are trained to write reports that truthfully and thoroughly set forth the facts of interviews but the only report by the agent in the room was a one line statement that Ms. Ramirez was interviewed. It is unusual that with several people participating in the interview of Ms. Ramirez, only one-half of a page of lined paper notes was produced.

[44] The Task Force is a partnership between the PNC in El Salvador and the FBI, where officers from both agencies work together.   *See* Description of MS-13 National Gang Task Force from the FBI website at https://www.fbi.gov/about-us/investigate/vc_majorthefts/gangs/gangs_ms13taskforce (last reviewed on June 14, 2016); *See also* Oct. 10, 2007 "Going Global on Gangs" from the FBI website at https://www.fbi.gov/news/stories/2007/october/ms13tag_101007 (last reviewed on June 14, 2016).

185

circumstances in which the family went to Guatemala. This is even more egregious considering the fact that trial counsel specifically requested any information that the Government had regarding Mr. Umaña's father being a drug dealer. In a December 17, 2009 email, trial counsel asked the prosecutors about an off-the-record statement made by one of the Assistant United States Attorneys working on the case:

> [The AUSA] told me that our client's father was a drug dealer in El Salvador. We have not come across any indication of this in our review of discovery. We believe that such information in possession of the Government must be disclosed to the defense as it is potentially mitigating for the sentencing phase. For example, if our client was raised in an environment where his father was dealing drugs or was made to participate in same, this would be mitigating.
>
> The court's discovery order would require disclosure of such information to the defense as it would be "favorable to the accused and material either to guilt or to punishment". Therefore, we request disclosure of any material possessed by or known to the Government tending to show that Defendant's father is or was a drug dealer or was otherwise involved in criminal activity.

Appx. 49. In response, one prosecutor stated that she did not "know that we have any evidence of such, more or less talk" but she did know that the father sold trinkets in the center of town and that Alejandro's brother was in prison. *Id*. Another prosecutor responded that it "was rumored that he had sold drugs and that is the full extent of my knowledge on the subject. You have all discovery and reports that would shed any light on the subject." *Id*.

The Government's response to that was that there was none, only speculation of "more or less talk." The prosecution's answer to the request for information was inaccurate, if not misleading. "[A]n incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on a misleading representation, the defense might abandon lines of independent

<center>186</center>

investigation, defenses, or trial strategies that it otherwise would have pursued." *Bagley*, 473 U.S. at 682.

The Government's failure to disclose mitigation evidence regarding these matters was a blatant disregard for Mr. Umaña's constitutional right to present mitigating evidence. The Government was well aware of the fact that trial counsel was not able to find Mr. Umaña's mother, they were on notice that trial counsel believed that information about the father being a drug dealer was mitigating evidence, but the Government failed to disclose that Mr. Umaña's mother had provided the Government with the very information that the defense sought and that was relevant to Mr. Umaña's constitutional right to present mitigating evidence at his capital trial.

    iii.    <u>Ms. Ramirez's statements regarding Mr. Umaña's upbringing and struggles in life were material because they directly contradict the Government's closing remarks that Mr. Umaña "by every account" had a "normal life."</u>

The information provided by Ms. Ramirez is material for several reasons. As stated by trial counsel, information that the person that raised Mr. Umaña was a drug dealer and influenced him demonstrates that he was raised in a poor environment without proper guidance, which had significant consequences on Mr. Umaña's social, emotional, and psychological development. The jury never heard any of this. Instead, the jury heard that Mr. Umaña was raised by what appeared to be a loving father who would lock his family in their home to protect them from the violence during the civil war. The Government embraced this imagery of a father taking responsibility for his son, and raising him to have, what appeared to be "by every account," a "normal life." PPT at 836.

187

The Government also had crucial mitigation information about the significance of his lack of papers and how that affected his trajectory in a place like El Salvador. The lack of adequate papers regarding his identity, in part, explains Mr. Umaña's difficulties in being able to utilize available institutional resources and obtain proper employment, and why he ultimately resorted to membership in a gang to survive. As Ramirez stated:

> 78. I believe my son Alejandro's problems were the papers. He had no form of identification and he could not get a job to survive. My son wanted to work but he needed a Salvadoran ID card called Documento Único de Identidad [Sole Identity Document (DUI for the Spanish initials)]. Once he turned 18, they required a form of identification in order for him to get work. For many years he did not have an ID because he was born in Guatemala and we never registered him as a Salvadoran citizen. Years later, I tried to help my two sons, Alejandro and Saul, to obtain their Salvadoran documents and I went to Guatemala to get their birth certificates. In the end, I was unable to help them get their documents because of the many obstacles we had to go through, like obtaining declarations and paying fees. I knew it was very important to Alejandro to obtain proper documentation; I even offered to sell my sewing machine that I use to earn a living so I could help him.

Appx. 10 ¶ 78. The jury only heard that the lack of identification prevented Mr. Umaña from playing soccer. PPT at 565. They heard that he eventually obtained a supplementary birth certificate in his early twenties which stated he was born in El Salvador. *Id*. at 534. And he joined the gang because of a girl. *Id*. at 593. What the jury received was thus a materially incomplete and misleading understanding of the significance of Mr. Umaña's lack of proper papers. Had the jury been provided with accurate information on this matter that explained the mitigating nature of this issue, there is a reasonable probability that the outcome of the proceeding would have been different.

The prosecution was able to take advantage of the fact that the defense did not understand the prosecutor's cryptic notes stating "[b]ecame involved w/ Mara over papers" and argued to the

188

jury that Mr. Umaña "wasn't some young, deprived kid" but an adult who joined a gang for something as petty as getting the attention of a girl. PPT 836. The Government emphasized the fact that Mr. Umaña was in the position he was in because of "choices." PPT 892-93 ("Those are choices. And he had every chance. Along the way, members of the jury, he had every chance to say no just like anybody does. It wasn't about a chance; it was about a choice. And that's why we're here to hold him accountable. It's for those choices."). His gang affiliation was a damning fact on which the Government relied to urge the jury to vote for death. The undisclosed information would have helped give the jurors a mitigating context about Mr. Umaña's path to joining a gang: not out of "choice" but out of a lack of other means to survive, the need for family, and the need for identity that was not otherwise available to him. Indeed, even when Mr. Umaña sought an escape from poverty through soccer, he could not, because he did not have the money or the papers. The lack of identification closed off the avenues for Mr. Umaña that could have changed the trajectory of his life. Not having proper Government identification was not something he chose. It was a situation he was put in due to circumstances outside of his control. He was dependent on his caregivers to straighten out the issues of his papers, but they were absent from his life. Thus, choices that other people made while he was a minor, that were outside his control, had important ramifications on his life and what opportunities would be available to him in the country where he lived.

      iv.    <u>Ms. Ramirez's statements regarding Mr. Umaña's background were material to Mr. Umaña's claims on intellectual disability.</u>

The information about Mr. Umaña's age was also material to the pretrial hearing on *Atkins v. Virginia*, 536 U.S. 304 (2002). The Court heard information to determine if Mr. Umaña met the three prongs of intellectual disability: (1) significantly subaverage intellectual

<div align="center">189</div>

functioning (IQ of about 70 or lower); (2) significant limitations in adaptive functioning; and (3) onset before age eighteen. The defense and Government experts both worked under the assumption that Mr. Umaña was born in El Salvador in 1984. *See* Appx.'s 70, 71, 72, 73.

Although the Government had already obtained Mr. Umaña's true birth certificate with the date of birth of 1982, instead of 1984, and had already interviewed his biological mother, they again said nothing. As set forth more fully below in Claim VII, information regarding Mr. Umaña's date of birth was material for the Court's determination on intellectual disability. For example, it mattered whether Mr. Umaña flunked third grade twice at the age of 12 instead of the age of 10. Mr. Umaña's age affected the experts' testimony and the Court's decision process and fact-finding on whether Mr. Umaña was eligible for the death penalty.[45]

The prosecution allowed its own expert witness to rely on the wrong date of birth, sat at the hearing knowing the Court was relying on false facts, and allowed the false facts to work against Mr. Umaña. The Government hid these materials facts until well after the hearing and the Court's denial of Mr. Umaña's motion. This was a clear *Brady* violation.

Upon information and belief, Mr. Umaña asserts that there is additional mitigating evidence that the Government has not yet disclosed. The undisclosed information is at issue in a discovery motion filed with the Court by postconviction counsel. *See* 16-cv-00057, ECF Doc.

---

[45] The relevance of these facts to the expert testimony and Court's fact-finding are explained in detail in Claim III, and are incorporated by reference here.

190

No. 18. There is a reasonable probability that had the jury known about the information, the outcome of the proceeding would have been different. [46]

**D.      The Government's failure to disclose exculpatory information that the "MS" tattoo does not have to be "earned" by killing was a violation of *Brady* and *Giglio*.**

As discussed below, and at Claim VII, C,[47] the Government introduced evidence during the guilt phase that an MS-13 member had to "earn" the ability to tattoo the letters "MS" on his body by killing. GPT at 920. Because Mr. Umaña had numerous "MS" tattoos (*See* Gov. Exhs 21-24), all of which had been displayed to the jury (PPT 80-84), and all of which were repeatedly referenced throughout the trial, the natural conclusion for the jury was that Mr. Umaña must have earned each of his many MS tattoos by killing other people. Indeed, the Government encouraged the jury to draw that exact conclusion.

When the Government elicited this testimony, they were in possession of other information that directly negated it. *See e.g.* ECF Doc. No. 1080, at 567-68 (key government informant Rony Lopez testifying that the MS tattoos could be earned in any number of way including "just committing different types of crimes."). Thus, the Government violated Mr. Umaña's constitutional rights pursuant to *Brady* when it did not turn the information

---

[46] Mr. Umaña cannot plead this, or any other claim, regarding the Government's failure to disclose material exculpatory and impeachment information with any more particularity at this time because the factual bases for such claims rests on information known only to the Government. Prior to filing his § 2255 Motion, Mr. Umaña attempted to obtain this information through motions for discovery of exculpatory, impeachment, and mitigating information. If evidence is disclosed that supports additional *Brady* claims Mr. Umaña will plead them at the appropriate time.

[47] The facts and arguments contained within Claim VII, C are incorporated into this claim by reference.

191

contradicting the idea that MS tattoos must be earned by killing because it was both exculpatory and material. The Government was also required to disclose the information because it served to impeach the testimony of its own witness. *Giglio v. United States*, 405 U.S. 150 (1971). The information known to the Government served to directly impeach the testimony it elicited during Mr. Umaña's trial.

The non-disclosure was prejudicial because it would have provided an explanation for Mr. Umaña's tattoos that was short of him having committed the same type of crime for which he was accused in the indictment. *See Old Chief v. United States*, 519 U.S. 172 (1997). The jury was therefore permitted to, and encouraged by the Government, to make the impermissible inference that because Mr. Umaña had killed before in order to earn his tattoos, he was more likely to have killed in this case. Furthermore, the testimony (and argument) that tattoos are earned by killing people impermissibly increased the chances that the jury would find Mr. Umaña guilty of the non-statutory aggravating factors that were accusations of unadjudicated murders. Had the exculpatory, impeachment evidence been turned over then the jury would have been required to evaluate the case based only on the evidence before it and there is at least a reasonable probability that the outcome of the proceeding would have been different.

## VII. THE GOVERNMENT PRESENTED FALSE AND MISLEADING EVIDENCE, AND ASKED JURORS TO RELY ON THIS EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

192

**A.     Introduction and Summary of Argument**

Mr. Umaña was denied due process because the Government presented misleading, inaccurate and prejudicial testimony at his trial.

Prosecutors violate due process by presenting material testimony that is false, creates a false impression, or by allowing such testimony to stand uncorrected. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935) (presenting knowingly false testimony violates due process); *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

In order to prevail on a claim of prosecutorial misconduct under this line of cases, Mr. Umaña need only establish the following three elements: (1) the testimony in question was false or, taken as a whole, gives a false impression; (2) the Government knew or should have known the testimony was false; and (3) the testimony was material. In order to establish materiality, one must demonstrate "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976) (emphasis added).

**B.     During the *Atkins* Hearing, the Government Knew, or Should Have Known, Based on Records and Interviews of Witnesses that the Court was relying on Information that was False or Left a False Impression.**

At the November 30, 2009 pretrial hearing held under *Atkins v. Virginia*, 536 U.S. 304 (2002), the Court heard information to determine if Mr. Umaña met the three prongs of intellectual disability: (1) significantly subaverage intellectual functioning (IQ of about 70 or

193

lower); (2) significant limitations in adaptive functioning; and (3) onset before age eighteen. The defense and Government experts both worked under the assumption that Mr. Umaña was born in El Salvador in 1984. *See* Appx.'s 70, 71, 72, 73.

Mr. Umaña's age and social history were false as presented to the Court. Specifically, prior to the hearing, the Government obtained a copy of Mr. Umaña's birth certificate and therefore knew that Mr. Umaña was born in 1982 in Guatemala, not in 1984 in El Salvador. Appx. 42; Appx. 46, 47. There should have been no doubt that the 1982 birth certificate was the accurate one. The circumstances of Mr. Umaña's birth were confirmed when the prosecutors interviewed Mr. Umaña's mother. Appx. 75.

The Government knew, or should have known, that the information presented at the Atkins hearing was false. The prosecutors that interviewed the mother were also present at the *Atkins* hearing but let the information stand uncorrected. Appx. 48.

The information about Mr. Umaña's age was material to the Court's findings on adaptive functioning. There is a reasonable probability that the outcome of the *Atkins* hearing would have been different if Mr. Umaña's correct age had been properly disclosed. The Court made its ruling based on the adaptive functioning which revolves around information of Mr. Umaña's functioning as a child up to the age of eighteen. His age mattered to the experts' testimony and how the Court evaluated the evidence. For example, for purposes of the functional academics factor, the defense presented evidence that Mr. Umaña repeated third grade twice, ultimately failed at the age of 10, and dropped out of school. Atkins Hrg, Nov. 30, 2009 Hrg. at 49. The Government argued that Mr. Umaña appeared to be on par with the rest of his classmates. *Id*. at 93; *See also* Appx. 31 at 5.

194

During an interview with postconviction counsel, however, a school teacher notes that based on Mr. Umaña's date of birth, he would have started first grade in 1989, rather than 1991. Appx. 6. The teacher also stated that it was highly unusual to have a 12-year-old in third grade and then fail. That would put him three grades behind other children his age. Dr. J. Gregory Olley noted this in his report, stating:

> In 2009, I was working under the assumption that Alejandro was two years younger than his actual age. The fact that he is two years older than what I originally believed strengthens the fact that Alejandro had significant learning struggles in school. Alejandro's Aunt Reina noted that her son, Giovanni, and Alejandro were born the same year, but Giovanni was "much further ahead in school." According to Ana Gladys Magana, a teacher who taught at Alejandro's school at the time he was a student there, Alejandro's age compared to the school records was very unusual. She stated "If Alejandro was born in 1982, he would have been twelve years old in 1994 when he still had not passed the third grade. This is very unusual. Normally, a child passes third grade by age nine." Aunt Reina stated, "Alex repeated grades several times. There came a time when he was the oldest child in the classroom. He was embarrassed, because not only were the kids in his class younger, but he also stood out physically from the rest. His cousins made fun of him, and Alex did not want to go to school anymore. Alex had learning problems. He tried, but he did not have the ability to learn and did not understand. Alex was also forgetful. People from the school would tell my mother Alex was doing poorly with his schoolwork, but my mother could not help him."

Appx. 28 ¶ 12; Appx. 19; Appx's 30, 31, 32. The Government's expert, Dr. Enrique Suarez, downgraded the importance of the dropping out at third grade. Atkins Hrg Nov. 30, 2009 at 307, 308. According to the expert, Mr. Umaña stopped going to school because his grandmother died. *Id*. But his age tells a different story. Mr. Umaña did not stop going to school because he did not have someone to take him, he kept trying well past the death of his grandmother. Dr. Suarez also emphasizes the fact that Mr. Umaña started working at the age of 10, which was inconsistent with someone that was intellectually and adaptively impaired. *Id*. at 309. But based on the

195

accurate birthday, Mr. Umaña would have started working sometime after the age of 12.

Moreover, the Court relied on the false birthday in denying Mr. Umaña's motion. For example, the Court concluded that the functional academics factor was a "close call." ECF 934 at 13. However, agreeing with the Government, the Court found that although Mr. Umaña repeated third grade, he did not appear to have the lowest grades in the class and it was not unusual for children in El Salvador to drop out of school to go to work. ECF Doc. No. 934 at 13. The fact that Mr. Umaña was actually 12 years old when he failed the third grade materially undermines the argument that Mr. Umaña was on par with his other classmates. In fact, it established the opposite: that Mr. Umaña's adaptive functioning was *not* normal given his actual age, and he displayed clear adaptive deficits with respect to, at the very least, functional academics.

This misconduct was compounded by the fact that at the time of the hearing, the Government was well aware of the fact that trial counsel had not been able to find Mr. Umaña's mother or any other family member, other than the father. ECF Doc. No. 689. Trial counsel was looking for family for purposes of developing Mr. Umaña's social history and additional evidence of adaptive functioning. When the defense requested a continuance based on this fact, *id*, the Government objected to a continuance arguing there was no reason to believe that the additional time requested would assist the defense in finding any mitigation witnesses. Sept. 29, 2009 Status Hrg. at 7-8. But the Government knew how to find the mother and knew that the mother had contact with other family members that knew Mr. Umaña during his childhood, who in turn would have provided information regarding his adaptive functioning. The prosecution said nothing. The birth certificate and the narrative regarding the interview of the mother was

196

ultimately turned over during trial, well past the *Atkins* hearing and the Court's ruling denying the motion.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereign whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. In this case, where an execution is at issue, the failure of the United States Attorney to live up to these obligations should not be lightly excused. This is particularly true here, where the material information at issue would have, if timely disclosed to the defense and properly presented to the Court, precluded a capital prosecution altogether. See 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who is mentally retarded.").

**C.     At the Guilt and Penalty Phase, the Government Presented and Argued False and Misleading Evidence that Mr. Umaña "Earned" His MS-13 Tattoo by Killing People**

In this case, Government witness Alexander Granados testified to Mr. Umaña's jury that the rules of MS-13 dictate that you earn the right to tattoo the letters "MS" on your body by killing someone. Granados initially testified to this on cross-examination, and then again in response to the first couple of questions the prosecutor asked during re-direct examination. GPT at 920. The Government knew, or should have known, that this testimony was false for multiple reasons. First, the Government presented contradictory testimony in the trial of Mr. Umaña's co-defendants. Second, the Government's expert on the rules, history and structure of MS-13 was asked in great detail about the meaning of MS-13 tattoos and he never mentioned the idea that a member had to kill someone in order to earn the ability to tattoo the MS-13 letters on his or her

197

body. Third, the Government introduced the MS-13 rules into evidence at Mr. Umaña's trial and that exhibit contains no such rule. Fourth, during closing argument, the Government itself argued that there was "no evidence" co-defendant, Julio Cesar Rosales Lopez (a.k.a. "Stiler"), was a killer, despite the fact that Stiler also had an MS tattoo. This belied the Government's claim that Mr. Umaña's tattoo meant that he had necessarily killed someone to earn it and that his tattoos distinguished him from those around him, including Stiler. *See* PPT 888-89; Gov. Exh. 7 and 8.

The argument prejudiced Mr. Umaña because it gave a false impression that not only had Mr. Umaña killed the Salinas brothers in Greensboro, North Carolina, as determined at the guilt phase of trial, and not only was he being accused of killing three people in Los Angeles, prior to the Greenboro killing, but in addition to all that, he had earned his tattoo by killing people for MS-13 prior to any of those events. There was no evidence of this at trial other than Granados's uncorroborated, contradicted statement that the MS tattoo is earned by killing. In fact, the allegations that Mr. Umaña had killed prior to the unadjudicated murders in Los Angeles were specifically precluded by the Court. See Doc. No. 1021 at 10-11 (finding that allegations of murder prior to the Los Angeles murders were inadmissible because the evidence was "entirely hearsay" from anonymous declarants and Mr. Umaña was acquitted of the charge). Nonetheless, the Government repeatedly used this false testimony in closing argument at both the guilt and penalty phases of trial. *See* GPT at 1156-57, 1170-71, 1183; PPT at 824, 892. During its closing argument at sentencing, the Government implored the jury to compare Mr. Umaña to other members of MS-13. PPT at 888-89. The Government argued that "not every gang member is a killer" but Mr. Umaña is. GPT at 889. The Government specifically referred to Stiler and reminded the jury "how deep into MS Stiler was," and in the very next sentence reminded the

198

jury there when it came to Stiler there was "no evidence of killing." *Id.* The Government capped this line of argument off by noting "Is MS bad? Sure is . . . Are they violent? Yes. But of everything you've heard about from both sides and all their cross-examination, he [Mr. Umaña] is the only killer." *Id.*

Therefore, this highly prejudicial evidence and argument that Mr. Umaña had killed before – at some unknown time and place – and wore a tattoo as some kind of trophy to commemorate the killing(s) was given to the jury for them speculate on what things Mr. Umaña may have done in order to earn that tattoo. But for this false and misleading evidence, there is a reasonable probability that the outcome of the proceeding would have been different.

     i.   <u>The Government knew or should have known that the testimony of Granados, that "in order to earn the two letters, you have to kill someone," was false and misleading.</u>

At the guilt phase of Mr. Umaña's trial, Alexander Granados was cross-examined about the rules of MS-13. GPT at 912-13. After explaining some of the rules, Granados testified that in order to "earn the letters" – meaning tattooing the letters "M" and "S" on your body – you are required to kill someone. GPT at 913. After cross-examination, the prosecution re-directed Mr. Granados and immediately asked him what he meant by the statement he made regarding "earning the two letters:"

Q. You mentioned in response to one of the questions about earning the two letters.

A. Yes.

Q. And what did you mean by this?

A. In order to earn the two letters, you have to kill someone.

Q. And what are the two letters you are talking about?

<div align="center">199</div>

A.   About MS.

Q.   Okay. And when you say earning the letters, does that mean placing them on your body?

A.   Yes.

GPT at 920.

The Government knew the statement that "in order to earn the letters you have to kill someone" was false because there was contradictory testimony in the trial of Mr. Umaña's co-defendants. During that trial, which took place three months prior to Mr. Umaña's, the Government relied on the testimony of its long-time, undercover MS-13 informant, Rony Lopez. In that trial, Rony Lopez testified that the MS letters are not earned exclusively by killing people but when you "put in work for the gang," or when you "rob people," or when you do "just different types of crimes." *United States v. Rosales Lopez, et al.*, 08-cr-00134-RJC Doc. No. 1080, at 567-68. Rony Lopez's testimony in the co-defendant's trial shows that the Government knew one did not have to kill in order to put an MS tattoo on one's body, and that having such a tattoo did not mean that one had committed a murder. However, at Mr. Umaña's trial, the Government did nothing to correct Granados's false testimony that a member had to commit murder in order to put a MS tattoo on one's body.

Further evidence that the Government knew that there was no requirement that a MS-13 member kill someone before they could "earn" the "MS" tattoo is evident from the Government's gang expert, Detective Frank Flores. Flores testified at length in both Mr. Umaña's trial and the trial of the co-defendants, and much of his testimony was explaining MS-13 tattoos and their significance, yet he conspicuously omitted making any statement that in

200

order to "earn" the MS tattoo, one had to kill someone. *See* GPT at 70-85; 08-cr-00134, ECF Doc. No. 1466 at 107-117. In Mr. Umaña's trial Flores was asked to identify and describe numerous MS-13 tattoos and describe their meanings. *Id*. He was specifically asked about the tattoos of the letters "M" and "S" and the head of Julio Rosales (Stiler), and all he said about them was that "There's a letter M beside the letter S there . . . M-S, representative of Mara Salvatrucha. I would consider that a gang tattoo for Mara Salvatrucha." GPT at 71. Flores also looked at Mr. Umaña's tattoos, noting that it was not simply a tattoo of the letters M and S, but rather a Spanish phrase that read "no pude mas homeboys" or "I couldn't anymore homeboys" in English. GPT at 80-81. He testified that there is "specific emphasis on the letters M and S" in the word "mas." *Id*. But nowhere in Flores's testimony in either trial did he indicate that Stiler, Mr. Umaña or any other of MS-13 member would have been required to kill someone before they could "earn" a "MS" tattoo and wear it on their body. Given the special attention that the Government paid in eliciting from Granados that the MS tattoo meant a person had committed murder, there is a good faith basis to believe that the Government had also discussed the meaning of the MS tattoo with Flores in preparing his testimony. The fact that the Government refrained from asking about this particular matter gives rise to a reasonable inference that the Government avoided this line of questioning with Flores because he would have contradicted Granado's testimony.

The Government also introduced a set of rules regarding membership in MS-13. GPT at 60-61. The Government elicited through Flores that the rules were very important to MS-13 and that they were common for all of MS-13's "cliques." GPT at 61. Nowhere within those rules

201

presented by the Government is there anything about killing someone before a member can get the MS tattoo. *See* Gov. Exh. 15a, translated MS-13 Rules.

The Government knew, or should have known, that Granado's testimony -- that one could only get an MS tattoo by killing someone – was false. Stiler had a very prominent MS tattoo on his forehead, which the Government introduced in multiple exhibits in Mr. Umaña's trial. *See* Gov. Exh. 7 and 8, photographs of Stiler's MS tattoo on his forehead. And at Stiler's own trial, there was abundant discussion about that MS tattoo, but never any implication that Stiler had killed someone in order to earn the tattoo. However, when it came to Mr. Umaña's trial, three months after Stiler's and the other co-defendants, and when it came to Mr. Umaña's tattoo, the Government relentlessly argued that Mr. Umaña "earned those letters" and that he "earn[ed] them by killing." GPT at 1170; *see* also GPT at 1156-57, 1171, 1183; and PPT at 824, 892.

The Government knew, or at the very least, should have known that the testimony was false and misleading. Rather than correcting the testimony and arguing Mr. Umaña's case in a manner that was consistent with the testimony of its undercover informant, its experts, its exhibits presented at trial, and the evidence that it presented in the trial of Mr. Umaña's co-defendants, the Government took advantage of the misleading testimony and put forward a story that was compelling, but untrue and unfairly prejudicial: that Mr. Umaña's MS tattoo was evidence that he had killed someone. *E.g.* GPT at 1170. The Government therefore violated its duty to correct the false testimony, and then exploited the situation by arguing that false testimony to the jury.

202

ii.   Mr. Umaña was prejudiced by the false and misleading evidence that Mr. Umaña earned his tattoo through killing.

The idea that Mr. Umaña "earned" his tattoo by killing someone was a central theme in the Government's arguments to the jury at both stages of the trial. The Government repeatedly made direct reference to Mr. Umaña having earned his MS tattoo by killing at the guilt and penalty phase. The Government also made numerous references to the idea that Mr. Umaña had earned the tattoos without explicitly saying he earned them by killing, but knowing that the only evidence at trial about how one earns the MS tattoo is by murder.

At the guilty phase, Mr. Umaña was charged under 18 U.S.C. § 1959, which prohibits the commission of murder "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(1). The Government relied on the false and misleading evidence   in order to support its guilt phase allegation that Mr. Umaña committed the Greensboro murders to maintain his position in the gang or "in furtherance" of the gang – he killed to "earn" the respect of his gang. The evidence at trial, as the jury unanimously found at the penalty phase, however, demonstrated that the shooting was a result of a fight that had no substantial planning – it was an unplanned act and committed under emotionally charged circumstances. ECF at 1048 at 4-6. The victims who were shot had blood alcohol levels of .17 and .20. GPT at 497, 493. In order to portray this murder as having been committed in order to maintain gang status or in furtherance of the gang, the Government prominently seized on the false and misleading tattoo:

203

> And the evidence has shown, ladies and gentlemen, that on that day, December 8th, 2007, Wizard of the Novena showed that he earned the big letters: The big M and the big S. And he earned them by respect. And he earned them with a .45. And he maintained his respect and maintained his status in the gang that night by showing Manuel and Ruben what the MS 13 is all about.

GPT at 1157; *See also* GPT at 1170 ("Wizard earned those letters. He earned them by, as the witnesses said, you earn them by killing. So you don't disrespect me. I earned this MS. I earned this MS."); GPT at 1157 ("he earned the big letters … And he earned them with a .45"); GPT at 1156 ("[Mr. Umaña] had earned his respect in the MS 13. He had earned it and he wore it proudly on his body, on his back, on his chest, right between his eyes."); GPT at 1157 ("[Mr. Umaña] showed that he earned the big letters: The big M and the big S."); GPT at 1171 ("Is it so hard to identify that tattoo? If you've seen that once, I think you remember . . . He wants you to remember that . . . that means a lot to him. He's earned that.").

For the penalty phase, the false evidence was used to support its otherwise weak evidence regarding the California murder aggravators and calculated to inflame the passions of the jury and scare the jurors to decide for a sentence of death. *See* PPT at 824 ("He had earned those two letters on his forehead and he earned them by killing."); PPT at 892 ("He earned those tattoos. You heard how he got those tattoos. He earned those tattoos."); PPT at 902 ("His tattoo says it all.").

Imploring the jury to believe that Mr. Umaña had earned his tattoo by killing invited it to make an impermissible inference that Mr. Umaña had killed someone in an incident unrelated to what he was being charged with in either the guilt or sentencing phase of his capital trial. It was an argument that was both sinister and inflammatory – and, given that it was also untrue, it was the very definition of unfair prejudice. The Government's evidence to meet the non-statutory

204

aggravator of prior unadjudicated acts of violence was based on the admitted Lemon Grove and Fairfax Avenue murders. As set forth elsewhere in this motion, the evidence of these murders was weak. Rather that attempting to prove its case beyond a reasonable doubt as to those murders, the Government relieved itself of its burden of proof by misleading the jurors into believing that there were additional murders that Mr. Umaña had committed even prior to the California shootings, for which Mr. Umaña had "earned" the MS tatttoo. A new trial is required if " the false testimony could… in any reasonable likelihood affect [] the judgement of the jury." *Giglio v. United States*, 450 U.S. 154 (1972).

**D.** **During the Penalty Phase, the Government Presented and Argued False and Misleading Evidence Relating to the Lemon Grove and Fairfax Shooting**

The Government presented evidence regarding the unadjudicated California murders that it knew, or should have known, to be false or misleading. Where evidence shows the prosecution's case includes the knowing use of false testimony, the Supreme Court has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair." *United States v. Agurs*, 427 U. S. 97, 103 (1976); *see also Kyles v. Whitley*, 514 U. S. at 432 n.7. In these circumstances, the Supreme Court has "applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *United States v. Agurs*, 427 U. S. at 104. The Government repeatedly presented false evidence in support of its non-statutory aggravator.

205

i.     <u>Lemon Grove Park</u>

For example, the Government argued to the jury that Mr. Umaña was the Lemon Grove shooter based on the testimony of eye witness Freddy Gonzalez.   At trial, Gonzalez made an in court identification of Mr. Umaña as being the shooter, and he testified that he was confident about his identification.

> Q:     And the person you picked is on the other side, is that the person that you picked that resembled the person?
>
> A:     Yes.
>
> Q:     *Were you sure of it or what was your statement to him at that time?*
>
> A:     *Yeah, it was him.*
>
> Q:     And the person you circled, was the person you previously testified about someone pulling out a gun when you held your hands up?
>
> A:     Yes.
>
> Q:     *Was that the person you saw*?
>
> A:     *Yes.*

PPT at 331-32. The Government then continued to the second (tentative) identification of Mr. Umaña. It once again elicited testimony to the effect that Gonzalez was sure of his pretrial identification of Mr. Umaña as the one shooter:

> Q:     What were you saying in that statement [referencing Gov. Exh. 506]?
>
> A:     That the guy in photo number five [Mr. Umaña] was the guy.
>
> Q:     Did you indicate [] at any point that you weren't 100 percent sure, or what was your statement [] about that?
>
> A:     *That was – it was – it was the guy.*
>
> Q:     *Now you mentioned – when you say the guy, the shooter?*

206

A:    *On picture, [sic] yes.*

PPT at 333-34 (emphasis added).

The prosecutor's direct examination of Gonzalez violates the basic tenet of *Napue,* which prohibits "soliciting false evidence," and requires the prosecutor to not "allow[ ] it to go uncorrected when it appears." 360 U.S. at 269. However, the Government knew, or should have known, that prior to his testimony, Gonzalez had identified no less than three other people as the one shooter. Indeed, when he finally picked out Mr. Umaña three months after the shooting, Gonzalez stated he was "not sure if [Mr. Umaña] is the one." Gov. Ex. 507. Three years later, when Gonzalez was again interviewed about the incident, he stated that "everything happened so fast I'm not 100% sure." Gov. Ex. 506.

Despite the fact that Gonzalez had, up until the trial, been hesitant about his ability to identify Mr. Umaña as the shooter, the Government specifically elicited testimony from Gonzalez on the stand that he was confident that Mr. Umaña was the shooter. PPT at 331-34. That testimony, however, was contrary to the evidence known to the Government; it knew, or should have known, that the confidence expressed for the first time by the witness five years after the shooting was misleading, if not false, given Gonzalez's repeated statements otherwise between the time of the incident and the trial.

Gonzalez was the only witness that identified Mr. Umaña as the shooter. The question regarding Gonzalez's confidence in his identification was clearly designed to bolster Gonzalez's credibility in the eyes of the jury. Had the jury known about Gonzalez's prior misidentifications

207

and statements expressing doubt about his identification of Mr. Umaña, there is a reasonable probability that the outcome of the proceeding would have been different.[48]

    ii.    <u>Fairfax</u>

In regards to Fairfax shooting, the Government knew, or should have known, that its witness Detective Gene Parshall provided false or misleading information regarding the case against Mr. Umaña. Specifically, Parshall testified that co-defendants Luis Rivera, Luis Ramos, and Rene Arevalo all corroborated one another and all consistently stated that Mr. Umaña was the Fairfax shooter. PPT at 221-22. The interrogations themselves were not introduced at trial but only summarized by Detective Parshall. What the transcripts show is that Detective Parshall took Luis Rivera's version of what happened, spread it to the other two co-defendants, and then warned the others that they could be blamed as the shooter if they did not tell the same story. *See* Claim V. Despite the fact that Parshall provided the suspects with many of the relevant details, including that Mr. Umaña was the shooter, Parshall instead testified that the other suspects corroborated Rivera's story, stating, for example:

> Basically [Ramos] said the same thing that Mr. Rivera had said, you know, about the gold [A]ltima. Driving on Fairfax. That Moe was the driver. That Umaña, or Wizard, had gotten out and shot the victims. And he talked about the -- he identified the same people being in the back seat of the car. And he described the confrontation with the two victims.

---

[48] Mr. Umaña cannot plead this, or any other claim, regarding the Government's failure to correct false or misleading information with any more particularity at this time because the factual bases for such claims rests on information known only to the Government. Prior to filing his § 2255 Motion, Mr. Umaña attempted to obtain this information through motions for discovery. If evidence is disclosed that supports additional *Napue* claims Mr. Umaña will plead them at the appropriate time.

208

PPT at 184.

Parshall also testified that although he initially believed Rivera lied during his interrogation, Parshall changed his mind after both Ramos and Arevalo confirmed to Parshall that Rivera never got out of the car. PPT 201-202. The transcripts of the actual recorded interviews indicate that Parshall's testimony was false. It cannot be disputed that the suspects confirmed several facts to the detectives only after those facts were fed to them by the same detectives, and only after the detectives threatened the suspects with harsh penalties if they did not corroborate the story that was being fed to them. The jury was misled into believing that the consistency between the accounts given by Rivera, Ramos and Arevala provided these witnesses' statements with certain indicia of reliability, when, in fact, the opposite was true: the statements were similar because they were the product of coaching and threats.

In fact, the prosecutor emphasized the misleading information to rebut the defense claim that the suspects' statements were unreliable. The prosecution argued in closing:

> Here's what's significant, and you've got the transcripts. [. . .] And Arevalo's interviewed at a totally different time. And they point out some inconsistencies about who was sitting in the middle, who was sitting on this side. *The facts, as the officer told you, were consistent across the board.* This is how we pulled up. This is what happened. And man, he went off.

PPT at 894. The Court also relied on the detectives' account of the investigation:

> As the Court recognized in its previous ruling, cross-examination of Detectives Parshall and Telis revealed that Rivera's, Ramos', and Arevalo's statements were somewhat self-serving in that each attempted to minimize his own involvement in the shooting. The statements were also inconsistent with respect to some details, such as who exited the automobile and whether they did so in the middle of Fairfax Street or after the Altima had pulled over the side of the road. However, each statement identified the defendant as the shooter and gave details of the shooting that were largely corroborative of each other and of the eyewitness

209

account given by Bautista. Detective Parshall's accuracy in relating these statements to the jury was further ensured by the fact that the defendant was able to cross-examine him with his prior testimony in a state court proceeding.

Order Denying Motion for New Trial, CR 1165 at 11.

The "corroboration" between the suspects was material because without it, it would have been nothing more than self-serving statements by gang members who had every incentive to point the finger at someone other than themselves. The jury, however, had little reason to doubt the detectives' accounts of the witnesses' statements. Had the jury known that the consistency of these witnesses' statement were not the product of independent corroboration, but rather the consequence of witness coaching and threats to prosecute the witnesses if they did not each tell the same version of the story, there is a reasonable probability that it would have undermined confidence in the outcome.

As explained in detail in Claim V, and are incorporated by reference here, the Government repeatedly presented false and/or misleading evidence in an attempt to meet its burden of proof as to the non-statutory aggravator of prior unadjudicated acts. The combination of this misconduct was a violation of Mr. Umaña's Fifth, Sixth, and Eighth Amendment rights.

## VIII. TRIAL COUNSEL FAILED TO ADEQUATELY OBJECT TO AND MITIGATE EVIDENCE OF JAIL LETTERS IN VIOLATION OF THE FIRST, FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

During trial the Government introduced over 200 pages of exhibits consisting of correspondence between Mr. Umaña and his co-defendants written while they were in custody awaiting trial. Trial counsel's performance in litigating the admission of these jail letters, and

210

failure to place the contents of the letters in proper perspective was objectively unreasonable and prejudiced Mr. Umaña. Admission of the letters was unduly prejudicial because it unfairly painted Mr. Umaña as a coarse person with repugnant religious and political views, in violation of the First, Fifth, Sixth and Eighth Amendments. The sheer volume of this material—over 200 pages of exhibits all told—along with the Government's emphasis in closing all but guaranteed an unreliable verdict based on passion, not reason. *See Darden v. Wainwright*, 477 U.S. 168 (1986) (a fundamentally unfair capital sentencing process violates due process).

From mid-2008 until trial in March 2010, the Government intercepted letters written by Mr. Umaña and his co-defendants. The letters, written in Spanish, were largely long, rambling missives to co-defendants reassuring them of his allegiance to, and glorifying, MS-13; complaining about his predicament; reporting on jail events (such as a fight with another inmate); trying to keep up on gang-related gossip (who was in what clique and so on); and badmouthing certain individuals (such as "Nene," testifying gang member Rony Lopez) and groups ("rivals," the "police," the "Government," and so on). A few contained quasi-religious references to the "devil" and "beast." Some sections of the letters were written in code, by way of syllable transposition, or number, letter or symbol substitution. All were grossly misspelled (including the coded sections), arbitrarily capitalized and punctuation-free, and laden with profanity and slang.

On the first day of trial, April 12, 2010, through its exhibit list, the Government identified the specific letters that it planned to introduce at either the guilt or penalty phase of trial. *See* ECF Doc. No. 986 at 8-10 (describing exhibits 151-163, 165-177 as "Jail Mail Letter" with an identifying "JMU" number). On April 14, 2010, these exhibits were conditionally admitted

211

(subject to a later relevance determination) during the testimony of the Government's translator, Susan Conrad. GPT at 596-600. The actual letters were marked for identification with a number. A full translation of the contents of the letters were marked for identification with the number and the letter "a." And selections of the translated letter were marked for identification with the number and the letters "b" or "c." *Id*.

The day after conditional admission, trial counsel orally objected to the actual admission of the correspondence. GPT at 959. Trial counsel cited Federal Rule of Evidence 403 and 404, and explained "there's a variety of extremely prejudicial, unfairly prejudicial material," and "[i]t's going to take going through each letter, I think, one at a time because there's different specific reasons why there's prejudicial material in each of those letters." GPT at 960.

The Court expressed frustration with the parties for bringing the matter up late in trial and not briefing the issue. *See* GPT at 965-66. After taking evidence to establish authenticity and foundation, the Court instructed the Government to provide it with the letters for review. The Government complied, explaining that it would provide the "selections pulled from the translations ... which it suggests are relevant." GPT at 1039. The Government initially provided the Court with Exhibits 161-170.[49] The next day the Government added Exhibit 160, but withdrew Exhibit 170 for admission as to guilt. *See* GPT at 1061 (the Court confirming Exhibit 170 "will not be introduced as well."). Another letter, Exhibit 157, 157a and 157b, had already been admitted, without an objection other than for lack of foundation. GPT at 901.

---

[49] Although not clear from the record, it appears the Government provided the Court with just the "b" or "c" selections of each exhibit.

212

After the Court's review, trial counsel was provided with the opportunity to object to each letter the Government sought to introduce at the guilt phase. GPT at 1047-54. Trial counsel limited the objections to each letter as a whole, generally citing grounds of relevance, undue prejudice, and future bad acts as grounds to preclude the admission of the entirety of each letter. Although trial counsel at times would quote passages containing profanity, homophobic and racial slurs, and anti-American sentiment, at no time did defense counsel request redaction of the letters to sanitize otherwise potentially admissible parts of the writings. *Id*.

In response, the Government argued that the "selections from the letters" were needed to "prove the enterprise, continuing involvement in the enterprise, running the enterprise, making sure that gangs are still coordinated, who the members are, sending information regarding the continued running of the gang, and the continued organization of the gang. … And the selections of these letters prove -- would support that." GPT at 1056.

The Court made an oral ruling that "having considered the substance of the letters in light of the proffered reasons for the admissibility, I find that the probative value is not substantially outweighed by unfair prejudice, except with respect to letters number 167 and 169." GPT 1061. As to Exhibit 160, the Court stated, "I believe that the excerpt that the Government intends to publish is highly probative." GPT at 1061.

In a written order the Court explained that this was "a somewhat difficult inquiry" as the letters were a mixed bag: "[T]he letters discuss multiple topics, some of which are relevant, and some of which are not." ECF 998 at 5. The Court found that the letters, in general, contained Mr. Umaña's "expression of loyalty to MS-13" and "suggest[ed] that MS-13 is an organized entity, and the author exercises some measure of control over its members." *Id.* at 6. These facts,

213

according to the Court, were "highly relevant" to "the defendant's membership in a RICO conspiracy," an element of the §§ 1959 and 1962 charges. *Id*. at 6. The Court also found that "[v]arious statements" made "throughout the letters" suggested "consciousness of guilt" of the charged offenses. *Id*. at 6. But the Court found "especially troubling certain racially-charged statements written in Exhibits 167 and 169." As noted by the Court, "Exhibit 167 contains a derogatory reference to African-Americans" and "Exhibit 169 contains a lengthy diatribe accusing the United States of subjugating Latin-Americans and predicting their violent uprising." *Id*. at 6 n.2. The Court concluded that "[t]hese comments are inflammatory and, critically, not probative to any issue in the defendant's case." *Id*. at 6.

Although the Government had been identifying only the "selections" as "relevant," GPT at 1039, and trial counsel "assumed" that the Government "were offering just the selections," GPT at 1054, the Government moved to admit, without any objection, both the full translations and the selections of the letters. GPT 1127-28. As such Exhibits 157, 157a, 157b, 158, 158a, 158b, 158c, 160, 160a, 160b, 161, 161a, 161b, 162, 162a, 162b, 163, 163a, 163b, 165, 165a, 165b, 166, 166a, 166b, 168a, and 168b, were admitted into evidence during the guilt phase of trial. Even though all these exhibits were available during deliberations, the Government only published Exhibits 161b, 163b, 166b, and 168b during the guilt phase. GPT at 1138.

At penalty phase, the Government moved to admit Exhibits 152, 153, 158, 171, 172, 174, 175, 176 and 177. PPT at 299, 349. Trial counsel offered little resistance. Instead of identifying and challenging the contents of each exhibit, trial counsel objected to the "one" where "there's some racial description," PPT at 293, and lodged a general objection to all letters that "it's unreliable evidence under 3593 and that the probative value is outweighed by unfair prejudice,

214

misleading the jury and confusing the jury, as well as authenticity." PPT at 306. The Court

admitted these exhibits, finding each to be "probative on the issue of future dangerousness and

deal, in general, with attempts to run MS from inside prison, to intimidate and control potential

witnesses, to engage in acts of violence, and direct acts of violence." PPT at 299. As examples,

the Court noted Exhibit 158 "talks about being Mara to the day we die," and Exhibit 174 "talks

about putting a light[50] on certain cooperating witnesses." *Id*. The Court, however, admitted

Exhibit 152 only after the Government claimed to have redacted a "racial comment."[51]  Thus,

the letters, full translations, and selections were admitted into evidence and later released to the

jury.  The Government, however, failed to request that Exhibit 170 be entered into evidence—

even though, as discussed below, the Government quoted from the exhibit during closing

argument..  PPT at 349-50, 943. And only Exhibits 153, 153b, 158, 158c, 172, 172b, 174, 174b,

175, and 175b were published to the jury during the penalty phase. PPT at 376-77

Defense counsel's performance in litigating the admission of the jail letters was

objectively unreasonable in many respects. First, although defense counsel generally objected to

each letter, they failed to argue that even if the Court believed some parts of each letter were

---

[50] The Government's gang expert testified, "Saying this person is green lighted, or that person is green lighted. You're identifying a person that needs to be targeted for a serious retaliation, generally it's death." GPT at 61-62.

[51] The word "black" was deleted from the phrase "that fucking black guy." Exhibit 152b. But the same redaction was not made to the full translation of the letter.  The full translation still has multiple references to the "fucking black guy."  *See* 152a at 2, 3, 5.  Habeas counsel received electronic copies of all exhibits. One exhibit is identified as Gov._152a and contains the full translation of the letter. The attached PDF, however, has a "Government Exhibit 152b" sticker. The exhibit identified as Gov._152b, which contains the selections, also has a "Government Exhibit 152b" sticker, therefore Mr. Umaña will refer to the full translation as Exhibit 152a.

215

relevant and admissible, others portions containing religious, political and racial views and other vulgar and inflammatory remarks should have been redacted. Second, defense counsel was ineffective for allowing the full translation of each letter go to the jury, even though the Government had consistently advocated for only "selections" of the letters to be shown to the jury. Third, defense counsel acted unreasonably by failing to object when the prosecutor, during rebuttal closing argument, read from a letter (Exhibit 170) that was never moved into evidence.

Further, counsel was ineffective for failing to place the contents of the letters in proper perspective. Among other things, trial counsel should have presented evidence that: 1) the code used was unsophisticated (one consisted of nothing more than a game played by children in El Salvador); 2) the writing in the letters was poor (unlike the English translations presented to the jury, the Spanish originals lacked punctuation, were fraught with misspellings, and contained the phonic combining of words); 3) rather than threating a potential witnesses, Mr. Umaña was expressing fear of his situation (a non-testifying FBI Language Analyst concluded that a part of Exhibit 152a was "a call for help through commiseration and old friendship"); and 4) to rebut the Government's (improper) argument that Mr. Umaña had the "beast" or "devil" in his heart (some letters offer prayers to "Father in Heaven," encourage others to "Reach out for the Lord," Exhibit 152a at 8-9, and express hope that the "Almighty Creator of Heaven and Earth is keeping you in good health." Exhibit 153a.).

216

**A.     Trial counsel's performance was objectively unreasonable.**

    i.     <u>Counsel unreasonably failed to request redaction.</u>

Regardless of whether some selections of the letters were probative to guilt and sentencing, redactions should have been requested and made to sanitize the letters from (1) religiously inflammatory remarks; (2) politically inflammatory remarks; and (3) generally coarse language (including sexual innuendo and profanity) and other improper topics.

    *a.     Religiously inflammatory remarks.*

Several of the admitted jail letters contained references to the "Beast" and the devil. *See* Exhibit 161a at 3; 161b ("We are and we always will be the Mara until God in heaven and the Beast come to remove us from this earth, they are going to have to hear us."); Exhibit 166a at 2; 166b ("I greet you in honor of the big hood with my claw on my forehead, the other on my heart, hoping that when you receive this letter the Beast has you enjoying good health, happiness and cheer"); Exhibit 177a ("Anyway, I'm fine now, thanks to the Beast. You know the devil's always with us. . . . But first of all, it's an honor for me to hope, before the two great big letters, that the Beast is with you. . . . They have no idea who the Beast is. . . . And I'll never leave this crazy life until the devil comes for me. . . . And fuck the cops. . . . They have no idea who the Beast is.").[52] Read in context, these references indicate that "the Beast" has a deity-like

---

[52] Exhibit 170, which was not admitted into evidence, but from which the Government read during rebuttal closing argument also contains similar "Beast" references. See Exhibit 170a at 3, 170c ("[The song is] called 'One More Day with the Beast' . . . . One more day has now begun and I thank the Beast that we keep on standing here with a joint of weed and belonging to my gang.").

217

significance for Mr. Umaña and his correspondents. The term is used where a conventional writer of Christian faith might invoke "the Lord," and is often understood as a reference to the devil (indeed, Figueroa, the author of Exhibit 177, directly equates "the Beast" with "the devil").

But evidence that "prove[s] nothing more than [the defendant's] abstract beliefs" may not be admitted at the penalty phase of a capital trial. *Dawson v. Delaware*, 503 U.S. 159, 167 (1992). Such evidence, at its core, concerns the defendant's exercise of his speech, religious exercise, and associational rights, and is protected by the First Amendment. Admission of "abstract beliefs" evidence—where it has no relevance to any sentencing issue—is impermissible, particularly where "one is left with the feeling that the . . . evidence was employed simply because the jury would find the[] beliefs morally reprehensible." *Id*. Thus, the repeated quasi-religious references in the letters should have (and easily could have) been redacted from the exhibits, just as the Court required the Government to do for a racially inflammatory comment. PPT at 300-01 (admitting letter subject to redaction of racial references).

> b.    *Politically inflammatory remarks.*

The letters also contained countless expressions of general anti-Government, anti-police, and anti-imperialist political sentiment. These, like the "Beast" references, were totally irrelevant "abstract beliefs" admitted in violation of *Dawson* and 18 U.S.C § 3593(c).

> c.    *Anti-American or anti-imperialist beliefs.*

Most significantly, one letter contained a lengthy diatribe expressing antipathy towards American imperialism in Latin America:

> [God has caused natural disasters like earthquakes in various countries like Haiti, Guatemala, and El Salvador.] All this has happened in the smallest and

218

poorest countries, right?   Can you imagine the earthquake that's coming directly to the USA, which is a rich country, one that discriminates, and one of murderers? Up to this time, they have not paid for the damage and humiliation this country has caused to neighboring countries.   It is not going to be the only one earthquake because the earth is going to tremble.   It is also going to be because in the aftermath most other countries are going to create a huge war against them that they are not expecting, and this is all starting in 2 thousand11.   Remember this date: January 11th, 11:11 am or 11:12 am or 11:13 2011 US.   We are still going to be here when we experience that.   The walls of these jails are going to open up, and we will be free.   It will be up to us if we stay in this country or not.

.... [T]he other two years, 2012 and 2013, are when these little Americans are going to be humiliated by all Hispanics from Central America, South America, and Latin America, especially by prisoners, drug dealers, mafias, and gangbangers. Four points that Earth has and on which the USA has not counted; therefore, we are going to have the pleasure and the privilege to mock them, even though they keep us locked up at this time.   USA fears death.   They only fight with the Hispanic Americans' balls which are the ones that go to the front to gain respect or to give their lives ....

Exhibit 176a. This was quintessential political speech, at the core of the First Amendment's protections, *Morse v. Frederick*, 551 U.S. 393, 403 (2007)—and it had no business coming into evidence in this case.

Mr. Umaña's views of the United States's role in international politics was not on trial—at least, not until the Government improperly made it so. Obviously, its probative value (zero) was outweighed by the high risk of unfair prejudice. Indeed, the Court found a similar letter to be inadmissible on precisely these grounds. *See* ECF 998 at 6 n.2 (excluding Exhibit 169 because it "contain[ed] a lengthy diatribe accusing the United States of subjugating Latin-Americans and predicting their violent uprising"). As with the "Beast" references, "one is left with the feeling that [this political material] was employed simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167.

219

> ### d. Defiance towards police.

Along similar lines, the letters expressed distrust of, and defiance towards, the police, casting the matter essentially as a struggle of "my people" against a powerful oppressor:

> [T]hat's why my people are never in peace here because the cops are always after people with my background. Fuck the cops, that trash is always killing the homeboys from my country. And how do they want you to change when even the authorities go around spilling blood. They are just the same, they just have paramilitary authorization, and they are a legal part of the Government, and in larger quantities. . . .
>
> . . . . We don't give a fuck about the enemy and the fucking cops. And also, fuck them because the Salvatrucha will remain here . . . .

Exhibit168a. *See also* Exhibit 161a at 3, 161b ("We need to figure out what's up with these fucking assholes that want to lock up our best warriors who are controlling those fuckers who keep making up things."); Exhibit 161a at 3("They are always looking for rivals and police because these fuckers keep making up a lot of things and locking up my homies."). Though perhaps crudely put, the expressive choices here give voice to "otherwise inexpressible emotions," *see Cohen v. California*, 403 U.S. 15, 25-26 (1971), no doubt related to the widespread perception of Salvadorans that police are involved in criminal activity, fail to protect the public, and are involved in death squads. See, e.g., Juan Fogelbach, *Gangs, Violence, and Victims in El Salvador, Guatemala, and Honduras*, 12 San Diego Int'l L.J. 417, 455-58 (2011).

Again, this is core political speech—unnuanced and immoderate though it may be. *See Cohen*, 403 U.S. at 26 (the First Amendment protects "not only informed and responsible criticism but the freedom to speak foolishly and without moderation"). Whether Mr. Umaña feels the police are "always killing the homeboys from my country" and "locking up my homies," Exhibits 168a & 161a, have nothing to do with any "attempt[] to run MS from inside prison" or

<p style="text-align:center">220</p>

"to intimidate and control potential witnesses." *See* PPT 299. Neither does it amount to an attempt to "engage in acts of violence" or "direct acts of violence." *Id*. These remarks simply do not fall into any of the categories the Court found to be relevant "in general"; indeed, they are quite unlike the examples it gave of probative statements. *See* PPT 299-300 ("being Mara until the day we die" and "putting a light on" certain witnesses). As such, these and all similar references should have been redacted. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485-86 (1993) ("a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing [jury]").

> ### e. *Coarse language and other remarks.*

The letters also contained countless instances of bad language and profanity with no conceivable relevance and significant risk of unfair prejudice, especially when referring to the United States Government and law enforcement. This included liberal usage of descriptors like "asshole," "fuck, "fuckers," "fucking," "motherfuckers," "sons of bitches," "bitch," "bitching," "shit," "full of shit," "bullshiting," which were repeatedly present in all of the letters.

In a similar vein, the letters contained homophobic,[53] sexist remarks, sexual innuendo and sexually charged anecdotes. *See* Exhibits 152a (discussing a female guard in a objectifying, derogatory manner), 160a (recalling conversation with a "Griselda" in which he tells her he has a "new stick" and describes "great whippings [she got] from me")  & 162a (making lewd comments about another "homie's girl" that he had "jacked off to her" many times and asking for "a photo of your sister"), 174a (discussing not "lending" "Salvadorian women" to "anyone").

---

[53] The terms "fags" and "faggot" are used throughout the letters.

221

There were also several references to poverty. Exhitit 160a (". . . I don't have anything on my account and they won't give me envelopes with the 6 cents I have"), 152a (he could not afford to "send her anything" for her birthday); 172a (asking for money). These statements raised the inferences that Mr. Umaña was not only poor but also lacked anyone on the outside willing to help him financially. *See United States v. Socony Vacumm Oil Co*., 310 U.S. 150, 239 (1940) ("appeals to class prejudice are highly improper and cannot be condoned").

Finally, some of the admitted statements suggested that Mr. Umaña was indifferent to receiving the death penalty. *See* Exhibit 158a ("we have to prepare ourselves if they say it's for life or they are going to inject our balls"); 162a at 4 ("I don't care if I even have to pay with my life. I will face it."). This presented the "intolerable danger that the jury [would] choose to minimize the importance of its role" by rationalizing away the "gravity of its task"—that is, its decision would hardly represent a "truly awesome responsibility," *Caldwell v. Mississippi*, 472 U.S. 320, 333, 341 (1985), if the defendant himself "[didn't] care" about the outcome.

**B.** **Trial counsel unreasonably failed to object to the full translations of the letters being released to the jury during deliberations.**

In addition to failing to request redaction of the letters, trial counsel was ineffective for failing to object to the full translation exhibits -- rather than just the selection exhibits -- being introduced into evidence and released to the jury during deliberations.

The discussion of admissibility of the letters focused on the "selections," that is the "b" or "c" exhibits, and not the full translation "a" exhibits. Indeed, the Government only provided the former, and not the latter, to the Court for review deeming only those "relevant." *See* GPT at 1039 ("MS. ROSE: And the Government has attached to the exhibits, Your Honor, the selections

222

pulled from the translations that it submits to the court … it would wish to publish. So the Government selected those portions which it suggests are relevant."): GPT at 1054 ("MS. ROSE: I will only say, Your Honor, that we and the defense has copies of selections that we've pulled from those. Some selections are relevant for sentencing. Some we would contend are relevant for sentencing. Some we would contend are relevant for the guilt phase."); GPT at 1054-55 ("MS. ROSE: Those [selections] would be the only thing that the Government would publish, or would seek to publish."); GPT 1055 ("MS. ROSE: Yes. And there are some selections, the ones we are also offering at sentencing -- I mean, the guilt, that I think are more probative for sentencing that I wouldn't produce to the jury."); GPT at 1056 ("And so all of the statements that the Government would offer at this stage, relate to his membership in MS, his allegiance to MS. And the fact that he wants – the controlling of the other gangs -- this trial has been about respect, it's been about control. And the selections of these letters prove -- would support that.").

Indeed, it was in the context of the "selections" and the Government's proffer regarding the selections that the Court admitted the letters. *See* GPT at 1061 ("having considered the substance of the letters in light of the proffered reasons for the admissibility, I find that the probative value is not substantially outweighed by unfair prejudice, except with respect to letters number 167 and 169." GPT at 1061. *See also id.* ("I believe that the excerpt that the Government intends to publish is highly probative."). In light of the Government's proffered reasons for admitting the selections and the Court's careful consideration of just the selections, failure to object to the admission of the full-letter "a" exhibits was unreasonable. There simply was no legitimate reason that the jury should have been exposed to the additional non-relevant

223

information as well as a double-dose of the selections. In other words, especially considering the danger of the unfair prejudice, the full letters on top of the selections was simply cumulative.

**C.      Trial counsel unreasonably failed to object to the Government reading a letter during closing argument that was never ruled upon, nor introduced at trial.**

Although it appears the Government intended to introduce Exhibit 170 into evidence during trial, it failed to do so. During the guilt phase, the exhibit was not addressed by the Court because the Government said it would not be moving to introduce it until sentencing. *See* GPT at 1055 (Government informing court that "Exhibit 170 is a sentencing" document); GPT 1061 (the Court indicating that Exhibit 170 "will not be introduced" based on the Government's representation that they "were going to offer 170 at sentencing"). But the Government never moved to admit Exhibit 170 at sentencing.   *See* PPT at 349 (moving other letters into evidence); PPT 943 (the Court, court clerk and trial counsel confirming that Exhibit 170 was not admitted).

Despite the exhibit not having been admitted, and without objection, the Government quoted from the letter at length during rebuttal closing argument during the penalty phase. The Government argued:

> You all saw a lot of letters that the defendant had written. I want to share one with you. … This one is called -- it's got a title. One more day with the beast. Do you remember who the beast is? It's tattooed on his body. It's in his heart. It's the devil. It goes like this:
>
> "One more day has now begun and I thank the beast that we keep on standing here with a joint of weed and a fully loaded gun, ready and prepared to go out into the streets like I have always planned. I don't know the fate of this day, but let me tell you, I'm still here in this world and belong to my gang. Mara Salvatrucha 13 is what I belong to. Day by day I go out into the streets to look for those F'ing gangs and the only thing I find is the F'ing police who want to arrest and F with my gang. That is the risk I take every day with these F'ing good for nothings and these F'ing police who want to finish off the destiny of my gang. But I tell them it can't be done yet because now we have come to control. Because

224

now we have come to belong to Mara Salvatrucha 13, to represent so all these fags can listen to us and know that they don't have to play and that they have to respect the Mara Salvatrucha. Damn F'ing good for nothings and that F'ing authority. They will have to suck up to us and even though they don't believe it, the Mara Salvatrucha has to triumph. On the streets or in the prisons, we are always going to control."

That's his message to you. Those are his words, his thoughts and his message to you. It's his challenge to you. He's mocking justice.

PPT at 900-01.

Trial counsel's failure to object to the reading this letter was unreasonable. It is well settled that it is improper for a prosecutor to argue facts not in evidence. *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 95 (2d Cir. 2014) (Government concedes comment referencing "facts not in evidence, was improper"); *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) ("It is thus 'improper for a prosecutor, during closing arguments, to bring to the attention of the jury any purported facts that are not in evidence and are prejudicial.'") (quoting *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000)); *United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000) ("Argument referencing facts not in evidence is clearly improper, and we conclude that the prosecutor engaged in misconduct in making the challenged statement.").

    i.    <u>Counsel unreasonably failed to mitigate the jail letters.</u>

Counsel's was also ineffective by failing to introduce evidence to place the jail letters in proper context.

    *a.*    *The code was unsophisticated and could be written by a child.*

Although trial counsel was aware months before trial that the Government would be presenting evidence of coded jail letters, and possibly testimony of a "cryptanalysis," *see* ECF

<div align="center">225</div>

689 at 6-7, they failed to adequately investigate the code to better understand and explain the simplicity of the codes used in the letters, a fact essential to mitigating factors such as lack of education and brain damage. Internet research, consultation with a "cryptanalysis," or similar expert would have allowed counsel to cross-examine the Government's witnesses, or present their own witnesses, to demonstrate the letter, number or symbol substitution code used was no more complex than games children play.

In fact, the number substitution code used in the letters was a child game commonly played in El Salvador called "Murcielago." As explained in a Highlights for Children article, "murcielago" is the Spanish word for "bat," and "Salvadoran children write messages to each other in a code they also call murcielago." Marcia Popp, *Secret code: a secret code from El Salvador*, 62 Highlights for Children, 7 (2007). This "bat code" just substitutes a number for each letter of the word murcielago. *Id*. As shown below, an FBI Laboratory Report of Examination provided to trial counsel over six months before trial documents the use of this code:

The following key was used to decrypt the enciphered portions of Item Q1:

| Plaintext | M | U | R | C | I | E | L | A | G | O | B | D | F | H | J | K | N | P | Q | S | T | V | W | X | Y | Z |
|-----------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ciphertext | 1 | 2 | 3 | 4 | 5 | 6 | 7 | X | 9 | 0 | B | D | F | H | J | K | N | P | Q | S | T | V | W | | Y | Z |

*[Note: On various occasions, ciphertext character "1" was also used to encrypt plaintext character "N"; and ciphertext character "5" was used to also encrypt plaintext character "S". The ciphertext character for plaintext character "X" was not used.]*

*See* Appx. 77 at 8. Significantly, this is the code used in two of the Government's exhibits introduced at trial. *See* Exhibit 163 and 170.

Further, even though the codes were simple, trial counsel failed to present evidence or otherwise inform the jury that many of the recipients could not understand the contents of the

226

code. *See e.g.* June 29, 2010 Sentencing Transcript Castellon, at 100 (Officer William Hastings testifying that "some of the defendants honestly – were not – didn't get a lot of the codes, didn't understand them when they were sending letters."); Exhibit 172b ("I wrote to him in this fashion, but I don't know if he was able to read it because he has not responded to me.").

Moreover, trial counsel was unreasonable for failing to present evidence that the use of codes in the letters did not show any high degree of skill. Prior to the *Atkins* hearing, trial counsel provided several letters and the FBI Laboratory Report of Examination to Dr. Olley. The report documented several of the "codes" used in the letters, such as number and letter substitution, and syllable and word transposition. *See* Appx. 77. Dr. Olley later testified at the hearing that the use of code was "not incompatible with mental retardation," Atkins Hrg Nov. 30, 2009 at 137, and could have been done by an 11 year old. *Id*. 138. *See also Id*. 70-71 (the transposition of syllable code is "similar to Pig Latin, except simpler," and its "something that children do in El Salvador"). Counsel unreasonably failed to present this or similar testimony at trial.

### b. *The writing in the letters was poor.*

The English translations of the letters were correctly spelled, punctuated, capitalized and separated by paragraphs. But these most basic foundations of the written word were mostly nowhere to be found in the actual letters. As such, the translations demonstrated a higher degree of command of language than the actual contents of the letters. Trial counsel unreasonably failed to demonstrate this vast disconnect between the Spanish of the original letters and English translations introduced at trial.

During the cross examination of the Government's language analyst, Susan Conrad, trial counsel did get her to admit that the author was a "very poor writer" as to

"punctuation," GPT at 605, and that "at first" she found the letters "difficult to read." GPT at 605-06. But this only exposed a small deficiency of the Spanish in the letters. One defense interpreter, who was not called as a witness, informed counsel "you might not find much sense in them since Alejandro does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other, and writes guided by the phonetic sound of words." ID Ex 12. And the specific letters introduced at trial are inundated with misspellings, missing accents and the phonetic combining of words which are completely absent from the English translations presented to the jury. The failure to present a defense linguist to properly explain the content of the Spanish of the letters, or at least object to the FBI language analyst's spelling and punctuation edited version of the letters was unreasonable. Seeing the letters in English with all the misspellings, mistakenly combined words, and without punctuation presents a very different picture of the author. *See* Appx 78 (translation of Mr. Umaña's writing with non-standard spelling, capitalization and word spacing as reflected in the source).

<div align="center">

*c.*     *Evidence that Mr. Umaña was not threatening Luis Ramos (aka Chipis).*

</div>

The Government claimed that the letters contained "orders" to "get Chipis." PPT 898, 900. One of the letters introduced by the Government, Exhibit 152a, however, contained a note to Chipis that according to an FBI language analyst, Edgar Cortes, was a "plea for help," and not a "veiled threat." Appx. 76. Trial counsel unreasonably failed to direct the jury's attention to and present evidence of Mr. Umaña's "call for help through commiseration and old friendship." *Id*.

Language Analyst Conrad consulted Cortes about the message to Chipis in Exhibit 152a. The "Umaña-speak" was giving her "headaches," and she wanted to make sure he was not

<div align="center">228</div>

"communicating a threat" against Chipis. She provided Cortes the full text as written in Spanish. Cortes noted the "horrible text" and he retyped it in the "proper Spanish transcription." *Id*. Cortes summarized the message as "a letter between 2 old friends, who have teased and joked with each other in the past." *Id*. As to "the tone of this letter," Cortes said, "it strikes me as an (sic) Umaña's plea for help, not as a veiled threat." *Id*. Cortes, concludes the email: "I don't consider this is a threat, but actually quite the opposite: **this is a call for help through commiseration and old friendship.   <u>Umaña's scared to death.</u>**" *Id*. (emphasis in original). Trial counsel unreasonably failed, not only to mention or publish this part of Exhibit 152a, but also to call Cortes to properly place the message in context.

> *d.*     *Evidence of Mr. Umaña's belief in God.*

Although Mr. Umaña's religious beliefs should not have been an issue, trial counsel unreasonably failed to use the contents of the letters rebut the Government's argument that Mr. Umaña had "the beast" or devil "in his heart." PPT 900.

For example, in sharp contrast to the non-admitted "Beast" passage that the prosecutor read during closing argument, another letter admitted during trial contained the following prayer:

> Reach out for the Lord for
>
> He doesn't care about your color or what you have caused
>
> Only, but only praising the Lord, my brother, I tell you with all my heart. This is a new very inspired song coming from this heart, brother. I ask you to pay close attention to the words of this song and you will see how it has the blessing that the Lord has delivered in every heart. Regardless of your color, the Lord doesn't show a preference for any nation.
>
> He doesn't care whether you are a white or brown Hindu or Chinese or what you

<div align="center">229</div>

have caused. Whatever it is, my brother, it will be forgiven. The only thing He wants from you is to have you on His side so you and your family can be forgiven for all your sins.

For that reason, I am asking you to come close to the Lord and kneel down and sing with me for all your sins. This is your prayer.

In the name of Jesus.

Father in Heaven, I come to you in humble prayer. I hope you can hear me in the Kingdom of Heaven, and I hope you can forgive me for all the offenses and all the sins that, in your view, I could have caused.

Father, please I ask you to have mercy and not punish me with your rage,

Father, please I ask you to mercy and not send me to Hell.

Father, please I ask you to have mercy, to show compassion and bless my soul so it can rest.

Father, please I ask you to have mercy and show me the way so I can walk and heal myself by my children's side, and also by the Lord's side, together with my family and the people who worship you, Father in Heaven

Please have mercy

In Jesus Christ's name

AMEN

Alej. E. U.

Exhibit 152a. Many other letters also contained pro-Christian greetings, instead of expressing allegiance to the Beast. *See* Exhibit 153a ("I hope the Almighty Creator of Heaven and Earth is keeping you in good health and some brother, one of those who has a heart in his chest regardless of his homeland."); 163a ("Look, before anything else, Merry Christmas, brother, with all my heart."); 172a ("I hope that when you receive this humble letter our Creator will have you enjoying good health"); 174a ("I hope you are blessed by God and in good health when you receive this letter."). Trial counsel unreasonably failed to bring these passages to the

230

attention of the jury (and to present other evidence) to rebut the Government's claim that Mr. Umaña had the "Beast" in his heart.

**D.** **The failure to adequately object to and mitigate the jail letter evidence was prejudicial.**

Trial counsel's failure to adequately object to and explain the jail letters unfairly prejudiced Mr. Umaña. The non-redacted content of the letters was patently prejudicial. The repeated references to the "Beast" painted Mr. Umaña as a devil worshiper, a belief system is certain to cast him as "morally reprehensible" to most people. *See Dawson*, 503 U.S. at 167. It also constituted a direct "appeal to religious symbols and beliefs" that "improperly appeal[] to the jury's passions and prejudices." *Cunningham v. Zant*, 928 F.2d 1006, 1019-20 (11th Cir. 1991); *see also Bennett v. Angelone*, 92 F.3d 1336, 1346 (4th Cir.1996) (condemning "religiously charged arguments as confusing, unnecessary, and inflammatory"); *United States v. Roach*, 502 F.3d 425, 436 (6th Cir. 2007) ("'[c]ourts universally condemn' the injection of religion into legal proceedings") (quoting *Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir.2004)).

The political they-will-get-theirs sentiments were at least polarizing, if not downright frightening, to any typical United States audience. Such an audience, like the jurors here (all United States citizens), would likely infer that Mr. Umaña harbored hostility towards their country, regarded them as "rich," discriminat[ory]" "murderers" that were going to get what was coming to them through "humiliat[ion] by all Hispanics." Ex. 176a. It is hard to imagine that this could have any effect other than inflaming the passions of the jurors (who would quite understandably feel wrongly maligned). Indeed, the Court rejected the admission of another letter with a political "diatribe" precisely because it was "inflammatory." ECF Doc. No. 998 at 6

231

& n.2. But Mr. Umaña's views of the United States's role in international politics was not on trial—at least, not until the Government improperly made it so. As with the "Beast" references, "one is left with the feeling that [this political material] was employed simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167.

The jury was also likely to find the large volume of obscene, racist, homophobic, and derogatory language "morally reprehensible." And in many cases the jury was not exposed to the improper material just once, but twice. *See e.g.* Exhibit 176a and 176b (containing much of the same political diatribe). Significantly, even the racially charged reference to a "fucking black guy" that the Court had the Government redact came in *three-fold* by the introduction of the full translation. The Government did redact the reference to the "fucking black guy" from the "selections" version of Exhibit 152a, but the reference was not redacted from the "full translation" version of Exhibit 152a, which also was admitted. Thus, while the Court was concerned about one inflammatory "fucking black guy" reference, the jury was actually exposed to three "fucking black guy" references. *See* Exhibit 152b at 2, 3, 5.

Although the content and mass of the letters was prejudicial enough, the Government's emphasis on the letters in arguing for death further prejudiced Mr. Umaña. The Government directly appealed to the religious passions of the jury by reading the non-admitted "Beast" letter to the jury, claiming that Mr. Umaña had the "devil" in his heart. PPT 900 ("he sent a few words to us. This one is called – it's got a title. One more day with the beast. Do you remember who the beast is? It's tattooed on his body. It's in his heart. It's the devil."). These arguments were left unanswered because trial counsel failed to direct the jury's attention to the fact the letters also contained evidence of Mr. Umaña devotion to God and pro-Christian beliefs.

232

The Government also repeatedly paraphrased and quoted the letters in an appeal to nationalistic passions, while at the same time highlighting Mr. Umaña's anti-authority beliefs:

> And it's his writing. It's his belief. And you have many of his letters and you can read those letters. We put more in at the sentencing phase. But, you know, the hood is large and worldwide. The Government may not accept it, but they have to put up with it because we're always going to listen to the Mara Salvatrucha and they're never going to be able to break us up no matter what they do. No matter what they do. No matter where I'm at. We are the Mara Salvatrucha. Born to control and make others understand that no other hood, much less the F'ing cops can stop us. Now they have arrested us and they think they finished us off. Ha ha ha. How many times does he say that in his letters? Ha ha ha. They're wrong. …

> Day by day I go out into the streets to look for those F'ing gangs and the only thing I find is the F'ing police who want to arrest and F with my gang. That is the risk I take every day with these F'ing good for nothings and these F'ing police who want to finish off the destiny of my gang. But I tell them it can't be done yet because now we have come to control. Because now we have come to belong to Mara Salvatrucha 13, to represent so all these fags can listen to us and know that they don't have to play and that they have to respect the Mara Salvatrucha. Damn F'ing good for nothings and that F'ing authority. They will have to suck up to us and even though they don't believe it, the Mara Salvatrucha has to triumph.

PPT 833-34, 901.

In addition to an emphasis on the inflammatory content of the letters, the Government used them to argue against finding factors of mitigation (such as brain damage and no schooling beyond the third grade) and for aggravating factors (such as future danger). *See* PPT 833 ("And that, ladies and gentlemen, is certainly evidence of future dangerousness. And you didn't hear any evidence that that will stop in federal prison versus the local jail. That he's not going to have the ability to communicate. He's Wizard. He's smarter than that. They break my code, I'll do a new code. If they try to read my mail, I'll put a message out to one of my other MS buddies in jail, he'll put a message to someone else and we'll take care of that problem."); PPT 896 ("Just

233

like the codes, just like his letters. This isn't some brain damaged individual over here. He's cold, he's calculating, and he's very savvy. And I think you saw that in his letters. He's very, very savvy."); PPT 900 ("And you remember as he wrote in code, as he gave all these ciphers, he knew the Government was reading his mail. That's why he wrote in ciphers and code. That's how he sent these messages about get Moe, get Chipis, organize this gang out there, organize this gang out here. He wrote that in code."). Indeed, only one juror found that Mr. Umaña "did not have the benefit of schooling beyond the third grade," even though that fact was undisputed. ECF Doc. No. 1048 at 5. Of course the jury was more likely to accept these arguments because trial counsel failed to illicit the simplicity of the code and poor quality of the writing. In light of the cumulative effect of the inflammatory content of the non-redacted letters, the substantial volume introduced, the failure of the trial attorneys to contextualize the letters and the Government's emphasis on the letters during closing, there is a reasonable probability that at least one juror might have struck a different balance if trial counsel had properly litigated this matter and excluded this material from the trial. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

## IX. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT SUBMITTING MR. UMAÑA'S NOTE OF APOLOGY IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Trial counsel rendered ineffective assistance of counsel by not responding to the Government's evidence that Mr. Umaña concealed a knife on his person on the day he was to be brought to court for jury selection. The same day that the knife was discovered, Mr. Umaña

234

wrote a note explaining his conduct and expressing remorse for his actions. Trial counsel's

failure to introduce the note into evidence was objectively unreasonable and prejudicial.

**A.      Trial counsel's failure to introduce Mr. Umaña's apology note was objectively unreasonable.**

On the first day of jury selection, Mr. Umaña was found in possession of a knife when he

was searched at the Mecklenburg County Jail, prior to transport to the federal courthouse.   The

Court called United States Marshal Russell Lashley to place the incident on the record. VDT 3.

Marshal Lashley testified that as part of a standard search prior to producing individuals for

court, he discovered a knife on Mr. Umaña's person. VDT 4. The knife was in a protective

sheath and attached to his penis with a rubber band.   VDT 5. Based on the discovery of this

knife, as well as on information contained in jail letters that authorities had intercepted that were

written by Umaña that mentioned possession of a shank and a desire to "do harm to a

correctional officer," Marshal Lashley requested to place Mr. Umaña in "a waist chain and

handcuffs." VDT 8-11. The Court took the matter under advisement, but admonished, "the Court

will not have toleration with respect to any outbursts, any demonstrations, and conduct by the

defendant that causes any alarm to the marshals would be something of paramount concern to the

court." VDT 14.

After the Court's admonishment, and during the voir dire proceedings, Mr. Umaña wrote

a note and gave it to trial counsel at the end of the day. The note explained that Mr. Umaña had

no intent to use the shank to attack any witness or court personnel, but intended it for his own

protection from rival gang members.   In this note, Mr. Umaña asked for forgiveness, and

promised it would not happen again.   The following is a Federal Court certified translation of

235

the note indicating, where possible, the non-standard spelling, capitalization and word spacing contained in the note:

> about the officer that is a lie
> at no time hav I wanted tudo
> that thing about the officer
> But about the blaid I acept that I
> had it but it is for some pro
> tection against me I'm a gang mem
> ber and I have gang member enemies
> from different gangs and thatis why
> I had it with m e I am isolated
> and many think that I am in that
> condition be cause I am talkin
> about somebody and for that Reeson I had
> it wi th me al though it is i
> who is being juged but
> I cant be trusting of any
> of the inmates I didnt have the blade
> to hert any
> other person I am in this case
> and I would be an idiot to cause somothr
> problem being in this situation
> and I Apologize to you all for this
> what happened will not happen a gain

Appx. 78.

During penalty phase, the Government called Marshal Lashley to testify about the incident and introduced the knife, sheath and rubber band into evidence. PPT 359-63. Trial counsel's cross-examination of Marshal Lashley was minimal: Lashley confirmed that the knife never made it to the federal courthouse; that Mecklenburg County jail houses rival gangs; that Mr. Umaña did not resist; that he was not in a "position to say whether this item was possessed for self-defense or some other purpose;" and the knife was four inches long. PPT 367-68. Trial

236

counsel presented no other evidence directly related to the incident. Trial counsel's failure to introduce the note into evidence was objectively unreasonable

**B.    Mr. Umaña was prejudiced by trial counsel's failure to introduce the note.**

The knife evidence had a large influence on the penalty phase. As the Court stated when denying Mr. Umaña's motion for new trial, "The evidence of the defendant's possession of the knife while in the transportation process to come to federal court was compelling in itself, as reflected by the jury's visible reaction when the deputy testified." ECF Doc. No. 1165 at 22. And the Government emphasized the knife evidence and trial counsel's failure to meaningfully respond to the evidence during closing argument. The Government argued, "Do we still recover shanks? Yes. And do you think he's ever going to stop? Has there been any evidence that he will stop?" Later, the Government even argued (improperly) that Mr. Umaña brought the "shank" to court to attack the jurors: "But they say he did it to fight off rivals. Over here at the federal courthouse. There were a lot of rivals in the courthouse. You know who the rivals were? They're the marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival." PPT 898-99.

Introducing the note would have significantly srebutted the Government's claims and would have placed the incident in a context that the jurors would have easily understood: namely, Mr. Umaña faced credible threats in prison from rival gangs, and so he carried a knife in order to protect himself in the event he was attacked. By its terms, Mr. Umaña's note directly reduces the "compelling" nature of the knife evidence and directly rebuts the Government's arguments. It explains the knife was for protection against other gangs, not to attack the jury; that he did not want to hurt anybody; that it would not happen again; and offers an apology. In other

237

words, there was evidence that Mr. Umaña "would stop," but trial counsel did not present it.

Not only did the content of the note mitigate the knife evidence and counter the Government's argument of future danger, but it also supported other mitigating theories. Presenting the note as written demonstrates Mr. Umaña's poor writing skills. The note also shows Mr. Umaña's inability to reason, poor decision-making, impulsivity, lack of knowledge of how to seek help if he thought he was in danger, feelings of isolation and paranoia, remorse for having caused a disturbance, and his pledge that he would attempt to better his behavior. Such evidence of Mr. Umaña's mental impairments was inherently mitigating. In light of the direct and circumstantial mitigating effect of Mr. Umaña's note, had it been introduced there is "a reasonable probability that at least one juror might have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

## X. MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF TRIAL, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WHEN HIS ATTORNEYS ALLOWED UNRELIABLE AND UNFAIRLY PREJUDICIAL EVIDENCE THAT MR. UMAÑA HAD COMMITTED MURDERS IN EL SALVADOR TO BE CONSIDERED BY THE JURY, EVEN AFTER THE COURT HAD PRECLUDED THE GOVERNMENT FROM INTRODUCING THIS EVIDENCE

All other claims and allegations in this Motion are incorporated into this claim by this reference.

At the penalty phase, the Government sought to introduce evidence that Mr. Umaña had committed additional murders in El Salvador. ECF Doc. No. 1021 at 2-3. Trial counsel sought its exclusion.

238

The Court found the allegations were acquitted conduct and the evidence of the murders was based on anonymous witnesses. The Court concluded evidence of the alleged El Salvador murders was inadmissible, noting that the evidence lacked "sufficient indicia of trustworthiness to be admitted" and that admission of the evidence would cause "unfair prejudice to the [Mr. Umaña]'s ability to defend the case." *Id*. at 7-8. In addition to its oral ruling, the Court followed up with a written order, explaining more the problematic nature of the evidence:

> It is almost entirely hearsay evidence of conduct for which the defendant was acquitted, based in part upon a finding that these statements – proffered here as reliable evidence – lacked credibility. It does not appear that any eyewitness will offer live testimony to corroborate these statements. Moreover, many of the declarant witnesses remain anonymous. The anonymous quality of these witnesses not only undermines the Court's assessment of their accuracy and truthfulness, but it also unfairly limits the defendant's ability to uncover any impeachment evidence that may exist. For these reasons, the Court finds that the government's proffered evidence of the El Salvador murder lacks sufficient indicia of reliability and its probative value is outweighed by a danger of unfair prejudice to the defendant. Thus, this evidence is inadmissible.

ECF Doc. No. 1021 at 10-11.

Despite this clear ruling from the Court, the Government nevertheless sent out with the jury, during deliberations at penalty phase, a transcript of Mr. Umaña being interrogated by Los Angeles police detectives about the California killings in which he is also interrogated about the El Salvador murders. *See e.g*. Gov. Ex. 522 at 58 (entire page in English discussing allegations of El Salvador conduct). Trial counsel did not object to the introduction of this lengthy transcript, nor ask for the portion of it that made reference to murders in El Salvador to be redacted. It appears trial counsel was simply unaware that this highly prejudicial and unreliable evidence they had fought so hard to successfully

239

keep out was in this document that then was sent to the jury – without even the benefit of the explanation that Mr. Umaña had been acquitted of these crimes.

Allowing this evidence to get into the hands of the jury constituted deficient performance. This Court itself recognized how highly prejudicial evidence of these murders was. But for trial counsel's failure to have the objectionable sections of it redacted prior to the transcript being sent out with the jury, there is a reasonable probability that the outcome of sentencing would have been different. *Strickland v. Washington,* 466 U.S. 664 (1984). This Court should vacate the death sentence and order a new sentencing hearing.

**A.      Trial Counsel performed deficiently by not reviewing the transcripts and redacting the precluded, prejudicial information before it was presented to the jury.**

When the Government sought admission of evidence of murders Mr. Umaña had purportedly committed in El Salvador for which there was no reliable evidence and of which Mr. Umaña had been acquitted, trial counsel wisely moved to exclude it. This Court agreed with trial counsel, finding that the evidence was unreliable and unduly prejudicial. That should have been the end of the matter.

The Government, however, later moved a transcript into evidence during penalty phase that contained the same unreliable, prejudicial accusations.[54] This time, trial counsel raised no

---

[54]      On direct appeal, Mr. Umaña contended that the Government had engaged in prosecutorial misconduct by moving the admission of this transcript without notifying the Court that it contained this same offending material that had already been excluded.   In its majority opinion, the Fourth Circuit never addressed this issue, although in dissent, Judge Gregory

240

objection. This transcript showed the exchange between Mr. Umaña and LAPD detectives when he was asked about having committed the California murder. *See e.g.* Gov. Ex. 522 at 58. Within this long document, however, were strong accusations the Government made during the course of this interrogation about Mr. Umaña's involvement in murders in El Salvador. There is no question but that the transcript that was introduced contained the offending materials. It was described by Judge Gregory, dissenting from the grant of relief on this claim on direct appeal, when raised as a claim of prosecutorial conduct:

> Finally, and most problematic, the government introduced evidence linking Umaña to murders in El Salvador, even though this evidence had been ruled as inadmissible and even though Umaña had no chance *364 to confront his accusers. At sentencing, the government sought to introduce evidence that Umaña had committed violent crimes, including homicide, in El Salvador. Specifically, the government wanted to call an El Salvadoran prosecutor to testify. The district court denied the government's motion, concluding that the evidence "lacks sufficient indicia of reliability" and that "its probative value is outweighed by a danger of unfair prejudice." J.A. 3232.
>
> Incredibly, in spite of the district court's clear ruling, the government introduced a transcript as evidence in which a United States law enforcement officer is quoted as saying "I know he's done stuff in El Salvador," J.A. 4301, "[w]e know ... that they were looking for you for homicide also in El Salvador," J.A. 4316, and "[w]e know that he' s, he's a violent, violent guy. We know that he's wanted in El Salvador ... for many violent crimes ... I know he's a shooter. I know he's an enforcer. I know he's a gangster," J.A. 4315. Through an evidentiary back door left wide open, the government snuck in testimony that "lacked consistency and credibility," per the district court, but had enough prejudicial value that the government made its entire case at sentencing about Umaña's past uncharged homicidal conduct.

*United States v. Umaña*, 750 F.3d 320, 363-64 (4th Cir. 2014) (J. Gregory, *dissenting*).

---

indicated his belief that the Government had improperly introduced the murders through "an evidentiary backdoor." *United States v. Umaña*, 750 F.3d 320, 364 (4th Cir. 2014) (J. Gregory, *dissenting*).

Trial counsel appears to have missed the fact that this transcript contained all of these prejudicial statements about criminal events in El Salvador.

But it was trial counsel's job to keep such evidence away from the jury, and their failure to object to the jury seeing these improper passages was simply deficient. The transcript contained numerous instances where law enforcement officers referred to extraneous acts of murder and violence this Court had ruled inadmissible, thereby circumventing Mr. Umaña's right to be judged "solely on the basis of evidence [properly] introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).

**B.** **Trial counsel had no reasonable strategy for failing to review the transcripts and prevent the jury from relying on the inadmissibly and highly damaging evidence.**

Trial counsel had moved for the preclusion of evidence that specifically related to El Salvador murders (*See* ECF Doc. No. 1021 at 2-3), and they had also moved for the suppression of Mr. Umaña's statements which is where the vast majority of the information concerning El Salvador homicide was contained. ECF Doc. No. 490. Thus, they had no strategic reason for failing to ask to have the objectionable portion of this transcript excluded from evidence by having it redacted.

**C.** **Mr. Umaña suffered prejudice from the introduction of improperly admitted evidence that he had murdered people in El Salvador.**

The references to Mr. Umaña having committed murders in El Salvador that trial counsel allowed the jury to read were highly damaging to Mr. Umaña's case at penalty phase. Gov. Ex. 522 at 44 ("O.K. And, you know, and I know he's done stuff in El Salvador"); *Id*. at 58 ("[W]e know. . . about your past, . . . that they were looking for you for homicide also in El Salvador."); *Id*. at 76 ("What about all these ones in El Salvador that he's wanted for?"); *Id*. at 60 ("People

242

talk about him. He's a legend."); *Id*. at 136 ("I know he's done a ton of shootings. . . ."); *Id*. at 174 ("Ask him [to] . . . tell us about all the murders that he's done. . . . And if he says he's never done any murders . . . then we don't believe that.").

The evidence of murder and violent acts in El Salvador was "the worst kind of bad evidence." *Wong v. Belmontes*, 558 U.S 15, 26 (2009). And the implications that Mr. Umaña had killed someone in El Salvador fit in with the government's theme in closing argument that Mr. Umaña had killed "over and over and over again." PPT at 889; *see e.g.* PPT 832-33 ("He had killed before and had earned his respect . . . by killing."); ("He had killed before and had earned his respect . . . by killing."). Furthermore, the evidence that Mr. Umaña had killed in El Salvador corroborated for the jury, the otherwise unfounded statement that Mr. Umaña had earned his "MS" tattoos by killing people. *See e.g.* PPT at 824 ("He had earned those two letters on his forehead and he earned them by killing."); GPT at 1156-57, 1170, 1171, 1183; *and* PPT at 824, 892.

Trial counsel allowed the jury to consider evidence that Mr. Umaña had killed a person in El Salvador when the Government had no credible or reliable evidence of this, and Mr. Umaña had been acquitted of this crime *which the jury was never even informed of,* and one must assume jurors relied on that information during their deliberations. If even one juror was swayed by virtue of this improper evidence that had been ruled inadmissible by the Court then Mr. Umaña suffered prejudice. Given the fact that the El Salvador murder evidence was "the worst kind of bad evidence" and that it was woven in with the Government's themes during closing argument, there is a reasonable probability that one of the jurors relied on it in determining whether Mr. Umaña received life or death.

243

Counsel performed deficiently as a result of which Mr. Umaña was prejudiced. This Court should find that his right to the effective assistance of counsel was abrogated, vacate his sentence of death, and grant him a new sentencing hearing.

**XI. TRIAL COUNSEL WAS INEFFECTIVE AT ALL PHASES OF TRIAL FOR FAILING TO REBUT THE FALSE AND MISLEADING EVIDENCE PRESENTED BY THE GOVERNMENT THAT MR. UMAÑA "EARNED" HIS MS-13 TATTOO BY KILLING PEOPLE IN VIOLATION OF MR. UMAÑA'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Government witness Alexander Granados testified that the rules of MS-13 dictated that one can only earn the right to tattoo the letters "MS" on one's body by killing someone. GPT 920. The testimony was inadmissible for a number of reasons, and trial counsel's failure to adequately challenge it constituted ineffective assistance of counsel.

**A. Trial counsel's failure to adequately challenge Alexander Granados's testimony was objectively unreasonable and constituted deficient performance.**

Alexander Granados was a cooperating MS-13 member who testified for the Government at trial. During his cross-examination, trial counsel asked whether he had told police that MS-13 members had to kill someone after they were initiated into the gang. GPT at 913. Granados's answer – that "you earn the two letters" when you kill someone – was non-responsive to trial counsel's yes or no question about what Alexander Granados had told police. GPT at 913-14. Trial counsel did not object to the response that Alexander Granados blurted out nor did he move to strike the testimony. *Id*. A few minutes later, trial counsel concluded his cross-examination and the prosecutor took over questioning Alexander Granados. GPT at 920. The very first

244

question posed by the prosecutor was "you mentioned in response to one of the questions about earning the two letters . . . what did you mean by this?" *Id*. Alexander Granados responded that "to earn the two letters, you have to kill someone." *Id.* Trial counsel raised no objections to this line of questioning, or to Granados' response, despite the fact that this topic was irrelevant, unfairly prejudicial, and improper evidence of prior bad acts under Federal Rule of Evidence 404(b).

The initial statement by Alexander Granados was non-responsive to trial counsel's question, and trial counsel should have objected on that ground and moved to strike the inflammatory testimony. Indeed, it is axiomatic that trial counsel has a duty to raise all proper objections and challenges to inadmissible and/or unduly prejudicial evidence. *See* ABA guidelines 10.8, commentary (Requiring trial counsel to ensure a complete record is made regarding all objections).

Moreover, the testimony (on both cross-examination and during re-direct) was irrelevant. Relevance is defined as that which has a tendency to make a fact of consequence to the litigation more or less probable. Fed. R. Evid. 401. The statement that tattoos are earned by killing people was irrelevant to any issue at trial; there was no allegation that Mr. Umaña had earned his tattoo by virtue of his role in the Greensboro killings. To the extent that Mr. Umaña's specific tattoo was relevant, it was only to show evidence of his membership in MS-13 (the alleged criminal enterprise). Introduction of the tattoo for that limited purpose did not open the door to evidence that the tattoo also signified that Mr. Umaña had necessarily killed someone in order to "earn" that tattoo. Furthermore, the evidence as presented was not specific to Mr. Umaña, but rather a general statement about the rules of MS-13 – a general statement that was contradicted by other

245

sources, including the Government's primary undercover informant, Rony Lopez. Indeed, that Rony Lopez testified about the meaning of that MS tattoo at the trial of Mr. Umaña's co-defendants, including Julio Rosales Lopez (aka Stiler). His sworn testimony was that the MS letters are not earned only if one commits a killing, but rather also when you "put in work for the gang," or when you "rob people," or when you do "just different types of crimes." *United States v. Rosales Lopez, et al.*, 08-cr-00134-RJC Doc. No. 1080, at 567-68. Thus, contrary to Granados's testimony, having an MS tattoo did not mean one had killed someone to earn that particular tattoo.

Moreover, the aforementioned testimony from the Rosales Lopez trial was given three months prior to Mr. Umaña's trial, meaning that transcripts of the testimony were readily available to trial counsel. Competent counsel should have been aware of Rony Lopez's testimony regarding the rules of MS-13 and been prepared to impeach Granados on his contradictory, prejudicial testimony. Trial counsel's failure to use that prior testimony to impeach Granados and otherwise rebut the Government's contention regarding the meaning of the MS tattoo was objectively unreasonable. Similarly, given that trial counsel was on notice that Mr. Umaña's tattoos were likely to be admitted into evidence for the more limited purpose of establishing his membership in MS-13, counsel failure to independently investigate the meaning of the tattoos – including seeking and securing the assistance of a gang and/or tattoo expert – constituted deficient performance. Had counsel done so, it was clear that Granados' testimony could have easily been rebutted and shown to be false.

Even if relevant, the statement was substantially more unfairly prejudicial than it was probative. Fed. R. Evid. 403. Reference to Mr. Umaña's tattoo was made throughout trial as a

246

means of identifying him, and the Government introduced close-up photographs of the tattoo as an exhibit. Gov. Ex's 21-24. The idea that Mr. Umaña earned that tattoo by killing someone invited the jury to baselessly speculate on when, where, how and how many people Mr. Umaña had killed in the past.

Finally, the testimony was objectionable because it constituted unnoticed and improper evidence of prior bad acts in violation of Federal Rule of Evidence 404(b). The Government had already established that Mr. Umaña had tattoos of the letters "MS" on his body. GPT at 80-83 (admitting numerous exhibits of photographs of Mr. Umaña's tattoos). Therefore, the testimony that an MS-13 member has to kill to earn the right to put the MS tattoos on his or her body meant only one thing in the minds of the jury – that Mr. Umaña had committed prior murders to earn those tattoos. Evidence of prior bad acts requires notice to the defense prior to trial, and it must be relevant for some purpose other than the character of the defendant. Fed. R. Evid. 404(b). Because this evidence was neither noticed nor did it go to motive, plan, intent, etc., it was inadmissible and trial counsel's objection would have been sustained. Thus, failure to raise this challenge constituted deficient performance.

**B. Trial counsel's failure to object to the inadmissible and inflammatory testimony was objectively unreasonable.**

One of trial counsel's defenses at trial was that even if there was sufficient evidence implicating Mr. Umaña as the shooter in the Greensboro case, those shootings were not done in furtherance of MS-13 but for some other purpose. *See e.g.* GPT at 1189 ("I would strongly and vehemently disagree with anyone that says that [the victims] were murdered for the purpose of increasing someone's position in MS 13."). Indeed, trial counsel went to great lengths to try and

247

distinguish "missions" that were carried out for MS-13 purposes from the spontaneous and unrelated Greensboro killings with which Mr. Umaña was charged. Trial counsel cross-examined both Frank Flores and Rony Lopez about the fact that "missions" are to benefit MS-13 (GPT at 100 and 730), and that drawing unnecessary attention from the police for doing something that is not a "mission" is against MS-13 rules. GPT at 741-42. Trial counsel then argued this point in closing noting that "[t]his was not a mission. If this was a mission, that is you have to go out and kill them, all right, that would be murder in the aid of racketeering. That would be someone who went out and had to do something to maintain or increase their position." GPT at 1190.

Rebutting the notion that MS-13 gang members can "earn" the ability to wear "MS" tattoos by killing people was thus in keeping with the defense strategy. Indeed, the implication of the tattoo evidence was that *any* killing could be in furtherance of the gang because killing anyone was a way to "earn" an MS tattoo, which in turn would help one increase or maintain one's status within MS-13. Thus, challenging the testimony about the meaning of the MS tattoo would have been entirely consistent with, and in service of, trial counsel's defense strategy because it would have established that the Greensboro shooting was not motivated by a desire to "earn" another MS tattoo, but rather was genuinely an unrelated incident that was not committed in furtherance of MS-13. In light of this, trial counsel's failure to adequately challenge the tattoo evidence was objectively unreasonable.

**C.     Mr. Umaña was prejudiced by trial counsel's deficient performance.**

Mr. Umaña suffered prejudice from trial counsel's failure to adequately challenge the improper testimony that MS tattoos are only earned by committing a murder. The Government successfully wove the theme, that Mr. Umaña earned his tattoo by killing, throughout the guilt and

248

penalty phases of trial, thus improperly suggesting to the jury that not only had Mr. Umaña killed before, but that he had done so in order to further the purposes of MS-13.

And the evidence has shown, ladies and gentlemen, that on that day, December 8th, 2007, Wizard of the Novena showed that he earned the big letters:

> The big M and the big S. And he earned them by respect. And he earned them with a .45. And he maintained his respect and maintained his status in the gang that night by showing Manuel and Ruben what the MS 13 is all about.

GPT 1157.

By constantly interchanging the themes of respect and MS tattoos as rewards for killing, the Government repeatedly emphasized the impermissible and prejudicial inference that Mr. Umaña's MS tattoo constituted independent and reliable evidence that he had "earned" his tattoos by killing people for MS-13. *See* GPT at 1170 ("Wizard earned those letters. He earned them by, as the witnesses said, you earn them by killing. So you don't disrespect me. I earned this MS. I earned this MS."); GPT at 1157 ("[H]e earned the big letters … And he earned them with a .45"); GPT at 1156 ("[Mr. Umaña] had earned his respect in the MS 13. He had earned it and he wore it proudly on his body, on his back, on his chest, right between his eyes."); GPT at 1157 ("[Mr. Umaña] showed that he earned the big letters: The big M and the big S."); GPT at 1171 ("Is it so hard to identify that tattoo? If you've seen that once, I think you remember . . . He wants you to remember that . . . that means a lot to him. He's earned that.").

This improper evidence and line of argument had prejudicial implications at both the guilt phase and penalty phase of the trial. For example, Mr. Umaña was charged in the indictment with the offense of 18 U.S.C. §1959. That offense required the Government to prove not only that Mr. Umaña committed the Greensboro murder, but that the murder was carried out

249

to maintain or further his position within MS-13. The actual evidence that the Greensboro shooting was related to an MS-13 "mission" or was otherwise in furtherance of the gang, however, was weak at best. Granados' testimony about the exclusive meaning of the MS tattoo was thus the very definition of evidence that is "unfairly prejudicial": it was prejudicial because it allowed the jury to find a requisite element of the § 1959 charge for which there was otherwise insufficient evidence, and it was unfair because that testimony also happened to be *utterly false*. Moreover, the § 1959 charge was one of the capital counts, which compounded the prejudice because a finding of guilt on this count exposed Mr. Umaña to the penalty of death.

Mr. Umaña was also unfairly prejudiced at the penalty phase. The evidence regarding the MS tattoos allowed the jury to draw the unfair and prejudicial inference that even prior to the Greensboro murder and the unadjudicated California offenses introduced in the penalty phase proceeding, Mr. Umaña had already committed additional murders in order to "earn" his tattoo. Indeed, during its closing argument, the Government invited the jury to draw those very inferences. PPT at 824 ("He had earned those two letters on his forehead and he earned them by killing."); PPT at 892 ("He earned those tattoos. You heard how he got those tattoos. He earned those tattoos."); PPT at 902 ("His tattoo says it all."). Thus, the jury was not only allowed, but was actively encouraged, to believe that his tattoos constituted independent and reliable evidence of additional murders that he had carried out earlier in his life, and that this should be taken into consideration in weighing whether Mr. Umaña should be sentenced to death. There could hardly be a more unduly prejudicial factor that one could inject into a capital jury's sentencing deliberations than the notion that the person on trial was guilty of multiple homicides for which he had not been previously punished. Trial counsel's failure to properly challenge and rebut such

250

evidence was objectively unreasonable, and there is a reasonable probability that if such improper evidence had not been presented to the jury, at least one juror would have balanced the scales differently and the outcome of the penalty phase proceeding would have been different.[55]

## XII. THE GOVERNMENT VIOLATED MR. UMAÑA'S RIGHT TO A FAIR TRIAL BY ENGAGING IN A PATTERN OF MISCONDUCT IN WHICH IT REPEATEDLY INTRODUCED INADMISSIBLE EVIDENCE TO THE JURY, IN DIRECT VIOLATION OF, OR BY CIRCUMVENTING THE COURT'S ORDERS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Long ago, the Supreme Court cautioned that "[i]t is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935). Often cited, the *Berger* case stands for the idea that while it is the job of the United States

---

[55] As is explained more fully in Claim V, trial counsel was also unreasonable for failing to properly investigate and challenge the Government's evidence regarding the unadjudicated murders in California, as there was readily available and compelling evidence that either exculpated Mr. Umaña entirely, or significantly impeached the Government's evidence such that there was a reasonable probability that one or more jurors would have concluded that the Government failed to prove those unadjudicated California murders beyond a reasonable doubt. Consequently, but for trial counsel's ineffectiveness, the jury would have been presented with a radically different case at the penalty phase – that is, one in which: 1) there was no evidence suggesting that the MS tattoo indicated Mr. Umaña had committed prior murders; 2) the weakness of the Government's case on the unadjudicated California murders was thoroughly exposed; and 3) the Greensboro murder was properly understood as an unplanned event that was not premeditated, but rather the result of an emotionally charged situation. When combined with the readily available mitigation evidence that trial counsel could have presented to the jury, see Claims I & II, there is a reasonable probability that the outcome of the penalty phase proceeding would have been different. See also Claim XXIV & XXX.

251

Attorney to "strike hard blows" to ensure that "justice will be done," it must not strike "foul ones" to "win a case." *Id.* At Mr. Umaña's trial, the Government violated this maxim by repeatedly introducing evidence in its trial exhibits that the Court had previously ruled inadmissible. Because trial counsel did not carefully review and ask for these exhibits to be redacted, the jury was exposed to and permitted to rely on numerous impermissible forms of evidence when making the decision of ultimate importance to Mr. Umaña: whether he lives or dies. The Government's surreptitious introduction of inadmissible evidence to the jury violated Mr. Umaña's rights under the Fifth, Sixth, and Eight Amendments.[56]

**A.    The prosecution's trial exhibits contained various references to evidence that the Court had ruled to be impermissible and therefore inadmissible.**

     i.    <u>Unreliable evidence that Mr. Umaña had killed people in El Salvador went to the jury despite the fact that he was acquitted in El Salvador and the Court had ruled it inadmissible.</u>

To prove the non-statutory aggravating factor that Mr. Umaña had engaged in a pattern of violence, the Government attempted to introduce evidence that he had participated in the murder of Jamie Samayoa in El Salvador. ECF Doc. No. 1021, at 2-3. The Court considered the issue factually and legally and came to the conclusion that the evidence was inadmissible in Mr. Umaña's capital sentencing trial. *Id*. at 10-11. The Court entered a written order to that effect, and the matter was discussed on multiple occasions outside the presence of the jury. *Id*.; PPT at 7; PPT at 78. The Government professed to understand the Court's ruling, stating that "the

---

[56] To the extent that trial counsel unreasonably failed to adequately challenge the Government's misconduct, trial counsel's deficient performance constituted ineffective assistance of counsel and has also been alleged in this Motion.

Government will not ask about El Salvador." PPT at 78.

Despite the Court's orders and the Government's stating that it understood those orders, the Government introduced exhibits containing explicit reference to Mr. Umaña committing murders in El Salvador. For example, in the transcript of Mr. Umaña's interrogation, the agents repeatedly assert that Mr. Umaña committed murders in El Salvador, both when talking among themselves and during questioning. Gov. Ex. 522 at 44 ("O.K. And, you know, and I know he's done stuff in El Salvador"); Id. at 58 ("[W]e know. . . about your past, . . . that they were looking for you for homicide also in El Salvador."); Id. at 76 ("What about all these ones in El Salvador that he's wanted for?"); Id. at 136 ("I know he's done a ton of shootings. . . ."); Id. at 174 ("Ask him [to] . . . tell us about all the murders that he's done. . . . And if he says he's never done any murders . . . then we don't believe that."). The Government's introduction of this "backdoor"57 evidence of the El Salvador murders was not merely a "hard blow"; it was a "foul one." *Berger*, 295 U.S. at 88

     ii.   <u>The Government introduced to the jury inflammatory racial remarks in Mr. Umaña's jail letters that the Court precluded.</u>

On April 21, 2010, the parties discussed which jail letters written by Mr. Umaña could be fairly introduced in the penalty phase. PPT at 300. The Court had specific concerns about the racial commentary in Gov. Ex. 152 and asked the Government to redact it to prevent "the potential for injecting race into [the jury's] deliberation." *Id.* The Government accordingly produced a redacted version of Exhibit 152b. Upon reviewing the redacted version, the Court

---

[57] *See United States v. Umaña*, 750 F.3d 320, 364 (4th Cir. 2014) (J. Gregory, *dissenting*).

ruled, "[w]ith that redaction, the Court will find that the probative value outweighs any unfair prejudice, confusion of issues and misleading the jury." PPT at 301.

Although the Government redacted the racial comment in Exhibit 152b, the Government failed to redact the fully translated version of Exhibit 152a. Thus, the Government presented to the jury the very racial comment that concerned the Court ("fucking black guy") when it moved to introduce both Exhibit 152a and Exhibit 152b. PPT 349-50, 941. And to make matters worse, the non-redacted full translation makes other references to the "fucking black guy." Gov. Ex. 152a at 2, 3, 5. Again, the Government's end-around the Court's redaction ruling was a "foul" blow.

      iii.    <u>The Government introduced improper opinion evidence that Mr. Umaña's accomplices were telling the truth about Mr. Umaña being the shooter in a non-statutory aggravator alleged against him (the Fairfax Avenue shooting), in direct violation of the Court's order.</u>

During a side-bar conference, trial counsel brought up the Government's desire to introduce the transcripts of Detective Parshall's interrogation of Rene Arevalo, in which the detective gave his opinion that Arevalo was telling the truth about Mr. Umaña committing the Fairfax Avenue shooting. PPT at 168. Trial counsel moved to preclude the objectionable statements and quoted Detective Parshall's comment to the Court: "I believe you because I do this for a living. I interview people. I know when people are lying. I know when people are telling me the truth." *Id*. The Court immediately agreed that the evidence was objectionable and ordered the prosecutor to "strike" and "sanitize" that portion of the transcript. *Id*. The prosecutor pledged to the Court that she would make the necessary redaction. *Id*. at 169. The transcript looked like this prior to the sanitization:

254

> DETECTIVE PARSHALL: I believe you because I do this for a living, I interview people. I know when people are lying. I know when people are telling me the truth. I can see you're a very genuine person.
>
> 142
>
> LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

scanned

> I can tell by your eyes and your mannerisms, okay. I -- I, you know, I regret you being in the situation, but you know you got --

Appx. 53 at 142-43.

The Government then "sanitized" the transcript and provided the jury with the following:

> DETECTIVE PARSHALL: I believe you because I do this for a living, I interview people. I know when people are lying.
>
> I can see you're a very genuine person.
>
> 142
>
> LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

00

scanned

> I can tell by your eyes and your mannerisms, okay. I -- I, you know, I regret you being in the situation, but you know you got --

Gov. Ex. 518.

255

That is, the Government redacted exactly one sentence of the improper paragraph ("I know when people are telling me the truth") and kept the detective's belief that Arevalo was honest because the detective had the professional experience to distinguish when someone was telling the truth or lying. Despite its redaction, the Government left the meaning of the objectionable statement undisturbed and allowed the jury to see that Detective Parshall believed Arevalo because he "do[es] this for a living," he "knows when people are lying," and he thought Arevalo was a "very genuine person" based on his "eyes and his mannerisms." *Id*. The failure to fully redact the transcript was yet another foul blow.

**B.**    **The Government elicited an unreliable, double hearsay statement that Mr. Umaña was the shooter in the Lemon Grove murder, without proffering the statement to the Court for a reliability finding.**

Prior to allowing evidence of unadjudicated conduct, the Court instructed the Government to submit copies of discovery materials, including transcripts, statements, reports, or other documents that form the basis of the Government's proffer. This proffer was necessary because as the Court explained in its order admitting some evidence of unadjudicated conduct, the Government "must demonstrate reliability prior to its admission before a capital sentencing jury," ECF Doc. No. 1021 at 7, and must make a "threshold showing that the evidence of unadjudicated conduct bears sufficient indicia of reliability before it may be submitted to the sentencing jury." *Id*. at 8. Based on the Government's proffer and submission of supporting evidence, the Court ruled that statements that Rene Arevalo made to Los Angeles detectives regarding *the Fairfax Avenue* shooting (in which Arevalo was a suspect) were admissible. *Id*. 8-9. The Government, however, did not proffer any statements Arevalo made regarding *the Lemon Grove* shooting.

256

Despite the Government being on notice that evidence of unadjudicated conduct had to be ruled upon by the Court prior to being presented to the jury, the Government elicited testimony from Los Angeles Police Department Detective Small about an accusation that Arevalo made regarding the Lemon Grove murder. According to Detective Small, when shown a photograph of Mr. Umaña, Arevalo "said that's your Lemon Grove shooter." PPT 110.

The Government's elicitation of Detective Small's testimony violated the procedure mandated by the Court because the Government failed to first proffer that testimony and receive a ruling regarding its admissibility prior to eliciting it from the witness. The Government's failure to follow the Court's order was significant; the Court later noted that Arevalo "wasn't present at the time the shooting occurred" and that there was "[n]o real basis for why he made that statement," PPT at 328, so there is a reasonable probability that the Court would have precluded that evidence if the Government had properly proffered that testimony to the Court outside the presence of the jury, as the Court had previously ordered it to do.

### C.   Mr. Umaña was prejudiced by the Government's many foul blows.

The prejudicial effect of the evidence admitted by the Government's unfair tactics is more thoroughly discussed in other claims. See Claims VIII, X. But it must be remembered that there was a reason the Court excluded evidence of the El Salvador murders, racist comments, agent vouching and unreliable accusations – the Court itself recognized that such evidence was unreliable and unduly prejudicial, and therefore should play no role in the jury's sentencing determination. Had the Government not resorted to these backdoor practices, there is a reasonable probability that at least one juror might have struck a different balance in deciding Mr. Umaña's fate. Wiggins v. Smith, 539 U.S. 510, 537 (2003).

257

**XIII. TRIAL COUNSEL DEPRIVED MR. UMAÑA OF EFFECTIVE ASSISTANCE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WHEN THEY FAILED TO ASK FOR A CONTINUANCE OF HIS INTELLECTUAL DISABILITY PRETRIAL HEARING AND THE CAPITAL TRIAL DATE.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Trial counsel rendered ineffective assistance by not requesting a motion to continue the April 12, 2010 trial proceedings or the November 2009 pre-trial hearing on intellectual disability under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). Trial counsel were unprepared and presented an inadequate mitigation case and defense against the Government's case. Counsel's failure to request a continuance was objectively unreasonable and prejudiced Mr. Umaña.

Jury selection for Mr. Umaña's trial began on March 22, 2010, twenty-one (21) months after his federal indictment. The guilt phase portion was a complicated case involving 26 co-defendants and approximately 70 counts in an over 100-page indictment. As of March 5, 2009, more than a year prior to Mr. Umaña's trial, approximately 40,000 pages of discovery and 400 hours of recorded conversation had been provided to the defense. ECF Doc. No. 445 at 1. Mr. Umaña's trial was severed from his co-defendants' trial. Citing to the voluminous discovery, complex nature of the case, and delays in translation, Mr. Umaña's co-defendants obtained a continuance of their trial to January of 2010. Mr. Umaña received just three more months of pretrial preparation time than his co-defendants who were not facing the death penalty and thus all the differences in time and preparation that latter cases necessarily entail. July 6, 2009 Status Conference (Oral Order to continue trial to Jan. 11, 2010).

258

In addition to the significant amount of discovery involving a complex multi-defendant guilt phase of trial, Mr. Umaña's counsel was also responsible for the complicated and time-consuming task of investigating and preparing for the penalty phase of trial. This included the mitigation investigation into Mr. Umaña's life history in a foreign country and the investigation into two additional alleged murders (with three victims) in a different state. By the time of the pretrial *Atkins* hearing and the trial, it was evident that trial counsel was not prepared.

Despite knowing they had not completed their investigation and were unprepared, counsel requested no continuances following the Court's grant of a single motion to continue. There were several reasons competent counsel would have requested a continuance in this case. Specifically, Mr. Umaña's attorneys had not undertaken an adequate investigation into Mr. Umaña's life history; they learned new information that was critical to mitigation but did not have time to investigate and present; and on the eve of trial they received discovery that rebutted the Government's aggravating factors but that they did not have time to adequately review.

**A.     Although trial counsel had an incomplete and inaccurate life history of Mr.   Umaña, counsel failed to request an additional continuance of the *Atkins* hearing and trial.**

The trial was originally set for October 9, 2009. On September 22, 2009, following two prior denied motions to continue, trial counsel filed their third motion to continue, arguing that they were unprepared to effectively assist Mr. Umaña in both an Atkins v. Virginia, 536 U.S. 304, 321 (2002), claim, and at trial. ECF Doc. Nos. 571, 662, 689. In seeking the continuances for the *Atkins* hearing and trial, counsel advised the Court:

> Defendant's mitigation investigator has been unable, on his own, to locate and interview any of Defendant's immediate family members in order to arrange for adaptive behavior interviews and assessment by a mental retardation expert. Defendant's father, although interviewed by the mitigation investigator is, at this

259

point, reluctant to submit to further interviews regarding Defendant's adaptive behavior deficits or to travel to the United States for Defendant's trial.[58]

ECF Doc. No. 689 at 4. Counsel also noted they were "grossly unprepared to represent their client in the capital matter." *Id*. at 1. The Court found trial counsel's request to be *nonfrivolous* and set the pre-trial hearing on *Atkins* for November 30, 2009 and the trial date for April 12, 2010, with jury selection on March 22, 2010. Sept. 28, 2009 Status Hrg. at 11, 13-14, 19.

      i.   <u>The defense was inadequately prepared to present the *Atkins* claim at the time of the hearing.</u>

When the Court agreed to continue the date for the *Atkins* hearing by two months, trial counsel responded they would like additional time for the *Atkins* hearing because of the ongoing mitigation investigation in El Salvador but ultimately stated they could "live with" the date proposed by the Court. *Id*. at 13. As noted in the motion to continue, in order to establish that Mr. Umaña is intellectually disabled and ineligible for the death penalty:

> [C]ounsel must investigate to determine whether evidence exists showing that Defendant has significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. In order to properly assess Defendant's adaptive skills and their manifestation prior to age 18, Defendant's attorneys must have a mental retardation expert interview family, friends, coworkers, etc., to administer adaptive behavior deficit testing.

ECF Doc. No. 689 at 3. Before the motion was granted, counsel advised the Court they had not been able to find family members in order to conduct the adaptive behavior assessments. *Id*. at 4.

---

[58] Mr. Umaña incorporates by reference Claim VII wherein he pleads the Government violated his constitutional rights by failing to disclose mitigating evidencing and presenting false or misleading evidence.

260

By the time of the November 30 hearing, counsel remained in the same position as they were when they filed the motion for a continuance. Counsel had not yet interviewed any family member or any person who had knowledge of Mr. Umaña's daily life during his childhood other than the unreliable father. ECF Doc. No. 689 at 4. Counsel, however, did not make a request for continuance despite the fact that they did not have sufficient evidence from Mr. Umaña's childhood—evidence that is fundamental to a determination of intellectual disability. Experts must consider risk factors that may be a cause for the diagnosis such as poverty, lack of parental childbearing, neglect, abuse, alcohol and drug use during pregnancy, and trauma. Appx. 28 at ¶28. It is also important to gather anecdotal evidence of adaptive functioning through lay witness interviews to show the adaptive skills and their manifestation prior to age 18. *See Atkins*, 536 U.S. at 318. The burden was on the defense to prove that Mr. Umaña met the *Atkins* prongs of intellectual disability, yet counsel did not have the foundation to prepare the experts and present the claim to the Court.

There was no reason not to seek a continuance. The attorneys knew they needed more time for the *Atkins* hearing but believed that the Court would reject any additional motion for more time. Appx's 23, 24. The Court, however, had previously found the same set of circumstances to be a non-frivolous reason to grant a continuance. Moreover, counsel could have informed the Court of the current state of the investigation so that the Court would then have had all the relevant information before it (as well as preserved any denial for review). There was no reason for trial counsel to not make an additional request, especially when trial was not set to begin until months later.

261

ii. By trial, counsel remained inadequately prepared to present a mitigation case -- and learned new information that showed that their mitigation case was incomplete and inaccurate -- but continued to proceed with trial without further investigation.

Following the *Atkins* hearing, trial counsel failed to properly represent their capital client when they did not seek to continue the trial date set for April 12, 2010, with jury selection to begin on March 22, 2010. Little of significance had changed between the pre-trial hearing and the trial date. The defense team had yet to interview anyone who had knowledge of Mr. Umaña's daily life as a child, other than Mr. Umaña's undependable father, and no immediate family members had been interviewed.

The failure to request a continuance became more problematic after counsel became aware of additional information that confirmed that their mitigation case was incomplete and inaccurate yet counsel failed to investigate these issues because of lack of time. In March of 2010, prior to jury selection, the Government informed counsel that it interviewed Mr. Umaña's mother, Leticia Ramirez. Counsel had not interviewed Ms. Ramirez and knew only limited information about her from Mr. Umaña's father, Rafael. The mother gave information to the Government that was contrary to the thin life history counsel was able to develop through the father. Specifically, trial counsel learned the following from the Government: Mr. Umaña was not born in El Salvador but in Guatemala; the mother did not abandon Mr. Umaña as an infant, he was taken away from her; and Ms. Ramirez had tried to have contact with Mr. Umaña as much as possible. Appx. 74. The prosecutor also provided counsel with her own handwritten notes from the interview with the mother stating, in part, "[b]ecame involved w/ Mara over papers." Appx. 75. *See* Claim VI, VII, *supra*.

262

In an email, the prosecutor also provided the following summary of what the prosecutor remembered from the interview with Ms. Ramirez from more than a year prior:

> There is no 302 because it was not a long conversation. I did find my notes which I will send to you. There's not a lot there but she did say something that I didn't write down but which I recall. She said she and Umaña's dad separated shortly after Alejandro's birth and that *Umaña's dad took Alejandro with him*. She was upset about this and made efforts to see Alejandro as much as possible. She thinks his dad turned Alejandro against her. *She continued to keep up with him through family members* - someone mentioned a newspaper article about him to her. As I recall she visited he and his brother in jail when they were incarcerated. She *cried* at some point while we were speaking to her.

Appx. 74.

The new information put the attorneys on notice that critical facts about their client's childhood were inaccurate. Counsel also learned there may have been alternative reasons for Mr. Umaña to have joined a gang in the first place and that those were mitigating in nature. Although the prosecutor's notes were cryptic ("[b]ecame involved w/ Mara over papers"), counsel was on notice that the mother appeared to know information about this important point. Furthermore, even if Mr. Umaña's mother was not the person who raised him, counsel was now on notice she cared for him and she continued to keep up with his life through other family members.

Trial counsel states in a post-conviction declaration that he believed then and continues to believe that "speaking to the mother of a capital defendant is vital to a mitigation case." Appx. 23 at ¶7. Counsel knew the information that the mother could provide was important yet did not attempt to obtain time from the Court so that they could investigate. Although they did not believe the Court would continue the trial date again after it had done so once before, counsel did not explain to the Court what they had learned and why it was significant to their case. Appx's 23, 24.

263

Adequate representation required requesting a continuance of the trial. That is particularly true in this case where the mitigation case for Mr. Umaña was thin and inaccurate, and mitigation means the difference between a life and death sentence. *See Code v. Montgomery*, 799 F.2d 1481, 1485 (11th Cir. 1986) (finding counsel ineffective for failing to move for a continuance to interview and present an apparently available witness). Moreover, this new information went to the core of the death penalty case in that "the fundamental respect for humanity underlying the Eighth Amendment … requires consideration of the character and record of the individual offender … as a constitutionally *indispensable* part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (emphasis added). Counsel was required to request a continuance if the basis for not exploring Mr. Umaña's background and character was based on lack of time.

Mr. Umaña was prejudiced by trial counsel's failure to request a continuance. Had counsel requested and obtained a continuance of the trial, they would have been able to speak to Mr. Umaña's mother who would have provided them with important details about Mr. Umaña's life. Specifically, counsel would have learned about her traumatic pregnancy with Mr. Umaña which had serious implications for his own mental and physical health. They would have heard for the first time that the person on whom they had relied for all information had drugged, beaten and prostituted Mr. Umaña's mother. Appx.10. Furthermore, Ms. Ramirez would have also explained the significance of the prosecutor's note "[b]ecame involved w/ Mara over papers:"

> I believe my son Alejandro's problems were the papers. He had no form of identification and he could not get a job to survive. My son wanted to work but he needed a Salvadoran ID card called Documento Único de Identidad [Sole Identity Document (DUI for the Spanish initials)]. Once he turned 18, they required a form of identification in order for him to get work. For many years he did not have an ID

264

because he was born in Guatemala and we never registered him as a Salvadoran citizen. Years later, I tried to help my two sons, Alejandro and Saul, to obtain their Salvadoran documents and I went to Guatemala to get their birth certificates. In the end, I was unable to help them get their documents because of the many obstacles we had to go through, like obtaining declarations and paying fees. I knew it was very important to Alejandro to obtain proper documentation; I even offered to sell my sewing machine that I use to earn a living so I could help him.

Appx. 10 at ¶78. This would have helped give the jurors a mitigating context about Mr. Umaña's path to joining a gang – i.e., that his parents' actions had made finding employment difficult, and that he needed to survive.[59] His lack of identification closed off the avenues for Mr. Umaña that could have changed the trajectory of his life. But counsel never learned this and they were never able to present to the jury.

Counsel should have requested a continuance of the trial upon learning the additional information. Their decision not to request one was unreasonable and as stated in Claim I, II, III, *supra*, the failure of counsel to interview Ms. Ramirez and other family members to develop an adequate mitigation case.

**B.** **Trial counsel received significant amount of discovery immediately prior to trial. Because of a lack time, they were unable to review and use the discovery in preparation of trial, prejudicing Mr. Umaña.**

Counsel were also unprepared to effectively represent Mr. Umaña in defense of the non-statutory aggravators 4(a) and (b) relating to the Los Angeles murders. The Government alleged that Mr. Umaña was the shooter during two homicides in Los Angeles, California. Mr. Umaña

---

[59] The jury also should have learned about other aspects of Mr. Umaña's life that might have made his initial entry into a gang more comprehensible, such as the need for protection and an escape from the nightmare of his home life. Given how central the "gang" theme was to the Government's case, it was unreasonable for the defense not to have put it in context for the fact finders.

265

had never been tried for much less convicted of those crimes, he was never appointed counsel, and he did not receive any process in California. Thus, this was a case that required investigation from scratch. These murders occurred in July and September of 2005, three years before his federal indictment for the Greensboro shooting and almost five years before trial.

On the eve of trial, the Government produced voluminous discovery. The discovery productions by the Government did not come with an index of the documents included. Starting a month before jury selection and during trial, the Government produced over 20,000 pages of discovery. Thousands of those documents related to the Los Angeles unadjudicated murders, including statements made by witnesses to those murders. Because of the voluminous discovery received by counsel on the eve of trial, they were not able to adequately prepare their defense and missed reviewing clearly available information in the discovery. *See* Claim V, supra.

Had counsel requested and obtained a continuance of the trial based on the need for time to review additional discovery, counsel would have been able to utilize information that was clearly favorable to Mr. Umaña and that would rebut the Government's aggravators. Counsel's lack of preparation was evident and prejudiced Mr. Umaña as stated in Claim V, supra.

Had Mr. Umaña's counsel asked to continue the *Atkins* hearing and the trial date, and based their requests on reasonable explanations and supporting facts, there is a reasonable probability that they would have received the necessary time to prepare and the outcome of Mr. Umaña's case would have been different.

266

**XIV.** **TRIAL COUNSEL'S FAILURE TO OBJECT TO JURORS BEING EXCUSED FOR CAUSE BASED ON ANSWERS TO QUESTIONNAIRES, WITHOUT FURTHER QUESTIONING IN VOIR DIRE, VIOLATED MR. UMAÑA'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS.**



268

Case 3:16-cv-00057-MOC     Document 22     Filed 06/22/16     Page 303 of 418



269



270

Case 3:16-cv-00057-MOC   Document 22   Filed 06/22/16   Page 305 of 418



271



272



273



274

[redacted]

## XV.  MR. UMAÑA WAS DEPRIVED OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS A RESULT OF MISCONDUCT RELATED TO THE JURY.

[redacted]





Case 3:16-cv-00057-MOC    Document 22    Filed 06/22/16    Page 311 of 418



277



Case 3:16-cv-00057-MOC     Document 22     Filed 06/22/16     Page 313 of 418



279



Case 3:16-cv-00057-MOC     Document 22     Filed 06/22/16     Page 315 of 418



281



282





284



285



286

Case 3:16-cv-00057-MOC     Document 22     Filed 06/22/16     Page 321 of 418



287



288



289



290



291



292



293



294



295



296



297

[redacted]

## XVI. TRIAL COUNSEL'S OBJECTIVELY UNREASONABLE AND PREJUDICIAL ACTIONS DURING JURY SELECTION VIOLATED MR. UMAÑA'S RIGHTS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

[redacted]



299



300



301



302



303



304

## XVII.  TRIAL COUNSEL FAILED TO RAISE A TIMELY CHALLENGE TO THE COMPOSITION AND SELECTION OF THE GRAND AND PETIT JURY VENIRES IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

### A.  Trial Counsel's Failure to Raise a Timely Challenge to the Composition and Selection of the Grand and Petit Jury Venires Constituted Deficient Performance.

Trial counsel "has essentially an unqualified" right to inspect and copy the relevant jury lists in order to determine whether the venire was drawn in compliance with statutory and constitutional law. *Test v. United States*, 420 U.S. 28, 29-30 (1975). *See also* 28 U.S.C. § 1867(f); *United States v. Curry*, 993 F.2d 43, 44 (4th Cir. 1993) ("Under *Test*, Curry was entitled to inspect, reproduce, and copy the master jury list to support a motion for a new trial based upon a substantial failure to comply with the provisions of 28 U.S.C. §§ 1861-68 ('the Act') in selecting the grand or petit jury."). Investigating the records and procedures used for jury selection is a standard component of competent performance by defense counsel in a capital case:

> Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

ABA Guideline 10.10.2, reprinted at 31 Hofstra L. Rev. 1049.

But challenges to the venire are waived unless made prior to trial. *See United States v. Webster*, 639 F.2d 174, 180 (4th Cir. 1981) (declining to address an untimely challenge to the

305

composition of the jury wheel); 28 U.S.C. § 1867(a); Fed. R. Crim. P. 12(b)(3). Despite the broad access to jury lists and clear direction to pursue challenges to the selection of grand and petit venire, trial counsel made no effort to investigate and challenge the grand and petit jury selection process. The failure to request or examine the jury selection records and challenge the grand and petit jury selection process was objectively unreasonable. *See Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (finding ineffective assistance in failing to challenge grand and petit jury composition).

**B.**    **Trial counsel's failure to challenge the jury selection processes for the grand and petit juries prejudiced Mr. Umaña, because the under-representation of distinct groups violated his Fifth, Sixth, and Eighth Amendment rights.**

Had trial counsel timely raised a challenge to the grand and petit jury venires, Mr. Umaña could have established that his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution were violated by the process which brought about his indictment and conviction. The Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury." Courts have interpreted this language to require that the panels from which petit juries are selected be drawn from a "fair cross section" of the community in which the proceedings are held. *See, e.g.*, *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). In jurisdictions where a grand jury system is employed, the fair cross section requirement applies to that process as well. *See Castaneda v. Partida*, 430 U.S. 480, 509-10 (1977) (Powell, J. dissenting); *Alexander v. Louisiana*, 405 U.S. 625, 635-637 (1972) (Douglas, J. concurring). A prima facie violation of the fair cross section requirement exists when:

> [T]he group alleged to be excluded is a "distinctive" group in the community; …
> the representation of this group in venires from which juries are selected is not
> fair and reasonable in relation to the number of such persons in the community;

<div align="center">306</div>

and … this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).

In addition to the Sixth Amendment fair cross section requirement, the equal protection clause of the Fifth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results. *Castaneda*, 430 U.S. at 493-94. Proving a prima facie showing of discrimination under the equal protection clause is similar to the fair cross section inquiry. A claimant must show "the procedure employed resulted in substantial underrepresentation of his race or identifiable group" by demonstrating: 1) the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; 2) the group was underrepresented in the grand jury process over a significant period of time; and 3) the selection procedure "is susceptible of abuse or is not racially neutral." *Id*. at 494.

Mr. Umaña has reviewed the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Western District of North Carolina 2007-2009,[73] the general population and voter registration demographics for the relevant counties, and data compiled from the Juror Qualification Questionnaires released to appellate counsel. Mr. Umaña

---

[73] Mr. Umaña believes this plan controlled the selection of his grand jury. Mr. Umaña attempted to obtain a copy of the subsequent plan (which depending on the effective date may have controlled the selection of his petit jury), but a representative at the Clerk's Office of the Western District of North Carolina, Charlotte Division, informed him that release of such plan would require a court order.

307

alleges based on information and belief that there is an underrepresentation of distinct groups, including but not limited to African-Americans, Hispanics/Latinos, and Asians in the grand and petit venires.[74] Mr. Umaña further alleges that the underrepresentation of these groups violates the Fifth, Sixth, and Eighth Amendments because the underrepresentation was not fair and reasonable, was systematic exclusion, was the result of different treatment, occurred for a significant period of time and the selection procedure was susceptible to abuse or was not racially neutral.[75]

## XVIII.  THE PROSECUTION ENGAGED IN RACIAL DISCRIMINATION IN ITS EXERCISE OF PEREMPTORY STRIKES, AND TRIAL COUNSEL UNREASONABLY FAILED TO ADEQUATELY OBJECT TO THESE UNCONSTITUTIONAL STRIKES.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Of the qualified venire members from which the jury was selected, the prosecution used peremptory strikes to remove 66 percent of the African-Americans (8 out of 12) who could have served. This discriminatory use of peremptory strikes violated the Equal Protection Clause of the Fifth Amendment. Trial counsel objected to the Government's persistent elimination of African-Americans, citing to *Batson v. Kentucky*, 476 U.S. 79 (1986). The Court required the Government to explain the basis of its strikes. But once the Court concluded that the Government

---

[74] Mr. Umaña attempted to obtain the representativeness statistics contained in the Form AO-12 reports for the relevant time periods, but the clerk has not responded.

[75] Although these allegations are general by necessity, Mr. Umaña will move for various jury selection documents and statutorily required collection of data in a discovery motion to support his claim at an appropriately scheduled evidentiary hearing.

308

had produced facially race-neutral reasons, trial counsel pressed the matter no further. Trial counsel's failure to claim that the Government's reasons were pretext for purposeful discrimination or make any other attempt to prove intentional discrimination violated Mr. Umaña's Sixth Amendment right to effective assistance of counsel.

**A.**     **Trial counsel failed to argue that the Government engaged in purposeful discrimination.**

The "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008) (internal quotation marks omitted). In *Batson*, the Supreme Court provided a three-step process for determining when a strike is discriminatory:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder*, 552 U.S., at 476–477 (internal quotation marks and brackets omitted). As to the third step, a "movant may show purposeful discrimination by demonstrating that the opposing party's explanation is mere pretext for racial discrimination." *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1026 (4th Cir. 1998). But the Fourth Circuit holds that the "failure to argue pretext constitutes a waiver of his initial [*Batson*] objection."   *Id.* at 1027. *See also United States v. David*, 83 F.3d 638, 641 n.5 (4th Cir. 1996) ("The important distinction between forfeiture and waiver is that if a defendant waives a right (which is waivable), he cannot later raise an objection on the grounds that the failure to provide him with the waived right is error.").

309

Trial counsel made a *Batson* objection every time the Government used a peremptory strike to dismiss an African-American. *See* VDT at 1505-32. Upon objection, the Court asked the Government to explain its reasons for the strike. *Id*. After hearing the reasons, the Court made a finding such as, "I have listened to the proffered explanations for each of the Government's challenged strikes, and find as to each of them that there is a race neutral explanation for the challenge." VDT at 1515.    Although defense counsel at times contested the factual accuracy of the Government's reasons, they never claimed that the reasons given were pretext for purposeful discrimination, asked the Court to engage in a comparative analysis of jurors, claimed the Government in general, and this prosecutor in particular, had a pattern of race-based strikes or made any other suggestion that further inquiry was necessary. *See* VDT at 1505-32. As such, trial counsel unreasonably waived the *Batson* objections.

**B.**     **Mr. Umaña suffered prejudice.**

The Fourth Circuit recognizes that "the prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc majority). And intentional discrimination in the exercise of peremptory strikes is structural. *See Batson*, 476 U.S. at 100; *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *Williams v. Woodford*, 396 F.4d 1059, 1069-70 (9th Cir. 2005) ("A *Batson* violation is structural error for which prejudice is generally presumed"); *Tankleff v. Senkowski*, 2135 F.3d 235, 248 (2d Cir. 1998) ("Because the effects of racial discrimination during voir dire 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review."). Thus, prejudice should be presumed.

310

But even assuming a showing of prejudice is required, a comparative analysis demonstrates that the Government engaged in purposeful discrimination. For each challenged juror, while individual reasons varied, the Government's common theme was that the juror had expressed some type uncertainty about being able to impose the death penalty, favored life imprisonment over the death penalty, and/or a belief that the death penalty should have a higher burden of proof or be reserved for only exceptional circumstances such as a serial killer. *See* VDT at 1505-32. But white and other non-African-American jurors, not struck by the Government, expressed similar uncertainty. For example Juror 202, a white male, said he only believed "in the death penalty in certain cases," VDT 869, offered the example of the murder of a "law enforcement" officer, VDT at 870, and announced "I wouldn't say that I'm an advocate for the death penalty." VDT at 869.

Moreover, "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Snyder*, 552 U.S. at 478. Other circumstances (which trial counsel failed to explore), such as Government counsel's history of discrimination, jury selection preparation, in-court note taking and *Batson* related training, provide additional support of purposeful discrimination. Thus, Mr. Umaña was deprived of his Fifth and Sixth Amendment rights.

311

## XIX. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY NOT INVESTIGATING AND INTRODUCING AVAILABLE MENTAL HEALTH EVIDENCE TO CONTEST THE ADMISSIBLITY AND CREDIBILITY OF MR. UMAÑA'S STATEMENTS TO LAW ENFORCEMENT OFFICERS IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

On April 23, 2008, Los Angeles police detectives interrogated Mr. Umaña while he was jailed on the Greensboro shootings. Mr. Umaña made incriminating statements which, at a minimum, placed him at the scene of each of the Los Angeles murders. Trial counsel's failure to secure and present expert assistance to challenge the admissibility of these statements pre-trial and to contest the credibility these statements during trial was objectively unreasonable and prejudiced Mr. Umaña.

On April 24, 2009, trial counsel filed a motion to suppress these statements claiming that Mr. Umaña did not knowingly and voluntarily waive his *Miranda* rights, and that the "use of promises and trickery" rendered the statements involuntary. ECF Doc. No. 491 at 3. These arguments were based primarily on the detectives repeatedly promising Mr. Umaña that his statements would not "affect" his pending North Carolina state case, and any statement would not "cost" him anything. In support of the motion trial counsel did not submit any evidence, but quoted from a translated transcript of the interrogation.

On August 26, 2009, the Court held an evidentiary hearing on the suppression motion. The Government called Detective Frank Flores and introduced the entire transcript of the interrogation. August 26, 2009, Motion Hearing, at 46, 71. Flores admitted making comments that Mr. Umaña had "nothing to lose by talking" about the Los Angeles murders, but asserted a

312

belief that Mr. Umaña understood his *Miranda* rights. *Id*. at 65-66. Trial counsel did not call any witnesses and did not introduce any exhibits relating to the *Miranda* and voluntariness motions. *Id*. at 73.

The Court denied the motion to suppress, but not without hesitation. The Court commented, that the detectives "do appear to have misrepresented to [Mr. Umaña], certain investigative facts that may have impacted his statements to them." *Id*. at 80. The Court also indicated that the totality of the circumstances "gives me more pause," *id*. at 101, and noted several factors "that tend towards showing some degree of coerciveness." *Id*. at 102. But ultimately, the Court did "not find a violation of the *Miranda* rights," and "the defendant's will was not overborne [and] his capacity for self-determination was not critically impaired." *Id*. at 102-03.

Appellate counsel raised this issue on appeal, but the Fourth Circuit denied it, agreeing with the Court's finding of no *Miranda* violation, and holding that the statements were voluntarily made "[c]onsidering the entirety of the interrogation." *United States v. Umaña*, 750 F.3d 320, 344-45 (4th Cir. 2014).

At the motion hearing, however, trial counsel failed to present all the relevant, and available, information to show that Mr. Umaña's statement were not voluntary and he did not validly waive his *Miranda* rights. Just days before the motion

313

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■ Despite counsel's familiarity with Mr. Umaña's intellectual deficits, trial counsel failed to present any evidence of them at the motion hearing. Significantly, two defense experts later testified at the *Atkins* hearing (on cross-examination by the Government) that Mr. Umaña probably did not understand his *Miranda* rights. *See* Atkins Hrg. at 83 (Dr. Olley stating "I think he probably did not understand his *Miranda* rights"); *id*. at 195 (Dr. Weinstein stating "I expressed my concern to them over the fact that he probably did not understand his Miranda rights"). Trial counsel's failure to produce evidence of intellectual deficits to explain how those deficits interfered with Mr. Umaña ability to knowingly and intelligently waive his *Miranda* rights and to voluntarily make a statement was objectively unreasonable.[76] Had trial counsel provided the Court with the readily available evidence of Mr. Umaña's intellectual disability and mental impairments – *see* Claim III, IV -- there is a reasonably probability that Mr. Umaña's statements would have been suppressed.

Moreover, trial counsel unreasonably failed to use expert testimony to question the

---

[76] Counsel's deficient performance includes failing to request a continuance of the motion hearing to present such evidence and failing ask for reconsideration once the Government elicited evidence contradicting the Court's earlier ruling.

314

reliability of the statements during trial. *See Crane v. Kentucky*, 476 U.S. 683, 688 (1986) ("because questions of credibility, whether of a witness or of a confession, are for the jury, the requirement that the court make a pretrial voluntariness determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial") (quotations omitted). The failure of trial counsel to present evidence of Mr. Umaña's intellectual deficits to give context to the statements was prejudicial because not only did the Government claim that the statements supported Mr. Umaña's participation in the Los Angeles murders, but they also used them to rebut mitigating factors, such as lack of education and brain damage. For example the Government argued:

> And you heard a little about the defendant's statements to law enforcement in April of '08. If you get a chance to look at that, look at the cat and mouse game he played. The brain damaged guy over there, he played an awesome cat and mouse game with the investigators. Yeah, I was there. Pulled it out of my pants. I don't know. I shot it. Read it.
>
> Just like the codes, just like the letters. This isn't some brain damaged individual over here. He's cold, he's calculating, and he's very savvy. And I think you saw it in his letters. He's very, very savvy.

PPT at 896-97.

But trial counsel had evidence to directly rebut the Government's arguments and did not use it. When questioned by the Government at the *Atkins* hearing Dr. Olley expressly stated that he "would not characterize" the interview as a "cat and mouse between the defendant and the investigators." Atkins Hrg. at 83. Instead, Dr. Olley offered his opinion that the transcript of the interrogation showed Mr. Umaña to be "extraordinarily unsophisticated," and "he was quite inarticulate and naïve." *Id*. at 83-84. Thus, had the jury been presented with Dr. Olley's testimony or other readily available expert testimony about Mr. Umaña's intellectual deficits and

315

mental impairments, there is a reasonable probability that at least one juror would have struck a different balance and that the outcome of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

## XX.  MR. UMAÑA WAS DEPRIVED THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS AND A FAIR TRIAL BY THE DENIAL OF HIS RIGHT TO BE PRESENT AT EVERY STAGE OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

A person charged with a felony has a fundamental right to be present at every stage of the trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970). This includes the right to be present during the jury selection process. *Diaz v. United States*, 223 U.S. 442, 455 (1912). The right of presence derives from the Confrontation Clause of the Sixth Amendment and the Due Process Clauses of the Fifth and Fourteenth Amendments. *United States v. Gagnon*, 470 U.S. 522, 526 (1985).

### A.  Mr. Umaña was denied the right to be present and the right to effective assistance of counsel during the jury selection process, in violation of the Fifth, Sixth, and Eighth Amendments.

More than a year after jury selection, the Court revealed that it excused fifty-four jurors for cause outside of Mr. Umaña's presence. Mr. Umaña's personal absence from the dismissal of these jurors was complete. Mr. Umaña was never informed about the contents of the Juror Questionnaires – only the attorneys were permitted to see them. *See* ECF Doc. No. 672 at 1 ("The attorneys are under orders to maintain the confidentiality of any information they learn in the course of reviewing these questionnaires."); VDT at 19-20 ("only the Court and the attorneys for both sides will have seen your answers."). Moreover, although the Court stated that "the

316

obvious 'for cause' jury challenges ... need to be discussed at a final pretrial conference," August 26, 2009, Motion Hearing, at 119, such a hearing was never held.

An accused's absence during jury selection denies "the defendant an opportunity to 'give advice or suggestions to his lawyer concerning potential jurors.'" *United States v. Rolle*, 204 F.3d 133, 136 (4th Cir. 2000) (quoting *United States v. Camacho*, 955 F.2d 950, 953 (4th Cir.1992) (citation omitted)). In fact, "a defendant's presence at voir dire is of utmost importance." *Id*.

> [T]he defendant has unique knowledge which is important at all stages of the trial, including voir dire. At the voir dire he may, for example, identify prospective jurors that he knows. He may also have knowledge of facts about himself or the alleged crime which may not have seemed relevant to him in the tranquility of his lawyer's office, and thus may not have been disclosed, but which may become important as the individual prejudices or inclinations of the jurors are revealed. He may also be a member of the community in which he will be tried and might be sensitive to particular local prejudices his lawyer does not know about.

*Camacho*, 955 F.2d at 956 (quotations omitted). Thus, "[a] defendant's absence during the impaneling of the jury certainly frustrates the fairness of the trial." *Id.* at 953. *See Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) ("pre-screening of prospective jurors is a material stage of trial at which the defendant has a constitutional right to be present."); *Gomez v. United States*, 490 U.S. 858, 873 (1989) ("'the trial commences at least from the time when the work of empanelling the jury begins.'") (quoting *Lewis v. United States*, 146 U.S. 370, 374 (1892) and *Hopt v. Utah*, 110 U.S. 574, 578 (1884)); *see also* FED. R. CRIM. P. 43(a) (providing the right to "be present ... at every stage of the trial, including the impaneling of the jury").

317

i.    Mr. Umaña's right to be present during jury selection was violated.

The use of juror questionnaires and the removal of jurors for cause based solely on the questionnaires violated Mr. Umaña's right to be present in two ways. First, Mr. Umaña was totally absent from the pre-voir dire removal of jurors. He did not know the contents of the questionnaires, he was not consulted about the proposed challenges, and the Court excused the prospective jurors without a hearing or any other notification. Thus, Mr. Umaña had no "opportunity to 'give advice or suggestions to his lawyer concerning potential jurors.'" *Rolle*, 204 F.3d at 136 (quoting *Camacho*, 955 F.2d at 953).

Second, Mr. Umaña's right to be present was violated by the Court's order for the attorneys "to maintain the confidentiality of any information they learn in the course of reviewing these questionnaires." ECF Doc. No. 672 at 1. The 23-page questionnaires, however, contained a wealth of important information as to the potential biases of the prospective jurors that were rarely mentioned during voir dire. Because the trial attorneys could not and did not share the questionnaire information with Mr. Umaña, this process again denied the "opportunity to 'give advice or suggestions to his lawyer concerning potential jurors.'" *Rolle*, 204 F.3d at 136 (quotations omitted).

ii.    The denial of this right was prejudicial.

Mr. Umaña's complete exclusion from voir dire prejudiced him. Fifty-four prospective jurors were excused, and all jurors were selected, outside of Mr. Umaña's presence. Considering that this was a capital trial, the denial of Mr. Umaña's right to be present during jury selection cannot be deemed harmless. Unlike a non-capital trial, the jurors who sat on Mr. Umaña's case would make a determination not only as to his guilt, but also as to whether he would live or die

318

as part of their legally binding sentence. As such, it was critical that Mr. Umaña participate during jury selection so that he could make informed decisions with his counsel about who would be sitting on the jury that would literally determine whether he lived or died. The violation of this fundamental right warrants a new trial. *See Hopt*, 110 U.S. at 577 ("the action of the court in permitting the trial in his absence of these challenges of jurors was so irregular as to vitiate all the subsequent proceedings"); *United States v. Gay*, 522 F.2d 429, 435 (6th Cir. 1975) ("the total absence of a record of the proceedings in which the changes in the makeup of the jury occurred requires us to assume prejudice").

      iii.    <u>Mr. Umaña's trial counsel was ineffective.</u>

*To the extent that trial counsel agreed to, misunderstood, or failed to object to the procedures that caused Mr. Umaña not to be present during the jury selection process, counsel's conduct was objectively unreasonable and prejudicial.*

**B.**    **Mr. Umaña was denied his right to presence and right to effective assistance of counsel throughout the proceedings because he was not provided with an effective mechanism to participate in his capital trial, to communicate with trial counsel, and to assist in his defense, in violation of the Fifth, Sixth and Eighth Amendments.**

Mr. Umaña was denied the right to presence and effective assistance of counsel for a second reason. Due to language barriers and intellectual disability, Mr. Umaña was effectively prevented from participating in his trial and communicating with and assisting in his defense. This, too, prejudiced the outcome of his case.

Born in Guatemala and raised in El Salvador, Mr. Umaña speaks only Spanish. The Spanish language has different dialects. As the Government language expert testified, "it's very helpful to know those differences in dialects." GPT at 608. While "Hondurans and Salvadorans

<div align="center">319</div>

have very similar dialect," "a Mexican will sound quite different." *Id*. Because Mr. Umaña has a Central American dialect, with an El Salvadoran subdialect, the Government used an "an expert in language in the Central American dialect" to interpret his recordings and writings. GPT at 572. This expert testified that Mr. Umaña had a poor vocabulary and his "own speak [and] idiolect." GPT at 605. Mr. Umaña is also uneducated and unfamiliar with the American legal system.

Additionally, Mr. Umaña suffers from brain damage and has deficits in intellectual functioning. He has frequent and severe migraine headaches as shown at his *Atkins* hearing, when he began throwing up during a fifteen-minute break. Atkins Hrg. at 285. Trial counsel explained that the "migraines" were "painful," "customary," and "[i]t's pretty normal for him to throw up quite a bit." *Id*.[77]

Because neither of Mr. Umaña's trial counsel spoke Spanish, Mr. Umaña had no way of directly communicating with anyone on his legal team during court proceedings. Nor was an interpreter provided for this purpose. While interpreters were generally present in the courtroom, their role was primarily focused on interpreting the testimony of witnesses, arguments of counsel, and pronouncements by the Court. The record does not show that any measures were taken to ensure that Mr. Umaña could communicate with counsel while the proceedings were taking place. And nothing indicates that Mr. Umaña could hear and understand the courtroom interpreter.

---

[77] At the *Atkins* hearing, although trial counsel represented that "[Mr.Umaña] feels okay, and is ready to keep going," the Court did not address Mr. Umaña personally to determine the accuracy of counsel's representations. Atkins Hrg. at 285.

"If the right to be present is to have meaning," it is "imperative that every criminal defendant . . . possess 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *U. S. ex rel. Negron v. State of N. Y.*, 434 F.2d 386, 389 (2d Cir. 1970) (quoting *Dusky v. United States*, 362 U.S. 402 (1962) (*per curiam*)). Here, Mr. Umaña's inability to communicate with counsel with a rational degree of understanding means that he was effectively prevented from participating in his own defense, in violation of the Fifth, Sixth and Eighth Amendments.

Moreover, to the extent that trial counsel agreed to or failed to object to the procedures that denied Mr. Umaña the ability to understand and participate in—and thus be present during— trial proceedings, counsel's conduct was objectively unreasonable and prejudicial.

## XXI. THE OVERWELMING NUMBER OF SECURITY MEASURES DEPRIVED MR. UMAÑA OF A FAIR TRIAL AND SENTENCING, AND AN IMPARTIAL JURY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Mr. Umaña alleges that the security measures within and outside the courtroom influenced the verdict in his trial. These measures include, but are not limited to, treating the jurors as anonymous, the leg shackling of Mr. Umaña during trial, VDT at 13 ███████ ████████████████████████████████████████████ ████████████████████████████████████ and the extra-ordinary security protocols, including an unusually large law enforcement presence in the courtroom, courthouse, and surrounding areas.

A basic principle defining the right to a fair trial is that a criminal defendant is entitled to a verdict based only upon the evidence introduced at trial. *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986); *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that the verdict must be based upon the evidence developed at trial "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies"). To ensure that right, courts must guard against "intrusion of factors into the trial process that tend to subvert its purpose." *Estes v. Texas*, 381 U.S. 532, 560 (1965). Specifically, courts should prevent "the atmosphere in and around the courtroom [becoming] so hostile as to interfere with the trial process, even though ... all the forms of trial conformed to the requirements of law." *Id.* at 561; *see also Woods v. Dugger*, 923 F.2d 1454, 1456-57 (11th Cir. 1991).

Based on the charges and his conduct, Mr. Umaña understands some precautions were necessary. But the measures taken were excessive and not enough was done to minimize the hostile atmosphere they created. For example, unlike other cases involving treating jurors as anonymous, the jury never received a non-prejudicial reason for empaneling an anonymous jury. *Accord United States v. Dinkins*, 691 F.3d 358, 378 (4th Cir.2012) ("[T]o protect a defendant tried by an anonymous jury from having the jury conclude that the defendant is a dangerous person from whom the jurors must be protected, courts customarily provide the jury a non-prejudicial reason for their anonymity"); *United States v. Hager*, 721 F.3d 167, 188 (4th Cir. 2013) ("the district court told the panel that the reason they were identifying them by numbers in court, as opposed to by name, was 'to protect [them] from contact in the media or other persons, curiosity seekers and the like, to protect [them] from unwanted publicity and to insure that no

322

outside information [was] communicated to [them] through th[e] process and the trial.'"). As such, the jury was left to assume that the reason for anonymity was for its own safety.

Further, the prosecutor improperly exploited the added security measures by arguing: "But they say he did it to fight off rivals. Over here at the federal courthouse. There were a lot of rivals in the courthouse. You know who the rivals were? They're the marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival." PPT at 898-99. Combined with the extraordinary security measures, this argument would have left jurors feeling that Mr. Umaña represented a danger to them, and that their safety was at risk. Thus, Mr. Umaña alleges that because of the hostile atmosphere that pervaded the trial in his case, jurors and some witnesses alike were affected. Mr. Umaña alleges that he can demonstrate both actual and inherent prejudice based on the totality of circumstances in his case, and that he is entitled to postconviction relief. Moreover, to the extent trial counsel agreed to or failed to object to circumstances that created the hostile atmosphere, counsel's conduct was objectively unreasonable and prejudiced Mr. Umaña.

## XXII. MR. UMAÑA'S SENTENCE OF DEATH MUST BE VACATED BECAUSE HIS CONVICTIONS FOR USE AND POSSESSION OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE RESULTING IN DEATH ARE VOID IN LIGHT OF THE SUPREME COURT'S RETROACTIVE DECISION IN *JOHNSON*.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

In Counts 23 and 25 Mr. Umaña was sentenced to death pursuant to 18 U.S.C. § 924(c) & (j). This provision authorizes imposition of a death sentence if an individual commits a murder with a firearm in the course of committing a "crime of violence" as defined by 18 U.S.C. §

323

924(c)(3). Counts 23 and 25 relied on the offenses of conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962 as charged in Count 1, and murder in aid of racketeering in violation of 18 U.S.C. § 1959 as charged in Count 22, as constituting "crimes of violence." But the recent, and retroactive, Supreme Court case of *Johnson v. United States*, 135 S.Ct. 2551 (2015), has changed the way "crime of violence" is defined in such a manner that neither of these offenses now qualifies as a "crime of violence."   As such, Mr. Umaña's convictions on Counts 23 and 25 are void, and his death sentences on all counts must be vacated.

Moreover, the verdict form and instructions called for a general verdict as to the "crime of violence." Each § 924(c) & (j) count provided: "As to [the specific count], charging the defendant with use of a firearm in relation to crime of violence resulting in the death of [victim], in violation of 18 U.S.C. § 924(c) & 924(j)(1), we, the jury, unanimously find the defendant" guilty or not guilty. *See* ECF Doc. No. 1043 at 2. The instructions similarly did not ask the jury to state the alleged "crime of violence" that had been committed. *See* GPT at 1250 (stating "[y]ou must be unanimous in your verdict as to which crime of violence, if either, that the defendant used a firearm during and in relation to," but not requiring the jury to state during which offense a firearm was used); GPT at 1219-20 ("where the indictment uses the word 'and,' you may consider it as 'or'"). Thus, if either conspiracy to participate in racketeering or murder in aid of racketeering no longer survive the constitutionally vague problems of *Johnson*, all of Mr. Umaña's death sentences must be vacated.   *See Griffin v. United States*, 502 U.S. 46, 53 (1992) (concluding that the "language" and "holding" of *Stromberg v. California*, 283 U.S. 359, 368 (1931) stands for the principle that, "where a provision of the Constitution forbids

324

conviction on a particular ground, the constitutional guarantee is violated by a general verdict

that may have rested on that ground").

**A.** **In light of *Johnson*, Mr. Umaña's convictions under 18 U.S.C. § 924(c) cannot be sustained because racketeering conspiracy and murder in aid of racketeering fail to qualify as "crimes of violence"[78]**

Mr. Umaña's § 924(c) convictions for using a firearm in relation to a "crime of violence"

are void because the "crime of violence" element cannot be satisfied here. The alleged offenses

of racketeering conspiracy and murder in aid of racketeering do not qualify as "crimes of

violence" as a matter of law.

Under § 924(c)(3), "crime of violence" is defined as follows:

(3)     For purposes of this subsection, the term "crime of violence" means an
offense that is a felony and –
(A)     has an element the use, attempted use, or threatened use of
physical force against the person or property of another, or
(B)     that by its nature, involves a substantial risk that physical force
against the person or property of another may be used in the course of
committing the offense.

18 U.S.C. § 924(c)(3). The first clause – § 924(c)(3)(A) – is commonly referred to as the force

clause.   The other – § 924(c)(3)(B) – is commonly referred to as the residual clause. *See United*

*States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015).

The determination of whether an offense qualifies as a "crime of violence" under §

924(c)(3) "does not consider the 'particular facts disclosed by the record of conviction.'" *Id*.

---

[78] In order to sustain a conviction and its accompanying death sentence under 18 U.S.C. § 924(j),
one must first have been convicted for using a firearm in relation to a crime of violence under 18
U.S.C. § 924(c). Thus, if Mr. Umaña could not have been found guilty under 924(c), his sentence
under 924(j) must fail, as well.

325

(quoting *James v. United States*, 550 U.S. 192, 202 (2007)). Instead, the § 924(c)(3) crime of violence determination employs the "categorical" or "modified categorical" approach depending on the applicable alleged statute. *Id. See also United States v. McNeal*, ___ F.3d ___, 2016 WL 1178823, at *8 (4th Cir. Mar. 28, 2016) ("In determining whether an offense is a crime of violence under either clause [of § 924(c)(3)], we utilize the categorical approach, which focuses solely on the elements of the offense, rather than on the facts of the case."); *United States v. Naughton*, 621 Fed. Appx. 170, 177-78 (4th Cir. Sept. 2, 2015) (the § 924(c)(3) inquiry "does not permit our review of the conduct underlying Naughton's conviction, but allows us to consider only 'the statutory definition of the [] crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a "crime of violence"'") (quoting *United States v. Royal*, 731 F.3d 333, 341-42 (4th Cir. 2013)).

This approach requires that courts "look only to the statutory definitions—i.e., the elements—of a defendant's [offense] and not to the particular facts underlying [the offense]" in determining whether the offense qualifies as a "crime of violence." *Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013). In addition, under the categorical approach, an offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute—"including the most innocent conduct"—matches or is narrower than the "crime of violence" definition. *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012). If the most innocent conduct penalized by a statute does not constitute a "crime of violence," then the statute categorically fails to qualify as a "crime of violence."

Moreover, not just any application or threat of physical force will do. The offense must

326

"contain an element that there be the intentional employment of physical force against a person or thing." *Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006) (interpreting identical language in 18 U.S.C. § 16). And "physical force" means violent force – that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

As discussed in the next sections, racketeering conspiracy and murder in aid of racketeering fail to qualify as "crimes of violence" under the applicable categorical or modified categorical approach. Neither offense can qualify under the residual clause because it is void for vagueness under the most recent *Johnson* decision. In *Johnson*, the Supreme Court struck down the Armed Career Criminal Act's (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) as unconstitutionally vague. 135 S. Ct. at 2557. Under *Johnson*, § 924(c)'s materially indistinguishable residual clause (§ 924(c)(3)(B)) must similarly be stricken as unconstitutional. Likewise, each alleged offense categorically fails to qualify as a "crime of violence" under the remaining force clause of § 924(c)(3)(A), because neither has an element requiring the intentional use, attempted use, or threatened use of violent physical force. Therefore, a conviction cannot be constitutionally sustained under § 924(c) for Counts 23 and 25.

     i.     <u>Section 924(c)'s residual clause is unconstitutionally vague.</u>

In *Johnson*, the Supreme Court decided that the ACCA's residual clause ("otherwise involves conduct that presents a serious potential risk of physical injury to another") is unconstitutionally vague. The decision equally applies to the parallel "crime of violence" definition in § 924(c)(3)'s residual clause, because § 924(c)(3)(B) suffers from the same two flaws that compelled the Supreme Court to declare the ACCA residual clause void for

<div align="center">327</div>

vagueness. Using § 924(c)(3)(B) to categorize a predicate conviction as a "crime of violence," therefore, violates due process.

Indeed, the Ninth Circuit in *Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015), and the Seventh Circuit in *United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015), have already struck down an identical residual clause – 18 U.S.C. § 16(b) – as unconstitutionally vague in light of *Johnson*.[79] The rationale of *Dimaya*, *Vivas-Ceja*, and *Gonzalez-Longoria* applies equally to the determination of whether an offense qualifies as a "crime of violence" under 18 U.S.C. § 924(c). Relying on the same reasoning of *Dimaya* and *Vivas-Ceja*, two district courts recently found that the § 924(c) residual clause was void for vagueness. *See United States v. Lattanaphom*, ___ F.Supp.3d___, 2016 WL 393545 (E.D. Cal. 2016); *United States v. Edmundson*, ___ F.Supp.3d___, 2015 WL 9311983 (D. Md. Dec. 30, 2015). This Court should do the same.

ii.    *Johnson* expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a "crime of violence."

In *Johnson*, the Supreme Court "began its analysis of the vagueness question by noting that the [ACCA] residual clause mandates the use of a two-step framework [under the categorical approach], to determine whether a crime is a violent felony." *Vivas-Ceja*, 808 F.3d at 721 (citing *Johnson*, 135 S. Ct. at 2557, 2562). "In the first step, the court must determine 'the kind of conduct that the crime involves in the ordinary case' as opposed to the facts on the ground in the defendant's prior case." *Id*. (quoting *Johnson*, 135 S. Ct. at 2557). The second step is also

___

[79]So did the Fifth Circuit in *United States v. Gonzalez-Longoria,* 813 F.3d 225, 235 (5th Cir. 2016), but the case is now pending rehearing en banc. *See United States v. Gonzalez-Longoria*, 815 F.3d 189 (2016).

328

dependent on the ordinary case. Specifically, the "court must gauge whether that ordinary case of the crime presents a serious potential risk of physical injury." *Id*.

The Supreme Court held that these "two features of the residual clause conspire to make it unconstitutionally vague." *Johnson*, 135 S. Ct. at 2557. To begin with, the Court held that it is impossible for a sentencing court to even get past the first step because there is too much uncertainty about what constitutes the ordinary case of a crime. *Id*. The Court concluded that the "the residual clause offers no reliable way to choose between [] competing accounts of what 'ordinary' . . . involves." *Id*. at 2558. Specifically, the Court explained that a statistical analysis of reported cases, expert evidence, Google, and gut instinct are all equally unreliable in determining the "ordinary case." *Id*. at 2557.

The Court then held that the second step of the residual clause is equally flawed because there is too much "'uncertainty about how much risk it takes' [i.e., the quantum of risk] before a court can conclude that the 'ordinary case' of a crime is serious enough to be a violent felony." *Vivas-Ceja*, 808 F.3d at 722 (citing *Johnson*, 135 S. Ct. at 2558). To be clear, the Court's reasoning on the second step did not turn on the type of risk, i.e. "serious potential risk of physical injury." Rather, like the first step, it also turned on the doomed "ordinary case" inquiry: "It is one thing to apply an imprecise 'serious potential risk' standard to real-word facts; it is quite another to apply it to a judge-imagined [ordinary case] abstraction." *Johnson*, 135 S. Ct. at 2558. With these words, the Court conveyed that the constitutionality of the ACCA residual clause would not have been in question if the statute had required the jury to determine the risk based on the individual facts in the case. *Id*. The Court explained that it was not doubting the constitutionality of any statute which "require[s] gauging the riskiness of conduct in which an

329

individual defendant engages on a particular occasion." *Johnson*, at 2561 (emphasis added).

However, because under the ACCA residual clause, the quantum of risk had to be assessed based

on the ordinary case, the clause was constitutionally doomed. The Court held that such

indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary" case analysis is more

than the "Due Process Clause tolerates." *Id*. at 2558.

Thus, *Johnson* not only invalidated the ACCA residual clause, but it invalidated the

"ordinary case" analysis and statutory provisions that compel such an analytical framework. In

other words, the only way to apply the residual clause is to use the "ordinary case" analysis, and

the "ordinary case" analysis is impossible to apply in a constitutional manner.

      iii.     *Johnson* means that § 924(c)(3)(B) is unconstitutionally vague.

The statutory phrase at issue in this case is essentially the same as the ACCA residual

clause.[80] To be sure, 18 U.S.C. § 924(e)(2)(B)(ii) and 18 U.S.C. § 924(c)(3)(B) are not

identical.[81] But the differences have no impact on the constitutional analysis. Although the risk

---

[80] Courts regularly compare the similarities between the residual clause in the ACCA to the clause at issue here. Although the comparison tends to specifically address 18 U.S.C. § 16(b), that statute is identical to § 924(c)(3)(B). *See, e.g., Chambers v. United States*, 555 U.S. 122, 133 n.2 (2009) (citing circuit splits on § 16(b) in the context of a residual clause case because § 16(b) "closely resembles ACCA's residual clause") (Alito, J., concurring). *See also United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same); *United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA residual clause and § 16(b) as "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)").

330

at issue in the ACCA is a risk of injury, and the risk at issue in Section 924(c) is a risk that force

will be used, this difference is immaterial to the due process problem and has no impact on the

*Johnson* decision.[82]  The Court's holding did not turn on the type of risk, but rather how a court

assesses and quantifies the risk.[83]  *See Welch v. United States*, 136 S. Ct. 1257, 1262,   (2016)

("The residual clause failed not because it adopted a 'serious potential risk' standard but because

applying that standard under the categorical approach required courts to assess the hypothetical

---

[81]  In pertinent part, the ACCA residual clause defines a "violent felony" as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Section 924(c)(3)(B) defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

[82]  *See Vivas-Ceja*, 808 F.3d at 722 ("§ 16(b) substitutes 'substantial risk' for the residual clause's 'serious potential risk.'   Any difference between the two phrases is superficial.   Just like the residual clause, § 16(b) offers courts no guidance to determine when the risk involved in the ordinary case of a crime qualifies as 'substantial.'"); *Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) "perfectly mirrored" each other). *See also United States v. Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer*, 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial" and holding that U.S.S.G. § 4b1.2, which uses the ACCA language, "is controlled by" a decision that interprets § 16(b)).

[83]  Of course, many federal and state criminal laws include "risk" standards that employ adjectives similar to those in the ACCA and § 924(c), such as "substantial," "grave," and "unreasonable." And the Supreme Court in *Johnson* said it did not mean to call most of these into question. But, as Justice Scalia's majority opinion observed, that is because the vast majority of such statutes require gauging the riskiness of conduct in which an individual defendant engages on a particular occasion; in other words, applying such a standard to "real-world conduct." 135 S.Ct. at 2561. By contrast, the ACCA's residual clause, and § 924(c)(3) too, require it to be applied to "an idealized ordinary case of the crime," an "abstract inquiry" that "offers significantly less predictability."   *Id*. at 2558.

331

risk posed by an abstract generic version of the offense.").

The two-step process is the same under both the ACCA and § 924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony,[84] and then decide if it qualifies as a crime of violence by assessing the quantum of risk posed by the "ordinary case." The Fourth Circuit held exactly as such in *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014) in construing § 16(b):

> [E]very set of conceivable facts covered by first-degree burglary does not have to present a serious risk of injury for it to qualify as a crime of violence. It is sufficient if "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U.S. at 208, 127 S. Ct. 1586. As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. § 16(b).

*Id*. *Avila* controls here because § 16(b) and § 924(c)(3)(B) are identical.[85] Thus, as Judge Grimm explained in *Edmundson*, the "§ 924(c) residual clause suffers from exactly the same double indeterminacy as the ACCA residual clause." *Edmundson*, 2015 WL 9311983, at *4.

---

[84] Indeed, the Fourth Circuit has directly applied the "ordinary case" inquiry to the § 924(c) residual clause. See *Fuertes*, 805 F.3d at 500 n.6; *Naughton*, 621 Fed. Appx. at 178 (applying the ordinary case inquiry to § 924(c)(3)(B)).

[85] Other courts likewise require the ordinary case analysis when the statutory language of § 16(b) (and thus § 924(c)(3)(B)) is at issue. *See, e.g., Keelan*, 786 F.3d at 871 (adopting "ordinary case" analysis for § 16(b)); *United States v. Ramos-Medina*, 706 F.3d 932, 938 (9th Cir. 2012) (citing *James* as the source of the "ordinary case" analysis required by § 16(b)); *Van Don Nguyen v. Holder*, 571 F.3d 524, 530 (6th Cir. 2009) (considering § 16(b) and concluding that "[t]he proper inquiry is one that contemplates the risk associated with the proscribed conduct in the mainstream of prosecutions brought under the statute."); *United States v. Sanchez-Garcia*, 501 F.3d 1208, 1213 (10th Cir. 2007) (same).

332

Moreover, the Seventh and Ninth Circuits recognized the same in invalidating § 16(b), the identical twin to § 924(c)(3)(B), as void for vagueness under *Johnson*. *See Vivas-Ceja*, 808 F.3d at 723; *Dimaya*, 803 F.3d at 1117.[86]

Moreover, in litigating *Johnson*, the Government, through the Solicitor General, agreed that the phrases at issue in *Johnson* and here pose the same problem. Upon recognizing that the definitions of a "crime of violence" in both § 924(c)(3)(B) and § 16(b) are identical, the Solicitor General stated:

> Although Section 16 refers to the risk that force will be used rather than that injury will occur, it is equally susceptible to petitioner's central objection to the residual clause: Like the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense and to make a commonsense judgment about the risk of confrontations and other violent encounters.

*Johnson v. United States*, S. Ct. No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964 at *22-*23) (March 30, 2015). The Solicitor General was right. Section 924(c)(3)(B) and the ACCA are essentially the same and contain the same flaws. This Court should hold the Government to that concession.

Section 924(c)(3)(B), like the ACCA residual clause, thus requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. *Fuertes*, 805 F.3d at 500 n.6; *Avila*, 770 F.3d at 1107; *Ayala*, 601 F.3d at 267; *Van Don Nguyen*, 571 F.3d at 530; *Sanchez-Garcia*, 501 F.3d at 1213. Since these are the identical analytical steps

---

[86] While the Fourth Circuit has yet to reach the merits of whether § 16(b) or § 924(c)(3)(B) are unconstitutionally vague, in the successive § 2255 context, it has held that it is not "implausible that § 16(b), too, is unconstitutionally vague." *In re Hubbard*, ___ F.3d ___, 2016 WL 3181417, *6 (4th Cir. June 6, 2016).

that brought down the ACCA residual clause, § 924(c)(3)(B) cannot survive constitutional scrutiny under the due process principles reaffirmed in *Johnson*. As a consequence, the residual clause cannot be used to support a conviction under § 924(c). *See Welch*, 136 S. Ct. at 1259 (holding that *Johnson* is a "substantive decision" that has "retroactive effect" in "cases on collateral review").

      iv.    <u>Conspiracy to commit racketeering in violation of § 1962(d) categorically fails to qualify as a crime of violence under the force clause.</u>

The offense of conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d), can never qualify as a "crime of violence" because the full range of conduct encompassed in the elements of the offense fails to satisfy the force clause. A federal conspiracy is merely "an agreement among two or more persons to achieve an unlawful object . . . the carrying out of the substantive crime." Sand and Siffert, *Modern Federal Jury Instructions*, 19-3S. Unlike traditional conspiracy, the racketeering conspiracy statute contains "no requirement of some overt act or specific act." *United States v. Cornell*, 780 F.3d 616, 624 (4th Cir. 2015) (quoting *Salinas v. United States*, 522 U.S. 52, 63 (1997)), cert. denied, 136 S. Ct. 127 (2015). Instead, a racketeering conspiracy may "exist even if a conspirator does not agree to commit or facilitate each and every party of the substantive offense." *Salinas*, 522 U.S. at 63. Thus, to secure a conviction for a racketeering conspiracy, the Government need not allege or prove the actual completion of a single racketeering act by the defendant or any member of the conspiracy. *See Cornell*, 780 F.3d at 624 ("The partners in the criminal plan need only 'agree to pursue the same criminal objective,' regardless of whether that criminal objective is ever started or carried out.") (quoting *Salinas*, 522 U.S. at 63); *United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002) ("[Section] 1962(d) requires no 'overt act or specific act' in carrying the RICO enterprise

334

forward."); *United States v. Loveland*, __ F.3d __, 2016 WL 3156308, at \*1 (9th Cir. June 3, 2016) ("Conspiracy means an *agreement* to commit a crime, not *commission* of the crime.") (emphasis added).

Because an overt act is not an element of the offense, the alleged racketeering conspiracy offense does not involve the use, attempted use, or threatened use of any physical force – let alone any violent physical force – required under the force clause. The Fourth Circuit's decision in *United States v. White*, 571 F.3d 365, 369 (4th Cir. 2009), is directly on point. In that case, at issue was whether the defendant's conspiracy to commit a North Carolina offense of robbery with a dangerous weapon was a "crime of violence" under the ACCA. Just like a racketeering conspiracy, North Carolina conspiracy requires an agreement to commit a substantive crime without any overt act. *White*, 571 F.3d at 368. Although the Fourth Circuit held that the conspiracy qualified as a "crime of violence" under the now-defunct ACCA residual clause (18 U.S.C. § 924(e)(2)(B)(ii)), the court, without hesitation, also held that the conspiracy is not a "crime of violence" under the ACCA's nearly identical force clause. *Id.* at 369 ("Applying a categorical analysis to the Conspiracy Offense, we first observe that it does not have 'as an element the use, attempted use, or threatened use of physical force against the person of another.'") (citing 18 U.S.C. § 924(e)(2)(B)(i)).

The Fifth Circuit reached the same conclusion in *United States v. Gore*, 636 F.3d 728 (5th Cir. 2011). Relying on *White*, the Fifth Circuit held that a Texas offense of conspiracy to commit an aggravated robbery did not meet the force clause: "A factfinder could convict a defendant of conspiracy to commit aggravated robbery by concluding that there was an agreement to (1) commit robbery and (2) engage in one or more of the acts enumerated in the

335

aggravated robbery statute, without finding that physical force against the person of another was actually used or that there was an attempted or threatened use of such force. Accordingly, conspiracy to commit aggravated robbery does not come within the definition of 'violent felony' in [the ACCA force clause]." *Id.* at 731 (emphasis added).

Post-*Johnson*, the Fourth Circuit as well as the Seventh Circuit have reinforced that conspiracies do not have a required element of violent force. *See United States v. Melvin*, 621 Fed. Appx. 226 (4th Cir. 2015) (relying on *White* to find that conspiracy to commit North Carolina robbery with a dangerous weapon does not qualify as an ACCA "violent felony" under the force clause); *United States v. Gonzalez-Ruiz*, 794 F.3d 832, 836 (7th Cir. 2015) (finding that conspiracy to commit armed robbery fails to qualify as an ACCA "violent felony" post-*Johnson*). Likewise, Judge Grimm of the District of Maryland, relying on the Fourth Circuit's decisions in *Melvin* and *White*, recently found that conspiracy fails to constitute a "crime of violence" under the 18 U.S.C. § 924(c) force clause. *See Edmundson*, 2015 WL 9311983, at *2 (finding that conspiracy to commit Hobbs Act robbery fails to qualify as a "crime of violence" under the force clause).

None of these decisions turned on the object of the conspiracy, whether that was robbery or armed robbery. Nor did the courts find or even hint that the robbery or armed robbery offenses themselves – which were the objects of the conspiracies – did not have an element of violent physical force. Whether or not the robbery offenses independently had an element of violent physical force was beside the point. Rather, these decisions reflect that regardless of the object of the conspiracy, conspiracy itself fails to qualify as a "crime of violence" under the force clause

336

because the act of conspiring is not the use, attempted use, or threatened use of violent physical force.

These decisions are consistent with the plain language of the force clause, which includes the inchoate offense of attempt, but not conspiracy. Because Congress included an inchoate offense in the force clause, it certainly knew how to write a statute that also included the inchoate offense of conspiracy. But it chose not to do so. Therefore, it is plain that the alleged racketeering conspiracy offense categorically fails to qualify as a "crime of violence" under the force clause. And because the jury entered a general verdict, without having the jury announce which crime of violence the offense rested upon, Mr. Umaña's convictions on Counts 23 and 25 must be vacated. *See Stromberg*, 283 U.S. at 368.

      v.    <u>The offense of murder in aid of racketeering, in violation of § 1959(a)(1) also does not categorically satisfy the force clause.</u>

Even though it is enough that racketeering conspiracy is not a crime of violence, neither is murder in aid of racketeering. Many "racketeering activities" do not have an element of the intentional use, attempted use or threatened use of violent physical force against a person or property. *See generally* 18 U.S.C. § 1961(1) (defining "racketeering activity"). Thus, whether a § 1959(a)(1) offense constitutes a crime of violence for § 924(j) purposes rests on whether the element of "murder" categorically requires the intentional use, attempted use, or threatened use of violent physical force against a person or property. It does not.

The generic definition of "murder" does not satisfy the force clause. Examples of "murders" that do not involve the intentional use, attempted use, or threatened use of violent physical force are endless. *See generally* 2 Wayne R. LaFave, Substantive Criminal Law § 14.2 (2d ed. 2003) (listing "opening, on a cold winter day, a window next to the bed of a helpless sick

337

person;" "perjur[ing] an innocent man into the electric chair;" "nag[ing] another, whom he knows to have heart trouble, into some death-producing exertion;" advising "a blind man at the edge of a precipice … that it is all clear ahead;" falsely shouting, "'Your son is dead' into the ears of a woman he knows to have a heart condition;" and a parent failing "to rescue his imperiled infant, such as one who is drowning face-down in the bathtub" as examples of murder); *United States v. Fleming*, 739 F.2d 945, 947-48 (4th Cir. 1984) (murder conviction upheld when an intoxicated defendant drove at excessive speeds, sometimes against traffic, and lost control on a sharp curve); *State v. Snyder*, 311 N.C. 391, 392-94 (1984) (murder conviction upheld when an intoxicated defendant drove into intersection against light and at speed of 60-70 miles per hour).

Moreover, while Mr. Umaña contends that consideration of only the "generic" definition of murder is permissible, even if the Court were to look to the murder statute alleged in the indictment, North Carolina General Statute § 14-17, or the different means of murder alleged (first degree murder, first degree felony murder and second degree murder), the statute and these different means still do not meet the force clause. By its plain terms the full reach of N.C. St. § 14-17 (2007) does not require the intentional use of violent physical force. Moreover, the statute has been applied to "recklessness of consequences," *State v. Wilkerson*, 295 N.C. 559, 581 (1978), but "a reckless use of force does not satisfy" the force clause. *United States v. Vinson*, 805 F.3d 120, 125 (4th Cir. 2015).

As to the different degrees of North Carolina murder, first degree murder can be based on intentional poisoning, even without an intent to kill. *See State v. Johnson*, 317 N.C. 193, 200-02 (1983) (first-degree murder where the defendant "intentionally caused poison to be placed into or

338

enter the body" and the poisoning proximately caused death); *see also State v. Evangelista*, 319 N.C. 152, 158 (1987) (evidence that defendant "deprived the infant of liquids and thereby caused his death" would support a conviction for first degree murder). But poisoning "involves no use or threatened use of force." *See Torres-Miguel*, 701 F.3d at 168-69. Second degree murder can be met by reckless conduct that results in death. *See Snyder*, 311 N.C. at 396 (evidence "was sufficient to support a finding that the defendant's acts evidenced recklessness of consequences"). And felony murder can be based on any number of felony offenses that do not satisfy the force clause, including North Carolina common law robbery, which the Fourth Circuit has specifically held to be not a crime of violence under the force clause. *See United States v. Gardner*, ___ F.3d ___, 2016 WL 2893881, *7 (4th Cir. May 18, 2016) (holding "North Carolina common law robbery does not necessarily include the use, attempted use, or threatened use of force capable of causing physical pain or injury to another.") (quotations omitted). Thus, the alleged murder in aid of racketeering offense also categorically fails to qualify as a "crime of violence" under the force clause.

**B.      Mr. Umaña's claim is cognizable under § 2255(a).**

A federal prisoner may obtain relief under 28 U.S.C. § 2255(a) if his conviction "was imposed in violation of the Constitution or laws of the United States," or is in excess of this Court's jurisdiction. Mr. Umaña's conviction violates the Due Process Clause of the Fifth Amendment, violates federal law, and exceeds this Court's jurisdiction. This Court therefore should grant him relief under § 2255(a).

339

First, for all the reasons explained above, Mr. Umaña's convictions on Counts 23 and 25, the § 924(j) charges, violate due process because they depended on the unconstitutionally vague residual clause.

Second, as also explained above, racketeering conspiracy and murder in aid of racketeering categorically cannot satisfy § 924(c)(3)'s force clause. Mr. Umaña's indictment therefore failed to state an offense under § 924(j), and Mr. Umaña now stands convicted of an offense that is no longer criminal. Given this, his conviction violates the laws of the United States and results in a fundamental miscarriage of justice. This is precisely the type of error that is cognizable under § 2255(a). *See Davis v. United States*, 417 U.S. 333, 346-47 (1974) (holding that when an intervening decision establishes that a prisoner was convicted of "an act that the law [no longer] make[s] criminal," "such a circumstance 'inherently results in a complete miscarriage of justice and presents exceptional circumstances' that justify relief under § 2255").

Third, Mr. Umaña's conviction exceeds this Court's jurisdiction because not only did the indictment fail to state a § 924(c) offense, it affirmatively alleged conduct that is outside that statute's reach. That is, Counts 23 and 25 of the indictment alleged that Mr. Umaña used or carried a firearm during or in relation to a racketeering conspiracy or murder in aid of racketeering, offenses that, as discussed above, categorically cannot qualify as a "crime of violence" for purposes of § 924(j). In turn, a § 924(j) conviction can never be sustained based on these underlying offenses, no matter what the facts are.

Simply put, Counts 23 and 25 altogether fail to state a § 924(j) offense. Mr. Umaña's convictions on these counts are therefore a legal nullity that were entered in excess of this Court's jurisdiction, and must be vacated. *See United States v. Brown*, 752 F.3d 1344, 1347 (11th

340

Cir. 2014) (a jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); *United States v. Barboa*, 777 F.3d 1420, 1423 n.3 (10th Cir. 1985).

      i.      <u>Mr. Umaña's invalid § 924(j) convictions also invalidate his death sentences on Counts 22 and 24.</u>

In addition to having been sentenced to death for two counts of §924(j), Mr. Umaña was also sentenced to death for murder in aid of racketeering in Counts 22 and 24. But the invalidation of Mr. Umaña's death sentences for his § 924(j) convictions requires that he be resentenced on the murder in aid of racketeering convictions as well.

Section § 2255(b) provides:

> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C.A. § 2255(b). As stated by the Fourth Circuit, this "language 'confers a broad and flexible power to the district courts to fashion an appropriate remedy.'" *United States v. Stitt*, 552 F.3d 345, 355 (4th Cir. 2008) (quoting *United States v. Hillary*, 106 F.3d 1170, 1171 (4th Cir.1997)) (other quotations omitted). But the Fourth Circuit has explained that "[t]he 'most appropriate remedy' … 'is to put § 2255 defendants in the same boat as direct appellants, i.e., to permit resentencing.'" *Id*. (quoting *Hillary*, 106 F.3d at 1172). As such, this Court's remedy must not conflict with the Fourth Circuit's "admonition that the defendant be placed in the 'same position' as if there was no error." *Id*. at 356.

341

Mr. Umaña cannot be placed in the same position as if there was no error, without a new sentencing phase proceeding where he would face just two, instead of four, death eligible counts. In addition to the fact it is easier to defend against two, as opposed to four death eligible counts, the record in this case shows at least a reasonable likelihood that the inclusion of the unconstitutional § 924(j) counts influenced the jury's decision to sentence him to death. The instruction for the § 924(j) counts affirmatively stated, "I instruct you that racketeering conspiracy and murder in aid of racketeering are crimes of violence." GPT 1249. Placing a judicial label of "crime of violence" on the other death eligible offense is prejudicial by itself, and the term would not have appeared in the instructions if not for the invalid § 924(j) counts.

But even worse, the invalid "crime of violence" label directly spilled over to the selection phase. The first aggravating factor alleged was essentially the dispositive element of the murder in aid of racketeering offense. *Compare* ECF Doc. No. 1048 at 7 ("The defendant killed Ruben Garcia Salinas and Manuel Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise."); *with* GPT at 1245 ("[T]he purpose of the defendant, or someone aided and abetted by the defendant, in committing the murder was to maintain or increase position in the enterprise."). Instead of determining on its own the aggravating weight of this factor, the jury was previously instructed that such conduct was a "crime of violence." Thus, this Court can only follow the Fourth Circuit's admonishment that "the defendant be placed in the 'same position' as if there was no error," *Stitt*, 552 F.3d at 356, by ordering a new penalty phase that is not corrupted by the inclusion of invalid death eligible counts.

Judicial affirmance of the remaining death sentences also violates the Sixth Amendment. As the Supreme Court recently made clear in *Hurst v. Florida*, 136 S. Ct. 616 (2016), the Sixth Amendment requires that a jury, and not the court, determine whether a defendant should be sentenced to death. *Hurst*, 136 S. Ct. at 624. The Court was unequivocal: "The Sixth Amendment protects a defendant's right to an impartial jury. This right required Florida to base [the defendant's] death sentence on a jury's verdict, not a judge's factfinding." *Id*.

After *Hurst*, any death sentence rendered by a court is unconstitutional. An appellate or post-conviction court that finds non-structural error in the defendant's death sentence therefore must remand for a new penalty phase before a jury. It may not engage in post hoc reweighing, or otherwise make its own determination about whether the defendant deserves a death sentence. To the extent any prior Supreme Court decisions, such as *Brown v. Sanders*, 546 U.S. 212, 224-25 (2006), *Stringer v. Black*, 503 U.S. 222, 237 (1992), or *Clemons v. Mississippi*, 494 U.S. 738, 745-46 (1990), authorized such judicial refashioning of a compromised death sentence, *Hurst* necessarily overrules them.

What is more, given the unparalleled need for reliability in capital sentencing, allowing Mr. Umaña's death sentence on Counts 22 and 24 to stand despite the jury's exposure to the invalid count and its prejudicial elements would implicate the Eighth Amendment. The Supreme Court's decision in *Johnson v. Mississippi*, 486 U.S. 576 (1988), provides an instructive analogy. There, the Court held that when a prior conviction used as aggravation in support of a death sentence has subsequently been overturned, the defendant's death sentence violates the Eighth Amendment. As the Court explained, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special

343

need for reliability in the determination that death is the appropriate punishment in any capital case." *Id*. at 584 (citations and internal quotations omitted).

Because the petitioner's prior conviction in *Johnson v. Mississippi* was invalid, the Court deemed it "apparent that the [prior] conviction provided no legitimate support for the death sentence imposed on petitioner." *Id*. at 585. Equally apparent, the Court said, was "that the use of that conviction in the sentencing hearing was prejudicial." *Id*. And while the prosecutor had repeatedly pointed to the prior conviction in his closing argument, the Supreme Court said the now-voided conviction's use as aggravation would have violated the Eighth Amendment no matter what. "Even without express argument, there would be a possibility that the jury's belief the petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id*. (quoting *Gardner v. Florida*, 430 U.S. 349, 359 (1977)).

The same principles apply here. The unconstitutional § 924(j) convictions had a profoundly prejudicial impact on Mr. Umaña's case as a whole, and undermines confidence in his death sentences on Counts 22 and 24.

Mr. Umaña likely was prejudiced even before his case reached the jury. When the Department of Justice considered whether to authorize the death penalty against Mr. Umaña, it was presented with an indictment alleging not two, but four capital offenses, including two § 924(j) counts. The Department's capital-case review process was skewed by the presence of the unconstitutional charge just as the jury's sentencing decision was skewed in *Johnson v. Mississippi*. Thus, this Court should vacate Mr. Umaña's sentence in its entirety and order that he be resentenced before a jury on Counts 22 and 24 alone.

344

**XXIII.**      **MR. UMAÑA WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PRESENTATION TO THE DEPARTMENT OF JUSTICE IN OPPOSITION TO THE AUTOHRIZATION OF A CAPITAL PROSECUTION, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Mr. Umaña was denied the effective assistance of counsel during a critical stage in his pretrial proceedings. Just one month after his attorney was appointed to represent him, that same attorney was required to go before a team of prosecutors who were interested in seeking the death penalty for Mr. Umaña to make the case for why they should exercise their discretion not to seek death. Counsel repeatedly told the representatives of the Government that he had done nothing to prepare for the meeting and beseeched them to postpone the meeting in order to make the appropriate inquiries into Mr. Umaña's apparent mental health issues and the mitigating circumstances of his childhood in war-torn El Salvador. His request was denied due to perceived concerns about scheduling and other issues that paled in comparison with the interest that Mr. Umaña had at stake – his right to life.

Mr. Umaña was charged with death-eligible federal offenses on June 23, 2008. ECF Doc. No. 3. His same attorney, John Bryson, was appointed to assist in his Federal representation on July 10, 2008. Appx. 23. Mr. Umaña would later be appointed a second attorney, as required by Federal law, on October 3, 2008. *See* 18 U.S. 3005. Shortly after his appointment, Mr. Bryson learned that his opportunity to convince the Department of Justice not to seek the death penalty against Mr. Umaña was set for August 11, 2008, leaving him just under a month to prepare. Having only a few weeks to prepare to present to the Department of Justice why his client should

345

not face execution, trial counsel expressed his concern about the extremely tight time frame and

explained that he believed that Mr. Umaña was suffering from mental health issues and because

he was raised in El Salvador, preparing a mitigation presentation prior to the August 11 hearing

was unrealistic. *See* Appx. 79. The Government responded on July 29, refusing to reschedule the

meeting and citing scheduling issues as the primary reason that the meeting could not be

delayed:

> We have given your request serious consideration but unfortunately cannot
> accommodate that request. As you may be aware Judge Conrad is faithful to the
> speedy trial clock and is very mindful of his docket. As such, it is likely that, were
> we to delay the [death penalty] process, the RICO prosecution will go to trial right
> around the time we would be superseding the indictment. This would no doubt
> create heartburn for the judge and substantial problems for us. The most
> significant being that a verdict on the RICO count may create a double jeopardy
> issue on the DP case.

Appx. 80.



346

Trial counsel was aware that he would be much better able to present information that would save his client from facing the death penalty if he could intelligently speak to the mitigating characteristics of his client, but he could not retain a mental health expert nor conduct an international investigation into the mitigating circumstances of his client's life without sufficient time or funds. Since he did not secure funding or have the time necessary to properly investigate Mr. Umaña's background, trial counsel attended the authorization meeting without mitigation information from El Salvador, without information on Mr. Umaña's cognitive impairment, and was constricted to explaining what little he knew about the facts underlying the offense that took place in Greensboro, and offered Mr. Umaña's willingness to accept a plea to life in prison. Attending that meeting, without requesting a continuance of Mr. Umaña's court date in order to assuage the concerns of the United States Attorney about the Court's schedule and the speedy trial clock was deficient. Even if a continuance would not have been granted, trial counsel was obligated to preserve the record with objections for appeal. See ABA Guidelines 10.8(B)(2) and commentary.

Counsel therefore wasted his opportunity to convince the committee that they should not seek death penalty. He was not properly prepared to make an adequate presentation to the authorization committee, but he was unwilling or neglected to move the Court for a continuance, or at least make a record that he needed one. The decision of the Government to seek the death penalty against Mr. Umaña was the most important legal decision he had ever faced. Both

347

because he failed to move for the continuance and because he could not give a dull and adequate presentation as to why his client should not face capital charges, his performance was deficient. There is a reasonable probability that if Mr. Bryson had been adequately prepared for the authorization hearing, he could have presented substantial mitigating factors that would have convinced the Department of Justice to try Mr. Umaña's case non-capitally. With adequate preparation, trial counsel could have presented to the Department of Justice the substantial evidence of poverty, trauma, intellectual disability, and brain damage described elsewhere in this motion. See Claims II, III, IV. The rushed timeline of the authorization meeting therefore prejudiced Mr. Umaña by depriving him of the kind "extraordinary efforts on behalf of the accused" necessary at "every stage of the proceedings." ABA Guidelines 1.1.

## XXIV. TRIAL COUNSEL RENDERED DEFICIENT PERFORMANCE FOR FAILING TO ADEQUATELY EXPLAIN TO THEIR INTELLECTUALLY IMPAIRED, BRAIN DAMAGED CLIENT FROM EL SALVADOR THE RISKS AND BENEFITS OF A PLEA DEAL IN THIS CAPITAL CASE, THEREBY VIOLATING RIGHTS GUARANTEED HIM BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

On August 29, 2009, Assistant United States Attorney Jill Rose agreed to have a conversation with trial counsel regarding a plea deal for Alex Umaña that began with various conditions: Mr. Umaña had to tell all that he knew about MS-13 and to testify in cases against MS-13 members. In addition to cooperating, Mr. Umaña had to enter a plea of admission for crimes he was alleged to have committed in Los Angeles.

348

Trial counsel presented the circumstances of this initial potential offer to Mr. Umaña on September 18, 2009, but failed to adequately explain, among other things, that if the case went to trial, the prosecution would almost certainly prove guilt and could prove the California murders through hearsay evidence. Because of Mr. Umaña's misunderstanding of the risks and benefits of going to trial, he declined to accept the deal.

Trial counsel rendered deficient performance by not adequately conveying to their client the risks and benefits of accepting a plea bargain in this case. In refusing to accept the plea bargain, Mr. Umaña operated under a basic misunderstanding of what the Government would have to prove in order to convict him and sentence him death. Throughout the pretrial proceedings, trial counsels' conduct failed to comport with minimal standards of practice in capital cases and, as a result, they were unable to gain the trust of their client or to convince that they were telling him the truth. In contravention of established standards in capital cases, trial counsel neglected to spend a sufficient amount of time with Mr. Umaña in order to understand his misconceptions of the trial and to explain to him, in a manner he could understand, his chances of succeeding at trial.

Furthermore, counsel failed to overcome the significant barriers caused by Mr. Umaña's foreign national status. For example, trial counsel could not speak Mr. Umaña's native language and thus could not directly communicate with him. Cultural barriers also often present obstacles that are difficult to surmount absent a detailed awareness of the client's cultural background. In many Latin American countries, for instance, the criminal justice system was traditionally an inquisitorial model based on the Spanish system. In these systems, the judge or magistrate directs the investigation and there is no adversarial process. Most inquisitorial systems have no plea

349

bargaining. A foreign national from such a country would likely have little to no understanding of the role of a public defender or what a plea bargain is. These inquisitorial processes were often rife with corruption and often were greatly distrusted by the citizens. Because the inquisitorial system was widely seen as a contributor to gross violations of human rights, most of Latin America began the slow process of judicial reform, and changes were introduced in El Salvador 1997 when Mr. Umaña was in his mid-teens. Given the historical absence of plea bargains in Latin American countries and the historical differences between the systems, trial counsel was obligated to ensure Mr. Umaña fully understood the decisions he faced in his capital case.

In addition, trial counsel began their efforts to communicate with their client about the benefits of a plea bargain much too late in the process. In this regard, upon information and belief, counsel did not have substantial conversations with him about a deal until after the death penalty had already been authorized. They also did not adequately continue to discuss the possibility and to address the misconceptions or fears Mr. Umaña may have had at the outset.

Finally, where a client has a compromised understanding due to intellectual disabilities or other problems, counsel have a duty to ensure that all aspects of the plea negotiation process are fully understood and considered. This is especially true in dealing with a traumatized client whose initial responses may be marked by fear or a brain-damaged client who has a susceptibility to impulsive decision making. Particularly in light of the combination of deficits Mr. Umana suffers from, counsel had an obligation here to work carefully and slowly, and with outside assistance if necessary, to explain the plea and trial possibilities.

There is a reasonable probability that, had trial counsel adequately consulted with and advised their client, the result of the proceeding would have been different and he would have

reached an agreement with the Government for a penalty less that death. Had trial counsel adequately explained the benefits of a plea bargain, the risks of going to trial early and in a timely fashion, there is a reasonable likelihood that a deal would have been reached.

Alternatively, had trial counsel adequately investigated and developed evidence of trauma, brain damage, intellectual disability and mental illness, they likely would have persuaded the DOJ to prosecute Mr. Umaña non-capitally or, in the alternative, to offer a plea deal that did not require him to cooperate with the DOJ.

## XXV. THE IMPOSITION OF THE DEATH PENALTY ON ALEJANDRO UMAÑA WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Mr. Umaña was deprived of his Fifth, Sixth, and Eighth Amendment rights when the Department of Justice ("DOJ"), approved the federal capital prosecution for Mr. Umaña. The imposition of the death penalty on Mr. Umaña was based in part on both his race and national origin and the race of the victim, as well as the geographic location where his crime occurred. Had certain basic demographic facts been different in Mr. Umaña's case – were Mr. Umaña not a Hispanic defendant and native of El Salvador – he may not have received a sentence of death. The biased nature of DOJ's decision to seek death was revealed by the prosecutors' sentencing phase closing argument where the prosecutor told jurors, among other discriminatory comments, that they should give Mr. Umaña "American justice" for "bringing El Salvador here." The Constitution does not tolerate a system in which capital-charging decisions are based in any part

351

on the arbitrary fact of a defendant or victim's race, ethnicity, national origin or the geographic

location where a defendant is prosecuted. *McCleskey v. Kemp*, 481 U.S. 279 (1987); Gregg v.

Georgia, 428 U.S. 153 (1976); *United States v. Armstron*g, 517 U.S. 456 (1996).

**A.     The Attorney General's Decision to Seek the Death Penalty Based on Both Mr.
         Umaña's Race Violates His Constitutional Rights.**

The arbitrary application of the federal death penalty based on consideration of the race

of the defendant and victim has been well-documented. Most notably, in September 2000, the

DOJ released a study (the "September 2000 Study") on its imposition of the federal death

penalty in the late twentieth century. The September 2000 Study presented evidence of both

racial bias and a lack of geographical uniformity. *See* U.S. Dep't of Justice, The Federal Death

Penalty System: A Statistical Survey (1988-2000) (Sept. 12, 2000). With regard to race, the DOJ

found that white defendants were almost twice as likely non-white defendants to receive plea

agreements that removed the death penalty from consideration. Id. at 12, 32. This was true at the

time of Mr. Umaña's indictment; it was true when his death sentence was returned; and it

remains true today as he awaits execution. When these statistics are viewed in combination with

the facts of Mr. Umaña's case, and the evidence and arguments presented by the Government at

trial, it is clear that race, ethnicity and national original were essential motivating factors in the

Government's decision to seek the death penalty.

**B.     The Attorney General's Decision to Seek the Death Penalty Based on Geographic
         Location Violates Mr. Umaña's Constitutional Rights.**

The Government also acted in violation of Mr. Umaña's constitutional rights when it

authorized federal prosecutors to seek a sentence of death based in part on consideration of

geography. In its September 2000 Study, the DOJ found a significant lack of geographical

352

uniformity in its imposition of the death penalty. According to the study, forty-two percent of the cases submitted to the Attorney General came from five of the ninety-four total federal districts; in contrast, U.S. Attorneys from forty districts had never sought the death penalty. *See* U.S. Dep't of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000), at 12. Mr. Umaña, by virtue of having committed his crime in North Carolina rather than elsewhere, was more likely to receive a sentence of death. Mr. Umaña's misfortune of falling subject to the arbitrary imposition of the death penalty based on geography stands in violation of his Fifth, Sixth, and Eighth Amendment rights.

The Government's decision to prosecute in the Western District of North Carolina also appeared to be based on impermissible geographic considerations. There is currently no one on death row in the federal system from the Middle District of North Carolina, where the shootings occurred in this case. In contrast, there are three persons on death row from the Western District of North Carolina, including Mr. Umaña. Further, the Government was motivated to seek the death penalty in the Western District for impermissible concerns about the racial makeup of the venires in that district compared to the Middle District of North Carolina. The jury venires in the Western District have smaller percentages of non-white persons than the jury venires in the Middle District of North Carolina.

Moreover, to the extent that trial counsel should have raised these issues regarding race and geography, the undersigned incorporate by reference the preceding facts and law and allege that prior counsel's failure to raise such issues constitutes ineffective assistance of counsel, and furthermore, that Mr. Umaña was prejudiced by counsel's deficient performance in this regard, in violation of his constitutional rights under the Fifth, Sixth, and Eighth Amendments.

353

## XXVI. THE FAILURE TO PRESERVE MR. UMAÑA'S RIGHTS UNDER THE VIENNA CONVENTION, AND HIS RIGHTS TO CONSULAR ASSISTANCE VIOLATED MR. UMAÑA'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS AND ARTICLE VI OF THE CONSTITUTION.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

The claims and factual allegations set forth in all other sections of this Motion are incorporated by reference and re-alleged as if set forth entirely herein. In support of this claim, Mr. Umaña alleges the following facts, among others to be presented after full discovery, approval to travel to Guatemala, access to this Court's subpoena power, and an evidentiary hearing:

Mr. Umaña was born in Escuintla, Guatemala. Appx. 10. Mr. Umaña's parents lived in Guatemala for the early years of Mr. Umaña's life. The Government was aware of Mr. Umaña's status as a Guatemalan citizen,[87] prior to indicting him on this case, and long before they sought his execution. On June 14, 2008, The National Civil Police interviewed Mr. Umaña's mother Leticia Diaz Ramirez, whereupon she provided information about her son's birth. She stated that Mr. Umaña was born in Escuintla, Guatemala and she provided a copy of Mr. Umaña's Guatemalan birth certificate. Appx. 43

The Government was therefore aware that Mr. Umaña was born in Guatemala, not in El Salvador. The apparently Government did not notify Mr. Umaña of his rights under the Vienna

---

[87] Mr. Umaña is a native Guatemalan citizen by virtue of birth. *See* Constitución de la Republica de Guatemala [constitution] art. 144

354

Convention did not contact the Guatemalan Consulate. This was a violation of the Vienna Convention and Mr. Umaña's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

Similarly, counsel was well-aware of Mr. Umaña's status as a Guatemalan citizen. They received records from the Government indicating his status and obtained his birth certificate indicating that he was born in Guatemala. When counsel learned of Mr. Umaña Guatemalan birth, they did not did not inform Mr. Umaña of his rights under the Vienna Convention, nor did counsel contact the Guatemalan Consulate to obtain Consular assistance, nor did counsel raise or litigate the constitutional violations arising from the Government's failure to notify Mr. Umaña of his rights to Consular assistance at critical stages of the prosecution or the Government's failure to notify the Consulate prior to authorizing Mr. Umaña's case as a capital prosecution. Counsel's failures constitute prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

## A. The Law

The Vienna Convention on Consular Relations ("Vienna Convention") is "an international treaty that governs relations between individual nations and foreign consular officials." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 366 (2006) (Breyer, J., dissenting). Article 36 of the Vienna Convention "addresses communication between an individual and his consular officers when the individual is detained by authorities in a foreign country." *Sanchez-Llamas*, 548 U.S. at 337. The text of Article 36 articulates the obligations of a detaining state:

(b) if he so requests, the competent authorities of the receiving State shall, without delay[88], inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.   Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay.   The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment.

Vienna Convention, art. 36(1)(b), 21 U.S.T. 77 (Dec. 14, 1969).

The Vienna Convention was binding on the Government at the time of Mr. Umaña's prosecution.   U.S. CONST. Art. VI, cl. 2 ("all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land"). The Vienna Convention imposes on the Government three specific obligations. *Osagiede v. United States*, 543 F.3d 399, 402 (7th Cir. 2008) ("Article 36 imposes three separate obligations on a detaining authority: (1) inform the consulate of a foreign national's arrest or detention without delay; (2) forward communications from a detained national to the consulate without delay; and (3) inform a detained foreign national of 'his rights' under Article 36 without delay.").

In addition to the treaty itself, the Government promulgated rules to ensure the Department of Justice's compliance with Article 36. *See* 28 C.F.R. § 50.5 (Jan. 28, 1967)

---

[88] Courts have held that "without delay" is satisfied if the consulate is notified within three days of the detention of the foreign national.   *See Sanches-Llamas*, 548 U.S. at 362 (citing *Case Concerning Avena and other Mexican Nationals* (Mex.v.U.S.), 2004 I.C.J. 12, ¶ 97 (Mar. 31, 2004) (*Avena*) (the U.S.'s notification of Mexican consulate within three working days of detainee's arrest satisfied Article 36(1)(b)'s "without delay" requirement)).

356

(requiring arresting officers with the Department of Justice to "inform the foreign national that his consul will be advised of his arrest" in every instance in which a foreign national is arrested).

Prior to Mr. Umaña's arrest and conviction, there were a number of high-profile death penalty cases involving foreign nationals in the United States Supreme Court and International Court of Justice (ICJ), which should have put the Government and counsel on notice of the Government's obligations under the Vienna Convention. In one of the earlier Supreme Court cases considering violations of Article 36 of the Vienna Convention, the Court addressed the claim that Virginia failed to inform a foreign national of his rights under the Vienna Convention. *Breard v. Greene*, 523 U.S. 371 (1998). The Court noted that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," providing the foundation for the innumerable Vienna Convention claims that would follow. *Id*. at 375-377

Only one year later, in 1999, the Court vacated stays of execution for German nationals Karl LaGrand, *Stewart v. LaGrand*, 525 U.S. 1173 (1999), and Walter LaGrand, *Stewart v. LaGrand,* 526 U.S. 115 (1999), though the Court did not review any claims based on the Vienna Convention. Karl LaGrand was executed on February 24, 1999, and Walter Lagrand was executed on March 3, 1999. Subsequently, the ICJ issued a decision in *LaGrand Case (Germany v. United States of America)* in 2001, finding that the United States violated its obligations under Article

The ICJ revisited this issue in 2004 when it decided *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States of America).* The ICJ held that the Vienna Convention created individual rights, that the United States had violated these rights, and that the United States must "provide, by means of its own choosing, review and reconsideration of the

357

convictions and sentences of the [convicted] Mexican nationals" to determine whether the violations "caused actual prejudice," without allowing procedural default rules to bar such review. 2004 I.C.J. 12 ¶¶ 121-122, 153(9). Finally, in 2005, the U.S. Supreme Court dismissed a certiorari petition as improvidently granted in *Medellin v. Dretk*e, a case out of Texas involving a Mexican citizen on death row, but discussed the issues of asserting a Vienna Convention claim in federal habeas corpus proceedings and recognized the *Avena* and *LaGrand* decisions by the ICJ. 544 U.S. 660 (2005).36. 2001 I.C.J. 466 ¶ 128(3)-(7).

All of these cases took place prior to Mr. Umaña's trial. These cases made headlines across the country. *See, e.g.*, Roger Cohen, *U.S. Execution of German Stirs Anger,* N.Y. TIMES, March 5, 1999, at A14; Raymond Bonner, *U.S. Bid to Execute Mexican Draws Fire,* N.Y. TIMES, October 30, 2000, at A20; Marlise Simons, *World Court Finds U.S. Violated Consular Rights of 2 Germans,* N.Y. TIMES, June 28, 2001, at A10; *2 U.S. Executions Violated Rights of Germany,* U.N. Says, ST. LOUIS POST-DISPATCH, June 28, 2001, at A7; Ginger Thompson, *An Execution in Texas Strains Ties with Mexico and Others,* N.Y. TIMES, August 16, 2002, at A6; Marlise Simons*, World Court Tells U.S. to Delay Executing 3,* N.Y. TIMES, February 6, 2003, at A13; Toby Sterling*, World Court Directs U.S. To Stay 3 Executions Court Wants To Review Legal Issues In The Cases,* ST. LOUIS POST-DISPATCH, February 6, 2003, at A2; Anthony Deutsch, *U.S. Violated Rights Of Mexicans On Death Row, World Court Says,* ST. LOUIS POST-DISPATCH, April 1, 2004.

During the same time-period there was also a well-developed body of materials discussing the Vienna Convention right to consular notification and the significance of Consular assistance in capital cases, including articles in lawyers' periodicals and law reviews. *See, e.g.,*

358

Logene Foster & Stephen Dogett, *Vienna Convention: New Tool for Representing Foreign Nationals in the Criminal Justice System,* THE CHAMPION, March 1997; Robert F. Brooks & William H. Wright Jr., *States Deny Treaty Rights to Foreign Defendants,* NAT'L L.J., Nov. 4, 1996, at B8.

Therefore, prior to Mr. Umaña's trial, national judicial and public attention focused on the plight of foreign nationals on death row in light of U.S. violations of the Vienna Convention. The Vienna Convention was the "Law of the Land," (U.S. CONST. art. VI, cl. 2), and 28 C.F.R. § 50.5 required Department of Justice officers to honor its obligations. There were "hundreds of cases in which courts had addressed [Article 36] rights, even in a criminal setting." *Osagiede,* 543 F.3d at 411. In addition, the Government and the Consulate had promulgated guidelines and directives to protect foreign nationals' right to consular assistance.[89]

## B. The Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eight and Fourteenth Amendments and Article VI.

As described above, the Government was on notice that Mr. Umaña was a Guatemalan citizen. Nevertheless, the Government did nothing. As set forth below, the Government's failure to honor its constitutional and treaty obligations violated Mr. Umaña's Fifth, Sixth, Eighth and Fourteenth Amendment Rights and Article VI.

---

[89] *See Osagiede,* 543 F.3d at 402 ("federal law enforcement agencies have also long been instructed by the State Department that they must comply with the requirements of Article 36") (citing U.S. Department of State, Pub. No. 10518, CONSULAR NOTIFICATION AND ACCESS: INSTRUCTION FOR FEDERAL, STATE, AND LOCAL ENFORCEMENT AND OTHER OFFICIALS REGARDING FOREIGN NATIONALS IN THE UNITED STATES 13-15 (Jan. 1998) ("when foreign nationals are arrested or detained, they must be advised of the right to have their consular officials notified")).

359

i.      The Government Violated its Duty to Inform Mr. Umaña of His Right to Consular
Assistance and to Notify the Guatemalan Consulate of His Detention

Under the Vienna Convention, the Government has a duty to inform a detained foreign

national of his right to request assistance from his consulate and to notify the sending state's

consulate upon the detainee's request.  *Medellin v. Texas*, 552 U.S. 491, 499 (2008) (quoting

Vienna Convention, Article 36(1)(b), 21 U.S.T. 77, 100, 101 (1969)); *Osagiede*, 543 F.3d at 402;

*Faulder v. Johnson*, 81 F.3d 515, 520 (5th Cir. 1996) (The Vienna Convention "requires an

arresting government to notify a foreign national who has been arrested, imprisoned or taken into

custody or detention of his right to contact his consul."); *Baires v. U.S.*, 707 F. Supp. 2d. 656

(E.D. Va. 2010) ("Law enforcement officers who arrest a national of a foreign country are

required to notify a consular representative of the arrestee's country promptly.")

This duty is also established by the Department of Justice's Statement of Policy. 28

C.F.R. § 50.5 (Jan. 28, 1967). These rules are "designed to establish a uniform procedure for

consular notification where nationals of foreign countries are arrested by officers of this

Department on charges of criminal violations," and require that "[i]n every case in which a

foreign national is arrested the arresting officer shall inform the foreign national that his consul

will be advised of his arrest unless he does not wish such notification to be given."[90] *Id.* §

50.5(a); see also U.*S. v. Cardoso-Lopez*, 2009 WL 3198658, at *2 (7th Cir. Oct. 5, 2009) (citing

28 C.F.R. 50.5(a)(3) and holding that "[th]e obligation to inform thus lies solely with the

government"). Additionally, "the local office of the Federal Bureau of Investigation or the local

---

[90] If there is a treaty in place between the U.S. and the foreign state requiring notification,
the U.S. Attorney will notify the consulate regardless of the detainee's wishes, and then inform
the detainee of that action. 28 C.F.R. § 50.5(a)(3).

360

Marshal's office, as the case may be, shall inform the nearest U.S. Attorney of the arrest and of the arrested person's wishes regarding consular notification," and then the U.S. Attorney will notify the consulate if appropriate. *Id*.

Despite these federal and treaty-based obligations, the Government held a meeting on August 11, 2008 to discuss Mr. Umaña's case and authorize the Federal Government to prosecute Mr. Umaña capitally. To this day, the Government has not fulfilled its obligations under the Vienna Convention and federal law, as the Government never contacted the Guatemalan Consulate and never informed Mr. Umaña of his Article 36 rights. The Government's disregard for Mr. Umaña's Vienna Convention rights and for its own federal obligations violated Mr. Umaña's due process rights.

    ii.   <u>The Government violated Mr. Umaña's right to due process and a fair trial in violation of the Fifth and Sixth Amendments.</u>

The Consulate plays a unique and pivotal role in assisting with a foreign national's defense, yet the Government deprived Mr. Umaña of that benefit throughout his trial. *See Osagiede*, 543 F.3d at 403 ("[T]he assistance of an attorney cannot entirely replace the unique assistance that can be provided by the consulate"); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001) (concluding that local counsel "are not equipped to provide the same services as the local consulate"); Linda Jane Springrose, Note, *Strangers in a Strange Land: The Rights of Non-Citizens Under Article 36 of the Vienna Convention on Consular Relations,* 14 GEO. IMMIGR. L.J. 185, 195 (1999) ("[consular] functions are very likely to make a difference for a defendant who chooses to exercise his right to contact consul, particularly since his attorney is not equipped to perform the same services as the consul"). In fact, the U.S. State Department has "described this right of access as the right to a 'cultural bridge,' and has acknowledged '[n]o one needs that

361

cultural bridge more than the individual . . . who has been arrested in a foreign country . . . .'" Mark J. Kadish, *Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul,* 18 MICH. J. INT'L L. 565, 606-607 (1997) (quoting U.S. Dep't of State, 7 Foreign Affairs Manual 403 (1984))).

Courts have previously addressed the harmful impact of the prosecution's Vienna Convention violations on the trial process.   In *Valdez v. State,* the Oklahoma Court of Criminal Appeals reviewed a Vienna Convention claim on the merits in a successive post-conviction petition.   46 P.3d at 710 (Okla. Crim. App. 2002).   The facts demonstrated that there was extensive mitigation evidence discovered by the Consulate after Mr. Valdez's conviction and death sentence that was not presented at trial due to the lack of consular assistance.   *Id.* The court found that "trial counsel, as well as representatives of the State who had contact with Mr. Valdez prior to trial and knew he was a citizen of Mexico, failed in their duties to inform Mr. Valdez of his right to contact his consulate." *Id*. In light of this, the Court concluded that "this Court cannot have confidence in the jury's sentencing determination and affirm its assessment of a death sentence where the jury was not presented with very significant and important evidence bearing   upon Mr. Valdez's mental status and psyche at the time of the crime." *Id*. Although the claim was procedurally defaulted, the court "[exercised] its power to grant relief when an error complained of has resulted in a miscarriage of justice, or [constituting] a substantial violation of a constitutional or statutory right" and remanded the case for resentencing.

Similarly, the Government's disregard for its duty to inform Mr. Umaña of his right to consular notification rendered Mr. Umaña's trial unreliable and fundamentally unfair. Here, not only did the Government fail to contact the consulate, but the Government actually held a

362

meeting to discuss Mr. Umaña's case and decide whether or not to authorize federal and capital prosecution. The Government did, in fact, authorize the case, yet failed to contact the consulate at any point during this process, demonstrating a disregard for its obligations under the Vienna Convention and its own policies, promulgated by the Department of Justice, to prevent exactly this sort of violation and subsequent harm. To this day, the Government never fulfilled its obligation to contact the consulate or inform Mr. Umaña of his rights.

The facts of this case are beyond explanation or excuse and show an absolute disrespect for the Vienna Convention, federal legislation, and due process rights. *See Mora v. New York*, 524 F.3d 183, 206 (2d Cir. 2008) (the Supreme Court has instructed that we "should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such." (Quoting *Breard*, 523 U.S. at 375)). "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

In this case, the Government lost sight of its duty to ensure that "justice shall be done," and instead disregarded and dismissed its obligations to inform Mr. Umaña of his right to consular assistance and to notify the Guatemalan Consulate of Mr. Umaña's arrest, capital prosecution, trial, and conviction. Mr. Umaña needed this consular assistance in order to receive a fair trial, and he had a right to this due process under federal legislation, the Vienna Convention, and the Constitution. Yet the Government deprived Mr. Umaña of this assistance,

363

which infected every phase of Mr. Umaña's trial and defense in violation of the Fifth, Sixth, Eighth and Fourteenth Amendment

      iii.    <u>The Government violated Mr. Umaña's right to present mitigating evidence under the Fifth and Eighth Amendments.</u>

In addition to violating Mr. Umaña's due process rights generally, the Government's failure to fulfill its obligation of consular notification specifically prevented Mr. Umaña from seeking consular assistance in developing mitigation evidence located in Guatemala, thereby depriving Mr. Umaña of the full opportunity to investigate and present mitigating evidence to a jury in violation of the Fifth and Eighth Amendments. "A defendant has the right to present all relevant mitigating evidence during the penalty phase of a capital trial." *Williams v. Norris*, 612 F.3d 941 (8th Cir. 2010) (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (concluding that the Eighth and Fourteenth Amendments require that neither the judge nor jury "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.")). In *Lockett v. Ohio*, the Court found that Eighth Amendment created this right because "in capital cases the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Id*. (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). This conclusion rests "'on the predicate that the penalty of death is qualitatively different' from any other sentence," and "this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed. *Id*. (quoting *Woodson*, 428 U.S. at 305).

<div align="center">364</div>

Because the Government did not fulfill its consular notification obligations, Mr. Umaña's ability to investigate these critical mitigation areas was compromised. As a result, Mr. Umaña's defense did not investigate nor were they in a position to present, accurate and mitigating evidence to a jury concerning his life and family history. Thus, the Government's disregard for its duties under the Vienna Convention directly undermined Mr. Umaña's constitutional rights. *See* 39 Am.Jur.2d Habeas Corpus § 43 (explaining that if the Government's misconduct "denied the habeas petitioner a specific constitutional right, rather than the general due process right to a fair trial, a valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair") (citing *Brown v. Sirmons*, 515 F.3d 1072, 1083 (10th Cir. 2008)).

iv.  The Government's violation of its obligation of consular notification under the Vienna Convention and federal law prejudiced Mr. Umaña.

The Government's failure to inform Mr. Umaña of his right to consular assistance and to notify the Consulate of Mr. Umaña's arrest. detention, and capital charges deprived Mr. Umaña of consular assistance, resulting in prejudice.   Consular assistance is unique from the assistance of local counsel, as the Guatemalan government is best situated to make legal claims on international law, obtain Guatemalan records, and locate Guatemalan witnesses, among other activities.  *See Osagiede*, 543 F.3d at 403 ("[T]he assistance of an attorney cannot entirely replace the unique assistance that can be provided by the consulate."); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001) (explaining that local counsel "are not equipped to provide the same services as the local consulate"); William J. Aceves, *Murphy v. Netherland*, 92 Am. J. Int'l L. 87, 89 ("At a minimum, [consular access] provides a cultural bridge for detained nationals who must otherwise navigate through an unfamiliar and often hostile legal system.").  This

assistance is not only distinct, but also invaluable, as demonstrated by a number of court decisions finding that a defendant was prejudiced when deprived of consular assistance. *Osagiede*, 543 F.3d at 403. ("[t]his assistance can be invaluable . . . [t]he consulate can provide critical resources for legal representation and case investigation").

**C.      Counsel's Failure to Notify Mr. Umaña of His Rights Under the Vienna Convention; to Contact the Guatemalan Consulate; and, Counsel's Failure to Raise and Litigate the Government's Failure to Honor Its Treaty, International Law, and Constitutional Obligations Violated the Fifth, Sixth, Eight and Fourteenth Amendments and Article VI.**

As described above, counsel became aware of Mr. Umaña's citizenship status as a Guatemalan citizen during the course of their representation, yet counsel failed to notify Mr. Umaña of his rights under the Vienna Convention, failed to contact the Guatemalan Consulate, failed to request Consulate assistance, and, failed to raise and litigate the Government's violations under federal, constitutional and international law. Counsel's failures constitute prejudicially deficient performance.

Counsel's performance is measured against an objective standard of reasonableness "considering all the circumstances." *Strickland,* 466 U.S. at 688. "[P]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." *Wiggins v. Smith,* 539 U.S. 510, 522 (2003) (citing *Strickland*, 466 U.S. at 688-89).

Here, trial counsel had a long-established professional obligation to investigate and discover Mr. Umaña's nationality, immediately notify him of his right to contact the consulate, and to litigate any and all Government violations of international law in light of Mr. Umaña's status.   The right to consular assistance and counsel's obligation to preserve that right were

366

already well known long before Mr. Umaña's trial. *See Murphy v. Netherland,* 116 F.3d 97, 100 (4th Cir. 1997) (in capital case, treaties such as the Vienna Convention on Consular Relations "are one of the first sources that would be consulted by a reasonably diligent counsel representing a foreign national"); *Ledezma v. State,* 626 N.W.2d 134, 152 (Iowa 2001) (concluding that "all criminal defense attorneys representing foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right"); *cf. Sanchez-Llamas v. Oregon*, 548 U.S. 331, 364 n.3 (2006) (Ginsburg, J., concurring) (recognizing the viability of "an ineffective-assistance-of-counsel claim predicated on his trial counsel's failure to assert the State's violation of those [Article 36] rights.").[91]

To begin, trial counsel had an obligation to know the relevant statutes and case law on this issue. "All lawyers that represent criminal defendants are expected to know the laws applicable to their client's defense." *Osagiede*, 543 F.3d at 409 (citing *Julian v. Bartley*, 495 F.3d

---

[91] In addition to the language in Justice Ginsburg's concurrence, a considerable portion of oral argument in *Sanchez-Llamas* was "spent discussing a defense counsel's role in notifying foreign nationals of Article 36 requirements and benefits." Kadish & Olson, *Sanchez-Llamas v. Oregon and Article 36 of the Vienna Convention on Consular Relations: The Supreme Court, The Right to Consul, and Remediation,* 27 MICH. J. INT'L L. 1185, 1218 (2006). Several Justices commented that defense counsel "should be taxed with knowing that [a foreign national has a right to consular assistance] . . . because it's the law of the land . . . . [T]he obligation is on the lawyer to [ask if the defendant received notice of his Article 36 rights] just as the lawyer would [ask if they received] the Miranda warnings." Id. (quoting Transcript of Oral Argument at 36-37, *Sanchez-Llamas v. Oregon,* 126 S. Ct. 2669 (2006) (No 04-10566), available at http://www.supremecourtus.gov/oral_arguments/argument_transcripts/04-10566.pdf (hereinafter "Transcript of Oral Argument")). Therefore, if counsel does not inform the client about his right to consular assistance, "then that's ineffective assistance in an appropriate circumstance . . . . And the other obligation is, counsel, you have to raise this issue as soon as everybody learns about it…." Id. (citing Transcript of Oral Argument at 31).

367

487 (7th Cir. 2007)). Two courts of appeals have held that a reasonably competent attorney should be aware of a client's Vienna Convention rights. *See Osagiede*, 543 F.3d at 411 (holding that "criminal defense attorneys representing a foreign national in 2003 should have known to advise their clients of the right to consular access and to raise the issue with the presiding judge"); *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997) (holding that "a reasonably diligent search by Murphy's counsel . . . would have revealed the existence and applicability (if any) of the Vienna Convention").

As noted previously, "[t]he law was on the books; the violation was clear. Simple computer research would have turned it up." *Osagiede*, 543 F.3d at 409. Nevertheless, counsel failed to learn the law, nor did counsel make any effort to invoke Mr. Umaña's rights under the Vienna Convention.   Counsel's failure to discover and uphold those rights did not meet minimum standards of effective representation. *Osagiede*, 543 F.3d at 405 (finding that Mr. Osagiede "argued, correctly, that the rights conferred by the Vienna Convention were individual rights," and his attorney's "failure to know the laws applicable to his case could constitute constitutionally deficient performance.").

In addition, counsel had an obligation not only to know about the right to consular assistance articulated by the Vienna Convention, but also to discover his client's nationality, inform him of his right to consular notification and assistance, and seek a remedy for the Government's Article 36 violations. *See Deitz v. Money*, 391 F.3d 804 (6th Cir. 2004) (remanding to determine if trial attorney's failure to "notify Deitz of his right to contact the Mexican consulate . . . deprived him of the effective assistance of counsel"); *Ledezma v. State,* 626 N.W.2d 134, 152 (Iowa 2001) (concluding that "all criminal defense attorneys representing

368

foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right").

Counsel's obligations were articulated in the 2003 edition of the ABA Guidelines, reflecting what had already become the standard of practice by capital defense attorneys. *See Hamblin v. Mitchell,* 354 F.3d 482, 487 (6th Cir. 2003) (the 2003 ABA Guidelines "represent a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases."); *Strickland,* 466 U.S. at 688 (1984) (observing that "[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable" assistance of counsel). The Guidelines articulate specific obligations for counsel representing a foreign national:

Guideline 10.6 Additional Obligations of Counsel Representing a Foreign National

A.  Counsel at every stage of the case should make appropriate efforts to determine whether any foreign country might consider the client to be one of its nationals.

B.   Unless predecessor counsel has already done so, counsel representing a foreign national should:

1. immediately advise the client of his or her right to communicate with the relevant consular office; and

2. obtain the consent of the client to contact the consular office.   After obtaining consent, counsel should immediately contact the client's consular office and inform it of the client's detention or arrest.

ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (February 2003), ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY

369

CASES (rev. ed. 2003) (hereafter "ABA Guidelines") (emphasis added). *See also Kadish*, 27 MICH. J. INT'L L. at 1218 ("[A] defense attorney representing a foreign national has two obligations with regard to Article 36. First, counsel is charged with a duty to notify a foreign national of her consular assistance rights. Second, counsel must raise any Article 36 violation at the proper time. Failure to do either of these should satisfy the deficient performance prong of the Strickland ineffectiveness test.").

Counsel failed to conduct an adequate investigation into Mr. Umaña's background and history as a Guatemalan citizen. "[I]t is imperative that counsel begin investigating mitigating evidence and assembling the defense team as early as possible—well before the prosecution has actually determined that the death penalty will be sought." GUIDELINE 1.1, History of Guideline.Discovering Mr. Umaña's birthplace and early childhood history should have been a central factor in the initial defense investigation into Mr. Umaña's social and family history. *See Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (finding the investigation was inadequate because "counsel abandoned their investigation of petittioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" (citing the 1989 ABA Guidelines at 11.8.6, p. 133 (stating that among the mitigation topics counsel must explore are the defendant's "family and social history")).

In fact, it is well established that "an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning, construction of the [mitigation] narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." GUIDELINE 10.11,

370

Commentary; *see also Williams v. Taylor,* 529 U.S. 362, 396 (2000) (finding trial counsel were ineffective because they had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background" as required under the ABA GUIDELINES); *Wiggins,* 539 U.S. at 524; *Rompilla,* 545 U.S. at 387 (recognizing the ABA GUIDELINES as the normative standards for defense counsel in capital cases). It is therefore "necessary to locate and interview the client's family members . . . and virtually everyone else who knew the client and his family." GUIDELINE 10.7, Commentary.

Here, a cursory investigation revealed that Mr. Umaña spent his early childhood in Guatemala and had a number of relatives still residing in the country. Yet Mr. Umaña's counsel failed to conduct any the critical mitigation investigation in violation of prevailing professional standards and Mr. Umaña's Sixth Amendment right to effective counsel. Had counsel undertaken a reasonable investigation into Mr. Umaña's childhood, they would have discovered a wealth of mitigating information that was never presented at his capital trial. *See* CLAIM I.

In sum, counsel had a clear and well established obligation to investigate and discover Mr. Umaña's Guatemalan citizenship, notify Mr. Umaña of his rights as a Guatemalan citizen and contact the Guatemalan Consulate to obtain assistance for Mr. Umaña. GUIDELINE 10.6, Commentary ("Subsection A is included in the Guideline to emphasize that the determination of nationality may require some effort by counsel. A foreign government might recognize an American citizen as one of its nationals on the basis of an affiliation (e.g. one grandparent of that nationality) that would not be apparent at first glance.") Counsel's total failure to

371

investigate and develop the claims arising from Mr. Umaña's status, to notify Mr. Umaña of his rights under the Vienna Convention, and counsel's failure to seek a remedy for the Government's violation of Mr. Umaña's rights was objectively unreasonable and constitutes deficient performance.

## D. Conclusion

Trial counsel had well-established obligations to discover Mr. Umaña's Guatemalan citizenship, know the law surrounding Mr. Umaña' rights as a foreign national, notify Mr. Umaña of his right to consular assistance, and seek a remedy for the Government's Article 36 violation. These obligations were enshrined in the ABA Guidelines, federal statutes, prevailing case law, and were the subject of national public discussion. However, trial counsel violated each and every one of these professional obligations. This support could have included assisting in plea negotiations, initiating legal submissions seeking a remedy for the Government's Article 36 violation, and obtaining mitigating evidence. Without this assistance, however, trial counsel failed to obtain a plea, never sought a remedy for the Government's violation, and did not investigate or present any mitigating evidence from Mr. Umaña's family and social history in Guatemala. In fact, trial counsel never traveled to Guatemala, obtained no document from Guatemala other than a single document provided by the U.S. government in discovery (Mr. Umaña's birth certificate), and did not interview any maternal family members still residing in Guatemala. This vast area of Mr. Umaña's family and social history was completely absent from the trial. These failures by Mr. Umaña's counsel deprived him of his Sixth Amendment right to effective assistance of counsel.

372

## XXVII.     TRIAL COUNSEL FAILED TO ADEQUATELY PRESERVE ISSUES FOR APPEAL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Counsel unreasonably failed to object to numerous errors at trial that subsequently required appellate issues to be raised under the "plain error" standard of review or not even addressed at all. These included the following issues that were briefed on appeal:

   i.    Whether the prosecution of the VICAR murder, 18 U.S.C. § 1959(a)(1), exceeded Congress's Commerce Clause authority either facially or as applied invalidating all death eligible counts.

   ii.    Whether Juror 286 was actually biased because she believed law enforcement to be more truthful.

   iii.    Whether admitting the transcripts of the detectives' interviews of Rivera, Arevalo, and Umaña himself on the ground that the transcripts included the detectives' statements vouching for the credibility of several MS–13 members during the interviews amounted to improper Government vouching at trial.

   iv.    Whether the prosecutor improperly argued that Mr. Umaña was "only killer" in MS-13, especially when he was not permitted to present evidence of others who killed.

   v.    Whether the prosecutor improperly argued that if there was an MS-13 member serving a life sentence "and was behaving, we would have heard all about it," when Mr. Umaña was precluded from presenting such testimony.

   vi.    Whether the prosecutor's "ready for some American justice" and us-versus-them themed arguments improperly urged the jury to consider ethnicity and national origin as aggravating factors.

   vii.    Whether the prosecutor improperly compared the plight of the victim with Mr. Umaña's potential life in prison.

   viii.    Whether the prosecutor's use of religious imagery, including telling the jury that the devil was "in his heart" and Mr. Umaña was sending a

373

message from the devil to the jury was improper.

ix.    Whether the Government should have borne the burden of proof in Mr. Umaña's *Atkins* intellectual disability hearing.

Mr. Umaña was prejudiced twofold by counsel's omissions: once at the time of trial, when counsel failed to raise these objections at a time when there was a reasonable probability that the Court could have corrected these errors, and a second time on appeal, when Mr. Umaña was deprived of review or more favorable standards of review for his legal claims, and was instead subjected to no review or the much more onerous "plain error" standard.

## XXVIII.    EXECUTING SOMEONE WITH BRAIN DAMAGE AND THE OTHER MENTAL IMPAIRMENTS FROM WHICH MR. UMAÑA SUFFERS WOULD VIOLATE THE EIGHTH AMENDMENT.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Alejandro Umaña is markedly brain-damaged and has been since early childhood at least. As a result, he has serious neuropsychiatric disorders that cause him to suffer from cognitive impairment, poor decision-making, impulsivity, marked poor judgment, and trouble modulating his emotions. Mr. Umaña also suffers from compound trauma and has been diagnosed with intellectual disability. He is unable to assess situations correctly, has a difficult time adjusting to unexpected stimuli or changes which he is not expecting, is more likely to act without being able to fully evaluate his options and alternatives, and is more likely to act reflexively and impulsively. This was all true at the time of his pretrial hearing on intellectual disability and at the time of trial. *See* Atkins Def. Exh. 14 and 17.

The United States Supreme Court has held that no one who satisfies the criteria for

374

intellectual disability can be executed consistent with the requirements of the Eighth

Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002). The Court reached this conclusion in part

because capital punishment's dual purposes of deterrence and retribution are not served for

persons such as Mr. Umaña, with a limited understanding of their actions and with a reduced

ability to control their behavior and conform their conduct to the requirements of the law.

Executing someone like Mr. Umaña who suffers from brain damage, trauma, and low

intelligence that results in  impaired cognition, judgment, impulse-control, and decision-making

would violate the Eighth   Amendment. In each case in which the Supreme Court has reversed

capital sentences for  ineffective assistance of counsel based on failure to conduct mitigation

investigation, the Court   has noted mental disorders or impairments that bear the hallmarks of

those from which Mr. Umaña suffers. *See Williams v. Taylor*, 529 U.S. 362, 370 (2000)

(describing petitioner as  possibly having "mental impairments organic in origin"); *Wiggins v.

Smith*, 539 U.S. 510, 523  (2003) (relying on social services records that documented

impairments and "difficulty coping  with demanding situations"); *Rompilla v. Beard*, 545 U.S.

374, 391 (2005) (reporting test scores   showing "third grade level of cognition after nine years

of schooling" and organic brain  damage); *Porter v. McCollum*, 558 U.S. 30, 36 (2009) (*per

curiam*) (finding trial counsel   ineffective for failing to discover substantial difficulties with

reading, writing, and memory, as   well as cognitive deficits; finding that state postconviction

experts could not rule out "brain   abnormality"); *Sears v. Upton*, 561 U.S. 945, 949 (2010) (*per

curiam*) (describing significant   frontal lobe damage suffered as a child, plus drug and alcohol

abuse in teens, problems with  "planning, sequencing and impulse control" as well as

"pronounced frontal lobe pathology.") By the same token, the Supreme Court's Eighth

375

Amendment cases prohibiting the death penalty for certain categories of offenders rely heavily on neuroscience to explain why people with particular deficits, attributable either to developmental neurological stage or organic brain disorder, are not eligible for execution. *See Roper v. Simmons*, 543 U.S. 551 (2005) (barring execution of people who committed capital offenses as juveniles); *Atkins v. Virginia*, 536 U.S. 304 (2002) (barring execution of the intellectually disabled). The Supreme Court described in *Roper* and *Atkins* the characteristics of capital offenders that led to these exclusions: disabilities in reasoning, judgment, and impulse control, as well as an underdeveloped sense of responsibility and vulnerability to negative influences. *See Atkins*, 536 U.S. at 320; *Roper*, 543 U.S. at 569. In other words, the Supreme Court has recognized that precisely the sorts of impairments that Mr. Umaña exhibits as a result of his brain damage exempt capital offenders from execution.

Our highest court has also held that capital punishment must be "limited to those offenders who commit 'a narrow category of the most serious crimes,' and whose extreme culpability 'makes them the most deserving of execution.'" *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008) (citing *Roper v. Simmons*, *supra*, at 568 and quoting *Atkins v. Virginia*, *supra*, at 319). Mr. Umaña's actions certainly resulted in tragedy, the loss of two lives. But it is difficult to imagine counting Mr. Umaña – a man whose badly damaged brain was further compounded by relentless exposure to a lifetime of trauma – as the kind of offender with a level of culpability deserving of execution. Executing someone with Mr. Umaña's impairments would violate the Eighth Amendment.

376

## XXIX. THE CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS IN MR. UMAÑA'S CASE, IN VIOLATION OF THE FOURTH, FIFTH, SIXTH, AND EIGHTH AMENDMENTS, WARRANTS POSTCONVICTION RELIEF.

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Deficient performance under the Sixth Amendment is proved by showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland* at 688. A movant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. *Strickland* thus requires a court to assess the totality of counsel's acts and omissions when deciding whether the representation was deficient.

Similarly, *Strickland* requires that this Court consider the cumulative effect of counsel's deficient performance when determining prejudice. *Id.* at 695. *Strickland* repeatedly describes a single ineffective assistance of counsel claim as consisting of multiple errors or omissions that result in prejudice. *See*, *e.g*., *Strickland*, 466 U.S. at 693 ("Even if a defendant shows that *particular errors* of counsel were unreasonable...the defendant must show that *they* actually had an adverse effect on the defense.") (emphasis added); *id.* at 694 (holding that a petitioner must show "a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added).

The Sixth Circuit has agreed that *Strickland* claims must be examined cumulatively, *see United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) ("[E]xamining an [IAC] claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally

377

deficient, in light of the totality of the evidence in the case.'") (quoting *Lundgren* v. *Mitchell*, 440

F.3d 754, 770 (6th Cir. 2006)), as have courts reviewing capital § 2255 cases. *See Johnson v.*

*United States*, 860 F.Supp.2d 663, 756 (N.D. Iowa 2012) ("*Strickland* stands for the proposition

that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim.").

These holdings are also confirmed by the Supreme Court's post-*Strickland* decisions. In

*Williams v. Taylor*, 529 U.S. 362 (2000), the Court identified multiple categories of mitigating

evidence omitted by trial counsel's deficient mitigation investigation. Nevertheless, those

omissions were treated collectively as part of the singular failure of "trial counsel [to] fulfill their

obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396. In

*Wiggins v. Smith*, 539 U.S. 510 (2003), the Sixth Amendment violation was predicated on

multiple investigatory omissions, including a failure to investigate the facts behind a social

service report and to commission a detailed social history. *See id.* at 525, 538. Yet *Wiggins* treated

the investigatory omissions and multiple categories of evidence as a single IAC claim: "In order

for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must

show that counsel's *failures* prejudiced his defense." *Id.* at 534 (emphasis added). And, more

recently, in *Porter* v. *McCollum*, 558 U.S. 30 (2009), the Court addressed an IAC claim in which

counsel failed to learn about the client's "abusive childhood, his heroic military service and the

trauma he suffered because of it, his long-term substance abuse, and his impaired mental health

and mental capacity[.]" 558 U.S. at 33. *Porter* grouped all categories of mitigating evidence

together *both* for the deficiency and prejudice analyses. *See id.* at 40 (finding single deficiency in

"fail[ure] to uncover and present any evidence of Porter's mental health or mental impairment, his

family background, or his military service"); *id.* at 40–41 (considering whether "that deficiency"

378

prejudiced Porter by considering "the totality of the available mitigation evidence") (internal quotations omitted).

Each of the individual assertions of ineffective assistance of counsel in Mr. Umaña's § 2255 motion establish *Strickland* prejudice. Cumulatively, they confirm that Mr. Umaña is entitled to postconviction relief.

**XXX. THE CUMULATIVE EFFECT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL AND THE GOVERNMENT'S *BRADY* VIOLATIONS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, UNDERMINE CONFIDENCE IN THE RESULT OF MR. UMAÑA'S TRIAL.**

All other claims and allegations in this Motion are incorporated into this claim by this reference.

Even where individual error is insufficient to raise a probability that the outcome of a trial would have been different, the cumulative impact of *Brady* and *Strickland* error can suffice to warrant habeas relief. *See Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989) (relying on "errors" language from *Strickland* to find that "*Strickland* clearly allows the court to consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced"); *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir. 2005) (adopting the reasoning from *Kubat*); *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (finding that "totality of the circumstances" language from *Strickland* mandates an aggregate error analysis); *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2007) ("We will address each aspect of Davis's performance the district court found deficient before considering whether Richards was cumulatively prejudiced thereby."); *Phillips v. Woodford*, 267 F.3d 966 (9th Cir. 2001) (remanding for cumulative prejudice analysis of *Brady* and *Strickland* error); and *Gonzales v. McKune*, 247 F.3d 1066, 1078 n. 4 (10th Cir. 2001),

379

*vacated in part on other grounds*, 279 F.3d 922, 925–26 (10th Cir. 2002) (en banc) (noting that language from *Strickland* "makes it clear that all acts of inadequate performance may be cumulated in order to conduct the prejudice prong").

Each of the *Brady* and *Strickland* errors in Mr. Umaña's case was sufficiently prejudicial to warrant habeas relief. Taken together they require this Court grant his § 2255 motion.

**PRAYER FOR RELIEF**

WHEREFORE, Alejandro Umaña respectfully requests that this Court provide the following relief:

1. Permit Mr. Umaña to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion;

2. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, identifying all proceedings conducted in Mr. Umaña's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3. Permit Mr. Umaña to file a Reply to the Respondent's answer, responding to any affirmative defenses raised by the Answer;

4. Permit Mr. Umaña to Amend this Motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Motion;

380

5.      Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Mr. Umaña's Reply to any affirmative defenses raised by the Respondent. Because Mr. Umaña has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

6.      Permit Mr. Umaña to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

7.      Permit oral argument as appropriate and required;

8.      Vacate Mr. Umaña's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted; and

9.      Grant such further and additional relief as may be just and proper.

381

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2016, I electronically filed the foregoing Motion Under

28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence of a Person in Federal Custody with

the Clerk of Court using the CM/ECF system, which will then send a notification of such filing

to the following:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
Anthony.enright@usdoj.gov

*/s/ Kenneth J. Rose*
**KENNETH J. ROSE**
The Center for Death Penalty Litigation
123 West Main Street
Suite 700
Durham, North Carolina 27701-3228
Telephone: 919-956-9545
ken@CDPL.ORG

*/s/ Zandra L. Lopez*
**ZANDRA L. LOPEZ**
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: 619-234-8467
Zandra_Lopez@fd.org

Attorneys for Alejandro Umaña

382

**VERIFICATION UNDER PENALTY OF PERJURY**

Undersigned counsel is authorized by Alejandro Umaña to file the foregoing motion pursuant to 28 U.S.C. § 2255. Undersigned counsel further declares that the contents of the foregoing are true to the best of his knowledge, information, and belief.

Dated: June 22, 2016

*/s/ Zandra L. Lopez*

383