# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| ALEJANDRO UMAÑA,<br>Movant | ) | No. 3:16-CV-00057-RJC<br>(3:08cr134-2) |
| | ) | |
| -v- | ) | **CAPITAL § 2255 PROCEEDINGS** |
| | ) | |
| UNITED STATES OF AMERICA,<br>Respondent. | ) | HON. ROBERT J. CONRAD JR. |
| | ) | |

## MEMORANDUM OF LAW

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................1

II.     LEGAL STANDARDS .........................................................................3

        A.      Discovery under section 2255.....................................................3

        B.      The liberal standard for fact development in capital § 2255 cases. .............5

                i.      Discovery is More Favored Under § 2255
                        than § 2254 cases. ...........................................................5

                ii.     Discovery Is Especially Warranted in a Capital Case. ....................7

        C.      Efforts to obtain discovery directly from relevant parties. .........................7

III.    DISCOVERY REQUESTS .....................................................................12

        A.      Mr. Umaña has good cause for his discovery requests.............................12

        B.      Mr. Umaña has good cause to obtain discovery about the
                unadjudicated California murders he was alleged to have
                committed to support his claims that the evidence presented to the
                jury about his role in these murders was false, misleading and
                incomplete because of prosecutorial misconduct and the failure of
                his trial counsel to adequately investigate these murders (§ 2255
                Motion, Claims V, VI, and VII)...................................................13

                i.      Mr. Umaña requests the opportunity to review the LAPD
                        files and FBI files relating to the investigation of the
                        California murders. .........................................................15

                ii.     Mr. Umaña requests discovery relating to Lemon Grove
                        Park shooting witness Freddy Gonzalez........................................19

                iii.    Mr. Umaña requests discovery relating to witness Roberto
                        Ramos regarding the Lemon Grove Park shooting.........................26

                iv.     Mr. Umaña requests discovery relating to witness Juan
                        Lara regarding the Lemon Grove Park shooting............................28

i

v.     Mr. Umaña requests discovery relating to interviews with Fairfax Avenue suspects Luis Rivera and Rene Arevalo regarding the Lemon Grove Park shooting. ....................................32

vi.     Mr. Umaña requests discovery relating to interviews with non-testifying witnesses to the Lemon Grove Park shooting. .........................................................................................36

vii.    Mr. Umaña requests discovery relating to evidence relating to other Lemon Grove Park shooting suspects. ............................38

viii.   Mr. Umaña requests discovery relating to separate shootings that took place at Lemon Grove Park in the months leading up to the murder of Andy Abarca.........................41

ix.    Mr. Umaña requests discovery relating to the interview of Fairfax Avenue witnesses. ..............................................................43

x.     Mr. Umaña requests production of true and correct copies of the photos or photo line-ups that were shown to witnesses to the Lemon Grove Park and Fairfax Avenue shootings. ......................................................................................46

C.     Mr. Umaña has good cause to obtain discovery about the "M" and "S" tattoos to support his claims of prosecutorial misconduct and ineffective assistance of counsel where the jury heard inaccurate and false evidence that Mr. Umaña had earned the "M" and "S" tattoo by having killed before (§ 2255 Motion, Claims VI, VII and XI). ..................................................................................................48

D.     Mr. Umaña has good cause to obtain discovery about the Government's investigation into the background of Mr. Umaña to support his claims that the evidence presented to the jury about his life was inaccurate and incomplete because of prosecutorial misconduct and the failure of his trial counsel adequately to investigate Mr. Umaña's life history (§ 2255 Motion, Claims I, VI, VII, and XIII). ..........................................................................................50

E.     Mr. Umaña has good cause to obtain discovery about his mental health to support his claims relating to *Atkins*, *Hall*, ineffective assistance counsel and government misconduct. (§ 2255 Motion, Claims II, III, and IV, VI and VII)...........................................................56

ii

F.     Mr. Umaña has good cause to obtain discovery about jurors to support his claim that he was denied the right to a fair and impartial jury (§ 2255 Motion, Claim XV)...............................................61

G.     Mr. Umaña has good cause to obtain discovery regarding the grand and petit jury venires in order to support his claim that trial counsel failed to challenge the underrepresentation of African Americans, Hispanics, Asians, and Women in the grand and petit jury venires. (§ 2255 Motion, Claim XVII).......................................................63

H.     Mr. Umaña has good cause to obtain discovery about the Government's jury selection process to support his claim that trial counsel failed to adequately object to the Government's race-based exercise of peremptory strikes. (§ 2255 Motion, Claim XVIII). ...............65

I.     Mr. Umaña has good cause to obtain discovery about the enhanced security measures and law enforcement and court personnel contacts with jurors to support his claims that he was denied the right to a fair trial and sentencing (§ 2255 Motion, Claims XV and XXI). ................................................................................................68

J.     Mr. Umaña has good cause to obtain discovery related to the Government's decision to prosecute capitally and related to juror demographics in order to support his claim that the Government's decision to seek and charge the death penalty against Mr. Umaña was impermissibly based on race and geography. (§ 2255 Motion, Claim XXV).................................................................................69

K.     Mr. Umaña has good cause to obtain discovery about the Government's authorization policy and co-defendant Elvin Pastor Fernandez-Gradis in order to support his claim that he was deprived the effective assistance of counsel during and prior to the meeting with the Department of Justice regarding the decision to seek the death penalty.  (§ 2255 Motion, Claim XXIII). ...........................70

L.     Mr. Umaña has good cause to obtain discovery about the interpreters used during his trial to support his claim that he was denied his rights effective assistance of counsel and to be present at every stage of the proceedings (§ 2255 Motion, Claim XX).................73

M.     Mr. Umaña has good cause to obtain the Government's logs, receipts, index, and any additional items that document what items were produced to Mr. Umaña's trial counsel and when they were produced to support all of his claims. ........................................75

iii

N.  Mr. Umaña has good cause to obtain discovery about his citizenship and policies for ascertaining immigration status of detainees to support his claim that his rights under the Vienna Convention were violated. ...........................................................76

IV.  REQUEST FOR EXCULPATORY AND IMPEACHMENT INFORMATION.................................................................................77

A.  The Government's broad disclosure obligations. ......................................77

B.  Mr. Umaña's request for all exculpatory and impeachment information..............................................................................84

V.  CONCLUSION..............................................................................89

iv

# I.    INTRODUCTION

Mr. Umaña respectfully moves the Court for leave to conduct discovery in support of the claims raised in his § 2255 Motion filed on June 22, 2016.[1]  ECF Doc. No. 22 and 24 ("§ 2255 Motion").  This request is authorized by Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts ("Habeas Rule 6")[2] and is consistent with the Supreme Court's directive that a federal habeas corpus petitioner is "entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts."  *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977) (same); *see also* Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[3]

In his § 2255 Motion, Mr. Umaña raised numerous claims for relief, including claims of ineffective assistance of counsel and prosecutorial misconduct among others.  Due to the scope  of Mr. Umaña's claims and the nature of his requests for discovery arising from those claims, a brief

---

[1] Mr. Umaña initially moved for discovery under Habeas Rule 6 prior to the filing of his § 2255 motion.  *See* ECF Doc. No. 13.  The Government responded that Mr. Umaña was not entitled to pre-filing discovery.  ECF Doc. No. 18.  Following the filing of the § 2255 motion, this Court declared his previously filed discovery motion moot and set a scheduling order with Mr. Umaña to file his first discovery motion on October 21, 2016.  ECF Doc. No. 30.

[2] Habeas Rule 6(A) states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."

[3] The Advisory Committee Notes to the *Rules Governing Section 2254 Cases in the United States District Courts* are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings for the United States District Courts*.

1

explanation of how this memorandum in support of his initial discovery motion is organized bears mention.

**Section II** sets forth the legal authority and "good cause" standard that govern discovery in § 2255 cases. Section II also discusses the distinctions between § 2255 and § 2254 proceedings and between capital and non-capital cases, as they highlight the liberal standard for fact development through discovery in capital § 2255 cases. In this section, Mr. Umaña will also lay out the efforts made to obtain discovery from the Government and other parties.

**Section III** sets forth Mr. Umaña's specific requests for discovery. These requests are organized according to the claims raised in Mr. Umaña's § 2255 Motion; the claims are incorporated by reference throughout Section III, and pertinent allegations raised in those claims are summarized in order to establish good cause for his requests.

Finally, **Section IV** sets forth Mr. Umaña's more general request for disclosure of exculpatory and impeachment information pursuant to obligations imposed on the Government by both constitutional doctrine and the Department of Justice's own ethical guidelines for its prosecutors.

Because this is Mr. Umaña's first § 2255 motion and he sets forth well-supported claims delineating deprivations of his constitutional rights, which, if proved, would necessitate a new trial or sentencing, governing law requires that he be permitted to discover the evidence requested below.[4]

---

[4] This is Mr. Umaña's initial request for discovery. Information that comes to light as the result of discovery obtained pursuant to this motion, and/or the nature of objections and responses given by parties from whom discovery is currently being requested, may require, and provide

Case 3:16-cv-00057-MOC   Document 36-1   Filed 10/21/16   Page 7 of 96

## II.  LEGAL STANDARDS

### A.  Discovery under section 2255.

Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts gives this Court express authority to order discovery "for good cause . . . under the Federal Rules of Criminal or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) incorporates the United States Supreme Court's directive that federal habeas corpus petitioners are "entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of the relevant facts," and to that end "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry" into the petitioner's allegations of illegal confinement.  *Harris v. Nelson*, 394 U.S. 286, 298, 300 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); *Cf.*  Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[5]

---

grounds for, Mr. Umaña to seek leave to conduct further discovery pursuant to Habeas Rule 6, including but not limited to additional requests for production, subpoenas duces tecum, and depositions of persons believed to have knowledge relevant to Mr. Umaña's § 2255 claims and/or any information disclosed pursuant to his requests for discovery.  Potential deponents, for example, could include such persons as trial counsel for Mr. Umaña and the Government, members of the Los Angeles Police Department, members of the Federal Bureau of Investigation, testifying and non-testifying witnesses to the incidents described at Mr. Umaña's trial, jurors and interpreters. Particularly in light of the expense and other resources necessary for depositions, and the fact that the materials sought here might ultimately obviate the need for some or all of them, Mr. Umaña is not making those requests at this time.

[5]  The Advisory Committee Notes to the Rules Governing Section 2254 Cases in the United States District Courts are "fully applicable to discovery under [the analogous Rule] for § 2255 motions." Advisory Committee Notes to Rule 6, Rules Governing Section 2255 Proceedings for

3

This Court may grant a petitioner leave to conduct discovery when "good cause" for doing so is shown. Rule 6(a) Governing Section 2255 Proceedings for the United States District Courts. The Supreme Court of the United States has held that good cause for discovery in habeas proceedings is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997).

It should also be noted that in a Section 2255 case, like all civil cases, discovery necessarily precedes resolution of claims on summary judgment. To be entitled to discovery, Mr. Umaña need not conclusively establish his entitlement to relief on the merits of his claims. Rule 6 and *Bracy* require only that the petitioner demonstrate "good cause," not a prima facie case. As the Court of Appeals for the Fourth Circuit has held, "[g]ood cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner *may* be able to demonstrate that he is entitled to relief." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (emphasis added); *see also Payne v. Bell*, 89 F.Supp.2d 967, 971 (W.D. Tenn. 2000) (good cause to grant discovery is not as high as the standard for granting relief or even that for granting an evidentiary hearing). In *Bracy*, the Supreme Court noted the movant's allegations were "only a theory at this point" and "not supported by any solid evidence[.]" 520 U.S. at 908. But the allegations were specific enough to establish good cause for factual development even if the defendant ultimately would "be unable

the United States District Courts. Accordingly, this Motion also refers to cases involving discovery in Section 2254 cases.

4

to obtain evidence sufficient" for actual relief. *Id*. at 909. The following requests meet the low bar set by the Supreme Court in *Bracy*.

**B. The liberal standard for fact development in capital § 2255 cases.**

    i.     <u>Discovery is More Favored Under § 2255 than § 2254 cases.</u>

Although governed by the same Eighth Amendment jurisprudence, capital § 2255 and § 2254 proceedings vary in ways critical to federal practice, including discovery. The most important of these is that in a capital § 2254 case, the main post-conviction process, including fact-finding and discovery, should occur in state court. By the time the petitioner has entered federal court, the primary opportunity to develop extra-record facts in support of the petition has already taken place. If the § 2254 petitioner does not succeed in state court, he has a chance to pursue federal claims for relief in the federal system, but the opportunity for new factual development, the ability to obtain a hearing, and the possibilities of relief are limited by the extent to which he availed himself of, and was granted, process in state court. *See, e.g*. 28 U.S.C. § 2254(e)(2) (setting forth conditions for evidentiary hearing in § 2254 cases).

For a capital § 2255 litigant, the federal district court is both the first and last place where she can develop facts necessary to support her constitutional claims. Because there are no prior state court proceedings, the federal prisoner is not constrained by exhaustion requirements or state procedural rulings like her state counterpart, and the federal district court has much more latitude in § 2255 litigation as a forum for fact-development.[6]

---

[6] Additionally, motions under § 2255 can be based on violations of federal statutory criminal law and criminal procedure codes as well as the federal Constitution, and accordingly are subject to a wider range of potentially available federal legal claims than are state prisoner actions

5

The liberal standard for fact development in capital § 2255 cases is reflected, for instance, in the text of the statute governing evidentiary hearings which creates a presumption in favor of promoting fact development: "Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon . . ." 28 U.S.C. § 2255(b). Mr. Umaña's capital § 2255 motion easily surpasses this threshold: he has raised numerous claims supported by detailed factual allegations, which if true, will entitle him to relief. In the same vein, Mr. Umaña is entitled not only to a forum in which to demonstrate the strength of his proof, but also to discovery of materials not otherwise available to him to enable him to develop that proof.

Legislative history also underscores the difference Congress saw between the necessity for hearings and factual development in § 2254 and § 2255 proceedings. When Congress passed the AEDPA, it curtailed a federal district court's discretion to grant an evidentiary hearing on a § 2254 petition. See 28 U.S.C. 2254(e). Congress, however, placed no such limitations on the standard for granting an evidentiary hearing in § 2255 proceedings.[7]

---

under § 2254. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence"). Thus, a § 2255 investigation must be more far-ranging because the potential cognizable claims can be statutory in nature as well as constitutional.

[7.] *See, e.g., Stead v. United States*, 67 F. Supp. 2d 1064, 1074 n.5 (D. S.D. 1999) ("Although the AEDPA modified, to some extent, the Townsend standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the Townsend standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases.").

6

The policies favoring discovery are even stronger in capital cases than in noncapital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland v. Scott,* 512 U.S. 849, 855 (1994).

Because this is a death penalty case, broad discovery is necessary to ensure the extra measure of process which is demanded in capital cases. "[I]f death is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims." *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987). Given the gravity of this capital case, Mr. Umaña requests this Court's leave to conduct discovery that will enable him to fully investigate, develop, and present any and all relevant claims.

**C. Efforts to obtain discovery directly from relevant parties.**

Prior to filing this discovery motion, Mr. Umaña made a good faith effort to obtain much of the requested discovery materials directly from the relevant parties, through discussions with the Government, and Freedom of Information and Open Records requests from third parties. Specifically, on August 24, 2015, Mr. Umaña sent a request to the custodian of records for the Los Angeles Police Department ("LAPD"), asking that the department release all documents in its possession pertaining to him or its investigation of him.  On September 15, 2015, the request was denied. *See* Exhibit 15.

On September 9, 2015 and April 25, 2016, Mr. Umaña made FOIA requests regarding records, documents or materials relating to Mr. Umaña and communication between the FBI, MS-

7

National Gang Task Force, Transnational Anti-Gang Center, and any other law enforcement agencies regarding Mr. Umaña. On May 26, 2016, Mr. Umaña was advised that "unusual circumstances" apply to the processing of his request as that phrase is defined in 5 U.S.C. § 552(a)(6)(B)(iii). Exhibit 16. For this reason, the processing of Mr. Umaña's FOIA request was delayed. On October 17, 2016, the Records Division of the FBI contacted Mr. Umaña's post-conviction team and indicated that there were approximately 5,030 pages exist that are potentially responsive to his request, but that due to the number of pages "it may be a very long time before [Mr. Umaña] would begin to receive material from this request." *Id*. To date, Mr. Umaña has not received any materials pursuant to the request, nor has he been given any date by when he may expect to receive any of those items. Counsel will continue to attempt to acquire the records directly from the FBI, but has no reason to believe that these items will be produced prior to the Court ruling on this discovery request.

Mr. Umaña also made multiple direct requests for discovery to the Government, both prior to, and after the filing his § 2255 motion, to resolve discovery issues without the involvement of the Court. Specifically, on February 11, 2016, Mr. Umaña sent a written letter to the Government requesting the production of numerous items relating to the unadjudicated California murders. In that letter, Mr. Umaña requested that the Government produce the following:

- A complete set of audio or video recordings, visual records, formal reports, typed memos and/or handwritten notes of witnesses interviewed regarding the Lemon Grove Park shooting, including:

    o The September 29, 2005 interview of witness Roberto Ramos labeled audio tape number 376049(B);

    o The September 29, 2005 interview of witness Freddy Gonzalez labeled audio tape number 376050;

8

- o The September 29, 2005 interview of witness Elgar Barrios labeled audio tape number 376049(A);

- o The September 29, 2005 interview of witness German Suarez and his wife labeled audio tape number 376051;

- o The October 18, 2005 interview of witness Juan Lara labeled audio tape number 376385;

- o The December 29, 2005 interview of witness Freddy Gonzalez labeled video tape number 376898;

- o The January 7, 2006 interview of witness Erik Lopez labeled video tape number 371939;

- o The January 7, 2006 interview of witness Alejandro Rodriguez labeled video tape number 371939;

- o The April 24, 2006 interview of witness Alejandro Rodriguez labeled video tape number 357881; and

- o The July 24, 2006 recorded interview described as "Fox11" labeled 492205.

- A complete set of audio or video recordings, visual records, formal reports, typed memos and/or handwritten notes of Fairfax Avenue suspects relating to information about the Lemon Grove Park shooting, including:

  - The April 24 or 25, 2006 interview of Fairfax Avenue suspect Luis Rivera; and

  - The September 13, 2006 audiotape interview of Fairfax suspect Rene Arevalo.

- True and correct copies of the six-pack identifications that were shown to eyewitnesses relating to the Lemon Grove shooting, including lineups numbered: 126533, 134998, 134190, 131339, 131346, 131348, 130150, 128866, 126533, 122791, 118737, 118775, 123032, 123896, 128874, 135865, 134886, 133015, and 130152;

- Records relating to the LAPD's June 20, 2006 sworn declaration filed in *People of the State of California v. Rene Arevalo*, Case No. BA301683 in support of

9

electronic surveillance of Fairfax Avenue suspect Rene Arevalo. The LAPD sworn declaration states it was believed Arevalo provided the weapon used at the Lemon Grove Park shooting;

- Records relating to information received from the state court's grant of electronic surveillance of Fairfax Avenue suspect Arevalo in *People of the State of California v. Rene Arevalo*, Case No. BA301683;

- Any and all information relating to rewards for information relating to the Fairfax Avenue and/or Lemon Grove shootings; and

- A complete set of audio or video recordings, visual records, formal reports, typed memos and/or handwritten notes of witnesses to the Fairfax Avenue shooting, including: Oscar Santiago, Noe Bautista, and Luis Rivera.

ECF Doc. 13, Appx. A.

After making direct requests to the Government did not result in production of discovery, Mr. Umaña filed a motion for discovery with this Court on April 27, 2016. ECF Doc. 13. In that motion Mr. Umaña requested the same items he had asked for in his request to the Government, as well as the following:

- Agents' notes, reports, recordings and other documentation from the Government's investigation into Mr. Umaña's social history and background in El Salvador, including documentation from the Government's meeting with Leticia Diaz (Mr. Umaña's mother) and any other family members or associates.

ECF Doc. 13.

Without addressing the merits, the Government's response to the discovery motion was that Mr. Umaña was not entitled to discovery prior to the filing of the § 2255 motion. ECF Doc. No. 18.

Following the filing of the § 2255 motion, counsel renewed discussions with the Government related to the discovery requests. On September 26, 2016, the Government produced, as a courtesy, four audio recordings of pre-trial interviews of testifying witnesses relating to the

10

unadjudicated California murders which were used as aggravating factors by the Government at the penalty phase. The Government produced the following four audio recordings to Mr. Umaña:

- September 29, 2005 Roberto Ramos interview;

- September 29, 2005 Freddy Gonzalez interview;

- October 18, 2005 Juan Lara interview; and

- December 29, 2005 Freddy Gonzalez interview.

The Government has advised post-conviction counsel that despite the disclosure of the four recorded interviews it is the Government's position that Mr. Umaña is not entitled to further discovery absent an order from the Court. Thus, Mr. Umaña has made a good faith effort to resolve his discovery requests without resorting to the Court and believes that the Court's involvement is now appropriate in order to address his remaining discovery requests.

Mr. Umaña notes that the previously undisclosed recorded interviews when evaluated item by item or cumulatively, support his claims for relief under *Strickland v. Washington*, 466 U.S. 668 (1984), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959) and help demonstrate the likelihood that the additional items he is requesting herein will likely also support his claims.[8] Therefore, this Court should grant Mr. Umaña's requests. *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998).

---

[8]This Court must assess a Brady violation based on the cumulative effect of all suppressed evidence. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). As discussed below, the mitigating and exculpatory nature of the previously undisclosed tapes increases the likelihood that additional mitigating and favorable information possessed by the Government was suppressed and makes it much more likely that those items, considered cumulatively with the tapes, may entitle Mr. Umaña to relief.

11

## III.  DISCOVERY REQUESTS

### A.  Mr. Umaña has good cause for his discovery requests.

In the following sections, Mr. Umaña identifies his specific discovery requests and the claims to which they relate.  Mr. Umaña also summarizes the specific facts he has alleged that, once fully developed, will demonstrate that he is entitled to relief for each such claim. In this section, Mr. Umaña also refers to the specific claims and subparts of his § 2255 Motion, which provide more detailed information regarding each claim which he incorporates here by reference. In some instances, a request is related to more than one claim. Accordingly, Mr. Umaña incorporates into each section all of the arguments presented in the other sections.

As used in Mr. Umaña's discovery requests, the term "communication" means any oral, written, or electronic utterance, notation, audio or video recording, or statement of any nature whatsoever, draft or final, by and to whomever, made or attempted to be made, including but not limited to correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, and other understanding, whether in a personal notation or between two or more persons.

The term "document" means any medium upon which intelligence or information can be recorded or retrieved and can be handwritten, typewritten, or electronically stored. The term "document" includes but is not limited to any record, note, email, memorandum, contract, draft, chart, report, drawing, sketch, graph, index, list, tape recording, or photograph.

To the extent the Government denies that the requested communications and documents are in its files, Mr. Umaña requests the Court order it to certify that no such responsive materials are in its possession, and, if applicable, the dates on which any responsive materials were

12

destroyed.[9]  To the extent that the Government has already provided all responsive documents for particular requests, Mr. Umaña requests the Court order it to submit a verification to that effect. To the extent privilege is claimed, Mr. Umaña asks that the Government be required to identify specific documents for which privilege is invoked. If the Government does not possess or have control over files of the agencies cooperating in the investigation, the defense requests that the Court issue subpoenas *duces tecum* to compel their production from these agencies.

The relationship between the requested discovery to the claims alleged, as well as the "good cause" for requests, is discussed below.

**B. Mr. Umaña has good cause to obtain discovery about the unadjudicated California murders he was alleged to have committed to support his claims that the evidence presented to the jury about his role in these murders was false, misleading and incomplete because of prosecutorial misconduct and the failure of his trial counsel to adequately investigate these murders (§ 2255 Motion, Claims V, VI, and VII).**

Mr. Umaña has good cause for this Court to grant permission to review evidence relating to the unadjudicated California murders.  In his § 2255 Motion, Mr. Umaña argued that his trial counsel provided ineffective assistance of counsel (Claim V), that the Government failed to produce exculpatory and impeachment evidence (Claim VI), and the Government introduced misleading and false information (Claim VII), relating to the allegations that Mr. Umaña shot and killed three people in two separate incidents in California (the Fairfax Avenue and Lemon Grove Park shootings), which occurred three years prior to the federal charges in North Carolina.  § 2255

---

[9] The absence of requested documents in the U.S. Attorney's files does not necessarily mean such documents do not exist, and Mr. Umaña has accordingly moved for discovery, in the form of subpoenas *duces tecum*, of the files of other agencies and third parties who investigated this case and may be in possession of the requested documents.

13

Motion at pp. 110-210. These unadjudicated killings were central to the Government's case at the penalty phase, as they provided the factual basis for the statutory aggravating circumstances alleged by the Government, legally necessary for the imposition of a sentence of death. *Id*. at 160. The California murders were used by the Government to convey to the jury that Mr. Umaña killed "over and over and over again," (Penalty Phase Transcript ("PPT") at 889), that he "kills who he wants to kill for his own reasons," (PPT at 834), and that "if it serves his needs he'll do it again." PPT at 835. Mr. Umaña now seeks discovery regarding the California murders.

In Claim V, Mr. Umaña alleged that trial counsel were ineffective in failing to investigate and present evidence that rebutted the Government's case on the unadjudicated California murders. § 2255 Motion at 110-69. He specifically alleged that trial counsel performed below established professional standards by failing to conduct an adequate and independent investigation, failing to obtain readily available records, and failing to make use of evidence that was produced in discovery or requesting the production of missing evidence. *Id*. In Claims VI and VII, Mr. Umaña alleged that the Government failed to disclose exculpatory and impeachment evidence and ultimately presented misleading and false evidence to the Court and the jury. *Id*. at 169-210. The ineffectiveness of counsel and the violations by the Government resulted in prejudice where the Court and the jury never learned about the serious shortcomings in proof of the crimes supporting the aggravating circumstances the Government used as its basis for a sentence of death.

As detailed in the following subsections, Mr. Umaña lists numerous examples of categories of evidence that exist, likely to be exculpatory, impeachment, or to demonstrate counsel's ineffectiveness, in the possession of the Government and/or law enforcement agencies. These

14

examples serve as both specific requests for discovery and also as examples for why production of the entire investigative files are necessary.

i. Mr. Umaña requests the opportunity to review the LAPD files and FBI files relating to the investigation of the California murders.

Mr. Umaña has good cause for this Court to grant him permission to review the Lemon Grove Park and Fairfax Avenue investigation files. In Claims V, VI, and VII, Mr. Umaña alleged there was significant information, including recordings of interviews with eyewitnesses that exculpated Mr. Umaña, impeached the Government witnesses, and rebutted the Government's arguments relating to the California murders yet were never presented to the Court or the jury.

Mr. Umaña alleged that a review of the record and the post-conviction investigation leads to a good faith belief that relevant evidence that supports his claims is missing and has not yet been produced by the Government. *E.*g. § 2255 Motion at 124. Specifically, in a post-conviction declaration filed in support of the Motion, the private investigator hired by trial counsel noted his concerns regarding the limited amount of discovery he received for review on the case. *See* § 2255 Motion, Appx. 25 at ¶ 6. The investigator stated that he encouraged trial counsel to request the information from the Government and/or obtain a subpoena from the Court in order to get the discovery from the LAPD. *Id.* at ¶ 12. In other post-conviction declarations, trial counsel also acknowledged that they did not review or receive important discovery, including the recorded pre-trial interviews of testifying witnesses. § 2255 Motion, Appx. 24 at ¶ 8 and Appx. 23 at ¶ 8.

Mr. Umana directs this discovery request not only to the Government but also to the LAPD and the FBI. Considering the amount of missing discovery relating to the California murders, it is possible that the Government did not receive all relevant discovery from the LAPD prior to trial.

15

In an October 18, 2008 letter, the Los Angeles District Attorney's Office stated that it provided the United States Attorney's Office in Charlotte with its files regarding the California murders. *See* attached Exhibit 17. The District Attorney's Office noted, however, that it had not received, nor would it be asking for, the complete investigative file from the LAPD since Mr. Umaña's return to their jurisdiction was uncertain considering the federal charges in North Carolina. *Id*. Moreover, as explained in more detail below, the recently produced audio tapes of interviews with testifying witnesses flatly contradict arguments and testimony presented by the Government, suggesting the possibility that the prosecuting office did not receive or review these recordings.

The FBI also participated in the investigation of the California murders and it appears from the record that the Government does not have the complete FBI files relating to the California murders, either. According to a one-page FBI-302 produced in discovery, between January 11 to January 16, 2009, FBI agents and prosecuting attorneys traveled to Los Angeles for meetings, interviews, and investigation. *See* January, 2009 FBI-302 attached hereto as Exhibit 18. The FBI-302 does not provide any details about the meetings or the interviews. The report simply states that "[a]dditional information pertaining to the details of interviews conducted during this investigation can be found in the interviewees corresponding FD-302 document made part of this investigative case file. Photographs taken during this investigation can be found in the exhibits 1(a) section of this case file." *Id*. Although the government did appear to produce in discovery the photographs taken during the LA investigation, missing from the production are the names of those interviewed and the information gained from those interviews. Based on the LAPD chronological record of the Lemon Grove shooting, the Government interviewed testifying witnesses Freddy Gonzalez and Juan Lara during this time. *See* § 2255 Motion, Appx. 51 at 41-2.

The chronological record, however, only provides the fact that the interview happened and no other information was given. *Id.* The LAPD chronological record for the Fairfax Avenue shooting as produced in discovery is incomplete and there is no reference to any investigation done after 2006. Thus, there is no information in the discovery as to what interviews were done relating to Fairfax Avenue shooting.

In support of his Claims V, VI, and VII Mr. Umaña requests the following discovery in the form of a court order compelling production by the Government (Exhibit 1) a subpoena *duces tecum* addressed to the LAPD (Exhibit 4):

1. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the LAPD file relating to the September 28, 2005 murder of Andy Abarca at Lemon Grove Park in Los Angeles, California;

2. A complete set of the LAPD's murder book[10] relating to the September 28, 2005 murder of Andy Abarca at Lemon Grove Park in Los Angeles, California;

3. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the LAPD file relating to the July 27, 2005 murder of Gustavo Porras and Jose Herrera on Fairfax Avenue in Los Angeles, California; and

4. A complete set and true and correct copy of the LAPD's murder book, including a complete chronological record of investigation, relating to the July 27, 2005 murder of Gustavo Porras and Jose Herrera on Fairfax Avenue in Los Angeles, California.[11]

---

[10] The LAPD "murder book" includes, but is not limited to, the chronological record, crime scene log, related crimes reports, witness lists, witness statements, field interview cards with identifying information for each witness, field identification cards for each witness, and investigation notes.

11 Mr. Umaña was provided with a portion of the chronological record for the Fairfax Avenue shooting. That record, however, only contains entries through 2006. Investigation into the Fairfax Avenue shooting continued for years after 2006. *See e.g.* Gov. Trial Ex. 522 (LAPD

17

In support of his of Claims V, VI and VII, Mr. Umaña also requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the FBI (Exhibit 5):

5. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the FBI file relating to the September 28, 2005 murder of Andy Abarca at Lemon Grove Park in Los Angeles, California; and

6. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the FBI file relating to the July 27, 2005 murder of Gustavo Porras and Jose Herrera on Fairfax Avenue in Los Angeles, California.

As Mr. Umaña alleged in his § 2255 Motion, exculpatory, impeachment, and mitigating evidence exists that the jurors never heard due to trial counsel's constitutionally deficient investigation and presentation, due to the Government's failure to produce evidence, and due to the Government's introduction of false and misleading evidence. § 2255 Motion at 110-210. The requested discovery goes to those claims. Specifically, it is expected that the LAPD and FBI investigative files will help establish that the Government's allegations that Mr. Umaña was the shooter in each of the California murders were unreliable, if not wholly unsubstantiated. At a minimum, Mr. Umaña anticipates that the files will provide mitigating evidence related to those unadjudicated murders. There is reason to believe that, if these facts are developed, Mr. Umaña will be able to prove that he is entitled to relief. Thus, this Court should permit discovery of these files. *Bracy*, 520 U.S. at 908-09.

---

Detective Gene Parshall – the lead detective in the Fairfax Avenue shooting investigation – interrogates Mr. Umaña regarding the Fairfax Avenue shooting).

18

ii.    <u>Mr. Umaña requests discovery relating to Lemon Grove Park shooting witness Freddy Gonzalez.</u>

Mr. Umaña has good cause for this Court to grant him permission to review evidence relating to testifying witness Freddy Gonzalez (aka Carlos Dominguez Gonzalez).

At the penalty phase, the jury heard from three men who were at Lemon Grove Park when two men approached them and began shooting which resulted in the death of Andy Abarca. Witness Freddy Gonzalez was the only witness that made any type of pretrial identification of Mr. Umaña. *See* PPT at 328. Prior to the penalty phase, the Government proffered to the Court two photo arrays in which Gonzalez gave written tentative identifications of Mr. Umaña as the Lemon Grove shooter. Gov. Trial Ex. 506-07. The identifications were made on December 29, 2005, and April 15, 2006. Based on these written statements, the Court expressed its lack of confidence in Gonzalez's pretrial identifications, referring to them as "suspect" (PPT at 328) and "lacking sufficient indicia of trustworthiness." PPT at 7. The Court nonetheless permitted the testimony of Gonzalez about those identifications after the Government orally proffered that despite the written statement, Gonzalez stated during an interview "I will never forget that face" and that out of the three testifying witnesses Gonzalez "had the best opportunity to see the [shooter]." PPT at 326.

On direct examination of Gonzalez, the Government elicited answers regarding Gonzalez's ability to identify the shooter in those photo arrays. PPT 330-33. Gonzalez confirmed for the prosecutor that despite the uncertainty in the written statements, he was "sure" about his identification of the shooter and the person he circled was in fact the shooter. *Id.* The jury saw the two photo arrays with the face of Mr. Umaña circled. Gov. Trial Ex. 506, 507. The

19

Government limited the testimony of the two other testifying witnesses – Roberto Ramos and Juan Lara – and did not ask them questions regarding their ability to recognize the suspects at the park. PPT 119-45.

Mr. Umaña has alleged that the Government failed to produce pre-trial interviews of various witnesses, including testifying witnesses, to the Lemon Grove Park shooting. As noted above, the Government recently produced some, but not all, of the requested recordings of the witnesses Gonzalez, Ramos, and Lara. The recordings raise serious concerns regarding the Government's case. Specifically, the recently produced September 29, 2005 and December 29, 2005 audio recordings of Gonzalez's interviews wholly contradict the Government's claim that Gonzalez said "I will never forget that face" during an interview and that he was the witness who got the best look at the shooter. The recordings also flatly negate his testimony that he was confident when he made the pretrial identification.

The newly produced audios show that on September 29, the day after the shooting, Gonzalez repeatedly told LAPD Detectives Thomas Small and Elizabeth Estupinian that he was not able to see the face of the shooter. *See* Sep. 29, 2005 Interview of Gonzalez attached hereto as Exhibit 20 (Gonzalez stated "Don't think I can remember his [the shooter's] face and tell you … how his face – nothin' like that" (p. 23); "But you got to understand that it happened so quick I wasn't looking at their faces." (p. 32); "I'm going by just the hair, you know, not the face, just the hair." (*Id.*)).

On December 29, detectives inform Gonzalez that they have received information during their investigation and had photos to show Gonzalez to see if he could identify the two men that came to the park. Only two photo line-ups were shown to Gonzalez. In the first, line-up Gonzalez

20

identifies Alex Montes as the person coming with the shooter.  Exhibit 21(a) at 37; § 2255 Motion, Appx. 62.  Gonzalez provides confidence in his identification because he has seen Montes before. *Id.*

The second photo line-up had the picture of Mr. Umaña.  When showed the photo array, Gonzalez stated "***No.  No, I don't recognize none of those guys***, never seen him at the park neither." Dec. 29, 2005 Transcript of Gonzalez Interview attached hereto as Exhibit 21(b) at 12 (emphasis added).  Rather than accepting that answer, Detective Small continued as follows:

Det. Small:     Anybody that's close or similar?

Gonzalez:       Close, maybe this one right here, the one in the middle.

Det. Small:     Number two?

Gonzalez:       Yeah.  Other than that no, I don't recognize him.

Det. Small:     Okay

Gonzalez:       Mm-hm.

Det. Small:     Um, the guy that walked up and drew the gun, had you ever seen that guy in the park before?

Gonzalez:       Never, never before.

Det. Small:     Okay.

Gonzalez:       Ever the first time I see that guy. That's why it's so hard for me to [. . .] recognize his face 'cause it happened so quick.  You know what I mean?

Det. Small:     Okay

Gonzalez:       It's hard for me to recognize his look – his face in my – my brain. And I can't.  **I just can't [. . .] recognize his face**.

21

*Id*. at 12-13 (emphasis added). Detective Small then said if the person in the picture in number two position was similar, then Detective Small could "work with that" but if Gonzalez was "sure" they needed to know that. *Id*. at 16. Gonzalez responded "***No. I'm not sure. No***." *Id*. (emphasis added). Gonzalez also suggested that the detectives speak to witnesses Ramos and Lara because he believed that they had a better opportunity to observe the shooter. *Id.* at 5-6. The recorded interview also provides information that is not otherwise accounted for in the police reports and detective notes. Specifically, Gonzalez was under arrest at the time of his December 29 interview and is told by LAPD that they are willing to help him out with his other case if he helps them with identifying the suspects. *Id*. at 10 ("Well, I tell you, you help us out here, it'll go a long way in speaking for your quality.").

The recorded interviews not only contradict the prosecutor's claim that Gonzalez said "I will never forget that face" and Gonzalez's testimony that he was "sure" in his pre-trial identifications, but it also differs substantially from Detective Small's handwritten notes. According to Detective Small's notes, Gonzalez said that photo #2 of Mr. Umaña "strongly resembled the shooter." § 2255 Motion, Appx. 51 at 15. That is an inaccurate summary of Gonzalez's actual statements. The discrepancy between the recorded interview and his notes call into question the accuracy of the detective's notes and reports. It also calls into question the detective's credibility as a witness and makes necessary the production of all other recorded interviews so they, too, can be compared against notes and reports of other members of the LAPD.

In his Motion, Mr. Umaña also alleged that the jury never heard that while Gonzalez only saw one person shooting, he identified at least two people who looked like the sole shooter.

22

§ 2255 Motion at 129-30.  The jury never heard that Gonzalez also circled the picture of MS-13 gang member Geovani Rodas from a photo array line-up.  *Id.*  Nor did the jury learn the following facts about Rodas:

- Two non-testifying witnesses implicated Rodas in the shooting (2255 Motion, Appx. 51 at 9);

- Rodas shot a man and committed robberies within a couple of blocks of the Lemon Grove Park just weeks after the murder of Andy Abarca  (*see* 2255 Motion, Appx. 61 at 9-10);

- When arrested for one of those robberies, Rodas was in possession of a .357 caliber handgun, the same type of gun that killed Andy Abarca (2255 Motion at 120; PPT at 154); and

- Another testifying witness, Juan Lara indicated prior to trial that Geovani Rodas resembled the shooter that killed his friend (2255 Motion, Appx. 51 at 23).

Thus, in addition to the interviews by the LAPD, four years after the Lemon Grove shooting, federal agents and prosecutors traveled to Los Angeles to conduct an investigation into the unadjudcated California murders.  A FBI-302, produced in discovery at pre-trial, simply states that interviews were conducted in Los Angeles.  *See* Exhibit 18.  No details of who was interviewed and what was said were given in the FBI-302.  *Id.*  Detective Small's notes indicate he "[t]ransported F. Gonzalez to Hollywood for interview with DOJ Attorney Sam Nazarro, FBI Agent Attard, and ICE Agent Romero."   § 2255 Motion, Appx. 51 at 41.  Yet, the Government has not produced any record of that interview other than the fact that it took place.

In support of his of Claims V, VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the LAPD and the FBI (Exhibits 4 and 5):

23

7. True and correct color copies of photo arrays shown to Freddy Gonzalez during any and all of his pretrial interviews with the Government, LAPD, FBI, or any other law enforcement agency;

8. Any communications, documents, recording, or information relating to the December 29, 2005 interview, including the *video* recording noted in the detective's notes;[12]

9. Any communications, documents, recording, or information relating to the March 15, 2006 the LAPD interview with Gonzalez (*see* Appendix 65 to the § 2255 Motion);

10. Any communications, documents, recording, or information relating to the April 15, 2006 interview where Gonzalez wrote that Mr. Umaña's hair looks like the shooter's but he is not sure (*see* Gov. Trial Ex. 506);

11. Any communications, documents, recording, or information relating to the June 28, 2006 interview with Gonzalez (see Appendix 51 at 28);

12. Any communications, documents, recording, or information relating to Gonzalez's interview(s) with federal agents and/or prosecutors;

13. Any communications, documents, recording, or information relating to any other interview by the Government, LAPD, FBI, or any other law enforcement agency with Gonzalez relating to the Lemon Grove shooting; and

14. Any communications, documents, recording, or information pertaining to promises, consideration, benefits and rewards made by the Government, LAPD, or any other law enforcement agency to Gonzalez in exchange for his cooperation.

The requested discovery is sought to establish that the account of the Lemon Grove Park shooting as presented by the Government at trial was inaccurate, and based on the available evidence the Government knew, or reasonably should have known, that identification by Gonzalez

---

[12] The LAPD notes and reports state that the December 29, 2005 interview of Gonzalez was video-recorded, Mr. Umaña, however, has only received an audio recording. *See* ECF Doc. 13-1, Appx. F.

of Mr. Umaña was wholly unreliable and his testimony false.  The requested discovery is also sought to show that trial counsel were ineffective investigating and preparing to rebut the Government's case.  Although Mr. Umaña is aware that on March 16, 2006, Gonzalez identified Rodas as someone who looked similar to the shooter, the requested notes, reports, or recordings relating to that interview may show that Gonzalez was more certain when identifying Rodas. Furthermore, given the fact that Gonzalez didn't recognize Mr. Umaña's photograph when it was first presented to him in 2005, but testified in 2010 that he was sure Mr. Umaña was the shooter, it is likely that Gonzalez's ability to identify the shooter could have been discredited. The requested discovery is likely to establish that Gonzalez's cooperation with the Government was influenced or "result[ed] from factors other than the witness's own recollection of the crime."  *Satcher v. Pruett*, 126 F.3d 561, 566 (4th Cir. 1977).  As the United States Supreme Court recognized in *Kyles v. Whitley*, "evolution over time of a given eyewitness's description can be fatal to its reliability."  514 U.S. at 444 (citations omitted).

There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief.  Thus, this Court should permit discovery of this specific information from the Government and grant the request for subpoenas *duces tecum* addressed to the LAPD and the FBI.  *Bracy*, 520 U.S. at 908-09.

25

iii. <u>Mr. Umaña requests discovery relating to witness Roberto Ramos regarding the Lemon Grove Park shooting.</u>

Mr. Umaña has good cause for this Court to grant him permission to review evidence relating to testifying witness Roberto Ramos.

Mr. Umaña alleged in his § 2255 Motion that the jury never learned that witness Roberto Ramos was confident in his ability to identify the shooter and was shown pictures of Mr. Umaña yet never identified him. *See* § 2255 Motion at 133-35.[13] In a post-conviction declaration submitted in support of the Motion, testifying witness Ramos stated that he told the LAPD that he was confident about his ability to identify the shooter but did not see the shooter in any of the photos shown to him by the LAPD. *See* § 2255 Motion, Appx. 11 at ¶ 16. Ramos further stated in his declaration that when he saw Mr. Umaña in person in federal court, he knew that the Government had the wrong person. *Id*. at ¶ 27. Ramos unequivocally stated that Mr. Umaña was not one of the suspects who perpetrated the shooting at the park. *Id*. According to Ramos, the prosecutor asked him to make a gesture when on the stand that would signal to the prosecutor that Ramos could identify Mr. Umaña as the shooter. *Id*. at ¶ 26-27. Ramos stated in his declaration that he did not signal to the prosecutor because Mr. Umaña was not the shooter. *Id*. Following his testimony, the prosecutor did not request any clarification from Ramos whether or not Mr. Umaña was in fact the shooter. *Id*. It is telling that although Ramos, unlike Gonzalez, told detectives that he was confident of his ability to identify the shooter, the Government did not

---

[13] Ramos consistently described the shooter as being in his late 30's or at least mid-30's. *See* Exhibit 23 at 14 (Recorded interview from the day after the shooting in 2005); *and see* § 2255 Motion, Appx. 11 ¶ 15 (Sworn declaration provided in 2016). At the time of the shooting, Mr. Umaña was only 22 years old.

26

question him at trial about his ability to see the shooter. Instead, the prosecutor only asked for confirmation from Ramos that the incident happened "quickly" and there "wasn't real good lighting." PPT at 132.

In support of his of Claims V, VI, and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the LAPD and the FBI (Exhibits 4 and 5):

15. True and correct color copies of photo arrays shown to Roberto Ramos during any and all of his pretrial interviews with the Government, LAPD, FBI, or any other law enforcement agency;

16. Any communications, documents, recording, or information relating to the October 25, 2005 interview of Ramos (*see* 2255 Motion, Appendix 51 at 13);

17. Any communications, documents, recording, or information relating to the March 31, 2006 interview of Ramos at his home with the LAPD (*see* 2255 Motion, Appendix 51 at 23);

18. Any communications, documents, recording, or information relating to the March 31, 2006 interview of Ramos at the Hollywood police station (*see* 2255 Motion, Appendix 51 at 24);

19. Any communications, documents, recording, or information relating to the April 24, 2006 interview of Ramos at his home (*see* 2255 Motion, Appendix 51 at 26);

20. Any communications, documents, recording, or information relating to the May 11, 2006 interview of Ramos by the LAPD where Ramos did identify MS-13 member "Trivalene" as someone he knows from the park (*see* 2255 Motion, Appendix 51 at 28);

21. Any communications, documents, recording, or information relating to the June 29, 2006 interview of Ramos (*see* 2255 Motion, Appendix 51 at 28);

22. Any communications, documents, or information relating to trial preparation of Ramos with Government; and

27

23. Any communications, documents, recording, or information relating to any other interview by the Government, LAPD, FBI, or any other law enforcement agency with Roberto Ramos relating to the Lemon Grove Park shooting.

The requested discovery is sought to establish that the account of the Lemon Grove Park shooting as presented by the Government at trial was false or misleading. The requested discovery is also sought to establish that based on the available evidence the Government knew, or reasonably should have known, that Ramos was an exculpatory witness for Mr. Umaña. The requested discovery would further support the claim that trial counsel were ineffective in investigating and preparing to rebut the Government's case. There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information and grant the request for subpoenas *duces tecum* addressed to the LAPD and the FBI. *Bracy*, 520 U.S. at 908-09.

iv. Mr. Umaña requests discovery relating to witness Juan Lara regarding the Lemon Grove Park shooting.

Mr. Umaña has good cause for this Court to grant him permission to review evidence relating to testifying witness Juan Lara.

Mr. Umaña alleged in his Motion that exculpatory and impeachment evidence had not been produced by the Government relating to statements made by witness Lara and the jury heard a false and/or misleading account of the Lemon Grove shooting. § 2255 Motion at 177-78. For example, Mr. Umaña alleged that the Government did not produce discovery relating to the pretrial interview of witness Lara by federal agents and prosecutors in January of 2009. *Id.* A FBI-302 report produced in discovery simply states that interviews were conducted in Los Angeles. *See* Exhibit 18. No details of who was interviewed and what was said were given in the FBI-302. *Id.*

28

The LAPD notes simply state "[m]et with Juan Lara with DOJ (Nazzaro) FBI (Attard) ICE (Romero) for follow up interview." § 2255 Motion, Appx. 51 at 41.

Moreover, the recent Government production of one of the Lara interviews supports the allegations in Mr. Umaña's Motion that there is additional exculpatory and/or impeachment evidence not yet produced. During an October 18, 2005 interview, Lara told the LAPD that he was confident in his ability to identify the shooter from a photo array and he was able to provide a detailed description of the suspects. Exhibit 22(a) at 28-31. Detective Small tells Lara that Officer Flores would be coming in to show him a large book of photographs containing numerous mugshots of MS-13 gang members, which presumably contained a picture of Mr. Umaña. Exhibit 22(b) at 2..

Mr. Umaña has a good faith reason to believe that Lara was shown a picture of Mr. Umaña by Detective Flores. Specifically, during the April 23, 2008 interrogation of Mr. Umaña by LAPD, Flores stated that he took Mr. Umaña's picture in late 2004 so that he could include it in a book of photographs of gang members. *See* Gov. Trial Ex. 522 at 6 (interrogation of Mr. Umaña).

In his § 2255 Motion, Mr. Umaña also alleged that trial counsel were ineffective in investigating and presenting evidence that Lara was shown photos of Mr. Umaña prior to trial but never identified him as the shooter or stated that Mr. Umaña looked like the shooter. § 2255 Motion at 133-35. In addition, the jury never heard that during a pre-trial interview, Lara identified MS-13 gang member Geovani Rodas as someone that was similar to the shooter. *See id*. at 120; Appx. 51 at 23. Rodas was considered a suspect in the shooting after being implicated by other MS-13 members and witness Gonzalez also identified Rodas as being similar to the shooter. PPT at 108. Except for the recent production of the audio recorded October 18, 2005, the Government

29

has not produced any other audio or video recordings of interviews with Lara.  The information relating to the multiple interviews with Lara are often times limited to a couple summary lines in the LAPD's chronological record of investigation.  *See* § 2255 Motion, Appx. 51.

Thus, in support of his of Claims V, VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to LAPD and the FBI (Exhibits 4 and 5):

24. True and correct color copies of photo arrays shown to Lara during any and all of his pretrial interviews including the book of photos shown to him during his October 18, 2005 interview;

25. Any communications, documents, recording, or information relating to the October 26, 2005 interview of Lara with the LAPD;

26. Any communications, documents, recording, or information relating to the January 3, 2006 interview of Lara with the LAPD (2255 Motion, Appx. 51 at 15);

27. Any communications, documents, recording, or information relating to the March 30, 2006 interview of Lara (*see* 2255 Motion, Appx. 51 at 23);

28. Any communications, documents, recording, or information relating to the April 24, 2006 interview of Lara by the LAPD (*see* 2255 Motion, Appx. 51 at 25);

29. Any communications, documents, recording, or information relating to the May 10, 2006 interview of Lara with the LAPD (*see* 2255 Motion, Appx. 51 at 26);

30. Any communications, documents, recording, or information relating to the July 6, 2006 interview of Lara with the LAPD (*see* 2255 Motion, Appx. 51 at 30);[14]

---

[14] According to the brief summary notes of the LAPD, during the April 24, 2006 interview, Lara states that he grew up with Fairfax Avenue suspect Rene Arevalo.  § 2255 Motion, Appendix 51 at 26.  He also stated that Fairfax Avenue suspect Luis Rivera as being "most similar in looks to the tall thin gunman" at Lemon Grove Park.  *Id*.

30

31. Any communications, documents, recording, or information, relating to any interview of Lara with federal agents and/or prosecutors following the indictment of Mr. Umaña; and

32. True and correct color copies of the MS-13 photo book(s) shown to witness Lara by LAPD Detective Frank Flores, identifying information for the subjects of those photos, and comments made by Lara in reaction to those photos.

The requested discovery is sought to establish that trial counsel were ineffective in rebutting the Government's case against Mr. Umaña, the Government knew, or reasonably should have known, that Lara was an exculpatory witness for Mr. Umaña, and that the Government failed to produce exculpatory and/or impeachment evidence relating to the interview of Lara. The requested discovery is likely to show that Lara repeatedly expressed confidence in his ability to identify the shooter yet on multiple occasions indicated that he did not recognize Mr. Umaña as one of the suspects. There is also reason to believe that requested discovery will show that Lara had additional information regarding the shootings that would place doubt in the Government's theory of the case. Specifically, the recently produced audio and the abbreviated detective notes produced in discovery indicate that Lara knew several MS-13 members, including Fairfax Avenue shooting suspect Rene Arevalo ("Mo") and he had a conversation with an MS-13 member after the shooting, who gave Lara information about the shooting. *See* § 2255 Motion, Appx. 51 at 25. There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information and grant the request for subpoenas *duces tecum* addressed to the LAPD and the FBI.

31

v.     <u>Mr. Umaña requests discovery relating to interviews with Fairfax Avenue suspects Luis Rivera and Rene Arevalo regarding the Lemon Grove Park shooting.</u>

Mr. Umaña has good cause for this Court to grant him permission to review evidence relating to statements made by Fairfax Avenue suspects Luis Rivera and Rene Arevalo regarding their knowledge about the Lemon Grove Park shooting.

In Claims V, VI, and VII, Mr. Umaña alleged ineffective assistance of counsel and prosecutorial misconduct because the Court and the jury were never told that Fairfax Avenue shooting suspect Luis Rivera was "steadfast" in his claim that Mr. Umaña was not involved in the Lemon Grove Park shooting. *See e.g.,* § 2255 Motion at 135-136. In an April 24, 2006 interview, Rivera told Detective Small that Mr. Umaña was not the Lemon Grove shooter but implicated MS-13 gang members "Casper" and "Trivilin." § 2255 Motion, Appx. 51, at 26. In a July 12, 2006 interview, Rivera would later "remain steadfast" in his explanation of the events at Lemon Grove explaining that Gasper (not Casper), Trivilin, and Sin (Geovani Rodas) were the gang members involved in the shooting. *Id*. at 32. Rivera's statements were never mentioned at trial.

Detective Small testified as to his interview of another Fairfax Avenue shooting suspect, Rene Arevalo. PPT at 110. According to Small, Arevalo looked at Mr. Umaña's photograph and said "that's your Lemon Grove shooter." *Id*. Mr. Umaña alleged in his § 2255 Motion that trial counsel were ineffective in failing to object to the introduction of this evidence and that the Government committed misconduct. § 2255 Motion at 142-42, and 256-57. Small's testimony regarding the statement of Arevalo was misleading, if not false. Small's abbreviated notes only state that Arevalo said Mr. Umaña was the "likely" shooter and that was based on information Arevalo received from an unidentified co-defendant in the Fairfax Avenue shooting case. *See* §

32

2255 Motion, Appendix 51 at 35. The jury never learned about the ambiguity in Arevalo's statements and the unreliability of their source. Moreover, Arevalo cooperated only after he was advised of a $75,000 reward for information. *Id.* This interview of Arevalo was recorded. *Id.* (Small's abbreviated notes of the interview with Arevalo stating "Refer to audiotape for more details."). The Government has not produced this recording, any notes (other than the abbreviated note described herein), or other documents relating to this interview.

In Mr. Umaña's prior discovery motion, he explained that Arevalo was connected to the gun used at both the Fairfax Avenue and Lemon Grove Park shootings. ECF Doc. No. 13 at 11. Detective Small filed an affidavit with the Superior Court of California, requesting electronic surveillance of Rene Arevalo while in custody and swearing to the Court that his investigation revealed that Arevalo was allegedly responsible for providing a weapon that was used in the Lemon Grove shooting. *Id.* However, at the sentencing phase, the Government argued that Mr. Umaña was the only MS-13 gang member linked to both the Lemon Grove shooting and the Fairfax shooting and therefore a ballistics match between the two crime scenes meant Mr. Umaña had to be the shooter on both occasions. PPT at 894. But none of the information connecting Arevalo to the Lemon Grove Park shooting was presented to the jury.

In support of his of Claims V , VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the LAPD (Exhibits 4 and 5):

33. Any communications, documents, or information relating to the April 24, 2006 interview of Luis Rivera with the LAPD;

34. Any communications, documents, or information relating to the July 12, 2006 interview of Luis Rivera with the LAPD;

35. Any communications, documents, or information relating to any other interview of Luis Rivera with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

36. Any communications, documents, or information pertaining to promises, benefits, consideration and rewards made by the Government, LAPD, or any other law enforcement agency to Luis Rivera in exchange for his cooperation;

37. Any communications, documents, or information relating to the September 13, 2006 interview of Rene Arevalo with the LAPD;

38. Any communications, documents, or information relating to any other interview of Rene Arevalo with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

39. Any communications, documents, or information pertaining to promises, benefits, consideration and rewards made by the Government, LAPD, or any other law enforcement agency to Rene Arevalo in exchange for his cooperation;

40. Any communications, documents, or information relating to LAPD's June 20, 2006 sworn declaration filed in *People of the State of California v. Rene Arevalo*, Case No. BA301683 in support of electronic surveillance of Fairfax Avenue suspect Rene Arevalo. The LAPD sworn declaration states it was believed Arevalo provided the weapon used at the Lemon Grove Park shooting;

41. Any communications, documents, or information relating to information received from the state court's grant of electronic surveillance of Fairfax Avenue suspect Rene Arevalo in *People of the State of California v. Rene Arevalo*, Case No. BA301683; and

42. Any audio and/or video recording, communications, documents, or information pertaining to the press conference held regarding the Fairfax Avenue shooting on July 29, 2005.

The requested discovery is sought in support Mr. Umaña's claims of ineffective assistance of counsel, the Government's failure to produce exculpatory and impeachment evidence, and the Government's introduction of false and/or misleading information. The production of

34

communication, documents, and information relating to the interviews of Luis Rivera and Rene Arevalo is likely to contradict the Government's case against Mr. Umaña. Because Detective Small appears to have embellished the statements of Arevalo when testifying at trial and because he omitted the exculpatory information given to him by Rivera, Mr. Umaña has shown good cause to review all information regarding their interviews. Moreover, if Detective Small used suggestive or coercive methods, made promises, or offered benefits to cause Arevalo to make the identification,[15] then Mr. Umaña was deprived of exculpatory and impeachment material in violation of *Brady* and the Government presented evidence that it knew or should have known to be false.

The requested discovery relating to the LAPD's request for surveillance of Arevalo is sought to rebut the Government's theory that Mr. Umaña was the only person in possession of a .22 caliber weapon that was used during both California murders. This connection of the gun to Mr. Umaña and no other MS-13 member was a critical component of the government's case. *See United States v. Umaña*, 750 F.3d 320, 348-49 (4th Cir. 2015) (relying upon the ballistics match between the Fairfax shooting and the Lemon Grove Park shooting to reject Mr. Umaña's argument on appeal). Because the link between Rene Arevalo and the Lemon Grove Park shooting murder weapon weakens the Government's inference that Mr. Umaña and the gun were the only two things

---

[15] At the time of the interview, Arevalo was in custody awaiting trial for the Fairfax Avenue murder. There is references in the chronological record that Detective Small spoke to the Assistant District Attorney on the case to see if any leniency could be provided to Arevalo in exchange for information relating to Lemon Grove Park shooting. *See* § 2255 Motion, Appx. 51 at 36.

35

in common between the Lemon Grove Park shooting and the Fairfax shooting, evidence connecting Arevalo to the weapon supports Mr. Umaña's claims.

There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information and grant the request. *Bracy*, 520 U.S. at 908-09.

> vi. Mr. Umaña requests discovery relating to interviews with non-testifying witnesses to the Lemon Grove Park shooting.

Mr. Umaña has good cause for this Court to grant him permission to review evidence relating to statements made by other witnesses to the Lemon Grove Park shooting.

In Claims V, VI, and VII, Mr. Umaña alleged ineffective assistance of counsel, Government's failure to produce exculpatory and impeachment evidence, and Government's introduction of false and/or misleading information relating to statements made by several other witnesses to the Lemon Grove Park shooting. Specifically, the jury never heard that on January 17, 2006, Detective Small interviewed Alejandro Rodriguez (aka Chocolate). § 2255 Motion, Appx. 69, at 11. Rodriguez told Small that Mr. Umaña did not do the shooting, but that Geovani Rodas was involved. *Id.* According to Rodriguez, Rodas drove a black Honda. *Id.* The jury also never heard that on October 18, 2005, witness Edgar Gutierrez told Detective Small that he spoke to Ranferic Vasquez (aka Blast) who stated that he knew who shot and killed Abarca and that the shooter drove a black Honda. 2255 Motion, Appx. 51, at 9. Several eyewitnesses were interviewed by LAPD. Many of these interviews were audio or video recorded, including two interviews with Rodriguez. The Government has not produced these recordings.

36

Thus, in support of his of Claims V, VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to LAPD (Exhibit 4):

43. Any communications, documents, or information relating to the January 7, 2006 interview of Alejandro Rodriguez (aka Chocolate) with the LAPD;

44. Any communications, documents, or information relating to the April 24, 2006 interview of Alejandro Rodriguez (aka Chocolate) with the LAPD;

45. Any communications, documents, or information relating to any other interview of Alejandro Rodriguez (aka Chocolate) with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

46. Any communications, documents, or information relating to the October 18, 2005 interview of Edgar Gutierrez with the LAPD;

47. Any communications, documents, or information regarding to Ranferic Vasquez (aka Blast) as it relates to the Lemon Grove Park shooting;

48. Any communications, documents, recording, or information relating to any other interview of Edgar Gutierrez with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

49. Any communications, documents, or information relating to the September 29, 2009 interview of Elgar Barrios with the LAPD;

50. Any communications, documents, or information relating to any other interview of Elgar Barrios with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

51. Any communications, documents, or information relating to the September 29, 2009 interview of German Suarez and his wife with the LAPD;

52. Any communications, documents, or information relating to any other interview of German Suarez and his wife with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

37

53. Any communications, documents, or information relating to the January 7, 2006 interview of Erick Lopez with the LAPD;

54. Any communications, documents, or information relating to any other interview of Erick Lopez with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting; and

55. Any communications, documents, or information relating to the interview of any other witness with the Government, LAPD, the FBI, or any other law enforcement agency relating to the Lemon Grove Park shooting.

The requested discovery is sought in support Mr. Umaña's claims of ineffective assistance of counsel, Government's failure to produce exculpatory and impeachment evidence, and Government's introduction of false and/or misleading information. The production of communication, documents, and information relating to the interviews of these witnesses is likely to contradict the Government's case against Mr. Umaña. Specifically, the evidence is likely to point to a third party as responsible for the murder of Andy Abarca. It is likely that the evidence will be exculpatory and impeachment material.

There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information and grant the request. *Bracy*, 520 U.S. at 908-09.

> vii. Mr. Umaña requests discovery relating to evidence relating to other Lemon Grove Park shooting suspects.

Mr. Umaña has good cause for this Court to grant him permission to review evidence relating to other Lemon Grove Park shooting suspects.

Mr. Umaña alleged in his motion that several witnessed implicated other suspects in the Lemon Grove Park shooting. As noted above, there was significant evidence implicating Geovani

38

Rodas. Witnesses Freddy Gonzalez, Juan Lara, Alejandro Rodriguez, Luis Rivera, and Edgar Gutierrez all made statements that pointed to Rodas's involvement. Moreover, Rodas was arrested near Lemon Grove Park shortly after the Andy Abarca's murder with a revolver that was the same caliber as the bullet that killed Abarca. § 2255 Motion at 120. Weeks after the shooting, Rodas shot a man and committed robberies within a couple of blocks of the Lemon Grove Park. § 2255 Motion, Appx. 51 at 9-10. When arrested for one of those robberies, Rodas was in possession of a .357 caliber handgun, the same type of gun that killed Abarca. 2255 Motion at 120; PPT at 154.

Suspect Alex Montes (aka Guanaco) and Juan Miguel Cortez (aka Trivilin) were also implicated as the Lemon Grove Park shooters. § 2255 Motion Appx. 51 at 32. In fact, prior to the Lemon Grove Park shooting, Montes and Cortez were alleged victims to an assault and robbery by Gonzalez and it was generally believed that the Lemon Grove Park shooting was meant to be revenge on Gonzalez for that assault. *See e.g.* PPT at 106.

Thus, in support of his of Claims V, VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the LAPD (Exhibit 2), United States Citizenship and Immigration Services ("USCIS") (Exhibit 6), and California Department of Corrections and Rehabilitation ("CDCR") (Exhibit 7):

56. Any communications, documents, or information relating to the arrest of Geovani Rodas in *People of the State of California v. Geovani Rodas*, Case No. BA291932;

57. Any communications, documents, or information relating to the arrest of Geovani Rodas in *People of the State of California v. Geovani Rodas*, Case No. BA293268;

58. True and correct copies of Geovani Rodas's entire C-File while he was incarcerated in the CDCR until his release in 2013;

59. The "A-file" from the US Citizenship and Immigration Services (USCIS) for Geovani Rodas (DOB ███████████) who was deported after he was released from Pleasant Valley State Prison on 9/11/2013;

60. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Geovani Rodas;

61. Any communications, documents, or information relating to Geovani Rodas's involvement in Lemon Grove Park shooting;

62. A-File from the US Citizenship and Immigration Services (USCIS) for Juan Miguel Cortez (DOB: ███████████);

63. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Juan Miguel Cortez;

64. Any communications, documents, or information relating to Juan Miguel Cortez's involvement in Lemon Grove Park shooting;

65. A-File from the US Citizenship and Immigration Services (USCIS) for Alex Montes (DOB ███████████);

66. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Alex Montes;

67. Any communications, documents, or information relating to Alex Montes involvement in Lemon Grove Park shooting;

68. A-File from the US Citizenship and Immigration Services (USCIS) for Alejandro Rodriquez (DOB: ███████████); and

69. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Alejandro Rodriguez.

40

The requested discovery is sought in support of Mr. Umaña's claims. Evidence that Rodas, Montes and/or Cortez committed Lemon Grove Park shooting is exculpatory and will likely lead to additional exculpatory and impeachment evidence. There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

> viii. <u>Mr. Umaña requests discovery relating to separate shootings that took place at Lemon Grove Park in the months leading up to the murder of Andy Abarca.</u>

Mr. Umaña has good cause for this Court to grant production of communication, documents or information relating to separate shootings that took place at Lemon Grove Park in the months leading up to the murder of Andy Abarca.

A .22 caliber casing on the ground at Lemon Grove Park did not match the caliber of bullet recovered from the And Abarca body. *See* PPT at 154-55. The .22 casings from the park, however, did match the bullets that killed the victims on Fairfax Avenue. *Id*. The Government successful argued to the jury that this matching bullet meant that the same person committed both California murders. PPT at 831.

Mr. Umaña argued in his § 2255 Motion that trial counsel were ineffective in rebutting the Government's claim and the Government presented false and misleading information regarding the significance of the bullets. Mr. Umaña alleged that the jury never learned that a witness named Alex Barrera told police that the .22 caliber bullets belonged to someone other than Mr. Umaña. § 2255 Motion at 141-42. Barrera also told the LAPD that this other person was the shooter at Fairfax. *Id*. Mr. Umaña further argued that the .22 caliber bullet in question could have been related to a shooting that had nothing to do with the murder of Andy Abarca. *Id*. Specifically, it

41

was represented at trial that the park was the subject of a turf war between gangs and shootings there were not unusual.  PPT at 92-93.

Indeed, according the at least one LAPD police report, approximately 4 months prior to the Lemon Grove shooting, there was a shootout in the park with a .22 caliber weapon.  *See* Exhibit 24.  It is possible that there were additional shootings that took place in the park with .22 caliber firearms that may have produced the bullet casing found by LAPD which would cast doubt on the ballistics link that served as evidence against Mr. Umaña in the Lemon Grove shooting evidence.

In support of his of Claims V, VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas *duces tecum* addressed to the LAPD (Exhibits 4):

> 70.    Any communications, documents, or information relating to shootings that occurred at Lemon Grove Park from July 28, 2005 to September 29, 2005.

The requested discovery is sought in support of Mr. Umaña's claims of ineffective assistance of counsel and prosecutorial misconduct.  Specifically, evidence of other shootings occurring prior to the murder of Andy Abarca at Lemon Grove Park, would further diminish the probative value of the ballistics evidence.  There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief.  Thus, this Court should permit discovery of this specific information.  *Bracy*, 520 U.S. at 908-09.

42

ix.  Mr. Umaña requests discovery relating to the interview of Fairfax Avenue witnesses.

Mr. Umaña has good cause for this Court to grant him production of evidence relating to the interview of Fairfax Avenue witnesses.

During the penalty phase of the trial, the jury heard that two neutral eyewitnesses, Oscar Santiago and Noe Bautista, both told LAPD that the driver of a gold Nissan got out of the car and shot Jose Herrera and Gustavo Porras on Fairfax Avenue on July 27, 2005. The Government presented the testimony of LAPD detectives Gene Parshall and Barry Telis who arrested and interrogated three MS-13 gang members that were believed to be in that car, including the driver. The three suspects did not testify at trial. Instead, the detectives purportedly summarized for the jury what these murder suspects told them during their custodial interrogations. Contrary to the statements of the neutral eyewitnesses, each of the gang members told detectives that the driver, Rene Arevalo, did not get out of the car and instead Mr. Umaña, who was a front seat passenger got out and shot the two young men.

In claims V, VI, and VII of his § 2255 Motion, Mr. Umaña alleged that numerous constitutional errors were committed in the presentation of Fairfax Avenue shootings, including ineffective assistance of counsel in failing to investigate and obtain readily available evidence, Government suppression of exculpatory and impeachment evidence, and the presentation of false and misleading evidence by the Government.

More specifically, Mr. Umaña alleged ineffective assistance of counsel and prosecutorial misconduct because the Court and the jury never heard of the statements of witness Alex Barrera. § 2255 Motion at 136-38. In a post-conviction declaration, trial counsel noted that they did not

43

recall ever reviewing statements made by Barrera. *Id*. at 138. In the recorded interview, Barrera repeatedly told LAPD that someone other than Mr. Umaña was the shooter at Fairfax. *Id*. at 137. According to Barrera, the Fairfax Avenue shooter was Luis Ramos, one of the suspects who agreed with the detectives during a custodial interrogation that Mr. Umaña was the shooter. *Id*. Although not in the car with the other gang members, Barrera stated he spoke to the Ramos immediately following the crime. At the direction of Ramos, Barrera he went to the scene of the Fairfax shooting. Subsequently Barrera received .22 caliber bullets from Ramos. *See* § 2255 Motion, Appx. 52. The day after the Fairfax Avenue shooting, Barrera was arrested for multiple armed robberies at Lemon Grove Park. § 2255 Motion at 141. At the time of his arrest, .22 caliber bullets were found in Barrera's pocket and the gun was not recovered. *Id*.

Additionally, Mr. Umaña alleged that trial counsel unreasonably failed to elicit testimony bolstering the identifications of Santiago and Bautista – that the driver of the Nissan was the Fairfax shooter. § 2255 Motion at 138-39. Trial counsel failed to emphasize that Santiago and Bautista saw the shooting in broad daylight and from different angles. *Id*. Moreover, the jury never heard that Bautista identified the driver as the shooter immediately after the incident, and he was so confident in his ability to identify the shooter that the officers sent him to a forensic sketch artist which produced a sketch that did not resemble Mr. Umaña. *Id*.

Thus, in order to support claims V, VI, and VII to his § 2255 Motion, Mr. Umaña requests the following in the form of an order of the Court compelling the government to produce the items (Exhibit 1) as well as subpoenas to LAPD (Exhibit 4) and USCIS (Exhibit 6):

44

71. Any communications, documents, or information relating to the arrest of Alex Barrera in *People of the State of California v. Alex Geraldo Barrera*, Case No. BA287819;

72. Any communications, documents, or information relating to the interrogation of Alex Barrera on or about July 28, 2005 relating to his arrest in *People of the State of California v. Alex Geraldo Barrera*, Case No. BA287819;

73. Any communications, documents, or information relating to any and all interviews of Alex Barrera relating to the Fairfax Avenue shooting;

74. A-File from the US Citizenship and Immigration Services (USCIS) for Alex Barrera (DOB██████████);

75. Any communications, documents, or information relating to any and all interviews of Oscar Santiago relating to the Fairfax Avenue shooting;

76. Any communications, documents, or information relating to any and all interviews of Noe Bautista relating to the Fairfax Avenue shooting;

77. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Oscar Santiago; and

78. A-file for Oscar Santiago (DOB: ██████████████).

The requested discovery pertains to the trial counsel's deficient performance in investigating and obtaining readily available evidence, particularly in regards to Santiago and Bautista. Moreover, any law enforcement communication with Barrera relating to the Fairfax shooting will likely result in additional exculpatory evidence that the government failed to produce. Statements Barrera made on the day of his arrest relating to the gun he used during the armed robberies or the bullets in his pockets may rebut the Government's case relating to both of the California murders.

45

There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

        x.    <u>Mr. Umaña requests production of true and correct copies of the photos or photo line-ups that were shown to witnesses to the Lemon Grove Park and Fairfax Avenue shootings.</u>

Mr. Umaña has good cause for this Court to grant him permission to review the true and correct copies of the photos or photo line-ups that were shown to witnesses.

In addition to Detective Flores's photo book shown to eyewitnesses, numerous photographic six-pack photo arrays were shown to witnesses including the Lemon Grove Park testifying witnesses Gonzalez, Lara, and Ramos. Although several line-ups were produced in discovery, it is unclear which line-ups were shown to specific witness. Several of the photo line-ups produced in discovery are not associated with a number. Thus, when a detective's note references that a specific line-up number was shown to a specific witness, it is impossible to discern which picture was shown. Moreover, in some instances, the detectives' notes mention a specific photo line-up number but do not provide the names of the suspects in those line-ups. Finally, as noted above, many of the photo line-ups produced in discovery are very poor quality black and white copies. For demonstrative purposes, below is a copy of Gov. Trial Ex. 507 as presented to the jury and produced in discovery:

46



ID:118737    Name:

The quality of several other line-ups are similarly of poor quality.

Thus, in support of his of Claims V, VI and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas duces *tecum* addressed to LAPD (Exhibit 4):

79. True and correct color copies of photographs, including photo line-ups, shown to Lemon Grove Park witnesses by the LAPD with corresponding identifying number and dates shown to the specific witnesses;

80. True and correct color copies of photographs, including photo line-ups, shown to Fairfax Avenue witnesses by the LAPD with corresponding identifying number and dates shown to the specific witnesses; and

81. Any and all identifying information relating to persons depicted in the photographs shown to Lemon Grove and Fairfax Avenue witnesses by the LAPD.

To properly develop these claims, post-conviction counsel would need to see a true and correct copy of the photographs with information as to the person being identified. True and accurate copies are also necessary to determine whether there was any impermissible suggestiveness in the line-ups. There is reason to believe that, if these facts are developed further,

47

Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**C. Mr. Umaña has good cause to obtain discovery about the "M" and "S" tattoos to support his claims of prosecutorial misconduct and ineffective assistance of counsel where the jury heard inaccurate and false evidence that Mr. Umaña had earned the "M" and "S" tattoo by having killed before (§ 2255 Motion, Claims VI, VII and XI).**

Mr. Umaña has good cause for this Court to grant the production of evidence relating to the Government's arguments on the significance of the "M" and "S" tattoo. In Claims VI and VII, Mr. Umaña alleged that the Government's failure to disclose exculpatory or mitigating information about the significance of the "MS" tattoo was a violation of *Brady* and *Giglio*, and that the Government introduced false and misleading evidence that Mr. Umaña "earned" his MS-13 tattoo by killing. *See* 2255 Motion at 197-205. In Claim XI, Mr. Umaña further argued that trial counsel were ineffective in failing to rebut the Government's evidence and argument. § 2255 Motion at 244. Specifically, Government witness Alexander Granados testified that in order to tattoo the two letters "MS" on your body, the person seeking to get such a tattoo must commit a killing. Guilt Phase Transcript ("GPT") at 913-14, 920. Mr. Umaña alleged that the introduction of the evidence at Mr. Umaña's trial is contrary to the evidence that was presented at the trial of his co-defendants, wherein the Government's witness Rony Lopez testified that there were numerous ways in which a member could earn the "MS" tattoo. According to Lopez, someone can have the tattoo if he "put in work for the gang" such as "rob people" or perform "different types of crimes." *United States v. Rosales Lopez, et al.*, 08-cr-00134-RJC Doc. No. 1080, at 567-68.

The violations by the Government and the ineffectiveness of counsel resulted in prejudice for Mr. Umaña. Government repeatedly emphasized the inference that Mr. Umaña's MS tattoo

48

constituted independent and reliable evidence that he had "earned" his tattoos by killing people for MS-13. *See e.g.* PPT at 824 ("He had earned those two letters on his forehead and he earned them by killing."). The Government encouraged the jury to believe that his tattoos constituted independent and reliable evidence of earlier murders, and to weigh those alleged murders in deciding whether to return a death sentence.

In support of his of Claims VI, VII and XI, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1), ) and in subpoenas addressed to the FBI (Exhibit 5), the Mecklenburg Sherriff's Office (Exhibit 12) and the Mecklenburg Police Department (13):

82. Any communications, documents, or information relating to the significance of tattooing the letters M and S by M-13 gang members;

83. The names of any persons the government consulted or interviewed regarding the significance of tattoos on MS-13 gang members, and any documents relating thereto;

84. Any communications, documents, or information that is inconsistent with or casts doubt on the testimony of witness Alexander Granados; and

85. Any communications, documents, or information relating to all promises, considerations, rewards, or inducements made by the Government, its prosecutors, agents or agencies to induce or encourage Alexander Granados' cooperation.

The requested discovery is sought to establish that trial counsel were ineffective in rebutting the Government's case against Mr. Umaña, the Government knew, or reasonably should have known, that Granados's testimony was false, if not misleading, and that the Government failed to produce exculpatory and/or impeachment evidence relating to the significance of the tattoos. The requested discovery is likely to show that the Government's repeated arguments at

49

both the guilt and penalty phase relating to the significance of Mr. Umaña's tattoos are unsubstantiated and contradicted by other evidence. There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**D. Mr. Umaña has good cause to obtain discovery about the Government's investigation into the background of Mr. Umaña to support his claims that the evidence presented to the jury about his life was inaccurate and incomplete because of prosecutorial misconduct and the failure of his trial counsel adequately to investigate Mr. Umaña's life history (§ 2255 Motion, Claims I, VI, VII, and XIII).**

Mr. Umaña has good cause for this Court to grant the production of communication, documents, and information relating to the investigation of the Government into Mr. Umaña's background. In his Motion, Mr. Umaña alleged that the jury heard an incomplete and inaccurate account of his life and never learned about the significant trauma, poverty, malnutrition, and abuse he suffered as a child and in his youth, or about his developmental delays and the adaptive deficits he displayed in childhood. In Claims VI and VII of his Motion, Mr. Umaña alleged that the Government conducted an investigation of Mr. Umaña's background in El Salvador, withheld material mitigating evidence from the defense in violation of *Brady*, and took advantage of the undisclosed favorable information by arguing to the Court and the jury that which it knew or should have known to be false and/or misleading during the proceedings in violation of *Napue*. *See* § 2255 Motion at 180-90, 193-97. Mr. Umaña also alleged in Claims I and XIII that trial counsel provided ineffective assistance of counsel in failing to investigate and present Mr. Umaña's social history and although counsel knew, or should have known, in advance of trial that the Government had information in its possession that would have assisted the mitigation, they failed to make direct

50

request discovery or ask for a continuance of the pretrial Atkins hearing and trial. § 2255 Motion at 7-61, 210-33.

Specifically, Mr. Umaña has alleged that the Government began its investigation into the social history of Mr. Umaña in the spring of 2008 in conjunction with the Transnational Anti-Gang Center and the El Salvador local police.[16] In June of 2008, Corporal Carlos Alberto Moreno of the Transnational Gang Unit went to the home of Mr. Umaña's mother, Leticia Ramirez, in Santa Ana, El Salvador and conducted an interview with her. In a post-conviction declaration, Ms. Ramirez states that Moreno came to her home to get information about her son. Appx. 10 at ¶81. Ms. Ramirez states that Moreno persuaded her to talk by claiming he was there to help her son, talking about religion, and said he wanted to evangelize Mr. Umaña. *Id.* Ms. Ramirez spoke in detail to Moreno about Mr. Umaña's life and family. *Id.* Ms. Ramirez explained that her son

---

[16] Knowledge of the existence of the requested documents, whether in the possession of the DOJ, the FBI MS-13 National Gang Task Force, the Transnational Anti-Gang Center, or El Salvador Policia Nacional Civil ("PNC") working in conjunction with the US Government is imputed to the Government. *See United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (for *Brady* analysis, no distinction is drawn between different agencies under the same government — all are part of the "prosecution team"); *United States v. Burnside*, 824 F.Supp. 1215, 1254-58 (N.D. Ill. 1993) (knowledge of warden and others at facility housing witnesses could be imputed to prosecution). In 2007, the Government formed the Transnational Anti-Gang Task force. *See* Oct. 10, 2007 "Going Global on Gangs" from the FBI website at https://www.fbi.gov/news/stories/2007/october/ms13tag_101007 (last reviewed on October __, 2016). The FBI described the "centerpiece" of the task force as "*eyeball-to-eyeball communication and collaboration*—namely, two FBI agents permanently stationed in San Salvador, working alongside 20 investigators and 10 analysts from the [PNC], the national law enforcement agency of El Salvador, to share intelligence information on gang activities." *Id.* (emphasis added). The task force works by having PNC officers conduct investigation relating to gang members in El Salvador, including the investigation of their family members. *Id.* The information obtained by PNC officers is then is channeled to FBI agents and then forwarded to the task force at FBI headquarters. *Id.*

51

could not get work because he did not have the Salvadoran identification since he was born in Guatemala and never registered his Salvadoran citizenship. *Id*. at ¶78. In 2003, she traveled to Guatemala and obtained Mr. Umaña's birth certificate in an effort to help her son. *Id*. She provided Moreno with the Guatemalan birth certificate. *Id*. at ¶81.

Mr. Umaña further alleged that in February of 2009, an FBI agent and an interpreter went to Ms. Ramirez's home and took her to a hotel room with several other people, including the prosecuting attorneys. Appx. 10 at ¶82. They interviewed Ms. Ramirez at length and asked her questions about Mr. Umaña's life. *Id*. She told them, in part, that Mr. Umaña's father sold drugs and involved his sons in the illicit activity. *Id*. Ms. Ramirez also told the Government that Mr. Umaña was born in Guatemala and that he could not find work because he had no Salvadoran identification. *Id*. Ms. Ramirez stated that she believed Mr. Umaña joined the gang because of a lack of employment opportunity. *Id*. Ms. Ramirez provided many of the details of the family's traumatic life history as noted in the post-conviction declaration. *Id*. According to Mr. Umaña's father, local detectives came to talk to him on behalf of the FBI and the prosecution to "help" his son. Appx. 18 ¶23. The detectives told him that they already spoke to Ms. Ramirez and threatened to investigate him if he refused to speak. *Id*. Rafael Umaña did not go with them to be interviewed. *Id*.

It was not until April 19, 2010, several days after the start of trial that the Government first produced the Guatemalan birth certificate and an abbreviated narrative written by Moreno based on information he received from Ms. Ramirez on or about June 8, 2008. The narrative gave names of the family members that went to live in Guatemala and explains that the father of Mr. Umaña is incorrectly listed as Luis Gonzalez, Rafael Umaña's cousin. The narrative does not provide any

52

explanation as to why the family moved to Guatemala or how they lived.  As to the February 2009 interview of Ms. Ramirez, the Government simply produced one line in a FBI-302 indicating that they interviewed Ms. Ramirez.  None of her statements were in the report.  The prosecutor provided a half-page of her own handwritten notes that failed to mention any of the mitigating statements Ms. Ramirez says she made to the Government.

Although Ms. Ramirez indicates that she provided the Government significant information regarding Mr. Umaña's life, the Government has not produced her statements other than the abbreviated narrative and the prosecutor's notes. No other discovery was provided regarding the interviews with Ms. Ramirez, the contacts with Rafael Umaña, or any other investigation involving Mr. Umaña's family.

In addition, the record shows that the Government concealed information from the Court and Mr. Umaña's trial counsel.  Although interviews with Ms. Ramirez occurred in June of 2008 and February of 2009, the Government said nothing when trial counsel informed the Court in September of 2009 that they had not been able to find and speak to any family members other than Mr. Umaña's father.  08-cr-00134 ECF Docs. 689 at 5-6 and 1254 at 7-8.  Trial counsel advised the Court that the father had been intimidated by local police and the FBI.  The Government also remained silent in November of 2009, when the Court and the experts relied on the wrong date of birth and country of birth for Mr. Umaña during the *Atkins* hearing.  08-cr-00134 ECF Doc. 932. During the April 19, 2010 eligibility phase, the Government presented evidence that Mr. Umaña was born in 1984, rather than in 1982.  PPT at 13-14.

Moreover, the Government successfully objected to trial counsel's introduction of the narrative prepared by Moreno.  PPT at 589.  Trial counsel argued that Moreno's narrative

corroborated the impact that the civil war had on Mr. Umaña's family such that they had to leave El Salvador to Guatemala. PPT at 589. Trial counsel further noted that the narrative was relevant to Mr. Umaña's self-identity due to the uncertainty of the time and place of his birth. *Id*.; *see also* 08-cr-00134 ECF Doc. 1103 at 16-17. The Government objected to the introduction of the narrative as irrelevant and noted that it provided no context other than that Mr. Umaña's family moved to Guatemala prior to his birth. 08-cr-00134 ECF Doc. 1147 at 17-18. The Court agreed, finding that the narrative "did not shed light on the effect of the civil war in El Salvador on the family, the role of the defendant's father in his life, or the defendant's personal sense of identity." 08-cr-00134 ECF Doc. No. 1165 at 15. Based on the post-conviction declarations, there is reason to believe that that Government learned more than just the fact that the family moved to Guatemala, but that it learned about details as to the family's specific reasons for leaving El Salvador, the family dynamics, and the difficulties Mr. Umaña suffered (including displacement and an inability to find employment) as the result of his lack of identification papers.

In Claim I, Mr. Umaña alleged that trial counsel failed to file specific, formal discovery requests relating to the Government interviews of Mr. Umaña's family, failed to seek mitigating evidence and information about the whereabouts of potential mitigation witnesses, and failed to use the little they learned from the Government as the impetus to renew and enlarge their own search for mitigating evidence. § 2255 Motion at 29. He argued in Claim XIII that trial counsel were ineffective in failing to request a continuance for purposes of obtaining this evidence from the Government. *Id*. at 258-266. The requested discovery is necessary to demonstrate the prejudice that resulted from counsel's deficient performance

Thus, in support of his of Claims I, VI, VII and XIII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas duces *tecum* addressed to the FBI (Exhibit 5) and Nassau University Medical Center in Meadow, New York (Exhibit 8):

86. Any communications, documents, or information pertaining to the June 2008 interview[s] of Leticia Ramirez (mother of Mr. Umaña) by Corporal Carlos Alberto Moreno of the Transnational Gang Unit in Santa Ana, El Salvador;

87. Any communications, documents, or information pertaining to Mr. Umaña's birth certificate which reflects Guatemala as his country of birth;

88. Any communications, documents, or information pertaining to communication with the Guatemalan Government regarding the birth and/or citizenship of Mr. Umaña;

89. Any communications, documents, or information pertaining to biographical and/or contact information for Mr. Umaña and/or members of his family in El Salvador or in the United States;

90. Any communications, documents, or information pertaining to the February 2009 interview[s] of Ms. Ramirez by the prosecuting attorneys and FBI agents in Santa Ana, El Salvador;

91. Any communications, documents, or information pertaining efforts by the FBI, Transnational Gang Unit, the PNC or any other law enforcement agency to interview Mr. Umaña's father, Rafael Umaña, in Santa Ana, El Salvador;

92. Any communications, documents, or information pertaining to interviews or communication between the FBI, Transnational Gang Unit, the PNC or any other law enforcement agency and Rafael Umaña in Santa Ana, El Salvador;

93. Any communications, documents, or information pertaining the investigation of the criminal background of Mr. Umaña's father, Rafael Umaña;

94. Any communications, documents, or information pertaining to interviews by the FBI, Transnational Gang Unit, the PNC or any other law enforcement agency with any other member of Mr. Umaña's family; and

55

95. Birth records from Nassau University Medical Center, Meadow, New York for Mr. Umaña's son ██████████████████████ who was born to mother Wendy Elizabeth Jaco Alvarez on ████████.

The requested discovery is sought to establish that trial counsel's deficient performance in failing to investigate and present mitigation based on Mr. Umaña's life history resulted in prejudice, and that the Government knew, or reasonably should have known, that the evidence of Mr. Umaña's background was false and/or misleading, and that the Government failed to produce exculpatory and impeachment evidence. The requested discovery is likely to show that the Government possessed information relating to Mr. Umaña's background that could have been used as mitigating evidence. There is reason to believe that, if these facts are developed further, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information.

**E. Mr. Umaña has good cause to obtain discovery about his mental health to support his claims relating to *Atkins*, *Hall*, ineffective assistance counsel and government misconduct. (§ 2255 Motion, Claims II, III, and IV, VI and VII).**

Mr. Umaña has good cause for this Court to grant the production of communication, documents, and information relating to Mr. Umaña's mental health. Mr. Umaña has alleged ineffective assistance of counsel claims related to trial counsel's mental health presentation at the penalty phase proceedings. Specifically, in Claim II and III, Mr. Umaña argued that trial counsel were ineffective in failing to properly investigate and present evidence of intellectual disability during the pretrial *Atkins* hearing and during the penalty phase before the jury. § 2255 Motion at 69-77. Mr. Umaña alleged that trial counsel failed in not presenting mitigating evidence of his low IQ and adaptive functioning to the jury. *Id.* Counsel also failed to present evidence of trauma and other mental illness. *Id.* Mr. Umaña further alleged that although trial counsel presented the

56

physical fact of Mr. Umaña having brain damage through images in a Positron Emission Tomography (PET) Scan, counsel presented nothing of its ramifications in his life – how it has likely affected his judgment, reasoning, and behavior. *Id.* Mr. Umaña has also alleged that trial counsel were ineffective in investigating and presenting evidence of brain damage, preparing their own witness, and preparing for the cross-examination of the Government witness Dr. Helen Mayberg. Specifically, Dr. Mayberg testified, contrary to the defense expert, that the results of the PET scan appeared to be normal. PPT at 762. Dr. Mayberg stated that prior to her testimony she spoke to the radiologist, Dr. Nirav Pravin Shah, who conducted the PET scan on Mr. Umaña. PPT at 760. Based on Dr. Mayberg's communication with Dr. Shah, Mayberg concluded that any abnormalities in the PET scan were likely due to the conditions of the testing rather than any actual brain damage. *Id.* 783.

Mr. Umaña has alleged that trial counsel's deficient performance prejudiced him since evidence of Mr. Umaña's intellectual deficits and brain damage would have given the jury another way to consider his unreasoned and impulsive actions at the time of the crime and during the pretrial and trial proceedings. Many of Mr. Umaña's actions which appear threatening in nature, would have been regarded differently if viewed through the prism of someone with a low IQ, adaptive behavior deficits and brain damage.

Mr. Umaña also alleged in Claims VI and VII, the Government failed to produce exculpatory and impeachment evidence and introduced misleading and false information relating Mr. Umaña's mental health claims.

Thus, in support Claims II, III and VII, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1) and subpoenas

addressed to Dr. Enrique Suarez (Exhibt 9), Dr. Helen Mayberg (Exhibit 10), Dr. Nirav Shah (Exhibit 11), Guildford County Sheriff Office (Exhibit 25) and the Mecklenburg County Sherriff's Office (Exhibit 12):

96. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, and correspondence concerning the examination of Mr. Umaña by Dr. Enrique M. Suarez;

97. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, and correspondence concerning the examination of Mr. Umaña by Dr. Enrique M. Suarez;

98. A complete set of all reports, notes, and/or memorandum prepared by Dr. Enrique Suarez in preparation for his testimony at the *Atkins* hearing;

99. Any communications, documents, or information relating communication between Dr. Enrique Suarez and jail guards cited in his November 2, 2009 report;

100. Any information that is inconsistent with or casts doubt on the testimony presented by Dr. Enrique Suarez;

101. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, and correspondence concerning the examination of Dr. Helen Mayberg;

102. A complete set of all reports, notes, and/or memorandum prepared by Dr. Helen Mayberg relating to Mr. Umaña and/or his sentencing hearing;

103. Any communications, documents, or information relating communication between Dr. Helen Mayberg and Dr. Nirav Pravin Shah relating to Mr. Umaña;

104. Any information that is inconsistent with or casts doubt on the testimony presented by Dr. Helen Mayberg; and

105. A true and correct complete set of all Mr. Umaña's pre-trial jail records from Mecklengburg County Sheriff Office and Guildford County Sheriff Office, which includes High Point and Greensboro detention facilities.

58

The requested discovery relates to whether trial counsel were ineffective in failing to investigate and present mental health claims and their ineffectiveness in rebutting the Government experts. Moreover, the requested discovery relates to whether any false, misleading, or inaccurate evidence was presented by the Government in order to defeat Mr. Umaña's *Atkins* defense and/or mitigation evidence. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

In Claim IV, Mr. Umaña alleged that his execution violates his rights to the effective assistance of counsel and to be free from cruel and unusual punishment because he is intellectually disabled. Mr. Umaña further alleges that the Court relied on evidence that is inconsistent with current accepted medical standards in violation of the Supreme Court's decision in *Hall v. Florida*, 134 S.Ct. 1986 (2014).

Moreover, Mr. Umaña has alleged that the Government's expert, Dr. Enrique Suarez, made findings based on factors that are inconsistent with accepted medical standards relating to intellectual disability. Mr. Umaña maintained that Dr. Suarez's determination of both the intellectual functioning and adaptive behavior prongs of the test of intellectual disability failed to comply with scientifically and medically-accepted standards.

Thus, in further support of Claim IV, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1):

106. Any briefs, memos, opinion papers, or policy statements from the Government regarding the requirements of *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), the definition of intellectual disability, the standards for evaluation or assessment of intellectual disability or other mental deficiency post-*Atkins* and *Hall*, and/or the procedures necessary to comply with *Atkins* and *Hall* in capital prosecutions;

59

107.	Any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on what constitutes intellectual disability or the appropriate definition for intellectual disability;

108.	Any evidence in its possession which suggests petitioner is intellectually disabled or suffers from any other mental impairment;

109.	The names of any persons the government consulted or interviewed regarding the existence (or not) of petitioner's intellectual disability or diminished psychological or adaptive functioning, and any documents relating thereto; and

110.	Any and all briefs, memos or position papers in possession of the Government which reflect the Government's position on the procedures to be employed in establishing intellectual disability, the lack of direction in 18 U.S.C. §3596, and/or the validity of 18 U.S.C. §3596.

The requested discovery is sought to establish that trial counsel's deficient performance in failing to investigate and request these materials resulted in prejudice, and that the Government knew, or reasonably should have known, that the testimony given by its expert witnesses was misleading and failed to comport with legal, medical and scientific standards for the determination of intellectual disability, and that the Government failed to produce exculpatory and/or impeachment evidence. The requested discovery is directly relevant to whether Dr. Suarez used methods of testing for intellectual disability that were contrary to community standards. The requested discovery will likely show that if accepted professional and clinical standards are considered as required by *Hall v. Florida*, Mr. Umaña can demonstrate that he meets the definition of a person with intellectual disabilities with significant impairment in intelligence and adaptive functioning that originated in childhood. *See* Petition, Appendix 28 at ¶23-24. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to

60

relief.  Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**F.  Mr. Umaña has good cause to obtain discovery about jurors to support his claim that he was denied the right to a fair and impartial jury (§ 2255 Motion, Claim XV).**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[17]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[17] ████████████████████████████████████████████████████
████████████████████████████████████████

61



62



**G. Mr. Umaña has good cause to obtain discovery regarding the grand and petit jury venires in order to support his claim that trial counsel failed to challenge the underrepresentation of African Americans, Hispanics, Asians, and Women in the grand and petit jury venires. (§ 2255 Motion, Claim XVII).**

In Claim XVII, Mr. Umaña alleged that trial counsel unreasonably failed to challenge the composition and selection of the grand and petit jury venires. § 2255 Motion at 305-308. Mr. Umaña further alleged that distinct groups, including but not limited to African Americans, Hispanics/Latinos, Asians, and women were underrepresented in the grand and petite jury venires

presiding over Mr. Umaña's case, and that this underrepresentation was due to a systemic exclusion of these groups in the jury selection process utilized. *Id*.

In support of this claim, Mr. Umaña requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and for requests of the Clerk's Office of the U.S. District Court for the Western District of North Carolina (Exhibit 2):

121. All JS-12 and/or AO-12 forms for the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina for a period dating from 1998 through 2009;

122. All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO-12s/JS-12s requested in item 121;

123. Any communications, documents (including, but not limited to, jury plans), or information explaining the process by which grand and petit juries were selected and summoned in the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina at the time of Mr. Umaña's indictment and trial;

124. Any communications, documents (including, but not limited to, jury plans), or information explaining any changes in the process by which grand and petit juries were selected in the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina since the time of Mr. Umaña's indictment and trial;

125. The Master Jury Wheel databases (in searchable format) from which (a) the grand jurors that indicted, and (b) the petite jurors that tried, Mr. Umaña were selected;

126. The reports on qualification status for the Master Jury Wheels from which Mr. Umaña's grand jurors and petite jurors were selected;

127. All Juror Qualification Questionnaires (regardless of whether they resulted in qualified, excused, exempt, or disqualified jurors) used to select the Grand Jury which indicted Mr. Umaña;

128. All Juror Qualification Questionnaires (regardless of whether they resulted in qualified, excused, or disqualified jurors) used to select Mr. Umaña's petit jury; and

64

129.     Any communications, documents, or information concerning statistical information on the make-up of Mr. Umaña's grand and petit jury venires, including to race, ethnicity, and gender for a period dating from 1998 through 2009 for the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina, and/or the actual numbers of African Americans, Hispanics/Latinos, Asians, and women in those venires.

This discovery is requested in order to establish that distinctive groups, such as African Americans, Hispanics/Latinos, Asians, and women were underrepresented in the venire from which the grand and petit jurors in Mr. Umaña's case were selected. The requested discovery may also establish that this underrepresentation was due to a systemic exclusion of these groups in the jury selection process utilized. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. Bracy, 520 U.S. at 908-09.

### H. Mr. Umaña has good cause to obtain discovery about the Government's jury selection process to support his claim that trial counsel failed to adequately object to the Government's race-based exercise of peremptory strikes. (§ 2255 Motion, Claim XVIII).

In Claim XVIII, Mr. Umaña alleges that the Government engaged in unconstitutional strikes of jurors under *Batson v. Kentucky*, 476 U.S. 79 (1986), and that trial counsel were ineffective for failing to properly object. *See* § 2255 Motion at 308-11. At trial, the government exercised eight of its sixteen strikes on twelve qualified black jurors. Eight strikes were used on white jurors as well, but there were twenty-seven such qualified jurors who were questioned by the government. While trial counsel made a general *Batson* objection each time the Government used a peremptory strike on an African-American, and the Court required the Government to state its reasons for each strike, trial counsel never claimed that the reasons given were pretext for

65

purposeful discrimination, asked the Court to engage in a comparative analysis of jurors, claimed the Government in general, and this prosecutor in particular, had a pattern of race-based strikes or made any other suggestion that further inquiry was necessary.

*Batson*'s progeny clearly provide that notes in the prosecution's file as well as more general materials related to policies and procedures for jury selection may provide relevant insight into the believability of any race-neutral reasons proffered by the government for a strike at trial. In *Miller-El v. Dretke*, 545 U.S. 231 (2005), for instance, the Court based its finding of purposeful discrimination on a detailed comparison of struck African-American and passed white venire members, together with other evidence, including old prosecutorial training manuals advocating racially based strikes. The recent decision in *Foster v. Chatman*, 136 S.Ct. 1737 (2016), is particularly illuminating. In *Foster*, the defendant raised *Batson* objections at trial, and the prosecutor put forward race-neutral explanations for the strikes. The trial court and the direct appeal court found no purposeful discrimination. However, in post-conviction litigation, counsel for Foster obtained portions of the prosecutor's file not previously disclosed, including notes indicating that race had been a significant factor in the prosecutor's preparation for jury selection. These notes, together with a close analysis of the record, including comparative juror analysis, "left [the Court] with the firm conviction that the strikes . . . were motivated in substantial part by discriminatory intent." *Id*. at 1754 (quotations omitted).

Given this precedent, and in support of Claim XVIII, Mr. Umaña requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1):

130. Complete and unexpurgated copies of the government's copies of juror questionnaires in this case, including all notations regarding the race or gender of the jurors;

66

131. Complete and unexpurgated copies of any notes, memoranda, communications and recordings of any kind made by the government in preparation for or during voir dire in this case;

132. Complete and unexpurgated copies of the government's copies of juror questionnaires, with accompanying work product associated with jury selection and preparation for jury selection, in all cases in which the two Assistant U.S. Attorneys who prosecuted his case have participated as prosecutors;

133. A description of any training and instruction, including topics, speakers, modes of presentation, and dates, that the United States Attorney's Office for the Western District of North Carolina provides to its attorneys regarding jury selection;

134. Any training guide, manual, chapter, videotape, audiotape or other training material regarding jury selection in the possession of any attorney in the employ of the United States Attorney's Office for the Western District of North Carolina;

135. The name and number of any case prosecuted by either of the Assistant U.S. Attorneys who prosecuted his case in which challenges were made under *Batson*; and

136. The title, forum, dates and written materials from any lecture, speech or panel regarding jury selection in which either of the Assistant U.S. Attorneys who prosecuted his case have participated.

The discovery is requested in order to establish that the Government engaged in purposeful discrimination. The materials may provide direct evidence of race-based strikes or circumstantial evidence based on prior practice and training. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

67

**I. Mr. Umaña has good cause to obtain discovery about the enhanced security measures and law enforcement and court personnel contacts with jurors to support his claims that he was denied the right to a fair trial and sentencing (§ 2255 Motion, Claims XV and XXI).**

In Claims XV and XXI, Mr. Umaña alleged that the security measures taken during trial violated his constitutional rights. In Claim XV, Mr. Umaña alleged that security measures such as the United States Marshal Service ("USMS") daily transportation of jurors to and from the courthouse, and the large number of law enforcement personnel (within and outside the courtroom and courthouse) created an improper extraneous influence which denied Mr. Umaña of the right to a fair and impartial jury. § 2255 Motion at 297-98. Mr. Umaña also alleged that jurors may have failed to abide by the Court's instructions to refrain from discussing the case with law enforcement or were otherwise exposed to, and improperly influenced by, extraneous evidence and information. *Id*. at 295. In Claim XXI, Mr. Umaña alleged that these and other additional security measures denied him of the right to a fair trial because they created an environment that interfered with the trial process. *Id*. at 321-23.

Thus, in support of these claims, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the United States District Court Clerk's Office for the Western District of North Carolina (Exhibit 2) and subpoenas *duces tecum* addressed to United States Marshal Service (Exhibit 14):

> 137.   Any communications, documents, or information relating to any security measures taken during, or because of, Mr. Umaña's jury selection and trial;
>
> 138.   Any communications, documents, or information relating to the transportation of jurors to and from the courthouse;

68

139.	Any communications, documents, or information known to the Clerk's Office, USMS or other law enforcement agencies regarding a juror being influenced by, or exposed to, extraneous influence, evidence or information; and

140.	Any video, audio or photographs of the courtroom taken during Mr. Umaña's jury selection and trial.

Mr. Umaña has good cause for the Court to grant this request because these materials will reveal the extent of the security measures taken during Mr. Umaña's trial and extent to which the jury was influenced by, or exposed to, extraneous influence, evidence or information.  There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief.  Thus, this Court should permit discovery of this specific information.  *Bracy*, 520 U.S. at 908-09.

**J.	Mr. Umaña has good cause to obtain discovery related to the Government's decision to prosecute capitally and related to juror demographics in order to support his claim that the Government's decision to seek and charge the death penalty against Mr. Umaña was impermissibly based on race and geography. (§ 2255 Motion, Claim XXV).**

In Claim XXV, Mr. Umaña has alleged that the Government's decision to seek the death penalty against him was impermissibly based on race and geography.  § 2255 Motion at 351-53. Had certain basic demographic facts been different in Mr. Umaña's case – were he not a Hispanic from El Salvador charged in Charlotte, North Carolina – he may not have received a sentence of death.

Thus, in support of Claim XXV, Mr. Umaña requests the following discovery, in the form of an Order from the Court for requests of the Government (Exhibit 1) and for the United States District Court Clerk's Offices for the Middle District of North Carolina (Exhibit 3):

69

141. Any communications, documents, or information relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of which defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;

142. Any communications, documents, or information relating to the United States Attorneys' and Attorney General's decision to prosecute Mr. Umaña capitally and the criteria used to make that determination;

143. All JS-12 and/or AO-12 forms for the Middle District of North Carolina for a period dating from 2007 through 2009; and

144. All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO-12s/JS-12s requested in item 143.

The requested discovery may establish that a pattern of racial and geographic disparities in the application of the federal death penalty existed at the time of Mr. Umaña's trial. It may also show that race played a role in the Government charging Mr. Umaña in the Western District of North Carolina, rather than the Middle District of North Carolina. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**K. Mr. Umaña has good cause to obtain discovery about the Government's authorization policy and co-defendant Elvin Pastor Fernandez-Gradis in order to support his claim that he was deprived the effective assistance of counsel during and prior to the meeting with the Department of Justice regarding the decision to seek the death penalty. (§ 2255 Motion, Claim XXIII).**

In Claim XXIII, Mr. Umaña alleged that he was deprived the effective assistance of counsel during and prior to the meeting with the Department of Justice ("DOJ") regarding the decision to seek the death penalty. § 2255 Motion at 345-48. At the authorization meeting, trial counsel were

70

unprepared to make a compelling presentation and was only able to comment on the facts of the offense and offer up Mr. Umaña's willingness to plead to a sentence of life without the possibility of parole. Trial counsel had no understanding of Mr. Umaña's cognitive impairments nor any of the many mitigating circumstances that plagued his life as a child in the slums of El Salvador. *Id.* at 347. Indeed, the factual allegations put forth by Mr. Umaña reveal evidence of a harrowing childhood, marked by abuse, neglect, and trauma. *See e.g.* § 2255 Motion at Appx. 2, ¶¶ 7-18. All of this information should have been presented to the DOJ before it made the decision whether to authorize the death penalty.

In order to determine whether the fact that Mr. Umaña's case was authorized for the death penalty was due in part to the lack of a meaningful presentation at the authorization meeting, it is necessary for him to review the decision-making process that the United States Attorney's Offices in North Carolina and elsewhere, as well as the DOJ, undertake in deciding whether they will or will not choose to seek and/or authorize the death penalty in a particular case. It is Mr. Umaña's understanding that the nature, background, and characteristics of the defendant as well as the treatment of similarly-situated defendants play a role in the DOJ's determination. Thus, it is also necessary to review what factors caused the prosecution not to seek the death penalty in the case of a Mr. Umaña's co-defendant, Elvin Pastor Fenrandez-Gradis, aka "Tigre."

Like Mr. Umaña, co-defendant Fernandez-Gradis was eligible for the death penalty for having committed a murder in furtherance of MS-13. *See* 08-cr-00134, ECF Doc. 1467 at 62-66 (AUSA explaining in closing argument that Fernandez-Gradis committed the murder in furtherance of the gang). The murder committed by Fernandez-Gradis was brutal, unprovoked, and took place at a birthday party where children were present. *See* 14-cv-00575, ECF Doc. 19 at

71

2-3. Fernandez-Gradis took part in meetings that included beating in new members, discussions of collecting taxes and other activities central to the function of the gang. *Id.* at 1-2. Nonetheless, the Government never sought authorization to seek the death penalty for Fernandez-Gradis and he was sentenced to life imprisonment after being found guilty at a trial by jury. 08-cr-00134, ECF Doc. 1406.

Thus, in order to support his claim that adequately prepared counsel may have been able to convince the Government not to seek and/or authorize the death penalty, Mr. Umaña requests the following discovery in the form of an order from the Court for requests of the Government (Exhibit 1):

145. All policies, formal or informal, regarding selection of defendants for authorization of the federal death penalty in existence at any time since enactment of the Federal Death Penalty Act in 1994;

146. All policies, formal or informal, relied upon in determining whether to seek and authorize the death penalty for Mr. Umaña;

147. All policies, formal or informal, relied upon in determining whether to seek and authorize the death penalty for Elvin Pastor Fernandez-Gradis;

148. All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty in existence at any time since enactment of the Federal Death Penalty in 1994;

149. All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty that were relied upon in determining whether to authorize Mr. Umaña for the death penalty;

150. All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty that were relied upon in determining whether to authorize Elvin Pastor Fernandez-Gradis for the death penalty;

72

151. All written communication and/or documents between attorneys for Mr. Umaña and the DOJ and/or the prosecution team in this case regarding the decision whether to authorize the death penalty for Mr. Umaña;

152. All written communication and/or documents between attorneys for Elvin Pastor Fernandez-Gradis and the DOJ and/or the prosecution team in this case regarding the decision whether to authorize the death penalty for Elvin Pastor Fernandez-Gradis; and

153. All documents and communication regarding Elvin Pastor Fernadnez-Gradis' mitigating and aggravating factors in the possession of the Government.

The requested discovery may establish that Mr. Umaña's trial counsel performed deficiently by failing to present mitigating and other evidence to dissuade DOJ from seeking death and that prejudiced Mr. Umana because counsel could have convinced the prosecution and/or the DOJ not to seek/authorize the death penalty had they properly prepared to make an effective presentation on Mr. Umaña's behalf. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**L. Mr. Umaña has good cause to obtain discovery about the interpreters used during his trial to support his claim that he was denied his rights effective assistance of counsel and to be present at every stage of the proceedings (§ 2255 Motion, Claim XX).**

In Claim XX, Mr. Umaña alleged, in part, that he was denied the right to presence and effective assistance of counsel because language barriers prevented him from participating in his trial and communicating with and assisting in his defense. § 2255 Motion at 319-21. Evidence presented at trial showed that Mr. Umaña communicated in Spanish with a Central American dialect and an El Salvadoran subdialect. *See id.* The government's language expert even testified that Mr. Umaña had a poor vocabulary and his "own speak [and] idiolect." GPT at 605.

73

But trial counsel did not speak Spanish and the record does not show that any measures were taken to ensure that Mr. Umaña could communicate with counsel or hear and understand the courtroom interpreters during the trial proceedings. Although "Courts will often verify an interpreter's credentials on the record, through a structured voir dire process," Federal Court Interpreter Orientation Manual and Glossary, Administrative Office of the United States Courts, Court Services Office (Last Revised May 8, 2014),[18] it does not appear this procedure was used in Mr. Umaña's case. Thus, from the currently available information about the interpreters (only the names of two interpreters appear on the docket) it is impossible to determine whether the interpreters at trial possessed the "aspects needed for effective interpreting." *See id.* (listing 10 aspects identified by professional interpreter organizations and linguistic experts).

Thus, in support of this claim Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the United States District Court Clerk's Office for the Western District of North Carolina (Exhibit 2):

154. Any communications, documents, information or transcripts related to any interview of trial interpreters to verify their credentials;

155. Any communications, documents, information, transcripts or records documenting whether the trial interpreters took an oath to properly discharge the role and responsibilities of an interpreter;

156. Any communications, documents, or information regarding mistakes, corrections disputes, requests for further resources relating to the interpretation given during voir dire and trial;

---

[18] There is even a United States Courts YouTube providing an example of a credential voir dire. *See.*https://www.youtube.com/watch?v=Ylq0A0NMtuk&list=PL4bcxoLSIaXfPvX9FXws4 S6XirPhUObBQ&index=4 (last visited October 20, 2016).

74

157.   Any resources or materials provided to the trial interpreters in preparation for or during Mr. Umaña's trial;

158.   Any notes taken by the interpreters during voir dire or trial;

159.   Any resumes or other qualification documents of the trial interpreters; and

160.   All purchase orders or other invoices submitted by the voir dire and trial interpreters.

Mr. Umaña has good cause for the Court to grant this request because these materials will reveal the extent to which the interpreters were qualified and able to provide effective interpretation of the proceedings. They may support Mr. Umaña's claim that he did not have the "'ability to consult with his lawyer with a reasonable degree of rational understanding.'" *U. S. ex rel. Negron v. State of N. Y.*, 434 F.2d 386, 389 (2d Cir. 1970) (quoting *Dusky v. United States*, 362 U.S. 402 (1962) (per curiam)). There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**M. Mr. Umaña has good cause to obtain the Government's logs, receipts, index, and any additional items that document what items were produced to Mr. Umaña's trial counsel and when they were produced to support all of his claims.**

As mentioned *supra*, discovery conferences with the Government have led to the production of only four audio recordings of Lemon Grove witnesses. When disclosing these recordings, the Government indicated that it did not have any reason to believe that they were not provided to trial counsel. The arguments presented in this motion suggest that these records and several other discovery items were not produced by the Government to trial counsel. Specifically, trial counsel filed post-conviction declarations stating that they did not receive any recordings of witnesses, including testifying witnesses, relating to the Lemon Grove shooting. Moreover, the

75

recordings suggests that the prosecutors themselves likely never reviewed the audio recordings since their proffers to the Court and the testimony elicited from the witnesses are in direct contradiction to the actual evidence.

Thus, in support of various claims, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1)

161. The Government to produce any and all logs, indexes, receipts, or other documentation that identifies or indexes the discovery turned over to trial counsel and when that discovery was produced.

The Government produced thousands of documents in this 26 co-defendant and thus likely kept inventory of what was produced. An inventory of what was produced in discovery will support all of Mr. Umaña's *Brady* claims. It also goes directly to Mr. Umaña's claims that trial counsel were ineffective in rebutting the Government's case and their failure to request a continuance due to the copious discovery that they received immediately prior to and during trial. This discovery will also be valuable in helping to establish whether trial counsel performed deficiently by failing to review all of the discovery materials produced by the Government, and whether Mr. Umana suffered prejudice thereby. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**N. Mr. Umaña has good cause to obtain discovery about his citizenship and policies for ascertaining immigration status of detainees to support his claim that his rights under the Vienna Convention were violated.**

In Claim XXVI, Mr. Umaña alleged that the Government failed to preserve his rights under the Vienna Convention and to Consular assistance. Specifically, the Government was aware of

76

Mr. Umaña's Guatemalan citizenship, but failed to notify him of his rights under the Vienna Convention and contact the Guatemalan Consulate. § 2255 Motion at 354-72.

In support of Claim XXVI, Mr. Umaña requests the following discovery in the form of an Order from the Court for requests of the Government (Exhibit 1), and subpoenas *duces tecum* addressed to the FBI (Exhibit 5), and the Charlotte-Mecklenburg Police Department (Exhibit 13):

162.    Any and all records regarding or reflecting Mr. Umaña's citizen status, including but not limited to consular, immigration, birth and/or State Department records regarding Mr. Umaña in the possession or control of the United States, Federal Bureau of Investigation, and/or the Charlotte-Mecklenburg Police Department; and

163.    Any and all policies and procedures, effective from December 2002 through April 2010, regarding the United States Marshal's Service, Federal Bureau of Investigation, the Charlotte-Mecklenburg Police Department, and United States Attorney's Office's policies for ascertaining the immigration status of pre-trial detainees in the possession or control of the United States, Federal Bureau of Investigation, United States Marshal's Service, and/or the Charlotte-Mecklenburg Police Department.

This discovery is requested in order to establish that the Government knew Mr. Umaña was a citizen of Guatemala and failed to make the required notifications to Mr. Umaña and the Guatemalan government. There is reason to believe that, if these facts are developed, Mr. Umaña may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

## IV.   **REQUEST FOR EXCULPATORY AND IMPEACHMENT INFORMATION**

### A.  **The Government's broad disclosure obligations.**

Mr. Umaña seeks disclosure of Government records, described in detail below, pursuant to obligations imposed by both constitutional doctrine and the Department of Justice's own

ethical guidelines for its prosecutors, which underscore that obligation and detail its practical application.

As the Court and the Government are aware, disclosure of exculpatory and impeachment information is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of such information when it is "material"[19] to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. Because *Brady* and *Giglio* impose constitutional obligations on the prosecution, *Brady* and *Giglio* material must be disclosed regardless of whether the defendant makes an explicit request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Recognizing that it is sometimes difficult to assess the materiality of evidence, the Supreme Court has counseled that prosecutors should err on the side of disclosure. *Kyles*, 514 U.S. at 439. *See also United States v. Agurs*, 427 U.S. 97, 108 (1976) ("The prudent prosecutor will resolve doubtful questions in favor of disclosure."). Accordingly, the Government has an affirmative duty to search for, learn of, and disclose exculpatory and impeachment information in the possession of the members of the prosecution team, which includes federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. United States Attorney's Manual

---

[19] Mr. Umaña asks the Court to issue an order to ensure the Government provides all exculpatory and impeachment evidence it is legally required to provide and certify that it has complied with its full obligation to do so.

78

("USAM") USAM §9-5.001; *Kyles*, 514 U.S. at 437-38.[20]  Moreover, "the duty to disclose is ongoing."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987). *See also Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor … is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.")

Consistent with the constitutional obligations outlined above, in 2006, the Department of Justice amended the USAM regarding *Brady*/*Giglio* obligations by requiring prosecutors to "take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence."  USAM § 9-5.001 (B)(1).[21]  However, responding to several high profile cases involving *Brady* violations and related prosecutorial misconduct where courts sanctioned prosecutors and/or dismissed cases altogether,[22] the Department of Justice issued three memos on January 4, 2010, through then-Deputy Attorney General David Ogden (the "Ogden memos"). The Ogden memos included "Guidance for Prosecutors Regarding Criminal Discovery" ("Guidance Memo") and related training initiatives that outlined "a methodical approach to

---

[20] *See also Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964) ("[T]he police are also part of the prosecution, and … the taint on the trial is no less if they, rather than the State's attorney, were guilty of nondisclosure.").

[21]  Available online at: http://www.justice.gov/usam/usam-9-5000-issues-related-trials-and-othercourt- proceedings (last visited 9/21/16).

[22] *See, e.g.*, Special Counsel Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to Court's Order, April 7, 2009 (documenting Government's failure to comply with Brady and Giglio obligations in prosecution of Senator Ted Stevens) (available online at https://s3.amazonaws.com/s3.documentcloud.org/documents/325801/court-report-on-stevensethics-case.pdf (last visited 9/21/16)).

consideration of discovery obligations that prosecutors should follow in every case to avoid lapses that can result in consequences adverse to the Department's pursuit of Justice."  Guidance Memo at 1.[23]  Concurrent with issuance of the Guidance Memo, the Deputy Attorney General directed all United States Attorney's Offices to develop a discovery policy with which prosecutors in each respective office must comply, and that reflects circuit and district court precedent and local rules and practices.

In October of 2010, the United States Attorney's Office for the Western District of North Carolina announced its new criminal discovery policy in a memorandum ("*Brady* Memo") issued pursuant to the Deputy Attorney General's directive.  The *Brady* Memo adopts the Guidance Memo as the District's criminal discovery policy and notes that all prosecutors in the District "must comply" with this policy.  *Brady* Memo at 1-2.[24]  The *Brady* Memo instructs that prosecutors conduct a thorough review process for all potentially discoverable material within the custody or control of the prosecution team.  Among the many areas on which the *Brady* Memo instructs prosecutors to focus are the following, which are relevant to Mr. Umaña's case:

1. <u>The investigative agency's file</u>. The Memo notes that prosecutors or case agent should review all substantive case-related information in the possession of an agent who is part of the investigative team to determine if it should be disclosed as part of discovery.  The

---

[23] Available online at: http://www.justice.gov/dag/memorandum-department-prosecutors (last visited 10/19/16).

[24] Available online at: https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/ncw_discovery_policy.pdf (last visited 10/19/16).

Memo instructs that the investigative agency's entire investigation file, including documents such as, for example, FBI Electronic Communications (ECs), searchable electronic databases, inserts, emails, or other forms of electronic communications. *Brady* Memo at 19-20.

2. Evidence and information gathered during the investigation. The Memo notes that all evidence and information gathered during the investigation should be reviewed, and that in cases involving a large volume of potentially discoverable information, prosecutors may discharge their disclosure obligation by choosing to make the voluminous information available to the defense. *Brady* Memo at 20.

3. Substantive case-related communications. As the Memo notes, "substantive" communications include "factual reports about investigative activity, factual discussions of the relative merits of evidence, factual information obtained during interviews or interactions with witnesses/victims, and factual issues relating to credibility." *Brady* Memo at 21.

4. Information obtained in witness interviews. The Memo defines an "interview" as "a formal question and answer session with a potential witness conducted for the purpose of obtaining information pertinent to a matter or a case." *Brady* Memo at 33. The Memo notes that prosecutors and agents should discuss note taking responsibilities and memorialization before the interview. The Memo includes examples of information obtained in witness interviews including:

81

a. <u>Agent Notes</u>.  Agents should retain all rough notes of interviews even if otherwise formalized in a final investigative report.  Agent notes should be reviewed if there is a reason to believe that the notes are materially different from the memorandum, if a written memorandum was not prepared, if the precise words used by the witness are significant, or if the witness disputes the agent's account of the interview.  *Brady* Memo at 34.

b. <u>Witness statement variations</u>. The Memo notes that some witnesses' statements will vary during the course of an interview or investigation, and that "[m]aterial variances in a witness's statement(s) should be memorialized, even if they are within the same interview, and they should be provided to the defense as *Giglio* information." *Brady* Memo at 35.

c. <u>Trial preparation meetings with witnesses</u>. The Memo states that "prosecutors should be particularly attuned to new or inconsistent information disclosed by the witness during a pre-trial witness preparation session." *Brady* Memo at 24. The Memo further instructs that new information that is exculpatory or impeaching should be disclosed even if the information is first disclosed in a witness preparation session. *Id*. at 34-35.

5. <u>Potential *Giglio* information relating to non-law enforcement witnesses and Fed. R. Evid. 806 declarants</u>. The Memo directs that all potential *Giglio* information known by or in possession of the prosecution team relating to non-law enforcement witnesses should be gathered and reviewed, and that such information includes, but is not limited to:

- Prior inconsistent statements, including inconsistent attorney proffers;

82

- Statements or reports reflecting witness statement variations, including statements made during trial preparation meetings with witnesses;

- Benefits provided to witnesses, including, but not limited to:

  - Dropped or reduced charges;

  - Immunity;

  - Expectations of downward departures or motions for reductions of sentence;

  - Assistance in a federal, state, or local criminal proceeding;

  - Considerations regarding forfeiture of assets;

  - Stays of deportation or other immigration status considerations;

  - S-Visas;

  - Monetary benefits;

  - Non-prosecution agreements;

  - Letters to other law enforcement officials (e.g., state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf;

  - Relocation assistance; and

  - Consideration or benefits to culpable or at risk third-parties.

- Other known conditions that could affect the witness's bias such as:

  - Animosity toward defendant;

  - Animosity toward a group of which defendant is a member or with which he is affiliated;

  - Relationship with the victim; and

  - Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor).

83

- Prior acts under Fed. R. Evid. 608;

- Prior convictions under Fed. R. Evid. 609; and

- Known substance abuse or mental health issues or other issues that could affect the witness's ability to perceive and recall events.

Guidance Memo at 6-7.

6. <u>Potential *Giglio* information relating to law enforcement witnesses</u>. The Memo states that prosecutors "should have candid conversations with the federal agents with whom they work regarding any potential *Giglio* issues" and "should be familiar with circuit and district court precedent and local practice regarding obtaining *Giglio* information from state and local law enforcement officers."

Guidance Memo at 6.

The Guidance Memo also notes that in cases arising out of investigations conducted by multi-agency task forces or otherwise involving state law enforcement agencies, prosecutors "are encouraged to err on the side of inclusiveness when identifying the members of the prosecution team for discovery purposes." Guidance Memo at 3.

**B. Mr. Umaña's request for all exculpatory and impeachment information.**

Consistent with Government's continuing constitutional obligation to disclose exculpatory and impeachment information, the undersigned respectfully requests that the Government conduct a review of the entire law enforcement file, including that of any federal, state, or local agency that participated in the investigation and prosecution of Mr. Umaña, and disclose the following exculpatory and impeachment information:

84

164. Any information that is inconsistent with any element of any crime of which Mr. Umaña was convicted, including but not limited to *mens rea* and whether the offense was committed in furtherance of MS-13;

165. Any information that establishes a recognized affirmative defense to any crime of which Mr. Umaña was convicted, including but not limited to insanity;

166. Any information that tends to cast doubt upon the accuracy of any evidence upon which the Government relied at trial8 to prove any element of any crime charged;

167. Any information that tends to cast doubt upon the accuracy of any evidence upon which the Government relied at trial to prove any statutory or non-statutory aggravating factors;

168. Any information that tends to cast doubt upon the accuracy of any evidence upon which the Government relied at trial to rebut any statutory or non-statutory mitigating factors;

169. Any information that tends to establish a statutory or non-statutory mitigating factor, including but not limited to any of the mitigating factors actually presented by the defense at trial;

170. Any information that would tend to prove or reveal a bias or motive to lie or withhold information of any Government witness who testified at the trial or before the Grand Jury;

171. Any information of any arrests, pending cases, and criminal convictions in this or any jurisdiction (state or federal) of any witness whom the Government called at trial or before the Grand Jury;

172. Any information of any suspected wrongdoing or ongoing investigations in this or any other jurisdiction (state or federal) of any witness whom the Government called at trial or before the Grand Jury;

173. Any potential *Giglio* information relating to non-law enforcement trial and/or Grand Jury witnesses and Fed. R. Evid. 806 declarants, including but not limited to:

- Prior inconsistent statements, including inconsistent attorney proffers;

- Statements or reports reflecting witness statement variations, including statements made during trial preparation meetings with witnesses; and

85

- Benefits provided to witnesses, including, but not limited to:

    - Dropped or reduced charges;

    - Immunity;

    - Expectations of downward departures or motions for reductions of sentence;

    - Assistance in a federal, state, or local criminal proceeding;

    - Considerations regarding forfeiture of assets;

    - Stays of deportation or other immigration status considerations;

    - S-Visas;

    - Monetary benefits;

    - Non-prosecution agreements;

    - Letters to other law enforcement officials (e.g., state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf;

    - Relocation assistance; and

    - Consideration or benefits to culpable or at risk third-parties.

- Other known conditions that could affect the witness's bias such as:

    - Animosity toward Mr. Umaña;

    - Animosity toward a group of which Mr. Umaña is a member or with which he is affiliated;

    - Relationship with the victims; and

    - Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor).

- Prior acts under Fed. R. Evid. 608;

86

- Prior convictions under Fed. R. Evid. 609; and

- Known substance abuse or mental health issues or other issues that could affect the witness's ability to perceive and recall events.

174.     Any and all threats of prosecution or any statements regarding the magnitude of penal liability made to any witness that the Government called at trial, or any witness called before a federal grand jury, by any agent or employee of the Government or by any state law enforcement or prosecutorial agency working or cooperating with the Government;

175.     A full and complete statement of all promises, considerations, rewards, or inducements made by the Government, its prosecutors, agents or agencies to induce or encourage any individual's trial or grand jury testimony, cooperation or provision of information, wherein the Government has agreed, either with the individual, his or her counsel, agent or representative, to any of the following: not to prosecute said person for any crime or crimes;

- not to prosecute a third party for any crime or crimes where the reason for not prosecuting the third party is a consideration to the person;

- to provide a formal grant of statutory immunity, or to provide an informal assurance that the person will not be prosecuted in connection with any testimony, cooperation, or information given;

- to recommend leniency or a particular sentence for any crime or crimes for which the person stands convicted or is expected to be convicted;

- to comply with any prior agreements although said witness may have previously violated a part of their agreement;

- to recommend or not oppose a reduction of the offense level of the person under the United States Sentencing Guidelines for acceptance of responsibility;

- to recommend to the sentencing authority under the United States Sentencing Guidelines a downward departure from the guidelines if that person provides substantial assistance to authorities;

- to recommend or not oppose any downward departures or offense level reductions for the person under the United States Sentencing Guidelines;

- to seal any plea or plea agreement of that person;

87

- to provide favorable treatment or consideration, including but not limited to money, expenses, subsistence, a job, relocation, or a new start, to the person or to friends or relatives of the person in return for that person's testimony, cooperation, or provision of information;

- to make any beneficial recommendation regarding the person to any state or federal agency;

- to cooperate with any state law enforcement agency and seek that agency's agreement not to prosecute said person for any crime or crimes prohibited by state law;

- to make any other recommendation of benefit, or give any other consideration to the person or friends or relatives of said person; and

- to provide a statement to, or speak with, any law enforcement agency, prosecution official or court (state or federal) concerning the witness's assistance or cooperation.

176. Any potential *Giglio* information relating to law enforcement trial and/or grand jury witnesses;

177. Any exculpatory or impeachment information obtained from witnesses who testified at the trial and/or Grand Jury;

178. Any exculpatory or impeachment information obtained from non-testifying witnesses;

179. Any exculpatory or impeachment information obtained from any confidential informant, confidential witness, confidential human source and/or confidential source; and

180. Any exculpatory or impeachment information contained in case-related communications that occurred: (a) among prosecutors and/or federal, state, or local agents/officers; (b) between prosecutors and/or federal, state, or local agents/officers and witnesses and/or victims; and/or (c) between victim-witness coordinators and witnesses and/or victims, including but not limited to:

- communications concerning the reasons a witness would not be called to testify at the trial;

88

- communications concerning any discussion not to conduct further interviews with any witnesses;

- Any exculpatory or impeachment information concerning any forensic tests, examinations, evaluations, reports, and/or conclusions drawn from them that were presented at trial, including but not limited to any information that tends to show that the testing procedures and analyses used in this case have ever been performed inadequately or imperfectly in any other case; and

- Any exculpatory or impeachment information concerning any forensic tests, examinations, evaluations, reports, and/or conclusions drawn from them related to this offense whether or not presented at trial, including any ballistics testing from either the events in Greensboro or in Los Angeles.

These requests are made as to all evidence, testifying and non-testifying civilian, law-enforcement, and expert and lay, witnesses relevant to either the guilt of penalty phase of Mr. Umaña's trial.

## V. <u>CONCLUSION</u>

Mr. Umaña requests that this Court permit him conduct discovery of the materials requested herein pursuant to Habeas Rule 6, order the Government to provide the discovery delineated herein and identified on the attached proposed orders, and grant Mr. Umaña authorization to issue subpoenas *duces tecum* identified herein and attached hereto.

Mr. Umaña also respectfully requests oral argument on this motion after the Government has submitted its Response and Mr. Umaña has submitted his Reply. Mr. Umaña submits that oral argument is necessary because of the complexity of the factual and legal issues presented in his motion.

Dated:                                          Respectfully submitted,


/s/ Kenneth J. Rose                             /s/ Zandra L. Lopez
**KENNETH J. ROSE**                             **ZANDRA L. LOPEZ**

The Center for Death Penalty Litigation         Federal Defenders of San Diego, Inc.
123 West Main Street, Suite 700                 225 Broadway, Suite 900
Durham, North Carolina 27701-3228              San Diego, California 92101-5030
Telephone: 919-956-9545                         Telephone:  619-234-8467
ken@cdpl.org                                    Zandra_Lopez@fd.org
Attorneys for Alejandro Umaña                   Attorneys for Alejandro Umaña

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2016, I electronically filed the foregoing Memorandum of Law in Support of Movant's Discovery Motion with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
Anthony.enright@usdoj.gov

*/s/ Kenneth J. Rose*
**KENNETH J. ROSE**
The Center for Death Penalty Litigation
123 West Main Street
Suite 700
Durham, North Carolina 27701-3228
Telephone: 919-956-9545
ken@CDPL.ORG

*/s/ Zandra L. Lopez*
**ZANDRA L. LOPEZ**
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: 619-234-8467
Zandra_Lopez@fd.org

Attorneys for Alejandro Umaña

91