# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

ALEJANDRO UMAÑA,                 )          No. 3:16-CV-00057-RJC
Petitioner/Movant                )          (3:08cr134-2)
                                 )
                                 )          **CAPITAL § 2255 PROCEEDINGS**
-v-                              )
                                 )          HON. ROBERT J. CONRAD JR.
UNITED STATES OF AMERICA,        )
Respondent                       )
                                 )

PROPOSED ORDER

Counsel, on behalf of movant Alejandro Umaña, has moved for leave to conduct

discovery and requests that the Government produce the following materials in its possession, or

alternatively certify their absence from its files, or submit a verification that all materials

responsive to the particular request have been provided. All materials pertain to the prosecution

and trial of the deaths of Manuel Garcia Salinas, Ruben Garcia Salinas:

1. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the LAPD file relating to the September 28, 2005 murder of Andy Abarca at Lemon Grove Park in Los Angeles, California;

2. A complete set of the LAPD's murder book relating to the September 28, 2005 murder of Andy Abarca at Lemon Grove Park in Los Angeles, California;

3. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the LAPD file relating to the July 27, 2005 murder of Gustavo Porras and Jose Herrera on Fairfax Avenue in Los Angeles, California;

1

4. A complete set and true and correct copy of the LAPD's murder book, including a complete chronological record of investigation, relating to the July 27, 2005 murder of Gustavo Porras and Jose Herrera on Fairfax Avenue in Los Angeles,

5. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the FBI file relating to the September 28, 2005 murder of Andy Abarca at Lemon Grove Park in Los Angeles, California;

6. A complete set of all reports, records, files, witness statements, documents and tangible objects that were part of the FBI file relating to the July 27, 2005 murder of Gustavo Porras and Jose Herrera on Fairfax Avenue in Los Angeles, California;

7. True and correct color copies of photo arrays shown to Freddy Gonzalez during any and all of his pretrial interviews with the Government, LAPD, FBI, or any other law enforcement agency;

8. Any communications, documents, recording, or information relating to the December 29, 2005 interview, including the *video* recording noted in the detective's notes;

9. Any communications, documents, recording, or information relating to the March 15, 2006 the LAPD interview with Gonzalez (*see* Appendix 65 to the § 2255 Motion);

10. Any communications, documents, recording, or information relating to the April 15, 2006 interview where Gonzalez wrote that Mr. Umaña's hair looks like the shooter's but he is not sure (*see* Gov. Trial Ex. 506);

11. Any communications, documents, recording, or information relating to the June 28, 2006 interview with Gonzalez (see Appendix 51 at 28);

12. Any communications, documents, recording, or information relating to Gonzalez's interview(s) with federal agents and/or prosecutors;

13. Any communications, documents, recording, or information relating to any other interview by the Government, LAPD, FBI, or any other law enforcement agency with Gonzalez relating to the Lemon Grove shooting;

14. Any communications, documents, recording, or information pertaining to promises, consideration, benefits and rewards made by the Government, LAPD, or any other law enforcement agency to Gonzalez in exchange for his cooperation;

15. True and correct color copies of photo arrays shown to Roberto Ramos during any and all of his pretrial interviews with the Government, LAPD, FBI, or any other law enforcement agency;

2

16. Any communications, documents, recording, or information relating to the October 25, 2005 interview of Ramos (*see* 2255 Motion, Appendix 51 at 13);

17. Any communications, documents, recording, or information relating to the March 31, 2006 interview of Ramos at his home with the LAPD (*see* 2255 Motion, Appendix 51 at 23);

18. Any communications, documents, recording, or information relating to the March 31, 2006 interview of Ramos at the Hollywood police station (*see* 2255 Motion, Appendix 51 at 24);

19. Any communications, documents, recording, or information relating to the April 24, 2006 interview of Ramos at his home (*see* 2255 Motion, Appendix 51 at 26);

20. Any communications, documents, recording, or information relating to the May 11, 2006 interview of Ramos by the LAPD where Ramos did identify MS-13 member "Trivalene" as someone he knows from the park (*see* 2255 Motion, Appendix 51 at 28);

21. Any communications, documents, recording, or information relating to the June 29, 2006 interview of Ramos (*see* 2255 Motion, Appendix 51 at 28);

22. Any communications, documents, or information relating to trial preparation of Ramos with Government;

23. Any communications, documents, recording, or information relating to any other interview by the Government, LAPD, FBI, or any other law enforcement agency with Roberto Ramos relating to the Lemon Grove Park shooting;

24. True and correct color copies of photo arrays shown to Lara during any and all of his pretrial interviews including the book of photos shown to him during his October 18, 2005 interview;

25. Any communications, documents, recording, or information relating to the October 26, 2005 interview of Lara with the LAPD;

26. Any communications, documents, recording, or information relating to the January 3, 2006 interview of Lara with the LAPD (2255 Motion, Appx. 51 at 15);

27. Any communications, documents, recording, or information relating to the March 30, 2006 interview of Lara (*see* 2255 Motion, Appx. 51 at 23);

3

28. Any communications, documents, recording, or information relating to the April 24, 2006 interview of Lara by the LAPD (*see* 2255 Motion, Appx. 51 at 25);

29. Any communications, documents, recording, or information relating to the May 10, 2006 interview of Lara with the LAPD (*see* 2255 Motion, Appx. 51 at 26);

30. Any communications, documents, recording, or information relating to the July 6, 2006 interview of Lara with the LAPD (*see* 2255 Motion, Appx. 51 at 30);

31. Any communications, documents, recording, or information, relating to any interview of Lara with federal agents and/or prosecutors following the indictment of Mr. Umaña;

32. True and correct color copies of the MS-13 photo book(s) shown to witness Lara by LAPD Detective Frank Flores, identifying information for the subjects of those photos, and comments made by Lara in reaction to those photos;

33. Any communications, documents, or information relating to the April 24, 2006 interview of Luis Rivera with the LAPD;

34. Any communications, documents, or information relating to the July 12, 2006 interview of Luis Rivera with the LAPD;

35. Any communications, documents, or information relating to any other interview of Luis Rivera with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

36. Any communications, documents, or information pertaining to promises, benefits, consideration and rewards made by the Government, LAPD, or any other law enforcement agency to Luis Rivera in exchange for his cooperation;

37. Any communications, documents, or information relating to the September 13, 2006 interview of Rene Arevalo with the LAPD;

38. Any communications, documents, or information relating to any other interview of Rene Arevalo with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

39. Any communications, documents, or information pertaining to promises, benefits, consideration and rewards made by the Government, LAPD, or any other law enforcement agency to Rene Arevalo in exchange for his cooperation;

4

40. Any communications, documents, or information relating to LAPD's June 20, 2006 sworn declaration filed in *People of the State of California v. Rene Arevalo*, Case No. BA301683 in support of electronic surveillance of Fairfax Avenue suspect Rene Arevalo. The LAPD sworn declaration states it was believed Arevalo provided the weapon used at the Lemon Grove Park shooting;

41. Any communications, documents, or information relating to information received from the state court's grant of electronic surveillance of Fairfax Avenue suspect Rene Arevalo in *People of the State of California v. Rene Arevalo*, Case No. BA301683;

42. Any audio and/or video recording, communications, documents, or information pertaining to the press conference held regarding the Fairfax Avenue shooting on July 29, 2005;

43. Any communications, documents, or information relating to the January 7, 2006 interview of Alejandro Rodriguez (aka Chocolate) with the LAPD;

44. Any communications, documents, or information relating to the April 24, 2006 interview of Alejandro Rodriguez (aka Chocolate) with the LAPD;

45. Any communications, documents, or information relating to any other interview of Alejandro Rodriguez (aka Chocolate) with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

46. Any communications, documents, or information relating to the October 18, 2005 interview of Edgar Gutierrez with the LAPD;

47. Any communications, documents, or information regarding to Ranferic Vasquez (aka Blast) as it relates to the Lemon Grove Park shooting;

48. Any communications, documents, recording, or information relating to any other interview of Edgar Gutierrez with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

49. Any communications, documents, or information relating to the September 29, 2009 interview of Elgar Barrios with the LAPD;

50. Any communications, documents, or information relating to any other interview of Elgar Barrios with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

5

51. Any communications, documents, or information relating to the September 29, 2009 interview of German Suarez and his wife with the LAPD;

52. Any communications, documents, or information relating to any other interview of German Suarez and his wife with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

53. Any communications, documents, or information relating to the January 7, 2006 interview of Erick Lopez with the LAPD;

54. Any communications, documents, or information relating to any other interview of Erick Lopez with the Government, LAPD, the FBI, or any other law enforcement agency relating to his knowledge about the Lemon Grove Park shooting;

55. Any communications, documents, or information relating to the interview of any other witness with the Government, LAPD, the FBI, or any other law enforcement agency relating to the Lemon Grove Park shooting;

56. Any communications, documents, or information relating to the arrest of Geovani Rodas in *People of the State of California v. Geovani Rodas*, Case No. BA291932;

57. Any communications, documents, or information relating to the arrest of Geovani Rodas in *People of the State of California v. Geovani Rodas*, Case No. BA293268;

58. True and correct copies of Geovani Rodas's entire C-File while he was incarcerated in the CDCR until his release in 2013;

59. The "A-file" from the US Citizenship and Immigration Services (USCIS) for Geovani Rodas (DOB: ██████) who was deported after he was released from Pleasant Valley State Prison on 9/11/2013;

60. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Geovani Rodas;

61. Any communications, documents, or information relating to Geovani Rodas's involvement in Lemon Grove Park shooting;

62. A-File from the US Citizenship and Immigration Services (USCIS) for Juan Miguel Cortez (DOB: ██████

6

63. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Juan Miguel Cortez;

64. Any communications, documents, or information relating to Juan Miguel Cortes's involvement in Lemon Grove Park shooting;

65. A-File from the US Citizenship and Immigration Services (USCIS) for Alex Montes (DOB: ▮▮▮▮▮▮▮▮▮▮);

66. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Alex Montes;

67. Any communications, documents, or information relating to Alex Montes involvement in Lemon Grove Park shooting;

68. A-File from the US Citizenship and Immigration Services (USCIS) for Alejandro Rodriquez (DOB: ▮▮▮▮▮▮▮▮▮▮▮▮);

69. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Alejandro Rodriguez;

70. Any communications, documents, or information relating to shootings that occurred at Lemon Grove Park from July 28, 2005 to September 29, 2005;

71. Any communications, documents, or information relating to the arrest of Alex Barrera in *People of the State of California v. Alex Geraldo Barrera*, Case No. BA287819;

72. Any communications, documents, or information relating to the interrogation of Alex Barrera on or about July 28, 2005 relating to his arrest in *People of the State of California v. Alex Geraldo Barrera*, Case No. BA287819;

73. Any communications, documents, or information relating to any and all interviews of Alex Barrera relating to the Fairfax Avenue shooting;

74. A-File from the US Citizenship and Immigration Services (USCIS) for Alex Barrera (DOB: ▮▮▮▮▮▮▮▮);

75. Any communications, documents, or information relating to any and all interviews of Oscar Santiago relating to the Fairfax Avenue shooting;

7

76. Any communications, documents, or information relating to any and all interviews of Noe Bautista relating to the Fairfax Avenue shooting;

77. Any and all contact information currently or previously in the possession of the Government, including phone numbers, residential addresses, employment addresses, email addresses, and any other manner of contacting Oscar Santiago;

78. A-file for Oscar Santiago (DOB: ███████████ );

79. True and correct color copies of photographs, including photo line-ups, shown to Lemon Grove Park witnesses by the LAPD with corresponding identifying number and dates shown to the specific witnesses;

80. True and correct color copies of photographs, including photo line-ups, shown to Fairfax Avenue witnesses by the LAPD with corresponding identifying number and dates shown to the specific witnesses;

81. Any and all identifying information relating to persons depicted in the photographs shown to Lemon Grove and Fairfax Avenue witnesses by the LAPD;

82. Any communications, documents, or information relating to the significance of tattooing the letters M and S by M-13 gang members;

83. The names of any persons the government consulted or interviewed regarding the significance of tattoos on MS-13 gang members, and any documents relating thereto;

84. Any communications, documents, or information that is inconsistent with or casts doubt on the testimony of witness Alexander Granados;

85. Any communications, documents, or information relating to all promises, considerations, rewards, or inducements made by the Government, its prosecutors, agents or agencies to induce or encourage Alexander Granados' cooperation;

86. Any communications, documents, or information pertaining to the June 2008 interview[s] of Leticia Ramirez (mother of Mr. Umaña) by Corporal Carlos Alberto Moreno of the Transnational Gang Unit in Santa Ana, El Salvador;

87. Any communications, documents, or information pertaining to Mr. Umaña's birth certificate which reflects Guatemala as his country of birth;

88. Any communications, documents, or information pertaining to communication with the Guatemalan Government regarding the birth and/or citizenship of Mr. Umaña;

8

89. Any communications, documents, or information pertaining to biographical and/or contact information for Mr. Umaña and/or members of his family in El Salvador or in the United States;

90. Any communications, documents, or information pertaining to the February 2009 interview[s] of Ms. Ramirez by the prosecuting attorneys and FBI agents in Santa Ana, El Salvador;

91. Any communications, documents, or information pertaining efforts by the FBI, Transnational Gang Unit, the PNC or any other law enforcement agency to interview Mr. Umaña's father, Rafael Umaña, in Santa Ana, El Salvador;

92. Any communications, documents, or information pertaining to interviews or communication between the FBI, Transnational Gang Unit, the PNC or any other law enforcement agency and Rafael Umaña in Santa Ana, El Salvador;

93. Any communications, documents, or information pertaining the investigation of the criminal background of Mr. Umaña's father, Rafael Umaña;

94. Any communications, documents, or information pertaining to interviews by the FBI, Transnational Gang Unit, the PNC or any other law enforcement agency with any other member of Mr. Umaña's family;

95. Birth records from Nassau University Medical Center, Meadow, New York for Mr. Umaña's son ███████████████████ who was born to mother Wendy Elizabeth Jaco Alvarez on ████████;

96. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, and correspondence concerning the examination of Mr. Umaña by Dr. Enrique M. Suarez;

97. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, and correspondence concerning the examination of Mr. Umaña by Dr. Enrique M. Suarez;

98. A complete set of all reports, notes, and/or memorandum prepared by Dr. Enrique Suarez in preparation for his testimony at the *Atkins* hearing;

99. Any communications, documents, or information relating communication between Dr. Enrique Suarez and jail guards cited in his November 2, 2009 report;

100. Any information that is inconsistent with or casts doubt on the testimony presented by Dr. Enrique Suarez;

9

101. Any communications, documents, or information, including opinions, reports (including interim or amended reports), memoranda, testing results, and correspondence concerning the examination of Dr. Helen Mayberg;

102. A complete set of all reports, notes, and/or memorandum prepared by Dr. Helen Mayberg relating to Mr. Umaña and/or his sentencing hearing;

103. Any communications, documents, or information relating communication between Dr. Helen Mayberg and Dr. Nirav Pravin Shah relating to Mr. Umaña;

104. Any information that is inconsistent with or casts doubt on the testimony presented by Dr. Helen Mayberg;

105. A true and correct complete set of all Mr. Umaña's pre-trial jail records from Mecklengburg County Sheriff Office and Guildford County Sheriff Office, which includes High Point and Greensboro detention facilities;

106. Any briefs, memos, opinion papers, or policy statements from the Government regarding the requirements of *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), the definition of intellectual disability, the standards for evaluation or assessment of intellectual disability or other mental deficiency post-*Atkins* and *Hall*, and/or the procedures necessary to comply with *Atkins* and *Hall* in capital prosecutions;

107. Any and all briefs, memos or position papers in possession of the Government which reflects the Government's position on what constitutes intellectual disability or the appropriate definition for intellectual disability;

108. Any evidence in its possession which suggests petitioner is intellectually disabled or suffers from any other mental impairment;

109. The names of any persons the government consulted or interviewed regarding the existence (or not) of petitioner's intellectual disability or diminished psychological or adaptive functioning, and any documents relating thereto;

110. Any and all briefs, memos or position papers in possession of the Government which reflect the Government's position on the procedures to be employed in establishing intellectual disability, the lack of direction in 18 U.S.C. §3596, and/or the validity of 18 U.S.C. §3596;

111.



112.

113.

114.

115.

116. ;

117.

118.

119.

120.

121. All JS-12 and/or AO-12 forms for the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina for a period dating from 1998 through 2009;

122. All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO-12s/JS-12s requested in item 121;

123. Any communications, documents (including, but not limited to, jury plans), or information explaining the process by which grand and petit juries were selected and summoned in the Charlotte Division and Statesville Division of the U.S. District

11

Court for the Western District of North Carolina at the time of Mr. Umaña's indictment and trial;

124. Any communications, documents (including, but not limited to, jury plans), or information explaining any changes in the process by which grand and petit juries were selected in the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina since the time of Mr. Umaña's indictment and trial;

125. The Master Jury Wheel databases (in searchable format) from which (a) the grand jurors that indicted, and (b) the petite jurors that tried, Mr. Umaña were selected;

126. The reports on qualification status for the Master Jury Wheels from which Mr. Umaña's grand jurors and petite jurors were selected;

127. All Juror Qualification Questionnaires (regardless of whether they resulted in qualified, excused, exempt, or disqualified jurors) used to select the Grand Jury which indicted Mr. Umaña;

128. All Juror Qualification Questionnaires (regardless of whether they resulted in qualified, excused, or disqualified jurors) used to select Mr. Umaña's petit jury;

129. Any communications, documents, or information concerning statistical information on the make-up of Mr. Umaña's grand and petit jury venires, including to race, ethnicity, and gender for a period dating from 1998 through 2009 for the Charlotte Division and Statesville Division of the U.S. District Court for the Western District of North Carolina, and/or the actual numbers of African Americans, Hispanics/Latinos, Asians, and women in those venires;

130. Complete and unexpurgated copies of the government's copies of juror questionnaires in this case, including all notations regarding the race or gender of the jurors;

131. Complete and unexpurgated copies of any notes, memoranda, communications and recordings of any kind made by the government in preparation for or during voir dire in this case;

132. Complete and unexpurgated copies of the government's copies of juror questionnaires, with accompanying work product associated with jury selection and preparation for jury selection, in all cases in which the two Assistant U.S. Attorneys who prosecuted his case have participated as prosecutors;

12

133. A description of any training and instruction, including topics, speakers, modes of presentation, and dates, that the United States Attorney's Office for the Western District of North Carolina provides to its attorneys regarding jury selection;

134. Any training guide, manual, chapter, videotape, audiotape or other training material regarding jury selection in the possession of any attorney in the employ of the United States Attorney's Office for the Western District of North Carolina;

135. The name and number of any case prosecuted by either of the Assistant U.S. Attorneys who prosecuted his case in which challenges were made under *Batson*;

136. The title, forum, dates and written materials from any lecture, speech or panel regarding jury selection in which either of the Assistant U.S. Attorneys who prosecuted his case have participated;

137. Any communications, documents, or information relating to any security measures taken during, or because of, Mr. Umaña's jury selection and trial;

138. Any communications, documents, or information relating to the transportation of jurors to and from the courthouse;

139. Any communications, documents, or information known to the Clerk's Office, USMS or other law enforcement agencies regarding a juror being influenced by, or exposed to, extraneous influence, evidence or information;

140. Any video, audio or photographs of the courtroom taken during Mr. Umaña's jury selection and trial;

141. Any communications, documents, or information relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of which defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;

142. Any communications, documents, or information relating to the United States Attorneys' and Attorney General's decision to prosecute Mr. Umaña capitally and the criteria used to make that determination;

143. All JS-12 and/or AO-12 forms for the Middle District of North Carolina for a period dating from 2007 through 2009;

13

144. All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO-12s/JS-12s requested in item 143;

145. All policies, formal or informal, regarding selection of defendants for authorization of the federal death penalty in existence at any time since enactment of the Federal Death Penalty Act in 1994;

146. All policies, formal or informal, relied upon in determining whether to seek and authorize the death penalty for Mr. Umaña;

147. All policies, formal or informal, relied upon in determining whether to seek and authorize the death penalty for Elvin Pastor Fernandez-Gradis;

148. All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty in existence at any time since enactment of the Federal Death Penalty in 1994;

149. All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty that were relied upon in determining whether to authorize Mr. Umaña for the death penalty;

150. All documents regarding and including guidelines, criteria, rules, factors, manuals, protocols, and any other means of selecting defendants for authorization of the federal death penalty that were relied upon in determining whether to authorize Elvin Pastor Fernandez-Gradis for the death penalty;

151. All written communication and/or documents between attorneys for Mr. Umaña and the DOJ and/or the prosecution team in this case regarding the decision whether to authorize the death penalty for Mr. Umaña;

152. All written communication and/or documents between attorneys for Elvin Pastor Fernandez-Gradis and the DOJ and/or the prosecution team in this case regarding the decision whether to authorize the death penalty for Elvin Pastor Fernandez-Gradis;

153. All documents and communication regarding Elvin Pastor Fernadnez-Gradis' mitigating and aggravating factors in the possession of the Government;

154. Any communications, documents, information or transcripts related to any interview of trial interpreters to verify their credentials;

14

155. Any communications, documents, information, transcripts or records documenting whether the trial interpreters took an oath to properly discharge the role and responsibilities of an interpreter;

156. Any communications, documents, or information regarding mistakes, corrections disputes, requests for further resources relating to the interpretation given during voir dire and trial;

157. Any resources or materials provided to the trial interpreters in preparation for or during Mr. Umaña's trial;

158. Any notes taken by the interpreters during voir dire or trial;

159. Any resumes or other qualification documents of the trial interpreters;

160. All purchase orders or other invoices submitted by the voir dire and trial interpreters;

161. The Government to produce any and all logs, indexes, receipts, or other documentation that identifies or indexes the discovery turned over to trial counsel and when that discovery was produced;

162. Any and all records regarding or reflecting Mr. Umaña's citizen status, including but not limited to consular, immigration, birth and/or State Department records regarding Mr. Umaña in the possession or control of the United States, Federal Bureau of Investigation, and/or the Charlotte-Mecklenburg Police Department;

163. Any and all policies and procedures, effective from December 2002 through April 2010, regarding the United States Marshal's Service, Federal Bureau of Investigation, the Charlotte-Mecklenburg Police Department, and United States Attorney's Office's policies for ascertaining the immigration status of pre-trial detainees in the possession or control of the United States, Federal Bureau of Investigation, United States Marshal's Service, and/or the Charlotte-Mecklenburg Police Department;

164. Any information that is inconsistent with any element of any crime of which Mr. Umaña was convicted, including but not limited to *mens rea* and whether the offense was committed in furtherance of MS-13;

165. Any information that establishes a recognized affirmative defense to any crime of which Mr. Umaña was convicted, including but not limited to insanity;

166. Any information that tends to cast doubt upon the accuracy of any evidence upon which the Government relied at trial8 to prove any element of any crime charged;

15

167. Any information that tends to cast doubt upon the accuracy of any evidence upon which the Government relied at trial to prove any statutory or non-statutory aggravating factors;

168. Any information that tends to cast doubt upon the accuracy of any evidence upon which the Government relied at trial to rebut any statutory or non-statutory mitigating factors;

169. Any information that tends to establish a statutory or non-statutory mitigating factor, including but not limited to any of the mitigating factors actually presented by the defense at trial;

170. Any information that would tend to prove or reveal a bias or motive to lie or withhold information of any Government witness who testified at the trial or before the Grand Jury;

171. Any information of any arrests, pending cases, and criminal convictions in this or any jurisdiction (state or federal) of any witness whom the Government called at trial or before the Grand Jury;

172. Any information of any suspected wrongdoing or ongoing investigations in this or any other jurisdiction (state or federal) of any witness whom the Government called at trial or before the Grand Jury;

173. Any potential *Giglio* information relating to non-law enforcement trial and/or Grand Jury witnesses and Fed. R. Evid. 806 declarants, including but not limited to:

- Prior inconsistent statements, including inconsistent attorney proffers;

- Statements or reports reflecting witness statement variations, including statements made during trial preparation meetings with witnesses; and

- Benefits provided to witnesses, including, but not limited to:

    - Dropped or reduced charges;

    - Immunity;

    - Expectations of downward departures or motions for reductions of sentence;

    - Assistance in a federal, state, or local criminal proceeding;

16

- Considerations regarding forfeiture of assets;

- Stays of deportation or other immigration status considerations;

- S-Visas;

- Monetary benefits;

- Non-prosecution agreements;

- Letters to other law enforcement officials (e.g., state prosecutors, parole boards) setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf;

- Relocation assistance; and

- Consideration or benefits to culpable or at risk third-parties.

- Other known conditions that could affect the witness's bias such as:

  - Animosity toward Mr. Umaña;

  - Animosity toward a group of which Mr. Umaña is a member or with which he is affiliated;

  - Relationship with the victims; and

  - Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor).

- Prior acts under Fed. R. Evid. 608;

- Prior convictions under Fed. R. Evid. 609; and

- Known substance abuse or mental health issues or other issues that could affect the witness's ability to perceive and recall events.

174. Any and all threats of prosecution or any statements regarding the magnitude of penal liability made to any witness that the Government called at trial, or any witness called before a federal grand jury, by any agent or employee of the Government or by any state law enforcement or prosecutorial agency working or cooperating with the Government;

175. A full and complete statement of all promises, considerations, rewards, or inducements made by the Government, its prosecutors, agents or agencies to induce

17

or encourage any individual's trial or grand jury testimony, cooperation or provision of information, wherein the Government has agreed, either with the individual, his or her counsel, agent or representative, to any of the following: not to prosecute said person for any crime or crimes;

- not to prosecute a third party for any crime or crimes where the reason for not prosecuting the third party is a consideration to the person;

- to provide a formal grant of statutory immunity, or to provide an informal assurance that the person will not be prosecuted in connection with any testimony, cooperation, or information given;

- to recommend leniency or a particular sentence for any crime or crimes for which the person stands convicted or is expected to be convicted;

- to comply with any prior agreements although said witness may have previously violated a part of their agreement;

- to recommend or not oppose a reduction of the offense level of the person under the United States Sentencing Guidelines for acceptance of responsibility;

- to recommend to the sentencing authority under the United States Sentencing Guidelines a downward departure from the guidelines if that person provides substantial assistance to authorities;

- to recommend or not oppose any downward departures or offense level reductions for the person under the United States Sentencing Guidelines;

- to seal any plea or plea agreement of that person;

- to provide favorable treatment or consideration, including but not limited to money, expenses, subsistence, a job, relocation, or a new start, to the person or to friends or relatives of the person in return for that person's testimony, cooperation, or provision of information;

- to make any beneficial recommendation regarding the person to any state or federal agency;

- to cooperate with any state law enforcement agency and seek that agency's agreement not to prosecute said person for any crime or crimes prohibited by state law;

18

- to make any other recommendation of benefit, or give any other consideration to the person or friends or relatives of said person; and

- to provide a statement to, or speak with, any law enforcement agency, prosecution official or court (state or federal) concerning the witness's assistance or cooperation.

176. Any potential *Giglio* information relating to law enforcement trial and/or grand jury witnesses;

177. Any exculpatory or impeachment information obtained from witnesses who testified at the trial and/or Grand Jury;

178. Any exculpatory or impeachment information obtained from non-testifying witnesses;

179. Any exculpatory or impeachment information obtained from any confidential informant, confidential witness, confidential human source and/or confidential source; and

180. Any exculpatory or impeachment information contained in case-related communications that occurred: (a) among prosecutors and/or federal, state, or local agents/officers; (b) between prosecutors and/or federal, state, or local agents/officers and witnesses and/or victims; and/or (c) between victim-witness coordinators and witnesses and/or victims, including but not limited to:

- communications concerning the reasons a witness would not be called to testify at the trial;

- communications concerning any discussion not to conduct further interviews with any witnesses;

- Any exculpatory or impeachment information concerning any forensic tests, examinations, evaluations, reports, and/or conclusions drawn from them that were presented at trial, including but not limited to any information that tends to show that the testing procedures and analyses used in this case have ever been performed inadequately or imperfectly in any other case; and

- Any exculpatory or impeachment information concerning any forensic tests, examinations, evaluations, reports, and/or conclusions drawn from them related to this offense whether or not presented at trial, including any ballistics testing from either the events in Greensboro or in Los Angeles.

19

After due consideration, it is hereby ORDERED that for each of the above-enumerated requests:

1. The Government produce any responsive materials that are in its possession; or

2. Certify that no such responsive materials are in its possession, and, if applicable, the dates on which any responsive materials were destroyed; or

3. Submit a verification that all materials responsive to the particular request have already been provided.

4. For any materials that are withheld, the Government shall expressly specify the discovery request(s) to which they pertain, state the grounds for withholding these materials, and describe the nature of the communications, documents or information not produced or disclosed, and do so in a manner that, without revealing information itself alleged to be privileged or protected, will enable Mr. Umaña to assess the claim.

**IT IS SO ORDERED.**

DATED:_____ _____

ROBERT J. CONRAD JR.
United States District Judge

20

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

ALEJANDRO UMAÑA,           )       No. 3:16-CV-00057-RJC
Petitioner/Movant          )       (3:08cr134-2)
                                    )
                                    )       **CAPITAL § 2255 PROCEEDINGS**
-v-                          )
                                    )       HON. ROBERT J. CONRAD JR.
UNITED STATES OF AMERICA,   )
Respondent              )
                                    )

## PROPOSED ORDER

Counsel, on behalf of movant Alejandro Umaña, has moved for leave to conduct

discovery and requests that the Clerk's Office for the Western District of North Carolina,

to produce the following materials in its possession, or alternatively certify their absence:

- All JS-12 and/or AO-12 forms for the Charlotte Division and Statesville Division of the Western District of North Carolina for a period dating from 1998 through 2009 (Discovery Request 121);

- All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO-12s/JS-12s requested in item 121 (Discovery Request 122);

- Any communications, documents (including, but not limited to, jury plans), or information explaining the process by which grand and petit juries were selected and summoned in the Charlotte Division and Statesville Division of the Western District of North Carolina at the time of Mr. Umaña's indictment and trial (Discovery Request 123);

- Any communications, documents (including, but not limited to, jury plans), or information explaining any changes in the process by which grand and petit juries were selected in the Charlotte Division and Statesville Division of the Western District of North Carolina since the time of Mr. Umaña's indictment and trial (Discovery Request 124);

1

- The Master Jury Wheel databases (in searchable format) from which (a) the grand jurors that indicted, and (b) the petite jurors that tried, Mr. Umaña were selected (Discovery Request 125);

- The reports on qualification status for the Master Jury Wheels from which Mr. Umaña's grand jurors and petite jurors were selected (Discovery Request 126);

- All Juror Qualification Questionnaires (regardless of whether they resulted in qualified, excused, exempt, or disqualified jurors) used to select the Grand Jury which indicted Mr. Umaña (Discovery Request 127);

- All Juror Qualification Questionnaires (regardless of whether they resulted in qualified, excused, or disqualified jurors) used to select Mr. Umaña's petit jury (Discovery Request 128);

- Any communications, documents, or information concerning statistical information on the make-up of Mr. Umaña's grand and petit jury venires, including to race, ethnicity, and gender for a period dating from 1998 through 2009 for the Charlotte Division and Statesville Division of the Western District of North Carolina, and/or the actual numbers of African Americans, Hispanics/Latinos, Asians, and women in those venires (Discovery Request 129);

- Any communications, documents, or information known to the Clerk's Office regarding a juror being influenced by, or exposed to, extraneous influence, evidence or information (Discovery Request 139);

- Any video, audio or photographs of the courtroom taken during Mr. Umaña's jury selection and trial (Discovery Request 140).

- Any communications, documents, information or transcripts related to any interview of trial interpreters to verify their credentials (Discovery Request 154);

- Any communications, documents, information, transcripts or records documenting whether the trial interpreters took an oath to properly discharge the role and responsibilities of an interpreter (Discovery Request 155);

- Any communications, documents, or information regarding mistakes, corrections disputes, requests for further resources relating to the interpretation given during voir dire and trial (Discovery Request 156);

- Any resources or materials provided to the trial interpreters in preparation for or during Mr. Umaña's trial (Discovery Request 157);

2

- Any notes taken by the interpreters during voir dire or trial (Discovery Request 158);

- Any resumes or other qualification documents of the trial interpreters (Discovery Request 159);

- All purchase orders or other invoices submitted by the voir dire and trial interpreters (Discovery Request 160).


After due consideration, this request is **GRANTED.**


DATED:_____ _____
ROBERT J. CONRAD JR.
United States District Judge

3

# EXHIBIT 3

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| ALEJANDRO UMAÑA,<br>Petitioner/Movant | ) ) ) | No. 3:16-CV-00057-RJC<br>(3:08cr134-2) |
| -v- | ) ) ) | **CAPITAL § 2255 PROCEEDINGS**<br><br>HON. ROBERT J. CONRAD JR. |
| UNITED STATES OF AMERICA,<br>Respondent | ) ) ) | |

PROPOSED ORDER

Counsel, on behalf of movant Alejandro Umaña, has moved for leave to conduct

discovery and requests that the Clerk's Office for the Middle District of North Carolina

to produce the following materials in its possession, or alternatively certify their absence:

- All JS-12 and/or AO-12 forms for the Middle District of North Carolina for a period dating from 2007 through 2009 (Discovery Request 143);

- All current census estimates the Administrative Office of the Courts provided to the clerk for each year of the AO-12s/JS-12s requested in item 143 (Discovery Request 144).


After due consideration, this request is **GRANTED.**


DATED:_____            _____

ROBERT J. CONRAD JR.
United States District Judge

1