# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL NO. 3:16CV57

| | |
|---|---|
| ALEJANDRO RAMIREZ UMAÑA, | ) |
| | ) |
| Movant, | ) |
| | ) |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

## RESPONSE OF THE UNITED STATES TO
## <u>UMAÑA'S MOTION FOR LEAVE TO CONDUCT DISCOVERY</u>

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ II

I. BACKGROUND ............................................................................ 3

    A. Umaña murders two individuals in a family restaurant in Greensboro, because one of the victims referred to his gang, MS-13, as "fake." ............................................. 3

    B. Umaña continues his gang leadership while in prison, orchestrating the intimidation of witnesses and participating in other violent misconduct................................. 6

        1. Umaña intimidates witnesses to his Greensboro murders. ........................................................... 7

        2. Umaña intimidates witnesses to earlier murders in which he had participated. ......................................... 8

    C. After Umaña is indicted, his defense team conducts an extensive pretrial investigation, endeavors to have this Court declare him ineligible for the death penalty, and seeks to limit the evidence introduced against him. ................ 9

        1. Umaña is indicted and charged with four capital offenses. ........................................................... 9

        2. This Court appoints two experienced attorneys, who represent Umaña zealously. ............................... 10

        3. This Court finds that Umaña is not mentally retarded. ......................................................... 11

    D. This Court presides over a three-phase trial. ......................... 14

        1. The jury finds Umaña guilty on all counts submitted to it. ....................................................... 14

        2. The jury finds Umaña eligible for the death penalty. ........................................................... 15

        3. The jury sentences Umaña to death. ......................... 16

    E. The Fourth Circuit affirms Umaña's conviction and death sentence........................................................... 33

ii

F. Umaña moves to vacate his sentence under 28 U.S.C. § 2255.................................................................34

II. DISCUSSION ...........................................................................35

A. Umaña's burden for obtaining leave to serve discovery requests in a proceeding under 28 U.S.C. § 2255......................37

B. Umaña has not established good cause to obtain discovery in support of his theory that the United States unconstitutionally suppressed information during his criminal case................................................40

1. Umaña must prove three elements to establish that the United States violated a cognizable discovery obligation during his criminal case..............42

2. Roberto Ramos's statement does not establish a prima facie case of a Brady violation, because the defense team and the jury were aware that Ramos was unable to identify Umaña. .........................46

3. Umaña's allegation that the United States failed to disclose recordings related to the Lemon Grove Murder investigation does not establish a prima facie case of a *Brady* violation. ....................................48

4. Umaña's allegation that the United States failed to disclose statements by his mother about his background does not establish a prima facie case of a *Brady* violation........................................................53

5. Rony Lopez's testimony about tattoos is not *Brady* material.............................................................57

6. The information that Umaña's 2255 motion alleges the United States suppressed, when considered collectively, is not material. .......................59

C. Umaña has not established good cause to obtain discovery in support of his claim that the United States knowingly introduced false evidence. ......................................62

Case 3:16-cv-00057-MOC    Document 50    Filed 03/23/17    Page 3 of 143

| | | |
|---|---|---|
| 1. | Umaña's procedural default precludes discovery on his *Napue* claim | 62 |
| 2. | Testimony by defense experts during the *Atkins* hearing before this Court does not establish a prima facie *Napue* claim. | 63 |
| 3. | Testimony that an MS-13 member earns tattoos by killing does not establish a prima facie *Napue* claim. | 66 |
| 4. | Freddie Gonzalez's testimony does not establish a prima facie *Napue* claim. | 68 |
| 5. | Detective Parshall's testimony about corroborating details provided by witnesses to the Fairfax Street murders does not establish a prima facie *Napue* claim. | 69 |

**D.** **Umaña has not made a prima facie case that the performance of his attorneys was constitutionally deficient.** ........................................................................ **71**

| | | |
|---|---|---|
| 1. | Umaña has not made a prima facie case that his trial attorneys were constitutionally deficient in addressing the Los Angeles murders in which Umaña participated. | 75 |
| 2. | Umaña has not made a prima facie case that counsel was deficient in addressing evidence about MS-13 tattoos. | 93 |
| 3. | Umaña has not made a prima facie case that counsel deficiently investigated and presented evidence about Umaña's "life history." | 94 |
| 4. | Umaña has not made a prima facie case that trial counsel deficiently sought to use his mental health as a defense. | 100 |
| 5. | Umaña's general and conclusory allegation that counsel unreasonably omitted to challenge the constitutionality of this Court's jury-selection plan does not establish a prima facie case. | 106 |

iv

6.  Umaña has not made a prima facie case that the Constitution compelled his attorneys to make different objections under *Batson.* ............................ 107

7.  Umaña was not deprived of a constitutional right to the effective assistance of counsel during the Department of Justice's death penalty authorization procedure. ........................................... 108

8.  Umaña has not made a prima facie case that counsel was deficient in communicating with Umaña or failing to object to interpreters in the Courtroom. ................................................................. 111

E.  **Umaña is not entitled to discovery in support of his theories of intellectual disability, juror misconduct, excessive security measures, selective prosecution, or a violation of the Vienna Convention.........................................112**

1.  Umaña cannot overcome his procedural default, and many of the errors he alleges would be harmless. ................................................................... 112

2.  This Court already properly decided that Umaña is not a person with an "intellectual disability." ....... 115

3.  Umaña has not made a prima facie case of "misconduct related to the jury."............................... 118

4.  Umaña has not established a prima facie case for relief based on the security measures employed by this court. ............................................................ 127

5.  Umaña has not established good cause for discovery in support of his theory that he was selectively prosecuted on the basis of race and geography. ............................................................... 130

6.  Umaña has not established good cause for discovery in support of his claim based on the Vienna Convention. .................................................... 131

F.  **Umaña is not entitled to discovery unmoored from the allegations in his 2255 motion...................................................132**

v

G. **Even if Umaña's 2255 motion contained a prima facie claim for relief, he would not be entitled to the discovery he requests.** ................................................................133

1. Umaña's requests fail to meet the specificity requirement imposed by the rules. ............................ 133

2. Even if Umaña's 2255 motion established a prima facie claim for relief, he has failed to meet his burden to prove that the discovery he seeks is material. .................................................................. 134

III. **CONCLUSION** .......................................................................................**135**

Case 3:16-cv-00057-MOC  Document 50  Filed 03/23/17  Page 6 of 143

Alejandro Ramirez Umaña requests leave to seek hundreds of items of discovery, from various entities, in support of his motion under 28 U.S.C. § 2255 to vacate the criminal convictions and death sentence that he received in 2010. He has failed to demonstrate good cause for leave to obtain any of the 180 categories of discovery that he requests. The specific facts that Umaña's 2255 motion alleges in support of claims for which he seeks discovery would not entitle Umaña to relief, even if, after full discovery, Umaña were able to prove them.

Umaña's 2255 motion does not allege a prima facie case of misconduct by the United States or his own attorneys, as required to establish good cause for more than 100 of the categories of discovery that he seeks. If proved, the facts his motion alleges would not establish that the United States unconstitutionally suppressed evidence or knowingly presented false testimony. Nor would Umaña's allegations establish that the performance of his attorneys related to evidence of Umaña's participation in murders in Los Angeles was constitutionally deficient. Umaña is, therefore, not entitled to the discovery he seeks in requests numbered 1–81 or 161. Because Umaña's 2255 motion also fails to make a prima facie case of ineffective assistance of counsel related to his tattoos, his personal history, his mental health, jury selection, the Justice Department's decision to seek the death penalty, or translation efforts during his trial, Umaña is also not entitled to the discovery he seeks in requests numbered 82–105, 121–36, and 145–60.

Nor does Umaña's 2255 motion allege a prima facie case under any other

theory, as required to establish good cause for the several dozen additional categories of discovery he seeks. Because the facts Umaña's 2255 motion alleges would not require this Court to relitigate its finding that Umaña failed to establish mental retardation, Umaña is not entitled to the discovery he seeks in requests numbered 106–110. Umaña's 2255 motion alleges no facts that would entitle him to relief on his theories of jury misconduct, excessive courtroom security, selective prosecution, or a violation of the Vienna Convention, so he is not entitled to the discovery he seeks in requests numbered 111–20, 137–44, or 162–63. And Umaña is not entitled to the discovery he seeks in requests numbered 164–180, which do not purport to relate to any claims for relief in his 2255 motion.

Umaña has not shown good cause for discovery to prove the facts alleged in his 2255 motion, because proving those facts would not allow him to prevail on his motion. And Umaña is not entitled to discovery to fish for new facts that his 2255 motion does not already contain. Moreover, even if Umaña's motion contained a prima facie case for relief, the extraordinarily broad discovery requests that Umaña seeks to serve do not comply with the applicable rules, which require specificity. And Umaña has not met his burden to show that the discovery he requests is material to any of the claims his 2255 motion alleges. The United States, therefore, respectfully requests that this Court deny Umaña's

2

motion for leave to conduct discovery.[1]

## I.    BACKGROUND

### A.    Umaña murders two individuals in a family restaurant in Greensboro, because one of the victims referred to his gang, MS-13, as "fake."

On the evening of Saturday, December 8, 2007, Manuel Garcia and his brother Ruben joined several of Manuel's coworkers at Las Jarochitas Mexican restaurant in Greensboro, North Carolina.  (Exh. 1, at 1605–10.)[2]  Las Jarochitas is a small, family restaurant located in a strip mall, near a Toys 'R' Us toy store.  (Exh. 1, at 1605–08, 2167.)  A number of people were in the restaurant, including the daughter of the restaurant's owners and her months' old baby son, who sat in his carrier in a booth.  (Exh. 1, at 1609–10, 1629–30, 2575, 2581.)

Also in the restaurant was Umaña, accompanied by a number of other members of his gang, Mara Salvatrucha, also known as MS-13.  (Exh. 1, at 1251, 1613–15, 1619–21, 1638, 1657, 2579–80, 3142.)  MS-13 is a notorious gang with a national and international presence, and Umaña, also known as "Wizard," was a highly respected member who had served the gang in California and New York.  (Exh. 1, at 1362–63, 1365–68, 1445, 1536–37, 2864, 1897.)  Gang leaders had sent

---

[1]  This Court has not yet asked the United States to respond to Umaña's 2255 motion, and the United States reserves the right to assert any defense or argument or oppose Umaña's motion on any ground at the appropriate time.

[2]  Exhibit 1 consists of the Joint Appendix filed in the Fourth Circuit by Umaña during his direct appeal.  Because it contains the vast majority of the record necessary to resolve Umaña's discovery request in a consecutively paginated, easily citable format, the United States has included it to assist the Court and the parties.

Umaña to North Carolina to run the Charlotte "cliques" of MS-13 members. (Exh. 1, at 1446, 1863, 1896–97, 1889–90, 1904–05.) Charlotte MS-13 members committed armed robberies, thefts, extortion, and violent crimes for the gang, and Umaña instructed those members how to conduct their business. (Exh. 1, at 1867–69, 1905–14, 1934–36.) Umaña told Charlotte MS-13 members that one of his goals "for Charlotte was to commit ten of the bloodiest murders Charlotte has ever seen. Salvadorian style, which means, you know, whacking people with a machete, cutting heads off and just chopping people up." (Exh. 1, at 1917, 1983.)

At Las Jarochitas, an argument arose over the music playing on the jukebox. (Exh. 1, at 1615–19, 1656.) An MS-13 member known as "Spider" stood up and became aggressive. (Exh. 1, at 1618.) Manuel bought Spider and his cohorts a bucket of beer to try to calm things down, but the gang members did not accept the gesture. (Exh. 1, at 1619.) Restaurant employees asked the gang members to leave, and one of the members told Manuel "to not mess with them because they were . . . from MS." (Exh. 1, at 1619–21, 1649.) Ruben replied that he was not scared, and stated that the gang was "fake to him." (Exh. 1, at 1621.)

Umaña pulled out a gun and, holding it sideways, pointed it at Ruben and Manuel. (Exh. 1, at 1625, 2579.) Umaña "stood there for a minute." (Exh. 1. at 1627.) During that time, with Umaña's gun pointed at them, the brothers "stood still" and "stood quiet." (Exh. 1, at 1627.)

Umaña fired five shots. (Exh. 1, at 1621, 1658, 1677.) He first shot Ruben in the chest, who fell back from the impact. (Exh. 1, at 1630.) Umaña shot

4

Manuel in the head.  (Exh. 1, at 1658–59, 1690–91.)  People in the restaurant ran or hid in booths or bathrooms, and bullets lodged in the kitchen and ladies' room.  (Exh. 1, at 1628–29, 1633–35, 1658–59, 1682–83, 2581–83.)  A third victim, Jorge Martinez, suffered a bullet wound in his shoulder.  (Exh. 1, at 2593–95.)

Although Ruben continued to gasp for breath for a time after police arrived, both Manuel and Ruben died at Las Jarochitas of the wounds that Umaña inflicted.  (Exh. 1, at 1581–83.)  Emergency medical providers took Martinez to the hospital.  (J.A. 2595.)

Umaña fled with his MS-13 cohorts to Charlotte.  (Exh. 1, at 1928.)  During the trip, Umaña cocked his gun and talked about bullets for the weapon.  (Exh. 1, at 1928.)  Umaña stopped at a nightclub and taco stand in Charlotte, put the gun in the face of one of his cohorts, Rony Lopez, also known as "Nene," and told him to smell it.  (Exh. 1, at 1928.)  After Lopez said the gun smelled like gunpowder, Umaña urinated on his hands to remove the gunpowder.  (Exh. 1, at 1928.)  Umaña told other members of MS-13 that he had shot two people at Las Jarochitas and demonstrated the shooting.  (Exh. 1, at 1459–60, 1463–65.)  He explained that he shot the victims because "they insulted the MS 13," noting that he acted for himself and his fellow gang members.   (Exh. 1, at 1464–65.)

Umaña left the club with a fellow gang member, who had been working with police as an informant.  (Exh. 1, at 1931–34.)  "When asked about the prospect of being pulled over by the police with the murder weapon, [Umaña] responded, as recorded on tape, that the officer would be on the wrong end of his

gun, as 'she is always close by.'" *United States v. Umaña*, 750 F.3d 320, 332 (4th Cir. 2014); (Exh. 1, at 1933.)  The same day, Umaña returned to the club with other gang members to confront a drug dealer who had failed to "pay[] rent to MS." (Exh. 1, 1935.)  Toward the end of the evening, Umaña went to the home of another gang member in Charlotte, Jaime Sandoval, also known as "Pelon," where Umaña stayed.  (Exh. 1, at 1936, 2035.)  Umaña spoke of the third victim that he had shot and "lamented that he 'didn't kill that son of a bitch.'"  *Umaña*, 750 F.3d at 332.

Police arrested Umaña several days after the shooting.  (Exh. 1, at 1936, 1938).  Umaña was sitting on the couch at Sandoval's home and had stashed his gun — the murder weapon — in the cushions.  (Exh. 1, at 1938–39.)  After his arrest, Umaña told another gang member that the police had been "lucky," because Umaña had tried to grab his gun when the arrest occurred.  (Exh. 1, at 1468.)

> **B.**     **Umaña continues his gang leadership while in prison, orchestrating the intimidation of witnesses and participating in other violent misconduct.**

Umaña continued his violent gang activity from prison.  (Exh. 1, at 2904–07, 2914, 2916–17.)  Law-enforcement officers recovered numerous letters from prison inmates bearing Umaña's name or those of his co-conspirator gang-members.  (Exh. 1, at 2510.)  In these letters, Umaña expressed continuing loyalty to MS-13, exercised control over other members, described engaging in acts of violence, and directed others to engage in violent acts.  *Umaña*, 750 F.3d

at 332; (Exh. 1, at 2510, 2514, 2860; Exh. 2, at 22.[3]) And Umaña orchestrated plans to intimidate witnesses to the murders he had committed.

### 1. Umaña intimidates witnesses to his Greensboro murders.

Umaña orchestrated a plan to intimidate witnesses to his murder of the Garcia brothers. (Exh. 1, at 2126–27.) While in jail, Umaña sent a message to Misterio, the MS-13 gang member who took over Umaña's role in Charlotte, to ensure that nobody would testify against Umaña in court. (Exh. 1, at 1470, 1946–47, 2126–2127.) Misterio met with a number of other gang members, including Alexander Granados, known as "Gorilon," Sandoval, and individuals known as "Chicago" and "Peligroso," and determined that the witnesses would "have to be killed" so they "would not appear in court." (Exh. 1, at 2126–2127.) Sandoval, Chicago, and Peligroso drove to Las Jarochitas in Greensboro, armed with guns, "to intimidate the owners so [they] won't testify." (Exh. 1, at 1495, 2128–29, 2184–86, 2193–96.) Sandoval walked into the restaurant and told the owner, "I know your children are going to testify." (Exh. 1, at 2160–61, 2186.) Sandoval left after learning that restaurant had a new owner. (Exh. 1, at 2163–64.)

Umaña and his cohorts also sought to kill or injure witnesses who were fellow gang members. MS-13 members suspected Rony Lopez, who had driven Umaña back to Charlotte after he murdered the Garcia brothers, of cooperating

---

[3] Exhibit 2 is a selection of exhibits admitted at Umaña's trial.

7

with police.  (Exh. 1, at 1468–69, 2119–20.)  The gang put a "green light" on Lopez.  (Exh. 1, at 2120.)  "When there's a green light, that person has to be killed."  (Exh. 1, at 2120.)  And MS-13 members unsuccessfully sought to "take Rony out."   (Exh. 1, at 1469.)  Among the several people to whom Umaña bragged about his murders in Las Jarochitas was Juan Vela Garcia, also known as "Mariachi," (Exh. 1, at 1407, 1422, 1464–65).  Umaña personally directed that Garcia "get a green light put on him, too."  (Exh. 2, at 2; *see also* Exh. 1, at 1497.)

### 2. Umaña intimidates witnesses to earlier murders in which he had participated.

Umaña also sought to intimidate witnesses to two additional murders in which he had participated on Fairfax Street in July of 2005 in Los Angeles, described below.  *See* section I.D.3.b.i, *infra*.   Three other MS-13 members who were with Umaña at the time, Luis Ramos, also known as "Chipis," Luis Rivera, and Rene Arevalo, also known as "Moe," had told police that Umaña had shot the victims.   (Exh. 1, at 2738, 2741–42, 2745, 2789–91.).

Umaña sent several messages while in jail, seeking to have witnesses to these murders threatened, injured, or killed.  Umaña, for example, wrote a coded letter to Sandoval, asking him to "Tell SIC or TG" that "we have to see how we can get Moe and that asshole Chipi."   (Exh. 2, at 20.)  In another letter to Sandoval, Umaña described where to find shanks that Umaña had prepared and wrote, "I'm going to write two letters for the brothers in Sivar right now, so they know that Chipi and Moe have a confirmed light on them." (Exh 2, 28–29.)

8

Another individual wrote to Sandoval stating that he and others had encountered Ramos and "left . . . him all fucked up." (Exh. 2, at 10.) The letter asked Sandoval to "let [Umaña] . . . know that the . . . kid already experienced MS presence first-hand . . . and well . . . now we need to get Moe." (Exh. 2, at 11.) Arevalo — "Moe" — informed police that he did not wish to testify against Umaña, because he was afraid of Umaña and worried for his safety and the safety of his family. (Exh. 1, at 2804.)

### C. After Umaña is indicted, his defense team conducts an extensive pretrial investigation, endeavors to have this Court declare him ineligible for the death penalty, and seeks to limit the evidence introduced against him.

#### 1. Umaña is indicted and charged with four capital offenses.

A federal grand jury indicted Umaña and charged him with a number of non-capital offenses related to his participation in MS-13. (Exh. 1, at 318–423.) The indictment charged Umaña, along with 25 other members of MS-13, with conspiracy to participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(d). (Exh. 1, at 318–42.) The indictment also charged Umaña with possession of a firearm by an alien illegally in the United States, 18 U.S.C. § 922(g)(5); robbery under the Hobbs Act, 18 U.S.C. § 1951; conspiracy to obstruct justice and tamper with witnesses, 18 U.S.C. § 1512(b)(1); and witness tampering, 18 U.S.C. § 1512(b)(1). (Exh. 1, at 369–70, 401–02, 405–09.)

The grand jury also charged Umaña with four capital offenses related to

9

his murders of Ruben and Manuel Garcia. Counts twenty-two and twenty-four charged Umaña with murdering Ruben and Manuel, respectively, for the purpose of maintaining or increasing his position in an enterprise — MS-13 — engaged in racketeering activity, 18 U.S.C. § 1959(b)(a)(1). (Exh. 1, at 364, 366.) Counts twenty-three and twenty-five charged Umaña with use of a weapon during or in relation to a crime of violence — the racketeering conspiracy and murder — resulting in the murder of Ruben and Manuel, respectively, 18 U.S.C. § 924(c), (j)(1). (Exh. 1, at 365, 367.) The grand jury also indicted a host of Umaña's cohorts, but this Court severed Umaña's case from theirs in the light of the capital charges against Umaña. (Exh. 1, at 73.)

### 2. This Court appoints two experienced attorneys, who represent Umaña zealously.

In October of 2008, this Court appointed two experienced attorneys, Mark Foster and John Bryson, to represent Umaña. (Exh. 1, at 72.) The United States provided discovery to Umaña's attorneys under a "limited open file policy." (Exh. 1, at 238.) As of June 2009, the United States had produced more than 40,000 pages of reports and statements and approximately 400 hours of recorded conversations. (Exh. 1, at 312; 2255 Mot. 258.) Although they received ample discovery, Umaña's attorneys were not shy about asking the United States for more when they believed they might be entitled to it. (*See, e.g.*, App'x 49 to 2255 Mot.)

The record, of course, discloses only a fraction of the work that Umaña's

defense team did for him.  What it does reveal reflects a thorough investigation and zealous advocacy.  Members of the defense team traveled to El Salvador, for example, at least five times.  (Exh. 1, at 3085–87, 3119, 3902.)  They interviewed family members, school administrators, employers, and people who knew Umaña in his youth.  (Exh. 1, at 3085–87, 3119, 3902.)  And Umaña was evaluated by numerous defense experts, who, among other things, conducted psychological evaluations, administered a positron-emission-tomography ("PET") scan, comprehensively evaluated his brain function, tested his intelligence, and performed a physical neurological evaluation.  (Exh. 1, at 662, 673–74, 783, 788, 3902, 3931, 3988–89, 3990.)

Counsel zealously sought to protect Umaña from damning evidence in advance of trial.  For example, counsel vigorously challenged the admission of Umaña's confession to participating in three murders in Los Angeles, moved to strike the nonstatutory aggravating factors related to these murders, and challenged the reliability of other evidence about those events.   (Exh. 1, at 177, 189, 193, 1138).  Although these efforts were largely unsuccessful, his attorneys succeeded in precluding the jury from hearing evidence that Umaña and his cohorts had decapitated an individual in El Salvador for attempting to leave MS-13.  (Exh. 1, at 3227.)  Counsel also secured the dismissal of two counts against Umaña.  (Exh. 1, at 2317, 2370.)

**3.      This Court finds that Umaña is not mentally retarded.**

In September of 2009, Umaña's attorneys moved for a "pretrial hearing to

11

determine whether [Umaña] is mentally retarded and thus ineligible for the death penalty." (Exh. 1, at 512 (citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).) As this Court explained, "the Eighth Amendment prohibits imposing the death penalty on mentally retarded persons." (Exh. 1, at 1000 (citing *Atkins*, 536 U.S. at 321).)

During the *Atkins* hearing held by this Court, the defense called three expert witnesses. First, the defense called Dr. John Olley, a psychologist, who testified that Umaña had "mild mental retardation." (Exh. 1, at 523.) Dr. Olley had personally traveled to El Salvador, interviewed a host of individuals who had known Umaña during his youth, and obtained records of Umaña's academic performance, the significance of which he discussed with a Salvadorian school administrator. (Exh. 1, at 557–96.) Dr. Olley testified that he had been "able to gather enough information in this case to make an assessment for Alejandro Umaña on the question of mental retardation." (Exh. 1, at 596.) Dr. Ricardo Weinstein testified for the defense that Umaña received a "full scale IQ score" of 66, and a "[n]onverbal intelligence quotient of 53." (Exh. 1, at 678, 680.) Those numbers were below what Dr. Olley had described as the "cutoff" for mental retardation on an IQ test: 70. (Exh. 1, at 537.) Finally, Umaña's attorneys called Dr. James R. Merikangas, who performed a physical neurological examination on Umaña and evaluated the results of his ("PET") scan. (Exh. 1, at 783, 788.) Dr. Merikangas described Umaña's brain as "quite abnormal," opined that Umaña probably suffered a "traumatic brain injury or something congenital" that would

12

"impact his ability to make judgments," to "have abstract reasoning," and "to control his behavior."  (Exh. 1, at 788, 792, 795.)

The United States called as a witness Dr. Enrique M. Suarez.  Dr. Suarez had conducted a thorough evaluation of Umaña.  (Exh. 1, at 804, 854–55.) And he opined that Umaña did not exhibit any of the criteria for mental retardation. (Exh. 1, at 804–55.)

After hearing the evidence, this Court denied Umaña's request to declare him ineligible for the death penalty on grounds of mental retardation.  (Exh. 1, at 1016.)  This Court used a three-part definition of the condition when making its decision.  First, the condition requires "significantly subaverage intellectual functioning." (Exh. 1, at 1000, 1001.)  Second, the condition requires concurrent significant limitations in "at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety." (Exh. 1, at 1000, 1001.)  Finally, the condition must "manifest[] before age 18." (Exh. 1, at 1000, 1001.).

The three-part definition of "mental retardation" that this Court used was described by the Supreme Court in *Atkins*, 536 U.S. at 308.  The definition was what Dr. Olley used and told the court "has been recognized for a good many years." (Exh. 1, at 533–34.)  And this definition was reaffirmed by the Supreme Court shortly after Umaña's appeal was decided.  *Hall v. Florida*, 134 S. Ct. 1986, 1994 (2014).

13

This Court found that Umaña had failed to prove the second and third elements, "involving adaptive skills and onset before age 18," by a preponderance of the evidence. (Exh. 1, at 1016.) The Court noted the "sharp disagreement" among the witnesses at the hearing about testing methods and resulting intelligence-test scores. (Exh. 1, at 1001–02.) The Court concluded, in the light of its other findings, however, that resolving that disagreement was unnecessary. (Exh. 1, at 1002.)

**D.    This Court presides over a three-phase trial.**

This Court "divided the trial" of Umaña "into three phases." *Umaña*, 750 F.3d at 333. The first phase required the jury to "determine guilt or innocence." *Id.* The second phase required the jury to "determine Umaña's eligibility for the death penalty." *Id.* And, after the jury found Umaña "death eligible," it was asked during the third phase "to select between the death penalty and life imprisonment without the possibility of release." *Id.*

**1.    The jury finds Umaña guilty on all counts submitted to it.**

During the first phase of the trial, the jury heard, among other things, eyewitnesses who had seen Umaña murder Ruben and Manuel in Las Jarochitas. (*See, e.g.*, Exh. 1, at 1615–39.) The jury heard from other MS-13 members who described Umaña's efforts to lead Charlotte members in violent crime, what he told them about the murders in Las Jarochitas, and how he had committed those murders for his fellow gang members. (*See, e.g.*, Exh. 1, at 1362–63, 1446, 1365–68, 1445, 1459–65, 1536–37, 1863, 1889–90, 1896–97, 1904–05, 1917, 1928, 1931–

14

36.) And the jury heard about and saw some of Umaña's written work from jail, orchestrating efforts to kill or injure witnesses. (*See, e.g.*, Exh. 1, at 1804–40; Exh. 2, at 2–4, 10–12, 19–22, 28–30.)

The jury returned a verdict of guilty on all of the nine counts submitted to it, including all four capital offenses. (Exh. 1, at 2552.) The jury deliberated for 5 hours and 45 minutes. (Exh. 1, at 2542, 2545, 2552.)

### 2. The jury finds Umaña eligible for the death penalty.

During the second phase, the jury concluded that the United States had proved beyond a reasonable doubt that Umaña was eligible for the death penalty. All evidence from the first phase was admitted. (Exh. 1, at 2573–74.) The jury heard testimony from a waitress at Las Jarochitas who described her efforts to protect her months-old baby, who was in the restaurant when Umaña began shooting. (Exh. 1, at 2576–83.) She described how other people, waitresses, and cooks ran through the back door to escape Umaña's gunfire. (Exh. 1, at 2583.) The jury heard testimony about the bullets and shell casings recovered from different parts of the restaurant. (Exh. 1, at 2596–2601.) And the jury heard testimony about the third victim that Umaña had shot. (Exh. 1, at 2791–95.) After deliberating for one hour and six minutes, the jury returned a verdict finding Umaña eligible for the death penalty on all four capital counts. (Exh. 1, at 2607–08, 2621–22, 2624–25.) The jury unanimously found, for each count, two statutory aggravating factors: (1) that Umaña had created a grave risk of death to one or more persons in addition to each victim; and (2) that Umaña had killed

15

more than one person in a single criminal episode.  (Exh. 1, at 2623–47.)

### 3. The jury sentences Umaña to death.

During the third phase, the jury was asked to weigh whether aggravating factors, proved by the United States beyond a reasonable doubt, outweighed any mitigating factors, proved by a preponderance of the evidence by the defense, sufficiently to justify a sentence of death.  (Exh. 1, at 2650.)  The jury heard evidence of four nonstatutory aggravating factors:  (1) that Umaña had killed the Garcia brothers to protect and maintain the reputation of MS-13 and to advance his position in that criminal enterprise; (2) that Umaña had caused injury and loss to the Garcia brothers' family and friends; (3) that Umaña had committed and participated in murders in Los Angeles; and (4) that Umaña posed a continuing and serious threat to the lives and safety of others, shown by his lack of remorse, his allegiance to MS-13, his lack of rehabilitation, and his pattern of violence.  (Exh. 1, at 3543–46.)  The jury also heard evidence of 13 mitigating factors, discussed below.  *See* Section I.D.3.d.iv., *infra.*

### a. The jury hears additional evidence of Umaña's violent conduct in jail and during trial.

During the penalty phase, the jury heard evidence of Umaña's continued violence and allegiance to MS-13 in jail, after his arrest.  Detention officers described Umaña's involvement in a physical fight and his threatening behavior.  (Exh. 1, at  2823, 2841–42, 2905–07.)  Another inmate told the jury that Umaña had asked him to join MS-13 and said that he was going to "beat . . . down" some

16

correction officers.  (Exh. 1, at 2914–16.)  The same inmate had encountered Umaña at the courthouse the day before he testified.  (Exh. 1, at 2916.)  He told the jury that Umaña had ordered him "not to say nothing in court" and said things about his sister that the inmate had understood as a threat.  (Exh. 1, at 2916–17.)  The jury also saw, over defense objection, a number of additional letters written by Umaña in jail expressing loyalty to MS-13, hatred for his enemies, and ordering and encouraging violence.  (Exh. 1, at 2910–11); *Umaña* 750 F.3d at 332.

The jury heard a second time from Rony Lopez, an MS-13 member who had testified during the guilt phase.  Lopez told the jury during the penalty phase that Umaña had thrown gang signs during his earlier testimony and told him, in court, in Spanish, "your family's going to pay, mother –."  (Exh. 1, at 2936.)

Umaña had strapped a four-inch metal knife to his penis on the first day of jury selection, and the jury heard about that knife from Russell Lashley, the Deputy United States Marshal who recovered it.  (Exh. 1, at 2920–21, 2929; Exh. 2, at 34.)  Deputy Lashley explained that he found the knife when searching Umaña at the jail before transporting him to Court.  (Exh. 1, at 2921.)  He confiscated the knife and searched Umaña's jail cell.  (Exh. 1, at 2922–25.)  He found pencil graphite and markings, which suggested that Umaña had used the concrete as a sharpening stone for the knife.  (Exh. 1, at 2926.)  This Court explained that the jury visibly reacted when Deputy Lashley testified.  (Exh. 1, at 3690.)

17

### b. The jury hears evidence of Umaña's participation in murders in Los Angeles.

The jury also heard evidence about the murders of three individuals in Los Angeles in which Umaña had confessed to participating. Contrary to what Umaña's brief suggests (Disc. Br. 14.), testimony related to these murders consumed less than one day of the eleven-day trial, not counting jury selection. (Exh. 1, at 110–13). And these Los Angeles murders were neither "statutory aggravating circumstances" nor "legally necessary for the imposition of a sentence of death." (*Cf.* Disc. Br. 14.) The Los Angeles murders were *nonstatutory* aggravating factors. (Exh. 1, at 156); *Umaña*, 750 F.3d at 333. And the jury heard evidence about them only "[a]fter" it "found Umaña eligible for the death penalty." *Id.* Because Umaña focuses an outsized portion of his discovery brief to theories purportedly related to these murders, the evidence heard by the jury is described in detail below.

### i. The jury hears evidence of Umaña's participation in the murder of two individuals on Fairfax Street in Los Angeles.

The jury heard about Umaña's participation in the murder of two victims, Jose Herrera and Gustavo Porras, on Fairfax Street in Los Angeles, mentioned above. *See* Section I.B.2., *supra*; (Exh. 1, at 2825, 2829.) Officers of the Los Angeles Police Department described their own work at the scene and their investigation. (Exh. 1, at 2716, 2741–42, 2745, 2783, 2790–91.) And the jury heard that the two victims died of gunshot wounds to the head. (Exh. 1, at 2825,

18

2829.)

The jury received a transcript of, and heard testimony about, Umaña's confession to police describing his participation in the murder of Porras and Herrera.  (Exh 1, at 2781, 4289, 4334–35, 4339, 4342–4346, 4348–55, 4359–65, 4371, 4373–87.)  Umaña told police that he was in the passenger's seat of a Nissan driven by Rene Arevalo — "Moe" — along with three others, who were in the back seat:  Luis Ramos — "Chipis"; Eddie Ruiz, also known as "Blackie or Negro"; and Luis Rivera, who was on crutches.  (Exh. 1, at 2747, 2753.)  The two victims, on foot, approached the Nissan on Fairfax Street and flashed the signs of a neighborhood gang.  (Exh. 1, at 2752, 4342–43.)  The three individuals in the back seat of the Nissan began throwing MS-13 gang signs back at the victims.  (Exh. 1, at 4377–78.)  Umaña admitted that once he saw signs from the neighborhood gang, he knew he was going to confront a gang member that was potentially armed (Exh. 1, at 4346), although Umaña did not see a weapon (Exh. 1, at 2752).

Umaña explained that he got out of the Nissan on Fairfax Street, armed with a gun, and, along with his cohorts in the back seat, confronted the victims. (Exh. 1, at 2753, 4348, 4354, 4373–74, 4381–83.)  Arevalo stayed in the car.  (Exh. 1, at 4348–49.)  When asked if he shot the victims, Umaña said, "You can say that."  (Exh. 1, at 2752.)  He also said that he did it not out of meanness but because he thought the victims were gang members.  (Exh. 1, at 4383.)  But Umaña also said, "I really didn't do it, right?"  (Exh. 1, at 4382.)

19

Although Umaña was equivocal about whether he or one of his cohorts had shot the victims on Fairfax Street, the jury heard testimony from Detectives Gene Parshall and Barry Tellis of the Los Angeles Police Department that three individuals in the car with Umaña had identified Umaña as the shooter. Rivera, Ramos, and Arevalo each stated that Umaña was the shooter. (Exh. 1, at 2741–42; 2745, 2790–91.)

Umaña's defense attorneys extensively cross examined the witnesses who testified about the Fairfax Street murders. Detective Parshall admitted that one of the victims, Porras, had, shortly before the murders, been involved in a fight in the same area, during which he was reported to have carried a knife. (Exh. 1, at 2759–60.) Detective Parshall also admitted that the other victim, Herrera, had belonged to a "tagging crew" and had "numerous fights and run-ins" with members of another tagging crew. (Exh. 1, at 2760.)

Detective Parshall admitted on cross examination that he had concluded that "Mr. Rivera lied" when speaking to him, that Rivera was evasive, that Rivera was an MS-13 gang member, and that Rivera's statements were "largely self-serving." (Exh. 1, at 2761–63.) Foster also elicited information that Rivera was arrested in early 2006, and the police report indicated that he "gave false information to police officers in an attempt to delay the investigation/lie." (Exh. 1, at 2765.)

Detective Parshall also admitted on cross examination that Ramos had initially denied knowing Umaña or "anything about the Fairfax Avenue

20

murders." (Exh. 1, at 2765.)  He also testified that Ramos had spoken with Rivera and discussed "a plan to tell the police a story" shortly before Ramos spoke with Detective Parshall for the second time.  (Exh 1., at 2766–67, 2769–70.) Detective Parshall testified that Rivera also changed his story after speaking with Ramos.  (Exh. 1, at 2768–69.)

Umaña's defense team also elicited testimony that Arevalo had denied any involvement in the Fairfax Street murders.  (Exh. 1, at 2799.)  Arevalo also denied being a member of MS-13.  (Exh. 1, at 2799.)  And Umaña's attorneys elicited testimony indicating that Arevalo had previously been involved in more than one shooting; that he had previously been deported; and that he had returned to the country illegally.  (Exh. 1, at 2771, 2802.)

The jury heard about witnesses to the Fairfax Street murders who contradicted evidence that Umaña had been the shooter.  Police officers testified that a gardener who observed the shooting, Noe Bautista, had reported seeing only three people in the car that contained the shooter.  (Exh. 1, at 2724, 2757.) They also testified that Bautista had "identified the driver as the shooter," which contradicted the accounts of Umaña and his cohorts.  (Exh. 1, at 2757.)  Officers also testified that Oscar Santiago, who had observed the murder from a different perspective while driving on Fairfax Street, like Bautista, had identified the driver of the vehicle as the shooter.  (Exh. 1, at 2775–76.)

21

### ii. The jury heard evidence of Umaña's participation in the murder of an individual in Lemon Grove Park in Los Angeles.

The jury also heard about Umaña's participation in the murder of Andy Abarca in Lemon Grove Park in Los Angeles in September of 2005. The jury heard that Freddy Gonzalez, a member of another gang had robbed a member of MS-13, Alex Montez, also known as "Guanaco," several months before the Lemon Grove murder. (Exh. 1, at JA. 2666–67.) On September 28, 2005, Gonzalez and three other individuals — Abarca, Juan Lara, and Roberto Ramos — were playing basketball at night at Lemon Grove Park. (Exh. 1, at 2655, 2657, 2683, 2685, 2700, 2876–77.) After the lights went out, they stopped playing and moved to nearby benches. (Exh. 1, at 2657.) Two Hispanic men approached, and Ramos said, "hey, watch those two dudes." (Exh. 1, at 2662.) As the men moved closer, "Gonzalez stood up and said, hey man, I don't bang anymore." (Exh. 1, at 2662, 2878–79.) The approaching men drew handguns and opened fire as the four ball players ran through a narrow walkway. (Exh. 1, at 2660–61.) Bullets struck all four victims. Ramos and Lara suffered gunshot wounds to the arms. (Exh. 1, at 2658, 2689, 2702–04.) The bullet that struck Gonzalez bounced off of his keys, and he suffered no injury. (Exh. 1, at 2880.) Abarca died of the three gunshot wounds that he suffered to the body and head. (Exh. 1, at 2657–58, 2689, 2711–13.)

The jury received a transcript of and heard testimony about Umaña's confession to police describing his participation in the Lemon Grove murder.

22

(Exh. 1, at 2676, 4452–91.)  Umaña told Detectives Thomas Small and Frank Flores of the Los Angeles Police Department that he and another MS-13 member, Giovani Rodus, also known as "Sin," had driven two unidentified Hispanic men — armed with guns — to Lemon Grove Park on the day of the murder.   (Exh. 1, at 2651–52, 2669, 2673, 2675–76.)  Rodus drove; Umaña was in the passenger seat. (Exh. 1, at 2676.)   The men driven by Umaña and Rodus went to the park to locate a rival that they believed to be in the park, and "they were gonna take care of him."  (Exh. 1, at 1197, 2676.)  Umaña told police that he and Rodus dropped the men off, and the men went immediately to the basketball court.  (Exh. 1, at 2676.)  Umaña said that he and Rodus then drove to the other side of the park and heard the gunfire.  (Exh. 1, at 2676.)  Umaña described to police the rhythm of the shots.  (Exh. 1, at 2676.)  Umaña and Rodus then picked up the two men and escaped from the park.  (Exh. 1, at 2677.)

Police had recovered a .22 caliber shell casing on the basketball court in Lemon Grove Park, near the benches where the victims had stood.  (Exh. 1, at 2668.)  William Moore, an expert in ballistics firearms analysis with the Los Angeles Police Department, conducted a microscopic analysis of the tool marks revealed by that casing and the casing recovered from the scene of the Fairfax Street murders.  (Exh. 1, at 2808, 2815–18.)  Moore testified that the casing recovered from the Lemon Grove basketball court "was fired from the same firearm that fired the two cartridge cases" recovered from the scene of the Fairfax Street murders.  (Exh. 1, at 2818.)  A second examiner verified and validated

23

Moore's opinion.  (Exh. 1, at 2820.)

In addition to the police officers who investigated the Lemon Grove murder and interviewed Umaña (Exh. 1, at 2651–52), the jury heard from each of the three surviving victims, Roberto Ramos, Juan Lara, and Freddy Gonzalez.  (Exh. 1, at 2680–97, 2699–2708, 2874–2889.)   Roberto Ramos and Juan Lara each described the events, but neither witness identified either of the shooters.  (Exh. 1, at 2680–97, 2699–2708.)

The jury heard evidence that Umaña had gone beyond helping others to commit the murder and had himself been a shooter.  In addition to recounting the events surrounding the Lemon Grove murder, Gonzalez testified that he had identified Umaña in photographic arrays when interviewed by police in December of 2005 and April of 2008 and asked to identify the shooter in the Lemon Grove murder.  (Exh. 2874–96.)  Although police reports produced in discovery, known to defense counsel, and described to the Court indicated that Gonzalez had not been sure that the person he identified was the shooter, (Exh. 1, at 2885–86), Gonzalez, on direct examination, expressed confidence that the person he had previously identified was the shooter.  (Exh. 1, at 2892–94.) Additionally, Detective Small testified that he had interviewed Rene Arevalo and asked if "he had any information on any other MS related shootings," besides the shooting that had occurred on Fairfax Street.  (Exh. 1, at 2671.)  The jury heard that Arevalo had said, "that's your Lemon Grove shooter" when looking at a photograph of Umaña.  (Exh. 1, at 2671.)

24

Umaña's attorneys moved this Court to preclude Gonzalez from identifying Umaña in court as the shooter, contending that such an identification would be impermissibly suggestive and unreliable. (Exh. 1, at 2861.) Foster told this Court, among other things, that when Gonzalez was first shown a photo array, Gonzalez had said he was "not sure [Umaña] is the one who came to the park that day with the pistol and shot us" and that he also stated he was not sure later, when shown a second array. (Exh. 1, at 2885.) Although the United States acknowledged that Gonzalez "wasn't 100% sure" when identifying in photo arrays, the United States proffered that Gonzalez had also said, "I will never forget that face," when interviewed. (Exh. 1, at 2887.) The United States argued in favor of allowing the jury to see whether Gonzalez would be able to identify Umaña as the shooter in court. (Exh. 1, at 2887.)

This Court granted the defense motion and precluded the United States from asking Gonzalez to identify Umaña in Court. (Exh. 1, at 2888.) Among other things, this Court found that Gonzalez's opportunity to view the shooter at the time of the crime was "limited" and "under poor lighting conditions." (Exh. 1, at 2888.) And this Court found that the accuracy of Umaña's previous identifications during photographic arrays was "suspect," noting that Gonzalez was not "positive that the photo of the defendant was the shooter" in either of the arrays. (Exh. 1, at 2888.)

When cross examined by Umaña's attorneys, Gonzalez admitted that, when police interviewed him in December of 2005 and showed him a photo array,

25

Gonzalez "w[asn't] sure if [Umaña] was the shooter." (Exh. 1, at 2897.) Foster confronted Gonzalez with his own written statement made during that interview, and Gonzalez admitted that he had said, "I'm not sure if he is the one that came that day to the park with the pistol and shot us," referring to a circled photograph of Umaña. (Exh. 1, at 2896.) Gonzalez also admitted that he had said he was not "100 percent sure" of the identity of the shooter when presented with another array in April of 2008. (Exh. 1, at 2897.)

Foster also elicited from Gonzalez that he was a member of a "tagging" crew. (Exh. 1, at 2898.) Gonzalez admitted that "beef" and "conflict" existed between Gonzalez's gang and MS-13. (Exh. 1, at 2898.) And he admitted that he had robbed Alex Montez, had been convicted of felony robbery, and previously been convicted of felony concealed-weapon offenses. (Exh. 1, at 2899.) Foster also elicited from Gonzalez that he had observed only one shooter, (Exh.1, at 2902), which contradicted the testimony of Ramos and Lara, who had described both of the men who had approached as shooters. (Exh. 1, at 2687–88, 2702.)

Foster also impeached Gonzalez after he testified on cross-examination that Alex Montez "wasn't there" the night of the Lemon Grove murder. (Exh. 1, at 2899.) Foster confronted Gonzalez with a written report to the contrary by Detective Small. (Exh. 1, at 2899–2901.) And Gonzalez admitted that he had "identified Alex Montez as being the second guy that came back with the shooter." (Exh. 1, at 2901.)

Umaña's defense attorneys cross examined the other witnesses who

26

testified about the Lemon Grove murder.  The jury heard that the shooting occurred after 9:00 at night, when it was dark outside and after the lights at the basketball court had been turned off.  (Exh. 1, at 2679–80, 2881.)  The forensic pathologist called by the United States admitted that he had recovered a bullet from Abarca's body that was "medium caliber" in size, "[l]arger than a [.]22." (Exh. 1, at 2715–16.)  And the ballistics analyst admitted that he had examined a fragment of a bullet from the Lemon Grove murder scene that was not from a .22 caliber bullet.  (Exh. 1, at 2821.)

The defense team's cross-examination of Ramos and Lara, who had claimed an ability to identify the shooters, revealed that they had failed to identify Umaña as a shooter when given the chance.  Each of the two witnesses testified that he believed he could identify the shooters if he saw them; the police showed each witness a photographic array on two occasions; and each witness told the jury he had been unable to identify either of the shooters among the people depicted in them.  (Exh. 1, at 2696–97, 2707–08.)

Umaña's attorneys also elicited testimony revealing limitations on Arevalo's identification of Umaña as a shooter.  Detective Small admitted that Arevalo "was not present at the Lemon Grove Park incident."  (Exh. 1, at 2678).  And Detective Parshall admitted that Arevalo had initially denied knowing anything about the Lemon Grove Park murder.  (Exh. 1, at 2778.)  Arevalo did not testify because he was worried for his own safety and that of his family because of Umaña.  (Exh. 1, at 2804.)  But Umaña's attorneys successfully moved

27

to preclude the jury from hearing what he had told police about his fear of Umaña.  (Exh. 1, at 2795–97, 2804–05.)

### c. The jury hears evidence of the loss Umaña caused to the friends and family of his victims.

The jury also heard from Jean Garcia, Manuel's wife of nearly 20 years; Douglas Friend, a friend of Manuel's who had worked with him; and Manuel's daughters, Carmen and Elizabeth.  (Exh. 1, at 2940–59.)  They testified that the Garcia brothers were both good workers and friends and beloved parents and uncles.  (Exh. 1, at 2940–59.)  The jury heard how the murders Umaña committed left the families of the victims, including their father and their children, grief stricken.  (Exh. 1, at 2946–59.)

### d. The jury hears Umaña's mitigation case and the United States's rebuttal evidence.

#### i. The jury learns of Umaña's childhood and youth in El Salvador.

The jury heard great detail from the defense team's mitigation investigator, Richard McGough.  (Exh. 1, at 3081.)  McGough had traveled four times to El Salvador and had interviewed people who knew Umaña in his youth, including Umaña's father, Rafael.  (Exh. 1, at 3085–87, 3119.)  The jury heard that Umaña and his father had become estranged from Umaña's mother when Umaña was approximately 7 months old.  (Exh. 1, at 3088–90.)  Umaña's great grandmother became Umaña's mother figure, until she passed away when Umaña was approximately seven years old.   (Exh. 1, at 3090, 3091, 3099.)  After

28

that age, an aunt helped take care of Umaña. (Exh. 1, at 3099–3100.)

The jury heard that Umaña suffered a head injury during a significant fall when he was two or three years old. (Exh. 1, at 3104.) He received "no real treatment" and suffered a permanent visible scar. (Exh. 1, at 3104–05.) And he experienced severe pain from that point forward, including when he was a teenager, and as an adult up through the time of the trial. (Exh. 1, at 3105–06.)

The jury heard that Umaña was born during a civil war that continued from 1979 until 1992 in El Salvador. (Exh. 1, at 3107.) Santa Ana, where Umaña was born, suffered significant violence at the beginning of the war, and Umaña's family would lock themselves in the house at sunset. (Exh. 1, at 3107.) Umaña had seen dead bodies, and recounted "witness[ing] five men attacking another man with machetes and killing him in the coffee trees." (Exh. 1, at 3108.) Umaña "felt fear even as a child from the conditions of the civil war." (Exh. 1, at 3108.)

The jury heard that Umaña struggled in school. (Exh. 1, at 3112.) He had to repeat grades, including third grade twice. (Exh. 1, at 3112.) Umaña's attorneys introduced records from schools he attended in Santa Ana. (Exh. 1, at 3114–19.) And they played a video of an interview with a school administrator, describing the records. (Exh. 1, at 3123–29.)

The jury heard that Umaña moved out of his father's home when he was a teenager. (Exh. 1, at 3113–14, 3133.) The jury saw interviews with people who knew Umaña around this time, and heard evidence of the various trades that

29

Umaña attempted.  (Exh. 1, at 3128, 3136–40.)  Umaña, jurors learned, "had the skills" to be a successful soccer player, "but he didn't have proper identification," because he lacked a birth certificate.  (Exh. 1, at 3132–33.)  And the jury heard about Umaña's two children.  (Exh. 1, at 3144–46, 50–51.)

The defense also introduced Umaña's two birth certificates.  Umaña obtained a "supplementary birth certificate" shortly after his oldest son was born, which states that Umaña was born in 1984 in El Salvador.  (Exh. 1, at 3146–47, 3101).  The other certificate states that Umaña had been born two years earlier, in 1982 in Ecuintla, Guatemala, approximately an hour north of Santa Ana, El Salvador.  (Exh. 1, at 3152–53, 3155.)

The defense called two expert witnesses who explained how components of Umaña's background created a risk that he would engage in violence and join a gang.  Dr. Selena Sermeno, an expert on Salvadorian culture and the moral development of children, testified that the Salvadorian civil war had escalated at the time of Umaña's birth, and that "people were constantly exposed to all kinds of terrifying circumstances such as disappearances, killings, bombings, forceful recruitment, armed forces, [and] . . . cars being burned."  (Exh. 1, at 3173, 3177.)  Dr. Sermeno opined that the risk factors present in Umaña's life "made him much more vulnerable" to behaving "in delinquent, violent ways."  (Exh. 1, at 3186–88.)  Maria Santacruz Geralt, a psychologist, identified a host of risk factors for gang participation in Umaña's life.  (Exh. 1, at 3205, 3257–63.)

30

### ii. The jury learns of the security measures that Umaña would face in prison.

Umaña's defense team also called two expert witnesses who testified that he would face high security in prison if sentenced to life imprisonment and would be unlikely to continue his violent behavior. (Exh. 1, at 2987, 2996, 3278.) Umaña's expert on the United States Bureau of Prisons testified that the level of security in a United States Penitentiary "is much higher" than in the Mecklenburg County Jail, where Umaña had been housed. (Exh. 1, at 3287–89.) He opined that the United States Bureau of Prisons was prepared to handle inmates like Umaña, who attempt, from jail, to have people killed or injured. (Exh. 1, at 3031–33, 3281–3283, 3289.) The Bureau does so "[o]n a daily basis." (Exh. 1, at 3289.)

### iii. The jury hears expert testimony about brain damage Umaña alleges he suffered.

The defense also called Dr. Merikangas, the expert in neuropsychiatry who had previously testified during the *Atkins* hearing held before the Court. (Exh. 1, at 3295.) Dr. Merikangas conducted an examination of Umaña, showed the jury images of Umaña's PET scan, and told the jury that he had "abnormalities" that indicated "brain damage." (Exh. 1, at 3298–3300, 3303–04, 3307–16.) "He had a number of falls" as a child, the jury heard, "including one that took him to the hospital and required stitching in his head." (Exh. 1, at 3325.) Dr. Merikangas opined that Umaña's brain abnormality probably resulted from "some developmental problem or injury early in life" and rendered him both more

31

susceptible to duress and "less able than normal people to control his conduct." (Exh. 1, at 3316.)

### iv.    In rebuttal, the United States challenges Umaña's evidence of brain damage.

The United States called one witness in rebuttal, Dr. Helen Mayberg, an expert in psychiatry, neurology, and radiologic studies. (Exh. 1, at 3336.) She testified that Umaña's PET scan was normal. (Exh. 1, at 3353.)

### e.    The jury sentences Umaña to death

The jury sentenced Umaña to death after deliberating for seven and one half hours. (Exh. 1, at 3499, 3526.) The jury found that the United States proved beyond a reasonable doubt all aggravating factors submitted to it, for each capital count. (Exh. 1, at 3543–46; 3552–57; 3561–64; 3570–73.) The jurors also found some of the thirteen mitigating factors argued by the defense: (1) four jurors found that Umaña was raised in poverty; (2) twelve jurors found that Umaña was raised without the care of his mother; (3) nine jurors found that Umaña was exposed to the violence of civil war at an early age; (4) zero jurors found that Umaña suffered head injuries early in life that resulted in behavior-related brain damage; (5) one juror found that Umaña did not have the benefit of schooling beyond the third grade; (6) no jurors found that Umaña's childhood was marked by many factors that increased the risk of criminal activity later in life; (7) three jurors found that Umaña's childhood was marked by factors that impeded his moral development; (8) two jurors found that Umaña's early life experiences

32

made him more susceptible to recruitment into MS-13; (9) twelve jurors found that his murders did not involve substantial planning; (10) twelve jurors found that his murders occurred during an emotionally charged argument; (11) one juror found that his murders did not involve cruelty or excessive infliction of pain and suffering; (12) twelve jurors found that Umaña's commission of his offenses occurred as a result of his indoctrination into the ways and thinking of MS-13; and (13) no jurors found that any other factor in Umaña's background, record, or character or any other circumstance of the offense mitigated against imposition of a death sentence. (Exh. 1, at 3546–48; 3555–57; 3564–66; 3573–75.) After weighing the mitigating and aggravating factors, the jury unanimously found that a sentence of death was warranted on each of Umaña's four capital convictions. (Exh. 1, at 3549, 3558, 3567, 3576.)

## E. The Fourth Circuit affirms Umaña's conviction and death sentence.

The Court of Appeals for the Fourth Circuit affirmed Umaña's conviction and sentence. *Umaña*, 750 F.3d at 360. The court reviewed the record and concluded that "Umaña had a fair trial and that the death penalty was justified by the jury's factual findings and by law and was not imposed under the improper influence of passion, prejudice, or any other arbitrary factor." *Id.* The United States Supreme Court denied Umaña's petition for a writ of certiorari on June 22, 2015. *Umaña v. United States*, 135 S. Ct. 2856 (2015).

33

**F.    Umaña moves to vacate his sentence under 28 U.S.C. § 2255.**

Exactly one year after his convictions became final, on June 22, 2016, Umaña challenged his convictions and death sentence under 28 U.S.C. § 2255. (2255 Mot. 382.)  Before Umaña filed his motion, he sought broad discovery from the United States and filed with this Court a motion for leave to conduct discovery.  (Doc. No. 13, 3:16CV57.)  The United States did not produce discovery in response to these efforts, because "'[t]here is no pre-motion discovery in a Section 2255 case,'" and this Court denied Umaña's motion for leave to conduct it.  (Doc. No. 30, 3:16CV57, at 1, 2 (quoting *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009)).)

The United States produced materials requested with specificity by Umaña's postconviction counsel after his 2255 motion was filed.  As discussed below, Umaña's 2255 motion alleges that the United States did not produce, during Umaña's criminal case, nine specific recordings of interviews by the Los Angeles police, related to the investigation of the Lemon Grove murders.  *See* Section II.B.3, *infra.*  And one of his trial attorneys has signed a postconviction affidavit stating that, "To [his] knowledge" recordings of "LAPD recorded interviews of Lemon Grove Park murder witnesses, including testifying witnesses," were "not produced."  (Bryson Aff. ¶ 8.)[4]  In an August 2016 telephone

---

[4] Bryson's affidavit likely says more about the understandable limits of his "knowledge" six years after the trial ended than it does about the discovery the United States produced.  In the same paragraph, Bryson admits lacking knowledge of another recording that Umaña concedes "was produced in discovery well in advance of trial."  (Bryson Aff. ¶ 8).  Counsel also states that he does not recall seeing any "discovery indicating that LAPD recorded interviews of Lemon

34

call, postconviction counsel requested four of the nine recordings described in Umaña's 2255 motion.  Counsel also requested a recording of an April 28, 2008 interview with Umaña, which counsel acknowledged had been produced to Umaña's trial attorneys but had fallen through the cracks on the defense side. (Exh. 3, at 2.)  Postconviction counsel then sent a letter restating these specific requests, which added requests for additional categories of documents.  (Exh. 3.) The United States produced audio recordings of the five specific interviews that postconviction counsel requested (Exh. 4),[5] not because it credits his allegation that they were not previously produced and not because of any obligation to produce them.  *See In re Pruett*, 133 F.3d 275, 281 (4th Cir. 1997) ("[L]eave of the court [must] be obtained before *any* discovery is conducted." (emphasis in original)).  Instead, the United States produced these materials as a courtesy.

## II.    DISCUSSION

Umaña's 2255 motion asserts dozens of different theories about how this Court, the United States, and Umaña's attorneys erred, under 30 different

---

Grove park murder witnesses." (Bryson Aff. ¶ 8.)  But police reports, which Umaña concedes were produced to trial counsel (2255 Mot. 178), clearly describe recordings of Lemon Grove witnesses:  (*See*, *e.g.*, App'x 69 to 2255 Mot., at 4 ("Gonzalez agreed to be interviewed regarding the incident.  The interview was recorded on audiotape No. 376050.").)  Foster does not say that the recordings were not produced, only that he does "not recall" receiving them. (Foster Aff. ¶ 8.) *See United States v. Andrews*, 532 F.3d 900, 907 n.3 (D.C. Cir. 2008) (trial counsel's inability to recall not sufficient to establish suppression). Notably absent from either affidavit is any allegation that the United States did not produce reports or other written records of interviews with Lemon Grove Park murder witnesses.  To the contrary, Counsel was well aware of these records and referred to them throughout the trial and in briefs. (*See, e.g.*, Exh. 1, at 229, 235, 311, 1184–88, 1195, 2566).

[5] Umaña complains that one of these recordings is not a videorecording, (Disc. Br. 24), but he cannot plausibly contend that any video contains undisclosed exculpatory material evidence not included in the audio recording of the same interview.

35

Roman-numbered headings.  (2255 Mot. i–xvi.)  He does not seek discovery in support of all of these theories (Disc. Br. i–iv.)  The theories under which he seeks discovery fall into five categories.  First, Umaña seeks discovery in support of a theory that the United States unconstitutionally suppressed information during Umaña's criminal case.  (Disc. Br. i–iii; 2255 Mot. vii.)  Second, Umaña seeks discovery in support of a theory that the United States knowingly presented false and misleading evidence to the jury.  (Disc. Br. i–iii; 2255 Mot. viii.)  Third, Umaña seeks discovery in support of a host of theories that the performance of his trial attorneys was constitutionally deficient.   (Disc. Br. i–iii; 2255 Mot. i–xvi.)  Fourth, Umaña seeks discovery in support of four other theories with common features — that this Court erroneously determined that Umaña did not have an intellectual disability; that "misconduct" occurred "related to the jury"; that this Court employed excessive security measures; that the United States engaged in selective prosecution; and that Umaña's rights under the Vienna Convention were violated.  (Disc. Br. iii–iv; 2255 Mot. v, xi–xvi.)  Finally, Umaña seeks dozens of categories of discovery unrelated to claims in his 2255 motion, based on an alleged ongoing constitutional entitlement to discovery and the internal discovery policy of the United States Attorney's Office.  (Disc. Br. iv.)

This discussion contains three parts.  The first part describes Umaña's burden for obtaining leave to conduct discovery.  The second part applies that standard to the five categories of theories mentioned above.  The third part explains why Umaña would not be entitled to the discovery he seeks even if his

36

motion contained a facially sufficient claim.

### A.    Umaña's burden for obtaining leave to serve discovery requests in a proceeding under 28 U.S.C. § 2255.

To obtain leave to serve discovery requests, Umaña has the burden to show "good cause" under Rule 6(a) of the Rules Governing Section 2255 Proceedings. *See Bracy*, 520 U.S. at 908. "[U]nlike the usual civil litigant in federal court," a movant under section 2255 "is not entitled to discovery as a matter of course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Umaña can establish good cause only with "specific allegations" that "show reason to believe that" Umaña "may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09 (ellipses omitted).

To meet his burden, Umaña's 2255 motion must establish "a prima facie case for relief" on the claims for which he seeks discovery. *Harris v. Nelson*, 394 U.S. 286, 290 (1969); *United States v. Roane*, 378 F.3d 382, 403 (4th Cir. 2004). "'Good cause' does not exist if a petitioner premises a discovery request on a claim that fails as a matter of law." (Jan. 26, 2017 Order (Dkt. No. 47, 3:16CV57), at 3 (citing *Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999))). A prerequisite for discovery is "specific allegations of fact" that, if proved, "would entitle him to relief." *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004). "Good cause . . . cannot exist where the facts alleged do not provide a basis for relief." *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004).

Not all allegations are capable of making a prima facie case for relief. The

37

Court "need not assume the credibility of factual assertions, as it would in civil cases," for example, "where the assertions are contradicted by the record in the underlying proceeding." *Puglisi*, 586 F.3d at 214. And it need not accept an allegation that is "inherently incredible, or [a conclusion] rather than [a] statement[] of fact." *Jackson v. United* States, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009); *Rose v. United States*, No. 3:08CV216, 2008 WL 2115133, at *1 (W.D.N.C. May 16, 2008) ("conclusory allegations" insufficient to establish good cause for discovery). Moreover, general allegations are, as a matter of law, insufficient to create viable substantive claims. For example, Umaña must "point to . . . specific evidence . . . withheld by the government" for any of his *Brady* claims to "get off the ground." *United States v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006). And, to establish ineffective assistance of counsel, Umaña must specifically identify the "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. at 690. In any event, for purposes of establishing good cause for discovery, only "specific allegations" count. *Bracy*, 520 U.S. at 908–09.

Cognizable allegations that, if proved, would entitle Umaña to relief are necessary, but not sufficient, to establish good cause for discovery; Umaña must also point to some "evidence" that "lends support" to them. *Bracy*, 520 U.S. at 909. The Supreme Court explained that Bracy's allegations would likely have been "too speculative to warrant discovery" in the light of the presumption of regularity that attaches to the work of public officials. *Id.* at 909. The Court

concluded that Bracy had made a "sufficient showing" only after noting that he "support[ed] his discovery request" by pointing to specific "evidence . . . that len[t] support to his claim." *Id.*; *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Good cause for discovery was established in *Bracy* primarily upon the specific nature of the allegations and the concrete nature of the evidence proffered to support Bracy's theory.").

Allegations based "purely on speculation" are insufficient to establish good cause. *Murphy*, 205 F.3d at 813–14; *Hill v. Ozmint*, 339 F.3d 187, 201 (4th Cir. 2003). Instead, Umaña must "provid[e] specific evidence that the requested discovery would support" his motion under section 2255. *Hirschfeld v. Comm'r of Parole*, 215 F.R.D. 464, 465 (S.D.N.Y. 2003).

If Umaña's motion contains a prima facie claim for relief, he would be able to establish good cause only to seek specific items material to that claim. The rules require Umaña to have "indicate[d] exactly what information he seeks to obtain." *Teti v. Bender*, 507 F.3d 50, 60 (1st Cir. 2007). Rule 6(b) requires Umaña to "specify any requested documents." R. Governing 2255 Proceedings 6(b). "Generalized" requests do not meet this requirement. *Teti*, 507 F.3d at 60. More importantly, Umaña has the burden to establish that the information he seeks "is material" to one of his claims. *See Stephens v. Branker*, 570 F.3d 198, 213 (4th Cir. 2009). "Discovery must relate solely to a specifically alleged factual dispute, not to a general allegation." *Clark v. Johnson*, 202 F.3d at 760, 767 (5th Cir. 2000). That factual dispute must "result in [Umaña's] being entitled to

39

habeas relief" if resolved in his favor. *Branker*, 570 F.3d at 21. And Umaña must give this Court reason to believe that the discovery sought would resolve the dispute. *Id.*; *accord Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (affirming denial of discovery where "discovery sought by [the habeas petitioner] would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor").

Umaña's burden is appropriately high. "A criminal trial is the 'main event' at which a defendant's rights are to be determined," even in a death-penalty case. *McFarland v. Scott*, 512 U.S. 849, 859 (1994). Umaña stands duly convicted and sentenced after a trial and an appeal that explicitly found it to be "fair." *Umaña*, 750 F.3d at 360. "[T]he Great Writ is an extraordinary remedy that should not be employed to 'relitigate . . . trials." *McFarland*, 512 U.S. at 859 (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)). Instead, habeas and 2255 proceedings are a "safeguard whose goal is to correct real *and obvious* wrongs." *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (emphasis added). They were "never meant to be a fishing expedition for habeas petitioners to 'explore their case in search of its existence." *Id.* (quoting *Calderon vs. U.S. Dist. Ct.*, 98 F.3d 1102, 1106 (9th Cir. 1996)).

**B.     Umaña has not established good cause to obtain discovery in support of his theory that the United States unconstitutionally suppressed information during his criminal case.**

In support of his theory that the United States violated its constitutional obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), during his criminal

40

trial, Umaña's motion under 28 U.S.C. § 2255 alleges that the United States suppressed four pieces of information.  First, Umaña alleges that the United States failed to disclose that Roberto Ramos was unable, at trial, to identify Umaña as one of the shooters in the Lemon Grove murders.  (2255 Mot. 171–77.) Second, Umaña alleges that the United States failed to disclose nine "video/audio recordings by LAPD." (2255 Mot. 177–79.)  Third, Umaña alleges that the United States failed to disclose statements made by Umaña's mother about his father's drug dealing and Umaña's lack of paperwork.  (2255 Mot. 180–91.)  Finally, Umaña alleges that the United States failed to disclose a statement by MS-13 member Rony Lopez that MS tattoos could be earned by killing, robbing, or committing other crimes.  (2255 Mot. 191–92.)

Umaña purports to devote nearly 50 pages of his discovery brief to this *Brady* theory (Disc. Br. 13–61), but he mixes his allegations among a host of unrelated allegations.  (*See* Disc. Br. 13–61.)  Umaña's brief alleges, for example, that the *jury* never heard, or did not hear enough, evidence about or from a number of individuals, including Giovani Rodus, Luis Rivera, law-enforcement agents who requested surveillance, Alex Montes, Juan Miguel Cortez, Oscar Santiago, Noe Bautista, Alex Barrera, and others.  (Disc. Br. 23, 29, 35–36, 38–39, 41–46.)  But his 2255 motion does not allege that this information was not produced by the United States.  (2255 Mot. 169–92.)  To the contrary, Umaña alleges that his attorneys received this information through discovery and should have done more with it.  (*See* Disc. Br. 23–46; 2255 Mot. 110–69.)  Umaña's

41

approach of scattering *Brady* allegations among a host of other allegations makes the task of discerning whether Umaña has identified "some evidence tending to show the existence of the essential elements" of his *Brady* claim more difficult. *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoted with approval in *Bracy*, 520 U.S. at 904). But the practice does not make his allegations any more viable.

Instead of following the structure of Umaña's brief, this brief follows the approach described by the Supreme Court. It first "identif[ies] the 'essential elements' of [Umaña's] claim." *Bracy*, 520 U.S. at 905 (quoting *Armstrong*, 517 U.S. at 468). It then addresses each of the four pieces of information that Umaña's 2255 motion alleges to have been suppressed and explains why he has failed to make a prima facie case of a constitutional violation. *Cf. id.* at 905–06 (explaining that the kind of judicial bias alleged to have occurred in Bracy's "own case" *would* "violate the Due Process Clause of the Fourteenth Amendment" if "it could be proved."). Umaña's only "specific allegations" fail to describe *Brady* material. *Bracy*, 520 U.S. at 908. Because the "facts alleged" do not provide a basis of relief, he has not established "[g]ood cause" for discovery to prove them. *Hubanks*, 392 F.3d at 933.

1. **Umaña must prove three elements to establish that the United States violated a cognizable discovery obligation during his criminal case.**

To establish that the United States violated a discovery obligation that would entitle him to relief under 28 U.S.C. § 2255, Umaña has the burden to

42

prove that the United States violated an obligation imposed by the Constitution. The United States provided Umaña with discovery during his criminal case well beyond what the Constitution requires. (*See, e.g.*, Exh. 1, at 238). But proof of a failure to comply with an obligation imposed by a source other than the Constitution, such as the Federal Rules of Criminal Procedure or the Jencks Act, 18 U.S.C. § 3500, would not establish a claim for relief cognizable under 28 U.S.C. § 2255. *Hill v. United States*, 368 U.S. 424, 428 (1962) (violation of Federal Rules of Criminal Procedure not cognizable on habeas review); *Wilson v. United States*, 554 F.2d 893, 894 (8th Cir. 1977) (Jencks Act violation not cognizable on habeas review). Umaña appears to acknowledge this limitation, and he does not purport to base "Claim VI" on obligations from sources other than the Constitution. (*See* 2255 Mot. 169–92.)

"There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). *Brady* held only that the prosecution may not suppress evidence that is favorable to the defense and material to the defendant's guilt or punishment. 373 U.S. at 87. "*Brady* does *not* create a full-scale, constitutionally-mandated discovery right for criminal defendants. Such a rule would impose an oppressively heavy burden on prosecutors and would drastically undermine the finality of judgments." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999) (emphasis in original).

To establish that the United States violated an obligation imposed under

43

*Brady* and related decisions, Umaña must prove "three elements." *Nicolas vs. Att'y Gen. of Md.*, 820 F.3d 124, 129 (4th Cir. 2016). He must prove that evidence was "suppressed by the government." *Id.* He must prove that the evidence was "favorable" to him. *Id.* And he must prove that the evidence was "material to the verdict at trial." *Id*; *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

First, to establish a violation of his Constitutional rights, Umaña must prove that "the government suppressed . . . evidence." *United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014). In the words of the Fourth Circuit, "[n]o *Brady* violation exists when the evidence 'is available to the defense from other sources' or through a 'diligent investigation by the defense.'" *Id.* (quoting *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011)). The Fourth Circuit and other courts have held, for example, that omissions to disclose statements that witnesses made to members of the prosecution team did not violate *Brady* where the defendant was free to question the witnesses and had reason to believe they might possess favorable information. *See, e.g.*, *United States v. Wilson*, 901 F.3d 378, 381 (4th Cir. 1990); *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990). To the extent that Umaña's defense team was "aware of the essential facts that would enable him to take advantage of the exculpatory evidence," no *Brady* violation occurred. *Todd*, 920 F.3d at 405. Similarly, Umaña cannot establish a *Brady* violation based on information that "lies in a source where a reasonable defendant would have looked." *Catone*, 769 F.3d at 872 (quoting *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)).

44

Second, Umaña must prove that the evidence allegedly suppressed by the government was favorable to him. "Evidence is 'favorable' not only when it would tend to exculpate the accused, but also where it can be used to impeach government witnesses." *United States v. Ellis*, 121 F.3d 908, 914 (4th Cir. 1997). A capital defendant has the right to ask a jury to consider "any aspect" of his "character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). But that right does not render all information "favorable." *See United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010) (rejecting *Brady* claim by capital defendant because he "failed to establish that the information requested would be favorable to him").

Inculpatory information is not favorable to the accused. 2 Charles Alan Wright et. al, *Federal Practice & Procedure* § 256 (4th ed.). Nor is "ambiguous information," *id.*, or "evidence that is 'more inculpatory than exculpatory.'" *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001). Information that has no inculpatory, exculpatory, or impeachment value does not qualify as favorable. *See United States v. Kennedy*, 819 F. Supp. 1510, 1519 (D. Colo. 1993).

Finally, Umaña must prove that the favorable evidence allegedly suppressed is "material," meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quotation mark omitted) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

45

Although this Court may "evaluate the tendency and force of the undisclosed evidence item by item," the Supreme Court instructs that the court must ultimately determine the materiality of that evidence "collectively." *Kyles v. Whitley*, 514 U.S. 419, 436 n.10 (1995). To assess materiality, the Court must examine the entire record, including the other evidence before the jury. *Strickler*, 527 U.S. at 294. Umaña has the burden to show that the "net effect" of the collective undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 438.

A "reasonable *possibility*" of a different result is not sufficient, even in a death-penalty case. *Strickler*, 527 U.S. at 291 (emphasis in original). The Supreme Court has made clear that a defendant challenging a capital conviction and sentence must show "that there is a reasonable probability that his conviction or sentence would have been different had [the] materials been disclosed." *Id.* at 296. That standard is unlikely to be met where the "record provides strong support for the conclusion that [the defendant] would have been convicted of capital murder and sentenced to death," even if disclosure had occurred. *See id. at* 294.

**2. Roberto Ramos's statement does not establish a prima facie case of a Brady violation, because the defense team and the jury were aware that Ramos was unable to identify Umaña.**

Roberto Ramos, one of the victims of the Lemon Grove Park shootings who testified at trial but did not identify Umaña, signed an affidavit dated March 26,

46

2016, and written by someone else.  (App'x 11 to 2255 Mot. ("Ramos Aff.") ¶ 33.) According to that affidavit, Ramos met with one of the prosecutors the day before trial — "the man and not the woman."  (Ramos Aff. ¶ 26.)  The prosecutor, according to the affidavit, asked Ramos to "give him a sign" while on the stand if he was able to identify Umaña as one of the Lemon Grove shooters.  (*Id.* ¶ 27.) Ramos did not give the prosecutor a sign, because he could not identify Umaña as one of the shooters.  (*Id.*)  Contrary to what Umaña's motion suggests, the affidavit does not say that Ramos *told the prosecutor* that "upon seeing Mr. Umaña in court Ramos was *certain* he was not one of the shooters."  (2255 Mot. 173 (emphasis added); Ramos Aff. ¶¶ 26–29.)

If this Court assumes that the affidavit prepared for Roberto Ramos is true, it would not establish that the United States failed to disclose any information that both defense counsel and the jury did not already know. Defense counsel was well aware that "Roberto Ramos was . . . shown a photographic lineup that contained Defendant's photo and was . . . unable to identify him as one of the assailants."  (Exh. 1, at 1196.)  Counsel used that fact in arguments to this Court.  (Exh. 1, at 1196.)  Counsel knew that Roberto Ramos had expressed confidence about his ability to identify the shooter.  (Exh. 1, at 2696–97.)  And counsel knew that Roberto Ramos failed to identify Umaña on two separate occasions shortly after the murder.  (Exh. 1, at 2696–97.)  The record precludes Umaña from establishing a Brady violation, because it shows that Roberto Ramos's inability to identify Umaña was "available to the defense."

47

*Catone*, 769 F.3d at 871.

Ramos testified on cross-examination that, even though he was confident he could identify the shooter, he did not identify Umaña when given the chance twice, shortly after the murder. (Exh. 1, at 2696–97.) That Ramos remained unable to identify Umaña as the shooter five years later, during the trial, is something the jury probably inferred from the fact that he did not identify Umaña, in the light of the United States' burden of proof. And the allegation in the affidavit that a prosecutor to give him a signal is not relevant to any issues that were before the jury. But, in any event, because the jury heard that Roberto Ramos was unable to identify Umaña even though he claimed to be able to identify the shooter, the information that Umaña alleges to have been suppressed is not material.

### 3. Umaña's allegation that the United States failed to disclose recordings related to the Lemon Grove Murder investigation does not establish a prima facie case of a *Brady* violation.

Umaña's 2255 motion alleges that the United States did not produce, during Umaña's criminal trial, nine "video/audio recordings by LAPD" that relate to the investigation of the Lemon Grove murder. (2255 Mot. 177–79; Disc. Br. 36–38.) The motion identifies by date, identifying number, and interview subject nine recordings of seven different individuals: Elger Barrios, Roberto Ramos, Freddy Gonzalez (two recordings); "German Suarez and his wife," Juan Lara, Erick Lopez, and Alejandro Rodriguez (two recordings). (2255 Mot. at 177.) Only Roberto Ramos, Juan Lara, and Freddy Gonzalez testified at Umaña's trial. And

48

the United States produced copies of the recordings for these testifying witnesses to postconviction counsel, a few months ago. (See Exh. 4.) As mentioned above, the basis for Umaña's allegation that these recordings were not produced during his criminal case is dubious. *See section* I.F. & n.4, *supra*. But even if this Court assumes that they were not produced before trial, Umaña has failed to establish a prima facie case of a *Brady* violation and has failed to establish good cause for discovery.

### a. Umaña's allegations do not describe *Brady* material.

Umaña's only specific allegations about what some of these recordings might contain do not describe *Brady* material. Umaña alleges that "Alejandro Rodriguez told LAPD that Mr. Umaña was not in Lemon Grove Park on the night of the shooting." (2255 Mot. 178; *see also* Disc. Br. 36–38.) But, in addition to being contradicted by Umaña's own confession, this allegation does not describe *Brady* material because Umaña admits that "documents in discovery" disclosed Rodriguez's statement. (2255 Mot. 178); *Catone*, 769 F.3d at 871 (evidence "available to the defense from other sources" is not *Brady* material).[6] Similarly, the record demonstrates that the fact that "neither [Roberto] Ramos nor Juan Lara picked Umaña out of a photo line-up prior to trial" (2255 Mot. 178; *see also* Disc. Br. 26–31.), was well known to the defense and the jury, (Exh. 1, at 2696–

---

[6] Rodriguez also said he was not "in the park at the time of the shooting" and "had no reasonable explanation as to how he knew" whether Umaña had been present. (App'x 69 to 2255 Mot, at 11.)

49

97, 2707–08.)  This information is not *Brady* information because it was known to the defense, and its cumulative nature makes it immaterial.  *Catone*, 769 F.3d at 871.

That Freddy Gonzalez was not "confident when he made the pretrial identification" of Umaña (Disc. Br. 20) in photographic arrays was already well known to the defense.  Umaña concedes that trial counsel received "in discovery" written statements Gonzalez made to police in 2005 and 2008.  (2255 Mot. 130.) The 2005 statement says that photo number 2, depicting Umaña, "*looks like or resembles* the guy who came to the park the day that they killed Andy — I remember seeing this guy *but I'm not sure if he is the one that came that day to the park with a pistol and shot at us.*"  (*id.* (emphasis added)).  The 2008 statement says, again of Umaña's photo, "My *first impression* was photo number five.  The way that he has *his hair* is looks the same, but everything happened so fast that *I'm not 100% sure.*"  (*Id.* (emphasis added)).

Gonzalez's statements in the audiorecordings discussed by Umaña are not materially different from the written statements Umaña admits receiving in discovery.  When police asked Gonzalez in September of 2005 if he would sit down with a "police artist" and describe the shooter at Lemon Grove Park, Gonzalez said, "[I] [d]on't think I could remember his face and tell you."  (Exh. 20 to Disc. Mot., at 22–23.)  Gonzalez also indicated that he had not gotten a good look at the shooter.  (*Id.* at 31–32.)  In December of 2005, when police showed Gonzalez the photo array, his initial response was, "No, I don't recognize none of

50

those guys.  Never seen him at the park either."  (Exh. 21b to Disc. Mot., at 12.)
Asked if anyone was "close or similar," Gonzalez identified Umaña's photo and
said, "Close, maybe this one right here, the one in the middle."  (*Id.*)   Gonzalez
told police that he had never "seen the guy that walked up and drew the gun"
before the shooting.  (*Id.*)  When he identified Umaña as "similar to the shooter"
in a photo array, Gonzalez said, "I'm telling you I never seen him before, so it's
hard for me to recognize his face."  (*Id.* at 15.).

Even if the Court assumes trial counsel did not receive these recordings
before trial, counsel was "aware of the essential facts" surrounding Gonzalez's
identification of Umaña from other discovery materials.  *Todd*, 920 F.3d at 405.
Those materials show that Gonzalez told police that the photograph of Umaña
only *resembled* the shooter.  (2255 Mot. 130.)  And they show that Gonzalez
repeatedly told police that he was not sure the person depicted was the shooter.
(*Id.*)

In addition to being known to the defense, the information in the
recordings of Gonzalez is not material.  Gonzalez candidly admitted to the jury
that he "w[asn't] sure if [Umaña] was the shooter" when cross examined about
his photo identifications.  (Exh. 1, at 2897.)  The jury also heard of Gonzalez's
bias against Umaña's gang; it heard that Gonzalez had multiple felony
convictions; it heard how Gonzalez's version of events contradicted that of other
witnesses, who had identified two shooters; and it heard that Gonzalez had
robbed Alex Montez and then told police that Montez had participated in the

51

Lemon Grove murder, before telling the jury that Montez "wasn't there." (Exh. 1, at 2687–88, 2702, 2899–2901, 2902.) Yet the jury still sentenced Umaña to death. "*Brady* does not extend to '[e]vidence that impeaches an already thoroughly impeached witness.'" *United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008) (quoting *United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994)). No reasonable probability exists that the jury would have reached a different result if it had heard the recordings of Gonzalez's interviews.

### b. Umaña cannot rely on speculation to establish that the recordings contain *Brady* material.

Umaña's assertion that the recordings his 2255 motion identifies contain other information that meets the elements of the *Brady* doctrine (2255 Mot. 178), is conclusory and speculative. Indeed, neither Umaña's 2255 motion nor his brief includes any allegations or information whatsoever about three of the interviewees, Elger Barrios, German Suarez, and Erick Lopez. Beyond the information mentioned above, which is not *Brady* information, Umaña offers only "speculat[ion] as to what" any of the recordings "might reveal." *Caro*, 597 F.3d at 619. That speculation "cannot satisfy *Brady's* requirement[s]." *Id.*

### c. The United States has produced to postconviction counsel the only statements of testifying witnesses that he alleges with any specificity not to have been produced earlier.

Although Umaña has not established that any of the recordings his 2255 motion identifies contain *Brady* material, the United States has produced the recordings described in that motion of testifying witnesses. Umaña offers no

52

plausible theory for why he would be entitled to the other recordings he identifies from the Lemon Grove murder investigation. Because the *only* materials that Umaña's trial attorneys have asserted may not have been produced are "recordings" of "interviews of Lemon Grove Park murder witnesses" by the "LAPD," (Bryson Aff. ¶ 8), Umaña cannot, in any event, establish good cause for additional discovery in support of his *Brady* theory.

4. **Umaña's allegation that the United States failed to disclose statements by his mother about his background does not establish a prima facie case of a *Brady* violation.**

Umaña's 2255 motion next alleges that the United States suppressed information provided to the government by Umaña's mother, Leticia Ramirez Diaz. (2255 Mot. 180–92; Disc. Br. 50–56.) Umaña's mother signed an affidavit dated February 4, 2016, written by someone else. (App'x 10 to 2255 Mot. ("L. Diaz Aff.") ¶ 88.) Although the affidavit contains a lengthy narrative, it identifies only two "facts" that she purportedly told the "FBI": "the fact that [Umaña's father] sold drugs and that he was the one who got her sons . . . involved in that business"; and "the fact that [Umaña] did not have identification and had nothing here." (*Id.* ¶ 82.) The affidavit also says that, on a separate occasion, she spoke to "a man who spoke Spanish." (*Id.* ¶ 81.) It says she told him "many" things, although it does not identify those things. (*Id.*) And it says that she "gave him a copy of [her] son's Guatemalan birth certificate." (*Id.*)

Umaña admits that the United States provided him with discovery about his mother, its interview with her, and information obtained from her. (2255

53

Mot. 182.)  The United States "produced . . . early in the case" contact information for Umaña's mother.  (2255 Mot. 20.)  The United States produced a report by an agent of the Federal Bureau of Investigation stating that an interview of Umaña's mother had been completed.  (2255 Mot. 182 & App'x 48.)  The United States produced a copy of the handwritten notes taken by one of the prosecutors during the meeting.  (2255 Mot. 183–84.)  That same prosecutor described what she recalled from the interview in an email to defense counsel.  (2255 Mot. at 183 & App'x 74.)  The record also demonstrates that the United States produced a copy of Umaña's Guatemalan birth certificate and "a narrative, written in Spanish, which summarized an interview of the defendant's mother" conducted "by Carlos Alberto Moreno" of the "Salvadorian police."  (Exh. 1, at 3594.)

Umaña nevertheless contends that the United States suppressed two categories of information:  the two things that his mother allegedly told the United States; and the birth certificate and narrative that she provided to the Spanish-speaking man.  (2255 Mot. 180–92; Disc. Br. 50–56.)  Neither category constitutes *Brady* material.

   **a.**  **Umaña has not made a prima facie case that the United States suppressed information provided by his mother.**

The information allegedly provided by Umaña's mother to the United States — that Umaña's father got him involved in his drug-selling business and that Umaña did not have proper identification when in El Salvador — is not

54

*Brady* material. (Cf. 2255 Mot. 180–92; Disc. Br. 50–56.) This information is quintessentially the kind that, if true, was "known by the defendant." *Roane*, 378 F.3d at 402. "[I]t was his history; who knew it better?" *United States v. Neal*, 611 F.3d 399, 401 (7th Cir. 2010). The defense team presented to the jury examples of challenges Umaña faced in El Salvador because he did not have proper identification documents. (Exh. 1, at 3132). And Umaña cannot plausibly contend that his father got him involved in the drug-dealing business without his knowledge. *Brady* did not require disclosure of what Umaña's mother purportedly told the Bureau because *Brady* requires disclosure only of evidence "*unknown to the defense.*" *Neal*, 611 F.3d at 401 (emphasis in original). Moreover, Umaña's mother was not involved in Umaña's life beyond a few months of age and received her information about him through third parties. *See* Sections II.B.4.b and II.D.3.b., *infra*. The United States had no obligation to "communicate preliminary, challenged, or speculative information." *United States v. Agurs*, 427 U.S. 97, 110 n.16 (1976).

> **b. Umaña has not made a prima facie case that it violated a *Brady* obligation by disclosing Umaña's Guatemalan birth certificate during trial.**

The record establishes that the United States produced Umaña's Guatemalan birth certificate during his criminal case, along with a narrative. (Exh. 1, at 3594.). Umaña, however, contends that the production was untimely because it occurred after Umaña's *Atkins* hearing. (2255 Mot. 190–92.) "[T]here is no Brady violation if the defense is aware of the evidence in time to reasonably

55

and effectively use it at trial." *United States v. Jeffers*, 570 F.3d 557, 573 (4th Cir. 2009).

Umaña has not made a prima facie case that the timing of disclosure of his Guatemalan birth certificate violated a *Brady* obligation. (*Cf.* 2255 Mot. 189–91.) Assuming that *Brady* applies at all to pretrial hearings, *cf. United States v. Thomas*, 835 F.3d 730, 734 (7th Cir. 2016), and to the Salvadorian police, Umaña's disclosure-timeliness claim fails as a matter of law for at least three reasons. It is barred by Umaña's procedural default. The record establishes that defense counsel received the certificate in time to use it during Umaña's criminal case. And the certificate is not material.

First, Umaña's challenge to the timing of disclosure of his Guatemalan birth certificate is barred by his procedural default. *See section* II.E.1.a, infra (describing the procedural-default doctrine). Meritorious *Brady* claims often establish "cause" for overcoming a procedural default, because "the reason for [the] failure to develop facts" in the earlier proceedings is "the State's suppression of the relevant evidence." *Banks v. Dretke*, 540 U.S. 668, 690 (2004). But "suppression" could not explain Umaña's failure to present this claim on direct appeal. Both the birth certificate and the timing of its disclosure were in the record, so any *Brady* claim based on it was ripe for that appeal. Although Umaña's motion contains a host of complaints about his trial counsel, he does not contend that his appellate counsel was deficient for failing to raise this claim.

Second, the United States' disclosure of the birth certificate was timely.

56

Umaña was able to use it at trial. The jury heard about it and still sentenced Umaña to death. And nothing prevented Umaña's attorneys from seeking to use the birth certificate to support a finding by this Court of mental retardation. Umaña had ample opportunity to seek a continuance of the trial or reconsideration of the Court's ruling on his *Atkins* motion. *See United States v. Beras*, 183 F.3d 22, 27 (1st Cir. 1999) ("In situations where defense counsel does not seek a continuance upon belated receipt of discoverable information, a court often can assume that counsel did not need more time to incorporate the information into the defense's game plan." (brackets omitted) (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993))).

Finally, Umaña's Guatemalan birth certificate is not material to this Court's determination that Umaña is not mentally retarded. The purported upshot of Umaña's allegation is that he was 12 instead of 10 when he repeated third grade. (2255 Mot. 100, 195–96.) There is no reasonable probability that this Court would have found Umaña mentally retarded if it were aware of this fact.

> **5. Rony Lopez's testimony about tattoos is not *Brady* material.**

Umaña's section 2255 motion alleges that the United States violated its *Brady* obligation by omitting to disclose testimony that Rony Lopez gave on January 14, 2010, during another trial before this Court, about MS-13 tattoos. (2255 Mot. 191–92; Disc. Br. 48–50.). Lopez testified, "If somebody has MS tatted on them, that means they earned the letters and they did something major

57

to earn those letters." (Jan. 2010 Trial Tr. 567 (Dkt. No. 1080, 3:02-CR-134).) Lopez was asked what an MS-13 member can do "to earn the big letters, the M and the S." (*Id.*) He replied, "They have to, one, kill or, as they say, put in work for the gang. Rob people. Just different types of crimes." (*Id.*)

Umaña acknowledges that he has "numerous 'MS' tattoos," but he contends that evidence that MS-13 members have to kill, rob, or commit crimes to earn tattoos is somehow exculpatory. (2255 Mot. 191.) He contends that Lopez's testimony contradicts the testimony of Alexander Granados, an MS-13 member who testified during Umaña's trial that "in order to earn the two letters" — MS — "you have to kill someone." (Exh. 1, at 2157.) Neither Granados nor Lopez purported to have personal knowledge of whether or how Umaña "earned" his own tattoos.

Rony Lopez's January 2010 statement is "more inculpatory than exculpatory,'" *United States v. Grintjes*, 237 F.3d at 880, but even if it were somehow favorable, it would not be *Brady* material. Umaña was undoubtedly present when he received his tattoos, and he admitted to having been a member of MS-13 for nearly nine years at the time of his trial. (2255 Mot. 191; Exh. 1, at 3142.) What, if anything, he did to "earn" his tattoos and the routine tattoo practices of MS-13 were undoubtedly known "to the defendant." *Catone*, 769 F.3d at 872. And Lopez's testimony would not be material in any event. The jury heard plenty of eyewitness evidence that Umaña killed people, and the jury saw letters in which Umaña wrote things such as, "They say I am a lost cause because

58

I keep screwing or *killing rival gang members* who mess with me." (Exh. 2, at 4 (emphasis added)).  Common sense, moreover, would tell the jury that anyone can go to commercial tattoo parlor and ask for any tattoo they want, without killing anyone.  The favorable "net effect" of evidence, not specific to Umaña, that it is possible for someone to obtain an MS tattoo by committing crimes other than murder would have been minimal.  *Kyles*, 514 U.S. at 421.  Umaña's allegations about Rony Lopez's testimony, therefore, do not establish a prima facie case of a *Brady* violation.[7]

**6. The information that Umaña's 2255 motion alleges the United States suppressed, when considered collectively, is not material.**

Umaña has failed to make a prima facie case of the collective materiality of the specific information his 2255 motion alleges to have been suppressed.  As explained in the above sections, the force and net effect in his favor of the evidence that he alleges to have been suppressed is minimal.  It would either be cumulative, or, in the case of information such as Lopez's testimony and Umaña's

---

[7] Umaña's discovery brief also alleges that the United States did not disclose the substance of interviews conducted in January of 2009 or a recording of an interview with Rene Arevalo. (Disc. Br. 16–17, 23, 28, 33.)  These allegations are immaterial to a prima facie case because they are not contained within his 2255 motion, *see Harris*, 394 U.S. at 290.  But these allegations would not establish a *Brady* claim in any event.  "[T]here is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" *Agurs*, 427 U.S. at 109.  And Umaña offers no specific allegations that the 2009 interviews uncovered information unknown to the defense, let alone information that was exculpatory or material. *Caro*, 597 F.3d at 619.  Trial counsel received notes about the interview with Arevalo, (Disc. Br. 32–33; App'x 51 to 2255 Mot., at 35), and cross examined Detective Small about it, (Exh. 1, at 2678–29.)  Those notes disclose what Umaña alleges, that Arevalo was informed of a $75,000 reward.  (App'x 51 to 2255, at 35.)  Umaña's trial counsel do not say that this recording was not produced (*see* Foster Aff.; Bryson Aff.), but, in any event, Umaña cannot establish that it contains *Brady* information.

59

purported involvement in his father's drug-dealing business, as likely to hurt the defense as to help it. Moreover, as described below, the favorable effect of even information thoroughly undercutting the United States' evidence that Umaña was a shooter in the Los Angeles murders would be small. Umaña confessed to substantially participating in both of those murders. *See* section II.D.1.l, *infra*. Similarly minimal would be the net favorable effect of any evidence from Umaña's mother. She would not be an unbiased witness, and she had no firsthand knowledge of Umaña's life after he was seven or eight months old. *See* section II.D.3.b, *infra*.

Critically, the evidence of Umaña's guilt and in aggravation was overwhelming. The jury heard from multiple eyewitnesses that Umaña murdered two people, after as much as a minute's contemplation, for suggesting that his gang was fake. *See* Section I.A, *supra*. The jury heard from eyewitnesses and forensic investigators that Umaña jeopardized the lives of families and children by opening fire in a small family restaurant. *See id.*; Section I.C, *supra*. The jury heard that, after Umaña had time to reflect, what he regretted about the event was *not* killing a third person, whom he had only wounded. *See* Sections I.A and I.C.2, *supra*. The jury heard that Umaña confessed to substantially participating in the murders of Andy Abarca, Jose Herrera and Gustavo Porras, in Los Angeles. *See* Section I.C.3, *supra*. The jury heard, from MS-13 members whom he instructed, that Umaña had come to North Carolina with the goal of helping MS-13 "commit ten of the bloodiest murders

60

Charlotte has ever seen." (Exh. 1, at 1917.) The jury saw Umaña's own corroborated words describing efforts to orchestrate the assault or murder of witnesses. *See* Section I.B., *supra.* The jury heard about Umaña's personal violent conduct in prison from those who observed it. *See* Section I.C.3.a, *supra.* The jury heard of the threats Umaña made against the family of a witness, right in the courtroom. *See* Section I.C.3.a., *supra.* And the jury saw the knife that Umaña sought to bring to the courthouse, while his attorneys were there to seek an acquittal or mercy. *See id.*

Simply put, the "record provides strong support for the conclusion" that Umaña "would have been convicted of capital murder and sentenced to death," even if the allegedly suppressed evidence had been disclosed. *See id. at* 294. In the words of Umaña's own defense counsel, writing with the benefit of six years of hindsight, Umaña's case involved "much more serious and far-reaching aggravation evidence than the typical capital murder case does." (Foster Aff. ¶ 3.) Even if this Court assumes that all of Umaña's allegations related to his *Brady* theories are true, he could not show "that there is a reasonable probability that his conviction or sentence would have been different" had any allegedly suppressed "materials been disclosed." *Strickler*, 527 U.S. at 296.[8]

---

[8] Request 161 seeks a log of discovery produced to trial counsel by the United States. (*See* Disc. Br. 76.) The United States did not prepare a log of the items produced to trial counsel and does not have documents that would reflect the entire universe of those items. Umaña, of course, would not be entitled to discovery of such a log or documents in any event, because he has failed to make a prima facie *Brady* or other claim.

61

**C.** **Umaña has not established good cause to obtain discovery in support of his claim that the United States knowingly introduced false evidence.**

In claim "VII," Umaña contends that the United States introduced and failed to correct false testimony. (2255 Mot. 192–210.) "In order to prevail on such a claim," the Fourth Circuit has held, Umaña must prove: "(1) the testimony was false, (2) the Government knew the testimony was false; and (3) there is a reasonable probability that the false testimony could have affected the verdict." *Roane*, 378 F.3d at 400 (4th Cir. 2004) (citations omitted). Courts refer to this kind of claim as a *Napue* claim, after *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.").

Umaña has failed to allege facts that, if true, would entitle him to relief on a *Napue* theory. His theory is barred by his procedural default. He has not established that any of the four pieces of testimony on which he seeks to base his claim are false, let alone knowledge or materiality. And, in any event, the defense was aware of the information that would correct any purported falsity.

**1.** **Umaña's procedural default precludes discovery on his *Napue* claim.**

At the outset, Umaña is not entitled to discovery in support of his *Napue* theory because he failed to raise that claim during his criminal case or on direct appeal. *See section* II.E.1.a, *infra* (describing the procedural-default doctrine);

62

*Allen v. Lee*, 366 F.3d 319, 324 n.* (4th Cir. 2004) (holding *Napue* claim procedurally defaulted); *Hoke v. Netherland*, 92 F.3d 1350, 1359 (4th Cir. 1996) (same). Umaña could not overcome his procedural default, even if he attempted to. The basis for his claim consists exclusively of information available to him, at the latest, by the time moved for a new trial on June 14, 2010. The information that he says establishes knowing falsity consists of a birth certificate that was produced during trial (2255 Mot. 193–94); evidence actually introduced at trial (*id.* at 197–98; 206–07); transcripts of interviews that counsel received early in discovery (*id.* at 209); and a transcript from the trial of his codefendants (*id.* at 200), which the docket indicates was served on Umaña's counsel by ECF on June 7, 2010. (Doc. No. 1080, 3:08-CR-134 (June 7, 2010)). Umaña's *Napue* claim, therefore, could have been "fully and completely addressed on direct review based on the record created" before this Court. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Umaña does not contend that his appellate attorneys were constitutionally deficient for failing to raise a *Napue* claim. He cannot show prejudice because, as explained below, none of the purported falsity that he alleges is material. And he could not come close to meeting the standard for establishing actual innocence. *See section* II.E.1.a, *infra.*

> **2. Testimony by defense experts during the *Atkins* hearing before this Court does not establish a prima facie *Napue* claim.**

The first purported basis for Umaña's *Napue* claim is testimony by his own expert witnesses, given after Umaña apparently provided them with allegedly

63

false information about his own birthday.  (2255 Mot. 193–97; Disc. Mot. 50–53.) Umaña does not identify any part of the record in which Dr. Olley or his other experts testified about Umaña's age during the *Atkins* hearing.  But Umaña alleges that Dr. Olley was "working under the assumption" that Umaña was "two years younger" than his Guatemalan birth certificate suggests.  (2255 Mot. 195.) Although Dr. Olley signed a postconviction declaration *reaffirming* his 2009 findings (App'x 28 to 2255 Mot. ("Olley Aff.") ¶ 23), Umaña contends that his Guatemalan birth certificate shows that the testimony of Dr. Olley and others at the Atkins hearing was somehow false.  (2255 Mot. 193–97.)  Documents that Umaña attached to his 2255 motion suggest that Umaña's Guatemalan birth certificate was not brought to the attention of prosecutors until "April 13, 2010," after the *Atkins* hearing had been completed.   (App'x 44 to 2255 Mot., at 5.)  But Umaña contends that the prosecution knew the *Atkins* hearing testimony was false, apparently on the theory that Umaña's mother had provided a copy of the Guatemalan birth certificate to *Salvadorian police* in June of 2008.  (*See* 2255 Mot. 193–97.)

Umaña's attempt to apply *Napue* to these facts stretches all three of its elements too far.  The facts he alleges do not establish that the evidence presented at the Atkins hearing was false.  They do not establish that the United States knew of any falsity.  And they do not establish a reasonable probability that the verdict could have been different.

The facts Umaña alleges fail, on two levels, to establish falsity.  First, he

64

offers nothing but a conclusory statement that "the 1982 birth certificate was the accurate one." (Exh. 1, at 194.) The jury heard that Umaña had two birth certificates — one that placed his birth in 1984 and the other in 1982. This information reveals no more than an inconsistency in evidence, which was fully before the jury. *See United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995) (noting that "direct conflict in testimony" is not enough). Umaña's conclusory allegation is not enough to establish falsity, or even a prima facie case of it. *Rose*, 2008 WL 2115133, at \*1. Second, even if Umaña's Guatemalan birth certificate were assumed to state the truth, Umaña has not identified any testimony before the Court that was false. Umaña must prove that "*testimony* was false," *Roane*, 378 F.3d at 400 (emphasis added), not assumptions in the heads of experts.

The facts Umaña alleges also fail, on two similar levels, to establish that the United States knew any testimony was false. First, the Fourth Circuit has held that "knowingly false or misleading *testimony by a law enforcement officer* is imputed to the prosecution," because the police cannot allow a prosecutor "to produce evidence pointing to guilt without informing him" of other, contradictory evidence. *Boyd v. French*, 174 F.3d 319, 330 (4th Cir. 1998) (emphasis added). But it has never held that prosecutors "know" that evidence presented by *defense experts* in their case is false if police in another country possess information that might undermine one of the experts' assumptions. Stretching the *Napue* doctrine that far would render it absurd. Second, Umaña points to no testimony contradicted by the Guatemalan birth certificate and therefore cannot show that

65

the United States knew of any false testimony.

Finally, the facts that Umaña alleges are not material. There is no reasonable probability that Umaña could have been found mentally retarded if this Court had learned that Umaña had been 12 instead of 10 when he repeated third grade. (2255 Mot. 100, 195–96); *Roane*, 378 F.3d at 400. And because the jury heard about both birth certificates, no reasonable probability exists that the Guatemalan birth certificate "could have affected the verdict." *Id.*

Moreover, to the extent this Court heard any testimony undermined by Umaña's Guatemalan birth certificate, that testimony did not "go uncorrected." *Napue*, 360 U.S. at 269. Umaña's counsel raised Umaña's Guatemalan birth certificate not only before the jury, but also in a motion to this Court for a new trial. (Exh. 1, at 3594–95.) Counsel could also have sought reconsideration of this Court's determination that Umaña is not mentally retarded. In any event, counsel's "prior knowledge" of the allegedly false information "precludes" relief. *United States v. Meinster*, 619 F.2d 1041, 1045–46 (4th Cir. 1980).

### 3. Testimony that an MS-13 member earns tattoos by killing does not establish a prima facie *Napue* claim.

Umaña has not established a prima facie Napue claim based on Alexander Granados's testimony, (Exh. 1, at 2157), that MS-13 members earn "MS" tattoos by killing. (*Cf.* 2255 Mot. 197–205; Disc. Br. 48–50.) Although Granados did not purport to have personal knowledge of what, if anything, Umaña had done to earn the tattoos on his skin, Umaña alleges that this testimony gave the jury the

66

"false impression" that Umaña had killed people to earn them. (2255 Mot. 198.)
Umaña has not alleged specific facts that, if proved, would establish any of the
elements of a *Napue* claim.

The facts Umaña has alleged do not establish that Granados's testimony
was false, or that the United States knew of any falsity. Lack of corroboration
does not establish falsity, let alone knowing falsity. (*Cf.* 2255 Mot. 198–203.)
Nor does Rony Lopez's testimony that an MS-13 member could "kill" or "[r]ob
people" to earn tattoos. (Jan. 2010 Trial Tr. 567 (Dkt. No. 1080, 3:02-CR-134);
*Cf.* 2255 Mot. 198–99.) "Mere inconsistencies in testimony by government
witnesses do not establish the government's knowing use of false testimony."
*United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). And, of course,
Umaña's conclusory allegation that Granados's testimony was "false" (2255 Mot.
198) is not sufficient. *Roane*, 378 F.3d at 400–01; *Rose v. United States*, 2008 WL
2115133, at *1. Conspicuously absent from Umaña's collection of exhibits is any
sworn affidavit from Umaña explaining what, if anything, he did to earn his
tattoos, to "lend support" to his allegation of falsity. *Bracy*, 520 U.S. at 909.

Nor would any alleged falsity be material. The jury heard strong evidence
of extraordinary violence — including multiple killings — that Umaña
perpetrated, attempted to perpetrate, and threatened to perpetrate. *See*, *e.g.*,
*Section* II.B.6, *supra*. Granados did not purport to have knowledge of what, if
anything, Umaña did to earn his tattoos. And common sense would tell the jury
that Umaña need not have killed to obtain his tattoos. *See* Section II.B.5, *supra*.

67

Finally, Umaña knew how he got his tattoos long before the trial began. That knowledge precludes posttrial relief on a *Napue* claim. *Meinster*, 619 F.2d at 1045–46; *see also* United *States v. Mangual-Garcia*, 505 F.3d 1, 10 (1st Cir. 2007) ("When the defendant knows about the false testimony and fails to bring it to the jury or the court's attention, the assumption is that he did so for strategic reasons, and the defendant will not be allowed to question his own strategic choices on appeal.").

### 4. Freddie Gonzalez's testimony does not establish a prima facie *Napue* claim.

Umaña's allegations about Freddy Gonzalez's testimony also do not support a prima facie case of a *Napue* error. (*Cf.* 2255 Mot. 206–08; Disc. Br. 19–25.) At the outset, Umaña's allegation that, "At trial, Gonzalez made an in court identification of Mr. Umaña as being the shooter" during the Lemon Grove murder (2255 Mot. 206), is directly contradicted by the record. This Court *sustained* a defense motion to preclude Gonzalez from making an in-court identification. (Exh. 1, at 2888.) Gonzalez testified that he had identified Umaña in photographic arrays earlier, when interviewed by police in 2005 and 2008. (Exh. 2874–96.) Although on direct examination, Gonzalez expressed confidence that the person he had previously identified — Umaña — was the shooter, on cross examination, Gonzalez admitted that he had not been sure if Umaña was the shooter either of the times he had previously identified him. (Exh. 1, at 2896–97.)

68

That Gonzalez expressed a greater degree of confidence in his prior identification of Umaña on direct than on cross-examination does not establish that the United States knowingly solicited false evidence. *Griley*, 814 F.2d at 971. Any overconfidence expressed by Gonzalez on direct did not "go uncorrected." *Napue*, 360 U.S. at 269. Moreover, in addition to hearing Gonzalez admit that he had not been sure if Umaña was the shooter, even in 2005, the jury also heard that Gonzalez was a convicted felon; that he had a bias against MS-13 members; and that his recollection of events of the shooting had significantly changed from what he had initially reported. No reasonable probability exists that the verdict could have been different if Gonzalez had stated on direct examination that he had been uncertain about whether Umaña was the shooter. And defense counsel's knowledge of Gonzalez's prior uncertainty, again, precludes relief. *Meinster*, 619 F.2d at 1045–46.

### 5. Detective Parshall's testimony about corroborating details provided by witnesses to the Fairfax Street murders does not establish a prima facie *Napue* claim.

Finally, Detective Parshall's testimony, which describes details corroborated by multiple witnesses to the Fairfax Street murders, does not establish a prima facie *Napue* claim. (*Cf.* 2255 Mot. 208–10.) Detective Parshall testified that three facts were "consistent among all the individuals that [he] interviewed," Luis Rivera, Luis Ramos, and Rene Arevalo: (1) Rivera had crutches and did not get out of the car; (2) Arevalo was the driver and did not get out of the car; and (3) Umaña was the front right passenger, got out of the car,

69

and shot the victims.   (Ex. 1, at 2782–83.)  Transcripts of Detective Parshall's interviews with Luis Rivera[9] and Rene Arevalo — which were introduced at trial (Exh, 1 at 3512, 3791–92, 4061, 4210) — contain the three corroborated facts described by Detective Parshall.  (Exh. 1, at 4099–100, 4111, 4113, 4114, 4125, 4161, 4164, 4187–88, 4220, 4226–29.)  Although Umaña concedes that a transcript of Luis Ramos's statement was also produced "early on in discovery" in his criminal case, (2255 Mot. 149), he does not point to any part of that transcript, let alone anything that suggests it does not contain the three facts described by Detective Parshall.

Umaña contends that Detective "Parshall's testimony was false" not because what he said was untrue.  (2255 Mot. 209.)  Umaña's argument is that this Court and the jury ought not have assigned great weight to the "corroboration" Detective Parshall described, because the witnesses he interviewed were familiar with what others had said and the police asked questions in a way that Umaña contends undermines the reliability of the answers. (2255 Mot. 208–10.)  The weight of any corroboration is an appropriate subject of cross-examination, as Foster demonstrated at trial.  (Exh. 1, at 2761–70.)  But Umaña has failed to make a prima facie *Napue* claim based on Detective Parshall's testimony, because he has not identified a false statement.  *See Maharaj v. Sec'y, Dep't of Corrs.*, 432 F.3d 1292, 1313 (11th Cir. 2005) ("[T]he

---

[9] Detective Parshall testified that, because of a transcription error, the name "Luis Ramos" appears on this transcript instead of Luis Rivera.  (Exh. 1, at 2782.)

70

defendant must conclusively show that the statement was actually false.")  And, as Umaña concedes, counsel had the transcripts of Detective Parshall's interviews.  He cannot obtain post-trial relief under a *Napue* theory based on information that his attorneys knew during trial.  *Meinster*, 619 F.2d at 1045–46.

### D. Umaña has not made a prima facie case that the performance of his attorneys was constitutionally deficient.

Umaña seeks discovery in support of a number of claims that the performance of the attorneys who represented him during his criminal case was constitutionally deficient.   To establish ineffective assistance of counsel, Umaña has the burden to prove that the performance of his attorneys fell below an objective standard of reasonableness, judged "from counsel's perspective at the time."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  He must also establish prejudice in the form of "a reasonable probability" that, "but for the deficient performance," he would not have been convicted or "sentenced to death." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694).

The *Strickland* standard that Umaña must meet to demonstrate constitutionally deficient performance by his attorneys is well established.  Three attributes of the standard are particularly relevant to Umaña's request for discovery.

First, the Supreme Court has explained that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the

71

exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Counsel has a duty to "make reasonable investigations" or "make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. But the "heavy measure of deference" that *Strickland* dictates applies "to counsel's judgments" about whether and to what extent to investigate. *Id.* at 691. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. "There are countless ways to provide effective assistance in any given case." *Id.* And the burden rests with Umaña to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

This component of the standard is particularly relevant to Umaña's request for discovery, because the two-page affidavits signed by his trial attorneys are silent about the vast majority of decisions that trial counsel made. (*See* Foster Aff.; Bryson Aff.) 'An ambiguous or silent record is *not* sufficient" to disprove the presumption that counsel acted reasonably. *Sallahdin v. Mullin*, 380 F.3d 1242, 1252 (10th Cir. 2004) (alteration omitted) (quoting *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc).) "[B]ecause counsel's conduct is presumed reasonable," for Umaña to "show that the conduct was unreasonable, [he] must establish that *no competent counsel* would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315 (emphasis added); *accord Sallahdin*, 380 F.3d at 1253 (10th Cir. 2004); *Jackson*

72

*v. United States*, 638 F. Supp. 2d 514, 533 (W.D.N.C. 2009).

Second, the reasonableness of counsel's performance during Umaña's criminal case is judged "from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). This component of the standard bears directly on Umaña's motion, because the discovery Umaña requests is, by its own terms, information that his attorneys did *not* have at the time of trial. None of Umaña's proposed discovery requests are directed at his two trial attorneys. Those attorneys already provided Umaña with affidavits and "everything that was in their possession." (Exh. 3, at 2.) "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, and information that Umaña's trial attorneys did not have during trial says nothing about counsel's perspective at that time. *See Van Poyck v. Fla. Dep't Corrs.*, 290 F.3d 1318, 1324 (11th Cir. 2002) (counsel not deficient for failing to introduce evidence "not known to Counsel at the time of the penalty phase").

Finally, although a capital defendant has the right to ask a jury to consider "any aspect" of his "character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett*, 438 U.S. at 605, "more is not always better," *Chandler*, 218 F.3d at 1318. Counsel is not required to "present all mitigation evidence." *Id.* To the contrary, "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.*; *see also United States v. Terry*, 366 F.3d 312, 318

73

(4th Cir. 2004). Similarly, an attorney is not required to investigate or seek out every piece of evidence that he is allowed to present in mitigation. "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distracts from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). Moreover, contrary to what Umaña's motion asserts, (*see, e.g.*, 2255 Mot. 245), counsel is *not* constitutionally compelled to raise every possible objection at trial. *United States v. Mason*, 774 F.3d 824, 830 (2014). "Indeed, it can be positively detrimental to a client's chances not to set priorities but rather to scattershot the case by raising every objection at trial and pressing every imaginable contention on appeal." *Id.*

Umaña seeks discovery in support of eight categories of theories that the performance of the attorneys who represented him during his criminal case was constitutionally deficient. Umaña contends that his trial counsel was constitutionally deficient because (1) they failed to adequately address the murders in which Umaña participated in Los Angeles (Disc. Br. 13–48; 2255 Mot. 110–169); (2) they failed to object to and introduce evidence about how MS-13 members earn tattoos (Disc. Br. 48–50); (3) they failed to adequately investigate Umaña's life history (Disc. Br. 50–56); (4) they failed to adequately use Umaña's mental health as a defense (Disc. Br. 56–59); (5) they failed to challenge the composition of the grand and petit jury venires (Disc. Br. 63); (6) they failed to "adequately object" to peremptory strikes during jury selection (Disc. Br. 65); (7) they failed to perform effectively when meeting with the Department of Justice

74

regarding the decision to seek the death penalty (Disc. Br. 70); and (8) they failed to do more to ensure that interpreters performed properly (Disc. Br. 73).

As with other claims, Umaña has scattered a handful of specific allegations about the performance of his counsel among various general allegations, conclusory allegations, and allegations related to different claims. (*See*, *e.g.*, Disc. Br. 13–61.) Umaña's general and conclusory allegations are insufficient as a matter of law. *See Roane*, 378 F.3d at 400–01; *Rose v. United States*, 2008 WL 2115133, at *1. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. And, as mentioned previously, only "specific allegations" can establish good cause. *Bracy*, 520 U.S. at 909.

The specific allegations to which Umaña points in would not entitle Umaña to relief, even if proved. Accordingly, Umaña has failed to establish a prima facie case of ineffective assistance of counsel. And he has failed to establish good cause for discovery.

1. **Umaña has not made a prima facie case that his trial attorneys were constitutionally deficient in addressing the Los Angeles murders in which Umaña participated.**

Umaña has not made a prima facie case that his trial attorneys performed deficiently in addressing the Los Angeles murders in which Umaña participated. What Umaña alleges, if proved, would not establish that the performance of his attorneys was "incompeten[t] under prevailing professional norms." *Harrington*

75

*v. Richter*, 562 U.S. 86, 88 (2011).  Nor would his allegations establish a reasonable probability that the jury would not have sentenced Umaña to death had counsel's performance been different.

> ### a.   Counsel was not constitutionally compelled to introduce additional evidence that Giovani Rodus was Umaña's cohort in the Lemon Grove shooting.

Evidence introduced by the United States indicated that two shooters participated in the Lemon Grove murder and that the other person involved, with Umaña, was "Giovani Rodus," also known as "Sin."  (Exh. 1, at 2669, 2687–88, 2702.)   Umaña contends that his defense attorneys ought to have done more to link Rodus to the shooting (*See* 2255 Mot. 119–20, 126–33), which would have corroborated the evidence introduced by the United States.

The facts Umaña alleges, if proved, would not overcome the presumption that trial counsel made reasonable decisions about information concerning Rodus.  Counsel could reasonably have concluded that information establishing that Rodus was arrested in possession of a gun consistent with the second kind of bullet recovered from the scene, that he had participated in other shootings nearby, and that persons not present during the murder and Freddy Gonzalez had identified Rodus as involved would *not* have "cast serious doubt on Mr. Umaña's role in the Lemon Grove shooting." (*cf.* 2255 Mot. 129–33.)  That information would have *corroborated* the United States' evidence that Umaña was a participant *along with* Rodus.  *See Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998) (failure to pursue evidence that acts as a double-edged sword,

76

with the potential to both help and hurt the defense, not constitutionally deficient).

The omission of Giovani Rodus from Foster's cross-examination of Freddy Gonzalez was not objectively unreasonable. (*Cf.* 2255 Mot. 128–33.) Gonzalez's identification of Rodus risked enhancing Gonzalez's credibility, because the jury had heard that Rodus was involved. (Exh. 1, at 2669.) Instead, counsel impeached Gonzalez with his prior inconsistent statement placing at the scene Alex Montez — a rival gang member whom Gonzalez had previously robbed. (Exh. 1, at 2899–2901.) By doing so, counsel avoided corroborating the government's evidence while establishing that Gonzalez was biased against MS-13 members, had made false statements about persons involved in the murder, and had a poor memory of both who was involved and what he had previously told police. (Exh. 1, at 2899–2901.) Foster's cross-examination strategy was not only reasonable; it was shrewd. And no reasonable probability exists that, had counsel approached the evidence about Rodus and Montez differently, the jury would have returned a different sentence.

> **b. Umaña's trial attorneys were not constitutionally compelled to introduce a second version of a photographic array already before the jury when cross examining Juan Lara and Roberto Ramos.**

Umaña's omission to introduce the specific photographic array shown to Juan Lara and Roberto Ramos does not establish a prima facie case of ineffective assistance of counsel. (*Cf.* 2255 Mot. 133–35.) The record establishes, and

77

Umaña concedes, that Roberto Ramos and Juan Lara both testified — on cross examination — that they were confident that they could identify the Lemon Grove shooters but did not identify anyone when presented with a photographic array. (2255 Mot. 134; Exh. 1, at 2696–97, 2708–09.) And, during closing argument, defense counsel argued specifically that both witnesses said that they could identify the shooter but did not identify Umaña. (Exh. 1, at 3423–25.) Umaña argues, however, that his attorneys were constitutionally deficient for failing to introduce as a defense exhibit the photographic array shown to Lara and Ramos, which bears number "118737." (2255 Mot. 134.)

The record shows that the photographic array presented to Roberto Ramos and Juan Lara was already in front of the jury as part of an exhibit introduced by the United States. (Exh. 1, at 4059 (bearing number 1118737).) As counsel noted during closing argument, the array was the same one presented to Freddy Gonzalez. (Exh. 1, at 3423.) "Counsel is not required to present cumulative evidence . . . ." *Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009). And Umaña offers no explanation for how a second version of the same array could plausibly result in a different verdict.

### c. Counsel was not constitutionally compelled to introduce statements about the Lemon Grove murder by three individuals who were not there.

Trial counsel's omission to present to the jury statements by three individuals not present at the Lemon Grove murder was not constitutionally deficient. (*Cf.* 2255 Mot. 135–36.) Detective Small received a telephone call from

78

"a person who identified himself as Edgar Gutierrez." (App'x 51 to 2255 Mot., at 9.) Gutierrez was not at the scene of the Lemon Grove murder. (*See id.*) But he told Detective Small that he ran into someone he "kn[ew] only as Blast," who "uses marijuana and drinks heavily." (*Id.*) "Blast," according to Gutierrez, had said that Andy Abarca's "shooter drove a black Honda Civic, and lived on Kenmore." (*Id.*) Detective Small also spoke to Alejandro Rodriguez, who also said he was not at the scene of the murder. (App'x 69 to 2255 Mot., at 10–11.) Rodriguez told Detective Small that Umaña was not in the park at the time of the murder, but he "had no reasonable explanation as to how he knew that." (*Id.* at 10–11.) Finally, Detective Small interviewed Luis Rivera, whom Umaña does not allege to have been present at the Lemon Grove murder. (2255 Mot. 135–36.) Rivera claimed knowledge "that 'Trivalin' and 'Gasper' . . . did the shooting" at Lemon Grove and "remained steadfast in his story" when interviewed again. (App'x 51 to 2255 Mot., at 26, 32.) Umaña alleges that his attorneys were constitutionally deficient for omitting to elicit the statements of these individuals during Detective Small's cross-examination. (2255 Mot. 135–36.)

The facts that Umaña alleges, if proved, would not overcome the strong presumption that counsel made reasonable decisions based on what they knew about these individuals. None of these three individuals were present at the Lemon Grove murder, and it would not have been unreasonable for counsel to focus on more probative evidence in the light of the questionable reliability of their statements. *Chandler*, 218 F.3d at 1318 ("Good advocacy requires

79

'winnowing out' some arguments, witnesses, evidence, and so on, to stress others.").  Moreover, asking the jury to believe arguably exculpatory statements by Rivera about the Lemon Grove murder risked bolstering his credibility.  That strategy had the potential — at best — to cut both ways, because Rivera had identified Umaña as the shooter on Fairfax Street, where Rivera *had been* present.  *See Truesdale*,142 F.3d at 754.  Especially because none of these witnesses claimed to have personal knowledge, no reasonable probability exists that the verdict would have been different if the jury had heard their statements.

> **d.**      **Counsel was not constitutionally compelled to place more emphasis on statements identifying Rene Arevalo as the Fairfax Street shooter.**

The jury heard that Noe Bautista and Oscar Santiago had both observed the Fairfax Avenue murder and had identified the driver of the vehicle — Arevalo — as the shooter.  Police officers testified that Bautista said the driver of the vehicle was the shooter.  (Exh. 1, at 2757).  The jury heard that Bautista described three people in the car.  (Exh. 1, at 2724, 2757.)  And the jury heard that Bautista reported that the victims "flashed gang signs and yelled at the people in the car."  (Exh. 1, at 2724.)  The jury also heard that Oscar Santiago observed the murder while driving on Fairfax Street and, like Bautista, identified the driver of the vehicle — Arevalo — as the shooter.  (Exh. 1, at 2775–76.)  During closing argument, defense counsel placed strong emphasis on the fact that both "Noe Bautista and Oscar Santiago" said that "the shooter was the driver of the car," arguing that "[t]he government's evidence in this case is best against

80

Rene Arevalo." (Exh. 1, at 3425.) In other words, Umaña's assertion that "none of this was presented to the jury," (2255 Mot. 139), is directly contradicted by the record.

Umaña has alleged no facts that, if proved, would establish that counsel's conduct was objectively unreasonable. That Bautista met with a sketch artist who drew a picture that "does not resemble Mr. Umaña," (2255 Mot. 139), would have been cumulative. Bautista did not claim to have identified Umaña; he identified the driver, Arevalo, as the shooter. *See Rhode*, 582 F.3d at 1287. And because the jury heard that Bautista and Santiago had identified the driver and still sentenced Umaña to death, the facts Umaña alleges do not establish a reasonable probability that the jury would not have done so if counsel had approached this evidence differently.

> **e. Counsel was not constitutionally deficient for failing to present statements by Alex Barrera undercutting the defense theory that Rene Arevalo was the Fairfax Street shooter.**

At the same time Umaña alleges that counsel ought to have done more to convince the jury that the evidence pointed to "Mr. Arevalo" as the Fairfax shooter, he asserts that counsel ought to have introduced statements by Alex Barrera *undercutting* that theory. (2255 Mot. 120–21, 136–37.) According to a hodgepodge of out-of-order, nonconsecutive pages from a transcript attached to Umaña's 2255 motion,[10] Barrera was with some unidentified "homeboys" at a get-

---

[10] The exhibit that Umaña cites in his motion (2255 Mot. 136–37) consists of twelve

together "a few days" after the Fairfax Street murders. (App'x 52 to 2255 Mot., at 50.) Barrera told police officers interviewing him, "[T]he *homeboys* told me, 'You know what? Your *homeboy* Chipi committed that murder." (*Id.* at 50 (emphasis in original).) Barrera also said that "when [he] got caught for robbery" he had "bullets" that he "was given." *Id.* at 105–06. And he said that the bullets were "[f]or Chipi." (*Id.* at 105.) As Umaña acknowledges, "Chipi" is Luis Ramos, (2255 Mot. 136–37; Exh. 1, at 2794), *not* Rene Arevalo.

Unlike almost all of the other pieces of discovery Umaña accuses his attorneys of overlooking, Barrera's statement *is* mentioned in the affidavits of his trial attorneys. The attorneys state that they received a recording of the statement in discovery. (Foster Aff. ¶ 7.) But they do not recall reviewing the recording. (Bryson Aff. ¶ 8; Foster Aff. ¶ 7.) One of the attorneys states that, if the recording consists of "[e]vidence of a third party shooter," counsel "would have presented it to the jury." (Bryson Aff. ¶ 2.) This *mea culpa* does not assist Umaña, however, because the standard for deficient performance is an objective one. *Chandler*, 218 F.3d at 1315. A reasonable attorney could have declined to introduce or further pursue this evidence because it is facially unreliable, and Barrera's information about Luis Ramos undercuts the defense argument that the evidence pointed to *Arevalo* as the shooter. *Rhode*, 582 F.3d at 1287 ("Counsel is not required to present . . . evidence incompatible with the defense

---

numbered pages assembled in the following order: 30, 50, 54, 56, 57, 77, 121, 12, 13, 14, 105, 106.

82

strategy.")

Even if this Court assumes that defense counsel dropped the ball by failing to review Barrera's statement, Umaña's allegations, if proved, would not establish prejudice. Barrera's purported information was as likely to have undermined the credibility of Bautista and Santiago, whom Umaña's attorneys urged the jury to believe, as to undermine the credibility of the witnesses who were in the car with Umaña. (Exh. 1, at 3425.) Moreover, the jury heard that Santiago and Bautista — *eyewitnesses* whose testimony was consistent — had identified someone other than Umaña as the shooter, and the jury still sentenced Umaña to death. No reasonable probability exists that the verdict would have been different if the jury had heard far less reliable, uncorroborated evidence that Barrera had heard from some "homeboys" that Luis Ramos was the shooter.

Nor would Barrera's possession of .22 caliber bullets support a conclusion of deficient performance or a reasonable probability of a different result. (*Cf.* 2255 Mot. 141–42.) Ballistics evidence corroborated other evidence, such as Umaña's confession, that Umaña had participated in both the Lemon Grove and Fairfax Street murders not because shell casings found at both scenes were both .22 caliber. The jury heard evidence that the shell casings recovered from both scenes were fired from the *same gun*. (Exh. 1, at 2818.) Umaña has pointed to nothing that suggests that Barrera was present during either the Lemon Grove or Fairfax Street murders, and his possession of bullets when arrested "for multiple armed robberies," (2255 Mot. 141), does nothing to undercut the

83

evidence against Umaña.

### f. Counsel was not constitutionally compelled to do more to blame the victims of the Fairfax Street shooting.

The jury heard that the victims of the Fairfax Street murders had "flashed gang signs and yelled at the people in the car" before the shooting. (Exh. 1, at 2724.) The jury heard that the victims were the "first ones to throw up gang signs" and that they had made a gesture that meant "fuck MS." (Exh. 1, at 2791, 2803.) The jury heard that officers recovered a knife from the victims. (Exh. 1, at 2735.) Defense counsel cross examined Detective Parshall about whether Bautista reported seeing a knife. (Exh. 1, at 2758.) And the jury heard that one of the victims had been involved in a knife fight in a similar location. (Exh. 1, at 2760.)

Nothing in the affidavits of counsel or elsewhere indicates that counsel did not fully consider all relevant information about the victims and make reasonable decisions about how to utilize it. (*Compare* 2255 Mot. 140–41 *with* Bryson Aff.; Foster Aff.) Counsel could not realistically have done more to convince the jury that Umaña's conduct was "akin to an act of — self defense" because Umaña did not perceive the victims as "threaten[ing] to actually kill the suspects in the car as they ran to them with a knife." (2255 Mot. 140–141.) Umaña admitted that he did *not* see a weapon on the victims. (Exh. 1, at 2752). The facts Umaña has alleged do not overcome the strong presumption that his counsel pursued a reasonable strategy. Nor do they establish a reasonable probability that the

84

result would have been different had counsel placed more emphasis on fault by the victims.

### g. Counsel objected to Rene Arevalo's statement about the Lemon Grove murder.

Umaña's allegation that his trial counsel failed to object to hearsay evidence from Rene Arevalo implicating Umaña in the Lemon Grove murder (*cf.* 2255 Mot. 142–44) is contradicted by the record. Umaña's trial counsel unsuccessfully moved to preclude the United States from introducing hearsay evidence about his participation in the Lemon Grove murder. (Exh. 1, at 3222–32.) Detective Small then testified that Arevalo had said, during an interview, that Umaña was the "Lemon Grove shooter." (Exh. 1, at 2671.) On direct appeal, the Fourth Circuit explicitly rejected Umaña's argument that the Court should have excluded this hearsay statement by Arevalo. *Umaña*, 750 F.3d at 349. The Fourth Circuit applied the standard of review applicable to preserved errors — "abuse of discretion." *Id.* at 348. Nothing in the opinion suggests that Umaña's trial counsel failed properly to challenge the admission of Arevalo's statement about the Lemon Grove murders. (*See id.* at 348–49.)

### h. Umaña's attorneys effectively cross examined the detectives who interviewed participants in the Fairfax street murders.

Umaña does not allege facts about his trial attorney's cross-examination of detectives who interviewed Luis Rivera, Luis Ramos, and Rene Arevalo about the Fairfax Street murders (2255 Mot. 144–49) that, if proved, would establish

85

deficient performance.  On cross-examination, detectives admitted that all three individuals changed their stories in response to questions or tactics by police. (Exh. 1, at 2761–63, 2765, 2768–69, 2789, 2799.)  Detective Parshall admitted, among other things, that he believed "Mr. Rivera lied," that Rivera was evasive, that Rivera was an MS-13 gang member, that Rivera's statements were "largely self-serving," and that Rivera had given "false information" to police officers on other occasions.   (Exh. 1, at 2761–63, 2765.)  Detective Parshall also admitted that Ramos had initially denied knowing Umaña or "anything about the Fairfax Avenue murders." (Exh. 1, at 2765.)

The jury heard that Ramos and Rivera got together and discussed "a plan to tell the police a story." (Exh 1., at 2766–67, 2769–70.)  After that meeting, Rivera changed his story, and Ramos gave his story.  (Exh. 1, at  2766–67, 2768–70.)  Detective Telis admitted that Arevalo had denied being a member of MS-13 and any involvement in the Fairfax Street murders until Telis "confronted" Arevalo with what he knew from other sources.  (Exh. 1, at 2789, 2799.)  Arevalo talked only after Ramos and Rivera had given their statements.  (Exh. 1, at 2801.)  Counsel also established on cross-examination that, of the five people who were in the car during the Fairfax Street murders, Umaña was the only one that police had been unable to locate in Los Angeles.  (Exh. 1, at 2801.)

After laying the foundation during cross-examination, counsel argued to the jury that these "other gang members" had gotten together to "cook up their story" that Umaña — the one individual whom police could not find — was the

86

shooter.  (Exh. 1 at 3425.)  This strategy was entirely reasonable.  And the facts Umaña has alleged would not establish prejudice in any event.  Contrary to what Umaña's 2255 motion suggests, (2255 Mot. 144), the transcripts of Ramos's and Arevalo's statements *were* before the jury.  (Exh. 1, at 4061–4257.)  Yet the jury still sentenced Umaña to death.

### i. The Constitution did not compel counsel to raise a meritless challenge to police statements in interview transcripts as improper vouching.

The decision in Umaña's appeal is dispositive of Umaña's argument that counsel was deficient for failing to object to statements he characterizes as "impermissible vouching" by police in transcripts of interviews with Rene Arevalo and Luis Rivera.  (2255 Mot. 149–52.)  The Fourth Circuit found "no error" in the admission of these transcripts.  *Umaña*, 750 F.3d 320, 350 (4th Cir. 2014).  And it held that a "reasonable jury would not take the detectives' comments during the interviews as vouching."  *Id.*  The facts Umaña alleges, therefore, do not establish deficient performance or prejudice.  "[A]n attorney is not ineffective for failing to raise meritless . . . theories."  *Carrasco v. United States*, No. 3:13-CR-199-RJC-1, 2016 WL 6023539, at *4 (W.D.N.C. Oct. 13, 2016) (citing *Mason*, 774 F.3d at 830).

### j. The Constitution did not require Umaña's trial attorneys to launch a *Daubert* challenge to the firearms expert called by the United States.

Umaña has not alleged facts that, if proved, would establish that his trial counsel was deficient for not challenging the admissibility of the testimony of William Moore, the firearms expert called by the United States.  (*Cf.* 2255 Mot.

87

152–57.)  Counsel is not required to raise every possible objection.  *Mason*, 774 F.3d at 830.  And expert testimony similar to Moore's has been accepted in the Fourth Circuit and elsewhere for decades.  *See, e.g.*, *Royal v. Taylor*, 188 F.3d 239, 245 (4th Cir. 1999); *Smith v. Smith*, 931 F.2d 242, 244 (4th Cir. 1991); *see also United States v. Hicks*, 389 F.3d 514, 525–26 (5th Cir. 2004).  It was entirely reasonable for Umaña's attorneys to decline to pursue a long-shot challenge to Moore's testimony, which, as Umaña's 2255 motion recognizes, would have required trial counsel to spend already limited time on an extensive, multi-expert *Daubert* hearing.  (*See* 2255 Mot. 154, 156.)  "Attorneys exist to exercise professional judgment, which often involves setting priorities."  *Mason*, 774 F.3d at 830; *Carrasco*, 2016 WL 6023539, at *4.

Nor do the facts Umaña has alleged show prejudice.  Umaña can only speculate about whether this Court would have excluded Moore's testimony after a *Daubert* hearing.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1997) (explaining that the matter is committed to the court's discretion).  And since Umaña's trial, other federal courts have permitted Moore to testify as a firearms expert.  *See, e.g.*, *Coleman v. Foulk*, No. CV 14-00133, 2014 WL 3734535, at *5 (C.D. Cal. July 28, 2014).  Umaña's facts, if proved, would not establish a reasonable probability that this Court would have excluded Moore's testimony or that the jury would have returned a different verdict had it not heard from Moore.

Umaña's allegation that trial counsel ought to have retained their own

88

firearms expert, (2255 Mot. 156–157), also fails establish a prima facie case of ineffective assistance. Umaña has not identified an expert who has evaluated Dr. Moore's work and found that there was "no scientific basis for it" (*id.*), and his speculation as to the availability that *Daubert*-qualified, admissible expert testimony to this effect is not sufficient. *See Derring v. United States*, No. 3:11-CR-179-RJC-DCK, 2015 WL 4611979, at \*6 (W.D.N.C. July 31, 2015), *appeal dismissed*, 634 F. App'x 941 (4th Cir. 2016). Counsel could reasonably have concluded that establishing, as they did on cross-examination, that Moore's analysis was a "subjective decision" made by someone who works full time for the government was sufficient, in the light of the United States' burden of proof. (Exh. 1, at 2820.) Because the jury heard as much and still sentenced Umaña to death, no reasonable probability exists that the result would have been different if the jury had heard from a defense expert.

### k. Counsel was not constitutionally compelled to ask this Court incorrectly to instruct the jury that evidence before it was "presumptively unreliable."

Counsel was not constitutionally deficient for not requesting an instruction that the hearsay evidence admitted by this Court after thorough vetting was "presumptively unreliable." (2255 Mot. 157–59.) That instruction would have misstated the law. As the Fourth Circuit held when affirming this Court's admission of the evidence, "the hearsay testimony" was "sufficiently reliable *to overcome any presumption*" of unreliability. *Umaña*, 750 F.3d at 348 (emphasis added) (citing *Lee v. Illinois*, 476 U.S. 530, 541 (1986)). A failure to make

89

meritless requests does not establish ineffective assistance. *Carrasco*, 2016 WL 6023539, at *4.

> **l.    Umaña's allegations about the effectiveness of his trial attorneys when addressing Umaña's participation in the Los Angeles murders would not establish prejudice in any event.**

Umaña's complaints about his trial counsel's handling of the Los Angeles murders focus exclusively on what counsel ought to have done differently to "undermine" the United States's "allegations that Mr. Umaña was *the shooter*." (2255 Mot. 112 (emphasis added).)  To be sure, the United States introduced substantial evidence that Umaña was a shooter in both the Lemon Grove and Fairfax Street murders.  And, for the reasons explained above, Umaña has not established a prima facie case of a reasonable probability that, but for the decisions made by counsel, the jury would have found Umaña's role to be different.  But even if defense counsel had been able to convince the jury that Umaña did not pull the trigger, the evidence would have remained overwhelming that Umaña substantially participated in both murders, and those murders would have remained only part of the overwhelming aggravating evidence against Umaña.

The jury was not asked to find that Umaña was a shooter in the Lemon Grove murder.  The question before the jury, which it answered affirmatively, was whether Umaña "participated and aided and abetted the killing of Andy Abarca."  (Exh. 1, at 3544, 3553, 3562, 3571.)  The evidence the jury heard of this

90

aggravating factor was strong.  Umaña confessed to accompanying the shooters to the park, aware that they were armed and going to confront a victim.  (Exh. 1, at 2676–77.)  He confessed to listening to the shots fired, while he waited for the shooters in their getaway vehicle, driven by a fellow gang member.  (Exh. 1, at 2676–77.)  And he confessed to picking the shooters up in that car and accompanying them as they escaped from the park.  (Exh. 1, at 2676–77; *see also* 4452–91.)  Umaña was not just along for the ride.  Ample evidence established that Umaña followed the rules of MS-13, which required him to have the back of his cohorts.  (Exh. 1, at 1356, 1863, 1865, 3284, 4306–07.)  Umaña's confession and the evidence corroborating it overwhelmingly established that he participated in and aided and abetted Andy Abarca's murder, whether or not he pulled the trigger of one of the guns that killed him.  *See Rosemond v. United States*, 134 S. Ct. 1240, 1249 (2014) ("[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission.").

Proof that Umaña participated in and aided and abetted the Lemon Grove murder "was sufficient under [this Court's] instructions."  *Strickler*, 527 U.S. at 280, 292; *see also* Garza v. Thaler, No. CA C-10-397, 2012 WL 3249464, at *14 (S.D. Tex. July 12, 2012) ("Given that the prosecutor sought to hold Petitioner accountable for the victim's murder on a theory of accomplice liability, the fact that he was not the person who actually pulled the trigger is irrelevant to the question of guilt.").  And no reasonable probability exists that the jury would

91

have found this aggravating factor inapplicable to Umaña, even if counsel had thoroughly discredited the evidence that Umaña pulled the trigger.

The evidence of Umaña's substantial participation in the Fairfax Street murders was also overwhelming, regardless of whether Umaña pulled the trigger. (Exh. 1, at 2747, 2752–53, 4342–43, 4346, 4377–78.) Umaña admitted that he was armed and planned to confront the victims on Fairfax Street when he saw them flashing neighborhood signs. (Exh. 1, at 4346.) He admitted he saw no weapon, but he got out of the car with his gun and his fellow gang members to confront the victims. (Exh. 1, at 2753, 4348, 4354, 4373–74, 4381–83.) Whether Umaña pulled the trigger himself or served as armed backup for one of his fellow gang members, the evidence overwhelmingly established his participation in the murder of Jose Herrera and Gustavo Porras on Fairfax Street. Although the jury found that Umaña "knowingly, intentionally, and unlawfully killed" these victims, (Exh. 1, at 3544), no reasonable probability exists that the jury would not have held him responsible for their death, even if convinced Umaña did not fire the gun he had with him. *See Rosemond v. United States*, 134 S. Ct. 1240, 1246 (2014) (describing the "centuries-old view of culpability" that "a person may be responsible for a crime that he has not personally carried out if he helps another to complete its commission.").

Even if Umaña were able to establish a prima facie case that counsel somehow unreasonably failed to rebut the United States' evidence that Umaña was a shooter in the Los Angeles murders, his allegations would not, if true,

92

establish prejudice. Umaña's participation in the Los Angeles murders accounts for only one of the six aggravating factors found by the jury. And the jury found those other factors in the light of overwhelming aggravating evidence. *See* section II.B.6, *supra.* Even if Umaña were able to prove all of his allegations with the benefit of discovery, they would fail to establish a reasonable probability that, absent counsel's errors, "the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Decastro v. Branker*, 642 F.3d 442, 450 (4th Cir. 2011) (ellipses omitted) (quoting *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007)).

> **2. Umaña has not made a prima facie case that counsel was deficient in addressing evidence about MS-13 tattoos.**

Umaña next seeks discovery in support of his theory that his trial attorneys were constitutionally deficient for omitting to object to testimony by Alexander Granados and to introduce testimony by Rony Lopez about MS-13 tattoos. (Disc. Br. 48–50; 2255 Mot. 244–51.) Declining to object to Granados's testimony was not objectively unreasonable. Contrary to what Umaña asserts, (2255 Mot. 245) counsel is *not* constitutionally required to raise every possible objection at trial. *Mason*, 774 F.3d at 830. That MS-13 rewarded its members with status symbols for killing was directly relevant to an element of an offense with which Umaña was charged: that Umaña had committed murder "with the purpose of maintaining or enhancing a defendant's or another's relative position" within the enterprise, MS-13. (Exh. 1, at 2484.) Nor was counsel deficient for

93

failing to introduce Rony Lopez's testimony from another trial that, to earn "MS" tattoos, members "have to, one, kill or, as they say, put in work for the gang. Rob people. Just different types of crimes." (Jan. 2010 Trial Tr. 567 (Dkt. No. 1080, 3:02-CR-134).) This evidence was, at best, a double-edged sword, and counsel could reasonably have decided not to introduce further corroboration that Umaña had committed murder or other violent crimes in the past. *See Truesdale*, 142 F.3d at 754.

The facts that Umaña has alleged would not, if proved, establish either deficient performance or prejudice. The jury heard ample evidence that Umaña had killed and participated in violent crimes. *See* Section II.B.6, *supra*. Granados did not purport to tell the jury what, if anything, Umaña personally did to earn his tattoos. And the evidence of Umaña's crimes and in aggravation was exceptionally strong. No reasonable probability exists that the jury would have acquitted Umaña or imposed a sentence less onerous than death if it had not heard Granados's general testimony about "MS" tattoos.

**3.** **Umaña has not made a prima facie case that counsel deficiently investigated and presented evidence about Umaña's "life history."**

Umaña's allegations do not establish a prima facie case of ineffective assistance of counsel related to the investigation and presentation of evidence about Umaña's "life history." (*Cf.* Disc. Br. 50.) Umaña's 2255 motion contains a host of allegations against his attorneys related to their presentation of mitigating evidence. (*See, e.g.*, 2255 Mot. 7–61.) But he seeks discovery in

94

support of only two components of this topic: (1) an allegation that counsel failed to file discovery requests related to "government interviews of Mr. Umaña's family," (Disc. Br. 54 (emphasis added) (citing 2255 Mot. 29)); and (2) an allegation that counsel was deficient for failing to "request a continuance" for purposes of obtaining this evidence from the government, (Disc. Br. 54 (citing 2255 Mot. 258–66). Neither of these allegations establishes a prima facie case of ineffective assistance of counsel.

### a. Umaña has not made a prima facie case of deficient performance of counsel related to information the United States obtained from his mother.

Umaña's allegation that counsel "failed to make a specific request for discovery" of information the United States had obtained from Umaña's mother (2255 Mot. 30), does not establish a prima facie case of deficient performance. As explained above, the United States produced a host of materials related to Umaña's mother. *See* section II.B.4, *supra.* Although he complains that some materials, such as "Appendix 44" to his motion, were not produced until April of 2010, (2255 Mot. 30, citing App'x 44), that document is dated "April 13, 2010," (App'x 44 to 2255 Mot., at 1), indicating that the United States would not have been able to produce it earlier.

Umaña has not identified any specific materials related to Umaña's mother that the United States was required to produce but did not. As explained previously, Umaña has not identified any *Brady* material related to his mother. *See* section II.B.4, *supra.* He has not identified any "documents and objects" the

95

United States failed to disclose that it intended to use during its case-in-chief, that belong to the defendant, or that was material to preparing the defense, "enabl[ing] the defendant significantly to alter the quantum of proof in his favor." *Caro*, 597 F.3d at 619; Fed. R. Crim. P. 16(a)(1)(E). Nothing from Umaña's mother was subject to the Jencks Act, because she was not "a witness called by the United States" who "testified on cross examination." 18 U.S.C. § 3500(b). Nor has Umaña pointed to any statement that was written by his mother, transcribed, or recorded, that was not produced in discovery. 18 U.S.C. § 3500(e).

The Constitution did not compel counsel to file formal requests for discovery that did not exist and to which Umaña was not entitled. *See Mason*, 774 F.3d at 830; *Carrasco*, 2016 WL 6023539, at *4. And because Umaña has failed to identify any material related to his mother that the United States was required to produce but did not, he cannot establish a reasonable probability of a different result had counsel filed formal requests.

Nor has Umaña made a prima facie case that trial counsel unreasonably failed to "search for additional witnesses" to facts or allegations that Umaña's father had involved Umaña in his drug-dealing business, that Umaña had a brother in El Salvador, and that Umaña had been born in 1982 in Guatemala. (*Cf.* 2255 Mot. 31; L. Diaz Aff. ¶ 82.) To the extent that it is true and relevant to *Umaña*'s history, counsel could reasonably have expected *Umaña himself* to know this information. *See Strickland*, 466 U.S. at 691 ("[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what

96

the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether."). And nothing in the affidavits of trial counsel or elsewhere indicates that counsel did not make reasonable decisions about how to follow up on this information after speaking with their client. *Owens v. Guida*, 549 F.3d 399, 411–12 (6th Cir. 2008) ("[A] limited investigation into a defendant's background is reasonable if defense counsel could reasonably have concluded that further investigation would be of little use."); (Exh. 1, at 3903 (describing Umaña's discussions with defense experts about his family, including his brother)). Nor, in the light of the overwhelming evidence against Umaña, *see* Section II.B.6, *supra*, would a different approach to this information establish a reasonable probability of a different verdict.

### b. Umaña has not made a prima facie case that counsel was deficient for omitting to make a fourth request for a continuance.

Counsel for Umaña made three requests for this Court to continue the trial date. In June of 2009, this Court denied a request for a continuance that defense counsel made, in part, based on a need to further "investigate . . . Defendant's life history." (Exh. 1, at 312; Dkt. No. 571 (3:08-CR-134), at 2.) In August, this Court denied another request for a continuance after counsel represented to the Court that, without a continuance, counsel would be unable to travel "to El Salvador to meet with and interview various members of Defendant's family, his friends, teachers, employers" and others. (Exh. 1, at 91, 431–42.) This Court did grant a defense request for a continuance in September of 2009 to permit a pretrial

97

*Atkins* hearing, after the defense disclosed that Umaña received a "full scale IQ score of 66, consistent with mental retardation" in a test administered by a court-appointed neuropsychiatrist. (Exh. 1, at 92, 484.) But this Court stated that it was emphatically "reluctant" to grant that continuance. (Sept. 28, 2009, Status Conf. Hr'g Tr. (Doc. No. 1254, 3:08CR134), at 11.) And the Court stated that, by continuing the trial until April, it had "given counsel for the defendant more than [it] wanted to" and "sufficient time to be ready to go." (*Id.* at 12).

Umaña's allegation that counsel failed to make a fourth request for a continuance to obtain additional "evidence from Mr. Umaña's childhood" in advance of the *Atkins* hearing, (2255 Mot. 260–61), does not make a prima facie case of deficient performance of counsel. First, counsel *did* "request" that this Court move the *Atkins* hearing "farther back" from November 30, 2009, (Sept. 28, 2009, Status Conf. Hr'g Tr. (Doc. No. 1254, 3:08CR134), at 11.) This Court rejected that request. (Exh. 1, at 93–94.) Second, counsel reasonably believed that this Court was not likely to grant another continuance, (*see* Foster Aff. ¶ 5; Bryson Aff. ¶ 6), and was not deficient for failing to make a long-shot request. *Mason*, 774 F.3d at 830. Third, Umaña's allegations do not establish prejudice because no reasonable probability exists that this Court would have granted a request for a continuance.

Nor do Umaña's allegations establish a reasonable probability that a continuance would have affected the outcome of the *Atkins* hearing. Although one attorney recalls harboring a general desire for "more time to prepare"

98

(Bryson Aff. ¶ 6), he does not identify anything that he would have done differently at the *Atkins* hearing if counsel had received a continuance, (Bryson Aff. ¶ 6.)  Indeed, Dr. Olley, who traveled to El Salvador and thoroughly investigated Umaña's background, (Exh. 1, at 557–96), testified before this Court that the information he had gathered by the time of the hearing was "enough . . . to make an assessment for Alejandro Umaña on the question of mental retardation."  (Exh. 1, at 596.)

Umaña's allegation that counsel "would have been able to speak to Mr. Umaña's mother" if they had obtained a continuance of the trial date, (2255 Mot. 262–65), also fails to make a prima facie case of deficient performance.  This Court had previously rejected *multiple* requests for continuances based on a need to further investigate Umaña's life history in El Salvador, and counsel's judgment that this Court would be unlikely to entertain a fourth request was entirely reasonable.  (*See* Foster Aff. ¶ 5; Bryson Aff. ¶ 6.)  Moreover, counsel explains that the reason that they did not "attempt an interview with the mother" was because they were focused on other work "in preparation for trial."  (Bryson Aff. ¶ 2.)

Counsel's decision to focus their limited time and resources on other matters was reasonable because Umaña had told his defense team that his mother had not been "in his life at all" from the time that he was seven months to one year old.  (Exh. 1, at 3090.)  Umaña's mother had told prosecutors that she kept up with Umaña "through family members" and newspaper articles.  (App'x

99

74 to 2255 Mot.)  Umaña's mother would not have been an impartial witness, and information she had about all but Umaña's earliest moments was not based on personal knowledge.  Counsel's decision to focus on other matters instead of a long-shot effort to obtain a continuance to interview Umaña's mother reflected a prudent effort to set priorities.  *See Van Hook*, 558 U.S. at 11.

Nor has Umaña made a prima facie case of prejudice.  No reasonable probability exists that this Court would have granted a fourth request for a continuance.  And Umaña's mother's affidavit confirms what Umaña and his father said — she was separated from Umaña when he was months old.  (Exh. 1, at 3090; L. Diaz Aff. ¶ 61.)  That affidavit does nothing to undermine what she told prosecutors, that her knowledge of Umaña was based on hearsay and newspaper articles.  (App'x 74 to 2255 Mot.)  A reasonable jury would view a defendant's mother as biased in his favor.  And Umaña's mother would have been able to provide the jury with only a small amount of reliable first-hand information.  No reasonable probability exists that the jury would have declined to sentence Umaña to death if Umaña's attorneys had interviewed his mother.

### 4. Umaña has not made a prima facie case that trial counsel deficiently sought to use his mental health as a defense.

Umaña allegations do not make a prima facie case that "trial counsel's mental health presentation at the penalty phase proceedings" (Disc. Br. 56) was constitutionally deficient.  Umaña seeks discovery in support of allegations in his 2255 motion that counsel was deficient in failing to investigate and present

100

evidence of childhood "trauma" that Umaña allegedly suffered. (Disc. Br. 56 (citing "Claim II"; 2255 Mot. 69–77).) And he seeks discovery in support of allegations that the performance of his attorneys was deficient during Umaña's *Atkins* hearing. (*Id.* (citing "Claim III.")) Neither set of allegations establishes a prima facie case of ineffective assistance of counsel.

### a. Umaña has not made a prima facie case that counsel's investigation and trial presentation related to childhood trauma was constitutionally deficient.

Counsel has not made a prima facie case that his attorneys performed deficiently when investigating and presenting evidence of childhood trauma purportedly suffered by Umaña. (*Cf.* 2255 Mot. 69–77.) The jury heard a detailed history of Umaña's youth, including details about horrors he witnessed during the Salvadorian civil war and difficulties he faced at home. (Exh. 1, at 3085–3142). His attorneys could reasonably have concluded that their time and resources were better spent elsewhere than with a neighbor who had never heard anyone call Umaña to eat or a cousin who recalled hunting for food with Umaña. (Exh. 1, at 72.)

Trial counsel says that he learned, presumably from postconviction counsel, that Umaña was "cared by [*sic*] a terrorizing father" (Bryson Aff. ¶ 2), but admits that he "did not have this information" at trial (Bryson Aff. ¶ 2). Counsel does not state that his defense team did not take reasonable steps to seek evidence of abuse. And any omission to dig for evidence of abuse was objectively reasonable when viewed from counsel's "perspective at the time."

*Strickland*, 466 U.S. at 689.  In September 2009, Umaña "denied *any* history of physical . . . abuse during his childhood upbringing."  (Exh. 1, at 4032 (emphasis added); *see also* Exh. 1, at 832.)  In the light of Umaña's own statements, it would have been entirely reasonable for counsel to limit any investigation into childhood abuse.  *See Strickland*, 466 U.S. at 691 ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless . . . counsel's failure to pursue those investigations may not later be challenged as unreasonable.").

Nor was counsel deficient for omitting to call an "expert on trauma" as a witness.  (Cf. 2255 Mot. 74–75.)  Umaña offers nothing but pure speculation that a properly qualified expert would have provided reliable testimony that traumatic experiences suffered by Umaña had a "deleterious impact" on his "neurobiological and psychological development."  (2255 Mot. 75); *Derring*, 2015 WL 4611979, at *9 (speculation about availability of qualified expert testimony insufficient).  And the jury *did* hear expert testimony, from a neuropsychiatrist, that "abuse, malnutrition, poor treatment" and the "terrible life" that Umaña had can "result in impaired brain functioning."  (Exh. 1, at 3297, 3325.)  The jury also heard from other experts who opined that Umaña's history placed him at risk for a violent adulthood.  The facts alleged do not show that counsel's choice of experts was unreasonable.  (Exh. 1, at 3186–88, 3205, 3257–63.)

Counsel has failed to allege facts that, if true, would establish prejudice from his trial attorney's approach to evidence about childhood "trauma."

102

Umaña's statement denying any abuse would have rebutted contrary evidence from other sources.  (Exh. 1, at 832.)  And the jury heard that Umaña, among many other things, set a goal of promoting ten of the bloodiest murders Charlotte has ever seen, murdered two people in a crowded family restaurant, lamented not killing a third person, threatened a witness's family while in court, and sought to bring a four-inch knife into the courtroom.  *See* Section II.B.6, *supra*.  Umaña's theory that the handful of specific pieces of evidence that Umaña alleges his attorneys ought to have pursued would have caused the jury to "regard[] differently" Umaña's "actions which appear threatening in nature," (Disc. Br. 57), is fanciful.

Contrary to what Umaña's discovery brief suggests, any change in counsel's approach to this "trauma" evidence would have had little to no bearing on "the pretrial *Atkins* hearing."  (Disc. Br. 56.)  Dr. Olley, the defense expert, testified unequivocally that he had been "able to gather enough information in this case to make an assessment for Alejandro Umaña on the question of mental retardation."  (Exh. 1, at 596.)  He states that the information uncovered by postconviction attorneys is "consistent with the information [he] learned in 2009" and "complementary to [his] 2009 report and testimony."  (App'x 28 to 2255 Mot. ("Olley Aff.") ¶¶ 16, 18.)  And Dr. Olley testified that the definition of mental retardation did not "require that a cause be identified."  (Exh. 1, at 537).  So evidence that any "impaired functioning," (Exh. 1, at 537), resulted from "trauma" or some other cause would have had little bearing on the outcome of the

103

*Atkins* hearing in any event.

### b. Trial counsel was not constitutionally deficient for omitting to utilize more anecdotal evidence of poor academic performance as a child.

Umaña's allegations that trial counsel omitted to introduce at the *Atkins* hearing and prepare his experts with anecdotal evidence that Umaña "struggled with basic academic skills" as a child, (2255 Mot. 97–100), does not establish a prima facie case of deficient performance. Dr. Olley traveled to El Salvador and obtained evidence of Umaña's academic difficulties from an impartial and more reliable source: a school official who described Umaña's academic records. (Exh. 1, at 3906–07.) This evidence established that Umaña's "grades were poor from the beginning of school." (Exh. 1, at 3907.) Umaña repeated third grade, and ultimately did not complete it. (Exh. 1, at 3907.) The evidence that informed Dr. Olley's testimony included that Umaña failed to pass a "remedial curriculum" that "included basic sight words, combining words into simple sentences, writing one's name, and simple addition." (Exh. 1, at 3907.) The anecdotal evidence that Umaña contends his attorneys ought to have introduced is largely cumulative of this more objective evidence (2255 Mot. 97–100), and counsel was not unreasonable for focusing on school records instead of the observations of others. *Rhode*, 582 F.3d at 1287.

Nor do Umaña's allegations establish that counsel deficiently prepared his expert witnesses with this anecdotal evidence. (2255 Mot. 100–02.) Dr. Olley obtained ample information about Umaña's academic performance after

personally conducting a full investigation in El Salvador.  And he testified that he had sufficient information to assess whether Umaña was mentally retarded.  (Exh. 1, at 596.)  Umaña points to nothing indicating that Dr. Olley or any other expert told counsel he needed more information.  *McHone v. Polk*, 392 F.3d 691, 705 (4th Cir. 2004) (holding that ineffectiveness attributable to a defendant's expert cannot support a claim of ineffective assistance of counsel).  Moreover, Dr. Olley's postconviction affidavit states that the anecdotal information Umaña describes is consistent with and complementary to what he learned in 2009 and included in his report.  (Olley Aff. ¶¶ 16, 17, 23.)

None of Umaña's allegations establish prejudice.  This Court noted the evidence of Umaña's childhood performance, but found that evidence from his later years established that "the defendant progressed from the limitations present in his childhood" and failed to establish that he was "*currently* substantially limited in functional academic skills, such that he needs supports and protections."   (Exh. 1, at 1011–12 (emphasis added).)  No reasonable probability exists that the evidence Umaña describes from Umaña's childhood would have altered this finding, let alone this Court's ultimate conclusion that he is not mentally retarded.  And Dr. Weinstein's "additional" intelligence tests that Umaña says were performed in December of 2009, (2255 Mot. 101–02), offer him no assistance.  This Court resolved the question of Umaña's mental retardation without resolving the dispute about his intellectual functioning.  (Exh. 1, at 1001–02.)

### 5. Umaña's general and conclusory allegation that counsel unreasonably omitted to challenge the constitutionality of this Court's jury-selection plan does not establish a prima facie case.

Umaña asserts that he has "reviewed the Plan" for jury selection in this district and makes a general and conclusory allegation "that there is an underrepresentation of distinct groups, including but not limited to African-Americans, Hispanics/Latinos, and Asians in the grand and petit venires." (2255 Mot. 308.) Umaña does not allege *any* specific facts in support of this conclusion. (2255 Mot. 306–08.) Indeed, he admits that his allegations "are general." (2255 Mot. 308.) He nevertheless alleges that if his attorneys had "raised a challenge to the grand and petit jury venires" he could have established a violation of several amendments to the Constitution. (2255 Mot. 306–08.) And, in support of this claim, Umaña seeks broad discovery that spans more than a decade. (Disc. Br. 63–65.)

Umaña's general and conclusory allegations are insufficient as a matter of law. They are insufficient to establish ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690; *Roane*, 378 F.3d at 400–01; *Pheasant v. United States*, No. 2:06CR25-MR, 2012 WL 3870508, at *9 (W.D.N.C. Sept. 6, 2012) (rejecting ineffective-assistance claim from movant who "offer[ed] only conclusory allegations which fail to show any actual discrimination in the selection of the jury pool."). And they are insufficient to establish good cause for discovery. *Clark*, 202 F.3d at 767 ("Discovery must relate solely to a specifically alleged

106

factual dispute, not to a general allegation."); *Rose*, 2008 WL 2115133, at *1. Umaña's allegations fail to show that counsel had any reason to believe that a venire challenge would be successful. *See Berghuis v. Smith*, 559 U.S. 314, 319 (2010) (describing the "three showings a criminal defendant must make to establish a prima facie violation of the Sixth Amendment's fair-cross-section requirements."); *Mason*, 774 F.3d at 830 (Courts "do not penalize attorneys for failing to bring . . . long-shot contentions."). And counsel points to nothing remotely suggesting that the jury would not have convicted Umaña or sentenced him to death if his trial counsel had launched a venire challenge. *See also Truesdale*, 142 F.3d at 755–56.

6. **Umaña has not made a prima facie case that the Constitution compelled his attorneys to make different objections under *Batson*.**

Umaña concedes that his attorneys "made a *Batson* objection every time the Government used a peremptory strike to dismiss an African American," but he contends that his attorneys' objections were inadequate. (2255 Mot. 308.) Umaña acknowledges that the "Court asked the Government to explain its reasons" for each challenged strike. (2255 Mot. 310.) And he acknowledges that defense counsel "at times contested the factual accuracy of the Government's reasons." (2255 Mot. 310.) Umaña does not identify any of the reasons given by the United States for its strikes. (2255 Mot. 310.) But, he alleges, trial counsel "never claimed that the reasons given were pretext for purposeful discrimination, asked the Court to engage in a comparative analysis of jurors, claimed the

107

Government in general, and this prosecutor in particular, had a pattern of race-based strikes or made any other suggestion that further inquiry was necessary." (2255 Mot. 310.)  Without alleging a single fact suggesting that any of those approaches would have been fruitful, Umaña makes a conclusory assertion that "trial counsel unreasonably waived the *Batson* objections."  (2255 Mot. 310.)

Umaña has not alleged any facts that, if true, would establish that the performance of his attorneys was deficient.  He has failed to overcome the presumption that "trial counsel heard the prosecutor's explanation" and reasonably "determined that it was race neutral and legally unassailable under *Batson*, such that it was unnecessary for him to argue that the prosecutor's explanation was pretextual."  *Dandridge v. Fitzpatrick*, No. 08-CV-0027OT, 2010 WL 3241504, at *5 (W.D.N.Y. Aug. 16, 2010).

Moreover, "*Batson* errors are not presumptively prejudicial when raised in an ineffective assistance of counsel claim," *United States v. King*, 36 F. Supp. 2d 705, 709 (E.D. Va. 1999); *Purvis v. Crosby*, 451 F.3d 734, 743 (11th Cir. 2006), and the facts Umaña alleges do not establish prejudice.  (*Cf.* 2255 Mot. 310–11.) None of the facts he alleges show that any *Batson* claim would have been meritorious, and he therefore cannot show a "reasonable probability of success." *Sneed v. Fla. Dep't Corrs.*, 496 F. App'x 20, 25 (11th Cir. 2012).

> **7. Umaña was not deprived of a constitutional right to the effective assistance of counsel during the Department of Justice's death penalty authorization procedure.**

Umaña has not established good cause for discovery in support of his

108

theory that he was denied a constitutional right to the effective assistance of counsel during the Department of Justice's death-penalty authorization procedure.  (2255 Mot. 345–48; Disc. Br. 70–73.)  "There is no Sixth Amendment right to counsel in connection with the Department of Justice's capital authorization procedure."  *Bolden v. United States*, 171 F. Supp. 3d 891, 911 (E.D. Mo. 2016); *United States v. Caro*, 102 F. Supp. 3d 813, 831–32 (W.D. Va. 2015); *United States v. Furrow*, 100 F. Supp. 2d 1170, 1177 (C.D. Cal. 2000); *United States v. Boyd*, 931 F. Supp. 968, 973 (D.R.I. 1996).  Because Umaña had no constitutional right to *any* counsel during this presentation, he was not denied a constitutional right to the effective assistance of counsel.  *See Caro*, 102 F. Supp. 3d at 832.  He is therefore not entitled to discovery.  *Barnette*, 2014 WL 234817, at *2 ("[G]ood cause does not exist if a defendant premises a discovery request on a claim that fails as a matter of law.").

Even if Umaña had a constitutional right to counsel during the Department's authorization procedure, the facts Umaña alleged would fail to establish deficient performance.  Umaña alleges that his attorneys were given an opportunity to convince the Department not to seek the death penalty a month after they were appointed.  (2255 Mot. at 345.)  They "beseeched" prosecutors to give them more time to investigate "Umaña's apparent mental health issues and the mitigating circumstances of his childhood in war-torn El Salvador," but that request was denied.  (*Id.*)  Counsel quickly "sought funds from the Court to hire a mitigation specialist and psychologist" in time for the "mitigation consultation,"

109

but the Court did not rule on the request in time. (*Id.* at 346.) So counsel attended the meeting scheduled by the United States and presented the information that counsel had. (*Id.* at 347.)

Counsel's efforts to persuade the United States to postpone its meeting with counsel and to request investigative resources were unsuccessful, but entirely reasonable. Counsel's complaint that his attorneys failed to request a continuance is misplaced because this Court does not have control over when the Department of Justice holds meetings. (*Cf.* Br. of Appellant 347.) And counsel did what he was supposed to do when requesting funds. (*Cf. id.*) This Court's fee determinations ordinarily are not appealable. *See United States v. Bloomer*, 150 F.3d 146, 148–49 (2d Cir. 1998). To the extent the Fourth Circuit had authority to review any denial of funds by this Court, counsel's request for those funds was sufficient to preserve appellate review. *See United States v. Smith*, 987 F.2d 888, 890 (2d Cir. 1993).

Moreover, Umaña offers nothing but pure speculation that he suffered prejudice from the performance of counsel during the capital authorization procedure. (2255 Mot. 348.) This speculation is insufficient to establish prejudice. And it is insufficient to establish good cause to cast about among two decades' worth of internal Department of Justice documents (*see* Disc. Br. 72–73), fishing for evidence of prejudice. *Murphy*, 205 F.3d at 813–14; *Ozmint*, 339 F.3d at 201.

110

### 8. Umaña has not made a prima facie case that counsel was deficient in communicating with Umaña or failing to object to interpreters in the Courtroom.

Umaña has not made a prima facie case that counsel was deficient in a way related to Umaña's ability to communicate with counsel or understand the language used during the proceedings. Umaña contends that he speaks Spanish with a dialect, that he is uneducated, and that he suffers from headaches. (2255 Mot. 320). And he contends that "[t]he record does not show" that "measures were taken to ensure that Umaña could communicate with counsel." (*Id.*) Although he concedes that multiple interpreters were in the courtroom, he asserts "nothing indicates that Mr. Umaña could hear and understand the courtroom interpreter." (*Id.* at 2255.)

Umaña has not alleged facts that, if true, would establish that his attorneys performed deficiently in any way. His argument about what the record does *not* show ignores that the burden of proof rests with *Umaña. Strickland*, 466 U.S. at 694. Although he was present at the trial and he has obtained affidavits from both of his attorneys, he has not identified any part of the trial that he was unable to understand or any specific inability to communicate with his attorneys. He has not identified any constitutional error related to interpreters. And he has not identified any specific objection that his attorneys had grounds to make. (*See* 2255 Mot. 319–21.) He has therefore failed to make a prima facie case of deficient performance or prejudice.

111

**E.** **Umaña is not entitled to discovery in support of his theories of intellectual disability, juror misconduct, excessive security measures, selective prosecution, or a violation of the Vienna Convention.**

Umaña also seeks discovery in support of five additional claims. He contends that this Court erroneously determined that he does not have an intellectual disability. (2255 Mot. 102–10; Disc. Br. 56–57.) He contends that "misconduct related to the jury" warrants relief. (2255 Mot. 275–298; Disc. Br. 61–63.) He contends that the security measures employed by this Court deprived him of a fair trial. (*Cf.* 2255 Mot. 321–23; Disc. Br. 68–69.) He contends that the decision to seek the death penalty against him was unconstitutionally based on race and geography. (2255 Mot. 351–53; Disc. Br. 69–70.) And he contends that he was denied a right to consular notification under the Vienna Convention. (2255 Mot. 354–55; Disc. Br. 77.)

Umaña has not alleged facts that, if true, would entitle him to relief on any of his remaining claims. His claims are barred by his failure to raise them on direct review, or, in the case of his intellectual-disability claim, because it was already decided against him. His claims are legally insufficient on their face. And many of the errors he alleges would be harmless, even if proved.

**1.** **Umaña cannot overcome his procedural default, and many of the errors he alleges would be harmless.**

Umaña's remaining claims have features in common. All of them either were or should have been raised during his criminal case and on direct appeal. And many of them would be harmless, even if they were not barred by Umaña's

112

procedural default or legally deficient.

### a. Umaña's claims are barred by his procedural default.

Umaña's remaining claims either were or ought to have been raised during his criminal case and on direct appeal. "Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994)). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Id.* (citations omitted). Umaña's "failure to even attempt to identify cause or prejudice or claim actual innocence is fatal" to his ability to overcome his procedural default. *Derring*, 2015 WL 4611979, at *9. But Umaña could not establish cause, prejudice, or actual innocence in any event.

Umaña cannot establish cause and prejudice to overcome his procedural default. "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010). None of Umaña's theories are novel. And although he has included conclusory allegations of deficiency by his *trial attorneys* among his claims, (*see, e.g.*, 2255 Mot. 321, 323, 355), these allegations would offer Umaña no assistance, even if they were not conclusory. Umaña was required to raise his claims at trial *and on appeal*. *Murray v. Carrier*, 477 U.S. 478, 491 (1986). And he does not

allege that his appellate attorneys were constitutionally deficient.  To establish prejudice, Umaña must show that the errors he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 171 (1982).  He cannot meet this standard.  He cannot show that he would have prevailed on any of these theories if he had raised them.  And he cannot show that he suffered actual prejudice from a handful of particular jurors who were seated, from the security measures employed by the court, or from any lack of consular notification.

Nor can Umaña establish actual innocence.  None of the errors he alleges plausibly "resulted in the conviction of one who is actually innocent."  *Bousley*, 523 U.S. 614, 624.  That standard "means factual innocence, not mere legal insufficiency."  (*Id.*)  The only other way for Umaña to overcome his procedural default would be to prove, through "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [Umaña] eligible for the death penalty."  *Prieto v. Zook*, 791 F.3d 465, 469 (4th Cir. 2015).  This "extremely high bar" is "'more stringent' than the standard for establishing 'actual innocence' of the conviction itself."  *Id.* at 470 & n.3.  The jury found Umaña *eligible* for the death penalty based on his age, state of mind, the grave risk of death he caused to others during his Greensboro murders, and the fact that he killed more than one person in a single criminal episode.  *Umaña*, 750 F.3d at 333.  The only error he alleges that could plausibly relate to this standard is his request for this court to relitigate his intellectual-disability argument.

114

And, as explained below, that alleged error would not even approach this extremely high bar.

Umaña's procedural default is fatal to his claims and his request for discovery. *Royal v. Taylor*, 188 F.3d 239, 249 (4th Cir. 1999) (upholding denial of discovery for procedurally defaulted claims). "[G]ood cause does not exist if a defendant premises a discovery request on a claim that fails as a matter of law." *Barnette*, 2014 WL 234817, at *2.

### b. Many of the errors Umaña alleges would be harmless, if not barred by his procedural default.

If Umaña were able to overcome his procedural default and the numerous other legal defects in his theories, many of the errors he alleges would be harmless. When considered on collateral review, an error in a criminal case "is harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 114 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)). The Fourth Circuit has made clear that the same standard applies to habeas petitions and motions under section 2255. *United States v. Smith*, 723 F.3d 510, 511 (4th Cir. 2013).

### 2. This Court already properly decided that Umaña is not a person with an "intellectual disability."

This Court already decided that Umaña is *not* "a person with intellectual[] disability," (2255 Mot. 102–10; Disc. Br. 56–57), when it found that he was not "mentally retarded," (exh. 1, at 998.) "[M]ental retardation" and "intellectual disability" are different terms for an "identical phenomenon." *Hall v. Florida*,

115

134 S. Ct. 1986, 1990 (2014).  Umaña challenged this Court's finding on appeal and made the same kinds of arguments that appear in his 2255 motion.  (*See* 2255 Mot. 106–110 (arguing that this Court erroneously "focused its previous analysis on what it perceived to be Mr. Umaña's strengths, rather than deficits, and based it on Mr. Umaña's self-reports and the testimony of correctional officers.")).  Before the Fourth Circuit, Umaña challenged, among other things, this Court's focus on "[s]trengths in certain areas" and "reliance on self-reporting and observations by correctional officers."  *Br. of Appellant* 146–47, *United States v. Umaña*, No. 10-6 (4th Cir. filed Sept. 3, 2013).  The Fourth Circuit rejected Umaña's argument.  *Umaña*, 750 F.3d 320, 358–59 (4th Cir. 2014).

This Court's prior finding is dispositive.  A prisoner may not relitigate in a motion under Section 2255 issues previously raised at trial or on direct appeal. *See Kaufman v. United States*, 394 U.S. 217, 227 n.8 (1969); *United States v. Roane*, 378 F.3d 382, 396 n.7 (4th Cir. 2004) (citing *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)).  The Fourth Circuit has suggested that an exception to this relitigation bar exists if a subsequent "change in the law . . . warrants . . . reconsideration."  *Roane*, 378 F.3d at 396 n.7.  But *Hall*, which was decided shortly after Umaña's appeal, did not change the law in a way material to this Court's mental-retardation determination.  (*Cf.* 2255 Mot. 105.) *Hall* held only that the Constitution forbids states from enacting a "rigid rule" that, if "a prisoner is deemed to have an IQ above 70, all further exploration of intellectual disability is foreclosed."  134 S. Ct. 1986.

116

*Hall*'s holding is not a "material change in the law" that would "warrant relitigation" of this Court's mental-retardation finding "in a motion under 28 U.S.C. § 2255." *Carrasco*, 2016 WL 6023593, at \*5. This Court did not apply a "rigid rule" based on Umaña's intelligence test scores or make its decision inconsistently with *Hall*'s holding. To the contrary, *Hall* reaffirmed the use of the three criteria upon which this Court relied in determining that Umaña had not established mental retardation. *Hall*, 134 S. Ct. at 1994.

Moreover, if *Hall* had changed the law in a way material to Umaña's mental-retardation claim, Umaña's procedural default would preclude its application to Umaña on collateral review. *See Prieto* 791 F.3d at 472–73 (holding a *Hall* claim barred by procedural default). Umaña cannot establish cause and prejudice to overcome that default. His trial counsel was not deficient for failing to anticipate *Hall*; "[c]lairvoyance is not a required attribute of effective representation." *United States v. Fields*, 565 F.3d 290, 295 (5th Cir. 2009). And Umaña does not contend that his appellate attorneys were constitutionally deficient. Umaña does not contend, nor would his allegations, if proved, establish by "clear and convincing evidence" that no reasonable decisionmaker could have found him eligible for the death penalty under the standards of *Atkins* and *Hall*. *Prieto*, 791 F.3d at 469. Indeed, the Fourth Circuit recently held that a defendant from El Salvador with a history of "poor adaptive functioning" remarkably similar to the history Umaña proffers for himself did not meet this "extremely high bar." *Id.*

117

Umaña's mental-retardation or intellectual-disability claim fails as a matter of law. And he is not entitled to use it as a basis for seeking discovery.

### 3. Umaña has not made a prima facie case of "misconduct related to the jury."

Umaña is not entitled to discovery in support of his theory of "misconduct related to the jury." (2255 Mot. 275–298; Disc. Br. 61–63.) He contends that jurors gave inaccurate answers during voir dire (2255 Mot. 275–93); that jurors were tainted by bias (*id.* 294); that juror omissions precluded him from making intelligent peremptory challenges (*id.* 295); and that one juror was barred from service by statute (*id.* at 295).

Umaña's juror-misconduct theories fail as a matter of law for three reasons. First, they are barred by Umaña's procedural default. *See* section II.E.1.a, *supra*; *Cleary v. United* States, 144 F. App'x 204, 204 (2d Cir. 2005) (juror-misconduct claim barred by procedural default); *Palmer v. United States*, 46 F. App'x 5, 8 (1st Cir. 2002) (juror-bias claim barred by procedural default); *Higgs v. United States*, 711 F. Supp. 2d 479, 553 (D. Md. 2010) (holding numerous juror-misconduct claims barred by procedural default, in federal death-penalty case), *aff'd*, 663 F.3d 726 (4th Cir. 2011). Second, none of his theories would entitle him to relief, even if Umaña proved the facts he alleges. Finally, Umaña has not alleged facts establishing that he suffered prejudice from any alleged juror misconduct.

118

### a. Umaña has not made a prima facie case for relief based on allegedly inaccurate answers by jurors during voir dire.

Umaña has not made a prima facie case for relief based on inaccurate answers by jurors to questions posed during voir dire. (Cf. 2255 Mot. 275–93; Disc. Br. 61–63.) Umaña accuses four jurors, ███████████████████, of giving inaccurate answers. (2255 Mot. 275–98). To obtain relief based on "juror deceit during voir dire or on jury questionnaires," Umaña "must first demonstrate that a juror failed to answer honestly a material question and then further show that a correct response would have provided a valid basis for a challenge for cause." *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) (quoting *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). "[T]he test applies equally to deliberate concealment and to innocent non-disclosure." *Id.* This Court would have been required to excuse jurors for cause "only 'where a per se rule of disqualification applie[d]'" or where declining to do so would "demonstrate[] a clear disregard for the actual bias" of the juror. *Umaña*, 750 F.3d at 338 (quoting *United States v. Fulks*, 454 F.3d 410, 432 (2006). The facts Umaña alleges, if proved, would not meet this test.

### i. Umaña has not established a prima facie case for relief based on Juror ███'s statements.





120



121



122

████████████████████████████

### ii. Umaña has not made a prima facie case for relief based on statements by Jurors ██████████████.

Umaña's allegations against Jurors ███████████, if proved, would not entitle Umaña to relief. The jurors were asked, "Have you or any immediate family or close friend ever been arrested, charged with a crime, or been the subject of an investigation." (2255 Mot. 292.) Umaña's 2255 motion does not say what answers these jurors provided, but nevertheless concludes that those answers were "inaccurate." (*Id.* at 292–93). ███████████████████████████

███████████████████████████████████████████

The information that Umaña alleges about these jurors would not have formed the basis for a challenge for cause. *Jones*, 311 F.3d at 313.███████████

███████████████████████████████████████████

[blacked out] Incorrect disclosure by jurors only warrants relief when it denies a defendant his constitutional "right to an impartial jury." *McDonough*, 464 U.S. at 549. The facts that Umaña has alleged would establish nothing of the kind.

### b. Umaña has not made a prima facie case of juror bias.

Umaña has not made a prima facie case that the jury was tainted by actual or implied bias, irrespectively of the jurors' answers to voir dire questions. (*Cf.* 2255 Mot. 294.) The information that Umaña alleges "does not give rise to an inference that the juror[s were] biased against" Umaña. *Jones*, 311 F.3d at 313. [blacked out] "The doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Umaña*, 750 F.3d 320, 341 (4th Cir. 2014). "Implied bias might arise where there is 'a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'" *Id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).

124

Umaña's allegations about █████████████████████████████████ █



### c. Umaña's theory about peremptory challenges is foreclosed by precedent.

The Supreme Court has specifically rejected Umaña's argument that he is entitled to relief because "non-disclosures" by jurors deprived him of the ability to "intelligently exercise his peremptory challenges." (2255 Mot. 295); *McDonough*, 464 U.S. 548, 549, 555–56 (rejecting conclusion that new trial is warranted if failure to disclose information "prejudiced the [party's] right of peremptory challenge"); *Zerka v. Green*, 49 F.3d 1181, 1185 (6th Cir. 1995) ("The Supreme Court in *McDonough* explicitly rejected the argument that a plaintiff who is prevented from intelligently utilizing his peremptory challenges is entitled to a new trial, and it counseled against exactly this sort of endless second-guessing."). No amount of discovery would overturn the Supreme Court's decision.

125

### d. Umaña's contention that ███████ was statutorily barred from jury service would not entitle him to relief.

Umaña's contention that ███████ was barred from jury service by statute, ████████████████████, offers him no assistance for at least three reasons, in addition to Umaña's procedural default. First, a violation of this statute would not be cognizable under 2255, which embraces only errors that are constitutional, jurisdictional, or "fundamental" and "inherently result[ing] in a miscarriage of justice." *United States v. Foote*, 784 F.3d 931, 936 (4th Cir. 2015). Second, Umaña's counsel was well aware of ████████████████████ ████████████████, and waived any right to invoke the statutory bar by omitting to do so during voir dire. *See United States v. Brazelton*, 557 F.3d 750, 755 (7th Cir. 2009). Third, Juror ████████████████████ ██████ would not be an "extraneous," let alone "improper," matter before the jury, (2255 Mot. 296–97). *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (The "general body of experiences that jurors are understood to bring with them to the jury room" is not "extraneous" information).

### e. The juror misconduct Umaña alleges would be harmless.

Umaña would not be entitled to discovery in support of any of his theories of jury misconduct in any event, because, if proved, they would not have had a "substantial and injurious effect of influence in determining the jury's verdict." *Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998) (quoting *Brecht*, 507 U.S. at 637–38. The Fourth Circuit has "repeatedly examined instances of juror

126

misconduct and bias for harmlessness" under this standard, including the kinds of allegations raised by Umaña. *Sherman v. Smith*, 89 F.3d 1134, 1138 (4th Cir. 1996). The evidence against Umaña was strong, see Section II.B.6, *supra*, and the jury found him guilty and sentenced him to death unanimously. Even if Umaña could establish that one of the jurors was improperly on the jury, his or her "presence on the jury" would be harmless. *Fitzgerald*, 150 F.3d at 366.

4. **Umaña has not established a prima facie case for relief based on the security measures employed by this court.**

Umaña's challenge to the security measures employed by this Court would fail as a matter of law, even if not barred by Umaña's procedural default. (*Cf.* 2255 Mot. 321–23.) The three measures that Umaña criticizes — treating the jury as anonymous; transporting the jury to the courthouse with the United States Marshal's Service; and permitting a "large law enforcement presence" in the courtroom and surrounding area (2255 Mot. 321) — are not "inherently prejudicial" measures. *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986). A "juror might reasonably draw" inferences from these measures other than the inference that the defendant "is particularly dangerous or culpable." *Id.* For example, jurors may "just as easily believe" that their anonymity, law-enforcement escorts, and police presence exist to guard against problems "emanating from outside the courtroom." *Id.* at 569. Because the measures employed by this Court are not "inherently prejudicial," Umaña's failure to allege any facts establishing "actual prejudice" is dispositive. *Id.* at 572.

127

Even if the security measures challenged by Umaña are "inherently prejudicial," the record establishes that they were "justified by an essential state interest specific to" Umaña's trial.  *Id.* at 568–69.  Umaña attempted to bring this knife into the courthouse on the first day of jury selection:



(Exh. 1, at 2920–21, 2929; Exh. 2, at 34.)  Umaña sought — at times successfully — to have witnesses injured or killed, including the owners of the restaurant where he murdered the Garcia brothers, testifying witnesses, (Exh. 2, at 2), and witnesses whom Umaña successfully frightened, who did not testify.  Umaña's gang required its members to "attack" or "kill" any nonmember who "disrespects" the gang.  (Exh. 1, at 2158.)  Gang members told witnesses, "[i]f you talk to

128

police . . . we're going to kill you." (Exh. 1, at 1865, 1878.) And Umaña and the gang had issued "green lights" —orders to kill — against multiple witnesses who testified. (Exh. 1, at 2120.)

The security risks that Umaña and his cohorts created were nothing short of extraordinary. This Court had broad discretion to "determin[e] what security measures [were] necessary to prevent disruption of the courtroom, harm to those attending the trial, escape of the defendant and the commission of other crimes." *Lopez v. Thurmer*, 573 F.3d 484, 494 (7th Cir. 2009). Umaña's conduct confirms that the measures that this court undertook were not excessive. They did not deter Umaña himself from threatening a witness's family in open court. (Exh. 1, at 2936.) The conduct of Umaña and his cohorts amply justified this Court's security measures. *See Lopez*, 573 F.3d at 494. (upholding trial court's decision to order "jury list sealed and order[] the jury sequestered" where defendant had been accused of murder and participants had discussed 'taking action against witnesses.'"); *see also Holbook*, 475 U.S. 560, 568 (noting that even binding and gagging a defendant may be proper under appropriate circumstances).

Moreover, if the security measures taken by this court were somehow excessive, "they could have overshot the mark only by a small margin." *Lopez*, 573 F.3d at 496. And the evidence against Umaña – including much of what justified the security measures — was strong. Accordingly, even if this Court were to conclude that it had erred with the measures it imposed, and that Umaña's argument is not barred by his procedural default, the error would be

129

harmless.  *See id*; *see also United States v. Fernandez*, 526 F. App'x 270, 277 (4th Cir. 2013) (unpublished) (upholding the use of an anonymous jury in the separate trial of Umaña's codefendants).

> **5. Umaña has not established good cause for discovery in support of his theory that he was selectively prosecuted on the basis of race and geography.**

Umaña has not established good cause for discovery in support of his theory that the Department of Justice exercised its discretion to seek the death penalty against Umaña unconstitutionally.  (*Cf.* 2255 Mot. 351–53; Disc. Br. 69–70.)  He contends that the decision to seek that penalty was based on his race, the race of the victim, and the geographic location where his crime occurred.  (2255 Mot. 351–53.)  In support, he cites general and conclusory allegations about his case and a 2000 study prepared by the Department of Justice, "The Federal Death Penalty System:  A Statistical Survey (1988–2000) (Sept. 12, 2000)."  *Id.* 352.  Even if it were not barred by Umaña's procedural default, this theory would fail as a matter of law.

"To obtain discovery" on this selective-prosecution claim, Umaña must "produce 'some evidence making a credible showing that (1) similarly situated individuals of a different race were not prosecuted; and (2) the decision to prosecute was invidious or in bad faith,'" *Barnette*, 2014 WL 234817, at *7, and Umaña has not.  The United States Supreme Court considered the specific survey cited by Umaña and held that it does not support such a showing.  *United States v. Bass*, 536 U.S. 862, 864 (2002).  Among other things, the survey says nothing

130

"about charges brought against *similarly situated defendants*" to Umaña. *Id.* Nothing in the United States' closing argument, which was thoroughly reviewed on appeal, is evidence of bad faith. (2255 Mot. 352.) And the fact that three individuals convicted in this district reside on death row, compared with zero convicted in the Middle District of North Carolina, says nothing about either of these requirements. *See Barnette*, 2014 WL 234817, at *7 (rejecting request for discovery by capital 2255 movant based on this same theory and same study).

### 6. Umaña has not established good cause for discovery in support of his claim based on the Vienna Convention.

Umaña is not entitled to discovery in support of his claim that the United States "did not notify Mr. Umaña of his rights under the Vienna Convention [and] did not contact the Guatemalan Consulate" (2255 Mot. 354–55; Disc. Br. 77), because that claim, like others, fails as a matter of law for a number of reasons, in addition to Umaña's procedural default. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 360 (2006) (holding that procedural-default rules apply to the Convention). First, "Article 36 of the Vienna Convention," the Article on which Umaña relies, "does not create an individually enforceable right." *Medellin v. Dretke*, 371 F.3d 270, 280 (5th Cir. 2004). Second, if individually enforceable, the Convention does not create a remedy that would relieve Umaña of his convictions or sentence. *See United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) (assuming that the Convention confers individual rights, dismissal of an indictment and suppression of evidence are not appropriate remedies). Third, a claim based on

131

an alleged violation of the Convention would not be cognizable under 28 U.S.C. § 2255 because it would not be a "constitutional" or "jurisdictional" claim or a claim based on "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Foote*, 784 F.3d 931, 936 (4th Cir. 2015); *see also Medellin v. Dretke*, 544 U.S. 660, 664 (2005) (noting that a violation of the Convention's "consular access provisions" may "not be cognizable in a federal habeas proceeding."). Finally, even if Umaña were somehow denied a right of consular notification relevant to his criminal case, the denial would not have had a substantial and injurious effect on the verdict.

### F. Umaña is not entitled to discovery unmoored from the allegations in his 2255 motion.

Umaña is not entitled to discovery based on a postconviction *Brady* obligation or the internal discovery policy adopted by the United States Attorney's Office for the Western District of North Carolina. (*Cf.* Disc. Br. 77–89.) Umaña cannot establish good cause to obtain this kind of discovery, because he does not contend that it is material to a prima facie claim for relief alleged in his 2255 motion. *See* Section II.A., *supra.* Moreover, the United States' constitutional discovery obligation does not extend to postconviction proceedings. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009); *In re Bolin*, 811 F.3d 403, 409 (11th Cir. 2016) ("*Brady* does not apply in the post-conviction context . . . ."); *Watkins v. Rubenstein*, 802 F.3d 637, 642 (4th Cir. 2015). And the Western District of North Carolina's discovery policy does not

132

create any rights enforceable by Umaña. By its terms, it "is for internal WDNC use only and does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, party, or witness in any administrative, civil or criminal matter." (Exh. 5, at 1.) *See United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005) ("Department of Justice guidelines and policies do not create enforceable rights for criminal defendants."); *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001).

**G.      Even if Umaña's 2255 motion contained a prima facie claim for relief, he would not be entitled to the discovery he requests.**

Even if Umaña's 2255 motion contained a prima facie case for relief, his extraordinary number of excessively broad discovery requests would continue to suffer from two fatal defects. Umaña has not complied with the rule requiring specificity. And he has not met his burden to establish that the discovery he seeks is material to what his motion alleges.

**1.      Umaña's requests fail to meet the specificity requirement imposed by the rules.**

Umaña's discovery motion fails to "specify any requested documents," as required by Rule 6. R. Governing 2255 Proceedings 6(b). All but a handful of proposed requests simply demand *all* documents within a broad category. (See Exh. 1, to Disc. Br., at 1–20.) Although they use different formulations — some, for example, seek "all reports, records, files, witness statements, documents, and tangible objects"; some seek "[a]ny communications, documents, recording, or information"; and others just seek "all" or "any" materials in one or another broad

133

class (*id.*) — Umaña's requests fail to "indicate exactly what information" Umaña "seeks to obtain." *Teti*, 507 F.3d at 60. His request to cast about in these broad categories is a request for the kind of "fishing expedition" that the rules prohibit. *See United States v. Wilson*, 901 F.2d 378, 382 (4th Cir. 1990) (upholding denial of discovery requests that were "far too broad and unspecific.").

> **2. Even if Umaña's 2255 motion established a prima facie claim for relief, he has failed to meet his burden to prove that the discovery he seeks is material.**

If this Court were to conclude that Umaña's 2255 motion alleges specific facts that, if true, would entitle him to relief, he would be entitled only to discovery that would help him prove *those facts*. *See Branker*, 570 F.3d at 213; *Clark*, 202 F.3d at 767; *Stanford*, 266 F.3d at 460. Umaña is not entitled to use discovery to "develop a claim" based on other facts that "are hidden" and not alleged in his 2255 motion. *Clark*, 202 F.3d at 767. That kind of request is, again, "a request for an impermissible fishing expedition." *Id.*

Umaña's discovery brief does not meet Umaña's burden to establish that "the information sought is material," *Branker*, 570 F.3d at 198. Umaña's brief consists almost entirely of his requests, listed in bullet-point form, preceded by paragraphs that do nothing to explain how they relate to the essential elements of his claims, let alone the specific factual allegations in Umaña's 2255 motion. (*See*, e.g., Disc. Br. 17–18, 23–24, 27–28, 30–31, 33–34, 37–38, 45, 47, 49, 55, 58, 59–60, 62–63, 64–65, 66–67, 68–69, 70, 72–73, 74–75, 84–89.) This Court is not required to dig for what connections might exist between Umaña's broad

134

discovery requests and the specific facts he alleges.

Even with good cause, "Rule 6 does not authorize fishing expeditions." *Murphy*, 205 F.3d 809, 814 (5th Cir. 2000). The burden to show that each piece of discovery requested would "resolve [a] factual dispute that could entitle him to relief" rests with Umaña, *Stanford*, 266 F.3d at 442. Because Umaña's brief does not meet that burden, this Court should not permit him to conduct any discovery. *See Branker*, 570 F.3d at 21.[11]

## III.  CONCLUSION

The United States respectfully requests that this Court deny Umaña's motion for leave to conduct discovery. The goal of section 2255 proceedings is to correct "real and obvious wrongs." *Rich*, 187 F.3d at 1067. If any such wrongs lurk within the 410 pages of Umaña's 2255 motion, they are not among the theories for which he seeks discovery.

RESPECTFULLY SUBMITTED, this 23rd day of March, 2017.

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

/s/Anthony J. Enright
Assistant United States Attorney

---

[11] Umaña requests a host of materials that are almost certainly privileged, even if they would otherwise be discoverable. (*See, e.g.,* requests No. 106, 110, 131, 132, 133, 134, 136, 141, 142, 145–50, 152–53, 161); *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 569 (5th Cir. 2006) (describing the law-enforcement privilege); *United States v. Frank*, 8 F. Supp. 2d 253, 284 (S.D.N.Y. 1998) (describing the deliberative-process privilege); *United States v. Nguyen*, 928 F. Supp. 1525, 1552 (D. Kan. 1996) (describing the work-product doctrine). The United States reserves the right to assert any privilege that may be appropriate. And, if this Court concludes that Umaña has established good cause for any of the discovery that he requests, the United States respectfully requests an opportunity to file a brief asserting any privilege that may apply to broad categories of materials before providing that discovery.

135

United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)
(704) 344-6629 (fax)
anthony.enright@usdoj.gov

136

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of March, 2017, I caused to be served a copy of the foregoing motion to be served on counsel for Umaña via electronic case filing.

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

137