No. 10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff-Appellee, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) |
|  | ) |
| Defendant-Appellant. | ) |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix
Volume 2 of 11**

VINCENT J. BRUNKOW
ZANDRA L. LOPEZ
JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Attorneys for Defendant-Appellant

-and-

MALCOLM RAY HUNTER, JR.
Attorney at Law
P.O. Box 3018
Chapel Hill, N.C. 27515-3018
Telephone: (919) 929-9655

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

Defendant's Reply to Government's Response to Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence Before Allowing Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . . 1202

      Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

      Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

            By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
            By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne                  Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet        Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette    Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn           Direct Examination . . . . . . . . . 1239

    J.E. Brown                Direct Examination . . . . . . . . . 1243

    Frank Flores            Direct Examination . . . . . . . . . 1247
                              Voir Dire Examination . . . . . . . 1255
                              Redirect Examination . . . . . . . . 1257
                              Cross Examination . . . . . . . . . . 1316

    Charles Barkley         Direct Examination . . . . . . . . . . 1332
                              Cross Examination . . . . . . . . . . 1338

iv

Jeff Bruner                    Direct Examination . . . . . . . . . . 1339

Eduardo Vasquez               Direct Examination . . . . . . . . . . 1344

Lenny Moriera                 Direct Examination . . . . . . . . . . 1352
                              Cross Examination  . . . . . . . . . . 1369

John Sloane                   Direct Examination . . . . . . . . . . 1371
                              Cross Examination  . . . . . . . . . . 1391

Gene Richey                   Direct Examination . . . . . . . . . . 1391

Juan Ruben Vela Garcia        Direct Examination . . . . . . . . . . 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341)  . . . . . . . . . . . . . . . . . . . . . . . . 1485

Juan Ruben Vela Garcia        Direct Examination . . . . . . . . . . 1492
                              Cross Examination  . . . . . . . . . . 1498
                              Redirect Examination  . . . . . . . . 1529

Officer James K. Griffen      Direct Examination . . . . . . . . . . 1530

Ann Hamlin                    Direct Examination . . . . . . . . . . 1537

T.J. Miller                   Direct Examination . . . . . . . . . . 1544
                              Cross Examination  . . . . . . . . . . 1566

Marie Terrell                 Direct Examination . . . . . . . . . . 1570
                              Cross Examination  . . . . . . . . . . 1576

Officer Benjamin Altizer     Direct Examination . . . . . . . . . . 1576
                             Cross Examination  . . . . . . . . . . 1584

Officer Ryan Dutko           Direct Examination . . . . . . . . . . 1586

Abel Santos                  Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos                  Cross Examination  . . . . . . . . . . 1644

Marco Antonio Guzman Mejia   Direct Examination . . . . . . . . . . 1651
                             Cross Examination  . . . . . . . . . . 1663

Teresa Ketner                Direct Examination . . . . . . . . . . 1666
                             Cross Examination  . . . . . . . . . . 1703
                             Redirect Examination  . . . . . . . . 1705

Barry Whitlow                Direct Examination . . . . . . . . . . 1707

John D. Butts                Direct Examination . . . . . . . . . . 1715
                             Cross Examination  . . . . . . . . . . 1733

James Cayton                 Direct Examination . . . . . . . . . . 1735

Amy Wilde                    Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342)  . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde                    Direct Examination . . . . . . . . . . 1765
                             Cross Examination  . . . . . . . . . . 1773

Doreen Huntington            Direct Examination . . . . . . . . . . 1780
                             Cross Examination  . . . . . . . . . . 1797

Susan Conrad                      Direct Examination . . . . . . . . . . 1804
                                  Cross Examination  . . . . . . . . . . 1840

Jeff Strohm                       Direct Examination . . . . . . . . . . 1846
                                  Cross Examination  . . . . . . . . . . 1851

Officer Renee Quiles              Direct Examination . . . . . . . . . . 1851
                                  Cross Examination  . . . . . . . . . . 1856

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1856

**VOLUME 5 (1900 - 2390)**

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1903
                                  Cross Examination  . . . . . . . . . . 1953
                                  Redirect Examination  . . . . . . . . 1987
                                  Recross Examination . . . . . . . . . 1988

William Chuck Hastings            Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings            Direct Examination . . . . . . . . . . 2034
                                  Cross Examination  . . . . . . . . . . 2044

Alexandra Hirsch                  Direct Examination . . . . . . . . . . 2049
                                  Cross Examination  . . . . . . . . . . 2054

Michele Scheuerman                Direct Examination . . . . . . . . . . 2055
                                  Cross Examination  . . . . . . . . . . 2064

Gene Rivera                       Direct Examination . . . . . . . . . . 2065
                                  Cross Examination  . . . . . . . . . . 2086

Andrew Cheramie          Direct Examination . . . . . . . . . . 2090
                         Cross Examination  . . . . . . . . . . 2095

Jose Romero              Direct Examination . . . . . . . . . . 2095

Alexander Granados       Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2133

Alexander Granados       Direct Examination . . . . . . . . . . 2136
                         Cross Examination  . . . . . . . . . . 2138
                         Redirect Examination  . . . . . . . . 2158

Maricruz Medina          Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie        Direct Examination . . . . . . . . . . 2166

Chris Tyndall            Direct Examination . . . . . . . . . . 2173
                         Cross Examination  . . . . . . . . . . 2190

Mark Young               Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson  Direct Examination . . . . . . . . . . 2208
                         Cross Examination  . . . . . . . . . . 2213
                         Redirect Examination  . . . . . . . . 2213
                         Recross Examination . . . . . . . . . 2215

Jeffrey Taylor           Direct Examination . . . . . . . . . . 2216
                         Cross Examination  . . . . . . . . . . 2247
                         Redirect Examination  . . . . . . . . 2254

Denise Daniels           Direct Examination . . . . . . . . . . 2255
                         Cross Examination  . . . . . . . . . . 2257

William Chuck Hastings      Direct Examination . . . . . . . . . . 2259
                           Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

Sergeant Scott Clarkson      Direct Examination . . . . . . . . . . 2323
                           Cross Examination  . . . . . . . . . . 2330

Denise Daniels               Direct Examination . . . . . . . . . 2332
                           Cross Examination  . . . . . . . . . . 2333

Jeffrey Taylor               Direct Examination . . . . . . . . . . 2333
                           Cross Examination  . . . . . . . . . . 2356
                           Redirect Examination  . . . . . . . . 2359

William Chuck Hastings      Direct Examination . . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . . 2391

Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

ix

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . . . . 2540

    Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
    Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
    Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

    Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . . . . 2559

    Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

    Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

    Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

        By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
        By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

        Ismar Sanchez                     Direct Examination . . . . . . . . . . 2574
                                                Cross Examination . . . . . . . . . . 2584
                                                Redirect Examination . . . . . . . . 2590

        David Henderson                  Direct Examination . . . . . . . . . . 2590

Case 3:16-cv-00057-MOC     Document 50-2     Filed 03/23/17     Page 11 of 522

Carlton Phoenix                    Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . 2648

Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

Thomas Small                   Direct Examination . . . . . . . . . . 2651
                               Cross Examination . . . . . . . . . . 2677

Roberto Ramos                  Direct Examination . . . . . . . . . . 2680
                               Cross Examination . . . . . . . . . . 2694

Juan Lara                      Direct Examination . . . . . . . . . . 2699
                               Cross Examination . . . . . . . . . . 2706

Raffi Djabourian               Direct Examination . . . . . . . . . . 2709
                               Cross Examination . . . . . . . . . . 2715

John Maloney                   Direct Examination . . . . . . . . . . 2716
                               Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall               Direct Examination  . . . . . . . . . . 2730
                                      Cross Examination  . . . . . . . . . 2756
                                      Redirect Examination  . . . . . . . . 2781

        Barry Telis                  Direct Examination  . . . . . . . . . . 2784
                                        Cross Examination  . . . . . . . . . . 2798
                                      Redirect Examination  . . . . . . . . 2803

        William Moore            Direct Examination  . . . . . . . . . . 2806
                                      Cross Examination  . . . . . . . . . . 2820
                                      Redirect Examination  . . . . . . . . 2822

        Susan Selser               Direct Examination  . . . . . . . . . . 2822

        J. Sage                    Direct Examination  . . . . . . . . . . 2838
                                        Cross Examination  . . . . . . . . . . 2842

        L. Goodman             Direct Examination  . . . . . . . . . . 2843
                                      Cross Examination  . . . . . . . . . . 2844

        A. Thornwell             Direct Examination  . . . . . . . . . . 2846
                                      Cross Examination  . . . . . . . . . . 2851

## VOLUME 7 (2857 - 3373)

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

Carlos Alfredos
Dominguez Gonzalez        Direct Examination . . . . . . . . . . 2874
                         Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper          Direct Examination . . . . . . . . . 2902
                         Cross Examination  . . . . . . . . . . 2908

Luis Amaro                Direct Examination . . . . . . . . . . 2911
                         Cross Examination  . . . . . . . . . . 2917

Russell Lashley           Direct Examination . . . . . . . . . . 2919
                         Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez  Direct Examination . . . . . . . . . . 2930
                         Cross Examination  . . . . . . . . . . 2931
                         Redirect Examination  . . . . . . . . 2935
                         Recross Examination . . . . . . . . 2936

Douglas Friend            Direct Examination . . . . . . . . . . 2938
                         Cross Examination  . . . . . . . . . . 2944

Jean Garcia               Direct Examination . . . . . . . . . . 2946
                         Cross Examination  . . . . . . . . . . 2952

Carmen Garcia             Direct Examination . . . . . . . . . . 2953
                         Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia          Direct Examination . . . . . . . . . . 2959
                         Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . 2975

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham                    Direct Examination . . . . . . . . . . 2986
                                   Cross Examination  . . . . . . . . . . 3050

Richard McGough                    Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260)  . . . . . . . . . . . . . . . . . . . . . . . . 3096

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

        Richard McGough            Direct Examination . . . . . . . . . . 3099
                                   Cross Examination  . . . . . . . . . . 3157

        Selena Sermeno             Direct Examination . . . . . . . . . . 3167
                                   Cross Examination  . . . . . . . . . . 3189
                                   Redirect Examination  . . . . . . . . 3203

        Maria Santacruz Geralt     Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350)  . . . . . . . . . . . . . . . . . . . . . . . . 3234

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

        Maria Santacruz Geralt     Voir Dire Exam. by Defendant  . . . 3237
                                   Voir Dire Exam. by Government . . 3250
                                   Direct Examination . . . . . . . . . . . . 3256
                                   Cross Examination . . . . . . . . . . . . 3263

        Mark Bezy                  Direct Examination . . . . . . . . . . . . 3276
                                   Cross Examination . . . . . . . . . . . . 3289

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 15 of 522

James R. Merikangas,
Ph.D.                        Direct Examination . . . . . . . . . . . . 3294
                             Cross Examination  . . . . . . . . . . . . 3317

        Government's Rebuttal Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

        Helen Mayberg              Direct Examination . . . . . . . . . . . . 3336
                                   Cross Examination  . . . . . . . . . . . . 3358

## VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . . . 3374

        Defendant's Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

                Richard McGough        Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

## VOLUME 9 (3705 - 4209)

## EXHIBITS

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3,  School Records . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

xvi

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home  . . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael  . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia  . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D.  . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana  . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana  . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez  . . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez  . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification  . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation  . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting  . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana  . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique  . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana  . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana  . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| v. | ) | DEFENDANT'S  RENEWED MOTION |
| | ) | TO CONTINUE TRIAL OR TO |
| ALEJANDRO ENRIQUE | ) | ALTERNATIVELY STRIKE THE |
| RAMIREZ UMANA | ) | DEATH PENALTY |

_____

NOW COMES Defendant ALEJANDRO UMANA, by and through undersigned counsel, and hereby moves this court to continue the trial of this matter to a later trial term or to alternatively strike the death penalty.  This case is currently scheduled for trial before this Honorable Court on October 5, 2009.  On June 11, 2009, the Defendant previously filed a motion to continue the trial of this matter.  This court denied that motion by order dated June 29, 2009.  On August 19, 2009 Defendant filed a motion to continue or to alternatively strike the death penalty.  This court denied that motion on August 26, 2009.  Counsel for the defendant find themselves on the eve of trial, grossly unprepared to properly represent their client's interest in a capital matter and move this court to either continue the case to allow the sufficient time to prepare or to alternatively strike the death penalty from consideration.  Defendant sets forth the following to support his request for a continuance of the trial in this case.

**JA483**

## UNDEVELOPED CLAIM OF MENTAL RETARDATION[1]

Defendant's attorneys have been trying to determine whether Defendant is mentally retarded and is thus ineligible for capital punishment. The government cannot impose the death penalty on a mentally retarded person. 18 U.S.C. §3596(c); <u>Atkins v. Virginia</u>, 536 U.S. 304, 321 (2002). The Defendant's court-appointed neuropsychologist recently tested Defendant and obtained a full scale IQ score of 66, consistent with mental retardation. Based on this finding and other factors the neuropsychologist opined that the defendant is probably mentally retarded.

The clinical definitions of mental retardation developed by the American Association on Mental Retardation ("AAMR") and the American Psychiatric Association ("APA") are very similar and constitute the accepted definitions used by mental retardation professionals. Each organization recognizes that mental retardation is a disability characterized by (1) "significant limitations in" (AAMR), or "significantly sub-average" (APA), intellectual functioning; (2) accompanied by "significant limitations" in adaptive "behavior" (AAMR) or "functioning" (APA); (3) the onset of which occur prior to the age of 18. AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 1 (10th ed.2002); APA, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. Text Rev. 2000). The consensus among mental health professionals is that a full-scale IQ of 70 or below satisfies the requirement of significant limitations in intellectual functioning.

---

[1] On September 4, 2009, Defendant filed a Sealed Notice of Intent to Introduce Expert Evidence of Mental Condition Bearing on the Issue of Punishment During the Penalty Phase. That motion was served only on the Government's firewall attorney and was sealed so as to prevent disclosure of its contents to the Government's trial attorneys pursuant to the Court's Order of August 12. The Court's Order was based on Rule 12.2(c)(3)'s requirement that the results and reports of defense mental examinations conducted pursuant to proper notice given under Rule 12.2(b)(2) are to be sealed and not disclosed to Government counsel until a guilty verdict is reached on a capital-eligible offense. This provision enforces Defendant's Sixth Amendment right to effective assistance of counsel by protecting from disclosure the results and reports of his mental health experts until such time as they become relevant during the sentencing phase. To the extent that the contents of this motion discloses information previously ordered kept from the Government's trial counsel, Defendant has elected to waive the protection of Rule 12.2(c)(3) and voluntarily disclose that information.

2
Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 21 of 522
Case 3:08-cr-00134-RJC Document 689   Filed 09/22/09   Page 2 of 11
**JA484**

Thus, a full-scale IQ of 70 or less indicates the need for further investigation to assess the extent to which a capital defendant exhibited significant limitations in adaptive behavior or functioning with the onset occurring before age 18. Here, with a full-scale IQ of 66, further investigation must be done to ascertain the extent to which Defendant exhibited significant limitations in adaptive behavior or functioning with the onset occurring before he was 18 years old. Such investigation would typically consist of assessments done by a mental retardation expert administering a standardized battery of questions on family members and other persons who spent sufficient time with Defendant during his developmental years. Only then would a mental retardation expert be in a position to render a solid opinion as to whether Defendant is or is not mentally retarded and thus eligible or not for the death penalty.

In order to establish whether Defendant is mentally retarded, counsel must investigate to determine whether evidence exists showing that Defendant has significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. In order to properly assess Defendant's adaptive skills and their manifestation prior to age 18, Defendant's attorneys must have a mental retardation expert interview family, friends, co-workers, etc., to administer adaptive behavior deficit testing.

Despite diligent efforts, Defendant's attorneys have, as yet, been unable to get the cooperation of Defendant's family members in El Salvador in order to conduct such adaptive behavior assessment. Defendant's father was initially contacted in El Salvador by Defendant's mitigation investigator in August, 2008 and was then willing to assist the mitigation investigator in his job. (See Attachment A, Affidavit of Richard McGough) However, according to Defendant's father, he was visited in February, 2009, by two detectives of the Salvadoran national police, who reportedly wanted him to accompany them to a hotel to be interviewed by a

3
Case 3:16-cv-00057-MOC-JC Document 50-2 Filed 03/23/17 Page 22 of 522
Case 3:08-cr-00134-RJC Document 459 Filed 05/22/09 Page 3 of 11
JA485

U.S. F.B.I. agent regarding his son. The Salvadoran detectives had Defendant's father speak on their cell phone with a man claiming to be an F.B.I. agent. The father declined to go to the hotel and was told by the Salvadoran detectives that they would open an investigation on him if he did not cooperate with them. Because of this incident, Defendant's father has declined further cooperation with Defendant's attorneys and mitigation investigator out of fear of being investigated by the F.B.I. and Salvadoran national police. Consequently, Defendant's father has not been willing to put Defendant's mitigation investigator in touch with Defendant's immediate family members.

Defendant's mitigation investigator has been unable, on his own, to locate and interview any of Defendant's immediate family members in order to arrange for adaptive behavior interviews and assessment by a mental retardation expert. Defendant's father, although interviewed by the mitigation investigator is, at this point, reluctant to submit to further interviews regarding Defendant's adaptive behavior deficits or to travel to the United States for Defendant's trial. Although Defendant's attorneys are working with governmental representatives in El Salvador in an attempt to overcome Defendant's father's unwillingness to cooperate, these efforts have no realistic hope of succeeding before the current trial date. Thus, the defense currently has no one for a mental retardation expert to interview regarding Defendant's adaptive behavior before age 18. Defendant's potential mental retardation claim is undeveloped and unready for trial.

Additionally, because mental retardation is a complete bar to the death penalty, determination of whether a capital defendant is mentally retarded and thus ineligible for imposition of the death penalty should be determined by the Court in a pretrial hearing outside the presence of the jury. *United States v. Hardy,* 2008 U.S. Dist. LEXIS 29996, 2008

4

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 23 of 522
Case 3:08-cr-00134-RJC Document 329   Filed 09/22/09   Page 4 of 11

**JA486**

WL1742490 (E.D. La. Apr. 10, 2008) (finding that question of mental retardation should be resolved by the judge at a pretrial hearing, and burden should be on defendant by preponderance of the evidence); *United States v. Nelson,* 419 F. Supp. 2d 891 (E.D. La. 2006) (same); *United States v. Sablan,* 461 F. Supp. 2d 1239 (D. Colo. 2006) (same). *United States v. Davis*, 611 F.Supp.2d 472, 474 (D. Md. 2009) (same).  With the current trial schedule, a pretrial hearing on mental retardation is impossible.

In *Williams v. Taylor*, 529 U.S. 362, 396 (2000), the United States Supreme Court held that capital trial counsel provided constitutionally deficient representation where they "did not fulfill their obligation to conduct a thorough investigation of the defendant's background".  In *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1998), the Ninth Circuit Court of Appeals stated that "[f]ailure to investigate a defendant's organic brain damage or other mental impairments may constitute ineffective assistance of counsel."  Here, Defendant's attorneys have, within the time allowed them, diligently worked to have qualified experts fully investigate Defendant's potential mental impairments for presentation as mitigating factors or as a bar to imposition of the death penalty, but do not have sufficient time to complete the job before the current trial date.

Consequently, Defendant's attorneys, as officers of the Court, inform the Court that they will not be able to provide Defendant with effective assistance of counsel at trial as guaranteed by the Sixth Amendment if the trial begins on October 5, 2009.

## MITIGATION EVIDENCE INVESTIGATION

For the reasons stated above defense counsel, now on the eve of trial in this capital matter, have not spoken with a single member of the defendant's family.  Defendant's mitigation investigator has only met with one member of defendant's family and that witness appears unwilling to attend defendant's trial. Accordingly defense counsel is left with very little to

5
Case 3:16-cv-00057-MOC-JC Document 50-2   Filed 03/23/17   Page 24 of 522
Case 3:08-cr-00134-RJC   Document 659   Filed 09/22/09   Page 5 of 11
**JA487**

present to the defendant's capital jury about defendant's life and background. Defense counsel have been unable to meet the requirements imposed upon them by the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. ed. 2003) which codify the expectations of the profession concerning the obligations of counsel in capital cases. Of particular note, Guideline 10.7 states the following:

> Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> 1.    The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.
>
> 2.    The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

ABA Guidelines, 31 Hofstra L. Rev. 913, 1015 (2003).

The Supreme Court has also been clear about the duties of capital case counsel to conduct a thorough investigation. *See*, e.g., *Williams*, supra; *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003) (counsel's failure to fully investigate Wiggins' background and present mitigating evidence of his unfortunate 'excruciating life history' violated his Sixth Amendment right to counsel) (citing ABA Guidelines).

## UNTRANSLATED DISCOVERY

As Defendant has previously noted in a prior motion, the Government has delivered to Defendant discovery consisting of a substantial amount of correspondence written by the Defendant and his co-defendants while incarcerated. Much of this correspondence was exchanged between and amongst the various co-defendants. Most of these documents are in Spanish and consist of over 7,900 pages. Some of the documents appear to contain passages

6

Case 3:16-cv-00057-MOC-JC Document 50-2   Filed 03/23/17   Page 25 of 522
Case 3:08-cr-00134-RJC Document 560   Filed 09/22/09   Page 6 of 11
**JA488**

that are written in code. These documents have now become critical as the Government has filed a notice under Rules 702, 703 and 705 of its intent to introduce expert testimony. The Government has specifically given notice that it intends to offer the testimony of an expert in "cryptanalysis." The Government's notice specifically states that the expert testimony will relate to "multiple writings seized during the investigation and the decryption of suspected codes, ciphers, and concealment therein."

Defendant has also received from the Government as discovery, a disk containing recorded conversations made by Defendant while incarcerated in the Mecklenburg County Jail. The Government has indicated that it will be using some of these conversations as part of its case against Defendant. These conversations are in Spanish. Defendant has previously advised the court that the vendor that the court approved to translate the audio and video recordings that Defendant received in discovery earlier in this case will not be able to translate these additional documents and audio recordings before October 5, 2009. Defendant has requested that the Government provide Defendant with copies of their translations of these documents and recordings. Defendant has not received any translations of these documents and recordings from the Government. The Government has advised defendant that they do not have any translations of the audio calls yet. The Government has further advised Defendant regarding the jail correspondence that any such correspondence the Government will use will "in great part" be that of Defendant. However at this point Defendant has no translations of either the written or audio discovery.

Defense counsel needs to be able to understand the evidence in this case in order to adequately represent Defendant. Defense counsel has been given over 7,900 pages of documents and 327 minutes of audio recordings that they cannot understand because they do not

7

Case 3:16-cv-00057-MOC-JC Document 50-2   Filed 03/23/17   Page 26 of 522
Case 3:08-cr-00134-RJC Document 50-2   Filed 03/22/09   Page 7 of 11

**JA489**

speak Spanish. Without an ability to understand this information, defense counsel have no way of knowing how to prepare to defend against the introduction of this evidence. Additionally, defense counsel will never know whether any of this evidence contains exculpatory material. Defense counsel is left to beg the Government to share its translations. Even were the Government willing to share everything they have, it appears that they have not translated the majority of this information and apparently have no intention to do so, at least not for this trial. This circumstance denies Defendant due process of law. At a minimum due process requires Defendant to be able to know what the evidence against him will be. The government is not required to request the court for permission to have Spanish documents or audio recordings translated, but because Defendant is indigent he must seek approval from the court. The court must allow Defendant the resources and the time to understand the evidence against him and to prepare to meet that evidence.

Defendant has delivered these new discovery items to the same vendor that had been approved by this court for translation of the original audio and video recordings received in discovery. Defendant attaches as "Attachment B" the correspondence and estimate that it has received from the vendor regarding translation of these materials. Defendant has filed, contemporaneously with this motion, an ex parte request for funding for the translations. In order to give Defendant the opportunity to understand the evidence to be used against him and to discover exculpatory evidence, this court must give Defendant the time and resources to translate these materials.

## CHANGED CIRCUMSTANCES

Since the government served its notice of intent to seek the death penalty in this case, the date of October 5 has been the only trial date in this case. There have been no continuances.

8

**JA490**

That trial date was set at a trial status conference hearing on October 6, 2008. Defendant's second counsel, who had been on the case for less than one week, was at the hearing without his co-counsel. In response to inquiry by the Court as to the setting of a trial date, counsel indicated the following:

> So the scope of the case is very large. Obviously, we're going to have to present a mitigation case, as well as a defense on the merits. I would state probably one year would be necessarily adequate to prepare that.
> My client is from Salvador (sic), all his family is down there. It will take time to look into those issues, as far as mitigation. That's about all I can put to the Court this morning.

See page 4 of transcript of hearing held 10-6-08, attached hereto as Exhibit C.

Defendant's counsel, when he spoke at that hearing, had not had the opportunity to review any discovery or to begin a mitigation investigation for the penalty phase. Counsel was providing an estimate of when the defense would "probably" be ready for trial. Counsel could not then have anticipated the following developments that have occurred since then: (1) that a below-70 IQ score indicating mental retardation would be obtained; (2) that development of evidence of adaptive behavior deficits relevant to mental retardation, as well as development of other mitigation evidence, would be stifled when Defendant's family in El Salvador became inaccessible due to actions by the Salvadoran national police; (3) that defense counsel would receive 327 minutes of jail phone calls by Defendant and over 7,900 pages of letters in Spanish between and among Defendant and his codefendants, and that the government would have not provided translations of any of them as of nine working days before trial.

### CONCLUSION

Based on the foregoing, Defendant's attorneys inform the Court that they will not be able to provide Defendant with effective assistance of counsel at trial. Therefore, due to

9

Case 3:16-cv-00057-MOC-JC Document 50-2   Filed 03/23/17   Page 28 of 522
Case 3:08-cr-00134-RJC Document 1029   Filed 03/22/09   Page 9 of 11
JA491

counsel's lack of preparation, if trial is held during the currently scheduled trial term, undersigned counsel will be unable to provide Defendant with effective assistance of counsel. Accordingly, pursuant to 18 U.S.C. §3161(h)(8)(B)(iv), Defendant submits that a denial of this continuance motion would deny Defendant and his counsel the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

Therefore, Defendant respectfully requests this Honorable Court to continue the trial of this matter from the October 5 trial term.  In the event the court does not allow Defendant's motion to continue in order to allow him effective assistance of counsel Defendant asks the court to strike the death penalty as a potential punishment as the only alternative to protect Defendant's constitutional rights.

Respectfully submitted this the 22nd day of September 2009.

/s/ Mark P. Foster, Jr.
Mark P. Foster, Jr. (NC State Bar No. 22717)
Attorney for Defendant
1011 E. Morehead Street, Suite 300
Charlotte, NC  28204
Telephone:  704-347-1809
Facsimile:  704-332-2716
E-mail:  mpfosterjr.@bellsouth.net


/s/ John D. Bryson
John D. Bryson (NC State Bar No. 12883)
Attorney for Defendant
P. O. Drawer 2086
High Point, NC  27261-2086
Direct Telephone:  (336) 819-6016
Direct Facsimile:  (336) 819-6076
E-mail:  jbryson@wehwlaw.com

10

Case 3:16-mc-00057-MOC-JC Document 56-3   Filed 03/23/17   Page 29 of 522
Case 3:08-cr-00134-RJC Document 262   Filed 09/22/09   Page 10 of 11

JA492

## <u>CERTIFICATE OF SERVICE</u>

  This is to certify that a true and correct copy of the above Defendant's Renewed Motion to Continue Trial has been duly served on the attorneys listed below by e-mail service through ECF on this 22nd day of September, 2009 as follows:

   Jill Rose
   Jill.Rose@usdoj.gov

   Sam Nazzaro
   Sam.Nazzaro@usdoj.gov

   Kevin Zolot
   Kevin.Zolot@usdoj.gov

   Adam Morris
   Adam.Morris@usdoj.gov

   Mark Jones
   Mark.Jones2@usdoj.gov

      /s/ Mark P. Foster, Jr.
      Mark P. Foster, Jr. (NC State Bar No. 22717)
      Attorney for Defendant
      1011 E. Morehead Street, Suite 300
      Charlotte, NC  28204
      Telephone:  704-347-1809
      Facsimile:  704-332-2716
      E-mail:  mpfosterjr.@bellsouth.net

11

Case 3:16-cv-00057-MOC-JC  Document 50-3   Filed 03/23/17   Page 30 of 522
Case 3:08-cr-00134-RJC  Document 76-2   Filed 09/22/09   Page 11 of 11

**JA493**

## AFFIDAVIT OF RICHARD MCGOUGH

I, Richard McGough, make the following statement voluntarily:

1.

My name is Richard McGough. I have worked as a mitigation specialist since 1990 at both the State and Federal levels. I have an MA in Anthropology. My cultural area for my graduate work was Latin America. I have worked and traveled extensively in Latin America and Spain. I am fluent in Spanish. Since the mid-90's, I have been involved as a mitigation specialist in capital cases involving Latino defendants residing in the US. I have traveled to clients' native countries to complete my work in those cases. In the last few years, I have worked on numerous cases involving defendants with some affiliation to MS-13 (Mara Salvatrucha) Since 2006, I have traveled to El Salvador on 12 occasions, working for a period of 7 days to 2 weeks each trip.

2.

In 2008, I was asked by John Bryson to assist him in the case of Alejandro Umaña. In the summer of 2008, I had scheduled a trip to El Salvador in another case. At that time, I had not yet been appointed to Mr. Umaña's case but suggested to Mr. Bryson that I could possibly make some initial contact with Mr. Umaña's family while in El Salvador.

3.

In August of 2008, I traveled to the Santa Ana area in order to make contact with Mr. Umaña's father, Rafael Umaña. I found Rafael at the stand from which he sells goods on the streets of Santa Ana. When I met him, his wife, Yanera, and their young daughter were present.

4.

Rafael told me that he is a street vendor (vendedor ambulante) and has sold his goods from the same  spot in front of the Museo de Santa Ana for a number of years . He told me that he is well known among the shopkeepers in that area. Rafael stated that he is involved in the local organization of street vendors that was organized to work with the office of the mayor's office (Alcaldia) to license and regulate street vendors. Rafael stated that he holds the position of Secretaria de Actas for the committee.

1

JA494

5.

I told Rafael about the charges his son, Rafael, faces in the United stated and that it was very possible Alejandro might face a death penalty should he be found guilty of those charges. I explained to Rafael that part of my work was to assist Alejandro's attorney in coming to understand Alejandro's personal and family history in an effort to convince the Court and jurors that Alejandro should be given a life sentence should he be found guilty. I explained to Rafael that I would need to talk with him and other family members at length in order to do my work and that I would return to do that sometime later that year or early the next year. Rafael gave me his cell phone number. Rafael agreed to introduce me to other family members upon my return. I took Rafael's photograph, along with his wife and daughter, and later brought that back for Alejandro to have in his cell.

6.

During this initial conversation, I didn't elicit much information from Rafael except to ask him about the origin of a visible scar that Alejandro has on his forehead. Rafael explained to me that that resulted from an accident that Alejandro had as a child. He told me that other family members, such as Alejandro's paternal aunt and grandmother, could give me more information about the accident. Rafael recalled running to the hospital with Alejandro in his arms following the accident.

7.

I wasn't able to return to El Salvador to work directly on Alejandro's case until May of 2009. At that time, I traveled to Santa Ana and again located Rafael at his spot across from the Museum in Santa Ana. Rafael told me that he was reluctant to talk with me about Alejandro's case and that he did not want to introduce me to his family in order for me to interview them.Rafael stated that in February of 2009, he was first contacted by what he described as two detectives of the PNC (Policia Nacional Civil or the National Civil Police) while manning his regular post on the street there in Santa Ana.

He stated that both men were dressed in normal street clothes. Rafael said that the men told him that they were there to help Rafael's son, Alejandro Umaña. Rafael stated that the two men told him that they were there that day in order to locate Rafael and that they were also trying to locate Alejandro's mother, Leticia Ramirez. Rafael said that he told the two detectives that he had lost contact with Leticia and could not help them find her.

Rafael said that a few days later, the two men returned and found Rafael again at his post across the street from the Museo de Santa Ana. Rafael said that the two detectives told Rafael that they wanted Rafael to accompany them in their car to a local hotel. Rafael said that he recalls that they wanted him to go to a local auto-hotel called the Hotel Presidencial. Rafael stated that the two detectives explained to him that they wanted

2

**JA495**

Rafael to meet with an agent of the FBI and that the hotel was a quiet place to talk. Rafael said that the detectives told Rafael that they had located Leticia and had spoken with her.

Rafael said that he told the detectives that he didn't want to get in the car with them. He said that one of the detectives took out his cell phone and called the American agent and gave the phone to Rafael to talk with this man identified as "Jo" or "Jog". Rafael said that he spoke with this agent on the phone. Rafael said that the man on the phone spoke Spanish but did not appear to be a local Salvadoran and perhaps was not a native Spanish speaker. Rafael said the man identified as "Jo" told Rafael that they would be better able to talk at the hotel. Rafael said that he told "Jo" that he didn't want to go to the hotel. Rafael said he asked "Jo" if they had in fact found Leticia and spoken with her. Rafael said that "Jo" told him that they had not located Leticia. Rafael said that when he informed "Jo" that the PNC detectives had stated that they had located Leticia, "Jo" said "Are you now investigating me?" Rafael said that he became concerned about the mention of the word "investigation" and wanted to know if he, Rafael, was under investigation. Rafael said that he declined to accompany the detectives.

Rafael said that the PNC detectives criticized him and tried to convince him to accompany them to talk with "Jo". Rafael said that one of the detectives told Rafael that they, the detectives, might begin an investigation of Rafael.

Rafael said that because of this incident with the PCN detectives and the agent "Jo", he does not want to introduce me to his family members for fear that he and his family might suffer reprisals. Rafael stated that there is nothing that Alejandro's lawyers can do to protect Rafael and his family from possible retaliation.

When asked if the PCN detectives or "Jo" had given Rafael any kind of contact information, Rafael replied that they gave him their cell phone numbers. Rafael said that he wrote down the following information about the police in his agenda:

7092-3691: Rafael showed me that after this number he made the notation "PC-D" for "policía civil-detective."

7946-6765: Rafael showed me that after this number he made the notation "Jog" to signify the number for the agent "Jo" or "Jog".

8.

During the remainder of my week there in El Salvador in May of this year, I traveled daily to Santa Ana in order to try to convince Rafael to introduce me his family members. I made many efforts to locate these relatives on my own but with no success.

9.

I returned to El Salvador again in August of 2009 to continue my work in Alejandro's case. I again traveled to Santa Ana and met again on a number of occasions with Rafael.

3

# JA496

He again told me that he was too concerned about his family's safety to introduce me to other family members. Rafael will talk to me but is visibly reluctant to give much in the way of details about Alejandro's and the family's history. I continued my efforts to locate family members on my own but to no avail.

10.

In the 3 years since I have been working in El Salvador I have learned that it is difficult to locate individuals without the assistance of a family member or acquaintance for the initial introduction. From my years working as a mitigation specialist I know that the type of information necessary to a mitigation presentation at trial will be found primarily with family members or other care givers. Without access to those individuals, I can not adequately assist counsel in their defense of Alejandro. To be more specific, I am aware that our expert has determined that Alejandro has a low IQ. In order for our experts to confirm any adaptive behavior functioning deficits that Alejandro might have exhibited, I must first be able to locate and interview family members. Next, a defense mental retardation expert would need to travel to El Salvador to conduct interviews with these family members for the purpose of assessing Alejandro's adaptive behavior deficits, if any. Without access to family members, we will not be able to get an expert opinion as to whether or not Alejandro is mentally retarded.

Sworn and ascribed before me this _18_ day of ___Sept.___, 2007.

_____
NOTARY PUBLIC

My commission expires the _19_ of ___Aug___, 20_04_.

4

Case 3:16-cv-00057-MOC-JC Document 502-1 Filed 03/23/17 Page 34 of 522
Case 3:08-cv-00134-RJC Document 50-2 Filed 09/22/09 Page 34 of 522
JA497

## Mark P. Foster

| | |
|---|---|
| **From:** | Alex Shurchin [ashurchin@lis-translations.com] |
| **Sent:** | Wednesday, September 09, 2009 1:00 PM |
| **To:** | jbryson@wehwlaw.com; mpfosterjr@bellsouth.net |
| **Cc:** | ptolle@lis-translations.com |
| **Subject:** | WEHW001 |

**Importance:**        High



C__DOCUME~1_LI
ГRA~1_LOCALS~1_
              Hello John and Mark,

I have attached the itemized estimate for the CD's that were provided by
both law firms.  In total there are 7934 pages that were sent to us.  Out of
those, there are probably 50-60% that are not legible.  We of course would
not bill for pages we will not be able to translate. Additionally, there are
327 audio minutes that need to be transcribed and translated.  This will
cost $10 per audio minute.

Due to the size of this project and the amount of time it will take to
translate and manage all the translators and transcribers our delivery
estimate of the 7934 pages is approximately 3-6 months.  Additionally, it
will take us approximately 2-4 weeks to transcribe and translate the 327
minutes of audio.

Please let me know whether you have any questions.

Thanks

Legal Interpreting Services
Alex Shurchin|Chief Operating Officer
 26 Court Street, Suite 2003
 Brooklyn, New York 11242-0500

 P: 718-237-8919 Ext. 14
 F: 718-749-0113
www.lis-translations.com

Language services you can trust.

1

JA498

# Estimate

## Legal Interpreting Services

26 Court Street Suite 2003
Brooklyn, NY 11242
 Tel: 718-237-8919
 Fax: 718-237-0956

| Date | Estimate # |
|---|---|
| 9/9/2009 | WEHW001 |

### Name / Address

Wyatt Early Harris Wheeler
1912 Eastchester Drive
High Point, NC  27265

| Terms |
|---|
| Net 30 |

| Language | Translation/Interpretation/Transcription | Pages/Words/Hours | Rate | Total |
|---|---|---|---|---|
| Spanish/English Translation | Letters To/From Jail to be translated. | 7,934 | 40.00 | 317,360.00 |
| Spanish/English Transcription | Audio CD to be transcribed. | 327 | 10.00 | 3,270.00 |

Tax ID # 54-2080325

**Total** $320,630.00

JA499

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA          )    DOCKET NO. 3:08-CR-134-2
                                  )
                                  )
        vs.                       )
                                  )
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____ )


TRANSCRIPT OF STATUS CONFERENCE HEARING
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
OCTOBER 6, 2008




APPEARANCES:

On Behalf of the Government:

        KEVIN ZOLOT and MARK A. JONES
        Assistant United States Attorneys
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina 28202

        SAM G. NAZZARO
        U.S. Department of Justice
        950 Pennsylvania Ave., NW
        Washington, DC 20530

On Behalf of the Defendant:

        MARK PATRICK FOSTER, JR.
        1011 E. Morehead Street, Suite 300
        Charlotte, North Carolina
        28204


                LAURA ANDERSEN, RMR
                Official Court Reporter
                United States District Court
                Charlotte, North Carolina

**JA500**

2

P R O C E E D I N G S

THE COURT:  Might as well stay where you are, Mr. Zolot, let's talk about Ayala.

MR. ZOLOT:  Ayala?

THE COURT:  Ayala.  Very well.

MR. ZOLOT:  Thank you, Your Honor.

There are, I believe, two outstanding motions to continue.  Are we ready on the status conference now?

THE COURT:  Yes, let's do that.

MR. ZOLOT:  May I introduce co-counsel?

THE COURT:  You may.

MR. ZOLOT:  Sam Nazzaro from the USDOJ gang squad, prosecuting the case along with Mark Jones from my office, a new attorney.

MR. NAZZARO:  Good morning, Your Honor.

MR. JONES:  Good morning, Your Honor.

THE COURT:  Mr. Nazzaro, Mr. Jones, nice to meet you.

This is a multi-defendant case with at least one capital count?

MR. ZOLOT:  Yes, sir.

THE COURT:  How many individuals are charged in that count?

MR. ZOLOT:  There is one who is charged with the capital crime, Your Honor.

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 2 of 12
Case 3:08-cr-00134-RJC   Document 663-2   Filed 09/22/09   Page 38 of 522
JA501

3

THE COURT: And who is that -- is that Ramirez Umana?

MR. ZOLOT: Alejandro Ramirez Umana.

THE COURT: Other defendants are charged, but not charged capitally?

MR. ZOLOT: Accessories after the fact, but no other people are charged with the actual murder, Your Honor.

THE COURT: Who are the defendants charged with accessory after the fact?

MR. ZOLOT: If I may have a moment, Your Honor. That would be -- beg the Court's indulgence, I know most of them by nicknames so -- Your Honor, defendant number 4, Lopez is charged with accessory after the fact. Defendant 15, Cesar Yoaldo Castillo, are the two people charged with accessory after the fact of that murder.

THE COURT: Is Mr. Foster still here?

MR. FOSTER: Yes, Your Honor.

THE COURT: Do the parties have any proposal that they wish to submit to the Court with respect to scheduling these matters for trial, otherwise, the Court will do what it thinks best.

MR. FOSTER: I have, just appointed on Friday, co-counsel John Bryson from High Point, will not be here today. Because of the nature of the notice declaring the government's intention of what is charged, I'm up to speed

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC    Document 649    Filed 08/09/2009    Page 3 of 12
Case 3:08-cr-00134-RJC-DSC    Document 662-2    Filed 09/22/09    Page 39 of 522
JA502

4

on what's charged, two murders in Greensboro, another one in the Western District, supposedly aided and abetted a double killing in California as an aggravating factor, and another killing in California as an aggravating factor.

So the scope of the case is very large. Obviously, we're going to have to present a mitigation case, as well as a defense on the merits. I would state probably one year would be necessarily adequate to prepare that.

My client is from Salvador, all his family is down there. It will take time to look into those issues, as far as mitigation. That's about all I can put to the Court this morning.

MR. ZOLOT: Just add to that, Your Honor, he didn't aid and abet a murder here. There were three murders in Los Angeles, and we believe other murders in El-Salvador which have to be investigated, which Mr. Foster didn't mention.

MR. FOSTER: I didn't know that.

THE COURT: I would treat that charge, and that defendant differently, because of the nature of the charge and what I've heard today, than the other defendants in the case.

And so what I'm inclined to do is sever out Mr. Ramirez Umana from the other defendants on my own motion, and put that on a separate track.

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 4 of 12
Case 3:15-cv-00134-RJC   Document 562-2   Filed 09/22/09   Page 40 of 522
JA503

5

MR. ZOLOT: Including the two who are charged with accessory after the fact, Your Honor?

THE COURT: Let me -- no, not including them at this time. But I would entertain a motion from either side if that were a wiser course. I don't see the necessity to do that at this time.

The rest of the defendants in 3:08-CR-134, I would treat as I would treat any other case. If there's a motion to continue that has merit to it, then I will consider it. But otherwise, as each criminal term comes up, the next one being, I guess, December, absent any motion to continue that's been granted, you all would be expected to go to trial.

MR. ZOLOT: Your Honor, if I may. Defense counsel were in my office, had a meeting prior to this meeting, two weeks ago. And we had talked about asking for a peremptory setting in the case.

There are over 150 hours of Spanish recordings that were turned over to defense and additionally, over -- about 35,000 pages -- documents. There is continuing discovery that is being provided as it comes into our office. I know that defense counsel were having issues with the translation and other things.

I would ask that the Court actually set a peremptory setting for this case, if the Court was willing

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 5 of 12
Case 3:08-cr-00134-RJC   Document 563-3   Filed 09/22/09   Page 41 of 522
JA504

6

to discuss dates for that.

MR. GSELL:  Good morning, Your Honor.  I've taken a point on interpretation during this conference we had with the government.

We were kind of informed that there was 100 hours of communications that needed to be translated.  On the basis of that, I contacted a professional service in New York that does this type of work for defense counsel and also the government.

And based upon 100 hours, I was given an estimate of having the materials produced within 60 days.  Now we didn't have a cost on that, yet.

This morning I found out that the number is probably somewhere between 150 and 200 hours.  I would assume that's going to change the turnaround time.  Even if we put it out to 90 days, that's just defense counsel getting the materials.

I've asked the service to provide us with a summary of each communication and a line-by-line interpretation of each communication.

I think defense counsel at that point will need to read the summaries, go through each and every communication, then determine what is relevant to their clients, and then meet with the clients.

Given the large number of Hispanic speaking

Laura Andersen, RMR 704-350-7493

**JA505**

7

clients, the limited number of interpreters, the fact that everybody is in custody, the logistics of having this case ready, really, even within six months, I don't think is possible at all.

Mr. Foster's time estimate, although dealt with a murder case, given the large volume of discovery and logistical aspects of it, I think putting it out in one year on a peremptory setting, that would give everybody sufficient notice to get the work done and get the cases either prepared for plea or prepared for trial by then.

Certainly from my standpoint, some of my colleagues I've spoken to, that's the timeframe that we would be looking at having this case ready for trial.

THE COURT: Worst case scenario, if you had translations available in 90 days, that would give you enough time, I think.

Your point is well-taken, and my earlier comment that this might be for trial as early as December, is obviously not practical, given the problems with interpretation and volume of discovery, number of defendants and counsel in this case.

And so I agree that we need to go out a little farther. I don't want to go out a year. I think if I set this for a peremptory setting for the first Monday in June, I think you all ought to have enough time to review

Laura Andersen, RMR 704-350-7493

**JA506**

8

discovery and get ready for trial. So that's what I will do.

I'm going to set this case -- I will sever out the Ramirez Umana defendant from the rest of the defendants. And I will set that case, peremptorily, for October of next year, first Monday in October.

And I will set the remaining defendants for the first Monday in June.

MR. GSELL: Would the Court consider setting a status conference, maybe in March? Hopefully by then we will have discovery materials. Myself and other defense attorneys will be involved in getting those materials to the client.

My concern is that in another large case that I have, there have been some technology issues that have popped up, once we have gotten discovery materials, that weren't readily apparent at the beginning, but popped up. But that may cause an anticipated trial date to be pushed back.

And so, to keep the Court informed where all defense counsel is with the government, I would suggest setting a status conference date for maybe February/March. That way we could apprise the Court as to where we are, whether or not the June date, based upon that point in time, is realistic.

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 8 of 12
Case 3:08-cr-00134-RJC   Document 562-7   Filed 09/22/09   Page 44 of 522
JA507

9

THE COURT: Let me hear from anybody else who wants to have input in scheduling.

Although the status conference in March sounds like a prudent thing to do.

MR. FOSTER: Ms. Pendry will be unable to be here. I'm advised of a conflict with a May 26, 2009 trial in the District Court in District of Columbia that she thought would take all summer, involving witnesses from Trinidad, Tobago. So, Your Honor, I just wanted to put that information before the Court.

THE COURT: Thank you.

MR. VON KALLIST: Joe VonKallist. I have a capital trial in Rowan County with Bill Kennerly, the DA up there, it starts the first week in May. We suspect jury selection to take about six weeks, alone. Of course federal court takes precedence, if that's a set trial date, I'll tell Kennerly today, and we can move that, if necessary.

MR. CULLER: I have a capital trial in Union County. We have not set a precise date, but it's going to be somewhere between February and April. Which if it starts in April, I will probably be in that trial in June.

I wondered if the Court -- obviously, you certainly don't anticipate all defendants will go to trial. But assuming 10 of the group that aren't severed went to trial, would you try all 10 in one hearing, or would there

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 9 of 12
Case 3:08-cr-00134-RJC-DSC   Document 593-2   Filed 03/22/09   Page 45 of 522
JA508

10

be two separate trials with say five at a time?

THE COURT:  I don't want to commit to a specific number at this time, because I don't know the nature of the charges.  But obviously if the numbers continue to be large, than the Court will have to take some action to try them in a way that makes sense.

And I can't -- I can't -- I can't estimate what that's going to look like until we go down the road a little bit, having discovery provided.

I think I will keep the June setting for now.  And we'll schedule a status conference in March in this case Monday, March 16.  I want the government to expedite the provision of discovery.  I want you to stay on top of it.

MR. ZOLOT:  Yes, sir.

THE COURT:  I don't want anything to fall between the cracks.  I want discovery produced in a timely fashion.

And the rest of the defense attorneys, whatever needs to be done in terms of getting that translated, Mr. Gsell, and in a form for your review, be diligent about that.

And we'll put off any further decisions in this case until the status conference in mid March.

MR. ZOLOT:  Your Honor, just for record, all discovery has been available for over a month to all defense counsel.

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 10 of 12
Case 3:08-cr-00134-RJC   Document 50-23   Filed 09/22/09   Page 46 of 522
JA509

11

MR. CULLER:  That's not actually true.  I apologize.  I just wanted to say one thing.

THE COURT:  Please sit down.

MR. CULLER:  Yes, sir.

THE COURT:  You did indicate to the Court there was some ongoing discovery --

MR. ZOLOT:  There will be, Your Honor.  There will be.

THE COURT:  -- in the works.  I want you to stay on top of that and provide that.

MR. CULLER:  Your Honor, may I inform the Court on one aspect of discovery?

THE COURT:  You may, as long as you don't do it while I'm talking.

MR. CULLER:  I apologize.  We -- because of the volume of the recordings, and I think some videos, there is a firm down in Texas that all defense counsel are using to actually get recordings.

Because they're having to produce them in some fashion, and Ms. Rauscher's office assisted us in making arrangements, they are actually being paid on a set fee.

Each counsel has had to sign, I think it was a CJA-21, if I remember correctly -- that may be the wrong one of the CJA forms -- we had to sign and send down to a gentleman in Texas.  I have sent that two weeks ago, have

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 11 of 12
Case 3:08-cr-00134-RJC   Document 592   Filed 09/23/09   Page 47 of 522
JA510

12

not received the material yet.  I'm sure others are having that same issue in the case.

So I just wanted the Court to be aware, the government has made the information available, but it's in a fashion that we had to go through another service to produce enough CD's for all the parties.  So that's going to take a little bit longer than it may appear on its face.

MR. GSELL:  Those are the materials sent to New York for an estimate, Your Honor.

THE COURT:  Very well.  Seems like an awful lot of work to do in a very complex case.  I urge everybody to stay on top of it, and try to get it done as quickly as possible.

And we'll just reconvene in March, see where we're at.

MR. GSELL:  Thank you, Your Honor.

MR. ZOLOT:  Thank you, Your Honor.

THE COURT:  Any other input from anybody else?  All right.  This matter is concluded.

(End of Proceedings.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.
Dated this the 9th day of August, 2009.
                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC-DSC   Document 649   Filed 08/09/2009   Page 12 of 12
Case 3:08-cr-00134-RJC   Document 5923   Filed 08/23/10   Page 48 of 522
JA511

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | MOTION FOR PRETRIAL |
| | ) | HEARING ON MENTAL |
| ALEJANDRO UMANA | ) | RETARDATION IN THE EVENT |
| | ) | THE TRIAL IS CONTINUED |

NOW COMES Defendant ALEJANDRO UMANA, by and through undersigned counsel, and hereby moves this Court, in the event it grants Defendant's Motion to Continue Trial (Document #687), to schedule and conduct a pretrial hearing to determine whether Defendant is mentally retarded and thus ineligible for the death penalty.

The government cannot impose the death penalty on a mentally retarded person. 18 U.S.C. §3596(c); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

In his Motion to Continue Trial filed September 22, 2009, Defendant has chosen to disclose that Defendant's court-appointed neuropsycholoigst recently obtained a full-scale IQ test result of 66. Based on this finding and other factors the neuropsychologist has opined that the defendant is probably mentally retarded.

Because mental retardation is a complete bar to the death penalty, determination of whether a capital defendant is mentally retarded and thus ineligible for imposition of the death penalty should be determined by the Court in a pretrial hearing outside the presence of the jury. *United States v. Davis*, 611 F.Supp.2d 472, 474 (D. Md. 2009) (finding that question of mental retardation should be resolved by the judge at a pretrial hearing, and burden should be on defendant by preponderance of the evidence); *United States v. Hardy*, 2008 U.S. Dist. LEXIS 29996, 2008 WL1742490 (E.D. La. Apr. 10,

1

Case 3:16-cv-00057-MOC Document 50-2 Filed 03/23/17 Page 49 of 522
Case 3:08-cr-00134-RJC Document 698 Filed 09/22/09 Page 1 of 4
**JA512**

2008) (same); *United States v. Nelson*, 419 F. Supp. 2d 891 (E.D. La. 2006) (same); *United States v. Sablan*, 461 F. Supp. 2d 1239 (D. Colo. 2006) (same). *United States v. Davis*, 2009 U.S. Dist. LEXIS 34707 (D.MD.2009) (same). A mental retardation hearing should be held pretrial, as opposed to after a verdict of guilt of a capital offense, because it is more efficient and practical for the trial judge to make the determination before trial due to the significant amounts of time, money, and effort that can be saved if an unnecessary penalty phase proceeding can be eliminated. *See United States v. Davis*, *supra*, at 474.

Because Defendant's court-appointed neuropsychologist has obtained a full-scale IQ result of 66, it appears that there is a substantial possibility that Defendant will ultimately be able to carry his burden of establishing by a preponderance of the evidence that he is mentally retarded and thus ineligible for the death penalty. That being the case, Defendant submits that the most efficient use of the Court's resources would be to determine before trial whether or not Defendant is mentally retarded.

However, as stated in Defendant's Motion to Continue Trial, Defendant's attorneys have not been able to complete their mental retardation investigation before trial. However, in the event this Honorable Court continues the trial, then Defendant requests that at an appropriate time before the continued trial date the Court hold a pretrial hearing to determine whether Defendant suffers from mental retardation and is thus ineligible for the death penalty.

Therefore, based on the foregoing, Defendant respectfully requests this Honorable Court, in the event it grants Defendant's motion to continue the trial, to hold a pretrial

Case 3:16-cv-00057-MOC-JCD Document 50-2 Filed 03/23/17 Page 50 of 522
Case 3:08-cr-00134-RJC Document 50-2 Filed 09/23/09 Page 2 of 4

**JA513**

hearing to determine whether Defendant is mentally retarded and thus ineligible for the

death penalty.

September 22, 2009                          Respectfully submitted,

                                           s/  Mark P. Foster, Jr.
                                           NC State Bar #22717
                                           Attorney for Defendant
                                           Law Offices of Mark Foster, P.C.
                                           1011 E. Morehead St., Suite 300
                                           Charlotte, NC 28204
                                           Ph 704 347-1809; Fx 704-332-2716
                                           E-mail:  mpfosterjr@bellsouth.net

                                           s/ John Bryson
                                           Wyatt Early Harris Wheeler, LLP
                                           1912 Eastchester Drive, Suite 400
                                           High Point, NC 27261
                                           336-819-6016
                                           Fax 336-819-6076
                                           jbryson@wehwlaw.com

3

**JA514**

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above has been duly served **DEFENDANT'S MOTION FOR PRETRIAL HEARING ON MENTAL RETARDATION IN THE EVENT THE TRIAL IS CONTINUED** on the attorney listed below by e-mail service through ECF on this date:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Kevin Zolot
Kevin.Zolot@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

Mark Jones
Mark.Jones2@usdoj.gov

September 22, 2009                     s/  Mark P. Foster, Jr.
                                       NC State Bar #22717
                                       Law Offices of Mark Foster, P.C.
                                       1011 E. Morehead Street, Suite 300
                                       Charlotte, NC 28204
                                       Phone 704-347-1809
                                       Fax 704-332-2716
                                       E-mail:  mpfosterjr@bellsouth.net

4

**JA515**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:08-CR-134-2 |
| | ) | |
| vs. | ) | |
| | ) | |
| ALEJANDRO UMANA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
SEPTEMBER 28, 2009

APPEARANCES:

On Behalf of the Government:

JILL WESTMORELAND ROSE
DONALD GAST
United States Attorney's Office
100 Otis Street
Asheville, North Carolina

SAM G. NAZZARO
US Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC

On Behalf of the Defendant:

MARK P. FOSTER
Law Offices of Mark P. Foster, PC
1011 East Morehead Street, Suite 300
Charlotte, North Carolina

JOHN DAVID BRYSON
Wyatt, Early, Harris and Wheeler, LLP
P.O. Box 2086
High Point, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/22/17   Page 53 of 522
Case 3:08-cr-00134-RJC   Document 1284   Filed 10/04/10   Page 1 of 20
JA516

the first or the second motion to continue.  But nonetheless, the ultimate concern of the court is to protect the interests of the litigants and the -- especially the defendant who has made reasonable claims of the need for a continuance.

So I'm going to grant the defendant's motion in the case for a continuance.  I'm going to set it over.  I can't set it for any time prior to April of next year.  I don't -- I don't believe that the government is prejudiced in trying the conspiracy case before the capital case or vice versa.  I have heard the defendant represent that they will not use the -- if the other case is tried first, that that won't be a basis for a continuance in the future of this case, and I'll take counsel at their word for that.

Having continued this case from October to April based upon the 3596 concerns and the need for transcription, I will ride both sides very hard to make sure that the need for translation -- I said transcription, but translation is -- that everybody is on top of that and that won't be a grounds for a continuance in the future.

And so I've given counsel for the defendant more than I wanted to and I believe sufficient time to be ready to go in April.

I think the best thing to do with respect to the 3596 issue is to set it for a pretrial hearing, and what I'd like to do is set that at the beginning of December or --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-000573-MOC   Document 50-2   Filed 08/23/17   Page 54 of 522
Case 3:08-cr-00734-RJC   Document 52-1   Filed 03/04/10   Page 12 of 20
**JA517**

November 30th is actually a Monday and I'd like to set it for that date, with an exchange of expert information two weeks before that date.  That's my intent.  I'd be glad to hear from both sides as to their response to that.  So I would set a date for the exchange of expert testimony November 16th and then intend to try the case -- or not try the case, but conduct the hearing beginning November 30th.

MR. FOSTER:  I mean, we can live with that, Your Honor, but it's going -- we would request it be farther back. We're trying to get down -- back to El Salvador and get these adaptive behavior things done and I'm not sure we can have it --

THE COURT:  It gives you two months.

MR. FOSTER:  Right.

THE COURT:  I would like to have this issue resolved before the first of the year.  And I think that -- the time you've had so far and an additional two months, you ought to be ready on that issue, and so I would suggest those dates.  I think those are the dates we should go by.

What I'd be inclined to do with respect to the trial of the matter is to set it for April 12th.  I think we'll have fewer jury issues if we set it for the 12th as opposed to the 5th because the school system takes spring break on the 5th, so I think we'd have a lot of complications if we tried to bring jurors in on that date.  But I'd like to pick the jury

Case 3:16-cv-00057-MOC   Document 52-4   Filed 03/23/17   Page 55 of 522
Case 3:08-cv-00734-RJC   Document 52-4   Filed 03/04/10   Page 13 of 20
**JA518**

```
                    UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                         CHARLOTTE DIVISION


UNITED STATES OF AMERICA            )DOCKET NO. 3:08-CR-134-2
                                    )
                                    )
     vs.                            )
                                    )
ALEJANDRO ENRIQUE RAMIREZ UMANA     )
_____ )



            TRANSCRIPT OF MENTAL RETARDATION HEARING
         BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
           UNITED STATES CHIEF DISTRICT COURT JUDGE
                      NOVEMBER 30, 2010

APPEARANCES:

On Behalf of the Government:
     DON GAST
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204



                   LAURA ANDERSEN, RMR
                  Official Court Reporter
                United States District Court
                 Charlotte, North Carolina
```

Case 3:16-cv-00057-MOC-JC   Document 50-2   Filed 03/23/17   Page 56 of 522
Case 3:08-cr-00134-RJC   Document 592   Filed 03/18/10   Page 1 of 493

JA519

2

I N D E X

DEFENDANT'S WITNESSES:

    JOHN G. OLLEY, M.D.
        Direct Examination by Mr. Bryson     5, 139
        Cross-Examination by Mr. Gast        80

    RICARDO WEINSTEIN, Ph.D.
        Direct Examination by Mr. Foster  144, 257, 425
        Cross-Examination by Mr. Gast     187, 430

    JAMES R. MERIKANGAS, M.D.
        Direct Examination by Mr. Bryson  261
        Cross-Examination by Mr. Gast     279

GOVERNMENT'S WITNESS:

    ENRIQUE M. SUAREZ, Ph.D.
        Direct Examination by Mr. Gast    284, 423
        Cross-Examination by Mr. Foster   368

* * * * * *

3

E X H I B I T S

DEFENDANT'S EXHIBITS:

| NO. | DESCRIPTION | MARKED | RECEIVED |
|-----|-------------|--------|----------|
| 1 | Olley, CV | 6 | 7 |
| 2 | Olley, report | 40 | 40 |
| 3 | Umana school records | 44 | 50 |
| 4 | Photo, school | 45 | 46 |
| 5 | Photo, school | 46 | 47 |
| 6 | Photo, director, school | 47 | 48 |
| 7 | Photo, father | 50 | 51 |
| 8 | Tropigas | 55 | 56 |
| 9 | Photo, Castaneda | 57 | 57 |
| 10 | Photo | 61 | 62 |
| 11 | Photo, Monica Reyes | 66 | 67 |
| 12 | Umana writing | 70 | 70 |
| 13 | Weinstein, CV | 145 | 146 |
| 14 | 2-page letter | 153 | 154 |
| 15 | Merikangas, CV | 262 | 263 |
| 16 | PET scan | 269 | 278 |
| 17 | Merikangas, report | 278 | 278 |

* * * * * *

GOVERNMENT'S EXHIBITS:

| NO. | DESCRIPTION | MARKED | RECEIVED |
|-----|-------------|--------|----------|
| A-1 | WAIS-III, sample | 217 | 339 |
| A-2 | Suarez, CV | 286 | 287 |
| A-3 | Suarez, report | 289 | 290 |
| A-4 | 4-23-08 police interview | 424 | 424 |

* * * * * *

Laura Andersen, RMR 704-350-7493

**JA521**

4

P R O C E E D I N G S

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  We're here in the matter of United States V Alejandro Umana on an *Atkins* Hearing; are the parties ready to proceed?

MR. GAST:  Yes, Your Honor.

MR. BRYSON:  Yes, Your Honor.

THE COURT:  Very well.  I believe the burden is on the defendant to establish -- as I understand it, by a preponderance, that the requisites for a finding of mental retardation are present.  So I will call upon the defendants at this time to present the first witness.

Or would you prefer -- does either side wish to make an opening statement before the evidence?

I've read *Atkins* and *Davis* and read the defendant's brief, and I'm prepared to go forward.  But I leave it to you whether you think it would be helpful to the Court.

MR. BRYSON:  We're not so inclined.

THE COURT:  All right.  Mr. Bryson, go ahead and call your first witness then.

MR. BRYSON:  Your Honor, we would like to call Dr. Olley.  Come around and be sworn.

THE COURT:  Some day we're going to make that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2 Filed 03/23/17 Page 59 of 522
Case 3:08-cr-00134-RJC Document 592 Filed 03/18/10 Page 59 of 493
**JA522**

DIRECT-OLLEY

monitor easier to use, but we're not there yet.

THEREUPON, JOHN GREGORY OLLEY, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MR.

BRYSON:

Q.   Please tell the Judge would your name is.

A.   John Gregory Olley.

Q.   And how are you employed?

A.   I'm a psychologist and a clinical professor at the University of North Carolina, Chapel Hill.  I'm primarily working in the Center for Development and Learning, which is North Carolina's designated university center for excellence and developmental disabilities.

Q.   What are your specific duties at the center?

A.   Well, up until a year ago, I was the acting director, so I've had administrative duties before that.

     And currently I've been working primarily in the area of people with developmental disabilities and their difficulties in the criminal justice system.

     I also direct a program for high school students with mild intellectual disabilities, and assisting them to make transitions to adulthood.

Q.   And you are a psychologist?

A.   Yes.

Q.   Do you have a particular area of specialty?

A.   Yes.  My training and my interest has been in mental

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-2   Filed 03/23/17   Page 60 of 522
Case 3:06-cv-00154-RJC Document 59-2   Filed 03/18/10   Page 55 of 493
**JA523**

6

DIRECT-OLLEY

retardation and related disabilities, since beginning of graduate school.

Q.    Do you deal directly with patients in your work?

A.    Yes, I do.

Q.    You are also a professor at the UNC School of Medicine?

A.    Yes, sir.

Q.    How long have you held that position?

A.    I have held different positions back to 1978 in the school of medicine.

Q.    And what is your educational background?

A.    I received a Bachelor's Degree in psychology from the college of Williams and Mary.  A Master's Degree in psychology from Wake Forest.  And a Doctorate Ph.D. in psychology from George Peabody College, which is now George Peabody College of Vanderbilt University.

Q.    When did you begin specializing in developmental disabilities?

A.    In my first year in graduate school at Wake Forest.

(Defendant Exhibit 1 was marked for identification.)

Q.    (By Mr. Bryson) I'm going to -- if I can do this properly.  Dr. Olley, I'm going to show you what I have marked as Defense Exhibit Number 1, and ask you if this is a copy of your CV.  Can you see that?

A.    Yes, it is.

Q.    You updated this in July of 2009; is that correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-2   Filed 03/23/17   Page 61 of 522
Case 3:08-cv-00134-RJC Document 59-2   Filed 03/18/10   Page 56 of 493
**JA524**

DIRECT-OLLEY

A.   This version is July, 2009, yes.

Q.   Is it accurate?

A.   It's accurate with only one change, and that is a month after that I became President of Division 33 of the American Psychological association.  That's the division on -- used to be called Mental Retardation, now called Intellectual and Developmental Disabilities.

        MR. BRYSON:  Your Honor, I would move to introduce Defense Exhibit Number 1?

        THE COURT:  It will be admitted.

(Defendant Exhibit 1 was received in evidence.)

Q.   (By Mr. Bryson) And have you -- you have written on the topic of developmental disabilities; is that correct?

A.   Yes, sir.

Q.   And have those writings been published in peer reviewed publications?

A.   Yes.  In a variety of publications.

Q.   Let me ask this, do you have a copy of your CV up there?

A.   No.  Just the one that's in front of me on the screen.

        MR. BRYSON:  May I approach?

        THE COURT:  You may.

        Does anyone know why the red lines going across the monitors?  Are they showing up at yours?

        MR. FOSTER:  They were, but they just disappeared,

Case 3:16-cv-00057-MOC-JC  Document 50-2   Filed 03/23/17  Page 62 of 522
Case 3:08-cv-00134-RJC  Document 50-2   Filed 03/18/10  Page 62 of 493
**JA525**

DIRECT-OLLEY

Your Honor.

Q.   (By Mr. Bryson) Looking at pages four through seven of your CV, is that where your published writings are listed?

A.   Yes, sir.

MR. BRYSON:  Would the court like a copy?

THE COURT:  Yes.  I would like to see a copy. Thank you.

MR. BRYSON:  May I approach?

THE COURT:  You may.

Q.   (By Mr. Bryson) I'm sorry.  My question was, on page 4 through 7, is that where your published writings are listed?

A.   Yes, sir.

Q.   And there are more than 50 works listed there; is that correct?

A.   I haven't counted them, but there's three pages, it looks like.

Q.   These include both articles for journals and books or parts of books?

A.   Yes, sir.

Q.   And referring to page four of your CV, does it show that your first published article on mentally retarded persons was in 1971?

A.   I believe that's true, yes.

Q.   The field of Developmental Disabilities has its own journals; is that correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2    Filed 03/23/17    Page 63 of 522
Case 3:06-cv-00154-RJC  Document 59-2    Filed 03/16/10  Page 63 of 493
**JA526**

DIRECT-OLLEY

A.   Yes, several.

Q.   And you have served as an editor of a number of journals, correct?

A.   Well, I currently serve as an associate editor of two journals, and then I've been a guest editor of several others over the years.

Q.   And the journals that you have been a guest editor are listed on page two of your CV?

A.   Yes, that's correct.

Q.   What is Division 33?

A.   Well, it's one of 54 divisions of the American Psychological Association.  Clearly psychologists specialize in many different things.  And this is the division for psychologists whose specialty field is mental retardation. Which is now more favorably called, intellectual disabilities, and other related developmental disabilities such as autism, cerebral palsy and so on.

Q.   Does Division 33 have a specific goal or mission?

A.   Yes.  It's stated on its web site.  It's a professional organization to promote the research and understanding of this condition, and to translate that information into improved services for individuals with disabilities.

Q.   What is your current role and capacity with Division 33?

A.   Well, I'm currently the president and member of the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 64 of 522
Case 3:06-cv-00154-RJC Document 50-2   Filed 03/18/10   Page 9 of 493
**JA527**

DIRECT-OLLEY

executive counsel, which is made up of officers who assume various roles, such as secretary/treasurer, past president, plan the annual program for the division at the meeting of the American Psychological Association in August, and address whatever other issues related to the field that come along in the course of the year.

Q.   On page two of your CV under grants and contracts, it lists you as the principal investigator for a workgroup on the role of psychologists in *Atkins* Hearings; can you tell the Court about that?

A.   Yes.  That was a small grant from the American Psychological Association to continue the work of a committee that was formed in 2005, and which I was pointed a chair of, Committee on Mental Retardation and the Death Penalty.

Our purpose was to serve a psychologist to get a better idea of what was regarded as appropriate professional practice in *Atkins* Hearings, and to gather people who had experience with this, in order to look at this data and have discussions and eventually generate some document that would be authoritative with the appropriate role of a therapist.

Q.   So is it fair to say that the committee's -- one of the committee's role is to set standards for psychologists in *Atkins* Hearings?

A.   Yes.  Just recently, what's now called the American

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 65 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/18/10   Page 10 of 33
JA528

DIRECT-OLLEY

Association on Intellectual and Developmental Disabilities has formed a similar committee.  And obviously we wish to work closely with them toward the same goals.

Q.    In 2006 through 2007, did you publish a series of articles in a journal called, Psychology and Mental Retardation and Developmental Disabilities on the Assessment of Adaptive Behavior in Adult Forensic Cases?

A.    Yes, I did.

Q.    And are they listed on page seven of your CV?

A.    Yes, sir.

Q.    This year you published an article in the American Journal of Forensic Psychology entitled, Challenges in Implementing the Atkins Decision; is that correct?

A.    Yes.

Q.    You also, this year, published in a journal called, Applied Neuropsychology, an article entitled, Knowledge and Experience Required for Experts in Atkins Cases; is that correct?

A.    Yes, it is.

Q.    You train other psychologists on how to do mental retardation assessments; is that correct?

A.    Yes.  That's one of the major functions of our center within the school of medicine.

Q.    And have you previously testified in any federal courts as an expert in the field of mental retardation?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 66 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/18/10   Page 11 of 433
**JA529**

DIRECT-OLLEY

A.    Yes.

Q.    And have you also testified in any state courts as an expert in the field of mental retardation?

A.    Yes.

Q.    And have you specifically testified as an expert in *Atkins* Hearings like this before?

A.    Yes, sir.

Q.    Approximately how many times?

A.    Approximately 16.

Q.    Have you ever worked for the government for -- in an *Atkins* case?

A.    Yes, sir.

Q.    Have you ever testified for the government before in an *Atkins* case?

A.    Yes, I have.

Q.    Have you ever evaluated defendants before and found them not to be mentally retarded?

A.    Yes, I have.

        MR. BRYSON:  Your Honor, I would tender Dr. Olley to the Court as an expert in the field of mental retardation.

        THE COURT:  Doctor, in looking at this list of articles, especially the most recent ones dealing with the *Atkins* decision.  Is there, in your opinion, a go-to-article in that list, or are you equally proud of all of them?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 67 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/18/10   Page 12 of 433
JA530

DIRECT-OLLEY

THE WITNESS:  I suppose I'm equally proud of all of them.  Although the three-part articles that Mr. Bryson referred to, were later elaborated upon in a chapter which is Olley and Cox, 2008.

So that is the better synopsis, with regard to the application of the adaptive behavior assessment system.  But it's really a broader consideration of assessment of adaptive function, which is the consideration of Atkins hearings.

THE COURT:  Thank you.  You've indicated you examined criminal defendants and found them not to be mentally retarded.  Have you ever testified in federal court to that effect?

THE WITNESS:  No, only in state court.

THE COURT:  Yes.  This doctor will be authorized to render an opinion in this area.

Q.   (By Mr. Bryson) Dr. Olley, I'm going to now turn and ask you some questions about mental retardation and how it is assessed.  You have prepared a power point program for this part of your testimony; is that correct?

A.   Yes.  And I am prepared to go through that information as quickly or slowly as the Court wishes.  I don't want to impair the Court's time schedule, but that information is available.

Q.   Okay.  And would it assist you to go ahead and go

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 68 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 13 of 433
JA531

DIRECT-OLLEY

through that at this point?

A.    Yes.  I'll follow your lead in whatever you like.

Q.    And I'm mindful of the time and I'll see if we can't do this rather quickly.

What is the authority for the authorities for defining mental retardation?

A.    Well, I think that's an important question, because I, in my report, cited the same authoritative references that Dr. Suarez cited.  And I believe that Dr. Weinstein has relied upon.

So generally there are two.  One published by the American Psychiatric Association, which is the Diagnostic and Statistical Manual.  It was published just after another publication by -- what was then called the American Association on Mental Retardation.

These were the publications that were available at the time of the *Atkins* case, and I believe were referenced in *Atkins*.  And they have been, I think, regarded as authoritative sources in such cases.

Although, the caveat, is always of course that these were written with the intention of diagnosing people with mental retardation in order to make them eligible for, and to plan community services.

So our challenge in *Atkins*, is to take this information and to translate it into the information that the court

**JA532**

15

requires.

Q.    How is mental retardation defined?

A.    This -- the definition of these two organizations is very similar.  And this three-part definition has been the one that has been recognized for a good many years.

The first part is significant impairment in intellectual functioning as measured by an individualized intelligence test.

The second part, not necessarily the one that comes second in sequence is significant impairment and adaptive functioning.

And on that slide, the reason that functioning is emphasized, is that, just to clarify that the definitions that we rely upon, make a clear emphasis that what we're looking for is the individual's actual behavior, how the individual functions, not how he might have functioned or what his potential for functioning is.  But being able to directly assess functioning.

Adaptive functioning is everyday life in one's community.  Of course, this is the way that this disorder has been identified for hundreds or perhaps thousands of years, as long as we've identified people who were incapable of fulfilling their adult responsibility.

The other part -- oh, and just to emphasize that word function again.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 70 of 522
Case 3:08-cv-00134-RJC   Document 59-3   Filed 03/18/10   Page 15 of 433
**JA533**

16

DIRECT-OLLEY

This is a class of disorders referred to as having a functional definition. So the definition is how one functions. It's not what the cause of the disorder was or other considerations.

And then the third part of this three-part definition is that it is in that class called developmental disabilities, that is things that originate in childhood.

Q. Is that -- the definition that you're talking about there is from the American Psychiatric Association; is that correct?

A. That's the one that's on the slide currently, yes.

Q. And is there another definition of it?

THE COURT: Before you go there, Mr. Bryson, is that what is found in the DSM-IV, or no?

THE WITNESS: Yes. This is the DSM-IV.

Q. (By Mr. Bryson) Is there another definition for it?

A. Well, the following slide is the one from what was at that time called the American Association on Mental Retardation.

This is the 2002 book, referred to as the red book. And just recently there is another one that has come out, and I only have scant information about it, because I have not received my copy yet.

But my understanding is that the definition has not changed, and none of the substantive things that we'll talk

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 71 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/18/10   Page 16 of 433
JA534

DIRECT-OLLEY

about today have changed in the new 2010 version.

Q.   Is there a substantial -- is there any difference -- what is the difference between the two definitions?

A.   The only difference -- well, at the time of *Atkins*, there was the DSM-IV, which we just looked at.  There was also a earlier MR version from 1992.  Those were the ones that were made reference to in the *Atkins* decision, and also in North Carolina state law at that time.

     And then the one that is on the slide currently, the 2002 version, of course, came along, by coincidence, the same month that the *Atkins* decision came out.  But it was not available for consideration at that time.

     The way that they differ -- the only difference is in how they articulate what a significant impairment in adaptive functioning is.  And the later slides contrast those two.

Q.   Okay.

          THE COURT:  Before you go any further, is the change in name from mental retardation to intellectual disabilities, is there any substantive difference in the two or is it just a cosmetic thing?

A.   Well, I think it's more than cosmetic, in the sense that it is in response to the wishes of people with disabilities.  Because that term, retarded and retardation, has such pejorative baggage.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 72 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/18/10   Page 17 of 433
JA535

DIRECT—OLLEY

THE COURT:  But in terms of the tests, no difference?

THE WITNESS:  There's no difference.  There is a bill before the Senate, currently.  Which the senators from North Carolina have endorsed to change the wording in many federal laws to intellectual disabilities.

But I think I continue in court to use the term mental retardation, because that's the term that's in the law and that we're all familiar with it.  But I certainly don't mean anything pejorative with it.

THE COURT:  Thank you.

Q.   (By Mr. Bryson) What causes mental retardation?

A.   My goodness, there are identified hundreds, perhaps thousands of different causes, I think.  And the categories are noted in this slide.

But without going into examples of each of them, the ones that are identifiable by cause, by biological cause, are typically those that result in much more severe impairment.

I think the key to this slide is the last point, which is that for all of mental retardation, about 30 to 40 percent of cases are of unknown cause or etiology.

And for people with mild mental retardation, that figure is even higher.

So the point is simply that although many causes are

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 73 of 522
Case 3:08-cv-00134-RJC   Document 90-2   Filed 03/18/10   Page 18 of 433
**JA536**

DIRECT-OLLEY

known, the definition does not require that a cause be identified, simply that impaired functioning be identified.

Q.   There's required to be a significant impairment; is that correct?

A.   Yes, sir.

Q.   And how is that defined or determined?

A.   It is determined statistically as two standard deviations below the mean.

And this slide is the normal distribution of intelligence.  If the mean being defined as a 100 -- score of 100 on an IQ test.  And that a cutoff for mental retardation has -- in all contemporary definitions -- been two standard deviations below the mean.  Or a score of 70 -- approximately 70 on an IQ test.

We can talk about what approximately means.

That lower portion of the normal curve represents about two and a half percent of the general population.

Q.   So looking at the diagram that's on the screen, this would reflect the general population in where everybody would fall?

A.   Yes.

Q.   In intelligence analysis?

A.   Yes.

Q.   And the bulk of people would be average or at the middle?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 74 of 522
Case 3:08-cr-00134-RJC   Document 593   Filed 03/18/10   Page 19 of 433
JA537

DIRECT-OLLEY

A.   Yes.  About half of the population, or actually two thirds of the population would be with one standard deviation above or one standard deviation below, a score of 100.

Q.   Are there different degrees of mental retardation?

A.   Yes.  Like any other disorder, visual impairment, hearing impairment, intellectual impairment exists in degrees.

And as you go further down the curve that we were just looking at, you see people with more significant impairment.

However, this pie chart is intended to illustrate that of all people with mental retardation, about 85 percent fall into that mild category.  That's with an IQ score of between about 70 and 55.

So the thing that's different about that group is, not only their large numbers, but the fact that their disability, although significant and impairs their life functioning, is not as impaired, nor as visible as for those people with moderate, severe or profound mental retardation.

So in short, the people in this largest group, 85 percent group of people shown in this pie chart, are people who look different or readily appear to be different.

I like to say, if these were the people you saw in the grocery store, you don't stop and look.  Because they don't look any different or behave any different superficially

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 75 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 20 of 433
JA538

DIRECT-OLLEY

than anyone else.  Impairments are more difficult to identify.

Q.   In an *Atkins* hearing, which group would you expect to be dealing with?

A.   I think it would be virtually exclusively people with mild mental retardation.  Partly because the people with more severe impairments are so carefully supervised, that they don't have opportunities to have problems with the law.

And the people with mild mental retardation are the people who are living in their communities, with some of them professional support, others support from friends and family members and so on.

Q.   What are some of the characteristics of mild mental retardation?

A.   Well, this one, I'm sorry, is a rather busy slide. Just quickly, the emphasize is that people with mild mental retardation can do a lot of things.

This is -- mild relative to people with severe mental retardation, but still a group of people who have significant impairment.

They can develop social and communication skills in the early years.  They don't have significant impairments in sensory motor skills.  That is to say, being able to, walk and run and jump and do motor things that would be difficult for somebody with severe profound mental retardation.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 76 of 522
Case 3:08-cv-00134-RJC   Document 90-2   Filed 08/14/13   Page 21 of 433
JA539

DIRECT-OLLEY

And as I mentioned earlier, they're often indistinguishable.  They don't get identified, usually until school years.  Because when people with mild mental retardation are required to meet the same academic standards as others, that's when their disabilities become much more readily available or noticeable.

But they can, as a group now, talking broadly, achieve academic skills up to about sixth grade, and adequate skills for most areas of everyday living, but may require assistance.

Q.   Is it easy to identify people with mild mental retardation?

A.   No, it is not.

Q.   Why?

A.   Well, because they can do a lot of things.  As I mentioned, I think that the AAMR manual, in particular, emphasizes that people with mild mental retardation are a very variable group.  They vary from one person to another.  They also variable within their own profile of skills.

So an individual may be relatively competent in one thing, but not competent in another thing.

So it's important to realize that an assessment of mild, mental retardation is going to not find uniform impairment across all performance.  It's going to have some highs and lows.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 77 of 522
Case 3:08-cv-00134-RJC   Document 93-2   Filed 03/18/10   Page 22 of 433
**JA540**

DIRECT-OLLEY

As noted in the *Atkins* decision, these are people who can tell right from wrong.  So this is not a matter of competence to stand trial.

Try very hide hard to hide their disabilities is something of a very well researched phenomenon.  The research on people with mild mental retardation shows their skills at being able to present themselves to others as not having disabilities.

And as it mentions in the slide, looking street smart, and the very up and down profile that I mentioned earlier.

Q.   How do you assess whether someone is mildly mentally retarded?

A.   Well, following the definition that we mentioned earlier, there are three parts.  And the first is one that other experts will testify to in more detail.

But following the diagnostic criteria for mental retardation, both definitions that we mentioned earlier require significant impairment in functioning on an IQ test.  This means not just any IQ test, but an appropriate one for the person's age and administered properly and interpreted properly and so on, as I'm sure will be discussed today.

And the other consideration that is evident in the AAMR quote, is considering the SEM, which is standard error of measurement for that particular test.

And that is a reminder that the score that is obtained

Laura Andersen, RMR 704-350-7493

**JA541**

DIRECT-OLLEY

is a indication of the person's functioning on that particular day.

And that if a person were tested on another day, under some slightly other circumstances, that different score might be obtained.

So the score -- and again, I think these standards come from clinical work, where it's very important not to make decisions based upon one score only, but to recognize that the standard error of measurement is a statistical indication of how much scores might -- the obtained score might vary.

Q.   So the intellectual functioning component is determined by IQ testing?

A.   Yes, sir.

Q.   What is adaptive behavior?

A.   Well, as mentioned earlier, that is the ability to function in everyday life.  So we assess adaptive functioning.

And this is what we were talking about earlier when we mentioned things I had written about adaptive functioning -- to make it a reasonably concise story -- is to gather information from as many sources as possible, that are relevant to that individual's functioning in everyday life, in his or her community, beginning as early in childhood as can be assessed, and up to whatever time the Court

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 79 of 522
Case 3:08-cv-00134-RJC   Document 93-1   Filed 03/18/10   Page 24 of 433
JA542

DIRECT—OLLEY

designates as relevant.

And the reason that I say that is because different courts have interpreted when we must demonstrate these impairments exist. The definition of course says they have to exist in childhood, so we must look at that.

The rationale of the *Atkins* decision was that the person experienced impairments in -- at the time of the crime, so we must look at that.

The point of which there are differences among the courts, and obviously we will follow the dictates of this Court.

But the question is, is the person's current functioning relevant to the diagnosis of mental retardation in *Atkins* hearing. And there have been different points of view voiced on that.

Q. Are there different types of adaptive behavior or classifications?

A. Well, the -- there are different categories --

Q. Okay.

A. -- of adaptive behavior that have been mentioned.

Q. Okay.

A. And this slide shows the ones that were noted in the 1992 AAMR definition, which was the one current at the time that *Atkins* was decided.

The criterion at that time, and the one that is also

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 80 of 522
Case 3:08-cr-00134-RJC   Document 53-2   Filed 03/18/10   Page 25 of 433
**JA543**

DIRECT-OLLEY

mentioned in the Diagnostic and Statistical Manual 4th Edition, is impairment, significant impairment in two out of the ten areas that are mentioned here.

And these are areas that are -- have been part of professional writings on adaptive functioning for many years emphasizing things such as social behavior and self-direction, and so on.

Q.   In the newer definition of mental retardation, are they categorized differently?

A.   Yes.  It's very similar information, but grouped into three categories.  And this is in response to research that has been done on adaptive functioning, to look at hundreds of characteristics of adaptive functioning, and doing statistical analysis that group into three types; conceptual, social and practical.

Q.   What are conceptual skills?

A.   Conceptual skills are ones that a person with mental retardation would be likely to have difficulty with, because they represent the application of abstract principles or abstract thinking to solving a problem.

And obviously abstract thinking criterion is relative is to a person's age.  So a child would be expected to be able to think and plan and so on abstractly, relatively to other people of his age, and the same with adults.

So it has to do with being able to understand and

Laura Andersen, RMR 704-350-7493

**JA544**

DIRECT-OLLEY

express complex language.  It has to do with what was referred in the previous slide as functional academics. Here it's referred to as reading and writing.  But the use of academics in everyday life.

Money concepts -- it's the concept part that's referring to here.  So it's being able, not just to add up money or get the correct change in the store, but to be able to plan a budget, live within a budget, understand planning for the future, as people plan for retirement and so on.

And the last one, self-direction, which is extremely important for people with mild mental retardation.  Because it's the difference between being able to make decisions in your life for yourself, versus being dependent upon other people to make those decisions or to assist you in things routinely people would be able to handle independently.

This is a reason why this cutoff of two standard deviation below the mean make sense.

Because for children, it's the point at which people below this cutoff have significant problems in school and require special assistance.

For adults, it's the point at which they require assistance for everyday living, for being able to pay their bills and get a place to live and manage all of the responsibilities of adulthood.

The conceptual skills are those things that require

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 82 of 522
Case 3:08-cv-00134-RJC   Document 53-2   Filed 03/18/10   Page 27 of 433
JA545

DIRECT-OLLEY

this kind of abstract thinking.

Q.   What are you looking at in terms of social skills?

A.   Well, this is one as I mentioned that has been part of any adaptive assessment, adaptive behavior assessment for many, many years.  It is being able to live and work cooperatively with other people, to be able to understand and reciprocate the responsibilities of our culture.

So as is mentioned here, interpersonal skills is being able to be a responsible person.

Some of these others go together a bit; self-esteem, gullibility, naivete.

These are people childlike in the sense of not understanding the nuances of social rules and social cues.

And further being able to follow rules, obey laws and avoid being victimized.  Again, if a person is naive, then they are more likely to be -- they're more vulnerable to being exploited by other people.

Q.   What about practical skills?

A.   Practical skills are ones that a person with mild mental retardation has greater likelihood to be able to be accomplished in.  Because practical skills are the things that you learn by doing, or learn by experience.

So they're not things that you have to understand the underlying principle.  You simply have to understand how to do it.  And you know how to do it because you've done it

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 83 of 522
Case 3:08-cv-00134-RJC   Document 53-2   Filed 03/18/10   Page 28 of 433
JA546

DIRECT-OLLEY

before or someone has shown you how to do it.

So many activities of daily living, being able to keep your house clean, simple cooking, finding your way around your neighborhood, things like that are examples.

Occupational skills are in here because being able to work, of course, is the central responsibility of adults. So being able to have the responsibilities of employment and related, managing money we mentioned earlier, and maintaining a safe environment using good judgment.

Good judgment is a theme that cuts across all of these things. Because the thing that gets people with mild mental retardation into trouble in their community living, is usually not an absence of knowledge, or even an absence of skills. It's an absence of judgment. They make foolish decisions and engage in what my colleague Stephen Greenspan refers to as foolish actions.

Q.   Is assessing adaptive behavior easy?

A.   No.  Particularly not easy for people with mild mental retardation. And of course in *Atkins* cases, if it was easy, there wouldn't be a need for a hearing. So *Atkins* hearings tend to be the close call; people who have some scores above, some scores below, some reasonable skills, some impaired skills.

So it requires a lot of homework, a lot of careful digging, and as many sources as possible.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 84 of 522
Case 3:08-cv-00134-RJC   Document 53-2   Filed 03/18/10   Page 29 of 433
JA547

DIRECT-OLLEY

Q.    What is the "Cloak of Competence"?

A.    That is the title of a book that was published a good many years ago by an anthropologist named Robert Edgerton, who did research in southern California on people with mild mental retardation.

      And one of the primary things that he found in studying a good many people was that they are skilled and exert a good bit of effort in trying to look competent.

      So he used this rather colorful term called the "Cloak of Competence".  They are putting forth a good bit of effort in order to look good.

Q.    And how does the "Cloak of Competence" affect your ability to assessment retardation?

A.    Well, I think for any -- that's the reason in any assessment that you have to look at information from a good many sources.

      In other words, if an individual has mild mental retardation or low intelligence in general, that means that the person is probably able to present him or herself fairly well.

      In other words, carry on a conversation, look well-groomed, look appropriate.  So you have to go beyond superficial information in a conversation in order to address these various aspects of adaptive functioning that we just discussed.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 85 of 522
Case 3:08-cv-00134-RJC   Document 53-2   Filed 03/18/10   Page 30 of 433
**JA548**

Q.   Can't you as an expert tell whether somebody is mentally retarded or not, simply by sitting down and talking to them for an extended period of time?

A.   I would get information that would be useful from that kind of discussion.  In that individuals who might be able to talk about something in a factual way, like this happened, or I heard that that happened, but wouldn't understand the reasoning behind it.

So it would be useful, and it is important.  I have mentioned gathering information from many, many sources is valuable in being able to interview the defendant is available.  But I would not make a diagnosis simply on that conversation.

Q.   Does the assessment for mental retardation focus on what a person is able to do?

A.   No.  It focuses upon what a person does.

Q.   What's the difference?

A.   Well, able to do is a supposition about what the person's potential is.  Now I'm able to learn to pilot an airplane, but I've never done it.  So you wouldn't judge my adaptive behavior on what I'm able to do, you have to actually show that you do it.

Q.   Is it based on what a person can do or what they can't do?

A.   Well it's defined as a significant deficit.  So

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 86 of 522
Case 3:08-cv-00134-RJC   Document 53-2   Filed 03/18/10   Page 31 of 433
**JA549**

DIRECT-OLLEY

therefore, the assessment of adaptive functioning is a search for deficits. It is demonstrated by showing that a person has deficits, as I mentioned earlier, either in two of ten areas of adaptive functioning, or one of three areas of adaptive functioning.

Does that answer your question?

Q. Is there something that a person can do, some function that a person can perform, that would exclude or rule out mental retardation?

A. Well, the DSM-IV specifically says that there are no exclusion criteria. So I think strictly speaking, the answer to that would be that there is nothing.

I've said, I guess jokingly in other times, that if the person graduated from Harvard, that would rule out mental retardation.

In general we're not looking for what the person did do, we're looking for what the person struggled to do, or was not performing that is expected of someone of his age.

Q. How do you conduct an assessment of adaptive behavior?

A. Well, in brief, to consider as many sources of information as possible. The AAMR manual emphasizes the use of a standardized measure of adaptive behavior; indeed that's valuable.

In this case it was not done by any of the experts, to my knowledge, simply because of difficulties of obtaining

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 87 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 32 of 433
**JA550**

33

DIRECT-OLLEY

that information in El Salvador.  Because that's where people are who knew Mr. Umana throughout his formative years.  And there are no standards that we have for functioning in El Salvador.  So that part was not applicable to this assessment, but it usually is.

And then gathering information from other sources, such as other people who have known the individual well, preferably throughout the individual's life, teachers, family members, friends, sports coaches, former employers, anyone in the community would know directly about the individual's level of functioning.  And across many contacts.

Because one of the things that was in one of the earlier slides, is that adaptive function is one's typical functioning.

So you can't assess what's typical, until you have assessed enough -- gotten enough samples from enough times and enough places to say that this is typical.

So choosing something that he did once and saying uh-hah, he did this, therefore he can't have mental retardation, would not be a valid assessment.

And so anyways, this information might come from interviews, records or files, depending upon the individual's circumstances.  What kind of archival information remains about the person.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 88 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/18/10   Page 33 of 433
**JA551**

34

DIRECT-OLLEY

And it's possible, of course, to get direct information, simply by watching the person.

But in an *Atkins* case the person is in jail or in prison.  So observing their functioning in such a restricted environment, doesn't allow us to draw the conclusions about community function that's necessary.

Q.   What's the problem with someone being in jail?

A.   Well by definition it's a restricted environment.  So people have access to only certain kinds of activities, and they are very structured.  And the demands of being in jail are less stringent than the demands for community living.

So generally, this is not regarded as a valid source of information.

Now it's fine to look at how the person's functioning in jail.  It's fine to look at anything.  All information is useful.

But then when making a decision, you look at those things that are most representative of the individual's community functioning.

And certainly how a person functions in jail, is not that standard.

Q.   Are there things to be wary of when conducting an assessment of adaptive behavior?

A.   Well, many.  And these have been written about extensively.  And so we just talked about accepting the

Laura Andersen, RMR 704-350-7493

**JA552**

DIRECT-OLLEY

35

individual's self-report as given, without challenging it or without looking for other sources that might corroborate that information.

One problem that can occur is the interviewing people who have somehow found out that this is an assessment having to do with mental retardation. So my emphasize is, just tell me about the person. I'm not saying, don't tell me about mental retardation.

So people sometimes jump the gun and say, oh, I think he has mental retardation, or I think he doesn't have mental retardation. And that is not -- these individuals are not trained to evaluate them or make a diagnosis. So that's a caveat.

And the AMR manual and some other publications by the AMR, place a great deal of emphasis upon clinical judgment. And by that they rather extensively define clinical judgment as not just seat of the pants impressions, but rather a decision that is drawn from many sources.

And the individual who makes that decision is one who has direct experience with people who have mental retardation, who knows the research literature on mental retardation, and can integrate all of that information, giving it all its weight that it deserves, and to make a decision based on all of that information.

Q.    You've got a couple more on the next screen.

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 90 of 522
Case 3:08-cv-00134-RJC    Document 50-2    Filed 03/18/10    Page 35 of 433
**JA553**

DIRECT-OLLEY

A.    Well, we mentioned the, not in prison as a standard earlier.

And then a B is not a B, is simply -- school records are very useful for many people, but even for school records in this country, they are not as objective as they appear to be.

And each school has its own manner of grading and deciding whether a person requires special services or is labeled as a person with mental retardation or is advanced to another grade.

So it's really important to find someone from that school system who understands what those school records are all about.  And sit down with that person and get an explanation of what this student's performance means.

Q.    And what are the other factors that make it difficult to diagnose someone as mild --

A.    Well, these other three were taken from the 2007 users guide, published by the AAIDD.

And briefly that -- difficulties in many of these apply to *Atkins* cases, which is why I mention them.

That people with higher IQ, still in the mild mental retardation range.  That's a challenge in making a proper diagnosis which we mentioned before.

Situations in which formal assessment is less than optimal.  And certainly in this case with an individual who

Laura Andersen, RMR 704-350-7493

**JA554**

DIRECT-OLLEY

is not a native English speaker, who did not grow up in this country, this is a challenge to our customary assessment method.

And I skipped over retrospective diagnosis, which is inherent in *Atkins* hearing.

In this case, we want to know the individual's functioning at the time of the crime, which was a few years ago.

In other *Atkins* hearings it's much more challenging because appeals may have to do with a crime that was committed 20 or more years ago.

But in every case it's retrospective. Which is different than what we do in a clinical setting, which is, we assess how he is doing now.

But in an *Atkins* hearing we are looking retrospectively, how was the person functioning in childhood; how was the person functioning at the time of the crime. And that provides its particular challenges.

The fourth one, dual diagnosis, I don't believe is relevant in this case. Although it's certainly the case that many people with mental retardation are also more prone to having mental illness. I don't believe that this is an issue that's been brought up in Mr. Umana's case.

Q. Can you talk about the concept of mental age and how it relates to mental retardation?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 92 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 37 of 453

**JA555**

DIRECT-OLLEY

A.    In earlier IQ tests when mental age was measured as an estimate of the person's cognitive or intellectual functioning.  And it's fallen out of favor a bit, because it is truly a bit of an over-simplification to simply say that a 35-year old man has the intellectual ability of an eight year old.  So it's not used as often.

But it is used in *Atkins* cases, because I think it has a clarifying effect to think that, what is the mental age that is corresponding to an IQ of 70.  And the answer to that is, it's about age 11.

So what we are examining here is, is this adult have -- does this adult have the functioning, the ability to think abstractly and to learn equivalent to an 11-year old.

I think in this case it's a useful concept, because an 11-year old can do great deal.  Many of us in this room have 11-year old children or have had.  And we know that their language and their reasoning and their physical abilities and ability to plan and so on is really pretty sophisticated.

But just for clarity, the diagnosis of mental retardation is looking at mental functioning of an 11-year old or younger.

Q.    Your involvement in this case is rather recent, correct?

A.    Yes.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 93 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/18/10   Page 93 of 433
JA556

DIRECT-OLLEY

39

Q.   I believe you didn't actually get involved in this case until October 14, 2009; is that correct?

A.   I don't remember the exact date, but it was rather recent, yeah.

Q.   What sources of information have you considered in your evaluation?

A.   Well, I'm going to cheat and look at the first page of my report, which I believe will be presented into evidence at some point.

But it is the interview of people who knew Mr. Umana in childhood, and knew him when he was working in Santa Ana, in El Salvador.

And in addition to that, the principal or what was called director of the elementary school that he attended who assisted me in going over his school records.

Shortly before I wrote my report, I also got information that the government has provided from an FBI laboratory, which consisted of letters that Mr. Umana had written.

And then after I wrote my report I had access to Dr. Suarez report for the government.

Oh, I also had access to information from a Dr. Weinstein, who will testify.  And for doctor -- I've forgotten his name -- who is the other expert today.

Q.   Dr. Merikangas.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 94 of 522
Case 3:08-cr-00134-RJC   Document 592   Filed 03/18/10   Page 39 of 433
JA557

40

DIRECT-OLLEY

A.    I believe those are the sources --

Q.    Yes.

A.    -- Merikangas.  I'm sorry.

Q.    If you would look at the monitor, since we're going to talk about it.  And I've highlighted what I've marked as Defense Exhibit Number 2.  And is that a copy of the report that you prepared in this case?

A.    Yes, sir.

Q.    And you have a copy yourself that you're referring to?

A.    Yes, I do.

        MR. BRYSON:  Your Honor, I would move for introduction of Defense Exhibit 2.

        THE COURT:  Any objection?

        MR. GAST:  No objection.

        MR. BRYSON:  Does the court need a separate copy?

        THE COURT:  I've got it.

(Defendant Exhibit 2 was received in evidence.)

Q.    (By Mr. Bryson) Now, one of the things that you considered in this case was the IQ testing done by Dr. Weinstein; is that correct?

A.    Yes.

Q.    Is it -- you yourself did not do any IQ testing?

A.    That's true.

Q.    Is it unusual for you to rely on the IQ testing of another psychologist?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 95 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 40 of 433
JA558

                    DIRECT-OLLEY

A.    No.

Q.    In this case you have had an opportunity to meet with Dr. Weinstein?

A.    Yes.

Q.    And you were able to ask him about the IQ testing that he did?

A.    Yes.

Q.    And you are also aware of the IQ testing that was done by Dr. Suarez?

A.    Yes, as contained in his report.

Q.    You know Dr. Weinstein is present in court today?

A.    Yes, sir.

Q.    And that he will be called to testify?

A.    Yes.

Q.    And that he is prepared to address his IQ testing and how it relates to that of Dr. Suarez?

A.    Yes.

Q.    All right.  You also met with Mr. Umana, Alejandro; is that correct?

A.    Yes, it is.

Q.    How many times have you met with him?

A.    Twice.

Q.    And where and when was that?

A.    In the Mecklenburg County jail.

Q.    Okay.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 96 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/18/10   Page 41 of 433
JA559

DIRECT-OLLEY

42

A.    And I don't recall -- the dates -- one is mentioned in my report, November 6th, and the other time was yesterday.

Q.    All right.  And what was your purpose in meeting with him?

A.    Well, as I mentioned earlier, I think it's always important to meet the individual and get whatever information the individual can provide, to learn how that individual communicates, and how that individual presents himself.

That's of course more difficult because my interview was done with the assistance of an interpreter.

The factual information that the individual can provide about his life is useful to know, because it's helpful to be able to compare that with what information we have from other sources.

As you asked me about earlier, I would not rely entirely upon the defendant's information, because there's substantial research on interviewing people of low intelligence with regard to their understanding the questions and being able to respond accurately and appropriately.

But it is useful to get information from that source. And then as I mentioned earlier, if we can get information from other sources, to see which of these all hang together.

I think -- I failed to mention earlier, that one

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 97 of 522
Case 3:08-cr-00134-RJC   Document 52   Filed 03/18/10   Page 42 of 433
JA560

43
DIRECT-OLLEY

acknowledgment of adaptive behavior assessment, is that it's almost entirely made up of imperfect information.

That is to say, there is no single source that you can rely upon to say this is the one that tells me he is impaired in adaptive functioning.

So we get information from many sources and look for where they all agree with each other.

Q.   Was there anything significant about your meeting with Mr. Umana?

A.   I would say that he was, in both cases, very cooperative, appropriate, willing to answer my questions. He was not hostile.  He did not -- I did not conduct any kind of formal assessment of his mental health.

But simply in the way that he presented himself, he did not show any overt indications of mental illness.  He was able to report on factual aspects of this life, such as who was in his family, where he lived, information about his work history.

And he described to me, fairly extensively, the same information that I think appears in Dr. Suarez's report, about his traveling from El Salvador to the United States, and traveling about in the United States.

So those were primarily the topics that I discussed with him.

Q.   One of the things that you also considered was his

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 98 of 522
Case 3:08-cr-00134-RJC   Document 532   Filed 03/18/10   Page 43 of 433
JA561

DIRECT-OLLEY

44

school records; is that correct?

A.   Yes, sir.

(Defendant Exhibit 3 was marked for identification.)

Q.   (By Mr. Bryson) If I can get you to look at the monitor, I'll show you what I've marked as Defense Exhibit 3.  Ask you if this is a copy of the school records you obtained?

A.   It appears to be.  Although I'm not able, at a glance, to see where Mr. Umana's name is on that list.  But it does appear to be the grades for a -- yeah, group of school children for 1991.

          MR. BRYSON:  Your Honor, I have an extra copy if the Court --

          THE COURT:  Yeah.  That would be helpful.

          MR. BRYSON:  May I approach?

          THE COURT:  Yes.

          Any objection to Defendant's 3?

          MR. GAST:  You haven't moved admission yet.

          MR. BRYSON:  That was my next -- may I move for the admission --

          THE COURT:  Any objection?

          MR. GAST:  I guess I would like a little more information how he came by these.  This is the first time I've seen it, Your Honor.

          THE COURT:  Do you want to make a proffer, Mr.

Laura Andersen, RMR 704-350-7493

**JA562**

DIRECT-OLLEY

Bryson?

MR. BRYSON:  Actually, I don't, Judge.

Let me just reserve on that and move on.

THE COURT:  Very well.

MR. BRYSON:  I'll come back for introduction purposes later.

THE COURT:  Very well.

Q.   (By Mr. Bryson) Now, as part of your assessment you actually traveled to El Salvador; is that correct?

A.   Yes.

Q.   And when did you do that?

A.   November 12th to 14th.

Q.   And while you were in El Salvador, did you go to the school where these records were from?

A.   Yes, I did.

Q.   If you would look at the monitor, does that appear to be -- well, look at the monitor, can you tell me what that is?

A.   That is the doorway.  That's a big metal door that's locked.  And the white wall that you see around it, surrounds the school, the Centro Escolar Santa Ana California.  Which is the first to third grade school that the defendant attended.

Q.   And does this photograph fairly and accurately depict the front of the school that you visited in El Salvador?

Laura Andersen, RMR 704-350-7493

**JA563**

DIRECT-OLLEY

A.   Yes, it does.

Q.   Would it assist in your testimony to use it as an exhibit?

A.   Yes.

MR. BRYSON:  Your Honor, I have physical copies of this to mark as an exhibit.  I'm not sure how the Court wants me to proceed at this point.

THE COURT:  We can capture it electronically. Let's go ahead and identify it as exhibit number.

MR. BRYSON:  I'll mark it as Defendant's Exhibit Number 4 then, if I may.

THE COURT:  Very well.

MR. BRYSON:  And then I would move for introduction of Defense Exhibit Number 4.

THE COURT:  Be admitted.

(Defendant Exhibit 4 was received in evidence.)

(Defendant Exhibit 5 was marked for identification.)

Q.   (By Mr. Bryson) Again referring to the monitor, can you tell the Court what this is?

A.   That is the interior courtyard of the school.  Which as you can see is marked as a basketball court.  And around it is classrooms.  Which you can see one with the door open here.  And they all open into the central courtyard/playground.

Q.   And does this photograph fairly and accurately depict

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17  Page 101 of 522
Case 3:08-cr-00134-RJC  Document 593   Filed 03/18/10  Page 46 of 433
JA564

47
DIRECT-OLLEY

the school as -- that you went to?

A.    Yes.

Q.    Okay.  And would it assist your testimony to use this photograph as an exhibit?

A.    Yes.

Q.    And this is what you see when you get beyond the wall that was in the prior photograph; is that correct?

A.    That's true.

            MR. BRYSON:  Your Honor, I'm gonna mark this as Defense Exhibit 4 and ask that it be admitted into evidence.

            THE COURT:  You have 4.

            MR. BRYSON:  Oh, 5, I'm sorry.

            THE COURT:  Five.  Let it be admitted.

(Defendant's Exhibit Number 5 having been marked, was received in evidence.)

Q.    (By Mr. Bryson) All right.  Now at the school, did you meet and speak with someone?

A.    Yes, I did.

Q.    And who was that?

A.    Carlos Alacides Peraza Alarcon, who was the director of the school.

(Defendant Exhibit 6 was marked for identification.)

Q.    If you would look at the monitor.  Can you tell me what that is?

A.    Yes, that is that gentleman.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-2 Filed 03/23/17 Page 102 of 522
Case 3:08-cr-00134-RJC Document 593-2 Filed 03/18/10 Page 47 of 433
**JA565**

DIRECT-OLLEY

Q.   I'm sorry?

A.   That is that gentleman.

Q.   Is that a picture of him?

A.   Yes, it is.

Q.   Does it fairly and accurately show, is it Mr. Aquino (sic?)  I'm sorry.  I got his name wrong.

A.   No.  It's Carlos Alacides Peraza Alarcon.  Peraza is the name that he goes by.

Q.   All right.  And would this -- I've marked this as Defense Exhibit Number 6.

Would it assist your testimony to use this photograph?

A.   Yes.

MR. BRYSON:  Move to --

THE COURT:  Be admitted.

(Defendant's Exhibit Number 6 having been marked, was received in evidence.)

Q.   (By Mr. Bryson) He's holding something in front of him. What is that, can you tell?

A.   Looks to be a pencil.

Q.   All right.  Now, can you tell the Court about your meeting with Mr. Alarcon?

A.   Yes.  I met in his office at the school.  And we went over the school's records for Mr. Umana's attendance at the school.  And I relied upon him for his interpretation of what those records meant.

Laura Andersen, RMR 704-350-7493

**JA566**

49

DIRECT-OLLEY

Although he pointed out to me Mr. Umana's name and grades, and we went year by year. And the bottom line is that I relied upon him for the interpretation of what those school records meant.

And that his message to me was that Mr. Umana did attend that school. That he had passing grades in first and second grade.

Although he noted to me that this is where the B is not a B caution comes in.

That it was not legal to retain students in first or second grade. So therefore they generally got acceptable grades simply for attendance and for some participation.

There was a brief period when Mr. Umana was not there, but apparently attended another school, but soon returned to this school where he continued until he had failed the third grade twice.

And then mister -- the director of the school pointed out to me that that was very unusual for someone to fail the third grade, or to fail the third grade twice.

That in his last year in school he had been in a combined first, second and third grade classroom. Which to the director indicated that it was a remedial program. And therefore he was not able to master the academic skills required in a remedial third grade.

Then following that time at about age ten, he did not

Laura Andersen, RMR 704-350-7493

**JA567**

DIRECT-OLLEY

continue going to school any longer.

Q.   When you were speaking to Mr. Alarcon, were you actually going through the records that I previously showed as Defense Exhibit Number 3?

A.   Yes.  And he was pointing out this information to me. Which was of course essential for me, because I would not have been able to interpret it without his assistance.

Q.   Did he speak to you in Spanish?

A.   No, he spoke to me in English.

Q.   And did he indicate to you that those records had in fact come from that school?

A.   Oh, yes.

        MR. BRYSON:  Your Honor, I would renew my motion to introduce Defendant's Exhibit Number 3.

        THE COURT:  Any objection?

        MR. GAST:  No objection.

        THE COURT:  Let it be admitted.

(Defendant Exhibit 3 was received in evidence.)

Q.   (By Mr. Bryson) While in El Salvador, you also met with the defendant's father; is that correct?

A.   Yes.

(Defendant Exhibit 7 was marked for identification.)

Q.   (By Mr. Bryson) Can you refer to the monitor and tell me if you recognize anybody in that photograph?

A.   Yes.  The gentleman on the right is Rafael Umana, the

Laura Andersen, RMR 704-350-7493

**JA568**

                    DIRECT-OLLEY

defendant's father.  I did not meet the other two individuals.

Q.    Does --

          MR. BRYSON:  I'm marking this as Defense Exhibit Number 7.

Q.    (By Mr. Bryson) Does the photograph of Raphael Umana fairly and accurately depict what he looked like when you met him?

A.    Yes.

Q.    Would it assist your testimony to use this exhibit?

A.    Yes.

          MR. BRYSON:  I move for introduction of Defense Exhibit Number 7.

          THE COURT:  Be admitted.

(Government Exhibit 7 was received into Evidence.)

Q.    (By Mr. Bryson) All right.  Can you tell the Court about your meeting with the defendant's father?

A.    Yes.  I meet with him with the assistance of an interpreter, in a coffee shop in Santa Ana, not far from his work.  And he works as a street vendor.  And he has a permanent position as a street vendor in a location downtown in the city where he lived and where his son grew up and went to school.

Q.    What did he tell you?

A.    Well, I spoke to him for about 45 minutes.  And I began

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC  Document 50-2  Filed 03/23/17  Page 106 of 522
Case 3:08-cr-00134-RJC  Document 593  Filed 03/18/10  Pages 51 of 433
**JA569**

DIRECT-OLLEY

my asking about confirmation of the defendant's childhood.

He indicated, yes, that he had difficulties in school. And he was aware of that because the school officials made him aware that he was not progressing well in school.

And then I talked to him about what happened after he left school at age ten.

In summary, Mr. Umana went through a series of jobs that he had tried to get his son to participate in without success.

For example, the first one was assisting a shoemaker. And Mr. Umana said that he was -- his son was only able to work there for a few days and the shoemaker sent him home and said that he was not able to do the job and was not able to learn the job.

So after that he participated in some other jobs that he -- his father arranged for him. None of which lasted very long. The -- he did confirm for me two jobs that were the most substantial ones that he held for more than a year.

The first one was as a helper on a Coca-cola delivery truck. I also spoke to the supervisor there, and we could come back to that if you would like.

Q.   Yes.

A.   But he basically confirmed what this employer said earlier, that it was helper position, which is to say -- there are three people on the truck. The second helper was

Laura Andersen, RMR 704-350-7493

**JA570**

DIRECT-OLLEY

the person who would hoist the cartons of Coca-cola products from the truck and carry them into the store. He did that job for between a year and two years.

And then -- by that time he was about age 16, and he -- all of this time was living with his father, or living with his father and the assistance of a maternal aunt who lived nearby or other relatives. But he was always living with his father nearby.

At the age of 16, his father indicated that he left to go to live with the other family. And that family provided him a place to live with that family and employment.

So that the father in the household was essentially a contractor and a mason for different kinds of different building projects.

And I spoke to him as well, and he confirmed the information that Rafael Umana had given me, that he worked as a mason's assistant on that job.

I asked him then, because this was the time in my understanding that the defendant had begun to become involved in gang activity.

And I asked if his father was aware of this. And that he said that he was aware, but he was very careful and that he always worked hard to keep his son away from gangs and keep a close look over him.

And at about that time he stood up and rather abruptly

Case 3:16-cv-00057-MOC-JC Document 50-2 Filed 03/23/17 Page 108 of 522
Case 3:08-cr-00134-RJC Document 59-2 Filed 03/18/10 Page 53 of 433
**JA571**

DIRECT-OLLEY

ended the interview.

I mentioned in my report that, through interpretation, I later learned that his reason was that the interpreter had gotten out her cell phone because she had been getting calls throughout the day about her grandson who was sick at school.

So she interrupted to get out the phone when it rang, and Mr. Umana inaccurately interpreted that cell phone as a recording device, and was concerned that we were recording the conversation, and that he was -- felt endangered by that, and he would not talk to us any further.

Q.   Were you finished with your interview with him when he terminated the interview?

A.   No.

Q.   There was more that you wanted to do with him?

A.   Some, yes.  But, I mean, in the time that we had, he did trace his son's development, and noted during that time his problems in school.  Also some memory problems that he perceived that manifested themselves in -- not only in school, but in being able to do the jobs that he was given.

Because the jobs, for example, assisting a school, were to go somewhere and purchase something.  So he couldn't remember what he was suppose to buy.

And also his academic problems meant that he was not able to handle money.

Laura Andersen, RMR 704-350-7493

**JA572**

DIRECT-OLLEY

So Mr. Umana confirmed all of these difficulties in development with me.  So there were some -- he mentioned some problems in communication.  Which is to say, to tell him over and over how to do things, and then he wouldn't remember how to do it.

So problems in memory, problems in handling money.  And certainly problems in reading and writing.

So there wasn't an opportunity to cover all of that material before the interview was abruptly ended.

Q.   At some point he talked to you about a job that Alejandro had at the Tropic Gas?

A.   Yes.

Q.   What was that?

A.   Go ahead.

Q.   I'm sorry?

A.   I interrupted you.  I'm sorry.

Q.   And did you go and see the Tropic Gas?

A.   Yes.  It was very near the place where the family was living at that time.

Q.   And did you get to see the home that he lived in at that time?

A.   I saw the outside door of the home, yeah.

(Defendant Exhibit 8 was marked for identification.)

Q.   (By Mr. Bryson) If you would look at the monitor.  Okay.  If you would look at the monitor --

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 110 of 522
Case 3:08-cr-00134-RJC Document 594   Filed 03/18/10   Page 55 of 433

**JA573**

DIRECT-OLLEY

THE COURT:  It's on the clerk's monitor but not on the witness's or mine.

MR. BRYSON:  Is it on now?

THE WITNESS:  Well, no.  But I can see on the clerk's monitor that it is the picture -- oh, yes, the same one.  The picture that I took, that I believe to be the homes that he grew up in for much of his youth.

MR. BRYSON:  I've marked that as Defense Exhibit Number 8.

And you actually took that photograph; is that correct?

A.   Yes.

Q.   (By Mr. Bryson) This was the home that Alejandro lived in when he worked at the tropic gas; is that correct?

A.   Yes.  Tropic gas is maybe just 20 yards to the left of this picture.  This is on a, what's referred to as the bypass.  So a highway is going right by here.

MR. BRYSON:  Your Honor, I would move for introduction of Defense Exhibit Number 8.

THE COURT:  Any objection?

MR. GAST:  No, Your Honor.

THE COURT:  Let it be admitted.

(Defendant Exhibit 8 was received in evidence.)

Q.   (By Mr. Bryson) Now, you met with more than one of his former employers; is that correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC  Document 50-2  Filed 03/23/17  Page 111 of 522
Case 3:08-cr-00134-RJC  Document 59-2  Filed 03/18/10  Page 56 of 433
**JA574**

DIRECT-OLLEY

A.    Yes.

Q.    Was one of those persons a Mr. Miguel Castaneda?

A.    Yes, sir.

(Defendant Exhibit 9 was marked for identification.)

Q.    Is your monitor working now?

A.    Yes.

Q.    Can you look at the monitor and tell me what this is?

A.    Yes.  That's a picture of Mr. Castaneda.

Q.    I am going to mark that as Defense Number 9, and ask you if that fairly and accurately depicts Mr. Castaneda?

A.    Yes, it is.

Q.    And would it assist your testimony to use this as an exhibit?

A.    Yes, sir.

        MR. BRYSON:  Your Honor, I would move for introduction of Defense Number 9?

        THE COURT:  That will be admitted.

(Defendant Exhibit 9 was received in evidence.)

Q.    (By Mr. Bryson) Where and when did you meet Mr. Castaneda?

A.    I met him in a hotel in Santa Ana.  I think it would have been November 12th of this year.

Q.    What did he tell you?

A.    I spoke to him with the aid of an interpreter, he was quite friendly and forthcoming.  He mentioned that he had

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 112 of 522
Case 3:08-cr-00134-RJC Document 59-2   Filed 03/18/10   Page 57 of 433
JA575

DIRECT-OLLEY                                    58

employed Mr. Umana when he was about 15 years old.  That he -- I asked how Mr. Umana had obtained the job.

And the answer was that Mr. Castaneda had known Mr. Umana's father.  Because at one Mr. Umana's father had a small store where Mr. Castaneda delivered Coca-cola products.  And so Mr. Umana's father asked this gentleman if he would employ his son.  He agreed to take him on as the second helper.

Now, the second helper -- well there are three people on the Coca-cola delivery truck.  There is the delivery man, who was at that time, Mr. Castaneda, and then a helper. Both of these people are employed by the Coca-cola company.

But because the work requires more people, a second helper is hired, and the driver has to pay that person out of his own pocket.  So he clarified that he was sort of a extra helper employee.

And he clarified the role, which was to carry the Coca-cola products from the truck to the -- to the -- the small stores could be located in a variety of places, sometimes out of town.  And so you couldn't just wheel it up to the door.  You had to sometimes go over rough ground and carry these things.  So he -- that was his responsibility.

Then I asked a number of other questions about whether Mr. Umana took on any other more complicated roles during the time that he was there.  And the answer was that he did

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 113 of 522
Case 3:08-cr-00134-RJC   Document 59-3   Filed 03/16/10   Page 58 of 433
JA576

DIRECT-OLLEY

not.

The only other role that he mentioned to me was that they sometimes had Coca-cola promotions.  Such as there was a new product -- such as Coke Zero had been introduced.  I don't know if it was during his time.  But Coke Zero was out in that country.

And so when there was a new product, they would hand out fliers and talk into a bullhorn.

And I asked Mr. Castaneda if this was a complex or difficult job.  And he said no, that was very simple.  You stand on the corner and yell.

And -- so that was the only other responsibility.  I asked about whether he had decisions to make about money or billing.  And he said no, Mr. Umana was not capable of doing that.

I asked about any other decisions.  And he indicated that there were no other decision-making roles that he took.

I also asked, because in my interview of Mr. Umana, we had talked about his driving.  And he said that he had tried to learn to drive the truck.  But that he was --

Q.   Who are you referring to?

A.   Mr. Umana had self-reported that he had tried to learn to drive the truck, but that he was not successful in doing so because he couldn't park, and it was a big truck and so on.  That was Mr. Umana's self-report.

Laura Andersen, RMR 704-350-7493

**JA577**

DIRECT-OLLEY

When I asked Mr. Castaneda about that, he said no, that he was not familiar with Mr. Umana ever driving the truck and didn't feel that he was a good risk to be driving the truck.

Q.   Was there some way to compare his performance, that is Mr. Umana's performance in this job, with those of other people who performed the job?

A.   Well, in the sense that I asked him, if he was able to do the job.  And what the job responsibilities were.  And I asked if he were -- well, Mr. Castaneda himself had started out in that role when he got out of school.  But he advanced to becoming the head person of the three-person team.

So I asked if he thought that Mr. Umana had the potential to advance beyond being the second helper.  He said no, he did not think he did.

Q.   Let me just stop here for a minute.  You interviewed Mr. Castaneda; is that correct?

A.   Yes, with the aid of an interpreter.

Q.   You did not ask him to take any tests or anything like that?

A.   That's true.

Q.   You're familiar with what's known as the ABAS II or ABAS scale?

A.   The Adaptive Behavior Assessment System.

Q.   Can you tell the Court what that is?

Laura Andersen, RMR 704-350-7493

**JA578**

DIRECT—OLLEY

A.   Well, it is one of, I would say, three currently available adaptive behavior scales.  That is a common way of assessing adaptive functioning.

As I mentioned earlier, I did not use that as a guide to gathering information for any of these folks, because it is scored relative to the general population of the United States.  And I thought that that was going to yield an uninterpretable score.

And so in this case I had to rely on objective questions.  I tried to make my questions as objective as possible, and not leading questions, to determine what Mr. Umana's work function was.

Q.   You also had a chance to meet with another one of his employers; is that correct?

A.   Yes.

Q.   Mr. Herrera?

A.   Carlos Aquino Herrera.

Q.   Okay.

A.   As distinguished from his son, who is also Carlos Herrera.

Q.   And you do not have an actual picture of the father; is that correct?

A.   That's correct.

(Defendant Exhibit 10 was marked for identification.)

Q.   (By Mr. Bryson) I'm going to show you on the monitor

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 116 of 522
Case 3:08-cr-00134-RJC   Document 593   Filed 03/18/10   Page 61 of 433
JA579

DIRECT-OLLEY

62

what's been marked as Defense Exhibit Number 10 and ask you what that is?

A.    This is the gentleman we spoke of, two children.  His son, Carlos Yovani Herrera, who is 27 years old.  And his daughter, Carla Herrera, who I believe is about 20.  They live -- this is in front of Carlos Aquino's home.  And they live nearby in this same little community.

Q.    Would it assist you to use Defense Exhibit Number 10 to explain your testimony?

A.    Yes.

        MR. BRYSON:  I would move for introduction of defense number ten.

        THE COURT:  Any objection?

        MR. GAST:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Defendant Exhibit 10 was received in evidence.)

Q.    (By Mr. Bryson) Is there a reason why you didn't get a picture of the father?

A.    He was inside and he was not feeling well that day.  It was also very dark inside this building.  It didn't have any, that I could tell, any window light.  And the doors were kept closed all the time.  So it was very dark.  And it seemed to me to be very intrusive to ask to take a picture with a flash inside their home.

        So I did take this picture of his two children when we

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 117 of 522
Case 3:08-cr-00134-RJC   Document 598   Filed 03/18/10   Page 62 of 433
**JA580**

DIRECT-OLLEY

stepped outside.  And obviously asked their permission to take the picture.  But it seemed less intrusive to take this picture, than it would to have taken a picture of their father.

Q.    What did Mister -- and you interviewed all three; is that correct?

A.    Yes.

Q.    And what did the father tell you?

A.    Well, he confirmed that he had been Mr. Umana's employer.  And that he had agreed to have Mr. Umana -- and this was at about age 17 or 18, come to live with him and his family, and to work for him.

And so we discussed what this work role was.  And it was a mason's helper, which also involved carrying things. In some ways much like the Coca-cola's distributor helper's role.

So he mixed the ingredients for concrete and he broke up rocks and he carried materials.  This was more -- masonry work was in the construction of commercial buildings, and several cell phone towers.

So the base of the cell phone tower is concrete.  And next to it is a concrete building, in which mechanical material or equipment is kept.  Those are the buildings that they constructed.

And I asked this gentleman about Mr. Umana's role in

DIRECT-OLLEY

this job. And it was primarily carrying materials.

And I asked him about measuring things. Because I had -- when I interviewed Mr. Umana, given him a ruler and asked him to measure some things. And he had a bit of difficulty with that, and said that he wasn't good at measuring things.

So there was some discussion about whether he measured for this job; and he did. He measured by the bucketful of cement. And he also used a tape measure to measure rebar and cut rebar. And he was able to do those tasks.

Q.   You also spoke with his children?

A.   Yes.

Q.   What did they tell you?

A.   Well, the son who is in this picture, told me that he worked with Mr. Umana. And basically I tried to interview these three people as separately as possible so they weren't influencing each other.

But he basically confirmed the nature of the work. I had -- I asked Mr. Carlos Herrera if Mr. Umana was able to read blueprints. He said, no, he was not able to do that. That it required more education than he was able to do.

So my conversation with each of these folks was about work.

Now the -- Carla, the younger daughter, did not work with him, so she couldn't comment on his work skills. And

Laura Andersen, RMR 704-350-7493

**JA582**

DIRECT-OLLEY

that was a consistent picture that he had a limited role.

I also asked them about his sociability. And they included -- I'll interject my impression from talking with them. Which is, I will identify it as my impression based upon this conversation.

My impression is that they -- despite my saying I wanted objective information, tell me the good or the bad, whatever. Don't mislead me in any way.

I think they -- in my opinion, they felt the need to make everything sound positive. So he was a good guy. He was social. He had friends. Everyone liked him. He got along fine. Everything's fine.

So there was a lot of repetition of that, everything's fine. And so that's hard for me to interpret. But at least in the social aspect, they were clear that he was a member of the family. He would help out around the house if he was asked to do something. And that people liked him.

I also asked them about his playing soccer because that was something that apparently was an important part of his interests when he was younger. And they confirmed that he did play soccer. And Mr. Umana confirmed his interest in soccer when I interviewed him.

And I was trying to get some assessment -- as I mentioned earlier, his motor skills are not an aspect of mental retardation, so it's not really relevant to a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 120 of 522
Case 3:08-cr-00134-RJC   Document 593   Filed 03/18/10   Page 65 of 433
JA583

DIRECT-OLLEY

diagnosis, but -- except to the extent that, did he have meaningful leisure skills.  And so he did.

He was interested in soccer.  He was interested in music.  He was interested in dancing.  So that was information they provided relative to adaptive functioning.

Q.   Did they tell you anything about who he looked and associate with in social situations?

A.   Yes.  They said that he was -- his social -- well, he was friendly and cheerful, but in a more childlike way.

So he was -- he seemed more comfortable with younger children.  And his friendliness and his joking manner, was more like that of a younger child.

Q.   Now, you also met with a Monica Reyes?

A.   Yes.

(Defendant Exhibit 11 was marked for identification.)

Q.   (By Mr. Bryson) If you look at the monitor, can you identify what I've marked as Defendant's Exhibit 11?

A.   Yes.  This is a picture of Monica Tatiana Reyes.

Q.   There's also a child with her?

A.   And her child, which is also the defendant's child, Ralphael.

Q.   Would it assist to use Defense Exhibit Number 11 to illustrate your testimony?

A.   Yes, sir.

MR. BRYSON:  I move for introduction of Defense

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 121 of 522
Case 3:06-cr-00134-RJC  Document 59-2   Filed 03/18/10   Page 66 of 433

JA584

DIRECT-OLLEY

Exhibit Number 11 for admission.

THE COURT:  Any objection?

MR. GAST:  No, Your Honor.

(Defendant Exhibit 11 was received in evidence.)

Q.   (By Mr. Bryson) Tell the Court about your meeting with Monica.

A.   Well, I took this picture with your permission in the coffee shop in Santa Ana where I interviewed her.  She was willing to talk to me.  And her value as a witness is -- has to be qualified a little bit in terms of something I mentioned before, which is that a good witness is one who can tell you about many aspects of the individual's functioning and report on what the person's typical adaptive functioning is.

Her limitation is that although she had a child with the defendant, she knew him only in a very restricted way.

That is, that they began seeing each other socially when she was very young, 14 or 15.  And she was living with her family.  And Mr. Umana was living with his father.

So although they had a child together, they never lived together.  They never maintained a household together.  They never engaged in the responsibilities associated with maintaining a household.

So her feelings toward him are certainly positive and her concern for him was sincere.  She did say positive

Laura Andersen, RMR 704-350-7493

**JA585**

68

DIRECT-OLLEY

things about that he was responsible toward his child who was a baby at that time.  Brought money for the baby.

And I asked her if he was engaged in gang activity at that time.  And she, I must say, I thought hedged on that a bit.  I think the answer was yes, but she was basically saying, that she tried to stay out of that.

She emphasized that he had never been bad to her.  That he was respectful to her.  And that he had never asked her to do anything improper.

She did also -- I think the only thing that I thought was really significant with regard to adaptive functioning, is that she indicated that he -- as been indicated by other people -- had problems with memory.

That is to say that he would put something somewhere and then not remember where he put it.  And then get mad at her, thinking he might have given it to her, and later he would find it.

Now she was not aware of -- and I didn't not mention, I apologize.  But in talking to Mr. Umana's father, one of the things that I had reviewed with him, is very important, was that he had had two head injuries when he was about five years old.

And Monica did not have -- she did not know him at that time.  So I was trying to get some indication of whether there was any tie with the head injuries and his

Laura Andersen, RMR 704-350-7493

**JA586**

DIRECT-OLLEY

forgetfulness.  But that's probably not something that would be considered a valid assessment.  But she did indicate that he's forgetful.

Q.   You also considered Mr. Umana's writing skills?

A.   Yes.

Q.   What did you consider?

A.   Well, when I was in El Salvador is when I received through e-mail, this information from the FBI which included letters that had been written by Mr. Umana, and allegedly written in code.

And so I asked the interpreter, Ms. Garcia, if she would read this information and give me some information about the quality of his literacy, his writing.

Q.   What did she tell you?

A.   Well, I have -- this is the original of her letter to me.  And I believe you have a pdf of it as well.

But she said to me, you might not have much sense in this information, since Alejandro does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other.  And writes guided by the phonetic sound of words.

So I thought that that was a useful description, because she wasn't simply saying, well, he doesn't write well.  She went into details about what it was about his

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 124 of 522
Case 3:08-cr-00134-RJC   Document 593   Filed 03/18/10   Page 69 of 433
JA587

DIRECT-OLLEY

writing that was substandard.

(Defendant Exhibit 12 was marked for identification.)

Q.    (By Mr. Bryson) If you would look at your monitor, I have marked, I think it's Defense Exhibit Number 12.  Is that a copy of the letter that you're referring to?

A.    Yes, it is.

Q.    And you got this from the interpreter that you were using while you were traveling through El Salvador; is that correct?

A.    Yes.

        MR. BRYSON:  Your Honor, I would move for the introduction of Defendant's Exhibit Number 12.

        THE COURT:  Any objection?

        MR. GAST:  No objection.

        THE COURT:  Let it be admitted.

(Defendant Exhibit 12 was received in evidence.)

Q.    (By Mr. Bryson) Now, you're aware that in his writing there's -- what appears to be him writing in code?

A.    Yes.

Q.    And how do you evaluate that?

A.    Well, there were two kinds of code.  One was the spoken code, and one was the written code.

    The -- I believe this is the information that -- same conclusion that the FBI came to.  That the spoken code was a reversal of syllables.  That is, to put the first syllable

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 59-3  Filed 03/23/17  Page 125 of 522
Case 3:08-cr-00134-RJC  Document 59-3  Filed 03/18/10  Page 70 of 433
**JA588**

DIRECT-OLLEY

toward the end.

And so it's -- as I indicated in my report, it's similar to Pig Latin, except simpler, because it's just a reversal of syllables.

And I asked Mr. Umana about the code. And was it difficult to do this, speaking in code. And he said, no, something that children do in El Salvador do. There are even some songs that are performed in this kind of speech. So it's a kind of altered speech that children do and that's common in El Salvador.

Q. For example, the Spanish word tango, would become gotan?

A. Yes.

Q. What about the written code?

A. The written code is a substitution of letter for letter. That is, that Mr. Umana had in front of him a written code in which, for example, A, is represented by some other letter. B, is represented by some other letter. So it's an exchange or transformation of letters, code.

And for Mr. Umana to write using that code, he had to make that transformation. So he had to first decide what he was going to say, the spelling of it, and then make the transformation from the letter that he thought went in there, to the coded substitute letter.

This was of course complicated for the FBI by the fact

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2 Filed 03/23/17 Page 126 of 522
Case 3:08-cr-00134-RJC Document 592 Filed 03/18/10 Page 71 of 433
JA589

DIRECT-OLLEY

that he spells very poorly.  So it's a transformation of his often misspelled words.  But that was the basis of what the code was.

Q.   Were you able to make an analysis or comparison between his writing in code and part of the IQ testing that he was given?

A.   Yes.  Because that task of substituting letter for letter, is similar to a task that is on the Wechsler Adult Intelligence Scale, which he was given twice, once by Dr. Weinstein and once by Dr. Suarez.  And I had access to Dr. Weinstein's data.

And the task on the Wechsler Adult Intelligence Scale is a substitute of a symbol for a number.  So it's a similar kind of substitution task.  And it's really just a test of speed.  It's given for two minutes.

And I believe Dr. Weinstein's data, Mr. Umana completed 41 correct transformations in 120 seconds.  So that's roughly one every three seconds, which is quite slow.  And it translated into a standard score that placed his performance at the second percentile which is, approximately in keeping with the IQ score that Dr. Weinstein obtained.

Q.   In Dr. Suarez's report, he gave consideration to several items that Mr. Umana had self-reported to him.  For example, his ability to travel from El Salvador, and to travel throughout the United States.  What weight do you

JA590

DIRECT-OLLEY

give those considerations?

A.   I also had that -- I think I mentioned that similar conversation with Mr. Umana.  And he did report his travels to me.

I think the key that I wanted to obtain from that interview, was whether he did all that traveling unassisted, or whether he had assistance.

And the short answer to that question is that he reported to me that he had assistance at each step along the way, about what bus to get, or how to get on a train, and that sort of thing.  And he was traveling with another friend of his.

So, I guess there's two parts to that question.  One is, what did I learn about his independent functioning.  In that I learned that he wasn't independent, that he had assistance for that travel.  And also for travel back and forth in the United States.

And basically someone gave him -- when he wanted to go from New York to Los Angeles, someone gave him a piece of paper with Los Angeles written on it and told him, show that at the bus station and they'll tell you what bus to get on. He took a zig zag path across the country and got to Los Angeles.

I think the other part of your question refers to my reliance on his -- or Dr. Suarez's reliance on the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 128 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 73 of 433
JA591

DIRECT-OLLEY

defendant's self-report in general.

I think we addressed that somewhat earlier in my saying that I welcome that information. But that I would not take self-report to be at face value.

I would want to -- for example, Dr. Suarez mentioned that Mr. Umana had said to him that he was a salesman in a tire store. That seemed a much higher level kind of job than what I knew him to have.

So when I asked Mr. Umana about that, he said no, he was never a salesman. That he worked in a place by the side of the road that repaired tires.

And I -- in my travels in El Salvador, I found that there are a lot of businesses that are literally -- people just set up shop on the side of the road.

So I think that there are some discrepancies in what I found and what Dr. Suarez found. And it may be simply what Mr. Umana is wishing to puff up his accomplishments a bit.

Q.   Did you find any other examples of Mr. Umana's self-reporting would be greater than what you learned from others?

A.   I did, and I cannot --

Q.   What about the driving the truck?

A.   Well, that was -- it was mentioned in Dr. Suarez's report that he drove a truck. But his employer indicated that he did not. And Mr. Umana indicated to me that he did

Laura Andersen, RMR 704-350-7493

**JA592**

DIRECT-OLLEY

not.  And also that he never had a driver's license.

Q.    What weight do you give to the jail's medical records?

A.    Well, as I said earlier, I'm willing to look at anything.  But I'm not sure that the jail -- any kind of jail functioning is very helpful in the diagnosis of mental retardation.

So his medical records do not address those criteria for diagnosis of mental retardation that we discussed earlier.

Q.    What about his disciplinary records from jail?

A.    The AAMR makes quite clear that there's a difference between what they refer to as maladaptive behavior.  That's the kinds of disciplinary problems.  And deficits in adaptive behavior.  Which is what we're talking about today.

So, in other words, his disciplinary record does not pertain to a diagnosis of adaptive -- an assessment of adaptive functioning, or the diagnosis of mental retardation.

Q.    Dr. Suarez interviewed three jail officers about his functioning in jail.  Is that important in your assessment?

A.    I think there is no harm in getting information about how the individual functions in jail.  But as I mentioned earlier, I would not rely upon that for a diagnosis.

I think, as I recall in Dr. Suarez's report, he even asked them whether he thought that he had mental

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-2  Filed 03/23/17  Page 130 of 522
Case 3:08-cv-00134-RJC  Document 59-2  Filed 03/18/10  Page 75 of 433
JA593

DIRECT-OLLEY

retardation.  This is not an appropriate way of assessing mental retardation.  These individuals are not qualified to be diagnosing mental retardation.

And if an individual functions well within the routine of jail, it in no way excludes the possibility of mental retardation.

Q.   What about the spelling test that Dr. Suarez gave Mr. Umana?

A.   As I recall how it was reported, he said that he selected 50 words from letters that Mr. Umana had written. And that Mr. Umana was able to spell all 50 words.

So I don't know how to assess it, because I don't know, did he choose 50 words that were properly spelled in the letter, or 50 words that were inaccurately spelled in the letter.  I mean, it seems like a strange kind of a spelling test.

To have a valid spelling test, you would have to choose words in Spanish that were indicative of a certain level of, you know, a grade level of being able to spell words.

I don't know how to interpret asking him to spell words that he had already written.

Q.   In Dr. Suarez's report he lists numerous skills that Mr. Umana has.  Are these skills something that can exclude him from a diagnosis of mental retardation?

A.   In general, no.  And this is what we're talking about

Case 3:16-cv-00057-MOC  Document 50-2  Filed 03/23/17  Page 131 of 522
Case 3:08-cv-00134-RJC  Document 50-2  Filed 03/18/10  Page 76 of 433

**JA594**

DIRECT—OLLEY

earlier, that the DSM says there are no exclusionary criteria. So -- I don't recall each of the things, and I don't have Dr. Suarez's report in front of me.

But in generally listing, he did this, he did this, he did this, does not exclude mental retardation, because the diagnosis is based upon deficits.

And as I mentioned earlier, people with mild mental retardation have quite varying skills. If you pick out the ones that they're able to do well, and only report on them, it's not a typical -- it's not an indication of typical functioning.

Q. What about the fact that he's never been diagnosed as being mentally retarded before?

A. Well, the AAMR clearly -- and Dr. Suarez relies upon the AAMR in his report. But the AAMR manual clearly indicates that it is not necessary to have a diagnosis in childhood. Because certainly if someone failed to make the diagnosis, that doesn't mean that the deficits never existed. So it's important that the deficits originated in childhood. But it is not required to have a diagnosis.

And certainly from what I learned about the school system in Santa Ana, it would be very unlikely, very unlikely, that a diagnosis of mental retardation would have been given to Mr. Umana in childhood.

Q. Did you review Dr. Merikangas' report?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-2 Filed 03/23/17 Page 132 of 522
Case 3:08-cv-00134-RJC Document 504 Filed 03/18/10 Page 77 of 433
JA595

                       DIRECT-OLLEY

A.    Yes, I've read it.

Q.    Is that of any significance to you in your assessment?

A.    It's significant in that I recognize and respect his credentials to diagnose brain impairment.  And that his conclusion is that this individual has brain impairment.

      As I mentioned earlier, it is not necessary to have a etiology or a cause for impaired functioning.  It's just required to have impaired function.

      But if there is information indicating that there is impaired brain functioning; yes, that's relevant because it is one of those contributing factors to mental retardation.

Q.    Were you able to gather enough information in this case to make an assessment for Alejandro Umana on the question of mental retardation?

A.    Yes, I was.

Q.    And what is your assessment?

A.    My assessment is that based upon the information that was available to me, that Mr. Umana, from childhood, has had mild mental retardation.  And that that is a condition that has continued up until the time of the crime.

      Because of the limitations that I mentioned earlier, and the assessment of adaptive functioning in jail, I don't believe I can offer a diagnosis about current functioning.

Q.    What -- why -- can you explain why you've come to that assessment?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 133 of 522
Case 3:08-cr-00134-RJC   Document 593   Filed 03/18/10   Page 78 of 433
JA596

DIRECT-OLLEY

A.   Well, based upon the IQ information that I had reviewed from both psychologists who did IQ testing, and from the available information from Dr. Suarez, and from my investigation of adaptive functioning, I believe that there's significant impairment in intelligence, and significant impairment in adaptive functioning.

Q.   Let me jump back to one thing.  When you were speaking with his father Raphael, in El Salvador, did he tell you when he received the head injuries?

A.   Yes.  At about age five.

Q.   And he described the two; is that correct?

A.   That's correct.

Q.   Did he describe when, in relation they occurred to each other?

A.   Very close in time.  I think he said a few weeks apart.

Q.   Do you know whether or not he received -- did he tell you whether or not he received any medical treatment?

A.   Yes.  In both instances he did.  His father took him to a hospital.  He was bleeding and obviously had been injured, in both cases.

        MR. BRYSON:  Those are my questions, Your Honor.

        THE COURT:  Why don't we take a morning break at this time.  We've been going at it for a couple hours.  Before we start cross, we'll take a 15 minute break.  Come back at 11:15.  Be back on the stand before 11:15.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-2   Filed 03/23/17  Page 134 of 522
Case 3:08-cv-00134-RJC  Document 59-2   Filed 03/18/10  Page 79 of 433
**JA597**

CROSS-OLLEY

(A brief recess was taken in the proceedings.)

THE COURT:  You may begin your cross.

CROSS-EXAMINATION BY MR. GAST:

Q.  Good morning, Doctor.

A.  Good morning, sir.

Q.  First I want to talk a little bit about your prior experiences in court.  You testified that earlier you had testified for the government on at least one occasion?

A.  Yes.

Q.  Was that in state court?

A.  Yes.

Q.  Was that prior to or after *Atkins*?

A.  After.

Q.  All right.  And so all your other appearances -- all your appearances in federal court have been on behalf of criminal defendants; is that true?

A.  That's true.

Q.  So -- and that's all 16, I believe you said, 16 times in federal court?

A.  No, no.  Sixteen times all together, which is mostly in state court in North Carolina.

Q.  All right.  And in terms of your current employment you're not -- you don't have any sort of clinical practice, right now; is that right?

A.  No.  The nature of the contract in the school of

Laura Andersen, RMR 704-350-7493

**JA598**

CROSS-OLLEY

medicine is that they own me.  So everything that I do -- I mean, they bill for my time.  But that all work is -- all my work is done as part of my employment with the university.

Q.    And how long has it been then, since you've been engaged in clinical practice?

A.    I'm probably misunderstanding your question.  If you mean by private clinical practice, I've never been involved in private clinical practice.

Q.    Okay.  All right.  And I take it you're full time at the university?

A.    Yes, sir.

Q.    So testifying as an expert is an extra curricular activity for you?

A.    No, sir, it's part of my job.  I'm a state employee.  I get my state salary.  So this is not -- this is something -- there's billing, it goes to the university or it goes to the medical school.  It doesn't go to me directly.

Q.    I see.  All right.  And I take it since you testified earlier that you've been using an interpreter, you don't speak Spanish yourself?

A.    Not enough to do this work, certainly.

Q.    So all the interviews with the defendant and everybody else was filtered through an interpreter?

A.    That's right.

Q.    And I believe you testified that you didn't know the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-2  Filed 03/23/17  Page 136 of 522
Case 3:08-cv-00154-RJC  Document 59-2  Filed 03/18/10  Page 81 of 433
**JA599**

CROSS-OLLEY

exact date that you got involved in this case, sometime in mid October?

A.    Yes.

Q.    And as far as preparing for this examination, you interviewed -- or for your testimony, rather, you interviewed the folks that are outlined on page one of your evaluation?

A.    That's correct.

Q.    And then you reviewed the work of other people?

A.    Yes.

Q.    You didn't run any tests of your own -- any standardized tests of your own; is that right?

A.    No.

Q.    Did you have an opportunity to read the discovery in this case, anything about what had happened, or anything like that?

A.    Could you be more specific about that, what it would be.

Q.    Well, why don't you tell me what if any discovery you reviewed.  Let's do it that way.

A.    I'm not aware of anything other than the information that I referred to that the FBI provided with regard to Mr. Umana's writing.

Q.    Okay.  So the only discovery you viewed in this case, is the -- a small selection of letters that the FBI

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2  Filed 03/23/17  Page 137 of 522
Case 3:08-cr-00134-RJC Document 1522  Filed 03/18/10  Page 82 of 433
**JA600**

CROSS-OLLEY

evaluated for code-breaking purposes?

A.   I did -- I did review the interview with Mr. Umana by a Greensboro policeman and a Charlotte policeman.

And at least -- very lengthy, so I didn't read every word of the longer, several hour interview by two Los Angeles detectives.

Q.   All right.  You reviewed that in its entirety?

A.   No, I did not.  I read like the first 30 pages of it.

Q.   All right.  I guess before I move on to other things, that interview itself, I don't know if you know this, is a subject of a Motion to Suppress in this courtroom.

But the Greensboro interview -- that Greensboro interview was characterized by a great deal of, kind of, cat and mouse between the defendant and the investigators; isn't that true?

A.   I would not characterize it that way.

Q.   You don't feel that he had a pretty complete understanding of the nature of what was going on and why he was there?

A.   No.  I think he probably did not understand his *Miranda* rights.  I think that his cat and mouse, if you want to call it that, was that he said, initially, I don't know what you're talking about.

And then tried to strike a bargain that if I talk, you will move me to New York.  Which was a rather naive request.

Laura Andersen, RMR 704-350-7493

**JA601**

84

CROSS-OLLEY

And then he opened up and started talking about it.  And of course he didn't have any likelihood that he would be moved to New York.

So I thought that he was extraordinarily unsophisticated.  He was not -- the language -- it's hard to tell, because in the interpretation there was a lot of inaudible and unintelligible things noted.

There was a lot of back and forth trying to get him to clarify things.  I thought he was quite inarticulate and naive.

Q.   Did you read any of the letters from him, written by him in the jail, anything like that, other than the ones that were submitted to you by the FBI?

A.   No.

Q.   And did you listen then to any of his jail phone calls?

A.   No.

Q.   All right.  Kind of talking, just kind of generally about mental retardation.

I think you testified several times that his diagnosis, particularly with regard to adaptive functioning, is a difficult task; I think that's fair to say?

A.   Yes.

Q.   And the causes, you said there's hundreds or thousands of causes?

A.   Yes.  Potential causes or identified causes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 139 of 522
Case 3:08-cr-00134-RJC  Document 592  Filed 03/18/10  Page 84 of 433
**JA602**

CROSS-OLLEY

Q.    And there are also environmental factors that might cause someone to under-perform, whether it's, you know, in life, generally, or particularly with testing and things like that; isn't that true?

A.    Yes.

Q.    And that those environmental causes oftentimes will not be attributable to mental retardation, but just environmental factors that might affect your schooling, your employment, things of that nature?

A.    Going back to my earlier statement, mental retardation is impaired functioning.  So if environmental factors contribute to impaired functioning and they're contributing to mental retardation.

Q.    Right.  Well, I guess what I'm getting at is, for example -- take for example a person growing up in a broken or abusive or traumatic home.  And they don't go to school as a result of that, and therefore don't do well in school. That doesn't necessarily make them retarded, it just means that they're not doing well in school because of environmental factors, right?

A.    No.  We -- what we refer to as mild mental retardation today, years ago -- since we're acknowledging some less than politically correct terminology -- used to be referred to as cultural familial mental retardation.

      And the reason that it had that term is because the

Laura Andersen, RMR 704-350-7493

people with mild mental retardation most typically come from circumstances where they've had limited opportunities to learn. And the familial part is that some substantial part of intelligence is heredity.

So people with mild mental retardation typically come from conditions of poverty. And typically have family members who themselves are low functioning.

So if a person is low functioning as a result of impaired opportunities, it's still going to be diagnosed as mental retardation.

Q. All right. So you're saying that merely doing well poorly in school because they don't attend, or for family reasons, that would make them retarded?

I mean, you could have an IQ of 140, but if you don't go to school, you're not going to read, right?

A. Yes. And you wouldn't have a diagnosis of mental retardation because you have an IQ of 140.

But the two parts, low intelligence and low adaptive functioning, have to coexist. There's no way of proving what caused what. That's why I said it's a functional definition. If you can determine that both exist, then the diagnosis can be made.

Q. Exactly. That's what I was getting at.

Now, the -- addressing then some other environmental factors that you didn't address.

JA604

CROSS-OLLEY

Number one, you're aware, are you not, that during the defendant's childhood, there was a -- what ended up being a 12 year long pretty nasty civil war going on in El Salvador.

A.    Yes.

Q.    From about 1980 to 1992, which is essentially his formative years of childhood, correct?

A.    Yes.

Q.    And that's certainly an environmental factor that probably affected all the children of his age group; isn't that fair to say?

A.    Probably.

Q.    And you also mentioned drug use.  Of course drug use and abuse is something that can affect someone's performance at school, one's performance at work, things of that nature, true?

A.    Absolutely.

Q.    And certainly involvement in drugs, you know, is routinely seen that it causes counter-productive behavior. That is, losing jobs, having to move, things of that nature?

A.    Yes.

Q.    And you're aware, are you not, the defendant admitted to using and selling marijuana at a pretty young age, even while in El Salvador?

A.    Yes, I'm aware of that.

Q.    Going to the school records; do you have those in front

Laura Andersen, RMR 704-350-7493

**JA605**

                         CROSS-OLLEY

of you still?

A.    No, I don't.

            MR. GAST:  Do you have a copy?

            MR. BRYSON:  I'll approach.  May I?

            THE COURT:  You may.

Q.    (By Mr. Gast) And for the record, that's Defense
Exhibit Number 3; do you have that in front of you now?

A.    Yes.

Q.    All right.  Now, this is -- and this is the first I've
seen this, so I'm kind of going through this along with you.
But this is handwritten.  Is this the way it was
originally -- in other words, was this handwritten produced
in front of you, or is this a copy of handwritten records
that were the originals?

A.    Well, what I saw were the originals.  Which were in a
big book, that was not eight and a half by 11 as this is,
but was long.  This is a reduced copy of it.  I did see the
original records that did look like this.

Q.    All right.  And you made mention of attendance records.
I don't see that on this.  Is that a separate record or is
that a part of this that didn't get copied or where is that?

A.    I do not know if it is on here.  I relied on the
director's report to me that his attendance was -- his
attendance was pretty good in the first couple of years,
grade one and two.  And then when he began failing, third

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-2  Filed 03/23/17  Page 143 of 522
Case 3:08-cv-00134-RJC  Document 59-2  Filed 03/18/10  Page 88 of 493
**JA606**

CROSS-OLLEY

grade, his attendance dropped off.

Q.   Well now, I mean, do we know that he started dropping off attendance when he started failing, or that he started failing as perhaps an effect of not going to school?

A.   No, we don't know that.  We know that they both occurred at the same time.

Q.   All right.  I mean, certainly, if you stop going to school, you'll stop doing well at school; is that fair to say?

A.   Yes.

Q.   And again, I've not seen this, and I don't read Spanish -- probably I don't do it probably as well as you do.  But looking at these it's a 1 to 10 scale, it appears?

A.   Yes.

Q.   Is ten the highest?

A.   Yes.

Q.   And the R's, B's, and E's, and MB's, in those columns, I'm assuming they mean -- and you correct me if I'm wrong -- did you have those explained to you?

A.   Yes.  If I can remember.  A B is bueno.

Q.   Which is good.

A.   Good.  An R is regularo, which would be --

Q.   Average?

A.   Less than -- well, I think less than -- like one step down from average.  E was excellenta.  M B is moi bueno.

Laura Andersen, RMR 704-350-7493

**JA607**

Q.   Very good.

A.   Yes, very good.  Yes, it's described that way, and with corresponding numbers.  So, for example, a three is a regularo, regular.  So three is low.  Five would be barely passing.  And below five would be, needs for improvement or some phrasing such as that.

Q.   All right.  And your understanding is that these letter designations B, E, M, B, et cetera, they go hand-in-hand with a number or --

A.   Yes, I believe that's true.

Q.   They're not independent scores?

A.   I believe they should match up to the numbers that are beside them.

Q.   All right.  So I see in each of those columns there's -- maybe I'm not pronouncing that number, but calificaton (phonetic) I don't know if that's the number score.  Then concepto (phonetic) goes with the letter?

A.   Yes, it looks that way.

Q.   All right.  And do you know -- did you have explained to you what concepto grades -- is that performance or effort or do you know?

A.   It's conduct, I think, or attitude, something to that effect.

Q.   All right.  Just looking then at pages one and two, that's part of the same document; is that right?

Laura Andersen, RMR 704-350-7493

Appeal: 10-6    Doc: 90-2    Filed: 08/14/2013    Pg: 145 of 522

CROSS-OLLEY

A.   Yes.

Q.   And Mr. Umana appears at the top of page two, that's his record within the class, true?

A.   I believe so.

Q.   All right.  And at what grade is this?

A.   This is 1991. I don't know which grade it is.

Q.   All right.  So these aren't necessarily in order of grade?

A.   I don't know.

Q.   All right.  Fair to say looking at those scores, though, that he was not the lowest kid in his class in any of those categories, was he?

A.   Well, if -- yes.  And if this was in his earlier years, his grades were better in his earlier years.

Q.   Okay.  And going on to the next page.  I guess I'll call this page three, where he is item number 21.  Do you see the page I'm referring to?

A.   Yes.

Q.   Again, he's, you know, he's probably in the bottom third overall as you go across.  But he's, again, not the lowest student in the class, correct?

A.   He's not the lowest, yes.

Q.   All right.  Again, I mean, I know you said that social promotion is -- that's the word I use and that we use in the United States.  But that they weren't allowed, I think you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 146 of 522
Case 3:08-cr-00134-RJC Document 592 Filed 03/18/10 Page 91 of 433
JA609

CROSS-OLLEY

said, to hold them back at those grades.

But certainly, you know, if they were going to hold him back -- if they changed those rules, it wasn't just going to be him, it was going to be some other kids too, right?

A.    Perhaps, yes.

Q.    All right.  And then the last page, it's hard to read on my copy.  But I believe he's student number seven.  This is where you say his grades get a little lower?  Is this third grade or do you know?

A.    I don't know.

Q.    And again, his scores seem rather commensurate with other members of his class.  They're kind of on the low end of the class; isn't that right?

A.    You know, it's just -- the copy is really hard to read, and my testimony is primarily a reflection of what the director told me.  So my reliance on him is very strong.  My ability to go through this and find something that might have contradicted what the director told me is pretty poor.

Q.    All right.  Well, talking about school then.  I mean, I think what you were told is, he didn't flunk out of school, right.  I mean, he left to go to work?

A.    Right.

Q.    And that's not unusual in El Salvador?

A.    No.  But in my talking to the director, that is unusual to drop out that early, and to do that poorly that early in

JA610

CROSS-OLLEY

education.

Q.   But they're not required to go to school to the same degree they are here in the United States where that wouldn't be permitted, right?

A.   Right.  I mean dropping out in the third grade is still low.  But the expectations certainly are far different than here the United States, you're correct.

Q.   And until -- the first and second grade he had passing grades.  They may not have been the best in the class, but he had passing grades.

A.   Yes.  And again, the director's interpretation to me was that if people attended and showed effort and participation, they would get passing grades.

Q.   And again, he outperforms some of his classmates it appears from the record?

A.   Yes, he may have.

Q.   And he was never identified as being -- and I'm going to keep using the word, "mentally retarded", because that's the catch phrase we're using in the law.  By whatever word, he was not identified in his schooling as being mentally retarded or something akin to it, right?

A.   That's true.

Q.   And we don't have any school records after that because he dropped out.

A.   That's correct.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 148 of 522
Case 3:08-cv-00134-RJC   Document 59-1   Filed 03/18/10   Page 93 of 433
**JA611**

CROSS-OLLEY

Q.   And the director of the school -- was he even there when Mr. Umana was there?

A.   No.

Q.   All right.  So he was extrapolating from the data much the way I was just doing?

A.   Well, yes.  I think much better informed than you or I could be about it.

Q.   Absolutely.

A.   But yes, he was interpreting the written record.

Q.   So he was able to provide you no insight as to whether the -- his leaving school was the cause or the effect of his performance in school?

A.   I don't think he could tell from the records why he left school.  He could just document that he was no longer enrolled after the third grade.

Q.   All right.  I'm kind of jumping around the order a bit because I know you talked about this last.  I want to talk to you about his head injury issue.  Most of this information you received from the defendant's father; is that right, the head injury information?

A.   Yes.  And from the defendant himself.

Q.   All right.  What did he report to you about his head injury, that is the defendant?

A.   The father -- oh, the defendant.  Well, that he was young, like five years old.  So he remembered that it

Laura Andersen, RMR 704-350-7493

**JA612**

CROSS-OLLEY

occurred.  I think he would be justifiably unsure of the details.

At age five you wonder how much he remembered directly, and how much he remembered because he had been told the story many times in childhood.

But what he recalled was congruent with his father, that he had been in a tree or fallen out of a tree and hit his head.

His father said, as indicated in my report, that he had been picking mangos and fell out of a mango tree for the first injury.  And that he was apparently working with his father or assisting his father at that time in picking mangos.

And the second time that he was at home and fell and hit his head on a piece of furniture.

Q.    All right.  And you're aware from having reviewed Dr. Suarez's report, that what Mr. Umana told him, that is the defendant, Mr. Umana, is that he fell trying to reach up for a bottle of cough syrup or something like that, some sort of medicinal syrup.  And then the bottle fell and he fell on it and cut it in the broken glass?

A.    Yes.

Q.    Is that what he reported to you, as well, in your interview with him?

A.    No.  He didn't talk to me about a bottle.  He just

Laura Andersen, RMR 704-350-7493

**JA613**

CROSS-OLLEY

said -- he just confirmed that he had those injuries.  And confirmed to me that the scar that appears on his left forehead was from that child -- or one of those childhood injuries.

Q.   All right.  But the father of the defendant didn't say anything about cutting his head open on broken glass from a cough syrup bottle at home?

A.   No, he did not.

Q.   All right.  And you don't have any medical records from El Salvador about either of those instances?

A.   No.  Apparently from what I know from the investigator who looked for that, that the hospital doesn't keep records back that far.

Q.   And he was not hospitalized in either occasion, correct?  In other words, he was treated and released?

A.   Yes.  I don't think he stayed overnight.  That's not what his father reported.

Q.   And you are aware, in the record, about the defendant having suffered injuries from a car accident at age 23 here in the United States in the Atlanta area?

A.   Yes.

Q.   And that -- and do you have medical records for that?

A.   No.

Q.   But it's been -- you've received some reports of that have you not?

Laura Andersen, RMR 704-350-7493

**JA614**

CROSS-OLLEY

A.    Yes.

Q.    And the reports of that car accident, at least on the face of it, sound to be much more severe than the incident involving falling out of mango tree or the cough syrup or hitting the furniture or whichever description you have?

A.    I don't think I'm in position to judge which one was more severe.

Q.    Were you told whether or not he was hospitalized in Georgia?

A.    I don't recall.

Q.    And this Georgia accident happened after age 18, correct?

A.    Yes.

Q.    Happened 2007, I believe?

A.    Yes.

Q.    All right.  I'm going to go on and talk about his employment history.

     Now, the folks you spoke to employed the defendant during his teen years; is that correct?

A.    Yes.

Q.    I believe you said he had a job making deliveries for Coca-cola about two years?

A.    Yes.

Q.    His construction job was roughly about a year and a half?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-2   Filed 03/23/17   Page 152 of 522
Case 3:08-cr-00134-RJC   Document 293-4   Filed 03/18/10   Page 97 of 433

JA615

CROSS-OLLEY

A.   Yes, I think.  Roughly is the right word to say.  I don't think anyone kept records that could be anything more than their recall.

Q.   And these jobs were what we call here in the United States, entry level employment, correct?

A.   Yes.

Q.   And that's not uncommon for teenagers in the United States, true?

A.   Right.

Q.   You don't see many teenagers employed on the board of IBM or things like that.  I mean, they work at McDonald's and Burger King, true?

A.   Yes.  Although Mr. Umana didn't have jobs that involved handling money, as might be the case in Burger King.

Q.   Sure.  But a lot of American teenagers have entry level jobs that don't handle money too, right?

A.   Right.

Q.   All right.  And he wasn't fired from these jobs except, I think, maybe the shoemaking job; is that right?

A.   The early jobs that Mr. Umana's father described in one way or another, didn't work out.  But they were such informal things, such as his father had tiendo, a little store at that time.  That he would send his son off on errands to get things.  And he would forget, or not be able to handle money, so he didn't perform well.  I wouldn't call

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 153 of 522
Case 3:08-cr-00134-RJC   Document 1794   Filed 03/18/10   Page 98 of 433
JA616

CROSS-OLLEY

that being fired, but he didn't work out satisfactorily in these jobs.

Q. Right. And again, there's probably a lot of American teenagers that don't perform their jobs particularly well, especially their first or second job, true?

A. Yes.

Q. And that doesn't make them retarded, it's just maybe something you look at. But that's not a -- you said there's not automatically disqualifying instances in their record to indicate mental retardation. Likewise, there's not mandatory qualifying factors that you find?

A. Right. Assessing what's a significant impairment in adaptive functioning, requires gathering lots of information. And that's the reason for talking to lots of people.

So you're right, I wouldn't want to take one instance and generalize from it.

Q. Right. And, you know, for example, this job on the delivery truck and being the second helper. I mean, certainly somebody has to be the second helper, right?

A. That's right.

Q. And you know, unless another opening opens up, they're probably not likely to advance in that job unless the first helper or the driver leaves that position, right?

A. Well, to assess that question I asked his employer

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-2  Filed 03/23/17  Page 154 of 522
Case 3:08-cv-00184-RJC  Document 191  Filed 03/18/10  Page 99 of 433
**JA617**

whether he thought that Mr. Umana had potential, or would be a suitable person to advance in that job, and he said no. That this was his level of capability.

Q.   Of course he was also 15 years old, right?

A.   Yes.

Q.   I mean, we don't trust 15 year olds in the United States to drive a Honda Civic, much less a delivery truck, right?

A.   Well, that's right.  I think the delivery truck driving was probably out of his league.

     But handling money, and making decisions about carrying information about how many kinds of -- this different kind of product the store needs, that would be within the realm of most 15 year olds.  But Mr. Umana was not able to do that.

Q.   Well, now, they didn't say that he wasn't able to do it.  They just said he didn't do it.  I mean, he was the third helper, right?  That's not the third helper's job, right?

A.   They said that -- that's why he stayed the third helper.  That they wouldn't give him more responsibility than that, because he couldn't handle money, and he couldn't remember what the orders were.

Q.   Well, they didn't give him the opportunity to try and he failed.  I guess that's fair to say.  That was not

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 155 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10   Page 100 of 433

**JA618**

CROSS-OLLEY

reported to you?

A.   No, I think it's more that -- I mean, you know, again, in talking to his direct supervisor I think was important, that his sense was that he did not have the capability to advance beyond the helper role.

Q.   At age 15?

A.   Yes.

Q.   And El Salvador doesn't have, you know, accommodation laws for the employment of the disabled like we do here in the United States.  Or at least in these interviews, you did not find that -- did you find that any of these employers hired him on that basis?  That is, that we felt like we had to hire a mentally retarded person because of the law, anything like that?

A.   No.  He was hired chiefly because of his father's recommendation.  Or I asked him throughout other jobs that he had in El Salvador and in this country, how did you get those jobs.

And they were by talking to friends who said he could get a job here, there, or by standing on the corner where day laborers are picked up.

So these are all things that are within the capabilities of someone with mild mental retardation.

Q.   All right.  And you made comment at one point, that, you know, while he was employed with Mr. Herrera, that's the

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 156 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10   Page 101 of 433
JA619

mason's helper job that you noted that, you know, that he was living with them. And he took care of them. He noted that that showed that he was not living independently?

A.    Right.

Q.    Now, of course, again, he was what, 15/16 at this age?

A.    I think he was a little older than that. But he was still a late teenager, yes.

Q.    And again, in the United States, it's not uncommon for an 18 year old to be working at Burger King and still living with their parents?

A.    That's true.

Q.    And with regard to this employment as a mason's helper, I mean, somebody has to do that job, right?

A.    Yes.

Q.    And he did it, and apparently did it well enough?

A.    Yes.

Q.    And you even noted that his employer noted that he was able to use a tape measure to cut rebar?

A.    Yes. I mentioned a tape measure, because this was an interesting thing. Of course a tape measure, you pull it out from the end that says zero.

Q.    Right.

A.    So, it's hard to make a mistake if you can match up the tape measure to a piece of rebar.

        When I gave him a ruler -- when I interviewed him in

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 157 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10   Page 102 of 433
**JA620**

jail and gave him a ruler and asked him to measure just pieces of paper, he randomly put the ruler down. So sometimes he was starting from zero and sometimes he was starting from 12.

And he used it with equal confidence, either way. Because if he was, you know, if you're measuring 3 inches from 12, you don't get 3 inches, you get 9. And he didn't appear to know the difference in that.

And I asked him if he was comfortable with using a ruler, and he said, well, this is something I always had difficulty with.

Q.   Well now, a ruler has a defined beginning point just like a tape measure does, it just doesn't have hook.

A.   Right.

Q.   And he was able to run a tape measure?

A.   Yes.  I'm just saying, a tape measure always starts from zero, so you don't have to make that decision.

Q.   Well, doesn't a ruler always start with zero?

A.   If you put it down, zero at the right end it does.  If you hand him a ruler and say measure this, and he puts it down with the 12 end, and you're starting from 12 to measure 3 inches, you get 9 instead of 3.

Q.   Well using a ruler, ineffectively, I guess for lack of a better expression, is a fairly easy thing to fake, for lack of a better word.

CROSS-OLLEY

I mean, if someone were -- if you were assessing somebody who wanted to malinger, and try to generate a defense of mental retardation or whatever, faking a ruler test is a fairly easy thing to do, would it not?

A.    If he were attempting to malinger mental retardation, he could -- someone could do that, yes.

Q.    And, you know, certainly in this circumstance, you have -- in this context of trying to determine whether he's mentally retarded so as to avoid the death penalty, he couldn't use the ruler.  But when getting paid was the motivation, he was able to run a tape measure and measure rebar?

A.    Yes.  He was able to use a tape measure.

Q.    And.  And as far as living with his -- you know, and getting rides from people and things like that to and from work, again, that's not uncommon here in the United States with illegal immigrants that work in construction, that their employers come to pick them up and take them back, true?

A.    That's true.

Q.    That's a fairly routine thing in construction, whether you're an illegal immigrant or not, isn't it?

A.    I think it is in this country.  And he did get rides to work, from Mr. Herrera and from -- the Coca-cola delivery job and the mason job, he often got transportation provided

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 159 of 522
Case 3:08-cr-00134-RJC   Document 522   Filed 03/18/10   Page 104 of 433
JA622

for him.

Q.   Did he own a car in El Salvador?

A.   Not to my knowledge.

Q.   So, you know, getting driven to work isn't necessarily an indicator.  Although you could look to it among other things.  But it's not necessarily an indicator that he couldn't drive to work.

It's just that perhaps he was too young to have a license, didn't have a car.  And he had employers that were willing to provide him transportation, correct?

A.   Yes.  But by Mr. Umana's report to me, he also had some difficulty with getting to work on time.  And sometimes the Coca-cola truck left without him because he didn't get to work on time.

Again, this is by his own report.  And I don't have that verified from any other source.

But he doesn't report himself to be a totally reliable employee when it comes to being where he needs to be to get to work.

Q.   And certainly there are a lot of unreliable entry level employees in the United States; isn't that true?

A.   Yes.

Q.   There are a lot of folks that show up to work late or get fired for showing up to work late, things like that?

A.   Yes.

Laura Andersen, RMR 704-350-7493

**JA623**

CROSS-OLLEY

Q.   Doesn't necessarily mean they're retired -- retarded. But, it's one of the factors you look at?

A.   Correct.

Q.   It's probably one of those reason why those folks stay in entry level jobs is, they're not otherwise reliable or show initiative; isn't that fair to say?

A.   That's right.  Although, and when we were going through those slides about adaptive functioning, one of the things we mentioned was reliability.  So it is something worth looking at.

Q.   All right.  And one test that you didn't mention on your direct, that you mentioned in your report is, you gave the defendant, essentially, a geography quiz, for lack of a better term.  Trying to find that in your report here.  Do you know what I'm talking about?

A.   Yes.

Q.   You asked him to identify El Salvador and the United States and Charlotte?

A.   Yes.  I showed him a map of the world, and he was able to find El Salvador.  And he was able to find the United States.  Although he was not able to find Charlotte, the approximate location of Charlotte within the United States.

Q.   All right.  Now, you don't have any reason -- you don't have any independent knowledge that the defendant ever lived in Charlotte, do you?

Laura Andersen, RMR 704-350-7493

**JA624**

CROSS-OLLEY

A.   No.

Q.   Did you have reason to expect that he would know where Charlotte was?

A.   Only that he's here and it's a major city in North Carolina and he's spent some time in North Carolina.

Q.   And certainly he traveled a lot.  Of course he traveled from El Salvador to the U.S. illegally, still I believe as a teenager, when he's 19; is that right?

A.   Yes.

Q.   And then, you know, in the United States he traveled from, literally, across the country, from California to New York.  He went back and forth to -- from New York to Atlanta several times --

A.   Yes.

Q.   -- is that true?  And these trips that went back and forth from New York to Atlanta, he drove, did he not?

A.   I believe he did drive some, yes.  And that's one of the reasons that I showed him another map of -- it was a Triple A map of North and South Carolina.  Because he had done some driving through that area.  But just to see how well oriented he was.

     And my impression was that he knew what road to be on. So, you know, he knew that Interstate 85 -- if you stay on Interstate 85, you'll get to where you want to go.  I think that was pretty much his understanding of getting from place

Laura Andersen, RMR 704-350-7493

**JA625**

to place when he was driving.

Q.   But not being acquainted with the finer aspects of American geography, that's not really unsurprising for a third grade education -- I guess a second grade education from a person from El Salvador is it?

A.   Yes.  And again, I don't want to make too much of these little tasks.  I do them just to get a flavor for whether a person has some sort of strategy for how to go about solving a problem.  And they're not standardized.  And again, I don't want to make them worth more than they should be.

I just want to see -- if a person -- if I say, here's this city, how would you get to another city that you're familial with; do they have a plan?

And some people are not good at maps.  He didn't know north, south, east or west.  He could tell me that to get -- I forget what the example was.  It may have been going from Greensboro to Charlotte.  He said you go south on Interstate 85.  Fine.  Okay.  Show me which way is south.

Well he didn't know north, south, east or west.  But he did know some functional things to find his way from place to place.

Q.   Well, Doctor, the reason I'm asking is, in terms of objective testing, from your report it appears to me that you only did two things; you did a ruler test, and you did this geography test.  You didn't do the ABAS or any of these

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 163 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 108 of 433

**JA626**

CROSS-OLLEY

other things; isn't that right?

A.    No.   No.   The other thing which I think is mentioned in there is that I gave him the lowest level - again, this is not intended to assess his intelligence.

The lowest level of one subtest called verbal absurdities.  And this is a statement of -- a brief statement that doesn't make sense.  Asking the individual to explain why it doesn't make sense.

And, again, I don't -- I don't mean to put much emphasis on this for broader cognitive functioning.  But this test was one that he failed at the eight year old level.

I can give you examples of the things that were on that, if that would help to clarify.

Q.    Well, I want to stick with the geography for a second. Because, you know, this is again, one of maybe three then tests that you gave him.  And the questions you asked him were not, you know, can you follow I-85 from where you are to where you want to go.

But you were asking him to find cities, and states and countries on a map.  And that is well documented in the media and the literature, that it's difficult for a lot of Americans to do; isn't that true?

A.    That's true.  I said, some people are just not good at map skills, but they can still find their way around.

Laura Andersen, RMR 704-350-7493

**JA627**

CROSS-OLLEY

And if you think of this in terms of adaptive functioning, it's cognitive or conceptual adaptive function versus practical.

Most people with mild mental retardation are stronger at practical skills.  That is, you get in the car and aim it along Interstate 85.  And that's a practical skill.

Q.   You said you teach at UNC, Chapel Hill, correct?

A.   Yes.

Q.   Do you know a Professor Richard Kopeck there?

A.   No, I don't.

Q.   He was a geography professor at your school.  I think he might be retired now.  He performed a study of 2,200 of your UNC students, and found that 97 percent of freshmen, and 93 percent of upper classmen, failed some basic geography concepts.  Eighty-eight percent of them couldn't name the Great Lakes.  Less than 50 percent knew that Texas and Alaska were the largest states.  Seventy-four percent of them could not name a single African country in South Africa.  I mean, these are things that you've seen in the media before, that Americans flunk geography, right?

A.   Yes.

Q.   This is something you're familial with?

A.   Yes.

Q.   Probably most American college students can't name all -- place all 50 states on the map?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 165 of 522
Case 3:08-cv-00134-RJC   Document 202-2   Filed 03/18/10   Page 110 of 433
**JA628**

CROSS-OLLEY

A.    Perhaps.

Q.    And this is a test that you gave him, to test if he's mentally retarded.  I mean, you gave him a very sophisticated test.

A.    No.  Again, I don't mean to overstate.  This is not a test of, does he have mental retardation.  This is my getting to know him, getting a flavor of what he's comfortable with.

      And again, I report it because I did it.  But I didn't report a standard score, or say that this is some -- this is the -- would be on my part, the error of picking at one thing and saying uh-huh, this is what conclusively indicates a diagnosis.

Q.    But this is one of three tests that you gave and you featured heavily in your report.  And if it's not all that important, then why did you run it in the first place?

A.    Well, everything is important, I think, you just have to give it its proper weight.  As I mentioned earlier, I'm willing to listen to information from all sources.

      I would not use this information to diagnose mental retardation.  It would give me a flavor of whether he was comfortable with knowing directions and knowing where places are, being able to read.

Q.    But knowledge of a political map in geography is probably more a function of education than inherent

Laura Andersen, RMR 704-350-7493

**JA629**

intelligence; isn't that true?

A.    Perhaps.

Q.    I mean, even in the United States we don't really start teaching kids the 50 states until fourth grade, right?

A.    Well, as you pointed out, he traveled a lot.  So I just wondered how oriented he was.

Q.    And they certainly don't ask -- you talked about the ABAS.  Now you said you didn't give that.  And ABAS is the -- what -- the Adaptive Behavior Assessment System?

A.    Yes, sir.

Q.    And that's kind of the most commonly used, if nothing else, assessment for adaptive functioning.  It's kind of a screening -- it's a clearing house of all kinds of questions, right?

A.    Well, I wouldn't say a screening.  But it is commonly used as getting a score, a standardized score about adaptive functioning.

Q.    And the ABAS doesn't ask any sorts of questions that you asked about finding Charlotte on a map, finding North Carolina on a map, finding El Salvador, for that matter, on a map.  They don't ask questions like that on the ABAS, do they?

A.    No.  And there's probably 100 other possibly relevant questions that aren't on that test.  That's one of the issues in our field is the capturing things that aren't

CROSS-OLLEY

necessarily on standard tests.

Q.   And I've got a copy of the ABAS here.  The questions that I found that pertain to geography, under community use, question number three, looks both ways before crossing a street or parking lot.  Is that one of those questions on there?

A.   Yes.

Q.   Question number seven, relies on him or herself for travel in the community.  For example, walks or uses public transportation, a bicycle or a car; is that one of those questions --

A.   Yes.

Q.   -- on the ABAS?

Question number ten, states generally -- states general address of a travel destination.  For example, on Washington Avenue, near Lake Street?

A.   Yes.

Q.   Question number 11, follows another's directions to nearby places.

A.   Yes.

Q.   Is that one of the questions?

Number 15, walks alone to friends' houses in the neighborhood.

A.   Yes.

Q.   Is that one of the questions?

Laura Andersen, RMR 704-350-7493

**JA631**

CROSS-OLLEY

114

A.   One of the questions.

Q.   Number 19, takes other people on trips to nearby places.  For example, takes a child or family member to a park.

A.   Yes.

Q.   Is that one of the questions?

A.   Yes.  That's one of the items.

Q.   And, you know, I could go on.  But, you know, nowhere in the ABAS do they ask any sorts of questions like you asked, where is North Carolina, where is El Salvador, where is Charlotte.  They don't ask questions like that on ABAS; isn't that right?

A.   Right.

Q.   The reason for that is because that's a fairly sophisticated geography question that probably a high percentage of Americans that are educated might fail?

A.   I don't know the reason that it's not.  There's countless things that aren't on the test.

Q.   Okay.  And did you ask any of these ABAS questions to him?  Did you run through the test?  I know you said you didn't want to use it because of the norming?

A.   No, I didn't use any of those questions.

Q.   All right.

A.   Sure, I might -- my inquires cover the same general kinds of topics.  But I did not rely upon it for questions.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 169 of 522
Case 3:08-cr-00134-RJC   Document 202   Filed 03/18/10   Page 114 of 433
**JA632**

CROSS-OLLEY

Q.   All right.  Well, going over, for example, the questions I just asked.  Did you ask those sorts of questions.  Are you able to get around your local neighborhood, essential is the nature of those questions?

A.   Some of that, yes, I asked about that, knowing his way around the city that he lived in.

Q.   And he's able to do that?

A.   Yes.

Q.   And indeed, if there were any deficiencies present that you would have noted from the ABAS or questions that would be taken from the ABAS, you would have noted those in report?

A.   No.  Because I just really wasn't using that as a frame of reference.  Because I didn't think -- I mean, that would imply that I had some way of creating a standardized score for information I gathered in El Salvador.  And I just didn't feel that that would have been valid.

Q.   We'll get to that in a minute, because I do want to ask you about that.

     Even if you don't score it, certainly asking these types of questions are valid in determining whether there are deficits in adaptive functioning, correct?

A.   Yes.

Q.   But you didn't ask him these questions.  You asked him to use a ruler.  You asked him a fairly sophisticated

Laura Andersen, RMR 704-350-7493

**JA633**

CROSS-OLLEY

geography test.  And you gave one subsection of the WAIS-III.  And WAIS is, W-A-I-S.

A.   Well, actually it's a subtest of an older Stanford-Binet Intelligence Scale.

But I wanted to clarify that using the ABAS to get information from the defendant to get a standardized score, is not something that is accepted practice.

And this issue has come up in other *Atkins* cases.  And in fact, one of the authors of the ABAS has testified to this effect, that it would not -- that using it to get information from the defendant by self-report and generating a score, would not be an appropriate use of the test.  So I did not do that.

Q.   All right.  But you didn't give it to any people who knew him either?

A.   Correct.

Q.   And you haven't talked to anybody who knew him since he left El Salvador, other than I guess his lawyers?

A.   That's true.

Q.   Now you say you didn't give the ABAS to his father, to his former employers, to his friends, et cetera.  And as I understood it, the reason you didn't, is that there aren't standardized norms suitable to use that test in El Salvador; did I understand that correctly?

A.   Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 171 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 116 of 433
**JA634**

CROSS-OLLEY

Q.   In other words, that, you know, we might give this same test, this ABAS test, to a bunch of Americans.  And Americans might have a scale that they would fall on as to how many of these questions they might get right.  But in El Salvador it might be much lower for reasons of education, for reasons of, you know, smaller range of mobility as compared to Americans, things of that nature; isn't that right?

A.   Perhaps.  But I think it's safer to just say it's an unknown.  I mean, you're saying it might be lower.  I'm just saying, you know, to me, it's unknown.  And so I wouldn't be confident in generating a score from it.

Q.   Fair enough.  So in order to generate a score from a test such as this, you would want to use the norms of that country?

A.   Yes.

Q.   Now, I note in your report that you specifically rejected that notion for the application of the WAIS-III. In that test you endorsed Dr. Weinstein's use of U.S. norms when trying to determine his IQ, rather than using El Salvadoran or some Latin American country that might be more analogous than American norms?

A.   Well, there are no El Salvador norms for the WAIS.  So that possibility is eliminated.  I'm sure the discussion of what's the appropriate norms to use will be enlightened in

Laura Andersen, RMR 704-350-7493

**JA635**

further testimony.

My agreement with Dr. Weinstein is that, when assessing adaptive functioning of someone who has lived in the United States, committed a crime in the United States, or is alleged to have committed a crime in the United States, or is being tried in a United States court, it is appropriate to use United States norms.

Q.   But you made no effort to assess his adaptive functioning here in the United States.  You didn't talk to anybody in the United States.  You didn't run an ABAS on anybody in the United States?

A.   That's true.  I don't know of anyone that I had access to.  And in asking this through the defense's investigators, they did not locate anyone who knew about his functioning here.  I asked about the mother of his second child.  And to my knowledge she could not be located.

So no, I don't have any information on his functioning in the United States.

Q.   These interviews that you performed, did you record any of them?

A.   No.

Q.   Did you document them in any other way, other than through your notes?

A.   No.

Q.   And all of these folks knew that the reason you were

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 173 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 118 of 433

JA636

CROSS-OLLEY

there to ask was, you were doing a mental health related assessment regarding a death penalty case here in the United States, didn't they?

A.    They knew that it was with regard to his death penalty case.

However, you're raising an interesting point with regard to all *Atkins* cases.  And that is, when interviewing people, what do you say this is all about.

And my feeling on that is that, although it's important to say things such as, the information you give me is not confidential, and it may be repeated in court.

I don't say to people, I'm trying to see if he has mental retardation.  Because that then runs the risk of my trying to influence that person's responses.

So I give a much broader statement about, that' it's important to know everything factual about the person.  And it's important for you to provide honest, accurate information that I can provide honestly to the court.

Q.    Right.  And I understand the dilemma there.  But what, you certainly weren't able to fully insulate them from the concept of why they were being talked to about these interviews?

A.    Yes, and that's true in any *Atkins* case.  I don't know what other people may have told people I interview.

Q.    And none of them identified -- none of them volunteered

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 174 of 522
Case 3:08-cr-00134-RJC   Document 223   Filed 03/18/10   Page 119 of 433
**JA637**

to you, I think, he is mentally retarded, or anything close to that?

A.   No.   I don't know that that's -- again, I can't present myself as an expert on the culture.

My sense is, from talking to people there, that they are very polite, and would be very reluctant to make those kinds of judgments about other people.

That's just my sense from interviewing people.  I guess if I were an anthropologist and knew Salvadoran culture I could answer that question better.

Q.   But whatever the cause, they didn't give you that assessment?

A.   Say again.

Q.   None of them said, I think he's slow.  I think he's mentally retarded.  I think his brain doesn't work right. Whatever cultural idiom they may use; none of them volunteered that to you?

A.   Not a general assessment that he was slow or mentally retarded.

Q.   And that could be attributable to El Salvadorian politeness.  And it could also be attributable to the fact that they didn't detect or form that conclusion; isn't that right?

A.   That's true.

Q.   I guess I want to get, kind of the heart of the matter.

JA638

CROSS-OLLEY

And, you know, I mean, being honest here, given the data that you have, I mean, these interviews and these three things that you asked him to do, this ruler and the geography test and the subscale, the Stanford-Binet is it -- Stanford-Binet test?

A.    Yes.

Q.    But for this IQ score that Dr. Weinstein came up with of 66, you'd not be given an opinion of mental retardation without that score would you, based on this data?

A.    I think as a practical matter of efficiently using the court's resources, if someone came to me and said, here is a person with an IQ that is -- we talked earlier about standard error of measurement of a score.

A score that's substantially above 70, I would say -- I don't think that it's worth the resources to go looking for adaptive behavior problems.  But with a lower score, then yes, it would be.

Q.    All right.  That wasn't exactly my question.  Let me try again.

This opinion, I mean, you've given an opinion to the Court, that is your professional opinion that he is mentally retarded.  And granted, you have to look at all three factors as the definition requires.  You have to have an IQ score.  You have to have a significant impairment of adaptive functioning, and you have to have some established

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 176 of 522
Case 3:08-cr-00134-RJC   Document 202   Filed 03/18/10   Page 121 of 433
**JA639**

CROSS-OLLEY

onset prior to age 18.  Did I understand those three categories, correctly?

A.   Yes, sir.

Q.   Given this data that you collected about his employment, you know, these folks that you talked to, and the tests that you've given, there's no smoking guns in there that's just so strong that if he had scored 100 on his IQ test, that you would say, I know he scored 100, but nevertheless, I think he's still mentally retarded?

A.   Well, that's -- I understand your point.  It's not a good example with the score of 100, but --

Q.   Tell me why it's not?

A.   Because you have to have both low intelligence and low adaptive behavior for a diagnosis of mental retardation.  So if he has a score of 100, it rules out one of those necessary criteria.

Q.   Let me put it another way than, rather than looking at it in terms of diagnostic criteria.

     There is nothing in your investigation that, you know, if he had scored 100, that you would just go, I'm floored. I cannot believe he scored 100, because of this thing that I found.

A.   Okay.  I understand your question.

Q.   Because -- let's just go through them.  In the social -- you use the three categories, the social, the

Laura Andersen, RMR 704-350-7493

**JA640**

practical and conceptual?

A.   Yes.

Q.   As defined by the AAIDD?

A.   Yes.

Q.   To assess the adaptive functioning portion of the prong of the mental retardation opinion that you gave, right?

A.   Yes.

Q.   Just going through them, I mean, the social prong.  You called this mixed, in your report.  You said that he doesn't have -- he doesn't seem to have a lot of limitations, except his failure to obey the law, essentially, right?

A.   Well, he's social, for sure.  And he has had friends.  And that is one part of it.

But let me back up to, I think to answer your -- the intention of your earlier question.  I wanted to acknowledge from the start, this is a challenging case in which to get all of the information that you want.

And I think all *Atkins* cases are challenging for reasons that I talked about before.  This one is particularly challenging.

My effort was to get the information from those sources of people who knew him best, and to focus on concrete things; did he do this or did he not.  What did he do in this job, for example.

And yes, there are -- as there always are in *Atkins*

Laura Andersen, RMR 704-350-7493

CROSS-OLLEY

cases, there are missing pieces to the puzzle.  The pieces of the puzzle are harder to find in this case.

So I don't know that I would call it a smoking gun, but I think that when the picture's put together, the AAMR or AAIDD criteria of three -- impairment in one out of three, or overall score, that's significant impaired.

Well, we don't have an overall score because we didn't administer the ABAS or something like that.

So this case more than most, relies upon my judgment to be able to pull this information together and to offer an opinion.  And I understand that you will focus on the missing pieces, and that's justifiable.

In my opinion, from the information that emphasizes people who knew him well as he was growing up, that was the most complete information that I could get.  Acknowledging that some of those things are not -- either coming from sources where people are rather tentative about talking to me, or circumstances where, because of language or culture, an inability to administer standardized test, relies more heavily on my judgment than it would in other cases.

I'm sorry to be so long about that.  But I think I understand your -- I wanted to make sure I understand your concern.

Q.    No, I think that answered it well.  In fact, earlier on in your power point, you indicated there's four typical

Laura Andersen, RMR 704-350-7493

**JA642**

CROSS-OLLEY

challenges for trying to identify adaptive behavior problems.

One is, if they have a higher IQ, it's more difficult. That is, they're more mildly mentally retarded, that makes it more difficult. That when trying to do a retrospective diagnosis, as opposed to one that's been documented throughout the years.

Whether there's less than optimal context, such as when they're in custody.

Or when the folks that you're asking questions of are in another country that haven't seen him in years.

Then you had fourth one of dual diagnosis that you said didn't pertain.

But three out of the four that make this hard work, you identified as being present in this case?

A.    Yes indeed.

Q.    But I want to go through these three things, because here in court we're about evidence, you know. And I understand, you know, you have an opinion and you've expressed it.

I guess what I'm getting at is that you don't have, it appears to me, a lot of evidence to back up this notion of adaptive functioning, except for this low IQ score from Dr. Weinstein.

Going with the social, you called this a mixed result

Laura Andersen, RMR 704-350-7493

**JA643**

in your report. But the only thing that you're able to identify in the social is that he violated the law.

Which, of course, everybody sitting in that chair is at least accused of having done, and they're not all mentally retarded.

A.  There's another part that I think pertains, but I think was very difficult to ascertain in this case. And that's the part about gullibility and being easily influenced.

And that's an area that I think is important, but very hard to get the information that I needed.

And really, the only specific information on that issue comes from the defendant. And I talked to him a couple of times about how did he get involved in a gang.

Because what I saw in talking to people who knew him from childhood, was a person who was limited in his skills, and certainly in his formal academic and practical academic skills.

But in addition, who was friendly and willing to help, and sort of wanted to be accepted, and a good guy. And so I wanted to get a picture of how does this person who seems like a regular kid, become a gang member.

And I think that the closest that I got from Mr. Umana, was the wanting to be part of something.

He grew up with his father and didn't -- his brother and his half siblings were not people he had close

127
CROSS-OLLEY

relationships with.  He wanted to be part of something.

Wanted to have a family.  Wanted to be accepted, socially.

And that to me is someone who has mild mental

retardation.  And who is gullibly pulled into something,

that better judgment would have kept him away from.

Now granted, my information from that comes from the

defendant.  But I think that it's certainly a consideration

in assessing his adaptive functioning.

Q.   And I can see how a diagnosis might go that road, but

what is your evidence of that.  I mean, did you talk to

fellow gang members to determine whether he was a leader or

a follower in the gang?

A.   No, that's what I'm acknowledging, that the information

comes solely from the defendant.

Q.   Again, we're about evidence here.  Of course what you

just described, is also what anyone would describe in high

school as peer pressure?

A.   Yes.

Q.   Wanting to fit in and wanting to belong?

A.   Yes.  But the people with low intelligence are more

vulnerable to that, or any kind of social pressure.

Q.   Can you point to a particular circumstance where that

played out?

A.   Well, his example of getting into the gang was that

there was -- well, that he would go to dances, and music in

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 182 of 522
Case 3:08-cr-00134-RJC    Document 262    Filed 03/18/10    Page 127 of 433
**JA645**

the park.  And there would be young people around.  And the gangs seemed to be the ones that had all of the -- I don't know what adjective to use.  They were the ones with the authority.

And there was a girl that he liked, that he wanted to impress.  She was affiliated with the gang.  So he thought that if he got in the gang, she would like him.

And this is pretty consistent, having been told to me twice, and to other people.

So he, in his reporting, naively figured, if I get in the gang, then I'll just be part of something socially valued.

And as it turned out, it still didn't get him the girl. But then he realized that he was in the gang, and once you're in, there's no getting out.  That's a sad story, I'm afraid.

Q.   So wanting to fit into a group?

A.   Well, that's one aspect of what's described here as gullibility.

Q.   Well, again in the social category though, I mean everybody you talked to said he's a really nice guy, a sociable guy, was good at soccer, which is a team sport.

A.   Yes.  That aspect -- that's why I said it was mixed. That aspect of sociability.  He did have friends.  And he was regarded -- although he was described as childlike in

**JA646**

CROSS-OLLEY

his social relationships, he did have friends.

Q.   So other than his failure to obey the law, you don't have any evidence that you can point to, to say this is a social deficit?

A.   Well, he didn't follow rules.  And I make my case for gullibility and naivete.

And I think that he -- the last one of avoid victimization, I think is quite relevant.  I think that he was victimized by the gang, by being drawn into it and then used for the gang's purposes.

Q.   Now did you talk to anybody in the gang other than him?

A.   No.

Q.   For all you know, he could have been a regional leader that ordered hundreds of other people; you don't have any idea?

A.   I don't know what his gang functioning was, other than small information about the alleged -- his alleged involvement in this crime.

Q.   And whether he was a leader or a follower in the gang?

A.   I don't know.

Q.   Either way, life in a gang is all about surviving a complex and even dangerous social network.  I mean, there are rules in a gang that if you break them could cost you your life; isn't that a fair assessment?

A.   I think so.  But as I understand it, one could argue

Laura Andersen, RMR 704-350-7493

**JA647**

CROSS-OLLEY

that they get into gangs to maintain their safety.  That is, that they are part of something that protects them.

Mr. Umana's description to me of life in El Salvador around this time, and as you pointed to the civil war, and that is a dangerous place in a variety of ways, but that the gang afforded him some protection.

Q.   And he specifically didn't disclose to you anything about life in the gang once he was in the United States?

A.   Or even earlier in that my questions about gang life, Mr. Umana did not acknowledge criminal activity, or at least not his criminal activity.  But more that the gang was -- well, once he got in the gang, they tattooed him, so that he was identifiable as a gang member.

And once you're in the gang you are -- you're pretty much -- there's no going back after being in the gang.  So that's a form of victimization.

How they used him, I don't know.  Because he side-stepped anything about criminal activity, and only emphasized that life in El Salvador, toward the end of the time that he was there, was that the police would stop people and beat them up.  Or -- so he was afraid of other gangs.  He was afraid of the authorities.

And, you know, in my view, he was seeking protection. And he got a form of it, but in exchange he got victimized by the gang.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 185 of 522
Case 3:08-cr-00134-RJC   Document 252   Filed 03/18/10   Page 130 of 433

**JA648**

CROSS-OLLEY

Q.   Well now, you say victimized, and you say used by the gang.  But again, other than perhaps some few scant things the defendant told you, because doesn't sound like he's told you much about gang life, you have no evidence to back that up.

He could have been a leader of the gang who used other people in the gang, and you have no -- you have no information about that whatsoever, do you?

A.   I have very little information about gang activity, other than what he provided and other people clearly didn't want to talk about it.

Q.   All right.  So whether he was a victim or a victimizer in the gang, is unknown to you?

A.   His being the victimizer seems implausible to me.  I'll rest on my opinion.  But you're right that it is only my opinion.

Q.   And as for the practical prong, if I read your report correctly, the only thing you cite is that the people that you talked to when he was still a teenager, is that he didn't live on his own, and that he had entry level jobs.  That's -- at least reading your report, that appears to me to be the only evidence that you have in support of a practical deficit?

A.   As we -- well -- as we discussed earlier, it's a bit more than that he only had entry level jobs.  When -- in

Laura Andersen, RMR 704-350-7493

**JA649**

CROSS-OLLEY

talking to his employers, they did not see him as suitable for more than entry level jobs, and that was influential to me.

But -- certainly work has always been an important part of adaptive behavior assessment. And his work was at a low level. And with not much potential for advancement.

Q. And certainly, you know, life in a gang is work. I mean, the gang doesn't just hang out, they engage in criminal enterprises. Is that your understanding of how a gang operates?

A. Well, only in the most general sense. I don't want to portray myself as an expert in gang sociology.

Q. So of the three then -- of these three categories for adaptive functioning, it appears to me, and you please correct me if I'm wrong, that the one you hang your hat on is the conceptual prong.

And your evidence for that is that you feel that he did poorly in first and second grade. Although we talked about his school records, and that now he's not particularly good at geography or using a ruler?

A. Those people that I talked to, in addition to the director of the school, consistently referred to his poor reading and writing skills, and his ability to handle money.

Dr. Weinstein administered to him the wide range achievement test, arithmetic portion of it. And he scored

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 187 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/13/10   Page 132 of 433
JA650

CROSS—OLLEY

substantially below average.  Dr. Weinstein can address that more fully.

Q.   And to be clear for your answer, I want to get away from the test.

Because this is kind of what I'm getting at in this line of questioning is, you know, but for this test, Dr. Weinstein's test, it appears to me that there is not much evidence to support adaptive behavior shortcomings, but for this test.  And that's what I'm trying to see what the evidence is that supports this.

And so without that, what I see in your report, and if you've got something else, now is the time to hear it, is that he didn't do that well in school; perhaps not good with money.  Although, again, he has, at best, a third grade education.  And he didn't do well on your geography test.

Is there something else in here that we're missing that shows that he's got conceptual problems, but for that test that Dr. Weinstein gave?

A.   Well, the test that I referred to was one of several tests that he did.  But it was the one with regard to functional academics.  And what I was portraying is that from at least third grade, up until currently, we have information for significant impairment and functional academics.  That he did poorly in school.  That he did poorly in any job that required him to apply functional

Laura Andersen, RMR 704-350-7493

**JA651**

134

academics.

The people that I talked to, acknowledged that he had difficulty in reading and writing and in money management.

The letters that he wrote that when he was in jail, and that Ms. Garcia offered an opinion on, indicated that his writing skills are still drastically insufficient.  And Dr. Weinstein found his arithmetic skills currently to be deficient.

So we have a picture that goes from at least third grade, up until the time of his present incarceration. Consistently through all of that, he has had very impaired academic skills.

He had work opportunities.  He had opportunities in life, where if he did not have mental retardation, he would have picked up on things.  Because practical skills, as I mentioned, are the things that you learn by doing and by experiencing.

And so if he did not have mental retardation, he would have improved these things over the time from when he left school at age ten, until the time that he was tested when incarcerated.

But he didn't improve.  All the information that we have is that he's still at the third grade level.

So I think that the evidence for significant impairment in his functional academics is very consistent, and very

Laura Andersen, RMR 704-350-7493

**JA652**

CROSS-OLLEY

strong.

The other portion of this is self-direction.  Which is, did he require assistance for the things that he did.

And he never was in a place where he didn't have to rely upon his father, an employer or someone else to assist him.

And the gang, apparently, provided some of that assistance.  When he was older, when he was in the United States, and he needed assistance for something, he was skillful enough to be able to locate other gang members.

So I think that his self-direction, his academic skills, both very significantly and well documented in there, apparently.

Q.   Well documented in the sense his schooling ended at second grade for all intents and purposes.

A.   Well, they were well documented by the interviews that I had with people who gave me practical examples of his limitations.  And well documented by the things that he wrote in jail.  And well documented by Dr. Ricardo's -- Dr. Weinstein's testimony.

Q.   And those are limitations that one would attribute to an uneducated person.

Obviously someone who only survived the second grade, would not be a good speller, probably not good at math.  May not be very good with money.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 190 of 522
Case 3:08-cr-00134-RJC   Document 333   Filed 03/18/10   Page 135 of 433
JA653

CROSS-OLLEY

Although there is no evidence in any of your interviews that he was ever tasked with a job that actually relied on counting money and then failed it.  He was simply not given the opportunity.

A.   I disagree with that, I spoke about this earlier.  My impression from talking to employers was that he was given opportunity.  His father gave him opportunities, and found that he was not successful in handling money.

And again, I'm sorry to keep repeating, but if he -- a person who does not have mental retardation, for heaven sakes, a person with an IQ in the nineties, which Dr. Suarez alleges, is a person who would have improved over time simply by working, and by exposure to everyday life, by television, by the mass media.

People with mental retardation would be likely to stay at the third grade level.  Whereas a person who simply didn't attend school well, would have shown some improvement over that time.

Q.   But you have not talked to anybody who's known him since the age of 19.  So you have no way of gauging whether he improved since then.  He could be great with money today, for all you know; isn't that fair?

A.   Not according to the Wide Range Achievement Test.  And with regard to his writing, he's still significantly impaired to this day.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 191 of 522
Case 3:08-cv-00134-RJC   Document 223   Filed 09/13/10   Page 136 of 433
JA654

Q.   And did he talk to you about selling drugs in El Salvador?

A.   No.

Q.   All right.

A.   He acknowledged that he used marijuana.

Q.   All right.  So to what -- whatever extent he handled money in the drug trade, if he did, he didn't talk to you about that?

A.   I'm not knowledgable about that.  Dr. Suarez's report indicates that he was unsuccessful in selling marijuana in Los Angeles.  So why he was unsuccessful, I'm not sure.

Q.   And then with regard to this code issue, how ever sophisticated or unsophisticated you may feel this code to be, he -- the fact that he used a code and used it correctly shows, does it not, that he:

A, understands the need to use a code.  That is, his writings and his jail phone calls may be being monitored by law enforcement.

That he was able to do it, as opposed to being unable to do it, being unsuccessful in applying the code.

And he did all this despite having almost no formal education, not since second grade, correct?

A.   I'm sure all of that's true.  But it doesn't -- it's not incompatible with mental retardation.  As we mentioned before, the cutoff of mental age for mental retardation is

JA655

CROSS-OLLEY

age 11.  Surely an 11 year old could do all of the things that you just said.

Q.   I mean, he may be a bad speller, but he could run a code?

A.   Well, what he told me was that it was very difficult to do this.  And that it took him more than a day to complete one letter, that was a page or two long.  And that he really disliked doing it.

And even in some of the material that's provided by the FBI, and I mention this in my report, he said something, and I can't remember the exact phrasing, because it was interpreted to me when I was in El Salvador, to the effect that it made his head hurt to do this.

So he found this task of transposing letters to be very arduous and very time consuming.  That would not be true for an 11 year old.

Q.   And that's according to his self-report to you?

A.   Yes.  And what he wrote in one of these letters that was translated to me.

MR. GAST:  May I have just a second?

THE COURT:  You may.

MR. GAST:  Thank you, Your Honor.  No further questions.

THE COURT:  Redirect?

MR. BRYSON:  Yes.  Let me just pick up with where

Laura Andersen, RMR 704-350-7493

**JA656**

you left off.

REDIRECT EXAMINATION BY MR. BRYSON:

Q.   You were talking about there being some notation where he said his head hurt to do this, that is, writing in code, correct?

A.   Yes.

Q.   That was actually in the letter that he was writing in code; is that correct?

A.   Yes.

Q.   There's a part in the letter where he's writing in code, and at the end of it he comes out and says, I have to stop here, it makes my head hurt to do this; is that right?

A.   Yes.

Q.   All right.  You spent a long time talking about what he told you about gang life, or his involvement in the gang, in terms of it relating to his naivete; is that correct?

A.   Yes.

Q.   Now, in your conclusion, you break the adaptive behavior down to the three groups; is that correct?

A.   Yes.

Q.   One of those is social, correct?

A.   Yes.

Q.   And that's where you were analyzing his gullibility?

A.   Yes.

Q.   Now, you did say that the results on this prong, the

CROSS-OLLEY

social prong were mixed; is that correct?

A.    Yes.

Q.    Okay.  So whether or not he was truly gullible or not, is not determinative of your assessment in this case?

A.    Well, it's one of the factors.

Q.    Okay.  But even if he wasn't gullible, that would only affect your assessment in the social skill prong?

A.    Well, that's true.  I mean, the requirement is significant impairment in one out of three.  And as I indicated in my report, I believe there is very strong evidence for significant impairment of conceptual skills. And there's mixed evidence in the other two.

Q.    You were questioned about, you're not using the ABAS scales; is that correct?

A.    Yes.

Q.    And you did not use them for third party reporters, correct?

A.    Right.

Q.    That was because you thought there was a problem with -- they were not normed for El Salvador?

A.    Right.

Q.    Why did you not use one on Mr. Umana?

A.    Because this is an issue that has come up in recent years in professional literature with regard to *Atkins* hearings and in testimony, that the test is not considered

Laura Andersen, RMR 704-350-7493

**JA658**

CROSS-OLLEY

by its author, to be a valid assessment of adaptive functioning, based upon self-report by the defendant.

Q.   Do you believe that in your dealings with Mr. Umana he was malingering with you?

A.   No, I don't believe so.

Q.   Why?

A.   Well, there's other information from the other testing that would indicate his not malingering in other testing. But just for me, this is my opinion and my judgment in my interaction with him.

First of all, my initial discussion with him about why I was there, emphasized to him that it was extremely important for him to be honest, and to tell me the truth regardless of what he thought it meant.

And that the only way that I could be of assistance to the Court, was to be assured that he would always be honest with me.  So there was a big emphasis on that.

I found his reporting to me to be consistent.  He was not always -- meaning consistent in theme, although it got lost in the detail sometime.

But in my opinion I did not see anything about his information that was provided to me that gave me an indication of malingering.  I did not do a formal test of malingering.  All the ones that I could think of had already been done by Dr. Weinstein and Dr. Suarez.  And I didn't

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 196 of 522
Case 3:08-cr-00134-RJC   Document 203   Filed 03/18/10   Page 141 of 433
JA659

think it was a good idea to repeat them.

Q.   You observed a scar on his head; is that correct?

A.   Yes.

Q.   When you spoke with the school director down in El Salvador, he told you that he -- the first -- he was in the third grade two years in a row; is that correct?

A.   Yes.

Q.   And the first time at the end of the third grade school year he was retained, correct?

A.   Yes.

Q.   That is, the school made him repeat the third grade the second year?

        THE COURT:  Mr. Bryson, I've heard this testimony already.  So if there's something new that your redirect is focused on that I've heard in Cross, I'll let you ask that.

        MR. BRYSON:  Okay.

Q.   (By Mr. Bryson) Did the school director give you any indication of the significance of being retained in the third grade school in El Salvador?

A.   Yes.  It was very significant in that it was very unusual, and that a person would have to be very limited to do that.  Because they were philosophically inclined to keep children in school.  I mean, obviously, they're not going to learn unless they're in school.  And so they don't want to discourage children.  So being retained would have been very

unusual.

Q.   When you testified earlier in giving your opinion about whether or not he is mentally retarded, you -- correct me if I'm wrong -- essentially said that you believe that he was mildly mentally retarded starting at a young age and going up to the time of his incarceration; is that correct?

A.   Yes.

Q.   Is he now, as he sits here, in your opinion, mentally retarded?

A.   I can not form -- if opinion means diagnosis, I cannot form a diagnosis, because I have no way of assessing his adaptive behavior, currently.

And if opinion means what would be my most likely answer to that question.  I don't see any reason that his functioning would have improved.

I relied upon the limited literacy in the letters that he wrote and current testing that Dr. Weinstein did.  So those things would indicate that the impairments that existed when he was younger, continue to this time.

MR. BRYSON:  Those are my questions, Your Honor.

THE COURT:  Very well.  You may step down.

Mr. Bryson, how long is your next witness?

MR. BRYSON:  He won't be particularly short.

THE COURT:  Probably good place to stop and break for lunch.  We will do that.  We will take an hour break for

Laura Andersen, RMR 704-350-7493

**JA661**

144
DIRECT-WEINSTEIN

lunch and come back at 1:45.

(Lunch recess.)

THE COURT:  We're back and ready are you ready to call your next witness.

MR. FOSTER:  Yes, Your Honor defense calls Dr. Ricardo Weinstein.

THEREUPON, RICARDO WEINSTEIN, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. FOSTER:

THE COURT:  Mr. Foster, whenever you're ready.

MR. FOSTER:  Thank you, Your Honor.

Q.   Dr. Weinstein, could you state your complete name, please?

A.   Ricardo Weinstein.  R-I-C-A-R-D-O.  W-E-I-N-S-T-E-I-N.

Q.   Okay.  Dr. Weinstein, are you fluent in both English and Spanish?

A.   Spanish is my first language, yes.

Q.   What is your occupation?

A.   I'm a psychologist.

Q.   Are you a licensed psychologist?

A.   I am licensed in the State of California.

Q.   How long have you been licensed in that state?

A.   Twenty-five years.

Q.   And what does it require to be licensed as a psychologist in the State of California?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 199 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10 Page 144 of 433
**JA662**

DIRECT-WEINSTEIN

A.    It requires to have a doctoral degree from an approved institution with an approved curriculum by the state.  It requires 3,000 hours of supervised work; 1,500 of which have to be post-doctoral.  It requires passing a national exam.  It requires -- at the time I got licensed, it required an oral examination.  Presently that oral examination has been changed to an ethics examination, written ethics examination.

Q.    And have you provided us with a copy of your curriculum vitae or CV?

A.    I have.

(Defendant Exhibit 13 was marked for identification.)

Q.    (By Mr. Bryson) Showing you what's been marked as Defendant's Exhibit 13 for identification, do you recognize what that is?

A.    I do.

Q.    What is that?

A.    It's a copy of my vitae, my curriculum.

Q.    At the end of that document, I think it indicates a date of January, 2007; is that right?

A.    Yeah.  This document indicates that, yeah.

Q.    Is there anything significant to -- that you would add to that at this date that you've done since January of 2007?

A.    I've done several professional presentations in national conferences.  And I think from 2007 I have not done

Laura Andersen, RMR 704-350-7493

**JA663**

146

DIRECT-WEINSTEIN

any international presentations.

Q.   Okay.

MR. FOSTER:  At this time, Your Honor, I would offer Defense Exhibit 13 into evidence.

THE COURT:  Any objection?

MR. GAST:  No, Your Honor.

THE COURT:  Let it be admitted.

MR. FOSTER:  Do you want me to bring you up a copy?

THE COURT:  Sure, that would be great.

(Defendant Exhibit 13 was received in evidence.)

Q.   (By Mr. Foster) Dr. Weinstein, what is your educational background?

A.   I have a Doctoral degree in psychology from International College.  I have a Master's degree in Psychology and Humanistic Psychology from Merrill-Palmer Institute.  My undergraduate degree is from the -- it's in Spanish, and it's Universidad Nacional Autonoma de Mexico, which is the National University of Mexico.

I have a post-doctoral training -- certified training in neuropsychology from the Fielding Institute.

And I have extensive training under the supervision of Dr. Stermon on quantitative electro enceph -- encephal -- encephalo -- encephalography -- I'm sorry -- or QEG.

Q.   Encephalo --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 201 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10   Page 146 of 433
**JA664**

DIRECT-WEINSTEIN

A.    I need a new one, sir.  Sorry about that.

Q.    Encephalo --

A.    Encephalography, sir.

Q.    All right.  Now, your CV indicates under your name, it says, neuropsychology.  Do you properly refer to yourself as a neuropsychologist or not?

A.    There is no license in the State of California as a neuropsychologist, or as any kind of psychologist.  Your license is a generic license of psychologist.

       And the ethical principals in California indicate that you should not represent yourself as, other than psychologist.  But with a specialty in terms of the kind of practice you have.  Like, my specialty is in neuropsychology.

Q.    Okay.  And what is your current occupation or work status?  Are you in private practice?

A.    I am in private practice.  I've been in private practice all my professional life, in addition to doing other work.  But presently I'm exclusively in private practice.  And my practice consists exclusively of forensic work.

Q.    Okay.  And how long have you -- what were your earliest training experiences in the field of developmental disabilities and mental retardation?

A.    Could you repeat the question, please?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 202 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10   Page 147 of 433

**JA665**

DIRECT—WEINSTEIN

Q.    Yeah.    What was the -- when did you begin any kind of training or receive experiences in developmental disabilities or mental retardation?

A.    Well, my interest in mental retardation started in 1973 when my son was born with down syndrome in Mexico, and there were no services.

So I started researching the disability, as well as potential programs.    Leading to starting a school for down syndrome individuals in Mexico, that's still ongoing.

Professionally, I've always been interested in that. But since I've been licensed, my most direct experience working with children, has been through the Baker Elementary School, where I worked for eight years.

And my position was to assist the teachers and the administrators in identifying children with needs, and finding the necessary services and support to help the kids be successful.

Q.    And in that role at Baker Elementary School, you were the -- this was after you already received your doctorate and you were a licensed psychologist?

A.    Yes.    That was in -- started in 1992.    I received my license in, I think it's 2004 (sic.) -- February of 2004 or 2005 (sic.) I'm not sure.

Q.    2004?

A.    No -- 1984.    I am sorry.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 203 of 522
Case 3:08-cv-00134-RJC   Document 252   Filed 03/18/10   Page 148 of 433
JA666

DIRECT-WEINSTEIN

Q.   All right.  And what -- have you ever had any teaching duties?

A.   I taught for a couple of years at the San Diego State University, as an adjunct professor teaching assessment.

Q.   What associations do you belong to?

A.   I belong -- most relevant in this case is the American Association of Intellectual and Developmental Disabilities. I belong to the National Academy of Neuropsychology.  I belong to several organizations that relate with -- relate to quantitative EEG's.  I belong to the American Neuropsychiatric Association, International Neuropsychological Association, and several other organizations related to the field of neuropsychology.

Q.   And have you authored various publications in the field of psychology?

A.   I've authored several publications in cooperation with my wife, who is a law professor.  They have been published in Law Review articles.  I've authored, also, several other papers whose abstracts, primarily abstracts, have been published in neuropsychological or neuropsychiatric journals.

Q.   How about professional presentations you've made to various professional groups?

A.   I've done extensive presentations, both nationally and internationally on neuropsychology, cultural competence,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 204 of 522
Case 3:08-cr-00134-RJC   Document 232-7   Filed 03/18/10 Page 149 of 433
**JA667**

DIRECT-WEINSTEIN

mental retardation and other issues.

Q.   Are you -- in your professional practice do you conduct intelligence testing?

A.   I do.

Q.   And how long have you been doing that?

A.   I've been doing that for more than 20 years, 25 years.

Q.   And the training you received that qualified you to do that was what?

A.   I received training all through my Master's and my Doctoral.  And I also received training in the different tests by taking continuing education courses.

When new publications or new tests, or new iterations of tests have been published and the course is offered, I've taken them.

Q.   All right.  And have you worked on *Atkins* cases in the role of evaluating people for mental retardation?

A.   I have.

Q.   And approximately how many times have you done that?

A.   It's difficult to determine the specific times, because often the referral is for a general assessment of cognitive abilities of an individual.

And when the information that I obtain from that assessment, which is like in this case, suggests the possibility of mental retardation, there's -- then there's additional work to be done.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 205 of 522
Case 3:08-cr-00134-RJC   Document 232   Filed 03/18/10   Page 150 of 433
**JA668**

151
DIRECT-WEINSTEIN

Specifically being referred for the assessment of *Atkins* issues, probably, I would estimate I've done about 25 to 30 cases in which was the original referral question.

Q.   And -- have you ever been asked to do a mental retardation evaluation for someone, and then found the person not to be mentally retarded?

A.   Oh, most of the time I don't find them mentally retarded.

In specific cases of *Atkins*, I would say probably 30 percent of the time I don't find them mentally retarded, 25, 30 percent.

But in general, in terms when I get a general referral for a cognitive evaluation, the great -- you know, probably about 70 percent are not mentally retarded.

Q.   Are not?

A.   Are not.

Q.   Have you qualified to testify as an expert before in state and federal court?

A.   Yes, I have.

Q.   And has that been in the field of psychology?

A.   Field of psychology, neuropsychology, mental retardation, cultural expertise, I think primarily those are the four ones, quantitative EEG's.

Q.   Has that been in -- do you know how many states it is roughly?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 206 of 522
Case 3:08-cv-00134-RJC   Document 252   Filed 03/18/10   Page 151 of 433
JA669

DIRECT-WEINSTEIN

Let me ask you this.  How many times have you testified as an expert?

A.    In *Atkins* cases or in general?

Q.    In general.

A.    Oh, more than 100.

Q.    In *Atkins* cases --

A.    That includes cases where I testified in juvenile court where often, you know, when you do an evaluation, you testify.

Q.    How many times in *Atkins* cases?

A.    I really don't know specifically in *Atkins* proceedings. But probably more than ten, ten, fifteen.

Q.    Have you ever found not to be qualified as an expert by a court?

A.    No.

        MR. FOSTER:  Your Honor, at this time I would tender Dr. Weinstein as an expert in intelligence testing.

        THE COURT:  He will be allowed to give an opinion in that area.

        MR. FOSTER:  Thank you, Your Honor.

Q.    Dr. Weinstein, you noted Spanish is your first language?

A.    That is correct.

Q.    Where were you raised?

A.    I was born and raised in Mexico City.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 207 of 522
Case 3:08-cr-00134-RJC   Document 202   Filed 03/18/10   Page 152 of 433
**JA670**

153
DIRECT-WEINSTEIN

Q.    And were you contacted by the defendant's attorneys in this case to do an evaluation of Mr. Alejandro Umana?

A.    I was.

Q.    And what type of evaluation did you then conduct?

A.    I was asked to do a comprehensive evaluation of brain function of cognitive abilities, and that's what I did.

Q.    And when did you do that?

A.    I saw Mr. Umana on July 1st and 2nd of 2009.

Q.    Where did you see him?

A.    At the county jail next door here.

Q.    The man you evaluated, is he seated over here at the end of this table?

A.    I believe so, yes.

Q.    And did you prepare a letter to myself and Mr. Bryson -- actually my co-counsel Mr. Bryson, detailing your findings?

A.    Just a very brief letter containing the instruments that I used, in a general statement about findings.  It's not a report, and it's not a comprehensive report of findings.

(Defendant Exhibit 14 was marked for identification.)

Q.    (By Mr. Foster) Showing you what's been marked as Defense Exhibit 14 for identification, do you recognize what that is?

A.    Yes.  That is the letter that I authored on July 17th,

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 208 of 522
Case 3:08-cr-00134-RJC    Document 2021    Filed 03/18/10    Page 153 of 433
**JA671**

154
DIRECT-WEINSTEIN

2009.

Q.   And that is a multi-page document that contains test scores and other data like that?

A.   The -- the actual letter is a two-page letter.  Then I did include with that, a number of printouts of test results, and a copy of the quantitative EEG analysis.

          MR. FOSTER:  At this time, Your Honor, I would offer Defendant's 14.

          THE COURT:  Any objection?

          MR. GAST:  No objection.

          THE COURT:  Let it be admitted.  I've got it.

          MR. FOSTER:  Okay.

(Defendant Exhibit 14 was received in evidence.)

Q.   (By Mr. Foster) Dr. Weinstein, in looking at this report recently, did you notice that you had made a mistake in the report -- not the report, but in the letter?

A.   Yes, I did.

Q.   And what was that?

A.   I included the word "memory test", as one of the tests that I did on Mr. Umana.  And I did not do that particular test.

Q.   And did you conduct, as part of this evaluation any intelligence testing of Mr. Umana?

A.   I did.

Q.   And what tests did you conduct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 209 of 522
Case 3:08-cr-00134-RJC   Document 722   Filed 03/18/10   Page 154 of 433
**JA672**

DIRECT-WEINSTEIN

A.    I used the WAIS Adult Intelligence Scales III, the Spanish version.  Meaning the translation into Spanish that is published in Mexico.

And I also used the comprehensive test of Nonverbal Intelligence.

And those are the two tests that are relevant to the issue of IQ scores.

Q.    Okay.  And the first one, the -- is that also -- do people refer to that as a WAIS-III?

A.    That's correct.

Q.    You said that was the Spanish translation?

A.    It was the Spanish translation published in Mexico. Because there's a Spanish translation published in Spain. And there's also a Spanish translation published in Puerto Rico.

Q.    Okay.  And why did you pick that particular test?

A.    I used that test because I believe it's the closest, linguistically speaking, and culturally speaking to Mr. Umana.  He is from El Salvador.

But it's a test that's been translated and culturally, kind of, validated in the sense that the items are pretty much the same as in the United States.

The order of the items has been changed to maintain the level of difficulty of the items.  And some of the questions have been culturally corrected.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 210 of 522
Case 3:08-cr-00134-RJC   Document 202-2   Filed 03/18/10   Page 153 of 433
**JA673**

DIRECT-WEINSTEIN

For instance, there's a question on the information section or information subtest that asks in the WAIS-III, who was the President of the United States during the Civil War.

In the Spanish version or the Mexican version, the question is, who was the President of Mexico during the Reform.

But this particular test also has a notation in there that if you're testing somebody from Central America or South America, you change that question to, who was the Liberator of your country.

So that's the cultural adjustments that were done to this particular test.

Q.   Okay.  Now, what about the tests that you used, what norms did you use?

A.   I always use the U.S. norms when I used the WAIS-III Mexican version.

Q.   All right.  And why do you do that?

A.   Well, the main reason that you use, or I use the WAIS-III U.S. norms, is because IQ scores are what they call deviation scores.  And that means, how far from the mean or the average of a particular population the individual that you're testing falls, in terms of their intellectual abilities.

The question -- IQ scores and everything else that we

Laura Andersen, RMR 704-350-7493

**JA674**

DIRECT-WEINSTEIN

do is contextual by nature.

In other words, it is related to, what is the question that I have been asked to answer. The question that I have been asked to answer is, that this individual qualifies for the definition of mental retardation.

And in this specific case, for the protection that the law has of individuals with mental retardation in terms of not being eligible for the death penalty.

So you have to compare them to everybody else that have the potential to face the death penalty in the United States.

And the norms that provide the basis for that comparison, are the U.S. norms. That's one reason.

Another reason, from a neuropsychological point of view, is because when you do testing of an individual, you want to be able to find all the tests, or the majority of the tests that we have for neuropsychological testing in the United States, are normed in the population of the United States. So you want to be able to compare apples to apples.

But primarily, and for certain when it's exclusively about mental retardation, you need to compare that individual to other members of the group that are facing similar circumstances.

Q.   To back up just a little bit. When you use the term "norms", could you explain what that means, really?

Laura Andersen, RMR 704-350-7493

**JA675**

DIRECT-WEINSTEIN

A.    Yes.   Psychological tests are a sophisticated way of using instruments that have been developed, to compare how individuals function in relationship to other individuals.

So the way you can do that, is by having a distribution of the scores that individuals obtained in tests that you know, provide you information regarding the issue or the concept that you want to test; in this case, intelligence.

So the way these tests are developed, is by once they are psychometrically sound, a normative sample is obtained.

Usually that normative sample, meaning a group of people that represent the population, is derived from the census of the country.  In this case the United States.

And that census of the country is representative of everybody that lives in this country, males, females, African-Americans, Salvadorans, Mexicans, Cubans.  Anybody else that lives in this country and is part of the census is, theoretically speaking, represented in that sample of the population.

Once you give that test to all these individuals, you obtain a distribution of the scores obtained.  And that distribution, you hope, is a normal curve, which is the basis.

And that distribution will allow you to know where the individual that you're testing, is placed in relationship to the population at large.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 213 of 522
Case 3:08-cr-00134-RJC   Document 226-2   Filed 03/18/10   Page 158 of 433
**JA676**

DIRECT-WEINSTEIN

In that particular sample of the population and the scores indicated are called the "norms".

Q.    Thank you.  Now the WAIS-III test, could you explain what kind of test that is and how it's administered?

A.    The WAIS-III is the third iteration of the most widely used test of intelligence or IQ scores in the United States, and probably in the world.  Is something that was revised, published -- was normed in 1995, published in 1997.

It's a test that consists of a series of subtests, and is divided in two areas, verbal and nonverbal -- or verbal and performance, and that yield three scores of interest; the verbal IQ score, the performance IQ score, and the full scale IQ score.

According to the definition of mental retardation, in both the DSM-IV and the AAIDD, we need to have a full scale IQ score that falls approximately two standard deviations below the mean.

And I think considering all the necessary issues that relate to type of testing, like standard error of measurement, clinical effect, practice effect, and anything else that may affect the results that you obtain.

Q.    All right.  And when you administered the WAIS-III to Mr. Umana, was that done one-on-one between you and him?

A.    That was done one-on-one.  It was done in Spanish.  He was informed of the limits of confidentiality.  I had him

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 214 of 522
Case 3:08-cr-00134-RJC   Document 202   Filed 03/18/10   Page 159 of 433
JA677

DIRECT-WEINSTEIN

perform a number of tests to determine prior to giving him the test that he was going to provide a good effort.  I had cautioned him that if he did not provide a good effort, I would likely be able to discern that, and invalidate the test.  So he was motivated, he was cooperative, and I believe he put forth his best effort.

Q.    Okay.  And what were the -- what results did you obtain on the WAIS-III subtest and the full scale IQ?

A.    On the full scale IQ score, Mr. Umana obtained a score of 66, with a 95 percent confidence interval of 63 to 71.

Q.    And explain that interval of confidence; what does that mean?

A.    The interval of confidence -- confidence interval is the result of applying the standard error of measurement.

     And the standard error of measurement, basically in lay terms, is what you expect.  That if you test the individual repeatedly with the same test, assuming you can control for practice effect, he's going to obtain different scores, over the course of the number of times you test him.

     And what it means is, that you can be 95 percent sure that no matter how many times you test him, that individual is going to obtain a score that falls within the range, in his case, of 63 to 71.

Q.    And how about the -- I think there were a couple of subtests or whatever, that feed into the full scale IQ?

Laura Andersen, RMR 704-350-7493

161
DIRECT-WEINSTEIN

A.    Well, the verbal IQ score, and performance IQ score, he obtained a verbal IQ of 70, with a 95 confidence interval of 66 to 76.

And a performance IQ score of 68, with a 95 confidence interval of 63 to 77.

Q.    So did the verbal and performance results get factored into what becomes the full scale IQ?

A.    That's correct.  It's not an average.

Q.    And in your opinion, do you think the full scale score of 66, is representative of Mr. Umana's true intellectual ability?

A.    I think that it is representative.  I think that he does function approximately two standard deviations below the mean.

Q.    In addition to the WAIS-III, you mentioned earlier another intelligence type of test, which is a comprehensive test of Nonverbal Intelligence; is that correct?

A.    That's correct.  That's the C-TONI.

Q.    Can you tell us about how that test is administered?

A.    This particular version of the C-TONI I administered in the computer.  And it's a test of nonverbal intelligence. As its name calls, is a test that does provide the equivalent of a full scale IQ score in nonverbal ways. Because it tests for two concepts, both pictorial concepts. Meaning you show the individual pictures and ask them to do

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 216 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 161 of 433
**JA679**

162
DIRECT-WEINSTEIN

certain tasks.  Or geometric, which requires a different type of level of abstraction than the pictorial.

And it provides both a geometric IQ score, a pictorial IQ score, and a composite score, both, which is the equivalent of the full scale IQ score.

Q.   And was there anything in the administration of the test that would undermine your confidence in its results?

Was there anything in your administration of the tests to Mr. Umana, that would undermine your confidence in the results?

A.   No.  The advantage of doing it with the computer is that you don't have an issue with scoring.  It's a relatively -- it could be not difficult, but it's easy to make mistakes in scoring manually, the C-TONI.  The advantage of using the computerized version is that you don't make those sorts of mistakes.

You know, it's not a -- it's not certainly as sophisticated as a WAIS test, but it does give you an estimate of where this individual stands.

Q.   And what was the score that you obtained on that test?

A.   He obtained a Nonverbal Intelligence quotient of 53.

Q.   What is the significance of that score?

A.   The significance of that score is that it is significantly lower than two standard deviations from the mean.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 217 of 522
Case 3:08-cr-00134-RJC   Document 228   Filed 03/18/10   Page 162 of 433
**JA680**

163

DIRECT-WEINSTEIN

But, as we saw before, you know, he does have some strengths, particularly verbal strengths, that are not measured at all by these tests.

Q.   And in conducting the testing that you did of Mr. Umana, did you also conduct any tests to gauge his effort, cooperation, and whether or not he is malingering?

A.   I did.

Q.   And what tests were those?

A.   I conducted three tests, which was the DOT counting test, the Rey Fifteen Item Test, and the Computerized Assessment of Response Bias.

Q.   And I guess if you could go through those one at a time, explain what they are, and why they work?

A.   The DOT counting test consists of a series of slides or pictures of a little booklet that have dots in it.  The task is for the individual to count the number of dots.  They are divided into two sections.  One section is random or appears to be random.  And then the second section they're organized like if they were in dice.  So it's a lot easier to count them and faster.

The results are based on the number of errors they commit, and the amount of time that it takes to do the test.

There is a cutoff score in this particular test.  Meaning that you get suspicion if the individual obtains, from his particular population, which was normal population,

Laura Andersen, RMR 704-350-7493

**JA681**

164
DIRECT—WEINSTEIN

if the individual obtains a score of 14 or above is suspicious.

Mr. Umana obtained the score of 9. So that provided a very strong support for the fact that he was making a good effort.

Q.   Now is the DOT counting test one that is commonly accepted and used in the psychological testing profession?

A.   It is. It is. It is commonly used for that purpose.

Q.   And how about -- can you tell us about the Rey Fifteen Item Test, and how that works, and why it indicates anything?

A.   The Rey Fifteen Item Test is a test in which you will instruct the individual that you're going to show him a slide with 15 stimuli on them. And you're going to show it to them for ten seconds. You're then going to take it away, and they're going to have to reproduce it.

The idea is that it appears to be a difficult task, but in reality is a very simple task to complete.

Q.   And is the Rey Fifteen Item Memory Test commonly accepted and used in the psychology testing profession?

A.   Yes, it is.

Q.   How did he do on this one?

A.   Well, he did well, as expected. He actually was able to reproduce all 15 items. But culturally, technically he only reproduced nine correctly.

Laura Andersen, RMR 704-350-7493

**JA682**

165

Because the first three items are a capital A, capital B, capital C. And then it's repeated after a while with a lower case a, lower case b, and lower case c. But he did not distinguish between upper case and lower case. He simply wrote a, b, c twice.

And then there is numerical 1, 2, 3, and Roman numerals I, II, III. And he remembered it was 1, 2, 3, but not the fact that they were Roman numerals.

And in my experience, that this culture happens very often with individuals that are not used to Roman numerals at all.

But even if I were to consider that he only did nine correct instead of the 15, is the cutoff point depending on the author, is seven, eight or nine.

But in any case, it produced a valid positive score.

Q.   One that would be consistent with a good effort?

A.   Yes, that's correct.

Q.   And finally you mentioned the -- what --

A.   Computerized Assessment of Response Bias or CARB. And that's a test that use a computer, in which the individual is asked to look at the screen, a number, a five digit number appears in the center of the screen. And then that number disappears, two numbers appear, one on the left side, one on the right side. And the individual has to choose which of the two had appeared before. You instruct the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 220 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 165 of 433
JA683

DIRECT-WEINSTEIN

individual that it's a difficult test.  That people with cognitive or memory problems are not able to do this.  And if they want to malinger, they aren't able to do this.

But in his case he was able to do all of the items requested perfectly, and the results indicate very good effort.

Q.   So was there a numerical score on that test?

A.   There's no numerical score.  There's a very elaborate statistical analysis of it.  But ultimately the conclusion is that he provided good effort.

Q.   So were those -- were there any other tests or evaluations you did during your testing of Mr. Umana that would have anything to do with his cooperation, effort or malingering?

A.   Well, those are the specific tests that I use to determine malingering.

The other tests you use to determine whether an individual is malingering or not, is by using different instruments at different times that are measuring same or similar concepts, or that basically are using the same tests.

And you expect the individual that is not malingering, to obtain similar results.

In the case of Mr. Umana, I think there's a very clear consistency in his responses and his scores, in terms of the

DIRECT-WEINSTEIN

different tests that I gave him.

For example, the WAIS-III has digits forwards and digits backward.  And then I gave him a test of attention from the psychological systems battery.  And that test contains the exact same thing, digits forward and digits backward.  And he was basically able to do the same number of numbers forward and the same number of numbers as backwards.

There's another test, single digit test, for instance, which is what Dr. Olley was reporting or referring to, in terms of having to look at a number and identify the figure.

Well, I gave him that test, he obtained 47, if I can remember correctly his score.

Then on another test, the neuropsychological test that was done on the computer, the CNS Vital Signs Political Test.  There's the exact same test, but done in the computer.  And in that case he was able to -- in two minutes, he was able to do 36 instead of 41.  So basically it's the same thing.

And that suggests that he's not only paying attention, but he's actually making a good effort.  Because if he was trying to malinger, it would be almost impossible for anybody that is not trained and doesn't know the test to obtain very similar scores and very similar tasks that you don't recognize.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 222 of 522
Case 3:08-cr-00134-RJC   Document 233   Filed 03/18/10   Page 167 of 433

**JA685**

DIRECT—WEINSTEIN

Q.   So in light of those tests and those scores that you just testified to, how does that affect your earlier -- what affect does that have on the full scale IQ score of 66 is valid?

A.   I think it's a valid score.  I think it's representative of his cognitive abilities.

Q.   Now, before you testified in this case, did you review the report of Dr. Suarez regarding his intelligence testing of Mr. Umana?

A.   I did.

Q.   And is -- did you have his raw data available to you as well?

A.   I had the raw data later on.  Not when I originally read the report.  But it was provided to me afterwards, yes.

Q.   And have you prepared a -- like a power point slide show illustrating your comparison to his testing and your testing?

A.   Not of his testing and my testing.  What I did was compare the use of the norms that he used.

Dr. Suarez gave him a test called the EIWA, E-I-W-A.  And that's a third version, A was three.  Which is the translation and cultural adjustment to the population in Puerto Rico.

That's a test he used.  And he used norms from Puerto Rico.  I was familiar -- this is a test I wasn't familiar

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 223 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 168 of 433
**JA686**

with because it's just very recently published this year and I don't use it.

I was familiar with the original EIWA that was published also in Puerto Rico, and was a translation and adjustment of norming of the original WAIS.

The literature clearly shows that that's a test that overrepresents I.Q. scores by approximately 20 points.

And there's a caution in the literature on the EIWA that should not be used to assess individuals for any purposes.

Particularly, at the time, the biggest concern was that the individuals that were being tested, Spanish speaking individuals that were being tested to determine whether they qualified for social security benefits.

In fact, there were a couple of individuals with down syndrome that were tested with that EIWA, that they're not qualified for the services. And that's what prompted my colleague to research it and publish -- Dr. Melinda published a lot related to the EIWA and other people did, too.

So I knew that the original EIWA overrepresented IQ scores by at least 20 points, or approximately 20 points.

So there is no literature about the EIWA III. And what I did, I did a comparison of the scores, of the scale scores that you would obtain in the EIWA-III, the WAIS-III, and the

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 224 of 522
Case 3:08-cr-00134-RJC   Document 228   Filed 03/18/10   Page 169 of 433
**JA687**

DIRECT-WEINSTEIN

WAIS-III that's published in Spain.

What I did is, I took the actual number of correct responses that Dr. Suarez obtained.  And then from there I figured the scale scores.  And, I mean, that's what the power point's about.  Maybe we can go there and see the actual thing.  But that's what the power point is about, comparing what scores --

Q.   I guess looking at the first slide here, do you have it up there?

A.   Yes.  That's just the title, comparing those norms in comparisons.

MR. FOSTER:  Go to the next.

Q.   Can you tell us what this is?

A.   This is the representation of the normal curve.  The way that the WAIS tests are scored, is first you obtain the raw scores, the actual number of correct responses that the individual gives on each of the individual tests.

You transform those to what is called "scales scores".  And that's what you see here.  That the scale score has a mean of ten, and a standard deviation of three.

In comparison to what's called "standard scores" or "IQ scores" that have a mean of 100 and a standard deviation of 15.

So the first task is, you obtain the raw scores, and you transform those raw scores into scale scores.

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 225 of 522
Case 3:08-cr-00134-RJC   Document 222-3   Filed 03/18/10   Page 170 of 433
JA688

DIRECT-WEINSTEIN

That's the first step I did, comparing the EIWA, the WAIS-III, and the WAIS-III published in Spain.

And you can start at the next one.

Q.   What does this tell us?

A.   These are the verbal scale scores.  You have the subtests, which are vocabulary, similarities, arithmetic, digit span, information and comprehension.

Q.   Let me just stop you there.  The numbers that are in these charts, are these the ones that actually applied to Mr. Umana?

A.   Yes.  The raw scores are the scores that Dr. Suarez reported in his testing, in the sense that that's the number of correct responses that Mr. Umana gave in the vocabulary test and so forth.

When you take that, and you use the EIWA-III norms, he obtains in the vocabulary a scale score of seven.  In the WAIS-III, a scale score of six.  And in the WAIS from Spain, a scale score of three.

In the similarities, he obtained 11 correct responses -- 11 points, based on correct responses.

The EIWA indicates a scale score of eight, a WAIS-III of five, and a WAIS-III in Spain of five, and so forth.

So that's the first step that you do in order to obtain an IQ score.

What you see at the bottom is the sum of scale scores.

**JA689**

DIRECT-WEINSTEIN

Suggesting the verbal test, you see that according to the EIWA, he obtains 55 points. In the WAIS-III, 44 points. And in the WAIS-III Spain, 39 points.

If you consider that the standard deviation is three points, you see that you already have significant differences.

The next slide does the same exercise with the performance. So there is the five performance tests or subtests, picture completion, digit span -- digit symbol, block design, matrix reasoning and picture arrangement.

I did the same exercise. And again you see that the sum of the scale scores in the EIWA gives you a 45, and the WAIS-III a 37, and the WAIS-III in Spain a 33.

So let's go to the next one.

So now you have the comparison of the addition of the two, the full scale in the EIWA is 100, in the WAIS-III is 81, and in the WAIS-III Spain is 72.

Now we're going to take this and transform this into IQ scores. And the way you do that -- everything you do by looking at the tables that are contained in the manuals.

So, using the EIWA-III, and according to what Dr. Suarez reported, he has a verbal IQ of 95, which is 90 to 100, in terms of 95 percent of level of confidence. In the performance 93, in the full scale 93; that's what was reported.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 227 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 172 of 433
JA690

DIRECT—WEINSTEIN

If you use the WAIS-III, that 95 turns into an 84. That 93 turns into an 83. And that 93 turns into an 82.

So the full scale score on the WAIS-III, compared to the EIWA-III, would be 82.

In the Spanish version from Spain, that 93 is 73. Now --

Q.   So -- I'm sorry.  Go ahead.

A.   Because the EIWA-III was very recently normed and published, what you need to do next, is to do what is called -- adjust for what is called the "Flynn effect".

Q.   What is the Flynn effect?

A.   The Flynn effect is called so by the author, James Flynn.  I mean, it's in his honor.  But basically what it is, is that Dr. Flynn and others have done research that shows that over the course of the years, IQ scores in the population increase.

In the United States -- because it's been done in over 20 countries -- in the United States that increase is of approximately .33 points per year.  Or three points, three points every 10 years.

The EIWA-III was published in 2008, and used information very -- from, you know, one year, two years.  So there's really very little adjustment there.

But the WAIS-III was published in 1995.  So we have 14 years, and that gives you approximately five points that you

Laura Andersen, RMR 704-350-7493

**JA691**

DIRECT-WEINSTEIN

need to adjust for.

The WAIS-III in Spain was published in, I think it was 1999.  So that gives you an adjustment of three points.  I think three points.  So go to the next one.

So when you adjust for the Flynn effect, the 93 that Dr. Suarez obtained in EIWA-III, which was 93, is the equivalent to a 77 on the WAIS.  And a 70 on the WAIS from Spain.  That 70 -- that 93 is 89 to 97.  That 73 to 81 is 62 to 78.

Q.   Is there also something else that you would need to consider in adjusting?

A.   Yes.  But, the additional problem is that the WAIS-III and the EIWA, are very much the same test, requiring pretty much the same skills, and testing the same parameters.  It is what -- there is what is called the "practice effect".

Q.   What is that?

A.   Practice effect means, and that the research shows, and that's published in the manuals, that if you test the individual repeatedly.  Meaning if you do a test and then you test him again, within 12 weeks, 14 weeks, you're going to find that the full scale IQ score, and this is reported both in the EIWA manual and in WAIS manual, and in the Spain manual, you're going to have to adjust for five points.  You expect that on average the individual will obtain an additional five points.

JA692

DIRECT-WEINSTEIN

So when you bring down -- you adjust that, adjust the equivalent without changing any of the responses that Dr. Suarez obtained, or any of the scores he obtained from the tests he gave, the equivalent of the EIWA, will give you a WAIS-III score -- or a 93 gives you a 72. In the Spanish version gives you 65.

And based on the literature that's been published, it's very consistent with what was found in the original EIWA.

Q. Is that what you testified to earlier about the EIWA-III overestimating by approximately 20 points the true IQ?

A. That's correct. The true or the comparable IQ with the population of the United States.

Q. Okay. Is that the last slide in the series or is there another?

A. I think so, but I'm not sure. Well, that's just an explanation of the -- what's contained both in the WAIS-III manual and the EIWA-III manual, in terms of what it says regarding the practice effect.

Q. Okay. So this quote on this slide about the practice effect for the WAIS-III, is right out of the WAIS-III manual?

A. Right, page 35. Yes.

And the next one, the EIWA is a translation that I did, and it's contained on page ten of the EIWA-III manual,

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 230 of 522
Case 3:08-cr-00134-RJC    Document 222-6    Filed 03/18/10    Page 173 of 433
**JA693**

DIRECT-WEINSTEIN

practice effect, yes.

Basically they both come up with the same conclusion. That if you test and you test and you test an individual, with the same or similar test, in this case the same test only the translation, you expect him to obtain five additional points. The IQ score would be five points up.

Q. So what you are saying then, the practice effect would apply in this case in Dr. Suarez's testing of Mr. Umana?

A. Yes. Yes. I tested him in July. He tested him in September.

Q. And you're saying the tests are essentially the same, just different translations?

A. That's correct.

Q. That's why the practice effect should be taken into account?

A. That's correct. And the Flynn effect should be taken into account. That's mentioned in the AAIDD.

Q. And your analysis of Dr. Suarez's report, was the practice effect noted or taken into account?

A. No. He doesn't mention the practice effect at all. He doesn't mention the fact that there is literature suggesting that the EIWA overestimates and it's something that should have been cautioned.

Even though there is no literature on the EIWA-III, but there is plenty of literature on the EIWA.

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 231 of 522
Case 3:08-cr-00134-RJC   Document 226   Filed 03/18/10   Page 176 of 433
JA694

DIRECT-WEINSTEIN

So basically when you do the adjustments and look at comparisons, you see that apples to apples, especially when you're talking about the range of scores that I obtained and Dr. Suarez obtained, are very similar.

Q.   So in your analysis, using the WAIS-III after you do your adjustments, you come up with a 72.  And what was that, I'm sorry.  I shouldn't have turned that off.  The range on the 72 is?

A.   It's somewhere between 67 and --

Q.   It just came back up -- do you have it?

A.   Sixty-seven to 76.

Q.   And the IQ score you obtained in your testing was what, full scale?

A.   Sixty-six.  But again, to do apples to apples, I would have to adjust my score with the Flynn effect, which is five points, that would be 61, which would be a 56 to 65.

    And if you were to use the Spanish version from Spain, then that score would be somewhere between 55 and 71.

Q.   That's because the WAIS from Spain was normed on the population of people in Spain?

A.   That's correct.  And the WAIS-III was normed on the population of the United States, based on the census of the United States.

    And the census of the United States includes people that are Spanish speakers -- but not the test, because you

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 232 of 522
Case 3:08-cr-00134-RJC   Document 226   Filed 03/18/10   Page 177 of 433
**JA695**

DIRECT-WEINSTEIN

can't take the test with Spanish speakers.

But they are from several different countries, Spanish speaking country, Salvadorans, Mexicans, whatever, that they have immigrated to the United States.

The EIWA-III uses the census in the population of Puerto Rico. And the Puerto Rican population is very different than the population, the mainland United States, and certainly very different than the population in El Salvador. They have absolutely nothing in common, other than the language.

Q. How do they differ, primarily?

A. Well, first of all, Puerto Ricans are a very terrigenous group of individuals. There's a very strong influence of slaves. Slavery was -- large percentage of people in Puerto Rico became slaves. There's a large percentage of individuals from other countries, European countries that arrived in Puerto Rico. None of that exist in El Salvador.

If you compare, food is very different. The music is very different. The culture is very different. The language is very different. Even though they both speak Spanish, it is not an equivalent Spanish.

There's no reason to compare an individual that was born in El Salvador, to the population of Puerto Rico.

There are very few Puerto Ricans -- I mean, there are

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 233 of 522
Case 3:08-cr-00134-RJC   Document 222-1   Filed 03/18/10   Page 178 of 433

**JA696**

179

very few people from El Salvador and Puerto Rico.  Whereas, there's approximately more than 3 million individuals from El Salvador living in the United States.  Which is almost, if not a little bit over 50 percent of the population of El Salvador.

The total population of El Salvador is estimated to be around 6 million.  Then you have an additional 3 million of them living in the United States.

There is really no people from El Salvador living in Puerto Rico.

Q.   And so, in your opinion, is there any reason why one would -- for testing a person from El Salvador who had been living in this country for five years -- is there any reason to use the EIWA-III which is normed in Puerto Rico in testing that person?

A.   No.  In fact, if you wanted to use a test and believe that you shouldn't use the norms of the United States, then you use the norms from Spain.

Spanish people conquered El Salvador.  The culture was brought in from El Salvador -- from Spain to El Salvador.

I don't know why Dr. Suarez chose the EIWA.  I know he's used the Spanish version from Spain in other cases.  I know he's aware of it.  He knows of it.  He's talked about it.  So the choice of the Puerto Rican norms, is something that I certainly believe is incorrect.  There's nothing,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 234 of 522
Case 3:08-cr-00134-RJC   Document 225   Filed 03/18/10   Page 179 of 433
**JA697**

DIRECT-WEINSTEIN

other than the language that makes the population of El Salvador similar to the population of Puerto Rico.

Puerto Rico is an island.  El Salvador has no access to the Atlantic Ocean or the Caribbean.  Puerto Rico has a very strong Caribbean culture, Puerto Rico doesn't -- I mean El Salvador doesn't.

So I mean, if you look at the cultural differences, history, there's nothing in common, nothing.

Q.   Now, did you also look at Dr. Suarez's use of the TONI-III?

A.   Yes.  Dr. Suarez used the TONI-III, instead of using the C-TONI.

Q.   And do you think that, in your opinion, is that appropriate?

A.   The TONI-III has several problems to be used as a measure of IQ or intelligence.  First of all, it's considered to be a brief test of intelligence that provides an estimate.  It's not considered a test that provides an IQ score.

Second of all, it does not provide the equivalent of a full scale IQ score, because it only measures one parameter of intelligence, which is nonverbal, or, you know, one area.

First of all, the manual, the flooring, the floor effect, okay, in the TONI-III, is not adequate to test individuals of low intelligence or what you suspect have low

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 235 of 522
Case 3:08-cr-00134-RJC   Document 22-3   Filed 03/18/10   Page 180 of 433
**JA698**

DIRECT-WEINSTEIN

intelligence.

For instance, if you obtain absolutely zero correct answers of the TONI-III, if I recall this correctly, you still get an IQ of 60. So you don't go below 60, even though you don't answer any questions.

So it's a test that certainly, in my opinion, should not be used with individuals that you suspect, or at least that you're evaluating for the purpose of determining whether they are mentally retarded or not.

And it doesn't provide you any information that would be consistent with the diagnosis in the sense that you don't have the equivalent of a full scale IQ score.

The only test of number in intelligence that is discussed in the AAIDD manual, is the C-TONI.

Q.    That's the one you used?

A.    That's correct.

Q.    So in your opinion, the scale he obtained on the TONI-III of 85, is -- what significance does that have?

A.    It has very little significance in that, first of all, we don't know what the full scale IQ score would be, because it's just giving you a portion of it.

Second of all, that 85, I don't recall and I don't have the manual of the TONI-III, when it was published and when it was normed, but it needs to be adjusted for the Flynn effect.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 236 of 522
Case 3:08-cr-00134-RJC   Document 222   Filed 03/18/10   Page 181 of 433
JA699

182

DIRECT-WEINSTEIN

Third of all, Dr. Suarez gave him the VIP.  The Validity Indicator Profile.  I don't know if he gave him the Validity Indicator Profile first or second, but either way there is contamination since they're pretty much the same items.

So that score, you know, certainly when properly adjusted, in consideration of the other issues, might be in the mentally retarded range or might not be in the mentally retarded range.  I don't think you can really come up to any conclusions for that.

Q.    Now the V-I-P stands for what?

A.    Validity Indicator Profile.

Q.    And in the manual for that, is there any kind of caveat about using it for people in mental retardation situations?

A.    Yes, it is.  There's a specific caveat that you don't use that -- I can read that to you.

Your Honor, may I just step down for a second and get the manual?

THE COURT:  You may.

THE WITNESS:  The Validity Indicator Profile on page 42, is based on the analysis they did in testing individuals or trying to identify individuals with mental retardation that would be malingering.  Using the VIP says, in summary, the data represented here recommend against the use of V-I-P or VIP test to evaluate the validity of

Laura Andersen, RMR 704-350-7493

**JA700**

cognitive testing for adults who are known from historical information to have bona fide mental retardation. Too many cooperative individuals may be mistakenly identified as not cooperating fully with the testing.

And even though it says, "bona fide history of mental retardation", I think what you are trying to determine before you know whether an individual is or is not mentally retarded, you don't use that test.

If you go to page 41, table 15, you will see that the same scores, or the same classification that Mr. Umana obtained in the V-I-P is what 45 percent of the individuals that have bona fide mental retardation obtained.

Only, in other words, the majority of the people -- because there's four classifications. Okay. And 45 percent obtained this classification. So the majority of the people that have bona fide mental retardation in this test, obtained the same classification that Mr. Umana obtained in the test.

And I think that in itself would be very difficult to interpret, in terms of what it means. You don't know if he obtained that because he's not giving you full effort or because he's retarded.

Q.   So are you saying that the validity of the VIP test results as an indicater of whether he's malingering, is not there because of the fact that he could be mentally

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 238 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 183 of 433
JA701

DIRECT—WEINSTEIN

retarded?

A.   It's very difficult to be able to properly analyze, and have any conclusions that are, in my opinion valid, regarding why is it that he obtained this pattern of responding.  Since 45 percent of mentally retarded people obtained this pattern.

And the pattern that he obtained doesn't say that he didn't put any effort on it.  Simply said that he was not able to put enough effort on more difficult tasks.  And so it's very difficult to say why this is happening.

And if you're going to base your conclusion on the result of this test, I think you -- you're not on solid ground.

Q.   And Dr. Suarez's report includes a section also, another test for malingering called the TOMM, the Test of Memory and Malingering.  Did you review that test as well?

A.   Yes, I did.  The Test of Memory and Malingering is a test that is widely used.  It's a test of effort.  And Mr. Umana obtained scores of 48, 50 and 50, which is basically 100 percent -- indicating that he provided 100 percent effort and attention on the test.

Q.   Are those scores typical for people who are providing their best effort?

A.   They are the scores of people that are making a good effort on the test obtain, yes.

DIRECT-WEINSTEIN

Q.   So that test result in Dr. Suarez's report then, would be inconsistent with malingering, correct?

A.   That is correct.

Q.   Now, also another test that was used in Dr. Suarez's test was the MMPI.  Did you review that portion of his report as well?

A.   I did.

Q.   What is the MMPI?

A.   MMPI is the Multiphasic Minnesota Personality Inventory.  It's the second iteration of the test.  It's a test of personality.

Q.   And what is the purpose of giving such a test.

A.   When you're evaluating for mental retardation, there is no purpose of that giving test.

When you're evaluating individuals that are not native to the United States and they don't speak English, then there's nothing that you're going to obtain from that test other than -- the most likely result is what he obtained. That it's not a valid test.  Because it's not a valid result.

Q.   Is it a -- is the MMPI a valid test for malingering?

A.   No.  No.  The MMPI contains scales that indicate what kind of response pattern the individual did on that particular test.  But it is not considered a test of effort or a test of malingering.  And it's not suppose to be used.

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 240 of 522
Case 3:08-cr-00134-RJC    Document 50-2    Filed 03/18/10    Page 185 of 433
JA703

DIRECT—WEINSTEIN

And certainly if -- there's too many compounding problems.

First of all, we don't have any information in terms of -- and Dr. Suarez didn't conduct any testing to determine what his level of reading comprehension or comprehension, relating comprehension.

Because even though he used a recorded version of it, you still have to understand the questions.  We don't know what his level of comprehension is.

Q.    And is that recommended or required or whatever, by the MMPI authors or other literature, that the reading comprehension ability be determined?

A.    Well, the reading comprehension in the manual -- they republished the manual.  And now they talk about fifth and sixth grade level.  Although some of the items may require up to an eighth grade level of reading ability comprehension.

Q.    So essentially then, if one is below the sixth grade reading level, comprehension-wise the MMPI would not be valid?

A.    Exactly.  Automatically you invalidate that.  Because if you can't understand the items, you can't obtain a valid pattern.

But even if you did, there's no connection between using a personality test to determine whether somebody has mental retardation or not.  Especially with an individual

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 241 of 522
Case 3:08-cr-00134-RJC   Document 50-3   Filed 03/23/10   Page 186 of 433
**JA704**

DIRECT-WEINSTEIN

that has a very different background in language and personality.

Q.   So Dr. Weinstein, in all the tests you did in your time with Mr. Umana, and considering the intelligence testing in Dr. Suarez's report, do you believe that your IQ, your full scale IQ result of 66 is valid?

A.   I believe it's an adequate or accurate representation of his intellectual abilities.  And that certainly is -- whatever the number is, certainly is approximately two standard deviations below the mean.

          MR. FOSTER:  I have no further questions.

          THE COURT:  Any Cross?

          MR. GAST:  Yes, Your Honor.  Can I have a five minute break just so I can talk to my expert for a minute?

          THE COURT:  Yes.  Why don't we take a ten minute break and be back at 3:15.

(A brief recess was taken in the proceedings.)

          THE COURT:  Mr. Gast, are you ready?

          MR. GAST:  Yes, sir, Your Honor.  Thank you.

          Shall I proceed, Your Honor?

          THE COURT:  You may.

          MR. GAST:  All right.  Thank you.

CROSS-EXAMINATION BY MR. GAST:

Q.   Good afternoon, sir.

A.   Good afternoon.

Laura Andersen, RMR 704-350-7493

**JA705**

188

CROSS-WEINSTEIN

Q.   I want to talk, first of all, about some of your training and experience, if I could.  It appears from looking at your CV, that you've not been in engaged in clinical practice for quite sometime; is that fair to say?

A.   For about five, six years, yes.

Q.   And was this period from 1992 to 2000 the Baker Elementary School, was that clinical or was that more advisory on policy issues?

A.   Not on policy, it's clinical, was helping evaluate the children.

Q.   And with regard to your testimony in court, where you indicated that the last several years you've been in private practice, exclusively forensic.  And by forensic meaning, essentially as an expert witness in one form or another; is that right?

A.   Yes.

Q.   All right.  And in those times you either primarily or exclusively have done defense work, is that true?

A.   In death penalty cases, yes.  But I do a number of both civil cases -- a few civil cases a year.  And I do competency evaluations, and that's pretty much appointed by the Court.

Q.   All right.

A.   And whoever might come on the side of whoever -- who I testify for.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 243 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 188 of 433
JA706

CROSS-WEINSTEIN

Q.    Is this your sole basis of income right now, your expert testimony work?

A.    Yes.

Q.    All right.  And going through your education then, you've got, let's see.  I don't speak Spanish, so pardon me.

But your university education in Mexico, was essentially a business degree; is that right?

A.    That's business -- yeah.  That's my undergraduate is in business, yes.

Q.    Then in 1979 you graduated from the Merrill-Palmer Institute?

A.    That is correct.

Q.    Is that an accredited university or college?

A.    It's now part of Wayne State University.  It's on the campus of Wayne State.  And it was on the campus of Wayne State.  It was a -- it's an institution that specialized or specialty of the institution is child development.

Q.    But at the time it was not, it was not an accredited --

A.    It was accredited in Michigan.

Q.    All right.  And was this a traditional institution of learning?  That is, you go in, sit in a room, have classes.  Or was this, I guess, it would have been on line of course.  But this is a traditional institution?

A.    Yeah, that's a traditional.  You go and sit on classes, you do everything in class.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 244 of 522
Case 3:08-cr-00134-RJC   Document 50-3   Filed 03/18/10   Page 189 of 433
**JA707**

CROSS-WEINSTEIN

Q.   All right, and it is no longer a stand-alone institution.  It's been amalgamated, I guess, with another institution?

A.   My understanding is, it's been amalgamated with two; one is with Wayne State University, and then there's another, which I'm not sure where it is, that took some of the programs.

Q.   All right.  And then your Ph.D was at International College; is that an accredited university?

A.   It was in the State of California.  I say it was, because it does not exist any more.

Q.   When did it disband?

A.   I really don't know, sometime in the 90's.

Q.   And while you were there, it was only accredited in California?

A.   That's correct.

Q.   And was that a traditional institution of learning, that is, did you go to classrooms and things like that?

A.   You go to classrooms, but it's not a traditional institution, in that it was a pictorial institution.  You had a tutor, you developed your curriculum together with your tutors.  And then you find places to do some of the work that you need to do.  And fulfill the obligations of the curriculum, in order to be licensed in the State of California.

JA708

CROSS-WEINSTEIN

Q.    Did you have exams and things like that?

A.    You had some exams, and you had -- mostly was done through papers that you have to write about what you learned.

Q.    All right.  And then in 1998 you've got a certificate in neuropsychology from the Fielding Institute.  Again, is that an accredited --

A.    Yes.  That's a Nationally accredited institution.

Q.    And is that still in --

A.    Yes.

Q.    -- still exists?

A.    Yes.

Q.    All right.  And a certificate -- I mean, what's a certificate program in neuropsychology?

A.    A certification program.  Meaning that it's a post-doctoral program.  That's a formal program -- at the time in the nineties, mid to late nineties, there was an issue about, if you wanted to be -- if you wanted to be a neuropsychologist or have training in neuropsychology, there were very limited opportunities, particularly if you had been practicing for a while.  Because it's really only post-doctoral in universities and training individuals that are just doing their post-doctoral work.

        This was a program that opened.  It was an alternative to that.  But it's a full curriculum, a two-year curriculum,

Laura Andersen, RMR 704-350-7493

**JA709**

CROSS-WEINSTEIN

including supervision and practical.

And at the completion of that you get -- there's no post-doctoral degree, but it's a post-doctoral acknowledgment that you completed the program.

Q.   And this QEEG training, that is not any sort of formalized training, you are just basically learning by association with somebody who knows how to do this?

A.   No.  It's formalized in the sense that certainly there were many hours of learning about EEG's.  And there's strong supervision of QEG.

It is not a formal program.  I mean, it's not in a university or an institution.  But there is a formal training.

Q.   There's not a piece of paper afterwards?

A.   I actually do have a piece of paper from the -- that says that I'm -- that I'm certified in the field of quantitative EEG's.  That's provided by the Society -- SNR, International -- ISNR, International Society Neuronal Regulation.

Q.   I'm sorry.  I just didn't hear your answer.

A.   I think it's International Society of Neuronal Regulation.

Q.   Okay.  And is that a neurologist organization or a psychologist organization?

A.   It has neurologists, it has psychologists, and it has

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 247 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/10   Page 192 of 433

**JA710**

CROSS-WEINSTEIN

people from other disciplines.

Q.   All right.  And you're not a neurologist.  A neurologist is a medical doctor, correct?

A.   That is correct.

Q.   All right.  And now, if I'm understanding correctly, it appears that you did a fairly specialized task with respect to analyzing Mr. Umana.  And that is just simply to run these tests?

     In other words, you didn't do any adaptive functioning interviews or tests or anything of that nature?

A.   Can you ask the question again?

Q.   I guess I'll break it down.

     Did you interview the defendant, other than to perform these exact tests that you testified about?

A.   Yes, I did.

Q.   Was that interview recorded or did you take notes on that interview?

A.   Yes, I did.

Q.   All right.  I take it since there's nothing in your report about that interview, there was nothing substantial --

A.   There is no report.  I have not produced a report.

Q.   Well, this letter -- this letter that you wrote the lawyer, is that intended to be your report to the court ordered?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 248 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 193 of 433
JA711

CROSS-WEINSTEIN

A.   I was not aware that the court ordered any reports. And it was not intended to be any other than -- what this was intended to be, is a letter to the attorneys.  Because I went -- after I saw Mr. Umana and tested him, I recommended that he should be seen by a neurologist.

And what I was asked to do, is to write a very brief summary of my findings, in order for the decision to have some information regarding what I had found.

But it was not, at no time I'd been asked to write a report.

Q.   So you were not asked to provide a summary to be turned over to the government in this case that describes your opinion, the basis of your opinion, and the reasons for those opinions and your qualifications; you were not asked to do that?

A.   Not to my recollection.

Q.   All right.  All right.  Well, nevertheless -- so you interviewed the defendant.  How long did you interview him?

A.   Probably a total of, face-to-face contact, including the testing that I conducted over two days, was probably approximately ten hours.

Q.   All right.  Excluding the testing.  What I want to get at is what you might have done, since you've not turned over a report to us, what you might have done in addition to these testings?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 249 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 194 of 433
JA712

CROSS-WEINSTEIN

A.   I interviewed him for about two hours.

Q.   All right.  And was that in conjunction with an ABAS or any sort of formalized screening test or just sort of a --

A.   No.  The original referral was to assess Mr. Umana's overall cognitive functioning.

As a result of my finding, in terms of his low IQ scores, and other findings and tests of brain dysfunction, I reported to the attorneys that he had a low IQ.  And that I suggested several things.

Amongst those things I recommended that a full evaluation of mental retardation be done.

A referral should be provided so a qualified neurologist or a neuropsychiatrist evaluate Mr. Umana.

I expressed my concern to them over the fact that he probably did not understand his *Miranda* rights.

And I suggested that all those issues needed to be further investigated and developed.

Q.   Did you read any discovery in this case?

A.   No, I did not.

Q.   Did you read any of his mail that he authored from jail or listened to any of his jail phone calls?

A.   No, I did not.

Q.   Did you go to El Salvador at any time?

A.   I did not.

Q.   All right.  Let's talk about the WAIS-III, if we could.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 250 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/10   Page 195 of 433
JA713

CROSS-WEINSTEIN

196

Before I get too far.  In this letter that you're saying is not a report, you said there was an error, that said you did not do a memory test?

A.   The "word memory test" is a test done for effort, and I did not do that test.

Q.   WMT?

A.   Correct.

Q.   Okay.  I wasn't sure what part to cross off.  All right.  Thank you.

All right.  The WAIS-III, I'm just going to call it the WAIS.  Is that routinely referred to that way?

A.   Well, yes.  But there is now a WAIS-IV, too.  So it's sometimes necessary to -- there's a WAIS, a WAIS-R, a WAIS-III, and a WAIS-IV.

Q.   All right.  The only WAIS that you gave is the WAIS-III, right?

A.   The only WAIS I gave him was the WAIS-III, translated into Spanish, and published in Mexico.

Q.   All right.  I'll try to say WAIS-III, but if I forget and say WAIS --

A.   It's fine.  I understand it's the WAIS-III.  I just was making sure that we understand that.

Q.   Right.

A.   And that research has been done in different iterations of the test.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 251 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 196 of 433
JA714

CROSS-WEINSTEIN

Q.   All right, super.  All right.  Norming these tests, the reason we have multiple versions of this test is to:

One:  Account for language.

And two -- that is, we don't want to give an English language test to somebody who doesn't speak English.

And secondly, is to take into account that person's cultural context.

Is that the basis for having these multiple versions, and having the tests normed to those different populations?

A.   Yes.  The tests -- the purpose of the test being translated and normed in different populations, is for using the test and the norms in the country where it's normed.

I mean, no test, whatever test that you find that's been published, has ever been published for the purpose of an *Atkins* hearing, or for the purpose of -- exclusively forensic purposes.  Every test has many different uses.

But when you translate -- the Mexican translation was done for the purpose of assessing intelligence in individuals from Mexico and other Latin American countries.

The purpose of the EIWA, was to assist individuals from Puerto Rico.

The purpose of the WAIS-III from Spain, was to assess individuals from Spain.

Q.   Right.  And that's for language and for cultural context reasons, correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 252 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 197 of 433

JA715

In other words, we wouldn't want to call someone retarded, because they're here in the United States but they came from a country where the, you know, the literacy rate is 30 percent, and they don't emphasize certain areas in their education that we emphasize here, for example?

A.   By the same token, we wouldn't want to deprive an individual from rights that they are entitled to, like social security, or not being eligible for execution, because you're comparing them to populations that have a significantly higher IQ score.

I mean, that's why you have to evaluate and use norms that are consistent for the purpose of the evaluation.

You certainly don't want to call a person retarded because, compared to individuals in Spain, he does poorly.

But by the same token, you don't want to compare a person with an average of individuals that have 20 points higher IQ scores, and not provide him with the rights of social security, if they qualify for the services of individuals with mental retardation.

Q.   I think you're getting maybe two or three questions ahead of me.

But for the purposes of this question, which is, is that why these tests are created in that fashion; that is, different norms for different countries?

A.   No.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 253 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 198 of 433

**JA716**

CROSS-WEINSTEIN

Q.    It is for that cultural context and language context, yes or no?

A.    No.  The reason they are used -- translated and used, have nothing to do with the population of the United States. Or have nothing to do for the purpose of evaluating the people in the United States.

Q.    I don't think I asked that question, sir.  I didn't ask for comparison of people in the United States.

    I simply asked, is that the reason they make these multiple versions of the test, is to take into account the cultural context of all these -- of different places in the world?

A.    That's partly so.  But they're normed in the populations, because they want to compare their populations with the norms, you know, with whomever their population is.

    And until those tests were translated and normed in these different countries, they were using obsolete norms, mostly from the United States.

    So they wanted to know how those individuals compared in their country, for whatever purposes they have in their country.

    Had nothing to do with what we use it in the United States.

Q.    Okay.  Again, I didn't ask that yet.

    But, there are different cultural context, and

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 254 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 199 of 433
JA717

CROSS-WEINSTEIN

according to the test providers anyway, those cultural context matter, right?

Education matters, culture matters, awareness of the world matters, you know, in respect to -- you know, someone is assessed of their mental retardation, based on their comparison to their peers from the society from which they came, correct?

A.   You know, I don't want to -- I don't want to not answer your question.

But again, the answer is, this tests were not translated or equated or normed in other countries for determining mental retardation or for determining anything else.  It's a test of intelligence.

The same way that we have them in the United States. We don't only use IQ scores to determine when someone is or is not mentally retarded.

We use it for research purposes.  We use it to determine if somebody is, you know, for instance, eligible to go into the army.

There's equated tests of intelligence that are used in a way to see if people are potentially capable of going to law school and so forth.

In each country that they have been translated, they have their own reasons and their own purposes.

The reason they're using the WAIS-III, is because over

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 255 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/10   Page 200 of 433

JA718

CROSS-WEINSTEIN

the course of many years, it's been proven that the psychometric qualities and the characteristics of the Wechsler test are very solid.

So instead of inventing the wheel, they are using what is already there, and they're translating it into their language and then norming it.

Because the way the Wechsler tests are designed, the items go in level of difficulty. They test for that. And sometimes they switch around the tests.

And, for instance, there are words that have no meaning in other languages, so they use equivalent words, or equivalent questions.

Within that translation and norming, there is a cultural adjustment to the test. But it is the same test.

Q.   I take it you're not saying that culture is irrelevant in this testing.

You don't seem to be wanting to answer my question, so I'll just ask it that way.

Is it, you're not saying that culture is irrelevant to these determinations?

A.   Culture is always relevant.

Q.   All right. Particularly to adaptive functioning issues, culture is very relevant?

MR. FOSTER:  Objection.  Beyond the scope of direct.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 256 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/13/17   Page 201 of 433
JA719

CROSS-WEINSTEIN

We didn't call him as a witness on adaptive functioning, Your Honor, we simply limited it to intelligence testing.

THE COURT:  Overruled.

THE WITNESS:  Can you repeat the question, please.

It was overruled, but could you repeat it?

MR. GAST:  Oh, it was overruled.  I'm sorry.  I didn't hear.

Q.   (By Mr. Gast) Actually, you know what, I don't even remember now, so I'll ask a different question.

DSM-IV, page 44.  You're familiar with the DSM-IV, are you not?

A.   I am.

Q.   Specific culture, age and gender features.  See if you recognize this passage.

"Care should be taken to ensure that intellectual testing procedures reflect adequate attention to the individual's ethnic or cultural background.  This is usually accomplished by tests in which the individual's relevant characteristics are represented in the standardization sample of the test, or by employing an examiner who is familiar with aspects of the individual's ethnic or cultural background."

So I guess my question is, do you agree or disagree with that statement?

Laura Andersen, RMR 704-350-7493

CROSS-WEINSTEIN

A.    No, I agree.

Q.    All right.  So, again, testing -- for the purposes of this testing, how it's normed and the population to which you are comparing it, is relevant, true?

A.    It is always relevant.

Q.    All right.

A.    The test can be used for different purposes.

Q.    Thank you.  All right.  In -- now I'm getting to what you've been wanting to talk about, which is, you, in this case, chose to use U.S. norms.

You issued a -- you gave the WAIS-III Mexican version. And rather than following the test instructions, you instead ran it through U.S. norms, correct?

A.    That is correct.

Q.    All right.  And this is not the procedure directed by the test publisher; is that right?

A.    No.  Well, the test publisher states two things.  One is, that is an accurate translation and equation of the test.

And that's what I'm interested in.  But I'm giving the individual a very similar test.

Q.    Right.

A.    That I would be giving to the same individual if they spoke English in the United States.

You know, if I have an individual that speaks English

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 258 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 203 of 433
JA721

CROSS-WEINSTEIN

and one that doesn't speak English, and I want to use the same test for both of them.

Using the translation that it's standardized translation, is a much more preferable way of doing it than, for instance, I, sitting there and translating every item to one person, or using an interpreter to translate every item.

The advantage of using a test that's been published, is that that translation has been standardized.

In other words, the exact same wording is used every time that you give the test to whoever you give the test. That is the value, in my opinion, of a test in -- of the WAIS translated into Spanish.

Q.   All right.  So my question was, the publisher does not recommend this procedure.  And I think the answer is correct, that is correct.  That they do not recommend doing what you've done.

A.   The publisher does not, not recommend that procedure. In fact, the Mexican version -- the Mexican translation and norming, has two sets of norms in the manual.  It has the U.S. norms and it has the Mexican norms.

Q.   I'll get to that in a second.  I do want to ask you about that.

Did you ever actually contact the publisher and say, you know what I've been doing in my cases, I've been running these cases through the U.S. norms, what do you think of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 259 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/10   Page 204 of 433
**JA722**

CROSS-WEINSTEIN

that; is that okay on your test?

A.   I actually did contact the publishers, because there was a whole issue, several issues on the WAIS-III, the Spanish version in Mexico.

And I don't have the manual, but I was informed that in the new version of the manual, there is no longer a recommendation to use U.S. norms.

They took that out because they noticed and they realized that it was, frankly, a very dumb thing to suggest to do.  Psychometrically speaking, you can't do it.  Statistically speaking, you can't do what they were suggesting you do.  So they took that out, according to what they informed me.

Regarding the translation and adaptation of the test, they informed me that it was equated.  Meaning that, they used the same test, the translation, and then used it with people that spoke Spanish only, and spoke English and Spanish, and that they found out that it was a very similar test.

Now that norming, it's not necessarily equated.  To the best of my knowledge, there is no equated tests in order for us to be able to use it for the purposes we want.

We would be required to translate the version from English to Spanish; norm it.  Then translate that translation from Spanish back to English; norm it.  And

Laura Andersen, RMR 704-350-7493

**JA723**

CROSS—WEINSTEIN

determine whether it equaled or what is the relation between them.  None of that has ever been done.

The purpose of using the Spanish version from Mexico, is because it's the most culturally equivalent to people from El Salvador that exists.

And because all I care about is a standardized translation that I don't have to -- standardized instructions that can be used.

Q.   Wait just a second.  Because if it's the most culturally relevant test, then why would you take it out of it's cultural context and then apply U.S. norms.

I mean, you're essentially removing entirely that cultural value of that test?

A.    No, sir.  No, sir.  People in death row, people that are accused of a particular type of crime, that in the United States is punished by death, are a culture in themselves.  That is the culture.  Okay.  That's the group of people that I'm interested.

Q.   Is that supported by the literature?

A.   There is --

Q.   People should test IQ on the basis of comparing them to other people on death row?

A.   For the purpose of *Atkins* cases, there is support and there is support in the literature --

Q.   So you're interjecting a legal analysis --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 261 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/23/10   Page 206 of 433

**JA724**

CROSS-WEINSTEIN

MR. FOSTER:  Excuse me.  Could we have the witness finish answering the question.

THE COURT:  Yeah.  Were you done with your answer before the next question was being asked?

The question was, for purposes -- people should test IQ on the basis of comparing them to other people on death row.

And you said, for purposes of *Atkins* cases, there is support in the literature.

And then another question was asked.  Were you done with the answer to that question?

THE WITNESS:  Well, there is support in the literature.  There's a position paper from the National Academy of Neuropsychology saying that, based on clinical judgment, you use the most relevant set of norms for the purpose of what you're trying to use.

I've had extensive discussions with other people in the field of mental retardation, including -- we've had a meeting in Boston last year, where Dr. Olley was presenting some of the information he obtained from a group of experts nationwide.

We discussed -- and there was, even though there was not 100 percent consensus, there was certainly agreement that that position was a tenable position.

So I'm not being in a counter class here.  I'm not

**JA725**

doing things my own way.  There is substantial support from the people in the field of mental retardation, that for the purpose of determination, whether an individual fulfills the definition of mental retardation, in issues related to *Atkins* cases, using the U.S. norms is the correct way of doing it.

THE COURT:  When you say U.S. norms, what are you referring to?

THE WITNESS:  Referring to the WAIS-III that was originally published in the United States, and normed in the United States, with the population of the United States.

THE COURT:  And how does the death row culture come into play with respect to that?

THE WITNESS:  Perhaps it's not a culture, but it's a group, in the sense that the individuals -- what they have in common are individuals that are going through legal proceedings to determine whether they are eligible for the death penalty or they are not.

And it's the same principle -- I mean, you can't say that if you were born in some place, you are eligible for the death penalty.  But if you were born in some place else you're not eligible for the death penalty.

THE COURT:  And how does this group factor into your test results?

THE WITNESS:  This group is representative of the

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 263 of 522
Case 3:08-cr-00134-RJC    Document 50-2    Filed 03/18/10    Page 208 of 433

**JA726**

CROSS-WEINSTEIN

population of the United States, based on the census of the United States, that includes individuals from El Salvador, from Mexico, from any other country; so there is a representation.

But the most important point is that they are all facing legal proceedings in the United States for crimes they committed in the United States.

THE COURT: So for purposes of determining the intelligence level of this defendant, you are comparing him to other people similarly situated on death row?

THE WITNESS: Yes. In the sense that all those people have been tested, based on norms from the United States.

THE COURT: Thank you.

MR. GAST: May I continue, Your Honor?

THE COURT: You may.

Q.   (By Mr. Gast) So if I understand your reasoning then, if he had stayed in El Salvador and never come to the United States, and he was being tested for some other purpose, they would use different norms?

There would be no -- certainly no one would say that they would use U.S. norms if he was being tested in Santa Ana and not for an *Atkins* hearing, right?

MR. FOSTER: Objection; calls for speculation.

THE COURT: Overruled.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 264 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 209 of 433
JA727

CROSS-WEINSTEIN

THE WITNESS:  Well, you know, I think the best thing I can do is give you an example of what I'm trying to say.

If you went to school in Mexico, or in El Salvador, and graduated from the University of Mexico and El Salvador, and you want to go to law school in the United States, you have to pass an LSAT that's normed and that's comparable in the United States.

They are not going to give you a test, they're not going to give you an LSAT that compares you to how you did with other students in El Salvador or in Mexico or wherever you went to undergraduate school.

They probably don't have it.  Or if they have it, it's not relevant to the United States.

Now, if you want to go to law school in El Salvador, and they have the equivalent of an LSAT, obviously they're going to give you an LSAT, based on the comparison with all the other people in El Salvador that want to go to law school.

The same thing in the army.  You know, if you come to the United States, if you become a U.S. citizen, doesn't matter whether you are from El Salvador or from China, you have to pass the standardized test that the army gives to anybody that wants to join the army.

If you want to join the army in El Salvador and

Laura Andersen, RMR 704-350-7493

**JA728**

they have a test, they're going to give you the test that they give to everybody that's going to join the army in El Salvador.

I don't know if that answers your question.

Q.   Well, if I understand your reasoning, then the second that someone is charged with a capital crime, their IQ score drops, under your reasoning.

Because if they weren't charged with a capital crime, you wouldn't be norming the tests the way you've done it in this case.

All of a sudden now that he's charged with a crime, now you're completely changing the way you assess his IQ by norming it to an entirely different population that doesn't even speak the same language as him.

So the second that he's charged with a capital crime, his IQ score drops.

A.   No, sir.  The second that he's charged with a capital crime, you have to compare him to other people that are charged with capital crimes.

By the same token of your logic -- I mean, using your logic, if you are born in another country and you are poor, and you don't speak the language, then you're not entitled to the protection that everybody else that commits a crime in the United States is entitled.  Because you're going to be compared to people that are different than that.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 266 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/17   Page 211 of 433

JA729

CROSS-WEINSTEIN

Q.   So you're not giving us a clinical opinion, you are giving us a legal opinion now?

A.   No, sir.  I'm not giving you a legal opinion.  That is a clinical opinion.  But you need to consider what the purpose of the test is, and what the referral question is.

The referral question in this case is, does his IQ score, and that's exclusively what I was asked to offer an opinion for, does his IQ score qualifies for the definition of mental retardation, according to the standards of the United States.

And we use the two basic, DSM-IV and AAIDD standards, which says that an IQ score of approximately two standard deviations below the mean, is what's required.  Approximately two standard deviations below the mean.

Considering the Flynn effect, the standard error of measurement, and anything else that needs to be considered.  That's what the book says.  And that's what I'm saying too.  That's what I'm saying.

Q.   Well, to determine mental retardation for an *Atkins* hearing, you have to show three things.  One of those prongs which stands alone is the IQ score.  The magic number is 70, approximately.

You're saying, your interpretation of applying clinical tests is, if you were doing it for purposes of an *Atkins* hearing, you would do it one way.

**JA730**

213

If you were doing it for purposes of just somebody came in and said, I would like to know what my IQ is, would you mind running a test on me, just run my IQ to see how smart I am; you would run it entirely differently?

A.   It's not that you run it entirely differently.

Q.   Well, you're norming -- you're scoring it entirely differently?

A.   You're scoring it according to what the question is, and what your best clinical judgment is, in terms of what is it that you're trying to accomplish.

If, for instance -- okay.  What I'm trying to do is a research project from people that grew up and were educated in Puerto Rico.  I would use -- certainly use norms of Puerto Rico.

Because if part of my research includes what the IQ scores, I'm doing my research there, that's what I want to find out.  So I would use those norms with the individuals which those norms would be relevant.

But I would certainly look at what the referral question is; why is it that I'm testing.

You know, we don't have -- we don't have an MMPI normed in Mexico.  We don't have an MMPI normed in Puerto Rico.  We don't have an MMPI normed anywhere else but in the United States.

Q.   I'm not asking about the MMPI.  We agreed that that's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 268 of 522
Case 3:08-cr-00134-RJC   Document 90-2   Filed 03/18/10   Page 213 of 433
**JA731**

CROSS-WEINSTEIN

not a relevant test for this proceeding.

A.   Right.  But the point is, we used the best norms we can get, based on our clinical judgment.

And I just explained why the best norms, in my opinion, are to compare the individual, with other individuals that are facing similar circumstances, and that are representative of the U.S. population.

Everybody that's in the United States, and that's facing some legal proceeding in the United States, you know, has to abide by the same laws.  And those are the United States laws.

They have to -- they have to have the ability to understand the law in the United States.  They have to have the cognitive ability to comply with the laws, et cetera, et cetera, of the United States; not of El Salvador, not Mexico, not of Puerto Rico.  Well, Puerto Rico is the United States, so.

Q.   Doctor, while I agree with that, you've not been asked to make a legal determination about this defendant.  You were asked to do, it sounds like one thing and one thing only, which is to run some tests.

And it sounds like you ran those tests through the prism of, what effect is this going to have on his legal outcome?

A.   No.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 269 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 214 of 433
JA732

CROSS-WEINSTEIN

Q.   Now, is that an appropriate way -- that sounds to me, at least, like a legal judgment, not a clinical judgment. Why am I wrong about that?

A.   You're wrong, because the referral question that I was asked is, how does he function.  Okay.

Now, when I was asked to do this, I run one test, and one full IQ score test.  And that's all I was -- that's all I did.  And that's the basis for my opinion today.

To answer some of your questions, there's other things that could have been done, and probably, if I would have been asked to offer an opinion about mental retardation, I would have done, which is what you asked.

But at this point, I tested the individual.  I obtained an IQ score.  That's what I was asked to report on.  That's what I was asked to offer an opinion, whether his IQ score is valid or is not valid.

And all I'm saying today, here, is that, that score is valid in terms of the determination of whether this individual qualifies for the definition of mental retardation that states you need an IQ of approximately two standard deviations below the mean.

That's the standard my participation took.

Q.   All right.  Well, let me ask it this way.

When you -- the effect of this, the effect of selectively choosing your norms -- and we saw this on your

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 270 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 215 of 433
JA733

CROSS-WEINSTEIN

slide when you ran Dr. Suarez's numbers through the different sets of norms. That's essentially what that exercise was. Is taking the same raw score and running them through different sets of norms, correct?

A. That is correct.

Q. That in so doing, the effect of this case, by switching from Mexican norms to U.S. norms, is to lower the score.

In other words, if you scored it the way the test told you to, he would have gotten a 75; isn't that right?

A. No. Just as an exercise -- let me address that two ways.

First of all, can't use Mexican norms. Reason you can't use the Mexican norms, is because there's been published, recently published information that those norms are not valid. That there is serious problems with the validity of those norms. Okay.

Q. I have a follow-up question about that later. But go ahead with the next point on that.

A. Just as an exercise, because I do this. I can tell you that using the Mexican norms, his IQ scores would have been very similar than the ones he obtained using the U.S. norms.

If you give me a second, I might find it here because I did this -- okay.

Using the Mexican norms, his full scale IQ score would have been 68 instead of the 66, with -- and this is the

Laura Andersen, RMR 704-350-7493

**JA734**

CROSS-WEINSTEIN

problem with the norms.

Okay -- with a 95 percent confidence interval; that 68 would be anywhere from 57 to 94.

So what does it tell you?  It doesn't tell you anything.  Because you say, well, it may be a 57.  But it may be a 94.  That's why you can't use them.

But when you run the norms, the Mexican norms, his full scale IQ score, using the Mexican norms, is 68.

Q.    Let me --

A.    So it's not that I used it in order to lower his IQ or anything like that.

Q.    Let me put a slide up, because I want to talk about different norming procedures.

I'll go ahead and mark this as Government's A-1.  We'll introduce this later, Your Honor.

(Government Exhibit A-1 was marked for identification.)

Q.    (By Mr. Gast) All right.  This, just by way of illustration, please correct me if I'm wrong about this.

But the way the original instructions for the WAIS-III, the Mexican version, was basically as follows, the procedure for scoring it.

First, you get the total raw scores for each subscale.

After that, step B is, you transform the raw score totals to standardized subscale scores.

And then finally, you transform the sum of the subscale

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 272 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 217 of 433
JA735

CROSS-WEINSTEIN

score totals to IQ and index scores.

That's the way you do it if this was the American version of the test, correct?

A.   That's the way you do it in any test.

Q.   All right.

A.   That's what I show you do -- you do.

Q.   All right.  Now, and as you indicated, there is some research in the literature with regard to the Mexican WAIS, specifically, that says, essentially, that if you followed this procedure, which was the recommended procedure in the original publication, that actually you might actually get an incorrectly low score, because of a glitch with the norming in Mexico; is that true?

A.   There was -- there was a warning on the manual saying that they don't know why they're incorrect.  And that it's possible that they underestimate the IQ scores.

And they recommended something that makes absolutely no sense.  That it's absolutely the most outrageous, psychometric stupidity that anybody could put in the manual, if you ask me.

Q.   And that's this, your opinion notwithstanding.  That what they recommended is, you still do A and B the same way. But when you transform the subscale scores, you run that through American norms, right?  That's the publication's recommendation.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 273 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10 Page 218 of 433
**JA736**

CROSS-WEINSTEIN

A.    That's what they suggested in there.  That's when I talked to the people that published, they said they were wrong.  And they corrected that.  And they understood that that was a very egregious mistake in their part.  And they took it out of the manual.  That's what they informed me.

Q.    But what you did, was this:  You took the raw score and then immediately went into American scores.

A.    Right, using U.S. norms.

Q.    Okay.  And this procedure is not recommended by the publisher; is that right?

A.    Has nothing to do with the publisher.

Q.    And indeed, this procedure that you followed is not used in any other area of psychology, other than in these *Atkins* cases with a select few people that go around the country doing this; isn't that right?

A.    No.  No.  You know, let's take the MMPI that Dr. Suarez used.  He used a Spanish translation of the MMPI.

Q.    Okay.  Well, I'm not asking you about the MMPI.

A.    But you asked me if it's only used --

Q.    That's not relevant.  Sir, let me finish.

       This MMPI, I'm not asking you any questions about that.  It was not run in this test for any reasons having to do with *Atkins*.

A.    Your question was, if I understood correctly, this is only used in *Atkins* cases and stuff like that.  That's what

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 274 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 219 of 433
**JA737**

CROSS—WEINSTEIN

your question was.

My answer is, no.  This is not the only psychological test that you use that way.

All the tests that are translated into Spanish.  And their translation, for instance, of the MMPI into Spanish.  Okay.

There's a translation of the Woodcock-Johnson III, and equated into Spanish, into Spanish.  It's called the Bateria Woodcock-Munoz, tres (phonetic).  Which is the exact translation as the English.

And all of them have the same process of, you take the raw score, and you transform that the same way that you transform that in any other test that you give to people that you give that test.

Q.  I'm not asking about other tests.  I'm asking about the WAIS.

The only time that this is done on the WAIS, it's not recommended by the publisher --

A.  Which publisher, sir?

Q.  The publishers of the WAIS.

A.  WAIS is published in Mexico, the WAIS is published in the United States.  The WAIS is published in Spain.  The WAIS is published in Puerto Rico.  The WAIS is published in many different places.  There is no issue --

Q.  Any of them.  Any of them.  Do any of them recommend.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 275 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 220 of 433
JA738

CROSS-WEINSTEIN

I don't care what country, Israel, South Africa.  Do any of them recommend doing what you've done in this test?

A.    What recommends doing what I did in this test, is what's called clinical judgment, and using the best norms for the purpose of your evaluation.

And I went over that and explained that to you.  It's supported by a position paper from the National Academy of Psychologist.  It's supported by the AAIDD Concept of Clinical Judgment, you know.  It's -- it's practiced.

I mean, if anybody could do this, you wouldn't need a qualified neuropsychologist or psychologist.  You could just get a psychometrist.  A person that could give the test and report the scores.

Q.    But it's also interesting, is it not, that only in this *Atkins* context do people exercise their clinical judgment to change the norming.

In other words, if someone runs the American WAIS, they run the American norms.  If they run the Mexican WAIS, they use the Mexican norms, except in *Atkins* context?

A.    No.  I know individuals that use it also to determine whether people qualify for social security services.

That is -- the main purpose -- you got to remember something.  The purpose we assess for intellectual limitations or disabilities, is because we want to be able to provide the necessary services and support for the

Laura Andersen, RMR 704-350-7493

**JA739**

individual to overcome to the best of their ability, those limitations.

That's the reason that IQ scores are used in the determination of mental retardation and other things. That's not the only use of IQ scores.

But when you're talking about mental retardation, you certainly have to use the same norms, the same basis that you're comparing everybody else to determine whether they are entitled or not entitled to services in this country where they live, and from where they are either citizens or residents. You have to use the same thing.

You can't tell somebody, oh. Okay. You were born in El Salvador, or your son was born in El Salvador or whatever it is, as a child, and doesn't speak English.

But if he would have been born in the United States, and even though he's a citizen or she's a citizen, would qualify for disability services and social security services.

But since he was born in El Salvador, and we have to compare to people in El Salvador, he is not qualified.

You use it any time that you want to determine what kind of services, or what kind of legal rights or anything else that everybody else in the United States are entitled to.

Q.    So you started with a legal purpose and moved from

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17  Page 277 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10  Page 222 of 433
JA740

CROSS-WEINSTEIN

there?

A.   You asked me that question.  I answered that question.  You want me to answer it again, the answer is, no.

Q.   But if he had just brought him in blind and said, I want you to test this guy, I'm not going to tell you why.  You wouldn't have done it this way?

A.   I wouldn't have tested him at all.  If somebody walks into my office and says, I want to be tested.  I ask, what for?  What's the purpose of the testing?  What do you want to find out?

If you go to a doctor and you say, just do an MRI on me, or just do a PET scan on me.  The first question they're going to ask you; what are your symptoms?  What is it you want to find out?  This is no differently than that.

Q.   Certainly the publishers of the test don't regard that.  There's no place before scoring that says, now before you score it, you need to decide why you're using it and what it's for?

A.   The publishers of the test have no clinical judgment in the use of the test.

The publisher of the test are only concerned with the psycho -- or should be only concerned with psychometric qualities and properties of the test.  That's what they're doing.

They are designing a test, they are norming the test,

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 278 of 522
Case 3:08-cr-00134-RJC   Document 532   Filed 03/18/10   Page 223 of 433

JA741

CROSS-WEINSTEIN

and they are measuring -- you know, there's statistical measure. There's validity, and there's many different types of validity. There's reliability, different types of reliability. That's what the publishers of the test are concerned with, and they should be.

Q.   Let's move on to the Flynn effect. This Flynn effect is a controversial theory or effect in the literature, is it not?

A.   No, it's not, sir. And it's actually -- I do happen to have the green book. I did get it last Friday.

And in the last version, in the red book that we had before, was not contained the Flynn effect. But it was contained in the -- I forget the name of the little booklet that was written in order to go with it. I'll remember in a second.

But actually, it is contained in the green book, specifically stating that you use -- you adjust for the Flynn effect, in determining IQ scores for the purpose of diagnosing mental retardation.

So, no, it's not controversial in the field of -- in the field of mental retardation, it is not a controversial issue at all.

Q.   Most experts agree with that?

A.   Most experts in the field of mental retardation agree with it, yes.

Laura Andersen, RMR 704-350-7493

**JA742**

CROSS—WEINSTEIN

Q.    Are you aware that the National Academy of Neuropsychology took this issue up, just last month?

A.    No.

Q.    To talk about the effect -- the Flynn effect, whether it even exists?

A.    No.  I'm not aware of that particular article.  I haven't received it.

Q.    Do you read the Archives of Clinical Neuropsychology?

A.    I do.

Q.    It's a trade publication?

A.    No, I do.  I receive it.  And I do read it.  I just don't read it the moment I get it.

Q.    Show you an excerpt from the annual reading abstracts from this year, 2009.

"Gradual upward drift in test performance may reflect increasingly stringent exclusionary criteria for renorming the cognitive tests."

THE WITNESS:  Excuse me for a second.  I don't particularly like to offer an opinion when somebody gives me a portion of a thing.  If you don't mind, I would like to read the whole part.

MR. GAST:  May I approach?

THE COURT:  You may.

THE WITNESS:  Okay.  Sir, this is a presentation by -- this is not a position paper from the National Academy

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 280 of 522
Case 3:08-cr-00134-RJC    Document 50-2    Filed 03/18/10    Page 225 of 433
**JA743**

CROSS-WEINSTEIN

of Neuropsychology.  This is something that somebody presented.  Okay.  That's -- there's a national conference.  All right.  And people offer their opinion.

This is not a position from the National Academy of Psychologists.  This is abstracts from the 29th annual meeting of the National Academy of Neuropsychology.

Q.   And the reason they decided to take it up at that meeting, was it not, that's just last month, because this issue is controversial, correct?

A.   Not in the field of mental retardation.  If it would be controversial, it would not be published in the definitions of mental retardation, which it is.

Q.   All right.  So, for the field of mental retardation, everybody agrees that the Flynn effect exists.  But when they're not talking about mental retardation the Flynn effect is controversial as applied to other aspects?

A.   No.  For the determination of the first prong of the definition of mental retardation, which is a full scale IQ score of approximately two standard deviations below the mean, you do adjust for the Flynn effect.

That is the position of the American Association of Intellectual Developmental Disabilities.  And if you want me to explain to you why, I will be happy to.

Q.   Well, let me back up for a minute first, and then maybe we'll get there.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 281 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 226 of 433

JA744

CROSS-WEINSTEIN

The Flynn effect, just so we're clear, is a theory. I'll call it a theory. That says that the WAIS scores or the IQ inflates over time, artificially. And that the Flynn effect has been measured or opined to be approximately .3 a year; is that correct so far?

A.   It is not a theory.

Q.   Okay.

A.   Because it's been replicated and validated. Meaning, a theory is when somebody publishes something that nobody's replicated.

It becomes a scientific fact when different people in different labs or in different circumstances, are able to run the same process and come to the same or similar conclusions. And that's what's happened with the Flynn effect.

Q.   So the idea then, is that for people that subscribe to this notion, is that you need to adjust someone's IQ score from the WAIS, because the norms -- there's just this inflation for perhaps, at this time, unknown reasons or unverified reasons.

And so the idea is you need to adjust downward, the score, depending on how long after the norming process the test has been administered, correct?

A.   It is not that you adjust backwards. What it is, is that the mean of the population, okay, increases.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 282 of 522
Case 3:08-cr-00134-RJC   Document 532   Filed 03/18/10   Page 227 of 433
**JA745**

CROSS-WEINSTEIN

So, let's say that you take a 1995 test.  I mean, a test that was normed in 1995, the WAIS or whatever.  And your mean is 100.  Correct?  That's how it's normed.

You take -- you make the same test ten years later -- and that's the reason that they keep on publishing the iterations of the test, or one of the reasons.

Q.   Right.

A.   That mean, compared to the one that you had before, is now 103.  Because the mean of the population has increased in 10 years, by approximately three points.

So the mean is now 103.  So two standard deviations below the mean, now it's going to be 73.  So what you're doing, you're adjusting downward, because of how the mean of the population, the definition of mental retardation states that it has to be approximately two standard deviations from the mean.

And obviously you want to compare it to the mean of the most -- the most accurate mean of the population.

Q.   Right.  Thank you.  Yes.  That's the procedure that's sometimes a suggestion.  But that procedure is not linked to mental retardation.

In other words, it's not just mentally retarded people that they noticed this Flynn effect.  The Flynn effect is, to whatever extent it's been observed, is observed over the entire bell curve?

CROSS-WEINSTEIN

A.    That's correct.

Q.    Okay.  So the fact that -- so -- for those who believe in the Flynn effect and say that it should be applied in terms of adjusting scores, it should matter not whether it's for purposes of *Atkins* hearing or for some other purpose taking the exam, right?

I mean, the effect is the same.  Whether I'm taking the IQ test just because I want to see how smart I am, or if I'm taking the IQ test because I'm trying to avoid the death penalty.

Either way, the adherence to the Flynn effect theory, believe that you should reduce it downward, correct?

A.    Yes.  But it's -- there's a difference in what you're talking about.  Let me give you an example.

If I want to do a research project.  Okay.  And I want to take 50 students, first year students, 50 law, first year students, and compare them amongst themselves.  It is not very relevant if I adjust that IQ score within the Flynn effect.

Because what I'm doing is, I'm giving them the same test and comparing them to the same things.

That's very different that if I -- let's forget about the death penalty for a second.

In the school system, the school systems all over the country.  For a child to qualify for services, there is

Laura Andersen, RMR 704-350-7493

CROSS-WEINSTEIN

criteria to be used in terms of what their IQ score is, versus what their achievement scores are.

If you use a test that's not been adjusted for the Flynn effect, your child may very well not qualify for special education, even though they have the exact same disability that another child that was born 10 years later would qualify for.

Because 10 years later the test has been renormed and now there is no Flynn effect.

Q.    Okay.

A.    The relevance -- that's the relevance of the Flynn effect.  It's only relevant, or very relevant when you have cutoff scores -- a cutoff score that will determine whether you are entitled to -- whether it's services, protection or whatever you want to quote.  You have to use the same criteria.

Q.    I get the relevance.  And I get why it matters in *Atkins* hearings.  And I get why it matters in the example you provided.

But I want to back up to my previous question, which is, is this a controversial theory; yes or no.  And you said, no.  All the people who do mental retardation agree with this.

And my point is, I handed you up an article that shows that this is a controversial theory amongst neurologists,

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 285 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/13/10   Page 230 of 433
**JA748**

CROSS-WEINSTEIN

who are not --

A.    Excuse me.

Q.    Let me finish --

THE COURT:  You've got to wait for the question --

THE WITNESS:  Yes, Your Honor, but --

Q.  (By Mr. Gast) -- that not everybody believes in the Flynn effect like you do.  And your answer to that is --

A.    Is this what you're quoting, the article --

THE COURT:  Wait a second.

Q.  (By Mr. Gast) Let me finish my question --

THE COURT:  Doctor, let the question be put to you, and then you can respond to it.

THE WITNESS:  Yes, sir.

THE COURT:  Don't interrupt the question.

THE WITNESS:  Yes, sir, Your Honor.

THE COURT:  Go ahead.

Q.  (By Mr. Gast) As I understood your answer to me, you basically said, the people in your circle.  That is people that do *Atkins* stuff with mental retardation issues, they believe in the Flynn effect; and that's great.

But my question was in the broader sense, of practitioners that deal with IQ scores for whatever reason, it's a controversial theory.  There are a lot of people out there that don't believe in it.  There's articles in the literature about studies actually showing a reverse Flynn

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 286 of 522
Case 3:08-cr-00134-RJC   Document 552   Filed 03/18/10   Page 231 of 433
JA749

effect where it goes down, instead of up.

A.    May I answer that?

Q.    So, my question is, yes or no; is this or is this not a controversial theory amongst people who care about WAIS-III scores?  Not just for *Atkins* hearings but for across the spectrum.

A.    You made about five or six different statements, which each one requires a response to.  And I don't know how many questions you have.  It is not a yes or no question.

For instance, one of the issues, there is no evidence that the Flynn effect is not occurring in the United States.

The only article that's been published that the Flynn effect seems to be evading is in -- I think it's either in Denmark or Sweden, but not in the United States.  That's not an issue.

You made a statement or you asked that -- you showed me an article that shows it's controversial.  You didn't show me any article.  What you showed me is an abstract of a presentation.  This has not been peer reviewed.  This has not been published in any -- as far as I know -- other than as an abstract.

The people that understand psychometrics and the reason for which tests need to be renormed, okay.  All the people that do that, regardless of what they use the test for, understand that the tests become obsolete.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 287 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 232 of 433
**JA750**

CROSS-WEINSTEIN

And they become obsolete, the publishers know they become obsolete, because the norms are not valid anymore, and they have to renorm the test.

When they do this every 10 years -- or however often they do, the WAIS, for instance.  They do it with brand new norms.  They don't just add something to the test.  Or they don't just add another test and use the old norms.

They actually go through the whole process of testing the items, finding their sample based on the census, and renorming the test.

That's why they don't do it often, because it's a very elaborate process.  And it's a very expensive process.  And that's why the tests, when we have to buy new ones, are very expensive to buy.

Q.    But my --

A.    What I'm answering to you is, it is not a controversial issue that the IQ scores change.

It is not a controversial issue that the Flynn effect is one of the reasons why tests are renormed by people that publish tests.

And all the tests that are -- you know, the Stanford-Binet, you know, was renormed three years ago, four years ago.

In fact, the C-TONI, the test that I used, is now a second edition.  Because it's been renormed.  There is a new

Laura Andersen, RMR 704-350-7493

**JA751**

CROSS-WEINSTEIN

edition of the C-TONI.

The WAIS-IV was published last year.  So the WAIS-III is not anymore used.

So it's not controversial.  It's not a question whether it exists or not.  It's not a theory.

Q.   When you gave the defendant the WAIS-III, the defendant was handcuffed, was he not?

A.   I don't think so.  I think that at least one of his -- I don't recall, but at least one of his hands was loose.

No -- I actually think both of his hands were loose.  I did request that.  And I think the sergeant had to come up and do that.  But don't quote me on that.  I don't recall.

Q.   I take it you've not read a letter that the defendant wrote from jail about those tests?

A.   No.  I have not read any letters that he wrote.

Q.   And would it surprise you to learn that the defendant said in that letter, he actually was handcuffed.  He had difficulty moving his hands at certain parts of the test.

You seem that you're not sure if he was handcuffed or not.  Would that surprise you to learn that?

A.   Again, I don't recall whether he was handcuffed or not. I would represent to you that I would certainly have requested that if he was handcuffed, his hands would have been extended.

You know, they usually -- when they refuse to let them

Laura Andersen, RMR 704-350-7493

**JA752**

CROSS—WEINSTEIN

loose, their handcuffs then they add an extension, okay, to where they can freely move their hands and do that. Otherwise, I don't test them.

So I can guarantee you that at a minimum that was done.

If he would have been handcuffed and would not have free access to -- or mobility, I would not have tested him.

Q.    Did you document that one way or another in your -- well, you didn't do a report -- in your notes?

A.    I didn't do a report, no.

Q.    Certainly if he was handcuffed in any degree, that would affect -- that would be an environmental factor that would affect the outcome of some of these tests quite acutely; isn't that fair?

A.    You know, the simple fact that we're testing these individuals in prison, in a prison environment, without the ideal, you know, facilities.  Where you're sitting across a table and doing this.  All those things affect the validity. That's something that we can't help it.

You know, that's the nature of -- nobody's going to take him to my office and uncuff him and do the standardized way of testing.

Q.    And some of these tests, the subtests of the WAIS, like the digital symbol test, the picture arrangement test, the block design test, these are timed tests and they require some degree of manual dexterity movement; isn't that right?

Laura Andersen, RMR 704-350-7493

**JA753**

CROSS-WEINSTEIN

A.    Yes.

Q.    And if, as Mr. Umana said in one of his letters -- I know you haven't seen it.  But if, hypothetically, he had been handcuffed, that would effect the outcome of that test; is that fair to say.

A.    It would effect the outcome, but consistently so. That's why you try to do multiple tests measuring the same things, to determine how much of that is there.

    But, unquestionably, it is not the standardized way of doing any testing, when you do it in prison or in a jail setting.

Q.    All right.  So these -- these three tests that I just talked about that are particularly impacted by manual dexterity, the digit symbol test, the picture arrangement test and the block design test, if he had done substantially better on those tests for Dr. Suarez while uncuffed, than he did for your, if hypothetically he might have been cuffed, might that be an explanation of why he had done better in one test than not another?

        MR. FOSTER:  Objection; assumes facts not in evidence.

        THE COURT:  Overruled.

        THE WITNESS:  It would potentially be that.  But those particular tests that are timed, are the most likely to be effected by practice effect.  Because he now knows

Laura Andersen, RMR 704-350-7493

**JA754**

CROSS-WEINSTEIN

what it is.  He's practiced it before.  So it would be difficult to know that.

But, again, let me represent to you that if in my clinical opinion I would have thought that the way the testing -- I had to conduct the testing, would have effected significantly his ability to perform the test, I would not have tested him.

Q.    But you don't remember how he was handcuffed?

A.    I don't remember.

Q.    All right.  The Rey Fifteen Item Test, you said that he did well, even though he technically got a score that by the test designer's estimation would be suspicious of underperformance; he got a nine?

A.    No.  Nobody would say that a nine is suspicious.  Nobody would say a nine is suspicious at all.  That's a cutoff score.  Anything below nine would be suspicious.

Q.    But I thought you said in your direct that a seven, eight or nine would be suspicious?

A.    I never said suspicious.  I never used the word suspicious.  I used the word, cutoff point, cutoff score.

Q.    Used the word what?

A.    Cutoff score.

Q.    Cutoff score.  All right.  All right.  So you're saying a nine under any way of scoring it is okay?

A.    That's correct.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 292 of 522
Case 3:08-cr-00134-RJC    Document 50-2    Filed 03/13/10    Page 237 of 433
**JA755**

CROSS-WEINSTEIN

Q.   And you actually --

A.   But remember I also mentioned that he actually remembered fifteen stimuli, even though nine were correct, and the three, and the six others were not correct.

Q.   Right.  Because you make adjustments?

A.   Were similar.  Were very similar, but they were not correct.

Q.   Because of cultural adjustments?

A.   Because his education and culture, yes.

Q.   That matters here, might not matter on the WAIS, but here it matters?

        MR. FOSTER:  Objection, Your Honor; argumentive.

        THE COURT:  Sustained.

Q.   (By Mr. Gast) Now, the C-TONI is another test you ran. And that's, you know, kind of -- it helps, but it's not as accurate overall or as -- doesn't give us as much information as the WAIS; isn't that true?

A.   That's correct.

Q.   And in the C-TONI, in fact, in the publication materials and literature about it, that a lack of familiarity with testing, generally, because of the lack of education, impacts that test, does it not?

A.   Yes.  There's a lot of reasons why, you know, the score probably is an under-representation, somewhat of an under-representation -- the score is three standard

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 293 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 238 of 433
JA756

CROSS-WEINSTEIN

deviations below the mean.

And I think that two standard deviations below the mean is probably more accurate.

Q.   And this one in particular used the computer version and --

A.   Yes.

Q.   -- lack of familiarity with the computer might also impact that as well?

A.   Potentially, yes.

Q.   All right.

A.   But he was familiar.  By the time I gave him that, he had done several other tests on the computer.  He was able to do it.  And I had tested him for that.

Q.   And speaking of computerized tests, I noticed on your letter -- I'll call it, to the attorneys -- that two of the computer tests, the category test and the Wisconsin card sorting tests, the results of that were lost; is that right?

A.   Yes.  They were -- I was not able to -- there was a glitch with the computer in the programs which use the same, basically the same -- it's the same publisher.  I just couldn't retrieve it.

Q.   Can you be more specific with what happened with it? What exactly happened?  Was it your computer itself that failed, or the program itself failed?

A.   I think it was my computer.  Because when I went back

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 294 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 239 of 433

**JA757**

CROSS-WEINSTEIN

to my office, I called the publisher and I explained what the issue was, and they tried to help me and they said something happened and it's not there.

Q.   Has that ever happened to you before?

A.   Yes.

Q.   Lost results tests?

A.   Yes.  Unfortunately when computers mess up, they mess up.  Yes.

Q.   But the C-TONI and the card, which are also computer-based tests, though, that didn't have that same problem?

A.   No, they didn't.  They are different programs.

Q.   All right.  All right.  I want to talk about your discussion of Dr. Suarez's results.

     Now, you talked about the literature saying that the previous Puerto Rican version should not be used.  That's a version from what, the 1960's; is that right?

A.   That's correct.

Q.   All right.

A.   Because it over-represented IQ scores by about 20 points.

Q.   All right.  Now, of course, that has nothing to do with this test that was run?

A.   No, I think it does.  I mean, that's why I was concerned about it.  Because apparently what happened is,

**JA758**

241

CROSS-WEINSTEIN

that it's not -- and that's what we saw here, you know.

It is not the test.  It is not a problem with the test.  Is that actually what appears to be, is that the population of Puerto Rico have IQ's that are significantly lower.

That the norm, okay, the norm in Puerto Rico, is significantly lower than the norm in the mainland U.S.A.

Certainly much lower than, the same token, the norm -- the mean, of the population of the U.S.A., is lower than the mean of the population of Spain.

Q.   But that's an old set of norms on an old test that wasn't even applied in this case.

In this case, for this test that was applied with these norms, you have no data whatsoever to back up that there's a problem with this test?

A.   The test was just published.  And what I have is the analysis that I did.  That I showed you.

I mean, if you use the exact same raw scores.  I didn't change the raw scores.  And you just make the transformation as you saw it.  From that raw score to scale scores.  And from scale scores to IQ scores.  You will see that there is a difference of about 20 points.  Which is consistent with what happened before.

So the assumption -- I mean, there's a lot of research that needs to be done with this test in order to do that.  I mean, I would need to get the test.  Give it to a certain

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 296 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 241 of 433
JA759

CROSS-WEINSTEIN

number of people, you know, do it.  And then someone needs to duplicate that.  And how it was done with the EIWA.

But the bottom line is, when you look at the scale scores, between the three versions of the test, you see that the Puerto Rican test, overestimates IQ scores when compared to the United States and Spain, by approximately 20 points.

Q.   Well, the exercise you engaged in, in your power point, doesn't say anything of the kind.

What it says is, does it not, that when you norm -- compare the same results to different norms -- different normative samples, you're going to get different results, right?

A.   And that when you compare the same results of a population in the United States, versus the population -- mainland United States, versus the population of Puerto Rico, you're going to find a difference of 20 points, of approximately 20 points.  It says that.

Q.   The fact that you would engage in that exercise at all, doesn't that prove the point I was trying to make earlier that you repeatedly denied me.  Which is the culture and the norms that you select matter for the results?

A.   I never denied that the culture -- that the norms that you select matter.  In fact, I stated that it matters very much.  And it's related to what the question is.

Because, again, you know, this would basically say, if

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 297 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/18/10   Page 242 of 433
**JA760**

CROSS-WEINSTEIN

you use that logic, okay.  But if you're born in Puerto Rico and come to the mainland, the United States, and you have a learning disability, and you try to be identified with a learning disability and therefore be provided services, in the mainland United States, you wouldn't qualify.  But if -- because -- if you were tested with the norms in the tests of Puerto Rico.

But if you were tested with the tests in the mainland United States, then you would qualify.

THE COURT:  Let me ask you this:  Let's say you have three different people from El Salvador that present in your office.

One just wants to know what his IQ is.

One wants to know what his IQ is for purposes of social services.

And one wants to know what his IQ is because he's facing the death penalty in a capital case.

And you perform the tests.  Are the tests any different depending upon their circumstances?

THE WITNESS:  No, sir.  The tests would be the same.  Yes, sir.

THE COURT:  Is the outcome any different -- let's say all three score exactly the same.  Is the outcome any different, in terms of the IQ, based upon the reason for presenting?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 298 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 243 of 433
JA761

244

CROSS-WEINSTEIN

THE WITNESS: No. The outcome would be the same provided you use the same norms.

THE COURT: Would you use the same norms?

THE WITNESS: Yes, I would use the same norms. I would want to know what is the purpose of that individual that just walks into my office.

THE COURT: Right. And I gave you three different purposes.

THE WITNESS: Right.

THE COURT: Would the same norm be used in all three cases?

THE WITNESS: Certainly on the two last ones would be the same.

The first one, if the person comes to my office and wants to know how does he compare to other people that live in El Salvador --

THE COURT: No. He wants to know what his IQ is.

He's an El Salvadoran that presents in your office in the United States, and he wants to know what his IQ is.

THE WITNESS: And my answer is, Your Honor, what is it -- or my question to the person, why do you want to know the IQ is? What is the purpose of you finding out what your IQ is?

An IQ score is not like an X-ray that you go to somebody's office and say, take an X-ray of my arm, tell me

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 299 of 522
Case 3:08-cr-00134-RJC   Document 552   Filed 03/18/10   Page 244 of 433
**JA762**

CROSS—WEINSTEIN

if it's broken or if it's normal.

IQ scores are contextual.  There's a reason.  There's a purpose.  And you need to determine that.

If somebody walked into my office and said, I just want to know how intelligent I am.  Well, I'm sorry.  But the IQ score is not going to tell you how intelligent you are.

The purpose of an IQ score is to determine what you can do, what you cannot do.  How you -- whether you are -- whether you potentially can go to college or not go to college, depends.

There's a reason why you want to test them.  And an IQ score is not enough reason to answer those questions.

Q.   (By Mr. Gast) Now, an IQ test is designed and used in every other circumstance except perhaps *Atkins* hearings and social security hearings, to measure intelligence; not education, is to measure intelligence, is it not?  Isn't an IQ score an IQ score?

A.   It's a very controversial issue.  Because even the definition of intelligence is not something that we know exactly what it is.  I mean, some people have even said that intelligence is what intelligence tests, test.  But that was a facetious answer.  What's intelligence?

An IQ score will not tell you how well a person can socialize.  Will not tell you how gullible a person is.

Laura Andersen, RMR 704-350-7493

**JA763**

CROSS—WEINSTEIN

Will not tell you -- let me give you example there is --

Q.   No matter how it's normed, it wouldn't do that.

My question is, does an IQ test measure intelligence; yes or no?  Isn't that what it was designed to do?

A.   It measures some aspects of intelligence.  And each test is designed to measure some aspects of intelligence.

Q.   You're kind of jumping ahead to the second prong of mental retardation.

A.   No, sir.  No.

Q.   Stick to IQ, the score, the number.  That IQ score is supposed to be given, and when you get that score, it's suppose to measure intelligence, period.  Isn't that what it's designed to do?

A.   No.  No.  No.  Intelligence -- intelligence is much more than what an IQ tests.

An IQ test -- for instance, the Wechsler -- right -- there's several different theories of intelligence.  What intelligence is --

Q.   Well, AAIDD asks --

MR. FOSTER:  Could we let the witness answer the question?

THE COURT:  That objection's sustained.  Finish your answer.

THE WITNESS:  For instance, the theory behind the WAIS is basically what is called the G factor, the general

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 301 of 522
Case 3:08-cr-00134-RJC   Document 552   Filed 03/18/10   Page 246 of 433
**JA764**

CROSS-WEINSTEIN

factor of intelligence.

You have other tests like the Stanford-Binet and like the Woodcock-Johnson, they're testing the theory of intelligence, a different one. They're both coming up with an IQ score. They're using different tests. And they're coming up with different information. But yes, it is comparable.

You expect somebody with an IQ below, two standard deviations below the mean, to get comparable results in tests that have been properly normed.

And that's why, for instance, the DSM -- both the DSM-IV and the AAIDD, recommend only certain tests be used.

And in fact, each state has only certain tests that they recognize as valid for the determination of mental retardation for social security services.

So there is not one IQ score. I mean, there is no such thing as intelligence, you know. Intelligence is --

THE COURT: Let me ask you this. I'm trying to figure this out. And at the end of the day, it's not what Mr. Gast understands about this, or Mr. Foster. It's what I understand. And I might be the dumbest guy in the room.

What I'm trying to figure out is, let's say instead of three people, one person presents to you. And he wants to know his IQ score. For no reason at all. He just wants to know his IQ score. He wants to know his IQ score

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 302 of 522
Case 3:08-cr-00134-RJC   Document 552   Filed 03/18/10   Page 247 of 433
**JA765**

for purposes of social services benefits.  And he wants to know his IQ score because he's facing the death penalty in capital litigation.

Could that person have different IQ scores depending upon the purpose for which he is coming to you?

THE WITNESS:  It can have different IQ scores depending what norms you use.  But cannot have a different -- if you use the same norms, within the standard error of measurement, will have the same scores.

THE COURT:  And would you use the same norms in all three of those situations with the same person?

THE WITNESS:  Yes, I would.  And the reason behind that:  If somebody just wants to come in is because the only tests -- the only norms that include individuals from El Salvador -- I think that's what the question was.

The only norms that would include sufficient individuals from El Salvador, in terms of the distribution or should include -- of the census of the population, are the norms from the United States.

There are no -- there are no tests published in El Salvador with norms from El Salvador.

THE COURT:  I guess I'm getting confused by your reference to comparing a person to other people on death penalty row.  I'm confused by that.

THE WITNESS:  Your Honor, IQ scores are what's

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 303 of 522
Case 3:08-cr-00134-RJC   Document 592   Filed 03/18/10   Page 248 of 433
JA766

CROSS-WEINSTEIN

called deviation scores.  As we saw, you know, on the standard curve.  You want me to put it up again?

THE COURT:  No.

THE WITNESS:  Okay.  That deviation score is in relationship to the mean -- that deviation score is in relationship to the mean, the line that --

THE COURT:  At 100.

THE WITNESS:  An IQ test is 100.  It could be -- that's by convention.  It could be anything else.

THE COURT:  Right.

THE WITNESS:  And then you have what's called standard deviations, which is a number of -- because you have a standard distribution.  Basic issue here is, what percentage of the population scores similarly to what you scored.

So you have to compare the person to the same people that you want to know how they compare to that kind of people.

You know, if people want to apply to law school, or people want to apply to the army, or people want -- no matter where they come from or what their background is, you have to use --

THE COURT:  So establishing your deviation from the mean, you're using other death penalty --

THE WITNESS:  No, Your Honor.  Everybody that's --

Laura Andersen, RMR 704-350-7493

**JA767**

CROSS-WEINSTEIN

everybody that's facing the death penalty, is compared to the general population of the United States.

In other words, the reason that they're not eligible for the death penalty, is because they have some limitations.

Now those limitations are in relationship to the population of the United States. It's not in relationship to the population anywhere else in the country. And that's why you have to use the same norms for everybody.

Otherwise what you're doing is, you're not comparing the person for the purposes of determining whether they complied with whatever it is. Whether they're entitled to services. Or entitled not to be executed. Or entitled to participate in joining the army. Or anything else that everybody else is doing. You don't have a special norm --

THE COURT: Why are you concerned with the purpose, instead of just establishing the score?

THE WITNESS: Because you can't just establish a score. A score doesn't tell you anything.

THE COURT: I know there's a three-part test. But for purposes of establishing the score, why does the purpose matter?

THE WITNESS: Well, there's several reasons. But, in terms of -- we don't have any test that is being published in norm in El Salvador in this case.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 305 of 522
Case 3:08-cv-00134-RJC   Document 50-2   Filed 03/13/10   Page 250 of 433
JA768

CROSS-WEINSTEIN

THE COURT:  Right.  I understand that.

THE WITNESS:  So we have to decide which one's the closest to the ones we want to use.  There are -- that are sound, that really reflect what you're trying to measure.

Tests have validity and reliability.  The most important issue is -- that you want to find out, does this test measure what you want to measure?  Is it valid?  No matter what test you're using.

So what you want to measure is, this person's ability to not to be gullible.  To understand accurate reasoning.  To do all the things that we know are the reasons why the Supreme Court says you don't execute mentally retarded people.  You have to use parameters that are similar to everybody else.

You can't use -- and that's why, you know, that's why you just don't use an IQ score.

Over the course of the last 100 years or so, the study of mental retardation has gone from -- there was a time that a score of 85 qualified for mental retardation.

And the whole purpose and reason of the definitions that have been done -- not the whole but a major purpose -- has been, over the years, to make sure that people don't make a determination in diagnosing mental retardation based on an IQ score.

THE COURT:  Oh, I understand that.

Laura Andersen, RMR 704-350-7493

**JA769**

THE WITNESS: Because it doesn't give you information.

THE COURT: I understand that.

But in establishing solely the IQ score aspect of the greater test, do you factor into that, the purpose for which the IQ is being sought?

THE WITNESS: Absolutely, Your Honor. Every case, any time that anybody wants to, you know -- I test anybody. If I'm doing a research project, or if I'm doing whatever it is, you have to factor that in.

If you want to compare, let's say I want to compare, just like we did. How does the average person from Puerto Rico, in Puerto Rico, compares to the average person in the United States?

Then I use the norms of the average person in Puerto Rico. And I use the average -- the norms of the average person in the United States. And I see what the difference is; if there is any difference.

But that's the question that I've been asked. That's the question I researched.

THE COURT: All right. Thank you.

Q. (By Mr. Gast) So one upshot of that is, if the purpose -- if by choosing the purpose, you choose the norms, and choosing the different norms causes different scores, somebody will have two different scores depending on what

JA770

the purpose is.

So if you had a higher IQ score when you just took the test and you were just normed straight up the way the test directions called for it and it gets one result.

And then you change norms and it gets you another result.

You're saying the purpose for which the test is being administered, if that effects the score, that's okay.

A.   I'm not sure I follow your question.

Q.   Let me put it this way.  Let's take a hypothetical.  The Judge's hypothetical.

The guy walks in -- let's not even use an El Salvadoran.  Let's take a Mexican, since we used the Mexican WAIS here.  Walks into your office.  He's been in the country one day.  So clearly his cultural reference is Mexico.

And he comes in and says, I just want to know how smart I am.  And you give him the Mexican WAIS.  And he scores X number.  Doesn't matter what it is.

A.   I think I already answered that and I said I wouldn't test him.  Because I cannot tell how smart he is by obtaining an IQ score.

Q.   Well, you're unusual in that respect because other people in your discipline wouldn't hesitate to give somebody an IQ test if they wanted one, right?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 308 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 253 of 433

JA771

CROSS-WEINSTEIN

A.   I hope that those people would not give somebody an IQ test just because they wanted one.

Q.   Well, let's say he gave you a good reason but it wasn't related to anything in the law.  He wanted to know for some very good reason that -- I don't know.  He gets a score. The second he's charged with a crime, you change the norming.  And then he --

A.   No.  I never said I would use the Mexican -- first of all I wouldn't use the Mexican norms.  The Mexican norms are not valid.

Q.   Well, you gave the Mexican WAIS?

A.   I used the translation of the WAIS into Spanish.  The standard translation of the WAIS into Spanish into Mexican. I did that.

Q.   You didn't consider using the Puerto Rican or the Spanish, that have their own norms?

A.   No, I did not.

Q.   I'm going to move on.

     Practice effect.  Now, you said that 2 to 12 weeks is kind of the magic time period where people, if they retake the same exam, they're going to do a little better?

A.   No, I didn't say that.  I said that the manual, both manuals talk about a period.  And they mention that period.

     There is research by Dr. Kaufman, for instance, about the practice effect actually persists over many, many years.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 309 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 254 of 433
JA772

CROSS-WEINSTEIN

But I was just using, because I needed to use something -- okay -- the specific wording in the manual. And it is approximately.

And it is approximately. There's nothing magic about 12 weeks. The only magic about 12 weeks is that that's the period in which they retested the individuals.

But it's not -- we don't know. If they would have retested the individuals 16 weeks after or 18 weeks, then they would be able to report what it is. Twelve weeks is what the period they used to test.

Q.   Okay.

A.   But it's very approximate. Twelve weeks is three months.

Q.   And in that time period, is it fair to say in the literature that if you do it two weeks, you're probably going to get a bigger effect than you would if you did it in 12, or is there data on that?

A.   To the best of my knowledge, there is no data.

Q.   Well, in this case we're pretty much right at 12 weeks. You ran yours on July 1st and 2nd. And Dr. Suarez did his on September 29th, pretty -- couple days shy.

A.   Well, assume there's four weeks in July, four weeks in August, and four weeks in September. Yes, approximately 12 weeks.

Q.   And actually that same manual, the WAIS-III manual says

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 310 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 255 of 433
JA773

CROSS-WEINSTEIN

that -- and even with the practice effect, and the Flynn effect, which you say is not controversial, your adjustment of Dr. Suarez's score still puts him at 72; is that correct, his full scale?

A.    I don't recall the exact numbers.  But 95 percent, somewhere around there, yes.  So I think it's somewhere around 67 to 77, something like that.

      Which is approximately two standard deviations below the mean.

Q.    And I notice in your direct examination you didn't make any comments about the QEEG and the PET scan data that was included in your -- well, you say it's not a report, your letter.

A.    I didn't do a PET scan.

Q.    All right.  And you didn't do the QEEG either?

A.    I did.

Q.    You did one.  All right.

      And you are not a neurologist; is that right?

A.    That's correct.

Q.    And this particular QEEG --

      MR. FOSTER:  Objection; beyond the scope of direct.

      MR. GAST:  We didn't talk about it.

      I'll withdraw that.

      No further questions.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 311 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/13/10   Page 256 of 433
**JA774**

257

REDIRECT-WEINSTEIN

THE COURT:  Any Redirect?

MR. FOSTER:  Yes, Your Honor.

REDIRECT EXAMINATION BY MR. FOSTER:

Q.   Dr. Weinstein, I believe you testified way back in the beginning of cross-examination that you'd never done an *Atkins* case for the prosecution.  I think you said that, didn't you?

A.   Never testified for the prosecution, that's correct.

Q.   Have you ever been asked by the prosecution to handle an *Atkins* case?

A.   The only time that I was asked for the -- by the prosecution to do a variation related to the *Atkins* case, I was in Arizona, and the judge appointed me.  But the prosecution asked the judge to appoint me.

Q.   And just so we're clear on this, you've distinguished between a report and a letter; could you explain that?

A.   Well, you know, a report should contain a full information, biographical information.  Should contain information obtained from the individual that you're evaluating.  Should contain a lot more than what I wrote.  Which it's a letter just -- with an overall test results.

     In other words, it's not a letter.  It's not offering an opinion.  It's not something that I -- you know, a report usually offers an opinion, comes to a conclusion.  States why the person was referred.  What for, et cetera, et

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 312 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/13/10   Page 257 of 433
JA775

REDIRECT-WEINSTEIN

cetera.

And this, my letter does not contain any of that.

Q.   Now you testified for quite a while back and forth about death row -- people facing the death penalty being included in the norm, correct?

A.   Yeah.  Everybody that is in the United States, and grew up, whatever it is, is included in the general population of the United States, it's part of the norms.

Q.   So were you saying then, that the people on death row represent a subset of the overall U.S. population, and are -- were therefore taken into consideration when the norms were done?

A.   What I'm saying is, that the issue is that all these individuals facing the death penalty, okay, are in themselves a group, specific group.  But they're all part of the U.S. population.  So when you do an evaluation, you have to compare them to the general population of the United States.

Q.   And is there anything that you did in your testing in this case, other than using the U.S. norms, that made any adjustment whatsoever, for the fact that this was a death penalty case?

A.   No, not at all.

Q.   Did the publisher of the WAIS-III Mexican version recommend against using the U.S. norms?

Case 3:16-cv-00057-MOC   Document 90-2   Filed 03/23/17   Page 313 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 258 of 433
JA776

REDIRECT-WEINSTEIN

A.    They don't have an opinion about it.  They actually recommend using U.S. norms.  But again, we went over that.

The way they recommend it, it's so outrageously -- they took it out anyway.  Because they realized that that's not feasible.  That that has no -- no meaning, what they were recommending.

So according to my information from talking to the publishers is, they already published the second version of the manual in which it's not included.

Q.    Okay.  And what you did in this case was not -- not the thing that they recommended that you disagreed with, correct?

A.    No, not at all.

Q.    You testified in regard to the Flynn effect that it's included in the green book.  And you have the green book up there.  Can you please tell us what the green book is?

A.    The green book is the 11th edition of the AAIDD Definition Manual.  And substitutes what we used to call the red book, which was the 10th edition.

MR. FOSTER:  May I have a moment, Your Honor?

THE COURT:  Yes.

Q.    (By Mr. Foster) Dr. Weinstein, just so we're clear on this, the 66 full scale IQ that you reported, does that include or not include a Flynn effect adjustment?

A.    It does not include a Flynn effect adjustment.

Laura Andersen, RMR 704-350-7493

**JA777**

Q.   So if you apply the Flynn effect, the number goes down, correct?

A.   Sixty-one, approximately.

Q.   And you were asked for quite a while about what an intelligence -- an IQ test means.

Would I be correct in saying that an IQ test, as you already testified, is in reference to a mean to the average. And it's a deviation test, to show how much that person deviates from the norm?

A.   It's a deviation score, yes.

Q.   So is it correct to say that there's really no such thing as an IQ test result in a vacuum.  It is only in comparison to a norm?

A.   That's correct.  That's what -- it's a deviation score.

Originally IQ meant, intellectual quotient.  And you obtained that by what used to be called, mental age between achievement age or intellectual age.  But that's been gone for at least 50 years or more.  No, much more than that. I'm getting old.

MR. FOSTER:  I have no further questions.

THE COURT:  I think we've all gotten older during this hearing.  You may step down.

Call your next witness.

Laura Andersen, RMR 704-350-7493

DIRECT-MERIKANGAS

THEREUPON, JAMES R. MERIKANGAS, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MR.

BRYSON:

MR. BRYSON:  May I proceed, Your Honor?

THE COURT:  You may.

Q.    Tell the judge what your name is.

A.    James R. Merikangas, M.D.

Q.    How are you currently employed?

A.    I'm a self-employed medical doctor in private practice.

Q.    And what is your educational background?

A.    I graduated in physics from Villanova University in 1960.  And went to the U.S. Navy Guided Missile School in Pomona, California.  And served on the U.S.S. Kitty Hawk in the far east for three years.

Then I did a year of graduate school in Washington, D.C. at Kaplan University to prepare for medical school. And went to Johns Hopkins University School of Medicine in Baltimore.  I interned in medicine and pediatrics at the Washington Hospital Center.  I received my M.D. degree in 1969.

I then went to Yale University where I did a residency in psychiatry from '69 to '72.  And then did a residency in neurology.  Chief resident in neurology at Yale in 1973.

And I became board certified in psychiatry in 1974. Board certified in neurology in 1978.  And been doing

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 316 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 261 of 433

JA779

DIRECT-MERIKANGAS

continuing education courses ever since.

Q.   And do you hold any board or specialty certifications?

A.   I'm board certified in psychiatry.  And I'm additionally board certified in neurology.

Q.   And what honors or recognition have you received in the field of neuropsychiatry?

A.   Well, I'm the former director of the Neuropsychiatric Association, and a fellow of that organization.  I'm also a distinguished life fellow of the American Psychiatric Association.

(Defendant Exhibit 15 was received in evidence.)

Q.   (By Mr. Bryson) I'm going to ask you if you can look at the monitor in front of you.  Do you see what I've marked as Defense Exhibit Number 15?

A.   Yes.

Q.   And is that a copy of your current CV?

A.   My current CV is dated October.  But this is fairly current.

Q.   All right.  Do you know what the differences would be from this one and your current CV?

A.   I think I may have one additional publication, book chapter, I believe.  No, it's probably -- it's probably pretty much the same.

        MR. BRYSON:  Okay.  Your Honor, I would move for introduction of Defense Exhibit 15.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 317 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 262 of 433
JA780

DIRECT-MERIKANGAS

THE COURT:  Let it be admitted.

(Defendant Exhibit 15 was received in evidence.)

MR. BRYSON:  Would the Court like a copy?

THE COURT:  Yes.  Thank you.

MR. BRYSON:  (Handing paper writing to the Court.)

Q.    In addition to practicing as a physician, have you also been an instructor at various universities?

A.    Yes.  I've been continuously on the faculty of various medical schools.  University of Pittsburgh from '73 to '79. Yale University School of Medicine from '79 to 2002.

And then since then, I'm Clinical Professor of Psychiatry and Behavioral Neuroscience at the George Washington University School of Medicine, Washington, D.C. Clinical Professor of Psychiatry at Virginia Commonwealth University in Richmond, Virginia.  Associate Professor, Clinical Professor of Psychiatry at Georgetown in Washington, D.C.

Q.    You have spent a significant part of your career teaching at Yale Univeristy School of Medicine?

A.    Yes, twenty-two years.

Q.    You've published numerous articles in scientific journals?

A.    Yes.

Q.    And are those original articles listed on pages 12 through 14 of your CV?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 318 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 263 of 433
JA781

264
DIRECT-MERIKANGAS

A.   Yes.

Q.   Do you want to see a copy?

A.   No.  I have a copy.

Q.   And there are over 35 published articles in the list; is that correct?

A.   Yes.

Q.   You've also written chapters for books in your field?

A.   I have about eight book chapters.

Q.   And those are listed on pages 14 and 15 of your CV?

A.   Yes, sir.

Q.   Have you previously testified as an expert in the field of neuropsychiatry in federal courts in the United States?

A.   Yes.

Q.   Approximately how many times?

A.   I don't know how many times for federal courts, how many times for state courts.  But I'm sure it's more than a dozen in federal court.

Q.   Have you ever testified for the prosecution in a criminal case?

A.   Yes.

        MR. BRYSON:  Your Honor, we would move -- tender Dr. Merikangas to the Court as an expert in the field of neuropsychiatry and ask that he be allowed to give an opinion in that field.

        THE COURT:  He will be allowed to do that.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 319 of 522
Case 3:08-cr-00134-RJC   Document 50-3   Filed 03/13/10   Page 264 of 433
JA782

DIRECT-MERIKANGAS

Q.   (By Mr. Bryson) You first became involved in this case in August of this year; is that correct?

A.   That's correct.

Q.   And you ultimately did conduct an examination of Mr. Umana; is that correct?

A.   Yes.

Q.   Prior to conducting an examination of Mr. Umana, what materials or sources did you review?

A.   A very brief small number of things.  I reviewed a Gwinnett Hospital, Lawrenceville, Georgia report of head injury in May 2007.

     I saw the neuropsychological testing by Dr. Weinstein.

     I think, subsequently, I reviewed something about a mitigation expert.  But I don't think I had anything more than that prior to my exam.

Q.   And you examined Mr. Umana on September twenty-first of this year; is that correct?

A.   That's correct.

Q.   And you performed a neurological examination on him?

A.   I did.

Q.   Can you tell the Court what that involves?

A.   A neurological examination is a physical examination in which you do a number of tests of reflexes with the reflex hammer, and sensation with a pinwheel and light touch.

     You examine the cranial nerves, the sense of smell,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 320 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 265 of 433
JA783

DIRECT—MERIKANGAS

hearing, sight, movements of the face and mouth.

You listen to the heart, do blood pressure, observe how the patient moves, how he walks, his gait, strength, coordination, muscle tone. That's basically what it is.

Q. What observations did you make from the neurological examination that you did on Mr. Umana?

A. Well, I observed that his head circumference was 58 and a half centimeters, which is on the large side.

That his swirls of hair on his scalp were somewhat abnormal. He had more than one hair swirl. Clockwise hair swirl in back of the head, which most right handers have. And an additional head swirl in the forehead, might be called a cowlick. That's related to the cortex of the brain.

The skin of the scalp and the cortex of the brain come from the same embryological tissue, so that's an interest to neurologists.

I noted that his blood pressure and pulse were within normal range. And that the most striking abnormality was the deep tendon reflexes in the knees and ankles, which were greatly excessive. He had hyperreflexia in the knees and the ankles.

Q. What does that mean?

A. That means when you hit the knee with the reflex hammer, you measure how much the leg jumps. Very simple

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 321 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 266 of 433
**JA784**

DIRECT-MERIKANGAS

test.  There's zero response or there's a little response, or there's more.  And his was excessive, more than you see normally.

And doing the same thing, hitting the Achilles tendon in the ankle, he had something called clonus.  Which is, instead of just one beat of response, his foot went into a series of muscular contractions, that's hyperreflexia.  And to a degree where he has ankle clonus.  That's a sign of decreased inhibition from the frontal lobes of the brain.  So that was an abnormality that was significant.

He also had an abnormality in the nerves to the eyes.  The seventh cranial nerve.  He could not close his left eye without simultaneously closing the right eye.  Which meant that there was a weakness of the seventh cranial nerve, the facial nerve.  That could be as a result of a number things, congenital brain damage or acquired brain damage.

He also, as part of my exam, I asked him a bit about some symptoms.  He had severe headaches, which he's had since he was a child.  These are the headaches which are pretty characteristic of migraine headaches.

Q.   As a result of your neurological examination, did you recommend additional testing?

A.   Yes.  I recommended that he have a PET scan of the brain, a positron emissions computed tomogram.  Which is a functional test of brain metabolism.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 322 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 267 of 433
JA785

DIRECT-MERIKANGAS

Q.    And are you aware that at some point that a PET scan was later performed?

A.    Yes.

Q.    And did you actually perform the PET scan yourself?

A.    No.  I wrote the requisition and a prescription.  And it was done at the Carolinas Medical Center.

Q.    What is a PET scan?

A.    A PET scan is a functional image of the brain.  A test is done by giving a injection into a vein of a radioisotope of glucose; sugar.  Sugar is the only fuel that the brain uses.

So by labeling the glucose, in this case, with radioactive fluorine.  This glucose distributes in the brain, depending on the metabolism of the brain.  The more active that area of the brain, the more glucose it gets. The brain regulates it's own metabolism.  Thereby putting radioactivity into the brain, proportional to the activity of the brain.

And then doing a scan.  Which presented the same way that a CAT scan or an MRI scan is, in cross sectional views. You can look at the various regions of the brain and how they're operating.

So that's what was done in case of Mr. Umana.

Q.    When the PET scan is over, how are the results documented?

Laura Andersen, RMR 704-350-7493

**JA786**

DIRECT-MERIKANGAS

A.   Well, they're generally -- they're documented with images.  In this case with color pictures.  Where red is high activity, or radioactivity.  And blue is low activity.  Colors of the spectrum in between, are related to the degree of metabolic activity in the brain.

Q.   And did you -- do you receive some form of -- a visual form of those images?

A.   Yes.  I got a computer disk in which contained the images which I looked at on my computer.

Q.   And did the -- the test is performed by a radiologist; is that correct?

A.   Yes.

Q.   All right.  Did the radiologist also prepare a report relating to the PET scan?

A.   Yes, he did.

Q.   And have you seen the radiologist report?

A.   Yes, I have.

(Defendant Exhibit 16 was marked for identification.)

Q.   (By Mr. Bryson) If you could look at the monitor.  And tell me what I refer to as Defense Exhibit 16, is in fact a copy of the radiological report that you received for the PET scan performed on Mr. Umana?

A.   Yes.  And I should explain that co-administered with the CAT scan.  A computerized X-ray of the brain.

       So that the PET scan is superimposed on the CAT scan to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 324 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/13/10   Page 269 of 433

JA787

DIRECT-MERIKANGAS

show you the anatomy of the brain in addition to the function of the brain.

Q.    And did you examine the findings from the radiologist with regard to the PET scan?

A.    Yes, I did.

Q.    Could you tell the Court what his findings were?

A.    It's probably best if I quote them, to be perfectly accurate.

What he described was a quite abnormal brain.  And he said there's a mild decreased fluorodeoxyglucose uptake, localizing to the bilateral posterior frontal convexities.  Bilateral frontal parietal.  Bilateral parietal.  Bilateral posterior parietal.  Bilateral parieto-occipital.  As well as bilateral anterior and posterior, temporal and temporal parietal regions.

These areas of mild decreased FDG uptake are somewhat heterogeneous with some degree of asymmetry.

Then he says the normal uptake pattern within the bilateral frontal cortices.  Normal uptake pattern within the cerebellar cortices.  Normal uptake pattern within the deep gray structures.

There are no definite regions of abnormal increased uptake.

And that the CT images, that's CAT scan, reveal no evidence of subdural or epidural fluid collections.  No

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 325 of 522
Case 3:08-cr-00134-RJC    Document 50-2    Filed 03/18/10    Page 270 of 433
JA788

271

DIRECT-MERIKANGAS

hydrocephalus.  No space-occupying mass lesion.  Gray-white differentiation is preserved.  No evidence of focal encephalomalacia.

Then he gives his impression.

Mild, somewhat heterogenous, and slightly asymmetric regions of decreased FDG uptake, involving the bilateral posterior frontal, fronto-parietal, parietal, posterior parietal, parieto-occipital, anterior temporal, and temporoparietal regions.

Then he gives his opinion.  These findings can be seen in sequelae of traumatic brain injury, diffuse axonal injury, or secondary to a chronic headache disorder such as migraines.

And the second opinion is, no evidence of frontotemporal dementia.

Third, no evidence of multi-infarct or vascular compromise.

Then misnumbered third, but actually the fourth, is no space-occupying mass on CAT scan images.  No subdural or epidural fluid collections.

I think that may require a little explanation.

Q.   Yeah.  Can you explain what this report means?

A.   Well, one picture being worth a thousand words, if you want to put up the pictures we have.

Should I explain these?

Laura Andersen, RMR 704-350-7493

**JA789**

272

DIRECT-MERIKANGAS

Q.   Yes.  Please.  What are we -- first of all, what are we looking at here?

A.   What we're looking at is a cross-sectional view of the brain from many different cross sections.  And if you look at the third down, and the far right, that's the cross section through the middle of the brain.

If you were to cut from the nose, forehead, straight back.  So it's a midline section of the brain, as seen from the side.

If you start up in the upper left, you are far removed.  And as you go to the right, the way you read a book, you get closer and closer to the midline.  And you pass the midline, you go further and further to the other side of the brain.

And what you see with the colors, is the bright red is a lot of brain activity.  And the blue is very little.  The reason there's a lot of blue, is that there's spaces inside the brain, and on the cortex where there's spinal fluid, which is no brain activity whatsoever.

So if I take, for instance, that one little box which is the midline.  You see that there is a bright red area in the left side.  Which is the posterior, in the back of the brain.  There's a more scattered red area on the right side.  Which is the frontal cortex.  There's a little red dot in the middle is the basal ganglia.

Now, if you then follow this, go to the left and then

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 327 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/10   Page 272 of 433
**JA790**

DIRECT-MERIKANGAS

continue to the right, you'll see there are different distributions of this colored activity.

And if you look at image 173-176, for instance, which is in the fourth row down, second from the right, you see a large area of green. Which would include the temporal lobe, the parietal lobe, occipital lobe; things which the doctor describes.

This is quite abnormal. You should have the same uptake throughout the brain.

THE COURT: What do you mean by uptake?

THE WITNESS: I'm sorry, Your Honor.

The same amount of metabolic activity. This is the metabolic activity. How much the brain is working in those areas.

So there are areas that are not working normally. If you go to the next --

Q.    (By Mr. Bryson) Can you go through the colors again?

A.    Yeah. Red is, there's a lot of brain activity. Green there's less. Blue there's no brain activity.

So what you have is a map of the activity of the different areas of the brain.

And particularly important is this reduced activity in the temporal lobes. Which are the parts of the brain which are on the bottom and on the -- each side, left and right, behind the temples. That's the part that is -- has a lot to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 328 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/17   Page 273 of 433
**JA791**

274

DIRECT—MERIKANGAS

do with impulse control.

And the other part that has less brain activity is the posterior frontal, both sides.  And has to do with judgment and impulse control.

So just looking at this, you would say this is somebody who's probably had a traumatic brain injury or something congenital, perhaps.  Which would impact his ability to make judgments, and to have abstract reasoning and then to control his behavior.

Q.    This is not a normal looking brain?

A.    This is a very abnormal brain.

Q.    The view on the screen that we're looking at right now, would be the view from the side?

A.    From the side, yes.  Sections -- cross sections from the side.

Q.    Now, I've changed the screen.  Can you tell us what we're looking at this time?

A.    These are called coronal sections.  These are sections that are cut through the plane of the ears.

And starting in the upper row, you have sections through the front.  And as you move backwards, you get to a section, which is the little box on the right, again, which is about the same area where the ears are.

Then you continue slicing the brain until you get to the back of the brain.

Laura Andersen, RMR 704-350-7493

**JA792**

275

DIRECT—MERIKANGAS

The lower left, bottom column, sections through the cerebellum, which is the back of the brain.  And here again you see a maldistribution of brain activity.

You see the red activity.  Mostly, if you look at say the second row, the last column on the right.  You see there's red around the top of the brain.

And as you move backwards, in this case, until you get to the one in the box, you see there's just green.  So there's reduced brain activity in the cortex.

You still have these bright red dots in the center of the brain, which are the basal ganglia.  And what you're looking at is the relative differences in brain activity.

If you look at that same picture in the box, you see on the lower regions of the brain, both left and right, the temporal lobes.  Which have less activity than they're suppose to.

Just in general, looking at these pictures are not uniform.  There is a great variation in the amount of brain activity in the different regions of the brain.  That's distinctly abnormal.

If you want to move on to the next one.

Q.   I will.

A.   These are called axial images.  These are in the plane, if you were wearing a hat, it would be in the plane of a hat.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 330 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 275 of 433
**JA793**

DIRECT-MERIKANGAS

Again, starting in the upper row.  You're going through the top of the head, slicing and slicing until you get, again, to this little box on the right, in the middle.  Which is about midway through the brain.

And you continue slicing down to the base of the brain where there's no activity at all, because it's just the skull, in the lower -- lowest right column.

So if you look at these sections, say for instance you look at the section which is in the box, you'll see that there are some areas in the top of this picture, which is right areas.  Then there's, towards the middle of it, there's yellow to green.

And if you continue slicing down further.  Say you look at image -- which I would pick, for instance, image 62-64, which is in the fourth row, third column from the right.

You see there's a lot of green and yellow in the sides of each part of that image, left and right, which are the temporal lobes.

So there's a distinctly abnormal pattern of activity of the brain.  Which is demonstrated through measuring the metabolism of these parts of the brain.  With an active isotope radioactive substance, glucose, which is the fuel of the brain.

This is something which is absolutely not susceptible to malingering, or to faking it.  This is a measure of how

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 331 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 276 of 433
JA794

Appeal: 10-6    Doc: 90-2    Filed: 08/14/2013    Pg: 332 of 522

his brain is working.  Which does not require any activity on his part whatsoever.

And is consistent with the abnormal neurologic examination, with the abnormal psychological testing, and the other tests that have been done in the case of Mr. Umana.

Q.   And as a result of the PET scan and your neurological exam, do you have an opinion about Mr. Umana's brain?

A.   Well, my conclusion is that he is a brain-damaged man, with developmental cognitive impairments in the mentally retarded range.

Now, the mentally retarded range is based upon, not my testing, but on the psychological testing.

He does have an abnormal neurological examination, and this abnormal PET scan.

And my opinion, these probably stem from early childhood.  Because this is not the kind of distribution you see in an ordinary head injury in an adult.  It's too diffuse.  And it's too much on both sides of the brain.

It is, however, possible that it's from the head injuries in childhood.  It's more likely it's those.

These are the kind of brain injuries you see in people who have traumatic brain injury, and trouble controlling their impulses, or mental retardation, or a number of other brain diseases.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 332 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 277 of 433
JA795

278
DIRECT—MERIKANGAS

Now, we've ruled out a lot of the other brain diseases, and the radiologist was very good at explaining he doesn't have Alzheimer's disease.  He doesn't have strokes.  He doesn't have any tumors.

In other words, this is a finding which is a general brain impairment.

Q.    You prepared a report as a part of your involvement in this case?

A.    I did.  A very brief report dated November seventeenth.

(Defendant Exhibit 17 was marked for identification.)

Q.    (By Mr. Bryson) If you would look at the monitor and tell me what I marked as Defendant's Number 17, is a copy of your report?

A.    Right.  That's the first of two pages.

Q.    You see there's another page there?

A.    Yes.

Q.    Okay.  And that is the report that you prepared in this case?

A.    Yes.

MR. BRYSON:  Your Honor, at this point in time I would move to introduce Defendant's Exhibit 15, 16 and 17.

THE COURT:  Any objection?

MR. GAST:  No, Your Honor.

THE COURT:  Be admitted.

(Defendant Exhibit 15, 16 & 17 were received in evidence.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 333 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 278 of 433
**JA796**

CROSS-MERIKANGAS

MR. BRYSON:  Does the Court need copies from me?

THE COURT:  I don't know that I have this doctor's report.  I have 15 and 16.

MR. BRYSON:  You don't have 17, his report?

THE COURT:  Right.

THE WITNESS:  I have one here, Your Honor, if you would like.

MR. BRYSON:  Those are my questions, Your Honor.

THE COURT:  Any cross?

MR. GAST:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. GAST:

Q.   Good afternoon -- I guess, good evening, now.

A.   Sir.

Q.   All right.  A few things.  Of course, this, you know, eventually a jury and/or this court will be called upon to make a lot of decisions about other aspects.  But today's decision is about mental retardation, specifically.

And as I understand your testimony, and please correct me if I'm wrong, your assessment about the mental retardation aspect is limited pretty much to the testimony -- or the input of other folks?

A.   Yes.

Q.   All right.  And you are basically ascribing or diagnosing some brain injury or abnormalities of the brain, whether it's congenital or caused by injury, you're not

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 334 of 522
Case 3:08-cr-00134-RJC   Document 50-3   Filed 03/18/10   Page 279 of 433
JA797

Appeal: 10-6   Doc: 90-2   Filed: 08/14/2013   Pg: 335 of 522

sure?

A.   Yes.  Abnormality of brain function.

Q.   And these kinds of tests, you know, in other words, one doesn't come to you and say, I've got this guy, I don't know if he's retarded or not.  Could you scan his brain and tell us if he's retarded.  That's not what these tests are for?

A.   That's correct.

Q.   All right.  And these hospital records, do you have those, the Gwinnett Hospital?

A.   I do.

Q.   Could I see those?

A.   They're in my briefcase in the back there.

        MR. GAST:  Your Honor, I would be happy, if this is contributing to the basis of his opinion, I just would like to have copies at some point.

        THE COURT:  Any objection?

        MR. BRYSON:  No.

        THE COURT:  By agreement, let's make those available.  If there's a dispute about that, bring it to me.

        MR. GAST:  All right.  Thank you Your Honor.

Q.   (By Mr. Gast) And you opined, that based on the distribution of these issues of the brain, that it's likely that it occurred during childhood.

        This cannot rule out the fact that -- this could have all happened from the car accident in 2007 though?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 335 of 522
Case 3:08-cr-00134-RJC   Document 50-3   Filed 03/13/10   Page 280 of 433
JA798

CROSS—MERIKANGAS

281

A.    May I explain my answer?

Q.    Sure.

A.    The answer is, yes.  But, the medical records do not support this extensive a brain injury in that car accident. He did not even have documented loss of consciousness.  And he was not treated in a neurological intensive care unit. He did not have the kinds of things one would characteristically see an accident causing this degree of brain dysfunction.

Whereas if he had an insult to his brain in childhood, his whole development could be altered.  And that's why I said in my report -- which I believe you have a copy -- based on the history, this is probably from childhood.

Q.    All right.  But you don't have any documentation from his childhood injuries to support that one way or another, I guess?

A.    No more than what's been testified to already today.

Q.    And whatever -- this is also the kind of thing, is it not, being treated in the ER, say, for a car accident, for example, that could be missed.

In other words, if there is -- if someone is being treated for a car accident, and, you know, they're not exhibiting extreme symptoms, they're conscious, they're generally alert, they might not do a PET scan, or they might determine that there's further injuries; is that fair to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 336 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 281 of 433
JA799

CROSS-MERIKANGAS

say?

A.    It's unlikely that they would do a PET scan for a car accident, acutely.  They would do it later.

Q.    The radiologist's report used the word "mild" in a couple of different ways.

And is that -- and whereas in your opinion you talked about a very abnormal or quite abnormal scan.

Are we talking about two different things?  Or does he just read it differently than you, or how does that --

A.    His mild is referring to the decreased uptake, not to the degree of severity of impairment.

In other words, if you look at the color scale, each change of color there is one standard deviation.

So that it's not a difference between bright red and, you know, blue.  It's a difference between red, yellow, green.  Each which is a certain degree of change.  So he's referring to that, as mild.

Whereas I'm referring to, when I say that this is a severe derangement, is the extensive nature of it.  That it's so many different parts of his brain.  That parts of his brain are quite green, compared to the normal red.  And that this is kind of a global dysfunction, actually.

Q.    And is this type of scan unusual in, for example, football players or boxers, people who have had, you know, several different more minor head injuries, as opposed to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 337 of 522
Case 3:08-cr-00134-RJC   Document 60-3   Filed 03/18/10   Page 282 of 433
JA800

CROSS-MERIKANGAS

one big one?

A.    It can be cumulative, yes.  Research shows that a lot of pro football players who are retired, have this kind of brain scan.

Q.    So if, for example, he had been in a lot of fights, that is another potential explanation for the results you see here?

A.    Well, that would be speculation as to how -- what kind of head injury he may have received in those fights.

Q.    Well, no more so than the speculation that we're engaging in that it was from falling out of the mango tree though, right?

A.    That's right.

Q.    And other than some deficits, and I believe you said impulsivity, I think, and perhaps some other things if -- strike that.

        MR. GAST:  I think those are my questions, sir. Thank you.

        THE COURT:  Any Redirect?

        MR. BRYSON:  We don't have any Redirect, Your Honor.

        THE COURT:  You may step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  Call your next witness.

        MR. BRYSON:  Your Honor, can he be released?  He

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 338 of 522
Case 3:08-cr-00134-RJC   Document 89-2   Filed 03/18/10   Page 283 of 433

**JA801**

has a plane to catch.

THE COURT:  Any objection to that?

MR. GAST:  No.

THE COURT:  He may be released.

MR. GAST:  You guys have the medical records?

MR. BRYSON:  Yeah.

That's our last witness, Your Honor.

THE COURT:  Very well.  The government ready to call its witness?

MR. GAST:  You have no other witnesses?

MR. BRYSON:  No.

MR. GAST:  Yes, Your Honor, we are.  You want us to go?

THE COURT:  We can talk about this.  The Court's slammed for a while, and so I would prefer to go till we're done, at least with the evidence part of this, no matter how long it takes.

MR. GAST:  Yeah.  That's fine with us.

THE COURT:  Very well.  Let's go.

THEREUPON, ENRIQUE M. SUAREZ, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. GAST:

MR. GAST:  Good evening, Doctor.

THE WITNESS:  Good evening.

THE COURT:  Before we start, why don't we take a break.  I sometimes forget to do that, and we've been going

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 339 of 522
Case 3:08-cr-00134-RJC   Document 60-2   Filed 03/18/10   Page 284 of 433
**JA802**

DIRECT-SUAREZ

at it for a while.  Let's take a 15 minute break and come back at 5:45.

(A brief recess was taken in the proceedings.)

THE COURT:  A scheduling matter I would like to talk to counsel about at side bar.

(Bench conference as follows:)

THE COURT:  The Marshals have told me that your client is downstairs throwing up.  So I don't know.  We need to go forward.  We're going to be here a while.  Or in light of his condition do something else.  You all might want to just talk with him and then just let me know.  Then we'll have another side bar on the issue.

(Pause.)

MR. FOSTER:  Well, Your Honor --

MR. BRYSON:  He's having migraine headaches.

MR. FOSTER:  Which he tends to have --

MR. BRYSON:  As you heard, that's why he's throwing up.  It's pretty normal for him to throw up quite a bit.  He doesn't expect he will throw up anymore.  He says it's painful, but this is customary for him.  And he says he feels okay, and is ready to keep going.

THE COURT:  All right.

MR. BRYSON:  Is that fair?

THE COURT:  Yeah.

MR. BRYSON:  Is that a fair assessment of what he

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 340 of 522
Case 3:08-cr-00134-RJC   Document 60-2   Filed 03/18/10   Page 285 of 433
JA803

DIRECT-SUAREZ

said?

MR. FOSTER:  Yeah.

THE COURT:  That would be preferable for me, too. How long do you think your direct will be?

MR. GAST:  Try to make the direct shorter.  We agree with a lot of what Dr. Olley said.  The direct will be shorter.  The cross is up to them.  I think it will be shorter than Weinstein's total.

THE COURT:  All right.  Let's go forward and see if we can get it all done and then go from there.

(The bench conference was concluded.)

THE COURT:  Mr. Gast, whenever you're ready.

MR. GAST:  All right.  Thank you, Your Honor.

DIRECT EXAMINATION BY MR. GAST:

Q.   (By Mr. Gast) Good evening, Doctor.  Please tell the court your full name and occupation.

A.   Enrique M. Suarez.  I'm a licensed psychologist in Texas.  I'm sorry, in Florida.  I was in Texas, as well.

Q.   All right.  And have you prepared a CV for us?

A.   I have.

(Government Exhibit A2 was marked for identification.)

Q.   (By Mr. Gast) I'll hand you what I've marked for identification purposes as Government's Exhibit A-2.  Ask if you recognize that?

A.   I do.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 341 of 522
Case 3:08-cr-00134-RJC   Document 802   Filed 03/18/10   Page 286 of 433
JA804

DIRECT-SUAREZ

Q.    What is that?

A.    Curriculum vitae.

Q.    Is that a fair and accurate copy?

A.    Yes.

Q.    Does that fairly and accurately represent your work experience history, articles published, et cetera?

A.    Yes.

        MR. GAST:  Move to admit as A2.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit A2 was received into Evidence.)

Q.    (By Mr. Gast) Have you testified in federal and or state court as an expert in psychology?

A.    I have.

Q.    Approximately how many times?

A.    Probably close to 1,000 over the last 20 years.

Q.    Tell us how that's distributed in terms of who asked you to come.  Whether it was the court or the prosecution or the defense?

A.    Well, the statistics that I have are from 1998 to 2006. In the period before '98, we had a burglary and all of our computers and backups were stolen.

       So from '98 to 2006, I received over 900 appointments from the court.  And they were discreet appointments.  That

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 342 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 287 of 433
**JA805**

DIRECT-SUAREZ

is, one individual.  If I was given three orders to evaluate for competency, that was counted as one.

So I had over 900 from the court.  About 650 from the defendant's point of view.  And I had 198 state appointments.

Q.   All right.  State appointments, meaning for the prosecution?

A.   Yes, that's correct.

Q.   How about federal court?

A.   I've testified in federal court, as well.

Q.   Approximately how many times, federally?

A.   About four or five times.

Q.   How is that distributed government, defense and court?

A.   All of them have been government.

Q.   All right.

MR. GAST:  Your Honor, at this time rather than having him repeat his CV, I don't think defense has any objection to tendering him as an expert.

THE COURT:  He will be allowed to render an opinion in this area.

MR. GAST:  Thank you, Your Honor.

Q.   Starting first with just why we're here.  Kind of defining mental retardation and the general standards and things like that.

Were you here and present for Dr. Olley's testimony?

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 343 of 522
Case 3:08-cr-00134-RJC   Document 622   Filed 03/18/10   Page 288 of 433
**JA806**

DIRECT-SUAREZ

A.    I was.

Q.    In terms of that stuff, in terms of how we define MR and the categories, what not.  Do you generally agree or generally disagree with what he testified?

A.    I agree.

Q.    All right.  Is there anything we need to go over, specifically, to address any of those standards that you would have addressed differently than Dr. Olley, in terms of what constitutes mental retardation and how you diagnose it?

A.    No.  I would quibble with the way it's applied.  We'll get to that I'm sure.

Q.    Let's move on then.  Of course you've been retained in this case by the government to do an evaluation of the defendant and you did so?

A.    I did.

Q.    When was that?

A.    I did that on September 28, 2009, September 29, 2009 and September 30th, 2009.

Q.    All right.  And did you produce a report as a result of that examination?

A.    I did.

        MR. GAST:  If I may approach the witness?

        THE COURT:  You may.

(Government Exhibit A-3 was marked for identification.)

Q.    (By Mr. Gast) Hand you what's been identified as

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 344 of 522
Case 3:08-cr-00134-RJC   Document 63-2   Filed 03/18/10   Page 289 of 433
JA807

DIRECT-SUAREZ

Government Exhibit A-3; ask if you recognize that?

A.    I do.

Q.    What is that?

A.    That's the report that I gave you.

Q.    Is that a fair and accurate copy of the original?

A.    Yes.

Q.    Does that outline what tests you performed, what your findings were, what your opinions are?

A.    It does.

Q.    Would the use of this help assist with your testimony today?

A.    Yes.

        MR. GAST:  At this time we move to admit Government's Exhibit A-3.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit A-3 was received into Evidence.)

        MR. GAST:  We had previously given the Court a copy.

        THE COURT:  I've got that.

        MR. GAST:  This is actually slightly revised.  Ask the Court not to use the other one.  If the Court has made notes on the other, the differences are, there's one test he had in his report, turns out he didn't run.  And then

Laura Andersen, RMR 704-350-7493

**JA808**

DIRECT-SUAREZ

there's a numeric difference.

Why don't I ask you, Doctor.

A.    Page 16.

Q.    Page 16 under symptom validity test results. Typographical error on the last one.  In the event the Court made notes on the one we already submitted.

Let's go chronologically, Doctor.  How did you begin your evaluation of the defendant?

A.    On the first day, which was September 28, 2009, the defendant was in court.  So what I did is, I carried out three interviews with Mecklenburg County officers at the jail in their administrative office conference room.

Q.    Why did you do that; for what purpose?

A.    I wanted to get information -- as much information as I could about Mr. Umana's adaptation in jail, and any other information they could give me.  Which one way or another would reflect on his functionality on a daily basis.

Q.    What Dr. Olley referred to as adaptive function issues?

A.    That would be part of it, yes.

Q.    Were those folks officers, had regular and prolonged contact with the defendant?

A.    Yes.

Q.    Tell us about those interviews starting in the order, I guess, that you performed them?

A.    Yes.  The first individual that I talked to was Officer

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 346 of 522
Case 3:08-cr-00134-RJC   Document 632   Filed 03/18/10   Page 291 of 433
**JA809**

DIRECT-SUAREZ

McIntyre.  And Officer McIntyre told me that he had been with the Mecklenburg County sheriff's office two and a half to three years.

Q.    I'm sorry.  What page?

A.    Page 19.

Q.    Okay.  Thank you.

A.    He told me he had known Mr. Umana for six months.

States, the defendant was initially in the general population of the jail then moved to protective custody unit referred to as 5630 unit.  That's where they house individuals that are in danger of being harmed because they are going to testify in one way or another against somebody.

He told me that he's been -- when he saw him he had been in protective custody for one month.

Told me Mr. Umana does not speak a lot of English, but does speak phrases.  Gave me some samples, can I watch TV?  Was one of them.  Can I come out?  What time is it?

He told me that he had also seen Mr. Umana prior, in the 5640 unit.  And he told me that he appeared, at that time, to him, to have some kind of gang affiliation, specifically MS 13.

He told me that while he was in the general population of the jail, that he, prior to his transfer to the protective custody unit, that he mingled with other Hispanics with no problem.

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 347 of 522
Case 3:08-cr-00134-RJC   Document 522   Filed 03/18/10   Page 292 of 433
JA810

DIRECT-SUAREZ

Told me that he mostly slept and watched television when he was in the protective unit because there was one other inmate in that unit.

Told me that his, in terms of his adaptive functioning in the jail.  In other words, things that he did or was required to do.  He told me that he showers regularly, was well groomed, dresses himself, turns in clothing for laundering.

Told me he gets cleaning supplies with which he used to clean his cell, including the sink, the toilet, desk areas.

Never saw anything that would tell him he was unable to do any duties they were able to do.

I asked if he purchased commissary items.  He told me -- he had explained to me that inmates at the Mecklenburg County jail use a commissary kiosk computer screen with a keyboard.  They have to key in what they purchase.  They have to know the price.  They have to know how much money they have in their commissary account.  Which they can check independently on the kiosk.

He told me he has seen Mr. Umana typing at the keyboard.  He doesn't really know whether he's ordering or checking his account.

Also I asked him about his ability to communicate his needs.  And he told me that he had no problem.  That he says that he has seen Mr. Umana submit request forms, but he

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 348 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 293 of 433
**JA811**

DIRECT-SUAREZ

didn't know what type of request forms. There are various ones, for example, sick call, medical requests, grievances, library requests, this type of thing.

He said he had seen him writing some of these -- I'm sorry. He does receive mail, and has seen him writing.

He told me that he had seen him making telephone calls. But did not know to whom, or if he was successful in reaching the party he was trying to contact.

That he has seen him go out to the recreation yard playing basketball, jogs, walks laps, does push ups and sit ups.

When I asked him about his overall adjustment, he told me not that he's not been aggressive toward him, that is Officer McIntyre.

And he told me today, he was fine after court. Which was, in fact, he was in court.

He told me that based on his observations, he didn't see anything different based on Mr. Umana's behavior, and what he termed, the average inmate.

And described him as being quiet and respectful. I asked him if there was any reason to believe that he may be mentally retarded.

He told me that he doesn't seem to have any intellectual impairments that he could see. And he told me that he does not require any type of special supports or

Laura Andersen, RMR 704-350-7493

**JA812**

DIRECT-SUAREZ

adaptive help while he's been in the jail.

I next talked to Officer M. Farley --

THE COURT:  Mr. Gast, this appears to be just recitation of the report which is in evidence.  Is there any need to have an oral presentation of what the Court has already received as a written record?

MR. GAST:  No, that's fine.  I'll start asking some more general questions about these.  Thank you, Your Honor.

THE COURT:  Thank you.

Q.   (By Mr. Gast) With respect to these three officers, I believe you said?

A.   Yes.

Q.   Were any of them able to identify any adaptive functioning deficits?

A.   No.  And two of them did communicate to me that they had had experience with special needs adults, and some mentally retarded adults, when they had prior positions in prior work places, and that they couldn't see any.

Q.   And, you know, we've talked earlier, I think, primarily with Dr. Olley, if I'm not mistaken, about the ABAS.  That form that has a lot of questions about the types of things that one can or cannot do.  A lot of things that you listed here and are in text form from other officers, is it apparent that he was able to do, at least in a jail setting,

Laura Andersen, RMR 704-350-7493

**JA813**

DIRECT-SUAREZ

a lot of those things that are listed on the ABAS form?

A.   Yes.  The things that are listed on the ABAS, and that were observed -- those things that we can say he has been observed able to do.

Q.   And I believe you were present when Dr. Olley testified, basically there are some limitations or concerns, perhaps a better word, of using interviews of folks while in institutional setting.  Were you present for that?

A.   Yes, I was.

Q.   If you could comment about that, about the relative value of these interviews, as opposed to anything else you've done in this examination?

A.   Well, there's some information relative to adaptive functioning that obviously you will not be able to obtain within the jail setting or within the prison setting.  And that is, that they don't take buses.  They don't go out shopping, so you can't observe that.

     But there are behaviors that you can observe.  For example, their communication skills.  Their ability to communicate to others.  How they've used that.

     For example, Mr. Umana was noted teaching other inmates how to speak Spanish.  And how to pronounce Spanish words.

     So we can get a slice of behavior.  We're not getting the entire scope of adaptive behavior in the community.  But we can get a lot of information.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 351 of 522
Case 3:08-cr-00134-RJC   Document 632-2   Filed 03/18/10   Page 296 of 433
JA814

DIRECT-SUAREZ

And if, especially if we're looking for impairments. Because if we have significant impairments, there ought to be some things that a person may not be able to do, even if they're in the jail setting. For example, hygiene, or cut their food, which is part of the ABAS. Do they just grab it with their hands or do they use utensils.

We can see them, for example, using a computer, type to setup a commissary account, use a telephone, all those things are in the ABAS.

Q.    All right.  Thank you.  After interviewing those three officers, what was your next item of business in the evaluation?

A.    The next day I began my face-to-face evaluation with Mr. Umana in an interview room of the Mecklenburg County jail.

Q.    Is this starting on page two of your report?

A.    It is.

MR. GAST:  And with the Court's permission, I would like him to go a little more thoroughly through the defendant's interview.

THE COURT:  Very well.

Q.    (By Mr. Gast) If you could just go ahead and tell us about your interview of the defendant.

Starting first with, I guess, with why is that important to do for this type of evaluation?

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 352 of 522
Case 3:08-cr-00134-RJC   Document 1521   Filed 03/18/10   Page 297 of 433
JA815

298

DIRECT-SUAREZ

A.   Well, it's important because, again, we're looking at a direct communication.  We can observe A, how he communicates.  How he speaks.  How fluent he is or nonfluent.

We can gauge if he's answering questions that we're asking.  Or if he's tangential or going off on different things or answering things that are not pertinent to what was asked.

We can see how, to what degree this individual can communicate information from his past and his recent behaviors.

And we can see how he responds, emotionally, in general, to the demands of an interview.

So, I think you can capture, again, a whole other slice of what's in the ABAS, of virtually all of the communication areas that we can observe.

And we can observe his hygiene.  If he's well dressed.  If he's clean.  What he tells us.  How aware he is of his own condition.  And what he's done in terms of his needs.  So that's why it's important.

We can take the information that he gives us, and correlate it with what is known from other collateral sources of information, such as other reports, or pre-arrest reports, other facts that we can tie those things to.

Q.   Did you conduct this interview in English or in

Laura Andersen, RMR 704-350-7493

**JA816**

DIRECT-SUAREZ

299

Spanish?

A.    I conducted it in Spanish.

Q.    Are you fluent in Spanish yourself?

A.    Spanish is my first language.  This is my second language.

Q.    All right.  So no interpreter?

A.    No interpreter, no.

Q.    All right.  If you would tell us about your interview with Mr. Umana?

A.    Well, he was brought to the room.  He was handcuffed, and had light chains.  I requested they be taken off and they were.  So he had absolutely no restrictions on his arms, whatsoever.

He sat down, and I began asking him about what we would term, psychosocial interview.  That is, where he was born. The information concerning his family of origin.  What he did.  His schooling, et cetera.  And eventually how he got to this country.

Q.    Can you tell us about that?

A.    Yes.  I asked him, initially, where he was from.  He told me he was from Santa Ana.  And he told me approximate distance of that city, from the capital of San Salvador. Which is the capital of El Salvador, the country.

He then remarked pretty spontaneously about his name. He said that it is really Umana.  But noted that in this

Laura Andersen, RMR 704-350-7493

**JA817**

DIRECT-SUAREZ

country they don't use the Spanish end with the diacritical mark, the tilde.

And again, that's important, because this is information that I necessarily wouldn't have asked him. But he contributed it and tells you that he's got some awareness about cultural differences, specifically in terms of language and written language.

He told me he entered this country in 2004. And was able to tell me, for example, the actual date that he left San Salvador -- I'm sorry, Santa Ana. His country of El Salvador.

He told me he left on October 26, 2004. He told me that he was accompanied by a friend. And that they had a total -- he had a total of 103 U.S. dollars.

And he mentioned to me that he purposely did not have any identification. However, he told me that later on his father did send him what's called, Documento Unico De Identidad. That's a unique identity document from El Salvador.

He then also contributed that he obtained an identification card while he was in the State of New York. He told me they left El Salvador and traveled to Guatemala.

He told me it took 20 -- let's see. That after Guatemala, he told me they went to the border of Mexico. And told me the name of the river they crossed. Which is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 355 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 300 of 433

**JA818**

DIRECT-SUAREZ

the Suchiate River.

And I asked him, for example, how he was able to cross borders without any passport or documentation.  He told me that they were not well patrolled.

And then told me that later on when they were in Mexico, that they kind of helped women who would travel -- they noticed they traveled across the border every day to sell vegetables.  And they worked for them for a little bit, I guess for a little bit of money.  Then they went ahead and crossed themselves.

Told me he took 26 days to traverse Mexico.  And then told me that while they were in Tapachula, Mexico, that they bought chain cutters.  They were advised to get some of those.

And he noted, and this was spontaneously.  That I asked him, they must have been pretty big chain cutters.  And he told me no.  That they were told to get the moderate size ones.

And he later then told me that they used that to break into the freight cars by cutting the seals so that they could ride on the trains to the border of the United States.

Told me that they crossed -- they got to the City of Algodones, which means cotton or cottons.  And that they traveled -- they crossed the border into Arizona -- Yuma, Arizona.

Laura Andersen, RMR 704-350-7493

**JA819**

DIRECT-SUAREZ

Told me that they went to a park.  Then they found the train tracks, and approximately, let's see, about five, six hours later, or seven hours later, they were able to board a train that took them to -- from Arizona to San Diego.

Then they took another train from San Diego to north Hollywood, he said, in Los Angeles.  Then while there, I think while they were in Arizona, they contacted someone by telephone.  And eventually they contacted someone in LA who agreed to pick them up.

Apparently it took about 12 hours.  They were to meet at a specific shopping center that they had to find, a supermarket place.  And that they were picked up at 6:00 a.m., after having contacted them approximately 12 hours later.

He told me that they stayed at a friend's house for 15 days.  During that time he began to look for work.  However, he says that he was arrested.  In the course of another arrest where police were apparently hitting one of his friends who was also an MS 13 fellow gang member.  He didn't like that and somehow intervened, verbally.  And they arrested him.

He was taken into custody and taken to a police station where he was searched and fingerprinted and photographed.

On his release he requested from police that they drive him back.  And the reason he told me he did that is because

Laura Andersen, RMR 704-350-7493

**JA820**

DIRECT-SUAREZ

he knew he was about 20 blocks from where he was picked up -- where he was staying.

And he knew that the intervening neighborhoods or blocks were controlled by different gang members.  And he didn't want to risk walking.

However, they didn't give him a ride.  And he ended up walking back to where he had been arrested.

When I asked him about his family constellation --

Q.    (By Mr. Gast) Let me interrupt you for a second, if I could.  Excuse me.

This is what we heard so far, about his kind of journey to the United States.  And then this encounter with law enforcement and getting back home and those kind of things.

What if anything does that tell you about matters pertaining to the issue at hand of whether or not he's mentally retarded?

A.    Well, you have to weigh both hypotheses.  One, that he's retarded with significant adaptive impairments.  And significant intellectual impairments.  And the other one is, he's not.

And you've got to ask yourself, how plausible or feasible is it to begin with, for someone to make a journey like this, without any plans, hotels.  And it would take you 26 days to go through Mexico, and be able to navigate across three international borders, and to be able to arrive in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 358 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 303 of 433

**JA821**

DIRECT-SUAREZ

United States.  And then successfully make it to Los Angeles.

Using cell phones in between, and being -- having the wherefor all to know how to acquire, what I noted, was conventional and unconventional ways of travel.  And being successful at it.

And now arriving at a foreign country where he does not know the language.  And being able to continue his travel.

And I think there is so many micro-behaviors that are needed to be able to successfully do that, that it boggles my mind to imagine someone who is significantly impaired, in terms of abstract reasoning, language, planning, to be able to do something of this magnitude.

That would be a challenge to a normal human being in any way, shape or form.  It would be a huge challenge for someone to do this.

Q.   And bringing us back to this ABAS test that -- was that administered in this case, specifically?

A.   It was not.

Q.   But did this journey tell you, or show you things that would be highlighted in that type of exam?

A.   Well, again, throughout the entire evaluation and throughout the history that I've taken, throughout the collateral documents, you could just sit there and probably mark off every category of behavior.  Because we know some

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 359 of 522
Case 3:08-cr-00134-RJC   Document 52   Filed 03/18/10   Page 304 of 433
JA822

DIRECT-SUAREZ

of them had to have happened.

We know that he's been in the United States.  Traveled in the United States.  And that that has happened.  That he came from El Salvador on his own.

For example, he even told me he knew the exchange rate at one point, which as 8.75 Salvadoran colones per every U.S. dollar.  That's an incredible amount of information for someone who is intellectually impaired.

Q.  I interrupted you when you started talking about his family history.  If you could proceed from there, please?

A.  Yes.  He was able to tell me about his family constellation.  He told me that he's the oldest of two brothers.  And then he told me that he had a younger maternal half sister and a maternal half brother.  So he was aware that not everyone in his family unit shared the same parents.

Told me that he was raised basically by his great grandmother -- and paternal great grandmother and great grandmother.  And told me that he had been raised, basically, by his father as well.

That he and his mother -- his father and mother had separated when he was about seven months old.

He denied any history of being abused, sexually or physically.

Told me he had -- he's never married, but he has two

Laura Andersen, RMR 704-350-7493

**JA823**

306

children, two sons, age five and four.

Told me that the four year old lives in New York with his girlfriend, the mother. And that his five year old is in El Salvador.

I then asked him if he ever contributed to the financial support of these two children. And he told me that at times when he had money, he would send approximately $100 a month.

I then asked him how he did that. And he told me he used Money Grams from Western Union. And that when he was in New York, he used the Commerce Bank to send money internationally.

And, again, this is just another example of the ability to handle, on a functional basis, money matters.

He had enough to know how to send money internationally. And, of course, that level of behavior is not even hinted at in the ABAS. Because that's much more sophisticated than one's daily living necessities.

Q.   By contrast, what sorts of things would they ask on the ABAS to screen for --

A.   If he could make change for buying, you know, small things. If he could find the products on the shelf, or if not, could he ask for them. This level of thing. Again, it's one's ability to adapt to daily living.

Not extraordinary things like traveling internationally

Laura Andersen, RMR 704-350-7493

**JA824**

DIRECT-SUAREZ

on his own with, you know, minimal funds.  Or knowing international exchange rates.

Q.    All right.  Did you ask him about his work and educational history?

A.    I did.  He told me that he had discontinued his education after the third grade.  Said he made basically five and six's.

And I asked him to explain that.  And he told me that it was on a scale of one to ten.

Now again, this is an abstraction.  And he's being able to tell me what the range of the scale is.  We call that scaling.

And he told me that they were five and six's, so that I could interpret the nature of the grades that he just told me that he made.

He told me he dropped out of school after the death of his great grandmother.  And he told me that she was the primary taker and there was basically no one to supervise him.

Then he told me about his activities in soccer.  He told me he was quite a good soccer player.  And in fact had been chosen as a teen, young adolescent teen to play in games in other countries.  But, however, his family did not have the money to acquire things like passport and other expenses that were needed for him to travel with the team.

Laura Andersen, RMR 704-350-7493

**JA825**

DIRECT–SUAREZ

He told me the position he played; midfielder, volante.

Told me later on as -- when he was older, he continued playing.  Told me that he had his own soccer shoes there.  In other words, they use a term called tacos.  Which is another name for -- here we would call them cleats.  So he had his own soccer cleats.

Told me that they would organize games.  And at times they would hire what he called an arbitrator -- in Spanish that's arbitro -- to referee the game.  And they would pay him 30 colones.

And it was in this context that he told me when I asked him how much is 30 colones.  Because I didn't know.  And he told me that it was 8.75 colones per U.S. dollar.

So, again, it shows a lot of his ability to play organized sports with rules.  And to know that in a rule game like that you would need a referee, in essence.

Q.   And with regard to his schooling, in particular, he never said, you know, I flunked out of school.  Or I got kicked out of school.  Or I wasn't able to perform.  The reason he gave was, his grandmother's passing?

A.   Correct.

Q.   All right.

A.   In terms of employment, we went through quite a lot.  He told me he began to work quite young with his father, who was a painter.  And then began to work for Tropi Gas.

**JA826**

DIRECT-SUAREZ

And he described to me what that job entailed.  Which was delivering propane gas tanks.  And he told me he quit that job because they tried to impose on him to do extra duties, cleaning the area around Tropi Gas.  And he didn't like that and so he told me he quit.

He told me that between the ages of 15 and 17 that he was hired by the Coca-Cola Bottling Company to deliver drinks.

And it was in the context of that, that he told me although he never had a driver's license, he was taught by the driver how to drive a manual transmission.

And, again, as I go through this, I keep in mind that we're talking about someone who is supposedly intellectually and adaptively impaired; the bottom 2 percent of his respective population.

And you have to imagine, someone who started working around 10 years old, and now he's 15, 17.  And he's doing these types of things in light of having these types of limitations.

He next told me he worked for a brief period one month at a tire store.  Which described by Dr. Olley as being the roadside sales kind of place, apparently.

He told me he then worked for a contractor, Carlos Aquirre, for two years.  And told me about the projects he was building houses and bridges.  Then he worked again for

Laura Andersen, RMR 704-350-7493

JA827

DIRECT-SUAREZ

Coca-Cola Company for a brief time.  And then again for the contractor for a period of 18 months.

And I asked him what kind of projects.  He told me telecommunication transmission towers.  And the adjacent houses where they would house the materials and the electronic equipment.

He told me he quit this job because that's when he left El Salvador to go to the United States.

Q.   With respect to his employment history, did he ever indicate any adaptive function deficits that would cause him to not be able to perform his job or anything like that?

A.   No, he did not.

Q.   All right.  Go ahead.

A.   He told me that shortly after he was in Los Angeles, he found a part time job at a place called Flowers Express.

And again, the other thing that an interview does, is allows you to see, indirectly, someone's ability to remember things.  Where he's been and how he's done it.  He apparently has quite good recall.

He said he worked there for about one month.  After which his girlfriend arrived in Los Angeles, and she was apparently pregnant.  So he went to New York with her.  She wanted to live with her mother, I guess for the delivery.

He said he spent two months at his girlfriend's mother's home before returning.  Came back and worked in

Laura Andersen, RMR 704-350-7493

JA828

DIRECT-SUAREZ

construction for a couple of weeks digging ditches for placement of plumbing pipes.

Then he returned, he told me, to New York, a month before the birth of the child. And was apparently there for about a year.

And he told me he initially worked at a car wash, and then subsequently for a roofing contractor. And told me how much he made. He said he made between $100 and $120 per day working for the roofer.

I asked him how he commuted to work sites. He told me the roofer would give him ride every day. Did not charge him anything.

And during that time he told me that he was involved in taking his wife to the prenatal care, was with her when she went into labor.

And I asked him how he got there. He says he took a taxi. Took her to the hospital. Told me how many days she was in the hospital, which was three.

And was there obviously for postnatal care that he told me on occasions he would go. On two occasions he drove a car that he had obtained from one of his bosses.

And he mentioned to me two automobiles. Again reiterated that he never had a driver's license. But he told me he had obtained a 1996 Ford van, that had transmission problems but he couldn't afford to repair it so

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 366 of 522
Case 3:08-cr-00134-RJC   Document 632   Filed 03/18/10   Page 311 of 433
**JA829**

DIRECT-SUAREZ

312

he sold it for $350.

He says, in 2007 he obtained a 1984, 8-cylinder Mercedes Benz. And then told me that eventually he couldn't afford the gasoline. This was the car that he told me he drove on a couple of occasions to take his wife to the physician.

He says after the birth of his son, he began to travel to Atlanta, Georgia. And he told me that -- I asked him why Atlanta. He says, well, he said there was a lot of construction going on in Atlanta. And that it was easy for him to obtain jobs.

Said he worked installing doors, windows and wall ornaments. And he told me how much he made; 200 to $385 per week.

Then he then told me that he would usually try and save up usually between $500 and $1,000, so that he could then take that time and go back to New York and spend time with his girlfriend and his son, visiting.

Apparently he took three trips, different trips to Atlanta. On the third one he told me he took his girlfriend.

And then he began to make some trips to Greensboro, North Carolina. And he said there he worked painting and installing fencing. And he made about $300.

Then he told me about being arrested on a specific

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 367 of 522
Case 3:08-cr-00134-RJC   Document 69-2   Filed 03/18/10   Page 312 of 433
JA830

date, which was August 6, 2007 in Greensboro, for a possession of drugs.  Said he spent 20 days in jail and was bailed out by friends.  He had a $10,000 bond.

So, again, reiterating, these aren't just little behaviors.  You have to have a lot of other abilities to be able to do any of these things.  And to recall doing all of these things.  And to know specific details about, for example, his legal history.

I asked him next about accommodations.  He told me that he would either rent a motel or share a room with co-workers.

Told me he preferred, at times, to rent a -- there were motels that would rent you a room for about $130 a week.

I asked him what he did about his laundry.  He said he would either wash his clothing by hand, if he didn't have a lot of money.  Or if he did, he would go to a coin laundry and wash his clothing.

I asked him about buying food.  He told me he would buy food with friends.  That he would cook.  He would make soups and other combined dishes, he told me with whatever was available, he could combine into a meal.

He told me his preference was to eat breakfast at Burger King, McDonald's or Wendy's.

I asked him about shopping for clothing and things such as these.  He told me that he bought at second-hand stores

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 368 of 522
Case 3:08-cr-00134-RJC   Document 60-2   Filed 03/13/10   Page 313 of 433
**JA831**

DIRECT-SUAREZ

and discount stores.  He mentioned 99 cent store; Clothing U.S.A.  Said the only thing he bought at retail were at malls, were shoes.

Told me that he had purchased a radio and television set while in New York.  And told me that he used public telephones and a cellular phone.  Told me that while he was in New York he obtained a cellular phone.  And quoted, it was a Boss mobile phone.  That was the type of phone.

Q.   And these sorts of things, doing his laundry, shopping, cooking, being able to use a telephone.  Are these the types of questions that show up in the ABAS test?

A.   Yes.  There's specific questions regarding the use -- the ability of using a telephone.  And many of these things, shop for clothing, shop for in sundry goods.

Q.   Go ahead.

A.   I asked him about his mental health.  He denied any mental health treatment.  Told me he never experienced hallucinations, never attempted suicide or thought about it. He denied experiencing depression or anxiety.

I asked him about substances.  He told me that he began smoking marijuana at the age of 17 on a daily basis.  And also consuming alcohol.  He told me he stopped the alcohol when he was 19 years old.  And told me he had been intoxicated on only two occasions with alcohol.

He denied use of cocaine, but then noted that on one

Laura Andersen, RMR 704-350-7493

**JA832**

315

DIRECT-SUAREZ

occasion he smoked a combination of marijuana and cocaine. He denied ever using the crack form of cocaine.

Told me that -- I asked him about any other drugs.  He denied hallucinogens, mushrooms, things like psilocybins, mushrooms or peyote, cactus, anything like that.

When I asked him about inhalants.  If he ever inhaled anything.  He did tell me that an adolescent who was riding in a freight car with him while they were going through Mexico, did give him some paint thinner something like that to inhale.  And he said it kind of helped him, because it was very cold when they were traveling.  And that he could see how that helped.  But that was the only time.

And again, these are important because, you know, we just heard testimony about PET scans.  And some of these things could have effect on PET scans.  Especially something like inhalants, like thinners.

He talked to me about his general health.  Told me that his main problem was migraine headaches.  And he used the word migraine.

I asked him about head injuries.  And he told me that between four and five years -- or four and six years old he fell.  And after that he has had these headaches.  Told me he has hyper sensitivity to light and sound, which is common with migraines.  And he told me how he fell and cut his head on a broken piece of glass.  Which was a medicinal -- some

**JA833**

316

DIRECT-SUAREZ

kind of jar of medicinal syrup that he was trying to reach for in the cabinet.

He told me that he was -- he denied that he lost any consciousness.  And told me that he was treated at the San Juan de Dios Hospital in Santa Ana.  Which is in fact a hospital there.  Told me that they closed the cut with 21 sutures and that he was released.

The next time -- told me the next time he had a head injury was in May of 2007.  He was involved in an automobile accident in Atlanta, Georgia.  And told me he was taken to a hospital in Gwinnett County.  And he used those terms himself.  He knew the name of the county that he was in.

Told me he was taken there about 8:00 p.m.  And was treated and released between 1 and 2:00 a.m.

He said that since that time he has experienced some problems with numbness, loss of sensation in his arms.

And he also told me that he had a positive tuberculin test, and was subsequently prescribed medication for that.

Told me he's also had Tylenol.  Which is a term he used for his headaches.  And he had been given Amoxicillin.  Which is a type of Penicillin and Ibuprofen, after having wisdom teeth extracted.

Q.   With regard to his childhood head injury that he described, did he say anything about falling out of a mango tree?

Laura Andersen, RMR 704-350-7493

**JA834**

A.    No.  He did not describe that to me.

Q.    Did he say anything about falling and hitting his head on a piece of furniture?

A.    No.  He told me that he was reaching for a jar of syrup.  The jar fell as well, and he broke it on a piece of glass -- cut his head on a piece of glass.

Q.    Did you ask him about his current legal situation?

A.    I did.  And he told me that he's facing four counts of homicide; two in Los Angeles and two in Greensboro.

      And he told me that there was a fifth, but indicated that the authorities don't have any proof of that.

      He told me he was being represented by public defenders who were being paid by what he termed as the government.

      When asked if these were serious charges.  He told me that he's facing the death penalty.  And then spontaneously noted, but my attorneys said that if I plead guilty, I might get two life sentences.

      Then he told me that he knows the individual in -- said that there was an individual who is accusing himself and 26 gang members -- I'm sorry -- including himself.

      And he says that, he laughed and told me that he just can't believe that.  Because he only talked to the individual who was accusing him of these things for about an hour.

      Told me that what he would wish.  When I asked him

JA835

DIRECT-SUAREZ

about what his hopes of the outcome.  He says that he could be sent to El Salvador to a maximum security prison.  Because he felt that that would be a better place.  Because he had family in that country.

Q.   What did his account of his legal situation tell you with regard to issues pertaining to this hearing?

A.   Well, it tells you he has an acute awareness of what's happening.  That again correlated with writings that he's done.  Kind of validate that.  And the fact that he is in fact facing charges of first degree murder.  And that the government is seeking the death penalty.  Tells you he is quite aware of his situation.

Q.   Did you ask him about his adjustments of jail life?

A.   I did.

Q.   What did he tell you about that?

A.   He told me, again, that he feels -- what I asked him was, how he's adjusted.  What problems he's encountered.

He told me that he thinks that people are prejudice against him because of his gang affiliation and the tattoos that he has on his body.

He told me he wakes up at 5 in the morning.  States that at about 7:00 a.m. has head count.  Usually showers daily, sometime between 9 and 11.  Gets dressed, eats breakfast.  Showers by himself.  Uses soap, shampoo, brushes his teeth.  Trims his toenails and fingernails every few

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 373 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 318 of 433
**JA836**

DIRECT-SUAREZ

weeks.  He says he does push ups in his cell.  However his cell was too small to do sit ups.

He says he played basketball a little bit.  But he doesn't like that sport in general.  Told me that again he prefers soccer.

When I asked him if he played any type of card games or anything.  He mentioned several, Rummy, Poker.  And a game called Con Quien with who.  And also mentioned a card game 21.  Which was, as he described it, was basically Blackjack.

I asked him if he corresponds or communicates with people while he's been in jail.  He told me he writes with other inmates in the county jail.

I asked him if he ever contacted the Salvadoran Embassy or Consulate in writing.  And he denied this, contacting them in writing, either office.

But I also asked him about his use of telephone.  He said he has used -- does not use it regularly.  But told me he's made about four or five calls since he's been incarcerated.  And explained to me that they have to be collect calls.  And told me that they cost about $3 per five to ten minutes.  He said he called his girlfriend on one of those occasions.

Asked him about commissary finances.  He told me that there were two sources.  One was the Salvadoran Embassy, and the other one was his girlfriend.  Who he specifically said

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 374 of 522
Case 3:08-cr-00134-RJC   Document 822   Filed 09/18/10   Page 319 of 433
**JA837**

DIRECT-SUAREZ

put in $70 into his commissary account.

And he told me that again, he does purchase things, and it requires him to fill out a form on a kiosk -- commissary kiosk. He has to put in his jail number, access number, and be able to put in the quantity and specific type of product he wants.

I asked him if he knew his balance on that date. He told me he apparently had only 4 cents in his commissary account so he wasn't able to get anymore products.

He also told me that at times that they fine him within the jail for infractions. He told me the fines were $5. That they would subtract from the commissary account.

He told me also that he had been contacted by the Salvadoran Embassy. And they told him that they visited him five or six months ago. This was five, six months from the end of September when I was there.

And he told me he had asked his attorneys about the number -- or to contact the embassy. But he finally got the telephone number from another inmate.

And when I talked to him about spiritual/religious needs. He told me that he had recently become interested in studying Islam. In fact, he had ordered a Koran.

Q. And what does this account of his adjustment to jail life tell you, if anything, about issues pertinent to this hearing?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 375 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 320 of 433
JA838

DIRECT-SUAREZ

A.    Well, basically, that he's able to use the resources that are available in the jail, to obtain things that he needs, at a level that's goes beyond what I would consider to be impairment.

That is, he knows about consular or embassy officials. He knows that there are representatives of his country in this country.  And he sought to contact them in order to help his situation, obviously.

And again, reviewing the letter that he wrote to the Consulate officials in Atlanta, he knew what he was asking for.  In terms of what his needs were, and what he was requesting in terms of assistance from those officials from those countries, representatives.

Q.    Anything in that account about his life in jail that allowed you to identify any adaptive functioning deficiencies?

A.    No.  He's got a scope of interest and needs that he's able to care for.  And apparently he's done it quite well.

Q.    Does that more or less conclude your one interview you had with him?

A.    Yes.

Q.    What did you do next in your investigation?

A.    The next thing I did is, I tested Mr. Umana.

Q.    Okay.  And by tested, do you mean, ran the standardized mental health tests?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 376 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/13/10   Page 321 of 433
**JA839**

322

DIRECT-SUAREZ

A.   Yes.  I gave him the Wechsler Adult Intelligence Scale, 3rd edition.  That was normed in Puerto Rico.  That's referred to as the EIWA-III.  I gave him the Test Of Nonverbal Intelligence, TONI-III.

I gave him an individualized spelling test from words that I took from letters that he's written.  And the words were words that he in fact spelled correctly.  And my purpose for doing that was to see if he would reproduce those, in fact, or if he could do them.

Either one, if he wasn't able to spell them, that would raise some question of either who wrote those letters.  Or potentially a low effort or malingering.

And if he did write them correctly, it would verify for me that he was able to write some of those letters.

I also gave him the Test Of Memory and Malingering, and the Minnesota Multiphasic Personality Inventory.

Q.   Okay.  Let's go through those one at a time, I guess. Starting with the -- well, I've been calling it the WAIS-III.  I guess the Spanish language -- or the Mexican edition is now called the EIWA?

A.   The Puerto Rican edition is --

Q.   Excuse me.  Puerto Rican edition.

A.   Yeah.  And it's just literal translation of Wechsler Adult Intelligence Scale.  It's that in Spanish.  That's why they just call it EIWA.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 377 of 522
Case 3:08-cr-00134-RJC   Document 252   Filed 03/18/10   Page 322 of 433
JA840

DIRECT-SUAREZ

Q.   First of all, why did you select that edition of the test as opposed to other editions?

A.   Well, from my experience, there has been problems with the Mexican WAIS, which would have been a possibility.  But starting in 2008, there was a -- it was called into question in terms of the -- their normative sampling of the population in Mexico.  And I was first made aware of that in 2008.

     And so -- also, Dr. Weinstein had given that.  I didn't want to give the exact same test.  So I chose the Puerto Rican WAIS.

     Puerto Rico is a country with much higher educational level.  And it's a U.S. territory.  It was a good test.

     It was standardized by the medical school at Ponce in Puerto Rico.  And it is being published and disseminated by the Psych Corporation, Pearson Assessments.  Which are people who disseminate the U.S. WAIS-III.

     As opposed to Mexico, who was licensed to published their own version.  This one is actually put out and sold by the same company that puts the WAIS-III out.

     And it's got very good sampling.  And it's got great reliability and validity.  And I felt that that was the most appropriate one because:  A, They're Hispanic.

     The culture is not that different from El Salvador.  Although as I noted, it's got a higher literacy rate.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 378 of 522
Case 3:08-cr-00134-RJC   Document 352   Filed 03/18/10   Page 323 of 433
**JA841**

DIRECT-SUAREZ

Q.    You said before a higher education rate.  And now you say a higher literacy rate.  You mean El Salvador?

A.    Yes.  El Salvador has about an 80 percent literacy rate.  The Puerto Rican population was about 94.  This was information taken by -- from the CIA Fact Book that is accessible on line.

Q.    And what effect, if any, would you expect that to have? That is, you know, the fact that the test you ran and normed had a higher education rate than that found in El Salvador?

A.    Well, again, it's a higher standard.  And therefore going from a country where you have 80 percent literacy to one where you have 94, is obviously going to compare you to a higher level of literacy.

And again, although we correct for age, we don't correct for education.  So we have an individual here with a second grade education, basically.  Who is going to be compared to a country where they have a much higher literacy rate.

Q.    Now, all this norming issue things I will cover later. So let's put that aside for now.

We did hear some testimony about past problems with the Puerto Rican version of this test.  Are those past problems pertinent in any way to the application of this test?

A.    They're not.  That was a test that was normed in 1968 or published in '68.  And if you gave it to people outside

Laura Andersen, RMR 704-350-7493

JA842

DIRECT-SUAREZ

of Puerto Rico, it would cause a higher level of, you know, inflate the scores.

The big problem was, it was still being given in the 1980's and 90s.  Which means you're giving a 20 -- 30 year old test.

That one was renormed, again, as I said by the medical school at Ponce in Puerto Rico.  And it's current, published in 2008.

And there's really no assumptions to be made that it isn't closer to El Salvador, for example -- and we'll discuss this later -- to that of the United States.  Which is a completely different culture.

Q.   Are these concerns that Dr. Weinstein testified about.  About this maybe not being a bad test because the prior iterations was a bad test.  Do you share those concerns?

A.   No, I do not.

Q.   Is there any support in the literature to support those concerns?

A.   I haven't seen a single article about it.  And again, that's why they publish the technical manuals with the reliability and validity studies that they've done with it.  Which is, by the way, how they began to see the problems with the Mexican edition of the WAIS.

These are very good.  As I said, they are published by Pearson Assessment Psych Corporation here in the United

**JA843**

326
DIRECT-SUAREZ

States.  It wasn't a licensing done to another country and then they did whatever they did.

Q.  Okay.

A.  It was more controlled.

Q.  All right.  We'll talk about norming and some of those issues later.  But let's just go over the results.

What scores -- what were the scores?  Are they documented here in your report?

A.  They are.  Mr. Umana achieved a full scale score of 93. Which is the 32nd percentile.  Again, compared to the population of Puerto Rico.

And the confidence interval -- or the standard error of measurement around that score was 89 to 97.

Q.  And the subscale results are on page 15?

A.  They are.  And again, those are scaled scores that are derived using his raw scores, and compared to the population of Puerto Rico.

So, in other words, this man functioning in the island of Puerto Rico, this U.S. territory, would be considered average, for the most part.  As far as intellectual functioning.

Q.  Okay.  And what -- this sounds like an obvious question.  What if anything does that score tell you about the first prong of the mental retardation test of the IQ score, two standards of deviation below the mean?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 381 of 522
Case 3:08-cr-00134-RJC   Document 1352   Filed 03/13/10   Page 326 of 433
JA844

DIRECT-SUAREZ

A.   Well, based on the criteria expounded in the DSM-IV or the AAIDD red book, means that he is not a candidate for the diagnosis of mental retardation.  Because he does not meet that first prong.  And you must meet all three.  Not just one or two out of three.  You must meet all of them.

Q.   Okay.  Tell us about the results.  What's the next test you ran?

A.   I gave him the test of Nonverbal Intelligence.  And he scored -- this is a test that does not involve words.  The instructions are not given word wise.  They're given in pantomine.

     And it's basically a visual test of abstract reasoning and problem solving.  And he scored an 85.  Which is a low average.  And his 95 percent confidence interval, the error rate around that says it could potentially be 77 or 93.

Q.   We heard some testimony about some concerns about running the TONI.  Is this the TONI?

A.   Yes.  That's correct.

Q.   Do you share those concerns.  And if so, what are they?

A.   I don't.  I wasn't using it as the primary test of his intelligence.  It is a nonverbal estimate of his intelligence.  But I was using it for two reasons.

     One, I was going to give him another test of symptom validity, known as the VIP.  That Dr. Weinstein commented on.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 382 of 522
Case 3:08-cr-00134-RJC   Document 352   Filed 03/18/10   Page 327 of 433
**JA845**

DIRECT-SUAREZ

It uses the same stimuli, although in a different order. And it gauges effort. And so it's a crosscheck on these two measures.

In other words, I know what he scored on. When you give this man the TONI, that's presented to him at hierarchically. That is from easier to increasingly more difficult problems.

And then later on I would give him the VIP, and see how he performs on that. Which is not given in order of difficulty, it's given randomly.

Q.   Okay. What was next test you administered?

A.   The next one was the individualized spelling test. And that again was 51 words that I gathered from different letters, one of them was to the Consulate of El Salvador in Atlanta, Georgia.

And I chose words that he spelled correctly in Spanish. And I administered to him. It ranged from very simple to more complex words.

This is not a standardized test. Again, as I noted earlier, I gave it to him to see if in fact he was capable of written some of those letters.

Q.   All right. And in this test, he didn't misspell words that he had spelled correctly from his mail from jail?

A.   No. He spelled them all correctly. And again, that's important because in some letters he does write

Laura Andersen, RMR 704-350-7493

DIRECT-SUAREZ

phonetically.  These were words that he did not write phonetically, that he wrote in actual Spanish and correctly.

Q.   What other tests did you administer?

A.   I gave him the Test of Memory Malingering.  Which is a test of effort and malingering.  That looks at the realm of memory.

In other words, it's looking to see, for example, sometimes we'll have people say, I don't remember.  I don't remember.  I don't remember.  They might be malingering memory.

In this case he did fine on that.  And in fact from looking at the narrative in my report, it's obvious that he wasn't malingering memory.  I didn't know that at the time.  But he scored well on that one.  He scored 48 out of 50 on first trial, 50 out of 50 on the second, and 50 out of 50 on the third.

And this is the test by the way that there is substantial literature saying that you must be cautious with the use of this test as well, if you give it to a mentally retarded individual.  Because they tend to fail it, even though they're not faking.

He did fine on this.

Q.   Okay.  And when you say it was obvious that he was not memory malingering, do you mean because of your prior interview appeared to be honest --

Laura Andersen, RMR 704-350-7493

**JA847**

DIRECT-SUAREZ

A.    Correct, yes.  The amount of information that he gave me, did not give me any initial cause for concern that he might be.  One never knows, but, you know, as I find out later looking at collateral things, he gave me very good information.

Q.    Okay.  All right.  So what other Symptom Validity Tests did you run besides the TONI?

A.    I gave him what's called the Validity Indicator Profile.  And I gave him a nonverbal test.  This is a test that has two parts.  One is nonverbal, and one is verbal.

The problem with the verbal is that it uses English words.  And obviously would be an inappropriate test to give him.  Because we can't measure his effort on foreign language that he doesn't know.

But the nonverbal one, again, can be given to him.  And it measures sustained effort, or lack of, that someone provides while taking this test.

Q.    What were his results on that?

A.    His results were that he was classified as an inconsistent responder.  Which says that it's invalid.

That he did not put as much effort into it as one would consider sufficient for other tests.

This test was developed to shed validity or lack of it on concurrently given tests.

For example, the WAIS and the TONI by itself, have

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 385 of 522
Case 3:08-cr-00134-RJC   Document 832   Filed 03/18/10 Page 330 of 433
**JA848**

DIRECT-SUAREZ

absolutely no safeguard against someone just not giving effort or malingering.  There's nothing within the test that can safeguard it.  There's a few measures, but they're not commonly known to people.

These tests, like the TOMM and the VIP are specific to that.

Now, the TOMM does not help us a lot on the WAIS, because that has to do with memory malingering or lack of effort.

The VIP does help us because it looks at nonverbal abstract reasoning, which has an overlap with the WAIS-III. There are scales in there that look at abstract reasoning that are nonverbal.

And so he came out as inconsistent.

The interesting part, however, I did not consider Mr. Umana to be purposely malingering.  I did not give him that designation.

And the reason is, when you look at the Validity Indicator Profile interpretative report that's generated by computer.  Because you can't score this by hand, it's very difficult.  It basically tells you that he did quite well.

In fact, it estimates his reasoning ability to be, at least, low average or possibly higher.

And what happens is, his performance curve on this, he began by doing fairly well.  In the easiest portion or the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 386 of 522
Case 3:08-cr-00134-RJC   Document 1352   Filed 03/18/10   Page 331 of 433
**JA849**

332

easier portion.  Than he kind of slipped down into random kinds of responses, and then he went back up.

And basically, if it wasn't for that little dip, he probably would have gotten a compliant valid profile.

But even with that little dip, which tells me he probably just didn't put as much effort as he could, they still estimate his reasoning ability to be at least low average or higher.

Q.   So am I understanding correctly, that the results of this test kind of help beat two impressions.

One, is just a general cognitive functioning.  The second whether he's giving his best effort on the test?

A.   Right.  It's the other way around.  Primarily how much effort he put into it.  And secondarily, that he's got fairly good reasoning ability, nonverbal.

Q.   All right.  Did you run any other symptom validity test?

A.   No, I did not.

Q.   All right.  So based on the total results, the results of all the symptom validity tests, what if anything was your opinion regarding overall level of effort, and/or the presence or absence of malingering?

A.   Well, the VIP tells us that he probably, might be slightly higher.  That what he did is the least he could probably do.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 387 of 522
Case 3:08-cr-00134-RJC   Document 662   Filed 03/18/10   Page 332 of 433
**JA850**

333
DIRECT-SUAREZ

But it doesn't tell us that he purposely feigned or malingered something.  He probably just wasn't that engaged in it for a period of time, and didn't put his full effort into that.

So we have to look at the concurrent test that we gave and ask, well, those tests may also be susceptible to that same test-taking approach in general.

Q.   I imagine the Court will take kind of a hard look at these WAIS-III scores.  So does this, am I understanding you correctly that this symptom validity test told you that perhaps if he had given more effort, he might have even scored higher on the WAIS-III?

A.   Correct.  Correct.  This is probably the gold standard for controlling effort and malingering in IQ tests.  And the reason, again, is because it has overlapping content areas.

Something like the TOMM doesn't have much of that with IQ tests.  This has a reasoning test and a verbal subtest, which unfortunately I wasn't able to give him because it wasn't in Spanish.

Q.   All right.  What was the next test you gave?

A.   The last test I gave was the Minnesota Multiphasic Personality Inventory.

Q.   Now, at the time you did this assessment, was I able to give you much information about what the defense team was asserting?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 388 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 333 of 433
JA851

DIRECT-SUAREZ

A.    Yes.

Q.    All right.  In other words, this MMPI, is this something you ran to test for mental retardation or some other purpose?

A.    No, it isn't.  It's for a second purpose.

Q.    All right.

A.    It's actually to look at the psychological status of the individual that you are testing.

In other words, if you look at the manual of the WAIS-III, it gives you a series of reasons why a person could score -- have low scores on an IQ test.  And they're not all because of low IQ.

And they mention specifically, psychopathology, anxiety, depression.  If someone is depressed or very worried, that may take away from their attention and concentration, and thus indirectly effect an IQ test.

In every neuropsychological evaluation that I do, I give an MMPI, which I was taught by Ralph Fraycon (phonetic spelling).  Who was the first person I was educated by in neuropsychology.  And that was the standard that we used in neuropsychology.

You give an MMPI to everyone you test who may have brain damage or are brain damaged.

And it's not to diagnose brain damage.  It's to look and see what the psychological status of that individual is

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 389 of 522
Case 3:08-cr-00134-RJC    Document 602    Filed 03/18/10    Page 334 of 433
JA852

DIRECT-SUAREZ

335

so you can see if there's any psychological conditions that might effect his test scores, that aren't directly because he lacks intelligence.

Q.   I see.  All right.  So did you find anything from your results in the MMPI that would impact on this IQ score issue?

A.   No.  The only thing I found was that he produced an invalid protocol.  And he produced an invalid protocol because the test picked up on, he overreported extremely severe psychological problems that obviously are so over the top, that are unrealistic.

And so the scoring, I ran a report that's called the Pretrial Criminal Report.  And it's specifically to assess people in a pretrial criminal area.

Let me mention about the MMPI, because there was some question about its applicability to Hispanics.

Unlike mental retardation, for example, schizophrenia and anxiety, are pretty much universal in how they present, and how people report.

And there's been innumerable studies done on Hispanic populations using the MMPI.

For example, they found basically no significant differences between Mexicans who took this test and U.S. citizens.

And again, it was given in Spanish.  And it was given

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 390 of 522
Case 3:08-cr-00134-RJC   Document 312   Filed 03/18/10   Page 335 of 433
**JA853**

DIRECT-SUAREZ

with the audio presentation.  He also had the booklet.  So he could read along if he wanted.  But he preferred the audio.

Q.   Okay.

A.   And let me add one more thing.  The test has an index that is built into the test, that can gauge if the individual was responding to the content.  That is, if they comprehended the items.  Or if they were just endorsing wildly.  Which could result in an invalid profile.

But the index that looks at that in Mr. Umana's case was well within normal.  That is, he actually responded to the content of the items, of which there are 567.

Q.   All right.  Any other tests that you ran?

A.   No.  That was it.

Q.   All right.  Before we get into kind of stuff that's previously been testified to.  Let me just go through them, if we agree with Dr. Olley, there's essentially the three-prong test for mental retardation.

Starting with the first prong of having a subnormal IQ score that's at least two standards of deviation less than the mean.

Do you have an opinion as to whether or not Mr. Umana meets that prong?

A.   No, he does not.

Q.   That's based on your WAIS-III score of 93?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 391 of 522
Case 3:08-cr-00134-RJC   Document 632   Filed 03/18/10   Page 336 of 433
**JA854**

337

DIRECT-SUAREZ

A.   That's correct.

Q.   And we'll talk about some of the specifics of that in a minute.

How about the second prong as to adaptive -- significant impairments of adaptive functioning.  Do you have an opinion as to whether or not he meets that prong?

A.   I don't believe he does at all, no.

Q.   That's based on the information you've given us previously?

A.   That's correct.

Q.   And then the third prong about whether or not -- of course, whether it's onset before the age of 18, presupposes there's something to -- some indication of something that occurred.

But is there anything indication that whatever brain injury or might have happened specific to age 18, versus say from a later car crash?

A.   No.  I didn't see, and I haven't seen any objective information of any kind that says, this individual was adaptively impaired as a young child.

And the other thing that's important, that's pointed out in the Diagnostic Statistical Manual, 4th edition, is that there are people who had -- who were classified as mentally retarded at a young age.  Who because they develop adaptive behavior, no longer meet that criteria.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 392 of 522
Case 3:08-cr-00134-RJC   Document 69-2   Filed 03/18/10   Page 337 of 433
JA855

So, in other words, mental retardation, for a few people, is not a lifelong proposition. Because, again, of that adaptive prong. If they learn to adapt, they may no longer qualify for that diagnosis.

Q. And therefore, do you have an opinion as to whether or not Mr. Umana is in fact mentally retarded now, or at the time of the offense, or even prior to that?

A. No. I don't feel he's mentally retarded for sure now. And again, I don't have -- we don't have any information that we would consider objective enough from his childhood to tell us that.

We've looked at the educational records that we were shown today. And there's nothing there that would tell us he's mentally retarded.

Q. Okay. All right. I want to go through then some of the issues that kind of were raised -- kind of balance some of the things you did before you took the stand.

Starting with the norming issues. The application of what norms to use for the WAIS-III IQ test.

And first of all, did you create a power point that would help to illustrate or some slides to help illustrate your testimony with regard to this?

A. I did.

Q. And I actually showed Dr. Weinstein the first few pages of that, have I not?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 393 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 338 of 433
**JA856**

A.    Yes.

MR. GAST:  May I approach the witness?

THE COURT:  You may.

(Government Exhibit A-1 was marked for identification.)

Q.    (By Mr. Gast) Doctor, I'm going to hand you a multi page exhibit marked Government's Exhibit A1.  If you will look that over and tell me what that is.

A.    Yeah.  These are the graphs that I generated in terms of looking at the scoring procedures used to score IQ tests.  And looking at the various scores that were obtained using the tests that I gave, and the tests that Dr. Weinstein gave.

Q.    Will the use of these help illustrate your testimony concerning norming practices and things of that nature?

A.    Yes.

MR. GAST:  Your Honor, we would move to admit Government's Exhibit A1.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit A-1 was received into Evidence.)

Q.    (By Mr. Gast) This is the first page of A1.  I believe I showed this to -- tell us the significance of this slide we're looking at here.

A.    This is the standard derivation of WAIS-III scores for

JA857

DIRECT-SUAREZ

all editions.

And basically, it would be all editions of the WAIS, no matter where they are. This is how you derive the final IQ scores.

You begin with the raw scores. You transform those to scale scores for each subtest that are included. And then finally you use the sum of the scaled scores to get the final IQ or index scores.

Let me say something about the standardized subscale scores. To standardize a test, it doesn't matter what test you use or you norm it. You give it to a random sample of the population.

You do it that way because you want it to represent the larger population that you will be addressing. How a person scores, relative on that test, to that great a population.

The minute you take the raw scores and you create scale scores which are standardized scores, you've now created the position that a certain score will have of the population that you're looking at.

In other words, if I score -- my raw score equals a ten, I know I'm an average on that subtest. Just like when I score 100. I know I'm right in the middle of the distribution of the IQ scores.

So, every test is intimately tied to the population on which it was normed. That's how you generate the

Laura Andersen, RMR 704-350-7493

341
DIRECT-SUAREZ

distributions and the score transformations for any test.
And it doesn't matter what type of test.

Otherwise, you've just got a test score.  And you have no idea how another population would score on this.  Because you don't have a norming.  You don't have a distribution of those tests.

So, B, is what really anchors you.  Then C, is, you assume, if you can, that you've got a normal distribution.  And then you can generate the final IQ scores.

But B is where you are really anchored to the population.

Q.   All right.  And this procedure, this is the procedure dictated by the directions given by the publisher of the test; is that correct?

A.   All WAIS tests.

Q.   All of them, doesn't matter which country?

A.   Doesn't matter.

Q.   Okay.  All right.  This one is labeled Optional Derivation Of IQ Scores For the WAIS-III Mexican Edition.

First, if you could start by explaining to us what problem arose with the Mexican Edition that caused this optional derivation.  Then go on to explain the test procedures that the producers suggested.

A.   In their technical manual and in their administration manual, they noted that there was an overrepresentation of

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17    Page 396 of 522
Case 3:08-cr-00134-RJC    Document 632    Filed 03/18/10    Page 341 of 433
**JA859**

DIRECT-SUAREZ

342

more educated Mexicans that overrepresented the proportion that actually exists in Mexico.

In other words, they said, there were more people of higher education. Which they classify as ninth to twelfth grade. And that because of that, you would underestimate someone's IQ scores. Because there were more intelligent people than was normal for that population.

So they said that if a clinician suspects that an individual may come up with a score that seems unduly low for their level of adaptation -- that's what they mean by clinical, the clinician, if they see this -- that you could correct it by first anchoring it in step B to the Mexican population. And then use the more normal distribution of the United States population that had more, you know, more bell-shaped numbers representing all different strata of education.

And so that's what they gave as a remedy for cases where you would have an underestimation of the IQ using the straight Mexican norms.

Q.   So this, then too, essentially -- this method as well, would be following the directions of the WAIS-III Mexican edition, as modified to attempt to correct this detected problem?

A.   Correct. And it needed some clarification. Because a manual, although to my understanding that's what it said.

Laura Andersen, RMR 704-350-7493

**JA860**

DIRECT-SUAREZ

It was argued against.  So I did contact the publisher.  And I had them send me some letters, which I've provided to you. That specifically said, you do not use the U.S. norms in step B.

Because if you do that, you've totally divorced that test from the population on which it was normed.  It's completely disconnected now.

Q.   Let me go ahead and go on to the next slide then.  In this slide, is that a representation of what Dr. Weinstein did?

A.   That's correct.  Instead of going from B to C-2.  He went directly to the U.S. norms.  Which means that test, that Mexican test, that has never been normed on the population of this country, ever, is now using the norms of this country to interpret that test.

The only way you could do that, is if you take that test, and give it to maybe bilingual speaking people. Because remember, it's in Spanish.

So if you give it in Spanish to Hispanics here, that maybe were born here and don't speak good English, they would flunk it.

But you would have to find perfectly bilingual people to give it to in Spanish.  And then you would have a normative sample of the population of Hispanics, not the general population.

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 398 of 522
Case 3:08-cr-00134-RJC   Document 252   Filed 03/18/10   Page 343 of 433
JA861

344
DIRECT-SUAREZ

So this is a test, again, that has never been normed on the population of the United States. It is a complete and total unknown, what that is.

In fact, it's completely opposite of the whole theory, in our profession, of what's called, norm reference testing.

To be able to relate a score, to a distribution of a population that you normed it on. If you don't do that, you've got a number and you have no idea what it means.

Q.   Now, you were here for us -- and I believe I'm paraphrasing, more or less correctly, Dr. Weinstein said, essentially, well, if you're being judged for the purpose of *Atkins* hearing. That is, you've got legal difficulties. You're trying to determine whether someone should be put to death in America. That you should use American norms. That's the population you should judge them against. Do you agree with that, and if not, why not?

A.   No. I completely disagree with this. We argued this in other cases *Atkins* hearings.

The truth is, that if you look at the definition of mental retardation in either the AAIDD or the DSM, mental retardation is a condition when you are subaverage to your population.

It doesn't -- you don't pick one population on this globe and say, we're gonna all be compared to this population, the U.S. population. Because there's other

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 399 of 522
Case 3:08-cr-00134-RJC   Document 352   Filed 03/18/10   Page 344 of 433
**JA862**

345
DIRECT-SUAREZ

countries with lower literacy rates, lower educational rates, where you can't say that half that population is retarded.

For example, the suggestion that Mr. Umana got a 93 on the Puerto Rican normed WAIS. And that he is really retarded. Really means that a 93 in Puerto Rico, is basically equal to a retarded person.

Which means that probably -- you would have to posit that they've got a 40 percent mental retardation rate in Puerto Rico. They probably wouldn't want to hear that. And that's a ludicrous suggestion anyway.

Because it means that the minute you step on an airplane and you're an average Puerto Rican, the minute you get to Miami or any other U.S. citizen, you automatically are transformed into a mentally retarded. At least on an intellectual basis. That doesn't make sense.

We're comparing Mr. Umana to the Puerto Rican population, as far as IQ, because that's as close as we can get to his population for which we have no norms.

If we did it to the Mexican, we would have problems with that because of the reliability, and the overrepresentation and the underestimation of IQ scores there.

So this is the best one that we could possibly use.

We could compare him to Europe, but now we're at a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 400 of 522
Case 3:08-cr-00134-RJC   Document 852   Filed 03/18/10   Page 345 of 433
**JA863**

346
DIRECT-SUAREZ

whole different culture, a European culture with a whole

different level of education and literacy.

Q.    Including Spain?

A.    Including Spain.  I mean that would be, I guess, my

third choice.

But the last choice that I would do is compare him to

the United States.  Because that's again like taking someone

from Pop Warner Football and putting them in the NFL or

college.  And that doesn't make sense.

And we can't say that this country is comprised --

Puerto Rico especially, is comprised of the 50 percent

mental retardation rate.

We know that the rates of mental retardation are pretty

consistent across countries.  They range from 1 to

3 percent.

So we can't posit that there's one country that has

50 percent of its population in the mentally retarded range,

with respect to IQ tests, doesn't make since.

Q.    And recognizing that's your opinion, is your opinion

controversial amongst your peers?  I mean, is this something

normally done and you just disagree with it?  Or is it

Dr. Weinstein did the aberration?

A.    I have never -- outside of Dr. Weinstein's procedures,

I have never seen anyone take one test and use the norms

completely of a different country.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 401 of 522
Case 3:08-cr-00134-RJC   Document 352   Filed 03/18/10   Page 346 of 433
**JA864**

347

DIRECT-SUAREZ

I've asked people this.  I've asked the publisher of the U.S. WAIS here in this country.  And they can't believe someone would do that.

I mean, we've heard Dr. Olley talk about the ABAS.  Why wouldn't you give it.  They have a translation of the ABAS in Spanish.  It's in their manual.

Why wouldn't you give it in Spanish to someone in El Salvador.  Because then you would have to bring it back and use the United States norms to interpret it.  That Spanish thing wasn't ever normed on the United States.  That was essence of his testimony.  And I agree with that.

For the same reason, I wouldn't do what Dr. Weinstein did, for the exact same reason.

Q.   For purposes of IQ testing, should it or does it matter why you want an IQ test for how you should norm it thereafter?

A.   An IQ test -- an IQ is an IQ.  You would evaluate anybody for what their IQ is, in the exact same way.  It would not vary by anyone.  If they're from Salvador.  It would be great if we had a Salvadoran normed WAIS-III.  We don't, you use the next one -- the next best thing.

And the reason why it's being asked has absolutely no pertinence.  That's a clinical test that we give.

The other reasons are political or legal.  And we have no part doing that.  That's not our role as psychologists.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 59-2  Filed 03/23/17  Page 402 of 522
Case 3:08-cr-00134-RJC  Document 352  Filed 03/13/10  Page 347 of 433
**JA865**

DIRECT-SUAREZ

Q.    All right.  And so if the Court's question that was addressed to Dr. Weinstein were addressed to you.  It almost sounds like the beginning of a joke.

But if three El Salvadorans walked in your office, and all of them wanted IQ test.  One of them because he wanted to know how smart he was.

The other because he wanted to determine whether or not he was eligible for government benefits.

And the third because he was facing the possibility of the death penalty and wanted to hopefully avoid it.

Would that matter or should that matter as to how the test is administered, and in particular, how it's normed?

A.    It shouldn't matter at all.  You take the best test closest to the norm of their population from which they were taken from, and you use that test, period.

Q.    And we heard testimony from Dr. Weinstein that, you know, someone walked in just wanting an IQ test just because they wanted one.  That he wouldn't do it.  I don't know whether it was professional reasons or what.

But do you know of any limitation, ethical or practical, or as a matter of procedure in your field, that would prevent somebody from giving an IQ test just if they want one?

A.    Well, it's not commonly done.  Put it that way.  First of all it's very expensive.  So many people don't do that.

Laura Andersen, RMR 704-350-7493

**JA866**

DIRECT-SUAREZ

I've known people who have gotten IQ tests because they wanted to qualify for Mensa.  Which is really a nonclinical reason to get an IQ test.

Q.   All right.  Tell us about this slide.

A.   This slide is looking at Dr. Weinstein's data.  And let me start by directing your attention to the burnt orange or yellowish brown in the center that says 67.

That's using the Mexican norms completely, like in that first depiction.

Q.   Straight A, B, C?

A.   Yeah.  Straight A, B, C.

Now, you look at these arrows.  That's the confidence interval.  The arrow goes up and down.  And it is extremely wide.  Most of it is in that cutoff of 70.

But basically, what you look at is, the Mexican WAIS said, it might be an underestimate.  So they offer a way to remedy this.

Now, when you go to the left and you see that 66, which is Dr. Weinstein's remedy.  It's not much of a remedy because it results in an IQ score that's lower than the one that was supposedly underestimate -- an underestimate.

When you use the correct form of using the U.S. norms that was in the manual, what you get is to the right, that blue bar.

What you get is an increase in IQ.  Because now we're

**JA867**

DIRECT-SUAREZ

using the distribution of IQ's in the United States, which is more symmetrical, more bell shaped curve.

But we've tied the initial scores to the Mexican population. So we kept it tied to Mexico. But we're just using a more normal curve of the IQ's.

But again, that 66 is not much of a remedy, if you think that the 67 is an underestimate.

Q. So in this center bar, this large arrow, this -- of the confidence interval, is that due to that aberration in the data on the bell curve you were discussing earlier?

A. Partly. The other part is, I've tried to replicate some -- their confidence interval equations. I think they made a mistake by doubling where they should have divided.

But that's something they'll have to work out. This is why I no longer use this test, because it raises too many questions.

Q. Just for the sake of clarity then. This first bar, that's what Dr. Weinstein did, which is this, correct?

A. Correct. That's correct.

Q. All right. And then the middle bar is, if you just ran a straight A, B, C?

A. That's correct.

Q. Okay. And then the blue bar then, is if you take the kind of hybrid, I guess, for lack of better term, means that the test preparers themselves recommend as a way to

Laura Andersen, RMR 704-350-7493

DIRECT-SUAREZ

compensate for that flaw in their data?

A.    That's correct.

Q.    All right.  This slide titled, Relationship of Verbal Performance and Full Scale IQ Score, tell us about that.

A.    Well, this kind of illustrates a little further what the problem is with the Mexican WAIS and their underestimation of IQ's.

If you look at the Mexican.  Which is the yellowish bars.  You notice that the verbal IQ that Mr. Umana obtained on the Mexican WAIS is a 75.  That's the fifth percentile. And it's in the borderline range.  The middle of the borderline range.

His performance was 78.  Which is in the upper part of the borderline range.  Eighty would place him at low average.

You take those two and then you look at what happens when you get a composite.  That is, summing the scale score. He gets a 67.

So he gets two borderline scores, well in the borderline range.  But when you compute that final thing, it knocks him down to 67.

That's part of the flaw in the Mexican norms.  If you look at all the other.  And we start with the black.  That's using Dr. Weinstein's procedure, using all U.S. norms.  And you notice that the verbal and the performance, the verbal

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 406 of 522
Case 3:08-cr-00134-RJC   Document 252   Filed 03/18/10 Page 351 of 433
**JA869**

DIRECT-SUAREZ

is 70, 68, the full scale is 66.  So they're all kind of under that line below 70.

If you take a look at the way the publisher recommends that you do it, you notice that his verbal is 80.  His performance is 73.  And his full scale is 75.

That tells us, again, all those scores are above the 70.  You don't get the discrepancy like you do in the next one.  Two borderline and then they're extremely low score.

Q.    Let me interrupt and ask, because I don't know.  Which set of raw scores are you using for those three representations; is that Weinstein or yours?

A.    The black is Dr. Weinstein's approach of using all U.S. norms.

Q.    I get that.  What I mean is, the actual test taking, the raw scores?

A.    Okay.

Q.    Are you using raw scores from his --

A.    The black, the blue and the dark yellow, are all Dr. Weinstein's testing.

Q.    Okay.

A.    The third one is the testing I did.

And again, you notice the relationship between the verbal and performance and the full scale.  It's got a connection.

The only one that is totally disconnected is the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 407 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 352 of 433
**JA870**

DIRECT-SUAREZ

Mexican WAIS.  Using all Mexican norms, it disconnects the verbal and performance almost completely from his full scale IQ.  That's the underestimation problem that they have.

Q.    Okay.  And I think we heard testimony before from Dr. Weinstein, that the full scale IQ score is not an average of the verbal and performance?

A.    That's correct, yes.

Q.    Despite the fact that it's not an average of those two numbers, you still nevertheless would expect to see some similarity or closeness in the numbers.  Do I understand that correctly?

A.    Yes, you do.  And that's what you see in the data with the black, the blue and the yellow.  That is that the black, you've got consistency there.  The blue you got consistency. The red you've got.

The Mexican problem, again, is, you've got two borderline scores.  And then the full scale which is a composite, is down in the 67 range.  Which is -- or the 67 level, which is incongruent.

Q.    All right. We have one more.  This one's titled WAIS-III full scale IQ scores obtained from doctors and Weinstein and Dr. Suarez.  Tell us what comparing here?

A.    That's basically the block is Dr. Weinstein.  The way he computed the scores, using all U.S. norms.  The 67 is the Mexican -- all Mexican norms.  The blue is doing it with

Laura Andersen, RMR 704-350-7493

**JA871**

DIRECT—SUAREZ

the -- what you call the hybrid.  The optional scoring method using -- the very last step using the American norms.  And the 93 is the Puerto Rican WAIS using all Puerto Rican norms.

Q.   Okay.  And just so we're clear, the blue column, this what we call the hybrid, that's the A, B and then go to C-2, instead of C.  Did I understand that right?

A.   Yes, correct.

Q.   Is that the current recommended practice -- I say recommended by the publisher for scoring the Mexican WAIS?

A.   That's correct, yes.

Q.   Okay.  All right.

A.   If the clinician suspects that the number is an underestimate.  If the full scale is an underestimate.

Q.   All right.  Yeah.  What Dr. Weinstein did, which is going straight from A to B-1 to -- B-2 to C-2, that is, in step B, jumping right to the U.S. norms.  Does anyone recommend that procedure other than Dr. Weinstein?

A.   I have never seen it written -- I've seen a couple of people say that you can do it, that but they're basically people who have been involved in buttressing Dr. Weinstein's procedure in other *Atkins* cases.

I have never known any psychometrician or statistician.  I was trained in graduate statistics.  I taught it.  That is a complete violation of norm reference testing.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17  Page 409 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/13/10  Page 354 of 433
**JA872**

DIRECT-SUAREZ

Q.   All right.  Now, the effect in this case, it appears from this exhibit, was essentially to lower the score.  From following the directions, you go from 75 to doing what Dr. Weinstein did, down to 66.  Is that typical?  In other words, if you did this routinely in a multitude of cases, it would consistently go down?

A.   Absolutely.

Q.   All right.  Let's go on to the Flynn effect.  We heard some testimony about that.

     And the general testimony in terms of, you know, that there's been identified this inflation of means over time.  And that people who ascribe to it, generally consider it to be approximately .33 per year.  Is that much generally correct, at least in the literature?

A.   That's what the Flynn effect is, yes.

Q.   All right.

A.   Point 3 per year.  Basically three points per decade.

Q.   I believe I'm paraphrasing Dr. Weinstein correctly.  That he was testifying, essentially, that the Flynn effect is not controversial in your field; do you agree or disagree with that?

A.   No.  I completely disagree.  It is controversial in the field.

Q.   Why is that?  Why is it controversial in your field, if you know?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 410 of 522
Case 3:08-cr-00134-RJC   Document 552   Filed 03/18/10   Page 355 of 433
JA873

DIRECT-SUAREZ

A.   Well, it's controversial for several reasons.  Number one, no one knows why it's occurring.  There are theories that it could be due to nutrition.  Most people don't think it has to do with people getting smarter.  They don't know what causes it.

So, again, doing these transformations is really not wise when you don't know what the phenomenon is tied to whatsoever, you just know.

And let me refer to a -- the Division 33 and APA, which is the division of which Dr. Olley says he's now the current president of, they had a very good series of articles on adaptive functioning.  But one that caught my eye was a letter to the editor by Roger Moore, who is a psychologist.

And he wrote a letter and it's entitled, Modification of Individual IQ Scores Is Not Accepted Professional Practice.

In which, basically, he argues specifically, that the modification of IQ scores, based on the Flynn effect, you shouldn't do it.

He notes that the publisher of the WAIS does not go along with this.  He noticed that again, in Denmark and Norway, these phenomenon have been reversed.  I've read articles on this happening in Great Britain, as well.

He noticed that some of these studies have used different IQ tests, when they go from the first testing to

Laura Andersen, RMR 704-350-7493

**JA874**

DIRECT-SUAREZ

the second.  So they're comparing apples and oranges, specifically.

And lastly, that they shouldn't use it because ethnic -- it's like correcting for ethnic things within the United States; having one for Mexican/Americans, one for Italian/Americans.  You don't do that.

Basically the article isn't -- I'm not saying that this proves that you should or shouldn't.  What I'm saying is, it really highlights the point that this is not something that's been settled by everybody.

And that there's a lot of discussion and a lot of reasons why you should not consider playing around with the IQ scores that are obtained by an individual through legitimate means.  And begin subtracting things based on a phenomenon that you have no idea why it's occurring.  And that it occurs differently in different countries, and seems to have reversed in some countries.  You don't begin to do that routinely.  That's why it's controversial.

Q.   Even if we grant that it exists and should be reduced, having applied the Puerto Rican WAIS in your test, since that was normed in 2008, that would be a very minimal, just a third of the point reduction, correct?

A.   Correct.

Q.   All right.

A.   Or even if we take it from the date of the actual

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 412 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/13/10   Page 357 of 433
**JA875**

DIRECT-SUAREZ

norming occurred in 2007, for example, talking about half a point, .6.

Q.   Okay.  And do you ever see the Flynn effect, even for those people who do agree that it's a problem on that side of the controversy.

Are IQ scores routinely reduced to take into account the Flynn effect in any other context, other than an *Atkins* context that you have seen?

A.   I haven't seen that, no.

Q.   So if the guy, the El Salvadoran guy comes into your office and says, I just want to get into MENSA, see how smart I am.  Even if you are a fan of the Flynn effect, you wouldn't be reducing it in that context.  It's only in these context that we see it typically, is that correct?

A.   Correct.  And when children are tested for admission into the gifted program.  I think you would see controversy if you begin telling parents, I'm sorry, the Flynn effect says your child can't go to the gifted program.

I mean, I've never seen a single educational IQ testing, when they are in fact testing for intelligence, deducting points for the Flynn effect.

Q.   The practice effect.  We heard some testimony about that.  I guess I'll just ask you, given the circumstances of your testing of Mr. Umana, do you have concerns, or do you not, with regard to the practice effect in these particular

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 413 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 358 of 433
**JA876**

DIRECT-SUAREZ

circumstances?

A.   The practice effect can occur, there is no doubt. Because part of what a test does is, it presents you with novel situations that you're not used to in every day life.

And that's specifically true for the nonverbal part of the WAIS, the performance tests.  They're not something that you run into every day.  So novelty does play a role.

So there is a practice effect that usually runs five points improvement from one test to the other.

But let me put a caveat here.  When you look at the research that was quoted in the WAIS technical manual, with regard to the practice effect, this information was acquired from the first WAIS that was published in the 50s'.

And what they note real clearly is, although many people score higher on the second testing, people also score lower.  So it's not an automatic thing that you're going to improve.  People in that sample went down.

So it's, again, that's another iffy thing on, if some people get worse, than should we routinely subtract points because of practice.

Like I said, the full scale IQ, sometimes at most, can go -- or in the norm, would go up five points on the second testing.  You could consider that.

Q.   Okay.

A.   But again, with that caveat.  That some people do worse

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 414 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 359 of 433
JA877

DIRECT-SUAREZ

on the second testing.

Q.    All right.  And am I correct that, given that you did yours -- just right about 12 weeks later, that tends to be on the outside edge of whatever effects there might be, or is your opinion different on that?

A.    There is no research on that, specifically.  That's the interval that was used back in using the WAIS -- the first WAIS in the 50's.  That's the interval that they use, two to 12 weeks.  We don't have data on what happens at 20 weeks, 26 weeks.

What they tell you in the manual is that by one or two years, the practice effect is pretty much gone.  And it goes quicker for the verbal subtest than it does for the performance.

So we don't have any curve that we could actually tell you, given this amount of time, what we call a regression line, here's how many points you ought to add or subtract.

And again, because of that reason, we don't know if everybody's going to improve or go down.

Q.    In your opinion then, based on all that you just described, do you feel it necessary to reduce the score in your result as a result of practice effect?

A.    I think you can consider it, you know, that it may happen.  I can't tell you how much to take.  You know, you could say take five, because that was the average.  But, you

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 415 of 522
Case 3:08-cr-00134-RJC   Document 60-2   Filed 03/18/10   Page 360 of 433
**JA878**

DIRECT-SUAREZ

know, then you would have to look and say, well, that average included people that went up eight or went down four, whatever.

So there's no systematic way to be assured when you begin playing with that level of adding or subtracting points to a test.

Q.   I want to talk about handcuffs.  You said the defendant did not have handcuffs on when he took your test; is that right?

A.   No.  I specifically requested that the cuffs be taken off.  Again, because I knew I would be asking him to write, to manipulate blocks on block design, to be putting in a digit, or symbol, codes.

And to be taking a rather lengthy test, the MMPI where he has to fill out 567 little bubbles.  And those handcuffs are pretty clumsy.

Q.   Were you privy to any information as to whether or not the defendant, Mr. Umana had handcuffs on during his testing conducted by Dr. Weinstein?

A.   Well, I saw a letter from Mr. Umana.  I don't remember who it was to.  But he has such an extraordinary description of his testing experiences, what went on.

And the fact that the person didn't notice that I was handcuffed.  And, you know, was having trouble with the handcuffs.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 416 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 361 of 433
JA879

DIRECT-SUAREZ

Handcuffs would absolutely affect every test that has to do with him manipulating anything with his hands or writing or drawing or any type of manipulation like that.

Q.   Moving on then to the Ray Fifteen Item Test.  I just want to ask you about that score of a nine that Dr. Weinstein got.  And you didn't give that test; is that right?

A.   I didn't give that test, no.

Q.   What, if any, opinion do you have about the score of the Ray Fifteen Item Test as administered by Dr. Weinstein?

A.   Well, number one, it is a screen test.  It doesn't have the -- what we call the sensitivity, in order to detect malingering.  Or the selectivity, in order to rule out that someone's -- or to rule in that someone's an anonymous responder, in the form that he gave it.

There is a form that you can use that raises those two things to acceptable levels.

But as he noted, some authors will recommend a cutoff of seven or less, eight or less, or nine or less.

Anyone in a situation like this that would score a nine, would prompt me to have some questions.  It would be a red flag.

As I said, in the form that Dr. Weinstein gave it, it is a screening test and not definitive.  But it does raise a flag.  Because that test is as easy as can be.

Laura Andersen, RMR 704-350-7493

JA880

363
DIRECT-SUAREZ

And, you know, part of the test is looking at 15 items that involve upper case and lower case. And you just, you don't have to know what Roman numerals are, you just have to see them and reproduce them. You don't have to say what they are or what they mean or what the quantity is.

Q. Okay. Moving on then. As one of the things that Doctor -- and I apologize, this is kind of an odd order. But these are things that just came up during the hearing.

Dr. Olley, amongst the tests that he gave to Mr. Umana, gave him, what I've been calling a geography test. Asked him some questions, where is the United States? Where is El Salvador on a map? Where is Charlotte? Things of that nature.

In your opinion, is that a good way to test for mental retardation?

A. Well, I don't believe he said he was testing for mental retardation. He was looking at adaptive functioning, just to get a feel for it.

But those are behaviors, that is, if you will note on my report, I noted go way beyond what we talk about in terms of the ability to adapt to everyday life. That's really above and beyond.

Which is why these adaptive behavior scale inventories don't even have driving a car as one of the scoreable items. Because that goes far beyond what being able to adapt to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 418 of 522
Case 3:08-cr-00134-RJC   Document 872   Filed 03/18/10   Page 363 of 433
**JA881**

364
DIRECT-SUAREZ

one's daily life in whatever context they find themselves.

Q.    And we've been talking about the ABAS, as kind of the typical form, although no one applied it in this case, either you or Dr. Weinstein.  But that's the typical way that people in your field ask questions about adaptive functioning; isn't that right, or a typical way?

A.    Yeah.  That's a typical and recommended way, to have at least one standardized test for adaptive functioning.  And again, that is a normed reference test.

And by that I mean, they gave that test to a normative sample, randomly chosen in the United States, across all areas of the country.  And that's what it's tied to.  So that's why I think Dr. Olley correctly said, he wouldn't give it, and then interpret it with the U.S. norms.  Because it's not normed on the population that's Hispanic.  So he wouldn't have any way of interpreting it.

You could do it qualitatively.  And what I mean by that, nothing stops anyone from using the translated form of the ABAS and asking those questions and presenting it to the court as, here's what people say.

But you wouldn't be able to compare that to a distribution here in this country.  Because it would be -- you wouldn't do that.

Q.    All right.  I believe the last thing that I wanted to ask you was about the defendant's use of code, both written

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 419 of 522
Case 3:08-cr-00134-RJC   Document 592   Filed 03/18/10   Page 364 of 433
**JA882**

365
DIRECT-SUAREZ

and spoken.

Are you -- first of all, familiar with the factual basis of that?  Have you reviewed some of those letters or calls or reports about them, and so contained in the discovery?

A.    I am.

Q.    Tell us what, if any, opinion you have, or how that data, or that information affects your opinion that you've given that he is not mentally retarded?

A.    Well, you have to look at the whole notion of what a code is and why it would be used.

Number one, you have to have something to say.

Two, you have to know that that's something that you want to say.  You don't want somebody, specifically in this case, authorities, to look at.

And then you have to put it in a form that's systematic, using a format where you transpose letters.  An A could mean Z -- whatever -- however you do that.

And then when you look at that, you have to be able to generate a letter.  Some of the letters I saw were quite lengthy.  And it was noted by Dr. Olley that Mr. Umana told him it took one or two days to write a one or two-page letter.

Well, I can't tell you the volume of letters I saw, but it was enormous.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 420 of 522
Case 3:08-cr-00134-RJC   Document 505   Filed 03/18/10   Page 365 of 433
**JA883**

366
DIRECT—SUAREZ

So that would tell me that this person has some things, acutely in his mind.  That he is well aware that other people would not see in the same way that he sees them.  And in fact, does not want other people to know it.  Some of those letters contain obvious reasons why you wouldn't want anyone to see that.

Q.   I'm sorry.  I lied.  I said that was my last thing, but I do have one more.

During that power point -- I can't pull it up.  But the power point the defense ran during Dr. Weinstein's testimony regarding -- you know, comparing the numbers as he ran them to the numbers you ran.  Kind of similar to what you did here, a little bit.  Were you able to see that power point?

A.   I was, yes.

Q.   You just kind of tell us, generally.  Do you agree with that comparison?  Is that a fair comparison?  If not, what if anything was wrong with doing what he did in that presentation to the court?

A.   It's a comparison that, really, you could take the norms that I did, and compare them to the Israeli WAIS, or the Argentinian WAIS, or the WAIS in England.  And you're going to get differences all the way around.  Because that's what different norming does.

It takes a test and it says, let's look at how this population does it.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 421 of 522
Case 3:08-cr-00134-RJC   Document 682   Filed 03/18/10   Page 366 of 433
**JA884**

DIRECT-SUAREZ

For example, we know that in terms of global, east Asians have the highest IQ using our measures. They score an average of 106. If you go to the United States, we score an average of 100. If you give it to subgroups, immigrants, Hispanics, African-Americans, you get another decrement. That's all you're showing.

So if you want to take any test and just start comparing it to the norms of Germany and different places in Europe, Israel, you're going to get changes.

The question is, do you want to cherry pick and decide which ones you're going to compare them to.

There is only one population that an individual being tested for intelligence or adaptive behavior should be compared to. And that is the population from which they were drawn, and from which they spoke, you know, lived in most of their life.

In Mr. Umana's case, it's obvious, this man doesn't speak fluent English today. So it's not like a Salvadoran in the United States.

There may have been Salvadorans in the normative sample, but these were people who spoke English, and were able to take the WAIS-III in English, which is the way it was normed. We don't have that with Mr. Umana. He doesn't speak English well.

Q.    Should his WAIS scores be normed to other people on

Laura Andersen, RMR 704-350-7493

JA885

CROSS-SUAREZ

death row?

A.    Well, no.  I mean, that doesn't even make sense.  Why would you want an average of people on death row.  That's -- you know, you would only be able to compare it to them.  And they are not representative of the U.S. normative population at all.

The average IQ sometimes in some jails is 85.  Well, that's not representative of the U.S. population.

And not everyone on death row is tested using the WAIS-III normed in the United States.  They're in fact tested with different tests.  If they don't speak English, you can't do that.

MR. GAST:  Thank you, sir.

THE WITNESS:  You're welcome.

MR. GAST:  I don't have any other questions.

THE COURT:  Cross?

CROSS-EXAMINATION BY MR. FOSTER:

Q.    Dr. Suarez, can you hear me?

A.    Fine.

Q.    Now you're being paid for your services in this case, correct?

A.    That's correct.

Q.    And how are you getting paid; hourly rate or flat fee?

A.    Hourly.  But our rate during my visits here, during the day, for a day rate.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 423 of 522
Case 3:08-cv-00134-RJC   Document 59-2   Filed 03/18/10   Page 368 of 433

**JA886**

369
CROSS-SUAREZ

Q.   How much is that?

A.   It's $3,200 per day.

Q.   How much were you paid to do the evaluations in the jail and the testing?

A.   Up to now it's been, it was approximately $17,000.

Q.   And you do a lot of these things for the prosecution, don't you?

A.   A lot of what things, specifically?

Q.   A lot of these evaluations?

A.   What is that?

Q.   A lot of these mental retardation evaluations?

A.   Well, for the *Atkins*, I've only been asked by prosecution.  I do mental retardation evaluations for other reasons, like first degree murders and other things like that, both for the defense and the prosecution and the court.

Q.   What was your Master's in from Baylor?

A.   My Master's was in psychology.  And if you're asking what my Master's thesis was in, it was in memory.

Q.   How about your Ph.D, what was that in?

A.   That was also looking at the issue of memory.

Q.   I notice looking at your list of publications here, is mostly on things that are not related to intelligence testing and mental retardation, correct?

A.   No.  I'm a clinician.  And I've been doing intelligence

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 424 of 522
Case 3:08-cr-00134-RJC   Document 636   Filed 03/18/10   Page 369 of 433
**JA887**

370
CROSS-SUAREZ

testing since graduate school.  But my research interest, because I've done statistics, I've done a variety of things.  Attention has been one of them, memory, both.

Q.   Plus stuff on taste aversion and obesity, correct?

A.   I don't think I've done a presentation on obesity.  I haven't done research on obesity.

Q.   Did you present a paper at Mercy Hospital?

A.   Correct.  That was not a research study.

Q.   So you haven't really published anything regarding intelligence testing or mental retardation, have you?

A.   No, I have not.  I have a lot of experience with mental retardation, almost on a weekly basis, in my practice.

Q.   Now, you've started out -- do you belong to -- do you know what Division 33 is of the American Psychological Association?

A.   I do.

Q.   What is that?

A.   That's a division that looks at intellectual deficits, mental retardation.

Q.   Do you belong to that?

A.   No, I do not.  I belong to the psychology and the law and the neuropsychology divisions.  But I do keep in touch with Division 33 on publication.

Q.   You're not board certified in anything, correct?

A.   I've got two certifications that go beyond my license.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 425 of 522
Case 3:08-cr-00134-RJC   Document 223   Filed 03/18/10   Page 370 of 433
**JA888**

CROSS-SUAREZ

The first one is the National Register for Health Service Providers in Psychology.

And that's an organization that was started by APA and then spun off. And that looks at your education, your training, your supervision.

And then qualifies you that you're able to have your name in the national register, under the areas that you are -- that they deem that you have proved that you have the education and training to do. That's the first one.

That also allows you to go to different states in the United States and obtain a license without having to take the national test. Because I qualified for having a high enough test not to do that.

The second certification that I have is from the State and Provincial Psychology Boards. And that's called a Certificate of Professional Qualification.

And that is a certificate, again, that looks at training, looks at your education. And there's an examination. And when you get that, you are also able to go to other states and obtain a license without taking the state exam.

Q.    But you're not board certified in a speciality?

A.    I don't have a specialty, no. I practice in the area of forensic, clinical and neuropsychology. Those are the specialities that I do, but I am not board certified in

Laura Andersen, RMR 704-350-7493

**JA889**

CROSS-SUAREZ

those.

Q.   And you agree with Dr. Olley about his testimony about the three prongs of mental retardation, correct?

A.   Yes, I do.

Q.   But what about his testimony about assessing adaptive behavior deficits in a prison setting.  You're aware that he thinks that is inappropriate, correct?

A.   Sure.  All I can tell you is, that's not a subtle thing.  There's quite a few references -- if you would like me to read them to you -- about people from the AAIDD that are very prominent, that have specifically talked about how to do that.

Q.   Well, you're aware of a chapter that Dr. Olley wrote about, stating that experts in the area pointed out that restricted and structured environment incarceration, makes it impossible to assess typical adaptive behavior?

A.   Sure.  That's why I don't rely 100 percent on the observations and reports from the jail.  That's one slice of the pie that you can correlate with what's known about other cases.

Q.   Well, in this particular case, though, you didn't seek to interview anybody in other phases of his life other than inside the jail, correct?

A.   That's the only people I did.  But I did have information regarding his activities.  And now we have

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 427 of 522
Case 3:08-cv-00134-RJC   Document 62-2   Filed 03/18/10   Page 372 of 433
JA890

373
CROSS-SUAREZ

information from his country of nativity, his family, specifically.

Q.    But that information is through him, correct?

A.    No.  I'm talking about what Dr. Olley testified to, that he did interview some people.

Q.    Okay.  But you didn't obtain that information during your evaluation?

A.    No, I did not.

Q.    And so you, in your analysis, relied, for the adaptive behavior deficit analysis, on his own self-reporting?

A.    That's one.

Q.    And on three jail guards?

A.    Three jail guards, his writings and the interview, just his presentation.  And the information collected by law enforcement.  I listened to tapes of his conversations on the telephone.  And I read innumerable letters involving code and no code.  And his ability to discuss problems and his concerns.

Q.    Well, none --

A.    Let me mention one thing.  I'm not finished --

Q.    None of what you did was retrospective --

A.    I'm not finished yet.

I also looked at his medical chart at the Mecklenburg County jail.  Where he requested help with medical problems, dental problems, headaches.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 428 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 373 of 433
**JA891**

374
CROSS-SUAREZ

And I also looked at his disciplinary files where he's had some problems there.

Q.    But none of the things you're looking at, are previous to age 18, or previous to him being incarcerated, correct?

A.    Well, I don't know if there's anything objectively that I've heard that exists about anything about prior to age 18, other than his school director who wasn't there when he was there, talking about the grades that he got.  And extrapolating from that what happened when this individual was in that school.

Q.    Well, you've heard today through Dr. Olley, and you've seen in his report, you know that these other sources of information do exist, that you didn't have at the time you did your report, right?

A.    That's correct, I didn't.

Q.    And so now you're aware that the defendant was held back in third grade, what twice?  Which you didn't know that before, did you?

A.    No, I did not.

Q.    And you didn't have any of the details about what the director of the school had to say about what it meant to be held back in third grade, correct?

A.    Well, again, I don't know -- I would not give that a lot of weight, since he obviously wasn't there when that happened.  And he was, apparently, according to Dr. Olley's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 429 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/18/10   Page 374 of 433
**JA892**

375

CROSS-SUAREZ

testimony, extrapolating that from the sheet of his grades.

I don't know how you do that.

Q.   Well, you didn't make any attempts to get any information from El Salvador, did you?

A.   No, I did not.

Q.   So you rely entirely on what is the current information, and ignore everything that came before, correct?

A.   No.  I looked at what's there.  If what's there does not appear to that adaptive deficits, it really doesn't matter what came before.

Because we have to look at his IQ and his adaptive impairments as is noted in all the literature, has to be concurrent.  They have to occur together.  You can't have one out of three, two out of three.  You have to have three out of three.

Q.   So once you get an IQ over 70, you stop looking?

A.   No.  Obviously, if you read my report, you'll notice I didn't stop looking.  I did some more.  The things that I've noted.

Q.   Now, are there any kind of -- earlier, when Dr. Weinstein was testifying, you were over passing papers to the prosecution.  And giving them advice and consultation on how to cross examine Dr. Weinstein?

A.   I did.  I was looking at the presentation and making

Laura Andersen, RMR 704-350-7493

**JA893**

CROSS-SUAREZ

some commentary, yes.

Q.   So you were serving then in a role as a consultant to the prosecution, correct?

A.   Absolutely.

Q.   Doesn't that conflict with your role as a forensic examiner in this case, providing an expert opinion?

A.   No.  My expert opinion was based on my testing and what's in my report.

The consultation I was giving them, was looking at things that were being presented by a colleague.  And being able to make some comments on what the nature of what was being presented.  And if all of it was to be accepted at face value.  Or if there was questionable.  On the basis of our literature and what we know in psychology.

So that part, yes, that was consultative.  And that's precisely what I'm there to do.

Q.   Isn't there an ethical standard within the American Psychological Association that discourages or prohibits wearing two hats in the same situation, serving as a consultant at the same time that you're serving as a forensic expert?

A.   No.  Because, again, my evaluation of this gentleman was done objectively using the tools that I noted on my report.  And it's very common in all states, that if you are appointed, for example, by a court to do competency, and you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 431 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 376 of 433
**JA894**

377
CROSS-SUAREZ

say -- whether you say they are competent or not, one side or the other is going to ask you for elaboration and explanation of what you mean.  And they're going to ask you why yours is different from say the other side.

And it's that type of consultation that's 100 percent appropriate.  You're not being an advocate.  You're basically telling them what you know.  And that's perfectly legitimate.

Q.   So you say you don't have any interest in the outcome of this hearing?

A.   I surely don't.  My interest is in supporting my methodology and my results.

Q.   Now, you interviewed these three jail guards.  And we kind of skipped ahead.  And you read pretty much what Officer McIntyre told you.

But all these things that he told you, about things that Mr. Umana could or couldn't do, you weren't able to -- I mean, you basically wrote down what he told you.  You didn't see any of this yourself, correct?

A.   Well, I did a lot of it myself.  Because I did talk to the gentleman for quite a few hours.  And I did see him function.  And we did have, obviously, a lengthy conversation about his life from childhood to the present.

So I was able to correlate some of what was told to me.  And I was able to tell you that this man speaks good

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 432 of 522
Case 3:08-cr-00134-RJC   Document 602   Filed 03/18/10   Page 377 of 433
**JA895**

378

CROSS-SUAREZ

Spanish, totally understandable, and was able to communicate. So, some of that I can correlate.

Q. So you relied on what Officer McIntyre told you?

A. In part, yes. As I did the other two officers.

Q. And one of the things he told you was that Mr. Umana was in protective custody unit, which is where inmates are housed when they're going to testify against others, and would be in danger of being harmed by other inmates, correct?

A. Correct.

Q. Do you have any information that Mr. Umana is testifying against someone else?

A. No. He said that that's where the unit -- that's where they put -- that was an example. I don't have any information that he's testifying against anybody.

Q. One of your sentences in your report here under Officer McIntyre says this, when asked about Mr. Umana's daily adaptive behavior functioning in the jail, Officer McIntyre states that Mr. Umana has not exhibited any difficulty in any area of functioning.

Is that considered professional procedure to ask a lay person whether they've noticed any adaptive behavior functioning?

A. Well, let me point to you to a couple of sources. The first one is the DSM-IV. And it states in there that the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 433 of 522
Case 3:08-cr-00134-RJC   Document 60-2   Filed 03/18/10   Page 378 of 433

**JA896**

CROSS-SUAREZ

presenting symptom in mental retardation is adaptive functioning, it's not IQ. People can't see IQ. But they can see if someone has difficulty going about their daily business. And it could happen within a jail quite easily.

Q. So, when you ask a jail guard, hey, have you observed any daily adaptive behavior functioning observations about this defendant; you're assuming that they understand what that means?

A. I explained to them what that means, yes. At the very beginning of my interview, I tell them what adaptive functioning is. I tell them why we look at it. And why they're being interviewed, yes.

Q. Well, you understand and agree with Dr. Olley that adaptive behavior deficit testing, is all about -- or that prong of the mental retardation definition, is not about what people can do, it's about the deficits in what they can do.

I mean, it's the things they can't do, is what I'm trying to say, correct?

A. Yeah. It depends on what degree they can't do. How many things they can't do.

Q. I mean, there's the -- one of the definitions out of AAMR book, the red book on mental retardation, is that -- or one of the considerations or analytical assumptions is that, within an individual, limitations often coexist with

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 434 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 379 of 433
**JA897**

CROSS-SUAREZ

380

strengths, correct?

A.    Correct.

Q.    And there's a lot of people who qualify as being mildly mentally retarded who can do a wide variety of tasks, successfully, correct?

A.    Well, they can't do all the tasks under one of the three areas, conceptual, practical and social.  Or else they wouldn't be classified as that.

Q.    Right.  But, I mean, there is a wide variety of things that they can do and still be mentally retarded?

A.    Well, they can do the degree, yes.  As Dr. Olley also noted, that in grade school, mildly mentally retarded kids will need help with school.  As adults, they need supports.

        Again, that's why I asked him if he's been given any type of support during the time he's been incarcerated.  And there hasn't been, other than language translation.

Q.    I mean, the fact that -- according to a detention officer, the defendant is able to do whatever he needs to do in jail, doesn't rule out mental retardation, does it?

A.    No.  But it doesn't rule in it.  Because there's no identifiable deficits, and that's what we're looking for, according --

Q.    Well, you would agree that a jail setting, incarceration in protective custody, is a much, much more restricted environment than what a normal person lives in,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 435 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 380 of 433

JA898

CROSS-SUAREZ

right?

A.   Depends on the adaptive behavior you're looking at.  If it's brushing your teeth, no.  If it's talking, being able to make eye contact, being able to cut up your food before you eat it, use utensils, no.  You can see all of that.

Q.   What about making decisions about what you're going to do each day and where you're going to go.  That's not an option that someone in protective custody has, is it?

A.   Not that one.  But decisions that are reflected in his writing, very much show decision-making processes and planning.

So there's a lot of things that you can see in jail if you have access to the information.

In this case, there's an overabundance of information from letters that he's written and conversations he's had, that give you a window into his adaptive functioning.

Q.   If he was not incarcerated and was free living in a residence like anybody else, that would present much more opportunity for an observer to view other areas of adaptive behavior deficits that would not be manifested in an incarceration situation, correct?

A.   Well, that's correct.  As I noted, there's a lot of things you won't be able to see because he's incarcerated.  And that's why we look at collateral information.  That's why I took a history of his work history.  Some of it which

Laura Andersen, RMR 704-350-7493

JA899

CROSS-SUAREZ

was validated by Dr. Olley's interviews in El Salvador. That's why we do that. Because you do want an overall picture of what this man has done. And some of these things are verifiable, like his trip to this country. No one argues that.

Q.   The vast majority if what he's told you in self-reporting, were not things you could go verify, correct?

A.   Well, we could verify that he came from El Salvador to the United States.

Q.   But you can't verify how he got here, can you?

A.   No. All I can tell you is what he told me. We can verify some of his travels in the United States.

Q.   And he told you that he came with a friend, correct?

A.   That's correct.

Q.   In fact, all his self-reporting to you about his journeys, included that he was with a friend, correct?

A.   Well, the one from Salvador to the United States was with a friend. Then he went by himself with his girlfriend to New York.

Q.   With his girlfriend?

A.   Correct.

Q.   So he wasn't by himself?

A.   Yeah. Who had just arrived in this country, yes.

Q.   So in each of those circumstances he was with someone

JA900

else?

A.    Yeah.   No indication that the person with him was the one directing or doing the behaviors.   That he told me, he bought tickets, not his girlfriend.

Q.    And no indication that they weren't doing those things?

A.    What's that?

Q.    You have no way to say that that person wasn't helping him, correct?

A.    Well, I can tell you what he told me is, he bought tickets.   And he made phone calls.   And he took -- he drove her to the doctor.   So there is, from his reports, he's telling me, that's --

Q.    Now, isn't it common for someone who is low average or mentally retarded, who is aware of his status, to cover and to exaggerate their achievements in telling other people of them?

A.    No.   That's very faulty data that's used to support what was mentioned by Dr. Olley, the "Cloak of Competence".

      And let me read you something from the "Cloak of Competence" that's very important that -- there's only one source and one source only, that's noted in the red book when it's referring to the "Cloak of Competency".   And that's the book, "Cloak of Competency" by Edgerton.

      And Edgerton, what he did is, he looked at a group of 110 people that were discharged between 1949 and 1957 from a

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 438 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/23/10   Page 383 of 433
JA901

CROSS-SUAREZ

Pacific coast hospital in California.

Out of that 110, he was able to find 48 that he studied. Now this was the basis of what they were referring to as research and study.

Out of that 48, 14 of them had IQ's above 70. Some of them as high as eighties. And so out of this, he formulated the fact that they were trying, as what he termed in his book, to pass. That is, to pass as a non-impaired, non-mentally retarded individual.

However, on his follow-up, which was done between, I think, 1972 and '73, I'll read you verbatim. It's on page 201.

"What these individuals told us in 1972/1973, and what we observed about their everyday activities, made it abundantly plain that what mattered most to them was not stigma or passing and not ability to work, but the quality of their lives."

In other words, they were stuck in this Pacific coast hospital where people were asylumed. Basically, that's what it was. They were warehoused. It was a time when mentally retarded individuals were not treated with the deference that they're treated, and with the care that they're treated with today.

Those people were interested in not appearing mentally retarded or trying not to, so they wouldn't have to be

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 439 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 384 of 433
**JA902**

CROSS-SUAREZ

locked up in the Pacific coast hospital for another 10 years.  That's what it's based on.

So you've got 48 people minus 14 to begin with, which is not a big sample.  And other than that, I have never found any source of data -- and you can look it up in the red book.  One source, and that's Edgerton.  I don't agree with that.  I don't think there's enough -- any indication that that's a generalizable comment; some might.

Q.    So you're saying there's no longer any stigma to being mentally retarded?

A.    No, didn't say that at all.  What I said, is that among mentally retarded people, one of the prime things in their mind is not getting you to think that they're not retarded. That may happen with some.  But it's not a generalizable thing the way it's been put across in the red book and in other publications, quoted everywhere.

Q.    But you'd agree that that's certainly a possibility when someone is mentally retarded.  That they would have that human instinct to avoid embarrassment by making themselves sound better than they really are?

A.    If they have a lot of social awareness, that's potentially true.  But what I'm telling you again is, that is not something that I would generalize in the way it's generalized in the AAIDD literature.  It's just not there. There's no basis for that, is what I'm telling you.  Even

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 440 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/13/10   Page 385 of 433
**JA903**

CROSS-SUAREZ

the -- Edgerton's telling you that.  What mattered to them is getting out.  The quality of their life, not passing.

Q.    So you disagree with the AAIDD?

A.    On that point I do, absolutely.

Q.    So that's their red book.  That's what everybody goes by, and you disagree with that?

A.    That point.  We disagree with a lot of things.  The American Psychological Association doesn't agree with the death penalty.  I can disagree with them.  I'm not here to testify for or against it.  I'm here to testify on psychological issues that have to do with the evaluation I did.

Q.    And so you threw in there -- so you agree with the death penalty then?

A.    No, I don't particularly like it.  But that's not what I'm here to testify on.  I understand why it's invoked.  But I'm not here to testify on the issue of death penalty.  I'm here to testify on my findings and an IQ examination.

Q.    But you just mentioned that the APA disagrees with the death penalty and you don't?

A.    The APA, yes.  The body officially doesn't like that.  That's fine.  I can disagree with some of their theories, as well.  I can disagree with some of their views and, you know, public policy.  I'm a psychologist, I'm a clinician, and that's what I do.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 441 of 522
Case 3:08-cr-00134-RJC   Document 642   Filed 03/18/10   Page 386 of 433
JA904

387
CROSS-SUAREZ

Q.   Officer McIntyre told you he's seen Mr. Umana at the kiosk typing on a keyboard, but he didn't know whether he was ordering or checking his accounts, correct?

A.   That's correct.

Q.   And you asked Officer McIntyre, according to your report, if he had any reason to believe that Mr. Umana may be mentally retarded?

A.   Correct.

Q.   Did Officer McIntyre have -- was he a trained psychologist, or was he aware of the three-prong definition of mental retardation?

A.   Not that I know of in terms of the three prong.  But, again, I asked that, and not as a professional giving me a diagnostic.  But if he saw anything that would suggest intellectual deficits, or mental retardation.

     And the reason I asked that and why I asked about their backgrounds, is that two of those officers did have a background working with intellectually disabled individuals. And that person did have something to say, both of them did.

Q.   But you didn't do any investigation into what their educational background was, other than having worked in a facility, correct?

A.   No, I did not.

Q.   And you say here that Officer McIntyre's response was, Mr. Umana does not seem to have any intellectual impairment.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 442 of 522
Case 3:08-cr-00134-RJC   Document 631   Filed 03/18/10   Page 387 of 433
JA905

Was that the language he used?

A.   Correct.  If it's a quote, that's what he used.  If it's not in quotes --

Q.   It's not quoted.

A.   Well then that's not -- he probably said he didn't see any problems with him, intellectually.  But if it's not in quotes, it's not in quotes, it's not a quote.

Q.   Again, going to what -- you interviewed Officer Holly, according to this, worked in law enforcement at schools with special education, special needs children and adults.

So he was a law enforcement officer in a facility, not any kind of counselor or health provider or anything like that, correct?

A.   That's correct, sir.  He had exposure to the behavior of large numbers of people, different degrees of impairments, yes.

Q.   So that makes him qualified to give an opinion about whether the defendant has exhibited any adaptive behavior deficits?

A.   No.  Gives him the ability to tell me if Mr. Umana in any way, shape or form behaves in some degree, more like, or different than the people he worked with.

As I noted, again, the DSM-IV tells you basically what people notice is adaptive impairments and impairments in behavior, not IQ's.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 443 of 522
Case 3:08-cr-00134-RJC   Document 593   Filed 03/18/10   Page 388 of 433

**JA906**

CROSS-SUAREZ

Q.   But you quoted him as saying -- not quoted, but in your report you say that he told you that Mr. Umana does not exhibit any of the deficits seen in mentally retarded adults or special needs children.

So he was apparently claiming to be educated enough to know what deficits are typically seen in mentally retarded adults or special needs children?

A.   No.  This was from his observation of having been exposed to that population and not seeing the same types of things.

Q.   The other --

A.   Lay people may not know diagnostics.  But it's like -- very much as Dr. Olley talked about.  We look at mental -- intellectual deficits in autism.  And I'd say 90 plus percent of the parents are the ones that bring to the attention of professionals that there's something wrong.

And it's the same with mental retardation.  Teachers and parents are the ones that bring up the issue, because they see that the child is unable to do certain things, or they behave in certain ways.

So they may not have a knowledge of diagnostics, but they have two eyes and they can compare behavior.  And that's what interested me, not a diagnosis.

Q.   The reason you didn't give jail guards the ABAS test is, it's not appropriate, is it, the jail guards?

Laura Andersen, RMR 704-350-7493

**JA907**

390

CROSS-SUAREZ

A.   Well, he hasn't been there long enough.  Some of those things may be able to be filled out by jail personnel if he'd been there -- for example, someone who's been at a certain institution for 20 years.  And he's been observed by a group of people over years, could probably give you good information in some of those adaptive functioning areas.  Obviously not all of them, like work, community things.  But they could give you good information.

Q.   Now, when you went in to do this testing of Mr. Umana, you knew that an IQ test had been obtained by the defense already, correct?

A.   That's correct.

Q.   And you knew it was a 66, correct?

A.    I didn't know which -- I think we got the number, I think we got the face sheet, yes.

Q.   Okay.  Because you stated earlier on direct something about, when you went through this -- whether you're looking at him as whether he was someone who was supposedly mentally impaired.

So the whole purpose of you going in there was to do a mental retardation evaluation.  You already knew there was a defense score, and a defense IQ test result, correct?

A.   Well, no.  I don't know at what point I found that out.  Because I don't think you all disclosed who your expert was, or the face sheet that you disclosed, which was the first

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 445 of 522
Case 3:08-cr-00134-RJC   Document 509   Filed 03/18/10   Page 390 of 433
**JA908**

sheet of the scoring using the U.S. norms.

Q.   Well --

A.   And I don't --

Q.   Were you aware from the U.S. Attorney's office, through a filing that the defense did in this case, that a full scale IQ score of 66 had been disclosed by the defense?

A.   Yeah.  What I'm saying is, I don't know at what point I knew that, off hand.

Q.   Well, you testified earlier that when you were in the jail doing this -- and this is a quote from you -- whether -- something about, he looks -- whether he looked to be someone who is supposedly mentally impaired.

     So when you went in there, you were already told that he was supposedly mentally impaired, correct?

A.   I knew that was the issue.

Q.   And you knew that he had already been tested?

A.   I don't recall.  I may have.  But again, I would have to look at the date that I received that one sheet.  Because it wasn't apparent who had tested him or what the results what.

Q.   And that -- if you were aware that he had been tested, that would call into question what tests you should use, and whether or not you should use -- apply the practice effect, correct?

A.   Say again?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 446 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10 Page 391 of 433
**JA909**

CROSS-SUAREZ

Q.   If you knew he already been tested, then if you were going to test him, the practice effect would be something you would need to take into account, wouldn't it?

A.   Well, it's something you take into account.  But, you know -- if I think back, I may have known that he was tested.  I knew -- at some point I did know the full scale score.

And if I did know that it was Dr. Weinstein that gave the Mexican WAIS, I would have definitely not used that.  I wouldn't use it at this point anyway.

But -- yeah.  You always look at that and see if there's an alternative test that you can give, so you don't repeat the exact same test.

Q.   But now that you know what test he gave and that you came in approximately 12 weeks later, and did essentially the same test but a different translation or whatever?

A.   Well, it's not essentially the same test.  Some of them have different orders of word presentation.  Some of them have different items.  The performance test would be more similar than the verbal.

Q.   But nevertheless, the literature would indicate that there would be a practice effect coming from similar tests, correct?

A.   No.  The literature tells you what happens when you give the WAIS.  The first WAIS that was published in '55,

Laura Andersen, RMR 704-350-7493

**JA910**

393

CROSS-SUAREZ

twice.  That's the information we have.

We don't have information regarding what happens if you give variance of the test if it's to the same degree.

I would probably say that in the performance subtest, you probably would get it since they're similar, more similar than the verbal ones.

And in general, the verbal subtests, the practice effect is lessened much quicker than the performance.

Q.  Isn't it true that the EIWA-III manual for the test you used, has -- right in the beginning of the book -- that the practice effect should be taken into account?

A.  Of course.  What I'm telling you is that the data is not on the WAIS-III Puerto Rican or the WAIS-III U.S. or the WAIS-III Mexican.  It's based on the 1956 initial WAIS test.  That's what we know.

Q.  Were you aware of a Wechsler study done in 2002 and it's listed in the WAIS-III technical manual that -- about participants who are tested twice for the test and retested interval averaging 35 days, 34.6 days?

A.  Yeah, that's -- I think through their reliability coefficients.  And that's not -- that's not what they did.  What they did is split half reliability.  Where they give you the odd number, say test items to vocabulary.  Then they give the other -- the even numbers to establish coefficients of reliability.  That's what they mean by the test retest.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 448 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 393 of 433
JA911

CROSS-SUAREZ

Q.    Isn't it true that the American Psychological Association ethics code, makes it clear that psychologists who perform assessments must consider all relevant test factors.

More specifically, standard 9.06 indicates that when interpreting assessment results, psychologists take into account the various test factors that might affect psychologist's judgments or reduce the accuracy of their interpretations?

A.    Absolutely.  Number one would be in this case, cultural.

Q.    What about practice effects?

A.    That too.  But they're specifically looking at those big factors, such as norms.  There's a whole -- actually there's a whole book called, The Standards For Education and Psychological Testing.  That's put out by the American Psych Association, the American Educational Research Education and the National Council on Measurement and Education.  That's specifically addressing those issues.

Q.    The bottom line in this case, you ignored the practice effect and did not do any adjustment to your score, correct?

A.    No.  Again, different test.

I wouldn't have any way of telling you how many points I should add or subtract.  And as I noted earlier, not everyone goes up in scores, some people go down.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 449 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/23/10   Page 394 of 433
JA912

CROSS-SUAREZ

Q.   Well, but those studies calculated an average based on the people went up and the people went down.

And you're saying that that average is invalid because some of the people went down while others went up?

A.   No.  What I'm telling you is that in a given case, you don't know if the average was, someone went down four points and the other person went up six points.

If you only have those two cases to tell you, which way would you go; would you add or would you subtract?

Now, as you get increasing numbers, you have the same problem, it's just difficult to look at.

In other words, I have never known anybody to adjust a test in a clinical setting for a practice effect.  You take it into consideration.  But that's different from doctoring the acquired test result.

Q.   Now, you mentioned during direct examination, you talked about Mr. Umana's ability to remember things, details very well, correct?

A.   Yeah.  Specifically the narrative that he gave me about his life coming from El Salvador to the U.S. and his activities in the U.S., yes.

Q.   But that -- having a memory that enables him to do that, that does not exclude a diagnosis of mental retardation, does it?

A.   It sure doesn't support it.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17 Page 450 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/18/10 Page 395 of 433
**JA913**

CROSS-SUAREZ

Q.　But it doesn't exclude it?

A.　Not by itself anyway.　But it makes it improbable.

Q.　And what's the literature that supports that?

A.　The literature on the fact that we gauge everybody's behavior and/or their test scores, based on the probability. That's why we say that you have to be in the lower two percentile or 2.3 percentile.　It's all based on probability.　And that's why we have standard error of measurement.　That's another probability, 95 percent confidence intervals.

So by definition, adaptive behaviors, when you look at all of them, the composite, it's someone who is in the lower second percentile, which is a low probability.　It's a low probability to be mildly mentally retarded in this population.　Because it only comprises 1 to 2 percent, if -- maybe.

Q.　Now, you testified about the PET scan.　That inhalants could have caused the effects that were seen on the slides that Dr. Merikangas testified to?

A.　I haven't said a word about PET scans.　I think you've got somebody else's Direct.

Q.　No.　You said that inhalants could have effects on his PET scans?

A.　A what?　Oh, drugs.

Q.　Inhalants, you said, yes.

Laura Andersen, RMR 704-350-7493

**JA914**

A.    Inhalants, drugs, yes.  Absolutely.

Q.    You're not an M.D, correct?

A.    No.  But I read the literature.  Anytime you do a PET scan or EEG, which I've done a lot of cases where that comes up, is, you better know if the person's been abusing drugs.

Q.    Well, you've relied on him, Mr. Umana's self-reporting. According to his self-reporting to you, he inhaled one time, on one incident, when he was cold on a train in Mexico, correct?

A.    That's correct.

Q.    So from that, you're speculating that this could have caused the brain damage that is seen on the PET scans?

A.    No.  What I'm saying, it's a factor.  And I was really looking more at the chronic marijuana use that occurred from the age of 17 continuously until he was arrested.

Q.    And as a psychologist, you're not qualified to say whether drug use could cause any brain damage on a PET scan, are you?

A.    I wasn't referring to brain damage on the PET scan. I'm saying it can effect both PET scans, EEG.

And in fact, every conceivable diagnosis in the DSM-IV cautions you, you must eliminate the effect of substances. Because if they're substance induced, then you don't have the primary diagnostic category that's correct.

Q.    Well, you heard Dr. Merikangas testify.  He identified

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 452 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 397 of 433
JA915

398
CROSS-SUAREZ

brain damage, brain dysfunction, correct?

A.    That's what he says, yes.

Q.    Now, to your knowledge, Alejandro Umana entered the United States in 2004, correct?

A.    Correct.

Q.    And to your knowledge he's been here ever since?

A.    Yes.

Q.    So when you went and tested him in September of 2009, that was just barely short of five years since he came over here from El Salvador, correct?

A.    Correct.

Q.    And you've got -- sat down and talked to him for many hours.  You know, his whole life story, pretty much, don't you?

A.    A lot of it, yes.

Q.    And he's never lived in Puerto Rico has he?

A.    No.

Q.    And he's not Puerto Rican, is he?

A.    No.  I'm not Puerto Rican and I'm not from El Salvador, but --

Q.    That's not what I asked.  Now, you picked the EIWA-III?

A.    Correct.

Q.    But you could have picked other tests, couldn't you?

A.    The EIWA-III was, to me, the most appropriate one.

Q.    But you could have picked other test, couldn't you?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 453 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 398 of 433
JA916

CROSS-SUAREZ

A.   I could have picked other tests, yes.

Q.   And you knew from your -- all the years you've been doing this, that the EIWA -- prior to the EIWA-III coming out, it was well known in the literature that the EIWA overestimated IQ's by 20 points, right?

A.   Approximately, yes.  The '68 EIWA, yes.

Q.   All right.  And you're not aware of any literature or any testing that's taken place yet, that would indicate that the EIWA-III has remedied that problem, correct?

A.   No, it has.  That's why they renormed it.  And they did a completely different test.  It's a completely different test.  This one is more, again, akin to the WAIS-III that's used in the United States or the WAIS-III from Mexico.  The EIWA-I, which was very, very different.

Q.   But it's normed on the Puerto Rican population?

A.   Yes, it is.

Q.   And if the EIWA from 1968, based on the norms of Puerto Rican population, tended to produce IQ scores 20 points lower -- I'm sorry -- higher, than it's the same population that it's being normed on again, correct?

A.   Yeah.  But the test --

Q.   There's no reason to change?

A.   -- is radically different.  The initial EIWA was completely different from the initial WAIS; that's the difference.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 454 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 399 of 433
**JA917**

CROSS-SUAREZ

Q.    But there's not been time for any kind of testing out in the field to see whether the Puerto Rican norms are now fixed compared to, let's say, U.S. norms, correct?

A.    You don't fix norms.  You norm a test.  And the test that they're norming now, is essentially the same as the WAIS-III.

So you don't fix the norms.  You just take that test that was -- it's now very similar to the WAIS-III here, and you norm it, period.

You don't have to fix the norms from the '68, because that was a different test, that at the time was radically different from the American version of that same test.

Q.    Well, you could have picked the Spanish norms, correct?

A.    Yes, I could.

Q.    And that would have brought in a lower IQ?

A.    No.  I would have had to use the Spanish test, as well.  Cause that test was the one that was normed in Spain.

Why would I use a European test, rather than a new world test.  Or even the -- you know, some of the items are much different.

Q.    Why would you pick a Puerto Rican test, when this case is happening in the United States?

A.    Well, it's somewhat closer than Spain, that's one reason.

Two, culturally, it's much more similar than Spain, a

Laura Andersen, RMR 704-350-7493

**JA918**

CROSS-SUAREZ

European country.

And the other thing is, again, the educational aspect of it is probably more similar to Puerto Rico, which is a more developed country or territory than El Salvador.

Q.   23ll, Puerto Rico is a country that's in the Caribbean, correct?

A.   That's correct.

Q.   An island nation?

A.   That's correct.

Q.   And Cuba, another island nation in the Caribbean, you previously testified that you've given the Spanish norms --

A.   That's correct.

Q.   -- for a Cuban person, right?

A.   That's correct.  Because of the demographics in Cuba. They're very connected to Spain.  It's one of the few countries that has international relationships with Cuba. They have free coming and going from Spain.  They're very much more Spanish than even Puerto Rico.

Q.   And you knew if you used Spanish norms in this case, that would tend to produce a lower IQ, correct?

A.    I didn't know what he would score.  Again, all I had was that he had been tested before.

Q.   But you're aware of the norms.  The norms of the Spanish test.  The mean IQ there is higher than it is in Puerto Rico, correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 456 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 401 of 433
JA919

CROSS-SUAREZ

A.   I didn't know that at the time.  Again, I just thought, use the EIWA, because it's a much more current test, 2008. We don't have to deal that much with the Flynn effect.  And it's a Latin American country.  Where the Spanish that is spoken in Puerto Rico is very akin to the Spanish that is spoken in El Salvador.  And it's very simple, it's more akin to El Salvador than Spain would be.

Q.   So you're saying that at the time you picked this test, you had no idea whether the Spanish norm, for instance, would turn out any different than the Puerto Rican norm; you had no knowledge of that?

A.   Well, in general, I know they have a higher level of education, sure.

Q.   So that would tend to produce a lower IQ test result from someone, correct?

A.   If you do that, all things being equally, probably yes. Just the way that we know that if you use the U.S. norms, you're going to get probably the lowest, absolutely.

Q.   Well, don't the Spanish norms give you the lowest?

A.   Not necessarily, no.  Depends on the age range.

Q.   So you knew when you picked the Puerto Rican test, for instance, that this would produce, because their norms are lower, based on past experience, this would be more likely to produce a higher IQ test result than using U.S. or Mexican norms?

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 457 of 522
Case 3:08-cv-00134-RJC   Document 64-2   Filed 03/18/10   Page 402 of 433
**JA920**

CROSS-SUAREZ

A.    No.  As I just noted, I looked at it because it's more demographically and more culturally akin to El Salvador.

Q.    Right.  But that's not what I asked.  My question is, didn't you know at the time you picked it, that this would tend to produce a higher IQ result, than if you used the Mexican or U.S. norms?

A.    Not absolute, basis, no, I didn't know that.

Q.    But this is what you do for living, right?

A.    Do what?

Q.    Testing.

A.    I do testing, correct.

Q.    And you weren't aware of that?

A.    No.  Like I said, it's just been published.  It was the first time that I'd seen it on the Pearson Psyche Corporation.  Last year it wasn't being sold by them.

Q.    So El Salvador, a country that has no east coast or no Caribbean coast; that has different history than Puerto Rico.  For instance, Puerto Rico has a larger number of immigrants who are from Africa and from the Caribbean, and even former slaves settled in Puerto Rico.

A.    No.  That's not true.  It's got a large U.S. presence there.  The majority of the population is not African slaves.  I don't know where that came from.

Q.    I didn't say the majority.  I just said that was one of the make ups of went into the population of Puerto Rico, as

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 458 of 522
Case 3:08-cr-00134-RJC   Document 60-2   Filed 03/18/10   Page 403 of 433
**JA921**

CROSS-SUAREZ

a group?

A.    I don't believe that's the predominant thing.  Cuba maybe, at some point.  But all you need to do is Google it on CIA Fact Book.

Q.    So your theory is that a person who has been in this country for five years in the United States, it is more fair to test him on Puerto Rico standards than it is U.S. standards?

A.    I think that would be an understatement.  Yes. Especially when they don't yet speak the language of the country that they're being compared to, as far as norms.

Q.    So a person who has never set foot in Puerto Rico and is from an entirely different country, is being compared to the people of Puerto Rican?

A.    Well, if you look at the literature that's put out, ethnicity is what we look at.  And ethnicity is really how acculturated someone is, not just racial.

Q.    Well, the U.S. norms are obviously created across the whole population of the U.S., which includes people from all sorts of countries all over the world, including approximately 3 million from El Salvador, correct?

A.    I don't know if there's any Salvadorans in that sample. It does include Hispanics.

     But I will guarantee you, that no one in that normative sample, and I mean no one, did not speak English.  Because

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-2    Filed 03/23/17    Page 459 of 522
Case 3:08-cr-00134-RJC    Document 59-2    Filed 03/18/10    Page 404 of 433
**JA922**

CROSS-SUAREZ

in order to be included in the normative sample, one of the criteria was that you had to be fluent in English so that you could take the WAIS-III.

If they couldn't speak English, they couldn't be included in the normative sample.  Because it's not normed on foreign-speaking individuals.

For example, the Psyche Corporation has put out the WISC, which is the Wechsler Intelligence Scale for Children in Spanish.  And then they went out and they normed it in the United States on bilingual Hispanic children.  Now you can use that test for that.  Because it was authored, standardized in Spanish, and it was given to a population of bilingual Hispanic children in this country.

No one, like Mr. Umana, would have been included in the norming of the WAIS-III, U.S. version.

Q.   Now, you called it the individualized spelling test.  I think it was 51 words?

A.   Correct.

Q.   Really, that was just picking 51 words out of letters that he apparently wrote.  And then seeing if he'll spell them the same way the second time, correct?

A.   Correct.

Q.   So it's really not -- it's not a standardized test?

A.   No, absolutely not.

Q.   It's not an intelligence test?

Laura Andersen, RMR 704-350-7493

**JA923**

CROSS-SUAREZ

A.   Nope.  Just a writing test to verify that he could have written those letters and those words that were contained in there, that's all.

Q.   So basically you were conducting, not just psychological evaluation, but some sort of law enforcement investigation to verify that he was the author of certain letters?

A.   No, absolutely not.  I wanted to see if, for example, sometimes when I do that, people will misspell all of them. Even though they in fact wrote those other notes.  So I do it to see if there's effort and/or malingering.

Q.   But there's no data to support that as being a valid malingering test, is there?

A.   Oh, of course there is.  You're comparing him to his own letters.

Q.   What's the data on that?

A.   The data is his own letters in comparison to the test.

Q.   What's the data supporting that an individualized spelling test of words someone's already written, is a valid measure of malingering or not?

A.   It's a valid measure of whether he reproduced it.  If he produced it on one occasion, and can't produce any of them on the second occasion, then you've got something to look at.

    If he produced them the way he did on this time, tells

Laura Andersen, RMR 704-350-7493

JA924

me, fine, he did all of them.  Apparently he's not fudging.

He's not, you know, doing floor effect things with regard to

this.  That's what it's for.

    And it also gives me an ability to look at the print

and see if the printing is similar to other things that he's

written.  Because we're looking at adaptive functioning.

Q.   The VIP test is a -- how would you describe the VIP

test?  What is it?

A.   It's a symptom validity test.

Q.   Is that to detect malingering?

A.   It's to detect low levels of effort to do well, or high

levels of effort to do poorly.

Q.   You're aware that in the VIP manual it indicates that

someone who is known from historical information of bona

fide mental retardation, is recommended it not be used,

correct?

A.   Yes, I am.

Q.   And also that the results you got here, that his

response style classification was inconsistent.

A.   Correct.

Q.   Is that what you testified to?

A.   Yes.

Q.   Isn't it true that of those with mental retardation on

the nonverbal subtest, 45 percent would end up with

inconsistent being their response-style classification, and

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 462 of 522
Case 3:08-cv-00134-RJC   Document 59-2   Filed 03/18/10   Page 407 of 433
JA925

CROSS-SUAREZ

based on the fact they were mentally retarded?

A.   Yes.   That was Dr. Fredrickson's data.   Let me correct you a little bit on that.

It is recommended that you not use this to evaluate when you have people with known, as you've stated.

But let me tell you what comes right after that statement in the manual.

It says on occasion, however, clinicians must evaluate individuals whose cognitive test results suggest mental retardation, but for whom the diagnostic issues are not clear.

Some of these individuals actually have mental retardations, others are not truly impaired to this degree, but have been presenting themselves in the evaluation setting as seriously impaired.

So it says, skilled use of the VIP can help the clinician distinguish between true mental retardation and feigned impairment.

So this is a test that you should be cautious.   If you know for a fact that someone has bona fide mental retardation, you'd wonder why you're giving this anyway.

But, in this case, we can't jump, leap frog to a conclusion and say, if I'm testing him for mental retardation, and I really don't know if he is or not, than I should probably take precautions for symptom validity.

CROSS-SUAREZ

Q.    So the results of that, according to what you testified to, is invalid?

A.    Well, what it said is that he didn't perform consistently with regard to effort.  But as I noted during direct, it doesn't appear that he was malingering, per se.  He just doesn't seem that he put as much effort.  Let me read to you what it says in terms about his performance curve.

He says, the length of the first section of his performance curve, which represents his demonstrated ability, suggested his reasoning ability is at least significantly below average or higher.

This conservative estimate of his ability is supported by his adjusted score, which estimates his reasoning ability to be at least below average or higher.

And basically when you look at this curve, and you've got a copy of it, you can see that he took a dip in the middle section, between moderately easier and harder items.

So if it wasn't for that dip, he would have had quite a valid profile.  So it just means that he didn't do sustained effort.  But again, I don't think he purposely focused on faking this.

So what this is telling is, that this individual probably has at least below average, possibly higher reasoning abilities.

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 464 of 522
Case 3:08-cr-00134-RJC   Document 502   Filed 03/18/10   Page 409 of 433

**JA927**

CROSS-SUAREZ

Q.   But it's not an intelligence test that would provide full scale IQ, correct?

A.   No.  It doesn't purport to be.  But what it's telling is, because the same items are used in intelligence, nonverbal intelligence test, that it can generate a reasonable estimate, a conservative estimate.

Q.   You testified on Direct that the VIP had some of the same items in a different order than another test that you gave?

A.   Correct.

Q.   What was the other test?

A.   The test of nonverbal intelligence.

Q.   And you gave the test of nonverbal intelligence first, correct?

A.   Correct.

Q.   So then wouldn't there be a practice effect that would reduce the score on the VIP?

A.   Not necessarily, because then on the TONI -- the IQ test, it goes from easy to very difficult, as the test goes on.  And so once you reach three errors in a row, you discontinue the test.

On the VIP, they're given in random order.  And what you expect is that someone, if they can't answer a question, will basically guess at it.  And probably 50 percent of the time will guess wrong.  But when they do get to an item that

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/18/10   Page 410 of 433
**JA928**

CROSS-SUAREZ

they do understand, they'll correctly answer it.

And what happened in Mr. Umana's case, of course, when the computer put it back in order of easier to more difficult, it showed a dip in an area that he probably had the ability to answer correctly.

Q.    Another malingering test you did was the TOMM, the Test of Memory and Malingering?

A.    Correct.

Q.    You testified basically he got perfect scores there correct?

A.    He got good scores, yeah.  There's no indication that he was malingering or had low effort with regard to memory, realm of memory.

Q.    Now you've relied on -- one of the tests you gave was the MMPI.  In your report you talk about overreporting of extreme psychological problems.

But are you saying that from that, you're concluding that that supports any conclusion of malingering on intelligence testing?

A.    Well, what it tells you is just what the printout from the interpretative report from the Forensic Criminal Pretrial Report just tells you that it's invalid because there was overreporting of serious and a wide variety of serious, psychological complaints.

So, therefore, you don't interpret that test because

Laura Andersen, RMR 704-350-7493

**JA929**

it's not realistic.  Why he did that, I don't know.  Maybe he's wanting you to think that he's disturbed.

But all we know is that it's not valid.  But we do know that it wasn't because he didn't understand the items.

Q.   Doesn't that test, to be valid, require a sixth grade reading level?

A.   If you read it.

Q.   Well, did he read it?

A.   He started to.  And then he -- I told him that we could also administer it with the audio.  And he said he would prefer to do that with earphones, and so he did it.  So he didn't have to read it.

Q.   Don't you also have to test his comprehension level of language to get a valid result on the MMPI?

A.   No.  The validity or invalidity of the MMPI, you look at the VRIN scale.  Which is Variable Response Infrequency.

And it will tell you if that individual responded in a random manner to the items.  Or whether they responded to the content.

And if you look at the report, it tells you that his responding was not random.  So he understood the items.  So he meant to choose or endorse the items that he did.  That's why that scale exists.

Q.   Dr. Suarez, if someone comes here from El Salvador and lives in the United States for 25 years, but never learns

JA930

CROSS-SUAREZ

English sufficiently to take a test, is it your testimony that person should be considered on an intelligence test under Puerto Rican norms?

A.   Depends on why didn't they learn to speak English.  If it's because they're in an enclave where people just don't. Like Miami tends to be in some areas.  Then you have to give them a test, such as the Puerto Rican one.  Because it's norms, and it's psychometric properties are problematic.

You can't give them the English one.  They may in fact be able to have some of the cultural knowledge.  But you're not going to give them a test in another language that isn't normed in the United States.

Now, in the future, I'm sure we will have a WAIS-III normed for Hispanic populations in this country.  Right now we don't.

As I noted, we do have one for children up to the age of 16 that is in Spanish and was normed on Hispanic children here in this country.  But we don't have that for adults.

Q.   Now, you mentioned the Flynn effect being controversial in the so called field.  What field are you talking about; mental retardation, neuropsychology, psychology?

A.   Well, psychology in general.  But I'm not talking about that the Flynn effect is controversial.  What's controversial is when someone purports that the IQ test should be modified by taking away points.  That's what's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 468 of 522
Case 3:08-cr-00134-RJC   Document 50-3   Filed 03/18/10   Page 413 of 433
**JA931**

CROSS-SUAREZ

controversial.

Now, if you ask me where is it controversial.  I would say in psychology in general.  But the article that I mentioned earlier was in Division 33 newsletter.  They're -- I don't know, I think it's quarterly that they do that or monthly.  But that's where that controversy was raised by Dr. Roger Moore.

Q.   And as you said when you testified, you referred to that as a letter to the editor, correct?

A.   That's correct.

Q.   So it wasn't a peer-reviewed publication, a scholarly piece, it was just a letter to the editor?

A.   Well, it was in the same publication that Dr. Olley published three of the positions that later became an article in the peer review.

Q.   Right.  But those are position papers, not letters --

A.   No.  It wasn't a position -- it was just a discussion of adaptive behavior and raising of issues.  So he raised a lot of issues of how it ought to be.  What are the questions in the field.

So it's the same type of news -- in fact, one of his articles is in the exact same newsletter that that one was in.  That's where they share ideas within Division 33.

Q.   Wasn't Dr. Olley's -- weren't his publications, though, peer reviewed scholarly articles, as opposed to a letter to

Laura Andersen, RMR 704-350-7493

**JA932**

CROSS-SUAREZ

the editor?

A.   Well, what I'm telling you is, that they were originally in the newsletter.

Then those three articles, as he stated on direct, became -- he submitted them to a journal.

What I'm saying is, that's where people discuss these issues within the household of Division 33.

And Dr. Moore's letter, again, is not a paper that proves you should or you shouldn't.  But it raises the question that it is a controversy and it's not a settled thing.

Q.   One of the things you talked about in comparing your testing with that of Dr. Weinstein, is that you were able to get the sergeant to take the handcuffs off of Mr. Umana, correct?

A.   I don't know if it was a sergeant.  Whoever brought him.  I had him take the handcuffs off.

Q.   Then you're basing your belief that Dr. Weinstein gave the test with handcuffs on, based on a letter you saw?

A.   No.  Based on the letter I saw that raises that from Mr. Umana.  And based on the fact that Dr. Weinstein says he really doesn't remember whether they were or they weren't.

Q.   But you don't know the letter that was -- that you saw by the defendant, you don't know whether he was referring to testing by Dr. Weinstein or Dr. Merikangas, do you?

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 470 of 522
Case 3:08-cr-00134-RJC   Document 692   Filed 03/18/10   Page 415 of 433
**JA933**

416
CROSS-SUAREZ

A.   Yes, I do.  Because he describes it in extraordinary detail.

Q.   What was the date of the letter?

A.   Well, it was obviously sometime after he played with blocks and did a bunch of other things that Dr. Merikangas did not do.  So I know it was post that.

THE COURT:  Mr. Foster, I'm not trying to rush you at all, but how much longer do you think you have?  Because if it's any length, I think we're going to take a break.

MR. FOSTER:  I think five or ten minutes.

THE COURT:  Do you plan on redirecting?

MR. GAST:  I might have one question.

THE COURT:  Let's keep going then.

Q.   (By Mr. Foster) Now, the fact that it appears that Mr. Umana was able to use a written code and a spoken code -- let me back up.

The spoken code you referred -- you heard Dr. Olley testify was basically reverse syllable type thing, where you put the last syllable first?

A.   Correct.

Q.   And you also heard how Dr. Olley was told by Mr. Umana, that sometimes it would take a day or two to write one of these letters?

A.   Correct.

Q.   Using the code?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 471 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/23/17   Page 416 of 433
JA934

417

CROSS-SUAREZ

A.    Correct.

Q.    The fact that he's able to do that, again, does not exclude the diagnosis of mental retardation, does it?

A.    It begins to erode it.  Because you have to realize that in the area of communication, for example, on the ABAS. Some of the questions refer to, can the person say "mama".

So we're not talking about a level, can the person write an encrypted code of any way, shape or form.

So again, we're looking at a level.  Code isn't even mentioned, let alone speaking in Pig Latin.

Because a mentally retarded individual who has impairments in communication, would have a difficult time with regular language, written or spoken, let alone putting it in code, which removes it another step.

I have never seen anybody mentally retarded that wrote in code.

Q.    Isn't that an element of the intelligence test though -- I forget what it's called, but there's one where you use a code provided in the test?

A.    No.  It's simply matching.  It has nothing to do with communicating words and ideas.  Using the code, it's just if one is paired with the X, when you see a one, put the X. That's it.

Q.    Well, that's basically substituting one thing for another right?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 472 of 522
Case 3:08-cv-00134-RJC   Document 59-2   Filed 03/18/10   Page 417 of 433
**JA935**

CROSS-SUAREZ

A.    Well, nine numbers, nine symbols.  The difference is, the code that Mr. Umana was using is 26 letters, transposing it with 26 other letters.  That's different.

Q.    Well, what about the -- there's one test called in Spanish digits and symbols, I guess, are you familiar with that one?

A.    That's the same one you were talking about Dr. Olley has mentioned, digit symbol in English.

Q.    So the person looks up at a key, figures out what each thing is equated to, then goes down slowly and then writes as fast as they can, substitutes the indicated thing that is suppose to be used in place of the original symbol, correct?

A.    No, that's not correct.  They don't substitute.  They just fill it in.

Q.    Right.

A.    There's a box on the top that has numbers one through nine.  And on the bottom box is right under those numbers, there's a symbol that goes with each number.  They basically just have to fill in the empty boxes that correspond to the numbers, the symbol.

There is no, they don't have to substitute which is what you've got to do in the code.  And it doesn't involve any type of cognitive message or meaning to it.

I guess what's on the screen now, if you look at the two, all those boxes are empty on the bottom, and you just

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 473 of 522
Case 3:08-cr-00134-RJC   Document 3-2   Filed 03/18/10   Page 418 of 433
**JA936**

CROSS-SUAREZ

take the two, the symbol under the two, and you put it in the empty box under the two.  That's it.

Q.   Okay.  If I was writing a letter in a code using -- and there's 26 letters in the alphabet, I could just take a notebook paper, write out what I want to say, look at my code and come back and do the substitutions.  Now I have a good version.  Now I can copy that over to a new piece of paper correct?

A.   That's right.  You have to first be able to write.  And then to transform that writing into the code.  And keep up with the sentence.  Try it sometime.  It's kind of interesting.  This is just filling in the blank spaces.  The other one has to do with a message and a meaning.

And when you read the messages and the meanings, you understand the reason for the code.

There's a lot of cognitive factors in there that are not -- this one is just what we call graphomotor speed.

Q.   In the last page of your report you say that it's implausible that a mentally retarded individual with significant adaptive impairments, possessing a third grade education, could become affiliated with a street gang such as MS 13 and the -- well, first off, are you aware of how people join MS 13?

A.   Yes.  I've dealt with gangs in south Florida.

Q.   So you're aware that they get jumped in, a thirteen

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 474 of 522
Case 3:08-cr-00134-RJC   Document 602   Filed 03/18/10   Page 419 of 433

JA937

420
CROSS-SUAREZ

second beating.  It's not exactly like filling out a job application, right?

A.    No.  It's called -- in American society and university it's called "hell night".  When you're inducted into a fraternity that you pledge, because you want to be in it, for some reason.  Usually social.  Usually involved with girlfriends.

Q.    So it doesn't take a high level of intellectual functioning to go through that process, does it?

A.    No.  The high level functioning comes in, in activities associated with gang membership.  Getting in, again, is rather like a fraternity.

Q.    Now, the other -- other than the EIWA-III, the other tests that you testified you used in this case, the Nonverbal Intelligence Test, the TONI-III, the Test of Memory and Malingering and the VIP, those are all using U.S. norms, correct?

A.    The TONI-III does use U.S. norms.  But, again, it's designed for people who have language impairments.  And it's specifically designed, like the C-TONI, for situations in which you're testing immigrants that really can't deal with the verbal portions of a normal IQ test.

Q.    And the MMPI are U.S. norms?

A.    The MMPI are U.S. norms based on symptomatology.  Again, that's not in the area of cognitive.  That's a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17  Page 475 of 522
Case 3:08-cr-00134-RJC   Document 63-2   Filed 03/18/10  Page 420 of 433
JA938

421
CROSS-SUAREZ

psychiatric thing that looks at symptoms having to do with everything from anxiety, depression, hallucinations, delusions, things like that, that are universal.

Q.   And the Test of Memory and Malingering, that's U.S. norms, correct?

A.   No.  Actually the Test of Memory and Malingering, because it's a forced-choice test, you can look at it, compare it to chance probability.

In other words, it's like flipping a coin.  You're gonna get a heads or a tails.

So if you guess on the Test of Memory and Malingering -- in fact, if you guess without ever looking at it, you're probably going to average 25 correct.

If you get anything below 18, you're probably faking because you can't do that by chance, readily.  So it means that you must know the answers.

In this case it was moot, because he did well on it.

Q.   None of the other tests that you use in this case, outside the EIWA-III, did you use -- on no other tests did you use Puerto Rican norms, correct?

A.   Well, Puerto Rican norms are not available for anything, as far as I know of, but the EIWA-III.

And in some of the tests that Dr. Weinstein mentioned, there are some norms from other countries, like the Bateria.

But the tests that I gave, no.  The EIWA-III is the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 476 of 522
Case 3:08-cr-00134-RJC   Document 50-2   Filed 03/23/17   Page 421 of 433
JA939

CROSS-SUAREZ

only one that's been standardized and normed in a Hispanic country, specifically, Puerto Rico.

Q.    What we just put up there, can you see it Dr. Suarez?

A.    Yes I can.

Q.    I believe this is part of Government Exhibit A1 -- or -- A1.  I think this the third or fourth page of that exhibit.  And the blue column you've noted as the full scale IQ score using United States norms, correctly?

A.    As specified in the Mexican manual, yes.

Q.    And that 75 that you come up with there, does that include the Flynn effect?

A.    No.

Q.    And if it was included, wouldn't that bring it down to about 70?

A.    It depends on how you factor that in.

Q.    Well, the rate that you testified that those who accept the Flynn effect, it's, I believe, .3 per year.  And for 10 years it's three points.  And that was normed what, in 1995?

A.    Came out in '97.

Q.    In '97.  That's twelve years, so that would be four points, or something like that.  So it gets you right down on the -- real close to 70, wouldn't it?

A.    Close.  But as I noted, I wouldn't agree with that.

Q.    What's that?

A.    As I noted earlier, I wouldn't agree with doing that,

**JA940**

REDIRECT-SUAREZ

423

adjusting those IQ scores.

MR. FOSTER:  I have no further questions.

THE COURT:  Brief Redirect?

MR. GAST:  Just one question.

REDIRECT EXAMINATION BY MR. GAST:

Q.   You have now had the opportunity to hear the testimony of Dr. Olley about some supplemental information that you did not have before; those interviews and those school records.  And you got to see those school records, too; correct?

A.   Correct.

Q.   Is there anything about any of that testimony, just the raw data of it, that would cause you to:

A, change your opinion with regard to mental retardation generally?

And -- or B, cause you concerns with regard to their being evidence of a significant adaptive functioning problem?

A.   No.

MR. GAST:  Thank you.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Any other witnesses from the government?

(Government Exhibit A-4 was marked for identification.)

Laura Andersen, RMR 704-350-7493

**JA941**

424

MR. GAST:  Your Honor, no more witnesses.

We just want to introduce one other piece of evidence as Government Exhibit A-4.  It is the April 23rd, '08 interview that the Los Angeles police conducted of the defendant in Greensboro.

That's already been the subject, as I understand I was not privy to it, but of an extensive suppression hearing.

We just move to introduce that for the purpose of this hearing, as well, so the Court can have that as guide to social interaction, strategy, and things of that nature.

As I understand it, it is a fairly lengthy interview.  And that might guide the Court's thinking in this.  It's already been authenticated and introduced in that hearing.

THE COURT:  I'll admit that.

(Government Exhibit 4-A was received into Evidence.)

THE COURT:  I would also like, from both sides, the power points that were used with various witnesses.  So if you all could, at some point soon, provide that to the court.

MR. FOSTER:  We will, Your Honor.  If we could have a minute, we would request to put on one of our witnesses in rebuttal.

THE COURT:  Sure.  Let's take a five minute break.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 479 of 522
Case 3:08-cr-00134-RJC   Document 352   Filed 03/18/10   Page 424 of 433
JA942

REBUTTAL—WEINSTEIN

The other thing I want from the government is any writings or recordings that were relied upon by your expert from the defendant. There is a great deal of testimony about that. And if you would make that an exhibit, introduce it at some point.

(A brief recess was taken in the proceedings.)

THE COURT: I should have raised this with you all before we broke. I'm not opposed to rebuttal evidence on something new. There was a fair amount of anticipatory rebuttal in the direct presentation.

MR. FOSTER: I will keep this very focused.

THE COURT: All right.

MR. FOSTER: Dr. Weinstein.

REBUTTAL EXAMINATION OF RICARDO WEINSTEIN BY MR. FOSTER:

Q.   Dr. Weinstein, you're still under oath, okay?

A.   Yes.

Q.   You've heard the testimony of Dr. Suarez, his testimony about your use of the U.S. norms as being inappropriate in this case?

A.   Yes. I heard Dr. Suarez say that's something you never do and you can't do. And that norms are norms. And IQ's are IQ's. And, you know, that everything is very specific. I heard him say that, yes.

Q.   Okay. And are you aware of any position papers or literature that supports the view that a psychologist in

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 480 of 522
Case 3:08-cr-00134-RJC   Document 532   Filed 03/18/10   Page 425 of 433

JA943

426

REBUTTAL—WEINSTEIN

these situations, practicing neuropsychology, uses clinical judgment to pick the right norms in the right situation?

A.   I had mentioned on direct, that the neuropsychology -- the National Academy of Neuropsychology, published a position paper expressing that view.  But I did not go into any details.

This is the property of the paper is titled, Professional Considerations For Improving the Neuropsychological Evaluation of Hispanics, The National Academy of Neuropsychology Education Paper.

It's published in the Archives of Clinical Neuropsychology, number 24, 2009, pages 127 to 135.

Q.   Is there a section in that position paper on test and norm selection?

A.   On page 132, specifically, there's a section on test and norm selection.  You can read the whole thing, but just to make it brief, the last paragraph in here is giving an example or clearly stating that you don't use norms -- that you have to decide what tests and what norms to use.  And it reads:

"Neuropsychological evaluations are often used, not only for identifying and quantifying neuro-cognitive impairment, but also for making predictions regarding real-world functioning.

"Neuropsychologists typically use clinical judgment to

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 481 of 522
Case 3:08-cr-00134-RJC   Document 652   Filed 03/18/10   Page 426 of 433
JA944

REBUTTAL—WEINSTEIN

determine which tests are most appropriate for specific purpose.

"For example, an English reading and writing achievement test applied to a student who's learning English as a second language, might be appropriate for determining the level of instruction needed, but would be inappropriate for diagnosing a learning disability."

That's just an example of why clinical judgment needs to be used in determining what tests and what norms for a specific purpose.

Even though it's the same -- if you're measuring the same thing, which is, in my opinion, contradicts everything -- the issue is that nobody uses or you should not use different norms or different tests or different situations or different individuals.

Q.   So are you saying that this basically supports your choice of the norms and the tests that you use in this case from testing Mr. Umana?

A.   Right.  Supports the fact that -- it is -- that testing is contextual.  That you have to understand why you're doing what you're doing.  You're not doing it in a void.

And you choose the right test.  And the right norms to answer the question that's related to that particular issue.

Q.   Also during Dr. Suarez's testimony, there were some exhibits that I handed up to you that were displayed on the

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 482 of 522
Case 3:08-cr-00134-RJC   Document 534   Filed 03/18/10   Page 427 of 433
**JA945**

REBUTTAL—WEINSTEIN

screen using symbols for A, B and C, and comparing the Mexican and U.S. norms. Were you in the courtroom during that testimony?

A.   I was in the courtroom. And frankly, I don't even know why this was something that was exhibited. I did not do anything related to that. My testing does not reflect anything that has to do with following or not following the instructions or doing one procedure or another.

I did mention on my direct examination, that what the manual suggested, makes absolutely no sense.

And even though Dr. Suarez says he taught statistics, I checked it with several people. I went over this with several people that are not only psychometrists, but also individuals that actually design tests, but also test tests.

And when they looked at what the manual was suggesting, say that's impossible, has absolutely no relevance and no meaning.

But regardless of that, has no relevance to my testing. Has no relevance to my findings. And has nothing to do with what I did.

What I did, because I think is the most appropriate translation of the test. Since I'm not going to -- and it's a standardized translation. I used a properly translated test, and culturally adjusted test. So I could compare his results with the American norms. And that is what I did.

Laura Andersen, RMR 704-350-7493

**JA946**

REBUTTAL—WEINSTEIN

429

I had nothing to do with finding -- there has nothing to do with all this explanation of what goes up, what goes down, I use scores.

The correct comparison -- in terms of what happens when you use different norms, and I agree with that.  There's no question, if you use different norms, you're going to come back with different results.  And that's the point.

If you use the Puerto Rican norms, he's going to obtain an IQ score that's 20 points higher, than if you use U.S. norms, or if you use norms from Spain or from Israel or from any other country.  You're going to have -- you're going to have different results depending on what norms you use.  There's no question about that.

What Dr. Suarez and I disagree on is, which norms are the proper norms.  Certainly the least proper, in my opinion, are the Puerto Rican norms.

Dr. Suarez talks about how similar the populations are.  But if you look at the demographics of each country.  If he looks at the culture of each country.  Compare Salvador with Puerto Rico, and you realize that the least appropriate norms to use for the Spanish speaker from El Salvador, are norms from Puerto Rico.

Q.    Why do you say that?

A.    Because they have nothing in common.  I mean, well, they have something in common, they have language in common.

Case 3:16-cv-00057-MOC   Document 59-2   Filed 03/23/17   Page 484 of 522
Case 3:08-cv-00134-RJC   Document 554   Filed 03/18/10   Page 429 of 433

JA947

REBUTTAL-WEINSTEIN

But, for instance, I mean, this is articles simply from Wikipedia, you know, demographics from El Salvador.

Again, as I mentioned before, you have 3 million people El Salvadorans living in the United States --

THE COURT:  We're going back into direct testimony.

THE WITNESS:  Right.  Right.

THE COURT:  Mr. Foster, if you would confine your questioning to something that hadn't been covered on Direct.

MR. FOSTER:  That's all I have, Your Honor.

THE COURT:  Any Cross?

CROSS-EXAMINATION BY MR. GAST:

Q.   Well, does this paper that you quoted from, it doesn't say anything about mixing and matching.  That is, I'm going to run test A, but use the norms from test B.

It just says that when you're -- you got to make cultural judgments.  And sometimes you pick American test, and sometimes you pick a Puerto Rican test.  But it doesn't say anything about mixing and matching, does it?

A.   It doesn't say about mixing and matching.  It says you use clinical judgment.  And it starts -- if you want me to read the whole thing.  It says, the selection of test and normative data is a complex issue in cross-cultural neuropsychology.  Attempts should be made to identify the most appropriate test versions and norms.  It's not like you

REBUTTAL—WEINSTEIN

have the -- have to use the same thing available for the particular individual in situation.

That's exactly what I'm saying.  That you can't just have a blank assumption, that you just use one thing and you just don't use any clinical judgment for that.

MR. GAST:  No further questions.

THE COURT:  Thank you.  You may step down.

All right.  If you all did a cross section of my brain, there wouldn't be much red activity at all at this point.  And so I don't think oral argument would be beneficial.

There's been a fair amount of testimony that the Court has to digest, so I'm going to take this under advisement.  I've asked for the power points from each side. And I think I know each side's argument pretty well.

I think I need to digest the testimony at greater length, and it would be beneficial to have the power points and other information that I requested.

Have you all worked out the medical record issue?

MR. BRYSON:  Your Honor, before Dr. Merikangas left, he gave it to me.  To be honest with you, the first time I've seen it.  When I get back, I'm going to scan it and e-mail it to Mr. Gast.

THE COURT:  That's fine.  Well, I'm going to take this under advisement.  Is there anything else we need to do

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 486 of 522
Case 3:08-cr-00134-RJC   Document 632   Filed 03/18/10   Page 431 of 433
**JA949**

432

at this time?

MR. GAST:  Your Honor, since we're talking about the discovery issue, I would ask the Court to order Dr. Weinstein to produce a report.  I know it's too late for this hearing.  But that was already ordered and --

THE COURT:  No.  I'm not going to order anything at this point.  I've got enough information in front of me to make a decision in this case.

MR. GAST:  Well -- and I don't mean to say produce it for the court for this hearing.  But, you know, this was -- his production of a report, of course his testimony is going to pertain to testimony at sentencing, assuming we get that far.  And he's already been ordered under Judge Cayer's order of September 23rd by this.  Now he's testifying that he didn't.  And we've been entitled to that report for quite some time.

THE COURT:  I hear your complaint, but I'm going to deny your request.

MR. GAST:  Thank you, Your Honor.

THE COURT:  Anything further from either side?

MR. FOSTER:  No.

MR. GAST:  Not from the government, Your Honor.

THE COURT:  Well, all right.  I'll take this under advisement and we'll stand adjourned at this time.

* * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 487 of 522
Case 3:08-cr-00134-RJC   Document 59-2   Filed 03/18/10   Page 432 of 433
JA950

433

(End of Proceedings.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

            I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

            Dated this the 16th day of March, 2010.


                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

Laura Andersen, RMR 704-350-7493

**JA951**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.3:08-cr-134 |
| | ) | |
| vs. | ) | |
| | ) | |
| JULIO CESAR ROSALES LOPEZ | ) | |
| JUAN GILBERTO VILLALOBOS | ) | |
| ELVIN PASTOR FERNANDEZ-GRADIS, | ) | |
| CARLOS ROBERTO FIGUEROA-PINEDA, | ) | |
| JOHNNY ELIAS GONZALEZ, AND | ) | |
| SANTOS ANIBAL CABALLER FERNANDEZ | ) | |
| _____ | ) | |


TRANSCRIPT OF PRETRIAL MOTIONS AND OPENING STATEMENTS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
JANUARY 12, 2010


LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

**JA952**

27

THE COURT:  You may begin.

MR. NAZZARO:  Thank you, Your Honor.

May it please the Court, counsel for the defendants, ladies and gentlemen of the jury.

Over the next two to three weeks, you will be entering into a different world, an underworld of sorts.  A world of gang, La Mara Salvatrucha, the MS-13.

As the evidence will show, ladies and gentleman, this is a gang that lives by violence.  That members often join by violence.  That members commit acts of violence.  And that members also discipline each other by violence.

As the evidence will unfold to you over the next two or three weeks, you will see that La Mara Salvatrucha is a gang of history.  It has international presence and national presence.  It has specific rules, codes of conducts, colors, it has sworn enemies.  This is the type of gang it is and this is the type of evidence you will hear.

As the Judge has indicated, this portion of the trial is opening statement.  It's the road map, the guide, there are some slides that I will be presenting to you, as sort of an outline of what the evidence will be.

The evidence, as the Court indicated, will come from that witness stand.  It will come from the exhibits that we enter into evidence.

By way of reintroduction, since now it's afternoon

**JA953**

28

and we were together throughout the large portion of the morning, my name is Sam Nazzaro.  I'm one of the federal prosecutors involved in this case and will be assisting and presenting the evidence in this case.

Mr. Zolot, who introduced us earlier, is seated there, and Mr. Adam Morris, they are all the federal prosecutors who will be presenting the evidence in the case.

You have also been introduced to Detective Chuck Hastings, seated there at the end.

Detective Hastings, as you will hear is known as the case agent.  You will hear from him as a witness in this particular case.  Detective Hastings who is a member of the Charlotte-Mecklenburg Police Department, is also a member of a specialized task force that the FBI has that deals with gangs.  He's deputized federally for that purpose?

And so with this team and some of the others that previously were introduced, we will be presenting the evidence of this throughout the course of this trial.

Now, as the Judge indicated, the evidence -- we're here because there has been an indictment returned.  The Judge has indicated that he will give you the indictment at the end of the case.

This, as you can see on the screen, is some of the charges that are set forth in the indictment.  It's a summary of the charges.  I will be talking about some of the

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 491 of 522
Case 3:08-cv-00134-RJC-DSC Document 59-14 Filed 07/28/11 Page 28 of 59
**JA954**

29

evidence that supports these charges.

As you can see, one of the charges which I will spend a little time talking about is a racketeering conspiracy charge, where all the defendants are charged.

Other charges that were involved with this MS-13 and these defendants are murder and murder in aid of racketeering, accessory after the fact of murder, conspiracy to distribute drugs, distribution of drugs, using communication facilities to distribute drugs.  You're going to hear evidence about robbery, robbery conspiracies, extortion, extortion conspiracies.

And you're also going to hear evidence about many of the defendants who are illegally here in the country, and have possessed firearms, also have re-entered after -- re-entered the country after being deported.

Now, you heard at the beginning of this case, and were introduced to the defendants by their names, starting with Julio Rosales Lopez seated over there.

Now, you've heard Mr. Lopez by his name.  But what you'll hear in this trial and the evidence will show ladies and gentlemen is, he doesn't go by the name Julio Rosales Lopez.  He goes by his gang name, which is Stiler.  That's the name you will hear, Stiler.

And evidence will show that he's an MS-13 member. He's from what's the called the Fulton clique.  That he's

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 492 of 522
Case 3:08-cr-00134-RJC-DSC Document 50-2 Filed 07/28/11 Page 29 of 49

**JA955**

30

from Mexico.  He's a senior member of the MS-13, an organizer, enforcer.

And the evidence will show that he conducted meetings, that he ordered members to be killed, or what's known as green lighted.  And he helped members to rob, extort and to escape after murder.  That's the name you'll hear is Stiler.

You next met Mr. Juan Gilberto Villalobos.  He's seated next to Mr. Stiler in the blue shirt there.  He's not known by that name, and people won't identify him by that name.  He's known by the gang name Smoke or Smoky.  He's an MS-13 member illegally here from Honduras -- excuse me, El Salvador.  You're gonna hear evidence about that.

You're gonna hear evidence about his drug dealing, about how he stored guns for the gang, how he collected taxes and rent from drug dealers and others.

Next, ladies and gentlemen, you'll meet Elvin Fernandez-Gradis who is seated over there next to Smoke.  But he doesn't go by that name.  He goes by the name Tigre, which you will hear evidence in Spanish means tiger.  He's originally from Honduras, entered and re-entered this country illegally.  You'll hear evidence of that.

He's from the Coronados clique of the MS-13.  He possessed firearms.  And you will hear evidence and talk a little bit about how he was triggerman on a murder that

**JA956**

31

occurred in April of 2008.

Next, you were introduced to Carlos Figueroa-Pineda seated over there.  Mr. Pineda is not known by that name.  That's not his name on the street.  That's not his gang name.  His gang name is Drogo, which means druggy or drugs.  He's a proud MS-13 member.  He's from a Charlotte clique.  He's also a drug dealer and possessed firearms and you're going to hear evidence of that, ladies and gentlemen.

And next you will one meet Johnny Elias Gonzalez who is seated next to him how goes by the name Solo.  That's his gang name.  It's Solo.  He's an MS-13 member from a Charlotte clique who possessed firearms.  And you'll hear evidence of another murder, in which was a robbery/murder which he participated about in 2005.

You'll hear about him plotting to kill and assault rival gang members.

And finally, ladies and gentlemen, you were introduced to the last person there, known as Santos Caballero Fernandez.  But that's not his name on the street.  That's not his MS-13 name.  You'll hear evidence that he goes by the name of Garra, which means claw.  He's an MS-13 member.  You'll hear evidence he's illegally here from Honduras.  He's a member of the Coronados clique.  He's a close associate of Tigre, and some of the other MS-13

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 494 of 522
Case 3:08-cr-00134-RJC-DSC Document 597 Filed 07/28/11 Page 31 of 73
**JA957**

32

members that here.  And he also was present at that 2008 murder, and assisted his fellow MS-13 member in the escape.

Now, collectively, ladies and gentlemen, they refer to each other as homeboys or homies.  That's the name they use.  That's the name means basically teammates or buddies.

And collectively, ladies and gentlemen, they're all charged in one charge that I talked to you about earlier, and that's the racketeering conspiracy charge.

Now the Judge, as he indicated is the master of the law and will destruct you on details and details of the law.  But I would like to give you a little framework of how some evidence will come in, based on some of the principles of racketeering and conspiracy.

Because you're going to hear evidence about an enterprise.  I'm going to talk more about the MS-13 enterprise.

But you're also going to hear about how it affects interstate commerce through its drug dealings, through the guns, through the phones.

You will see that these defendants are associated with this enterprise, and that they agreed to participate in the affairs of the enterprise.  Because it's a conspiracy case.  So you have to have an agreement.  You have to agree to participate in the affairs.

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 495 of 522
Case 3:08-cr-00134-RJC-DSC Document 654-4 Filed 07/28/11 Page 32 of 49
**JA958**

33

It sounds complicated with racketeering and conspiracy, but we're going to try to break it down for you a little bit now, and through the exhibits and the witnesses.

But you have to remember, ladies and gentlemen, that we will be presenting multiple acts that occurred during the course of this conspiracy. But they don't necessarily apply to every single defendant. But the key is to remember that whether they agreed to the principles of the conspiracy, whether or not anybody else actually committed the crimes.

As I indicated, a lot of the evidence will demonstrate that MS-13 is a criminal enterprise. Let's talk about some of that evidence and what a criminal enterprise is.

Basically, it's, you have to have an organization for an enterprise, in this case a criminal enterprise, with a purpose and some continuity.

We're going to talk a little bit about the organization of the MS-13, because you will hear evidence about how they are organized.

And what you'll hear, ladies and gentlemen, is that as I indicated previously, it is a gang with an international scope. Although the roots are in Los Angeles, traditionally, you will hear from expert witness who will

**JA959**

34

testify about how MS-13 was formed.  You're gonna hear from other witnesses in the case.

But the roots were in Los Angeles, as the evidence will show.  The core leadership is in El Salvador and Los Angeles.  It has spread across the United States and Central America, including in Charlotte here, and that's certainly why we're here today.

And you're gonna hear about the communication and control from El Salvador through some of evidence in the case.

You will also see, ladies and gentlemen, and when I introduce the defendants, reintroduce the defendants, I refer to some of them from certain cliques, the Fulton clique or Centrales clique.  What's a clique?

Well, a clique is basically an operating unit of the MS-13.  It's a subset.  You're gonna hear one of the witnesses refer to it as similar to a McDonald's franchise. They're all MS-13 members, all part of MS-13, but they belong to different operating units from time to time which are called cliques.

Cliquea, in Spanish, is the word you may hear.

Now, how do these cliques operate?  Do they have leadership?  And it is based on a system of senior leadership.  It's not a corporation.  It's not a formal organization in that regard.  But it does have a system of

**JA960**

35

leadership. And you gain status and leadership by committing criminal offenses.

And it's a big on respect. Somewhat of a vouching system, as to who the leaders are. And who is sent into the leaders, depends on other factors such as who vouched for them, who spoke for them in El Salvador and elsewhere.

And you will hear that these cliques have regular meetings. Sometimes they meet together. Certain -- the cliques meet as one clique, or they meet multiple cliques.

They sometimes refer to these meetings as a mesa. Which is a Spanish word. You will hear a lot of Spanish words. I'm gonna talk to you a little about translations in the case.

A mesa is a mass, in Spanish. That's the word they use. But they don't go to church. They go to a meting where they discuss criminal activity. That's part of how they're organized. And that's part of evidence you will hear ladies and gentlemen.

You will also see that the MS-13 organization has very specific rules and discipline. I motion at the beginning about some of the rules that they have, that they have specific rules, and some of those you're going to hear evidence of.

One of them is, when I say they join by violence, they have a jumping-in ceremony. It's a 13-second ceremony

**JA961**

36

where you're beaten into the gang.  It's a 13-second ritual. And that's part of how they joined the gang.  That's part of the ritual.  And they go by gang names.  I didn't make those up.  Those are their gang names.  That's part of the MS-13, they are proud of those names.

You will hear from some witnesses that don't even know the defendants' real names.  They know them by their gang names, because that is how they go by.

They go by certain colors.  Blue and white is traditionally maybe the colors of El Salvador flag.  They use the LA Lakers.  And you will see a lot of this colors. Because we seized a lot of this evidence.  And you're gonna see testimony of a lot of these colors.

They have hand signs.  They identify each other by hand signs.  And I'm not going to try to mimmick the hand signs.  You will see them during the course of the trial. But it's an M and an S.  And there's different ways to do it.  And if you do it, they know you did it.  If you do it wrong, they know you did it wrong, because they are particular hand signs.

They have slang, they have code.  They have a language of their own.  Some of these words like mesa, they use.  They have their own language.

Sometimes they speak in what's called reverse language.  They have a different way of speaking to help

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 499 of 522
Case 3:08-cr-00134-RJC-DSC Document 544 Filed 07/28/11 Page 36 of 549
**JA962**

37

evade law enforcement.

They have sworn enemies. Sworn enemies. Other gangs. One of them is the 18th Street who wears red. That's one of their sworn enemies. They call them Chavalas. That's another Spanish word that basically means little girl or lad. But they use it to identify for rival gang.

And you'll see evidence of this, ladies and gentlemen, through the things that we've seized, through the exhibits.

They have rules of discipline. I mention that when I first spoke to you. The rules of discipline require action. And when you violate the rules, you could be given a 13, sometimes, or a 26, which is a beating.

And if you ultimately break the rules of the MS-13 by, for instance, testifying, or doing something that is considered a violation of the rules, they can order what's known as a green light. Which is basically ordered you to die, as another member.

Now, ladies and gentlemen, any criminal organization also has to have a purpose. You will see through the witnesses, through the evidence that we will present, that MS-13 has really no -- has no legitimate purpose. It has a criminal purpose.

It's to preserve power and turf and territory, it's done through violence. And you're going to see

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 500 of 522
Case 3:08-cr-00134-RJC-DSC Document 543 Filed 07/28/11 Page 37 of 79
**JA963**

38

evidence of that in this case.  It's to expand the hood. It's not really about making money.  It's -- the money that is made is invested in other criminal activity to buy tools of the trade, to buy guns or other things.

But respect is a very support thing, to promote respect.  Enhance the gang activities, but through different criminal activity, but you have to have respect for the members.

And you'll see, ladies and gentlemen, through the evidence that we'll present, that the support for the gang doesn't end if you -- a gang member, another gang member goes to jail, or if another gang member commits a crime.  In fact, that's when it's stepped up.  They're there to help, because you're part of this organization.  You're part of this new family.

And they will often keep witnesses and victims in fear.  And you will see some evidence of that also in this case.

And you'll see that the gang remains constant. It's one enterprise.  It's the MS-13.  You'll hear about the M and the S.  It's the two big letters that matter.  Because the core structure doesn't change.  The rules remain constant throughout this organization.  And it doesn't matter if you're jailed, leaders, people can be replaced.

I talked, ladies and gentlemen, about the MS-13,

**JA964**

39

about -- what it's all about, how the enterprise works and some of the evidence that will demonstrate this. But the story really will be told through the MS-13 in Charlotte, North Carolina. That's not only where we are, but that's where the case is obviously.

And that story, ladies and gentlemen, begins really in the early 2000s. And you're going to hear evidence early on. And I'll tell you at the onset, as best as we will try to present the case to you in some sort of chronological fashion, it's not always possible because there's a lot of witnesses, a lot of exhibits, but we will try to tell the story as logically as we can throughout the course of this trial.

But the case begins early on in Charlotte, in the early 2000s, and around 2003, when officers in the Charlotte-Mecklenburg Police Department started discovering a lot of graffiti. Sometimes it's referred to as tagging. Marking your territory. A lot of MS-13 graffiti. You will see this graffiti. You will see photos of it, descriptions of it, what it stands for, what it means.

The officers started discovering a lot this throughout the early 2000s and 2003. And you will hear specifically about an incident at some point in this trial in 2003 about an incident at Blockbuster video involving an individual by the name of Chacua.

Case 3:16-cv-00057-MOC-DSC Document 59-2 Filed 03/23/17 Page 502 of 522
Case 3:08-cr-00134-RJC-DSC Document 1445 Filed 07/28/11 Page 39 of 73
**JA965**

40

I'm gonna come back to that name. But Chacua was an individual found vandalizing a Blockbuster Video. He's not in the courtroom today. And I'll talk about him in a little bit. But Chacua was subsequently deported. And you're gonna hear other things that were done early on.

Identification of gang members. They found in October 2004, Tigre and Drogo were at a meeting in a trailer, so that the police starting uncovering different things about these early meetings.

They also started to uncover certain crimes. And you're gonna hear evidence about one of those crimes which is a murder which I refer to, when I introduced Mr. Solo previously. You're gonna hear about August 6, 2005, a robbery and a murder of a Yonni Morales Maradiago.

And you're gonna hear that that was typical activity of the MS-13, because they were basically a robbery turned into a murder.

And they often -- one of the activities they often did, and you will hear evidence of this, and Mr. Solo's involvement, is that they would stakeout one of the local clubs, until some drunk people, sometimes they call them piases (phonetic) -- and I probably mispronounced the word and I know I probably did.

They wait for people which they refer to as non-gang members to come out. Hopefully they were drunk or

**JA966**

41

walking along, and they would rob them.  That happened August 6, 2005.

Mr. Solo was there, as the evidence will show, and ultimately Mr. Maradiago made the mistake of resisting with a penknife and was shot and killed.  You will hear evidence of that, ladies and gentlemen, as well as other evidence about some of these early activities.

Ultimately, what you're gonna see, ladies and gentlemen, and what you're gonna hear about, is that by 2006, and specifically getting into 2007, this FBI gang task force that I referred to that Detective Hastings and others, and other agents you're gonna hear from is Mike Attard, Special Agent of the FBI, they began concentrating their focus on gangs and the MS-13.

And they were picking up all this information, some of this early information.  They were trying to develop, what investigators do, sources of information, informants or cooperators.

And what happened, ladies and gentlemen, is you will hear in 2007, an individual came to them by the name of Rony.  You're gonna hear that name.  His name is actually Rony Lopez and we'll refer to him as Rony.

You will hear that in 2007, Rony, who was a member of the MS-13 Centrales clique, like Mr. Solo and some of the others, he was a gang member.  He was a gang member who did

**JA967**

42

a lot of bad things.  And you're gonna hear from Rony in this trial.  You're gonna hear, ladies and gentlemen, that he wanted out.  He had made a decision in 2007 that he wanted out.

Now you're going to hear the evidence about how easy or not easy it is to get out of the MS-13.  But he made the decision to get out.  And you're gonna hear from his own words, his motivations and what the decision was.

But what happened then, ladies and gentlemen is, he agreed to cooperate with Detective Hastings and the FBI, and to actually give the FBI insight into the inner workings of this gang.  That's what happened starting in the fall of 2007.

There was also another person at the time by the name of Sombre.  He's another person that the FBI developed as a source.  But as you will see, he wasn't able to separate himself from the gang.  And he was only a cooperator for a short time.  Rony, however, was able to separate himself, as you will see and hear from him.  And what happened next?

Well, what happened is, what the FBI did.  What they did is they developed a plan.  And the plan was to see what the inner workings were through wires.  No other simple way to say it.  You're gonna hear a lot of different names. You're gonna hear a Hawk and a Eagle, different names of

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 505 of 522
Case 3:08-cr-00134-RJC-DSC Document 448 Filed 07/28/11 Page 42 of 79
**JA968**

43

these types of wires.  Some have audio and video, others just have audio capability.  And they're called different things.

But they fitted Rony with these wires.  And they sent him back out to the gang who, as far as the gang knew, he was still one of them.  He was still one of the group, one of the gang, one of the MS-13.

And they began making a number of these recordings.  They also began making recording of phone conversations, through court-ordered wiretaps, and other methods.  They started recording activities of the MS-13.  And that's really in a large way, where the story starts with respect to the FBI's involvement in the MS-13.

Now, what the FBI uncovered then, was the network that I've been talking about where the MS-13 which is headquartered in Los Angeles and El Salvador, operates throughout the country.  In Charlotte in particular, it operates through cliques.  And you're gonna hear some of the names of those cliques.

As I said, some of the members are from different cliques.  Some from cliques that aren't even in Charlotte, but they're all part of the MS-13.  The cliques are the operating units.  And you're gonna hear about how they operated in Charlotte.

There's El Salvador on the map, the United States.

**JA969**

44

I think you probably would be better able to pick out Charlotte than I would.  But that's where the command and control was in this investigation, and you're going to hear about that.

Now what did the MS-13 do in Charlotte.  I told you lot of different things that the MS-13 does.  What did they do in Charlotte?

Well the main thing, as the FBI uncovered, was that they wanted to control turf.  Remember, that's one of their purposes, turf.

The control in Charlotte was basically through clubs, nightclubs, Hispanic nightclubs that were frequented by MS-13.  Some of the names that you're gonna hear are El Vaquero, Mi Cabana.  There's other clubs you might hear names of.  And so they controlled the clubs.

What do I mean by control?  Well, they would call it renting and taxing.  That is, we control this club.  We want to drug deal here.  We want to do criminal activity here.  If you want to do criminal activity here, you have to pay up to the MS-13.  That's a tax.  That's extortion.  They would rob and extort people in the clubs.  You will hear evidence of that.  But they had control of the clubs.

Some of the reason for that was the turf.  Some of it was to protect their own members' drug dealing.  You're gonna hear evidence about that drug dealing.  You're gonna

**JA970**

45

hear about Smoke in particular, who on four different occasions, you will hear the FBI actually bought drugs through him as a middleman through Rony.  And you're gonna hear from that through the tapes.  And you're gonna see the drugs.  And you're gonna hear the evidence about that.  But he was protecting his drug business as an MS-13 member.  And his other MS-13 members were assisting in that regard.

What the FBI also found, ladies and gentlemen, and you will hear evidence of that, is that the control of the MS-13, and I told you earlier that the command and control, so to speak, is in Los Angeles and El Salvador.

And in fact, you're gonna hear evidence of that. You're gonna hear evidence, because this individual -- remember I mentioned at Blockbuster Video.  The person who was at Blockbuster Video was putting some graffiti, subsequently deported, Chacua.  Well, Chacua, you're gonna hear from Chacua.  He's not here in court, but you're gonna hear from him because we have phone calls from him.

Where was he calling from?  He was calling from El Salvador from a jail where he gained access, as you'll hear that many MS-13 members do to telephones.  They controlled business from a jail in El Salvador.  And you're gonna hear evidence of that.

You're gonna hear own words.  You're gonna hear him talking to some of the other MS-13 members and others

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 508 of 522
Case 3:08-cv-00134-RJC-DSC Document 55-14 Filed 07/28/11 Page 45 of 79
**JA971**

46

about the control, and what matters most is the two big letters, the M and the S.  And he was controlling things from the jail.  And you're going to hear those conversations in this trial.

And what happened?  So Chacua was calling.  Why was he calling?  Well, he was calling to control it.  But he was also calling because he wanted some adjustments to be made to the Charlotte cliques.

Just like corporate headquarters finding out some of the things aren't going well.  In this case, he felt things weren't going well.  And so he called -- he called in.  And what did he say?

He said, well, I'm gonna send some senior members to make some adjustments.  One of those senior members is in the courtroom today, and it's Stiler, sitting right there.

One of the other senior members, you're gonna hear the name Wizard, isn't in the courtroom.  But they were two of the initial people that were sent to Charlotte to make the adjustments, to make sure the gang was committing crimes, was controlling the clubs, was organized properly, following the rules of MS properly.

And you're gonna hear evidence of this, ladies and gentlemen, through some organizational meetings that were had, and one of them referred to a meeting in the woods in October 2007, where the cliques get together to see if they

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 509 of 522
Case 3:08-cr-00134-RJC-DSC Document 504-5 Filed 07/28/11 Page 46 of 49

**JA972**

47

can form one clique in Charlotte, rather than having separate cliques.

You're gonna hear about a meeting in Greensboro, in November of 2007, hosted by Stiler and Wizard. And at that meeting, they started dictating what -- how to reorganize. How to bet tax in the clubs. How to commit the crimes for effectively. And how to live by the rules of MS-13.

You're gonna hear about those meetings, ladies and gentlemen. And you're gonna hear about other criminal activity that occurred in furtherance of this criminal enterprise that I've talked about.

You're gonna hear about attempted robberies of a prostitution house; a couple different occasions. Now, by this time, Chuck Hastings and the FBI was working with the informant, to basically -- they wouldn't let the robberies actually happen. So you're gonna hear evidence that they were attempts. That they stopped the robberies before they happened. But you're gonna hear some evidence of those.

And ultimately, ladies and gentlemen, eventually it will lead to an event that occurred on December 8, 2007, one of the other murders that we're gonna have evidence about. A murder that occurred in Greensboro, not here in Charlotte.

And you're gonna hear, ladies and gentlemen, that

**JA973**

48

at a Mexican restaurant in Greensboro, a family restaurant, two -- there was two of the patrons in there were the Salinas brothers who had frequented that restaurant. And there was a number of MS-13 members here. One of them is here in the courtroom, is Stiler, another one is Wizard. And you're gonna hear some names of other people that were there that night. And what happened?

Well, what happened, ladies and gentlemen, as the evidence will show, is that a murder occurred. The two Salinas brothers were shot dead with shots in the head, shots in the chest. And they were shot for one simple reason, because they disrespected the gang. And you're gonna hear evidence of that. They weren't gang members, but they disrespected the gang.

And so what did I say at the earlier in my presentation about the purpose of the MS-13; respect. But once you -- once the gang member gets in trouble, what happens? Well, the gang kicks into action.

In this case, Stiler kicked into action. What did Stiler do?

Well, he called Charlotte. Because now he had just been -- he had met his new homies in Charlotte. His new buddies in Charlotte, and he called for assistance. We're in Greensboro. We need help. How do we know that? We have a recording of the phone call.

**JA974**

49

We need help.  We need to come to Charlotte.  We had some problems.  Meet us in Concord.  And you're gonna hear about that meeting.  You're gonna hear evidence of that meeting.

And you're gonna hear that ultimately, where did they end up?  They ended up at the El Vaquero.  One of the clubs that I spoke about earlier.  One of the places where they had turf.  It was business as usual that night.

Two men lay dead in Greensboro, business as usual at the El Vaquero.  In fact, you'll hear evidence that Stiler and others participated in an extortion.  They just robbed the guy in the bathroom at the El Vaquero.  Business as usual.

Ultimately, the person known as Wizard, you're gonna hear evidence of that was arrested.  And he was arrested on December 12th.

Now, by this time, ladies and gentlemen, the MS-13 obviously is a little bit suspicious.  We have a cooperator.  A lot of arrests are being made.  Crimes were getting stopped before they happen.  And they're concerned.

So, as any concerned MS-13 members do, they call meeting.  Stiler calls a meeting in Greensboro, January 5th, 2008.

Now, ladies and gentlemen, you will have the opportunity to attend that meeting because there's a

**JA975**

50

recording of it.  You're gonna hear what was said.  So my opening is my opening statement, but you're going to hear in Stiler's own words what was said at that meeting.

You're gonna hear how they identify themselves at the meeting, how they talk only gang business at the meeting.  How they talk about charging rent, dealing drugs.  How they talk about merging the cliques and other criminal activity.

You're also going to hear about -- at this meeting is where Stiler put what's known as a "green light".  That's an MS-13 word.  And what that means is, they -- that someone is going to die.  And that person was Rony.  The person who was cooperating.  Because Stiler had concluded in his mind that he needed to die, because he felt there was sufficient evidence that he was cooperating.

You're going to hear evidence at this point in time after you attend that meeting, that you're also going to attend the discussions that went back and forth from El Salvador.  Because we have recorded phone calls from El Salvador from Chacua.  Because Chacua was the one calling from El Salvador and calling the shots.

You're gonna hear Chacua calling to discuss the green light, whether or not Rony would get killed.  And it was discussions with Rony, and there was discussions with other MS-13 members.

**JA976**

51

And you're gonna hear that ultimately they put a hold on it. They didn't feel there was enough evidence at the time, at least by the MS standards of what they needed, any papers. And they put a hold, a temporary hold on it. Put him on sort of a watch list.

But at this point the FBI, knowing some of the activities going on, decided to relocate Rony temporarily. And you're gonna hear evidence through the FBI and through Rony, there was a lot of cover stories that were told during this time period. Rony would say different things on why he was leaving, or why he was doing something. He would brag about doing things just so the MS-13 felt he was still one of them.

And ladies and gentlemen, nothing slowed down the criminal activity. The fact that some people got arrested, whatever, you're gonna hear evidence in January, in February, or January and March, and some other time periods of different events.

You're going to hear one in January 12, 2008 about Solo possessing firearms and talking about plans to assault rivals.

You're gonna hear about a search in January 18th, 2008, Stiler's apartment. The same apartment where he had the meeting. We're gonna bring in the evidence the assault weapon that he had in his apartment. The MS-13

**JA977**

52

paraphernalia, the notebooks, the photos that he had.

You're gonna hear about other things that happened in January of Drogo, of an incident involving guns and drugs that were seized out of where he was staying.

You're gonna hear about attempt -- another robbery attempt which was stopped by the police in Virginia, involving a firearm that Smoke provided.

Because a lot of these guns and these firearms were MS-13 guns that were held at one time and the other by different individuals.

Ultimately, ladies and gentlemen, what you're going to see is that additional meetings were held. And once again, you will have the opportunity, ladies and gentlemen, to attend some of these meetings because these are also in court.

And you're going to actually see some video of some of the meetings. The video, because they were on a person aren't very clear, but there's some video.

You're gonna see one of the meetings where they were asked to actually lift up their shirts to see if they have a wire on. The wire, of course, is concealed elsewhere. And you're gonna get to go to the meetings.

By this time another senior leader arrived, his name is Misterio. He's not in the courtroom, but he is one of the co-conspirators.

**JA978**

53

And you're gonna see that Rony was able to return by them, the cover story that the FBI had used and Rony had used, sufficed.  He attended these meetings.  You're also gonna see that a lot of the other people in the courtroom attended the meetings.

February 29, Tigre, Garra, Drogo and Smoke were at the meeting.  And you're gonna see as I said, that these are MS-13 clique meetings, there are multiple clique meetings.

You're also gonna see on March 7 that Drogo and Smoke were present at the meeting.  So you're going to see various members at various times, some who attended meetings, some who attended meetings, but not particular meetings that I'm referencing here.  But you're gonna hear from other MS-13 members about them being at meetings.

And then a third murder, ladies and gentlemen, is -- we're going to present to you through the evidence.  And that murder occurred on April 12, 2008.  It was a murder of a young man named Ulisses Mayo.  It occurred on Belton Street here in Charlotte.  And that was suppose to be a birthday party for a one-year old child of a woman named Kathy.

And at the time Kathy was dating a man by the name of Ruben.  You're gonna hear from several of the witnesses that were at the party.  But Ruben was invited to the party.

And Ruben, at the time, worked at a bakery with

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 516 of 522
Case 3:08-cr-00134-RJC-DSC Document 1446 Filed 07/28/11 Page 53 of 59
JA979

54

his cousin Ulisses. So he brought Ulisses. Ulisses came in the car. He never left the car. He never left the car alive. He stayed in the passenger seat as Ruben left the car to go to the party.

Now also attending the party was Tigre and Garra, and other MS-13 members who aren't here in the courtroom.

And when Ruben got out of the car as the evidence will show, he made a big mistake. And what was that big mistake? He wore the color red. Well red happens to be the color of the 18th Street, a rival gang. That didn't go over too well with the MS-13. Didn't go over too well with Tigre. Didn't go over too well with Garra.

And so, ladies and gentlemen, what you'll hear is that Ruben was immediately told by his girlfriend and others to get back in the car and get out of here.

Meanwhile Ulisses, who is the victim, never left the passenger seat. As Ruben got back in the car, getting ready to leave, you will see evidence that Tigre, Garra, came up to the window, started ordering that the window be brought down. And they said some other things, which you'll hear from the witnesses, some other ways that they said it were probably not as nice as I just did. And they asked that the window be brought down.

Well, unfortunately, Ulisses couldn't roll down the window. The window didn't work, or he couldn't roll it

**JA980**

55

down fast enough.  It didn't matter.  It was just a split second later, Tigre starts firing rounds into the vehicle. One of the rounds killed Ulisses.  The others he fired as the car sped asway.  So you'll hear evidence of several rounds that were fired.

You're gonna hear from the witnesses that were there.  But you're also going to hear, obviously, from some of the crime scene people about this.

And who helped him escape?  Well, his buddy, Garra.  His MS-13 member, because that's what the MS-13 does.

Ultimately, unfortunately, tragically, Ulisses Mayo died with the one shot, all over the red clothing on April 12th, 2008.

Now, one of the things I said, ladies and gentlemen, is that the help -- the MS-13 help to other members, doesn't mean just driving them away at necessarily a murder scene.  That's one thing.  Or having other MS-13 members meet, we also include intimidating witnesses.  We're gonna hear some evidence of that.

One of the murders as you recall in Greensboro, at the restaurant, you're gonna hear about an attempt there to intimidate witnesses that were at the restaurant, by the MS-13.

You're also gonna hear about another attempt at a

Case 3:16-cv-00057-MOC-DSC  Document 50-2  Filed 03/23/17  Page 518 of 522
Case 3:08-cr-00134-RJC-DSC  Document 50-2  Filed 07/28/11  Page 55 of 59
**JA981**

56

Charlotte bakery, involving a murder I just spoke about, the Mayo murder in April, where a worker at the bakery where Ruben and Ulisses worked at, were approached with a firearm by gang members.

And that's the type of evidence, ladies and gentlemen, that we're going to be presenting to you throughout the course of this trial.

You're ultimately gonna hear, and I told you about Rony and a lot of these recordings that he made and others and the FBI was able to make. Ultimately, he was relocated, and is now, as you're gonna hear from him, in the witness security program, commonly referred to as the Witness Protection Program.

Now, the types of evidence, ladies and gentlemen, that we will present, and I think I've referred to a lot of this, but I just wanted to -- just go over a few points before I close-up here on some of the types of evidence that you'll hear about.

I talked about Rony. He was a gang member. And he's going to tell you his story. As the Judge said, you're gonna be the judges of the facts. The judges of the credibility of the witnesses.

But you're gonna hear a lot of the tapes that he made also. You're gonna hear from Rony himself. You're gonna hear about his story, which I told you a little bit

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 519 of 522
Case 3:08-cr-00134-RJC-DSC Document 504-5 Filed 07/28/11 Page 56 of 59
**JA982**

57

about.  And you have to ultimately be the judges of that.  But you're gonna see what evidence supports what is said by Rony and others.

Now -- but in addition to Rony, there's gonna be other gang members, Rony a former gang member, and other gang members who were part of this gang, this group here, this conspiracy, that will testify.  They're members who have pled guilty.  And you're gonna hear about plea agreements they entered into.  And they're gonna tell you their story.  It's gonna be their story about their involvement in the MS-13, their involvement with these defendants.  And you're gonna hear from their own words.

Some of those individuals speak English, some speak Spanish.  I talked to you a little bit about the language I through -- and probably butchered a few Spanish words in the meantime, but we're gonna have professional translators testify as experts, people that are familiar with the language.

And when you see the recordings, you will obviously hear them in Spanish, but you'll be able to see them in English, the translated portions.  So you'll see them on a screen, and be able to understand what was going on.

But we will have to present, obviously, that evidence, how that was formulated, and how the interpreters

Case 3:16-cv-00057-MOC-DSC Document 50-2  Filed 03/23/17  Page 520 of 522
Case 3:08-cr-00134-RJC-DSC Document 843  Filed 07/28/11  Page 57 of 79
**JA983**

58

do their work.  You're gonna also see, as you see in the courtroom, different people that are interpreting.  And if there's a Spanish-speaking witness, you'll obviously be able to hear the evidence in English.

But you're going to hear from experts like that.  You're gonna hear from some other forensic experts.  You're gonna hear from a gang expert, who I referenced earlier.  He's from Los Angeles, his name is Frank Flores.  And he's gonna tell you about the MS-13 and how it's organized.

You're gonna see a lot of evidence from search warrants and other things that we're gonna present to you the actual physical exhibits.  You're gonna see guns and drugs.  And I refer to immigration information, because several of the defendants are charged with being here illegally.

You're also going to see, ladies and gentlemen, that they continue to communicate.  You're gonna see evidence of that, through the evidence in this trial, is that the MS-13 is the MS-13 for life.  They don't necessarily stop just because, you know -- just because they're arrested, or somebody is picked up, one of their members is picked up.  It's an ongoing enterprise.  It's an ongoing criminal enterprise.

And as I said, ladies and gentlemen, there will be a lot of different types of evidence, a lot of witnesses

Case 3:16-cv-00057-MOC-DSC Document 50-2 Filed 03/23/17 Page 521 of 522
Case 3:08-cr-00134-RJC-DSC Document 545 Filed 07/28/11 Page 58 of 59

**JA984**

59

that may not be in a perfect order.  But at the end of the case, ladies and gentlemen, you will see how the MS-13 operates.  How it operates as a gang of violence that celebrates violence on a daily basis, through not only its initial phases as you get in, but what you do when you're there, and how it punishes people.

And at the end of the case when the government, Mr. Zolot and myself come back to visit you, we will ask you to return the only just verdict in this case, which will be a verdict of guilty on all counts against all defendants.

Thank you for your time and attention.

Counsel, do you want the podium or do you want me to --

MR. GSELL:  You can leave that, please.

THE COURT:  Mr. Beam.

MR. BEAM:  Thank you, Your Honor.

Ladies and gentlemen, I'm going to be a lot more brief than the government.

And I wish I could tell you that I thought things were going to get a lot clearer; expect them to get a lot more complicated.  You're going to hear a lot of evidence.  Some of it, facts are what the facts are.

The issue becomes, how do the facts apply to what the law as the Court will instruct you are.  I sincerely doubt we're going to agree on that with the government.

**JA985**