No.  10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff-Appellee, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) |
|  | ) |
| Defendant-Appellant. | ) |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix**
**Volume 3 of 11**

VINCENT J. BRUNKOW
ZANDRA L. LOPEZ
JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467
Attorneys for Defendant-Appellant

-and-

MALCOLM RAY HUNTER, JR.
Attorney at Law
P.O. Box 3018
Chapel Hill, N.C. 27515-3018
Telephone:  (919) 929-9655

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

iii

Defendant's Reply to Government's Response to Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence Before Allowing Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . . . 1202

      Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

      Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

           By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
           By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne               Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet        Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette    Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn           Direct Examination . . . . . . . . . 1239

    J.E. Brown               Direct Examination . . . . . . . . . 1243

    Frank Flores            Direct Examination . . . . . . . . . 1247
                              Voir Dire Examination . . . . . . . 1255
                              Redirect Examination . . . . . . . . 1257
                              Cross Examination . . . . . . . . . . 1316

    Charles Barkley         Direct Examination . . . . . . . . . . 1332
                              Cross Examination . . . . . . . . . . 1338

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/23/17    Page 5 of 508

Jeff Bruner                 Direct Examination . . . . . . . . . . 1339

Eduardo Vasquez             Direct Examination . . . . . . . . . . 1344

Lenny Moriera               Direct Examination . . . . . . . . . . 1352
                            Cross Examination  . . . . . . . . . . 1369

John Sloane                 Direct Examination . . . . . . . . . . 1371
                            Cross Examination  . . . . . . . . . . 1391

Gene Richey                 Direct Examination . . . . . . . . . . 1391

Juan Ruben Vela Garcia      Direct Examination . . . . . . . . . . 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341)  . . . . . . . . . . . . . . . . . . . . . . . . . 1485

Juan Ruben Vela Garcia      Direct Examination . . . . . . . . . . 1492
                            Cross Examination  . . . . . . . . . . 1498
                            Redirect Examination  . . . . . . . . 1529

Officer James K. Griffen    Direct Examination . . . . . . . . . . 1530

Ann Hamlin                  Direct Examination . . . . . . . . . . 1537

T.J. Miller                 Direct Examination . . . . . . . . . . 1544
                            Cross Examination  . . . . . . . . . . 1566

Marie Terrell               Direct Examination . . . . . . . . . . 1570
                            Cross Examination  . . . . . . . . . . 1576

Officer Benjamin Altizer       Direct Examination . . . . . . . . . . 1576
                               Cross Examination  . . . . . . . . . . 1584

Officer Ryan Dutko             Direct Examination . . . . . . . . . . 1586

Abel Santos                    Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos                    Cross Examination  . . . . . . . . . . 1644

Marco Antonio Guzman Mejia     Direct Examination . . . . . . . . . . 1651
                               Cross Examination  . . . . . . . . . . 1663

Teresa Ketner                  Direct Examination . . . . . . . . . . 1666
                               Cross Examination  . . . . . . . . . . 1703
                               Redirect Examination  . . . . . . . . 1705

Barry Whitlow                  Direct Examination . . . . . . . . . . 1707

John D. Butts                  Direct Examination . . . . . . . . . . 1715
                               Cross Examination  . . . . . . . . . . 1733

James Cayton                   Direct Examination . . . . . . . . . . 1735

Amy Wilde                      Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde                      Direct Examination . . . . . . . . . . 1765
                               Cross Examination  . . . . . . . . . . 1773

Doreen Huntington              Direct Examination . . . . . . . . . . 1780
                               Cross Examination  . . . . . . . . . . 1797

Susan Conrad | Direct Examination . . . . . . . . . . 1804
Cross Examination . . . . . . . . . . 1840

Jeff Strohm | Direct Examination . . . . . . . . . . 1846
Cross Examination . . . . . . . . . . 1851

Officer Renee Quiles | Direct Examination . . . . . . . . . . 1851
Cross Examination . . . . . . . . . . 1856

Rony Antonio Magana Lopez | Direct Examination . . . . . . . . . . 1856

## VOLUME 5 (1900 - 2390)

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256) . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez | Direct Examination . . . . . . . . . . 1903
Cross Examination . . . . . . . . . . 1953
Redirect Examination . . . . . . . . 1987
Recross Examination . . . . . . . . . 1988

William Chuck Hastings | Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343) . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings | Direct Examination . . . . . . . . . . 2034
Cross Examination . . . . . . . . . . 2044

Alexandra Hirsch | Direct Examination . . . . . . . . . . 2049
Cross Examination . . . . . . . . . . 2054

Michele Scheuerman | Direct Examination . . . . . . . . . . 2055
Cross Examination . . . . . . . . . . 2064

Gene Rivera | Direct Examination . . . . . . . . . . 2065
Cross Examination . . . . . . . . . . 2086

vii

Andrew Cheramie          Direct Examination . . . . . . . . . . 2090
                         Cross Examination  . . . . . . . . . 2095

Jose Romero              Direct Examination . . . . . . . . . . 2095

Alexander Granados       Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2133


Alexander Granados       Direct Examination . . . . . . . . . . 2136
                         Cross Examination  . . . . . . . . . 2138
                         Redirect Examination  . . . . . . . . 2158

Maricruz Medina          Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie        Direct Examination . . . . . . . . . . 2166

Chris Tyndall            Direct Examination . . . . . . . . . . 2173
                         Cross Examination  . . . . . . . . . 2190

Mark Young               Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson  Direct Examination . . . . . . . . . . 2208
                         Cross Examination  . . . . . . . . . 2213
                         Redirect Examination  . . . . . . . . 2213
                         Recross Examination . . . . . . . . . 2215

Jeffrey Taylor           Direct Examination . . . . . . . . . . 2216
                         Cross Examination  . . . . . . . . . 2247
                         Redirect Examination  . . . . . . . . 2254

Denise Daniels           Direct Examination . . . . . . . . . . 2255
                         Cross Examination  . . . . . . . . . 2257

William Chuck Hastings  Direct Examination . . . . . . . . . . 2259
Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

Sergeant Scott Clarkson  Direct Examination . . . . . . . . . . 2323
Cross Examination  . . . . . . . . . . 2330

Denise Daniels  Direct Examination . . . . . . . . . 2332
Cross Examination  . . . . . . . . . . 2333

Jeffrey Taylor  Direct Examination . . . . . . . . . . 2333
Cross Examination  . . . . . . . . . . 2356
Redirect Examination  . . . . . . . . 2359

William Chuck Hastings  Direct Examination . . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . . 2391

Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding "Equally Culpable" Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . . . 2540

      Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
      Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
      Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
      Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
      Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

      Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . . . 2559

      Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

      Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

      Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

          By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
          By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

      Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

          Ismar Sanchez                     Direct Examination . . . . . . . . . . 2574
                                              Cross Examination . . . . . . . . . . 2584
                                              Redirect Examination . . . . . . . . 2590

          David Henderson                Direct Examination . . . . . . . . . . 2590

Carlton Phoenix                Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . 2648

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

        Thomas Small                Direct Examination . . . . . . . . . . 2651
                                    Cross Examination . . . . . . . . . . 2677

        Roberto Ramos               Direct Examination . . . . . . . . . . 2680
                                    Cross Examination . . . . . . . . . . 2694

        Juan Lara                   Direct Examination . . . . . . . . . . 2699
                                    Cross Examination . . . . . . . . . . 2706

        Raffi Djabourian            Direct Examination . . . . . . . . . . 2709
                                    Cross Examination . . . . . . . . . . 2715

        John Maloney                Direct Examination . . . . . . . . . . 2716
                                    Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall               Direct Examination . . . . . . . . . . 2730
                                       Cross Examination . . . . . . . . . 2756
                                       Redirect Examination . . . . . . . . 2781

        Barry Telis                   Direct Examination . . . . . . . . . . 2784
                                         Cross Examination . . . . . . . . . . 2798
                                       Redirect Examination . . . . . . . . 2803

        William Moore              Direct Examination . . . . . . . . . . 2806
                                         Cross Examination . . . . . . . . . . 2820
                                       Redirect Examination . . . . . . . . 2822

        Susan Selser                 Direct Examination . . . . . . . . . . 2822

        J. Sage                     Direct Examination . . . . . . . . . . 2838
                                         Cross Examination . . . . . . . . . . 2842

        L. Goodman               Direct Examination . . . . . . . . . . 2843
                                       Cross Examination . . . . . . . . . . 2844

        A. Thornwell              Direct Examination . . . . . . . . . . 2846
                                       Cross Examination . . . . . . . . . . 2851

**VOLUME 7 (2857 - 3373)**

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 13 of 508

Carlos Alfredos
Dominguez Gonzalez          Direct Examination . . . . . . . . . . 2874
                           Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper            Direct Examination . . . . . . . . . . 2902
                           Cross Examination  . . . . . . . . . . 2908

Luis Amaro                  Direct Examination . . . . . . . . . . 2911
                           Cross Examination  . . . . . . . . . . 2917

Russell Lashley             Direct Examination . . . . . . . . . . 2919
                           Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 2930
                           Cross Examination  . . . . . . . . . . 2931
                           Redirect Examination  . . . . . . . . 2935
                           Recross Examination . . . . . . . . 2936

Douglas Friend              Direct Examination . . . . . . . . . . 2938
                           Cross Examination  . . . . . . . . . . 2944

Jean Garcia                 Direct Examination . . . . . . . . . . 2946
                           Cross Examination  . . . . . . . . . . 2952

Carmen Garcia               Direct Examination . . . . . . . . . . 2953
                           Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia            Direct Examination . . . . . . . . . . 2959
                           Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2975

     Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham        Direct Examination . . . . . . . . . . 2986
                       Cross Examination   . . . . . . . . . . 3050

Richard McGough        Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260)  . . . . . . . . . . . . . . . . . . . . . . . 3096

Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

Richard McGough        Direct Examination . . . . . . . . . . 3099
                       Cross Examination   . . . . . . . . . . 3157

Selena Sermeno         Direct Examination . . . . . . . . . . 3167
                       Cross Examination   . . . . . . . . . . 3189
                       Redirect Examination  . . . . . . . . 3203

Maria Santacruz Geralt  Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350)  . . . . . . . . . . . . . . . . . . . . . . 3234

Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

Maria Santacruz Geralt  Voir Dire Exam. by Defendant  . . . 3237
                        Voir Dire Exam. by Government . . 3250
                        Direct Examination . . . . . . . . . . . . 3256
                        Cross Examination  . . . . . . . . . . . . 3263

Mark Bezy              Direct Examination . . . . . . . . . . . . 3276
                       Cross Examination  . . . . . . . . . . . . 3289

xiv

James R. Merikangas, Ph.D.          Direct Examination . . . . . . . . . . . . 3294
                                    Cross Examination  . . . . . . . . . . . . 3317

Government's Rebuttal Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

Helen Mayberg          Direct Examination . . . . . . . . . . . . 3336
                       Cross Examination  . . . . . . . . . . . . 3358

## VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . . . 3374

Defendant's Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

Richard McGough          Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

xv

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

**VOLUME 9 (3705 - 4209)**

**EXHIBITS**

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3,  School Records . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home  . . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael  . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia  . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D.  . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana  . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana  . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez  . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez  . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

FILED
CHARLOTTE, NC

JAN 26 2010

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | VERDICT FORM |
| | ) | |
| ELVIN PASTOR FERNANDEZ-GRADIS (6) | ) | |

1.      As to Count One, charging the defendant Elvin Pastor Fernandez-Gradis with conspiracy to conduct, or participate in the conduct, of the affairs of an enterprise affecting interstate commerce through a pattern or racketeering activity, in violation of 18 U.S.C. § 1962(d), we, the jury, unanimously find the defendant:

Guilty: __X__     Not Guilty: _____

1a.     If guilty, did the defendant's agreement include the willful, deliberate and premeditated murder of Ulisses Alejandro Mayo De La Torre, in violation of N.C. Gen. Stat. § 14-17?

Yes: __X__     No: _____

2.      As to Count Fifty-One, charging the defendant Elvin Pastor Fernandez-Gradis with murder in aid of racketeering, in violation of 18 U.S.C. § 1959, or aiding and abetting in that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

Guilty: __X__     Not Guilty: _____

Final 1.0 Page 1

**JA986**

3.    As to Count Fifty-Two, charging the defendant Elvin Pastor Fernandez-Gradis with use of a firearm in relation to crime of violence resulting in death, in violation of 18 U.S.C. § 924(j), we, the jury, unanimously find the defendant:

Guilty: ____X____    Not Guilty: _____

3a.    If guilty, was the killing with malice aforethought?

Yes: ___X____    No: _____

4.    As to Count Fifty-Four, charging the defendant Elvin Pastor Fernandez-Gradis with being an illegal alien in possession of firearm, in violation of 18 U.S.C. § 922(g)(5), or aiding and abetting in that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendnat:

Guilty: ____X____    Not Guilty: _____

5.    As to Count Fifty-Five, charging the defendant Elvin Pastor Fernandez-Gradis with illegal re-entry into the United States by a deported alien, in violation of 8 U.S.C. § 1326(a), we, the jury, unanimously find the defendant:

Guilty: ___X____    Not Guilty: _____



Signed:

Dated: _____11 - 26 - 10_____

Final 1.0 Page 2

JA987

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:08CR134-RJC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| ALEJANDRO ENRIQUE RAMIREZ | ) | |
| UMANA, | ) | |
| a/k/a "Wizard" | ) | |
| "Lobo" | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

THIS MATTER is before the Court on the defendant's "Motion to Dismiss Counts for Improper

Venue or In the Alternative, for a Change of Venue to the Middle District of North Carolina" (Doc. No.

480) and the government's Response (Doc. No. 503). The Magistrate Judge issued a Memorandum and

Recommendation and Order ("MR&O"), recommending that the defendant's Motion to Dismiss be denied

and denying the defendant's alternative Motion for a Change of Venue (Doc. No. 527), to which the

defendant objects (Doc. No. 543). For the reasons stated below, the Court **DENIES** the defendant's

Motion to Dismiss and **AFFIRMS** the Magistrate Judge's Order denying the defendant's Motion for a

Change of Venue.

I.     BACKGROUND

The defendant is charged in a Superseding Indictment[1] with the multiple federal offenses arising out

---

[1] The Court notes that the instant motion was filed on April 24, 2009, against the defendant's
Second Superseding Indictment (Doc. No. 355). The grand jury returned a Third Superseding
Indictment on July 27, 2009. The Court evaluates the defendant's motion against the allegations set

1

**JA988**

of his alleged affiliation with La Mara Salvatrucha, also known as the MS-13 gang (hereafter "MS-13").

Count 1 of the Indictment charges the defendant with conspiring to conduct and participate in the affairs

of MS-13 through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). As an overt act

in furtherance of this conspiracy, the Indictment alleges that on December 8, 2007, the defendant murdered

two individuals, Ruben Garcia Salinas and Manuel Garcia Salinas, in a restaurant in Greensboro, North

Carolina. These murders are also charged separately in Counts 22 and 24 of the Indictment as murder in

aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and in Counts 23 and 25 as use of a firearm

during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). The

government also alleges that the defendant conspired with others to prevent witnesses to these murders

from testifying or otherwise cooperating with law enforcement. These allegations form the basis for Counts

61, 62, and 63 of the Indictment, charging the defendant with conspiracy to obstruct justice and tamper

with witnesses, in violation of 18 U.S.C. §§ 371, 1503, and 1512(b)(1), as well as those substantive

offenses.

The defendant argues that Counts 1, 22, 23, 24, 25, 61, 62, and 63 should be dismissed from the

Indictment because the government has failed to establish that venue is proper in the Western District of

North Carolina.[2] The Magistrate Judge recommended that this motion be denied based on findings that the

government had sufficiently alleged facts establishing venue for each count. The defendant's objections

---

forth in his Third Superseding Indictment.

[2] It is somewhat unclear whether the defendant in fact moves to dismiss Count 1 for improper venue. However, the Magistrate Judge's Memorandum and Recommendation construed the defendant's motion as such and addressed the propriety of venue for Count 1. (Doc. No. 527: MR&O at 9).

2

**JA989**

specifically challenge the Magistrate Judge's findings that: (1) Counts 22, 23, 24, and 25 allege continuing conduct that took place in the Western District of North Carolina; and (2) the offenses alleged in Counts 61, 62, and 63 were carried out with the intent to affect a grand jury proceeding initiated in the Western District of North Carolina. (Doc. No. 543: Obj. at 1-3).

In the alternative, the defendant moved for a change of venue. The magistrate judge denied this motion upon his finding that venue in the Western District of North Carolina was proper. The defendant objects to this Order on the same grounds raised in his objections to the Magistrate Judge's Memorandum and Recommendation. (Id. at 4).

## I.    STANDARD OF REVIEW

Federal Rule of Criminal Procedure 59(a) allows a district judge to refer to a magistrate judge for determination any matter that does not dispose of a charge or defense. When a party objects to a magistrate judge's order on a nondispositive matter, a district judge must determine whether the order is contrary to law or clearly erroneous. Fed. R. Crim. P. 59(a). A district judge may also refer any matter that may dispose of a charge or defense, such as a motion to dismiss an indictment. Fed. R. Crim. P. 59(b)(1). When a party objects to a magistrate judge's recommendation for a dispositive matter, a district court must consider the objection de novo. Fed. R. Crim. P. 59(b)(3).

## III.    DISCUSSION

### A.    Murder in Aid of Racketeering and Use of Firearm Resulting in Death

The Magistrate Judge first considered whether venue was proper for Counts 22 and 24, charging the defendant with two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1). Relying on the reasoning set forth in United States v. Saavedra, 223 F.3d 85 (2d Cir. 2000), the Magistrate

3

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 24 of 508
Case 3:08-cr-00134-RJC Document 692   Filed 03/18/10   Page 3 of 10

**JA990**

Judge determined that a violation of § 1959 is a continuing offense predicated upon a racketeering enterprise, alleged in this case to be MS-13, making venue proper in any district in which MS-13 operated. (Doc. No. 527 at 5-6). Because the Indictment alleged that many of MS-13's activities occurred in the Western District of North Carolina, the Magistrate Judge found that venue lay in that district for Counts 22 and 24. (Id. at 6).

The Magistrate Judge then considered whether venue was proper for Counts 23 and 25, each charging the defendant with use of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). Finding that murder in aid of racketeering is, in this case, a predicate offense to those charged under § 924(j), the Magistrate Judge reasoned that venue lay for Counts 23 and 25 in any proper venue for Counts 22 and 24. (Id. at 7). Having found that the Western District of North Carolina was a proper venue for Counts 22 and 24, the Magistrate Judge then found that venue was also proper for Counts 23 and 25. (Id. at 8). Although the defendant objects to the Magistrate Judge's findings regarding each count, the objections collapse into a single issue: whether Counts 22 and 24 allege continuing conduct that took place in the Western District of North Carolina.

For continuing offenses, venue is proper "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Courts have held that 18 U.S.C. § 1959 is a continuing offense because it requires as an essential element that the act be done for the purpose of maintaining or increasing position in an ongoing enterprise engaged in racketeering. See Saavedra, 223 F.3d at 88-94; United States v. Williams, 181 F. Supp.2d 267, 290-92 (S.D.N.Y. 2001); United States v. Aiken, 76 F. Supp.2d 1346, 1349-51 (S.D. Fla. 1999). Thus, "the murders contemplated by Section 1959 are those which occur not as single, solitary acts, but as part of the larger structure of the criminal enterprise." Aiken, 76 F. Supp. 2d

4

JA991

at 1350 (citing United States v. Concepcion, 983 F.2d 369, 380-81 (2d Cir. 1992)). Because an offense under § 1959 is a continuation of an underlying racketeering enterprise, it may be tried in any venue where that enterprise operates.

The defendant argues that his case is materially distinguishable from the facts of Saveedra because the government has not shown that MS-13 is principally based in the Western District of North Carolina. In Saavedra, the Second Circuit considered the proper venue for defendants, members of a racketeering organization operating in the Southern District of New York, charged with committing an assault punishable under § 1959 that occurred in the Eastern District of New York. Noting that offenses under § 1959 are "part and parcel of membership in a RICO enterprise," 223 F.3d at 91, the Second Circuit held that venue for § 1959 offenses lay in any district that had "substantial contacts" with the offense, including the underlying racketeering enterprise. Id. at 93 (quoting United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985). Relying upon the district court's finding that the defendants' racketeering enterprise was "principally based" in the Southern District of New York, the Second Circuit held that venue was proper in that district. Id. at 94.

The Saavedra court made a separate inquiry into "substantial contacts" between the forum and the underlying racketeering activity because it questioned whether the Constitution would permit the government to prosecute a § 1959 offense in one venue and the underlying RICO offense in another. 223 F.3d at 92-93. Here, unlike Saavedra, a RICO conspiracy is also charged in Count 1 of the defendant's Indictment. Where the government actually charges a defendant with a RICO conspiracy under 18 U.S.C. § 1962(d), it is without question proper to charge related § 1959 offenses in the same venue. See Aiken, 76 F. Supp. 2d at 1350-51. Although the defendant moves to dismiss his RICO conspiracy charge for

5

Case 3:16-cv-00057-MOC Document 50-3    Filed 03/23/17    Page 26 of 508
Case 3:08-cr-00134-RJC Document 603    Filed 03/23/10    Page 5 of 10

**JA992**

improper venue, he makes no specific objection to the Magistrate Judge's finding that venue is proper for that count. (Doc. No. 527: MR&O at 8-9). That finding is accepted by the Court; thus, the government may also prosecute the defendant's § 1959 charges in this forum without making an additional showing that MS-13 is principally based in or otherwise bears substantial contacts with the Western District of North Carolina.

Lastly, the defendant argues that the government has not alleged that the Greensboro murders were carried out for the benefit of a racketeering enterprise operating in the Western District of North Carolina, as opposed to some other organization operating elsewhere. This is simply not true. Counts 22 and 24 each allege that the defendant committed murder for the purpose of maintaining and increasing his position in MS-13, "a criminal organization described in paragraphs 1 through 16 of Count One [of the Indictment]." (Doc. No. 623: Third Superseding Indictment at 47 & 49). These paragraphs describe MS-13's operation within the Western District of North Carolina and elsewhere. The government's allegations are therefore sufficient to link the purpose behind the defendant's acts and a specific racketeering enterprise operating within the Western District of North Carolina. Thus, the Magistrate Judge correctly concluded that venue is proper for Counts 22 and 24, as well as Counts 23 and 25.

### B.    Obstruction of Justice and Witness Tampering

The Magistrate Judge next found that venue was proper for Count 61, charging a conspiracy to obstruct justice and tamper with witnesses under 18 U.S.C. §§ 371, 1503, and 1512(b)(1), because the Indictment alleges overt acts of communication and travel by co-conspirators within the Western District of North Carolina. (Doc. No. 527: MR&O at 11). The Magistrate Judge then found that venue was also proper for Counts 62 and 63, charging obstruction of justice and witness tampering as substantive offenses,

6

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 27 of 508
Case 3:08-cr-00134-RJC   Document 693   Filed 03/18/10   Page 6 of 10
**JA993**

because at the time alleged in the Indictment, a grand jury investigation had already convened in the Western District of North Carolina. (Id. at 10). The defendant objects to these findings on the ground that he lacked actual knowledge of the grand jury's investigation at the time alleged in Counts 61, 62, and 63 of the Indictment.

The Fourth Circuit has recognized that "in a conspiracy charge, venue is proper for all defendants wherever the agreement was made or wherever any overt act in furtherance of the conspiracy transpires." United States v. Bowens, 224 F.3d 302, 311 n.4 (4th Cir. 2000). Moreover, the Fourth Circuit has held that the acts of one member of a conspiracy can be attributed to all other co-conspirators for purposes of venue. United States v. Al-Talib, 55 F.3d 923, 928 (4th Cir. 1995) (citing United States v. Snead, 527 F.2d 590, 591 (4th Cir. 1975)). Count 61 alleges a conspiracy to obstruct justice and tamper with witnesses that includes overt acts of communication and travel by co-conspirators between the Western and Middle Districts of North Carolina. (Doc. No. 623: Third Superseding Indictment at 89-90). Thus, the Magistrate Judge correctly concluded that venue is proper in the Western District of North Carolina for Count 61 of the Indictment.

For Counts 62 and 63, which charge substantive offenses under 18 U.S.C. §§ 1503 and 1512(b)(1), venue is designated by statute. See United States v. Johnson, 510 F.3d 521, 524 (4th Cir. 2007) ("In accordance with . . . constitutional principles, Congress may, if it so desires, prescribe specific venue requirements for a particular crime."). A 1988 amendment to 18 U.S.C. § 1512, which now appears as subsection (i) to that statute, states that:

> A prosecution under [section 1512] or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected, or in the district in which the conduct constituting the alleged offense occurred.

7

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 28 of 508
Case 3:08-cr-00134-RJC Document 923   Filed 03/18/10   Page 7 of 10
**JA994**

Although Counts 62 and 63 allege conduct occurring in Greensboro, within the Middle District of North Carolina, a federal grand jury investigation of the defendant and MS-13 was then pending in Charlotte, within the Western District. Its investigation included the Greensboro murders, and the basis for Counts 62 and 63 of the Indictment is the government's allegation that the defendant sought to prevent witnesses from testifying and cooperating with law enforcement regarding those murders. A significant connection therefore exists between the conduct alleged in Counts 62 and 63 of the Indictment and the federal grand jury investigation that convened in the Western District of North Carolina.

Contrary to what the defendant argues in his objection, the government need not allege or prove that the defendant had actual knowledge of the federal nature of his proceeding to establish venue in the Western District of North Carolina under 18 U.S.C. § 1512(i). To convict the defendant of witness tampering under 18 U.S.C. § 1512(b)(2), the government need only prove that the defendant intended to influence, delay, or prevent the testimony of any person in an official proceeding that was in fact federal, not that the defendant knew the proceeding was federal in nature. 18 U.S.C. § 1512(g)(1); United States v. Pabellon, 1999 WL 305052, at *8-9 (4th Cir. May 14, 1999) (unpublished); United States v. Cross, 258 F. Supp. 2d 432, 434-35 (E.D.Va. 2003). Similarly, "while the existence of an ongoing proceeding is an element of [an 18 U.S.C. § 1503] violation, . . . the statute does not require a specific intent to interfere with a proceeding known by the defendant to be federal in nature." United States v. Ardito, 782 F.2d 358, 362 (2d Cir. 1986) (internal quotations and citations omitted). See also United States v. Aragon, 983 F.2d 1306, 1310 (4th Cir. 1993) (a defendant charged with violating § 1503 in connection with an escape plot need not have knowledge that the prisoner he sought to free was in custody on federal charges).

To establish venue, the government is not required to prove an element of knowledge beyond that

8

**JA995**

which is required to convict the defendant of either offense. An allegation that the defendant sought to prevent witnesses from testifying or otherwise cooperating with law enforcement regarding the Greensboro murders, coupled with the grand jury's investigation into those murders in the Western District of North Carolina, is sufficient. Thus, the Magistrate Judge correctly concluded that venue is also proper for Counts 62 and 63.

9

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 30 of 508
Case 3:08-cr-00134-RJC Document 693   Filed 03/13/10   Page 9 of 10

**JA996**

## IV.    CONCLUSION

After a de novo review of each objection raised by the defendant, the Court finds no error in the conclusions reached by the Magistrate Judge. Accordingly, the Court also finds for the same reasons that the Magistrate Judge's denial of the defendant's motion in the alternative for a change of venue was not contrary to law or clearly erroneous.

**IT IS, THEREFORE, ORDERED** that the defendant's Motion to Dismiss Counts for Improper Venue (Doc. No. 480) is **DENIED** and the Order (Doc. No. 527) denying the defendant's Motion In the Alternative for a Change of Venue (Doc. No. 480) is **AFFIRMED**.

Signed: March 18, 2010

Robert J. Conrad, Jr.
Chief United States District Judge

10

JA997

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

UNITED STATES OF AMERICA        )
          )
       vs.          )
          )     <u>ORDER</u>
          )
ALEJANDRO UMANA (2)        )
_____ )

**THIS MATTER** is before the Court on motion of the defendant to declare him ineligible for the death penalty based on mental retardation, (Doc. No. 690), and his supporting memorandum, (Doc. No. 750). For the reasons that follow, the Court finds that the defendant has not established by a preponderance of the evidence that he is mentally retarded; therefore, the motion will be denied.

I.     BACKGROUND

The defendant is charged with capital offenses among various charges relating to an alleged RICO conspiracy involving the MS-13 gang. (Doc. No. 275: Notice).[1] However, a death sentence may not be carried out on a mentally retarded person. 18 U.S.C. § 3596(c). Based on the defendant's motion to determine whether he is mentally retarded prior to trial, the Court held an evidentiary hearing

---

[1] The precipitating murders charged in the indictment allegedly occurred in a restaurant in Greensboro, North Carolina, on December 8, 2007, after which the defendant allegedly fled to Charlotte, North Carolina, with the assistance of MS-13 gang members. (Doc. No. 623: Indictment at ¶ 23(kk)).

**JA998**

on November 30, 2009.[2]

The defendant called three expert witnesses at the hearing: Dr. John Olley, Dr. Ricardo Weinstein, and Dr. James Merikangas. Dr. Olley is a psychologist licensed in North Carolina who focused on the defendant's adaptive abilities.[3] (Tr. 5; Def. Ex. 1).[4] Dr. Olley interviewed the defendant in jail and interviewed family members, a school official, former employers, and friends of the defendant in El Salvador with the assistance of an interpreter. (Tr. 39; Def. Ex. 2). Dr. Weinstein is a psychologist licensed in California who performed intelligence testing on the defendant.[5] (Tr. 144, 153; Def. Ex. 13 and 14). Dr. Merikangas is a medical doctor licensed in Maryland, with certifications in psychiatry and neurology, who conducted a neurological examination of the defendant and interpreted a radiological scan of the defendant's brain.[6] (Tr. 261, 265, 270, Def. Ex. 15 and 16).

The government called Dr. Enrique Suarez, a psychologist licensed in Florida who conducted intelligence testing on the defendant and also focused on the defendant's adaptive abilities.[7] (Tr. 286;

---

[2] Courts have determined that pretrial hearings are in the interest of judicial economy. United States v. Davis, 611 F. Supp. 2d 472, 474 (D. Md. 2009) (collecting cases).

[3] Dr. Olley stated he had testified approximately 16 times in state or federal court, always on behalf of a defendant, except in 1 state case. (Tr. 80).

[4] The transcript of the hearing is filed at Doc. No. 932.

[5] Dr. Weinstein stated he had testified in over 100 cases. (Tr. 152). In cases involving the death penalty, he had always testified on behalf of a defendant. (Tr. 188).

[6] Dr. Merikangas estimated that he had testified more than a dozen times in federal court, including at least 1 appearance on behalf of the government. (Tr. 264).

[7] Dr. Suarez estimated that he had testified in over 900 cases in state and federal court, appearing approximately 650 times for the defendant and nearly 200 times for the government. All of his approximately 5 appearances in federal court had been on behalf of the government. (Tr. 287-288).

2

Case 3:16-cv-00057-MOC JC Document 50-34   Filed 03/23/17   Page 33 of 508
Case 3:08-cr-00134-RJC Document 50-34   Filed 03/23/17   Page 2 of 20
**JA999**

Gov't Ex. A2).  Dr. Suarez interviewed the defendant and three officers who had interacted with him in

jail. (Tr. 291; Gov't Ex. A3).  During the hearing, the Court received exhibits, including the reports,

curriculum vitae, and electronic presentations of the witnesses, as well as letters and other

communications of the defendant.

II.    DISCUSSION

     A.    Legal Standard

In Atkins v. Virginia, 536 U.S. 304, 321 (2002), the Supreme Court held that the Eighth

Amendment prohibits imposing the death penalty on mentally retarded persons.  In referencing clinical

definitions of mental retardation, the Supreme Court recognized they require "not only significant

limitations in intellectual functioning, but also significant limitations in adaptive skills, such as

communication, self-care, and self-direction that became manifest before age 18." Id. at 318.  The

definitions of mental retardation by the American Association on Mental Retardation (AAMR)[8] and the

American Psychiatric Association (APA) were mentioned in a footnote, Id. at 309 n.3.

The AAMR's  definition provides that:

> Mental retardation relates to substantial limitations in present functioning. It is
> characterized by significantly subaverage intellectual functioning, existing concurrently
> with related limitations in two or more of the following applicable adaptive skill areas:
> communication, self-care, home living, social skills, community use, self-direction, health
> and safety, functional academics, leisure, and work. Mental retardation manifests before
> age 18.

AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed. 2002).

---

[8] This organization is now called the American Association on Intellectual and Developmental
Disabilities (AAIDD).  A new edition of the organization's manual was published in 2010, but the
defendant does not contend the definition has been substantively revised. (Olley, Tr. 16-17).

3

**JA1000**

The APA's definition states that:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).

B.    Factual Findings

1.    Intellectual Functioning

In order to establish that he is mentally retarded, a defendant must prove he has substantial limitations in intellectual functioning.[9] Intelligence quotient (IQ) testing is recognized as an important, but not exclusive, indicator of intellectual functioning. Maldonado v. Thaler, — F. Supp. 2d — , 2009 WL 3074330, at *17 (S.D. Tex. 2009). It is generally accepted that an IQ score two standard deviations below the mean, or a score of 70 where the mean is 100, is the threshold for mental retardation.[10] (Olley, Tr. 19; Weinstein, Tr. 70; Suarez, Tr. 289). Although IQ testing theoretically results in a standardized, objective measure of intelligence, there was sharp disagreement at the hearing regarding the testing methods employed by Drs. Weinstein and Suarez which resulted in divergent IQ scores for

---

[9] The defendant did not dispute that he bears the burden to prove mental retardation by a preponderance of the evidence. (Tr. 4), See Davis, 611 F. Supp. 2d at 474 (defendant's burden of proof).

[10] Some states, such as North Carolina, use an IQ of 70 as a prerequisite to a finding of mental retardation. Larry v. Branker, 552 F.3d 356, 368 (4th Cir. 2009).

4

Case 3:16-cv-00057-MOC Document 59-3   Filed 03/23/17   Page 35 of 508
Case 3:08-cv-00134-RJC Document 59-3   Filed 03/23/17   Page 4 of 20
JA1001

the defendant.[11]  Given the Court's factual findings below regarding the defendant's adaptive skills, it is not necessary to resolve the conflicting evidence regarding his intellectual functioning.

        2.        Adaptive Skills and Functioning

Even if the defendant were able to establish an IQ score within the range allowing for mental retardation, he must also show significant limitations in adaptive skills. Atkins, 536 U.S. at 318.  The AAMR and APA definitions of mental retardation considered by the Supreme Court in Atkins require present significant limitations in at least two of the following skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Id. at 309 n.3.  These are the skills required for adults to function in their every day lives. Although the focus of the definitions is the current level of functioning, Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir. 2009), courts have looked retrospectively at defendants' lives because mental retardation, if present, inhibits skills that should emerge during the developmental period, that is, birth to age 18, United States v. Davis, 611 F. Supp. 2d 472, 476 (D. Md. 2009).

Standardized tests, such as the APA's Diagnosic and Statistical Manual, Fourth Edition (DSM-IV), and the Adaptive Behavior Assessment System (ABAS), are available to measure adaptive skills objectively.  This case presents particular difficulty as Drs. Olley and Suarez each chose not to use such tests because they are  not standardized based on the El Salvadoran population. (Def. Ex. 2 at 5;

---

[11]  For example, Dr. Weinstein found the defendant's full scale IQ score to be 66, below the threshold for finding mental retardation, using the Spanish translation of the Wechsler Adult Intelligence Scale III (WAIS III) standardized in Mexico. (Def. Ex. 14 at 1-2).  Dr. Suarez administered the Spanish translation of the WAIS III standardized in Puerto Rico and found the defendant's full scale IQ score to be 93, well above the mental retardation threshold. (Gov't Ex. A3 at 14).

5

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 36 of 508
Case 3:08-cr-00134-RJC Document 49-3   Filed 03/13/10   Page 5 of 20

JA1002

Suarez, Tr. 34739).  Instead, they interviewed the defendant and persons familiar with him to assess his adaptive skills.  Recognizing that "[t]he adaptive behavior prong is the most fact-intensive, and subjective, part of the mental retardation inquiry," Maldonado, — F. Supp. 2d —, 2009 WL 3074330, at *33,[12] the Court must distill from the record whether there is evidence of intellectual impairment that produced "real-world disabling effects" in the defendant's life, User's Guide: Mental Retardation 24-25 (AAIDD, 2007), causing him to need "supports and protections," Mental Retardation 33 (AAMR 2002).

a.     Communication

Evidence regarding the defendant's communication skills came through his interaction with Drs. Olley, Weinstein, and Suarez; information reported by persons who know the defendant; and letters and recorded telephone conversations of the defendant.  In summary, the evidence does not show that the defendant has a significant limitation in the ability to communicate, even though his writing reflects the fact that he is uneducated.

Dr. Olley testified that the defendant willingly answered questions and was able to provide factual information about his life and family. (Tr. 43).  Dr. Weinstein noted that the defendant has verbal strengths. (Tr. at 163).  Dr. Suarez testified at length regarding the information relayed to him by the defendant about his personal and family history, his experience in jail, and his understanding of his case. (Tr. 299-321).  None of the doctors indicated any difficulty in communicating with the defendant.

Others who know the defendant have likewise not experienced problems in their interactions

---

[12]  That court noted that the same evidence can be viewed by defense experts who conclude the glass is half-empty and government experts who conclude it is half-full. Maldonado, — F. Supp. 2d —, 2009 WL 3074330, at *34.

6

Case 3:08-cr-00134-RJC  Document 99-3  Filed 03/23/10  Page 6 of 20

**JA1003**

with the defendant. The mother of his child in El Salvador knew the defendant before he came to the United States. (Olley, Tr. 68). She told Dr. Olley that the defendant was responsible toward his child and had treated her respectfully. (Id.). Each of the corrections officers interviewed by Dr. Suarez reported that the defendant had been cooperative with them and made appropriate requests for things he needed, despite his limited ability to speak English. (Gov. Ex. A3 at 19-23). One officer noted that he observed the defendant teaching Spanish to other inmates. (Id. at 22).

The government provided some of the defendant's letters and telephone calls intercepted by jail officials which had been decoded and translated.[13] Dr. Olley described how the defendant used a code when speaking that involved reversing syllables in words and a code in writing that involved letter substitution. (Tr. 70-71). He also relayed that a translator told him that the defendant did not separate words, that he spelled words incorrectly, and that there was no sequence to his thoughts. (Tr. 69). Dr. Suarez found the defendant's coded letter writing to be significant because it evidenced the defendant had something in his mind that he wanted to say and was aware of the need to prevent other people from reading the letters. (Tr. 366). Having reviewed the letters, the Court finds that the defendant is able to communicate cogently in writing, including expressing feelings;[14] giving directions to use a code when

---

[13] The defendant did not claim someone else had written the letters.

[14] In a letter postmarked September 8, 2009 , mailed under a different name, the defendant wrote to Jamie Sandoval, a co-defendant, "Look they [his attorneys] are even going to have my dad come so I can see him and so he can be present during the trial but I have been thinking that when they sentence me that is going to mess with his head and I don't want that." (Letter JMU 148).

7

Case 3:16-cv-00057-MOC-RJC Document 50-3 Filed 03/23/17 Page 38 of 508
Case 3:08-cr-00134-RJC Document 593 Filed 03/19/10 Page 7 of 20

**JA1004**

writing;[8] making jokes, even sexual innuendo;[8] requesting legal intervention;[8] and an understanding of concepts, such as constitutional rights.[9]  It is also clear from the letters that the defendant read mail directed to him. (Letter JMU 56).

Accordingly, the evidence establishes that the defendant does not have significant limitations in communication.  Although his writing reflects his lack of formal education, he has the ability to communicate in writing and orally so that others can understand the ideas he is conveying.

> b.      Self-care

Information about the defendant's ability to care for himself came from the same people that described his ability to communicate.  Dr. Olley related that the defendant's father said the defendant lived with him until age 16. (Tr. 53).  After that, the defendant worked for a building contractor and lived with his family. (Id.).  The defendant told Dr. Suarez that he quit that job after 18 months when he left El Salvador to come to America. (Tr. 310).  It is to be expected that the defendant would have lived with a family during his childhood and teenage years.  Except for the defendant's father's report that the

---

[8]  In a letter postmarked July 1, 2009, the defendant wrote to Carlos Figueroa, a co-defendant, "Make yourself an ABC and send it within the letters and I am going to find it." (Letter JMU 56).

[8]  Congratulating someone for finally responding to one of his letters, the defendant wrote, "You responded to one of my letters and your prize is going to be A ONE EYED BIG HEAD DOLL Just tell me how I can send it to you because that's your prize I hope you enjoy it ha-ha-ha I hope you play with it and give it little kisses on the little head where it has the eye ha-ha-ha." (Letter JMU 22) (all capital letters in original).

[8]  In a letter dated July 27, 2009, the defendant wrote the Consulate of El Salvador, "Well after this little greeting I'll move on to my next issue I am Alejandro E. Umaña, and I write to you to see if you can help me with a case I am fighting in North Carolina in Mecklenburg County and I am afraid they would like to give me the death penalty or life in prison for some crimes." (Letter JMU 2).

[9]  In letter JMU 148, the defendant relates his attorneys' strategy to argue that police violated constitutional laws when he was interrogated.

**JA1005**

defendant had poor memory (Tr. 54), there is no evidence that he required special support in the area of self-care prior to age 18.

The only information about the defendant as an adult came from the defendant and his jailers. Some courts have discounted the value of such evidence under the theories that persons with mild mental retardation are likely to embellish their description of their skills to avoid stigma and that highly structured environments, like jail, do not provide a realistic picture of how a person would function on his own. Davis, 611 F. Supp. at 494-95. In the circumstances of this case, the Court credits the testimony of Dr. Suarez about the defendant's ability to care for himself as an adult because the details the defendant provided are verified by other evidence. For example, the defendant reported that he drove himself around the country, including from New York to Atlanta and from Greensboro to Charlotte. (Gov't Ex. A3 at 6). Dr. Olley testified that the defendant showed him on a map that Interstate 85 south is used to go from Greensboro to Charlotte. (Tr. 108). The defendant reported a history of migraine headaches since age 4 or 5, (Gov't Ex. A3 at 7), and during the evidentiary hearing he experienced one and vomited during a break, (Tr. 285).

Accordingly, the Court finds that the defendant's and correctional officers' reports of his ability to recognize his own needs and seek to have them met, Gov't Ex. A3 at 7-9, 20-23), are credible and persuasive. Thus, the defendant has not shown by a preponderance of the evidence that he has substantial limitations in the area of self-care.

        c.       Home Living

As detailed above, Dr. Olley testified that before age 18, the defendant did not maintain his own home, as would be expected. The only information at the hearing about the defendant's home living

9

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 40 of 508
Case 3:08-cr-00134-RJC Document 99-1   Filed 03/13/10   Page 9 of 20

JA1006

after age 18 came from the defendant through Dr. Suarez. The defendant related that he has lived in motels or shared a room with co-workers in North Carolina and Georgia which would cost approximately $130 per week.[10] (Gov't Ex. A3 at 6). He liked to eat breakfast at fast food restaurants, but when he had the ability to cook, he would make soup or combine what was available for a meal. (Id.). He purchased clothes and basic items at discount or second-hand stores, but bought his shoes at malls. (Id.). He washed his clothes by hand or at coin laundromat. (Id.). When he needed a telephone, he used public phones, but at the time of his arrest in 2008, he had obtained a mobile phone. (Id.). Given the correctional officers' accounts of the defendant's cleaning his cell, taking care of his clothes, and using the telephone while in custody, (Gov. Ex. A3 at 20-22), the Court finds the defendant's statements to Dr. Suarez to be credible. Thus, the defendant has not proven that he has substantial limitations in home living.

d.      Social Skills

As summarized in the area of communication, the evidence shows that the defendant has the ability to communicate effectively with others. Dr. Olley related that the family the defendant lived with in El Salvador described his behavior around others as child-like. (Tr. 66). Dr. Olley opined that the defendant joined the MS-13 gang out of naivete and was victimized by the gang. (Tr. 127). However, Dr. Olley admitted that people in El Salvador refused to discuss the defendant's involvement in the gang, that he did not speak to any gang members to determine whether the defendant was a leader or follower, and that he did not listen to any of the jail calls. (Tr. 53, 68, 127).

---

[10] In-Town Suites currently advertises weekly rates in Atlanta, Georgia, as low as $149.99. See http://www.intownsuites.com/detail_metro.asp?city=Atlanta.

10

Case 3:16-cv-00057-MOC-JC   Document 50-3   Filed 03/23/17   Page 41 of 508
Case 3:08-cr-00134-RJC   Document 632   Filed 03/19/10   Page 10 of 20

**JA1007**

The Court has reviewed the defendant's interaction with others, reflected in his interviews with law enforcement, telephone calls from jail, and letters, and finds that Dr. Olley's opinion regarding the defendant's social skills is not persuasive. The Court finds that the evidence establishes the defendant's ability to respond to various social situations: he has been pleasant and cheerful with family and friends, (Def. Ex. 2 at 7); he has been respectful to those in authority, (Gov't Ex. A3 at 20-21); he has exercised authority and given direction to others in MS-13, (Letter JMU 18); and he has responded with hostility to those who opposed or threatened him, (Gov't Ex. A3 at 13-14; Letter JMU 13). Therefore, the defendant has not established that he has substantial limitations in social skills.

e.        Community Use

The next area of consideration is use of community resources. Dr. Olley provided school records from El Salvador showing that the defendant withdrew from school without completing the third grade. (Def. Ex. 3). The official who provided the records was not at the school when the defendant attended and, thus, could not state whether the defendant's low grades and withdrawal were the result of intellectual deficits or poor effort and supervision.[11] (Tr. 94). There was no evidence of any other community resources available to the defendant in El Salvador. The evidence about his use of community resources in America came from the defendant himself. He told Dr. Suarez about sending money to El Salvador via Western Union. (Gov't Ex. A3 at 4). Also, he took his wife to the hospital in a taxi when she was in labor and later took the child to the doctor on different occasions. (Id. at 5). He

---

[11]  The defendant told Dr. Suarez he dropped out after his grandmother died and there was no one to supervise him. (Tr. 307).

11

Case 3:16-cr-00057-MOC-DSC  Document 503  Filed 03/23/17  Page 42 of 508
Case 3:08-cr-00134-RJC  Document 583  Filed 03/19/10  Page 11 of 20
**JA1008**

never obtained a driver's license,[12] but he purchased vehicles which he drove until he could no longer afford them. (Id.). He said he never received any disability payments, (Id. at 6), but there was no evidence that he sought such assistance or should have. Thus, the defendant has not proven he suffered substantial limitations in using community resources.

f.      Self-direction

As noted above, the Court is not persuaded by Dr. Olley's theory that the defendant did not live independently in El Salvador and that he joined a gang because he lacked the ability to direct himself. Likewise, the Court finds that Dr. Olley's opinion that the defendant's travel from El Salvador to California and then to New York was only accomplished at the direction of others, (Tr. 70), is not supported by any evidence in the record. It was clear that the defendant traveled with another person and that they took advice from people about how to cross international borders and reach their destination, (Suarez, Tr. 300-302), but no evidence suggests that the defendant was led by the hand, unable to make decisions. The defendant's ability to travel across the country, as evidenced by his traffic accident in Georgia and arrest in North Carolina, shows his ability to make decisions to pursue employment or visit people and take the necessary steps to carry out a plan. Additionally, the defendant's letters reflect a choice not to give information to the police, even though he knew some gang members were. (Letter dated June 16, 2009, to Carlos Figueroa). Therefore, the defendant has not shown that he has substantial limitations in self-direction.

g.      Health and Safety

---

[12] The defendant said he was able to obtain an identification card while in New York. (Suarez, Tr. 300).

12

**JA1009**

Evidence presented at the hearing shows that the defendant was aware of his needs regarding health and safety. The defendant and people who knew him reported that he suffered from frequent headaches. (Def. Ex. 2 at 7; Gov't Ex. A3 at 7). After he was placed in jail, the defendant told medical personnel about his head injury and headaches, along with other medical problems. (Gov't Ex. A3 at 9). He further reported that Tylenol usually helped with his headaches. (Id. at 10). The defendant stated, and corrections officers confirmed, that he exercised while in custody, doing push-ups and sit-ups, playing basketball, and walking or running. (Id. at 8, 20). Accordingly, the evidence does not show the defendant had substantial limitations in maintaining his health and safety.

### h. Functional Academics

A great deal of information was presented at the hearing regarding the defendant's academic skills. As noted above, the defendant did not complete the third grade, which the school official informed Dr. Olley was very unusual. (Tr. 49). Yet, the defendant's grades were not the lowest in the class and it was not unusual for children in El Salvador to drop out of school to go to work. (Tr. 92-93). The defendant himself reported that he quit going to school because of a lack of supervision by his family. (Suarez, Tr. 307). The contractor who employed the defendant as a teenager said that he was able to measure re-bar with a tape measure; however, when Dr. Olley asked the defendant to measure objects with a regular ruler, he made mistakes.[13] (Tr. 102-103). When Dr. Olley showed him a map, the defendant was not able to locate Charlotte, North Carolina, but he was able to identify El Salvador and the United States and describe the interstate used to travel between Greensboro, North Carolina,

---

[13] Dr. Olley admitted the defendant's mistakes using the ruler could be a sign of malingering. (Tr. 104). In a letter, the defendant showed his awareness that the psychological testing by the doctors was to see if he qualified for the death penalty. (Letter JMU 56).

13

Case 3:16-cv-00057-MOC-JC Document 59-3 Filed 03/23/17 Page 44 of 508
Case 3:08-cr-00134-RJC Document 52-4 Filed 03/19/10 Page 23 of 20
**JA1010**

and Charlotte. (Tr. 106-108). The defendant's letters reflect his lack of formal education, as shown by misspellings and lack of punctuation, but they also show the ability to read and write at a level sufficient to communicate with other adults.

The defendant's father described the defendant as generally having problems handling money, and one of his employers said that he did not consider the defendant capable of handling money. (Olley, Tr. 54, 59). Evidence from later in the defendant's life, however, reflects that he progressed in the area of mathematics and handling money. The defendant reported to Dr. Suarez that he helped organize a soccer league in El Salvador, which involved hiring a referee. (Tr. 308). Not only did he remember the amount paid to the referee, but he accurately related the exchange rate between El Salvadoran colones and United States dollars. (Id.). Corrections officers observed the defendant using a computer kiosk for checking his commissary account balance and placing orders. (Gov't Ex. A3 at 20-21). In one of his letters, the defendant wrote in detail about his commissary account and accurately did the math to figure his balance.[14]

While the evidence is mixed and presents a closer call than most of the other adaptive abilities, the Court finds that the defendant progressed from the limitations present in his childhood and that the preponderance of the evidence does not show that the defendant is currently substantially limited in

---

[14] The defendant wrote:

So he [defendant's father] put in 22 dollars because I said it [telephone calling card] costs 20 but with taxes it comes out to 21.15 and that's what he put in No little extra for some soup but no problem.

(Letter JMU 22).

14

Case 3:16-cc-00057-MOC-JC  Document 59-3   Filed 03/23/17   Page 45 of 508
Case 3:08-cr-00134-RJC  Document 632   Filed 03/19/10   Page 14 of 20
JA1011

functional academic skills, such that he needs supports and protections.

i.      Leisure

Evidence regarding the defendant's leisure activity centered on his interest in soccer.  The  family the defendant lived with in El Salvador reported that the defendant enjoyed music, dancing, and soccer. (Olley, Tr. 66).  The defendant told Dr. Suarez about being good at soccer, not being financially able to play on a traveling soccer team, and organizing games, including hiring a referee and owning his own cleats. (Tr. 307-308).  He further reported playing card games, such as rummy, poker, and blackjack. (Gov't Ex. A3 at 8).  Accordingly, the Court finds that the defendant has not show he has substantial limitations enjoying leisure activities appropriate for his age.

j.      Work

As with functional academics, the was a great deal of focus on the defendant's work history at the hearing.  Dr. Olley chronicled the various jobs the defendant held or attempted prior to leaving El Salvador with information from the defendant's family and former employers.  Dr. Suarez relayed the defendant's work history upon arrival in the United States from interviewing the defendant himself.

The defendant's father stated that the defendant failed at his first job with a shoemaker because he was not able to learn what needed to be done. (Olley, Tr. 52).  After attempting some other jobs, the defendant held two positions for more than a year. (Id.).  The first was working as a helper on a truck that delivered Coke products when the defendant was 15 years old. (Id. at 52, 58).  According to the father and the employer, the defendant was not responsible for driving the truck or managing money, but

15

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 46 of 508
Case 3:08-cr-00134-RJC   Document 603   Filed 03/19/10   Page 15 of 20
JA1012

simply assisted with carrying products from the truck to the store.[15] (Id. at 58-59).  The defendant's

other job working for a building contractor began when he was about 17 years old. (Id. at 63).  His role

was to assist a mason by carrying items, mixing cement, but also measuring and cutting re-bar. (Id. 63-

64).

Dr. Olley opined that the defendant functioned in these jobs at the level of his capability which

was limited by mild mental retardation. (Tr. 101).  However, he admitted that many American teenagers

perform similar entry-level roles. (Id. 102).  Particularly when considering the defendant's age at the time

he entered the work force and the context of the El Salvadoran job market, the Court finds that the

evidence does not establish that his limited role was related to any intellectual deficit.  During his adult

working career, the defendant continued working, usually in the construction field, taking different jobs

depending on the opportunity. (Gov't Ex. A3 at 5-6).  Although there is no corroborating evidence to

support it, there is also no contradicting evidence regarding the defendant's account of working in

various jobs digging ditches, washing cars, roofing and installing fixtures in houses, and painting and

building fences in the cities of New York, Atlanta, and Greensboro. (Id.).

Courts have found that rote tasks can be mastered by mildly mentally retarded persons. Davis,

611 F. Supp. 2d at 505.  While the defendant's childhood and teenage employment reflects such types

of work, it is not necessarily attributable to intellectual deficits.  His account of adult employment reflects

jobs that would require abilities beyond mastery of rote, repetitive tasks.  Accordingly, the Court finds

that the defendant has not carried his burden to prove he currently has substantial limitations in the area

---

[15]  The defendant told Dr. Suarez he did learn to drive the manual transmission truck on rural
roads where there was little traffic. (Gov't Ex. A3 at 4).

16

**JA1013**

of work.

> k.    Additional Evidence

Subsequent to the evidentiary hearing on November 30, the Court conducted the trial of co-defendants in January 2010.  Although the Court finds that the information presented at the Atkins hearing is sufficient to find that the defendant does not have significant limitations in adaptive skills, reliable evidence introduced during the trial supports that conclusion.[16]  For example, MS-13 gang member Alexander Granados testified that the defendant wrote him a letter from jail wherein the defendant identified two other gang members as snitches. (Doc. No. 907: Tr. 43).[17]  Juan Vela Garcia described the defendant as one of the people sent to organize a group of MS-13 gang members in Charlotte. (Doc. No. 906: Tr. 32).

Another gang member, who was cooperating with the police, recorded a conversation with the defendant immediately after the incident in Greensboro.  According to the English interpretation of that recording, the defendant explained how they had to high-tail it out of there because of something that they did, that the victims started a beef with the hood, and that the victims thought the gang was a joke. (Gov't Trial Ex. 47A, Session 3 at 8-10).  He offered to help the informant strike back at rival gang members who had shot out the rear window of the informant's car and to help the informant shorten his .30-30 rifle by taking off its stock. (Id. 11, 14).  He gave another gang member directions about

---

[16]  The trial evidence was subject to cross-examination by those sharing an interest with the defendant as the Greensboro homicides were charged as overt acts of a RICO conspiracy and one of the defendants was charged with being an accessory after the fact to murder in the aid of racketeering. All the defendants were convicted of the RICO conspiracy and Defendant Rosales Lopez was convicted of the accessory charge. (Doc. Nos. 842-847: Jury Verdicts).

[17]  Citations will be provided where transcripts are currently available.

17

**JA1014**

changing clothes and announced his own plan to wash his hands with urine. (Id. 20).[18]  When they

arrived at a club, the defendant asked whether he would be frisked going in asked where he could go

urinate. (Id. 22-25).  According to the informant, the defendant asked him to smell the gun involved in

the shooting while they were in the bathroom of the club. (Id. at 26).  The informant also described how

the defendant later attempted to get to the pistol hidden under a couch in a residence when a SWAT

team made entry to arrest the him.[19]

Considering all of the evidence presented and definitions regarding adaptive skills, the Court

finds that the defendant has not shown by a preponderance of the evidence substantial limitations in the

areas identified by the AAMR and the APA as basic to independent living as an adult.  There is no

evidence to suggest that the defendant required services and protections as an adult to compensate for

disabling intellectual deficiencies.[20]

### 3.      Manifestation Before Age 18

The evidence was conflicting on whether any intellectual disability was manifest before age 18.

Dr. Olley testified that the defendant's father told him about head injuries the defendant suffered when he

was 5 years old. (Tr. 68).  According to the father, the defendant fell from a mango tree on one

---

[18]  The informant testified that it was their understanding that urine would remove gun powder residue.

[19]  The pistol was later matched to the shooting in Greensboro.

[20]  The Court finds that Dr. Olley's opinion that the gang provided such support and protection, (Tr. 129-130), is unpersuasive.  Dr. Olley did not base that opinion on any substantial information and did not investigate the defendant's role in the gang, as compared to other members, and candidly admitted that lack of factual support. (Id.).  On the contrary, the trial evidence showed that the defendant was a respected veteran who helped give direction to gang members in Charlotte.

18

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 49 of 508
Case 3:08-cv-00134-RJC Document 52-3 Filed 03/19/10 Page 18 of 20

**JA1015**

occasion and hit his head on a piece of furniture a few days later. (Def. Ex. 2 at 8). The defendant, himself, reported to Dr. Suarez that he fell and cut his head on a bottle between the ages of 4 and 6. (Gov. Ex. A3 at 7). There was no evidence of the extent of any injury from contemporaneous medical treatment in El Salvador.

Dr. Merikangas opined that brain damage indicated in a November 2009 PET scan probably resulted from a childhood injury, but admitted it could have been caused by a series of minor injuries, such as fights or sports injuries. (Tr. 277, 283). Evidence was introduced that the defendant was injured and lost consciousness in a head-on car accident in 2007, that he played soccer extensively, and was involved in fighting in jail prior to the scan. (Tr. 316; Gov't Ex. A3 at 7, 14). Additionally, Dr. Merikangas's opinion on the defendant's mental retardation was not based on the PET scan, but rather psychological testing done by others. (Tr. 277, 279). There is no evidence of any intelligence testing of the defendant prior to age 18, and, as detailed above, details about the defendant's intellectual functioning prior to that time do not show mental retardation. Therefore, the third element of the AAMR and APA's definition was not proven by a preponderance of the evidence.

III.    CONCLUSION

A finding of mental retardation requires proof of all three elements of the AAMR and the APA's definition. Here, the evidence on the first element involving intellectual functioning is mixed, and the second or third elements involving adaptive skills and onset before age 18 were not proven by a preponderance of the evidence.

**IT IS, THEREFORE, ORDERED** that the defendant's motion to declare him ineligible for the death penalty (Doc. No. 690) is **DENIED**.

19

Case 3:16-cv-00057-MOC-JC Document 58-3 Filed 03/23/17 Page 50 of 508
Case 3:08-cr-00134-RJC Document 893 Filed 03/19/10 Page 19 of 20

**JA1016**

Signed: March 19, 2010

Robert J. Conrad, Jr.
Chief United States District Judge

20

**JA1017**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


DOCKET NO. 3:08-CR-134-2


UNITED STATES OF AMERICA            )
                                    )
        vs.                         )        VOLUME I OF VI
                                    )
ALEJANDRO ENRIQUE RAMIREZ UMANA     )
_____)



TRANSCRIPT OF JURY VOIR DIRE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
MARCH 22, 2010

APPEARANCES:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    Assistant United States Attorney
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK PATRICK FOSTER, JR.
    1011 E. Morehead Street
    Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    P.O. Box 2086
    High Point, North Carolina 27261


LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

**JA1018**

17

PROSPECTIVE JURORS:  Good morning.

THE COURT:  My name is Bob Conrad.  I'm the judge that is presiding over the case of United States of America V Alejandro Umana.

The first question I have for you is for those of you who are sitting in the back row, if you can hear me at this point would you raise your hand?

PROSPECTIVE JURORS:  (Indicating.)

THE COURT:  So apparently my voice is carrying this far.

If at anytime in these proceedings you can't hear me or you don't understand the question that is being addressed to you, if you would raise your hand and let me know and I can repeat myself.

I appreciate you all coming down here.  We were suppose to start an hour or so before, and you were sitting around for a little bit.  I want to let you know that the Court is very concerned with your time.  And everything that we do in this proceeding from this point forward, the Court has in mind if your time is valuable.  And that your service as jurors is something you do as citizens, volunteering your time and attention so that we can have the criminal justice system that we have.

And so, right off the bat I want to thank you for being here.  I want to tell that you your time is important

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 53 of 508
Case 3:08-cv-00134-RJC   Document 1952   Filed 01/30/11   Page 23 of 296

**JA1019**

to us. And I will promise to you to do everything that I can to use that time in an effective manner.

There are times during a trial in which matters need to be discussed among the Court and the lawyers, and they don't involve the jury. And we will keep those matters -- those times to a minimum. But it does happen from time to time. And if you would all bear with us, the Court would be very appreciative.

Now you have been selected as prospective jurors in this case. Let me tell you a little bit about this case.

This is a criminal case in which the Defendant, Alejandro Umana has been charged in a Bill of Indictment with conspiracy to engage in racketeering activity from 2003 to the present, by virtue of his association in fact with La Mara Salvatrucha or the MS 13 gang, whose members are alleged to have participated in murders, robberies, assaults, obstruction of justice and witness retaliation in Mecklenburg County, Guilford County, and other locations.

In this trial, the United States is seeking the death penalty for the defendant on some of the charges alleged in the Bill of Indictment.

If and only if a defendant is found guilty of certain charges, a case would proceed to a penalty phase to determine if the defendant would be sentenced to death or life in prison without the possibility of parole.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 54 of 508
Case 3:08-cr-00134-RJC   Document 1253   Filed 01/30/11   Page 24 of 296

JA1020

19

Now we will select a panel of 12 jurors and four alternates to serve on this case. And the trial in this case will likely commence after the jurors and alternates have been selected, and may take several weeks to complete.

Those who are selected as members of this jury, including alternates, will live at home have their weekends and evenings free to themselves. And your contact with other people will not be restricted during the trial.

Although you will, of course, not be permitted to talk about the case with anyone or read, listen to or watch any press coverage about the case.

Now previously each of you completed and returned to the Court a written juror questionnaire pertaining to various aspects of your background, your knowledge of the case, and the case issues.

The information that you provided in your answers to this questionnaire has been reviewed by the Court and the parties and will be used to select an appropriate jury in the case.

And the purpose of the questionnaire was to save time and avoid jurors having to wait extensive periods of time before they answered these or similar questions in person.

I want to remind you that after a jury has been selected, all copies of your responses to this questionnaire

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 55 of 508
Case 3:08-cv-00134-RJC    Document 1953    Filed 01/30/11    Page 25 of 296
**JA1021**

20

will be returned to the Clerk of Court and kept in confidence, under seal, not accessible to the public. And only the Court and the attorneys for both sides will have seen your answers.

The attorneys are also under direction to maintain the confidentiality of any information they learn in the course of reviewing these questionnaires.

Now, you have already answered some questions about your family, your occupational background and interests in the questionnaire that you have completed.

And today, each of you will be asked additional questions pertaining to your qualifications for jury service in this case.

The procedure that we will follow, is as follows:

First, I will ask the panel as a whole, a few general questions pertaining to your knowledge of the attorneys, the witnesses in the case, and other questions to determine whether there have been any changes in circumstances related to your personal situation or work responsibility since you completed the jury questionnaire, that might affect your ability to serve as a juror in this case.

Following these general questions, the attorneys and I will need to question each of you individually in this courtroom outside the presence of other jurors.

Laura Andersen, RMR 704-350-7493

And while one juror is being questioned individually, the remainder of the panel will remain in the jury lounge and will be free to walk around in the jury lounge while waiting for his or her turn to be questioned individually.

And after each juror has been questioned individually, he or she will be sent home with a call back number and a date to call back in for further instructions regarding the jury selection process in this case.

Some of the questions -- individual questions you may be asked are intended to follow-up your responses in the juror questionnaire, and other questions will pertain to your views on the death penalty and capital punishment.

Now, again, we're not seeking to pry unnecessarily into your personal lives or your beliefs, but to determine, simply, an appropriate jury in the case.

In answering the questions that will be put to you today, you should understand that although it is your duty as a citizen to serve on a jury if chosen, it is also your duty as a citizen not to serve on a jury if there is a reason that you cannot do so in fairness to the parties.

In responding to our questions, you are to keep in mind that there are no right or wrong answers to any of these questions, it's not a test.  And neither I nor the attorneys have expectation from you as to what your answer

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 57 of 508
Case 3:08-cv-00134-RJC   Document 1553   Filed 01/30/11   Page 27 of 296

JA1023

22

ought to be, except to be honest and complete.

Again, if at anytime you don't understand a question, you are asked please let us know so the question can be clarified for you.

Now as I mentioned, the possible consideration of the death penalty by the jury may become an issue in this case.  For that reason, each of you will be questioned in some detail about your opinion and beliefs about the death penalty, and about the sentence of life without the possibility of parole.

Let me now give you some additional information that will allow you to put these questions and your potential answers to these questions in context.

I previously told you that the defendant has been charged in a Bill of Indictment with conspiracy to engage in racketeering activity from 2003 to the present, by virtue of his association in fact with La Mara Salvatrucha or the MS 13 gang.

An indictment is merely a device for setting in motion the presentation of a case to the jury for your determination of a person's innocence or guilt.  An indictment is not proof, and no unfavorable inference may be drawn against a person merely because he is charged with a crime.

Under our constitution, there is a presumption

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 58 of 508
Case 3:08-cv-00134-RJC   Document 1953   Filed 01/30/11   Page 23 of 296
**JA1024**

23

that every person charged with a criminal offense is presumed innocent of any crime, unless and until proven guilty beyond a reasonable doubt.

The burden of proof beyond a reasonable doubt is greater for a criminal case than it is for a civil case. The burden rests with the prosecution to prove each and every element of an offense beyond a reasonable doubt.

A defendant in a criminal case is not required to explain his side of the case, and has a constitutional right not to testify. A jury cannot consider the exercise of the right not to testify as any indication whatsoever of guilt.

Having explained the nature of an indictment, and having told you that it is not evidence of any kind, but merely the instrument by which the defendant is brought into Court, advised of the charges against him, and that that case is presented to you for your determination, I want now to talk a little bit more specifically about the indictment itself.

The government has alleged among other things that the defendant was a member of the MS 13 gang. And that in furtherance of his position within the gang, on or about December 8, 2007, the government alleges that the defendant killed Ruben and Manuel Salinas at a restaurant in Greensboro, North Carolina.

In addition, the government has alleged that

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 59 of 508
Case 3:08-cv-00134-RJC   Document 1253   Filed 01/30/11   Page 29 of 296

**JA1025**

Mr. Umana was involved in other MS 13 activities including robbery, extortion and drug possession.

Finally, the government has alleged that Mr. Umana obstructed justice and intimidated witnesses by directing or otherwise procuring MS 13 gang members to harass and threaten witnesses in an attempt to prevent them from cooperating with law enforcement.

The defendant has pleaded not guilty to these charges and is presumed to be innocent. Unless and until a jury unanimously concludes at the completion of all evidence that the defendant is guilty beyond a reasonable doubt of some criminal conduct, the defendant remains not guilty.

The law of the United States provides that the punishment for the offense of murder in aid of racketeering and use of a firearm during a crime of violence which resulted in death, may be death or life imprisonment without the possibility of parole.

Those are the two punishments available, if the defendant is -- if the government proves the defendant's guilt beyond a reasonable doubt on those two charges; death and life imprisonment without the possibility of ever getting out.

The defendant in this case is charged with such murders in Counts 22, 24, 23, and 25 of the bill of Indictment.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 60 of 508
Case 3:08-cr-00134-RJC   Document 1253   Filed 01/30/11   Page 60 of 296

JA1026

25

If you find the defendant guilty of murder in aid of racketeering and/or the use of a firearm during a crime of violence, it will be your responsibility to determine whether the defendant should be sentenced to death or life imprisonment without the possibility of parole.

Since this is a case where the jury may consider death as a possible punishment, it is important that we know your true thoughts and opinions regarding the death penalty.

It is important that you understand and accept that the fact that you are being asked questions about the death penalty, in no way means or suggests that the defendant is guilty.

The indictment is merely a charging document. In this case, as in every criminal case, the defendant is presumed to be innocent, and the government bears the burden of proving guilt of any and all charges in the indictment unanimously, and beyond a reasonable doubt.

However, there could be two phases in this trial if the defendant is convicted. During the first phase, or what is often called the guilt/innocence phase of the case, evidence is presented only on the issue of whether the United States has proven each element of the crime charged against the defendant beyond a reasonable doubt.

During the guilt/innocence phase of the case, the possibility of punishment must not enter into your

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC   Document 50-3   Filed 03/23/17   Page 61 of 508
Case 3:08-cv-001344-RJC   Document 1953   Filed 01/30/11   Page 61 of 298

**JA1027**

deliberation at all.

If the jury finds that the United States has not met its burden of proving beyond a reasonable doubt each element of the charge for which the death penalty is a possible punishment, the jury's duties would be discharged, even if the defendant was convicted of other charges in the indictment.

If and only if the jury unanimously finds the defendant guilty of a charge for which the death penalty is a possible punishment, will there be a second phase of a trial. That is known as the sentencing phase.

In the sentencing phase, the jury must decide between a death sentence and a sentence of life in prison without the possibility of release or parole. There will be no other sentence for the jury's consideration.

During the sentencing phase, the jury will be presented with information about the crime, the victim and the defendant that is relevant to the issue of punishment.

The jury will first be asked to determine whether the defendant had one or more of the required intents. Before a jury can vote to impose a death penalty against the defendant each juror must be persuaded beyond a reasonable doubt that the defendant had the required state of mind when he engaged in the crime for which he had been convicted.

Second, during the sentencing phase the United

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 62 of 508
Case 3:08-cv-00134-RJC   Document 1953   Filed 01/30/11   Page 62 of 295
JA1028

States has opportunity to present information as to what it contends are aggravating factors.

Aggravating factors are circumstances that if proven beyond a reasonable doubt, permit but do not require any juror to vote to impose a sentence of death.

The word "aggravate" means to make worse or more offensive or to intensify.

Likewise, in the sentencing phase, each defendant will have the opportunity to present information about what I refer to as mitigating factors.  The word "mitigate" means to make less severe or to moderate.

Mitigating circumstances are facts or circumstances about a defendant or the crime that would cause any member of the jury to believe that a sentence of death is not appropriate.  Even though they had found the defendant guilty of the crime.

Mitigating circumstances could include information about the defendant's character and background, his upbringing and family, or any other fact or circumstance that would cause a juror to believe the death penalty may not be appropriate in this case.

Mitigating circumstances, unlike aggravating circumstances, need not be proven beyond a reasonable doubt.

Each juror must come to his or her individual decision as to whether to impose the death penalty.  The

Case 3:16-cv-00057-MOC  Document 59-3  Filed 03/23/17  Page 63 of 508
Case 3:08-cv-00134-RJC  Document 1253  Filed 01/30/11  Page 63 of 296
JA1029

jury must unanimously determine whether the aggravating factor or factors found to exist, sufficiently outweigh the mitigating factor or factors found to exist, to justify a sentence of death.

Now, obviously this is only an overview of the law applicable to a jury's consideration of the death penalty. This overview is being provided to you to provide a context for understanding and responding to the questions that you will be asked about your views on the death penalty, and your ability to fairly evaluate and consider both the aggravating factors presented by the government, and any mitigating factors provided by the defense, which support a sentence of life in prison without the possibility of release.

Now from this point forward while you're involved in this process, you must not talk about the case or anything we have discussed here so far. Do not read about, or allow anyone else to talk with you about the case. You may not conduct any indigent research. Do not Google, Twitter or engage in any electronic chat or other discussion about the case.

Finally, do not engage in any discussion with your fellow jurors or anyone else about any of the issues I have mentioned here today, including the subject of the death penalty.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 64 of 508
Case 3:08-cv-00134-RJC   Document 1253   Filed 01/30/11   Page 64 of 295

**JA1030**

Even after you have completed your individual questioning, or during any of the lunch or other breaks, if you encounter other potential jurors for any reason, you must continue to follow these introductions and refrain from talking about the case or any of the questions or the answers you have given to them or anyone else.

Indeed, you may not discuss anything you learn in court with anyone, including your family members, friends and co-workers.

In addition, you must not read or listen to any news broadcast about this case, or do any independent research or investigation into any aspect of the case.

With this overview in mind, I'm going to ask the clerk to call forward 14 members of the prospective jurors. In doing that, some of you will be called up and asked to take a seat in the jury box.

Some of you who are not called will remain where you are, but I would ask you to listen -- to listen carefully to the questions that the Court is going to ask of the people in the jury box. Because you may find -- you will find yourself later on in that same box. And if you've had a chance to consider the question, you may be able to -- we may be able to expedite the process.

So at this time I would ask the clerk to call 14 numbers out. And if you hear your number called, if you

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 65 of 508
Case 3:08-cv-00134-RJC   Document 1053   Filed 01/30/11   Page 65 of 296

**JA1031**

would come forward please.

COURT CLERK:  Ladies and gentlemen, as I call your number, please come up and have a seat in the jury box. Seat number 1 is on the front row closest to you.

Seat number 1, Juror Number 2.

Seat number 2, Juror Number 4.

Seat number 3, Juror Number 7.

Seat number 4, Juror Number 8.

Seat number 5, Juror Number 9.

Seat number 6, Juror Number 19.

Seat number 7, Juror Number 22.

Juror Number 22, seat number 7 is on the back row. Again, it's the seat closest to the audience.

Seat number 8, is Juror Number 23.

Seat number 9, is Juror Number 30.

Seat number 10, is Juror Number 39.

Seat number 11, is Juror Number 46.

Seat number 12, is Juror Number 53.

Seat number 13, is Juror Number 68.  And that seat is on the front row.

Seat number 14, is Juror Number 69.

THE COURT:  Good morning again.

PROSPECTIVE JURORS:  Good morning.

THE COURT:  Were you all able to hear the questions and the instructions so far?

Laura Andersen, RMR 704-350-7493

40

reasons why it may be helpful to everybody.

MR. FOSTER:  Is there a way to move the microphone over?

THE COURT:  Why don't we have them in the box, if having them there presents a problem to you, let me know and we can readdress it.

MS. ROSE:  If we have each of them sit in the front row center, have them seat in seat number 3 or 4.

THE COURT:  And let me know if you're having trouble.

MR. FOSTER:  I will.

THE COURT:  Thank you.

(The bench conference was concluded.)

THE COURT:  All right.  Thank you.  Sorry for the delay.  We're going to ask the 14 of you to be excused for the moment and retire to the jury deliberation room while we put another group of people in your place.  So if you all at this time would retire to the jury deliberation room.  Thank you.

(The prospective jurors were escorted from the courtroom.)

THE COURT:  Madam Clerk, would you call out the next group of names.

COURT CLERK:  Seat number 1, is Juror 71.

Seat number 2, is Juror 74.

Seat number 3, is Juror 80.

Laura Andersen, RMR 704-350-7493

41

Seat number 4, is Juror 84.

Seat number 5, is Juror 89.

Seat number 6, is Juror 94.

Seat number 7, is Juror 95.  And seat number 7 again is on the back row.

Seat number 8, is Juror 97.

Seat number 9, is Juror 98.

Seat number 10, is Juror 104.

Seat number 11, is Juror 112.

Seat number 12, is Juror 119.

Seat number 13, is Juror Number 120.  And that seat is on the front row.

Seat number 14, is Juror 289.  And that seat is on the back row.

Seat number 15, is Juror 1073.

THE COURT:  Good morning.

PROSPECTIVE JURORS:  Good morning.

THE COURT:  Were you all able to hear the questions and the overview of the instructions I gave to the previous people who were sitting in your seats, as well as the general instructions that I gave to them?

PROSPECTIVE JURORS:  (Nodding head.)

THE COURT:  General jury pool?  Were you all able to hear all those things?

PROSPECTIVE JURORS:  Yes.  (Nodding head.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 68 of 508
Case 3:08-cv-00134-RJC   Document 1053   Filed 01/30/11   Page 47 of 296

**JA1034**

THE COURT: Particularly with respect to the principles of federal prosecution, the fact that the defendant is presumed innocent; that the indictment is a charge, it's not evidence of any kind. That the burden of proof is on the government to prove each element of the offense beyond a reasonable doubt. Were you all able to hear those instructions?

PROSPECTIVE JURORS: (Nodding.)

THE COURT: Did you all understand those instructions?

PROSPECTIVE JURORS: (Nodding.)

THE COURT: Are you willing to commit to applying those principles in this case?

PROSPECTIVE JURORS: (Nodding head).

THE COURT: Very well. First the government then the defendant's attorneys introduced themselves, read to you a list of names that either side may call in the case. Were any of the attorneys, the law enforcement officers introduced to you, the defendant who was introduced to you or any of the witnesses whose names were read to you, were any of those names familiar to you?

Juror number 71.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: What name was familiar to you?

PROSPECTIVE JUROR: John Maloney and Jeff Taylor,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 69 of 508
Case 3:08-cv-00134-RJC   Document 1053   Filed 01/30/11   Page 48 of 298

JA1035

43

if I heard the names correctly.

THE COURT:  And how do you know Mr. Maloney and Mr. Taylor?

PROSPECTIVE JUROR:  I know a John Maloney who is an assistant district attorney for the City of Charlotte; casually, through church, not well.

THE COURT:  And how about Mr. Taylor?

PROSPECTIVE JUROR:  I know Mr. Jeffrey Taylor as a handwriting expert for the police department for the City of Charlotte, if it's the same one.  And I have retained him on a couple of occasions to assist in legal matters that I work on.

THE COURT:  So you know Mr. Maloney as an ADA, casually and through church affairs.  Is there anything about the relationship with Mr. Maloney that would make it difficult for you to sit as a fair and impartial juror?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  But Mr. Taylor you've actually thought well enough to hire?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  And so you engaged him in legal matters?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Thank you.  Anyone else?

PROSPECTIVE JUROR:  (Indicating.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 70 of 508
Case 3:08-cv-00134-RJC   Document 1053   Filed 01/30/11   Page 49 of 298
JA1036

44

THE COURT:  Are you Juror Number 94?

PROSPECTIVE JUROR:  Yes.  The name Pearson is my maiden name.  I'm not sure it's a relative, but just would like that repeated and spelled, please.

MS. ROSE:  The government did not have a witness by the last name of Pearson, we have a Parshall.

PROSPECTIVE JUROR:  Okay.

MS. ROSE:  Thank you.

COURT CLERK:  One on page two, Judge.

THE COURT:  Check out page two.

MS. ROSE:  There is an Officer M.A. Pearson, M.A. Pearson an officer with the Mecklenburg County Sheriff's Office.

THE COURT:  How do you spell Pearson?

MS. ROSE:  This one is spelled, P-E-A-R-S-O-N.

PROSPECTIVE JUROR:  The name is spelled the same, but it is not a relative.

THE COURT:  Not somebody you are related to, as far as you know?

PROSPECTIVE JUROR:  Right.

THE COURT:  All right.  Who raised their hand in the back row?

PROSPECTIVE JUROR:  (Indicating.)

THE COURT:  Juror Number 98?

PROSPECTIVE JUROR:  I actually know two Jeff

Laura Andersen, RMR 704-350-7493

Taylors; one is a Charlotte-Mecklenburg police officer.  I believe he's a resource officer at Berry Academy.  Another one is a younger gentleman who is in construction.

THE COURT:  The second Taylor is -- how do you know him?

PROSPECTIVE JUROR:  I've known him all his life.  He's a younger gentleman who is a construction worker.

THE COURT:  Here in Charlotte?

PROSPECTIVE JUROR:  Yeah, in the Mint Hill area.

THE COURT:  Jeff Taylor that's on the government's witness list, does he work for the CMPD?

MS. ROSE:  He does.  He is the handwriting witness, yes.

THE COURT:  The resource officer, Jeff Taylor --

PROSPECTIVE JUROR:  I'm not sure, I don't think he does.  I don't know for sure.

THE COURT:  How would you know if -- the Jeff Taylor that you know is a resource officer, how do you know him?

PROSPECTIVE JUROR:  Just through our kids playing ball together going out and eating with family.  He married a good friend of mine.

THE COURT:  And so you have occasion socially to meet this person who is a resource officer for CMPD?

PROSPECTIVE JUROR:  Yes, sir.

Laura Andersen, RMR 704-350-7493

46

THE COURT:  As far as you know, is he a handwriting expert?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Is there anything about your social relationship that you couldn't set aside and follow the evidence instructions of the Court and be fair and impartial to either side?

PROSPECTIVE JUROR:  No.

THE COURT:  Whatever relationship you have with this resource officer, you think you can be a fair and impartial juror?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Thank you.  Anyone else?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  All right.  Members of this jury, we're going to take you to a separate location.  We're going to go through an individual process with each of you to determine the appropriate jury in the case.  And rather than have you all confined in one room, we're going to let you go back to the jury assembly room.

And so a CSO at this time would escort you there. (The prospective jurors were escorted from the courtroom.)

THE COURT:  We'll take a morning break at this time.  We'll take a 15 minute break.  I'll ask the parties to be back in court at 11:35.

Laura Andersen, RMR 704-350-7493

**JA1039**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DOCKET NO. 3:08-CR-134-2

UNITED STATES OF AMERICA          )
                                  )
     vs.                          )          VOLUME II OF VI
                                  )
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____ )

TRANSCRIPT OF JURY VOIR DIRE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
MARCH 23, 2010

APPEARANCES:

On Behalf of the Government:

     JILL WESTMORELAND ROSE
     Assistant United States Attorney
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     United States Department of Justice
     950 Pennsylvania Avenue, NW
     Washington, DC 20530

On Behalf of the Defendant:

     MARK PATRICK FOSTER, JR.
     1011 E. Morehead Street
     Suite 300
     Charlotte, North Carolina 28204

     JOHN DAVID BRYSON
     P.O. Box 2086
     High Point, North Carolina 27261

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 74 of 508
Case 3:08-cr-00134-RJC   Document 393   Filed 01/30/11   Page 1 of 335

JA1040

leaning or a strong view.  He indicated it was a strong view.  And the answers to the defendant's questions were unequivocal, and I think reflected his true state of mind.

And so I would grant the defendant's challenge for cause.  You know, he has said both things.  It's purely a credibility assessment by the Court.

Juror 119.

(The prospective juror was brought into the courtroom.)

THE COURT:  Good morning, ma'am.

PROSPECTIVE JUROR:  Good morning.

THE COURT:  I can say that for a few more minutes.

Any difference now between now and the time you filled out the questionnaire that would make your answers any different if you were asked again?

PROSPECTIVE JUROR:  No.  Nothing else has happened to me.

THE COURT:  It was some time ago.  Do you feel like you've heard anything about this case or seen or read anything about this case?

PROSPECTIVE JUROR:  I have not.  Absolutely not.

THE COURT:  If you were chosen as a juror, your role would be to find the facts from the evidence.  You would hear the evidence and find the facts.  My role as the judge is to give you the law.  And if the law I give to you is different from what you think the law should be, or what

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 75 of 508
Case 3:08-cr-00134-RJC   Document 1354   Filed 01/30/11   Page 109 of 339

**JA1041**

400

you think the law is, can you set aside your own notions of the law and follow my instructions?

PROSPECTIVE JUROR:  Yes.

THE COURT:  You can do that?

If the jury were to decide that the defendant was guilty or that the defendant was guilty, that is, the government has proven beyond a reasonable doubt that he committed murder in aid of racketeering, the jury would then be asked to engage in a sentencing determination.

And I'm not saying that you will.  I'm not saying -- but assuming for purposes of the question that you're considering sentencing, the two options would be the death penalty or life without release.

The government would put on evidence of aggravation, arguing to you that the death penalty is appropriate.

And the defendant would put on evidence of mitigation, arguing to you that life without release is the appropriate punishment.

The question I have for you is, would you be able to fairly consider both of those options or would you automatically chose one over the other?

PROSPECTIVE JUROR:  Well, I guess I would just have to listen to, you know, the evidence that was presented.  You know, that would depend.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17 Page 76 of 508
Case 3:08-cr-00134-RJC   Document 1554   Filed 01/30/11 Page 110 of 339
JA1042

401

THE COURT:  If the Court were to tell you that that's what you are to do, that you are to weigh the aggravating factors and mitigating factors and to weigh them, consider them and weigh them, you believe you could do that?

PROSPECTIVE JUROR:  Yeah.  I did put down on my application that I do believe in the death penalty.

THE COURT:  And the lawyers may have some follow-up questions with you on that point.  But the question I have for you is whether you would consider those both -- those two options?

PROSPECTIVE JUROR:  Oh, yes.

THE COURT:  Or automatically choose one over the both?

PROSPECTIVE JUROR:  No.  No.

THE COURT:  You would consider both?

PROSPECTIVE JUROR:  I would consider both.

THE COURT:  Well, is it the government's turn to go first?

MR. NAZZARO:  I believe so.

THE COURT:  Mr. Nazzaro.

MR. NAZZARO:  Yes, sir, Your Honor.

Good morning.

PROSPECTIVE JUROR:  Good morning.

MR. NAZZARO:  Good afternoon.  I'm Sam Nazzaro,

Laura Andersen, RMR 704-350-7493

**JA1043**

402

one of the prosecutors for the United States.  This is Jill Rose.  And I just have a couple questions and follow up on a couple things you wrote on the questionnaire, which I know was some time ago.

One of the things you mentioned is, you had some experience with law enforcement of legal proceedings before. I think you mentioned in one of the questions was you -- whether immediate family member or close friend had been questioned or something?  Do you remember that question?

You wrote that there was -- you reacted to Charlotte police about my mom being coerced by several people coming to the house or something.

PROSPECTIVE JUROR:  Yes.  She's been a victim of a crime, but they were never able to catch them in the act.

MR. NAZZARO:  Okay.  Does that experience -- will you be able to -- with that experience in mind, you still will be able to weigh the facts of this case and fairly -- or did that influence you in some way or give you some preconceived --

PROSPECTIVE JUROR:  Well, I'll tell you.  The experience with my mom and the people extorting money from her.  I am very furious that nothing could ever be done to prove it, to catch them.

MR. NAZZARO:  Were you upset with the prosecutors or the police?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/23/17    Page 78 of 508
Case 3:08-cr-00134-RJC    Document 1354    Filed 01/30/11    Page 112 of 339
JA1044

403

PROSPECTIVE JUROR:  I am upset with my mother for one thing.  Because she would not cooperate with the police.

MR. NAZZARO:  I see.

PROSPECTIVE JUROR:  She was suppose to notify them when these people came to the house again.  And, you know, tell them something and give her time to let them know.  And she just would not do it.  Because she kept falling for these people's stories of why they needed money.  It still bothers me.  Because I don't think they're gone.

MR. NAZZARO:  No.  I understand.  It sounds like it was a very personal experience.  But you were -- you were satisfied with the way the investigation went, or you don't have any prejudice against the police or anything based on that experience?

PROSPECTIVE JUROR:  No, I do not.  I do not.

MR. NAZZARO:  Thank you.  I appreciate your honesty.

And just one question, it came towards the end of the questionnaire and, you know, sometimes maybe the questions weren't as clear.  Maybe you didn't understand it.

One of them dealt with whether or not you would impose -- whether you would -- the question actually was, I would never impose a penalty of life imprisonment without the possibility of parole under any circumstances in a case where an accused has been found guilty of murder in aid of

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/23/17  Page 79 of 508
Case 3:08-cr-00134-RJC    Document 1534    Filed 01/30/11  Page 113 of 339
**JA1045**

404

racketeering or the use and possession of a firearm during and in relation to a crime of violence.

And the question said, you would never vote to impose, and you agreed with that.

And based on what your answers were for the Judge, it seems like you would weigh the evidence based on the standards the Court gave you?

PROSPECTIVE JUROR:  I would.  But I must tell you, the way some of those questions were worded were very confusing.

MR. NAZZARO:  Okay.

PROSPECTIVE JUROR:  And it was like 57 words when maybe eight or nine would have done.  And, you know, some, you know, us little lay people that are not experienced with legalese talk, it can be very confusing.

MR. NAZZARO:  There was a lot.

PROSPECTIVE JUROR:  I said to myself, I'm not sure if I answered that or not.

MR. NAZZARO:  I understand.  That's why we're having this process, just to follow up on some of those questions.

As I said, there's no right or wrong answer. We're just trying to determine, and I appreciate you clarifying that for us today.

And so if I understand your answer you -- as you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 58-3   Filed 03/23/17   Page 80 of 508
Case 3:08-cr-00134-RJC   Document 1534   Filed 01/30/11   Page 114 of 339

JA1046

405

explained to the Court, you would consider both options, life without parole or the death penalty, and it would depend on the circumstances and the instructions and the evidence presented?

PROSPECTIVE JUROR:  Yes.

MR. NAZZARO:  Okay.  Thank you very much for clearing that up.

No other questions.

THE COURT:  Anybody want to take responsibility for the lengthy questions?

MR. NAZZARO:  No.

MR. BRYSON:  Well, we certainly approved it so I have to take partial blame.

MR. NAZZARO:  There's a lot of lawyers in the room.

PROSPECTIVE JUROR:  Yes.

MR. NAZZARO:  But there's only one judge.

MR. BRYSON:  Juror Number 119.  And I apologize by calling you by number --

PROSPECTIVE JUROR:  That's fine.

MR. BRYSON:  That's what we're doing.

My name is John Bryson.  This is Mark Foster. This is Alejandro Umana.

Now is my chance to ask you some questions.  I'm not going to try and pry into your background.  If for some

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 81 of 508
Case 3:08-cr-00134-RJC   Document 1534   Filed 01/30/11   Page 115 of 339
**JA1047**

406

reason I ask you a question you don't want to answer you just tell me and I will move on.

PROSPECTIVE JUROR:  I will.

MR. BRYSON:  I'm going to go ahead and turn right to the death penalty questions.  But before I do, let me just say this.  Just because I'm asking you about the death penalty, doesn't mean I believe it's going to be an issue in the case.

Everybody at this table believes that if you're selected as a juror and you hear this case, the jury will find him not guilty of the capital offenses.  And the jury will never been involved in the question of the death penalty.

But the rules of court give me only this one opportunity to speak with you.  And because there is the possibility that it could be an issue, I have to talk to you about it now.  Do you understand that?

PROSPECTIVE JUROR: Um-hmm.  Okay.

MR. BRYSON:  All right.  Can you tell me about your views on the death penalty?

PROSPECTIVE JUROR:  My views?

MR. BRYSON:  Yes.

PROSPECTIVE JUROR:  Well, I believe in it. Violent crimes where the person is, you know, found guilty, I believe it.  I have a problem with life imprisonment.  I

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 82 of 508
Case 3:08-cr-00134-RJC   Document 1354   Filed 01/30/11   Page 116 of 339
JA1048

mean, if the person is guilty of a violent crime -- I don't know how to explain it.

MR. BRYSON:  Take your time.

PROSPECTIVE JUROR:  I don't -- find the words --

MR. BRYSON:  You have reservations about life imprisonment?

PROSPECTIVE JUROR:  Well, it just depends on the circumstances.  I know everybody is not -- and I'm just saying this in general.

MR. BRYSON:  Um-hmm.

PROSPECTIVE JUROR:  Everyone that is killed, you know, there might be extenuating circumstances.  But if somebody is out there and they are just out for killing, for killing, yes, I would believe in the death penalty.

MR. BRYSON:  Okay.

PROSPECTIVE JUROR:  But it depends on the evidence, what's presented, witnesses.

MR. BRYSON:  All right.  Let me take that a little further with you.

If you were selected as a juror in this case, the first thing this jury would do is determine whether or not Alejandro is guilty of any crime.  Okay.

PROSPECTIVE JUROR:  Okay.

MR. BRYSON:  And it would only be if the jury found him guilty of a homicide, of a murder case, that would

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 83 of 508
Case 3:08-cr-00134-RJC   Document 1534   Filed 01/30/11   Page 117 of 339
JA1049

we even consider going to the next part.  Okay.

PROSPECTIVE JUROR:  Okay.

MR. BRYSON:  You know, any cases that are not homicide cases, Judge Conrad would do the sentencing on. The jury only becomes an issue of sentencing if it's a homicide charge.  You follow me?

PROSPECTIVE JUROR:  Yes.

MR. BRYSON:  Now, in this case he's actually charged with two murders.  He's charged with on December 8th, 2007, killing two people at one time.  And the charges are -- they are charged different ways.  But one of the charges are what we call, murder in aid of racketeering. Okay.

And to break that down, essentially what in layman's terms what that means is, murder, intentional killing of a human being, in aid of racketeering means, in this case, he did it to further his position in the gang, MS-13.  So it's intentionally killing somebody to make himself a big shot in the gang.

MS. ROSE:  Well, objection.

THE COURT:  Overruled.

MR. BRYSON:  You understand what I'm saying?

PROSPECTIVE JUROR:  (Nodding head.)

MR. BRYSON:  Okay.  So if -- before we could ever get to the question of whether the death penalty is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 84 of 508
Case 3:08-cr-00134-RJC   Document 1524   Filed 01/30/11 Page 118 of 339
JA1050

appropriate, the jury would have already found these facts unanimously, by proof beyond a reasonable doubt.  Are you following me?

PROSPECTIVE JUROR:  Um-hmm.  (Nodding head.)

MR. BRYSON:  Okay.  So my question for you is this, can you consider life imprisonment without parole as a possible punishment for someone that you have found guilty of an intentional killing, the purpose to increase his position in the gang?

MS. ROSE:  Well, objection.  That doesn't go through the entire process.

THE COURT:  Sustained.  Sustained as to form.

MR. BRYSON:  Well, my question is, if you found the defendant guilty of an intentional killing to increase his position in the gang, does that in and of itself suggest to you, I mean, you know, at that point what the appropriate punishment is, or do you need to hear more?

MS. ROSE:  Objection.

THE COURT:  Overruled.  Go ahead and answer.

PROSPECTIVE JUROR:  So it's me?

MR. BRYSON:  Yeah.

PROSPECTIVE JUROR:  Proving intentional killing?

MR. BRYSON:  Yes.

PROSPECTIVE JUROR:  Yes.  I would lean heavily towards the death penalty for proving intentional killing.

Case 3:16-cv-00057-MOC    Document 58-2    Filed 03/23/17    Page 85 of 508
Case 3:08-cr-00134-RJC    Document 1384    Filed 01/30/11    Page 119 of 339

JA1051

410

MR. BRYSON:  Okay.  The way we're set up here is, if the jury were to find him guilty of that offense as I've described it, the death penalty really -- the jury doesn't get to the death penalty at that point.

PROSPECTIVE JUROR:  Okay.

MR. BRYSON:  They're required to find something else called an aggravating circumstance.  Okay.  An aggravating circumstance -- there are several that apply, but it's something that makes the case worse than what I already described.  You follow me?

PROSPECTIVE JUROR:  Worse than intentional?

MR. BRYSON:  Well, other facts -- it can be other facts not related to the crime itself.

PROSPECTIVE JUROR:  Okay.

MR. BRYSON:  Or things like that.  Okay.

And the government would have to prove that by proof beyond a reasonable doubt before the jury would even get to the question of whether the death penalty is on the table.  Are you following me?

PROSPECTIVE JUROR:  Okay.

MR. BRYSON:  All right.

PROSPECTIVE JUROR:  In steps.

MR. BRYSON:  Yes.  Okay.  And can you do that?

MS. ROSE:  Objection.

THE COURT:  I sustain the objection.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 86 of 508
Case 3:08-cr-00134-RJC   Document 1534   Filed 01/30/11   Page 120 of 339
**JA1052**

411

Let me ask the question this way:

PROSPECTIVE JUROR:  Okay.

THE COURT:  What the lawyers are trying to ask you is whether you would automatically choose the death penalty after you've found the defendant guilty of the murder that triggered the consideration for the death penalty?

Or would you follow the Court's instructions and weigh the aggravating factors presented by the government, and the mitigating factors presented by the defendant?

Would you weigh those things and keep an open mind with respect to the issue of the death penalty or life without release as a possible punishment?

PROSPECTIVE JUROR:  I'm not sure.

THE COURT:  And what is the basis for your uncertainty?

PROSPECTIVE JUROR:  And this is -- this is after -- after everything?

THE COURT:  After the trial on the guilt --

PROSPECTIVE JUROR:  After the trial?

THE COURT:  -- on the guilt part.  You are then in the sentencing phase.  And I would instruct you at that time that in order -- that the two options for punishment would be the death penalty or life without release.

And in deciding on those two options, you would have to weigh, consider and to weigh the aggravating factors

Laura Andersen, RMR 704-350-7493

**JA1053**

412

and the mitigating factors in reaching your conclusion.

And the question is, could you go through that process, or would you automatically, at that point, choose one or the other, regardless of the aggravating or mitigating factors?

PROSPECTIVE JUROR: Okay. I remember there's the difference. The aggravating are the worse, the mitigating are the lesser.

THE COURT: Right. Um-hmm.

PROSPECTIVE JUROR: I -- I would -- I would do my best. It's hard for me to say yes or no.

THE COURT: All right. And the reason that that is hard is, would you have difficulty following the Court's instructions or?

PROSPECTIVE JUROR: The taking of a life is weighing heavy on my mind. I mean, I would do my best to follow the Court's instructions, yes. I know that's not what you want to hear.

THE COURT: No. There's nothing I want to hear except for --

PROSPECTIVE JUROR: I'm trying to be truthful here.

THE COURT: -- your very candid answers.

Any other questions?

MR. BRYSON: May I have just a little -- you know,

Case 3:16-cv-00057-MOC    Document 50-2    Filed 03/23/17 Page 28 of 508
Case 3:08-cr-00134-RJC    Document 1354    Filed 01/30/11 Page 122 of 339
JA1054

413

I want you to understand that there's no right or wrong answers to these questions.  We're asking you about your opinions.  I'm not in any way challenging your opinions.  I fully respect what you're saying.

I just want to -- you know, we see all sorts of people here, have all different opinions, and they're all valid.  You can't have a wrong opinion.

We have people come in and here say, I believe in an-eye-for-eye.  You take a life, you lose a life.  Those people have difficulty following the process.

Because the process we follow says, just taking a life doesn't get you to death.  There's more steps that you have to follow.  Do you understand what I'm saying?

PROSPECTIVE JUROR:  Yes.

MR. BRYSON:  We're trying -- the questions we're asking are trying to figure out whether you can really follow the process, and make the government go through all the steps and really consider whether the death penalty is the appropriate punishment or the life imprisonment is the appropriate punishment.

Or whether in your mind, once you get to the intentional killing for the purposes of increasing his position in the gang, you know longer are considering life imprisonment and death is becoming pretty much automatic to you.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17   Page 89 of 508
Case 3:08-cr-00134-RJC   Document 1554   Filed 01/30/11   Page 123 of 339
**JA1055**

414

PROSPECTIVE JUROR:  I see what you're saying, yes.

MR. BRYSON:  Can you address that?

PROSPECTIVE JUROR:  I don't know what to tell you other than I said I would do my best.

MR. BRYSON:  Okay.

PROSPECTIVE JUROR:  I can't put it in, you know, blood.

MR. BRYSON:  Right.

PROSPECTIVE JUROR:  I've never been on -- selected for a jury of this nature before.  It's mostly been civil court.  So this is very, very important.

MR. BRYSON:  Extraordinarily.

PROSPECTIVE JUROR:  Very important.

MR. BRYSON:  And you understand the problem we have is, we can't look into your mind.  You know, you say, I'm going to do my best.  We can't look in your mind, look six weeks down the road and say, gee, she's doing her best.

And given the really incredible importance of this, we need to know if you have doubts about your ability to do that, we need you to express them now.

PROSPECTIVE JUROR:  I don't know.  I would like to be able to say, yes, I'm going to put.  I'm --

THE COURT:  Let me ask you this question:  I'm not asking you to tell me what your decision will be.

What I'm asking you is, are you willing in good

**JA1056**

415

faith, to go through the process of considering and weigh both options?

PROSPECTIVE JUROR: Yes.

THE COURT: As part of that, would you be willing to consider and weigh the aggravating factors presented by the government and the mitigating factors presented by the defendant?

PROSPECTIVE JUROR: Yes.

THE COURT: Would you be able to follow the Court's instructions on those points?

PROSPECTIVE JUROR: Yes. I would have to.

THE COURT: Thank you. You may step down and be excused. If you would call back on Friday, you'll get further instructions at that point, end of the day Friday.

PROSPECTIVE JUROR: Okay. The same number?

THE COURT: Yes.

(The prospective juror was escorted from the courtroom.)

THE COURT: Challenges?

MR. BRYSON: Your Honor, I make a challenge. I don't care to be heard.

THE COURT: Very well.

The Court will overrule the challenge for cause. I think that the juror struggled with the questions, but I'm satisfied based upon the examination that she's not substantially impaired, that she could in good faith weigh

Case 3:16-cv-00057-MOC   Document 58-2   Filed 03/23/17   Page 91 of 508
Case 3:08-cr-00134-RJC   Document 1584   Filed 01/30/11   Page 125 of 339
JA1057

416

both options.

Juror Number 120.

(The prospective juror was brought into the courtroom.)

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Hi.

THE COURT:  We have some questions for you.  Some are follow-up to the questionnaire that you responded to several months ago.

PROSPECTIVE JUROR:  Um-hmm.

THE COURT:  Are there any changes?  As you sit here today, can you think of anything that's changed that would make your answers back then different than today?

PROSPECTIVE JUROR:  I don't think so.  I don't know.

THE COURT:  Well, let me ask you, have you heard anything about -- do you think you've heard anything about this case?

PROSPECTIVE JUROR:  No, I'm sure I haven't.

THE COURT:  If you were selected as a juror, if at any time you heard people talking about this case or saw something on TV or something like that, I would instruct you to disregard that and render a verdict only on the evidence that you hear in court.  Would you be able to do that?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  You could follow that instruction?

Laura  Andersen,  RMR  704-350-7493

Case 3:16-cv-00057-MOC   Document 50-2   Filed 03/23/17 Page 92 of 508
Case 3:08-cr-00134-RJC   Document 1554   Filed 01/30/11 Page 126 of 339
JA1058

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


DOCKET NO. 3:08-CR-134-2


UNITED STATES OF AMERICA            )
                                    )
     vs.                            )        VOLUME IV of VI
                                    )
ALEJANDRO ENRIQUE RAMIREZ UMANA     )
_____)



TRANSCRIPT OF JURY VOIR DIRE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
MARCH 25, 2010

<u>APPEARANCES</u>:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    Assistant United States Attorney
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK PATRICK FOSTER, JR.
    1011 E. Morehead Street
    Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    P.O. Box 2086
    High Point, North Carolina 27261

                LAURA ANDERSEN, RMR
               Official Court Reporter
             United States District Court
              Charlotte, North Carolina

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 93 of 508
Case 3:08-cr-00134-RJC   Document 333   Filed 01/30/11   Page 1 of 355
JA1059

1144

receive further instructions.

(The prospective juror was escorted from the courtroom.)

MR. BRYSON:  Challenge for cause, Your Honor.

THE COURT:  That challenge will be granted.

Well, I think we're done until after lunch.  We've got another group coming in at 1:30.  It will take them a while to get signed up and all that.  So we'll break for lunch until 1:45.

(Lunch recess.)

THE COURT:  Good afternoon, ladies and gentlemen. My name is Bob Conrad.  I'm the presiding judge in this case which is styled, United States of America V Alejandro Umana.

This is a criminal case in which the defendant has been charged in a Bill of Indictment with conspiracy to engage in racketeering activity from 2003 to the present, by virtue of his association in fact with La Mara Salvatrucha or the MS 13 gang, whose members are alleged to have participated in murders, robberies, assaults, obstruction of justice and witness retaliation in Mecklenburg County, Guilford County and other occasions.

The United States is seeking the death penalty for the defendant on some of the charges alleged in the Bill of Indictment.

If and only if a defendant is found guilty of certain charges, the case would proceed to a penalty phase

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 94 of 508
Case 3:08-cr-00134-RJC   Document 1366   Filed 01/30/11   Page 164 of 359
**JA1060**

to determine if the defendant would be sentenced to death or life in prison without the possibility of release.

Now we will select a panel of twelve jurors and four alternates to serve on this case.  The trial in this case will commence after the jurors and alternates have been selected, and is likely to take several weeks to complete.

And those who are selected as members of the jury, including alternates, will live at home and have their weekends and evenings free to themselves.  Your contact with other people will not be restricted during the trial.  Although you will of course not be permitted to talk about the case or read, listen or watch any press coverage that the case might receive.

Now previously each of you completed and returned to the court a written juror questionnaire pertaining to various aspects of your background, your knowledge of the case and case issues.

And the information that you provided in your answers to this questionnaire has been reviewed by the court and the parties, and will be used to select a qualified jury.

The purpose of the questionnaire was to save time and avoid jurors having to wait extensive periods before they answer these or similar questions in person.

All copies of your responses to this questionnaire

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/23/17    Page 95 of 508
Case 3:08-cr-00134-RJC    Document 1356    Filed 01/30/11 Page 165 of 359

JA1061

1146

will be returned to the Clerk of Court and kept in confidence under seal, not accessible to the public.

Only the court and the attorneys for both sides will have seen your answers.  And the attorneys are also under direction to maintain the confidentiality of any information that they learn in the course of reviewing the questionnaires.

Now you have already answered some questions about your family, occupational background and interests in the questionnaire that you've completed.  And today each of you will be asked additional questions pertaining to your qualifications for jury service in the case.

I want to outline the procedure that we are going to follow from this point forward.

First, as I am doing, I will generally instruct the jury and ask a few questions pertaining to your knowledge of the attorneys and the witnesses in the case. And following these general instructions there will be additional questions for you individually.

And after each juror has been questioned individually, he or she will be sent home with a call back number and a date to call back for further instructions at a later point.

Some of the individual questions which you may be asked are intended to followup on your responses to the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 96 of 508
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 96 of 359
JA1062

1147

juror questionnaire, and other questions will pertain to your views on the death penalty and capital punishment.

Now we're not seeking to pry unnecessarily into your personal lives. The questions are designed to give the Court and the attorneys sufficient information to select the appropriate jury in the case.

Now, in responding to questions, you are to keep in mind that there are no right or wrong answers, only your candid responses. This is not a test and there is no expectation of what your answer to be, other than to be completely honest and forthcoming.

And if at any time during the individual questioning process you don't understand a question, let us know and we'll repeat it for you.

Now as I mentioned, the possible consideration of the death penalty by the jury may become an issue in this case, and for that reason each of you will be questioned in some detail about your opinion and beliefs about the death penalty, and about the sentence of life without the possibility of release.

I want to give you some more information to put the questions that you are going to get and your potential answers in the proper context.

I've previously told you that the defendant has been charged in a Bill of Indictment. An indictment is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 97 of 508
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 167 of 359
**JA1063**

merely a device for setting in motion the presentation of a case to the jury for your determination of a person's guilt or lack of guilt.

An indictment is not proof and no unfavorable inference may be drawn against a person merely because he is charged with a crime.

Under our constitution there is a presumption that every person charged with a criminal offense is presumed innocent of any crime until proven guilty unanimously and beyond a reasonable doubt.

The burden of proof in a criminal case is greater than that of a civil case. The burden rests with the prosecution to prove each and every element of an offense beyond a reasonable doubt.

The defendant in a criminal case is not required to explain his side of the case and has a constitutional right not to testify. A jury cannot consider the exercise of the right not to testify as any indication whatsoever of guilt.

As I said, the defendant has pled not guilty to these charges and is presumed to be innocent, unless and until the jury unanimously concludes at the completion of all evidence that the defendant is guilty beyond a reasonable doubt of some criminal conduct, the defendant remains not guilty.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 98 of 508
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 168 of 359
JA1064

1149

The law of the United States provides that the punishment for the offense of murder in aid of racketeering, and the use of a firearm during a crime of violence which resulted in death, the punishment may be death or life without the possibility of release.

And the defendant in this case is charged with such murders in Counts 22 through 25.

Since this is a case where the jury may consider death as a possible punishment, it is important that we know your true thoughts and opinions regarding the death penalty.

The fact that you are being asked questions about the death penalty, in no way means or suggests that the defendant is guilty.

The indictment, as I said, is merely a charging document.  And this case, as in every criminal case, the defendant is presumed to be innocent and the government bears the burden of proving guilt of any and all charges in the indictment unanimously and beyond a reasonable doubt.

However, there could be two phases in this trial if the defendant is convicted.

During the first phase or what is often called the guilt phase of the case, evidence is presented only on the issue of whether the United States has proven each element of the crime charged against the defendant beyond a reasonable doubt.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 99 of 508
Case 3:08-cr-00134-RJC   Document 1366   Filed 01/30/11   Page 169 of 359
**JA1065**

1150

During the guilt phase of the case, the possibility of punishment must not enter into your deliberations at all.

If the jury finds that the United States has not met its burden of proving beyond a reasonable doubt each element of the charge for which the death penalty is a possible punishment, then the jury's duties would be discharged even if the defendant was convicted of other charges in the indictment.

If and only if the jury unanimously finds a defendant guilty of a charge for which the death penalty is a possible punishment, will there be a second phase of the trial.

The second phase is known as the "sentencing phase".  In the sentencing phase, the same jury must decide between a death sentence and a sentence of life in prison without the possibility of release.  There will be no other sentence for the jury's consideration.

During the sentencing phase, the jury will be presented with information about the crime, the victim and the defendant that is relevant to the issue of punishment.

The jury will first be asked to determine whether the defendant had one or more of the required intent.

Before a jury can vote to impose the death penalty against a defendant, each juror must be persuaded beyond a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 100 of 508
Case 3:08-cr-00134-RJC    Document 1326    Filed 01/30/11    Page 170 of 359
JA1066

1151

reasonable doubt that the defendant had required state of mind when he engaged in the crimes for which he has been convicted.

Second, during the sentencing phase the United States has the opportunity to present information as to what it contends are aggravating factors.

Aggravating factors are circumstances that if proven beyond a reasonable doubt, permit, but do not require any juror to vote to impose a sentence of death.

The word "aggravate" means to make worse or more offensive or to intensify.

Likewise in the sentencing phase, each defendant will have the opportunity -- or the defendant will have the opportunity to present information about what is referred to as mitigating factors.  The word "mitigate" means to make less severe or to moderate.

Mitigating circumstances are facts or circumstances about a defendant or the crime that would cause any member of the jury to believe that a sentence of death is not appropriate, even though they had found the defendant guilty of the crime.

Mitigating circumstances, unlike aggravating circumstances, need not be proven beyond a reasonable doubt.

Each juror must come to his or her individual decision as to whether to impose the death penalty.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 101 of 508
Case 3:08-cr-00134-RJC   Document 1252   Filed 01/30/11   Page 171 of 359

**JA1067**

1152

The jury must unanimously determine whether the aggravating factor or factors found to exist, sufficiently outweigh the mitigating factor or factors found to exist to justify a sentence of death.

Now obviously this is only an overview of the law applicable to a jury's consideration of the death penalty. This overview is being provided to you to provide a context for understanding and responding to the questions that you will be asked about your views on the death penalty, and your ability to fairly evaluate and consider both the aggravating factors presented by the government, and any mitigating factors provided by the defense, to support a sentence of life without the possibility of release.

Now while you are involved in this process, you must not talk about the case or anything we have discussed here so far.  Do not read about or allow anyone else to talk with you about the case.

You may not conduct any independent research. Don't Google, Twitter or engage in any electronic chat or other discussion about the case.

Finally, do not engage in any discussion with your fellow jurors or anyone else about any of the issues that I have mentioned here today, including the subject of the death penalty.

Even after you've completed your individual

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 102 of 508
Case 3:08-cv-00134-RJC   Document 125-6   Filed 01/30/11   Page 172 of 359
**JA1068**

1153

questioning, or during any of the breaks that we might take during the day, if you encounter other potential jurors for any reason, you must continue to follow the same instructions I have given to you to refrain from talking about the case, or any of the questions or the answers you have given.  You should refrain from discussing them with fellow jurors or anyone else, including members of your family, friends or co-workers.

In addition, you must not read or listen to any news broadcasts about this case.

So with this overview in mind, I want to ask a few general questions before we do the individual questioning.

The first question I want to ask the members of the jury pool is about the discussion I had with you about the principles that apply to criminal prosecution.

And specifically, the presumption of innocence that our constitution affords a criminal defendant.  And the burden of proof which is on the government throughout the trial to prove each and every element of the crime charged unanimously and beyond a reasonable doubt.

I want to make sure that you all understand those concepts.  So if there is anybody who doesn't understand the concept, would you raise your hand at this time?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  I don't see any hands raised.  So I

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 103 of 508
Case 3:08-cv-00134-RJC   Document 1256   Filed 01/30/11   Page 173 of 359
JA1069

1154

take it from that that you all do understand the principles of criminal prosecution, our constitutional principles that apply to this case.  And I want to make sure that each of you is able to commit to applying those principles in this case.

If you believe you would have difficulty applying those principles in this case, would you raise your hand?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  I don't see any hands raised -- well, are you Juror Number 273?

PROSPECTIVE JUROR:  (Indicating.)

THE COURT:  We will discuss that with you in your individual questioning.  And so you should be prepared to discuss any concern you have in that area at that time.

Anyone else?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Very well.  What I want to do now is ask the government attorneys if they would introduce themselves to the jury, anybody that might be working with you, and any proposed -- any witnesses who you may call in the case.

MR. NAZZARO:  Yes, Your Honor.  Thank you.  Good afternoon.  My name is Sam Nazzaro, and this is Jill Rose. We are both federal prosecutors and we represent the United States in this matter.  Seated over here is Detective Chuck

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 104 of 508
Case 3:09-cr-00134-RJC   Document 1253   Filed 01/30/11   Page 174 of 359
JA1070

1155

Hastings. And he also represents the United States as the chief investigator in this case.

I'm going to read a list of witnesses that's rather lengthy. Please bear with me. These are potential witnesses in the case.

Frank Flores, Barry Telis, Tom Small, Gene Parshall, John Maloney, Brent Phillips, Officer Bruner -- Brumer, Officer John Moreno, Elizabeth Estupian, William Moore, Susan Selser, Raffi Djabourian, Henry Cambara, Mario Vasquez Gerro, Lansore Eraso, Oscar Casteo, Denise Daniels, Blondie Davis, Officer Culpepper, Captain R.L. Hammacher, Officer M.A. Pearson, M. Chong, L.A. Goodman, J.W. Sartin, T.P. Williams, C.L. Smith, S.N. Flint, Officer Sage, Deputy Sheriff Rose, Scott Clarkson, Johnnie Whaley, J.P. Kimmell, D.J. Williams, Officer S.J. Way, Teresa Ketner, Carlton Phoenix, Michael Terry, K.S. Allison, T.J. Miller, J.K. Griffen, Officer W.C. Tyndall, M.T. Young, R.M. Dutko, James Cayton, John Sloane, Terry Baldwin, B.M. Altizer, Amy Wilde, Tammy Hinson, Sergeant G.M. Richey, Norman Rankin, Katie Robbins, Teresa Johnson, Doreen Huntington, John Butts, Carlos Lopez, Detective William Hastings, Todd Roberts, Gene Rivera, Jeffrey Taylor, Officer T.W. Hildebran, J.S. Willinsky, K.R. Scheuerman, J.K. Mardis, M. Scheuerman, Andrew Wrenn, Officer J.E. Brown, G.M. Barnette, Jr., Officer J.T. Courtet, Rene Quiles, Officer John Melekian,

Laura Andersen, RMR 704-350-7493

**JA1071**

1156

Officer D.N. Horne, Kevin Wallin, Officer Timothy White, Betsy Ulibarri, Alex Hirsch, Michael Attard, Susan Conrad, Charles Barkley, a representative from Sprint/Nextel, Andrew Cheramie, Jose Romero, Ann Hamlin, Wayne Henderson, Art Dunckel, Jose Acevedo, C.J. Martinez, Jason Satrsky, Manuel Hiraeta, Hermis Jiminez, Eduardo Vasquez, Oscar Santiago, C.E. Lopez, N. Escobar, Jed Worrell, Alvaro Mayo, Jose La Cruz, Manuel Campana, Gerlin Diaz-Failloz, David Guillien, Miriam Hernandez, Emilio Mar, Jorge Martinez, Jose Noriega, Robert Granacher, Jr., E.M. Suarez, John Dunn, Michael Wellner, Peter Carlson, John Shaw, Michael Cooksey, Howard Neuman, Bob Hood, Abel Santos, Jr., Ismar Sanchez, Jasmine Dinwiddie, Maricruz Medina, Marco Guzman Mejia, Ana Maria Lopez, Ronald Journey, Marie Terrell, Jessica Scarborough, Barry Allen Whitlow, Cherie Whitlow, Ross Womack, Noe Bautista, Juan Lara-Hernandez, Carlos Dominguez, Roberto Ramos, Celestino Lopez, Noe Escobar, Erick Lopez, Galo Ramirez, Rene Arevalo, Ruben Moreno, Alex Granados, Miguel Roque, Angel Granados, Cesar Castillo, Luis Amaro, Juan Vela-Garcia, Rony Lopez, Doug Friend, Jean Garcia, Carmen Garcia, Elizabeth Garcia, Melissa Belton, Hermenio Aguilar, Nancy Almarez, Maria Herrera, Jessica Abarca, Hilda Abarca and Lenny Moriera.

Thank you.

THE COURT:  Thank you, Mr. Nazzaro.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 106 of 508
Case 3:08-cv-00134-RJC   Document 1254   Filed 01/30/11   Page 176 of 359
JA1072

Ask the defense counsel if you would introduce yourself, your client, any witnesses who you may but are not required to call.

MR. BRYSON:  Thank you, Your Honor.

My name is John Bryson.  This is Mark Foster. This is Alejandro Umana.

Our list includes the following names:

Michael Attard, Miguel Eduardo Castaneda, Oscar Vasquez Castillo, Mark Cunningham, Enrique Gloden, Angel Rivera Granados, Mario Alberto Vazquez Guerrero, Griselda Madai Guzman, Detective Hastings, Miriam Hernandez, T.S. Kroh, M.A. Kugel, Julio Cesar Rosales Lopez, D.A. Lyndrup, Jorge Dominguez Martinez, Richard McGough, Marco Antonio Guzman Mejia, James Merikangas, Lansore Vasquez Eraso Nelson, Greg Olley, Carlos Arcides Peraza, Monica Tatiana Reyes, Bernadina Rivera, Judy Vanessa Lopez Rivera, S.M. Russell, Ismar Arody Sanchez, Maria Lizet Santacruz, Oscar Santiago, Abel Santos, Selena Sermeno, Nirav Pravin Shah, M.W. Smith, Michael Terry, Kevin Wallin and Ricardo Weinstein.

THE COURT:  Those were a lot of names thrown at you.  And do any of you believe that you recognize any of those names?

PROSPECTIVE JUROR:  (Indicating.)

THE COURT:  Are you Juror Number 318?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00557-MOC    Document 59-3    Filed 03/23/17    Page 107 of 508
Case 3:08-cr-00134-RJC    Document 1252    Filed 01/30/11    Page 177 of 359

**JA1073**

1158

PROSPECTIVE JUROR: Yes, sir.

THE COURT: I'm going to ask you later on during your individual questioning to follow-up on that.

Anyone else?

PROSPECTIVE JURORS: (No response.)

THE COURT: Okay. What I want to do now is excuse you to the jury deliberation room, then bring each of you out one by one for some additional questions, follow-up to your questionnaire responses, and some questions about your views on the death penalty and related matters.

So if you all would follow the security officer back into the deliberation room, we will begin individual questioning at this time.

(The prospective juror was escorted from the courtroom.)

THE COURT: Juror 203.

(The prospective juror was brought into the courtroom.)

THE COURT: Ma'am, good news/bad news. You're the first one out here, so.

PROSPECTIVE JUROR: That's correct.

THE COURT: You might think that's tough, but it's closest to the general instructions so you might remember them perhaps.

PROSPECTIVE JUROR: Yeah.

THE COURT: Any changes -- sometime ago you filled out the questionnaire. Are you aware of any changes that

Laura Andersen, RMR 704-350-7493

**JA1074**

1194

PROSPECTIVE JUROR:  April?

THE COURT:  April 5th.

PROSPECTIVE JUROR:  No.  No.  No.  It starts like May 5th.  April 12 to 16th.

THE COURT:  If we had a trial that could be done in the week of the fifth, you're ready to go.

PROSPECTIVE JUROR:  I'd rather not, but I don't have a plane itinerary to show you otherwise.  Yeah, I mean, I'm backed up from the conversion at work as it is I'm working overtime on the weekends, but yeah.

THE COURT:  Very well.  We're going to excuse you from this trial.  But if you would call back in on Friday for further instructions.

PROSPECTIVE JUROR:  Okay.  So call on Friday?

THE COURT:  Yeah.

PROSPECTIVE JUROR:  Thank you.

(The prospective juror was escorted from the courtroom.)

THE COURT:  Juror 286.

(The prospective juror was brought into the courtroom.)

THE COURT:  Good afternoon ma'am.

PROSPECTIVE JUROR:  Hi.

THE COURT:  We're going to ask you a few follow-up questions to your questionnaire and questions about your views on the death penalty.

You responded to the questionnaire several months

1195

ago, and so I was wondering as you sit here today, is there anything that you answered back then that you're thinking or your circumstances have changed such that your answers would be different today?

PROSPECTIVE JUROR:  I don't think so, Your Honor. I tried to give each question a lot of thought, originally. So I would doubt it.

THE COURT:  Okay.  And I think you indicated you didn't know any of the names that were read by the attorneys as potential witnesses in the case?

PROSPECTIVE JUROR:  No, I don't.

THE COURT:  Have you heard anything about this case?

PROSPECTIVE JUROR:  No.

THE COURT:  If you were selected as a juror in the case, you would be the decider of the facts, you would find the facts from the evidence that you heard.  And in that respect you're considered the judges of the facts.

I'm the judge of the law.  And I would give you the law to apply to the facts that you found.

And I saw all that to ask you, if the law that I give to you is different from what you thought the law was or think the law ought to be, can you set aside your own notions of the law and follow the instructions I give you?

PROSPECTIVE JUROR:  I would say so.

Laura Andersen, RMR 704-350-7493

**JA1076**

1196

THE COURT:  We talked earlier this afternoon about the two potential parts of the trial.  The guilt phase where the jury determines whether the government's proved the charges they have alleged beyond a reasonable doubt.

And no one knows what the jury will do in that respect but -- because you haven't heard the evidence.

But assume for purposes of these questions that the jury has found the defendant guilty beyond a reasonable doubt of the homicide charges in the indictment, it then becomes the jury's duty to determine the appropriate sentence.  And the two options are the death penalty and life without release.

And at that point in the trial I would instruct the jury that they are to consider the aggravating factors presented by the government in support of the death penalty, and the mitigating factors presented by the defendant in support of life without release.

And I say that to you to ask you this question:

Is there anything about your personal beliefs or your life experiences that would make it difficult for you to engage in that process and meaningfully consider both the aggravating factors supporting the death penalty, and the mitigating factors supporting life without release?

PROSPECTIVE JUROR:  Would you ask me that question again?

Laura Andersen, RMR 704-350-7493

**JA1077**

1197

THE COURT:  Yes.  I guess what I'm asking you is, is there anything about your belief system or your life experience or anything else, that would prevent you from going through that process of considering both penalties?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Another way of looking at it is, assuming the jury's found the defendant guilty beyond a reasonable doubt of one or both of the homicides that are alleged in the indictment, would you at that point automatically choose one or the other options, or would you be willing as a juror to meaningfully consider the aggravating factors in the death penalty, and the mitigating factors of life without release?

PROSPECTIVE JUROR:  Yes.  I think you would have to look at both.

THE COURT:  Well, the attorneys may have some more questions for you in that area.  So if you would give them your attention.

Ms. Rose.

MS. ROSE:  Good afternoon.

PROSPECTIVE JUROR:  Hi.

MS. ROSE:  And I'll follow-up with your last response.

Obviously you haven't heard any evidence in this case.  And what everybody seeks is someone who can keep an

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 112 of 508
Case 3:08-cv-00134-RJC   Document 225-6   Filed 01/30/11   Page 112 of 359

**JA1078**

1198

open mind until you've heard all the evidence and the law that the Judge gives the jury before making any decisions. Are you able to do that?

PROSPECTIVE JUROR:  I think so.

MS. ROSE:  And obviously, as the Judge said, the first stage is where the jury hears the evidence related to the charges in the bill of indictment for the murder charges and others that are included.

And it's only if the jury finds the defendant guilty of those charges, that the issue of penalty or punishment is considered.

You understand that as part of the process?  There are two separate hearings.

PROSPECTIVE JUROR:  Yes.

MS. ROSE:  First is the guilt/innocence and then the second is the sentencing?

PROSPECTIVE JUROR:  Yes.  I understand that.

MS. ROSE:  And at the sentencing hearing as the Judge said, there's additional evidence presented.  And it's only after considering that evidence that the jury makes the decision as to whether the appropriate punishment is life in prison or the death penalty?

PROSPECTIVE JUROR:  (Nodding head.)

MS. ROSE:  And are you able to keep an open mind until you've heard the evidence to make that decision

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 113 of 508
Case 3:08-cv-00134-RJC    Document 125-3    Filed 01/30/11    Page 218 of 359
**JA1079**

1199

together with the other jurors?

PROSPECTIVE JUROR:  I would like to think so.  I mean, I don't know anything about the case.

MS. ROSE:  And that's the point.  But you haven't heard the evidence, so are you able to keep an open mind and consider both options at the conclusion of the evidence?

PROSPECTIVE JUROR:  I think so.

MS. ROSE:  Okay.  I'll move on.

PROSPECTIVE JUROR:  Okay.

MS. ROSE:  I think you've answered that.

I do -- you were nice enough to give some additional explanation on your jury questionnaire about a couple of circumstances from your life.

And I'll tell you that nobody who comes in here is expected to leave all their lives experiences behind.  Once again, it goes back to that, keeping an open mind about the facts in this case, and not the facts in any other case. Because it's about the government presenting evidence against this defendant, under these circumstances.

And given the information that you shared about the tragedy with your brother and a cousin, are you able to come into this courtroom and consider only the facts and evidence that are presented in this case in making your decision?

PROSPECTIVE JUROR:  I hope that I can.  I mean, I

Laura Andersen, RMR 704-350-7493

JA1080

1200

can't forget those --

MS. ROSE:  Nobody's asking you to do that.

PROSPECTIVE JUROR:  -- experiences that I've had.

MS. ROSE:  Nobody's asking you to do that.

All we can ask is that as you sit as a juror, that the facts in evidence that you consider, along with the law that the Judge gives you, are the facts that you heard in this particular case, the evidence of this case?

PROSPECTIVE JUROR:  I would -- I would hope, and I think that I would look at the facts of this case.

MS. ROSE:  And I notice that you are employed, and in your job description, it sounds as if you have to consider a lot of facts in making your decisions every day.

PROSPECTIVE JUROR:  Yes, I do.

MS. ROSE:  That's what we're asking you to do here, is just to take into consideration what you have in front of you at the conclusion of the case, along with the law that the Judge provides.

Your niece is an officer.  How long has she been in law enforcement?

PROSPECTIVE JUROR:  I would say probably two to three years.

MS. ROSE:  And has she talked a lot with you about what she does or her experiences?

PROSPECTIVE JUROR:  Some.

Laura Andersen, RMR 704-350-7493

**JA1081**

1201

MS. ROSE:  She's not listed as a witness in this case, I take it?

PROSPECTIVE JUROR:  No.

MS. ROSE:  All right.  And anything that she's told you that you think would affect your ability, once again, to look at the evidence in this case and this case only?

PROSPECTIVE JUROR:  I don't think so.

MS. ROSE:  Is it because your niece is in law enforcement that you checked that you believe law enforcement to be more truthful than potentially other witnesses?

PROSPECTIVE JUROR:  I don't know if it was because of her or just in general.  I was on the grand jury in Monroe for a year, I think in 1998.  And, you know, we had a lot of interaction with detectives and policemen.  And based on that, I have a positive opinion towards them.

MS. ROSE:  The Judge will tell you -- and obviously the grand jury is a whole different setting than it is here in the courtroom.

But the Judge will tell you and instruct you that you're to judge the demeanor of each witness based upon their testimony, their believability, their demeanor, their credibility, comparing it to the other facts in the case.

Are you able to judge each individual witness, and

Laura Andersen, RMR 704-350-7493

**JA1082**

1202

give it -- based upon what you see from the witness stand -- as opposed to just assuming based upon what their position may be?

In other words, are you going to treat civilians and law enforcement, you're going to be able to evaluate their testimony and weigh it equally?

PROSPECTIVE JUROR:  Um, I think so.  But in all honesty, I do have to say that I do have a positive feeling towards them, police officers, detectives and so forth.

MS. ROSE:  Would you tell us your thoughts and opinions regarding the death penalty?

PROSPECTIVE JUROR:  I've never been on a trial before, of course.  I've never been involved with it.  In general I do believe in it where the facts are supported and it's justified.

MS. ROSE:  You indicated on your questionnaire that you would consider both life imprisonment and the death penalty in cases where the accused has been found guilty of murder in furtherance of the racketeering crime, or use of a gun during a crime of violence.  Has that opinion changed?

PROSPECTIVE JUROR:  No.

When you say "racketeering", can you maybe expand on that a little bit.  I'm not sure that I understand.

THE COURT:  I will give you definitions at trial, but it's a fancy word -- in the context of this case it

Laura Andersen, RMR 704-350-7493

**JA1083**

1203

means a gang activity.  And so that the charge is, murder in aid of racketeering.  The intentional killing of another person for the purpose of maintaining or enhancing the defendant's position in a gang.

PROSPECTIVE JUROR:  Oh.

THE COURT:  Shorthand for --

PROSPECTIVE JUROR:  Okay.

THE COURT:  There will be a more complete definition at a later time.  But for purposes of these questions, that's what it means.

PROSPECTIVE JUROR:  Okay.  Thank you.

MS. ROSE:  Do you have any questions based on the further information provided by the Court?

PROSPECTIVE JUROR:  No.  I just wasn't sure.  You know, I've heard of racketeering, but I didn't know how it would apply here.

MS. ROSE:  All right.  And so as you sit here today, based upon your answers during the questioning and according to your questionnaire, until you've heard all the facts in evidence in this case, you would be able to fairly consider both potential punishments; life imprisonment without parole and the death penalty?

PROSPECTIVE JUROR:  Yes.

MS. ROSE:  Okay.  Thank you very much.

THE COURT:  Mr. Foster.

Laura Andersen, RMR 704-350-7493

**JA1084**

1204

MR. FOSTER: Good afternoon, Juror 286.

I'm Mark Foster, one of the attorneys for Alejandro Umana. This is my co-counsel John Bryson.

You mentioned having been on a grand jury back in what, 1998?

PROSPECTIVE JUROR: I think that was the year.

MR. FOSTER: Okay. And that was for a one year period of time?

PROSPECTIVE JUROR: It was.

MR. FOSTER: And you understand, I'm sure, that a grand jury and a trial jury are totally different things?

PROSPECTIVE JUROR: Exactly. Yes, I do.

MR. FOSTER: And so would that have any affect on your ability to be a fair and impartial trial juror?

PROSPECTIVE JUROR: You know, I don't think so.

MR. FOSTER: Because what you're doing there was doing, I assume, was lots of cases every day, and making determination of deciding probable cause and they would charge it and move on.

This is a whole different ball game of deciding the ultimate question of guilt or innocence and potentially life or death. So you're clear on that?

PROSPECTIVE JUROR: I know the difference. Yeah, I understand the difference. We just decided whether someone should go to trial.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 119 of 508
Case 3:08-cv-00134-RJC    Document 122-3    Filed 01/30/11    Page 24 of 359

JA1085

1205

MR. FOSTER: Right.

PROSPECTIVE JUROR: And here you're deciding the outcome.

MR. FOSTER: Okay. By being on the grand jury for that year, did you develop any particular friendships or relationships -- well, just friendships with police officers or detectives anything like that?

PROSPECTIVE JUROR: Not friendships, no.

MR. FOSTER: Okay. so you would be able to judge fairly the testimony of a police officer, the same way you would a civilian witness in this case?

PROSPECTIVE JUROR: I have to answer again in all honesty that I hope that I would be able to. But also as I say, I do support and see law enforcement in a favorable light.

MR. FOSTER: Well, I guess basically what I'm asking you, you know, at the end of the trial the Judge will always instruct on -- give you certain instruction on determining the credibility of witnesses. It's one instruction that applies to everybody alike, police officers and civilians.

My question is, would you follow that same instruction and use the same standard in evaluating the credibility of each type of witness?

PROSPECTIVE JUROR: I think so. I've never done

Laura Andersen, RMR 704-350-7493

JA1086

1206

it before, as I say.  I just have to say that I would hope and I would think that I would.

MR. FOSTER:  Okay.  Now, Ms. Rose asked you a little bit about this on -- a minute ago.  And you obviously attached an extra page to your questionnaire explaining what happened to your brother back in 1976.  I don't really want to bring up something that may be painful to you.

But you did mention -- it sounds like you expressed real frustration or distrust at the criminal justice system, based on how the person shot your brother's case was handled; is that accurate?

PROSPECTIVE JUROR:  Yes.

MR. FOSTER:  Okay.  Does that come into play now, if you're a juror in a case like this, that involves two charges of murder?

PROSPECTIVE JUROR:  I don't know if it would or not, to be honest.  I do have strong feelings about it.  You know, the sentence -- the sentence to me did not -- it was not justified, based on the circumstances and what happened.

And that person, because he didn't have a sufficient sentence, I think, initially, went on to do additional murder and suicide.  And yeah, I do have a problem getting past that.

MR. FOSTER:  Well, in the context of this case, typically jurors do not have anything to do with punishment.

Laura Andersen, RMR 704-350-7493

JA1087

1207

You hear the facts, you decide whether guilty or not guilty, then you leave and the Judge does the sentencing.

The exception is, if you have any capital eligible offenses like we have in this case, we have two murders charged in different ways, but two murders.

So it's possible if we got to that point in the trial, you could be sitting in the position of trying to decide what the right sentence is for this case.  And let me just tell you if that happened, you would be at the end of this process where the only two options on the table, if you -- well, let me back up.

These two charges are murders in aid of racketeering.  In other words, an intentional killing for the purpose of furthering his position in the gang.  Okay.

So the only way you would be sitting as a juror in the penalty phase, would be if the jury, beyond a reasonable doubt, found him guilty of one or both of those charges.  Okay.

And then there would be the issue of whether there are aggravating factors proven beyond a reasonable doubt by the government, such as would then empower the jury to consider the death penalty as an option.

Now the only other option on the table at that point, if you found that, would be life without parole.  Also known as life without possibility of release.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 123 of 508
Case 3:08-cr-00134-RJC    Document 1253    Filed 01/30/11    Page 122 of 359
**JA1088**

1208

So if you got to that point in the trial, there would not be any kind of possibility that the defendant could get any lesser term of years or anything.

If you found him guilty of those murders, it's either one or the other, death or life without the possibility of release.

Knowing that, does your attitude about your frustration with the judicial system and the sentence that that assailant of your brother's got, how -- can you tell us whether that would be an issue or affect you or?

PROSPECTIVE JUROR:  I think it's a bit different than the situation with my brother.  Because in that instance I just didn't think that there was sufficient punishment that fit the crime.

In this case you're looking at the death penalty, or as you're telling me, someone who would be in prison the rest of their life.  It's different, and I hope that I would see that.

MR. FOSTER:  Okay.

PROSPECTIVE JUROR:  And be able to --

MR. FOSTER:  So --

PROSPECTIVE JUROR:  -- make a decision.

MR. FOSTER:  Are you saying then, that based on how I've outlined things for you, if you're at that end of this process, are you saying that you would consider

Laura Andersen, RMR 704-350-7493

JA1089

1209

equally, or give fair consideration to both types of sentences?

In other words, that you would think that either death or life without parole would be considered as sufficient sentences for those crimes?

PROSPECTIVE JUROR:  I think depending on the circumstances and the evidence.

THE COURT:  I think what the question is, would you meaningfully consider -- you're not being asked to say what you would do.  But would you meaningfully consider both of these sentencing options in the sentencing phase of this trial?

PROSPECTIVE JUROR:  Yes.  Yes.

MR. FOSTER:  Let me back up just a little bit.

The fact that this is a -- these two murder charges make this a death penalty possible case or eligible case, however you want to say it, do you think that would have any impact on your ability to be a fair juror during the guilt/innocence phase where you're first making the decision about, is he guilty in the first place.

Do you think just knowing the death penalty is hanging out there as a possibility, would affect your ability to be fair during the guilt/innocence phase?

PROSPECTIVE JUROR:  I don't think so.

MR. FOSTER:  And also regarding the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 124 of 508
Case 3:08-cv-00134-RJC   Document 1-24   Filed 01/30/11   Page 229 of 359
**JA1090**

1210

guilt/innocence phase, do you think there's any -- do you think that the experience with what happened to your brother's attacker and everything, would have any impact on your ability to be a fair judge on the facts, as far as guilt versus -- guilty versus not guilty?

PROSPECTIVE JUROR:  Well, I don't know how to say it any differently than I already have, that I would hope I would not have -- I would hope it would not enter into my decision, but I still have that experience.

MR. FOSTER:  All right.

PROSPECTIVE JUROR:  You know, I want to do the right thing, but I don't -- I can't forget the past experience.

MR. FOSTER:  So do you have concern at this point then that you would not be able to be a fair juror in this case because of that experience?

PROSPECTIVE JUROR:  Like I say, I would hope that I could do the job, but I don't know that I can say 100 percent.

As I say, I want to do the right thing.  But I still have that experience.

MR. FOSTER:  And there's nothing wrong with that experience, and nobody's judging it.  But the question, of course, is a difficult question to answer, I know.

PROSPECTIVE JUROR:  It is.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 125 of 508
Case 3:08-cv-00134-RJC   Document 125-6   Filed 01/30/11   Page 230 of 359
JA1091

1211

MR. FOSTER: But whether you really feel that you can be someone who can give both sides in this case a fair trial in both stages of the trial, the guilt/innocence phase and the sentencing stage if we get there.

This is a hugely important case to both parties. And the defendant has the right, as does the government, to have a jury of people who are fair and impartial and open-minded. And I guess, do you feel that you are one of those people right for this case?

PROSPECTIVE JUROR: I don't know if I can say 100 percent. I really don't.

THE COURT: Let me ask you this question: If -- you heard me talk about early, when I was talking to all the jurors at one time, I was describing to them the constitutional principles that we have. That every defendant is presumed innocent.

And the indictment is as, you know from your grand jury experience, is just a mechanism for bringing him to court so his case can be decided by a jury.

And the presumption -- or the burden of proof is on the government to prove the defendant's guilt beyond a reasonable doubt, each element that they charge.

PROSPECTIVE JUROR: Yes.

THE COURT: And so, this defendant stands in the same footing as any criminal defendant, in terms of that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 126 of 508
Case 3:08-cr-00134-RJC   Document 1253   Filed 01/30/11   Page 231 of 359
**JA1092**

1212

presumption of innocence, and the burden of proof being on the government to prove the case unanimously and beyond a reasonable doubt.

Now, is there anything about your life experience that keeps you from understanding those principles and agreeing to apply them in this case?

PROSPECTIVE JUROR:  I understand the principles entirely.  And I hope that I could, you know, do -- do the job that's requested.  I just -- as the reason that I put on my questionnaire is, I have these things in my experience that I don't know whether they would prevent me from doing the job correctly or not.

THE COURT:  Do you agree with those principles?

PROSPECTIVE JUROR:  Yes, I do.

THE COURT:  And did you understand me and the attorneys when -- and when we were referring to the sentencing phase and the process that the juror goes through in determining between the two penalty options?

PROSPECTIVE JUROR:  Yes.

THE COURT:  And is there anything about your past experience that would prevent you from meaningfully participating in that process?

PROSPECTIVE JUROR:  No, I don't think so.

MR. FOSTER:  Do you think that -- I have to figure out how to ask this.

Laura Andersen, RMR 704-350-7493

1213

I'm not trying to beat a dead horse here, but do you think your feelings about the whole thing with your brother, would impair your ability to be a fair and impartial juror, both in the facts and the sentencing phase of this case, due to the strong feelings that you have?

MS. ROSE:  I'll object.

THE COURT:  I'll sustain the objection.

That means you don't have to answer that question.

MR. FOSTER:  All things considered, to the best of your ability, do you think you could be a fair and impartial juror for the defendant who is on trial or not?

MS. ROSE:  She's answered that as well, Your Honor.

THE COURT:  Overruled.

PROSPECTIVE JUROR:  What was the -- I can answer?

THE COURT:  Yes.  I'm sorry.

PROSPECTIVE JUROR:  Well, I think I answered that, too.  I believe in doing the right thing.  And I believe in the process.  Whether my previous life experience would enter into that, I don't think I can tell you.

MR. FOSTER:  I have no further questions.

THE COURT:  Thank you, ma'am.

Would you call in at the end of the day tomorrow for further instructions?

PROSPECTIVE JUROR:  Okay.

Laura Andersen, RMR 704-350-7493

Case 3:16cv-00057-MOC    Document 59-3    Filed 03/23/17  Page 128 of 508
Case 3:08-cv-00134-RJC    Document 1274    Filed 01/30/11  Page 238 of 359

**JA1094**

1214

(The prospective juror was escorted from the courtroom.)

MR. FOSTER:  Your Honor, we challenge for cause on the grounds that this juror indicates that prior experience with her brother has given her a jaundiced view of the justice system that makes her not have faith in it, not trust it.  And she was frustrated by what happened to her brother's assailant.  Clearly she's very emotionally upset about the whole thing.

And although her answers are kind of inconsistent, it would appear that she is impaired from being a fair and impartial juror on both phases of the trial, she's so affected by what happened to her brother's case.

THE COURT:  What says the government?

MS. ROSE:  I think this juror is one of those jurors who -- and she said it over again.  I believe in doing the right thing.  I want to do the right thing.

I think she thinks that we expect her to forget her life experiences.  And clearly this is a situation that was an unfortunate one for she and her family.

But she also told the Court that she would consider the facts and the evidence here.  That she would consider the law, and that she would do her very best, and is a believer in doing the right thing, and a believer in the process, and that she would follow what the Court asked her to do.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 129 of 508
Case 3:08-cv-00134-RJC   Document 126-4   Filed 01/30/11   Page 234 of 359
JA1095

1215

I think that's all we can do, like every juror who comes in here with past life experiences. And I think she was just being extremely honest in saying, I can't forget what happened to my brother.

But she was particularly strong in responding to her ability to consider both those sentencing options. Because she understood this was -- in fact, she said, this is a very different circumstance. And I would be very open to considering both of those. And she indicated that on her questionnaire as well, so.

THE COURT: I agree. I've listened carefully to this juror. And she does have a unique life experience that creates issues in her mind as to fairness. And she really seemed to be earnest in her efforts to respond to the questions put to her.

When I first questioned her, she indicated she could consider both sentencing options. And throughout the government examination of her, she said she could keep an open mind.

Although she couldn't forget the past experiences, she recognized that the facts of this case are different from that of her brother's situation, in that the -- she could consider both sentencing options.

She repeated that testimony in answer to the defense questions concerning her ability to meaningfully

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 130 of 508
Case 3:08-cr-00134-RJC    Document 1558    Filed 01/30/11    Page 235 of 359

**JA1096**

1216

consider both options, be fair in the guilt phase and wanting to do the right thing.

I think that the totality of her responses, her demeanor, indicated to me that she was not a substantially impaired juror. That she could fairly consider the guilt question, and would consider both options at the sentencing phase.

And so I'll deny the defense challenge for cause.

Let me just say, I refer to it as the guilt phase not the guilt/innocence phase, because I think the guilt/innocence description implies a burden that you all don't have. But I would yield to whatever you want me to say in that area. I want to make sure that you understood why I referred to it as the guilt phase instead of the guilt/innocence phase.

MR. FOSTER: Okay.

THE COURT: I'll refer to it any way you all want me to.

MR. BRYSON: I just always habitually call it the guilt/innocence phase.

MR. FOSTER: I guess the reason I say guilt/innocence, I've always thought that saying guilt almost implies that of course they're going to be found guilty. But I see the Court's point --

THE COURT: I guess I could say guilty/not guilty,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 131 of 508
Case 3:08-cv-00134-RJC   Document 126-3   Filed 01/30/11   Page 236 of 359
**JA1097**

1217

whatever you prefer.

MR. FOSTER:  I don't think there's an easy solution.

THE COURT:  All right.  Juror 287.

(The prospective juror was brought into the courtroom.)

THE COURT:  Good afternoon.

PROSPECTIVE JUROR:  Good afternoon.

THE COURT:  Thank you for your patience with this process.  We have some questions for you, both in updates on your questionnaire responses and your views on the death penalty.  I think you indicated you didn't know any of the names that were mentioned to you; is that correct?

PROSPECTIVE JUROR:  That's correct.

THE COURT:  Now you filled out the questionnaire sometime ago.  Sitting here right now, is there anything in that questionnaire, any answers you can think of that would be different if you were to answer them today?

PROSPECTIVE JUROR:  Well, you know that's, whether or not you believe in the death penalty, is one of the things that, you know, people talk about from time to time.  And I've never really known where I stood on that.  And I'm I still don't, you know.  It's a difficult, difficult decision to make.  And I'm not sure at this point that I could, you know, be a part of condemning someone to death.

THE COURT:  Well, I'm going to ask you some

Laura Andersen, RMR 704-350-7493

**JA1098**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DOCKET NO. 3:08-CR-134-2

UNITED STATES OF AMERICA            )
                                    )
       vs.                          )        VOLUME VI OF VI
                                    )
ALEJANDRO ENRIQUE RAMIREZ UMANA     )
_____)

TRANSCRIPT OF JURY VOIR DIRE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
MARCH 29, 2010

APPEARANCES:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    Assistant United States Attorney
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    United States Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK PATRICK FOSTER, JR.
    1011 E. Morehead Street
    Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    P.O. Box 2086
    High Point, North Carolina 27261

                LAURA ANDERSEN, RMR
               Official Court Reporter
             United States District Court
              Charlotte, North Carolina

Case 3:16-cv-00057-MOC-RJC Document 50-3   Filed 03/23/17   Page 133 of 508
Case 3:08-cr-00134-RJC Document 523   Filed 01/30/11   Page 1 of 35
JA1099

1502

P R O C E E D I N G S

(Interpreters Maria Lando and Julia Davis present.)

(Defendant Umana is present.)

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  All right.  We're here to select a jury in the case of United States V Alejandro Umana.

What I propose to do is have -- the clerk has each of the 60 numbers representing the 60 qualified jurors in a -- in a basket.

What I propose is that the clerk will just blindly fish out a number from the basket, read it out loud, and we'll come up with a pool of 12 by that process.

Then I would call upon the government to exercise their peremptory challenges and then call upon the defendant to do likewise.

See how many, if any, are left from that initial group of 12.  And whoever is -- emerges from that process, will be members of the jury.

Then we'll call out 12 names and start with the defense, and ask them to exercise their peremptories, and likewise the government, and see who's left until we get a group of 12.

At that point we will turn to the alternate selection with each of you getting two alternate selection.

Laura Andersen, RMR 704-350-7493

JA1100

1503

Any objection to that process or any clarification needed about that process?

MR. BRYSON:  Just one question.  Let's say that we have 6 jurors after the first strike and 10 after the next panel of 12.  Will we do another panel of 12?  And if so, will the jurors that are accepted beyond 12 automatically become alternates?

THE COURT:  Here's what we'll do.  Let's say there's 6 and 10.  Then that first 6 in that group of 10 will be the jury.  The first 6 chosen, numerically, will be the jury.  So we'll have 4 left over.

We'll go to that first left over for the alternate 1 spot and ask each side if there's a strike.  If there's no strike, she's alternate 1.

We'll go through that process until we've got 4 alternates.

I can explain it again.

MR. BRYSON:  It probably be easier once we get into it.

THE COURT:  All right.

MR. FOSTER:  Your Honor, I have one question.  And I apologize, the rules probably say this, but any left over of the 20 peremptories that aren't used on the 12, those can or cannot be used?

THE COURT:  Cannot.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 135 of 508
Case 3:08-cr-00134-RJC Document 1436   Filed 01/30/11   Page 4 of 35
JA1101

1504

MR. FOSTER:  Cannot.

THE COURT:  You'll have two alternate strikes. You either use your 20 on the jury or you don't.

All right.  So do each of you have a jury box in front of you?

ALL COUNSEL:  (Indicating.)

THE COURT:  Well, Madam Clerk, if you would begin calling -- pulling out 12 numbers.

COURT CLERK:  Seat number 1, 289.

Seat number 2, 330.

Seat number 3, 214.

Seat number 4, is 104.

Seat number 5, 322.

Seat number 6, 328.

Seat number 7, 165.

Seat number 8, is 39.

Seat number 9, 119.

Seat number 10, 124.

Seat number 11, 253.

Seat number 12, 182.

(Pause.)

MS. ROSE:  Number 3 is 213 or 214?

COURT CLERK:  Number 214.

(Pause.)

THE COURT:  Are you ready?

Laura Andersen, RMR 704-350-7493

**JA1102**

1505

MS. ROSE:  Yes.

THE COURT:  Mr. Bryson, are you ready?

MR. BRYSON:  We're ready for them to go, yes.

THE COURT:  All right.  If the government has any strikes would you announce them in open court?

MS. ROSE:  Yes, Your Honor.

The government would strike Juror number 1, 289; Juror 4, 104; Juror 6, number 328.

And we would be satisfied with the remainder of the panel.

THE COURT:  Defense have any strikes?

MR. FOSTER:  May we have a moment, Your Honor?

THE COURT:  You may.

MR. BRYSON:  Your Honor, before we -- I'm not sure exactly how the Court wants us to proceed in this manner.

Before we make a challenge, we would make a *Batson* challenge at this point.

Just noting statistically that there were three black or African-American jurors presented to the government for their strikes.  That they exercised strikes pick two out of three, being a 66 percent challenge rate.  We would think that would be a prima facie basis.

THE COURT:  Who are the African-American challenges by the government, what numbers?

MR. BRYSON:  Number 1, Juror Number 1.  Excuse me.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 137 of 508
Case 3:08-cr-00134-RJC Document 143-3   Filed 01/30/11   Page 6 of 35
**JA1103**

1506

Seat number 1, Juror Number 289.  And seat number 4, Juror Number 104.

There's another one on the panel that they passed on and that would be seat number 8, Juror -- no, I'm sorry -- yes, I'm sorry.  Juror number 8 -- seat number 8, Juror Number 39.  I'm sorry.  There was the juror that was passed on.

THE COURT:  Ms. Rose, if you would give explanation for your challenges with respect to number 1 and number 4.

MS. ROSE:  All right.  And I would also add before doing that, Your Honor, Juror Number 11, Number 253.  I would submit -- he's a Pacific Islander who is a cognizable recognizable group which the government did not move to strike.

That's what he listed on his questionnaire.  I believe he said he was Filipino.

As to Juror Number 289, Your Honor, the government would move to strike that juror because on her questionnaire she indicated she was uncertain about the death penalty.

In fact, she indicates, she was not sure about anything.  She indicated life in prison was basically death. That she believed that there was a potential for redirecting gang members and therefore she would strongly favor life in prison.  She indicated her quote was, "Life in prison is a

Laura Andersen, RMR 704-350-7493

JA1104

1507

person losing their life".  And therefore she was -- she was -- very highly favored life in prison, which was consistent with what she said on her questionnaire.

She also said she would always vote to impose the penalty of life in prison without the possibility of parole in a case such as this.

And so given all of that, Your Honor, the government would submit that she was a juror that was not satisfactory to the government.

THE COURT:  Very well.  And with respect to 104.

MS. ROSE:  On her questionnaire she said that she was uncertain about the death penalty.  And that the only time she would consider it was if it was a serial killer that can't be rehabilitated, that may kill again.

She constantly referred, during her questioning, to "Scar Face", and a lot of TV and movie references.

And she also indicated on her questionnaire that she would always vote for life.

Those would be the reasons the government would move to strike her, Your Honor.

THE COURT:  I find that the government has proffered race neutral explanations with respect to strikes that were utilized on Jurors number 289 and 104.  And would deny the *Batson* challenge at this time.

MR. BRYSON:  Your Honor, at this time the

Laura Andersen, RMR 704-350-7493

**JA1105**

1508

defendant would exercise the following peremptory challenges:

We would challenge Juror seat number 3, number 214 -- I'm sorry. And seat number 5, Juror number 322; seat number 7, Juror number 165; seat number 10, Juror number 124. And seat number 11, Juror number 253.

THE COURT: Jurors 3, 5, 7, 10 and 11?

MR. BRYSON: Yes, Your Honor.

THE COURT: All right. So it appears to the Court that we have one, two, three, four jurors that survived that first round; 330, 39, 119, and 182.

MR. BRYSON: Can we now pencil them in as jurors one, two, three, four?

THE COURT: Correct.

MS. ROSE: And just as to Juror number 11, Your Honor, that being 253, the government would make a *Batson* challenge as to that juror.

THE COURT: And what is your prima facie case based upon?

MS. ROSE: He -- that juror as I said, is Filipino. He indicated he was a Pacific Highlander -- Islander excuse me, on his questionnaire.

THE COURT: I don't think that in and of itself raises a prima facie case, and so I'll deny the government's *Batson* challenge -- or reverse *Batson* challenge.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 140 of 508
Case 3:08-cr-00134-RJC Document 435   Filed 01/30/11   Page 3 of 35

JAT106

1509

Madam Clerk, would you draw 12 additional names.

COURT CLERK:  Seat number 1 is number 203.

Seat number 2, Juror 149.

Seat number 3, 157.

Seat number 4, 240.

Seat number 5, 202.

Seat number 6, 309.

Seat number 7, is 911.

Seat number 8, Juror number 7.

Seat number 9, Juror 208.

Seat number 10, is Juror number 19.

Seat number 11, Juror 155.

Seat number 12, Juror 191.

(Pause.)

THE COURT:  Is defense ready?

MR. BRYSON:  Yes, Your Honor.

Your Honor, from this group we would excuse Juror seat number 2, number 149; seat number 9, Juror number 208; and seat number 11, Juror number 155.

Thank you.

THE COURT:  Jurors 2, 9 and 11.

MR. BRYSON:  Yes, Your Honor.

(Pause.)

MS. ROSE:  Are you ready?

THE COURT:  Yes.

Laura Andersen, RMR 704-350-7493

**JA1107**

1510

MS. ROSE:  The government would excuse Juror number 1, that's Juror 203; Juror number 3, 157; Juror 6, 309; Juror 7, number 911; Juror number 8, which is number 7; and Juror number 12, which is 191.

THE COURT:  Jurors 1, 3, 6, 7, 8 and 12.

MS. ROSE:  Yes, sir.

MR. BRYSON:  We would once again make a challenge on a *Batson*.  Do you want to go through the numbers?

THE COURT:  Yes.  Thank you.

MR. BRYSON:  Okay.  The Government's challenges on this occasion for black or African-American jurors were seat number 3, juror number 157; seat number 6, Juror number 309; seat number 8, Juror number 7; and seat number 12, Juror number 191.

Out of six challenges on this occasion, four were used to strike black or African-American jurors.

THE COURT:  The government would proffer its explanation for the challenges to 3, 6, 8 and 12.

MS. ROSE:  All right.  As to Juror number 157, this juror -- the first thing -- she said she did not like finality -- I don't know if this is a male or a female.  But this juror said that they did not like finality.

This was -- this juror actually -- the Court will probably recall, his brother and father had both served time.  His brother is still in jail, but he could not,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3  Filed 03/23/17  Page 142 of 508
Case 3:08-cr-00134-RJC Document 528-3  Filed 03/30/11  Page 114 of 135
**JA1108**

1511

despite numerous questions, would not tell the government what -- for what charges those individuals were in custody or any specifics about that. He just kept saying, I don't have any idea. I can't remember. He was very evasive in his responses regarding the crime. He refused to respond to certain questions.

When asked about the death penalty he said, I don't know how I feel about it. I don't like finality. If there is "liberating" was his quote, evidence, there's no way to take it back.

He was slow in his responses even with the Court. The Court explained the questions or the process several times, and he indicated he didn't understand and acted confused during the process.

So for those -- he was not able to give any real opinion on the death penalty other than he didn't like it because he didn't like finality, and was concerned about ultimately being able to make that decision.

As to Juror number 309, this juror said when asked, do you favor the death penalty. Could not give a response. That -- said she would always vote to impose life.

The fact that the defendant may face the possibility of death in the second phase, she said she did not know if she could be impartial in the first phase

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 143 of 508
Case 3:08-cr-00134-RJC Document 50-3   Filed 03/30/11   Page 12 of 35

**JAT109**

1512

because of her strong feelings against the death penalty that.

She indicated initially that she would always give life. And that she felt like the death penalty was the easy way out. That life in prison -- she gave opposite responses from questionnaire.

Juror number 7 said that they were likely to favor a sentence of life. They were not equally considering either one.

But more specifically that she did not believe she could personally render a verdict of death. And that she could not equally consider both.

That she had changed her view to life imprisonment since filling out the questionnaire. That it was her thought that everybody had a chance to live, and therefore she could not personally render -- did not believe she could personally render a verdict of death.

Juror number 191 said the death penalty -- on her questionnaire said the death penalty is wrong. I would probably favor abolishing the death penalty. I very strongly oppose the death penalty. I believe to take a life is a sin. I think the death penalty is wrong and it should be abolished because it is wrong. And I would always vote to impose life.

In questioning she said, I do not believe in the

Laura Andersen, RMR 704-350-7493

**JA1110**

1513

death penalty.  She was very hesitant on death penalty questions, and once again repeated that to take a life is a sin.

And that to do her civic duty in this case would conflict with her religious beliefs.

She said, again, I do not like the death penalty. It certainly wouldn't hurt my feelings if it was abolished. And again repeated that she did not believe in the death penalty.

Those are the reasons the government would move to strike those jurors.

Also, just for the record, Juror number 19 which is seat number 10, he is a Latino juror, Your Honor.  He was born in Cuba.  And the government did not move to strike him.

THE COURT:  I believe the defense indicated the strikes were four minorities out of a total of six.  And you were including number 10 in that list of six, I believe.

MR. BRYSON:  No.  I'm sorry.  What I was saying was, that out of the six challenges they made, four were toward African-Americans.

THE COURT:  I see.

MR. BRYSON:  I think in terms of who they were -- and it appears to me that on this pass, they did pass on one African-American juror, which would be Juror number 4, seat

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3    Filed 03/23/17   Page 145 of 508
Case 3:08-cr-00134-RJC   Document 525    Filed 03/30/11   Page 144 of 35

JATT11

1514

number 4, Juror number 240.

And I do have Juror number 10. We have him shown as a Hispanic male.

THE COURT: Thank you.

MR. BRYSON: Your Honor, before you go into rebuttal (sic,) can I just do one -- rebuttal on one?

THE COURT: You may.

MR. BRYSON: On Juror number -- seat number 6, Juror number 309. The government indicated that in stating the reasons that she stated that she would always favor life.

And again, the transcript will show what the transcript will show.

Our recollection is that she did not say that. Our recollection is that at one point during the questioning she was asked if she didn't write on her questionnaire that she would always favor life.

She did answer the question, the long question that said if you would always vote to impose life for someone convicted of murder in aid of racketeering and use and possession of a firearm in connection with a violent crime.

But she -- when read that question, she didn't read the complete question to her, and she stopped after do you -- you always voted life.

Laura Andersen, RMR 704-350-7493

**JAT112**

1515

The question actually just said that she did not answer it that way. And it would be our recollection that she never did say or write on the questionnaire that she would always vote for life, exception of that one question where it specified the two offenses.

THE COURT: My recollection of her testimony was that she said in response to government questioning, I would rather not have the death penalty because they don't think about what they did. I would take life without parole.

She did indicate that she would have to hear the circumstances before she decided the case. But then she said as well, I feel like the death penalty is the easy way out, and she wouldn't do it.

Then she indicated that she would meaningfully consider it, if the defendant deserved it.

I have listened to the proffered explanations for each of the government's challenged strikes, and find as to each of them that there is a race neutral explanation for the challenge.

And I do not -- I find that there is a sufficiently race neutral explanation, one that satisfies the Court, and I will overrule the *Batson* challenge at this time.

It appears that out of this panel we have three jurors who survived; number 240, 202, and 19. Those will be

Laura  Andersen,  RMR  704-350-7493

**JA1113**

1516

Jurors 5, 6 and 7.

MR. BRYSON:  Your Honor, before we start, can we get some more boxes?

THE COURT:  Yes.

MR. BRYSON:  Do you need some more, Sam?

MS. ROSE:  No, we're good.  Thank you.

THE COURT:  Madam Clerk, if you would draw an additional 12 names.

COURT CLERK:  Seat number 1, Juror number 503.

Seat number 2, is Juror number 2.

Seat number 3, Juror number 306.

Seat number 4, Juror 243.

Seat number 5, Juror number 151.

Seat number 6, Juror number 210.

Seat number 7, Juror 286.

Seat number 8, Juror number 53.

MR. FOSTER:  53?

COURT CLERK:  Fifty-three.  Five-three.

MR. FOSTER:  I'm sorry.  I'm sorry.

COURT CLERK:  You're okay?

MR. FOSTER:  Yes.  Thank you.

COURT CLERK:  Seat number 9, is Juror 73.

Seat number 10, Juror 222.

Seat number 11, Juror 231.

And seat number 12, Juror 173.

Laura Andersen, RMR 704-350-7493

**JA1114**

1517

(Pause.)

MS. ROSE:  Your Honor, the government would move to strike number 1, that's Juror 503; number 8, which is 53.

Just one second, Your Honor, I'm sorry.

And number 231.

THE COURT:  Number 11?

MS. ROSE:  Number 11, yes.  That's 1, 8 and 11.

MR. BRYSON:  Just for purposes of record keeping.

THE COURT:  Yes, sir.

MR. BRYSON:  I would show that out of this panel there were three black or African-American jurors; Juror number 8 -- excuse me -- seat number 8, Juror number 53; seat number 10, Juror number 222; and seat number 12, Juror number 173.

Out of those three jurors, government exercised challenge toward one, seat 8, Juror 153 (sic.).

Our record shows that the government has now exercised peremptory challenges toward 7 of the 11 black or African-Americans that were presented to it.

THE COURT:  Are you challenging on *Batson* grounds?

MR. BRYSON:  We would renew the cause -- challenge, Your Honor.

THE COURT:  What says the government?

MS. ROSE:  As to number 53, Juror number 53, this juror said that they would consider the death penalty only

Case 3:16-cv-00057-MOC-JC Document 50-3   Filed 03/23/17   Page 149 of 508
Case 3:08-cr-00134-RJC  Document 50-3   Filed 03/30/11   Page 18 of 35

JA1115

1518

in the case of an eyewitness.  That they most definitely considered life in prison.  And that there were two burden of proofs; that an eyewitness and if proven with no doubt. Is morally strongly affected his opinion about the death penalty.  Those are the reasons, Your Honor.

THE COURT:  The reasons you struck number 53 -- 53 is that he indicated a requirement of an eyewitness in terms of burdens of proof and proof beyond a shadow of a doubt, is that what you're saying?

MS. ROSE:  He said, no doubt.  He said, there had to be no doubt.

I would also, Your Honor -- he said, no doubt.  If it's proven by an eyewitness and there is no doubt.  And I made a quote here, two burdens of proof.  But that he would more likely and most definitely consider the life imprisonment.

THE COURT:  My notes indicate he said he would consider both options, said that twice in response to defense questioning.  I don't know if the government even questioned his witness, did you, or this potential juror?

Is there a way to pull up the transcript on Juror number 53?

MS. ROSE:  I remember that the eyewitness was significant for this defendant -- I mean, excuse me, this juror.  And that was something that may be an issue in this

Laura Andersen, RMR 704-350-7493

**JA1116**

1519

case.

It's certainly something that was questioned by defense on a number of individuals regarding strength of eyewitnesses testimony, and that stuck out to the government that that was one of his requirements.

I think in other ways the government in some ways he, you know, he seemed somewhat strong on the death penalty.  But that saying that he would only impose it if it was proven by an eyewitness and that there was no doubt, was of concern to the government under the facts of this case.

MR. FOSTER:  Your Honor.

THE COURT:  Hang on.

MR. FOSTER:  I think the government indicated that we questioned potential jurors about eyewitness testimony. I don't recall that we ever did that.  If I'm mistaken, I'm mistaken.  But I don't think either one of us ever reached that issue.

THE COURT:  I asked the juror the question:

"Do you believe you could consider both the death penalty and life without parole and weigh those factors and the evidence and choose between those two?"

And the potential juror said, "Yes".

Mr. Foster began an examination of the juror.

Juror said, "I don't have a problem with the death penalty.  I just don't have a problem with it .  If it's

Laura Andersen, RMR 704-350-7493

**JA1117**

1520

proven by at least by, like an eyewitness or something, like that, if it's no doubt I don't have a problem with it."

He said, "I guess part of -- I know it's an eyewitness to the fact that's actually seen it, that kind of like what I meant, maybe an eye for an eye but only by an eyewitness."

Then the follow-up question by Mr. Foster was with respect to whether the view stems from a generic religious thing, a Bible, eye for an eye, tooth for a tooth, that sort of thing.

The witness again said, "Yeah.  Along with an eyewitness, or if there's two burdens of proof of some sort."

The follow-up question to that was, "So in other words are you saying that if you're convinced beyond a reasonable doubt that it's murder, what you're saying is if you got an eyewitness, and I think two burdens, two separate sources of information".  He said, "Yes, sir".

"Okay.  So the question then is, in such a circumstance where you've been convinced beyond a reasonable doubt that someone committed murder, are you open to both sentences?  Yes, I would consider both."

Said, he would listen to what the Judge has to say about the law.  "Moral belief only goes towards having the option for the death penalty, not saying that the death

Laura Andersen, RMR 704-350-7493

JATT18

1521

penalty is the only way of punishment, just another option."

Be open to mitigating evidence.

Hold the government to its burden of proof.

Very open to both sides.

The government did examine this potential juror.

"You indicated that you believe the death penalty is proper only in circumstances where there was an eyewitness".

And the answer is, "or it's a -- or there's physical proof or eyewitness, yes".

"Would you be able to consider the facts and the evidence in the guilt/innocence portion of the case without regard to what you may later consider the punishment".  He said, "Right".

And he said he could personally impose the death penalty.  Open to both sides.

I think this is a close call on this one, because he -- the witness does indicate that he could consider -- or the witness -- I keep saying the witness.  I mean the potential juror.

Does say he can consider both sides.  But in reading through the transcript, I am persuaded that there was a repeat reference to almost an insistence on the necessity of an eyewitness that would trigger consideration of the death penalty.  That kind of response was repeated

Laura Andersen, RMR 704-350-7493

**JATT19**

1522

several times.

The witness -- or the witness -- the potential juror did ultimately conclude that he could consider both sides and hear other evidence.

But reading through the transcript it does indicate to me that there is a non-contextual ground for a concern on the government's part with the repeated reference to an eyewitness.

And so I'll overrule the *Batson* challenge to Juror number 53.

(Pause.)

THE COURT:  Defense have any challenges?

MR. BRYSON:  Just one moment, Your Honor.

THE COURT:  Sure.

(Pause.)

MR. BRYSON:  Your Honor, out of this panel, the defendant would thank but excuse juror in seat number 2, and that's Juror number 2; seat number 3, Juror number 306; seat number 4, Juror number 243; seat number 5, Juror number 151; and seat number 9, Juror number 73.

That's all.

THE COURT:  Jurors 2 through 5 and 9.

MR. BRYSON:  Yes.

THE COURT:  So the jurors that remain from this round are 6, 7, 10 and 12.  And they would be 8, 9, 10 and

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 154 of 508
Case 3:08-cr-00134-RJC Document 1283 Filed 03/30/11 Page 23 of 35
JA1120

1523

11.

MR. BRYSON:  Yes.

THE COURT:  Everybody in agreement?

MR. BRYSON:  Yes.

MR. FOSTER:  Yes, Your Honor.

THE COURT:  Defense has at this point exercised 13 challenges and the government 12.

MS. ROSE:  Eleven.

MR. BRYSON:  We've got 12.

THE COURT:  I've got 12.

MS. ROSE:  You've got 12?

THE COURT:  Let me go back through it.

Government 3 in the first round, 6 in the second and 3 in the third.

MS. ROSE:  Twelve.

THE COURT:  Madam Clerk, if you would call out 12 new names.

We have 11 already.  We need one more juror.  So the first numerical juror from 1 to 12.  If there's no challenge to 1 by either side, that would be the 12th juror.

And then we would stop the selection process for -- when we got a juror, we would then turn our attention to the alternates.

And we'd go to the next available alternate that hasn't been struck, and consider that person for an

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 155 of 508
Case 3:08-cr-00134-RJC Document 50-3   Filed 03/30/11   Page 24 of 35
JAT121

1524

alternate.

I will ask the government and then the defense whether they have a strike. And we'll go until we get 4.

MR. BRYSON: So we're gonna do the whole 12 the way we've been doing it. The first one who survives is the 12th juror?

THE COURT: Correct. The next survivor is the first consideration for alternate 1.

MR. BRYSON: And then we would use our alternate strikes toward those?

THE COURT: Right.

MR. BRYSON: Okay.

MR. FOSTER: So if we pass -- anybody we pass on then for the 12, if they then become the alternate, we still can use alternate challenges on them?

THE COURT: Right. This is round four, so the defense would exercise their strikes first.

Madam Clerk, would you call out 12 names.

COURT CLERK: Seat number 1, Juror 207.

Seat number 2, 334.

Seat number 3, 329.

Seat number 4, number 244.

Seat number 5, number 145.

Seat number 6, 139.

Seat number 7, 179.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 156 of 508
Case 3:08-cr-00134-RJC Document 5083 Filed 01/30/11 Page 25 of 35
JA1122

1525

Seat number 8, Juror number 30.

Seat number 9, Juror number 71.

Seat number 10, Juror 175.

Seat number 11, Juror 95.

Seat number 12, Juror 127.

(Pause.)

THE COURT:  Mr. Bryson, are you ready?

MR. BRYSON:  Yes, sir.  Out of this group, Your Honor, the defendant would excuse seat number 2, Juror number 334; seat number 3, Juror number 329; seat number 4, Juror number 244; seat number 5, Juror number 145; seat number 8, Juror number 30.

THE COURT:  Jurors 2 through 5 and 8.

MR. BRYSON:  Yes, Your Honor.

(Pause.)

THE COURT:  The government ready?

MS. ROSE:  Your Honor, just for the record, Juror number 2, which is 334, which was stricken by the defendant; Juror number 4, which is 244.  Juror number 2, 334, is an African-American female.  Juror number 4, number 244 was an eastern Indian.  Number 5, Juror number 145, was also a black female stricken by the defendant.

The government would make motions as to each of those.

THE COURT:  Mr. Bryson, I'll be glad to hear from

Laura Andersen, RMR 704-350-7493

**JA1123**

1526

you on your reasons for striking 2, 4 and 5.

MR. BRYSON: On Juror number 2, I can do that one relatively quickly.

Seat number 2, Juror number 334, she was the last juror that we saw. And if you recall, she had a brother who was a prison guard who had been stabbed by an inmate. And given what happened here on Monday, and the government's allegation of future dangerousness, we felt that she would possess -- and she also spoke about how her knowledge about how gangs rule in prisons, and their activities in prisons.

And as I said, given what happened here on Monday. And of course the jury would hear that Alejandro is in fact a member of MS 13, we felt that she had specific personal information that could be very damaging to us on the issue of future dangerousness come a penalty phase.

THE COURT: Juror 244.

MR. FOSTER: Your Honor, that one was a gentleman who was repeating about the death penalty being appropriate if it was a heinous crime. And I believe questioning his, what he described as heinous, sounded like it would very well cover this type of case.

He also indicated that police are often more truthful than other witnesses.

He also indicated on his questionnaire, the death penalty should be imposed -- carried out more promptly if

Laura Andersen, RMR 704-350-7493

**JA1124**

1527

it's imposed.

He seemed to be very -- his questioning seemed to indicate that he believed that the death penalty was the appropriate sentence for an intentional murder is my recollection of his comments.

As far as Juror number 145, she's married to a Mecklenburg County Sheriff's Captain who works in the jail as a supervisor of the jail personnel.

Given what happened on Monday with the security issues and the future dangerousness aspect of this case and the sentencing aspect of the case if we get there, it seemed that was a very risky thing to have her on the jury with her views and her husband's position.

Not to mention that there are numerous witnesses on the government's list that would presumably be called, perhaps during the sentencing phase on future dangerousness. There are seven -- somewhere between seven and twelve witnesses, I believe, from the Mecklenburg County sheriff's office.

MR. BRYSON:  Can I just add one other thing on Juror number 244?

While I was questioning her, she repeatedly would look over at -- I'm sorry -- thank you -- 145.  What I'm saying relates to Juror 145.

She would repeatedly, as I was questioning her,

Laura Andersen, RMR 704-350-7493

**JATT125**

1528

look over toward the table for the prosecution.  I just found it disturbing.

THE COURT:  I'll overrule the government's *Batson* challenge to all three of these jurors.

MS. ROSE:  Thank you, Your Honor.

The government would move to strike juror numbers 6, 9, 10 and 11.

MR. BRYSON:  Your Honor, just for purposes of the record to make clear, Juror number 95 in seat number 11 was an African-American or black female juror.  And that would have been the only African-American or female -- excuse me, African-American or black juror remaining in the panel for the government, and they did exercise a challenge for cause against her.

THE COURT:  Glad to hear from the government on explanation for its challenge.

MS. ROSE:  First of all, this juror was a mental health social worker.  Which the government doesn't tend to -- particularly in a case where there may be some mitigation type evidence regarding the defendant's background, childhood, otherwise; certainly social workers would not be preferable for the government.

Secondly, she indicated she had been on a jury before and it was a bad experience.  And the reason she noted it was a bad experience, was because she did not like

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 160 of 508
Case 3:08-cr-00134-RJC Document 5263 Filed 03/30/11 Page 29 of 35
**JA1126**

1529

deciding on a person's guilt or innocence.

She said, I don't like making this decision.  I'm uncomfortable with this decision.  And she struggled through the death penalty questions.

She also said she does not like making a decision about someone else's future.  This is a very difficult decision.

In response to the Court's questioning her -- they were never strong, they were "I will try", "I could try".  But she certainly indicated that she did not like making decision about somebody else's life at all.  And that she was very uncomfortable with this situation.

And so for those reasons the government would move to strike that juror.

THE COURT:  I think that's a race neutral explanation.  I would note that she is the remaining minority member of the jury, only because the defense had struck the other three minority members of the panel.

The government's proffered explanation satisfies the Court.  And the Court will overrule the defendant's *Batson* motion.

All right.  So it appears to me that Juror number 1, 207 is our 12th juror.

And so -- 179, Juror number 7, is the first alternate under consideration.

Laura Andersen, RMR 704-350-7493

**JA1127**

1530

Does the government wish to -- each side now has two alternate strikes.  And I'm going to go one by one and ask each side whether they have a strike for the alternate under consideration.

Juror 179, does the government --

MS. ROSE:  The government's satisfied with 179.

THE COURT:  What says the defendant?

MR. BRYSON:  No challenges, Your Honor.

THE COURT:  That's Alternate 1.

With respect to the next person under consideration, Juror number 127.

Does the defense have any challenge?

MR. BRYSON:  No.

THE COURT:  What says the government?

MS. ROSE:  No objection.

Alternate number 2.

Madam Clerk, if you would draw a name for consideration of Alternate number 3 -- or not a name, I'm sorry, a number.

COURT CLERK:  Number 103.

THE COURT:  Juror 103 is with the government for consideration as to Alternate number 3.

MS. ROSE:  The government moves to strike Juror number 103.

MR. BRYSON:  We would renew our *Batson* challenge,

Laura Andersen, RMR 704-350-7493

**JAT128**

1531

Your Honor.  For the record, he is an African-American male, our records show.

THE COURT:  What says the government?

MS. ROSE:  This defendant, excuse me -- this witness said that he wants a --

THE COURT:  Try a third time.

MS. ROSE:  Juror.

THE COURT:  There you go.

MS. ROSE:  This judge -- no, just kidding -- this juror says that regarding the death penalty, he wants -- wants a defendant to live with what they have done.  That no one should put death on someone else.  He doesn't feel comfortable doing that.

He believes the death penalty should be abolished because it is wrong.  He said he feels very strongly about the death penalty.  That no one has the right to end someone else's life.

Forgiveness is a significant part of his religious and moral background.

He said a decision regarding death won't bring people back that are murdered and doesn't change anything.

But most importantly -- well, he said, he didn't know what he would do in the sentencing hearing.  And that he did not feel like a life should be in human hands.

For those reasons he -- for those reasons -- he

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 163 of 508
Case 3:08-cr-00134-RJC  Document 505  Filed 01/30/11  Page 32 of 35
**JAT129**

1532

said, God should decide.  It should not be in human hands.

For those reasons the government would move to strike this juror.

THE COURT:  I will deny the *Batson* challenge with respect to number 103.

Madam Clerk, if you would draw another number.

COURT CLERK:  Number 68.

THE COURT:  Juror 68 will be with the defense in the first instance.

MR. BRYSON:  Satisfied; pass.

THE COURT:  What says the government?

MS. ROSE:  The government would move to strike, Your Honor.

THE COURT:  Madam Clerk, if you would draw another number.

COURT CLERK:  Number 22.

MR. BRYSON:  Pass.

THE COURT:  All right.  Number 22 is Alternate number 3.

Madam Clerk, if you would draw another number.

COURT CLERK:  Number 89.

MR. BRYSON:  Pass.

THE COURT:  Juror 89 is Alternate number 4.

Madam Clerk, if you would read out the names (sic.) of the 12 jurors and the 4 alternates in United

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 164 of 508
Case 3:08-cr-00134-RJC  Document 505-3  Filed 01/30/11  Page 35 of 35

JA1130

1533

States V Alejandro Umana so that we're all sure we are all on the same page.

COURT CLERK:  Seat number 1 is Juror number 330.

Seat number 2, Juror number 39.

Seat number 3, Juror number 119.

Seat number 4, Juror number 182.

Seat number 5, Juror number 240.

Seat number 6, Juror number 202.

Seat number 7, Juror number 19.

Seat number 8, Juror number 210.

Seat number 9, Juror number 286.

Seat number 10, Juror number 222.

Seat number 11, Juror number 173.

Seat number 12, Juror number 207.

Seat number 13, Juror number 179.

Seat number 14, Juror number 127.

Seat 15, Juror number 22.

Seat 16, Juror 89.

THE COURT:  All right.  Is there anything else from either side?

MR. FOSTER:  No, Your Honor.

MS. ROSE:  No, Your Honor.

THE COURT:  Then we're done.

We'll see everyone -- unless otherwise notified, we will see everyone at 9:30 Monday morning, April 12th.

Laura Andersen, RMR 704-350-7493

**JA1131**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **COURT TO DETERMINE THE** |
| ALEJANDRO UMANA | ) | **ADMISSIBILITY AND** |
| | ) | **RELIABILITY OF EVIDENCE** |
| | ) | **OF UNADJUDICATED** |
| | ) | **CRIMINAL ACTS BEFORE** |
| | ) | **ALLOWING EVIDENCE** |
| | ) | **TO BE PRESENTED TO JURY** |
| | ) | **IN SENTENCING PHASE** |

NOW COMES Defendant ALEJANDRO ENRIQUE RAMIREZ UMANA, by and through counsel, and hereby files this Motion for Court to Determine the Admissibility and Reliability of Evidence of Unadjudicated Criminal Acts Before Allowing Evidence to Be Presented to Jury in Sentencing Phase. Previously, Defendant filed his Motion to Strike Nonstatutory Aggravating Factor and Exclude Evidence of Unadjudicated Criminal Acts During the Penalty Phase of Trial (Document 483 filed 4/24/09), as to which this Honorable Court has not yet ruled. The original motion sought to strike the allegation of the nonstatutory aggravating factor of "Participation in Additional Uncharged Murders and Other Acts of Violence" and to exclude evidence of such uncharged murders and other acts of violence from the penalty phase of the trial. The instant Motion pertains to the procedure that should be followed if the Court denies Defendant's original Motion.

1

Case 3:16-cv-00057-MOC Case 3:08-cr-00134-RJC Document 50-3 Document 598 Filed 03/23/17 Filed 03/31/10 Page 166 of 508 Page 1 of 6

JA1132

1.     **IN THE EVENT THIS HONORABLE COURT DENIES DEFENDANT'S MOTION TO STRIKE THE AGGRAVATING FACTOR AND EXCLUDE THE EVIDENCE, THEN THE COURT SHOULD NEVERTHELESS EVALUATE THE GOVERNMENT'S EVIDENCE, BEFORE ALLOWING ITS PRESENTATION TO THE JURY, TO DETERMINE ITS RELIABILITY AND WHETHER ITS PROBATIVE VALUE OUTWEIGHS THE DANGER OF CREATING UNFAIR PREJUDICE, CONFUSING THE ISSUES, OR MISLEADING THE JURY.**

The government, in its Consolidated Response to pretrial motions (Document 503 filed 5/08/09) opposed Defendant's motion, arguing against striking the nonstatutory aggravating factor from the Notice of Intention to Seek the Death Penalty and against the exclusion of evidence in support of the aggravating factor of unadjudicated murders and violent acts.  However, in its brief, the government acknowledged "that evidence of the unadjudicated serious acts of violence will only be admissible at trial if the Government can establish reliability."  (Document 503, page 18, fn. 7).  In support of this acknowledgement, the government cited United States v. O'Driscoll, 250 F.Supp.2d 432, 436 (M.D.Pa. July 8, 2002).  The court in that case held as follows:

> We conclude that where the government attempts to use unadjudicated acts of violence and misconduct the heightened standard of reliability applicable to capital sentencing proceedings requires that the hearsay rule be fully applicable to the penalty phase proceeding.  In other words unadjudicated acts of violence or misconduct cannot be proven by hearsay testimony unless a well-recognized exception to the hearsay rule is applicable.

United States v. O'Driscoll, 250 F.Supp.2d at 436.

The court in O'Driscoll delineated the procedure it would use to determine the reliability of such evidence:

> Information regarding unadjudicated acts of violence and misconduct will be found reliable only under the following circumstances:
> (1) a juror would be justified in relying on such information

2

Case 3:16-cv-00057-MOC-RJC   Document 50-3   Filed 03/23/17   Page 167 of 508
Case 3:08-cr-00134-RJC   Document 582-3   Filed 05/31/10   Page 2 of 6
**JA1133**

in voting for a sentence of death;
(2) the probative value of the information is (not) outweighed by other considerations, such as remoteness in time or danger of unfair prejudice;
(3) the information satisfies the Constitution's requirement of heightened reliability for information presented by the government at the sentencing phase of a capital case.

Id., 250 F.Supp.2d at 436.

The court in O'Driscoll quoted United States v. Beckford, 964 F.Supp.2d 993, 1002 (E.D.Va. 1997) for the proposition that 18 U.S.C. §3593(c) "does not 'permit an evidentiary free-for-all that undermines reliability.'" Finally, the court stated that "[w]here a defendant faces the ultimate penalty of death the Confrontation Clause of the Sixth Amendment requires that despite Section 3593(c) unadjudicated acts of violence and misconduct be proven by the government in accordance with the Federal Rules of Evidence." Id., 250 F.Supp.2d at 436. The court then went through each of the alleged unadjudicated acts and separately analyzed the evidence regarding each to determine whether the government could prove each in accordance with the Federal Rules of Evidence and beyond a reasonable doubt. Id., 250 F.Supp.2d at 436-442.

Thus, courts that have allowed evidence of unadjudicated criminal acts during the sentencing phase have nevertheless required the government to establish the reliability of the evidence. For example, the Seventh Circuit Court of Appeals stated as follows in United States v. Corley:

> As Corley and the government recognize, the district court in determining whether such information may be considered must consider a number of factors, including the reliability of the evidence, the prejudicial and probative impact of the evidence, and the burden of proof both for determining reliability and for a jury to determine whether the conduct may be considered. In this case, the district court recognized the significance of those factors in assuring that Corley's rights were protected. Before the court would allow the jury

3

JA1134

> to hear the evidence, the court conducted a two-day hearing to determine the reliability of the evidence against Corley.

United States v. Corley, 519 F.3d 716, 724 (7th Cir. 2008).

The Fourth Circuit Court of Appeals indicated, in a decision rendered before Crawford v. Washington reinvigorated the Confrontation Clause of the Sixth Amendment, that "it is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003). However, after Higgs, at least one U.S. district court within the Fourth Circuit has held the Confrontation Clause applicable during the eligibility phase (as opposed to the selection phase) of the sentencing hearing. See United States v. Jordan, 357 F.Supp.2d 889, 903 (E.D.Va. 2005). However, Defendant respectfully submits that the Sixth Amendment Confrontation Clause should be applied to at both the eligibility and selection phases of the sentencing hearing.

Here, as stated in his original Motion, Defendant submits that the nonstatutory aggravating factor of "Participation in Additional Uncharged Murders and Other Acts of Violence" should be stricken from the Notice and that evidence of these unadjudicated criminal acts be excluded from the sentencing phase. However, in the event that this Honorable Court denies Defendant's motion, then Defendant respectfully submits that in compliance with 18 U.S.C. §3593(c) and the above case authorities, this Honorable Court should hold a hearing outside the presence of the jury for the purpose of determining whether the government has constitutionally admissible nonhearsay evidence, whether that evidence possesses sufficient indicia of reliability, and whether the probative value of the evidence is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

**JA1135**

2.    **CONCLUSION**

Based on the foregoing points and authorities, Defendant respectfully requests this Honorable Court to grant his motion to strike the allegations of the nonstatutory aggravating factor of "Participation in Additional Uncharged Murders and Other Acts of Violence" from the government's Notice of Intention to Seek the Death Penalty. Further, Defendant respectfully requests this Honorable Court to exclude evidence of such unadjudicated criminal acts from the penalty phase of this trial. Finally, in the event the Court denies the first two requested forms of relief, then Defendant respectfully requests the Court to require the government to proffer its evidence at a hearing for this Court to determine its reliability, sufficiency, admissibility, and probative value versus the danger of unfair prejudice, confusing the issues, or misleading the jury before allowing such evidence to be presented to the jury during the sentencing phase.

Respectfully submitted,

March 31, 2010

s/ Mark P. Foster, Jr.
Attorney for Defendant
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Phone 704-347-1809
Fax 704-332-2716
e-mail:  mpfosterjr@bellsouth.net

s/ John Bryson
Wyatt Early Harris Wheeler, LLP
1912 Eastchester Drive, Suite 400
High Point, NC 27261
336-819-6016
Fax 336-819-6076
jbryson@wehwlaw.com

5

Case 3:16-cv-00057-MOC-RJC Document 50-3    Filed 03/23/17    Page 170 of 508
Case 3:08-cr-00134-RJC Document 505    Filed 03/31/10    Page 5 of 6

**JA1136**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above **DEFENDANT'S MOTION FOR COURT TO DETERMINE THE ADMISSIBILITY AND RELIABILITY OF EVIDENCE OF UNADJUDICATED CRIMINAL ACTS BEFORE ALLOWING EVIDENCE TO BE PRESENTED TO JURY IN SENTENCING PHASE** has been duly served on the attorney(s) listed below by e-mail service through ECF on this date:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

March 31, 2010                          s/  Mark Foster
                                        NC State Bar #22717
                                        Law Offices of Mark Foster, P.C.
                                        1011 E. Morehead Street, Suite 300
                                        Charlotte, NC 28204
                                        Pone 704-347-1809
                                        Fax 704-332-2716
                                        E-mail:  mpfosterjr@bellsouth.net

6

**JA1137**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>　　　　　Plaintiff,<br><br>　　v.<br><br>ALEJANDRO ENRIQUE RAMIREZ<br>　UMANA,<br>　　　　　Defendant. | DOCKET NO. 3:08-cr-134-RJC<br><br>UNITED STATES'S RESPONSE<br>REGARDING THE APPLICABILITY<br>OF *CRAWFORD v. WASHINGTON*<br>AT SENTENCING HEARING |

Defendant Alejandro Umana invokes the Supreme Court's 2004 decision in *Crawford v. Washington*, 541 U.S. 36, and asks, without citation to any authority, that it be applied at the selection phase of his sentencing. (Docket No. 960.) The Court should reject defendant's invitation because *Crawford* arose in the context of trial testimony, and it did not purport to apply to sentencing. Every court to consider the question has held, therefore, that *Crawford* does not apply at sentencing.

It remains a partially open question — in the sense that the law is still developing — whether *Crawford* and the confrontation right applies at the sentencing hearing of a capital case, and specifically at the "selection" phase of the hearing. But logic and precedent decree that it does not. The Fifth Circuit has so held, as has one district court in this Circuit. The Fourth Circuit and the Seventh Circuit have suggested the same, albeit before *Crawford*, and the Supreme Court's only case on confrontation in the capital context is consistent with this view. Because *Crawford* does not apply to the <u>non-statutory-aggravator</u> portion of a capital sentencing hearing, the United States seeks the Court's permission to adduce testimonial hearsay at that part

**JA1138**

of the sentencing hearing in this matter, even if (as sometimes is done) that necessitates bi-furcating the sentencing hearing (or "tri-furcating" the trial as a whole).

## I.     Factual background

On June 23, 2008, a Grand Jury charged defendant Umana with several death-eligible offenses:  Counts 22 and 24, murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1); and Counts 23 and 25, use of a firearm during and in relation to a crime of violence, resulting in death, in violation of 18 U.S.C. § 924(j).  The Grand Jury also charged him with RICO conspiracy, 18 U.S.C. § 1962(d) (Count 1).  It also returned a finding of probable case with respect to several sentencing factors constitutionally required, as explained below, to render Umana eligible for a death sentence on Counts 22-25, and a life sentence on Count 1. Three superseding indictments were later returned, none of which materially amended the charges against Umana.

Three months after indictment, the United States filed a notice of its intention to seek the death penalty.  (Docket No. 273.)  In that notice, as to each of the two victims, the United States alleged four "gatekeeping" factors:  Intentional killing, intentional infliction of serious bodily injury resulting in the death of the victim, intentional acts to take life or use lethal force, and intentional acts of violence creating a grave risk of death.  (*Id.*)  It then alleged the same two statutory aggravating factors as to each of the two victims:  Grave risk of death to additional persons, 18 U.S.C. § 3592(c)(5), and multiple killings or attempted killings, *id.* § 3592(c)(16). (Docket No. 273.)  Finally, it alleged five non-statutory aggravating factors (the focus of this Motion):  (1) gang-motivated killing; (2) victim impact; (3) callous disregard for the severity of the offense; (4) participation in additional uncharged murders or other acts of violence, two of which were specifically alleged; and (5) future dangerousness.  (*Id.*)  Defendant has moved to

Case 3:16-cv-00057-MOC-JCD  Document 50-3  Filed 03/23/17  Page 173 of 508
Case 3:08-cv-00134-RJC  Document 116-3  Filed 04/05/10  Page 2 of 31
JA1139

strike the reference to factors (1), (2), and (4) above, (Docket No. 483, 489, 497); (*see* Gov't Resp., Docket Nos. 503 & 504), and the Court has not yet ruled on those motions. The Court should deny those motions for the reasons previously stated.

Defendant's motion correctly anticipates that, at the sentencing hearing in this case, the government intends to elicit the following reliable "testimonial" hearsay (all statements having been long ago provided to the defense) in support of certain non-statutory aggravating factors:

1. Statements (against penal interest) made to police by Rene Arevelo, Ruben Moreno, and Luis Rivera about two murders committed by defendant Umana in Los Angeles, on or about July 25, 2005. All three were represented by counsel and a preliminary examination was held on December 15, 2006 (a transcript of which was long ago provided to the defense), in which eyewitnesses and investigating officers testified and were subject to cross-examination concerning these declarants' related charges. Their pre-indictment statements as well as statements made by witnesses at the preliminary hearing will be presented during the sentencing phase regarding this non-statutory aggravator.

2. Statements made by Salvadorean eyewitnesses regarding some of Umana's acts in El Salvador, as alleged in court pleadings in El Salvador, testified to by Salvadorean public attorney (a civil-law prosecutor).

3. Statements made to police by witnesses regarding the events leading up to a murder committed by defendant Umana in Los Angeles on or about September 28, 2005. Eyewitnesses also will testify about this murder, and this murder was the subject of defendant Umana's April 23, 2008 confession to being a participant in the crime (previously addressed in the Court's suppression ruling).

None of these statements concern the "gatekeeping" or the statutory aggravating factors necessarily to render defendant eligible for a death sentence. For reasons now to be explained, this "information" should be admitted as long as, under the due process clause, it is reliable. In the government's view, the proffer in this memorandum or, if the Court wishes, a more detailed proffer before admission of the testimony, suffices to establish the reliability of the information and is preferable to a separate *voir dire* hearing, which promises to be protracted and repetitive of the sentencing hearing.

Case 3:16-cv-00057-MOC-JCD Document 50-3 Filed 02/23/17 Page 174 of 508
Case 3:08-cv-00134-RJC Document 506 Filed 04/05/10 Page 3 of 31
**JA1140**

## II.    Analysis

A.  Introduction

In *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), *cert. denied*, 128 S.Ct. 1065 (Jan. 14, 2008), the Fifth Circuit held, in a treatise-like opinion, that *Crawford* did not apply to hearsay adduced in support of non-statutory aggravating factors at a federal capital sentencing hearing.  One court in this Circuit likewise has held.  *See United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005) (Hudson, J.).[1]  At the outset, put in simplest terms, the United States urges the Court to adopt *Fields*' and *Jordan*'s reasoning.  In turn, as *Fields* discussed, the question depends in substantial part on the Supreme Court's opinion in *Williams v. New York*, 337 U.S. 241 (1949).  The United States will not endeavor simply to repeat what these courts held, but rather will explain why they are persuasive authority.

B.  Overview of the governing law.

*1.  The Federal Death Penalty Act*

The Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.*, sets forth a detailed structure for federal capital trials and sentencings such as this one.  It naturally requires the commission of an offense for which Congress has provided a penalty including a sentence of death.  *Id.* § 3591. If the United States is seeking such sentence, section 3593(a)(1) requires it to provide to the defendant, a reasonable time before trial, a notice setting forth certain eligibility (or what the United States has in this case called "proportionality") factors.  *Id.* § 3591(a)(2)(A–D).  These factors generally concern *mens rea* and must be proved beyond a reasonable doubt.  *Id.*  The pre-trial notice must also identify any statutory aggravating factors, which are found in section 3592(c), that the government intends to rely upon in seeking a death sentence.  *Id.* § 3593.

---

[1]    The defendant in Jordan was sentenced to life, thus on appeal this holding was not contested.  509 F.3d 191, 195 (4th Cir. 2007).

**JA1141**

Under *Ring v. Arizona*, 536 U.S. 584 (2002), discussed *infra*, the Sixth Amendment requires that both the eligibility factors and the statutory aggravating factors be found by a jury, since both are "elements" in the sense that a death sentence may not be imposed without them. Finally, the United States's notice must identify any non-statutory aggravating factor or factors it intends to rely upon. *Id.*

The Act ultimately contemplates a post-guilt sentencing "hearing," which takes place before a jury unless the defendant waives one. *Id.* § 3593(b)–(f). Such jury sentencing is not constitutionally required in capital cases, however, *Spaziano v. Florida*, 468 U.S. 447, 460-63 (1984), any more than it is in non-capital cases, *McMillan v. Pennsylvania*, 477 U.S. 79, 93 (1986). The Act in any event requires the government, at such hearing, to prove all aggravating factors beyond a reasonable doubt, and the jury must be unanimous in finding them proved. 18 U.S.C. § 3593(c), (d). The defendant has a right to offer mitigating factors, some (but not all) of which are identified in section 3592(a). *Id.* § 3593(c), (d). Mitigating factors need only be proved by a preponderance of the evidence and the jury need not be unanimous as to them. *Id.* § 3593(d).

Regarding the sentencing verdict, the jury must find at least one statutory aggravating factor. *Id.* § 3593(e). If it does so, and having previously found satisfied the eligibility or *mens rea* requirement, it is said at this point that the defendant is "death-eligible." The jury then must weigh, in what is often called the "selection" phase of the hearing, any aggravating factors against any mitigating factors (found under the standards above) and determine the sentence. *Id.* *See also Zant v. Stephens*, 462 U.S. 862, 878 (1983) (differentiating among statutory aggravating factors, which are necessary to "circumscribe the class of persons eligible for the death penalty," and "the selection stage" at which the jury makes an "individualized determination on the basis

Case 3:16-cv-00057-MOC-JCD Document 50-3   Filed 03/23/17   Page 176 of 508
Case 3:08-cv-00154-RJC Document 446   Filed 04/05/10   Page 5 of 31
**JA1142**

of the character of the individual and the circumstances of the crime") (emphasis in original). A jury's selection of a death sentence must be unanimous. 18 U.S.C. § 3593(e). The Court must impose the sentence recommended by the jury, a life sentence being the default. *Id.* § 3594.

      *2.   Constitutional developments in capital cases* — Ring v. Arizona*.*

The Supreme Court has, over the years, held that the Constitution imposes various requirements in capital cases. As relevant here, the Supreme Court long ago held that the Constitution requires the specification of <u>statutory</u> aggravating factors, before imposing a sentence of death, as a way to narrow the class of persons eligible for a death sentence. *See Zant*, 462 U.S. at 878. *Ring*, *supra*, built upon this principle and, in treating statutory factors as elements, became relevant to the evidentiary question discussed herein.

In *Ring*, the Court held that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which had required that any fact necessary to increase a defendant's "maximum sentence" be charged and found by a jury, likewise required any <u>statutory</u> prerequisite to a capital sentence — by whatever name — to be treated as an "element" and found by a jury beyond a reasonable doubt. 536 U.S. at 609. *Ring* plainly did not concern, identify, or discuss, however, any Eighth Amendment matters. Its focus, rather, was the Sixth Amendment right explained in *Apprendi*. *Id.*; *see also id.* at 612 (Scalia, J., concurring); *cf. Gardner v. Florida*, 430 U.S. 349, 371 (1977) ("the prohibition of the Eighth Amendment relates to the character of the punishment, and not to the process by which it is imposed") (Rehnquist, J., dissenting). Significantly, *Ring* did not purport to apply to the "selection" or "weighing" process that the fact-finder engages in <u>after</u> finding the prerequisites (or "elements") to imposing such sentence. Courts have therefore rejected *Ring*-based constitutional challenges to the "selection" or "weighing" portion of the Act. *See, e.g.*,

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 177 of 508
Case 3:09-cv-00154-RJC Document 56 Filed 04/05/10 Page 6 of 31

**JA1143**

*United States v. Sampson*, 486 F.3d 13, 31-32 (1st Cir. 2007) (rejecting constitutional, and statutory, challenge to "weighing" instruction).

There is no doubt that the Act comports with *Ring* in that it requires the jury unanimously to find aggravating factors beyond a reasonable doubt. And, although it is perhaps an open question whether the Fifth Amendment's indictment clause applies to the Act's notice requirement, *e.g.*, *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) (en banc), the Indictment returned by the Grand Jury in this case set forth all statutory eligibility and aggravating factors (in *Ring* parlance, factors "necessary to increase a defendant's sentence"). (Docket No. 623 at 100-03 (Third Superseding Indictment, Special Sentencing Factors).) The foregoing discussion about *Ring* therefore illustrates the Sixth Amendment background against which the *Crawford* evidentiary question must be assessed.

3. *The Act's evidentiary rules,* Crawford, *and post-*Crawford *sentencings generally.*

The evidentiary rules surrounding the Act and capital sentencing have been hotly contested in recent years. The Act itself indicates that "<u>information</u> may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592." *Id.* § 3593(c) (emphasis added). Such "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials," with the caveat that the court is given more leeway to exclude evidence that is unfairly prejudicial, confusing, or misleading. *Id.* Tellingly, the Act substitutes the word "information" for the word "evidence" even in the time-worn phrase "preponderance of the [evidence]," which it uses in establishing the defendant's evidentiary burden with respect to mitigating factors. *Id.*

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 178 of 508
Case 3:09-cv-00154-RJC Document 196 Filed 04/05/10 Page 7 of 31

**JA1144**

The appellate courts have had little trouble holding that the Act's evidentiary standard, which (except for Rule 403-type issues) favors admission of more evidence than at a criminal trial, is constitutional. *See, e.g.*, *United States v. Fulks*, 454 F.3d 410, 437-38 (4th Cir. 2006). In *Fulks*, the defendant conceded that, at the "selection" stage, the jury should have maximal information. *Id.* at 437. But he argued that the lower evidentiary standard, as applied to the eligibility phase (*i.e.*, to proof of at least one statutory aggravating factor) violated *Ring*. *Id.* The court held, however, that the rules of evidence do not apply, since they provide greater protection than the Constitution commands. *Id.* at 438. This appears to be the unanimous position of the circuit courts. *See also, e.g.*, *United States v. Fell*, 360 F.3d 135, 144-46 (2d Cir. 2004).

Set against this background is *Crawford*. As noted above, that case held that out-of-court "testimonial" statements (those the declarant would reasonably expect would be used in court) are inadmissible at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him. 541 U.S. at 68-69. Beyond its holding, several aspects of *Crawford* bear particular mention here. First, the Court did not decide the issue in this case and, other than citing common-law cases, such as Raleigh's trial, for which capital punishment was imposed, *id.* at 44, there was <u>no</u> discussion of capital crimes *per se*. (As the Supreme Court elsewhere has noted, almost every felony at common law was punishable by death. *E.g.*, *United States. v. DiFrancesco*, 449 U.S. 117, 133 (1980).) Second, beginning with the Constitution's text, namely the words "criminal prosecutions," "the accused," and "witnesses against," 541 U.S. at 42, and indeed throughout its discussion of the history of the right to confrontation, the *Crawford* Court repeatedly discussed the right's connection to "trials" and "evidence." Its summation reinforced the trial-like nature of the right: "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 179 of 508
Case 3:08-cv-00154-RJC Document 1966 Filed 04/05/10 Page 8 of 31
**JA1145**

particularly its use of *ex parte* examinations as <u>evidence</u> against the accused." *Id.* at 50 (emphasis added). Thus the constitutional text "is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Id.* at 54.

This last and simplest phrasing of the holding — that the Sixth Amendment incorporates "the right of confrontation at common law" — is critical to the analysis of whether *Crawford* applies at <u>any</u> sentencing hearing. That is because criminal defendants have never had a right, under any source, at common law or otherwise, to keep relevant, reliable information from a sentencer. That, indeed, is the entire premise of the *Booker* line of jurisprudence, and *Ring* for that matter: once a jury determination establishes the "maximum" sentence, the constitutional limitations on sentencing are the province of due process, not the Sixth Amendment. *See United States v. Grubbs*, 585 F.3d 793, 801-03 (4th Cir. 2009).

For these reasons, the appellate courts have unanimously held that *Crawford* does not apply to non-capital federal sentencings. *See United States v. Bras*, 483 F.3d 103, 109 (D.C.Cir. 2007); *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006); *United States v. Chau*, 426 F.3d 1318, 1323 (11th Cir. 2005); *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005). The Fourth Circuit's opinions on the matter are all unpublished, *per curiam* decisions, but are in accord. *E.g.*, *United States v. Newbold*, 215 F. App'x 289, 299 (4th Cir. 2007) (per curiam). Like *Grubbs*, these decisions expressly have stated that the Supreme Court's Sixth Amendment cases — specifically, *Booker*, which like *Ring* was predicated upon *Apprendi* — do not warrant applying *Crawford* to sentencing. *See United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006). These cases also often cite the Supreme Court's seminal decision on hearsay at (capital) sentencing. *E.g.*,

*United States v. Littlesun*, 444 F.3d 1196, 1200 (9th Cir. 2006) ("The Supreme Court held in *Williams v. New York* that admission of hearsay evidence at sentencing did not violate the due process clause. [Because] *Crawford* [did] not explicitly overrule *Williams*[,] ... hearsay [evidence] is admissible at sentencing, so long as it is accompanied by some minimal indicia of reliability.") (quotation omitted). The United States thus turns to that case.

> C. In *Williams*, the Supreme Court held that a capital defendant being sentenced by a judge has no due process right to confrontation.

The question of whether *Crawford* applies to capital sentencings under the Act begins, though it does not necessarily end, with *Williams v. New York*, 337 U.S. 241 (1949). In that case, the Supreme Court considered whether a capital-eligible defendant had a constitutional right of confrontation at sentencing. Specifically, following conviction by a jury (which recommended a life sentence), the sentencing judge relied on a pre-sentence investigation report, much of which information concerned other crimes committed by the defendant, as well as assessments of the defendant's rehabilitative potential, and imposed a sentence of death. *Id.* at 244. The defendant argued that this violated his constitutional rights, specifically under the due process clause. (The importance of the source of the right is discussed below.)

The *Williams* Court began with the longstanding — the Court used the word "always" — distinction between guilt determinations subject to "strict evidentiary procedural limitations," on the one hand, and sentencing on the other. *Id.* at 246. The latter involves "wide discretion in the sources and types of evidence used to assist [the judge] in determining the kind and extent of punishment to be imposed within limits fixed by law." *Id.* The Court then mentioned the paradigmatic "testimonial" statement, "out-of-court affidavits," as one such permissible source. *Id.* The purpose of imposing strict evidentiary limitations at trial was to confine the jury to "guilt of a particular offense," and also to keep it from convicting on the basis of other misconduct,

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 181 of 508
Case 3:08-cr-00134-RJC Document 1467   Filed 04/05/10   Page 10 of 31

JA1147

whereas the sentence judge should have — the Court suggested it was "essential" that he have — "the fullest information possible concerning the defendant's life and characteristics."  *Id.* at 247. This is the very same standard that the courts, many times since *Williams*, have held applies at capital sentencings.  *See Barclay v. Florida*, 463 U.S. 932, 967 (1983) (collecting cases); *Zant*, 462 U.S. at 879 (calling capital sentencing an "individualized determination on the basis of the character of the individual and the circumstances of the crime") (emphasis in original).

The *Williams* Court also gave a cogent discourse on the evolution of sentencing. Namely, "modern changes in the treatment of offenders make it more necessary now than a century ago for observance of the distinctions in the evidential procedure in the trial and sentencing processes."  337 U.S. at 248-49.  Again focusing on the claimed constitutional right to cross-examination, the Court held that "to deprive sentencing judges of this kind of information would undermine modern penological procedural policies . . . [because] most of the information now relied upon by judges to guide them in the intelligent imposition of sentences would be unavailable if information were restricted to that given in open court by witnesses subject to cross-examination."  *Id.* at 249-50.  In sum, there had never been a right to confront at sentencing, and the absence of such right had never been clearer than at the time of the decision.

The Court therefore concluded that "the due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure."  *Id.* at 251.  Most importantly for present purposes, the Court expressly rejected the idea that, where death is a possible sentence, there is a "constitutional distinction."  *Id.*  Rather, where a judge is constitutionally authorized to sentence a defendant to death based on the verdict alone, without even giving a reason, there should be no constitutional limitation to his considering more

Case 3:16-cv-00057-MOC-RJC Document 50-3   Filed 03/23/17   Page 182 of 508
Case 3:08-cv-00134-RJC Document 54-37   Filed 04/05/10   Page 11 of 31

JA1148

information, even if a procedure allowing more information might theoretically be susceptible to abuse. *Id.* at 251-52.

> D. *Crawford* does not apply to the weighing (or "selection") process at capital sentencings.

If (1) confrontation rights do not attach to capital sentencing by judges, and (2) *Crawford* does not apply at a non-capital sentencing, under what logic might *Crawford*'s confrontation holding apply to capital sentencing by juries? The government acknowledges some recent precedential uncertainty regarding this question, *Fields*' being the first appellate court to directly address the issue. *Cf. United States v. Brown*, 441 F.3d 1330, 1361 n.12 (11th Cir. 2006) (declining to decide it and noting lack of clarity, the year before *Fields* was decided). The only logical answer, however, is that *Crawford* does not apply to any information given to the sentencer in aid of its weighing of the appropriate sentence, *i.e.*, information that is not "necessary," in the sense of element-like, under *Ring*, to make the defendant eligible for a death sentence. And *Fields* is therefore correct.

> 1. Williams *is the key to the analysis, and it remains good law.*

Since the minor premise (2), that is, *Crawford*'s non-applicability to non-capital federal sentencings, is universally accepted, the lynchpin of the syllogism is the major premise (1), *i.e.*, *Williams*. Whatever result they reach, the federal decisions addressing the question posed in this memorandum agree on *Williams*' centrality to the analysis. *Compare Fields*, 483 F.3d at 326-30 (5th Cir. 2007) (Smith, J.), *with id.* at 364-69 (Benavides, J., dissenting); *see also, e.g., Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (Easterbrook, J.) ("the Supreme Court has never questioned the precise holding of *Williams*"); *United States v. Taveras*, 424 F. Supp. 2d 446, 457 (E.D.N.Y. 2006) (Weinstein, J.) (deciding that *Williams*' logic has "eroded"). For the following reasons, *Williams* remains persuasive.

Case 3:16-cv-00057-MOC-RJC Document 50-3 Filed 03/23/17 Page 183 of 508
Case 3:08-cr-00134-RJC Document 1457 Filed 04/05/10 Page 12 of 31

JA1149

The Circuit authority addressing *Williams*' modern relevance as a confrontation case weighs in favor thereof. *Szabo*, 313 F.3d at 398-99; *Fields*, 483 F.3d at 326-30. The government is unaware of any appellate holding directly to the contrary. Indeed, before *Crawford*, the Fourth Circuit several times cited, if not relied on, *Williams* for the proposition that the confrontation clause might not apply in capital sentencing. *See United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) (on plain error review, holding that any error could not have been plain, because "[i]t is far from clear that that Confrontation Clause applies to a capital sentencing proceeding") (citing *United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990); *Bassette v. Thompson*, 915 F.2d 932, 939 (4th Cir. 1990); and *Maynard v. Dixon*, 943 F.2d 407, 414 n.5 (4th Cir. 1991)).

And *Crawford* itself did not mention *Williams*, much less purport to overrule it. Meanwhile, the Supreme Court has continued to cite *Williams* as a relevant precedent. Although the citations are not in support of a "confrontation clause" analysis *per se*, *see, e.g.*, *United States v. Watts*, 519 U.S. 148, 151-53 (1997); *Apprendi*, 530 U.S. at 481, the only right in question invoked and decided in *Williams* was the right to challenge hearsay evidence at a capital sentencing via cross-examination. 337 U.S. at 243 (calling the issue in the case a "narrow" one). For these reasons alone, *Williams* is hardly a dead letter. The question therefore is whether *Crawford* overruled *Williams* without saying so.

The courts and judges contending that *Williams* cannot apply to a "Confrontation Clause" analysis, post-*Crawford*, have focused largely on the fact that the claimed source of the right in *Williams* was the due process clause, whereas the Sixth Amendment had not yet been incorporated against the states at the time it was decided. *See United States v. Hall*, 152 F.3d 381, 405-06 n.13 (5th Cir. 1998), *cited in dissent in Fields*, 364 F.3d at 364. On the other hand,

Case 3:16-cv-00057-MOC-RJC Document 50-3 Filed 03/23/17 Page 184 of 508
Case 3:08-cr-00134-RJC Document 54-37 Filed 04/05/10 Page 13 of 31
JA1150

the Seventh Circuit in *Szabo* directly called *Williams* a "Confrontation Clause" case. 313 F.3d at 398 ("Yet the Supreme Court has held that the Confrontation Clause does not apply to capital sentencing. It applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty. See *Williams* . . . ."). In the government's view, the supposed distinction is no distinction at all, and *Szabo* has the better of the characterizations.

First and foremost, the *Williams* opinion itself answers this objection. The Court stated in numerous places that the core constitutional <u>right</u> violated pertained to confrontation and cross-examination. *Id.* at 244, 245, 250. And in the Court's description of the applicable precedent it characterized the due process right at issue as "an opportunity to examine adverse witnesses," tracking the Sixth Amendment's formula. *Id.* at 245. The Court even phrased the question as "relat[ing] to the <u>rules of evidence</u> applicable to the <u>manner</u> in which a judge may obtain information to guide him in the imposition of sentence upon an already convicted defendant." *Id.* at 244 (emphases added). *Crawford*'s most famous phrase uses the same word: "[Confrontation] is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be tested in a particular <u>manner</u>: by testing in the crucible of cross-examination." 541 U.S. at 61 (emphasis added).[2]

If, as the government contends, the right at issue was the same, it is far from clear why the difference in the <u>source</u> of the right matters. Many courts, even in the post-incorporation era, have indicated that due process provides the relevant construct even for the right of confrontation at sentencing. *See, e.g.*, *United States v. Wise*, 976 F.2d 383, 398 n.2 (8th Cir. 1992) (en banc) (collecting cases). Second, the Supreme Court in *Jones v. United States*, 526 U.S. 227 (1999) —

---

[2]   *Williams* didn't just discuss confrontation; it observed that most, if not all, of what are now thought of as "Sixth Amendment" rights were at that time due process rights. *Williams*, 337 U.S. at 245 & n.3. The substantial overlap — rights to counsel, notice, confrontation, and so on — further discredits the idea that *Williams* was a "due process-only" case that carries no weight after incorporation.

Case 3:16-cv-00057-MOC-RJC   Document 50-3   Filed 03/23/17   Page 185 of 508
Case 3:08-cr-00134-RJC   Document 1467   Filed 04/05/10   Page 14 of 31

JA1151

a case that happens to be one of the first in the *Ring*/*Apprendi* line of cases — suggested how closely intertwined the concepts of due process and the Sixth Amendment right to jury findings on elements really are. *Id.* at 242-43 & n.6 ("*McMillan*, then, recognizes a question under both the Due Process Clause of the Fourteenth Amendment and the jury guarantee of the Sixth:  when a jury determination has not been waived, may judicial factfinding by a preponderance support the application of a provision that increases the potential severity of the penalty for a variant of a given crime?").

Moreover, while the Amendment's text was the primary consideration for *Crawford*, the same text continues to provide the justification for <u>not</u> applying *Crawford* to non-capital sentencings. *See United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005) (relying on *Williams* to conclude that *Crawford* did not change the fact that "witnesses providing information to the court after guilt is established are not <u>accusers</u> within the meaning of the confrontation clause") (emphasis added); *cf. Rothgery v. Gillespie County*, 554 U.S. —, 128 S.Ct. 2578, 2594  (2008) (Alito, J., concurring) ("[W]e have held that 'defence' [the genesis of the Sixth Amendment right to counsel] means defense at trial, not defense in relation to other objectives that may be important to the accused.").  Since the non-application of *Crawford* to a non-capital sentencing, on a <u>textual</u> basis, is such a vital part of the proof here, the post-*Williams* incorporation of the Amendment's text supports the *Fields* majority's view of *Crawford* more than it does the dissent's (or at most is neutral).

And incorporation *vel non* has less to do with precise contours of a right than with constitutional history.  This is evident most recently with respect to *Heller v. District of Columbia*, 128 S.Ct. 2783 (2008), and this term's Supreme Court case about whether to incorporate that decision against the states in *McDonald v. City of Chicago*, No. 08-1521

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 186 of 508
Case 3:08-cr-00134-RJC Document 45-7   Filed 04/05/10   Page 13 of 31

JA1152

(pending). The modern incorporation test asks whether a right is "fundamental to the American scheme of justice," *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968), or "necessary to an Anglo-American regime of ordered liberty," *id.*, 150 n.14. At all events, although *Williams* did not wax eloquent about Raleigh's trial and the like, there is no doubt that *Williams* acknowledged the constitutional importance of the right to cross-examination. Indeed, like *Crawford*, it discussed "Anglo-American" practice as a justification favoring its holding: but the right to confront, it reasoned, had <u>never</u> been regarded as applying to sentencing information. *Id.* at 246 (referring to pre-colonial and English practice), 251 (calling it the "age-old practice").

It cannot be gainsaid that a capital defendant has a due-process right to have an "opportunity to deny or explain" adverse information. *Gardner v. Florida*, 430 U.S. 349, 362 (1977). But that right has never been understood as co-terminous with "confrontation" by cross-examination. Notably, the plurality in *Gardner* did not use the constitutionally loaded verb "confront," nor did it hold or even suggest that the denial or explanation must take the form of cross-examination. On the contrary, the plurality in *Gardner* indicated that *Williams* was <u>not</u> implicated, *id.* at 356, and further that its holding did "not, of course, implicate the entire panoply of criminal trial procedural rights," *id.* at 358 n.9. And the controlling opinion in *Gardner*, under the *Marks* rule, was even narrower: Justice White indicated that the <u>Eighth</u> Amendment was violated by a process that allowed "secret" information to be the basis for "select[ing]" somebody for capital punishment. *Id.* at 364. Hence, the Supreme Court has several times characterized *Gardner* as a case about "secret" information. *See, e.g.*, *Gray v. Netherland*, 518 U.S. 152, 164-64 (1996) ("*Gardner* forbids the use of secret testimony in the penalty proceeding of a capital case which the defendant has had no opportunity to consider or rebut."); *id.* at 168 (distinguishing *Gardner* on the basis that the defendant "literally had no

**JA1153**

opportunity to even see the confidential information, let alone contest it"). *Gardner* is light years from announcing a confrontation right — and, not coincidentally, *Crawford* did not mention *Gardner*, either.

For all these reasons it is clearer today than at any recent time that the Fifth Amendment, not the Sixth, provides the relevant construct at any sentencing proceeding, and there is no categorical right to cross-examine declarants. While a defendant has no constitutional right to test evidence in the same manner he would in trial, that does not mean that he is powerless against the state. On the contrary, the courts construing the Act's evidentiary restrictions have held that the due process clause continues to give district courts authority to control the presentation of evidence, despite the statutory relaxation of the Evidence Rules, by making sure that the evidence is reliable and not "unfairly" prejudicial. *See Fell*, 360 F.3d at 144-46; 18 U.S.C. § 3593(c).[3] In addition to discussing the prophylactic role of the due process clause and the role of district courts in enforcing it, the fact that, under these decisions, the due process clause applies to presentation of evidence only augments the relevance of *Williams* despite its pre-incorporation status.

It bears noting in closing that there is one category of statement[4], admitted in many (if not all) capital cases, that has never been thought barred by the confrontation clause despite its

---

[3]    "Unfair" prejudice does not mean simply detrimental to the defendant, because all probative evidence would qualify under that definition. Rather, it means tending to encourage a decision on a basis other than the probative value of the evidence. *See, e.g.*, *United States v. Basham*, 561 F.3d 302, 326-27 (4th Cir. 2009). At the weighing stage of a sentencing hearing, because the individual's characteristics are obviously relevant, more information is likely to be probative vis-à-vis a trial, whereas at trial the evidence must generally be probative of an "element" of an offense.

[4]    Perhaps two categories: courts plainly may consider, at sentencing, statements obtained in violation of *Miranda v. Arizona*. *See, e.g.*, *United States v. Nichols*, 438 F.3d 437, 442-43 (4th Cir. 2006). And, because *Miranda* was conceived, in part, out of a concern for reliability of confessions, 384 U.S. 436, 455 n.24, 470 (1966), decisions like *Nichols* further suggest different constitutional rules at sentencing versus at trial.

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 188 of 508
Case 3:08-cr-00134-RJC Document 54-57   Filed 04/05/10   Page 17 of 31
JA1154

clear testimonial nature:  the victim-impact statement.  The government is not aware of any court that has questioned on confrontation grounds the admission, at the sentencing phrase, of a victim-impact "statement."  *See Fulks*, 454 F.3d at 436 (holding that murder victim's letter to sister, written years before death (and hence trial) was not inadmissible hearsay at sentencing phase); *United States v. DeAngelis*, 243 F. App'x 471, 474-75 (11th Cir. 2007) (per curiam) (rejecting confrontation challenge to victim-impact statements in non-capital case).  Yet such statements, if read, as in *Fulks*, are quite obviously classic hearsay not subject to cross-examination.  Here, in fact, defendant Umana has asked that the Court in this case limit the government's victim-impact information in this case to a "statement" that be read to the jury, and thus not be cross-examinable.  (Docket No. 497.)  While perhaps not a "waiver" of a *Crawford* objection, the defendant's request and the general practice strongly suggest that *Crawford* should not apply to the other non-statutory aggravating factors, either.[5]

In the final analysis it is no accident that the *Williams* Court's focus on maximizing information available to the sentencer is shared by the Act; by the courts that have affirmed the constitutionality of its broad-minded evidentiary policy; and by the non-capital pre- and post-*Booker* sentencing corpus of case law.  Indeed, *Fell* remarked — consciously echoing *Williams* and *Gregg v. Georgia*, 458 U.S. 153, 203-04 (1976) — that sentencing "reliability" depends on as much information as possible.  *See United States v. Jones*, 132 F.3d 232, 241-42 (5th Cir. 1998) (concluding that the relaxed evidentiary standard in the Act "does not impair the reliability or relevance of information at capital sentencing hearings").  This "age-old" principle is a deliberate societal choice that reflects our Nation's constitutional history rather than offends it.

---

[5]    As for the possible counter-argument that "confrontation" does not apply to delicate witnesses like victims, the government is aware of no case granting an exception on this basis.

**JA1155**

### 2. Fields *is on point and persuasive*.

For many of these reasons, *Fields* is persuasive authority. The government nevertheless will provide a brief overview. There, the district court admitted several kinds of hearsay statements at the sentencing phase of the defendant's trial: statements about the defendant in juvenile probation records, in prison records, and in police reports; police testimony about another shooting committed by the defendant, which was based on a non-testifying officer's report; and statements about the defendant's uncharged conduct made by percipient witnesses to officers. 483 F.3d at 325. All of these statements concerned non-statutory aggravating factors. *Id.* The defendant argued that admission of the statements violated *Crawford*, and the court of appeals reviewed that claim *de novo*. *Id.* at 324.

The court first observed that the establishment of non-statutory aggravating factors — there, past violent conduct and future dangerousness — "is neither necessary nor sufficient to authorize imposition of the death penalty." *Id.* at 325 (relying on *Zant* and concept of "individualized sentencing"). It reasoned that "constitutional rights traditionally have been more circumscribed at sentencing, even capital sentencing, then during the guilt phase," and based this conclusion on an extensive discussion of *Williams*, *Gardner*, and some of the other cases discussed herein. *Id.* at 326-31 & nn. It relied substantially on the proposition that *Crawford* does not apply at non-capital sentencings, *id.* at 331-32, and then rejected the dissent's proposition that "death is different" by explaining that, in capital sentencings, more information rather than less is necessary, *id.* at 332-38 & nn. (arguing, *inter alia*, that "the need for greater reliability in the selection of an appropriate punishment entails <u>not</u> stricter evidentiary rules, but the assurance of 'individualized sentencing' once a defendant is eligible for the death penalty"). In discussing why more information makes a sentence more "reliable," the court correctly

Case 3:16-cv-00057-MOC Document 50-3  Filed 03/23/17  Page 190 of 508
Case 3:08-cr-00134-RJC Document 54-7  Filed 04/05/10  Page 13 of 31

**JA1156**

characterized *Crawford* as a case about a particular manner of determining reliability, not an overarching substantive-reliability command. *Id.* at 337 (distinguishing a "reliable" sentence from "evidentiary reliability"). For all these reasons, the court affirmed admission of the statements at issue. *Id.* at 338.

> 3. *Objections to* Fields

Beyond the source of the right, as discussed with respect to *Williams* above, several objections to the *Fields*-type analysis have been levied (including in the dissent in *Fields*). The United States addresses them *seriatim* in this section, although there is some overlap between the foregoing and this section, and among the objections themselves.

Judge v. jury. Since *Williams* discussed the same functional right — to ask questions of witnesses instead of having a judge adopt a report's findings — the primary difference between *Williams* and this case, or any other case under the Act, is the identity of the sentencer. But the fact that the Act provides for a jury determination (going beyond the Constitution in this regard) does not change the foregoing analysis.

The first flaw in any argument predicated on this distinction is the fact that a jury is not constitutionally required. *See Spaziano*, *supra*. Moreover, the concern that a sentencing jury, since the Act requires one, cannot separate the wheat from the chaff runs headlong into the penological proposition, apparently widely held, that juries provide a better bulwark against capital-sentencing errors than do judges. *See Gregg v. Georgia*, 428 U.S. 153, 190-91 (1976); *id.* at 192-93 (stating that juries need "guidance," meaning instructions and a demand to weigh the information); *Spaziano*, 468 U.S. at 461-62 (summarizing the pro-jury arguments). It would be passing odd if the Constitution allowed judges, a group supposedly more susceptible to wrongful imposition of death and less reflecting community values, to consider un-cross-examined hearsay

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 191 of 508
Case 3:08-cr-00134-RJC Document 14-57   Filed 04/05/10   Page 20 of 31

JA1157

about the individual being sentenced, and yet compelled keeping such information from the more "trustworthy" jury.

The Supreme Court likewise has repeatedly held that a sentencing "trial" before a jury is not necessarily like a trial for Sixth Amendment purposes. In *Spaziano*, *supra*, the defendant urged that a sentencing judge's imposition of a death sentence, over the sentencing jury's recommendation of life imprisonment, violated, among other provisions, the Sixth Amendment. 468 U.S. at 458. The Court rejected this proposition. *Id.* at 459 (reasoning that capital sentencing, though like a trial, "does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial"). The bases for this conclusion, just like in *Williams* and under the Act for that matter, were that (a) a sentencer has a "constitutional obligation" to consider all the information, and (b) "a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding — a determination of the appropriate punishment to be imposed on an individual." *Id.* (emphasis added). If the issue is fundamentally the same, how could the Constitution now impose different rules?

The *Fields* dissent argues that the rules are different: the "Confrontation Clause" applies in all criminal prosecutions, and sentencing is obviously a part of a criminal prosecution. 483 F.3d at 369. Undoubtedly, sentencing is important, and that, for example, is why a lawyer is constitutionally necessary. *See id.* (Unsurprisingly, a due process right to a lawyer was recognized pre-incorporation, as *Williams* observed. *See supra*.) But that argument cannot overcome the non-applicability of *Crawford* to regular sentencings. It therefore amounts to little more than a policy statement that the rules should be different in capital cases. In the end, therefore, the dissenting position expressly and necessarily relies on the Sixth Amendment as

Case 3:16-cv-00057-MOC-RJC  Document 50-3  Filed 03/23/17  Page 192 of 508
Case 3:08-cr-00134-RJC  Document 451  Filed 04/05/10  Page 21 of 31
**JA1158**

interpreted by *Ring* and the Court's broader Sixth Amendment jurisprudence regarding "elements." *Id.* at 370.

Ring v. Arizona.  *Ring* was an important case because it imposed a Sixth Amendment notice requirement on anything that is the functional equivalent of an element, irrespective of what it is called.  As explained above, *Ring* derived from *Apprendi*, which in turn was an outgrowth of *Jones v. United States*, *supra*.  A precursor to all these cases was *Specht v. Patterson*, 386 U.S. 605 (1967), in which the Court held that the Confrontation Clause applies during any portion of a sentencing proceeding that can lead to an increase in the statutory maximum lawful punishment.  *Id.* at 608 (expressly distinguishing *Williams* on this basis).

Such Sixth Amendment "element" cases are perfectly consistent with the government's position, which is that once the jury has decided the defendant's statutory eligibility, the "maximum lawful punishment" (death) has been put in play.  The *Fields* majority addressed the impact of *Ring* and *Apprendi* on the question in this way, 483 F.3d at 331 n.18, and the Seventh Circuit in *Szabo* also discussed it at length.  In the latter case, the sentencing judge, at a capital re-sentencing, admitted transcripts of testimony that had been adduced at a first capital sentencing, and the defendant claimed that this violated the Confrontation Clause.  313 F.3d at 397.  The court held that, because Illinois has a three-phased sentencing procedure, and because the transcripts were introduced "only during the third, balancing phase," the clause was not violated.  *Id.* at 399 (holding that the third "phase is outside the ambit of *Specht* because the stipulation that pretermitted the second phase [the defendant admitted he was "eligible'] already had lifted the maximum punishment to a sentence of death").  Admittedly, *Szabo* was a habeas case and discussed the issue as if arising pre-*Ring*, for procedural reasons.  *Id.* at 398.  But as *Fields* correctly noted, 483 F.3d at 331 n.18, the Court, in *Shriro v. Summerlin*, 542 U.S. 348

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 193 of 508
Case 3:08-cr-00134-RJC Document 84-37   Filed 04/05/10   Page 22 of 31

JA1159

(2004), confirmed that "elements" are only those matters having to do with death-eligibility, and only for that reason did the "procedural requirements [of] trial" attach in *Ring*. *Id.* at 354 (explaining why *Ring* was "procedural" and not "substantive"). The Fourth Circuit's approach, post-*Ring*, is identical. *See Higgs*, 353 F.3d at 298-99 (holding that non-statutory aggravators are not necessary to trigger death eligibility, *i.e.*, they "do not increase the available punishment to which a defendant might be subjected," and therefore need not be alleged in indictment under *Ring*).

The dissent in *Fields* pooh-poohs the distinction between "eligibility" and "selection" factors, calling it "artificial." 483 F.3d at 367; *id.* at 368 n.7 (citing a law review article). It argues that the jury, in "finding" the non-statutory aggravating factors, is making findings necessary to the sentence. *Id.* at 367-68 & nn.7&8. This incorrectly tortures the *Apprendi*/*Ring* concept of the "necessary." Even *Zant v. Stephens*, decided 20 years before *Ring*, makes clear the constitutional difference between an element-like statutory aggravator on the one hand and a non-statutory aggravator on the other. 462 U.S. at 878-80 & n.17. The Act reflects that distinction: a jury, having found guilt on the underlying offense, and having found the *mens rea* gatekeepers met, and having found (at least) one statutory aggravating factor, may constitutionally impose the death sentence <u>without</u> finding a single non-statutory aggravating factor.[6] The Act's text contemplates this possibility by using the singular "aggravating factor [or factors]" in the section describing the jury's duty to weigh. 18 U.S.C. § 3593(e). Stated otherwise, as the Supreme Court has long held with respect to capital sentencing, the jury's

---

[6] The *Fields* dissent effectively admits that this is true, but blithely indicates that the government in such cases "is at liberty to proceed" without proving any non-statutory aggravating factors. 483 F.3d at 368 nn. 7&8. But the Constitution does not command the introduction of the bare minimum. *Cf. Hoffa v. United States*, 385 U.S. 293, 310 (1966) (explaining that "[l]aw enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause").

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 194 of 508
Case 3:08-cr-00134-RJC Document 1157 Filed 04/05/10 Page 23 of 31
**JA1160**

weighing process is not mathematical but instead is a subjective, discretionary process. *See Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985).

An example plainly non-violative of *Crawford* illustrates the ongoing flaw in the dissent's colloquial use of the word "necessary": a judge, who "must" consider the guidelines under *Gall* and *Rita*, may rely on non-cross-examined hearsay (say, to find a drug amount in a section 841(b)(1)(A) case). Suppose that such a finding takes the guidelines sentence from the 10-year minimum up to the life maximum: the finding matters, and indeed is vital (or "necessary") to the sentence, because if it is unsupported the sentence can (and will) be reversed either as procedural error or as unreasonable, or both. The non-statutory aggravating factors play a similar role. It's not that the non-statutory aggravating factors "don't matter" to the sentence. It's just that, for Sixth Amendment purposes, they have nothing to do with the sentencer's <u>authority</u> to impose sentence, which derives only from the statutory aggravator. Tellingly, the one court that called these non-statutory aggravating findings "constitutionally significant," notwithstanding all the foregoing, did so in sole reliance on *Blakely*. *See United States v. Mills*, 446 F. Supp. 2d 1115, 1134-35 (C.D. Cal. 2006) (Carter, J.). That label therefore begs the question, as it leaves unanswered why a 50-year sentence increase based on non-confronted drug-amount testimony is <u>not</u> "constitutionally significant." *Cf. Fields*, 483 F.3d at 337 (stating that evidentiary reliability is important at <u>all</u> sentencings). Five years after *Booker* (and *Blakely*), it is apparent, however, that the Supreme Court's Sixth Amendment jurisprudence has drawn a constitutional line at the "elements" (by whatever name). Though difficult to apply in some instances, what constitutes an "element" is pellucid in comparison with the standard(less) "constitutional significance."

Case 3:16-cv-00057-MOC-RJC Document 50-3 Filed 03/23/17 Page 195 of 508
Case 3:08-cr-00134-RJC Document 14-37 Filed 04/05/10 Page 24 of 31

JA1161

Miscellaneous authority.   One last case in the panoply for this Court to consider is *Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006).  As relevant here, in that case, the Fourth Circuit considered whether the presence of a Bible in the jury-deliberation room violated the Sixth Amendment.   *Id.* at 357.   The court observed that a jury's verdict must be based upon the evidence, rather than outside influences, that evidence being subject to confrontation.  *Id.* at 359.  The court then wrote:  "These rights apply equally to sentencing proceedings tried to a jury.  *See Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992)."  *Id.* The remainder of *Polk* consisted of a Rule 606(b) analysis in connection with a discussion of "external" and "internal" influences on the jury.  *Id.* at 360-66.

*Polk* does not govern here for several reasons.  First, although the court mentioned the right of confrontation, the passage quoted above was *dicta*-like if not *dicta simpliciter.*  Second, and relatedly, nowhere did the majority or dissent mention *Crawford*, despite the fact that it had been decided almost two years earlier. Third, in *Fields*, the majority aptly explained why this passing reference was not persuasive:  because the citation, to *Morgan*, had nothing to do with confrontation.  *Fields* 483 F.3d at 333-34 n.22.  Close examination of *Morgan* shows this to be correct.  In *Morgan* — just like in *Polk* — the question was juror partiality; specifically, the trial judge declined to ask the jurors whether they would "automatically" impose a sentence of death, upon conviction.  504 U.S. at 723-24.  (Interestingly, the issue as phrased by the Court was not a Sixth Amendment violation:  "The issue, therefore, is whether petitioner is entitled to relief under the Due Process Clause of the Fourteenth Amendment."   *Id.* at 726 (discussing independent requirement of an impartial jury).)  Thus, the Court's holding had nothing to do with confrontation but the right, recognized since Lord Coke's time, to an impartial jury.  *Id.* at 727. And the Court, reversing the death sentence, did not so much as mention cross-examination, nor

Case 3:16-cv-00057-MOC-RJC Document 50-3   Filed 03/23/17   Page 196 of 508
Case 3:08-cv-00134-RJC Document 28-37   Filed 04/05/10   Page 25 of 31

JA1162

for that matter any other Sixth Amendment-related right.  Unsurprisingly, then, <u>no</u> federal appellate decision cites *Morgan* for any proposition related directly to confrontation.  *See, e.g.*, *Fields v. Brown*, 503 F.3d 755, 783-84 (9th Cir. 2007) (en banc) (Gould, J., dissenting) (mirroring *Polk*'s phrasing, in case discussing jury's use of Bible, which case also did not mention *Crawford v. Washington*).

<u>Death is different</u>.   The *Crawford*-applies, "constitutionally significant" position therefore boils down to the idea that "death is different."  *See Taveras*, 424 F. Supp. 2d at 457-58 (distinguishing *Williams* largely on this ground).   But, constitutionally speaking, a capital sentencing is not all that different from any other sentencing.  *Williams* said so.  337 U.S. at 251. So did *Spaziano*.  468 U.S. at 461.  *See also* John G. Douglass, *Confronting Death*, 105 Colum. L. Rev. 1967, 1993 (Nov. 2005) (writing, and criticizing the Court, "at least with regard to the rights listed in the Sixth Amendment, the Court's rules for capital sentencing are essentially the same as for noncapital sentencing").  Death is indeed the ultimate penalty.  And nobody can deny the variegated moral and religious and penological and economic views regarding the death penalty.   The government's memorandum is not meant to minimize the seriousness of the ongoing debate, but rather to differentiate between "law" and "philosophy."

It is uncontested that the "reliability" of a death sentence is of vital importance.  *See Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989).  But "reliability" of a sentence is qualitatively different from "reliability" of evidence, as *Fields* explained.  In fact, *Crawford* itself expressly disavowed having anything to do with reliability (which, after all, was the basis for *Ohio v. Roberts*, the case *Crawford* overruled).  541 U.S. at 67-68 ("Moreover, [to] conduct[ ] our own reliability analysis would perpetuate, not avoid, what the Sixth Amendment condemns.  The Constitution prescribes a procedure for determining the reliability of testimony in criminal trials,

**JAT163**

and we . . . lack authority to replace it with one of our own devising."). Conversely, it appears to be common ground, in *Williams*, in the Act, and in almost every sentencing case in existence, that the more information about the offender is in the hands of the sentencer, the more "enlightened and just" the sentence will be. *Williams*, 337 U.S. at 251.

The contrary proposition that the jury's power to <u>impose</u> a death sentence must be circumscribed by different rules ultimately equates an "enlightened and just" sentence with a non-death sentence. The Constitution requires that the sentencer be allowed to consider all possible mitigation evidence. *See Lockett v. Ohio*, 438 U.S. 586, 603-04 (1978) (plurality), *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982). To impose a trial-based limitation on its corresponding ability to consider reliable aggravating information would create a playing field on which the defendant's interest in life is vindicated at the expense of Society's legitimate interests. In this way, the "death is different" argument is at loggerheads with the Supreme Court's modern jurisprudence.[7] To take just one example, albeit a telling one, in *Kansas v. Marsh*, 548 U.S. 163 (2006), the question was the constitutionality of a state sentencing statute that mandated a death sentence if the aggravating and mitigating factors were in equipoise. The Court concluded its affirmance of a death sentence ordered under such scheme by rejecting the dissent's "death is different" argument. Specifically, it called the dissent's conflation of guilt-phase innocence — modern exoneration of capital defendants by DNA testing — with penalty-phase procedures, "irrelevant." *Id.* at 180 ("But the availability of DNA testing, and the questions it might raise about the accuracy of guilt-phase determinations in capital cases, is simply irrelevant to the question before the Court today, namely, the constitutionality of Kansas'

---

[7]    *See, e.g.*, *Proffitt v. Wainwright*, 685 F.2d 1227, 1252-55 (11th Cir. 1982) (relying on *Gardner*, distinguished *supra*, and concluding that confrontation clause applies at capital sentencing proceeding, although indicating that a "compelling interest" could justify an exception to that rule).

Case 3:16-cv-00057-MOC-RJC Document 50-3 Filed 03/23/17 Page 198 of 508
Case 3:08-cr-00134-RJC Document 1557 Filed 04/05/10 Page 27 of 31
JA1164

capital <u>sentencing</u> system.") (emphasis in original).  According to the Court, such "general criticisms"

> are ultimately a call for resolving all legal disputes in capital cases by adopting the outcome that makes the death penalty more difficult to impose.  While such a bright-line rule may be easily applied, it has <u>no basis in law</u>.  Indeed, the logical consequence of the dissent's argument is that the death penalty can only be just in a system that does not permit error.  Because the criminal justice system does not operate perfectly, abolition of the death penalty is the only answer to the moral dilemma the dissent poses.  This Court, however, does not sit as a moral authority.  Our precedents do not prohibit the States from authorizing the death penalty, even in our imperfect system.

*Id.* at 181 (emphasis added).

\*　　　\*　　　\*

The defendant's earlier request to strike the non-statutory aggravating factors, and the instant motion seeking absolute exclusion of relevant information on the basis of the confrontation clause, are jointly and severally inconsistent with the settled idea that a jury's punishment decision is made more reliable if the jury is fully informed about the crime and about the offender.  As long as the information submitted by the government is reliable, the jury should be permitted to consider it.

### III.    A bi-furcated sentencing hearing is necessary and desirable in this case.

As the foregoing makes clear, because *Ring* holds that the "eligibility" finding is akin to an element and subject to the Sixth Amendment, all of the foregoing applies only to non-statutory aggravating factors that the jury may, but need not, find to impose a death sentence.

Courts have two ways to ensure that the jury, in considering the "element" of a statutory aggravator, does not consider information not subject to confrontation that is meant for its consideration only in the selection process.  The first is to instruct the jury accordingly.  *See United States v. Bolden*, 545 F.3d 609, 619 (8th Cir. 2008) (approving instruction to prevent "spillover" from non-statutory aggravator, and suggesting that instruction is a preferable

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 199 of 508
Case 3:08-cr-00134-RJC Document 1433   Filed 04/05/10   Page 28 of 31

JA1165

precaution, but noting that confrontation clause may provide a good basis to bi-furcate the sentencing hearing).  The second, and apparently more common method is to "bi-furcate" the sentencing hearing (which means "tri-furcating" the trial as a whole).  *See Jordan*, 357 F. Supp. 2d at 903-04; *United States v. Johnson*, 378 F. Supp. 2d 1051, 1060-62 (N.D. Iowa 2005); *cf. United States v. Caro*, — F.3d —, No. 07-5, 2010 WL 963201 (4th Cir. Mar. 17, 2010) (affirming death sentence without commenting on the divided sentencing phase).  (For verdict forms and instructions in *Caro*'s bi-furcated sentencing, *see* No. 06cr00001, Docket Nos. 585-640 (W.D. Va.)).

The government believes that bi-furcation of sentencing hearing is the better approach, on the facts of this case, and in light of the weighty and evolving issues discussed herein. Although some courts have expressed concern that this approach risks making the proceeding exceedingly complicated, and lengthy, because the penalty-phase, statutory aggravating factors in this case — multiple killings, and grave risk of death to others — will be proved almost entirely by adoption of the evidence from the guilt phase, that risk is minimal.  The government at a later time will formally seek, however, an instruction that the jury may consider any statutory aggravating factor found in the first part of the bi-furcated sentencing in the second part.  Other than such instruction, the jury instructions from a bi-furcated sentencing hearing should closely resemble those that would be used in a unitary proceeding.

In sum, for all the foregoing reasons, the Court should admit the proffered evidence as reliable and probative of the "individualized determination" that the jury must make, but it should do so in a bi-furcated sentencing hearing to ensure that the jury does not consider the information with respect to the sentencing "elements," meaning the statutory eligibility factors.

**JA1166**

RESPECTFULLY SUBMITTED this 5th day of April, 2010.

EDWARD R. RYAN
UNITED STATES ATTORNEY

**s/ Jill Westmoreland Rose**
NC Bar Number: NA
Assistant United States Attorney
United States Attorney's Office
100 Otis Street
Asheville, North Carolina 28801
Phone: (828) 271-4661
Fax: (828) 271-4670
Email:  jill.rose@usdoj.gov

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

Case 3:16-cv-00057-MOC-RJC Document 50-3   Filed 03/23/17   Page 201 of 508
Case 3:08-cr-00134-RJC Document 115-7   Filed 04/05/10   Page 30 of 31

**JA1167**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of April 2010, the foregoing document was served electronically through ECF filing upon defense counsel at the following email addresses:

Mark Foster
mpfosterjr@bellsouth.net

John Bryson
jbryson@wehwlaw.com

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

− 31 −

**JA1168**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA

v.                                                **File No.:  3:08CR134-2-RJC**


ALEJANDRO ENRIQUE RAMIREZ
UMANA

_____


## MOTION TO STRIKE THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS F ROM THE NOTICE OF INTENT TO SEEK THE DEATH  PENALTY


NOW COMES the defendant, Alejandro Enrique Ramirez Umana, by and through his duly appointed attorneys, Mark P. Foster, Jr. and John D. Bryson, who respectfully moves this Court to strike the non-statutory aggravating factor of future dangerousness from the Notice of Intent to Seek the Death Penalty.  In support of this Motion, defendant hereby alleges and says the following:

1.      On September 23, 2008, the government filed and served a Notice of Intent to Seek the Death Penalty as to defendant (hereinafter "Notice").

2.      In addition to setting out two statutory aggravating factors, the Notice includes five non-statutory aggravating factors the government will seek to prove as the basis for the imposition of the death penalty.

3.      Defendant has previously filed motions seeking to strike other non-statutory aggravating factors from the Notice [Document Nos. 483, 488 & 963].  Defendant supplements

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 203 of 508
Case 3:08-cv-00134-RJC Document 1066 Filed 04/06/10 Page 1 of 14
JA1169

those motions with the instant petition for the Court to also strike the non-statutory aggravating factor of future dangerousness.

4.      Future dangerousness as a non-statutory aggravating factor is unreliable within the meaning of the Eight Amendment to the United Sates Constitution and therefore must be struck from the Notice to be consistent with defendant's rights therein.

5.      The government alleges that the defendant "<u>is likely to</u> commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others..."(emphasis supplied)    The phrasing of this non-statutory aggravating factor lessens the government's statutory burden of proof in violation of 18 USC § 3952(c) and thereby violates defendant's constitutional rights to due process of law.

6.      By submitting this non-statutory aggravating factor as four separate sub-components the government inherently seeks the court's instruction on the marshalling of evidence.  The jury must be unanimous on all aggravating factors.  To the extent that the government's phasing of these subcomponents is interpreted as eliminating the requirement that the jury find and be unanimous on each subcomponent, they should be stricken from the Notice.

7.       The inclusion of "lack of remorse" as indicia of future dangerousness violates defendant's constitutional rights as it is based on an allegation that defendant "has never expressed any remorse for killing...", thereby implicating defendant's right to remain silent, particularly post-arrest and at trial.

8.      The allegation of defendant's "low rehabilitative potential" is irrelevant where the only alternative punishment for the jury is life imprisonment without release.

9.      The allegations of "low rehabilitative potential" and "lack of remorse" must be the subject of a reliability analysis before submitted to the jury for their consideration. The court

Case 3:16-cv-00057-MOC-JCG  Document 50-3  Filed 03/23/17  Page 204 of 508
Case 3:09-cv-00154-RJC  Document 90-3  Filed 04/06/10  Page 22 of 14
JA1170

must require the government to show that these factors are predictive of future dangerousness before they can be submitted for a jury's consideration.

**ARGUMENT**

The Reliability of Future Dangerousness Under the Eighth Amendment

In federal cases like this in which the jury has the option of choosing life without release as the only alternative to the death penalty, the aggravating factor of future dangerousness is limited to how the defendant would behave in a prison setting if sentenced to life. *See Simmons v. South Carolina*, 512 U.S. 154, 165 n.5 (1994) (for defendant who would be "parole ineligible . . . . The State is free to argue that the defendant will pose a danger to others in prison and that executing him is the only means of eliminating the threat to the safety of other inmates or prison staff"). This makes it quite different from the analogous factor employed under capital statues like Virginia's, for example, where state law directs the jury to consider danger to "society" as a whole. See *Lovitt v. Com.*, 537 S.E.2d 866, 879 (Va. 2000); Va. Code Ann. § 19.2-264.2.[1]

It is that assessment of dangerousness in the larger society that the Supreme Court approved more than a quarter century ago in two Texas cases involving this aggravating factor, *Barefoot v. Estelle*, 463 U.S. 880, 897 (1983), and *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976). While acknowledging that it is "not easy to predict future behavior," the Court observed that such predictions are "an essential element in many of the decisions rendered throughout our criminal justice system," such as bail determinations, noncapital sentencing choices, and parole decisions. *Barefoot*, 463 U.S. at 897, *quoting Jurek*, 428 U.S. at 274-76. Of course, all of those

---

[1] *See also, e.g., Berry v. State*, 233 S.W.3d 847, 863 (Tex.Cr.App. 2007) ("Our precedent states clearly that 'society' . . . includes both prison and the 'free world,' and that the jury must consider dangerousness in that context"). *Accord Berget v. State*, 824 P.2d 364, 374 (Okl.Cr.App. 1992) (same, as to Oklahoma aggravating factor of "continuing threat to society").

Case 3:16-cv-00057-MOC-JCD Document 50-3 Filed 03/23/17 Page 205 of 508
Case 3:09-cv-00154-RJC Document 166-4 Filed 04/06/10 Page 3 of 14

**JA1171**

involve assessing whether a defendant would pose a danger to the safety of others in the community at large.

By contrast (since life imprisonment without release is the only alternative to the death penalty), defendant's jury would confront the issue of he would do so in a maximum-security federal penitentiary, a setting specifically designed, organized, and staffed to handle inmates who have been convicted of violent crimes.[2]    The Supreme Court has never considered the reliability of such judgments under the Constitution or the Federal Death Penalty Act.[3]

And there is growing reason to question whether even experienced government prosecutors are equipped to make them.  For example, one recent empirical study, of 145 death-noticed federal defendants who were ultimately sentenced to life imprisonment, covered the period from 1991 to 2005.  It found no statistically significant difference in the rates of serious disciplinary infractions between those against whom the government had alleged future danger

---

[2] Changes in sentencing laws since Barefoot mean that life imprisonment without release is now available as an alternative sentence in every capital-punishment jurisdiction in this country.  See Mark D. Cunningham & John R. Sorenson, *Improbable Predictions at Capital Sentencing: Contrasting Prison Violence Outcomes*, 38 J. Am. Acade. Psychiatry Law 61, 62 (2010).

[3] "The universal availability of super-maximum conditions of confinement in correctional jurisdictions throughout the United States" represents another "important change" since *Barefoot*.  Cunningham, *Capital Jury Decision-Making, supra*, at 248.  Indeed, at the time the Texas statute was enacted in the mid-1970's, the prison system in that state "was quite a different place than it is today . . . . staffing was limited, 'building tenders' (inmates selected by the correctional officers and wardens for positions of authority in the inmate hierarchy) were used extensively in the management of the prison milieu, and there were limited accommodations for super-maximum or administrative segregation confinement . . .  Accordingly, there were limited mechanisms for preventing inmate violence, which led legislators to believe that such violence was always imminent."  John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel"?*, 29 Law & Hum. Beh. No. 1, at 57 n.6 (Feb. 2005).  But, with the advent of super-maximum presents and better correctional management, it is not surprising that, in the two decades since *Barefoot* was decided, "rates of inmate homicide in state prisons nationwide fell by 90 percent."  Mark D. Cunningham & John R. Sorenson, *Improbable Predictions at Capital Sentencing: Contrasting Prison Violence Outcomes*, 38 J. Am. Acade. Psychiatry Law 61, 62 (2010).

Case 3:16-cv-00057-MOC-JCD  Document 50-3  Filed 03/23/17   Page 206 of 508
Case 3:09-cv-00154-RJC  Document 50-3  Filed 04/06/10   Page 4 of 14

JA1172

as an aggravating factor and those against whom it had not. Cunningham, M.D., Reidy, T.J. and Sorensen, J.R., *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law and Hum. Behav. 46, 55-57, 59, 61 (2008).

As one might expect, federal jurors fair no better than prosecutors at predicting future dangerousness. Another study of 72 federal inmates who had been capitally tried and either sentenced to life imprisonment or death over two decades, compared rates of serious prison violence against jury findings on this aggravating factor. It found that more than 90 percent of the defendants whom jurors had judged dangerous had, in fact, not engaged in any serious violence in prison in the ensuing years. This statistic cannot be dismissed just because most such defendants were sentenced to death and security is greater on death row.[4] For even among those defendants found to be a future danger but sentenced to life, the jurors' positive predictions still proved wrong more than two-thirds of the time.[5] *See* Mark D. Cunningham, Jon R. Sorensen, Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychology, Public Policy & Law 223, 239-40 & Table 4 (2009).

---

[4] Many death-sentenced inmates at USP Terre Haute, though, do have access to other inmates and staff. *See* Cunningham, *Capital Jury Decision-Making* at 243.

[5] And this comports with previous research. For example, a study in the early-2000's examined the disciplinary records of 150 Texas inmates whom juries had found were a future danger and sentenced to death. These inmates, which included ones who had been executed, who were still on death row, and who had had their death sentences set aside on appeal, had been incarcerated for an average of 10 years following their sentence. The study found that only five percent had committed a serious assaultive act in that time. Notably, for most of the period covered by the study, "death row confinement was similar to that of the general population, including routine, unshackled interaction with staff and other inmates." " John F. Edens et al., *Predictions of Future Dangerousness in Capital Murder Trials: Is it Time to "Disinvent the Wheel"?*, 29 Law & Hum. Beh. No. 1, at 61-63 (Feb. 2005).

Case 3:16-cv-00057-MOC-JCG Document 50-3 Filed 03/23/17 Page 207 of 508
Case 3:08-cv-00154-RJC Document 186-2 Filed 04/06/10 Page 5 of 14
JA1173

These results should not surprise. The overall rate of significant prison violence by capital offenders is vanishingly small. And there simply do not exist any data from which jurors, or anyone else for that matter, can reliably determine which such offenders pose a danger. *See id*. at 227-28, 246. Even obvious "common-sense" factors, like having committed multiple murders, possessing an anti-social personality, or serving a life-without-release sentence, do not correlate — or correlate inversely — with a higher likelihood of prison violence. *See id.* at 227. All this raises serious doubt about whether future dangerousness in prison satisfies the reliability and non-arbitrariness requirements of the Eighth Amendment; we contend it does not.

<u>Phrasing Subverts Reasonable-Doubt Standard.</u>

The Notice alleges two statutory aggravating factors. One of which is, "The defendant killed and attempted to kill more than one person in a single criminal episode. 18 U.S.C. § 3592(c)(16)". This factor is phrased in definite terms, rather than probabilistic ones: the defendant killed or attempted to kill, not that he "likely" killed or attempted to kill. The same is true of the other statutory aggravating circumstance and the other non-statutory aggravating circumstances alleged in the Notice. It is only the Non-statutory aggravating circumstance of future dangerousness where the government alleges an aggravating circumstance wherein the allegation is based on a probability. "Defendant is likely to commit criminal acts of violence in the future...".

The Federal Death Penalty Act provides that "The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt." 18 U.S.C. § 3592(c). Thus if the government were to notice an aggravating factor involving a past event, it would not be permitted to allege that event "likely" or "probably" occurred. It therefore follows that the government cannot be

JA1174

permitted to arrive at the same result by the back door method of diluting its reasonable doubt standard by incorporating the word "likely" into the definition of the aggravating circumstance itself.

There is no reason why a different rule should apply simply because the government has chosen to fashion an aggravating factor involving, not past events, but future ones. If the government wishes to obtain a sentence of death based on violent acts that the defendant will commit it still must satisfy the proof beyond a reasonable doubt standard required by 18 U.S.C. § 3592(c). It would not suffice to instruct jurors that they need to find "beyond a reasonable doubt" a likelihood that the defendant will commit criminal acts in the future. Not only would this fail to correct the inherently diluted standard of proof for an aggravating circumstance, but the very notion of a probability proved beyond a reasonable doubt remains, at its core, incoherent. The United States Supreme court has recognized this, although, in a different context.

> But to say...that one must demonstrate that something is more probably clearly erroneous than not or more probably than not unreasonable is meaningless. One might as intelligibly say, in a trial court, that a criminal prosecutor is bound to prove each element probably true beyond a reasonable doubt. The statute is thus incoherent with respect to the degree of probability of error required of the employer to overcome a factual conclusion made by the plan sponsor."

*Concrete Pipe and Products of California v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 625 (1993).

Case law on the purpose of the reasonable-doubt standard at trial confirms the unacceptability of diluting it at sentencing through a likelihood definition of this aggravating factor. "The reasonable-doubt standard . . . . is a prime instrument for reducing the risk of convictions resting on factual error." *In re Winship*, 397 U.S. 358, 363 (1970). Thus, in

**JA1175**

charging jurors on the burden of proof beyond a reasonable doubt, a court should "impress upon" them "the need to reach a subjective state of near certitude of the guilt of the accused." *Victor v. Nebraska*, 511 U.A. 1, 15 (1994), *quoting Jackson v. Virginia*, 443 U.S. 307, 315 (1979). *See also Winship*, 397 U.S. at 364 (reasonable-doubt standard requires government to "convince a proper factfinder" of defendant's "guilt with utmost certainty").

It stands to reason that Congress adopted the reasonable-doubt standard for aggravating factors in FDPA because it wanted to ensure that, before any jury weighed alleged conduct by the defendant in favor of a death sentence, the government had to prove the conduct with "near" or "utmost certainty." Surely Congress chose this stringent standard to try to prevent, as much as reasonably possible, death verdicts "resting on factual error." Yet allowing a federal defendant to be dispatched to execution because jurors believe it "likely" he will engage in future criminal conduct raises the serious, if not probable specter of just such an error.

The Government is Not Entitled to an Instruction on
Marshalling Evidence On Future Dangerousness

The government has alleged that the defendant's future dangerousness is comprised of four sub-components. They are:

1.      A continuing pattern of violence;

2.      Low rehabilitative potential;

3.      Lack of remorse; and

4.      Gang membership.

The government is required to prove an aggravating circumstance by proof beyond a reasonable doubt. Defendant's complaint with the phrasing of future dangerousness in four sub-components, is that any court instruction which would track the language of this notice, would put the court's imprimatur on the idea that these four sub-components do in fact provide proof of

Case 3:16-cv-00057-MOC-JCD Document 50-3   Filed 03/23/17   Page 210 of 508
Case 3:08-cv-00154-RJC Document 1190-6   Filed 04/06/10   Page 8 of 14
**JA1176**

future dangerousness. Further, in order to be consistent with the requirement the government prove aggravating circumstances by proof beyond a reasonable doubt, the court must necessarily require the government to prove each of the four sub-components unanimously to a jury by proof beyond a reasonable doubt. If the court were to instruct the jury that it must find future dangerousness by proof beyond a reasonable doubt, but then instruct them to consider the four sub-components, without requiring each sub-component be unanimously found by proof beyond a reasonable doubt, the court would be instructing the jury on the government's ability to marshal evidence on the non-statutory aggravating factor of future dangerousness. In order for such an instruction to pass constitutional muster, the court would necessarily be required to instruct the jury that they must find each sub-component unanimously and by proof beyond a reasonable doubt, or alternatively to strike the four sub-components altogether from the notice.

Lack of Remorse

"In any criminal case, the Constitution prohibits the government from encouraging the jury to hold against the defendant his choice to remain silent rather than speak about the charges. This applies to the defendant's exercise of his right not to testify at trial, S*ee, Griffin v. California,* 380 U.S. 609, 614-15 (1965), or at a capital-sentencing hearing, at which he retains the privilege against self-incrimination.[6] *See Estelle v. Smith*, 451 U.S. 454, 462-63 (1981); *Mitchell v. United States*, 526 U.S. 314, 316-17 (1999).

Thus, the Fourth Circuit recently suggested that the Fifth Amendment prohibits "considering a defendant's silence regarding the non-statutory aggravating factor of lack of remorse." *United States v. Caro*, ___ F.3d ___, 2010 WL 963201 (4th Cir. Mar. 17, 2010). And

---

[6] In federal prosecutions, this principle also derives from a statutory command. *See* 18 U.S.C. § 3481 (defendant's failure to testify "shall not create any presumption against him"); *Bruno v. United States*, 308 U.S. 287, 292-93 (1939).

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 211 of 508
Case 3:08-cv-00154-RJC Document 366 Filed 04/26/10 Page 9 of 14

**JA1177**

other federal courts have not hesitated to condemn summation arguments that suggest a capital defendant's failure to testify about the crime demonstrates his remorselessness. For example, in *Beardslee v. Woodford*, 358 F.3d 560 (9th Cir. 2004), the prosecutor argued at sentencing that the defendant "had no remorse," and explained: "'Since you only heard the defendant through the tape recorder and his previous testimony, you were not able to observe his demeanor and sincerity at the time he testified so you, too, could judge if there was any feeling in the man.'" *Id.* at 586-87. The Ninth Circuit found that "[t]hese comments were impermissible under *Griffin.*" *Id.* at 587.

Similarly, in *Lesko v. Lehman*, 925 F.2d 1527 (3rd Cir. 1991), the prosecutor argued that the defendant "'didn't have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry.'" *Id.* at 1541-44. The Third Circuit found that this "penalized the assertion of his Fifth Amendment privilege against self-incrimination, in violation of the rule in *Griffin.*" *Id.* at 1545.

Several state courts have reached similar holdings. *See, e.g., People v. Boyette*, 58 P.3d 391 (Cal. 2003) (prosecutor violated *Griffin* by arguing, at capital sentencing: "'[I]f he were to somehow, God forbid take the stand and say he was sorry, which you didn't see"); *Cockerham v. State*, 365 S.E.2d 22, 23 (S.C. 1988) (prosecutor violated capital defendant's "Fifth Amendment right to remain silent" when, at sentencing, he "instructed the jury to 'look at [defendant], does he look sorry to you?' Later, he asked the jury to look at [defendant]: 'Have you seen any remorse?'"); *see also Jackson v. State*, 643 A.2d 1360 (Del. 1994); *Swallow v. State*, 829 S.W.2d 223, 224-25 (Tex. Cr. App. 1992); *People v. Ramirez*, 457 N.E.2d 31, 37 (Ill. 1983)."

**JA1178**

Relevance of Low Rehabilitative Potential

The government has alleged as a sub-component of future dangerousness, the defendant's "low rehabilitative potential." The government's specific allegations under this sub-component state:

> Defendant poses a future danger to the lives and safety of others as demonstrated by his lack of rehabilitation after prior incarceration, his pattern of criminal conduct and his allegiance to and membership in MS-13.

Death Notice, p. 4.

Defendant would first note that the allegation regarding his allegiance to membership in MS-13 is simply a duplication of the fourth sub-component alleged as part of future dangerousness. The government has specifically alleged defendant's gang membership as sub-component D under its allegation of future dangerousness. More importantly however, as defendant has noted previously, in the event of a penalty phase, the instant jury will only have the option of choosing between a sentence of death and a sentence of life without release. Accordingly, to the extent that the government can prove the defendant has a "low rehabilitative potential," it would have no relevance to the issue. The issue for the jury is not whether the defendant can be rehabilitated, but whether he can be safely managed within the Bureau of Prisons. Accordingly, to allow the jury to consider and speculate on the defendant's low rehabilitative potential would serve no useful purpose in determining whether or not he is a future danger. Due to the lack of relevancy of the defendant's rehabilitative potential, this court should strike this provision from the death notice.

Low Rehabilitative Potential and Lack of Remorse Require A
Showing of Reliability As Indicia of Future Dangerousness

As noted in a prior section, the prediction of future dangerousness is inherently speculative. As components of its case for arguing future dangerousness, the government has

JA1179

specifically alleged "low rehabilitative potential" and "lack of remorse." Defendant submits that there is no empirical evidence that these factors have any correlation with the notion of predicting future danger. Before this court should put its imprimatur on such untested notions, the court must require the government to come forward with some evidence that demonstrates that evidence of lack of remorse and evidence of low rehabilitative potential are in fact indicia of future dangerousness. Defendant submits that the government is engaging in pure speculation, lacking any empirical basis, in formulating how to predict future dangerousness. The court should not engage with the government in this speculation. To avoid this, defendant contends the court must require the government to come forward within empirical proof of these assertions before allowing any such evidence and instruction on these allegations. Absent such a showing by the government, defendant contends that these sub-components of future dangerousness must be stricken from the death penalty notice.

### CONCLUSION

Based on the foregoing, defendant contends that the allegations of future dangerousness in the death penalty notice violate the aforementioned statutory and constitutional provisions. Accordingly, this court must strike this non-statutory aggravating factor from the death notice in order to comply with the Federal Death Penalty Act and the defendant's constitutional rights.

Respectfully submitted this the 6th day of April, 2010.

/s/ Mark P. Foster, Jr.
Mark P. Foster, Jr. (NC State Bar No. 22717)
Attorney for Defendant
1011 E. Morehead St. Suite 300
Charlotte, NC  28204-2261
Telephone:  (704) 347-1809
Facsimile:  (704) 332-2716
E-mail:  mpfosterjr.@bellsouth.net

**JAT180**

/s/ John D. Bryson
John D. Bryson (NC State Bar No. 12883)
Attorney for Defendant
P. O. Drawer 2086
High Point, NC  27261-2086
Direct Telephone:  (336) 819-6016
Direct Facsimile:  (336) 819-6076
E-mail:  jbryson@wehwlaw.com

**JA1181**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of the above Defendant's **Motion to Strike The Non-Statutory Aggravating Factor of Future Dangerousness from the Notice of Intent to Seek the Death Penalty** has been duly served on the attorneys listed below by e-mail service through ECF on this 6th day of April, 2010 as follows:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazarro
Sam.Nazzaro@usdoj.gov

Kevin Zolot
Kevin.Zolot@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

Mark Jones
Mark.Jones2@usdoj.gov

/s/ John D. Bryson
John D. Bryson (NC State Bar No. 12883)
Attorney for Defendant
P. O. Drawer 2086
High Point, NC  27261-2086
Direct Telephone:  (336) 819-6016
Direct Facsimile:  (336) 819-6076

14

**JAT182**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | **DEFENDANT'S REPLY TO** |
| | ) | **GOVERNMENT'S RESPONSE** |
| ALEJANDRO UMANA | ) | **TO DEFENDANT'S MOTION** |
| | ) | **FOR COURT TO DETERMINE** |
| | ) | **THE ADMISSIBILITY AND** |
| | ) | **RELIABILITY OF EVIDENCE** |
| | ) | **BEFORE ALLOWING** |
| | ) | **EVIDENCE TO BE PRESENTED** |
| | ) | **TO JURY IN SENTENCING** |
| | ) | **PHASE** |

NOW COMES Defendant ALEJANDRO ENRIQUE RAMIREZ UMANA, by and through counsel, and hereby files this Reply to the government's Response to "Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence of Unadjudicated Criminal Acts Before Allowing Evidence to be Presented to Jury in Sentencing Phase". Defendant's motion was Document 960 filed on March 31, 2010. The government's Response was entitled "United States Response Regarding the Applicability of *Crawford v. Washington* at Sentencing Hearing" (Document 967 filed 4/5/10).

On page 3 of its Response, the government declares its intention to present, during the sentencing phase, evidence of unadjudicated conduct through a variety of what the government calls "reliable 'testimonial' hearsay" in support of certain non-statutory aggravating factors. The government contends that its description of its evidence in its Response is a sufficient proffer to establish the reliability of the evidence or, if not, then a

1

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 217 of 508
Case 3:08-cv-00134-RJC Document 1068 Filed 04/10/10 Page 1 of 19
**JA1183**

more detailed proffer would be provided, but that a hearing is not necessary. However, Defendant submits that the hearsay statements referred to by the government are unreliable for a number of reasons and that they should be excluded from evidence. What follows is a summary demonstrating the unreliability of the government's proffered evidence.

**1.**   **STATEMENTS BY CODEFENDANTS/ACCOMPLICES AS TO DOUBLE MURDER IN LOS ANGELES ON JULY 25, 2005**

The discovery in this case shows that Defendant is accused of killing two members of a rival gang on Fairfax Avenue in Los Angeles, California, on July 25, 2005. The police investigators came to the opinion that there were five people in a car that pulled over on Fairfax Avenue and that one of these people got out of the car and shot and killed the two victims. Defendant and three codefendants were charged in these murders by the State of California. The three codefendants are Rene Arevalo, Ruben Moreno, and Luis Rivera. These three codefendants are the declarants who made the statements that the government has classified as having been made "against penal interest". However, careful review of their statements indicates that they are actually self-serving, blame-shifting statements implicating Defendant. Additionally, these alleged accomplices lied to police about various issues. For these reasons, the statements are not reliable.

Police reports show that one of the persons seen outside the car during the shooting was on crutches. According to an arrest warrant affidavit by LAPD Detective Gene Parshall, police knew that Luis Rivera, an MS-13 member, had been on crutches immediately before and after July 25, 2005. Therefore, he was contacted and interviewed

2

**JA1184**

by police on April 21, 2006. He claimed to have been seated in the back left seat of the car, while Eddie Ruiz was in the middle rear seat and Ruben Moreno was in the right rear seat. He claimed that Rene Arevalo was the driver of the vehicle, while Alejandro "Wizard" Ramirez was the right front passenger. He claimed that Alejandro "Wizard" Ramirez and Ruben Moreno exited the vehicle, Moreno taking one of Rivera's crutches with him, and approached the two Hispanic males who had flashed gang sings at them. Rivera claimed that he never exited the car. He claimed that Ramirez was the shooter. He *denied* being an MS-13 member. (Pages 3-4 of 8 of arrest affidavit dated May 16, 2006 by Detective G. Parshall). This last assertion was false as shown by a report written by LAPD Detectives Parshall and Telis which states that Rivera is in fact a "documented Mara Salvatrucha gang member." (Page 2 of 7 of Parshall/Telis report).

That same LAPD report included the following analysis of Luis Rivera's April 21 statement:

> Based on Rivera's statements admitting that he was in the vehicle when the homicide took place, the fact that *he lied* about being in the vehicle until confronted with evidence he could not deny, the fact that both eyewitnesses stated that three suspects exited the vehicle when Rivera said only two suspects exited, and that one witness observed the third suspect to be holding two crutches, detectives determined that Rivera was the third suspect to exit the vehicle in order to confront the two victims. Based on Rivera's statements where he implicated Alejandro Ramirez as the shooter and Rene Arevalo as the driver and the known evidence supporting the identifications, detectives formed the opinion that Rivera's identification of Luis Ramos was also accurate. *Detectives opined that Rivera denied getting out of the car in order not to further implicate himself and his statements were largely self serving.* (emphasis added). (Page 4 of 7 of Parshall/Telis report)

Additional discovery in this case shows the lack of truthfulness by Luis Rivera. He had also *lied to police* on a separate occasion just two months earlier. According to a

JA1185

report by LAPD Officer M. Solis, on February 19, 2006, Luis Rivera gave a false name and date of birth to him during a detention for drinking in public. (page 1 of 2/19/06 arrest report by LAPD Officer M. Solis).

On April 21, 2006, the same date that Rivera was arrested and interviewed, Ruben Moreno (AKA Luis Ramos) was arrested and brought to the same police station where Rivera was being held. Ramos waived his Miranda rights, but then *denied knowing anything about the murder* and invoked his right to counsel. (Page 4 of 8 of Detective Parshall arrest affidavit dated 5/16/06). Police allowed the two suspects to be placed in the same room and given an opportunity to talk. Their talk was surreptitiously recorded. According to Detective Parshall's affidavit, "Together, Ramos and Rivera discussed what they would tell the police officers *in order to minimize their involvement in the murder*." (emphasis added). (page 5 of 8 of Detective Parshall arrest affidavit dated 5/16/06).

According to the report by Parshall and Telis, a recording made of the conversation between Rivera and Ramos when they were initially placed in a room together yielded comments by Ramos where he told Rivera "Let's talk and I will say that you did not do anything". Moments later, Rivera told Ramos "Let's say that we did what we did because we felt threatened because both they (sic) were armed." Ramos then said "This is what we are going to say." He then laid out a detailed story that included "I did not do anything and you did not do anything." He said "I'm gonna say that you remained inside the car and did not do anything and that they threatened us." Referring to Defendant Umana, Ramos said "I will not make a thousand years for any son of a bitch." (page 6 of 7 of Parshall/Telis report).

4

**JA1186**

According to Parshall's affidavit, Rivera and Ramos were booked into the jail and placed in a jail cell together for the weekend.  An electronic audio monitor was placed in the cell to record their conversations, but apparently the suspects removed and disarmed the device.  After being allowed to spend the weekend together, Rivera told police that both he and Ramos had asked a jailer if they could speak with detectives about the case and that he now wanted to tell detectives what happened.  According to Parshall's affidavit, Rivera "then gave *another version* of the shooting event now switching the seating positions of Ramos and Ruiz." (emphasis added) (page 6 of 8 of Parshall arrest affidavit dated 5/16/06).  Rivera now claimed that Ruiz had been sitting in the right rear seat and had been flashing gang signs at the two victims and that Ramos had been in the middle seat and had not flashed gang signs or yelled anything at the victims.  Rivera now claimed that when the car had pulled over, Ruiz grabbed one of his crutches and that both Ruiz *and Ramos* exited the car to confront the victims and then Defendant Umana shot the victims.  He claimed that Rene Arevalo was the driver of the vehicle and that Defendant Umana was the right front passenger.  (page 6 of 8 of Parshall arrest affidavit dated 5/6/06).

Ramos, who had earlier *denied* knowing anything about the murders, now spoke to Parshall and claimed that he was present and had been seated in the middle rear seat of the vehicle.  He told Parshall that the two victims first flashed gang signs and that in response Ruiz, Arevalo, and Ramirez all flashed gang signs back at them.  Ramos claimed Ruiz exited the car and confronted the victims with one of Rivera's crutches.  Ramos stated that Arevalo told Ramirez to "hit him, hit him."  He said that Ramirez then shot the victims.  Ramos *claimed he did not exit the car until after the shooting*, when he

5

**JA1187**

exited the car to retrieve Rivera's crutch at his request. (pages 6-7 of 8 of Parshall arrest affidavit dated 5/16/06).

Rene Arevalo, AKA "Mo", was contacted by LAPD on May 25, 2006. According to a report on that date by Detectives Parshall and Telis, he agreed to speak to them about the Fairfax Avenue murders. However, instead of indicating (like Rivera and Ramos) that he pulled the car over before anyone exited, he told police that Defendant Ramirez exited the car along with Luis Ramos and Eddie Ruiz while the car was stuck in stop-and-go traffic. *After* they exited the vehicle, he then pulled to the curb to wait for his friends. He told police *that Luis Ramos yelled out "La Mara"*, which is short for Mara Salvatrucha, at which time Defendant shot the victims. Thus, Arevalo's statement contradicts those of Luis Ramos and Luis Rivera not only as to Ramos' role but also as to his own knowing involvement. His statement is clearly self-serving as he attempts to minimize his responsibility by claiming that his passengers spontaneously exited the vehicle for the confrontation before he ever pulled over to stop.

Casting further doubt on the reliability of all three accomplice statements is the fact that, according to an LAPD report by Parshall and Telis, Detective Urena interviewed Oscar Santiago, a neutral eyewitness who saw the shooting. Santiago told Urena that the *driver* of the vehicle was the shooter.

The government attempts to establish reliability of the codefendants' hearsay statements by categorizing them as statements "against penal interest". However, as the U.S. Supreme Court has stated in the context of trial testimony and Sixth Amendment confrontation, where the government seeks to introduce a confession by an accomplice incriminating a defendant, this hearsay encompasses statements that are inherently

6

**JA1188**

unreliable.  Lilly v. Virginia, 527 U.S. 116, 130-131, 119 S.Ct. 1887, 144 L.Ed.2d (1999).  While the instant issue does not involve trial testimony, the Supreme Court's views on the unreliability of this type of hearsay are instructive:

> Typical of the ground swell of scholarly and judicial criticism that culminated in the *Chambers* decision, Wigmore's treatise still expressly distinguishes accomplices' confessions that inculpate themselves and the accused as beyond a proper understanding of the against-penal-interest exception because an accomplice often has a considerable interest in "confessing and betraying his cocrim-inals." (cite omitted)  Consistent with this scholarship and the assumption that underlies the analysis in our *Bruton* line of cases, we have over the years "spoken with one voice in <u>declaring presumptively unreliable accomplices' confessions that incriminate defendants</u>." *Lee*, 476 U.S., at 541.  See also *Cruz*, 481 U.S., at 195 (White, J., dissenting) (such statements "have traditionally been viewed with special suspicion"); *Bruton*, 391 U.S., at 136 (such statements are "inevitably suspect").  (emphasis added)

Lilly v. Virginia, supra, 527 U.S. at 131.

Again, while Lilly was dealing with Confrontation Clause rights at trial and not at a capital sentencing hearing, the Supreme Court's analysis of the reliability *vel non* of this type of evidence should not be ignored:  "Indeed, even the dissenting Justices in *Lee* agreed that 'accomplice confessions ordinarily are untrustworthy precisely because they are *not* unambiguously adverse to the penal interest of the declarant,' but instead are likely to be attempts to minimize the declarant's culpability."  Id., 527 U.S. at 132 (emphasis in original).

Here, the statements of the three codefendants all fall into this category of the self-serving statement minimizing the declarant's culpability while incriminating the charged defendant.  Thus, these statements are presumptively unreliable and should therefore be excluded from Defendant's capital sentencing hearing pursuant to 18 U.S.C. §3593(c) and the case authorities cited in Defendant's previous motion (Document 960).

7

Case 3:16-cv-00057-MOC-JCH Document 50-3   Filed 03/23/17   Page 223 of 508
Case 3:09-cv-00154-RJC   Document 968   Filed 04/10/10   Page 7 of 19

JA1189

2.    **PRELIMINARY HEARING TESTIMONY REGARDING DOUBLE MURDER IN LOS ANGELES ON JULY 25, 2005**

The government has also declared that it intends to use a transcript of preliminary hearing testimony given on December 15, 2006 regarding the July 25, 2005 double murder. The government indicates that all three codefendants were represented by counsel at that hearing and that the witnesses were subject to cross-examination. However, this Defendant was not present and not represented by counsel. The three codefendants and their counsel clearly had an interest at that hearing in denying or minimizing their involvement and shifting the criminal liability to the absent Defendant. Thus, insofar as the preliminary hearing testimony implicates Defendant in the double murder, such testimony was not tested in the adversarial process by someone representing Defendant's interests.

In any event, as far as implicating Defendant in the double murder, the preliminary hearing testimony is nothing more that a rehash of the previous codefendant statements discussed above. Detectives Parshall and Corona testified to the statements made by the three codefendants that have already been discussed above. The fact that they did so under oath does not strengthen the inherent unreliability of the underlying self-serving hearsay from the three codefendants.

Other than Detectives Parshall and Corona, the other witnesses who testified were as follows. Eyewitness Noe Bautista testified about the incident but was not able to describe or identify the shooter. Officer Jose Cortez testified to the translation of the recorded conversation between Rivera and Ramos where they discussed what they would tell police. Detective Telis provided brief testimony regarding the date and

8

**JA1190**

circumstances of the recorded conversation and interviews. Detective Flores testified that he had previous contact with Defendant and that he knew that he was a member of MS-13, but indicated no personal knowledge of Defendant's involvement in this incident. Detective Flores provided opinion testimony regarding the purpose of the murders.

Thus, the preliminary examination transcript does not add any reliable information to the statements by the three codefendants implicating Defendant in the Fairfax Avenue double murder. As such, its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

3. **TESTIMONY BY A SALVADORAN PROSECUTOR SUMMARIZING UNRELIABLE HEARSAY STATEMENTS REGARDING AN ALLEGED MURDER IN EL SALVADOR**

In its Response, it is apparent that the government also intends to try to prove Defendant committed another unadjudicated murder, this one in El Salvador. They plan on doing this not through the testimony of eyewitnesses or by introduction of any admissions by Defendant. Instead, they seek to prove this unadjudicated conduct through the testimony of an interested party—one of the prosecutors on the case.

Based on translations of Salvadoran judicial documents received in discovery, it appears that the conclusion of the prosecutor that Defendant was involved in a murder in El Salvador is based on statements of alleged perpetrators and co-participants of the alleged murder. The victim was Jaime Ernesto Medina Samayoa, a purported MS-13 member who had tried to leave the gang. Some of the witnesses who made statements did so under a numerical identification so that their true name is not even known.

9

**JA1191**

The prosecutorial documents do not make clear whether the declarants testified under oath or were subject to cross-examination by anyone. The prosecutorial documents refer to "extrajudicial statements" made by witnesses and indicate that the statements were taken in private interviews while the witnesses, particularly the ones whose identities are withheld and who are given code numbers instead of names, were in protective custody. It is impossible for the defense to investigate the background and credibility of a witness whose name is withheld and who is known only by a number. There is no indication that any of their statements were subject to any meaningful testing through cross-examination or otherwise.

Interestingly, the translated documents indicate that the witness code-named 2306-UDVA-6-T-2003 claimed that the victim was decapitated while still alive. This claim is directly contradicted by the medical examiner's finding that the victim's head was cut off after death, as he died from asphyxiation by suffocation due to obstruction of the respiratory orifices due to tape being placed over his mouth and nose. This finding was included in the Analysis and Evaluation of the Presented Evidence in the Findings of Fact by the court. Thus, the coded witness's allegation is false, making his statement not credible and not reliable. Further, witness 2306-UDVA-6-T-2003 denied being a member of MS-13, yet claimed to have been allowed to be present for this beating, stabbing, and murder. This is extremely unlikely and further undermines the reliability of his statement. The court itself stated that this witness's pretrial statement contains contradictions and conflicts with that of witness Hilario De Jesus Flores Colocho.

The court also stated that witness 2306-UDVA-6-T-2003's claim that the hole dug to bury the victim was about four meters deep was contradicted by the fact that

10

Case 3:16-cv-00057-MOC-JC Document 50-3   Filed 03/23/17   Page 226 of 508
Case 3:08-cr-00134-RJC Document 157-3   Filed 04/20/10   Page 10 of 19

JA1192

investigators found the grave and measured its depth at one meter and seventy centimeters, "a noticeable measurement difference that could not give place to errors." The court found his statement not credible, based in part on his claim of not having been a member of MS yet having been allowed to witness the murder.

Another witness referred to only by a code number was Witness 2603-UDVA-T-7-03. He claims to have been an eyewitness to the killing, yet it is evident in later statements attributed to him that he only heard about it from other people. He claims that the murder was committed by three people: "El Maniaco", AKA Walter; "Wizar"; "Crazy", AKA Erick. However, it is apparent he has no personal knowledge of this as he indicated that he arrived at the tenement and "they" showed him the victim's head that had already been cut off and that they said they were going to bury it but he did not witness that, either. This witness also denied being a member of the MS-13 gang. It is highly doubtful that these violent gang members would admit their conduct and show the severed head of their victim to a non-member. Thus, his statement is not credible or reliable.

Witness Hilario De Jesus Flores Colocho provided information about a "green light" being put out by the gang on the victim Jaime Ernesto Medina Samayoa, but he indicated that he found out about the killing eight days after it had happened. Thus, he was not an eyewitness to the killing. The court indicated that Colocho placed himself at a gang meeting to the extent of measuring the time it took "El Tecolote" to call "Scooby" and order him to bring the victim to the location of the planned attack. The court found these to be "incongruent words" because it would be illogical for El Tecolote to have ordered the victim to be taken to Texistepeque, where the meetings of the "Wester"

Case 3:16-cv-00057-MOC-RJC Document 50-3    Filed 03/23/17    Page 227 of 508
Case 3:08-cr-00134-RJC Document 64-3    Filed 04/10/10    Page 12 of 19
JA1193

clique took place, if the killing took place in Santa Ana.  Although Colocho claimed to

have known who transported the victim to the scene of his death, the court indicated that

Colocho was not certain of that because "he is said not to know when he was transported

since he was not present."  The court found inconsistencies in Colocho's story about

when he got out of the "Wester" clique of MS.  The court later states that "Again, the

same witness is inconsistent about his leaving the gang to which he belonged."

Also key is the indication in the translated documents that there were

inconsistencies and contradictions by eyewitness Hilario Flores as well as deficiencies

and contradictions by two code-named witnesses.  The court concluded as follows:

> Given the inconsistencies and contradictions denoted on witness
> Hilario Flores, as well as the deficiencies and contradictions of the
> witness coded under numbers 2306-UDVA6-T-2003 and
> 2603-UDVA-T-7-03 whom by their numbers cannot be linked to
> any act of identification in a persons' line-up either, do not merit
> credibility before the undersigning Judges, therefore, the participation
> of defendants Gonzalez Ramirez, Berganza Batres, Medina and Mejia
> Moran is not proved in the offense of aggravated homicide in detriment
> of Jaime Ernesto Medina Samayoa; for the same reasons mentioned and
> which made the referred witnesses lose credibility, there was not a
> positive certainty either of the participation of the six defendants taken
> to trial in the illegal [act] of conspiracy.

Thus, the court in El Salvador already found that the statements made by the

purported witnesses to the killing of the victim were not credible and as a result it

acquitted the four defendants of the murder and the six defendants of the conspiracy.

Therefore, a court having already made a determination that these statements were not

credible, the government can hardly maintain to this Honorable Court that such

statements constitute reliable evidence.

To allow a foreign prosecutor to testify at a capital sentencing hearing as to

hearsay statements by accomplices implicating Defendant through self-serving and

Case 3:16-cv-00057-MOC-JC Document 50-3   Filed 03/23/17   Page 228 of 508
Case 3:08-cr-00134-RJC Document 54-3   Filed 04/20/10   Page 12 of 19

JA1194

untested statements that have already been determined by a foreign court to be not credible, would denigrate our federal justice system, violate Defendant's Due Process rights, and would be in violation of Section 3593(c) because clearly the probative value of this evidence is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  The proffered hearsay evidence of the El Salvador unadjudicated conduct is not reliable and worthy of being presented at a capital sentencing hearing.

**4.     HEARSAY STATEMENTS MADE TO POLICE BY WITNESSES REGARDING AN ALLEGED SEMPTEMBER 28, 2005 MURDER OF A PERSON IN LOS ANGELES.**

The government indicates that it intends to offer not only eyewitness testimony, but statements made to police by witnesses in an attempt to prove that Defendant committed yet another alleged and unadjudicated murder.  The discovery indicates that this murder occurred in Lemon Grove Park in Los Angeles on the night of September 28, 2005.  The victim was Andy Abarca, one of a group of men who had been sitting in bleachers talking and drinking after playing basketball on the outdoor court.  Two other members of the group were shot, wounded, and survived:  Juan Lara and Roberto Ramos.  Two other people who were present as part of the group were Freddy Gonzalez and Elger Barrios.

The witnesses indicated that they were approached by two Hispanic males who both pulled out guns.  The witnesses started running and the suspects started shooting at them.  Abarca was hit and killed.  The others survived and were interviewed by police.

13

Case 3:16-cv-00057-MOC-JC Document 50-3    Filed 03/28/17    Page 229 of 508
Case 3:08-cr-00134-RJC Document 64-3    Filed 04/20/10    Page 13 of 19

**JA1195**

Juan Lara was able to give a description of the two assailants but was not able to identify anyone as one of the shooters. In fact, Lara was shown a photographic lineup that contained a photograph of Defendant and he failed to identify him.

Roberto Ramos was also shown a photographic lineup that contained Defendant's photo and was also unable to identify him as one of the assailants.

Elger Barrios told police he could not see the faces of the shooters and thus was not shown any photographic lineups.

Galo Ramirez was another person who witnessed the shooting but from a distance of at least 100 feet away. He, too, was unable to identify anyone as the shooter in a photographic lineup that included a photograph of Defendant.

According to LAPD reports, Freddy Gonzalez was an admitted member of Tree Park Criminals, a gang that was a rival of MS-13. Approximately three months before this incident, Gonzalez had been arrested and convicted for robbing an MS gang member. According to a police report by LAPD Detective Small, when Gonzalez was shown a photographic lineup containing a photograph of Defendant, he made a "tentative identification" of Defendant "as most resembling the primary shooter". This is hardly a convincing identification and it was done by someone who had a motive to get back at MS-13.

Thus, there is no positive, credible identification of Defendant as one of the shooters by anyone.

The government also has indicated that it intends to introduce Defendant's April 23, 2008 recorded "confession" to investigators. However, that recorded statement indicates that Defendant told police that although he was present that night, he was not

14

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 230 of 508
Case 3:08-cr-00134-RJC Document 54-3   Filed 04/20/10   Page 14 of 19

JA1196

one of the shooters.  He told police that "Castore", a member of MS from the Parkview clique, was the shooter.  At best, the government can interpret part of the statement as admitting awareness that others in his car got out of the car to go take care of Freddy Gonzalez, but that "Sin" was the driver and that Defendant was just a passenger who did not drive the car or fire any shots.

Therefore, Defendant submits that the proffered evidence does not comprise reliable evidence sufficient to convince a jury beyond a reasonable doubt that Defendant is guilty of the murder of Any Abarca.  Defendant submits that the probative value of the proffered evidence is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

## 5.   <u>CONCLUSION</u>

A federal district court was presented with very similar issues in a capital case in <u>United States v. Gonzalez</u>, 2004 U.S.Dist. LEXIS 16907 (D.Conn. 2004).  In that case, the government had alleged as a nonstatutory aggravating factor that the defendant had committed four other killings.  The government submitted a proffer of the evidence it intended to use to prove these killings during the sentencing phase.  The proffered evidence consisted mostly of actual testimony (as opposed to hearsay renditions of their statements) by cooperating accomplices as to the defendant's alleged killings.  The court stated as follows:

> Having obviously had only the Government's proffer to review,
> the Court is in no position to assess the strength or sufficiency of
> this evidence against Gonzalez.  Nonetheless, the nature of the
> evidence the Government intends to present highlights the
> imperative for an impartial jury.  The Government is relying almost
> exclusively on the testimony of cooperating and accomplice

15

**JA1197**

> witnesses who either participated in or witnessed the preparation
> for the murders at issue, or the testimony of cooperating witnesses
> to whom Gonzalez allegedly confessed.  Such evidence is of the
> kind that is traditionally viewed with great caution, because such
> witnesses may have motives to testify falsely.

United States v. Gonzalez, 2004 U.S.Dist. LEXIS 16907, *19 (D.Conn. 2004).

The court in Gonzalez pointed out that the evidentiary standard for capital sentencing hearings under 18 U.S.C. §3593(c) provides greater discretion for a court to exclude evidence than Rule 403 of the Rules of Evidence provides because §3593(c) "allows the exclusion of evidence if the unfair prejudice 'outweighs' the probative value, while Rule 403 requires a showing that the prejudice 'substantially' outweighs the probative value." Id., at *7.  The court found that the probative value of the government's evidence of unadjudicated criminal conduct on whether Gonzalez should receive the death penalty was outweighed by the danger of creating unfair prejudice by the process of trying those four murders in the penalty phase. Id., at *6.

The court in Gonzalez summarized the basis for its exclusion of the evidence and striking of the nonstatutory aggravating factor as follows:

> This Court's finding of unfair prejudice to Gonzalez is based
> on a recognition that Gonzalez is entitled to the presumption of
> innocence in the trial at the penalty phase on unrelated unadjudi-
> cated charges, and that the presumption of innocence is too likely
> eroded when a jury, having deliberated and found the defendant
> guilty of capital murder, is then charged with determining whether
> the Government has proved beyond a reasonable doubt that Gonzalez
> committed four other murders.  The underlying crime is of an
> inflammatory nature, making it more likely that a jury's finding of
> guilt on the indicted crime on trial will bleed into its deliberations
> on the unrelated penalty phase crimes.  In addition, as will be
> detailed below, the unadjudicated murders sought to be proven at
> the penalty phase, while distinct and unrelated to the underlying
> murder of Teddy Casiano, are based on fact patterns similar to that
> of the underlying crime, further increasing the risk that the jury will
> use its guilty phase findings of guilty in its adjudicatory penalty

16

Case 3:16-cv-00057-MOC-JC   Document 50-3   Filed 03/23/17   Page 232 of 508
Case 3:08-cr-00134-RJC   Document 1258   Filed 04/16/10   Page 16 of 19
JA1198

phase deliberations.

Id., at *7-*8.

Here, we have a remarkably similar scenario.  The government seeks to establish a nonstatutory aggravating factor of "Participation in Additional Uncharged Murders and Other Acts of Violence".  According to the government's Response brief (Document 967) and a review of the discovery, the government will seek to introduce evidence of four murders committed by Defendant:  (1) an alleged double murder of two members of a rival gang in Los Angeles on July 25, 2005; (2) a murder of a wayward gang member in El Salvador in 2003; (3) a murder in Los Angeles on September 28, 2005, of an unintended victim in a gang-related shooting.  None of these alleged offenses have resulted in convictions against Defendant.  As to each, Defendant is entitled to the presumption of innocence.  As to each, the government must convince the jury of their truth beyond a reasonable doubt in order for them to be found as aggravating factors.

However, if there is a capital sentencing phase, the jury would have already found Defendant guilty of a gang-motivated murder.  To have that same jury extend the presumption of innocence to Defendant on these four unadjudicated gang-related murders and to hold the government to its burden of proof beyond a reasonable doubt is asking too much.  Defendant submits that he will not be able to get a fair trial from the jurors on the unadjudicated murders when those jurors are presented with unreliable hearsay claims that Defendant committed other gang-related murders.  Defendant submits that the weak probative value of the government's proffered evidence of unadjudicated criminal acts is outweighed by the danger of creating unfair prejudice, confusing the issues, and misleading the jury.  Therefore, Defendant respectfully requests this Honorable Court to

17
Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 233 of 508
Case 3:08-cr-00134-RJC Document 1143   Filed 04/20/10   Page 17 of 19
**JA1199**

exclude such evidence and strike this Nonstatutory Aggravating Factor from the

Government's Notice of Intent to Seek the Death Penalty.


Respectfully submitted,

April 10, 2010                                                    s/ Mark P. Foster, Jr.
                                                                 Attorney for Defendant
                                                                 NC State Bar #22717
                                                                 Law Offices of Mark Foster, P.C.
                                                                 1011 E. Morehead Street, Suite 300
                                                                 Charlotte, NC 28204
                                                                 Phone 704-347-1809
                                                                 Fax 704-332-2716
                                                                 e-mail:  mpfosterjr@bellsouth.net


                                                                 s/ John Bryson
                                                                 Wyatt Early Harris Wheeler, LLP
                                                                 1912 Eastchester Drive, Suite 400
                                                                 High Point, NC 27261
                                                                 336-819-6016
                                                                 Fax 336-819-6076
                                                                 jbryson@wehwlaw.com

18

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 234 of 508
Case 3:08-cr-00134-RJC Document 50-3   Filed 04/10/10   Page 18 of 19

JA1200

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above **DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COURT TO DETERMINE THE ADMISSIBILITY AND RELIABILITY OF EVIDENCE OF UNADJUDICATED CRIMINAL ACTS BEFORE ALLOWING EVIDENCE TO BE PRESENTED TO JURY IN SENTENCING PHASE** has been duly served on the attorney(s) listed below by e-mail service through ECF on this date:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

April 10, 2010

s/ Mark Foster
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Pone704-347-1809
Fax 704-332-2716
E-mail: mpfosterjr@bellsouth.net

19

**JA1201**

```
               UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                    CHARLOTTE DIVISION



UNITED STATES OF AMERICA        )   DOCKET NO. 3:08-CR-134-2
                                )
                                )
     vs.                        )
                                )
ALEJANDRO ENRIQUE RAMIREZ UMANA )
_____ )


              TRANSCRIPT OF OPENING STATEMENTS
                TAKEN DURING THE GUILT PHASE
        BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
           UNITED STATES CHIEF DISTRICT COURT JUDGE
                      APRIL 12, 2010


APPEARANCES:

On Behalf of the Government:
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204

                  LAURA ANDERSEN, RMR
                 Official Court Reporter
                United States District Court
                 Charlotte, North Carolina
```

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 236 of 508
Case 3:08-cr-00134-RJC Document 1453 Filed 01/30/11 Page 1 of 20

JA1202

2

I N D E X

JURY IMPANELED                                                    4
COURT'S OPENING INSTRUCTIONS                                      4

GOVERNMENT'S OPENING STATEMENT BY MS. ROSE                       11
DEFENDANT'S OPENING STATEMENT BY MR. FOSTER                      17

* * * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 237 of 508
Case 3:08-cr-00134-RJC Document 1283 Filed 01/30/11 Page 2 of 20

JA1203

3

P R O C E E D I N G S

(Interpreters, Maria Lando and Julia Davis.)

THE COURT:  Good morning, everyone.

MR. BRYSON:  Good morning, Your Honor.

MR. FOSTER:  Good morning, Your Honor.

THE COURT:  We're here in the matter of United States V Umana for beginning of trial.  Are there any matters that need to be taken up before we call in the jury, either side?

MR. FOSTER:  No, Your Honor.

THE COURT:  Are you all ready to go, in terms of opening statements?

MR. FOSTER:  Yes, Your Honor.

MS. ROSE:  Yes.

THE COURT:  For those in the spectator section and for counsel advising any family members or other people who may wish to come during the course of the trial, we break every two hours.  And to try to keep the distractions down, in terms of keeping the jury focused on the evidence, I'm going to impose a rule that if anybody leaves during the trial, they won't be allowed back in until a break.  And so at the most, that would be a two hour -- you left right away after a break, within two hours you could come back in.

So if you leave the courtroom and want to come back in, you will have to come back in during a break.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-DSC Document 50-3 Filed 03/23/17 Page 238 of 508
Case 3:08-cr-00134-RJC Document 1453 Filed 01/30/11 Page 3 of 20
JA1204

4

There will be an exception for people working directly with either of the trial teams.

All right.  I'm told that the jurors are here. You all don't have anything that we need to take up, let's call the jury in.

MR. FOSTER:  Your Honor?

THE COURT:  Yes.

MR. FOSTER:  I did want to make a standard motion under Rule 615 to exclude witnesses during the trial.

THE COURT:  Very well.  Except for the case agent, all testifying witnesses will be sequestered.

MR. FOSTER:  Thank you, Your Honor.

THE COURT:  Let's call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Good morning, Members of the Jury.

THE JURY:  Good morning.

Madam Clerk, would you impanel the jury.

(Twelve jurors were selected and passed by the Government and the Defendant.  Four alternate jurors were selected and passed by the Government and the Defendant.  All sixteen jurors were duly impaneled.)

THE COURT:  Members of the Jury, now that you have been sworn and impaneled, I want to give you some preliminary instructions to guide your participation in the trial.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-3   Filed 03/23/17   Page 239 of 508
Case 3:08-cr-00134-RJC Document 453   Filed 01/30/11   Page 4 of 20
**JA1205**

5

I think you all will get a lot better at coming in and out of the courtroom as the trial progresses.

It will be your duty to find from the evidence, what the facts are in this case. You and you alone will be the judges of the facts. You will then have to apply to those facts, the law as the Court will give it to you.

Now nothing the Court may say or do during the course of this trial is intended to indicate in any way what your verdict should be.

The evidence from which you will find the facts, will consist of the testimony of witnesses, documents admitted -- documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to, or that the Court may instruct you to find.

Now certain things are not evidence, and must not be considered by you as evidence, and those things include: Statements, arguments, and questions by the lawyers. Objections to questions are not evidence. The lawyers have an obligation to their clients to object to anything that they believe the rules of evidence don't permit. You should not be influenced by the objection. If the objection is sustained, then you would ignore the question. And if the objection is overruled, you would treat the answer like any other answer.

And if a particular piece of evidence or answer of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 240 of 508
Case 3:08-cr-00134-RJC Document 442-3 Filed 01/30/11 Page 5 of 20
JA1206

6

a witness is -- if the Court instructs you to consider it for a limited purpose, then you, of course, would follow that instruction.

Testimony that the Court tells you to disregard is not evidence and must not be considered. And importantly, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide this case solely on the evidence presented here in the courtroom.

As you know, this is a criminal case and there are basic rules about a criminal case which we went over during the jury selection process, but I want to remind you about it at this time.

First, the defendant is presumed innocent. The indictment against the defendant brought by the government is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant starts out with a clean slate.

Second, the burden of proof is on the government until the very end of the case. The defendant has no burden to prove his innocence, to present evidence, or to testify.

And since the defendant has the right to remain silent, the law prohibits you from drawing any inference against him if he does not testify.

Third, the government must prove the defendant's

Laura Andersen, RMR 704-350-7493

guilt beyond a reasonable doubt.

Now I will give you further instructions on this point later, but bear in mind that in this respect a criminal case is different from a civil case.

Now the defendant has been charged in a Bill of Indictment with conspiracy to engage in racketeering activity from 2003 to the present, by virtue of his association in fact with La Mara Salvatrucha, or the MS 13 gang, whose members are alleged to have participated in murders, robberies, assaults, obstruction of justice and witness retaliation in Mecklenburg County, Guilford County and other locations.

I will give you detailed instructions on the law and a copy of the indictment at the end of the case.  Those instructions will control your deliberation and decision.

Punishment provided by law for the offenses charged in the indictment, should there be a verdict of guilty on any of the offenses, should never be considered by you in any way in arriving at an impartial verdict as to the guilt or lack of guilt of the defendant.

Now, the Court instructs you again that you are the sole judges of the credibility of the witnesses, and the weight their testimony deserves.  While there is no absolute or arbitrary guide or measure by which you shall determine the truthfulness or untruthfulness of a witness, the Court

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 242 of 508
Case 3:08-cr-00134-RJC Document 1443-3   Filed 01/30/11   Page 7 of 20

JA1208

8

will point out to you certain general factors which may assist you in the determination of the credibility of the witnesses.

These include such things as whether the witness has any motive or reason for being truthful or untruthful; the witness' interest, if any, in the outcome of the case; whether there has appeared from the witness' attitude or conduct, any bias, prejudice or feeling which may cause that person's testimony to be influenced; whether the testimony bears the earmarks of truthfulness. And to what extent, if any, it is corroborated or confirmed by other testimony which is not questioned or confirmed by known or admitted facts.

You may also consider the intelligence and mental capacity of a witnesses, and the witness' opportunity to have accurate knowledge of the matters to which the person testifies. I instruct you that you may believe all of what that witness says or none of it. You may believe part and disbelieve part.

Now, a few words about your conduct as jurors.

First, I will instruct you that during the trial you are not to discuss the case amongst yourselves or with anyone else, nor should you permit anyone to discuss it with you.

Until you retire to the jury room at the end of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 59-3 Filed 03/23/17 Page 243 of 508
Case 3:08-cr-00134-RJC Document 443 Filed 01/30/11 Page 8 of 20
JA1209

the case to deliberate on your verdict, you simply are not to talk about the case. If anyone should try to talk to you about it, bring it to the Court's attention promptly.

You may not use any electronic device or media such as a telephone, cellphone, smart phone, I-Phone, Blackberry or computer. You may not use the internet, any internet service or any text or instant messaging service or any internet chat room, blog or web site such as Facebook, MySpace, Linked-in, You-Tube, Twitter or any other electronic communication device to communicate to anyone, any information about the case.

Second, do not read or listen to anything touching on the case in any way.

Do not try to do any research or make any investigation about the case on your own.

And finally, do not form any opinion until all the evidence is in. Keep an open mind until you start your deliberation at the end of the case.

Now, if you wish, you may take notes, but remember, if you take notes, those notes serve merely as an aid to your own memory and not a substitute for your memory.

Now, you may have seen during the jury selection process that occasionally the court will be required to conduct side bar conferences with the attorneys about legal matters, scheduling matters, or other matters that do not

Case 3:16-cv-00057-MOC-DSC Document 50-3 Filed 03/23/17 Page 244 of 508
Case 3:08-cr-00134-RJC Document 143-2 Filed 01/30/11 Page 9 of 20

JA1210

10

concern you.  That is a way for us to effectively use your time rather than excusing you from the courtroom and bringing you back in.  And we do that side bar thing so that -- so that your time is not unnecessarily occupied.  It can be distracting, but I would ask you to bear with us as we go through the trial.

The trial is about to begin.  First, the government will make their opening statement to you, which is simply a forecast of the evidence.  Next, the defense attorney may, but is not required to make an opening statement.  I remind you that opening statements are not evidence.

The government will then present its witnesses and counsel for the defendant may cross examine them.  And following the government's case, the defendant may, if he chooses, present witnesses whom the government may cross examine.

And after all the evidence is in and I've given you general instructions, the attorneys will make their closing arguments.  Then I will instruct you on the law and you will begin to deliberate on the case.

We will begin most mornings at 9:30, and we'll take a morning break, and we will take a break at 1:00 for lunch.  We'll come back at 2:00 and continue with the trial, take an afternoon break, and most days we will finish at

Laura Andersen, RMR 704-350-7493

**JA1211**

11

6:00. Today is a little different in that we will be finishing today at 5:00.

But most days we'll finish at 6:00 because it doesn't do much good to let you out in Charlotte traffic at 5:00. We can get a lot of work done later in the afternoon.

And so those are preliminary instructions from the Court to help you understand the trial as we go forward.

The government ready to begin its opening statement?

MS. ROSE: Yes, Your Honor.

THE COURT: You may do so.

MS. ROSE: Thank you. May it please the Court.

It was a few weeks before Christmas, and in this small family restaurant, everything was decorated. They had garland, they had ornaments, they had a small lit tree in the corner. At the Toys 'R Us next door, shoppers were busy. And in the restaurant there was music, Santa hat. In the center of the restaurant you will hear a group of co-workers were eating dinner together, dining and drinking. In a booth on the side, a couple on a date. In another booth, a mother and a child. It was just a pleasant Saturday evening, dinner time, a few weeks before Christmas.

But then La Mara Salvatrucha came to dinner and everything changed. Words were exchanged. We are La Mara Salvatrucha, don't mess with La Mara Salvatrucha, gunfire,

Laura Andersen, RMR 704-350-7493

**JA1212**

12

chaos, patrons were diving under booths.  It was fear and chaos.

Ruben Garcia, a regular patron, was shot in the chest.  His brother, Manuel, also a regular customer, was shot through the head.  And Ruben and Manuel Garcia died on the cold tile floor of that restaurant a few weeks before Christmas.

And within hours, the defendant was together with some of his gang members, his homies, and he was detailing the events in the restaurant.  A lot of people think that La Mara is a joke.  But if you don't make yourself be respected, they don't respect you.  So I just went pop, pop to them.  Those are the words of the defendant, and you will hear that during the course of this trial.

Now the defendant is at the end of the table in the white buttoned up shirt.  He was introduced to you during jury selection as Alejandro Umana.  During the course of this trial you'll come to know him as Wizard.  That's his gang name; Wizard.

The evidence will show that he came from El Salvador to LA, New York, and then this area, all in relation to the gang.

You may ask yourself, why are we here, here in federal court.  First of all we're here because Ruben and Manuel Garcia died in that restaurant.  But we're also here

Laura Andersen, RMR 704-350-7493

**JA1213**

because MS 13 had established itself in the Charlotte area. We're here because MS 13 wanted to be organized, productive and effective here in the Charlotte area.

And so MS gang leaders from El Salvador and elsewhere sent a strong loyal soldier named Wizard to come to Charlotte to help it become organized, to get with the program, to create fear and respect for MS 13.

We will show during the course of this trial that MS 13 is a criminal enterprise. And a criminal enterprise is just a group of people who joined together for a common purpose over a continuing period of time.

What's the common purpose of MS 13? The evidence will show the common purpose of MS 13 is to establish itself, to grow to get turf and members.

I think the evidence will also show that there really is no legitimate purpose of MS 13, except of course to enrich its members, to enrich them through theft, extortion, robbery, drug dealings, a lot of crimes that you'll hear about through the course of this testimony.

And you will hear from an expert, a gang expert in MS 13. And he'll explain to you the history and the origins of the gang, it's common practices, it's common beliefs.

You will hear from former gang members. Some of whom were co-defendants of this defendant. They will talk to you about their membership in the gang. They will talk

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 248 of 508
Case 3:08-cr-00134-RJC  Document 52-3  Filed 01/30/11  Page 13 of 20

JA1214

14

to you about their activities, their crimes, their actions, and those of the defendant.

You will hear about the common entrance requirement.  Whether you're in El Salvador, New York, D.C., LA, anywhere else in the United States, the entrance requirement for this gang is the same; you're beaten for 13 seconds.  Your fellow gang members beat you in, so that you as a new member are introduced properly, through violence, to the violence yet to come.

You will hear evidence about cliques.  A clique is just a group, part of the bigger organization.  The cliques have names.  Some cliques are local.  Some are nationally affiliated.  But you will hear that the purpose of the clique is to have a group that's organized locally, but also to support members who are jailed, both here in the United States and abroad.

And within these cliques everyone has a nickname. This is Wizard of the Novenas.

And the evidence will show that people who have known each other for years, may not know an individual's true given name, just their gang name.  But that's all they need, because the evidence will show that your clique name and gang name is your ultimate letter of introduction.  It can take you anywhere within the MS 13 network.

You will hear that this group is very organized.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 249 of 508
Case 3:08-cr-00134-RJC  Document 599-3  Filed 03/30/11  Page 14 of 20

JA1215

15

The evidence will show they have common rules, common practices. You must attend meetings. You must pay dues. They have the colors. They have signs. And punishments, if you break a rule. A punishment, 13 second beating, a 26 second beating, or the ultimate punishment you will hear about is the green light, the order to kill on sight.

This group has a motto, a creed, a mission statement, mata, violar, controla (phonetic spellings); murder, rape, control.

They have a mascot, kind of a figurehead, La Bestia, the beast, the devil. The devil horns are seen in their gang signs. The devil horns are seen in the tattoos on their bodies where they dedicate their body to MS 13. You will hear all of this evidence.

You will hear from enforcement witnesses. You will hear from civilian witnesses. You will hear from expert witnesses. You're gonna see photographs. You're gonna see physical evidence, the murder weapon, but there's more.

You, members of the jury, will, through recordings, attend secret MS meetings. You will have an insight into MS that would be otherwise impossible. We have this evidence because you will hear about a young man who in late summer 2007, walked into the police station here in Charlotte. He was an MS member, a young man. He said, I

Case 3:16-cv-00057-MOC Document 50-3 Filed 03/23/17 Page 250 of 508
Case 3:08-cr-00134-RJC Document 523 Filed 01/20/11 Page 15 of 20

**JA1216**

16

want out of MS.  I want out.  He knew that leaving the gang was forbidden.  He knew that cooperating with law enforcement meant death, the green light.  But he did cooperate with law enforcement, and he went to meetings. And he continued to associate with those other gang members. Except this time he was with law enforcement, working and recording.

You'll hear the defendant on these recordings. And you truly will get an insight into this gang.  You will get an insight into a world that has its own rules.  It has its own language.  Yes, it's Spanish, but it's Spanish mingled with Salvadoran dialect and code and gang slang and backwards talk.

A unique language that MS 13 members use to communicate among one another, but they also hope to elude law enforcement in doing so.

Members of the Jury, this really is just a brief overview, as the Judge said, of what is to come.  There will be a lot more evidence, lots of types of evidence.

But when the last witness leaves that witness stand, we will have met our burden of proof on those charges.  And Mr. Nazzaro and I will come back before you, and we'll ask you to convict the defendant.  We will ask you to convict the Wizard.  Thank you.

THE COURT:  Mr. Foster.

Laura Andersen, RMR 704-350-7493

**JA1217**

17

MR. FOSTER:  Thank you, Your Honor.

Good morning, ladies and gentlemen.  It's been a couple weeks since we last spoke.  Again, I'm Mark Foster. I'm one of the attorneys for Alejandro Umana.  My co-counsel, John Bryson.

As the Court's instructed, and as you know, as we stand here right now, no evidence has been presented, Mr. Umana is innocent.  It's only if you come back later and find that all the elements have been proven beyond a reasonable doubt that you can convict.

I want to focus -- there's several counts in this case, but I want to focus on the heart of this case which is the murder counts.  There are two people that were allegedly murdered by our client.  Each murder has been charged in an alternative way.  One is charged to be murder in the aid of racketeering.  In other words, a killing to further his position with MS 13.

The other way each murder is charged alternatively, is to -- that he used and carried a firearm during and in relation to a crime of violence, being conspiracy to engage in racketeering activity, and to commit murder in aid of racketeering.  That's the murder charges.

And I would like to discuss with you now what the defense believes the evidence will show in this case.

The evidence will show that on December 8, 2007,

Laura Andersen, RMR 704-350-7493

**JA1218**

18

in Greensboro, Guilford County, at Las Jarochitas Restaurant, a Mexican Restaurant on High Point Road. It was a Saturday night, and there were some people engaged in dinner and drinking in that restaurant.

Turns out, as far as relevant to this trial, there were two groups of Hispanic males at different tables. One group contained four or five people that included brothers, Juan Manuel Garcia-Salinas and his brother, Ruben.

The evidence will show that those two brothers were originally from Mexico. The evidence will show that they were not gang members. The evidence will show at the time of this incident they were both intoxicated.

The other table had a group of people that were also Hispanic males, essentially of Central American origin.

The evidence will show that during the time that these groups were in the restaurant, a disagreement arose over what music was being played on the juke box. This argument escalated and lead to what happened in this case.

The evidence will show in this case there was no green light put out by anybody in MS 13 to attack or kill the Garcia-Salinas brothers. There was no mention that the MS 13 members that were alleged in that restaurant were armed.

The evidence will show that these brothers that ended up being killed, were not targeted by the MS 13 gang.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 253 of 508
Case 3:08-cr-00134-RJC Document 593 Filed 01/30/11 Page 18 of 20

JA1219

19

Instead, what the evidence will show is, that these people, the two groups, got more and more angry, it escalated and they got to their feet. The two Garcia-Salinas brothers got to their feet. They were intoxicated. The words got to a very angry level. The evidence will show that someone in the other group pulled out a gun, fired shots, and killed the Salinas-Garcia (sic.) brothers.

But the evidence will not show that those killings were done to further the purposes of MS 13, or to further anyone's position with that gang, particularly Alejandro Umana's.

In fact, the evidence in this case will show that there are significant contradictions and inconsistencies regarding the identification of the shooter.

Now, it was asked in opening statement by the government, why is this case in federal court. Well, as far as the murders, it's only in federal court if you find the elements that I discussed earlier. That this was a murder in aid of racketeering to further the position of the person with a gang, or that it was done during and in relation to the crime of violence of participating in racketeering activity, and committing a murder in aid of racketeering activity.

At the end of this case we will be coming back to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-3a Filed 03/23/17 Page 254 of 508
Case 3:08-cr-00134-RJC Document 523a Filed 03/30/11 Page 19 of 20
JAT220

20

you to ask you to return verdicts of not guilty, because ultimately, the evidence in this case will not show that Alejandro Umana killed these brothers to further his position with the gang, or during and in relation to the alleged gang activity.

Therefore at the end of this case, we will assert to you that the government has not met its burden of proof and you should find Alejandro Umana not guilty.

Thank you.

(Please turn to Volume I for the continuation of the trial.)

(End of Proceedings.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.

Dated this the 1st day of November, 2010.

s/Laura Andersen
Laura Andersen, RMR
Official Court Reporter

Laura Andersen, RMR 704-350-7493

**JAT221**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA            )DOCKET NO. 3:08-CR-134-2
                                    )
                                    )
        vs.                         )VOLUME I
                                    )
ALEJANDRO ENRIQUE RAMIREZ UMANA     )
_____ )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 12, 2010

<u>APPEARANCES</u>:

On Behalf of the Government:
    JILL WESTMORELAND ROSE
    Assistant United States Attorneys
    100 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

On Behalf of the Defendant:
    JOHN DAVID BRYSON
    Wyatt, Early, Harris & Wheeler, LLP,
    P.O. Box 2086
    High Point, North Carolina 27261

    MARK PATRICK FOSTER, JR.
    Law Offices of Mark Foster, PC
    1011 E. Morehead Street, Suite 300
    Charlotte, North Carolina 28204



LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JAT222

I N D E X

GOVERNMENT'S WITNESSES:

DAN HORNE
        Direct Examination by Mr. Nazzaro            1

JEFFREY T. COURTET
        Direct Examination by Ms. Rose              7

GEORGE MARSHALL BARNETTE
        Direct Examination by Ms. Rose              10

ANDREW WRENN
        Direct Examination by Ms. Rose              14

J.E. BROWN
        Direct Examination by Mr. Nazzaro           18

FRANK FLORES
        Direct Examination by Mr. Nazzaro           22
        Voir Dire Examination by Mr. Bryson         30
        Cross-Examination by Mr. Bryson             91

CHARLES BARKLEY
        Direct Examination by Mr. Nazzaro           107
        Cross-Examination by Mr. Bryson             113

JEFF BRUNER
        Direct Examination by Ms. Rose              114

EDUARDO VASQUEZ
        Direct Examination by Ms. Rose              119

LENNY MORIERA
        Direct Examination by Mr. Nazzaro           127
        Cross-Examination by Mr. Foster             144

JOHN SLOANE
        Direct Examination by Ms. Rose              146
        Cross-Examination by Mr. Foster             166

GENE RICHEY
        Direct Examination by Ms. Rose              166

JUAN RUBEN VELA GARCIA
        Direct Examination by Mr. Nazzaro           182

* * * * *
Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-3  Filed 03/23/17   Page 257 of 508
Case 3:08-cr-00184-RJC  Document 92-3  Filed 03/30/11   Page 2 of 253

JA1223

E X H I B I T S

GOVERNMENT'S EXHIBITS:

| NO. | | RECEIVED |
|---|---|---|
| 1 | ......................................... | 6 |
| 2 | ......................................... | 20 |
| 3 | ......................................... | 9 |
| 4 | ......................................... | 12 |
| 4a | ......................................... | 70 |
| 5 | ......................................... | 16 |
| 6 | ......................................... | 17 |
| 7 | ......................................... | 71 |
| 8 | ......................................... | 72 |
| 8a | ......................................... | 72 |
| 9 | ......................................... | 73 |
| 10 | ......................................... | 74 |
| 10a | ......................................... | 74 |
| 11 | ......................................... | 75 |
| 11a | ......................................... | 76 |
| 12 | ......................................... | 76 |
| 13 | ......................................... | 77 |
| 13a | ......................................... | 77 |
| 14 | ......................................... | 78 |
| 14a | ......................................... | 78 |
| 15 & 15a | ......................................... | 60 |
| 16 | ......................................... | 90 |
| 17 | ......................................... | 90 |
| 18 | ......................................... | 90 |
| 19 | ......................................... | 39 |
| 20 | ......................................... | 79 & 112 |
| 21 | ......................................... | 80 |
| 22 | ......................................... | 81 |
| 22a | ......................................... | 81 |
| 23 | ......................................... | 82, 179 |
| 23a | ......................................... | 83 |
| 24 | ......................................... | 83, 180 |
| 24a | ......................................... | 84 |
| 25 | ......................................... | 85 |
| 28 | ......................................... | 85 |
| 29 | ......................................... | 87 |
| 30 & 30a | ......................................... | 112 |
| 31 | ......................................... | 144, 159 |
| 34 | ......................................... | 151 |
| 35 | ......................................... | 151 |
| 36 | ......................................... | 154 |
| 37 | ......................................... | 159 |
| 38 | ......................................... | 164 |
| 39 | ......................................... | 162 |
| 40 | ......................................... | 163 |
| 41 | ......................................... | 179 |

Laura Andersen, RMR 704-350-7493

**JAT224**

4

E X H I B I T S

GOVERNMENT'S EXHIBITS:

| NO. | | RECEIVED |
|-----|---|----------|
| 42 | ........................................... | 180 |
| 45 | ........................................... | 177 |
| 49 | ........................................... | 210 |
| 50 | ........................................... | 211 |
| 51 | ........................................... | 212 |
| 52 | ........................................... | 217 |
| 53 | ........................................... | 193 |
| 54 | ........................................... | 189 |
| 55 | ........................................... | 195 |
| 55a | ........................................... | 235 |
| 57 | ........................................... | 241 |
| 59 | ........................................... | 242 |
| 60 | ........................................... | 243 |
| 112 | ........................................... | 88 |
| 114 | ........................................... | 216 |
| 164 | ........................................... | 197 |
| 173 | ........................................... | 196 |
| 227 | ........................................... | 210 |

* * * * * *

COURT INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

Laura Andersen, RMR 704-350-7493

**JAT225**

DIRECT-HORNE

P R O C E E D I N G S

(Opening statements were done in a previous volume.)

THE COURT:  Call your first witness.

MR. NAZZARO:  United States calls Dan Horne.

THEREUPON, DAN HORNE, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good morning, would you please state your name for the jury.

A.    Detective Dan Horne.

Q.    And Detective Horne, what is your occupation?

A.    I'm a detective with the Charlotte-Mecklenburg Police Department, Charlotte, North Carolina.

Q.    And you said detective, is that your current assignment?

A.    That is my current assignment.

Q.    How long have you been a detective?

A.    Approximately four years.

Q.    And how long have you been with the Charlotte-Mecklenburg Police Department?

A.    Just over 11 years.

Q.    What type of other assignments did you have with the police department?

A.    I started out in patrol.  I was on the patrol, third shift, for about five years, five and a half years.  Then I did three years with the schools as a school resource

Laura Andersen, RMR 704-350-7493

JA1226

DIRECT-HORNE

officer in two different schools.  And then I moved to my current position as a detective with the computer forensic unit.

Q.   Now I want to direct your attention to June of 2003, and specifically June 12th and 13th of 2003; what were your duties at that time?

A.   I was a patrol officer working third shift.

Q.   Okay.  What is third shift, if you recall?

A.   Third shift hours were from 10:00 p.m. at night until 6:00 in the morning.

Q.   So working patrol, you were in uniform; is that correct?

A.   That's correct.

Q.   And a patrol car?

A.   Yes.  Marked patrol car in police uniform.

Q.   Do you recall what area of the city you were working in on that occasion?

A.   The police district I was assigned to or CMPD district I was assigned to is called Baker Three or the Independence Division, which is Independence Boulevard/Monroe Road, kind of the eastern section of the city and county.

Q.   And at some point during your shift that evening, did you respond to a call associated with a Blockbuster Video store?

A.   I did.

Case 3:16-cv-00057-MOC Document 50-3   Filed 03/23/17   Page 261 of 508
Case 3:08-cv-00134-RJC   Document 59-34   Filed 03/30/11   Page 6 of 293

**JA1227**

DIRECT-HORNE

Q.   And could you tell us what you did, I mean how you received that information or not -- what information you received that caused you to respond?

A.   I originally was just performing routine patrol.  I believe I was actually flagged down by the manager, or a person who stated that they were the night manager for Blockbuster.  They said that they thought they had seen --

MR. FOSTER:  Objection.

THE COURT:  Hang on.  Listen to the question asked of you and respond to the question, don't elaborate.

THE WITNESS:  Okay.

THE COURT:  Ask your next question.

Q.   (By Mr. Nazzaro) You saw the manager, and after you saw the manager flagging you down, what did you do next?

A.   I proceeded -- she had said that she thought she saw --

MR. FOSTER:  Objection.

THE COURT:  That's not the question that's asked of you.  The question that's asked of you is, what did you do next.  And so answer that question.

THE WITNESS:  I proceeded to the Blockbuster Video.

Q.   (By Mr. Nazzaro) And did you, shortly thereafter arrive at the Blockbuster Video?

A.   As I arrived at the Blockbuster Video -- when I arrived at the Blockbuster Video, I came in from the back, behind

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-3 Filed 03/23/17 Page 262 of 508
Case 3:08-cr-00134-RJC Document 59-3 Filed 03/30/11 Page 720 of 293
JA1228

the backside of the store. I observed some graffiti that had been spray painted on the back of the wall. The back wall is approximately five and a half to six feet tall and stretched probably seven or eight feet along the back of the wall.

I didn't see anybody standing there at the time, and I proceeded down the back of the strip mall next to the Blockbuster to observe -- to see if there were any other markings on any other buildings.

Q.   Did you see anybody at that point in time?

A.   Not at that time when I first arrived on scene, no I did not.

Q.   Did you see anybody subsequent to that?

A.   As I got to the end of the strip mall, I observed a vehicle pull up and several individuals get out of the vehicle and approached the back of the Blockbuster Video, where I just left that had the graffiti marking on it.

Q.   Were you able to observe what those individuals were doing?

A.   Yes.  I observed several individuals standing at the back of the Blockbuster Video with spray painting -- spray paint can in their hand, appeared to be spray painting on the wall.

Q.   What did you do after you observed this?

A.   I radioed for additional units to respond to the scene.

Case 3:16-cv-00057-MOC-JC  Document 50-3  Filed 03/23/17  Page 263 of 508
Case 3:08-cr-00134-RJC  Document 52-3  Filed 01/20/11  Page 8 of 293

JAT229

And I pulled up in my patrol car and exited my vehicle and placed all the individuals under arrest.

Q.   How many individuals were there?

A.   I believe there were four -- four or five.

Q.   Do you recall any of the names of the individuals?

A.   There were two individuals with the last name Ayala. There was -- I don't recall all of their names.

The two individuals with Ayala, I remember just because I thought they might have been related or might have been connected together somehow because of the same last name.

Q.   Did you learn whether they had other names that they went by other than Ayala?

A.   I since learned they --

MR. FOSTER:  Objection; lack of personal knowledge; hearsay.

THE COURT:  Sustained.

Q.   (By Mr. Nazzaro) Do you have any knowledge of the names that they went by other than Ayala, at the time?

MR. FOSTER:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  One of them was -- went by the name of Sixteen, and the other went by the name of Chacua.

Q.   (By Mr. Nazzaro) And they were two of the people that you arrested that day or took into custody?

A.   Yes.

JAT230

DIRECT-HORNE                                      6

Q.   I would like to show you what's been previously marked as Government Exhibit 1, and ask if you recognize Government Exhibit 1?

THE COURT:  You can tilt that monitor.

THE WITNESS:  Yeah.  That's --

Q.   (By Mr. Nazzaro) Just, do you recognize it?

A.   Yes, I do.

Q.   Okay.  Does it depict the scene that you just described that occurred on -- in June of 2003?

A.   Yes, it does.

MR. NAZZARO:  Your Honor, I would move Government Exhibit 1.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

MR. NAZZARO:  Published.

THE COURT:  You may.

(Government Exhibit 1 was received into evidence.)

Q.   (By Mr. Nazzaro) What is Government Exhibit 1, could you describe it in more detail?

A.   The -- this is what I observed on the back of the Blockbuster Video when I approached the scene.  Appears to be some graffiti.  I see an MS, looks like a three.  There's Mara Salvatrucha -- I butchered that I'm sure, but -- and there's some other graffiti markings that I can't

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 265 of 508
Case 3:08-cr-00134-RJC   Document 1231   Filed 01/30/11   Page 16 of 253
**JA1231**

7
DIRECT-HORNE

necessarily make out.

Q.   This is a black and white photo?

A.   Um-hmm.

Q.   Was the drawing in black and white?

A.   No.  It was -- I believe it was blue spray paint.

Q.   Did you recover anything else from the scene, other than the individuals and obviously a photo?

A.   I recovered a can of blue spray paint.

MR. NAZZARO:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. FOSTER:  One moment, Your Honor.

No questions, Your Honor.

THE COURT:  You may step down be excused.

Call your next witness.

MS. ROSE:  The Government will call Officer Courtet.

THEREUPON, JEFFREY T. COURTET, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   Good morning.  If you would please introduce yourself to the jury.

A.   Officer Jeffrey Courtet.

Q.   And you are employed at the Charlotte-Mecklenburg Police Department?

A.   Yes, ma'am.

Q.   How long have you been so employed?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 266 of 508
Case 3:08-cr-00134-RJC   Document 124   Filed 01/30/11   Page 11 of 253
JA1232

DIRECT-COURTET

8

A.   Fourteen years.

Q.   What is your position at the police department at this time?

A.   I'm a patrol officer in the Steele Creek Division.

Q.   How long have you had that position?

A.   Approximately eight years in Steele Creek, my entire time with the police department.

Q.   I would like to call your attention to January the 29th of 2007.  Do you recall getting a call -- a service call related to some graffiti on that particular evening?

A.   Yes, ma'am.

Q.   Tell the jury what happened when you received this particular call?

A.   It was a call for service about graffiti on the back of the North Carolina DMV building at 201 Arrowwood Road.  I responded to it and met the complainant.  She showed me the graffiti on the back of the building.

Q.   And did you, at that time, document the graffiti through photographs or otherwise?

A.   Yes, ma'am.  I took photographs -- I had another officer take photographs and I completed an incident report.

Q.   Was anyone there other than the individual who you met, once you got to the DMV?

A.   DMV was all open, so there would have been several people inside.  The only one I spoke to was the reporting

Laura Andersen, RMR 704-350-7493

**JA1233**

9

DIRECT-COURTET

person.

Q.   I would like to show you at this time what's been marked as Government's Exhibit Number 3.  Do you recognize Government's Exhibit Number 3?

A.   Yes, ma'am.  That's the graffiti from the report I took.

Q.   And does the photograph -- what's shown in Government's Exhibit 3, is that a fair and accurate representation of what you saw when you went to the DMV on that particular occasion?

A.   Yes, ma'am.

MS. ROSE:  I would move to admit Government's Exhibit Number 3, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 3 was received into evidence.)

MS. ROSE:  Move to publish.

THE COURT:  You may.

Q.   (By Ms. Rose) Other than the -- what's depicted within the photograph, was there any evidence there?  Did you locate any spray cans or any other evidence related to the graffiti?

A.   No, ma'am.

Q.   Had you, prior to this occasion, seen graffiti of this

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 268 of 508
Case 3:08-cr-00134-RJC   Document 121-3   Filed 01/30/11   Page 13 of 253
JA1234

DIRECT-BARNETTE

10

nature?

A.    Yes, ma'am.

Q.    MS graffiti?

A.    Yes, ma'am.

Q.    Is the police department active in documenting graffiti, gang graffiti, whenever they encounter it?

A.    Yes, ma'am.

Q.    After you took the report and photographs, did you have any further involvement in this particular investigation?

A.    Follow-up one time with the reporting person, and then after that, no, ma'am.

            MS. ROSE:  All right, sir.  Thank you very much.

            THE COURT:  Any cross?

            MR. BRYSON:  No questions.

            THE COURT:  You may step down be excused.

            Call your next witness.

            MS. ROSE:  The Government would call Officer George Barnette.

THEREUPON, GEORGE MARSHALL BARNETTE, JR., being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.    Good morning.

A.    Good morning.

Q.    Sir, if you would introduce yourself to the jury.

A.    My name's George Marshall Barnett, Jr.

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 269 of 508
Case 3:08-cr-00134-RJC   Document 122-3   Filed 01/30/11   Page 14 of 253
JA1235

DIRECT-BARNETTE

11

Q.    Where do you work, Officer Barnett?

A.    I'm a police officer for the Charlotte-Mecklenburg Police Department.

Q.    How long have you been working at the police department?

A.    Twenty-four years.

Q.    And during that time, what positions have you held?

A.    I've been a patrol officer.

Q.    Have you always been on patrol in the same particular division or areas of --

A.    Separate -- separate areas, but always remained in patrol.

Q.    I want to direct your attention to June 19 of 2007, and ask if you, on that occasion, responded to 3601 South Boulevard regarding some graffiti?

A.    Yes, ma'am, I did.

Q.    When you got to South Boulevard, what did you see?

A.    The business was called the Carolina Rock Shop.  And on the side of the building, the south side of the building there was some graffiti sprayed painted on the side, type of a royal blue shade, a shade of blue.

Q.    Was anyone there when you arrived?

A.    The owner of the company.

Q.    Other than the owner of the company, anyone else?

A.    No, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 270 of 508
Case 3:08-cr-00134-RJC   Document 129-3   Filed 01/30/11   Page 13 of 253
JA1236

DIRECT-BARNETTE

Q.   Once you had a chance to see what the nature of the call was, what did you then do, what further investigation?

A.   Examined the graffiti, got a camera, photographed the graffiti, and then subsequently turned in those photos into our property control bureau for storage.

Q.   Let me show you what has previously been marked as Government's Exhibit Number 4.  Ask you if you are able to identify Government's Exhibit 4?

A.   Yes.  That's one of the photographs taken of the graffiti.

Q.   And does the photograph fairly and accurately represent what you saw on this occasion?

A.   Yes, ma'am it does.

          MS. ROSE:  I would move to admit Government's Exhibit 4, Your Honor.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

(Government Exhibit 4 was received into evidence.)

          MS. ROSE:  Move to publish.

          THE COURT:  You may.

Q.   (By Ms. Rose) Officer Barnett, how large was the graffiti that we see in Government's Exhibit 4?

A.   Roughly from -- being from the ground up to the top of it, be in the area of approximately 6 to 7 feet.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 271 of 508
Case 3:08-cr-00134-RJC   Document 123-8   Filed 01/30/11   Page 16 of 253

**JA1237**

DIRECT-BARNETTE

13

Q.    What does the graffiti say, the first letters there?

A.    To me it appeared to be MS.

Q.    Had you seen graffiti of this nature previously?

A.    Yes, ma'am.

Q.    You indicated that when you took the photographs, you then turned them into property control.  Is that something that is a standard practice within the police department, documenting graffiti?

A.    Yes, ma'am.  We photograph it for evidence purposes. And then we turn it into our central storage facility where they store and keep the evidence until it's needed.

Q.    The letters P-V-L-S also appear in the photograph, Government's Exhibit Number 4; do you have any idea what that means?

A.    No, ma'am.

Q.    Any experience with MS 13?

A.    I'm not familiar with those initials.

        MS. ROSE:  All right, sir.  Thank you.

        I don't have any other questions at this time.

        THE COURT:  Any cross?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  You may step down, be excused.

        Call your next witness.

        THE WITNESS:  Thank you, sir.

        MS. ROSE:  The government would call Officer

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 272 of 508
Case 3:08-cr-00134-RJC   Document 124   Filed 01/30/11   Page 17 of 253
JA1238

DIRECT-WRENN

14

Andrew Wrenn.

THEREUPON, ANDREW WRENN, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   Good morning, officer.

A.   Good morning.

Q.   If you could tell us your name.

A.   Officer Andrew Wrenn.

Q.   You're with the CMPD?

A.   Yes, ma'am.

Q.   How long have you worked with the police department?

A.   Eleven years.

Q.   What are your duties?

A.   I was a patrol officer for ten and a half years currently assigned to training academy as an instructor.

Q.   During the time that you were a patrol officer, I want to direct your attention specifically to September 13th, 2007.  Did you have occasion to respond to a call for graffiti?

A.   Yes, ma'am.

Q.   Where was that call?

A.   200 block of Dinadin Lane.

Q.   In what area of Charlotte is that located?

A.   Southwest Charlotte off of Nations Ford Road.

Q.   What type of building is that?

A.   It's a multi-complex apartment building.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/23/17    Page 273 of 508
Case 3:08-cr-00134-RJC   Document 120    Filed 01/30/11   Page 18 of 253
JA1239

DIRECT—WRENN

Q.   When you got to the building, what did you see?

A.   Specifically to the graffiti?

Q.   Yes.

A.   Okay.  I saw written, "cop killin" were the words that was written in the graffiti there.  And additionally, I believe there was a word contra, C-O-N-T-R-A.

Q.   Let me ask you this.  When you got to the scene, was there anybody there, did you meet anybody there?

A.   No.  No one was there.

Q.   Was it your standard practice, at that time while on patrol to document graffiti, particularly if it appeared to be gang graffiti?

A.   Yes.

Q.   All right.  And did you do so on this occasion?

A.   I did, I took photos.

Q.   All right.  I'm going to show you two exhibits; first Government's Exhibit Number 5.  Do you recognize Government's Exhibit Number 5?

A.   Yes, I do.

Q.   Is that a photograph that you took?

A.   Yes, it is.

Q.   Does it fairly and accurately represent part of what you observed on that occasion?

A.   Yes, it is.

            MS. ROSE:  The government would move to admit

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 274 of 508
Case 3:08-cr-00134-RJC   Document 128-3   Filed 01/30/11   Page 19 of 253
JA1240

16
DIRECT—WRENN

Government Exhibit 5, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  Yes, Your Honor; relevance.

THE COURT:  Overruled.  Let it be admitted.

MS. ROSE:  Publish.

THE COURT:  You may.

(Government Exhibit 5 was received into evidence.)

Q.   (By Ms. Rose) I'll also -- is that a fair and accurate representation, sir?

A.   Yes.

Q.   Did you, at that point, have any indication, just based on what you see in this photograph, Government's Exhibit Number 5, to whom this related or any particular gang?

A.   No.

Q.   I'll also then show you what has been marked as Government's Exhibit Number 6.  Do you recognize Government's Exhibit Number 6?

A.   I do.

Q.   Is that a part or a second portion of the photograph which you took?

A.   It is.  Yes, ma'am.

Q.   Does that fairly and accurately represent you what saw on that occasion?

A.   Yes.

MS. ROSE:  I move to admit Government's Exhibit

Laura Andersen, RMR 704-350-7493

**JA1241**

Number 6, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No objection.

THE COURT:  Let it be admitted.

(Government Exhibit 6 was received into evidence.)

MS. ROSE:  May I publish the exhibit, Your Honor?

THE COURT:  You may.

Q.   (By Ms. Rose) Do you speak Spanish?

A.   Very little.

Q.   Did you know the meaning of the Spanish words or what appear to be Spanish words within Government's Exhibit Number 6?

A.   No, ma'am.

MR. BRYSON:  Objection.

THE COURT:  Overruled.

Q.   (By Ms. Rose) Have you seen graffiti of this nature before, that is, the MS or the 13?

A.   I have.

Q.   In what area of town had you seen it on other occasions?

A.   The same area of town, southwest Charlotte where I worked patrol.

Q.   Did you photograph and document this graffiti on other occasions, as well?

A.   Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 276 of 508
Case 3:08-cr-00134-RJC   Document 120   Filed 01/30/11   Page 21 of 253
JA1242

DIRECT-BROWN

Q.   Other than taking the photographs that have been presented to the jury, Government's Exhibits 5 and 6, did you conduct any further examination at this particular location?

A.   No, ma'am.

MS. ROSE:  Thank you.  I don't have any other questions.

THE COURT:  Any cross?

MR. BRYSON:  No questions.

THE COURT:  You may step down, be excused.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MR. NAZZARO:  J.E. Brown.

THEREUPON, JAMES E. BROWN, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good morning.  Would you please state your full name.

A.   James E. Brown.

Q.   And Mr. Brown, how are you currently employed?

A.   I'm an officer with the Charlotte-Mecklenburg Police Department.

Q.   Officer Brown, how long have you been with the police department?

A.   About eight and a half, almost nine years.

Q.   Are you a patrol officer, or do you have other duties?

A.   Patrol officer slash community coordinator.

Laura Andersen, RMR 704-350-7493

DIRECT-BROWN

Q.   What's a community coordinator?

A.   Basically a liaison between the communities and the police department.

Q.   Now, I want to direct your attention to August 18, 2007.  Were you working on that particular day as a patrol officer?

A.   Yes, sir.

Q.   Did you have occasion to be at the Cedars Court Apartment area and observe some graffiti?

A.   Yes, sir.

Q.   Could you tell the jury a little bit about that area of the city, where it is, the Cedars Court area that I referred to?

A.   It's basically the crossroads of Idlewild Road and Independence Boulevard, U.S. 74.  Just another apartment complex with approximately 460 units.

Q.   Is it a residential area then?

A.   Residential and multi-use or multi-family types of apartment complex, and also single family homes.

Q.   On that particular day in August of 2007, did you have occasion to observe some graffiti in that area?

A.   Yes, I did.

Q.   And what did you observe?

A.   I observed graffiti on the backside, and the side of a apartment building in Idlewild Apartments.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 278 of 508
Case 3:08-cr-00134-RJC   Document 121-3   Filed 01/30/11   Page 23 of 253
**JA1244**

DIRECT-BROWN

Q.   I would like to show you at this time, what's been previously marked as Government Exhibit 2.  Are you able to recognize Government Exhibit 2?

A.   Yes, sir.

Q.   And is that a fair and accurate representation of the writings and graffiti that you observed August 18, 2007?

A.   Yes, sir.  I took that picture.

MR. NAZZARO:  I would like to move Government Exhibit 2, Your Honor, ask that it be published.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.  You can publish.

(Government Exhibit 2 was received into evidence.)

Q.   (By Mr. Nazzaro) You said you took that picture; is that right?

A.   Yes, sir.

Q.   Now where is this writings -- is it attached to the apartment complex?

A.   It is basically, what is -- that picture that's on there, it's on a like a storage area behind that apartment.

Q.   Did you see anybody when you were there?

A.   No, I did not.

Q.   And you said you took the picture; is it your practice to document these types of graffiti?

A.   Yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 279 of 508
Case 3:08-cr-00134-RJC   Document 157   Filed 01/30/11   Page 24 of 253
JA1245

Q.   And why is that?

A.   Due to the fact of the sheer damage to property of that nature, and also to document the gang type of graffiti.

Q.   And do you have any knowledge based on your experience of the writings that are on there anything on there?

A.   I recognize MS and then the cross there and the three that's basically Mara Salvatrucha, Sur 13.

Q.   Do you see the three dots at all?

A.   Yes, I do.

          MR. FOSTER:  Objection; lack of foundation.

          THE COURT:  Sustained.

Q.   (By Mr. Nazzaro) Is there any other parts of this graffiti that you recognize?

A.   Just other types of Latino writing.

Q.   Have you ever encountered this type of graffiti before in that area?

A.   Yes, I have.

Q.   Have you encountered it in other areas of Charlotte?

A.   Yes, I have.

Q.   Have you documented that?

A.   Yes, I have.

          MR. NAZZARO:  No further questions, Your Honor.

          THE COURT:  Any cross?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  You may step down, be excused.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 280 of 508
Case 3:08-cr-00134-RJC   Document 1230   Filed 01/30/11   Page 23 of 253
JA1246

DIRECT-FLORES

22

Call your next witness.

MR. NAZZARO:  Frank Flores, Your Honor.

THEREUPON, FRANK FLORES, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good morning.  Could you please state your name.

A.   Yes.  Frank Flores.  Frank, F-R-A-N-K.  Flores, F-L-O-R-E-S.

Q.   Mr. Flores, you can maybe push that screen down for now.  I'm not going to show you anything right away.

Mr. Flores, how are you employed, sir?

A.   I'm a detective with the Los Angles Police Department in the City of Los Angles.

Q.   How long have been employed with the Los Angles Police Department?

A.   I've been a police officer just over -- almost 14 and a half years now.

Q.   Has your whole career in law enforcement been with Los Angeles Police Department?

A.   Yes, sir.

Q.   And Mr. Flores, do you speak any other languages other than English?

A.   Spanish.

Q.   Are you fluent in Spanish?

A.   Yes, sir.

Q.   And in the 14 years that you've been with the Los

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 281 of 508
Case 3:08-cr-00134-RJC   Document 1291   Filed 01/30/11   Page 26 of 253
JA1247

DIRECT-FLORES

Angeles Police Department, have you had a number of different assignments?

A.   Yes, sir.

Q.   And could you describe some of the assignments and type of work you've done with the Los Angeles Police Department?

A.   Yes, sir.  My career began in patrol assignment.  I spent my first year learning my job duties as a young police officer.  From that I transferred to a different division.  There are roughly, 20 geographical divisions within the Los Angeles Police Department.

Once I arrived at a new division, I worked again patrol function.  From there I went and I worked a vice assignment.  From the vice assignment I graduated into a gang assignment where I worked a uniform gang assignment the patrol, suppression portion of working gangs in Los Angeles, collecting intelligence, monitoring gang activities, and responding to calls, physically.

From that assignment I graduated to a detective assignment working homicides, focusing primarily again on gangs.  I worked that from the investigative aspect of -- once the crime report or crime occurs, coming in, picking up the pieces and going forward with that.

From that assignment, which I stayed for a good portion of my career.  I graduated into a task force assignment working with the Federal Bureau of Investigation.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 282 of 508
Case 3:08-cr-00134-RJC   Document 139-6   Filed 01/30/11   Page 27 of 253
JA1248

24
DIRECT—FLORES

Q.    I would like to stop you there for a second, I want to talk about that.  I want to just go back a little bit to the uniform suppression.  Is that what you referred to it as?

A.    Yes, sir.

Q.    And that's, sir, you're obviously in uniform during that period of time; is that right?

A.    Yes, sir.

Q.    And it's a specific gang type of program?

A.    Yes, sir.

Q.    And could you describe a little bit more detail exactly what type of activities you do?

A.    Yes.  In Los Angeles, the gang assignments are broken down, depending on the amount of officers that are tasked with focusing on -- in a specific area, focusing on gangs. Assignments are broken down by gangs.

You'll have certain officers that -- in my case spoke Spanish, I would deal with primarily the gangs that were Spanish speaking.

I grew up in Los Angeles, so my task as a Spanish speaker and knowing the area, I dealt primarily with Mara Salvatrucha.  Yet other officers that were assigned some of the smaller gangs based on abilities or other skills, language skills.

Q.    And so with respect to uniform suppression, you were working La Mara Salvatrucha?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 283 of 508
Case 3:08-cr-00134-RJC   Document 1241   Filed 01/30/11   Page 28 of 253

JA1249

DIRECT—FLORES

A.    Yes, sir.

Q.    When you said as a detective you were investigating gangs and the crimes they commit?

A.    Yes, sir.

Q.    Did that involve La Mara Salvatrucha?

A.    Primarily because my primary focus from the suppression aspect was Mara Salvatrucha, I developed a certain expertise, a certain connection with the community.  So part of my duties as active as Mara Salvatrucha was during my early assignment.

A lot of the cases that I worked in homicide, came back to areas where Mara Salvatrucha claimed were prevalent or were suspects in the cases.

Q.    And before, I guess, interrupted you and went back, you were talking about your experiences with this FBI task force; is that right?

A.    That's my current assignment, yes, sir.

Q.    How long have you been in that assignment?

A.    Roughly four years now.

Q.    And what type of work do you do with this FBI task force?

A.    It is similar to my functions as suppression or investigative.  It just gives me the ability to focus on certain aspects of the investigation a little bit longer.

We incorporate homicides, robberies, extortions.  So we

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 284 of 508
Case 3:08-cr-00134-RJC   Document 1246   Filed 01/30/11   Page 23 of 253
**JA1250**

investigate the whole gamut of the gang.  But it gives me primarily the focus -- the ability to focus on certain targets or individuals or areas.  It gives us a prolonged ability to leave a more lasting impression.

Q.   And with respect to your work with the FBI task force, are you -- you're a Los Angeles police officer, but are you deputized as a federal FBI officer also?

A.   Yes, I am deputized.

Q.   And with respect to your 14 year career working as you indicated primarily in gangs, how many of those years have been dedicated to La Mara Salvatrucha?

A.   I began working gangs in the suppression aspect in roughly March, 1999.  I've been working gangs ever since.

Q.   And how about La Mara Salvatrucha?

A.   That was my original assignment, and I've stayed with it since.

Q.   Does your experience with that -- La Mara Salvatrucha's also known as the MS 13; is that right?

A.   Yes, sir.  Mara Salvatrucha, MS 13.

Q.   Does it include interviewing gang members?

A.   Yes, sir.

Q.   And have you conducted those interviews?

A.   Yes, sir.

Q.   And how many of those interviews have you been able to conduct throughout your career?

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 285 of 508
Case 3:08-cr-00134-RJC   Document 1251   Filed 01/30/11   Page 36 of 253
**JA1251**

DIRECT-FLORES

A.    I would say well in excess of 2,000, either admitted, suspected members of Mara Salvatrucha, associates.  Through the course of probably a couple thousand investigations, stemming from homicide down through vandalism.

Q.    How has that experience, interviewing MS 13 members, how has that been helpful to you in learning about the MS 13?

A.    It's contributed a great deal to my knowledge of the gang.  Gives me some insight.  You're able to kind of take some of the information, learn from it, also verify that some of the information they are telling you is also true.

Incorporating that with my actual experience, working the streets, not only dealing with the gang members or suspected gang members, but the people that live within the community people, the people that work within the community, gives you definite insight that no other assignment can give you.

Q.    And you may have mentioned this, but how many investigations involving the MS 13 have you been involved in?

A.    I would probably estimate well over a couple thousand, as well.

Q.    And does your experience also include working with other law enforcement agencies, other than just in Los Angeles?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 286 of 508
Case 3:08-cr-00134-RJC   Document 1252   Filed 01/30/11   Page 32 of 253
**JA1252**

DIRECT—FLORES

28

A.   Absolutely.

Q.   And could you describe that experience?

A.   Dealing with Mara Salvatrucha, which is fairly widely spread throughout the United States and other parts of Central America, and due in part to a lot of the expertise we developed in Los Angeles where Mara Salvatrucha originated from, we received, and I received a lot of requests for information for intelligence, for training, just for general intelligence sharing.  Because we do have a lot of movement of gang members, not only within California, the United States, but to and from Central America.

So, get requests from other FBI agencies or officers, other states and other federal law enforcement agencies, also law enforcement in other countries from Canada, all the way down through El Salvador.

Q.   And have you ever worked with FBI National MS 13 Task Force?

A.   Yes, sir.

Q.   And what is that task force?

A.   It's the national gang task force that focuses on facilitating or assisting local agencies with cases involving Mara Salvatrucha.

Q.   And as part of your experience, have you also attended any trainings concerning MS 13?

A.   Yes, sir.

Laura Andersen, RMR 704-350-7493

DIRECT-FLORES

Q.   Could you describe some of those?

A.   Yes.  It's -- training is a constant with law enforcement, particularly dealing with gangs and trends, a lot of things change, and information is always fluid.

So quite regularly we have informal and formal trainings.  Some of the formal trainings I've been apart of and where I've taught and also had the ability to sit and learn through as well, have been functions sponsored by the FBI, sponsored by different California associations.  Which I'm a part of, California Gang Investigator's Association, California Homicide Investigator's Association, the International Latino Gang Investigator's Association.

I've flown to and participated in training in other states as well.  Which has kind of afforded me wide respect of training in regards to gangs and specifically Mara Salvatrucha.

Q.   So you've attended trainings, but you've also participated as an instructor?

A.   Yes, sir.

Q.   Has that included any international work?

A.   Yes, sir.

Q.   Could you describe that?

A.   One of our International trips involved a trip down to El Salvador where we met and had some training with the National Police of El Salvador, the PNC.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 288 of 508
Case 3:08-cr-00134-RJC   Document 1203   Filed 01/30/11   Page 33 of 253
JA1254

Q.   And from your work experience and your training experience, have you become familiar with the history, structure, rules and organization of the MS 13?

A.   Yes, sir.

Q.   Have you previously been qualified as an expert in either state or federal court in discussing these matters concerning the MS 13?

A.   Yes, sir.  I've qualified as an expert in both state and federal court.

Q.   And how many times has that occurred, if you recall?

A.   Federal court -- state court well over 80 occasions, just an estimate.  And state court -- I mean, federal court, I'd say at least a half a dozen times.

         MR. NAZZARO:  Your Honor, at this time I would move Detective Flores to render opinions on La Mara Salvatrucha, including its history, structure, rules and organization.

         THE COURT:  Any voir dire?

         MR. BRYSON:  Yes, Your Honor.

         THE COURT:  You may.

VOIR DIRE EXAMINATION BY MR. BRYSON:

Q.   All of your experience with MS 13 comes from your work as a police officer, correct?

A.   Correct.

Q.   You've never studied the group in an academic setting?

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 289 of 508
Case 3:08-cr-00134-RJC   Document 1255   Filed 01/30/11   Page 34 of 253
JA1255

VOIR DIRE-FLORES

A.  I've never personally studied it from that academic setting.  We do deal with a lot of people from the academic world that inquire.  And I've heard their opinions and talked to them about their opinions.

Q.  Have you ever taken any formal college courses that dealt with MS 13?

A.  No.

Q.  Have you ever conducted any studies on MS 13?

A.  No.  Outside of my police work, no.

Q.  Okay.  You never published any papers on MS 13?

A.  No, sir.

Q.  Most of your knowledge from MS 13 -- about -- excuse me.  Most of your knowledge about MS 13 comes from your speaking directly with MS 13 members?

A.  No, that's part of it, is my personal conversations.  But not only with members, suspected members, people within the community.

And the totality of my experience, both from interviews from what personally I've observed or been privileged to, conversations from wiretaps, taken the totality of my experience.

Q.  Wouldn't the primary part of it be from speaking with MS 13 members?

A.  I would say a portion of it, not primary.

MR. BRYSON:  Those are my questions.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 290 of 508
Case 3:08-cr-00134-RJC   Document 1256   Filed 01/30/11   Page 33 of 253

JA1256

DIRECT—FLORES

THE COURT:  Very well.  I will permit Detective Flores to offer an opinion in the areas specified.

MR. NAZZARO:  Yes, Your Honor.  Thank you.

CONTINUED DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Detective Flores, is there a generally accepted definition of gangs in law enforcement that you use?

A.   Yes, sir.

Q.   And what is that definition?

A.   By definition, a gang is considered a group of three or more persons with a common name, sign or symbol; where the members individually or collectively engage in a pattern of criminal activity, which creates a sense of fear and intimidation in the community.

Q.   Does La Mara Salvatrucha or the MS 13 meet that definition?

A.   Yes, sir.

Q.   What are the origins of the MS 13?

A.   The MS 13 gang or Mara Salvatrucha originated in Los Angeles.

Q.   Could you describe how it came into being?

A.   Yes, sir.  The origin being the gang was created initially out of self-protection.  During the mid 1980s, there was a great deal of people that were fleeing from Central America.  A good portion of these people were from primarily El Salvador, you had some from Honduras, that

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 291 of 508
Case 3:08-cr-00134-RJC   Document 1257   Filed 01/30/11   Page 36 of 253
**JA1257**

33

settled into what is considered the west side of Los Angeles, a portion just west of downtown LA.

During the mid eighties, you already had several prevalent gangs, primarily Mexican street gangs existed in that area.

When you had this group of people settle in, all of a sudden there's some cultural differences, there's some definite biases there. A lot of the youth, the Central American youth were not allowed to join the existing Mexican street gangs.

A lot of this youth was victimized, they were preyed upon. So Mara Salvatrucha originally was formed out of self-protection.

And when you take the name or the definition of Mara Salvatrucha, what it means, mara is a slang term for a group of people, a mob, a gang. It's taken after a small indigenous ant to Central America, the Marabunta ant. And you take the word salva, Spanish for save or saviors. And trucha, it's also a fish. But it's also used as slang for look out.

And you take the combination of the words, we are the saviors, mara. Salva, we are the saviors. Trucha, look out.

It's kind of a warning shot against the gangs and other people that have preyed upon them at that time. We are the

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 292 of 508
Case 3:08-cr-00134-RJC   Document 1212   Filed 01/30/11   Page 37 of 253

**JA1258**

DIRECT-FLORES

saviors, look out.

So it goes back to the origin of the gang out of self-protection as it was originally formed.

Q.   And did it transform into something other than self-protection?

A.   Yes, sir.

Q.   And what did it transform into?

A.   It transformed into another local -- at that time, when it originated, another street gang.  It took on the same characteristics, the same activities, the same territorial type behavior which involved the violence and the other criminal activity that we saw in other street gangs.

Q.   And what has it transformed into today?

A.   It's transformed into a more transnational gang. Again, with the presence in various states throughout the U.S. and other countries, from Canada down through all parts of Central America.

Q.   Now you mentioned about the name, La Mara Salvatrucha. It's also -- I referred to it as the MS 13.  Could you describe what the 13 is all about, and the MS, is that just the abbreviation?

A.   Yes.  MS is the abbreviation for Mara Salvatrucha. Thirteen is something that's more localized to California, specifically southern California.

Within the California prison system there is a -- what

Laura Andersen, RMR 704-350-7493

**JA1259**

35

originated as a prison street gang, a prison gang, which was known as the Mexican Mafia.  It was a small group of members from various street gangs in California, which banned together to seize control, and exert control of the prison system.

As that organization graduated out to the streets, it took control of the oversight and the influence on a lot of street gangs throughout southern California.

So, as part of the gang world, a lot of gang members understand that they will eventually go to jail, eventually go to prison.  And there is where the Mexican Mafia exerts its control.

So, and part -- being part of that organization, the Mexican Mafia has street gangs which are divvied up between other mafia members.

Kind of in a situation where you have, best way to describe it, you have congressmen, Mexican Mafia members that represent specific areas.  And they collect taxes from specific street gangs that are within that territory, Mara Salvatrucha being one of them.

As part of their participation, or being part of this umbrella under the Mexican Mafia, all of these street gangs add a 13 or Sur, representing south.

And this is to show their allegiance to the Mexican Mafia, to show that they are paying their taxes, paying

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/28/17   Page 294 of 508
Case 3:08-cr-00134-RJC   Document 1258   Filed 01/30/11   Page 35 of 253
**JA1260**

36

DIRECT-FLORES

homage to this over-body that oversees most Hispanic street gangs in southern California. It's due to respect.

Thirteen, being the thirteenth letter of the alphabet. M, M for Mexican Mafia. So we will see the majority of our street gangs in southern California that have a 13. Or you'll see Sur, which is Spanish for south, or some reference to south side, south.

Again, it's paying homage to Mexican Mafia, which is very influential to Hispanic street gangs in southern California, and now moving up into northern California.

Q. And you mentioned a lot about Los Angeles and LA and the origins there. Has the MS 13 gang spread outside of Los Angeles?

A. Yes, sir.

Q. And how has it done that, in your opinion?

A. Well, my opinion, for various reasons, one of them, obviously deportation. Law enforcement efforts, which has pushed a lot of members to flee and move to other areas.

Been financial reasons, simply due to the fact that some of these families are able to find jobs in other states more easily. You know, they move here for opportunity. By happenstance some of their kids involved with gangs go with them. And it aides the spread of the gangs into other areas.

Q. When we say other areas, are we talking about in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 295 of 508
Case 3:08-cr-00134-RJC   Document 127-3   Filed 01/30/11   Page 40 of 253

JA1261

DIRECT-FLORES

continental United States or outside of the United States?

A.    Both.

Q.    Where?

A.    Well, we look at places like Canada, other parts of the U.S, of course.  But Canada, into Mexico, Honduras, El Salvador have always had a presence, Guatemala.  And they start to look into other places, Nicaragua, other places where the gang is beginning to spread.

Q.    Do you know how many states it's spread to in the United States?

A.    We -- the estimate from my dealings, roughly 40 -- little over 40, I believe.

Q.    And is there a quantifiable number of MS 13 members in the United States?

A.    I could just give you a rough estimate.  Roughly between 8 to 12,000, within the United States.

Q.    Is there a number associated with amount of MS 13 outside the United States?

A.    Primarily in Central America, I believe that number would go into the tens of thousands, 20 to 30,000.

Q.    And you say primarily Central America, what are the primary countries that the MS 13 is present in Central America?

A.    Primarily the strongholds would be El Salvador, Honduras, significant presence in Guatemala, and there is an

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MGC   Document 50-3   Filed 03/28/17   Page 296 of 508
Case 3:08-cr-00134-RJC   Document 124   Filed 01/30/11   Page 41 of 253
JA1262

DIRECT-FLORES

emerging presence in Mexico as well.

Q.   Now, with respect to the spread to other states, what is the relationship in the organization with MS 13 in other states, and the MS 13 either in Los Angeles or El Salvador?

A.   My experience, of course because my years working the gang, there are -- what I would describe generally as two hubs of power.  Two areas where a member comes from or a member has spent time, there is some respect, added respect that's given; El Salvador being one, Los Angeles being another.

Los Angeles being the origin of the street gang kind of seen as -- best way I can describe it, kind of a mecca.  If you've been there, been through there, you earned certain added respect.

El Salvador being a country of origin for a lot of these members.  Also very significant, because it is also a very violent place to exist and survive it.

Q.   Do you know if the MS 13 operates in prisons in El Salvador and the United States?

A.   Yes.

Q.   Like to show you Government 19.  Do you recognize this as a map of the United States?

A.   Yes, sir.

MR. NAZZARO:  Your Honor, I would move Government 19 and ask that it be published.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 297 of 508
Case 3:08-cr-00134-RJC   Document 1343   Filed 01/30/11   Page 42 of 253
JA1263

DIRECT-FLORES

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 19 was received into evidence.)

Q.   (By Mr. Nazzaro) This depicts where El Salvador is, is that correct as relation to the United States?

A.   Yes, sir.

Q.   And the other countries are referenced Guatemala, Honduras, they are located adjacent to El Salvador?

A.   Yes.  Further up you would have Guatemala, Honduras then Mexico, which is immediately south of the U.S. border.

Q.   I suppose you can pick LA, although that' not marked?

A.   I believe I can.

Q.   Now, with respect to the organization of the MS 13, in your experience and based on your investigations and other expertise, how is the MS 13 organized?

A.   MS 13 is organized, as I would describe, it's broken down into cliques.  Cliques, best way to describe a clique is kind of like into a McDonald's franchise.

You have a portion of the organization that has the ability to exist in various parts.  And it exists in various parts of the state or country.  In this case, in parts of the world, broken down into cliques.

A clique can be named after a particular street, an area, or even a park.  But it allows the gang to exist in

Laura Andersen, RMR 704-350-7493

**JA1264**

40

different parts of the states or the world.  But it's a function part of the whole.  They're representing the same gang.  You see a lot of the same behaviors, same graffiti.

Oftentimes I've seen graffiti -- you know, oftentimes I've seen graffiti from a particular area, and I can't tell whether that's Los Angeles or that's New York, unless there's some point of reference in the background.  Because a lot of the graffiti, a lot of these activities are the same.

Q.   And these particular cliques which you kind of referred to with the McDonald's analogy, are they all part of the MS 13, or do they operate separate and apart from the MS 13?

A.   No.  They are a part of the whole.  They have a different organizational group within the clique, which is dependent on the amount of members in the clique; how long the colleague has existed; how many influential members that clique has.  And that is tied into how long it -- the clique has existed.

You have some cliques in Los Angeles that originated with the gang.  So you have a long-standing history of long influential members.  So time, and the time a member has in the gang, representing that clique, adds to the ability to the clique to be influential overall.

Q.   What are some of the larger well-known cliques that you know of, based on your experience?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 299 of 508
Case 3:08-cr-00134-RJC   Document 1341   Filed 01/30/11   Page 44 of 253
JA1265

DIRECT-FLORES

A.    Los Angeles, some of the original cliques that we look at involve the Normandie clique, which is a street in Los Angeles.  The leeward clique, which is also a street in Los Angeles.  Hollywood clique, which is an area of Los Angeles, the southern portion of Hollywood.  Francis; Park View.

These are some other streets where you have a lot of older members, members that originated.  So you have a lot of influence from some of these cliques, just because of the name and the fact that they are old.

Q.    Have you ever heard of the abbreviation NLS?

A.    Yes, sir.

Q.    What does that stand for?

A.    NLS, I would understand that -- I would read that as abbreviation for Normandie clique.  NLS Normandie locals, NLS.

Q.    What about PVLS?

A.    PVLS, I would read that as Park View Locals.

Q.    And you mentioned -- well, let me ask you more about cliques and the names.  Are there cliques that originate in Central America, and El Salvador?

A.    Yes.

Q.    And do they have particular names?

A.    Yes.  There are cliques that originate within El Salvador, and those also would be named after something close, whether it's a street, an area or a park.

Laura Andersen, RMR 704-350-7493

**JA1266**

DIRECT-FLORES

You do have some LA cliques, Park Views, Normandies, Hollywood, that have kind of established chapters in other countries.

So you will have members from say the Hollywood clique in El Salvador, that have never seen even the Hollywood sign.  They have never seen a street in Los Angeles.  But they'll strongly claim Hollywood clique, because that's the clique that they were jumped into.

So, sometimes you'll see, you know, Normandie clique.  And it's wow, this guy's not even Normandie.  This clique is 3,000 miles away.  But because they've established other chapters, it has the ability to have the clique in different parts of the U.S.

Q.   What about Novena?

A.   I've heard of that clique.  It's not a clique from Los Angeles.  I believe it's a clique that originated in El Salvador.

Q.   And with respect to -- you talked about the different cliques.  Are there any types of differences among the cliques, as far as how they operate?

A.   No.  Again the -- it's all dependent upon the amount of members, the influence and some cliques are more tightly run, a lot more powerful, a lot more organized.

But it's all dependent on law enforcement efforts and who's out on the street, and who's in charge of the clique.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 301 of 508
Case 3:08-cr-00134-RJC   Document 1364   Filed 01/30/11   Page 46 of 253

JA1267

DIRECT-FLORES

But generally they run very similarly.

Q.    Is there a leadership structure within the clique?

A.    Yes, sir.

Q.    Can you describe that?

A.    Yes.  It's generally identified in slang terms.  In terms of a person that's in charge.  A shot caller, a llavero, which is Spanish for key holder.  Or a ranflaro (phonetic spelling), which is a person that drives a car.  A ranflaro meaning -- translating to a chauffeur, a driver.  It's basically identifying the person in charge.

And generally with that person in charge -- or that shot caller for that individual clique, you have a person just underneath that person, maybe a co-runner.  Somebody there in the event that the leader is arrested or incapacitated, the second person will be able to continue the organized -- continuing organizing the clique.

Q.    Do the cliques have meetings?

A.    Yes, sir.

Q.    And which have been your experience with that?

A.    My experience is the group does meet.  The individual cliques meet and a lot of it has to do with -- out of necessity.  Because the gang is involved in a lot of rivalries, a lot of fighting with other street gangs.

Their necessity to share information, share resources is -- goes -- kind of goes hand-in-hand with just existing.

Laura Andersen, RMR 704-350-7493

DIRECT—FLORES

Information that's shared or passed on to one another during these meetings, obviously has to do with rivalries, what's going on. Who has been shooting at us. Who are we shooting at. Who we have problems with. Who disrespected us. Who is cooperating with law enforcement.

This is the kind of information is the lifeblood of the gang, allows the gang to exist. So the information -- necessity of these meetings, is critical to the existence of the gang or clique as a whole.

Q. If a person travels from one part of the country from one clique to another clique, what are the rules regarding that? Does he have to join that clique, or how does that work?

A. Generally that person, depending on, again, the clique, the person's personal representation, their status within MS as a whole.

There are different pressures for a member that's traveling, say from Los Angeles to New York, Los Angeles to El Salvador, that person has a very strong, very well-known reputation, has very good references, they're less likely to be pressured to join the local clique.

If there's a presence of their own clique within the defined area, then they're welcomed in. They're welcomed in, generally, as a whole as long. Because as you're a member of MS, and you come in with good references.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 303 of 508
Case 3:08-cr-00134-RJC   Document 1241   Filed 01/30/11   Page 48 of 253

JA1269

45

DIRECT-FLORES

Meaning, we understand that you're not running because you are cooperating with law enforcement somewhere else, we have the ability to verify your information, who you are, to some degree, you're welcomed in.

But after you stay there for an extended period of time, you start getting involved with the individual clique in the area, they may pressure you to join their local clique, to boost their numbers, and boost their standing with MS 13 as a whole.

The reputation of the gang and the clique is everything. These members see that as kind of their existence. So it's very important to uphold the reputation of the gang and the reputation of the clique.

Q. You mentioned references, what do you mean by that, references?

A. References in the sense that it's been my experience where you have members that will check or call back. Communication is so readily accessible through cellphones, through Twitter, through Facebook, through My Space. That it's fairly easy for somebody to communicate and say, you're from Los Angeles, and all of a sudden you show up in Washington D.C. Members from Washington D.C. can simply go on line, call. Maybe -- there's a lot of relationships, family relationships that are built through some of these communities.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/28/17    Page 304 of 508
Case 3:08-cr-00134-RJC    Document 1270    Filed 01/30/11    Page 45 of 253

JA1270

So it's fairly easy to reach back and know somebody within Los Angeles and find out who this person is, and find out what they're involved in.

So references in that respect of just checking to see that primarily they're not somebody that's cooperated with law enforcement.

Q.   Is this movement we've been referring to among cliques and between cliques, is that a common thing in your expertise and experience?

A.   Yes, sir.  I've seen a lot of movement.  Definitely a lot of movement within certain areas.  I've seen a lot of movement within states.  But I've definitely seen a lot of movement, whether it's voluntary or involuntary within the United States, El Salvador and other parts of Central America.

Q.   How do you join MS 13?

A.   You join the gang primarily through initiation which is known as a jump in for 13 second.  Which is the amount of time that's given for you to be jumped in.  It's a physical beating by two or three other members, generally around the same age or some height and weight.  You have to physically depend yourself and fight these other members off for a period of 13 seconds, depending on how fast or how slow the counter is counting.

Q.   Is there a particular age before you join?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 305 of 508
Case 3:08-cr-00134-RJC   Document 1271   Filed 01/30/11   Page 306 of 253

**JA1271**

DIRECT—FLORES

A.    No.

Q.    What age could you be to join?

A.    I've seen members young as 12 to 13 years old.  It's all depending on a lot of factors, how you're courted, how you are recruited, whether you already have family members that are part of the gang.  There's a lot of influences that kind of go into account of how young a person can join the gang.

Q.    Can women join MS 13?

A.    Yes.  It's not as common.  If I'm understanding right, a full-fledged member of the gang, person that's jumped in. Women, it's less common but it does exist.

Q.    Are there other ways for women to join?

A.    All the women are brought in, and more so used, as I can describe it.  Sometimes they're girlfriends, sometimes they're women that they use generally just for sex, that kind of hang out and, you know, party with a lot of the members.

      But I would consider them actually physical members that have been jumped in.

Q.    Have you ever heard the expression, blood in/blood out?

A.    Yes, sir.

Q.    What does that refer to?

A.    It's common among Hispanic street gangs.  It's an understanding when you join a gang, that you go in, you're

Laura Andersen, RMR 704-350-7493

**JA1272**

DIRECT—FLORES

jumped in, you're physically beat, you're going to bleed in. And if you decide to leave, you're going to bleed out.  So it's referenced as, blood in/blood out.

Q.   Do members of the MS 13, do they go by birth names or given names?

A.   No.

Q.   What names do they use?

A.   Generally they're identified by a moniker and their clique, or what area they're from.

Q.   Can you give an example of that?

A.   I could be, you know, my last name is Flores.  I would be Flores from Los Angeles.  Or I would be Snoopy from Lester.  Chucky from Leeward.  Scooby from Francis.  That's generally how they're identified, by a moniker and their clique when you're dealing with MS 13.

Q.   In your experience, do gang members know the actual name of other gang members?

A.   Their birth names, generally not.

Q.   And what about -- you mentioned in the definition of a gang, about the way a gang conducts itself with perhaps colors.  Is that common to the MS 13, particular colors?

A.   Yes.

Q.   Could you tell us about that?

A.   Because MS is a subservient to the Mexican Mafia. Surenos, Hispanic street gangs that claim 13, just like MS

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 307 of 508
Case 3:08-cr-00134-RJC   Document 1273   Filed 01/30/11   Page 52 of 253
JA1273

does.  The common color is always blue.  Blue is very common among other Hispanic street gangs in southern California.  They claim 13 or claim allegiance to the Mexican Mafia.  MS 13 being one of them, blue is very common.  Blue, blue and white.  But generally some dark shade of blue.

Q.   Do members wear, in your experience, tattoos?

A.   Yes, sir.  It's not as common as when I started my career early on.  Some of the tattooing has kind of tapered off.  But you still see it on some members.

Q.   What about graffiti, is there graffiti associated with MS 13?

A.   Yes, sir.

Q.   Could you tell us in your experience how you run across that?

A.   Graffiti is still very common.  It's the most common way for the gang to advertise.  It's not something that they can go out in the LA times or in a newspaper and claim to build a reputation.

     A lot of what they do by using graffiti, is using, you know, the walls to claim territory, to define territory, to be used as physical visual intimidation of people that live within the community, people that work within the community.  It's used for -- definitely for intimidation value.  For control of territory.

     It also goes to disrespect or to begin rivalries with

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 308 of 508
Case 3:08-cr-00134-RJC   Document 1274   Filed 01/30/11   Page 53 of 253
JA1274

DIRECT-FLORES

other street gangs beginning to cross out other graffiti. So it's very common and it's still very relevant.

Q.   Do MS 13 members have a particular way they address themselves as some sort of sign or signal?

A.   Yes.

Q.   Could you tell the jury about that?

A.   Generally there is one hand sign -- well, there's a variation.  But there's one particular hand sign that MS uses that, from my understanding, my experience, no other street gang uses.  And that's, if I can describe it, my pinky, and my ring finger pointed up, my middle and my index pointed down, with my thumb covering my middle and my index finger.  It is a hand sign that I've only seen associated with Mara Salvatrucha in the gang world.

The only other place I've seen this hand sign used is by the University of Texas, Texas Longhorns, but in the gang world, it's only used by Mara Salvatrucha.

Q.   Now what does that signify, that particular -- you demonstrated for the jury.  You described, you were holding up your hand, your right hand.  What does that signify if you do that?

A.   When the gang originated during the mid eighties, hard rock was very prevalent.  A lot of the earlier members were considered themselves stoners, into the hard rock culture. They dressed the part.  They had long hair.  They were into

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 309 of 508
Case 3:08-cr-00134-RJC   Document 1275   Filed 01/30/11   Page 54 of 253
JA1275

the heavy metal, Black Sabbath, AC/DC type of music.  So they took on a lot of the characteristics and they maintained that.

This hand sign, which is common at a lot of concerts is something they adopted and took on as their own to identify themselves.

They also used a combination of other hand signs to configure their hands to identify themselves as MS.  But this hand sign is the most prevalent.

Q.   You said the combination of other ones.  Could you give an example of some of the other ones you've seen?

A.   Yes.  You'll see members on photographs or videos or different things, they will contort their hands to form an M or an S.

I can put my hands together, my thumbs pointed together, by fingers pointed down, and I can form my hands to an M.

I can put my both hands together cupped as Cs, and I can form an S.

Q.   Is there a particular way that they greet each other with a hand shake at all?  Have you ever experience that in your expertise?

A.   Yes.  I've seen it.  And, again, what's common is, they may slap hands and shake.  And at some point, you know, utilizing the -- what I identified as -- I describe as kind

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/20/17   Page 310 of 508
Case 3:08-cr-00134-RJC   Document 1276   Filed 01/30/11   Page 53 of 253
JA1276

DIRECT—FLORES

of the devil's pitchfork.  They'll slap hands while having that hand sign as a part of the greeting.

Q.    Now you mentioned, Detective Flores, during some of your testimony about, you know, marking the territory for rivals.  Are there particular rival gangs that the MS 13 has, other rivals?

A.    Yes, sir.  Various -- I mean, their longest standing rivalry is with the 18th Street gang.  That goes back to the origin of La Mara Salvatrucha street gang.

Q.    What's 18th Street gang?

A.    The 18th Street gang is another LA based street gang, which at the time that MS 13 was forming itself, was one of the first street gangs that opened up their -- or loosened their criteria for allowing members to join.

So you had some Central American youth which joined the 18th Street gang early on while MS 13 was forming.  And it began an early feud.

Members that would join the 18th Street, were seen as people that were portraying, you know, what they were establishing as their own -- as their own gang.

You know, it seemed like betrayal.  They were joining the Mexican street gang that had never allowed them to join before, and all of a sudden these members were joining that gang.

And it began the early basis for what we have now is

Laura Andersen, RMR 704-350-7493

**JA1277**

53

probably the largest, longest-standing feud between two Hispanic street gangs.

Q.   So the 18th Street is still a current rival?

A.   Yes.  It's probably one of the largest Hispanic street gangs in the United States.

Q.   Is it a national rival then?

A.   Yes, sir.

Q.   Do -- the 18th Street include the letter 8 in it; is that right?

A.   Yes, sir.

Q.   And does that have any significance to MS 13?

A.   Yes.

Q.   What is the significance?

A.   Generally the number 8 or 18, they'll shy away from. If they're writing something down, you know, they'll cross the 8 out, or they'll cross the 18 out.

If they're writing numbers, in Spanish, 8, ocho. Again, you'll see similar things where they refuse to say 8, or they say 8 in some kind of disrespectful way to avoid or coming across that number.

Various examples were -- instead of say 18, they will say fate teen.  At some point in time they will try to work around it or talk around it, to refuse, or to disrespect it in any way.

Q.   Are there other rival gangs, other than the 18th Street

Laura Andersen, RMR 704-350-7493

**JA1278**

54

to the MS 13?

A.   Yes, sir.

Q.   And does that vary by region?

A.   It varies by region, by alliances, by politics, by what's going on in a particular area, that can vary.  What other street gangs to proximity to MS 13 gang or their territory.

But the longest-standing feud, which has -- to my knowledge there's never been any kind of a letdown has been with the 18th Street gang.

Q.   What are the MS 13 rules with respect to rivals?  You mentioned the rivals, what does that mean if you're a MS 13 member?

A.   Rival is your enemy.  A person is there that disrespected you by their very existence.  Rivals are commonly referred to as -- by various derogatory terms, a lot of them as Chavalas.

Q.   What's that word mean?

A.   Chavalas is a Spanish term for a young kid, generally a young girl.  So calling somebody a little girl is something very derogatory in Spanish.

Q.   So what is the MS 13 member required to do if he sees a Chavala?

A.   They are required to attack on sight, seize the opportunity.  In particular if they have been disrespected

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 313 of 508
Case 3:08-cr-00134-RJC   Document 1279   Filed 01/30/11   Page 58 of 253

JA1279

by a Chavala, a rival, or somebody in general that has disrespected them, or they have perceived to have disrespected them.

Q.    Can you be disrespected by someone other than a rival gang member?

A.    Yes.

Q.    And would that person be referred to as a Chavala?

A.    Yeah.  Any disrespect, a gang member represents their gang.  The gang lives through them.  If they're seen as being coward, then the gang as a whole is seen as being a coward.  If they back down, they lose respect, the gang loses respect.  So it's something that they defend vehemently.  And any person, again, even the slightest disrespect can be reacted to.

Q.    And how important then is respect in the MS 13 culture?

A.    Respect is everything.  It's the way an individual member holds himself.  It's the way an individual member kind of rises through the ranks, by gathering that respect, by building on that respect.

    And in part, not only do they benefit, but the gang benefits.  It's the way the gang maintains that fear, that intimidation in the community, through its actions, through its members that engage in these activities.  And it's how it enhances the reputation overall.

Q.    How do you gain respect for MS 13?

JA1280

A.    You gain respect through actions.  It's commonly referred to in slang as you're putting in work; you're putting in work for the neighborhood; you're putting in work for la barrio.  Barrio being slang for your neighborhood or your 'hood.

It's attacks on rivals.  It's attacks on people who disrespected the neighborhood, disrespected you.  It's your level of activity, how you enhance your reputation and how you're able to build, enhance your reputation of the gang overall.

Q.    What is the rule -- if you're disrespected, what are you obligated to do?

A.    As a member, if you're disrespected, you're obligated to react, you're obligated to respond.  Because, again, if you're disrespected, and you allow even the slightest perceive attack on you and you don't respond, you lose respect of the people with you.  You lose the respect of the gang.  The gang itself is seen as weak, not only by the person that has just caused you some disrespect and you backed down, but the people around you.

So it's kind of the -- there's certain achievable, achievable on steroids where it's a constant battle to uphold this reputation, to uphold this standing, where any disrespect has to be reacted to or dealt with.

Q.    With respect to the discipline procedures in the MS 13,

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 315 of 508
Case 3:08-cr-00134-RJC  Document 1296  Filed 01/30/11  Page 60 of 253

JA1281

DIRECT—FLORES

57

do they have such procedures?

A.   Yes, sir.

Q.   And could you describe those?

A.   Yes.  Some of these disciplines within the gang are generally conducted in some of these meetings, that's another topic that comes up.

Some of these issues can include a person not showing up to one or two meetings without being given a pass.  Or if a person loses control of a weapon, which is a, you know, a gun that belongs to the gang as a whole.  Or a person that's refused or has shown some kind of cowardice.

So there are different variations of discipline.  It could be something where you're charged an extra $20 for not showing up for a particular meeting or two.

Or whether you're brought into what's considered a 13 second -- another 13 second, which is another physical beating, as punishment for perceived violation, which can be however slight, up to the point of where there's an issue.

Or a person has been considered or labeled as an informant, a rat, a snitch, and that person can be green lighted.  A green light is a person that's targeted for death.

Q.   How do you become green lighted, just if you're an informant?

A.   Generally, that's the number one way to get green

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 316 of 508
Case 3:08-cr-00134-RJC   Document 126   Filed 01/30/11   Page 316 of 253

JA1282

DIRECT-FLORES

lighted.  A person that is perceived to be cooperating with law enforcement or has been confirmed to be cooperating with law enforcement.  It's the ultimate betrayal, ultimate disrespect within the gang.

Q.   What about a 26, have you ever heard of that?

A.   A 26 is doubling up on a 13.  Again, it's just a different level of a beating a person can get for a perceived violation.  So instead of getting a 13 second violation, they identify, well, whatever violation you've been involved in, you deserve twice that.  That would be a 26.

Q.   What is the purpose of the MS 13.  You talked a lot about it, what has been the purpose of it in your experience and in your opinion?

A.   Well, my experience, I have not seen a legitimate reason for the gang to exist, other than to promote its own criminal activities, it's own criminal organization as a whole.

It's used to, again, control territories, allows the gang to function in various parts of, not only the United States, but other parts of the world.

All my experience that I've been involved with, in dealing with gangs, I have not seen any good come out of the gangs, in particular, Mara Salvatrucha.

Q.   And what types of crimes in your experience and your

Laura Andersen, RMR 704-350-7493

**JA1283**

59

expertise have you seen La Mara Salvatrucha commit?

A.    Murders, various types of assaults with deadly weapons, with hands, various types of extortion, robbery, burglaries, car theft -- all the way down to simple vandalisms.

Q.    Compared to some other organizations, would you consider it a money-making organization?

A.    No, I would not consider it a money-making organization.

Q.    What role does money have in the gang's existence?

A.    I mean, money is important.  And part of the gang does focus on making some money.  Because there is a necessity to obviously, assist and help other members financially, members that are in jail, members that have been deported.

But, the primary of that function within MS 13, compared to other street gangs that I've worked, isn't necessarily money, but territory, control, reputation. Which does factor into their ability to make money, but I wouldn't say it's their primary focus.

Q.    Like to show you what's been previously marked as Government Exhibit 15.  Have you been shown Government Exhibit 15 before?

A.    Yes, sir.

Q.    In your expertise, does it contain certain guidelines and rules of the MS 13?

A.    Yes.

Case 3:16-cv-00057-MOC  Document 50-3   Filed 03/23/17   Page 318 of 508
Case 3:08-cr-00134-RJC  Document 1344   Filed 01/30/11   Page 63 of 253
**JA1284**

DIRECT-FLORES

60

Q.   Like to show you Government Exhibit 15a.  15a is a translated copy; do you see that?

A.   Yes, sir.

Q.   Is that a fair and accurate translation of Government Exhibit 15?

A.   Yes, sir.

MR. NAZZARO:  Your Honor, at this time I would move Government Exhibit 15, and 15a, subject to further connection, and ask that they be published.

THE COURT:  Any objection?

MR. BRYSON:  No objection.

THE COURT:  Let them be admitted and published. (Government Exhibit 15 & 15a was received into evidence.)

THE COURT:  I'll conditionally admit it and let you publish it, subject to further linkage.

MR. NAZZARO:  Yes, sir.

Q.   (By Mr. Nazzaro) That's 15, right?

A.   Yes, sir.

Q.   And can we see 15a, please.  That's a translation of 15, is that?

A.   Yes, sir.

Q.   You see the top it says, Fundamental Rules Or Principles of Our Hood", do you see those?

A.   Yes, sir.

Q.   There's five different things listed there.  Are those,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 319 of 508
Case 3:08-cr-00134-RJC   Document 1284   Filed 01/30/11   Page 64 of 253
JA1285

DIRECT-FLORES

in your experience, how important are those principles?

A.    I would say they're very important.

Q.    And are those particular principles common for all MS 13 or just particular cliques?

A.    I would say they're fairly common for all cliques fundamentals.

Q.    Now, you've mentioned in some of your testimony, for instance, you use the word Chavala, which is used in a slang fashion by MS 13; is that right?

A.    Yes, sir.

Q.    Are there other words that the MS 13 uses, based on your experience and expertise, that are slang words, or that are commonly used by the MS 13?

A.    In terms of disrespecting other gang members?

Q.    Well, in terms of disrespecting other gang members or in terms of -- you mentioned green light, for instance.  How do you say that in Spanish?

A.    Luz Verde.

Q.    Which just means green light?

A.    Yes.

Q.    But you testified that has different meaning to the MS 13?

A.    Yes.  A green light is, by definition, a more serious term when used in reference to somebody.  Saying this person is green lighted, or that person is green lighted.  You're

Laura Andersen, RMR 704-350-7493

DIRECT—FLORES

identifying a person that needs to be targeted for a serious retaliation, generally it's death.

Q.    Okay.  Now with respect to a green light, that's a particular decision that has to be made by the gang?

A.    Yes, sir.

Q.    And that's -- I think the testimony was -- is that in circumstances when somebody is cooperating with law enforcement?

THE COURT:  That's been testified to two times already.

MR. NAZZARO:  Okay.

THE COURT:  Move on, Counselor.

MR. NAZZARO:  Yes, sir.

Q.    Is that the only circumstance when an MS 13 member can kill someone under a green light or are there other circumstances?

A.    There have been other circumstances, or perceived egregious violations.  An MS 13 gang member hanging out with an 18th Street gang member.  Or a female MS 13 gang member hanging out with an 18th Street gang member.  That would be a serious disrespect issue that might call for a green light on that person.

Q.    Okay.  But can they kill other than having a green light?  Not against an informant, but can they kill anybody without having a green light?  Not necessarily another gang

Laura Andersen, RMR 704-350-7493

JA1287

DIRECT-FLORES

member?

A.   I don't think I understand your question.

Q.   Well, have you had, in your experience has there been any situations where a civilian has been killed out of disrespecting the gang?

A.   Yes, I mean --

MR. BRYSON:  Object.

THE COURT:  Hang on a second.  I'll overrule the objection.

THE WITNESS:  Violence is generally very common. A lot of things happen unplanned or may happen on very short notice.

Disrespect, somebody is confronted, they react. Yes, they're required to act appropriately, whether confronted or disrespected by rival gang member, by somebody from the general public who they have taken some kind of disrespect from.  It's part of the normal, everyday activities.

Q.   What does the word mesa mean?

A.   Spanish word for mass.

Q.   What does it mean in the MS 13 lingo?

A.   Mesa would be slang for a meeting.  They go to mass. They see it as more of a formal ritual where they have to go report and be a part of.  So mesa being mass in Spanish.  In their terms means meeting.

Laura Andersen, RMR 704-350-7493

JA1288

DIRECT-FLORES

Q.   Have you ever become familiar with different ways that they talk, as far as transposing certain words?

A.   Yes, sir.

Q.   What does that mean?

A.   Where they take, for example, I've seen experienced it in my case.  Or my name Flores, they will take R-E-S the last three letters of my name, put it in front of the F-L-O. Instead of referring to me as Flores, it will be resflo. Simply just taking a word, putting the first portion in front of the word and then pronouncing it that way.

Also substituting words, you know, whether it's in conversations or certain communication.  They'll identify, for example, methamphetamine.  In Los Angeles an ounce of methamphetamine was referred to as one cheese pizza.

So you will see a lot of substitution.  A lot of wordplay.  A lot of word game, which is intended to, obviously, throw off law enforcement, or try to hide or conceal a lot of their messages or communication.

Q.   You mentioned about the penalty if you cooperate with law enforcement.  Does that only extend to other gang members or what about civilians, if they cooperate?

THE COURT:  I'll sustain the court's objection. That's been asked and answered already.

MR. NAZZARO:  I'm sorry.

THE COURT:  This is a good stopping point, Members

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/20/17   Page 323 of 508
Case 3:08-cr-00134-RJC   Document 1240   Filed 01/30/11   Page 68 of 253
JA1289

DIRECT—FLORES

of the Jury.  I told you we would take a morning and an afternoon break.  We'll take our morning break at this time. And I told you at the beginning of the testimony, that you're not to talk about the case until the end of the case. And I'll remind you about that as we take a break.

I also asked you to keep an open mind until all the evidence is in.  And if you would remember that, as well.

We'll take a 15 minute break and come back in approximately 11:30.

(The jury was escorted from the courtroom.)

THE COURT:  We'll take our morning break at this time.

Mr. Nazzaro, if you'll go through your remaining questions and eliminate duplicative questions.

MR. NAZZARO:  Yes, sir.  I'm going to show him a series of exhibits.

THE COURT:  Very well recess.  We'll take our morning break and be back at 11:30.

(Recess.)

THE COURT:  Ready for the jury?

Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Mr. Nazzaro, you may continue.

MR. NAZZARO:  Thank you, Your Honor.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 324 of 508
Case 3:08-cr-00134-RJC   Document 1294   Filed 01/30/11   Page 65 of 253
JA1290

66
DIRECT—FLORES

CONTINUED DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Detective Flores, I would like to show you what's been previously introduced into evidence as Government Exhibit 1 if you would look at that on the screen when it comes up.

Do you see Government Exhibit 1?

A.   Yes, sir.

Q.   And that has been some testimony that's graffiti.  Do you recognize anything in particular about that particular graffiti?

A.   Yes.

Q.   And could you tell us and describe what you see?

A.   The left portion of the photo here, you see the M and the S for Mara Salvatrucha.  The M, and the S there, (witness indicating).

On the right portion of the photo you'll see it spelled out here, Mara Salvatrucha in Spanish.  Below that it appears to be the name of the clique, or the abbreviation for the clique, PVLS or PLS, excuse me.

So I would read that as MS 13 La Mara Salvatrucha gang graffiti.

Q.   And that -- you said the name of the clique, is that common in the graffiti, to put the name of the clique?

A.   Generally, you'll see the clique written in.  You may have more than one clique member or different cliques that are hanging out together, that decide to go out and graffiti

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 325 of 508
Case 3:08-cr-00134-RJC   Document 1291   Filed 01/30/11   Page 73 of 253
**JA1291**

DIRECT-FLORES

an area.  So you may see the local clique's name and cliques -- the other cliques that are participating.

Q.   Are you familiar with that particular clique from this photo or not?

A.   I'm familiar with a clique that uses the abbreviation PLS.  In Los Angeles, PLS, I would read that as Pasadena Locals.

Q.   I would like to show you what's been entered into evidence as Government Exhibit 2.  And it's been previously identified as MS 13 graffiti.  Are you able to further describe for the jury, based on your expertise, what the writings are all about?

A.   Yes, sir.

Q.   Could you do that?

A.   On the right side of the photo is a fair commonly graffati that I observed prior, the M, the S there, the X, Roman numeral for 10.  And then you have the 3 next to it, 13.  Then within the 3 you see the three dots.  Representing the common tattoo from Hispanic street gang members that represents in Spanish, Mi Vida Loca, or in English, my crazy life.  An acceptance of the lifestyle of a gang member.

     At the bottom of that again you'll see MS X3, MS 13. Again, utilizing the X as a Roman numeral.

     On the left side of the photo, you have what appears two gang monikers, Nino and Oro.  Nino is Spanish for kid.

                    Laura Andersen, RMR 704-350-7493

DIRECT—FLORES

Oro is Spanish for gold.

Below that you have MS X3 again.

Under that MS X3 here, you have controla, which is Spanish for control.

And below that you have what appears to be an abbreviation for the clique, CLSC.

Q.    Are you familiar with that particular clique?

A.    No, sir.

Q.    This type of graffiti, have you seen this type of graffiti before?

A.    Yes, sir.

Q.    And where have you seen it?

A.    I've seen it in Los Angeles.  I've seen it in photos in other parts of the United States, it's fairly common.  MS 13, MS X3, different variations for writing out the 13.  The three dots is fairly common.  The gang monikers are fairly common in relation to gang graffiti.

The words like controla.  Controla is Spanish for control.  It's them kind of showing, exerting their dominance, their control of an area, what they're claiming. So it's fairly common.

Q.    Does the MS 13 have a particular motto that they use?

A.    Yes.

Q.    What is that?

A.    I've heard from different members, it's commonly

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 327 of 508
Case 3:08-cr-00134-RJC   Document 1246   Filed 01/30/11   Page 72 of 253
JA1293

DIRECT—FLORES

referred to as, I don't know if it's defined as their motto, but it's very close.  It would be best defined as a motto in my explanation.

Mata violar controla.  Mata, Spanish for kill.  Violar Spanish for rape.  Controla, Spanish for control.  So it's kind of again, more so one of the fundamentals define the organization kind of terms.

Q.   I would like to show you what's been previously marked as Government 4, and admitted into evidence.

And could you further describe what is depicted in Government 4?

A.   Yes.  Again, you have graffiti on the wall.  You have an M.  You have an S here.  You have a 13.  And then at the bottom here you have the clique, PVLS.

I would read that as MS 13, Park View Locals, PVLS.

Q.   And the PVLS, once again, is that same PVLS you previously testified about as a clique in LA?

A.   Yes.  It's a clique which originated in Los Angeles.  I know it has a presence outside of Los Angeles.  But PVLS Park View Clique originated in Los Angeles.

MS. ROSE:  Your Honor, if I could mark the screen and ask that it be admitted with the annotations.

THE COURT:  Any objections?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted as 4a.

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 328 of 508
Case 3:08-cr-00134-RJC   Document 1294   Filed 01/30/11   Page 73 of 253
JA1294

70
DIRECT—FLORES

(Government Exhibit 4a was received into evidence.)

Q.   (By Mr. Nazzaro) Like to show you what has previously been admitted into evidence as Government 6.  Do you see Government 6?

A.   Yes, sir.

Q.   Are you able to recognize that as MS 13 graffiti?

A.   Yes, sir.

Q.   Could you further describe what you see in Government 6.  Obviously we see a 13 MS.  What is underneath that?

A.   Underneath here you have Spanish word reynando. Spanish to reign, to rule, reynando.

And then on the other side of that you have controlando, controlling.  So reigning and controlling. It's -- again, the way I would read it in terms of they re that territory, they're saying, hey, we reign here, we control here.

Q.   Once again, have you seen similar type of graffiti before in your experience?

A.   Yes, sir.

Q.   Like to now move on and show you what's previously marked as Government Exhibit 7, not yet into evidence.

Are you able to recognize MS 13-like tattoos in this picture?

A.   Yes, sir.

MR. NAZZARO:  Your Honor, I would move,

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 329 of 508
Case 3:08-cr-00134-RJC   Document 129-2   Filed 01/30/11   Page 74 of 253
JA1295

DIRECT-FLORES

conditionally, Government 7, subject to connection to a later witness?

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  I'll conditionally admit it at this time.

(Government Exhibit 7 was received into evidence.)

Q.   (By Mr. Nazzaro) Could you describe Government's Exhibit 7?

A.   Yes.  It's an individualized tattoos on his forehead. There's a letter M beside the letter S there.  And it appears he's got some horns on either side of the letter.

M-S, representative of Mara Salvatrucha.  I would consider that a gang tattoo for Mara Salvatrucha.

The horns aren't particularly something unique to Mara Salvatrucha gang members.  But you do see a lot of demonic references.  Not only in the hand sign, but in some of the tattoos.  Which it's commonly referred to as la bestia or the devil, or references to the devil.

But the horns aren't unique to Mara Salvatrucha, but the two letters are.

Q.   Government Exhibit 8, which is, I think a close-up of Government 7.

Are you better able to see what you just described as the devil horns in Government Exhibit 8?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 330 of 508
Case 3:08-cr-00134-RJC   Document 1296   Filed 01/30/11   Page 75 of 253
JA1296

72
DIRECT-FLORES

A.   Yes, sir.

MR. NAZZARO:  Your Honor, I would move, conditionally, Government 8, subject to further condition and ask it be published.

THE COURT:  I'll conditionally admit it and let it be published.

(Government Exhibit 8 was received into evidence.)

Q.   (By Mr. Nazzaro) Can you circle the horns that you refer to in this case?

A.   Yes.

MR. NAZZARO:  Your Honor, I would move the screen as Government 8a.

THE COURT:  It will be admitted as 8a.

(Government Exhibit 8a was received into evidence.)

Q.   (By Mr. Nazzaro) Like to show you Government 9.  Are you familiar with this particular tattoo?

A.   Yes.

Q.   Seen this type before?

A.   Yes, sir.

Q.   And it's MS 13 related?

A.   Yes, sir.

MR. NAZZARO:  I would move Government 9 subject to connection.

MR. BRYSON:  No objection.

THE COURT:  That will be admitted.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-3  Filed 03/23/17  Page 331 of 508
Case 3:08-cr-00134-RJC  Document 1244  Filed 01/30/11  Page 76 of 253
JA1297

73
DIRECT-FLORES

(Government Exhibit 9 was received into evidence.)

Q.    (By Mr. Nazzaro) Appears to have the word, "Southern Gangster"; is that right?

A.    Yes, sir.

Q.    What's the significance of that?

A.    Again, it's a reference to the 13, it's a reference to the origin of the gang, their affiliation with the Mexican Mafia.  The Spanish translation would be Sureno, sur.  So any reference to sur or southern gangster, points back to the origin, points back to their affiliation with the Mexican Mafia.  It also points back to Los Angeles in general.

So you start seeing these tattoos on gang members outside of Los Angeles, it's their attempt to show connection to Los Angeles.

Because, again, members from Los Angeles, or particularly from parts of El Salvador, have a lot more -- a little more respect by the mere fact that they're connected to LA or may have gone through LA where they've earned an added degree of respect.

So -- but, Southern Gangsters, Sureno, it's common to Hispanic street gangs.  Gangs members that are fallen under control of the Mexican Mafia.  It's a reference back, of respect.

Q.    I would like to show you Government's 10.  Does this

Laura Andersen, RMR 704-350-7493

**JA1298**

74
DIRECT—FLORES

also contain tattoos that reference MS 13?

A.   Yes.

MR. NAZZARO:  Your Honor, I would move 10, subject to further connection.

MR. BRYSON:  No objection.

THE COURT:  I'll admit it, conditionally.

(Government Exhibit 10 was received into evidence.)

Q.   (By Mr. Nazzaro) I think what's evident is the 13. What is written to the left of that 13?

A.   Yes.  Just to the left of the 13 is a Spanish word here sur, S-U-R.  Which is Spanish for south.  Again, it's just a reference to southern California, is a reference to south. It's a reference to affiliation to other Hispanic street gangs in southern California, which fall under the umbrella of the control of the Mexican Mafia.  It's their show of respect.

Q.   Are you able to recognize anything above that word, sir?

A.   Not clearly.

Q.   Okay.

MR. NAZZARO:  I would also ask that 10a be moved, Your Honor, and admitted, the screen.

THE COURT:  It will be committed, 10a.

(Government Exhibit 10a was received into evidence.)

Q.   (By Mr. Nazzaro) And ask the witness to view Government

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 333 of 508
Case 3:08-cr-00134-RJC   Document 1299   Filed 01/30/11   Page 78 of 253
JA1299

11.  Now, does Government 11 depict MS 13 type tattooing?

A.   Yes, sir.

MR. NAZZARO:  Your Honor, I would move Government 11, subject to connection.

THE COURT:  Let it be admitted.

(Government Exhibit 11 was received into evidence.)

Q.   (By Mr. Nazzaro) Could you describe the significance of the tattoos with respect to the MS 13 in Government 11?

A.   Yes.  At the, kind of the top portion of his head here, you have the words eme ese.  E-M-E, then looks like they used the E at the end of the M, again.  And then you'll see E-S, looks like an E at the end of it.  Spanish M is spelled E M E.  S is spelled, E-S-E.

So it's just another clever way of identifying the gang, M-S.  It's just spelled out in the back of his head.

Q.   What about below that mark that you just made?

A.   Yeah, it's LA.  Symbol for LA.  Common identifier for Los Angeles.  It's a common symbol you've seen on the Dodgers, the Dodgers baseball team, their hat.  It's just a reference, a tie back to Los Angeles.

It's significant, again, because, you know, a person being seen as from LA, part of LA, has a degree more respect because they've been through, again, what's considered the mecca, the beginning.

MR. NAZZARO:  I would move 11a and ask that screen

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 334 of 508
Case 3:08-cr-00134-RJC   Document 1241   Filed 01/30/11   Page 79 of 253
JA1300

76

DIRECT—FLORES

be captured and marked as a separate exhibit.

THE COURT:  Let it be admitted.

(Government Exhibit 11a was received into evidence.)

Q.    (By Mr. Nazzaro) Like to show you a series of photos --
some photos depicting some hand signs starting with
Government 12.

And do you recognize that photograph as MS 13-type hand
signs?

A.    Yes, sir.

MR. NAZZARO:  I would move Government 12, subject
to connection.

THE COURT:  Any objection.

MR. BRYSON:  No objection, Your Honor.

THE COURT:  Let it be admitted, conditionally.

(Government Exhibit 12 was received into evidence.)

Q.    (By Mr. Nazzaro) Now, there's two individuals in this
photo; is that right?

A.    Yes, sir.

Q.    Could you describe what they're doing in that
photograph?

A.    You have two individuals, basically just joining their
hands to form the MS gang hand sign, in this photo.  I mean,
they're squatting down, but clearly both their hands are
placed together, it's flashing the MS gang sign.

Q.    Like to show you Government 13.  Do you recognize hand

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/20/17    Page 335 of 508
Case 3:08-cr-00134-RJC    Document 1251    Filed 01/30/11    Page 80 of 253
**JA1301**

DIRECT—FLORES

signs in Government 13 that are consistent with the MS 13?

A.    Yes, sir.

        MR. NAZZARO:  I would move Government 13, Your Honor, subject to connection.

        THE COURT:  Conditionally admitted.

        MR. NAZZARO:  And ask that it be published.

        THE COURT:  You may.

(Government Exhibit 13 was received into evidence.)

Q.    (By Mr. Nazzaro) Could you describe the various hand signs we see in Government 13?

A.    Yes.  Beginning at the bottom here, you have one individual utilizing one hand to flash MS.  The individual with the white shirt, and the individual with the gray shirt are kind of joined together.  The individual with the white shirt is displaying an M with his hands.  And the individual with the gray shirt is forming an S with his hands.

     And then the individual with the peach colored shirt above him, again, is utilizing both hands to configure the MS hand sign.

        MR. NAZZARO:  I would also move the screen that's been marked by Detective Flores as 13a, and ask that it be admitted, Your Honor.

        THE COURT:  It will be conditionally admitted, as well.

(Government Exhibit 13a was received into evidence.)

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 336 of 508
Case 3:08-cr-00134-RJC   Document 1311   Filed 01/30/11   Page 336 of 253
**JA1302**

78
DIRECT—FLORES

Q.    (By Mr. Nazzaro) Government 14.  Are you able to recognize Government 14 as MS 13 hand signs?

A.    Yes, sir.

Q.    Could you describe what you see in Government 14?

A.    Yes.  Clearly --

MR. NAZZARO:  I would move 14, subject to connection also, Your Honor.

THE COURT:  Be conditionally admitted.

(Government Exhibit 14 was received into evidence.)

THE WITNESS:  The individual on the left, here, with the long sleeve white shirt, just utilizing both hands to configure the street hand sign for Mara Salvatrucha.

And then the individual on the right with the white Los Angeles jersey using both hands cupped as Cs to form an S.  So reading it together, Mara Salvatrucha.

MR. NAZZARO:  I would also move Government 14a which is the screen that Detective Flores drew on.

THE COURT:  Be admitted.

(Government Exhibit 14a was received into evidence.)

Q.    (By Mr. Nazzaro) Show you Government 20, Detective.

Do you recognize Government 20 as MS 13 related tattooing?

A.    Yes, sir.

MR. NAZZARO:  Your Honor, I would move 20 subject to connection.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 337 of 508
Case 3:08-cr-00134-RJC   Document 1311   Filed 01/30/11   Page 82 of 253
JA1303

DIRECT-FLORES

THE COURT:  Conditionally admitted at this time.

MR. NAZZARO:  And published.  Thank you.

(Government Exhibit 20 was received into evidence.)

Q.    (By Mr. Nazzaro) What is 20?  What do you see in 20?

A.    Twenty, just beginning with the stomach area, you have the letters M and S tattooed on his stomach.  Again, some graffiti, some tattoos you'll see in different types of fonts.  But it's representative of M and S for Mara Salvatrucha.

On his chest, left chest area looks like he's got letters WLS.  That could be the clique that he's from.

And it appears on the top right shoulder he has some type of MS tattoo.  I can see clearly a hand and one of the fingers that I've seen on various other MS tattoos.

Q.    Are you able to recognize any of the other types of tattooing on the chest area?

A.    I see other types of tattoos that are -- I've seen, when dealing with other Hispanic street gang members, nothing that's unique to MS.

Certain references, songs, the words that they'll tattoo on themselves.  In this case he's got, in Spanish, perdona mi madre por mi vida loca; mother forgive me for my crazy life.  But that tattoo's not unique to MS, MS 13 gang members.

Q.    You have seen it on MS 13 gang members?

Laura Andersen, RMR 704-350-7493

JA1304

DIRECT-FLORES

A.   I have, but it's not unique to MS 13.

Q.   Like to first move for Government 21.  Are you able to recognize some tattooing on Government 21?

A.   Yes.

Q.   MS related tattooing?

A.   Yes.

MR. NAZZARO:  I would move 21, subject to connection.

THE COURT:  Be conditionally admitted.

(Government Exhibit 21 was received into evidence.)

Q.   (By Mr. Nazzaro) could you tell us what you see in 21?

A.   Yes.  I see tattooing on the eyelids, in Spanish.  On the right eye you see the words, "no pude", which is Spanish for, I couldn't -- or translates to, I couldn't.

Right on the bridge of the nose there -- I'm sorry. You have the word, "mas", which emphasizes the M and S, mas, meaning more.  So, I couldn't anymore.

Then over the right eyelid you see the word, "home boys".  Which translates to, reference to other gang members, other close associates within the gang.

So reading it all together in Spanish, "no pude mas", "home boys", or, "I couldn't anymore home boys".

Q.   And 22, I think is a close-up of that.  I would like to let you see that.  Is that the same person depicted and the same tattooing --

Laura Andersen, RMR 704-350-7493

DIRECT—FLORES

A.    Yes, sir.

Q.    -- a close-up version?

I would move 22, Your Honor, subject to connection.

THE COURT:  Be admitted.

(Government Exhibit 22 was received into evidence.)

MR. NAZZARO:  And ask it be published.

THE COURT:  You may.

Q.    (By Mr. Nazzaro) Is this -- could you circle on this, maybe read a little more clearly what you see?

A.    Yes.  The right eye, "no pude", I couldn't.  And then center of the nose here, "mas", with specific emphasis on the letters M and S, much larger.  Then over the left eye or the eyelid there you have "home boys"; "no pude mas, home boys", "I couldn't anymore home boys".

MR. NAZZARO:  I would move 22a, the markings Detective Flores made.

THE COURT:  Be admitted.

(Government Exhibit 22a was received into evidence.)

Q.    (By Mr. Nazzaro) I'll show you Government 23.  And these particular tattoos on the body, could you describe those?

A.    Yes.

Q.    Are they -- first of all, let me ask you, are they consistent with MS 13 tattooing?

A.    Yes, sir.

Laura Andersen, RMR 704-350-7493

JA1306

82
DIRECT—FLORES

MR. NAZZARO:  I would move 23, subject to connection.

THE COURT:  Admit it conditionally.

(Government Exhibit 23 was received into evidence.)

MR. NAZZARO:  And ask that they be published.

THE COURT:  You may.

MR. NAZZARO:  Thank you.

Q.   And could you describe what you see on Government 23?

A.   Yes.  On the chest area you have the letters M and the S boldly right on the chest.  Just below the nipple line there.  Just above the stomach you have PVLS.  Which I would read as Park View Locals, MS Park View Locals.  Partially between the V and L there's a number 9 or a G.  I think it's a 9.  But MS 13 PVLS.

And you have other specific tattoos.  The tattoo in the center, I wouldn't say it's unique to MS 13 gang members.  But it's generally another demonic, kind of intimidating type tattoo that I see commonly among gang members.  The grim reaper.

And then other tattoos here closer to the shoulder areas.  Which are common among, again, other Hispanic street gang members, and MS 13 street gang members, referred to as the smile now cry later tattoos.

Q.   What's the significance of those tattoos?

A.   Again, it goes kind of --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 341 of 508
Case 3:08-cr-00134-RJC   Document 1341   Filed 01/30/11   Page 86 of 253

JA1307

DIRECT-FLORES

Q.   In the gang?

A.   Sorry.

Q.   In the gang, with gangs, what's the significance?

A.   In reference to the gangs, it's kind of the understanding of the lifestyle again.

You smile now, you have fun now, you're going to cry later.  There's good and bad to this lifestyle.  So it's just going to be acceptance of the tattoo that goes with it.  You know, in reference to other street -- other tattoos la vida loca, the three dots.  It's an understanding and acceptance of this lifestyle.

MR. NAZZARO:  I would move 23a, which is the markings Detective Flores made; ask it be conditionally admitted.

THE COURT:  They will be.

(Government Exhibit 23a was received into evidence.)

Q.   And do you recognize 24 as MS related tattooing?

A.   Yes, sir.

MR. NAZZARO:  I would move 24, subject to connection, and ask that it be published.

THE COURT:  Let it be admitted.  You may publish.

(Government Exhibit 24 was received into evidence.)

Q.   (By Mr. Nazzaro) Could you describe what we see in Government 24?

A.   Yes.  You can clearly see at the top of the tattoo, the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 342 of 508
Case 3:08-cr-00134-RJC   Document 1310   Filed 01/30/11   Page 87 of 253

JA1308

84
DIRECT—FLORES

letters M and the letters S for Mara Salvatrucha.

Part of the tattooing, a lot of the things you'll see are kind of more subtle.  You'll see this figure here on the right, this face.

And at the top of his head you'll see these kind of horns that are part of the letter, but also kind of serve as horns that are coming out of his head.

And at the bottom of the photo you'll see this figure here, and you'll see his hand.  And he's got his hand contorted into an MS hand, flashing MS gang hand sign there as well.

MR. NAZZARO:  I would ask that 24a, which is the markings also be admitted.

THE COURT:  It will be.

(Government Exhibit 24a was received into evidence.)

Q.   (By Mr. Nazzaro) Government 25.  Is that something consistent with gangs and the MS 13?

A.    That's something that I would say it's unique to MS 13 gang members.  It's, again, another reference to something demonic, something intimidating.  I've seen these types of tattoos, not only on MS 13 gang members, but other Hispanic street gangs members as well.

MR. NAZZARO:  I would move Government's 25, subject to connection.

THE COURT:  Be admitted.

Laura Andersen, RMR 704-350-7493

JA1309

(Government Exhibit 25 was received into evidence.)

Q.   And you're familiar with that type of tattoo, could you describe what it's meant to depict in your experience and expertise.

A.   Yes.  Again, it's kind of a more intimidating tattoo of a devilish figure with his hands and long intimidating fingernails kind of covering his face.

Again, a lot of demonic reference are used by MS 13 gang members in tattoos and a lot of the verbiage they'll use.  Again, it's a reference for intimidation, a reference to la bestia in Spanish or the devil as it translates from Spanish to English.

Q.   I'd like to show you, Detective Flores, what's been previously marked as Government 28.  And that appears to be a drawing; is that right?

A.   Yes, sir.

Q.   Is that drawing consistent with MS 13 depictions?

A.   Yes, sir.

MR. NAZZARO:  I would move 28, subject to connection, Your Honor, and ask that it be published.

THE COURT:  I'll conditionally admit it and let you publish it.

(Government Exhibit 28 was received into evidence.)

Q.   (By Mr. Nazzaro) Now, there seems to be a lot going on in this particular drawing.  Are you able to explain to the

DIRECT—FLORES

jury what you see and what it represents?

A.   Yes.  We'll kind of start from the top.  You have the letters in the background, the M and the S, kind of serve as the backdrop for this.

And then you have the horns, within the horns here you see the M and you see the S, and the horns on the head.

Over the eyebrows you have the words in Spanish, eme ese.  E-M-E for M.  E-S-E for S.

And then over the left eyebrow, trece.  So you would read that as MS 13.

And then downward toward the chest, you have an M and an S on the chest.  And you have a 3 C between the letters M and S.  Spanish that would be trece 13.  That's just a clever way to identify 13; 3 C Spanish, trece.

Q.   Are you able to circle that 3 and the C, show where that is?

A.   Yes, sir.  It's right there between the M and S on the chest.

Q.   Okay.  Is there anything else on that?

A.   Yes.  The hands on the figure.  On the right hand he's flashing the devil's pitchfork for the M, or throwing out La Mara.

And the hand on the left -- left hand on the figure he's flashing an S with one hand.  It's rather small, but if you follow the curvature of the hand, he's kind of forming

Laura Andersen, RMR 704-350-7493

87
DIRECT-FLORES

an S with his left hand.

MR. NAZZARO:  I would move Government 28a.  Which I would ask to be identified as a screen with the markings from Detective Flores and ask that it be conditionally admitted.

THE COURT:  I think you're stuck with Government Exhibit 28.  I don't know that 28a is that helpful.

MR. NAZZARO:  Okay.  I withdraw that exhibit. Just go with 28.  If you could take that -- thank you.

Anything else on this exhibit?

A.   The last final thing at the bottom there you have a 3 and you have C here.  So again, Trece, 13.

Q.   I would like you to see what's previously been marked as Government 29.  Which is writing and a drawing.  Are you able to identify that as consistent with MS 13 drawings or writings?

A.   Yes.

MR. NAZZARO:  And I would move 29 subject to connection.

THE COURT:  Be conditionally admitted.

MR. NAZZARO:  Published, please.  Thank you.

What is depicted in Government 29?

(Government Exhibit 29 was received into evidence.)

THE WITNESS:  Obviously, there's some writing there.  Towards the bottom there's a picture of a fish,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 346 of 508
Case 3:08-cr-00134-RJC   Document 1312   Filed 01/30/11   Page 91 of 253
**JA1312**

DIRECT-FLORES

which is, in Spanish trucha, is also reference to a fish. It's also slang for look out, watch out, be careful.

So looking at this and understanding Spanish and reading it, the person here is writing off or signing off as, you know, like the fish, trucha, you know, be careful, you know, look out.

But he's using a substitute of a picture for a word or a message.

Q.   I would like to show you the next exhibit which I would ask that it be labeled as 112.  It may not appear on the screen as 112, but I would ask that it be marked as 112.

Are you able to identify any MS 13 writings, what I indicate as Government 112?

A.   Yes, sir.

MR. NAZZARO:  Your Honor, I would move Government 112, subject to connection.

THE COURT:  Conditionally admit it.

(Government Exhibit 112 was received into evidence.)

MR. NAZZARO:  Published.

THE COURT:  You may.

Q.   (By Mr. Nazzaro) Could you please describe what is depicted in your -- based on your expertise and experience in Government 112?

A.   Yes.  You have the letters M and S for Mara Salvatrucha.  You also have the 3 -- sorry -- and the C

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 347 of 508
Case 3:08-cr-00134-RJC   Document 1312   Filed 01/30/11   Page 92 of 253
JA1313

DIRECT-FLORES

written next to it for Trece, or 13. So you would read that as MS 13.

Then you have the word "Novena", written at the base of the letter S.

Q. Is there a signature on the bottom also?

A. Yeah. The signature on the bottom, L. Wizard. Identifying the signature of possibly the person who wrote that.

MR. NAZZARO: Your Honor, may I be permitted to approach the witness with other evidence?

THE COURT: You may.

Q. (By Mr. Nazzaro) Detective Flores, I placed in front of you three items. Are you able to identify those as MS-related clothing or other apparel?

A. Yes.

Q. Could you look at them and just see before we ask questions about them?

A. (Witness complies.) Yes, sir.

Q. Are those items that depict MS-type clothing?

A. They would be common among Hispanic street gang members, MS 13 being one, yes.

MR. NAZZARO: Your Honor, at this time I would conditionally move, I believe it's 16, 17 and 18. And ask that they be admitted and published, subject to connection through a later witness.

Laura Andersen, RMR 704-350-7493

**JA1314**

DIRECT-FLORES

THE COURT:  I will conditionally admit Government 16 through 18.

(Government Exhibit 16, 17 & 18 were received into evidence.)

Q.   (By Mr. Nazzaro) Why don't we start with 16, which appears to be a blue jersey.  Could you describe to the jury what that is in your experience?

A.   Yeah.  It's a -- just a blue-colored jersey.  The color blue being significant because it is a color that the southern California Hispanic street gangs use, which Mara Salvatrucha is one a part of.  It just references Los Angeles.

Again, claiming Los Angeles, showing some reference, some connection to Los Angeles, adds to a person's standing in the gang.

Q.   Government 17; is that right, is that the next one? There's a tag on there.

A.   Yes, 17.

Q.   What is that?

A.   Seventeen is the black and gray jersey.  This is little bit more significant, because it's a little clear with the connection to gang or gang activity.  The 13 on the neckline is significant.

Again, showing affiliation with, and paying homage to Mexican Mafia, another connection to southern California

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 349 of 508
Case 3:08-cr-00134-RJC   Document 1313   Filed 01/30/11   Page 94 of 253
**JA1315**

DIRECT-FLORES

Hispanic street gangs.

South Side, again, it's a big reference. Connectivity to Los Angeles. The connectivity that they try to use by wearing this type of clothing, enhances their reputation.

The back of the jersey you have South Side written at the top. And you have the number 13. So this is clearly, I would consider a gang jersey.

It does, again, aid in the -- enhancing the reputation of the person that's wearing this a person devoted and committed. It does show the affiliation.

Q.   And the last one I believe is 18.

A.   Yes, sir. This is just three bandannas, kind of tied together. Again, the color blue is very significant. It's the color that Surenos, southern California, Hispanic gang members affiliate with. Blue is their color. It's what they use.

MS 13 being -- originating as a southern California Hispanic street gang. And being a part of the Sureno gang population, also affiliate and use the color blue.

MR. NAZZARO:  Your Honor, I have no further questions at this time.

THE COURT:  Any cross?

CROSS-EXAMINATION BY MR. BRYSON:

Q.   Detective Flores, you said that a member of MS 13 can increase his reputation in a gang by committing acts of

Laura Andersen, RMR 704-350-7493

**JA1316**

Appeal: 10-6   Doc: 90-3     Filed: 08/14/2013    Pg: 351 of 508

violence, correct?

A.   Correct.

Q.   But MS has rules, correct?

A.   Yes.  There are some general rules and there are some understandings.

Q.   And members of MS must follow the rules of MS?

A.   They are suppose to.  But obviously there's rules that are broken, and there's a policy for what happens when you break those rules as well.

Q.   Well, okay.  And in fact, in order for an act of violence to increase a member's reputation, it has to be done in observance of the rules, correct?

A.   It could be in part of their observance, in the spirit of the rules.  Obviously, things happen in the heat of things that go on.  When a person is confronted on their way to school, or on their way to pick up their girlfriend, or at a party, where they have to react.  So it's not necessarily planning or thought out.  It's just their ability to represent the gang and not show cowardice in the act of disrespect towards themself or towards the gang.

Q.   Here's my question:  If a member of MS commits an act of violence in disregard of the rules, or in violation of the rules, that does not increase his reputation with the gang?

A.   Depends on the situation, sir.

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 351 of 508
Case 3:08-cr-00134-RJC   Document 1210   Filed 01/30/11   Page 96 of 253
JA1317

CROSS-FLORES

Q.   In fact, he can be punished for committing an act of violence in violation of the rules, correct?

A.   Depending on the situation, yes.

Q.   Okay.  Well, for example, if an MS member wants to kill another MS member, he can't just do it, correct?

A.   Generally not, no.

Q.   He has to have permission before he can do that?

A.   Permission that the person has to be green lighted or identified as an informant.

Q.   And the way you get a green light is, you have to get permission from somebody else in the gang before you can kill another MS member?

A.   Depending who that member is.  If that person is the shot caller or the person with the most authority with that clique or in that area, that person can order that.  Again, depending on that person's individual status, their standing.

Q.   Okay.  But one of the rules of MS is that you can't kill another MS member without permission, correct?

A.   Without -- yes.  Permission meaning -- I mean, that the person's clearly been identified, and there's a consensus and there's permission by the individual shot caller or leaders of that particular area.

Q.   Can I get Government's 15 brought back up, please?

You've seen this before, correct?  You've identified

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/28/17   Page 352 of 508
Case 3:08-cr-00134-RJC   Document 1312   Filed 01/30/11   Page 97 of 253
JA1318

CROSS-FLORES

this as an exhibit, correct?

A.   Correct.

Q.   All right.  And these are rules of MS, correct?

A.   The rules are written out by a member, yes.

Q.   Okay.  A member of MS wrote these down stating that these were the rules?

A.   Correct.

Q.   Okay.  Rule number two says that you can't kill another member of MS, correct, without permission?

A.   It's number, rule number two?

Q.   Yes.

A.   You should not take a life of another Sureno, another southern gangster, unless that person brings a problem to the neighborhood.  Because killing this person could bring consequences to the neighborhood.  That's rule number two.

Q.   Can I get, is it 15a?

        THE COURT:  15a.

        MR. BRYSON:  Thank you.

Q.   All right.  The translation on 15a says, never make an attempt on the life of any homie or Sureno unless you have a problem with the 'hood.  Since it can bring you the same consequences -- excuse me.  Since it can bring you consequences from the same 'hood; is that what it says?

A.   Correct.

Q.   Okay.  And what it means is, if you kill somebody

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 353 of 508
Case 3:08-cr-00134-RJC   Document 1312   Filed 01/30/11   Page 98 of 253
JA1319

CROSS-FLORES

without permission, the 'hood -- the MS is going to come after you?

A.    What it means is, in terms of defining that is, in Los Angeles and dealing with street gangs in general, if an MS gang member kills another person that has some significant role or some significant contributor to say a particular Mexican Mafia member, and you kill that person.  And by killing that person you obviously cut off that person's ability to make money.  That mafia member can order retaliation against the whole gang.  In terms of, that person's going to be ordered killed, and necessarily ordered killed by their own friends who are closest to that person.

So, in terms of when you're dealing with politics in large group of gangs, and large control of gangs, unless it's something which a particular responding, particularly to an attack, immediate attack on the neighborhood, you need to know what you're doing, who you're going after.  And that the person is not necessarily connected when dealing with the gangs as a whole.

But -- and the environment of the gang of the clique, you do have a lot of murders that occur --

MR. BRYSON:  I object as nonresponsive.

THE COURT:  Sustained.

Q.    (By Mr. Bryson) All right.  Here's my question:  If an MS member kills another MS member without permission, he can

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-3    Filed 03/28/17    Page 354 of 508
Case 3:08-cr-00134-RJC    Document 1319    Filed 01/30/11    Page 95 of 253
JA1320

CROSS-FLORES

be in trouble with the gang, correct?

A.   Correct.

Q.   All right.  So just committing an act of violence, does not automatically increase your reputation with the gang, correct?

A.   Correct.  There are some perceived benefits of the gang.

Q.   Okay.  And the rules are generally given orally by the clique leader, correct?

A.   Correct.

Q.   Sometimes they're written down, correct?

A.   On occasion, it's rare.

Q.   All right.  Well, 15a was an example of someone's attempt to write them down, correct?

A.   Correct.

Q.   Another MS rule is that you must attend meetings, correct?

A.   Correct.

Q.   All right.  Another MS rule is that you cannot cooperate with law enforcement, correct?

A.   Correct.

Q.   Now, if someone does cooperate with law enforcement, they're not automatically given a death sentence are they?

A.   Depending on the perceived violation against --
somebody that's cooperating with law enforcement, is

Laura Andersen, RMR 704-350-7493

**JA1321**

CROSS-FLORES

generally seen as just that, a snitch, a rat.  And that's the lowest form that person can be considered.  And it's a direct violation of the rules.

So generally that -- I've seen that as generally death, targeted for death.

Q.   But it's not automatic, there can be other punishments, correct?

A.   There can be lesser punishments, but not generally.

Q.   All right.  You have testified in other cases before, correct?

A.   Yes, sir.

Q.   And you gave testimony in a case in Maryland in September of 2006, correct?

A.   Correct, I believe so.

Q.   I'm going to ask you to look at the screen in front of you, and ask you if that doesn't look like a transcript.  And if I can scroll down for you.

Does that not look like a transcript of your testimony from that case in Maryland in 2006?

A.   Yes, sir.

Q.   Okay.  I'm going to -- let me get to where I want.

MR. NAZZARO:  Your Honor, I'm going to object; foundation.  I don't know that the question's been asked yet.

Q.   (By Mr. Bryson) During that --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 356 of 508
Case 3:08-cv-00134-RJC   Document 1290   Filed 01/30/11   Page 101 of 253
JA1322

THE COURT:  Well, I'll overrule the objection because I haven't heard the question yet.

Q.   (By Mr. Bryson) During that trial, were you asked a question about what happens at meetings?

A.   Correct.

Q.   And in response to that question, did you not say that one of the things that they did at meetings was, decisions -- "decisions made" -- excuse me, I'm sorry.  "Decisions may be made whether to kill, attack, or try to dissuade people involved with those investigations or involved with anything that stands in the way of the Mara Salvatrucha gang", close quote.  That's what you said, correct?

A.   Correct.

Q.   So someone who's cooperating with law enforcement office, is not automatically going to be sentenced to death, correct?

A.   Depending on, again, whether it's an individual member that's turned.  Or you have a member of the public that's just cooperating because, you know, as a citizen they've been called as a witness.  I mean, there's an egregious perceived violation by an individual member of the gang that's turned against the gang.

That's more likely to be targeted for death, versus someone who is targeted to be dissuade or intimidated.

Q.   Okay.  But a decision has to be made?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 357 of 508
Case 3:08-cr-00134-RJC   Document 1596   Filed 01/30/11   Page 102 of 253
JA1323

CROSS-FLORES

A.    Yes.  And the information has to go out to the members.

Q.    Okay.  And you said before, when an MS member is disrespected, they are required to respond, okay?

A.    Correct.

Q.    And they have to attack, correct?

A.    Correct.

Q.    They don't necessarily have to kill, but they do have to attack, correct?

A.    Correct.  They have to defend their honor, defend the honor of the gang.

Q.    Okay.  Now MS members are required to follow the directions of their clique leader?

A.    Correct.

Q.    The person who runs the meetings is the clique leader?

A.    Generally, yes, sir.

Q.    Okay.  MS members are required to go on missions?

A.    Correct.

Q.    Missions are criminal activities?

A.    Yes, sir.

Q.    They are planned ahead of time?

A.    Generally, there's some planning, some happen, again, on the spur.

Q.    They are directed by the clique leader?

A.    Generally, there are some direction from the clique leader.  But there is some understanding.  Obviously, if a

Laura Andersen, RMR 704-350-7493

**JA1324**

member is confronted by a rival gang member or disrespected, they don't necessarily need the coordination of the clique leader in responding.

I mean, they obviously know the rules. They know the understanding of the gang that they're in. How they're suppose to respond. And how they learned to respond.

So in that sense they wouldn't need the coordination of the clique leader for that.

Q. But something that happens spontaneous is not a mission?

A. No. Again, depending on the timing of the situation.

Q. Okay. But, I mean -- a mission is something that is directed ahead of time, correct?

A. It could be. But it could be five minutes ahead. It could be two days ahead. Depending on the timeline.

Q. Okay. But regardless of the timing, it is directed ahead of time?

A. Yes.

Q. Okay. Missions are crimes committed to benefit the gang?

A. Yes.

Q. Not every crime that a gang member -- excuse me. Not every crime that a MS member commits is benefit for the gang?

A. Correct.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-3   Filed 03/23/17   Page 359 of 508
Case 3:08-cr-00134-RJC   Document 1340   Filed 01/30/11   Page 104 of 253

JA1325

Q.   One of the rules of MS is that members are not suppose to commit criminal acts that will draw the police presence to their own territory?

A.   Generally it would be something that, you know, unnecessarily causes it, or brings attention to, you know, the neighborhood.

Q.   I think they said, don't bring the heat to your own territory?

A.   Correct.

Q.   And that's a rule of MS?

A.   That's a general understanding; unnecessary.  The gang is involved in various activities which causes a lot of response by law enforcement.  So in a sense it's a little bit of a contradiction, but that's a general understanding there.

Q.   Right.  Members are expected to use their head, and not do something stupid that's going to bring the police down on everything?

A.   Yes.

Q.   Okay.  Members are not suppose to be shooting rivals if children are around?

A.   Correct.

Q.   Of course, one of the rules of MS is that you have to follow the rules of MS?

A.   Generally, that's the understanding.  Rules aren't

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 360 of 508
Case 3:08-cr-00134-RJC   Document 1940   Filed 01/30/11   Page 105 of 253

JA1326

CROSS-FLORES

always followed to a T, but.

Q.   Okay.   But for those members who don't follow the rules, they can be sanctioned?

A.   Depending on the violation, yes.

Q.   Okay.   And they can get a 13, correct?

A.   Correct.

Q.   And that's a beating like they get when they get jumped in?

A.   Correct.

Q.   They can get a 26; correct?

A.   Yes, sir.

Q.   Okay.   And that's a 26 second beating, correct?

A.   Yes, sir.

Q.   And they could even be green lighted?

A.   Depending on the violation, that's a possibility.

Q.   It's not a rule that you are required to kill a rival upon being jumped in, is it?

A.   No.

Q.   All right.   And if you were interviewing an MS member and he told you that everybody was jumped in is required to kill a rival, you wouldn't believe that, would you?

A.   Well, depending on where that member is from.   That member is directly from El Salvador, there maybe, you know, different rules of initiation there.

     But my understanding of the rules here in the United

Laura Andersen, RMR 704-350-7493

**JA1327**

CROSS-FLORES

States, it's a little different.

Q.   Right.   That's different from your understanding of the rules?

A.   Correct.

Q.   If you were interviewing somebody from -- in the United States, an MS member, and he told you that, you wouldn't believe that?

A.   Not necessarily.   Again, I have to take it into context all the other factors I know about the person, the clique, the area.

Q.   Okay.   You were shown some various tattoos before.   The current trend is away from tattoos; is that correct?

A.   Generally it's tapered off.   Specifically more visible tattoos.

Q.   Tattoos make it easy to identify a person as a gang member?

A.   It is one of the factors that attracts attention.

Q.   You've been to El Salvador?

A.   Yes, sir.

Q.   You're aware of the anti-gang policy they have down there?

A.   Somewhat.

Q.   They have some tough anti-gang policies?

A.   Yes.

Q.   They have a crime called, Elicit Associations down

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 362 of 508
Case 3:08-cr-00134-RJC    Document 1290    Filed 01/30/11    Page 107 of 253
**JA1328**

CROSS-FLORES

there?

A.    Yes.

Q.    And it essentially makes it illegal to be a gang member?

A.    My understanding, be a gang member or to associate.

Q.    And if you have visible gang tattoos, you can be arrested?

A.    Yes, sir.

Q.    Okay.  And a person from El Salvador, to have visible gang tattoos, is not a smart thing to do, is it?

A.    No.  But it's very common.  I would say it's more common in El Salvador than it is in the United States for members to have visible tattoos.

Q.    You talked about the origins of MS.  And a lot of the people that started the gang had come from Central America, correct?

A.    Yes, sir.

Q.    And that was back in the eighties?

A.    Yes, sir.

Q.    Many of those people came from El Salvador?

A.    Yes, sir, primarily.

Q.    Most of the people came from El Salvador, correct?

A.    Yes, sir.

Q.    And that was because there was a civil war going on in El Salvador?

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 363 of 508
Case 3:08-cv-00134-RJC    Document 1240    Filed 01/30/11    Page 108 of 253
JA1329

A.   Yes, sir.

Q.   And it was a very bloody war?

A.   Yes.

Q.   And the people came here to avoid the death squads that were going on down there?

A.   Yes.  The war, and the other pressures that were going on there at the time.

Q.   In fact, the name, Mara Salvatrucha, the Salva is reference to El Salvador; isn't it?

A.   It does double as a reference to the origin of the gang which is primarily from El Salvador.

Q.   Okay.  You had said before that women can join MS?

A.   Yes, sir.

Q.   Correct?  All right.  Haven't they changed that rule?

A.   Not my understanding.  Women are still allowed. It's -- I wouldn't say it's very common where you have as many women members of the gang as you do men.  But my understanding is, it's still open.

Q.   All right.  You also said that in the motto it mentions the word "rape"; is that correct?

A.   Correct.

Q.   Haven't they also implemented a rule that says you can no longer rape, commit rape?

A.   It's something they shy away from, specifically in California; rapist, child molesters, any sex offense persons

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 364 of 508
Case 3:08-cr-00134-RJC   Document 1248   Filed 01/30/11   Page 109 of 253
JA1330

REDIRECT-FLORES

in California that go to jail, go to prison there, that's seen as an egregious violation and they are ostracized.

Q.   And so it's become a MS rule not to rape?

A.   I know it's been part of the motto.  I take rape in the sense of more of a pirate sense.  Robbery, rape and pillage, in the sense of how it's defined.  But I know rape is, obviously, at least in California, a little bit more of a taboo there in the gang world.

MR. BRYSON:  Okay.  Can I have just a moment, Your Honor?

THE COURT:  You may.

MR. BRYSON:  Those are my questions.

MR. NAZZARO:  Yes, sir.

THE COURT:  Any redirect?

MR. NAZZARO:  Yes, sir.

THE COURT:  Something new?

REDIRECT EXAMINATION BY MR. NAZZARO:

Q.   You were shown 15a and asked about the rules relating on 15a; do you remember that?

A.   Yes, sir.

Q.   I show you also the rules that were referenced, were referenced to killing another member of a gang; is that right?

A.   Yes, sir.

Q.   If you're disrespected by someone who is not a member

Laura Andersen, RMR 704-350-7493

**JA1331**

REDIRECT-FLORES

of a gang, in relation to MS 13, what action is a member suppose to take?

THE COURT:  That's been asked and answered.

MR. NAZZARO:  No further questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. NAZZARO:  Charles Barkley.

THEREUPON, CHARLES BARKLEY, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.    Would you please state your name, sir.

A.    Charles Barkley.

Q.    You're not a basketball player?

A.    I --

Q.    You're not a professional basketball player?

A.    No, sir.  I wish I was.

Q.    Your name has come up before, that's why I asked that.  I'm sorry.  What is your occupation?

A.    I'm a police officer for the City of Durham, dispatched over to the FBI.

Q.    How long have you worked in that capacity as a police officer?

A.    Police officer, five years.  I've been on the FBI task force for five.  I'm sorry, 15 years as a police officer, FBI task force for five.

Laura Andersen, RMR 704-350-7493

**JA1332**

DIRECT-BARKLEY

Q.   Are you on this task force in your role as a police officer?

A.   Long term investigation, yes, sir.

Q.   What type of assignments have you had during your career as a police officer and with the task force?

A.   As a police officer, I've been on crime unit, target team, gang uniform patrol, special operations division, and I'm currently, as I said before, on an FBI task force.

Q.   Tell us about this FBI task force.  What type of duties do you have with the FBI task force?

A.   What I do is, I usually either work bank robberies or I do gangs.  If we get a person that goes out and rob a bank, we go out and track them down.  We build a case, make sure all the evidence is turned in.

     The other thing I do is, we do gang work.  If we have a specific gang, we go after them, see what type of activity that they're doing.  And if they're doing illegal activities, we try and build a case against them.

Q.   Have your duties involved investigating the MS 13?

A.   Yes, sir.

Q.   And you've investigated MS 13 in the past?

A.   Yes, sir.

Q.   I want to direct your attention to the spring of 2006.  Were you involved in an investigation of the MS 13 in Durham during that period of time?

Laura Andersen, RMR 704-350-7493

**JA1333**

DIRECT-BARKLEY

A.    Yes, sir.

Q.    And what was the focus of your investigation at that time?

A.    We had heard that MS 13 was having some illegal activities in Durham.

        MR. BRYSON:  Well, object to what he heard, Your Honor.

        THE COURT:  Members of the jury, the testimony of the officer as to what he heard, is not offered to you for the truth of the matter about what he heard, but only to help explain why he did what he did next, if it does.

Q.    (By Mr. Nazzaro) Could you continue what you were saying?

A.    That they were having some -- they were doing some illegal activities in Durham.  So what we did was, we had an informant.  We were able to talk to the informant.  The informant advised us that there was going to be a beat in, in one of the parks in Durham.  So we set up surveillance at that location.

Q.    And when you talk about surveillance at the location, were you involved in setting up the -- that surveillance personally?

A.    Yes, sir.

Q.    Was that in March of 2006?

A.    Yes, sir.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 368 of 508
Case 3:08-cv-00134-RJC    Document 1290    Filed 01/30/11    Page 113 of 253

JA1334

DIRECT-BARKLEY

Q.   And did you in fact set up some surveillance at the park?

A.   Yes, sir.  We set up a camera.

Q.   And where did you set it up, approximately?

A.   We set up in the woods.  We was able to talk to our informant and let him know that that activity did take place, wanted to take place at this location right here.  So we previous went out there and set up a camera, so the camera wouldn't be detected, but we could see the activity that was taking place.

Q.   Did you later retrieve that video from the woods?

A.   Yes, sir.

Q.   Were you able to look at it since that point in time?

A.   Yes, sir.

MR. NAZZARO:  I would like to show you what's been previously marked as Government Exhibit 30 and ask if I could approach the witness?

THE COURT:  Government Exhibit what?

MR. NAZZARO:  Thirty.

THE COURT:  Thirty; you may.

Q.   (By Mr. Nazzaro) Are you able to recognize Government 30?

A.   Yes, sir.

Q.   What is Government 30?

A.   City park meeting log beat in.

Laura Andersen, RMR 704-350-7493

111
DIRECT-BARKLEY

Q.   Is that your initials on that exhibit?

A.   Yes.

Q.   Does that capture what happened in the woods in March of 2006?

A.   Yes, sir.

          MR. NAZZARO:  Your Honor, I would move 30 and ask that 30a be published, which is a portion of the video.

          THE COURT:  Any objection?

          MR. BRYSON:  No, Your Honor.

          THE COURT:  Let it be admitted.  You may publish.

(Government Exhibit 30 & 30a were received into evidence.)

Q.   (By Mr. Nazzaro) As this video is playing, could you provide -- there's no sound on it; is that right?

A.   No, sir.  No sound.

Q.   Could you provide some narrative, the individuals and what is occurring?

(Video playing.)

A.   We actually had the camera set up in the woods right here, and what they're doing is making a circle.

     The person you see right there in the film with the white T-shirt and he's putting his hands together, that's Cholo.  He's the leader of MS 13 -- he was the leader of MS 13 in Durham.  What they are about to do is give the beat in to two members.  The female is also a member.  And they're going to give him a 13 second beat in.

                    Laura Andersen, RMR 704-350-7493

JA1336

DIRECT-BARKLEY

Cholo with his shirt off.

They just giving him a hand shake, showing him love after the beat in.

Q.    You said there was a second beat in?

A.    There's another one coming up.

(Video stopped.)

Q.    (By Mr. Nazzaro) You referred to this individual by the name of Cholo.  Did you later determine his real name?

A.    Yes, sir.

Q.    Do you remember what that was?

A.    Michael Mena.

Q.    And the individual you've indicated, Cholo, did your investigation reveal whether he had any connection to Charlotte?

          MR. BRYSON:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  Yes, sir.

Q.    (By Mr. Nazzaro) And do you know if he was ultimately charged in Charlotte?

          MR. BRYSON:  Objection.

          THE COURT:  I'll sustain the objection to that.

Q.    (By Mr. Nazzaro) Did you share any information with Charlotte about Cholo?

          MR. BRYSON:  Objection.

          THE COURT:  Sustained.

                    Laura Andersen, RMR 704-350-7493

**JA1337**

DIRECT-BARKLEY

Q.    (By Mr. Nazzaro) Was it common during your investigation to exchange information with other law enforcement agencies?

MR. BRYSON:  Objection to what was common.

THE COURT:  Overruled.

THE WITNESS:  Yes, sir.

Q.    (By Mr. Nazzaro) And did you do that in this particular investigation?

MR. BRYSON:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, sir.

MR. NAZZARO:  Thank you.  I have no further questions.

THE COURT:  Any cross?

CROSS-EXAMINATION BY MR. BRYSON:

Q.    The video we just watched showed two different people being jumped in; is that correct?

A.    Yes, sir.

Q.    And each person was beat in by three other people, correct?

A.    I couldn't tell you how many people they were beat in by.  Yes, sir, by members of that gang, yes, sir.

Q.    Not everybody jumped in, some people were standing around watching, right?

A.    Yes, sir.  If you're not a member, you cannot

Laura Andersen, RMR 704-350-7493

JA1338

participate.

Q.    Okay.  And one of the people in both jump ins doing the attacking was a girl?

A.    You said one of the active member -- I'm sorry, sir. Could you say that again?

Q.    In both the jump ins, one of the people doing the attacking or the assaulting was a girl?

A.    That is correct.

        MR. BRYSON:  Those are my questions.

        THE COURT:  You may step down and be excused.

        Call your next witness.

        MS. ROSE:  Jeff Bruner.

        THE COURT:  Jeff who?

        MS. ROSE:  Bruner, B-R-U-N-E-R.

THEREUPON, JEFF BRUNER, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.    If you would please state your name, spell your last name for the reporter.

A.    Jeff Bruner, B-R-U-N-E-R.

Q.    Where are you employed?

A.    Los Angeles Police Department.

Q.    How long have you been employed at the Los Angeles Police Department?

A.    Ten years.

Q.    What are your duties there at the department?

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 373 of 508
Case 3:08-cv-00134-RJC    Document 1340    Filed 01/30/11    Page 187 of 253
JA1339

DIRECT—BRUNER

A.    Right now I'm currently assigned to the 77th patrol as a regular patrol officer.  My prior assignments include Metropolitan Division, Ran Park Enforcement Details, Ran Park Narcotics, Ran Park Special Problems Unit and Ran Park Patrol.

Q.    In 2007, what was your position?

A.    At that time I was working the Ran Park Gang Enforcement Detail.

Q.    When you say gang enforcement in that particular division, what were your duties?

A.    We would monitor and track the various criminal street gangs within the division.  At that time I was specifically assigned to monitor the La Mara Salvatrucha or MS 13.

      Our daily duties were to gather intelligence on the various gang members, track their crime trends, keep track of who is on parole or probation.  Monitor the various locations where the gang crime and the gang members would commit their crimes.  As well as testify in court.  Go through crime reports.  Conduct surveillance, serve gang-related search warrants.

Q.    And at that time, did LA have what's called a gang injunction program?

A.    Yes.

Q.    And if you would, just explain to the jury what this gang injunction program is?

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 374 of 508
Case 3:08-cv-00134-RJC    Document 135-0    Filed 01/30/11    Page 19 of 253
**JA1340**

DIRECT—BRUNER

116

A.    It was put forth by the city attorney to -- an injunction that prohibits any gang members listed on the injunction from engaging in a variety of criminal activity listed on the gang injunction, within a prescribed area or safety zone, if you will.

Q.    And how did you go about identifying specific gang members for these injunctions?

A.    There's various ways to identify them.  Either through the community, through citizens.  For the most part when we stop or identify gang members, they would admit their gang membership by claiming they're from the gang with a moniker. And usually they would claim a clique of the gang.

Q.    Were you working with a partner back in August of 2005?

A.    Yes, ma'am.

Q.    Who was your partner?

A.    Brent Philips.

Q.    And 2005 is part of the time period that you were working this gang suppression or gang unit?

A.    Yes, ma'am.

Q.    And on or about August the 19th of 2005, did you and your partner encounter an individual named Alejandro Umana?

A.    Yes, ma'am.

Q.    If you recall, what were the circumstances?

A.    He was in front of 1021 North Mariposa Avenue.  Which at the time was a problem location for MS.  And my partner

Laura Andersen, RMR 704-350-7493

JA1341

DIRECT-BRUNER

and I directed a lot of time and patrol efforts at that location.  There was vacant apartments that MS gang members would hang out in, loiter in, commit gang crime in.

MR. FOSTER:  Objection; motion to strike.

THE COURT:  Basis?

MR. FOSTER:  404(b), Your Honor.

THE COURT:  I'll overrule the objection.  I'll sustain it as nonresponsive and ask you to follow-up.

Q.   (By Ms. Rose) What did you -- if you recall, what were the circumstances under which you encountered the defendant and how do you specifically recall that instance?

A.   We warned him for trespassing.  And we served him with a copy of the MS gang injunction.

Q.   And how do you recall this particular defendant?

A.   How do I recall him?

Q.   Yes.

A.   I remember stopping him several times during that week --

MR. FOSTER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  -- but I specifically served him with the gang injunction on that day.

Q.   (By Ms. Rose) Do you see here in the courtroom, the individual you recall as Alejandro Umana?

A.   Yes, I do.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 376 of 508
Case 3:08-cr-00134-RJC    Document 1240    Filed 01/30/11    Page 21 of 253
**JA1342**

DIRECT—BRUNER

118

Q.   If you could identify that individual, please?

A.   He's the gentleman wearing the white shirt seated to the left of defense counsel.

MS. ROSE:  If the record could so reflect the identification of the defendant, Your Honor.

THE COURT:  Would you point to the person you're referring to.

THE WITNESS:  (Indicating.)

THE COURT:  It will so reflect.

MS. ROSE:  Thank you, Your Honor.

Q.   What if anything about the defendant, did you specifically recall after encountering him on those several occasions?

A.   He had an MS tattoo between his eyes.  And he had MS on his chest.  And he told us that he was from Park View Locals clique, and they called him Lobo.

Q.   Did you -- other than those occasions, did you have any other interactions with this particular defendant during that time in August of 2005, other than what you've already told the jury?

A.   Just those couple of weeks there, no, ma'am.

MS. ROSE:  All right, sir.  Thank you very much.

THE COURT:  Any cross?

MR. FOSTER:  One moment, Your Honor.

No questions, Your Honor.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 377 of 508
Case 3:08-cr-00134-RJC   Document 2940   Filed 01/30/11   Page 122 of 253
JA1343

DIRECT-VASQUEZ

119

THE COURT:  You may step down, be excused.

Call your next witness.

MS. ROSE:  Eduardo Vasquez, Your Honor.

THEREUPON, EDUARDO VASQUEZ, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.    If you would, please state your name, sir, and spell your name for the court reporter if you would please.

A.    Last name Vasquez, V-A-Z-Q-U-E-Z.  First name, Eduardo.

Q.    Where are you employed?

A.    I'm employed for the D.C. police, the Metropolitan Police Department.

Q.    In Washington D.C.?

A.    Yes, ma'am.

Q.    How long have you been in law enforcement?

A.    Twenty-one years.

Q.    Always with the metropolitan police department there in D.C.?

A.    Yes, ma'am.

Q.    What are your primary duties?

A.    I'm currently assigned to a United States Marshal's Fugitive Task Force.

Q.    How long have you been on the task force?

A.    Twenty years.

Q.    As part of that task force, do you also work in investigations?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 378 of 508
Case 3:08-cv-00134-RJC   Document 2940   Filed 01/30/11   Page 123 of 253
**JA1344**

DIRECT-VASQUEZ

A.    Yes, ma'am.

Q.    Are there any particular type of investigations to which you are assigned?

A.    Mostly homicides, ma'am.

Q.    Were you the lead investigator in a case known as U.S. versus William Cordova?

A.    Yes, ma'am.

Q.    When was that case?

A.    Somewhere around 2007.

Q.    And how long were you involved in that particular investigation?

A.    I was asked, the beginning of June, 2007, until apprehension, which took place in August of 2007.

Q.    Without going into a whole lot of detail about that particular -- particular case, what was the nature of the case?

A.    It was --

            MR. FOSTER:  Object.

            THE COURT:  Hang on a second.

            MR. FOSTER:  Object.

            THE COURT:  Let me see the attorneys at side bar.

(Bench conference as follows:)

            THE COURT:  What's your objection?

            MR. BRYSON:  My understanding, correct me if I'm wrong, my understanding this leads as the foundation for an

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 379 of 508
Case 3:08-cv-00134-RJC   Document 1249   Filed 01/30/11   Page 247 of 253
**JA1345**

arrest he picked up in North Carolina with this guy Cordova in August or September.

MS. ROSE:  He's with this defendant.  There's another witness will show they fled from part of this investigation.  They fled from New York, came to D.C, then came to North Carolina.  This guy's tracking Cordova, arrests Cordova.  That's when Umana is arrested with the drugs alleged in the Bill of Indictment.  Kind of ties in the whole, how they came to encounter the defendant.

THE COURT:  And your objection is relevance to the nature of the investigation?

MR. BRYSON:  My understanding, I thought you were asking about the nature of the case?

THE COURT:  She did.

MR. BRYSON:  That Cordova was arrested --

THE COURT:  Let's get past that.

MS. ROSE:  I was trying to get him -- it was an MS case.

MR. BRYSON:  Umana was not involved in that.

MS. ROSE:  Not part of the flight.  I'll do that when I go out.

THE COURT:  Your objection is sustained as to the nature of that investigation.

MR. BRYSON:  All right.

(The bench conference was concluded.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 380 of 508
Case 3:08-cr-00134-RJC   Document 1240   Filed 01/30/11   Page 125 of 253
**JA1346**

122
DIRECT-VASQUEZ

Q.    (By Ms. Rose) Detective Vasquez, did that investigation involve Mr. Cordova as a member of MS 13?

A.    Yes, ma'am.

Q.    Did Mr. Cordova have a nickname or gang name by which he was known?

A.    Yes, ma'am.

Q.    What was that name?

A.    Sentinela.

THE COURT:  What was it?

THE WITNESS:  Sentinela.

Q.    (By Ms. Rose) Would you spell that for the court reporter, please.

A.    S-E-N-T-I-N-E-L-A.

Q.    At some point were you attempting to locate this Mr. Cordova, Sentinela?

A.    Yes, ma'am.

Q.    What efforts -- describe some of the efforts that you used to locate him in relation to his charges there in D.C.?

A.    One of the primary tools that we used on the unit is create a wanted poster.

Q.    I'm going to show you what has been marked as Government's Exhibit 32.  Are you able to identify Government's Exhibit 32?

A.    Yes, ma'am.

Q.    What is Exhibit 32?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 381 of 508
Case 3:08-cr-00134-RJC    Document 1290    Filed 01/30/11    Page 126 of 253
**JA1347**

DIRECT-VASQUEZ

A.    It's a Metropolitan Police Department, intelligence bulletin distributed through law enforcement for the capture.

Q.    And did you actually create that particular intelligence bulletin or wanted flyer?

A.    No, ma'am.  Not this one.

Q.    Did you provide some of the information?

A.    Yes, ma'am.

Q.    And is that a fair and accurate representation of the wanted poster that was circulated to law enforcement?

A.    Yes, ma'am.

MS. ROSE:  I would move to admit 32.

MR. BRYSON:  Your Honor, we would object.  There's a lot of information that's not relevant.

THE COURT:  Sustained.

Q.    (By Ms. Rose) As a result of the issuance of this particular intelligence bulletin or wanted poster, what happened?

A.    It was distributed to different law enforcement units, different states and communities within the metro area.  And apprehension came about August of 2007.

Q.    All right.  And as you were attempting to locate Mr. Sentinela, did your investigation lead you, at some point, to New York?

A.    Yes, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 382 of 508
Case 3:08-cv-00134-RJC   Document 1230   Filed 01/30/11   Page 127 of 253
JA1348

DIRECT-VASQUEZ

Q.    Then back to D.C.?

A.    Yes, ma'am.

Q.    And after the defendant and others came to D.C. what did you do in an effort to further --

        MR. BRYSON:  Objection; assumes facts not in evidence.

        THE COURT:  Sustained.

Q.    (By Ms. Rose) After the defendant came to D.C --

        MR. BRYSON:  Objection; assumes facts not in evidence.

        THE COURT:  Let me hear the question.

Q.    (By Ms. Rose) After you tracked the defendant to New York --

        MR. BRYSON:  Objection.

Q.    (By Ms. Rose) Excuse me.  Not defendant, Mr. Sentinela; what happened next in your investigation?

A.    There were several suspects involved in my case.  One of the suspects was apprehended in New York.  We continued on to follow Sentinela until we arrested him in North Carolina.

Q.    Do you know where in North Carolina he was arrested?

A.    I don't want to give the specific town, because I'm not too familiar with the towns.  But I think it was Greensboro.

Q.    And without going into the specifics of your investigative techniques, did you use some law enforcement

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 383 of 508
Case 3:08-cr-00134-RJC    Document 1940    Filed 01/30/11    Page 128 of 253
JA1349

sensitive techniques in order to locate him in Greensboro, North Carolina?

A. Yes, ma'am.

Q. Were you working with law enforcement in Greensboro, North Carolina to locate this individual, Mr. Cordova Sentinela?

A. Yes, ma'am.

Q. Do you remember specifically with whom you were working, what officer?

A. Sloane, John Sloane.

Q. Ultimately, was this individual, the defendant in your case, Mr. Cordova, arrested?

A. Yes, ma'am.

MS. ROSE: All right, sir. Thank you. I don't have any other questions.

MR. BRYSON: No questions, Your Honor.

THE COURT: You may step down and be excused.

How long is your next witness?

MR. NAZZARO: Probably at least a half hour, Your Honor, 45 minutes.

THE COURT: All right. I think we'll probably take a lunch break at this time.

Members of the Jury, we'll take our lunch break at this time. Remember don't talk about the case, keep an open mind, and we'll see you at five to two.

JA1350

DIRECT-VASQUEZ

126

(The jury was escorted from the courtroom.)

THE COURT:  Ms. Rose, at side bar I sustained an objection to your question with respect to the nature of the investigation.  I think you proffered that the defendant was arrested -- or was present at the time of the arrest of this Sentinela person.

MS. ROSE:  Yes.

THE COURT:  I was not sustaining an objection to that fact.  I was sustaining an objection to your question concerning the nature of the investigation of Mr. Sentinela.

And so, I don't know if you understood the Court's ruling or not.  So based upon your proffer, I was expecting at least one more question.

MS. ROSE:  I was being very cautious, Your Honor.

THE COURT:  All right.  Well, I'm just telling you what the nature of my ruling was.

MS. ROSE:  All right.  Thank you.

THE COURT:  You can leave it there or -- I'm just explaining my ruling to you for whatever purpose you want to make of it.

MS. ROSE:  Thank you, sir.

THE COURT:  Anything further from either side?

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  We'll take our lunch break and we'll see you all at five to two.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 385 of 508
Case 3:08-cr-00134-RJC   Document 2946   Filed 01/30/11   Page 130 of 253

**JA1351**

Appeal: 10-6    Doc: 90-3    Filed: 08/14/2013    Pg: 386 of 508

(A brief recess was taken in the proceedings.)

THE COURT:  Ready for the jury?

MR. BRYSON:  I just want the Court to know, Mr. Umana is experiencing one of his headaches.  We brought the trash can here.  He just advises us that he might have to throw up here.  We brought the trash can here and I just wanted to let the Court know.

THE COURT:  Then if you need to signal me and we need to take a break, let me know.

MR. BRYSON:  Okay.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Welcome back.  It's pretty outside. Nice and cool inside.

THE JURY:  Is it?

THE COURT:  There's not as much pollen inside the courtroom as there is outside, that's one advantage.

Is the United States ready to call its next witness?

MR. NAZZARO:  Yes, Your Honor.

United States calls Lenny Moriera.

THEREUPON, LENNY MORIERA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good afternoon.  Can you please state your full name?

A.   Lenny Moriera.

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC    Document 59-3    Filed 03/23/17    Page 386 of 508
Case 3:08-cv-00134-RJC    Document 1546    Filed 01/30/11    Page 131 of 253
**JA1352**

DIRECT—MORIERA

Q.   Mr. Moriera, how old are you, sir?

A.   Twenty-eight.

Q.   And where were you born?

A.   In East Meadow.

Q.   And where is East Meadow?

A.   In New York.

Q.   What part of New York is that in?

A.   It's in East Meadow on Long Island.

Q.   Did you grow up in New York?

A.   Yes.

Q.   Are your parents from the United States?

A.   No.

Q.   Where are they from?

A.   Salvador.

Q.   Do you speak a language other than English; do you speak Spanish?

A.   Yeah.

Q.   Do you also understand Spanish?

A.   Yes.

Q.   How far did you go in school in New York?

A.   The 10th.

Q.   Tenth grade?

A.   Yes.

Q.   And did you leave voluntarily or were you kicked out of school?

Laura Andersen, RMR 704-350-7493

JA1353

DIRECT—MORIERA

A.    No, just left, you know, never finished.

Q.    And you never finished after that point?

A.    No.

Q.    Have you ever had any sort of work or jobs in the New York area?

A.    Yes, on and off.

Q.    What type of work have you done?

A.    Construction, landscaping.

Q.    And are you familiar with the MS 13?

A.    Yes.

Q.    Were you ever a member and are you a member of the MS 13?

A.    Yes.

Q.    Are you still a member?

A.    Yes.

Q.    When did you join the MS 13?

A.    When I was 13.

Q.    And where did you join the MS 13?

A.    In Long Island.

Q.    And why did you join the MS 13?

A.    Because it was like a family, like a hangout thing.

Q.    Were you in school at the time you joined the MS 13?

A.    Yes.

Q.    Did you join a particular group or clique in the New York area?

Laura Andersen, RMR 704-350-7493

**JA1354**

DIRECT-MORIERA

A.    Yes HLS.

Q.    HLS?

A.    Yes.

Q.    What does that stand for?

A.    For Hempstead.  Hempstead Locotes Salvatrucha.

Q.    What type of activities would the MS 13, and specifically the clique you were involved in, do in New York?

A.    Sell drugs, rob people, try to kill people.

Q.    And have you personally been involved in some of those activities?

A.    Yes.

Q.    And were you jumped into the MS 13, do you know what that means?

A.    Yes.

Q.    What does that mean?

A.    I became a part of them.

Q.    How do you get jumped in?

A.    They beat you for 13 seconds.

Q.    And did that happen in your case?

A.    Yes.

Q.    How many people participate in that process?

A.    About three to four, depending on your size.

Q.    And after you became a member of the MS 13, did you become familiar with the ways of MS 13 and some of the

Laura Andersen, RMR 704-350-7493

**JA1355**

Q. rules?

A. Yes.

Q. And what were some of those rules that you learned of as you became a member and after you became a member?

A. Show your love to the gang, like how much are you willing to go for it.

Q. How do you do that?

A. By showing them loyalty and, you know, part of the rules, like robbing people, stealing, you know.

Q. And were there particular rival gang members in New York?

A. Yes.

Q. Was there a rival gang; what was that gang?

A. The rival was 18th Street, Latin Kings.

Q. Were they present in New York, those two gangs?

A. Yes.

Q. And did the MS 13 have a particular way they would greet each other --

A. Yes.

Q. -- a hand shake. What is that?

A. Like this. (Witness indicating.)

Q. And could you do that again a little slower?

A. (Indicating.)

Q. Okay. And you put your two fingers up together?

A. Yeah, like this (indicating).

DIRECT—MORIERA

Q.   And your right hand is displaying your fingers in the middle down and your two --

A.   Yeah.

Q.   -- outer fingers up?  What is that symbol?

A.   It's like the horns of the devil.

Q.   Is that a symbol associated with the MS 13 gang that you were a member of?

A.   Yes.

Q.   And what about -- was there particular colors that the gang had?

A.   Yeah, blue and white.

Q.   Did you ever attend any meetings of the MS 13?

A.   Yes.

Q.   How frequently were the meetings?

A.   Every other week.

Q.   Was there any type of disciplinary procedures, if the rules weren't abided by or were broken?

A.   Yeah.  You would get a violation.

Q.   What type of violations are there?

A.   You'd get beat for 13 seconds.

Q.   Was there any other type of violation?

A.   Yeah.  If you didn't abide by that one, you get beat for 26.

Q.   Is there anything stronger than that?

A.   Yeah.  After that they green light you.

Laura Andersen, RMR 704-350-7493

**JA1357**

Q.    What is a green light?

A.    The whole gang gets after you.

Q.    How do you get green lighted?  What are the ways to get green lighted?

A.    People that work for officers and you don't abide by the rules.

Q.    Did the MS 13 in New York have any association with El Salvador?

A.    Yes.

Q.    What was that association?

A.    They're stronger over there and they check up on other cliques from over here from New York, Long Island, you know, to make sure everything is going good.

Q.    Did you personally ever talk to anybody in El Salvador about those types of issues?

A.    Yes.

Q.    And was there ever an occasion where El Salvador would send any people to check on your clique?

A.    Yes.

Q.    Did that happen in New York?

A.    Yes.

Q.    What was the -- what's the name that was associated with the head of a clique?  Did they have a particular name, not the person, but did they go by -- was there a particular word that was used if someone was the leader of the clique?

Laura Andersen, RMR 704-350-7493

JA1358

DIRECT—MORIERA

A.    The first word.  Who had the first word.

Q.    Was there any other names that you would use?

A.    Yeah.  Like rafliendo (phonetic spelling) in Spanish.

Q.    What does that mean in Spanish?

A.    Like who's running the set or where you from.

Q.    I mentioned about some of the crimes.  You personally were involved in some crimes, is that right, in New York?

A.    Yes.

Q.    And you have some convictions for various offenses?

A.    Yes.

Q.    And is one of them robbery?

A.    Yes.

Q.    And when did that occur?

A.    In '98.

Q.    How old were you at the time, do you know?

A.    Sixteen.

Q.    And was that a felony?

A.    Yes.

Q.    And do you have any convictions for assault?

A.    Yes.

Q.    And were those also felonies?

A.    Yes.

Q.    And when did those occur, do you recall?

A.    In '99 and 2001.

Q.    And what were -- what was the -- were any of the

Laura Andersen, RMR 704-350-7493

**JA1359**

DIRECT-MORIERA

assaults related to your activities with the MS 13?

A.    Yes.

Q.    Could you tell us about which one was related to it and what the crime was?

A.    It was the last assault I had.  That we was hanging out in the 'hood where, you know, the block that MS 13 hangs out at.  And a guy came through, and they thought he was a gang member.  And one of the -- one of the guys that was with me asked him if he was from another rival gang, and the guy said, no.  And he said, he don't give a fuck.

Q.    What did he say?

A.    He said he didn't give a fuck about the gang, and that he doesn't do that.

Q.    And what happened?

A.    So the guy that was with me struck him with a bottle. And then they started beating him.

Q.    And you were involved in that?

A.    Yes.

Q.    And why did you do that as part of the MS 13?

A.    To show respect to the gang.

Q.    How important is respect in the MS 13 gang?

A.    It goes by how are you showing the love that you're showing for the gang.  That's how you going up in levels, going up and up and up.

Q.    Want to direct your attention to the summer of 2007.

Laura Andersen, RMR 704-350-7493

JA1360

DIRECT-MORIERA

Were you still associated during that summer with the MS 13?

A.   Yes.

Q.   And in particular, I want to direct your attention to Hempstead, New York.  Were you in that area at the time?

A.   Yes.

Q.   Was there a particular place or location where the MS 13 would hang out or associate themselves at?

A.   Yes.  Henry Street.

Q.   Where was that?

A.   Henry Street.

Q.   Henry Street?

A.   Yeah.

Q.   Was there a particular place on Henry Street?

A.   Yeah, it was a deli.  A deli.

Q.   Were you at that deli on occasions during the summer of 2007?

A.   Yes.

Q.   Have you ever heard of the name Coyote?

A.   Yes.

Q.   Who is that?

A.   That's the head of my clique.

Q.   Is that a nickname?

A.   Yes.

Q.   Is that how you refer to him?  Is that a name -- is that the name you refer to --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 395 of 508
Case 3:08-cr-00134-RJC   Document 1340   Filed 01/30/11   Page 140 of 253
JA1361

DIRECT-MORIERA

137

A.    That's what they called him.

Q.    Okay.  And with respect to nicknames, when you met people, did you know their real names?

A.    They would make up, like, real names.

Q.    Did you go by a nickname also?

A.    Yes.

Q.    And during that summer, did Coyote introduce you to any other MS 13 members who were not from your clique?

A.    Yeah.  He introduced me to a guy called Wizard, that I met as Alex.  And then later on he told me that was his tag name.

Q.    And how did -- how was he introduced to you, this guy named Alex or Wizard?

A.    Like he was big time.

Q.    And what do you mean by big time?

A.    Like he had a lot of respect in the gang.

Q.    And do you remember anything in particular about this person you referred to as Alex or Wizard, as far as any features, facial features?

A.    Tattoos on his eyelids.

Q.    Do you remember what those tattoos were?

A.    Yeah, no pude mas.

Q.    Are you able to look around the court and recognize that person in the court today?

A.    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 396 of 508
Case 3:08-cr-00134-RJC    Document 1230    Filed 01/30/11    Page 141 of 253
**JA1362**

DIRECT—MORIERA

Q.   And could you please identify him, what he has on and where he's sitting.

A.   He has a white shirt, and he's sitting at the left -- at the end of the table.

Q.   Could you point in his direction?

A.   (Indicating.)

     MR. NAZZARO:  If the record could so reflect, Your Honor?

     THE COURT:  It will.

     MR. NAZZARO:  Indication of the defendant.

Q.   How many times in that summer of 2007 did you see the person you've identified as Wizard?

A.   About seven times.

Q.   When you were together with him was it -- were you together with just him or other MS 13 members?

A.   No.  Coyote all the time.

Q.   Did you ever have occasion to talk to Wizard?

A.   So and so yeah.

Q.   Did he talk much?

A.   He was a quiet person, mostly.

Q.   And did he ever indicate to you the clique that he was from?

A.   No.

Q.   He never told you his clique?

A.   No.

Laura Andersen, RMR 704-350-7493

DIRECT—MORIERA

Q.   Did any of the other MS 13 members, including Coyote, did they tell you where he was from?

MR. FOSTER:  Objection; hearsay.

THE WITNESS:  Yes.

THE COURT:  Overruled.  Overruled.

Q.   (By Mr. Nazzaro) What did Coyote say?

A.   He said he was from Novenas clique.

Q.   Where was that clique from?

A.   Salvador.

Q.   Did you know the Novenas by any other name?

A.   No.

Q.   And during that -- those times that you met Wizard in the summer, did you learn where he lived?

A.   They told me he lived in 50 Jackson Street.

Q.   And where is 50 Jackson Street?

A.   In Hempstead.

Q.   You mentioned that you had some rivals in New York; is that right?

A.   Yes.

Q.   And who was the biggest rival?

A.   Bloods.

Q.   And during that summer, did you have any problem with the Bloods?

A.   Yes.

Q.   What problem did you have?

Laura Andersen, RMR 704-350-7493

**JA1364**

DIRECT-MORIERA

MR. FOSTER:  Objection.

THE WITNESS:  They shot --

THE COURT:  Overruled.

THE WITNESS:  -- one of our members.

THE COURT:  What did you say?

THE WITNESS:  They shot one of our members from our gang.

Q.  (By Mr. Nazzaro) After that happened, did your gang take any action?

A.  Yes.

Q.  And who took that action?

A.  Coyote and Wizard.

Q.  And how do you know that?

MR. FOSTER:  Objection; hearsay and 404(b), Your Honor.

THE COURT:  Overruled.

Q.  (By Mr. Nazzaro) How did you know that?

A.  Cause coyote told me.

Q.  What did he tell you?

A.  They went in and rolled on the Bloods.

Q.  What do you mean, rolled on the Bloods?

A.  Like, they went after the Bloods.

Q.  Do you know if they got them?

A.  Yes.

MR. FOSTER:  Objection.

Laura Andersen, RMR 704-350-7493

DIRECT-MORIERA

THE COURT:  Overruled.

Q.   (By Mr. Nazzaro) Now with respect to any conversations you had with Wizard, did he speak in a different way or with a different accent at all?

A.   He talked like in -- like words backwards.  Like for, you know, other people couldn't understand him that wasn't part of the gang.

Q.   And have you heard that type of talk before?

A.   Yes.

Q.   And when have you heard it?

A.   When they was around me.

Q.   Okay.  Have you heard it since then?

A.   Yes.

Q.   And is that -- why do people talk like that in the MS 13?

A.   So the officers and other people wouldn't understand if they're about to do something or understand what they were talking about.

Q.   During that summer, did you meet a person by the name of Jose?

A.   Yes.

Q.   And was this person by the name of Jose, did he go by any other names?

A.   He told me by Seis Seis (phonetic).

Q.   Seis Seis?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 400 of 508
Case 3:08-cr-00134-RJC    Document 2340    Filed 01/30/11    Page 145 of 253
JA1366

DIRECT-MORIERA

A.    Yeah, Seis Seis.

Q.    What does that mean?

A.    Like six six.

Q.    Did you learn he had another gang name he went by?

A.    Sentinela.

Q.    Did you see him at the deli during the summer?

A.    Yes.

Q.    And who was he with?

A.    Coyote and Wizard.

Q.    And was he from New York or from another area, if you know?

A.    He was from another area.

Q.    And with respect to the summer of 2007, do you know -- do you know the months that you observed Wizard and Sentinela there?

A.    Yes.

Q.    When was it?

A.    In the summer time, like.

Q.    Do you know which months in the summer?

A.    Around July, June.

Q.    And did you see those individuals there after July?

A.    After, like at the end of the summer they disappeared.

Q.    And did you learn from other MS 13 members --

          MR. FOSTER:  Objection; leading, hearsay.

          MR. NAZZARO:  -- where they went?

                    Laura Andersen, RMR 704-350-7493

**JA1367**

143

DIRECT-MORIERA

THE COURT:  Let me hear the question.

Q.    (By Mr. Nazzaro) Did you hear from any other MS 13 members where they went?

MR. FOSTER:  Same objection.

THE WITNESS:  No.  They just --

THE COURT:  Overruled.

Q.    (By Mr. Nazzaro) Did you know if they were still in New York at all?

A.    They told me they had left.

Q.    I would like to show you what has been previously marked as Government 31.  Are you able to recognize Government 31?

A.    Yes.

MR. NAZZARO:  Your Honor, I would move -- who is in Government 31?

THE WITNESS:  Sentinela.

MR. NAZZARO:  Your Honor, I would move Government 31.

THE COURT:  Any objection?

MR. FOSTER:  Objection; irrelevant.

THE COURT:  Overruled.  Let it be admitted.

MR. NAZZARO:  And published.

THE COURT:  You may.

(Government Exhibit 31 was received into evidence.)

Q.    (By Mr. Nazzaro) Is this the person you said --

Laura Andersen, RMR 704-350-7493

JA1368

CROSS-MORIERA

referred to as Seis Seis or Six Six?

A.    Yeah, Seis Seis.

Q.    Was he -- in the summer of 2007, he was at the deli?

            THE COURT:  That's been asked and answered.

            MR. NAZZARO:  Just want to make sure that's the same person.

Q.    That's the same person?

A.    Yes.

            MR. NAZZARO:  No further questions.

            THE COURT:  Any cross?

            MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q.    Mr. Moriera, you were asked about your prior felony convictions.  You said you had a robbery back in '98, correct?

A.    Yes.

Q.    Did you ever have another robbery conviction in addition to that one?

A.    Um, I think so, yes.

Q.    Yes?  So two robbery convictions?

A.    Yes.

Q.    Yes.  Okay.  And you also left out on direct examination, you had some felony weapons convictions too, didn't you?

A.    Yes.

Laura Andersen, RMR 704-350-7493

CROSS-MORIERA

145

Q.    You didn't mention that on direct examination, did you?

A.    I answered what he asked me to answer.

Q.    Now you're not -- you've had all these felony convictions, but you're free right now, correct?

A.    Yes.

Q.    Okay.  Are you on probation or parole or anything?

A.    No.

Q.    You also previously have cooperated with law enforcement in exchange for money, haven't you?

A.    Yes.

Q.    Okay.  And, in fact, also when you were an informant with the New York Police Department and Nassau County District Attorney's Office, you purchased an illegal handgun without authorization in advance, correct?

A.    Yes.

Q.    And, in fact, after that happened, they stopped using you as a confidential informant, correct?

A.    No.

Q.    That's not correct?

A.    They always did.  They kept using me in that.  And I bought that on my own, from the guy that I was getting all the guns from.

Q.    Didn't the U.S. Attorney's Office in the Eastern District of New York, not authorize you to be a confidential informant in federal investigations any further as a result?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 404 of 508
Case 3:08-cr-00134-RJC   Document 1292   Filed 01/30/11   Page 149 of 253
JA1370

DIRECT—SLOANE

A.    Oh, yes, after.

Q.    So all you know about what happens with the Bloods was what you were told by others, you weren't present for any of the incidents, correct?

A.    No.

MR. FOSTER:  Just a minute, Your Honor.

(Pause.)

MR. FOSTER:  No further questions.

THE COURT:  You may step down.

Call your next witness.

MS. ROSE:  The government will call John Sloane.

THEREUPON, JOHN SLOANE, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.    Good afternoon.  If you would please, introduce yourself to the jury.

A.    My name is John Sloane.  I'm a corporal with the Greensboro Police Department.

Q.    How long have you worked with the Greensboro Police Department?

A.    Almost 15 years.

Q.    You said you are now a corporal.  What other positions have you held there at the department?

A.    I was a street officer in patrol.  I worked the street crimes units.  I was on a fugitive task force with the U.S. Marshals for five years.  I've been a detective in the

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 405 of 508
Case 3:08-cr-00134-RJC    Document 1290    Filed 01/30/11    Page 150 of 253
JA1371

147
DIRECT-SLOANE

criminal investigations division and intelligence unit where I'm currently one of the supervisors.

Q. And in the criminal intelligence division, what specifically are your duties?

A. Our duties consist of keeping up with domestic terrorism, outlaw motorcycle gangs. We did have street gangs that we kept up until we formed the gang unit back in 2007, I believe it was. And those duties left from our duties at that time.

Q. Back in the summer of 2007 what was your assignment?

A. At that time I was a detective in the criminal intelligence unit.

Q. And if you recall, on or about August the sixth of that year, 2007, were you assisting officers from Washington, D.C.?

A. Yes, I was.

Q. What assistance were you offering?

A. They had contacted me in regards to a fugitive being in our jurisdiction, and requested assistance in me going out and trying to find him.

Q. Based upon the request from Washington, what did you then do?

A. I responded to a hotel in Greensboro where they had believed the suspect to be at. And I went there and spoke with the clerk at the hotel.

Laura Andersen, RMR 704-350-7493

**JA1372**

DIRECT-SLOANE

Q.   Did you -- were you provided any information in advance, any name or a photo or anything that would help you in furtherance of this investigation?

A.   Yes.  They provided me the fact that this suspect I was after was William Cordova.  And that he had warrants on him for various charges.  And they sent me a wanted bulletin with his photograph on it.

Q.   And this William Cordova, did it also indicate whether he had a nickname or a moniker?

A.   I believe it was Sentinela, if I'm pronouncing it, probably was his street name.

Q.   You said that based upon the information that had been provided to you from investigators in D.C, that you then went to this hotel in Greensboro; why there specifically?

A.   Some electronic surveillance methods that they utilized indicated that he should be at that hotel.

Q.   If you would, just tell the jury what you did to further that investigation.  How you went about surveillance on that occasion?

A.   I went into the hotel and parked, went in and spoke to the clerk at the hotel.  And explained to them that I was looking for a Hispanic male.  She looked through the roster -- he or she, I don't recall what the clerk was.  But they looked through the roster.

     And this type of establishment was one where most of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 407 of 508
Case 3:08-cv-00134-RJC   Document 236-3   Filed 01/30/11   Page 152 of 253
**JA1373**

DIRECT-SLOANE

the people stayed there for a long amount of time.  And based upon that, she knew the people that belonged or didn't belong.

And the room -- there was one room that she said she wasn't familiar with the occupants, and it was Room 59.  And it was a Hispanic male that rented that room.

Q.   I'm going to show you Government's Exhibit 34.  Are you able to identify what is depicted within Government's Exhibit 34?

A.   Yes.  That's the office to where I can see there was 26 hung above it.  That's the hotel I went to.

Q.   And the name of that hotel at the time?

A.   Best Value Inn and Suites, I believe is what they called it at the time.

Q.   Does that photograph fair and accurately represent --

A.   Yes, it does.

Q.   -- that hotel?

A.   Yes.

Q.   I'm also going to show you Government's Exhibit 35.  And ask if you're able to identify what's shown in Government's Exhibit 35?

A.   Yeah.  That's the door to Room 59.

Q.   There at the Value Inn?

A.   Correct.

Q.   Fairly and accurately represent what you saw on that

DIRECT-SLOANE

occasion?

A.   Yes, it does.

MS. ROSE:  Your Honor, at this time the Government would move to admit, Government's Exhibit 34 and 35.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let them be admitted.

(Government Exhibit 34 & 35 were received into evidence.)

MS. ROSE:  If I may publish Government Exhibit 34?

THE COURT:  You may.

Q.   (By Ms. Rose) Officer Sloane, you indicated that you went here to the office.  Where is Room 59 in relation to the office there at the inn?

A.   All I can describe it as the backside of the hotel. The hotel was more like a U-shape, and 59 was on the backside of it.

Q.   And I'll show you what's been admitted as Government Exhibit 35.  Obviously, that's a close-up.

Were you able to see this room while you were conducting surveillance?

A.   I would have to move, periodically.  I was setting where I could watch the entryway.  There was only one entryway to come into the hotel.  So I was watching vehicles come in.  And when they went to the backside, I would give them ample time to park, and then I would drive.  Because I

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 409 of 508
Case 3:08-cr-00134-RJC    Document 2948    Filed 01/30/11    Page 154 of 253
JA1375

DIRECT-SLOANE

was in a pickup truck so, obviously, it wasn't noticed as being the police.

Q.   And I take it at that time you weren't in uniform either?

A.   No, I was in plain clothes.

Q.   Where, in Greensboro, is the Value Inn located?

A.   It's located off of Business 85, Interstate Business 85.  It's sitting in direct line with the particular street name there, I'm not exactly sure what it is at this point in time.

Q.   After you had spoken with the manager and kind of zeroed in on Room 59, describe specifically what you did?

A.   Knowing that there was a great likelihood that the person I was after was there, I called -- at the time it was my sergeant, Mike Richey.  And we started arranging for various resources to come and assist us with the apprehension.  People that we generally use that have special weapons and tactics.

Q.   Why did you feel you needed additional resources, special weapons, resources or tactics on this occasion?

MR. FOSTER:  Objection; irrelevant.

THE COURT:  Sustained.

Q.   (By Ms. Rose) Were you able to get some backup or someone to help you?

A.   Yes, we did.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 410 of 508
Case 3:08-cr-00134-RJC   Document 1246   Filed 01/30/11   Page 155 of 253
**JA1376**

Q.    During this time what did you do?

A.    I stayed sitting near the front of the hotel to watch the entryway, watching the vehicles come and go.

Q.    Ultimately, did you leave the hotel or did you stop any vehicles?

A.    There was a burgundy Honda Passport or Isuzu Rodeo that pulled in, and it pulled around the back part of the hotel.

I gave it ample time, once again, to where the folks would be out of it.  I pulled back and saw that parked by Room 59.

So I went back to the front.  Because when it came in, it only had one occupant in it.  So I went back and sat at the front.

After a few minutes it left.  And when it left, it then had a front seat passenger that I could see.  And at the time it didn't look like the suspect that I was after.

So as it left, I got the tag number off of it and I ran the tag on it.

Q.    Let me show you what's been marked as Government's Exhibit 36.

Are you able to identify what's depicted in Government's Exhibit 36?

A.    Yeah.  That's the Isuzu Rodeo that I saw come in there the first time.

Q.    And where is that photograph taken?

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 411 of 508
Case 3:08-cr-00134-RJC   Document 1940   Filed 01/30/11   Page 156 of 253
JA1377

DIRECT-SLOANE

A.    At the hotel at the time when we were dealing with them.

Q.    And this was obviously, later -- at a later point in time?

A.    Yes it was.

Q.    During your investigation?

A.    Yes.

        MS. ROSE:  I would move to admit Government's 36?

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit 36 was received into evidence.)

Q.    (By Ms. Rose) You indicated that because you weren't able to -- you didn't identify the person in the car as being the person that you were looking for.  You let the red Isuzu go at that point?

A.    Yes, I did.

Q.    Were there other officers there?

A.    No, there weren't.  I was still there by myself.

Q.    As you continued to wait there at the hotel, what if anything did you see?

A.    Another vehicle came on the lot.  Once again, I think the person was by themselves, just the driver.  It was a white, like four-door Mercury Tracer.

        It went around to the back of the hotel.  And I gave it

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000573-MOC   Document 59-3   Filed 03/23/17   Page 412 of 508
Case 3:08-cr-00134-RJC   Document 1296   Filed 01/30/11   Page 157 of 253
**JA1378**

DIRECT—SLOANE

ample time, once again, to where I wouldn't run into the folks that were in the car.

But I drove back there and saw it parked by Room 59. Then I went --

Q.   Did you -- I'm sorry.  Go ahead.

A.   Then I went and back and set back at the front of the hotel to watch the vehicles coming and going.

Q.   At this point, did you have anybody there to assist you in surveillance yet?

A.   No, I did not.

Q.   What then happened as you continued to sit there at the hotel?

A.   Within a couple of minutes, the white Mercury Tracer was leaving the lot.  And as it left, I could see the front seat passenger.  And it, to me, it appeared to be Mr. Cordova, the suspect that I was after.

Q.   What did you do?

A.   I began following that vehicle, and notified the sergeant that we were mobile.  And he was not too far off that point in time.  So we followed that vehicle until we could get more police units in place to assist us to stop it.

During the time that we were following, I was able to pull up to the passenger side of the vehicle at the stop light where it was a four lane highway.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 413 of 508
Case 3:08-cr-00134-RJC   Document 290   Filed 01/30/11   Page 158 of 253
JA1379

DIRECT-SLOANE

155

And I pulled up beside it and looked in, and I could see that it was Cordova. And one of the things that he had on was an MS 13 ball cap. Obviously indicating his affiliation with the gang.

I received that information as part of the -- when they told me he was a wanted, he was a gang member.

MS. ROSE: If I may approach the witness, Your Honor?

THE COURT: You may.

Q. (By Ms. Rose) I want to show you, Officer Sloane, what has been marked as Government's Exhibit 33. Are you able to identify Exhibit 33?

A. Yeah. This is the ball cap that Mr. Cordova had on. When we arrested him, that's what he was wearing. That's what I saw at the stop light.

Q. How quickly after you saw Mr. Cordova in this hat were you able to make a stop?

A. It was within a couple minutes, because we were waiting for the marked units to be in place to help us with it.

Q. How far had you traveled from the hotel by that point, by the point you were able to actually make the stop with assistance?

A. I would say the total distance from the hotel may have been 4 or 5 miles at the most.

Q. And did you actually assist in the stop of that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 59-3  Filed 03/23/17  Page 414 of 508
Case 3:08-cr-00134-RJC  Document 1290  Filed 01/30/11  Page 159 of 253
JA1380

DIRECT-SLOANE

vehicle?

A.    Yes, I did.

Q.    What happened?

A.    Well, we were traveling on Florida Street in Greensboro --

MR. FOSTER:  Objection; irrelevant.

THE COURT:  Overruled.

THE WITNESS:  Florida -- East Florida Street in Greensboro.  As we were traveling -- as he went past where the marked units were at, the driver turned on his left turn signal.  And -- but he made a -- he immediately made a right hand turn.  Obviously it appeared something they were nervous.

As we traveled down Glenwood, I could see the front seat passenger, being Mr. Cordova, he was moving around, fumbling around.  And he was -- it appeared to me he was placing an item between him and the driver.

Q.    How far was it then from that point that you were able to stop the car?

A.    I was a few -- well, a couple hundred feet.  Because I actually pulled my truck in front of the car and blocked the car in.  I used the rest of the vehicles to block them in to where they couldn't run from us.

Q.    When the stop was made, what happened next?

A.    Both occupants were taken out of the vehicle and

Laura Andersen, RMR 704-350-7493

DIRECT-SLOANE

handcuffed.  And when they took the passenger out, there was a gun in plain view in the area where he had been moving around.

Q.   Who was the passenger?

A.   William Cordova.

Q.   And at that point he was wearing the hat, as well?

A.   Yeah.  The hat was on.  It may have came off when he was being taken out of the car, but --

MS. ROSE:  I would move, Your Honor, to admit Government's Exhibit 33.  That was the hat previously identified.

THE COURT:  Any objection?

MR. FOSTER:  Objection; irrelevant.

THE COURT:  Overruled.  Let it be admitted.

Q.   (By Ms. Rose) You testified that there was a gun.  Who had the gun?

A.   Based upon the movements of the passenger, Mr. Cordova, it was his gun.

Q.   Do you recall what type of weapon?

A.   I think it was a revolver, like a 38, maybe.

Q.   Who was driver?

A.   If I'm pronouncing it proper, I think it was Abraham Abundez.  I'm not positive off the top of my name.  But it's something along that line with that name.

If you have it, I'll be happy to look at it, but I

Laura Andersen, RMR 704-350-7493

DIRECT-SLOANE

can't speak to that right off the top of my head.

Q.   And I'll show you an exhibit which has been marked as Government's Exhibit 37.  Do you recognize Government's Exhibit 37?

A.   Yeah.  There's the driver of that vehicle.

Q.   And do you recall if that photograph was actually taken at the time of Mr. Cordova's arrest?

A.   Yeah.  Cause we were arresting him also, because he had warrants for his arrest out on him, the driver did.

MS. ROSE:  I move to admit Government's Exhibit 37?

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 37 was received into evidence.)

Q.   (By Ms. Rose) I'm also going to show you what we have marked -- what we marked as Government's Exhibit 31.  Do you recognize Government's Exhibit 31?

A.   Yeah.  That's Mr. Cordova.

Q.   And was that photograph that was taken on the date of arrest?

A.   Yeah.  It appears to be at the jail.

MS. ROSE:  Move to admit Government's Exhibit Number 31.

THE COURT:  Any objection?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 417 of 508
Case 3:09-cr-00134-RJC   Document 253   Filed 01/30/11   Page 162 of 253
JA1383

DIRECT-SLOANE

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 31 was received into evidence.)

Q.   (By Ms. Rose) Did you actually -- you said you thought this was a photograph that was taken at the jail.  Did you actually make those photographs or did someone else?

A.   Someone else took that one.  Because I actually had to get back down the hotel, because part of the information was that I had received when they asked me to go --

MR. FOSTER:  Objection; hearsay.

THE COURT:  Sustained.

Q.   (By Ms. Rose) Based upon what you had heard, what did you then do after Mr. Cordova's arrest?

A.   I had to go back to the hotel because there were two minor females that were believed to be missing or in danger that were believed to be with him --

MR. FOSTER:  Same objection, Your Honor.  Motion to strike.

THE COURT:  I'll sustain the objection.  Ask the jury to disregard the statement about minor females.

Q.   (By Ms. Rose) When you got back to hotel -- and when you say hotel, to which hotel are you referring?

A.   The Best Value Inn and Suites.

Q.   You got back to the Best Value Inn, where did you immediately go?

Laura Andersen, RMR 704-350-7493

**JA1384**

DIRECT-SLOANE

A.   I pulled in the parking lot and were parked -- we were going towards -- we were actually coming up with a plan to go to knock on the door at Room 59.

Q.   And when you say we, who was we?

A.   Myself, Sergeant Richey and some of the other folks from, I think it was the tactical and special enforcement team that came out there with us.

Q.   Was the red Isuzu which you previously identified, was that still there in the parking lot?

A.   As we were coming up with a plan, it was leaving the parking lot.  And I told Sergeant Richey he needed to stop that vehicle.

Q.   And were you able to see how many people were in the red Isuzu Rodeo as it was leaving?

A.   I could not, from the position I was in, I just could see the vehicle.

Q.   Did you ultimately assist in that stop?

A.   I had very -- I came up on the tail end of it, because we went to Room 59.  I came back to them once we cleared Room 59.

So I was present when they already had everybody handcuffed and found the stuff they found.

Q.   All right.  When you went to Room 59, what did you see?

        MR. FOSTER:  Objection; irrelevance.

        THE COURT:  Overruled.

Laura Andersen, RMR 704-350-7493

JA1385

DIRECT-SLOANE

161

THE WITNESS: We were able to gain access to the room and there from what -- we found two females.

Q. (By Ms. Rose) And was any assistance given to those females?

MR. FOSTER: Objection; irrelevant.

THE COURT: Overruled.

THE WITNESS: We did try to speak with them to determine what their status was, because they were underage.

Q. (By Ms. Rose) They were not arrested, however?

A. No, they were not.

Q. You indicated that you came in on the tail end of the stop involving the red Isuzu. What did you observe?

A. I observed three suspects that were in handcuffs that were all riding in that vehicle.

Q. Did you assist any further in the investigation with the search or arrest or photographing of any of those witnesses?

A. The most I saw, I'm pretty sure my camera was used to take photographs of them. I don't know that I actually took them, but I know my camera was used for that purpose. I'm pretty sure of that.

Q. I'm going to show you what has been marked as Government's Exhibit 39. Do you recognize Government's Exhibit 39?

A. Yes. It's Mr. Cordova with his MS tattoo on his chest.

DIRECT-SLOANE

Q.   And again, was this taken on the date of arrest?

A.   Yes.  That is our jail, correct.

           MS. ROSE:  Move to admit number 39.

           THE COURT:  Any objection?

           MR. FOSTER:  No, Your Honor.

           THE COURT:  Let it be admitted.

(Government Exhibit 39 was received into evidence.)

           MS. ROSE:  May I publish that, Your Honor?

           THE COURT:  You may.

Q.   (By Ms. Rose) Also show you what's been marked as Government's Exhibit 40.  What is Government's Exhibit 40?

A.   That's a photograph representing Mr. Cordova's tattoos, once again, on the front of his body, MS being on his chest.

Q.   You indicated that you had worked in some gang investigations for a period before your gang unit was created.  Did you learn anything about MS gang?

A.   Yeah.  We were trained they were one of the most ruthless gangs on the streets --

           MR. FOSTER:  Objection; motion to strike.

           THE COURT:  Sustained.

Q.   (By Ms. Rose) Is it part of the Greensboro Police Department procedures, that they will photograph gang members and gang locations?

A.   Yes, we do.  And we document people and validate them, yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000573-MOC    Document 59-3    Filed 03/23/17    Page 421 of 508
Case 3:09-cr-00134-RJC    Document 1546    Filed 01/30/11    Page 166 of 253

JA1387

DIRECT-SLOANE

MS. ROSE:  Government would move to admit Government's Exhibit 40, Your Honor.

THE COURT:  Let it be admitted.

MS. ROSE:  And published.

THE COURT:  You may.

(Government Exhibit 40 was received into evidence.)

Q.   (By Ms. Rose) Also going to show you what's been marked as Government's Exhibit Number 38.  Do you recognize Government's Exhibit 38?

A.   Yes.  That's the picture of the arm of the driver of that Mercury Tracer that Cordova was driving in.  And he's got his Sur 13 tattoo above his initials on his arm.

Q.   And once again, that was taken at the time of arrest?

A.   Yes, it was.

Q.   Is that a fair and accurate representation?

A.   Yes, it is.

MS. ROSE:  Government would move to admit Government's Exhibit 38, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 38 was received into evidence.)

MS. ROSE:  Thank you.  And may the government publish the exhibit, Your Honor.

THE COURT:  You may.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 422 of 508
Case 3:08-cr-00134-RJC   Document 594   Filed 01/30/11   Page 167 of 253
JA1388

DIRECT-SLOANE

Q.    (By Ms. Rose) You indicated that he had a Sur 13 tattoo.  What's the significance, if any, of that to you?

MR. FOSTER:  Objection; lack of foundation.

THE COURT:  Overruled, if you know.

THE WITNESS:  We were actually a little bit confused by it at the time we saw it.  We didn't think Sur 13 and MS 13 got along and hung out together.  So when we saw that, we were a bit confused.

Q.    All right.  At a time -- did you have any further involvement on this particular date in this investigation?

A.    No.  Actually I just came back from a conference, so I wasn't even suppose to be working that day.

Q.    All right.  At a later time, however, though, in December 8th of 2007, were you still a member of the marshals task force, or the fugitive task force?

A.    During that whole time period, with all this transpiring, I was not on the task force.  It's just the fact that the relationships and the contacts I developed, they would still call me for stuff.  And that's -- in the intelligence we worked stuff like that if needed.

Q.    And do you recall the incident at the Las Jarochitas Restaurant on December the 8th of 2007, were you working?

A.    I was not working, but I was called out to the scene.

Q.    Why were you called out to the scene?

MR. FOSTER:  Objection; hearsay.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 423 of 508
Case 3:08-cr-00134-RJC    Document 1296    Filed 01/30/11    Page 168 of 253
**JA1389**

DIRECT-SLOANE

THE COURT:  Overruled.

MR. FOSTER:  I was called out to the scene to help with gathering intelligence in regards to the homicide investigation that our guys were conducting.

Q.    (By Ms. Rose) And ultimately at some point in that investigation, were you in contact with detectives from Charlotte?

A.    Yes, I was.

Q.    Do you recall with whom you were speaking?

A.    Chuck Hastings with the Charlotte Police Department.

Q.    And did you in fact assist in some fashion with the investigation related to getting some court orders?

A.    Yes, I did.

Q.    What type of court orders?

A.    I got pin register track and trace phone orders to track the suspect's cell phone.

Q.    And between December the 8th of 2007 and December the 12th of 2007, were you continuing your coordination in that light with the FBI and officers from the Charlotte-Mecklenburg Police Department?

A.    Yes, I was.

MS. ROSE:  All right.  Thank you.  I have no other questions of this witness at this time, Your Honor.

THE COURT:  Any cross?

MR. FOSTER:  Yes.  Can I have a moment, Your

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 424 of 508
Case 3:08-cv-00134-RJC   Document 2346   Filed 01/30/11   Page 169 of 253
JA1390

CROSS-SLOANE

Honor?

THE COURT:  You may.

(Pause.)

CROSS-EXAMINATION BY MR. FOSTER:

Q.  Corporal Sloane, the person that was stopped in the car with William Cordova, that person was Abraham Abonda?

A.  I believe that's his name.

Q.  And that's where the gun was found, is in the car with Mr. Cordova and Mr. Abonda, correct?

A.  That is correct.

Q.  And the photograph you identified, Exhibit 38, you said you were confused because Sur 13 is a different gang than MS 13 is, to your knowledge, correct?

A.  Yeah.  And they supposedly did not get along.

MR. FOSTER:  No further questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MS. ROSE:  The government would call Officer Richey.

THEREUPON, GENE RICHEY, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.  Good afternoon.  If you would introduce yourself to the members of the jury, please.

A.  I'm Gene Richey.  Lieutenant with the Greensboro Police Department.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 425 of 508
Case 3:08-cr-00134-RJC   Document 1240   Filed 01/30/11   Page 170 of 253
JA1391

167

DIRECT-RICHEY

Q.   How long have you been employed with the police department?

A.   Sixteen plus years.

Q.   You said you were a lieutenant, what other positions have you held there at the police department?

A.   Police department I've held the ranks up to lieutenant, police officer, corporal, sergeant and now lieutenant.

Q.   Back in the summer of 2007, what was your position?

A.   At that time I was a criminal intelligence sergeant. Sergeant over detective unit of about eight officers.

Q.   And you say criminal intelligence unit.  Is that another name for the detective division, or do you have some very specific duties there?

A.   Very specific duties there.

A member of the criminal investigations division, and then we were one squad that was based solely for intelligence gathering, dignitary protection, monitoring gang activity, that type of thing.

Q.   And if you recall on or about -- well on August the 6th of 2007, did you assist Officer Sloane with some surveillance and ultimately some arrests?

A.   Yes, I did.

Q.   If you would, just tell the members of the jury how you came to be involved in that particular investigation?

A.   Certainly.  Officer Sloane received a phone call from

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 426 of 508
Case 3:08-cv-00134-RJC   Document 200-6   Filed 01/30/11   Page 174 of 253
**JA1392**

DIRECT—RICHEY

another officer in D.C. asking him to find a gentleman named William Cordova.

MR. FOSTER:  Objection; hearsay.

THE COURT:  Overruled.

Members of the Jury, this -- what the other officer told Officer Sloane, is offered not for the truth of the matter asserted, but to explain why the officers did what they did on that day.

You may continue.

THE WITNESS:  Yes, sir.

And William Cordova was wanted out of Washington, D.C. for homicide.

MR. FOSTER:  Objection; motion to strike.

THE COURT:  I'll strike that part of it.

THE WITNESS:  All right.

THE COURT:  Ms. Rose, if you would direct this witness.

THE WITNESS:  Sorry about that.

MS. ROSE:  Yes.

Q.   What did you do then?  You were called out?

A.   Right.

Q.   You don't have to tell us why you were called out. What did you do as a result of your call for service?

A.   Okay.  As a result, I responded to the area of the Best Inn Suites.  And basically at Holden and 85 in Greensboro,

Laura Andersen, RMR 704-350-7493

**JA1393**

DIRECT-RICHEY

and took up a position away from the hotel, while Officer Sloane conducted surveillance of the hotel for Mr. Cordova.

Q.   I want show you what's previously been admitted as Government's Exhibit Number 34.  Do you recognize Government Exhibit 34?

A.   Yes, sir.  That's the -- or, yes, ma'am.  That's the front driveway to the Best Inns and Suites.

Q.   All right.  When you arrived at this particular location, what did you do?

A.   I stayed back out of the way, so as not to be seen. And Officer Sloane called me on the radio and explained that he was behind a white Mercury that had just pulled out of the parking lot.  And was asking me to catch up to it, because he believed that the person we were looking for was in that car.

Q.   And when you say you stayed out of the way so as not to be seen, what type of car were you driving?

A.   I was driving a blue Yukon, GMC Yukon.  Not an obvious police vehicle by any means.  But again, we didn't want to have too many cars with people in them -- being seen in broad daylight in this location, was worried about surveillance.

Q.   After you communicated with Officer Sloane, what did you?

A.   We both ultimately were behind the vehicle.  We

Laura Andersen, RMR 704-350-7493

DIRECT—RICHEY

executed a vehicle stop at the corner of Glenwood and Linwood.  It's a small intersection in the City of Greensboro.  Officer Sloane placed his vehicle in front of Mercury Tracer.  I placed my vehicle behind it.  We had a couple of field units that came in behind us.

As soon as the vehicle stopped.  I exited my vehicle and went to the passenger side of that vehicle, of the Mercury Tracer.

And when I got to the Mercury Tracer, I observed the subject, William Cordova.  I immediately pulled him out of the vehicle, placed him in handcuffs.

And as I was pulling him out of the vehicle, I observed a handgun down to the right hand side -- or correction -- the left hand side, the driver's side of that vehicle, directly next to Cordova's leg.

Q.   Do you recall what Cordova was wearing on this particular occasion?

A.   I note -- the only thing that I recall is a hat.  He was wearing -- that's what drew our attention to him, to believe that that was him to begin with.

And it was a white hat with blue letters saying MS on the front and 13 on the back.

Q.   Show you what's been previously admitted in Government's Exhibit 31.  Do you recognize who is depicted within Government's Exhibit 31?

Laura Andersen, RMR 704-350-7493

JA1395

DIRECT—RICHEY

A.   Yes.   That is Mr. Cordova.

Q.   Now, after Mr. Cordova was in custody, did you have any interaction with the driver of the car?

A.   Mr. Abundez Aranda (phonetic spelling).  His name was Abraham Abundez Aranda.  Spoke with him for a good bit at the scene.

Q.   I want to show you what's been previously admitted as Government's Exhibit Number 37.  Do you recognize that individual?

A.   I do.  That is Mr. Abundez Aranda.

Q.   And you said you had quite a bit of interaction with him at the scene; why?

A.   Basically I wanted to find out what was going on at the hotel.  Because we were under the impression that --

MR. FOSTER:  Objection; hearsay.

THE COURT:  Hang on a second.

Q.   (By Ms. Rose) You don't need to tell us any conversations that you had with him.

Did he have any charges, or did you take him into custody on that occasion?

A.   Yes, we did.  We took him into custody for driving while license revoked.  And he had an outstanding warrant, if I remember correctly.

Q.   Thereafter, did you return to the hotel?

A.   Yes, I did.

Laura Andersen, RMR 704-350-7493

DIRECT-RICHEY

Q.   What did you do once you got back to the Best Value Inn?

A.   I called for several units to come and meet me at the hotel.  And I went to the room that we suspected the subjects had come out of, and knocked on the door.

Q.   Do you recall that room number?

A.   It's in the 50s.  I want to say 58 or 59, but I'm not sure.

Q.   Were there any people in that room?

A.   Yes, there were.

Q.   Females?

A.   Yes, there were two.

Q.   Were they taken into custody?

A.   They were not.

Q.   Thereafter, did you have any other interactions or any further investigation there at the hotel?

A.   Well, I had interaction prior to this, to finding the two women.

Q.   What did you do?

A.   There was a burgundy Isuzu Rodeo that corresponded to that room number.  And then observed the uniformed officers in the area.  Or, uniformed officers in the area were in plain sight.  And that particular Isuzu Rodeo drove back to the front of the hotel, at which time I stopped it.

Q.   And Officer Richey, I'm showing you what's been

Case 3:16-cv-00517-MOC   Document 59-3   Filed 03/23/17   Page 431 of 508
Case 3:09-cv-00134-RJC   Document 236-3   Filed 01/30/11   Page 176 of 253
JA1397

DIRECT-RICHEY

previously identified and admitted as Government's Exhibit Number 36?

A.    Yes.

Q.    Is what's shown in Government's Exhibit 36 the Isuzu Rodeo?

A.    That is the Isuzu Rodeo that I stopped, yes, ma'am.

Q.    Why did you stop this particular car?  What were the circumstances?

        MR. FOSTER:  Objection; irrelevant.

        THE COURT:  Overruled.

        THE WITNESS:  I stopped that vehicle because it stopped in front of the room where we were trying to make contact with the two women.  And it had been seen previously at that hotel.

Q.    (By Ms. Rose) When you stopped the car, explain what happened?

A.    When I stopped the car, the driver stopped the car. But as he was stopping the car, the passenger in the right front seat made a motion, as if reaching down and placing something below him, such as this (indicating).

    And again, I'm staring straight at him.  And so that concerned me for weaponry, considering I just removed another weapon out of a vehicle stop with ties to that hotel room.

Q.    So what did you?

                Laura Andersen, RMR 704-350-7493

JA1398

DIRECT-RICHEY

A.    At that point we controlled the driver and the passengers.  And I did a -- I had -- an officer and myself, another officer did a protective sweep of that vehicle to make sure there were no weapons in the lunge area of that vehicle.

Q.    Did you locate any?

A.    No, we did not.

Q.    Who were the passengers and the driver of that car?

A.    At the time, the driver was identified as Juan Bautista and the -- or, Jesus Bautista.  And the passenger -- the back rear passenger was Roberto Alman Delgado.  And the right front passenger was Mr. Umana.

Q.    When you say Mr. Umana, do you recognize the individual you have called Mr. Umana here in the courtroom today?

A.    I believe so, but I would have to get closer to make sure that I could recognize him for sure.

        MS. ROSE:  May the witness be allowed to step down, Your Honor?

        THE COURT:  You may.

        THE WITNESS:  (Witness exiting witness box approaching the defense table.  Returning to witness box.)

        Yes, ma'am, that is Mr. Umana.

Q.    (By Ms. Rose) And you indicated -- you stepped down.  Why did you move closer?

A.    Reason why I moved closer is, A, my prescription is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00557-MOC    Document 59-3    Filed 03/23/17    Page 433 of 508
Case 3:08-cr-00134-RJC    Document 1590    Filed 01/30/11    Page 178 of 253
JA1399

DIRECT—RICHEY

failing.  So I apologize for that.

But B, the very distinctive tattoo in the middle of his brow.

Q.    And you indicated that the defendant was seated as the front right passenger?

A.    Yes, ma'am.

Q.    Front passenger.  After you had the defendant and the other two individuals out of the car, what then happened?

A.    At that point, Officer Griffin took over the investigation with Mr. Umana, and controlled Mr. Umana and the other suspects.

Q.    Did you assist, or were you present for the taking of any photographs?

A.    Yes, I was.  I took pictures of each of the subjects that were in the car.

Q.    First I'm going to show you -- first I'm going to show you what's been marked as Government's Exhibit Number 45.

Do you recognize the individual depicted in Government's 45?

A.    That is the person who at the time identified himself as Jesus Bautista.

Q.    And you say at the time?

A.    Yes.  And what I mean by that is, quite frankly I'm not sure what his real name is.  Through further investigation, he was --

Laura Andersen, RMR 704-350-7493

**JA1400**

DIRECT-RICHEY

MR. FOSTER:  Objection; hearsay and narrative.

THE COURT:  Overruled -- sustained.

Q.   (By Ms. Rose) And the individual depicted in Government's 45 was where in the vehicle?

A.   He was the driver.

MS. ROSE:  I would move to admit Government's 45, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 45 was received into evidence.)

Q.   (By Ms. Rose) I'm going to show you Government's Exhibit Number 20.  Do you recognize Government's Exhibit Number 20?

A.   I do.  This is an individual who at the time again identified him as Roberto Alman Delgado.

Q.   And where was he seated in the car?

A.   He was in the rear passenger compartment.

Q.   And is that a fair and accurate representation of that individual taken on that occasion?

A.   It is.

MS. ROSE:  I move to admit Government's 20, conditionally admitted earlier, Your Honor.

THE COURT:  It will be admitted unconditionally at this point.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 435 of 508
Case 3:08-cr-00134-RJC    Document 1340    Filed 01/30/11    Page 180 of 253
JA1401

DIRECT—RICHEY

(Government Exhibit 20 was received into evidence.)

Q.    (By Ms. Rose) I'm going to show you what's been marked as Government's Exhibit 44.  Who's depicted in Government's Exhibit Number 44?

A.    The same person as in Government's -- that's Exhibit 20.  This is the person identified himself as Alberto Alman Delgado a/k/a Scrappy.

Q.    A/k/a?

A.    Scrappy.

        MS. ROSE:  I move to admit Government's Exhibit 44, Your Honor?

        THE COURT:  It will be admitted.

Q.    (By Ms. Rose) Based upon your training and observation of Mr. Vasquez and the tattoos, did you form any opinion as to whether he belonged to any particular group?

        MR. FOSTER:  Objection; lack of foundation.

        THE COURT:  Sustained.

Q.    (By Ms. Rose) I'm going to show you what has been marked as Government's Exhibit Number 41.  Do you recognize Government's Exhibit 41?

A.    Yes, I do.

Q.    How do you recognize Exhibit 41?

A.    This is Mr. Umana.

Q.    Also taken on this occasion?

A.    It was taken that same occasion.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 436 of 508
Case 3:08-cr-00134-RJC    Document 1946    Filed 01/30/11    Page 181 of 253
JA1402

DIRECT-RICHEY

MS. ROSE:  I move to admit Government's 41, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 41 was received into evidence.)

Q.   (By Ms. Rose) I'm going to show you what has been previously conditionally admitted as Government's Exhibit Number 23, and ask you if you're able to identify Government's Exhibit 23?

A.   Yes.  That is a full front shot of Mr. Umana.

MS. ROSE:  I move to admit this unconditionally at this time, Your Honor.

THE COURT:  Let it be admitted.

MS. ROSE:  All right.  It's already been published to the jury, if I may do so again.

THE COURT:  You may.

(Government Exhibit 23 was received into evidence.)

Q.   (By Ms. Rose) I'm going to show you what has been previously conditionally admitted as Government's Exhibit Number 24 and ask you is that a photograph you took on this occasion as well?

A.   It is.

Q.   And who is that a photograph of?

A.   That's Mr. Umana as well.

Laura Andersen, RMR 704-350-7493

**JA1403**

179
DIRECT-RICHEY

MS. ROSE:  I move to unconditionally admit, Your Honor?

THE COURT:  Let it be admitted.

(Government Exhibit 24 was received into evidence.)

Q.   (By Ms. Rose) Government's Exhibit 42, is that a photograph you took as well?

A.   Yes, ma'am, it is.

Q.   Fair and accurate reputation of how the defendant looked on that occasion --

A.   Yes, it is.

Q.   -- august of 2007?

A.   Yes.

MS. ROSE:  I move to admit Government's Exhibit 42, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 42 was received into evidence.)

Q.   (By Ms. Rose) And finally, Government's Exhibit Number 43 Officer Richey.  We've seen some portion of that photo already.

A.   That is Mr. Umana.

Q.   You referred to him as Mr. Umana, at that time did he have identification?

A.   I do not remember how we identified him.  But at the

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC    Document 59-3    Filed 03/23/17   Page 438 of 508
Case 3:08-cv-00134-RJC    Document 99-6    Filed 01/30/11   Page 183 of 253

**JA1404**

DIRECT—RICHEY

time he did give the name Alejandro Umana.

Q.   On this particular occasion, after taking the photographs of the individuals that were located there in the Isuzu, did you do anything else?  Did you collect any other evidence or assist further in the investigation?

A.   No.  At that point I was focusing my attention on the room with the young women.

Q.   At a later date, December the 8th of 2007, did you assist in some way in an investigation following a shooting at Las Jarochitas Restaurant?

A.   Yes, I did.

Q.   What did you do?

A.   At that time I was contacted by Captain Hastings, and informed that there was a shooting at that location, requesting help from the criminal intelligence squad.

Q.   And as a result of that request, what did you do?

A.   I dispatched Officer Sloane, who was here earlier.  And I sent copies of the pictures that you have just seen, to the scene.

Q.   Now, did you do anything else in furtherance of that particular investigation?

A.   At that time, no, ma'am.

          MS. ROSE:  Thank you, very much, sir.

          I don't have any other questions, Your Honor.

          THE COURT:  Any cross?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 439 of 508
Case 3:08-cr-00134-RJC   Document 294-6   Filed 01/30/11   Page 184 of 253

**JA1405**

181
DIRECT-RICHEY

MR. FOSTER:  Just a moment, Your Honor, please.

(Pause.)

MR. FOSTER:  I have no questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. NAZZARO:  Your Honor, could we have a side bar, quickly?

THE COURT:  Yeah.

(Bench conference as follows:)

MR. NAZZARO:  A few minutes, a couple minutes. The next witness we're going to call has a doctor's appointment.  He's not here yet.  We intend to call Juan Garcia Mariachi.  I wanted to alert the court and marshals. We may call other people out of order if we are permitted later in the day, just so we can complete the incident that occurred in August.  But that would involve interrupting the witness.  I wanted to bring that up now.  Also the marshals may need a couple minutes, I don't know, for the next witness.

THE COURT:  Well, we're going to quit today at 5 instead of 6.  We could take our afternoon break, although we haven't been going at it that long.  So your next witness is Mariachi, an in-custody witness?

MS. ROSE:  Yes, Your Honor.  Our next witness is two people from Greensboro who aren't here.  One had a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 440 of 508
Case 3:08-cv-00134-RJC    Document 234    Filed 01/30/11    Page 185 of 253
**JA1406**

doctor's appointment.  They're on their way.  We don't know if they will be here by then.  If not, we can call Mariachi or Garcia instead.

THE COURT:  Go ahead and call your next witness.  Is he up here?

MARSHAL:  Yes, sir.

THE COURT:  Just call your next witness.  We'll go for about a half an hour then take our afternoon break.

(The bench conference was concluded.)

MR. NAZZARO:  The United States calls Juan Vela Garcia.

THEREUPON, JUAN RUBEN VELA GARCIA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.    Please state your name, sir.

A.    Juan Ruben Vela Garcia.

Q.    And Mr. Garcia, are you currently in federal custody?

A.    Yes, sir.

Q.    And for what charge are you in custody?

A.    The RICO Act Conspiracy.

Q.    Does that charge involve the MS 13?

A.    Yes, sir.

Q.    Did you plead guilty to that charge?

A.    Yes, sir.

Q.    Did you enter into an agreement with the United States

Case 3:16cv-000573-MOC    Document 59-3    Filed 03/23/17    Page 441 of 508
Case 3:08-cr-00134-RJC    Document 1946    Filed 01/30/11    Page 186 of 253

JA1407

DIRECT—VELA GARCIA

concerning that particular charge?

A.    No, sir.

Q.    Can you try speak into the microphone?

A.    Say again?

Q.    Do you have a Plea Agreement with the United States?

A.    Yeah, plea of guilty.

Q.    And what is your understanding of that agreement?

A.    It was 20 to life, and they made a mistake, and now it's 20.

Q.    What is your understanding of your obligation to testify?

A.    Tell the truth.

Q.    And are you currently in a protection program, the Witness Protection Program in your current situation in prison?

A.    Yes, sir.

Q.    Where were you born, Mr. Garcia?

A.    I was born in Mexico town of Tamaulipas.

Q.    How long did you live in Mexico?

A.    Since I was six.

Q.    Did you go to school in Mexico, or do you remember?

A.    I don't remember.

Q.    Okay.  And did you come to the United States after Mexico?

A.    Yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 442 of 508
Case 3:08-cr-00134-RJC    Document 1346    Filed 01/30/11    Page 187 of 253
**JA1408**

DIRECT-VELA GARCIA

Q.    And where did you come to, eventually?

A.    I went to Arkansas, and then North Carolina.

Q.    What area in North Carolina?

A.    Rowan County.

Q.    Was there a particular area in the county that you lived?

A.    Landis is the name of the town.

Q.    Did you go to school in that area?

A.    Yes.

Q.    How far did you go to school?

A.    I went to the 12th grade.

Q.    Did you graduate though the 12th grade?

A.    Yes, sir.

Q.    What schools did you go to?

A.    I went to elementary, China Grove Elementary, China Grove Middle School and South Rowan High.

Q.    And what year did you graduate, do you recall?

A.    Ninety-eight.

Q.    Did you play any sports in high school?

A.    Yes, sir.

Q.    What sports did you play?

A.    Played basketball and football.

Q.    How did you do with respect to your grades, what kind of student were you?

A.    I was a C average student.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 443 of 508
Case 5:08-cr-00134-RJC    Document 1249    Filed 01/30/11    Page 188 of 253
**JA1409**

DIRECT-VELA GARCIA

Q.   Were you ever involved with the MS 13 when you were in high school?

A.   No, sir, I wasn't.

Q.   And did you become involved with the MS 13 after high school?

A.   Yes, sir.

Q.   And how did you become involved with the MS 13?

A.   There was a club up the street from my house.

Q.   What was the name of the club?

A.   Tropicana.

Q.   And what happened at that club, the Tropicana?

A.   I was in the bathroom, I was using the bathroom, a bunch of them came around me and tried to fight me because of my tattoos on my hands.

Q.   What tattoos do you have on your hand?

A.   Brown Pride.

Q.   What does Brown Pride mean?

A.   It's a code from Mexican Pride.

Q.   But does it mean something else to the people that approached you?

A.   Yes, it's another gang.

Q.   What happened when you were approached?

A.   I was approached by a guy named Doodle.  And he was throwing MS 13 signs and everything.  I didn't know, you know, what a MS 13 was at that time.  So I told him, dude, I

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 444 of 508
Case 3:08-cr-00134-RJC   Document 1946   Filed 01/30/11   Page 189 of 253
JA1410

DIRECT-VELA GARCIA

fight one on one with them guys.  And from there, my friend, Kilo (phonetic) was talking to one of the guys name Agular (phonetic) and he was in -- he was in the bar, the side of the bar looking at the bathroom.  And when he saw that I was being surrounded by them he came in.

Q.   And did they attack you at the time, then?

A.   No, sir.  They just surround me.

Q.   And you mentioned a lot of different nicknames.  Were those names that were given to you by those individuals, I mean, did those people identify themselves with those names?

A.   Yes, sir.

Q.   And you mentioned the name Kilo.  Who was Kilo?

A.   Kilo was Centrales, Kilo was MS 13 Centrales.

Q.   At the time did you know he was MS 13 member?

A.   No, sir.

Q.   That's the first time you met the MS 13?

A.   That's the first time I knew about MS 13.

Q.   Did you later -- were you later recruited or did you later join the MS 13 after that incident?

A.   After that incident, Kilo got a number for one of them and he used to call them back and forth, and want us to come to one of the meetings.  And I never went.

Q.   Okay.  Did you eventually join the MS 13?

A.   Yes, sir.

Q.   How did that come about?

Laura Andersen, RMR 704-350-7493

**JA1411**

DIRECT-VELA GARCIA

A.    After Kilo talked to me and going to club in Albemarle road called Disco Rodeos, that's when I first met Pajaro and Little Loco and Piaso.

Q.    And that club, you said what, Disco Rodeos?

A.    Disco Rodeos, Albemarle.

Q.    That's a different club than the one you referred to before, right?

A.    Yes, sir.

Q.    Where is that club at?

A.    Which one, sir?

Q.    Rodeos?

A.    Rodeos, that's in Charlotte.

Q.    So you eventually ended up in Charlotte.  How did you get into Charlotte?

A.    I end up going in Charlotte because Kilo had a friend which was a name -- what was it -- Suave was his name, not Jaidenty Suave, it was another name, which is Agular's brother.  He told us to meet him up there at Disco Rodeos.

Q.    Okay.  I would like to show you what's been previously marked as Government Exhibit 54.  Are you able to recognize Government 54?

A.    Yes, sir.

Q.    How do you recognize 54?

A.    That's the club, Disco Rodeos.

Q.    Is that the one you been referring to?

Laura Andersen, RMR 704-350-7493

**JA1412**

DIRECT-VELA GARCIA

A.    Yes, sir.

Q.    Is that in Charlotte?

A.    Yes, sir.  That's in Charlotte.

MR. NAZZARO:  I'd move Government 54, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 54 was received into evidence.)

Q.    (By Mr. Nazzaro) You mentioned the name Pajaro; is that right?

A.    Yes.

Q.    You could put the screen down for a second, if you could.  Did you neat him at Disco Rodeos?

A.    Yes, sir.

Q.    Is that where you joined MS 13?

A.    Yes, sir.  That's where we --

Q.    And could you tell us what type of things you did after you joined the MS 13 at the Disco Rodeos?

A.    We -- as soon as you go in the -- where you pay the money and the ticket to get in, there's like a -- steps from -- there's like a little balcony when you go in.  And right there, that's when MS 13 controls just that area right there.  That's just we used to fight rival gang members.

Q.    And so there was an area in the club that was controlled by the MS 13?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 447 of 508
Case 3:08-cr-00134-RJC   Document 2940   Filed 01/30/11   Page 192 of 253
JA1413

DIRECT-VELA GARCIA

A.    Yes, sir.

Q.    And was there a particular clique that you joined or a particular part of the MS 13 in Charlotte?

A.    Yes, sir.  It was South Boulevard.

Q.    That was the name of the clique?

A.    That was the name of the clique.

Q.    Who was the leader of the clique?

A.    Pajaro.

Q.    And did you -- when you joined the MS 13, were you jumped into the MS 13?

A.    No, sir.

Q.    Do you know what jumped in means?

A.    Yes, sir.

Q.    And what does being jumped in mean?

A.    It's when some guys jump you in, three of them.  And they count 13 seconds.  And one counts 13 seconds.  So it's three, actually four.  The one that counts and the one is beating is three.

Q.    Have you ever been to one of these jump ins?

A.    Yes, sir.

Q.    Now you yourself however were not jumped in, is that what your testimony is?

A.    Yes, sir.  I wasn't jumped in.

Q.    How were you able to be in the MS 13 without being jumped in?

JA1414

DIRECT—VELA GARCIA

A.    Pajaro and Little Loco and Piaso, they vouched for me, saying any time if anybody asked me, whoever jumped me in, I just say them.

Q.    Is that what you did when you met people?

A.    Yes, sir.

Q.    And did your clique, the South Boulevard clique, did you have meetings?

A.    Yes, sir.

Q.    And did you have rival gangs in Charlotte?

A.    Yes, sir.

Q.    And who were some of the rival gangs?

A.    The Sureno gang.

Q.    Was the Sureno -- besides the Sureno, were there other rivals in Charlotte?

A.    Yes.  There was 42nd and 18th Street.

Q.    Now is the 18th Street a rival only in Charlotte, if you known?

A.    No, it's -- they's -- everywhere 18th Street.

Q.    How about the Sureno.  You said the Sureno.  Is that a rival only in Charlotte or is it other places, if you know?

A.    Just in Charlotte, that I know.

Q.    And 42nd street, what was that?

A.    That was a Charlotte gang in Charlotte.  Little Criminales -- Little Criminals, that's the name of 42nd Street.

Laura Andersen, RMR 704-350-7493

**JA1415**

DIRECT-VELA GARCIA

Q.   What was the rules you had with respect to rivals, when you saw rivals?

A.   When you see a rival, you flash up the gang sign, MS 13, and you hit them.

Q.   What is the -- what is the gang sign of the MS 13?

A.   You got the M like this, the S and the 13 (indicating).

Q.   Now, with respect to Charlotte, and you mentioned the Rodeos and the picture we showed you of that.  Were there other clubs that the MS 13 would go to in the Charlotte area?

A.   Yes, sir.

Q.   And what were the names of some of those clubs?

A.   There was a club called Sensation.  And Starlights, and there was Cabana's and Vaqueros.

Q.   Did you ever hear the name Mi Cabana?

A.   Yeah, Cabana's, yes.

Q.   You mentioned, with respect to the Rodeos, that you had a section within the club?

A.   Yes, sir.

Q.   Was that the same as these other clubs?

A.   No, sir.

Q.   Tell me what was the arrangement in the other clubs?

A.   The other clubs were controlled by the MS 13, the whole -- whole clubs, the bouncers, the owners.

Q.   I would like to show you -- well, let me ask you about

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 450 of 508
Case 3:08-cr-00134-RJC   Document 1948   Filed 01/30/11   Page 195 of 253
JA1416

DIRECT-VELA GARCIA

that.  When you say controlled, what do you mean by controlling the clubs?

You said the bouncers and -- what would you do to control the club?

A.   They be drug dealers in there, and they sell drugs and then they pay taxes for them.

Q.   They pay taxes?

A.   Yes, sir.

Q.   How would they pay taxes to you?

A.   By however many drugs they sell.  You know, is like half a percent of profit they make.

Q.   And what if they didn't pay taxes to the MS 13?

A.   They usually get beat up.

Q.   Now I want to show you what's been previously marked as Government Exhibit 53.  Were you able to recognize 53?

A.   Yes, sir.  Yes, sir.

Q.   And is it one of the clubs you refer to in your testimony?

A.   Yes, sir.  Cabana's.

        MR. NAZZARO:  Your Honor, I would move Government 53, ask that it be published.

        THE COURT:  Let it be admitted.  You can publish it.

(Government Exhibit 53 was received into evidence.)

Q.   (By Mr. Nazzaro) This is Mi Cabana?

                    Laura Andersen, RMR 704-350-7493

DIRECT-VELA GARCIA

A.    Yes, sir.

Q.    Was this an MS 13 controlled club?

A.    Yes, sir.

Q.    How do you know that?

A.    Because I went in there.  I been in there.

Q.    And what happened when you would go in there.  What type of activities occur?

A.    They be a lot of drinking, and people selling drugs in the bathroom, and sometimes fights, you know.

Q.    Was there taxing that went on at the Mi Cabana?

A.    Yes, there was taxes.

Q.    Who was -- which MS 13 member was involved at the Mi Cabana.  Was there all of them, or was there some people more involved than others?

A.    It was one of them, his name is Smoke.

Q.    What did he do at the Mi Cabana?

A.    He controlled the bathroom, and the taxes there.  They used to pay to him to sell drugs in there.

Q.    Did you assist in that process at some point in time?

A.    Beating up somebody, yes, sir.

Q.    Like to show you what's been previously marked as Government Exhibit 55.  Are you able to recognize Government 55?

A.    Yes, sir.

Q.    And what is Government 55?

Laura Andersen, RMR 704-350-7493

JA1418

DIRECT-VELA GARCIA

A.    This is Vaqueros.

Q.    Is that one of the clubs you referred to in your testimony?

A.    Yes, sir.

MR. NAZZARO:  I would move Government 55.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 55 was received into evidence.)

Q.    (By Mr. Nazzaro) You called it Vaqueros, El Vaqueros or --

A.    Yes.

Q.    It doesn't say that on the sign in this photo, but is that what it was named at the time?

A.    No, sir.  It was El Vaqueros.

Q.    And with respect to the arrangements at that club, could you describe to the jury how the MS 13 controlled El Vaqueros?

A.    From the bouncers and the owners to the bathroom where the drug trade and taxes.

Q.    What do you mean by the bouncers; how did that work?

A.    The bouncers, if someone was getting in a fight, they want to kick us out of the club.  And if they wanted drugs or whatever, we just gave it to them.

Q.    And were there rents paid at the El Vaqueros?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 453 of 508
Case 3:08-cr-00134-RJC   Document 1940   Filed 01/30/11   Page 198 of 253
JA1419

DIRECT—VELA GARCIA

A.    Yes, sir.

Q.    Do you have personal knowledge of that?

A.    Yes, sir.

Q.    Like to show you what's been previously marked as Government 173.  What is Government 173?

A.    It's one of the Starlights.

Q.    Was that one of the clubs that the MS 13 controlled?

A.    Yes, sir.

Q.    Was that in Charlotte?

A.    Yes, sir.

        MR. NAZZARO:  Move Government 173.

        THE COURT:  Be admitted.

(Government Exhibit 173 was received into evidence.)

Q.    (By Mr. Nazzaro) What type of activities occurred at the Starlight?

A.    From drugs in the bathroom, taxing people, to fighting, drinking.

Q.    Did the MS 13 have total control of that club?

A.    Yes, sir.  That's --

Q.    Like to show you what's been previously marked as Government 164.  Are you able to recognize Government 164?

A.    Yes, sir.

Q.    Was that a club that you're familiar with in Charlotte?

A.    Yes, sir.

Q.    Was it a MS 13 club?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 454 of 508
Case 3:08-cr-00134-RJC   Document 1940   Filed 01/30/11   Page 195 of 253
JA1420

DIRECT-VELA GARCIA

A.    No, sir.

Q.    Was it a -- was it a club you ever have been to before?

A.    Yes, sir.  I been in that club.

Q.    And was it controlled by anybody else?

A.    Controlled by Surenos.

MR. NAZZARO:  I move Government 164.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 164 was received into evidence.)

Q.    (By Mr. Nazzaro) You mentioned it was controlled by the Surenos.  What did that mean?

A.    Means that they controlled everything inside the club, once we go in there.  And means to get in a fight with them, the bouncers used to kick us out of the club and would beat us up.

Q.    Okay.  Why would you go to that club then?

A.    To show them that we weren't scared of them.

Q.    Now, do you see the white area in Government 164?

A.    Yes.

Q.    By the two doors?

A.    Yes, sir.

Q.    Do you remember that area at all before?

A.    Yes, sir.  That used to be a tag of MS 13.

Q.    How do you know that?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 455 of 508
Case 3:08-cr-00134-RJC    Document 1940    Filed 01/30/11    Page 200 of 253
JA1421

DIRECT-VELA GARCIA

A.   Somebody up the street, one of the Home Boys told me that the guy who done it is up the street, where we live at.

Q.   Could you mark on this screen where that tag was, I think you referred to.

A.   Right here (indicating).

Q.   Could you just mark directly on the screen with your finger.  Are you touching the screen?

A.   Yeah.  Yes, sir.

Q.   I think we'll describe it as that white area by the double doors.  Is that where you said the tag was?

A.   Yes, sir.

Q.   What was there actually?

A.   It was MS 13.

Q.   And how do you know that?

A.   Cause one of the home boys did it.  He lives up the -- right beside there's a trailer park right beside of there.  One night he went up there and done it.

Q.   You keep mention the word "home boy", what is that?

A.   That is, home boy means one of the gang members, brother for them.

Q.   Now you mentioned a lot of nicknames at the beginning.  Did you have a nickname also?

A.   Yes, sir.

Q.   And what was your gang name?

A.   Mariachi.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 456 of 508
Case 3:08-cv-00134-RJC   Document 23-40   Filed 01/30/11   Page 205 of 253
JA1422

DIRECT—VELA GARCIA

Q.   As an MS 13 member, did you become familiar with the rules of the gang?

A.   Yes, sir.

Q.   What were some of the rules you became familiar with?

A.   Jumping in.  Jumping in, 13 seconds.  You disobey gang rule or some —— some rules they beat you up for 13 seconds, three of them.

And if a second time, if you disobey again, there will be 26 of them, 26 seconds, and everybody, the whole gang beats you up.

And as far as, you know, some of the rules about how the girls can get in, you know.  You have to sleep with three guys, 13 seconds.  What the M means.  What the S means.  What the 13 means.

Q.   What does the 13 mean?

A.   The 13 is the letter M in the alphabet.

Q.   Now with respect to these things you describe as beating up or this discipline, when would you get discipline —— what could you do to get discipline?  Or what —— what were the occasions when the MS 13 would discipline its other members?

A.   If you ever, you know, get in a fight, and you don't join the fight, if you just standing there, from disobeying any kind of rules, they put calenton, which is a heat, the heat.

Laura Andersen, RMR 704-350-7493

**JA1423**

DIRECT-VELA GARCIA

Q.   Calenton you said?

A.   Calenton.

Q.   What does that mean?

A.   It's a word that warms you up, it's like a heat, calenton.

Q.   Did you ever participate in any of those?

A.   Yes, sir I did.

Q.   Could you tell the jury about that?

A.   One of my home boys named Drogo.  He disobeyed one of the rules, which is letting a home -- never let a homie down.  He didn't go to a club to fight anybody.  He just stayed there, started drinking and smoking weed.

When we came back, you know, we got -- we got him inside of the club, beat him up for 13 seconds.

Q.   Have you ever heard of the word green light?

A.   Yes, sir.

Q.   What is green light?

A.   It's when -- green light is when they take you out, when you got a hit to take you out.

Q.   When do they do a green light.  When does the MS 13 do a green light?

A.   When you either cooperate with the government or you ratting people out.

Q.   Does the MS 13, to your knowledge, have any motto or creed that they live by?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 458 of 508
Case 3:08-cr-00134-RJC   Document 1948   Filed 01/30/11   Page 203 of 253

JA1424

DIRECT-VELA GARCIA

A.   The three things, you know, that is the most is mata violar robar (phonetic).  Which is kill, rape and steal.

Q.   Now you mentioned the clique, South Boulevard, right?

A.   Yes, sir.

Q.   That was the clique you were a member of in Charlotte?

A.   At the beginning, yes, sir, at the beginning.

Q.   Did it always keep the name South Boulevard, or did it change?

A.   It changed.

Q.   Could you tell the jury about that change?

A.   We changed it cause it was South Boulevard.  And it's -- the name from a rival gang, which is Sureno.  And we -- we changed to Coronados.

Q.   How did you go about changing the name of the clique from South Boulevard to Coronados?

A.   We had to talk to somebody, it was -- who was a big shot caller, to ask permission, to baptize us to use the name.  We couldn't just use the name Coronados.

Q.   Who did you have to talk to?

A.   We had to -- Pajaro, Little Loco and Piaso talked to a guy named Tigre.

Q.   Why did you have to get permission to use the name Coronados?

A.   We couldn't use the name Coronados.

Q.   Why is that?

Laura Andersen, RMR 704-350-7493

**JA1425**

DIRECT-VELA GARCIA

A.   Because you needed somebody to baptize you, to vouch for.

Q.   Where does the name Coronados come from?

A.   Came from a clique in Honduras.

Q.   Did you eventually get that permission from Honduras to change the name?

A.   Yes, sir.

Q.   Now, sir, with respect to Charlotte then, when we talk about South Boulevard or the Coronados, that's one in the same, that's the same clique?  It's just changed its name over time?

A.   Say, repeat again.

Q.   Is the -- when we refer to the South Boulevard or the Coronados, that's the same clique, right?

A.   The clique changed names from South to Centrales.  Some people went to Coronados and some went to Centrales, another clique name.

Q.   Okay.  So South Boulevard no longer existed at that point, as far as the name?

A.   No, sir.  It doesn't exist, not the clique name.

Q.   It merged into two other cliques, which were Coronados and Centrales?

A.   And Centrales, yes, sir.

Q.   Do you remember which of those cliques -- did you stay as a member with?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00557-MOC   Document 59-3   Filed 03/23/17   Page 460 of 508
Case 3:08-cr-00134-RJC   Document 2940   Filed 01/30/11   Page 205 of 253
JA1426

DIRECT-VELA GARCIA

A.   Coronados.

Q.   And this other clique you referred to as Centrales, were you familiar with members of that clique in Charlotte at the time?

A.   Yes, sir.

Q.   And could you tell us about the Centrales, what was that clique like?

A.   That -- the Centrales were -- they were much -- the guys were much older.  Most of them had training from Salvador.  We didn't quite get along with them because they called us little pee wees.  And they had more -- they knew more about the rules.  They knew more about Salvador and all that we didn't know that much.

Q.   You said they had more training.  What do you mean by training?

A.   They had more -- they were more -- like I -- experience.  They had -- they called people from Salvador and then they were just -- they were just ruthless.

Q.   And did they assist in controlling some of these clubs that we referred to in Charlotte?

A.   They had -- they had some, you know, they had -- but they had like some clubs Iguana and some of the Starlights.

Q.   Did you know the members of the Centrales?

A.   Yes, sir.

Q.   You mentioned -- did they have a closer connection to

Laura Andersen, RMR 704-350-7493

**JA1427**

DIRECT—VELA GARCIA

El Salvador than your clique?

A.   Yes, sir.

Q.   How was that?

A.   People used to call them from El Salvador.  They used to send them money and --

Q.   Do you -- go ahead.

A.   They -- they buy samples and sent them over there and stuff like that.

Q.   Do you know some of those people who they talked to in El Salvador?

A.   Yes, sir.  They talked to Chacua.  Who is a guy named Cobra.  And there was another name and a guy named Casper.

Q.   Who was Chacua?

A.   Chacua was one of shot callers from Centrales.

Q.   Was he in Charlotte at any point in time?

A.   Yes, sir.

Q.   And was he a shot caller in Charlotte?

A.   Yes, sir.  He was one of them.

Q.   And you mentioned he was in El Salvador at some point in time; when did that happen, do you recall?

A.   Since he been deported, he's been in El Salvador --

Q.   Okay.  Well, did the members of the Centrales and the other MS 13 communicate with him when he was back in El Salvador?

A.   Yes, sir.  He -- they used to call him on cell phone.

Laura Andersen, RMR 704-350-7493

**JA1428**

DIRECT-VELA GARCIA

They used to -- sometimes they used to call me.

Q.    Okay.  And do you know where he was calling from in El Salvador?

A.    Yes, sir.  He was calling from the jail in Salvador.

THE COURT:  Mr. Nazzaro, this is probably a good point to take our afternoon break.

Members of the Jury, we will take our afternoon break for 15 minutes.  When you do break, don't talk about the case, keep an open mind.  And we'll see you at 5 to 4. Thank you.

(The jury was escorted from the courtroom.)

(A brief recess was taken in the proceedings.)

THE COURT:  We're going to go to 5 and call it a day wherever we are at that time.  We'll start up at 9:30. If there are any legal issues that need to be addressed before we start up at 9:30, let chambers know and we can start before 9:30.  But I want to make sure we start promptly at 9:30.

Are we ready for the jury?

ALL COUNSEL:  Yes, Your Honor.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  All right.  Mr. Nazzaro, you may continue.

Laura Andersen, RMR 704-350-7493

Case 3:16cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 463 of 508
Case 3:08-cr-00134-RJC   Document 240   Filed 01/30/11   Page 208 of 253

JA1429

DIRECT-VELA GARCIA

CONTINUED DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Mr. Garcia, I ask you to stand just a little bit further from the microphone so we don't get too muffled. But I think it's pretty well.

All right.  Now, before the break, I was asking you about Chacua.  Do you remember those questions?

A.   Yes.  Chacua.

Q.   Do you know a person by the name of Sixteen?

A.   Yes, sir.

Q.   Who is Sixteen?

A.   Sixteen is a shot caller for the Centrales, Chacua's cousin.

Q.   Now, I want to direct your attention to October or the fall of 2007.  At that point in time you were still a member of the MS-13?

A.   Yes, sir.

Q.   And at that point in time did you receive any information from any other MS 13 members that there would be somebody checking up on your clique?

A.   Yes, sir.

Q.   And could you tell the jury what information you received and what the information was?

A.   It was -- they was gonna send two big guys from down -- from Salvador.  And they was gonna come and put us straight, correct us, and set them straight.

Laura Andersen, RMR 704-350-7493

**JA1430**

DIRECT-VELA GARCIA

Q.   Why were they going to set you straight.  What was the problem at the time?

A.   Because we wasn't doing things right at the time.  They said we were fighting each other.  Everybody was going to one side.  It was a lot of friction among each other.

Q.   Who did you receive that word from?

A.   I received it through a guy named Sombre, it was Centrales.

Q.   Is this person by the name of Sombre, a MS 13 member of the Centrales?

A.   Yes, sir.  He was Centrales.

Q.   Did he indicate who had contacted him?

A.   He said it was some guys from Greensboro.

Q.   From Greensboro?

A.   Yes, sir.

Q.   And what were the people from Greensboro?  Were they the same people you referred to that were being sent in?

A.   Yeah.  They said some guys, you know, they were gonna send from Salvador.  And they were gonna -- Greensboro and --

Q.   Okay.  Were they from Salvador or Greensboro?

A.   No.  They were from Salvador.

Q.   Okay.  That was your understanding?

A.   Yes, sir.  They were from Salvador.

Q.   What was the Greensboro connection then?

Laura Andersen, RMR 704-350-7493

**JA1431**

DIRECT-VELA GARCIA

A.    That's where they lived.

Q.    Okay.  And at some point did you travel to Greensboro?

A.    Yes, sir.

Q.    Okay.  Now before that point that you traveled to Greensboro in the fall of 2007, did you and the other -- did your cliques in Charlotte have a meeting?

A.    Yes, sir.

Q.    And tell the jury about that meeting, what you recall from that meeting?

A.    We had a meeting, Centrales and Coronados.  We had a meeting in the woods.  We were kind of scared, because we didn't know what was going to happen when we were going to that meeting.

Q.    Okay.  What meeting are you referring to?

A.    The meeting in Greensboro.

Q.    So you had a meeting before you went to Greensboro?

A.    Yes, sir, we had.

Q.    And these are members of the two different cliques?

A.    Yes, sir.

Q.    And what was discussed at that meeting that you referred to, I think, in the woods?

A.    The meeting in the woods was discussed about them coming.  I mean, we going over there.  And how we gonna get there.  How we gonna get a car.  Make sure we take guns with us.  And discussed about, you know, we got to choose one

Laura Andersen, RMR 704-350-7493

DIRECT-VELA GARCIA

name from the whole and clique in Charlotte.

Q.   Why did you have to choose one name, why were you discussing that?

A.   Because they wanted one -- one name for the whole Charlotte area.

Q.   Okay.  One name for the clique?

A.   For the clique, yes, sir.

Q.   So was it basically a merging of the cliques, was that one of the things you were discussing?

A.   Yes, sir, coming together.

Q.   And you attended that meeting in October of 2007 in the woods?

A.   Yes, sir.

Q.   Now, I would like to show you what's been previously marked as Government Exhibit 227; do you recognize 227?

A.   Yes, sir.

Q.   How are you able to recognize 227?

A.   That's me driving the car.

Q.   Now, do you know when this was taken?

A.   This was taken after we -- we met in a hotel, in the parking lot of the hotel before we went to woods to have a meeting.

Q.   Okay.  You didn't take this -- nobody you're associated with took this picture, did they?

A.   No, sir.

Laura Andersen, RMR 704-350-7493

JA1433

DIRECT-VELA GARCIA

MR. NAZZARO:  Okay.  And I would like to move Government 227.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

MR. NAZZARO:  Published.

THE COURT:  You may.

(Government Exhibit 227 was received into evidence.)

Q.   (By Mr. Nazzaro) I would like to show you Government 49.  Do you recognize the person in Government 49?

A.   That's me in the picture right here.  And the one beside me is Sicario.

MR. NAZZARO:  We move Government 49.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 49 was received into evidence.)

Q.   (By Mr. Nazzaro) So this is a picture of you, and it's indicated date stamped October 27, 2007, do you see that?

A.   Yes, sir.

Q.   Okay.  And what about the -- which one is you, with the jersey, is that right, Los Angeles?

A.   It's a shirt says, Los Angeles, sir.

Q.   Why were you wearing that?

A.   Because it had blue on blue.

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC    Document 59-3    Filed 03/23/17    Page 468 of 508
Case 3:08-cv-00134-RJC    Document 194    Filed 01/30/11    Page 213 of 253

**JA1434**

210
DIRECT-VELA GARCIA

Q.   And the person next to you, are you able to identify who that is?

MR. FOSTER:  Objection; asked and answered.

THE COURT:  Sustained.

Q.   (By Mr. Nazzaro) I think he answered -- I think the name was Chicago, is that?

A.   No, sir.  No, sir it's Sicario.

Q.   Okay.  Sicario.  Is that an MS 13 member?

A.   Yes, sir.

Q.   Like to show you what's been previously marked as Government Exhibit 50.

     Are you able to recognize anything in Government 50?

A.   That's the hotel.

Q.   What hotel?

A.   The hotel we got together before we went to the meeting.

Q.   Okay.  Is this where you -- this was before the meeting we're referring to in the woods?

A.   Yes, sir.  We all got together at the hotel in the parking lot, then we all rode to the woods.

MR. NAZZARO:  Move Government Exhibit 50.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 50 was received into evidence.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 469 of 508
Case 3:08-cv-00134-RJC   Document 243   Filed 01/30/11   Page 214 of 253
**JA1435**

DIRECT-VELA GARCIA

Q.   (By Mr. Nazzaro) I would Like to show you finally, what's been marked as Government 51.  Do you recognize anybody in Government 51?

A.   Yes.  I'm the one with the white shirt right there. Right beside me in the hat is --

Q.   Are you able to recognize some of the people in 51?

A.   Yes, sir; three people.

Q.   Okay.  Appears to be a wooded area.  Do you know where that is, was taken?

A.   We -- we was -- we were walking towards the wooded area, that was like a little path.

Q.   That's the meeting we are referring to; is that right?

A.   Yes.

        MR. NAZZARO:  I move Government Exhibit 51 and ask that it be published.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted, published.

(Government Exhibit 51 was received into evidence.)

Q.   (By Mr. Nazzaro) Now, Mr. Garcia can you identify which people you can pick out?  I know you said yourself. Can you point it out or circle -- I don't know if it's working, but if it is, can you attempt to circle yourself on that picture.  Are you touching the screen?

A.   Yes, sir.

                Laura Andersen, RMR 704-350-7493

DIRECT-VELA GARCIA

Q.   Okay.  It's not -- there it is.  That guy right there on the red?

A.   Yes.

Q.   Is that you?

A.   That's me.

Q.   Okay.  And as you're looking at the screen, the person to the right or to the left of you, are you able to identify any of those people?

A.   This right here, right beside me, this guy got a hat. That's Sombre.

Q.   That's the Sombre you were referring to previously?

A.   Yes, sir.

Q.   And anybody else?

A.   This guy right here beside me (indicating).

Q.   Who is that?

A.   That's Sicario.

Q.   That's the same person you previously referred to?

A.   Yes, sir.

Q.   Anybody else, there's two other people in the picture. It's grainy, but are you able to recognize any of those people?

A.   No, sir.

Q.   Okay.  Now did you -- Mr. Garcia, did you eventually go to Greensboro?

A.   Yes, sir.

Case 3:16cv-000573-MOC    Document 59-3    Filed 03/23/17   Page 471 of 508
Case 3:08-cv-00134-RJC    Document 284    Filed 01/30/11   Page 216 of 253
JA1437

DIRECT-VELA GARCIA

Q.   And how long after this meeting in the woods did you go to Greensboro, do you recall the time period?

A.   Probably about a week and a half or so.

Q.   And who went to Greensboro?

A.   It was me, Sombre, Sicario, Tigre, Diablo, and Nene.

Q.   Okay.  Let's talk about these people.  They're all nicknames; is that right?

A.   Yes, sir.

Q.   You mentioned Nene.  Who's Nene?

A.   Nene, he's a -- he's a MS 13 member, he's Centrales.

Q.   I think you mentioned Psicopata?

A.   Psicopata, yeah.

Q.   Who is he?

A.   He's from Honduras, he's Coronados.

Q.   And I believe you mentioned two other people, was that right?

A.   Yes, sir.

Q.   What were their names?

A.   His brother Tigre.

Q.   Tigre?

A.   Yes, sir.

Q.   And who is Tigre?

A.   Tigre is a MS 13 member, Coronados.

Q.   And how about the last person you mentioned, I think, Diablo?

Laura Andersen, RMR 704-350-7493

**JA1438**

DIRECT-VELA GARCIA

A.    Yes, sir.

Q.    Is that the name you used?

A.    Diablo, yes, sir.  He's Honduras, he's Coronados, too.

Q.    I just want to make sure I'm pronouncing these names right.  Did you say Sicario or Diablo?  I'm not sure which name you used.

A.    Right now, Diablo.  Diablo's Coronados.

Q.    And how did you go to Greensboro from Charlotte, this group of people?

A.    They came picked me up on the way.

Q.    And who picked you up?

A.    Nene, Sombre, Sicario and Diablo, Tigre.

Q.    Do you remember what kind of car it was?

A.    They got a car from Smoke.  It was like a blue escort, car.

Q.    Smoke is the person you previously referred to at Mi Cabana?

A.    Yes, sir, Smoke.

Q.    The same Smoke?

A.    The same Smoke.

Q.    He's MS 13 member?

A.    Yes, sir.

Q.    And you all went in the car together, is that my understanding?

A.    Yes, sir.  We all piled in the car.

JA1439

DIRECT-VELA GARCIA

Q.   And did you bring with you any guns?

A.   Yes, sir, we brought guns.

Q.   What did you bring?

A.   We brought a little .25.  And it's a -- Mach 10 or Mach 11, a gun with a big clip.

Q.   I'd like to show you what's been previously marked as Government 114.  Are you able to recognize anything in 114?

A.   Yes, sir.

Q.   How are you able to recognize anything in 114?

A.   The little .25, that one's mine.  And this is the one they had.

MR. NAZZARO:  Okay.  I would like to move 114 and ask that it be published.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted, published.

(Government Exhibit 114 was received into evidence.)

Q.   (By Mr. Nazzaro) Those are your red arrows you just put on there; is that right?

A.   Yes, sir, right here.

Q.   The smaller .25, whose weapon was that?

A.   That was mine, sir.

Q.   And the larger weapon with the clip, who had that weapon?

A.   They shared.  They shared back and forth.  But if I

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 474 of 508
Case 3:08-cv-00134-RJC   Document 29-3   Filed 01/30/11   Page 219 of 253

**JA1440**

DIRECT-VELA GARCIA

remember, it was Diablo that had it.

Q.   Okay.  You say share.  Was that something that was done a lot with the MS 13 when you guys traveled with weapons?

A.   Yes, sir, we shared.

Q.   And so where did you go in Greensboro?

A.   We went to some apartments.

Q.   And how did you know how to get there?

A.   When Nene was driving, he was talking to some guys from Greensboro, and he was directing how we got -- how we get there and everything.

Q.   Like to show you what's been previously marked as Government Exhibit 52; are you able to identify or recognize Government 52?

A.   Yes, sir.

Q.   How are you able to recognize that?

A.   Where the car is at, that's where we park.  Because they tell us to park way down here, where the car is at right here.

        MR. NAZZARO:  Like to move Government 52, Your Honor, and ask that it be published.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted and published.

(Government Exhibit 52 was received into evidence.)

Q.   (By Mr. Nazzaro) That's the apartment complex in

JA1441

DIRECT-VELA GARCIA

Greensboro you're referring to?

A.    Yes, sir.

Q.    And, okay, so you arrive at this location.  What happens next?

A.    We -- there was a -- there was a guy that met us right in front of the apartments, like before you get in there and he told us where to park.

Q.    What was his name, do you know?

A.    Don't know, sir.  I didn't know nobody at that time.

Q.    Okay.  And what happened after he showed you where to park?

A.    He told us to park the car there, not to make a scene.  To be quiet, he says.  And then he told us to park there, and then to walk around the back.

Q.    Okay.  You went in the back?

A.    Yes.

Q.    And where did you go?

A.    We went in back -- all the way back there.  And there was a guy behind us.  Couple guys behind us.  And then we met another guy down here, like right in the middle.  And went through the back.  And then through the middle.  And this guy popped the door open.  And we all got in, in apartment.

Q.    All right.  Was there anybody in the apartment?

A.    No, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 476 of 508
Case 3:08-cr-00134-RJC    Document 2943    Filed 01/30/11    Page 217 of 253
JA1442

DIRECT-VELA GARCIA

Q.   What do you mean, no.  Was there furniture, anything in the apartment?

A.   No, sir.  He -- he popped the door.  It was -- it was nobody there.  It was no lights or nothing.  It was just dark, and we just went in there.

Q.   Okay.  And was there any people in the apartment when you got in there?

A.   No, sir.

Q.   Did there eventually arrive some other people at the apartment?

A.   Just us.  Once we went in there, that was the only ones there.

Q.   When you say us, is the people came from Charlotte, right?

A.   Yes, sir, just --

Q.   Was there other people there from Greensboro?

A.   Yes, sir.  There was a couple guys.

Q.   And who were they?

A.   They, at the time, you know, I didn't meet them.  So I didn't know the name until we went inside.

Q.   Okay.  When you went inside, did you get to meet them?

A.   Yes, sir.  We made a circle and we start -- we start meeting, saying our name.

Q.   You said you made a circle?

A.   Yes.

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 477 of 508
Case 3:08-cv-00134-RJC   Document 59-3   Filed 01/30/11   Page 222 of 253
**JA1443**

219
DIRECT-VELA GARCIA

Q.  What do you mean, a semi circle or a full circle?

A.   No.  It was a full circle, sir.

Q.   Okay.  And then what did you do after you make a full circle, what happened?

A.   You count to 13.  And we start counting, you know, after 13, you start waving MS 13 in the air.  And that's how the meeting starts before we start the meetings.

Q.   Do you then identify yourself?

A.   Yes, sir.  I said Coronados.  And I said Mariachi MS 13.  And the other guys said the same thing.

Q.   Did the people that were there from Greensboro, did they identify themselves?

A.   Yes, sir.

Q.   In the same way?

A.   Yes.  The same way, sir.

Q.   What names did they use?

A.   One was Chino.  And one was Wizard.  And one was Stiler.  And another guy name Piaso.

Q.   Did they also identify what cliques they were from or where they were from?

A.   Yes, sir.

Q.   And what did they say, these people from Greensboro?

A.   They -- they said after -- you know, they said after they said their names and the clique they were from, they --

Q.   Which clique did they say they were from?

Case 3:16-cv-000573-MOC   Document 59-3   Filed 03/23/17   Page 478 of 508
Case 3:08-cr-00134-RJC   Document 2943   Filed 01/30/11   Page 223 of 253
JA1444

DIRECT-VELA GARCIA

A.   Well, one of them -- they said -- one of them, Wizard, was from --

MR. FOSTER:  Excuse me.  Could you say it again.  I couldn't hear.  I'm sorry.

Q.   (By Mr. Nazzaro) Go ahead, say that again.

A.   Well, Wizard, they said where they from, Wizard was from Venice.  And Stiler, Normandie.  And just the clique names they said, the other guys.

Q.   They were from different cliques?

A.   Yes, sir, different cliques.

Q.   And the person that you refer to as Wizard, do you see him here in the courtroom today?

A.   Yes, sir.

Q.   Could you identify where he is and what he has on?

A.   He's got a white shirt.

Q.   Where is he seated?

A.   Right here, sir.  (Indicating.)  He's got a tattoo right here.  (Indicating.)

Q.   You're pointing to the middle of your forehead?

A.   Yes, sir (pointing).

MR. NAZZARO:  Your Honor, if the record could reflect the identity of the defendant?

THE COURT:  It will.

Q.   (By Mr. Nazzaro) And you said something about the tattoo.  Did you see the tattoo on that occasion, in

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 479 of 508
Case 3:09-cr-00134-RJC   Document 1943   Filed 01/30/11   Page 224 of 253
JA1445

DIRECT-VELA GARCIA

Greensboro?

A.    Yes, sir.

Q.    What was discussed at the meeting?

A.    It was -- there was discussed, you know, that they were gonna run Charlotte their way, stressing their rules.  They had one clique on it.  And they were telling us how they do it where they came from.  How they had people taxed and, you know, stuff.

Q.    Who was doing the talking from Greensboro people?

A.    Started with Stiler first and then Wizard.

Q.    All right.  Was mostly those two people doing the talking?

A.    Yes, sir.  Only two people usually talking.

Q.    How did they say things should be run?

A.    They -- they said, you know, as far as, you know, taxing people, more people about, you know, naming one clique in Charlotte, just having one.  And not to fight each other, among each other.

Q.    And did they talk about any other activities that you should be doing in Charlotte?

A.    Just -- just control, you know.  Have better control in Charlotte.

Q.    Did they talk about taxing?

A.    Yeah, taxing.

Q.    What did they say about taxing?

Laura Andersen, RMR 704-350-7493

**JA1446**

DIRECT-VELA GARCIA

A.    Taxing drug dealers, you know, taxing where we live at. You know, people there, tax them.

Q.    What did they -- did they talk about selling drugs?

A.    They -- yes, sir, selling drugs, stealing cars, stealing stereos from cars.

Q.    Did they talk about guns?  I mean, you mentioned you had guns.  What was the situation with the guns at the time?

A.    At the time which they had one, one gun, we had the other guns, and they would pass around.  We didn't have much guns, because we didn't have much money.

Q.    And those two guns that I previously showed you, you brought them into the meeting; is that right?

A.    Yes, sir.

Q.    And did the people from Greensboro have any guns?

A.    Yes, sir.

Q.    And what -- who had guns from Greensboro?

A.    They -- they had a .45.

Q.    Did you see the .45?

A.    Yes, sir.

Q.    Who had the .45?

A.    They passed it around, it was Stiler and then Wizard.

Q.    Did Wizard say anything about the .45?

A.    He just said, you know, it was a good gun.

Q.    Did he call it anything in Spanish or just a good gun?

A.    Just a good gun.

Laura Andersen, RMR 704-350-7493

**JA1447**

DIRECT-VELA GARCIA

Q.   Did he say anything about whether the gun had any ammunition?

A.   Yes, sir.  He -- he told us that, you know, that right behind him at the apartments he had some -- he had like a carton of bullets hidden underneath the leaves.

Q.   Did he tell you that?

A.   Yes, sir, he told me that.

Q.   Was there any discussion about Chavalas?

A.   Yes, sir.

Q.   And what was discussed about Chavalas?

A.   You know, the guns were for the Chavalas.

Q.   What's a Chavala?

A.   Chavala is a name we use for rival gang members.

Q.   Was there any discussion about respect at this meeting?

A.   Respect, you know, it was everything to them, you know. It was everything.

Q.   Was there any discussion about Sixteen at the meeting?

A.   Yes, sir.  Sixteen where -- Sixteen was collecting taxes, using -- using MS 13 name on it.  He -- he used the name, and he didn't never come and control the streets or nothing.  He just, you know, he used the name from other drug dealers, and they used to pay him -- taxes to him.

Q.   Okay.  So what was discussed about his activities?

A.   It was just -- it was discussed that he wasn't, you know, he wasn't running the Centrales, right.  And the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00557-MOC   Document 59-3   Filed 03/23/17   Page 482 of 508
Case 3:08-cr-00134-RJC   Document 2940   Filed 01/30/11   Page 227 of 253
**JA1448**

DIRECT—VELA GARCIA

Centrales who were there, they were mad about it.

Q.   And was there any discussion by the people from Greensboro about what action needed to be taken?

A.   Well, you know, they say that they told us, you know, they're going to investigate it and come to Charlotte, investigate everything, and see who -- who he was, Sixteen was all about, and talk to him and all that.

Q.   Now, I showed you the picture previously of that larger firearm you had with the clip.  Was there any discussion about that gun at the meeting?

A.   Yes, sir.

Q.   What was discussed?

A.   It was he -- he asked me --

Q.   Who did?

A.   Wizard asked me if he can borrow it.  Because there was some Latin Kings up the street from where they live at and, you know, they want to use it for it.  I said, you know, you don't ask me cause, you know, it's not mine.  You ask them.  And he said, you know, that are you gonna let us borrow it.

Q.   Well, did he say anything else about that particular gun?

A.   He liked it.  He said that's one of the guns they like to use down in Salvador.

Q.   Okay.  So how long did this meeting last, if you recall?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 483 of 508
Case 3:08-cr-00134-RJC    Document 2943    Filed 01/30/11    Page 228 of 253
JA1449

DIRECT-VELA GARCIA

A.   It was, say about -- just the meeting, you know, itself, about 30 minutes.

Q.   And you said the meeting, was there something that happened after the meeting?

A.   Well, yes.  After the meeting, that's when we started talking to each other, you know, about what kind of guns we had.  And they showed their gun, and we showed them our guns.

Q.   Now, what was the result of the meeting?  What happened after the meeting?  What was the conclusion of the meeting?

A.   It was -- the way we started, you know, we left out of there, and we was kind of nervous.  Because everybody was talking about the tattoos they had on his face and --

Q.   Whose?

A.   Stiler's tattoos and Wizard's tattoos they had on his face.  And they all were a talking about it, because we never seen somebody like that.

Q.   And did -- was there any discussion about whether Wizard and Stiler would have another meeting or come to Charlotte at some point in time?

A.   They said that soon as, you know, they talk to people who in Salvador and around the area, that they were gonna come down to Charlotte.

Q.   Did they say when, or was there a particular date discussed or not?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 484 of 508
Case 3:08-cr-00134-RJC   Document 1946   Filed 01/30/11   Page 229 of 253
JA1450

DIRECT-VELA GARCIA

226

A.   It wasn't a date specific, when.

Q.   Now, you returned to Charlotte that evening then; is that right?

A.   Yes, sir.

Q.   Now, once you returned to Charlotte, were you -- did you have any discussion with other MS 13 members about committing a robbery?

A.   Yes, sir.

Q.   And what was that discussion about?

A.   We all got together and start talking about planning a -- a robbery to hit up this prostitute house.

Q.   Okay.  Where was the prostitute house at?

A.   I don't remember.

Q.   Was it in Charlotte?

A.   Yes, sir, in Charlotte.  I don't know what street or anything.

Q.   So what was the plan?

A.   That we was gonna go in there and tie the people up and steal their -- the money.

Q.   And who was participating in this?

A.   It was suppose to be me and Nene, Sombre, Tigre and Diablo.

Q.   Okay.  Those were some of the same people you previously mentioned, right?

A.   Yes, sir.

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 485 of 508
Case 3:08-cr-00134-RJC   Document 1346   Filed 01/30/11   Page 230 of 253
JA1451

DIRECT-VELA GARCIA

Q.   The same people that went to Greensboro?

A.   Yes, sir.

Q.   And did you -- after you discussed this plan, was there a discussion about obtaining any weapons?

A.   Yes, sir.

Q.   And what did -- what was the decision about that?

A.   We -- we, you know, we asked around for, let us borrow some weapons, some guns.

Q.   And so what -- what happened after you decided -- did you decide to do this, you and the other MS 13 members?

A.   I'm suppose to go with them, but I didn't go, so they end up going themselves.

Q.   Okay.  And -- go ahead.

A.   I didn't make it cause I was at work.

Q.   And what happened?  Did they rob the whore house or the prostitution house?

A.   No, sir.

Q.   Okay.  What happened?

A.   They when they got out --

        MR. FOSTER:  Objection; lack of personal knowledge.

        THE COURT:  I'll require you to lay a foundation.

Q.   (By Mr. Nazzaro) Okay.  Did you have a discussion with any of the members of -- that were going to commit this robbery?

                Laura Andersen, RMR 704-350-7493

**JA1452**

DIRECT—VELA GARCIA

A.    Yes, sir.

Q.    Okay.  Did you have a discussion with them after they attempted to do it?

A.    Yes, sir.  When they were going, they got pulled over by --

MR. FOSTER:  I'm going to object when he doesn't identify the speaker, Your Honor.

THE COURT:  Sustained.

Q.    (By Mr. Nazzaro) Who did you discuss this with?

A.    I discussed it with Nene and Sombre.  They call me up right after they got pulled over and they had the guns taken out by the police officers.

Q.    You weren't with them at the time?

A.    No, sir I wasn't.

Q.    Okay.  Now this, I guess attempt, this occurred after this meeting in Greensboro, right?

A.    Yes, sir.

Q.    But it wasn't the same night or anything?

A.    No, sir, it wasn't.

Q.    Was it sometime later?

A.    It was.

Q.    If you remember?

A.    I don't recall it, but it was down a couple weeks maybe.  I forgot the date.

Q.    I'd like to show you again what's been entered into

Laura Andersen, RMR 704-350-7493

evidence, 110. You previously identified these were the guns you took to Greensboro, do you remember that?

A. Yes, sir.

Q. Were any of these guns provided to be used in the robbery, if you know? The robbery of the prostitution house?

A. Yes, sir. Yes, sir. These are the guns we took them to the robbery.

Q. And so from what you were informed by the other MS 13 members, this plan failed, right?

A. Yes, sir.

Q. Did -- was there a discussion amongst or between you and any other MS 13 player -- member, about why this failed?

A. There was -- me and Sombre was talking, you know, that -- that somebody had -- was cooperating with the police.

Q. Okay. Was there a particular person that you began to suspect?

A. Yes, sir. That was Nene.

Q. Okay. And that's the same Nene that you talked about earlier?

A. Yes, sir, same one.

Q. Was there -- after this first attempt, did you have any discussions with the MS 13 members about another robbery?

A. Yes, sir.

JA1454

DIRECT-VELA GARCIA

Q.   And what was that discussion?

THE COURT:   Well -- you can ask him who he had a discussion with.

MR. NAZZARO:   Yeah, I'm sorry, Your Honor.  I will.

Q.   (By Mr. Nazzaro) Did you -- you had -- who did you have the discussion with?

A.   Nene, Tigre, Sombre, Chicago and Diablo.

Q.   What was the nature of that discussion?

A.   We were suppose to do the same thing, go to the prostitute's house and rob it.

Q.   So you were going to try again?

A.   Yes, sir.

Q.   You mentioned Nene, did you know his real name?

A.   Rony.

Q.   Rony?

A.   Rony.

Q.   So Nene and Rony are the same person?

A.   Yes, sir.

Q.   Now, with respect to this second time that you were going to this prostitution house, did you -- were you present with them on that occasion?

A.   No, sir, I wasn't.

Q.   And did you have discussions with anybody from the MS 13 on the night of that robbery?

Laura Andersen, RMR 704-350-7493

JA1455

DIRECT-VELA GARCIA

A.    Yes, sir.

Q.    Who did you have a discussion with?

A.    Nene.

Q.    And what was the -- what was the result of that attempt?

MR. FOSTER:  Objection; lack of personal knowledge.

THE COURT:  Sustained.

Q.    (By Mr. Nazzaro) Did you have a discussion with any other MS 13 member about what happened with that particular plan to rob the same prostitution house again?

A.    Yes, sir.

Q.    Who did you have that discussion with?

A.    Nene.

Q.    And what was -- do you know what happened on that occasion?

THE COURT:  I'll sustain the objection.

MR. NAZZARO:  Okay.

Q.    (By Mr. Nazzaro) After -- well, first of all, let me ask you about the second attempt.  Was there any discussion with any MS 13 members about bringing a gun on that occasion?

A.    Yes, sir we --

Q.    Who did you have that discussion with?

A.    I talked to Nene.  And Nene talked to Smoke.  And Smoke

Laura Andersen, RMR 704-350-7493

JA1456

DIRECT-VELA GARCIA

let us borrow his shotgun.

Q. Now, on that particular occasion, on the day or night of that robbery or attempted robbery you mentioned, did you have a discussion later with Nene; is that right?

A. Yeah, I discussed with Nene.

Q. Okay. Now, after your discussion with Nene, do you know -- did you go anywhere after on that particular night, if you recall?

A. After -- after -- you talking about after the robbery?

Q. Yes.

A. The -- well, we -- the robbery didn't come through, because the police got there before we did. So after that, we take -- Rony called me up and said, you know --

MR. FOSTER: Objection; hearsay.

THE COURT: Sustained.

THE WITNESS: The police got there --

THE COURT: Hang on a second. Wait for the lawyer to ask a question.

Q. (By Mr. Nazzaro) Okay. Now after Rony called you up, did you have a discussion with him about where you were going to go next; what you were going to do?

A. After the --

MR. FOSTER: Objection; hearsay.

THE COURT: Sustained.

Q. (By Mr. Nazzaro) Did you discuss with him, did you

Laura Andersen, RMR 704-350-7493

**JA1457**

DIRECT-VELA GARCIA

tell him about any other plans that evening?  Did you tell Rony about anything after -- after that call?

A.    After that call --

Q.    Not what Rony told you, did you tell Rony anything?

A.    I told Rony to go plan B, if --

Q.    Okay.  What was plan B?

A.    We was suppose to hit up this drug dealer named Gordo.

Q.    Who is Gordo?

A.    Gordo's a drug dealer.

Q.    Where does he deal drugs?

A.    He goes around to all the clubs in that area there. And he came to Vaqueros, and we was gonna rob him.

        MR. FOSTER:  Objection.  Sounds like he's testifying what Rony's saying.

        THE COURT:  Sustained.

Q.    (By Mr. Nazzaro) okay.  Once again, you came up with the idea of plan B; is that right?

A.    Yes, sir.

Q.    Now, this guy Gordo, what were you going to rob him, money or something else?

A.    No, sir.  We was gonna rob him, break into his SUV and steal his gun.

Q.    Now, at some point after this discussion with the plan B, did you go to the El Vaquero that night?

A.    Yes, sir.

Laura Andersen, RMR 704-350-7493

DIRECT-VELA GARCIA

Q.   And when you were at the El Vaquero, did you meet with any other MS 13 members?

A.   There was me and Pajaro -- and that's where we both, a lot of people hang out.  That's where MS 13 hang out most of them.

MR. FOSTER:  Objection; nonresponsive.

THE COURT:  Overruled.

Q.   (By Mr. Nazzaro) Now, I want to direct your attention to December 8th, 2007.  Were you at the El Vaquero on that occasion?

A.   Yes, sir.

Q.   Do you remember being at a taco stand?

A.   Yes, sir.  I was at a taco stand.

Q.   Like to show you again Government Exhibit 55, which I believe has been entered into evidence.

You previously said this was El Vaquero?

A.   Yes, sir.

Q.   I said something about a taco stand.  Is there a taco stand at that El Vaquero club?  I mean, it's not in the picture.

A.   No.  It's not right here at the time.

Q.   Where was it at the time?

A.   The taco stand be right here, parked right here where that car is at.

MR. NAZZARO:  I would mark 55a, Your Honor, which

Laura Andersen, RMR 704-350-7493

**JA1459**

DIRECT-VELA GARCIA                                    235

is the depiction of where the taco stand was.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

(Government Exhibit 55a was received into evidence.)

Q.   (By Mr. Nazzaro) Now, I called it a taco stand.  Was it -- what kind of stand was it?  Was it a truck?  Was it an outdoor restaurant?  What was it?

A.   It's like a -- like a truck that's got stuff you can cook inside of it.  And they sell tacos, they sell drinks.

Q.   On December 8th, were you at that stand?

A.   Yes, sir.

Q.   And did any other MS 13 members arrive on that occasion?

A.   Yes, sir.

Q.   And who were they?

A.   Nene -- Nene, Wizard, Stiler and Chino.

Q.   And did they arrive together?

A.   Yes, sir.

Q.   Whose car were they in?

A.   It was in Nene's Honda, they came in.

Q.   And what were you doing when they arrived?

A.   I was eating a taco right there at the taco stand.

Q.   Had you received any information prior to the arrival that they would be arriving that night?

A.   Yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 494 of 508
Case 3:08-cr-00134-RJC   Document 59-3   Filed 01/30/11   Page 239 of 253
JA1460

DIRECT-VELA GARCIA

Q.   Okay.  That's -- that's enough.  I don't want you to tell me who told you.

But when they arrived, do you remember what kind of car Nene was driving?  I may have asked you that.  I'm sorry if I did.  But do you recall?

A.   Yes, sir.  It was a Honda, it was a red Honda.

Q.   Okay.  And they were -- all these individuals you identified as Wizard, Stiler, Chino and Nene were all in the vehicle?

A.   Yes, sir.

Q.   Is the person you previously identified as Wizard, the same Wizard that you saw that evening?

A.   Yes, sir.

Q.   And the person you previously indicated as Stiler, was this the same Stiler from the Greensboro meeting?

A.   That's the same one in the meeting yes, sir.

Q.   What about Chino?  I think you might have mentioned Chino.  Was it the same Chino you saw in Greensboro?

A.   Yes, sir.  It was the same one.

Q.   Now, did you -- when they arrived, did you have a discussion with Wizard?

A.   When they arrived, Nene and Wizard went straight to the bathroom.

Q.   Do you know why they went to the bathroom?

MR. FOSTER:  Objection; lack of personal

Laura Andersen, RMR 704-350-7493

DIRECT-VELA GARCIA

knowledge.

THE COURT:  Overruled.

Q.    (By Mr. Nazzaro) Do you know why they went to the bathroom?

A.    Yes, sir.  They went to -- they went to -- Wizard was gonna wash his hand for the gun residue.

Q.    And when -- so, immediately after they arrived, you saw Wizard -- did Wizard say this?

A.    No, sir.  That was just -- that was Stiler said that.

Q.    Okay.  And did you see Wizard go to the bathroom or in the direction of the bathroom?

A.    Yes, sir.  They got up real quickly, and the one that was talking was Stiler.

Q.    And where did -- where did Wizard go?

A.    He -- him and Nene went straight to the bathroom.

Q.    Is there a bathroom outside or bathroom inside the club?

A.    No, sir, it's inside.

Q.    And so he was together with Nene?

A.    Yes, sir.  He was together with Nene.

Q.    And you were still there at the taco stand with Stiler at the time?

A.    It was Stiler and Chino.

Q.    Okay.  And did you have a discussion -- and Stiler is the same Stiler, the MS 13 member that you saw in

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 496 of 508
Case 3:08-cr-00134-RJC   Document 1940   Filed 01/30/11   Page 241 of 253
JA1462

DIRECT-VELA GARCIA

238

Greensboro?

MR. FOSTER:  Objection; asked and answered.

MR. NAZZARO:  I know.

THE COURT:  Sustained.

Q.   (By Mr. Nazzaro) I Just want to make sure if we have the same person; is that right?

A.   Yes, sir.  It's the same person.

Q.   Okay.  And what did Stiler say to you when he arrived?

A.   When he arrived, he was kind of nervous, and he was just saying, I hope the camera doesn't work.  That's basically what he was saying.  I was, so what happened, Homie.  And he started telling me that, you know, they got into some troubles.  And they needed somebody to -- somewhere to stay until everything cooled off.

Q.   What did he say happened?

MR. FOSTER:  Objection; assumes facts not in evidence; leading.

THE COURT:  Overruled.

Q.    (By Mr. Nazzaro) What did Stiler say happened?  You said some trouble.  What did he say, specifically?

A.   He said that Wizard shot somebody in the restaurant.

Q.   Did he say where that restaurant was?

A.   Yes, sir.  The name was Las Jarochitas.

Q.   And you mentioned cameras.  Did he specify what cameras he was referring to?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17  Page 497 of 508
Case 3:08-cr-00134-RJC    Document 1249    Filed 01/30/11  Page 242 of 253
JA1463

239
DIRECT-VELA GARCIA

A.    Yeah.  He was talking about the cameras in the -- as soon as you come in the door where the cashier's at.

Q.    And did -- you mentioned that you testified that Wizard and Nene went to the bathroom, right?

A.    Yes.

Q.    Okay.  Did they return at some point?

A.    Yes, sir, they came back.

Q.    Okay.  Was this while you were talking to Stiler?

A.    Yes, sir.  We was talking and eating.

Q.    Did you have a discussion with Wizard at that point?

A.    Yes, sir.

Q.    And what did Wizard say?

A.    He came out and told me that he got in some trouble. He shot somebody in the restaurant.  And said it started over a music box.  That they were playing raton (phonetic spelling).  And Mexican country people put in country, Mexican country music.  And they came back and they flipped again to the boom box.  And then from there some -- one of the guys was looking -- looking at him and mad, because the waitress was flirting with them -- with them.  And so they came to the table, and he flipped up MS 13 in his face.  And he said, F, MS 13.

Q.    Who said that?

A.    Wizard.  And after that, you know, he was telling me, they said, F, MS 13.  He took out the gun, and he starts

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 498 of 508
Case 3:08-cr-00134-RJC   Document 2949   Filed 01/30/11   Page 243 of 253
**JA1464**

DIRECT-VELA GARCIA

saying -- then I shot him like this pow, pow, pow, pow.

Q.   You were holding your hands sideways?

A.   Yes, sir.

Q.   And he demonstrated that for you?

A.   Yes, sir.  When we was in the taco stand.

Q.   And you said that someone said F, the MS 13?

A.   Yes.  Yes, sir.

Q.   Who was that?

A.   One of the -- the guys that came to the table.  Said, you know, F, MS 13.  And he said, you know, he come out and start shooting the guys; boom, boom, boom.

Q.   Did he tell you why he did that?

A.   He said they insulted the MS 13.  And he was doing it not only because of him, because he was doing it because of us, too.

Q.   You say us, you mean the other MS 13 members?

A.   Yes, sir.

Q.   I would like to show you what has previously been marked as Government 57, do you see that?

A.   Yes.

Q.   Who is depicted in Government 57?

A.   That's Wizard.

        MR. NAZZARO:  I move Government Exhibit 57, Your Honor.

        THE COURT:  Any objection?

                Laura Andersen, RMR 704-350-7493

**JA1465**

DIRECT-VELA GARCIA

241

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 57 was received into evidence.)

Q.   (By Mr. Nazzaro) Do you remember if that's how Wizard appeared on the -- during this conversation?

A.   Yes.  Yes, sir.

Q.   Show you Government 58.  Are you able to recognize anybody in 58, if you can?

A.   I can't see it.  I can't --

Q.   It may be darker on yours.  Okay.  I would like to show you 59.  Are you able to recognize anybody in 59?

A.   Yes, sir.

Q.   Who are you able to recognize in 59?

A.   This guy's Stiler.

Q.   Are you able to recognize the person next to Stiler?

A.   No, sir.

MR. NAZZARO:  Okay.  We would move Government 59, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 59 was received into evidence.)

Q.   (By Mr. Nazzaro) I would like to show you Government 60.  Are you able to recognize Government's 60?

A.   It's Stiler here.  This is Chino.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 500 of 508
Case 3:08-cv-00134-RJC   Document 2949   Filed 01/30/11   Page 245 of 253
JA1466

DIRECT-VELA GARCIA

MR. NAZZARO:  Okay.  Move Government 60.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

MR. NAZZARO:  Can I ask it be published?

THE COURT:  You may.

(Government Exhibit 60 was received into evidence.)

Q.   (By Mr. Nazzaro) The two marks, you have the arrow, which person is that you drew a red arrow on that, which one?

A.   This one's Stiler (indicating).

Q.   And who's the other person?

A.   Chino.

Q.   Now, after this discussion at the taco stand that you just described, did you stay at the El Vaquero that evening?

A.   I left home about 1:00 or so.

Q.   Did you see Wizard after that point in time?

A.   No, sir, I didn't see him.

Q.   Did you later, after this taco stand incident you described, did you later have a discussion with Chino, the guy you already previously identified as Chino?

A.   Yeah.  I seen him in the club.

Q.   Did you ever have a discussion with him about Wizard?

A.   Yeah -- yes, sir.

Q.   And what did Chino say about Wizard?

A.   After he was arrested, they were --

Laura Andersen, RMR 704-350-7493

243

DIRECT-VELA GARCIA

Q.   Who was arrested?

A.   Wizard was arrested in his house.  They were having a party after the -- after that night.  And they came in, the police came in and arrested Wizard.  Chino said -- Chino said that Wizard told him that they were lucky, because he was trying to grab for his gun.

Q.   Chino told you this?

A.   Yes, sir.  Chino told me this.

Q.   Now, you previously testified about there was some suspicions of Nene and Rony; is that right -- same person, Nene or Rony?

A.   Yes, sir.  Same people.

Q.   Okay.  Now after this, you just described was an arrest of Wizard, did -- was there any other discussions about Rony cooperating with the police?

A.   They -- a lot of people were pointing fingers at Rony that he was -- he was cooperating with the police, because every time there was something going to happen, they always got -- they were there.

Q.   Did you ever have a discussion with Chicago about that, a person by the name of Chicago about that?

A.   Yes, sir, Chicago.

Q.   Chicago an MS 13 member?

A.   Yes.

Q.   Did you ever have a discussion with Chicago about a

Laura Andersen, RMR 704-350-7493

**JA1468**

244

DIRECT-VELA GARCIA

green light on Rony?

MR. FOSTER:  Objection; hearsay.

THE COURT:  Overruled.

THE WITNESS:  One day Chicago came to a club down the street from Vaquero and we sit there and drink.  And he said that how he was gonna take Rony out at Cabana's, but a bunch of guys didn't let him take him out.

Q.   Did he tell you why he was gonna take him out?

A.   Yes, sir.

Q.   What did he say?

A.   He said because he was -- he was a rat, and he was -- he's the one reason why Wizard got arrested that night.

Q.   Now, did you ever hear of the name Misterio?

A.   Yes, sir.

Q.   Is he an MS 13 member?

A.   Yes, sir.

Q.   And did you ever have a discussion with Misterio?

A.   Yes, sir.

Q.   And who is Misterio?

A.   Misterio is one of big guys come out of California.

Q.   Do you know what clique he's from?

A.   I think it's Normandie, if I'm not mistaken.

Q.   And so was he ever in the Charlotte area?

A.   Yes, sir.

Q.   Why was he in the Charlotte area?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 503 of 508
Case 3:08-cr-00134-RJC   Document 1949   Filed 01/30/11   Page 248 of 253
JA1469

245
DIRECT-VELA GARCIA

A.   Because after -- after all this happened, you know, Wizard got in jail, and Stiler went out.  He -- they -- Wizard came -- I mean, not Wizard -- sorry.  Misterio came up, and he wanted to take over Charlotte and show us how to run it, all the stuff in Charlotte, the same way Wizard and Stiler wanted to do it.

Q.   Did you ever attend any of these meetings that Misterio had?

A.   No, I never did.

Q.   Were you aware of any such meetings?

A.   Yeah.  They had meetings in South Carolina in his house in the garage right beside his house.

Q.   Where did he live, do you know?

A.   He lived in -- I don't know.  He lived in South Carolina is all is --

Q.   What was -- you didn't go to the meetings?

A.   No, sir.

Q.   Were you suppose to go to the meetings?

A.   Yes, sir.

Q.   And was there any -- problem that you faced because you didn't go to the meetings?

A.   Yes, sir.

Q.   Tell me about that?

A.   That they were gonna -- they were gonna calenton.  They were gonna heat me up.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-3    Filed 03/23/17    Page 504 of 508
Case 3:08-cr-00134-RJC    Document 1048    Filed 01/30/11    Page 249 of 253
JA1470

DIRECT-VELA GARCIA

Q.   Is it just because you didn't go to the meetings or was there other things?

A.   It was cause I never went to the meetings and I had friction with -- with Drogo.

Q.   Who's Drogo?

A.   Drogo is a MS 13 gang member.

Q.   Did you actually meet Misterio?

A.   Yes, I met him.

Q.   Where did you meet him?

A.   Met him in the parking lot at Vaquero's.

Q.   What happened when you met Misterio at the El Vaquero's?

A.   I was running with Pinon.  Pinon was going to collect some money that they owe him at the club.  So I said I'm going to salute all the home boys.  The other guys were there, I went and shook their hands.  When they was shaking their hands, they ask me why I got in a fight with Drogo.  And what's going on.  How come I don't go to meetings.  And when I was doing that, I was right beside the car, here comes a car real fast, pulled in and Misterio got out.

Q.   What did he do?

A.   He just got out, you know, and talked to -- talking to me, you know, asking me why I never went to the meetings.  And I need to go to meetings and --

Q.   Did they do anything -- any punishment to you at that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 505 of 508
Case 3:08-cv-00134-RJC   Document 334   Filed 01/30/11   Page 250 of 253
**JA1471**

DIRECT-VELA GARCIA

time?

A.    No, sir.

Q.    And why not?

A.    Because miss -- cause I had Pajaro there and I had other -- other guys there, you know, that if something bad was going to happen to me, they would react.

Q.    Now you mentioned the name Pinon; is that right?

A.    Yes, sir, Pinon.

Q.    Who is Pinon?

A.    Pinon is one of the big drug dealers.

Q.    Is he MS 13?

A.    MS 13, yes.

Q.    Okay.  And you know him?

A.    Yes, sir.

Q.    I want to direct your attention to June of 2008.  Did Pinon contact you about doing some work for MS 13?

THE COURT:  Mr. Nazzaro, I think we're going to stop you there.

MR. NAZZARO:  Okay, Your Honor.

THE COURT:  Members of the Jury, I said we're going to break at 5:00 tonight.  So we're going to stop here.

I'm going to remind you that when you go home, you're not to talk about the case.  Friends or family might be really interested in what you did all day, and you just

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 506 of 508
Case 3:08-cr-00134-RJC   Document 2243   Filed 01/30/11   Page 251 of 253
**JA1472**

DIRECT—VELA GARCIA

can't talk to them.  It's important to the integrity of this process that you not talk about the case until the end of the case.

Now if there's some media coverage of today's trial, I'm going to ask you to be very careful and stay away from the electronic media, the newspaper, and the local TV, and not to be exposed to any coverage of this case, if there is any.

And of course, any coverage of this case outside this courtroom, is not evidence.  And you should disregard it because you're going to base your verdict in the case solely on the evidence you hear in his courtroom.  So do everything you can to avoid exposure to any media coverage.

Don't talk about the case.  And keep an open mind until you've heard all of the evidence.

With those instructions, I'll excuse you for the evening, and ask you to be back in the -- to be back in court ready to go into court at 9:30 tomorrow morning.

Thank you very much.

(The jury was escorted from the courtroom.)

THE COURT:  Anything we need to take up before we adjourn for the evening?

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  See you all ready to go 9:30 tomorrow morning.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-3   Filed 03/23/17   Page 507 of 508
Case 3:08-cr-00134-RJC   Document 294-3   Filed 01/30/11   Page 252 of 253
JA1473

DIRECT-VELA GARCIA

MR. FOSTER:  Your Honor, I'm sorry.  There was one thing.

Our client -- we wanted him to shave for this trial.  Due to his past history of what happened, he's not being allowed to do that.  I don't know if there's any way to have some compromise where he can get a shave.  He would like to do that.

THE COURT:  Well, there are heightened security concerns as a result of your client's conduct.  And so I'll speak with the Marshals outside of court and let you know in the morning.

MR. FOSTER:  Thank you, Your Honor.

(Evening recess was taken in the proceedings at 5:02 p.m.)

\* \* \* \* \* \*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.

Dated this the 5th day of May, 2010.

s/Laura Andersen
Laura Andersen, RMR
Official Court Reporter

Laura Andersen, RMR 704-350-7493

**JA1474**