No.  10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff-Appellee, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) |
|  | ) |
| Defendant-Appellant. | ) |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix**
**Volume 4 of 11**

> VINCENT J. BRUNKOW
> ZANDRA L. LOPEZ
> JANET C. TUNG
> Federal Defenders of San Diego, Inc.
> 225 Broadway, Suite 900
> San Diego, California  92101-5030
> Telephone:  (619) 234-8467
> Attorneys for Defendant-Appellant
>
> -and-
>
> MALCOLM RAY HUNTER, JR.
> Attorney at Law
> P.O. Box 3018
> Chapel Hill, N.C. 27515-3018
> Telephone:  (919) 929-9655

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

iii

Defendant's Reply to Government's Response to Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence Before Allowing Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339)  . . . . . . . . . . . . . . . . . . . . . . . . 1202

    Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

    Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

        By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
        By the Defendant  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340)  . . . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne                    Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet          Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette    Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn            Direct Examination  . . . . . . . . . 1239

    J.E. Brown                 Direct Examination  . . . . . . . . . 1243

    Frank Flores             Direct Examination  . . . . . . . . . 1247
                                   Voir Dire Examination  . . . . . . . 1255
                                   Redirect Examination  . . . . . . . . 1257
                                   Cross Examination  . . . . . . . . . . 1316

    Charles Barkley            Direct Examination . . . . . . . . . . 1332
                                   Cross Examination  . . . . . . . . . . 1338

Jeff Bruner                 Direct Examination . . . . . . . . . . 1339

Eduardo Vasquez            Direct Examination . . . . . . . . . . 1344

Lenny Moriera              Direct Examination . . . . . . . . . . 1352
                           Cross Examination  . . . . . . . . . . 1369

John Sloane                Direct Examination . . . . . . . . . . 1371
                           Cross Examination  . . . . . . . . . . 1391

Gene Richey                Direct Examination . . . . . . . . . . 1391

Juan Ruben Vela Garcia     Direct Examination . . . . . . . . . . 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341)  . . . . . . . . . . . . . . . . . . . . . . . 1485

Juan Ruben Vela Garcia     Direct Examination . . . . . . . . . . 1492
                           Cross Examination  . . . . . . . . . . 1498
                           Redirect Examination  . . . . . . . . 1529

Officer James K. Griffen   Direct Examination . . . . . . . . . . 1530

Ann Hamlin                 Direct Examination . . . . . . . . . . 1537

T.J. Miller                Direct Examination . . . . . . . . . . 1544
                           Cross Examination  . . . . . . . . . . 1566

Marie Terrell              Direct Examination . . . . . . . . . . 1570
                           Cross Examination  . . . . . . . . . . 1576

Officer Benjamin Altizer    Direct Examination . . . . . . . . . . 1576
                            Cross Examination  . . . . . . . . . . 1584

Officer Ryan Dutko          Direct Examination . . . . . . . . . . 1586

Abel Santos                 Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos                 Cross Examination  . . . . . . . . . . 1644

Marco Antonio Guzman Mejia  Direct Examination . . . . . . . . . . 1651
                            Cross Examination  . . . . . . . . . . 1663

Teresa Ketner               Direct Examination . . . . . . . . . . 1666
                            Cross Examination  . . . . . . . . . . 1703
                            Redirect Examination  . . . . . . . . 1705

Barry Whitlow               Direct Examination . . . . . . . . . . 1707

John D. Butts               Direct Examination . . . . . . . . . . 1715
                            Cross Examination  . . . . . . . . . . 1733

James Cayton                Direct Examination . . . . . . . . . . 1735

Amy Wilde                   Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342)  . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde                   Direct Examination . . . . . . . . . . 1765
                            Cross Examination  . . . . . . . . . . 1773

Doreen Huntington           Direct Examination . . . . . . . . . . 1780
                            Cross Examination  . . . . . . . . . . 1797

vi

Susan Conrad                 Direct Examination . . . . . . . . . . 1804
                             Cross Examination  . . . . . . . . . . 1840

Jeff Strohm                  Direct Examination . . . . . . . . . . 1846
                             Cross Examination  . . . . . . . . . . 1851

Officer Renee Quiles         Direct Examination . . . . . . . . . . 1851
                             Cross Examination  . . . . . . . . . . 1856

Rony Antonio Magana Lopez    Direct Examination . . . . . . . . . . 1856

## VOLUME 5 (1900 - 2390)

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez    Direct Examination . . . . . . . . . . 1903
                             Cross Examination  . . . . . . . . . . 1953
                             Redirect Examination  . . . . . . . . 1987
                             Recross Examination . . . . . . . . . 1988

William Chuck Hastings       Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)  . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings       Direct Examination . . . . . . . . . . 2034
                             Cross Examination  . . . . . . . . . . 2044

Alexandra Hirsch             Direct Examination . . . . . . . . . . 2049
                             Cross Examination  . . . . . . . . . . 2054

Michele Scheuerman           Direct Examination . . . . . . . . . . 2055
                             Cross Examination  . . . . . . . . . . 2064

Gene Rivera                  Direct Examination . . . . . . . . . . 2065
                             Cross Examination  . . . . . . . . . . 2086

Andrew Cheramie          Direct Examination . . . . . . . . . . 2090
                         Cross Examination  . . . . . . . . . . 2095

Jose Romero              Direct Examination . . . . . . . . . . 2095

Alexander Granados       Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2133


Alexander Granados       Direct Examination . . . . . . . . . . 2136
                         Cross Examination  . . . . . . . . . . 2138
                         Redirect Examination  . . . . . . . . 2158

Maricruz Medina          Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie        Direct Examination . . . . . . . . . . 2166

Chris Tyndall            Direct Examination . . . . . . . . . . 2173
                         Cross Examination  . . . . . . . . . . 2190

Mark Young               Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson  Direct Examination . . . . . . . . . . 2208
                         Cross Examination  . . . . . . . . . . 2213
                         Redirect Examination  . . . . . . . . 2213
                         Recross Examination . . . . . . . . . 2215

Jeffrey Taylor           Direct Examination . . . . . . . . . . 2216
                         Cross Examination  . . . . . . . . . . 2247
                         Redirect Examination  . . . . . . . . 2254

Denise Daniels           Direct Examination . . . . . . . . . . 2255
                         Cross Examination  . . . . . . . . . . 2257

William Chuck Hastings      Direct Examination . . . . . . . . . . 2259
                           Cross Examination   . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

Sergeant Scott Clarkson     Direct Examination . . . . . . . . . . 2323
                           Cross Examination   . . . . . . . . . . 2330

Denise Daniels             Direct Examination . . . . . . . . . 2332
                           Cross Examination   . . . . . . . . . . 2333

Jeffrey Taylor             Direct Examination . . . . . . . . . . 2333
                           Cross Examination   . . . . . . . . . . 2356
                           Redirect Examination  . . . . . . . . 2359

William Chuck Hastings     Direct Examination . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . 2391

Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding "Equally Culpable" Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

ix

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . . . 2540

    Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
    Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
    Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

    Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . . 2559

    Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

    Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

    Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

        By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
        By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

        Ismar Sanchez                Direct Examination . . . . . . . . . . 2574
                                          Cross Examination . . . . . . . . . . 2584
                                          Redirect Examination . . . . . . . . 2590

        David Henderson           Direct Examination . . . . . . . . . . 2590

x

Carlton Phoenix                Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . 2648

Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

Thomas Small                Direct Examination . . . . . . . . . . 2651
                            Cross Examination . . . . . . . . . . 2677

Roberto Ramos               Direct Examination . . . . . . . . . . 2680
                            Cross Examination . . . . . . . . . . 2694

Juan Lara                   Direct Examination . . . . . . . . . . 2699
                            Cross Examination . . . . . . . . . . 2706

Raffi Djabourian            Direct Examination . . . . . . . . . . 2709
                            Cross Examination . . . . . . . . . . 2715

John Maloney                Direct Examination . . . . . . . . . . 2716
                            Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . . . 2727

 Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

  Gene Parshall        Direct Examination . . . . . . . . . . 2730
                 Cross Examination . . . . . . . . . 2756
                 Redirect Examination . . . . . . . . 2781

  Barry Telis          Direct Examination . . . . . . . . . . 2784
                 Cross Examination . . . . . . . . . . 2798
                 Redirect Examination . . . . . . . . 2803

  William Moore        Direct Examination . . . . . . . . . . 2806
                 Cross Examination . . . . . . . . . . 2820
                 Redirect Examination . . . . . . . . 2822

  Susan Selser         Direct Examination . . . . . . . . . . 2822

  J. Sage            Direct Examination . . . . . . . . . . 2838
                 Cross Examination . . . . . . . . . . 2842

  L. Goodman         Direct Examination . . . . . . . . . . 2843
                 Cross Examination . . . . . . . . . . 2844

  A. Thornwell         Direct Examination . . . . . . . . . . 2846
                 Cross Examination . . . . . . . . . . 2851

## VOLUME 7 (2857 - 3373)

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

 Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

xii

Carlos Alfredos
Dominguez Gonzalez          Direct Examination . . . . . . . . . . 2874
                           Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper           Direct Examination . . . . . . . . . 2902
                           Cross Examination  . . . . . . . . . . 2908

Luis Amaro                 Direct Examination . . . . . . . . . . 2911
                           Cross Examination  . . . . . . . . . . 2917

Russell Lashley            Direct Examination . . . . . . . . . . 2919
                           Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez  Direct Examination . . . . . . . . . . 2930
                           Cross Examination  . . . . . . . . . . 2931
                           Redirect Examination  . . . . . . . . 2935
                           Recross Examination . . . . . . . . 2936

Douglas Friend             Direct Examination . . . . . . . . . . 2938
                           Cross Examination  . . . . . . . . . . 2944

Jean Garcia                Direct Examination . . . . . . . . . . 2946
                           Cross Examination  . . . . . . . . . . 2952

Carmen Garcia              Direct Examination . . . . . . . . . . 2953
                           Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia           Direct Examination . . . . . . . . . . 2959
                           Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . 2975

        Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

Mark Cunningham   Direct Examination . . . . . . . . . . 2986
          Cross Examination  . . . . . . . . . . 3050

Richard McGough   Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260) . . . . . . . . . . . . . . . . . . . . . . . . 3096

 Defendant's Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

Richard McGough   Direct Examination . . . . . . . . . . 3099
          Cross Examination  . . . . . . . . . . 3157

Selena Sermeno    Direct Examination . . . . . . . . . . 3167
          Cross Examination  . . . . . . . . . . 3189
          Redirect Examination . . . . . . . . 3203

Maria Santacruz Geralt  Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350) . . . . . . . . . . . . . . . . . . . . . . . . 3234

 Defendant's Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

Maria Santacruz Geralt  Voir Dire Exam. by Defendant . . . 3237
          Voir Dire Exam. by Government . . 3250
          Direct Examination . . . . . . . . . . . . 3256
          Cross Examination . . . . . . . . . . . . 3263

Mark Bezy      Direct Examination . . . . . . . . . . . . 3276
          Cross Examination . . . . . . . . . . . . 3289

James R. Merikangas,
Ph.D.                                Direct Examination . . . . . . . . . . . . 3294
                                     Cross Examination  . . . . . . . . . . . . 3317

    Government's Rebuttal Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

        Helen Mayberg             Direct Examination . . . . . . . . . . . . 3336
                                  Cross Examination  . . . . . . . . . . . . 3358

### VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . . . 3374

    Defendant's Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

        Richard McGough         Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

**VOLUME 9 (3705 - 4209)**

**EXHIBITS**

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3, School Records . . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

xvi

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home . . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D. . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez . . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 18 of 444

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification  . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation  . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting  . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana  . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique  . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana  . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana  . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>            Plaintiff,<br><br>        v.<br><br>ALEJANDRO ENRIQUE RAMIREZ<br>    UMANA,<br>            Defendant. | DOCKET NO. 3:08-cr-134-RJC<br><br>UNITED STATES'S SUR-REPLY<br>REGARDING RELIABILITY |

Defendant Alejandro Umana dissects the government's proffered "other acts" information in finest of detail, and contends that it is not "reliable" and must be kept from the sentencing jury during the selection phase.  (Reply, Docket No. 985.)  The government briefly replies.  Because defendant's discussion (a) disregards the "total picture" aspect of the capital-sentencing weighing process, and more importantly (b) applies a "beyond a reasonable doubt"-like standard for determining sentencing reliability, the Court should reject defendant's position.

*        *        *

The information at issue, about other murders committed by defendant in Los Angeles and El Salvador, has been briefly described by the government in its *Crawford* memorandum. Defendant has not challenged the *Crawford* analysis and instead has focused on reliability.  Here, the government will address the defendant's specific criticisms.

July 25, 2005 murders.  First, defendant claims that the putative declarants regarding the July 25, 2005 murder at various times made false statements about their own involvement or contradicted each other in some respect or another.  (Reply, at 3 (arguing that Rivera lied about being an MS-13 member and about the scope of his own involvement); 4 (arguing that he lied

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 20 of 444
Case 3:08-cr-00134-RJC   Document 50-4   Filed 04/23/10   Page 1 of 10
JA1475

earlier about minor offenses); at 4 (arguing that Moreno/Ramos and Rivera orchestrated a story by which they minimized their own involvement); at 5 (arguing that Rivera mixed up the seating arrangements of the participants); at 6 (arguing that Arevalo contradicts the others' statements about who yelled what, and minimized his own role).) Things like the seating position of the several people in the car, and who yelled "La Mara," and even the sequence of events leading up to the shooting — all of these discrepancies are capable of innocent explanation. Indeed, defendant's confession to being present corroborates many of these statements.

And, while these differences might matter, they are of far-secondary (or tertiary) importance, behind the identity of the shooter. Not coincidentally, defendant's criticisms do not mention that <u>all</u> of the foregoing declarants said that defendant was the triggerman. Only one eyewitness has said something different, (Reply, at 6), and defendant offers little basis on which to conclude that that witness' version is more reliable. As the Court is aware from the motion to suppress, though defendant does not confess to pulling the trigger, he does confess to exiting the car, taking the gun out of his pants, and to the shooting having occurred. So it's not as if the hearsay statements exist, or will be presented to the jury, in a vacuum.

Defendant also minimizes the significance of the preliminary hearing, admitting that his unreliability arguments are essentially the same. (Reply, at 8.) The fact that the witnesses, though not the declarants, were sworn should count for something. Interestingly, those witnesses were at the time not relaying hearsay, but party-admissions of the declarants, who had been charged, or co-conspirator statements, or both. And the officers were subject to cross-examination about this then-non-hearsay by the declarants' lawyers, who undoubtedly had the same interest in contesting the information against their clients as defendant Umana does here. Defendant's view that the presence of another lawyer shouldn't matter because it wasn't <u>his</u>

**JA1476**

lawyer is at odds with the concept of co-defendant identity of interest. *Cf. LaGrand v. Stewart*, 133 F.3d 1253, 1274 (9th Cir. 1998).

Above all, defendant will have the ability to point out all of the flaws he has identified to the sentencing jury, by cross-examining the police officers who will testify in his hearing. He will be able to highlight every inconsistency, to identify Santiago as somebody who ID'ed the driver of the car as the shooter (or, for that matter, to call Santiago himself), and to elicit Noe Bautista's non-identification as well. And then it will be for the jury to decide, as it makes the "individualized determination" in which it is supposed to have the maximum amount of reliable information. Defendant's reliability argument improperly attempts to foreclose jury evaluation of the information, and effectively asks for proof "beyond a reasonable doubt" before admission of the information. That simply is not the standard. *See infra*. Notably, the Court has, and the jury will have, corroborating evidence that defendant fails to mention: the fact that Umana had Ruben Moreno, a/k/a Chipi, assaulted in jail to keep him from testifying in this trial. Defendant's own conduct is perhaps the best corroboration of all.

Furthermore, the idea that a statement is unreliable because it's "self-serving" applies to all cooperator testimony. In this regard, defendant identifies a single case in support of his broad contentions, *Lilly v. Virginia*, 527 U.S. 116 (1999). That case applied an *Ohio v. Roberts* analysis to determine whether a co-defendant's statement was admissible at trial against the defendant. *Id.* at 124-26. Specifically, the case concerned the how well-established was the exception for statements made "against penal interest." *Id.* at 127. The Court plurality indicated that these kinds of statements warrant special caution for the reasons stated in defendant's brief. *Id.* at 131-32. But the plurality's analysis expressly disclaimed a *per se* bar to admission, and indicated that the government — barred from arguing that this kind of statement was a "firmly

Case 3:16-cv-00057-MOC-JC Document 50-4   Filed 03/23/17   Page 22 of 444
Case 3:08-cr-00134-RJC   Document 928   Filed 04/23/10   Page 22 of 10

JA1477

rooted" exception — would always be free to proceed under the second prong of *Roberts*, which is that it bears particularized guarantees of trustworthiness. *Id.* at 134 n.5. The plurality's analysis of that issue, however, consisted of (circularly) asking whether the statement satisfied the confrontation clause: "For these reasons, when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause." *Id.* at 137.

Hence, *Lilly* was a confrontation-clause case that begged the question posed here. It did not give the court any guide to determine what "reliability" means in the absence of asking whether there was confrontation — which the Court in *Crawford* later explained was a procedural guarantee divorced from the issue of reliability. This surely explains why the cases rejecting *Crawford*'s applicability to a federal capital-sentencing's selection phase do not mention a *Lilly* bar to admission. *See generally, e.g.*, *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) (admitting statements similar to those here); *United States v. Jordan*, 357 F. Supp. 2d 889 (E.D. Va. 2005) (citing *Lilly* but admitting similar statements). Indeed, the cases citing *Lilly* for the proposition defendant advances incorrectly find *Crawford* applicable. *E.g.*, *United States v. Taveras*, 570 F. Supp. 2d 481, 484 (E.D.N.Y. 2008). Further, as the concurrence to the plurality opinion in *Lilly* explained, the statements in question were "not in the least against [the declarant's] penal interest. This case therefore does not raise the question whether the Confrontation Clause permits the admission of a genuinely self-inculpatory statement that also inculpates a codefendant . . . ." 527 U.S. at 146 (Rehnquist, J., concurring). In contrast, the statements of the declarants here were party-admissions to crimes, and perhaps co-conspirator

Case 3:16-cv-00057-MOC-JC Document 50-4   Filed 03/23/17   Page 23 of 444
Case 3:08-cv-00154-RJC Document 52-4   Filed 04/23/10   Page 23 of 444
**JA1478**

statements, and therefore differ qualitatively from the statements at issue in *Lilly*. They are not "presumptively unreliable."

El Salvador murder.  The same flawed logic infects defendant's claim that the statements about defendant's El Salvador murder are not reliable.  For example, the fact that some witnesses claim the decedent was decapitated while alive, and others say that it happened shortly after death, does not necessarily make one statement "false."  (Reply at 10.)  Maybe the event was so horrific that it impaired the declarant's memory.  Maybe the event was so quick that it would take a doctor to tell precisely when death occurred.  Maybe the medical examiner made a mistake.  Likewise with the depth of the hole in which the victim was buried.  Finally, taking as true that some of the witnesses to this murder falsely denied being members of MS-13, or when they left the gang, that is garden-variety cooperator minimizing that happens in many cases, if not all.  Again, defendant may point out all these flaws at his sentencing hearing.

Defendant finds fault with the fact that these witnesses were anonymous in El Salvador. Even some trials in the United States have allowed Salvadoran witnesses to testify anonymously, due to the obvious danger they face in a country where MS-13 has such power.  *See United States v. Ayala*, — F.3d —, 2010 WL 1409417, at *14 (4th Cir. Apr. 8, 2010) (observing that Salvadoran police officer-expert testified under a pseudonym in recent MS-13 case).  This, in itself, has little bearing on reliability.  Certainly, the Salvadoran authorities knew which names were assigned to which numbers.

At all events, the United States does not propose to "prove" this murder as a murder in aggravation.  Rather, it may offer information about defendant's involvement in MS-13 in El Salvador, and some information about crimes committed there, for other purposes.  Namely, the

information is relevant to anticipate and rebut defendant's apparent defense that he is mentally impaired, or any similar contentions about his mental state or capability or life in El Salvador.

September 28, 2005 murder.  Defendant's last contest is to some of the information about another Los Angeles murder, a couple months after the first two discussed above.  Again, defendant claims that nobody has identified him as the shooter, and therefore that none of this information should be presented.

At the outset, however, it bears noting that the Notice in this case (disjunctively) indicates that defendant was an aider and abettor to that murder, as well as a principal.  Defendant's confession establishes at least that much:  he admits being present, knowing why the group was there, and escaping with the group.  Moreover, Jose Lara will be called to discuss the incident and will corroborate much of what defendant said in his confession.  Although Mr. Lara did not identify the defendant in a photo lineup, it remains possible that he may identify defendant in court.  Most importantly, Los Angeles Police were able to match, ballistically, casings and the projectiles from this murder with those from the July murders discussed above.  Defendant was the **only** person identified at the scene of both incidents.

For these reasons, Detective Small's testimony relaying Freddy Gonzalez's identifying statement is reliable under the governing standard.  *See infra*.  All of the flaws defendant identifies in the information in his brief, especially about Gonzalez's identification and supposed bias, will certainly be elicited by defense counsel while they cross-examine Lara and Detective Small.  Then the jury can decide whether (a) the shooter wasn't defendant, (b) defendant was an aider and abettor based on his admissions alone, or (c) defendant was the shooter and all the witnesses are scared of being killed on his orders, among other possibilities.

*    *    *

The point of all of the foregoing, as stated in the government's earlier memorandum, is that in a capital sentencing's weighing process, the jury is the fact-finder that is supposed to make these determinations. The defendant's proposal that "reliable" really means "uncontradicted" turns the Act, and the purpose of a capital sentencing, on its head. *See United States v. Fell*, 360 F.3d 135, 144 (2d Cir. 2004) (observing that the "standard permits the jury [to] have before it all possible relevant information about the individual defendant whose fate it must determine.") (alteration in original, quoting *Jurek v. Texas*, 428 U.S. 262, 276 (1976)). In *United States v. Beckford*, 964 F. Supp. 993 (E.D. Va. 1997), Judge Hudson applied these principles in considering the standard for "reliability" as applied to information submitted at a federal capital sentencing. The United States asks that the Court apply the same analysis here.

In short, the unadjudicated information at issue in that case consisted of information that the defendant aided a cohort in disposing of a murder victim's body, and possessed guns on various occasions, both of which were offered in support of future dangerousness. *Id.* at 996-97. The court held that because future-dangerousness evidence was relevant only upon the fulfillment of a conditional fact, *i.e.*, that the act occurred and that defendant was the actor, the reliability standard applied by the court would be "whether the jury could reasonably find the conditional fact by a preponderance of the evidence." *Id.* at 1004 (quoting and citing *Huddleston v. United States*, 485 U.S. 681, 690 (1988)). Since *Huddleston* was a Rule 404(b) case, the logical issue was essentially identical, but for the heightened reliability requirement attendant to a capital case. *Id.* at 1005. That requirement was met <u>not</u> by altering the well-worn evidentiary standard, but because (a) future dangerousness was a non-statutory aggravator, *i.e.*, a secondary factor for the jury, and (b) because — unlike introduction of Rule 404(b) evidence — future dangerousness [like the incidents here] ultimately must be proved beyond a reasonable doubt.

Case 3:16-cv-00057-MOC-DSC Document 50-4 Filed 03/23/17 Page 26 of 444
Case 3:08-cr-00134-RJC Document 59-4 Filed 04/23/10 Page 26 of 30

JA1481

*Id.* The court therefore rejected a heightened, "clear and convincing evidence" test proposed by the defendants, which had been premised on a due-process/*McMillan* contention, and in so doing relied substantially on *Williams* and some of the other arguments already advanced by the government in this case. *Id.* at 1005-10.

The *Beckford* analysis applies with equal force here, but defendant asks the Court instead to follow *United States v. Gonzalez*, 2004 WL 1920492 (D. Conn. Aug. 17, 2004). But that case said little about evidentiary "standards"; it's ruling, rather, was that a Rule 403-type analysis precluded the consideration of the challenged aggravating information. *Id.* at *3. The court based that ruling on its view that not excluding the information would erode the presumption of innocence as to those other acts. *Id.* at *4-*6. And it expressly eschewed applying any reliability standard at all (meaning reliability of the information) in favor of a global, sentencing-reliability analysis. *Id.* at *9. It did so, what is more, on the basis that *Williams v. New York* was of limited ongoing utility. *Id.* at *10-*11. The government has already addressed most of these arguments. Suffice it here to say that *Beckford*'s analysis is more persuasive, because it is far more grounded in the law of evidence and far more cognizant of the full-information purpose of capital sentencing, than *Gonzalez*.

A final hypothetical will illustrate how defendant's "reliability" argument is really intertwined with the *Crawford* question. Suppose all the declarants at issue here were to testify exactly as their out-of-court statements indicated. Every one of defendant's criticisms about their reliability could still be levied in support of keeping the information from the jury; this one has bias, that one forgot who was sitting where, and so on. That — and defendant's reliance on *Lilly* — illustrates that defendant is really making a *Crawford* challenge in different terms. For the reasons already explained, the Court should permit the jury to make the "individualized

Case 3:16-cv-00057-MOC-JC Document 50-4 Filed 03/23/17 Page 27 of 444
Case 3:08-cv-00134-RJC Document 52-4 Filed 04/23/10 Page 27 of 40

**JA1482**

determination" that is required, and to do so with as much relevant information as possible, including the proffered statements about defendant's several murders, which are reliable for the reasons discussed above.

RESPECTFULLY SUBMITTED this 13th day of April, 2010.

EDWARD R. RYAN
UNITED STATES ATTORNEY

**s/ Jill Westmoreland Rose**
NC Bar Number: NA
Assistant United States Attorney
United States Attorney's Office
100 Otis Street
Asheville, North Carolina 28801
Phone: (828) 271-4661
Fax: (828) 271-4670
Email:  jill.rose@usdoj.gov

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

Case 3:16-cv-00057-MOC-JC Document 50-4   Filed 03/23/17   Page 28 of 444
Case 3:08-cr-00134-RJC Document 52-3   Filed 04/13/10   Page 28 of 30
**JA1483**

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of April 2010, the foregoing document was served electronically through ECF filing upon defense counsel at the following email addresses:

Mark Foster
mpfosterjr@bellsouth.net

John Bryson
jbryson@wehwlaw.com

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

– 10 –

**JA1484**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA | )DOCKET NO. 3:08-CR-134-2 |
| | ) |
| | ) |
| vs. | )VOLUME II-A |
| | )MORNING SESSION |
| ALEJANDRO ENRIQUE RAMIREZ UMANA | ) |
| _____ | ) |


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 13, 2010

APPEARANCES:

On Behalf of the Government:
    JILL WESTMORELAND ROSE
    Assistant United States Attorneys
    100 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

On Behalf of the Defendant:
    JOHN DAVID BRYSON
    Wyatt, Early, Harris & Wheeler, LLP,
    P.O. Box 2086
    High Point, North Carolina 27261

    MARK PATRICK FOSTER, JR.
    Law Offices of Mark Foster, PC
    1011 E. Morehead Street, Suite 300
    Charlotte, North Carolina 28204


LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC  Document 50-4  Filed 03/23/17  Page 30 of 444
Case 3:08-cr-00134-RJC  Document 594  Filed 01/30/11  Page 1 of 156
JA1485

I N D E X

GOVERNMENT'S WITNESSES:

      JUAN RUBEN VELA-GARCIA
          Direct Examination by Mr. Nazzaro   257, 294
          Cross-Examination by Mr. Foster   263

      OFFICER JAMES K. GRIFFEN
          Direct Examination by Mr. Nazzaro   295

      ANN HAMLIN
          Direct Examination by Ms. Rose   302

      T.J. MILLER
          Direct Examination by Ms. Rose   309
          Cross-Examination by Mr. Bryson   331

      MARIE TERRELL
          Direct Examination by Mr. Nazzaro   335
          Cross-Examination by Mr. Bryson   341

      OFFICER BENJAMIN ALTIZER
          Direct Examination by Ms. Rose   341
          Cross-Examination by Mr. Foster   349

      OFFICER RYAN DUTKO
          Direct Examination by Ms. Rose   351

      ABEL SANTOS
          Direct Examination by Ms. Rose   369

* * * * * *


COURT INTERPRETERS JULIA DAVIS AND MARIA LANDO, PRESENT.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 31 of 444
Case 3:08-cr-00134-RJC   Document 124   Filed 01/30/11   Page 31 of 156
JA1486

E X H I B I T S

GOVERNMENT'S EXHIBITS:

| NO. | | RECEIVED |
|-----|---|----------|
| 9   | ...................................... | 329 |
| 10  | ...................................... | 329 |
| 11  | ...................................... | 329 |
| 12  | ...................................... | 326 |
| 13  | ...................................... | 327 |
| 14  | ...................................... | 327 |
| 16  | ...................................... | 326 |
| 17  | ...................................... | 326 |
| 18  | ...................................... | 326 |
| 46  | ...................................... | 301, 308 |
| 47  | ...................................... | 301, 308 |
| 48  | ...................................... | 308 |
| 63  | ...................................... | 313 |
| 64  | ...................................... | 328 |
| 65  | ...................................... | 317 |
| 66  | ...................................... | 313 |
| 67  | ...................................... | 345 |
| 70  | ...................................... | 360 |
| 70A | ...................................... | 360 |
| 74  | ...................................... | 388 |
| 77  | ...................................... | 396 |
| 78  | ...................................... | 383 |
| 81  | ...................................... | 401 |
| 86  | ...................................... | 396 |
| 121 | ...................................... | 398 |

* * * * * *

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 32 of 444
Case 3:08-cr-00134-RJC    Document 50-4    Filed 01/30/11    Page 32 of 156
**JA1487**

253

P R O C E E D I N G S

APRIL 13, 2010.  9:26 A.M.

(Defendant present.)

THE COURT:  All right.  Let's come to order and take up a few matters before we call the jury.

First one, Mr. Bryson, you raised at the end of the day yesterday the concern with your client being able to shave.

I've been advised by the marshals that that option is being made available to him and it's his exercise of the choice not to do that.  So you may want to discuss that with him.

But I understand that several times a week an opportunity is being made for him to shave and otherwise take care of personal hygiene.  And so, as far as I know, that is being made available to him.  If you believe the situation is different we can take that up later in the trial.

The defendant filed a Motion in Limine with respect to certain statements that appear to be on a -- an audio transcript -- audio transcript of the car ride; it appears to the Court to be well-founded.  What says the government?

MS. ROSE:  There -- Your Honor, we would submit that that information when looked in context of all the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 33 of 444
Case 3:08-cr-00134-RJC   Document 50-4   Filed 01/30/11   Page 43 of 156
JA1488

254

evidence at this trial becomes relevant.

First of all, it certainly shows a comfort level with Mr. Lopez.  They were both discussing girlfriends and women.  Mr. Lopez takes a phone call from his girlfriend. The defendant admonishes him about only speaking Spanish to the girlfriend.  They have this discussion about women. They have discussion about women gang members.  How women should be treated in the gang and schooled.  That's part of the discussions on that particular evening.

So I would submit to the Court that it's not just a random statement that seems to be negative about women. There are a number of discussions related to women.

Secondly, the portion of that recording the defendant refers to the person with whom he was speaking as his son's mother.  And at some point that also may become a relevant part of this trial.

So I would submit to the Court that for those reasons in the totality it is relevant.

I will tell the Court that I spoke with your clerk this morning.  The government will provide entire documents of the transcripts, as well as the portions that we provided to the defense which we intend to play.  We have -- excuse me cut those down, cut out pauses and things and really condensed those clips.

THE COURT:  I would really encourage the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 34 of 444
Case 3:08-cr-00134-RJC   Document 524   Filed 01/30/11   Page 5 of 156
JA1489

255

government in the condensation and parring process.

MS. ROSE:  We have done so, Your Honor, quite a bit.

THE COURT:  But on this particular issue, I think that the marginal prohibitive value that you have proffered to the Court is outweighed, substantially outweighed by the unfair prejudice of the particular comments that are reflected in the defendant's Motion in Limine.

And so I would instruct you all to delete those from the disk and transcripts you present to the jury.

MS. ROSE:  And I will also say to the Court, there was one portion where there was a racial comment, we had already clipped that out since we sent you the transcripts. I looked back over those and the part reflecting the racial comments had already been clipped out; the ones relative to his son's mother had not.

I would ask the Court that if at some point those may become relevant at any point during this trial or another hearing --

THE COURT:  I'll be glad to hear from you again. But I wanted to give you advance notice so the technical --

MS. ROSE:  Thank you, Your Honor.  We'll take care of that.

While I'm up may I address another issue?

THE COURT:  Would that be the victim --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 35 of 444
Case 3:08-cr-00134-RJC   Document 224   Filed 03/30/11   Page 35 of 156
JA1490

DIRECT-GARCIA

MS. ROSE:  Yes, sir.

THE COURT:  -- issue.  Go ahead.

MS. ROSE:  We are abiding by the rules of sequestration pursuant to 615.  However, I did want to address the Court that the victim's family is here today, and would request the Court's permission pursuant to 42 U.S.C. 10606, which is the rights of crime victims.  That statute, as Your Honor knows, allows the right to be present at all public court proceedings related to the offense.  These witnesses would only testify at subsequent sentencing hearing, if we reach that point.  So I would submit that pursuant to the rule that they be allowed to be present at this hearing, Your Honor.

THE COURT:  You're not intending -- intending to call any of the family as fact witnesses?

MS. ROSE:  No, sir.

THE COURT:  Any objection?

MR. FOSTER:  As long as they're not being called during the guilt phase, then I guess we have no objection.  We submit that for the Court's ruling, Your Honor.

THE COURT:  Very well.  I do think there's an authorized by statute exception to the sequestration rule. I do think the Victim's Rights Act provides a directive to the Court to permit attendance to the fullest extent possible and to consider reasonable alternatives to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-4  Filed 03/23/17  Page 36 of 444
Case 3:03-cr-00134-RJC  Document 224  Filed 03/30/11  Page 36 of 156
JA1491

DIRECT-GARCIA

exclusion.

It doesn't appear to me that their testimony would be materially altered in any way if they heard the testimony of other witnesses.  Based on the proffer of the government they're not fact witnesses, they would only be testifying in a sentencing phase, should that become necessary.  And looking at that in its totality, and not really hearing an objection from the defense, I would permit their attendance during the guilt phase of the trial.

MS. ROSE:  Thank you, Your Honor.

THE COURT:  All right.  Anything else before we call the jury?

(No response from counsel)

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Good morning, Members of the Jury.

THE JURY:  Good morning.

THE COURT:  Hope you all had a pleasant evening and a good night's rest and are ready to go to work again this morning.

The Government may resume its direct examination.

MR. NAZZARO:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning, Mr. Garcia.

A    Good morning.

Laura Andersen, RMR 704-350-7493

**JA1492**

258
DIRECT-GARCIA

Q    When we broke last evening I had asked you about an individual named Pinon; do you remember those questions?

A    Yes.

Q    I direct your attention to June 8th -- or June of 2008. Did you have a discussion with Pinon at that point in time?

A    Yes, sir.

Q    Could you tell us what the nature of that discussion was?

A    He asked me to go help him pick up a truck in Greensboro.

Q    And did he tell you at the time why he had to pick up a truck?

        MR. FOSTER:  Objection; hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  I don't know.  He just asked me if I can help him pick up a truck in Greensboro.  At the time he said he didn't want to talk on the phone, so I went and picked them up and --

Q    (By Mr. Nazzaro) Go ahead.

A    And then we was driving his car and they start telling me why he wanted -- wanted me to help him pick up the truck.

Q    Okay.  Now who's driving?

A    My brother was driving the car.

Q    You picked up this individual known as Pinon?

A    Yes, sir.  I picked him up.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 38 of 444
Case 3:08-cr-00134-RJC   Document 1244   Filed 03/30/11   Page 9 of 156
JA1493

259
DIRECT-GARCIA

Q    And so the three of you were in the car?

A    Yes, sir.  The three of us.

Q    And you were driving to Greensboro?

A    Yes, sir, Greensboro.

Q    And during that drive what did Pinon say about why you were going to Greensboro?

A    He said that the homies got arrested.  That he needed to go pick up his truck that he let him borrow.  And he said they -- they left it like five blocks from the restaurant.

Q    Did he say what restaurant?

A    Yes, sir.

Q    What did he say?

A    The Jarochitas.

Q    And had you -- now, when he said they left the car five blocks, I think he referred to them as homies; is that right?

A    Yes, homies.

Q    Did he say who the homies were?

A    Yes.

Q    And who were they?

A    It was Chicago and Pelon and it was another homies in Greensboro.

Q    And did he tell you why they had left the car five blocks from the restaurant or why the car was there?

A    Yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 39 of 444
Case 3:08-cv-00134-RJC   Document 1714   Filed 01/30/11   Page 39 of 156
JA1494

Q    What did he say?

A    He said they got arrested because they wanted to intimidate the owners so he won't testify.

Q    The owner of the restaurant?

A    Yes, sir.

Q    So when you got to Greensboro, what did you do?

A    When I got to Greensboro we was looking for the truck and we finally found it.  It was parked in front of Dollar General, Family Dollar.  And right beside it was Burger King.

Q    Okay.  And when you got to the truck, who drove the truck back?

A    I drove the truck.

Q    And who was in the truck with you?

A    Me and Pinon.

Q    And what car did your brother drive?  The one he was driving up?  The one you came up in?

A    Yeah.  My brother was driving my car the one --

Q    So you were together with Pinon on the way back?

A    Yes, sir.

Q    And on the way back, did anybody call during your drive back, any other MS 13 member?

A    Yes, sir.

Q    And who was that?

A    Misterio called.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17   Page 40 of 444
Case 3:08-cv-00134-RJC    Document 50-4    Filed 03/30/11   Page 40 of 156
JA1495

DIRECT-GARCIA

Q    And did you speak to him or did Pinon speak to him?

A    No.  Pinon spoke to him.

Q    Did you hear what he was saying to him?

A    Yes, sir.  He had him on speaker phone I was hearing.

Q    What was the discussion?

A    He was asking did he get somebody to go pick up the truck.  And he said, yeah.  He said, I got Mariachi to do it.  And he wanted me to talk to him.

Q    And did you talk to him?

A    Yes, sir, I talked to him.

Q    And what did -- what was your discussion with Misterio?

A    Misterio just told me how come I hadn't went to meetings.  That I need to go to meetings.  And did I know what was going on, why I picked up the truck and what happened there.

     I said, yeah.  Pinon just got done telling me.  And so, I handed him the phone back, after we got done talking.

Q    Did he say anything about why you had to pick up the truck?  Did Misterio say anything to you about it?

A    Misterio just -- he just asked me, you know, if I knew what was going on with the picking up the truck and stuff.  And I say, yeah.  And I said, Pinon already filled me in.  He said a couple homies got arrested.  And I said, yeah, I know.  Because Pinon got done telling me.

Q    And did you have any discussion with him during that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 41 of 444
Case 3:08-cv-00513-RJC   Document 1244   Filed 01/30/11   Page 12 of 156
JA1496

DIRECT-GARCIA

time about anybody who was ratting out the MS 13?

A    No, sir, I don't recall that.

Q    And with respect to your invitation to go to any meetings, did you go to any meetings after that?

A    No, sir.

Q    Were you arrested shortly after that incident -- not the same day, but some weeks later?

A    A couple weeks later I was arrested.

Q    And that was in this case, the case you pled guilty to; is that right?

A    Yes, sir.

Q    And I think you testified you later agreed to cooperate?

A    Yes, sir.

Q    And you're any longer in the MS 13, or are you still an MS 13 member?

A    No, sir.  I don't consider that.

Q    And why have you decided to leave the MS 13?

A    Once I -- once I cooperated, it's automatic, you know, green light for me so, you know, I don't consider me as MS 13.

MR. NAZZARO:  No further questions at this time.

THE COURT:  Before cross-examination, ladies and gentlemen, you've heard testimony that this witness has pled guilty to certain charges.  The fact that this witness or

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 42 of 444
Case 3:05-cv-00134-RJC    Document 544    Filed 01/30/11    Page 43 of 156
JA1497

DIRECT-GARCIA

any other witness may or may have pled guilty to certain charges in this case is no evidence, whatsoever, of the defendant's guilt.  And you must not consider that in any way for that purpose.

You may begin cross.

MR. FOSTER:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q   Mr. Garcia, yesterday when you testified, didn't you say you were still MS 13?

A    No, sir.  No, sir.

Q   Now, you pled guilty to a count one of your indictment which was a racketeering, a RICO conspiracy, correct?

A    Yes, sir.

Q   And according to the Plea Agreement that you signed, you're facing a maximum of life imprisonment, correct?

A    No, it was -- it was a mistake.  The maximum was 20 years.

Q   Well, was that mistake ever corrected?

A    No, sir.  I just -- it was corrected -- I was just brought up to knowledge about two weeks ago.

Q   Well, your Plea Agreement says you face a maximum of life imprisonment, correct?

A    Yes, sir.  But it was a mistake.

Q   Okay.  Well, was anything filed to correct that mistake?

Laura Andersen, RMR 704-350-7493

JA1498

DIRECT-GARCIA

A    Sir?

Q    Was anything filed to correct that mistake?

MR. NAZZARO:  Objection, Your Honor.

THE COURT:  Sustained.  The statutory maximum is what it is.  And so I'll sustain the objection.

Q    (By Mr. Foster) Could you pull up Defense Exhibit 1, Susan?

THE COURT:  Do we need a side bar?

MR. NAZZARO:  Yes, sir.

(Bench conference as follows:)

THE COURT:  Did you previously supply a disk of exhibits?

MR. FOSTER:  I e-mailed it to Susan just this morning -- wherever Susan went.  And this is just the Plea Agreement.

MR. BRYSON:  We can put it on the ELMO.

THE COURT:  Yeah.  I thought we would break so we would make sure what the process is going forward.

We get those ahead of time so that it's easier for her to capture them electronically as the exhibits are being played.  But it's not her role to play those during the trial.  And so I don't know --

MR. FOSTER:  I guess I didn't get that.

MR. NAZZARO:  Your Honor, I would object anyhow if he's -- dwell on this issue of life.  The Presentence Report

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 44 of 444
Case 3:08-cv-00134-RJC    Document 524    Filed 09/30/11    Page 25 of 156
JA1499

DIRECT—GARCIA

is 20 years, I think his attorney --

THE COURT:  He's got a right to cross examine the witness as to his understanding of the Plea Agreement.  I think we've -- we're not going any farther on the 20 or the life because that's a legal matter.

MR. FOSTER:  I just want to develop the fact that he cooperated, pled guilty and his understanding he was facing a maximum of life.  That's all I'm trying to get at.

THE COURT:  Well, that's a simple question.

MR. FOSTER:  Right.

THE COURT:  But as far as exhibits are concerned -- so you don't have the capability of doing that from your table or you weren't intending to do that?

MR. BRYSON:  We don't have it scanned in.

MR. FOSTER:  I scanned it in back in my office.  I copied you when I sent the e-mail, you haven't seen it yet.

MR. BRYSON:  It's probably shut down already.

THE COURT:  During a break in the trial if you want to talk to Susan and try to figure out exactly the most effective way to present that, let's go ahead and do that. Otherwise we use the ELMO and we can capture it.

MR. BRYSON:  While you're going, I can try to shift over from my e-mail to this computer.  Let me see what I can do.

THE COURT:  Then at a break we will figure it out.

Laura Andersen, RMR 704-350-7493

JA1500

266

In terms of the agreement with the government, the relevant question as far as the Court is concerned is, what his understanding is.  You can impeach that understanding.

MR. FOSTER:  Okay.

(The bench conference was concluded.)

Q    (By Mr. Foster) Mr. Garcia, when you signed your Plea Agreement, at that time it was your understanding that you face a maximum of life in prison, correct?

A    Yes, sir, when I signed.

Q    And then you also understand when you signed your Plea Agreement there was a clause in the Plea Agreement that said that if the government decides you provide substantial assistance, they can, in their discretion, make a motion to reduce your sentence, correct?

A    Yes.

Q    Okay.  And so you understand that if you cooperate with the government and they find that you provide substantial assistance, you can get your sentence potentially lowered from whatever would otherwise be, to something less, correct?

A    Yes, sir.

Q    And you have not yet been sentenced, correct?

A    I've been sentenced.  I have been sentenced.

Q    You have not been to Court and the Judge has not yet given you your sentence?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 46 of 444
Case 3:09-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 46 of 156
JA1501

A     No.  Nobody has given me no sentence.

Q     Now, Mr. Garcia, you've been in this country since your youth, but you're not here legally, correct?

A     Yes, sir I'm not here legal -- illegally.

Q     In fact, one of the things you're hoping comes out of your cooperation with the government is that you are able to become a U.S. citizen and stay in this country, correct?

A     Yes, sir.

Q     Now you joined MS 13 in the bathroom of Disco Rodeo is that basically it?

A     No, sir.  I -- I did not join MS 13 in Disco.

Q     Okay.  Where did you join?

A     It was -- it was at -- it was at when we -- we had a meeting right after the meeting then I joined.  Right after the meeting I had, I joined.  I was -- I met the guys at Disco, we started hanging around.  We met at a meeting.  We met at a meeting.  Then after that I became MS 13.

Q     Okay.  But you weren't beat-in, correct?

A     I wasn't beat-in, no, sir.

Q     You'd gone through high school and were able to graduate, correct?

A     Yes, sir.

Q     Did you have a job at the time you joined MS 13?

A     Yes, sir.

Q     Okay.  But nevertheless you decided to go ahead and

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 47 of 444
Case 3:08-cv-00134-RJC   Document 1944   Filed 01/30/11   Page 18 of 156
JA1502

DIRECT-GARCIA

join the gang, right?

A    Yes, sir.

Q    Okay.  Why did you make that decision?

A    I made the decision I seen my best friend do it and I went behind him.

Q    And what was the last part?

A    I said I went -- I went behind him.

Q    You went behind him?

A    Yeah.  I saw my best friend, he joined, and after that I joined.

Q    Did joining the gang fill some other void in your life that you had?

A    My friend named Kilo, he joined, and right after I joined.

Q    Okay.  And so did -- when you joined the gang did that basically become your family?

A    Yes, sir.

Q    And is that -- wasn't that sort of comradery and family that caused you to join the gang?

A    It was -- it was, yeah.  It was family.  The gang's family once you join.

Q    Now you've testified about the rules of MS 13, correct?

A    Some of them, yes, sir.

Q    And one of the main rules is this thing called being jumped in or being beat into the gang, right?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 48 of 444
Case 3:08-cv-00513-RJC    Document 594    Filed 01/30/11    Page 25 of 156
JA1503

DIRECT-GARCIA

A     Yes, sir.

Q     And that's a 13 second period of time where three other members beat the person up and that person's not allowed to defend themselves, correct?

A     Yes, sir.

Q     And that's one of the more primary rules of MS 13, correct?

A     Yes.  That's one -- one of the big ones.

Q     And yet, you avoided that successfully during your entire membership in the gang, correct?

A     Yes, sir, I did.

Q     And your main clique leader Pajaro, he was aware you were never beat-in, correct?

A     Yes.  Pajaro and Little Loco and Piaso.

Q     Little Loco and Piaso were the others?

A     Yes.

Q     So those three members all knew that you had not been properly joined into the gang, correct?

A     Yes, sir.

Q     And in fact, they covered for you and represented to other MS 13 members that in fact you had been jumped in?

A     They vouch for me, yeah.

Q     Yeah.  So they also violated the rules because they knew you had not been jumped in but represented falsely that you had been?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 49 of 444
Case 3:09-cv-00134-RJC   Document 59-4   Filed 01/30/11   Page 20 of 156
JA1504

DIRECT—GARCIA

A      Yes, sir.  They --

Q      Okay.  And nothing -- in fact, down the road, other people knew that you had not been jumped in as well, correct?

A      Not just them people, three people.

Q      Well, what about Misterio.  Wasn't there some conversations where he was pestering you about not only coming to meetings but getting you jumped in?

A      No, sir.

Q      That never happened?

A      No, sir.  Not --

Q      Now, you've been interviewed on four prior occasions with law enforcement as part of your cooperation in this case?

A      I think it's been more than that, sir.

Q      I'm sorry, what?

A      I think it's been more, different -- different people.

Q      Okay.  Well, do you recall that maybe one of the -- well, do you recall a lengthy interview on September 17, 2008 where you were interviewed by FBI Special Agent Michael Attard in the presence of your attorney and someone from the U.S. Attorney's office named Kevin Zolot?

A      Yes.

Q      Okay.  And there were many matters discussed that day, but do you recall telling them at that time that Misterio

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 50 of 444
Case 3:09-cr-00134-RJC    Document 1044    Filed 01/30/11    Page 50 of 156
**JA1505**

271
DIRECT-GARCIA

was questioning why you were avoiding him and why you wouldn't come to a meeting?

A    Yeah.  Misterio was asking me when I talked to him why wasn't I coming to the meeting.

Q    Okay.  And didn't you also tell them at that same time that Misterio told you that you better get jumped in or some people are coming down to take care of you?

A    No, sir.  No, sir.  I don't have -- I told them that, you know, if I don't go to a meeting there was going to be a heat they would give me for not going to the meeting.

Q    But you're saying you never told them that?

A    I don't recall.

Q    You don't recall or you're not --

A    I don't recall Misterio saying that.

Q    Okay.  So you're saying you don't recall whether you told them that, correct?

A    Yes, sir.  If Misterio knew I wasn't jumped in, then he would -- he would do more than try telling me that he's going to jump me in.

Q    Would it refresh your memory to look at a report that someone wrote about your statement during that meeting?

A    Yes.

        MR. NAZZARO:  Your Honor, I'll object to the foundation.  He said that somebody else wrote, is what I think his question was.

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

THE COURT:  Overruled.  He's entitled to show him anything he wants.

MR. FOSTER:  Okay.  Can I exhibit it to the witness, Your Honor.

Q    Do you have something before you, there, sir?

A    Yes, sir.

Q    If you can look at what's on that screen there and read it to yourself.  And when you're doing reading it, let us know and then I'll ask you some more questions.

A    The whole -- which one you want me to read?

Q    Well, read all -- everything that's visible starting with the first full paragraph and then I'll ask -- well, actually the one I'm asking about is the big paragraph the one starts with -- we just indicated in the red.  Can you see the red marks?

A    Yes, sir.  Right here.

Q    That's the paragraph.  If you can read that to yourself.

A    Yes, sir.

Q    Okay.  Does that refresh your memory about whether or not you told the agent that day that Misterio had told you, you better get jumped in?

A    That -- that -- what I recall that day is, we didn't talk about it when I speak to Pinon and I was speaking to Misterio I didn't -- I don't recall.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 52 of 444
Case 3:08-cv-00134-RJC   Document 197-1   Filed 01/30/11   Page 23 of 156
JA1507

Q    Okay.  So you're saying that portion you just read does not refresh your memory that in fact you did say that?

A    Yes.

Q    Yes, it does?

A    What was the question, can you repeat it?

Q    Sorry.  I'm sorry.  You're saying that does refresh your memory that you did tell the agent that in fact Misterio told you, you better get jumped in?

A    It's there -- I don't.

THE COURT:  The question is, does it refresh your memory, whether you said that?

THE WITNESS:  This -- I mean -- it's-- is that the same day we went to Greensboro?

MR. FOSTER:  Well, I can't --

THE COURT:  Ask the question again.

Q    (By Mr. Foster) The question is simply this.  The portion that we had you read to yourself?

A    Yes, sir.

Q    Does that portion refresh your memory as to whether you told the agent that in fact Misterio had told you, you better get jumped into the gang?

A    I don't remember talking to Misterio about that.  At that time or any time.

Q    So you're saying it doesn't refresh your memory then; is that right?

Laura Andersen, RMR 704-350-7493

JA1508

274

DIRECT-GARCIA

MR. NAZZARO:  Objection.

THE COURT:  Overruled.

Q    (By Mr. Foster) Are you still looking at it, Mr. Garcia, are you done?

THE COURT:  No, it's off.

Q    (By Mr. Foster) Mr. Garcia, so basically during your entire time in the gang you were -- you were worried that you might be exposed for being someone who is not properly jumped into the gang, correct?

A    Yes, sir.

Q    Now one of the rival gangs you mentioned yesterday was the Surenos?

A    Surenos.

Q    Are they also known as Sureno 13?

A    Yes, sir.

Q    That's a rival gang of MS 13?

A    Yes, sir.

Q    You wouldn't find two people of those two gangs hanging out together, would you?

A    Not here -- not here in Charlotte.

Q    So one of the rules you testified about yesterday were certainly disciplinary rules.  If you broke a rule of the gang, you faced a 13 second beat-in, I think you called it, a calenton?

A    Calenton, correct.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 54 of 444
Case 3:08-cr-00134-RJC   Document 1612   Filed 01/30/11   Page 54 of 156
**JA1509**

DIRECT-GARCIA

Q    That's a 13 second beating, correct?

A    It's also used for another calenton, which is 26.

Q    Okay.  So that's a more serious violation you get a 26 second beat-in?

A    Yes, sir.  Whole gang beats.

Q    And one of the rules, I think you said is, that if a member fails to join in a fight that another member is in, that's a violation?

A    If you don't -- if there's a fight and you're standing there, you got to go in the middle of it.

Q    Okay.  So in other words, if there's a fight that's beginning, and someone, a member leaves or backs out of the situation, that would be wrong, right?

A    No, sir.  If there's a fight, if a fight breaks out and you standing there, you would never leave a homie behind. So you got to be right in there in the middle of it.

Q    Okay.  So a fight breaks out and a member leaves, that would violate the rules?

A    Yeah.  That would be calenton.

Q    So you faced -- you yourself stopped going to meetings completely at some point in time you testified just a minute ago, correct?

A    Yes, sir.

Q    And that was Misterio trying to get you to come down to South Carolina for meetings?

JA1510

DIRECT-GARCIA

A     Yes, sir.

Q     And due to your failure to go down there, you were facing a calenton for that, theoretically, correct?

A     That was -- that was Pinon told me not to go over there.  And Pinon told me not to go over there because he -- you know, he knew that something bad is going to happen.

Q     Right?

A     So I never went to --

Q     Something bad was suppose to happen, was because you had been missing meetings for quite a while, right?

A     I was missing meetings and also got in a fight with -- with another MS 13 member.

Q     Who is that?

A     That was Drogo.

Q     Who?

A     Drogo.

Q     Drogo.  But ultimately over quite a period of time you had missed meetings on many occasions, not just at the end of 2008 before you were arrested, but before that too, correct?

A     No, sir.  I just -- when Misterio -- I never went to meetings.  We had meetings -- us, like the Centrales and the Coronados.

Q     But you never got a beat-in for any of those violations, did you?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 56 of 444
Case 3:09-cv-00134-RJC    Document 19-4    Filed 01/30/17    Page 275 of 456
JA1511

DIRECT-GARCIA

A     No, sir, I didn't.

Q     And none of the people who were fronting for you claiming that you'd been jumped in, they never suffered any discipline for that false representation either, did they?

A     No, sir, they didn't.

Q     Now, at some point in time when the South Boulevard clique changed its name and became the Coronados, you were in the clique, right?

A     Yes, sir, I was in the clique.

Q     And in fact, you went to this -- a meeting in the woods in October of 2007 with Coronados and Centrales, right?

A     Yes, I went to the meetings.

Q     And the purpose of that meeting was try to -- well, what was the purpose of that meeting?

A     The purpose of that meeting was to -- to get one clique and meet the homies from Greensboro.

Q     And you were one of the leaders speaking at that meeting, weren't you?

A     Yes, sir, I was.

Q     And so you at that point were becoming one of the leaders of the Coronados clique, right?

A     Yes, sir.

Q     And yesterday you testified that there was a lot of concern among the Coronados and the Centrales about going up and meeting these people in Greensboro, right?

Laura Andersen, RMR 704-350-7493

DIRECT—GARCIA

A     Yes, sir.

Q     In fact, one of the things that was at issue was making sure that you had guns to go to that meeting?

A     Yes, sir.

Q     So you were concerned about your safety, meeting with other MS 13 gang members?

A     We all -- we all were, cause we -- we -- we wasn't knowing things was right.  We was all scared because we didn't know what to expect.

Q     Okay.  So just the fact that you're going up to meet with other MS 13 fellow gang members, you still didn't trust that you were safe, correct?

A     I was -- yes, sir.  Cause this guys they -- they was saying from down there that they knew more stuff than we did.

Q     So you feared that you weren't following the rules and might get in trouble?

A     Yeah.  We all were, yes.

Q     Now, as a leader of the Coronados you held meetings where you imposed calentons on other members, correct?

A     Yes, I did.

Q     And how many times do you think you did that?

A     About twice.

Q     Twice?

A     Yes.

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

Q    So you were the shot caller for Coronados, right?

A    It was -- that wasn't normally the shot caller.  That wasn't normally -- it was just --

Q    Well, you were on occasion though, right?

A    Yes, I was -- I wasn't no one, but they all looked up to me.

Q    In fact, you were the one who called the shots on those two attempts at the prostitution house robberies, correct?

A    Yes, I were.

Q    So you called the shots on those but did not attend those, right?

A    Yeah, I didn't go, sir.

Q    Now, there were more than just the two Charlotte cliques of MS 13, correct?

A    There was -- there was only in Charlotte that we -- that I know of was -- it was just Coronados and Centrales.

Q    No other cliques?

A    There was some other cliques -- I mean people came from other places, but they were just -- those two cliques known in Charlotte.

        MR. FOSTER:  Can you pull back up Government Exhibit 227, please?

        Okay.  Do you see that on your screen?

A    Yes, sir.

Q    Do you remember testifying about this yesterday, this

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 59 of 444
Case 3:06-cv-00134-RJC    Document 1914    Filed 01/30/11    Page 59 of 156
JA1514

DIRECT—GARCIA

was a photo of you on your way to the -- to the meeting in the woods in October, 2007?

A    Yes, sir.  That's me, yeah.  We're going to the meeting in the woods.

Q    Right.  Now, you didn't take this picture, did you?

A    No, sir.  I didn't take this picture.

Q    And there's nothing particularly distinctive about this picture that tells you that that was on that day, is there?

A    No, sir.

Q    So in fact, the reason you know or that you testified that this is you on that date, is that someone told you that, correct?

A    No, sir.  That's me right there.

Q    Right.  But knowing that this was supposedly in October of 2007, that's because an agent told you that's when this was taken, correct?

A    No, sir.

Q    Well then how do you know this was taken, then?

A    That -- the picture, are you asking me who took the picture, is that what you're asking me.

Q    No.  I'm asking you how could you know that this was taken on your way to that particular meeting?

A    I don't know.

        MR. FOSTER:  You can take that down now.

Q    (By Mr. Foster) Now, the meeting in the woods takes

DIRECT-GARCIA

place and you agree to go up to Greensboro for this meeting, correct?

A    Yes, sir.

Q    And the guns that you take are a .25 caliber pistol is one of them, right?

A    Twenty-five, yes, sir.

Q    And that was your gun, correct?

A    Yes.

Q    The other gun was a Mac 10 or a Mac 11?

A    Yes, sir.

Q    And whose was that?

A    That was -- that was -- it was -- it was borrowed actually from -- to Tigre and Diablo.

Q    So you arrived at the meeting and went into essentially an abandoned apartment, correct?  There was no furniture, no people, it was dark, right?

A    You talking about the meeting in the woods or you talking about in Greensboro, sir?

Q    In Greensboro.

A    Yes, sir.  There was no other people in the apartment.

Q    And the people that were present that were -- that had not come with you -- in other words, the ones who were already in Greensboro as you testified, were people you referred to as Stiler, Chino and Wizard?

A    Yes.  Yes, sir.  There was some.  There was some more,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 61 of 444
Case 3:09-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 62 of 156
JA1516

DIRECT-GARCIA

about two other guys.

Q    Two other guys?

A    Yes, sir.

Q    And the one who was doing most of the talking was Stiler, wasn't it?

A    It was Stiler and Wizard.

Q    Well, Stiler was the one leading the meeting, wasn't he?

A    It was both of them, sir.

Q    Now, isn't it true that there was a guy named there Picasso?

A    Not Picasso; Piaso.

Q    Piaso.  Okay.  All right.  So wasn't it Stiler the one who said he had connections to El Salvador?

A    Who.

Q    Stiler?

A    Said that Piaso?

Q    No.  The discussion was, how things were being run in Charlotte.  And isn't it true that Stiler said, he had connections to El Salvador, regarding running things in Charlotte?

A    No.  It was -- there was two guys it was in that meeting.  That we were suppose to meet two big guys that we were suppose to meet.

Q    Well my question is, did Stiler say that he had

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 62 of 444
Case 3:08-cv-00134-RJC   Document 19-4   Filed 01/30/11   Page 63 of 156
JA1517

DIRECT-GARCIA

connections to El Salvador?

A    Stiler?  Yeah.  Stiler said that.

Q    And didn't Stiler also tell you to run your clique with school, meaning apply the rules?

A    Yes, sir.  Both of them said that, sir.

Q    Both of them?

A    Yes, sir.

Q    It wasn't just Stiler?

A    It was Wizard and Stiler, sir.  One started it and then the other one.  They were both talking.  One stopped the other one talked.

Q    Okay.  Didn't you tell the agent on the same interview on September 17, '08 that it was Stiler that was telling you this not Wizard?

A    I don't recall, sir.

Q    You don't recall?

A    No, sir.  But it was --

Q    Let me ask you --

A    The whole purpose of going up there was to meet --

Q    Right.

A    The whole purpose of going up there was to meet two guys.

Q    I understand that.  Did you also tell them that -- or tell the agents in September '08 that Stiler was talking about organizing Charlotte cliques?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 63 of 444
Case 3:08-cr-00134-RJC    Document 1944    Filed 01/30/11    Page 64 of 156
JA1518

284
DIRECT—GARCIA

A    Yes, sir, become one.

Q    Right.  And also that Stiler was wanting to purchase the Tech .9 from you but you refused?

A    The Tech .9; no, sir.  Wizard wanted to borrow it. They wanted to borrow it.

Q    So you're saying that you did not tell the agents in September 2008 that Stiler wanted to purchase the Tech .9 from you and you refused?

A    No, sir.  Not --

Q    I'd like to pull up -- I'm going to show you another page of the same interview I showed you earlier, page 15, of a statement written about what you said on September 17, 2008, and see if you can read that, and see if it refreshes your memory.

      We're going to mark the part I want you to read to yourself.

A    Yes, sir.

Q    Okay.  Read this portion first.  Let us know, then we'll scroll and down then I'm going to ask you some questions.

A    Yes, sir.

Q    Okay.  Now we're going to scroll down a little further. Okay.  If you could just read the part now that's next to the red line highlighted.  Let me know when you're done with that.

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 64 of 444
Case 3:09-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 65 of 156
JA1519

A    Yes, sir.

Q    Okay.  Does that refresh your memory as to whether Stiler ever told you to run your clique with school, meaning running it with the rules?

A    Yes.  Stiler said that -- said, you know --

Q    So he did tell you that?

A    Yes.  Stiler did say that and Misterio said that and Wizard said that.

Q    Well, but at the time you were interviewed in September, you only said Stiler said these things not Wizard, correct?

A    Yes, sir.

Q    Okay.  And it was also -- isn't it true then that Stiler's the one who wanted to buy that Tech .9 gun from you, correct?

A    The Tech .9, yeah.

Q    All right.  Now yesterday you testified about a .45 being present -- the .45 caliber handgun being present at this meeting, correct?

A    Yes, sir the .45.

Q    Isn't it true that Stiler handled that gun as well?

A    Yes, sir.

Q    In fact, Stiler is the one who mainly possessed that gun, isn't he?

A    At the time, yes, sir.  At the meeting, yeah, it was --

DIRECT-GARCIA

Q    And the .45 caliber pistol, it was a chrome gun wasn't it?

A    Yeah, it was shiny.

Q    So the things that were said at this meeting that the Charlotte clique was suppose to do, included taxing drug dealers, selling drugs, committing theft, that sort of thing, correct?

A    Yes, sir, and sending money to Salvador.

Q    The taxing drug dealers, selling drugs, those were things already happening, correct?

A    Yeah, but it wasn't organized.

Q    And so this meeting was ended with you supposedly going back to Charlotte to -- to take charge and organize the stuff, right?

A    No, sir.

Q    But you were the leader of the Coronados clique, weren't you?

A    Yes, sir.

Q    Now there was also a discussion at this meeting in Greensboro about this guy named Sixteen?

A    Yes, sir.

Q    He was breaking the rules because he was taxing drug dealers and keeping the money for himself?

A    He was robbing, yeah.

Q    And so this was discussed, but he was never disciplined

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 66 of 444
Case 3:09-cv-00134-RJC    Document 1941    Filed 01/30/11    Page 66 of 156
JA1521

DIRECT-GARCIA

287

either, was he?

A    No, sir.  They were going to investigate.

Q    I'm sorry, what?

A    They were going to investigate it.

Q    But they never --

A    They --

Q    They never got him, right?

A    They were trying to call him while we had the meeting on the cell phone.

Q    So he was never disciplined, correct?

A    Sixteen; no.

Q    Now, the guns that you testified about at that meeting, the .25 and the Mac .10 or Tech .9 or whatever it is -- well, let me ask you -- the references to a Tech .9 or a Mac .10, were you referring to the same gun?

A    Yes, sir same -- it's the same.

Q    And those guns were both taken by the police when they prevented the first of the two prostitution house robberies?

A    Yes, sir.  The first time, yes, sir.

Q    And so at that point then, the clique was left with -- with how many guns?

A    There were no guns.

Q    And so you had to have somebody borrow a gun to make the second attempt at the prostitution house robbery?

A    Yes, sir, a shotgun.

Laura  Andersen,  RMR  704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 67 of 444
Case 3:08-cv-00513-RJC   Document 19-4   Filed 01/30/11   Page 68 of 156
JA1522

Q    And you weren't present for that attempt either, right?

A    No, sir.

Q    And then the second -- when the second robbery at the prostitution house failed, you were on the phone instructing them to go to plan B, right?

A    Yes, sir, plan B.  Yes, sir.

Q    And plan B that you had devised was to break into Gordo's SUV and steal his gun?

A    Yes, sir.

Q    And that never took place, did it?

A    No.  We didn't break in, no, sir.

Q    And so then on December 8, 2007, you go to El Vaquero and you're at the taco stand, right?

A    Yeah, taco stand, yes.

Q    And is this the same night as the failed second attempt at the prostitution house robbery?

A    It was -- I don't -- I'm not good with, you know.

Q    What?

A    It was -- it was the -- it was -- it was the same night.

Q    And so you're at the taco stand which is outdoors?

A    Correct.  Yes, sir.

Q    There's basically some sort of a stand or a vehicle that was outside and next to El Vaquero?

A    Yes.  Yes, sir.  Beside -- it's a vehicle.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 68 of 444
Case 3:08-cv-00134-RJC   Document 19-4   Filed 01/30/11   Page 69 of 156
JA1523

DIRECT-GARCIA

Q    So that was an area where anybody could come buy a taco or other food, correct?

A    Yes, anybody, yes.

Q    So you say you were there when a car arrived with Nene?

A    It was -- yeah.  Nene called me and said he was on his way with the home boys from Greensboro.

Q    Okay.  And you saw them show up?

A    Yes, sir.  I saw them.

Q    And yesterday you testified that Wizard went into wash his hands -- he went into the restroom with Nene to wash his hands?

A    Yes, sir.

Q    And then the two of them came out together?

A    One came -- one came and the other one came, sir.

Q    Okay.  And then they were both out there with you?

A    Nene was talking on the phone and he was talking to me.

Q    But you're all standing in one group?

A    Yes.  Yeah.  Yes, sir.  Kind of scattered, but in the same -- like in a group.

Q    Okay.  And so when -- when Wizard was telling you his description of what had occurred in that restaurant, Nene was standing right there, wasn't he?

A    No, sir.  Nene wasn't standing right there.  Nene was in the side talking to his girlfriend on the phone.

Q    Well, how far away was he?

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 69 of 444
Case 3:03-cv-00134-RJC   Document 19-4   Filed 01/30/11   Page 40 of 156
JA1524

DIRECT-GARCIA

A    He was -- he was on the side of the taco stand in the side of it.

Q    Inside of it?

A    No.  No.  Beside of it.

Q    To the side of it?

A    Yeah.

Q    Okay.  How many feet was Nene from you when Wizard was talking to you?

A    I mean, I can see him, but I don't know how far he was.

Q    And -- but Nene wasn't on the telephone the entire time Wizard was talking to you, right?  He came over and joined in the conversation, didn't he?

A    Nene was talking in and out, you know, on the phone, arguing with his girlfriend.

Q    And then also participating in the conversation that you were having with Wizard?

A    It was just me and Wizard and Stiler and Chino sometimes.  They were coming back and forth.

Q    And what -- what you say that Wizard told you was that this shooting had taken place -- had started over an argument over the music box, correct?

A    Yes, sir; over the music box.

Q    So Stiler was -- was Stiler part of this conversation, you said?

A    It was -- the beginning was Stiler telling me, then

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 70 of 444
Case 3:06-cr-00134-RJC   Document 1974   Filed 01/30/11   Page 70 of 156
JA1525

DIRECT-GARCIA

Wizard.

Q    And Chino?

A    Chino was a little bit to the side, he wasn't --

Q    And Stiler was wearing a hat, wasn't he?

A    That's -- I seen him with a hat but I don't think he come out with a hat.

Q    You saw him with a hat, but -- say it again?

A    I saw him with the hat in the car.  When they were coming in and --

MR. FOSTER:  Can you pull Exhibit 59, please.

Q    This is -- you identified this photograph yesterday and identified this guy as Stiler?

A    This guy here?

Q    On the left.  The person on the left -- yeah.

Now, if you look to the very top edge of that photograph, to the right of his head, there's a little -- looks like something, a little brim coming down, looks like a hat, doesn't it?

A    It's --

Q    I'm sorry?

A    It looks like a hat right here.

Q    I mean, it looks like his eyes are in shadow and it looks like that's a brim of a hat hanging down, doesn't it?

All right.  I'm not sure I heard you.  Did you ever answer the question or --

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

A    I'm still looking at it.

Q    Okay.

A    Looks like a hat, yes, sir.

Q    Okay.  Now, Wizard wasn't wearing a hat, was he?

A    It's a -- that is -- when -- when they got out, they went quickly to the bathroom, so.

Q    Well --

A    Cause --

        MR. FOSTER:  Can you pull Exhibit 57, please?

Q    Now yesterday you identified Exhibit 57, this photograph here, as being Wizard as the way he appeared when you were talking to him, correct?

A    That's Wizard, yes, sir.

Q    Okay.  So in that photograph he's not wearing a hat, is he?

A    No, sir.  He's not wearing a hat.

Q    Thank you.  Now, yesterday you testified that -- something to the effect that Chino told you, that Wizard had told him, that the police were lucky when he was arrested that he couldn't reach for the gun; did I get that right?

A    Yes, sir.  That's what Chino told me that.

Q    Okay.  And when did Chino tell you that?

A    I don't know specific date, you know.  I know he was in the club.

Q    In the club?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 72 of 444
Case 3:06-cv-00134-RJC   Document 19-4   Filed 01/30/11   Page 73 of 156
JA1527

293

DIRECT—GARCIA

A    Yes.  In the parking lot.

Q    And Chino didn't tell you when it was that Wizard allegedly told him this, did he?

A    No, sir.  He didn't tell me.

Q    Or where?

A    He didn't tell me when.

Q    Now, you've had jobs in this country before getting arrested, correct?

A    Yes, sir.

Q    And to do so, you used fake -- false papers to show that you had legal status, correct?

A    Yes, sir I did.

Q    In fact, you had fake social security card, didn't you?

A    Yes, sir, I had that.

Q    And when you were first arrested in this case on June 24th, 2008.  You were -- you were interviewed on the date of your arrest Detective Hastings and Special Agent Attard, do you remember that?

A    Yes, sir.

Q    Okay.  And do you recall that they asked you whether you were a member of MS 13 and you denied it?

A    Yes, sir, I denied it.

Q    And you also told them on that date that you had no knowledge of the Coronados clique or MS 13, correct?

A    Yes, sir, I did.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 73 of 444
Case 3:08-cr-00134-RJC   Document 1044   Filed 01/30/11   Page 73 of 156
JA1528

DIRECT—GARCIA

Q    And you told them that you never attended meetings, correct?

A    Yes, sir, I did.

Q    And that was -- those were false statements, weren't they?

A    Yeah, I was lying.

Q    So Mr. Garcia, after lying to the police on June 24th, 2008, what changed down the road was, you signed the Plea Agreement where you realized the only way to help reduce your sentence was to cooperate with the government, correct?

A    Yes, sir.

        MR. FOSTER:  I have no further questions.

        THE COURT:  Any redirect?

        MR. NAZZARO:  Just one question, Your Honor.

REDIRECT EXAMINATION BY MR. NAZZARO:

Q    I think during your cross-examination when they asked you about the Greensboro guys you said they were sent from down there, I think those were your words.  What did you mean by down there?

A    Salvador.

        MR. NAZZARO:  Thank you.  No further questions.

        THE COURT:  You may step down.

        Call your next witness.

        MR. NAZZARO:  Officer Griffen.

THEREUPON, JAMES K. GRIFFEN, being first duly sworn,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 74 of 444
Case 3:08-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 75 of 156
JA1529

DIRECT—GARCIA

testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning.  Could you please state your name, sir?

A    Officer J.K. Griffen.  James K. Griffen, Greensboro Police Department.

Q    And how long have you been with the Greensboro Police Department?

A    A little over 10 years.

Q    What kind of work have you done with the Greensboro Police Department?

A    I was in patrol for three years.  And I've worked street level narcotics on a special team for a little over six years.

Q    Is that special team you're referring to have a special name?

A    It's the tactical special enforcement team.  We call it TSET.

Q    And this TSET, what type of work does it do?  What are its duties?

A    At the time we were street level narcotics.  We handled sales on the street.  Short term investigations, for example crack houses.  I would get PC for it, investigate it, serve search warrants.  We were also available for tactical situations that needed heavier armor, things like that.

Q    And with respect to your work with this unit and

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 75 of 444
Case 3:08-cv-00134-RJC    Document 19-44    Filed 01/30/11    Page 76 of 156
JA1530

DIRECT—GARCIA

specifically with drugs, how many drug investigations have you been involved in?

A    Numerous, 200 plus.

Q    Some of those involve cocaine?

A    Yes.  Majority of the cases were either marijuana, cocaine, powder or crack.

Q    And with your experience, have you become familiar with a packaging of cocaine?

A    Yes, I have.

Q    And the type of quantities that are sold in the Greensboro, area?

A    Yes, I have.

Q    I want to direct your attention to August 6, 2007. Were you working with this unit, I think what you referred to as the acronym TSET at this time?

A    Yes, sir, I was.

Q    Sometime on August 6, did you receive information to respond to a call at the Best Value Inn?

A    Yes, I did.

Q    And could you tell us what your role was after receiving that information?

A    My role was to respond to the Best Value Inn and assist with the investigation.

Q    Where did you initially respond to?

A    I responded to Room 59, it's on the northwest side of

Laura Andersen, RMR 704-350-7493

JA1531

DIRECT-GARCIA

297

the building.

Q    Who was present, other law enforcement, at the time?

A    Some of the criminal intelligence section were there, Sergeant Mike Richey, J.D. Sloane.  I believe there were some K-9 officers there and my squad.

Q    And at some point were you asked to respond to a different section of the motel or hotel?

A    Yes, I was.  We -- when I first arrived at Room 59 it was on the second floor.  We were attempting --

        MR. FOSTER:  Objection; nonresponsive.

        THE COURT:  Sustained.

Q    (By Mr. Nazzaro) At some point after you responded -- or you responded to Room 59, did you go to a different location

A    Yes I did.

Q    And could you tell us what location that was?

A    I responded to the east side of the hotel in the PVA near the entrance exit of the hotel to a vehicle that sergeant Richey had stopped.

Q    PVA you said?

A    The PVA of the hotel, the parking lot.

Q    Okay.  Did you -- were you asked to assist in that stop of the vehicle, or had the vehicle already been stopped?

A    The vehicle had already been stopped by the time I got to that side of the building.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 77 of 444
Case 3:08-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 48 of 156
JA1532

DIRECT—GARCIA

Q    Were you -- did you lend assistance to the investigation at that point?

A    Yes, I did.

Q    And what was your role?

A    When I got there, the vehicle stopped.  There was three occupants, they were already outside the vehicle and detained.

        Sergeant Richey had requested that I help him perform a protective sweep of the area, the passenger area of the vehicle, where Sergeant Richey informed me that the right front passenger --

            MR. FOSTER:  Objection; hearsay.

            THE COURT:  Overruled.

            THE WITNESS:  -- made a movement to the floor of the car.

Q    (By Mr. Nazzaro) Did you then assist in searching the vehicle?

A    Yes, sir.  I walked to the vehicle.  The front right door was already opened.  And at that point I saw in plain view what I believed to be marijuana on the floorboard.

Q    Did you seize that item?

A    Yes, I did.

Q    And how much marijuana was there?

A    Approximately 14 grams.

            MR. FOSTER:  Objection; lack of foundation.

Laura Andersen, RMR 704-350-7493

DIRECT—GARCIA

299

THE COURT:  Overruled.

Q    (By Mr. Nazzaro) And so you're describing the front right area of the car; is that right?

A    Yes, sir.

Q    Passenger?

A    Just -- just under the edge of the seat.

Q    Okay.  Did you have occasion to search the person who was in front right passenger seat?

A    Yes, I did.

Q    And is that person here in courtroom today?

A    Yes, sir.

Q    And could you further identify him for the record?

A    The gentleman sitting at the table in the blue.

Q    Could you point to his direction?

A    (Indicating.)

        MR. NAZZARO:  If the record could so reflect, Your Honor.

        THE COURT:  It will reflect that the witness has identified the defendant.

Q    (By Mr. Nazzaro) And could you tell us about what you did next with respect to the defendant?

A    When I found the marijuana in the car, in the area that he was at and I was informed that he was the one sitting there.  I arrested the subject -- Mr. Umana and searched his person.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 79 of 444
Case 3:08-cv-00134-RJC    Document 1944    Filed 01/30/11    Page 307 of 456
JA1534

DIRECT-GARCIA

Q    And did he have any items on his person?

A    He had a wallet in his back pocket.

Q    And that wallet -- did you search the wallet?

A    Yes, I did.

Q    And did you recover any drugs from the wallet?

MR. FOSTER:  Objection; lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I located six small Ziploc baggies containing white powder in his wallet.

MR. NAZZARO:  Your Honor, if I could approach?

THE COURT:  You may.

Q    (By Mr. Nazzaro) Officer, I would like to show you what's been marked as 46 and 47; are you able to recognize those items?

A    Yes, I do.

Q    And how are you able to recognize those?

A    I filled out the evidence bag and the label on the top and initialed it.

Q    Okay.  What is Government 46 and 47?

A    It is small bags of white powder I retrieved from Mr. Umana's wallet.

Q    And how are they -- how are those items packaged?

A    They're small little zip -- plastic Ziploc baggies. They're whatever, an inch long and not quite an inch wide, I think.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 80 of 444
Case 3:08-cv-00134-RJC   Document 1944   Filed 01/30/11   Page 80 of 156
JA1535

301

DIRECT-GARCIA

Q    And how many were there?

A    Six.

Q    And have you seen packaging like that before in your drug work?

A    Yes, I have.

Q    Is that type of packaging consistent with personal use or distribution?

MR. FOSTER:  Objection; lack of foundation.

THE COURT:  Overruled.

THE WITNESS:  I have seen packaging like this many times for powder cocaine.  And it -- it is consistent what I have found on other persons that were selling.

MR. NAZZARO:  Your Honor, I would move 46 and 47 subject to connection through our next witness, which is a chemist.

THE COURT:  Well, any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  I'll admit 46 and 47.

(Government Exhibit 46 & 47 were received into evidence.)

Q    (By Mr. Nazzaro) Now, did you find any identification in the wallet?

A    Yes.  There was a I.D. card within his wallet.

Q    What was the I.D. card?

A    It was an I.D. card with Mr. Umana's information on it.

Q    And was it from North Carolina or from some other --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 81 of 444
Case 3:08-cr-00134-RJC    Document 1044    Filed 01/30/11    Page 82 of 156
JA1536

DIRECT-GARCIA

A    It was from New York.

Q    Was there an address on the I.D. card?

A    Yes it was, it was number 50 Jackson Street, Apartment 3, I think, Hempstead, New York.

Q    Finally, I would like to show you what's been previously placed in evidence as Government 36.  Are you able to recognize Government 36?

A    Yes, I do.

Q    How do you recognize 36?

A    This is the vehicle that I searched that day.

MR. NAZZARO:  I have no further questions.

THE COURT:  Any cross?

MR. FOSTER:  One moment, Your Honor.

No questions, Your Honor.

THE COURT:  You may step down; be excused.

Call your next witness.

MS. ROSE:  Ann Hamlin.

THEREUPON, ANN HAMLIN, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    Good morning, if you would please state your name for the jury?

A    Yes.  It's Ann Hamlin.

Q    And Ms. Hamlin where are you employed?

A    I'm employed with the North Carolina State Bureau of Investigation the Raleigh Crime Laboratory.

Laura Andersen, RMR 704-350-7493

**JA1537**

Q    What's your position there at the crime laboratory?

A    I am a special agent in charge of the drug chemistry and the toxicology section.

Q    And if you would just explain for the jury your background and education related to your position there at the SBI?

A    I've got a bachelor's degree in chemistry and a master's degree in forensic drug chemistry.

I've also completed the six month training program with the SBI, as well as I've been employed there for almost 21 years.

Q    In your position as a forensic chemist, describe what your daily activities and responsibilities entail?

A    As a forensic drug chemist that includes receiving evidence from our evidence control unit, marking evidence, analyzing the evidence, preparing a report based on our conclusion of our analysis of that particular evidence and then testifying in court as well.

MS. ROSE:  Your Honor, at this time I would tender Miss Hamlin as an expert in forensic chemistry and drug analysis.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  She will be recognized as such.

Q    (By Ms. Rose) If you would, explain the method —— you

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 83 of 444
Case 3:06-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 83 of 156
JA1538

DIRECT—GARCIA

said that one of the things you do is you retrieve evidence from your control room, and then you go through an analysis process.

Just give us an overview of those protocols and procedures.

A    Okay.  The SBI does have written procedures involving the receipt of evidence from local law enforcement agencies. We do not except evidence unless it is in a sealed condition and properly marked.

In this particular case, I received an item of evidence from our evidence custodian.  She receives it from the law enforcement officer.  She marks it.  Gives it a unique SBI laboratory number.  And then puts it in a -- a evidence vault until which time she can transfer it to a chemist. That would be the time that I would receive the evidence.

At which time I mark it with a date received, that same unique identifier, as well as my initials.  And I place it in my locked evidence locker until I can analysis it.

MS. ROSE:  If I may approach the witness, Your Honor?

THE COURT:  You may.

Q    (By Ms. Rose) I'm going to show you what's been marked as Government's Exhibit 46.  If you would take a look at 46 which is the outer packaging.  Do you recognize in any way, Exhibit 46?

Laura Andersen, RMR 704-350-7493

**JA1539**

DIRECT-GARCIA

A     Yes, I do.

Q     How do you recognize this particular exhibit?

A     I recognize the plastic bag contained in the outer plastic bag.  And it's got my marks on it, my initials, the date I received the item, as well as the laboratory unique identifier.

Q     And I'm just going to -- snip open here Government's Exhibit 46, remove the inner baggie about which you testified.

I'll go ahead and mark that as Government Exhibit 47. If you would take a closer look now at Exhibit 47; you do recognize that?

A     Yes, I do.

Q     And you indicated that there are a number of markings on this which help you to identify Government Exhibit 47; what are those specific markings?

A     I can testify to my markings, which include my initials, the date that I received this item of evidence. As well as the unique SBI laboratory case number that was assigned to this, and I placed it on the outer packaging.

The outer packaging also contains the seal that I made after I made the analysis, which contains my initials, the date that I've made the seal, as well as the unique SBI laboratory case number that was assigned to this.

Q     And when you received Government's Exhibit Number 47,

JA1540

DIRECT—GARCIA

was it as you testified, in a sealed condition?

A    Yes, it was.

Q    When you opened it and removed the items, describe for the Members of the Jury then the process that you followed?

A    In this particular instance, that outer plastic bag contains six smaller plastic bags.  Since there was more than one piece, I had to determine that they were all consistent.

I did several tests on a random sample of the six bags. I did preliminary examination, which consists of color tests as well as a crystalline test on four out of the six bags. I also observed them visually.  At the time I determined they were consistent.  I weighed them.  And when I weighed them, I remove them from the outer plastic bag.  So what the weight is, is an actual weight of the powder.

After they were combined, I performed two more instrumental examinations to form my conclusion as to what was contained in the powder.

Q    Briefly describe, because I know there's quite a bit involved.  But if you would briefly describe for the jury the procedures that you go through in testing a controlled substance which you have received for analysis?

A    The procedures that we use are, we first make a visual examination.  We also record our observations.  Once we've made that visual examination, we use preliminary analysis

Laura Andersen, RMR 704-350-7493

**JA1541**

which are not specific, they're general.  And they help us to guide us in the direction that we want our analysis to go in.

So that helps us to make our determination and draw our

Once we've performed these preliminary tests, we then use more specific tests that provide things such as what we call a fingerprint of the chemical substance.  And that is specific for the controlled substances.

So that helps us to make our determination and draw our conclusion as to what was obtained in any piece of evidence.

Q    And did you follow those procedures and protocols as you conducted your analysis of the items contained in Government Exhibit Number 47?

A    Yes, I did.

Q    And based upon your analysis, what did you determine those substances to be?

A    I determined that they contained the substance cocaine hydrochloride in the amount of 3.4 grams.

Q    And what is cocaine hydrochloride?

A    Cocaine hydrochloride is also commonly known as powder cocaine.

Q    Did you prepare a report of these findings?

A    Yes, I did.

Q    If you would take a look on your screen there.  Do you see before you Government's Exhibit 48?

A    Yes, I do.

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17   Page 87 of 444
Case 3:06-cr-00134-RJC    Document 19-4    Filed 01/30/11   Page 88 of 156

JA1542

DIRECT-GARCIA

Q    What is Government's Exhibit 48?

A    That is a representation of my report.  It contains my unique SBI identifier, my electronic signature, and the information in this case where it came from, the description of the evidence.

Q    Did -- and is this report one that you normally make in your daily duties as an analyst there at the lab?

A    Yes, it is.

Q    And is this part of your conclusion of particular investigation which you were involved?

A    Yes, it is.

        MS. ROSE:  The government would move to admit Government Exhibit 48, Your Honor.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

        MS. ROSE:  Ask that it be published.

        THE COURT:  You may.

(Government Exhibit 48 was received into evidence.)

        MS. ROSE:  I have no other questions of this witness.

        Thank you, ma'am.

        THE COURT:  Any cross?

        MR. FOSTER:  No questions, Your Honor.

        THE COURT:  You may step down and be excused.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 88 of 444
Case 3:06-cv-00134-RJC   Document 194-4   Filed 01/30/11   Page 98 of 156
JA1543

DIRECT-GARCIA

Call your next witness.

MS. ROSE:  I would just move to admit at this time, Your Honor, which were conditionally admitted, 46 and 47.

THE COURT:  They will be admitted.

MS. ROSE:  Thank you.

(Government Exhibit 46 & 47 were received into evidence.)

MS. ROSE:  The government would go ahead and call T.J. Miller.

If I may, Your Honor, go ahead and put this on the ELMO so we may capture a representation for the evidence.

THE COURT:  You may.

MS. ROSE:  Officer Miller.

THEREUPON, T.J. MILLER, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    If you would please sir introduce yourself to the jury.

A    I'm Officer T.J. Miller I'm employed with the Greensboro Police Department.

Q    Officer Miller, how long have you been employed at the Greensboro Police Department?

A    Approximately 10 and a half years.

Q    What is your current position there?

A    I'm currently a corporal assigned to the patrol bureau.

Q    Have you had any other positions while employed at the police department?

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 89 of 444
Case 3:06-cv-00134-RJC   Document 194-4   Filed 03/30/11   Page 90 of 156
JA1544

DIRECT—GARCIA

A    Yes.  Prior to that for approximately 20 months I was assigned to the gang enforcement team.

Q    And what were your duties as part of that team?

A    Our main focus was just targeting any gang activity, and all gang criminal activity in any type of crime.  And then follow-up investigation, assist CID when they were able to learn that possibly a crime was committed by a gang member.

Q    What does CID stand for?

A    I'm sorry.  The criminal intelligence division detectives.

Q    And when approximately was the gang unit formed there at Greensboro Police Department?

A    Officially it was formed early October, 2007.

Q    And were you then, one of the first members of that team?

A    Yes, ma'am, I was.

Q    After this unit was formed and as you were, I guess figuring out your positions and what your duties and roles were, what did you and other members of the gang unit do?

A    Our main thing, we would focus on citizen complaints where they believe they had gang activity in their neighborhoods, and follow-up to see if in fact that was true.

And then also we initially went after all the known

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 90 of 444
Case 3:08-cv-00134-RJC   Document 90-4   Filed 01/30/11   Page 90 of 156
JA1545

DIRECT-GARCIA

gang members in Greensboro that were wanted or currently involved in criminal activity.

Q    As you were gathering your intelligence and getting this gang unit formed, did you also go around town based upon citizen complaints or otherwise, and document graffiti?

A    Yes, ma'am.

Q    On or about or on December 8, 2007, were you working that particular day?

A    Yes, ma'am I was.

Q    And with whom were you working?

A    With Officer A.J. Blake.

Q    And where were you working on that occasion?

A    We were following up on a complaint reference possible gang graffiti on Merritt Drive, they thought was either MS 13 or Sur 13 related.  And so we responded to the 1800 block of Merritt Drive, the General Greene apartment complex to see if indeed there was actually any graffiti.

Q    And when you say you responded to that particular apartment complex, what specifically did you do?

A    We went there basically in an unmarked police car.  We wore plain clothes and just basically observed to see if we -- drove around the apartment complex to see if we saw any graffiti, which we didn't.  I located a number 13 sprayed painted in black on a dumpster in the PVA of 1835 Merritt Drive.  Then at the back of 1845, which is a different

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

parking lot, but just south of where the initial graffiti was on a brick wall, there was the number 13 spray painted in black.

Q   Now, I'm going to show you what has previously been conditionally admitted as Government Exhibit 52.  Is it there on the screen before you?

A   Yes, ma'am it is.

Q   What is shown in Government's Exhibit 52?

A   That would be the General Greene apartment complex. And that would be the PVA for buildings 1831 to, I believe, 1837 Merritt Drive.

Q   And you use the term PVA?

A   I'm sorry.  Parking lot.

Q   The public vehicular area is what PVA stands for. That's cop talk.  We call it parking lot, right?

A   Yes, ma'am.

Q   All right.  Are there other parking lots in the complexes.

A   Yes there are.  One is just east of this location.  And then there's one just west of this location.  They go into a small, another group of buildings.

MS. ROSE:  Your Honor, at this time I would move to admit Government's Exhibit 52.  It's already in.

Q   All right.  I'm also going to show you what's admitted as Government 66.  Are you able to see 66?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 92 of 444
Case 3:06-cr-00134-RJC    Document 1944    Filed 01/30/11    Page 93 of 156
JA1547

DIRECT—GARCIA

A    Yes, ma'am.

Q    And what is shown in Government's Exhibit 66?

A    That's the additional entrance to General Greene apartments located on Merritt Drive, just east of that location, right at the intersection of Merritt and Fairfax Drive.

Q    Is that a fair and accurate representation of that complex from that particular angle showing Merritt Drive?

A    Yes, ma'am.

MS. ROSE:  If that hasn't been admitted, I would move to admit 66 at this time.

THE COURT:  It may be admitted.

MR. FOSTER:  Does it say 56 on it.

MS. ROSE:  Sixty-six.

(Government Exhibit 66 was received into evidence.)

MS. ROSE:  May I publish, Your Honor?

THE COURT:  You may.

Q    (By Ms. Rose) Now Officer Miller, you indicated this is at the corner of Merritt and --

A    Near Fairfax Drive.

Q    On the particular occasion about which you testified where you were conducting surveillance there on December 8, 2007, where were you located?

A    I was parked directly across from the eight -- the PVA -- the parking lot form 1835 Merritt Drive, across the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 93 of 444
Case 3:06-cv-00134-RJC    Document 59-4    Filed 03/30/11    Page 94 of 156
JA1548

DIRECT-GARCIA

street, approximately about 150 feet from the front of the apartment buildings.

Q    And that was actually the 1800 was what was shown in the previous exhibit?

A    Yes, ma'am, the first photograph.

Q    All right, sir.  So you parked across the street or were looking at that parking lot area, what happened?

A    Almost immediately once we parked, I observed two Hispanic subjects appeared to be in their 20's standing between 1835 and building -- I'm sorry, 1833 and 1831 Merritt Drive.  And they were kicking a soccer ball with a small child, a four or five year old child, a male.

But what stood out was, one of the subjects was wearing a white or off-white in color, jersey, LA Dodgers jersey with the number 13 on it in blue.

So we possibly believe maybe the subject was possibly a gang member.  So we just conducted surveillance for what turned out to be three or four hours.

The majority of the time all they did was pretty much just kick the soccer ball and then go back inside apartment 1833A.

Q    At some point did you end your surveillance late that afternoon or early in the evening?

A    Yeah.  The subjects kicking the soccer ball -- at least one of the male subjects and the female left.  They left --

DIRECT—GARCIA

one left in a SUV, and then one left in white two door Dodge or Plymouth Neon.  They traveled Merritt Drive to Spring Garden Street.  I attempted to catch up with them.

But at that point it's right around I believe 4:30 or 5, so traffic was picking up.  I lost sight of them briefly. And then they started coming back down Merritt Drive towards the apartment complex.  Pulled back in.  Got back out.  Went inside the apartment.

And due to becoming dark soon, that's when we ended our surveillance.

Q    Were you still working later on that particular evening?

A    Yes, ma'am.

Q    And what do you recall occurring about the time that you had done to dinner?

A    Shortly after we ate dinner, we responded back to our office to regroup and inform our sergeant what we saw. That's when I heard on the police radio there had been a shooting on High Point Road.

Q    Did you actually respond to High Point Road?

A    Yes, ma'am.  I initially responded and circulated the area because we were given the information that there were three possible suspect vehicles.

MR. BRYSON:  Objection to what information he was given, Your Honor.

Laura Andersen, RMR 704-350-7493

**JA1550**

316
DIRECT-GARCIA

THE COURT:  I'll overrule the objection.  But instruct the jury that the information given to this officer is not to be considered by you for the truth of the matter asserted, but rather to help explain to you, if it does, why the officer took the actions he did.

Q    (By Ms. Rose) You said that you were looking for three possible vehicles at the time?

A    Yeah.  I believe one was a white Expedition.  One was another SUV.  And then one was a white two door Plymouth Neon.

Q    The particular area to which you initially responded was what location?

A    Where we circulated?

Q    Yes.

A    Just up and down High Point Road between Makey and then I-40 just --

Q    I'm going to show you what's been marked as Government Exhibit 65.  If you take a look at that.  What is depicted in Government Exhibit 65?

A    That's a photograph of High Point Road with -- right where the crime scene was, beside the Toys 'R Us and the Mexican restaurant.

Q    And is this part of the area that you were --

A    Yes, ma'am.  That's part of the area.

Q    -- were circulating?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 96 of 444
Case 3:08-cv-00134-RJC    Document 194-1    Filed 03/30/11    Page 96 of 156
JA1551

DIRECT-GARCIA

Is that a fair and accurate representation of the roads there --

A   Yes, ma'am.

Q   -- in that area?

You're familiar with them from your patrol duties?

A   Yes, ma'am.

MS. ROSE:  The government at this time would move to admit Exhibit 65, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 65 was received into evidence.)

Q   (By Ms. Rose) The little arrow marked A there in red, is that the approximate location of the restaurant you described?

A   Yes, ma'am.

Q   And what particular area were you conducting your search for these vehicles?

A   I went up and down High Point Road in both directions to Makey, which is probably just another mile and a half past Merritt Drive.  And then towards I-40, which is the next street past South Holden.  Then I went back Merritt Drive where I was earlier in the evening.

Q   And you may not be able to see it in this photograph, but High Point Road intersects Merritt Drive?

Laura Andersen, RMR 704-350-7493

**JA1552**

318
DIRECT–GARCIA

A      Yes, ma'am it does.

Q      And on the other side there's Holden Road.  Is there a road to the top of the exhibit out of the range that connects Holden and Merritt.

A      Not directly.  You take Boulevard Street to West Avenue which connects.  But they do connect.

Q      How far is the General Greene Apartments, about which you previously testified, from the location of the restaurant?

A      It's approximately about a four to five minute drive.  About a mile and a half with traffic.

Q      And if -- if you cut -- don't take the roadways, how long would it take on foot?

A      Oh, well, on foot, probably seven, eight minutes on foot.

Q      Did you locate any of the vehicles on that particular evening?

A      When we went back to Merritt Drive, another officer did locate the Neon at the General Greene apartment complex.

Q      Did you examine that car that day?

A      Briefly I went up with the other officer and I noticed that where the car was kind of parked diagonally in the space.  The door was ajar about three to four inches and the hood was warm.  But there was no occupants in the vehicle.

Q      And about what time was that?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 98 of 444
Case 3:06-cv-00134-RJC    Document 19-4    Filed 01/30/11    Page 98 of 156
JA1553

DIRECT-GARCIA

A    I believe it was about 20 to 25 minutes after the initially the call went out on the radio.

Q    What call are you referring to?

A    The shooting on High Point Road.

Q    Did you have any involvement -- any further involvement that particular evening relative to the investigation?

A    We just assisted knocking on the doors in the General Greene apartment complex attempting to locate the driver of the vehicle.  But other than that, no, ma'am.

Q    Did you in fact go door-to-door yourself?

A    Yes, ma'am.  With other officers, yes, ma'am.

Q    And how many doors approximately did you knock on that particular evening?

A    I think I only personally knocked on about six.

Q    Did that -- did that prove fruitful for you at that time?

A    Not for me.  But other officers I believe it did.

Q    Was there another time approximately a month or so later when you returned to those apartments on Merritt Drive?

A    Yes, ma'am, on January 18th of 2008.

Q    And why did you go to those apartments on January the 18th?

A    We received information --

        MR. BRYSON:  Object to the information he

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 99 of 444
Case 3:08-cv-00134-RJC    Document 19-11    Filed 01/30/11    Page 99 of 156
JA1554

DIRECT-GARCIA

received.

THE COURT:  Counsel --

Q    (By Ms. Rose) Officer Miller, was it in response to a conversation you had with another officer?

A    Yes, ma'am it was.

Q    Did you have any particular information with you that you were taking to the location?

A    Yes.  We were attempting to locate a subject that went by the name of Mr. Stiler who was an MS 13 gang member.  And we were shown a photograph of the interior of the apartment.

Q    And from whom did you receive that particular photograph?

A    From the FBI.

Q    I'm going to show you what has been marked as Government Exhibit 61.  Are you able to see that on your screen, Officer Miller?

A    Yes, ma'am.  It's a little blurry, but I can see it.

Q    Are you familiar with Government 61?

A    Yes, ma'am.  That's the photograph I was shown.

Q    When you went to Merritt Drive on January 18th of 2008, what did you do?

A    I was attempting to see if possibly maybe the subject was at the same apartment complex I had seen earlier from the shooting.  I went up to 1833-A; noticed there was an orange power cord running from that apartment to the end of

Laura Andersen, RMR 704-350-7493

**JA1555**

Appeal: 10-6   Doc: 90-4   Filed: 08/14/2013   Pg: 101 of 444

1831-F.

And when I walked up to the door the -- there was a light on.  The door was closed, but the window was open. There's a front window, bay window right beside the front door.  The curtain was open, probably six to eight inches.

When I looked in the window, I observed the interior, which I was shown from that photograph earlier.  Which there's a picture of -- there's a velvet picture of Jesus Christ with -- he's with a white robe with like an orange cross that was glowing with a green background and the mirror beside it on the wall in the living room.

Q    You were able to see that through the window?

A    Yes, ma'am.

Q    And is it fair to say -- was that in any way consistent with what you had observed in the photograph?

A    Yes, ma'am.  It was very consistent.

Q    When you noticed that particular unique photograph or painting or velvet wall hanging, what did you do?

A    I knocked on the door and it sounded like either there was a large dog in the apartment walking around upstairs or someone inside, but no one would respond.

Q    How long did you knock at the door way?

A    Probably 20 to 25 minutes and repeatedly identified my self as a Greensboro police officer.

Q    Ultimately, what happened?

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 101 of 444
Case 3:08-cv-00134-RJC   Document 19-4   Filed 03/30/11   Page 101 of 156
JA1556

DIRECT-GARCIA

A    The resident came home.  And after speaking with her and obtaining the information, based on the information she provided, we went inside the apartment and searched it.

Q    And when you got inside the apartment, what did you see?

A    I walked up the steps, which are immediately behind the front door.  As I was walking up the steps I could hear someone walking around.  I again identified myself as a police officer.  They gave no response.  When I got to the top of the steps, there was a male subject standing right in front of the bathroom, right at the edge of the steps.

Q    I will show you what has previously been conditionally admitted as Government Exhibit 7.  Do you recognize the individual shown in Exhibit 7?

A    Yes, ma'am.  That was the subject inside the residence.

Q    At the time you first encountered that individual on that date, were these particular tattoos present?

A    Not on his forehead.  No, ma'am.

Q    Okay.  When you encountered this particular individual, what happened?

A    You know, I spoke briefly to him.  I noticed he had several MS 13 tattoos on his hand.  He had the three dots on his left hand with Mexical, South Side gangster.  The number 13 on the back of his head.  Spoke with him briefly.  Then asked him for consent to search his residence.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 102 of 444
Case 3:08-cr-00134-RJC   Document 19-1   Filed 03/30/11   Page 73 of 156
JA1557

DIRECT-GARCIA

Q    Did you get -- were you able to get an identification from him at that time?

A    Yes, ma'am.  We identified him as Julio Cesar Lopez.

Q    And did he have a nickname or provide you with a nickname?

A    I actually -- when we went in his bedroom, written on the dresser, the brown wooden dresser right beside his bed, was Mr. Stiler written in ink.

Q    I want to show you Government's Exhibit 63.  Do you recognize Government Exhibit 63?

A    Yes, ma'am.  That was his dresser with --

Q    And did you actually photograph --

A    Yes, ma'am.

Q    -- you made this photograph?  And is it a fair and accurate representation of what you observed?

A    Yes, ma'am.

            MS. ROSE:  Move to admit 63, Your Honor.

            THE COURT:  Any objection?

            MR. BRYSON:  No, Your Honor.

            THE COURT:  Admitted.

            MS. ROSE:  Move to publish.

            THE COURT:  You may.

(Government Exhibit 63 was received into evidence.)

Q    (By Ms. Rose) What else did you -- while you were in the home, you said you conducted a search?

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

A     Yes, ma'am.

Q     What if anything did you see?

A     Right when you walked in his bedroom, there were numerous jerseys, MS 13 jerseys hanging from his bed.  And the white and blue bandannas above his bed with the number 13, either embroidered on them from where it was made or written in ink.

We located an SKS assault rifle under his bed.  It was wooden with a green strap with a bayonet.

There were three or four cardboard boxes in his room, and one large cardboard box in his closest, which contained various notebooks with, like gang rappings, writings and rules.  Which also contained Mr. Stiler, admitting same, he was the person, Mr. Stiler.

Q     First I would like to show you a couple of exhibits. Show you a couple of items which have previously been marked.  First Government's Exhibit 18.  Do you recognize 18?

A     Yes, ma'am.  These were hanging from above his bed.

Q     And Government's Exhibit 18, just for the record are?

A     They're bandannas.  We call them flags.  Gang flags to represent their gang.

Q     I show you what has also been marked as Government Exhibit 16.  If you would take a look at 16, please, sir?

A     This was another jersey that was hanging above the bed.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-4   Filed 03/23/17   Page 104 of 444
Case 3:05-cr-00134-RJC   Document 19-4   Filed 02/30/17   Page 73 of 136
JA1559

325

DIRECT-GARCIA

Which is just the gang colors.

Q    And finally, Government 17?

A    This was also hanging above the bed, which actually has the number 13 on it.

Q    And you are actually the officer who seized these particular items?

A    Yes, ma'am.

Q    And once they were seized, if you would just tell the Members of the Jury, seized evidence is maintained how, at the Greensboro Police Department?

A    I collected it, packaged it in cardboard boxes. Packaged the firearm.  And then labeled them.  And we put them in our evidence section which is locked until it's taken -- I believe the FBI and U.S. Attorney's office came and seized it several months later.  But it's secured.

Q    And has the condition of those particular items changed in any way, other than obviously the exhibit stickers, changed in any way since the time that you seized them?

A    No, ma'am.

          MS. ROSE:  Your Honor, at this time, I would move to admit Government's Exhibits 16, 17, and 18.

          THE COURT:  Any objection?

          MR. BRYSON:  No, Your Honor.

          THE COURT:  Let them be admitted.

(Government Exhibit 16, 17 & 18 were received into

Laura Andersen, RMR 704-350-7493

**JA1560**

DIRECT-GARCIA

326

evidence.)

Q    (By Ms. Rose) You indicated that you also seized a photo album and some other notebooks?

A    Yes, ma'am.

Q    I'll show you what has been previously identified as Government's Exhibit Number 12.  Do you recognize Government's Exhibit Number 12?

A    Yes, ma'am.  That was one of the pictures in the -- in his -- it was a black photograph book from a party they took and Mr. Stiler's -- in Mr. Lopez's room.

Q    And again, this is an item that you seized?

A    Yes, ma'am.

MS. ROSE:  This was conditionally admitted, Your Honor.  I would move to admit it at this time.

THE COURT:  Let it be admitted.

(Government Exhibit 12 was received into evidence.)

Q    (By Ms. Rose) Show you what's been marked as Government Exhibit Number 13.  Is this also an item you seized?

A    Yes, ma'am.  It was in the photo album.

Q    The individual you identified as Stiler or Rosales Lopez, is he also in this photograph?

A    Yes, ma'am he is.

Q    And which member is he?

A    The gentleman in the blue jersey.

Q    You identified him as an individual in a county

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 106 of 444
Case 3:08-cr-00134-RJC   Document 50-4   Filed 03/30/11   Page 106 of 156
JA1561

DIRECT—GARCIA

something shirt jersey?

A    Yes, ma'am.

Q    All right.  Thank you, sir.

Also show you what's been previously identified as Government's 14.

A    That was another photo in the album.

Q    And which one do you know or were you able to identify either of the parties shown in 14?

A    Yes, ma'am.  The one on the right is Mr. Lopez with the white bandanna on his head.

MS. ROSE:  Thank you.

At this time I move to admit 12, 13 and 14, Your Honor, previously conditionally admitted.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let them be admitted.

(Government Exhibit 12, 13 & 14 were received into evidence.)

Q    (By Ms. Rose) I'm also going to show you Government Exhibit 64.  Do you recognize Government Exhibit 64?

A    Yeah.  That was one of the drawing and writings in one of the notebooks that were located in the cardboard box in the closet.

Q    Obviously, this is a copy.

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 107 of 444
Case 3:08-cr-00134-RJC   Document 1564   Filed 01/30/11   Page 107 of 156
JA1562

DIRECT-GARCIA

Q    Other than them being a copy, is it a fair and accurate representation of the item that you seized?

A    Yes, ma'am it is.

        MS. ROSE:  I move to admit 64, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit 64 was received into evidence.)

Q    (By Ms. Rose) You indicated that you noted some particular tattoos on Stiler, Mr. Rosales' head.  I'm going to show you what's been marked as Government Exhibit Number 8.

    Now at the time that you saw Mister -- this individual Stiler, Mr. Rosales Lopez, did he have these particular tattoos?

A    No, ma'am, he did not.

Q    The date you encountered him was January 18th of '08?

A    Yes, ma'am.

Q    All right.  Show you Government Exhibit Number 9.  Did you see those particular tattoos?

A    Yes, ma'am.  That tattoo was there.

Q    On who was this tattoo?

A    On the left side of Mr. Lopez's head.

        MS. ROSE:  This was conditionally admitted.  I move to admit number 9.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 108 of 444
Case 3:08-cr-00134-RJC   Document 1344   Filed 01/30/11   Page 73 of 136
JA1563

DIRECT-GARCIA

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 9 was received into evidence.)

Q    (By Ms. Rose) Also show you Government Exhibit 10 which has previously been identified.  Do you recognize Government Exhibit Number 10?

A    Yes, ma'am.  That was the tattoos located on Mr. Lopez's right side of the head that day.

Q    Once again you took this photograph?

A    Yes, ma'am.

MS. ROSE:  The government would move to admit 10, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 10 was received into evidence.)

Q    (By Ms. Rose) And finally, Government Exhibit Number 11, Officer Miller.  Do you recognize Government's Exhibit 11?

A    Yes, ma'am, that too.  That's the back of Mr. Lopez's head.

MS. ROSE:  Move to admit that, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 11 was received into evidence.)

Q    (By Ms. Rose) As you looked at the photographs that were shown earlier, seized from the photograph album, did

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 109 of 444
Case 3:03-cr-00134-RJC    Document 15-1    Filed 01/30/11    Page 80 of 156
JA1564

DIRECT-GARCIA

you recognize any of the other individuals?

A    No, ma'am, I did not.

Q    Did you have an occasion after this date in January of '08 to return to this restaurant -- restaurant -- excuse me -- apartment?

A    No, ma'am, I did not.

Q    You indicated that when you first arrived prior to your search and prior to entering the apartment, that you noticed a power cord running between apartments.  What -- what significance, if any, did that have for you?

A    Well, that either indicates that the people inside the apartment are either stealing the power, or the apartment's been condemned by the City.  And so they don't have power so they're just getting, borrowing power from the neighbor.  Normally it indicates that they're stealing power.

Q    Did you also, on the occasions when you were there, note whether there were any vacant apartments in this particular complex?

A    At the time I would say about 25 to 30 percent of the apartments were vacant in the entire complex.  The building 1835 had, I believe, three vacant apartments directly beside it.  And some of the windows were broken out.

        MS. ROSE:  All right.  I don't have any other questions of this witness, Your Honor.

        THE COURT:  Any cross?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 110 of 444
Case 3:08-cr-00134-RJC    Document 193-1    Filed 01/30/11    Page 61 of 156
JA1565

DIRECT-GARCIA

MR. BRYSON:  Yeah.

CROSS-EXAMINATION BY MR. BRYSON:

Q    When you first went out to the General Greene apartments, you described that was on December 8; is that correct?

A    Yes, sir, it was.

Q    That's when you conducted surveillance on this apartment?

A    Yes, sir.

Q    And the specific apartment building that you were looking at was 1835?

A    Yeah, that's where they were -- I'm sorry, 1833.  My error 1833-A, that's where they were kicking the soccer ball in front of the --

Q    Okay.  And you saw two Hispanic men?

A    Yes, sir.

Q    And they also had a child with them?

A    Yes, sir, a four or five year old boy.

Q    They were kicking a soccer ball?

A    Yes, sir.

Q    Amongst the three of them.

And were they going in and out of 1833?

A    Yeah.  Periodically they were.

Q    Okay.  And so it appeared they had access to that apartment in that building?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 111 of 444
Case 3:03-cr-00134-RJC   Document 50-4   Filed 03/23/17   Page 111 of 156

**JA1566**

DIRECT—GARCIA

A    Yes, sir.

Q    Now, when you went back in January, was it the same apartment, 1833?

A    Yes, sir 1833-A.

Q    Okay.  And you observed that Mr. Stiler lived in one of the apartments, correct?

A    On that day, yes, sir.

Q    1833-A?

A    Yes, sir.

Q    Is that correct?

A    Yes, sir.

Q    And is that the same apartment that these other people were going in and out of on December the eighth?

A    Yes, sir.

Q    Okay.  Are you able to identify Stiler as one of the people playing soccer with the young child?

A    After the fact, yes.  I believe he was one of the subjects that was kicking -- the ones that was kicking the soccer ball.

Q    And so it would appear that Stiler lived there in December, correct?

A    Yes, sir.

Q    And continued to live there in January?

A    Yes, sir.

Q    And there was a small child that was going in and out

Laura Andersen, RMR 704-350-7493

JA1567

DIRECT—GARCIA

of that apartment?

A    Yes, sir.

Q    And the person that gave you access to the apartment in January, was Stiler's sister?

A    Yes, sir it was.

Q    The General Greene apartments are not far from the Las Jarochitas restaurant?

A    No, sir.  No, sir, not at all.

Q    In fact, when we looked at the map, Merritt Drive does intersect Holden Road -- I'm sorry, High Point?

A    High Point Road.

Q    I'm sorry.  Let me say that again.  Merritt Drive intersects High Point Road?

A    Yes, sir.

Q    Okay.  And in fact, there's actually a back way --

A    Yes, sir.

Q    Colby -- the restaurant is on an intersection of Colby Street and High Point Road, correct?

A    Yes, sir.

Q    You can go down Colby and it brings you right out to Merritt Drive, correct?

A    Yes, sir.  From West Avenue, yes, sir.

Q    Okay.  And you said that's a five minute drive?

A    Yeah, without -- probably less than that if there's no traffic.

Laura Andersen, RMR 704-350-7493

JA1568

DIRECT—GARCIA

Q    Okay.

A    With traffic about five minutes.

Q    When you first got up December 8, it was around noontime?

A    Yeah -- I believe so, like 12:30, probably.

        MR. BRYSON:  Those are my questions.

        THE COURT:  You may step down; be excused.

        I think this is a good time to take our morning break.

        Members of the Jury, don't talk about the case, keep an open mind.  And we will see you back in court at 11:45.

(The jury was escorted from the courtroom.)

(A brief recess was taken in the proceedings.)

        THE COURT:  Call the jury.

        COURT SECURITY OFFICER:  Yes, sir.

        THE COURT:  Mr. Nazzaro, do you have your next witness in court ready to go?

        MR. NAZZARO:  Yes, Your Honor.

(The jury was returned to the courtroom.)

        THE COURT:  Call your next witness.

        MR. NAZZARO:  Yes, Your Honor.  The United States calls Marie Terrell.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 114 of 444
Case 3:05-cr-00134-RJC   Document 15-4   Filed 01/30/11   Pages 3 of 156
JA1569

DIRECT-GARCIA

THEREUPON, MARIE TERRELL, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning.  Would you please say your name?

A    Marie Terrell.

Q    And Ms. Terrell, what city do you live in?

A    Greensboro, North Carolina.

Q    And how long have you lived in Greensboro?

A    Basically, all my life.

Q    And do you work in Greensboro?

A    Yes.  I have a beauty salon.

Q    And how long have you worked in that capacity?

A    (Indicating.)

Q    How long have you worked in that capacity?

A    Thirty-two years.

Q    I would like to now direct your attention to December 8, 2007; on that occasion did you have plans to go out that evening?

A    Yes.  We were taking my niece out to eat at the Mexican restaurant beside Toys 'R Us.

Q    And who is we taking -- who are you referring to?

A    Me, Jose, Kimberly and Jessica.

Q    And you mentioned this Mexican restaurant near Toys 'R Us in that in Greensboro?

A    Yes.

Q    Do you know the area that's in?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 115 of 444
Case 3:08-cr-00134-RJC   Document 152-1   Filed 01/30/11   Page 86 of 136
JA1570

A    It's on High Point Road.

Q    Have you ever -- what was the occasion you were taking her out?  Why were you taking her out?

A    It was her birthday.

Q    And had you ever been to that restaurant before?

A    Yes.  Probably a dozen times.

Q    What type of restaurant was it you -- said Mexican?

A    Mexican.

Q    What type restaurant was it?

A    A family restaurant.

Q    Was it very big?

A    Small.

Q    On the other occasions you had been there, had you had any problems at the restaurant?

A    No.

Q    And do you recall that evening or that -- the time you arrived at the restaurant?

A    Pardon me?

Q    Do you remember when you arrived at the restaurant?

A    It was late evening.

Q    And do you recall where you parked at all?

A    Yeah.  About four -- four parking places from the door.

Q    I'd like to show you what's been previously marked as Government 67.  Do you recognize Government 67?  Do you see it on the screen?

DIRECT-GARCIA

A    Pardon me?

Q    Do you see it on your screen?

THE COURT:  You can tilt that screen --

THE WITNESS:  Yeah.  That's the restaurant.

Q    (By Mr. Nazzaro) And the name is Las Jarochitas.  You see that, that's the name of the restaurant?

A    Yes.

Q    Okay.  Now, you mentioned you parked in front of the restaurant.  In relation to the vehicle that's parked there, where did you park?

A    Okay.  That was Manuel's vehicle, and mine was like three or four doors, parking spots down to the left.

Q    You mentioned Manuel.  Had you seen Manuel at that restaurant before?

A    Yes.

Q    So after you parked, did you get -- you got out of your car?

A    Yes.

Q    And --

A    I was the first in the restaurant and they were on the floor.  And I saw that there wasn't any movement, so I flipped my phone and dialed 911 and made everyone else stay out.

Q    So you went into the restaurant?

A    Um-hmm.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 117 of 444
Case 3:08-cr-00134-RJC   Document 12-1   Filed 02/30/11   Page 84 of 156
JA1572

DIRECT-GARCIA

Q    You said they were on the floor.  Who was on the floor?

A    At the time, I did not know it was Manuel's brother. But Manuel and his brother.

Q    Okay.  But did you see Manuel?

A    Yes.

Q    And where was he laying on the floor?

A    Laying on top of his brother.

Q    And you said you called 911?

A    Right.

Q    Why did you call 911?

A    (Indicating.)

Q    Why did you call 911 after you saw them?

A    I mean, I didn't know anything else to do.

Q    Were they moving?

A    If he needed help or -- at the point, I didn't know.

Q    And did you stay in the restaurant then or did you come back out?

A    No, I come back out.

Q    And while you were coming back out, did you see anything?

A    Yes.  I saw the two guys that were coming out of the restaurant before I went in.  Um, they got in a -- um, I think it was a maroon and silvery gray jeep Cherokee.

Q    Which direction did that vehicle go, if you know?

A    They come out over the curb and into the middle lane

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 118 of 444
Case 3:05-cr-00134-RJC   Document 15-41   Filed 03/30/11   Pages 4 of 156
JA1573

DIRECT—GARCIA

going toward Holden.

Q    And did you notice anything that happened when --

A    Yes.  They hit -- they hit a car and the bumpers locked.

Q    And what did you observe next?

A    One of them got out and was jumping up and down on the bumper to release the cars.

Q    Did the cars release?

A    I hollered to the couple that was in the car to stay in it because there was a gun.

Q    Why did you say that?

A    Because there was blood all over the floor.

Q    Did you notice anything about the individuals, as far as whether they had a gun as they were leaving?

A    I could just tell there was something under one of them's shirt.  But, I mean, it could have been anything.  I didn't see a gun.

Q    You mentioned you called 911; is that right?

A    Yes.

        MR. NAZZARO:  Your Honor, if I may approach?

        THE COURT:  You may.

Q    (By Mr. Nazzaro) Like to show you, Ms. Terrell, what's been previously marked as Government 68.

A    Yes.

Q    And that's -- that's a disk of a 911 call.  Are your

JA1574

DIRECT-GARCIA

initials on that disk?

A    Yes, it is.

Q    And you've heard this call since you've made it?

A    Um-hmm.  Yes.

        MR. NAZZARO:  Your Honor, I would --

Q    When you heard the call, was it an accurate recording
of what you -- what occurred that night as far as your
discussion with the 911 --

A    Yes, it was.

        MR. NAZZARO:  I would like at this time, Your
Honor, move 68 and publish 68-A.

        THE COURT:  68 is the disk, 68-A is the
transcript.

        MR. NAZZARO:  It's not a transcript, but it's a
recording?

        THE COURT:  Is there a transcript that goes with
it?

        MR. NAZZARO:  No, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No objection.

        THE COURT:  Let it be admitted.

(Recording playing.)

        MR. NAZZARO:  Your Honor, can we restart it.  I
don't think it was started --

        THE COURT:  Yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 120 of 444
Case 3:08-cr-00134-RJC   Document 52-1   Filed 01/30/11   Page 120 of 156

JA1575

DIRECT-GARCIA

MR. NAZZARO:  Okay.  Thank you.

(Recording playing.)

Q    (By Mr. Nazzaro) Now, did you stay after this happened or did you leave at that time?

A    No.  No.  I left shortly after.  I talked to the police, but then I left.

Q    Okay.

MR. NAZZARO:  Thank you.

THE COURT:  Any cross?

CROSS-EXAMINATION BY MR. BRYSON:

Q    You say that as you were walking into the restaurant, two people walked out.  And you couldn't see a gun, but you thought you saw a bulge under one of their shirts?

A    They were pulling -- yeah, one was pulling at his pants, like through the shirt.

Q    And they got into the burgundy jeep?

A    Right.

MR. BRYSON:  Those are my questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MS. ROSE:  The government will call Officer Altizer.

THEREUPON, BENJAMIN ALTIZER, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    If you would please, sir, introduce yourself.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 121 of 444
Case 3:05-cr-00134-RJC   Document 1574-1   Filed 03/30/11   Page 92 of 156
JA1576

DIRECT-GARCIA

A     My name is Corporal Benjamin Altizer.

Q     Where are you employed?

A     Greensboro Police Department.

Q     What's your position there at the police department?

A     I'm a patrol supervisor.

Q     How long have you worked for Greensboro Police Department?

A     Eleven years, 11 months.

Q     And were you working patrol back on December 8 of 2007?

A     No, ma'am, I was not.  I was working for the tactical special enforcement team at the time.

Q     What were your duties as a member of that team?

A     We were a street level narcotic, focused mainly on street level drugs.

Q     Did you receive a call or hear a call for service go out over your police radio regarding an incident at Las Jarochitas restaurant?

A     Yes, ma'am I did.

Q     What do you recall?

A     The call was initially dispatched as a fight in progress.  Later the dispatcher added notes they heard -- they were receiving reports shots were being discharged inside the business.

Q     Approximately what time in the evening was this on this particular date?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 122 of 444
Case 3:08-cv-00134-RJC   Document 12-41   Filed 01/30/11   Page 93 of 156
JA1577

DIRECT-GARCIA

343

A    It was dark outside around -- probably between -- around 7, 8:00 at night.

Q    Did you upon hearing that radio traffic or radio communication begin to respond?

A    Yes, ma'am.  My supervisor added us to the call at the time.

Q    Where were you at the time you heard this information being relayed over the radio?

A    I was on Merritt Drive, near High Point Road.  Maybe three -- 4/10ths of a mile from the business.

Q    When you got to the business, you said three or four minutes.  Where on High Point Road was that restaurant located?

A    It's maybe a quarter mile from the intersection of High Point Road and Holden Road.

Q    And what type of business is it?

A    It's a restaurant.

Q    And what type of location is that restaurant?

A    It's in a business district.  High Point Road has a lot of businesses, shopping centers, the mall for Greensboro is maybe a mile down the road.  Directly across the strip was a strip mall.  There's a Toys 'R Us just to the south of the restaurant.

Q    Is this restaurant the only building in that particular location or are there other buildings?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 123 of 444
Case 3:09-cr-00134-RJC   Document 12-41   Filed 01/30/11   Page 123 of 156
JA1578

DIRECT—GARCIA

A    This was the only business, but there's several surrounding buildings.

Q    When you got to the location of the restaurant what's -- what did you initially note?

A    There were several people standing in the parking lot. They appeared to be almost panicky.

Q    Were other law enforcement officers there yet?

A    No, ma'am there was not.

Q    Now were you working alone or did you have a partner on this occasion?

A    I had a partner at the time.

Q    Who was your partner?

A    Officer Dan Moore.

Q    Were you two riding in the same car?

A    Yes, ma'am.

Q    I want to show you what has been previously identified as Government's Exhibit 67.  Are you able to see 67 on the screen there?

A    No, ma'am.

Q    Is it now on the screen?

A    Yes, ma'am.

Q    What is shown in 67?

A    Front door to the business.

Q    Which business?

A    Las Jarochitas.

Laura Andersen, RMR 704-350-7493

JA1579

DIRECT-GARCIA

Q    And is this the location to which you responded on December 8th?

A    Yes, ma'am.

Q    Is that a fair and accurate representation of the front of that restaurant on that particular evening?

A    It is.

MS. ROSE:  Government would move to admit number 67, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

MS. ROSE:  May it be published?

THE COURT:  You may.

(Government Exhibit 67 was received into evidence.)

Q    (By Ms. Rose) When you got to the restaurant, were there -- was this particular car, a Chevrolet truck, was it parked there in that same position?

A    I don't remember if it was.

Q    There appears to be a blue tarp or something draped over the front of the restaurant; was that there when you arrived?

A    It was not.

Q    Immediately when you got there, did you get out and enter the restaurant?

A    Yes, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 125 of 444
Case 3:08-cr-00134-RJC   Document 152-1   Filed 03/30/11   Page 96 of 156
JA1580

DIRECT-GARCIA

Q    Did you speak to anybody that was outside?

A    No, ma'am I didn't.

Q    When you walked in the restaurant, what did you see?

A    I saw two -- looked like two males of Latino descent lying on the floor.

Q    How were the bodies positioned when you first saw them?

A    One was lying with his feet faced towards the entrance to the business.  The second had his head laying on the abdomen of the other individual.

Q    Did you immediately go to the two people you saw on the floor?

A    Yes, ma'am.

Q    What did you do?

A    I just looked -- I just took a quick assessment to see if I could administer any aid to the two individuals.

Q    What did you notice about their condition at that time?

A    It didn't look like I could do anything to help them.

Q    Was either one of them alive?

A    One would take a gasping breath about every 10 to 15 seconds.

Q    Which one?

A    It was the gentleman that was, I guess you would say on the bottom.

Q    Was anyone in the restaurant?

A    There was one additional person we located inside, he

Laura Andersen, RMR 704-350-7493

JA1581

347
DIRECT-GARCIA

appeared to be an employee.

Q    Where was he located?

A    In the kitchen.

Q    Other than that, the restaurant was empty?

A    Yes, ma'am.

Q    Initially, what -- other than what you've described relative to the victims there on the floor, what else did you notice?

A    That there was a juke box playing inside, and it was just -- it was exceptionally loud.  And after clearing people, we wanted to just go ahead and turn it off so we could speak with one another and speak with our dispatch.

Q    How long was it before anybody else arrived, either law enforcement or medical or fire?

A    Pretty -- as soon as we arrived, it wasn't long before other officers started arriving on scene.

Q    Did you stand by while the fire department, medics or the ambulance medic rendered any assistance?

A    Yes, ma'am.

Q    What did you observe?

A    They removed the two individuals from touching one another, and they placed heart monitor leads on both the victims.

Q    And at that point was any other additional medical attention given?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 127 of 444
Case 3:03-cr-00134-RJC   Document 15-4   Filed 01/30/11   Page 94 of 156
JA1582

DIRECT-GARCIA

A    I think they pronounced them deceased, both individuals.

Q    Are you still in the restaurant during this entire process?

A    Yes, ma'am.

Q    Had anyone else come into the restaurant by that time, other than the individuals who were giving medical assistance?

A    There was myself and two other police officers inside the business.

Q    Did you or the other officers or any of the medical personal, other than what they needed to do to render assistance to the victims, did they or you move or alter anything on the scene?

A    No, ma'am.

Q    Did you notice at that point, did you see any weapons, knives, guns, sticks, any type of weapons around the victims?

A    No, ma'am.

Q    Did you assist in securing the scene or calling for the crime scene investigators to arrive?

A    No, ma'am.

Q    What did you do then once EMS had come -- what did you do?

A    I stood by, waited for them.  And then maybe 15, 20

Laura Andersen, RMR 704-350-7493

349
DIRECT–GARCIA

minutes after the initial medical response, I was ordered to a different location by my supervisor.

Q    During the time that you were waiting, did you do anything to secure the entrance to the restaurant?

A    We just stood by in front of -- we weren't allowing anybody besides medical personal.  We kept all additional police officers, I guess patrol officers outside of the business.

MS. ROSE:  All right, sir.  Thank you.  I don't have any other questions.

THE COURT:  Any cross?

MR. FOSTER:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q    Is it pronounced, Altizer?

A    Altizer.

Q    Altizer.  Okay.  Sorry.  So you said that the initial call that you got -- excuse me -- that you responded to, there was a fight in progress at this restaurant?

A    The best I remember yes, sir.  The initial dispatch was a fight in progress.

Q    Okay.  And when you got inside the restaurant -- excuse me.  Sorry.  You said the only other person in the restaurant besides the victims was somebody who was back in the kitchen?

A    Yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 129 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 206 of 256
JA1584

DIRECT-GARCIA

Q    And you thought he was employee?

A    Yes, sir.

Q    What did you do with him?

A    We got him out of the business.

Q    What was his name?

A    I didn't ask him at the time.

Q    So you didn't follow-up any investigation with him about who he was or anything?

A    No, sir.

Q    You said the juke box was playing exceptionally loud when you came in there?

A    It was.

Q    And so you checked the victims.  One, you observed to be gasping for breath about every 10 or 15 seconds?

A    Yes, sir.

Q    And then how much time went from that point to when the EMS people entered the restaurant?

A    Maybe about a minute.

Q    And you said shortly upon their arrival they pronounced both of the victims dead?

A    Yes.

Q    And you mentioned that you were dispatched to another location, was that over to Merritt Drive?

A    Yes, sir.

Q    The General Greene apartments?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 130 of 444
Case 3:08-cv-00134-RJC   Document 53-4   Filed 01/30/11   Page 130 of 156
JA1585

351
DIRECT—GARCIA

A    I believe that's correct.

Q    Do you know what time you got over there?

A    Not exactly.  No, sir.

Q    How long -- do you know how long it took you to get over there from the restaurant?

A    It can take two to three minutes at the most.

Q    So would you say you arrived over at the General Greene apartments with an hour of your initial arrival at Las Jarochitas restaurant?

A    Yes, sir.

            MR. FOSTER:  No further questions.

            THE COURT:  Any redirect?

            MS. ROSE:  No.  Thank you very much, sir.

            THE COURT:  You may step down and be excused.

            Call your next witness.

            MS. ROSE:  Officer Dutko.

THEREUPON, RYAN DUTKO, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    Please state your name, sir.

A    Ryan Dutko.

Q    Would you spell your last name, please.

A    D-U-T-K-O.

Q    You may need to pull that mic a little closer.

A    Is that better?

Q    Yes, sir.  Where are you employed?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 131 of 444
Case 3:09-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 123 of 150
JA1586

DIRECT-GARCIA

352

A    Greensboro Police Department.

Q    How long have you worked at the police department?

A    A little over three years and three months.

Q    What's your position there?

A    Crime scene investigator.

Q    If you would, describe for the jury what your position requires?  What do you do in that role?

A    Our typical duties are to document a crime scene with photography and videography and written notes, sketches, if necessary.  And then to process for latent prints and trace evidence such as DNA, hairs, fibers.  And lastly we process for latent prints.

Q    Were you working in this capacity then back in December of '07?

A    Yes, ma'am, I was.

Q    Whenever you are called to a crime scene, do you have any particular role or do you take direction once you're there from someone else?

A    Typically on major calls, if I'm the first responding investigator, I'll be briefed by one of the first responding officers.  And then I'll stand by for our forensics team.

Q    And is the forensics team part of your unit?

A    Yes, ma'am, it is.  It's also called the homicide team.

Q    On this particular occasion, December 8 of 2007, did you receive a call to service at Las Jarochitas restaurant

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 132 of 444
Case 3:09-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 83 of 150

JA1587

DIRECT-GARCIA

in Greensboro?

A    Yes, ma'am, I did.

Q    Approximately, what time were you called?

A    Approximately 8:01 p.m.

Q    And do you recall the nature, specifically, what you were told?

A    At that point I was told it was a shooting.

Q    How far were you from the restaurant when you received the call?

A    I can't remember my exact distance; but my response time was nine minutes.

Q    Where is the restaurant located?

A    On High Point Road near Colby Street.

Q    When you got to the restaurant, what did you see?

A    The restaurant was part of a strip mall, a smaller building of a few stores at High Point Road and Colby Street.  I noticed that the front of the building, particularly the restaurant was blocked off with crime scene tape.  That were -- a lot of the public was outside of the tape.  There were several police vehicles, there were several civilian vehicles outside in the parking lot, outside the front entrance.

Q    I want to show you what's already been marked into evidence as Government Exhibit 67.  Do you see Exhibit 67?

A    Yes, ma'am, I do.

Laura Andersen, RMR 704-350-7493

354
DIRECT-GARCIA

Q   What is shown in 67?

A   This is the front of the restaurant and a civilian vehicle parked outside.

Q   Is this generally what it looked like when you arrived?

A   Yes, ma'am.

Q   Was the -- there appears to be a blue tarp or some kind of blue covering at the front of the restaurant was that already up?

A   Yes, ma'am.

Q   Do you know the purpose for placement of that tarp?

A   Yes, ma'am it was to keep the public from seeing into the crime scene.

Q   Initially, did you wait outside there in the parking lot or did you go ahead and go inside the restaurant?

A   I examined the front of the restaurant, however, I did not go inside until the response of the forensics team.

Q   Why did you wait?

A   Because all of my duties from there on out would be under the authority of the lead investigator on the forensics team.

Q   How long do you recall did you wait before a member of the forensic team arrived?

A   I believe it was about an hour.

Q   During that time were people coming and going?

A   Yes, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 134 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 01/30/11   Page 135 of 156
JA1589

355
DIRECT—GARCIA

Q    Inside the restaurant?

A    No, ma'am.

Q    Did you look inside to determine what the situation was or whether anyone was in there?

A    No, ma'am I didn't.

Q    Were there officers standing outside?

A    Yes, ma'am.

Q    Once you went into the restaurant, with whom did you go?  Who was with you?

A    I was with the forensic specialist Teresa Ketner and forensic specialist Carlton Phoenix.

Q    Prior to entering the restaurant, had you received any specific directions from either Ms. Ketner or Mr. Phoenix?

A    Before or after their arrival?

Q    Did you speak to them before they got there?

A    No, ma'am.

Q    Okay.  When they got there then, did you receive any direction from them?

A    Yes.  They wanted me to videotape the exterior of the crime scene.

Q    And is videotaping equipment, that's part of your duties?

A    Yes, ma'am.

Q    And you keep that equipment with you for that purpose?

A    Yes, ma'am I do.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 135 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/23/11    Page 135 of 150
JA1590

DIRECT-GARCIA

Q    At their request did you beginning to do that?

A    Yes, ma'am I did.

Q    What next did you do?

A    Once I videotaped the exterior of the crime scene, we proceeded inside to begin processing the interior.

Q    If you would, describe for us that procedure, how do you begin to process a scene or to collect evidence?

A    For this particular scene we entered in through the front entrance.  And before proceeding further into it, we would take videotape and photographs of the overall interior, documenting any potential evidence, prior to stepping into the crime scene.

Q    I'm going to show you Government's Exhibit 69.

     Government's 69; are you familiar with that photograph?

A    Yes, ma'am.

Q    Were you part of the team that took the photographs?

A    I did not take the photographs, but I was there with the team, yes.

Q    At what point would this photograph have been taken in the process that you just described?

A    Pretty close to the time that we entered through the front -- through the front door.

Q    And once again, had -- whenever you and the other members of the forensic team go into a scene, do you alter it in any way or change things prior to documenting it?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 136 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/30/11   Page 136 of 150
JA1591

DIRECT-GARCIA

A     No, ma'am.  The only change we may make is to put an evidence marker near a piece of evidence so that we can secure it and make sure it's not contaminated or altered in any way.

Q     And was that procedure followed on this particular occasion?

A     Yes, ma'am.

Q     You indicate that you were videoing; once you entered the restaurant did you continue to video the scene?

A     Yes, ma'am.

Q     Describe exactly the procedure that you followed doing so; how you moved about that particular location and documenting it.

A     I would start at the front door and do 180-degree pan of the entire interior to get the overall scene, stopping and zooming in on any items of evidence along the way.

Q     Did you do that throughout the entire premises?

A     Yes, ma'am.

Q     Did you go into the restrooms?

A     Yes, ma'am.

Q     Did you go into the kitchen area?

A     Yes, ma'am, only after we completed the dining area.

Q     So there's some methodology in how you document a particular scene?

A     Yes, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 137 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 01/30/11   Page 203 of 250
JA1592

DIRECT-GARCIA

Q    Once you had completed your recording, what did you then do with that recording?

A    Videotape was turned over immediately on scene to forensic specialist Ketner.

Q    And describe for the jury the procedures that you and the other forensic specialists utilize whenever you collect evidence?

A    When evidence is collected on a scene, it is turned over immediately to the lead investigator, to be turned in all under the same name, to keep a proper change of command -- I'm sorry, chain of custody.

Q    And once all that evidence is turned into one individual, do you know where it's maintained or how it's stored?

A    It is turned into our evidence section at 300 South Swing Road (phonetic) in Greensboro.

Q    Describe for the jury what that facility is?

A    It is a warehouse, a secure warehouse where any evidence that we submit is stored by evidence property personnel.

Q    Is it a locked facility?

A    Yes, ma'am.

Q    Is access into and out of that facility controlled?

A    Yes, ma'am.

Q    The movement of any evidence within that facility is

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

controlled by whom?

A    By evidence personnel only.

Q    Is there documentation required for any evidence that is checked into that facility maintained by the facility and then checked out of the facility?

A    Yes, ma'am.

Q    I will show you what I have marked as Government's Exhibit 70.  What is Government's Exhibit 70?

A    This is a CD copy of the videotape.

Q    And is that one of the ways that you maintain evidence on CD's as well as the videotape?

A    Yes, ma'am.

Q    Is the information contained on Government's Exhibit 70 a fair and accurate representation or the videotape that you made that evening?

A    Yes, ma'am.

        MS. ROSE:  I would move to admit Government Exhibit 70, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

        THE COURT:  Let it be admitted.

        MS. ROSE:  Government Exhibit 70-A, Your Honor, is a condensed version of that recording.  I would move to admit that, play that version for the jury at this time.

        THE COURT:  Any objection to that version?

Laura Andersen, RMR 704-350-7493

**JA1594**

DIRECT-GARCIA

MR. FOSTER:  No, Your Honor.

THE COURT:  You may.

(Government Exhibit 70 & 70-A were received into evidence.)

Q    (By Ms. Rose) Was there any sound to the recording?

A    No, ma'am.

(Video playing.)

Q    What roadway are we seeing in the videotape at this point?

A    High Point Road, ma'am.

Q    What's -- this obviously is inside the restaurant, from which perspective are you filming at this point?

A    This is looking in from the front entrance.

Q    And you began to the left of the doorway as you began filming?

A    Yes, ma'am.

MS. ROSE:  May we have just a moment, Your Honor. It appears we have lost the connection here.

(Pause.)

Q    (By Ms. Rose) and What are you focusing on at this point, Officer Dutko?

A    A surveillance camera.

Q    The markings seen in the video at this point, markings one and two why are they placed there?

A    They're denoting items of interest at that time.

Q    Any markings will denote, as you said, an item of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 140 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 01/23/11   Page 111 of 156
JA1595

DIRECT-GARCIA

interest?

A    Yes, ma'am.

Q    Is it fair to say that this has been condensed in some form?

A    Yes, ma'am.

Q    Cutting out some of the photos of the bodies?

A    Yes, ma'am.

Q    What are you focusing on?

A    That was the glass display case in the kitchen area.

Q    And in the wall there?

A    Suspected bullet damage.

Q    And display case there?

A    The same.

Q    Your focus here?

A    That would be the wall behind the display case.

Q    What's your purpose in filming here behind the cash register area?

A    There was the VCR for the surveillance equipment.

Q    And was there a tape in there or was that operating, to your knowledge?

A    No, it wasn't.

Q    In this photograph -- video?

A    This is the front wall of the kitchen area next to the glass display case, but the rear side of it.

Q    And where is this portion?  Clearly it's the kitchen,

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 141 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 112 of 150
JA1596

DIRECT-GARCIA

where is it located relative to the prepping area or the cooler area we saw just a moment ago?

A     This would be the area directly behind the back wall.

Q     At this point you've returned to the main portion of the restaurant?

A     Yes, ma'am.

Q     And which restroom is this?

A     This is the ladies restroom.

Q     And where is this located relative to the front of the restaurant?  What's between the front of the restroom and the front of the restaurant, if you recall?

A     I believe -- I believe that the cold prep area was between the ladies restroom and the dining room.

(Video concluded.)

Q     (By Ms. Rose) That fairly and accurately represents, in a condensed version, what you saw on the evening of December 8, 2007?

A     Yes, ma'am it does.

Q     After you had made this recording, what did you next do in the investigation?

A     My next assignment was to assist forensic specialist Ketner with measurements of any suspected bullet damage in the restaurant.  And once those were documented with photography, I was charged with collecting the suspected bullet out of the wall in the ladies restroom.

Laura Andersen, RMR 704-350-7493

363
DIRECT-GARCIA

Q    Did you do so?

A    Yes, ma'am I did.

Q    Once you had collected that from the wall in the ladies restroom, what did you do with it?

A    I turned it over immediately to forensic specialist Ketner.

Q    Is it packaged in some form at the moment you collect it?

A    Typically it's put in a coin envelope, which is a smaller version of our evidence envelopes.  And then put inside an evidence envelope.

Q    And is it sealed at that point, do you make notations in any way or do you let the individual to whom you provided that evidence make those notations?

A    That would be her responsibility.

Q    Where did you recover the slug or bullet in the ladies room?

A    It was in the corner by the sink, partially in the wall.

Q    Did you alter or modify that evidence in any way when you collected it?

A    No, ma'am.  I cut the wall around it.

Q    Once you had provided that evidence to Officer Ketner -- what did you then do?

A    My next duty was to collect DNA swabs from all of the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 143 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 14 of 150
JA1598

DIRECT—GARCIA

bottles and cans on the table in the dining area.

Q    What's the purpose in swabbing all of those items?

A    They were to confirm or refute witness reports of where subjects were located within the scene, at the time of the incident.

Q    And is that done on every crime scene?

A    Yes, ma'am.

Q    Is collected but not always utilized?

A    Yes, ma'am.

Q    After you had done that, what did you next do?

A    I turned the swabs over to her while I was on the scene -- and her, I'm sorry -- forensic specialist Ketner. And then I was charged with the duty of processing the bottles and cans, and the plastic table tops for latent evidence.

Q    Describe for the members of the jury what latent evidence is?

A    Latent evidence is fingerprints that can be left behind that are not visible to the naked eye.  It's left behind by a mixture of contaminants and oils along with a mixture of water, that gets left on your skin during the day.

Q    Are all surfaces suitable for the collection of latent or fingerprint evidence?

A    No, ma'am.

Q    And in your training and experience, every time you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 144 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 03/30/11    Page 15 of 150
JA1599

DIRECT—GARCIA

touch something, is a good print left behind?

A      No, ma'am.

Q      Describe the process that you used to collect the fingerprint evidence?

A      Typically I will use a fiberglass brush, coated with a powder that consists of metallic parts, and I believe it's volcanic ash.  And the brush will be dipped into the powder, and then gently applied to the surface that's being processed.

Q      And again, what areas -- from what areas of the restaurant did you perform this process to collect evidence?

A      I performed it on any of the bottles and cans on the tables in the dining area, the plastic table covers on the dining area, and the interior of the front door.

Q      And did you do this for the entire restaurant, as far as the plastic covers on the tables in the dining area; did you do that at every table in the restaurant?

A      The central dining area.

Q      And why did you select just the central dining area?

A      That's reportedly where the victims and the suspects were seated.

Q      Was there evidence on the booths on the surrounding walls that there had been other individuals in the restaurant, other than just those in the center of the restaurant?

Laura Andersen, RMR 704-350-7493

Case 3:09-cv-00134-RJC    Document 52-4    Filed 01/03/11    Page 116 of 156
JA1600

A    Yes, ma'am.

Q    You said you -- along with the bottles, cans or glasses and table tops, you also collected evidence from the front door, why there?

A    It was reported that the suspects left through the front door --

MR. BRYSON:  Object to what was reported, Your Honor.

THE COURT:  Again -- overruled.

But again, ladies and gentlemen, what was reported to this witness is not offered for the truth of the matter, but just simply to explain to you why he did what he did.

You may continue.

THE WITNESS:  Thank you.

It was reported that the suspect left through the front door, returned through the front door, and then fled through the front door finally.

Q    (By Ms. Rose) At the time that you were collecting evidence or attempting to, whether you did or not there at the front door, did you notice any damage to the door?

A    No, ma'am there was no damage.

Q    I'm going to show you what has been marked as Government's Exhibit 71.

Are you able there to see Exhibit 71?

A    Yes, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 146 of 444
Case 3:08-cr-00134-RJC   Document 59-4   Filed 01/30/11   Page 147 of 150
JA1601

DIRECT-GARCIA

Q    Can you tell what Exhibit 71 is?

A    It's what we call a latent lift card.  It's a white card that we place our lifting tape on when we have secured latent fingerprints or palm prints.

Q    Is that your method of once collecting evidence so it can later be potentially analyzed?

A    Yes, ma'am.

Q    Is Exhibit 71 a fair an accurate representation of prints which you collected on December 8, 2007?

A    Yes, ma'am.

        MS. ROSE:  Government would move to admit 71.

        THE COURT:  Any objection?

        MR. BRYSON:  Object; appears to have been altered.

        MS. ROSE:  Subject to connection, Your Honor.

        THE COURT:  I will require you to wait for the connection.  Just --

Q    (By Ms. Rose) I will also show you then Government's Exhibit number 72.  What is Government's Exhibit 72?

A    It's another lift card.

Q    Are these lift cards that you collected and prepared and maintained as evidence?

A    Yes.

Q    Once you had collected your prints on this particular evening, do you recall how many lifts actually you made throughout the restaurant?

                    Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

A    The number of lift cards I remember is 14.  I do not remember exactly how many lifts were on each card.

Q    There are -- there's the possibility of more than one lift per card?

A    Yes, ma'am.

Q    In other words, the tape that you used, if the card has enough room, you can stick that tape to the card; is that fair to say?

A    Yes, ma'am.

Q    Once you had completed the task of searching and collecting latent evidence, what did you next do?

A    I packaged them in my own latent evidence envelope, and I turned them directly into the latent section myself.

Q    When you say the latent section, what do you mean?

A    It's a separate section of our lab, other than the evidence section that's a secure facility.  They store latent prints, unknown prints collected at scene, and cards of when you roll fingerprints, they store them as well.

Q    And is that -- when you say our latent print section, that is actually part of the crime investigators section at the Greensboro Police Department?

A    Yes, ma'am.

Q    Once you turn them into that particular section, are they maintained there?

A    Yes, ma'am.

Laura Andersen, RMR 704-350-7493

JA1603

DIRECT–GARCIA

Q    Do you know how they are maintained?

A    No, ma'am, I don't.

Q    What else did you do on the scene this particular evening?

A    I believe that's all, ma'am.

Q    During your examination of the crime scene, did you note any weapons around the bodies of the victims?

A    No, ma'am.  I believe I noted a cell phone and a set of keys.

Q    Did you note any broken bottles, or bottles on the floor scattered about the restaurant?

A    No, ma'am.

        MS. ROSE:  Thank you, very much, sir.

        I have no other questions of this witness.

        THE COURT:  Cross?

        MR. BRYSON:  No questions, Your Honor.

        THE COURT:  You may step down; be excused.

        Call your next witness.

        MS. ROSE:  Able Santos.

THEREUPON, ABLE SANTOS, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    If you would please, sir, state your name.

A    Abel Santos.

Q    Mr. Santos, do you live in the Greensboro/Winston–Salem area?

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 149 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 01/30/11   Page 20 of 150
JA1604

DIRECT-GARCIA

A    Yeah.

Q    Are you in school?

A    Yeah.

Q    You're in high school?

A    Yes.

Q    Will you graduate this year?

A    Yes.

Q    Do you also work?

A    Yes.

Q    What type of work do you do?

A    I'm a sales associate at a grocery market.

Q    Do you have another job?

A    Yeah.  In a company for sanitation.

Q    So you go to school and work two jobs?

A    Yeah.  Um-hmm.

Q    Back in 2007, did your parents own a restaurant called Las Jarochitas?

A    Yes, ma'am.

Q    Where is that restaurant located?

A    It's on High Point Road.  I can't remember the number, 3531 I think.

Q    What's it near?

A    Toys 'R Us.  Bojangles, Goodwill.

Q    You say High Point Road, what city?

A    Greensboro.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 150 of 444
Case 3:08-cv-00134-RJC   Document 52-4   Filed 01/03/11   Page 21 of 150
JA1605

DIRECT-GARCIA

Q    Did you work at the restaurant?

A    Yeah, as a host and a cashier.

Q    How often did you work at the restaurant?

A    We were barely making a year so like a year.

Q    That your parents had owned the restaurant?

A    Yes.

Q    Not quite a year?

A    It was -- I can't really remember, but it was -- we had -- we were barely making a year.

Q    Okay.  During that time that your parents owned the restaurant, how frequently did you work?

A    Every weekend and sometimes during the week after school.

Q    Always as a host or cashier?

A    Yeah.

Q    Did you help out in other ways in the restaurant?

A    Yeah, like washed dishes.

Q    Did -- I'm going to show you what has been marked as Government's Exhibit 7, already admitted -- excuse me, 67.  And ask if you're able to identify Exhibit 67?

A    Yeah.  That was --

THE COURT:  You can tilt that up, enable you to see it better.

THE WITNESS:  Yeah.  That was Manuel's truck.

Q    (By Ms. Rose) All right.  So you actually knew the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 151 of 444
Case 3:09-cr-00134-RJC   Document 1244   Filed 01/30/11   Page 223 of 256
JA1606

DIRECT-GARCIA

owner of that truck?

A    Yeah.  He was -- he was a customer.  He would come regularly.

Q    All right.  And where is that truck parked?

A    In front of the restaurant.

Q    And the restaurant, is that fair to say it's at the end of a strip mall, that there were other small businesses also in the building?

A    Yeah.  Like before it was beside us used to be a mattress, Mattress Firm.  But that's it.

Q    All right.  And to the right, looking at the photograph, the sign in the background is for what business?  There's a lit sign.

A    Where?

Q    In the right hand side of your photograph.

A    Oh, Toys 'R Us, yes.

Q    So it was close by?

A    Oh, yes.

Q    Was there a roadway between the Toys 'R Us and the restaurant, was it a parking lot?

A    It was a parking lot.

Q    How large was your family's restaurant?

A    It was -- it was small.  It wasn't like big.  But it held like 16 tables, 16, 17 tables.

Q    All right.  And you said your parents owned it.  Did --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 152 of 444
Case 3:09-cr-00134-RJC   Document 59-4   Filed 01/30/11   Page 23 of 150
JA1607

Appeal: 10-6    Doc: 90-4    Filed: 08/14/2013    Pg: 153 of 444

did you have other family members who also worked at the restaurant?

A    Yeah.  My aunt used to be a waitress.

Q    Did your sister work there from time-to-time?

A    And my sister, yeah.

Q    I call your attention to December 8 of 2007, were you working on that Saturday?

A    Oh, yeah, since they opened.

Q    And you mean since they opened, what do you mean?

A    We used to open at 9:00 a.m.

Q    Did your -- did the restaurant serve breakfast?

A    No.  It was just same food all day, we would have lunch specials.

Q    But you go in to begin preparing for the lunch hour in the morning?

A    Yeah.

Q    What type of restaurant was it?  What type of food did you serve?

A    It was Mexican food and seafood.  We served some seafood.

Q    Were any of your other family members working on this Saturday, December the eighth?

A    Yeah, my parents.  But we -- they owned a house, like right behind the restaurant.  And at that moment they were -- they were fixing the house because it was messed up.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-4    Filed 03/23/17    Page 153 of 444
Case 3:09-cv-00134-RJC    Document 52-4    Filed 01/05/11    Page 24 of 150
JA1608

DIRECT—GARCIA

They were painting it, so they weren't there at that moment that everything happened.

Q    They had been there at some point during that day?

A    Yeah, in the morning they opened.

Q    Had you been there throughout the course of the entire day?

A    Yeah.

Q    Was your sister working on this particular day?

A    Yeah.  But she came in the afternoon.  Like around 6, I think she came.  I can't really remember.  She wasn't there in the morning.

Q    When your sister came in, was anyone with her?

A    Yeah.  Her sister-in-law, her little son.

Q    How old was your sister's son at the time?

A    He was like months old, I can't remember.  But he was still a baby.

Q    In a baby carrier, do you remember?

A    Yeah, he was still a baby.

Q    Late afternoon or early evening, did you see the individual you previously referred to as Manuel?

A    Yeah.

Q    Who was he with?

A    He was with his brother and some co-workers.

Q    Do you recall where they were sitting in the restaurant?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 154 of 444
Case 3:09-cv-00134-RJC    Document 52-4    Filed 01/05/11    Page 25 of 150
JA1609

DIRECT-GARCIA

A     Yeah.  When you go in the restaurant, they be like a table -- there's a middle section.  They be like two rows of tables.  He was on the right row, the first one.

Q     Do you recall how many were seated at their table?

A     Like five or six.

Q     And you said they were co-workers; how did you know that?

A     Cause he had came in before.  We would talk to him.  We were friends.  He was like a family friend.

Q     How often did Manuel eat in the restaurant?

A     He would come often, like every day.  Sometimes he'll come by himself.

Q     On this occasion you said that his brother was there. Did you know his brother?

A     Yeah.  Ruben.

Q     And did Ruben come to the restaurant frequently?

A     Yeah, with Manuel.  He would bring his son.

Q     Who would bring his son?

A     Ruben.

Q     How old was Ruben's son?

A     I don't know.  He was like -- he was young.  He was like six, or he looked like six.  I don't know his age.

Q     He was small?

A     Yeah, he was small.

Q     On this particular Saturday, did Ruben have his son

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 155 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 03/23/11   Page 26 of 156
JA1610

DIRECT-GARCIA

with him?

A    No, he didn't come that night.

Q    Did you know any of the persons that you called co-workers, did you know any of the other people sitting at the table with Ruben and Manuel?

A    No we didn't know them that much -- or I didn't know them that much.  I just know Ruben and Manuel and his little boy.

Q    All right.  During time you had gotten to know Ruben and Manuel there in the restaurant, what kind of customers were they?

MR. BRYSON:  Object.

THE WITNESS:  They were friendly.

THE COURT:  Overruled.

THE WITNESS:  They were friendly.

Q    (By Ms. Rose) Did you ever have any problems?

A    With Manuel, no, or Ruben.

Q    Okay.  While they were there in the restaurant, were they eating and drinking?

A    Yeah.  They had ate first than drank.

Q    And is there a juke box in the restaurant?

A    Yeah.  In the middle section towards the back.

Q    What kind of music was on there on this particular player?

A    It was any type, like it wasn't just one specific type

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 156 of 444
Case 3:08-cv-00134-RJC    Document 52-4    Filed 01/30/11    Page 275 of 250
JA1611

DIRECT-GARCIA

of music.  It was -- you just had to research -- you had to search the song you wanted, and it would like play it for you.

Q    But it was one of those you had to pay --

A    Oh yeah.

Q    -- to play the songs?

A    Yeah.

Q    Do you recall on this particular evening, early evening, late afternoon, were there other people in the restaurant?

A    Yeah, there was.  There were -- yeah, there was a couple people.  I mean it wasn't full or anything.  But there was a couple people in the restaurant.

Q    And as it got closer to the dinner hour, did more people tend to -- did more people come in?

A    Yeah.  There was people that had came in, and people were still coming.  Like some people didn't get to come in or --

Q    All right.  Later that evening there were people outside, is what you're saying, that weren't able to come in and eat?

A    Yeah.  Yeah.

Q    All right.  While Ruben and Manuel were in there dining, were they at one table or were there two tables pushed together?

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 157 of 444
Case 3:08-cv-00134-RJC    Document 324    Filed 01/30/11    Page 23 of 156
JA1612

378

DIRECT-GARCIA

A    There was two tables.  Cause each table holds just four.  There were like six of them, five or six of them.

Q    Were there any other people at some point seated in the center of the restaurant as well?

A    Yeah.  They were in front of the juke box.  There's a table in front of the juke box or beside it, and they were sitting there.

Q    How many were initially there, if you recall?

A    Three.

Q    Did they come in before or after Manuel came into the restaurant?

A    It was after.

Q    Those three were sitting there, were they later joined by others?

A    Yeah.

Q    How many?

A    Like three or four, I can't remember.  There was like a second, he had like a second group.

Q    And do you recall how much time had passed between the first group came and they sat by the juke box and then the second group joined them?

A    Like half a hour, I'm not really sure.

Q    Okay.  Did you know -- in the first group of people there by the juke box, did you know any of those?

A    Yeah, like two.

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 158 of 444
Case 3:08-cv-00134-RJC    Document 52-4    Filed 01/30/11    Page 29 of 150
JA1613

379
DIRECT-GARCIA

Q    Did you know them by name or just by photograph or just by -- excuse me, not photograph, but by seeing them?

A    Yeah.  I knew one.  And the other one, I can't remember his name now.  But there was two of them they would come like -- or that I remember, you know.  And one of them was called Spider, and the another one I can't remember his name no more.

Q    I'm going to show you -- I'm going to show you Government's Exhibit number 12, first.  Photograph has already been admitted.  Do you recognize anyone in that photograph?

A    Yeah, him.

Q    The guy you just marked the blue next to?

A    Yeah.

Q    Was he in the restaurant on this particular evening?

A    No, he wasn't.

Q    But he'd been in there before?

A    Yeah.

Q    I'll show you next Government's Exhibit 45, it's been previously admitted.  Do you recognize the individual in Government's Exhibit 45?

A    Yeah.  That's the other person that I remember.

Q    Was this person -- did you know his person's name?

A    No.  That's the person I can't remember his name, but he had been in the restaurant before.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 159 of 444
Case 3:08-cr-00134-RJC   Document 522-4   Filed 01/30/11   Page 309 of 564
JA1614

DIRECT-GARCIA

Q    Was he there on this particular evening?

A    Yeah.

Q    Was he in the first or second group?

A    I think it was the first.

Q    Show you Government's Exhibit 21.

A    Yeah.  He was in the second group.

Q    This individual was in the second group that came in?

A    Yeah.

Q    And finally Government's Exhibit 188.  Had you ever seen the person in Government's Exhibit 188?

A    No, I don't remember.

Q    Very good then.

After the second group came in and joined the first group by the juke box, what if anything did you notice?

A    After the second group came in?

Q    Yes.

A    ,Well they were putting music in the juke box.  At that time I think Manuel's kind of music was playing.

Q    What kind of music did Manuel listen to?

A    Corrida.

Q    Fair to say, kind of Mexican country music?

A    Yeah, Mexican.

Q    And is that music that Manuel often listened to in the restaurant?

A    Yeah, every time he came.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 160 of 444
Case 3:09-cv-00134-RJC    Document 52-4    Filed 01/30/11    Page 31 of 150
JA1615

DIRECT-GARCIA

Q    All right.  And so that music was playing, what happened?

A    They were drinking.  I think Manuel got upset because his music was stopped playing or had finished.  And it was other type of music playing, he didn't like it.  And I think -- so he demanded -- like when he -- when he would be drunk, he would be very cocky, very demanding.  That was his only problem.

Q    Did he create problems?

A    No.

Q    He was frequently in the restaurant, so he felt -- is it fair to say he felt rather comfortable there?

A    Oh, yeah, yes.

Q    Did -- was something said between the two parties regarding this music change?

A    Oh, Manuel had said he didn't like the music.  He wanted us to change it.  And he like demanded for us to change it.  And like, he didn't like it.

Q    Okay.  And then what happened?

A    I mean, I can't remember if that was -- that's what started the argument, I don't recall, because the juke box was still playing.  But I mean, that's when just everybody started getting upset over the middle section started getting upset.

Q    What was said or what did you see?

DIRECT-GARCIA

A    The group by the juke box, one of them had stood up.

Q    Did you know the one that stood up?

A    Yeah.

Q    Who was that?

A    Spider.

Q    I'm going to show you Government's Exhibit 78.  Do you recognize anyone in Government's Exhibit 78?

A    Yeah.  That was him.

Q    That was who?

A    That was Spider.

Q    And you indicated that you had seen him in the restaurant before?

A    Oh yeah.  He used to come in before.

Q    Did you know what kind of car Spider drove?

A    Oh, Expedition.

Q    What color?

A    White.

Q    Is this a photograph, a fair and accurate representation of what Spider looked like?

A    Yeah.

        MS. ROSE:  The Government would move to admit 78, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No.

        THE COURT:  Let it be admitted.
                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 162 of 444
Case 3:08-cr-00134-RJC    Document 224    Filed 01/06/11    Page 36 of 150
JA1617

383

DIRECT—GARCIA

(Government Exhibit 78 was received into evidence.)

Q    (By Ms. Rose) You said that Spider stood up.  What did he do?

A    Well, I couldn't hear him, but he was being aggressive by the way he was looking, like his movement, whatever.

Q    And when you say his movements were aggressive, what did you observe?

A    Well, he was mad.  He had gotten upset.  I don't know.  But there was the other guy that I remember, he was trying to calm him down.

Q    Which other guy that you remember?

A    You showed me a picture.  I don't remember his name, it was the short chubby one, chunky.

Q    Let me show you --

A    Yeah, him.

Q    So the individual in Government's Exhibit 45 was trying to calm Spider down?

A    Yeah.

Q    Could you see what he was doing?

A    Who, Spider or?

Q    This person.  What was he doing to try to calm Spider?

A    He was trying to telling him to let it go.  I didn't hear him, but he would try to like sit him down.

Q    At this point were Manuel and Ruben, were they seated at their table?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000557-MOC    Document 50-4    Filed 03/23/17    Page 163 of 444
Case 3:08-cr-00134-RJC    Document 1244    Filed 01/30/11    Page 346 of 150

JA1618

A    Yeah.  They were still sitting -- no, Manuel he had stood up.

Q    Did he send anything over to the other table?

A    Oh yeah.  When they were arguing, Manuel tried to calm him down.  He tried to like --

Q    What did Manuel do to try to calm things down?

A    He had offered some beers, like a bucket of beers.  A bucket of beers brings like six -- six beers of your choice.  And he had told one of the waitresses just, you know, take them a bucket of beer.  Just forget about it.  Like forget it ever happened.  Try to let it go.

Q    And after Manuel made this offer to calm the situation, what did Spider and the others do?

A    I don't remember.  But I know they didn't drink it.  They didn't bother with it.  They didn't say thank you.  Like, they didn't take it or not.  They didn't take it.  I can't remember exactly what happened.  I just know -- I just remember from when they were walking out, I remember the second group was leaving, they were --

Q    And describe how that took place.  How did it take place that part of the group was leaving?  Did anyone get involved or intervene as the words were being exchanged?

A    Oh yeah, my sister.

Q    What did she do?  What did you see?

A    Well, she was trying to calm them down, telling them to

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 164 of 444
Case 3:08-cv-00134-RJC    Document 244    Filed 01/30/11    Page 135 of 150
JA1619

DIRECT-GARCIA

leave, like we don't want no problems.

Q    Who was she telling to leave?

A    The second group.

Q    The ones by the juke box?

A    Yeah.

Q    And did you see her interacting with them trying to get them to leave?

A    Yeah.

Q    And what -- what was happening?

A    I mean, they were leaving.  They had got nothing.  They were leaving.  But they were like, exchanging words.  And Ruben didn't like that.  So he got upset and --

Q    How did he get upset, did he stand up?

A    Yeah.  He was saying that he wasn't scared of them or whatever, right, so he --

Q    Did you --

A    He got up.  And he was just saying, he wasn't really scared, like --

Q    Well, did you hear anything that the group sitting by the juke box that your sister was trying to get them to leave, did you hear them saying anything?

A    Yeah.  Not to mess with them, like.

Q    What specific -- you can say what they said or what you heard.

A    Oh, to not -- to not mess with them because they were

Laura  Andersen,  RMR  704-350-7493

Case 3:16-cv-00057-MOC   Document 59-4   Filed 03/23/17   Page 165 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 01/30/11   Page 165 of 150
JA1620

DIRECT-GARCIA

from a certain gang, from MS.

Q    Did you see them make any signs or move their hands about?

A    I don't remember.

Q    When they said that, what did Ruben say?

A    Oh, that he wasn't scared.  That's when he got upset. He wasn't scared.  Told him that it was all fake to him.

Q    Ruben said that what was fake to him?

A    The gang.

Q    What happened?

A    Ruben got up, like ready to like -- like fight, get physical with them.  And that's when my sister and she had called the cook -- or one of the waitresses had called the cook, like the male cook.  He came up to the front, like try to kick them out.

Q    Kick who out?

A    The group by the juke box.

Q    Was the group by the juke box the ones saying they were MS?

A    Yeah.  Yeah.

Q    Okay.

A    And he managed to get all of them out except for one, and that's the one that shot.

Q    What did -- what did the one that shot, what did he look like?  What did you notice?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 166 of 444
Case 3:08-cr-00134-RJC   Document 1244   Filed 01/30/11   Page 37 of 150
JA1621

DIRECT-GARCIA

A    Oh, he had tattoos on his face.

Q    Where?

A    One middle of his eyebrows, and one on each eyelid.

Q    Describe exactly what you saw and what you heard at that point?

A    Well, my sister and the cook had locked them out, they locked the doors.  The people outside that stayed outside, the group that stayed outside, got mad.  They had gotten mad.  They had gotten upset because they left the defendant inside by himself.  But at the same time, my sister got locked out with them, cause the cook was the one that looked the door.

Q    And your sister was locked outside with them?

A    Yeah, with them.

Q    So what happened?

A    She was trying to get inside.  So the cook let her back inside.

Q    When she came in, did anybody else?

A    Yeah.  Like two or three came back in.

Q    Describe what happened?

A    I'm trying to remember.  I think once they came in, my sister was trying to pull the defendant out and --

Q    And the person you're calling the defendant, which person is that?

A    The one that shot -- the one that stayed inside, the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 167 of 444
Case 3:08-cv-00134-RJC    Document 124-2    Filed 01/06/11    Page 38 of 156
JA1622

DIRECT-GARCIA

tattoos on his face.  And I think Spider grabbed her, and pushed her off and was like, you know, don't touch him. Something like that.  I don't recall.

    And I remember -- well, I remember before that told me to call 911, but I didn't.  I didn't think nothing would happen.  Nothing ever happened.  Last thing you expect, and so I didn't.  But I don't know -- I don't know if that's when he pulled out the gun.  But I remember there was still some people still inside when he pulled it out.

Q    And where were you standing at this point, Abel?

A    I was by the cash register.

Q    Let me show you an exhibit, do you recognize what's shown in Government's Exhibit 74?

A    Yeah.  That was the door right there.  That was the register.

Q    All right.  Let me ask you this before you go on.  Is that a fair and accurate representation -- is that a good picture of what the restaurant looked like on that particular night?

A    Oh yeah.

        MS. ROSE:  I move to admit 74 and publish that, Your Honor.

        MR. BRYSON:  No.

        THE COURT:  Let it be admitted.  You may publish.

(Government Exhibit 74 was received into evidence.)

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 168 of 444
Case 3:08-cr-00134-RJC   Document 244   Filed 01/06/11   Page 39 of 150
JA1623

DIRECT—GARCIA

Q    (By Ms. Rose) Tell us in relation to the gum ball machine's there.  Where is the door?

A    Right here.

Q    You can touch the screen, it will show.

A    I'm touching.

        COURT CLERK:  Try it again.  There you go.

        THE WITNESS:  Right here.

Q    (By Ms. Rose) You've drawn a red arrow pointing toward the doorway?

A    Yeah.

Q    And at this point that we've gotten to in your testimony, where are you standing?

A    Right here.  By where that three is at.

Q    About where the yellow three marker on the floor is?

A    Yeah.

Q    That marker wasn't there at the time; is that fair to say?

A    No, it wasn't.

Q    All right.  And where was your sister standing?

A    Oh, she was like right in front of them, like by the door.  Like I can't see it here.  But it was by the door.

Q    Okay.  And the person you referred to as the defendant with the eyelid tattoos, where was he standing?

A    Oh, he was right in front of the door.  It was like a whole group in front of -- like two or three in front of the

                    Laura Andersen, RMR 704-350-7493

JA1624

DIRECT-GARCIA

door, including my sister.

Q    And so as you were standing over here in front of the cash register area, what did you see?

A    Oh, I saw -- when he pulled it out, when he pulled the gun out.

Q    How did that -- describe how -- what happened at that point?  What did you see?

A    Oh, my sister ran, like.

Q    Well, no.  You said he pulled the gun out.  Describe that -- that event, that action?

A    Oh, he -- he just pulled it out of nowhere.  Like he pulled it out, and he pointed it at Ruben and Manuel.

Q    And where were Ruben and Manuel at that point?

A    They were like -- they were not at their table, but they were like in front of their table.

Q    And how far -- going to show you Government Exhibit 77. This is obviously after the events you're describing, but what's the perspective.  The picture is taken looking in what direction in the restaurant?

A    It was like -- it was like, if you were standing in the back.  You were looking at like -- like the doorway that way.  And you're in the back.  The doorway that way and you're in the back.  So it's like in back of the restaurant.

Q    Now, where you were standing at the cash register area?

A    By the cash -- by the cash register, the wooden wall.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 170 of 444
Case 3:09-cv-00134-RJC    Document 59-4    Filed 01/28/11    Page 170 of 156
JA1625

DIRECT-GARCIA

I can't see the picture no more.  Yeah.  By where the three is at, there's like a wooden wall right there.

Q    And the wooden wall, is that a half wall?

A    Yeah.  It's a half wall.

Q    And behind that wall, is that the center part of the restaurant?

A    Yeah.  On the other side of it there was another wall -- half wall and that was the middle section.

Q    Ruben and Manuel were in that middle section still?

A    Yeah, they were.

Q    And you said that the defendant pulled out the gun; describe how he was holding the gun?

A    Like sideways.

Q    Hold up your hand.

A    (Witness indicating.)  Like it wasn't straight, it was sideways.

Q    Turned sideways?

A    Yeah.

Q    How far were you from the person holding the gun, the defendant, at this point?

A    Well, he was at the door and I was at the cash register.  That wasn't really far.  That was like, I don't know, I wouldn't -- it was like if I'm -- like if the door, I'm the door -- I'm by the door, and I was like -- like by the end of the desk, it wasn't really far.

Laura Andersen, RMR 704-350-7493

DIRECT—GARCIA

Q    The desk in front of you?

A    Yeah.

Q    When the gun was pulled out and held sideways, was there any shouts at that moment or was there anything said?

A    I don't really remember.  But I mean he pulled it out, and he didn't start shooting right away.  He stood there for --

Q    Where was the gun pointed?

A    Towards Manuel and Ruben.

Q    And what were Manuel and Ruben doing at that point?

A    They just stood quiet.  Like I guess they were in shock.  I don't know.  They didn't say anything.

Q    Did they make a motion or move toward?

A    No.  They just stood still.  They didn't try to run or anything.  They just stood still.

Q    And at that moment as everybody was standing still, did you hear anything said?

A    Not that I could remember.

Q    And what happened?

A    That's when he stood -- I mean, he didn't take minutes.  I mean, it was all in one minute.  But he -- he didn't start shooting right away.  I don't know if he said something, I can't really remember.  But he stood there for a minute.  But after the first shot, that's when I ran.  Like, I didn't see the rest.  I just saw when -- when he shot Ruben.  Ruben

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

was the first one he shot.

Q    What did you see?

A    He shot Ruben, Ruben fell back.  It like threw him back.  He just fell back.

Q    And at that point, did you see what other people in the restaurant are doing?

A    Oh yeah, one of them -- Manuel's co-workers, I see him on the half wall, the half wooden wall, he jumped over it, like try to cover himself.  But that was -- when he shot the first time, that's -- I started running towards the back. You know, when I was running, that's when I saw him.  That's when I saw the other guy.  But I started ducking, like try to cover myself with that half wall.

Q    Ran along the half wall?

A    Yeah.

Q    Are there booths to the side --

A    Yeah.

Q    -- of the half wall?

A    Yeah.

Q    Between -- the half wall runs, it fair to say, between the booths and the center of the restaurant?

A    Yeah.

Q    How many more shots did you hear as you were running along -- were you crouched down, close to the ground?

A    Yeah.  You know -- and like three or four including the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17   Page 173 of 444
Case 3:09-cv-00134-RJC    Document 50-4    Filed 01/30/11   Page 173 of 150
JA1628

DIRECT-GARCIA

first one, Ruben's.  Like three or four shots, I heard.

Q     But where did you go as you ran?

A     Towards the back where the kitchen is at.

Q     Did you see your sister?

A     Oh yeah.  She was already -- she was already back there by the exit.

Q     Where was your sister standing were when the shooting began?

A     Right in front of the defendant.  Right in front of the group, the MS group.

Q     And when the defendant pulled out the gun started shooting, what did your sister do?

A     Oh, she ran.  She didn't think about it twice, she just ran.

Q     Where did she run to?

A     Towards the back.

Q     And did she stop and get anything?

A     Yeah.  Her little son.  Cause her son was there on the -- the last booth at the back.

Q     I'm going to show you real quick, Government's Exhibit 86.

A     Yeah.  Right there.  Yup.

Q     Is that a fair and accurate representation of the restaurant that evening?

A     Yeah.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 174 of 444
Case 3:08-cr-00134-RJC    Document 224    Filed 01/30/11    Page 45 of 150
JA1629

DIRECT-GARCIA

MS. ROSE:  I move to admit 86.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 86 was received into evidence.)

Q    (By Ms. Rose) Government's 86.  Where is the booth there with the baby carrier in relation to the front of the restaurant, to the register?

A    Well, it's -- that's the back.  Like this wall right here -- yeah, this wall right here, is going towards the kitchen, towards the back.  And if you just keep on walking down this, the register is right there.  You'll see the Christmas tree and the register right beside it.

Q    Did your sister run -- you marked on the screen a red marking right between the half wall and the booths.  Did your sister run that way or did she run right through the middle section?

A    Yeah, she ran right through the middle section.

Q    By where Manuel and Ruben were standing?

A    The what?

Q    By where --

A    Oh yeah, yeah.

Q    When you ran to the back of the restaurant, where did you particularly go?  Where did you go?

A    I went through this -- I went through this way.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 175 of 444
Case 3:08-cv-00134-RJC   Document 224-4   Filed 01/30/11   Page 46 of 150
JA1630

DIRECT-GARCIA

This -- this way.  I ran towards the back, you know, by where the kitchen is -- yeah, through here.

Q    What is shown -- I've now put on your screen Government Exhibit 77.  What do you see in Exhibit 77?

A    Well, this way was the cooler, that was the sink where -- like we washed the food, like the frozen food.

Q    Let me ask you this, is that a fair and accurate representation of the back of the restaurant?

A    Oh yeah.

MS. ROSE:  Move to admit 77, Your Honor.

THE COURT:  Let it be admitted.

MR. BRYSON:  No objection.

(Government Exhibit 77 was received into evidence.)

Q    (By Ms. Rose) You marked the cooler and the washing area; did you run through this area?

A    Oh yeah.  Right towards the back, the exit.

Q    And then what's in that back room?

A    Just like, there's a office back there.  But we used to use it to put like brooms, all like, the sanitation stuff.

Q    Is there a doorway to the outside from that back room?

A    Yeah.

Q    Where the exit sign is?

A    Yeah.

Q    When you ran to the back room, was anyone else there?

A    Well, they were already outside.  They were outside.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 176 of 444
Case 3:09-cr-00134-RJC    Document 1244    Filed 01/30/11    Page 176 of 456
JA1631

DIRECT-GARCIA

Q    And when you say outside, through the doorway?

A    Yeah, through the doorway.

Q    In that back room?

A    Yeah.

Q    And where does that doorway lead to?  When you step outside the door, what's there?

A    It was like a big parking lot and a dumpster.

Q    I'm going to show you Government's Exhibit 118.

A    That's the side of the restaurant.

Q    Is the back door further beyond there?

A    Yeah.  Like more over there.

Q    At the back you said there were some dumpsters.  While you were waiting there at the back door, who else was there?

A    The employees, the waitresses, the cooks.  There were two cooks, me and my sister, and my sister's sister-in-law.

Q    Did you see anything when you got to the back door?

A    Oh yeah.  Well, I called 911 and -- but I didn't say much, I passed it to my sister.  Meanwhile I saw the group by the juke box, they were running on that road.  There's a road right beside the little shopping center.

Q    Between the Toys 'R Us and the restaurant?

A    No.  Between the restaurant -- well, not the restaurant but -- the restaurant is at the end, right.  And there's like other separations for businesses.

Q    Other part of the strip mall?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 177 of 444
Case 3:08-cv-00134-RJC    Document 244    Filed 01/30/11    Page 187 of 256
JA1632

DIRECT—GARCIA

A      Yeah.  And there's a road.  I don't know what's the name, but Colby I think.

Q      Okay.

A      And, I mean -- yeah, on that road they were running down there.  Coming through here --

Q      Let me ask you before you go on, look at Government Exhibit 121, it's on the screen in front of you.

Is that a fair an accurate representation of the other end of the strip mall where the restaurant was located and the road you described as Colby?

A      Yeah.

MS. ROSE:  Move to admit 121, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 121 was received into evidence.)

Q      (By Ms. Rose) Show us -- mark first where the restaurant's located.

A      Right -- (indicating).

Q      And -- and the street that you refer to as Colby?

A      Like coming in through here (indicating).

Q      And does that street run, continue to run along side the building and continue behind?

A      Yeah, it does.

Q      And when you were at the back of the building when you had exited by the dumpsters, were you able to see across the back of the building on to Colby?

Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

A    Yeah, I did.

Q    And at that point what did you see?

A    I saw the group by the juke box running, like towards that street, down.

Q    Continuing down behind the building?

A    Yeah.

Q    Where did you see them go?  Did you see where they, how far they went?

A    No, it was dark.

Q    Did they say anything to you at that point or did --

A    No, I don't remember.

Q    Do you remember how many you saw running?

A    It was a group though.  I don't remember how many.

Q    Did you stay outside until law enforcement arrived?

A    No.  I went back inside the restaurant.

Q    Why did you go back in?

A    Because there were still people inside.  So I wanted to go check.  Like, well -- yeah, I wanted to go check, and there was people under the table, under the booths, and people in the bathrooms.  And then Manuel and Ruben in the middle section.

Q    Did you get the people out of the booths and the bathroom, let them know it was okay to come out?

A    Yeah.

Q    The people that were hiding under the booths or in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00557-MOC   Document 50-4   Filed 03/23/17   Page 179 of 444
Case 3:09-cr-00134-RJC   Document 1244   Filed 01/30/11   Page 507 of 1564
JA1634

DIRECT-GARCIA

bathroom, were those other customers that had been in the restaurant?

A    Yeah.

Q    When you saw Ruben and Manuel there in the floor, how were they positioned?

A    Ruben was on top of Manuel, the older brother. I remembered that. They were all both covered in blood, well, the floor was, behind. And I remember Ruben was still breathing, because his stomach was moving up and down. He was -- he was pretty fat. You could have see his belly, so --

Q    So the one you would describe as, let's say the chubbier one --

A    Yeah.

Q    -- was the one that was still alive?

A    Yeah. And then one of the waitresses was outside in front of the restaurant. And I think she had managed to get the -- one of the license plates of the car. I don't know which one though. But she stood outside and --

Q    Did you see Spider's red X -- excuse me, white Expedition?

A    Oh, yeah. It was still parked there.

Q    Are you able to see Government's Exhibit 81 on the screen there?

A    Yeah, and that was it.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 180 of 444
Case 3:09-cr-00134-RJC    Document 1244    Filed 01/30/11    Page 151 of 156
JA1635

DIRECT—GARCIA

Q    What's shown in Government's 81?

A    The Expedition.

Q    And is that where it was located that particular evening?

A    Yeah.

MS. ROSE:  I move to admit 81.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 81 was received into evidence.)

Q    (By Ms. Rose) Obviously, when you first saw the Expedition parked there, did it -- did it have the yellow tape on it?

A    Oh, no.

Q    And where is it parked in relation to the front door of the restaurant?

A    It was like right in front of the restaurant.  Like, there's the parking spaces in front of the restaurant, and then there's like -- like a walkway.  Like you get to walk to like -- there's a sidewalk.  And he was right there.

Q    Is that -- would it be fair to say it's parallel to High Point Road?

A    Yeah.

Q    But it's still part of the parking lot that's still in front of the restaurant?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 181 of 444
Case 3:09-cr-00134-RJC    Document 1244    Filed 01/30/11    Page 52 of 150
JA1636

DIRECT—GARCIA

A    Yeah.

Q    Did you talk to law enforcement that night?

A    Yes.  He drove me, like towards like the back of the restaurant.  And we parked -- there's a church right there, like across the street, like crossing Colby on that corner.  And we parked there, and he was talking to me.  I don't remember the officer's name though.

Q    By that point had you alerted your parents and they were there as well?

A    Oh, yeah.  When I came in -- when I came back in the restaurant to see if everything was okay.  I went back out to tell my parents.  They were at a house behind the restaurant that they had bought.  And they were painting.  So I ran back there to let them know.  And when I told them, she had -- my mom had told me, no wonder she saw the group pass by the house.  Because she saw them.  She got to see them --

        MR. BRYSON:  Object.

        THE COURT:  Hang on a second.  You need to listen to the question, just answer the question.

        Members of the Jury, if you would disregard the last statement about what the mother said.

        THE WITNESS:  Oh, okay.

Q    (By Ms. Rose) And then did you tell law enforcement what you had seen and describe the shooter for law

                Laura Andersen, RMR 704-350-7493

DIRECT-GARCIA

enforcement?

A     Yes.

Q     Did you tell them what you told the jury here today?

A     Yeah.  Well, what I could remember.  Been like three years, two year.

Q     And if you would look around and see if you're able to identify the person you saw as the shooter in the restaurant that night.  If you need to get down, you can do so.

A     I have to put my glasses on.  Yeah.

Q     Can you identify the person?

A     Well, I mean, I couldn't -- I couldn't remember.  I couldn't see his face that much, because he had a hoody.  Like, I don't remember his hair.  We couldn't see his hair, but --

Q     What do you remember?

A     The tattoos.

Q     Do you see that person here today?

A     Yeah.

Q     Could you identify please by what they're wearing?

A     Light blue.

Q     Point in the direction?

A     That way.  (Indicating.)

          MS. ROSE:  The record will reflect the identification of the defendant, Your Honor?

          THE COURT:  It will.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 183 of 444
Case 3:08-cr-00134-RJC    Document 244    Filed 01/30/11    Page 183 of 150
JA1638

DIRECT-GARCIA

Q    (By Ms. Rose) Did your parents, do they still own the restaurant?

A    No.

Q    When did they sell?

A    When did they sell the restaurant?

Q    Um-hmm.

A    I think it was the beginning of '08, of 2008.  We still had -- we still had rented a little bit after the shooting.

Q    And do you know why the restaurant was sold?

            MR. BRYSON:  Object.

            THE COURT:  Sustained.

            MS. ROSE:  All right, sir.  Thank you.

            THE COURT:  We'll take our lunch break before you proceed on cross.

            Members of the Jury, we've gone a little long. We're going to take our lunch break at this time.  Don't talk about the case.  Keep an open mind, and we will be back at 2:30.

(The jury was escorted from the courtroom.)

(Lunch recess.)

                    *  *  *  *  *  *

                    Laura Andersen, RMR 704-350-7493

JA1639

405

DIRECT-GARCIA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER


          I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

          Dated this the 13th day of April, 2010.



                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

                Laura Andersen, RMR 704-350-7493

**JA1640**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA          )    DOCKET NO. 3:08-CR-134-2
                                  )
        vs.                       )    VOLUME II-B
                                  )    AFTERNOON SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA,  )
                                  )
        Defendant.                )
_____ )

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 13, 2010

APPEARANCES:

On Behalf of the Government:

        JILL WESTMORELAND ROSE
        Assistant United States Attorney
        100 Otis Street
        Asheville, North Carolina 28801

        SAM G. NAZZARO
        U.S. Department of Justice
        950 Pennsylvania Avenue, NW
        Washington, DC 20530

On Behalf of the Defendant:

        MARK P. FOSTER
        Law Offices of Mark Foster, PC
        1011 East Morehead Street, Suite 300
        Charlotte, North Carolina 28204

        JOHN DAVID BRYSON
        Wyatt Early Harris & Wheeler, LLP
        P.O. Box 2086
        High Point, North Carolina 27261


                CHERYL A. NUCCIO, RMR-CRR
        United States District Court Reporter
                Charlotte, North Carolina

JA1641

I N D E X

PAGE

GOVERNMENT'S WITNESSES

ABEL SANTOS, JR.
        Cross Examination by Mr. Bryson............... 409

MARCO ANTONIO GUZMAN MEJIA
        Direct Examination by Mr. Nazzaro............. 416
        Cross Examination by Mr. Foster............... 428

TERESA KETNER
        Direct Examination by Ms. Rose................ 431
        Cross Examination by Mr. Bryson............... 468
        Redirect Examination by Ms. Rose.............. 470

BARRY WHITLOW
        Direct Examination by Mr. Nazzaro............. 472

JOHN D. BUTTS
        Direct Examination by Ms. Rose................ 480
        Cross Examination by Mr. Foster............... 498

JAMES CAYTON
        Direct Examination by Mr. Nazzaro............. 500

AMY WILDE
        Direct Examination by Ms. Rose................ 504

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 187 of 444
Case 3:08-cr-00134-RJC   Document 235   Filed 10/24/10   Page 187 of 444

JA1642

I N D E X   O F   E X H I B I T S

|  | OFFERED | RECEIVED |
|---|---|---|

GOVERNMENT'S EXHIBITS

| | OFFERED | RECEIVED |
|---|---|---|
| No. 26...................................... | 467 | 467 |
| No. 27...................................... | 468 | 468 |
| No. 69...................................... | 436 | 436 |
| No. 75...................................... | 437 | 437 |
| No. 76...................................... | 446 | 446 |
| No. 79...................................... | 426 | 426 |
| No. 80...................................... | 427 | 427 |
| No. 82-87................................... | 439 | 439 |
| No. 88, 88A-88D............................. | 444 | 444 |
| No. 89-90................................... | 439 | 439 |
| No. 91-91A.................................. | 445 | 445 |
| No. 92-94................................... | 439 | 439 |
| No. 94A..................................... | 448 | 448 |
| No. 96-97................................... | 439 | 439 |
| No. 98-98A.................................. | 451 | 451 |
| No. 99...................................... | 439 | 439 |
| No. 105-106................................. | 460 | 460 |
| No. 115..................................... | 463 | 463 |
| No. 116-116A................................ | 455 | 455 |
| No. 118-118A................................ | 475 | 475 |
| No. 119..................................... | 476 | 476 |
| No. 119A.................................... | 477 | 477 |
| No. 120..................................... | 478 | 478 |
| No. 120A.................................... | 478 | 478 |
| No. 121..................................... | 479 | 479 |
| No. 121A.................................... | 479 | 479 |
| No. 123..................................... | 484 | 484 |
| No. 124B.................................... | 492 | 492 |
| No. 127..................................... | 494 | 494 |
| No. 130A.................................... | 497 | 497 |
| No. 135..................................... | 512 | 512 |

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-45   Filed 03/23/17   Page 188 of 444
Case 3:08-cr-00134-RJC   Document 235   Filed 10/04/10   Page 3 of 12

JA1643

ABEL SANTOS - CROSS

TUESDAY AFTERNOON, APRIL 13, 2010

THE COURT:  Ready for the jury?

MR. FOSTER:  Yes, Your Honor.

MS. ROSE:  Yes, Your Honor.

THE COURT:  Call the jury.

(Jury entered the courtroom.)

THE COURT:  Mr. Santos, if you would please take the witness seat.

(Witness resumed the witness stand.)

THE COURT:  Mr. Bryson, you may begin when you're ready.

MR. BRYSON:  Thank you.

ABEL SANTOS, JR.

CROSS EXAMINATION

BY MR. BRYSON:

Q.   Your parents owned Las Jarochitas restaurant, correct?

A.   Yes, sir.

Q.   And you worked there.

A.   Yeah.

Q.   And on this occasion, December the 8th, you were working as a host.

A.   Yeah.

Q.   You were 16 years old on that day.

A.   Yeah.  I was going on 17.

Q.   You wear glasses.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 189 of 444
Case 3:08-cr-00134-RJC   Document 232   Filed 10/04/10   Page 189 of 214
JA1644

ABEL SANTOS - CROSS

A.    Not at that time.

Q.    Okay.  When did you first start wearing glasses?

A.    Like, two months ago.

Q.    All right.  As the host, you work near the cash register.

A.    Yeah.

Q.    All right.  There was a group of three people that were sitting near the juke box originally.

A.    Yeah.

Q.    They ate food?

A.    I can't remember.

Q.    All right.  They were drinking.

A.    Yeah.

Q.    There was another group of people near the front of the restaurant, correct?

A.    Yeah.

Q.    There were five or six people at that table.

A.    Yeah.

Q.    And that was the table where Manuel and Ruben were sitting, correct?

A.    Yeah.

Q.    Throughout your testimony, you referred to them as Manuel and Ruben; is that right?

A.    Yes, sir.

Q.    You gave a statement to the police immediately after this happened, correct?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-45   Filed 03/23/17   Page 190 of 444
Case 3:08-cr-00134-RJC   Document 235   Filed 10/24/10   Page 590 of 121

JA1645

A.   As soon as they got there.

Q.   Okay.  And when you spoke with the police originally, you didn't call them Manuel and Ruben, did you?

A.   I don't remember.

Q.   Okay.  Didn't you, in fact, refer to one of them as the chubby guy?

A.   Oh, yes.

Q.   Okay.  Is it fair to say that later you learned what their names were?

A.   No.

Q.   Okay.  Now, Manuel and Ruben's table that -- they were drinking there.

A.   Yeah, they were drinking.

Q.   And they drank a lot.

A.   Yes, somewhat, yeah.

Q.   All right.  There was a second group of three people that entered the restaurant later, correct?

A.   Yes.

Q.   And they joined the group near the juke box.

A.   Yeah.

Q.   And after a while an argument started, correct?

A.   Yes.

Q.   The argument was between the group at the juke box and Manuel and Ruben's table.

A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

ABEL SANTOS – CROSS

Q.   Manuel had become upset.

A.   Yes.

Q.   He got mad about the music.

A.   Yeah.

Q.   And he demanded that the music be changed.

A.   Yes.

Q.   He would become demanding when he was drunk.

A.   Yeah, he would get, like, cocky.

Q.   And on this occasion he was drunk.

A.   I mean, he still had some sense in him.

Q.   Okay.  But he drank enough that he was to the point where he became demanding.

A.   Oh, yeah.

Q.   All right.  Ruben was drunk too.

A.   No, I don't think Ruben was drunk.

Q.   One of the people at the table near the juke box was called Spider.

A.   Yeah.

Q.   You had heard him called that.

A.   Yeah.

Q.   He was wearing a tan hoodie.

A.   I don't remember.

Q.   Okay.  He had an earring under his bottom lip.

A.   Yeah.

Q.   He had tattoos of spider webs on both his elbows.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 192 of 444
Case 3:08-cr-00134-RJC   Document 235   Filed 10/24/10   Page 192 of 444
JA1647

ABEL SANTOS - CROSS

A.   No, I think it was just one.

Q.   Okay.  Spider had been in the restaurant before?

A.   Yeah.

Q.   You even know -- excuse me.  You even knew what car he drove.

A.   Yeah.

Q.   There was another person at the table near the juke box that you had seen in the restaurant before.

A.   Yeah.

Q.   That was the one that was later trying to calm things down.

A.   Yeah, he was.

Q.   During the argument Spider was doing most of the argument from the table at the juke box.

A.   He was the most aggressive.

Q.   Okay.  And that was when the other person was trying to calm him down, correct?

A.   Yes.

Q.   He said let it go to Spider, correct?

A.   Yeah.

Q.   All right.

A.   Well, I'm not sure.  He was trying to calm the whole group.

Q.   Trying to calm everybody down.

A.   Yeah.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 193 of 444
Case 3:08-cr-00134-RJC   Document 235   Filed 10/04/10   Page 8 of 121
JA1648

ABEL SANTOS – CROSS

Q.   Okay.  Spider didn't calm down, though.

A.   No, he didn't.

Q.   He kept on arguing.

A.   Yes.

Q.   At some point Ruben stood up.

A.   Yes, he stood up when they were leaving.

Q.   Okay.  And Spider had stood up too.

A.   Yeah, in the beginning.

Q.   All right.  And then everyone in both groups stood up.

A.   I know the group from the juke box stood up to leave.

Q.   Okay.

A.   I think it was just Ruben and Manuel that was up.

Q.   All right.  So after they were asked to leave, everybody in the juke box group was up on their feet, correct?

A.   Yeah.

Q.   But only Ruben and Manuel were standing from the other table.

A.   From what I remember.

Q.   Okay.  Now, the person that asked them to leave was your sister.

A.   And the cook and one of the waitresses.

Q.   Your sister is named Ismar Sanchez.

A.   Yes.

Q.   And everybody with the exception of one person did leave the restaurant from the juke box table, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA1649

ABEL SANTOS - CROSS

A.    Yes.

Q.    And they all were moved out of the restaurant, correct?

A.    Yeah, they were locked out, yes.

Q.    And the door was locked.

A.    Yes.

Q.    But later when your sister was let back in, some of them came back in.

A.    Yeah, like two or three.  Not all of them.

Q.    Right.  Okay.  And at this point, you were standing near the cash register.

A.    Yeah.

Q.    And the people who had come back in were all standing by the door.

A.    Yeah.

Q.    Manuel and Ruben were not afraid of the other group.

A.    Well, it was just Ruben.  But, no, he wasn't saying nothing really.

Q.    In fact, Ruben said that.  He said he wasn't scared.

A.    Yeah.

Q.    And he acted like he was ready to fight.

A.    Yeah.

Q.    And he even said, I'm going to give you your little gang stuff.

A.    Yeah.

Q.    Meaning he wanted to fight.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 195 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/10   Page 195 of 444

JA1650

MARCO MEJIA - DIRECT

A.   Yeah, he was, I guess, ready.

Q.   When the shooting started, you ran to the back of the restaurant.

A.   Yeah.  After the first shot, I ran.

Q.   And you stayed there for at least five, six minutes.

A.   I stayed there enough to see the first shot.

          MR. BRYSON:  Okay.  Those are my questions.

          THE COURT:  Any redirect?

          MS. ROSE:  No, Your Honor.

          THE COURT:  You may step down and be excused.

          Call your next witness.

          MR. NAZZARO:  United States calls Marco Guzman Mejia.  We'll need an interpreter for this witness.

          (Witness stepped down.)

                    MARCO ANTONIO GUZMAN MEJIA,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MR. NAZZARO:

Q.   Good afternoon.  Would you please state your name.

A.   (Interpreter:) Yes.  My name is Marco Antonio Guzman Mejia.

Q.   And Marco, how old are you, sir?

A.   (Interpreter:) Twenty-five years.

Q.   And where do you live currently?

A.   (Interpreter:) In Greensboro, North Carolina.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 196 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/10   Page 196 of 444

JA1651

MARCO MEJIA – DIRECT

Q.   And how long have you lived in Greensboro, North Carolina?

A.   (Interpreter:) Ten years.

Q.   And do you work in Greensboro, North Carolina?

A.   (Interpreter:) Yes, I do work in Greensboro.

Q.   And what type of work do you do?

A.   (Interpreter:) Construction.

Q.   And are you originally from the United States or are you from another country?

A.   (Interpreter:) No, I'm Mexican.

Q.   Now, Marco, I'd like to direct your attention to December 8, 2007.  Were you living in Greensboro at that time?

A.   (Interpreter:) Yes.

Q.   And at some point in that day or evening, did you decide to go to a restaurant in Greensboro?

A.   (Interpreter:) Yes.

Q.   And did your plan include going by yourself or with others?

A.   (Interpreter:) I was just going with my wife.

Q.   Okay.  What was her name?

A.   (Interpreter:) Ana Maria Angelas Lopez.

Q.   And she's still your wife?

A.   (Interpreter:) Yes.

Q.   Was there a special occasion or anything why you decided to go out to dinner that night?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 197 of 444
Case 3:08-cv-00573-RJC   Document 50-4   Filed 03/23/10   Page 127 of 444
JA1652

418

MARCO MEJIA - DIRECT

A.   (Interpreter:) It was just Saturday and we wanted to go out and eat.

Q.   And did you decide to go to a particular restaurant that evening?

A.   (Interpreter:) No, but we were driving down High Point Street and looking down the restaurants, and we decided to stop at the Jarochitas.

Q.   Had you ever stopped or eaten at that restaurant before?

A.   (Interpreter:) Two years before that.  I don't remember the time, but sometime before that, yes.

Q.   But you didn't go there frequently.  This was -- you hadn't been there in two years.

A.   (Interpreter:) No.

Q.   And do you remember the time that you arrived at the restaurant, the approximate time?

A.   (Interpreter:) Between 6:40, 6:50 in the afternoon.

Q.   When you entered the restaurant, where were you seated?

A.   (Interpreter:) Walking into the restaurant towards the left, the second table.

Q.   Okay.  Was it a table or a booth?

A.   (Interpreter:) I believe it was a table with chairs -- no, a booth.

Q.   Could you describe when you come into the restaurant what you see.

A.   (Interpreter:) I came into the restaurant and I only saw

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 198 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 198 of 444
JA1653

MARCO MEJIA – DIRECT

two groups of people.

Q.   Okay.  When you say groups of people, were there two different groups?

A.   (Interpreter:) Yes.

Q.   And where did you see these two groups of people at?

A.   (Interpreter:) In the center of the restaurant.  There was one group in one corner and another group in the other corner, but it was in the center of the restaurant.

Q.   Okay.  And you weren't seated in the center of the restaurant.  You were seated on the left-hand side of the restaurant.

A.   (Interpreter:) Yes.

Q.   And do you recall how many people were in each of these two different groups when you arrived?

A.   (Interpreter:) Not exactly, but each group had five and six people.

Q.   When you entered the restaurant, did you see a juke box or hear any music playing?

A.   (Interpreter:) Yes, there was music playing.

Q.   Was any of the groups that you've just described seated near that particular location?

A.   (Interpreter:) The Mexican group was seated close to the juke box.

Q.   Okay.  When you look into the restaurant -- you said the Mexican group?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 199 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 199 of 444
JA1654

MARCO MEJIA - DIRECT

A.   (Interpreter:) Yes, the group of Mexicans was seated in the one corner and the other group was seated in the other corner.

Q.   I understand.  You said Mexicans.  What do you mean by that?  Were you able to -- how were you able to tell they were from Mexico?

A.   (Interpreter:) Because of the accent, the voices of people.

Q.   Did you hear accents from other countries other than Mexico?

A.   (Interpreter:) Yes.  The other group was Salvadorian or Honduran, perhaps.

Q.   Were you able to -- that was based on the accents you heard?

A.   (Interpreter:) Yes.  That's more or less how I identified them.  There were two different groups of people.

Q.   Okay.  Now, after you were seated, did you -- it was you and your wife; is that right?

A.   (Interpreter:) Yes.

Q.   Did you order anything at that time?

A.   (Interpreter:) No, we just got seated and they bring you some nachos and water, two waters.

Q.   Okay.  Had you planned to eat there that evening?

A.   (Interpreter:) Yes.  I had come into the restaurant.  I had sat down on a side and I was just going to eat.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 200 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 10/24/10   Page 8 of 12
JA1655

MARCO MEJIA – DIRECT

Q.    After you had ordered your drinks and nachos, did you hear any loud discussions or arguments?

A.    (Interpreter:) Yes.  When I had been in the restaurant only for a few minutes, the two groups of people started arguing.  What I understood was they were arguing about the music.

Q.    And did you see what the waitresses were doing at the time?

A.    (Interpreter:) Yes.  When they -- when they were arguing, the waitresses and waiters started trying to separate the two groups and to walk out the group of Salvadorians, getting them out of the restaurant.

Q.    Did you actually see them start to do this?

A.    (Interpreter:) Yes.  They were arguing and they started to argue and the waitress tried to separate them and tried to get the group of Salvadorians out, but she couldn't.

Q.    And what happened next after she couldn't do that?

A.    (Interpreter:) Well, yes, after the -- they started pushing and shoving and then one of them pulled out a gun and he pointed it at the two people -- at the other group of people, and that's when he shot.

Q.    Now, you mentioned about the people, the waitress trying to get the people out.  Did you see whether any people were -- actually, she was successful in pushing anybody out of the restaurant before the shooting?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 201 of 444
Case 3:09-cv-00734-RJC    Document 50-4    Filed 03/23/17    Page 201 of 444

JA1656

MARCO MEJIA - DIRECT

A.    (Interpreter:) Yes.  She -- she pushed them out and at some point some of them were outside and some were inside.  I didn't pay much attention to that, when suddenly one of them came in -- he came with a gun and -- and I --

THE INTERPRETER:  The interpreter is going to request repetition of the last part.

A.    (Interpreter:) He said immediately, Come -- come over. Come, let's fight.  But he already had the gun in his hand and he started shooting right away.

Q.    And before he said, Come over, let's fight, did you see him make any signs, this person with the gun?

A.    (Interpreter:) Yes.  The whole group, they were doing signs like with their fingers and I don't know what.  They were waving their hands and, like, saying, We are Mara Salvatrucha.  Nobody can mess with us, because they were a group of people.

Q.    And that group, is that the group with the Salvadorian accents?

A.    (Interpreter:) Yes.

Q.    Did that also include the person with the gun you talked about?

A.    (Interpreter:) Yes, he was there with them also.

Q.    Now, could you describe -- you started to talk about how the person who did the shooting held the gun.

A.    (Interpreter:) Yes.  When he pulled out the gun, he put

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 202 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 202 of 444
JA1657

MARCO MEJIA - DIRECT

it like that (indicating) and he started shooting right away.

Q.   Okay.  And you were holding your arm sideways.  Is that the way the shooter was holding his arm?

A.   (Interpreter:) Yes.  When I saw him, he already had the gun like this in his hand (indicating).

Q.   And the people that got shot, what were they doing at that time?

A.   (Interpreter:) They were standing up and they were arguing.  They were arguing verbally.

Q.   Were there any punches thrown?

A.   (Interpreter:) At the beginning there were some pushing. Like, Come on, I want to fight with you.  But no punches.  It was just pushing and shoving.

Q.   Now, how many -- when the person started shooting, did you see him shooting?

A.   (Interpreter:) When he pulled out the gun and shot the first person, I got up and pulled my wife down to the floor.

Q.   And what did you do next?

A.   (Interpreter:) I pulled her by the bar towards the bathrooms.

Q.   Did you hear any more shots after you heard the first shot -- or saw the first shot?

A.   (Interpreter:) I heard three more.

Q.   And did you get to the bathroom or pull your wife successfully to the bathroom, you said?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 203 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 10/24/10   Page 8 of 12
**JA1658**

MARCO MEJIA - DIRECT

A.   (Interpreter:) Yes.

Q.   Were there other people other than these two groups also in the restaurant at the time?

A.   (Interpreter:) Just as far as I remember.  I don't remember seeing more people.

Q.   Okay.  On your side of the restaurant, were there any other people?

A.   (Interpreter:) No.  No, the row where I was was empty. There were no more people.  I don't know about the other side.

Q.   Now, when you got to the bathroom, what did you do?

A.   (Interpreter:) I locked -- I was there locked up for about five -- for 10, 15 minutes.

Q.   When you say locked up, you stayed in the bathroom?

A.   (Interpreter:) Yes, I remained in the bathroom for a while.

Q.   Did you lock yourself -- you and your wife into the bathroom?

A.   (Interpreter:) Yes.

Q.   And when did you eventually come out?

A.   (Interpreter:) When I didn't hear anything anymore, I came out and I ran to the back side of the restaurant towards the back of the restaurant.

Q.   Did you exit the restaurant at some point?

A.   (Interpreter:) Yes.  I ran to the store that was next door, but it was closed.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 204 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 8 of 21

JA1659

MARCO MEJIA - DIRECT

Q.   Did you leave anything behind when you left the restaurant?

A.   (Interpreter:) Yes.  I left my keys on the table.

Q.   I'd like to show you what's been previously marked as Government's Exhibit 79.

Are you able to recognize Government 79?

A.   (Interpreter:) What do you mean?  I don't understand.

Q.   There is a photo of some tables or booths.

THE COURT:  You can sit down, flip it up.

Q.   Can you see?

A.   (Interpreter:) Yes.

Q.   What do you see in the picture?

A.   (Interpreter:) It's just a menu, a dish with salsa, and two cups.

Q.   Okay.  But do you recognize those tables at all?

A.   (Interpreter:) Yes.

Q.   And how do you recognize them?

A.   (Interpreter:) Because I've been there.  I -- I walked through there.  That's maybe where I was.

Q.   Okay.  Are those the tables -- type of tables you were seated at?

A.   (Interpreter:) Yes.

Q.   Do you remember which one you were seated at by this photo at all?

A.   (Interpreter:) Yes.  In the second table.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 205 of 444
Case 3:08-cr-00734-RJC   Document 502-4   Filed 10/04/10   Page 205 of 444
JA1660

MARCO MEJIA - DIRECT

MR. NAZZARO:  I'd like to move Government's Exhibit 79.

THE COURT:  Any objection?

MR. NAZZARO:  Ask that it be published.

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.  You may publish.

(Government's Exhibit No. 79 was received into evidence.)

Q.   Could you point, if you could, because there's -- it will draw on the screen, which table you remember being at.

A.   (Interpreter:) Here on the screen?

Q.   On the screen.

A.   (Interpreter:) In this one (indicating).

Q.   Okay.  And could you also indicate in the same way what direction you ran once the shooting started.

A.   (Interpreter:) Yes.

Q.   Could you do it on the screen just like you did the last time.

A.   (Interpreter:) I was standing here and my wife was here sitting (indicating).  I looked at the people -- I saw that the people in the middle of the restaurant were fighting. When the guy pulled out the -- pulled out the gun, I pulled my wife down to the floor and went -- ran back to the bathroom.

Q.   I'd like to show you what's been previously marked as Exhibit 80.  Are you able to recognize anything in Exhibit 80?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 206 of 444
Case 3:08-cr-00734-RJC    Document 50-4    Filed 03/23/17    Page 206 of 444
JA1661

MARCO MEJIA - DIRECT

A.    (Interpreter:) Yes.

Q.    And what do you recognize?

A.    (Interpreter:) My keys.

        MR. NAZZARO:  Okay.  I'd move Government 80, Your Honor.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 80 was received into evidence.)

Q.    Those are the keys you left behind on the table?

A.    (Interpreter:) Yes.

        MR. NAZZARO:  One moment, Your Honor.

        (Government counsel conferred.)

BY MR. NAZZARO:

Q.    Now, the people that you -- or the person that you saw shooting, had you ever seen him before?

A.    (Interpreter:) Never in my life.

Q.    And were you able to get a look at him at all that evening, a good look at him?

A.    (Interpreter:) I didn't pay that much attention because there were two groups of people, so I didn't pay attention to all the people.  I remember more or less.

Q.    When the shooting happened, was it very -- was it somewhat quickly?  I mean, you didn't -- how long -- how long

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 207 of 444
Case 3:08-cr-00734-RSC   Document 50-4   Filed 03/23/17   Page 220 of 444

JA1662

a time between the argument and the shooting?  How much time passed, if you know?

A.    (Interpreter:) The argument lasted a little longer.  The shooting was one, two, three shots, four shots, and that's it.

Q.    Okay.  You say a little longer.  How long?

A.    (Interpreter:) How long what?

Q.    How long was this argument?

A.    (Interpreter:) I have no idea.  Maybe five, ten minutes.

        MR. NAZZARO:  Thank you.  Okay.  Thank you.  No further questions.

        THE COURT:  Any cross?

        MR. FOSTER:  Yes, Your Honor.

        THE INTERPRETER:  The interpreters are going to switch.

                    CROSS EXAMINATION

BY MR. FOSTER:

Q.    Mr. Guzman Mejia, you were there that night with your wife, correct?

A.    (Interpreter:) Yes.

Q.    And the first group you described was the Mexican group and they were the ones closest to the juke box?

A.    (Interpreter:) Yes.

Q.    You said the two groups were pushing and shoving each other.

A.    (Interpreter:) Not really that much.  They started

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

MARCO MEJIA - CROSS

arguing because of the music.

Q.   But you did testify earlier that -- you used the phraseology that they were pushing and shoving; isn't that -- isn't that right?

A.   (Interpreter:) Yes, they were pushing and shoving each other and the waitress tried to separate them.

Q.   And so the -- some of the people at the Mexican -- some of the people at the table with the Mexican group, they were pushing some of the people with the Salvadorian group, correct?

A.   (Interpreter:) Could you repeat the question, please.

Q.   Some of the Mexicans were pushing and shoving some of the Salvadorians or the Hondurans.

A.   (Interpreter:) Yes, they got up and both of the groups were arguing and kind of like pushing each other.

Q.   Now, you said that the waitress was trying to separate the two groups, correct?

A.   (Interpreter:) Yeah, the people that were working the tables were there trying to separate them, yes.

Q.   And you said that some of them actually -- the waitress succeeded in getting some of them outside the door, right?

A.   (Interpreter:) Yes, but I don't know what happened; if she did not succeed in closing the door or they pushed the door back in and got back in.

Q.   So you don't know whether they all got out or whether

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 209 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 209 of 444
JA1664

MARCO MEJIA - CROSS

maybe a few stayed inside, do you?

A.   (Interpreter:) I don't remember exactly, but, yes, there were some of them that were standing by the door.

Q.   But you're sure that some actually exited the restaurant and some may not have exited the restaurant; is that correct?

A.   (Interpreter:) Yes.

Q.   You said somebody was saying something about we are the MS -- we are MS, but you're not able to say who that was, correct?

A.   (Interpreter:) The whole -- the whole group, all the either Salvadorians or Hondurans were sort of saying that and making signs with their hands and saying, You can't mess with us.

Q.   So you said that -- you testified that when you saw the people were fighting and then the gun was pulled out, that's when you pulled your wife down, correct?

A.   (Interpreter:) When -- when this one person took out the gun, pointed it and shot it, that's when I kind of coached my wife to get on the ground.

Q.   Did you -- didn't you say earlier that you pulled her down on the ground as soon as you saw the gun before it was fired?

A.   (Interpreter:) It's just -- it's not a question of five or ten minutes.  This all happened in a matter of seconds.

Q.   So you didn't actually -- when you saw the gun come out,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 210 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 210 of 444
JA1665

TERESA KETNER – DIRECT

you immediately grabbed your wife to protect her.  You didn't actually see the shot get fired, correct?

A.    (Interpreter:) Yes, I saw him when he shot the first shot.

Q.    And the group -- the Mexican group that had the guys in it that got shot, that group had gotten angrier and said something like, Come on, let's fight, right?

A.    (Interpreter:) Yes, the Mexicans also said that, Let's fight.  But they didn't fight, you know, by hitting each other, but basically with words and shoving each other.

(Defense counsel conferred.)

MR. FOSTER:  No further questions.

THE COURT:  Any redirect?

MR. NAZZARO:  No, Your Honor.

THE COURT:  You may step down and be excused.

Call your next witness.

(Witness stepped down.)

MS. ROSE:  The government will call Teresa Ketner.

TERESA KETNER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.    Good afternoon.  If you would introduce yourself to the jury, please.

A.    My name is Teresa Ketner.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 211 of 444
Case 3:08-cv-00574-RJC   Document 50-4   Filed 03/23/17   Page 211 of 444
JA1666

TERESA KETNER – DIRECT

Q.   Where are you employed?

A.   I'm employed with the Greensboro Police Department.  I work with the crime scene unit.

Q.   How long have you been in that position?

A.   Approximately about seven and a half years.

Q.   Is that the total amount of time that you have been in law enforcement?  Have you had any other positions in law enforcement other than the one you currently hold?

A.   No.

Q.   If you would just tell us what your position requires.

A.   I'm a forensic specialist.  I'm a part of the forensic team and my job responsibility, basically, is to respond to homicides or any other death investigation type scenes, process, document, collect evidence, and bring it back to the lab and process it or package that evidence.

Q.   And do you recall particularly December the 8th of 2007 --

A.   Yes.

Q.   -- responding to a call for service?

A.   Yes, I do.

Q.   What time, if you recall, were you dispatched?

A.   I was dispatched at 1947 hours.

Q.   7:47 p.m.?

A.   Yes, that's correct.

Q.   And were you on duty at that time?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 212 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 10/24/10   Page 27 of 12

JA1667

433

TERESA KETNER – DIRECT

A.    No, I was not.  I was at home.

Q.    Did it take you some time to get to the scene since you were at your residence?

A.    Yes, a little -- a little over an hour.

Q.    Did you -- once you got to the scene, describe what you saw.

A.    Once I arrived at the scene, I saw the parking lot with several cars located within.  Crime scene tape was surrounding the front parking lot.  There was a fairly large crowd of folks standing or speculators outside in the parking lot.  There was a lot of command staff and other police officers on the outside.

Q.    If you would look at your screen there in front of you, Government's Exhibit 67 which has already been entered.  Do you recognize what's shown in Government's Exhibit 67?

A.    Yes, I do.

Q.    What is that?

A.    This is the front of the Mexican restaurant.  There's a vehicle parked or backed up to the front door.  This is the vehicle that belonged to one of the victims.  And you can see the blue tarp in the background which was covering the front entrance.

Q.    To the right side of the picture connecting to what appears to be a telephone pole or a light pole, what is that?  Is that yellow crime scene tape --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 213 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 213 of 444

JA1668

TERESA KETNER – DIRECT

A.    Yes, it is.

Q.    -- about which you testified?

All right.  Who was there, if anyone, on the inside of the restaurant when you arrived?

A.    Upon my arrival I met with CSI Dutko and Forensic Specialist Phoenix.  They were already present at the time of my arrival.

Q.    And were they waiting outside or had they already entered the restaurant at that point?

A.    They had already entered the restaurant at that time.

Q.    What were they doing, if you recall?

A.    Once I got there, I briefly met with them and they had already photographed some of the exterior and CSI Dutko had already placed a couple placards down at evidence that was located near the front entrance just to identify them so no one would step on them or accidentally kick them.

Q.    Other than the other two members of your team, anyone else inside of the restaurant?

A.    Not at the time that I arrived.

Q.    Is it typical that the crime scene investigators, that you all work as a team?

A.    Yes, we do work as a team.  And one of us is assigned as a lead investigator for that scene and that would be your primary person that would pretty much divvy out the job duties or make sure that everything is done, completed, and just sort

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 214 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 214 of 444
JA1669

TERESA KETNER – DIRECT

of maintain chain of custody of all the evidence collected.

Q. And who took that particular role on this occasion?

A. I was the lead investigator.

Q. When you entered the restaurant, what did you see?

A. Upon entering the restaurant, I immediately observed that it was sort of like a center, a dining area in the middle with approximately about a 4 foot wood, little wall bordering around the main area of the dining room and this was with tables and chairs. The outside edges along the walls were booths.

It looked like the cold prep or the kitchen area was towards the back of the restaurant.

And I immediately observed the two victims in the floor.

Q. I'm going to show you what has been marked as Government's Exhibit 81. Do you recognize Government's Exhibit 81?

A. Yes, I do.

Q. Was this a photograph taken prior to your entering the restaurant?

A. Yes. This was a photograph that I believe Forensic Specialist Phoenix had already photographed prior to my arrival.

Q. Show you Government's Exhibit Number 69. Do you recognize Government's Exhibit Number 69?

A. Yes, I do.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 215 of 444
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 30 of 214

JA1670

TERESA KETNER – DIRECT

Q.   And is this a fair and accurate representation of how the restaurant appeared when you entered?

A.   Yes, it is.

MS. ROSE:  I move to admit 69.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 69 was received into evidence.)

Q.   Now, do you know whether the bodies had been moved prior to the taking of this photograph shown in 69?

A.   Yes.  During my briefing when I first arrived, I was informed that one of the victims had been turned --

MR. BRYSON:  Object what she was informed.

THE COURT:  Sustained.

Q.   If you would, once you'd entered and taken a look at what already had occurred, what did you begin to do?

A.   Once we had done the walk-through of the scene, I began to photograph the interior and the exterior -- some of the exterior again as well before we proceeded to anything else.

Q.   First I'm going to show you Government's Exhibit 74.  Do you recognize what's shown in that exhibit?

A.   Yes, I do.

Q.   Where is the doorway relative to the candy machines?

A.   It was to the right of the candy machines.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 216 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 216 of 444
JA1671

TERESA KETNER – DIRECT

Q.   And in the photo there are a couple of yellow markers shown.  Were those already in place when you arrived?

A.   Those particular ones were, yes.

Q.   Show you what's been marked as Government's Exhibit 75. Do you recognize what's shown in Exhibit 75?

A.   Yes, I do.

Q.   Why was this -- is it a fair and accurate representation of what you saw when you were actually making these photographs?

A.   Yes, it is.

           MS. ROSE:  I would move to admit and publish, Your Honor.

           THE COURT:  Any objection?

           MR. BRYSON:  No, Your Honor.

           THE COURT:  Let it be admitted.  You may publish.

           (Government's Exhibit No. 75 was received into evidence.)

Q.   And what was the significance, if any, of this particular photograph?  What's shown in 75?

A.   Near the bottom of the shelf there is a VCR that was hooked into the surveillance and I wanted to try to see if I could retrieve the surveillance tape.  However, it was already in the ejected position, but I went ahead and collected it and photographed it.

Q.   And ultimately, after you collected it, did you, at some

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 217 of 444
Case 3:08-cr-00734-RJC    Document 50-5    Filed 10/24/10    Page 32 of 21
JA1672

TERESA KETNER – DIRECT

later time, review the tape to see if there was anything on it?

A.    Yes, I did.

Q.    Was there -- was there anything on the tape?  Had anything been recorded?

A.    No.

Q.    Did you note -- you've called it a security system.  Did you note how many cameras were located either in or around the restaurant?

A.    I know there was one over the -- near the register in the corner of the restaurant.  There was another one at the exit door.  And I think there was a total of three.  I think the other one was near the office storage area, if my memory holds correct.

Q.    I'm going to show you just -- I'm going to scroll through a series of photographs and ask you if they're fair and accurate representations of what you saw.

       First Exhibit 82, 83, 84, 85, Exhibit 86, 87, 89, 90, 92, 93, 94, 96, 97, and 99.

       Did you make each of those photographs on this particular occasion?

A.    Yes, I did.

Q.    And are each fair and accurate representations of the scene?

A.    Yes.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 218 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 10/04/10   Page 38 of 124
JA1673

TERESA KETNER – DIRECT

MS. ROSE:  I'd move to admit each of those, Your Honor.  I believe 86 has already been admitted through a previous witness.

THE COURT:  86 or 88?

MS. ROSE:  88 was not shown at this time.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let them be admitted.

(Government's Exhibits Nos. 82, 83, 84, 85, 86, 87, 89, 90, 92, 93, 94, 96, 97, and 99 were received into evidence.)

Q.   First -- did you begin -- did you begin photographing as you -- as you entered the door to the right of the door and then around the restaurant?

A.   The first photograph that I took was standing in the doorway, was a straight shot.  Then I pan around from my right to my left.

Q.   Government's Exhibit 82, what is shown in this exhibit?

A.   In this particular exhibit is -- item number 1 was a shell casing that was located underneath the gumball machines.

And marker number 2 was a round plastic key chain attachment and inside were earplugs.

Q.   And just once again, what's the purpose of using these markers?  Does the numeric system have any particular meaning?

A.   Yes.  This is also a good way for us to package our

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 219 of 444
Case 3:08-cr-00734-RSC   Document 50-5   Filed 03/23/17   Page 219 of 444
JA1674

TERESA KETNER – DIRECT

evidence.  The number that you see in the photograph, the item number 1 would be packaged as item number 1 and also it would be represented in the sketch as item number 1.

MS. ROSE:  If I may approach the witness, Your Honor?

THE COURT:  You may.

Q.   Show you what's been marked as Government's Exhibit Number 88 and ask if you're able to identify Exhibit 88?

A.   Yes, I am.

Q.   How are you able to identify Exhibit 88?

A.   This is my handwriting on the front.  This is a Greensboro Police Department evidence envelope that I have filled out on the front.  It shows item number 1 as being a .45 caliber CCI casing.  My initials and the date that I sealed it is located on the back.

Q.   And CCI casing, CCI is representative of what?

A.   It's the brand, the manufacturer.

Q.   And when you say casing, what are you referring to?

A.   When you have an unspent or a live round, it consists of the bullet as well as the casing, the housing, the little round cylinder housing for the bullet.  Once it's fired from the gun, the bullet is expelled and the shell casing is ejected from the gun.  Unless it's a revolver, then the shell casing would remain inside the chamber -- or the cylinder, excuse me.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 220 of 444
Case 1:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 320 of 444

JA1675

TERESA KETNER – DIRECT

MS. ROSE:  I'd move Exhibit Number 88 be admitted, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 88 was received into evidence.)

MS. ROSE:  If I may approach?

Q.   I'm just going to open for you Government's Exhibit Number 88.  Contained in Government's Exhibit Number 88 is?

A.   It's a .45 caliber CCI shell casing.

Q.   And that was collected from marker number 1?

A.   That's correct.

Q.   And you indicated that at marker number 2 were the earplugs that you found on a key chain or on some kind of attachment chain.

A.   That's correct.

Q.   Show you Government's Exhibit 83.  What is located within Government's Exhibit 83?

A.   That's also a shell casing that was located under the table in the corner of the restaurant immediately to my right. This was a .45 caliber RP, which is Remington-Peters, manufactured shell casing.

Q.   Government's Exhibit 84.  Do you -- what's shown in Government's Exhibit 84?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA1676

442

TERESA KETNER – DIRECT

A.    Number 3 -- item number 4 or number 3?

Q.    What's at number 4 -- well, 3, 4, and 5.  What's shown on the screen?

A.    Okay.  Item number 3 is a .45 caliber CCI brand shell casing.

Item number 4 is a .45 caliber RP brand shell casing.

Item number 5 is a .45 caliber CCI brand shell casing.

Q.    Government's Exhibit 85?

A.    Yes.

Q.    What's shown in Government's Exhibit 85?

A.    85 is a .45 caliber CCI brand shell casing.

Q.    86?

A.    86 is a booth that was located to my -- to the back side of the dining area on the right-hand side.  It was a booth where there was an infant seat, it seems like a Santa hat and a cell phone.  Different items there on the table.

Q.    And Government's Exhibit 87?

A.    Yes.  87 was also another .45 caliber RP shell casing.

Q.    How many, then, shell casings were collected in total?

A.    A total of five.

Q.    If I may approach and then show you four evidence envelopes marked as 88A, 88B, 88C, and 88D.

First looking at Government's Exhibit 88A.  What is contained -- do you recognize that exhibit?

A.    Yes, I do.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1677**

TERESA KETNER – DIRECT

Q.   How do you recognize it?

A.   Also same -- this is our evidence envelope.  My writing is on the front indicating that it is item number 4 which is a .45 caliber RP brand shell casing.  My signature and date that I sealed it is on the back.

Q.   Government's Exhibit -- and the shell casing, when you say RP shell casing, same type shell casing which you previously removed from Government's Exhibit 88?

A.   It was the same caliber.  It was just a different manufacturer.

Q.   88B?

A.   Yes, I recognize this as my item number 6 which was a .45 caliber RP which is Remington-Peters brand shell casing.  My signature and date is on the back.

Q.   Government's Exhibit 88C?

A.   Yes, I recognize this also as item number 5, a .44 -- a .45 caliber CCI brand shell casing.  And my date and signature is on the back.

Q.   And finally, Government's Exhibit 88D?

A.   Yes, this is item number 3, a .45 caliber CCI brand shell casing.  And again, my date and signature is on the back.

          MS. ROSE:  I'd move to admit 88, 88A, B, C, and D, Your Honor.

          THE COURT:  Any objection?

          MR. BRYSON:  No, Your Honor.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 223 of 444
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 363 of 1

JA1678

TERESA KETNER – DIRECT

THE COURT:  Let them be admitted.

(Government's Exhibits Nos. 88, 88A, 88B, 88C, and 88D were received into evidence.)

Q.   Show you Government's Exhibit 89.  In the far back corner of Government's Exhibit 89 there appears to be -- is that the juke box?

A.   Yes.

Q.   And there's also a marker number 7.

A.   Yes.

Q.   And what was collected at marker number 7, if anything?

A.   Marker number 7 was a bullet.

Q.   And when you say bullet, what do you mean?

A.   The bullet is -- has already been fired from the gun.  It has separated from the shell casing.

Q.   I'm going to show you what has been marked as Government's Exhibit 91.

MS. ROSE:  If I may approach, Your Honor?

THE COURT:  You may.

Q.   Are you able to identify Government's Exhibit 91?

A.   Yes.  This is item number 7.  It's a spent bullet that was on the floor.  Again, my date and signature is on the back.

Q.   And is this the spent bullet which was located at marker number 7?

A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 224 of 444
Case 3:08-cr-00734-RSC   Document 50-5   Filed 10/24/10   Page 324 of 444
JA1679

TERESA KETNER – DIRECT

Q.   As depicted in photograph marked Government's Exhibit 89.

A.   That's correct.

Q.   I'm going to remove what's contained within Government's Exhibit Number 91.

     And are you able to identify that item?

A.   I am.  This is the bullet that was located on the floor and identified as marker number 7.

         MS. ROSE:  Your Honor, I will, if I may, publish 91 and I'll call it 91A for evidence.

         THE COURT:  You may.

         Government's 91A is the contents of Government 91?

         MS. ROSE:  The bullet -- the item that was removed from Government's Exhibit 91.

         (Government's Exhibits Nos. 91 and 91A were received into evidence.)

Q.   When you're collecting evidence, for instance this particular item, 91A, are you at that point able to make determinations about how it may be related to any other evidence there at the scene?

A.   No.

Q.   Is that -- you collect it and turn it over to someone else for that type of analysis.

A.   Right.  You're asking for the weapon that fired the gun -- I mean, that might have been used to fire it, or what was your question?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 225 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 225 of 444

JA1680

TERESA KETNER – DIRECT

Q.   Right.  Or any other conclusions relative to a bullet such as this which is recovered at a scene.

A.   Right.  No, I would only collect it.

Q.   Show you Government's Exhibit 76.  From what perspective was the photograph marked Government's Exhibit 76 taken?

A.   I was standing towards the back of the main dining room area.  Took the photograph pointing back to the front entrance.

        MS. ROSE:  I would move to admit Government's Exhibit 76.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 76 was received into evidence.)

Q.   You said from the back to the front of the restaurant.  How far back were you when you were taking -- do you note that there is a short or half wall on either side of this intersection?

A.   Yes.

Q.   Do you know specifically where you were standing when you took this photograph?

A.   I was standing in between that short 4 foot wall and the back of the wall that separates the cold prep area and the main dining area.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 226 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 226 of 444

JA1681

TERESA KETNER – DIRECT

Q.   Show you what has been marked as Government's Exhibit 92. What is shown in Exhibit 92?

A.   This is a photograph of the drink cooler that was located towards the back of the main dining area.  There's a bullet hole located just under the little red Christmas bulb up top. You can see the shattered glass.

Q.   You can touch the screen there, and if you can identify the area where the bullet hole is.

A.   Right there (indicating).

MS. ROSE:  Madam Clerk, could we mark that as Exhibit 92A.

Q.   Show you Government's Exhibit 93.  What is shown in Government's Exhibit 93?

A.   This is the back wall in the cold prep area just showing the -- this is an entrance where the bullet entered and still proceeded to go to the other side of the wall.

Q.   And when you -- what you're calling the cold prep area, where is that located relative to the back of the restaurant or the beverage case that we just saw?

A.   To the right of the beverage case.  The cold prep area is in between the kitchen and the main dining area.

Q.   Government's Exhibit 94.  Where -- what area of the restaurant is shown in Government's Exhibit 94?

A.   This is also located in the cold prep area.  There was two bullet holes in this area.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 227 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 10/04/10   Page 227 of 444

JA1682

TERESA KETNER - DIRECT

Q.   If you would just mark on your screen to show the two bullet holes.

A.   Whoops I missed that one.  The screen is -- yeah.

     There and there (indicating).

     MS. ROSE:  Your Honor, I would move to have that marked as Exhibit 94A representing the markings made by the witness.

     THE COURT:  It will be admitted as such.

     (Government's Exhibit No. 94A was received into evidence.)

Q.   Show you what has been marked as Government's Exhibit 96.  Where is what's depicted in Government's 96 located?

A.   This is in the kitchen area.  Be on the opposite wall where the cold -- where you seen the bullet holes in the cold prep area.

Q.   I'm going to zero in on a portion of that.  What is shown in the close-up section of Government's Exhibit 96?

A.   This is an indentation or a ding that -- where the projectile, the bullet entered the wall from the cold prep area, traveled through the wall, and struck this metal, like a back splash that was located behind the deep fryers.

Q.   Were you able to recover from behind that stainless steel wall area the slug that made contact there?

A.   No.

Q.   Why not?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 228 of 444
Case 3:08-cr-00734-RSC   Document 50-4   Filed 03/23/17   Page 228 of 444
JA1683

TERESA KETNER – DIRECT

A.    We would have had a large construction taken that metal -- we'd probably had to take the fryers out and also the metal plate there to retrieve that bullet.  And it appeared that it could have possibly fell down between the walls.

Q.    Show you what's been marked as Government's Exhibit 77 already admitted.  Where is this relative to the outer part of the restaurant?

A.    This is located at the very back of the restaurant.  Once you enter the kitchen area, it's towards the back.  You can see the exit door there that would lead to a storage area which would be at the very back of the store.  It's an extension off the kitchen area.

Q.    Show you Government's Exhibit 79.  You took that photograph as well?

A.    Yes, I did.

Q.    Government's Exhibit 80, is that a closer version of Government's Exhibit 79?

A.    Yes, it is.

Q.    There are some keys on the table there.  Ultimately did you recover those keys and return them to anyone?

A.    Yes, I did.

Q.    What is shown in Government's Exhibit 97?

A.    This is a photograph of the wall inside of the ladies restroom.

Q.    And where is the ladies restroom relative again?  Is it

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 229 of 444
Case 3:08-cr-00734-RSC   Document 50-4   Filed 03/23/17   Page 229 of 444
JA1684

in the front or the back?  What area of the restaurant?

A.   If you're coming in the front door, it's located all the way towards the back on the left-hand side down a little hallway area.  The ladies room was the first door to the right.

Q.   And where is it located relative to that cold prep area that you previously described?

A.   The cold prep area is basically in the middle of the restaurant.  Several walls separate them.  And you have to go over to your left and back down a little hallway to get to the ladies room.

Q.   And Government's Exhibit 99?

A.   Yes.  This is also in the ladies room.  This is on the opposite wall from the picture that was up right before.  And you can see that the bullet traveled through the wall in the ladies room, continued across the bathroom, and entered into the wall area on the opposite wall.

Q.   And what is shown on the screen there, is that a closeup of ultimately where the bullet rested?

A.   Yes.  Right to the left corner of the toilet -- or the sink.

Q.   And did you recover anything from that particular bullet hole or that location?

A.   Yes, we did.  Recovered a bullet.

        MS. ROSE:  If I may approach the witness?

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 230 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 230 of 444

JA1685

TERESA KETNER – DIRECT

THE COURT:  You may.

Q.   Officer Ketner, I'm going to hand you an exhibit marked as Government's Exhibit 98.  Once again, are you able to identify Exhibit 98?

A.   Yes, I am.  This is my handwriting.  It's item number 12 that I packaged it as.  It is a spent bullet.  And we labeled each bullet hole as either B1 or B2.  This was actually B2 collected from the west wall in the ladies bathroom.  Also, my signature and date is on the back of that.

Q.   And is the item contained in Government's Exhibit 98 the item that you recovered from the wall there that is before the jury in Government's Exhibit 99?

A.   Yes.

Q.   I'll remove the item from Government's Exhibit 98 and ask if you're able to identify that particular object?

A.   Yes, it is.  This is the bullet that was removed from the ladies bathroom wall.

MS. ROSE:  I would move to admit, Your Honor, Government's Exhibit 98.  I will mark the contents of 98, if I may, as 98A and move to admit.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let 98 and 98A be admitted.

(Government's Exhibits Nos. 98 and 98A were received into evidence.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 231 of 444
Case 3:08-cr-00734-RJC   Document 90-4   Filed 08/14/13   Page 231 of 444

JA1686

TERESA KETNER – DIRECT

Q.   How many lead fragments or bullets, expended bullets or slugs like we've just shown the jury, how many were ultimately collected?

A.   From the scene, two bullets were collected.

Q.   Once -- if you would, just describe for the jury the process or the protocol there at the police department for the maintenance of any evidence that is seized and collected.

A.   Once I package the evidence and seal it, I turn it into the evidence section.  I'll put it into a locker that I have a key for.  Once I seal it, I put the key into a -- turn it into the evidence section, and they remove that evidence from the locker and they check it in.

On some occasions if they're not really busy, I can actually give it to them and they will sign for it direct from person to person.  There's always a chain of custody.

Q.   And that's a locked facility where all evidence is maintained?

A.   Oh, yes.

Q.   After you had collected evidence, did you make a closer examination of the victims?

A.   Yes, I did.

Q.   What did you do first as you examined the victims?

A.   First thing that I did was to photograph them as they were there on the floor, different area of shots going around the bodies.  Then I want to do any closeup shots, facial

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 232 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 10/24/10   Page 47 of 214

JA1687

TERESA KETNER – DIRECT

shots, photograph any injuries, tattoo and jewelry, anything like that that may be present.

Once that is completed and video is completed as well, then we will proceed with a gunshot -- to collect a gunshot residue kit on the victims' hands.

We would also do fingerprinting, to collect fingerprints on the victims.

Once that is complete and we're getting ready to do a transport to the morgue, we would check also their pockets for any identification or anything that also would need to be collected.

Q.    Which victim did you conduct this examination first?

A.    The first one was identified as victim 1 because I didn't know at the time their identity, so we designated victim 1, victim 2.  Victim 1 was the first victim that I approached once I entered the restaurant and he was the one that had suffered a gunshot wound to the chest.  We later identified him as Ruben.

Q.    What -- what did you note about Ruben and his condition and any items pertinent to him?

A.    There appeared to be two injuries or two wounds to the chest area that I photographed.  There was a large -- very large pool of blood surrounding pretty much his body.  And also there was some matter that appeared to be consistent with possible brain matter sort of towards the center torso area of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 233 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 48 of 124

JA1688

this victim.

Q.   Did you note any items around the body?

A.   Yes, I did.  There was two cell phones.  One was laying towards the knee area of the right leg and another cell phone was laying near the victim's right side of his head.

Q.   Did you note any keys or other belongings?

A.   Yes.  There was some keys hanging from a clip from his belt.

Q.   Did you conduct any further examination or inventory of items related to Ruben on what you had labeled as victim 1?

A.   There was.  After we finished and -- I documented items that was located in his pockets as well as in his wallet.

Q.   Show you two items marked as Government's Exhibits 116 and 116A.  First Government's Exhibit 116.  What is Exhibit 116?

A.   This appears to be a business card from the Mexican restaurant.

Q.   And you say the Mexican restaurant.  Which Mexican restaurant?

A.   I hope I say this correctly.  Las Jarochitas.

Q.   Is that the restaurant in which you were -- the crime scene?

A.   Yes, that's the one that I was located at.

Q.   And then Government's Exhibit 116A?

A.   Yes.  This is a business card also from Garcia's Masonry,

TERESA KETNER – DIRECT

Incorporation, and the owner being displayed as Manuel Garcia.

Q.   And are these in the same or substantially the same condition as they were, Government's Exhibits 116 and 16A?

A.   Yes.

Q.   When you removed them?

A.   Yes.

         MS. ROSE:  I'd move to admit Government's Exhibits 116 and 116A, Your Honor.

         THE COURT:  Any objection?

         (No response.)

         THE COURT:  Let it be admitted.

         MR. BRYSON:  I'll object.  Lack of foundation.

         THE COURT:  Overruled.

         (Government's Exhibits Nos. 116 and 116A were received into evidence.)

         MS. ROSE:  116, Madam Clerk.

         THE CLERK:  Got that.

         MS. ROSE:  116A.

         THE CLERK:  Got it.

Q.   Regarding the other victim, what you initially labeled in your report as victim number 2.

A.   Yes.

Q.   What did you do?

A.   Also did the same thing basically I did to the first victim which was photograph the condition of the body, the

                Cheryl A. Nuccio, RMR–CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 235 of 444
Case 3:09-cv-00734-RJC   Document 50-4   Filed 10/04/10   Page 56 of 124
JA1690

TERESA KETNER – DIRECT

location of the body, an injury that I located on the left side of the head.  Also documented -- there was some keys hanging down from the victim's belt as well, and documented things in his wallet.  And also did a gunshot residue kit on his hands as well as collected postmortem fingerprints.

Q.   And is that a standard procedure even if there -- whether there is evidence of gunfire or otherwise?

A.   Yes.  If it's a gunshot related type scene, we would automatically do a gunshot residue kit on everybody involved, whether it be the victim or suspect.

Q.   And did you -- was there a cell phone or anything else noted next to Manuel's body?

A.   I don't recall.  May I refer to my report?

     Yes, there was a Nextel brand cell phone that was clipped to the front right pocket.

Q.   And how did you note that the victim Manuel was dressed?

A.   Was what?

Q.   How was he dressed?  Did you make a note of that in your report?

A.   Yes, I did.  Hang on just a second, please.

     He was wearing blue denim jeans, a gray colored long sleeve T-shirt, and he had a pair of tan work type boots on.

Q.   During your examination of the bodies and the area around the bodies, did you note any weapons or bottles or anything of that sort on the floor?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 236 of 444
Case 3:03-cr-00734-RJC   Document 52-1   Filed 03/23/10   Page 54 of 12

JA1691

TERESA KETNER – DIRECT

A.    No.   There was no weapons located or any other type evidence.

Q.    After you had -- did you do anything else there on the inside of the restaurant?  Was that your final step of your investigation inside?

A.    Basically, we also are requested from CSI Dutko to fingerprint, do some fingerprinting of the tablecloths, bottles, collect some DNA as well from the bottles.  And the front door was also processed for fingerprints.  We completed a video and we completed a rough crime scene sketch to document the interior of the restaurant.

Q.    Did you -- any items were turned over to you?

A.    Yes, all items except for the fingerprint lift cards were turned over to my custody.  The videotape, the DNA swabs.  Anything that someone would assist in collecting was all turned over prior to leaving the scene.

Q.    And once again, were those items maintained consistently with what you testified as the procedure for the maintenance of evidence?

A.    Yes.  Remained in my custody until I turned them over to evidence.

Q.    After you completed your work in the restaurant, what did you then next do?  Did you go outside or were you done for the evening?

A.    Yes, I did go outside.  I was requested to.  The keys

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 237 of 444
Case 3:08-cv-00573-RJC    Document 50-4    Filed 03/23/17    Page 237 of 444
JA1692

TERESA KETNER – DIRECT

laying on the table in the restaurant that you've seen in the previous photograph, I was requested to go out, meet with the vehicle owner. Photograph the owner of the vehicle and his passenger and to document their information as far as their name and address. Verify that that key fit that car. And then I turned it over to the owner.

Q.   After -- after you completed that task, did you take any other photographs on the exterior of the restaurant?

A.   Yes, I did. I photographed the vehicle that was parked directly in front of the front door which was later determined that the vehicle appeared to belong to Manuel Garcia which was victim number 2. Photographed, documented the interior as well as the exterior of the vehicle.

Q.   I'm going to show you a series of photographs. Government's Exhibit 100, Government's Exhibits 101, 102, 103, and 104.

     Are these the photographs about which you testified?

A.   Yes.

Q.   Are they a fair and accurate representation of the victim's truck and what you saw on this particular evening?

A.   Yes.

          MS. ROSE:  Move to admit 100 through 104, Your Honor.

          MR. BRYSON:  Object.  Relevance.

          THE COURT:  What's the relevance, counsel?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 238 of 444
Case 3:08-cr-00734-RJC   Document 52-4   Filed 10/04/10   Page 538 of 444
JA1693

MS. ROSE:  It's part of the crime scene and part of the evidence that was collected on this particular evening, Your Honor.

THE COURT:  I'll sustain the objection at this time.

Q.   What did you note about the victim's truck?

A.   The interior of it was very clean and neat and it appeared to be a lot of --

MR. BRYSON:  Object.

THE COURT:  Sustained.

Q.   Did you collect any other evidence that night there at the scene?

A.   Yes, I did.  From the victim's wallet I collected the currency, the money that was inside of the wallet and packaged those as well, along with the other evidence from the wallets and the wallets themself.

Q.   All right.  And once again, was that maintained as well?

A.   Yes.

Q.   A few days later on December the 11th, did you assist Detective Terry with the collection of some additional evidence?

A.   Yes, I did.  I was requested by Detective Terry to respond to our evidence garage facility located at the police department substation number 3.  And we have an evidence garage, like a three-car bay area.  He requested that I process a 1996 Neon, Plymouth Neon that was parked inside the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 239 of 444
Case 3:08-cv-00574-RJC   Document 50-4   Filed 03/23/17   Page 239 of 444

JA1694

TERESA KETNER – DIRECT

bay area.  I documented the license plate, the VIN number. Took photographs of the interior as well as the exterior.  And also collected some DNA swabs from some items located there within -- in the car.  And completed some fingerprint examination.  Collected some fingerprints.

Q.   First I'm going to show you what's been marked as Government's Exhibit 105.  What's shown in Exhibit 105?

A.   Yes, this is the Neon.  It's inside the bay area.

Q.   And 106?

A.   This is the interior photographing from standing outside the driver's door photographing into the vehicle.

Q.   Are each of those accurate representations of that particular car?

A.   Yes.

        MS. ROSE:  Move to admit 105 and 106.

        THE COURT:  Objection?

        MR. BRYSON:  No.

        THE COURT:  Let them be admitted.

        (Government's Exhibits Nos. 105 and 106 were received into evidence.)

Q.   That is the exterior of the Neon?

A.   Yes, that's correct.  The driver's side.

Q.   Did you have -- the car was already at this particular location when you first saw it; is that fair to say?

A.   That's correct.  It had already been towed to this

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 240 of 444
Case 3:09-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 58 of 124

JA1695

Appeal: 10-6   Doc: 90-4   Filed: 08/14/2013   Pg: 241 of 444

location.

Q.   106?

A.   This is the interior of the vehicle looking --

Q.   You indicated --

A.   -- from the driver's side.

Q.   I apologize.

You indicated that you collected evidence from this particular car, the Neon.  What evidence did you collect?

A.   In this particular one I collected a DNA swab from the mouth area of the can that is located in the cup holder on the driver's side.  See it right under the steering wheel there.  Collected a DNA swab from that area.

There was another can, a beer can located on the floor area behind the driver's seat.  You can see that in the floor there.  And a DNA swab was collected from that area, as well as the whole interior, exterior car was processed for fingerprint evidence.

Q.   And regarding collection of DNA, is that something that is done on every crime scene?

A.   Not every single crime scene, but it is done quite often.

Q.   And --

A.   Especially on a homicide, it would be pretty much protocol.

Q.   You don't have anything to do with any processing of that type of evidence or comparisons made between known standards

Cheryl A. Nuccio, RMR-CRR (704)350-7494

TERESA KETNER – DIRECT

of that evidence.

A.    No.  With the latent fingerprints, no.

Q.    That or the DNA.

A.    No, I just collect.

Q.    If, in fact, DNA is present.

A.    That's correct.

Q.    You indicated that you collected fingerprints from all over the car?

A.    Yes.  Interior as well as exterior.

Q.    Did you, on this occasion, also process another vehicle?

A.    I did.

Q.    What was -- what was that vehicle?

A.    This was the white Ford Expedition that was parked at the scene.  You seen it early on in the photographs with the crime scene tape wrapped around it.  It was towed the night that I was there processing the scene.  It was towed and escorted back to our evidence garage where I later processed it on December the 11th.

Q.    Show you Government's Exhibit 115.  What is Government's Exhibit 115?

A.    This is a photograph of the Expedition once it was parked inside the bay area at the evidence garage.

        MS. ROSE:  Move to admit, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 242 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/10   Page 57 of 121

JA1697

TERESA KETNER – DIRECT

THE COURT:  Let it be admitted.

(Government's Exhibit No. 115 was received into evidence.)

Q.   I'm also going to show you a series of exhibits.  First beginning with Exhibit 107.  107, front and back of that.

What is 107?

A.   Is that the one I'm looking at now?

Q.   Yes.

A.   The one I'm looking at now is the front of a latent card. And what that does, it's similar to an index card, but it's used to -- once we lift fingerprints with fingerprint tape, the tape is stuck to this card.  And this is actually what they do their fingerprint -- the fingerprint analysis is done off of these latent fingerprint cards.

And on the back I will write my name, the case number, where the particular print was lifted from or what type item it was lifted on, as well as the case number involved in this particular case.

Q.   Show you Government's -- I'm sorry, I apologize.

Government's Exhibit 108.  The same?

A.   Yes.  Card item number -- I mean, cards labeled number 5 and 6.

Q.   109?

A.   Yes, this is the front and back of cards labeled 7 and 8.

Q.   Exhibit 110?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

464

TERESA KETNER – DIRECT

A.   Yes, front and back of latent lift cards 9 through 12.

Q.   Exhibit 111?

A.   Yes, this is latent cards labeled 1 through 3 off of the Expedition.

Q.   And the previous cards were collected from the Neon; is that correct?

A.   That's correct.

Q.   Did you, while processing -- let me ask you before we move on.  As to those fingerprint cards, do you maintain those or are they locked at the evidence facility?  What's your procedure related to fingerprint lifts?

A.   Once I collect them and put them inside of a latent envelope, a fingerprint envelope, then I immediately, once I get back to the lab, I turn it over to our latent evidence section and they maintain custody of those.

Q.   Other than markings that were not made by you on the particular exhibit you just reviewed, were those, in fact, fingerprint lifts that you collected?

A.   Yes.

Q.   And subsequently turned over to the latent section?

A.   Yes.

Q.   When you were examining both the Neon and the Expedition, was there any material or registration information located in either of those cars?

A.   Yes, there were.  On the Ford Expedition, vehicle

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 244 of 444
Case 3:08-cv-00573-RJC   Document 50-4   Filed 10/04/10   Page 58 of 214
JA1699

TERESA KETNER – DIRECT

registration was located in the glove compartment.  And it was registered to Daniel -- and I'll spell the middle name for you, P-a-d-i-l-l-a, Ramirez.  Last name is R-a-m-i-r-e-z.  And it was -- address was 4203 Hewlett Street, Apartment 7B, in Greensboro.

Q.   And the Neon?

A.   And the Neon.  Yes, also the registration was located in the glove compartment.  It was registered to Rosa, and the middle name is I-s-e-l-a, Sanchez, and last name being E-s-p-e-j-o.  The address is displayed as 1835 Merritt Drive, Apartment E, in Greensboro.

Q.   And did that complete your examination on that particular day or collection of evidence?

A.   Yes.

Q.   Then again, a few days later on December the 13th of 2007, did you again assist Detective Terry in the collection of additional evidence?

A.   Yes, I did.

Q.   Where did that occur?

A.   This occurred in an interview room located at substation 3 at the police department right there in the same building as our police lab is at.

Q.   And what was your purpose in reporting to that location?

A.   I was requested to respond to the interview room to, what we call, process a suspect, which means to photograph the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 245 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 50 of 124
JA1700

TERESA KETNER - DIRECT

suspect, all sides, front, back, facial, up close, photograph any scars or tattoos located on that person, collected DNA swabs, buccal swabs from the inside cheek area of the mouth, and also I fingerprinted this person.

Q.   And did you, in fact, conduct those collections on this date, December the 13th of '07?

A.   Yes, I did.

Q.   And who was the person that you collected this evidence from?

A.   The suspect Umana.

Q.   Do you see him here today?

A.   Yes, he is.

Q.   Okay.  If you could identify that individual, please.

A.   Yes, he's sitting over there in the blue shirt beside the attorney.

        MS. ROSE:  If the record could so reflect the identification of the defendant, Your Honor.

        THE COURT:  It will.

Q.   I'm going to show you some exhibits, some of which have already been identified.

     First Government's Exhibit 21.  Did you take that photograph?

A.   Yes, I did.

Q.   Who is in the photograph, Exhibit 21?

A.   That's the suspect Umana.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 246 of 444
Case 3:08-cr-00134-RJC   Document 1274   Filed 10/24/10   Page 64 of 212
JA1701

TERESA KETNER – DIRECT

Q.    Exhibit 25.  Did you take this photograph?

A.    Yes, I did.

Q.    And this photograph was taken of whom?

A.    It was a tattoo located on the left arm, forearm of Umana.

Q.    Government's Exhibit 26.  What is shown in Government's Exhibit 26?

A.    This is a photograph of two separate tattoos that you can see on the inside thumb and forefinger area.  One I was not quite sure what it was.  And then there was some -- a design and then some initials that extended from the finger area.

Q.    And again -- is this the left hand of the defendant Umana?

A.    Yes.

          MS. ROSE:  Move to admit Government's Exhibit 26, Your Honor.

          THE COURT:  Any objection?

          MR. BRYSON:  No, Your Honor.

          THE COURT:  Let it be admitted.

          MS. ROSE:  Publish?

          THE COURT:  You may.

          (Government's Exhibit No. 26 was received into evidence.)

Q.    Government's Exhibit 27.  If you would take a look at that photograph, please, ma'am.  What is -- did you take this

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 247 of 444
Case 3:08-cr-00134-RJC    Document 50-4    Filed 03/23/17    Page 62 of 124

JA1702

photograph?

A.    I did.

Q.    From what area and of whom?

A.    This is also a tattoo that was located on the upper leg area, also of suspect Umana.

        MS. ROSE:  Move to admit 27.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

        THE COURT:  Let it be admitted.

        MS. ROSE:  Publish, Your Honor?

        THE COURT:  You may.

        (Government's Exhibit No. 27 was received into evidence.)

Q.    You also took other photos of tattoos or other parts of defendant's body?

A.    Yes.

        MS. ROSE:  Thank you very much.  I don't have any other questions at this time.

        THE COURT:  Do you want to begin cross or would you like to take an afternoon break at this time?

        MR. BRYSON:  I won't be long.

        THE COURT:  Okay.

                        CROSS EXAMINATION

BY MR. BRYSON:

Q.    You referred to victim number 1 as Ruben Garcia.  You

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 248 of 444
Case 3:08-cr-00134-RJC   Document 59-4   Filed 10/24/10   Page 53 of 121
JA1703

called him Ruben; is that correct?

A.   Yes, that's correct.

Q.   Okay.  And you recovered items from his person, correct?

A.   That's correct.

Q.   And you recovered items that -- he had two pieces of identification that indicated that his name was Pedro Castro; isn't that correct?

A.   Yes, there was several different names inside his wallet that was displayed on identification.

Q.   Are you the person that actually identified him as Ruben?

A.   No.  I think that would be -- I'm not sure which detective made the final identification, how they did it I'm not sure.

Q.   That was not you that did that?

A.   No.  I just documented what was located in his wallet.

Q.   All right.

A.   And there was a key chain hanging on the one -- victim number 1 which I referred to as Ruben and the name Ruben was located on that key chain.

Q.   All right.  You processed the white Expedition at a garage; is that correct?

A.   Yes, at the evidence garage facility.

Q.   All right.  But you had seen an Expedition at the scene, correct?

A.   Yes.  It was surrounded with crime scene tape upon my

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 249 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 249 of 444

JA1704

TERESA KETNER – REDIRECT

arrival; and shortly after I arrived, we had the vehicle towed to the evidence garage facility just so that we could have better light and everything to process it at a later time.

Q.   You also processed the Neon at the same garage that you processed the Expedition, correct?

A.   Yes.  Different bays.

Q.   It was not on the seen at Las Jarochitas.

A.   No, not that I'm aware of.

Q.   Did you see where it was before it was towed to the garage?

A.   No, I did not.

Q.   All right.

       (Defense counsel conferred.)

       MR. BRYSON:  Those are my questions.

       MS. ROSE:  I just have a follow-up question, if I may, Your Honor.

       THE COURT:  You may.

                  REDIRECT EXAMINATION

BY MS. ROSE:

Q.   Regarding Manuel Garcia whom you identified as victim 2, did he have identification?

A.   Yes, he did.

Q.   What identification did he have?

A.   Let me refer to my notes, please -- or my report.

     There was a wallet located in his right rear pocket and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 250 of 444
Case 3:08-cv-00734-RJC   Document 59-4   Filed 10/24/10   Page 58 of 124

JA1705

BARRY WHITLOW - DIRECT

inside there was a North Carolina driver's license that listed the name of Manuel Garcia Salinas. I'm not sure how to pronounce the last name. Spelling S-a-l-i-n-a-s.

Q. And an address of Stokesdale, North Carolina?

A. That's correct.

Q. And a permanent resident card in his name as well?

A. Several bank cards, credit cards, and a permanent resident card, same name identified to, yes.

MS. ROSE: Thank you.

THE COURT: You may step down and be excused.

(Witness stepped down.)

THE COURT: Members of the jury, we'll take our afternoon break at this time. Again, don't talk about the case amongst yourselves. Keep an open mind. And we'll see you at 4:35.

(Brief recess at 4:20 p.m.)

THE COURT: Ready for the jury?

MR. FOSTER: Yes, Your Honor.

THE COURT: Let's call them. Call the jury.

(Jury entered the courtroom.)

THE COURT: Call your next witness.

MR. NAZZARO: Yes, Your Honor. United States calls Barry Whitlow.

BARRY WHITLOW,

being first duly sworn, was examined and testified as follows:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 251 of 444
Case 3:08-cr-00534-RJC   Document 58-4   Filed 09/24/10   Page 56 of 124
JA1706

BARRY WHITLOW – DIRECT

DIRECT EXAMINATION

BY MR. NAZZARO:

Q.   Good afternoon.  Please state your name, sir.

A.   Barry Whitlow.

Q.   And Mr. Whitlow, where do you live?  What state do you live in?

A.   Virginia.

Q.   And what type of work do you do?

A.   I'm a high school guidance counselor.

Q.   And is that in Virginia?

A.   Yes.

Q.   Now, do you -- do you live near Greensboro?  Greensboro, North Carolina?

A.   About an hour or so.

Q.   Do you ever go to Greensboro, North Carolina?

A.   Yes.

Q.   And why do you go to Greensboro?

A.   Shopping mostly.

Q.   I want to direct your attention to December 8th, 2007. Did you have an occasion to go to Greensboro, North Carolina, on that day?

A.   Yes.  We were in Greensboro Christmas shopping.

Q.   Okay.  You said we.  Who was with you?

A.   My wife and two-year-old son.

Q.   And where were you Christmas shopping?

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 252 of 444
Case 3:08-cv-00734-RJC   Document 59-4   Filed 10/04/10   Page 67 of 121

JA1707

BARRY WHITLOW – DIRECT

A.    We were at Toys R Us.

Q.    And did you Christmas shop at Toys R Us that evening?

A.    Yes.  We bought a bicycle.

Q.    And did you -- did you park in the lot at Toys R Us?

A.    Yes.

Q.    And after you bought the bicycle, where did you go?

A.    We proceeded over to the end of the lot to pull out into traffic.

Q.    Was there a lot of traffic that evening?

A.    Yes.  There was probably three, maybe four cars in front of us.

Q.    And the Toys R Us you're referring to, where is that located?

A.    It's on High Point Road.

Q.    And was it crowded, the area, at the time you were there?

A.    Yes.

Q.    Do you remember what time it was approximately?

A.    I can't remember, to be honest with you.  It was crowded. It was on a Saturday night about three weeks from Christmas.

Q.    And as you were leaving Toys R Us, did you observe anything in the area?

A.    Yes.  We were -- when we were sitting in line waiting to pull out into the High Point Road, we noticed a man running out of the Mexican restaurant next door.  A guy ran out, jumped into a Neon.  There was a lady chasing him out of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 253 of 444
Case 3:08-cv-00734-RJC   Document 52-4   Filed 10/04/10   Page 253 of 444
JA1708

BARRY WHITLOW – DIRECT

back of the store.  He got in his car, cranked up.  Tried to go forward.  Couldn't go forward because he was blocked in. Tried to go backwards.  He couldn't go backwards because there was a line of traffic behind him.  He pulled up, backed up three or four times.  And then he jumped the curb, went through the parking lot at the Mexican restaurant and out on to High Point Road.

Q.   Did you observe anybody else exiting that restaurant?

A.   At the same time this was going on, I saw another guy run out of the front of the restaurant to a Ford Expedition, I believe it was, grab the door handle, tried to get in.  The car was locked.  And he turned and ran back through the parking lot.

Q.   And were you able to further identify any of these people or you just saw them for a brief moment?

A.   I just saw them as they were running through the parking lot.

Q.   And I'd like to show you what's been previously marked as Government 118.  And are you able to recognize Government 118 at all?

A.   Yes.  That's the end of the Toys R Us parking lot.

Q.   Okay.  And were you -- you were describing when you left the Toys R Us.  Are you able to indicate on this photograph at all approximately where your car was at this time?

A.   Somewhere -- doesn't appear to be marking where I'm

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 254 of 444
Case 3:08-cr-00734-RJC   Document 52-4   Filed 10/24/10   Page 53 of 124
JA1709

BARRY WHITLOW - DIRECT

trying to --

THE COURT:  You can clear it at the top and start again.

THE WITNESS:  Okay.

A.    Somewhere in that neighborhood (indicating).

Q.    That's where you were when you -- after you purchased your bicycle?

A.    Yes, that's where we were after we got in the car leaving to head home.

MR. NAZZARO:  I would move Government 118 and ask for it to be published along with what I would label as 118A which is the marking.

THE COURT:  All right.  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  I'll admit Government's Exhibit 118 which is a photograph and I'll admit 118A, the illustrated copy of the photograph.

(Government's Exhibits Nos. 118 and 118A were received into evidence.)

Q.    And the line is where you approximately were; is that right?

A.    Yes, sir.

Q.    Okay.  I'd like to show you 122.

MR. NAZZARO:  Let me see 119, please.

Q.    Do you see Government 119?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 255 of 444
Case 3:08-cv-00734-RJC    Document 59-4    Filed 03/23/17    Page 255 of 444
JA1710

A.    Yes.

Q.    Do you recognize 119?

A.    Yes.

Q.    And how do you recognize 119?

A.    On the night in question, we were parked -- where you see the first parking spot, we were almost directly behind that in line.

Q.    Okay.

          MR. NAZZARO:  I'd move 119, Your Honor.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          MR. NAZZARO:  Ask that it be published.

          THE COURT:  Let it be admitted

          (Government's Exhibit No. 119 was received into evidence.)

Q.    You mentioned about a Neon.  Where was the Neon parked?

A.    It was right here in this first space (indicating).

Q.    And where was your car?

A.    My car was directly behind it.

Q.    Were there other cars that were lined up, so to speak?

A.    Yes.  I believe there was three or four in front of me and two or three cars behind me.

Q.    And the person that you've indicated that got in the Neon, where did that car then go?  You said it jumped the curb.  Where exactly did it travel, what direction?

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 256 of 444
Case 3:08-cr-00734-RJC   Document 52-4   Filed 10/04/10   Page 256 of 444
JA1711

BARRY WHITLOW – DIRECT

A.    It -- they backed up enough that he could jump the curb. Went this way out by the pole into the parking lot next door (indicating).

MR. NAZZARO:  Your Honor, if I could mark the markings as 119A.

THE COURT:  Very well.  Are you moving admission?

MR. NAZZARO:  Move it as a separate exhibit.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 119A was received into evidence.)

Q.    Like to show you 120.  And are you able to recognize Government 120?

A.    Yes.

Q.    It's a different angle of the area?

A.    Yes.

Q.    Okay.  And are you able from Government 120 to mark -- I I don't want you to do it at this time, but are you able to mark where this Neon exited and where it went, what direction it went?

A.    Yes.

MR. NAZZARO:  Your Honor, I would move 120.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-4  Filed 03/23/17  Page 257 of 444
Case 3:08-cr-00734-RJC  Document 50-4  Filed 10/04/10  Page 257 of 444

JA1712

BARRY WHITLOW – DIRECT

THE COURT:  Let it be admitted.

(Government's Exhibit No. 120 was received into evidence.)

Q.   Could you indicate on the screen once again using the drawings.

(Witness complied.)

Q.   And that's the direction that you observed the Neon going?

A.   Yes.

MR. NAZZARO:  I would move 120A which is the markings that have been made on the exhibit.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 120A was received into evidence.)

Q.   And when you made the markings, you were making them from right to left on the exhibit; is that right?

A.   Yes.

Q.   Okay.  That indicates the direction of the Neon as you recall?

A.   Yes.

Q.   And I'd like to show you finally Government 121.  Are you able to recognize 121?

A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 258 of 444
Case 3:08-cr-00734-RJC   Document 59-4   Filed 10/04/10   Page 73 of 124

JA1713

BARRY WHITLOW - DIRECT

Q.   How are you able to recognize 121?

A.   The road -- the road beside the building on the left is where the Neon turned.  It turned down the side street beside the little strip mall.

MR. NAZZARO:  Move 121, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 121 was received into evidence.)

Q.   And which road are you referring to?  Can you mark which road you're referring to you saw it go.

(Witness complied.)

Q.   Do you know the name of that road by any chance?

A.   I do not.

MR. NAZZARO:  I would move 121A which is the markings made indicating direction of the vehicle.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 121A was received into evidence.)

Q.   And once you observed this, did you -- what did you do?

A.   We called 911.  At the same time this was going on, there was a wreck in front of the Toys R Us.  So we called 911 to report the wreck.

Q.   And did you later also report this information --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 259 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 10/04/10   Page 259 of 444
JA1714

JOHN BUTTS - DIRECT

A.   Yes.

Q.   -- to the police?

MR. NAZZARO:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. FOSTER:  One moment, Your Honor.

(Defense counsel conferred.)

MR. FOSTER:  No questions.

THE COURT:  You may step down and be excused.

Call your next witness.

(Witness stepped down.)

MS. ROSE:  Dr. John Butts.

JOHN D. BUTTS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Good afternoon.  If you would introduce yourself to the jury, please, sir.

A.   John D. Butts, B-u-t-t-s.

Q.   Where are you employed?

A.   I'm employed by the Office of the Chief Medical Examiner in Chapel Hill.

Q.   What is your position at the Office of the Chief Medical Examiner?

A.   I am the chief medical examiner for the State of North Carolina.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 260 of 444
Case 3:08-cv-00734-RJC   Document 59-4   Filed 10/04/10   Page 760 of 1244

JA1715

JOHN BUTTS - DIRECT

Q.   How long have you held that position, Dr. Butts?

A.   Since 1986.

Q.   Prior to that time, where did you work?

A.   I worked at the office as a deputy chief.  I've been continuous employment there since 1977.

Q.   And as the chief medical examiner, what is it that you do?

A.   I have a variety of responsibilities, including administrative oversight of our state's medical legal death investigation system.  I have certain teaching responsibilities, but I also actively participate in medical legal death investigations and perform forensic autopsies.

Q.   And are you, in fact, a forensic pathologist?

A.   Yes.  I'm certified in anatomic, clinical, and forensic pathology by the American Board of Pathology and I've held that certification since 1977.

          MS. ROSE:  I would tender Dr. Butts as an expert.

          THE COURT:  Any objection?

          MR. FOSTER:  No objection, Your Honor.

          THE COURT:  Very well.  He may give an opinion in this area.

Q.   Dr. Butts, if you would just briefly explain for the jury the process in North Carolina that is followed whenever there is a suspicious death or a homicide.

A.   When a death occurs it falls under medical legal

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Appeal: 10-6   Doc: 90-4   Filed: 08/14/2013   Pg: 262 of 444

jurisdiction because it's a sudden unexpected death or a death related to some type of injury or violence.  The county medical examiner, who is a public official appointed in a particular county of the state, is notified.  That individual takes charge of the body, conducts an inquiry.  In those instances where our guidelines that we promulgate require an autopsy examination, then they contact the pathology, the doctor -- doctors who perform autopsies that perform them for that particular jurisdiction and make arrangements for that examination.  And then the remains of the individual under investigation are brought to that facility for an examination.

Q.   And at your office there at Chapel Hill, what is the procedure for when a body arrives for examination?

A.   Our procedure would be, of course, initially to get some additional information or get information about the circumstances surrounding death, why the individual was being brought to us.  What happened to them or what's believed to have happened to them.

When they arrive, we examine their body.  We look at them with the clothing on.  We make a record note of the clothing that's present.  We remove the clothing.  We clean the individual.  We look for evidence of injury, other abnormalities.  When we see injuries, abnormalities, we take photographs, we make measurements, prepare diagrams, and ultimately dictate a written description of what we see.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 262 of 444
Case 3:08-cv-00734-RJC   Document 52   Filed 10/04/10   Page 76 of 124
JA1717

JOHN BUTTS – DIRECT

During this process we may also collect items of evidence depending on the nature of the death that we're investigating.

Following this external examination, we actually open the body and we look at the organs in place and individually. This allows us to determine the health or presence of disease or presence of injury if there's injury internally. When we find internal injuries, we try to link them to the external injuries. For instance, tracing the path of a bullet or a stab wound, and the like.

During this process we may also collect items of evidence, a bullet for instance, a sample of blood for possible toxicology testing. Blood for possible DNA analysis we give to law enforcement. We prepare small portions of the tissues which we later look at under the microscope, what we call our microscopic examination. The samples that we obtain for toxicology testing will be analyzed for alcohol and sometimes other drugs or toxins, again, depending on the nature of the death that we're investigating.

Finally, when those results are back, we complete a report which we would detail the findings and conclusions we reached as a result of that examination.

Q.    Thank you, Doctor. And on or about Sunday, December the 9th, did you conduct an autopsy on the body of an individual who was identified for you as Manuel Garcia Salinas?

A.    Yes, ma'am.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 263 of 444
Case 3:08-cv-00734-RJC    Document 50-4    Filed 03/23/10    Page 263 of 444
JA1718

JOHN BUTTS – DIRECT

Q.    And did you generate a report such as the one you have described to the jury?

A.    Yes.  I prepared a report in which I detailed my findings as a result of that examination.

Q.    And is that -- would that be your report file number B2007-3716?

A.    Yes.  That was the case number assigned to that particular examination.

Q.    I'm going to show you what I've marked as Government's Exhibit 123.  Do you recognize Exhibit 123?

A.    Yes, I do.

Q.    What is that exhibit or at least the first part of that exhibit?

A.    The first page is the first page of my report on my examination, my autopsy report on Manuel Salinas.

Q.    As reflected it is a six-page report?

A.    Yes, ma'am.

       MS. ROSE:  I'll move to admit Exhibit 123, Your Honor.

       THE COURT:  Any objection?

       MR. FOSTER:  No, Your Honor.

       THE COURT:  Let it be admitted.

       (Government's Exhibit No. 123 was received into evidence.)

Q.    What was the condition of Mr. Manuel Garcia's body when

                  Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 264 of 444
Case 3:08-cr-00734-RJC   Document 50-4   Filed 03/23/17   Page 76 of 12

JA1719

JOHN BUTTS – DIRECT

you received it?

A.    He was clothed.

Q.    Did you -- you made notation pursuant to your procedures of that clothing?

A.    Yes, I made a record of his clothing.  Also measured and weighed him, and the like.

Q.    What did you initially note about Mr. Garcia's body?

A.    Well, the major finding was the presence of a gunshot wound involving his head.

Q.    Prior to that, did you note any ink residue on the hands consistent with a gunshot residue test?

A.    Well, ink on his hands would be the result of fingerprinting rather than a gunshot residue.

Q.    Did you note any presence of gunshot residue testing or otherwise?

A.    I did not see anything that I would relate to gunshot residue testing, no.

Q.    When you collected his clothing and other items, what do you do with those?

A.    I put them in bags and ultimately I turn them over to law enforcement if law enforcement is collecting them in that particular case.

Q.    Describe the procedure you followed, then, to conduct your examination of the body.

A.    Well, I followed the procedure I described a moment ago

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 265 of 444
Case 3:08-cv-00734-RJC    Document 50-4    Filed 03/23/17    Page 265 of 444
JA1720

JOHN BUTTS - DIRECT

with an external examination, removal of the clothing, cleaning the body, looking at the injuries that were present, taking photographs, preparing diagrams.  Ultimately, then, an internal examination, and the like.

Q.   You indicated earlier in your testimony that during this procedure, particularly of the wounds that you've observed, photographs would be taken.

A.   Yes.

Q.   I'm going to show you first what's -- a series of photographs, Government's 124, 125, and 126.  Are each of those fair and accurate representations of the wounds that you observed during the examination of Manuel Garcia's body?

A.   Yes.  These exhibits were taken to illustrate the gunshot entrance and then the gunshot exit that was present in his head.

        MS. ROSE:  I would move to admit Government's Exhibits 124, 125, and 126 to assist in his testimony, Your Honor.

        THE COURT:  Any objection?

        MR. FOSTER:  I'll just object on the grounds it's cumulative, Your Honor.

        THE COURT:  Sustained.

Q.   Why did you take three different photographs?  Do they all show the same thing?

A.   No.  One photograph showed the wound of entrance on the

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 266 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 266 of 444

JA1721

JOHN BUTTS - DIRECT

left side of the head.  One photograph showed the area of the exit on the right side of his head with some damage to his ear.  But a great part of the exit was behind the ear and so another photograph was taken where the ear was pushed down so that you could actually see the hole that the bullet made leaving his body, leaving his head.

MS. ROSE:  Given that testimony, Your Honor, I move to admit as not cumulative because they show three different areas of the wound, the entrance and the exit wounds.

MR. FOSTER:  I would object under 403, Your Honor.

THE COURT:  Doctor, can you explain your findings without resort to the photographs?

THE WITNESS:  I can certainly describe my findings.

THE COURT:  Very well.  Overruled -- or I'll sustain the objection.

MS. ROSE:  Will the government be allowed to move any of those exhibits in?

THE COURT:  I've sustained the objection to the three photographs and so if you would continue your examination.

BY MS. ROSE:

Q.   Exhibit 124 there before you, Dr. Butts, what is shown in that exhibit?

A.   Exhibit 124 is a photograph, closeup, that shows the wound of entrance that was present in the left side of this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 267 of 444
Case 3:08-cv-00534-RJC   Document 59-4   Filed 10/24/10   Page 82 of 124
**JA1722**

JOHN BUTTS - DIRECT

gentleman's head.

Q.   And where on the left side of the head?

A.   It is up above his left ear approximately where I'm pointing now on my body (indicating).

Q.   And for the record, that would be about three inches above your --

A.   I believe I described it as two inches above, but if I might check a moment.

Yes, I described it as two inches up from the external ear canal.  So again, approximately where I'm pointing on my body (indicating).

Q.   Now, did you note anything around that particular wound that would have any stippling or gunshot residue or anything of that nature?

A.   No.  When I examined the wound, I did not notice any powder residues around the wound or on that side of the face in the areas that weren't -- weren't covered by hair.

Q.   And is it fair to say that powder residue would typically be left if the wound occurred close -- within close range of the shot fired?

A.   Yes.  Powder residue is a deposit on the skin around an entrance wound if the weapon is in very close proximity, inches rather than several feet.

Q.   If you'd take a look at Government's Exhibit 125.  What is shown in Government's Exhibit 125?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 268 of 444
Case 3:08-cr-00734-RJC   Document 52-4   Filed 10/21/10   Page 32 of 21
JA1723

JOHN BUTTS — DIRECT

A.    125 is a photograph that shows the right side of the head and it shows a tear of the upper part of the ear that was produced as the bullet exited the right side of his head.

Q.    And if you would just more specifically describe the portion of the ear that is gone.

A.    It's the top part of the ear flap or technically what we call the pinna, p-i-n-n-a.  It's torn, again, where I'm pointing on my body.

Q.    And what -- about what percentage of the upper part of the ear is blown off there or removed?

A.    It's only a small percent.  Five.

Q.    Did you note in your report how long?

A.    I did describe the tear in terms of distance.  Overall I described it as a 1.2 by .5 inch defect, but that involved the skin as well behind the ear.

Q.    Okay.  And you are pointing at this time to your right ear.

A.    I have been pointing to my right ear, yes.

Q.    Yes.  And the defect that you've explained is to Manuel Garcia's right ear.

A.    That is correct.

Q.    I'll show you 126.  What is shown in Government's Exhibit 126?

A.    Government's Exhibit 126 is a photograph of the same area with the ear pulled down so that we can visualize the actual

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 269 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 10/04/10   Page 269 of 444
JA1724

JOHN BUTTS - DIRECT

defect in the side of the head.

Q.   And if you could more -- with more detail describe the defect that is -- that you observed on the body of Manuel Garcia.

A.   It's a ragged hole or defect in the skin just, again, at the base of the top of the ear on the right side where the bullet that it exited in the left side of his head -- exited -- or entered in the left side of his head, exited after passing through his skull and his brain.

Q.   And what was the size of the defect noted on the right side of the head of Manuel Garcia?

A.   That was the 1.5 by -- rather 1.2 by .5 inches.

Q.   If you would just tell the members of the jury how it was that you determined what was the entrance wound versus the exit wound.

A.   The appearance of the two wounds is such that I could conclude that one was the entrance and one was the exit.  The hole on the left side was regular, rounded.  The hole on the right side is irregular and larger.  Entrance wounds tend to be smaller, rounder and more regular than exit wounds.

Q.   Were you able to make -- or draw a conclusion based upon what you had observed of the type of projectile or size of the caliber of weapon?

A.   I have an opinion, yes.

Q.   And what is your opinion?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JOHN BUTTS – DIRECT

A.   In my opinion, it is a rifled weapon, a bullet, probably a jacketed bullet because no significant amount of lead was left behind.

Q.   I'm going to show you what I've marked as Government's Exhibit 124A.

MS. ROSE:  If I may approach, Your Honor?

THE COURT:  You may.

Q.   I'm going to show you, Dr. Butts, Government's Exhibit 124A.  Are you able to identify that exhibit?

A.   Other than to say it's an envelope that's marked as a bullet fragment, no.

Q.   Okay.  I will remove what is contained within Government's Exhibit 124A.  I'll mark that for the record as Government's Exhibit 124B, and ask you if you're able to identify that object at this time?

A.   I am.

Q.   What is 124B?

A.   This is a fragment, a very small fragment of bullet that I recovered from the wound track that I just described in Mr. Salinas' head.

Q.   Do you know where within that wound track in that it passed from one side of the head to the other, where within that particular wound that fragment was located?

A.   I don't recall exactly where, but it was along the path that the bullet took going from the left towards his right and

Cheryl A. Nuccio, RMR–CRR (704)350–7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 271 of 444
Case 3:08-cv-00734-RJC   Document 52-4   Filed 10/04/10   Page 36 of 92

JA1726

JOHN BUTTS – DIRECT

exiting.

Q.    Thank you.

MS. ROSE:  I would move to admit 124B if I have not already done so.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 124B was received into evidence.)

Q.    Did you note any other injuries or defects to the body either by external or internal examination?

A.    I did not describe any other significant injuries on this gentleman's body, no.

Q.    While you provided information from which we can certainly draw a conclusion, did you form an opinion as to the cause of death of Manuel Garcia?

A.    I did.

Q.    And what is your opinion, Doctor?

A.    He died as a result of the gunshot wound I've described, the one to his head.

Q.    Were fluids collected per your typical protocol?

A.    Yes.

Q.    And were those submitted for analysis?

A.    Yes.  We performed an alcohol test on the sample of blood that I obtained from this gentleman.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 272 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 272 of 444

JA1727

JOHN BUTTS - DIRECT

Q.   And what was the result of that test?

A.   It was positive.  We found a concentration of alcohol in his system of 200 milligrams per deciliter.  That's an equivalent of a .20 on the breathalyzer scale.

Q.   Now, the bullet fragment that you collected which was marked as -- the bullet fragment that you identified as 124B, to whom did you provide that evidence once you had completed your examination?

A.   To a representative of the Greensboro PD, a Mr. Barnes.

Q.   On that very same date, December the 9th of 2007, did you also examine the body of Ruben Garcia?

A.   I did.

Q.   And once again, did you generate a report of your findings?

A.   I did.

Q.   Is that noted as your file number B2007-3712?

A.   Yes, ma'am.

Q.   I'll show you what's been marked as Government's Exhibit 127.  Are you able to identify Exhibit 127?

A.   Yes.  This is a copy of the report of autopsy examination I prepared on Ruben Garcia Salinas.

Q.   And did you note that it was a five-page document?

A.   Yes.

Q.   And is that -- those five pages consistent with your report --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 273 of 444
Case 1:08-cr-00734-RJC   Document 50-4   Filed 10/24/10   Page 36 of 124

JA1728

JOHN BUTTS - DIRECT

A.   Yes.

Q.   -- fairly and accurately represent --

A.   Those are the -- those are copies of my report.

MS. ROSE:  I'd move to admit 127, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 127 was received into evidence.)

Q.   Does this report fairly and accurately reflect the details of your examination of Mr. Ruben Garcia's body, the findings and conclusions?

A.   It does.

Q.   What was the condition of Ruben Garcia's body when you received it?

A.   Well, as with the other gentleman, he was also clothed and it was obvious that he had a gunshot wound as well.

Q.   Again, did you collect the clothing, inventory the items in his pockets and prepare those to be turned over to law enforcement?

A.   Yes, ma'am.

Q.   During your examination of the body, what did you note?

A.   The most significant finding was the presence of a gunshot wound of the central chest region right about at the level of his nipples in the -- basically the middle of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JOHN BUTTS – DIRECT

chest.

Q.    Show you what's been marked as Government's Exhibit 128. What is Government's Exhibit 128?

A.    Exhibit 128 is a photograph that shows the location and appearance of the gunshot wound entrance that was present in the central chest of Mr. Ruben Garcia.

        MS. ROSE:  Move to admit 128.

        MR. FOSTER:  Objection under 403.

        THE COURT:  Sustained.

Q.    Now, you've noted an external wound there.  When you performed your internal examination, what did you note?

A.    I traced the path of the bullet.  It went into his chest, through his breast bone.  It struck his heart, passed through a portion of the heart.  Damaged a large vessel coming from the heart.  Also damaged the liver.  And then impacted or ran into his back bone, and I recovered a bullet up against the vertebral column or back bone internally.

Q.    And what was the path of travel from the entrance to the point where you found the bullet resting against his back bone?

A.    Pretty much from front to back and a little bit downwards.

        MS. ROSE:  If I may approach?

        THE COURT:  You may.

Q.    Government's Exhibit 130.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 275 of 444
Case 3:08-cr-00734-RJC   Document 59-4   Filed 10/24/10   Page 96 of 124
JA1730

JOHN BUTTS – DIRECT

A.    Yes, ma'am.

Q.    I'm going to open Government's Exhibit 130.

I will later mark what I have removed from Government's Exhibit 130 as Government's Exhibit 130A.  Are you able to identify that exhibit, Dr. Butts?

A.    I am.

Q.    What is shown within the baggie marked -- or which will be marked as Government's Exhibit 130A?

A.    This item is the bullet that I recovered from the body of Mr. Ruben Garcia, the one that I've just described.

Q.    Same or substantially the same condition as when you received it?

A.    Yes.  It's substantially the same.  A little tarnish on it, but otherwise it looks the same.

Q.    Based upon your examination and your training and experience, were you able to make any determination as to the type of bullet or caliber of this particular bullet?

A.    Other than it appears to be a larger caliber bullet, I would -- I would refer that particular type of determination to experts in the field.

MS. ROSE:  If I could, Your Honor, what's on the ELMO, move as I've already admitted -- or marked -- or identified as Government's Exhibit 130A, to admit that and publish.

THE COURT:  Any objection?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 276 of 444
Case 3:08-cr-00734-RJC    Document 59-1    Filed 10/24/10    Page 94 of 124
JA1731

MR. FOSTER: No, Your Honor.

THE COURT: Let it be admitted and published.

(Government's Exhibit No. 130A was received into evidence.)

Q. Was this item also turned over to the Greensboro Police Department?

A. Yes, to Mr. Barnes.

Q. And did you also submit any bodily fluids which you had collected for analysis and toxicology?

A. Yes. We ran an alcohol analysis on this gentleman as well.

Q. And what was the result of that examination?

A. He had an alcohol concentration of 170 milligrams per deciliter. That's the equivalent of .17 on the breathalyzer scale.

Q. Is it part of your examination, your internal examination that you will note the contents of an individual's stomach or...

A. Yes.

Q. Did you make any notation as to the contents of Ruben Garcia's stomach?

A. Yes, I did describe it as containing several cups of recently ingested, well chewed food materials.

Q. Did you note any other external injuries or internal injuries to Mr. Garcia's -- Ruben Garcia's body?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 277 of 444
Case 3:08-cv-00534-RJC   Document 59-4   Filed 10/24/10   Page 92 of 124

JA1732

A.   I did not note any other internal injuries.  I didn't describe any -- any other -- any other external injuries other than the gunshot wound.

Q.   And that was -- if again, you would just describe the location of that gunshot wound relative to other marking points on his body.

MR. FOSTER:  Objection.  Asked and answered.

A.   When we describe the entrance --

THE COURT:  Hang on a second.  What was the objection?

MR. FOSTER:  Asked and answered.

THE COURT:  Sustained.

MS. ROSE:  Thank you.  I don't have any other questions.

CROSS EXAMINATION

BY MR. FOSTER:

Q.   Dr. Butts, starting first with Manuel Garcia Salinas.  Cause of death was a single gunshot wound to the head, correct?

A.   Yes, sir.

Q.   Okay.  And did you note in your report on him his height and weight?

A.   Yes, sir.  I measured him to be 69 inches in length.  That would be 5 foot 9 inches.  And we weighed him at 184 pounds.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 278 of 444
Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 95 of 121

JA1733

JOHN BUTTS - CROSS

Q.   And his ethanol converted to a breathalyzer scale, you said, was .20.

A.   That is correct.

Q.   And are you aware that the legal limit in North Carolina for impairment is .08?

MS. ROSE:  Objection.

THE COURT:  Sustained.

Q.   And as to Ruben Garcia, did you determine that his cause of death was a single gunshot wound to the chest?

A.   Yes, sir.

Q.   And did you also conduct measurements of his body weight and length?

A.   I did.  He was 68 inches.  That is 5 foot 8 inches tall. And he weighed 210 pounds.

Q.   And as you said, the ethanol in him was the equivalent of .17 on the breathalyzer scale.

A.   Yes, sir.

MR. FOSTER:  I have no further questions.

THE COURT:  Any redirect?

MS. ROSE:  No redirect.  Thank you, sir.

THE COURT:  You may step down and be excused.

THE WITNESS:  Thank you.

(Witness stepped down.)

THE COURT:  Call your next witness.

MS. ROSE:  Amy Wilde -- excuse me.  I apologize.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 279 of 444
Case 3:08-ct-00734-RJC   Document 59-4   Filed 10/24/10   Page 94 of 124
JA1734

JAMES CAYTON - DIRECT

MR. NAZZARO:  Jim Cayton.  Sorry.

JAMES CAYTON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NAZZARO:

Q.   Good afternoon.  Would you please state your name, sir.

A.   James Cayton.

Q.   And Mr. Cayton, how are you employed currently?

A.   City of Greensboro Police Department.

Q.   And how long have you been employed, Officer, with the Greensboro Police Department?

A.   Twenty-four-and-a-half years now.

Q.   What type of assignments have you had?  Can you describe them generally.

A.   Yes.  I spent 18 years in the patrol division and then I was at the beginning of the -- went into the community resource team which basically deals with crime prevention. And then when we formed our gang unit, I went with them temporarily.  And then I'm back in community resource.

Q.   I want to direct your attention to December 8th, 2007, and the early morning hours of December 9th.  Were you working that particular evening?

A.   Yes, sir, I was.

Q.   And what role were you -- what assignment did you have at that time in your career?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:08-cv-00734-RJC   Document 50-4   Filed 03/23/17   Page 280 of 444

JA1735

JAMES CAYTON - DIRECT

A.    I was assigned to the gang unit.

Q.    And were you working with the gang unit on that evening?

A.    Yes, sir.

Q.    And were you called out to assist in an investigation?

A.    Yes, sir.

Q.    And what was your role in that investigation?

A.    Officers had located a white Nissan -- I'm sorry, a white Dodge Neon, and I went over and sat up on that vehicle while waiting for detectives to look at the vehicle.

Q.    Where was that vehicle located?

A.    It was located at Merritt and Moseby Drive in a parking lot near an apartment complex.

Q.    And are you familiar with where that apartment complex is in Greensboro?

A.    Yes, sir.

Q.    What's the name of the apartment complex again, I'm sorry?

A.    It's changed hands several times.  It's owned by Imas Properties.

Q.    Okay.  You don't remember the name at the time?

A.    At the time, no, sir.

Q.    Now, this particular vehicle, did you -- what time did you arrive at this apartment complex to observe this vehicle?

A.    Originally it was around 8:00, 8:30 is when we originally located the vehicle.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 281 of 444
Case 3:08-cv-00734-RJC    Document 59-1    Filed 10/04/10    Page 96 of 124

JA1736

JAMES CAYTON - DIRECT

Q.   And when you arrived, was anybody in the vehicle?

A.   No, sir.

Q.   And did you -- you said you were waiting for somebody to come and take the vehicle.  Is that...

A.   Yes, sir.  The tag number had been confirmed that was given out by a witness was -- matched this Dodge Neon and therefore we were waiting for the detectives to respond to the scene to look at the vehicle.

Q.   Did they ultimately respond?

A.   Yes, sir, they did.

Q.   And did you stay there for a period of time?

A.   Yes, sir.

Q.   And what are you doing in addition to staying there and observing the Neon?  Did you have any other duties?

A.   At the time I was there to just make sure that nothing happened to the vehicle and that the -- waiting for the wrecker to arrive on the scene.

Q.   Did you later observe anything at the apartment complex?

A.   Yes, sir.

Q.   And what was that?

A.   Around 12:00, 12:30 in the morning, I observed a subject walking down Moseby Drive toward the parking lot where I was sitting.

Q.   Was the Neon there at the time or had it already been removed?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 282 of 444
Case 3:08-cv-00734-RJC    Document 32-4    Filed 10/24/10    Page 97 of 121

JA1737

A.    Still waiting on the wrecker.

Q.    And what did you observe about that person?

A.    As he approached the area, I -- what I had done was I didn't like my position, so tactically I pulled back into a parking spot just to kind of set up and watch the area.  And I observed him come across the parking lot.  As he walked by me, I observed that there was a spider web type tattoo on one of his arms.  And then he climbed over a fence and disappeared.

Q.    Okay.  What did you do next?

A.    I contacted Officer Miller who was in the apartment complex on the other side of the fence.  They had been doing a perimeter search and searching vacant apartments.

Q.    And after you -- after you spoke with Officer Miller, did you -- what further did you do with respect to this individual?

A.    I asked Officer Miller if he had observed a subject walk by him.  When he stated to me that he did not, I had lost sight of him.  There was no way that he could have went by him without seeing him.  So they initiated a further search again, this time looking for the individual that went over the fence.

Q.    And did that -- did they -- was that individual ultimately located?

A.    Yes, sir.

Q.    And where was he found?

A.    He was inside one of the vacant apartments.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 283 of 444
Case 3:08-cv-00734-RJC   Document 52-4   Filed 10/04/10   Page 98 of 124
JA1738

AMY WILDE – DIRECT

Q.   You mentioned -- is it the same individual that you saw with the spider web?

A.   Yes.

Q.   And do you remember what his name was?

A.   No, sir.

Q.   Was he detained at some point in time?

A.   Yes, sir, he was.

          (Government counsel conferred.)

          MR. NAZZARO:  No further questions.  Thank you.

          THE COURT:  Any cross?

          MR. BRYSON:  No questions.

          THE COURT:  You may step down and be excused.

          Call your next witness.

          (Witness stepped down.)

          MS. ROSE:  Government calls Amy Wilde.

                    AMY WILDE,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. ROSE:

Q.   Good afternoon.  If you would introduce yourself to the jury, please.

A.   Amy Wilde.

Q.   You may need to pull that mike a little closer.

          (Witness complied.)

Q.   Thank you.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 284 of 444
Case 3:08-cr-00734-RJC   Document 59-4   Filed 10/04/10   Page 98 of 121
JA1739

AMY WILDE – DIRECT

A.    Uh-huh.

Q.    Ms. Wilde, where are you employed?

A.    With the Greensboro Police Department.

Q.    What's your position?

A.    Latent print examiner.

Q.    How long have you been a latent print examiner?

A.    Since approximately the year 2000.

Q.    Prior to that time, what did you do?

A.    I was a crime scene investigator for the Greensboro Police Department.

Q.    Do you have any other law enforcement experience?

A.    Yes.  I was a latent print examiner with the City/County Bureau of Identification in Raleigh for three years.

Q.    How long total have you been in law enforcement?

A.    Approximately 14 years.

Q.    If you would describe your education.

A.    I began with my bachelor of science degree from Western Carolina University where I graduated in 1996.  While at Western Carolina University, I studied psychology and criminal justice, along with crime scene investigation courses and fingerprint courses.

I was hired with the Greensboro Police Department in 1996, at that same year.  And while hired with the Greensboro Police Department, I have attended approximately 350 additional hours of fingerprint courses and then another 300

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-4   Filed 03/23/17   Page 285 of 444
Case 3:08-cv-00134-RJC   Document 55-4   Filed 10/04/10   Page 285 of 444
JA1740

AMY WILDE - DIRECT

hours of educational crime scene investigation courses which includes the preservation and collection of fingerprints on scene.

Q.   And do you hold any specific certifications?

A.   Yes.  I'm certified as a certified latent print examiner through the International Association for Identification, approximately 1 of 800 in the world.

Q.   And what kind of requirements must you complete in order to be certified as a latent print examiner?

A.   You must go through a three-year mentoring program under a certified latent print examiner.  And during that time there's specific courses that you must take, specific books that you must study and read.  Then we take a multiple choice, true/false, classification test along with a practical test where no missed identifications or no bad or erroneous identifications can be made at all.

Q.   Generally, what's the record of success on that examination?

A.   When I took it, it was approximately 50 percent.

Q.   How long have you been certified?

A.   Since 2000.

     MS. ROSE:  Your Honor, I would tender Ms. Wilde as an expert in the analysis and identification of latent prints.

     THE COURT:  Any objection?

     MR. BRYSON:  No objection.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

AMY WILDE – DIRECT

THE COURT: She may be allowed to offer an opinion in that area.

Q.   Would you describe for the jury the protocol that's used within the Greensboro Police Department regarding fingerprint evidence.

A.   Yes.  When a CSI goes to the crime scene and develops latent prints on a crime scene, they will turn those latent prints into an envelope and that envelope is placed into a secure lockbox within our lab.  And then someone from my unit will collect the latent evidence or the fingerprints from the crime scene in the envelope and do an analysis to determine is it of value for comparison purposes.

Q.   If you would, when you receive that evidence, do you receive any information from the investigator who actually collected those particular pieces of evidence?

A.   Yes.  The actual fingerprint will be placed on a lift card.  The back of the lift card will have the location that the latent print or the fingerprint was lifted from at the crime scene.  It will have the CSI's initials and the date that the fingerprint was lifted, along with the case number.

Q.   And does that report in any way determine the process that you will employ to begin your analysis?

A.   Absolutely.

Q.   How does that affect the analysis?

A.   When you're looking at a surface that a fingerprint can

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 287 of 444
Case 3:08-cv-00154-RJC   Document 124   Filed 10/04/10   Page 236 of 444
JA1742

AMY WILDE – DIRECT

come from, there's all kinds of distortion.  Fingerprints -- the skin on the underneath of your fingers and your palms and the soles of your feet is unlike any other skin on your body with the raised lines that produce an outline or your fingerprint, your footprint.  And this skin is very elastic.

So when you touch an item such as a curved surface and you've got elastic skin along with moisture from sweat, you're going to distort the fingerprint from the skin elasticity or as opposed to touching a flat surface, you're also going to have a different type of distortion.

So we take into account what item's touched and how the hand -- or how that item may be handled in order to know how much distortion to allow.

Q.    What about other environmental factors, either -- you mentioned sweat.  What about anything that may be going on with the body of the person as well as other aspects of the environment?

A.    Yes.  It's common thought, especially with CSI on TV, that every time you touch an item, you're leaving a fingerprint behind.  And this is simply not true.  A fingerprint is a chance impression.  In order for you to leave a print behind, you have to be sweating the right amount.  If you're sweating too much and you touch a surface, you're going to obliterate all the detail or the message within a print. Kind of like taking a rubber stamp and placing the rubber

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-4    Filed 03/23/17    Page 288 of 444
Case 3:08-cv-00164-RJC    Document 254    Filed 10/04/10    Page 288 of 444
JA1743

AMY WILDE - DIRECT

stamp into a bucketful of ink and you just douse the stamp and then I place it here and say can you read the stamp for me. It's going to be too much paint or too much ink and it will obliterate the detail. The same thing with the fingerprint.

Also with the fingerprint, you have to have the right surface. If we go outside and find a tree with heavy bark and you place your fingerprint on it, you're not leaving -- you place your hand on it, you're not leaving a fingerprint behind. And it's the same thing with a stamp. We put the right amount of ink on the stamp and walk outside and touch the bark of a tree, you're going to look at it and say I can't read the detail. Same thing within the fingerprint.

So we have to have the right amount of sweat, the right type of surface touched, and it needs to be a clean touch and release. If I'm sweating the right amount and I touch here but I'm moving my hand all around, I'm obliterating all the detail within that fingerprint just like you would with a stamp.

Q. Whenever you receive the prints after examining the information that accompanies them, what then do you do to begin your print examination and analysis?

A. Once we determine if there's enough value for a fingerprint comparison, we try to find out is there a suspect, a particular suspect in a case. And if so, do we have known standards from that suspect. Or if there's no suspect, is

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 289 of 444
Case 3:08-cv-00164-RJC   Document 254   Filed 10/29/10   Page 289 of 444
JA1744

510

AMY WILDE – DIRECT

there enough detail or characteristics to place this fingerprint into a database to search for the owner of the fingerprint.

Q.   And what -- what type of database are you referring to?

A.   A fingerprint and palm print database.

Q.   And from -- how large is that database and what are the sources for that database?

A.   The local -- we have a local database that's fingers and palms, and it's right at 30,000.  And it's local arrestees. Those who have been arrested by the Guilford County Sheriff's Office and the Greensboro Police Department and High Point Police Department.

Then we have a regional database that extends from our location to Winston-Salem, North Carolina, Durham, North Carolina, and Raleigh, North Carolina.  And they're arrestees within those areas.

And then we have the state database which encompasses the entire state and those arrested in the state for any crimes.

Q.   Once you have made those -- checked the database or if you have known prints or known standards which have been submitted, what then next do you do in your process?

A.   We use a scientific methodology of ACEV, analysis, comparison, evaluation.  And we always get a verification to do quality assurance.  We look at different detail, different levels of detail within the fingerprint, making sure that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1745**

AMY WILDE – DIRECT

everything within the fingerprint from top to bottom, left to right lines up spatially and that there are no unexplained dissimilarities to determine the identity.

Q.   Are there -- in reviewing this initial review, are there specific pattern types that help you in your analysis?

A.   Yes.

Q.   What are the pattern types?

A.   There are three basic pattern types when it comes to fingerprints and everyone has either arch, loops or whorls, or a combination of all three of those.

Q.   I want to show you what's been marked as Government's Exhibit 135.  Are you able to see Exhibit 135 there on your screen?

A.   Yes.

Q.   Is that a document that you prepared?

A.   Yes, it is.

Q.   And is that a document which would assist you in your explanation of your analysis and conclusions?

A.   Yes, it is.

        MS. ROSE:  The government would move to admit Government's Exhibit 135.

        THE COURT:  For demonstrative purposes?

        MS. ROSE:  Yes, sir.

        THE COURT:  Any objection?

        MR. BRYSON:  No.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 291 of 444
Case 3:08-cv-00164-RJC   Document 252   Filed 10/29/10   Page 69 of 244
JA1746

AMY WILDE – DIRECT

THE COURT:  Let it be admitted.

(Government's Exhibit No. 135 was received into evidence.)

Q.   If you would explain to the jury the various patterns of fingerprints that are possible.

A.   The three main types of fingerprints are the loop, arch, and whorl.  And you can see in the example of the loop, if you look at the right side of the -- the right side of that fingerprint, the ridges come in on one side, they loop around the middle or recurve around the middle of the fingerprint and they go back out the same side that they entered upon.  And it's just a looping formation.  You can see -- yes, here we go.

You can see the ridges come in on one side and then they loop around the middle of the fingerprint and go back out the opposite -- or the same side that they entered upon.  And that's the looping pattern.

And with the arch, this is more like a hill or a mountain range.  The ridges come up on one side of the finger and they rise up or tend to rise, wave, and then go back out the opposite side.  So that's an arch pattern.  It looks like a mountain range or hills.

And the whorl pattern is a circular pattern.  Some people can see a target or a bulls eye when you look at it.  But it's very circular in the middle.  Very distinct patterns.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 292 of 444
Case 3:08-cv-00164-RJC   Document 158   Filed 10/04/10   Page 292 of 444
JA1747

AMY WILDE - DIRECT

Q.   Are there any other patterns other than the three you just described?

A.   No, no more main patterns.  There are sub types of each of these, but these are the main three pattern types.

Q.   So in your preliminary examination, is that the first level to determine what is present relative to one of these three patterns?

A.   Absolutely.  When -- when I receive a latent from a crime scene or a fingerprint from the crime scene, the first thing that I have to do is determine is this an arch, loop or whorl from the crime scene.  And then look at the suspect and determine, okay, does the suspect have any arch, loops or whorls.

Q.   And then what's the next step in your analysis?

A.   The next step is to look at individual characteristics within the pattern type.

So the very first thing that I do is without using a magnifying glass, look at the fingerprint.  Determine -- in this case on your screen you'll see a whorl.  And if the suspect has whorls, the next thing I do is look at the characteristics within the whorls.  So that's when you use the magnifying glass.  And you can see, these characteristics are not continuous ridges or continuous lines but, rather, they're ridges that stop abruptly, called ridge endings.  Or they're ridges that fork, called bifurcations.  Or you can see short

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-4   Filed 03/23/17   Page 293 of 444
Case 3:06-cv-00164-RJC   Document 58-4   Filed 10/04/10   Page 293 of 444
JA1748

AMY WILDE - DIRECT

ridges and dots within this fingerprint.

So I pick a target group of those characteristics that I just explained. Look at the target group as far as maybe three or four or five of them that are closely related. And then search for that same target group in the inked impression, in the inked impression of the suspect any whorls that he or she may have.

Q.    What's the next step then? Do you go further in your analysis?

A.    Yes. If I find the same target group that's in the latent fingerprint from the crime scene in the suspect's inked fingerprint and I can find the same five characteristics called the target group, the next thing I will do is look at everything within that fingerprint from top to bottom, left to right. And it's -- actually, it's called running the ridges or the flow of the ridges. And I'm making sure that everything spatially adds up from left to right, top to bottom. The same number of intervening ridges, the same number of continuous ridges, and no unexplainable differences.

Q.    I'm going to show you another part of this exhibit. Would this label, Location of the Core/Delta Areas, would this assist in your testimony?

A.    Yes.

MS. ROSE: If I may publish this as well? It's part of that same exhibit, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 294 of 444
Case 3:08-cv-00164-RJC   Document 124   Filed 10/04/10   Page 109 of 244
JA1749

AMY WILDE – DIRECT

THE COURT:  You may.

THE WITNESS:  When looking at any fingerprint, some of them can be partial and they will not have a core and a delta.  But most fingerprints that we can get from the crime scene will have a core and a delta, and this just shows us specific focal points of the fingerprint.  The core is always the center.  And then the delta will be a specific focal point that will have a lot of the characteristics we were talking about, the forking ridges and the ending ridges.

Q.   I'll also show you part of the same exhibit entitled Ridge Flow.  Will this assist you in your testimony?

A.   Yes.

MS. ROSE:  I'd ask to publish that as well.

THE COURT:  You may.

THE WITNESS:  When we get a latent print from the crime scene and we're analyzing that print, the very first thing we have to do is determine is it an arch, loop or whorl, and then the correct orientation.  In other words, which way is up?  How is the print oriented?

And as you can see here, once you can determine the ridges come in on one side, loop around and go back out the opposite side, you know the loop is always going to be up so you know how to orient.  So there's a lot of orientation that goes along with looking at the type of surface that the print was on that goes into the analysis.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 295 of 444
Case 3:08-cv-00164-RJC   Document 522   Filed 10/04/10   Page 495 of 444
JA1750

AMY WILDE – DIRECT

Q.   And this relates back, as you said, to whether it was a curved or flat or crinkled or whatever the type of surface may be.

A.   Yes.

Q.   Show you another slide, part of your exhibit that shows Bifurcation, Ending Ridge and Dot.  Will this assist --

A.   Yes.

Q.   -- as you further explain your analysis?

          MS. ROSE:  I'd like to publish this as well, Your Honor.

          THE COURT:  You may.

          THE WITNESS:  And this is the level 2 or the characteristics that I was talking about.  And you can see I've taken some of the level 2 detail with the ending ridge, the bifurcation, which is a fork, or the dot.  And you can see that when we blow these up, they have specific endings or specific characteristics about them, even their shapes.  And this is -- this would be an idea of a target group that we would use in searching.

Q.   Showing you a slide which is marked Relationship Between Features.  Will this also assist you in explaining your analysis?

A.   Yes, it will.

          MS. ROSE:  If I may publish that, Your Honor?

          THE COURT:  You may.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 296 of 444
Case 3:08-cv-00154-RJC   Document 184   Filed 10/04/10   Page 296 of 444
JA1751

AMY WILDE - DIRECT

THE WITNESS:  And when we're conducting the comparison and evaluation between the latent print from the crime scene and the suspect -- or the inked print from the known card, once we find the ending ridge or the bifurcation and the dot, we're also counting those continuous ridges that are intervening between the dots and the bifurcation and the ridge endings.  So it's not just looking at characteristics and points and counting those, but, rather, it's a totality of every single ridge within the print.

Q.   And finally, a slide Examples of Level 3 Detail.  Will that also assist you?

A.   Yes.

MS. ROSE:  If I may publish that, Your Honor?

THE COURT:  You may.

THE WITNESS:  After we have determined the pattern type, the orientation, found the target group and the target groups are aligning within the latent print from the crime scene to the arrest print, and then we've looked at everything from top to bottom, left to right as far as counting the characteristics and the intervening continuous ridges, the last thing we do is look at something called level 3 detail.

Level 3 detail is the shapes of the individual ridges.  And you can see on the right, the fingerprint on the right with the blue ridge.  There's a couple of bulges in the blue ridge and then there's also an area where that ridge gets

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 297 of 444
Case 3:08-cv-00154-RJC   Document 524   Filed 10/04/10   Page 129 of 244
JA1752

AMY WILDE – DIRECT

very slim.  These are biological characteristics that are reproduced and that is what that ridge looks like on the finger.  So each time that it's reproduced in a fingerprint, you will see the skin –- the skinny or the slim area of that ridge along with those two bulges.  And those areas are also used for identification purposes.  That's called edgeoscopy.

On the print on the left, you can see –- this is a print that has been magnified.  And if you'll look right in the center of that circle, you'll see a small white dot.  That is actually a pore, a sweat pore.  So we can even compare the location of the sweat pores on the ridges.

Q.   Did you receive lifted prints from Officer Dutko which he collected on December the 8th, 2007?

A.   I did.

Q.   And how were those marked or identified for you?  Did he indicate the location from which he had collected each of those?

A.   It did.  And he also had his initials, the case number, and the date on them.

Q.   How many lifted prints did you receive for review from Officer Dutko?

A.   There were 14 lift cards.

Q.   And in reviewing those prints, did you follow the procedure which you've just described for the jury?

A.   I did.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1753**

AMY WILDE – DIRECT

Q.   Now, did you have any known standards to compare?

A.   I was later given known standards.

Q.   First I'm going to show you what's -- what we have marked as Government's Exhibit 131.

Do you recognize Government's Exhibit 131?

A.   Yes, I do.

Q.   How are you able to recognize that exhibit?

A.   My initials and the date.

Q.   And is there an opp -- is that the opposite side of Government's Exhibit 131, the back side of the card?

A.   I believe so.

Q.   And did you use Government's Exhibit 131 in performing your analysis?

A.   I did.

MS. ROSE:  Move Government's Exhibit 131, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  Object.  Lack of foundation.

THE COURT:  Let me see counsel at sidebar.

(Side-bar conference as follows:)

THE COURT:  Your objection is to lack of foundation?

MR. BRYSON:  Right.

THE COURT:  It appears to be an SBI fingerprint card.

MS. ROSE:  That was collected by Officer Ketner.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 299 of 444
Case 3:08-cv-00134-RJC   Document 254   Filed 10/04/10   Page 299 of 444
JA1754

THE COURT:  Do we have testimony --

MS. ROSE:  She testified that she collected his print when she took his photograph.

MR. FOSTER:  Did she identify that exhibit?

MS. ROSE:  No.

THE COURT:  Is there any reason to believe that it's not what it appears to be?  I mean, it's -- we can bring Ketner back in.

MR. FOSTER:  I mean, I thought the card -- the exhibit said it was Officer Morehead that -- just from looking at it, that rolled the prints.  I didn't see Ketner's name on there.

MS. ROSE:  She said she collected his prints.  And they're going to be -- I mean, these are fingerprint cards from a number of people that were taken at various times during their arrest.  Now, I don't have to show the witness that -- those particular exhibits, but they're what were used to make these -- they're the known standards and they're maintained at any time anybody is arrested.  Clearly he's been arrested, as have the other --

MR. FOSTER:  I thought Ketner testified to lifting the question prints, not the known.

THE COURT:  That was Dutko, right?

MR. BRYSON:  Yes.

MS. ROSE:  She took his pictures and did --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 300 of 444
Case 3:08-cv-00154-RJC    Document 52-4    Filed 10/04/10    Page 130 of 244
**JA1755**

MR. BRYSON:  She said she went down there.

THE COURT:  Look, I mean -- I could rule that there's not a foundation laid and put Ketner back on.  I'm wondering why we're -- I'm wondering if there is a -- if there is a good faith reason to believe that there's not a foundation for it.  I mean...

MS. ROSE:  And we're going to be -- I mean, if that's the case, we've got exhibits -- we've got prints from everybody that was -- you've got the report.  We've got the prints from everybody that was compared as known standards.  I mean, I don't -- I don't know why there would be any reason to believe that fingerprint cards which are routinely taken and maintained in multiple databases would not be accurate.

THE COURT:  Well, it's the government's burden to show that they are what they purport to be.  And if there's a serious objection to it, I'll require you to bring the -- some kind -- to put on some kind of evidence to lay the foundation.  I'm just wondering whether -- I mean, at this point I would sustain the defendant's objection because I don't think there's been a connection between his fingerprint card and -- I'll have to go back and review the testimony of Ketner.

MR. FOSTER:  Perhaps, Your Honor, if we can look at that fingerprint card a little more closely.  If Ketner's name is on it -- it just seemed to me it said Morehead not Ketner, and it looked like --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 301 of 444
Case 3:06-cr-00164-RJC   Document 254   Filed 10/29/10   Page 180 of 244
JA1756

THE COURT:  That's a card that was taken from the defendant at the time of his state arrest on the --

MR. BRYSON:  It's dated December 13.

THE COURT:  -- cocaine -- or for the arrest in this case.

MR. BRYSON:  Yes, I did see that.  That was the date that she did say she was there.

MR. FOSTER:  Okay.

MR. NAZZARO:  Are you going to have similar objections to the other people that are not your client? Because we have other ones that we're going to be submitting also as known standards.

MS. ROSE:  That way we'll know so we can bring in those witnesses.

MR. BRYSON:  Can we go look at it just for a minute?

THE COURT:  Yeah, why don't you look at it.  See if there's a continuing objection.

Hang on a second.  Everyone come in here.

If y'all have a continuing objection, I think the best thing to do is recess overnight and bring the witness back in the morning and --

MS. ROSE:  And we'll have those other witnesses, too, we can just...

THE COURT:  Go ahead and look at the card.

MR. BRYSON:  Give us a minute to look at the card

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1757**

and consult.

MS. ROSE:  I've got the other ones too.

THE COURT:  If, after looking at it, you still have an objection, just say you renew your objection and I'll react to it.  If you don't, if you withdraw your objection, we'll go forward.  Just let me know.

MR. BRYSON:  Are you guys going to stay here while we go back?

THE COURT:  No, we'll all go back you can just tell me from the table.  All right.

(End of sidebar conference.)

THE COURT:  Ms. Rose, do you have the hard copy of Government's Exhibit 131?

MS. ROSE:  I do, Your Honor.  I'm going to provide it to the defense.

(Counsel conferred.)

THE COURT:  Counsel, it appears this witness might take longer than the eight minutes that I have budgeted for the testimony today.  So I think what we might do is call it a day at this point and pick up in the morning.

Members of the jury, it looks like we're not going to get the full testimony of this witness in by the time I told you we would break for the day, and so we are going to break for the evening and resume in the morning.

I would ask you to follow the instructions I've

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 303 of 444
Case 3:08-cv-00164-RJC    Document 52-4    Filed 10/04/10    Page 303 of 444
JA1758

given you already, and that is to not talk about the case either amongst yourselves or with any one of your family members or friends when you go home and go about your business tonight.

I would ask you to take serious efforts to keep yourselves untainted from any possible media coverage, newspaper, radio, TV, internet. And just try the best you can to avoid any kind of exposure to that kind of thing.

And also, to keep an open mind. You haven't heard all of the evidence and so keep an open mind until the evidence -- the end of the case.

With those instructions, I would tell you we're going to break for the day and -- for the evening and come back at 9:15 tomorrow -- well, actually, no. Just be ready to come into court at 9:30 in the morning.

So with those instructions, we will break for the day. Thank you.

(Jury exited the courtroom.)

THE COURT: Ms. Wilde, sometimes trial work is an art, not a science. And we thought we would be able to get your testimony in by the end of the day, but I'll ask you to come back in the morning at 9:30.

THE WITNESS: Yes, sir.

THE COURT: You may be excused at this time.

THE WITNESS: Thank you.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

(Witness stepped down.)

THE COURT:  Let me just ask counsel with respect to the remaining potential fingerprint cards, if you all would discuss those and figure out where you stand and the government be prepared to lay a foundation for any objected to cards.  We'll start this in the morning.  I just ask you all to get together after hours and confer and see where we're at in the morning.

Mr. Nazzaro, Ms. Rose, I get nervous with some of those evidence envelopes cut open and evidence being unsealed.  And so if you would seal -- have somebody seal those again, any of the evidence envelopes that you cut open, and initial them.  And if you need to use them again, we can go through that process again in the morning or whenever we get to it.  I just get a little nervous with that -- those evidence envelopes in the condition they're in.

Now, is there anything else we need to take care of before we adjourn for the day?

MS. ROSE:  No, sir.

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  Well, we'll start again at 9:30.  If there are legal issues we need to deal with, let my chambers know and we'll come in earlier than that.  Just be ready to go at 9:30.

(Evening recess at 5:58 p.m.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

        I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

        Dated this 14th day of April, 2010.


                                s/Cheryl A. Nuccio
                                Cheryl A. Nuccio, RMR-CRR
                                Official Court Reporter


                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 306 of 444
Case 3:08-cv-00154-RJC   Document 125-4   Filed 10/04/10   Page 306 of 444
JA1761

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA                )DOCKET NO. 3:08-CR-134-2
                                        )
                                        )
        vs.                             )VOLUME III-A
                                        )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA         )
_____ )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 14, 2010

APPEARANCES:

On Behalf of the Government:
    JILL WESTMORELAND ROSE
    Assistant United States Attorneys
    100 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

On Behalf of the Defendant:
    JOHN DAVID BRYSON
    Wyatt, Early, Harris & Wheeler, LLP,
    P.O. Box 2086
    High Point, North Carolina 27261

    MARK PATRICK FOSTER, JR.
    Law Offices of Mark Foster, PC
    1011 E. Morehead Street, Suite 300
    Charlotte, North Carolina 28204




LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 307 of 444
Case 3:08-cr-00134-RJC   Document 504-2   Filed 03/28/11   Page 1 of 198

JA1762

527

I N D E X

GOVERNMENT'S WITNESSES:

    AMY WILDE
        Direct Examination by Ms. Rose            529
        Cross-Examination by Mr. Bryson           537

    DOREEN HUNTINGTON
        Direct Examination by Mr. Nazzaro         544
        Cross-Examination by Mr. Bryson           561

    SUSAN CONRAD
        Direct Examination by Mr. Nazzaro         568
        Cross-Examination by Mr. Bryson           604

    JEFF STROHM
        Direct Examination by Ms. Rose            610
        Cross-Examination by Mr. Foster           615

    OFFICER RENEE QUILES
        Direct Examination by Mr. Nazzaro         615
        Cross-Examination by Mr. Foster           620

    RONY ANTONIO MAGANA LOPEZ
        Direct Examination by Ms. Rose            620

                    * * * * * *

                    E X H I B I T S

GOVERNMENT'S EXHIBITS:
NO.                                              RECEIVED
71    ......................................... 533
72    ......................................... 536
107   ......................................... 553
108   ......................................... 555
109   ......................................... 556
110   ......................................... 558
111   ......................................... 560
131   ......................................... 531
132   ......................................... 531
133   ......................................... 532
134   ......................................... 532
138   ......................................... 576
143 & a   ..................................... 590
144 & a   ..................................... 590
145 & a   ..................................... 590
146 & a   ..................................... 590
147& a   ...................................... 590

                Laura Andersen, RMR 704-350-7493

JA1763

528

E X H I B I T S

GOVERNMENT'S EXHIBITS:
NO.                                                              RECEIVED

| NO. | RECEIVED |
|---|---|
| 148 & a | 590 |
| 149 & a | 590 |
| 150 & a | 593 |
| 151 | 600 |
| 152 | 600 |
| 152 a&b | 603 |
| 153 & b | 600 |
| 153a | 603 |
| 154, a&b | 600 |
| 155 & a | 600 |
| 156 & a | 600 |
| 157 & a&b | 600 |
| 158 & a,b&c | 600 |
| 159 & a&b | 600 |
| 160 & a&b | 600 |
| 161 & a&b | 600 |
| 162 & a&b | 600 |
| 163 & a&b | 600 |
| 165 & a&b | 600 |
| 166 & a&b | 600 |
| 167 & a&b | 600 |
| 168 & a&b | 600 |
| 169 | 637 |
| 169a&b | 600 |
| 170 & a,b&c | 600 |
| 171 & a&b | 600 |
| 172 & a&b | 600 |
| 174 & a&b | 600 |
| 175 & a&b | 600 |
| 176 & a&b | 600 |
| 177 & a&b | 600 |
| 178 & a | 591 |
| 178c | 592 |
| 179& a&c | 592 |
| 180 | 634 |
| 207&b | 611 |
| 263&a | 601 |

* * * * * *

COURT INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 309 of 444
Case 3:08-cr-00134-RJC   Document 50-4   Filed 03/23/11   Page 309 of 108
JA1764

529

P R O C E E D I N G S

APRIL 14, 2010.

(Defendant present.)

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  Are we ready for the jury?

ALL COUNSEL:  We are, Your Honor.

THE COURT:  Very well.  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Good morning, everyone.

THE JURY:  Good morning.

THE COURT:  Glad to see everyone.  Hope you had a nice evening and are ready to work this morning.  The government recall its witness.

MS. ROSE:  Will you come around please, Ms. Wilde.

(Amy Wilde resumes the witness stand.)

CONTINUED DIRECT EXAMINATION BY MS. ROSE:

Q    Good morning, Ms. Wilde.  Of course you're still under oath.  I think the point we reached yesterday, you had indicated you received 14 lift cards from Officer Dutko from the restaurant?

A    Correct.

Q    I'm going to show you Government Exhibit 131.  Are you able to see 131 there?

A    Yes.

Laura Andersen, RMR 704-350-7493

JA1765

530

Q     Are you familiar with Government's Exhibit 131?

A     Yes, I am.

Q     What is 131?

A     This is a known fingerprint card bearing the name Alejandro Umana.

Q     And when you say known fingerprint card, what does that mean?

A     This is a fingerprint card or fingerprints taken, using known standards or a live scanner or inked fingerprint method, in order to obtain known sample from a known individual.

Q     And is that sample or this known standard collected by law enforcement?

A     Yes, it is.

Q     And is it maintained as either evidence or as part of the database?

A     Yes, it is; both.

Q     And did you utilize Government's Exhibit 131 in performing any of your analysis?

A     I did.

        MS. ROSE:  The Government would move to admit Exhibit 131, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

        THE COURT:  Let it be admitted.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 311 of 444
Case 3:08-cr-00134-RJC   Document 504-2   Filed 03/28/11   Page 5 of 108
JA1766

531

(Government Exhibit 131 was received into evidence.)

Q    (By Ms. Rose) Also show you Government's Exhibit 132. What is Government Exhibit 132?

A    This is a known fingerprint card bearing the name Cesar Castillo.

Q    And once again, is it what you refer to as a known standard?

A    Yes, sir.

Q    And was this Exhibit 132, the fingerprint card of Cesar Castillo used in performing any of your examinations and analysis?

A    Yes, it was.

MS. ROSE:  Move to admit 132, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 132 was received into evidence.)

Q    (By Ms. Rose) I will show you what's been marked as Government's Exhibit 133.  What is Government's 133?

A    That is a known standard fingerprint sample for Angel Rivera.

Q    And once again, was this used in performing your analysis?

A    Yes, it was.

MS. ROSE:  Move to admit 133, Your Honor.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 312 of 444
Case 3:06-cr-00194-RJC   Document 504   Filed 03/30/11   Page 6 of 198
JA1767

532

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 133 was received into evidence.)

Q    (By Ms. Rose) Government Exhibit 134.  What is 134?

A    This is a known fingerprint sample for Julio Rosales Lopez.

Q    And did you use this sample or known standard in your analysis?

A    Yes, I did.

MS. ROSE:  The Government would move 134, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 134 was received into evidence.)

Q    (By Ms. Rose) Did you utilize the protocol that you described for all of us yesterday, in matching these known samples to those which were lifted at the restaurant?

A    Yes, I did.

Q    Were any identifications made?

A    Yes.

Q    I'm going to show you first Government Exhibit 71.  Do you recognize Government's Exhibit 71?

A    Yes, I do.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 313 of 444
Case 3:08-cr-00154-RJC   Document 50-4   Filed 03/23/11   Page 73 of 198
JA1768

533

Q    From whom did you receive Exhibit 71?

A    CSI Ryan Dutko.

Q    And is this one of the lifts that you used to perform your analysis?

A    Yes, it was.

MS. ROSE:  The Government would move to admit 71, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 71 was received into evidence.)

Q.    (By Ms. Rose) If you would, just describe what we see on the screen here in Government's Exhibit 71?

A    These are fingerprints that were developed at the crime scene using black fingerprint powder.  And then a fingerprint lift tape was used to remove that fingerprint from the item that it was developed on, and placed on this white lift card.

So in essence you have CSI Dutko lifted the print from the crime scene from this item, and placed it on this lift card so that he could bring it back to my office for analysis, possible identification.

Q    And using the items contained in Government 71, did you perform analysis on it?

A    I did.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 314 of 444
Case 3:08-cr-00134-RJC   Document 50-4   Filed 03/23/11   Page 8 of 108
JA1769

534

Q    And based upon that, what conclusions did you make?

A    The fingerprint that you can see on the left side of the screen, that has the blue oval on top of it with the number three, that is the right middle finger of Alejandro Umana.

Q    Does that evidence also indicate from what location that fingerprint was lifted?

A    Yes.  On the backside, on the reverse side of this lift card, there would be notation as to where that fingerprint came from.

Q    And where was this fingerprint came from or lifted?

A    If I may refer to my notes.  A Bohemian beer bottle.

Q    Now, how many, if you know from the items that you have before you, how many prints were actually lifted from that bottle?

A    Five fingerprints total from that bottle.

Q    And were there varying degrees of comparability to those lifts?

A    Yes.  As we talked about yesterday with the skin being very elastic, due to the elasticity of the skin, any condensation from a drink bottle or a beer bottle, and the curvature of the surface of a beer bottle, the fingerprints left on that can be of different clarity and quality.

So kind of like the rubber stamp we were talking about yesterday the message within the rubber stamp, or the

Laura Andersen, RMR 704-350-7493

JA1770

535

message within the fingerprint, may be readable or may not be, depending on how much the skin had the moisture in it, how much curvature, how much movement, and then also how much moisture.

Q    Of the five lifts, how many were of identifiable quality?

A    Two.

Q    And the other three, what was their quality -- or what did you determine them to be?

A    Unidentifiable.

Q    Were other identifications made from the prints lifted and the fingerprint cards which you have already testified about?

A    I made two fingerprints to Alejandro Umana and that was it.

Q    I show you what's been marked as Government's Exhibit 72. Do you recognize Exhibit 72?

A    Yes.

Q    What is Exhibit 72?

A    This is another lift card where CSI Dutko used black fingerprint powder on scene, and developed the print, and then preserved it using the fingerprint tape and lift card.

Q    Where was this fingerprint lifted?

A    From the Bohemian beer bottle.

Q    This is the second one that was of comparable quality

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 316 of 444
Case 3:08-cr-00134-RJC   Document 1242   Filed 03/30/11   Page 316 of 138
JA1771

536

that you testified about earlier?

A    Yes.

MS. ROSE:  Move Government Exhibit 72, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 72 was received into evidence.)

Q    (By Ms. Rose) Noted on -- aside from the lift card, is there other writing seen on Exhibit 72?

A    Yes.

Q    What is the other writing?

A    As explained yesterday, when we use the Ace V Analysis, the analysis comparison, evaluation and verification, yesterday I spoke that we always have our results verified by another examiner for quality assurance and quality control.

So the red writing that you see on the bottom of that lift tape on the left of your screen, is the verifier who is an independent examiner who verified this case to make sure that there are no mistakes and it's quality assurance.

You must understand that when we make an identification, when I make a single identification, I am placing my entire career, someone else's life --

MR. BRYSON:  Object, Your Honor.

THE COURT:  Sustained.  I'm going to sustain.

Laura Andersen, RMR 704-350-7493

537

Q    (By Ms. Rose) You do have a verification process?

A    Yes.

Q    Who verified these particular prints?

A    Doreen Huntington.

Q    Were there any other identifiable prints of the 14 lift cards that were provided to you by Officer Dutko, were any other identifiable prints identified?

A    No other identifications were made.

       MS. ROSE:  Thank you, very much.  I don't have any other questions of this witness at this time, Your Honor.

       THE COURT:  Any cross?

       MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q    Do I call you Ms. Wilde or Officer Wilde or --

A    Ms. Wilde will work fine.

Q    Okay.  Yesterday when you were testifying you had some large blowups of examples of fingerprints, correct?

A    Yes, sir.

Q    But they weren't specifically related to this case?

A    Correct.

Q    They were just general --

A    Examples.

Q    Okay.  Now, with the actual fingerprints that you identified in this case, you did not have any blowups?

A    Other than the ones you just saw on screen.

                    Laura Andersen, RMR 704-350-7493

538

Q    Okay.  Well, we couldn't -- they were not of such a magnitude -- magnification that we could actually see the details of the fingerprints, could we?

A    I could see them pretty -- they were pretty big on screen.

Q    On 71?

A    Yes, sir.

Q    And 72?

A    Um-hmm.

Q    You thought they were the same blowup size as the ones we saw yesterday?

A    Not the same exact size as the examples, no.

Q    Okay.  And when you examine these, you use a magnifier glass?

A    Yes, I do.

Q    Okay.  These were actual size.  They weren't blown up at all, were they?

A    You must -- when I say actual size, actual size to me is this (indicating).

Q    Right.

A    So it was bigger than that on screen, but yes, they were not the same magnification as the ones yesterday, the examples in the slides, sir, you're correct.

Q    All right.  Now, you testified that you use the Ace V method of analysis, correct?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 319 of 444
Case 3:03-cr-00134-RJC   Document 19-12   Filed 01/30/11   Page 13 of 138
JA1774

539

A    Yes, sir.

Q    And that is a subjective analysis, correct?

A    Yes.  Yes, sir.

Q    Okay.  There's no objective standard that you're using when you use the Ace V Analysis Method, correct?

A    Objective standard in that I'm looking at everything within the print, the totality of the print.

Q    Okay.  But there's no requirement that you have to match, say, at least six points in a fingerprint before you can call it a match, correct?

A    That's right.  We use -- we use more than just the characteristics involved.  If I wanted to use just six points, then I'm not looking at the continuous ridges in between the characteristics or in between the points.

I'm just using the safety net of six points.  And you can make a bad or an erroneous identification just using points, and not the totality of all the ridges within those points, or in between those points intervening.

Q    When I used the number six, I wasn't suggesting six is a magic number.  What I'm suggesting is, there is no set number of points that you have to match before you can call it a match, correct?

A    Absolutely correct.

Q    In other words, it's up to you, you decide when it's a match?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 320 of 444
Case 3:03-cr-00734-RJC   Document 50-4   Filed 03/30/11   Page 320 of 444
JA1775

540

A    It's up to your individual training and skill level and what -- in 1973 the International Association for Identification, which is the largest organization for forensics in the world, determined that having a set number to identify a fingerprint, is not really scientific. Because bad or erroneous identifications had been made using the set number, with examiners not looking at the entire ridges within the print, the entire totality of the print.

So rather with the no set standard, it's up to the individual examiner and they're training and their certification to determine, is this an identification.  And then use the verification process to go with it.

Q    Isn't that also one of the criticisms of your field, is that there is no objective standard for declaring a match in fingerprint analysis?

A    Some see it as a criticism, yes.

Q    In fact, the National Academy of Sciences criticizes your field for not having objective standard, correct?

A    They would like for us to have more of a statistical model, like DNA, 1 of 99,500.  Instead of, this is the print to the exclusion of all others in the world.

Q    You're familiar with the recent National Academy of Sciences report entitled, Strengthening Forensic Sciences in the United States, correct?

A    Yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 321 of 444
Case 3:08-cr-00134-RJC   Document 152-2   Filed 01/30/11   Page 15 of 138
JA1776

541

Q    And one of the things they found is that because there's no objective standards, examiners sometimes disagreed with their own conclusions when shown the events at a later time.

A    Yes, sir.  When you have someone with different skill levels, and different education, and training, something that I may identify, and then later let someone who has less training or even less skill level, they may not agree with my results because they are not at a point of skill level where they can see, where they can identify.  And that is something that the NAS report recorded.

And I agree with a lot of things the NAS report said, and there are some disagreements that I have with that report also, sir.

Q    Okay.  But, I mean, they weren't talking about examiners disagreeing with each other.

They were talking about the fact that one examiner could call something a match and then be shown the same thing at a later time and saying that it didn't match, correct?

A    And that has happened to me.  The identifications or the cases that I looked at my first three or four years of training, and first three or four years on the job, when I go back and look at them now, I have developed a skill level where I can identify a lot more with 14 years of training

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 322 of 444
Case 3:03-cv-00534-RJC   Document 1577   Filed 01/30/11   Page 162 of 188
JA1777

542

than I can with three or four years of training.  It comes with expertise.

Q   And you said earlier you're not testifying as to a probability that this is his fingerprint?

And you're not using any -- I'm sorry, your answer was?

A   No, I'm not testifying to a probability.

Q   And you're not using any population studies to narrow this field?

A   No, sir.

Q   Okay.  Again, that's another one of the criticisms, is that -- is that you should be doing this based on a population study, correct?

A   There are criticisms to that.  And I feel with AFIS, which is the Automated Fingerprint Identification System that is used in many law enforcement agencies throughout the states, the United States and the world -- fingerprints are searched on these databases daily, multiple times a day.

And with all of the agencies that are using these databases daily, and no two fingerprints are found to be the same over 100 years of history, and then utilizing these databases daily, there's still no fingerprints that have been found to be the same.

Then, in my opinion, probability is not an issue when no two fingerprints have been found to be the same.  You do have the same DNA in family member twins, but you do not

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 323 of 444
Case 3:09-cv-00134-RJC   Document 50-4   Filed 03/30/11   Page 323 of 444
JA1778

543

with fingerprints.

Q    But there have been fingerprints found to be the same, correct?

A    No, sir.

Q    What about the guy out in Oregon who is matched up to the train bombing in Madrid?

MS. ROSE:  Well, objection.

THE COURT:  Sustained.

Q.    (By Mr. Bryson) One of the complaints in the National Academy of Sciences report was that the uniqueness that you are describing, does not guarantee that a print that you match up didn't come from two different people?

A    The uniqueness -- it's the -- not only is it the uniqueness, but it's the quantity and quality.  And that's what I was talking about yesterday with the rubber stamp. You have to have a certain amount of sweat, a certain amount of contact and release, and a certain amount of processing to get the right clarity and quantity.

Without a sufficient quality and quantity within the print, I will not make an identification.  It's not worth it.

MR. BRYSON:  Those are my questions.

THE COURT:  Any redirect?

MS. ROSE:  No redirect.  Thank you, very much.

THE COURT:  You may step down and be excused.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 324 of 444
Case 3:03-cv-00734-RJC   Document 15-42   Filed 03/30/11   Page 18 of 138
JA1779

544

Call your next witness.

MR. NAZZARO:  United States calls Doreen Huntington.

THEREUPON, DOREEN HUNTINGTON, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning.  Would you please say your name.

A    Doreen Huntington.

Q    Ms. Huntington, what is your current employment?

A    I'm employed with the Guilford County Sheriff's Department in Greensboro, North Carolina.

Q    And what type of work do you do with the sheriff's department?

A    I'm the latent print examiner and supervisor of the unit.

Q    And how long have you been involved as a latent print examiner?

A    My career started in 1985 with the Cleveland, Ohio, police department.  In that capacity I processed crime scenes for physical evidence, processed prisoners for their fingerprints, compared the latent prints from -- developed from crime scene prints to known prints.

From there in 19 -- I was there approximately four years.

In 1991 I moved to Wisconsin, and I was employed by the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 325 of 444
Case 3:09-cr-00134-RJC   Document 1574   Filed 01/30/11   Page 193 of 198
JA1780

545

State of Wisconsin's Department of Justice, the state crime lab in Milwaukee, Wisconsin. And my duties there included receiving evidence from submitting surrounding agencies; processing this evidence for latent prints; comparing the latent prints to known suspects; running any of the unknown latent prints through the AFIS systems.

And AFIS stands for Automated Fingerprint Identification System. And simply it's a computer database of known 10 print cards that allows us to take a latent print from a crime scene who we don't know who it belongs to and search it against the known database. So we also did that.

In 1994 my husband and I, we moved to Greensboro, North Carolina and I took a job with the Guilford County Sheriff's Department. My capacity there is to compare latent prints against known persons, and to search through the databases to attempt to find out the identity of the latent prints.

Q   So in some capacity or other, for the past 25 years you've been involved with latent prints?

A   Yes, sir.

Q   And what is your educational background?

A   I have a degree in criminology and criminal justice, bachelor's degree from Ohio State University. I have over 1,000 hours in training throughout the last 25 years. A couple of them 120 hour, three-week course at the FBI

546

Academy in Quantico, Virginia in administrative advance latent fingerprint course. I've had a 40-hour course on ridgeology, 25-hour course on palm print. Numerous seminars through out the year and throughout the many years.

Q   And what about -- is there a certification that you also have with respect to your work?

A   Yes. I have certification through the International Association for Identification. I am a certified latent print examiner through this organization since -- I think I passed the test in 1993.

Q   Do you have other duties as a certified examiner?

A   Well, my unit is -- the reason I'm involved with this case is, my unit is different from some of the other units within the state.

The Greensboro Police Department and the Guilford County Sheriff's Department have a joint partnership with the AFIS system.

So, in other words, the Greensboro Police Department pays half the budget for my section to the Sheriff's Department. So we run cases, we do search cases for the Greensboro Police Department. That's how I became involved in this case, since it's a Greensboro case.

Q   With respect to your certification, are you also involved in certifying or assisting in certifying other examiners?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 327 of 444
Case 3:08-cv-00134-RJC   Document 59-4   Filed 03/30/11   Page 327 of 135
JA1782

547

A    Yes, I am.  I am the chairperson for the North Carolina Latent Print Certification Board.  So I now give the test to other potential candidates to become certified.

Q    Have you testified as an expert witness in other cases in state and federal court?

A    Yes, sir.

Q    How many times, approximately, have you testified?

A    Over 40.

MR. NAZZARO:  Your Honor, at this time I would move Ms. Huntington as an expert in fingerprint latent analysis.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  She will be allowed to offer an opinion in the area of latent fingerprint examination.

Q.   (By Mr. Nazzaro) Now, you mentioned the association with the Greensboro Police Department, do you have an association with them as far as with respect to verifying fingerprints?

A    Yes.  Yes, sir.

Q    Can you explain what that is?

A    Sure.  Part of our methodology I use when we are doing analysis comparison and an evaluation, when we're actually looking at a case and following it through from beginning to end, the last phase is the verification phase.  And that is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 328 of 444
Case 3:05-cr-00134-RJC   Document 152-4   Filed 03/30/11   Page 22 of 138

JA1783

548

where initial examiner has either made an identification, or non-identification. They made a determination on the validity of the latent print to a known print.

The final phase in our process is to do verification. And that is where a second examiner comes in and takes a look at the case, individually, does their own examination and comes to their own conclusion.

Part of our partnership with Greensboro Police Department is Amy, Ms. Wilde who was just up, we verify each other's work.

Because I don't have anybody in my department who is certified, and she doesn't have anybody in her department.

There's only approximately 800 of us who are certified throughout the world. So what we try to do is help each other out.

So we verify each other's work. And this is what we did in this case, is we verified anything that she identified I verified. And anything I verified -- I identified she verified.

Q    Meaning two people examine it independently?

A    Two people examine every single positive identification independently; yes, sir.

Q    Is there any sort of system in place that you put in place to test whether that's being done properly?

A    Um --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 329 of 444
Case 3:03-cv-00534-RJC    Document 159-4    Filed 01/30/11    Page 329 of 444
JA1784

549

Q    As far as -- I mean, is there some fail-safe system where you sometimes do a blind test?

A    Oh, a blind verification.  That is where we sometimes we -- we -- the second examiner knows what prints -- say the right thumb made the identification, so it's a known that we already know what -- what finger the other examiner believes it to be.

A blind verification is where you are just given the case, you don't know what the results were and you give your own determination.

So we've done that, just to keep us in check, so to speak, checks and balances.  Where I'll give her a case or she'll give me a case, and we won't know that they've already looked at it and they've already come to their conclusions, nothing will be written up.  So it's a way to make sure we stay proficient in what we do.

Q    Now, you mention in this particular case you were involved in -- were you involved in verifying some prints?

A    Yes, sir.

Q    Were you also involved in independently examining some prints --

A    Yes.

Q    -- verified by Amy?

A    Yes.

Q    I would like to first show you what's been previously

Laura Andersen, RMR 704-350-7493

**JA1785**

550

marked and put into evidence 131, and 132, 133 and 134.

These have been previously identified as known standards from various individuals.  Have you seen these before?

A    Yes, I have.

Q    And were these cards that you used or assisted in your analysis and verification?

A    Yes, sir.

Q    Now, I would like to show you what's been previously marked and placed in evidence as Government 71.  And do you recognize 71?

A    Yes, I do.  It is a latent lift card with my initials and Ms. Wilde's initials.

Q    Where are your initials; what color?

A    Mine are in the red.

Q    Okay.  And what was your opinion based on your expertise on this particular exhibit?

A    I verified that the one print made by Alejandro Umana, the right middle finger, number three finger, was in fact made by the right middle finger.  This is my check on Ms. Wilde's initial verification.

So I initial -- I put my name -- my initials, the date, and then the V circled, and then the one saying that there was one print I verified.

Q    Now, Ms. Wilde explained in detail yesterday about the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 331 of 444
Case 3:08-cr-00134-RJC   Document 195-4   Filed 02/30/11   Page 25 of 138
JA1786

551

process of analysis, comparison, evaluation; is that a process you're also followed and are familiar with?

A   Yes.  Even -- even when we do -- um -- a verification of someone else's work, we still follow through.  We initially examine the latent print.  And we look for the level one, level two, level three, detail.  We look for the ridge below, the ridge characteristics ourselves.

And then we look to the known, and compare it to the known and the unknown to find matching characteristics.  And then we come to our own opinion.

So we do follow the Ace V Methodology, analysis, comparison, evaluation every time we do an examination, whether it's an initial examination or verification.

Q   I would like to show you also what's previously moved into evidence as Government 72.  Are you able to recognize, Ms. Huntington, Government 72?

A   Yes, sir.  This is also a lift card with two pieces of lift tape on them.  Again, my initials are in the red.  And then I verified the one latent print made by Alejandro Umana is the right middle finger.

Q   And following the same procedures that you previously?

A   Yes, sir.

Q   Now, I think you also indicated you also independently examined some other latent print cards that you received; is that right --

Case 3:16-cv-00057-MOC  Document 50-4  Filed 03/23/17  Page 332 of 444
Case 3:08-cr-00134-RJC  Document 1787  Filed 03/30/11  Page 26 of 133
JA1787

552

A    Yes, sir.

Q    -- for this investigation?

A    I received two envelopes from the Greensboro Police Department on this case.  Two latent print envelopes containing latent lifts in them from the Greensboro Police Department.

Q    And I previously showed you Government 131 through 134 which were the known standards, did you use those in your comparison?

A    Yes, sir.

Q    I would like to now show you what's been previously marked as Government 107.  Are you able to recognize 107?  It has, I believe, two pages to it.

A    Yes.  The first page is the back of the lift cards and there was -- on this one envelope, the first envelope I received, there were actually 12 lift cards, latent lift cards.  That's why it's 1 of 12, 2 of 12.  Because we mark each lift card so we know where they belong and in what envelope.

And on the back is stated where the lifts from, who lifted them and what date.

On the front of the lift cards are the actual pieces of lift tape from the objects that they were lifted from.

And what you see in the red again is my writing making this on the initial identification.  And then in the blue is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 333 of 444
Case 3:09-cr-00134-RJC   Document 142   Filed 03/30/11   Page 333 of 444
JA1788

553

Ms. Wilde's verification initials.

Q    Okay.  So were you able to render a conclusion and opinion with respect to this lift card as compared against the known standards we previously talked about?

A    Yes.

Q    And what was your opinion based on her expertise?

A    On lift card number one, could you go back to the first --

Q    Yes.

A    I didn't note where it was from.

Lift card number one which is from a Budweiser and Clamato beer can --

MR. NAZZARO:  Your Honor, I'm sorry.  I got ahead of myself.

I ask Government 107 be admitted at this time.

THE WITNESS:  Oh.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let's it be admitted.

(Government Exhibit 107 was received into evidence.)

THE WITNESS:  Lift card number one, which was lifted from the Budweiser and Clamato beer can from the first console cup holder driver's side, was made by the right thumb of a Julio Rosales Lopez.

Lift number three -- can you go back to the first

Laura Andersen, RMR 704-350-7493

554

page, please?

Q    Yes.

A    Which is also from a Budweiser and Clamato beer can from the floor behind the driver's seat.  These notes were written down by Ms. Ketner who was the crime scene tech from the scene.

This print and lift number three was made by -- go to the front please -- the next page -- was made by Jose Garcia.  And that was made by his left thumb.

Jose Garcia also is known, I found out later, by the name of Cesar Castillo.  I put down the name Jose Garcia, because the first fingerprint card I came across had the name Jose Garcia, so that is how I marked the first lift there.

On lift card number four, which is from the exterior passenger side window.  That was made by the left palm of Cesar Castillo a/k/a Jorge Garcia.

Q    It's indicated on the backside of the lift cards -- the lifts, that it came from a Neon, is that --

A    Yes.  All these lifts were from the Neon.  The first envelope I received, I received 12 lift cards, they were all from the Neon.

Q    I would like to show you what's been previously marked as 108, it's not yet in evidence, and ask you if you can identify 108?

555

A    Yes.  This is lift cards number five and number six from the total of the 12 from the Neon, containing three pieces of lift tape on the two cards.

Q    Okay.  With respect to 108, were you able to make a comparison and render an opinion?

A    Yes, sir.

MR. NAZZARO:  Your Honor, I would move 108.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 108 was received into evidence.)

THE WITNESS:  Okay.

Q.   (By Mr. Nazzaro) Could you render your opinion here today that you reached your conclusion with respect to 108?

A    Sure.  Both of these lifts as you can see, were lifted from the exterior passenger side window.  And next --

Q    The Neon again is what we're referring?

A    From the Neon.  So both from the passenger side window, three different individuals were identified on these lifts. The number seven and number eight finger.  So the left index finger and the left middle finger of Angel Rivera was identified.

The right palm of Cesar Castillo a/k/a Jorge Garcia.

And then the number four finger, which is the right ring finger of Alejandro Umana.  Those were all lifted from

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 336 of 444
Case 3:08-cr-00134-RJC   Document 599-4   Filed 01/30/11   Page 336 of 138
JA1791

556

the exterior passenger window of the Neon.

Q   And once again, your initials and also there's initials of a verification on that?

A   Yes.  My -- all my writing is in red, and Ms. Wilde's is in the blue and the green.  Because we did the -- some of the examinations did not happen all on the same day, so that's why there are different dates.

Q   I would like to show you what's been previously marked as Government 109.

Once again, can you -- would you review 109, the two parts of it and see if you recognize it.

A   Yes.  They are two lift cards lifted -- labeled number seven and number eight, from the initial 12 from the first envelope.  Front and backs of the lift cards, number seven and number eight.

Q   Were you able to render an opinion and a conclusion based on your experience, with respect to these particular lift cards?

A   Yes, sir.

MR. NAZZARO:  Your Honor, I would move 109 at this time and ask that it be published.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 109 was received into evidence.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 337 of 444
Case 3:08-cr-00134-RJC   Document 1504   Filed 03/30/11   Page 337 of 338
JA1792

557

Q.   (By Mr. Nazzaro) Could you explain to the jury your opinion with respect to 109?

A    Yes, sir.  Two lift cards from State's Exhibit 109 were both lifted from the exterior passenger window of the Neon. And they were identified to -- one print was identified to the left little finger of Jorge Garcia a/k/a Cesar Castillo. And the right middle finger was also identified to Jose Garcia.

So, two fingerprints, again, from the exterior passenger side window of the Neon, were identified to Garcia a/k/a Castillo.

Q    And once again the different colors in the lifts were the verification process also used?

A    Right.  The red is my markings, and the blue is Ms. Wilde's for verification.

Q    I would like to now show you what's previously been marked for identification as Government 110.

Are you familiar with 110, which once again has two parts to it?

A    Yes, sir.

Q    And how are you familiar with it?

A    These are the lift cards number nine, 10, 11 and 12. So the last four in the envelope.  Lifted from interior driver's window and exterior driver's window from the Neon. And it's the front and the backside of the lift cards.

558

Q    Were you able to render an opinion with respect to 110?

A    Yes, sir.

MR. NAZZARO:  Your Honor, I would move 110 and ask that it be published at this time to the jury.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 110 was received into evidence.)

Q.    (By Mr. Nazzaro) Could you further describe Government 110, and also render your conclusion and opinion with respect to it?

A    Yes, sir.  Could I see the front side of those latents, please.  Very quickly.  Okay.  You can go back now, please.

All right.  Lifts number 10 and 11 were only two of the lift cards out of the four I identified that had latent prints suitable to compare.  They are both from the interior driver's window of the Neon.  And you can go back now to the other side, please.

Lift number 10 from the interior driver's side window was made by the right index finger, or the number two finger of Alejandro Umana.

And also lift number 11 was also made by the right index finger.

So from the interior driver's side window of the Neon, we have two fingerprints lifted that were identified to the

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 339 of 444
Case 3:08-cr-00134-RJC   Document 1334   Filed 03/30/11   Page 339 of 358
JA1794

559

right index finger of Mr. Umana.

Q   Now, you mentioned that some of the other ones you couldn't compare.  I mean, is that common or unusual?

A   No.  Sometimes when you -- when you -- when the crime scene techs lift prints, not everything they lift is identifiable.  There just may be a few ridges.  It may be smeared or smudged.  And so it's not suitable to compare.

Sometimes I can tell it's actually been touched, but I can't -- there is not enough detail, there is not enough information contained in the lift, in order to make an actual comparison, and then therefore an identification.

Q   Like to show you one other exhibit.  And with respect to -- just as a follow-up of what you just said.

With respect to the prints you receive, are they -- every time someone touches something, is there always a quality print?

A   No.  There are many factors that can come into whether you leave a print on a surface.  Part of the situation is the surface itself, if it's a very rough surface, your skin when it comes into contact with it will not leave a print. If it's a very smooth surface, you're more likely to leave a print.  If it's raining outside, you're less likely.  If it's very cold, you're less likely.  If it's very hot, you're more likely because you're going to be sweating more and you may have a better chance of leaving a print.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 340 of 444
Case 3:08-cr-00134-RJC   Document 1579   Filed 02/30/11   Page 340 of 138
JA1795

560

You may have oils on your skin from your face or something, then when you touch a surface, you're more likely to leave an impression, based on the oils and the sweat that is on your fingers.

So every time you touch something, you don't always leave a print.  Even sometimes if you do touch something, you may not leave a legible print that is suitable for comparison.

Q    Now with respect to 107, 108, 109, 110, they all dealt with Neon; is that right?

A    Yes, sir.

Q    Like to show you now 111.  Were you able to recognize 111, which is two parts again?

A    Yes.  These are the three lift cards from the second envelope I received.  And they were lifted from the Expedition vehicle.

Q    Were you able to render a conclusion and opinion with respect to 111?

A    Yes, sir.

MR. NAZZARO:  Your Honor, I would move at this time 111 and ask to be published.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government Exhibit 111 was received into evidence.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 341 of 444
Case 3:08-cr-00134-RJC   Document 54-4   Filed 03/30/11   Page 341 of 444
JA1796

561

Q.    (By Mr. Nazzaro) Once again, can you explain the exhibit and your conclusion with respect to 111?

A    Yes, sir.  Of the three lift cards, only lift card number two, had a fingerprint that was suitable for comparison purposes.

This lift is from the front driver's exterior door from the Expedition.  And this lift was -- the lift from -- the latent fingerprint from this lift card was made by the number three finger, which is the right middle finger of Angel Rivera.  And this is from the Expedition.

Q    Once again, as both 107, 108, 109, 110, was 111 identified through this procedure?

A    Yes.  The red writing is my writing and the blue is Ms. Wilde's.

MR. NAZZARO:  I have no further questions at this time.

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q    You work for the Guilford County Sheriff's Department?

A    Yes, sir.

Q    Ms. Wilde works for the Greensboro Police Department?

A    Yes, sir.

Q    Greensboro is the county seat of Guilford County?

A    Yes.

Laura Andersen, RMR 704-350-7493

JA1797

562

Q    And in fact, the office where you work in, is in Greensboro, correct?

A    Yes.

Q    And in fact, the Guilford County Sheriff's Department is a block away from the Greensboro Police Department?

A    A little bit farther than that but we're pretty close.

Q    Aren't you in the --

A    I'm in a -- like a satellite office.  You're right, the main office is a block away from the main office of Greensboro.  I'm in a different building.  Apologize.

Q    Okay.  And so you and Ms. Wilde work together all the time?

A    Yes.

Q    And in fact, this was a Greensboro Police Department case, correct?

A    Yes, it was.

Q    But you were asked to work on it?

A    Yes.

Q    And you do that regularly?

A    Yes.  We receive cases on a regular basis from the Greensboro Police Department, all types of cases, to search the prints through our state AFIS database to attempt to find out who the prints belong to, so that we may find the suspects so that we may close the case.

Q    Okay.  Now, when you're doing a verification of her

                Laura Andersen, RMR 704-350-7493

563

work, you said you sometimes do you blind verifications, correct?

A    Yes.

Q    You did not do that on this occasion?

A    I don't believe so.

MR. BRYSON:  Can you put up 71 -- Government Exhibit 71?

MS. ROSE:  71?

MR. BRYSON:  Yes, ma'am.

Q    When you got this print card from Ms. Wilde, this blue writing that has his name written on it, that was already there, correct?

A    Yes, I believe so.

Q    All right.  You can take it down now.  Thank you.

And was there a decision made as to how to split up the work?  Did you take half the print cards and she took half the print cards?

A    No.  Actually in this case, I don't think we realized that there were three envelopes.  I received the initial two envelopes.  And generally we like to keep the lead examiner to do the whole case.  Just because then we don't have to have both of us testifying on the same case.

In this case, we didn't realize that I already had two envelopes at my office.  And then the third envelope came into Ms. Wilde.  That's how we both ended up on the same

564

case.

Generally, I was asked initially to take the envelopes -- the first two envelopes, and search them through AFIS looking for possible identifications for suspects.  That's how I initially became involved.

Q   All right.  And you also used the Ace V Method?

A   Yes.

Q   All right.  And this -- this is a subjective analysis, correct?

A   The opinion is, at the end, on the evaluation part is. The analysis and comparison phase, I would say that they're objective.

Because we're -- by my saying objective, I mean we are actually looking at the physical evidence.  We're looking at the latent print.  We're looking at the known print.  We're actually physically looking at -- at something.

A subjective opinion is my opinion.  It is based on my experience, my training.  It's like a psychiatrist giving an opinion in a way.

I'm looking at physical evidence, and based upon my training and my experience, and all the courses that I've done, and all the thousands and thousands and thousands of latent print comparisons I've done, I come to a conclusion whether or not there's enough -- a significant amount of detail in the latent print, and the known print is of a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 345 of 444
Case 3:09-cr-00134-RJC   Document 16-4   Filed 02/30/11   Page 39 of 138
JA1800

565

sufficient quality that I can come to a conclusion of whether or not the identification is by, you know, it is by the source of the person.

So, yes, it is a subjective opinion, as far as the identification or non-identification.

Q    When you call a match, there's no objective number criteria that you have to fill before you are allowed to call a match, correct?

A    No.  There's no number.  There is -- there has to be, based upon my experience and my training, a sufficient amount of detail, corresponding detail, compliance between the two, the unknown print -- the latent print and the known print.

Q    It's one of the criticisms of your field is that there isn't an objective criteria for what you're doing?

A    I wouldn't necessarily say a criticism, it is -- I'm not sure how to answer that.

It is a subjective opinion.  It is based upon objective detail.  But, yes, it does -- it does take a person -- even with AFIS.

AFIS is a computer system that has hundreds of thousands of fingerprint cards from individuals throughout the state as its database.

The AFIS system is a computer system.  It will take the latent print and we will encode it.  And meaning, we will

Laura Andersen, RMR 704-350-7493

JA1801

566

take the characteristics --

MR. BRYSON:  Can I object as nonresponsive.

THE COURT:  Sustained.

Q.   (By Mr. Bryson) You're familiar with the National Academy of Sciences report on Strengthening Forensic Sciences in the United States, correct?

A    Yes, sir.

Q    And they criticized your field for not having objective standards in calling a match, correct?

A    That was one of the objections, yes, that they raised.

Q    Okay.  In fact, they even noted that some examiners would later disagree with their own work at a later point in time?

A    Okay.  I'm not -- I'm not familiar with that part of it.

Q    Okay.  And they also disagreed with the fact that you would call an absolute match, correct?

A    Yes.

Q    They think that you should use a statistical narrowing of what the correlation should be, correct?

A    Yes.  They would like us to go towards that direction, yes, sir.  That is what they stated in the report.

Q    All right.  And you looked at the report?

A    Yes.

Q    But you're still calling an absolute match?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 347 of 444
Case 3:03-cv-00734-RJC   Document 18-4   Filed 03/30/11   Page 41 of 138
JA1802

567

A    Based upon my experience and my training, yes, I can say that this print was made -- these prints in this case were made by these defendants.

Based on my years of experience, over 100 years in the field that we have had looking at prints.  Based upon all the AFIS searches that have come out and have not yet found, you know, two prints to be identical.

Do we need to do more research and more statistical analysis, yes we do.  That's how we evolve.  That's how a science always gets better is, you always want to go and try to better yourselves.

And this report is a boost for us to try to go out and make our science better, make our profession better.

Q    But you're still calling an absolute match, even though they say you shouldn't do so?

A    If what I say is to 100 percent, I would say that we have been told that, yes, we are not suppose to say it is 100 percent match.

But I would say that on -- in this case, that yes, I do believe that these prints were made by these individuals, based on these prints in this case.

            MR. BRYSON:  Those are my questions.

            THE COURT:  Any redirect?

            MR. NAZZARO:  No.

            THE COURT:  You may step down and be excused.

Laura  Andersen,  RMR  704-350-7493

568

Call your next witness.

MR. NAZZARO:  Susan Conrad.

THEREUPON, SUSAN CONRAD, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning.  Would you please state your name, ma'am?

A    My name is Susan Conrad.

Q    And Ms. Conrad, how are you currently employed?

A    I'm a language analyst for the FBI stationed in Charlotte.

Q    What is your educational background?

A    I have a Bachelor's degree from UNCC in Spanish, education Latin America studies.

I have a Master's from Indiana University in Spanish and teaching.

And a Master's from UNCC in curriculum studies, education.

Q    And after you received these degrees or -- did you work in the educational field for a while?

A    Around 23 years, yes, in university and high school.

Q    Could you describe your experiences in that field?

A    I have been a high school Spanish teacher for nine years in two different spurts.  Recently I did have -- my most recent teaching position was in high school, that I left in 2006, to take a job in the bureau.

And the rest of my teaching experience has been in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-4  Filed 03/23/17  Page 349 of 444
Case 3:09-cr-00134-RJC  Document 1542  Filed 01/30/11  Page 349 of 138
JA1804

569

university level; Spanish language and linguistics.

Q    And high school --

A    High school is AP and IB Spanish literature and language.

Q    And with respect to your high school experience, did you also receive some certification from the state in that regard?

A    Yes.  Teaching certificate in Spanish and -- on a Master's level and curriculum specialist.

Q    As part of your work in a high school level, did you develop any programs or publish any items to assist the high schools in Spanish?

A    Besides workshops that I gave, several of those through the years.  I also gave -- did the AP Spanish language -- Spanish Literature Curriculum Guide for Charlotte-Mecklenburg schools.

Q    With respect to your experience in the university, that was all related also to Spanish?

A    I did teach freshman experience, but otherwise, yes.

Q    And what type of courses and what type of experience did you have at the university level?

A    In the university level, beginning in graduate school as a teaching assistant, I taught from Spanish, what the equivalent in Spanish, 101 and 1.  In other words beginning Spanish, intermediate Spanish, the 200 level, into the 300

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 350 of 444
Case 3:03-cv-00534-RJC    Document 18-4    Filed 01/30/11    Page 350 of 438
JA1805

570

level, and Spanish for the Professions and then into linguistics and phonetics.

Q    Did you -- have you published any articles in Spanish or guides, or anything of that nature?

A    Not on the university level.

Q    But in the AP --

A    But in the AP, yes.  And I was an AP reader in San Antonio for four or five years.

Q    What was that?

A    I was an AP reader.  That's the people that correct the AP Spanish language test.  And I was a reader.  You're invited to do that.  And I was invited five times, and went, I think, four times.

Q    With respect to your educational experiences, did you travel abroad and have some experience abroad?

A    Yes.  I was a student in Mexico.  I did a study abroad in Mexico.  I've been to Puerto Rico, still go to Puerto Rico quite a lot.

And I did, as an administrator and a leader of two study abroad programs at Wingate University in the southern colones, South America, Argentina and Uruguay.  We also did a study abroad with kids, college kids in Puerto Rico twice.

And then I've been on two different trips with the investigators in this case to El Salvador.  One to go as an interpreter at the Transnational Gang Conference in

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 351 of 444
Case 3:08-cr-00134-RJC   Document 19-4   Filed 01/30/11   Page 351 of 135
JA1806

571

Sonsonante, El Salvador.

And then one as an investigative trip with the AUSA as an interpreter last year.

Q   With respect to your experience, you mentioned the FBI that you're working for now.  Could you relate to the jury when you started working with the FBI?

A   I was a contract linguist first, starting in 2001, and also held a teaching job.  And in 2006 was offered a language analyst position.  Stayed as a contractor in Charlotte in 2009, May 2009 was converted to a language analyst.

Q   With respect to your contract positions, what were you actually doing, what type of work?

A   It's the same work.  We do everything a language analyst does.  It's different -- the pay is different but the work's the same.  You do --

Q   What is --

A   -- document translation, verbatim and summary document translation.  Verbatim and summary audio to transcript translation.  Interpreting, live interpreting simultaneous and consecutive.

And also we're subject matter specialists, so that's the analyst part, cultural issues, anything that we would have as knowledge, we are asked.

Q   And did a large percentage of your work with the FBI

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 352 of 444
Case 3:08-cr-00134-RJC   Document 1284   Filed 01/30/11   Page 46 of 158
JA1807

572

include interpreting different dialects resulting in Central America?

A    Yes.  FBI language analysts have to be generalists. Because we are tasked to -- we have to be ready to take -- to be able to use knowledge in our resources to interpret or analyze any dialect that we come upon.  Because we come upon any dialect.

Q    And did you -- with your work with the FBI, did you -- did it include dialects in Central America?

A    Yes.

Q    Did it also involve investigations involving the MS 13?

A    Yes.

Q    And interpreting --

A    Yes.

Q    And have you testified as an expert before --

A    Yes.

Q    -- in court?

A    Yes.

          MR. NAZZARO:  Your Honor, at this time I would move Ms. Conrad as an expert in language in the Central American dialect.

          THE COURT:  Any, objection?

          MR. BRYSON:  No, Your Honor.

          THE COURT:  She will be permitted to offer an opinion in that area.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 353 of 444
Case 3:09-cr-00134-RJC   Document 1684   Filed 01/30/11   Page 353 of 438
JA1808

573

Q.    (By Mr. Nazzaro) I mentioned the MS 13, when did you start listening to recordings involving MS 13 investigations?

A    Around 2006, when this case basically started in Durham.

Q    And you listened to recordings at that time?

A    Recordings, um-hmm.

Q    And was that a continuous effort until the current time?

A    Yes.

Q    You mentioned, I think, in your testimony about summary transcripts and verbatim; could you explain what that is?

A    Yes.  A summary transcript is an operational document. Linguists take -- take -- whether it's a recording or a document itself.  And instead of translating word-to-word, we make summaries of the information in the document or in the -- or in the recording.

So it's not a word-for-word it's just a summary of what is the contents of that particular document or that particular recording.

Some of the -- in summary -- in summary translations, it's -- the optimal is just basically to summarize the whole translation.  But special attention is paid to pertinent events, names, associates, telephone numbers, details that might be of interest to the investigators.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 354 of 444
Case 3:08-cr-00134-RJC   Document 1846   Filed 03/30/11   Page 48 of 138
JA1809

574

And a verbatim transcript is a word-for-word what the person said or wrote, depending on what kind -- if it's a document or a recording. A verbatim would be exactly what was said or written.

And it also -- a verbatim transcript may also include notations shown in brackets. In an audio recording may say there was a noise or may say a phone rings or something like that, or a pause. So there might be notations for sounds, other than conversation.

Q    And is there some sort of check and balance on the verbatim process --

A    Yes.

Q    -- in the FBI?

A    All -- all court documents have been -- translations have been quality controlled by our language services section.

Q    Okay. What is quality control?

A    That means another trained quality reviewer, quality control reviewer, has to have hands on that and give it a satisfactory rating, whether it be a document or a translation of a recording. And then it's sent back to be submitted for court.

Q    And is it fair to say you've listened to hundreds of hours of recordings in various MS 13 investigations?

A    Probably over 500.

575

Q   And with respect to these verbatim transcripts, when you listen to a recording, how are you able to determine voices in the recording?  What is process for that?

A   It's sometimes a long process because we have a lot of recordings.  However, many times people introduce themselves, they'll say they're names.  Other times we have audio/video, so we see the person actually talking.  So we can confirm it there.

Sometimes we can combine then resources of investigators and use those to help us identify -- trying to remember the all -- that's it, yeah.

Q   Were you able to use those factors and resources in this particular investigation --

A   Yes.  Absolutely.

Q   -- to help identify voices?

A   Yes.

Q   Now, I spoke -- spoke earlier about the different dialects and different ways of speaking, did you encounter that in this investigation?

A   Absolutely.

Q   Okay.  Did you prepare an exhibit that explains some of those types of terminology and types of speak, so to speak, in this case?

A   Yes.

Q   I would like to show you now what's been previously

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 356 of 444
Case 3:08-cr-00134-RJC   Document 1341   Filed 01/30/11   Page 356 of 444
JA1811

576

marked as Government 138.

THE COURT:  Government what?

MR. NAZZARO:  138, Your Honor.

A    In the -- in the recordings and the documents that --

Q    Let me ask questions first.

A    I'm sorry.

Q    In 138, it contains several pages.  I would like for you to review it on the screen.

A    Yes.

Q    Just review each page while we're showing it.

A    Um-hmm.

Q    And is this a document that you prepared to aide you in your testimony?

A    Yes, sir.

MR. NAZZARO:  Your Honor, I would move 138.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 138 was received into evidence.)

MR. NAZZARO:  And published, please.

THE COURT:  You may.

Q.    (By Mr. Nazzaro) If we could go through 138, starting with the first page it says, English words.  I know it refers to particular exhibits which later we'll discuss.  But just explain what 138 is, the first page.

577

A    Besides having Spanish language in the documents and recordings, we also of course heard English words or saw English words.  In transcripts they are in italics.  You can see that this is an example of an English word that came out of a document.

Q    That word is what, homie?

A    Homie, um-hmm.

Q    And next page, hybrid words?

A    We also found hybrid words, which there aren't very many, but they're indicated in bold.

A hybrid word is a word that combines characteristics of two languages, could be two or more.

In this case the word, homito.  Homito is a homie.  The I-T ending is a diminutive ending in Spanish, that corresponds to a diminutive ending in English, e, like John and Johnnie, kind of like that.

But it has characteristics of both a Spanish word, ito, and an English word, Homie.

Q    And you indicated they're in bold on this exhibit, is that how they are on the --

A    Yes.

Q    -- transcripts also?

A    Yes.

Q    So that's the way you would identify them --

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 358 of 444
Case 3:08-cr-00134-RJC   Document 1344   Filed 01/30/11   Page 62 of 138
JA1813

578

Q    As hybrid words?

A    Yes, consistently.

Q    Okay.  Next page.

A    In our documents and recordings we also had word transpositions.  Word transpositions are when syllables and/or letters are switched out of the normal order.

And this exhibit shows a line in a document that you can see that, for example, el brenom, becomes el nombre.  So there's been a transposition of the two syllables.  It's not exactly backwards.  It's actually in a different order.

And it goes into English as el nombre de Antoni Lopez en otra torsida, goes to the name of Antonio Lopez in another jail.

And you can see that in our -- in our transcripts they will be underlined.  That indicates that the word in the original document -- or the original how it was said, would be underlined.

In Exhibit 144 you can see at the bottom, the querova, becomes El Vaquero.  So that's underlined then, indicating that in the original it was transposed.

Q    Is that how something you ran across in this investigation?

A    Absolutely.  Yes.

Q    And that's how it will be reflected in the transcripts?

A    Yes, sir.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 359 of 444
Case 3:08-cr-00134-RJC   Document 1812   Filed 01/30/11   Page 359 of 438

JA1814

579

Q    The next page.

A    Even though the dialect is Central American for most of the examples of language in this case are Spanish, there is quite a bit of Salvadoran, what we can call a subdialect for what you may call slang -- found quite a few -- a few examples of these, quite a few.

      Exhibit 145a was a recording.  And we had the word guachar, guachar or guachar.  Sometimes it's spelled with a W.  But W is not a Spanish letter.  It really probably is a hybrid word coming from English, to look or to see.  But there's a very common word in just general speech, in Salvadoran subdialect.

Q    So this is what we have slang in English too, right?

A    Sure.  Like we have especially kids.  Kids will have their own way of talking.  If you ever dealt with teenagers, you'll know that.  You know, that each group of teenagers will have their own inter-speak together.  This is some of that, but this is more on a country area basis.

Q    How was that noted in the documents you translated?

A    That was -- that's Spanish, subdialect so it would be Spanish.

Q    How is it noted, is it italicized?

A    No.  It would just be a regular translation because it is Spanish.

Q    It's just a slang --

580

A      It's just a slang word that --

Q      Okay.

A      You know --

Q      Did you run across that a lot --

A      Not a standard Spanish word.

Q      Did you run across that often?

A      Quite often.

Q      And the word transpositions which you previously showed, did you run across that one often?

A      Quite often.

Q      And the next slide, please.

A      And then there was basically language of MS 13 or gangs.  As a couple of those examples, in standard Spanish, el barrio, it's the neighborhood, district or area.  It could be a suburb.  But --

Q      That's the translation then?

A      That's the standard english translation to that standard Spanish word.

Q      Okay.

A      But, context would bring us to that it was -- in our translations, what we found it meant the 'hood, which is the gang itself, the members of the gang.  Which sometimes would have been the same neighborhood, but they called it -- we call it the 'hood.

       Huila in the original Spanish it was spelled wila.  It

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 361 of 444
Case 3:08-cr-00134-RJC   Document 1344   Filed 03/30/11   Page 361 of 438
JA1816

581

would be standard spelled in Spanish as huila.  Because W doesn't exist in Spanish alphabet, in pure Spanish alphabet.  That's a letter or a kite that was passed or a communication that's come to even mean word now.  Like I'm saying word, I'm going to say wila.

Exhibit 168 found Chavalas.  This was found quite often.  And Chavala in Central America is a kid or a Chavala is a girl, or could be a sissy girl.

But in our examination of the documents and recordings Chavalas was rival gang members.  So it was sometimes in the masculine to even say that, or enemy gangs, or an enemy.

Q    Or derogatory term against someone?

A    Yes.

Q    And now these are just some examples; is that right?

A    Yes.

Q    There would be others --

A    There would be -- yes.

Q    They would be translated -- in other words, Chavalas instead of saying kids or sissy, would be rival gang member or enemy or something like that?

A    Because of the context of what was examined and translated.

Q    We had some testimony about the word mesa which means mas, and how was that -- would that be an example of MS 13 language?

JA1817

582

A    Because the standard Spanish is mas for that.  We also saw that transposed quite a bit, seme, instead of mesa.  But that's a meeting.  And it was translated as meeting.

Q    Like to show you the next slide, please.

A    The other kind of language that we found in this would only have been in documents was ciphered messages.  This is an example of Exhibit 160 had in May 2009, we received a document that had this on the back of the envelope.  Notice this is standard alphabet.  Standard alphabet characters. This is what it looked like when we got it.

Q    Then the next page --

A    The next slide -- in the next slide, because it was standard alphabet, we -- we worked with it and saw also this had word boundaries indicated.  So you see the spaces where the words are, which made it even easier to deal with.

But we determined that the ciphered text, which is what it was written in the original, corresponds to the plain text standard alphabet like you see on the top of the slide.

Where there was a Z, it was an A.  And we know this because we know Spanish.

In Spanish, just like every language, has to have patterns.  And we look at frequency tables.  And E is the most -- the letter E is the most common vowel.  Vowels of course drive Spanish, the language.

And so we would find where combinations were of Q U.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 363 of 444
Case 3:09-cr-00134-RJC   Document 13-2   Filed 01/30/11   Page 370 of 435
JA1818

583

Which Q is only with you in Spanish.  So we looked at patterns.  That's how we determined that the decipher, the key, if you will, was the one you see there.

And it has to work.  It has to make since.  And when we put in the -- you know, when we started the decipher, we got this from that first line on that envelope.  Hey, digale al Pegaso que diga que el Chino.  And it works, it makes words.  So the Spanish then is what you see there.

And then the English comes in to what you see there. Hey, tell Pegaso to say that Chino.

Q    Did you also have some guidance provided to you --

A    Yes.

Q    -- in some of the documents that you reviewed?

A    Yes.  In the next example, you're also going to see -- if I could get to this one.  You also see it's not only alphabetic letters.  This one mixes numbers and characters or figures and --

Q    Do you need to see the next slide also?

A    If you look at the next one you'll see that with the -- with the actual segment of communication, the actual decipher key was included.

So the very first line where you see the arrow, was actually corresponding.  And that's the first way we actually found out this is what we were seeing.  Because there were strings of letters that corresponded to alphabet,

Case 3:16-cv-00057-MOC  Document 50-4  Filed 03/23/17  Page 364 of 444
Case 3:09-cr-00134-RJC  Document 1342  Filed 01/30/11  Pages 364 of 138
JA1819

584

if you just wrote the alphabet on the top.  This was an example of that.  That really gave us the indication of what we needed to do with this.

But we also find sometimes word transpositions in this, hybrid words.  We found all the languages I've already talked to you about in these ciphers.

And this is the decipher, using the ciphered key that was provided in the same document, this is the decipher to the three lines, after we were given the key, there at the middle -- or the top of the screen.

Q    I think it's pretty clear.  But these, when you're talking about the cipher, that obviously was in written communication, right?

A    Yes.

Q    Okay.

A    I stated at the beginning, that.

Q    And with respect to these particular ciphers, did you note those somehow in the translations?

A    Yes.  Because they were usually in chunks, in long segments, we used the translator's note which is a bracket.  A bracket that said in enciphered segment begins.  And at the end of it we put, enciphered segment ends.  Because it was usually a big segment.

So -- and if in that there was a word transposition that once we had it deciphered, then we underlined that word

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 365 of 444
Case 3:08-cr-00134-RJC   Document 194-2   Filed 01/30/11   Page 365 of 444
**JA1820**

585

too.  So all of that becomes important in this as well.

Q    Thank you.  Is there anything else on your slides?  I don't think there is.

A    No.  I think that was the end of the ciphers.

Q    Thank you.  I would like to now show you, if I may be permitted to approach, Your Honor, some exhibits in this case.

THE COURT:  You may.

Q.   (By Mr. Nazzaro) Ms. Conrad, this is too large a stack, but a stack of some exhibits.  Would you just review those and see if you recognize those in any way.

A    Yes, sir.  These are the transcripts, the disks and the corresponding transcripts for -- that we analyzed, translated, prepared.  And my signature is on these.

Q    Okay.  And on all those documents?

A    On all the headsheets of all these and the disk.

Q    And you've also reviewed those prior to coming into court today?

A    Yes, sir.

Q    With respect to those -- those are then recordings or audio recordings?

A    Yes, sir.

Q    Then those are verbatim transcripts that you have in front of you?

A    All of these are verbatim, yes, sir.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 366 of 444
Case 3:09-cr-00134-RJC   Document 1342   Filed 03/30/11   Page 366 of 444
JA1821

586

Q    Could you -- and with respect to those, those are identified by speaker; is that correct?

A    Yes.

Q    Okay.

A    If the speaker was known, yes.

Q    Now, you have other identifying features that you put on, when you listen to a recording.  You obviously identify the speaker.  Is there other codes that you use also?

A    Yes.  If -- if what the speaker said was not -- none of the linguists that -- that worked on this particular piece, if they could not understand it, we put U-I.

     If it was a word that was unfamiliar in Spanish or English, we did a phonetic spelling, and that's a P-H.

     And then the other language was indicated the way I explained before with the slides.

     If a person was not able to be identified at all, couldn't have certainty about who that was, they were indicated as a U-M, unidentified male, one through how many ever there was.  And also unidentified female.  If there was a child, an unidentified child.

Q    And what was U-I again, I'm sorry?

A    A U-I was unintelligible.  That means that as much as we all listened to it, we couldn't determine exactly what that person said.  Maybe they mumbled or --

Q    You could hear the voice --

                    Laura Andersen, RMR 704-350-7493

587

A    You could hear the voice, uh-huh.  And if we couldn't hear a voice, we put an I-A, which is inaudible.  We couldn't hear anything.

Q    Okay.  And those are all reflected in some form --

A    Yes.

Q    -- or fashion on those transcripts in front of you?

A    Yes.

Q    There's also various names that are associated with each of those exhibits?

A    Yes, sir.

Q    And I think you have in front of you, if you could just verify one -- well, actually you have disks and transcripts, right?

A    Yes.

Q    And explain that.

A    Disk is the exhibit number itself.  And then the transcript has -- is the exhibit number plus an A or B.  This -- in this case is an A.  For example, 143 is the recording.

Q    And that disk was provided to you by the investigators in that case?

A    Yes.

Q    And then you listen to that disk and made the transcript?

A    Yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 368 of 444
Case 3:09-cr-00134-RJC    Document 19-4    Filed 02/30/11    Page 62 of 133
JA1823

588

Q    Okay.  And I think you have in front of you 143, 143a?

A    Yes, sir.

Q    144, 144a?

A    Um-hmm.

Q    145, 145a?

A    Yes, sir.

Q    And just for further identification, I'm sorry, 143 is dated November 30th, 2007?

A    Yes, sir.

Q    And 143a is a transcript?

A    Yes, sir.

Q    144 is dated December eighth --

A    Yes.

Q    -- 2007.  And 144a is the transcript?

A    Yes, sir.

Q    145 is dated -- is a disk dated December ninth --

A    Yes.

Q    -- 2007.  And 145a is the transcript?

A    Yes, sir.

Q    146 is a disk dated January 5th, 2008?

A    Yes.

Q    And 146a is the transcript?

A    Uh-huh.

Q    And 147 is a disk dated 2/29/08?

A    Yes, sir.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 369 of 444
Case 3:08-cr-00134-RJC   Document 164   Filed 01/30/11   Page 369 of 438
JA1824

589

Q    147a is a transcript?

A    Yes.

Q    148 is a disk dated 2/29/08, also?

A    Yes, sir.

Q    148a is a transcript?

A    Yes.

Q    149 is dated 3/7/08?

A    Yes.

Q    And 149a is a transcript?

A    Yes.

Q    And those transcripts, have they all been reviewed by you?

A    Yes.

Q    And are they fair and accurate representations of the speakers and what was said in those particular conversations?

A    Yes.

          MR. NAZZARO:  Your Honor, at this time I would move to admit 143, 143a, 144, 144a, 145, 145a, 146, 146a, 147, 147a, 148, 148a, 149 and 149a.

          THE COURT:  Any objection?

          MR. BRYSON:  No objection to translation aspect of it, Your Honor.

          THE COURT:  All right.  I'll conditionally admit it at this time, subject to relevancy determination at a

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 370 of 444
Case 3:08-cr-00134-RJC   Document 1842   Filed 01/30/11   Page 64 of 138

JA1825

590

later time.

(Government Exhibit 143, 143a, 144, 144a, 145, 145a, 146, 146a, 147, 147a, 148, 148a, 149 and 149a were conditionally received into evidence.)

Q.   (By Mr. Nazzaro) Okay.  Now, just with respect to the recordings.  You mentioned that how you determined speakers.  Did you also work with some of the participants that were speaking in helping that determination?

A    Yes.

Q    Okay.  And some of those were cooperating with the government at the time?

A    Yes.

          MR. NAZZARO:  If I could approach with some items.

          THE COURT:  You may.

Q.   (By Mr. Nazzaro) Ms. Conrad, I've given you some other exhibits.  Do you have those in front of you?

A    Yes, sir.

Q    And are you able to recognize those exhibits?

A    Yes.

Q    And are those all recordings that you reviewed and translated?

A    Yes, sir, that we prepared, um-hmm.

Q    Okay.  And these particular items in front of you which I'll identify in a moment, are they items that were -- were recorded by phone calls?

Laura Andersen, RMR 704-350-7493

591

A    They were.

Q    Okay.  Now, the items that you have in front of you are 178, which is a disk dated January 10, '08?

A    Yes, sir.

Q    That's a phone call?

A    Phone call.

Q    And 178a is the transcript?

A    Yes, sir.

Q    And that's a fair and accurate representation of that phone call, that transcript?

A    Yes, sir.

Q    And you made it?

A    Yes, sir.

Q    Okay.  You didn't make the call, but you reviewed it --

A    Yeah.

Q    The call.

MR. NAZZARO:  Okay.  At this time I would move 178 and 178a, subject to connection, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  All right.  I'll conditionally admit it subject to a relevancy finding at a later point.

(Government Exhibit 178 & 178a were received into evidence.)

Q.    (By Mr. Nazzaro) Is there also a 178c?

A    Sorry.  Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 372 of 444
Case 3:09-cr-00134-RJC   Document 188   Filed 01/30/11   Page 66 of 138

JA1827

592

Q    And is that a call dated January 19, '08?

A    Yes, sir.

Q    And you've reviewed that call also?

A    Yes, sir.

MR. NAZZARO:  Move 178c.

THE COURT:  Same conditional admission.

(Government Exhibit 178c was conditionally received into evidence.)

Q.   (By Mr. Nazzaro) And is there a 179, which is a disk with a transcript, which is 179a, dated January 14th, '08?

A    Yes.

Q    And 179c is a transcript, January 14th, 08?

A    Yes, sir.

Q    Okay.  Those are two different transcripts of different calls?

A    Yes.

Q    Okay.  And you reviewed those and based on your expertise, they're fair and accurate translations?

A    Yes.

MR. NAZZARO:  I would move 179, 179a and 179c, Your Honor.

THE COURT:  I'll conditionally admit those at this time.

(Government Exhibit 179, 179a & 179c was received into evidence.)

593

Q.   (By Mr. Nazzaro) And is there also another call which is contained on 150 and a translation which is 150a?

A    Yes, sir.

Q    Is that dated December 23rd, '08?

A    Yes, sir.

Q    And that's a document -- that's a call that you reviewed and translated also?

A    Yes.  It was prepared by the FBI, yeah.

Q    Is that a fair and accurate translation, based on your expertise?

A    Yes, sir.

        MR. NAZZARO:  Your Honor, I would move 150 and 150a.

        THE COURT:  Conditionally admit those.

(Government Exhibit 150 & 150a were conditionally received into evidence.)

Q.   (By Mr. Nazzaro) Now, Ms. Conrad, I would like to show you what's been previously marked, and I believe admitted into evidence, 15a.  This was a translation of a document which -- I'm sorry -- 15 and then 15a, they've already been admitted into evidence.  Do you see those?

A    Yes.

Q    Is that a translation that you performed?

A    Yes.

Q    That's a fair and accurate translation?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 374 of 444
Case 3:09-cr-00134-RJC   Document 16-4   Filed 01/30/11   Page 68 of 138
JA1829

594

A    Yes, sir.

MR. NAZZARO:  If I may approach, Your Honor.

THE COURT:  You may.

Q.  (By Mr. Nazzaro) Now, I've just handed you another stack of documents, do you see those?

A    Yes, sir.

Q    Okay.  And those are writings, correspondence that you reviewed?

A    Yes, sir.

Q    And you also translated those?

A    Yes, we prepared these, um-hmm.

Q    There's a number of different ones; is that right?

A    Yes.

Q    I would like to go through those.  Let me ask you just to review them.  And if you could review them briefly to determine if all of those you've seen before, and whether they're accurate translations.  I could maybe hopefully ask you en masse?

A    These are the ones that I have seen before, yes.  Yes.

Q    Okay.  And those are all -- those are writings, right?

A    Yes.

Q    And some of them -- did some of them contain drawings, also?

A    Yes, also.

Q    And did you translate some of the drawings, also?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 375 of 444
Case 3:09-cr-00134-RJC   Document 50-4   Filed 03/30/11   Page 69 of 138
JA1830

595

A    Yes.

Q    So just so we know, with respect to those documents, I've given you a stack of documents and I'll identify the exhibits in a moment.

They -- those documents are -- there's a document in Spanish then or written in Spanish or cipher or whatever communication that you previously described?

A    Yes.

Q    And then there's a English version that's translated?

A    Yes.

Q    Okay.  And then in some of the documents is there a portion of the document from the translation that's marked as a separate exhibit?

A    A separate exhibit, yes.

Q    Okay.  And you have reviewed all those correspondence and translations?

A    Yes.

Q    And those are fair and accurate translations to the best of your ability?

A    Yes.

Q    And your expertise?

A    Yes.

Q    Okay.  And the documents you have in front of you -- Your Honor, which the Court would permit, I would just name the documents that I'm going to move en masse, if that's

596

okay.  Which would be 151.  I will move that at this point, 151.

MR. NAZZARO:  Move 151; any objection?

THE COURT:  Any objection?

MR. BRYSON:  Conditionally.

MR. NAZZARO:  Conditionally admitted, Your Honor, all of these.

THE COURT:  All of these documents which the Government moves, I'll assume they are moving conditionally, subject to a relevance determination later on.

MR. NAZZARO:  Yes, Your Honor.  We've discussed this and I believe they are anticipating that we're conditionally admitting these at this time.  I'll name the items.  Just please correct me if I'm wrong, the items you have in front of you.  151, 152 -- I move all of these at this time.  153, 153b, 154b.  Is there a 154 or 154b?

A    Okay.

Q    Which one?

A    154, 154a, 154b.

Q    Okay.  And 155?

A    Uh-huh.

Q    155a is a translation?

A    Yes.

Q    156 is a letter and 156a is a translation?

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 377 of 444
Case 3:03-cr-00134-RJC   Document 1342   Filed 01/30/11   Page 131 of 138
JA1832

597

Q    157?

A    Yes.

Q    Is a letter, and 157a is a translation?

A    Yes.

Q    157b is a portion of that translation?

A    Yes.

Q    158 is a letter?

A    Yes.

Q    158a is a translation of the letter?

A    Yes.

Q    And selections of that translation are contained in 158b and 158c; is that correct?

A    Yes, sir.

Q    159 is a letter?

A    Yes, sir.

Q    And 159a is a translation of the letter?

A    Yes, sir.

Q    And 159b is a selection from that translation?

A    Yes.

Q    160 is a letter?

A    Yes.

Q    160a is translation?

A    Yes, sir.

Q    160b is selection of that translation?

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 378 of 444
Case 3:09-cr-00134-RJC   Document 1918-2   Filed 01/30/11   Page 2 of 138
**JA1833**

598

Q    161 is a letter?

A    Yes.

Q    161a is a translation of the letter?

A    Yes.

Q    And 161b is a selection of that translation?

A    Yes.

Q    When I say selection, it's a portion of it?

A    Yes, that's what --

Q    162 is a letter, and 162a is the translation, 162b is a selection?

A    Yes.

Q    163b (sic.) is a letter?

A    Yes.

Q    163a a translation, 163b the selection?

A    Yes.

Q    165 is a letter?

A    Yes.

Q    65a (sic.) a translation?

A    Yes, sir.

Q    65b (sic.) the selection?

A    Yes, sir.

Q    66 (sic.) is a letter.

A    Um-hmm.

Q    66a (sic.) is a translation?

A    Yes.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 379 of 444
Case 3:08-cr-00134-RJC   Document 1234   Filed 01/30/11   Page 379 of 138
JA1834

599

Q    66b (sic.) is a selection?

A    Yes.

Q    167 is a letter?

A    Yes.

Q    67a (sic.) is a translation, and 167b is a selection?

A    167b, yes.

Q    168 is the letter?

A    Yes.

Q    168a is the translation?

A    Yes.

Q    168b is the selection?

A    Yes.

Q    169 is a letter?

A    Yes.

Q    69a (sic.) is a translation.  69b (sic.) is a selection?

A    69a, (sic.) yes.

Q    And the same with 170, 170a and 170b, there are letters translations and selections?

A    Yes, and C.

Q    And C for 170?

A    Yes.

Q    Okay.  171 is a letter.  171a is a translation, 171b is a selection of that translation?

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 380 of 444
Case 3:09-cr-00134-RJC   Document 191-2   Filed 01/30/11   Page 480 of 138
JA1835

600

Q    172 is a letter.  172a is a translation, and 172b is a selection of that translation?

A    Yes.

Q    And it goes to 174?

A    Yes.

Q    174 which is a letter.  174a a translation, and 174b a selection of that translation?

A    Yes.

Q    175a (sic.) is a letter.  175a, is a translation, 175b is a selection of that translation?

A    Yes.

Q    And 176 is a letter?

A    Yes.

Q    176a being a translation, 176b being a selection or portion of a translation?

A    Yes.

Q    And 177 is a letter, which 177a is a translation?

A    Yes.

        MR. NAZZARO:  I would move all those items at this time, Your Honor.

        THE COURT:  They will be conditionally admitted at this time.

(Government Exhibit 151, 151a, 152, 153, 153b, 154, 154a & b, 155, 155a, 156, 156a, 157, 157a & b, 158, 158a, b & c, 159, 159a & b, 160, 160a & b, 161, 161a & b, 162, 162a & b,

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 381 of 444
Case 3:09-cr-00134-RJC   Document 19-4   Filed 03/30/11   Page 75 of 135
JA1836

601

163, 163a & b, 165, 165a & b, 166, 166a & b, 167, 167a & b 168, 168a & b, 169, 169a & b, 170, 170a, b & c, 171, 171a & b, 172, 172a & b, 174, 174a & b, 175, 175a & b, 176, 176a & b, 177 & 177a were conditionally received into evidence.)

Q.   (By Mr. Nazzaro) Do you have other exhibits in front of you?

A    Yes.

Q    And what are those exhibits?

A    263 and 263a.

Q    Is that also writings with translations?

A    Yes.

Q    Did you review those translations and are they fair and accurate?

A    Yes.

MR. NAZZARO:  I would move 263 and 263a at this time.

THE COURT:  Same conditional admission.

(Government Exhibit 263 & 263a were conditionally received into evidence.)

Q.   (By Mr. Nazzaro) I would like to show you government Exhibit 29.  This was previously conditionally admitted.  Is this a -- is this part of another writing that I previously showed you, if you know?

A    Yes, it is.

Q    It's part of Government 165?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 382 of 444
Case 3:09-cr-00134-RJC   Document 10-4   Filed 03/30/11   Page 382 of 444
JA1837

602

A    Yes.

Q    Okay.  So you recognize that?

A    Yes.

Q    Also would like to show you Government 28.  And are you able to recognize Government 28?

A    Yes.

Q    I believe that was previously conditionally admitted. Is Government 28 related to one of the writings I previously showed you, Government 167.

A    Yes.

Q    And so that was contained in 167?

A    Yes.

Q    Thank you.

     I would like to just show you three more documents, if I could approach.  Could you review those documents, please?

A    Yes, sir.

Q    And they are other writings; is that correct?

A    Yes.

Q    Which ones do you have in front of you, first?

A    I have 152a.

Q    Okay.  You have 152 and 152a?

A    I have 152a, 152b and 153a.

Q    Okay.  And what are those documents?

A    These are translations and a selection from the translation.

                    Laura Andersen, RMR 704-350-7493

603

Q    They're a fair an accurate representation?

A    Yes.  Yes.

MR. NAZZARO:  Your Honor, I would move those items at this time.

THE COURT:  And those items being 152a, b and 153a.

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  I'll conditionally admit those at this time.

(Government Exhibit 152a, 152b & 153a were conditionally received into evidence.)

MR. NAZZARO:  I think there's one other exhibit or two other exhibits identified as 151a and 154a, do you recognize those documents?

A    Yes.

Q    And are they writings and translations you previously translated to the best of your ability?

A    Yes.

MR. NAZZARO:  I would move those items at this time.

THE COURT:  I'll conditionally admit them.

MR. FOSTER:  I'm sorry.  I missed the numbers. Can you say those numbers again?

THE WITNESS:  151a, 154a.

MR. FOSTER:  Thank you.

Laura Andersen, RMR 704-350-7493

JA1839

604

MR. NAZZARO:  No further questions at this time, Your Honor.

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q    One of the things that you had to do in putting together these translations, was identify who was speaking at what time?

A    Yes, sir.

Q    And I think you said there are a variety of different ways that you did that, correct?

A    Yes, sir.

Q    One of the ways was to actually meet with cooperating informants for the government and have them identify the speaking voices, correct?

A    Yes, sir.

Q    And in fact, with regard to several of these transcripts, they were the primary source of identification for the speakers on the tapes?

A    They worked with me on it, yes.

Q    I'm sorry?

A    They worked with me on identifying, yes.

Q    But they would tell you who was speaking at different times?

A    Or verify that I had the right one.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 385 of 444
Case 3:08-cr-00134-RJC   Document 1034   Filed 01/30/11   Page 385 of 444
JA1840

605

Q    Okay.  And in some of these letters that you got, you said that they were written in code, correct?

A    Cipher.

Q    Cipher.

A    Yes.

Q    Okay.  And on some of them you would need to determine a key to decipher them, correct?

A    On some, um-hmm.

Q    And on some of them you were able to find that the key was actually written into the letter itself?

A    On that document or a previous document, yes.

Q    Okay.  You were given many letters to read as part of this case, correct?

A    Yes, sir.

Q    Many of the letters were given to you, and were represented as being written by Alejandro Umana?

A    Yes.

Q    Whoever the author was of those letters, was a very poor writer, wasn't he?

A    In vocabulary, not; but in punctuation, yes.

Q    In fact, you actually referred to it as Umana speak; isn't that correct?

A    Yes.  Because it's a -- each person has their own speak, yes, sir; idiolect.

Q    Right.  It was difficult to read?

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 386 of 444
Case 3:08-cr-00134-RJC   Document 192-2   Filed 01/30/11   Page 386 of 438
JA1841

606

A    At first.

Q    And he almost never used punctuation?

A    No.

Q    I think you commented at one point that you read over 300 letters and he maybe used three periods?

A    Possibly.

Q    Possibly used three?

A    Possibly three periods.

Q    Okay.

A    There were some datives, some slashes, those kind of things.  But periods were not common.

Q    Okay.  I'm going to -- I want to show you something and ask you if you've seen it as part of your work in this case.

     And I'll be glad to scroll up -- can you see that?

A    Yes.

Q    Okay.  I'll be glad to scroll it up if you need me to.

A    That's fine.

Q    Do you recognize that?

A    Yes.

Q    And have you translated that?

A    Not in a final form.

Q    Okay.  You did a summary of it?

A    Yes.

Q    Okay.

A    I'm sorry.  Not in verbatim.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 387 of 444
Case 3:09-cr-00134-RJC    Document 59-2    Filed 01/30/11    Page 387 of 438
JA1842

607

Q    Okay.

A    I'll say it like that.

Q    Okay.

MR. BRYSON:  Those are my questions.

THE COURT:  Before we go, Mr. Bryson, just for record purposes, if you would assign an exhibit number to the document that you showed the witness.

MR. BRYSON:  Okay.

THE COURT:  So the record will be clear.

MR. BRYSON:  Have we used an exhibit number yet?

COURT CLERK:  No.

MR. BRYSON:  That will be number one.

THE COURT:  Very well.

Ma'am, you may step down.

MR. NAZZARO:  Your Honor, can I redirect on two items?

THE COURT:  Something new in cross?

You want to redirect on something came up?

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  Very well.

REDIRECT EXAMINATION BY MR. NAZZARO:

Q    You were asked about the identification of voices; did speech patterns play any role in that?

A    Absolutely.

Q    And explain that?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 388 of 444
Case 3:05-cr-00134-RJC   Document 182   Filed 01/30/11   Page 386 of 188
JA1843

608

A     Well, a Central American will talk like a Central American.  Someone who is in a social group, such as a gang, will talk like gang members.  Adults have -- people that are around each other will talk similarly.  Hondurans will talk -- Hondurans and Salvadorans have very similar dialect.  But a Mexican will sound quite different.  They will choose different words.  A bus for a Mexican may be a different word for a Salvadoran.  So it's very helpful to know those differences in dialects.

Q     And you didn't rely on any one factor to verify the speaker, did you?

MR. BRYSON:  Object to the leading --

THE COURT:  I'll sustain the objection.

Q.    (By Mr. Nazzaro) Now, with respect -- you were asked about some writings that were purported by Mr. Umana.  Did some of those writings -- you were asked about the grammar and the punctuation.  Did some of those writings contain the cipher you referred to?

A     Yes, sir.

Q     Did they contain some of the backwards talk?

A     The word transpositions, yes.

Q     Word transpositions, I'm sorry.  And I guess, were those punctuated, the cipher?  The cipher punctuated?

A     No.

MR. NAZZARO:  Okay.  Thank you.

Laura Andersen, RMR 704-350-7493

609

No further questions.

THE COURT:  Now you may step down and be excused.

THE WITNESS:  Thank you.

THE COURT:  Members of the Jury, we'll take our morning break at this time.  We'll take a break for 15 minutes.  Don't talk about the case, keep an open mind, and we'll see you back in court at 11:35.

(The jury was escorted from the courtroom.)

(A brief recess was taken in the proceedings.)

THE COURT:  Before we call the jury, let me just comment, we spent a considerable amount of time getting in, just past authenticity, a number of documents that seems to me took a look of the jury's time that if the objections, if any were relevancy objections, we could have done by stipulation that in some way didn't use as much of the jury's time as the testimony did.

So I would encourage the lawyers that if there's other evidence where there's no disagreement as to foundation, that you get together and come up with a way of presenting the evidence that is efficient.

Any issues before we call the jury?

ALL COUNSEL:  No, Your Honor.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Call your next witness.

Laura Andersen, RMR 704-350-7493

**JA1845**

610

MS. ROSE:  Jeff Strohm.

THEREUPON, JEFF STROHM, being first duly sworn, testified as

follows during DIRECT EXAMINATION BY MS. ROSE:

Q     If you would please state your name, sir.

A     Jeff Strohm, S-T-R-O-H-M, as in Mary.

Q     Where do you work?

A     Sprint/Nextel Telecommunications.

Q     What's your position there?

A     I'm a custodian of records.

Q     And as a custodian of records, what specifically do you do?

A     I go out and testify for the records produced in Sprint's Legal Compliance Department.  And when I'm not on the road testifying, I'm responsible for responding to legal demands, providing various forms of phone records.

Q     I'm going to show you what's previously been marked -- if I may approach, Your Honor?

THE COURT:  You may.

Q     (By Ms. Rose) -- as Government's Exhibit 207 and 207b and ask if you are able to identify each of these exhibits?

A     Yes, I am.

Q     What is Government's Exhibit 207?

A     It's a call detail record report and direct connect report for phone number 703-499-7784.

Q     And are these Sprint/Nextel records?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 391 of 444
Case 3:09-cr-00134-RJC   Document 19-4   Filed 03/30/11   Page 35 of 138
JA1846

611

A    Yes, they are.

Q    And are these generated through -- in the regular course of business at your at Sprint/Nextel?

A    Yes.

Q    207b; what is 207b?

A    This is a call detail record report for all of the incoming and outgoing phone calls for the target number ending in 7784.  It encompasses the date range of November 11, 2007, to December 11, 2007.

Q    And the call detail records from 207 for the phone number -- for the same phone number, what period of time is covered?

A    The direct connect records cover November 7th -- I'm sorry, November 11th of 2007, to December 11th of 2007.

Q    Would these records be fair and accurate representations of the information kept regarding that particular phone and that particular phone number?

A    Yes.

         MS. ROSE:  I would move to admit Government's Exhibit 207 and 207b, Your Honor?

         THE COURT:  Any objection?

         MR. FOSTER:  No.

         THE COURT:  They will be admitted.

(Government Exhibit 207 & 207b were received into evidence.)

Q.   (By Ms. Rose) You described that there are two

Laura Andersen, RMR 704-350-7493

612

different types of records for the same phone number; what are the two different types?

A    Interconnect records, which is utilizing your normal 10 digit phone number.  And then direct connect records, which is the walkie-talkie aspect of our Nextel phones.

Q    And you said the 10 digit number, is that your traditional 704 --

A    Yes, your normal phone number.

Q    Then the direct connect, the walkie-talkie, what type of numbers are used for connection with that type of communication?

A    As opposed to the 10 digit number, it utilizes what we call a UFMI, or Urban Fleet Mobile Identifier.  Same phone as the 10 digit interconnect number, and then the UFMI for direct connect purpose.

Q    So you can receive calls in the normal ring and answer your phone, but you can also do the push-to-talk, what's called chirping, or communicate that way through the walkie-talkie version?

A    Yes.

Q    Now, with the push-to-talk, how are the records different than the direct connect?

A    For interconnect, it's all of the incoming and outgoing phone calls that show up in this report.  For direct connect it's only outgoing push-to-talk entries that show up on the

Laura Andersen, RMR 704-350-7493

**JA1848**

613

report.

Q    Do both types of communications require a connection with cell towers?

A    Yes.  Both utilize cell towers the same way.

Q    And does Sprint/Nextel have its own cell towers?

A    Yes, we do.

Q    Are they shared with any other service providers?

A    No, they are not.

Q    How are your cell towers identified?

A    That internal information for cell phone towers, it has its own unique name assigned to each tower.

Q    And that's maintained within Nextel.  And that one tower has that one specific number and no other?

A    Right, yes.

Q    And then the records that are before you that were requested, does it reflect the cell towers that would have been utilized during a phone call?

A    Yes, it does.

Q    And even the walkie-talkie utilizes a cell tower?

A    Yes it does, and yes it is identified on here.

Q    Now, regarding your cell towers -- what is the range for a cell tower?

A    We say that there is a nationwide average maximum distance from the phone to the cell phone tower, of 2 to 10 miles.  Two miles is going to be the norm in a more

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 394 of 444
Case 3:03-cr-00134-RJC   Document 19-2   Filed 02/30/11   Page 394 of 138
JA1849

614

urban.  And 10 miles is going to be the norm in a more rural area.

Again, that's a maximum distance.  You could obviously be standing right underneath a cell phone tower and connect to it accordingly.

Q    When records are provided such as these, pursuant to a request, along with that specific tower identifier, does Sprint/Nextel also provide the GPS coordinate, or the latitude/longitude location of that particular tower?

A    Yes.  We keep all of our longitude and latitudes for all of the cell phone towers.

Q    Is there -- were -- did Sprint/Nextel merge at some point?

A    Yes, early part of 2006.

Q    And as part of the compliance department or your electronic surveillance department, do you provide in real time, if requested, the GPS coordinates of a phone that's being used?

A    Yes, we have a capability.

Q    And just explain briefly what that would entail or what that capability is?

A    The GPS ping, what that is, is utilizing satellites to locate a phone.

Q    So within Sprint/Nextel phones specifically, that's an internal mechanism that is going to tie into a satellite?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 395 of 444
Case 3:09-cr-00134-RJC   Document 19-4   Filed 01/30/11   Page 395 of 438
JA1850

615

A    Yes.

Q    And at any point you can generally pinpoint where that phone is?

A    Yes.

MS. ROSE:  All right, sir.  I don't have any other questions.  Thank you.

THE COURT:  Any cross?

CROSS-EXAMINATION BY MR. FOSTER:

Q    Mr. Strohm, your records and your processes there do not enable you to tell who is using the phone, correct?

A    Correct.

Q    And they don't enable you to determine what's being said, correct?

A    Correct.

MR. FOSTER:  No further questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. NAZZARO:  Renee Quiles.

MS. ROSE:  May I approach to retrieve those records, Your Honor.

THE COURT:  Sure.

THEREUPON, RENEE QUILES, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Morning.  Would you please state your name, sir?

A    My name is Officer Renee Quiles.

Laura Andersen, RMR 704-350-7493

JA1851

616

Q    And what is your occupation?

A    I'm a police officer with the Charlotte-Mecklenburg Police Department.

Q    Officer Quiles, how many years have you worked with the Charlotte Police Department?

A    Ten years now.

Q    What type of assignments and duties have you had in those 10 years?

A    I've been regular patrol.  I was liaison with Spanish community, a coordinator.

Q    And are you bilingual?

A    Yes, sir.

Q    You speak Spanish?

A    Yes, sir.

Q    You say liaison officer; what does that involve?

A    Just pretty much not direct control, but I would deal with some of the issues related to the Spanish community.

Q    Have you had the occasion to meet a Rony Lopez Magana, during your time as a police officer?

A    Yes, sir.

Q    And when did you first encounter Rony Lopez?

A    It was around, back in 2004.

Q    And do you remember what the circumstances were of how you met him?

A    He had a -- he approached me about a case he had.  He

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 397 of 444
Case 3:08-cv-00134-RJC   Document 18-4   Filed 03/30/11   Page 397 of 444
JA1852

617

was shot.

Q    He was shot, he was a victim of a crime?

A    He was a victim, yes, sir.

Q    Did you investigate that crime?

A    Yes, sir.

Q    And did you -- did you determine who shot him?

A    Yes.  We had a suspect.

Q    Who was the suspect?

A    A gang member by the name of Edgar Villa (phonetic spelling).

Q    You say a gang member; the person who shot him was a gang member?

A    Yes, sir.

Q    Do you know what gang he was associated with?

A    Sur 13.

Q    And was that case pursued or prosecuted?

A    Yeah, it was.  The charges, they were dismissed.

Q    Okay.  And did Mr. Lopez who was the victim of that crime, did he cooperate with the police in that investigation?

A    Yes, sir.

Q    And did the fact it wasn't prosecuted, have anything to do with Mr. Lopez?

A    No, sir.

Q    After this first encounter with Mr. Lopez, did you

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 398 of 444
Case 3:09-cr-00134-RJC   Document 1954   Filed 01/30/11   Page 98 of 138
JA1853

618

become aware of whether he was associated with any particular gang?

A    Yeah.  At the beginning when I first met him, he denied that he was associated with any gang.  Then I confronted him one day and I told him that I knew that he was with MS 13. He said, yes, that he's friends.

Q    Now after this encounter with this Suave incident, did you have other times that you saw him?

A    He lived in the same area that I worked, and I saw him many times after that.

Q    Did you always ever see his family or have any interactions with his family?

A    Yes, sir.

Q    I want to direct your attention, Officer, to October 2007.  Did Mr. Lopez, Rony Lopez approach you at that time?

A    Yes, sir.

Q    And what were the circumstances of that occasion?

A    He told me he had some --

        MR. FOSTER:  Objection; hearsay.

        MR. NAZZARO:  It's not for the truth of the matter asserted, Your Honor.

        THE COURT:  Members of the Jury, this officer will -- might testify as to what another person told him. You're not to consider those statements for the truth of the

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 399 of 444
Case 3:08-cr-00134-RJC   Document 18-4   Filed 03/30/11   Page 399 of 408
JA1854

619

matter asserted, but simply for -- to explain the relationship between this officer and Mr. Lopez.

Q.   (By Mr. Nazzaro) What was it that he approached you about?

A    He told me that he had some information, and he really wanted to get out of this gang life.

Q    And as a result of that, what did you do?

A    I contacted one of the detectives in the gang unit and asked him to meet with us, so he could speak with him.

Q    And did you arrange that meeting then?

A    Yes, sir.

Q    Did you have anything further to do with the later investigation?

A    No.  Once I introduced him to the gang unit, they pretty much dealt with him and --

Q    Now, at that point in time, October 2007, was Mr. Lopez under investigation for anything by you --

A    No, sir.

Q    -- the police?

     Did he have any charges pending against him, if you know, at the time?

A    No, sir.

Q    I have no further questions?

          THE COURT:  Any cross?

          MR. FOSTER:  Yes, Your Honor.

                    Laura Andersen, RMR 704-350-7493

JA1855

620

CROSS-EXAMINATION BY MR. FOSTER:

Q    So the first time you met Mr. Lopez and you talked to him, he denied being in the gang, correct?

A    At first, yes.

Q    And so it turned out that was not true, correct?

A    Yeah.  When I started talking to him --

Q    I'm just asking, did it turn out that that was not true?

A    No.  He was a gang member, yes.

Q    So the first time he talked to you about his gang membership, he lied about it, correct?

A    He just denied it.

Q    He falsely denied it, didn't he?

A    Yes.

        MR. FOSTER:  No further questions.

        THE COURT:  You may step down, be excused.

        Call your next witness.

        MS. ROSE:  Rony Lopez.

THEREUPON, RONY ANTONIO MAGANA LOPEZ, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    Would you introduce yourself please, sir?

A    My name is Rony Antonio Magana Lopez.

Q    How old are you?

A    I'm 22.

                    Laura Andersen, RMR 704-350-7493

JA1856

621

Q    When was your birthday?

A    12/88.

Q    Are you currently in the Witness Protection Program?

A    Yes, I am.

Q    How long have you been in that program?

A    A good year and a half, two years now.

Q    And if you would just briefly, what were the circumstances which lead to your entrance into that program?

A    I helped the police against MS 13.

Q    And why did you enter the program as a result of that assistance?

A    Because if I didn't, they would have killed me.

Q    Prior to entering the Witness Protection Program, where did you live, what area?

A    Charlotte.

Q    How long had you lived in Charlotte?

A    For a good five, six -- six years.

Q    Where were you born?

A    El Salvador.

Q    When did you come to the United States?

A    When I was a baby.

Q    Did you come with your family?

A    Yes, I did.

Q    When you -- when your family came from El Salvador where did they live?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 402 of 444
Case 3:08-cr-00134-RJC   Document 184   Filed 01/30/11   Page 96 of 138
JA1857

622

A    They moved to Los Angeles, California.

Q    Did you already have family in Los Angeles?

A    Yes.

Q    When your parents came into the country, did they get legal status here in this country?

A    Yes, they did.

Q    Do you have other family members, siblings?

A    Yes, brothers and sisters.

Q    In what area of Los Angeles did you live when you came here?

A    Montebello.

Q    How long did you and your family live there in Los Angeles?

A    A good 13, 14 years.

Q    And were you, during your time there, exposed to any gangs?

A    Yeah.  There was gangs every where.

Q    What effect, if any, did that have on you or your family?

A    That's why we decided to get up and move.

Q    And when your family left Los Angeles, where did they then move?

A    Charlotte.

Q    Once your family moved here to Charlotte, did you enter school?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 403 of 444
Case 3:08-cr-00134-RJC   Document 131-4   Filed 01/30/11   Page 403 of 434
JA1858

623

A    Yes, I did.

Q    What was it that specifically brought your family to Charlotte?

A    Get away from the gangs, and so we can live a better lifestyle.

Q    How old were you when you came to Charlotte, what grade?

A    I was in the seventh grade.

Q    What school did you go to?

A    I started at Northeast Middle School.

Q    How was your English at that time?

A    It was fair, good.

Q    Did you have any problems fitting in, being a new student in seventh grade at Northeast Middle?

A    Yes, I did.

Q    What were the problems?

A    It wasn't that many Hispanic kids in that school when I used to go there.  So, you know, I got into a lot of fights.

Q    Why did you get into a lot of fights?

A    Just kids trying to pick on me and things like that.

        MS. ROSE:  Your Honor -- were you raising your hand?

        JUROR:  I was scratching.

        MS. ROSE:  I wanted to make sure you could hear. I'm sorry.

                    Laura Andersen, RMR 704-350-7493

624

Q     How long did you go to that school?

A     For a few months, five, six months, somewhere around there.

Q     Where did you go next?

A     I went to Cochran Middle School.

Q     And where was that in relation to where you and your family lived?

A     It was actually closer to my house, because I lived in North Tryon area, so.  And that was right off of, I believe Plaza.  It was too far from my house.

Q     When you went to that school, what was your experience?

A     It was a lot of Spanish kids there.  And I was still getting discriminated against by the Mexican kids, because I wasn't Mexican.

Q     Were there many, if any other Salvadoran --

A     Yes.

Q     -- kids at that school?

A     There was, yeah.

Q     As a result, did the Salvadoran teens join together?

A     Yes.

Q     Join a group?

A     Yes.

Q     Why was that?

A     I mean, basically because we were picked on because we weren't Mexican.  We weren't part of their race, culture

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 405 of 444
Case 3:09-cr-00134-RJC   Document 49   Filed 01/30/11   Page 99 of 138
JA1860

625

they didn't really like us.

Q    At some point did you meet members of MS 13?

A    Yes, I did.

Q    When was that?

A    Later on that year I met -- when I was 15 I started meeting a few members.

Q    And how did you meet them?

A    Through a friend in school.

Q    When you first met these MS 13 members, were you eager to become a part of their gang in any way?

A    I was just -- they show you a good time.  They, you know, take you out, party, you know, they always have girls with them, and just seems fun.

Q    Now, during this time, you were still living with your parents?

A    Yes, I was.

Q    What was going on in your daily life related to your parents, were they working?

A    Yeah, they were always working.

Q    And did that have any affect on the people you were hanging out with?

A    Yeah.  You know, I had more freedom to go out.  Even when my parents said not to go out, both of them were working two jobs so, you know, I was -- I just got up and left.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 406 of 444
Case 3:09-cv-00134-RJC   Document 552   Filed 01/30/11   Page 406 of 444
JA1861

626

Q    Did you meet other people that belonged to different gangs other than MS?

A    Yes, I did.

Q    What other gangs?

A    Surenos, VL's, Malditoes.

Q    And were these gangs -- members of these gangs, did they live in the particular area where you lived here in Charlotte?

A    Yes, they did.

Q    Did you encounter those other gang members in your school?

A    Yes, I did.

Q    At some point did you decide to join MS 13?

A    Yes.

Q    Why?

A    Because they offer you protection.  They offer you friendship.  They -- basically once you start hanging around with them at the end, they tell you, you know what, you know what we do, you know what we're about.  Either you're with us or you're against us.

So that let's you know, if you're not their friends, who are you going to hang around with, you know.  They're going to go up against you too.

Q    And once you get that message we're going to go up against you if you're not one of us, what does that mean?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00557-MOC    Document 50-4    Filed 03/23/17    Page 407 of 444
Case 3:08-cv-00134-RJC    Document 59-4    Filed 03/30/11    Page 407 of 444
JA1862

627

A   That means anywhere we see you, whoever you're with, we're going to -- if we're riding in a car, whatever we're doing, we're going to get out and get you, get you.  They can beat you up, they can shoot you, do anything to you.

Q   Even though you aren't, at that point, a rival of a member -- a member of a rival gang?

A   They consider you something like that because, you know, you don't have their back.  So they're like, we don't need you, so.

Q   What is a clique?

A   A clique is just -- it's part of MS 13.  It's just a different name.  Say I lived on north -- Central Avenue.  I lived around that area, but I'm MS.  I run with a clique called Centrales.  If I lived off of South Boulevard, I joined the South Boulevard clique.  But we're all MS.

Q   And is there any significance to the clique?

A   It's just basically representing your side of town, that's all.

Q   When you joined the gang, describe that process?

A   They beat you in, 13 seconds.  It can be four or five guys.  Basically they tell you, you know, what you're part of us.  Rule number one, don't talk to police.  And they explain a few things to you.

Q   Like what?  What kind of things do they explain to you initially?

Laura Andersen, RMR 704-350-7493

JA1863

628

A    When we first get beat-in, tell your clique, rule number one, don't talk to police.  Don't ever leave your home boys down.  Like say somebody from your gang is getting beat up.  You can't run away.  You got to stay there with them.  Because if you don't, we're gonna come back and get you for that.  If you talk to police that's -- we're going to kill you.

Q    At the time that you were beaten, were you then an official member?

A    Yes, I was.

Q    And what did that mean, relative to MS in general?

A    That means showing up to meetings, following MS rules. Doing what they do, when ever they decide they're going to go out, you're going to go out and do the same things they do.

Q    Were you given a nickname or a gang name?

A    Yes, I was.

Q    What was your name?

A    Nene.

Q    What does Nene mean?

A    That's another word like youngster, young boy.

Q    Do you know why that name in particular was chosen for you?

A    Because I was the youngest one out of everybody at that time.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 409 of 444
Case 3:08-cv-00134-RJC    Document 50-4    Filed 01/30/11    Page 03 of 138
JA1864

Q    When you were beaten in, who were the members that were involved in that ritual?

A    Trece, Cholo, Sixteen, and a few others.  I can't remember who all was there.

Q    What does the word homie or home boy mean to an MS member?

A    That means somebody that is part of your gang.  Someone that has your back.  Cause you're not just gonna go out -- go up to anybody and call them your home boy or your homie. They got to be part of your gang for you to call them that.

Q    Did you learn anything about the colors or signs related to MS?

A    They tell you all that.  They tell you, you know, got to represent the colors.  They show you the hand signs and all that.  They tell you once you see an enemy, someone wearing a red shirt, you know, that's an enemy, most likely Bloods or 18th Street.  They show you how to throw up gang signs to let them know what gang you're from.

Q    And is that the significance of the hand sign, or at least one of the reasons for the hand signs?

A    Yes, it is.

Q    What are the other reasons?

A    To identify yourself to your gang members, your friends, your home boys.  You see them from far, you throw up hand signs, you let them know who you are, what clique

630

you're from.

Or if say something's going to happen, you let them know with your hands, too, you know.  There's an enemy up there or, you know, you can throw their gang sign, throw it down.  Then you show him where he's at or she's at.  You let them know things like that.

Q    And what is -- what are the hand signs for MS?

A    They have that, like that.  (Indicating.)  The M and the S.  They have one and the three.  They just have a couple of them.

Q    Are these typical and recognizable by MS members no matter where you may be?

A    Yes, they are.

Q    Is MS a national or international gang?

A    It's an international gang.

Q    Had you heard of MS when you were living in California?

A    I did.  Yeah, I heard of it, but never really came across them.

Q    Within your clique, did you have a leader or someone who acted in a leadership role from time to time?

A    Yes.

Q    At the time that you were jumped in, who was your leader?

A    Sixteen.

Q    And did Sixteen have other -- or did Sixteen have

Laura Andersen, RMR 704-350-7493

JA1866

631

relatives who were also members?

A    Yes.

Q    Who were those relatives?

A    What was his name -- oh, boy, I can't remember his brother's name.  I know he had a few brothers -- he had one brother, some cousins.  I know Sixteen was brother with Casper.  He was Casper's brother.  And Chacua is their cousins.  He had some other cousins, I just can't remember their names.

Q    Did all of them live, at that time, in the Charlotte area?

A    Yes, they did.

Q    Once you were an official member, what kind of activities were you involved in?

A    Going out to night clubs, getting in fights, stealing, robbing, and basically -- just -- that was a every night thing.

Q    Now, going out to night clubs, were there any particular clubs in the Charlotte area where MS were comfortable or where MS members were in charge?

A    There was a few of them actually, Vaquero, Rodeo, Mi Cabana, there was a good five, six clubs.

Q    And you said you were pretty young at this time.  Did you have any problems getting into those clubs?

A    No.  No.  Not at all.

                    Laura Andersen, RMR 704-350-7493

**JA1867**

632

Q    Now, you also said that you were involved in all kinds of crimes.  Why is it that MS members commit crimes?  What's the purpose?

A    One, to let everybody know who's in that area and who controls that area.

Two, so you can prove yourself to them.

So say I was that young, I had to show them that I wasn't scared to do anything.  You know, anything they told me to do, I'll go out and do it.

Q    But does proving yourself ever end in MS?

A    No, it doesn't.  Never.

Q    Are you always proving yourself?

A    Constantly.

Q    What about the things that were stolen.  What happened -- were you allowed to keep those things?

A    You had to sell them and basically whatever you sold, the money you got out of it, you had to give them a cut in every meeting so they can buy new guns and drugs and all that for the gang.

Q    You mentioned meetings, were meetings a normal part of gang life?

A    Yes, they are.

Q    How frequently did your group or your clique have to meetings?

A    Every weekend or every other weekend.

Laura Andersen, RMR 704-350-7493

JA1868

633

Q    And describe for the members of the jury what happened in these meetings and the purpose of the meetings?

A    In these meetings you go, and everyone gets -- huddles up, and they all talk about how -- what gang is coming into what area.  You need to take them out.  What needs to be done to control this and this club.  What needs to be sold. How we're gonna get money.  How we're going to go out and buy such and such gun for such and such person.  And they -- that's what they do in meetings.

Q    At the beginning of the meeting, or at any point in the meeting, are there any standard procedures that the clique follows?

A    Before a meeting starts, everyone puts their hands up. Throws up MS signs and they count 13 seconds, then the meeting starts.

Q    If you didn't have money from stolen goods, did you still have to pay dues or give money to the clique?

A    Yes, you did.

Q    Was there someone who was responsible for maintaining that money or keeping control of, like the cash register, I guess?

A    Yes.

Q    Was that person assigned by the group as a whole, or how were they chosen?

A    It was everyone was assigned.  Yeah, everyone basically

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 414 of 444
Case 3:08-cv-00134-RJC   Document 532   Filed 01/30/11   Page 8 of 135
JA1869

634

decided, yeah, he's -- he's trustworthy.

Q    And when you joined MS, do you remember who the treasurer was, or the person who kept the dues?

A    Sixteen.

Q    Let me show you a couple exhibits if you're able to see on your screen there.  First, Government Exhibit 180.  Are you able to see Exhibit 180?

A    Yes.

Q    What do you see in Government Exhibit 180?

A    That's Magic and myself.

Q    And do you recall when that was taken; not specifically, but about when that was taken?

A    I know it was a while ago it was -- I don't remember when it was taken.  I just know it was a while ago.

             MS. ROSE:  Move to admit Government Exhibit 180.

             THE COURT:  Any objection.

             MR. FOSTER:  No, Your Honor.

             THE COURT:  Let it be admitted.

(Government Exhibit 180 was received into evidence.)

Q.   (By Ms. Rose) You said the other individual was Magic?

A    Yes.

Q    Who is Magic?

A    Magic, he's a guy that came out from Boston.

Q    And what are you and Magic doing in this photo marked as Government Exhibit 180?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 415 of 444
Case 3:09-cr-00134-RJC   Document 594   Filed 01/30/11   Page 109 of 138
JA1870

635

A    Basically, we had done some graffiti right here.  It's MS 13, and just throwing up MS.

Q    And behind you, not totally visible or -- it looks like fingers or fingernails or some pointy objects, what is that?

A    That's a sign for MS.

Q    And is that a usual sign for MS, the long fingernail?

A    Yeah.  Because they consider it as, you know, the devil's horns, you know.  They believe -- they say that the devil will help you do stuff if you act upon what he says. So they don't really believe in God.  They're willing to believe into the devil and stuff like that.  They believe that if you do bad, he will help you.

Q    Was that something that you bought into or believed in?

A    No.  No.

Q    I'm going to show you another exhibit which is marked as Government's Exhibit Number 2.  Do you recognize the area or where that photograph is taken?

A    Yes, I do.

Q    Where was that taken?

A    This is -- this girl name Grena.  I used to call her Grena.  She used to live in these apartments off of Albemarle Road.

Q    And do you recognize the graffiti there?

A    Yes, I do.

Q    What's the significance of the graffiti?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 416 of 444
Case 3:08-cv-00134-RJC   Document 50-4   Filed 01/23/11   Page 416 of 444
JA1871

636

A    It's saying, you know, MS 13 controls here.  And it has Nino up top.  And it has CLS bottom.  It's another clique.

Q    CLSC, what does that stand for?

A    Charlotta Locotes Salvatrucha (phonetic).  That's what it stands for.

Q    Was that a clique in this area?

A    Yes, it was.

Q    You indicated -- let me show you what's previously been admitted as Government's Exhibit Number 6.  What is the significance of what is shown in Government's Exhibit 6?

A    Just MS 13, they're letting them know they're in that area, they control.  And someone named Reynando.  I don't really know who that is.  They put also killin, up here. It's telling you, you know, you come into this area here, you're from another gang, we will get you.

Q    Now, what is -- is that the purpose of this graffiti? Why do gang members go around spray painting other people's property?

A    They want rival gang members to know that that's their area.  If they're going to come around that area, they're going to get shot.

Q    Does it send a message, or is it intended to send a message to the people in that community that aren't gang members?

A    Yes.

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 417 of 444
Case 3:08-cr-00134-RJC   Document 884   Filed 01/30/11   Page 111 of 138
JA1872

Q    What's the message that the gang is trying to send just to the average citizen?

A    They are -- that they control that area.  Don't mess with them.  Because they will come after you.

Q    Now, you said that part of the reason that you had this treasury within the gang or within the clique, was to buy guns.  Why did you need guns?

A    To shoot at rival gang members, rob people.

Q    Let me show you Government's Exhibit 139.  What do you see in Government's 139?

A    That's Chacua.  He used to be here.  He got deported. He's in El Salvador now.

Q    And is that the Chacua that you referred to as being a member of your clique?

A    Yes.

Q    Along with Sixteen.

     I move to admit 169, Your Honor?

         THE COURT:  Let it be admitted.

(Government Exhibit 169 was received into evidence.)

         MS. ROSE:  May I publish that as well?

         THE COURT:  You may.

Q    (By Ms. Rose) You said Chacua had been deported, to where was he deported?

A    To El Salvador.

Q    After his deportation, did you or other members of the

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 418 of 444
Case 3:09-cv-00134-RJC   Document 594   Filed 01/26/11   Page 12 of 136
JA1873

638

clique continue to communicate with him?

A    Yes, we did.

Q    Where is he now, where was he back in 2007/2008?

A    In prison.

Q    Were you still able to communicate with him?

A    Yes, I was.

Q    As time went by, did new members join the clique or did the cliques in Charlotte form some kind of coalition or come together in some way?

A    Yes, they did.

Q    Describe that?

A    Everybody came together because a lot of them had been deported, and all that.  So everyone said, let's just get together and let's try to, you know, control this.

Q    And you the name of your clique was?

A    CCLS.

Q    And that was the Centrales?

A    Yes, it was.

Q    What was the other clique?

A    South Boulevard.

Q    And did South Boulevard at any time take another name?

A    Yeah.  They had -- they had Coronados Little Psychos.

Q    And did the Centrales and the Coronados then come together?

A    Yes, it did.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 419 of 444
Case 3:08-cr-00134-RJC   Document 654   Filed 01/03/11   Page 13 of 138
JA1874

639

Q    When those two gangs joined, who else -- did it become just the one clique here in Charlotte?

A    What was that again?

Q    When the two cliques came together made just one, was that the only clique of MS 13 in Charlotte then?

A    No.  There was -- people -- people were from different cliques.  But they all just decided just to join in one big family, they would call it, you know.

Q    And so who were the other people that came into your family and what cliques?

A    Misterio came in, and he was from a clique out in California.  Wizard came in, he was from a clique out in California, too.  And so did Stiler.

Q    Do you remember Stiler's clique?

A    I believe it's Novena.

Q    Now who is Mariachi?

A    Mariachi, he's a member from South Boulevard clique.

Q    And did you -- how long did you know Mariachi?

A    I know Mariachi from a while back.

Q    Did you two attend school together?

A    No, we didn't.

Q    And which school did he originally belong to?

A    Coronados Little Psychos.

Q    Did you all meet an individual named Smoke?

A    Yes.

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 420 of 444
Case 3:09-cv-00134-RJC    Document 50-4    Filed 01/30/11    Page 420 of 444
**JA1875**

640

Q    How did you meet Smoke?

A    I met Smoke he was -- he was part of the gang, and I, you know, just met him.

Q    Who is Pajaro?

A    Pajaro, another member from South Boulevard.

Q    Chicago?

A    Chicago is actually from New York.  That's his nickname, Chicago.  But he's actually from New York.  I don't remember what clique he's from, but I remember him being in town for a while.

Q    At some point did an individual named Psicopata join your clique?

A    Yes, he did.

Q    Tigre?

A    Yes.

Q    And which clique originally was Tigre from, if you remember?

A    I don't remember which clique he was from, but I remember -- I remember him.

Q    Did you meet an individual named Pelon?

A    Yes, I did.

Q    Where is Pelon from, if you know?

A    He's from Novena, too.

Q    How long were you an active participant in this gang life that you describe, the robbing, stealing and partying?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 421 of 444
Case 3:08-cv-00134-RJC    Document 52-4    Filed 01/30/11    Page 15 of 138
JA1876

641

A     For a good four years.

Q     At some point did you begin to kind of question your choices?

A     Yes, I did.

Q     Describe that and how you came to that conclusion?

A     Well, you know, when you're younger they just -- they show you a good time.  They show you how to go out and party, how to party with girls.  You know, basically in you're mind you're thinking, oh, this is a cool thing.  But as I grew up, I realized, you know, this isn't right.  I'm hurting innocent people.  It just made no sense.

Q     Did you see any affect that your gang membership and gang activities, the gang life, was having on your family?

           MR. FOSTER:  Objection; irrelevant.

           THE COURT:  Overruled.

           THE WITNESS:  My mom just -- she was up crying for me every night.  My little brothers were following in my footsteps.  That's when I realized that that wasn't worth it.

Q     What did you do?

A     I decided to talk to the police about it.

Q     Was that an easy decision for you?

A     No, it wasn't.

Q     Describe what you went through in coming to that conclusion, making that decision?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 422 of 444
Case 3:09-cv-00134-RJC    Document 52-4    Filed 01/26/11    Page 216 of 138
JA1877

642

A    I knew an Officer Quiles.  He used to talk to me about all that, and about how gangs are, you know, how they're messed up.  He gave me a card, and he told me whenever you're ready to talk, just let me know.

And I remember I went up and down that police station a good 10, 12 times deciding, debating whether I was going to go in or not.  And at the end I decided, I was gonna go in.  And I went in and I spoke to Chuck and all that.

Q    When you made this decision, what ramifications did you believe -- what were the ramifications going to be of this decision, relative to the gang?

A    I knew that -- I knew that as soon as they found out, they were gonna kill me.  Cause one, I was talking to the police, that's a number one rule.  Do not talk to the police.

Q    And if you do talk to the police, are you truthful with them?

A    Yeah.

Q    No, I'm not saying you.  I'm saying as a gang member, if you are forced to speak to police under whatever circumstances, what generally is the rule there?

A    Death.

Q    For instance, if a gang member is stopped by law enforcement under circumstances, and they're asked questions, are they truthful?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 423 of 444
Case 3:09-cv-00134-RJC   Document 394   Filed 01/30/11   Page 172 of 188
JA1878

643

A    No, they're not.

Q    When you went into that police station and spoke with Officer Quiles what did you tell him?

A    Well, I didn't really speak to him, I spoke directly with Chuck, Lopez, and all of them.  He told me he was gonna help me -- that I could talk to a gang unit, anti-gang units.  That's who I spoke to.  And I spoke to him.

Q    But the first person you spoke to was Officer Quiles?

A    Yes, it was.

Q    Then he connected you with gang guys; is that correct?

A    Um-hmm.

Q    When you sat down with what you call the gang unit, who was present?

A    Chuck.

Q    Referring to Officer Hastings?

A    Yeah.  Mike.

Q    Is that Agent Attard?

A    Agent Attard.  And I remember Lopez, and that's it.

Q    Carlos Lopez?

A    Yes, it is.

Q    What did you tell him on that first meeting?

A    I told him a few things, but I wasn't truthful with them all the way, because I didn't really know them like that, and I didn't really trust them.  So I was kind of sketchy about what I told them.

Laura Andersen, RMR 704-350-7493

**JA1879**

644

Q    What you did tell them -- was that true, what you did tell them?

A    Yes, it was.

Q    Did you hold back, though?

A    Yes, I did.

Q    At some point did you feel more comfortable and communicate for fully with these officers?

A    Yes.

Q    How long was that between your first meeting and the next time that you sat down to speak with them?

A    I can't remember how long it was but I know after a while, man, I trusted those guys with my life, basically.

Q    Once you had met with the officers, had developed a relationship with them, what did you ask for?  What did you tell them you wanted to do?

A    I told them I wanted money -- what I wanted was to move out me.  And my family to move out.  And just to help met get some type of legal status so I can work.

Q    Well, now, at this time, did you have a job?

A    Yes, I did.

Q    What kind of job did you have?

A    I was a translator and a supervisor in a construction company.  I worked for a subcontractor.

Q    Was that a good job?

A    It was.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 425 of 444
Case 3:09-cv-00134-RJC    Document 52-4    Filed 01/30/11    Page 19 of 138
JA1880

645

Q    Did you continue to work as you cooperated and were meeting with Agent Attard and Detective Hastings?

A    I did for a while.

Q    What happened?

A    Well, I couldn't work anymore because I was staying out real late.  And I would stay out till like 4:00 in the morning, 3:00 in the morning.  I have to work and wake up the next day at 6:00 in the morning, go to work.  So I couldn't do it anymore.

Q    What specifically on these late nights that you were working with law enforcement, what were you doing?

A    Just recording where -- wearing recording devices on me.

Q    What were you recording, where were you going, who were you seeing?

A    Just hanging out with the gang.

Q    Where did the gang hang out?

A    Bars, clubs.

Q    I'm going to show you what's already been admitted, it's Government Exhibit 53.  What do you see in Exhibit 53?

A    It's a bar, it's called Mi Cabana.  And we all used to hang out right there.

Q    Was this a -- did this club have any particular significance for MS, or was it just a place for you and your friends to hangout?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 426 of 444
Case 3:08-cr-00134-RJC    Document 834    Filed 01/30/11    Page 426 of 438
JA1881

646

A    No.  That was one of their main hangout spots, cause they used to charge rent there.

Q    When you say they, to whom are you referring?

A    MS.

Q    What is charging rent?

A    Like drug dealers used to go in there and sell drugs. They used to take a percentage of that a night.

So say he made -- they had to pay rent to him.  Every weekend they will give him 400 -- 400 bucks or so, depending on how much they made.

Q    So if a drug dealer has, as you said, makes 400 bucks or sells drugs over the weekend, they're going to give a significant part to MS for allowing them to be there?

A    Yeah.  Because they consider that their bar.

Q    Were there MS members that sold drugs though?

A    Yes, there was.

Q    And did you actually do that at some points?

A    Yes, I did.

Q    Let me show you what's been admitted as Government's Exhibit 54.  What is Government's Exhibit 54?

A    It's a Rodeo, club.

Q    Where is that located?

A    It's off of Albemarle Road.

Q    And again what's the significance, if any, of Disco Rodeo or Club Rodeo?

Laura Andersen, RMR 704-350-7493

**JA1882**

647

A    These two rival gang members used to go there, used to fight, shoot, sell drugs.  Do whatever they could to keep rival gang members out of there.

Q    When you say keep rival gang members out of there, was any -- was this an exclusively controlled MS club?

A    This is the club they were fighting for, because there was a few gangs that wanted that club.

Q    Who were the other gangs that were interested in controlling that club.

A    VL, Malditoes and Surenos.

Q    Show you what's been previously admitted as Government Exhibit 55.  Do you recognize 55?

A    Yes, I do.

Q    What is shown in Exhibit 55?

A    That's Vaquero.

Q    It shows a different name on there?

A    Yeah.

Q    Do you know when that name changed?

A    No.

Q    What was the significance, if any, of Vaquero?

A    That was one of the main spots, Mi Cabana.  Those two were the main hangout spots where they used to just, you know.  Cause they knew the owners.  They knew they could get away with things there.  That's why they hung around these spots.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 428 of 444
Case 3:09-cr-00134-RJC    Document 504    Filed 01/26/11    Page 22 of 138
JA1883

648

Q    You keep saying they, to whom are you referring?

A    MS.

Q    Now was food sold here at El Vaquero?

A    Yes, there was.

Q    Where the food sold?

A    There was a lunch truck somewhere parked in front.

Q    When you say a lunch truck, what type of?

A    One of those taco truck things.

Q    Was that taco truck pretty much a regular fixture at that particular club?

A    Yes, it was.

Q    Show you what's been previously identified as Government's Exhibit 50.  Government's Exhibit 50 familiar to you in any way?

A    These are some -- they were some hotel rooms off of North Tryon.  I can't remember the name of it, but.

Q    Did you go to that location?

A    Yes, I did.

Q    For what purpose?

A    Sombre used to live there.

Q    Were there other gang members there?

A    Yes, there was.

Q    Now, did you ever go there while you were cooperating with law enforcement?

A    Yes, I did.

Laura Andersen, RMR 704-350-7493

JA1884

649

Q    What was the purpose of going there at that time?

A    I believe there was gonna be -- there was a meeting that -- there was gonna be a meeting and they were -- they were following, I guess.

Q    What do you mean they were following you?

A    Chuck and them.

Q    Well, did you know they were following you?

A    I didn't know they were following me.  But I know I had a recording device on me, too.

Q    So you were cooperating at that time.  Had you told them, there's a meeting and I'm going to attend?

A    Yeah.

Q    But the police didn't tell you they were going to be watching you as well?

A    No.

Q    All right.  After you went to the -- this motel on this occasion, where did you go next?

A    We went out to what was that street up -- Little Rock Road.  And we got off there somewhere.  And there's a -- near where the airplanes land.  I don't know how to -- what street that is, or -- I just know how to get there, you know.  And there was a -- that's where the meeting took place.

Q    Who went to this particular meeting?

A    It was a few guys Mariachi, Sombre, Conejo.  There was

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 430 of 444
Case 3:08-cv-00134-RJC    Document 264    Filed 01/30/11    Page 24 of 136
JA1885

650

a few of them.

Q    Was this the meeting that you went to after you congregated at the motel that you testified about a moment ago?

A    Yes.

Q    Going to show you Government's Exhibit 51.  Does that look familiar to you?

A    Yeah.  This is where the meeting happened.

Q    Are you able to recognize or identify any of the individuals?  It's a grainy photograph.

A    Yeah.  I can identify one, two, three of them for sure.

Q    Who are the three?

A    The one in the middle with the white shirt, that's Mariachi.  The one next to him, Sombre, and Psicopata.

Q    You said you were wearing a recording device.  Describe the procedure that you would go through when meeting with officers and being outfitted with this recorder?

A    Well, I would just meet up with them and they would give me a jacket.  Throw that on and that was basically it. It would record.  If not, I would just get audio, which was a little box and I keep it in my pocket.

Q    So were there two different types of recording equipment that you could wear depending on the circumstances?

A    Yes, there was.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 431 of 444
Case 3:08-cr-00134-RJC   Document 594   Filed 01/03/11   Page 253 of 138
JA1886

651

Q    And were you able to manipulate those recording devices in any way, alter them?

A    No.

Q    Erase anything?

A    No.

Q    Did you ever have devices that you could have on your person or near you, that would also transmit live, what was happening, so that someone else in another location could hear it?

A    No, I don't think so.

Q    Did -- not to your knowledge?

A    Yeah.  Not to my knowledge.

Q    Did -- did the recording equipment make different types of recordings?

A    Yeah.

Q    What types?

A    One was audio, and the other one, you can -- it was a camera.

Q    And is the camera -- was it always -- were you always able to wear the one with the camera?

A    Not always.

Q    Did it depend on the circumstances?

A    Um-hmm.

Q    Was that a decision that you and Officer Hastings and Officer Attard would make together?

Laura Andersen, RMR 704-350-7493

652

A     Yeah.

Q     Depending on what the plan was?

A     Yeah.

Q     This particular meeting here in the woods, what was the purpose of that meeting?

A     I remember it was because Wizard and Stiler would come in.  We had heard of them already, that they were gonna come in town.

So Mariachi said, hey, you know what, let's all get together and let's prove to them that we don't need nobody come up here and try to straighten ourselves out.  We can do it ourselves.  Let's prove it to them, those guys.

Q     When you say that you had heard that Wizard and Stiler were coming, from who?

A     Chacua.

Q     And at this point where was Chacua?

A     Prison.

Q     Where?

A     El Salvador.

Q     And describe how you received this information from Chacua and why?

A     He had his own cell phone.  He just -- he has contacts with MS members in every state in the United States.  If there's somebody in Kansas, he'll have their phone number. He'll get in contact with them somehow.  And he'll let them

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 433 of 444
Case 3:08-cv-00134-RJC    Document 524-4    Filed 01/06/11    Page 273 of 438
JA1888

653

know, hey, some other people from out of town will come to your location, you know.  They're name is such and such.  I vouch for them.  They have been around for a while, and they know what they're doing.

Q    Now, why would someone in El Salvador -- or in a jail in El Salvador, decide that people needed to come into Charlotte to straighten things out?

A    Because there was a lot -- you know, he used to live there.  He was there at one point.

Q    You talking about Chacua?

A    Yeah, Chacua.  And he knew things were out of control because everybody that was -- basically people that were running the gang, some had disappeared, or some had gotten deported.  So he was telling us, you know, some older members are going to come in there and settle everything, you know, out.

Q    Did you receive word from any other MS members about this Wizard and Stiler, and what they were going to do, or what type of people they were?

A    I remember I had heard it from this guy that used to live in South Carolina too -- I can't remember his name -- it's been a while.

Q    Is he MS member?

A    Yeah, he's in the MS gang.

Q    And was this discussion prior to Wizard and Stiler

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 434 of 444
Case 3:08-cr-00134-RJC    Document 584    Filed 01/30/11    Page 28 of 138
JA1889

654

coming to Charlotte?

A    Yes, it was.

Q    And as a result of those conversations, what were you anticipating?

A    I knew they were gonna come in, come into town, and basically tell everyone how it is and how things are gonna be -- how things are gonna run, they were gonna run from that point on.  And I knew they were gonna take control. Because they're older gang members, they're coming from California, they know how to -- how to run a gang.

Q    When -- after the meeting with Mariachi and the others that you identified, what happened?

A    Not much resulted from that meeting.  But a few days later they came.

Q    Who is they?

A    Stiler and Wizard.

Q    And how did they first make contact with you or other members of the clique?

A    Like I said, there was a lot of -- they have -- they have types of ways to get in contact with other MS gang members.  And they got my number -- somehow they had my number.  They called me up, and they told me who they were. What clique they were from.  And that they were gonna come in town.  And that's when I started talking to them.

Q    So prior to even meeting them face-to-face, you were

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 435 of 444
Case 3:09-cv-00134-RJC   Document 524   Filed 01/30/11   Page 295 of 358
JA1890

having some conversations?

A    Yeah.

Q    Did there come a time when you met Stiler and Wizard face-to-face?

A    Yes.

Q    Where was that first meeting?

A    It was out in Greensboro.

Q    And why did you go to Greensboro for that first meeting?

A    They wanted us to go down there.  And, you know, they are older gang members they have -- they have more -- more of a say so in the gang.  So we had no other option, we had to go down there.

Q    When you say we, who went?

A    Mariachi, Psicopata, Tigre, Diablo and Sombre.

Q    Who drove?

A    I did.

Q    What car did you take?

A    It was one of Smoke's cars.

Q    Did you guys borrow that?

A    Yeah.

Q    Did you have any weapons?

A    Yes, we did.

Q    What weapons did you have?

A    We had a Uzi, a Tech .9 and we had a 825 or -- we had

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 436 of 444
Case 3:08-cr-00134-RJC   Document 1522   Filed 01/06/11   Page 436 of 444

JA1891

two or three guns.  I can't remember exactly what they were.
But I know we had two guns -- two, three guns.

Q    To who did those guns belong?

A    The Uzi was an MS gun.  Everybody used that gun.
Mariachi had a gun, and Sombre had another gun.

Q    Describe where you went -- had you been there before?

A    No.  Stiler was living there at that time though.  We
drove up, and there was some apartments he told us to park.
And we went into an empty apartment they had.  We went in
there, and that's where the meeting took place.

Q    How did you know where to go?

A    Well, they -- we were on the phone.  He was telling us
how to get there.

Q    When you got to this apartment complex, what if
anything did you notice?

A    I noticed that there was -- there was one guy in every
corner.  In the entrance of the apartments, there was a guy
here.  There was another guy here.  And then they were in
the back.  You know, just, I guess, they were just making
sure that we were who we said we were.

Q    Now, why would -- knowing that these are older,
long-time gang members, why would you take weapons?

A    Cause we didn't know -- we hadn't -- we didn't meet --
we hadn't met them yet.  So we -- we were kind of iffy about
it too, so we took some guns.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 437 of 444
Case 3:09-cv-00134-RJC   Document 504   Filed 01/30/11   Page 437 of 444
JA1892

657

Q    And were you concerned about what kind of reprimand you and the other clique members may be getting?

A    Yeah.

Q    When you got to these apartments in Greensboro, you said you went into an empty apartment?

A    Yeah.

Q    What do you mean by empty apartment?

A    They had an apartment.  And they had opened the door.  They cracked the door open, or, I don't know.  They broke into the apartment.  And it was an empty apartment.  That's where we used to hangout at.

Q    Describe what happened once you all got into this apartment, who was there?

A    I know it was three of them, it was Spider, Stiler and Wizard.

Q    And did everybody who rode up with you, go into the apartment?

A    Yes.

Q    Did you carry your guns into the apartment?

A    Yes.

Q    What happened?

A    As soon as we get in, they said, well, we're such and such.  We're from this and this clique.  My name is such and such.  And they all introduced themselves.  After that they said, well, now that we know each other, whose all got guns.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 438 of 444
Case 3:09-cv-00134-RJC    Document 50-4    Filed 01/30/11    Page 32 of 138
JA1893

658

Everybody pulled out the guns.

Q    Was there -- go ahead?

A    They pulled out their guns, too.

Q    What did they pull out?

A    Wizard had a .45 and Spider had some other kind of gun, I can't remember what kind of gun he had.

Q    Did you guys show them your guns?

A    Yeah.

Q    Was there any discussion about the guns?

A    No.  They just said they liked the little Uzi we had.

Q    Did you go through any processes before that meeting?

A    No.

Q    Did you throw signs or do any of that?

A    No.  The meeting hasn't -- didn't get started.  It didn't start until after we showed each other our guns.

Q    So after the guns were shown, discussion about what you called the Uzi, what happened next?

A    And the meeting got started?

Q    Describe how the meeting began?

A    Meeting, basically everybody got up.  They said their names, what clique they were from.  Everybody threw MS up in the air.  And they counted 13 seconds, and then the meeting gun.

Q    Now at this particular meeting, were you able to wear a recording device?

                    Laura Andersen, RMR 704-350-7493

JA1894

659

A      No, I wasn't.

Q      Why?

A      Because I was scared that they might pat me down and find it on me.

Q      Did you and Chuck or you and Agent Attard talk about that?

A      Yes, we did.

Q      And did you all jointly make the decision that you would go in without that recorder?

A      Yeah.

Q      Did -- because of your concerns, were they able to conduct close surveillance there in Greensboro?

A      I don't -- I don't remember if they did.  They followed me, I don't know.

Q      You didn't see them?

A      No, I didn't see them.

Q      Once the meeting began, what was the topic of discussion?

A      They wanted to know where Sixteen was at.  That was their priority.  And to get MS members in Charlotte straight, basically, following the program, following the rules.  Do as they say, you know.

Q      What was this big concern with Sixteen.  Why was everybody looking for Sixteen?

A      When people started getting deported, Sixteen grabbed

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 440 of 444
Case 3:08-cv-00134-RJC   Document 56-4   Filed 01/30/11   Page 34 of 138
JA1895

660

all the money and he disappeared.  He took all the money that was collected from say, four or five months.  He had -- he had that money.  He just disappeared.  Nobody knew where he was at or anything.

Q    And when the treasurer of a certain clique disappears with the cash, what happens?

A    They better -- when they find them, they better have a good explanation why they disappeared with the money, or if they don't have any explanation, they kill him.

Q    Why was this such an important topic of discussion at this particular meeting, do you know?

A    Because they -- everybody -- everybody was looking for him.  And they were gonna come in and settle everything out, you know.  They wanted to get everybody straight.  They wanted to find him, ask him why he did it.  And they said, if he has a good explanation, all right.  And if he doesn't, well, we'll take care of it, too.

Q    Who ran that particular meeting?  Who were the main people doing the talking, setting out the rules?

A    Stiler and Wizard.

Q    What if anything did you observe about them that let you know that they were in fact long-time gang members, people that were who they were suppose to be, based upon the phone calls you had received in advance?

A    You can tell by the way they talk, by the way they

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 441 of 444
Case 3:08-cv-00134-RJC   Document 50-4   Filed 01/30/11   Page 339 of 339
JA1896

661

introduce themselves, by the way they act around other members.  You can tell they don't -- they don't mess around.

Q    Do you see the person who you call Wizard here today?

A    Yes, I do.

Q    If you could identify that individual?

A    He's right there.  (Indicating.)

Q    What's he wearing?

A    He's wearing a striped shirt.

MS. ROSE:  Could the record reflect that the defendant flashed signs at the witness?

THE COURT:  It will.

Q.    (By Ms. Rose) What signs did the defendant just show to you?

A    MS signs.

THE DEFENDANT:  (Inaudible.)

Q.    (By Ms. Rose) If you could finish your -- is the person that showed you the MS signs, the defendant?

A    What was it?

Q    Who showed you the MS signs?

A    Wizard.

Q    And you were describing him as wearing what?

A    Long color shirt, striped shirt.

MS. ROSE:  If the record could reflect the identification of the defendant.

THE COURT:  It will.  And I think this will be a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 442 of 444
Case 3:09-cv-00134-RJC   Document 50-4   Filed 03/23/11   Page 436 of 138
JA1897

662

good time for a lunch break.

So Members of the Jury, we'll take our lunch break at this time.  Come back at 2:00.  Don't talk about the case.  Keep an open mind.  And we'll see you at 2:00.

(The jury was escorted from the courtroom.)

THE COURT:  All right.  We're going to take our lunch break at this time.

Mr. Bryson, Mr. Foster, during the testimony of Mr. Lopez, the Court observed your client flashing gang signs to the witness during the in-court identification, and also saying something verbally.  I'm just not going to stand for that during this trial.

And this Court has bent over backwards trying to accommodate Mr. Umana, and to give him a fair trial, but I'm not going to tolerate outbursts or in-court demonstrations.

And so I would ask you to have a conversation with your client over the lunch break, and I will expect better behavior from this point forward.

We will take our break at this time.

(Lunch recess.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-4   Filed 03/23/17   Page 443 of 444
Case 3:08-cr-00134-RJC   Document 1664   Filed 01/30/11   Page 347 of 368
JA1898

Dated this the 14th day of April, 2010.


                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

Case 3:16-cv-00057-MOC    Document 50-4    Filed 03/23/17    Page 444 of 444
Case 3:08-cv-00134-RJC    Document 50-4    Filed 01/30/11    Page 38 of 138

JA1899