No. 10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix**
**Volume 5 of 11**

VINCENT J. BRUNKOW
ZANDRA L. LOPEZ
JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467
Attorneys for Defendant-Appellant

-and-

MALCOLM RAY HUNTER, JR.
Attorney at Law
P.O. Box 3018
Chapel Hill, N.C. 27515-3018
Telephone:  (919) 929-9655

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

**VOLUME 3 (986-1474)**

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

iii

Defendant's Reply to Government's Response to Defendant's Motion for Court to
Determine the Admissibility and Reliability of Evidence Before Allowing
Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . . 1202

    Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

    Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

        By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
        By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne               Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet        Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette    Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn          Direct Examination . . . . . . . . . 1239

    J.E. Brown              Direct Examination . . . . . . . . . 1243

    Frank Flores           Direct Examination . . . . . . . . . 1247
                         Voir Dire Examination . . . . . . . 1255
                         Redirect Examination . . . . . . . . 1257
                         Cross Examination . . . . . . . . . . 1316

    Charles Barkley        Direct Examination . . . . . . . . . . 1332
                         Cross Examination . . . . . . . . . . 1338

iv

Jeff Bruner                    Direct Examination . . . . . . . . . . 1339

Eduardo Vasquez               Direct Examination . . . . . . . . . . 1344

Lenny Moriera                 Direct Examination . . . . . . . . . . 1352
                              Cross Examination  . . . . . . . . . . 1369

John Sloane                   Direct Examination . . . . . . . . . . 1371
                              Cross Examination  . . . . . . . . . . 1391

Gene Richey                   Direct Examination . . . . . . . . . . 1391

Juan Ruben Vela Garcia        Direct Examination . . . . . . . . . . 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1485

Juan Ruben Vela Garcia        Direct Examination . . . . . . . . . . 1492
                              Cross Examination  . . . . . . . . . . 1498
                              Redirect Examination  . . . . . . . . 1529

Officer James K. Griffen      Direct Examination . . . . . . . . . . 1530

Ann Hamlin                    Direct Examination . . . . . . . . . . 1537

T.J. Miller                   Direct Examination . . . . . . . . . . 1544
                              Cross Examination  . . . . . . . . . . 1566

Marie Terrell                 Direct Examination . . . . . . . . . . 1570
                              Cross Examination  . . . . . . . . . . 1576

Officer Benjamin Altizer        Direct Examination . . . . . . . . . . 1576
                                           Cross Examination  . . . . . . . . . . 1584

Officer Ryan Dutko           Direct Examination . . . . . . . . . . 1586

Abel Santos                   Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos                   Cross Examination  . . . . . . . . . . 1644

Marco Antonio Guzman Mejia Direct Examination . . . . . . . . . . 1651
                                           Cross Examination  . . . . . . . . . . 1663

Teresa Ketner                 Direct Examination . . . . . . . . . . 1666
                                           Cross Examination  . . . . . . . . . . 1703
                                           Redirect Examination  . . . . . . . . 1705

Barry Whitlow                Direct Examination . . . . . . . . . . 1707

John D. Butts                Direct Examination . . . . . . . . . . 1715
                                           Cross Examination  . . . . . . . . . . 1733

James Cayton                Direct Examination . . . . . . . . . . 1735

Amy Wilde                   Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde                   Direct Examination . . . . . . . . . . 1765
                                           Cross Examination  . . . . . . . . . . 1773

Doreen Huntington           Direct Examination . . . . . . . . . . 1780
                                           Cross Examination  . . . . . . . . . . 1797

Susan Conrad                    Direct Examination . . . . . . . . . . 1804
                                Cross Examination  . . . . . . . . . . 1840

Jeff Strohm                     Direct Examination . . . . . . . . . . 1846
                                Cross Examination  . . . . . . . . . . 1851

Officer Renee Quiles            Direct Examination . . . . . . . . . . 1851
                                Cross Examination  . . . . . . . . . . 1856

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1856

**VOLUME 5 (1900 - 2390)**

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1903
                                Cross Examination  . . . . . . . . . . 1953
                                Redirect Examination  . . . . . . . . 1987
                                Recross Examination . . . . . . . . . 1988

William Chuck Hastings          Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)  . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings          Direct Examination . . . . . . . . . . 2034
                                Cross Examination  . . . . . . . . . . 2044

Alexandra Hirsch                Direct Examination . . . . . . . . . . 2049
                                Cross Examination  . . . . . . . . . . 2054

Michele Scheuerman              Direct Examination . . . . . . . . . . 2055
                                Cross Examination  . . . . . . . . . . 2064

Gene Rivera                     Direct Examination . . . . . . . . . . 2065
                                Cross Examination  . . . . . . . . . . 2086

Andrew Cheramie           Direct Examination . . . . . . . . . . 2090
                          Cross Examination  . . . . . . . . . . 2095

Jose Romero               Direct Examination . . . . . . . . . . 2095

Alexander Granados        Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2133

Alexander Granados        Direct Examination . . . . . . . . . . 2136
                          Cross Examination  . . . . . . . . . . 2138
                          Redirect Examination  . . . . . . . . 2158

Maricruz Medina           Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie         Direct Examination . . . . . . . . . . 2166

Chris Tyndall             Direct Examination . . . . . . . . . . 2173
                          Cross Examination  . . . . . . . . . . 2190

Mark Young                Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson   Direct Examination . . . . . . . . . . 2208
                          Cross Examination  . . . . . . . . . . 2213
                          Redirect Examination  . . . . . . . . 2213
                          Recross Examination . . . . . . . . . 2215

Jeffrey Taylor            Direct Examination . . . . . . . . . . 2216
                          Cross Examination  . . . . . . . . . . 2247
                          Redirect Examination  . . . . . . . . 2254

Denise Daniels            Direct Examination . . . . . . . . . . 2255
                          Cross Examination  . . . . . . . . . . 2257

viii

William Chuck Hastings        Direct Examination . . . . . . . . . . 2259
                              Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

        Sergeant Scott Clarkson        Direct Examination . . . . . . . . . . 2323
                                       Cross Examination  . . . . . . . . . . 2330

        Denise Daniels                 Direct Examination . . . . . . . . . 2332
                                       Cross Examination  . . . . . . . . . . 2333

        Jeffrey Taylor                 Direct Examination . . . . . . . . . . 2333
                                       Cross Examination  . . . . . . . . . . 2356
                                       Redirect Examination  . . . . . . . . 2359

        William Chuck Hastings        Direct Examination . . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . 2391

        Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

                By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
                By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
                Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

        Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

ix

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345)  . . . . . . . . . . . . . . . . . . . . . . . . 2540

      Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
      Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
      Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
      Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
      Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

      Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346)  . . . . . . . . . . . . . . . . . . . . . . . 2559

      Motion to Strike  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

      Court's Opening Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

      Opening Statements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

            By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
            By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

      Government Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

            Ismar Sanchez                Direct Examination . . . . . . . . . 2574
                                          Cross Examination  . . . . . . . . . 2584
                                          Redirect Examination  . . . . . . . . 2590

            David Henderson              Direct Examination . . . . . . . . . 2590

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 11 of 510

Carlton Phoenix                  Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2648

Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

Thomas Small                  Direct Examination . . . . . . . . . . 2651
                              Cross Examination . . . . . . . . . . 2677

Roberto Ramos                 Direct Examination . . . . . . . . . . 2680
                              Cross Examination . . . . . . . . . . 2694

Juan Lara                     Direct Examination . . . . . . . . . . 2699
                              Cross Examination . . . . . . . . . . 2706

Raffi Djabourian              Direct Examination . . . . . . . . . . 2709
                              Cross Examination . . . . . . . . . . 2715

John Maloney                  Direct Examination . . . . . . . . . . 2716
                              Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall            Direct Examination . . . . . . . . . . 2730
                                      Cross Examination . . . . . . . . . 2756
                                      Redirect Examination . . . . . . . . 2781

        Barry Telis               Direct Examination . . . . . . . . . . 2784
                                        Cross Examination . . . . . . . . . . 2798
                                      Redirect Examination . . . . . . . . 2803

        William Moore           Direct Examination . . . . . . . . . . 2806
                                        Cross Examination . . . . . . . . . . 2820
                                      Redirect Examination . . . . . . . . 2822

        Susan Selser             Direct Examination . . . . . . . . . . 2822

        J. Sage                   Direct Examination . . . . . . . . . . 2838
                                        Cross Examination . . . . . . . . . . 2842

        L. Goodman           Direct Examination . . . . . . . . . . 2843
                                        Cross Examination . . . . . . . . . . 2844

        A. Thornwell          Direct Examination . . . . . . . . . . 2846
                                        Cross Examination . . . . . . . . . . 2851

## VOLUME 7 (2857 - 3373)

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

xii

Carlos Alfredos
Dominguez Gonzalez          Direct Examination . . . . . . . . . . 2874
                           Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper           Direct Examination . . . . . . . . . 2902
                           Cross Examination  . . . . . . . . . . 2908

Luis Amaro                 Direct Examination . . . . . . . . . . 2911
                           Cross Examination  . . . . . . . . . . 2917

Russell Lashley            Direct Examination . . . . . . . . . . 2919
                           Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez  Direct Examination . . . . . . . . . . 2930
                           Cross Examination  . . . . . . . . . . 2931
                           Redirect Examination  . . . . . . . . 2935
                           Recross Examination . . . . . . . . 2936

Douglas Friend             Direct Examination . . . . . . . . . . 2938
                           Cross Examination  . . . . . . . . . . 2944

Jean Garcia                Direct Examination . . . . . . . . . . 2946
                           Cross Examination  . . . . . . . . . . 2952

Carmen Garcia              Direct Examination . . . . . . . . . . 2953
                           Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia           Direct Examination . . . . . . . . . . 2959
                           Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . 2975

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham        Direct Examination . . . . . . . . . . 2986
                                                   Cross Examination . . . . . . . . . . 3050

Richard McGough        Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260) . . . . . . . . . . . . . . . . . . . . . . . . 3096

    Defendant's Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

Richard McGough        Direct Examination . . . . . . . . . . 3099
                                                   Cross Examination . . . . . . . . . . 3157

Selena Sermeno        Direct Examination . . . . . . . . . . 3167
                                                   Cross Examination . . . . . . . . . . 3189
                                                   Redirect Examination . . . . . . . . 3203

Maria Santacruz Geralt        Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350) . . . . . . . . . . . . . . . . . . . . . . . . 3234

    Defendant's Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

Maria Santacruz Geralt        Voir Dire Exam. by Defendant . . . 3237
                                                   Voir Dire Exam. by Government . . 3250
                                                   Direct Examination . . . . . . . . . . . 3256
                                                   Cross Examination . . . . . . . . . . . 3263

Mark Bezy        Direct Examination . . . . . . . . . . . 3276
                                         Cross Examination . . . . . . . . . . . 3289

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 15 of 510

James R. Merikangas,
Ph.D.          Direct Examination . . . . . . . . . . . . 3294
          Cross Examination . . . . . . . . . . . . 3317

Government's Rebuttal Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

Helen Mayberg         Direct Examination . . . . . . . . . . . . 3336
          Cross Examination . . . . . . . . . . . . 3358

## VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261) . . . . . . . . . . . . . . . . . . . . . . . . 3374

    Defendant's Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

       Richard McGough        Voir Dire Exam. by Defendant . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

xv

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

## VOLUME 9 (3705 - 4209)

## EXHIBITS

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3, School Records . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home . . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D. . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez . . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 18 of 510

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification  . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation  . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting  . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana  . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique  . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana  . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana  . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:08-CR-134-2 |
| | ) | |
| vs. | ) | VOLUME III-B |
| | ) | AFTERNOON SESSION |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 14, 2010

APPEARANCES:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    Assistant United States Attorney
    100 Otis Street
    Asheville, North Carolina 28801

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK P. FOSTER
    Law Offices of Mark Foster, PC
    1011 East Morehead Street, Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    Wyatt Early Harris & Wheeler, LLP
    P.O. Box 2086
    High Point, North Carolina 27261

CHERYL A. NUCCIO, RMR-CRR
United States District Court Reporter
Charlotte, North Carolina

**JA1900**

I N D E X

                                                            PAGE

GOVERNMENT'S WITNESSES

RONY LOPEZ
        Direct Examination by Ms. Rose................    667
        Cross Examination by Mr. Foster...............    717
        Redirect Examination by Ms. Rose..............    751
        Recross Examination by Mr. Foster.............    752

WILLIAM HASTINGS
        Direct Examination by Ms. Rose................    753

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 08/03/17    Page 21 of 510
Case 3:08-cr-00734-RJC    Document 385    Filed 10/04/10    Page 21 of 85

JA1901

I N D E X   O F   E X H I B I T S

OFFERED RECEIVED

GOVERNMENT'S EXHIBITS

| | OFFERED | RECEIVED |
|---|---|---|
| No. 53..................................... | 784 | 784 |
| No. 144, A-B.............................. | 690 | 690 |
| No. 145, A-B.............................. | 697 | 697 |
| No. 178, A................................ | 706 | 706 |
| No. 178B.................................. | 707 | 707 |
| No. 178C-D............................... | 708 | 708 |
| No. 182................................... | 673 | 673 |
| No. 183................................... | 674 | 674 |
| No. 184................................... | 674 | 674 |
| No. 185................................... | 675 | 675 |
| No. 186................................... | 670 | 670 |
| No. 187................................... | 677 | 677 |
| No. 188................................... | 790 | 790 |
| No. 189................................... | 703 | 703 |
| No. 190................................... | 703 | 703 |
| No. 191................................... | 693 | 693 |
| No. 192................................... | 712 | 712 |
| No. 193................................... | 713 | 713 |
| No. 194................................... | 714 | 714 |
| No. 196................................... | 714 | 714 |
| No. 197................................... | 715 | 715 |
| No. 198................................... | 715 | 715 |
| No. 201................................... | 780 | 780 |
| No. 205................................... | 792 | 792 |
| No. 212................................... | 703 | 703 |

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 58-5   Filed 08/23/17   Page 22 of 510
Case 3:08-cr-00734-RJC   Document 355   Filed 10/04/10   Page 3 of 85

JA1902

WEDNESDAY AFTERNOON, APRIL 14, 2010

(Jury not present.)

THE COURT:  Good afternoon, everyone.

ALL COUNSEL:  Good afternoon, Your Honor.

THE COURT:  Anything we need to take up before we call the jury?

MS. ROSE:  No, sir.

MR. BRYSON:  I would just tell you I spoke with Mr. Umana over the lunch break.  He came in right after the lunch, told me he wanted to apologize to the court.  I told him I would pass that apology on to the court.

THE COURT:  Thank you.

All right.  Do we have Mr. Lopez nearby?  We'll get him on the witness stand and then we'll call the jury.

(Pause.)

(Witness resumed the witness stand.)

THE COURT:  Call the jury.

(Jury entered the courtroom.)

THE COURT:  Ms. Rose, you may continue.

MS. ROSE:  I'm sorry, I didn't understand Your Honor.

THE COURT:  You may continue.

MS. ROSE:  Thank you, Your Honor.

RONY ANTONIO MAGANA LOPEZ

DIRECT EXAMINATION (Cont'd.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA1903

RONY LOPEZ - DIRECT

BY MS. ROSE:

Q.   When we broke for lunch, Mr. Lopez, we were discussing the meeting there in Greensboro.

A.   Uh-huh.

Q.   You indicated that along with the defendant who you identified, there were two other people with him.

A.   Yeah.

Q.   And what were their names?

A.   Stiler and Spider.

Q.   Show you what's already been admitted as Government's Exhibit 14.  Do you recognize anyone in Exhibit 14?

A.   Yes, I do.  The one with the white shirt.

Q.   Who is that?

A.   Says Los Angeles.  That's Stiler.

Q.   Also show you Government's Exhibit 78.

A.   I believe that's Spider, but not too sure on that.  Looks a bit different.

Q.   Now, after discussing the changes that needed to be made in Charlotte, were there discussions about meeting again soon with the members from Greensboro?

A.   Yes, there was.

Q.   What was said?

A.   That they were going to come down -- they were going to come down to Charlotte and take care of business.

Q.   And what does that mean?

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 24 of 510
Case 3:08-cr-00734-RJC   Document 585   Filed 06/04/10   Page 24 of 35
JA1904

RONY LOPEZ - DIRECT

A.   That means basically we're going to come down here, look for who they had to look, do what they had to do and set everything straight.

Q.   Was there any specific date set for that next meeting?

A.   I don't quite remember if they set an exact date.  I would believe it was the following weekend that they came down.

Q.   The next weekend.  Does November 30th sound about right to you?

A.   Uh-huh.

Q.   Calling your attention to November the 30th.  Did you and some of the other MS members in Charlotte have any plans for that particular evening?

A.   I remember -- I believe that's the day we went and tried to rob a prostitution house.

Q.   And with whom were you having discussions or who came up with this plan?

A.   Mariachi calls me up and he tells me, you know what, pick up such and such, and they're going to tell you what you're going to go do with them.  So I picked them up and they tell me they were planning to rob a prostitution house.

Q.   Who were the other people that you met with on that evening?

A.   It was Tigre, Sombre, Psicopata, and Diablo.

Q.   And were each of those individuals clique members or MS

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-000573-MOC   Document 50-5   Filed 08/22/17   Page 25 of 510
Case 3:08-cr-00734-RJC   Document 3856   Filed 10/04/10   Page 6 of 85

JA1905

RONY LOPEZ – DIRECT

members?

A.    Yes, they were.

Q.    Did you know specifically where this robbery was going to take place, the location of the house of prostitution?

A.    I didn't know it was going to take place until I got there.  And it was off Eastway.

Q.    Show you Government's Exhibit 186.  Do you recognize Government's Exhibit 186?

A.    Yes.  That's the house that was going to get robbed.

Q.    Is that a fair and accurate representation?

A.    Yes, it is.

         MS. ROSE:  Government would move Exhibit 186, Your Honor.

         THE COURT:  Any objection?

         MR. FOSTER:  No, Your Honor.

         THE COURT:  Let it be admitted.

         (Government's Exhibit No. 186 was received into evidence.)

Q.    And you indicated that this home was off Eastway here in Charlotte.

A.    Yes.

Q.    Who was driving?

A.    I was.

Q.    What were you driving?

A.    I was driving my car.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1906**

RONY LOPEZ – DIRECT

Q.   And what kind of car did you have?

A.   It was an Accord.  Honda Accord.

Q.   And did you have to pick anybody up or did you meet up with the other MS members somewhere?

A.   I actually went to Sombre's hotel room and they were all there.  So they just hopped in the car.

Q.   Now, you said that you had spoken with Mariachi earlier in the day about this plan.  Once you heard this plan had been devised, did you contact law enforcement?

A.   Yes, I did.

Q.   Who did you contact?

A.   I believe I called Chuck -- Chuck or Mike, one of them.

Q.   And what did you tell them?

A.   I told them what was happening, what he wanted me to do. And they told me they were -- they were going to take care of it.

Q.   Did Mariachi or any of the other MS members discuss whether there would be weapons used in this robbery?

A.   Yes.  They -- they had a shotgun and the Uzi and a .25 or .22, something like that.

Q.   Now, did you also let law enforcement know that they were going to have weapons?

A.   Yes, I did.

Q.   So did -- did Officer Hastings or Agent Attard together with you devise how they would handle this situation?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 27 of 510
Case 3:08-cr-00134-RJC   Document 385   Filed 10/04/10   Page 8 of 135

JA1907

RONY LOPEZ - DIRECT

A.    Yes, they told me.

Q.    What -- what were you told?

A.    That they were -- as soon as I hit the corner, they were going to pull the car over and they were going to take -- they were going to take the guns from us.

Q.    And on this particular occasion, had they already outfitted you with a recording device?

A.    No.

Q.    So when you picked up the other members, describe what happened.

A.    I just showed up and I didn't know what we were going to go do so he told me what we were going to do.  I said, Well, hold on, give me a minute.  Let me go park the car.  That's when I called Chuck or Mike, one of them.  I let them know what was happening.  And I called Mariachi back and I told him why didn't he let me know what was going to happen.  And basically, we got in an argument after that.

Q.    Ultimately, did you and the other individuals leave and go toward this house on Eastway?

A.    Yes, we did.

Q.    What happened as you got close to the Eastway house?

A.    We got pulled over.

Q.    And describe what happened at that point.

A.    They pulled us over.  They searched the car.  They found the guns.  Took the guns.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 28 of 510
Case 3:08-cr-00734-RJC   Document 1855   Filed 10/04/10   Page 9 of 135

JA1908

673

RONY LOPEZ - DIRECT

Q.   Did they give you -- did Agent Attard or Officer Hastings give you specific instructions about what you were to do when law enforcement stopped the car?

A.   Yes.  They just said get out and, you know, we'll put you back in the patrol car and we'll take everybody else out.

Q.   At that point prior to leaving the hotel, did you have any idea where in the car the guns would be located?

A.   I knew they had them in the back.  That's all.  That's all I knew.

Q.   I'm going to show you Government's Exhibit 182.  What's Exhibit 182?

A.   That's me in back of a patrol car.

Q.   And why was it that you were to be taken from the car and put in a patrol car?

A.   Because -- so it didn't seem like I was, you know, working for the police.

Q.   Is this how you looked on that particular evening?

A.   Yes.

        MS. ROSE:  Move to admit 182, Your Honor.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 182 was received into evidence.)

Q.   Show you Government's Exhibit 183.  Who is shown in Government's Exhibit 183?

A.   That's Tigre.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/20/17   Page 29 of 510
Case 3:08-cr-00134-RJC   Document 1556   Filed 10/04/10   Page 29 of 510
**JA1909**

RONY LOPEZ – DIRECT

Q.   Was he with you on that evening?

A.   Yes, he was.

Q.   Is that how he looked?

A.   Yes.

MS. ROSE:  Move to admit 183, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 183 was received into evidence.)

Q.   Show you Government's Exhibit 184.  Who is shown in the photograph labeled Government's Exhibit 184?

A.   Psicopata.

Q.   Is that how he looked on that particular evening --

A.   Yes.

Q.   -- after law enforcement officers had stopped you?

A.   Yes.

MS. ROSE:  Move to admit 184.

THE COURT:  Be admitted.

(Government's Exhibit No. 184 was received into evidence.)

Q.   Finally, show you Exhibit 185.  What is shown in Government's Exhibit 185?

A.   Those are the guns that were in the car.

Q.   Ultimately what happened to those guns on that particular

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 30 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 130 of 131
JA1910

RONY LOPEZ – DIRECT

evening?

A.    They took them.

Q.    Who took them?

A.    The police.

Q.    And did you see them at any point after that?

A.    No, I didn't.

MS. ROSE:  Move to admit 185.

THE COURT:  Be admitted.

(Government's Exhibit No. 185 was received into evidence.)

Q.    And that photograph, that's inside of your car?

A.    Yeah.

Q.    Now, was anybody arrested on this particular evening?

A.    No.

Q.    After -- did the police take the weapons and let you go?

A.    Yes.

Q.    Was there a lot of discussion about that?

A.    Yes, there was.

Q.    Now, at some point were you able to meet after the traffic stop, to meet either Agent Attard or Officer Hastings?

A.    Yes.

Q.    And at that point, were you outfitted with a recorder?

A.    Yes, I was.

Q.    Where did -- once -- tell the jury how that happened. How were you able to accomplish that given all that had gone

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 03/29/17   Page 31 of 510
Case 3:08-cr-00134-RJC   Document 1856   Filed 10/04/10   Page 23 of 131

JA1911

RONY LOPEZ – DIRECT

on?

A.   Well, I just took them back to the hotel room.  I said, Look, I'll be right back.  I kind of snuck away for a good 10 minutes, 15 minutes.  They were right around the corner.  They gave me the jacket.

Q.   And on this particular occasion, then, the recording device you were wearing was concealed in a jacket?

A.   Yes, it was.

Q.   Did you then go pick up the individuals that you'd left at the hotel?

A.   Yes.

Q.   Where did you go?

A.   I picked them up and they said, you know what, they were going to try it again.  They had a shotgun or –- I remember –- they had a shotgun or something like that.  They wanted to try to rob the same house again later on that day.

Q.   At some point did –- did you go to Pelon's home that evening?

A.   Yes, we did.

Q.   Who went with you to Pelon's home?

A.   Same people that were in my car.

Q.   And who was Pelon?

A.   Pelon, he's another MS member.

Q.   Why did you go to Pelon's home on that evening?  Was there a particular reason you were meeting with anyone?

Cheryl A. Nuccio, RMR–CRR (704)350–7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 32 of 510
Case 3:08-cv-00134-RJC   Document 1256   Filed 10/04/10   Page 32 of 310
JA1912

A.   Stiler, Spider, and Wizard were there.

Q.   And how did you know that those three were there?

A.   They had told us.  I believe Pelon was the one that called me and told me that they were there.

Q.   I'm going to show you Government's Exhibit 187.  Do you recognize 187?

A.   Yes, I do.

Q.   What is shown in Government's Exhibit 187?

A.   That's my car --

Q.   And --

A.   -- at Pelon's house.

Q.   And this particular photo was not taken that evening, the evening of November 30th.

A.   Oh.

Q.   This photo was taken at a later time.

A.   Oh, okay.

        MR. FOSTER:  Objection.  Leading.

        THE COURT:  Sustained.

Q.   Do you know when this photo was taken?

A.   No, I don't.

        MS. ROSE:  I move to admit 187.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 187 was received into

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 33 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 43 of 131

JA1913

evidence.)

Q.   When you got to Pelon's home, what did you do?

A.   We just sat around and we talked about what had happened. And they were -- we were talking to Wizard, Stiler, and Spider and they were telling us how to -- how to talk in a different way so the police wouldn't understand us and how to use words, like, you know, flip them, like, use them backwards.  And I just...

Q.   Was that something that you -- you guys in Charlotte had done before or were aware of?

A.   We knew about it, but nobody really used it, you know. It's only the really -- the other MS members that use that a lot.

Q.   Did you have an opportunity at the conclusion of this case to listen to the recordings that you made throughout the investigation?

A.   Yes, I did.

Q.   Did you have an opportunity to also review transcripts, the Spanish and English versions of those transcripts?

A.   Yes, I did.

Q.   And did you determine whether they were accurate; and if there were inaccuracies, did you make any changes?

A.   I did.

Q.   With whom did you go through that process?

A.   Susan.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 34 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 36 of 131

JA1914

RONY LOPEZ – DIRECT

Q.    Who works with the FBI?

A.    Yes.

Q.    Are each of the transcripts that you had an opportunity to review, were they fair and accurate representations of what took place and who spoke on each of those instances?

A.    Yeah.

MS. ROSE:  First, Your Honor, I would move to unconditionally admit Exhibit 143 which is the disk, 143A, and to play Exhibit 143B which is the merged exhibit of those two exhibits.

THE COURT:  And that's a recording of what?

MS. ROSE:  That is a recording of the events of November 30th, 2007, that the defendant -- excuse me, that the witness has just testified about.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  I'll admit Government's Exhibit 143, 143A, and 143B.  And you wish to publish B?

MS. ROSE:  I do, Your Honor.

THE COURT:  Very well.  Before you do that, members of the jury, the government is going to play a recording and a transcript of a recording which has been admitted into evidence and the transcript represents itself as an accurate record of what was said and an accurate translation of what was said in the Spanish language.  And the transcripts are

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 35 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 63 of 131
JA1915

RONY LOPEZ – DIRECT

intended as an aid to identify who was speaking and what was said.  And you are instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine.  And you should make this determination without prejudice or bias based on the testimony regarding preparation of the transcripts and your own comparison of the transcript to what you have heard on the recording and any other relevant evidence or testimony.  And should you determine that the transcript is incorrect or inaccurate in any respect, you should disregard it to that extent.

Ms. Rose.

MS. ROSE:  Thank you, Your Honor.

(Government's Exhibit Number 143B was played to the jury.)

BY MS. ROSE:

Q.   Where did that discussion take place, Mr. Lopez?

A.   At Pelon's house.

Q.   Inside or outside, or where were you located?

A.   Outside on the driveway.

Q.   During the conversation a word was used, "jales."  What does that mean?

A.   Another word for, like, jobs or, like, a -- mission.

Q.   And in MS 13, what does a mission mean?

A.   Mission, go do something for the gang.  Say they tell you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 36 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 76 of 131
JA1916

RONY LOPEZ – DIRECT

go shoot somebody, that's your mission.

Q.   And when the defendant said, "We came to do what we came to do," what was the discussion about?

A.   Well, they had said previously that their goal for Charlotte was to commit ten of the bloodiest murders Charlotte has ever seen.  Salvadorian style, which means, you know, whacking people with a machete, cutting heads off and just chopping people up.

Q.   Who said that?

A.   Wizard.

Q.   When the defendant said "wrap it up for him" in reference to Casper, what -- what did that mean?

          MR. FOSTER:  Objection.

A.   Saying --

          MR. FOSTER:  Calls for speculation.

          THE COURT:  You can ask him what it meant to him.

Q.   What did it mean to you --

          THE COURT:  Sustained.

Q.   -- in the context of the conversation?

A.   When he said wrap it up, to me it means like I said earlier:  We're going to ask him what happened.  If he doesn't give a good enough excuse, we're going to kill him.  If he -- if he gives a good enough excuse, we'll spare him.

Q.   There was also the term "piece," p-i-e-c-e, piece used to describe something in the conversation.  Take care of that

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 37 of 510
Case 3:08-cr-00134-RJC   Document 1456   Filed 10/04/10   Page 48 of 131

JA1917

RONY LOPEZ – DIRECT

piece down there or that's a valuable piece.  To what was that referenced?

A.   Valuable piece, they're referring to older gang members. Gang members that have more knowledge, that have contacts in every state or out of the United States.  They might have contacts in five different countries, you know.  Say they kill somebody here, they can just run to a different country and they have the connections for it.  So that's why they consider them a valuable piece.

Q.   And the term something will be done that will be heard below, what does "heard below" mean?

A.   That means do something crazy.  Something -- something that -- that you will hear about it in the news.  Like Charlotte's never seen somebody get their head cut off --

          MR. FOSTER:  Objection.  This is total speculation.

          THE COURT:  Sustained.

Q.   After those individuals, the defendant and Stiler and Spider left, did you have communication with any of them during the course of the week?

A.   Yes, I did.  They chirped me.

Q.   And what do you mean when you say they chirped you?

A.   Nextel.  Chirp.

Q.   The next weekend, Saturday, December 8th, did you and other gang members in Charlotte have any plans regarding a second attempt at the prostitution house?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 38 of 510
Case 3:08-cr-00134-RJC   Document 156   Filed 10/04/10   Page 38 of 510

JA1918

RONY LOPEZ - DIRECT

A.   Yes.  They called -- Mariachi called me up.  He told me to go pick them up again.  They didn't tell me what they were going to do again.  I picked them up and, bam, they told me they were going to go try to hit the same house up.  Which I got away.  Managed to get away for two, three minutes.  Called them and let them know again, Chuck.  And I let them know.  And they said, All right, we'll have something set up by the time you get up there.

Q.   Now, did you have time to meet with Officer Hastings to get any recording devices at that time?

A.   I believe I did.  When you met up with the other individuals, particularly who -- who went with you for the second attempt.  Who was with you?

A.   It was the same -- same people.  Sombre, Diablo, Psicopata, and Tigre.

Q.   Where did you go after you picked them up?

A.   We drove going up to that same house.  And once we got there, once we were facing -- we were driving to the house and there was a police officer there already.

Q.   When you -- when you all saw the police officer, what did you do?

A.   We just turned around.  We went right back to Sombre's house.

Q.   And were you expecting that based upon your conversations with Detective Hastings?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 39 of 510
Case 3:08-cr-00134-RJC   Document 1516   Filed 10/04/10   Page 39 of 131

JA1919

RONY LOPEZ – DIRECT

A.   Yes.  I already knew what was going to happen.

Q.   When you went back to Sombre's residence, what happened there?

A.   They just started talking, saying that something was going on and they were suspecting.

Q.   Suspecting what?

A.   That somebody was working with the police and they thought it was me.

Q.   Because of the two botched attempts?

A.   Uh-huh.

Q.   How did you deal with that -- those concerns at that time?

A.   Well, they didn't really come out and say it to me, but, you know, they made comments that, you know, I knew what they were trying to say.  They were saying, ah, like, ah, this is weird.  This is really weird.  Two times in a row, no, this is not possible.  There is something wrong here.  And, you know, all three of them lived -- all four of them lived together so, you know, they kind of looked at me.

Q.   All right.  Now, after the things didn't go through on that evening, did you or any of the other individuals you were with call Mariachi and explain what had taken place?

A.   Yes, I called him.

Q.   What discussion did you have with Mariachi?

A.   I told him, you know, why are you sending me to these

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 40 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 21 of 31

JA1920

RONY LOPEZ – DIRECT

little dumb things off of Eastway?  There's a lot of cops there.  That's exactly what I told him.

Q.   Did you tell him that you guys were unsuccessful?

A.   Yeah.

Q.   And what did Mariachi say?  Did he indicate there was another plan?

A.   He said it's time for plan B.

Q.   What was plan B?

A.   I didn't know at that time, but then later on that night he told me it was to rob this guy that was selling drugs out in Vacquero.

Q.   Who was that individual, do you recall?

A.   Some -- some guy they used to call Gordo.

Q.   Why rob someone who was selling in an MS controlled club?

A.   Because he wasn't paying his rent.  He -- he wasn't paying rent to anybody so nobody had allowed him to go in there and sell drugs.  He was just doing that on his own.

Q.   What kind of drugs were sold there in the MS controlled clubs?

A.   Weed, coke, ice.

Q.   When you say coke...

A.   Cocaine.

Q.   And ice is what kind of drug?

A.   I don't know.  Ice.  I know it by ice.

Q.   All right.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 41 of 510
Case 3:08-cr-00134-RJC   Document 1756   Filed 10/04/10   Page 22 of 310
JA1921

RONY LOPEZ – DIRECT

A.    Meth, I guess.  Crystal meth.

Q.    Okay.  When Mariachi said this would be plan B to take care of Gordo that evening, what did you and the others then do?

A.    We just -- we went to a club.  Then he was there and --

Q.    Well, now, at some point did -- were you expecting to hook up with the guys from Greensboro?

A.    No.  I chirped them and they had told me what had just happened.

Q.    When you say you chirped them, who specifically did you call?

A.    Stiler.

Q.    And when you called Stiler, what did you hear?

A.    He was running and he said, Homeboy, we -- we just shot some guys.  Let me call you back in a second.  That's all he said.

Q.    Did you talk to Stiler shortly thereafter?

A.    Yes, I did.

Q.    What did you hear?

A.    Just him.  Just -- what do you mean right after?

Q.    Did you guys make a plan --

A.    Yeah.

Q.    -- after the phone call?

A.    Yeah, he called me back and he told me to pick him up halfways.  They were trying to get out of Greensboro into

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 90-5    Filed 03/29/17    Page 42 of 510
Case 3:08-cr-00134-RJC    Document 1956    Filed 10/04/10    Page 23 of 131
JA1922

RONY LOPEZ – DIRECT

Charlotte.

Q.   What did you do when you had that conversation?  Did you make contact with the agents?

A.   Yes, I did.

Q.   Describe what happened.

A.   I told them what had happened and that I had to go pick them up, and they said okay and they gave me the recording -- the video so I can -- can record video.  And I went to go get them.

Q.   Where -- was there -- were there some exchanged phone conversations in between about where would be the best place to meet them?

A.   Yeah.  They had said halfway from Charlotte and Greensboro, but I ended up meeting them in Concord somewhere.

Q.   Did -- were Officer Hastings and Agent Attard, were they going to conduct surveillance or be with you in some fashion during that meeting?

A.   I don't remember if they did.

Q.   Ultimately, did you start heading up the interstate?

A.   Yes.

Q.   Which interstate?

A.   85.

Q.   Did you meet the Greensboro people with whom you had spoken?

A.   Yes, I did.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 43 of 510
Case 3:08-cr-00134-RJC   Document 1756   Filed 10/04/10   Page 43 of 510

JA1923

RONY LOPEZ - DIRECT

Q.    Where did you meet them?

A.    At an IHOP.

Q.    And that IHOP was located --

A.    In Concord somewhere.

Q.    -- off of 85?

A.    Yes.

Q.    Who did you meet?

A.    Spider, Stiler, and Wizard.

Q.    Any -- who drove them there to meet you?

A.    Spider.

Q.    What car were you driving?

A.    I was driving my car.

Q.    And which car was that?

A.    A Honda Accord.

Q.    Had there been an incident earlier regarding some damage to your car?

A.    Yes.  Some -- some -- they shot at me from the back and they shot my back windows out.

Q.    Who is they?

        MR. FOSTER:  Objection -- never mind.

A.    Other gang members.

Q.    Had you let Officer Hastings know about that and was he helping you with that?

A.    Yeah.

Q.    Do you recall what car the people from Greensboro came

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 44 of 510
Case 3:08-cv-00134-RJC   Document 1596   Filed 10/04/10   Page 25 of 131

JA1924

689

RONY LOPEZ – DIRECT

in?

A.   It was a black Mitsubishi Montero, SUV.

Q.   And did they leave -- did the three of them leave with you or who left with you?

A.   Three of them left with me, and Spider drove back to Greensboro.

Q.   Who were the three that went with you?

A.   Chino, Wizard, and Stiler.

Q.   When Chino, Wizard, and Stiler got into the car, did you immediately head back towards Charlotte?

A.   Yeah.

Q.   Was there conversation in the car along the way?

A.   Yes.

Q.   Did you -- during that time, were you and Chino, Stiler or Wizard talking on the phone?

A.   Yes, we were.  Stiler was on the phone with somebody. And I don't remember.  Everybody was just doing -- Wizard was on the phone with somebody else.  There was conversations going on, you know.

Q.   There were phone conversations going on and conversation in the car --

A.   Yeah.

Q.   -- is that fair to say?

A.   Yeah.

Q.   Did you -- did you have an opportunity to review the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 45 of 510
Case 3:08-cr-00134-RJC   Document 1296   Filed 10/04/10   Page 26 of 131

JA1925

RONY LOPEZ – DIRECT

recording from that instance?

A.    Yes, I did.

Q.    And the transcript that you reviewed of that recording in Spanish and English, were they fair and accurate?

A.    Yes, they are.

            MS. ROSE:  Your Honor, these have been previously identified as Government's Exhibit 144.  144A is the transcript.  That's of December 8th, '07.  And then 144B is the merged audio transcript.

            THE COURT:  Are you moving admission at this time?

            MS. ROSE:  And I would move to admit those and publish the merged transcript.

            THE COURT:  Any objection?

            MR. FOSTER:  No, Your Honor.

            THE COURT:  Let them be admitted and you may publish B.

            (Government's Exhibits Nos. 144, 144A, and 144B were received into evidence.)

            THE COURT:  May I see counsel at sidebar.

            (Side-bar conference as follows:)

            THE COURT:  Has B been sanitized consistent with the court's earlier ruling?

            MS. ROSE:  Yes, sir.

            MR. BRYSON:  This is not the one that it particularly referred to.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 90-5    Filed 03/29/17    Page 46 of 510
Case 3:08-cr-00134-RJC    Document 1656    Filed 10/04/10    Page 246 of 310
JA1926

691

RONY LOPEZ – DIRECT

THE COURT:  The conversation about his girlfriend.

MS. ROSE:  That's the second part of this.

THE COURT:  Okay, right.  And that's been sanitized.

MS. ROSE:  Yes.  Yes, it has.

(End of sidebar conference.)

THE COURT:  Members of the jury, the same instruction with respect to this transcript.  You're to consider the way in which it was prepared, the testimony about its preparation, and any other relevant evidence to determine whether the transcript accurately reflects the conversations that are described.

(Government's Exhibit Number 144B was played to the jury.)

BY MS. ROSE:

Q.   Now, during the trip -- the trip, there was noted early on in the recording, it's noted gun cocking or sound of gun cocking.

A.   Uh-huh.

Q.   Do you recall that?

A.   Yeah.

Q.   Who had the weapon?

A.   Wizard.

Q.   Pardon?

A.   Wizard.

Q.   There was also some talk about little fat ones.  Do you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1927**

RONY LOPEZ – DIRECT

recall what was happening at the time there was a discussion about the little fat ones?

A.   Talking about the bullets for the .45.

Q.   Who was talking about it?

A.   Me and Wizard.

Q.   When you got to -- we heard the music and everything. Where -- what location was that?

A.   That's Vacquero's.

Q.   And when you and the defendant went into the bathroom, what did he do?

A.   He put the gun in my face and told me to smell it and tell him -- he said, How does it smell?  You know, it smelled like gunpowder.  He said, All right.  Well, I'm about to piss on my hands.  Because he said if you pee on your hands, the gunpowder will come out or get out your hands or something like that.

Q.   And did he do that?

A.   Yes, he did.

Q.   Show you what's been marked as Government's Exhibit 191.
     Are you able to see Government's Exhibit 191?

A.   Yeah.

Q.   What is that?  I know it's blurry, but what do you make that out to be?

A.   That's -- that's his gun when we were in the restroom.

Q.   And was that taken from the recording device you had?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/29/17    Page 48 of 510
Case 3:08-cr-00134-RJC    Document 456    Filed 10/04/10    Page 29 of 31

JA1928

RONY LOPEZ – DIRECT

A.    Yes.

MS. ROSE:  Move Exhibit 191.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it in -- or let it be admitted.

MS. ROSE:  Publish, Your Honor?

THE COURT:  You may.

(Government's Exhibit No. 191 was received into evidence.)

Q.    And is that the point that you were smelling it?

A.    Yeah.

Q.    After -- at the end of the tape, did you and the defendant stay in there in the restroom or did you go back outside?

A.    We -- we went back outside for a while.

Q.    And were you there near the taco stand?

A.    Yeah.

Q.    Who else was there at that point?

A.    Mariachi was there.

Q.    Now, at some point that evening, were you all standing around in various places around the taco stand?

A.    Uh-huh.

Q.    Did you ever step away?

A.    Yes, I did.

Q.    What did you do?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 49 of 510
Case 3:08-cr-00134-RJC   Document 1252   Filed 10/04/10   Page 50 of 131

**JA1929**

RONY LOPEZ – DIRECT

A.   Got on the phone.  I had to step away for a minute.  And I believe that's the time I kind of left for a little while so I can -- I was -- I had to change the recording I had.  I believe I gave them the jacket back.

Q.   And why did you feel like you needed to change the recording device you had on at that point?

A.   Because I felt like, you know, it was too -- too risky for me to wear that.  Felt like they were going to check me because, you know, that's nothing -- you know, MS -- MS members do that to each other.  They pat each other down, see that you're not wearing anything.

Q.   And did you slip away for a short visit with Agent Hastings or Agent Attard?

A.   Yeah.

Q.   And what kind of recording device were you fitted with then at that point?

A.   With just an audio.

Q.   And without talking too much about the law enforcement technology, is that something that wouldn't be noticed as a recording device?

A.   Yeah, you wouldn't notice it.

Q.   What was -- if you recall, what was the defendant's demeanor and attitude from the time you picked him up and you ordered the food and went to the bathroom, what did you note about him?

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 50 of 510
Case 3:08-cr-00134-RJC   Document 1150   Filed 10/04/10   Page 50 of 131

JA1930

RONY LOPEZ – DIRECT

A.   That he didn't -- he didn't care.  He was just trying to let people know that, you know, you don't mess with MS because MS will come back and get you.

MR. FOSTER:  Objection.  That's speculation.  That's not based on any words.

THE COURT:  Sustained.

Q.   Now, who is Crazy?  There was some discussion about a female named Crazy.

A.   Yeah, she's an MS member too.

Q.   Where is she an MS member?

A.   In Charlotte.

Q.   Do you know her true name?

A.   Rosa something.

Q.   Rosa is her first name?

A.   Yeah.

Q.   When you returned, did you -- after you met with Agent Hastings and changed your recording device, did you return immediately to Vacquero, to the club there at Vacquero?

A.   Yes, I did.

Q.   At that point did you and the defendant leave together?

A.   Yes, we did.

Q.   Describe how that came about and what was the purpose of you and the defendant leaving together.

A.   Basically, I just wanted to get him alone and ask him a few questions because I was instructed to do so, so I was just

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/29/17  Page 51 of 510
Case 3:08-cr-00134-RJC  Document 1596  Filed 10/04/10  Page 52 of 131
JA1931

RONY LOPEZ - DIRECT

trying to take him somewhere else where I can just talk to him and just like the officers told me, get him alone, try to admit to it.  So that's what I was trying to do.

Q.   Where did -- where did you and the defendant leave?

A.   Went to another club called Rodeo.

Q.   And where is Rodeo located?

A.   Off of Albemarle Road.

Q.   And what was the purpose of you and defendant going to Rodeo?

A.   Just was trying to get him away, talk to him so I can record him saying that, yeah, he did do the shooting.

Q.   And had you talked with Agent Hastings prior to leaving with the defendant?

A.   Yeah.

Q.   Had you told the defendant anything about on a prior occasion or when you met on another time about Club Rodeo or Disco Rodeo?

A.   No.  Just that one night we were talking about it.

Q.   Now, is Disco Rodeo the one that's not exclusively controlled by MS?

A.   Yeah, that's the one everybody used to fight for.

Q.   Have you also reviewed the disk and the transcript of the recording that was made during that portion of the evening?

A.   Yes, I did.

Q.   And is it fair and accurate?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 52 of 510
Case 3:08-cv-00134-RJC   Document 1755   Filed 10/04/10   Page 53 of 310

JA1932

RONY LOPEZ - DIRECT

A.    Yes, it is.

MS. ROSE:  That, Your Honor, is marked as Exhibit 145.  The transcript is 145A.  And the merged version is 145B.  I'd move for admission of all of those and permission to publish 145B.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted and publish B.

(Government's Exhibits Nos. 145, 145A, and 145B were received into evidence.)

(Government's Exhibit Number 145B was played to the jury.)

BY MS. ROSE:

Q.    At some point during this conversation with the defendant, the words "she is close by.  She is always close by."  What was the defendant doing at that point?

A.    Grabbing the gun.

Q.    The same gun that he showed you earlier?

A.    Yes.

Q.    There was some discussion about if they stop us and ask us for the license.  What was that about?

A.    He was telling me -- I told him, You know what, if we get pulled over, we're going to be screwed with that -- with that gun.  You just shot somebody with that gun.

He was like, Well, there's a problem for me having it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/29/17    Page 53 of 510
Case 3:08-cr-00134-RJC    Document 1750    Filed 10/04/10    Pages 53 of 131
JA1933

RONY LOPEZ – DIRECT

I said, Yeah.  We'll get busted for that.

He said, There ain't no problem.  If he stops us and asks us for our license and registration, just --

MR. FOSTER:  Objection.

THE COURT:  Basis?

MR. FOSTER:  The tape speaks for itself.  It's the best evidence, Your Honor.

THE COURT:  Well, I'll sustain the objection as nonresponsive.

Q.   Was the defendant holding anything in his hand as you -- as he said, "One to each one?"

A.   Yeah, he was holding his gun.  Showing it to me.

Q.   What was the reference to the fat one?

A.   Bullets.

MR. FOSTER:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.   Talking about the bullets.

Q.   What did the defendant do, if anything?  Did he make any motions when he said the words, "I just went pop, pop to him, pop and I shot another dude."  What did he do?

A.   He was going like that (indicating).

Q.   Did the two of you get out of the car there at Club Rodeo?

A.   No, we didn't.

Q.   Eventually where did you go?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 54 of 510
Case 3:08-cv-00134-RJC   Document 156   Filed 10/04/10   Page 56 of 131
JA1934

RONY LOPEZ – DIRECT

A.    We went right back to Vacquero's.

Q.    And when you got back to Vacquero's, who was there?

A.    Just a bunch of members there.

Q.    Did you and the defendant and some of the other individuals go into the bathroom --

A.    Yes, we did.

Q.    -- again?

A.    Yeah.

Q.    Who did you see there?

A.    That guy Gordo.

Q.    And what was the purpose of seeing Gordo there in the bathroom at Vacquero?

A.    That was Mariachi's plan B.  He was selling drugs but wasn't paying rent to MS.  So they were going to confront him about it.

Q.    And did you go into the bathroom on that occasion?

A.    Yes, I did.

Q.    Were you there when that happened?

A.    Yes, I was.

            (Government's Exhibit 145B resumed.)

BY MS. ROSE:

Q.    What was happening during this exchange?

A.    They had the guy in the restroom, Gordo, and they were making him take his pockets out of his pants and just searching him.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 55 of 510
Case 3:08-cr-00134-RJC   Document 1756   Filed 10/04/10   Page 56 of 131

JA1935

RONY LOPEZ – DIRECT

Q.    Was anything located?

A.    No.

Q.    Did they locate anything on him?

A.    No.

Q.    Ultimately that evening, did you leave and go home at some point?

A.    Yeah.

Q.    Did you -- did -- do you know where the defendant went? Did you have conversations with him about where he was going to go?

A.    Yeah, they went to Pelon's house.

Q.    What about Stiler, where did go?

A.    He went back to Greensboro.

Q.    Did you -- did you speak with the defendant the next day?

A.    Yes, I did.

Q.    And did the two of you stay in contact through the next few days?

A.    Yes, we did.

Q.    As you were doing so, were you providing this information to Officer Hastings?

A.    Yes, I was.

Q.    Take you to December the 12th.  Did you see the defendant on that particular day?

A.    Yes, I did.

Q.    Where did you see him?

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/20/17    Page 56 of 510
Case 3:08-cr-00134-RJC    Document 1258    Filed 10/04/10    Page 56 of 131

JA1936

RONY LOPEZ – DIRECT

A.   At Pelon's.

Q.   Why did you go over to Pelon's or what were the circumstances?

A.   They were always there.  And I can't remember if someone called me or what it was, but, you know, I went over there.  I remember him -- I remember seeing him there.

Q.   Did you talk to Officer Hastings before you went?

A.   Yes, I did.

Q.   And once you got to Pelon's residence, did you have an opportunity also to stay in touch with Officer Hastings?

A.   Yes.

Q.   When you got to Pelon's residence, was the defendant there?

A.   Yes, he was.

Q.   Was anyone else there?

A.   Yeah.

Q.   Who?

A.   There was two girls and Chino.

Q.   And who were the two girls?  Did you know them?

A.   Yeah, it was Crazy, this girl called Crazy, and this other girl called Guara.

Q.   At some point while you were there, did anything happen?

A.   Yes.  That's when the SWAT came in.

Q.   Had you talked to Detective Hastings or were you speaking with him as the police were coming?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 57 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 58 of 131
JA1937

RONY LOPEZ – DIRECT

A.   He just gave me a heads up.  He said, You know what, they're going to come in.  Just be ready.  Don't do anything.  Don't sit near -- anywhere near the gun.  And I tried to, but, you know, he stuck the gun right where I was sitting at.

Q.   Who?

A.   Wizard.

Q.   Where was the gun -- where did the defendant put the gun?

A.   He put the gun like a cushion away from me.

Q.   Where were you sitting?

A.   In the sofa.

Q.   Describe what happened then when law enforcement arrived.

A.   All I heard was a bang and that's all I remember.  Big bang, and they took everyone down.

Q.   Were you arrested as well?

A.   Yes, I was.

Q.   Was the defendant arrested?

A.   Yes, he was.

Q.   Were you able to see anything as the officers made entry?

A.   Yeah, it was the SWAT.  They said, Nobody move.  Nobody look up.  Just keep your face down.  And they just took him.

Q.   I'm going to show you a few photographs.  First Government's Exhibit 189.  Do you recognize Government's Exhibit 189?

A.   Yes, I do.

Q.   Is that a fair and accurate representation of that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 03/29/17   Page 58 of 510
Case 3:08-cr-00134-RJC   Document 1258   Filed 10/04/10   Page 58 of 131
JA1938

RONY LOPEZ – DIRECT

residence?

A.   Yes, it is.

Q.   Which residence is this?

A.   Pelon's house.

Q.   I'm also going to show you 190.  Do you recognize what's shown in Government's Exhibit 190?

A.   Yes, I do.  That was the couch where I was sitting at. And that's where he put the gun.

Q.   And then Government's Exhibit 212.  Do you recognize Exhibit 212?

A.   Yeah.  That's his gun.

Q.   Each of those photographs a fair and accurate representation of what is shown in each exhibit?

A.   Yes, it is.

        MS. ROSE:  I'd move to admit, Your Honor, Government's 189, 190, and 212.

        THE COURT:  Any objection?

        MR. FOSTER:  No objection.

        THE COURT:  Let them be admitted.

        (Government's Exhibits Nos. 189, 190, and 212 were received into evidence.)

Q.   As to Government's Exhibit 189, where were you sitting in relation to the sofas here in the photograph?

A.   I was sitting right here.  The gun was right here (indicating).

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 59 of 510
Case 3:08-cr-00134-RJC   Document 1252   Filed 10/04/10   Page 40 of 131

JA1939

RONY LOPEZ – DIRECT

Q.   And were there only -- how many people were in the room?

A.   Five, including myself.

Q.   And who were the other ones?

A.   Guara, Crazy, Chino, him, myself.

Q.   Who's him?

A.   Wizard.

Q.   Show you 190.  What's shown in Government's 190?

A.   It's the couch where I was sitting at.  The gun was right here (indicating).

Q.   And Government's Exhibit 212.  Is that the gun you previously identified as the defendant's?

A.   Yes, it is.

Q.   Is that the one you saw him with on December the 8th?

A.   Yes, it is.

Q.   Is that the one you saw him with the first time you met him in Greensboro?

A.   Yes.

Q.   After the defendant was arrested by law enforcement here in Charlotte, did you continue to immediately cooperate with law enforcement?  Were you doing anything active particularly at that time for them?

A.   No, because at that time everybody thought, you know, it was me.

Q.   What do you mean everybody thought it was me?

A.   Everybody -- they were kind of putting the pieces

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/20/17   Page 60 of 510
Case 3:08-cr-00134-RJC   Document 1250   Filed 10/04/10   Page 60 of 131
JA1940

RONY LOPEZ - DIRECT

together, you know.  They started figuring out it was me working with the police.

Q.    At some point did you make contact with Chacua down in El Salvador?

A.    Yes, I did.

Q.    Why did you speak with Chacua?

A.    Because he -- like I say, he's an older member and he has -- he has a big say so.  If they wanted to kill me, they had to show him proof.  They had to have court paperwork saying Rony provided this evidence for the police or whatever. They needed evidence to kill me.  Which they didn't have.

So I spoke to him and he said, You know what, they don't have any evidence against you yet so don't worry about it.

Q.    Was -- did you know whether he was in communication with other members of your clique here in Charlotte --

A.    Yes, sir.

Q.    -- on your behalf?

A.    Yes, he was.

Q.    During the -- during the time you were cooperating with law enforcement, did you consent to have them record your phone conversations?

A.    Yes.

Q.    And did you -- were the calls that you made to Chacua down in El Salvador, were those calls recorded?

A.    Yes, they were.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 08/14/2013   Page 61 of 510
Case 3:08-cr-00134-RJC   Document 1610   Filed 10/04/10   Page 42 of 131

JA1941

RONY LOPEZ – DIRECT

Q.    And did you have an opportunity to review the transcripts of those calls?

A.    Yes.

Q.    And are they fair and accurate?

A.    Yes, they are.

MS. ROSE:  Your Honor, at this time I would move to admit Government's 178, a disk with a telephone call, and 178A which is a transcript from January 10th of '08.  I'll ask some more questions before I publish, if I may, Your Honor.

THE COURT:  January 10th of '08?

MS. ROSE:  Yes, sir, 178A.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let them -- let 178 and 178A be admitted.

(Government's Exhibits Nos. 178 and 178A were received into evidence.)

Q.    Now, during the times that you spoke with Chacua down in El Salvador, did he also make a request of you?

A.    Yeah.  He would tell me, well, you know what, send me like a hundred bucks to do stuff out there, transport things or -- he needed money for something.  He'll tell me to help him out, he'll help me out.

Q.    And did -- and did you, in fact, send money to him in El Salvador --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 62 of 510
Case 3:08-cr-00134-RJC    Document 726    Filed 10/04/10    Page 43 of 131

JA1942

RONY LOPEZ – DIRECT

A.   Yes, I did.

Q.   -- to the jail?

How did that work?

A.   He had somebody on the outside and I'll send the money to that person on the outside and that person will cash the money order or go get money and they would sneak it in to prison and give it to him.

MS. ROSE:  At this time, Your Honor, I'd move to publish 178B, the transcript and recording merged.

THE COURT:  You may.

(Government's Exhibit Number 178B was received into evidence and played to the jury.)

THE COURT:  All right.  We'll take a break at this time.

Members of the jury, we'll take our afternoon break.  Don't talk about the case.  Keep an open mind and we'll see you at 4:15.

(Brief recess at 4:03 p.m.)

THE COURT:  Are we ready for the jury?

(No response.)

THE COURT:  Call the jury.

(Jury entered the courtroom.)

THE COURT:  You may continue.

RONY ANTONIO MAGANA LOPEZ

DIRECT EXAMINATION (Cont'd.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 63 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 63 of 131
JA1943

RONY LOPEZ - DIRECT

BY MS. ROSE:

Q.   Did you at a later time -- did you actually send Chacua some money there in the jail in El Salvador?

A.   Yes, I did.

Q.   And who is Stiler's best homeboy?

A.   Wizard.

Q.   Did you talk to -- have a call with Chacua again a few days later on January the 19th of 2008?

A.   I did.

Q.   And you have reviewed that transcript and it's accurate?

A.   Yes.

        MS. ROSE:  I'd move 178C, 178D, and I would publish 178D, I guess is the merged.  178C is the transcript.  178D is the merged tape of the transcript.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let them be admitted and you may publish D.

        (Government's Exhibits Nos. 178C and 178D were received into evidence.)

        (Government's Exhibit Number 178D was played to the jury.)

BY MS. ROSE:

Q.   At some point, even though you had spoken with Chacua regarding your concerns with other people suspecting you for

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 64 of 510
Case 3:08-cr-00134-RJC   Document 1750   Filed 10/04/10   Page 45 of 131

JA1944

RONY LOPEZ – DIRECT

cooperating with law enforcement, did you speak to Agent Attard and Officer Hastings and did the three of you decide perhaps you should leave town?

A.    Yes.

Q.    Describe what happened and ultimately what you did.

A.    They just figured out it was me and we decided I was going to leave.  So they -- at first they bought me a plane ticket so I can leave town for a while.  And after that, I left for good.

Q.    Did you -- when you left town for a while, did you go stay with some family?

A.    Yes, I did.

Q.    Where did you go stay with family?

A.    California.

Q.    How long, if you recall, did you stay in California with family?

A.    Month.

Q.    When you -- what made you return?  Did you feel like it was safe to return at some point?

A.    Yeah.  I spoke to Chacua and he told me everything was going to be all right.  That everyone was assuming, you know.  Nobody had evidence against me.  It was all right for me to come back.  And I came back.

Q.    At some point did you feel comfortable enough to actually continue working actively with law enforcement?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 65 of 510
Case 3:08-cv-00134-RJC   Document 1256   Filed 10/04/10   Page 46 of 131
JA1945

RONY LOPEZ - DIRECT

A.   Yeah.

Q.   Did you, toward the end of February of '08, February 29th of '08, actually attend a meeting?

A.   Yes, I did.

Q.   Who did you go to that meeting with?

A.   Mariachi, Sombre.  It was -- it was a few guys.  It was just so long ago, I...

Q.   Who lived on Rozzelles Ferry Road here in Charlotte?

A.   Shorty.

Q.   Did you ever -- did you go to a meeting at Shorty's house at any time?

A.   Yes.

Q.   At that particular meeting, did you wear a recording device again?

A.   Yes, I did.

Q.   Following the protocols that you had used on each of the prior occasions with Agent Attard and Officer Hastings?

A.   Yes.

Q.   If you recall, who was -- who was running that meeting or the person in charge at that particular gathering?

A.   Misterio.

Q.   And who is Misterio and when did he come into the picture here in Charlotte?

A.   He came as soon as -- as soon as Wizard got locked up and Stiler disappeared, he came in.  He -- he's also from

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA1946

RONY LOPEZ - DIRECT

California.  He was living up in South Carolina and he just --
he used to come up here.

Q.   And like the previous occasion with the defendant coming,
did you or other members of the clique receive a call in
advance that Misterio would be arriving in Charlotte?

A.   Yes.

Q.   What were you told?

A.   That there was going to be -- there was going to be
someone coming up here from South Carolina.  They were
originally from LA.  That he used to run his own clique and
all that, and Chacua had told us this.  And that he was -- he
was straight.  That he was going to get things running right.

Q.   At this particular meeting, were you able to wear
recording equipment that also made video recording from which
photographs could be taken?

A.   Yes, I was able to.

Q.   I'm going to show you a series of photographs first and
ask you if you are able to identify any of these photographs.
192.  Who is shown in Government's Exhibit 192?

A.   To the right, that's Misterio.  To the left, that's
Shaggy.

Q.   And where was the -- is this taken from the video you
were wearing, the recording device?

A.   Yes, it is.

Q.   And where was this actual -- where was this taken?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 67 of 510
Case 3:08-cr-00134-RJC   Document 1536   Filed 10/04/10   Page 48 of 131

JA1947

RONY LOPEZ - DIRECT

A.    Shorty's house.

MS. ROSE:  I move to admit Exhibit 192, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 192 was received into evidence.)

Q.    Exhibit 192, who is -- which one of these individuals was leading the meeting?

A.    The one on the right.

Q.    And that's?

A.    Misterio.

Q.    Show you Exhibit 193.  What is -- what is shown in Exhibit 193?

A.    They're basically checking each other.  We have to lift up our shirt and check you, pat you down, make sure you're not wearing anything.

Q.    And who did that during this meeting?

A.    Everybody.

Q.    Everybody lifted their shirt?

A.    Everybody patted each other down.

Q.    And was this also taken from the recording equipment which you were wearing on that occasion?

A.    Yes.

MS. ROSE:  Move to admit Government's 193.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 68 of 510
Case 3:08-cr-00134-RJC    Document 1956    Filed 10/04/10    Page 49 of 131
JA1948

RONY LOPEZ - DIRECT

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 193 was received into evidence.)

Q.   During the pat down and the search that was conducted on one another, was your recording equipment discovered?

A.   No, it wasn't.  Actually, I took off my jacket before they even started patting people down.  I took it off and threw it in the couch.  That's how they didn't...

Q.   How did they get this picture?

A.   Well, see, everybody -- I think that's the last thing I caught before I took off my jacket.  Because when they said everybody started patting each other down, I was taking it off and threw it back there.

Q.   I'm going to show you some -- 194.  Was this taken at what point in the meeting?

A.   That's -- I believe that's when everybody was introducing themselves.

Q.   And do you recognize or can you see at least one individual's face in that particular photograph?

A.   It's Shorty to the right.  In the middle is Tigre.  And to the left it's Garra.

Q.   And was this taken -- you said at the beginning of the meeting.  Is that the part where everybody introduces

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 69 of 510
Case 3:08-cr-00134-RJC   Document 1156   Filed 10/04/10   Pages 69 of 510

JA1949

RONY LOPEZ – DIRECT

themselves and throws the signs?

A.    Yeah.

Q.    This was taken, then, prior to you -- to the body checks.

A.    Yes.

        MS. ROSE:  Move to admit 194.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 194 was received into evidence.)

Q.    Show you Government's Exhibit 195.  Do you recognize anyone in that photograph?

A.    Yeah.  Shorty, Tigre, and Garra.

Q.    196.  What is shown in Exhibit 196?

A.    That's Drogo throwing up an MS sign.

        MS. ROSE:  Move to admit 196.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 196 was received into evidence.)

Q.    That, I'm sorry, is who?

A.    Drogo.

Q.    And was he a Charlotte clique member as well?

A.    Yes, he was.

Q.    Who's shown in Government's Exhibit 197?

A.    Garra.

        MS. ROSE:  Move to admit 197.

        THE COURT:  Let it be admitted.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 70 of 510
Case 3:08-cr-00134-RJC   Document 1416   Filed 10/04/10   Page 170 of 311
JA1950

RONY LOPEZ – DIRECT

(Government's Exhibit No. 197 was received into evidence.)

Q.   Garra also a Charlotte member?

A.   He's actually from Virginia.

Q.   And Exhibit 198.  Taken before the meeting began?

A.   Yeah.  That's --

Q.   Is this a fair and accurate representation of the individuals?

A.   Yes, it is.

MS. ROSE:  I'd move to admit 198.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 198 was received into evidence.)

Q.   You marked on the screen with red.  Who were you indicating by that marking?

A.   Pelon.

Q.   And is it -- is that the same Pelon whose home you had been to on a couple of occasions about which you have testified?

A.   Yeah.

Q.   And it was Pelon's home where actually the police arrested the defendant?

A.   Yes, it is.

Q.   Who is next in the photograph standing up next to Pelon?

A.   That's Crazy.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 71 of 510
Case 3:08-cr-00134-RJC   Document 1506   Filed 10/04/10   Page 72 of 131
JA1951

RONY LOPEZ - DIRECT

Q.   Are you able to identify any of the other individuals for certain in the photograph?

A.   Just the one on the right.  The last one on the right. That's Smoke.

Q.   Is that the same Smoke whose car you had borrowed to go to Greensboro the first time you met the defendant?

A.   Yes, it is.

Q.   Were you able still to capture a recording of the meeting, audio recording?

A.   Yes, I was.

         MS. ROSE:  At this time, Your Honor, I would move to play the portion that's already been admitted.

         THE COURT:  You may.

         (Government's Exhibit Number ____ was played to the jury.)

BY MS. ROSE:

Q.   What is the lighting of the cigarettes?  What's the significance of that?

A.   If you lose something -- if you disrespect another member or do something you're not supposed to, they have the option to beat you up, send you on a mission or lit up three cigarettes and turn them off on you.  Like...

Q.   This was referred to as a dinner.  Is there any significance to that term?

A.   Dinner, it's -- it's another word for meeting.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 72 of 510
Case 3:08-cr-00134-RJC   Document 156   Filed 10/04/10   Page 73 of 131
JA1952

RONY LOPEZ - CROSS

Q.   After this particular meeting, at some point did you have additional concerns again for your safety?

A.   Yes, I did.

Q.   And at some point, what did you -- what did law enforcement do in order to remove you again from Charlotte?

A.   I believe that's the time I -- I left for good.

Q.   Did they ever put you in jail for a week or so --

A.   Oh, yeah.

Q.   -- while they were making arrangements?

A.   Yeah, they threw me in jail for about a week.

Q.   And during that time you just waited until they could get you out and then get you somewhere safe?

A.   Yes.

A.   Ultimately, you then entered the program -- the witness protection program.

A.   Yes, I did.

Q.   And you have remained in that program.

A.   Yes, I have.

        MS. ROSE:  Thank you very much.

        THE COURT:  Any cross?

        MR. FOSTER:  Yes, Your Honor.  Thank you.

                CROSS EXAMINATION

BY MR. FOSTER:

Q.   Now, Mr. -- your last name is Lopez, correct?

A.   Yes, it is.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 73 of 510
Case 3:08-cr-00134-RJC    Document 1356    Filed 10/04/10    Page 73 of 310
JA1953

RONY LOPEZ – CROSS

Q.    You came to this country when you were how old?

A.    I was a kid.  Baby.  Probably three, two.

Q.    Okay.  And the reason your family came here from El Salvador was to flee the civil war there.

A.    Yes.

Q.    Which was a very violent, dangerous thing.

A.    Yes.

Q.    And back in those days, people in El Salvador feared the death squads.

A.    Yes.

        MS. ROSE:  Objection.

        THE COURT:  Overruled.

Q.    And then you joined the gang eventually here, MS 13, when you were what?  Fifteen or 16?

A.    Fifteen, 16, around there.

Q.    Okay.  And again, the reason you joined was there were things about it that were attractive to you.  They had a party life, right?

A.    Yeah.

Q.    They had girls that were part -- part of their social scene.

A.    Uh-huh.

Q.    They had drugs and booze, that sort of thing.

A.    Booze, yeah.  They had drugs.  They had everything, basically.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 74 of 510
Case 3:08-cv-00134-RJC   Document 156   Filed 10/04/10   Page 56 of 131
JA1954

RONY LOPEZ - CROSS

Q.   Okay.  And members had cars, ways to get around and that sort of thing.

A.   Yeah.

Q.   So it was like being part of a big family, wasn't it?

A.   Yeah.  At that time that's what it seemed like.

Q.   And it replaced or filled the void in your life because both your parents were working two jobs, correct?

A.   What was that?

Q.   Well, you -- both your parents were working two jobs you said, right?

A.   Yeah.

Q.   So they weren't around a lot.

A.   No, they weren't.

Q.   So this -- because they weren't around a lot, you were -- this was opportunity for you to join the gang because they didn't know what you were doing, right?

A.   That's right.

Q.   And your parents, in fact, would have been very opposed to this had they known that you were joining the gang, right?

A.   Yeah.

Q.   In fact, that's one of the reasons why they left Montebello, California, to come out to Charlotte, right?

A.   Yes, sir.

Q.   And so because your parents weren't around much, this seemed like a good thing to be part of.  This was your family,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 75 of 510
Case 3:08-cr-00134-RJC   Document 155   Filed 10/04/10   Page 76 of 131

JA1955

RONY LOPEZ - CROSS

correct?

A.   It was -- they had fun all the time.  They always went out to party and all that.  So, yeah, I looked at it as people I can party with.

Q.   And then -- and then once you got into it, it became something that you couldn't get out of, basically, correct?

A.   Yeah.

Q.   And once you're in, you're in.

A.   Yeah.

Q.   Now, the money that you testified a few minutes ago that you sent to Chacua down in El Salvador in January of 2008, where did you get that money?

A.   Well, I was working.  I was still working and some of the money, they -- they were giving me some of the money too.

Q.   They being the agents?

A.   FBI, yeah.

Q.   So some of the money that you sent down to Chacua came from federal or state funds?

A.   Yeah -- no.  That's the money they paid me with for -- because sometimes I couldn't go to work.  I'd miss a whole week.  I had to pay bills.  I had to buy food.

Q.   You testified -- I think that you said it was what?  Was it $150 that you sent down to Chacua?

A.   Yeah.

Q.   Did you just have that on hand or did you need to get it

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 76 of 510
Case 3:08-cr-00134-RJC   Document 1566   Filed 10/04/10   Page 76 of 131

JA1956

RONY LOPEZ – CROSS

from the agents?

A.   No, I had that on hand.

Q.   Now, you have a prior felony conviction yourself, don't you?

A.   Yes, I do.

Q.   And that's for possession of a stolen vehicle in Mecklenburg County?

A.   Yes.

Q.   And that was 2006 that you got that conviction.

A.   Yes, I do.

Q.   And you received a number of different types of benefits due to your cooperation with the government in this case, correct?

A.   Yeah.  Benefits of getting out of town.

Q.   Okay.  Well, you also had a misdemeanor driving while license revoked charge that was dismissed at the request of the agents for you, correct?

A.   Yeah.

Q.   And you've also received considerable financial assistance during the last two or three years, correct?

A.   Yeah.  That's for me when I left.  It was to pay hotel rooms and food.  Not just for me, but my whole family.  It was what?  Eight of us, so...

Q.   There's a total of what?  Seven of you that are being protected right now, you and your family, correct?

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 77 of 510
Case 3:08-cr-00134-RJC   Document 1356   Filed 10/04/10   Page 87 of 131

JA1957

RONY LOPEZ - CROSS

A.   Yeah.

Q.   Okay.  And isn't it true that the records indicate that overall -- first off, the marshal service through the witness security program, the total amount of benefits that have gone to you and your family are $437,000.

A.   I don't know the exact amount.  I don't know.

Q.   Well, would you -- would you accept that that's the correct amount or do you feel that that's not right?

A.   Well, I mean, it might be.  I don't know.  I don't keep track of the monies.

Q.   Well, did they ever talk to you about this or shown you any forms that showed what the totals were?

A.   I mean, if that's what it says, that's what it is.

Q.   And then also, that the -- that was from the marshal service.  Also, the FBI a total amount of over $20,000 that went for various things to you, correct?

A.   Yeah.

Q.   Okay.  And also, the U.S. Attorney's Office, funding for various things for you, over $11,000, correct?

A.   Uh-huh.

Q.   So the total amount of federal funds that have gone to you or your family as of the beginning of this trial is over $468,000, correct?

A.   Uh-huh.

Q.   And you also signed a nonattribution agreement back in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 78 of 510
Case 3:08-cr-00134-RJC   Document 156   Filed 10/04/10   Page 78 of 131
JA1958

RONY LOPEZ - CROSS

November of 2009 that basically said nothing you said would be used against you, correct?

A.   Yes, I did.

Q.   As long as you told the truth.

A.   Yes, sir.

Q.   But the person that is deciding whether you're telling the truth is the prosecutors in this case, correct?

A.   No.  No.  I mean, I don't know who's -- I mean, I don't know.  I don't understand that question.  Can you rephrase it.

Q.   Okay.  Well, you're aware that there's protection so that you can talk freely to them without worrying about being prosecuted when you tell them of various crimes you've committed, correct?

A.   Yeah.  They told me to say the truth.

Q.   Right.

A.   And the words I use can't be used against me.

Q.   Right.  So you can then talk freely to them and talk about crimes you've committed in the past and they will not charge you with those, correct?

A.   Yeah.

Q.   Okay.  Now, that's important to you because you in the past have been involved in somewhere -- approximately 50 to 60 robberies, correct?

A.   Yes, sir.  A few of them.

Q.   And one of those robberies led to the death of one of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 08/23/17   Page 79 of 510
Case 3:08-cr-00134-RJC   Document 1355   Filed 10/04/10   Page 80 of 131

JA1959

RONY LOPEZ – CROSS

victims, correct?

A.    Yes, sir.

Q.    And that was -- that victim was Yonni Alexander Morales Maradiaga who died on August 6th, 2005, correct?

A.    Uh-huh.

Q.    And that was where you were a driver and a lookout while Solo and Osi got out and robbed two drunk Hispanic guys and one of them was shot dead and killed, correct?

A.    Yes, sir.  I didn't know it was going to happen.

Q.    Well, you knew that they were going to do a robbery, though.

A.    Yeah.  Well, I was -- see, what happened is he said come and follow me.  I followed him.  And as soon as we hit this little one-way street and I seen the two drunk guys, I already knew what was going to happen.

Q.    Right.  That's what I'm saying.  You knew at that point what was going to happen.

A.    Yeah.  Well, I mean, I couldn't run away from it, you know.

Q.    Right.  And you stayed there as a lookout at that point, correct?

A.    Yeah.

Q.    And you drove at least Solo, Johnny Gonzalez, away from the scene after the robbery, correct?

A.    Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 80 of 510
Case 3:08-cv-00134-RJC    Document 1356    Filed 10/04/10    Page 81 of 131
JA1960

RONY LOPEZ - CROSS

Q.   So you understand you were an aider and abettor to a robbery that led to the death of the victim, correct?

A.   Yes, sir.

Q.   And you understood or understand now that that -- those facts would make you guilty of first degree murder --

MS. ROSE:  Objection.

Q.   -- under state law.

THE COURT:  Sustained.

Q.   You've never been prosecuted for that, have you?

A.   No, sir.

Q.   In fact, you're not being prosecuted for any of the things that you've done, correct?

A.   No, sir.

Q.   During your cooperation, some of the instructions that you received from Officer Hastings included basically committing no crimes and possessing no weapons, correct?

A.   That's right.

Q.   So how were you supposed to go out and do these things with MS without committing crimes?

A.   I didn't commit no crimes.

Q.   You didn't?

A.   (Negative nod.)

Q.   Well, wasn't there an occasion where you were challenged to prove that you were not a snitch and that you're a true homie and you had a gun and you pointed it at a couple rivals?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 81 of 510
Case 3:08-cv-00154-RJC   Document 116-6   Filed 10/04/10   Page 82 of 310
JA1961

RONY LOPEZ – CROSS

A.   If I wouldn't have done that, they would have killed me on the spot.  And as soon as it happened, I called them and I let them know what had just happened.

Q.   But you did assault those two rivals by pointing a gun at them, correct?

MS. ROSE:  Objection as to assault.

THE COURT:  Sustained.

Q.   Are you aware in North Carolina there is a crime of --

MS. ROSE:  Objection.

THE COURT:  Sustained.  Question about a legal conclusion.

Q.   And on a number of occasions during your cooperation, you are in the possession of guns either on your person or in your car, correct?

A.   In my car, yeah.

Q.   And that would have meant that you were breaking the law by being a convicted felon in possession of a firearm, correct?

MS. ROSE:  Objection.

THE COURT:  Sustained.

Q.   Did you know that you were allowed --

A.   Sir, I didn't have them on my possession.  They just came into my car and they had the guns on them.  So if I said no, you can't come into the car with the gun, I mean, they would have known right there, okay, well, it's you working with the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 82 of 510
Case 3:08-cr-00134-RJC   Document 1516   Filed 10/04/10   Page 83 of 131

JA1962

police.  You know, I couldn't do nothing about it.  And as soon as it happened, I would text them or call them or, you know, I'll do something.  I'll say I have to stop at the gas station, use the restroom, and I'll call them or text them and let them know who was in the car and how many guns that was in there.

Q.   So you realize that the -- your -- the benefits that you currently receive and the protection you receive from the federal government is entirely dependent on them accepting what you have to say and not having any problems with it, correct?

A.   What do you mean?

Q.   Well, you understand that under your agreement with them, you could lose your benefits, your protection, that sort of thing, if -- if you violate the agreement with them.  If you don't tell the truth.

A.   Yes, sir.

Q.   Or if you don't -- so do you feel that you have to -- well, strike that.

You're aware of what the allegations are in this case, correct?  What the indictment says.

A.   Uh-huh.

Q.   Let's talk about missions.  Tell us again what a mission is in MS 13.

A.   A mission is when they send you to do something.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 83 of 510
Case 3:08-cr-00134-RJC    Document 1456    Filed 10/04/10    Page 83 of 131
JA1963

RONY LOPEZ - CROSS

Q.   Okay.  And that's -- who's they?

A.   Other MS, older MS members.

Q.   Somebody who's in some role of leadership.

A.   Yeah.

Q.   And they send out the directions go do this and they tell you what to do.

A.   Yeah.

Q.   So there's some sort of advance knowledge, advance planning about what the mission is, correct?

A.   No.  If there's an older member there and they consider you a peewee, they just go ahead and tell you, you know what, go beat him up and you have to do it.

Q.   So they tell you that in advance.  It's not just on the scene.  They say go somewhere and do this.

A.   It's on the scene.  If they see you there, they feel like you haven't proved yourself, they'll tell you right there and then go beat up such and such right now.

Q.   But it's not a mission until you're told to do it, correct?

A.   It's not a mission until you're told to do it, yeah.

Q.   Right.  And for instance, the first attempt of the robbery at the prostitution house, I think back on November 30th, that was -- that was a mission, correct?

A.   No, it wasn't because I didn't know about it.  When I showed up, they told me.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RONY LOPEZ - CROSS

Q.    Right.

A.    Mariachi told me go pick them up.  I show up and they tell me what they're going to do.  They said, hey, we're going to go rob such and such place.  I said, What?  You know, so I said, All right.  Well, give me a minute or so, I'm going to go park the car.  And I text them and I let them know.

Q.    So that -- when Mariachi told you to do that, that became a mission, correct?

A.    Mariachi didn't tell me anything.

Q.    Well, he told you to go pick up the guys, correct?

A.    No, he didn't say nothing else.  He said go pick them up.  They'll tell you what's up.

Q.    Okay.  But -- and they told you what was up, correct?

A.    Yeah.

Q.    And they told you they had a mission.

A.    Yeah.

Q.    Okay.  So it was something that Mariachi had told them about.

A.    But they didn't tell me because they didn't trust me at that point.

Q.    That's not what I said.  They told -- Mariachi told those other guys.

A.    Yeah.

Q.    You rendezvoused with them.  They had received a mission.  You joined in with them, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 85 of 510
Case 3:08-cr-00134-RJC    Document 1156    Filed 10/04/10    Page 86 of 131

JA1965

RONY LOPEZ - CROSS

A.   Yeah, I picked them up, yeah.

Q.   Right.  At that point Mariachi was the leader of the clique, correct?

A.   Yeah, somewhat, yeah.

Q.   And the mission -- when a mission is given, it's to benefit the clique, correct?

A.   Yes.

Q.   Now, the the meeting on November 30th that you testified about, where did that take place again?

A.   On November 30th?

Q.   I'm sorry, November 23rd, I think is -- I'm sorry, the meeting in Greensboro.

A.   Greensboro, yeah.

Q.   Okay.  It was Stiler who called you and told you about that meeting, correct?

A.   Yeah.

Q.   Okay.  And it was Stiler that gave you directions to the meeting spot, right?

A.   Yeah, how to get there, yeah.

Q.   And the meeting was held in Stiler's apartment or next door to it, correct?

A.   Yeah.  It was an empty apartment, yes.

Q.   And it was Stiler that ran the meeting.

A.   Him and Wizard.

Q.   Well, didn't you testify at a previous hearing in this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 03/29/17   Page 86 of 510
Case 3:08-cr-00134-RJC   Document 1356   Filed 10/04/10   Page 86 of 131

JA1966

RONY LOPEZ – CROSS

courtroom where you were asked who ran the meeting and you said Stiler?

A.   He -- yeah, him and Wizard did most of the talking, you know.  He would say something and he would agree with him and he'll tell us, you know.

Q.   But it was -- it was your previous testimony that Stiler ran the meeting.  That's correct, isn't it?

A.   Both of them were doing the talking.

Q.   But Stiler was doing far more talking, wasn't he?

A.   I say they were doing about the same.

Q.   Again, last time when you testified, you were asked under oath the question who ran the meeting and you said Stiler, right?

        MS. ROSE:  Asked and answered, Your Honor. Objection.

        THE COURT:  Overruled.

Q.   Isn't that correct?

A.   Yeah.

Q.   And you didn't mention anything about Wizard when asked that before, did you?

A.   I mean, I said he was there and he was the one with the gun.  He's the one that showed me the gun.

Q.   I'm going to pull something up on the screen for you and I guess for this purpose it will be marked as Defense Exhibit 2 for identification.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 87 of 510
Case 3:08-cr-00134-RJC   Document 1456   Filed 10/04/10   Page 68 of 131

JA1967

732

RONY LOPEZ – CROSS

You do recall testifying in this courtroom back in January.

A.    Yes.

Q.    Okay.  And if you can just take a look at the middle of that page there.  Can you see it?

A.    Yes.

Q.    Okay.  About line 17 and 18:  "Who ran the meeting?"

A.    Uh-huh.

Q.    Isn't it true that you also said that -- or you were asked what are the basic things that Stiler talked about, and then you went on and talked about all the things that Stiler talked about, correct?

A.    Yeah.

Q.    That he was saying -- he was talking about getting the same program that's in Greensboro up in Charlotte.  That it was going to be followed the way it should be.  Whoever didn't follow the program the way it was, they were going to answer to him.  That's what Stiler said, right?

A.    Uh-huh.

Q.    Okay.  And then, isn't it true that you were asked in court last time:  "Did Stiler give you instructions about going forward from that meeting?"

And you said, "Yes."

A.    Uh-huh.

Q.    So that's all true, correct?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1968**

RONY LOPEZ - CROSS

A.   Yeah, he said that.

Q.   And when you were asked those questions and gave that testimony, you didn't mention Wizard, did you?

A.   No, I didn't.

Q.   Now, the second attempt at the prostitution house robbery, that was -- how far in advance did you know about that one?

A.   Just another one like the first one.  Go pick them up.

Q.   Okay.

A.   I showed up.  There they were with the same plan all over again.

Q.   And once again, the person that told you to go show up to this, was it -- it was Mariachi?

A.   Yes.

Q.   And so then you rendezvoused with the other guys, picked them up, and you had your mission, right?

A.   Uh-huh.

Q.   And once again, this was something to benefit the Mara, the clique.

A.   Yeah.

Q.   And obviously, this one was foiled because you had once again had an opportunity to tell the police first, correct?

A.   Yes.

Q.   Okay.  Now, the next meeting that was supposed to take place between the Greensboro guys and you guys, as of the date

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 89 of 510
Case 3:08-cr-00134-RJC   Document 1256   Filed 10/04/10   Page 70 of 131

JA1969

RONY LOPEZ – CROSS

of this second foiled attempt for the robbery at the prostitution house, had there been another meeting scheduled?

A.    I don't really remember.

Q.    Well, the -- what was discussed before, I think you said, is you testified that they were going to come down to Charlotte, weren't they?

A.    Yeah.

Q.    Okay.  And they were going to do some things to help get Charlotte organized.

A.    Okay, yeah.

Q.    They never said anything about -- there was no plan discussed by anybody about doing a mission in Greensboro, correct?

A.    No.

Q.    In fact, when you got the -- when Stiler communicated with you on the telephone, we heard that earlier today, about when he says, you know, they've just been in some incident where three guys got shot.

A.    Uh-huh.

Q.    That was a total surprise to you, correct?

A.    Yeah.

Q.    Because no one had planned that -- I mean, you had not been told that had been planned, correct?

A.    No.

Q.    Now, you testified that after the second attempt at the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 90 of 510
Case 3:08-cv-00134-RJC   Document 1356   Filed 10/04/10   Page 7 of 31

JA1970

RONY LOPEZ - CROSS

robbery of the prostitution house failed, you were told by Mariachi to go to plan B, correct?

A.    Yeah.

Q.    Okay.  And you weren't aware of what plan B was at that moment.

A.    No, I wasn't.

Q.    And then -- but you later found out from who?

A.    From him when we were at the bar.

Q.    Okay.  And that plan was -- wasn't it to break into Gordo's SUV and steal something out of that?

A.    Yeah, he had a gun or something like that in there.

Q.    To steal that out of his car?

A.    Yeah.

Q.    That was the plan.

A.    And they call it hit him up.  Hit him up.  Go up to him and ask him what's going on, you know.  Check him, basically.  Check him.

Q.    I mean, isn't it true that what -- what Mariachi told you had nothing to do with going and hitting up the guy in person. It was going and breaking into his car and stealing his gun out of it.

A.    I remember him saying that.

Q.    Okay.  So that was the plan.  It did not include going into the restroom and robbing him personally, correct?

A.    No, I believe -- I was wearing a camera at that time.  I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 91 of 510
Case 3:08-cv-00134-RJC   Document 156   Filed 10/04/10   Page 2 of 13

JA1971

RONY LOPEZ - CROSS

believe it was -- he said let's go see what's up with him or something like that.

Q.   No, I'm talking -- I'm not talking about later.  I'm just focusing on what -- when he told you about plan B.

A.   Yeah.

Q.   What plan B was, not what actually developed later.

A.   Okay.  Yeah.  Yeah.

Q.   So you agree that plan B was to break into his car --

A.   Yeah.

Q.   -- and steal things.

A.   Yeah.

Q.   Okay.  And once again, that was something that was directed.  It was a mission.  It was known in advance what to go do, correct?

A.   Yeah.  When I got there, he just said --

Q.   Right.

A.   -- we're going to get his car.  So I didn't know in advance.  As soon as I got there, I knew, you know.

Q.   I understand things change.  But I'm just talking about what he told you when he gave you the mission.

A.   He didn't give me no mission.  See, when he called me, he said, It's time for plan B.  And I said, What's plan B?  And then he said, I'll tell you whenever we get there.

     When we got there, he said -- then that's what he told me.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 92 of 510
Case 3:08-cv-00134-RJC   Document 156   Filed 10/04/10   Page 73 of 131

JA1972

RONY LOPEZ - CROSS

Q.    When you talked to Mariachi about plan B, you were still up in the Concord/Kannapolis area in your car?

A.    I think so.

Q.    I'm sorry.  I'm sorry.

A.    I don't remember.

Q.    Where were you when you had this conversation about plan B?

A.    I don't remember where I was at.

Q.    Okay.

A.    It was such a long time ago.

Q.    It was a phone conversation, though, right?

A.    Yeah, I believe so.

Q.    Okay.  Now, another benefit you've received as a result of your cooperation from the federal government concerns your immigration status, correct?

A.    Yeah.

Q.    Okay.  And they did -- initially what they did is they prevented you from being deported, correct?

A.    Yes, sir.

Q.    Okay.  And then they've also let you stay in the country -- let's see.  They've sought and had granted what's called Significant Public Benefit Parole for you which basically means you can stay in the country.  Correct?

A.    I think so.  I don't -- I don't really know too much about all that immigration stuff.  I mean...

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/28/17   Page 93 of 510
Case 3:08-cr-00134-RJC   Document 1356   Filed 10/04/10   Page 74 of 131
JA1973

RONY LOPEZ - CROSS

Q.   And they're also -- you're aware of this through the witness security program.  They're helping you to try to obtain legal status for you within the United States, correct?

A.   Yes, so I can work and live a normal life.

Q.   And this -- this assistance involved terminating the immigration proceedings against you, correct?

A.   Against me?

Q.   Yeah.

A.   I didn't know I had anything against me for immigration.

Q.   Well, did you have a detainer filed against you at some point or something like that?

A.   Not that I know of.

Q.   And the government has also assisted your family in their attempts for any of them to gain legal status as well, correct?

A.   Yeah.  Well, my mom and dad had some type of legal status.  All my other brothers, they were born here except me and my older sister.

Q.   Now, you have -- do you have any memory problems?

A.   Not -- not really, you know.  Not -- not something that's real bad.  Just here and there I forget little things, but...

Q.   And that comes from a head injury you suffered getting shot in the head.

A.   Yes, sir.

Q.   And also as far as your ability to remember what has

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 94 of 510
Case 3:08-cr-00134-RJC   Document 1550   Filed 10/04/10   Page 94 of 311
JA1974

RONY LOPEZ - CROSS

happened in the past, in the past you used cocaine and marijuana, correct?

A.    Yeah, I tried it.  Nothing -- nothing that I was using every day.  And I think I was the only member out there that wasn't getting stoned every day.

Q.    Now, when you testified about when you joined MS 13 and the people that you met and the people that jumped you in and all that sort of thing, did you mention Solo, Johnny Gonzalez?

A.    No.  I met Johnny when I was in school.

Q.    In school.

A.    Yeah.

Q.    But he was -- he was MS 13 too, right?

A.    Yes, he was.

Q.    Was he in your same clique?

A.    Yes, he was.  He was South Boulevard at first.  Then he turned into Centrales.

Q.    Now, let's talk about the rules of MS.  There's -- how many rules are there?

A.    There's quite a few, you know.  They just keep making up more and more and more and more, you know.

Q.    I mean, one of the rules is you have to be jumped in, 13 second beat in to join the gang, right?

A.    Yes, sir.

Q.    Okay.  And it turns out that a number of people somehow avoided that requirement, didn't they?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 03/23/17   Page 95 of 510
Case 3:08-cr-00134-RJC   Document 1350   Filed 10/04/10   Page 76 of 131

JA1975

RONY LOPEZ – CROSS

A.    Nah, I don't -- I don't think there was a number of people that --

Q.    Okay.  You were aware of some people, weren't you?

A.    There was one.

Q.    Mariachi?

A.    No, Pajaro or Mariachi, one of them.  And everybody was iffy trying to find out.  But other than that, there was -- there's not a whole lot of that going on.

Q.    Okay.  And one of the other rules is obviously don't snitch to the police.  Don't cooperate with the police, correct?

A.    That's right.

Q.    And obviously, that rule has been broken by some people here also, correct?

A.    That's right.

Q.    And another rule is, I think you testified, don't ever let the homies down.  Stay with them if they're getting attacked or whatever.

A.    Yeah.

Q.    Correct?

      So from your understanding of the rules, if someone is an MS 13 member and they're attacked by somebody, the rules require any other members present to assist and not back off, right?

A.    Yes, sir.

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 96 of 510
Case 3:08-cr-00134-RJC   Document 1260   Filed 10/04/10   Page 96 of 131
JA1976

RONY LOPEZ – CROSS

Q.   And that would violate the rules if they backed off or didn't assist, correct?

A.   Yeah.

Q.   Another rule is that homeboys come before family, right?

A.   Yeah.  Some of them look at it like that.

Q.   Okay.

A.   Not me.

Q.   And another rule is you must complete missions, right?

A.   Yeah.

Q.   Okay.  And something about every mission is witnessed by the eyes.

A.   By the eyes of another homeboy.

Q.   Okay.  And that it gets reported to somebody so they know that you did the mission, right?

A.   Yeah.

Q.   Okay.  And another rule is that you don't do anything stupid to draw attention from the police.

A.   Yeah.

Q.   Right?

So that rule is just like any other rule.  If you -- if you -- if you violate that rule, you can be subject to discipline, right?

A.   Yes, sir.

Q.   So if you do something that's not -- not a mission and it draws unnecessary attention from the police, that's against

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA1977

RONY LOPEZ – CROSS

the rules.

A.    Yes, it is.

Q.    Now, you testified about the two cliques in Charlotte coming together.

A.    Uh-huh.

Q.    And what were those two cliques called?

A.    Coronados Little Cycles.  It was known as that at first. And then it turned into the South Boulevard clique and Charlottes, Centrales.

Q.    Centrales?

A.    Yeah.

Q.    Okay.  So you're saying first the other clique was originally Coronados and switched to South Boulevard?

A.    Yeah.

Q.    And this occasion where you talked about the cliques coming together, there was some sort of a meeting.  What about the other cliques, weren't there other cliques in Charlotte besides those two?

A.    Yes, there was.

Q.    What?

A.    There was.

Q.    Okay.  But they weren't included?

A.    But they were all -- everybody just joined, it didn't matter what clique you were from, joined one of those two and...

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 98 of 510
Case 3:08-cr-00134-RJC   Document 1350   Filed 10/04/10   Page 98 of 131

JA1978

RONY LOPEZ - CROSS

Q.   Okay.  And then you -- I think you testified that other people -- you gave examples of other people from other cliques who then became part of the Charlotte clique.

A.   Uh-huh.

Q.   And you said Misterio and then you also said Wizard, right?

A.   Became part of the Charlotte clique?

Q.   Yeah.  That's not -- that's not right, is it?

A.   No.  Became part of the Charlotte clique, no.

Q.   Now, your original contact with law enforcement about your gang activity, when the subject of gang membership came up with Officer Quiles -- or I don't know how to say it -- back in 2004 or so, you lied to him and denied membership in the gang, correct?

A.   Yes, I did.  I didn't trust him.  I didn't know if he was going to turn around and tell somebody and that somebody was going to tell somebody else and it was going to get back to me.  I didn't know that.

Q.   And you yourself, some of your gang activities in addition to the robberies and that sort of thing, you also did some drug selling, didn't you?

A.   Yes, I did, sir.

Q.   Cocaine and marijuana?

A.   No.  Cocaine.

Q.   Just cocaine?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 99 of 510
Case 3:08-cr-00134-RJC    Document 1456    Filed 10/04/10    Page 80 of 131
JA1979

RONY LOPEZ - CROSS

A.   Yes.

Q.   Now, you were asked about your audio recording device, whether you had the ability to alter it or erase it or manipulate it or anything and you said no.  But who had -- did you have the ability to turn it on or off?

A.   Yes, sir.  On one occasion they gave me the jacket, and I believe it was a holiday or something.  And they said as soon as you leave, as soon as you leave and meet up with them, cut it on; and as soon as you leave and get to your house, cut it right back off.  And I believe like the next day or so, they got the jacket from me.

Q.   They got the jacket what?

A.   They got the jacket from me.  They took it back.

Q.   Because you'd misused it or what?  I don't understand.

A.   No, no, no.  Because they said -- they weren't -- I don't know what happened.  They couldn't be out that night or they were doing something else.  I don't know what it was.  Gave me the jacket -- or they couldn't stay too close.  I can't remember what it was.  They told me this is how you cut it on; this is how you cut it off.  Cut it on as soon as you get there; cut it off as soon as you leave.

Q.   So you had -- you had the control over turning it on and turning it off?

A.   For about one night.

Q.   What about the audio transmitter normally, the one that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1980**

RONY LOPEZ - CROSS

didn't have the camera?

A.   No, I couldn't -- couldn't do nothing with that.

Q.   You couldn't turn it on or turn it off?

A.   I don't remember doing that to that.

Q.   Now, you were told about this -- before this meeting in the woods that took place in the fall of 2007 that we were talking about a minute ago, that a couple guys were coming from elsewhere who were going to help get the Charlotte clique in shape, correct?

A.   Yes, sir.

Q.   And isn't it true that the names that you were told back then were Snoopy and some other name that you couldn't remember?

A.   Snoopy?

Q.   Right.

A.   I don't remember.  It might have been because there's so many guys from different states that used to come down to Charlotte from Virginia, from Washington, from New York, California.  Just a bunch of people coming -- coming through to Charlotte.

Q.   Now, you're saying that the meeting was called by Mariachi, right?

A.   Yes.

Q.   And you're saying that what he -- his position was, he was -- he was wanting to be real tough and prove to the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 101 of 510
Case 3:08-cr-00734-RJC   Document 505   Filed 10/04/10   Page 32 of 35

JA1981

RONY LOPEZ - CROSS

Greensboro guys that you guys could do it yourself, right?

A.   Yeah.

Q.   So he wasn't scared or concerned about what was going to happen to you guys going up there?

A.   No.

Q.   Then why the need to get guns?

A.   Because we didn't know them like that.  See, we never -- we had never met face-to-face.  And everyone, you know, they were like, well, we don't know them, they don't know us.  Just like we had guns, they had guns too.

Q.   So the first time you ever met the people you referred to as Stiler and Wizard was at the meeting in Greensboro, correct?

A.   Yes, sir.

Q.   And the second time you ever saw them was a meeting down in Charlotte.

A.   Yes.

Q.   And the third time would have been December 8th, 2007, at El Vacquero.

A.   Yes, sir.

Q.   During the meeting in Greensboro at Stiler's apartment, he handled the .45 pistol some of the time, didn't he?

A.   Yeah.

Q.   So both attempts at the prostitution house robberies did not include Wizard, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 102 of 510
Case 3:08-cr-00734-RJC   Document 505   Filed 10/04/10   Page 83 of 135

JA1982

RONY LOPEZ - CROSS

A.   No, they didn't, sir.

Q.   And the meeting on February 29th, 2008, did not include Wizard either, correct?

A.   Where was that meeting at?  The woods?

Q.   No.  You testified the one at Rozzelles Ferry Road February --

A.   No, he wasn't.

Q.   Now, you were asked by the prosecution right after the recording was played of the meeting with Stiler and Wizard about what Wizard meant by something and you said -- you went on and said something about chopping off heads with machetes and stuff.  But that was not on the tape.  You heard the tape, correct?

A.   Yeah.

Q.   So he didn't say that during the meeting, did he?

A.   He didn't say it like that, but I know what he meant. And before that he had said it to me.  He didn't say it that time, but before that he had said it to me.

Q.   And that --

A.   And as soon as I knew, I told them.

Q.   Okay.  But what -- those words that you're attributing to him are not on tape anywhere, are they?

A.   I don't know if they are.

Q.   Because he didn't say it on that occasion.

A.   No.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1983**

RONY LOPEZ - CROSS

Q.   And you don't have it on tape anywhere else, correct?

A.   No.

Q.   And the same thing, you were asked during that same meeting supposedly Wizard said something about wrapping up and you were asked what does that mean and you said to kill someone.  That also was not stated on the tape either, correct?

A.   It's not -- he didn't say it in those words, but I know what he means.  A gang member knows what another gang member means when they say something a certain way.  Just like Misterio says we got to take care of the problem if he doesn't answer it the right way, I know what that means.  Everyone else in that room knows what they meant -- what he meant.

Q.   I was asking what he said, though, not what --

A.   No, he didn't say that, not in those exact words.

Q.   Now, I believe it was in the car ride down between Concord and Charlotte, and we heard that recording and saw the transcript, where Stiler was talking about his concern that somebody could have seen him in the restaurant.  Do you remember that?

A.   Uh-huh.

Q.   And he said he lived in that area for three, almost four years, right?

A.   Yeah.

Q.   And that half the world knows who he was, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 08/23/17   Page 104 of 510
Case 3:08-cr-00734-RJC   Document 585   Filed 10/04/10   Page 85 of 357

JA1984

RONY LOPEZ - CROSS

A.    Yeah.

Q.    Because that was -- that was his hood up there in Greensboro, correct?

A.    Yeah.  That was their...

Q.    He lived right in that area and was concerned that people in that restaurant might have known who he was, correct?

A.    Yeah.

Q.    And so doing a crime that brought down the attention of the police in that area was -- would violate an MS rule, wouldn't it?

A.    See, it's not like that.  When you draw attention to yourself from cops to your gang, it's like you do something dumb, like, you know, like go and spray paint the front of your apartments and say, yeah, I'm MS 13 and put your nickname under it and your clique name.  Cops are going to know you live there, you know.  That -- stuff like that.

        Like -- you know, what they did, it's not considered dumb because they felt disrespected, like they were disrespecting MS.  So they don't take that as a dumb -- dumb move.  They take it as okay, they disrespected MS.  They got what they were supposed to get.

Q.    But the bringing down heat on -- for doing something against people who aren't rivals when it wasn't necessary, that would violate the rule we talked about earlier, wouldn't it.  Bringing down unnecessary heat in the neighborhood where

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1985**

these guys are.

A.   Like I said, they felt like they disrespected them so they did what they thought they had to do.  That's how everybody looked at it.  Like, okay, they disrespected you, they disrespected MS, you did what you had to do.

Q.   But you'd agree with what you said earlier that there is a rule about not bringing down unnecessary heat from the police.

MS. ROSE:  Asked and answered, Your Honor. Objection.

THE COURT:  Overruled.

Q.   Correct?

A.   Yes, sir.  But like I said, it's for dumb stuff.  Like having a stolen car in front of your house.

Q.   So in the restroom of El Vacquero, this attempt to get something of value from Gordo was a complete failure, right? He had nothing.  Nothing was taken from Gordo.

A.   No, nothing was taken from him.

Excuse me, can I ask him something -- can I ask you something?

THE COURT:  No.  Just listen to the questions and answer the questions.

Q.   We heard the tape of that confrontation in the restroom between you guys and Gordo and there are a few times there where you were actively participating, saying he had to give

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 106 of 510
Case 3:08-cv-00734-RJC   Document 50-5   Filed 10/04/10   Page 87 of 351

JA1986

RONY LOPEZ – CROSS

money, he had to pay up.

A.    Yes, sir.

Q.    I mean, you were part of this crime taking place, weren't you?

A.    I -- like -- once again, I had no way out.  If I just stood there, you know, they would know something is up with me.  If I just went into a roomful of them and I'm not saying nothing, I'm just standing there just trying to lay low, they're going to know there's something wrong -- wrong with me.  There's something going on.

      MR. FOSTER:  No further questions.

      THE COURT:  Any redirect?

      MS. ROSE:  I do have a couple of questions, Your Honor.  Thank you.

                REDIRECT EXAMINATION

BY MS. ROSE:

Q.    If a homie feels attacked or disrespected, do they have to have permission or a mission to respond?

A.    No.  If you're disrespected and you don't do anything about it, you'll receive punishment for that.

      MS. ROSE:  Thank you, sir.

      THE COURT:  You may step down.

      Call your next witness.

      MR. FOSTER:  I have just a follow-up based on that, Your Honor.

               Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1987**

WILLIAM HASTINGS – DIRECT

THE COURT:  Based on that question?

MR. FOSTER:  Yes.

THE COURT:  All right.

                    RECROSS EXAMINATION

BY MR. FOSTER:

Q.   The -- were there any -- any subsequent meetings after the Greensboro restaurant incident, was there any talk about taking disciplinary action against Chino or Stiler for not helping out in the Greensboro restaurant?

A.   For not helping out?  No.  They -- we -- actually, everybody was looking for a way to help them get out of Charlotte.  They were thinking about going to New York or somewhere out there.

Q.   That's not what I asked, though.  The question was whether there was any discussion about disciplinary action against Chino and Stiler for not assisting in whatever attack took place in the Greensboro restaurant.

A.   No, sir.

MR. FOSTER:  No further questions.

THE COURT:  You may step down.

(Witness stepped down.)

THE COURT:  Call your next witness.

MS. ROSE:  Call Officer Hastings.

                    WILLIAM CHUCK HASTINGS,

being first duly sworn, was examined and testified as follows:

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 108 of 510
Case 3:08-cr-00734-RJC    Document 50-5    Filed 10/04/10    Page 39 of 131

JA1988

WILLIAM HASTINGS - DIRECT

DIRECT EXAMINATION

BY MS. ROSE:

Q.    Good afternoon.  If you would introduce yourself, please, sir.

A.    My name is William Chuck Hastings.

Q.    And where are you employed?

A.    Charlotte-Mecklenburg Police Department.

Q.    How long have you been with the Charlotte-Mecklenburg Police Department?

A.    Approximately eleven-and-a-half years.

Q.    What have been your positions at the department?

A.    I worked regular patrol for a few years and was assigned temporarily to the gang unit and helped start Gang of One, the prevention and intervention program for gangs.  And now I'm currently in the gang unit assigned to the FBI Safe Streets Task Force.

Q.    And how long have you been working with the FBI Safe Streets Task Force?

A.    Almost four years.

Q.    At some point either before or during your time with the task force, did you begin investigating MS 13 along with other officers in Charlotte?

A.    Yes, way before we started the task force.  Approximately 2001.

Q.    And you mentioned this Gang of One program.  What is that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 109 of 510
Case 3:08-cr-00734-RJC    Document 50-5    Filed 10/04/10    Page 90 of 510
**JA1989**

program and why was it devised?

A.   Well, the current gang problem in this area, we needed another avenue for young juveniles or anyone to try to get out of a gang or prevention or just education for the community.

Q.   And --

A.   Through the police department, excuse me.

Q.   And was that in reaction to seeing gangs being formed in this area?

A.   Yes, ma'am.

Q.   When did you say you began to first notice the presence of MS in the Charlotte area?

A.   MS 13, approximately 2001.

Q.   What did you first notice?

A.   Graffiti.  They started throwing up graffiti, putting up graffiti, excuse me, throughout the city in different parts. Started running across individuals here and there with noticeable tattoos of MS.  It was clearly that they were MS members.

Q.   When, then, aside from those early indicators, what did you -- when did you begin to notice a more serious presence or more visible presence?

A.   Well, it came to -- came to notice within the police department when we had a serious crime occur in 2003 involving MS.

Q.   What was that?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1990**

WILLIAM HASTINGS – DIRECT

MR. FOSTER:  Objection.  Hearsay and irrelevant.

THE COURT:  Sustained.

Q.   As a result of that crime, what happened?

A.   A gang unit was established in the city for CMPD and we started identifying and targeting individuals of gangs in general throughout the city of -- when they committed criminal acts.

Q.   And when you say identify, what -- what active steps was the police department taking to identify gang members?

A.    Identifying them was, you know, developing informants, sources of information, the public, using them a lot to give us information of areas to target in, whether it be graffiti or just other areas that the gangs were, you know, predominantly in the city.

Q.   At some point were -- was there a move also to deport those gang members who were involved in criminal activity who were arrested and caught in criminal activity?

A.   Yes.  I believe that was 2003 or 2004.  It was Operation Fed Up, I believe it was called.

Q.   During -- you indicated that you began to identify gang members.  At some point did you come across the name or either the person of Manuel Ayala?

A.   Yes.

Q.   When was that?

A.    I would say right around 2003.  He escaped the initial

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 111 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 92 of 135
JA1991

WILLIAM HASTINGS - DIRECT

Fed Up roundup.

Q.   When did you next see him?

A.   It wasn't long after that.  He was picked up on a state charge and he was deported for that charge.

Q.   And Manuel Ayala, as part of your identification, did you learn his gang name?

A.   Yes.  It was Chacua.

Q.   And what gang did he belong to?

A.   MS 13.

Q.   Did -- were you able to identify any family members or others associated with this Chacua who were also MS members?

A.   Yes.  The two big ones were his cousin Sixteen and he had another cousin which was Sixteen's brother.  His name is Casper.  There are several other brothers, but their involvement was very minimal.

Q.   At some point in 2007 -- by that time you were on the task force.

A.   Yes, ma'am.

Q.   Were you only working MS investigations or were you working other gangs as well?

A.   Our unit is pretty small so we were working a lot of things.  But predominantly, my main goal was MS 13.  That was assigned to me, and I started in 2006 buying narcotics.

Q.   And from whom were you buying narcotics?

A.   With the use of vice detectives, we were buying from El

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1992**

WILLIAM HASTINGS - DIRECT

Nino and Sixteen.

Q.   Continuing that investigation, what next did you do to further gang information or access to MS 13?

A.   We developed sources within the gang, informants and other sources of information.  And, you know, started identifying all the members coming in and out of Charlotte with the use of these informants.

Q.   When did you meet Rony Lopez?

A.   It was, I think, mid to late 2007.

Q.   How were you introduced?

A.   As -- at the North Tryon division with Officer Quiles.

Q.   When you first met Mr. Lopez, did you first have an opportunity to do an extensive debrief or interview with him?

A.   No.  To be quite honest, I didn't feel comfortable speaking to an extensive level to him at a substation of the police department.  I wanted him away from all the uniforms and away from, you know, somebody who could just walk by and see him through a window even if it's the police or the public.  So, no, we did a very cursory talk to.

Q.   And why was that?  Why were you being so cautious?

A.   Well, in a situation like this it's very hard to get informants to talk to you anyway, especially dealing with any gangs anyway, not just MS 13.  Informants are very cautious with you so you want to show them respect back and make sure that nobody knows exactly who you're talking to.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA1993

WILLIAM HASTINGS - DIRECT

Q.   Did you set up a meeting, a subsequent meeting?

A.   Yes, we did.

Q.   Did he come --

A.   Yes.

Q.   -- to that meeting?

     Where did that take place, if you recall?

A.   I don't recall the exact location.  It very well could have been just behind a strip mall in a car.  You know, it's very hard to get informants as well to come to the FBI office. You know, so we do a lot of our meetings out in a car, behind strip malls, behind just, you know, abandoned houses.  We do anything just to stay out of the public eye.

Q.   As you met with Mr. Lopez and had an opportunity to speak with him more fully, what did you learn and what were your impressions?

A.   Initially, you know, you could -- it was apparent that he was being very cautious and being hesitant because I already knew of Rony Lopez being a member of MS 13 before we sat down at the table the first time.  So he -- some of the things he was telling me, I could tell he wasn't being totally, you know, forefront and honest with me.

Q.   At the second meeting, then, was that different?

A.   A little bit.  It was gradual.  But it was definitely more than the first time.  I believe the second time we made some consensual phone calls, calling some MS members, talking

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1994**

WILLIAM HASTINGS - DIRECT

about narcotics.  Second or third time.  Right around there.

Q.    At some point did you and Agent Attard begin using Mr. Lopez in a more significant way?

A.    Yes.  After going through the FBI protocols within setting up an informant through the FBI, we started using -- or he started helping us identify MS members, wearing recording devices, making consensual monitored phone calls, and such.

Q.    When you met with Mr. Lopez, did he have any pending charges?

A.    Pending, no, but he was on state probation for the -- I don't believe the charge he pled guilty to was possession of a stolen vehicle, but it was something to that extent.  It was dealing with a stolen vehicle.

Q.    And he had pled guilty to that charge.

A.    Yes, he did.

Q.    Did he ask for anything in exchange?  Did he come in and make demands and ask for favors or money or anything of that nature?

A.    The only, I wouldn't call it demand, but a request was his family.  He wanted to make sure his family was taken care of.

Q.    And what do you mean taken care of?

A.    Safety wise, I apologize.  You know, he knew that ultimately -- I mean, he told me ultimately this is a death

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 115 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 96 of 351
JA1995

WILLIAM HASTINGS – DIRECT

sentence for him.  He wanted to make sure his family was safe.

Q.    Other than that request?

A.    He wanted to join the military.  That was a big one.  You know, his status at that point, you know, I was honest with him.  I said, you know, I don't know if we can make that happen.  He said, Well, as long as you'll give me your word that you'll try, we're fine.  I said, I'll try, but I'm not making you no promises.

Q.    Did he tell you what branch he wanted to join?

        MR. FOSTER:  Objection.  Irrelevant.

        THE COURT:  Sustained.

Q.    You indicated that it began with consensual phone calls and then other recordings.  If you would, just explain for the jury the process or the procedures or protocols that are followed with someone who's cooperating, particularly when it relates to the use of this surveillance equipment.

A.    Well, the consensual phone calls first?

Q.    If you want to start there.

A.    All right.  Consensual phone calls, usually in any setting we'll meet behind a strip mall, wherever.  There is a little earlobe device we put in your ear and you just use a regular cell phone and we have a recorder, a digital recorder and we tape it.  It's very basic.  It's nothing high tech.

    In this case we did that for some months and then it got so extensive we couldn't be with him all the time.  It wasn't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA1996**

WILLIAM HASTINGS - DIRECT

safe.  Then he gave us permission to consensually monitor all his phone calls, and we could do that from the office in a room and just sit there and listen to everything that he called, which made it easier and safer for him.

Q.   So that's -- that's a wire or electronic surveillance intercept and that's real-time interception?

A.   Yes, ma'am, real-time.

Q.   How long did that continue?

A.   I'm not sure of the exact time, but it was well over a month or two.

Q.   What was the next step you took, then, in the investigation or in the use of electronic surveillance?

A.   The other step, we have two devices.  One is a video and audio device.  On the device itself, the only switch on it is an on/off switch.

What we would do is put it in a -- conceal it in a piece of clothing.  Turn it on.  Tell him -- you know, say the date, who's there, who's wearing the device, the case number, and give the piece of clothing to the source.  And they would go and be instructed not to touch it until they come back to us later in the evening or whenever it is.  And we would end it by giving a time and date and cutting it off ourselves most times.

Q.   And then from -- are you able to manually manipulate the information that's recorded, the data that's on that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 117 of 510
Case 3:08-cr-00734-RJC   Document 505   Filed 10/04/10   Page 98 of 351
**JA1997**

WILLIAM HASTINGS - DIRECT

particular piece of equipment?

A.   No, not at all.  The only way we extract information from the device is we have a connect -- a computer connect cord at our office that we will manually pull things off of using a computer program.  When we do that, every piece of recording is time and date stamped by seconds, which we'll know if he cuts it off and cuts it back on.  We would know that immediately through looking at the device.  But I can't manipulate the recording.

Q.   You have to have a special program to download that information, that data?

A.   Yes, ma'am, special program to download it, but I have no idea how you would manipulate that device.

Q.   Did you note on any occasion during the time that Mr. Lopez was cooperating any such manipulation or attempts to alter any of the recordings?

A.   No.

Q.   Were there occasions during his cooperation where he wasn't able to be in a position to either get to you to get recordings or that it wasn't a safe situation?

A.   Often, yes, ma'am.

Q.   If you would describe that, please.

A.   A lot of times he would be called on the spur of the moment saying he's got to go somewhere, pick up somebody.  You know, from where he lived to where he might have been, we

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 118 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 99 of 135

**JA1998**

WILLIAM HASTINGS – DIRECT

might have been, you know, on the other side of the city and just the time matter, we couldn't get to him and meet in a safe location.  Or somebody just might stop by his house or apartment, wherever he was residing at the time, and we couldn't get to him and give him a device.

Devices are very expensive and the Federal Bureau of Investigation don't like people just -- you know, us just giving them to them for long periods of time such as that.  So it was very hard for us to get to him.

Q.    What was the -- what was the procedure, then, you had in place to be able to document those occasions and make contact with him?

A.    The procedure we had is every time he would, you know -- we would make a substantial contact with him, we would document it on, you know, FBI -- well, then called a 1023 form.  We would document pretty much every contact with him at that point, information, everything he said to us in a summary format.

Q.    Was he consistent with staying up with you on a daily basis?

A.    Unfortunately, yes.  At some times it was a little too much, you know.  At some point -- you know, all hours of the night the phone would be ringing as well as during the day.

Q.    When did -- did you first send him to make recordings at an organized meeting?  Do you recall that occasion?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 119 of 510
Case 3:08-cr-00134-RJC   Document 1255   Filed 10/04/10   Page 100 of 131

JA1999

WILLIAM HASTINGS - DIRECT

A.    The first meeting we didn't send him with a recorder. That was October -- no.  It was late 2007.

Q.    In October of 2007 do you recall there being a meeting in the woods?

A.    Yes.  That was -- I apologize.  That was a meeting that we did have a recording device on.

Q.    In addition to the recording device, did you as agents conduct surveillance?

A.    Yes.  We were out there doing surveillance as well as the Charlotte-Mecklenburg Police Department SWAT team and helicopter was out.

Q.    Did he know that any of this was going on?

A.    He had no idea SWAT was 5 feet from his feet, no, ma'am.

Q.    When you say SWAT, was that part of the woods?

A.    No, they blended in with the woods.  I couldn't even see them.

Q.    Earlier the jury was shown photographs, some grainy photographs that witnesses have testified were part of the woods meeting.  Is that what you're referring to?

A.    Yes, ma'am.

Q.    Were you also conducting surveillance at any point?

A.    Yes, I was out there, yes, ma'am.

Q.    Why did you do that?

A.    Well, one, we try to maintain constant eyesight on our source just for danger purposes and verify what he's saying,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 120 of 510
Case 3:08-cv-00134-RJC   Document 225   Filed 10/04/10   Page 120 of 131
**JA2000**

WILLIAM HASTINGS – DIRECT

especially the first time he's carrying a device.  And we want to make sure that everything he tells us when he comes back is accurate.  That's, you know, the big two reasons.

Q.    On this particular occasion, was there an audio recording as well?

A.    Yes, ma'am.

Q.    Was that the first time that you saw some of the other members of this particular MS clique?

A.    Before the woods, at the hotel was the very first time, yes, ma'am.

Q.    And following that meeting, did you meet with Mr. Lopez?

A.    Yes.

Q.    Were you able to make further identifications of the individuals there?

A.    Yes.  At -- I believe we met either the next day or the day after and we sat down and I pulled still photos from the video from either the pictures we took at the hotel or the woods and we identified -- you know, told which is which at that point.

Q.    Were you aware that MS had a presence in some nightclubs or bars or gathering places in the Charlotte area?

A.    We -- we have been advised of that, but no proof until Mr. Lopez started assisting us.

Q.    What were the clubs that you became familiar with?

A.    Predominantly El Vacquero, Mi Cabana, Sensations on South

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 121 of 510
Case 3:08-cv-00134-RJC    Document 535    Filed 10/04/10    Page 102 of 131

JA2001

WILLIAM HASTINGS – DIRECT

Boulevard, Starlight on South Boulevard, and we knew that they frequented Disco Rodeo on Albemarle Road.

Q.   Were these locations places that were easy to conduct surveillance?

A.   El Vacquero was pretty easy due to the fact it was right across the street from North Tryon police division.  We could get on the roof and sit and watch it pretty well.  But it was very dark and the street lights out there didn't help us very much, but it was easy to stay close.

Mi Cabana, it's directly -- about the 200 block of Eastway.  There was a big parking lot across the street.  You kind of stuck out that late at night sitting there because you're really the only car.  It was pretty hard.

Disco Rodeo, it was so crowded all the time, it was pretty easy just to blend in.

And the other two have -- Starlight has a very small parking lot.  You could virtually do no surveillance there.

And Sensations, it was just a big parking lot.  We could fit in no problem.

Q.   You're talking about parking lot surveillance.  Were you able to get into these clubs unnoticeed?

A.   No, ma'am, I stick out.  And at times they get to know me.

Q.   Do you recall -- let me back up a second.

You talked about one of the ways that you were

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 122 of 510
Case 3:08-cv-00134-RJC   Document 59-5   Filed 10/04/10   Page 103 of 131
JA2002

identifying MS members early on was through their tattoos.

A.    That was one way we identified them, yes, ma'am.

Q.    Did Mr. Lopez have any tattoos?

A.    No, he has not a one tattoo.  And unfortunately, I know that for sure.

Q.    We're not going to ask that.

A.    No, ma'am.

Q.    However, did you -- was that part of the process is documenting anybody you came in contact with for these tattoos?

A.    That is a process that we just verify they have no tattoos or markings or marks on their body at all.  But hiding some of the devices, we -- you know, we had to hide them in unusual places to make sure they wasn't found.

Q.    What is the significance of noting on those occasions or those individuals that you encountered or arrested or had contact with who had tattoos, what's the significance of documenting those tattoos?  Why is that done?

A.    Well, the biggest significance is before now tattoos were very general with gang members.  Pretty much all -- a lot of -- a majority of them had tattoos.  Different places they have tattoos, we could identify them or send them to another agency throughout the state and the United States.

We still identify people through their tattoos only due to the fact that they use fraudulent names all the time.  So I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 123 of 510
Case 3:08-cv-00164-RJC   Document 55-5   Filed 10/04/10   Page 123 of 510
**JA2003**

WILLIAM HASTINGS - DIRECT

could -- I can send something to DC and say I have a guy that has a, you know, three-point star, you know, underneath his left eye and they'll send me back everything they have.  Now, granted, it might be a lot of people, but we can break it down by race, sex, and that way.

Q.   At some point after the woods meeting, did Mr. Lopez indicate that the Charlotte -- some of the Charlotte clique members had been invited to Greensboro?

A.   Yes.

Q.   What do you recall about that?

A.   I recall --

        MR. FOSTER:  Objection.  Hearsay and 403.  It's cumulative and redundant.

        THE COURT:  Sustained.

Q.   Were you able to conduct surveillance on that occasion?

A.   Greensboro?

Q.   Yes.

A.   No, ma'am.

Q.   Why?

A.   Pure safety.  We didn't know who we were dealing with. Due to them being new and the source, Mr. Lopez, had no idea who they were either.  He did not know we wasn't following him.  We made it very clear that, you know, he had -- he basically had no idea.  We knew he was going to Greensboro. Our fear was, you know, their surveillance and, you know, if

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 124 of 510
Case 3:08-cr-00134-RJC   Document 526   Filed 10/04/10   Page 105 of 131
JA2004

WILLIAM HASTINGS – DIRECT

we'd have been seen following him into the complex, it would have been bad.

Q.   When you say their surveillance, what are you referring to?

A.   They often have --

MR. FOSTER:  Objection.  Calls for speculation.

THE COURT:  Sustained.

Q.   Do you have experience with individuals conducting countersurveillance?

A.   Yes.

MR. FOSTER:  Objection.  Irrelevant.

THE COURT:  Sustained.

Q.   Is surveillance technique something that you have to be aware of whenever you're in an area or assisting someone who's cooperating?

A.   Yes, sir.

MR. FOSTER:  Same objection.

THE COURT:  I'll sustain the objection to this line of questions.  Move on, counselor.

Q.   After Mr. Lopez returned, did he talk to you before going to the meeting?

A.   Yes.

Q.   Did he talk to you after coming back from the meeting?

A.   Yes, ma'am.

Q.   Was he able to provide information concerning the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-5   Filed 03/29/17   Page 125 of 510
Case 3:08-cv-00134-RJC   Document 59-5   Filed 10/04/10   Page 06 of 13
**JA2005**

WILLIAM HASTINGS - DIRECT

individuals with whom he had met?

A.   To some point, but not -- you know, nicknames, but not exact, you know, full names like me and you would know each other.

Q.   And did you document what he shared with you about what had happened at the meeting?

A.   Yes.

Q.   As a result of the information he'd given you there, were you able to make further inquiry or do some additional investigation to try to make identifications at that time?

A.   Yes.  I requested any -- by the description he gave me of tattoos, I requested information from Greensboro Police Department due to the fact they went to Greensboro.

Q.   Now, the next weekend, November the 30th, do you recall events that were to take place on that occasion?

A.   Yes.  It was an attempt on a prostitution house. Robbery.

Q.   Did Mr. Lopez make contact with you prior to that event?

A.   Yes, ma'am.

Q.   Did he share with you what the plan was as it had been relayed to him?

A.   Yes, ma'am.  It was pretty --

        MR. FOSTER:  Objection.  Hearsay.

        THE COURT:  Sustained.

Q.   As a result of what he told you, what did you do?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 126 of 510
Case 3:08-cv-00164-RJC   Document 52-5   Filed 10/04/10   Page 126 of 131
**JA2006**

WILLIAM HASTINGS – DIRECT

A.   I placed a transmitter in his vehicle, a recording device on his person, and instructed him to go down certain streets and turn which way and advised him that he would be stopped as soon as he turned on Central Avenue.

Q.   Were any other officers working with you on this occasion?

A.   Yes.  We had a street crimes unit with the Charlotte-Mecklenburg Police Department, all uniformed.  And I believe there was at least one agent, special agent out there with us.

Q.   And were you there as well?

A.   Yes, ma'am.

Q.   Describe what happened.

A.   As Mr. Lopez's vehicle pulled out of the hotel, he went exactly where I told him:  Inbound Independence to Briar Creek, Briar Creek all the way to Central Avenue.  As soon as he turned left on Central Avenue, the patrol cars came out of an apartment complex and initiated a traffic stop.

At that point we were listening to live conversations within the car just in case in the car they were basically saying just shoot it out with the police.  We wanted to make every precaution before the stop was made.

The stop was made and two firearms were recovered out of the car and all occupants were identified and documented.

Q.   Who was driving?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 127 of 510
Case 3:08-cv-00164-RJC   Document 50-5   Filed 10/04/10   Page 08 of 13

JA2007

WILLIAM HASTINGS – DIRECT

A.   Mr. Lopez.

Q.   Who else was in the car?

A.   Carlos Torres, known as Sombre, and Psicopata, Diablo, and Tigre.  I apologize, I don't know their names right off.

Q.   And did you actually seize the weapons that were located in the car?

A.   Yes, ma'am, I seized them myself.

Q.   Did you photograph them in place before they were removed?

A.   Yes.

Q.   Where were they initially located?

A.   Underneath the back seat.

Q.   I'm going to show you two exhibits, both of which have been rendered safe.

          MS. ROSE:  Do you want to take a look at these?

          (The exhibits were tendered to defense counsel.)

          MS. ROSE:  If I may approach the witness, Your Honor?

          THE COURT:  You may.

Q.   I'm going to show you first what's been marked as Government's Exhibit 199.  Are you able to recognize the packaging there?

A.   Yes, ma'am.  It's my initials on this side, as well as right here (indicating).

Q.   Okay.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 128 of 510
Case 3:08-cr-00134-RJC   Document 595   Filed 10/04/10   Page 109 of 131

JA2008

WILLIAM HASTINGS – DIRECT

A.   And there (indicating).

Q.   If you would just briefly describe for the members of the jury that whenever any item of evidence is seized, how is it maintained and what's the protocol there at the department?

A.   Every time we seize something, we have a case number within the Charlotte-Mecklenburg Police Department.  It goes on there, as well as the charge, so to speak, the location where it's seized, and a date and time.

From there we place firearms in a box, strap them down and turn them into our property control bureau at the police department.  At that point they'll scan it, bar code it, and it will be placed in a secure location.

Q.   Does every piece of evidence within your control room have, you said, a bar code?  Does it have its own unique identifier?

A.   Yes, it does.

Q.   And is it cataloged, then, by that identification number?

A.   Yes, ma'am.

Q.   As to Government's Exhibit 199, is that exhibit open?

A.   No, ma'am.

MR. FOSTER:  Your Honor, I would object to these exhibits as being cumulative and irrelevant under 403 at this point.

THE COURT:  Sustained.

MS. ROSE:  All right.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 129 of 510
Case 3:08-cv-00134-RJC   Document 52-5   Filed 10/04/10   Page 129 of 510
JA2009

WILLIAM HASTINGS — DIRECT

Q.   After you recovered these weapons and placed them in evidence, did -- were they removed from evidence except for court purposes?  Were they used for any other reason?

A.   They were sent to our firearms ballistics lab where they were fired and compared to any open cases.

Q.   After you seized the weapons on that occasion, what -- did you let the folks in the car go?  Were there any arrests made?

A.   No arrests were made.  We put them back in the car and I sent them on their way.

Q.   Did you continue to monitor where the occupants of the car, Mr. Lopez and the others, went?

A.   Yes.

Q.   Where did they go?

A.   They ended up at Glen Robin Court which is directly back off Kilbourne Drive.

Q.   Let me show you what has previously been marked as Government's Exhibit 186.  187.

Q.   Do you recognize Government's Exhibit 187?

A.   Yes, I do.

Q.   How do you recognize that particular location?

A.   That exact residence was identified the date of the search warrant.

Q.   And what is that address?

A.   3136 Glen Robin Court.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 130 of 510
Case 3:08-cr-00134-RJC   Document 2254   Filed 10/04/10   Page 130 of 131
**JA2010**

WILLIAM HASTINGS – DIRECT

Q.   Is that -- where within the Charlotte area is that residence located?

A.   East Charlotte directly off Kilbourne.  Main intersection would be Eastway and Kilbourne.

Q.   And you indicated that you knew Mr. Lopez and the occupants of the car went directly to this location.  How do you know that?

A.   Well, one, we tracked them to -- well, we followed them to that particular road.  But due to a dead end road, we didn't go down so we couldn't determine exactly which residence they were at that night.

Q.   Were you able to monitor real-time any recordings or any -- excuse me, any conversations that took place?

A.   Real-time, it was very sketchy.  We were having problems with the equipment that night, of the real-time equipment. But not the other recording device.

Q.   And once again, on that particular occasion, did you follow the procedures that you'd previously used with Mr. Lopez in giving him the recording equipment and then retrieving it?

A.   Yes, ma'am.

Q.   After that -- after that meeting when you retrieved the equipment, did you conduct an interview of Mr. Lopez?  Or how did you document generally what was occurring on each of these occasions?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 131 of 510
Case 3:08-cv-00164-RJC   Document 52-5   Filed 10/04/10   Page 123 of 510
**JA2011**

WILLIAM HASTINGS – DIRECT

A.   We would call in a debrief usually that -- the same evening we would get a very brief detail just in case there was an immediate threat on someone or someplace at that point. We would usually break it off, send him home or wherever he was going at that point in time and we would schedule a full debrief, exactly details later, at a later time.

Q.   Do you know whether another meeting was scheduled between the parties?

A.   Initially all we were told was possibly the following weekend.

Q.   And now, were you able to immediately download the recordings that were made?

A.   No.

Q.   Do you speak Spanish?

A.   No.

Q.   How were you and the other agents dealing with the language barrier there as far as detailing or determining what was actually on the recordings?

A.   On the recordings we used FBI Linguist Susan Conrad. On the scene usually when we had a transmitter listening to it live, we had a task force officer at the time, Carlos Lopez, who spoke Spanish.

Q.   Earlier we heard about some ability to summarize information as opposed to verbatim translations. Were you utilizing that quite a bit during this process?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 132 of 510
Case 3:08-cv-00134-RJC   Document 228   Filed 10/04/10   Page 136 of 310
**JA2012**

WILLIAM HASTINGS - DIRECT

A.   The entire time up until court.

Q.   The next weekend, that would be the weekend of December the 8th, did you speak to Mr. Lopez?

A.   Yes.

Q.   At what point, if you recall, during that day did you speak with him?

A.   I think it was early afternoon.  Maybe mid -- closer to early to midafternoon.

Q.   Did you -- after speaking with him, were you able to meet with him and provide him some recording equipment?

A.   Yes, ma'am.  Again -- yes, ma'am.

Q.   What type of equipment on this particular occasion?

A.   I believe it was an audio video recorder recording device hid in a piece of clothing.

Q.   Were you advised when you met with Mr. Lopez as to what, if any, plan there was for the evening with the other clique members, Mariachi and the others?

A.   Yes.  He advised us that they were going to attempt --

        MR. FOSTER:  Objection.  Hearsay.

        THE COURT:  Overruled.

A.   He advised that they were going to attempt to rob the same prostitution house again.

Q.   Did he have any particular details at that -- at that point?

A.   Only that they had obtained a shotgun from Smoke and they

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 133 of 510
Case 3:08-cv-00164-RJC   Document 2256   Filed 10/04/10   Page 143 of 310
**JA2013**

WILLIAM HASTINGS - DIRECT

were going to do it fairly quickly to get it done, to get money.

Q.   What did you do as a result of the information that Mr. Lopez provided?

A.   Immediately I had a street crimes unit assigned to the Charlotte-Mecklenburg Police Department do a knock and talk, is what we call it, where officers would go to the residence and knock on it and actually speak to the residents for some period of time until I told them that we were good, you know, safe.  At that time they advised the residents that they were in danger.  I believe they moved pretty quickly.

Q.   Did you have law enforcement vehicles around that residence or in the general vicinity?

A.   Oh, yes, ma'am.  I had marked cars in the driveway and officers standing on the front porch to avoid the robbery.

Q.   Again, did you know who was participating in those plans?

A.   Yes, ma'am.

Q.   Who?

A.   That was Psicopata, Tigre, Diablo, and I believe Sombre was still in the vehicle.  He was on crutches, though.

Q.   Thereafter, did you -- were you able to speak with Mr. Lopez or was he able to make contact with you at some point?

A.   Yes, by phone.

Q.   And how did that work?  Was that a method that you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 134 of 510
Case 3:08-cv-00164-RJC   Document 228   Filed 10/04/10   Page 156 of 131
JA2014

WILLIAM HASTINGS - DIRECT

frequently used?

A.   Yes.  We -- we would use the phone as much as humanly possible until we needed to put a device on his car, his person or recover it.

Q.   When Mr. Lopez called you again, what did you do?

A.   At that point we immediately went to meet him, I believe it was in the vicinity of Sugar Creek and I-85, to assure that the GPS tracking device on his vehicle was working.

Q.   And why did you have a GPS tracking device on his vehicle on this particular occasion?

A.   He was going out of the city of Charlotte and we didn't know exactly where at that point.

Q.   Do you know what he was going to do or what his plans were at that point?

A.   To pick up other MS 13 individuals.

Q.   Did he know where he was going?

A.   He -- all he knew was halfway to Greensboro.

Q.   So then, how -- how were you all able to devise a situation where you could monitor what was happening both for Mr. Lopez's safety and to determine exactly where he was going and whom he was going to meet?

A.   Well, with the GPS tracker on the vehicle, it's real-time.  We can log on from our laptop and an air card in the vehicle so we could stay pretty close to him.  And following him on Interstate 85, it was very easy to follow him

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 135 of 510
Case 3:08-cv-00134-RJC   Document 528   Filed 10/04/10   Page 169 of 131

JA2015

WILLIAM HASTINGS – DIRECT

and not be made, so to speak, until he exited the exit.  At that point we relied on the GPS until he was parked.

Q.   Now, during -- during this trip as you were following him, was he communicating with you via cell phone?

A.   Some.  Very little due to the fact he was still trying to confirm where he was meeting.

Q.   Where ultimately did Mr. Lopez go?

A.   The IHOP restaurant, exit 58 in Concord.  Just as you get off exit 58, go back towards Kannapolis, it's on the right.

Q.   And that's exit 58 off of what highway?

A.   I-85, I apologize.

Q.   Show you what's been previously identified as Government's Exhibit 201.  Do you recognize what's shown in Exhibit 201?

A.   Yes, ma'am.  That's the IHOP restaurant.

Q.   Is that -- obviously, this is a daylight photo, but is it a fair and accurate representation of that location?

A.   Yes, ma'am.

          MS. ROSE:  I'd move to admit Exhibit 201.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

          (Government's Exhibit No. 201 was received into evidence.)

Q.   Were you able, as you were following Mr. Lopez, to get

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 136 of 510
Case 3:08-cv-00164-RJC   Document 226   Filed 10/04/10   Page 136 of 310
JA2016

WILLIAM HASTINGS - DIRECT

close to the restaurant?

A.   Yes, ma'am.  I actually pulled in the parking lot as three individuals were getting into Mr. Lopez's vehicle.

Q.   And he was driving his own car on this particular evening?

A.   Yes, ma'am.

Q.   What was that car?

A.   I'm sorry?

Q.   What car did he own?

A.   A burgundy Honda Accord.

Q.   Were you able from the position where you were sitting or located, were you able to see specifically who got into the car?

A.   No.

Q.   Were you --

A.   It was dark.

Q.   Were you -- you did see three individuals.

A.   Three, yes, ma'am.

Q.   Were you able to see the car that they exited before they got into Mr. Lopez's car?

A.   We believed it was a black Mitsubishi SUV, but I couldn't get the tag -- I don't believe get the tag that night.

Q.   After the three people got into Mr. Lopez's car, what then happened?

A.   At that point they immediately hit 85 southbound back

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 137 of 510
Case 3:08-cv-00164-RJC   Document 225   Filed 10/04/10   Page 138 of 310

JA2017

towards Charlotte, and we continued following them until they returned at -- well, they pulled into the El Vacquero restaurant/bar.

Q.    Where did you go, then, at that point?

A.    Across the street near -- beside the police station.

Q.    Were you able from the police station to see clearly what was happening or to make identifications from that point?

A.    No, ma'am, not make identification.  Lighting was very poor in that parking lot of the El Vacquero so we couldn't make any identification on them.

Q.    If you recall, did you make any notation regarding the time that Mr. Lopez contacted you and indicated that he needed to go meet individuals from Greensboro?

A.    Yes.  Can I refer to my notes?

     Approximately 7:30 p.m. is when he received a call from individuals from Greensboro.

Q.    Well, did he receive a call or did he make a call?

A.    I'm sorry, either received or made the call.  I have received a call.  But he -- I don't know, received or made.  I have received a call in my statement.

Q.    But the time that was noted was 7:30 p.m.?

A.    Approximately 7:30, yes, ma'am.

Q.    When -- were you able to see from where you were located at the substation where the individuals went, Mr. Lopez and the three passengers, when they got to El Vacquero?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 138 of 510
Case 3:08-cv-00164-RJC    Document 226    Filed 10/04/10    Page 138 of 131
JA2018

WILLIAM HASTINGS – DIRECT

A.   No, ma'am.

Q.   At this point, did you have equipment that was also transmitting live from the interior of the car or was Mr. Lopez just outfitted with a recording device?

A.   I don't recall if we had the recorder live in the car.  I don't believe so.  But he was equipped with a recording device on his person.

Q.   And was this --

A.   In a piece of clothing.

Q.   And was this recording device one that could also make video?

A.   Yes, ma'am.

Q.   If -- was that dependent on lighting conditions and otherwise?

A.   Yes.

Q.   The video.

A.   Very much so.

Q.   I'm going to show you Government's Exhibit 58.  Looking at Government's Exhibit 58, what is the -- what's shown there in the background?  Are you able to identify?

A.   Yes, ma'am.  That's the taco truck that was parked outside of the club, El Vacquero.

Q.   And this was a still made from the recording device?

A.   Yes, ma'am.

       MS. ROSE:  Move to admit 58.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 139 of 510
Case 3:08-cv-00164-RJC   Document 52-5   Filed 10/04/10   Page 209 of 510

JA2019

WILLIAM HASTINGS – DIRECT

THE COURT:  That hasn't been admitted already?

THE CLERK:  No.

THE COURT:  All right.  I'll admit it.

(Government's Exhibit No. 58 was received into evidence.)

Q.   Show you what's been previously admitted as Government's Exhibit 191.  Do you know what's shown in Government's Exhibit 191?

A.   It's a firearm.  A gun.

Q.   And from where was that photograph retrieved?

A.   From the video as well.

Q.   At some point did -- were you able to speak to Mr. Lopez while he was at El Vacquero?

A.   Very briefly.  Very briefly on the phone.  Then he came over in person and we switched recording devices.

Q.   And why was the recording device switched?

A.   Well, the piece of clothing, he didn't feel comfortable. As I already mentioned, it was a jacket and it was getting -- it was pretty warm outside and he was scared that, you know, he -- that it would be noticed and observed.  So we switched it to an audio only device and put it on his person and took the jacket back.

Q.   Did he at that point immediately return to El Vacquero?

A.   Yes, ma'am.

Q.   Were you able to -- or did you know whether he left El

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 140 of 510
Case 3:08-cr-00134-RJC   Document 586   Filed 10/04/10   Page 140 of 131
JA2020

WILLIAM HASTINGS – DIRECT

Vacquero?

A.    Not initially, but observed his car as it turned off of Sugar Creek -- I mean, off of North Tryon, excuse me.

Q.    Were you able to conduct surveillance as he traveled down the roadway?

A.    At points, but I didn't want to get too close.  Had other officers helping me as well.

Q.    Ultimately where did he go?

A.    Disco Rodeo on Albemarle Road near the county line.

Q.    During that time, I think you testified earlier, were you able to go into the parking lot and conduct surveillance there at Disco Rodeo?

A.    We could if we wanted to.  That night we did not.  We had marked vehicles in the parking lot already working off duty, so we didn't want to run into the possibility of them waving at us as we pulled into the parking lot.

Q.    Now, at some point that evening, Mr. Lopez went home.  Was it late in the evening or early the next morning?

A.    As I have, our surveillance and debrief was discontinued at 3:30 in the morning.

Q.    At some point as -- did you meet with him at a later time to gather information regarding what had transpired during the trips and during the evening?

A.    Yes, ma'am.  I don't know the exact date, but I think it was a day or so later.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 141 of 510
Case 3:08-cv-00134-RJC    Document 52-5    Filed 10/04/10    Page 22 of 131
JA2021

Q.   Once you had gotten information regarding what Mr. Lopez had heard taken place in Greensboro, what did you do relative to contacting law enforcement in Greensboro?

A.   I contacted Greensboro Police Department dispatch and confirmed the information.

Q.   Did you make contact with individuals from the detective's division or otherwise there to provide information or to find out the status of any investigation or what was happening relative to an investigation there?

A.   A captain with Greensboro Police Department advised that --

MR. FOSTER:  Objection.  Hearsay.

THE COURT:  Sustained.

Q.   Did you continue to do that over the next day or so?

A.   Yes.

Q.   Were you able to -- while Greensboro was conducting their investigation, were you able to try to maintain surveillance or contact with the defendant?

A.   Yes.  As much as possible, yes, ma'am.

Q.   What methods or means were you using to do that?

A.   With the use of Mr. Lopez, trying to contact the individual on multiple occasions as well as GPS coordinates from the cell phone he was using.

Q.   How were you able to get GPS coordinates from -- and when you say he, whose cell phone?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

787

WILLIAM HASTINGS - DIRECT

A.    I'm sorry, Alejandro Umana, Wizard.

Q.    How were you able to get that information?

A.    Through -- got an exigent order through Sprint and Nextel, they would give us latitude and longitude of the device within certain meters.

Q.    And who provided you the phone numbers so that surveillance could be utilized?

A.    Mr. Lopez.

Q.    At some point did you determine after communications with Greensboro that you were going to try to locate the defendant and take him into custody?

A.    Yes, ma'am.  It was on the 12th of December.

Q.    In the intervening time, was Mr. Lopez maintaining contact with the defendant?

A.    Attempts were made, yes, ma'am.

Q.    On the 12th, what happened?

A.    We had Mr. Lopez call Mr. Umana and then just finally said just go to the residence, confirm that he's inside the residence.

Q.    And where did Mr. Lopez go?

A.    3136 Glen Robin Court.

Q.    And is that the location that you previously testified about?

A.    Yes, ma'am.

Q.    Did you secure some court orders or search warrant to be

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 143 of 510
Case 3:08-cr-00134-RJC    Document 2256    Filed 10/04/10    Page 143 of 510
JA2023

WILLIAM HASTINGS – DIRECT

able to go to that residence?

A.   Yes, ma'am, a state search warrant for the arrest and evidence related to the homicide in Greensboro, North Carolina.

Q.   At that point do you know whether Greensboro had warrants?

A.   Yes, ma'am, they did.  Signed on December 11th.

Q.   Describe for the jury, then, what took place on the 12th at this residence on Glen Robin.

A.   At that point as soon as we had the warrant signed by a state magistrate giving us legal ability to force entry into the residence, Charlotte-Mecklenburg Police Department SWAT team made entry and arrested Mr. Umana for the two homicide warrants.

Q.   Now, prior to going into the residence, were you able to have a phone conversation with Mr. Lopez?

A.   We made several very quick ones.  Nothing to alert anyone.  Just to -- you know, just to see if everything was all right.  We had a live feed coming from the house, but it was sketchy.  Very loud music so it was very hard to figure out if something was wrong or not.

Q.   Was that through Mr. Lopez that you had this live feed?

A.   Yes, ma'am.

Q.   Audio feed.

     When -- were you there for the execution of the search

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 144 of 510
Case 3:08-cr-00134-RJC   Document 2326   Filed 10/04/10   Page 25 of 131
JA2024

WILLIAM HASTINGS - DIRECT

warrant?

A.   Yes, ma'am.

Q.   Were you there at the time that the defendant was arrested?

A.   As he was being picked up from the floor, yes, ma'am.

Q.   Who else was in the residence?

A.   Cesar Castillo, known as Chino, Rosa Iglesias, known as Crazy, La Crazy, and another female, Wetta Irene.  I don't recall her last name right off.

Q.   You indicated an individual named Chino.  What is -- do you know Chino's complete name?

A.   Cesar Yolado Castillo.  Middle name is Y-o-l-a-d-o. Something like that.

Q.   Show you what's been marked as Government's Exhibit 188. Who's shown in Government's Exhibit 188?

A.   That's Cesar Castillo known as Chino.

Q.   When was this photograph taken, if you know?

A.   It was in an interview room at the Charlotte-Mecklenburg Police Department.  I was standing next to the camera when she took it.

Q.   It was taken on December the 12th?

A.   Yes, ma'am.

        MS. ROSE:  I'd move to admit Government's Exhibit 188.

        THE COURT:  Let it be admitted.

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 145 of 510
Case 3:08-cr-00134-RJC   Document 526   Filed 10/04/10   Page 126 of 131

JA2025

WILLIAM HASTINGS - DIRECT

(Government's Exhibit No. 188 was received into evidence.)

Q.   Did you assist in the collection of any evidence from that residence?

A.   From the -- all I seized was two cell phones from the actual residence, but noted property from Mr. Umana that was on his person, excuse me.

Q.   What was on -- what property was on Mr. Umana's person?

A.   He had a wallet, a gray cell phone, and a necklace of sorts that I recall.

Q.   Did you shortly after seizing the cell phone download information that was contained within that cell phone?

A.   Yes.  With the assistance of our computer forensic unit, I stood by and assisted them -- well, they assisted me in pulling the information from the phone.

Q.   I'm going to show you what's been marked as Government's Exhibit 204.

MS. ROSE:  If I may approach the witness, Your Honor?

THE COURT:  You may.

Q.   You don't have to look at every piece of paper contained in Government's Exhibit 204, but if you'd take a quick look at that and tell me if you can identify that package of materials.

A.   Yes.  That appears to be the photographs taken from the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 146 of 510
Case 3:08-cr-00134-RJC    Document 528    Filed 10/04/10    Page 146 of 131
JA2026

phone, the actual contents of the phone.

Q. And when you say the contents of the phone, to what are you referring?

A. The actual picture of the outside of the phone, the serial number in the back, so to speak, and actual content -- I mean, excuse me, contacts from the phone and incoming and outgoing phone calls that's still on the phone.

Q. And what's your purpose for doing that?

A. To document and to at a later time come back and verify who was using what phone or who had what phone. A lot of times what we run into is you and I might have our cell phone in our name, but these guys, you know, ladies don't usually put their phones in their name so we --

MR. FOSTER: Objection.

THE COURT: Sustained.

Q. I'm going to show you what's been marked as Government's Exhibit 205. Is that one of the photographs contained within the greater packet marked as 204?

A. Yes, it appears so, yes, ma'am.

Q. And were you there when that was downloaded?

A. Yes, ma'am.

MS. ROSE: Move to admit Government's 205.

THE COURT: Any objection?

MR. FOSTER: Lack of foundation.

THE COURT: Overruled. Let it be admitted.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2027

WILLIAM HASTINGS - DIRECT

(Government's Exhibit No. 205 was received into evidence.)

Q.   What is 205?

A.   That is the direct connect, Nextel direct connect number for Mr. Lopez, Nene.

Q.   I'm also going to show you Government's Exhibit 203.

MS. ROSE:  And I know -- I've noted the hour, Your Honor.  If at any point you want me to stop, I can cut off at any point.

THE COURT:  How long is your direct expected to go?

MS. ROSE:  About 20 minutes, 30 minutes.  We've got some recordings.

THE COURT:  Why don't you get through the end of your Government's Exhibit 200.  Do you have other exhibits from the cell phone?

MS. ROSE:  No, there are no other exhibits from the cell phone, Your Honor.

THE COURT:  Then maybe we'll stop here.

Members of the jury, we'll stop for the evening. Remind you to not talk about the case.  And try as best you can to avoid any exposure to any media coverage of the case. And keep an open mind.  And we'll see you tomorrow morning. Be ready to come back into court at 9:30.  Thank you.

(Jury exited the courtroom.)

THE COURT:  Ms. Rose, you say you have about 20

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 148 of 510
Case 3:08-cr-00134-RJC    Document 526    Filed 10/04/10    Page 29 of 131
JA2028

minutes left on direct?

MS. ROSE:  Yes, sir, I believe so.  Twenty to 30 minutes.  And I'll take a look at the recordings that I have here.

THE COURT:  Very well.  Anything further from either side before we break for the night?

MR. FOSTER:  No, Your Honor.

MS. ROSE:  No, Your Honor.

THE COURT:  All right.  We'll start again at 9:30. If there's any legal issues that need to be taken up before we call the jury, let us know so we can come in early and resolve those.  But otherwise, we'll see you at 9:30.

(Evening recess at 6:23 p.m.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 149 of 510
Case 3:08-cv-00164-RJC   Document 52-5   Filed 10/04/10   Page 130 of 131

JA2029

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

          I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

          Dated this 15th day of April, 2010.


                              s/Cheryl A. Nuccio
                              Cheryl A. Nuccio, RMR-CRR
                              Official Court Reporter


               Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 150 of 510
Case 3:08-cv-00164-RJC   Document 226   Filed 10/04/10   Page 150 of 310
JA2030

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA            )DOCKET NO. 3:08-CR-134-2
                                    )
                                    )
      vs.                           )VOLUME IV-A
                                    )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA     )
_____ )


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 15, 2010

<u>APPEARANCES</u>:

On Behalf of the Government:
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204



LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

JA2031

795

I N D E X

GOVERNMENT'S WITNESSES:

        CHUCK HASTINGS
                Direct Examination by Ms. Rose          797
                Cross-Examination by Mr. Foster         807

        ALEXANDRA HIRSCH
                Direct Examination by Ms. Rose          812
                Cross-Examination by Mr. Foster         817

        MICHELE SCHEUERMAN
                Direct Examination by Mr. Nazzaro       818
                Cross-Examination by Mr. Foster         817

        GENE RIVERA
                Direct Examination by Ms. Rose          828
                Cross-Examination by Mr. Bryson         849

        ANDREW CHERAMIE
                Direct Examination by Mr. Nazzaro       853
                Cross-Examination by Mr. Foster         858

        JOSE ROMERO
                Direct Examination by Mr. Nazzaro       858

        ALEXANDER GRANADOS
                Direct Examination by Mr. Nazzaro       865

                    *  *  *  *  *  *

                Laura Andersen, RMR 704-350-7493

JA2032

796

E X H I B I T S

GOVERNMENT'S EXHIBITS:

| NO. | | RECEIVED |
|---|---|---|
| 22 | ......................................... | 827 |
| 140 | ......................................... | 861 |
| 140a | ......................................... | 861 |
| 141 | ......................................... | 862 |
| 146 & a | ......................................... | 805 |
| 179 & 2 | ......................................... | 803 |
| 208 | ......................................... | 815 |
| 212a | ......................................... | 820 |
| 212b | ......................................... | 822 |
| 214 | ......................................... | 824 |
| 215 | ......................................... | 825 |
| 215a | ......................................... | 823 |
| 217 | ......................................... | 826 |
| 218 | ......................................... | 826 |
| 220 | ......................................... | 848 |
| 222 | ......................................... | 883 |
| 222a | ......................................... | 884 |
| 223 | ......................................... | 885 |
| 224 | ......................................... | 799 |
| 225 | ......................................... | 894 |

*  *  *  *  *  *

COURT INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-5 Filed 03/23/17 Page 153 of 510
Case 3:08-cr-00134-RJC Document 502a Filed 01/30/11 Page 3 of 102

JA2033

797

P R O C E E D I N G S

APRIL 15, 2010.

(Defendant present.)

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning.

THE COURT:  We ready to get started?

ALL COUNSEL:  Yes, sir.

THE COURT:  All right let's call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Good morning, Members of the Jury.

THE JURY:  Good morning.

THE COURT:  Is the Government ready to resume their Direct Examination?

MS. ROSE:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION BY MS. ROSE:

Q    Agent Hastings, I believe we left off after the defendant was taken into custody on December the 12th, you were outside of the Glen Robin residence where there had been a search.  What did you see?  Did you encounter any individuals outside of the home?

A    Outside of the residence, yes, ma'am, was Carlos Figueroa, known as Drogo, and another female driving past the residence.

Q    I'll show you what's been marked as Government's Exhibit 203.  What is Exhibit 203?

Laura Andersen, RMR 704-350-7493

JA2034

798

A    That is Drogo's driver's license.

Q    Is that the individual that you encountered outside of the Glen Robin residence?

A    Yes, ma'am.

MS. ROSE:  I move to admit 203.

THE COURT:  Any objection?

MR. FOSTER:  No objection.

THE COURT:  Let it be admitted.

(Government Exhibit 203 was received into evidence.)

Q    (By Ms. Rose) Did you know Mr. Figueroa, Drogo?

A    Yes.  He was arrested outside the residence for drug paraphernalia.

Q    Were you aware of him prior to that time?

A    Yes, ma'am, very familiar with him.

Q    In what way?

A    Known MS member and actually --

MR. FOSTER:  Objection; irrelevant.

THE COURT:  Overruled.

THE WITNESS:  Known MS 13 member, and actually had contact with him back in 2004, as well.

Q    (By Ms. Rose) I'm also going to show you Exhibit 224. Do you recognize Government's Exhibit 224?

A    Yes, ma'am.  Jaime Sandoval known as Pelon.

Q    Pelon.  And is he a residence at the Glen Robin home about which you testified?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-5 Filed 03/23/17 Page 155 of 510
Case 3:08-cr-00134-RJC Document 505-2 Filed 03/30/11 Page 5 of 102
JA2035

799

A    Yes, ma'am.  He was not present that day, though.

MS. ROSE:  Move to admit Exhibit 224.

THE COURT:  Let it be admitted.

(Government Exhibit 224 was received into evidence.)

Q    (By Ms. Rose) Were you familiar with Mr. Sandoval, known as Pelon, prior to getting to his residence on December 12?

A    We knew his nickname, but not his legal name until later on in the investigation.

Q    Thank you.  After the defendant was taken into custody, did Mr. Lopez continue to cooperate?

A    Yes.

Q    At some point -- did there become concerns for his safety?

A    Very much so.

Q    Describe what those concerns were?

MR. FOSTER:  Objection.

THE COURT:  Sustained.

Q    (By Ms. Rose) What did you do as a result of your concerns for Mr. Lopez?

A    We purchased an airline ticket for him to leave town for an unknown amount of time at that point to stay with family.

Q    At some point, however, did he return?

A    Yes, ma'am.

Laura Andersen, RMR 704-350-7493

**JA2036**

800

Q    Did -- during the course of your investigation, did you encounter an individual named Mr. Granados nickname Spider?

A    Yes, ma'am.

Q    I will show you an exhibit already marked as Government's Exhibit 78.  Who is shown in Government's Exhibit 78?

A    Angel Rivera Granados, known as Spider.

Q    After -- or at some point while Mr. Lopez was cooperating, did you for a short period of time have another MS member who assisted in some way in the investigation?

A    Yes, ma'am.

Q    Who was that?

A    Carlos Torres known as Sombre.

Q    How long was he involved as an informant or as cooperator?

A    He actually started cooperating before Mr. Lopez, and he was terminated probably six months later, approximate. I'm not sure of the exact date ranges.

Q    And why was he terminated?

A    He confessed to shooting a gentleman walking down the street.

Q    At that point what -- you say terminated, what steps did you take -- you or other agents with the FBI take?

A    He was terminated as a source with the FBI immediately. And the case continued investigation, attempt to locate the

Laura Andersen, RMR 704-350-7493

Case 3:16-mc-00057-MOC   Document 505-2   Filed 03/23/17   Page 157 of 510
Case 3:08-cr-00134-RJC   Document 5054   Filed 03/30/11   Page 7 of 102
JA2037

801

victim.  And a warrant was secured from a superior court judge resecuring his bond.

Q    And was he then taken into custody?

A    Yes, ma'am.

Q    However, in early January of 2008, was he still in a cooperative status?

A    I believe so, yes, ma'am.

Q    How was it that -- how did you come to know Mr. Torres, and why was any information that he was able to provide helpful to you?

A    We first came into contact with him when he was picked up on a misdemeanor charge.  He was homeless living in the woods.  From there he had told us that, you know --

            MR. FOSTER:  Objection; hearsay.

            THE COURT:  Sustained.

            MS. ROSE:  Oh, I'm sorry.  I didn't hear the ruling.  I apologize.

            THE COURT:  Sustained.

            MS. ROSE:  Thank you.

Q    Did he at some point attend MS meetings?

A    Yes, ma'am, he did.

Q    Was he wearing recording equipment?

A    Yes, ma'am.

Q    Do you recall a time that he did attend a meeting wearing such equipment?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 59-5  Filed 03/23/17  Page 158 of 510
Case 3:08-cr-00134-RJC  Document 505  Filed 03/30/11  Page 8 of 102
**JA2038**

802

A    Yes, ma'am.

Q    When?

A    He went to Greensboro, North Carolina in, I believe it was 2008.

Q    Early January, does that refresh --

A    Sounds about right, yes, ma'am.

Q    Did you also, for a time, have his consent to monitor his telephone calls?

A    Yes, ma'am.

Q    How long did that period last?

A    Right around the same as Mr. Lopez, maybe a couple months, approximate.

Q    During that time did -- like you previously testified, were those recordings made and maintained and subsequently interpreted, translated?

A    Yes, ma'am.

Q    I'm going to show you what's been marked as Government's Exhibit 179 and 179a, already been identified.

        If I may approach the witness, Your Honor.

        THE COURT:  You may.

Q    (By Ms. Rose) Are you able to identify each of the exhibits 179 and 179a?

A    Yes, ma'am.  January 14th call.  Yes, ma'am.

Q    And you said January 14th.

A    2008, I apologize.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 159 of 510
Case 3:08-cr-00134-RJC  Document 592  Filed 03/30/11  Page 9 of 102
JA2039

803

Q    And is that the disk upon which the call was recorded, as well as the translation?

A    Yes, ma'am.

Q    By Mrs. Conrad?

A    Yes.  Ms. Conrad did the transcript, yes, ma'am.

MS. ROSE:  I would move -- I think these were conditionally admitted, Your Honor.  I would move to admit them at this time as 179 and 179a?

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let them be admitted.

(Government Exhibit 179 & 179a were received into evidence.)

MS. ROSE:  The merged transcript of the disk and the translation is 179c (sic.) I would ask to publish that to the jury at this time.

THE COURT:  179c?

MS. ROSE:  179c -- excuse me, 179b.

THE COURT:  You may.

(Video playing.)

(Video stopped.)

Q    (By Ms. Rose) Did you also have an opportunity to review any transcripts and disks from the January 5th meeting?

A    Yes, ma'am.

MS. ROSE:  If I may approach?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/28/17   Page 160 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 10 of 102
JA2040

804

THE COURT:  You may.

Q    (By Ms. Rose) I show you Government Exhibit 146 and 146a and if you if those exhibits are familiar to you?

A    Yes, ma'am.  That was the meeting on January 5th, yes, ma'am.

Q    Also initialed by Mrs. Conrad?

A    Yes, ma'am, doing the transcripts.

MS. ROSE:  I would move Exhibits 146 and 146a, Your Honor.  They were conditionally previously admitted.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let them be admitted.

MR. FOSTER:  What date is this meeting?

MS. ROSE:  January 5th.

MR. BRYSON:  Is the meeting or phone call?

MS. ROSE:  The meeting.

MR. FOSTER:  We object on lack of foundation grounds, Your Honor.

THE COURT:  I'll sustain the objection and ask you to establish foundation.

Q    (By Ms. Rose) Were you the one that recovered -- you indicated this was from a January 5th or 6th meeting in Greensboro?

A    Yes, ma'am.

Q    Exhibit 146 and 146a that you just reviewed.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 161 of 510
Case 3:08-cr-00134-RJC   Document 1525   Filed 01/30/11   Page 161 of 210
JA2041

805

Did you actually recover that recording from Mr. Torres after that recording was made?

A    Yes, ma'am, myself and Agent Attard did.

Q    And did you -- and that was maintained in the way that the other recordings were --

A    Yes.

Q    -- about which we've heard and reviewed, and translated -- or transcripts provided by Mrs. Conrad?

A    Yes.

MS. ROSE:  Move to admit, Your Honor.

THE COURT:  I'll overrule the objection; allow you to play that.

(Government Exhibit 146 & 146a was received into evidence.)

Q    (By Ms. Rose) At some point was -- after Mr. Lopez returned, did you and Agent Attard have him arrested?

A    Yes, ma'am.

Q    What were the circumstances?  Why did you do that?

A    Well, directly -- you know, not long after he admitted to shooting someone --

Q    I'm sorry.  I said Mr. Lopez.

A    I'm sorry.  I apologize.

He was -- we had him arrested due to the fact that he was provided a firearm by Pelon, and from that and the danger of, we didn't want him to take the gun back to the gang.  So we arrested him with the permission of the state

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 162 of 510
Case 3:08-cr-00134-RJC   Document 1052   Filed 01/30/11   Page 12 of 102

**JA2042**

806

judge for carrying a concealed weapon, falsely.

Q   When you say with the permission of the state judge, what do you mean?

A   When you falsely arrest someone, you have to have permission from a state judge in whatever county you're doing the arrest in.  And we did it in Mecklenburg County.

Q   You falsely arrested Rony Lopez?

A   Yes, ma'am.

Q   For what reason?

A   Safety.

Q   Where did you put him?

A   Well, he said in Mecklenburg County Jail Central, downtown, for approximately a week before we went and got him.

Q   And thereafter did he leave the area?

A   Yes, ma'am.

Q   Did you continue, however, to work the investigation?

A   Yes, ma'am.

Q   And ultimately in June, did your investigation begin -- end?

A   Yes, ma'am, it ended.  Yes, ma'am.

Q   During -- between or prior to June, what steps, investigative steps, were you taking relative to interviewing witnesses and otherwise?

A   I'm sorry.  Repeat the question.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 163 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 13 of 102
JA2043

807

Q    Were you interviewing witnesses, civilian witnesses, and otherwise, prior to the arrests in June?

A    Yes, ma'am.

Q    Of the MS you were investigating, how many did you arrest?

A    Twenty-six -- well, 25 actually arrested, ma'am.

MS. ROSE:  All right, sir.  Thank you.  I don't have any other questions.

THE COURT:  Any cross?

MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q    Officer Hastings, you've been the main case agent or officer on this MS 13 investigation from the beginning to the end, correct?

A    Yes, sir, from the city level, yes, sir.

Q    And you were -- were you actually present on December 12th at the Glen Robin residence when the arrest took place?

A    Yes, sir.  I wasn't part of the SWAT team.  But as soon as the SWAT team went in, made sure it was safe, I walked right in after.

Q    And so that was the date that you've testified you went there and you had a couple different warrants.  You had a search warrant from a Mecklenburg County judge to search the residence; is that correct?

Laura Andersen, RMR 704-350-7493

JA2044

808

A    From the magistrate, I believe.

Q    Okay.  And you also had two arrest warrants from Guilford County for murder?

A    I believe there were three; two arrest warrants for murder, and I think a possession of cocaine charge from Guilford County, as well.

Q    And those warrants were for the arrest of Alejandro Umana?

A    Yes, sir.

Q    And so, he was arrested in that house pursuant to those warrants, correct?

A    Yes, sir.

Q    And on that date he was taken to downtown Charlotte, to the Charlotte-Mecklenburg Police Law Enforcement Center, correct?

A    Yes, sir.

Q    And after being in Charlotte for some period of time, he was transported up to the Guilford County jail, correct?

A    I believe he spent the night in Mecklenburg County jail and maybe the following day -- I wasn't present.  I don't know the exact time.

Q    But he was transported up to Guilford County jail in custody, correct?

A    Yes, sir.

Q    And he's remained in custody ever since that day,

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 165 of 510
Case 3:08-cr-00134-RJC   Document 1052   Filed 01/30/11   Page 15 of 102
JA2045

809

correct?

A    Yes, sir.

Q    And he was up in Guilford County jail until about July 2008 when he was brought down here for the federal charges?

A    I don't know the exact timeframe.  But I know he was brought down probably around that area, yes, sir.

Q    And just a moment ago you were asked if 26 were arrested, you said 25.  And the reason there wasn't 26, was because he was already in custody, Mr. Umana?

A    No, sir.  That was counting Mr. Umana.  Chacua hadn't been arrested.  He's in El Salvador.

Q    Now, Mr. Torres, also known as Sombre, he was a cooperator for some period of time, correct?

A    Yes, sir.

Q    And the reason he was able to cooperate and be out at all, was that he had a pending state charge for robbery, and the FBI requested the court unsecure his bond so he could cooperate, correct?

A    Initially, he did not have that charge, no, sir.  Later on he acquired that charge, and we requested to a superior court judge that his bond be unsecured.

Q    And in fact, after that, it was some time after that when he was out on his unsecured bond, that he shot someone on the street, correct?

                    Laura Andersen, RMR 704-350-7493

**JA2046**

810

A    Yes, sir.

Q    Now, in the recording that we heard a few minutes ago, the January 14th, 2008 telephone call, that was between Stiler and Sombre?

A    Yes.

Q    And Stiler is Julio Rosales Lopez?

A    Yes, sir.

Q    And Sombre is Carlos Torres?

A    Yes, sir.

Q    That was a recorded conversation.  We saw the transcript go by.  During the conversation they discussed Gorilon, correct?

A    Yes, sir.

Q    And it was stated that they talked about the fact that Gorilon had hit a rival?

A    Yes, sir.

Q    Meaning, he shot a rival?

A    No.  Meaning, Gorilon had told them that he had ran over somebody and left the state.

Q    And so he told them that he run over and killed someone, correct?

A    That's what he told them, yes, sir.

Q    That was -- that statement was consistent with a conversation you had heard earlier between Gorilon and Sombre, where Gorilon in fact told that to Sombre, correct?

Laura Andersen, RMR 704-350-7493

**JA2047**

811

A    Yes, sir.

MR. FOSTER:  No further questions.

THE COURT:  Redirect?

REDIRECT EXAMINATION BY MS. ROSE:

Q    Was that actually -- what Gorilon had said, was that true?  Was that ever verified or confirmed?

MR. FOSTER:  Objection.

THE COURT:  Compound question.  I'll object to form.

Q    (By Ms. Rose) Was that -- did that occur?

MR. FOSTER:  Objection.

THE WITNESS:  No, it did not.

THE COURT:  Overruled.

Q    (By Ms. Rose) Do you know why that statement was made?

MR. FOSTER:  Objection.

THE WITNESS:  Yes.

MR. FOSTER:  Calls for speculation.

THE COURT:  Sustain the objection to that.

MS. ROSE:  I don't have any other questions.

Thank you, sir.

THE WITNESS:  Thank you.

MR. FOSTER:  I have a couple.

RECROSS-EXAMINATION BY MR. FOSTER:

Q    Detective Hastings, you just said that did not occur. I mean, there's no way you can go out and prove that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 168 of 510
Case 3:08-cr-00134-RJC   Document 505   Filed 01/30/11   Page 18 of 102
JA2048

812

something like that never happened, correct?

A    The area was given in which the crime supposedly occurred.  We checked every police report in Charlotte in that area, did not find anything.  And after discussing it with Mr. Gorilon at a later date, he admitted that he made up the story to get out of town.

MR. FOSTER:  No further questions.

THE COURT:  You may step down.

Call your next witness.

MS. ROSE:  Alex Hirsch.

THEREUPON, ALEXANDRA HIRSCH, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    If you would please, ma'am, state your name?

A    Alexandra Hirsch.

Q    Where are you employed?

A    With the FBI.

Q    What's your position with the FBI?

A    I'm a staff operations specialist.

Q    What do you do in that position?

A    I have a range of duties in support of intelligence operations and intelligence reporting and basic case support research.

Q    And as part of your job, do you take information which has been gathered during an investigation and then compile summaries of that?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 169 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 13 of 102
JA2049

A    Yes.

Q    Did you have an occasion to review some phone records which had been received from Sprint pursuant to a court order?

A    Yes.

Q    And did those phone records include cell tower information?

A    Yes.

Q    Whenever Sprint provides phone call details, do they also provide a document that indicates the latitude and longitude for every one of their specific cell towers?

A    Yes, they do.

Q    And are you able to take the latitude and longitude and map those towers?

A    Yes.

Q    And did you in fact do some mapping relative to the phone records which were provided to you by Sprint in this particular case?

A    Yes, I did.

Q    I'm going to show you what has been marked as Government Exhibit 208.  See 208 before you?

A    Yes.

Q    And did you create that document?

A    I did.

Q    From what information?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 170 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 20 of 102
JA2050

814

A    Based on the cell tower information and the phone toll records from Sprint/Nextel for the phone number that's listed on here 703 -- oh.

Q    Go ahead.

A    703-499-7784.

Q    And just to confirm, I'll show you some exhibits which have already been admitted.

Governments Exhibits 207 and 207b, are those records familiar to you?

A    Yes.

Q    Did you also -- based upon the call data in the records, were you able to match up the phone numbers listed and the information provided?

A    Yes.

Q    How were you able to do that based upon what's shown here on the chart that you created?

A    Some of the names that are next to the phone numbers came directly out of the address book of the target number. And then some of them are subscribers, and others were found through investigative resources.

Q    And when you say the address book, let me show you another exhibit that has previously been admitted. Government's Exhibit 204.  You can flip through those if you need to, see if you're familiar with that particular exhibit?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 171 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 21 of 102
JA2051

815

A     Yes.

Q     How are you familiar with what's contained in Exhibit 204?

A     They look like screen shots of the phone numbers in the address book.

Q     And do you know from where these phone numbers were recovered?

A     From -- I believe from the phone number 703-499-7784.

Q     And where was the phone shown in Government Exhibit 204, when was that seized?

A     On December 12th, 2007, during the arrest of Alejandro Umana.

Q     Does the chart, Exhibit 208, accurately reflect the mapping information that you did indicating the cell towers relative to those phone calls shown in the chart on the side?

A     Yes.

Q     If you would just explain what -- I move to admit Government Exhibit 208?

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

(Government Exhibit 208 was received into evidence.)

Q     (By Ms. Rose) First as to the map, what is represented on the map?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 172 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 22 of 102
JA2052

816

A    The red dots on the map are cell tower locations.  Each red dot indicates a different cell tower.  And the numbers that are referenced to each cell tower, refer to specific phone calls that were made, that were on the right of that map before you zoomed in.

Q    And the phone call then transmitted through that particular tower is what you're relating it to?

A    Yes.

Q    The other chart, if you would, describe what information you put together there for 1 through 21.  What do each of those numbers represent?

A    It's a chronological list of the phone calls either received or made from the target phone number, and the name next to it of either the user or the subscriber.

Q    And the number 1 through 21, what do those numbers represent?

A    Those represent on the map, each cell tower has a number next to it.  So, for example, the number one is next to a cell tower in the Greensboro area, that correlates directly to call number one listed to the right at, I think it's 332.

Q    And say call tower five and six relate to --

A    Number five and six on the right, made at 8:55 and 8:56.

Q    P.M.  And the dates -- the range for the phone numbers

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 173 of 510
Case 3:08-cr-00134-RJC  Document 50-5  Filed 01/30/11  Page 23 of 102
JA2053

that you've listed here?

A    December 8 and December 9, 2007.

MS. ROSE:  Thank you very much.

THE COURT:  Any cross?

MR. FOSTER:  One moment, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q    Ms. Hirsch, on Exhibit 208, pull that up again.  If you could focus on -- magnify the list on the right again.

Now, it looks -- one of the entries there, it looks like about the second call off to the right it says Sapirris/Bautista?

A    Yes.

Q    And is that the name the party, the connection was made with?

A    Sapirris is the name that was found in the address book.  And Bautista is the last name of the subscriber on that phone.

Q    Okay.  And was that line also being monitored by the FBI, too?

A    I don't recall.  I don't know.

MR. FOSTER:  No further questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. NAZZARO:  Michele Scheuerman.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 174 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/17   Page 24 of 102
JA2054

818

THEREUPON, MICHELE SCHEUERMAN, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MR.

NAZZARO:

Q    Good morning.  Please state your name for the jury.

A    M. L. Scheuerman.

Q    And Ms. Scheuerman, what is your current occupation?

A    Crime scene investigator.

Q    How long have you been a crime scene investigator?

A    Since May of 2003.

Q    Where do you work as a crime scene investigator?

A    Charlotte-Mecklenburg Police Department.

Q    What are your duties as a crime scene investigator with

the Charlotte police department?

A    At the request of a detective or an officer, we respond

to a crime scene to attempt to collect any physical

evidence, document, preserve, and photograph the crime

scene.

Q    And were you working in that capacity on December 12,

2007?

A    Yes.

Q    Were you asked to respond to a particular location?

A    Yes.

Q    And do you recall what location that was?

A    May I refer to my note?

Q    Yes, you may.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 175 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 25 of 102
JA2055

819

A   I was asked to respond to 3136 Glen Robin Court.

Q   And what was your role at that location?

A   To photograph the residence, and to collect some evidence that the officers had found prior to me getting there.

Q   Okay.  And did you in fact perform those duties?

A   Yes, I did.

Q   And did you collect certain evidence?

A   Yes.

MR. NAZZARO:  Your Honor, if I may approach?

THE COURT:  You may.

Have you all seen.

MR. FOSTER:  No, Your Honor.

MR. NAZZARO:  I'm sorry.

Q   I would like to show you what was indicated as 212a and 215a and ask you if you can identify those items and see if you can identify them.

Start with 212a.  Did you open that up?

A   Yeah.  Yes.

Q   What is contained in 212a?  How are you able to identify 212a?

A   It's a Ruger handgun that I collected that was photographed with the letter A.  I can match it back to the serial number that I documented on the scene.

Q   Okay.  You collected that item at the scene; is that

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 176 of 510
Case 3:08-cr-00134-RJC   Document 1055   Filed 01/30/11   Page 26 of 102
JA2056

820

right?

A    Yes.

Q    And has that item been maintained in some sort of custody and control of the Charlotte-Mecklenburg Police Department?

A    Yes.

Q    And what is the procedure for that?

A    Once I collected it, I collected it as is on scene, and turned it into property controlled and filled out a property sheet with it.  And the lab had unloaded it and put it in this box.

Q    Okay.  And are you able to identify through your -- just by remembering it or by some sort of initials that you placed on any of the items or the documentation?

A    I have a property sheet that documents what this -- because this is not the box that I turned it in.

Q    But is that the item?

A    Yes.

MR. FOSTER:  Your Honor, I would move 212a at this point.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 212a was received into evidence.)

MR. FOSTER:  Is the firearm rendered safe, at this

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 177 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 27 of 102
**JA2057**

821

point?

Display it on the ELMO, Your Honor?

THE COURT:  You may.

(Published.)

Q    (By Mr. Nazzaro) There was another bag, is that contained in this?

A    It was part of this, yes.

Q    Is that part of the item that you seized?

A    Yes.

Q    What have you just taken out of 212a?

A    212b; I took out the live rounds that were in there.

Q    I'm sorry, 212.  212a then is the firearm itself?

A    Yes.

Q    And what is 212b?

A    Is the live rounds that were in this envelope.

Q    Where were those live rounds when you seized the firearm?

A    I believe they were in the clip of the gun, but I collected the gun as is.  I did not unload those on the scene.

MR. NAZZARO:  Your Honor, I would move 212b at this time.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 178 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 23 of 102
JA2058

822

MR. NAZZARO:  And publish them?

THE COURT:  You may.

(Government Exhibit 212b was received into evidence.)

Q    (By Mr. Nazzaro) Now, Ms. Scheuerman, with respect to those two items, 212a and b, where did you seize those from?

A    They were located underneath the rear couch cushion. Which the couch that was along the right wall of the downstairs front left living room of that residence.

Q    Okay.  And was there anything else underneath that cushion?

A    Yes.  There was also a plastic Wal-Mart bag that was tied that had some live ammunition in there.

Q    I would like you to look at the second exhibit -- actually third exhibit by identification, I think it's 215a; is that correct?

A    Yes.

Q    Could you please see if you can identify 215a?

A    Yes.  This is the plastic bag that the live rounds were in.  And this is the 17 live rounds 45, and 1 Winchester 38 special, live round.

Q    And those -- how are you able to identify 215a?

A    They are in the slide boxes with my name and code number on them.  And also it was also in the bag that had my name and code number on there.

Q    And those were seized next to the firearm which you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/30/17  Page 179 of 510
Case 3:08-cr-00134-RJC  Document 50-5  Filed 03/30/17  Page 29 of 102
JA2059

823

identified as the Ruger in 212a?

A    Yes.

MR. NAZZARO:  Your Honor, I would move 215a.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 215a was received into evidence.)

MR. NAZZARO:  Ask it be published.

THE COURT:  You may.

Q.    (By Mr. Nazzaro) Now, Ms. Scheuerman, the boxes -- you placed them in these boxes, that's correct?

A    Yes.

Q    They were contained in this plastic bag?

A    Yes.

Q    I want to ask you to remove the items from the boxes that you put them in, if you could, please.

A    (Witness complies.)

Q    And please examine the bag to see if there's anything else in the bag?

A    (Witness complies.)  It has a control number on there, when I turned it into property control that they assigned. And it has my label on the outside of what is in the bag.

Q    Why did you put them in two different boxes?

A    I put them in two different boxes because they were two different calibers.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 180 of 510
Case 3:08-cr-00134-RJC   Document 51-5   Filed 01/30/11   Page 30 of 102
**JA2060**

824

Q    Just to be clear, the plastic bag is the bag they were originally found in?

A    Yes.

Q    Now, I would like to show you what's been previously marked as Government 214.  Are you able to recognize 214?

A    Yes.

Q    And how are you able to recognize 214?

A    That is the picture that has the handgun and the bag of live ammunition --

Q    Okay.

A    -- on the couch.

Q    Is that the location that you found those items in?

A    Yes.

Q    And you photographed that location?

A    Yes.

         MR. NAZZARO:  Now -- Your Honor, I would move 214 at this time.

         THE COURT:  Any objection?

         MR. FOSTER:  No, Your Honor.

         THE COURT:  Let it be admitted.

(Government Exhibit 214 was received into evidence.)

Q    (By Mr. Nazzaro) Now, the cushion is removed from the photograph?

A    Yeah.

Q    From the photograph?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 181 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 31 of 102
JA2061

825

A    Yes.

Q    Is that -- where was the cushion at the time you found the items?

A    The cushion was partly on top of the other cushion, it had been disturbed.

Q    I would like to show you what's been previously marked as Government 215.  What is 215?

A    That is the picture of the live ammunition with the bag tied in a not.

Q    That's a close-up of it?

A    Yes.

          MR. NAZZARO:  Your Honor, I would move 215.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

(Government Exhibit 215 was received into evidence.)

Q    (By Mr. Nazzaro) As part of your additional duties that day, did you also have the occasion to take any photographs of the -- of Mr. Umana?

A    Yes.

Q    Okay.  And is that the person that's here in the courtroom today?

A    Yes.

Q    Can you identify him, please?

A    He's over there.

                    Laura Andersen, RMR 704-350-7493

**JA2062**

826

MR. NAZZARO:  If the record would so reflect, Your Honor.

Q    I would like to show you 218 -- 218.  Take a look at that.  And is this a photograph that you took on December 12th?

A    Yes.

MR. NAZZARO:  I would move 218.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 218 was received into evidence.)

Q.    (By Mr. Nazzaro) And did you also photograph certain items that you took from Mr. Umana?

A    The officers had taken from him, but I did photograph them.

Q    I would like to show you 217.

A    Those are the items that the officers had taken off the -- Mr. Umana, and I photographed them.

MR. NAZZARO:  I'd move, Your Honor, 217.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 217 was received into evidence.)

Q    (By Mr. Nazzaro) Show you one other exhibit that is conditionally admitted, Government 22.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 183 of 510
Case 3:08-cr-00134-RJC  Document 1050  Filed 01/30/11  Page 53 of 102
JA2063

827

Did you take Government 22?

A    Yes, I did.

MR. NAZZARO:  Move Government 22.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 22 was received into evidence.)

MR. NAZZARO:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q    Ms. Scheuerman, is that how you say it?

A    Yes.

Q    How many total live rounds did you seize in that residence on December 12?

A    In the bag there were 17 and -- 18.

Q    So 17 in the bag, and was --

A    Well, 18 in the bag total.

Q    Okay.

A    And then I seized the gun as is.

Q    Okay.  And so the total number of live rounds you seized was 18?

A    Yes.

Q    And they were all in the bag?

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 184 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 34 of 102
JA2064

828

Q    So the gun had no live rounds?

A    I do not know, I did not unload it.

Q    Did the gun have the clip in it?

A    Yes.

Q    And the clip had no rounds in it?

A    I did not take the clip out of the gun.  I collected it as is and put it in steel lined wooden gun box and turned it in.

Q    All you can testify about today is that 18 live rounds were found there all in the bag, correct?

A    Yes.

        MR. FOSTER:  If I could just have a moment, Your Honor.

        THE COURT:  You may?

        MR. FOSTER:  No further questions.

        THE COURT:  Redirect?

        MR. NAZZARO:  No, Your Honor.

        THE COURT:  You may step down and be excused.

        You may call your next witness.

        MS. ROSE:  Gene Rivera.

THEREUPON, GENE RIVERA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    Good morning.  If you would introduce yourself, please, sir?

A    Gene Rivera.

                Laura Andersen, RMR 704-350-7493

**JA2065**

829

Q    Mr. Rivera, where are you employed?

A    Charlotte-Mecklenburg Police Department crime laboratory firearm section.

Q    What is your position at the police department in the firearm section?

A    I'm a firearm and tool mark examiner.

Q    When you say firearm and tool mark examiner, describe for the jury what that position entails?

A    I examine firearms and firearms related evidence, such as bullets and discharged cartridge cases.  I write a report regarding the results of my examination and may be called to testify in court as to those results.

Q    How long have you held that position?

A    I've been a firearm examiner seven years.  I've been at the police department for 11.

Q    What did you do prior to joining the firearm section?

A    I was an IBIS technician for two and a half years, which is another job in the firearm section.  Prior to that, I was a crime scene search technician for a year and a half.

Q    When you say I-B?

A    IBIS, I'm sorry.

Q    IBIS.  What is IBIS?

A    IBIS is an acronym for the Integrated Ballistics Identification System.  It's a computerized database used to correlate or take images of bullets and cartridge cases to

Laura Andersen, RMR 704-350-7493

**JA2066**

830

try to find matches that are at that point unknown.

Q    And is that a nationwide system?

A    It is.

Q    Any time that you received cartridges or bullets or otherwise, it's somehow put into that system?

A    Not all cartridge cases or bullets.  But the majority of the ones we examine are put into the system, yes.

Q    If you would, please tell the members of the jury about your background, your training and some of your experience?

A    I have a Bachelor of Science degree in marine biology from the University of North Carolina at Wilmington.  I also have a Bachelor of Science in criminal justice from the University of North Carolina in Charlotte.

I graduated from the National Firearms Examiner's Academy.  Which is a comprehensive year-long training program, offered by the Bureau of Alcohol, Tobacco, Firearms and Explosives.

Prior to that training at the ATF, I received extensive in-house training in test-firing firearms and operability examinations.  I've attended two-week long courses in firearm and tool mark identification at the FBI training academy.  I've completed a number of armors courses for various firearms.  I've attended eastern regional training conferences for firearm and tool mark examiners.

I'm a member of the Association of Firearm and Tool

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 187 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 37 of 102
**JA2067**

831

Mark Examiners, and have attended four week-long training seminars for AFTE.

I've also conducted research in the area of firearms identification and have had articles published in the AFTE journal.

Q     And you indicated -- you use the word, tool mark examination; what do you mean?

A     Tool mark -- firearms examination is simply tool mark examination -- a firearm is a specific kind of tool.

A tool, which is an item that's used to make -- it's used in various degrees to do work.

Tool marks may be left on the items that are worked upon by the tool itself.  These tool marks which are generally microscopic in nature, can be examined and compared.

Tool mark identification is trying to determine if a particular tool mark were these microscopic marks that were produced by an individual tool.

Q     And what's the significance when you talk -- significance of this tool marks -- where are tool marks made in relation to a firearm that assists in any type of identification?

A     Typically on -- in relation to a firearm, it being the tool, it causes work upon a cartridge case and a bullet.

Q     Explain then how it causes markings upon the tool

Laura  Andersen,  RMR  704-350-7493

**JA2068**

832

casing or the bullet?

A    During the firing process, the actions that cause the firing of that live cartridge, the bullet is forced down the barrel of the gun.

The surfaces, the surfaces of the bullet, are marked upon against the inside of the barrel as it goes down the barrel of the gun.

In addition, the cartridge case which it receives work upon it -- basically it's a tiny explosion that happens within the firearm, forces are created on that cartridge case that imparts marks upon it from that firearm.

Q    And are those marks unique to each firearm?

A    Yes.

MS. ROSE:  I would tender Mr. Rivera as an expert in ballistics, firearm and tool mark.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  He will be allowed to offer an opinion in that area.

MS. ROSE:  And If I may approach.

Q    First I will hand you what's previously been admitted as Government Exhibit 212a.  If you would examine the exterior of 212a, are you able to identify that exhibit?

A    Yes.

Q    How so?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 189 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 39 of 102
JA2069

833

A     I have my initials placed on the exterior of the evidence.  As well as a F number, which is a shorthand for the complaint number itself.

Q     When you receive and item, such as Exhibit 212, how do you receive it and what's the chain of custody or how is that evidence maintained within your department?

A     There is also a property sheet that goes with each piece of evidence.  I would sign that property sheet with -- sign it, date it, and with the date and time that I received it.  I also date and initial when I receive the package itself, before opening it.

Q     What -- open Government's Exhibit 212, which was previously opened.  There we go.  What is located within Government's Exhibit 212a, specifically?

A     I see a firearm.

Q     And you have removed what's been -- from the box, what's been marked as Government Exhibit 212b.  If you would examine what's contained in 212b, sir.

      And are you familiar with that particular item?

A     Yes.  This item also has my initials and the date I received it, placed on the outside.

Q     What did you just remove and examine from Exhibit 212b?

A     Those are five -- excuse me, seven live cartridges.

Q     And where were those cartridges located when you first examined the weapon?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 190 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 40 of 102
**JA2070**

834

A    They would have been in the box with the other items.

Q    Were they -- did you remove the clip or had that already been removed?

A    The live -- the live ammunition in magazine had already been removed from the firearm itself prior to me receiving it.

Q    But were they contained all together?

A    Yes.

Q    Did you have a chance to examine the clip of this particular firearm, are you familiar with it?

A    Yes.  It's in there as well.

Q    If you would take a look at the clip contained withing the firearm -- first of all, Exhibit 212a, what type of firearm is that?

A    It's a Ruger P 90 pistol, 45 Auto caliber.

Q    And the clip that is contained within the .45 caliber holds how many rounds?

A    It's not marked on the magazine itself.  Sometimes the number of rounds is marked.  Usually this magazine would hold eight.

Q    Did you have an opportunity after receiving the items you've just described, to conduct an examination?

A    Yes.

Q    What examinations did you perform?

A    Initially the firearm was merely examined visually;

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/28/17    Page 191 of 510
Case 3:08-cr-00134-RJC    Document 50-5    Filed 01/30/11    Page 41 of 102
JA2071

835

noted make, model, serial number, a number of other factors.

The firearm itself it was test-fired twice at our in door range.  And those test fires were submitted for IBIS inclusion.

Q    Now, the first step in your examination is just to look over the weapon itself?

A    Yes.

Q    Did you also examine the -- the live bullets which were contained with that exhibit?

A    Yes.  They were just simply visually examined, noting the caliber and the manufacturer of the actual ammunition itself.

Q    What caliber were the items found that were contained with the firearm?

A    Those are 45 Auto caliber live cartridges.

Q    And did you note the manufacturer of those bullets?

A    Yes.  Five of those were manufactured by CCI, and two of those were manufactured by Remington.

Q    You said you test-fired the weapon, what's your purpose in doing so?

A    The original request was to make sure the firearm was operable and submit those test fires to IBIS.  So that's the purpose of the examination to begin with, was to make sure the firearm was in operating condition.  I found it to be in good operating condition.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 192 of 510
Case 3:08-cr-00134-RJC   Document 1070-5   Filed 01/30/11   Page 42 of 102
**JA2072**

836

Q    And were the shell casings and any shell fragments that you collect, other than entering them into the IBIS system, are they used in any way further in your examination?

A    Not at that time, not during that initial examination, no.

Q    Did you have an opportunity then to conduct further examination on Exhibit 212a, the firearm which you've identified?

A    Yes.  A number of months later I re-examined, retest-fired the actual firearm itself.

Q    Still in operable working condition?

A    Yes.  Yeah.

Q    Then what did you?

A    Those tests, the secondary tests were compared to additional evidence items that were received at that time.

Q    I will show you a number of items which have already been admitted.

        If I may approach the witness, Your Honor?

        THE COURT:  You may.

Q    (By Ms. Rose) Government's Exhibit 88.  Are you able to recognize the outer envelope, what's been marked as Government's 88?

A    Yes.  My initials are on it and the date I received it.

Q    I'm also going to hand you, just for your review of the exterior the contents of the envelope mark the 88a, 88b,

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 193 of 510
Case 3:08-cr-00134-RJC   Document 10-5   Filed 01/30/11   Page 43 of 102
**JA2073**

837

88c, 88d, Exhibit 91, 98, 124a and 130.

And I'll leave those with you for this time and take a look and tell us whether you're able to identify each of those exhibits?

A    Yes.  They all bear my initials and the date I received it regarding -- in regards to examining them for this case.

Q    And how did you use the contents of each of those exhibits in your examination?

A    They were individually examined to determine what they were to begin with.  And depending on what they were, they were compared to the tests that I mentioned before, the secondary tests that I made with that firearm.

MS. ROSE:  If I may approach again?

THE COURT:  You may.

MS. ROSE:  Just to assist the witness, Your Honor.

Q    Beginning with -- you have these separated into two separate piles, is there a reason for that?

A    These are cartridge cases and these are bullets and lead fragment.

Q    Begin then with Government's Exhibit 88.  I will remove the contents of Government's Exhibit 88 and ask you if you're able to identify that particular item?

A    Yes.  This is one of the cartridge cases that I examined for this case.

Q    How do you recognize that particular cartridge case?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 194 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 44 of 102
**JA2074**

838

Are there any markings upon it or manufacturer?

A    We engrave the evidence items that we get with my initials and the F number, which is just a shorthand version of the complaint number is engraved on the cartridge case itself.

Q    Who is the manufacturer, if you can see, of that particular cartridge case?

A    That's CCI.

Q    I've removed the contents of Government Exhibit 88a. Do you recognize that item, Mr. Rivera?

A    Yes.  Again, my initials and the F number are engraved on it.

Q    And the manufacturer of that bullet?

A    Remington Peters.

Q    I guess it's a casing?

A    It's a cartridge case.

Q    I'm removing the contents of Government's Exhibit 88b. Are you able to identify Exhibit 88b?

A    Yes.  My initials and F number is engraved on it.

Q    And the manufacturer of the shell casing identified as Government's Exhibit 88b?

A    Remington Peters.

Q    I have removed the contents of Government's Exhibit 88c.  I will ask you to examine that exhibit, please, sir.

A    Again, my initials and F number is engraved on that.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 195 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 43 of 102
JA2075

839

Q    And that particular bullet is manufactured by?

A    CCI.

Q    And the contents of Government's Exhibit 88d?

A    Also has my initials and F number, made by CCI.

Q    Thank you.

Now, if you would -- I'll return in just a moment.  But if you would tell the Members of the Jury what examination you performed on each of the five shell casings you have there before you?

A    These were visually examined noting the caliber, manufacturer, other characteristics as well were noted. They were then compared to the tests that I made previously with the Ruger firearm.

Compared using a comparison microscope which is a microscope which has two stages on it which allows the user to simultaneously view two items.

My examinations take -- took place generally from 20 to 30 times what the human eye can see.

Q    And during that examination, what exactly is the process?  You said you have a side-by-side comparison.  What particularly are you looking to compare?

A    I'm looking at the microscopic marks that may have been imparted, or what imparted from the firing process itself that I explained earlier.

When that cartridge explodes in the firearm, forces are

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 196 of 510
Case 3:08-cr-00134-RJC   Document 1035   Filed 01/30/11   Page 46 of 102
JA2076

840

put upon that cartridge case that transfers marks from that firearm to the cartridge case itself.

Q    Once again, those are unique to each firearm?

A    Yes.

Q    What did you find when you made your comparisons relative to the five shell casings and the Government's Exhibit 212a, which was 45 Ruger?

A    Through the cartridge cases I was able to positively identify as having been fired in that Ruger firearm.

One of the cartridge cases I was able to say it exhibited some similar characteristics, however I was not able to make a positive identification.

The last cartridge case I wasn't able to say -- it was inconclusive.  I wasn't able to say that it was fired or that it wasn't fired in that firearm.

Q    You've given us three different standards of comparison.  You said positively I.D.  Where does that fall in your standard of comparison?

A    That's an identification.  That means that those three cartridge cases were fired in that firearm.

Q    Which three cartridge cases did you make the positive identification?

A    It was the three manufactured by CCI.

Q    You said a second comparison standard you noted was probably.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 197 of 510
Case 3:08-cr-00134-RJC   Document 505   Filed 01/30/11   Page 47 of 102
**JA2077**

841

A    Correct.

Q    And that probable standard means what within your examination?

A    It just did not have enough individual characteristics, microscopic marks, for me to make a determination of a positive identification.

Like was stated before, it's a probably was fired in it but I can't say positively.

Q    There's not enough there for you to make that conclusion?

A    That's correct.

Q    Correctly, you feel?

A    Yes.

Q    And then finally you indicated one was inconclusive?

A    Yes.

Q    Why did you determine that to be inconclusive?

A    Again, there were even less marks on that one.  There was minimal compared to the test itself.  So in the absence of any individual marks, you can't make a conclusion, so therefore it was inconclusive.

Q    The three CCI's were positive; one of the Remington Peters was probably; and the other Remington Peter was inconclusive; is that correct?

A    Yes.

Q    Did you also -- if I may approach again?

Laura Andersen, RMR 704-350-7493

**JA2078**

842

THE COURT:  You may.

MS. ROSE:  I'll retrieve those make sure they are probably bagged.

Q    You identified other items, 91, 98, 124a and 130. Looking at the individual evidence envelopes, what are those items noted as and from where did you receive them?

A    I received those in the same box that I received the cartridge cases.  Containing in each -- in the envelopes themselves, that are three bullets and one lead fragment.

Q    What is a bullet and what is a fragment?

A    A lead fragment is simply that, a piece of lead.  I could make no other determinations.

Q    And the bullet is what part of the particular -- the shell casing that you described before, what part of that is the bullet?

A    A live cartridge is composed of the cartridge case itself, which were those five I was just testifying to.  The bullet which is what comes out of the barrel when it's fired.  The priming mixture, which is within the cartridge case of the primer.  And then also the powder that's inside the cartridge case which burns to cause that bullet to come out of the barrel.

So these are the bullets that came out of the barrel as these cartridges were fired.

Q    I will show you what has been previously admitted as

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 199 of 510
Case 3:08-cr-00134-RJC   Document 30-5   Filed 01/30/11   Page 43 of 102
JA2079

843

Government's Exhibit 91, removing the contents of

Government's Exhibit 91, and ask you if you're able to

identify Exhibit 91?

A    Yes.  It has my initials and the F number engraved on

it.

Q    Now, what is Exhibit 91?

A    That's a bullet.

Q    And what condition is that bullet?

A    It's slightly -- it's mushroomed.  It was a jacketed

hollow point bullet when it hits a surface, those sometimes

tend to mushroom or open up.  That's that condition it's in.

Q    Now, are you able to tell upon just a cursory

examination, what type of bullet that is, or from what

manufacturer?

A    Not necessarily what manufacturer it came from, no.

Q    Are you able to tell what type it is, what caliber?

A    Narrow it down the caliber, yes.

Q    And did you do that on that particular bullet,

Government's 91?

A    Yes.  That was consistent with a 45 Auto caliber

bullet.

Q    I have removed the contents of Government's Exhibit 98

and I'll ask you to examine 98.  Are you able to identify

Exhibit 98?

A    Yes.  It also has my initials and the F number engraved

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 200 of 510
Case 3:08-cr-00134-RJC   Document 1015   Filed 01/30/11   Page 54 of 102
JA2080

844

on it.

Q    What is Government Exhibit 98?

A    It's also a bullet.

Q    Are you able to determine upon examination, the manufacturer of that bullet?

A    No, not the manufacturer.

Q    What about the caliber?

A    It's a 45 Auto caliber bullet.

Q    Show you what's been marked as Government Exhibit 124a and ask if you're able to identify 124a?

A    Yes.  The packaging has my initials and the F number on it.  Obviously it's a lead fragment which was too small to engrave, so that's why it itself is not engraved, just the packaging.

Q    Are you able to make any kind of determination or conclusion based upon that particular piece of evidence?

A    No.  Other than it was a piece of lead -- lead fragment, that's all.

Q    And finally, Government's Exhibit 130.  I'll remove the contents of Exhibit 130 and ask you if you are able to identify Exhibit 130?

A    Yes.  It's another bullet, my initials, and F number engraved on it, 45 Auto caliber bullet that I examined during this case.

Q    And again, were you able to make a determination as to

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 201 of 510
Case 3:08-cr-00134-RJC   Document 1396   Filed 01/30/11   Page 31 of 102
JA2081

845

the manufacturer of this particular bullet?

A    No.

Q    You previously testified about a hollow point bullet being able to mushroom.  Does this exhibit assist you in discussing that particular phenomenon?

MR. BRYSON:  Object to the characterization, hollow point, Your Honor.

MS. ROSE:  That particular occurrence or characteristic?

THE WITNESS:  This bullet --

MR. BRYSON:  Objection --

THE COURT:  Hang on, what's the objection.

MR. BRYSON:  Assumes facts not in evidence, Your Honor.

THE COURT:  With respect to Exhibit 91, I believe the witness testified to a hollow point bullet and used the terminology, mushroom; is that what you're referring to, Ms. Rose?

MS. ROSE:  Yes.

THE COURT:  I will overrule the objection.

Q    (By Ms. Rose) What is the condition of this particular exhibit?

A    This bullet exhibits mushrooming.  It was a hollow point bullet.

THE COURT:  Are you saying this bullet, which

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 202 of 510
Case 3:08-cr-00134-RJC   Document 503   Filed 01/30/11   Page 52 of 102
**JA2082**

846

exhibit are you referring to?

MS. ROSE:  130.

Q    Regarding the three exhibits that were large enough for you to make an examination, that would be 130, 91 and 98, what were your conclusions?

A    Two of those bullets I was able to positively identify as having been fired from that Ruger firearm.

The third bullet I was not able to identify nor eliminate, basically inconclusive due to damage.

Q    Which bullets were you able to identify as having been fired from the Ruger 45 which was previously introduced?

A    It's going to depend on the item number you're using. I'm not familiar with your exhibit numbers.

MS. ROSE:  If I may approach?

THE COURT:  You may.

Q.    (By Ms. Rose) I'll hand you this, perhaps you made your markings on the envelope.  I apologize.

A    Exhibit 130, was fired from the Ruger firearm.

Exhibit 91, was fired from the Ruger firearm.

Exhibit 98, I could not identify or eliminate as it having been fired from the Ruger firearm.

Q    And why were you not able to make either identify or eliminate Exhibit 98?

A    It exhibited some damage on the bearing surface, or the surface that comes in contact with the inside of the barrel

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 203 of 510
Case 3:08-cr-00134-RJC   Document 1050   Filed 01/30/11   Page 53 of 102
JA2083

847

of the firearm.  That damage obscured any individual characteristics that would allow me to make a positive identification.

Q     In your report you indicated that there was a particular substance that was on that projectile that may have impaired your ability to make a comparison?

THE COURT:  When you say that projectile, what exhibit number are you referring to?

MS. ROSE:  Exhibit 98.

THE WITNESS:  You say in my report?

Q     (By Ms. Rose) Did you make a notation of that during your examination?

A     Yes, in my notes.

Q     What did you note?

A     That it -- there was some white trace material on it, and it has some surface scratches.

Q     And what did you determine that white trace material to be or believe that to be?

A     I didn't determine it to be anything.  It most likely consistent with possibly drywall or something similar.

Q     Did you prepare a report of these conclusions, of your examination and conclusions?

A     Yes.

Q     Let me show you what has been marked as 220.  Are you able to see Government's Exhibit 220?

Laura Andersen, RMR 704-350-7493

**JA2084**

848

A    Little blurry.

THE COURT:  You can tilt that screen.

THE WITNESS:  Still a little blurry, but yes, I can see it.

Q.   (By Ms. Rose) And is that a report of your finding?

A    Yes.

Q    Of your examination and your conclusions about which you have testified to today?

A    Yes.

Q    And is that your standard procedure that you make a report of conclusions, findings, analysis and maintain those as part of the investigation?

A    Yes.

MS. ROSE:  I move Exhibit 220, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 220 was received into evidence.)

Q.   (By Ms. Rose) And obviously you identified or testified to the exhibit numbers presented to you by the government on the envelopes you had there before you, the control numbers contained within your report are found on the envelopes; is that correct?

You make these identifications by control number?

A    That's how I was -- I referred them back to how they

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 205 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 53 of 102
**JA2085**

849

were turned into evidence.  They were turned into evidence under a control number, so.

Q    And those are marked on the envelope?

A    There should have been a -- well, there was an original box I believe these envelopes came in.

Q    And it was marked on that particular original box?

A    Yes.

MS. ROSE:  If I may approach, I'll --

THE COURT:  You may.

MS. ROSE:  -- I'll have this marked.

If I may approach?

THE COURT:  You may.

Q.   (By Ms. Rose) Hand you what I marked as Government Exhibit 136, and perhaps this will assist you.

A    Yes.  The control number that you were referring to earlier, is on the exterior evidence packaging itself.

MS. ROSE:  All right.  Thank you, sir.

I don't have any other questions of this witness, Your Honor.

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q    When you received the Ruger P 90 that you've been referring to, it was unloaded, correct?

A    Yes.  I received it unloaded.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 206 of 510
Case 3:08-cr-00134-RJC   Document 10-5   Filed 01/30/11   Page 56 of 102
JA2086

850

Q    And that's standard procedures for the way evidence is handled at the Charlotte-Mecklenburg Police Department, correct?

A    Sometimes we can receive guns that are loaded, but they would be in a secured steel lined gun box.

        However, the box that this one was received in, was simply cardboard, and it was in an unloaded condition, yes.

Q    Now, the analysis that you do is based on -- well, it's a subjective analysis, correct?

A    My opinions are -- are subjective in nature, yes.  But they're based on scientific principles.

Q    Okay.  But there's no objective standard that you're required to meet before you declare a match?

A    That's correct.

Q    And that's one of the criticisms of your field, isn't it?

A    Some people may see that as such.

Q    Okay.  Well, some of the people that see that is the National Academy of Sciences, correct?

A    Yes.

Q    I mean, you're familiar with the 2009 report from the National Academy of Sciences entitled, Strengthening Forensic Science in the United States, correct?

A    Yes, I am.

Q    And that's one of the criticisms of firearm and tool

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/30/17   Page 207 of 510
Case 3:08-cr-00134-RJC   Document 150-5   Filed 01/30/11   Page 57 of 102
JA2087

851

mark examiners, is that what you're doing is completely subjective, correct?

A   They have a lot of issues -- they had a lot of issues with the whole forensic science field, not just firearm and tool mark examination.

Q   Okay.  But specifically with regard to firearm and tool mark issues, one of the complaints was that it was subjective, correct?

A   I don't know if that was specifically addressed in there.

Q   All right.  Did they not say, that even with more training and experience using newer techniques, the decision of the tool mark examiner remains a subjective decision, based on unarticulated standards, and no statistical foundation for estimation of error rates?

A   That's true, the discipline -- the decisions are subjective in nature.  As I stated before, they're based on scientific facts.  There has been error rates determined for our discipline.

Q   And you are -- you are saying with regard to three of these cartridges, that they positively came from this gun, correct?

A   Yes.

Q   And you are saying the same thing with two of the bullets, that they positively came from this gun, correct?

Laura Andersen, RMR 704-350-7493

**JA2088**

852

A    Yes.

Q    You're not saying that they came from a Ruger P 90, correct?

A    No.  I'm saying they came from that Ruger P 90 that I examined.

Q    All right.  And that's another complaint that the National Academy of Sciences Report has with your field, doesn't it?

A    I don't know if I understand the question there.

Q    They think that there's not enough known about the individuality of characteristics on firearms for you to make that call that it's the exact same gun, correct?

A    That may be their opinion.  However, there are hundreds of studies.  This discipline's been around for more than 100 years.  There are hundreds of studies that have been done regarding individuality, uniqueness of tool marks and their reproducibility.

Q    Did the Academy of Sciences specifically find that sufficient studies have not been done to understand the reliability, refutability of the methods you employ?

A    That is their opinion and that's one that I disagree with.

      The association -- the professional association that I belong to, the Association of Firearm and Tool Mark Examiners has released a response to that NAS report.

                    Laura Andersen, RMR 704-350-7493

**JA2089**

853

Q    And it disagrees with the National Academy of Sciences?

A    Not totally disagrees, there are some -- however, they acknowledge that not enough was done by the NAS to actually go after one specific discipline.  They seem to blanket the whole forensic science field in that report.

Q    They made specific findings regarding all areas of forensic science, correct?

A    I suppose.

MR. BRYSON:  Those are my questions.

THE COURT:  Any redirect?

MS. ROSE:  No.  Thank you, sir.

THE COURT:  You may step down, be excused.

Call your next witness.

MR. NAZZARO:  Andrew Cheramie.

THEREUPON, ANDREW CHERAMIE, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Please state your name, sir.

A    It's Andrew.  My last name is Cheramie, C-H-E-R-A-M-I-E.

Q    And how are you employed?

A    I'm a special agent with the Bureau of Alcohol, Tobacco and Firearms.

Q    And what type of duties do you have with the Alcohol, Tobacco and Firearms?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 210 of 510
Case 3:08-cr-00134-RJC   Document 505   Filed 01/30/11   Page 54 of 102
JA2090

854

A      Primarily our responsibilities are to investigate violent crime, and investigate violations against federal firearms and explosive laws.

Q      Have you also received from specialized training in determining the manufacturer and origin of certain firearms?

A      Yes, sir.

Q      And could you describe that type of training that you've had?

A      Sure.  I've been a special agent for approximately nine years with ATF.  As part of our training, all special agents go through the ATF academy, which is about 14 weeks in length.  During that program all agents receive a block of instruction on firearms and identification; teaches agents the laws with respect to how firearms are required to be marked; teaches agents the nomenclature of firearms or what the different pieces and parts of firearms are.

But in addition to that, in 2006 I attended a course that's given by the ATF firearms technology branch in Martinsburg, West Virginia.  It's called an interstate nexus class.

Basically what that does is, it's an additional period of instruction that instructs agents on the origin and where firearms are manufactured.

Q      What is the process for determining that?

A      Well, it sort of depends on what the firearm is that

Laura Andersen, RMR 704-350-7493

JA2091

855

you're looking at.  Generally it all starts with the physical examination of the firearm.  As I mentioned earlier, all firearms by law, by federal law, are required to have certain markings on them.  The gun control act of 1968 required --

MR. FOSTER:  Objection; legal opinion.

THE COURT:  Overruled.

THE WITNESS:  Required that all firearms, at the minimum, be marked with the manufacturer name, the city and state of where the firearm was manufactured.  It has to have a serial number on it if it was manufactured after 1968.

And in addition to that, if the firearm was manufactured in a foreign country, it has to have the company that imported the firearm into the United States.

So that would be the first step to take in determining interstate nexus, would be to conduct the physical examination of the firearm.

Q    Okay.  And then there's further procedures after that?

A    If necessary.  We do have a series of publications that are available to us, reference materials that are available to the general public that give information on where firearms are manufactured, and the history and the origin of firearms.

And then introduced into that finally, the agents that practice in the interstate nexus community, if you will, we

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 212 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 62 of 102
JA2092

856

have an internal database that's only available to those agents. There's maybe about 200 of us within the bureau that practice, regularly give interstate nexus determinations.

And that research is compiled over years and years of agents who have done this type of activity, and based upon what they learn about firearms through contacts with manufacturers, through federal firearms licensees, they put and document those conversations in this database. And we have access to that and we share information with each other as we, you know, go through the process of examining firearms.

Q    And have you testified as an expert before in your capacity to determine the interstate nexus of certain firearms?

A    Yes, sir I have.

Q    And has that been on more than one occasion?

A    If my documentation is correct, today will be the 13th time I've testified in federal court.

MR. NAZZARO:  Your Honor, at this time I move special agent as a firearm expert in his knowledge of the interstate nexus.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  He will be allowed to offer an opinion

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 213 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/17   Page 63 of 102
**JA2093**

857

in that area.

Q    (By Mr. Nazzaro) I would like to show you what's been previously marked as Governments 212a.  Are you able to recognize that exhibit?

A    Yes, sir.

Q    And how are you able to recognize it?

A    I completed a report on my examination of this firearm. I actually physically examined this firearm on August the 14th of 2009.  It is the same make, model and serial number that is indicated in my report, and of the handwritten notes that I took when I physically examined the firearm.

Q    And does that item meet the definition of a firearm?

A    It does.

Q    And had you made -- do you have an opinion or determination of whether or not that firearm traveled or affected any interstate commerce in this case?

A    I do.

Q    And could you please tell us what that opinion is and explain it?

A    Sure.  Based upon my research, this is a Ruger P 90. It's a .45 caliber semi-automatic pistol.  It's manufactured by Stern Ruger, Incorporated.  And this particular firearm was manufactured in Prescott, Arizona.

          MR. NAZZARO:  No further questions.

          THE COURT:  Any cross?

                    Laura Andersen, RMR 704-350-7493

**JA2094**

858

CROSS-EXAMINATION BY MR. FOSTER:

Q    Agent Cheramie, what's the serial number on the firearm that you have there, Exhibit 212a?

A    According to the sticker, Mr. Foster, it's Exhibit 212a.  The serial number is 662-20928.

MR. FOSTER:  I have no further questions.

THE COURT:  You may step down, be excused.

Call your next witness.

THE WITNESS:  Thank you, Judge.

MR. NAZZARO:  Jose Romero.

THEREUPON, JOSE ROMERO, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning.  Could you please state your name, sir.

A    Jose Romero.

Q    And how are you employed, Mr. Romero?

A    I'm a senior special agent with Immigration and Customs Enforcement.

Q    What is Immigrations, Customs Enforcement?

A    It falls under the Department of Homeland Security.

Q    What type of duties do you have with Immigration, Customs Enforcement?

A    I enforce the immigration and customs laws of the United States.

Q    And how long have you been doing that type of work, Special Agent?

Laura Andersen, RMR 704-350-7493

**JA2095**

859

A    About 13 years.

Q    Now I want to ask you something about Homeland Security, that's the agency that you're a part of; is that right?

A    Yes.

Q    Do they typically maintain records referred to as A-files?

A    Yes.

Q    And what is an A-file?

A    It's a file created on immigrants or subjects that are encountered while we enforce immigration laws.  It's a file that we open up on foreign nationals, or if they nationalize, we'll have a file on them as well.

Q    And those records, are they business records of the Department of Homeland Security, your agency?

A    Yes.

Q    Is it the practice of your agency to keep those records in the regular course of their business?

A    Yes.

Q    And do they maintain the records so you can review them periodically?

A    Yes.

Q    I want to direct your attention to a person known as Manuel De Jesus Ayala; do you know that name?

A    Yes, I do.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 216 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 66 of 102
**JA2096**

860

Q    How do you know that name?

A    I processed him for deportation in 2005.

Q    What were the circumstances you processed him for deportation?

A    I was notified that he was being released from the Mecklenburg County jail on trafficking of a firearm --

MR. BRYSON:  Objection.

THE COURT:  Sustained.

Q.    (By Mr. Nazzaro) When you say you processed him, was he ultimately deported?

A    Yes.

Q    Were you able to determine through your investigation and the A-file where he was from?

A    Yes.

Q    And where was that?

A    El Salvador.

Q    And was he here legally or illegally?

A    Illegally.

Q    I would like to show you what's been previously marked as 139.  It's been previously admitted into evidence, do you recognize 139?

A    Yes, I do.

Q    How do you recognize it?

A    I took that photograph when I processed him.

Q    And that's the person known as Chacua?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 217 of 510
Case 3:08-cr-00134-RJC   Document 505   Filed 01/30/11   Page 67 of 102

JA2097

861

A    Yes.

Q    And I refer to him also as Mr. Ayala?

A    Yes.

Q    Like to show you 140 -- 140, do you recognize 140?

A    Yes.

Q    How are you able to recognize 140?

A    I also took that photographs.

        MR. NAZZARO:  Your Honor, I move 140, ask it be published.

        THE COURT:  Any objection?

        DEFENSE COUNSEL:  (No response.)

        Let it be admitted and published.

(Government Exhibit 140 was received into evidence.)

Q.   (By Mr. Nazzaro) What's depicted in 140?  Who is that?

A    That's Chacua, again, Manuel De Jesus Ayala.

Q    Like to show you 140a.  Do you recognize 140a?

A    Yes, I do.

Q    How do you recognize 140a?

A    I also took that photograph of Chacua.

        MR. NAZZARO:  I would move 140a.

        THE COURT:  Let it be admitted.

(Government Exhibit 140a was received into evidence.)

Q.   (By Mr. Nazzaro) And 141, do you recognize 141?

A    Yes, I do.

Q    And how do you recognize 141?

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 218 of 510
Case 3:08-cr-00134-RJC   Document 50-5   Filed 01/30/11   Page 68 of 102
**JA2098**

862

A    I took that photograph when I processed Chacua.

MR. NAZZARO:  Move 141.

THE COURT:  Let it be admitted.

(Government Exhibit 141 was received into evidence.)

Q.   (By Mr. Nazzaro) Now, I would like to also ask you about Alejandro Umana.  Do you know who that is?

A    I do.

Q    Is he here in the courtroom today?

A    Yes.

Q    Could you please identify him?

A    He's facing me wearing a stripe, black and white shirt, and wearing an ear piece on his right ear.

MR. NAZZARO:  The record can so reflect, Your Honor.

THE COURT:  It will.

Q.   (By Mr. Nazzaro) Did you have an opportunity in this investigation to review the A-file of his status here in the United States?

A    Yes.

Q    What was the result of that review?

A    He was interviewed by an immigration enforcement agent in Guilford County.  He admitted to being illegally in the country, and he claimed he was a citizen of El Salvador.

Q    So he has no legal status in this country?

A    Negative, no.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 219 of 510
Case 3:08-cr-00134-RJC   Document 1050   Filed 01/30/11   Page 63 of 102

JA2099

863

Q    Do your records reflect his date of birth at all?

A    11/25 of 1984.

MR. NAZZARO:  No further questions of Special Agent Romero.

MR. FOSTER:  No questions.

THE COURT:  You may step down, be excused.

THE WITNESS:  Thank you.

THE COURT:  Members of the Jury, we'll take our morning break at this time.  Don't talk about the case, keep an open mind and we'll see you at 11:30.

(The jury was escorted from the courtroom.)

MR. FOSTER:  Can we take up one matter?

THE COURT:  Yes.

MR. BRYSON:  Out of an abundance of caution, we -- looking down the road where we might be, we have scheduling concerns about the way things might proceed should we go through a second phase.  And I don't know if you want to -- when would be the appropriate time for us to address that to the Court.

THE COURT:  Okay.  What's the forecast on how much more time.

MS. ROSE:  Of when the Government will finish its presentation of evidence, Your Honor?

THE COURT:  Um-hmm.

MS. ROSE:  We're moving pretty rapidly,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 220 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 74 of 102
JA2100

864

potentially by the end of this day or tomorrow.

THE COURT: All right. And so, doesn't look like we'll get to a -- if there is a next phase, doesn't look like that will happen this week, so we will go over into next week.

MR. BRYSON: Let me be more specific.

Going into a penalty phase is not going to be an issue or concern for us in terms of addressing the government's case of aggravation, subject to the Court's ruling on various issues.

Our concern is, when we get to our presentation of mitigation, we have some witnesses traveling from El Salvador.

THE COURT: Okay.

MR. NAZZARO: It's going to be our request that the Court might consider at the completion of the Government's case in aggravation, that the Court might grant us, maybe a couple of days.

THE COURT: I'll tell you what. Why don't we talk about that. We'll probably will have a charge conference -- in light of the government's indications, we'll probably have a charge conference early in the morning. Let's take that up at the charge conference.

MR. BRYSON: Okay.

THE COURT: All right. Stand in recess until

Laura Andersen, RMR 704-350-7493

**JA2101**

865

11:30.

(A brief recess was taken in the proceedings.)

THE COURT:  Ready for the jury?

MS. ROSE:  Yes.

(The jury was returned to the courtroom.)

THE COURT:  Call your next witness.

MR. NAZZARO:  Yes, Your Honor.  Alexander Granados.  We ask for use of interpreters for this witness.

THEREUPON, ALEXANDER GRANADOS, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q    Good morning.  Would you please state your name, sir?

A    Alexander Granados.

Q    And what is your age Mr. Granados?

A    Twenty-eight.

Q    And where were you born?

A    In El Salvador.

Q    Now, Mr. Granados, you have entered into a Plea Agreement with the United States for charges involving the MS 13?

A    Yes.

Q    And those charges involve your role in a conspiracy involving MS 13?

A    Yes.

Q    And you were represented by an attorney in that matter?

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 222 of 510
Case 3:08-cr-00134-RJC   Document 1140   Filed 01/30/11   Page 222 of 102
JA2102

866

A    Yes.

Q    And do you understand -- what is your understanding of the agreement with respect to testifying in court?

A    That I was going to testify.

Q    And have you also -- have you also -- been indicated to you that you would be put in the Witness Protection Program?

A    Yes.

Q    And you're currently in custody; is that right?

A    Yes.

Q    Is it your understanding that with respect to your protection, you would be protected while you're in jail?

A    Yes.

Q    And you're currently in that capacity in custody; is that correct?

A    Yes.

Q    Now, you mentioned you were born in El Salvador, where were you born?

A    In La Union.

Q    How long did you live in El Salvador?

A    About 14 years.

Q    Did you go to school while you were in El Salvador?

A    Yes.

Q    And after those 14 years, where did you go?

A    I came here to the United States.

Q    And how did you get to the United States, if you

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 223 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 73 of 102
**JA2103**

867

recall?

A    By bus.

Q    Did you come legally or illegally at the time?

A    Illegally.

Q    And where did you live when you first came to the United States?

A    I arrived in Indianapolis, then I went to Virginia and then finally to Boston.

Q    And how long did you live in Boston?

A    Approximately eight years.

Q    Did you live with any family members in Boston or did you live by yourself?

A    With my family.

Q    And did you become involved with the MS 13 or Mara Salvatrucha while you were in Boston?

A    Yes, correct.

Q    Could you tell the jury how you first became involved with the MS 13?

A    It was in a park where the people from the gang were hanging out.  And there is when I -- where I started relating to them.  They started to smoke drugs.  And I started smoking with them.  And I started hanging out with them, and that's how I, you know, got involved with the gang.

Q    Do you remember how old you were at the time?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 224 of 510
Case 3:08-cr-00134-RJC   Document 1440   Filed 01/30/11   Page 24 of 102
JA2104

868

A    About 16 or 17 years old.

Q    And did you become a member of a particular clique in the Boston area?

A    Yes.  Of the EDLS -- EVLS (sic.)

Q    What does that stand for, what's the name of that?

A    East Boston Locale Salvatruchas.

Q    And what type of things did you do in Boston with the MS 13?

MR. BRYSON:  Object.

THE COURT:  Hang on a second.

MR. BRYSON:  Object.

THE COURT:  Basis.

MR. BRYSON:  Outside the scope.

THE COURT:  Overruled.

THE WITNESS:  We had meetings and --

INTERPRETER:  The witness just used a term that I'm -- that the interpreter is unfamiliar with and would like a clarification.

THE COURT:  Okay.

THE WITNESS:  We confronted rivals from other big gangs.  The Blow Cribs, 18th Street.

Q.   (By Mr. Nazzaro) At the time that you joined, did you have a gang name that was used?

A    Yes.  Gorilon.

Q    And how did you get that name?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 225 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 73 of 102
**JA2105**

869

A     When we smoked marijuana together, basically what I would do is climb on trees and that's what gave me that name.

Q     Did the other members of your clique have different nicknames also?

A     Yes, they did.

Q     Do you have a tattoo?

A     Yes.

Q     What type of tattoo do you have?

A     I have two clowns.

Q     And what is the significance of the two clowns?

A     Laugh now and cry later.

Q     And while you were a member of the MS 13 in Boston, did you get in trouble with law enforcement on different occasions?

A     Yes.

Q     What type of things were you in trouble with law enforcement?

A     Car theft, muggings, drugs, street fights.

Q     And at some point after your problems with law enforcement, were you deported back to El Salvador?

A     Yes, that is so.

Q     And do you remember when that occurred, approximately?

A     It was approximately in 2004.

Q     Were you deported with any other MS 13 members?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 226 of 510
Case 3:08-cr-00134-RJC   Document 1140   Filed 01/30/11   Page 76 of 102
JA2106

870

A    Yes, with one additional member.

Q    And who was that?

A    Chockie.

Q    That's a nickname?

A    Yes.

Q    And when you returned to El Salvador, were you greeted by any members of the MS 13 in El Salvador?

A    Yes, that is so.

Q    And what happened when you returned to El Salvador?

A    There they have a lot of programs that help you.  The same members as the gang that help you get a hold of weapons for self-protection from rivals.

Q    And did you -- were you offered those programs when you got back to El Salvador?

A    Yes.  They did offer it, but I didn't need it because I had family there also.

Q    Okay.  Other than guns, did they offer you anything else?

A    Those who don't have families, also they get help with housing.

Q    And what types of things, when you returned to El Salvador, was the MS 13 doing there?

A    Extortions, killings.

Q    Did they have any contact with cliques in the United States?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 227 of 510
Case 3:08-cr-00134-RJC   Document 1446   Filed 01/30/11   Page 227 of 102
JA2107

871

A    Yes.

Q    Now, while you were in El Salvador, did you commit any crimes with the MS 13?

A    No.

Q    Did they ask you to commit any crimes?

A    Yes.

Q    What did they ask you to do?

A    That we should go and kill somebody down there.

Q    And did you do it?

A    I did not personally, but the others did.

Q    And how long did you stay in El Salvador when you returned in 2004?

A    Approximately one year.

Q    And after that one year, did you decide to return to the United States?

A    Yes, that is so.

Q    And did you discuss that with other MS 13 members?

A    Yes.

Q    And who were they?

A    Chockie.

INTERPRETER:  The witness said a name that did I not -- that the interpreter did not catch.

THE WITNESS:  And Boser of my clique.

Q.   (By Mr. Nazzaro) Those are two different people, right?

A    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 228 of 510
Case 3:08-cr-00134-RJC   Document 1440   Filed 01/30/11   Page 78 of 102
JA2108

872

Q    And together with those people, did you return to the United States?

A    We were coming together, but the other two got arrested on our way back.

Q    Were there any MS 13 contacts that helped you return in your initial try?

A    When I was returning with two other people, they had the contacts with members of MS 13 in Mexico to come in.

Q    Okay.  And where were those contacts to help -- where were those contacts at in Mexico?

A    All over Mexico.

Q    And you said that something happened on your way back, what happened?

A    When we were coming back, the anti-gang group of the police arrested them.

Q    And where was that?

A    It was in Mexico.

Q    Okay.  And did you get arrested at the time?

A    No, they did not arrest me.  They arrested the other two people.

Q    And why didn't you get arrested, do you know?

A    Yes.  Because they had the two letters and that's why they got arrested.

Q    And after that happened, did you make it back to the United States?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 229 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 73 of 102
JA2109

873

A    Yes.

Q    You mentioned two letters; what two letters did they have, the other people?

A    M-S.

Q    And how did you get back in the United States?

A    I started contacting other people on the way, and that's how I was able to come back to the United States.

Q    And once you got back into the United States, where did you go?

A    Here to Charlotte.

Q    Do you remember approximately when that was that you arrived in Charlotte?

A    At the end of the last month of 2006.

Q    And when you arrived in Charlotte, did you become familiar with some of the MS 13 members in Charlotte?

A    Yes.

Q    And did they have -- were the particular cliques in Charlotte at the time?

A    Yes.

Q    And do you remember any of the names of those cliques?

        INTERPRETER:  The interpreter is going to ask him -- ask the witness to mention them one by one.

A    Charlotte Locale Salvatruchas, Centrales, Coronados.

Q    Did you start associating yourself with MS 13 members from those particular cliques?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 230 of 510
Case 3:08-cr-00134-RJC   Document 1142   Filed 01/30/11   Page 30 of 102
JA2110

874

A    Yes.

Q    And what type of activities were those MS 13 members doing in Charlotte?

A    They purchased weapons.  They faced off rivals.  They also have meetings to decide what they're going to do.

Q    And were there any clubs that the MS 13 used to frequent?

A    Yes, El Vaquero.

Q    Was there any others that you remember?

A    Mi Cabana, Acapulco, La Iguana.

Q    What type of activities did the MS 13 do at those clubs?

A    They committed extortion.

Q    And what do you mean by extortion, who did they extort?

A    They charged rent to drug traffickers or drug sellers.

Q    What do you mean by rent?

A    All those who sold drugs, had to pay money to the MS 13.

Q    Do you remember meeting a MS 13 member by the name of Smoke, Smokey?

        INTERPRETER:  Excuse me.  Could you repeat your question?

Q.   (By Mr. Nazzaro) Do you remember meeting an MS 13 member by the name of Smoke or Smokey?

A    Yes.

                    Laura Andersen, RMR 704-350-7493

**JA2111**

875

Q     How about the name Pelon, do you remember that?

A     Yes.

Q     And were they involved in some of those activities you just described about charging rent?

A     Yes.

Q     And I think you also mentioned rivals.  Who are some of the rival gang members in Charlotte area at the time?

A     Surenos 13, Malditoes 13, 18th Street and 42.

Q     At some point during the time you were in Charlotte, were you ever contacted by a person named Chacua, an MS 13 member?

A     Yes.

Q     Now, who is Chacua, do you know who he is?

A     Yes.  He's a member of the gang who is locked up in prison in El Salvador.

Q     Okay.  Had you ever met him before?

A     No.  I had just spoken with him on the phone.

Q     And what was the conversation that you had with him when he contacted you?

A     How the gang was run here in Charlotte.

Q     Okay.  And what do you mean how it was run.  Was he concerned or did he ask about how it was run?

A     Yes, he was worried.  He wanted to know what was going on.  And he wanted to put more rules.

Q     And at some point during your conversations with

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 232 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 32 of 102

JA2112

876

Chacua, did he discuss with you whether any other MS 13 members from outside of Charlotte would come in to Charlotte?

A    Yes.   That was on another occasion when he called me and he told me some other members of the gang would be arriving in Charlotte.

Q    Okay.   Did he tell you why they would be arriving in Charlotte?

A    Yes.   To train them to see how they were running the gang over here and to make things stricter.

Q    And did he tell you from where they would be arriving or any other information about these individuals?

A    Yes.   He said that they were gonna be arriving from Greensboro.

Q    Okay.   And did you eventually find out who those individuals were?

A    Yes.

Q    And who were they?

A    Stiler and Wizard.

Q    And the person you refer to as Wizard, is he here in the courtroom today?

A    Yes.

Q    Could you please identify him for the record in the court?

A    Yes.   He has a striped shirt.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 233 of 510
Case 3:08-cr-00134-RJC   Document 1442   Filed 01/30/11   Page 83 of 102
JA2113

877

Q     And where is he seated?

A     At the edge of the room next to the two gentlemen.

MR. NAZZARO:  If the record would so reflect.

THE COURT:  It will.

Q.    (By Mr. Nazzaro) Now, did you also meet the person you identified as Stiler?

A     Yes.

Q     And did you meet them together at some point?

A     Yes.  They came together to El Vaquero that same night.

Q     And on that occasion, did you have a discussion with Wizard on that night?

A     Yes.

Q     Did he identify himself as an MS 13 member?

A     Yes, that is so.

Q     And what -- did he indicate what clique or what part of the MS 13 he was from?

A     Yes.  He told me that he was from Novena or Ninth.  And I told him that I was from EBLS.

Q     And did you also meet Stiler that particular night?

A     Yes.

Q     And did he indicate to you where he was from or which clique he was from?

A     Yes.  He told me that he was from California, but that he, at that time, was in Greensboro, and that he belonged to the Normandie.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/28/17  Page 234 of 510
Case 3:08-cr-00134-RJC  Document 1142  Filed 01/30/11  Page 84 of 102

**JA2114**

878

Q    And do you know an individual by the name of Chino?

A    Yes.

Q    Is he an MS 13 member?

A    Yes.

Q    And did you meet him at the El Vaquero or anywhere else?

A    I had met him previously.

Q    Okay.  And what clique is he from, if you know?

A    Fulton.

Q    Did you -- do you recall that time you met Wizard at the El Vaquero, did you also see Chino that night or the next or sometime after that?

A    In another location.

Q    Was it after that night in the El Vaquero?

A    Yes.

Q    And did you ever have a discussion with Chino about a shooting that occurred in Greensboro?

A    Yes.

Q    And what did Chino say about the shooting?

A    That at a restaurant, Wizard had killed two people there.

Q    Did he say anything else about the incident?

A    Yes.  That they were sitting at another table drinking, and that in one way or another they offended the gang, and that he stood up and killed him.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 90-5  Filed 03/28/17  Page 235 of 510
Case 3:08-cr-00134-RJC  Document 1144  Filed 01/30/11  Page 83 of 102
**JA2115**

879

Q    Okay.  What do you mean, offended?  What does that mean, offended the gang?

MR. BRYSON:  Object.

THE COURT:  I'll sustain the objection as to form.

Q.   (By Mr. Nazzaro) Is respect important to the Mara Salvatrucha?

A    Yes.

Q    How important is it?

A    Too important.

Q    What do you mean by that?

MR. BRYSON:  Object.

THE COURT:  Overruled.

THE WITNESS:  That if somebody disrespects the gang, the gang is sort of like a God.

Q.   (By Mr. Nazzaro) Go on.

MR. BRYSON:  Object.

THE COURT:  Overruled.

Q.   (By Mr. Nazzaro) And he was disrespected?

MR. BRYSON:  Object.  Just commenting on something, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  And he was disrespected, and so he pulled out his weapon and started shooting at him.

INTERPRETER:  We would like to change interpreters.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 236 of 510
Case 3:08-cr-00134-RJC    Document 1142    Filed 01/30/11    Page 86 of 102
JA2116

880

MR. NAZZARO:  Yes.

THE COURT:  You may.

(Pause.)

Q.    (By Mr. Nazzaro) Now, after the first occasion when you saw the defendant, Wizard, at the El Vaquero, did you see him after that time?

A    Yes, one more time.

Q    And was that after that evening?

A    Yes, afterwards.

Q    And where was that at?

A    In the apartments where I was living.

Q    Where were you living at the time?

A    Here in Charlotte.

Q    And whose apartment were you living in?

A    At Drogo's.

Q    Who's Drogo?

A    He's another gang member.

Q    What's the nature of that visit when you saw Wizard on that occasion?

A    That he came to visit Drogo and he found me there.  And he asked me how I was doing.  And he asked when we were gonna hang out, and when we were gonna chill together.

Q    And do you know where he was staying at the time?

A    No, not exactly.

Q    He wasn't staying with you at Drogo's apartment though?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 237 of 510
Case 3:08-cr-00134-RJC   Document 1442   Filed 01/30/11   Page 87 of 102
JA2117

881

A     No.

Q     Did you see him after that occasion?

A     No.

Q     Now Mr. Granados, I would like to direct your attention now to January 5th, 2008.  Did you have an occasion to attend an MS 13 meeting in Greensboro on that day?

A     Yes.

Q     And could you tell us who was present at that meeting?

A     There was Stiler, Psicopata, Chicago, I was there, Extrano (phonetic), and some other gang members belonging to the Mara.

Q     And the Stiler you referred to, is he the same Stiler you saw together with Wizard, the defendant, that you testified previously?

A     Yes.

Q     And was there another person at the meeting with a similar name to Stiler?

A     Yes.

Q     Who was doing most of the talking at the meeting, which -- which Stiler?

A     The one that was in charge of the meeting, Normandie.

Q     And that's the one you saw was with Wizard at the El Vaquero?

A     Exactly.

                MR. NAZZARO:  Your Honor, at this time I would
                       Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 238 of 510
Case 3:08-cr-00134-RJC  Document 1442  Filed 01/30/11  Page 88 of 102
JA2118

882

publish 146b.

THE COURT:  146b?

MR. NAZZARO:  Yes, Your Honor.  That's the merged transcript that's being entered into evidence.

THE COURT:  Very well.  You may publish at this time.

(Audio playing.)

(Audio concluded.)

Q    (By Mr. Nazzaro) Mr. Granados, that portion that we played, was that the entire meeting or just a portion of it?

A    It's only a portion, not all of it.

Q    Okay.  And just, if you could speak up just a little bit.

At the time -- I mean, you heard a recording, but at the time did you know the meeting was being recorded?

A    No, I didn't know.

Q    And you heard some -- you heard some references to Wizard from the Novenas in that meeting, who was being referred to in that meeting?

A    The Wizard who had been locked up.  He had been locked up.

Q    Is that the one you identified in court today?

A    Yes.

Q    Mentions several times about a light.  Did you see that?  What does it mean?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 239 of 510
Case 3:08-cr-00134-RJC   Document 1442   Filed 01/30/11   Page 89 of 102
JA2119

883

A    Yes.  The green light they put on Nene.

Q    What's the green light they put on Nene?

A    Because Nene had been cooperating with the police.

Q    And what does the green light require the MS 13 to do?

A    When there's a green light, that person has to be killed.

Q    Now -- and it's called a green light for another gang member; is that right?

A    Yes.

Q    I would like to show you what's been previously marked as 222.  Are you able to recognize anything from 222?

A    Yes.

Q    And what are you able to recognize?

A    Stiler.

Q    Is that -- does that appear to be a representation of him at the January 5th meeting?

A    Yes.

        MR. NAZZARO:  I would move 222, Your Honor.

        THE COURT:  Any objection?

        MR. BRYSON:  No.

        THE COURT:  Let it be admitted.

(Government Exhibit 222 was received into evidence.)

Q.   (By Mr. Nazzaro) Could you circle or point to where you see Stiler.  On the screen.  Are you able to mark it with your hand?  Try again.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 240 of 510
Case 3:08-cr-00134-RJC   Document 1142   Filed 01/30/11   Page 96 of 102
**JA2120**

884

A      (Witness complies.)

MR. NAZZARO:  Mark that as 222a, Your Honor.

THE COURT:  Admit it as 222a.

(Government Exhibit 222a was received into evidence.)

Q.   (By Mr. Nazzaro) Are you able to recognize anybody else in that photograph or is it too grainy?

A      Yes.  Can I move it?

Q      Yeah.  Move the screen?

A      Yes.  Move -- move it.

Q      Yeah.  To make you see it better?

A      Yes.

Q      Yes.  Yes.  Please.

A      There's my cousin, there's Extrano.

Q      Okay.  Is he in the middle or towards the left as you look at the screen?

A      In the middle.

Q      Are you able to recognize anyone else?

A      No, not there.  Only those two.

Q      And the person you circled as Stiler, is that the same Stiler you saw with Wizard at the El Vaquero?

A      Yes.

Q      Like to show you what's been previously marked as 223. Is that -- from that photo are you able to recognize anybody?

A      Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5   Filed 03/28/17   Page 241 of 510
Case 3:08-cr-00134-RJC  Document 1440   Filed 01/30/11   Page 91 of 102

**JA2121**

885

Q    And does that photo represent some of the people at the meeting on January 5th, 2008?

A    Yes.

MR. NAZZARO:  We move 223, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 223 was received into evidence.)

Q.   (By Mr. Nazzaro) And who, if any, are you able to recognize starting from left to right as you look at the screen, if you know any of those individuals or can identify them from the quality of the photograph?

A    Stiler from Siler.

Q    Say that again please, I'm sorry.

A    He is Stiler from Siler.  He's another Stiler.

Q    Okay.  That was the second Stiler you were referring to, the other Stiler, other than the one you previously identified?

A    Yes.

Q    Okay.  Go ahead.

A    Only that one.  The others are blurry, I can't.

Q    There was also an indication -- a person by the name of Chicago was there, do you recall that?

A    Yes.

Q    And who is Chicago?

                    Laura Andersen, RMR 704-350-7493

**JA2122**

886

A    He's another gang member.

Q    Now, after this meeting which occurred in January of '08, did you have any other conversations with Chacua?

A    Yes.  On that same day when we were coming back from that meeting, he called me on the phone and asked me what my opinion was about the green light that we had -- that had been put on Nene.

Q    And what was the discussion, what did you say?

A    At first I told him, you know, they needed to do whatever they wanted to.

Q    And what happened after that?

A    When we arrived here to Charlotte and a light was put on Nene.

Q    Okay.  And after you got back to Charlotte, what did you do?  Did you stay in Charlotte or did you go somewhere else?

A    Afterwards, some days afterwards I had to leave here.

Q    Okay.  Why did you have to leave?

A    Because I didn't -- I didn't want to commit these crimes any more.

Q    Okay.  And so where did you go?

A    I went to Tennessee at a cousin's of mine.

Q    Okay.  And you said you didn't want to commit the crimes any more, you mean killing Nene and those types of crimes?

                    Laura Andersen, RMR 704-350-7493

**JA2123**

887

A    Yes.

Q    And what did you tell other MS 13 members about why you left the area?

A    That I had ran over somebody, a rival, and that was the reason why I had left.

Q    You can put the screen down.  Okay.  And why did you tell him that?

A    So that they would believe me and that I would have a reason for leaving.

Q    Okay.  Was that story that you just relayed, was that in fact a true story?

A    The story I told them, the reason why I had left; no.

Q    Now, at some point did you return from Tennessee -- did you return to Charlotte from Tennessee?

A    Yes.

Q    And do you recall when that was, approximately?

A    A few months afterwards.

Q    At some point did you ever meet a person by the name of Misterio?

A    Yeah.  He had already told me that he was gonna come, and -- but then I left and when I came back, I saw that -- I saw him there.

Q    Okay.  You saw him where, in Charlotte?

A    Yes.  He came to Charlotte and then we went to his house.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 244 of 510
Case 3:08-cr-00134-RJC   Document 1446   Filed 01/30/11   Page 94 of 102
JA2124

888

Q      Okay.  Now, was he an MS 13 member?

A      Yes.

Q      And why was he in the Charlotte area?

A      He came also to check out the gang, how it was running.

Q      Mr. Granados, did you attend any meetings in which Misterio was present?

A      Yes.

Q      And were these MS 13 meetings?

A      Yes, that is so.

Q      And you said at his house, do you know where he was living at the time?

A      Yes, in South Carolina.

Q      And what was discussed, in general, at those meetings that you attended with Misterio?

A      It was the same thing, of crimes and purchasing weapons.

Q      Okay.  Why did you decide to go back into the meetings.  You said you left to go to Tennessee at some point, but you came back.  Could you tell us about that -- the reason for that?

A      Well, I came back to Charlotte and I started seeing the same people and hanging out with them and that's how it happened.

Q      I want to direct your attention to June 7th, 2008, do you remember that particular day?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 245 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 93 of 102
JA2125

889

A    Yes.

Q    How are you able to remember that day?

A    Because that day is my birthday.

Q    Now, on that particular day, did you attend a meeting with other MS 13 members?

A    Yes, that is so.

Q    And which MS 13 members were present at that meeting?

A    Chicago, Pelon, Peligroso, Misterio, I was present.

Q    Anybody else?

A    El Drogo.

Q    Now, the person you refer to as Chicago, is that the same Chicago who we heard at the January 5th meeting?

A    Yes.

Q    And the person you refer to as Drogo, that was somebody you talked about earlier in your testimony that you were at his apartment one time?

A    Yes.

Q    And I think you also mentioned a Pelon before and his involvement in rent.  Is that the same person we're talking about, same Pelon?

A    Correct.

Q    Okay.  And who is Peligroso; you mentioned him?

A    Another member of the gang.

Q    Now, what was discussed at that meeting?

A    Specifically, the topic was the case of Wizard.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 246 of 510
Case 3:08-cr-00134-RJC   Document 1440   Filed 01/30/11   Page 96 of 102
JA2126

890

Q    And what specifically was discussed?

A    Well, specifically that he had a court date the following week and he sent a message to Misterio so that there won't be somebody speaking out at the court.

Q    And was this -- who was leading the meeting at the time?

A    Misterio.

Q    Okay.  And Misterio then was relating this information that he received from Wizard?

A    Yes.

Q    Okay.  And so what specifically was discussed as what would have to be done about this issue?

A    So that the witness would not appear in court, he would have to be killed.

Q    And what was the -- what was the plan?  Was there a plan that was made at this particular meeting that you attended?

A    Yes.  They made a plan that mission had to be carried out by Pelon, Peligroso and Chicago.

Q    And were you -- did you participate in that discussion at the meeting?

A    Yes.  They wanted to send me but I declined.  I refused.

Q    Did the others volunteer?

A    Well, Misterio asked, well who's going to go.  And he

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 247 of 510
Case 3:08-cr-00134-RJC    Document 1142    Filed 01/30/11    Page 97 of 102
JA2127

was the one who chose who was gonna get to go.

Q    And do you have any knowledge of whether or not they actually went on this mission at some point after that?

A    Yes.  They met at Pelon's house and decided to go that day.  And I was present at Pelon's house.

Q    That was a different day?

A    Yes.

Q    And so who was there at Pelon's house?

A    Joe, El Drogo, Peligroso, Pelon and Chicago who were the ones who were going to be going.

Q    Was there any discussion about a firearm or weapon that would be brought?

A    Yes.

Q    And what was that discussion?

A    Well, that they had the weapons already.  And they said that they would be going, and I wished them luck.

Q    Do you know what weapons they had, if you remember?

A    I think it was a one, 380 and a 38.

Q    Do you know how they were going to go to Greensboro?

A    Yes.  Another person that was present was going to guide them.

Q    Do you know who that person was?

A    No, not that person.  He was in Greensboro, and he was the one that was gonna take them there.

Q    And do you know how those individuals -- well, let me

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 248 of 510
Case 3:08-cr-00134-RJC   Document 1144   Filed 01/30/11   Page 98 of 102
JA2128

892

ask you.  Who exactly left to go to Greensboro?

A     Pelon, Chicago, and Peligroso.

Q     Do you know what type of vehicle they used, if you know?

A     Yes, a Toyota Four Runner.

Q     And whose vehicle was that, if you know?

A     Pinon.

Q     And Pinon is different from Pelon, right?

A     Yes.

Q     Okay.  And who is Pinon?

A     Another member of the gang.

Q     And so they used his vehicle, is what you're saying?

A     Yes.

Q     And you didn't go; is that right?

A     No.

Q     Did you later receive any contact from them about what happened in Greensboro?

A     Yes.  Peligroso called me and told me that he had been arrested.

Q     Okay.  Who called you, I'm sorry?

        INTERPRETER:  Peligroso.

Q.    (By Mr. Nazzaro) And did he call anybody else, if you know, or did he only call you?

A     They also called Misterio.

Q     Okay.  And after you received this call and Misterio

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 249 of 510
Case 3:08-cr-00134-RJC   Document 1142   Filed 01/30/11   Page 93 of 102

**JA2129**

893

received a call, did you have any discussion with Misterio about what to do next?

A    Yes.  He wanted us to pay the bond to get him out of jail.

Q    And who is that Peligroso?  Peligroso wanted to pay the bond?

A    Nobody paid the bond because nobody had money.

Q    So what did you decide to do?

A    What they did is, they put some money at the commissary so they could eat.

Q    Why didn't they -- why didn't they bail him out?

A    Well, because he had probation, and if they got him out, he was going to -- he probably would have to go in again.

Q    How about the others that were in custody, was there any discussion about getting them out?

          INTERPRETER:  May I ask him to repeat his answer?

          MR. NAZZARO:  Yes.

          THE WITNESS:  Well, if they paid their bond, they were going to be deported.

Q.    (By Mr. Nazzaro) Now, this -- do you remember how much money was put towards the commissary as you said?

A    They put in about 400 or $200, something like that.

Q    And how was that money raised?

A    They had to go and rob some cars in order to be able to

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 250 of 510
Case 3:08-cr-00134-RJC   Document 5945   Filed 01/30/11   Page 100 of 102
JA2130

894

get that money and put it in the commissary.

Q    Like to show you what's been previously submitted into evidence, 224.  Are you able to recognize 224?

A    Yes.

Q    And what's 224?

A    Pelon.

Q    Okay.  And that's the Pelon you've been referring to in your testimony?

A    Yes.

Q    Like to show you 225, already in evidence.  Do you recognize 225?

A    Yes.

Q    And how are you able to recognize 225?

A    Chicago.

        MR. NAZZARO:  Your Honor, I would move 225, ask it be published.

        THE COURT:  Let it be admitted.  You can publish.

(Government Exhibit 225 was received into evidence.)

Q.   (By Mr. Nazzaro) Is that the Chicago you've been referring to?

A    Yes.

Q    Now, after this event occurred, at some point --

        THE COURT:  Mr. Nazzaro, before you go much further, how much more do you have?

        MR. NAZZARO:  Your Honor, towards the end here.  I

                Laura Andersen, RMR 704-350-7493

**JA2131**

895

would say about 10 minutes --

THE COURT:  Ten minutes?

MR. NAZZARO:  Ten or 15 minutes.

THE COURT:  I think we'll take a break.

Members of the Jury, we'll take our lunch break at this time.  Don't talk about the case, keep an open mind, and we'll see you back in court at 2:00.

(The jury was escorted from the courtroom.)

(Lunch recess.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.

Dated this the 15th day of April, 2010.


                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 252 of 510
Case 3:08-cr-00134-RJC   Document 59-3   Filed 01/30/11   Page 102 of 102
JA2132

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA          )    DOCKET NO. 3:08-CR-134-2
                                  )
        vs.                       )    VOLUME IV-B
                                  )    AFTERNOON SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA,  )
                                  )
        Defendant.                )
_____ )

TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 15, 2010

APPEARANCES:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    Assistant United States Attorney
    100 Otis Street
    Asheville, North Carolina 28801

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK P. FOSTER
    Law Offices of Mark Foster, PC
    1011 East Morehead Street, Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    Wyatt Early Harris & Wheeler, LLP
    P.O. Box 2086
    High Point, North Carolina 27261


CHERYL A. NUCCIO, RMR-CRR
United States District Court Reporter
Charlotte, North Carolina

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 253 of 510
Case 3:08-cr-00134-RJC   Document 1653   Filed 10/04/10   Page 1 of 145

JA2133

I N D E X

                                                              PAGE

GOVERNMENT'S WITNESSES

ALEXANDER GRANADOS
        Direct Examination by Mr. Nazzaro.............        899
        Cross Examination by Mr. Bryson...............        901
        Redirect Examination by Mr. Nazzaro...........        921

MARICRUZ MEDINA
        Direct Examination by Ms. Rose................        922

JASMINE DINWIDDIE
        Direct Examination by Ms. Rose................        929

CHRIS TYNDALL
        Direct Examination by Ms. Rose................        936
        Cross Examination by Mr. Bryson...............        953

MARK YOUNG
        Direct Examination by Mr.Nazzaro..............        954

SCOTT CLARKSON
        Direct Examination by Ms. Rose................        971
        Cross Examination by Mr. Foster...............        976
        Redirect Examination by Ms. Rose..............        976
        Recross Examination by Mr. Foster.............        978

JEFFREY TAYLOR
        Direct Examination by Ms. Rose................        979
        Cross Examination by Mr. Foster...............       1010
        Redirect Examination by Ms. Rose..............       1017

DENISE DANIELS
        Direct Examination by Ms. Rose................       1018
        Cross Examination by Mr. Foster...............       1020

WILLIAM HASTINGS
        Direct Examination by Ms. Rose................       1022
        Cross Examination by Mr. Foster...............       1024

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 254 of 510
Case 3:08-cr-00134-RJC  Document 152  Filed 10/04/10  Page 2 of 145

JA2134

I N D E X   O F   E X H I B I T S

                                      OFFERED  RECEIVED

GOVERNMENT'S EXHIBITS

No. 157A.................................   901      901
No. 226..................................   899      899
No. 228..................................   950      958
No. 230..................................   958      958
No. 231..................................   957      957

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 255 of 510
Case 3:08-cr-00134-RJC  Document 505-2  Filed 10/04/10  Page 3 of 145

JA2135

ALEXANDER GRANADOS – DIRECT

THURSDAY AFTERNOON, APRIL 15, 2010

THE COURT:  Ready for the jury?

MS. ROSE:  Yes.

THE COURT:  Call the jury.

(Jury entered the courtroom.)

THE COURT:  Mr. Nazzaro, you may continue.

MR. NAZZARO:  Yes, sir.

ALEXANDER GRANADOS

DIRECT EXAMINATION (Cont'd.)

BY MR. NAZZARO:

Q.   Mr. Granados, I'd like to show you what's been previously marked as Government 226.  Are you able to recognize 226?

A.   (Interpreter:) Yes.

Q.   And who is depicted in that picture?

A.   (Interpreter:) Peligroso.

MR. NAZZARO:  Your Honor, I move 226.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 226 was received into evidence.)

Q.   Is that the same Peligroso you've been talking about in your testimony?

A.   (Interpreter:) Yes.

Q.   Now, Mr. Granados, you were arrested in this case, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 256 of 510
Case 3:08-cr-00134-RJC   Document 505-2   Filed 10/04/10   Page 4 of 145

JA2136

ALEXANDER GRANADOS – DIRECT

A.   (Interpreter:) Yes.

Q.   And at some point after that, you decided to cooperate.

A.   (Interpreter:) Yes.

Q.   And you've been in custody since your arrest.

A.   (Interpreter:) Yes.

Q.   And while you were in custody, did you receive any communication from Wizard?

A.   (Interpreter:) Yes, a letter.

Q.   And at that time were you cooperating or not cooperating?

A.   (Interpreter:) No.

Q.   I'd like to show you what's been previously marked as Government's Exhibit 157.  Do you see the front of that letter?

A.   (Interpreter:) Yes.

Q.   And do you recognize it?

A.   (Interpreter:) Yes.

Q.   And I'd like to show you the next page of the exhibit. Do you see that part of the exhibit?

A.   (Interpreter:) Yes.

Q.   I think there's one other page.  Do you see that page?

A.   (Interpreter:) Yes.

Q.   And how are you able to recognize that Government 157?

A.   (Interpreter:) This is the letter that Wizard sent me.

Q.   And what did you do with the letter that you received?

A.   (Interpreter:) I gave it to the police.

Cheryl A. Nuccio, RMR–CRR (704)350–7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 257 of 510
Case 3:08-cr-00134-RJC   Document 1265   Filed 10/04/10   Page 5 of 145

JA2137

ALEXANDER GRANADOS – DIRECT

Q.   And was that after you had received it or a later point in time?

A.   (Interpreter:) Later on in time.

MR. NAZZARO:  Your Honor, I would at this time move 157A and ask that it be published.

MR. BRYSON:  Objection.

THE COURT:  Basis?

MR. BRYSON:  Lack of foundation.

MR. NAZZARO:  We've called previous witnesses.

THE COURT:  I'll overrule the objection.

MR. NAZZARO:  This is 157A, Your Honor.  Move to publish it.

THE COURT:  You may.

(Government's Exhibit No. 157A was received into evidence.)

Q.   Mr. Granados, the letters -- the letter referred to two letters in our heart.  How did you interpret that?

MR. BRYSON:  Object.

THE COURT:  Overruled.

A.   (Interpreter:) That we really have them inside of our hearts.

Q.   And what -- what do you have in your heart?

A.   (Interpreter:) The two letters, the L -- no, the M and the L -- and the S, which is the gang.

MR. NAZZARO:  No further questions, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 258 of 510
Case 3:08-cr-00134-RJC   Document 545   Filed 10/04/10   Page 6 of 145
JA2138

ALEXANDER GRANADOS – CROSS

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS EXAMINATION

BY MR. BRYSON:

Q.    You joined MS in Boston, correct?

A.    (Interpreter:) Yes.

Q.    And MS was attractive to you at that time.

A.    (Interpreter:) That is so.

Q.    MS members had marijuana.

A.    (Interpreter:) Yes.

Q.    MS members had cars.

A.    (Interpreter:) Yes.

Q.    MS members had girls.

A.    (Interpreter:) Yes.

Q.    And you wanted to be part of that.

A.    (Interpreter:) Well, yes.

Q.    They gave you a name.

A.    (Interpreter:) After a while that I had been hanging out with them.

Q.    Okay.  Your name is -- was Gorilon.

A.    (Interpreter:) Gorilon.

Q.    That means big gorilla.

A.    (Interpreter:) Yes.

Q.    When you went back to El Salvador, you met with MS people there.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 259 of 510
Case 3:08-cr-00134-RJC  Document 505  Filed 10/04/10  Page 259 of 145
JA2139

ALEXANDER GRANADOS – CROSS

A.   (Interpreter:) Yes.

Q.   They helped people that didn't have families.

A.   (Interpreter:) Yes.

Q.   MS fulfilled the role of a family for some MS members.

A.   (Interpreter:) Yes, of the gang.

Q.   You were arrested in this case on June 24th, 2008, correct?

A.   (Interpreter:) Yes.

Q.   They took you to the police station.

A.   (Interpreter:) Yes.

Q.   They read you your rights.

A.   (Interpreter:) Yes, in court.

Q.   They read them to you at the police station.

A.   (Interpreter:) Yes.

Q.   They asked you to speak with them.

A.   (Interpreter:) Yes.

Q.   You agreed to speak with them.

A.   (Interpreter:) No.

Q.   You told the police that you were not a member of MS.

A.   (Interpreter:) That is correct.

Q.   You told them that you didn't know anybody involved in MS.

A.   (Interpreter:) Exactly.

Q.   You told them that you never attended an MS meeting.

A.   (Interpreter:) I don't think I told them that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 260 of 510
Case 3:08-cr-00134-RJC   Document 915   Filed 10/04/10   Page 8 of 145

JA2140

ALEXANDER GRANADOS – CROSS

Q.   They showed you 14 photographs of other MS members involved in this case.

A.   (Interpreter:) I don't know how many, but, yes, they did show me photos.

Q.   You told them you didn't recognize any of the photographs.

A.   (Interpreter:) That's correct.

Q.   But now you say you were an MS member.

A.   (Interpreter:) Yes.

Q.   When you talked to the police on June 24th, you lied to them.

A.   (Interpreter:) Well, I wanted to obey the rules of the gang.

Q.   The rules of the gang say you can never deny your membership in MS.

A.   (Interpreter:) Only to the police, yes.

Q.   Your name isn't Alexander Granados, is it?

A.   (Interpreter:) Correct.

Q.   Your name is actually Edgar Alvarez Granados.

A.   (Interpreter:) Edgar Misael Alvarez Granados.

Q.   That's your real name.

A.   (Interpreter:) Yes.

Q.   Alexander Granados is not your real name.

A.   (Interpreter:) No.  That is another name that I use.

Q.   As an MS member, one of the things that you did was sell

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 261 of 510
Case 3:08-cr-00134-RJC   Document 1912   Filed 10/04/10   Page 9 of 145

JA2141

ALEXANDER GRANADOS – CROSS

cocaine.

A.    (Interpreter:) Yes.

Q.    You sold a thousand dollars worth of cocaine every day.

A.    (Interpreter:) No.

Q.    You had half kilos at a time.

A.    (Interpreter:) No.

Q.    Now, after you were arrested, they gave you a lawyer, correct?

A.    (Interpreter:) In court, yes.

Q.    And your lawyer would come see you in the jail.

A.    (Interpreter:) That's correct.

Q.    And that's how you learned about the evidence against you in the case.

A.    (Interpreter:) No.  In my case, yes.

Q.    Okay.  And you learned that they had you on tape attending an MS meeting.

A.    (Interpreter:) Yes.

Q.    And that they had recorded phone calls that you made to other MS members.

A.    (Interpreter:) Yes.

Q.    And so at some point you decided it was best for you to plead guilty.

A.    (Interpreter:) Yes.

Q.    And so your lawyer arranged for you to have a meeting with the police.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 262 of 510
Case 3:08-cr-00134-RJC   Document 32-5   Filed 10/04/10   Page 10 of 45

JA2142

ALEXANDER GRANADOS - CROSS

A.   (Interpreter:) Yes, that's correct.

Q.   And you decided it would be best for you to cooperate with the government.

A.   (Interpreter:) I did not think of -- I did not think that initially, but later on, yes.

Q.   Okay.  Well, in fact, as we already said, when you first met the police, you told them you didn't know anything about MS, right?

A.   (Interpreter:) Yes.

Q.   But then later you decided to cooperate with the government.

A.   (Interpreter:) That's correct.

Q.   In order to cooperate with the government, you had to know something about the case.

A.   (Interpreter:) That's correct.

Q.   And so at this meeting, you had to tell the government everything you knew about MS.

A.   (Interpreter:) Yes, the information that I had.

Q.   Okay.  And the first meeting that you had was in March of 2009.

A.   (Interpreter:) I don't remember.

Q.   If I -- if I showed you -- you remember meeting with the police, correct?

A.   (Interpreter:) I've had many interviews, but I don't remember exactly.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 263 of 510
Case 3:08-cr-00734-RJC   Document 325-7   Filed 10/04/10   Page 46 of 45

JA2143

ALEXANDER GRANADOS - CROSS

Q.   Okay.  Detective Hastings was there, correct?

A.   (Interpreter:) I don't remember.

Q.   Okay.  But anyway, you remember the first meeting that you had with the police.

A.   (Interpreter:) As I told you before, I have had several interviews with them and so I don't remember.

Q.   Okay.  But you remember the first one was a long one, wasn't it?

A.   (Interpreter:) I can't remember.

Q.   All right.  If I showed you a copy of the report, would it help you remember the meeting?

A.   (Interpreter:) Maybe.

Q.   All right.  Would you take a look at the screen for me.
     You can read English, can't you?

A.   (Interpreter:) A little bit.

Q.   Okay.  If you want me to scroll up, let me know and I'll move that up.

        (Pause.)

        THE COURT:  Mr. Bryson, reading the whole report could take a long time.  Is there a specific question you want to ask him about to refresh his recollection?

        MR. BRYSON:  I do.

Q.   Does that -- does that help jog your memory about your first interview?

A.   (Interpreter:) Well, I don't know if it's the first one,

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 03/23/17   Page 264 of 510
Case 3:08-cv-00734-RJC   Document 50-5   Filed 10/04/10   Page 264 of 510

JA2144

ALEXANDER GRANADOS – CROSS

but yes.

Q.   Okay.  And in that interview, they asked you about different MS members.

A.   (Interpreter:) Yes.

Q.   Okay.  And at some point they asked you about Wizard.

A.   (Interpreter:) I think so, although I don't remember exactly.

Q.   Okay.  You only told them two things about Wizard.

A.   (Interpreter:) Well, I don't remember.

Q.   Okay.  Well, you told them about the letter that just was shown to you, correct?

A.   (Interpreter:) Yes.

Q.   And the only other thing you told them was that you had seen him at the El Vacquero, correct?

A.   (Interpreter:) That's correct.

Q.   And that you were aware that he had killed someone in Greensboro.

A.   (Interpreter:) Yes.

Q.   Okay.  You never told them that you had heard he was coming to town with Stiler.

A.   (Interpreter:) Well, Chacua had told me that he was going to come.

Q.   But you never told that to the police in your first interview.

A.   (Interpreter:) Well, there are a lot of things that you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 265 of 510
Case 3:08-cr-00134-RJC   Document 52-57   Filed 10/04/10   Page 136 of 145

JA2145

ALEXANDER GRANADOS - CROSS

just don't remember and then with time you start remembering them.

Q.   So your memory got better later.

A.   (Interpreter:) Well, with time you remember more and more things.

Q.   And you never told them about the conversation that you had with Chino.

A.   (Interpreter:) Maybe I didn't remember it at the time.

Q.   You never told them about seeing him later at Drogo's apartment.

A.   (Interpreter:) I didn't remember at that time.

Q.   Now, you have pled guilty here pursuant to a plea agreement.

A.   (Interpreter:) Yes.

Q.   You pled guilty to a racketeering or a RICO conspiracy charge.

A.   (Interpreter:) Yes, conspiracy of the gang.

Q.   You're facing a life sentence.

        MR. NAZZARO:  Objection.

        THE COURT:  Sustain the objection to the form of the question.

BY MR. BRYSON:

Q.   Your plea agreement states that you are -- face a maximum sentence of life imprisonment.

A.   (Interpreter:) I did not plead guilty to that conspiracy.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 266 of 510
Case 3:08-cr-00734-RJC   Document 52-57   Filed 10/04/10   Page 146 of 145
JA2146

ALEXANDER GRANADOS – CROSS

I just pled guilty to the conspiracy.

Q.   My question is, does your plea agreement state that the maximum sentence you face is life imprisonment?

A.   (Interpreter:) Well, I don't know, to be truthful.

Q.   If I showed you your plea agreement, would it help you to remember?

A.   (Interpreter:) Well, maybe.

Q.   All right.  Would you look at the screen.  Does the top of that look like your plea agreement?

A.   (Interpreter:) It must be.

Q.   Okay.  Now, would you look down to this part right here. Can you just read where it says count one to yourself, please.

         (Witness complied.)

A.   (Interpreter:) Yes.

Q.   Okay.  So your plea agreement does reflect that the maximum sentence you face is life imprisonment, correct?

A.   (Interpreter:) Well, I believe so.

Q.   Okay.  Now, you're testifying here today in hopes that you will get a lesser sentence when your sentencing time comes, correct?

A.   (Interpreter:) The first part, yes.  And another part is just to get out of everything that I was doing.

Q.   Okay.  But one of the parts is to get a lower sentence.

A.   (Interpreter:) Yes.

Q.   If you help the government today, you expect them to help

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 267 of 510
Case 3:08-cr-00134-RJC   Document 504   Filed 10/04/10   Page 86 of 145

JA2147

ALEXANDER GRANADOS – CROSS

you at your sentencing hearing.

A.    (Interpreter:) Yes.

Q.    You have also asked to be put into the witness protection program.

A.    (Interpreter:) Yes.

Q.    That has not been approved yet, has it?

A.    (Interpreter:) Yes, correct.

Q.    You are also here illegally in the country, correct?

A.    (Interpreter:) Yes.

Q.    And you hope that your cooperation will lead to the government assisting you with gaining legal status.

A.    (Interpreter:) Yes.

Q.    Now, MS has rules, correct?

A.    (Interpreter:) Yes.

Q.    And in one of the interviews that you gave to the police, you told them about the rules of MS; correct?

A.    (Interpreter:) Yes.

Q.    And one of the rules we talked about already is whether or not you can deny membership to gang -- deny being a member of MS, correct?

A.    (Interpreter:) You can deny it only to the police but not to rivals.

Q.    All right.  When you talked to the police, didn't you tell them that you can't deny membership of a gang to anyone?

A.    (Interpreter:) I don't remember.  I gave them a lot of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 268 of 510
Case 3:08-cr-00134-RJC    Document 52-5    Filed 10/04/10    Page 6 of 45

JA2148

ALEXANDER GRANADOS – CROSS

information.

Q.   Okay.  If I showed you a copy of a report from that meeting, would that help you remember?

A.   (Interpreter:) Maybe.

Q.   All right.  Would you look at number one on the screen there.

A.   (Interpreter:) Yes, I'm looking at it.

Q.   Correct.  So my question is you told the police during that interview that you were not -- one of the rules of MS is that you could not deny membership of the gang to anyone, correct?

A.   (Interpreter:) I repeat, I don't remember if I told that to the police.  But you cannot deny being a member to the rivals.

Q.   All right.  Another rule you told them about is that you have to be jumped in to be in MS, correct?

A.   (Interpreter:) That's right.

Q.   But you were not jumped in to MS.

A.   (Interpreter:) They didn't jump me in because of the situation where I was.  I started representing the gang and that's how I was left.

Q.   Right.  So you were never jumped in to MS.

A.   (Interpreter:) No, I stayed in like that.

Q.   Okay.  And that violates the rules.

A.   (Interpreter:) Well, since nobody was finding out and I

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 269 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 17 of 45

JA2149

913

ALEXANDER GRANADOS - CROSS

stayed in with the veterans like this and nobody found out.

Q.   Nobody found out because you used to lie about it.

A.   (Interpreter:) Maybe I didn't lie to them before because I -- I had love for the gang, you know.

Q.   Well, didn't you tell the police that you used to lie to other MS members about being jumped in?

A.   (Interpreter:) Yes, I would tell the other members that.

Q.   Okay.  Now, another rule of MS is you have to do missions.

A.   (Interpreter:) Yes.

Q.   You can't refuse a mission.

A.   (Interpreter:) You can depending on how that person is, if that person is hot.

Q.   Well, you used to refuse missions, correct?

A.   (Interpreter:) Yes.

Q.   You told the police that a rule of MS was that when you got jumped in, you had to kill an enemy.

A.   (Interpreter:) Not only killing, it could be anything.

Q.   But my question is when you told -- when you talked to the police, didn't you tell them that when you get jumped in, you are supposed to kill an enemy?

A.   (Interpreter:) That is when you win the two letters.

Q.   Okay.  Here's my question.

        THE INTERPRETER:  When you earn -- the interpreter's correction, when you earn the two letters.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2150

ALEXANDER GRANADOS - CROSS

Q.   Here's my question.  When you talked to the police, didn't you tell them that when you get jumped in, you are supposed to kill an enemy?

A.   (Interpreter:) Well, some -- some do that, but you don't only have -- you don't have to do only that.  You can do any other thing.

Q.   I'm not asking about the rule.  I'm asking about what you told the police.

        MR. NAZZARO:  Objection, Your Honor.  Asked and answered.

        THE COURT:  Objection what?

        MR. NAZZARO:  Asked and answered.

        THE COURT:  Overruled.

        MR. BRYSON:  Did he get that?

        THE COURT:  Why don't you repeat the question.

Q.   I'm not asking about what the rule is.  I'm asking about what you told the police.

A.   (Interpreter:) Well, I don't remember.

Q.   Okay.  You attended that meeting on January the 5th that we heard played, correct?

A.   (Interpreter:) Yes.

Q.   And that meeting was held at Stiler's apartment.

A.   (Interpreter:) Yes.

Q.   And Stiler ran that meeting.

A.   (Interpreter:) Yes.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 271 of 510
Case 3:08-cr-00734-RJC   Document 92-5   Filed 10/04/10   Page 19 of 45

JA2151

ALEXANDER GRANADOS - CROSS

Q.   And you never attended a meeting where Stiler was punished, did you?

A.   (Interpreter:) No.

Q.   You never attended a meeting where it was discussed whether or not Stiler should be punished.

A.   (Interpreter:) No.

Q.   You never attended a meeting where Chino was punished.

A.   (Interpreter:) No.

Q.   You never attended a meeting where it was discussed whether Chino should be punished.

A.   (Interpreter:) No.

Q.   You never attended a meeting where Spider was punished.

A.   (Interpreter:) No.

Q.   You never attended a meeting where it was discussed whether Spider should be punished.

A.   (Interpreter:) No.

Q.   All right.  You were talking about the meeting in June that Misterio ran.

A.   (Interpreter:) Yes.

Q.   And you said that was where they were planning the trip to Greensboro.

A.   (Interpreter:) Yes.

Q.   You said that Wizard had sent a message to Misterio.

A.   (Interpreter:) Yes.

Q.   Now, you described -- you talked about this to the police

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOCC   Document 50-5   Filed 03/23/17   Page 272 of 510
Case 3:08-cv-00734-RJC   Document 50-5   Filed 10/04/10   Page 20 of 45

JA2152

ALEXANDER GRANADOS - CROSS

before you testified here today, correct?

A.   (Interpreter:) Yes.

Q.   And when you told the police about it, you said that he had -- excuse me.  When you told the police about it, you told them that Wizard had called for assistance while in jail, correct?

A.   (Interpreter:) Yes.

Q.   But you know that they record your phone calls when you're in jail.

A.   (Interpreter:) Well, yes.

Q.   Okay.  And you also told them that Wizard knew someone in Greensboro that would assist the members locate the restaurant.

A.   (Interpreter:) Yes, another person in Greensboro.

Q.   Okay.  And this person was supposed to have visited Wizard in jail, correct?

A.   (Interpreter:) What was discussed in the meeting was about a message that Wizard had sent.  I don't know if this guy went to the jail and got it from him, but it was a message that he had sent.

Q.   Okay.  But you told the police that it was a phone call first, correct?

A.   (Interpreter:) No.

Q.   You didn't say --

A.   (Interpreter:) I never did.

                  Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2153**

ALEXANDER GRANADOS – CROSS

Q.   All right.

A.   (Interpreter:) No, I don't think so.

Q.   If I showed you a report, would it help you remember?

A.   (Interpreter:) Well, maybe.

Q.   All right.  Would you look at this first part of this paragraph here.  You don't have to read the whole paragraph.

A.   (Interpreter:) Yes.

Q.   Do you see the part that said -- well, didn't you tell the police that Wizard had called for assistance while in jail?

A.   (Interpreter:) I don't remember.  I don't remember.

Q.   And didn't you also tell them that the guy who was going to help him in Greensboro had gone to see him in jail?

A.   (Interpreter:) I said that a person in Greensboro went to see him.

Q.   Okay.  Now, you know that when you go visit somebody in jail, you have to sign in, right?

A.   (Interpreter:) I don't know.  I've never visited anybody.

Q.   Okay.  But your testimony here today is that Wizard sent a message.

A.   (Interpreter:) Asking for help.

Q.   Okay.  Now, you said that you left Charlotte in January of 2008 because you didn't want to commit any more crimes.

A.   (Interpreter:) Yes.

Q.   And you say that you made up a story in order to leave.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 274 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 22 of 45

JA2154

ALEXANDER GRANADOS - CROSS

A.   (Interpreter:) Yes.

Q.   Okay.  Now, you were listening to the tape that Stiler -- of the tape that Stiler ran the meeting, correct?

A.   (Interpreter:) Yes.

Q.   You were actually at that meeting.

A.   (Interpreter:) Yes.

Q.   And didn't Stiler say that MS didn't want people who didn't want to be in the gang?

A.   (Interpreter:) They say that, but that's not the situation.

Q.   Well, that's what Stiler said in the meeting, correct?

A.   (Interpreter:) Maybe they say that to see what your reaction is.

Q.   Okay.  But you wanted to get out of the gang.

A.   (Interpreter:) Well, truth is whoever joins the gang cannot -- can never leave.

Q.   Okay.  Well, back in January you had decided you wanted to get out of the gang.

A.   (Interpreter:) Yes, I decided, but that's not -- that's not how it is.

Q.   Well, but you made up a story, correct?

A.   (Interpreter:) Yes.

Q.   Your story was that you killed a rival.

A.   (Interpreter:) Not specifically killed, but I run him over.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 275 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 23 of 45

JA2155

ALEXANDER GRANADOS - CROSS

Q.   Okay.  The story was you ran him over with your car.

A.   (Interpreter:) Yes.

Q.   You didn't know whether he lived or died.

A.   (Interpreter:) Yes.

Q.   And you told them -- the other MS members that the police were looking for you.

A.   (Interpreter:) Yes.

Q.   And that you had to leave town.

A.   (Interpreter:) That's right.

Q.   And then you went to Tennessee.

A.   (Interpreter:) Exactly.

Q.   And within two months you were back in town attending meetings.

A.   (Interpreter:) Yes.

Q.   Now, the story that you created about running over a rival, you did that in January of 2008, correct?

A.   (Interpreter:) Yes.

Q.   And that was a complete falsehood, correct?

A.   (Interpreter:) Yes.

Q.   There was no other rival.

A.   (Interpreter:) No.

Q.   And you never ran anybody over with your car.

A.   (Interpreter:) No.

Q.   Now, when you began cooperating with the government, you did tell the police about another MS member who had killed

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 276 of 510
Case 3:08-cr-00134-RJC   Document 552   Filed 10/04/10   Page 24 of 45

JA2156

ALEXANDER GRANADOS – REDIRECT

somebody, correct?

A.   (Interpreter:) Yes.

Q.   You told the police that Drogo had killed somebody.

A.   (Interpreter:) Yes.

Q.   You told them that he did it by running over somebody with a car.

A.   (Interpreter:) Yes.

            MR. BRYSON:  Those are my questions.

            THE COURT:  Any redirect?

            MR. NAZZARO:  A few questions, Your Honor.  Thank you.

BY MR. NAZZARO:

Q.   You mentioned in response to one of the questions about earning the two letters.

A.   (Interpreter:) Yes.

Q.   And what did you mean by this?

A.   (Interpreter:) In order to earn the two letters, you have to kill someone.

Q.   And what are the two letters you're talking about?

A.   (Interpreter:) About MS.

Q.   Okay.  And when you say earning the letters, does that mean placing them on your body?

A.   (Interpreter:) Yes.

Q.   And you were also shown a number of documents that you didn't write.  You didn't write any of those documents, did

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 277 of 510
Case 3:08-cv-00734-RJC   Document 52-5   Filed 10/04/10   Page 28 of 45
JA2157

ALEXANDER GRANADOS - REDIRECT

you?

A.    (Interpreter:) Excuse me, which documents?

Q.    Well, the documents that the attorney was showing you on the screen.

A.    (Interpreter:) I don't believe so.

Q.    Now, you were asked about the rules, and I think we were shown some rules that you related to the police.  Do you remember seeing that?

A.    (Interpreter:) Yes.

Q.    Do you remember the rule if a non-gang member disrespects somebody, disrespects a gang member?

A.    (Interpreter:) Yes.

Q.    And what is that rule?

A.    (Interpreter:) well, if you disrespect the gang, you know, as I told you before, I repeat, the gang is like God. So if a nonmember disrespects the gang, you have to attack them with whatever you have; and if necessary, then you kill them.

          MR. NAZZARO:  No further questions.

          THE COURT:  You may step down.  Call your next witness.

          MR. BRYSON:  I just have one follow-up.

          THE COURT:  Certainly.

                    RECROSS EXAMINATION

BY MR. BRYSON:

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 278 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 26 of 45
JA2158

MARICRUZ MEDINA - DIRECT

Q.   If someone disrespects you, you have to attack them, correct?

A.   (Interpreter:) Yes.

Q.   You don't have to kill them.

A.   (Interpreter:) I repeat, if they disrespect you, you have to do it with whatever you have in your hand.

MR. BRYSON:  Those are my questions.

THE COURT:  You may step down.

(Witness stepped down.)

THE COURT:  Call your next witness.

MS. ROSE:  Maricruz Medina.

MARICRUZ MEDINA,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   If you would state your name, please, ma'am.

A.   Maricruz Medina.

Q.   Do you need an interpreter or do you just want the interpreter standing by?

A.   She can stand nearby, but I can -- I can speak English.

Q.   If at some point you need her --

A.   Okay.

Q.   -- you can certainly turn to her.

Your name is Maricruz Medina?

A.   Yes, ma'am.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 279 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 279 of 510
JA2159

923

MARICRUZ MEDINA - DIRECT

Q. Do you live in the Greensboro/Winston-Salem area?

A. Yes, ma'am.

Q. And what is your business? In what business are you involved?

A. We have a restaurant, Mexican restaurant in Greensboro. Family restaurant.

Q. And where is that restaurant located?

A. High Point Road. 2428 High Point Road.

Q. I'm going to show you what has -- I'm going to show you what has been previously marked as Government's Exhibit 120. Do you recognize Government's Exhibit 120?

A. Yes, ma'am.

Q. What is 120?

A. It's our restaurant with a new name.

Q. What is the name of your restaurant?

A. Villa del Mar.

Q. You can touch that screen and just point out where your restaurant is located.

        (Witness complied.)

Q. How long have you owned that restaurant?

A. Two years.

Q. Are you married?

A. Married.

Q. You and your husband own the restaurant together?

A. Yes, ma'am.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 280 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 280 of 510
JA2160

MARICRUZ MEDINA - DIRECT

Q.   You said two years.  Do you recall when you bought the restaurant or when you took over the operations there?

A.   Excuse me, can you say that again, please.

Q.   Do you remember when you specifically bought the restaurant or took over that restaurant?

A.   In April 2009.  Nine.

Q.   So you've owned it one year or two years?

A.   It's going to be two years in April, yeah.  2008.

Q.   When you bought the restaurant, did you make any changes to the interior?

A.   Yes.

Q.   What did you do?

A.   We painted.  We put some more lights.

Q.   Was there a juke box in the restaurant when you purchased it?

A.   Yeah.  We removed that one from there.

Q.   What time -- what are the hours of operation for your restaurant?

A.   10:00 to 10:00 during the week and then 10:00 to 11:00 on weekends.

Q.   I'm going to call your attention to June the 16th of 2008.  June of 2008.  Were you working?

A.   Yes, ma'am.

Q.   Were you working alone that day?

A.   No.  I have one person doing waiting -- waitress and I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/03/17   Page 281 of 510
Case 3:08-cr-00734-RJC   Document 52-7   Filed 10/04/10   Page 29 of 145

JA2161

MARICRUZ MEDINA - DIRECT

was in the kitchen.

Q.   I think I misstated.  I think it was June the 12th.  But on or around June 12th.

A.   Yes.

Q.   About 3 o'clock on that afternoon, do you recall an occurrence there at your restaurant?

A.   Yes.

Q.   What happened?

A.   I was in the kitchen and then a waitress came and said there is a guy looking for you for the owner.  So I went outside to the dining area and I -- and I saw this guy and I said can I help you.

Q.   Had you seen this person before?

A.   Never.

Q.   And when you asked him if you could help him, what did he say?

          MR. BRYSON:  Object.

          THE COURT:  Hearsay objection?

          MR. BRYSON:  Yes.

          THE COURT:  What's the proffer?

          MS. ROSE:  801(d)(5), Your Honor, in furtherance of the conspiracy.  Statement by a co-conspirator in furtherance of the conspiracy.

          THE COURT:  Overruled.

A.   He came and said, I'm here to deliver a message about the

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 282 of 510
Case 3:08-cr-00134-RJC   Document 52-5   Filed 10/04/10   Page 30 of 45

JA2162

MARICRUZ MEDINA - DIRECT

shooting that happened in here. I know your children are going to testify. And then at that moment I stop him. I say, Wait a minute. I'm not the person that you're looking for.

Q. And why did you know at that moment that you were not the person that he was looking for?

A. Because I think he was trying to threat the children of the last owner. I knew everything about what happened about the accident. So I thought this is not me. This is not the person that he was looking for.

Q. Now, describe that person's -- how was he acting as he was speaking to you?

A. He was very nervous. He was sweating a lot. His voice was -- was kind of shaking.

Q. And when you stopped him, what did you say?

A. I said, You're mistaking me. I'm not the person that you're looking for. I had nothing to do with that accident. I don't know the person that did it. I didn't know the person that was killed in here. I'm new person and I just took over. And at that moment he felt so relieved.

Q. When you say he felt so relieved, tell me --

A. Because he took my hand with both of his and he was like, Oh, thank you. Thank you. Thank you. He thanked me several times. But he -- I could feel his hands were shaking a lot.

Q. And at that point, then, after he thanked you, what did he do?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 52-5   Filed 03/23/17   Page 283 of 510
Case 3:08-cv-00734-RJC   Document 52-5   Filed 10/04/10   Page 34 of 45

JA2163

MARICRUZ MEDINA – DIRECT

A.   He left.  He left.  And I -- I was trying to see through the window if he was running or driving or something, but I couldn't see anything.

Q.   I'm going to show you what has previously been admitted as Government's Exhibit 224.  Do you recognize 224?

A.   Yes, ma'am.

Q.   Who do you see in Exhibit 224?

A.   It was the guy that went into the restaurant and...

Q.   The one with whom you spoke on that day?

A.   Yes, ma'am.

Q.   Shortly thereafter, did you see the police?

A.   Yeah, they came in after.

Q.   Do you recall about how long it was after this person left the restaurant before the police came in?

A.   It was probably less than 30 minutes or 40 minutes. Something like that.

Q.   What happened when the police came?

A.   They came in and asked me did you know the person that came in.  Did he say something different?  Did he say something weird?  And I just told them what I just told and -- because we just caught him.  And I say, Why?  What was going on?  He was coming probably to do something to you.  Threaten you --

             MR. BRYSON:  Object.

             THE COURT:  Sustained and ask the jury to disregard

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 284 of 510
Case 3:08-cr-00734-RJC   Document 52   Filed 10/04/10   Page 32 of 45

JA2164

Appeal: 10-6    Doc: 90-5    Filed: 08/14/2013    Pg: 285 of 510

that last statement of the witness.

Q.   Did you just explain to the officers specifically what you told the jury here?

A.   Yes, ma'am.

Q.   Did you have any further contact, then, on that occasion with the person you identified in the photograph or anyone else --

A.   No, ma'am.

Q.   -- related to that?

A.   Huh-uh.

MS. ROSE:  Thank you very much.

THE COURT:  Any cross?

(Defense counsel conferred.)

THE COURT:  Any cross?

MR. BRYSON:  No questions.

THE COURT:  You may step down and be excused.

Call your next witness.

(Witness stepped down.)

MR. NAZZARO:  Jasmine Dinwiddie.

THE COURT:  Pardon me?

MR. NAZZARO:  Jasmine Dinwiddie.

JASMINE DINWIDDIE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NAZZARO:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 285 of 510
Case 3:08-cr-00734-RJC    Document 52-5    Filed 10/04/10    Page 33 of 45

JA2165

JASMINE DINWIDDIE - DIRECT

Q.   Good afternoon.  Would you please state your name, ma'am.

A.   (Interpreter:) My name is Jasmine Dinwiddie.

Q.   And where do you live?  Which city?

A.   (Interpreter:) Winston-Salem.

Q.   And do you work in Winston-Salem?

A.   (Interpreter:) Now I do.

Q.   What type of work do you do?

A.   (Interpreter:) I'm a waitress in a restaurant.

Q.   And have you ever worked as a waitress in a restaurant in Greensboro, Pennsylvania -- or excuse me, Greensboro, North Carolina?

A.   (Interpreter:) Yes.

Q.   And are you familiar with the restaurant Las Jarochitas?

        THE INTERPRETER:  Pardon me?

Q.   The restaurant Las Jarochitas.

A.   (Interpreter:) Jarochitas.  Yes.

Q.   You're more familiar with the name than I am, I appreciate that.

     Did you ever work at that restaurant?

A.   (Interpreter:) Yes.

Q.   And when did you work at that restaurant?

A.   Last year.  I quit working last -- last October.  In October.

     (Interpreter:) In October.

Q.   Were you working there on December 8th, 2007?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2166**

JASMINE DINWIDDIE - DIRECT

A.    (Interpreter:) Yes.

Q.    Who was -- who owned the restaurant at the time?

A.    (Interpreter:) Sylvia Santos.

Q.    Okay.  And is that -- was it family owned?

A.    (Interpreter:) Yes.

Q.    And how long had you been working there prior to December 8th, 2007?

A.    (Interpreter:) More than a year.

Q.    Okay.  And you had some relation to the family that owned the restaurant?

A.    (Interpreter:) My sister.

Q.    Now, getting back to the date of December 8th, 2007. What was your shift that day?

A.    (Interpreter:) In the morning from 10:00 to 5:00.

Q.    And was that normally when you worked at the restaurant?

A.    (Interpreter:) Yes.

Q.    What type of restaurant was it?

A.    (Interpreter:) A family restaurant.

Q.    When you say family, does that include children?

A.    (Interpreter:) Yes.

Q.    Now, was the restaurant during the time you were working, was it busy that day?

A.    (Interpreter:) Yes.

Q.    Were there any regular customers in the restaurant that had been there before?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 50-5   Filed 08/23/17   Page 287 of 510
Case 3:08-cr-00734-RJC   Document 54-5   Filed 10/04/10   Page 38 of 45

JA2167

JASMINE DINWIDDIE – DIRECT

A.   (Interpreter:) Yes.

Q.   And who was that?

A.   (Interpreter:) The ones that died and their families.

Q.   And do you know the names of the individuals you're referring to?

A.   (Interpreter:) Yes, Manuel, and his brother I don't remember too well.

Q.   Did you know Manuel?

A.   (Interpreter:) Yes.

Q.   Had he been in the restaurant in the past?

A.   (Interpreter:) Many times.

Q.   Was he considered a regular customer?

A.   (Interpreter:) Yes.

Q.   Had you ever had any problems with Manuel --

        MR. BRYSON:  Object.

Q.   -- in the restaurant?

        THE COURT:  Overruled.

A.   (Interpreter:) No.

Q.   Was he a good customer?

        MR. BRYSON:  Object.

        THE COURT:  Overruled.

A.   (Interpreter:) Yes.

Q.   Had he ever been in any fights or arguments during the time you worked there?

        MR. BRYSON:  Object.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 288 of 510
Case 3:08-ct-00734-RJC   Document 52-5   Filed 10/04/10   Page 36 of 45

JA2168

THE COURT:  I'll sustain the objection to that. That's cumulative.

Q.   Well, that particular day, do you remember Manuel and his brother being in the restaurant?

A.   (Interpreter:) Yes.

Q.   Was there anybody else with them?

A.   (Interpreter:) Yes.

Q.   And do you know who was with them?

A.   (Interpreter:) Their employees.

Q.   Employees of whom?

A.   (Interpreter:) Manuel.

Q.   Had that -- was that a regular occurrence that his employees would be with him?

MR. BRYSON:  Object.

THE COURT:  Overruled.

A.   (Interpreter:) Yes.

Q.   You were -- you left the shift at what?  5 o'clock you said?

A.   (Interpreter:) In fact, I left at 6:00.

Q.   Okay.  And that was before there was any shooting that happened; is that right?

A.   (Interpreter:) Yes.

Q.   Was everything normal before you left?

A.   (Interpreter:) Yes.

Q.   Now, after that -- that day, did you continue to work at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 289 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 37 of 45

JA2169

that restaurant?

A.   (Interpreter:) Yes.

Q.   Was the restaurant eventually sold?

A.   (Interpreter:) A few months later.

Q.   Okay.  And did you continue to work for the new owners?

A.   (Interpreter:) Yes.

Q.   And who was the new owner?

A.   (Interpreter:) Maricruz and Marcos Medina.

Q.   Now, were you working for Maricruz in the restaurant on June 12th, 2008?

A.   Yes.

Q.   And who was -- who was in the restaurant on that particular day?

A.   (Interpreter:) The restaurant was empty.

Q.   Okay.  But you were there working, right?

A.   (Interpreter:) I was there and Maricruz.

Q.   Okay.  And did somebody at some point in time during the day come in to the restaurant?

A.   (Interpreter:) Yes, a man.

Q.   And do you remember, did you have a conversation with that man?

A.   (Interpreter:) Yes.

Q.   And what was your conversation with him?

A.   (Interpreter:) He came asking for the owner.

Q.   And how did he appear to you at the time?

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 290 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 38 of 45

JA2170

JASMINE DINWIDDIE - DIRECT

A.   (Interpreter:) He looked like a normal, decent person.

Q.   Okay.  And at some time after he asked for the owner, did you further question him or did you further have a further conversation with him?

A.   (Interpreter:) Yes.

Q.   And what did you say to him?

A.   (Interpreter:) I told him that the owner wasn't there. That his wife was there.

Q.   And what did he say?

A.   (Interpreter:) That he wanted to speak with her.

Q.   And did you ask him who he was?

A.   (Interpreter:) I asked him for his name.

Q.   And did he -- what happened when you asked him for his name?

A.   (Interpreter:) He got nervous.

Q.   And did he -- was he able to provide you a name?

A.   (Interpreter:) He gave me his name, but he thought about it for a while.

Q.   Do you remember what name he gave you?

A.   (Interpreter:) Roberto, I think.

Q.   So he thought about it before he gave you his -- the name that he ultimately gave you.

A.   (Interpreter:) Yes.

Q.   Okay.  And then did you ultimately bring him or introduce him to Maricruz?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 291 of 510
Case 3:08-cr-00734-RJC   Document 54-7   Filed 10/04/10   Page 39 of 45

JA2171

CHRIS TYNDALL — DIRECT

A.   (Interpreter:) I called Maricruz.

Q.   And did she speak with him?

A.   (Interpreter:) Yes.

Q.   And were you able to observe her when she was speaking with this gentleman?

A.   (Interpreter:) Yes.

Q.   And how did she appear?

A.   (Interpreter:) She got nervous and tense.

Q.   Were you able to hear anything that was discussed?

A.   (Interpreter:) No.

Q.   And did the person that you spoke about, did he leave the restaurant at some point thereafter?

A.   (Interpreter:) Yes, he left.

        MR. NAZZARO:  No further questions.

        THE COURT:  Any cross?

        (Defense counsel conferred.)

        MR. BRYSON:  No questions.

        THE COURT:  You may step down and be excused.

        (Witness stepped down.)

        THE COURT:  Call your next witness.

        MS. ROSE:  Call Officer W.C. Tyndall.

                CHRIS TYNDALL,

being first duly sworn, was examined and testified as follows:

                DIRECT EXAMINATION

BY MS. ROSE:

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 292 of 510
Case 3:08-cr-00734-RJC   Document 325   Filed 10/04/10   Page 409 of 510
JA2172

CHRIS TYNDALL – DIRECT

Q.   Good afternoon.  If you would please introduce yourself to the jury, sir.

A.   Chris Tyndall with the Greensboro Police Department.

Q.   How long have you been with the police department?

A.   I've been with Greensboro Police Department for five, almost six years, and I was with another agency for about eight years before that.

Q.   During your time at Greensboro, what have been your roles or your position?

A.   I worked in the patrol division, and my current assignment is in the gang investigations.

Q.   Back in September of 2007, were you working in the patrol division at that time?

A.   Yes, I was.

Q.   Do you recall working that evening about 10:45 on routine patrol?

A.   Yes.  Yes, I was.

Q.   Do you recall that particular evening, were you running radar or checking traffic?

A.   Yes.  I was on Hilltop Road conducting stationary radar.

Q.   And in what area of Greensboro is Hilltop Road?

A.   It's in the western division.

Q.   And the western division is close to what landmarks or...

A.   Wendover Avenue, Interstate 40.

Q.   About 10:45 that evening, did you stop a work van?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 293 of 510
Case 3:08-cv-00734-RJC   Document 50-5   Filed 10/04/10   Page 44 of 45

JA2173

A.    Yes, I did.

Q.    Why did you stop the van?

A.    The van was speeding.

Q.    When you stopped the van, did you approach it from the left or -- from the driver or the passenger side?

A.    I approached it from the passenger side.

Q.    Why did you do that?

A.    For safety reasons.  You can't see into the van real well and usually there is a window on the passenger side from where the passenger back door opens.

Q.    And as you approached from the back, did you see occupants inside the van?

A.    Yes.  There was an Hispanic male sitting in the back sitting on what I found to be a paint bucket turned upside down and there was someone in the front passenger seat and in the driver's seat.

Q.    And who was driving?

A.    The driver was an Andres Aranda Saldavar or also known as Andres Saldavar Aranda.

Q.    I'm going to show you what has previously been admitted as Government's Exhibit 37.  Do you recognize the individual in Government's Exhibit 37?

A.    Yes, he was the rear passenger, Abraham Aranda.

Q.    You did not take this photograph.

A.    No.  No, I didn't.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 294 of 510
Case 3:08-cr-00734-RJC    Document 34    Filed 10/04/10    Page 42 of 45

JA2174

Q. And who did you say was the driver?

A. Andres Aranda.

Q. And the passenger?

A. Alejandro Umana.

Q. At that time after the car was stopped and you identified who was in the car, what next did you do?

A. At that time I removed the driver of the vehicle and brought him back to my vehicle to conduct a check of his license.

Q. And at that time did you make a notation of his license, his name or his status?

A. Eventually I discovered his license were revoked.

Q. Did you speak with anyone else in the van?

A. Yes. As I had approached the van, I noticed the gentleman that was in the back, Abraham Aranda, was attempting to hide a beer bottle that he appeared to be drinking from. So once I called for another car to come by, I eventually spoke to Mr. Abraham Aranda about the open container.

Q. And did you have any conversation with the passenger?

A. Yes, I did.

Q. What conversation did you have with the passenger and why?

A. The front passenger was removed from the vehicle as well because there was -- marijuana was later found in the vehicle. I had gotten consent to search.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 295 of 510
Case 3:08-cr-00134-RJC   Document 52-5   Filed 10/04/10   Page 43 of 145

**JA2175**

CHRIS TYNDALL – DIRECT

I spoke to Umana and got some form of ID from him.  It was not a state issued ID, but it showed an address of Hempstead, New York.  And at that time we noticed several tattoos that appeared to be gang related, and I called for a supervisor to come out and bring a camera.

Q.   And why did you do that?

A.   Common practice if you notice someone that you suspect to be involved in gang activity.  And at this time Alejandro Umana actually had a gang alert on his name in our database.

MR. BRYSON:  Objection.

THE COURT:  I'll sustain the objection.

MR. BRYSON:  Move to strike.

THE COURT:  Ask the jury to disregard that last statement.

Q.   Did you note anything -- you indicated that you wanted to -- noticed gang tattoos.  What gang tattoos specifically?

A.   Well, he had a tattoo on his eyelids and one between his eyes that appeared to say MS.

Q.   And do you see the individual that you identified as Umana from that occasion, do you see him here today?

A.   Yes.

Q.   If you could identify that individual.

A.   Yes.  He's sitting right there to the far left.

MS. ROSE:  If the record could so reflect the identification of the defendant.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 296 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 44 of 45

JA2176

CHRIS TYNDALL – DIRECT

THE COURT:  It will.

Q.   Did you make photographs at that time of any gang related tattoos?

A.   Yes.  His back and chest.

Q.   Whose back and chest?

A.   The gentleman sitting right there, Alejandro Umana.

Q.   Did you photograph any of the other individuals in the car?

A.   I don't recall.  I may have taken some of Abraham Aranda, but I can't recall at this time.

Q.   In April of 2008, did you change your position there at the police department?

A.   Yes.

Q.   What position did you then move to?

A.   In April of 2008 I was assigned to the gang squad, gang investigation squad.

Q.   In June when you were working in the gang squad, did you work days or evenings with that particular group?

A.   It was a combination of both.  It was the second shift. A little bit of daylight and nighttime combined.

Q.   I'll call your attention to June 12th, 2008.

A.   Uh-huh.

Q.   Were you working on that occasion?

A.   Yes, I was.

Q.   Were you working with a partner or in your position at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 297 of 510
Case 3:08-cr-00134-RJC   Document 1457   Filed 10/04/10   Page 48 of 145

JA2177

that time did you work alone?

A.   No, I had someone riding with me that day.  There was four or five of us working on the shift, but in my car was Anthony Hill.

Q.   Describe what you -- what occurred that afternoon.

A.   We had actually -- we were conducting surveillance and we saw some individuals at a park which Officer Hill had made several drug arrests at.  They appeared to be meeting at the park.  There was two vehicles.  One was a black-in-color Toyota 4Runner.  The other one was a small Honda.

Q.   Did you pull up and approach those individuals or what specifically --

A.   Not at that time.  We kept back from a distance and observed the meeting, thinking perhaps a drug transaction was going to take place.  We observed some people talking.  There was three Hispanic males occupying a black-in-color 4Runner and one Hispanic male operating a Honda.  We observed them for a few minutes.  After they met and talked, didn't appear to do any transactions.  Less than five minutes later, they all left.  The Honda traveling and it appeared that the Toyota 4Runner was following the Honda.

Q.   And were you able to get a look at the license plate or the registration of either of those cars?

A.   Yes.

Q.   Did you check those registrations to see to whom they

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 298 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 46 of 145

**JA2178**

CHRIS TYNDALL - DIRECT

were registered or what city?

A.    Yes.   We noticed that the Honda came back to an address in Greensboro and the 4Runner was registered to someone, an Hispanic male in Charlotte.

Q.    Did you -- when you realized that -- or that you didn't see any transaction take place, did you cease any investigation at that point?

A.    No, we continued to follow the cars to conduct surveillance and radioed the other units to have them come in the area.

Q.    And why did you do that?

A.    Well, when you're going to do mobile surveillance, you need more than one car for one thing because it's kind of obvious to someone, you know, if you make all the same turns. So we originally called for assistance to help us with the mobile surveillance.

Q.    And why did you feel based upon what you had observed that it was necessary to continue conducting surveillance?

        MR. BRYSON:   Object.

        THE COURT:   Overruled.

A.    Well, we thought perhaps at that time they were going to -- they didn't do a transaction there.   Perhaps the car was showing them where to go do a transaction.

Q.    Did you follow -- or continue surveillance on both vehicles?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 299 of 510
Case 3:08-cr-00734-RJC    Document 52-5    Filed 10/04/10    Page 47 of 145

JA2179

CHRIS TYNDALL – DIRECT

A.   We did.  And they went a short ways up Groometown Road and turned on to High Point Road.  And from that point they went to Colby Street and turned and parked aacross the street from a restaurant known as Las Jarochitas.

Q.   Show you what's been previously admitted as Government's Exhibit 120.  Do you recognize what's shown in Government's Exhibit 120?

A.   Yes, that's the same location.  It's just a different name on the sign.  That's the address formerly known as Las Jarochitas.

Q.   You said that you saw the cars you were following go near that restaurant.  If you would first point out where Colby Street is.

A.   Colby Street will be the street over to, I guess, my left.  It's the side street that runs in front of the building.

Q.   And the four or five lanes running in front?

A.   That is High Point Road.

Q.   Where did -- once the cars turned down Colby Street, where did they go?

A.   Went less than 50 feet and they parked on the opposite side of the street than the restaurant.  They backed in side-by-side facing Colby Street.

Q.   Show you what's been admitted as Government's Exhibit 121.  And is that from the perspective of Colby Street?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 52-5    Filed 03/23/17    Page 300 of 510
Case 3:08-cr-00734-RJC    Document 52-5    Filed 10/04/10    Page 480 of 510

JA2180

944

CHRIS TYNDALL - DIRECT

A.   Yes.  Yes, it is.

Q.   Where did you go?

A.   I was parked on the opposite side of High Point Road.

Q.   What did you observe?

A.   Once the vehicles stopped, parked side-by-side, an Hispanic male, appeared to be in his 30s, bald, exited the vehicle wearing an olive colored shirt.  He got out of the back, the rear passenger area of the black-in-color 4Runner and proceeded to walk toward Las Jarochitas.

Q.   Did you continue to watch either him or the other cars?

A.   Yes.  We could see both, but our attention was focused on the gentleman that was walking toward the restaurant.

Q.   Where did he go?

A.   He walked into Las Jarochitas.

Q.   Did you follow him in or did you stay --

A.   No, I was stationary across the street less than 75 yards away.

Q.   How long was he in there?

A.   I'd say less than three minutes.

Q.   Did you see him leave?

A.   Yes.  After a brief period, he walked out of the building.  And at the same time the vehicles that had parked across the street pulled out on to Colby Street facing High Point Road.

Q.   Where did the -- the person who had gone into the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2181**

CHRIS TYNDALL – DIRECT

restaurant and come back out, where did he then go?

A.   He got into the black-in-color 4Runner, the back rear passenger area.

Q.   What, if anything -- did that create any suspicions for you or were you concerned at that point?

A.   Yes, we were.

Q.   Why?

A.   Well, we knew that the incident had taken place there and we have heard rumors, and following up on --

        MR. BRYSON:  Objection to rumors, Your Honor.

        THE COURT:  Overruled.

A.   Of possible extortion at some Hispanic businesses.

        MR. BRYSON:  Object.

        THE COURT:  I'll sustain the objection to that.  Ask the jury to disregard that.

Q.   However, when the cars pulled out to High Point Road, what did you do?

A.   When the cars pulled out to High Point Road, I radioed to the people that we had called to the area and asked them what was their location.  Found out they were in the proximity and let them know of the situation, that we had some suspicious activity we were going to follow up on.  We didn't know if it was a robbery.  It was a real brief visit.  We saw how the cars had cranked up and pulled out as soon as he walked out of the building.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 302 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 50 of 145

JA2182

And while I was on the radio speaking with them, both cars ran through the intersection of Colby and High Point Road failing to stop at the stop sign.

Q.   As a result of that, what did you do?

A.   The units that I had radioed for were in the area and we began to conduct a traffic stop at the intersection of High Point Road and Groometown.

Q.   How far is Groometown from Colby Street or from the restaurant?

A.   Less than three-quarters of a mile.

Q.   Where did you ultimately stop the two cars?

A.   At the intersection of Groometown and High Point Road.

Q.   All right.  Is there a business there?  Did you stop them there in the roadway or pull into a business or parking lot?

A.   The vehicles pulled into a parking lot.  Parking lot is shared by several different businesses, Burger King and there's a strip mall there as well.

Q.   How many officers were present by the time you got the two cars stopped?

A.   The time we got them stopped, I believe it was actually four officers.

Q.   How many cars?

A.   There was two.  Two cars.

Q.   Each car had two officers in it?

A.   That's correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 303 of 510
Case 3:08-cv-00734-RJC   Document 52-5   Filed 10/04/10   Page 303 of 510

JA2183

CHRIS TYNDALL - DIRECT

Q.   When you got the two cars stopped, the 4Runner and the Honda, describe what occurred.

A.   At that time I was approaching the driver's side of the black-in-color 4Runner.  Going to ask for some identification. At that time I began to hear yelling to my right where Officer Mark Young and Officer D. Anderson were stationed.  I heard them yelling, telling somebody, you know, to get back in the car, get back in the car.  They had their weapons drawn.

At that time I unholstered my weapon and was covering the passenger -- or the driver's side of the car.  Officer Hill was next to me.  At that point I moved over to my right to give commands in Spanish.  And Officer Hill actually went around and flanked and come up to the side of the -- and found an individual standing in the doorway on the passenger side of the black-in-color 4Runner.

Q.   What did you observe?

A.   Hispanic male standing in the passenger area of the vehicle.  The door was open.  He was standing in the parking lot with his right side turned away from the officers standing at an angle in what we refer to as a bladed position.

Q.   What, if any, significance did that have for you?

A.   In our training, that is a -- either a fight position. Most people who are carrying a weapon, they usually tend to keep their weapon side away from people they're in confrontation with.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 304 of 510
Case 3:08-cr-00734-RJC   Document 522   Filed 10/04/10   Page 52 of 145

JA2184

Q. As a result of what you observed and what you had heard from the other officers, what then -- what then did you do or what happened?

A. I began to tell the individual in Spanish to put his hands up. And Officer Hill actually approached him from -- came around the other side and had his handgun drawn and told him to get on the ground. And at that point the individual got on the ground.

Q. What about the -- any other people, were there any other people from either car out of the cars?

A. Not at that time.

Q. Once the front passenger of the Toyota 4Runner had been taken into custody or secured, what then happened?

A. At that time we began to -- we got him secured. We began to remove the occupants of the vehicle because when the individual was secured, the first thing they found in his right side, right pants pocket was a .38 revolver. So at that time we began to remove the occupants of the black-in-color 4Runner and the Honda. The driver of the Honda was in the vehicle as well.

Q. When you got everybody out of the car -- out of both cars, what did you then do?

A. Performed a search of the black-in-color 4Runner.

Q. Did you locate anything?

A. Yes. In the back seat area there was a .380 caliber

Case 3:16-cv-00057-MOC Document 50-5 Filed 03/23/17 Page 305 of 510
Case 3:08-cr-00134-RJC Document 52-5 Filed 10/04/10 Page 53 of 145
**JA2185**

CHRIS TYNDALL – DIRECT

handgun.

Q.   Who did you remove from the back seat area, if you recall?

A.   Jaime Sandoval.  Goes by Pelon.

Q.   I'm going to show you what has previously been marked as Government's Exhibit 224 and admitted.  Do you recognize the individual shown in Government's Exhibit 224?

A.   Yes, that's the individual that went into the restaurant and was also removed from the back area of the black-in-color 4Runner.

Q.   Show you Government's Exhibit 225.  Do you recognize the person in the photograph labeled Government's Exhibit 225?

A.   Yes.  He was in the front passenger area.  He was the -- Chicago is his nickname.  He was the one that got out of the vehicle and had taken a bladed position towards officers.

Q.   And is he the one from whom you removed the .38 revolver?

A.   He was in possession of the .38 revolver, yes.

Q.   Also show you Government's Exhibit 226.  Do you recognize the person in the photograph marked as Government's Exhibit 226?

A.   He was driving the black-in-color Toyota 4Runner.

Q.   Finally, I'll show you Government's Exhibit 228.  Do you recognize the person in Government's Exhibit 228?

A.   Yes.  Miguel Thomas Roque.  I believe he was driving -- he was driving the Honda, either Accord or Civic.  Small car

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 306 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 54 of 115

JA2186

CHRIS TYNDALL – DIRECT

Q.   Was that photograph taken on the date that you encountered him?

A.   Yes.  He was wearing a blue shirt, El Camino.  That's it.

MS. ROSE:  I move to admit Government's Exhibit 228.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 228 was received into evidence.)

Q.   After you -- did you locate anything in the car which Mr. Roque, the individual shown in Government's Exhibit 228, the car which he was driving?

A.   I did not.

Q.   After you had removed the four people from their cars and had conducted your search, what then next did you or other officers do?

A.   At that time we had requested for patrol units to come by in marked cars to transport the individuals to a room -- a place to be interviewed.  And Officer Hill and I went to -- back to Las Jarochitas to speak with the manager to see if anything had taken place.

Q.   Did someone then interview the owner or any other individuals at the restaurant?

A.   Yes.  Officer Hill and I did.

Q.   With whom did you speak?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 307 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 58 of 145

JA2187

CHRIS TYNDALL - DIRECT

A.   I spoke with Maricruz.  I don't remember her last name.
Maricruz Medina.

Q.   And did you take a statement from those individuals and
make that part of your investigative report?

A.   Yes, I did.

Q.   Did you then return to the police station and have any
contact further with the four people that you'd taken into
custody earlier?

A.   Yes, I did.

Q.   What, if anything, did you notice about the clothing that
some or all of them were wearing?

A.   They either had 13 somewhere on it, written on the belt
or belt buckle, or they were wearing some form of blue.

Q.   And what significance, if any, did that have to you?

A.   Shows affiliation with the MS 13.

Q.   Did you speak with any of the four individuals?

A.   Yes, I was able to conduct an interview with Jaime
Sandoval, the guy referred to as Pelon.

Q.   Did he -- was he Mirandized?

A.   He was advised of his Miranda rights, yes.

Q.   And did -- after doing so, did he speak with you?

A.   Yes, he agreed to speak to us.

Q.   And you conducted a complete interview of him?

A.   I did.

Q.   And did you make that interview part of your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 308 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 56 of 145
JA2188

CHRIS TYNDALL - DIRECT

investigative report?

A.   I did.

Q.   Did Mr. Sandoval tell you --

     MR. BRYSON:  Object to what Mr. Sandoval said.

     THE COURT:  Sustained.

Q.   After the individuals were taken to the police department, were they kept in custody or were they released?

A.   They were kept in custody.  They were all charged.

Q.   With what?

A.   Intimidating a witness --

     MR. BRYSON:  Object.

     THE COURT:  Overruled.

A.   Intimidating a witness and carrying a concealed weapon.

Q.   Whenever individuals are taken into custody who have cars, what do you do with those cars?

A.   It depends on the situation.  The cars are searched and if they provide any evidentiary value, they sometimes are seized and taken to a lot at the police department or the district three substation.

Q.   On this date, did you take either of the two cars into custody?

A.   Neither car was seized as evidence, no.

Q.   Where were the cars left?

A.   They were both left at the parking lot at Hilltop and -- I'm sorry -- well, Groometown and High Point Road.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 309 of 510
Case 3:08-cv-00734-RJC   Document 52-5   Filed 10/04/10   Page 57 of 145

**JA2189**

CHRIS TYNDALL – CROSS

Q.   The place where you had stopped them?

A.   Yes, where the original stop took place.

Q.   Were the weapons which you or other officers had located, were those seized?

A.   Yes, they were.  They were seized and turned in to the evidence section.

          MS. ROSE:  All right, sir.  Thank you very much.

          THE COURT:  Any cross?

          MR. BRYSON:  Yes.

                    CROSS EXAMINATION

BY MR. BRYSON:

Q.   You first spoke about an event in September of 2007, correct?

A.   That's correct.

Q.   All right.  And on that occasion when you stopped this vehicle, you found Mr. Umana to be in the passenger seat of the vehicle; is that correct?

A.   Front passenger seat, that's correct.

Q.   He was not in possession of any weapons?

A.   No, no weapons were found on Mr. Umana.

Q.   He was not in possession of any controlled substances.

A.   No, he was not found to be in possession of any controlled substances.

Q.   You charged the driver with driving while license revoked.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 310 of 510
Case 3:08-cr-00134-RJC   Document 52-5   Filed 10/04/10   Page 58 of 145
**JA2190**

954

MARK YOUNG – DIRECT

A.    That's correct.

Q.    You charged the other passenger with an open container violation.

A.    I think it was open container and possession of marijuana.  Criminal citation was issued.

Q.    Right.  You did not charge Mr. Umana with any offenses.

A.    No, Mr. Umana was not charged on that date, no.

        MR. BRYSON:  Those are my questions.

        THE COURT:  You may step down and be excused.

        (Witness stepped down.)

        THE COURT:  Call your next witness.

        MR. NAZZARO:  Yes.  Officer Young.

                     MARK YOUNG,

being first duly sworn, was examined and testified as follows:

                 DIRECT EXAMINATION

BY MR. NAZZARO:

Q.    Good afternoon.  Can you please state your name, sir.

A.    Mark Young.

Q.    And how are you employed?

A.    Greensboro Police Department.

Q.    How long have you been with the Greensboro Police Department?

A.    Going on 14 years now.

Q.    And were you working with the Greensboro Police Department on June 12th, 2008?

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2191**

MARK YOUNG – DIRECT

A.   Yes, sir.

Q.   And on that occasion, did you assist Officer Tyndall and others in a traffic stop?

A.   Yes, sir, I did.

Q.   Okay.  What was your role?

A.   I just -- I helped with the traffic stop.  What had happened was as soon as we initiated the blue lights, initiated the traffic stop, the right front passenger, who was later identified as Granados, jumped out and in my opinion was looking for an avenue to flee.  We gave him commands.  He finally turned around, looked at me and then he bladed, he bladed his side to the right side and quickly moved his right hand down to his right front pocket before pulling it back up.  Other officers gave him commands.  He finally proned down on the ground.

        MR. BRYSON:  Objection.  Narrative, Your Honor.

        THE COURT:  May I see counsel at sidebar?

        (Side-bar conference as follows:)

        THE COURT:  I don't think there's any cross on this incident, is there?  Is there something new you intend to get out of this officer?

        MR. NAZZARO:  We're going to move into weapons that he seized.

        THE COURT:  Let's go right to that.

        MR. NAZZARO:  Yes, sir.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 312 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 60 of 145

**JA2192**

THE COURT:  This is cumulative testimony.

MS. ROSE:  And while we're here, the next witness we will call will be Scott Clarkson from the jail with the seized jail mail correspondence.

MR. FOSTER:  We have --

THE COURT:  Do we need to talk about that?

MR. BRYSON:  Yeah, that would be a good idea.

MS. ROSE:  That's why I --

THE COURT:  After this witness we'll take an afternoon break.

MS. ROSE:  I wanted to let the court know while we were here.

(End of sidebar conference.)

DIRECT EXAMINATION (Cont'd.)

BY MR. NAZZARO:

Q.   Officer, as part of your duties that day -- or as part of what you did that day, did you seize any firearms?

A.   Yes, sir, I did.

MR. NAZZARO:  If I may just approach the witness?

THE COURT:  You may.

Q.   And show you what's been previously marked as Government 230 and 231.  Ask if you can open those items and see if you recognize them.

(Witness complied.)

A.   Yes, sir.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 313 of 510
Case 3:08-cr-00134-RJC   Document 52-5   Filed 10/04/10   Page 313 of 510

JA2193

957

MARK YOUNG – DIRECT

Q.   Which item do you have in front of you?

A.   The revolver, sir.

Q.   What's the Exhibit Number?

A.   231.

Q.   Okay.  And did you seize 231 on that particular occasion?

A.   Yes, sir, I did.  I seized it off of Mr. Granados.

Q.   Was it on his person?

A.   Yes, sir, in his right front jean pocket.

Q.   And is that what's contained in 231?

A.   Yes, sir.

Q.   Was it loaded or unloaded?

A.   Yes, sir, it was loaded.

MR. NAZZARO:  Your Honor, I would move 231.

THE COURT:  Any objection?

MR. BRYSON:  No.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 231 was received into evidence.)

Q.   And is there -- could you examine the second item.

(Witness complied.)

A.   Yes, sir.  Exhibit 230.

Q.   Excuse me?

A.   Exhibit 230.

Q.   230.  And what's in 230?

A.   It's a weapon I seized out of the back seat area of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2194**

Toyota where Mr. Sandoval was sitting.

Q.   What type of weapon is that?

A.   It's a .380.

Q.   And was that loaded or unloaded at the time it was seized?

A.   It was loaded also.

         MR. NAZZARO:  Your Honor, move 230.

         THE COURT:  Any objection?

         MR. BRYSON:  No.

         THE COURT:  Let it be admitted.

         (Government's Exhibit No. 230 was received into evidence.)

Q.   Did you -- you didn't seize anything else or have any other participation in the investigation?

A.   No, sir.

         MR. NAZZARO:  Your Honor, I would ask to publish those items.

         THE COURT:  You may.  What exhibit number is that?

         MR. NAZZARO:  Exhibit 230.

Q.   And those items have been rendered safe, Officer?

A.   Yes, sir.

Q.   There is no -- there is no ammunition in them at this point?

A.   No, sir.

         MR. NAZZARO:  This is Exhibit 230 -- I'm sorry, 231.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 315 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 63 of 145
JA2195

MARK YOUNG – DIRECT

Q.   Do you recall if the firearms were fully loaded at the time?

A.   I believe they were, sir.  The revolver, I believe, had six rounds in it.  And the semi had seven.

MR. NAZZARO:  I have no further questions.

THE WITNESS:  Seven live rounds.

MR. NAZZARO:  No further questions.

THE COURT:  Any cross?

MR. BRYSON:  No questions.

THE COURT:  You may step down and be excused.

(Witness stepped down.)

THE COURT:  Members of the jury, I think we'll take our afternoon break at this time.  Remember, don't talk about the case.  Keep an open mind.  And we'll see you sometime around five after 4:00.

(Jury exited the courtroom.)

THE COURT:  At sidebar the government had indicated that they intended to call a jail employee and attempt to introduce certain correspondence and the defense indicated there may be an objection to that.  So let's do that in terms of a motion in limine.  We'll be glad to hear from defense with respect to their objection.

MR. FOSTER:  Well, Your Honor, we have a variety of objections to the letters.  Common objection based on what we have in the discovery would be one of relevance or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 316 of 510
Case 3:08-cr-00734-RJC   Document 92-5   Filed 10/04/10   Page 64 of 145

**JA2196**

authenticity.  There was -- we don't see anything that authenticates the letters.  There was a report by a handwriting expert that did not seem to establish that these were from our client.  So that's the first stage, we're contesting authenticity.

And then in general for the rest of the letters, under Rule 403 and also Rule 404 there's a variety of extremely prejudicial, unfairly prejudicial material.  Some of it relates to admissions of misconduct in the jail and discussion of things that are just simply not relevant to the guilt/innocence phase of the trial at all.

It's going to take going through each letter, I think, one at a time because there's different specific reasons why there's prejudicial material in each of those letters, of which I believe there's 13.  Actually, one came in during the testimony from Alexander Granados so I think we're left with 12 letters that the government seeks to admit.  As to all of those we object.

THE COURT:  What says the government?

MS. ROSE:  First of all, these are -- well, first of all, as to authenticity.  There were a number of letters that the government selected which had information specific to this defendant.  He signed his name.  Gave his PID number, his prisoner identification number in the correspondence.  Within the body of that correspondence he made very specific

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 317 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 68 of 145

JA2197

references to information only he would know.  For instance, one of the letters is a letter to the El Salvadorian consulate.  He gives his name, his prisoner identification number, his date of birth.  Tells why he is in custody, the charges, his concerns for family members.  Provides a great deal of personal information relative to this defendant.

Another letter that the government selected as one specific to this defendant was a letter in which he wrote a co-defendant about a visit with a psychiatrist and some of the tests that were performed by that psychiatrist.  Your Honor has heard some of that testimony or had an opportunity to view that in relation to the *Atkins* hearing.  Information that clearly only this defendant would know.  He gave great specifics about the tests that he took.  How he reacted to those tests.  What those tests meant.  What the psychiatrist said to him.  And the court heard information from that psychiatrist at the hearing which was consistent with what was written in the letter.

Another letter which the government selected which had -- which is very specific to this defendant, one to an individual from California that the government had writted here in relation to some of the Los Angeles testimony.  In that letter the defendant writes very specifically about his relationship with this person, their time in LA.  Uses his nickname.  This was not someone involved in the instant case,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

but as I said, who was writted here from California, and the defendant was very specific in that letter.

Second letter to that individual as well with other identifying information.

Another letter wherein the defendant spoke about his court date. How this court -- there had been a suppression hearing. The date was continued from -- to another court date and gave specific information about what had taken place at the court hearing.

The government selected those letters as ones for the handwriting analyst to use as known standards of the unique specific information not only, as I said, the defendant identifying himself in the letters by giving his prisoner identification number, also in those letters gave very specific information relative to him. So those letters, Your Honor, were marked as exhibits for foundational purposes for the handwriting analyst to use as known samples.

Thereafter, the government provided another group of letters for comparison which were letters from the defendant to -- one to Mr. Granados which has already been admitted; to an individual known as Drogo, a co-defendant; a letter to -- several to Pelon, one of which says blame Chino; to Bonilla, another co-defendant; numerous to Pelon discussing the facts of the case; a letter to Misterio, co-defendant; to Stiler, co-defendant; to Mr. Figueroa, co-defendant; to Mr. Reyes, a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 319 of 510
Case 3:08-cr-00734-RJC   Document 52   Filed 10/04/10   Page 67 of 145

JA2199

co-defendant; and a couple more to Mr. Sandoval, Pelon, with information about the case and about the conspiracy and about MS. And I can get more specific in a moment, Your Honor.

And then the government also selected seven letters that are also to co-defendants or -- or all to co-defendants: To Mr. Sandoval; to Castellon who's known as Misterio; Figueroa; and also letters wherein the defendant makes statements about the shank or the jail knife that he had and plans to escape. Those letters were selected, seven of which were just identified by Ms. Conrad for the translations, not for use during this phase but any subsequent phase.

THE COURT: Well, let's talk about the letters that you intend to introduce today.

MS. ROSE: The letters that the government would intend to introduce at this time would be Government's Exhibits 158, 159, 160, 161, 162, 163, 165, 166, 167, 168, 169, and 170. Those letters -- and also a letter to him. We'll talk about that one separately. That was admitted previously from Drogo, Mr. Figueroa, where that had been previously identified by Mr. Taylor, the handwriting expert, as Mr. Figueroa's handwriting and that was addressed to the defendant. But that's at a later stage as well.

The ones that the government would move in this case, as I said, 160 through 170, are the letters that were all to co-defendants in this case. 158 to 170. And just

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 320 of 510
Case 3:08-cr-00734-RJC    Document 525    Filed 10/04/10    Page 684 of 1510
JA2200

portions of those letters.  Obviously, they have been marked in their totality both in the Spanish and in the translated version.

The significance of these letters, Your Honor, obviously, they are admissions of a party opponent.  Clearly letters that weren't written under duress, threats.  There's not a voluntariness issue here.  They're letters which show evidence of continuing conspiracy.  Evidence of the defendant's involvement in MS 13.  In these letters he shows consciousness of guilt in that he tries to convince other co-conspirators to get other members of the gang to take responsibility for the shootings.  He writes in ciphers and codes which we've heard evidence of used to prevent understanding by others reading the letter.  Contained in these letters are evidence of obstruction of justice.

And so for those reasons, Your Honor, we would submit that they are not only probative, but in that they are admissions of the defendant, are significant to the issues before the court.

THE COURT:  What other witnesses do you have?

MS. ROSE:  I have -- the first witness is Sergeant Clarkson --

THE COURT:  No, not with respect to these letters.

MS. ROSE:  Oh.

THE COURT:  This comes to the court in a very

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 321 of 510
Case 3:08-cr-00134-RJC   Document 525   Filed 10/04/10   Page 69 of 145

JA2201

difficult context.  It would have been nice if the attorneys had spotted this issue and could have briefed it.  I may have had a ruling that's actually based upon my review of the letters as opposed to shooting in the dark, which I don't feel inclined to do.  So I'm inclined to have you submit those letters to me overnight so I can review them myself in light of the objections and the stated grounds for admission and make rulings as to each.  I just can't do it en masse without seeing them myself.

And so what other evidence do you have other than the evidence related to these letters?

MS. ROSE:  At this point we wouldn't call any other witnesses, Your Honor, other than those related to the foundation of the letters and the handwriting analyst.

THE COURT:  What is -- what is the handwriting analyst going to say?

MS. ROSE:  He will identify, based upon the known samples that I mentioned to the court, that he will identify that the probability -- I guess the methodology they use is the most certain is called strong probability.  Identifies the defendant as having written all of these letters except the one related to Mr. Figueroa.  There are some drawings on the outside of the envelopes or writings within some of the envelopes that were not identified as the defendant, but everything the government would seek to admit, the handwriting

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/03/17   Page 322 of 510
Case 3:08-cr-00734-RJC   Document 525   Filed 10/04/10   Page 70 of 145

JA2202

analyst has identified that as being that of the defendant.

THE COURT:  You don't -- you don't have any other evidence other than the evidence related to these -- I mean, you're done?

MS. ROSE:  Yes, sir.

THE COURT:  Well, submit those letters to the court along with the translations.  See what I can do.  So we'll take a break until I've had a chance to review those letters.

MS. ROSE:  Does the court want to see the foundational letters, the ones that the government just marked, as I stated, for foundational purposes?  Those contain some legal information that the government would not seek to admit.  As I said, they were just used for identification purposes.

THE COURT:  The handwriting expert is going to testify that he reviewed those letters and compared those letters to the letters you intend to submit to the jury?

MS. ROSE:  Correct.  But he does not speak Spanish. He's not going to testify as to the content of any letter.

THE COURT:  Well, but the purpose of those letters is just to establish foundation.

MS. ROSE:  Yes, sir.

THE COURT:  They're not going in front of the jury.

MS. ROSE:  No, sir.

THE COURT:  No, I don't need to see those.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-000573-MOCC   Document 50-5   Filed 03/23/17   Page 323 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 73 of 145

JA2203

MR. FOSTER: Again, Your Honor, just so our position is clear when the court is reviewing those, our position is the handwriting -- there are no known samples. Even the handwriting expert's reports say they are purported -- they are writings bearing the purported writing of Mr. Umana. So we contest even that. I don't know if the court wants -- I mean, it's hard to deal with these on a blanket basis, but we have different objections.

THE COURT: It is pretty hard to deal with it on a blanket basis and therefore I'm kind of surprised to be put in this situation at 4 o'clock on a Thursday by counsel on both sides who are experienced and could have anticipated this and given me a better -- you know, an earlier opportunity to look at this and make a ruling.

When were you provided copies of these letters?

(Defense counsel conferred.)

MR. FOSTER: Well, Your Honor, two answers. We got these as part of a big discovery batch, I believe in the last couple of weeks. But it was only during the course of this trial within the last, I don't know, what, couple days, I think, they designated which ones out of all the many ones they're offering. But I'm not sure about when we got them. I just know it was within the last several weeks or a month. I'm not exact -- I don't know, to be honest with you.

MS. ROSE: Well, now, we provided the first batch of

letters at the time that the court had ordered us to.

THE COURT: When did you let counsel know that you were intending to offer these letters into evidence in the trial of this matter?

MS. ROSE: We let counsel know that -- first of all, these are all marked as JMU which is the identifying -- they're all on the exhibit list. We talked over the past --

THE COURT: I wasn't asking that question. The question I was asking you is when did you notify counsel that you intended to offer these letters, 158 through 170, into evidence in the trial of this matter? When did you do that?

MS. ROSE: Monday. We discussed it day before yesterday, I guess, when I asked them if I needed to go ahead and bring the jail expert here to lay -- not the jail expert, but the jail custodial witness to lay the foundation for the letters. All the letters that we have given them have the identifying numbers, the JMU number that's on the exhibit list.

THE COURT: You're going into detail on things I haven't asked you about. It's not very helpful.

Give me the letters, the translations and -- I just don't think I can make an on-the-spot ruling on this.

I tell you what I do want to do. I want the government to call the authenticating witnesses outside the presence of the jury. I want to hear from them at this time.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 325 of 510
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 73 of 145

JA2205

How long do you think that's going to take?

MS. ROSE:  He'll talk about the procedures and how he received them --

THE COURT:  I'm not that interested --

MS. ROSE:  Fifteen minutes.  I think about 15 minutes for the direct examination.

THE COURT:  All right.  Let's do this.  Let's take a ten minute break and then if you would have that person ready to testify.

(Brief recess at 4:05 p.m.)

THE COURT:  All right.  What I think I'm going to do is bring the jury back in and excuse them for the day and then hear from the witness authenticating the exhibits and the handwriting expert, and then take the proposed exhibits under advisement for the night and come back in the morning with a ruling.  So what I'm inclined to do is have a charge conference and a -- or not a hearing but -- at the charge conference let you all know what the ruling is on the exhibits at 8:30 in the morning.  I'm going to bring the jury in at 9:30.

So we'll let them go early tonight and have them come back in at 9:30.  We'll spend the balance of time, whatever time we need to hear from the witnesses outside the presence of the jury.  And then I'll take the exhibits under advisement at that time.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/03/17   Page 326 of 510
Case 3:08-cr-00734-RJC   Document 585   Filed 10/04/10   Page 74 of 145
JA2206

SCOTT CLARKSON - DIRECT

I guess at this point I'll just call the jury and let them go for the evening.

(Jury entered the courtroom.)

THE COURT:  Members of the jury, all week we've been letting you go at 6 o'clock at night because, among other things, I don't find that letting you go at 5 o'clock in rush hour traffic is very helpful to anybody.  Actually, today there's some matters that I need to take up with the lawyers and so I'm going to let you go a little bit early so you can beat the 5 o'clock traffic.

So we're going to let you go early this afternoon and just ask you to come back at 9:30 in the morning ready to go tomorrow.

So remember to keep an open mind.  Don't talk about the case.  And make best efforts to not be exposed to any coverage of this case in any way outside the courtroom.  And we'll see you back at 9:30 in the morning.

(Jury exited the courtroom.)

THE COURT:  All right.  If you all would call your first witness.

MS. ROSE:  Scott Clarkson.

SCOTT CLARKSON, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2207**

SCOTT CLARKSON - DIRECT

Q.    Good afternoon.  If you would, please, sir, state your name.

A.    Scott Clarkson.

Q.    Mr. Clarkson, where are you employed?

A.    With the Mecklenburg County Sheriff's Office.

Q.    And what's your job there at the sheriff's office?

A.    I'm a sergeant responsible for inmate telephone monitoring and mail.

Q.    And when you say you're the person responsible for those two areas of the detention facility, what does that specifically mean?  What do you do?

A.    In relation to the telephone calls, I am the keeper of the records.  I will monitor the telephone calls and provide those calls as evidence on CD as requested by various law enforcement agencies or court officials.

        In relation to the mail, I've been designated to collect mail that has been deemed necessary as evidence for delivery to the appropriate personnel.

Q.    And when you say mail, if you would just describe, what's the procedure there in the jail for inmates who want to mail a letter?  What do the inmates have to do first?

A.    The inmates are required to address the envelope in a specific way.  That being the full address of the person they're sending the mail, and in particular the -- their -- their name, their positive identification or PID number and

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 328 of 510
Case 3:08-cv-00734-RJC   Document 52-5   Filed 10/04/10   Page 763 of 45
JA2208

SCOTT CLARKSON – DIRECT

the jail's return address.

Q.   And if those requirements are met, who collects the mail from the inmates?

A.   With those requirements being met, the inmate will give that letter to the officer in that housing unit and that officer will then take it out of the housing unit to the administrative area to be mailed out by the postal carrier.

Q.   And do you have in this particular instance two individuals that work with you that collected all of this mail along with you?

A.   Yes, ma'am.

Q.   Who are they?

A.   Denise Daniels at jail central and Kathy Dugan at jail north.

Q.   Specifically with regard to Ms. Daniels because she's here at central and -- is that where the defendant Umana is housed?

A.   Yes, ma'am, he is housed at jail central.

Q.   Ms. Daniels, what is the method once she picks up the mail from the inmate, where does it then go?

A.   Outgoing mail is collected and unless it's specified for that mail to be reviewed for potential threats to security or others, something along that nature, that is a security threat, the mail would automatically go out.  If it's already been identified that it needs to be reviewed, Ms. Daniels

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16cv-000573-MOCC   Document 50-5   Filed 08/23/17   Page 329 of 510
Case 3:08-cr-00734-RJC   Document 505   Filed 10/04/10   Page 7 of 45

**JA2209**

SCOTT CLARKSON - DIRECT

would open that letter, review it, and copy and deliver it to me.

Q.   Now, which letters were you selecting relative to this case?  Not just Mr. Umana, but other individuals with whom he was charged.

A.   There was a list of, I believe, 26 defendants associated with the MS 13 trial.  That list of names was provided to Ms. Dugan and Ms. Daniels and they were requested to be on the lookout for mail coming to or from those inmates and to make those copies and provide them to me.

Q.   Now, the mail that was going to and from these inmates, was much of this mail actually internal from inmate to inmate within the same jail?

A.   I did see a high frequency of communication between inmate to inmate with this trial, yes, ma'am.

Q.   And what significance, if any, is there regarding inmate-to-inmate mail?

A.   The concern would be internal security.  Also threats to co-defendants who may be housed within the facility itself but not directly associated or in close proximity to the person that's writing that mail.  So for the purpose of safety for those other inmates, co-defendants, the mail would be reviewed.

Q.   What about legal mail?

A.   No, ma'am, that was never opened.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 330 of 510
Case 3:08-cr-00134-RJC   Document 5255   Filed 10/04/10   Page 78 of 145
JA2210

SCOTT CLARKSON - DIRECT

Q.   Is it also your policy in the jail to open mail, particularly inmate-to-inmate mail to check for contraband or other items?

A.   Yes, ma'am.  Again, we would review for contraband.  We would also review for concerns of threats to the facility as far as escape plans, things of that nature, threats to other inmates or officers.  There's also communication issues of manufacturing or hiding weapons.

Q.   In that standard collection procedure, then, once the mail was retrieved by Ms. Daniels, copied, is it then sent on its way to whomever it was mailed?

A.   Yes, ma'am.  All mail, once it was copied, was sent, unless it was deemed that there was a threat to a person on the outside where delivery of that mail would cause harm to that person.

Q.   Once you had the copies of the mail of everyone that you were collecting relative to this case, including the defendants, what did you then do with those copies?

A.   I notified Chuck Hastings with Charlotte-Mecklenburg Police Department that I had mail ready for pickup.  He would come to my office and I would hand deliver it to him where he would then take it for translation.

Q.   Now, do you have a Mecklenburg County jail inmate handbook?

A.   Yes, ma'am, we do.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2211**

SCOTT CLARKSON - DIRECT

Q.   Is that both in English and Spanish?

A.   Yes, ma'am, it is.

Q.   Is that provided to inmates when they come into your facility?

A.   Yes, ma'am.

Q.   And regarding mail, does it indicate that mail will be checked and anything inappropriate will not be allowed?

A.   Yes, ma'am, it does.

Q.   That all incoming and outgoing mail would be inspected?

A.   Yes, ma'am.

Q.   I do have a quick question relative to the phone monitoring.  There at the phones that inmates have access to in the jail, is there -- are there any signs posted regarding monitoring of those phone calls?

A.   Yes, ma'am.  There are signs physically attached to the telephone call.  There's also verbal notification given at the engagement of each telephone call where the receiving party as well as the inmate who is placing that telephone call hear the advisement that these calls are monitored and recorded.  There is also again another advisement within the inmate handbook stating the same.

Q.   You also provide to inmates who are not American citizens that come into the jail both in English and Spanish, information regarding embassy notification and consular notifications for their particular country?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 08/23/17   Page 332 of 510
Case 3:08-cv-00734-RJC   Document 52-5   Filed 10/04/10   Page 86 of 145

JA2212

SCOTT CLARKSON – CROSS

A.    Yes, ma'am, there's postings within the identification area of the jail arrest processing center that gives notification of the foreign national's right to make consular notifications.

        MS. ROSE:  All right, sir.  I don't have any further questions of this particular witness.

        THE COURT:  Any cross?

        MR. FOSTER:  Yes, Your Honor.

                        CROSS EXAMINATION

BY MR. FOSTER

Q.    Sergeant Clarkson, you're not the person who would have ever had personal knowledge of receiving a letter from an inmate, verifying that the inmate who handed the letter to you was the inmate whose name and PID were on the return address of the envelope, correct?

A.    No, sir, I did not do that.

Q.    So what you've said is that any mail that was on this list of 26 people, it was opened, it was reviewed, it was copied, and it would then be closed back up and sent on to the addressee unless there was some sort of a threat problem or something like that?

A.    That's correct, sir.  We didn't interfere with the delivery of the mail.

        MR. FOSTER:  I have no further questions.

                        REDIRECT EXAMINATION

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 333 of 510
Case 3:08-cv-00734-RJC   Document 59-5   Filed 10/04/10   Page 333 of 510

**JA2213**

SCOTT CLARKSON - CROSS

BY MS. ROSE:

Q.   If the PID number on the front is not correct for the person's name, what happens to the letter at that point?

A.   If it's identified by the receiving officer that the name or PID number that is provided on the outside of that envelope does not -- or is not associated with the inmate who is asking that it be mailed, it is corrected or it is destroyed, but it is not mailed.

MS. ROSE:  All right.  Thank you, sir.

THE COURT:  Ms. Dugan or Daniels gets it right from the inmate, gets the letter right from the inmate?

THE WITNESS:  No, sir.  The process would be the inmate would write the letter, address the envelope, seal the envelope, provide it to the officer within that housing unit. That officer would then take that letter out of the housing unit to the administrative area for delivery.

Again, if that letter originates from someone who's been identified as a need to be monitored, then that letter will be forwarded to Ms. Daniels who would then inspect it. So she did not physically --

THE COURT:  She did not personally get it from any particular inmate.

THE WITNESS:  To my knowledge, no.

THE COURT:  Is there any mechanism for the officer who does do that to check the PID number or the name against

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 334 of 510
Case 3:08-cr-00734-RJC   Document 502   Filed 10/04/10   Page 82 of 145

JA2214

SCOTT CLARKSON – CROSS

the person who's giving him the letter?

THE WITNESS:  They are trained to do that.  But can I say that they do?  I cannot say that.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   That is part of your policy and procedure there at the jail regarding the collection of inmate mail.

A.   I'm sorry?

Q.   That is part of the policy and procedure at your jail regarding inmates is that they confirm the inmate from whom they're receiving it and check the PID number.

A.   It's policy, yes, ma'am.  And standard procedure, yes.

MS. ROSE:  Thank you.

MR. FOSTER:  If I can just...

RECROSS EXAMINATION

BY MR. FOSTER:

Q.   So you're -- the whole reliability of your system to prevent an inmate from sending out mail under a PID number that doesn't -- that's not his or a name that's not his is relying on the detention officer to compare it before they let it go out of that pod, correct?

A.   Yes, sir.

Q.   And if they're busy and they don't do that, then that could be bypassed and that could go out, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cr-00057-MOC   Document 50-5   Filed 03/23/17   Page 335 of 510
Case 3:08-cr-00734-RJC   Document 525   Filed 10/04/10   Page 335 of 510

**JA2215**

JEFFREY TAYLOR - DIRECT

A.    That's a possibility, yes, sir.

          MR. FOSTER:  Nothing further.

          THE COURT:  Thank you.

          (Witness stepped down.)

          MS. ROSE:  Ms. Daniels is not here yet, Your Honor, from central jail.  I can go ahead and call the handwriting analyst out of order, if I may.

          THE COURT:  Let's do it.

          MS. ROSE:  Mr. Taylor.

                    JEFFREY S. TAYLOR,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. ROSE:

Q.    If you would, please, sir, state your name.

A.    Jeffrey S. Taylor.

Q.    Where are you employed, Mr. Taylor?

A.    With the Charlotte-Mecklenburg Police Department crime lab.

Q.    What's your position there?

A.    I'm the forensic document examiner.

Q.    How long have you been forensic document examiner?

A.    Twenty years.  Fourteen of that with CMPD.

Q.    And the other six?

A.    Seven, yeah.  About seven years with the United States Secret Service with their forensic services division.

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 336 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 346 of 510

**JA2216**

JEFFREY TAYLOR - DIRECT

Q.   During your entire career, what has been your position?

A.   Forensic document examiner.  I'm also the quality manager with the CMPD crime lab as well.

Q.   What does that mean?

A.   I run the quality assurance program.  Make sure we stay up with our rules and SOP's for accreditation.

Q.   If you'll tell us a little bit more about your training and experience, educational background.

A.   I earned a bachelor of arts, bachelor of science from Michigan State University.  After completion of college, I was hired by the United States Secret Service and put into their question document training program.  This was an extensive training program three years in length.  I studied the leading textbooks in the field of question documents.  I wrote research papers.  Conducted independent research.  I also examined cases that were routinely submitted to the laboratory and reported my findings to senior examiners for their review.

Q.   Do you continue to maintain your training?

A.   In addition to being certified by the secret service, I was tested, went through a two-year testing program with the American Board of Forensic Document Examiners, and they require me to do continuing education.

Q.   And do you also teach?

A.   Yes.  Yes, I do.  On occasion.

Q.   Do you also, for documents that you examine and those

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 90-5   Filed 08/23/17   Page 337 of 510
Case 3:08-cv-00734-RJC   Document 50-5   Filed 10/04/10   Page 35 of 45

JA2217

JEFFREY TAYLOR - DIRECT

where you make comparison or make a conclusion as to the comparison, do you have someone check your work for quality control?

A.    A minimum of 10 percent of my case work has to be reviewed technically.  And I do that, yes.  And usually it's a little more than 10 percent that actually gets reviewed.

Q.    And who do you have do that?

A.    Mr. Greg Floyd.  He's out of Bostic, North Carolina.  He was previously with the United States Secret Service for approximately 30 years.  And he was my principal trainer back then when I first started.

Q.    During -- when you say principal trainer, was he also an individual whose specialty was examination of forensic documents or document examinations?

A.    Yes.

Q.    Did you have him perform quality control on some of the items that were submitted in this particular case?

A.    Yes.  He reviewed the second report, I believe -- no, excuse me, the first report that I submitted and I think he -- I'm pretty confident that he also reviewed an e-mail transmission that I made to him, some charts that I put together on the second report.

Q.    Did he determine that there had been any conclusions with which he disagreed?

A.    No.  He thought my conclusions were consistent with what

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 338 of 510
Case 3:08-cv-00734-RJC   Document 59-5   Filed 10/04/10   Page 36 of 45

JA2218

JEFFREY TAYLOR - DIRECT

was correct.

Q.   First I'm going to hand you documents 235, 236, 237.

MR. FOSTER:  Are those exhibit numbers?

MS. ROSE:  These are exhibit numbers.  I can give you the JMU number which you probably have as well.

JMU2.  236 is JMU22.  237 is JMU66.

THE COURT:  To me JMU means James Madison University.  What does it mean to you?

MS. ROSE:  It means jail mail Umana.  And in this particular case, every defendant's jail mail was identified in that manner.

Q.   All right, sir.  The three exhibits which I have provided to you, how were those significant to you?

A.   They appear to be submitted to me as specimen writing of Mr. Alejandro -- no, excuse me, Mr. Umana, pardon me.  Known specimen material.

Q.   And are any of those documents original documents?

A.   JMU22 or Government's Exhibit 236 is original.  And that's -- that's the only original there.

Q.   With regard to 235, if you would, is there a photocopy of an envelope?

A.   Photocopy of the front of an envelope.  And it appears to be a two-page -- well, one-page, probably front and back, photocopy of a letter, one-page letter.

Q.   And the envelope, I know you don't speak Spanish, but if

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 339 of 510
Case 3:08-cr-00134-RJC   Document 5257   Filed 10/04/10   Page 37 of 45

**JA2219**

JEFFREY TAYLOR – DIRECT

you could at least read the addressee and the return address and any numbers that are there.

A.   Portion I can read is Alejandro E. Umana.  And I suspect it's a D, number 362221, Box 34429.  And then there's the R, and then the remainder of Charlotte, NC 28234.

And then it appears to be to a Consulato D El Salvador, 3505 Duluth Park Lane, Suite 320, Atlanta, Georgia 30096.

Q.   The second exhibit that you have there, Government's Exhibit Number 236.

A.   Yes.

Q.   What is contained within Government's Exhibit 236?

A.   Two sheets of paper with hand printing on the front and back submitted to me -- it's labeled S1 known, JMU22.  And that was submitted as known material.

Q.   And is that a photocopy or an original?

A.   This is an original, penciled writing.

Q.   And to whom is -- is there an envelope copied as well with that one, with that particular exhibit?

A.   No, there is not.

Q.   And then the final Exhibit 237.

A.   Appears to be the front of an envelope, also the reverse side of an envelope and one -- three pages and possibly a reverse side of either a page or an envelope containing some hand printing.

Q.   And the envelope, again, if you would tell us what's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 52-5   Filed 03/23/17   Page 340 of 510
Case 3:08-cr-00134-RJC   Document 525   Filed 10/04/10   Page 38 of 45

**JA2220**

JEFFREY TAYLOR – DIRECT

marked on that envelope.

A.   Alejandro Umana, PID number 362221, P.O. Box 34429, Charlotte, North Carolina or NC 28234.

Jaime Sandoval, PID number 190829, P.O. Box 34429, Charlotte, NC 28234.

Q.   And did you mark in some way the exhibits that are before you which you've just identified with your handwriting, your initials or any other identifying information?

A.   Yes.  My initials, the date, and the S1 appear on each one of those items.

Q.   Now, first as to those three documents, did you make an examination of those particular documents in relation to one another?

A.   Yes, I did.  I examined them and inner compared them to determine whether or not they were of common authorship.

Q.   And what was your conclusion?

A.   I believe -- yes.  I determined everything with the exception of the final two lines on JM -- well, Government's Exhibit 236 all appear to be of common authorship.

Q.   And the final two lines on 236, how are they different than the rest of the items which you examined?

A.   They appear to be of a higher skill level, more cursive in nature than the remainder of the hand printed material.

Q.   Then once you had made that determination, did you have an exhibit or certain items with which to compare, to which

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/03/17   Page 341 of 510
Case 3:08-cr-00134-RJC   Document 1255   Filed 10/04/10   Page 39 of 145

JA2221

JEFFREY TAYLOR - DIRECT

you compared those items?

A.   Yeah, I was submitted numerous questioned items to compare with these items.

Q.   I hand you what we have marked as Government's Exhibits 238 to 250.  And first, do each of those exhibits have your markings on them?

MR. FOSTER:  Excuse me, Your Honor.

(Counsel conferred.)

A.   Yes, they all appear to have a JMU number, my initials, a control number going with the property sheet that it was submitted under to me on, as well as a date.

Q.   Beginning with Government's Exhibit 238 which is marked as Q1.  What does Q1 mean?

A.   Q1 is what I labeled this item on my original submission, I believe, on 9/25/09, and that would be under my original report.

Q.   Is that your report dated October the 8th, 2009?

A.   That's correct.  And that's one of 32 sheets of paper containing photocopies of what appear to be 13 letters and nine envelopes labeled Q1 through Q13.

And this would be the envelope under which would be considered Q1 and there should be a letter probably along with this.  Possibly.  Maybe not.  It just has the code on the back.

And that's a photocopy of an envelope addressed to Jaime

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 342 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 90 of 145

JA2222

JEFFREY TAYLOR - DIRECT

Sandoval from Alejandro Umana and then an E at the end.

Q.   And does it have the prisoner identification or the PID number?

A.   Yes PI -- for Umana it's PID 362221, and for Sandoval it's PID 190829.

Q.   Now, do you see on the screen before you Exhibit 238?

A.   Yes.

Q.   And is that similar to what you have in front of you except is it fair to say that the small writing at the bottom is in red on the copy which you're looking at?

A.   That's the only difference it appears.

Q.   Is there anything else contained within 238?

A.   Just the reverse side.  Appears to be a photocopy of the reverse side of the envelope.

Q.   Government's Exhibit 239 which will be your Q2.

A.   Yes, it appears to be an envelope with a three-page, front and back, hand printed document.

Q.   That document has the defendant's name and PID number in the upper left corner?

A.   That's correct.

Q.   Addressed to a Jesus Rangel or Rongel?

A.   Yes, with a PID 358348.  It's Jesus A.

Q.   And again, the small writing, which on our screen appears black and white, down in the corner, a date of 9/25/09 and Q2, is all that your handwriting?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 50-5   Filed 08/23/17   Page 343 of 510
Case 3:08-cr-00734-RJC   Document 1955   Filed 10/04/10   Page 91 of 145

JA2223

JEFFREY TAYLOR - DIRECT

A.   That is correct.

Q.   And on the copy that you're holding before you, the original of Exhibit 239 is in red, written in red?

A.   That is correct.  All of the exhibits that I have in my possession that you handed to me will have my original initials, the date, the Q number, sometimes the JMU number, the control number, and I did say the date already, all in red.

Q.   And that's also reflected in JMU13, correct?

A.   I don't see a JMU number on this one.  The first submission did not -- I don't believe had JMU numbers along with them, if I remember correctly.

Q.   All right.  Then Exhibit 240.

A.   Appears to be portions of a two-page hand printed letter, photocopies of.  Once again, it contains my initials, date, Q2, control number 49303.

Q.   And there are numerous pages.  We scrolled through them on the screen.  You may be looking at the one in front of you.  How many pages are included in Exhibit 239?

        THE COURT:  40.

A.   Excuse me, I thought we were on 240.

Q.   I apologize.  239.  I don't think I asked you how many pages were included in your Exhibit 239.

A.   Three pages, all printed, front and back.  So a total of six printed pages.  They came in, appears to be six sheets of

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 344 of 510
Case 3:08-cr-00734-RJC   Document 50-5   Filed 10/04/10   Page 92 of 145

**JA2224**

JEFFREY TAYLOR - DIRECT

paper.

Q.    All right.  Then Government's Exhibit 240.

A.    Appears to be a photocopy of a two-page item, hand printing on the front and back.

Q.    And is that marked as your Q3, Government's Exhibit 240?

A.    No, that's Q -- yes, it is.  Q3.

Q.    Government's Exhibit 241.

A.    Single page, hand printing, front and back, and it's a photocopy once again.  And Q4 is on the lower right portion.

Q.    Exhibit 242.

A.    Appears to be a two-page hand printed letter, hand printing on the front and back of each page, along with an envelope from Alejandro Umana E., PID 362221 to a Carlos Figueroa, PID 298904.

Q.    And have you marked that as your exhibit -- or quality number Q5?

A.    Q5, Exhibit Q5.

Q.    Government's Exhibit 243.

A.    Appears to be a 2 -- 2-1/2 page hand printed letter, front and back, along with an accompanying envelope to -- or from Alejandro Umana E., 362221, to a Jaime Sandoval, PID 190829.

Q.    And your quality -- is it your Q number 6 on that?

A.    That's correct.

Q.    Government's Exhibit 244.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16cv-000573-MOCC    Document 50-5    Filed 03/23/17    Page 345 of 510
Case 3:08-cr-00734-RJC    Document 50-5    Filed 10/04/10    Page 93 of 145

JA2225

JEFFREY TAYLOR - DIRECT

A.   Appears to be a two-page hand printed letter.  One of the letters appears on the reverse side of the photocopy of the envelope.  So it's a total of four pages if you count the front and the back.  The accompanying envelope is from an Alejandro Umana E., PID number 362221, to a Carlos Figueroa, PID number 298904.  My initials appear on that, and it's labeled Q7.

Q.   Exhibit 245.

A.   There's a variety of pages here.  One is -- they're all photocopied.  There's a single page with some, appears to be a photocopy of some kind of a pamphlet on two of the sheets of paper.  And then some hand printing on the backs of two sheets and then a two-page letter.  One side contains hand printing on one page and both sides on the other page.  There's an accompanying envelope from a Alejandro Umana E., PID number 36221 -- excuse me, 362221, to a Ruben Moreno, PID number 370455.  And it has been marked with my initials, date of 9/25/09.  Appears to be Q8.

Q.   246.

A.   It's a single page, I call it hand printing.  It's more like artwork on the back of the photocopy of the envelope as well as the following page.  And there are some alpha characters in there.  And it is -- the envelope is from an Erick TeJada, PID 336204, to an Alejandro Umana.  I can read Uman on the photocopy.  PID number 362221.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 90-5   Filed 08/23/17   Page 346 of 510
Case 3:08-cr-00134-RJC   Document 595   Filed 10/04/10   Page 94 of 145

JA2226

JEFFREY TAYLOR - DIRECT

Q.   And then 247.

A.   Appears to be a single page, hand printed letter. Printing on both sides of the sheet.  Contains my initials, date 9/25/09, as well as 2/26/10.  Q number is 10.

Q.   248.

A.   248 is a single sheet of paper containing mainly what I would consider artwork characters.  It's labeled -- it has that printing on the front and the back.  And initialed, dated 9/25/09, 2/26/10.  And it has Q11 on it.

Q.   249.

A.   Single sheet of paper, front and back, containing hand printing.  The reverse side is normal Latin copy book form. Q12 appears in the lower right corner.  And it's from Alejandro Umana E., PID number 362221, to a Jose Garcia Bonilla, PID number 368221.

Q.   And that's marked with your Q number.

A.   Twelve.

Q.   Government's Exhibit 250.

A.   This is a single sheet of paper photo -- well, it's two sheets but the letter is a single-page, hand printed letter, front and back.  Accompanying envelope is from a Luis J. Amara, PID number 316271, to a Jaime Sandoval, PID number 190829.  And that is Q13.

Q.   With regard -- at this time, those particular items, did you make comparisons between the items labeled as Q numbers

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2227**

JEFFREY TAYLOR - DIRECT

which you've identified and the S numbers which you have identified?

A.    Yes, I did.

Q.    What process did you utilize to make those comparisons?

A.    By the time I had finished conducting examination of the known material, I had been looking at not just class characteristics but also individual characteristics found in the writing.  I compared those individual characteristics also to what I found in the question material, as well as the class characteristics, inner comparing, looking for both similarities and differences to arrive at my opinion.

Q.    And what was your opinion regarding the items that you had been presented and that you've marked as your Q numbers 1 through 13?

A.    My results state there is a strong probability that Alejandro Umana wrote the question hand printed material appearing on the exhibits Q1 through Q8, Q12, and Q13 items.

Q.    If we can stop for a moment and -- 238 is Q1.  Again, just identify it by the -- so Q1.

A.    Yes.

Q.    And you said strong probability.  If you would just explain your classification of identification.  What are the various levels of identification?

A.    I use the ASTM standard 9 point scale, and that goes from could not determine up to identification as well as could not

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 348 of 510
Case 3:08-cr-00134-RJC   Document 525   Filed 10/04/10   Page 96 of 145
**JA2228**

JEFFREY TAYLOR - DIRECT

determine to elimination.

And basically, what it is is when I'm examining handwriting, if I have a little bit of confidence that it may be that individual, I will render an opinion of indications that the writer of the known material may have written the question material.

Up from that would be he probably wrote the question material.  It's a fairly strong opinion, but it's not near the level of identification.

Further up the line would be highly probable; that is, I am virtually certain that the writer of the known material wrote the material in question, but there is something about the quality of writing or something missing from one body when compared to the other body of writing so that it's a less than definite opinion.

And then finally there's the identification of an author.

Now, as I have that gradation of opinions going from could not determine up to identification, I also render opinions from could not determine to elimination of an author based on differences in that case.

Q.   Now, is there any effect to your ability to make your identifications based upon a photocopies versus originals?

A.   In this case I think the quality of the photocopies is the main issue.

Q.   So as to Exhibit Q1 which is marked as Government's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 349 of 510
Case 3:08-cr-00734-RJC   Document 52-5   Filed 10/04/10   Page 97 of 145

JA2229

JEFFREY TAYLOR - DIRECT

Exhibit 238, what was your opinion?

A.   I determined that it's -- I'm virtually certain that the writer of the known material wrote the material in question. Highly probable.

Q.   Q -- you found that as to Q1, 238, 239, Exhibit 239.

A.   239, 240, 241, 242, 243, 244, and 245.  And that is the bulk of the handprinting that appears in those items.

Q.   Now, as to Government's Exhibit 246?

A.   246?

Q.   That was a letter addressed from someone else to Mr. Umana, correct?

A.   Erick TeJada to Alejandro Umana.

Q.   And your opinion as to that particular document known as Government's Exhibit 246?

A.   There's a strong probability that Alejandro Umana did not right the question material appearing on the Exhibit Q9 envelope -- yes, Q9 envelope.  Now, that does not -- that does not go to the unusual hand printing that appears within the letter itself.  In that case, with the material available for comparison, it could not be determined whether or not he wrote the block printing or artwork found in the letter.  Most of that -- the strong probability did not opinion goes to the hand printing found on the front of the envelope from Erick TeJada to Alejandro Umana.  The other portions of the writing could not be adequately compared.  There simply is no basis

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 350 of 510
Case 3:08-cr-00134-RJC   Document 1225   Filed 10/04/10   Page 98 of 145

JA2230

994

JEFFREY TAYLOR – DIRECT

for comparison.  They're slowly drawn and unnaturally executed.

Q.   247.

A.   Strong probability that Alejandro Umana did not write the question material appearing on this exhibit as well.

Q.   And did you have an envelope with that particular one?

A.   No, I did not.

Q.   And then 248.

A.   With the material available for comparison, it could not be determined whether or not Mr. Alejandro -- Mr. Umana wrote the question block printing or the artwork found on 248.

Q.   And then as to 249?

A.   I think there is a strong probability that Mr. Umana wrote the question material in this instance with the exception, of course, of the one page of hand printed block or artwork stylized hand printing.

Q.   And what was your determination as to that portion?

A.   I could not determine whether or not he did in fact do that.

Q.   Why is that, if it is, more difficult?

A.   Once again, there's really nothing to compare in the known writing to this material.  Even if there was, it is slowly -- more slowly and deliberately executed; therefore, just about anybody can draw it.  If you decide to draw those kind of shapes or formations, there's no way to determine one

Case 3:16-cv-00057-MOC   Document 52-5   Filed 03/23/17   Page 351 of 510
Case 3:08-cr-00134-RJC   Document 1225   Filed 10/04/10   Page 93 of 145

**JA2231**

JEFFREY TAYLOR - DIRECT

person drawing slowly and unnaturally from another person drawing slowly and unnaturally.

Q.   And then finally 250.

A.   There is a strong probability that Alejandro Umana wrote the question hand printed material appearing on this exhibit as well.  Just about everything on there appears to be hand printed, naturally executed writing.

Q.   And was that the -- all the items that you exhibit -- that you compared and examined relative to your report that you generated on October the 8th, 2009?

A.   Yes, that's correct.

Q.   Now, you have before you Government's Exhibit -- is your next exhibit 253?

A.   Yes, it is.  JMU241 or Government's Exhibit 253.

Q.   As to Government's Exhibit 253, what -- what markings did you make, if any, on this exhibit, 253?

A.   JMU41A through B -- A and B, and it has a control number, my initials, and the date of 2/26/10.

Q.   How many pages were in that particular exhibit?

A.   Two pages, penciled writing, hand printed, and front and back.

Q.   Exhibit 254.

A.   Is one envelope and two sheets of paper and they're labeled JMU458A, B, and C.  Control number, my initials, and a date of 2/26/10.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 352 of 510
Case 3:09-cr-00134-RJC   Document 522   Filed 10/04/10   Page 108 of 145
JA2232

Q.    255.

A.    Single page of hand printing, labeled JMU47.  2/26/10 is the date.  And it's front and back.

Q.    256.

A.    It's a single sheet of paper, labeled JMU49.  My initials, the control number of 49398, and then a date of 2/26/10.

Q.    257.

A.    Two sheets of paper, hand printing, bearing penciled hand printing on the front and back, containing JMU52A, 52B, my initials, the control number, and the date of 2/26/10.

Q.    Exhibit 258.

A.    One envelope and a single sheet of paper bearing hand printed material, front and back, JMU82A and B, my initials, dated 2/26/10.

Q.    259.

A.    Two sheets of paper bearing hand printed material, front and back, JMU120A and B, and that's control number 49398, dated 2/26/10.

Q.    JMU -- excuse me, Exhibit 260.

A.    It is labeled JMU140, my initials, the control number 49398, dated 2/26/10.  Single sheet of hand printing.  And it does contain some of those unusual characters as well as some numbers in the center of page 1.

Q.    261.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2233

JEFFREY TAYLOR - DIRECT

A.   Single sheet of paper bearing hand printing on the front and the reverse side, labeled JMU141, JST, my initials, 49398, 2/26/10.

Q.   262.

A.   Two sheets of paper bearing hand printed material on both sides of the first sheet, front side of the second sheet, labeled JMU142A and B, JST, 49398, 2/26/10.

Q.   263.

A.   Two sheets of paper bearing mainly hand printed material. The second page is just -- has some material on the front which is mainly artwork.  Labeled JMU143A and B.  49398 is the control number, my initials, 2/26/10.

Q.   264.

A.   Three sheets of paper and an accompanying envelope bearing hand printed material and some handwritten material on the front and back.  And it appears to be mainly block printing, if you will.  The envelope is -- and they're all labeled JMU255A through 255D.

Q.   265.

A.   Two sheets of paper and accompanying envelope bearing hand printed material, as well as the second sheet being nothing but artwork.  They are labeled JMU258A through C, my initials, control number 49398, and the date of 2/26/10.

Q.   266.

A.   A single sheet of paper with an accompanying envelope.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-5   Filed 03/29/17   Page 354 of 510
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 103 of 145
JA2234

JEFFREY TAYLOR – DIRECT

Hand printing appearing on the front and reverse side of the sheet of paper.  The label on both are JMU259A and B.  49398 is the control number, my initials, and 2/26/10.

Q.   267.

A.   267?

Q.   Yes, 267.

A.   Two sheets of paper bearing hand printed material, labeled JMU260A and B, control number 49398, and my initials, and the date of 2/26/10.

Q.   268.

A.   It's a single sheet of paper bearing hand printed material on the front and back, labeled JMU261, control number 49398, my initials, and a date of 2/26/10.

Q.   269.

A.   It's a single sheet of paper.  Hand printing appearing on the front and the reverse side.  Labeled JMU262, my initials, control number 49398, and 2/26/10.

Q.   270.

A.   Photocopy of what appears to be two sheets of paper with hand printing on the front of both, and accompanying envelope. And they're labeled JMU34A, B, and C, control number, my initials, and a date of 2/26/10.

Q.   271.

A.   Photocopies of what appear to be a two-page letter, hand printing on both sides -- the front of both sheets of paper,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 355 of 510
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 308 of 451
**JA2235**

JEFFREY TAYLOR – DIRECT

not on the reverse side.  There's also a photocopy of the front and reverse side of an envelope.  Labeled JMU42A, B, C, and D, my initials, the control number 49398, 2/26/10.

Q.   272.

A.   Eight sheets of paper containing hand printed material on the front side of every one.  It's got a front of the accompanying envelope.  Labeled JMU95A through 95I, my initials, 49398, and a date of 2/26/10.

Q.   273.

A.   Appears to be five sheets of paper with hand printed material on the front of each page.  There is also some of the unusual characters on the first page.  They're labeled JMU149A through 1 -- excuse me, JMU144A through 144E, my initials, JST, control number 49398, dated 2/26/10.

Q.   274.

A.   Appears to be two sheets of paper with hand printed material on the front of each page.  Labeled -- along with an accompanying envelope.  Labeled JMU159A, B, and C, my initials, 49398, and 2/26/10.

Q.   275.

A.   Two sheets of paper bearing hand printed material. Appears to be a letter with an accompanying envelope.  And they're labeled JMU182A, B, and C, control number 49398, my initials, and 2/26/10 is the date.

Q.   276.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 356 of 510
Case 3:08-cv-00164-RJC   Document 527   Filed 10/04/10   Page 103 of 145

JA2236

JEFFREY TAYLOR - DIRECT

A.    Two sheets of paper, hand printed letter on the front of each sheet of paper.  Accompanying envelope along with those two.  JMU186A, B, and C, control number 49398, my initials, and 2/26/10 also appearing in the lower right corner.

Q.    277.

A.    Appears to be four sheets of paper with a hand printed letter on the front of each one, accompanying envelope. Labeled JMU202A, B, C, and D -- or excuse me, E.  A through E. My initials appear on each one, along with 49398 for the control number, and a date of 2/26/10.

Q.    278.

A.    Appears to be a hand printed letter on two sheets of paper.  The front sides of each one contain the hand printing. Along with an accompanying envelope.  Labeled JMU205A, B, and C, my initials, 49398 for the control number, and a date of 2/26/10.

Q.    279.

A.    Appears to be a six-page hand printed letter.  There's also a page of artwork in there.  Appears to be two letters, actually.  But labeled J -- and along with a accompanying envelope.  Labeled JMU206A through G.  My initials appear on each sheet of paper, along with a control number 49398, and 2/26/10.

Q.    280.

A.    Appears to be four sheets of hand printing and an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 357 of 510
Case 3:08-cv-00164-RJC   Document 522   Filed 10/04/10   Page 105 of 145

JA2237

JEFFREY TAYLOR – DIRECT

accompanying envelope.  Printing appears on the front side of each sheet of paper.  Labeled JMU212A through 212E, my initials, control number of 49398, date of 2/26/10.

Q.    And 281.

A.    Two sheets of paper bearing hand printed material, some of it block print, along with an accompanying envelope. Labeled JMU235 through 23 -- excuse me, 235A, B, and C. Containing my initials, as well as the control number 49398 and 2/26/10.

Q.    282.

A.    Appears to be two pages of hand printing in block printing.  No printing on the reverse side of each page.  And then the front -- photocopy of the front and back of an envelope.  And all items are labeled JMU239A, B, C, and D, control number 49398, my initials, and the date of 2/26/10.

Q.    283.

A.    Appears to be two pages of hand printing and some artwork.  The printing -- hand printing is on the front of each sheet, along with a photocopy of an accompanying envelope.  Labeled JMU242A, B, and C, control number 49398, my initials, 2/26/10.

Q.    And 284.

A.    Excuse me?

Q.    Is your report?  Did you -- do you see before you on the screen 284?  Is that --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-5   Filed 03/29/17   Page 358 of 510
Case 3:08-cv-00134-RJC   Document 252   Filed 10/04/10   Page 368 of 145

**JA2238**

JEFFREY TAYLOR - DIRECT

A.   Yes.

Q.   -- the report that you generated regarding these exhibits?

All right.

A.   It's one of the pages of a report, yes.

Q.   Did you compare these exhibits which you've just identified to the known or S1 documents that you've previously testified about?

A.   Yes.  I did a similar examination as I did in my original -- the original group submitted to me.

Q.   All right.  As to -- what were your conclusions?

A.   In this conclusion -- or in this case it -- I determined that it had been concluded that Alejandro Umana wrote the bulk of the questioned hand printed material appearing on the exhibit Q1 letters and envelopes.

Q.   All right.

A.   And I have listed separately in my explanation of the exhibits what JMU letters those go with.

Q.   So to clarify, JMU41, which is Government's Exhibit 253, you determined the defendant had written.

A.   Yes.

Q.   JMU45, which is Government's Exhibit 254.

A.   Yes.

Q.   You concluded the defendant wrote that.

JMU47, which is Government's Exhibit 255, was written by

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 359 of 510
Case 3:08-cr-00134-RJC   Document 525   Filed 10/04/10   Page 359 of 145

JA2239

JEFFREY TAYLOR - DIRECT

the defendant according to your conclusion, correct?

A.    Correct.

Q.    JMU49, which is 256.

A.    Correct.

Q.    JMU52, which is Government's Exhibit 257.

A.    Correct.

Q.    Each of those also you determined --

A.    Yes.

Q.    -- were written by the defendant.

A.    JMU82 or Government's Exhibit 258 as well.

JMU120 or Government's Exhibit 259, Mr. Alejandro --
Mr. Umana wrote that.

JMU140, Government's Exhibit 260, identified as being
written by Mr. Umana.

JMU141 or 261 also identified as being written by
Mr. Umana.

JMU142 or Government's Exhibit 262, Mr. Umana wrote that.

And Government's Exhibit 263 identified as being executed
by Mr. -- I identified as being executed by Alejandro Umana.

MR. FOSTER:  I don't want to interrupt, was that JMU
or an exhibit number?  You lost me on the last one.

THE COURT:  That was an exhibit number.

THE WITNESS:  Government's Exhibit 263 or JMU143.

Government's Exhibit 264 or JMU255.

Government's -- with the exception of one sheet of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2240**

JEFFREY TAYLOR - DIRECT

paper on there.

Q.    Which exhibit are you speaking of?

A.    In the case of JMU -- excuse me, Government's Exhibit 264, which is JMU255D.  Mr. Umana did not write the front of that sheet of paper or the reverse side with the exception of the final paragraph which I concluded Mr. Umana did write.

Q.    So what's being -- so on D of JMU55 (sic), one portion of it was Mr. Umana and the rest was not.

A.    That is correct.  And I also missed one exhibit earlier when I was going through.  JMU141.

Q.    Which is our 261.

A.    Yes.  261 or JMU141, I concluded that Mr. Umana did not write that as well.

Q.    Now, regarding the remainder beginning with --

A.    Government's Exhibit 265.

Q.    Yes.  Which is JMU258.

A.    Yes.  I concluded that he wrote the bulk of that as well. Of course, there is some artwork in that instance as well as when we have other cases of artwork where we have a full sheet of paper with a picture, I did not identify that material. That...

Q.    You didn't identify that type of artwork?  Are you looking at it?

A.    Yeah, I'm looking at the screen.  That's the type of artwork right in the center that I would not identify.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 361 of 510
Case 3:08-cv-00134-RJC   Document 523   Filed 10/04/10   Page 109 of 145
JA2241

JEFFREY TAYLOR - DIRECT

Q.   But would you look at the handwriting around it?

A.   Yes, I would.  And in that case it appears to be Mr. Umana's.  I'm not sure which exhibit that's from.

Q.   That's 265.

A.   Oh, it is the reverse side of the envelope, correct.

     And there's also 265C which is this item that I would not identify.

     Yes, that is correct, what is on the monitor now.

Q.   266.  Government's Exhibit 266, which is JMU259.

A.   Yes, I determined Mr. Umana wrote that as well.

Q.   Exhibit 267, which is Exhibit -- which is JMU260.

A.   Yes, Mr. Umana wrote that material as well.

Q.   Government's Exhibit 268, JMU261.

A.   Yes, Mr. Umana wrote that material.

Q.   Government's Exhibit 269, which is JMU262.

A.   Yes, Mr. Umana wrote that as well.

Q.   Regarding your Q2 exhibits as reflected on your March 19th, 2010 report, what were your conclusions?

A.   There is a strong probability that Alejandro Umana wrote the bulk of the question hand printed material appearing on Exhibit Q2, letters and envelopes.

     There is a strong probability that Alejandro Umana did not write the question material appearing on Exhibit Q1 page labeled JMU206F.

Q.   I show you what's been marked as 269 -- 279.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 362 of 510
Case 3:08-cv-00134-RJC   Document 52-5   Filed 10/04/10   Page 136 of 145

JA2242

JEFFREY TAYLOR - DIRECT

A.   Yes, I see that.

Q.   And what part of that particular exhibit did you determine Mr. Umana did not write?  JMU206.

A.   No, go to the next.

It would be 206F.  And it starts with "que ondas ese yolo."

Yes, that sheet of paper right -- or that portion of the letter right there I determined he very probably did not write.

Q.   The remainder of that exhibit, that's JMU206, Exhibit 279, you determined what?

A.   Yeah, Exhibit 279, the page labeled JMU206F, there is a strong probability that Mr. Umana did not write that.

Q.   And regarding the remainder of that exhibit A, B, C, D, E, and G?

A.   There's a strong probability he wrote the remainder of that exhibit with the exception of that artwork, of course.

Q.   Regarding JMU34, which is Government's Exhibit 270.

A.   Yes.

Q.   What was your determination?

A.   Strong probability that Mr. Umana wrote that.

Q.   Exhibit 271, which is labeled as JMU42.

A.   Yes, strong probability that he wrote that as well with the exception of the artwork on the reverse side of the envelope.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 363 of 510
Case 3:08-cv-00134-RJC   Document 529   Filed 10/04/10   Page 13 of 145
JA2243

JEFFREY TAYLOR – DIRECT

Q.   Government's Exhibit 272, which is JMU95.

A.   Once again, there is a strong probability that he wrote all of that question material.

Q.   JMU44, which is marked as Government's Exhibit 273.

A.   Again, a strong probability that Mr. Umana wrote all of that material.  There is some unusual printed artwork in there that -- or block printing in an unusual style that I could not determine who wrote, whether or not he wrote.

Q.   And what part of Exhibit 273?

A.   If you go to the first page, lower portion, about halfway down, you can see the block unusual artwork.  And then about midway down the second page, you get a -- about six -- five and a half lines, and then another line at the very top of that sheet.  It's just simply unnaturally executed and not good for comparison purposes.

Q.   And then as to Government's Exhibit 274, that would be JMU159.

A.   Once again, Mr. Umana -- there's a strong probability that Mr. Umana wrote that.

Q.   Exhibit 275, which is JMU182.

A.   There is a strong probability that Mr. Umana wrote that question material.

Q.   276.

A.   There is a strong probability that he wrote the hand printed material appearing on Government's Exhibit 276.  There

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 10/04/17   Page 364 of 510
Case 3:08-cr-00134-RJC   Document 52   Filed 10/04/10   Page 126 of 145
JA2244

JEFFREY TAYLOR - DIRECT

is some artwork in there, looks like a picture of a fish, that I can't determine whether or not anybody wrote -- or whether or not he wrote that.

Q.   And then 277.

A.   There is a strong probability that Mr. Umana wrote the question material appearing on Government's Exhibit 277.

Q.   And that's JMU202.

A.   Yes, ma'am, that's correct.

Q.   Government's Exhibit 278, which is JMU205.

A.   Yes, there is a strong probability that Mr. Umana wrote the question material appearing on Government's Exhibit 278.

Q.   Government's Exhibit...

A.   279?

Q.   You've already addressed that.

A.   Yeah, addressed that.

Q.   With regard -- with the exception of F.
     280.

        THE COURT:  Back to 279.  Was that a strong probability finding on 279?

        THE WITNESS:  On all but the F letter, and then it was a strong probability he did not write that.

Q.   Regarding Exhibit 28, which is JMU212.

A.   Yeah, there's a strong probability Mr. Umana wrote the question material appearing on Government's Exhibit 280.

Q.   Government's Exhibit 281 identified as JMU235.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 365 of 510
Case 3:08-cv-00134-RJC   Document 529   Filed 10/04/10   Page 138 of 145
JA2245

JEFFREY TAYLOR - DIRECT

A.   There is a strong probability that he wrote the bulk of the hand printed material there.  There is some block printing that starts about halfway down the first page and ends about halfway down the second page where there is some evidence that suggests that he wrote it, but the evidence is not -- well, no.  Yeah, some evidence to suggest that he wrote it, but the evidence is not conclusive.

Q.   Exhibit 282.

A.   Once again --

Q.   Which is JMU239.

A.   Yes, Government's Exhibit 282, there is a strong probability that he wrote the question hand printed material on there with the exception of the more block hand printing, which there is some evidence that suggests that he wrote that but the evidence is not conclusive.

Q.   283, which is JMU242.

A.   Once again, there is a strong probability that he wrote the question material here that is the normal hand printing. There's once again a bunch of artwork on there starting on the second page about halfway down that I cannot determine who wrote, or whether or not he wrote it.

Q.   And then 284 is your report that you generated and about which you have testified.

A.   That's correct.

          THE COURT:  Am I to understand that the exhibit

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 366 of 510
Case 3:08-cv-00134-RJC   Document 52   Filed 10/04/10   Page 136 of 145

**JA2246**

JEFFREY TAYLOR - CROSS

numbers 253 through 269, your conclusion is that he did write it, and then exhibits after that are a strong probability with the exceptions that you noted.  Am I understanding your testimony that way correctly?

THE WITNESS:  That's correct.  There were some isolated issues where I either identified or eliminated -- or excuse me, eliminated him or very probably eliminated him, but the bulk of it is him.

MS. ROSE:  I don't have any further questions as to the issue before the court at this time.

THE COURT:  All right.  Any cross?

MR. FOSTER:  Yes, Your Honor.

CROSS EXAMINATION

BY MR. FOSTER:

Q.   Mr. Taylor, handwriting comparison is -- in your field what you do, it's a subjective determination, correct?

A.   As with most forensic sciences, there is some subjectivity, yes.

Q.   And one of the things that you would typically need to start off with your comparison, you'd need to have a known sample first, correct?

A.   You can compare question to question as well.

Q.   But to --

A.   You can have a common authorship problem as well as a known versus question problem.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 367 of 510
Case 3:08-cv-00164-RJC   Document 52   Filed 10/04/10   Page 118 of 145

JA2247

JEFFREY TAYLOR – CROSS

Q.   But in a case where you're trying to identify who the author is, to be able to come in and identify someone as the writer, you need a known sample from the writer, don't you?

A.   That is correct.

Q.   Okay.  And so that's a premise of your whole identification is knowing -- or having a known sample from the question suspect, correct?

A.   That's correct.

Q.   And in this case, what you were provided as -- or what you have referred to as S1 or the known is actually -- was brought to you by jail personnel and presented as their belief that it was from him, correct?

A.   No, it was submitted to property control.  I received a request from Investigator Hastings and I went down and picked it up.  There was no conversation per se on the location.

Q.   So you never had Mr. Umana in this case sit down and fill out a handwriting exemplar, correct?

A.   That's correct.  Later on I think I discussed with the prosecutor, I think some of it came from a consulate.  But outside of that, I never sat down with --

Q.   Right.

A.   -- Mr. Umana at any time.

Q.   And that would be the ideal method, correct, to get --

A.   No.  Actually, the ideal handwriting for comparison is handwriting executed in somebody's normal course of daily

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 368 of 510
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 18 of 145
JA2248

JEFFREY TAYLOR – CROSS

business where they're not paying attention to the writing act.  Something like letters mailed out.

Q.    Okay.

A.    That's the ideal situation.  More often than not we can't obtain that.  A lot of times with fraud cases we can't get signatures in somebody else's name from an individual, so we have to sit them down and ask them to write the name.  That's not as good as collected material, but usually it does well.

Q.    But nevertheless, the strength of your opinion that someone authored a letter is only as good as the truth that the known sample was authored by them.

A.    It's only as good as the individual characteristics found in agreement between the two bodies of writing.

Q.    Right.

A.    Whether or not that's his writing is for somebody else to determine.

Q.    Right.

A.    But it was purported to be his writing to me.

Q.    Right.

A.    And that's -- the writing was good enough for an identification.

Q.    And as you indicated in both of your reports, you referred to -- when you described what S1 was in each report, you referred to it as bearing purported writing of Alejandro Umana, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC    Document 59-5    Filed 09/29/17    Page 369 of 510
Case 3:08-cv-00134-RJC    Document 522    Filed 10/04/10    Page 176 of 145
**JA2249**

JEFFREY TAYLOR - CROSS

A.   Yeah.  Quite often when I receive collected specimens, I consider them purported.

Q.   You consider them -- I couldn't hear you.

A.   Purported.  Request specimens executed in the presence of an investigator or myself are considered just that, they are considered specimens of the author.  The purported is never added in that report.

Q.   Now, in your first report, the one dated October 8th, 2009, which I believe is Exhibit 252 or 253.  I forget which one it is.  But in any event, you wrote at the end of that report in the comments, you said it would be of value to reexamine the case if the originals of the Exhibits Q1 through Q13 items and the specimen writing of Alejandro Umana, S1, became available for comparison purposes, correct?

A.   That's correct.  Portions of the specimen material were photocopied, as well as all of the question material in that first submission were photocopies.  And photocopies are, generally speaking, never as good as the originals.

Q.   Now, if it turned out that the -- what you used as S1, if it turned out that, in fact, that had been authored by someone else, then -- then your -- that would be of -- then your opinions about who authored all the question documents would be of no value, correct?

A.   They would be -- if you could prove that it was somebody else, then I'm identifying someone else.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2250

JEFFREY TAYLOR - CROSS

Q.   Right.  And as far as the ability to compare and identify cursive writing versus printing, is there any difference there?

A.   Typically with cursive, you have a single signature more often than not and it's -- generally speaking it's more identifiable because you have the connecting strokes to compare.  In this case with the hand printing and the amount of hand printing, and the naturalness found between -- within the questioned and within the known material, it's very identifiable.

Q.   Explain again what it means -- you said a strong probability.  Where is that on your scale?  Identification is the highest.

A.   Yes.

Q.   What's the next one down?

A.   Strong probability.

Q.   And what's after --

A.   I'm virtually certain that Mr. Umana wrote the question material where I've identified.

         THE COURT:  Do you use strong probability and highly probable interchangeably?

         THE WITNESS:  They are interchangeable.

         The same would hold true in the instance where I have a strong probability belief that he did not write those few items.

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 371 of 510
Case 3:08-cv-00134-RJC   Document 59-5   Filed 10/04/10   Page 19 of 145
JA2251

JEFFREY TAYLOR – CROSS

MR. FOSTER:  Will you pull up Exhibit 236, please.

Q.  I believe you testified that this was one of the three components of S1, the specimen that you used as a known, if I'm not mistaken.

A.  Let me be certain here.  Let me find that.

Q.  I believe that's JMU22.

A.  Okay.  That appears to be a photocopy to me, and the one I have is an original.

Q.  Okay.  But that is the document, though?  It was one of the three specimens?  I mean, I realize it's a photocopy, but --

A.  Yes, it is.

Q.  How many pages are there to that exhibit?  I think -- is it two pages?

A.  Two pages, hand printing, front and back.

Q.  So there is no envelope that came with that one, correct?

A.  That is correct.

Q.  So it was just presented to you.  And it actually looks like there's no -- show the other page again, please.

There's no signature.  It doesn't purport to be -- are there three pages or two?

THE COURT:  Two pages, front and back.

MR. FOSTER:  Okay.

Q.  There's no signature by anybody that I can see on there, correct?  Or it doesn't purport to have the author's name on

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 2:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 372 of 510
Case 3:08-cv-00134-RJC   Document 52-5   Filed 10/04/10   Page 20 of 145
**JA2252**

JEFFREY TAYLOR – CROSS

it.

A.   I don't -- I don't see one, no.

          MR. FOSTER:  And could we look at 235, please.

Q.   Is that the last page?

A.   Yeah, this is a single page, front and back, photocopied document with an accompanying envelope.

Q.   That's exactly how you received it was a photocopy, not an original?

A.   That's correct.

          MR. FOSTER:  And lastly, could we look at 237, please.

          THE WITNESS:  Appears to be four sheets of paper. Two of the pages are hand printing, front and back.  The remaining two pages have hand printing on the front.  And there's an accompanying envelope from Alejandro Umana.

Q.   All right.  So those three exhibits we just went through, that was -- that was what you used as the known specimens.

A.   That's correct.

          THE COURT:  Now, are those all specimen 1 or did you --

          THE WITNESS:  I considered -- I lumped them together as S1 and then itemized them out in a description.

BY MR. FOSTER:

Q.   And was S1 the same for both reports that you did on the two groups of letters?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 373 of 510
Case 3:08-cv-00134-RJC   Document 52-5   Filed 10/04/10   Page 237 of 145

**JA2253**

JEFFREY TAYLOR – REDIRECT

A.   Yes, sir.

MR. FOSTER:  That's all I have, Your Honor.

MS. ROSE:  I do have a question.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   How many originals do you have other than -- you said you had one original for your S1 grouping.

A.   There is a two-page, hand printed item and it's hand printing on the front and back, so really four pages in the S1, and that's Government's Exhibit 236.  And it's labeled -- it's got a Post-it on it of JMU22.  Essentially, I had four pages of hand printing that were original.

     And there is a small portion on the reverse side of page 4 that -- I should say the reverse side of page 2 that does not appear to be of common authorship with the remainder of the known writing.  It's two lines of hand printing.

Q.   And then in the second grouping that are labeled as the JMUs, were there any originals?

A.   Yes.  For the question material?

Q.   Yes, for the question material.

A.   Government's Exhibit 253 through what appears to be 269 are all original hand printing, penciled hand printing.

THE COURT:  253 through 269?

THE WITNESS:  That's what it appears, 253 through 269, if I said that wrong.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2254

THE COURT:  Are those the documents in which you positively concluded it was the defendant as opposed to a highly probable or a strong probability?

THE WITNESS:  That is correct.  The genuine -- or the original genuine material is all identification for the most part on the bulk of it.  And as far as the photocopied material, those were held back to highly probable.

BY MS. ROSE:

Q.  Because they were copies.

A.  The main -- I believe that's the main reason.

MS. ROSE:  Thank you.  I don't have any other questions of the witness.

MR. FOSTER:  I have nothing further.

THE COURT:  Thank you.  You may step down.

THE WITNESS:  Yes, sir.

(Witness stepped down.)

THE COURT:  She wants to know if Denise Daniels is here.  It's been a long day.

DENISE DANIELS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.  If you would state your name, please, ma'am.

A.  Denise Daniels.

Q.  Where are you employed, Ms. Daniels?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 375 of 510
Case 3:08-cv-00164-RJC    Document 282-5    Filed 10/04/10    Page 23 of 145

**JA2255**

DENISE DANIELS – DIRECT

A.   Mecklenburg County jail central.

Q.   And what's your position there?

A.   Mail room, admin assistant.

Q.   Explain what you do on a daily basis or what your responsibilities are.

A.   It's to distribute the inmate mail incoming and to send out the outgoing mail.

Q.   Were you under particular instructions regarding some inmate mail and pulling that aside and making copies?

A.   Yes, ma'am.

Q.   Describe what your responsibilities were relative to that and what you had been asked to do.

A.   I was asked to pull certain people's mail and make copies of it, front and back, and copies of the envelopes and send them to Sergeant Clarkson.

Q.   And did you do that?

A.   Yes, ma'am.

Q.   Who were the people that were identified for you to make -- to go through those processes to copy the envelopes and the contents?

A.   I don't know all of their names.  I was given a list of names.

Q.   Did you use that list to -- in order to accomplish that task each day?

A.   Yes, ma'am.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 376 of 510
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 276 of 145
**JA2256**

DENISE DANIELS – CROSS

Q.   Whenever you make copies of the envelope and then of the contents of the envelope, what was your process in doing so?

A.   We would use a letter opener and slit the top of the envelope open and make copies of it, put the contents back in, tape it shut, and send it out.  And staple the contents of it and send it to Sergeant Clarkson.

Q.   And did you maintain them until you turned them over to Sergeant Clarkson?

A.   Yes, ma'am.

Q.   Did you alter or modify those items in any way, either the envelopes or the contents?

A.   No, ma'am.

MS. ROSE:  All right.  Thank you.

CROSS EXAMINATION

BY MR. FOSTER:

Q.   Ms. Daniels, you work in the mail room?

A.   Yes, sir.

Q.   Where is that located in the jail?

A.   On the first floor by the visitation desk.

Q.   Okay.  So you don't go up into the pods to collect mail, right?

A.   No, ma'am -- no, sir.

Q.   And so the mail comes to you out -- I'm talking about outgoing mail.

A.   Uh-huh.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 377 of 510
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 125 of 145
**JA2257**

WILLIAM HASTINGS - DIRECT

Q.    It comes to you, somebody brings it to you every day in different groups from the pods, correct?

A.    Yes, sir.

Q.    And when it comes to you, it's already been -- had an address placed on it and a return address and a stamp, correct?

A.    Correct.

Q.    And you don't see who actually presented that -- or which inmate presented each envelope, correct?

A.    Correct.

Q.    So you don't -- you can't testify to who presented any piece of mail, right?

A.    No, sir.

        MR. FOSTER:  I have no further questions.

        THE COURT:  Thank you.  You may step down and be excused.

        (Witness stepped down.)

        THE COURT:  Is that it?

        MS. ROSE:  Just quickly, Agent Hastings.

        THE CLERK:  You're under oath.

                    WILLIAM HASTINGS,

having been previously duly sworn, was examined and testified further as follows:

        THE COURT:  Would that be Detective Hastings?

        THE WITNESS:  Yes, sir.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 378 of 510
Case 3:08-cv-00164-RJC    Document 52-7    Filed 10/04/10    Page 26 of 45

JA2258

WILLIAM HASTINGS – DIRECT

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Did you request from Sergeant Clarkson at the Mecklenburg county jail to monitor outgoing inmate mail?

A.   The request was made through the sheriff's office legal -- their attorney for the sheriff's office, and arrangements were made with Sergeant Clarkson to collect the mail from him, yes, ma'am.

Q.   And did you identify the particular individuals for whom this was to be accomplished?

A.   Yes, ma'am.

Q.   Who did you select?

A.   Initially it was the 25 defendants that were arrested in the MS RICO indictment.

Q.   And did you routinely collect the requested items from Sergeant Clarkson?

A.   Yes, ma'am.

Q.   Once they were collected, what did you then do with them?

A.   I took them to the FBI office where linguist Susan Conrad would translate -- summary translate them for me initially. At that time we would bring them to the U.S. Attorney's Office and scan them for discovery purposes.

Q.   Now, did you main -- did you receive any original letters, any original documents?

A.   From the sheriff's office?  Very few.  Due to the fact

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 379 of 510
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 278 of 145
JA2259

WILLIAM HASTINGS – DIRECT

they kept the jail mail going out.  Instead of -- we requested originals, but they were unable to give us those.

Q.   But do you have some original documents which were ultimately provided to Mr. Taylor?

A.   Yes.

Q.   Where did you receive the original documents?

A.   I'm trying to recall the original documents.  Some were taken -- given to us from Mr. Granados, known as Gorilon. Trying to think of who else.  I don't recall the rest.

Q.   Would it help you to look at the documents?

A.   Yes.  I mean, it very well could.

Q.   Not all of these are originals, Officer Hastings, but if you'll look at just the original documents.

        THE COURT:  Ms. Rose, what was the exhibit number for the document that was admitted into evidence through the witness Gorilon?

        MR. FOSTER:  It was Exhibit 157, Your Honor.

        THE COURT:  157.

        THE WITNESS:  Yes, ma'am, that did remind me.

        MR. FOSTER:  I'm sorry, could you repeat that.  I couldn't hear you.

        THE WITNESS:  I said yes, ma'am, it did remind me now that I looked at the documents that are not copies.  They were received from Jaime Sandoval, Pelon, through his attorney in a debrief conducted with his attorney.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 380 of 510
Case 3:08-cv-00164-RJC    Document 52-7    Filed 10/04/10    Page 28 of 145

**JA2260**

WILLIAM HASTINGS - DIRECT

Q.   And then the other original was from Mr. Granados.

A.   Yes, ma'am.

Q.   Which was 157.

Did you then secure the items you had received, either the original copies that you had gotten from Sergeant Clarkson and then any original letters and maintain them in your standard course of evidence maintenance?

A.   Yes, ma'am.

Q.   Did you at some point produce those for Mr. Taylor's examination?

A.   Yes, through the Charlotte-Mecklenburg Police Department property control.

Q.   When he concluded his examination, were they returned to property control?

A.   They were returned to property control and portions of them were taken from property control for court purposes.

Q.   Were those the items that you see before you?

A.   Yes, ma'am.

Q.   Did you retrieve those items from property control and mark them as exhibits?

A.   Yes, ma'am.

        MS. ROSE:  All right, sir.  Thank you.

                    CROSS EXAMINATION

BY MR. FOSTER:

Q.   Detective Hastings, what -- what exhibits did you -- so

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 381 of 510
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 239 of 145

JA2261

WILLIAM HASTINGS - CROSS

we're clear, the ones you said you received from Jaime Sandoval's attorney, what exhibit numbers are those?

A.   Exhibit Number 254.  That I can say for sure, 258.

THE COURT:  254 through 258 or 254 comma 258?

THE WITNESS:  No, 254 comma 258.  I'll have to go back through my notes to verify exactly, but there's a lot of loose pieces of mail.

264, 265, 266, and that's it.

Q.   And what was the exhibit -- was it just Exhibit 157 -- I'm sorry, it was Exhibit 157 you received from Mr. Granados?

A.   The one that's already been placed in, yes.  I believe so, yes, sir.

(Pause.)

MR. FOSTER:  Sorry, Your Honor.

THE COURT:  Take your time.

MR. FOSTER:  I have no further questions.

MS. ROSE:  Thank you, sir.

THE COURT:  You may step down.

(Witness stepped down.)

MS. ROSE:  Nothing further, Your Honor, as to this matter.

THE COURT:  Ms. Rose, when Mr. Taylor was testifying, he indicated that with respect to question documents 1 through 13, he concluded that there was a strong probability that defendant wrote question documents 1 through

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 382 of 510
Case 3:08-cr-00134-RJC   Document 527   Filed 10/04/10   Page 306 of 145

JA2262

8, 12 and 13. What are the exhibit numbers and JMU numbers for those documents?

MS. ROSE: As to -- and I'm matching some of these up now. I know we went through them earlier, but...

THE COURT: For question documents 1 through 13.

MS. ROSE: Question document 1 is also known as JMU18. That is Government's Exhibit 160.

Question document number 2, which is 239, that is JMU13, which is Government's Exhibit 152.

Question document -- and that's -- 239 and 240 are both JMU13.

THE COURT: When you say 239 and 240, what are you...

MS. ROSE: Exhibits 239 and 240. I can tell Your Honor just for ease if your clerk wants to go back, these are all specifically listed on the government's exhibit list by both the JMU and the Q numbers.

But Exhibits 239 and 240 -- 239 is Q2. That's JMU13.

Government's Exhibit 240 is Q3. It is also JMU13.

JMU13 --

THE COURT: Hang on a second. Let me make sure I understand what you're saying.

Question document number 2 is JMU what?

MS. ROSE: Thirteen.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 383 of 510
Case 3:08-cr-00134-RJC   Document 525   Filed 10/04/10   Page 383 of 451

JA2263

JMU13 is marked as Government's Exhibit 152.  We have two sets here because -- I'll just explain it before we go back through it.  Part of those are the ones that the government had -- may introduce or might -- would request introduction of portions and the other part were the ones we separately marked them because they were examined separately by Mr. Taylor.  He examined far more than the government has marked as exhibits here.

THE COURT:  So where does 239 and 240 come in?  If it's Exhibit Number 152, how is it also --

MS. ROSE:  Because you'll see, if you look on page 14 of the Government's exhibit list, Government's Exhibit 239 is Q2.  It is marked as JMU13.  Because he broke some of the documents apart.

240, which is Q3, is also JMU13.

JMU13 in its entirety is marked as Government's Exhibit 152.  152A is the translation of JMU13 and 152B is a selection.

THE COURT:  So you have it marked as two different exhibit numbers?

MS. ROSE:  Right, because we have the original document with the translation and a selection.

THE COURT:  No, no, I'm talking about 152 and 239.  Are they two different exhibit numbers?

MS. ROSE:  They are two different exhibit numbers

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 384 of 510
Case 3:08-cv-00134-RJC   Document 52   Filed 10/04/10   Page 326 of 451

JA2264

because what we have here at 152 is a copy.  152A is a translation.  152B is a section of that translation.

THE COURT:  Right.

MS. ROSE:  239 and 240, which he marked as Q2 and Q3, are also JMU13.  Those were the original documents and it had his markings on them and we kept them as original exhibits.  And so we -- because they were coming in through two separate witnesses, two separate purposes, and he had made separate markings on those exhibits, I marked them for him as well.

THE COURT:  All right.  So Q2, which is JMU13, is -- the copy of it is Exhibit 152A and B -- or 152, and then A is the translation and B is the excerpt.

MS. ROSE:  Right.  But you'll also see that Government's Exhibit 240, which he marked as Q3, is a portion of JMU13.  He marked some pages separately as control numbers or...

THE COURT:  So the original of Exhibit 152 is 239 and 240.

MS. ROSE:  Correct.

THE COURT:  All right.  So go ahead and go through the list of 1 through 13 and give me the exhibit number for the copy of the transcript and the excerpt.

MS. ROSE:  Right.

THE COURT:  Then give me the original exhibit number

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 385 of 510
Case 3:08-cv-00134-RJC   Document 250-5   Filed 10/04/10   Page 138 of 145

JA2265

for that.

MS. ROSE:  All right, sir.  Government's Exhibit 241, which Mr. Taylor testified was his Q4 is JMU18.

THE COURT:  Do it so it's -- so I get this down. Give me --

MS. ROSE:  Okay.  Government's Exhibit --

THE COURT:  Hang on a second.  Give me the question number, the JMU number, the exhibit copy number with transcript and excerpt, and then give me the original exhibit number or the exhibit number for the original.

MS. ROSE:  Original documents are going to be the ones Mr. Taylor identified.

THE COURT:  Right.

MS. ROSE:  Okay.

THE COURT:  But what I want is, so that I understand all of this, if there is a document that's -- that you're going to -- you're seeking to introduce the copy, the transcript and the excerpt, I want to know what the corresponding original exhibit number is for the corresponding original.

MS. ROSE:  Okay.  So we were at 241.

THE COURT:  We -- all I know is we were at Q4.  I don't know what else.  Tell me the JMU number for Q4.

MS. ROSE:  Q4 is JMU18.

THE COURT:  All right.  And the exhibit number for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/29/17    Page 386 of 510
Case 3:08-cr-00134-RJC    Document 522    Filed 10/04/10    Page 386 of 451

**JA2266**

the copy, the transcript, and the excerpt.

MS. ROSE:  160, 160A, and 160B.

THE COURT:  Now, I thought 160 was question document 1.

MS. ROSE:  It is -- it is, Your Honor.  Mr. Taylor took the documents and sometimes labeled one particular document with four separate Q numbers and that's why I broke it down this way.  And so Q1 is JMU18.  Q4 is JMU18.

THE COURT:  Okay.

MS. ROSE:  Both of those, however, are in its entirety Government's Exhibit 160, translation 160A, selection 160B.

THE COURT:  Right.  And the exhibit number for the original for Q1 and Q4.  Q4 is 241?

MS. ROSE:  Yes, sir.

THE COURT:  And exhibit number for the original Q1?

MS. ROSE:  Those are both JMU18.  So they're 160, 160A, and 160B.

THE COURT:  And do you have an original for that?

MS. ROSE:  Yes.

THE COURT:  And what is that?

MS. ROSE:  I apologize.  The original being original that Mr. Taylor testified about or the first identification -- the first exhibit number that Ms. Conrad looked at the copies and did the translations?  Because some originals are copies,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/29/17   Page 387 of 510
Case 3:08-cr-00164-RJC   Document 529   Filed 10/04/10   Page 388 of 445
JA2267

so I'm trying to understand what Your Honor means by original.

THE COURT: Well, you were able to tell me the exhibit -- the 200 series exhibit number for 2 through 4. I'm just asking you is there a 200 series number for question document number 1?

MS. ROSE: Yes, sir.

THE COURT: And what is that?

MS. ROSE: 238. Exhibit 238 is Q1. It's also known as JMU18.

THE COURT: Right.

MS. ROSE: JMU18 was marked earlier --

THE COURT: I just wanted 238.

MS. ROSE: Okay.

THE COURT: So let's go to question document number 5.

MS. ROSE: Q5, also known as Government's Exhibit 242, JMU53, is Government's Exhibit 158, translation 158A, selection 158B.

THE COURT: Q6.

MS. ROSE: Q6 marked as 243, is JMU55. JMU55 is marked as Government's Exhibit 162, translation 162A, selection 162B.

THE COURT: Q7.

MS. ROSE: Is Government's Exhibit 244, JMU56. JMU56 is marked as Government's Exhibit 154, translation 154A,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 388 of 510
Case 3:08-cr-00134-RJC   Document 525   Filed 10/04/10   Page 36 of 145
JA2268

selection 154B.

THE COURT:  Q8.

MS. ROSE:  Q8 is JMU60.  It is Government's Exhibit 245.  And the government is not seeking to introduce that.  It was not identified by Ms. Conrad, nor a translation nor a selection.

THE COURT:  Okay.

MS. ROSE:  Q9 is 246, JMU69.  That is Government's Exhibit 155.  155A is the translation.  And 1 -- and there was no selection chosen for that one.

THE COURT:  Okay.

MS. ROSE:  Q10 is also JMU69.  Q10 is marked as Government's Exhibit 247.  69, as I said, is 155, and 155A is the translation.

THE COURT:  That's for Q9 and for Q10.

MS. ROSE:  Q9, 10, and 11 are all JMU69, Exhibits 155 and 155A.

THE COURT:  All right.

MS. ROSE:  Q12, Government's Exhibit 249, is JMU97.  That's Government's Exhibits 161, 161A translation, 161B selection.

Q13 is marked as Government's Exhibit 250, JMU148.  JMU148 is identified as Government's Exhibit 153, translation 153A, selection 153B.

The next series identified by Mr. Taylor, Your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-5    Filed 09/29/17    Page 389 of 510
Case 3:08-cr-00154-RJC    Document 525    Filed 10/04/10    Page 378 of 445
JA2269

Honor, were beginning with Government's Exhibit 253. That was identified as JMU41. JMU41 is Government's Exhibit 170, 170A, 170B, and 170C.

All right. JMU45, which was identified as Government's Exhibit 254, was not one of the matters which was identified by Ms. Conrad with a translation.

Government's Exhibit 255 is JMU47. JMU47 was not one of the letters translated nor selected and identified by Ms. Conrad.

Government's Exhibit 256, JMU49, was not selected nor marked as a translation.

Government's Exhibit 257, which is JMU52, was not previously identified as an exhibit with Ms. Conrad.

258 is JMU82. 82 was not identified earlier by Ms. Conrad.

Government's Exhibit 259 is JMU120. Government's Exhibit JMU120 was not selected otherwise.

260 is JMU140. JMU140 was not selected otherwise.

Exhibit 261 is JMU141. 141 was not selected otherwise.

262 is JMU142. 142 was not otherwise marked.

Government's Exhibit 263 was JMU143. JMU143 was not selected otherwise.

264 is JMU255. JMU255 was not marked otherwise.

265 is JMU258. 258 was not otherwise marked.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 390 of 510
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 388 of 445
JA2270

266 is JMU259.  259 was not otherwise marked.

267 is JMU260.  JMU260 is not otherwise marked.

268 is JMU261.  261 is not otherwise marked.

269 is JMU262.  And that's not otherwise marked.

270 is JMU34.  JMU34 is marked as Government's Exhibit 175, translation is 175A, selection is 175B.

271 is JMU42.  JMU42 is not otherwise marked.

272 is JMU95.  JMU95 is marked as Government's Exhibit 159, 159A, and 159B is the selection.

273 is JMU144.  JMU144 is marked as Government's Exhibit 163, translation 163A, selection 163B.

JMU159 is marked as Government's Exhibit 274.  That has previously been admitted as Government's Exhibit 157. 157A is the translation.  157B is the selection.  Those have already been admitted, Your Honor.

Government's Exhibit 275 is JMU182.  182 has not otherwise been marked.

276 is JMU186.  JMU186 has been marked as Government's Exhibit 165, translation 165A, selection 165B.

Government's Exhibit 277 has been -- was marked as JMU202.  That was otherwise marked as Government's Exhibit 166, 166A, selection 166B.

Government's Exhibit 278 is JMU205.  That is not otherwise marked, Your Honor.

Government's Exhibit 279 is JMU206.  206 has been

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2271**

marked as Government's Exhibit 167, translation 167A, selection 167B.

Government's Exhibit 280 is JMU212.  That was marked as Government's Exhibit 168, translation 168A, selection 168B.

Government's Exhibit 281, is JMU235.  That was marked as Government's Exhibit 174, translation 174A, selection 174B.

Exhibit 282, JMU239.  That was marked as Government's Exhibit 172, 172A translation, 172B selection.

Government's Exhibit 283, JMU242.  Marked as Government's Exhibit 176, translation 176A, selection 176B.

THE COURT:  And 84 is the second report.

MS. ROSE:  284 is the second report.

THE COURT:  All right.  Anything further from either side?

MR. FOSTER:  Well, not evidence, Your Honor.  I have some argument to make on authenticity.  Do you want to hear that now or...

THE COURT:  I thought you had made those arguments before, but I'd be glad to hear from you on those arguments again.

MR. FOSTER:  Okay.  Thank you, Your Honor.  I think based on the testimony --

THE COURT:  Because my plan is to go through these proposed exhibits overnight and render an opinion in the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 392 of 510
Case 3:08-cv-00134-RJC   Document 227   Filed 10/04/10   Page 140 of 145

JA2272

morning both as to authenticity and as to relevance.  And so if there's anything you wish to tell me on either one of those things at this time --

MR. FOSTER:  All right.  Thank you, Your Honor.

THE COURT:  -- I'd be glad to hear from you.

MR. FOSTER:  First as to authenticity, the government's theory here is that the known samples of these letters were established by the fact that they came out of the jail.  Two of the specimens with the return address of Alejandro Umana.  One of them did not, though.  Exhibit 236 was just a letter with no signature, no name attributed to it, no envelope.  So how that could be attributed as a known sample is questionable.

The other two are based on the premise that because they came out of the jail with the return address of Alejandro Umana, they must have been authored by him.  However, as we have seen, many of the exhibits -- the very exhibits that the government has offered and introduced evidence about are letters that they are attributing to our client, yet the envelope claims to be from someone else to someone else.  So obviously, they've proven that their premise is false because letters coming out of that jail written by one person under the return address of someone else.  So the premise that they could use these as known samples in the first place because they were from the return address of Alejandro Umana is a

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 393 of 510
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 49 of 145
JA2273

flawed premise.

Therefore, as Mr. Taylor acknowledged in his first report and his second report, these are purported writings of Alejandro Umana; they're really not known writings.

And then to then match up all these other writings to those purported writings obviously does not lead to any kind of convincing identification that the author of all these other question documents was indeed Alejandro Umana.

There's no evidence before the court that established that necessarily any mail coming out of that jail had been checked by the detention officer to make sure the person who handed it to him was actually the same person described on the return address of the envelope.

THE COURT: What about the argument that Taylor inner compared the three specimen examples and found common authorship except for two lines? 235 is clearly something that is -- purports to be a letter from Umana to the consulate and so even though you don't have any address information with respect to 236, you have the expert's opinion of common authorship.

So in terms of the argument that the purported writings, there's no evidence that they're Umana, you do have evidence with respect to 235. Some evidence.

MR. FOSTER: Yes. I mean, that is some evidence, Your Honor. It's a common sense conclusion that -- I guess

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 09/29/17   Page 394 of 510
Case 3:08-cr-00134-RJC   Document 52-7   Filed 10/04/10   Page 42 of 145

JA2274

the court is saying who else would write a letter to the consulate except the person --

THE COURT:  And I haven't reviewed that letter for other clues as to whether it's Umana or someone else, but in terms of your argument that 236 is not reliable because there's no address information, just a two-page, front and back letter without an envelope, that's true as far as it goes, but there's also the testimony of the expert if believed that there's -- it was compared for common authorship and there -- the finding was common authorship except for a couple of lines in 236.

MR. FOSTER:  That's correct, Your Honor.  And I would just submit that that's -- a scientific opinion to identify something to establish authenticity for relevance purposes, I would submit that's just not good enough to lay a proper foundation linking this evidence to our client in this case.

THE COURT:  All right.

MR. FOSTER:  And I would -- now I'd like to -- I guess this is the time to go through the individual letters and kind of flag what our objections are on relevance and prejudice and that sort of thing, is that --

THE COURT:  Well --

MR. FOSTER:  -- how we do this?

THE COURT:  -- you can do that, but I'm kind of at a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 395 of 510
Case 3:08-cv-00134-RJC   Document 522   Filed 10/04/10   Page 48 of 145

JA2275

handicap because you haven't done it before, either side, and so I haven't read those letters at this point. And so, you know, I guess what I'll do is review these for authenticity tonight and hear from you in the morning.

MR. FOSTER: Thank you, Your Honor.

MS. ROSE: And the government has attached to the exhibits, Your Honor, the selections pulled from the translations that it submits to the court --

THE COURT: All right.

MS. ROSE: -- it would wish to publish. So the government selected those portions which it suggests are relevant.

THE COURT: So do you have those ready for me now?

MS. ROSE: I do have those ready for you.

THE COURT: All right. I'd be glad to receive them.

MS. ROSE: All right. I have -- I will also provide the court, if you would like, the translations to the three foundational letters about which you heard testimony.

THE COURT: Yes. Are you talking about the specimens?

MS. ROSE: S1, S2 --

THE COURT: I thought that was part of that package. Do you have that separately?

MS. ROSE: Yes, sir.

THE COURT: Yes, I very much would like to see that.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/29/17   Page 396 of 510
Case 3:08-cr-00134-RJC   Document 52-7   Filed 10/04/10   Page 44 of 145
**JA2276**

MS. ROSE:  I'm pulling those right now for you.

THE COURT:  All right.  Anything else tonight?

MS. ROSE:  No, Your Honor.

MR. FOSTER:  No, Your Honor.

THE COURT:  See you all at 8:30 in the morning.

We'll get proposed jury instructions to you tonight electronically, and see you in my chambers at 8:30 in the morning.

MS. ROSE:  8:30, okay.

(Evening recess at 6:23 p.m.)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

Dated this 16th day of April, 2010.

s/Cheryl A. Nuccio
Cheryl A. Nuccio, RMR-CRR
Official Court Reporter

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 397 of 510
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 46 of 145

JA2277

```
               UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                   CHARLOTTE DIVISION


UNITED STATES OF AMERICA          )DOCKET NO. 3:08-CR-134-2
                                  )
                                  )
     vs.                          )VOLUME V-A
                                  )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____   )



               TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
       UNITED STATES CHIEF DISTRICT COURT JUDGE
                   APRIL 16, 2010

APPEARANCES:

On Behalf of the Government:
     JILL WESTMORELAND ROSE
     ADAM CHRISTOPHER MORRIS
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204



               LAURA ANDERSEN, RMR
              Official Court Reporter
            United States District Court
             Charlotte, North Carolina
```

JA2278

1042

I N D E X

GOVERNMENT'S WITNESSES:

SERGEANT SCOTT CLARKSON
        Direct Examination by Ms. Rose                1086
        Cross-Examination by Mr. Foster               1093

DENISE DANIELS
        Direct Examination by Ms. Rose                1095
        Cross-Examination by Mr. Foster               1096

JEFF TAYLOR
        Direct Examination by Ms. Rose                1096
        Cross-Examination by Mr. Foster               1119

CHUCK HASTINGS
        Direct Examination by Ms. Rose                1124

* * * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cr-00057-MOC Document 50-5   Filed 03/23/17   Page 399 of 510
Case 3:08-cr-00134-RJC   Document 52-4   Filed 01/30/11   Page 239 of 513
**JA2279**

1043

E X H I B I T S

GOVERNMENT'S EXHIBITS:
NO.                                                          RECEIVED
61      ...........................................    1126
73      ...........................................    1127
158     ...........................................    1127
158a    ...........................................    1127
158b    ...........................................    1127
158c    ...........................................    1127
160     ...........................................    1127
160a    ...........................................    1127
160b    ...........................................    1127
166b    ...........................................    1127
168     ...........................................    1128
168a    ...........................................    1128
168b    ...........................................    1128
204     ...........................................    1128
235     ...........................................    1123
236     ...........................................    1123
237     ...........................................    1123
251     ...........................................    1107
251a-e    .........................................    1107
252     ...........................................    1104
284     ...........................................    1118


                    *  *  *  *  *  *


Government rests                              1129, 1138
Defense Motion, Rule 29                       1129
Defendant rests                               1138


                    *  *  *  *  *  *



COURT INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

Laura Andersen, RMR 704-350-7493

JA2280

1044

P R O C E E D I N G S

APRIL 16, 2010.

IN CHAMBERS, COUNSEL AND THE COURT.

THE COURT:  We got a jury coming in soon, so let's get right down to business.

Mark, John, I indicated that I would hear any relevance 403 objections that you had to the proposed correspondence that the government intends to get into evidence.  I've reviewed each of them in light of the government's proposed bases for admission.  I'll be glad to hear from you if there's anything you want to address at this time.

MR. FOSTER:  Thank you, Your Honor, yes.

I guess, I'll try to make this as simple -- I'm going to address this -- it is it okay if I address it by the exhibit number --

THE COURT:  Exhibit --

MR. FOSTER:  -- in the 100 series?

THE COURT:  Yes.

MR. FOSTER:  Exhibit 152, this is a letter, supposedly from Alejandro Umana to Jesus Miguel --

THE COURT:  The government -- the first one I have from the government is 161 -- are you trying to get seek admission of 152?

MS. ROSE:  152 is -- no 152 is not on the list.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-5   Filed 03/23/17   Page 401 of 510
Case 3:08-cr-00134-RJC  Document 924-1  Filed 03/30/11  Page 401 of 513
JA2281

1045

THE COURT:  What I've got, Mark, is 161 through 170.

MS. ROSE:  Did you bring our exhibit list?

MR. FOSTER:  No, I left it.  Okay.  Well --

MR. NAZZARO:  151 and 156 were foundational.

157 is the one, I think, we already had in evidence.

I think it starts at 158, there's b and c and then 159 and then --

MR. FOSTER:  I was just going by what you told me. Originally, you said you were seeking to introduce 151, basically all the way through 170.  So that's what I was originally told, so that's what I --

MS. ROSE:  What number did you just call out though?

MR. FOSTER:  Me?

MS. ROSE:  Did you say 152?

MR. FOSTER:  Yeah.  I'm sorry, 152.

MS. ROSE:  Exhibit 152?

MR. FOSTER:  Yeah, Exhibit 152.

MS. ROSE:  Okay.  Which is JMU13.

MR. FOSTER:  Right.  So are you seeking to introduce that?

THE COURT:  The documents I was given to review last night are 161 through 170.  157 is already in.  I've

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5   Filed 03/23/17   Page 402 of 510
Case 3:08-cr-00134-RJC  Document 52-4   Filed 03/30/11   Page 5 of 113
**JA2282**

1046

already admitted that.

MS. ROSE:  The foundation --

THE COURT:  Yeah, the foundational -- are you talking about the specimen documents?

MS. ROSE:  Right.

THE COURT:  That's just for the expert.

MS. ROSE:  Right.  And I had actually labeled more foundational documents if we needed them than the experts have relied upon, and JMU13 was one of those.

THE COURT:  But in terms of admitting correspondence before the jury, 161 to 170.

MS. ROSE:  157 is where it starts.

THE COURT:  Well, 157, yes.  157 and then 161 through 170?

MS. ROSE:  158.

THE COURT:  What is 158?

MS. ROSE:  JMU53.

THE COURT:  Do you have it?

MS. ROSE:  (Handing paper writing to the court.)

THE COURT:  What I was given to review was 161 through 170.  In addition to the specimen documents, and so.

MS. ROSE:  I know, but I gave him everything, because they were all referred to in the report.

THE COURT:  I don't want to talk about sentencing documents today.

Laura Andersen, RMR 704-350-7493

**JA2283**

1047

MS. ROSE:  Okay.  All right.

THE COURT:  We're not talking about 158.

MS. ROSE:  No.

THE COURT:  How about 159?

MS. ROSE:  No.

THE COURT:  160.

MS. ROSE:  Yes.

THE COURT:  All right.  Do you have 160?

MS. ROSE:  Is 97.

MR. FOSTER:  I thought it was JMU18.

MS. ROSE:  160 is 18.  You have 161?

THE COURT:  I start at 161.

MS. ROSE:  Okay.

THE COURT:  What I want to do is go through 161 to 170, and then circle back at the end to 160.

MR. FOSTER:  Okay.  All right.

As to Exhibit 161, I mean, I just think this is -- really has no -- little or no probative value as to the charges that are before the court, or the elements of the offenses.  It's just sort of generic rambling about the gang.

It's also, I would assert, unfairly prejudicial and inflammatory to the jury, talking about language in here "figuring out what's up with these fucking assholes.  They want to lock up our best warriors.  We're controlling those

Laura Andersen, RMR 704-350-7493

**JA2284**

1048

fuckers making up things."

I mean, just -- it's just a rambling, this is just not probative of anything. But it's unfairly prejudicial. It's one of these things that's going to play to the emotions of the jury rather than to anything factual that's been proven.

So I would assert that the unfair prejudicial value outweighs the probative value.

THE COURT: All right. 162.

MR. FOSTER: 162 is talking about future intentions about what he contends he's going to do to the police. About, "you have the power because of the fucking uniform, that fucking star you have on your chest. But remember that out on the streets you are just like me, idiot. No problem. I'm here at the moment, but we will get out one day".

I would assert that under 404(b), that's uncharged conduct in the future. It's not part of this indictment. It doesn't tend to prove anything in issue before the jury. It goes to character evidence about future intentions.

And so I would assert that it's inflammatory, and it's unfairly prejudicial, and has little probative value to anything.

THE COURT: 163.

MR. FOSTER: 163 I would assert is -- it's

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 405 of 510
Case 3:08-cr-00134-RJC   Document 524   Filed 03/30/11   Page 8 of 103
**JA2285**

irrelevant.  It's other conduct under 404(b).  It's irrelevant.  They're talking about people that we don't even know have anything to do with the case, I mean a Donatello doing a hit on somebody named Six.  The Latin Chet, C-H-E-T. Talking about other counties that aren't even involved.  At the end he says, "talking about some who are going to have a light put on them".  And although he names people related to this case, once again it's future conduct.  It's past the date of the indictment would end.  Which ends at the date of the last superseding indictment was filed.  So therefore I would assert is not probative of anything and it's unfairly prejudicial.

THE COURT:  165.

MR. FOSTER:  This one, I would assert first off, it's hearsay.  The envelope it came in was purportedly from Polo Torres to Misterio.  So on its face, on the envelope it would purport to be not from or to Mr. Umana.  Therefore would be hearsay.  It's also, therefore, little probative value.  It's just a brief selection of that.  It's not even clear what's being referred to.  So it's just -- I would assert has no probative value.  And whatever probative value it has, is outweighed by the unfair prejudice.  He's talking about "guys in neck ties that are bullshitting and want to fuck with our minds however possible".

THE COURT:  166.

Laura Andersen, RMR 704-350-7493

Case 3:16-cc-00057-MOC Document 595 Filed 03/23/17 Page 406 of 510
Case 3:08-cr-00134-RJC Document 524 Filed 03/30/11 Page 9 of 113
**JA2286**

1050

MR. FOSTER:  This one I would object, not only 403, but also on hearsay grounds.  The envelope this one came in was purportedly from Carlos Figueroa to Stiler.  Therefore, I would object on hearsay grounds, it's not from our client.

Then I would also assert that it's irrelevant.  Most of the content of this letter is referring to matters that aren't related to this case, apparently.  Talking about things that are going on in New York with some group called Familia Fripor F-R-I-P-O-R.

And it -- towards the end talking about, they say that he told the "fed fags that he doesn't belong to the Mara, rather he's Mexican".  There's just a lot of things like that, that are prejudicial.

And again, this doesn't seem to be relevant.  It doesn't link up to anything that would seem to be about this case and what's alleged in the indictment.  I mean, the letter appears to be addressed to somebody named Cyclon in the Normandies.

And again -- so I would assert that the unfair prejudicial value, outweighs any probative value which appears very nil here, because the matters discussed appear to be unrelated to the indictment.  And as I say hearsay, because it's from Carlos Figueroa to Stiler on the envelope.

THE COURT:  167.

Laura Andersen, RMR 704-350-7493

**JA2287**

1051

MR. FOSTER:  Object on this grounds under 403.  This letter is very sort of non-specific as to any particular parties involved in this case.

And towards the end there's some racial matters that would inflame the jury.  We do have four African-Americans on the jury.

And towards the end it does say, "and squeeze the shit out of these black guys until they make it so that all Hispanics are get together, or all of us".

So I would assert that that's inflammatory, it's unfairly prejudicial and outweighs no apparent probative value out of this letter.

THE COURT:  All right.  168.

MR. FOSTER:  I would object to this one on the grounds that this really doesn't help prove any element in any of the offenses before the Court.  It's not relevant.  It's talking about future intentions.

He says, "the moment has come for me to try to recover and calm myself down.  But the past doesn't let me carry on.  And never mind changing or stopping the shootings."

But that has to do with future conduct, not whether he's committed the past, charged conduct.  So I would assert this is not probative of anything, and it's unfairly prejudicial regarding character evidence regarding

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 408 of 510
Case 3:08-cr-00134-RJC   Document 1394   Filed 01/30/11   Page 11 of 113
**JA2288**

1052

him.

So I assert the unfair prejudicial value outweighs any probative value.

THE COURT:  169.

MR. FOSTER:  This one I would assert under 403 is very unfairly prejudicial.  There's a section towards the beginning that talks about, "they", meaning, apparently the Americans "will have to pay".  He says, "hopefully at the hands of all Spanish America.  And even though they don't like it, we are more Americans than these fucking English people who have taken possession of this continent.  But soon all Spanish Americans are going to realize that these fuckers are humiliating them too much, and there's when the bomb has to burst.  It has to burst.  These fuckers are going to cry, and they'll have kneel down in front of all of us.  This has to happen.  And if they don't like it, fuck the mother that gave birth to the mother fuckers."

So that this would have the effect of frightening the jury.  It's not probative of anything factual in the charged elements.  It's just inflammatory and would tend to make the jury have emotion and fear enter into their decision, which is suppose to be an objective and factual decision.

THE COURT:  170.

MR. FOSTER:  170, I would assert this has very

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 409 of 510
Case 3:08-cr-00134-RJC   Document 1252   Filed 01/30/11   Page 12 of 113
JA2289

1053

little probative value of anything.  I would assert -- I would add most of my other objections, many of these are cumulative as well.

This one just talks about general things and says, "these fucking good for nothings and these fucking police, they want to finish off the best of my gang".

Down further he says, "fucking good for nothings and that fucking authority, they will have to suck up to us. Even though they don't believe it, the Mara Salvatrucha 13 has to triumph on the streets or in the prisons we are always going to control".

That doesn't tend to prove he committed any of the charged crimes.  It's evidence of -- you can call it bad character evidence.  It's unfairly prejudicial and not probative of anything, and also cumulative.

And towards the end of that same exhibit is more of the same about saying about, "now those fucking cops are mad because the members of the mara haven't left any evidence behind, ha, ha, ha".

So that's the sort of material that's in that letter that's not probative of anything.  The unfairly prejudicial value outweighs whatever the probative value is.

THE COURT:  And 160.  Let's go ahead and deal with that as well.

MR. FOSTER:  I would object to this on the grounds

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 410 of 510
Case 3:08-cr-00134-RJC   Document 1524   Filed 01/30/11   Page 13 of 113
JA2290

1054

that it's not probative of any issue before the jury.

It's talking about things he's trying to do, allegedly, in the future.

I mean, it's also -- I just would assert that the -- that it's not particularly relevant.  It doesn't prove anything that has happened.  It's talking about things that it's trying to have happen in the future.  Therefore it's irrelevant and outside the scope of the indictment.

THE COURT:  All right.  The government care to respond briefly then, to any of that.

MS. ROSE:  I will only say, Your Honor, that we and the defense has copies of selections that we've pulled from those.  Some selections are relevant for sentencing. Some we would contend are relevant for sentencing.  Some we would contend are relevant for the guilt phase.

But in all of these cases, it's clear that the defendant --

THE COURT:  Well, which ones do you think are for sentencing?

MS. ROSE:  Well, there are parts of -- say for example.

MR. FOSTER:  Can I ask a question.  When you gave me those selections last night, I assumed that's what you were offering were just the selections, correct.

MS. ROSE:  Those would be the only thing that the

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 411 of 510
Case 3:08-cr-00134-RJC   Document 129   Filed 01/30/11   Page 14 of 113

**JA2291**

1055

government would publish, or would seek to publish.  And I'm not sure that we're going to -- all of it.

All right.  First, JMU41 is 170.  Well, the first part of that on the selection, "The mara is the one that stands up.  The mara is the one that shoots, it plays no games, it hits them in the face.  That's how the mara homies control.  I'm from El Salvador and just look at my claw."

THE COURT:  I've read this.  What is --

MS. ROSE:  Right.  It shows his membership.  They put on evidence that he's either breaking the rules or he's not a leader.  It also proves the enterprise --

THE COURT:  No.  My question was, which of these do you intend to introduce, not at the guilt phase but at sentencing?  Did you say there were some selections for sentencing, not the guilt phase?

MS. ROSE:  Yes.  And there are some selections, the ones we are also offering at sentencing -- I mean, the guilt, that I think are more probative for sentencing that I wouldn't produce to the jury.

THE COURT:  Tell me which ones those are.

MS. ROSE:  All right.  Well, the sentencing ones are Government's Exhibit 170 is a sentencing.  Government's Exhibit 171 is sentencing.

THE COURT:  Yeah.  I'm talking about from 160 to 170.

Laura Andersen, RMR 704-350-7493

JA2292

1056

MS. ROSE:  What the government would seek, just in general, you've read them, Your Honor, are selections from the letters which show -- prove the enterprise, continuing involvement in the enterprise, running the enterprise, making sure that gangs are still coordinated, who the members are, sending information regarding the continued running of the gang, and the continued organization of the gang.

And his membership is highly relevant to Count One and the other counts.  There's been some evidence by the defense as to that level of membership and where he falls within the gang.

And so all of the statements that the government would offer at this stage, relate to his membership in MS, his allegiance to MS.  And the fact that he wants -- the controlling of the other gangs -- this trial has been about respect, it's been about control.  And the selections of these letters prove -- would support that.

THE COURT:  All right.  First, with respect to authenticity.  When I heard the defendants arguing yesterday, was that there was no evidence that anyone saw the defendant write the letters or receive the letters directly from him, and that the jail policy was insufficient, in and of itself to document that the letters actually came from the defendant.

Laura Andersen, RMR 704-350-7493

**JA2293**

1057

And second, that the expert's testimony was based upon the failed premise of having a known specimen to compare the questioned documents to, and therefore any conclusion of the expert, concerning the questioned documents, was insufficient.

Did I get your argument right?

MR. FOSTER:  Yes, Your Honor.

THE COURT:  I considered those arguments in light of rule -- Federal Rule of Evidence 901 which says, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claim".

To meet that threshold, the parties seeking to introduce the evidence must provide a basis for the jury to resolve the authenticity question in favor of that party.

And so long as this initial threshold is met, any deficiency in the reliability of the authentication goes to the weight not its admissibility.

In this case I find that the defendant's objections go to the weight of the identification not its authenticity.

The jail policy I think is insufficient in and of itself to establish that the letters came from the defendant, but it is some evidence in terms of the exhibits

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 414 of 510
Case 3:08-cr-00134-RJC   Document 154   Filed 01/30/11   Page 174 of 213
**JA2294**

1058

that had the defendant's names, P.I.D. number, return address for the jail.  And the policy in place at the jail that required that is some evidence of authorship by the defendant.

Then I believe that there are sufficient indicators of the defendant's authorship of the specimen documents, to justify conclusion that he authored each of those specimen documents.

151 is -- Exhibit 151 JMU22 (sic.) is an envelope indicating that it's from Umana to the El Salvadoran consulate reflecting his name, jail pin number, return address.

Contains a several page letter referencing the defendant as an author, requesting Consulate help in avoiding the death penalty charges of being an MS 13 gang member.  Alleging discrimination because of the fact of his illegal status.  Reference to his family status that he gave in that letter the author gives a correct P.I.D. number that matches the one on the envelope.

JMU66 is an envelope bearing the name of the defendant, his PID number, his jail return address, addressed to Jaime Sandoval, identifying the author as Wizard, a known nickname of the defendant, and describing in detail, psychological testing performed on the defendant. Also references known associates of the defendant and uses

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MGC   Document 50-5   Filed 03/23/17   Page 415 of 510
Case 3:08-cr-00134-RJC   Document 1305   Filed 01/30/11   Page 14 of 113
JA2295

1059

terminology others have associated with him.

Then the third specimen is an envelope with identical address information as the previous letter, containing a detailed analysis of the social importance of MS 13 gang, and asking for PID numbers of other gang members.

I found the forensic expert to be credible, qualified, and he testified that he compared the specified exhibits, one to the other, and found a common authorship, except for two lines in one of the specified documents.

Based on that, I find that the specimen writings are what the government claims they are, various writings of the defendant.

The details and the portions of the letter, particularly regarding the psychological testing would only be known to the defendant, and there appears no reason another person within the jail would embark on such a prolific letter writing campaign under the defendant's name.

Comments in the letter, as I said, are consistent with verbal statements of the defendant as recorded and related by other alleged co-conspirators.

And so I find that the specimen documents are sufficient to establish known writings of the defendant.

The expert compared the known specimens to the questioned documents, and as to each of the documents the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 416 of 510
Case 3:08-cr-00134-RJC   Document 1129   Filed 01/30/11   Page 194 of 213
JA2296

1060

government intends to introduce in the guilt phase, found a probability of highly probable to virtual certainty, that the questioned documents were the writings of the defendant.

And where virtual certainty was not opined, it was only because the expert was working off a copy, not an original document.

So this expert testimony, combined with jail policy, the address identifiers, and the information contained within each questioned document unique to the defendant, satisfied me that the documents are what they purport to be, the writings of the defendant, and meet the evidentiary threshold of 901(a).

As far as relevance, the government has offered these documents among other things to prove the existence of the enterprise, membership of the defendant in the enterprise, the purpose of the enterprise; has offered them as co-conspirator statements, as party admissions, as evidence of consciousness of guilt, and in some cases obstruction of justice.

I do find that the conspiracy charged in the indictment is ongoing, and that efforts by various co-conspirators after the indictments were returned, demonstrate the existence of an ongoing conspiracy, and acts in furtherance of that conspiracy.

With respect to 157, which I previously admitted,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 417 of 510
Case 3:08-cr-00134-RJC   Document 1354   Filed 01/30/11   Page 24 of 113

JA2297

1061

a letter to the co-conspirator, Gorilon, for all those reasons, I believe it was relevant, admissible and not outweighed by 403.

I've listened to the arguments of the defendants with respect to each of the proposed letters to be admitted, and having considered them, and having considered the substance of the letters in light of the proffered reasons for the admissibility, I find that the probative value is not substantially outweighed by unfair prejudice, except with respect to letters number 167 and 169.

As to those exhibits, I'll sustain the defendant's objections to those exhibits.

And as I understood, Miss Rose, for you to be saying you were going to offer 170 at sentencing, if we reach there or not, of the guilt phase; was I right about that?

MS. ROSE:  Yes.

THE COURT:  So that will not be introduced as well.

I didn't review 160 last night, but I am reviewing it now, and I believe that the excerpt that the government intends to publish is highly probative.  It talks about various alleged co-conspirators by name, indicates a request for a co-conspirator's pin number.  And I find it is probative on the issues of the existence of the enterprise,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 418 of 510
Case 3:08-cr-00134-RJC   Document 1347   Filed 01/30/11   Page 21 of 113
JA2298

1062

the conspiracy and membership therein, as well as knowledge of co-conspirators, and that the probative value is not substantially outweighed by unfair prejudice.

I didn't have time to get out a written order, but I will follow those oral rulings up with a written order.

Anything further from either side before we talk about jury instructions?

MS. ROSE:  No, sir.

THE COURT:  All right.  Let's talk about jury instructions.

I intend to give general instructions to the jury before you all argue.  And my general instructions would go to page 30.  And I put them all in here, but if there's some that I've already done in preliminary instructions that I don't have to repeat, let me know, and if both of you agree, I'll take it out.  If there are some that you all have questions about, let me know and I'll consider it at this time.

But they're general instructions not too controversial, I don't think, so I'm not going to go through them one by one.  If there's an objection or request for, addition let me know.

MR. BRYSON:  Can I ask a question at this point, goes more to argument than instruction.  I understand the Court's instruction on reasonable doubt.  Does the Court

**JA2299**

1063

allow counsel to argue definition of reasonable doubt.

THE COURT:  I do not other, than what I give.

MR. BRYSON:  All right.

MR. MORRIS:  Judge, we've got something on 19. Second line from the bottom of the first paragraph on the page, "as a result of being immunized from prosecution". There's been no testimony of that and no witness has been immunized.

THE COURT:  There was use immunity, I guess, in one of the witnesses, but not a prosecution immunity.

MR. MORRIS:  Yes.

MR. FOSTER:  Changing that to be, as a result of being -- having his statements immunized from use against him --

THE COURT:  I think what I might say is, benefits of the witness has received either financially or as a hope that he won't be prosecuted.

Any objection to that?

MS. ROSE:  No, objection.

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.

MR. MORRIS:  And related -- I realize they're on different pages, but this page 19 is talking about accomplice informant immunity.

You give, after that sentence that we just talked

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/30/17   Page 420 of 510
Case 3:08-cr-00134-RJC   Document 1534   Filed 01/30/11   Page 23 of 113
JA2300

1064

about, you should keep in mind that type of testimony is always to be received with great caution and care, you give it again about three sentences later at the end of the second paragraph of page 20.  And it seems to me --

THE COURT:  Yeah, I don't want to say it twice. So if the defense would like at page 19 and 20 and tell me where I should state that concern, I will do it where you want me to.

I think what I propose to do is just take all of the -- on page 19 starting with, you should keep in mind, just delete that to the end of the instruction.  And end it with, the benefits that the witness has received either financially or as a hope that he won't be prosecuted, and carry into the credibility instruction.

MR. FOSTER:  So we'll skip --

THE COURT:  Is that satisfactory?  Everything after, you should keep in mind, on 19.

MR. FOSTER:  Because the last two parts are repeated again on page 20?

THE COURT:  Yeah.  Correct.  All right.  Anything else?

MR. MORRIS:  Nothing else in part one.

THE COURT:  I would intend to question your client on the record as to his choice to testify or not, unless objected to by you all.  It seems like an appropriate thing

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 421 of 510
Case 3:08-cr-00134-RJC   Document 1122   Filed 01/30/11   Page 24 of 113
**JA2301**

1065

to do.

MR. FOSTER:  We probably would -- it would be helpful if we could have a few minutes to talk to him somewhere privately before we do that.

THE COURT:  Very well.

MR. FOSTER:  I don't know how we can do that upstairs here without having everyone overhear it.

THE COURT:  I guess what we can do is, when they bring the defendant in, that you can meet with him in that room we've been having a side bar.

MR. FOSTER:  Okay.

THE COURT:  Just make sure the marshals know you need to do that.

MR. FOSTER:  Okay.  Thank you.

THE COURT:  Let's start with Count One.

My approach in these substantive instructions is to read the charge, to read the statutes, and then to go to the elements of the charge.

MR. MORRIS:  May I ask, we had some discussion with your clerk yesterday, but the speaking portion of Count One is not something you intend to read I gather?

THE COURT:  I do not, no.

MR. MORRIS:  It's fairly long.  Is that something the jury will have access to?

THE COURT:  The jury will, yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 422 of 510
Case 3:08-cr-00134-RJC   Document 1154   Filed 01/30/11   Page 25 of 113
**JA2302**

1066

MR. MORRIS:  Thank you.

THE COURT:  So pages one through six of the substantive instructions are the Count One.

Seven is just an, on or about instruction.

Pages 8 through 12 outline the various statutes alleged to have been part of the conspiracy instruction.

MR. FOSTER:  I must have different page numbers.

THE COURT:  Once I got out of -- page 30 the is last general instruction.

MR. FOSTER:  Okay.

THE COURT:  I started the numbers again --

MR. FOSTER:  I'm sorry.

THE COURT:  -- in the substantive part.

I would intend to provide this part of the substantive instructions to the jury in their deliberation, and so I started with page one.

So just keep that thought in mind.  We can talk about it at the end if anyone objects.

Thirteen is just an and/or instruction, because I find if I don't give it, they ask a question about it.

The elements begin on page 14.

MR. MORRIS:  On that page, Your Honor, the third paragraph.

THE COURT:  Yes.

MR. MORRIS:  We have phrased as would commit.  And

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 423 of 510
Case 3:08-cr-00134-RJC   Document 1394   Filed 01/30/11   Page 26 of 113
**JA2303**

1067

I would propose, have agreed to commit, at least to the racketeering acts.

THE COURT:  Any objection?

MR. MORRIS:  My co-counsel is now objecting with me, so pardon me for a second.

THE COURT:  I think the way it's stated is correct statement of the law, and so I'm going to leave it as is.

I define conspiracy on 16, 17.

Define conducts -- conducts, enterprise, interstate commerce, pattern of racketeering.

MR. MORRIS:  Judge --

THE COURT:  Yes.

MR. MORRIS:  Excuse me.  On pattern of racketeering we've got the same sort of issue, and here it might be clearer in light of the RICO conspiracy charge.  In that first paragraph it's they were separate acts, were committed, were in some way.  And I would propose, would be, would have been.

THE COURT:  Where are you now?

MR. MORRIS:  First paragraph on page 22.

THE COURT:  Right.

MR. MORRIS:  Some member of the conspiracy would commit at least two acts of racketeering --

THE COURT:  Right.

MR. MORRIS:  -- and that they would be separate

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 424 of 510
Case 3:08-cr-00134-RJC   Document 1354   Filed 01/30/11   Page 74 of 113
**JA2304**

1068

acts.

THE COURT: Yes.

MR. MORRIS: And so on with the other be verbs in that paragraph.

THE COURT: All right. I'll do that.

Then racketeering activities defined in 24 and 25.

Mere preparation on 26.

Racketeering contact 24 and 25, racketeering obstruction of justice on 27.

MR. MORRIS: Your Honor, on 27.

THE COURT: Yes.

MR. MORRIS: Element two, number two. That the defendant or co-conspirator knew of the pending proceeding. I think that the law supports knew or reasonably could have foreseen. And I've got a case and a copy actually, if Your Honor cares for it, but it's a Second Circuit case called *Bruno*.

MR. FOSTER: We would object to the change and think it should remain knew.

THE COURT: I'll look at Bruno and consider that.

MR. MORRIS: The section is flagged.

THE COURT: All right. I'll circle back to that before I give the instruction.

I get nervous because you all get me to do objection of justice instruction, and then you profess error

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 425 of 510
Case 3:08-cr-00134-RJC   Document 1514   Filed 01/30/11   Page 24 of 113

**JA2305**

1069

on appeal, so.

MR. MORRIS:  Which case was that?

THE COURT:  That would be Corbet and Belk.

MR. MORRIS:  I'm not familiar.  Talk to Amy about that.

THE COURT:  That was a recent case involving a series of Food Lion robberies, and some acts of witness intimidation.

I let it go to the jury, instructed on it, and then the circuit found that there was an insufficient showing of knowledge of the defendant of a pending proceeding, so.

I'll strike that cheap shot against the government and go on from here.

MR. MORRIS:  Well-taken.  I'll just note 1503 causes a lot of confusion.

THE COURT:  So, I'll defer my cheap shot to a later conversation with them.

Witness tampering on 29 and 30.

Drug aspect, 30 through 34.

MR. MORRIS:  On 34, Your Honor.

THE COURT:  Yes.

MR. MORRIS:  If everyone is caught up.

Second to last paragraph, which is a one sentence paragraph.  I would submit adding into that serial list, the

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 426 of 510
Case 3:08-cr-00134-RJC   Document 191   Filed 01/30/11   Page 294 of 313
JA2306

1070

packaging of that substance, which was an issue the jury heard evidence on in this case.

THE COURT:  I usually give that.  I don't know why I didn't put it in here.  I will add that after the period, control substance, the packaging of the controlled substance, quantity.

MR. MORRIS:  Thank you.

THE COURT:  All right.  Then 35 is just the substantive part of that.

Then 36, 37, illegal communications facility; 38, 39, aggravated robbery; 40, common law robbery; 41 extortion; 42 and following, murder under state law; 45, the elements of first degree murder.

MR. BRYSON:  Can I ask a question about that?

THE COURT:  Yes.

MR. BRYSON:  Do you tend to give both First and Second?

THE COURT:  I didn't intend to, no.

MR. BRYSON:  You didn't intend to?

THE COURT:  I did not intend to, be glad to hear from you if you want one.

MR. BRYSON:  Well, we would think that there would not be sufficient evidence of premeditation and deliberation.

THE COURT:  Well, so you're asking me to give just

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/28/17  Page 427 of 510
Case 3:08-cr-00134-RJC  Document 1317  Filed 01/30/11  Page 364 of 1113

the second degree murder instruction instead of first degree?

MR. BRYSON:  Yes.

THE COURT:  I'll overrule that.  I think there is sufficient evidence.  Take that back -- on 45 I instruct on first, and 46 I instruct on second.  And I think there's sufficient evidence to instruct on first degree murder, so I'll overrule your objection to that.

MR. MORRIS:  Your Honor, if I may just make a record.  I don't know, since that's probably going to be important in this case, that's also part of the Count One RICO conspiracy instruction and allegation, and so it's relevant.

THE COURT:  That's where we are on Count One. We're still -- we haven't gotten through Count One --

MR. MORRIS:  I understand.  But Mr. Bryson's objection went more to the actual murder that committed in this case.

MR. BRYSON:  I mean -- I can't say I wasn't going to raise it again.  But since we're here, that's why I thought I would mention it first.

THE COURT:  I hear you.

So 49 is the agreement required; 49 is unanimity instruction; 51 is the membership instruction.  Define knowingly, willfully, 52 through 53; co-conspirator

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 428 of 510
Case 3:08-cr-00134-RJC   Document 1331   Filed 01/30/11   Page 34 of 113
JA2308

1072

statements, 54, 55.

MR. MORRIS:  Your Honor, excuse me, on page 54, I actually haven't come across this and so I'm frankly not sure but I'll raise it with you.

It seems to me at the bottom of that paragraph on page 54, even though the Court has already found that they were in furtherance.  You're giving the jury the duty to find that it's in furtherance by sort of an unfair standard.  And I just haven't come across that or seen that before.

THE COURT:  What's the unfair standard?

MR. MORRIS:  Well, there's no standard defined.  I mean, the standard for admission at trial is preponderance.  But they're being told everything they have to find is beyond a reasonable doubt.

THE COURT:  They're not told that with respect to these acts and statements of the co-conspirators.  They're being told that with respect to the essential elements of the offense.

So there's not a reasonable doubt standard with respect to these statements or acts, only the proof of the elements.

MR. MORRIS:  And I accept that and note that.  I just haven't seen, and think it could be a little confusing if the jury is asked, in effect, to revisit the requirements for admission that have already been ruled upon.  I'm not

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5   Filed 03/23/17   Page 429 of 510
Case 3:08-cr-00134-RJC  Document 1337   Filed 01/30/11   Page 32 of 113
JA2309

1073

sure how I would propose to deal with it, but it does seem a little --

THE COURT:  I think I was satisfied from an evidentiary standpoint, that the standard for admission had been met by the government.  Whether the jury believes that or not is entirely up to them.  I wouldn't take that away from them.

MR. MORRIS:  All right.  Thank you.

THE COURT:  All right.  Count 22, again, I would read it and then I would define the statute on 57.  Talk about aiding abetting, 58, 59.  The elements on 60.

And I believe, Mr. Bryson, you had an objection to the proposed elements.  I'll be glad to hear from you on that.

MR. BRYSON:  And before I do that, just on the top of page 60, three lines down it says, you must be convicted beyond a reasonable doubt --

THE COURT:  Convinced.

MR. BRYSON:  I think it should be convinced.

THE COURT:  Where do you see that?

MR. BRYSON:  Three lines down from the top.

THE COURT:  My apologies.

MR. BRYSON:  But we have a proposed substituted instruction we submitted to the Court.  It's a modern federal instruction pattern, SAM, and we thought it --

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 430 of 510
Case 3:08-cr-00134-RJC   Document 1154   Filed 01/30/11   Page 34 of 113
JA2310

1074

THE COURT:  Very similar to the one I'm proposing.

MR. BRYSON:  Correct.

MR. MORRIS:  May I be heard?

THE COURT:  Sure.

MR. MORRIS:  The government has a few comments.  I mean, most of the instruction is in fact the SAM instruction that we submitted in the first trial with examples.  And I do think it's very similar, and we were satisfied with the instruction as given.

The real part of the instruction, and I don't believe that this paragraph comes from SAM, is the conversely is not sufficient paragraph which begins on page five of the defendant's filing.

First of all, I think that that instruction generally is already covered.  Like the -- for example, the point of advancing the defendants or the enterprise's reputation.  That's covered by the element of having position, and the requirement, and the word position.

THE COURT:  So as I understand, John, you're proposed instruction inserts the conversely paragraph at the end of, these examples are only illustrations?

MR. BRYSON:  Yes.

THE COURT:  And you're objecting to that?

MR. MORRIS:  Yes, Your Honor.

THE COURT:  And the basis of the objection is?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-54   Filed 03/28/17   Page 431 of 510
Case 3:08-cr-00134-RJC   Document 1654   Filed 01/30/11   Page 34 of 113
JA2311

1075

MR. MORRIS:  I don't believe -- I believe it's already covered.  I believe that the wording in the proposed instruction is a little confusing and vague.

And I believe that part of it, specifically relative position vis-a-vis other members, is both duplicative and sort of narrower than the statute.

The statute reads, maintain or increase position. It can be another's position.

And in fact, we've heard evidence, argument through cross examination by the defense that Stiler was the real honcho in this case.  It doesn't necessarily have to be, his position.

And I understand, linguistically, as Your Honor is reading these instructions, generally, that's how you would phrase it.  But the statute doesn't require that.

And the conscious purpose language in the second sentence of the proposed paragraph by the defendant.  The defendant had to have the conscious purpose to maintain or enhance his position, is already covered and sort of actually contradicts what the defendant has proposed, which is that the general purpose in committing the crime of violence was to maintain or increase position.

So those are -- and then last, I guess, Your Honor, in that paragraph, the words broader community is first of all sort of undefined.  But second of all, what

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 432 of 510
Case 3:08-cr-00134-RJC   Document 1654   Filed 01/30/11   Page 35 of 113
**JA2312**

1076

Your Honor has already makes clear, that it's maintain or increase position in the enterprise.  Which of course is an element.

THE COURT:  The government makes strong points that some of this is covered in other aspects of the instruction.  But I'm going to give the conversely paragraph as requested by the defense.

I do think it's, though, in some ways possibly redundant.  I think it also, in other ways, is helpful, and sufficiently helpful to give at the end of the instruction, these examples are only illustrations.

I note the government's objection, but I will give that requested instruction.

MR. MORRIS:  Your Honor.

THE COURT:  Yes.

MR. MORRIS:  May I ask then, also, for one addition on page 62, or anywhere really that Your Honor -- I have as the first line of page 62, maintain or increase his position or another's -- or another member's within the enterprise.

THE COURT:  And what is the basis for that?

MR. MORRIS:  That the theory of defense that Stiler was the leader.  And the law allows a conviction if the defendant committed the crime to please Stiler.

THE COURT:  Where do you get the "or another"

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 433 of 510
Case 3:08-cr-00134-RJC   Document 1554   Filed 01/30/11   Page 36 of 113

JA2313

language from the statute?

MR. MORRIS:  The statute reads, maintain or increase position.

And the case law, therefore interpreting it has indicated -- and I don't have a case handy.  I did cite some in my previous filing on the jury instructions.  But I believe it may even be in the SAM instruction.

But any way, the omission of the word "his" in the statute was intentional.  I'll be happy to find a case.

THE COURT:  Well, I think the easiest thing to do is to take the word "is" out of the instruction.

MR. MORRIS:  That would be --

THE COURT:  Any objection to that?

Because the statute does not use the word "is". It uses the word, "for the purpose of gaining entrance to or maintaining or increasing position in".

MR. MORRIS:  In fact, Your Honor, I don't mean to cut off that proposal.

But the SAM instruction which the government previously submitted in the other case, and which the defense has submitted, gives as an example, or if he committed the crime because he thought it would enhance his or another's position or prestige within the enterprise.

THE COURT:  I'm going to take the word "his" out, and let you argue that theory.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 434 of 510
Case 3:08-cr-00134-RJC   Document 1574   Filed 01/30/11   Page 374 of 113

**JA2314**

1078

And I'll do the same with respect to the conversely paragraph that I'm adding to the request of the defense, wherever it is indicated "his" or "the defendant's" relative position, I'm going to change to strike the "his" or add "the defendant" or "another's relative position within the enterprise".

All right. Then Count 24. From this point forward I think there will be a lot of reference back -- well, actually, Count 24 begins 924(c) -- 924(j) counts. I'm sorry, Count 23 on page 64. Read the count the statute. The elements begin on page 67. That there's different ways to violate 924(c).

I give the unanimity instruction on 69.

Define malice aforethought on 70.

MR. MORRIS: Your Honor, excuse me, on page 69.

THE COURT: Yes.

MR. MORRIS: The government's theory in all of the evidence is about using the firearm. I think we can do away with the carrying prong and unanimity instruction, can't cause death by just carrying.

MR. BRYSON: No objection.

THE COURT: That's true. We'll strike the carrying.

Sanitize that from the indictment that goes back to the jury as well.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5  Filed 03/23/17  Page 435 of 510
Case 3:08-cr-00134-RJC  Document 1154  Filed 01/30/11  Page 34 of 113
**JA2315**

1079

All right.  So Count 25 just references back.

Count 27, possession of a firearm by illegal alien.  Count is read on page 72, the statute on 73, the elements on 74.

And I believe there was testimony with respect to the interstate nexus on the Ruger but not the ammunition. So I'll Rule 29 on the ammunition.

MR. FOSTER:  The defendant's --

MR. MORRIS:  Name.

MR. FOSTER:  Wrong defendant there, Julio Cesar. Although we would be happy --

THE COURT:  We do that every once in a while just to see if anybody's asleep.

MR. FOSTER:  Actually, we would ask to make it consistent, change the name throughout.

THE COURT:  Elements on 78, carry over to 79. Most of the definitions have previously been given as indicated on 80.

Count 58, extortion conspiracy, elements on 84, 85.

Count 61 is the obstruction conspiracy.

MR. BRYSON:  If we have a problem with the charge itself, should we mention it at this point?

THE COURT:  Yeah.

MR. BRYSON:  I guess I'm a little unsure as to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-54   Filed 03/28/17   Page 436 of 510
Case 3:08-cr-00134-RJC   Document 1504   Filed 01/30/11   Page 39 of 113
JA2316

1080

what Count 58 was in relation to.

MS. ROSE:  I'm looking at that too.

MR. BRYSON:  Even in the indictment, he's never really -- it's never mentioned in the overt acts.

MS. ROSE:  Yeah, I agree.

THE COURT:  Are you moving to dismiss Count 58?

MS. ROSE:  Yes.

THE COURT:  All right.

MS. ROSE:  That saves us a whole set of additional instructions.

THE COURT:  All right.  What about 61; there was evidence of that.  So the count is charged -- or spelled out, 86 to 89, statute on 90, the elements on 91, carry over 92.

MR. MORRIS:  On the bottom of page 92, Your Honor, the last sentence, you must be unanimous in your finding as to which agreed upon crime, just say "or crimes"?

THE COURT:  Right.  I'll give that.

And 62 is a substantive instruction count; 63 is substantive tampering count, and then we finish.

MR. MORRIS:  Your Honor, I have -- are we going to address the verdict form at this time?

THE COURT:  Yes, let's do that.

MR. MORRIS:  Your Honor, I have one more instruction actually, I should have raised it earlier.  But

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-54   Filed 03/28/17   Page 437 of 510
Case 3:08-cr-00134-RJC   Document 1354   Filed 01/30/11   Page 40 of 113
JA2317

1081

it's a general on flight.  The evidence was that the defendant fled from Greensboro on that night.

THE COURT:  I'm not going to instruct on it, but you're free to argue it.

Okay.  Verdict form.  Have you all had a chance to review the proposed verdict form; any objections?

MR. MORRIS:  Two small ones, Your Honor.  One larger than the other.

On 1C, that is contained in the verdict form for Count One because it's a special sentencing factor charged at the end of the indictment.

The government will abandon -- he's not charged in Count Two, the government will abandon that.  I don't know if the word is dismissed.

MR. NAZZARO:  We're not relying on that special sentencing factor to enhance the sentence on Count One, we're relying on the murder.

THE COURT:  So 1C goes?

MR. MORRIS:  Yes.

THE COURT:  All right.  What else?

MR. MORRIS:  Paragraph seven, on page three.  It charges actually, robbery or attempted robbery affecting interstate commerce.

MR. FOSTER:  I assume paragraph eight to Count 50 which will be deleted since they're dismissing --

Laura Andersen, RMR 704-350-7493

**JA2318**

1082

THE COURT:  Eight comes out.

MS. ROSE:  Yes.

THE COURT:  All right.  Any other changes or objections?

MR. MORRIS:  No.

THE COURT:  Let's talk about how much time you all want or need; 45 minutes.

MR. BRYSON:  You mean to argue?

THE COURT:  Yeah.

MR. BRYSON:  Yeah, you know, I would like to say an hour, with the idea I probably wouldn't use that long.  I would never want to argue an hour, but at the same time --

THE COURT:  What do you need?

MS. ROSE:  I think 45 and 15 rebuttal.

MR. NAZZARO:  Yeah.

THE COURT:  You both want an hour.  I'll give you each an hour if you need it.  Do either of you want any time indicators?

MS. ROSE:  Please.  Yes.

MR. NAZZARO:  Judge, will we have just a few minutes before close?

THE COURT:  I'm sure we'll do that, yes.

MR. BRYSON:  Will we be able to get a written copy of the new instructions?

THE COURT:  We will work on those as we finish up.

Laura Andersen, RMR 704-350-7493

**JA2319**

1083

But what I'm asking right now, do you want any warnings if your time is --

MS. ROSE:  Yes.

THE COURT:  When?  Last chance for telling us what you want.

MS. ROSE:  You want a warning at 35 minutes?

MR. NAZZARO:  That's fine, Your Honor.

MS. ROSE:  Yes.  Did Your Honor want to discuss any other scheduling?  I know you mentioned yesterday that you would take up the defense's request at this time.

THE COURT:  That's right.  We're not, you know, predicting anything, but for purposes of scheduling, assuming that there is a guilty verdict and then a need for a sentencing phase.  You all have witness issues with folks from El Salvador?

MR. BRYSON:  Yes.

THE COURT:  What exactly did you want?

MR. BRYSON:  We're just concerned, you know, we want -- once we get to our case in mitigation, we want to be able to organized and structured and be able to present it in a move ahead fashion.  I've also had e-mail correspondence with Dawn, making sure we don't have expert witnesses sitting around for days waiting for other people and so --

THE COURT:  How long do you think --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 440 of 510
Case 3:08-cr-00134-RJC   Document 1514   Filed 01/30/11   Page 43 of 113
**JA2320**

1084

MS. ROSE:  Our case in chief?

THE COURT:  Yes.  I'm not holding you to it, but a reasonable prediction.

MS. ROSE:  Three days.

THE COURT:  Here's what I'm going to do.  And not just because this works out for me as well, part of my duties here as the Chief Judge, there's a conference I'm suppose to go to Thursday and Friday of next week that I thought I would miss.  But in light of your request, which is not an unreasonable one, in light of your forecast, I think what we'll do is work Monday through Wednesday and take Thursday and Friday off, so that you will know that you won't have to bring witnesses next week.

MR. BRYSON:  Thank you, very much.

MS. ROSE:  If we're running over, we'll wrap up Monday?

THE COURT:  If you're running over, you'll get that eyebrow over the glasses look.

MS. ROSE:  I'll take the eyebrow, just no pumping veins, please.

I did have a question regarding foundation for these letters.  I don't know how, given the record we've already made in some ways, I will -- I don't want to take up too much time --

THE COURT:  I mean, you made -- you've convinced

Laura Andersen, RMR 704-350-7493

**JA2321**

1085

the Court that there is a foundation.  So the only thing you would have to put up in front of the jury would be --

MS. ROSE:  Mr. Taylor.

THE COURT:  Yeah.  Those jail witnesses aren't going to take long.  Because I think there may be a desire to cross examine them.

MR. BRYSON:  You talking about -- okay.  I see what you mean?

THE COURT:  Do it as quickly as possible.

MS. ROSE:  Okay.

THE COURT:  I think there is probably a need for the jury to hear that.

All right.  Well, we'll see you in about five minutes.

Let me too, before we go off record, say how appreciative I am for the professionalism on both sides in this very difficult case.  It's very difficult for both sides and the court.  It would be a lot more difficult except for the hard work and professionalism and skill that you all bring to it, so thank you.

MR. FOSTER:  Thank you, Your Honor.

(A brief recess was taken in the proceedings.)

THE COURT:  Are we ready for the jury?

ALL COUNSEL:  Yes, Your Honor.

THE COURT:  Call the jury.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 442 of 510
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 45 of 113
**JA2322**

1086

(The jury was returned to the courtroom.)

THE COURT:  Good morning, Members of the Jury.

THE JURY:  Good morning.

THE COURT:  Call your next witness.

MS. ROSE:  The Government will call Sergeant Scott Clarkson.

THEREUPON, SCOTT CLARKSON, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q    Good morning, sir.  If you would please introduce yourself.

A    Good morning.  Scott Clarkson.

Q    Where are you employed, Mr. Clarkson?

A    Sergeant with the Mecklenburg County Sheriff's Office.

Q    How long have you been with the sheriff's office?

A    Thirteen years.

Q    What's your position there?

A    I'm currently responsible for monitoring inmate telephone calls and inmate mail.

Q    And when you say monitoring calls and mail, what specifically do you do?

A    In relation to the mail specifically for this case, letters that are coming in, I would review and then submit those to Officer Chuck Hastings with CMPD for translation.

Relating to the telephones, I'll monitor active calls, listening to threats, other information that maybe of

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 443 of 510
Case 3:08-cr-00134-RJC   Document 1054   Filed 01/30/11   Page 46 of 113
JA2323

1087

interest to law enforcement, as well as provide records to those various law enforcement agencies for evidence purpose.

Q    So relative to telephone calls, it's not every call is not listened to by you?

A    No, ma'am, not every call.

Q    And regarding the jail mail, if you would, describe for the Members of the Jury the procedure there within the jail for collecting inmate mail, and either mailing it or prior to that time documenting it in some way?

A    When mail is to be taken outside the facility, it's written by someone in our custody, the inmate is required to address it in a very particular manner.  That manner being a full address for the person who is to receive that letter. As well as the inmate sending the letter must provide their full name, their positive identification, or PID number, which is a unique number to them, as well as a return address for the jail.

Q    You indicated that in this particular case, that you had spoken with Officer Hastings regarding the collection of mail from some specific individuals?

A    I'm sorry, ma'am?

Q    You indicated that you spoke with Officer Hastings about collection of mail from some specific individuals that were housed there within your facility?

A    Yes, ma'am, that's correct.

Laura Andersen, RMR 704-350-7493

**JA2324**

1088

Q     How many were you collecting mail from?

A     There were -- relating to the MS 13 case, 26 inmates that were listed.

Q     And what was your procedure relative to the mail of those 26 inmates?

A     Those inmates -- when the letters were sent outside of the facility, the letters would be collected, photocopied. Those photocopies would be sent directly to me.  And the mail or the letters themselves would go out to the intended recipient.  Those letters were not interfered with, as far as delivery, unless there was something that was identified as a specific threat to somebody on the outside where delivery would cause harm to someone.

Q     Is there a policy -- do you have an inmate handbook there in your jail?

A     Yes, ma'am we do.

Q     Is that inmate handbook printed in Spanish and English?

A     Yes, ma'am it is.

Q     Does the inmate handbook reflect the mail handling procedures within the jail?

A     Yes, ma'am, it does.

Q     Does it advise inmates that their jail (sic.) will be monitored?

A     Yes, ma'am.  The mail will be monitored and inspected for contraband.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 445 of 510
Case 3:08-cr-00134-RJC   Document 1324   Filed 01/30/11   Page 48 of 113
JA2325

1089

Q    What is the specific procedure for mail collection? For example, an inmate writes a letter.  How does that letter go from the inmate to the mailing facility, or to you in this case?

A    The inmate will write the letter within the housing unit that they are assigned to.  They will then hand that letter to the officer who is supervising at the time.

That officer, upon receipt of that letter, will verify that the envelope is addressed appropriately to include the addressee's information, as well as the appropriate information dealing with the inmate who wrote it.

Again, his name, positive identification number and return address for the jail.

That officer would then take that outside of the housing unit with the paperwork to the administrative area for delivery to the postal carrier.

With the exception of those that were identified should be collected for evidence and photocopied, they would be first photocopied.

Q    And then after the photocopying, or even prior to the photocopying, were they altered or modified in any way?

A    No, ma'am.

Q    To whom were the 26 letters -- or excuse me, the letters of the 26 inmates, to whom were they delivered once they were collected from their respective housing units?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 446 of 510
Case 3:08-cr-00134-RJC   Document 1527   Filed 01/30/11   Page 49 of 113
JA2326

1090

A    Because they were all co-defendants, they are housed throughout our jail facilities, predominantly jail central, who the person responsible for collecting those letters would be Denise Daniels.  And then the jail north would be Kathy Dugan.

Q    And where is the defendant housed?

A    He is housed at jail central.

Q    And is his mail one of those included within the 26 requested by Officer Hastings?

A    Yes, ma'am.

Q    Then who would be responsible for photocopying and collecting the defendant's mail?

A    Denise Daniels, upon receipt of those letters would make those photocopies and then provide those copies to me for delivery.

Q    If an individual is housed in a unit apart from other inmates, does that mail go directly from that inmate to Ms. Davis (sic.) then, without being mixed in, in any way with any of the other mail?

A    To Miss Daniels, you mean?  If in the case of Mr. Umana, he's housed in a -- administrative segregation. Which is protective custody.  And he has been, for the past five months, housed alone with no inmates present.  So any mail that would have come from that housing unit, would have come strictly from and only from Mr. Umana.  That mail would

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 447 of 510
Case 3:08-cr-00134-RJC   Document 1354   Filed 01/30/11   Page 50 of 113
**JA2327**

having handled to -- or excuse me -- handed to the housing officer who would have then taken it downstairs, and it would have been placed with other outgoing mail, but it would have been separate, in the sense that it would have been put aside.

Q    And were there other occasions during Mr. Umana's time in your facility, when he was in the same circumstances, that is, in a segregated area where his mail was picked up separately?

A    Yes, ma'am.  There have been occasions where Mr. Umana has been placed in a disciplinary unit --

MR. FOSTER:  Objection; motion to strike.

THE COURT:  Sustained.  Sustained.

Q    (By Ms. Rose) Not -- just -- not what kind --

THE COURT:  Hang on a second.

Members of the Jury, just disregard that last statement.

Listen carefully to the question, and see if you could directly respond to it.

Q    (By Ms. Rose) I don't want any specifics about the type of unit he may have been placed, but whether it was just a separate unit from other inmates?

A    Yes, ma'am.  There are varying levels of segregation.

Q    And, so my question is, other than the five months -- the past five months about which you have testified

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 448 of 510
Case 3:08-cr-00134-RJC   Document 1264   Filed 01/30/11   Page 51 of 113
JA2328

1092

regarding his segregation, have there been other times during his tenure in your facility where he was held separately?

A    Yes, ma'am.

Q    And on those occasions as well, his mail would have been segregated?

MR. FOSTER:  Objection; calls for inspection.

THE COURT:  Overruled.

THE WINTESS:  His mail would have been handled in similar fashion; handed specifically from Mr. Umana to the officer.

Q    (By Ms. Rose) Do you know the defendant's PID or identification number?

A    Yes, ma'am I do.

Q    What is the defendant's pin number within your facility?

A    His positive identification number is 362221.

Q    Was one of the other inmates included within those 26, an individual named Carlos Figueroa Pineda?

A    Yes, ma'am.

Q    Would his mail be collected in the fashion to which you previously testified?

A    Yes, ma'am.

MS. ROSE:  All right, sir.  Thank you, very much.

THE COURT:  Any cross?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 449 of 510
Case 3:08-cr-00134-RJC   Document 1327   Filed 01/30/11   Page 52 of 113
**JA2329**

1093

MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q    So Denise Daniels is the one to whom all outgoing jail mail comes at central jail, correct?

A    She is the one that has been designated.  There are -- there is one other that may assist her, but she's been, relating to this case, the primary contact.

Q    So she doesn't receive the mail directly form an inmate?

A    No, ma'am -- excuse me.  No, sir.

Q    And you don't do that yourself, you're not handed mail by the inmates either, right?

A    No, sir, I am not.

Q    So you can't testify in this case that any particular letter that's being offered in evidence was handed by the defendant to a detention officer, correct?

A    No, sir, I cannot.

Q    And you testified that during certain periods of time, Mr. Umana has been in sort of -- some sort of sole detention, not a regular pod, correct?

A    Yes, sir, that is correct.

Q    But nevertheless during the many months that he has been at the jail, there have been months at a time or weeks at a time where he has been in a regular pod with access to other inmates, correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 450 of 510
Case 3:08-cr-00134-RJC   Document 1524   Filed 01/30/11   Page 53 of 113
JA2330

1094

A     Yes, sir, that's correct.

Q     Now you said that on the occasions when he was in the solitary situations, his mail would have been handed by him to the detention officer, correct?

A     Yes, sir, that's correct.

Q     But you weren't there to observe it, right?

A     No, sir, I was not.

Q     And you're aware that there are situations where, despite the rules, inmate mail has left pods and it turns out later that the belief is that the person identified as the return address, the sender, is not really who sent it, correct?

A     I'm sorry, I don't understand.

Q     Where envelopes have come out of the jail, mail coming out of the jail, where the true sender is misrepresented on the return address?

A     That has happened, yes, sir.

        MR. FOSTER:  I have no further questions.

        MS. ROSE:  No redirect, Your Honor.  Thank you.

        THE COURT:  You may step down.

        Call your next witness.

        MS. ROSE:  Denise Daniels.

(Pause.)

        MS. ROSE:  May we have just a moment, she apparently took a restroom break.

                    Laura Andersen, RMR 704-350-7493

**JA2331**

1095

THEREUPON, DENISE DANIELS, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q   Good morning.  If you would introduce yourself please, ma'am?

A   Denise Daniels.

Q   Where are you employed, Ms. Daniels?

A   Mecklenburg County Sheriff's Office.

Q   What is your position with the sheriff's office?

A   I'm an admin assistant with the mail room.

Q   What are your duties?

A   To check the incoming and outgoing mail for contraband.

Q   Did you assist Sergeant Clarkson in reviewing certain selected mail, coping that mail, and then sending it on its way as addressed?

A   I did.

Q   Describe the procedure that you employed?

A   I received a list with different names on it of inmates that we needed to check their mail.  We would receive the mail, and open it, and make copies of it, front and back, the envelopes, who it's from and everything, and then send it to Sergeant Clarkson.

Q   And did you in any way modify the contents or the envelope of any of the mail that you were screening?

A   No, ma'am.

Q   Once you made copies as instructed, what did you do

Laura Andersen, RMR 704-350-7493

**JA2332**

1096

with the original document?

A    We sealed them back up and sent them out.

Q    Once you had collected the copies you made, to whom did you provide those?

A    To Sergeant Clarkson.

MS. ROSE:  All right.  Thank you.

CROSS-EXAMINATION BY MR. FOSTER:

Q    Ms. Daniels, you're not in the change of receiving actual outgoing mail from inmates, correct?

A    Correct.

MR. FOSTER:  I have no further questions.

THE COURT:  You may step down, be excused.

MS. ROSE:  Call Jeff Taylor.

THEREUPON, JEFFREY S. TAYLOR, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:.

Q    Good morning, sir.  If you would please state your name for the record.

A    Jeffrey S. Taylor.

Q    Where are you employed, Mr. Taylor?

A    I'm an examiner of questioned documents with the Charlotte-Mecklenburg Police Department.

Q    How long have you been with the police department?

A    I've been with the police department 14 years.

Q    Prior to that time were you also employed with law enforcement?

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 453 of 510
Case 3:08-cr-00134-RJC   Document 1524   Filed 01/30/11   Page 56 of 113
**JA2333**

1097

A    Yes.  I earned my training with the U.S. Secret Service, and I worked for them almost seven years.

Q    And your position at the Secret Service?

A    Forensic document examiner.

Q    What your -- the same as your current position?

A    Same as my current position, yes.

Q    If you would, describe for the Members of the Jury your training?

A    I earned a Bachelor of Arts, a Bachelor of Science from Michigan State University.  I was then accepted into the U.S. Secret Service training program.  It was a three-year training program.  Basically I had to study the leading textbooks in the field of questioned documents.  I wrote essays on various document problems.  I conducted independent research.

Also during this training period I examined case work that was routinely submitted to the laboratory.  I reported my findings to senior examiners for their review.  Upon completion I was accepted and qualified by them as an examiner of questioned documents.

Also after the Secret Service, I underwent a two-year testing program, administered by the American Board of Forensic Document Examiners.  This group -- the certify me and they require me to conduct ongoing education.

Q    I would tender the defendant as -- the witness, as an

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MGC   Document 50-5   Filed 03/28/17   Page 454 of 510
Case 3:08-cr-00134-RJC   Document 137   Filed 01/30/11   Page 57 of 113
JA2334

1098

expert in questioned and forensic documents, examination and analysis.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  He will be allowed to offer an opinion in that area.

MS. ROSE:  I apologize, Mr. Taylor.

THE WINTESS:  Quite all right.

Q    (By Ms. Rose) Did you have an opportunity to receive documents in relation to this case?

A    Yes, I have.

MS. ROSE:  If I may approach, Your Honor?

THE COURT:  You may.

Q    (By Ms. Rose) I'm going to hand you what have previously been marked as Government's Exhibit 235 through 249, initially.  If you would review those documents, please.

A    A few moments, if that's okay.

Q    Certainly.

A    Yes.  I reviewed these documents.  My initials, control number and how they were submitted and the dates appear on each one.

Q    Initially, when did you receive the documents that you have before you at this time?

A    Refer to my notes, please?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 455 of 510
Case 3:08-cr-00134-RJC   Document 195-1   Filed 01/30/11   Page 54 of 113
JA2335

1099

Q    Yes, sir.

A    The first submission came to me on 9/25/09.

Q    And do those include the documents you have before you at this time?

A    That is correct.  Both questioned material, as well as known material of Mr. Alejandro Umana.

Q    And if you would, Mr. Taylor, please describe for the jury, whenever you receive documents such as those you have before you at this time, government's exhibits, what is your process in reviewing and analyzing those documents?

A    Once I document what I have is consistent with the property control sheet, as well as initial and date and put the control number on the documents, I conduct an examination of the known material, as well as the questioned material, independently.

And what I'm looking for is common authorship within each body of writing.  And I'm looking for both class and individual characteristics in agreement.

If I find anything that is out of agreement, I examine it real close to make sure it's not a variation of the same author, or it's a totally different author.

Once I examine both bodies of writing independently, separate from one another, I then compare the two, intercompare them.  Looking both for class characteristics, those found often in random writing, and individual

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 456 of 510
Case 3:08-cr-00134-RJC   Document 1534   Filed 01/30/11   Page 59 of 113
JA2336

characteristics, so more personal characteristics, which are those characteristics found seldom in random writing.

Q    Regarding what you call your sample documents or your known standards, how many documents did you have of that type of document?

A    I had a two-page hand-printed letter that was hand printing appearing on front and back.  That was genuine writing.

Then I had photocopies of what appears to be a one-page and a three-page hand-printed letter with accompanying envelopes.  That would be Government's Exhibit 235 through 237.

Q    Thank you.  Now then, Government's Exhibits 238 through 250, what are those documents?

A    238 through 250, were the photocopies of roughly 32 sheets of paper, and nine envelopes.  And that would be all photocopied material.  And that was the questioned material that I compared with the known material, or Government's Exhibit 235 through 237.

Q    Did you prepare some charts that would help explain your testimony relative to the comparison that you made in this case?

A    I prepared charts that support the second submission of the documents.

Q    Regarding the first submission then, the questioned

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 457 of 510
Case 3:08-cr-00134-RJC   Document 152-5   Filed 01/30/11   Page 60 of 113
JA2337

1101

documents, which would be Government's 238 through 250, what were your conclusions after you performed your analysis?

A    There is a strong probability that Alejandro Umana wrote the questioned hand-printed material appearing on the exhibit -- Government's Exhibit 238 through 245, Government's Exhibit 249 and Government's Exhibit 250.

There is also a strong probability that Alejandro Umana did not write the questioned material appearing on Government's Exhibit 246, that is an envelope in Government Exhibit 246, as well as the 247 letter.

And with the --

Q    I apologize, go on.

A    Oh, that's all right.

With the material available for comparison, I could not determine whether or not Alejandro Umana wrote the questioned block printing or the art work that appears on the Government Exhibit.

There's a couple different places where there is extensive art work, or block printing in that case.

Q    And why is art work particularly difficult?

A    There's no known, I should say, copy book form for art work.  There's a copy book form that we go from when we identify handwriting.  It's departure from copy book form in the letters and letter combinations that we're looking for. Art work, there's just no copy book, if you will.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 458 of 510
Case 3:08-cr-00134-RJC   Document 1054   Filed 01/30/11   Page 61 of 113
**JA2338**

1102

And as far as the block printing goes, block printing tends to be more slowly and deliberately executed, especially in this case.

And deliberately executed material is not natural. And typically we need more natural material for comparison purposes.

Q    What are your levels of identification for questioned materials?

A    I use the American Society of Testing Materials Nine Point Scale. And I start at a, could not determine whether or not the writer of the known material wrote the material in question.

And I have various graduations up to identification, as well as to elimination of that author.

The first is indications that the writer of the known material wrote the material in question.

Typically, in those cases, there's just some isolated characteristics in agreement, but nothing glaring or nothing unusual or completely departing from that author.

Then I have a, probably wrote the material. In those cases it's a very strong opinion, but it doesn't reach the identification category.

I also have a, strong probability, which is the bulk of what I had in the first submission in this case.

And in this instance, I am virtually certain Alejandro

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 459 of 510
Case 3:08-cr-00134-RJC   Document 1654   Filed 01/30/11   Page 62 of 113
**JA2339**

1103

Umana was the writer of the bulk of the questioned material.

In this case, I think the limitation is due to the quality of the photocopy submitted to me, as far as questioned material goes.

And then I have an identification of the author. When I identify somebody, I am certain that the writer of the known material wrote the material in question.

Q    Having the originals of these documents would have made your conclusions different, in your opinion?

A    In my opinion, it would have -- it should have helped, yes.

Q    Regarding additional exhibits, hand you Government's 253 through 283, and I'll --

A    Can I keep the known?

Q    Absolutely.

Regarding the first set of documents about which you just testified, did you prepare a report of your findings and conclusions?

A    On the first submission?

Q    Yes, sir.

A    Yes.  Yes, I did.  That's what I was kind of reading from.

Q    What is that report dated?

A    My first submission was 10/8, 2009 is the report date, Government's Exhibit 252.

Case 3:16-cv-00057-MOC  Document 50-5   Filed 03/28/17   Page 460 of 510
Case 3:08-cr-00134-RJC  Document 1514   Filed 01/30/11  Page 63 of 113
**JA2340**

1104

Q    And do you see that report there on the screen before you?

A    Yes, that's a copy of it.

Q    That fairly and accurately represents your findings and conclusions?

A    That is correct.

        MS. ROSE:  The Government would move Exhibit 252.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit 252 was received into evidence.)

Q    (By Ms. Rose) Now, regarding the exhibits you have before you at this time 253 through 283, if you would review each of those exhibits en masse, then I will follow-up with you?

A    A few minutes, if I could.

(Pause.)

A    Yes.  These exhibits submitted to me on 2/26/10.  My initials, date, control number as well as the JMU number appear in lower right corner in red.

Q    As in your previous testimony, were these exhibits removed from quality -- from the controlled evidence facility there at the police department?

A    Yes.  I retrieved these from the property control division.  And the property control technician was T.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 461 of 510
Case 3:08-cr-00134-RJC    Document 1574    Filed 01/30/11    Page 64 of 113
JA2341

1105

Schauer (phonetic spelling).

Q    When you received these documents, what did you then do?

A    I examined and compared these.  First I did the questioned material.  And I compared it for consistency to determine whether or not the full body of writing appeared to be of common authorship.

Once again, I examined the known material which I had previously examined in my previous report -- for my previous report, and then I intercompared the two bodies of writing.

Q    In this stance, were any of the questioned materials or marked government's exhibits before you original letters?

A    Yes.  Government's Exhibit 253 through 269 were originals, letters and envelopes.

Q    And the remainder then were copies?

A    Yes.  Government Exhibit 270 through 283 were photocopied material.

Q    Having original documents to review in this instance, was that helpful?

A    Yes.  It's very beneficial.  When you look at the originals, you can use a microscope to determine direction and sequence of strokes of letters.  It's not always necessary, but it's best to have originals.

Q    Does it matter whether the questioned document is written in pen or pencil?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 462 of 510
Case 3:08-cr-00134-RJC   Document 157-4   Filed 01/30/11   Page 65 of 113
**JA2342**

1106

A    Typically it's easiest if it's a ballpoint pen, because you can determine the direction of stroke easier.  But in this case, no, I was still able to determine the direction of stroke with the microscope.

Q    Did you prepare charts to assist in your testimony regarding examination of these documents, that would be Government's Exhibits 253 through 283?

A    Yes, I did.

Q    Would those assist in your testimony?

A    It would help me show the jury some of the things I look at and identify handwriting.

Q    I'm first going to show you and scroll through a few exhibits, 251, 251a.

A    Yes.  What you see here --

Q    If you could just hold on for a minute.  I want you to look at them first, if you would.

A    Okay.

Q    251b.

A    Okay.  I think I see 251a and b.

Q    251c, 251d, 251e.  Did you prepare each of those charts?

A    Yes, I did.

        MS. ROSE:  I would move to admit Government's Exhibits 251 through 251e, Your Honor.

        THE COURT:  Any objection?

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 463 of 510
Case 3:08-cr-00134-RJC   Document 1314   Filed 01/30/11   Page 66 of 113
JA2343

1107

MR. FOSTER:  Just for the record, renew the objection earlier throughout this, Your Honor.

THE COURT:  Very well.  That will be overruled. And I'll allow Government's 251a through e for illustrative purposes.

And Mr. Foster, you don't have to continue making that objection.

MR. FOSTER:  Thank you.

MS. ROSE:  May the government publish these --

THE COURT:  You may.

MS. ROSE:  -- to assist the jury as Mr. Taylor testifies.

(Government Exhibit 251, a, b, c, d & e were received into evidence.)

Q    (By Ms. Rose) First, to Exhibit 251, are you able to see that, Mr. Taylor?

A    Yes.

Q    If you would explain 251, the contents?

A    Yes.  This is a photographic enlargement, or should say, digital enlargement of a portion under the caption Questioned, of just a small sample of some of the questioned material found in Government's Exhibit 253 through 269.

Then you see under the caption Known, this is a small portion of, or isolated letters -- excuse me, words taken from Government's Exhibit 270 through -- excuse me

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 464 of 510
Case 3:08-cr-00134-RJC   Document 1574   Filed 01/30/11   Page 67 of 113

JA2344

1108

Government's Exhibit 253 through 237. And that would be known material of Mr. Umana. You can see the enlargement at the bottom. There is a scale that was one inch, and they were enlarged. So it's roughly two and a half to three times.

Q    Why is it that you selected same words from various documents, what's the purpose in that?

A    The main purpose is to show how letters are formed in combination with one another and show like against like.

Q    And 251a.

A    Basically the red arrows and the lines show some of the similarities between the Questioned material and the Known material.

For example, under the caption Questioned, the first arrow and the left side of M in Mara. Normally when you're taught to write or draw an M back in grade school, usually that down stroke suppose to retrace back up the arch of the letter. In this case it's pulled off of the letter.

Under the caption Questioned Known, you'll see that in both the Maras, you get the same exact characteristic found in agreement.

Under the caption Questioned, you'll see the tops of the A's, at least in the Mara they're open.

Under the caption Known, you'll see that both Maras in that instance, all of the A's are open, they're formed more

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 465 of 510
Case 3:08-cr-00134-RJC   Document 1554   Filed 01/30/11   Page 64 of 113
**JA2345**

1109

like a U, rather than a capped off A.

Under the caption Questioned, you'll see the R. It looks somewhat like a tipped over 2. And the R, microscopically, is made from right to left, not left to right, at least with the Mara.

And that's found in agreement under the caption Known. You'll see that those R's, they're very unique, and they're tipped over, kind of up on the edge shaped somewhat like a 2.

Another thing we look for are height ratio differences. You'll see under the caption Questioned, the S is significantly shorter than the L. And typically that would be a capital letter.

Under the caption Known, you get the same feature in agreement.

You'll also see that the bulk of the hand printing in both the Questioned and Known material is disconnected, making it -- there are no connecting strokes making it, not handwriting but hand printing. In this case the A L combination are connected.

In Salvatrucha, under the caption Known, the second Salvatrucha, you get that connection.

You'll also see under the caption Questioned, the V. The V is pulled off to the right, and it's longer on the right hand side than the left. You get that same feature

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 466 of 510
Case 3:08-cr-00134-RJC   Document 1574   Filed 01/30/11   Page 69 of 113

JA2346

1110

under the caption, Known, for the V, both V formations.

You'll see under the caption, Questioned, the T is significantly taller than the H.  If you look at both of those letters, I have red lines above and below each.  Most of the time you're taught to write or draw these in elementary school or grade school, the same height relative to one another.

In this instance, under the caption Questioned, you see the T is significantly taller than the H.  You get that same feature under the caption Known, in the known writing of Alejandro Umana.

Another feature you'll see is the A in Salvatrucha, the terminal A.  The bowl of the letter is higher up off the baseline than the finish on that letter.

You get that same feature under the caption Known in Salvatrucha, the terminal A.  You've got the bowl up higher off the baseline than you do the finish of that letter.

These are just a few of the characteristics that I look at.  It's not one or two, or three that make the difference, it's all of the characteristics in agreement, in combination that make the identification possible.

Q    251b.

A    Yes.  Under the caption Questioned, you'll see the word por, and then que.  The P, if you will, is pulled up to the right.  That is the right hand portion of that letter is

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 467 of 510
Case 3:08-cr-00134-RJC   Document 1524   Filed 01/30/11   Page 74 of 113
JA2347

1111

higher off the baseline than the left or downstroke of the letter.

And you'll also see a small space in the center portion of the letter, as that loop comes back around, or the bowl comes back around.  It does not completely connect to the downstroke.

You get that two times in the Questioned material.  You also get that under the caption Known.  You'll find it on line four, the P in por que -- por and que.  And then you'll see it in the final por, on the line three under the caption Known.

And the first two pors under the caption Known, line three, you see how that P is pulled up and away.

Once again, you get that R as you do in Mara, that's kind of a tilted over 2.

The Q in que, the type right portion, there's a slight tick at the top of the first que, that you don't get in the second one under the caption Questioned.  You have variation from one Q to the next Q.

Under the caption Known, the very first que on line three, you'll see that it has -- doesn't have that tick.  Yet the final que in that line has the little tick up above the bowl formation of the letter.

You'll also see that there is no retrace back to the right on the Q.  It terminates straight down, and it's up on

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 468 of 510
Case 3:08-cr-00134-RJC   Document 1574   Filed 01/30/11   Page 71 of 113
**JA2348**

1112

the printed baseline.  Normally when you write or draw lower extended letters, they are down below the baseline of the writing.

The Gs in this stance, the Qs, and any other lower case letters that are extensions -- that have extensions below the baseline of the writing, Mr. Umana leaves them all above the baseline.  And you find that throughout the Questioned writing.

You'll see the height ratio of the U to the E in the que.  That is the second one under the caption Questioned. The U is significantly shorter than the E.

Normally when you're taught to write or draw a U, a lower cases U, it should be the same height overall as an E.

You get that same feature under the caption Known, line four, the U is significantly shorter than the E, and actually all the Us compared to the Es.

Q   251c.

A   Okay.  This is the word Je Fita.  You'll notice under the caption Questioned, the first J is more like a checkmark.  It's kind of an angular formation of the lower portion of that letter J, and there's no crossbar on the top.

Under the caption Known, the very first and the second Js, you get that same check-like formation of the letter.

The E starts a little left of the downstroke on that

Laura Andersen, RMR 704-350-7493

**JA2349**

1113

letter.  On the C side of the E, E starts a little bit left of the downstroke on the letter.  You get that under the caption Questioned, the very first E.  And you'll also get that under the caption Known, the very first E in je fito, and the second E as well.  And also down on line 6, the first je fito, you get that E starting well to the left of the letter.

The I in je fito, is significantly shorter than any other lower case letter.  That is the lower portion of that I.  It's almost as if it's a small dot.  You get that in both of the Is, it's a small dash, if you well.  And you find that throughout the je fitos in the known writing. They're significantly shorter, overall, than the remainder of the letters, or lower case letters.

Finally, the O in je fito, the second je fito.  It's more like a six without a top, there's an open space in there, on the upper left portion of that letter O.

You get that same feature under the caption Known, the very first two Os in je fito, there's kind of an open space on the upper left side of that letter.

You'll also notice that O is significantly well off the baseline of the writing.  It's higher up than the remainder of the letters.

This is a characteristic found in the known writing of Mr. Umana and it's found throughout the questioned material.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 470 of 510
Case 3:08-cr-00134-RJC   Document 1535   Filed 01/30/11   Page 473 of 1 13
**JA2350**

1114

Q   251d.

A   This is the word ab lar.  You'll see -- unlike the As in Mara, the first A in ab lar is more capped, and it's larger than the second A in ab lar.

You see that in the first ab lar under the caption Questioned, you'll also see that in the second and third.

You find that under the caption Known, the second ab lar, you get that A, significantly larger than the second one.

You'll also see it down on the second line for ab lar.

Another feature you'll see is the bottom of the B, the lower left portion is somewhat angular sometimes, not always.  But on occasion you get an angular portion on the lower left portion of the B -- angular movement, I should say.  You see that in first ab lar under the caption Questioned.  You see that also in the first ab lar under the caption Known.  It will be line seven down from the caption Known.  You also get it down on line eight, the second ab lar.

You'll also see the height -- or excuse me, the height off the baseline, relative to one letter to the next.  The first A in ab lar is higher off the baseline than the B, at least in the second ab lar, and the third ab lar under the caption Questioned.

You get the same feature found throughout the Known

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 471 of 510
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/17   Page 74 of 113

JA2351

writing, the first ab lar, the second ab lar.  And the A is basically resting up above the baseline where the B is down lower.

You also see a height ratio difference.  B should be the same height overall as an L.  They're both upper extended letters.  And in this case you got a B that's significantly taller than the letter L.  It's outlined with a couple of lines on the third ab lar under the caption Questioned.  You'll also find that under the caption Known, the third ab lar, as well as the bottom second ab lar.

Q    251e.

A    Just a couple more characteristics.

You see the A once again is up off the baseline, relative to the letter L.  You get that feature in both algos.  And you get that in the Known, the second two algos.

You'll also see the bottom of the G is pulled well left of the bowl or body of the letter.  Typically you're taught to write or draw those one above the other.  And in this case the G's pulled well to the left of the letter.

The O formation, is narrower overall, than the bowl of the G.  Normally these are -- you're once again taught to write or draw the same relative size.

Under the caption Questioned, you see that the O is -- especially in the first G/O combination, the G is significantly wider than the O.  And you get that down under

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 472 of 510
Case 3:08-cr-00134-RJC   Document 1315   Filed 01/30/11   Page 75 of 113

JA2352

1116

the caption Known, and a couple of the algos down there as well.

And once again, it's not one characteristic or four or five, it's the combination of all the characteristics found in agreement.

I also look for differences in handwriting. I'm not just looking for similarities. And I found no significant differences between the questioned and known material in this case.

Q    Regarding your analysis of the documents presented at this point, as I said they're 253 through 283, what were your conclusions?

A    Government's Exhibit 253 through 269, I concluded that Alejandro Umana wrote the bulk of the questioned hand-printed material appearing on 253 through 269, the letters and envelopes.

I also concluded that Mr. Alejandro Umana did not write the Questioned material appearing on the reverse side of the exhibit -- Government's Exhibit 261 letter.

I also determined that Alejandro Umana did not write the Questioned material appearing on the Government's Exhibit 264, labeled JMU255d. And that's with the exception of the last three hand-printed lines on the reverse side of that document.

Q    But 264 had a, b, c and d --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 473 of 510
Case 3:08-cr-00134-RJC   Document 1095   Filed 01/30/11   Page 76 of 113
JA2353

1117

A    That is correct.

Q    -- as part of that particular exhibit, a, b and c, you determined he did write?

A    He did write that.  It's that final page that the bulk of it he did not write.  The final three lines on the reverse side of d.

Q    Regarding -- those are the documents then that were the originals?

A    That is correct.  With regards to the photocopied material, which is Government's Exhibit 270 through 283. Once again there's a strong probability that Mr. Alejandro Umana wrote the bulk of the Questioned hand-printed material appearing on those exhibits.

There's -- I did isolate out Government's Exhibit 279. I think there's a strong probability that Alejandro Umana did not write the Questioned material appearing on that exhibit.

There was evidence also noted to indicate that Mr. Umana may have written the block printing appearing on the Government's Exhibit 264, 281 and 282.  But the evidence is not conclusive.

Q    So as to the copies in Exhibits 270 through 283, aside from the few samples you've noted, your conclusion was --

A    Strong probability that Mr. Umana wrote the Questioned material.

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 474 of 510
Case 3:08-cr-00134-RJC   Document 131   Filed 01/30/11   Page 77 of 113
JA2354

1118

Q    And once again, the question between the -- you call that a virtually certain as a strong probability --

A    That's correct.

Q    -- because of the photocopying, is that your opinion?

A    In my opinion, the quality of the photocopies is probably the reason for less than a definite opinion.  But still virtually certain, they're in very good agreement.

Q    As to Government Exhibit 284, once again, did you prepare a report of your findings?

A    Yes.  That's what I was reading from.

Q    And I believe 284 has two pages.  Do you see those there before you?

A    That's correct.  That appears to be my report -- or a copy of my report.

          MS. ROSE:  I would move to admit that, Your Honor.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

(Government Exhibit 284 was received into evidence.)

Q    (By Ms. Rose) Do you, after you have completed your analysis, rendered your conclusions, do you then have an individual who can check your work, or quality control measures within your profession?

A    Typically I have a minimum of 10 percent of my case work where I make -- render some type of positive opinion.

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 475 of 510
Case 3:08-cr-00134-RJC   Document 151   Filed 01/30/11   Page 78 of 113

**JA2355**

1119

A minimum of 10 percent of my work has to be checked, technically reviewed, and I do that. A minimum -- it's significantly more than that, but a minimum of 10 percent is checked.

Q    And with regard to these particular documents?

A    Yes. The first submission was technically reviewed by Mr. Greg Floyd, who is a certified AVFD Certified Document Examiner. He was trained in the Secret Service. He was there, roughly 30, 35 years before retiring.

Q    Were there any disagreements with Mr. Floyd's conclusions and with your conclusion?

A    No. No.

          MS. ROSE:  Thank you, sir.

          THE COURT:  Any cross?

          MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q    So Mr. Taylor, when you testify to something that you -- there's a strong probability that Mr. Umana wrote something, you said that means you're virtually certain?

A    That is correct.

Q    And that is, what that means is, it is your opinion that you're virtually certain, I mean --

A    Yes. That is my opinion.

Q    All these -- even when you identify something, when you give an identification which you say you are certain, never

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 476 of 510
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 74 of 113
JA2356

1120

the less, that is still just your opinion, correct?

A    Based on my training and experience, yes.

Q    And the identification of handwriting, in the final analysis when you issue an opinion, it's a subjective as opposed to objective thing?

A    There is some subjectivity in the examination, in any forensic examination.

Q    And the extent to which many of the Questioned documents were photocopies, that diminished the extent to which you could make an identification, correct?

A    Yes.

Q    Now, you never witnessed -- the three exhibits that you refer to as -- that comprise specimen one, what you refer to as the Known, you did not see Mr. Umana author those documents, correct?

A    I did not.

Q    Okay.  And in your reports you refer to specimen one in both reports as bearing -- I'm sorry, bearing the purported writing of Mr. Alejandro Umana, correct?

A    That is correct.

Q    These were presented to you as they are, as being what you were suppose to use as the known writing of Alejandro Umana, correct?

A    It is what I used as the known writing.

Q    And what those consisted of was two envelopes and

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 477 of 510
Case 3:08-cr-00134-RJC   Document 131   Filed 01/30/11   Page 84 of 113
JA2357

enclosed letters, and then one letter that had no envelope, correct?

A   Yeah.  The letter that had no envelope was the -- I think the most important, that would be Government 253.  Basically that was a two-page hand-printed letter with writing on both the front and the back.

Q   I'm sorry, isn't that 236?

A   I'm -- my mistake.  Sorry about that.  Yes.  Government's Exhibit 236 is a hand-printed pencil letter that has hand printing on both sides of each sheet of paper.

Q   And that letter has no name at the end, a signature or a name indicating who is the claimed author, correct?

A   That is correct.

Q   And it also had came with no envelope when you received it, correct?

A   That is correct.

Q   And then -- so those were the items you used as the known -- known writing of Alejandro Umana?

A   That is correct.

Q   And if it turned out that in fact that was not correct and that was not the known writing of Alejandro Umana, your testimony that all these other documents were written by him would not be correct?

A   I would identify the author of the write -- whoever is -- if the name changes, then that's the name of the

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 478 of 510
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 84 of 113
JA2358

1122

identification and not a probable.

Q    So you can't testify that the three exhibits, 235, 236 and 237, you can't testify under oath that those were written by this man seated over here, can you?

A    I did not witness these being executed.

MR. FOSTER:  I have no further questions.

THE COURT:  Any redirect?

MS. ROSE:  Yes, Your Honor.

REDIRECT EXAMINATION BY MS. ROSE:

Q    Are you able to see on your screen, Government's Exhibit 235?

A    Yes.  And I have it in front of me.

MS. ROSE:  This has already been admitted as Government's Exhibit -- before I have him look over that, Your Honor, he's previously identified Government's Exhibit 235, 236 and 237 I would move to admit those documents?

THE COURT:  Any objection?

MS. ROSE:  I do not move to ultimately publish Government's Exhibit 236, but in that it was part of the basis for his conclusion, just as he can render.

MR. FOSTER:  I would make the same objection as we made before, just the continuing objection, Your Honor.  I didn't think these would be introduced.

THE COURT:  Very well.  Members of the Jury, the Government's offering 235 and 237 -- or 235, 236 and 237?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/30/17   Page 479 of 510
Case 3:08-cr-00134-RJC   Document 137   Filed 01/30/11   Page 82 of 113
**JA2359**

1123

MS. ROSE:  Yes, Your Honor.

THE COURT:  Members of the Jury, I'm going to admit Government's Exhibit 235, 236, 237 for a limited purpose.  They're not admitted to establish the truth of anything in those documents.  But solely for the limited purpose of showing to you what documents this person relied upon in giving his opinion to you as to the authorship.  And for that limited purpose I'll allow the government to introduce those exhibits.

(Government Exhibit 235, 236 & 237 were received into evidence.)

Q    (By Ms. Rose) You have before you 235.  Do you see that on the screen?

A    Yes, I do.

Q    And do you see the name or where you see a portion on the copy up in the left hand corner?

A    Yes, that's correct.  N-D-R-O, part of Alejandro, I assume.  E Umana.  And you have a PID number of 362221.

Q    That is addressed to what address?

A    Consulado de El Salvador.  And that's 3505 Duluth Park Lane, Suite 320, Atlanta, Georgia, 30096.

MS. ROSE:  Thank you.  I wouldn't have any other questions as to this witness at this time, Your Honor.

THE COURT:  Any recross?

MR. FOSTER:  No, Your Honor.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 480 of 510
Case 3:08-cr-00134-RJC   Document 1547   Filed 01/30/11   Page 34 of 113
JA2360

1124

THE COURT:  You may step down and be excused.

THE WITNESS:  Thank you, sir.

MS. ROSE:  I would briefly recall Officer Hastings.

CHUCK HASTINGS, PREVIOUSLY SWORN, DIRECT EXAMINATION BY MS. ROSE:

Q    Officer Hastings, still under oath, did you make a request to collect letters from 26 individuals related to this particular case?

A    Yes.  I believe there was 25.  But there were more suspected members not charged in the indictment, might have made it 26 or 27, but yes.

Q    Was the defendant's mail one of those requests you made of --

A    Yes.

Q    -- of the jail?

Did you -- in addition -- did you receive copies from the jail?

A    Yes.  Straight from Sergeant Clarkson.

Q    And did you do that on a regular basis?

A    Yes, ma'am.

Q    After receiving them on some occasions, were they provided to Ms. Conrad for translation?

A    Yes.

Q    But in all occasions, maintained -- what you had

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-5   Filed 03/23/17   Page 481 of 510
Case 3:08-cr-00134-RJC  Document 1547   Filed 01/30/11   Page 84 of 113
**JA2361**

1125

received, maintained or kept in evidence?

A     Yes, ma'am.

Q     Did you also -- if you have before you there, look at Government's Exhibit 235, 236 and 237.

A     Okay.

Q     One of those exhibits is an original letter.

A     Yes, ma'am.

Q     Did you actually receive that original letter?

A     Appears to be one of the ones that we received, yes, ma'am.  I can't say for certain without looking at the photocopies we made at the office.

Q     Well, could you -- from whom did you receive original letters?

A     Original letters we received from Alexander Granados also known as Gorilon, and Jaime Sandoval, also known as Pelon.

Q     And why were those letters provided to you?

A     During meetings with their attorneys, they provided original letters that they had received while in custody.

Q     And did you have an opportunity to speak with Mr. Granados and Mr. Sandoval, also known as Pelon --

A     Yes.

Q     -- regarding from whom they had received these letters?

A     Yes.

Q     What did they tell you?

                    Laura Andersen, RMR 704-350-7493

1126

MR. FOSTER:  Objection; hearsay.

THE COURT:  Sustained.

MS. ROSE:  All right.  Thank you very much.

MR. FOSTER:  I have no questions.

THE COURT:  You may step down.

MS. ROSE:  Your Honor, there are a couple of exhibits that to clear the record, that were identified during testimony which the government -- and to which the witness testified and the government did not move to admit, they were conditionally admitted, Government's Exhibit 73, Government's Exhibit 61 was conditionally admitted.  I move to admit that.

THE COURT:  What is Government's Exhibit 61?

MS. ROSE:  Government's Exhibit 61 was the hawk photo from the 1508.  Both Mr. Miller, Mr. Hastings testified -- I'll pull that up for Your Honor to see.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 61 was received into evidence.)

MS. ROSE:  Exhibit 73, Officer Dutko testified about this particular photograph.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 483 of 510
Case 3:08-cr-00134-RJC   Document 197   Filed 01/30/11   Page 86 of 113
JA2363

1127

(Government Exhibit 73 was received into evidence.)

MS. ROSE:  I would move at this time to admit Government's Exhibits 151 through 166b; those were conditionally admitted earlier.

THE COURT:  What are they?

MS. ROSE:  Those are letters, translations and selections of -- previously approved by the Court, foundation through Ms. Conrad and the other witnesses today.

MR. FOSTER:  Well, Your Honor, I of course make my continuing objection.  But we have exhibit numbers that were not included in what we discussed this morning, I don't believe.

MS. ROSE:  I did not move to admit 167.

MR. FOSTER:  Well, I'm talking about 151 through 159.

MS. ROSE:  I'm not seeking to publish those.  Those were --

THE COURT:  157 is already in.  What are the exhibits that you're seeking to admit?

MS. ROSE:  158, 158a, 158b and c.  Beginning at 160, Your Honor, 160, 160a, 160b through 166b.

THE COURT:  Those will be admitted.

(Government Exhibit 158, 158a, 158b, 158c, 160, 160a, 160b through 166b were received into evidence.)

MS. ROSE:  The Government would moved to admit

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 484 of 510
Case 3:08-cr-00134-RJC   Document 1547   Filed 01/30/11   Page 87 of 113
JA2364

1128

168, 168a, 168b.

THE COURT:  They will be admitted.

(Government Exhibit 168, 168a 168b were received into evidence.)

MS. ROSE:  That will be all at this time, Your Honor.

THE COURT:  Very well.  Take a look at 204 and see whether you have moved admission of 204.

MS. ROSE:  Yes.  I move to admit 204.  That's all for the jail mail, let me look at -- the matters -- yes, 204, Your Honor.

And then looking at the matters about which we heard today, 235.

THE COURT:  Before you go there, any objection to 204?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 204 was received into evidence.)

MS. ROSE:  235 through 250, Your Honor, just in -- I move to admit them, not to publish them, in that they were the foundation for testimony of Mr. Taylor.

But the same with Government's Exhibits 253 through 283, not -- excluding 279.  I'm not moving to admit those -- or to publish those, but just to admit them in that they were relied upon by Mr. Taylor in forming his

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 485 of 510
Case 3:08-cr-00134-RJC   Document 197   Filed 01/30/11   Page 84 of 113
JA2365

1129

conclusions and opinions.

THE COURT:  He testified to that.  I think that's sufficient, so I'll decline admission of those.

MS. ROSE:  All right.  Thank you, Your Honor.  I think that's it.

And at this time the Government would rest.

THE COURT:  Very well.

Members of the Jury, we'll take our morning break at this time.  Don't talk about the case, keep an open mind until the end of the case.  And we will see you back in court in 15 minutes.

(The jury was escorted from the courtroom.)

THE COURT:  Any motions at this time?

MR. FOSTER:  Yes, Your Honor.  Defense moves under Rule 29 for Judgment of Acquittal on all counts.  And I would like to be heard as to certain specifics.

THE COURT:  Okay.

MR. FOSTER:  As to count -- of course I make the motion as to all elements and all counts.  But specifically as to Count 28, which is the alleged Hobbs Act Robbery, on or about December 8, 2007.

I would submit that there is an insufficient evidentiary basis for federal jurisdiction of this.  It was -- this was the restroom gathering with the person who is known as Gordo.  He never testified.  He never presented

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 486 of 510
Case 3:08-cr-00134-RJC   Document 1527   Filed 01/30/11   Page 89 of 113
**JA2366**

1130

any evidence whatsoever, or was even actually identified specifically, other than his nickname.

So there's an inadequate showing that this was without his permission, which is typically presented in a robbery defense.

Additionally, there is inadequate evidence that at best this was an attempt at some sort, nothing was taken. And there was inadequate evidence that he had any drugs, or that they really thought he had any drugs to support this being a Hobbs Act Robbery or attempted Hobbs Act Robbery.

As to Count 61 and Count 62, these are violations of U.S. Code Section 1503 and 1512.  This is conspiracy to obstruct justice and tamper with witnesses, and actual obstruction of justice.

One of the elements that's in the court's instructions on these charges, is that the first element is that there was a proceeding pending before a federal court or Grand Jury.

And secondly, that the defendant or co-conspirator knew of the pending proceeding.

I would submit there was absolutely no evidence as to these elements.  The evidence that was presented was that these people were aware that the defendant was jailed on state murder charges in Guilford County.  There was nothing presented that would indicate any awareness of a federal

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 487 of 510
Case 3:08-cr-00134-RJC   Document 1547   Filed 01/30/11   Page 90 of 113

JA2367

proceeding, a federal grand jury proceeding or likewise.

I would submit as to those Counts 61 and 62, there's been an inadequate showing to support a jury verdict on those two counts. And the same reasoning would apply to Count 63, as well, the witness tampering count.

And that's what I would like to be heard on, Your Honor.

THE COURT: Thank you. What says the government?

MR. NAZZARO: Your Honor, with respect to the extortion, it's also as we discussed, charged as an attempt. And the evidence that supports that is not only an eyewitness which who testified.

But there also was testimony of the attempts to extort drug dealers and pay them rent. There's also a tape of that in which the defendant's voice was identified and other MS 13 members in attempting to commit the extortion. There was a lot of testimony --

THE COURT: Taking the evidence in the light most favorable to the government at this stage, I do think there is sufficient evidence to go to the jury on Count 28.

What about the argument with respect to the obstruction of justice, conspiracy, substantive offense, and tampering with witness.

MR. NAZZARO: Well, as far as those counts, Your Honor, the Court would recall the testimony of Officer

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 488 of 510
Case 3:08-cr-00134-RJC   Document 1317   Filed 01/30/11   Page 91 of 113
JA2368

1132

Hastings, discussing the fact of the investigation and the witnesses. And there also was testimony of Alexander Granados who testified in detail about the message received from the defendant to another MS 13 member Misterio, and then the subsequent attempt to bring weapons to kill the witnesses in Greensboro.

And I think there was adequate testimony about that issue before the jury. There also was testimony from Mariachi, which corroborated some of that testimony about retrieving a vehicle that was to be used for that attempt.

And of course there was a lot of circumstantial evidence that Mr. Umana who was alleged to be involved in that, certainly would be the beneficiary of that act.

THE COURT: What's the evidence, if any, that the defendant knew there was a federal action, as opposed to a state action?

MR. NAZZARO: There was testimony from Officer Hastings about the investigation, and there's strong circumstantial evidence from the events that he knew.

And I don't know that it's as strict a requirement that the defendant had to actually have knowledge of the federal investigation.

But I think there was strong circumstantial evidence through Officer Hastings and the events themselves, that he knew about a pending investigation.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-5    Filed 03/23/17    Page 489 of 510
Case 3:08-cr-00134-RJC    Document 1517    Filed 01/30/11    Page 92 of 113

**JA2369**

1133

THE COURT:  I think there is evidence that is sufficient to go to the jury that the defendant was aware that there was a pending proceeding.

The question the Court has is whether you believe that legally the defendant has to know that it was a federal proceeding versus a state proceeding.  And if so, what evidence is there of that fact?

MR. NAZZARO:  Which count specifically, Your Honor?

THE COURT:  For Counts 61 through 63.

MR. NAZZARO:  Well, I think they're different; 61 was the conspiracy -- can I have one moment, Your Honor?

THE COURT:  You may.

MR. NAZZARO:  Your Honor, I believe with respect to the conspiracy, which alleges two objects, which is the 1512 and the 1503.  There is no requirement with the 1512 that it has to be -- has to know that it's a federal investigation.

To the extent there's a requirement under 1503, we would submit that there is strong circumstantial evidence to support that.

THE COURT:  I'm going to grant the government -- or, I'm sorry -- the defendant's Rule 29 Motion with respect to counts -- to the 1503, object of the Count 61 conspiracy, and the substantive 1503 offense in Count 62.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 490 of 510
Case 3:08-cr-00134-RJC   Document 154   Filed 01/30/11   Page 93 of 113
JA2370

1134

Taking the evidence in the light most favorable to the government, which is the standard at this time, I think there's sufficient evidence to go to the jury with respect to Count 63, and so that will remain standing.

So what's struck from the conspiracy count is the 1503 object.

MR. NAZZARO:  Yeah, but -- as to the conspiracy object --

THE COURT:  Right.

MR. NAZZARO:  But if the object was for 1512 --

THE COURT:  That would remain.

MR. NAZZARO:  So the conspiracy still goes.

THE COURT:  Count 61 remains in modified form.

MR. NAZZARO:  Thank you.

THE COURT:  All right.  Mr. Foster, Mr. Bryson, I would like to make an in court inquiry of your client at this time as to his knowledge of his right to testify or not.

MR. BRYSON:  Yes, Your Honor.

THE COURT:  Mr. Umana, you have a right to testify, if you wish to testify in this case.  That decision is yours to make.  You also have a constitutional right not to testify, if that's the choice you make.

I've already instructed the jury that if you choose not to testify, that they cannot hold that against

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/20/17   Page 491 of 510
Case 3:08-cr-00134-RJC   Document 1544   Filed 01/30/11   Page 491 of 510
**JA2371**

1135

you, it's your constitutional right.  And I would instruct them again, in my closing instructions, of that right that you have.

I just want to make sure at this time that you understand your rights to testify or not to testify.  And that's something that you should have consulted with your attorneys.  And I believe you have consulted with your attorneys about that decision.

But I would like to ask you at this time on the record, whether you have made the decision whether to testify or not?

THE DEFENDANT:  No.

INTERPRETER:  No.

THE COURT:  When you say no, what do you mean?  Do you wish to testify?

THE DEFENDANT:  No.

INTERPRETER:  No.

THE COURT:  I have heard from you that you do not wish to testify.  I will make that part of my instruction to the jury, that you have a constitutional right not to testify, and that they should not hold that against you.

Is there anything further at this time?

MR. BRYSON:  No, Your Honor.

MR. FOSTER:  No, Your Honor.

THE COURT:  Do you all intend to put up any

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/28/17   Page 492 of 510
Case 3:08-cr-00134-RJC   Document 134   Filed 01/30/11   Page 95 of 113
**JA2372**

1136

evidence?

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  Well then let's take --

MR. NAZZARO:  Your Honor, I'm sorry.  I think we still did intend to publish those portions of the letters, if we could, to the jury.  I know they will be sent back.

THE COURT:  I didn't know that.  I thought you all had rested.

We can -- well, what I'll do is reopen and allow you to publish what you want to publish.  And then you all can rest.

And then I can make inquiry of the defense if they wish to put on any evidence or not, whatever your preference is.  If you want me to make inquiry in front of the jury, I will be glad to do that.

MR. FOSTER:  We'll do it in front of the jury, Your Honor.

THE COURT:  All right.

And then, so let's take a 10 minute break.  Let's set up for closing argument, so that right after the government publishes what they want to publish and rests, and defense indicates they don't wish to put on evidence, we'll go right into general instructions at that time and then argue.

MR. FOSTER:  Have we got a copy of the --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 493 of 510
Case 3:08-cr-00134-RJC   Document 1574   Filed 01/30/11   Page 96 of 113
JA2373

1137

THE COURT:  We'll take a 15 minute break at this time.

(A brief recess was taken in the proceedings.)

THE COURT:  All right.  With the pace we're going at, I think the procedure ought to be the government publish what it intends to publish.  We'll ask you all if you intend to put on any evidence.  And then I'll give general instructions to the jury.

We probably should take our lunch break at that time, rather than interrupt closing arguments.  So we'll go through the general instructions, take a break and then come back and argue.

All right.  Are we ready?

MS. ROSE:  Yes, Your Honor.

THE COURT:  All right. Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  All right.  Does the government wish to reopen at this time?

MS. ROSE:  Just to publish some exhibits which were previously admitted, Your Honor.

THE COURT:  You may.

MS. ROSE:  Thank you.

First Government Exhibit 161b.

MR. FOSTER:  I'm sorry.  What exhibit number is that?

Laura Andersen, RMR 704-350-7493

**JA2374**

1138

MS. ROSE:  161b.

(Published.)

MS. ROSE:  163b.

(Published.)

MS. ROSE:  166b.

(Published.)

MS. ROSE:  168b, Your Honor.

(Published.)

MS. ROSE:  Thank you, Your Honor.  That's the conclusion.

THE COURT:  The government rests?

MS. ROSE:  Yes, Your Honor.

THE COURT:  The defense wish to put up evidence at this time?

MR. FOSTER:  No, Your Honor.  The defense rests.

THE COURT:  Thank you.

All right.  Members of the Jury, what I am going to do now is give you some general instructions to guide your participation from this point forward.  And once I do that, we'll take a lunch break and we'll go to lunch and come back, and after lunch the attorneys will make their closing arguments to you.

You have now heard the evidence and soon you will hear the arguments of counsel.  And after counsel have made their closing arguments, I will come back and discuss the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 495 of 510
Case 3:08-cr-00134-RJC   Document 154   Filed 01/30/11   Page 94 of 113
**JA2375**

1139

specific offenses charged, give you the elements of those offenses, and follow with further directions to guide you in your deliberations.

It is your duty and your responsibility in this trial to find the facts. You may find those facts only from the evidence which has been presented during the trial. The evidence consists of the testimony of the various witnesses who have been called, sworn and testified in your presence; any exhibits which have been admitted into evidence by the Court; and any stipulation of fact made by the parties.

In reaching your decision as to the facts of this case, it is your sworn duty to follow the law as the Court instructs you. You will apply the law given to you by the Court, to the facts which you find from the evidence and reach a verdict.

Now, counsel may refer to some of the governing rules of law in their arguments. And if any difference appears to you between the law as stated by counsel and that stated by the Court, you are, of course, to follow the instructions -- you are to follow the instructions of the Court.

And you are not to single out one instruction alone as stating the law, but must consider all of the instructions as a whole. You may not substitute or follow any personal or private notion or opinion as to what the law

Case 3:16-cv-00057-MOC   Document 50-5   Filed 03/23/17   Page 496 of 510
Case 3:08-cr-00134-RJC   Document 1544   Filed 01/30/11   Page 94 of 113
**JA2376**

1140

is or ought to be.  You are required to perform these duties without bias, without prejudice, or sympathy for any party. The law does not permit jurors to decide cases on the basis of bias, prejudice, sympathy, or on any basis other than solely upon the facts and the law arising in the particular case.

Now this case involves charges brought by Bill of Indictment against the defendant, Alejandro Umana.  You are instructed again, that an indictment is but a formal method of accusing the defendant of a crime.  Its purpose is to inform the defendant of the charges against him and to bring him to trial.  It is not evidence of any kind, nor does it permit any presumption or inference of guilt.

In other words, an indictment is not consistent either with guilt or lack of guilt.  It simply puts that question at issue for your decision.  It is up to you the jury to decide if in fact the defendant is guilty or not guilty of any of the charges outlined in the Bill of Indictment.

A separate crime is charged in each count of the indictment.  Each count and the evidence pertaining to it, should be considered separately.

The fact that you may find the defendant guilty or not guilty as to one of the crimes charged, should not control your verdict as to any other.  And you are here to

Laura Andersen, RMR 704-350-7493

JA2377

decide whether the government has proved beyond a reasonable doubt that the defendant is guilty of the crimes charged. The defendant is not on trial for any act, conduct or offense not alleged in the indictment.  Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

Every defendant in a criminal case is presumed to be innocent.  And this presumption continues through out the course of the trial.  The presumption will end only if you reach the jury room and arrive unanimously at the conclusion, if you do, that the government has shown to your satisfaction that the defendant is guilty beyond a reasonable doubt.

This burden on the government does not change at any time during the course of the trial.  The presumption of innocence in favor of a defendant is not a mere formality to be disregarded by the jury at its pleasure, it is a substantive part of our criminal law.

Accordingly, the government must prove each of the elements of the crimes charged in this indictment beyond a reasonable doubt before they can -- before there can be a conviction.

The term "reasonable doubt" means just what it says.  It is a doubt based upon reason and common sense. Its meaning is no doubt self-evident and understood by you,

Case 3:16cv-00057-MOC    Document 59-5    Filed 03/23/17    Page 498 of 510
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 101 of 113

JA2378

1142

and the Court will not attempt to define the term further.

Now, there are two types of evidence from which a jury may properly -- which a jury may properly assess in determining whether the government has met its burden of proof as to any offense.

One is direct evidence, such as the testimony of an eyewitness.  The other is circumstantial evidence, a proof of a chain of circumstances pointing to the commission of the evidence.

Circumstantial evidence is evidence of facts or circumstances, from which the existence or non-existence of other factors in controversy may be inferred.

As a general rule, the law makes no distinction between direct and circumstantial evidence.  But simply requires that before convicting a defendant, the jury must be satisfied of the guilt of such defendant beyond a reasonable doubt from all the evidence in the case.

Now while you should only consider evidence presented during the trial of this matter, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.

In other words, you may make deductions and reach conclusions, which reason and common sense lead you to draw from the facts which have been established by the testimony

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/23/17    Page 499 of 510
Case 3:08-cr-00134-RJC    Document 5945    Filed 01/30/11    Page 1029 of 1113
JA2379

and evidence in the case.

Questions may have been raised by the government's failure to use or decision not to employ certain investigative techniques. You may consider these facts in considering whether the government has met its burden of proof, because you should look to all the evidence or lack of evidence in deciding whether the defendant is guilty.

However, you are also instructed that there is no legal requirement that the government use any specific investigative technique to prove its case. Therefore, the government is not required to present such evidence for you to find the defendant guilty.

In short, law enforcement or investigative techniques are simply not your concern. Rather, your concern to whether the evidence which was admitted, proved the defendant's guilt beyond a reasonable doubt.

Now, during the trial I instructed you to exclude from your consideration, certain statements made from the witness stand. I remind you that it is your duty to follow that instruction, and consider only that evidence which was duly allowed from the witnesses presented to you.

Now, at the beginning of the trial I gave you some guidance on judging the credibility of the witnesses, and the weight their testimony deserves.

I told you that you are the sole judges of the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/23/17    Page 500 of 510
Case 3:08-cr-00134-RJC    Document 59-2    Filed 01/30/11    Page 103 of 113
**JA2380**

1144

credibility of witnesses.  But, as well, I also gave you certain factors in which you may consider in making that assessment of the credibility of the witnesses.

Those factors included whether the witness has any motive or reason for being truthful or untruth.  The witness' interest, if any, in the outcome of the case. Whether there appeared from the witness' attitude or conduct, any bias, prejudice or feeling which may cause that person's testimony to be influenced.  Whether the testimony bears the earmarks of truthfulness.  To what extent, if any, it is corroborated or confirmed by other testimony which is not questioned, or by known or admitted facts.

And you may also consider the intelligence and mental capacity of a witness and the witness' opportunity to have accurate knowledge of the matter to which the person testified.

I instruct you that you may believe all that a witness says, or none of it, or believe part and disbelieve part.

You are not required to accept testimony, even though the testimony is uncontradicted and the witness is not impeached.  You may decide, because of the witness' bearing and demeanor, or because of the inherent improbability of his or her testimony, or for other reasons sufficient to you, that such testimony is not worthy of

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 501 of 510
Case 3:08-cv-00134-RJC   Document 59-2   Filed 01/30/11   Page 104 of 113

JA2381

belief.

The testimony of a witness may be discredited or impeached by showing that he or she previously made oral or written statements, which are inconsistent with his or her present testimony. The earlier, contradictory statements are admissible only to impeach the credibility of the witness, and not to establish the truth of those statements.

It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached. If a witness is shown knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony and other particulars. And you may reject the testimony of that witness or give it such credibility as you may think it deserves.

You have heard certain identification testimony, and you should carefully consider whether the identification was accurate and reliable.

In deciding this you should especially consider if the witness had a good opportunity to see the person at the time. For example, you should consider the visibility, the distance, whether the witness had known or seen the person before, and how long the witness had to see the person.

You may take into account any occasion in which the witness failed to make an identification of the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/23/17    Page 502 of 510
Case 3:08-cv-00134-RJC    Document 59-2    Filed 01/30/11    Page 105 of 113
**JA2382**

defendant, or made an identification that was inconsistent with his identification at trial.

You should consider all these things carefully in determining whether the identification was accurate and reliable.

Remember, the government has the burden of proving beyond a reasonable doubt that the defendant was the person who committed the crime charged.

You also heard the testimony of a witness who was convicted of a felony, a crime for which a person may receive a prison sentence of more than a year.

Prior conviction of a crime that is a felony, is one of the circumstances that you may consider in determining the credibility of a witness.

While the testimony of a witness may be discredited or impeached by evidence showing that the witness has been convicted of a felony, it is the sole and exclusive right of the jury to determine the weight to be given to the testimony of anyone who has previously been convicted of a felony.

The testimony of an alleged accomplice, and the testimony of one who provides evidence against the defendant as an informer for pay or for benefits in a Plea Agreement, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 503 of 510
Case 3:08-cv-00134-RJC   Document 592   Filed 01/30/11   Page 106 of 113
JA2383

caution than the testimony of an ordinary witness.

You the jury must determine whether the witness' testimony has been affected by any of those circumstances, or by the witnesses interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of the hope that he will not be prosecuted.

In this case the government called as some of its witnesses, alleged accomplices named as co-defendants in the indictment, with whom the government has entered into a Plea Agreement from which the person expects to benefit.

Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court.  An alleged accomplice, including one who has entered into a Plea Agreement with the government, is not prohibited from testifying, on the contrary.  The testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty.

You should keep in mind that such testimony is always to be received with caution and weighed with great care.  You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt.

You must not consider that guilty -- you must not consider that guilty plea as any evidence of the defendant's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000573-MOC    Document 59-5    Filed 03/23/17    Page 504 of 510
Case 3:08-cr-00134-RJC    Document 594    Filed 01/30/11    Page 207 of 213
JA2384

guilt.  You may consider that witness' guilty plea only for the purpose of determining how much, if at all, to rely upon the witness' testimony.

The testimony of someone who has shown to have used addictive drugs during the period of time about which the witness testified, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.

You should never convict any defendant upon the unsupported testimony of such a witness, unless you believe that testimony beyond a reasonable doubt.

During the trial you heard the testimony of witnesses who have expressed opinions.  If scientific, technical or other specialized knowledge might assist the jury in understanding the evidence, or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may testify and state an opinion concerning such matters.

Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion.  You should judge such testimony like any other testimony.  You may accept it or reject it, give it as much weight as you think it deserves considering the witness' education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 505 of 510
Case 3:08-cv-00134-RJC   Document 593-2   Filed 01/30/11   Page 508 of 513

JA2385

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party.

You should consider all of the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe.

You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

The law does not require either the defendant or the government to cross examine any witnesses.  And you may not draw any inferences from the fact that the government or a defendant did not cross examine a witness.

Now the defendant has elected not to testify in this case.  The Court instructs you again, that he has a constitutional right not to take the stand and testify, and not to speak at all or offer any evidence; the burden of proof being entirely upon the government.

You must draw no adverse inferences of any kind from his exercise of his privilege not to testify.  This right is a fundamental one in America's criminal law and one which cannot be disregarded by the jury at its pleasure.

Now, the lawyers for both sides objected to certain things during the trial of this case.  They have an

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-5    Filed 03/23/17    Page 506 of 510
Case 3:08-cr-00134-RJC    Document 5942    Filed 01/30/11    Page 509 of 113

**JA2386**

obligation to their clients to make such objections when they believe that a certain piece of evidence is not permitted by the rules of evidence.  Those rules are designed to make sure that both sides receive a fair trial.  Do not draw any conclusions from such objections.  They relate only to the legal question that the Court must determine and should not influence your thinking.

If I sustained an objection to a question, the witness was not allowed to answer it.  Do not attempt to guess what the answer might have been given had I allowed the question to be answered.

And if an objection was overruled you should treat the answer like any other.

Let me emphasize that a lawyer's question is not evidence.  At times, a lawyer may have incorporated into a question a statement that assumed certain facts to be true, and asked a witness if the statement was true.

If the witness does not answer or denies the truth of the statement, and if there is no other evidence in the record proving that the assumed fact is true, then you may not consider the fact to be true simply because it was contained in the lawyer's question.

On the other hand, if a witness adopts or agrees to the assumed facts in his answer, then the witness may be considered to have testified to the facts assumed in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 59-5  Filed 03/23/17  Page 507 of 510
Case 3:08-cv-00134-RJC  Document 592  Filed 01/30/11  Page 510 of 113
JA2387

1151

question.  And his testimony is evidence of those facts.

A couple of final notes; one is on notes.  Several of you took notes during the course of the trial.  You are instructed again, that your notes are only a tool to aid your own individual memory, should not be substituted for your memory.

Moreover, you should not compare your notes with other juror's notes in determining the content of the testimony, or in evaluating the importance of any evidence.

Remember, your notes are not evidence.  If you chose not to take notes, remember it was your own individual responsibility to listen carefully to the evidence.  You cannot give this responsibility to someone who took notes.  We depend on the judgment of all members of the jury.  You must all remember the evidence in the case.

A final note is that punishment provided by law for the offenses charged in the indictment, should there be a verdict of guilty on any of the offenses, should never be considered by you in any way, in arriving at an impartial verdict as to the guilt or lack of guilt of the defendant.

Those are the general instructions I wish to give you before the attorneys make their closing arguments.  Once they have made their closing arguments, I will come back and give you specific instructions on the crimes charged, the statutes alleged to have been violated, and the elements of

Case 3:16cv-000573-MOC    Document 59-5    Filed 03/23/17    Page 508 of 510
Case 3:08-cv-00134-RJC    Document 59-4    Filed 01/30/11    Page 11 of 13
**JA2388**

each of the crimes charged, which the government has the burden of proving beyond a reasonable doubt.

But I'll defer all of that until after lunch so we don't break up these arguments.

We'll take a lunch break at this time, 12:10.  I would ask the jurors to be ready to come back into court at 1:00, and we'll resume at that time.

Still, it's near the end of the trial, but we haven't gotten to the end of the trial, so I would give you the same instructions you've heard so many times before:

Don't talk about the case amongst yourselves or with anyone else.  Keep an open mind, you still haven't heard the arguments of counsel or the instructions of the Court.  Avoid any exposure to any coverage of this case outside the courtroom.

With those instructions we'll take a lunch break and see you back at 1:00.

(The jury was escorted from the courtroom.)

(Lunch recess.)

* * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-5   Filed 03/23/17   Page 509 of 510
Case 3:09-cr-00134-RJC   Document 592   Filed 01/30/11   Page 12 of 113
**JA2389**

1153

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER


        I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

        Dated this the 17th day of April, 2010.



                            s/Laura Andersen
                            Laura Andersen, RMR
                            Official Court Reporter

JA2390