No.  10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellee, | ) |
| v. | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) |
| Defendant-Appellant. | ) |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix**
**Volume 6 of 11**

VINCENT J. BRUNKOW
ZANDRA L. LOPEZ
JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467
Attorneys for Defendant-Appellant

-and-

MALCOLM RAY HUNTER, JR.
Attorney at Law
P.O. Box 3018
Chapel Hill, N.C. 27515-3018
Telephone:  (919) 929-9655

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

iii

Defendant's Reply to Government's Response to Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence Before Allowing Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . 1202

   Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

   Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

      By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
      By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . . 1222

      Dan Horne                    Direct Examination . . . . . . . . . . 1226

      Jeffrey T. Courtet           Direct Examination . . . . . . . . . . 1232

      George Marshall Barnette     Direct Examination . . . . . . . . . . 1235

      Andrew Wrenn                 Direct Examination . . . . . . . . . 1239

      J.E. Brown                   Direct Examination . . . . . . . . . 1243

      Frank Flores                 Direct Examination . . . . . . . . . 1247
                                   Voir Dire Examination . . . . . . . 1255
                                   Redirect Examination . . . . . . . . 1257
                                   Cross Examination . . . . . . . . . . 1316

      Charles Barkley              Direct Examination . . . . . . . . . . 1332
                                   Cross Examination . . . . . . . . . . 1338

iv

| | | |
|---|---|---|
| Jeff Bruner | Direct Examination | 1339 |
| Eduardo Vasquez | Direct Examination | 1344 |
| Lenny Moriera | Direct Examination | 1352 |
| | Cross Examination | 1369 |
| John Sloane | Direct Examination | 1371 |
| | Cross Examination | 1391 |
| Gene Richey | Direct Examination | 1391 |
| Juan Ruben Vela Garcia | Direct Examination | 1407 |

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341) . . . . . . . . . . . . . . . . . . . . . . . 1485

| | | |
|---|---|---|
| Juan Ruben Vela Garcia | Direct Examination | 1492 |
| | Cross Examination | 1498 |
| | Redirect Examination | 1529 |
| Officer James K. Griffen | Direct Examination | 1530 |
| Ann Hamlin | Direct Examination | 1537 |
| T.J. Miller | Direct Examination | 1544 |
| | Cross Examination | 1566 |
| Marie Terrell | Direct Examination | 1570 |
| | Cross Examination | 1576 |

Officer Benjamin Altizer      Direct Examination . . . . . . . . . . 1576
     Cross Examination  . . . . . . . . . . 1584

Officer Ryan Dutko      Direct Examination . . . . . . . . . . 1586

Abel Santos      Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos      Cross Examination  . . . . . . . . . . 1644

Marco Antonio Guzman Mejia      Direct Examination . . . . . . . . . . 1651
     Cross Examination  . . . . . . . . . . 1663

Teresa Ketner      Direct Examination . . . . . . . . . . 1666
     Cross Examination  . . . . . . . . . . 1703
     Redirect Examination  . . . . . . . . 1705

Barry Whitlow      Direct Examination . . . . . . . . . . 1707

John D. Butts      Direct Examination . . . . . . . . . . 1715
     Cross Examination  . . . . . . . . . . 1733

James Cayton      Direct Examination . . . . . . . . . . 1735

Amy Wilde      Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342)  . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde      Direct Examination . . . . . . . . . . 1765
     Cross Examination  . . . . . . . . . . 1773

Doreen Huntington      Direct Examination . . . . . . . . . . 1780
     Cross Examination  . . . . . . . . . . 1797

Susan Conrad                    Direct Examination . . . . . . . . . . 1804
                                Cross Examination   . . . . . . . . . . 1840

Jeff Strohm                     Direct Examination . . . . . . . . . . 1846
                                Cross Examination   . . . . . . . . . . 1851

Officer Renee Quiles            Direct Examination . . . . . . . . . . 1851
                                Cross Examination   . . . . . . . . . . 1856

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1856

## VOLUME 5 (1900 - 2390)

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1903
                                Cross Examination   . . . . . . . . . . 1953
                                Redirect Examination  . . . . . . . . 1987
                                Recross Examination . . . . . . . . . 1988

William Chuck Hastings          Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)  . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings          Direct Examination . . . . . . . . . . 2034
                                Cross Examination   . . . . . . . . . . 2044

Alexandra Hirsch                Direct Examination . . . . . . . . . . 2049
                                Cross Examination   . . . . . . . . . . 2054

Michele Scheuerman              Direct Examination . . . . . . . . . . 2055
                                Cross Examination   . . . . . . . . . . 2064

Gene Rivera                     Direct Examination . . . . . . . . . . 2065
                                Cross Examination   . . . . . . . . . . 2086

Andrew Cheramie          Direct Examination . . . . . . . . . . 2090
                         Cross Examination  . . . . . . . . . . 2095

Jose Romero              Direct Examination . . . . . . . . . . 2095

Alexander Granados       Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2133


Alexander Granados       Direct Examination . . . . . . . . . . 2136
                         Cross Examination  . . . . . . . . . . 2138
                         Redirect Examination  . . . . . . . . 2158

Maricruz Medina          Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie        Direct Examination . . . . . . . . . . 2166

Chris Tyndall            Direct Examination . . . . . . . . . . 2173
                         Cross Examination  . . . . . . . . . . 2190

Mark Young               Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson  Direct Examination . . . . . . . . . . 2208
                         Cross Examination  . . . . . . . . . . 2213
                         Redirect Examination  . . . . . . . . 2213
                         Recross Examination . . . . . . . . . 2215

Jeffrey Taylor           Direct Examination . . . . . . . . . . 2216
                         Cross Examination  . . . . . . . . . . 2247
                         Redirect Examination  . . . . . . . . 2254

Denise Daniels           Direct Examination . . . . . . . . . . 2255
                         Cross Examination  . . . . . . . . . . 2257

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 9 of 485

William Chuck Hastings        Direct Examination . . . . . . . . . . 2259
                              Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

        Sergeant Scott Clarkson       Direct Examination . . . . . . . . . . 2323
                                      Cross Examination  . . . . . . . . . . 2330

        Denise Daniels                Direct Examination . . . . . . . . . 2332
                                      Cross Examination  . . . . . . . . . . 2333

        Jeffrey Taylor                Direct Examination . . . . . . . . . . 2333
                                      Cross Examination  . . . . . . . . . . 2356
                                      Redirect Examination  . . . . . . . . 2359

        William Chuck Hastings        Direct Examination . . . . . . . . . . 2361

**VOLUME 6 (2391 - 2856)**

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . 2391

    Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

        By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
        By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
        Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

    Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding "Equally Culpable" Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . . 2540

    Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
    Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
    Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

    Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . . 2559

    Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

    Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

    Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

        By the government . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
        By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

        Ismar Sanchez           Direct Examination . . . . . . . . . . 2574
                                Cross Examination . . . . . . . . . . 2584
                                Redirect Examination . . . . . . . . 2590

        David Henderson        Direct Examination . . . . . . . . . . 2590

x

Carlton Phoenix                Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347)  . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347)  . . . . . . . . . . . . . . . . . . . . . . . . . 2648

        Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

                Thomas Small                Direct Examination . . . . . . . . . . 2651
                                            Cross Examination  . . . . . . . . . . 2677

                Roberto Ramos               Direct Examination . . . . . . . . . . 2680
                                            Cross Examination  . . . . . . . . . . 2694

                Juan Lara                   Direct Examination . . . . . . . . . . 2699
                                            Cross Examination  . . . . . . . . . . 2706

                Raffi Djabourian            Direct Examination . . . . . . . . . . 2709
                                            Cross Examination  . . . . . . . . . . 2715

                John Maloney                Direct Examination . . . . . . . . . . 2716
                                            Cross Examination  . . . . . . . . . . 2724

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 12 of 485

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall                Direct Examination . . . . . . . . . . 2730
                                           Cross Examination . . . . . . . . . 2756
                                         Redirect Examination . . . . . . . . 2781

        Barry Telis                     Direct Examination . . . . . . . . . . 2784
                                             Cross Examination . . . . . . . . . . 2798
                                         Redirect Examination . . . . . . . . 2803

        William Moore               Direct Examination . . . . . . . . . . 2806
                                           Cross Examination . . . . . . . . . . 2820
                                         Redirect Examination . . . . . . . . 2822

        Susan Selser                  Direct Examination . . . . . . . . . . 2822

        J. Sage                         Direct Examination . . . . . . . . . . 2838
                                         Cross Examination . . . . . . . . . . 2842

        L. Goodman                 Direct Examination . . . . . . . . . . 2843
                                         Cross Examination . . . . . . . . . . 2844

        A. Thornwell               Direct Examination . . . . . . . . . . 2846
                                         Cross Examination . . . . . . . . . . 2851

## VOLUME 7 (2857 - 3373)

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

Carlos Alfredos
Dominguez Gonzalez          Direct Examination . . . . . . . . . . 2874
                           Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper           Direct Examination . . . . . . . . . 2902
                           Cross Examination  . . . . . . . . . . 2908

Luis Amaro                 Direct Examination . . . . . . . . . . 2911
                           Cross Examination  . . . . . . . . . . 2917

Russell Lashley            Direct Examination . . . . . . . . . . 2919
                           Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez  Direct Examination . . . . . . . . . . 2930
                           Cross Examination  . . . . . . . . . . 2931
                           Redirect Examination  . . . . . . . . 2935
                           Recross Examination . . . . . . . . 2936

Douglas Friend             Direct Examination . . . . . . . . . . 2938
                           Cross Examination  . . . . . . . . . . 2944

Jean Garcia                Direct Examination . . . . . . . . . . 2946
                           Cross Examination  . . . . . . . . . . 2952

Carmen Garcia              Direct Examination . . . . . . . . . . 2953
                           Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia           Direct Examination . . . . . . . . . . 2959
                           Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . 2975

        Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham    Direct Examination . . . . . . . . . . 2986
                   Cross Examination  . . . . . . . . . . 3050

Richard McGough    Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260)  . . . . . . . . . . . . . . . . . . . . . . . 3096

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

        Richard McGough    Direct Examination . . . . . . . . . . 3099
                           Cross Examination  . . . . . . . . . . 3157

        Selena Sermeno     Direct Examination . . . . . . . . . . 3167
                           Cross Examination  . . . . . . . . . . 3189
                           Redirect Examination  . . . . . . . . 3203

        Maria Santacruz Geralt    Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350)  . . . . . . . . . . . . . . . . . . . . . . . 3234

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

        Maria Santacruz Geralt    Voir Dire Exam. by Defendant  . . . 3237
                                  Voir Dire Exam. by Government . . 3250
                                  Direct Examination . . . . . . . . . . . . 3256
                                  Cross Examination  . . . . . . . . . . . . 3263

        Mark Bezy         Direct Examination . . . . . . . . . . . . 3276
                          Cross Examination  . . . . . . . . . . . . 3289

James R. Merikangas,
Ph.D.                          Direct Examination . . . . . . . . . . . . 3294
                               Cross Examination  . . . . . . . . . . . . 3317

Government's Rebuttal Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

Helen Mayberg             Direct Examination . . . . . . . . . . . . 3336
                          Cross Examination  . . . . . . . . . . . . 3358

## VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . . . 3374

    Defendant's Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

        Richard McGough          Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

**VOLUME 9 (3705 - 4209)**

**EXHIBITS**

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3,  School Records . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

xvi

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home  . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael  . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia  . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D.  . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana  . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana  . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez  . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez  . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

```
            UNITED STATES DISTRICT COURT
    FOR THE WESTERN DISTRICT OF NORTH CAROLINA
              CHARLOTTE DIVISION
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:08-CR-134-2 |
| | ) | |
| vs. | ) | VOLUME V-B |
| | ) | AFTERNOON SESSION |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

```
           TRANSCRIPT OF TRIAL PROCEEDINGS
      BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
        UNITED STATES CHIEF DISTRICT COURT JUDGE
                  APRIL 16, 2010
```

<u>APPEARANCES</u>:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    Assistant United States Attorney
    100 Otis Street
    Asheville, North Carolina 28801

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK P. FOSTER
    Law Offices of Mark Foster, PC
    1011 East Morehead Street, Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    Wyatt Early Harris & Wheeler, LLP
    P.O. Box 2086
    High Point, North Carolina 27261

```
            CHERYL A. NUCCIO, RMR-CRR
       United States District Court Reporter
            Charlotte, North Carolina
```

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 20 of 485
Case 3:08-cr-00134-RJC    Document 526    Filed 08/24/10    Page 20 of 145

JA2391

FRIDAY AFTERNOON, APRIL 16, 2010

THE COURT:  Are we ready for the jury?

MS. ROSE:  Yes, Your Honor.

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  Call the jury.

(Jury entered the courtroom.)

THE COURT:  Government ready to make its opening statement -- or closing argument?

MR. NAZZARO:  Yes, we are.

THE COURT:  You may.

MR. NAZZARO:  May it please the court, counsel, ladies and gentlemen of the jury:

Good afternoon.  At the beginning of this case, Ms. Rose explained to you about the events that occurred on December 8th, 2007, and gave you a preview.  You now have the facts and the evidence before you.  And you've heard, ladies and gentlemen, about what happened on that Christmastime, December 8th, 2007, in Greensboro, North Carolina, at the Las Jarochitas restaurant.  You heard about that restaurant.  A family owned restaurant.  Serves Mexican food.  Serves seafood.  Everything was normal that evening, ladies and gentlemen.

The family that owned the business, Abel Santos, one of the family members, was working there as he had worked many

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 21 of 485
Case 3:08-cr-00534-RJC   Document 50-6   Filed 03/23/17   Page 21 of 485

JA2392

1156

times before. Reported for work. Worked as the cashier. He also worked waiting on -- or hosting on tables. Everything was normal.

You also know now that Manuel and Ruben Garcia Salinas, two brothers. Manuel, who was an owner of a business. Who had frequented that restaurant many times before over the past months and even year. And had come in that Saturday evening with a group of coworkers, as they had on many other occasions. Everything was very normal.

And then you heard, ladies and gentlemen, about Marco Guzman. Passing by with his wife that night on High Point Road. Decided to get something to eat. Found the restaurant. Saw it. Decided to go there. He had been there many times. Went inside the restaurant. Everything, again, very normal.

Until, of course, La Mara Salvatrucha arrived. Until, of course, the MS 13 arrived. Until, of course, Wizard of the Novena arrived. That's when everything changed. Because unbeknownst to Ruben, Manuel, and those others in that restaurant that night, Wizard, a valuable piece in MS speak, a veteran in MS speak, had earned his respect in the MS 13. He had earned it and he wore it proudly on his body, on his back, on his chest, right between his eyes.

And unbeknownst to the people in that restaurant that evening, the MS 13, which you now know as an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:08-cr-00734-RJC    Document 50-6    Filed 03/23/17    Page 33 of 485

**JA2393**

international criminal organization.  They didn't know it that night.  They didn't know what the MS 13 was about.  They didn't know about the old creed that the MS 13 has.  They didn't know about the violence that the MS 13 does.  They didn't know about the ways of earning respect.

And the evidence has shown, ladies and gentlemen, that on that day, December 8th, 2007, Wizard of the Novena showed that he earned the big letters:  The big M and the big S.  And he earned them by respect.  And he earned them with a .45.  And he maintained his respect and maintained his status in the gang that night by showing Manuel and Ruben what the MS 13 is all about.

Showed them first -- he first showed Ruben a hollow point shot right in his stomach, lodged against his spine. And then his brother, Manuel, hollow point right to the head. He showed them, ladies and gentlemen, what the MS 13 is about. And at this point you now have heard the evidence about the MS 13.  The criminal organization that it is and the participation of this guy, Wizard of the Novena.

Ladies and gentlemen, as the judge indicated, this is the closing portion of the case.  This is what's called closing argument.  It's an opportunity to explain the evidence and how it fits into the law.  The judge, as he indicated and as he started to do, will instruct you about the law.  And you will determine the facts based on that law.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 23 of 485
Case 3:08-cr-00134-RJC   Document 1356   Filed 03/24/10   Page 23 of 145

**JA2394**

And we're here, obviously, as was indicated, because it's a federal indictment. There's several counts you're going to be considering in your deliberations. And some of those deal with racketeering, a racketeering enterprise. I'm going to explain a little bit about that. I'm going to explain a little bit about some of the charges as I go through.

But I want to start a little bit and explain a little bit about what a racketeering enterprise is. It's also known as a RICO conspiracy. It may sound complicated, but it's pretty simple, ladies and gentlemen. You have to have these elements: You have to have an enterprise; it has to affect interstate commerce; you have to be associated with it, as Wizard was; and you have to agree to participate in its affairs. An enterprise is a legal term, but it's pretty simple. It's an organization with an ongoing purpose: The MS 13.

And the other charges, ladies and gentlemen, which I will explain in more detail as we go through, deal -- especially the murder charges, deal with the same enterprise. That the murder was in furtherance of the enterprise.

Now, what is the MS 13 all about? You know a lot more now than you obviously did at the beginning of this case. You heard a lot of evidence about the organization. And you also heard some evidence about the purpose of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 24 of 485
Case 3:08-cr-00134-RJC   Document 1366   Filed 09/24/10   Page 24 of 145
**JA2395**

organization, which is pretty straightforward. There's no real dispute about this. It's all about turf. It's all about respect. It's all about assisting other gang members. That is the whole organization. It's to keep witnesses and victims in fear. That's what they're all about. There is no other purpose. It's a criminal organization with a criminal purpose. That's why it's an enterprise. That's why it's a racketeering conspiracy.

And what do we know about this enterprise? What evidence have we shown? Well, some of the evidence we've shown, we heard from gang experts, and we obviously heard from gang members. The gang experts and the gang members talked about tagging, about graffiti, about marking your territory, showing your control to the rival gangs and to the people that live in those areas.

Frank Flores testified about how the gang started, about its origins. But you also heard through many of the other witnesses, through people with gang names such as Mariachi, Gorilon. You heard from a person named Lenny. And, of course, you heard from Rony, the informant in this case.

And you heard, as Detective Flores showed you, it's organized by cliques. And what are cliques? I mean, everything sounds so complicated, but it's pretty basic. It's just like he described. It's like McDonald's. They're just the same MS. It's one MS organization. One organization.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 25 of 485
Case 3:08-cr-00134-RJC    Document 1026    Filed 08/24/10    Page 25 of 485
**JA2396**

One group with operating units throughout the United States and internationally. They're called cliques. They're groups you join to commit criminal activities. Some of the differences may be you commit different criminal activities in different -- different places, but they have the same main purpose. They're part of the same two big letters as you heard, the M and the S.

And what did you hear about this MS 13? How was it controlled? Who calls the shots? How do people associate with each other? We heard, ladies and gentlemen, about the connection to El Salvador. There is obviously a connection to LA also as Detective Flores said, but in this case you heard about the control from El Salvador.

You heard about a person by the name of Chacua. And you remember that name Chacua, with the various tattoos. Jose Romero, the ICE agent, testified that he was deported in 2005 and he took all those pictures. Well, before he was deported, what was he? He was a clique leader in Charlotte. He was the leader of the Centrales clique. And when he left, he put his relative Sixteen in charge. And he left because he got deported.

Well, at some point during his stay in El Salvador, he finds himself in an El Salvador jail. But that doesn't stop him. That doesn't stop the MS 13. That doesn't stop Chacua from still controlling his territory. His territory

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 26 of 485
Case 3:08-cr-00134-RJC   Document 1326   Filed 03/23/17   Page 26 of 485

JA2397

included Charlotte. And he's calling the shots. How do we know that? Well, you heard the phone calls. He made the phone calls. He's calling the gang members -- you heard some of those recorded phone calls -- and letting them know what's going on. Arbitrating who lives and who dies. Telling them what's going to happen. He's Chacua. He's in prison.

Now, if that isn't a criminal enterprise with international connection, it's hard to say what is. It's hard to imagine, too, that it's run like that, but it is. It's run from the prisons. It's run from the streets. That's how criminals run their organization. McDonald's runs it out of a corporate headquarters, Bank of America. But the MS 13 runs it out of the prisons and the streets. And that's what happened in this case.

And what do we find out is happening? Well, what we hear is that in the Charlotte area they had a long-standing -- their cliques, the Centrales, the South Boulevard, later changed to the Coronados, they controlled the clubs. That was their way of doing business. Control the clubs. Control, control, control. Respect, respect, respect.

And we showed you some of the clubs they controlled. The Vacquero, Mi Cabana, other clubs in the Charlotte area. And what's that mean, control the clubs? It means rent and tax. What's rent and tax mean? It means we deal the drugs. If you want to deal drugs in our place, then you pay us, the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 27 of 485
Case 3:08-cr-00134-RJC   Document 1226   Filed 03/24/10   Page 37 of 145
JA2398

MS 13.  We extort you, drug dealers, because we control this area.

Some clubs, as you heard from Mariachi, said, hey, we control the whole club.  Other clubs just have an area.  Other clubs are controlled by rivals.  Control means we come and go as we please in those clubs and we also do whatever we want in those clubs.  And rivals, if they come to those clubs, they pay a price.

And that's what was going on in Charlotte, ladies and gentlemen, during 2006, 2007.  You heard testimony about that.

But what else was going on?  Well, what else was going on, there apparently was some in fighting in the gang.  Some gang members, there was talk of a merger.  And so what happens when the cliques, when the organization has a little problem?  Well, corporate headquarters gets involved.  Where's corporate headquarters located?  It's located in a prison cell in El Salvador.

Chacua gets on the phone.  Calls several MS 13 members and says, look, got some problems here.  You know, you're out on the streets.  You're doing some hustling.  We got to make some corrections.  So I'm sending some valuable pieces, MS speak.  I'm sending some veterans.  I'm sending Stiler and I'm sending Wizard.  Because they're the real deal.  They're the veterans.  They're the people who can make the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 28 of 485
Case 3:08-cr-00134-RJC   Document 1266   Filed 08/24/10   Page 28 of 485
JA2399

difference.

And so what do we know about what happens?  What do we know about Wizard at this point?  Well, at this point what we know and what the evidence has shown, as you heard from Jose Romero, that he's illegally here from El Salvador.  We know from Officer Burner that in August of 2005, he was in LA.  He was in a gang area, an MS 13 area, and he was served with some gang injunction papers because he was an MS 13 member.

And where do we next pick up Wizard?  We next pick him up in New York.  El Salvador, LA, New York.  What's he doing in New York?  Well, we know he's with Coyote.  Who is Coyote?  Coyote is a clique leader in Long Island.  We heard from Lenny who told us about what's going on in New York.  And they meet at this deli and they hang out.  And Coyote brings some people in.  And once again, he's introduced with status.  He's a veteran.  He's a guy that's respected.  And he's in New York.

And in New York he's hanging out, we know the same address, 48 Hempstead.  The apartment was an ID that he later had in Greensboro.  But what do we know in New York?  Well, he does a mission for the Bloods.  Goes out with Coyote one time.  Coyote indicated that to Lenny.  But what happens next?  All of a sudden he disappears in that summer of 2007.  Who does he disappear with?  Remember the evidence about Sentinela.  Sentinela who is wanted out of DC.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 29 of 485
Case 3:08-cv-00134-RJC    Document 526    Filed 10/24/17    Page 29 of 485
JA2400

Ends up where at?  Greensboro, North Carolina, at the True Value Motel or Best Value Motel.  And what are they doing there?  Well, they're hanging out with who?  Other MS members.  Sentinela is stopped, arrested.  The other car is stopped and who's in it?  The defendant.  Wizard of the Novena.  Now, what's Wizard doing?  Well, Wizard is with other MS 13 members, obviously, because that's his whole existence.  But he also has some drugs in his pocket which we entered into evidence.  Drugs that he was dealing.  And we know later in a recorded phone -- recorded conversation that you heard that he was contacting people from Atlanta about dealing kilos.  So we know he's a drug dealer.  He had drugs in his pocket.  He's with other MS 13 members.  It's August in the summer of 2007.

Sentinela is arrested.  Driving the car is this person, I think, if you'll remember the name Aranda.  I may have mispronounced the name or stated it wrong.  He's driving Sentinela.  Why do we enter some evidence later in September?  Well, the same guy is with Umana again in September.  He's stopped.  He didn't have any drugs on him that time.  He didn't have a gun.  But he's with one of the same associates of the same group.  The MS 13, ladies and gentlemen, because that's the life cycle of the MS 13.  You could travel.  You have the ability, especially if you're respected.  Especially if you're a veteran.  Especially if you're a valuable piece.  You can go wherever you want, whatever clique, and you're

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 30 of 485
Case 3:08-cv-00134-RJC   Document 522   Filed 10/24/17   Page 30 of 485

JA2401

welcomed in.  You're looked up to.  That's the respect that you've earned.

You can travel from El Salvador to LA.  And we've heard about how they travel up from El Salvador.  You heard from Granados about the routes that they control.  The way they can come in and come out.  You can travel freely from clique to clique.  And when you're a veteran and when you have the respect that he does, you're welcomed in.  There's no question about your credentials.

And what happens later, ladies and gentlemen?  What happens next?  Well, we know then that the word had gotten out.  Stiler, Wizard are here.  They're in town.  They're in the state.  They're coming to see you.

So what's the MS in Charlotte do?  Well, they have a meeting.  They meet in the woods.  Put evidence in about that meeting.  And they discuss, hey, maybe we better get merged or we better do something.  They're sending in corporate headquarters.  They're sending in the big guys.  We've got to be ready.  This is our world.  This is our life.  And they get the word then to go to Greensboro.

Now, you've got to think about this.  They get the word to go to Greensboro from El Salvador from a guy named Chacua.  Don't even know his real name.  And they say go see Wizard and Stiler.  They're respected members.  And they all go.  That's the way the organization works.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 31 of 485
Case 3:08-cv-00134-RJC   Document 1332   Filed 10/04/10   Page 31 of 485

JA2402

Now, they're a little cautious because they thought maybe, hey, we have been messing up around here and they're sending in some guys to do something to us. So they bring some weapons with them and they go to Greensboro. And they meet in the back of an abandoned apartment near Stiler's apartment. We know about Stiler's apartment because we heard evidence about that. And they meet together with Wizard, with Stiler, some other MS 13 members.

And what do they discuss? They discuss the business, the reason they were sent. We were sent here to clean you up. Got to start hitting the rivals more. You've got to collect rent better. You've got to start doing what we do best. And hey, everybody shows their guns. Everybody makes the signs. That's a meeting. And the guns. Hey, that's a really neat Uzi you've got there. I like that piece, Wizard and Stiler say. And they also -- he had a .45. They're passing around guns. It's a typical time for the MS 13.

And what happens on the way back? On the way back, the guys from Charlotte, they know they're dealing with a veteran. They know they're dealing with a valuable piece and they're listening to these people. They're listening to them because they're leaders of the MS 13. They go back to Charlotte.

About a week or so later, what happens?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

November 30th.  Well, we hear about this series of prostitution house robberies.  Mariachi and some others organize it.  The informant, Mr. Lopez, is involved in it also and is told what to do by the officers.  And they go on November 30th and they get stopped by the police.  Obviously, the police were not going to allow the crime to occur.  They have the same firearms that we showed a photo of and are into evidence.  The Uzi and the little .22, I believe.

And so what happens?  Well, then, who do they go see?  Well, they go see Wizard.  They go see Stiler and Spider.  They're at Pelon's house.  Remember, Pelon gets introduced now.  Pelon.  And they go there and they meet outside and they're questioned.  And you heard the tape.  That one's recorded.  They're questioned about, hey, what happened?  What was your interaction with the cops?  Hey -- they were a little -- this sounds a little funny.  Let's question about it.  Hey, let's give you some further instruction.  You've got to start speaking backwards when you deal with each other because of the police.  They start giving them some guidance, including Wizard.  And that's on tape, ladies and gentlemen.  November 30th.

And so what happens next?  Well, what happens next is they try to do the same failed robbery again at the same prostitution house.  Now it's December 8th.  December 8th, 2007.  And what happens?  Well, Rony, who -- the police once

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 33 of 485
Case 3:08-cv-00134-RJC   Document 528   Filed 10/24/17   Page 43 of 485

JA2404

again showed up. They didn't stop them this time, but they showed up. He calls Mariachi in a recorded conversation and he tells Mariachi, hey, this didn't work out, you know.

Mariachi talks about a plan B. There was some discussion about Gordo. You know, he's a drug dealer. We're going to have to maybe get something off of him later. And so there's some discussion about that. And then all of a sudden Rony says, hey, wait a second. I think the guys from Greensboro are coming down tonight. I better check with them. And so who does he call? He calls Stiler, the guy from Greensboro.

And he calls him. If you look, ladies and gentlemen -- I don't know the exact time, but we do know what happened right before that. He calls him when they're in flight. We just shot some rivals, Homie. We just shot some rivals. I'll call you back. He's in flight.

And what happens that day, ladies and gentlemen? What has the evidence shown that happens on December 7th, 2007? You've heard from the witnesses. You've seen the exhibits. You know that at the restaurant that day, as I stated at the beginning, it was a normal day. Abel testified, Marco testified who both were at that restaurant. There are two groups of people.

A lot of questioning on cross examination. It's pretty basic. There's two groups of people. One group:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 34 of 485
Case 3:08-cv-00174-RJC   Document 538-6   Filed 10/24/10   Page 35 of 465

JA2405

Ruben and Manuel with their co-workers. And the other group: The MS 13 with Wizard. First a smaller group of three and then three more arrive. They weren't there for long. Marco Guzman wasn't there for long.

And then what happens next? What happens next is an argument over the music. There's an argument over music. And there's some discussion about that. Spider, as Abel indicated, was one of the MS 13 members, was the aggressor in the argument. Might have been some tables pushed. No punches thrown. No evidence of that. And Spider is the aggressor.

And the waitresses react, as Abel told you. They try to separate. They feel -- you could feel in the air now something is happening. They see who these people are. Now it starts to click. Let's get them out of here. Let's get them out the door. Let's get them out the door.

And who -- who's the one that remains behind? Wizard. Ultimately they all come back in. But what happens as they're going out the door? What happens is nothing to do with the music on the juke box. What happens is that Wizard, who's very good at throwing the signs, and threw them here in court, ladies and gentlemen, knows them very well because that is what he's all about, started throwing the signs. Says, hey, we're from the MS 13. And who said this? Abel said it, Marco said it. Don't mess with us. We're from the MS 13. You don't mess with us. Throwing the signs all around, as he

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 35 of 485
Case 3:08-cv-00174-RJC   Document 538-2   Filed 10/24/17   Page 36 of 145

JA2406

can do.

And what happens next?  Well, according to Abel, you heard the evidence, ladies and gentlemen, Ruben says -- because unbeknownst to him who they're dealing with.  Hey, I don't believe in that fake stuff.  And that was it.  What happens -- what changes then?  Well, what changes then is Ruben and Manuel and every one in that restaurant, they become chavalas.  They become chavalas.  They're now rivals of the MS 13.  And I can be a rival gang.  They have to rival the gang.  They have to address the gang wrong and not give the gang respect.  Because you know what?  Wizard earned that respect.  He earned those letters.  He earned them by, as the witnesses said, you earn them by killing.  So you don't disrespect me.  I earned this MS.  I earned this MS.

And so what's he do next?  Well, he gets the -- he takes out the .45, aims it sideways.  Every witness says he's holding it like this (demonstrating).  Abel says he stood there.  Abel -- do I call 911?  Do I run?  What do I do?  Well, he had been there interacting with them in the day and he got a good look at them.  And what's he do?  What's he do?  He fires a shot.

And one other thing, ladies and gentlemen.  If you remember the testimony also was Manuel tried to send out -- over a bucket of beer.  But the MS 13 refused that.  Don't try to buy us off.  You respect us.  That's what we want.  You

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 36 of 485
Case 3:08-cv-00134-RJC   Document 526   Filed 10/04/10   Page 36 of 485
JA2407

can't just send us beer. You respect us. You don't say that our gang is fake. You don't say anything to us when we address you. We're the MS 13. I'm Wizard of the Novena. And it's your chance -- it's your time to die.

And that's exactly what happened. One shot into Ruben, as I said, as the coroner described, lodged against his spine. A hollow point. Another to his brother. He falls on top of him, his brain matter on top of his own brother. And that's what happened in the restaurant, ladies and gentlemen. And where were they standing? They weren't standing next to the defendant. They were standing a few feet away. They were standing a few feet away. But it didn't matter where they were standing, what they were doing. What mattered is they disrespected the MS 13.

And what do we know, ladies and gentlemen. We know Abel identified them. Is it so hard to identify that tattoo? If you've seen that once, I think you remember. And everybody remembered it, everybody who saw it. And you know what, he wants people to remember it. He wants you to remember that. Because that's what -- that means a lot to him. He's earned that. He doesn't care if he's identified. Because later on you'll know why he doesn't care that he's identified because people still have to testify.

So what happens? Abel IDs him as the shooter. We know we heard evidence of a fingerprint, his fingerprint on

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 37 of 485
Case 3:08-cv-00164-RJC   Document 1326   Filed 10/04/17   Page 37 of 145
JA2408

the table where he was sitting. You've heard evidence about that through Amy Wilde. We know about the gun. What do we know about the gun? Well, we know this gun was in his possession that night. Later on December 12th when they went to Pelon's house, they seized the gun from under a cushion nearby where he was in Pelon's house. And what did they do with this gun? They matched it up. And what did Rivera testify about? He said there was a perfect match. The two bullets, the bullets that killed Manuel and Ruben, forensically, ballistically matched to this weapon. This is the murder weapon. Three shell casings also matched. And there were other shots fired in that restaurant as people were diving and running for cover.

We saw also the photo of that gun later when he was with the informant. And that's also one of the exhibits we entered into evidence.

Ladies and gentlemen, the counts that deal with the murder are what's called violent crime in aid of racketeering. And there's one count for each of the deceaseds. And there's one count also for use of a firearm during the same commission. So there's four counts that deal with the murders. Two for each of the deceaseds.

And to prove that count, ladies and gentlemen, it has to be -- it's the same enterprise. It's not a different enterprise. It's the MS 13 enterprise that he was part of and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 38 of 485
Case 3:08-cv-00164-RJC   Document 536   Filed 10/24/10   Page 38 of 485
JA2409

it was -- and the activity that he did was to -- in furtherance of that enterprise was to maintain or increase his position. And you've heard a lot about that. Because the judge is going to instruct you, if he committed the crime, he knew it was expected of him by reason of his membership in the enterprise or he committed it because he thought it would enhance his position or prestige within the enterprise or to maintain his position, that's -- that's -- that's enough. And that's exactly what happened, ladies and gentlemen. That's exactly what he did. That's exactly not only what he did, it's what he said.

And it's not just the evidence of what happened that night, it's what happened after that also. We know about the escape. We know about the fingerprints on the Neon. The Neon that is used to get out of there. And you heard from some of the people that were there that night. I think it was Mr. Whitlow. Hey, it jumped a curb. It almost backed up and the Neon took off. People were running. There were fingerprints on the Neon inside and outside of the defendant. Of the defendant.

And what else do we know about that evening? Well, we know about the flight. And what do we know about the flight? Well, we know about the call. I talked to you about the call. Stiler calls Rony. And then we also know about the defendant's phone. This is hard to read. You'll have it as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 39 of 485
Case 3:08-cv-00574-RJC    Document 535-6    Filed 10/24/17    Page 39 of 485

JA2410

an exhibit. But this is calls the defendant made. You didn't have a real good chance to look at them during the trial. But ladies and gentlemen, who's he calling at 7:35, 7 -- 7:37 as he's running out of the restaurant? He's calling Stiler. Stiler's got the Neon. And they run and they get it and the Neon ends up back at the apartments.

And then what happens next? Well, we've got to get out of town now. How do you get out of town if you're an MS 13 and you just committed a crime in furtherance of the gang? You get out of town by calling other MS 13 members up. That's what the organization is all about. And who do they call up? Well, they call up -- they called up Rony. Of course, they didn't know he was working for the FBI. And they said, hey, we need a place to go. We need a place to stay. Call up Pelon. Hey, Rony, come and pick us up.

And Rony went up there. And we know Rony went up there and we know the route they took through the cell towers. But we also know through Detective Hastings that he went up there and followed Rony. And who gets in the car? Wizard, Stiler, and Chino all get in Rony's car. But they didn't know that Rony had a recording on him. But you do know that and you have heard that. And what does that tell you, ladies and gentlemen? It's further evidence of his guilt.

First of all, you hear the gun cocking. If you listen to it, you can hear the gun cocking. And then what

Cheryl A. Nuccio, RMR-CRR (704)350-7494

else does he say on the drive down? What does he say? Well, hey, they just started a beef with the hood. They think the Mara is a joke. They think it's a joke. It isn't a joke. He says that, ladies and gentlemen, on 144A which is the drive down. There's different parts of that evening that we played, but that's the drive down from Concord to Charlotte.

And then what happens, ladies and gentlemen? Well, they -- where do they plan to go? Well, they plan to go to their old haunt, El Vacquero. And if you hear also on that tape, he talks to them about -- he talks to them about, hey, is this place safe? Will we get searched going in? You know, I got -- I got to urinate on my hands to get rid of the gun powder residue. And in the bathroom is where the picture came that you saw in evidence, the picture of the gun from the video that Rony was wearing.

And so what happens at El Vacquero? What do we know happens there? Well, we know about the taco truck. Eating tacos. We heard from Mariachi. We know Mariachi was there. And he's having a conversation with Stiler as Wizard's in the bathroom washing his hand in urine so he can avoid any problems with gunpowder residue. And he's talking to Stiler. And what's Stiler telling him? Stiler is telling him what happened. Hey, Wizard just shot these guys. You know, hey, they didn't respect the gang. And then Wizard comes back and what's Wizard say? Hey, I did this for everybody. I did this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

for La Mara. I did this for the MS 13.

Says, well, hey, well, you know, Mariachi has got this agreement. He's got that agreement. Well, you know, Stiler says the same thing January 5th after Wizard is already locked up. If you remember, we played that January 5th meeting. What's Stiler say? What's Stiler say at that meeting that's being recorded? He says, hey, and third, the guy ratted on him, homeboy Wizard, Government's Exhibit 146A, from the Novena clique. The strong homeboy that we had over here with us who went out and killed some rivals here. Here. In Greensboro. Understand? That's where the meeting was. And we took him down there and they ratted him out.

Okay. So is Mariachi making that story up? Stiler says the same thing on tape. He just didn't know it was being taped.

And then what happens later that evening? Well, later that evening Rony and Wizard are alone together in a car. They go to another club in the area. And what do we know about that discussion, ladies and gentlemen? Well, from that discussion we know a lot. We know once again, I mean, he's proud of what he just did. This is not -- I mean, this is a flight from law enforcement, but it's not a nervous flight. Not for the Wizard. He's a veteran. He's a strong homeboy. He's a respected member.

And, you know, a lot of people think the Mara is a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 42 of 485
Case 3:08-cv-00154-RJC   Document 528-6   Filed 10/04/10   Page 23 of 145

JA2413

game, you know, and if you don't make yourself be respected, they won't respect you.  Those are his words.

And then Nene says, Yeah, it's not a game to play.

And then he says, Hell, but you see, I just went pop, pop to him.  Pop and I shot another dude, but I didn't hit the son-of-a-bitch.

He's upset.  He meant to do more.  But he -- he got the two and he's happy about that.

He ran away, Nene says?

Wizard says, Yeah, he just -- I saw him doing like this at me.  He was laughing at me.  Ah, the son after bitch. I shot the son-of-a-bitch too.

Remember the testimony about the guy diving over? He was shooting at more than one person.  And he's upset about that.  He got the two, but he didn't get everybody else.

And what happens later that night, ladies and gentlemen?  And this deals with another charge in the indictment which is count twenty-eight.  It's a separate count that deals with extortion.  You heard a lot about how they would shake people down in the clubs.  About they would get other drug dealers.

And you heard an instance of this involving the defendant that night.  Because, you know, it's all about the MS.  All right.  We're fleeing from the murder.  But, you know, now it's time to do a little extortion.  And Gordo is

Cheryl A. Nuccio, RMR-CRR (704)350-7494

the guy they try to extort. It was an attempt, but you heard what happened, ladies and gentlemen. It's right on tape. It's right on tape. And Wizard -- in Wizard's own words. And once again, he says, Don't be stupid. La Mara Salvatrucha is in control here, you understand.

That's all about him. It's all about control. And that's count twenty-eight, ladies and gentlemen. That's an extortion from -- an attempt of an extortion.

Now, ladies and gentlemen, you heard some discussion in the car ride down after the murder about cameras. And you saw some testimony that there were some cameras in the restaurant. But the cameras weren't working. Well, they didn't know that. But they later did find that out, cameras weren't working. All right. But there's one other type of camera that they also found out about. And that's an eye witness. That's Abel.

And so what happens, ladies and gentlemen? Well, what happens is later in the spring, you know, Wizard needs some help. Chacua sends another veteran in to clean up the system: Misterio. He starts holding some meetings. You heard a couple of those meetings. What's Misterio decide to do? Well, Misterio receives a message, a message from the Wizard. And that message is pretty clear. It's like, hey, there is a camera. It's called a witness. And we need to -- we need to get rid of that witness. We need to get rid of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 44 of 485
Case 3:08-cv-00134-RJC   Document 534   Filed 10/04/10   Page 25 of 145
**JA2415**

that family.  We need to go up there and make something happen.  So the plan is hatched.

And you heard the testimony from Granados about what happens next.  They meet on June 7th, 2008.  Remember, because it's his birthday.  They discuss the plan, who's going to be involved.  Pelon.  Pelon, his homeboy.  His homeboy that he stayed at his house.  You have Chicago, another homeboy you heard in the January 5th meeting.  Peligroso.  Gorilon doesn't go, but he knows about the plot.  They meet.  They decide they're going to kill the witnesses in Greensboro.  We'll have somebody else up there take us to them.

What happens next?  January -- June 12th, they meet again.  They meet at Pelon's house.  They get ready for the trip the way the MS 13 does:  With two loaded firearms.

On their way to Greensboro in Pinon's car.  We heard about Pinon's car.  We also heard Mariachi talking about it.  He later picked it up.  We know it was later left there by the police.  So what happens?  They get to Greensboro.  They meet in the woods or in the park.  Officer Tyndall doesn't really know what's up.  He thinks a drug deal is going down or something is going down.  What's he do?  He follows the vehicles.  Follows the vehicles and he sees them pull into the restaurant.  And he notices Pelon getting out, going in.

And what happens when Pelon gets to that restaurant? He's got a gun.  He's got a gun on him.  And you heard

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 45 of 485
Case 3:08-cr-00134-RJC   Document 1268   Filed 10/24/17   Page 26 of 145
JA2416

testimony, ladies and gentlemen, from two people, Jasmine and Maricruz. Jasmine who also was working at the restaurant that day, she has a discussion with him. Nobody is in the restaurant.

What do you want, sir? What can I do for you?

Well, I don't want to eat or anything. I want to see the owner.

Well, the owner is not here, but his wife is here.

I want to see her.

And she says, Well, can I ask you who you are? And that's when everything changed. Gets nervous. She knows something is up then. He makes up a name or gives her a name.

And then he goes over and sees Maricruz. And she notices while Maricruz is talking, and Maricruz told you about the conversation. Hey, we know about your family going to testify. And then boom, at some point she stops him. She realizes, hey, this is not a good thing. He's here for a different reason and I'm not the reason, and I'm going to let him know. And he realizes that these aren't the owners. These were the new owners. And so they're not the people they needed to get. But that's the people they wanted to kill.

And who were they looking for? They were looking for Abel. Abel who testified. He's the camera. That's who they were looking for. And that's who Wizard was looking for. Because he knew that Abel and other people could identify him.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

And so, ladies and gentlemen, what happens is the guns are later seized, and those are counts involved in the conspiracy involving the defendant who sent a message and who would benefit from it on tampering with witnesses and attempted tampering with witnesses.  Luckily it was not successful, but they had every intention of doing it.

Ladies and gentlemen, one of the correspondences you saw at the end of the trial from the defendant, from Wizard, he says, I got the claw on my forehead and the other in my heart.  The claw, the MS on my forehead, the other in my heart.  And maybe guys like Rony, Mariachi, Gorilon, maybe they didn't have it in their heart.  And they testified and you have to judge their credibility and their reasons for testifying.  But he does have it in his heart.  And that means something to somebody.  That means if you get up there and you violate that MS 13, you're going to die.  That's what a green light is.

There's some confusion.  Defendant wants you to think a green light is some order -- to kill anybody, you have to get some approval from El Salvador.  No.  If you want to kill another gang member, you got to get approval because we're a close-knit organization.  If you're going to put a green light out on one of us, you got to get somebody's approval.  You got to have some proof.  We're not going to just go around killing each other.  But if we want to kill a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 47 of 485
Case 3:08-cv-00164-RJC   Document 575-6   Filed 10/24/17   Page 28 of 145

JA2418

chavala, if we want to kill somebody who disrespects you, that's on site. That's not a green light. That's not a mission. That is an ongoing obligation. That's an ongoing duty. That's something that he earns every day in, day out when he's on the streets.

As he said in one of his other letters, 161B, Nobody plays or jokes with our hood or else we're going to be leaving you on the damn ground. Nobody plays or jokes with our hood or we're going to be leaving you on the damn ground.

And as Ms. Rose said at the beginning of this case, in this case it was the cold tile. And who was left was Ruben and Manuel. They were left on the ground because they didn't respect the MS 13. They didn't respect the Wizard. The Wizard of Novena. The veteran. The strong homeboy. The solid piece. Has respect in his world, the criminal world of the MS 13, ladies and gentlemen.

And as he said in 161B, They end up respecting us because we don't play around and we don't joke around. The Mara controls the world. Rules the world. Ha ha ha.

Those are his words. Not mine. Those are Wizard's words. And those are words that he believes in and those are words that he lives by day in, day out when he's on the street. He lives by those words, ladies and gentlemen.

Ladies and gentlemen, you have heard the facts. You're the fact finders. The judge told you that. You know

Cheryl A. Nuccio, RMR-CRR (704)350-7494

the facts, the facts of what happened that night.  How that murder occurred.  Why it occurred.  And the evidence to support it.  And once you get -- once you assemble the facts as you now know them, you're going to have the truth in your your hand.  The truth of what happened.  The truth of the MS 13.  The truth of Wizard.  The truth about the two big letters, the M and the S.  And once you have the truth, ladies and gentlemen, the United States will ask you to render justice in this case.  And we submit to you justice in this case is a verdict of guilty against the defendant on all counts in the indictment.

Thank you for your time and attention.

THE COURT:  Mr. Bryson.

MR. BRYSON:  May it please the court, counsel:

Several weeks back during jury selection when we talked to you, we talked to you only about the murder cases.  That was our focus then.  That's been our focus this week.  That's going to be my focus now.  We're only going to talk about the murder cases.

Now, there's two questions that you have to answer on the murder cases.  One is, who's the shooter?  And two is, are these federal crimes?  That is, has the government proved the elements of these federal crimes to make them more than the average murder case?  More than a Guilford County murder case that should have been tried in Guilford County.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 49 of 485
Case 3:08-cv-00134-RJC   Document 52-6   Filed 10/04/17   Page 50 of 485

JA2420

MS. ROSE: Objection.

THE COURT: Overruled.

MR. BRYSON: Let's start with the first question: Who is the shooter?

Now, the government says, well, all the evidence we presented shows he's the shooter. So he's the shooter. What's the question? Well, that's true. That's what you heard from. But let's look more carefully about who you heard from and who you didn't.

You heard from Abel Santos, okay. He came in, he was the gentleman from the restaurant, the host, son of the owner. And he did testify that the shooter was Alejandro. Okay.

Who else from the restaurant identified Alejandro as the shooter? Nobody. Now, think about that just for a minute. We're talking about a murder that occurs in a restaurant on a Saturday night in front of how many people? Just the people -- the people involved in it alone, there's six at one table, six at another. That's twelve people. You've got waitresses, bus boys, all these people in this restaurant, and you heard from one person. Why? Why is that? Why out of all these potential witnesses would the government only present one witness?

And we know from the evidence, from Abel Santos, he said that his own sister was there. She was the one that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 50 of 485
Case 3:08-cv-00154-RJC   Document 52-6   Filed 10/04/10   Page 50 of 485

**JA2421**

tried to break up the fight. Got in the middle. Okay. She was the one that asked the table by the juke box to leave. She was outside, got locked out with the table from the juke box. She came in, was standing next to the shooter. Wouldn't she have had a better opportunity to see what was going on there than Abel was or really anybody else? Why didn't the government call her?

I suggest to you there's only one reason why they wouldn't have called her as a witness and that is because she would have said that somebody else was the shooter.

Now, you might be saying, well, maybe she just didn't get a good look at anybody. Okay. Well, we heard from Mr. Mejia. He was the other person in the restaurant. He came in and basically he didn't identify anybody. He told what he saw, but he didn't see who the shooter was. So why not bring Ms. Sanchez in if she just didn't get a good look at him? And I contend that the reason is because she did get a good look at him and she identified somebody else.

Who else -- who else could have been called to testify in this case? What about the other employees? Manuel supposedly had at least four or five other people at the table. Why did we not hear from them? Not a single witness.

What about the other waitresses? The government called the waitress who left at 6 o'clock. They didn't call any of the waitresses who were actually waiting on the

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 51 of 485
Case 3:08-cv-00164-RJC   Document 538-6   Filed 10/24/11   Page 52 of 485

**JA2422**

parties. Why? What did they have to say that they didn't want you to hear?

Now, when I sit down in a minute, they get to argue again. And they're going to come up and say, well, they could have called these people too. And it's true, we could have called witnesses. But at the same time, we don't have the burden of proof. It is not our obligation to call witnesses or present evidence. We don't have anything to prove here today. The government has the burden of proof. And they know when they don't call witnesses, that I'm going to stand up here and point this out to you. But yet, they chose -- it was better not to present these witnesses and to let me make this argument and to let you wonder about this. Why? Why?

Who else didn't you hear from? You know, there was an investigation here in Charlotte about MS 13 and it was headed up by Detective Hastings, and at the end of this case you got to hear from Detective Hastings. The lead investigator came in, testified at the end of the case as to -- filled in all the gaps in the case.

Well, you don't think there was an investigation by the Greensboro Police Department about what happened in that restaurant? You don't think there was a lead investigator there? You never heard from him. Why? What could he possibly have had to say that they didn't want you to hear?

Now, the court has already told you that a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 52 of 485
Case 3:08-cv-00164-RJC    Document 538    Filed 10/04/10    Page 52 of 145

**JA2423**

reasonable doubt can be found not only from the evidence but a lack of the evidence. Now, if the government isn't presenting evidence that convinces you by proof beyond a reasonable doubt, then you can have a reasonable doubt.

Now, even if you think at this point that's enough, okay. If you are convinced beyond a reasonable doubt that he's the shooter, you still have to go to my second question. And that is, these murders occurred in Guilford County. He was charged with these murders in Guilford County. Why are you being asked to decide this case? Why is this a federal case? Why shouldn't this case be tried in Guilford County like every other murder in Guilford County?

Well, they say these are federal crimes. Okay. This is not just murder. This is murder in the aid of racketeering. Okay. Let's talk about that. Because you have to decide whether this is murder in aid of racketeering.

And let's be very clear about one thing up front. You can, as you sit right there right now, be convinced beyond a reasonable doubt that Alejandro murdered Ruben and Manuel Garcia. You can believe that and still be required to find him not guilty unless you find the other elements to this federal offense.

And I argue to you that even if you do believe that he's the shooter, you must still find him not guilty because the elements of the federal offense are not here.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 53 of 485
Case 3:08-cv-00134-RJC    Document 52-6    Filed 10/24/17    Page 53 of 485
**JA2424**

Now, I'm not going to go -- the court is going to give you instructions on them. There's one I want to focus on. Okay. Number 4, the purpose of the defendant in committing the murder was to maintain or increase his position in the enterprise. That's what I'm going to argue to you. That's not present here. Okay. And when we look specifically at what that means, you will see that that's true.

Mr. Nazzaro has argued very forcefully that he shot and killed him because he disrespected MS. Even if you believe that, that's not enough. Okay.

Now, before I go through this, I want to talk about the facts of the case just a little bit.

Occurs in a Mexican restaurant on a Saturday night. We know that. There's two groups of Hispanic males. There's drinking going on. There's a conflict about the juke box.

Now, I want to talk about Manuel and Ruben for just a minute. Let me just say this before I do this because I don't want anybody coming out here and saying I disrespected them or their memory. I want to be very clear, what happened to them was a tragedy. Terrible, terrible tragedy. Okay. They were murdered. I will concede that. Whoever did the shooting is guilty of a murder.

Now, it would be a second degree murder because it's not a premeditated and deliberated crime. If you listen to the court's instructions on what deliberation is, deliberation

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 54 of 485
Case 3:08-cv-00164-RJC   Document 526   Filed 10/04/10   Page 54 of 145

JA2425

is when you weigh the consequences in more or less calmness. When there's -- when you form the intent to kill not under a violently aroused sudden passion. And everybody was under a violently aroused sudden passion in this case. So it's not a first degree murder, but I would not disagree with anyone who says that Manuel and Ruben were murdered. Okay.

I would strongly and vehemently disagree with anyone that says that they were murdered for the purpose of increasing someone's position in MS 13.

Now, back to the facts. They're drinking. In effect, they were drunk. Okay. I'm not trying to insult them, but the autopsy reports show conclusively they were very drunk. Abel Santos said that Manuel got demanding when he was drunk. And on this occasion he was upset about the juke box and he was demanding that the music play his -- that the juke box play his music. This started an argument primarily between Spider and someone in their group. The argument escalated. Everybody got on their feet. Mr. Mejia said that there was pushing and shoving. At some point Ruben squared off and said he was ready to fight. And somebody in the MS group lost their cool and shot them.

Now, does this sound like the kind of case that you thought you were going to hear when we talked to you about this three weeks ago? You probably thought it was -- we told you it was a gang case. You probably thought it was going to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 55 of 485
Case 3:06-cr-00164-RJC   Document 1306-6   Filed 10/04/10   Page 56 of 145

JA2426

be one gang member against another gang member.  Or when you think about murder in the aid of racketeering, someone who says, hey, look, if you want to join this gang, you have to go out and kill somebody.  If you want to be the leader of this clique, you have to go out and kill somebody.

But that's not what happened here.  Okay.  This was not about somebody trying to increase their position.  It was about anger and machismo.  This was not a mission.  If this was a mission, I would agree with them.  Okay.  If this was a mission, that is, you have to go out and kill them, all right, that would be murder in the aid of racketeering.  That would be someone who went out and had to do something to maintain or increase their position.  Okay.  But just doing it because you got angry because you got disrespected, that doesn't prove that you were trying to do this to increase your position.

There's no evidence that this was a mission.  You heard what missions were.  Missions are planned ahead of time.  They're called by the shot caller.  Everything here shows this was a completely spontaneous event.

Look at the escape.  Okay.  Was this planned?  Did Stiler tell anybody to shoot anybody?  No.  The -- look at the escape.  They -- if this was planned, it certainly wasn't planned well.  Half the people are fleeing on foot.  You heard the gentleman who described how the people got into the Neon and couldn't get out of the parking lot.  They had to jump a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 56 of 485
Case 3:08-cv-00374-RJC   Document 538   Filed 10/04/10   Page 56 of 485

JA2427

curb and go through the grassy area before they got into another parking lot. The other car that left pulls out on High Point Road and gets T-boned. This -- this was a big mistake. This was a mess. This was not planned. This was completely unexpected. This is one person who acted alone. This is a bar fight that got way out of hand.

Now, let's turn to the specific instructions that I think you're going to hear from the court in determining what you have to find in order to find that he committed this act to increase his position.

The court's going to give you several things to think about. Will say you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise. Okay. Was this the motivation of the person that did this? To maintain discipline in MS? No. Okay.

First of all, and I'll talk more about this later, but Stiler was the leader of the clique. He would have been in charge of discipline. And the discipline problem was in Charlotte, not in Greensboro. Okay. So there's no reason to believe that this shooting was done to maintain discipline in the group. All right.

Number two. The defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise. And I think that's what

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 57 of 485
Case 3:08-cv-00574-RJC   Document 526   Filed 10/04/10   Page 57 of 145

**JA2428**

Mr. Nazzaro was just arguing is that he knew it was expected of him by reason of his membership.  Wrong.  Disagree strongly with that.  Okay.

First of all, one, was it expected that he would have to kill these people because they disrespected him? First of all, take their open expert, Detective Flores.  Okay. If you're disrespected, do you have to kill?  No.  You have to react; you don't have to kill.  Okay.

But better yet, take the actions of the other people there.  Okay.  What did they do?  They all walked out of the restaurant.  Look, who's there in the restaurant?

According to their own evidence, one guy was a guy named Chino.  They showed a photograph of him.  They identified him.  They determined he was an MS member.

There was another guy there named Spider.  Okay. They showed a photograph of him.  They identified him.  He's an MS member.  Okay.

They showed another guy who was identified, I believe, as Jesus Bautista.  We didn't get his gang name. Okay.  But he was the guy that was arrested with Alejandro back in August down at the motel.  Okay.  Another MS member. All right.

And then there's Stiler who's the clique leader. Okay.

So that -- out of -- if there's five or six people,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

we know there's five people that are MS members.  Okay.  MS members, they all follow the same rules.  Okay.  So if it was expected to attack these guys, why didn't everybody else attack these guys?  I mean, it's expected, right?  Why didn't everybody else do it?  It wasn't expected.  And it wasn't expected because there's -- there's more than one rule to MS. Okay.  There are multiple rules to MS.  It's not just you have to attack everybody who disrespects you.  Okay.

What else?  Well, let me -- okay.  I'm saying Stiler was the clique leader.  I don't know if that's disagreed or not.  But I think clearly the first time Mariachi described a meeting, the first time they met him.  And Mariachi said -- well, Mariachi said here today -- not today, but this week that both Stiler and Wizard talked at the meeting.  But I would argue to you that he said earlier that it was Stiler who ran the meeting.

Now, you actually got to hear Stiler on the November 30th place out at Pelon's house.  And again, you can look at these tapes and hear them over again.  Okay.  Who ran that meeting, if you call it a meeting?  Stiler.  He did 99 percent of the talking.  Okay.  Stiler is the clique leader.  And it's unquestionably true on the January 5th meeting.  Is there any doubt that Stiler is the leader?  Okay.

So here's all these MS guys at this restaurant on December 8th and they get into this argument and they get

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 59 of 485
Case 3:08-cv-00134-RJC   Document 538-6   Filed 10/24/17   Page 40 of 145
JA2430

disrespected, and what does Stiler do? He along with everybody else, except the shooter, leave. They are asked to leave the restaurant and they all go out. Well, you know, if you have to react, if you can't respond to disrespect by walking away, why would all these MS guys do this?

And they -- not only that, but one of the MS members, the evidence was, was he was trying to calm the thing down. He was trying to stop the situation in the first place. Why would they do that?

And it's because there are other rules to MS. Okay. There are other rules and there two important ones for this case and that is you don't do stupid things that bring down the heat in your own territory. All right. And another important rule is you don't shoot kids -- you don't shoot when there are kids around.

Now, I'm not making this stuff up. This was their expert, Detective Flores, from California said this. Okay. These are rules of MS, right? Yes. You don't bring down the heat -- you don't do stupid stuff that brings the heat down in your own territory. Okay. And you don't shoot when kids are around. You saw the car seat. You heard Abel Santos. There was a little kid in the car seat right there. You know, you're not supposed to shoot in those situations. You're not supposed to bring down the heat in your own territory.

Now, even Rony agreed with that to some point. Now,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 60 of 485
Case 3:08-cv-00164-RJC    Document 538-6    Filed 10/24/10    Page 1 of 1
JA2431

he backed off on it later and said, well, what that really means is, you know, you don't spray paint in front of your own house. But, what, shooting two people in a restaurant in front of many witnesses, that's okay? That doesn't make any sense.

And also, it's contradicted by their own evidence, you know, when the one Greensboro police officer went out to conduct surveillance on what turned out to be Stiler's home. What was the reason he went out there? There was MS 13 graffiti on the dumpster at Stiler's apartment. So clearly that's not right.

And also, you know, what Rony saw, and agreed afterwards, there's a lot of bravado after this happened. There was a lot of bravado. But what were they going to say? What is Stiler going to say? Wizard messed up royally and shot these people when he shouldn't have? You know, they put the best face on it. But Stiler knew that this was a big mistake. This should not have happened. He was not thinking when this happened.

Let's talk about this rule. You don't draw the heat on your own territory. Okay. This was their territory. Stiler is the clique leader. He lives a short place away from this restaurant. His -- he lives there with his sister and a small child.

We know that Spider lives over there. He's seen

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2432

over there after the event. He's right there on Merritt Drive. Abel Santos said that he knew Spider from before and the other guy Jesus Bautista. They had been in his restaurant before. They even knew Spider's car. They knew the car that Spider was driving that he left in the parking lot when this happened.

The Greensboro police are over at Spider's house -- excuse me, Stiler's house less than an hour after the shooting occurs. This is clearly their territory and whoever the shooter was brought the heat down on them right away. And this is why none of the other MS members did anything but walk out of that restaurant because they knew that they were not supposed to bring the heat down.

One of the things -- when you go back to the jury room, you can ask for any exhibit that you want, and I believe they've got it set up that you can actually just do it electronically. But on the tape that Rony makes when they're in the car, this is after the shooting and they're driving down the road. They're coming -- Rony has got the three of them in the car and they're driving down the road. And there's a conversation in the car. And there's a part that I want you to look at and listen to. Because if you listen carefully, it's Stiler complaining. Stiler is complaining to Wizard exactly about this. That he brought the heat down on them in their own territory.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 62 of 485
Case 3:08-cv-00174-RJC   Document 526-3   Filed 10/04/10   Page 63 of 145
JA2433

Stiler says, They're, and then there's a blank.  You don't know what he said.  He says, They're knocking.

Wizard:  Okay.

Stiler:  The thing is that they -- they're -- excuse me, the thing is that they're -- they already know me.

Wizard:  Well, yeah, if there's any problem, I go, you know.

Stiler:  Huh?

Wizard:  If there's any problem, I don't know, you're going to be hot.

This was Wizard saying this to Stiler, If there's a problem, you're going to be hot.

Stiler:  The next blank we meet up, we'll move.  He's talking about moving.

Wizard:  Yeah.

Stiler:  We're going to move Flaco from there, too.  Flaco, excuse me.

And then Nene comes in and says, So what's up?  They saw that it was you?

Stiler:  No, but a lot of people know me there.

Nene:  Or someone could have seen you?

Stiler:  And for someone to go through the apartments and we've been hanging out there for three, almost four years, and, well, that has been the Mara's area, do you understand?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 63 of 485
Case 3:08-cv-00134-RJC   Document 532   Filed 10/04/10   Page 63 of 145

JA2434

Nene says, Uh-huh.

Stiler:  Half the world knows.

Nene:  Oh, shit.

Now that's what he's saying.  Stiler is saying this was a big mistake.  Okay.  This wasn't part of the plan.  This isn't part of the program.  This isn't following the rules.  This isn't what you're supposed to do.  Okay.  This was a big error.  And he's complaining about it.  The rules are you don't bring the heat down in your territory, but the heat got brought down in their territory.

You know, if you're supposed to react, if they were all supposed to kill and none of them did it, did you ever hear any evidence that Stiler got punished for this?  Or that Chino got punished for this?  Or that Bautista got punished for this?  Or that Spider got punished for this?  These guys all walked away.  Because that's what they were supposed to do.  The shooter is the one who messed up.  He's the one who didn't follow the rules.  Okay.

Now, what else is the court going to tell you to consider in determining whether this is murder in the aid of racketeering?  Okay.  Consider if he committed the crime because he thought it would enhance his position or prestige within the enterprise or if he committed it because he thought it was necessary to maintain position already held.

Now, if you believe Mr. Nazzaro, Wizard is already a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 64 of 485
Case 3:08-cv-00164-RJC   Document 536   Filed 10/24/10   Page 45 of 145

JA2435

big shot anyway. Was there any evidence or testimony that he was in danger of losing his position if he didn't do something immediately? Was he going to get some new territory? He's not even from the Charlotte clique. The shooting was completely over the top. It was not required.

And MS members know that acts of violence can result in punishment too. I had this dialogue with Detective Flores the other day about you can't just go shoot another MS member. You have to have permission. That would be an act of violence. You can't just commit an act of violence and be guaranteed respect. You have to do it consistent with the rules.

What this crime shows is that the person who did it wasn't thinking at all. If they were thinking, if the person pulled out the gun and said I'll shoot these guys, I'll increase my position, if they were really thinking, they wouldn't have thought that at all. They'd have thought, you know, there's kids in the restaurant and, you know, this is -- all my homies have been eating here in this restaurant. That's what the rules required him to do.

Now, I want to give you another example to prove that this was a mistake. This was not in accordance with the rules of MS. This would not have enhanced anybody's position. Mr. Nazzaro -- I already mentioned Stiler talking at the last meeting. The -- not -- the January 5th meeting. January 5th,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 65 of 485
Case 3:08-cv-00164-RJC   Document 538-6   Filed 10/24/11   Page 66 of 145

JA2436

2008. All right. And this is the last thing that he says on the tape. This is Stiler talking. Now, Wizard is locked up at this point. Okay. This is Stiler talking.

And he says, he's talking to the group, And above all, try to do everything with schooling. You understand? Because that is what all the homeboys on the inside tell you. No, homeboys, we don't want to see them locked inside here. Think things through. But you know, sometimes we are too anxious and if we see a rival giving trouble, sometimes we shoot him right there, boom boom. But also, if we think about it, homeboy, and think clearly, hey, we can just watch and follow the rivals, homeboy, and we can shoot them boom boom where the cameras can't see. But also, it's like we don't tolerate a rival gang member in plain view of the camera. And we say what the hell, man. But we have also to try to use our heads when we do things, homeboy. Think things through so we don't end up locked up also.

And I argue to you what Stiler is saying here is the shooting in the restaurant in Greensboro was a huge mistake. It shouldn't have been done. And he's telling the other members of the group use your heads. Don't bring the heat down in your own territory. Don't do stupid things.

Now, Mr. Nazzaro argued to you that this was in furtherance of his position in the gang because he was disrespected and he was going to gain respect for the gang.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

And if you listen to the court's instructions, the court, I argue to you, is going to tell you that's not enough.

After going through all these things that I talked about, the things you need to consider, the court will say, conversely, it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise. The defendant had to have the conscious purpose to maintain or enhance position within the organization. The statute prohibits murders that are committed with the purpose of maintaining or enhancing a defendant's or another's relative position, okay, over another's position with the enterprise, vis-a-vis other members of the enterprise. In the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute.

So even if you believe he did it just because they disrespected MS and he wanted to get back at them for that, that's not enough. He has to have consciously made the decision, this is going to improve my position in MS before he shoots. That's the required intent. And that has not been proven here. All right.

They have also charged this offense another way and that is use of a firearm in commission of a crime of violence. Excuse me just one moment.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 67 of 485
Case 3:08-cv-00134-RJC   Document 596   Filed 10/24/10   Page 48 of 115
JA2438

Okay.  Now, there's two ways -- there's two crimes of violence.  Okay.  Use of a firearm in relation to a crime of violence.  Well, the first way they've charged it is use of a firearm in the first crime of violence and that's murder in the aid of racketeering, which I just spent the last 20 minutes talking to you that's not fulfilled.  Okay.  So if you don't find this murder in the aid of racketeering, you wouldn't find it for the use of a firearm in relation to that crime.

But they've charged another way too and it's use of a firearm in relation to another crime of violence and that would be the RICO conspiracy itself.  Okay.  And again, for many of the same reasons that I've just been arguing to you, that isn't here.  Because it's got to be in furtherance of the conspiracy.  Okay.  And once again, just for all the reasons I've been saying, that becomes dependent upon the rules of MS. It's got to be part of the conspiracy.  Did anybody agree to this?  Is this a mission?  Did anybody talk about doing this before it was done?  This is just some MS guys in a restaurant who are eating and drinking when an argument starts and one guy loses his cool.

As their own expert said, Detective Flores said not every crime a gang member commits is to benefit the gang.  And this is one that clearly did not benefit the gang.  The government wants you to believe that anything an MS member

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 68 of 485
Case 3:08-cr-00134-RJC   Document 1352-6   Filed 10/24/17   Page 69 of 145
JA2439

does that's violence increases their position. And that's just not true. They want to focus in on one rule of MS and they're ignoring the other rules that apply. And this is why the other members walked out of that restaurant. Because they knew what the other rules were. The shooter blew it. He didn't know what the rules were. Or he acted in disregard of the rules, and I argue to you he wasn't thinking at all.

Don't fall for the oversimplification here. When Ms. Rose got up in her opening statement, one thing she was talking about, she said, you know, the motto for MS is kill, rape, and rob, you know, and emphasized the word rape. Well, you know, Detective Flores came out here and told you, you know, they have a rule against rape. So why are we presenting that to you? I mean, the government wants you to make an emotional decision on this and they want you to ignore what really is going on here.

Look at the rules of MS. This was not something that was in furtherance of the conspiracy. It was not something that was in aid of racketeering. And there is no better example of that than the fact that is one person. Okay. If you take this one person out of this equation, nothing happens. Okay. What happens if the shooter is not present? Okay. The argument starts. All right. The people come over, tell them to leave, and they all walk out the door and there is no crime. You can't have a one-person

Cheryl A. Nuccio, RMR-CRR (704)350-7494

conspiracy.  This was about one person who couldn't control his anger.

Now, I'll talk briefly about the witness intimidation case and then I will wrap up.

All right.  Now, there is no doubt that it happened. All right.  There is no doubt that Maricruz Medina was there when Pelon came in.  And he was very nervous.  And he said, I'm here to deliver a message, and he started to deliver the message and she interrupted him and said, hey, you've got the wrong person.  And he became -- he was shaking and nervous and he said thank you, thank you, and he got out of there.  Okay.

There's no doubt that that happened.  All right. The question is did he have anything to do with it?  Is this something that MS just thought up on their own?  Did he direct that?  And I would argue to you there's -- the only evidence that he had anything to do with it was the statement of Alexander Granados -- that's not his real name.  Gorilon. Let's call him Gorilon.  He said that he was at a meeting where somebody said Wizard sent a message.

And I argue to you if he had sent a message, you would have heard that.  Okay.  He's in jail.  They record all his phone calls.  If he'd made a phone call, you'd know about it.  You saw how they're inspecting every letter that he writes.  Okay.  There was some talk that he told somebody that visited him.  They have visitation logs.  They know who has

Cheryl A. Nuccio, RMR-CRR (704)350-7494

gone to see him.  There is absolutely no good evidence that he had anything to do with this.  And the only reason you're even being allowed to consider it is that one statement from Alexander Gorilon who, I argue, is just not a credible witness at all.

So I would argue -- that's the only thing I would argue to you other than the murder cases.  And I would argue to you that you should find him not guilty of those cases.

Now, I'm going to sit down in just a minute.  And like I said before, they get to argue again and they get to argue last, which is always fun because you get to have the last word.  And I just want you to please on these murder cases, concentrate on what the intent element is for the federal crime.  Okay.  It's okay for you to believe that he committed these murders.  But you still must be convinced by proof beyond a reasonable doubt that these other elements of these federal offenses are present before you can return a verdict of guilty here.  And they are not.  The evidence before you is not that the thought process here of the shooter was I'm going to increase my position.

The thought process was -- and I'll -- you know, I'll go along with that.  They want to say that he was angry because he got disrespected and shot.  Okay.  You still have to find him not guilty.  That's not sufficient under the statute.  This is not a federal crime.  That's the key to the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 71 of 485
Case 3:08-cv-00184-RJC    Document 538-6    Filed 10/04/10    Page 2 of 145
JA2442

case is to crawl inside the mind of the shooter and find out at the time he was pulling the trigger, was he doing it because he was worried about his position in the gang? There's not evidence of proof beyond a reasonable doubt that that's what it was about. Disrespect, sure. Position in the gang, no.

I would strongly argue that the evidence of the thought process of the shooter here was based on anger and machismo and nothing about anybody's position in the gang.

Now, I just want to remind you as you go through deliberations that you all have the right to have your own opinion about the case. You all make up your own minds what you think about the case. And you all agreed that you would respect each other's opinions as you went through the deliberation process.

I haven't argued to you any of the other cases that are before you. I would just submit that you do the best job that you can with those cases and you render what verdicts you think are appropriate. But when you get the verdict form, go to count two, murder in the aid of racketeering. And I think what you ought to say is, look, even if I believe by proof beyond a reasonable doubt that he committed the murders, the purpose was not to increase his position. Not guilty.

Count twenty-four is the same thing: Not guilty.

Counts three and five, use of a firearm resulting in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2443**

death in relation to a crime of violence.  Well, it wasn't in relation to a crime of violence.  It was a purely spontaneous act that had nothing to do with MS 13.

Not guilty on three, four, five, and two.  And let him go back to Guilford County and be prosecuted for his murder cases in the State of North Carolina versus Alejandro Umana in the Superior Court of Guilford County where this case belongs.

MS. ROSE:  May it please the court:

Did your mother and daddy tell you when you were growing up that all you had was your reputation?  You needed to protect it.

What people think of you can change in a moment.  We have that in our daily life.  Can your reputation be changed by your decisions in your daily life?  Can people think differently of you because of your actions and your decisions and your behavior?  Absolutely.

And it's no different in this gang.  Every single witness that got on that witness stand that talked about MS said what? Respect.  Respect is everything.  Respect is everything.  Your reputation matters.  It matters in the world.  And it matters in the world of MS.

And so if you think that the defendant killed Manuel and Ruben Garcia on a whim, it's just not true.  And if you think that the defendant killed Ruben and Manuel Garcia just

Cheryl A. Nuccio, RMR-CRR (704)350-7494

because he was a little hot headed that day, it's ridiculous. This is somebody who has marked their body, marked their mind, marked their soul and lives his life MS.  MS every day all the time.  And he doesn't want anybody to doubt that.  You know why?  Because he lets you see it first thing.  This is who I am.  And do you think he would just show up and make a whimsical decision?  A little hot headed?

His behavior afterwards shows you that this wasn't just a -- it had to happen.  He was cool, calm and collected after the fact.  Went to the next mission.  Made it clear he'd kill somebody there.  Even if a police officer who walked up to the car and asked for our driver's license.  Lean back, I'll let him eat my .45.  She's always close by.  So you can hit him.

Reputation is everything.  And I want you to listen to the judge's instructions.  And I'm reading from the instructions.  If the defendant committed the crime because he knew it would enhance his position or prestige or committed it because he thought it was necessary to maintain the position he already held, this is established.

Now, we did hear, and I think it's uncontroverted, that for the Mara to have anything, they've got to have a reputation.  In order to do business where they do business, you've got to have a reputation.  You can't run the dealers out of the club if you don't have a reputation.  You can't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 74 of 485
Case 3:08-cv-00134-RJC   Document 538-6   Filed 10/04/10   Pages 5 of 145
JA2445

extort people around there if you don't have a reputation. What are they without their reputation?  Really?

So if somebody disrespects the Mara and you walk out, they're nothing.  They're nothing.

The defense said, oh, well, you know, they plan and they think and they follow the rules and they would never bring heat on their neighborhood.  Well, guess what they did in June.  They went back in broad daylight with guns to kill witnesses.  Now, is that smart?  They did what they had to do. They did what they had to do.  Because we are the Mara.  We control.  We rule.  They did what they had to do.

And to think that this man over here just killed because he could.  No.  You know why he did it.  You know why he did everything he did in here.  He did it because it's about the gang.  That's why he did it.  And there's no question otherwise.

I want to ask you a question.  If the Mara only kills when there's a plan and it's not in their neighborhood, why do you carry a gun to dinner?  Why do you carry a gun to dinner if you're in your neighborhood?  It's your territory. You don't want to bring any heat, why do you take a gun to dinner?  Maybe it has something to do with the people you're dining with.  And that's what this is about.

He chose his friends.  He chose his life.  And he knew when he chose his friends and he chose his life, he made

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 75 of 485
Case 3:08-cv-00134-RJC   Document 539   Filed 10/04/10   Page 76 of 145
JA2446

that decision.  All gang all the time.  It's ridiculous to think that if somebody came in there and said we think your little gang is fake, we don't care about your little gang, that they're going to walk away.

They didn't walk out of that restaurant.  The cook came from the back.  The waitress, the owner's daughter.  They're getting them out of the restaurant.  If they want to leave, why did they come back in?  They locked them out.  But he didn't leave.

And don't you forget what Abel said.  He stood there with that gun and Ruben and Manuel just stood there.  It was like time froze.  That's called deliberation.  That's called intent.  That's not hot headed.  We are the Mara.  Don't mess with the Mara.

So you must ask yourselves, members of the jury, what have you heard here that would give you any reason, any reason at all to believe that this wasn't about the gang?

The defendant's words:  We are here.  Always in control and banging MS 13 in a big way.  They end up respecting us because we don't play around and we don't joke.

Now, are those the words of somebody who could just walk away?  No.  It's not reasonable.

Members of the jury, we're not asking you to do anything but to use your reason and your common sense.  And when you mark your body, when you mark your territory, when

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 76 of 485
Case 3:08-cv-00134-RJC    Document 538-6    Filed 10/24/17    Page 76 of 485

JA2447

you make it clear who you are and what you're about, that doesn't change.  In the words of the defendant, for the rest of that night and as you've seen since that time:  We are here.  We're always in control and banging MS in a big way.

Everything that the defendant did was about reputation and it was about respect.  And that's what you saw here in the courtroom.  You may have seen pictures of graffiti.  You may have seen pictures of -- or seen drugs and other evidence.  But what you saw here from the defendant in this courtroom when he stood there and threatened a witness and threw those signs was real.  And that's the only evidence you need.  On top of everything else that we gave you.  We're not asking you to make leaps in logic.  We're not asking you to piece small things together.  We gave it to you, members of the jury.  We met our burden.  We've given it to you and now it's your turn to do your job.  It's your turn to do your job.  Find that man guilty.

THE COURT:  Members of the jury, I think we'll take our afternoon break before I give you the final instructions.  So we'll take a 15 minute break and I'll see you at 3:05.

(Brief recess at 2:51 p.m.)

(Jury not present.)

THE COURT:  A couple of things before we bring the jury back.  One is my intent to send back the substantive instructions and the exhibits electronically and so that will

Cheryl A. Nuccio, RMR-CRR (704)350-7494

take some -- I want to make sure that the attorneys get together with the clerk and make sure that all the exhibits that we have marked as admitted are the exhibits. And once you all agree to that, unless there's an objection, we'll send it all back at the beginning of deliberations electronically with instructions on how to work that equipment, which is very simple to do. So think about that. We'll talk about that once we excuse the jury.

The second thing is I intend to excuse the four alternates and send them back with instructions to continue to avoid local coverage of this case. The alternative would be to keep them here quarantined until the jury reaches its decision, and actually through the sentencing process as well. But I think it's adequate to send them home with instructions not to read or listen to local news until further instruction of the court. So think about that. I guess we probably need to decide that right now.

Any objection to that?

MS. ROSE: Not from the government.

MR. FOSTER: No, Your Honor.

THE COURT: All right. So I'll instruct the jury. I'll send them back. I'll tell them while they're in the process of choosing a foreman and beginning deliberations, that we will gather the evidence together. And once you all are in agreement as to what's in, what's not, we'll send all

Cheryl A. Nuccio, RMR-CRR (704)350-7494

of that back.

All right.  Call the jury.

(Jury entered the courtroom.)

THE COURT:  All right.  Members of the jury, as I said, I'm going to now read each count in the indictment to you, the statutes that are alleged to have been violated and the essential elements of each count.

Now, keep in mind that as I do this, you will have a copy of the indictment with you back in the jury room so you don't have to memorize the indictment.  I will also send -- be sending back with you an electronic copy of these instructions and so you will have that with you as well.  But at this point I want to read through them with you in court.

Count one -- and I want to remind you as well that the bill of indictment is not evidence.

Count one reads in pertinent part as follows:

Beginning on a date unknown to the grand jury but from at least in or about 2003, and continuing to the present date, in the Western District of North Carolina, and elsewhere, defendants Manuel De Jesus Ayala, also known as Chacua, Alejandro Enrique Ramirez Umana, also known as Wizard and Lobo, Heverth Ulises Castellon, also known as Misterio and Sailor, Julio Cesar Rosales Lopez, also known as Stiler, Juan Gilberto Villalobos, also known as Smoke and Smokey, Elvin Pastor Fernandez-Gradis, also known as Tigre and Flaco and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 79 of 485
Case 3:08-cv-00134-RJC   Document 526   Filed 10/04/10   Page 79 of 145

**JA2450**

Juan Alberto Irias and Freddy, Juan Ruben Vela Garcia, also known as Mariachi, Jose Amilcar Garcia-Bonilla, also known as Psicopata, Sicario, Lucio Caesario, and Jose Luis Ferufino, Yelson Olider Castro-Licona, also known as Diablo, Carlos Ferufino-Bonilla, also known as Tigre, Nelson Hernandez-Ayala, also known as Sixteen, Mario Melgar-Diaz, also known as Nino, Alexi Ricardo Ramos, also known as Pajaro, Carlos Roberto Figueroa-Pineda, also known as Drogo, Cesar Yoaldo Castillo, also known as Chino, Edgar Miguel Granados-Alvarez, also known as Gorilon and Alexander Granados, Michael Steven Mena, also known as Cholo, Johnny Elias Gonzalez, also known as Solo, Jaime Sandoval, also known as Pelon, Santos Canales-Reyes, also known as Chicago, Jose Efrain Ayala-Urbina, also known as Peligroso, Oscar Manuel Moral-Hernandez, also known as Truchon, Santos Anibal Caballero Fernandez, also known as Garra, Manuel Cruz, also known as Silencioso, Javier Molina, also known as Big Psycho and Gringo, and Mario Guarjardo-Garcia, also known as Speedy and Iran Guerrero-Gomez, together with others, both known and unknown to the grand jury, each being a person employed by and associated with MS 13, an enterprise engaged in and the activities of which affected interstate and foreign commerce, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate directly and indirectly in the affairs of the MS

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 80 of 485
Case 3:08-cv-00754-RJC    Document 526    Filed 10/04/10    Page 80 of 485
**JA2451**

13 enterprise through a pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and (5), which pattern of racketeering activity consisted of multiple acts, indictable under the following provisions of federal law:

One, 18, U.S.C., Section 1951, otherwise known as the Hobbs Act robbery and extortion.

Two, 18, U.S.C., Section 1512, tampering with witnesses, and multiple acts involving the following provisions of federal narcotics laws:

21, U.S.C., Section 846, which is conspiracy to distribute and possess cocaine and marijuana.

21, U.S.C., Section 841(a)(1), which is distribution and possession with intent to distribute cocaine.

21, U.S.C., 843(b), the illegal use of a communication facility, and multiple acts involving offenses chargeable under the following provisions of North Carolina law:

One, murder, in violation of North Carolina General Statute Section 14-17 and 14-2.4.

Two, robbery, in violation of North Carolina General Statute 14-87.1, 14.87, and 14-2.4.

Three, extortion, in violation of North Carolina General Statute 14-118.4 and 14-2.4.

All of this is alleged to be in violation of Title

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 81 of 485
Case 3:08-cv-00164-RJC   Document 526   Filed 10/04/10   Page 2 of 145

JA2452

18, United States Code, Section 1962(d).

You will note that the bill of indictment charges that the offense was committed in or about or on or about a certain date or dates. The proof need not establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense in question was committed on a date reasonably near the date or dates alleged.

The statute alleged to have been violated is 18, United States Code, Section 1962(d). That statute reads in pertinent part:

That it shall be unlawful for any person to conspire to violate certain federal racketeering laws.

One of these laws is Title 18, United States Code, Section 1962(c) which reads in pertinent part as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Racketeering activity is a violation of certain federal and state laws.

The first violation alleged as racketeering activity is Title 18, United States Code, Section 1951, which reads in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 82 of 485
Case 3:06-cv-00164-RJC   Document 1206   Filed 10/24/17   Page 83 of 145
**JA2453**

pertinent part as follows:

Whoever, in any way or degree, obstructs, delays or affects commerce or the movement of any article or commodity in commerce by robbery or extortion or attempts or conspires so to do commits an offense.

This statute is sometimes referred to as the Hobbs Act.

The next violation alleged as racketeering activity is Title 18, United States Code, Section 1512, which reads in pertinent part as follows:

Whoever uses physical force or the threat of physical force against any person with intent to influence, delay or prevent the testimony of any person in an official proceeding commits an offense.

The next violation alleged as racketeering activity is Title 21, United States Code, Section 846, which reads in pertinent part:

Any person who conspires to commit any offense defined in Title 21 of the United States Code, which makes drug trafficking illegal, shall be subjected to the same penalties as those prescribed for the offense, the commission of which was the object of the conspiracy.

One of the offenses referenced in Section 846 is Title 21, United States Code, Section 841, which reads in pertinent part:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 83 of 485
Case 3:08-cv-00164-RJC   Document 538-6   Filed 10/24/17   Page 83 of 485

**JA2454**

It shall be unlawful for any person knowingly or intentionally to distribute or possess with intent to distribute a controlled substance.

Section 841 is also alleged as a separate act of racketeering activity.

The next violation alleged as racketeering activity is Title 21, United States Code, Section 843, which reads in pertinent part as follows:

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of a controlled substance offense.

Now, there's several alleged racketeering acts involving violation of state law. One of them is 14-17, which reads in pertinent part:

Any willful, deliberate, and premeditated killing shall be deemed to be murder in the first degree. All other kinds of murder shall be deemed murder in the second degree.

The next violation alleged as racketeering activity is Section 14-87 of the North Carolina General Statute, which reads:

Any person or persons who, having in possession or with the use or threatened use of any firearm or other dangerous weapon, whereby the life of a person is endangered or threatened, unlawfully takes or attempts to take personal

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 84 of 485
Case 3:08-cv-00154-RJC   Document 505-6   Filed 10/04/10   Page 53 of 145

JA2455

property from another or from any place where there is a person or persons in attendance at any time commits an offense.

The final violation alleged as racketeering activity is Section 14-118.4 of the North Carolina General Statutes, which reads in pertinent part:

That any person who threatens or communicates a threat to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage or immunity, commits an offense.

Each violation of state law is also alleged under Section 14-2.4 of the North Carolina General Statutes, which reads in pertinent part:

That a person who enters into a conspiracy to commit a felony commits an offense.

Where a statute specifies several alternative ways in which an offense can be committed in the disjunctive, or using the word "or," the indictment may allege the several ways in the conjunctive, or using the word "and." You may find the defendant guilty of the offense if you find beyond a reasonable doubt that he committed one or more of the means of violating the statute. Thus, where the indictment uses the word -- the term "and," you may consider it as "or" unless I specifically instruct you differently.

However, in order to find that the -- to find the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 85 of 485
Case 3:08-cv-00174-RJC   Document 506   Filed 10/24/10   Page 86 of 145
JA2456

defendant guilty of such an offense, you must all unanimously agree as to which means of violating the statute the defendant committed.

To prove the defendant guilty of conspiracy to commit racketeering as charged in count one, the government must prove each of the following beyond a reasonable doubt:

That on or about the date alleged, within the Western District of North Carolina:

One, that a conspiracy or agreement existed, as detailed in count one, to participate in the affairs of an enterprise that affected, or would have affected, interstate commerce through a pattern of racketeering activity.

Two, that the defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose.

And three, the defendant knew at the time he joined the conspiracy or at some later time while he was still a member, that someone, not necessarily the defendant, would commit at least two racketeering acts in furtherance of the racketeering scheme.

I'm going to define some of the terms that I used in describing this offense and you are to apply these definitions as you consider the evidence.  If I do not define certain words, you will assign to them their ordinary, everyday meaning.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 86 of 485
Case 3:08-cv-00164-RJC   Document 526   Filed 10/04/10   Page 76 of 145

**JA2457**

A conspiracy is an agreement between two or more persons to join together to accomplish some unlawful purpose. It is a kind of partnership in crime in which each member becomes the agent of every other member.  A co-conspirator may be a person not on trial in this case or not named in the indictment.  However, a person who is an undercover government agent or informant cannot count as one of the two people required to find that a conspiracy existed.

One may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators.  If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

The government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme.  Similarly, the government need not prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out.  Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 87 of 485
Case 3:08-cv-00164-RJC   Document 56-6   Filed 10/04/10   Page 87 of 485

JA2458

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy.

Also, a person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of the conspiracy does not thereby become a conspirator.

A person conducts or participates in the conduct of the affairs of an enterprise if that person uses his position in or association with the enterprise to perform acts which are involved in some way in the operation or management of the enterprise, directly or indirectly, or if the person causes another to do so.

An enterprise is operated not just by those who manage the enterprise, but also by lower-rung participants in the enterprise who are under the direction of upper management.

Additionally, a person need not have participated in all the activity alleged to be part of the racketeering scheme.

The word "racketeering" is a term used by Congress to describe the statute. Remember that the defendant is presumed innocent and the government has the burden to prove

Cheryl A. Nuccio, RMR-CRR (704)350-7494

each element beyond a reasonable doubt.

The term "enterprise" includes a group of people associated together for a common purpose of engaging in a course of conduct.  This group may be associated together for purposes that are both legal and illegal.  In considering whether a group is an enterprise, you should consider whether it has an ongoing organization or structure, either formal or informal, and whether the various members of the group functioned as a continuing unit.  A group may continue to be an enterprise even if it changes membership by gaining or losing members over time.

The existence of an enterprise is a separate element of the crime that the government must prove distinct from a pattern of racketeering activity.  However, you may infer the existence of an enterprise from evidence showing that persons associated with the group engaged in a pattern of racketeering activity if the evidence supports such an inference.

The government must prove that the group described in the indictment, MS 13, was or would have been an enterprise as charged, but need not prove each and every allegation in the indictment about the enterprise or the manner in which the enterprise operated.

Interstate or foreign commerce includes the movement of money, goods, services or persons from one state to another or between another country and the United States.  This would

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 89 of 485
Case 3:08-cv-00174-RJC    Document 1356    Filed 10/04/10    Page 89 of 485
JA2460

include the purchase or sale of goods or supplies from outside North Carolina, the use of interstate mail or wire facilities, the travel of people between states, or the causing of any of those things.

To establish an effect on interstate or foreign commerce, the government is not required to prove a significant or substantial effect on interstate or foreign commerce. Rather, a minimal effect on interstate or foreign commerce is sufficient.

Additionally, individual racketeering acts need not have an effect on interstate or foreign commerce. Rather, the government may satisfy this requirement by proving beyond a reasonable doubt that MS 13 as a whole engaged in or would have engaged in interstate commerce or that its activity affected or would have affected interstate commerce to any degree.

In order to find a pattern of racketeering activity, you must find beyond a reasonable doubt that the defendant agreed that some member of the conspiracy would commit at least two acts of racketeering and that they would be separate acts. You must also find that those acts would be committed within ten years of each other, would be in some way related to each other, and that there would be continuity between them.

Acts would be related to each other if they would

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 90 of 485
Case 3:08-cv-00134-RJC   Document 1276   Filed 10/24/10   Page 90 of 485

JA2461

not be isolated events, that is, if they would have similar purposes or results or participants or victims, or would be committed in a similar way or have other similar distinguishing characteristics, or are part of the affairs of the same enterprise.

There would be continuity between acts if, for example, they would be ongoing over a substantial period of time or had the potential to continue over a substantial period, or if they would be part of the regular way some entity would do business or conduct its affairs.

The government does not have to prove that any racketeering acts were actually committed at all, or that the defendant agreed to personally commit any such acts, or that the defendant agreed that two or more specific acts would be committed.

I have previously read you the types of racketeering acts alleged in the indictment and their corresponding statutes. I will now define the elements of each of these crimes.

The first racketeering activity alleged is a violation of Title 18, United States Code, Section 1951, which makes it a crime for anyone to affect interstate commerce through robbery or extortion. The elements of this offense are:

One, that the defendant or a co-conspirator

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 91 of 485
Case 3:08-cv-00164-RJC   Document 1316-6   Filed 10/24/10   Page 24 of 485

JA2462

knowingly obtained or attempted to obtain money or property from an individual or attempted to do so.

Two, that the defendant or co-conspirator did so by means of robbery or extortion.

Three, that the defendant or co-conspirator believed the individual parted or would have parted with the money or property because of the robbery or extortion.

And four, that the robbery or extortion affected or would have affected interstate commerce.

"Robbery" means the unlawful, actual or attempted taking or obtaining of personal property from the person or in the presence of another against his will by means of actual or threatened force or violence.

"Extortion" means the actual or attempted obtaining of property from another with his consent induced by wrongful use of actual or threatened force, violence or fear.

"Wrongful" means that the defendant or some member of the conspiracy had no lawful right to obtain money or property in that way.

The term "fear" means a state of anxious concern, alarm or apprehension of harm.

I have previously defined the term "interstate commerce."  While it is not necessary to prove that the defendant specifically intended to affect commerce, it is necessary that the government prove that the natural

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 92 of 485
Case 3:08-cv-00154-RJC    Document 52-6    Filed 10/04/17    Page 92 of 485
JA2463

consequences of the acts alleged in the indictment would delay, interrupt or adversely affect the flow of commerce or business activities between a state and any point outside of that state, even to a minimal degree.

Now, mere preparation for the commission of a crime does not constitute an attempt to commit a crime. But if preparation comes so near to the accomplishment of the crime that it becomes probable that the crime will be committed absent an outside intervening circumstance, the preparation may become an attempt.

To determine whether conduct is preparation or an attempt, you must assess how probable it would have been that the crime would have been committed from the defendant's perspective had intervening circumstances not occurred. A direct, substantial act toward the commission of a crime need not be the last possible act before its commission. An attempt comprises any substantial act in a progression of conduct that is meant to culminate in the commission of the crime intended. Thus, while words and discussions would usually be considered preparation for most crimes, a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed.

The next racketeering activity alleged is a violation of Title 18, United States Code, Section 1512, which makes it a crime for anyone to obstruct justice by tampering

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 93 of 485
Case 3:06-cv-00164-RJC    Document 528-6    Filed 10/24/10    Page 93 of 145
JA2464

with a witness. The elements of witness tampering are:

One, that the defendant or co-conspirator used threats or intimidation against a person.

And two, that the defendant or co-conspirator acted knowingly and did so for the purpose of influencing, delaying, or preventing that person's testimony in an official proceeding.

To "intimidate" someone means to intentionally -- intentionally to say or do something that would cause a person of ordinary sensibilities to be fearful of harm to himself or another.

To act with intent to influence the testimony of a witness means to act for the purpose of getting the witness to change, color or shade his or her testimony in some way, but it is not necessary for the government to prove that the witness's testimony was, in fact, changed in any way. For purposes of this offense, it is not necessary for the government to prove that an official proceeding was actually pending or about to be instituted at the time of the offense or that the defendant or co-conspirator was aware of the federal character of any pending judicial proceeding.

The next racketeering activity alleged is a violation of Title 21, United States Code, Section 846, which makes it a crime for anyone to conspire with someone else to commit a violation of certain controlled substances laws of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 94 of 485
Case 3:08-cv-00164-RJC   Document 504-6   Filed 10/24/17   Page 95 of 145
JA2465

the United States.  Controlled substance offenses include distribution of a controlled substance and possession with the intent to distribute a controlled substance.  Cocaine and marijuana are controlled substances within the meaning of these laws.

For you to find a violation of the federal narcotics conspiracy law as a racketeering activity, you must be convinced beyond a reasonable doubt that two or more persons directly or indirectly reached an agreement to distribute a quantity of cocaine or marijuana; or that two or more persons, directly or indirectly, reached an agreement to possess with intent to distribute a quantity of cocaine or marijuana.

Two, that the defendant or co-conspirator knew of the unlawful purpose of the agreement.

And three, that the defendant or co-conspirator joined in the agreement willfully, that is, with the intent to further its unlawful purpose.

To "distribute" a substance means to knowingly and intentionally deliver or transfer possession or control over something to someone else.

The word "possess" means to own or exert control over.  The word "possession" can take on several different, but related meanings.  The law recognizes two kinds of possession -- actual possession and constructive possession. A person who knowingly has direct physical control over a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 95 of 485
Case 3:06-cv-00574-RJC    Document 1306    Filed 10/24/17    Page 76 of 145
JA2466

thing at a given time is then in actual possession of it.  A person who, although not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it.

The law recognizes that possession may be sole or joint.  If one person alone has actual or constructive possession of a thing, then possession is sole.  If two or more persons share actual or constructive possession of a thing, then possession is joint.  You may find that the elements of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the conspirator would have actual or constructive possession, either alone or jointly with others.

However, merely being present with others who have possession of the object does not constitute possession.  In the situation where an object is found in a place such as a room or a car occupied by more than one person, you may not infer control over the object based solely on joint occupancy. You must consider all the evidence in deciding whether the government has shown possession beyond a reasonable doubt.

Next, you must determine if the substance or substances involved were cocaine or marijuana.  The government may prove this through either direct or circumstantial

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 96 of 485
Case 3:16-cv-00574-RJC    Document 50-6    Filed 10/24/17    Page 96 of 485
JA2467

evidence.  Circumstantial evidence would be evidence from which you could infer that the material contemplated was cocaine or marijuana, such as testimony concerning the names used by the defendant to refer to the material or testimony about the material's appearance.  Whether the government relies on direct or circumstantial evidence to prove that the material in issue was cocaine or marijuana, it must prove so beyond a reasonable doubt.

The phrase "with intent to distribute" means to have in mind or to plan in some way to deliver or transfer possession or control over a thing to someone else.

In attempting to determine the intent of a defendant or a co-conspirator, you may take into consideration all the facts and circumstances shown by the evidence received in the case concerning the defendant or co-conspirator's state of mind.

In determining a person's intent to distribute controlled substances, you may consider, among other things, the purity of the controlled substance, the packaging of the controlled substance, the quantity of the controlled substance, the presence or absence of equipment used in the processing or sale of controlled substances, and the presence or absence of large amounts of cash or weapons.

The next racketeering activity alleged is a violation of Title 18 -- or Title 21, United States Code,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 97 of 485
Case 3:08-cv-00374-RJC   Document 5026   Filed 10/24/10   Page 97 of 485
JA2468

Section 841(a), which makes it a crime for anyone to distribute a controlled substance or possess with intent to distribute a controlled substance.

The elements of this offense are:

One, that the defendant or co-conspirator distributed or possessed with intent to distribute a quantity of cocaine or marijuana.

And two, that the defendant acted knowingly and intentionally.

Now, I have previously defined the terms "distribute" and "possess with intent to distribute," and you are to use those definitions here, as well as the instructions in determining whether the substance or substances involved were cocaine or marijuana.

The next racketeering activity alleged is a violation of Title 21, United States Code, Section 843, which makes it a crime for anyone to use a communications facility in order to facilitate a controlled substance offense. The elements of this offense are:

One, that the defendant or co-conspirator committed a controlled substance offense.

I instruct you that distribution of a controlled substance, possession with intent to distribute a controlled substance, and conspiracy to distribute or possess with intent to distribute a controlled substance are controlled substance

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 98 of 485
Case 3:08-cv-00164-RJC    Document 595-2    Filed 10/24/17    Page 98 of 485
**JA2469**

offenses within the meaning of this statute.

Two, that the defendant or co-conspirator used a communications facility.

And three, that the defendant or co-conspirator intended that his use of a communications facility would facilitate the controlled substance offense.

A communications facility includes a telephone or cellular phone.

A communications facility facilitates the commission of an offense if it makes that offense easier or if it assists in the commission of the offense.

The next racketeering activity alleged is a violation of Section 14-87 of the North Carolina General Statutes, which makes it a crime for anyone to commit robbery with a firearm or dangerous weapon.

The elements of this offense are:

One, that the defendant or co-conspirator took and carried away property from the person of another individual or in that individual's presence without his consent.

Two, that the defendant or co-conspirator was not lawfully entitled to take the property.

Three, that at the time of the taking, the defendant intended to permanently deprive the individual of the property.

Four, that at the time of the taking, the defendant

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 99 of 485
Case 3:08-cv-00134-RJC   Document 539   Filed 10/04/10   Page 99 of 145
JA2470

had a firearm or dangerous weapon in his possession, or it reasonably appeared to the individual that a firearm or dangerous weapon was being used.

And five, that the defendant obtained the property by endangering or threatening the life of that individual or any other person.

A "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by the actions of an explosion and includes any handgun, shotgun or rifle.

A "dangerous weapon" is a weapon that is likely to cause death or serious bodily injury.

The next racketeering activity alleged is a violation of Section 14-87.1 of the North Carolina General Statutes, which makes it a crime for anyone to commit robbery. This crime is identical to the robbery offense that I just explained to you, but there is no requirement that the defendant use a firearm or dangerous weapon during the robbery.

The next racketeering activity alleged is a violation of Section 14-118.4 of the North Carolina General Statutes, which makes it a crime for anyone to obtain property from another by means of extortion.

The elements of this offense are:

One, that the defendant or co-conspirator threatened

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 100 of 485
Case 3:08-cr-00734-RJC    Document 50-6    Filed 03/23/17    Page 100 of 485

**JA2471**

an individual.

Two, that the defendant or co-conspirator did so with the intent to obtain property from the individual.

And three, that the defendant intended to obtain the property wrongfully, that is, knowing that he was not lawfully entitled to obtain property in this manner.

The final racketeering activity alleged is a violation of Section 14-17 of the North Carolina General Statutes, which makes it a crime for anyone to commit murder. North Carolina law recognizes first degree murder and second degree murder.

First degree murder is the unlawful killing of a human being with malice and with premeditation and deliberation.  First degree murder also includes felony murder or the unlawful killing of a human being by a person committing or attempting to commit certain felonies under state law.

Second degree murder is the unlawful killing of a human being with malice, but without premeditation and deliberation.

The elements of first degree murder are:

One, that the defendant intentionally and with malice wounded an individual with a deadly weapon.

Two, that the defendant's actions caused the victim's death.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 101 of 485
Case 3:08-cv-00734-RJC    Document 50-6    Filed 03/23/17    Page 32 of 485

JA2472

Three, that the defendant intended to kill the victim.

Four, that the defendant acted with premeditation.

Five, that the defendant acted with deliberation.

And six, that the defendant did not act in self-defense during the killing.

As it is used here, "malice" means an intent to take the life of another or an intent to inflict serious injury.

A "deadly weapon" is one which is likely to cause death or serious injury.

"Serious injury" is injury that creates or causes a substantial risk of death.

The defendant's actions caused the death of another if they are the real cause of that person's death, a cause without which the person's death would not have occurred.

"Premeditation" means that the defendant formed the intent to kill over some period of time, however short, before the defendant acted.

"Deliberation" means that the defendant acted while the defendant was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the defendant's intent to kill was acted upon.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 102 of 485
Case 3:08-cv-00534-RJC   Document 50-6   Filed 03/24/10   Page 33 of 41

JA2473

The elements of first degree felony murder are:

One, that the defendant committed a felony offense, including robbery, in violation of North Carolina General Statute 87.1 and robbery with a firearm or dangerous weapon in violation of North Carolina General Statute 87.1.  And I have previously described the elements of those offenses and you are to apply that law here.

And two, that during the commission of such felony, the defendant caused the death of another person.

I have previously defined for you the term "cause" as it relates to whether a person's actions caused the death of another and you are to use that definition here.

Second degree murder differs from first degree murder in the sense that the government is not required to prove that the defendant acted with a specific intent to kill, premeditation or deliberation.  Thus, the elements of second degree murder are:

One, that the defendant intentionally and with malice wounded an individual with a deadly weapon.

Two, that the defendant's actions caused the victim's death.

And three, that the defendant did not act in self-defense during the killing.

Conspiracy to commit murder, robbery, and extortion are violations of state law which are also alleged as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

conspiracies that constitute racketeering activity. Section 14-2.4 of North Carolina General Statutes makes it a crime for anyone to conspire with others to commit a felony under North Carolina law.

Here the government has alleged a conspiracy to commit murder in violation of North Carolina General Statute 14-17, a conspiracy to commit robbery in violation of North Carolina General Statute 14-87 and 14-87.1, and a conspiracy to commit extortion in violation of North Carolina General Statute 14-118.4.

I have previously defined for you the law relating to conspiracy, as well as the law relating to murder, robbery, and extortion under state law, and I instruct you to apply that law here.

The elements of this offense are:

One, that two or more persons directly or indirectly reached an agreement to commit murder, robbery or extortion.

Two, that the defendant knew of the unlawful purpose of the agreement.

And three, that the defendant joined in the agreement willfully, that is, with the intent to further its unlawful purpose.

Now, for each of these racketeering acts that I have just described, it is not necessary for the government to prove that the racketeering acts actually occurred, but it is

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 104 of 485
Case 3:09-cr-00734-RJC   Document 50-6   Filed 10/04/10   Page 35 of 485
JA2475

necessary for the government to prove that the defendant agreed to commit the act himself or the defendant knew that some member of the conspiracy agreed to commit the act and the defendant intended for him to commit the act.

You will note that the government has alleged many acts of racketeering, but it is sufficient if the government proves that the defendant agreed to commit or knew and intended that a co-conspirator would commit any two of these acts.  The two acts may be of the same type of violation or a combination of types alleged in the indictment.  However, you must be unanimous in your finding as to which agreed upon acts of racketeering the government has proved beyond a reasonable doubt.

You must determine whether the conspiracy charged in count one of the indictment existed.  And if it did, whether the defendant was a member of it.  If you find that the conspiracy charged did not exist, then you must return a not guilty verdict even though you find that some other conspiracy existed.  If you find that the defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty even though that defendant may have been a member of some other conspiracy.

I want to speak to you a little bit about the mental element of the crime charged.  I remind you that the burden of proof beyond a reasonable doubt remains on the government as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 105 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 03/23/17   Page 105 of 485
**JA2476**

to each and every element of the offense charged in count one, including the requirement that the government show beyond a reasonable doubt that the defendant willfully joined the conspiracy.

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident.

The word "willfully" as used in these instructions to describe the alleged mental state of the defendant means that the -- that he knowingly performed an act deliberately and intentionally or on purpose, as contrasted with acting accidentally or carelessly.

Next, I want to explain something about proving a defendant's state of mind. Ordinarily, there is no way that a defendant's state of mind can be proved directly because no one can read another person's mind and tell what that person is thinking. But a defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the defendant said, what he did, how he acted, and any other facts or circumstances in evidence that show what was on his mind. You may also consider the natural and probable results of any act that the defendant knowingly did and whether it is reasonable to conclude that the defendant intended those results. This, of course, is all for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 106 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 10/24/10   Page 87 of 485
JA2477

you to decide.

Now, evidence has been received in this case that a certain person or persons who are alleged to have been co-conspirators with the defendant have done or said things during the existence or life of the alleged conspiracy in order to further or advance its goals.  Such acts and such statements of alleged co-conspirators may be considered by you in determining whether or not the government has proven the charges in count one of the indictment against the defendant.

Since these acts may have been performed or these statements may have been made outside the presence of the defendant, and even done or said without the defendant's knowledge, these acts or statements should be examined by you with particular care before considering whether they may be used against the defendant.  If you find that the acts or statements were in furtherance of the goals of the conspiracy, and you find that the defendant was or became a member of that conspiracy, you may consider those acts or statements as evidence against the defendant.

Acts done or statements made by an alleged co-conspirator before the defendant joined the conspiracy may also be considered by you in determining whether the government has sustained its burden of proof on count one. Acts done or statements made before the alleged conspiracy began or after it ended, however, may only be considered

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 107 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 10/24/10   Page 85 of 485
JA2478

against the person who performed the act or made the statement.

Now, that's the longest count in the indictment and it's a long count because it alleges a conspiracy to violate the racketeering statute and the government alleged many racketeering acts as objects of that conspiracy. The charges from this point forward will be a little shorter and some of them I've already discussed with you so I'll just refer you back to those definitions.

But the next count in the indictment to consider is count twenty-two. That charges the defendant with the offense of murder in aid of racketeering, or aiding and abetting that offense. And count twenty-two reads in pertinent part as follows:

That on or about December 8, 2007, in Guilford County, within the Middle District of North Carolina, and in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant, Alejandro Enrique Ramirez Umana, also known as Wizard, aided and abetted by others known and unknown to the grand jury, for the purpose of maintaining and increasing position in MS 13, an enterprise engaged in racketeering activity, unlawfully and knowingly murdered Ruben Garcia Salinas, in violation of North Carolina General Statute Section 14-17.

All in violation of Title 18, United States Code,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 108 of 485
Case 3:08-cr-00134-RSC   Document 50-6   Filed 03/23/17   Page 39 of 485
JA2479

Sections 1959(a)(1) and (2).

Section 1959(a)(1) reads in pertinent part:

That whoever, for the purpose of maintaining or increasing position in an enterprise engaged in racketeering activity, murders, assaults with a dangerous weapon or threatens to commit a crime of violence against any individual in violation of the laws of any state or the United States commits an offense.

And Section 2 reads that whoever commits an offense against the United States, or aids and abets, counsels, commands, induces or procures its commission is punishable as a principal.

The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged.  The law recognizes that ordinarily anything a person can do for himself may also be accomplished by him through the direction of another person as his or her agent or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise.

If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 109 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/17   Page 90 of 485

JA2480

the acts or engaged in such conduct.

Before any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

To "associate with the criminal venture" means that the defendant shared the criminal intent of the principal. This element cannot be established if the defendant had no knowledge of the principal's criminal venture.

To "participate in the criminal venture" means that the defendant engaged in some affirmative conduct designed to aid the venture or assisted the principal of the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the intent to violate the law.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 110 of 485
Case 3:08-cr-00134-RJC   Document 76-6   Filed 03/23/17   Page 110 of 485
JA2481

To find that the defendant -- to find the defendant guilty of murder in aid of racketeering, or aiding and abetting that offense, you must be convinced beyond a reasonable doubt:

One, that a racketeering enterprise existed which was engaged in or its activities affected interstate or foreign commerce.

Two, that the enterprise was engaged in racketeering activity.

Three, that the defendant, or someone aided and abetted by the defendant, committed murder.  The alleged victim involved in this count is Ruben Garcia Salinas.

And four, that the purpose of the defendant, or someone aided and abetted by the defendant, in committing the murder was to maintain or increase position in the enterprise.

Now, I have previously defined the terms "enterprise" and "affect interstate commerce" and you are to use those definitions here.  Except for purposes of this count, to return a guilty verdict, you must find that the enterprise actually existed and was engaged in racketeering activity.

"Engaged in racketeering activity" means that at or near the time of the alleged murder, one or more individuals associated with or employed -- with or employed enterprise committed or planned to commit at least one racketeering

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA2482**

activity as alleged in count one.

And I have also already defined the elements of each racketeering activity alleged in count one and you are to apply that law here as well.

I have already read to you North Carolina's murder statute in relation to the racketeering activity alleged in count one and provided instructions on the elements of murder under that statute. You are to apply that law here to this count.

Because North Carolina's law -- North Carolina laws's definition of murder includes both first degree and second degree murder, you must be unanimous as to which, if either, was established beyond a reasonable doubt.

In determining whether a person's purpose in committing the alleged murder, assault with a deadly weapon, or other crime was to maintain or increase position within the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all the facts and circumstances in making that determination. For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 112 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/17   Page 112 of 485
JA2483

enhance position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position already held, this element would be established. These examples are only illustrations.

Conversely, it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise. The defendant had to have had the conscious purpose to maintain or enhance position within the organization. The statute prohibits murders that are committed with the purpose of maintaining or enhancing a defendant's or another's relative position with the enterprise, vis-a-vis other members of the enterprise. In the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute.

I have previously defined for you the term "knowingly" and you are to apply that definition here to count twenty-two.

Count twenty-four of the indictment charges the defendant with another murder in the aid of racketeering involving the alleged victim Manuel Garcia Salinas. You are to apply the instructions from count twenty-two to this separate charge.

Count twenty-three charges the defendant with the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 113 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/17   Page 113 of 485
JA2484

offense of using a firearm during and in relation to a crime of violence resulting in death.

Count twenty-three reads in pertinent part as follows:

That on or about December 8, 2007, in Guilford County, within the Middle District of North Carolina, and in Mecklenburg County, within the Western District of North Carolina, and elsewhere, defendant Alejandro Enrique Ramirez Umana, also known as Wizard, during and in relation to a crime of violence, that is, conspiracy to participate in a racketeering enterprise and murder in aid of racketeering, violations of Title 18, United States Code, Sections 1962 and 1959, which are set forth in count one and count twenty-two of this indictment and incorporated herein by reference, for which he may be prosecuted in a court of the United States, did knowingly and unlawfully use a firearm, and in furtherance of such crime of violence did possess said firearm, to wit, a Ruger .45 caliber semi automatic pistol. Such use and possession resulting in the unlawful killing of Ruben Garcia Salinas with malice aforethought as defined in Title 18, United States Code, Section 1111(a).

All in violation of Title 18, United States Code, Section 924(c) and 924(j)(1).

924(j) reads in pertinent part:

That a person who, in the course of a violation of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 114 of 485
Case 3:08-cr-00134-RJC    Document 50-6    Filed 10/04/10    Page 95 of 145
JA2485

Section 924(c), causes the death of a person through the use of a firearm commits an offense.

And Title 18, United States Code, Sections 924(c) reads in pertinent part:

That any person who, during and in relation to any crime of violence for which the person may be prosecuted in a court of the United States, uses a firearm or who, in furtherance of any such crime, possesses a firearm commits an offense.

Title 18, U.S.C., Section 1111(a) reads in pertinent part:

Murder is the unlawful killing of a human being with malice aforethought.

To find that the defendant used a firearm during and in relation to a crime of violence, you must be convinced beyond a reasonable doubt that:

One, the defendant committed the crime alleged in count one, that is, racketeering conspiracy, or the crime alleged in count twenty-two, that is, murder of Ruben Garcia Salinas in aid of racketeering.

I instruct you that racketeering conspiracy and murder in aid of racketeering are crimes of violence.

Two, that the defendant knowingly used a firearm during and in relation to the crime of violence.

And three, that the defendant caused the death of a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 115 of 485
Case 3:08-cr-00134-RJC    Document 50-6    Filed 10/24/10    Page 96 of 485
JA2486

person through the use of the firearm in the course of violating 18, U.S.C., Section 924(c).

Now, I have previously defined -- or detailed the elements of racketeering conspiracy and murder in aid of racketeering and you are to apply those instructions to this count. And I have also defined the terms "firearm" and "knowingly" and "cause" and you are to apply those definitions here.

A firearm is used during and in relation to a crime of violence when it is actively employed, such as by brandishing, displaying, firing or attempting to fire the firearm.

"In relation to" means that the firearm must have some purpose, role or effect with respect to the crime of violence.

Now, the indictment alleges two different crimes of violence, that is, racketeering conspiracy as alleged in count one and murder in aid of racketeering as alleged in count twenty-two. You must be unanimous in your verdict as to which crime of violence, if either, that the defendant used a firearm during and in relation to.

Now, if you find beyond a reasonable doubt that the defendant committed the offense alleged in count twenty-three, you must also decide whether the killing of Ruben Garcia Salinas was with malice aforethought.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 116 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 10/04/10   Page 116 of 485
JA2487

Two kill with malice aforethought means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life.  To find malice aforethought, you need not be convinced that the defendant hated the person killed or felt illwill toward the victim at the time.

In determining whether the killing was with malice aforethought, you may consider the use of a weapon or instrument and the manner in which death was caused.

You will receive a special verdict to record your decision.

Count twenty-five of the indictment charges the defendant with another use of a firearm during a crime of violence involving the alleged murder of Manuel Garcia Salinas.  And you are to apply the instructions from count twenty-three to this separate charge, except that the alleged crimes of violence are racketeering conspiracy as alleged in count one and murder of Manuel Garcia Salinas in aid of racketeering as alleged in count twenty-four.

Now, count twenty-seven of the bill of indictment charges the defendant with the offense of possession of a firearm by an illegal alien in violation of 18, United States Code, Section 922(g)(5).

Count twenty-seven reads as follows:

On or about December 8th, 2007, in Guilford County,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 117 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 10/04/10   Page 97 of 485
JA2488

within the Middle District of North Carolina, and in Mecklenburg County, within the Western District of North Carolina, and elsewhere, Alejandro Enrique Ramirez Umana, also known as Wizard and Lobo, then being an alien illegally and unlawfully in the United States, did knowingly possess in and affecting commerce one or more firearms, to wit, one Ruger .45 caliber semi automatic pistol, in violation of Title 18, United States Code, Section 922(g)(5).

Title 18, United States Code, Sections 922(g)(5) reads in pertinent part as follows:

It shall be unlawful for any person who, being an alien illegally or unlawfully in the United States, possess in or affecting commerce any firearm.

For you to find the defendant guilty of the offense charged in count twenty-seven, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

That on or about the date alleged, within the Western District of North Carolina:

One, the defendant knowingly possessed the firearm described in count eight of the indictment, that is, a Ruger .45 caliber semi automatic pistol -- count twenty-seven of the indictment.

Two, that during the possession, the defendant was an alien unlawfully residing in the United States.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 118 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 10/24/10   Page 99 of 145
JA2489

Three, and that the possession of this firearm was in or affecting interstate or foreign commerce.

And I already defined for you the term "possess" and "firearm" in my instructions relating to the racketeering charge in count one and you are to use that definition here.

An alien is someone who is not a natural born or naturalized citizen or a national of the United States.

The phrase "in or affecting interstate or foreign commerce" includes movement of a firearm between any place in a state or country and any place outside that state or country.

Thus, if you find beyond a reasonable doubt that the firearm in question was manufactured outside of North Carolina and that the defendant possessed the firearm in North Carolina, then you may find that this element has been satisfied.

I have previously defined the term "knowingly."  You are to apply that definition here.

Count twenty-eight charges the defendant with the offense of robbery or attempted robbery affecting interstate commerce in violation of 18, United States Code, Sections 1951 and 2.

Count twenty-eight reads in pertinent part as follows:

On or about December 8, 2007, in Mecklenburg County,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 119 of 485
Case 3:08-cv-00574-RJC   Document 53-6   Filed 10/04/10   Page 118 of 485
JA2490

within the Western District of North Carolina, defendant Alejandro Enrique Umana, also known as Wizard and Lobo, Julio Cesar Rosales Lopez, also known as Stiler, and Jaime Sandoval, also known as Pelon, aiding and abetting each other, and others both known and unknown to the grand jury, attempted to and did knowingly and intentionally obstruct, delay, and affect commerce as that term is defined in Title 18, United States Code, Section 1951(a)(3) by robbery, in that they did unlawfully attempt to take and did take controlled substances and proceeds of the illegal trafficking of controlled substances from the person of an individual known to the grand jury, without consent, against his will, and by means of actual and threatened force, violence, and fear of immediate and future injury, and induced by the wrongful use of force, violence and fear, including fear of economic loss.

All in violation of Title 18, United States Code, Sections 1951 and 2.

I have already read to you Section 1951 in relation to the racketeering activity alleged in count one.

And I have previously read to you 18, U.S.C., Section 2 in relation to count twenty-two.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

That on or about the dates alleged, within the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 120 of 485
Case 3:08-cr-00134-RJC    Document 52-6    Filed 10/04/10    Page 120 of 485
JA2491

Western District of North Carolina:

One, defendant, or someone aided and abetted by the defendant, knowingly obtained or attempted to obtain or took or attempted to take the personal property of another or from the presence of another as charged.

Two, that the defendant, or someone aided and abetted by the defendant, took or attempted to take the property against the victim's will by means of actual or threatened force or violence or fear of injury, whether immediately or in the future.

And three, that as a result of the defendant's actions, or the actions of someone who was aided and abetted by the defendant, commerce, or an item moving in commerce was delayed, obstructed or affected in any way or degree.

I instruct you that property includes controlled substances and the proceeds of the illegal trafficking of controlled substances.

I have also previously defined the terms "aiding and abetting," "attempt," "commerce," and "knowingly." You are to apply those definitions here.

Count sixty-one charges the defendant with conspiracy to tamper with a witness. Count sixty-one reads in pertinent part:

That on or about and between June 12th, 2008, in the Western District and Middle District of North Carolina, and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 121 of 485
Case 3:08-cv-00154-RJC   Document 52-6   Filed 10/04/10   Page 121 of 485

JA2492

elsewhere, defendants Alejandro Enrique Umana, also known as Wizard and Lobo, Heverth Ulises Castellon, also known as Misterio and Sailor, Jaime Sandoval, also known as Pelon, Santos Canales-Reyes, also known as Chicago, and Jose Efrain Ayala-Urbina, also known as Peligroso, did knowingly and willfully conspire and agree with each other, and with others both known and unknown to the grand jury, and aiding and abetting each other, and others both known and unknown to the grand jury, to commit an offense against the United States, to wit, corruptly persuade another person or attempt to do so with intent to influence, delay or prevent the testimony of any person in an official proceeding, in violation of Title 18, United States Code, Sections 1512(b)(1) and (2).

The primary object of the conspiracy was to intimidate witnesses to prevent them from testifying and cooperating with law enforcement in relation to count one and counts twenty-two through twenty-five of this indictment.

In furtherance of this conspiracy and to effect the object thereof, defendants and others, both known and unknown to the grand jury, performed or caused to be performed the following acts in the Middle and Western District of North Carolina, and elsewhere, including but not limited to:

(A), on or about June 12, 2008, defendant Alejandro Enrique Umana, also known as Wizard and Lobo, did communicate directly or indirectly with Jaime Sandoval, also known as

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 122 of 485
Case 3:08-cv-00134-RJC   Document 50-6   Filed 10/24/10   Page 122 of 485
**JA2493**

Pelon, to plan a scheme to prevent eye witness testimony and procure false evidence for the defendant.

(B), on or about June 12, 2008, defendant Heverth Ulises Castellon, also known as Misterio, also known as Sailor, organized a meeting which Jaime Sandoval, also known as Pelon, Jose Efrain Ayala-Urgina, also known as Peligroso, and Santos Canales-Reyes, also known as Chicago, attended to plan a trip to Greensboro to prevent eye witnesses to the murders charged in counts twenty-two through twenty-five from cooperating with law enforcement.

(C), on or about June 12, 2008, defendants Jaime Sandoval, also known as Pelon, Jose Efrain Ayala-Urbina, also known as Peligroso, and Santos Canales-Reyes, also known as Chicago, and others both known and unknown to the grand jury, did drive to Las Jarochitas restaurant in Greensboro, North Carolina, and did attempt to locate, intimidate, and influence witnesses in relation to counts one and twenty-two through twenty-five in the indictment.

And that on or about June 12, 2008, defendants Jaime Sandoval, also known as Pelon, and Santos Canales-Reyes, also known as Chicago, did possess firearms during and in relation to their attempt to locate, intimidate, and influence witnesses in relation to count one and counts twenty-two through twenty-five of the indictment.

All in violation of Title 18, United States Code,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 123 of 485
Case 3:08-cv-00154-RJC   Document 52-6   Filed 10/04/10   Page 123 of 485

JA2494

Sections 371 and 2.

Title 371 reads in pertinent part as follows:

If two or more persons conspire either to commit any offense against the United States or to defraud the United States or any agency thereof in any manner or for any purpose and one or more such persons do any act to effect the object of the conspiracy, each commits an offense.

The purpose of the alleged criminal agreement was to violate Title 18, United States Code, Sections 1512 and 2, which I have previously read to you.

For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

One, that the defendant and at least one other person made an agreement to commit the crime charged in this count of the indictment, that is, witness tampering.

Two, that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

And three, that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment in order to accomplish some object or purpose of the conspiracy.

I previously explained to you the elements of witness tampering in relation to count one and you are to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 124 of 485
Case 3:08-cv-00134-RJC   Document 52-6   Filed 10/04/10   Page 124 of 485

JA2495

apply those instructions here to count sixty-one.

I have also defined certain terms and explained to you the law about aiding and abetting and conspiracy.  I instruct you that unlike count one which did not require the actual commission of an overt act, to return a guilty verdict on this count, you must unanimously find that one of the co-conspirators committed an overt act in furtherance of the conspiracy.

Count sixty-three -- while count sixty-one charges a conspiracy to commit witness tampering, count sixty-three alleges an actual violation of the witness tampering statute by the defendant, or someone aided and abetted by the defendant.  And I have given you instructions about the elements of that offense in relation to count one and you are to apply them here in count sixty-three.

Now, those are a lot of instructions and because they're so lengthy, we are going to provide them to you electronically during the course of your deliberations.

Now, you've heard the evidence, the arguments of counsel for the government and for the defendant and it is your duty to remember the evidence whether it has been called to your attention or not.  And if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of the evidence in your deliberations.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 125 of 485
Case 3:08-cv-00164-RJC   Document 52-6   Filed 10/04/10   Page 125 of 485
JA2496

I have not reviewed the contentions of the parties, but it is your duty not only to consider all the evidence, but also to consider the arguments, contentions, and positions urged by the attorneys, and any other contention that arises from the evidence, and to weigh them all in the light of your common sense and as best you can to determine the truth of this matter.

The law, as indeed it should, requires the presiding judge to be impartial. Therefore, do not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in the case.

I instruct you that a verdict is not a verdict until all 12 jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote or any other voting mechanism aside from a unanimous verdict of 12.

Now, I suggest to you that as soon as you retire to the jury room, before you begin your deliberations, you select one of your members to serve as foreperson of the jury. That individual has the same vote as the rest of the jurors but simply serves to preside over the discussion. And once you begin deliberating, if you need to communicate with me, the foreperson will send a written message to me by knocking on the door and handing it to the marshal. However, you are not to tell me how you stand numerically as to your verdict. For instance, should you be split in your voting at any time, you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 126 of 485
Case 3:06-cv-00164-RJC   Document 52-6   Filed 10/04/10   Page 126 of 485
JA2497

would not tell me the specific number of division in your note.

Now, we use a verdict sheet which is simply the written notice of the decision that you reach in the case. And as soon as you have reached a verdict as to the counts alleged in the bill of indictment, you will return to the courtroom and the foreperson will on request hand the verdict form to the clerk. And there are places on the verdict form for the foreperson to enter the verdict, sign it and date it.

Now, during the trial numerous items were received into evidence as exhibits. And while you begin your deliberations, we are going to go over that exhibit list with the attorneys and we will make an electronic form of exhibits available to you in the deliberation room. And if you need to see the actual hard copy exhibit, you can request that by note.

Now, if you need a break during deliberations, you may do so in the jury room. Or if you need a break outside the jury room, the marshal will escort you for that purpose. But if you're taking a break and not all 12 of you are together, then cease deliberating on the case until all 12 are together.

You have been on the court's time the entire week and I've told you when you can take a break, how long you could take for lunch, and when you had to show up in the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 127 of 485
Case 3:08-cv-00154-RJC   Document 26-6   Filed 10/04/10   Page 03 of 145

JA2498

morning.  And the court is on your time now.  And so it's 4:20 now.  You're going to get the case shortly.  You can stay this evening as long or as short as you want.  It's up to you. Discuss it in the jury deliberation room and just simply let us know by the note process that I discussed with you.

Does either side wish to have a sidebar on the instructions?

MS. ROSE:  Not from the government, Your Honor.

MR. FOSTER:  No, Your Honor.

MR. BRYSON:  No.

THE COURT:  All right.  I'm going to ask jurors 179, 127, 22, and 89, the four of you to step aside and let the other 12 jurors go back to the jury deliberation room and then I just want to speak with you for a moment.

So at this time I'm going to ask the jury to retire and begin deliberations in the case.  We will provide -- provide you with a copy of the indictment, the verdict form, and we will shortly make available to you electronically the evidence in the case.

(Jury, excluding the alternates, exited the courtroom at 4:24 p.m.)

THE COURT:  If y'all would just sit anywhere there. I need to speak with you briefly.

Y'all have served as alternates in the case and it appears that there are jurors capable of deliberating.  We

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 128 of 485
Case 3:08-cr-00134-RJC   Document 52-6   Filed 10/04/10   Page 128 of 485
JA2499

won't know that for sure until the process is through.  And I have two options at this time.  One, I could cabin you in a room in the courthouse until the case is over in case your services are needed.  Or the second thing I can do is what I do every night which is let you go home with the commitment that you won't talk about the case.  That you'll keep an open mind and you'll make every conceivable effort to keep from being exposed to any coverage of the case.

My guess is you all would prefer the latter option to the former.  And I'm willing to do that as long as you make those commitments that until you're further notified by the court, that you'll do those three things.  If you will all make that commitment, we will let you go home, but keep in mind that you may be called in to service and therefore you can't talk about the case, can't read anything or listen to anything or see anything about the case.  You have to keep an open mind about the case until further instruction from the court.  So if you can all do that, we'll ask one of the marshals to escort you out at this time and you're free to go until further notice.

(Alternates exited the courtroom.)

THE COURT:  I'm not sure how best to facilitate this, but I would like the attorneys to consult with the deputy clerk and make sure that we're in agreement as to the admitted exhibits before we release them electronically to the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 129 of 485
Case 3:08-cv-00154-RJC    Document 55-6    Filed 10/24/10    Page 129 of 485
JA2500

jury.  So if y'all would do that.  And except for that, we'll stand in recess until further notice.

(Recess pending a verdict at 4:28 p.m.)

*****

(Note at 4:33 p.m.)

THE COURT:  Let's deal with this note question.  It's fairly simple.  I think I can instruct the jury.  That may be influencing their foreman verdict.  The question is is the verdict read by the foreman?

And what I intend to do is have the deputy clerk instruct them that she will read the verdict.  Any verdict that's rendered, she will read it in open court.  Any objection to that?

MR. FOSTER:  No, Your Honor.

MS. ROSE:  No objection.

THE COURT:  Madam Clerk, if you will do that.

(The clerk complied.)

*****

(Note at 4:53 p.m.)

THE COURT:  They want to see the instructions online.  So what I propose to do is send those back and then continue with this process.

MS. ROSE:  Yes.

(The clerk and the court conferred.)

THE COURT:  Right now, to just send the instructions

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 130 of 485
Case 3:08-cv-00154-RJC    Document 55-6    Filed 10/04/10    Page 130 of 145

JA2501

back, we would have to unclick everything we've done.  Is there any objection to what we've done so far in terms of exhibits going back?

MS. ROSE:  No objection.

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  Let's go ahead and do what we have right now, let's release to the jury.

Would you go back there and turn the machine on.

(The clerk complied.)

                              *****

THE COURT:  Anybody object to a paper copy of the jury instructions going back to the jury while we get this technical problem fixed?

MS. ROSE:  No, Your Honor.

MR. FOSTER:  No, Your Honor.

MS. ROSE:  It's one, I take it, that has all the changes we discussed?

THE COURT:  Right.

(The instructions were tendered to the jury.)

THE COURT:  Any objections to what we have done so far?

MR. FOSTER:  No, Your Honor.

MS. ROSE:  No objection.

THE COURT:  Well, we've got -- there's a couple we need to do -- let's release what we have now and then I

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 131 of 485
Case 3:08-cv-00164-RJC   Document 55-2   Filed 10/04/10   Page 123 of 485
JA2502

think --

MS. ROSE:  I've got the other exhibits here to complete those photographs.

THE COURT:  Let's go ahead and do that.  And when we're finished with that, we can release that.

Have the marshals take the defendant downstairs until further notice.

(Defendant exited the courtroom at 5:33 p.m.)

*****

(Note at 6:27 p.m.)

THE COURT:  They're ready to go.  We can bring the defendant up and have him come in or I can just let them go and tell them to come back at 9:30.

MR. FOSTER:  You can let them go.

THE COURT:  Tell them they can go and be back at 9:30 in the morning on Monday.  Come back at 9:30 on Monday.

THE CLERK:  And the marshals will be around to pick them up, I guess.

(The clerk complied.)

THE COURT:  All right.  Why don't we just stand in recess until 9:30 Monday morning.

(Evening recess at 6:27 p.m.)

*****

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 132 of 485
Case 3:08-cv-00164-RJC   Document 55-6   Filed 10/04/10   Page 132 of 145

JA2503

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

     I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

     Dated this 6th day of May, 2010.

                    s/Cheryl A. Nuccio
                    Cheryl A. Nuccio, RMR-CRR
                    Official Court Reporter

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 133 of 485
Case 3:08-cv-00164-RJC    Document 52-6    Filed 10/04/10    Page 133 of 145

JA2504

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>ALEJANDRO ENRIQUE RAMIREZ<br>　UMANA,<br>　　　　　Defendant. | DOCKET NO. 3:08-cr-134-RJC<br><br>UNITED STATES'S MOTION *IN LIMINE* TO PRECLUDE INFORMATION AND ARGUMENT REGARDING "EQUALLY CULPABLE" DEFENDANTS AND PROPORTIONALITY |

Section 3592(a)(4) of the Federal Death Penalty Act specifically allows for a defendant to present, as a mitigating factor, information that "[a]nother defendant or defendants, equally culpable <u>in the crime</u>, will not be punished by death."  (Emphasis added.)  The United States believes, based on cross-examination by the defense at trial, that Defendant Alejandro Umana, if convicted, will seek to put on such information at sentencing in this matter.  He should not be permitted to do so.

The case law is clear that the Act's words "in the crime" mean what they say — in the capital crime before the jury.  *See United States v. Caro*, 461 F. Supp. 2d 459, 464 (W.D. Va. 2006); ; *United States v. Beckford*, 962 F. Supp. 804, 814-15 (E.D. Va. 1997) (construing text of 21 U.S.C. § 848(m)(8)); *United States v. Sampson*, 335 F. Supp. 2d 166, 196-97 (D. Mass. 2004).

Applying that standard to this case, no other person is equally culpable "in the crime." As the Court has heard, the evidence in this case about what happened in the restaurant is that only one MS-13 member had a gun, and only one MS-13 member fired.  Although some of the bullets and cases were too damaged to be matched, the ones that were identifiable all came from

Case 3:16-cv-00057-MOC-RJC Document 50-6   Filed 03/23/17   Page 134 of 485
Case 3:08-cr-00134-RJC Document 560   Filed 04/19/10   Page 1 of 5
JA2505

the same gun. The defendant was the shooter, and the gun was his gun. So, while other MS-13 members were present, and were perhaps involved in shouting, pushing, and "throwing up" gang signs, the others did not kill. There is no evidence that any one of the other MS-13 members present aided and abetted the defendant, either — the defendant simply took out his gun, paused, and started shooting. Based on the evidence at trial (and at the other trial), nobody was aware beforehand that defendant was going to do so. Certainly, some or all present became accessories after the fact. But accessories are traditionally not punished the same way as aiders; an aider and abettor is punishable as a principal, while an accessory is not. *Compare* 18 U.S.C. § 2, *with id.* § 3. In the end, the relevant question has been phrased as: which person "had a dominant role in the crime"? *See United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2004) ("Although it was undisputed that Haynes was the triggerman, a rational juror could well have found that Higgs had the dominant role in the murders and, therefore, that Higgs and Haynes were not 'equally culpable in the crime.'") (holding evidence sufficient to support jury's rejection of "equally culpable" mitigating factor). Here, the only person with a "dominant role" is defendant.

Much less are the RICO co-conspirators — whether Gorilon (who, the evidence showed, fabricated a murder to get out of town), Drogo (who was mentioned as possibly having committed one), Solo (who was mentioned on the cross of Rony Lopez), or Tigre (who was not mentioned in the guilt phase) — equally culpable in "the crime" with which defendant is charged. Defendant is not constitutionally entitled to a "proportionality" review of sentences between or among defendants in different murders, even co-defendants. *See Pulley v. Harris*, 465 U.S. 37, 43 (1984); *Higgs*, 353 F.3d at 321 (rejecting constitutional argument); *see also United States v. Johnson*, 495 F.3d 951, 961 (8th Cir. 2007) (specifically rejecting the claim "the Eighth Amendment requires not only proportionality between a sentence and a particular

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 135 of 485
Case 3:08-cr-00134-RJC Document 56-6 Filed 04/19/10 Page 135 of 485
**JA2506**

category of crime, but also proportionality between codefendants' sentences."). Nor does the Act entitle him to such review, for reasons already stated by the government in other pleadings — *i.e.*, all of the mitigation information contemplated by the Act pertains to the "background, record, or character" of the defendant "or any other circumstance of the offense."

Interpreting "in the crime" broadly to mean any act of violence undertaken as part of the RICO enterprise would confuse and mislead the jury. First, practically speaking, any contrary view would turn a sentencing, supposed to be an "individualized determination," into a mini-trial on the Attorney General's charging practices. *See, e.g.*, *United States v. Regan*, 221 F. Supp. 2d 659, 660-61 (E.D. Va. 2002). That is a significant risk in this case, for example, because of the circumstances of the other murders, such as "Solo's" juvenile status at the time of that crime. If the government is legally barred from seeking the death penalty, as in that case, then the argument becomes a referendum on capital punishment as a whole. As the Court is aware, it is the United States that chose not to seek a death sentence with respect to any Charlotte co-conspirator, the reasons for which decisions are largely privileged and policy-based.

A related problem attends the very different factual circumstances of the other crimes at issue in the Indictment. By way of example, "Solo" was not the triggerman in the murder he was involved in; "Tigre" had been drinking and doing cocaine for over 24 hours, and tearfully expressed remorse during his interrogation. No other defendant killed two people; tried to grab his gun when the police arrived; premeditated before shooting; or bragged about the murder. Indeed, it was partly for these reasons that the government did not seek a death sentence in either of those cases. At all events, trying to compare such cases "would necessitate turning the trial into a series of mini-trials over the facts and circumstances of other prosecutions, in a situation where the specific facts and circumstances and the exact reason the juries [or the government]

**JA2507**

reached their [or its] decisions in those other prosecutions are not available.  Such information has no probative value and would confuse and mislead the jury with irrelevant information." *United States v. Taylor*, 583 F. Supp. 2d 923, 935-36 (E.D. Tenn. 2008); *see also United States v. Sampson*, 486 F.3d 13, 45 (1st Cir. 2007) (adopting similar argument).

This sentencing should not be about any other person or murder that is not "equal" to defendant's.  There is no such murder in this case.  This sentencing instead should be an individualized determination based on the defendant's (presumably) unique self and the circumstances of the double-murder offense of conviction, in which he was — far and away — the most culpable participant.  The Court should preclude information and argument along these lines.

RESPECTFULLY SUBMITTED this 19th day of April, 2010.

EDWARD R. RYAN
UNITED STATES ATTORNEY

**s/ Jill Westmoreland Rose**
NC Bar Number: NA
Assistant United States Attorney
United States Attorney's Office
100 Otis Street
Asheville, North Carolina 28801
Phone: (828) 271-4661
Fax: (828) 271-4670
Email:  jill.rose@usdoj.gov

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 137 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 04/19/10   Page 4 of 5
JA2508

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April 2010, the foregoing document was served electronically through ECF filing upon defense counsel at the following email addresses:

Mark Foster
mpfosterjr@bellsouth.net

John Bryson
jbryson@wehwlaw.com

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

**JA2509**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:08CR134-RJC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| ALEJANDRO ENRIQUE RAMIREZ | ) | |
| UMANA, | ) | |
| a/k/a "Wizard" | ) | |
| "Lobo" | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the defendant's objection to the admission of Exhibits 160, 161, 162, 163, 165, 166, 167, 168, 169, and 170, offered by the government as letters purportedly written by the defendant while in state custody.

The defendant is one of 26 co-defendants charged with multiple federal offenses arising principally out of their alleged affiliation with La Mara Salvatrucha, also known as the MS-13 gang (hereafter "MS-13"). The defendant's charges include RICO conspiracy, murder in aid of racketeering, Hobbs Act robbery and extortion, and witness tampering. The defendant's case has been severed, and his jury trial began on April 12, 2010.

On April 15, 2010, the government moved to introduce into evidence a number of letters confiscated from the Mecklenburg County Jail that purport to be written by the defendant to several of his alleged co-conspirators, or which purport to be written by other co-conspirators the author of which has been identified as the defendant. (Gov. Exhibits 160-63, 165-70). The defendant objected to these exhibits on grounds of authenticity, relevance, and undue prejudice. The Court held an evidentiary hearing outside the presence of the jury, receiving testimony from Mecklenburg County

1

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 139 of 485
Case 3:08-cr-00134-RJC   Document 508   Filed 04/19/10   Page 1 of 39
JA2510

Sheriff's Department Sergeant Scott Clarkson and administrative employee Denise Daniels, Jeffrey Taylor, a qualified expert in forensic handwriting analysis, and Detective Chuck Hastings of the Charlotte-Mecklenburg Police Department. After hearing the evidence and arguments of counsel, the Court announced its factual findings and legal conclusions, which are stated below.

I.    FINDINGS OF FACT

The defendant was taken into custody on state-issued arrest warrants on January 12, 2008. He remained in state custody, at the Guilford County Jail, until he was taken into federal custody in June of 2008. Several of his alleged MS-13 co-conspirators were held at the Mecklenburg County Jail for several months. Each inmate taken into state custody receives a Prisoner Identification Number ("PID number"). On all outgoing mail, inmates are required to put their names, PID #s and jail return address. It is a policy of the jail that prison guards verify that inmates included their name, correct PID number and return address on their outgoing mail. Whether the policy was complied with concerning each letter here is in dispute.

At the direction of investigators, jail personnel flagged for inspection all ingoing and outgoing mail associated with MS-13 inmates. Any letter addressed to these inmates was first intercepted by Daniels, who before mailing the originals, made copies of the letters and delivered the copies to Clarkson, who in turn delivered them to Hastings. The copies were then sent to the FBI, for translation, and to Taylor, for handwriting analysis. Each letter was labeled with a "JMU" document number for internal reference.

Taylor was asked to perform a handwriting analysis of the letters in order to determine which, if any, had been written by the defendant. His analysis began on the premise that certain documents were known specimens of the defendant's handwriting. The first specimen, Exhibit 151 (JMU 2), is an envelope addressed to the El Salvadoran consulate bearing the defendant's name, PID number, and jail return address. It contains a several page letter, referencing the defendant as the

2

**JA2511**

author, requesting consulate help in avoiding the death penalty for charges of being an MS-13 gang member and alleging discrimination because of that fact and his illegal status. The letter also references his family status and contains the same PID number that appears on the envelope. The second specimen, Exhibit 156 (JMU 66), is an envelope bearing the defendant's name, jail address, and PID number, addressed to his alleged co-conspirator Jaime Sandoval. It contains a handwritten multi-page letter identifying the author as "Wizard," a known alias of the defendant, and describes in detail psychological testing identical to the testing performed on the defendant in this case. It references known associates of the defendant and uses terminology others have associated with him. Finally, the third specimen, Exhibit 169 (JMU 22), is an envelope also addressed to Sandoval bearing the same information as Exhibit 156, containing a detailed analysis of the social importance of MS-13 and asking for the PID number of another known MS-13 member. Taylor credibly testified that he compared these specimens and determined they were of common authorship, except for the final two lines of Exhibit 169, which were written in a different handwriting style that Taylor could not analyze.

Taylor then compared the handwriting found in the known specimens to the handwriting found in the other confiscated letters (the "questioned documents"). For each of the questioned documents, he found a "strong probability" or a "virtual certainty" that they were authored by the defendant.[1] Where Taylor could not opine to a "certainty," it was only due to the fact that he analyzed a copy of the letter rather than the original.

II.    DISCUSSION

A.    Authenticity

The defendant objects to the authenticity of all the letters on the ground that there is

---

[1] Taylor also found a "strong probability" that the defendant did not write certain of the confiscated letters. The government did not seek to introduce these letters into evidence.

3

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 141 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 04/19/10   Page 3 of 61
JA2512

insufficient evidence to establish the authenticity of the defendant's known handwriting specimens. Because no witness actually saw the defendant write the specimens, or testified that the general jail policy of comparing PID numbers to inmates upon receipt of outgoing mail is always followed, the defendant concludes that the government has not established that the "known" specimens were actually written by the defendant. Therefore, Taylor's handwriting analysis is fundamentally flawed as based on the faulty premise that the defendant's known specimens are authentic. The defendant argues that these questions of authenticity render the letters inadmissible into evidence. The Court disagrees.

Rule 901(a) of the Federal Rules of Evidence states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." To meet this threshold for admission into evidence, "the party seeking to introduce physical evidence must provide 'a basis for the jury to resolve the authenticity question in favor of' that party." United States v. Patterson, 277 F.3d 709, 713 (4th Cir. 2002) (quoting United States v. Capers, 61 F.3d 1100, 1106 (4th Cir.1995)). So long as this initial threshold is met, any deficiency in the reliability of the authentication goes to the weight of the evidence, not its admissibility. See Capers, 61 F.3d at 1106.

Here, there is evidence of a jail policy requiring an inmate to write his name, PID number, and jail address on each piece of correspondence before it can be mailed out. Although it could not be verified whether this policy was followed in every instance, many of the proposed exhibits contain such indicators. This is some evidence of authorship by the defendant. More importantly, the information contained in the letters is strong circumstantial evidence of their authenticity. The author of these letters shares intimate details—particularly regarding his psychological testing—that would only be known to the defendant. See Fed. R. Evid. 901, Advisory Committee's Note, Example 4 ("[A] document . . . may be shown to have emanated from a particular person by virtue

4

Case 3:16-cv-00057-MOC Document 50-6    Filed 03/23/17    Page 142 of 485
Case 3:08-cr-00134-RJC Document 50-6    Filed 04/19/10    Page 4 of 7

**JA2513**

of its disclosing knowledge of facts known peculiarly to him."). There appears no reason another person within the jail would embark on such a prolific letter writing campaign under the defendant's name. Additionally, comments in these letters are consistent with verbal statements of the defendant as recorded and related by alleged co-conspirators.

Taylor testified that he concluded with high probability that there was a common authorship of the known specimens as well as the questioned documents offered into evidence. An expert need not testify with absolute certainty that writings are authentic to satisfy the threshold for admission under Rule 901. See United States v. McGlory, 968 F.2d 309, 329 (3rd Cir. 1992) (upholding the admission of handwritten notes, relying in part on an expert's inconclusive finding of "numerous similarities" between the questioned documents and the defendant's handwriting exemplar). This expert finding, combined with the jail policy, the address identifiers, and the information contained within each questioned document unique to the defendant all satisfy the Court that there is more than a sufficient basis for the jury to resolve this question of authenticity in favor of the government. Patterson, 277 F.3d at713. The objections raised by the defendant therefore go to the weight of this evidence, not its admissibility.

B.      Relevance and Undue Prejudice

In the alternative, the defendant objects to the letters under Rules 401 and 403 as irrelevant, or even if marginally relevant, unduly prejudicial. The defendant states that much of the letters is generic rambling, profanity, and evidence of bad character or bad acts not relevant to this case. He argues that these comments have no bearing on the case and pose a uniquely high danger of creating unfair prejudice.

This is a somewhat difficult inquiry because the letters discuss multiple topics, some of which are relevant, and some of which are not. A unifying theme, however, is the author's expression of loyalty to MS-13. Various statements made throughout the letters suggest a

consciousness of guilt of the offenses charged in this case. Moreover, both the content and the frequency of these communications suggest that MS-13 is an organized entity, and the author exercises some measure of control over its members. This aspect of the letters is highly relevant to the defendant's RICO conspiracy and murder in aid of racketeering charges, both of which allege the defendant's membership in a racketeering enterprise. As defendant's statements during and in furtherance of an on-going conspiracy, they amount to party admissions and co-conspirator statements and therefore are not hearsay. Fed. R. Evid. 801(d)(2)(A) and (E).

Against these findings of relevance, the letters must demonstrate a significant danger of unfair prejudice that substantially outweigh their probative value. After review, the Court finds especially troubling certain racially-charged statements written in Exhibits 167 and 169.[2] These comments are inflammatory and, critically, not probative to any issue in the defendant's case. Thus, the Court finds that the letters offered as Exhibits 167 and 169, though relevant, are sufficiently prejudicial to warrant exclusion under Rule 403. As for the remaining letters, they do not demonstrate a danger of unfair prejudice that substantially outweighs their probative value.

---

[2] Exhibit 167 contains a derogatory reference to African-Americans. Exhibit 169 contains a lengthy diatribe accusing the United States of subjugating Latin-Americans and predicting their violent uprising.

6

**JA2515**

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that Exhibits 160, 161, 162, 163, 165, 166, 168, and 170 are admissible into evidence as the purported writings of the defendant. Exhibits 167 and 169 are inadmissible, however, because their probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury.

Signed: April 18, 2010

Robert J. Conrad, Jr.
Chief United States District Judge

7

**JA2516**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:08CR134-RJC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| **ALEJANDRO ENRIQUE RAMIREZ** | ) | |
| **UMANA,** | ) | |
| a/k/a "Wizard" | ) | |
| "Lobo" | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

THIS MATTER is before the Court on the "Defendant's Motion to Strike Non-statutory Aggravating Factor and to Exclude Evidence of Unadjudicated Criminal Acts During Penalty Phase of Trial" (Doc. No. 483) filed April 24, 2009; the "Defendant's Motion to Strike Non-Statutory Aggravating Factors from Notice of Intent to Seek the Death Penalty" (Doc. No. 488) filed April 24, 2009; the government's Consolidated Response (Doc. No. 503) filed May 8, 2009; the defendant's "Motion to Strike the Non-Statutory Aggravating Factor of Future Dangerousness from the Notice of Intent to Seek the Death Penalty" (Doc. No. 968) filed April 6, 2010; and the government's Response (Doc. No. 991) filed April 13, 2010. For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion to strike non-statutory aggravating factors (Doc. No. 488) and **DENIES** the defendant's remaining motions (Doc. Nos. 483&968).

I.    BACKGROUND

The defendant is charged in a Superseding Indictment with multiple federal offenses arising out of his alleged affiliation with La Mara Salvatrucha, also known as the MS-13 gang (hereafter

1

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 146 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 04/19/10   Page 1 of 23
JA2517

"MS-13"). Count 1 of the Indictment charges the defendant with a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). As an overt act in furtherance of this conspiracy, the Indictment alleges that on December 8, 2007, the defendant murdered two individuals, Ruben Garcia Salinas and Manuel Garcia Salinas, in a restaurant in Greensboro, North Carolina. These murders are also charged separately in Counts 22 and 24 of the Indictment as murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and in Counts 23 and 25 as use of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). In the event the defendant is found guilty of Counts 22, 23, 24, or 25, the government has filed a Notice of Intention to Seek the Death Penalty (Doc. No. 275), as required by the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq. In its Notice, the government lists several aggravating factors it contends justify a sentence of death. Several of these are enumerated aggravating factors listed in § 3592(c) (the "statutory aggravating factors"). The government has also given notice of its intent to prove additional aggravating factors which are not enumerated in § 3592(c) (the "non-statutory aggravating factors"), including the following:

> 1.      Gang Motivated Killing.
>
> The defendant killed Ruben Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise.
>
> * * *
>
> 3.      Callous Disregard for the Severity of the Offense.
>
> Defendant has demonstrated a callous disregard for the severity of the offense, as evidenced by his words and actions following the murder of Ruben Garcia Salinas.
>
> 4.      Participation in Additional Uncharged Murders and Other Acts of Violence.
>
> Apart from the offenses charged in the First Superseding Bill of Indictment, defendant has been involved in other serious acts of violence, which are not reflected in his criminal record. Including but not limited to:

2

**JA2518**

a.        On or about July 27, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras.

b.        On or about September 28, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca.

5.        Future Dangerousness.

Defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a.        Continuing Pattern of Violence.

Defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against defendant in the First Superseding Bill of Indictment.

b.        Low Rehabilitative Potential.

Defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after prior incarceration, his pattern of criminal conduct, and, his allegiance to and membership in MS-13.

c.        Lack of Remorse.

Defendant has never expressed any remorse for killing Rubin Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the First Superseding Bill of Indictment.

d.        Gang Membership.

Defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise.

(Doc. No. 275 at 4-5).[1] On April 24, 2009, the defendant filed two motions to strike non-statutory aggravating factors from the government's Notice. (Doc. Nos. 483 & 488). Therein the defendant moves to strike all his non-statutory aggravating factors as unauthorized by the FDPA. The

---

[1] Each aggravating factor is also re-alleged with respect to the other murder victim, Manuel Garcia Salinas. (Doc. No. 275 at 5-8).

3

Case 3:16-cv-00057-MOC-JC Document 50-6 Filed 03/23/17 Page 148 of 485
Case 3:08-cr-00134-RJC Document 564 Filed 04/19/10 Page 3 of 23
JA2519

defendant also moves to strike on various other grounds the aggravating factors Uncharged Murders and Other Violent Conduct, Gang Motivated Killing, and Callous Disregard for the Severity of the Offense. Later, on April 6, 2010, the defendant filed a third motion to strike the non-statutory aggravating factor Future Dangerousness. (Doc. No. 968).

## II.    LEGAL FRAMEWORK

### A.    Capital Sentencing

The FDPA directs that sentencing in a federal capital case be performed in two discrete phases. The first phase, "eligibility," requires the jury to determine whether the defendant qualifies for the death penalty, while the second phase, "selection," requires a decision as to whether a particular defendant "should in fact receive that sentence." Tuilaepa v. California, 512 U.S. 967, 972 (1994). Both the eligibility and selection phases are conducted in a special sentencing hearing mandated by the FDPA. 18 U.S.C. § 3593(b). At this hearing, "information may be presented as to any matter relevant to the sentence, . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). However, the process must be "neutral and principled so as to guard against bias or caprice in the sentencing decision." Tuilaepa, 512 U.S. at 973 (citing Gregg v. Georgia, 428 U.S. 153, 189 (1976)).

To be eligible for the death penalty in a homicide case, the jury first must find that the defendant acted intentionally in killing another person. 18 U.S.C. § 3591(a)(2). Next, it must find beyond a reasonable doubt the presence of at least one statutory aggravating factor alleged in the government's Notice. 18 U.S.C. 3593(e)(2). If these findings are made, the defendant is eligible for the death penalty, and the jury proceeds to the selection phase. During this phase, the jury may

4

consider the presence of any statutory or non-statutory aggravating factor for which the government has given notice. 18 U.S.C. § 3592(c). Each juror then weighs aggravating factors, found unanimously beyond a reasonable doubt, against mitigating factors, found by that juror by a preponderance of evidence. 18 U.S.C. § 3593(d). The jury may recommend the death penalty if it unanimously concludes that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist . . . , or, in the absence of a mitigating factor, . . . the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e).

B.    Constitutional Protections

The Fifth, Sixth, and Eighth Amendments of the Constitution require that a capital sentencing scheme " 'suitably direct[ ] and limit[ ]' " a sentencing jury's discretion " 'so as to minimize the risk of wholly arbitrary and capricious action.' " Lewis v. Jeffers, 497 U.S. 764, 774 (1990) (quoting Gregg v. Georgia, 428 U.S. 153, 189 (1976)). Pursuant to these protections, the Court will not permit the jury to consider aggravating factors that are impermissibly vague, overbroad, or otherwise fail to " 'genuinely narrow the class of persons eligible for the death penalty.' " Arave v. Creech, 507 U.S. 463, 474 (1993) (quoting Zant v. Stephens, 462 U.S. 862, 877 (1983)); accord Maynard v. Cartwright, 486 U.S. 356, 364 (1988) (invalidating an aggravating factor that "an ordinary person could honestly believe" applied to every eligible defendant). In sum, the Court must ensure that aggravating factors put before a sentencing jury permit it "to make a principled distinction between those who deserve the death penalty and those who do not." Jeffers, 497 U.S. at 776.

III.    DISCUSSION

A.    FDPA Authorization of Non-Statutory Aggravating Factors

5

**JA2521**

At the outset, the defendant challenges the government's right to present evidence[2] of any non-statutory aggravating factor during the selection phase of his sentencing. Section 3591(a) of the FDPA directs the jury to "consider[ ] . . . the factors set forth in section 3592" when deciding whether to impose the death penalty. The defendant argues that because § 3591(a) references only the factors "set forth" in § 3592, it authorizes the jury to consider only the statutory aggravating factors explicitly listed in that section. Thus, the FDPA is vague as to whether non-statutory aggravating factors are ever proper to consider. In light of this vagueness, the defendant argues that the rule of lenity[3] should compel the Court to construe the FDPA to limit the government's Notice and subsequent proof to the statutory aggravating factors enumerated in § 3592(c)(1)-(16).

The defendant's argument fails because the FDPA is not vague in this regard. Section 3592(c) contains an explicit "catch-all" provision authorizing the jury to consider "any other aggravating factor for which notice has been given . . . ." Moreover, section 3593(d) contains identical language instructing the jury to consider the presence of both statutory aggravating factors "and any other aggravating factor for which notice has been provided," i.e., any non-statutory aggravating factor alleged in the government's Notice. Reading the FDPA as a whole, it is clear that the "set forth" language in § 3591(a) authorizes the consideration of both statutory and non-statutory aggravating factors. Moreover, any contrary construction of the FDPA would render several of its other provisions essentially meaningless. To the extent possible, a statute should be read so that no

---

[2] The FDPA conspicuously uses the term "information" rather that "evidence," perhaps because the Federal Rules of Evidence are explicitly rendered inapplicable to capital sentencing proceedings. 18 U.S.C. § 3593(c). However, because the parties have often used the term "evidence" in their briefing of these issues, the Court will use that term throughout this Order.

[3] The rule of lenity requires a court to resolve any ambiguity in a criminal statute in favor of the defendant. United States v. Munn, 595 F.3d 183, 194 (4th Cir. 2010) (citing United States v. Santos, 553 U.S. 507, 128 S. Ct. 2020, 2025 (2008)).

6

**JA2522**

part is rendered superfluous or inoperable. <u>Shipbuilders Council of America v. U.S. Coast Guard</u>, 578 F.3d 234, 244 (4th Cir. 2009); <u>Zheng v. Holder</u>, 562 F.3d 647, 654 (4th Cir. 2009). Other courts have considered the arguments raised by the defendant and reached the same conclusion. <u>See United States v. Le</u>, 327 F. Supp. 2d 601, 614 (E.D.Va. 2004); <u>United States v. Nguyen</u>, 928 F. Supp. 1525, 1536 (D. Kan. 1996). Thus, the Court finds that the FDPA generally authorizes a jury to consider any non-statutory aggravating factor for which notice has been provided.

      B.      Uncharged Murders and Other Violent Conduct

The defendant lodges several objections to the non-statutory aggravating factor "Uncharged Murders and Other Violent Conduct," which alleges the defendant's participation in additional uncharged murders and other acts of violence. First, the defendant makes a constitutional challenge under the Fifth, Sixth, and Eighth Amendments to the use of uncharged criminal conduct as an aggravating factor. Next, the defendant argues that because the FDPA includes certain types of prior convictions as statutory aggravating factors, Congress intended to exclude unadjudicated criminal conduct from consideration. Finally, as an additional ground to his motion to strike, the defendant claims evidence of uncharged acts should be excluded from his sentencing hearing because the probative value of such evidence is outweighed by its likelihood to confuse or mislead the jury.

      1.      Constitutionality

In support of his constitutional challenge under the Fifth, Sixth, and Eighth Amendments, the defendant makes two separate arguments: (1) that it is unconstitutional to try uncharged conduct under the relaxed evidentiary standard mandated by the FDPA; and (2) having already convicted the defendant of capital offenses, the jury will be unable to remain impartial when determining whether he committed the uncharged conduct.

Despite these concerns, the established law in the Fourth Circuit is that non-statutory

7

Case 3:08-cr-00154-RJC Document 50-6   Filed 04/19/10   Page 7 of 23

**JA2523**

aggravating factors alleging uncharged criminal conduct do not violate the Constitution so long as the jury is properly instructed that it must find such conduct unanimously and beyond a reasonable doubt. See United States v. Higgs, 353 F.3d 281, 323 (4th Cir. 2003); see also United States v. Cisneros, 363 F. Supp. 2d 827, 838-39 (E.D.Va. 2005) (citing Higgs, denying a motion to strike aggravating factors alleging uncharged criminal conduct); United States v. Beckford, 964 F. Supp. 993, 1002-03 (E.D.Va. 1997) (holding that due process does not require a defendant's sentencing hearing to be governed by the Federal Rules of Evidence, even when allegations of unadjudicated conduct are present).

Here, the defendant is alleged to have committed, or aided and abetted in the commission of, uncharged acts of violence including participation in the murder of several individuals. Critically, the government's allegations attribute these crimes to the defendant himself, not MS-13. Cf. United States v. Rivera, 405 F. Supp. 2d 662, 670-71 (E.D.Va. 2005); United States v. Grande, 353 F. Supp. 2d 623, 638 (E.D.Va. 2005) (related cases, both striking non-statutory aggravating factors attempting to impute to the defendants acts of violence committed by their affiliated gang). Thus, the government's non-statutory aggravating factor alleging uncharged criminal conduct does not violate the defendant's Fifth, Sixth, and Eighth Amendment rights.

### 2.    FDPA Authorization

Next, the defendant argues that in enacting statutory aggravating factors related to six categories of prior conviction,[4] Congress intended for the FDPA to exclude all uncharged criminal conduct from the jury's consideration. This proposition is based upon the maxim of statutory

---

[4] See 18 U.S.C. § 3592(c)(2) (violent felony involving firearm); (c)(3) (offense for which death or life imprisonment was authorized); (c)(4) (two violent felony offenses); (c)(10) (two felony drug offenses); (c)(12) (serious federal drug offense); (c)(15) (sexual assault or child molestation).

8

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 153 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 04/19/10   Page 8 of 23
JA2524

construction expressio unius est exclusio alterius, meaning "that the express designation of one thing may properly be construed to mean the exclusion of another." Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474, 483 (4th Cir. 2007) (quoting Volvo Trademark Aktiebolaget v. AIS Constr. Equip. Corp., 416 F. Supp. 2d 404, 411 (W.D.N.C. 2006)). "The maxim requires great caution in its application, and in all cases is applicable only under certain conditions." STATUTES AND STATUTORY CONSTRUCTION § 47:25 (Norman J. Singer & J.D. Shambie Singer eds., 7th ed. 2007) (quotations omitted). One such limitation of the maxim is that it should not be applied if it creates "contradiction" within a statute. Id.; see also U. S. Dept. of Labor v. Bethlehem Mines Corp., 669 F.2d 187, 197 (4th Cir. 1982) ("The maxim is to be applied with great caution and is recognized as unreliable.").

Here, the defendant's preferred construction of the FDPA would contradict a number of its provisions. Section 3592(c) itself specifically allows the sentencing jury to consider not only statutory aggravating factors but "any other aggravating factor for which notice has been given." Similarly, the jury is instructed to return findings for any statutory aggravating factor "and any other aggravating factor for which notice has been provided . . . ." 18 U.S.C. § 3593(d). These open-ended provisions would be thwarted by applying a literal interpretation to the categories of prior conviction enumerated as statutory aggravating factors. Noting this, the Fourth Circuit has rejected the defendant's line of reasoning. See Higgs, 353 F.3d at 322-23. Thus, the Court concludes that by listing six categories of prior conviction as statutory aggravating factors, Congress did not intend for the FDPA to preclude allegations of uncharged criminal conduct in non-statutory aggravating factors.

3.      Admissibility of Evidence

Finally, the defendant argues that any evidence of uncharged violent acts is inadmissible at

9

**JA2525**

his sentencing hearing under 18 U.S.C. § 3593(c), which directs the Court to exclude evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." The defendant claims that because the Federal Rules of Evidence are inapplicable to a capital sentencing hearing, any evidence of uncharged criminal acts admitted at his sentencing hearing would lack sufficient indicia of reliability. The defendant concludes that complete exclusion is necessary under § 3593(c) because the probative value of such evidence would be limited, while the risk of unfair prejudice, confusion of the issues, and misleading the jury would be high.

Although the Federal Rules of Evidence do not apply, "the FDPA provides a capital defendant with constitutionally sufficient evidentiary protection." United States v. Fulks, 454 F.3d 410, 438 (4th Cir. 2006); accord United States v. Lee, 374 F.3d 637, 648 (8th Cir. 2004); United States v. Fell, 360 F.3d 135, 145-46 (2d Cir. 2004) (reaching the same conclusion). Thus, the mere fact that the Rules are inapplicable is no reason to categorically exclude evidence. Without ruling on any specific evidence the government might seek to admit at the defendant's sentencing hearing, the Court declines to hold that all evidence of uncharged acts of violence is per se inadmissible. The Court therefore denies the defendant's motion to strike the non-statutory aggravating factor Participation in Additional Uncharged Murders and Other Acts of Violence.

In this manner, the Court defers making an admissibility determination of specific evidence of unadjudicated criminal conduct until after its review of said evidence. Should the defendant's trial proceed to the penalty phase, the Court will bifurcate eligibility and selection phases into two discrete proceedings. Both the government and the defendant have argued to the Court whether the Confrontation Clause and Crawford v. Washington, 541 U.S. 36 (2000), should apply to the selection phase of the defendant's sentencing hearing. If Crawford does apply, its prohibition against

10

the admission of testimonial statements from unavailable witnesses not subject to a prior opportunity for cross-examination would operate to bar certain statements proffered by the government as evidence of the defendant's unadjudicated criminal acts.

Although the Fourth Circuit has noted pre-Crawford that "it is far from clear that the Confrontation Clause applies to a capital sentencing proceeding," Higgs, 353 F.3d at 324, the applicability of Crawford to a capital sentencing proceeding is unsettled in this jurisdiction. See United States v. Jordan, 357 F. Supp. 2d 889, 901 (E.D.Va. 2005) (noting that Higgs is "of limited value in a post-Crawford analysis"). Absent guidance from the Supreme Court or the Fourth Circuit, the district courts are left to determine this issue. After review, the Court agrees with the districts courts in this jurisdiction that have determined Crawford only applies to the eligibility phase of capital sentencing proceedings. See United States v. Bodkins, No. 4:04cr70083, 2005 WL 1118158, at *4-5 (W.D.Va. May 11, 2005); Jordan, 357 F. Supp. 2d at 903-04. Thus, testimonial hearsay evidence offered during the eligibility phase would have to meet the requirements of Crawford before it could be presented to the jury. Crawford would not, however, operate to bar similar hearsay testimony offered during the selection phase.

Nevertheless, regardless of Crawford, courts recognize that heightened reliability concerns related to capital sentencing require a threshold determination that evidence of unadjudicated conduct is reliable prior to its admission. See Jordan, 357 F. Supp. 2d at 904; United States v. Cisneros, 363 F. Supp. 2d 827, 838-39 (E.D. Va. 2005); United States v. Breeden, No. 3:03cr13, 2004 WL 1920981, at *4 (W.D.Va. Aug. 27, 2004); United States v. Foster, No. CRIM. CCB-02-410, 2004 WL 903921, at *1 (D.Md. Apr. 9, 2004); Beckford, 964 F. Supp. at 1000. Therefore, should the defendant's trial proceed to the penalty phase, the government shall present to the Court and to the defendant information it intends to introduce as unadjudicated conduct for a determination

11

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 156 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/10   Page 156 of 485

JA2527

of reliability. Only if the government satisfies that threshold determination will such evidence be presented to the jury. See Beckford, 964 F. Supp. at 1000.

### C.    Future Dangerousness

The defendant moves to strike the non-statutory aggravating factor "Future Dangerousness" in its entirety on the grounds that any inquiry into his future dangerousness is unreliable within the meaning of the Eighth Amendment, and that by alleging that the defendant "is likely" to commit criminal acts of violence in the future, the government improperly suggests its burden of proof is less than proof beyond a reasonable doubt.

### 1.    Constitutionality of Future Dangerousness

It has long been held that a sentencing court may evaluate and consider a defendant's propensity to commit acts of violence in the future as an aggravating factor weighing in favor of the death penalty. See Jurek v. Texas, 428 U.S. 262, 274-76 (1976). In Jurek, the Supreme Court noted that:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a [capital sentencing jury] jury must perform in answering the . . . question [of future dangerousness] is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.

Id. at 274-75. See also Simmons v. South Carolina, 512 U.S. 154, 162 (1994) (reaffirming the central holding of Jurek).

In addition to lay testimony, the government may also offer expert opinion testimony

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 157 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/10   Page 12 of 23

JA2528

concerning the defendant's future dangerousness. See Barefoot v. Estelle, 463 U.S. 880, 897-99 (1983), superseded in part by statute, Pub. L. No. 104-132, § 102 (1996) (28 U.S.C. § 2253(c)), as recognized in Slack v. McDaniel, 529 U.S. 473, 480-81 (2000). In Estelle, the petitioner argued that scientific experts were categorically unable to render predictions about a defendant's future dangerousness with any degree of reliability. 463 U.S. at 896. Although the Court recognized a disagreement among penological experts about the accuracy of these predictions, it was "not persuaded that such testimony is almost entirely unreliable and that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." Id. at 899. Applying these precedents, the Fourth Circuit has consistently upheld consideration of future dangerousness as an aggravating factor. E.g., Eaton v. Angelone, 139 F.3d 990, 998 (4th Cir. 1998); Bunch v. Thompson, 949 F.2d 1354, 3367-68 (4th Cir. 1991); Woomer v. Aiken, 856 F.2d 677, 680 (4th Cir. 1988) (all denying habeas relief, upholding state capital sentencing schemes that consider a defendant's future dangerousness).

In citing to studies that suggest predictions of future dangerousness are often wrong, or that subsequent advancements in federal corrections facilities have reduced prisoner violence, the defendant argues that the Court should conclude that Jurek and Barefoot are no longer controlling law. These are not legitimate grounds for a district court to question the continuing validity of otherwise mandatory precedent. Moreover, few of the reliability concerns raised by the defendant in the instant motion are new considerations. In Barefoot, the Supreme Court explicitly recognized that some studies indicated that predictions of future dangerousness were often wrong. 463 U.S. at 899 n. 7. However, this did not render consideration of future dangerousness unconstitutional, because "[a]ll of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury." Id. Thus, the Court denies the defendant's motion to strike Future

13

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 158 of 485
Case 3:08-cv-00154-RJC  Document 50-6  Filed 03/23/10  Page 13 of 23
JA2529

Dangerousness on the ground that it is unreliable within the meaning of the Eighth Amendment.[5]

2.    "Is Likely" Phrasing

The defendant next argues that by alleging that he "is likely" to commit acts of violence in the future, the factor improperly suggests that the government's burden of proof is less than is required by due process and the FDPA. This argument is plainly without merit. The term "is likely" is necessary phrasing because, of course, one cannot predict future events with absolute certainty. The government still retains its required burden of proof, i.e., it must prove beyond a reasonable doubt that the defendant poses a danger to the lives and safety of others. It is no surprise, then, that the Fourth Circuit has noted that "[f]uture dangerousness is best defined as evidence that a defendant is 'likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others.' " United States v. Basham, 561 F.3d 302, 331 (4th Cir. 2009) (quoting United States v. Bernard, 299 F.3d 467, 482 (5th Cir.2002)). Thus, the government's phrasing of this aggravating factor does not imply a lesser burden of proof than the defendant's right to due process requires.

3.    Sub-factors

As an alternative to striking the factor in its entirety, the defendant challenges the government's allegation of four specific sub-factors supporting a finding of future dangerousness: (1) "Continuing Pattern of Violence"; (2) "Low Rehabilitative Potential"; (3) "Lack of Remorse"; and (4) "Gang Membership." (Doc. No. 275 at 4-5). The defendant first argues that alleging specific sub-factors under the heading Future Dangerousness will mislead the jury. The defendant also

---

[5] For the same reasons, the Court denies the defendant's motion for an order requiring the government to produce empirical evidence establishing the reliability of the sub-factors Low Rehabilitative Potential and Lack of Remorse as a condition to presenting evidence of these sub-factors.

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 159 of 485
Case 3:08-cr-00134-RJC   Document 506   Filed 03/19/10   Page 14 of 23
JA2530

argues that an allegation of his low rehabilitative potential is irrelevant where the defendant's only alternative to the death penalty is life in prison without the possibility of parole,[6] and that his lack of remorse is alleged in such a way that violates his Fifth Amendment right to silence.

As an initial matter, the government may allege specific sub-factors under Future Dangerousness without misleading the jury from its core inquiry of whether the defendant is likely to commit acts of violence in the future. To the contrary, these sub-factors clarify the factor's "common-sense core of meaning," Jurek, 428 U.S. at 279 (White, J., concurring in judgment), and focus the jury on the government's proffered evidence. For this reason, Future Dangerousness is often alleged with multiple sub-factors, including Low Rehabilitative Potential and Lack of Remorse. See United States v. Bin Laden, 126 F. Supp. 2d 290, 303-04 (S.D.N.Y. 2001) (collecting cases). Moreover, because these sub-factors are alleged as evidence—not elements—of future dangerousness, the jury need not separately find the presence of all four sub-factors to find the presence of future dangerousness. Thus, the government may generally allege specific sub-factors in support of an allegation of the defendant's future dangerousness.[7]

Next, because certain of his capital offenses carry a life sentence as the only alternative to the death penalty, the defendant challenges the relevance of the sub-factor Low Rehabilitative

---

[6] The Court notes that although this is true for Counts 22 and 24, see 18 U.S.C. § 1959(a)(1), Counts 23 and 25 do not necessarily carry a minimum life sentence. See 18 U.S.C. § 924(j)(1) (authorizing punishment "by death or by imprisonment for any term of years or for life").

[7] To the extent the defendant suggests that certain of these sub-factors are unconstitutionally duplicative of each other, duplicative sub-factors are not unconstitutional, because each sub-factor falls under the umbrella of a single non-statutory aggravating factor: future dangerousness. United States v. Mayhew, 380 F. Supp. 2d 936, 950-51 (S.D.Ohio 2005); United States v. Taylor, 316 F. Supp. 2d 730, 742-43 (N.D. Ind. 2004); United States v. Davis, No. CR.A. 01-282, 2003 WL 1873088, at *10 (E.D. La. Apr. 10, 2003).

15

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 160 of 485
Case 3:08-cr-00134-RJC   Document 306-2   Filed 03/19/10   Page 15 of 23

JA2531

Potential. The defendant reasons that the issue before the jury is not whether he can be rehabilitated, but whether he would pose a continuing danger to others in federal prison.

This argument ignores the fact that although future dangerousness is the jury's overall inquiry, the defendant's potential for rehabilitation is directly relevant to his future dangerousness. See United States v. Gooch, No. 04-128-23, 2006 WL 3780781, at *29 (D.D.C. Dec. 20, 2006) ("[The defendant's] alleged low rehabilitative potential is relevant . . . as it bears on his future dangerousness in prison."). This case is not one where the criminal behavior alleged by the government would be wholly prevented by the defendant's incarceration. See United States v. Taveras, 424 F. Supp. 2d 446, 463-64 (E.D.N.Y. 2006) (excluding evidence of sexual abuse against minors to prove a defendant's future dangerousness, when it was highly unlikely the defendant would ever be released from prison). Rather, the government alleges by this sub-factor that the defendant's low potential for rehabilitation increases the likelihood that he will commit acts of violence against other prisoners and correctional officers throughout his incarceration. For these reasons, Low Rehabilitative Potential is a relevant sub-factor of Future Dangerousness.

Finally, the defendant raises a Fifth Amendment challenge to the sub-factor Lack of Remorse, which alleges that he "has never expressed any remorse for [the murders] as indicated by defendant's statements to fellow gang-members during the course of and following the offenses . . . ." (Doc. No. 275 at 5). There is nothing per se unconstitutional about considering a defendant's lack of remorse as a characteristic that favors imposition of the death penalty. See Zant, 462 U.S. at 885 n. 22 (noting that lack of remorse is an appropriate aggravating factor); see also United States v. Cooper, 91 F. Supp. 2d 90, 112-13 (D.D.C. 2000); Nguyen, 928 F. Supp. at 1541 (both citing Zant). However, the Fifth Amendment limits proof of lack of remorse to "affirmative words or conduct" expressed by the defendant. United States v. Caro, 597 F.3d 608, 627 (4th Cir. 2010)

16

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 161 of 485
Case 5:08-cr-00154-RJC Document 26-6 Filed 03/23/10 Page 16 of 23

JA2532

(citing <u>United States v. Basham</u>, 561 F.3d 302, 334 (4th Cir. 2009), and <u>Emmett v. Kelly</u>, 474 F.3d 154, 170 (4th Cir. 2007)).

Given this restriction, the Court finds the government's allegation that the defendant "has never expressed any remorse" somewhat troubling. However, upon reading the sub-factor in its entirety, it seems clear that the government intends to offer only affirmative statements made by the defendant to others to prove his lack of remorse. Moreover, if necessary, the Court will offer an instruction to the jury that the defendant's mere silence may never be considered as proof of lack of remorse. <u>See</u> <u>Caro</u>, 597 F.3d at 630-31 (approving of a similar instruction). Thus, although the Fifth Amendment places restrictions on admissible evidence concerning the defendant's lack of remorse, it does not require the Court to strike this sub-factor from the government's Notice. The Court therefore denies the defendant's motion to strike Future Dangerousness and certain of its sub-factors.

D.    Gang Motivated Killing

The defendant moves to strike the non-statutory aggravating factor "Gang Motivated Killing" from the government's Notice as duplicative of both the criminal conduct alleged in Counts 22 and 24 of his Superseding Indictment and the non-statutory aggravating factor Future Dangerousness.[8] The defendant asserts that the duplicative nature of this aggravating factor violates the Eighth Amendment in the sense that it fails to narrow the class of persons eligible for the death penalty from those guilty of the underlying capital offense, which in the defendant's case is a violation of 18 U.S.C. § 1959(a)(1).

---

[8] In his motion, the defendant fails to specify which non-statutory aggravating factor is supposedly duplicative of Gang Motivated Killing, but the government addresses Future Dangerousness in its response. Absent a reply from the defendant, the Court assumes that this is the aggravating factor at issue.

17

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 162 of 485
Case 3:08-cr-00134-RJC   Document 506   Filed 03/19/10   Page 17 of 23
JA2533

In Lowenfield v. Phelps, 484 U.S. 231 (1988), the United States Supreme Court upheld a state capital sentencing scheme that required a jury to consider certain circumstances as both statutory elements of first-degree murder and aggravating factors. Id. at 241-43. Because each circumstance elevated the offense beyond a common-law murder, thereby "genuinely narrowing the class of death-eligible persons," there was nothing unconstitutional about the jury performing this narrowing function at the guilt phase of the trial. Id. at 244-45. Thus, "the fact that the aggravating circumstance duplicated one of the elements of the crime [did] not make the [the] sentence constitutionally infirm." Id. at 246. Federal courts, including the Fourth Circuit, have uniformly applied the Lowenfield holding to aggravating factors that duplicate elements of federal homicide statutes. See Higgs, 353 F.3d at 315-16 (upholding an aggravating factor that duplicated an element of 18 U.S.C. § 1111(a), causing death during the commission of a kidnapping); see also Deputy v. Taylor, 19 F.3d 1485, 1502 (3rd Cir. 1994) ("Following . . . Lowenfield, federal courts of appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating circumstance even if it is duplicitous.").

It is less clear, however, whether the same circumstance alleged as two separate non-statutory aggravating factors would comply with the Constitution. The Supreme Court has expressly declined to rule on this issue. See Jones v. United States, 527 U.S. 373, 398 (1999) (declining to decide whether "aggravating factors could be duplicative so as to render them constitutionally invalid"). Prior to the Jones decision, the Fourth Circuit held that permitting a jury to make "cumulative findings" during the penalty phase of trial creates a "clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally." United States v. Tipton, 90 F.3d 861, 899 (4th Cir. 1996) (citing Stringer v. Black, 503 U.S. 222, 230-32 (1992)). Although Tipton concerned a jury's cumulative finding of

18

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 163 of 485
Case 3:08-cv-00154-RJC   Document 50-6   Filed 03/23/10   Page 163 of 485
JA2534

several death-eligible <u>mens rea</u> identical to those set forth in 18 U.S.C. § 3591(a)(2)(A)-(D), several district courts within the Fourth Circuit have concluded that <u>Tipton</u> also prohibits duplicative aggravating factors. See, e.g., <u>Rivera</u>, 405 F. Supp. 2d at 668; <u>Grande</u>, 353 F. Supp. 2d at 631; <u>United States v. Regan</u>, 228 F. Supp. 2d 742, 750-51 (E.D.Va. 2002); <u>United States v. Johnson</u>, 136 F. Supp. 2d 553, 559 (W.D.Va. 2001). These courts have held that aggravating factors are impermissibly duplicative if they "necessarily subsume[ ]" each other. <u>Regan</u>, 228 F. Supp. 2d at 750 (quoting <u>United States v. McCullah</u>, 76 F.3d 1087, 1111 (10th Cir. 1996)). This occurs "when the factors in question substantially overlap, or the factor's elements necessarily include elements of another factor." <u>Id.</u>

As it relates to Counts 22 and 24 of his Indictment, the defendant's argument is foreclosed by <u>Lowenfield</u> and <u>Higgs</u>. In order to convict the defendant on Counts 22 and 24, the government will have to prove not only that he murdered Ruben and Manuel Salinas, but that he did so for the purpose of maintaining or increasing position in MS-13. 18 U.S.C. § 1959(a); (Doc. No. 623: Third Superseding Indictment ¶ 49&54). Thus, a guilty verdict on Count 22 or 24 "genuinely narrow[s] the class of death-eligible persons" from those who simply commit murder to those who commit murder for the purpose of maintaining or elevating position in a racketeering organization. <u>Lowenfield</u>, 484 U.S. at 244. Such a finding during the guilt phase of the trial would not prevent the government from properly re-alleging the same circumstance as an aggravating factor.

Moreover, Gang Motivated Killing is not duplicative of Future Dangerousness. Each aggravating factor relates to a different characteristic of the defendant: Gang Motivated Killing concerns the defendant's motive for committing a specific act of violence in the past, while Future Dangerousness concerns his propensity for violence in the future. The only overlap is found in the sub-factor Gang Membership, which alleges as evidence of the defendant's future dangerousness

19

Case 3:08-cr-00134-RJC   Document 500   Filed 03/19/10   Page 19 of 23

**JA2535**

that he "has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise." (Doc. No. 275 at 5). Although the defendant's allegiance to MS-13 is certainly relevant to both factors, this single commonality does not create a substantial overlap between Gang Motivated Killing and Future Dangerousness, nor does it subsume the elements of one factor into the other. Regan, 228 F. Supp. 2d at 751. Thus, these aggravating factors are sufficiently distinguishable such that a finding of both would not impermissibly or arbitrarily skew the jury's weighing process in favor of the death penalty.

      E.      Callous Disregard for the Severity of the Offense

Finally, the defendant moves to strike the non-statutory aggravating factor "Callous Disregard for the Severity of the Offense" (hereafter "Callous Disregard") on the ground that it is unconstitutionally vague, irrelevant, and duplicative of the non-statutory aggravating factor future dangerousness.[9]

A factor is not unconstitutionally vague if it possesses "some 'common-sense core of meaning . . . that criminal juries should be capable of understanding . . . .' " Tuilaepa, 512 U.S. at 973 (1994) (quoting Jurek v. Texas, 428 U.S. 262, 279 (1976) (White, J., concurring in judgment)). However, "the proper degree of definition" required to withstand a vagueness challenge falls well short of "mathematical precision." Id. (quoting Walton v. Arizona, 497 U.S. 639, 655 (1990)). Moreover, a relevant aggravating factor is one that assists the jury "in distinguishing 'those who deserve capital punishment from those who do not . . . .' " United States v. McVeigh, 944 F. Supp. 1478, 1488 (D. Colo. 1996) (quoting Creech, 507 U.S. at 474); accord Johnson, 136 F. Supp. 2d at

---

    [9] In his motion, the defendant again fails to specify which non-statutory aggravating factor is supposedly duplicative of Callous Disregard, and the government does not identify one in its response. After a review of the government's Notice, it seems likely that the defendant is again referring to Future Dangerousness.

20

**JA2536**

558 ("[T]he aggravating factor must be sufficiently relevant to the question of who should live and who should die.") (internal quotations omitted). Courts have often emphasized that relevant evidence is "particularized to the individual defendant." <u>United States v. Chong</u>, 98 F. Supp. 2d 1110, 1116 (D. Hawai'i 1999) (citing <u>United States v. Frank</u>, 8 F. Supp. 2d 253, 279 (S.D.N.Y.1998)). If the aggravating factor bears only a "tangential relationship" to whether the defendant deserves the death penalty, it should be excluded. <u>Rivera</u>, 405 F. Supp. 2d at 668. Finally, aggravating factors are not duplicative unless they substantially overlap, or the elements of one necessarily include the elements of another. <u>Regan</u>, 228 F. Supp. 2d at 751.

Callous Disregard is neither unconstitutionally vague nor irrelevant. As is noted <u>supra</u>, general constitutional challenges to Lack of Remorse, a similar factor, have failed. <u>See</u> <u>Cooper</u>, 91 F. Supp. at 112-13; <u>Nguyen</u>, 928 F. Supp. at 1541 (both citing <u>Zant</u>, 462 U.S. at 885 n. 22) In order to prove his callous disregard for the severity of these offenses, the government will have to show that the defendant, through his words and actions, failed to appreciate the gravity of killing two human beings. This has a "common-sense core of meaning" sufficient to overcome any vagueness concerns. <u>Jurek</u>, 428 U.S. at 279 (White, J., concurrin). Moreover, the factor is also relevant, because whether the defendant appreciated the gravity of his actions relates to his individual character and provides one legitimate basis to distinguish whether the death penalty is justified in this particular case. <u>Creech</u>, 507 U.S. at 474. Thus, Callous Disregard is sufficient to overcome vagueness and relevance challenges.

Greater concerns are raised by the defendant's claim that Callous Disregard is duplicative of Future Dangerousness. Both the government and the Court have likened the concept of callous disregard for the severity of the offense to a lack of remorse, which the government also alleges in its Notice as a sub-factor of Future Dangerousness. (Doc. No. 275 at 5). As a starting point, the

21

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 166 of 485
Case 3:08-cr-00134-RJC   Document 500-6   Filed 03/19/10   Page 21 of 23

**JA2537**

Court recognizes the difference between alleging lack of remorse in its own right and alleging of lack of remorse as it relates to the defendant's future dangerousness. Moreover, Lack of Remorse is alleged as only one of four sub-factors of Future Dangerousness, each of which is meant to explain rather than supplant that aggravating factor. But despite these distinctions, a possibility exists that the jury could interpret the government's Notice as suggesting that a finding of Lack of Remorse automatically results in a finding of both Future Dangerousness and Callous Disregard. In this sense, the jury could perceive that the elements of Callous Disregard necessarily subsume the elements of Future Dangerousness. Regan, 228 F. Supp. 2d at 750. To eliminate this risk, the Court grants the defendant's motion to strike Callous Disregard from the government's Notice. No part of the Court's ruling on this matter shall prevent the government from arguing the defendant's lack of remorse as proof of his future dangerousness.

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1.    The "Defendant's Motion to Strike Non-Statutory Aggravating Factors and Exclude Evidence of Unadjudicated Criminal Acts During Penalty Phase of Trial" (Doc. No. 483) is **DENIED**;

2.    The defendant's "Motion to Strike the Non-Statutory Aggravating Factor of Future Dangerousness from the Notice of Intent to Seek the Death Penalty" (Doc. No. 968) is **DENIED**;

3.    The "Defendant's Motion to Strike Non-Statutory Aggravating Factors from Notice of Intent to Seek the Death Penalty" (Doc. No. 488) is **GRANTED IN PART** and **DENIED IN PART**; that is, **GRANTED** such that the Court **STRIKES** the non-statutory aggravating factor "Callous Disregard for the Severity of the Offense" from

22

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 167 of 485
Case 3:08-cr-00134-RJC   Document 1060   Filed 03/19/10   Page 22 of 23
JA2538

the government's Notice of Intention to Seek the Death Penalty (Doc. No. 275), and **DENIED** in all other respects; and

4. Should the defendant's trial proceed to the penalty phase, the government shall present to the Court and to the defendant information it intends to introduce as unadjudicated conduct for a determination of reliability. Only if the government satisfies that threshold determination will such evidence be presented to the jury.

Signed: April 19, 2010

Robert J. Conrad, Jr.
Chief United States District Judge

23

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 168 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 04/19/10   Page 23 of 23
JA2539

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA | )DOCKET NO. 3:08-CR-134-2 |
| | ) |
| | ) |
| vs. | )VOLUME VI |
| | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA | ) |
| _____ | ) |


TRANSCRIPT OF TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 19, 2010

APPEARANCES:

On Behalf of the Government:
　　JILL WESTMORELAND ROSE
　　Assistant United States Attorneys
　　100 West Trade Street, Suite 1700
　　Charlotte, North Carolina 28202

　　SAM G. NAZZARO
　　U.S. Department of Justice
　　950 Pennsylvania Avenue NW
　　Washington, D.C. 20530

On Behalf of the Defendant:
　　JOHN DAVID BRYSON
　　Wyatt, Early, Harris & Wheeler, LLP,
　　P.O. Box 2086
　　High Point, North Carolina 27261

　　MARK PATRICK FOSTER, JR.
　　Law Offices of Mark Foster, PC
　　1011 E. Morehead Street, Suite 300
　　Charlotte, North Carolina 28204




LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC-RJC Document 50-6   Filed 03/23/17   Page 169 of 485
Case 3:08-cr-00134-RJC Document 364   Filed 01/30/11   Page 1 of 16
JA2540

1268

I N D E X

JURY DELIBERATIONS:
     Jury begins deliberating ......................... 1269
     Jury Question #1          ......................... 1269
     Jury Question #2          ......................... 1271
     Jury Question #3          ......................... 1274
     Jury Question #4          ......................... 1277

Jury Verdict                   ......................... 1277

INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

* * * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 170 of 485
Case 3:08-cr-00134-RJC Document 584   Filed 01/30/11   Page 2 of 16

JA2541

1269

P R O C E E D I N G S

(Jury begins deliberations at 9:15 a.m.)

(9:27 jury knocks with question.)

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning.

THE COURT:  Apparently, right out of the box we have a question.  So we can deal with that first.

They want multiple copies of the verdict form so they can each have a copy as they go through it; any objection?

MS. ROSE:  No objection from the Government.

MR. FOSTER:  No, Your Honor.

THE COURT:  The only question I have is whether we should -- we just provide it electronically, as well, so they can put it up electronically; any objection to that?

MR. BRYSON:  No.

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  Madam Clerk, if you would make -- cause to be made, I guess, 12 copies of the verdict form, and then post it electronically, as well.

Let me also talk with everyone while we're here. I don't want to forecast anything, but just for scheduling purposes.  I want to talk about if there is a next phase to this what that might look like.

And my suggestion is to have a bifurcated hearing,

Case 3:16-cv-00057-MOC-JC Document 50-6 Filed 03/23/17 Page 171 of 485
Case 3:08-cr-00134-RJC Document 504 Filed 01/30/11 Page 3 of 16
JA2542

1270

dealing with the eligibility factors first, submitting those to the jury. Seeing what they do with those before a selection phase of the sentencing hearing. Is there any objection to that procedure?

MS. ROSE: Not from the government, Your Honor.

MR. FOSTER: No, Your Honor.

THE COURT: If we did it that way, I don't know, would either side -- just starting with the eligibility phase -- would either side be presenting new evidence?

MS. ROSE: As to the eligibility, a few witnesses from the government.

THE COURT: And I guess I'll ask you at a later time. I was just trying to, for scheduling purposes, figure out how much time to expect.

Would you all want to open and close at that part of it or -- I'll have a verdict form for both sides to review.

MS. ROSE: And instructions?

THE COURT: Um-hmm.

MS. ROSE: I think if the government were to make a statement, it would be a very brief statement.

THE COURT: Just be thinking about that. We can talk about it some more. But I just want you all to be thinking in terms of, if the jury were to come back with a verdict that triggers a sentencing phase, the Court's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 172 of 485
Case 3:08-cr-00134-RJC   Document 844   Filed 01/30/11   Page 172 of 485
JA2543

1271

inclination is to do it in a bifurcated manner with a submission to the jury of the eligibility questions. And if those are answered in a way that triggers the selection process, to go to that process sequentially.

So I'll hear from you later on as to whether you want to make opening statements or other concerns you might have with that process.

Throughout the day I'll be getting out orders on motions in limine and the other things that have been filed. I don't know how much access you have to ECF. I can make hard copies available as I get them out, if that's your preference.

MS. ROSE: Thank you, Your Honor.

MR. FOSTER: As well, we would request that also, Your Honor.

THE COURT: Anything else we can deal with at this time?

ALL COUNSEL: (No response.)

THE COURT: We'll just stand in recess until further notice.

(The Court stood at ease at 9:34 a.m. waiting for a response from the Jury.)

(Jury knocks with a question at 10:45 a.m.)

THE COURT: Let me read you all the question and then see if we should bring your client up to discuss it.

Laura Andersen, RMR 704-350-7493

**JA2544**

1272

We'll just wait one second, the defendant is here.

The jurors want the English translation of Government Exhibit 235, which is the letter allegedly written from the defendant to the consulate.  Exhibit 235 is in evidence, and I would be inclined to just provide it.

MS. ROSE:  I don't have that in here right now, but I've got it somewhere, and I'll provide it to the Court.

THE COURT:  Pull it out and put it on the ELMO and let's make sure we're all talking about the same thing; 235a or b?

MS. ROSE:  I'll ask Ms. Hensley bring that over from the office.

THE COURT:  Our records show that 235 was admitted into evidence.  235 is the Spanish, the letter written in Spanish.  I don't show that English was admitted into evidence.  Do your records indicate that under another number?

MS. ROSE:  It would have been with this.  And because it was a known sample, we did not move the English in with this.  Although we have the English and provided it to the defense.

THE COURT:  I think what I will just tell the jury is that the English version of that was not admitted into evidence.  I think that's the best answer.

I had thought that maybe the English version of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 174 of 485
Case 3:08-cr-00134-RJC Document 644   Filed 01/30/11   Page 4 of 16
JA2545

1273

this had been admitted under a different number, but apparently not.

So I'm going to respond to this note by saying that the English translation of Government Exhibit 235 is not in evidence.  I hate to bring the jury out here to do that.  Any objection to the clerk just informing them?

MR. BRYSON:  No, Your Honor.

MS. ROSE:  No objections.

THE COURT:  That's what we'll do.

Stand in recess.

(The Court stood at ease at 10:55 a.m. waiting for a response from the Jury.)

(Jury knocks at 11:37 a.m.)

THE COURT:  Jurors have asked for transcripts of the testimony of Abel Santos and Gorilon and Rony Lopez.

I'm going to instruct them that they have to rely upon their own recollection of the testimony.  I don't intend to provide transcripts of testimony to the jury; any objection?

MS. ROSE:  No objection.

MR. BRYSON:  No, Your Honor.

THE COURT:  I let -- I think I better bring them in and indicate that to them.

So if you would call the jury.

(The jury was returned to the courtroom.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 175 of 485
Case 3:08-cr-00134-RJC Document 584   Filed 01/30/11   Page 175 of 16
JA2546

1274

THE COURT:  Good morning, Members of the Jury.

THE JURY:  Good morning.

THE COURT:  I think I can still say that.  I know you've been working hard.  The Court appreciates your conscientious deliberation.

You've asked for the testimony of Abel Santos, Gorilon and Rony Lopez.

And in response to that request I'm going to tell you that it is up to you to rely upon your own recollection of the testimony.  We do not have transcripts to be made available to you.  You must all rely upon your own individual recollection of the testimony.  And so with that answer to your question, I would ask you to go back and continue to deliberate.  Thank you.

(The jury was escorted from the courtroom.)

THE COURT:  We'll stand in recess.

(The Court stood at ease at 11:40 a.m. waiting for a response from the Jury.)

(The jury knocks at 3:17 p.m.)

(Defendant in.)

THE COURT:  The question is, does the foreperson sign the verdict form with their name or number?

And my inclination is to just say with the name.  Although the name will be sealed in any public filing of the verdict form; any objection?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC  Document 50-6  Filed 03/23/17  Page 176 of 485
Case 3:08-cr-00134-RJC  Document 50-6  Filed 01/30/11  Page 4 of 16

**JA2547**

1275

MS. ROSE:  I don't object.

MR. BRYSON:  No, Your Honor.

THE COURT:  All right.  Any objection to my just writing that down on this note and sending it back with the jury?

MS. ROSE:  No objection.

MR. FOSTER:  No, Your Honor.

THE COURT:  What I've written, the foreperson signs the verdict.  Any public display of the verdict we would redact the name.

(The note goes to the jury 3:24 p.m.)

THE COURT:  Have you all had a chance to review the eligibility preliminary and instructions?

MR. NAZZARO:  Yes, Your Honor.

MR. FOSTER:  Yes, Your Honor.

THE COURT:  Any suggested changes or are you satisfied with it?

MR. NAZZARO:  We just have one issue, Your Honor, on the draft page three of the instructions.

THE COURT:  Yes.

MR. NAZZARO:  On the eligibility factors, the second factor indicates the defendant acted with a level of intent sufficient to allow consideration of death penalty.

And then the rest of that sentence says, which may be different than the intent require to convict the

Case 3:16-cv-00057-MOC-JC Document 50-6  Filed 03/23/17   Page 177 of 485
Case 3:08-cr-00134-RJC  Document 584  Filed 01/30/11   Page 3 of 16
**JA2548**

1276

defendant of offense.  I don't think that's applicable or supported in this case.  And I'm not sure that's confusing.

THE COURT:  I'm trying to figure out where you are.

MR. NAZZARO:  It's on page three of the eligibility factors, the instructions, not the verdict form.

THE COURT:  So you're recommending that I delete the second --

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  -- phrase.

MR. NAZZARO:  The -- later the Court says, you know, just says, intentionally killed the victim.  There's going to be no, I think, further definition of intent.  So we would ask that that be deleted.

THE COURT:  Any objection from the defense?

In other words, so in number two, I would just say the defendant acted with at level of intent sufficient to allow consideration of the death penalty.  And then let that be flushed out by the verdict form.

MR. NAZZARO:  Yes, Your Honor.

MR. FOSTER:  We don't object to that.

THE COURT:  All right.  Anything else from either side?

MS. ROSE:  No, sir.

MR. FOSTER:  One moment.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 178 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 178 of 485
**JA2549**

1277

THE COURT:  Yes.

MR. BRYSON:  Your Honor, we wanted to object to the two statutory aggravating factors we submitted and just wanted to submit to the Court that it would be our position that two are essentially the same, and would be subsumed by each other.  There's at least one case that holds that, a case out of Kansas.

(Jury knocks at 3:27 p.m.)

MR. BRYSON:  *U.S. versus Glover, 43 Fed Supp 1217.* I don't want to be heard at length.  We would just argue that the two are subsumed.

THE COURT:  What's the cite?

MR. BRYSON:  *U.S. versus Glover, 43 Fed Supp 1217, 1999.*

THE COURT:  I'll take a look at that.  Thank you.

COURT SECURITY OFFICER:  Got a verdict.

THE COURT:  Verdict.

(Jury knocks with verdict at 3:27 p.m.)

MR. BRYSON:  *F Supp 2d*, my fault.

THE COURT:  Oh, okay.  All right.

Are we ready for the jury?

ALL COUNSEL:  Yes, sir.

THE COURT:  Call the jury.

(The jury was returned to the courtroom at 3:30 p.m.)

THE COURT:  Members of the Jury, have you selected

Laura Andersen, RMR 704-350-7493

**JA2550**

1278

a foreperson?

THE JURY:  Yes, we have.

THE COURT:  And juror number 330, is that you?

JUROR:  That's correct.

THE COURT:  Has the jury reached a verdict in this case?

JUROR:  We have, Your Honor.

THE COURT:  And have you reduced that verdict to the verdict form, signed it and dated it?

JUROR:  Yes, I have, Your Honor.

THE COURT:  Very well.  At this time would you hand that verdict form to the deputy clerk.

JUROR:  (Complies.)

COURT CLERK:  (Handing same to the Court.)

THE COURT:  Members of the Jury, I am going to inspect the verdict form, and then I'm going to ask the clerk to publish it in open court.  And I would ask you to listen very carefully to the publishing of the verdict, either side may wish to have you polled to make sure it's your own individual verdict.

Madam Clerk, would you publish the verdict in the case of United States of America versus Alejandro Umana.

COURT CLERK:  Ladies and gentlemen of the jury, in the case of United States of America versus Alejandro Umana, docket number 3:08-CR-134, you returned the following

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 180 of 485
Case 3:08-cr-00134-RJC   Document 59-6   Filed 03/23/11   Page 180 of 485
JA2551

1279

verdict:

As to Count One, you find the defendant, "Guilty".

Did the defendant's agreement include the willful, deliberate and premeditated murder of Ruben Garcia Salinas, in violation of NC General Statute 14-17?  You found, "Yes".

Did the defendant's agreement include the willful, deliberate and premeditated murder of Manuel Garcia Salinas in violation of NC General Statute 14-17?  You found, "Yes".

As to Count 22, you find the defendant, "Guilty".

As to Count 23, you find the defendant, "Guilty".

Was the killing with malice aforethought?  You found, "Yes".

As to Count 24, you find the defendant, "Guilty".

As to Count 25, you find the defendant, "Guilty".

Was the killing with malice aforethought?  You find, "Yes".

As to Count 27, you find the defendant, "Guilty".

As to Count 28, you find the defendant, "Guilty".

As to Count 61, you find the defendant, "Guilty".

As to Count 63, you find the defendant, "Guilty".

THE COURT:  Does either side wish to have the jury polled?

MR. FOSTER:  Yes, Your Honor.

THE COURT:  Madam Clerk, would you poll the jury.

COURT CLERK:  Ladies and gentlemen, you've heard

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 181 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 181 of 485
JA2552

1280

the verdict as published.

Juror Number 1, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 2, was this your verdict, is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 3, was this your verdict is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 4, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 5, was this your verdict, is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 6, was this your verdict, is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 7, was this your verdict, is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror Number 8, was this your verdict, is this still your verdict?

JUROR:  Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 182 of 485
Case 3:06-cr-00154-RJC   Document 50-6   Filed 03/30/11   Page 14 of 16
**JA2553**

1281

COURT CLERK: Juror Number 9, was this your verdict, is this still your verdict?

JUROR: Yes.

COURT CLERK: Juror Number 10, was this your verdict, is this still your verdict?

JUROR: Yes.

COURT CLERK: Juror Number 11, was this your verdict, is this still your verdict?

JUROR: Yes.

COURT CLERK: And Juror Number 12, was this your verdict, is this still your verdict?

JUROR: Yes.

THE COURT: Very well. Members of the Jury, we will now begin the sentencing phase of the trial, and before we do that, I would ask you to retire back to the deliberation room until you are called back into the courtroom.

(The jury was escorted from the courtroom at 3:34 p.m.)

THE COURT: Madam Clerk, would you enter the verdict in the record.

The jury's verdict has now made necessary the sentencing phase of the trial. We had given the alternates the freedom to go home with the instructions not to talk about the case, and not to consider any of the coverage of the case. It would take some time to get them back here to

Laura Andersen, RMR 704-350-7493

**JA2554**

1282

sit as alternates in the sentencing phase.  How long does the government think its eligibility phase evidence will last?

MS. ROSE:  An hour at the most, Your Honor, pretty quick.

THE COURT:  We have two options; we can stand in recess until the alternate jurors arrive, or we could convene in the morning.  I would be glad to hear from both of you -- both sides, which is the preferable option.

MS. ROSE:  The Government's ready to go this afternoon, Your Honor.

MR. FOSTER:  We're ready and we're here.  So whatever the Court wants to do.

THE COURT:  Why don't we take a recess, call the alternates, and I'll notify you when they arrive.

So we'll stand in recess until further notice.

(A brief recess was taken in the proceedings.)

                         * * * * * *
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER


        I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

        Dated this the 6th day of May, 2010.

                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

            Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 184 of 485
Case 3:08-cr-00134-RJC   Document 596   Filed 01/26/11   Page 16 of 16
JA2555



IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

UNITED STATES OF AMERICA            )
                                    )
            vs.                     )            VERDICT FORM
                                    )
ALEJANDRO UMANA (2)                 )

1.     As to Count One, charging the defendant with conspiracy to conduct, or

participate in the conduct, of the affairs of an enterprise affecting interstate commerce through a

pattern or racketeering activity, in violation of 18 U.S.C. § 1962(d), we, the jury, unanimously

find the defendant:

            Guilty: _____✓_____        Not Guilty: _____

1a.    If guilty, did the defendant's agreement include the willful, deliberate and

premeditated murder of Ruben Garcia Salinas, in violation of N.C. Gen. Stat. § 14-17?

            Yes: _____✓_____        No: _____

1b.    If guilty, did the defendant's agreement include the willful, deliberate and

premeditated murder of Manuel Garcia Salinas, in violation of N.C. Gen. Stat. § 14-17?

            Yes: _____✓_____        No: _____


2.     As to Count Twenty-Two, charging the defendant with the murder of Ruben

Garcia Salinas in aid of racketeering, in violation of 18 U.S.C. § 1959, or aiding and abetting in

that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

            Guilty: _____✓_____        Not Guilty: _____

Final 1.1 Page 1

JA2556

3.      As to Count Twenty-Three, charging the defendant with use of a firearm in relation to crime of violence resulting in the death of Ruben Garcia Salinas, in violation of 18 U.S.C. §§ 924(c) and 924(j)(1), we, the jury, unanimously find the defendant:

Guilty: _____✓_____          Not Guilty: _____

3a.     If guilty, was the killing with malice aforethought?

Yes: _____✓_____          No: _____

4.      As to Count Twenty-Four, charging the defendant with the murder of Manuel Garcia Salinas in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), or aiding and abetting in that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

Guilty: _____✓_____          Not Guilty: _____

5.      As to Count Twenty-Five, charging the defendant with use of a firearm in relation to crime of violence resulting in the death of Manuel Garcia Salinas, in violation of 18 U.S.C. §§ 924(c) and 924(j)(1), we, the jury, unanimously find the defendant:

Guilty: _____✓_____          Not Guilty: _____

5a.     If guilty, was the killing with malice aforethought?

Yes: _____✓_____          No: _____

Final 1.1 Page 2

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 186 of 485
Case 3:09-cv-00154-RJC Document 50-6-3 Filed 03/23/10 Page 186 of 485
JA2557

6.    As to Count Twenty-Seven, charging the defendant with being an illegal alien in possession of firearm, in violation of 18 U.S.C. § 922(g)(5), we, the jury, unanimously find the defendant:

Guilty: _____✓_____    Not Guilty: _____

7.    As to Count Twenty-Eight, charging the defendant with robbery, or attempted robbery, affecting interstate commerce, in violation of 18 U.S.C. § 1951, or aiding and abetting that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

Guilty: _____✓_____    Not Guilty: _____

8.    As to Count Sixty-One, charging the defendant with conspiracy to commit witness tampering, in violation of 18 U.S.C. § 371, or aiding and abetting that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

Guilty: _____✓_____    Not Guilty: _____

9.    As to Count Sixty-Three, charging the defendant with witness tampering, in violation of 18 U.S.C. § 1512(b)(1), or aiding and abetting that offense, in violation of 18 U.S.C. § 2, we, the jury, unanimously find the defendant:

Guilty: _____✓_____    Not Guilty: _____

Signed: _____
FOREPERSON

Dated: _____4/19/2010_____

Final 1.1 Page 3

Case 3:16-cv-00057-MOC-RJC   Document 50-6   Filed 03/23/17   Page 187 of 485
Case 3:09-cv-00154-RJC   Document 50-6   Filed 04/19/10   Page 3 of 3
JA2558

```
                    UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                        CHARLOTTE DIVISION


UNITED STATES OF AMERICA          )DOCKET NO. 3:08-CR-134-2
                                  )
                                  )
     vs.                          )VOLUME I
                                  )
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____  )
```

TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 19, 2010

<u>APPEARANCES</u>:

On Behalf of the Government:
    JILL WESTMORELAND ROSE
    Assistant United States Attorneys
    100 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

On Behalf of the Defendant:
    JOHN DAVID BRYSON
    Wyatt, Early, Harris & Wheeler, LLP,
    P.O. Box 2086
    High Point, North Carolina 27261

    MARK PATRICK FOSTER, JR.
    Law Offices of Mark Foster, PC
    1011 E. Morehead Street, Suite 300
    Charlotte, North Carolina 28204


                    LAURA ANDERSEN, RMR
                  Official Court Reporter
                United States District Court
                 Charlotte, North Carolina

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 188 of 485
Case 3:08-cr-00134-RJC   Document 504   Filed 01/30/11   Page 1 of 91

**JA2559**

2

## I N D E X

MOTION TO STRIKE                                         3
COURT'S OPENING INSTRUCTIONS                            10
    OPENING STATEMENTS:
        MR. NAZZARO                                     13
        MR. FOSTER -- WAIVES                            15
                        * * * * * *

GOVERNMENT'S WITNESSES:

    ISMAR SANCHEZ
        Direct Examination by Ms. Rose                  16
        Cross-Examination by Mr. Bryson                 26
        Redirect Examination by Ms. Rose               32

    DAVID HENDERSON
        Direct Examination by Mr. Nazzaro              32

    CARLTON PHOENIX
        Direct Examination by Ms. Rose                  38

                    * * * * * *

## E X H I B I T S

GOVERNMENT'S EXHIBITS:
NO.                                            RECEIVED
ALL EVIDENCE ADMITTED DURING TRIAL               15
501  ........................................... 36
502  ........................................... 40
503  ........................................... 44

                * * * * * *

COURT'S INSTRUCTIONS                                    44

JURY QUESTION                                           50

INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT
                        * * * * * *

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 189 of 485
Case 3:08-cr-00134-RJC   Document 646   Filed 01/30/11   Page 2 of 51

JA2560

3

P R O C E E D I N G S

THE COURT:  Before we call the jury, I did want to address a couple of things.  One is the Motion to Strike as statutory aggravating factors as duplicative.  I've looked at the *Glover* case, I've also looked at the *U.S. V Lee* case, the Eastern District of Virginia, 327 F. Supp 2d, 601.

And I find that the two statutory aggravating factors alleged by the government are sufficiently different in purpose so as not to be duplicative.

I find that the grave risk of death to others can be construed to mean innocent bystanders, and the killed more than one person statutory aggravating factor, obviously, is with respect to intended victims.

And so the very same case that was considered in *Lee*, and which the Court came out with the appropriate decision, I believe, that the statutory aggravating factors are sufficiently different so as not to be duplicative.  And so the Court will overrule that motion.

I also want to give the parties some indication of the Court's ruling which will come out in written form with respect to the unadjudicated crimes, non-statutory aggravating factors.

If we reach the selection stage of the sentencing hearing.  The standard is whether the evidence probative value outweighs the unfair prejudice, confusion of issues or

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 190 of 485
Case 3:08-cr-00134-RJC   Document 58-6   Filed 01/30/11   Page 3 of 91

JA2561

misleading the jury.  Whether there's sufficient indicia of trustworthiness as so to make hearsay testimony reliable.

There's three categories of evidence which is before the Court for its consideration.  And it will be referred to by shorthand as the Fairfax Street murder, the Lemon Grove murder, and the murder alleged to have occurred in El Salvador.

With respect to the Fairfax Street murder -- and with respect to all of these unadjudicated crimes, consideration of the evidence in these matters, the Court has reviewed the Government's evidence that it submitted this morning.  And I will refer to it as the documents under review with respect to the unadjudicated crimes, non-statutory aggravating factors.

And at the end of the day I would ask the government to retrieve those exhibits from my chambers, but also to keep that material segregated for purposes of appeal.

But I've also reviewed the parties briefing papers and considered those arguments in light of the evidence reviewed.  I find that the evidence with respect to the Fairfax Street murder contains sufficient indicia of trustworthiness that I will permit the government to present it.

And the various factors that the Court has

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6  Filed 03/23/17   Page 191 of 485
Case 3:08-cr-00134-RJC Document 592-6  Filed 01/30/11   Page 4 of 91
JA2562

5

considered is the fact that as I understand it, Ruben Moreno will be a witness in this case.  Do you intend to call him?

MS. ROSE:  No, Your Honor.

THE COURT:  What about with respect to the Lemon Grove murder, do you intend to call Juan Lara?

MS. ROSE:  We do, Your Honor.

THE COURT:  Very well.  Well, with respect to the Fairfax Street murder, I find that the statements of the various participating co-conspirators identifying the defendant as the shooter in interviews with law enforcement, although differing in detail, I find that there is substantial inter-corroboration to give the Court confidence that the statements bear sufficient indicia of trustworthiness so as to be admitted into evidence in the case.

I've considered the statements of the various participants, as well as the defendant's own statement implicating himself in the shooting, and providing details that were consistent with the statement of others, such as the type of car, the presence of crutches, the names of other participants, the number of victims, and the hand signs that were given, all of this is information provided to law enforcement by the defendant and consistent with particular details provided by the other participants in their hearsay statements to officers.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 192 of 485
Case 3:08-cr-00134-RJC Document 846   Filed 01/30/11   Page 192 of 485
**JA2563**

6

I note that the detective in the case gave sworn testimony subject to adversarial cross-examination regarding statements made against interest by the co-participants. And I find that a significant factor, as well as the ballistics match connecting the two shootings, the Fairfax Street murders and the Lemon Grove murder.

And the fact that the defendant was the only individual who was identified to be present at both of those murders.

And I also find that the defendant has the ability to bring out the inconsistencies in the prior statements in their cross-examination of the detective witness.

And so the Court finds, because of totality of the facts, that there is sufficient indicia of trustworthiness for the government to present this evidence.

With respect to the Lemon Grove murder, appears from the proffer of the government that there will be an eyewitness who will testify, subject to cross-examination. The defendant himself has made statements putting himself at the scene of that murder.

I believe the defense will have the opportunity to bring out any inconsistencies through cross-examination, and the ballistic matches connecting the two different shootings, and the defendant's prior statements, including the defendant's own statement putting him at both crime

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 193 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 01/30/17   Page 193 of 485
**JA2564**

7

scenes, I think is sufficient in terms of significant indicia of trustworthiness for the Court to permit that evidence.

I would note in my review of the evidence, that there appears to have been a tentative identification of the defendant as a shooter, by one of the victims named Gonzalez.

The Court finds that there is insufficient indicia of trustworthiness as to permit the presentation of testimony on that point. The witness Gonzalez appears to have been running away. The identification appeared to be tentative, was not made in its first interview, and the identification was only made several months afterwards.

And so for all those reasons, I do not believe that testimony bears the sufficient indicia of trustworthiness to be admitted.

Finally, with respect to the murder in El Salvador, it appears to the Court that that involves, to some degree, acquitted conduct. There appears to be a judicial finding of inconsistency in that case.

Does not appear to the Court to be any witness who will testify in this case who was an eyewitness to any of the events in El Salvador. The witnesses were anonymous.

The anonymous quality of the witnesses, goes to the lack of trustworthiness, but also to the unfair

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-6 Filed 03/23/17 Page 194 of 485
Case 3:08-cr-00134-RJC Document 546 Filed 01/30/11 Page 194 of 491
JA2565

8

prejudice to the defendant's ability to defend the case.

For all those reasons the Court will not permit the government to put on evidence of the alleged murder in El Salvador.

I will follow-up with a written order in this case, but I wanted to give the parties a heads up on where I was going. Mr. Foster?

MR. FOSTER: Your Honor, we would object to the ruling on the Fairfax Avenue murders. We had no knowledge any documents were submitted by the government that were under review by the Court. We don't know what those documents were.

THE COURT: Well, I'll let you review them afterwards. I indicated in your presence, that the Court (sic.) was to produce that evidence to me for my review. I also indicated that in the written order that I filed earlier today.

I will give you an opportunity to review that material overnight, and raise any issues you wish to raise in the morning.

MS. ROSE: And I would just, if I may Your Honor, for the record, everything presented to the Court was in discovery. As the Court probably noted, it had either scanned or Bate stamped numbers on everything that was presented. And there was nothing outside of what had been

Case 3:16-cv-00057-MOC-DSC Document 50-6 Filed 03/23/17 Page 195 of 485
Case 3:08-cr-00134-RJC Document 586 Filed 01/30/11 Page 195 of 491

**JA2566**

9

presented.

MR. FOSTER:  Still, we want to know what was presented to the Court.

THE COURT:  Very well.  What I suggest you do, Mr. Foster, is come with the government attorney at the end of the day, pick up the files and review them.  Then any objection you have after your review, I'll hear from you in the morning.

MR. NAZZARO:  Your Honor, just one other question on the Court's ruling.  With respect to the Lemon Grove, and I think you identified the witness, Carlos Dominguez.  But certainly if he testifies in person, that's permitted. That's not precluded by the Court's ruling?

THE COURT:  Correct.

MR. NAZZARO:  Okay.  Thank you.

MR. FOSTER:  Is that pertaining to Freddy Gonzales, is that who you meant?

MR. NAZZARO:  Yeah, Freddy.

MR. FOSTER:  Not sure who you're talking about.

MR. NAZZARO:  I think he has two different names. It's the person who picked him out of the lineup, I believe.

THE COURT:  Yeah.  Raise that with me before you call him.

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  We'll discuss that.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-6   Filed 03/23/17   Page 196 of 485
Case 3:08-cr-00134-RJC   Document 846   Filed 01/30/11   Page 196 of 485
JA2567

10

All right.  Are we ready for the jury?

MR. NAZZARO:  Yes, Your Honor.

MS. ROSE:  Yes, sir.

THE COURT:  Call the jury.

(The jury was returned to the courtroom at 4:51 p.m.)

THE COURT:  Members of the Jury, you have unanimously found Alejandro Umana guilty of murder in the aid of racketeering of Ruben Garcia Salinas and Manuel Garcia Salinas, and using a firearm in a crime of violence resulting in the murder of those two victims.

Accordingly, we will begin a new phase of the trial, the sentencing hearing.  As I told you when you were selected as jurors, the purpose of the sentencing hearing is to determine whether or not the defendant is to be sentenced to death or imprisoned for life without the possibility of release.

The decision whether or not to impose a death sentence, is left exclusively to you the jury, I would not be able to change it, you and you alone must resolve the question.

I will now instruct you as to the process you must follow.

I remind you that at the time you were selected as jurors, each of you assured the Court that if this case required a capital sentencing hearing, you would follow the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 197 of 485
Case 3:08-cr-00134-RJC   Document 502   Filed 03/26/11   Page 10 of 91
**JA2568**

11

law as I told you it applied.  It is imperative that you do that.

Although the law has left to you the decision whether the defendant should be executed, it has narrowed and channeled your discretion by requiring certain findings to be made before the death penalty is even considered.

Thus, you are not free to substitute your own views about circumstances that might warrant capital punishment for those specific ones chosen by the law.

On the other hand, you should clearly understand, that even if you make the findings provided for by law, no jury is ever required to impose the death penalty. Moreover, you may decline to impose a death sentence without giving any reason for that decision.

The sentencing hearing will be divided into two parts.  In the first part you will consider whether the government has proved beyond a reasonable doubt, that the defendant is eligible to be sentenced to death.

The law limits consideration of the death penalty to cases in which the government can prove beyond a reasonable doubt that the defendant was at least 18 years old at the time of the offense.  And in which the government can prove beyond a reasonable doubt the existence of certain factors drawn from two specific statutory categories.

You will have a verdict form to record your

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 198 of 485
Case 3:08-cr-00134-RJC  Document 596  Filed 03/26/11  Page 11 of 51
**JA2569**

12

findings about the factors.  Only if you are unanimously persuaded beyond a reasonable doubt that at least one factor from each of the two statutory categories has been proved, will we go to the second part of the capital sentencing hearing in which you will consider actually imposing the death penalty on the defendant.

In seeking to establish these factors, the government may rely on your recollection of certain evidence presented at trial and need not repeat it to you now.  The parties may, however, present further evidence at the sentencing hearing, specifically related to your consideration of these factors.

I direct that during the sentencing hearing you continue to observe all of the instructions about your own conduct as jurors that I gave to you earlier in the trial.

In the event you find that the government has proved beyond a reasonable doubt that the defendant is eligible to be sentenced to death, we will proceed to the next and final part of the sentencing hearing, after which you will decide whether the defendant is to be sentenced to death or imprisoned for life without the possibility of release.

In short, you will not be making that decision in this part, but only deciding whether the defendant is eligible for consideration of the death penalty.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 199 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 12 of 51
**JA2570**

13

I will now ask the attorneys to make opening statements to you.  I remind you that these statements and any other statements by the lawyers in the sentencing hearing are not evidence unless they are in the form of stipulation or agreement of the parties.

The government ready to make its opening statement?

MR. NAZZARO:  Yes, Your Honor.  Thank you.

May it please the Court, ladies and gentlemen of the jury.  As the Court just indicated, we're now at a different stage, a stage we discussed when you first came here several weeks ago, and it's called, as the Court referred to, as the eligibility phase.

As the Judge indicated it's a reasoned process. The Judge is going to give you additional legal instructions at the end of this phase, which we don't anticipate will take very long, as far as the presentation.

Does it mean you forget everything you've heard; absolutely not.  Everything you heard up to this point about the guilt phase, about the intentional killing of Ruben and Manuel is very relevant to the eligibility phase.  Because as the Judge indicated, you're going to have to find certain factors for each of the different counts against each of the different victims.

First of all, that is, we presented evidence

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 200 of 485
Case 3:08-cr-00134-RJC  Document 50-6   Filed 03/30/11   Page 13 of 91
JA2571

14

already through Jose Romero, that we're going to refresh your memory during this phase, that the defendant was born in 1984.

In addition, there's another list of factors which are called intentionality factors; whether or not it was an intentional killing, whether it was an intentional infliction of serious bodily injury.

The Judge will list these all for you to consider and check off whether he intentionally participated to take the life of another person or involve an act of violence. All intent.

Those are four different factors which we submit to you the evidence has shown have already been met. You just have to find one of them for the eligibility phase. We submit they already have been made.

The statutory aggravating factors as the Judge indicated to you, is another legal requirement in this phase of the process.

Whether or not this incident that occurred at the restaurant created a grave risk of death to more than one person; and whether it killed or attempted to kill more than one person in a single episode.

Now, obviously there's two victims, so there was more than one person. And there was testimony, you may recall, in one of the tapes where the defendant even

Laura Andersen, RMR 704-350-7493

**JA2572**

15

indicated that pow, pow, he hit the other guy.

Well, we will have a short presentation that there was in fact another person shot, shot in the shoulder. We're going to present some evidence about that. Also going to present some evidence about other potential individuals that were exposed to this in the restaurant on December 8, 2007.

So it's going to be very a focused and short presentation with two or three additional witnesses. And at the end of that, we will submit that there is sufficient evidence already before you to consider the Eligibility Phase has already been met. Only then, as the Judge indicated, do you go to the next phase to determine and select the appropriate penalty. That will be a different type of presentation at that juncture.

So thank you for your attention.

THE COURT: Mr. Foster.

MR. FOSTER: We waive opening, Your Honor.

THE COURT: Very well.

Call your first witness.

MS. ROSE: Thank you, Your Honor. Prior to doing so, the Government at this time would move to admit all evidence which was admitted in the first portion of this hearing for the Court and jury's consideration.

THE COURT: That will be admitted.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 202 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/26/11   Page 15 of 91
**JA2573**

DIRECT-SANCHEZ                    16

(All Government Exhibits previously admitted into evidence were received into evidence.)

THE COURT:  And Members of the Jury, I will remind you to use your own recollection as to that evidence.

Call your first witness.

MS. ROSE:  Ismar Sanchez.

THEREUPON, ISMAR SANCHEZ, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   If you would please, ma'am, state your name for the record.

A.   Ismar Sanchez.

Q.   And if you would spell your first name.

A.   I-S-M-A-R.

Q.   And do you live in the Greensboro/Winston-Salem area?

A.   Yes, ma'am.

Q.   Back in 2008, did your parents own a restaurant in Greensboro?

A.   Yes.

Q.   What was the name of that restaurant?

A.   Las Jarochitas Mexican Restaurant.

Q.   Do you recall when your parents bought the restaurant?

A.   It was the beginning of 2007.

Q.   Did you work in the restaurant with other family members?

A.   Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 203 of 485
Case 3:08-cr-00134-RJC   Document 500-6   Filed 03/20/11   Page 16 of 91
**JA2574**

DIRECT-SANCHEZ

Q.   Who else worked there?

A.   My parents, my brother, my aunt and me.

Q.   What was your position or your task whenever you were there at the restaurant?

A.   Waitress, hostess, cashier.

Q.   And your brother?

A.   He did a little bit of everything, about the same.

Q.   And what is your brother's name?

A.   Abel Santos.

Q.   Were you working on the evening of December the eighth, 2007?

A.   Yes.

Q.   When did you go to work on that particular day?

A.   It was late afternoon.  Probably around -- after 6 or so.

Q.   When you went to work, did you take anyone with you?

A.   My baby.

Q.   How old was your baby at the time?

A.   He was only a few months, about three, four months.

Q.   When you went into the restaurant that evening, where did you and your baby go?

A.   There's three sections, and we were at the right, in the right section, all the way in the back.  There's a booth all way in the back.

Q.   Was anyone else sitting at that booth or -- with you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 204 of 485
Case 3:08-cr-00154-RJC   Document 59-6   Filed 03/26/11   Page 17 of 51
JA2575

DIRECT-SANCHEZ

and your baby?

A.   Not really -- I mean, there was some waitresses that came and got up.  That was like the resting area, I guess.

Q.   All right.  I'm going to show you a photograph which has already been admitted as Government's Exhibit 86.  Are you able to see on your screen?

A.   Yes.

Q.   Do you recognize Government's Exhibit 86 or what's shown within that exhibit?

A.   Yeah.  That's where we were sitting.

Q.   In the last booth there is actually a baby carrier?

A.   Yes.  That's my baby's car seat.

Q.   There's some Santa Claus hats in the booths.

A.   Yes.

Q.   Did you bring those into the restaurant?

A.   My dad did.

Q.   And why did you have the Santa hats there?

A.   He had just bought them and he was giving them out to the waitresses.  He wanted them to wear it at a Christmas party we were going to have.  And he was giving them out. He gave some out to the Manuel.

Q.   And when you say Manuel, to whom are you referring?

A.   The victim.

Q.   Did you know Manuel?

A.   He was a regular customer.

Laura Andersen, RMR 704-350-7493

DIRECT-SANCHEZ

Q.    How frequently did he come into the restaurant?

MR. BRYSON:  Object.

THE COURT:  Sustained.

Q.    (By Ms. Rose) On this particular evening, did you -- did you begin working or were you just helping out in any particular place?  Did you have a specific task that evening?

A.    No, I was just helping out.

Q.    Did you observe words being exchanged between people in the restaurant?

A.    I mean -- yeah, yeah.

Q.    What did you see?

A.    I was -- I was at the register.  Somebody had -- a customer came in, he had a to go order.  When I saw one of the guys started -- or when he got up.

Q.    Where did you see the person that was standing up, where were they seated?

A.    They were in the center of the restaurant.

Q.    To the left or the right in the center portion?

A.    To the right from where I was -- to the right.

Q.    Was there a juke box?

A.    Yes.

Q.    In the restaurant at that time?

A.    Um-hmm.

Q.    When you heard words being exchanged, what did you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 206 of 485
Case 3:08-cv-00154-RJC   Document 50-6   Filed 03/23/11   Page 19 of 91
JA2577

DIRECT-SANCHEZ

observe?

A.   Well, they seemed that they were a little upset.

Q.   Who is they?

A.   The -- the second group, the MS 13 people.

Q.   Could you tell what they were upset about?

A.   No, I don't --

Q.   What did you observe?

A.   They were just exchanging words, I mean.

Q.   With whom?

A.   With Manuel's party.

Q.   What did you do?

A.   I was trying to call the waitresses to talk to them to try to distract them and, you know, break it up for whatever reason they were arguing.  But it didn't seem to work.

Q.   What happened?

A.   Um, they were just -- they kept exchanging words at each other.  And we tried to take the -- the MS 13 people out, but -- I mean, we got to a point where we took three out, but one of -- one of them stayed inside.

Q.   Describe as specifically how you went about getting, who you characterize as the MS 13 people outside?

A.   Well, me and the cook were -- I was just -- I was going to tell them that we have -- we didn't want any problems. We didn't want nothing to happen.  And I mean, they were -- three of them walked outside.  I walked outside with them.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 207 of 485
Case 3:08-cr-00134-RJC   Document 52   Filed 03/20/11   Page 20 of 91
JA2578

And then the cook locked the door, and one of them stayed inside.

Q.   Were you able to get back inside?

A.   Yes.  He opened the door back up.  I started banging, because the other people that were out there started getting upset.

Q.   And what happened when the door was opened?

A.   All -- well, I walked in and so did they.

Q.   How many were there?

A.   Three.

Q.   Now you referred to them as MS 13 people; why are you calling them that about --

A.   Well, in between the hassle, they kept shouting out that they were MS 13s.

Q.   When you came back into the restaurant, what happened?

A.   I tried to pull the other guy out, and then one of the other guys pulled me back, pushed me to the side and said not to touch him.  Um, a few seconds later he just, I don't know, pulled the gun out.

Q.   Describe what happened when the gun was pulled out?

A.   At the moment all I thought was about my baby.  I ran through the middle.  And when I turned to the first right, that's when I heard the first shot.

Q.   Where were Ruben and Manuel as you ran through the middle?

22
DIRECT-SANCHEZ

A.   They were on the right side, next to their table.

Q.   What were they doing at that moment?

A.   Um, they were just standing there.  They kept exchanging words.

Q.   Before you -- before the gun came out, before you ran, did you get to see the person who had the gun, who pulled out the gun?

A.   Yeah.

Q.   Do you see that person here today?

     MR. BRYSON:  Object.

     THE COURT:  Overruled.

     THE WITNESS:  Do I have to point him out?

Q.   (By Ms. Rose) If you see that person.

A.   I think it's him.

Q.   And -- are you okay?

A.   Yeah.

Q.   Okay.  Which person are you referring?  Describe what that person is wearing?

A.   A blue shirt.

Q.   At which table?

A.   To my left.

     MS. ROSE:  If the record would reflect the identification of the defendant?

     THE COURT:  It will.

Q.   (By Ms. Rose) What particularly did you remember about

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 209 of 485
Case 3:08-cr-00154-RJC   Document 50-6   Filed 03/30/11   Page 22 of 51
JA2580

DIRECT-SANCHEZ

the defendant?

A.   I just -- I remember his red eyes.  He had tattoos on his eyelids.  He was wearing a hoody and a hat, and some baggy jeans.

Q.   When the gun came out, what if anything was the defendant saying?

A.   I just remember -- I don't remember exactly what he was saying at the moment, but I know they kept shouting out MS 13.

Q.   As you went, you said you -- when you saw the gun, you ran through the center of the restaurant?

A.   Yes.

Q.   How far through the center of the restaurant were you before you heard the first shot?

A.   I was turning into, I mean, there was like little walls like this (indicating), and I was turning to the right to get my baby.

        MS. ROSE:  I'm going to show you what's been previously admitted as Government Exhibit 76.

        THE COURT:  Seventy-six?

        MS. ROSE:  Seventy-six.

        THE COURT:  Ma'am, you can raise and lower that screen if it will help you see it better.

Q.   (By Ms. Rose) Where were you standing when you saw the defendant pull out the gun?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 210 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/30/11   Page 23 of 91
**JA2581**

DIRECT-SANCHEZ

A.    In front of the door.

Q.    I'm sorry?

A.    In front of the door.

Q.    In the perspective of Exhibit 76, in the photograph, you can mark on the screen the direction you ran and where you went?

A.    Through the center.

Q.    And when you got to the back of the restaurant, which way did you go?

A.    There (indicating).

Q.    And on the other side of that half wall, what is there?

A.    Restrooms.

Q.    Pardon?

A.    Through -- through that side, they were going like going through the other section, and through the restroom -- to the restrooms.

Q.    Okay.  Where was your baby?

A.    He was on the left.

Q.    Where did -- were you able to get to your baby after the firing began?

A.    Yes.

Q.    How many shots did you hear?

A.    I heard about two shots -- two to three shots.  I was running out.

Q.    Where did you run?

Laura Andersen, RMR 704-350-7493

JA2582

DIRECT-SANCHEZ

A.    Through the back -- through the kitchen, then through the back door.

Q.    Was anyone else there at the back door when you got there?

A.    Well, there was a lot of people running out through there, the waitresses, the cooks.

Q.    When you got outside, what did you do?

A.    I hid behind the dumpster.

Q.    Did you see anything else?

A.    I saw two guys run out the right side.

Q.    Did they say anything or did you notice anything at that point?

        MR. BRYSON:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  They were just running.

Q.    (By Ms. Rose) After that, what did you do where did you go?

A.    Then my brother came out running through the back door and he handed me the phone he was talking to -- to the police.

Q.    Did you go back into the restaurant on that particular evening?

A.    I did to just close the blinds.

        MS. ROSE:  All right.  Thank you.  I don't have any other questions.

                    Laura Andersen, RMR 704-350-7493

**JA2583**

DIRECT—SANCHEZ

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS—EXAMINATION BY MR. BRYSON:

Q.   Ms. Sanchez, the evening this happened, you did speak with the police, correct?

A.   Yes.

Q.   This is the Greensboro Police Department, correct?

A.   Yes.

Q.   And you knew you were being interviewed by police officers, correct?

A.   After they got there -- yes.

Q.   Yes.  I mean, they had uniforms, you knew you were speaking to police officers?

A.   Um-hmm.

Q.   And you knew you were providing information about a very serious offense, correct?

A.   Okay.

Q.   And you knew that the information that you were providing would be used in the investigation, correct?

A.   Yes.

Q.   All right.  And they asked you to provide a description of the person that you described as the shooter, didn't they?

A.   Yes.

Q.   And at that time, the events were very fresh in your

Laura Andersen, RMR 704-350-7493

**JA2584**

CROSS-BRYSON

27

mind, correct?

A.    Um-hmm.

Q.    And you were doing your best to cooperate with the police, correct?

A.    Yes.

Q.    Okay.  At that time when you gave the description to the Greensboro police officers, the day this happened, you didn't say anything about the person having tattoos on their eyelids, did you?

A.    I don't remember.

Q.    Okay.  If I showed you a copy of a Greensboro police report, would that help you refresh your memory?

A.    It might.  I mean, it depends on how long and I've just been trying to forget about this.

Q.    Okay.  But you -- would you take a look at the screen in front of you and see if that doesn't look like part of what you were talking to the police about.  Where I put the line there, those two paragraphs.

A.    Okay.

Q.    Okay.  Does that refresh your recollection?

A.    A little.

Q.    Okay.  And so my question is, when you spoke with the Greensboro police that night, you didn't say anything about the shooter having had tattoos on his eyelids; is that correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 214 of 485
Case 3:08-cv-00134-RJC   Document 50-6   Filed 03/26/11   Page 27 of 51
JA2585

CROSS-BRYSON

A.   Probably, I mean, I was -- I was really nervous, I was --

Q.   Okay.  You described the shooter as having a skinny build, correct?

A.   I mean, he was wearing loose clothes, very loose clothes.

Q.   Okay.  And he had a hat on with a 13 on the front, correct?

A.   I remember the hat.

Q.   Okay.  And you said that he had his sleeves pushed up and had tattoos of 13 on his arms?

A.   I just remember he had a hoody on.

Q.   Okay.  My question is, do you remember telling the police the night that you were interviewed that the shooter had his sleeves pushed up and had tattoos of 13s on his arms?

A.   I don't remember.

Q.   You don't remember.  Okay.  Now, later you also gave testimony to the Grand Jury about this case, correct?

A.   Yes.

Q.   And you were also asked at your appearance before the Grand Jury to provide a description of the shooter; is that correct?

A.   Yes.

Q.   And do you remember telling the Grand Jury that you

Laura Andersen, RMR 704-350-7493

**JA2586**

never saw his face?

A.   I saw his face.  I just -- I mean, I can't remember his facial -- I just remember -- the hat, his red eyes.  The -- the tattoos on his eyelids.

Q.   All right.  Here's my question.  When you testified in front of the Grand Jury, didn't you tell him that you never saw his face?

A.   It was the glass -- it's when I was trying to get the -- the -- trying to calm the guys down.  He was -- I mean, I remember --

Q.   Okay.

A.   I just remember his eyes.

Q.   I'm not asking what happened.  Okay.  Here's my question:  My question is, when you spoke with the Grand Jury, in providing a description to the Grand Jury, didn't you tell them that you never saw the shooter's face?

A.   I don't remember.

     MS. ROSE:  Objection; that's a misstatement, at least of what's on the screen.

     THE COURT:  Overruled.

Q.   (By Mr. Bryson) Okay.  I'm sorry.  Did you tell the Grand Jury that you never saw his face?

A.   I don't remember.

Q.   You don't remember?

A.   (Shaking head.)

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 216 of 485
Case 3:08-cr-00134-RJC  Document 50-6  Filed 03/23/11  Page 29 of 91
JA2587

CROSS-BRYSON

Q.   If I showed you a copy of the -- if I showed you a copy of part of your Grand Jury testimony, would that help you refresh your memory?

A.   It might.

Q.   Okay.  Would you take a look at that and see if that doesn't look like your testimony from the Grand Jury?

Okay.  Does that refresh your recollection?

A.   Yes, a little.

Q.   So my original question is, didn't you tell the Grand Jury that you never saw the shooter's face?

A.   Yeah, I -- I guess I did.  But when they were arguing -- and when I was trying to calm them down I -- I do remember cause he -- I mean, he was just -- he wasn't saying anything.  He didn't say nothing at all when the whole argument was going on when they were in the center.  But I do remember his eyes.

Q.   On April 1st, do you remember speaking with an investigator about this case?

A.   Yeah.

Q.   And you did talk to him about what happened, correct?

A.   Yes.

Q.   All right.  And you told him that you didn't really remember a lot of what happened at the restaurant, isn't that correct?

A.   Um-hmm.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 217 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 30 of 91
JA2588

Q.   And you told him that the FBI agent named Brad had talked to you about the facts of the case; is that correct?

A.   Yes.

Q.   And that he may have suggested to you that the shooter had tattoos on his eyelids; is that correct?

A.   I don't know.  I really didn't want to speak to that investigator.  I tried to keep it as short as I could.

Q.   But didn't you tell him you couldn't remember where he had tattoos, or if he had them on his eyelids or the bridge of his nose?

A.   On his arms.  I mean, there's a lot of stuff like --

Q.   Just before the shooting, there was one of the members with the MS 13 group that was trying to stop the argument; isn't that correct?

A.   Yes, one of the shorter guys.

Q.   Okay.  And he shout out, "no, Spider, no", correct?

A.   Yes.

Q.   And he said something about, there are families in the restaurant, correct?

A.   I believe so.

Q.   And that's why he was trying to stop the fight, correct?

A.   Yes.  The two shorter guys were trying to -- to stop the fight.

          MR. BRYSON:  Those are my questions.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 218 of 485
Case 3:08-cr-00134-RJC   Document 506   Filed 03/30/11   Page 31 of 91
**JA2589**

THE COURT:  Any redirect?

REDIRECT EXAMINATION BY MS. ROSE:

Q.   Who was it that -- you testified earlier that someone grabbed your arm as you tried to get the defendant to leave and said, don't touch him, nobody touches him?

A.   The one they call Spider.

Q.   That's the person that spoke to you as you were trying to pull the defendant out?

A.   The one that pushed me to the side and said not to touch him.

        MS. ROSE:  Thank you.  No other questions.

        THE COURT:  You may step down, be excused.

        Call your next witness.

        MR. NAZZARO:  Captain Henderson.

THEREUPON, DAVID HENDERSON, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good afternoon.  Can you please state your name, sir?

A.   I'm David Wayne Henderson.  I'm a captain with Greensboro Fire Department.

Q.   Captain Henderson, how long have you been with the Greensboro fire department?

A.   Twenty-eight years.

Q.   Do you work out of a particular station in Greensboro, particular location?

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 219 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 32 of 91
JA2590

DIRECT-HENDERSON

A.    Yes, sir.  I'm assigned to Station 8.

Q.    Where is that station?

A.    2201 Coliseum Boulevard.

Q.    I want to direct your attention to December 8, 2007, were you working with the fire department on that day?

A.    Yes, sir.

Q.    And which firehouse were you working out of on that particular occasion?

A.    Station 10.

Q.    Where is that located?

A.    High Point Road.

Q.    And did you have an occasion to respond to a call that evening?

A.    Yes, sir.

Q.    And do you recall what time you responded?

A.    It was -- the call come in at 19:37 for us.

Q.    And where did you go after that call came in?

A.    We responded to 3738 High Point Road.

Q.    Okay.

A.    On a medical call.

Q.    And what was located at that particular location?

A.    It's a possible shooting.

Q.    And what time did you arrive there?

A.    19:39.

Q.    You were very close to the area?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 220 of 485
Case 3:08-cr-00134-RJC  Document 506-1  Filed 03/26/11  Page 33 of 91
JA2591

34
DIRECT-HENDERSON

A.   We were within three or four blocks of the station.

Q.   And that's where -- is there a restaurant there, Las Jarochitas?

A.   Yes, sir.

Q.   And when you responded at that time, what did you do, what was your role?

A.   Our protocol is to standby on any type of police assistance.  And we staged out in the middle of High Point Road which is the main thoroughfare there.

Q.   And at some point after you responded, did you become involved in treating any injured individuals?

A.   Yes, sir.  We had -- once we got clearance from the police department to come in, we -- they told us that there was a subject that had been injured, and was sitting in the parking lot near the front of the building.  So we proceeded to him.  And he had -- was injured to his right shoulder.

Q.   Okay.  And did other firemen proceed inside the restaurant --

A.   Yes, sir.

Q.   -- to treat the other victims?

A.   Yes, sir.

Q.   Okay.  I want to focus on the person, the right shoulder.  Could you tell us were you involved in that treatment then and that care?

A.   I was the instant command on that particular call

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 221 of 485
Case 3:08-cr-00134-RJC   Document 556   Filed 03/26/11   Page 34 of 91
JA2592

DIRECT-HENDERSON

because we had a second company there also.

Q.    Now with respect to the shoulder, could you talk about that individual and what treatment?

A.    Okay.  We -- myself and another firefighter walked to the patient -- or the subject.  And he -- we had found that he had bleeding coming from the right shoulder from an injury.  And so we proceeded in bandaging for the injury. And we couldn't do anything for his pain, but we could bandage for bleeding.

Q.    Were you able to determine the source of that injury, how he received that injury?

MR. FOSTER:  Objection; calls for hearsay and confrontation clause.

THE COURT:  Sustained.

Q.    (By Mr. Nazzaro) Was -- with respect to the injury -- you provided medical attention; is that right -- to him?

A.    Yes, sir.

Q.    In anticipation of that, were you able to determine the nature of the wound?

A.    Appeared to be a gunshot wound.

Q.    And with respect to that wound, is that the one then that you -- that was bleeding?

A.    Yes, sir.

Q.    And you bandaged it up?

A.    Yes, sir.

Laura Andersen, RMR 704-350-7493

**JA2593**

DIRECT-HENDERSON

Q.    Were you able to observe if the person appeared to be in any pain or --

A.    Yes, sir.

Q.    He did appear to be in pain?

A.    Yes, sir.

Q.    I would like to show you what's been previously marked as Exhibit 501.  Are you able to identify Exhibit 501?

A.    Yes, sir.

Q.    I believe it's labeled on the screen as S-1, but we labeled it as 501.  How do you recognize that picture?

A.    From the bandages we put on him and the clothes --

Q.    Is this --

A.    -- the clothes we had on.

        MR. NAZZARO:  Your Honor, I would move this is as Government 501?

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit 501 was received into evidence.)

Q.    (By Mr. Nazzaro) Do your records reflect the name of this individual?

        MR. FOSTER:  Objection; hearsay and confrontation clause.

        THE COURT:  Overruled.

        THE WITNESS:  Do I say a name?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 223 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 36 of 91
**JA2594**

DIRECT-HENDERSON

THE COURT:  Yes.  You may answer the question.

THE WITNESS:  Thank you.  Jorge Martinez.  This is what I got off of a identification card.

THE COURT:  No.  Hang on a second.  Listen to the question and answer it.

THE WITNESS:  I'm sorry.

Q.   (By Mr. Nazzaro) The name Jorge Martinez is the person that's in the photograph here?

A.   Yes, sir.

Q.   After you provided your aid to this Mr. Martinez, what did you do next?

A.   Ambulance service, Guilford County EMS, we assisted them with loading the patient for transport.  They took care or -- priority over the medical part, and once there on the scene, they transported him to the hospital.

MR. NAZZARO:  No further questions.

THE COURT:  Any cross?

MR. FOSTER:  One moment please, Your Honor.

We have no questions, Your Honor.

THE COURT:  You may step down and be caused.

Call your next witness.

THE WITNESS:  Thank you.

MS. ROSE:  Carlton Phoenix.

Laura Andersen, RMR 704-350-7493

**JA2595**

DIRECT-PHOENIX

38

THEREUPON, CARLTON PHOENIX, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   If you would please, sir, state your name.

A.   W.C. Phoenix.

Q.   Where are you employed?

A.   Greensboro Police Department.

Q.   How long have you been at the police department?

A.   A little over 13 years.

Q.   What is your position there?

A.   I am a forensic specialist.

Q.   What does that mean?

A.   I do CSI work for high profiled cases.

Q.   Did -- were you working on the evening of December the

eighth, 2007?

A.   Yes, I was.

Q.   Where did -- were you called out to service on that

particular evening?

A.   Yes, ma'am.

Q.   Where did you go?

A.   The address on High Point Road, 3738-A.

Q.   And what was at that address?

A.   A Mexican restaurant.

Q.   When you got to the restaurant, what were your duties

at that time?

A.   I was the second CSI to respond.  I was requested to go

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 225 of 485
Case 3:08-cr-00154-RJC   Document 50-6   Filed 03/20/11   Page 38 of 91

JA2596

in and take a cursory look around, try to determine if the victims had tattoos.

And also specifically requested to look for evidence, ballistic evidence, to determine what type or what caliber weapon was used at that incident.

Q. Did the victims have any -- why were you looking for tattoos?

A. I think the original --

MR. FOSTER: Objection.

THE COURT: Overruled.

THE WITNESS: The original suspicion was that --

MR. FOSTER: Objection.

THE WITNESS: It was A gang retaliation or a gang shooting.

THE COURT: Overruled.

Q. (By Ms. Rose) And did the victims have any tattoos?

MR. FOSTER: Objection; irrelevant.

THE COURT: Overruled.

THE WITNESS: There were no tattoos visible.

Q. (By Ms. Rose) Did you, while there at the crime scene, assist Officer Dutko, Officer Ketner?

A. Yes, I did.

Q. Did you quick draw a diagram of the restaurant?

A. Yes, I did.

Q. Show you what has been marked as Government's 502. See

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 226 of 485
Case 3:08-cr-00134-RJC Document 526 Filed 03/30/11 Page 39 of 91
JA2597

the exhibit there in front of you?

A.    Yes.

Q.    What is shown in S2, Government's S2?

A.    This is a sketch or a computer-aided diagram of the restaurant.  The actual floor plan layout as I saw it that night.

Q.    And is that a -- fairly and accurately represent the layout of the restaurant and what you observed that evenings?

A.    Yes, it does.

MS. ROSE:  I move to admit S2, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 502 was received into evidence.)

MS. ROSE:  See if I can make this a little bigger here.

Officer Phoenix, if you would just orient -- orient us to the entrance to the restaurant.  And you can touch the screen.

A.    The -- that's the entrance at the bottom of the page.

Q.    (By Ms. Rose) And did you note a number of items of evidence on this particular diagram, Government's 502

A.    Yes, I did.

Q.    What did you note?

JA2598

DIRECT-PHOENIX

A.   There were five shell casings, or cartridge cases; four of which were on the right hand side as you went into the door, fairly close to the bottom right hand corner of the building.  One toward the center section of the tables and then there was a bullet that was located on the left hand side of the center seating section.

Q.   And on your diagram, is it correct that where you have S/C that represents shell casing?

A.   Yes, ma'am.

Q.   There also are some dots drawn on the diagram.  What's the significance of the dots?

A.   The dots actually indicate the trajectory of two bullet holes that passed through several walls in the building.

Q.   Is it fair to say that you worked backwards from the bullet holes toward the door?

A.   Yes, that's correct.

Q.   Where did you note areas -- I guess you have it labeled as B1 and B2?

A.   Yes, ma'am.

Q.   B1; how did B1 travel through the restaurant?

          MR. FOSTER:  Objection; lack of foundation.

          THE COURT:  Overruled.

          THE WITNESS:  B1 was a bullet hole that passed through that center wall at the they backside of the seating area, through several walls and ended up hitting a metal

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 228 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 41 of 91
JA2599

DIRECT-PHOENIX

backsplash plate behind the cooking area.  The trajectory of which, if you worked backwards, went to an imaginary spot in the restaurant somewhere near the front door.

Q.   (By Ms. Rose) Why did you decide it was near the front door; what evidence lead you to that conclusion?

A.   The trajectory would have been anywhere along that imaginary line.  The difference being, the shell casing location on the right hand side of the building, would indicate that they were injected up and back to the right.

But it's an imaginary line.  That point of actual firing the weapon, could have been anywhere on that line.

Q.   And reference the line that you have marked as B2?

A.   The same thing, we worked backwards.  B2 is a bullet hole that passed through a cooler, through a couple more walls and actually was found lodged in a corner of the lady's bathroom.

Q.   Were you able to recover the bullet which you had marked as B1, the one that hit in the kitchen?

A.   No, ma'am.  The bullet actually struck the back of the metal plate that was on the back of the stove.  It dented it so obviously it couldn't go any further.  That bullet fell down inside the wall and we did not recover that.

Q.   And regarding B2, were you able to recover that bullet?

A.   Yes, ma'am.

Q.   And did you recover any other bullets in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 229 of 485
Case 3:08-cr-00134-RJC   Document 862   Filed 01/20/11   Page 42 of 91
JA2600

DIRECT-PHOENIX

restaurant?

A.   The bullet marked number seven, that was the only --
the third bullet we found.

Q.   You had five shell casings, three known bullets at that
point?

A.   That's correct.

Q.   Were there -- when you got to the restaurant, were any
workers still there?

A.   Yes, ma'am.

Q.   Were they -- where were they located?

A.   They were outside.  The restaurant had been cleared of
the workers, but they were still present.

            THE COURT:  Any cross?

            MR. FOSTER:  No questions, Your Honor.

            THE COURT:  You may step down and be excused.
Call your next witness.

            MS. ROSE:  The Government would move to admit what
has been marked as Government's 503, Your Honor.  It is the
transcript testimony of Jose Romero from the earlier
proceeding in this case, relative to his testimony in the
defendant's birth date.

            THE COURT:  Any objection?

            MR. FOSTER:  What is -- it that's from this trial?

            THE COURT:  Yes.  Jose Romero.

            MR. FOSTER:  I thought that was already admitted,

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 230 of 485
Case 3:08-cr-00134-RJC   Document 360   Filed 03/26/11   Page 43 of 91
JA2601

DIRECT-PHOENIX

but no objection.

THE COURT:  Let it be admitted.

(Government Exhibit 503 was received into evidence.)

MS. ROSE:  And if I may publish just a portion of that, Your Honor.

THE COURT:  You may.

MS. ROSE:  Nothing further, Your Honor, at this time.

THE COURT:  Very well.

MS. ROSE:  That's the Government's evidence.

THE COURT:  The defendant wish to put on evidence at this time?

MR. FOSTER:  No, Your Honor.

THE COURT:  Very well.

Members of the Jury, I am now going to give you instructions regarding the law which you are to follow when determining whether Alejandro Umana is eligible for the death penalty.  Will also send an electronic copy of these instructions with you to the jury room.

You are to base your decision only upon the law as I give it to you, regardless of any opinion you may have as to what the law should be.

While the lawyers may have properly commented during the hearing on some of these rules, you are to be guided only by what I say about them.  You must follow all

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 231 of 485
Case 3:08-cr-00134-RJC  Document 286  Filed 03/26/11  Page 44 of 91
**JA2602**

the rules as I explain them to you.  You may not follow some and ignore others.  I remind you of your oath as jurors not to base your verdict on any view of the law other than given to you in these instructions.

Some of the legal principles that you must apply during the sentencing phase, duplicate those you've followed in reaching your verdict as to guilt or innocence.  For example, you should follow my earlier instructions to you regarding the types of evidence in the case, and the weight to be given direct and circumstantial evidence, and how to determine the credibility of witnesses.

Some of the legal rules applicable to your decision today will be different from my previous instructions.  I prepared the following instructions to ensure that you are clear in your duties at this stage of the case.  And the same instructions apply to each of counts 22, 23, 24 and 25.

You should consider each count and the conduct relating to each separately.  You will have a special verdict form for each count on which to record your findings.

These are some general instructions that I wanted to give to you to guide your participation in the trial.

May I see the attorneys at side bar.

(Bench conference as follows:)

Laura Andersen, RMR 704-350-7493

**JA2603**

46
DIRECT-PHOENIX

THE COURT:  Does either side wish to close?

MS. ROSE:  No, Your Honor.

MR. FOSTER:  We don't.

THE COURT:  The government doesn't?

MS. ROSE:  No.

THE COURT:  Then I will give the substantive instructions at this time.

(The bench conference was concluded.)

THE COURT:  To find the defendant eligible for a sentence of death, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

One, the defendant was at least 18 years old when the capital offenses were committed.

Two, the defendant acted with a level of intent, sufficient to allow consideration of the death penalty.

And three, the existence of at least one statutory aggravating factor.

Aggravating factors reflect circumstances that tend to support imposition of the death penalty.  If you find that any one or more of these three eligibility conditions has not been proved beyond a reasonable doubt by the government, the defendant is not eligible for a sentence of death and your deliberations are over.

If you find that the government has proved beyond a reasonable doubt that all of these conditions are

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 233 of 485
Case 3:08-cr-00134-RJC  Document 866  Filed 03/28/11   Page 46 of 51
JA2604

DIRECT-PHOENIX

satisfied, the defendant is eligible for a death sentence.

First, you must determine whether the defendant was at least 18 years old when he killed Ruben Garcia Salinas and Manuel Garcia Salinas.

Next, you must determine whether the government has proved beyond a reasonable doubt that in committing the offense, the defendant committed at least one of the following acts:

A:  He intentionally killed the victim.

B:  He intentionally inflicted serious bodily injury that resulted in the death of the victim.

C:  He intentionally participated in an act contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act.

Or D:  He intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act.

These alternative acts are set out in section two of the special verdict form.

And you must consider and resolve them separately.

Laura Andersen, RMR 704-350-7493

48
DIRECT-PHOENIX

If you answer "yes", unanimously, to one of the alternative acts, stop your deliberations for this section and proceed to the next step in your deliberations.

If you answer "no" to all four alternatives, your deliberations are over.

Your next task is to consider the statutory aggravating factors.  You must determine whether the government has proved beyond a reasonable doubt that at least one of the following -- at least one of the following aggravating factors prescribed by Congress, and alleged by the government in this case.

A:  The defendant in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to the victim of the offense.

And B:  The defendant killed and attempted to kill more than one person in a single criminal episode.

The statutory aggravating factors are set out in section three of the special verdict form, and you must consider and resolve them separately for each count.

To answer "yes" on either statutory aggravating factor or both, your decision must be unanimous.

If you answer "no" on both statutory aggravating factors, your deliberations are over.

In considering whether the defendant is eligible for the death penalty, you shall not consider the race,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 235 of 485
Case 3:08-cr-00134-RJC   Document 586   Filed 03/30/11   Page 48 of 91
**JA2606**

color, religious beliefs, national origin or gender of the defendant or of any victim.

You are not to find the defendant eligible for the death penalty unless you conclude that you would do so no matter what the race, color, religious beliefs, national origin, or gender of the defendant or victim may be.

Whatever decision you reach, each of you is required by law to sign a certification attesting to the fact that you followed this instruction.

The certification is set out in section four of the special verdict form.

As I did in the guilt phase of the trial, I'm going to ask the jurors, 179, 127, 22 and 89 to step aside, and I'll ask the remaining jurors to retire to the jury room to begin your deliberations.

(The jury was escorted from the courtroom at 5:48 p.m.)

THE COURT:  You all may take a seat again for a brief moment.

I thank you for responding so quickly to our call to come back to court.  I thank you for participating in the first part of the sentencing phase.  I'm going to ask you to -- we're going to take you to another room, and ask you to remain there until we give you further instructions.

There are 12 jurors that were capable of sitting and deciding the first phase of the sentencing hearing, and

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 236 of 485
Case 3:08-cr-00134-RJC   Document 1860   Filed 03/28/11   Page 49 of 91
JA2607

DIRECT-PHOENIX

depending upon what their resolution of certain issues are, we may or may not use your services again.

So at this time, Madam Clerk, if you would take jurors 179, 127, 22 and 89 to a separate room in the courthouse at this time. Thank you.

(The alternates were escorted from the courtroom.)

THE COURT: And we'll stand in recess until further notice.

MS. ROSE: Prior to the adjourning, may I ask the Court at this time to remove the firewall which is in place, relative to the mental health evidence that may or may not be presented by the defendant. We have been, as you know, walled off from that information and at this stage would ask that that firewall be removed.

THE COURT: Any objection?

MR. BRYSON: No.

THE COURT: Very well. The Court will so order.

(The Court stood at ease at 5:51 p.m. waiting for a response from the Jury.)

(Jury knocks at 5:55 p.m.)

THE COURT: I don't know that we need the defendant out. I'll just state their question, you can tell me. "We desire to quit for the night."

So I propose to let them go and starting back at 9:30 in the morning.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 237 of 485
Case 3:08-cr-00134-RJC  Document 1860  Filed 03/26/11  Page 50 of 91
JA2608

51

DIRECT-PHOENIX

Tell them they're done for the evening.

(A evening recess was taken in the proceedings at 5:56 p.m.)

                    *  *  *  *  *  *
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

         I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

         Dated this the 6th day of March, 2010.


                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 238 of 485
Case 3:08-cr-00134-RJC  Document 286   Filed 03/30/11   Page 51 of 51
JA2609

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA          )DOCKET NO. 3:08-CR-134-2
                                  )
                                  )
     vs.                          )VOLUME II-A
                                  )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____   )



TRANSCRIPT OF ELIGIBILITY/SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 20, 2010

APPEARANCES:

On Behalf of the Government:
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204




LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 239 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 01/30/11   Page 1 of 95
JA2610

71

I N D E X

GOVERNMENT'S WITNESSES:

    THOMAS SMALL
        Direct Examination by Mr. Nazzaro          90
        Cross-Examination by Mr. Foster           116

    ROBERTO RAMOS
        Direct Examination by Mr. Nazzaro         119
        Cross-Examination by Mr. Bryson           133

    JUAN LARA
        Direct Examination by Mr. Nazzaro         138
        Cross-Examination by Mr. Bryson           145

    RAFFI DJABOURIAN
        Direct Examination by Mr. Nazzaro         148
        Cross-Examination by Mr. Foster           154

    JOHN MALONEY
        Direct Examination by Ms. Rose            155
        Cross-Examination by Mr. Foster           163

                 *  *  *  *  *  *

                E X H I B I T S

GOVERNMENT'S EXHIBITS:
NO.                                              RECEIVED
509  ...........................................  160
510  ...........................................  159
531  ...........................................  113
532  ...........................................  98
533  ...........................................  98
534  ...........................................  132
535  ...........................................  102
536  ...........................................  104
536a ...........................................  104
536b ...........................................  131
536c ...........................................  103
541  ...........................................  150
                 *  *  *  *  *  *
INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

DUE TO PREVIOUSLY PRODUCED EXCERPTS, THERE IS A DIFFERENCE IN
PAGE NUMBERS FROM THE PRIOR VOLUME.  THERE ARE NO PROCEEDINGS
OR PAGES MISSING; JUST A PAGE NUMBERING ERROR.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-DSC Document 50-6   Filed 03/23/17   Page 240 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 01/30/11   Page 240 of 95
JA2611

72

P R O C E E D I N G S

APRIL 20, 2010.  A.M. SESSION.

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning.

THE COURT:  The jurors are together and begun deliberation.  And I just wanted to ask if there was anything we need to discuss at the outset of the day, any issues from either side?

MR. FOSTER:  I filed a Motion in Limine regarding portions of the preliminary hearing transcript from the California case, Your Honor.  I don't know if you saw that yet.  I just filed it about an hour ago.

THE COURT:  All right.  Go ahead and briefly tell me what that is.

MR. FOSTER:  I assume the government tends to offer the entire transcript.  It is listed on their new amended exhibit list.  There are portions in that preliminary hearing transcript that I would submit should be excluded under Section 3593(c) as having its probative value outweighed by the prejudice and misleading and confusing the jury.  The sections are five different sections --

THE COURT:  Before you get into that.  Do you all intend to introduce a transcript of the hearing?

MS. ROSE:  We do, Your Honor.  And as to -- there are five sections that the defense has proposed be redacted.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-6   Filed 03/23/17   Page 241 of 485
Case 3:08-cr-00134-RJC Document 834   Filed 01/30/11   Page 3 of 95
JA2612

73

The government would concur that Section C, based on a question that one of the attorneys asked the witness, that he assumed something.  The other one references El Salvador.  And the other one gives some testimony about the gang-related nature of the murders, opinion testimony.  The government has no objection to redacting that portion.

The other two relate to one of the witnesses saying that he was afraid of Wizard.  That he heard about Wizard and his reputation.

THE COURT:  Which witness was that?

MS. ROSE:  This is when they were questioning the detective regarding his interview of Luis Rivera.  And the question in the transcript is:

"Did he tell you also that he was afraid of the Wizard, that he heard about the Wizard and his reputation?

"A   Yes.

"Q   Mr. Rivera, when he was talking to you during this taped conversation, he told you that he knew and had heard about the Wizard and had heard his reputation that he was the killer?

Q.   Yes.

"Q   Personally, he himself was afraid of him?

Q.   Yes."

Those two sections, the government would submit, are probative.  It goes -- it ties in with other statements

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 242 of 485
Case 3:08-cr-00134-RJC  Document 864   Filed 01/30/11   Page 4 of 95
JA2613

74

made that the government would offer those entire recordings.

THE COURT: Do you intend to call this detective as a witness in the case?

MS. ROSE: I do, Your Honor.

THE COURT: So, as to the part of his examination, you would be asking him what Rivera and other witnesses said to him about the defendant?

MS. ROSE: Yes, Your Honor.

THE COURT: And so what would be the purpose of offering the transcript, which is just a recapitulation of what the witness had told the detective?

MS. ROSE: Right. And frankly, the transcript has other witness testimony in it that the government would submit is pertinent. And if the Court would want us to remove anything that is cumulative, that is Detective Parshall's testimony at that hearing, certainly the government will be glad to do that.

THE COURT: You know, I can see it coming up in cross, as in terms of impeachment, and perhaps then being relevant on redirect, in terms of completeness. But in terms of cumulative, I would see it as cumulative on your direct examination.

And so, seems to me that the Parshall's -- Parshall, is that the correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-DSC Document 50-6 Filed 03/23/17 Page 243 of 485
Case 3:08-cr-00134-RJC Document 50-6 Filed 01/30/11 Page 3 of 95
JA2614

75

MS. ROSE: Correct.

THE COURT: He's here testifying. And that testimony is what is probative to the jury. And so I'd be inclined not to let you put in the transcript on Parshall, unless a need arose to, as a result of cross examination.

MS. ROSE: And let me ask the Court, the government is -- plans to move the statements, each of these witnesses made during their interviews, both detective Parshalls and Telis who conducted the interviews will be here. Maybe parts of that will be published to the jury during that testimony. But as Your Honor has seen, they are very, very lengthy interviews. And it would seem to me, if they have been -- if the Court allows us to admit them as evidence, that the jury at some point should they wish to read the entire transcript, it would be in evidence.

I just didn't want to publish two or three pages relative to questioning, and then the Court say, well that's all the jury gets to see. Because the entire transcript we would move in the testimony --

THE COURT: So we're off the transcript now, and we're talking about reports of interview by the agents or recorded interviews?

MS. ROSE: The recorded. And we have provided the transcripts. The Court reviewed those. Obviously the defense has them. That's the complete statements of those

Laura Andersen, RMR 704-350-7493

JA2615

76

witnesses.

THE COURT:  Before we go there, the government's clear on the Court's ruling on the preliminary hearing transcripts?

MS. ROSE:  Yes.  We will remove Detective Parshall's testimony.  We will --

THE COURT:  Does that cure your objection on that?

MS. ROSE:  And also Detective Flores.

MR. FOSTER:  I think -- I think that would take care of everything, yes.

THE COURT:  All right.  Now, on the witness statements.  Does the defense object to the introduction of the recorded interviews, with these non-testifying witnesses?

MR. FOSTER:  We do, yes.

THE COURT:  And your proposal is to introduce the recorded interviews in their entirety, and to publish portions of them to the jury?

MS. ROSE:  That's correct.  Because the officers will be testing -- testifying from those recorded interviews.  And obviously they were significant in how they directed the investigation.

THE COURT:  And the recorded interviews are of who?

MS. ROSE:  They are of Rene Arevalo, Luis Ramos.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 245 of 485
Case 3:08-cr-00134-RJC Document 324   Filed 01/30/11   Page 245 of 485
JA2616

THE COURT:  You're not going to get into the theological discussion between Arevalo and the investigating officers, am I correct about that?

MS. ROSE:  Regarding the DiVinci Code?

THE COURT:  Yes.

MS. ROSE:  No.

THE COURT:  It made for interesting, but not very probative reading.

Arevalos and who else?

MS. ROSE:  Luis Ramos and Luis Rivera.

THE COURT:  Are any of those three individuals -- is the government calling any of those three individuals?

MS. ROSE:  We are not.  They are afraid to testify.

THE COURT:  Pardon me?

MS. ROSE:  They are afraid to testify.  We brought them here, but due to the threats --

THE COURT:  Mr. Foster, I made the ruling on this yesterday.  I reviewed these transcripts.  My written order I rejected the per se exclusion of evidence in the areas of the LA murders.  And indicated that I would take up an independent review of the material pertaining to those incidents, and I've done that.  And I've announced an oral ruling yesterday, with respect to the statements of -- or with respect to that unadjudicated crimes evidence.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 246 of 485
Case 3:08-cr-00134-RJC   Document 504   Filed 01/30/11   Page 2 of 95
JA2617

78

But I'll be glad to hear from you and revisit that.  I've read your briefs.  I've read them, studied them, and studied the government's response, and reviewed the evidence in the light of the arguments which you made, which I think you made in a very cogent way.

But if there's anything else you wish me to consider, I'll be glad to hear from you?

MR. FOSTER:  Your Honor, I have nothing to add I didn't put in the brief already.  I would just ask for clarification.

Is the five items that I listed in my Motion in Limine, is all that not coming in now, is that --

THE COURT:  Yes.  Parshall and Telis are out, unless some cross-examination opens the door to reconsideration of that.

MS. ROSE:  And I want to be clear as well.  We're not offering that portion of the transcript because the witnesses will testify.  It's not that those witnesses can't testify about that information.  Although the government will not ask about El Salvador.

THE COURT:  That's my ruling.

MR. FOSTER:  Okay.  And Detective Flores, the last one --

MS. ROSE:  Not going to ask about that either.  We will remove that as well.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 247 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 01/30/11   Page 3 of 95
JA2618

79

And I just wanted to let the Court know that the government would also move at the appropriate time, in that the detectives will be discussing it during their testimony, the April 23rd, '08 interview and statement of the defendant.

Once again, the complete, the government would move to admit the complete interview.  Portions of that we may publish during the testimony.  But that will be the last transcript of any interviews that the government will move to admit.

THE COURT:  And I've reviewed that as well. Mr. Foster, are you going to object now or object later; or object now and later or not object?  I've reviewed it in light of the arguments made by both sides, and I find its probative value outweighs any unfair prejudice.

MR. FOSTER:  We just renew our objection, as well as our original basis in the suppression motion we previously litigated.

THE COURT:  Very well.  You have that for the record.  You don't have to object to preserve it.

Anything else?

MS. ROSE:  Not from the government, Your Honor.

THE COURT:  All right.  Well, we'll stand in recess until further notice from the jury.

(The Court stood at ease at 9:38 a.m. waiting for a response

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 248 of 485
Case 3:08-cr-00154-RJC   Document 286   Filed 03/23/11   Page 10 of 95
JA2619

80

from the Jury; after which, the following occurs in the presence of the Defendant, together with Counsel and Counsel for the Government at 9:53 a.m.:)

THE COURT:  The jury has indicated they have reached a verdict.  So I will have them brought in and go back through the same process with them that we did at the end of the guilt phase.

Are we ready for the jury?

ALL COUNSEL:  (No response.)

THE COURT:  Call the jury.

CSO:  (Handing note to the Court.)

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Juror number 330, has the jury reached a verdict on the eligibility phase of this hearing?

JUROR:  We have, Your Honor.

THE COURT:  And have you reduced that verdict to the verdict forms that you were provided?

JUROR:  We have Your Honor.

THE COURT:  Signed and dated.

JUROR:  Yes, Your Honor.

THE COURT:  Very well.  Would you hand those verdict forms to the deputy clerk at this time.

JUROR:  (Complies.)

COURT CLERK:  (Handing same to the Court.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 249 of 485
Case 3:06-cr-00154-RJC   Document 586   Filed 03/30/11   Page 11 of 95
JA2620

81

THE COURT:  As with the process that we went through in the guilt phase of this trial, I'm going to inspect the verdict sheets, and then have them published in open court by the deputy clerk.

I would ask each of you to listen carefully to the publishing of the verdict, either side may wish to ask you whether it is your own individual verdict.

Mr. Foreperson, I have inspected the verdict form as to Count Twenty-three.  There were verdict forms provided to the jury for each of Counts 22, 23, 24 and 25.  Were verdicts reached as to the other counts as well?

JUROR:  Your Honor, we only reached the verdict on the form that was submitted, so.

THE COURT:  Very well.  Well, what I'm going to ask you to do at this time, is reconvene and deliberate on Counts 22, 23, 24 and 25.  The verdict form for those counts will be provided to you.  And so at this time if you would all return to the jury deliberation room.  I will keep the verdict rendered on Count 23 under seal until you have deliberated on Counts 22, 23, 24 and 25.

(The jury was escorted from the courtroom at 10:01 a.m.)

THE COURT:  The jury had four separate verdict forms, one for each count that was submitted.  They filled out the verdict form on Count 23.  And they now have back with them, and have had, verdict forms for the other counts.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 250 of 485
Case 3:08-cr-00134-RJC   Document 862   Filed 03/23/11   Page 125 of 95
JA2621

82

They thought they were duplicative.  As you all heard, I instructed them to deliberate on the other counts.  And I am going to ask the clerk to keep the returned verdict under seal in the court file.  And we will stand in recess until further notice.

(The Court stood at ease waiting for a response from the Jury; after which, the following occurs in the presence of the Defendant, together with Counsel and Counsel for the Government at 10:25 a.m.:)

THE COURT:  They need an envelope.

(The jury knocks on the door at 10:36 a.m.)

THE COURT:  Are we ready for the jury; they have a verdict.

ALL COUNSEL:  (No response.)

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Mr. Foreman, you have previously tendered to the Court a verdict form for Count 23.  Has the jury also reached a verdict on Count 22, 24 and 25?

JUROR:  We have, Your Honor.

THE COURT:  And have you reduced that -- those verdicts to the verdict form, signed and dated them?

THE JURY:  We have, Your Honor.

THE COURT:  Very well.  If you would, at this time, hand those over to the deputy clerk.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17   Page 251 of 485
Case 3:08-cr-00134-RJC  Document 562  Filed 03/30/11   Page 13 of 95
JA2622

JUROR:  (Complies.)

COURT CLERK:  (Handing same to the Court.)

THE COURT:  Madam Clerk, if you would publish the verdicts concerning Death Penalty Eligibility on Counts 22, 23, 24 and 25 at this time.

COURT CLERK:  Ladies and gentlemen of the jury, in the case of United States of America versus Alejandro Umana, Special Verdict Form Death Penalty Eligibility, Count 22:

Section one:  Age of the defendant.  The defendant was 18 years or older at the time of the offense committed, Count 22, that is the murder of Ruben Garcia Salenas in aid of racketeering.  You answered, "Yes".

Section two, requisite mental state.

Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Ruben Garcia Salenas died as a result of the act.

You answered, "Yes".

Count Three, statutory aggravating factors.

Number one, do you have the jury find the government has proven beyond a reasonable doubt that the

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 252 of 485
Case 3:08-cr-00134-RJC   Document 862   Filed 03/28/11   Page 145 of 95
JA2623

84

defendant in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to Ruben Garcia Salenas.

You answered, "Yes".

Number two, do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill more than one person in a single criminal episode.

You answered, "Yes".

Special verdict form, death penalty eligibility, Count 23.

Section one:  Age of the defendant.

Number one, the defendant was 18 years of age or older at the time of the offense committed in Count 23; that is using a firearm in a crime of violence resulting in the murder of Ruben Garcia Salenas.

You answered, "Yes".

Section two, requisite mental state.

Number one, do you the jury unanimously find the government has proven beyond a reasonable doubt that the defendant intentionally killed Ruben Garcia Salenas.

You answered, "Yes".

Section three, statutory aggravating factors.

Number one:  Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 253 of 485
Case 3:08-cr-00134-RJC   Document 1362   Filed 03/30/11   Page 15 of 95

JA2624

85

defendant in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Ruben Garcia Salenas?

You answered, "Yes".

Number two, do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill more than one person in a single criminal episode?

You answered, "Yes".

Special Verdict Form Death Penalty Eligibility, Count 24.

Section one:  Age of the defendant.

The defendant was 18 years or older at the time of the offense committed in Count 24, that is the murder of Manuel Garcia Salenas in aid of racketeering?

You answered, Yes.

Section two:  Requisite mental state.

Number four, do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person other than one of the participants in the offense; such that participation in the act constituted a reckless disregard for human life, and Manuel Garcia Salenas died as a direct result of the act?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 254 of 485
Case 3:08-cr-00134-RJC   Document 882   Filed 03/28/11   Page 16 of 95
JA2625

86

You answered, "Yes".

Section three, statutory aggravating factors:

Number one, do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to Manuel Garcia Salenas?

You answered, "Yes".

Number two, do you the jury unanimously find that the government has proven beyond a reasonable doubt, that the defendant killed and attempted to kill more than one person in a single criminal episode?

You answered, "Yes".

Special Verdict Form Death Penalty Eligibility Count 25.

Section one:  Age of the defendant.

Number one, the defendant was 18 years of age or older at the time of the offense committed in Count 25; that is using a firearm in a crime of violence resulting in the murder of Manuel Garcia Salenas?

You answered, "Yes".

Section two:  Requisite mental state.

Number one, do you the jury unanimously find the government has proven beyond a reasonable doubt that the defendant intentionally killed Manuel Garcia Salenas?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 255 of 485
Case 3:08-cr-00134-RJC   Document 1862   Filed 03/30/11   Page 175 of 195
**JA2626**

87

You answered, "Yes".

Section three:  Statutory Aggravating Factors.

Number one, do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Manuel Garcia Salenas?

You answered, "Yes".

Number two, do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill, more than one person in a single criminal episode?

You answered, "Yes".

THE COURT:  I will note for the record that upon my inspection of each of the verdict forms the section three certificates were all filled out by each of the jurors.

Does any?  Does either side wish to have the jury polled on these verdicts.

MS. ROSE:  Not the United States, Your Honor.

MR. FOSTER:  No, Your Honor.

THE COURT:  Very well.

Madam Clerk, would you see if the alternates -- would you file the verdict forms in the court file under seal.  And if you would see if the alternates are ready to join us.

Laura Andersen, RMR 704-350-7493

**JA2627**

FILED
CHARLOTTE, NC

APR 20 2010

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | SPECIAL VERDICT FORM |
| ALEJANDRO UMANA, | ) | DEATH PENALTY ELIGIBILITY |
| a/k/a "Wizard" | ) | COUNT TWENTY-TWO |
| "Lobo" | ) | |
| | ) | |

## I.    AGE OF THE DEFENDANT

**Instructions**: Answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

1.    The defendant was eighteen years of age or older at the time of the offense committed in Count Twenty-Two, that is murder of Ruben Garcia Salinas in aid of racketeering?

Yes: _____✓_____          No: _____



(FOREPERSON

**Instructions**: If you answered "No" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, and III of this form, and proceed to Section IV. Each juror should then carefully read the statement in Section IV, and sign in the appropriate place, if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

Final 1.0 Page 1

Case 3:16-cv-00057-MOC-RJC   Document 50-6   Filed 03/23/17   Page 257 of 485
Case 3:08-cr-00134-RJC   Document 504   Filed 04/20/10   Page 257 of 485
JA2628

If you answered "Yes" with respect to the determination in Section I, then proceed with Section II, which follows:

II. **REQUISITE MENTAL STATE:**

**Instructions**: Answer the following "Yes" or "No." If you answer "Yes" with respect to any one of the determinations in Section II, stop your deliberations and then proceed to Section III.

1. Do you the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Ruben Garcia Salinas?

Yes:_____         No: _____

_____
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Ruben Garcia Salinas?

Yes:_____         No: _____

_____
FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

Final 1.0 Page 2

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 258 of 485
Case 3:09-cv-00154-RJC Document 50-6 Filed 03/23/10 Page 258 of 485
JA2629

force would be used in connection with a person, other than one of the participants in the offense, and Ruben Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

_____
                                                        FOREPERSON

4.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Ruben Garcia Salinas died as a direct result of the act?

Yes:_____ ✓         No: _____

                                                        FOREPERSON

**Instructions**:  If you answered "No" with respect to all of the determinations in this Section II, then stop your deliberations, cross out Section III of this form, and proceed to Section IV.  Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the Court that you have reached a decision.

If you answered "Yes" with respect to any one of the determinations in Section II, then proceed to Section III which follows:

Final 1.0 Page 3

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 259 of 485
Case 3:09-cv-00154-RJC Document 24-6   Filed 03/23/10   Page 259 of 485
**JA2630**

III.   **STATUTORY AGGRAVATING FACTORS:**

**Instructions**: For each of the following, answer "Yes" or "No."

1.   Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Ruben Garcia Salinas?

Yes:_____✓_____   No:_____

FOREPERSON

2.   Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill more than one person in a single criminal episode?

Yes:_____✓_____   No:_____

FOREPERSON

**Instructions**: Once you have completed all of the determinations in this Section III, stop your deliberations and proceed to Section IV.  Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the Court that you have reached a decision.

Final 1.0 Page 4

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 260 of 485
Case 3:08-cv-00154-RJC   Document 50-6-1   Filed 04/20/10   Page 260 of 485
**JA2631**

IV.    **CERTIFICATION**

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.





Final 1.0 Page 5

Case 3:16-cv-00057-MOC-DLC Document 50-6 Filed 03/23/17 Page 261 of 485
Case 3:09-cv-00154-RJC Document 50-6 Filed 04/20/10 Page 5 of 9
**JA2632**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

FILED
CHARLOTTE, NC

APR 20 2010

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES OF AMERICA      )
                              )
        v.                    )
                              )      SPECIAL VERDICT FORM
ALEJANDRO UMANA,              )      DEATH PENALTY ELIGIBILITY
    a/k/a "Wizard"            )      COUNT TWENTY-THREE
    "Lobo"                    )
                              )
_____)

## I.    AGE OF THE DEFENDANT

**Instructions**:  Answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

1.    The defendant was eighteen years of age or older at the time of the offense committed in Count Twenty-Three, that is using a firearm in a crime of violence resulting in the murder of Ruben Garcia Salinas?

Yes: _____✓_____          No: _____

_____
FOREPERSON

**Instructions**:  If you answered "No" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, and III of this form, and proceed to Section IV. Each juror should then carefully read the statement in Section IV, and sign in the appropriate place, if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the Court that you have reached a decision.

Final 1.0 Page 1

Case 3:16-cv-00057-MOC-JC   Document 50-6   Filed 03/23/17   Page 262 of 485
Case 3:08-cv-00134-RJC   Document 50-6   Filed 03/23/10   Page 262 of 485
JA2633

If you answered "Yes" with respect to the determination in Section I, then proceed with Section II, which follows:

II.    **REQUISITE MENTAL STATE:**

**Instructions**: Answer the following "Yes" or "No." If you answer "Yes" with respect to any one of the determinations in Section II, stop your deliberations and then proceed to Section III.

1.    Do you the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally kill

Yes:_____✓_____         No:_____

FOREPERSON

2.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Ruben Garcia Salinas?

Yes:_____         No:_____

_____
FOREPERSON

3.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

Final 1.0 Page 2

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 263 of 485
Case 3:09-cv-00154-RJC   Document 50-6   Filed 03/23/10   Page 263 of 485
JA2634

force would be used in connection with a person, other than one of the participants in the offense, and Ruben Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

_____

FOREPERSON

4.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Ruben Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

_____

FOREPERSON

**Instructions**:  If you answered "No" with respect to all of the determinations in this Section II, then stop your deliberations, cross out Section III of this form, and proceed to Section IV.  Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the Court that you have reached a decision.

If you answered "Yes" with respect to any one of the determinations in Section II, then proceed to Section III which follows:

Final 1.0 Page 3

Case 3:16-cv-00057-MOC Document 50-6  Filed 03/23/17  Page 264 of 485
Case 3:09-cv-00154-RJC Document 24-5  Filed 04/20/10  Page 3 of 9

JA2635

III.   **STATUTORY AGGRAVATING FACTORS:**

**Instructions**: For each of the following, answer "Yes" or "No."

1.   Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Ruben Garcia Salinas?

Yes:_____✓_____        No: _____

                                                                FOREPERSON

2.   Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill more than one person in a single criminal episode?

Yes:_____✓_____        No: _____

                                                                FOREPERSON

**Instructions**: Once you have completed all of the determinations in this Section III, stop your deliberations and proceed to Section IV. Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

Final 1.0 Page 4

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 265 of 485
Case 3:09-cv-00134-RJC Document 52-6 Filed 04/26/10 Page 265 of 485
**JA2636**

## IV.    CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.





Final 1.0 Page 5

JA2637

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134



FILED
CHARLOTTE, NC

APR 20 2010

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.  )<br>)<br>ALEJANDRO UMANA,  )<br>a/k/a "Wizard"  )<br>"Lobo"  )<br>)<br>_____ ) | SPECIAL VERDICT FORM<br>DEATH PENALTY ELIGIBILITY<br>COUNT TWENTY-FOUR |

## I.    AGE OF THE DEFENDANT

**Instructions**: Answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

1.    The defendant was eighteen years of age or older at the time of the offense committed in Count Twenty-Four, that is murder of Manuel Garcia Salinas in aid of racketeering?

Yes:_____✓_____      No:_____

<span style="color:gray">[FOREPERSON signature redacted]</span>

FOREPERSON

**Instructions**: If you answered "No" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, and III of this form, and proceed to Section IV. Each juror should then carefully read the statement in Section IV, and sign in the appropriate place, if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

Final 1.0 Page 1

Case 3:16-cv-00057-MOC-JC   Document 50-6   Filed 03/23/17   Page 267 of 485
Case 3:08-cr-00134-RJC   Document 502-6   Filed 04/20/10   Page 267 of 485
JA2638

If you answered "Yes" with respect to the determination in Section I, then proceed with Section II, which follows:

II. **REQUISITE MENTAL STATE:**

**Instructions**: Answer the following "Yes" or "No." If you answer "Yes" with respect to any one of the determinations in Section II, stop your deliberations and then proceed to Section III.

1.      Do you the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Manuel Garcia Salinas?

Yes:_____          No: _____

_____
FOREPERSON

2.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Manuel Garcia Salinas?

Yes:_____          No: _____

_____
FOREPERSON

3.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

Final 1.0 Page 2

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 268 of 485
Case 3:09-cv-00154-RJC Document 26-6 Filed 04/20/10 Page 268 of 485
**JA2639**

force would be used in connection with a person, other than one of the participants in the offense, and Manuel Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

_____
FOREPERSON

4.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Manuel Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

FOREPERSON

**Instructions**:  If you answered "No" with respect to all of the determinations in this Section II, then stop your deliberations, cross out Section III of this form, and proceed to Section IV.  Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the Court that you have reached a decision.

If you answered "Yes" with respect to any one of the determinations in Section II, then proceed to Section III which follows:

Final 1.0 Page 3

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 269 of 485
Case 3:09-cv-00154-RJC Document 50-6 Filed 03/22/10 Page 269 of 485
**JA2640**

III.   **STATUTORY AGGRAVATING FACTORS:**

**Instructions**: For each of the following, answer "Yes" or "No."

1.   Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Manuel Garcia Salinas?

Yes: ✓   No: _____

FOREPERSON

2.   Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill more than one person in a single criminal episode?

Yes: ✓   No: _____

FOREPERSON

**Instructions**: Once you have completed all of the determinations in this Section III, stop your deliberations and proceed to Section IV. Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

Final 1.0 Page 4

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 270 of 485
Case 3:09-cv-00154-RJC   Document 50-6   Filed 03/23/10   Page 270 of 485
JA2641

## IV.    CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

**JA2642**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

FILED
CHARLOTTE, NC

APR 2 0 2010

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | SPECIAL VERDICT FORM |
| ALEJANDRO UMANA, | ) | DEATH PENALTY ELIGIBILITY |
| a/k/a "Wizard" | ) | COUNT TWENTY-FIVE |
| "Lobo" | ) | |
| | ) | |

## I.    AGE OF THE DEFENDANT

**Instructions**: Answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

1.    The defendant was eighteen years of age or older at the time of the offense committed in Count Twenty-Five, that is using a firearm in a crime of violence resulting in the murder of Manuel Garcia Salinas?

Yes:_____✓_____        No:_____



FOREPERSON

**Instructions**: If you answered "No" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, and III of this form, and proceed to Section IV. Each juror should then carefully read the statement in Section IV, and sign in the appropriate place, if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

Final 1.0 Page 1

Case 3:16-cv-00057-MOC-DSC Document 50-6 Filed 03/23/17 Page 272 of 485
Case 3:08-cr-00134-RJC Document 924-7 Filed 04/20/10 Page 172 of 485
JA2643

If you answered "Yes" with respect to the determination in Section I, then proceed with Section II, which follows:

II.    **REQUISITE MENTAL STATE:**

**Instructions**: Answer the following "Yes" or "No." If you answer "Yes" with respect to any one of the determinations in Section II, stop your deliberations and then proceed to Section III.

1.    Do you the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed

Yes:_____        No: _____

FOREPERSON

2.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Manuel Garcia Salinas?

Yes:_____        No: _____

_____
FOREPERSON

3.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

Final 1.0 Page 2

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 273 of 485
Case 3:09-cv-00154-RJC Document 50-6 Filed 04/20/10 Page 273 of 485
JA2644

force would be used in connection with a person, other than one of the participants in the offense, and Manuel Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

_____
FOREPERSON

4.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Manuel Garcia Salinas died as a direct result of the act?

Yes:_____          No: _____

_____
FOREPERSON

**Instructions**: If you answered "No" with respect to all of the determinations in this Section II, then stop your deliberations, cross out Section III of this form, and proceed to Section IV. Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "Yes" with respect to any one of the determinations in Section II, then proceed to Section III which follows:

Final 1.0 Page 3

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 274 of 485
Case 3:09-cv-00154-RJC Document 50-7 Filed 03/23/10 Page 274 of 485
**JA2645**

III.    **STATUTORY AGGRAVATING FACTORS:**

**Instructions**: For each of the following, answer "Yes" or "No."

1.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant, in the commission of the offense, knowingly created a grave risk of death to one or more persons in addition to Manuel Garcia Salinas?

Yes: _____✓_____        No: _____

FOREPERSON

2.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed and attempted to kill more than one person in a single criminal episode?

Yes: _____✓_____        No: _____

FOREPERSON

**Instructions**: Once you have completed all of the determinations in this Section III, stop your deliberations and proceed to Section IV. Each juror should carefully read the statement in Section IV, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

Final 1.0 Page 4

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 275 of 485
Case 3:09-cv-00134-RJC   Document 50-6   Filed 03/23/10   Page 275 of 485
JA2646

IV.     **CERTIFICATION**

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 276 of 485
Case 3:09-cv-00154-RJC Document 50-6  Filed 04/20/10   Page 276 of 485

JA2647

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA                )DOCKET NO. 3:08-CR-134-2
                                        )
                                        )
        vs.                             )VOLUME II-A
                                        )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA         )
_____ )


TRANSCRIPT OF ELIGIBILITY/SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 20, 2010

APPEARANCES:

On Behalf of the Government:
    JILL WESTMORELAND ROSE
    Assistant United States Attorneys
    100 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

On Behalf of the Defendant:
    JOHN DAVID BRYSON
    Wyatt, Early, Harris & Wheeler, LLP,
    P.O. Box 2086
    High Point, North Carolina 27261

    MARK PATRICK FOSTER, JR.
    Law Offices of Mark Foster, PC
    1011 E. Morehead Street, Suite 300
    Charlotte, North Carolina 28204




LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 277 of 485
Case 3:08-cr-00134-RJC Document 52-34 Filed 01/30/11 Page 1 of 95
JA2648

88

(Thereupon, the alternates were brought into the courtroom.)

THE COURT:  The government may call its next witness.

Before you do that, let me give the jury some preliminary instructions.

Members of the Jury, since you found that the defendant is eligible for the death penalty, we will now proceed to the second and final part of the sentencing hearing.  After which you will decide whether the defendant should be sentenced to death, or imprisoned for life without the possibility of release for murder in aid of racketeering and sentenced to death or a sentence up to life without the possibility of release, which the Court would decide for using a firearm in a crime of violence resulting in murder.

Before the parties begin their presentations, I wish to give you a summary or overview of the law.  And I will give you more detailed instructions at the conclusion of the hearing.

This part of the hearing which focuses on all relevant aggravating and mitigating factors, is broken down into two steps.

First, you must determine what factors have been proved.

As for the aggravating factors, you must unanimously determine whether the government has proved

Laura Andersen, RMR 704-350-7493

**JA2649**

89

beyond a reasonable doubt any additional statutory or nonstatutory factors relied upon to support the death sentence.

In contrast, the defendant may prove mitigating factors to decide, individually, whether any mitigating factors by just a preponderance of evidence.  Moreover, it is up to each juror to decide, individually, whether any mitigating factor exists.  There is no requirement that the defendant establish mitigating factors unanimously.

The second step involves a weighing process.  You must decide whether the proved aggravating factors, outweigh the proved mitigating factors, sufficiently to justify the death sentence.

If you do not find any mitigating factors, you still must decide whether the aggravating factors are sufficient to justify imposition of a death sentence.

If you determine as a result of this weighing process, that the factors do not justify a death sentence, such a sentence may not be imposed and your deliberations are over.

Weighing aggravating and mitigating factors is not a mechanical process.  And the judgment involved is exclusively yours.  Whatever findings you make with respect to aggravating and mitigating factors, remember that a jury is never required to impose a sentence of death.  Any

Case 3:16-cv-00057-MOC Document 50-6 - Filed 03/23/17    Page 279 of 485
Case 3:08-cv-00134-RJC Document 58-6 - Filed 03/23/11    Page 279 of 95
**JA2650**

90

decision to impose a sentence of death must be unanimous.

I direct that during the sentencing hearing you continue to observe all of the instructions about your conduct as jurors that I gave you earlier in the trial.

May I see the lawyers at side bar.

(Bench conference as follows:)

THE COURT:  Do you all wish to make opening statements at this time or do you want to just go into the evidence?

MR. FOSTER:  We don't.

MS. ROSE:  No.

THE COURT:  All right.  Is your first witness ready?

MS. ROSE:  Yes.

(The bench conference was concluded.)

THE COURT:  Those are the instructions I wish to give you before you hear the presentation of evidence in this part of the sentencing hearing.  Thank you.

The government may call its first witness.

MR. NAZZARO:  Yes, Your Honor.  The United States calls Tom Small.

THEREUPON, THOMAS SMALL, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good morning.  State your name for the jury.

A.   Good morning.  My name is Detective Thomas Small.  It's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 280 of 485
Case 3:08-cr-00134-RJC   Document 562   Filed 03/30/11   Page 210 of 95
JA2651

91

T-H-O-M-A-S.  S-M-A-L-L.

Q.   Detective Small, where do you work as a detective?

A.   I'm a Los Angeles police detective.  I'm currently assigned to the Hollywood homicide unit.

Q.   How long have you been working with the Los Angeles police force?

A.   I've been with LAPD for over 26 years.  I've been in law enforcement for over 28 years.

Q.   What other jobs in law enforcement have you had other than at LAPD?

A.   I've been a police officer in Racine, Wisconsin.  I've been an FBI agent and also a police officer prior to becoming a detective with Los Angeles.

Q.   How long have you been in your current position as a detective?

A.   I've been a detective since 1993.  And I've been assigned homicide for approximately 14 years.

Q.   So for the last -- is that in the last 14 years you've been in homicide?

A.   Yes.

Q.   And that involves homicides that occur in your sector, which is the Hollywood division, I think you named?

A.   Yes, sir.

Q.   Is the area which contains Lemon Grove Park in your sector?

Laura Andersen, RMR 704-350-7493

**JA2652**

92

A.    Yes.

Q.    And what is Lemon Grove Park?

A.    Well, Lemon Grove Park is a district in the east end of Hollywood area.  Just to clarify, in Los Angeles we have 21 areas of the city.  Every division is separate, but part of LAPD.  My area's Hollywood.  Lemon Grove Park is contained within Hollywood.

Lemon Grove Park is a recreational facility.  There's a recreational building, a playground for small children. There's a couple of basketball courts, a baseball field, and a large green area for sitting and picnicking, and things like that.

The area surrounding, the residential area is considered part of Lemon Grove Park area.

Q.    Is that section called a particular area, that neighborhood, or is it just part of Lemon Grove?

A.    Well, we refer to it as part of Lemon Grove Park.

Q.    Now, in your duties as a homicide detective, have you also had occasion to investigate gang-related homicides?

A.    Yes.

Q.    And with respect to this area that you just described, are there gangs that operate in the Lemon Grove area?

A.    Yes.  That area has been heavily seeded with gang activity over many years.  That park at one time was under the control of an old gang in Los Angeles called the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 282 of 485
Case 3:08-cr-00134-RJC   Document 986   Filed 03/30/11   Page 283 of 95
JA2653

Clantone or C 14. It was rested away from them by the MS 13 gang. There is also another gang in the immediate vicinity called TPC. At one time that referred -- was referred to as The Perfect Criminals. Today we call it the Tree Park Criminals.

Q. Why do you call it the Tree Park Criminals?

A. That's what they call themselves.

Q. And when you say control, what do you mean by that with respect to this particular playground and park?

A. Well gangs, they assume responsibility for turf, they claim it. They mark it with graffiti, and they'll fight for it, and they'll kill for it.

In this particular case, MS in conjunction with a lesser gang at that time called the JM gang, Junior Mara, they worked in conjunction with each other to occupy and hold that park.

Q. Now, I want to direct your attention to September 28, 2005. Were you working on that occasion and did you have occasion to respond to a homicide?

A. Yes.

Q. And with respect to Lemon Grove playground itself, you describe the playground. What are the operating hours of it, so to speak?

A. The playground opens in the morning hours, somewhere around 9, 9:30. The park officially closes at 9:00 p.m,

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 283 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 03/23/11   Page 24 of 95
JA2654

94

meaning that the park and rec people, that's when they sign off, lock the building.  And they turn off the court lights, baseball field lights.

The only lights that remain on would be the side lighting, the sidewalk lighting.  So there is some illumination.

Q.   And the basketball courts, they remain open, though, they're not locked.  You can still play basketball after 9?

A.   You can.

Q.   Okay.  Now with respect to this particular date, September 28, 2005, what was the occasion that you responded to a call about a homicide?

A.   I was notified at my residence that we had a shooting at the park, by my boss, at that time, Wendy Pur.  I responded from home to Hollywood station, met my partner and then we went over to the park, initiated our investigation.

Q.   And that particular investigation was at Lemon Grove playground; is that right?

A.   Yes.

Q.   And were you the chief detective involved in that particular investigation?

A.   My partner and I were each assigned the case.  I assumed the primary role.

Q.   And what time approximately did you receive the call to go out there?

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 284 of 485
Case 3:08-cv-00154-RJC   Document 286   Filed 03/28/11   Page 23 of 95

JA2655

95

A.    It was sometime after 10:00 p.m.

Q.    And did you then arrive there sometime after 10:00 p.m?

A.    Yes, sir.

Q.    What did you observe with respect to your initial part of your investigation?

A.    Initially, I just basically -- I looked over the park to see, basically, size, parameters, kind of had a feel for, you know, direction of where everything was situated.

As we moved into the vicinity where the victims had been, I observed blood, bloody clothing.  On the basketball court itself I observed some ballistic evidence.  And one area where there was a bullet strike on a concrete standard that held a light -- light pole.

Q.    You mentioned victims.  What did your investigation reveal about the victims?

A.    We had four victims --

Q.    First of all, did you determine it was a shooting?

A.    Yes.

Q.    I want to talk to you more about that, but you mentioned victims during your testimony.

What was the nature of the people that were either killed or injured?

A.    Well, upon initial entry into the crime scene I was briefed by the officers, the first responders.  They indicated that we had four down -- or actually three were

Laura Andersen, RMR 704-350-7493

**JA2656**

96

down, one was not.  That they had gone to the hospital.
These individuals, all four of them, had been playing
basketball until the park closed.  And approximately
9:00 when the lights went off, they stopped playing
basketball and they went to the side of the basketball
court.

Just to set the stage, there's two parallel courts.
They were on the east court.  And just east of that along
the side line is a set of aluminum benches.  They were over
there having some -- some drinks, just kind of kicking back.

Q.   I want to talk more about what happened.  But first,
was there anybody identified as being a victim of a
homicide?

A.   Yes.

Q.   And who was that?

A.   Andy Abarca.

Q.   Go ahead.

A.   Andy was a male Hispanic, approximately 23 years old.
He played basketball at the park fairly frequently.  We
could establish no gang ties with Mr. Abarca.  In fact, he,
as we came to learn, was a loan agent for a mortgage company
locally.  But he grew up in the neighborhood.  That was his
home park as a kid.  So he felt comfortable playing
basketball up there.

The other individuals Juan Lara, Roberto Ramos, are

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 286 of 485
Case 3:08-cv-00154-RJC  Document 50-6  Filed 03/23/11  Page 286 of 95
JA2657

long-time friends, and friends of Andy.  They all played basketball together.  That was a repeated event.

Q.   Okay.  Andy died?

A.   Andy was killed.

Q.   And do you -- I know we have the coroner here, but do you know the nature of his wounds, generally?

A.   Yes.  He suffered multiple gunshot wounds.

Q.   And what about, you mentioned Roberto -- Robert Ramos and Juan Lara, were they killed or injured?

A.   They were injured.  Each had sustained gunshot wounds to the body, to the arms and wrist.

Q.   Was there another victim?

A.   Another victim we knew him as Freddy Gonzalez.  He was struck by a bullet, but it did not injure him.  It bounced off his keys.

Q.   Now, I would like to show you what's been previously marked as Government's Exhibit 532.  Do you recognize 532?

A.   Yes, sir.

Q.   And does that depict an area in Lemon Grove Park?

A.   It does.  Depicts the basketball courts.  And from my perspective here, I'm looking northwest across the east court.

          MR. NAZZARO:  I would move 532 at this time.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

                    Laura Andersen, RMR 704-350-7493

JA2658

98

THE COURT:  Let it be committed.

(Government Exhibit 532 was received into Evidence.)

Q.   (By Mr. Nazzaro) Now, you said the basketball courts. It's two different courts; is that right?

A.   Yes.

Q.   And do you know which court the victims or the injured were playing at?  Is it on this photograph at all?

A.   It is.  It's the one immediately to the forefront.

Q.   Could you mark it on the screen?

A.   (Witness complies.)

Q.   Now, this was taken, a daylight photo, right taken after -- taken that evening, right?

A.   No.  It was taken at day time.

Q.   Okay.  I would like to show you what's been previously marked as Government Exhibit 533.  What does 533 depict?

A.   533 --

Q.   Let me ask you, are you familiar with 533?

A.   I am.

Q.   Does it depict the area in Lemon Grove Park in which some of the events you just talked about occurred?

A.   Yes, it does.

MR. NAZZARO:  Your Honor, I would move 533.

THE COURT:  Let it be admitted.

(Government Exhibit 533 was received into Evidence.)

MR. NAZZARO:  Published.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 288 of 485
Case 3:08-cr-00134-RJC   Document 586   Filed 03/26/11   Page 29 of 95
JA2659

99

THE COURT:  You may published.

Q.   (By Mr. Nazzaro) If you could now describe what we're seeing in 533.

A.   533 is the east court.  And this perspective is a view northbound.  And there are some individuals seated on a bench, aluminum stands off to the right.

Q.   Could you circle that area.

A.   (Witness complies.)

Q.   Now, once again I'll ask you, this basketball court, is that the court where the deceased and the victims -- the shooting victims were playing basketball?

A.   Yes.

Q.   Okay.  And as part of your investigation, did you determine how many shooters there were?

A.   Yes, I did.

Q.   And how many were there?

A.   Two.

Q.   And with respect to where the victims were before the shooting, could you indicate that on Government 533?

A.   The victims, as the shooting initiated, were sitting on this bench right here.  (Indicating.)

Q.   And where were the shooters at this point?

A.   Witnesses -- the victims told us they entered from this area, off -- I believe that's Hobart, and walked this direction here, and approximately in this area (witness

Laura Andersen, RMR  704-350-7493

JA2660

100

indicating) the two male Hispanics pulled out handguns and opened fire.

Q.   And the four people you indicated, you said Andy Abarca, Robert Ramos, Juan Lara and Freddy, I think Gonzalez; is that right?

A.   Yes.

Q.   Are they in the area you circled on the right?

A.   Yes.

Q.   Now, what happened after the shots were fired?

A.   The --

          MR. NAZZARO:  I would still like to have that exhibit up, please.

          THE WITNESS:  May I give you a brief narrative?

          MR. NAZZARO:  Yes.  See if the photo helps.

          THE WITNESS:  The witnesses -- victims seated on the bench as the two male Hispanic suspects --

          MR. FOSTER:  Your Honor, I object to a narrative unless we know who it is told him as opposed to --

          THE COURT:  Sustained.  Ask you lay a foundation.

Q.   (By Mr. Nazzaro) If you could indicate who told you what happened when you're testifying.

A.   Mr. Lara was seated at the bench with the other victims.  And he indicated that Mr. Ramos was looking to the west toward, Hobart, and saw two male Hispanics walking toward them.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 290 of 485
Case 3:08-cr-00134-RJC   Document 862   Filed 03/23/11   Page 310 of 95
**JA2661**

101

And according to Mr. Lara, Ramos stood up and said, hey, watch those two dudes.  As the two male Hispanics approached closer and got to about half court, Freddy Gonzalez stood up and said, hey man, I don't bang anymore.  And no other words were said.  Gun fire erupted.  And the victims bolted to the north and through a narrow walkway -- I mean, excuse me, to the south, through narrow walkway out to Lemon Grove Avenue.

Q.    On this photo, could you at least point in the direction that they started to flee?

A.    (Witness indicating.)

Q.    What is that walkway?  If you could further describe what that leads to?

A.    That the walkway -- actually it's -- it's around this pole.  And the walkway leads between the recreational building which is to the southwest.  And then there is a baseball field with cyclone fencing by the dugouts and the back stop.  So it's like a funnel.  And there's only one way to go.  You don't have much lateral movement.

Q.    I would like to show you what's previously been marked as Government Exhibit 35 -- I'm sorry, 535.

Does this photo depict some of the area where this -- the witnesses indicated they were fleeing?

A.    It does.

MR. NAZZARO:  Your Honor, I would move 535.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 291 of 485
Case 3:08-cr-00154-RJC   Document 586   Filed 03/28/11   Page 32 of 95
JA2662

102

THE COURT: Let it be admitted.

(Government Exhibit 535 was received into Evidence.)

Q. (By Mr. Nazzaro) And could you indicate the direction of -- if you could orient us as to what this photo depicts with respect to the area that they were fleeing?

A. The general area that you're looking at is the parking lot to the southeast of the park facility. And the baseball field is in this area (indicating).

And of course the rec building in between, the rec building and the baseball field is a narrow walkway that leads out into this area.

If you're looking as you look toward the building, you're looking west. If you look to the left of the building, you're looking south. And that street is Lemon Grove Avenue.

Q. And where, if you can maybe point with a pointer, where are the actual basketball courts in relation?

A. The basketball courts are through -- on the other side of the baseball field to the northeast.

Q. Okay. I would like to show you what's been previously marked as Government 36 -- 536c.

Is 536c, was that a photo that depicts some events in this investigation?

A. It does, yes.

MR. NAZZARO: Your Honor, I would move 536c.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 292 of 485
Case 3:08-cr-00134-RJC Document 506 Filed 03/30/11 Page 33 of 95
JA2663

103

THE COURT:  Let it be admitted.

(Government Exhibit 536c was received into Evidence.)

Q.   (By Mr. Nazzaro) And what does 536c depict?

A.   The grassy area near that nearest boulder.  That's where Andy Abarca finally dropped.

Q.   And Andy Abarca was the individual who died from multiple gunshots?

A.   Yes.

Q.   And this also is in the direction of where the other witnesses indicated they were fleeing?

A.   Yes.

Q.   Now, you mentioned -- well, excuse me.  I would like to show you a couple more photos; 536.  Does 536 depict some of the events in the investigation?

A.   Yes.

MR. NAZZARO:  I would move 536.

THE COURT:  Let it be admitted.

(Government Exhibit 536 was received into Evidence.)

Q.   (By Mr. Nazzaro) What does 536 show that the other photos don't?

A.   536 depicts the exit that the victims took to the south from the basketball court area.  This is a narrow area that leads out -- it's a walkway area that leads out to the parking lot that we just viewed.

And then one of the victims, I believe it was Lara,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 293 of 485
Case 3:08-cr-00134-RJC   Document 566   Filed 03/28/11   Page 34 of 95
JA2664

104

went this route.  This is a access for handicapped wheelchair bound people, what not.  And it goes up, slightly.  But it's part of this narrow area.

I believe Abarca and Ramos went this route (indicating) and Lara took this route (indicating).

Q.   I'd like to show you what's been previously marked as 536a.  Does that depict something that was part of your investigation?

A.   Yes.

MR. NAZZARO:  Your Honor, I would move 536a.

THE COURT:  Let it be admitted.

(Government Exhibit 536a was received into Evidence.)

Q.   (By Mr. Nazzaro) What does 536a depict that the other photos do not?

A.   This area here, this is a concrete abutment.  And there is -- it holds a light standard.  Where I have it circled is a bullet impact.

Q.   And were you able to determine from your investigation the amount of shots that were fired on that particular evening, September 28, 2005?

A.   According to witnesses, it was five to six shots.

Q.   Now, you mentioned earlier -- you mentioned earlier that there was a statement by, I think it was Freddy, that he didn't bang there anymore.  Do you remember that statement?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 294 of 485
Case 3:06-cr-00154-RJC   Document 686   Filed 03/23/11   Page 33 of 95
JA2665

105

A.   Yes.

Q.   Did your investigation determine that this shooting was the -- was part of a gang initiated shooting?

A.   Yes, sir.

MR. FOSTER:  Objection.

THE COURT:  Overruled.

Q.   (By Mr. Nazzaro) And could you tell us what your investigation determined in that regard and how you came to that conclusion?

MR. FOSTER:  Your Honor, I would object based on the court's previous ruling as to one of these persons, if he's not going to be testifying.

THE COURT:  I'll overrule that objection.

But instruct counsel not to ask any questions with respect to any matters previously ruled inadmissible.

MR. NAZZARO:  Yes, Your Honor I discussed that with the witness.

Q.   (By Mr. Nazzaro) The -- tell us if your investigation determined that there was some rival gang motive as a result, that precipitated this particular attack?

A.   Yes.

Q.   And could you tell us -- how did you determine that and could you explain to the jury who told you that?

A.   Freddy Gonzalez is a Tree Park Criminal gang member, by his own admission to us.  He had had a previous

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 295 of 485
Case 3:06-cr-00154-RJC   Document 586   Filed 03/28/11   Page 36 of 95
**JA2666**

106

confrontation with an MS 13 gang member that we know as street name Guanaco, later identified him to be an Alex Montez.  The confrontation occurred several months prior to this incident.  And Freddy had ultimately got arrested behind that and served some time.

Q.   What type of incident was that?

A.   It was a robbery.

Q.   Was it a robbery by Freddy of this person named Guanaco?

A.   Yes.  There had been some ongoing back and forth. Ultimately Freddy took matters into his own hand and robbed Guanaco.

Q.   And Guanaco, according to your investigation was an MS 13 member?

A.   Yes.

Q.   So did your investigation reveal who was the target of the particular event?

        MR. FOSTER:  Objection; calls for speculation.

        THE COURT:  I'll sustain the objection as to the form of the question.

        MR. NAZZARO:  Okay.

Q.   (By Mr. Nazzaro) Did you, through any of your interviews, determine who was the intended target?

A.   Yes.

Q.   And who was that?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 296 of 485
Case 3:08-cr-00134-RJC   Document 538-6   Filed 03/30/11   Page 37 of 95
JA2667

107

A.   It was Freddy.

Q.   And of the people you mentioned, and I believe you've already testified to this, but just to be clear, were any of the other individuals members of any gangs?

A.   Not that we ever determined, no.

Q.   Now, did you recover any ballistics evidence or shells or anything of that nature from the crime scene?

A.   Yes, I did.

Q.   And what did you recover?

A.   There was a .22 caliber casing in the vicinity between the concrete abutment where the bullet strike was and the benches where the victims had been standing.  It was somewhere in the middle, on the basketball court.

     And below the -- where the bullet impact was on the concrete abutment, there was some fragments of a round projectile.

Q.   What did you do with that particular item?

A.   It was all booked into evidence.

Q.   Okay.  Is it ultimately submitted to a ballistics lab as part of your department?

A.   Yes, sir.

Q.   And did you do that in this case?

A.   Yes.

Q.   Now, at some point in your investigation after September of 2005, did you start to focus on particular

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 297 of 485
Case 3:06-cr-00154-RJC   Document 286   Filed 03/26/11   Page 38 of 95
JA2668

108

suspects and individuals that you believed were involved in this murder and attempted murder?

A.   Yes.

Q.   And who were those two individuals?

A.   One was known as Wizard, Alejandro Umana.  At the time I believe we had him as Alejandro Ramirez.

The other one was a MS gang member by the name of Giovani Rodus.  At the time we only knew him as Sin.  Sin is the moniker he uses.  He was subsequently identified by his true name.

Q.   Now, with respect to that determination, did the ballistics that we were just talking about, did that play any role in your determination?

A.   It did.

Q.   Could you tell the jury what role that played?

A.   Later on, after requesting some analysis on the .22 caliber casing, it was linked to another double --

MR. FOSTER:  Objection.

THE WITNESS:  -- homicide that occurred in Wilshire division, which --

THE COURT:  Hang on.  Hang on a second.  I'll overrule that objection.

Q.   (By Mr. Nazzaro) You can continue your answer.

A.   Wilshire is an adjacent LAPD division to Hollywood. They had a double homicide that they were working, which

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 298 of 485
Case 3:08-cr-00134-RJC   Document 586   Filed 03/23/11   Page 39 of 95
JA2669

involved a .22 caliber handgun.  The casings were matched up and linked, one in the same gun.

Q.   As part of your investigation, did you consult with the investigating officers on that particular double homicide?

A.   Yes.

Q.   And who were those officers?

A.   Gene Parshall and Barry Telis are the detectives on that case.

Q.   Who was the focus of that investigation?

A.   Alejandro Ramirez, a/k/a Wizard.

Q.   And so the ballistics of those two homicides then, you had a match, at least the information you received from the crime lab?

A.   Yes.

Q.   And that -- did that assist in further focusing your efforts or your determination about a person known as Wizard?

A.   Yes.

Q.   And did you also have occasion to interview an MS 13 member about the Lemon Grove murder?

A.   Yes.

Q.   And who was that?

A.   Rene Arevalo.  He's an MS gang member.  He was affiliated with Mr. Ramirez on the Wilshire case.  And he was in the county jail, Los Angeles County jail.  I went

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 299 of 485
Case 3:08-cr-00154-RJC   Document 586   Filed 03/26/11   Page 46 of 95
JA2670

110

over and interviewed Mr. Arevalo.

Q.    When was that?

A.    That would have been -- I think it was in zero -- late '06 or '07.  I could refer to my reports if you want a date.

Q.    Was it sometime after the ballistics information that you received?

A.    I believe so.

Q.    Okay.  But you interviewed him yourself; is that right?

A.    Yes.

Q.    And did you ask him about the Lemon Grove murder?

A.    I did.  I asked him if he had any information on any other MS related shootings.  I showed him some photographs.  One photograph included Mr. Ramirez Umana.  And he said that's your Lemon Grove shooter.

Q.    Now, in addition to this ballistics and the information you received from Mr. Arevalo, did you also have occasion to in fact participate in an interview of Mr. Umana or Wizard, in April of 2008?

A.    Yes.

Q.    Is that person you interviewed -- participated in an interview with, is he in courtroom today?

A.    Yes, sir, he is.

Q.    And could you please identify him for the record?

A.    He's sitting next to his counselors.  He's wearing a blue shirt.

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 300 of 485
Case 3:08-cr-00134-RJC  Document 1262   Filed 03/26/11   Page 41 of 95
JA2671

111

MR. NAZZARO:  If the record could so reflect, Your Honor.

THE COURT:  It will.

Q.   (By Mr. Nazzaro) Is that the same person you've been referring to in your testimony with the moniker of Wizard or Lobo?

A.   Yes.

Q.   Now, this interview that was conducted in April of '08, did you conduct this with other LAPD members?

A.   Yes.

Q.   And were you questioning him about the two murders that you just talked about, the one in Lemon Grove and the one in Wilshire or Fairfax Avenue?

A.   Yes.

Q.   What was your focus, was it the Lemon Grove or the other?

A.   My focus was the Lemon Grove homicide.

Q.   Okay.  And I want to talk to you about that interview.

With respect to Mr. Umana, was he asked questions then during the course of that interview about the Lemon Grove murder?

A.   Yes.

Q.   And could you summarize and describe what Mr. Umana said with respect to that particular incident?

MR. FOSTER:  Objection to the summary.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6  Filed 03/23/17  Page 301 of 485
Case 3:08-cr-00134-RJC  Document 508  Filed 03/30/11  Page 42 of 95
**JA2672**

THE COURT:  Overruled.

THE WITNESS:  Initially, when I told him what the purpose of my interview was -- and I have to backtrack. This was done through another detective who spoke Spanish to Mr. Umana.

Q.   (By Mr. Nazzaro) Right.

A.   I would relay questions through that detective, which was Frank Flores.  And he would ask and then respond back to me.  The initial focus was, I wanted to talk about the Lemon Grove shooting.  And what he knew about it.  What his level of participation was in it.

Mr. Umana denied any knowledge.  Although he did admit some things to me.  He admitted being an MS 13 gang member. He admitted what clique he was, Park View clique.  That he was jumped in, in El Salvador.  He admitted various other things, his comings and goings in LA.  He did admit that he knew where Lemon Grove Park was.  And where he stayed when he was in Los Angeles was a street adjacent to the park on the other side of the freeway.

Q.   What is the name of that street?

A.   Mariposa Avenue.

Q.   I would like to show you what has been previously marked as Governments 531.

Was this photograph taken as part of your investigation?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 302 of 485
Case 3:08-cr-00134-RJC   Document 502   Filed 03/20/11   Page 43 of 95
JA2673

113

A.    Yes.

MR. NAZZARO:  Your Honor, I would move to admit 531.

THE COURT:  Let it be admitted.

(Government Exhibit 531 was received into Evidence.)

Q.    (By Mr. Nazzaro) What does 531 depict?

A.    This is a tunnel which leads under the freeway, which is adjacent to Lemon Grove Park.  So from this perspective you are looking due east.  And that tunnel empties out on to a cul-de-sac which is Mariposa Avenue, North Mariposa Avenue.  And the -- toward me would be toward the park.

Q.    Now, how far is this particular -- you said adjacent to the park.  How far in terms of yards is that particular area from the park?

A.    The tunnel is probably 120 yards or so from the park.

Q.    And Mr. Umana, during this interview, admitted that he lived in Mariposa Avenue at the time?

A.    Yes.

Q.    And you said he initially -- you asked him about the shooting; was that was your purpose there?

A.    Yes.

Q.    Did he -- did you also ask him about what participation, if any, he had in the shooting that evening?

A.    I asked him what he knew about it; he denied.  However, the more I asked about it, his body language indicated --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 303 of 485
Case 3:08-cr-00134-RJC  Document 1266   Filed 03/26/11   Page 44 of 95
JA2674

114

MR. FOSTER:  Objection; nonresponsive.

THE COURT:  I'll sustain the objection.

Q.    (By Mr. Nazzaro) First, I want to get into what he told you about that particular evening.

A.    Okay.  The -- basically he denied any knowledge of the shooting itself.  Then I confronted him with some information.  I showed him a couple of booking photos of MS gang members, one of them being Sin, who we had subsequently identified as Giovani Rodus.

And Mr. Umana looked at the photo and started to grin, kind of laughed, and said that's Sin.

Then I showed another photo of Alex Montez, MS gang member known as Guanaco.  And he, again, had the same reaction.

I did show him a photo of Freddy, and there was no response.  He indicated he didn't know Freddy.

I then further told him that we had eyewitnesses that put him in the park on the day of the shooting and saw him shoot.  And provided him, not only with that information, but with a ruse that I had arranged.  A ruse was a photographic line up which circled him.

The purpose of the ruse was to elicit a truthful statement from him, and apply some pressure, get him to tell me really what the truth was.

And at that moment he started to change his story a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 304 of 485
Case 3:08-cr-00134-RJC   Document 1686   Filed 03/26/11   Page 49 of 95
**JA2675**

115

little bit.  And he indicated to me, and through Detective Flores, that he had been to the park.  And that they went there in Sin's car, that night.

Q.   You said went to the park, was on that particular day of the murder?

A.   Yes.

Q.   And what did he say?

A.   He went to the park.  He and Sin drove in Sin's car which is -- he described it as a dark colored Honda.

And there were two other unknown male Hispanics, he said, in the back seat.  They went there with guns.  And they went there for the purpose of locating a rival that they were told was in the park.  And they were gonna take care of him.

Q.   And did Mr. Umana indicate what happened in the park or what he heard or observed?

A.   Yes.  He indicated that he dropped off the two unknown male Hispanics.  And that they immediately went to the basketball court.  And Umana and Sin drove to the other side of the park on the east side -- or the south side.

And -- but then he told me that all the gun fire began on the basketball court.  And he started to describe the succession of shots.  I asked him, was the shooting fast or was the shooting slow fire.  And he actually he gave me the rhythm of how they shot.

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 305 of 485
Case 3:08-cr-00134-RJC   Document 586   Filed 03/26/11   Page 46 of 95
**JA2676**

116

And so I asked him, well, demonstrate it for me.  And he said pow, pow, pow pow, pow, pow.

After that they collected up their two unknown bodies and escaped from the park.

Q.   That was his version of what happened?

A.   Yes.

Q.   And with respect to your investigation based on some of the information you've related here today and other information you may have obtained, did you present any formal charges in California?

THE COURT:  I'll sustain the objection to that.

MR. NAZZARO:  Show you a couple more exhibits -- I believe I already showed you the exhibits.  I don't have any other questions at this time.

THE COURT:  Any cross?

MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Detective Small, what the defendant actually told you was that a gang member known as Castor from the Park View clique was the shooter, correct?

A.   I believe he gave us that at the end or toward the end of the interview.

Q.   But that's what he told you?

A.   Yes, sir.

Q.   So he denied being the shooter, correct?

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 306 of 485
Case 3:08-cv-00154-RJC   Document 50-6   Filed 03/20/11   Page 47 of 95

**JA2677**

117

A.    Yes.

Q.    And this interview that you conducted on April 23rd, 2008, that was -- the entire thing was tape recorded, correct?

A.    It was audio taped.

Q.    And there's a tape and transcript of that interview, correct?

A.    I believe so.

Q.    And this interview took place not in English, right?

A.    No.

Q.    In other words, what you've testified to today -- well, do you speak Spanish, are you fluent in Spanish?

A.    No, sir.

Q.    Everything you've told us is what an interpreter translated to you from what Mr. Umana said?

A.    It's a summary of what -- how it was related to me.

Q.    Now you interviewed Mr. Arevalo in the county jail, and you say that he told you that the defendant in this case was the Lemon Grove Park shooter, correct?

A.    Yes.

Q.    But Mr. Arevalo was not present at the Lemon Grove Park incident, was he?

A.    No, sir.

Q.    And he later denied this same allegation to Detectives Parshall and Telis, didn't he?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 307 of 485
Case 3:08-cr-00134-RJC   Document 526   Filed 03/30/11   Page 48 of 95
JA2678

118

A.    Which allegation?

Q.    Or actually earlier?  His claim that Mr. Umana or Mr. Ramirez, the defendant in this case was the shooter in Lemon Grove Park?

A.    I don't know what he told them.

Q.    You were asked, who was the focus of the investigation of the double murder on Fairfax Avenue, you said Wizard. But there were actually four other participants to that murder, correct?

A.    To my understanding there were several.

Q.    And when you showed the photograph of Freddy to Mr. Umana, he indicated he did not know him, correct?

A.    He didn't seem to know him.  He didn't acknowledge him.

Q.    And you mentioned Freddy Gonzalez, and his connection with the former MS 13 member known as Guanaco.  You said he -- so are you saying, if I'm understanding your testimony, was Mr. Gonzalez convicted of felony robbery in Los Angeles?

A.    He suffered a conviction.  I would have to look at his rap sheet to see exactly what it was.  I believe it was a robbery.

Q.    Now the reported time of this shooting in Lemon Grove Park was, according to your report, was about 9:25 p.m, correct?

A.    Well, 9 -- 9:30 I think is roughly.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 308 of 485
Case 3:08-cr-00134-RJC   Document 586   Filed 03/26/11   Page 49 of 95
JA2679

119

Q.   And this was -- this was in the end of September, September 28th?

A.   Yes, sir.

Q.   Okay.  So 9:30 at night on September 28, it was basically dark outside, correct?

A.   Yeah, it was night time.

MR. FOSTER:  Could we have a moment, Your Honor?

THE COURT:  You may.

MR. FOSTER:  No further questions.

THE COURT:  You may step down, be excused.

Call your next witness.

THE WITNESS:  Thank you, Your Honor.

MR. NAZZARO:  Robert Ramos.

THEREUPON, ROBERTO RAMOS, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Sir, would you please state your name.

A.   Roberto Ramos.

Q.   Mr. Ramos, how old are you, sir?

A.   Thirty-nine.

Q.   Where do you live?

A.   Hollywood.

Q.   And Hollywood, California?

A.   Hollywood, California.

Q.   How long have you lived in Hollywood?

A.   About 27 years now.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 309 of 485
Case 3:08-cv-00154-RJC   Document 538-6   Filed 03/28/11   Page 50 of 95

JA2680

120

Q.   Were you born in California or somewhere else?

A.   No.  I was born in El Salvador.

Q.   And where were you -- did you grow up in El Salvador?

A.   Until about -- I was 14 when I left.

Q.   Where did you grow up?  Which part of El Salvador?

A.   San Salvador, the capital.

Q.   And so you came to the U.S. with your family?

A.   My mother.

Q.   You're a citizen of the United States?

A.   I'm a resident, legal resident.

Q.   Are you currently employed or have you been employed in Hollywood area?

A.   Right now I'm not working, but I have worked in that area before.

Q.   What type of work?

A.   I was -- the last job I had I was working for nonprofit.

Q.   And do you have immediate family, as well as other family in the Hollywood area?

A.   Yeah, I do.  My brother and my mother.

Q.   And I would like to direct your attention to September of 2005.  Were you working or were you living in Hollywood at that time?

A.   Yes.

Q.   And specifically directing your attention to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 310 of 485
Case 3:08-cr-00134-RJC   Document 566   Filed 03/30/11   Page 310 of 485
JA2681

121

September 28, 2005.  Were you in the Hollywood area on that day?

Q.  A.  Yes, I was.  I was at Lemon Grove Park.

Q.  Did you work at that point in time?

A.  No, I wasn't working.  I was -- it was at night.  We were playing basketball.

Q.  Okay.  Were you employed at that time?

A.  Was I employed; I believe, I was.

Q.  And you said Lemon Grove Park; is that near where you live?

A.  Yeah.  It's a few blocks from my house.

Q.  And have you been to that park before?  Is that a park you frequent?

A.  Yeah.  Ever since I've been in the United States, I usually go play in that park.

Q.  And you play basketball?

A.  Yeah, soccer before, basketball.

Q.  Are there any gangs in that area, in the Lemon Grove Park area?

A.  Yeah, as far as I know, yeah.

Q.  What type of gangs?  You know any of the names of any of them?

A.  I believe Clantone should be one of them.  And then, you know, you hear others, but I don't really know much about them.

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 311 of 485
Case 3:06-cr-00194-RJC   Document 566   Filed 03/28/11   Page 52 of 95
JA2682

122

Q.   Okay.  You're not a member of a gang, right?

A.   No.

Q.   You don't associate with gangs?

A.   No.

Q.   Now on that particular day, September 28, 2005, how was it that you came to be at the park on that day?

A.   I let my friend borrow my car.  And he said he was going to return it within a few hours, but he took longer. So I went to look for him at the park.

Q.   And who was that friend?

A.   His name is Juan Lara.  And I went to look for him at the park.  I just assumed he was there.  And sure enough he was.

Q.   Do you know what time you got to the park?

A.   I believe I got there about 8:30.

Q.   And did you play any basketball when you got to the park?

A.   Yeah, I ended up playing a game.

Q.   Who was there at the park that you were playing basketball with?

A.   There was Andy, Elger, Juan, Colby and a few other guys.

Q.   Now, you mentioned Andy, who's Andy?

A.   Andy's one of the victims that was with me at the time, you know.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 312 of 485
Case 3:06-cr-00154-RJC   Document 566   Filed 03/28/11   Page 53 of 95
JA2683

123

Q.   Did you know Andy?

A.   Yeah, I knew Andy.

Q.   Was he a gang member?

A.   No, not at all.

Q.   Did he work, do you know?

A.   Yeah.  He was -- he was working in the real estate business.

Q.   You played basketball with him before?

A.   Yeah.

Q.   You mentioned Juan, is that another one of your friends?

A.   Yeah.

Q.   Person --

A.   That was the guy had my car that I went to look for, Juan Lara.

Q.   Okay.  And do you call him Juan, or does he have a nickname?

A.   I call him Juan, but they most people call him Flaco.

Q.   What does that mean?

A.   Skinny.

Q.   Skinny.  He used to be skinny or still is?

A.   Yeah, he used to be slim.

Q.   Do you have a nickname that some people called you?

A.   Leapo (phonetic spelling).

Q.   What's Leapo?  How did you get that nickname?

Laura Andersen, RMR 704-350-7493

**JA2684**

124

A.   It's -- I used to be real thin.  And like an energy drink, it's suppose to like give you energy so you can exercise and get bigger.  So that's what they --

Q.   Now that -- was there anybody else playing basketball with you that nightlight?

A.   Yeah.  Like I said, there was a -- there was five and five, so there was a few more guys.  I mean, I can't recall all of them.

Q.   Was there a guy named Freddy at all?  Do you remember that name?

A.   Yeah.  I think he showed up late.  I mean, after I did. I got there 8:30, he got there maybe 10, 15 minutes later. You know, I can't recall if he played or not, to be honest. But I know he was there.

Q.   Now, at some point in the evening did you stop playing basketball?

A.   Yeah.  Yeah.  They -- we finished around 9:00, 9:05. They turned off the lights, you know the main lights.  So we just went and sat on the bleachers.

Q.   Okay.  You sat on the bleachers; who was on the bleachers?

A.   At the time it was Juan Lara, Andy and Freddy and Colby and Elger.  But they -- they just sit there.  Elger and Colby, they stayed there for about five minutes and they left.

Laura Andersen, RMR 704-350-7493

Case 3:08-cr-00154-RJC  Document 660  Filed 03/23/11  Page 53 of 95

**JA2685**

125

Q.   Did somebody go somewhere?

A.   One was -- Elger was going to go buy some beers.  And Colby just had something to do so he left.  I don't know what exactly he had to do, but.

Q.   I would like to show you what's been previously admitted into evidence as Government 533.  Do you see that photo in the bleachers?

A.   Yeah.

Q.   You mentioned bleachers.  Are those bleachers familiar to you?

A.   Yeah.  Yeah.  They're on the right side of the park. Right in between the basketball court and the baseball field.

Q.   There's a fence behind that?

A.   There's a fence behind that, yeah.

Q.   When you referred to bleachers, were those the bleachers?

A.   Yeah.  We were sitting right on those bleachers.

Q.   And that's the four of you, basically.  That was Andy, yourself you mentioned, and Juan --

A.   Yeah, and Juan.

Q.   And Freddy.

     Now, at some point in the evening when you were sitting on the bleachers, did you notice anything?

A.   Like I said, there was some -- there some guy -- there

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 315 of 485
Case 3:08-cr-00134-RJC  Document 562   Filed 03/30/11   Page 56 of 95
JA2686

126

was still some people playing, you know, what I mean.
Nothing -- we didn't socialize with them but, you know, what
I mean.  They would come and play late.

And on the court right in front of us, there were three
Filipino guys playing.

On the other court right next to it, closer to the
street, there were some guys playing soccer.

Q.   Did, at some point after everybody was playing and you
were sitting on the bleachers, did you notice anybody about
that roused your suspicion?

A.   Yeah.  I saw these two guys coming.  They were walking
on Hobart towards our direction.  You know, some -- for
whatever reason, they caught my eye.  And I just tell
everybody to just, you know, be careful.

Juan was laying on one of the bleachers, and he got up.
So we were kind of like -- we saw them coming, you know what
I mean.  We had our -- we were watching them.  They were
walking.

They didn't seem like they were doing anything, you
know unusual.  But, you know, for some reason they caught my
eye.  And once they got to right in between the two courts
there, you know, they took their guns and started shooting
at us.

Q.   So they took their guns, you say?

A.   Yeah.

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 316 of 485
Case 3:08-cr-00134-RJC   Document 5069   Filed 03/20/11   Page 57 of 95
JA2687

127

Q.   Tell us exactly what happened?

A.   Like I said, it wasn't -- that didn't say anything.  It just got to -- there's a fence dividing the two courts.  And they -- they got to the point and took their guns out, you know, from -- from their belt, you know what I mean, and just started shooting.

Q.   Did they say anything before they shot?

A.   No.

Q.   Did Freddy -- do you recall if he said something before they shot?

A.   You know what, honestly, I can't recall if he said anything to them.  But like I said, as far as I remember, there was no words exchanged or anything like that.

Q.   Okay.  It wasn't an argument or anything like that?

A.   No.

Q.   And when you saw them taking out the guns, what did you do?

A.   Well, I took off running, you know.

Q.   And what about the other individuals you were with?

A.   We all -- we all took off running.  Juan was first.  Andy was second.  I was right behind Andy, and Freddy was last.

Q.   And so what happened as you were running and Andy was in front of you?  What did you see next?

A.   I saw him -- I saw him fall.  You know, like tumble.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 317 of 485
Case 3:08-cr-00134-RJC   Document 538-7   Filed 03/25/11   Page 53 of 95
JA2688

128

You know, I said something to him, you know, like what's wrong with you.  Not in those words, but, you know, because it wasn't time to be funning.  These people were trying to kill us, you know.  So I sort of pulled him a little bit.  But they were still shooting.  I couldn't do anything else, so I just kept running.

Q.    Was that the last time you saw Andy alive?

A.    Yeah.  That was the last time I saw him, alive.

Q.    And you went to his funeral?

A.    Yes.

Q.    Now, as you were running, what happened?

A.    Well, I felt something in my arm, my left arm.  But, like I said, I just -- I was running.  I wasn't paying attention, you know what I mean.  Until I got further down the street, that's when I noticed that I was hit.

Q.    Okay.  And where were you -- you said hit?

A.    Yeah.

Q.    You were hit?

A.    I was hit on my left arm.

Q.    Okay.  And you're displaying your left arm.  Is there a mark on your arm still?

A.    Yeah.  Yeah.  There's a scar where the bullet went in and out.

Q.    And that scar on your left wrist is from the bullet?

A.    From the bullet.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 318 of 485
Case 3:08-cr-00134-RJC   Document 266   Filed 03/28/11   Page 59 of 95
**JA2689**

129

Q.   Did it break any bones or cause any damage or what happened?

A.   No.  It just went in and out, you know, in and out, through.

Q.   And where did you go after this occurred?

A.   You know what, I kept walking.  I believe it's Harvard Street.  I kept running down.  I got closer to Melrose, maybe like within 100 feet.  And I -- I went into a garage, you know what I mean.  And I started thinking, you know what, if these guys are still following us, they're going to catch me right here.  So I came back out.  And I noticed there was nobody coming.  So I just kept going to my house.

Q.   And as you were running as you described, were you able to hear shots being fired in addition to the one --

A.   Oh, yeah.  There were shots being fired, definitely.

Q.   Do you remember how many?

A.   To be honest, I can't recall.  Seemed like it never stopped so, you know what I mean.

Q.   I would like to show you what's been previously marked as 536.  Are you able to recognize 536 at all?

A.   Yeah.  That's about where the area where Andy fell.

Q.   Were you running and --

A.   We were running towards Lemon Grove Avenue.  You know, which is, like I said, there's the baseball cage.  And there's some steps where people sit down to watch the kids

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 319 of 485
Case 3:08-cr-00154-RJC  Document 1862   Filed 03/23/11   Page 60 of 95
**JA2690**

130

play.  So he fell right around that area.

Q.    Where were you running?  Could you point in the direction on the screen?

A.    Like I said, Juan was first Andy was --

Q.    You can use your hand on the screen.

A.    Okay.  Right around this area (indicating), that's where he fell.  Juan had already gone to his -- to his right (indicating) and I was behind Andy.

Q.    You don't know if Andy eventually got up and fell?

A.    Yeah.  You know what, once I get up, I kept going.  I didn't look back, to be honest.

Q.    The area to the right, do you know what that is?

A.    That's like a ramp where handicapped people get into the office of the park, the bathrooms are in that -- somewhere in that area.

Q.    Who was running in that direction?

A.    Juan ran in that direction.

Q.    And could you point the arrow where you eventually ran to?

A.    Oh, I just kept going, you know what I mean.  Like I said, I jumped over Andy.  I grabbed his shirt.  I just kept going in that direction towards Lemon Grove.

Q.    And this area that you were running in, was it very wide, or was it a thin area?

A.    It's a -- you know, I mean, it's a good size, I mean,

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 320 of 485
Case 3:08-cr-00134-RJC   Document 362   Filed 03/28/11   Page 61 of 95
JA2691

131

you know, for two people to walk right next to each other.

Q.   You weren't able to run to the baseball field, right, because the fence is there?

A.   Well, no.  It's fenced in.  So you can't go in that direction.

Q.   You didn't have any problems with any gangs yourself, right?

A.   No.  I had been going to that park, like I said, since I came to the United States, you know, like I was 14, 15.  I knew all the guys that lived in that area.  Like I said, I used to play soccer, basketball.  Never had any fights or any issues with anybody there.

        MR. NAZZARO:  One moment.

Q.   (By Mr. Foster) I would like to show you what's been previously marked as 536b.  Do you recognize that photo?

A.   Yeah.  That's part of the pathway that leads out to Lemon Grove Street.

        MR. NAZZARO:  I move 536b.

        THE COURT:  Let it be admitted.

(Government Exhibit 536b was received into Evidence.)

Q.   (By Mr. Nazzaro) And you said part of the pathway.  Is that the pathway where you ran?

A.   Yeah.  From the basketball court towards the Lemon Grove Boulevard or Street.

Q.   What direction is the basketball court?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 321 of 485
Case 3:08-cr-00134-RJC   Document 2062   Filed 03/26/11   Page 62 of 95

JA2692

132

A.    Somewhere in this area, heading this way.

Q.    I just want to show you 534.  Do you recognize 534?

A.    Yeah.

          MR. NAZZARO:  I move 534.

          THE COURT:  Let it be admitted.

(Government Exhibit 534 was received into Evidence.)

Q.    (By Mr. Nazzaro) How do you recognize 534?

A.    That's from the Lemon Grove Street entrance into the park.

Q.    Was that in the direction that you ran at all?

A.    Yeah.  You know, it's -- it was to my right.  This entrance is to my right from where I ran.

Q.    Is that the street you ran on to?

A.    Yeah.  Well, I went through Lemon Grove Boulevard, which is this one, on to Harvard.

Q.    Now this all happened pretty quickly; is that right?

A.    Yeah.  You know, minutes, five, maybe less, 10 minutes. I don't know.  Just happened so fast that.

Q.    There wasn't real good lighting?  There was not real good lighting or there was some lighting?

A.    It was some light, but it was dim.  Like I said, the main lights had been turned off.

          MR. NAZZARO:  No further questions.

          THE COURT:  Any cross?

          MR. BRYSON:  Yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 322 of 485
Case 3:08-cr-00134-RJC   Document 366   Filed 03/30/11   Page 63 of 95
JA2693

133

CROSS-EXAMINATION BY MR. BRYSON:

Q.   You said you were originally from El Salvador, correct?

A.   Yes.

Q.   And you left when you were 14 years of age?

A.   Yes.

Q.   That would have been 1985?

A.   Just about, yeah.

Q.   And you came with your family?

A.   Yeah.

Q.   Your family left because of the civil war going on?

A.   You know what, my older brothers had left because of that.  And I was getting in that age where you run the risk of getting -- having to make a choice either to go with the government or the gorillas.  So they decided to bring me over.

Q.   They didn't want to make that choice?

A.   You know, no.  Well, you don't have a choice.

Q.   Right.

A.   But --

Q.   It was very difficult situation?

A.   Yeah.

Q.   Now, you knew Freddy Gonzalez?

A.   Yeah.

Q.   Back on --

A.   I mean, like I said, I'm not -- I wouldn't say the word

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 323 of 485
Case 3:08-cr-00134-RJC   Document 366   Filed 01/26/11   Page 64 of 95
JA2694

134

friends, but I know him.

Q.   Did you know him to be a gang member?

A.   Yes.

Q.   Did you know what gang he was involved in?

A.   As far as I know, it's called TPC.

Q.   Okay.  Now, right after the shooting, eventually you met with the police that night, correct?

A.   Like I said, I ran home.  My girlfriend took me to the hospital.  For some reason they were already there.  So they questioned me.

Q.   So you did speak with police that night?

A.   Yes.

Q.   And you knew -- they were wearing uniforms, you knew they were the police?

A.   Yeah.

Q.   And you were cooperating with their investigation?

A.   Yeah, definitely.

Q.   Did you know at that time that Mr. Abarca had been killed?

A.   No.

Q.   But you wanted to assist in their investigation with the shooting?

A.   Well, like I said, they asked me what happened.  I told them what happened and --

Q.   And you provided a description of the suspects?

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 324 of 485
Case 3:08-cv-00134-RJC   Document 50-6   Filed 03/26/11   Page 63 of 95
JA2695

A.    Yeah.

Q.    And you even told the police that you believed you could identify them again if you saw them?

A.    Yeah.

Q.    They came to you on October 25th, 2005, and asked you to look at some photographs?

A.    Probably, I mean, I couldn't recall all the dates I seen them.  I seen them a few times.

Q.    You don't remember the dates, but you do remember at least one occasion where they came back and asked you to look at photographs?

A.    Yeah.  Showed me some pictures, yeah.

Q.    And you looked at the photographs?

A.    Yeah.

Q.    Okay.  And you didn't see anybody in the photographs that matched shooters?

A.    No.

Q.    Okay.  And, but even though you did that, you told them -- you provided them more information about the case. You said that you had thought you had seen one of the shooters in the park before?

A.    Yeah.

Q.    So you still believed that you could identify the shooters?

A.    Well, its been five years so, you know what I mean,

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 325 of 485
Case 3:06-cr-00154-RJC   Document 266   Filed 03/30/11   Page 66 of 95
JA2696

136

people change.

Q.   No.  I'm talking about, when they showed you the photographs the first time?

A.   Yeah.

Q.   You -- even though you couldn't identify anybody in those photographs, you still believed that you could identify somebody?

A.   Yeah.

Q.   If you were shown the right photograph, correct?

A.   Yeah.

Q.   And then they came back to you several months later in December of 2005 and showed you some more photographs, correct?

A.   I believe so.

Q.   Okay.  And you looked at those photographs?

A.   Um-hmm.

Q.   And you didn't see the shooters in those photographs either?

A.   No.

          MR. BRYSON:  Those are my questions.

          THE COURT:  Any redirect?

          MR. NAZZARO:  One second.

          No other questions, Your Honor.

          THE COURT:  You may step down, be excused.

          Call your next witness.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 326 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/17   Page 326 of 485
JA2697

137

MR. NAZZARO:  Juan Lara, Your Honor.  Juan Lara.

Laura Andersen, RMR 704-350-7493

JA2698

THEREUPON, JUAN LARA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Please say your name, sir.

A.   Juan, J-U-A-N.  Last name Lara, L-A-R-A.

Q.   And how old are you, sir?

A.   Thirty-four.

Q.   And where do you live?

A.   Long Beach, California.

Q.   And how long have you lived in California?

A.   About 25 years.

Q.   Where did you live before California?

A.   I was born in El Salvador, Central America.

Q.   Did you grow up in El Salvador?

A.   Yeah, from zero to eight, I believe.

Q.   Do you work or have you worked in the California area?

A.   Ever since the age permitted me to work, yes.

Q.   What type of work do you do?

A.   I deliver gasoline for a living.  I'm a commercial driver, trucks.

Q.   I would like to -- do you have any nicknames that you go by, Juan?

A.   Well, when I used to play basketball I used to play basketball with grown men and I was famous, so they used to call me Flaco.  But nothing else related.

Q.   Flaco means slim or skinny?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 328 of 485
Case 3:08-cr-00134-RJC  Document 566   Filed 03/26/11   Page 69 of 95

JA2699

139

A.   Yeah.  I was a skinny kid playing with grown men.

Q.   So some people know you by that name, that played basketball with you back then?

A.   Yes.

Q.   Okay.  Now, I want to direct your attention to 2005 September, 28.  Were you playing basketball at Lemon Grove Park on that particular occasion?

A.   Yes.

Q.   Tell us how it came that you were in Lemon Grove Park on that day playing basketball?

A.   Well, I hadn't played basketball in like three months. And my transportation to go to work, it broke down, so I didn't go to work that day, so I had some free time and I went to play basketball.

Q.   Okay.  And who were you playing basketball with?

A.   The -- with Robert, another -- Andy and --

Q.   Who's Robert, what's his name?

A.   Well, I call him Robert, but I guess his name is Roberto Ramos.

Q.   And Andy, who is Andy?

A.   Andy -- rest in peace, Andy.

Q.   Did you know Andy well, or just from basketball?

A.   I wouldn't say super, super well.  But, you know, he was -- he was a nice person.  He was -- I mean, he was -- we had an open friendship.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 329 of 485
Case 3:08-cr-00154-RJC   Document 50-6   Filed 03/23/11   Page 70 of 95
JA2700

140

Q.    Was he -- was he a part of any gang, as far as you know, Andy?

A.    Not that I know of, I doubt that.

Q.    Okay.  Are you part of any gang?

A.    I've -- from my -- what I knew about him, he was a good individual.

Q.    No, I'm talking about yourself also.  Were you part of any gang, you yourself?

A.    Oh, no.  That has never gone through my mind.

Q.    Now, at some point after you were playing basketball that evening, did a shooting occur?

A.    Yes.

Q.    Could you describe what happened, from your perspective, from what you remember that evening?

A.    From what I remember?

Q.    Yeah, from what you remember, yes, sir?

A.    I just remember laying down on the bleachers because I hadn't played basketball in a long time.  And all of a sudden I heard someone say, watch out for these guys.  I said, man, nobody messes with us.  Everybody knows that we just play basketball.  I was still laying down, and something just told me to sit up.  And when I sit up -- when I sat up, they just happened -- just --

Q.    What happened?

A.    Bullets started flying out.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 330 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 73 of 95
JA2701

141

Q.    How many people were shooting?

A.    Two.

Q.    What did you do when that happened?

A.    Run.

Q.    And do you remember what direction you ran?

A.    South bound.

Q.    And what were the other individuals you were with doing; did they run also?

A.    I don't know.  At that point every man for themselves, you know.  I got -- as soon as I turned, and I swang my arm to -- for the running motion, I got struck by a bullet in my arm.  So it almost -- it was centimeters away from my back.  So what I was thinking was like, well, you got to concentrate a bit more to dodge some more bullets.

Q.    And what did you do next?

A.    Well, run.

Q.    Were you still able to run after getting shot in the arm?

A.    Yeah.  But my arm went like, dead, I guess.  You know, I was still able to keep composure and dodge some more bullets.  And thank God I dodged them.

Q.    Okay.  Did you continue to run or did you at some point stop running?

A.    No, I ran.  But I -- I jumped this -- well, I -- I don't know if you would say hurdle jumped or like a super --

Case 3:16-cv-00057-MOC-DSC Document 50-6   Filed 03/23/17   Page 331 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 03/23/17   Page 72 of 95
JA2702

142

I wouldn't say superman, but just laid out and jumped over a wall and stood there, and bullets were still flying.

Q.    Okay.  So did you remain still then or were you continuing to run at this point?

A.    I couldn't, because when I jumped over the wall, I landed with my shoulder and my head, and that hurt.  And I was trying to protect my -- my shot up arm.  So I just -- I know, I guess it was, I just crawled back towards the wall so they wouldn't see me.  And I put the arm on top of my body and I calmed down my breathing.  I basically played possum.

Q.    What do you mean by possum, that you were --

A.    Played dead.

Q.    That you were dead?
      And you mentioned shots, how many shots did you hear?

A.    Oh man, quite a few.

Q.    And you yourself were struck by some of the shots?

A.    (Nodding head.)

Q.    Is that a yes?

A.    (Nodding head.)

Q.    You have to say yes or no?

A.    Yeah.

Q.    And do you still have any injuries from any of that shooting that night?

A.    Well, my left arm is feeble.  I can't really do

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6 Filed 03/23/17 Page 332 of 485
Case 3:08-cr-00134-RJC Document 50-6 Filed 03/23/11 Page 73 of 95
JA2703

143

push-ups or anything like that.

Q.    And do you have a visible sign on your left hand of the damage that that bullet did to you?

A.    Yes, I do, sir.

Q.    Could you please show that at this point?

A.    From which side do you want to see it.

Q.    Well, if you could just show the injury that you have.

A.    (Indicating.)

Q.    Where is it exactly, if you could point?

A.    I guess in my -- I guess in my forearm.  It has both ways of the entry and where it came out (indicating).

Q.    You have some permanent effects from that, that's your left arm?

A.    Yeah.  I don't really feel my fingers.

Q.    Were you shot anywhere else, sir?

A.    People say that I got shot in my quad.  But I had my cell phone there.  And I believe it bounced off my quadricep, or off my front right pocket.  I don't -- it's hard to say, everything just happened so fast.

Q.    It was a pretty traumatic experience, I guess, is that fair to say?

A.    Yeah.  I wouldn't want anybody to go through that.

Q.    I would like to show you what's been previously marked as Government Exhibit 536, previously in evidence.  Are you able to recognize 536?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 333 of 485
Case 3:08-cr-00134-RJC   Document 906   Filed 03/23/11   Page 73 of 95
**JA2704**

A.    Yeah, I can recognize that, sir.

Q.    How do you recognize 536?

A.    That's the pathway that Andy and Roberto took.  That's like the back stop of the diamond field of the baseball diamond.

Q.    What's the pathway you took?

A.    It's --

Q.    You can mark on your screen with that finger and it will actually turn on.

A.    More like over here.  More on the right hand side.

Q.    Could you touch the screen.  It will actually appear in a line.

A.    I'm touching, nothing moves.  (Witness indicating.)  I was on that side.  The picture can't really say.  It doesn't really cover it.  There's a pathway.

Q.    And that concrete barrier that we see there, is that where you were talking about where you played possum?

A.    Yeah.  That's the one that when I jumped over it, that wall covers -- covers about 2 to 3 feet.  So my body was able to hid or to hide from -- I wasn't able to be seen.

Q.    Just show you 536b.  Do you recognize 536b at all?

A.    Yeah.  That's that little pathway to -- that's where we ran to.  Where I ran to.

Q.    Now, with respect to after you played possum, at some point did you get up?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 334 of 485
Case 3:06-cr-00184-RJC  Document 50-6   Filed 03/23/11   Page 73 of 95
**JA2705**

145

A.   Yeah, eventually.

Q.   What did you do?

A.   I looked around.  I thought I was the last person there.  I never thought that what happened, had happened.  It was pretty much unbelievable.  So I ran to get help, started calling 911, I guess.

Q.   Did you see Andy at all?

A.   No.  Not at all.

Q.   And you cooperated with the police later in the investigation; is that right?

A.   (Nodding head.)

Q.   You talked to the police about this?

A.   Yeah, basically.  (Nodding head.)

        MR. NAZZARO:  Thank you.  I have no further questions.

        THE COURT:  Any cross?

CROSS-EXAMINATION BY MR. BRYSON:

Q.   You knew Mr. Freddy Gonzalez?

A.   Say again, sir?

Q.   One of the people playing basketball with you that night was a guy named Freddy Gonzalez, correct?

A.   That they were gunning for Freddy?

Q.   When you were playing basketball that night, one of the people you were playing basketball with was Freddy Gonzalez?

A.   Me personally, I wasn't playing with him that day.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 335 of 485
Case 3:06-cr-00154-RJC   Document 506   Filed 03/26/11   Page 76 of 95
**JA2706**

146

Q.   Do you know Freddy Gonzalez?

A.   Basketball-wise, he would play there.

Q.   And he was there that night?

A.   Yes.

Q.   Okay.  Now, after the -- after the shooting you cooperated with the police, correct?

A.   Yes.

Q.   And you met and spoke with them, correct?

A.   Yes.

Q.   And you provided a description of the shooters for the police?

A.   What I recalled, yes.

Q.   And you told the police that you were pretty sure that you could recognize the shooters if you saw them in pictures?

A.   Yes.

Q.   On October 26, 2005 the police came to you and showed you a series of photographs, correct?

A.   A lot of things transpired.  I don't really know the dates or anything like that.

Q.   At some time during this investigation you recall the police coming to you and showing you a series of photographs?

A.   Right.

Q.   And you looked carefully at those photographs?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 336 of 485
Case 3:08-cr-00134-RJC  Document 596   Filed 03/23/11   Page 73 of 95
JA2707

147

A.    Yes.

Q.    And you didn't see the shooters in any of those photographs?

A.    No.

Q.    Okay.  And then on another occasion in January they came back and showed you some more photographs, correct?

A.    I don't remember the dates, but they showed me quite a few pictures.

Q.    But you remember them coming back a second time and showing you more photographs?

A.    Right.

Q.    And you looked carefully at those?

A.    Right.

Q.    And you didn't identify -- you didn't see any of the shooters in those photographs, correct?

A.    I didn't -- it's -- everything happened so fast, I wasn't like -- you know, before you shoot me, let me take a look at you.  I don't know who shot me.  I don't know nothing.  I was just there.

Q.    I'm not trying to give you a hard time.  The second time you've looked at photographs, you did identify somebody that you'd seen as being in the park in the past, correct?

A.    Right.

Q.    But you said he hadn't been there on the night of the shooting?

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 337 of 485
Case 3:08-cr-00134-RJC   Document 506   Filed 03/26/11   Page 73 of 95
JA2708

148

A.   Right.

        MR. BRYSON:  Those are my questions.

        THE COURT:  You may step down, be excused.

        Call your next witness.

        MR. NAZZARO:  Raffi Djabourian.

THEREUPON, RAFFI DJABOURIAN, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MR.

NAZZARO:

Q.   Sir, could you please state your name for the jury?

A.   My name is Raffi Djabourian.

Q.   How are you employed, Mr. Djabourian?

A.   I'm a forensic pathologist.  I'm employed as a deputy

medical examiner at the Los Angeles County Department of

Coroner.

Q.   Doctor, how long have you been employed in that

capacity?

A.   Almost 12 years.

Q.   What are your duties?

A.   My duties are to conduct forensic autopsy in which we

determine the cause of death and the manner of death.

Q.   And you've been doing that for the last 12 years?

A.   Yes.

Q.   And what type of educational background do you have

that enables you to perform those duties?

A.   I'm a licensed physician in the State of California.  I

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 338 of 485
Case 3:08-cv-00134-RJC   Document 50-6   Filed 03/26/11   Page 79 of 95
JA2709

149

have four years of training in general anatomic pathology. One year of sub-specialty training in forensic pathology. I have board certification in both those areas.

Q.   And how many -- do you know how many autopsies you perform on a yearly basis or since you've been doing that?

A.   On a yearly basis, about 250; over all about 3,000 in my years.

Q.   Have you testified as an expert before in the field of forensic pathology?

A.   Yes.

Q.   Is that a regular part of your duties?

A.   Yes, it is.

        MR. NAZZARO:  Your Honor, at this time I would move to have Dr. Djabourian admitted as an expert in forensic pathology.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  He will be allowed to testify and offer an opinion in that area.

Q.   (By Mr. Nazzaro) I would like to direct your attention to an incident that occurred involving Andy Abarca.  Did you open a matter in that particular case?

A.   Yes.  I conducted an autopsy of that decedent.

Q.   And do you know when that autopsy was conducted?

A.   Yes, October 2nd, 2005.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 339 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/26/11   Page 80 of 95
JA2710

150

Q.   I would like to show you what's been previously marked as Government 541.  Do you recognize -- there's multiple pages, I believe, in this document.  Do you recognize 541?

A.   Yes, I do.

Q.   And how do you recognize it?

A.   That's the autopsy report which has the coroner's case number of the decedent.  And it's my autopsy report, so far, the pages that have come up.

Q.   That's the report involving Mr. Abarca?

A.   Yes.  The portions that I dictated and that were transcribed were 11 pages.

          MR. NAZZARO:  Your Honor, I would move at this time 541?

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

(Government Exhibit 541 was received into Evidence.)

 541.

Q.   (By Mr. Nazzaro) Now, with respect to this particular autopsy, were you able to determine the cause of death?

A.   Yes, I was.

Q.   And what was the cause of death?

A.   The cause of death was multiple gunshot wounds.

Q.   And you classified it in your report as a homicide?

A.   Yes, I did.

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 340 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 81 of 95
**JA2711**

151

Q.    Now, you said multiple gunshot wounds.  Does your autopsy determine -- how many gunshot wounds does your autopsy conclude?

A.    I determined that there are a total of three numbered gunshot wounds.  That is gunshot wounds that I ascribed a number to.

Q.    And was -- could you describe each of those wounds, starting with, I believe there was one in the right buttock area that's referenced?

A.    Yes.  There was a gunshot wound at the right buttock, just next to the crease of the buttock.  The bullet went through the buttock, and then ended up just behind the femur bone.  Which is the long bone in the thigh area.  And the direction of that one was from back to front.  And from left to right.  And I did recover a bullet.

Q.    You recovered a bullet in that particular one?

A.    Yes.  A bullet was recovered.

Q.    Now, with -- was there another wound; you mentioned three wounds?

A.    Yes.  Gunshot wound number two was on the left buttock. That went deeper into the hip area.  It caused an area of fracturing, a break of the pelvis bone in one area.  And then it subsequently exited at the right groin.  So there was an entry wound and an exit wound for gunshot wound number two.

Laura Andersen, RMR 704-350-7493

JA2712

Again, the same direction, back to front; left to right.

Q. And was there another wound?

A. Yes. The gunshot one number three, it was a gunshot one which involved the head. The entry was at the top of the head, towards the back, and just a little bit to the right.

The main direction was downwards, as it went through the skull and the brain. And it subsequently exited at the right temple.

So again, the direction, downwards, back to front, left to right.

Q. And did your autopsy determine which wound was the actual fatal wound?

A. The most rapidly fatal was the gunshot wound to the head. It caused a fracturing of the skull. And that would cause severe damage to the brain.

Q. And did your autopsy -- did your autopsy determine whether there were any abrasions on the individual that -- that you observed?

A. Yes. I did see some -- I'm sorry -- I did see some scrapes to the knee on both sides.

Q. In your opinion, were the wounds consistent -- were the gunshot wounds, as well as the abrasions, consistent with somebody running?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 342 of 485
Case 3:08-cr-00134-RJC Document 50-6   Filed 03/26/11   Page 83 of 95
JA2713

153

A.    They could have been.  Particularly the gunshot wounds numbers one and two.  They were coming from the backside, so he would have been running away from the direction the bullets were coming, in order for the wounds to be on the back of the body, or turned.  But to answer your question, yes, it could be consistent with running.

Q.    The third one was the one to the head; is that right; the back of the skull?

A.    That's correct.  It was towards the top of the head, and a little bit towards the back.

Q.    And you indicated the actual location in your autopsy report; is that right through a drawing?

A.    Yes, I do.

Q.    Now, is it also part of your investigation to do toxology (sic.) reports with respect to your autopsy?

A.    Yes.  We do toxicology testing.

Q.    Toxicology, I'm sorry.  Did you do that in this case?

A.    Yes.

Q.    Did that reveal anything in the victim, Mr. Abarca?

A.    No.  It was -- no drugs of abuse, no drugs or alcohol were detected.

Q.    And I also noticed on Government 541, there is some markings on the chest that are made, what are those?

A.    That's an area where there were incisions made after death.  So they were post-mortem incision.  They were tied

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 343 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/17   Page 84 of 95
JA2714

154

with string.  What they did is, took out the heart for tissue recovery, for tissue donation after death.

Q.   Okay.  So that was donated after death?

A.   Yes.

Q.   Is that reflected in your report also?

A.   Yes.  In one of my diagrams, I diagram the incision, and I indicate that it's a post-mortem incision.

MR. NAZZARO:  No further questions.

THE COURT:  Any cross?

MR. FOSTER:  One moment, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Dr. Djabourian, is that how you pronounce it?

A.   Djabourian.

Q.   Thank you.  In your report you indicate one of the three gunshot wounds you were actually able to recover the projectile?

A.   Yes, that's correct.

Q.   Okay.  And were you able to determine what caliber that was at all?

A.   I described it as a medium caliber bullet.  It was actually the core of a bullet.  It was the lead core.

Q.   Okay.  And when you say medium, in your language or your parlance, what does medium caliber mean?

A.   Medium caliber can include things such as 9-millimeter, .357, 38 calibers.  Those are some things that would be

Laura Andersen, RMR 704-350-7493

**JA2715**

155

included in medium caliber.

Q.   So larger than a 22?

A.   Yes.

          MR. FOSTER:  No further questions.

          THE COURT:  Any redirect?

REDIRECT EXAMINATION BY MR. NAZZARO:

Q.   You didn't recover any bullet from the fatal shot in the skull, did you?

A.   No.  That entered and exited.

          MR. NAZZARO:  Thank you.

          THE COURT:  You may step down, be excused.

          Call your next witness.

          MS. ROSE:  John Maloney.

THEREUPON, JOHN MALONEY, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   Good -- almost afternoon.  How are you?

A.   Good.

Q.   What is your name please, sir?

A.   John Maloney.  J --

Q.   Where are you employed?

A.   Los Angeles police officer.

Q.   How long have you been with the Los Angeles Police Department?

A.   Since May of 2003.

Q.   During that time what positions have you held?

                    Laura Andersen, RMR 704-350-7493

JA2716

156

A.    I'm just as a police officer.

Q.    When you say police officer, at the LAPD, what duties would that involve?

A.    At that time I was on patrol; patrol duties.

Q.    Were you assigned to any particular division?

A.    Wilshire Division.

Q.    And how large is the Wilshire Division?

A.    It's a pretty large division at the time.  I would say approximately 500,000 people.

Q.    Were you working in that capacity in July of 2005?

A.    Yes.

Q.    Do you recall going to a -- the scene of an incident there in your area?

A.    Yes.

Q.    What date was that?

A.    July, I believe was it 27, maybe.

Q.    On this particular occasion where did you go?

A.    1175 South Fairfax, that approximate area.

Q.    At what time of day?

A.    It was approximately 3:00 in the afternoon.

Q.    Could you just describe Fairfax, that particular road. Is it a wide road, a narrow road, what type of thoroughfare is it?

A.    Fairfax it's a pretty -- it's a major street.  But in that section of Fairfax it becomes residential.  There's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 346 of 485
Case 3:08-cv-00134-RJC  Document 50-6  Filed 03/23/11  Page 87 of 95
JA2717

157

lots of apartments.  And a little bit south of it there's a convenience store, 7/11 store further down the way.  But it's -- I -- two lanes on each side going north and south.

Q.    And you said it was a rather residential area, single family homes?

A.    They're apartment complexes.

Q.    And what was your reason for going that afternoon to that particular address on Fairfax?

A.    I was on uniform patrol in the area, and a call was generated of shots fired in the area.

Q.    How long did it take you to get to the specific address?

A.    I would guesstimate, less than two minutes.

Q.    What was traffic like at that particular time of the day?

A.    For that day I remembered it being moderate to light.

Q.    When you got to the address to which you had been dispatched, what did you see?

A.    As we were pulling up, my partner and myself, an ambulance was arriving almost simultaneously.  There was a crowd out in front of an apartment building motioning for us, and I observed two victims laying face down on the sidewalk.

Q.    At that point were -- could you tell what their condition was?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 347 of 485
Case 3:08-cr-00134-RJC  Document 50-6  Filed 03/23/11  Page 83 of 95

JA2718

158

A.   We went up and attempted to, you know, see if there were any vital signs.  They appeared to be dead at the scene.  No signs of life.

Q.   Did you step back and allow the ambulance to render any assistance?

A.   Yes.

Q.   Did the ambulance actually remove the bodies from the scene?

A.   Yes, they did.

Q.   I'm going to show you first what has been marked as Government Exhibit 511; do you recognize 511?

A.   Yes.

Q.   What is that?

A.   That appears to be -- see the address -- yeah, says 1167 Fairfax.

Q.   Let me show you Government Exhibit 509 -- 510.  Are you able to see Government Exhibit 510?

A.   Yes.

Q.   What is 510 showing?

A.   That's the west side of the street on Fairfax in front of that address.

Q.   And what's the significance of what is shown in Government's Exhibit 510?

A.   That is the clothing of one of the victims.  And then a little bit further by the tree, is the clothing of the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 348 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/23/11   Page 89 of 95
JA2719

second victim.  They were -- obviously, looks like they were cut out of their clothing and transported to the hospital.

Q.   There also appear to be some markers in that photograph?

A.   Yes.

Q.   What's the significance, if any, of those markings -- markers?

A.   To the best of my recollection, I'm not so sure but I believe those would be evidence markers.

Q.   Did you actually place those markers?

A.   I did not myself.

Q.   Other than the bodies being removed, is that a fair and accurate representation of what you saw?

A.   Yes.

        MS. ROSE:  On -- move to admit 510, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit 510 was received into Evidence.)

Q.   (By Ms. Rose) If you would, you said that it showed the clothing of the two victims.  You can touch the screen there.  Show the areas that you indicated in your testimony.

A.   The first one is there, the second one is right there. (Indicating.)

Q.   The first one, is it fair to say, in a tree in a distance next to a white car?

A.   Yes.  I remember that the guy was lying face down with

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-6   Filed 03/23/17   Page 349 of 485
Case 3:08-cr-00134-RJC  Document 50-6   Filed 03/23/11   Page 90 of 95

JA2720

160

his head almost at the curb.  And then the second one was face down on the sidewalk.

Q.    Were you able to tell at that -- when you first saw the victims still there, what injuries were present?

A.    On one of them, since they were both face down, on one of them I could see that he had a bullet wound to the back of his head.  And the other one I couldn't tell.

Q.    Let me show you what's been marked as Government 509. Are you able to see Government's 509?

A.    Yes.  Now I can.

Q.    Is that from a different perspective than the previous exhibit?

A.    Yes.  This would be north of the location looking southbound.

Q.    And fair and accurate representation of what you saw on that occasion?

A.    Yes.

        MS. ROSE:  Move to admit, Your Honor.

        THE COURT:  Let it be admitted.

(Government Exhibit 509 was received into Evidence.)

Q.    (By Ms. Rose) As to 509, if you would again then orient us relative to the previous exhibit 510, about which you testified.

A.    Touch the screen?

Q.    Yes.

Laura Andersen, RMR 704-350-7493

**JA2721**

161

A.   There and there (indicating).

Q.   What did you mark on the screen?

A.   The locations that I observed the bodies, and their location on the sidewalk and on the grass.

Q.   Now, after the -- after the bodies were removed, what investigation, if any, did you do at that time?

A.   I spoke to a witness at the scene to gather information about possible suspects to initiate a -- call it an initial crime broadcast, to put out information for responding units.

Q.   Do you recall who that witness was?

A.   I believe his name was -- last name was Bautista.  I don't know, I think he was a gardener.  Because he was out in front with a rake, you know, doing yard work.

Q.   What did Mr. Bautista tell you he had seen or heard?

A.   He said he was out in front and heard --

MR. FOSTER:  Objection; unreliable.

THE COURT:  Overruled.

THE WITNESS:  He observed two young men walking south on the west side of the street.  I guess arguing with three suspects in a vehicle, in a gold Altima, Nissan Altima.  And that the vehicle pulled over.  They got out, walked passed them.  One of the suspects removed the handgun from his waistband and shot the two victims, and then fled back into the vehicle, southbound on Fairfax.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 351 of 485
Case 3:08-cr-00154-RJC   Document 50-6   Filed 03/23/11   Page 92 of 95
JA2722

162

Q.    And at that time was he able to provide much information about what he had seen?

A.    Just -- he'd given me the vehicle description.  And the initial information was just, three male Hispanics, shaved head, baggy clothing.  He wasn't that descriptive with me, because I was just trying to get out a quick broadcast so that hopefully a responding unit would pick up the vehicle as it was fleeing.

Q.    Did you, in fact, broadcast that information particularly relative to the gold Altima?

A.    I did not myself, but Officer Torres who was with me wound up broadcasting it.

Q.    After that, did you have any further responsibilities relative to the crime scene or that particular investigation?

A.    Nothing more than just keeping pedestrians from entering the crime scene.

Q.    And after that date, did you have any further involvement in the investigation?

A.    No.

Q.    Did you note any weapons around the bodies of the two victims?

A.    No.

        MS. ROSE:  Thank you.  I don't have any further questions.

                  Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 352 of 485
Case 3:08-cr-00134-RJC   Document 982   Filed 03/28/11   Page 93 of 95
JA2723

163

THE COURT:  Any cross?

MR. FOSTER:  Yes.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Officer Maloney, the witness you spoke to at the scene, you said it was a Mr. Bautista?

A.   Yes.

Q.   And he told you the two guys that had gotten shot -- before they were shot, he told you they flashed gang signs and yelled at the people in the car, didn't they?

A.   Yes.  That it was some sort of argument.  That they were throwing up some sort of hand signs towards each other.

Q.   And as far as the people in the car that got out, he said there were a total of three people, correct?

A.   Yes.  That's what he had mentioned to me, three people.

Q.   He didn't talk about any other people that were in the car, correct?

A.   Not to me, no.

Q.   And whatever you discussed with Mr. Bautista, he didn't give you anything in writing or a diagram or anything, correct?

A.   No.  Detectives came on scene and then they -- I guess spoke with him at a more lengthy.  I was more, as I said earlier, just trying to get out quick information to responding units.

MR. FOSTER:  No further questions.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 353 of 485
Case 3:08-cr-00134-RJC   Document 592   Filed 03/26/11   Page 94 of 95
JA2724

164

THE WITNESS:  Thank you.

THE COURT:  You may step down.  Be excused.

THE WITNESS:  Thank you.

MS. ROSE:  My next witness, Your Honor, is rather lengthy.  I don't know if the Court wants to break.

THE COURT:  Members of the Jury, we didn't have a morning break.  We'll take a lunch break a little bit early today.  Take a lunch break for an hour.  During the lunch break, don't talk about the case.  Keep an open mind.  And we will see you at 1:45.

(The jury was escorted from the courtroom.)

(Lunch recess.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.

Dated this the 20th day of April, 2010.

s/Laura Andersen
Laura Andersen, RMR
Official Court Reporter

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-6   Filed 03/23/17   Page 354 of 485
Case 3:08-cr-00134-RJC  Document 50-6   Filed 03/26/11   Page 95 of 95
JA2725

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:08-CR-134-2
)
      vs. ) VOLUME II-B
) AFTERNOON SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA, )
)
      Defendant. )
_____)

TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 20, 2010

APPEARANCES:

On Behalf of the Government:

      JILL WESTMORELAND ROSE
      Assistant United States Attorney
      100 Otis Street
      Asheville, North Carolina 28801

      SAM G. NAZZARO
      U.S. Department of Justice
      950 Pennsylvania Avenue, NW
      Washington, DC 20530

On Behalf of the Defendant:

      MARK P. FOSTER
      Law Offices of Mark Foster, PC
      1011 East Morehead Street, Suite 300
      Charlotte, North Carolina 28204

      JOHN DAVID BRYSON
      Wyatt Early Harris & Wheeler, LLP
      P.O. Box 2086
      High Point, North Carolina 27261


                  CHERYL A. NUCCIO, RMR-CRR
            United States District Court Reporter
                  Charlotte, North Carolina

Case 3:16-cv-00057-MOC  Document 50-6  Filed 03/23/17  Page 355 of 485
Case 3:08-cr-00134-RJC  Document 545  Filed 10/24/10  Page 1 of 181

JA2726

I N D E X

                                                              PAGE

GOVERNMENT'S WITNESSES

GENE PARSHALL
        Direct Examination by Ms. Rose.................    169
        Cross Examination by Mr. Bryson...............    195
        Redirect Examination by Ms. Rose..............    220

BARRY TELIS
        Direct Examination by Ms. Rose.................    223
        Cross Examination by Mr. Foster...............    237
        Redirect Examination by Ms. Rose..............    242

WILLIAM MOORE
        Direct Examination by Ms. Rose.................    245
        Cross Examination by Mr. Bryson...............    259
        Redirect Examination by Ms. Rose..............    261

SUSAN SELSER
        Direct Examination by Ms. Rose.................    261

J. SAGE
        Direct Examination by Mr. Nazzaro.............    277
        Cross Examination by Mr. Bryson...............    281

L. GOODMAN
        Direct Examination by Mr. Nazzaro.............    282
        Cross Examination by Mr. Bryson...............    283

A. THORNWELL
        Direct Examination by Mr. Nazzaro.............    285
        Cross Examination by Mr. Bryson...............    290

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 356 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/31/10   Page 2 of 1

JA2727

<u>I N D E X   O F   E X H I B I T S</u>

OFFERED  RECEIVED

<u>GOVERNMENT'S EXHIBITS</u>

| | OFFERED | RECEIVED |
|---|---|---|
| No. 112................................... | 287 | 287 |
| No. 504................................... | 253 | 253 |
| No. 505................................... | 185 | 185 |
| No. 515................................... | 176 | 176 |
| No. 516................................... | 177 | 177 |
| No. 517................................... | 232 | 232 |
| No. 518................................... | 231 | 231 |
| No. 520................................... | 221 | 221 |
| No. 522................................... | 220 | 220 |
| No. 523................................... | 269 | 269 |
| No. 525................................... | 270 | 270 |
| No. 545................................... | 285 | 285 |
| No. 547................................... | 279 | 279 |
| No. 549A.................................. | 288 | 288 |
| No. 550................................... | 289 | 289 |

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 357 of 485
Case 3:08-cr-00134-RJC   Document 596   Filed 10/24/10   Page 357 of 485
JA2728

TUESDAY AFTERNOON, APRIL 20, 2010

(Jury not present.)

THE COURT:  Are we ready for the jury?

MS. ROSE:  Yes, Your Honor.

MR. BRYSON:  Your Honor, before we do...

THE COURT:  Yes.

MR. BRYSON:  I apologize for not pointing this out to the court.

THE COURT:  Okay.

MR. BRYSON:  On -- with regard to the statement of Rene Arevalo -- again, I'm sorry to bring this up now.  I should have looked at it earlier, but I was under the impression we were going with the transcripts of the preliminary hearing.  There was one part that I wanted to ask the court to consider for redaction, for exclusion, and it's on page 142 of the statement.  And it's at the end of the interview where Detective Parshall is conversing with Arevalo and Parshall says:  "I believe you because I do this for a living.  I interview people.  I know when people are lying.  I know when people are telling me the truth."

THE COURT:  Yeah, let's strike that.  Let's sanitize that.  All right.

MS. ROSE:  And I'm -- you said that's on 143?

MR. BRYSON:  At the bottom of page 142 to the top of page 143.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 358 of 485
Case 3:08-cr-00134-RJC   Document 54-6   Filed 10/31/10   Page 358 of 485
JA2729

GENE PARSHALL – DIRECT

MS. ROSE:  I will do that.

THE COURT:  All right.

MR. BRYSON:  Thank you.

THE COURT:  Thank you.

Call the jury.

(Jury entered the courtroom.)

THE COURT:  Call your next witness.

MS. ROSE:  Gene Parshall.

GENE PARSHALL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Good afternoon.  If you would state your name, please.

A.   Gene Parshall.

Q.   Where are you employed?

A.   Los Angeles Police Department.  Currently at Mission Division homicide.

Q.   How long have you been with the police department?

A.   Over 16 years.

Q.   During that time, what has been your assignments?

A.   I have worked as a gang officer, patrol officer, robbery detective, and homicide detective since 2001.

Q.   Have you been assigned to divisions other than the Mission Division?

A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 359 of 485
Case 5:08-cr-00134-RJC   Document 50-6   Filed 10/24/10   Page 359 of 481

JA2730

GENE PARSHALL – DIRECT

Q.   What other division?

A.   Foothill, Pacific, Devonshire, and Wilshire.

Q.   Was Wilshire the division to which you were assigned immediately prior to your current assignment in the Mission District?

A.   Yes, it was.

Q.   While you were employed at Wilshire, were you a homicide investigator solely during that time?

A.   No.  I started out juvenile.  Then I went and investigated robberies, and then homicides.

Q.   Did you work with a partner?

A.   Yes.

Q.   With whom did you work?

A.   During the time of this investigation, I was working with Detective Telis.

Q.   And when you say this investigation, I'm going to turn your attention to July 27th of 2005.  Do you recall that date?

A.   Yes, I do.

Q.   How do you recall that occasion?

A.   We were notified of a homicide investigation on Fairfax Street, and we responded to that location.

Q.   And did you actually respond that day?

A.   Yes, I did.

Q.   Do you recall about when you got there?

A.   It was daylight.  It was afternoon sometime.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 360 of 485
Case 9:08-cr-00134-RJC   Document 59-6   Filed 10/24/10   Page 360 of 81
JA2731

Q.   And Fairfax is a roadway in the Wilshire Division?

A.   Yes, it is.  A north/south street.

Q.   Is it -- how would you characterize that particular road?

A.   That particular road is a busy street.  There is one lane in each direction running north and south.  It's mostly multi-unit apartment buildings along both sides of that street.

Q.   When -- do you recall the specific address to which you reported on July the 27th, '05?

A.   It was the 1100 block, as I remember.

Q.   When you got to the 1100 block, what initially did you see?

A.   We saw a crime scene that had been taped off with crime scene tape.  There were officers there that got there before us.  And there was an area where there was -- appeared to be some ballistic evidence as well as some other items of interest to us.

Q.   I'm going to show you what has previously been identified as Government's -- Government's Exhibit 509.

First I'm going to show you what has already been admitted as Government's Exhibit 510.  Are you able to see that on your screen there?

A.   Yes.

Q.   Do you recognize what's shown in Government's 510?

A.   Yes.  That's a photograph of the crime scene that I

GENE PARSHALL – DIRECT

responded to.

Q.   And is that what you saw when you first got there?

A.   Yes.

Q.   There appears to be -- there are some markers as well as some other items on the sidewalk and the grassy area.  What are those markers there?

A.   Those are number markers that we place down to mark items of evidence that we are planning on recovering and booking.

Q.   And regarding the clothing, do you see that in the photograph?

A.   I do.

Q.   Did -- do you know why there was clothing left on the sidewalk there in the distance on the grass?

A.   Yes.  That was clothing that was cut off of the victims that had fallen at the scene.

Q.   Once you arrived at the scene, what did you then begin doing?

A.   We began directing officers.  We evaluated our crime scene, if it needed to be increased or not.  We directed officers to canvass the area, the apartments, surrounding apartments for witnesses.  And we began to process and collect the evidence.

Q.   Initially were there any witnesses there for you to interview?

A.   Not initially.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 362 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 10/24/10   Page 8 of 18

JA2733

GENE PARSHALL – DIRECT

Q.   Did you ultimately have an opportunity to interview a witness who had been there or was present at some part of the scene?

A.   Yes.

Q.   Who was that?

A.   Noe Bautista.

Q.   And do you know what Mr. Bautista was doing on that particular date when the events happened?

A.   Yeah.  He was doing some gardening at the apartment building thre.  I believe it was 1167 South Fairfax.

Q.   And what information was Mr. Bautista able to give you?

A.   He stated that he observed a gold or tan Nissan Ultima driving southbound on Fairfax.  He observed that there were three occupants inside the vehicle that appeared to be arguing and gesturing with their hands to two individuals on the sidewalk.  He then stated the Ultima stopped.  The occupants got out and confronted the victims on the sidewalk.  And ultimately one of the suspects from the vehicle shot the two victims.

Q.   Was he able to make any identification for you as to any of the people in the car?

A.   No.

Q.   Did you collect any evidence there at the scene?

A.   Yes.

Q.   What did you collect?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 363 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 03/24/10   Page 96 of 161
JA2734

GENE PARSHALL – DIRECT

A.   We collected the victims' clothing that was there.  We collected two .22 caliber casings, spent casings.  We recovered a couple Xbox video game CDs, an Xbox game, like, manual, a small steak knife.  And that's about it.

Q.   The -- where were the Xbox games and the Xbox manual?  You said there was a bag with those.  Where were they located relative to the clothing that was left behind?

A.   I can't give you an exact measurement, but in very close proximity to the clothing in the parkway.

Q.   Did you take all the evidence that you collected, turn it in to your evidence facility, and was it maintained there?

A.   Yes.

Q.   What then next did you do in the investigation?

A.   Once we completed the required reports, we began following up on possible leads as they presented themselves to us.

Q.   Initially what did -- what was your first lead or where did you first begin interviewing witnesses who may be able to provide information?

A.   Well, we interviewed witnesses that saw various portions of what had happened.  I can just remember Noe and one other particular witness that we had a chance to speak to.

     And then we concentrated on a dispute that we knew the victims had had with some other kids in the neighborhood.  We looked at that as a possible lead as well.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 364 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 16 of 34

JA2735

GENE PARSHALL – DIRECT

Q.   And that was a dispute that had happened some time prior to these events?

A.   Yes.

Q.   And why did you focus on that as your first group of leads that you followed?

A.   That was the best lead we had at the time.  And we figured that since there was some prior conflict with someone, that might have been an escalation of that conflict.

Q.   Did those leads take you anywhere?  Did you learn anything that helped?

A.   No.

Q.   What did you learn as you interviewed people relative to whether there had been an altercation at some time -- some time prior to these events?

A.   We learned that there was an altercation, but we were unable to tie any of those individuals in with this murder.

Q.   What did you next do?  What was the next lead that you had, if any, to follow?

A.   Just the area that it happened, direction that the vehicle was traveling.  We were looking at another gang called 18th Street which is a large Los Angeles gang.  And we, you know, did some research into 18th Street shootings and guns and arrestees and stuff, and that didn't pan out with anything either.

Q.   At some point did you put out some bulletins trying to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

attract attention hoping that someone could come forward and provide information?

A.   Yes.  We did a press conference with members of the victims' families and we put out some photographs of the two victims requesting the public's help for information on leads in this case.

Q.   Show you what has been marked as Government's Exhibit 515.  What is -- what is Government's 515?

A.   That is a picture of one of the victims, Gustavo Porras.

Q.   And is this one of the flyers that you and Detective Telis generated hoping to get some information from the community or some leads?

A.   Yes.  This was used -- this wasn't distributed, like handed out to people.  This was used during the press conference and was something that the cameras could photograph.

          MS. ROSE:  Move that as 515, Your Honor.

          THE COURT:  Any objection?

          MR. FOSTER:  No, Your Honor.

          THE COURT:  Let it be admitted.

          (Government's Exhibit No. 515 was received into evidence.)

Q.   I'll also show you what has been marked as Government's Exhibit 516.  Are you able to identify Government's Exhibit 516?

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 366 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 12 of 34
JA2737

GENE PARSHALL - DIRECT

A.   Yes.  That's the victim, Jose Herrera.

Q.   It's the same -- same type flyer that you discussed regarding Mr. Porras?

A.   Yes, it is.

MS. ROSE:  I'd move 516, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 516 was received into evidence.)

Q.   When did you next get some information that helped to further your investigation?

A.   We got some information from an individual who said that he -- his friend Chipis had told him about a murder that occurred on Fairfax and that the murder may be related to the gang MS or Mara Salvatrucha.

Q.   And did you know if Chipis had -- were you able to determine Chipis' true given name?

A.   At that time, no, but later on.  His name was Luis Ramos.

Q.   Did you have conversations with anyone from the ballistics division or other investigators regarding some shell case matchings?

A.   Yes.  The .22 casings that we recovered were input in -- they were actually compared against .22 casings from a shooting at Hollywood division.  We spoke to -- I spoke to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 367 of 485
Case 3:08-cr-00734-RJC   Document 1252   Filed 10/04/10   Page 367 of 485
JA2738

GENE PARSHALL - DIRECT

Detective Small from Hollywood Division and we were -- I was informed that there was a match between his casings and our casings.  And he further related that his case involved the gang MS as well.

Q.   After you had this information, the lead regarding this Chipis or Luis Ramos, what did you next do in your investigation?

A.   Well, I need to back up to the witness who gave us information.  We asked him -- since Noe Bautista had told us that he observed one of the occupants of the suspect vehicle had crutches and now we had the information about MS.  The witness had also -- we asked him if he knew anyone from MS that had crutches.  He said that he knew someone from MS that was using crutches.  He was shot during the murder of Dime or Dime.  So we got --

Q.   Let me stop you there.  Was this murder to which you're referring, was that prior to July 27th, '05, the offense which you were investigating?

A.   Yes.

So after that we found out who the detectives were that were investigating the Dime murder and asked them about an individual that was shot during that murder that was -- that had crutches.  And I was told by Detective Motto from Rampart Division who was investigating that case that a male named Luis Rivera, in fact, had crutches both before and after the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 368 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 46 of 85
JA2739

GENE PARSHALL – DIRECT

date of our murder.  And he was an MS associate.

Q.   Based upon all of this evidence, what did you then do?

A.   We asked Mr. Rivera to come to the station for an interview.

Q.   And did he voluntarily do so?

A.   He did.

Q.   What day were you able to speak with Luis Rivera?

A.   I think it was April 21st of...

Q.   '08?

A.   '08.

Q.   Who was present for that interview?

A.   Myself and Mr. Rivera as far as I remember.  Possibly Detective Telis.

Q.   And at that particular interview, describe what transpired.

A.   Well, based on the information I had, I felt that he was probably the -- one of the occupants of the vehicle and had information about my murder.  I questioned him about that.  He was evasive at first and didn't want to talk.  At first he lied a little bit about the incident, saying that he had been in a gold Nissan Ultima.  He had gone to the beach, but he didn't know about a shooting.  Eventually he told me the truth about what happened.

MR. FOSTER:  Objection to the truth, Your Honor.

THE COURT:  Sustained.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 369 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 369 of 485
JA2740

GENE PARSHALL – DIRECT

Q.   Eventually what did he tell you?

A.   Eventually he told me -- told me his account of what had happened.

Q.   What did he tell you?

A.   He told me that he was in a gold Nissan Ultima with four associates of his.  They were traveling on Fairfax Street.  He identified the driver as a gentleman by the name of Rene Arevalo, a/k/a Moe.  He said the front passenger was a guy named Wizard who he identified as Alejandro Ramirez.  He stated that the other -- he was seated in the back seat on the left side which would be behind the driver.  And the other two occupants in the back seat was Luis Ramos and Eddie -- if I can look at my follow-up to refresh my memory as to his last name.

Q.   You may do so.

A.   Oh, it's Ruiz.  Eddie Ruiz.

     Shall I continue?

Q.   Yes.

A.   He stated that as they were driving along the street, two males on the sidewalk began saying things to them and throwing gang signs.  He said that the occupants of his car were throwing gang signs back.  Eventually Rene Arevalo pulled the car over to the curb and several of the occupants of his car got out, including Mr. Ramirez or Mr. Umana.  He stated that they got out to confront the two kids on the sidewalk, and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 370 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 03/23/17   Page 370 of 485
JA2741

eventually Mr. Umana fired on the two victims striking them both. Striking them both.

He then stated they got -- Mr. Umana and the other two people in the car got back in the car and they proceeded to go to the beach.

Q. Did he -- was he able to describe for you at that time what he observed about how the victims fell after they were shot?

A. Yes. He said that the first victim was shot in the head or the face and fell forward. And that the -- and then the other victim was shot, and I don't remember if he described how he fell or where exactly he was shot on the second victim.

Q. Was the information that he had provided, particularly regarding the position of the first victim being face down, was that consistent with your investigation?

A. Yes.

Q. The information about the crutches, was that consistent?

A. Yes. He stated that one of the back seat occupants had grabbed one of his crutches and took it out of the car with him.

Q. Had Mr. Bautista indicated that he had seen someone with crutches?

A. Yes.

Q. Did you have -- on that particular occasion after you had spoken with Mr. Rivera, what then next did you do in the

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 371 of 485
Case 3:08-cr-00134-RJC   Document 52-6   Filed 10/24/10   Page 371 of 485

JA2742

investigation?

A.   Based on the information he gave about the other people in the car, we decided to contact Luis Ramos who he said was at his own house while we were interviewing him.  And Detective Telis went out and detained Mr. Ramos and brought him to the station for questioning.

Q.   Did you then question Mr. Ramos on that occasion?

A.   Yes.

Q.   Did he provide an account of what had occurred on this date, April 21st, '08?

A.   Not on that occasion, no.

Q.   What did -- what did Mr. Ramos do on April 21st, '08, at the interview?

A.   At the end of the interview, he invoked -- he asked for his lawyer.  Said he didn't want to talk any more, and the interview was terminated.

Q.   After that interview was terminated, what then did you do with Mr. Ramos and Mr. Rivera?

A.   We put them -- got them some pizza.  Put them in an interview room together which was audio recorded.

Q.   What was your purpose in doing so?

A.   To see if they were going to talk about the crime at all.

Q.   And at this point, you had already documented what Mr. Rivera had told you regarding the specifics of the shooting.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 372 of 485
Case 3:08-cv-00534-RJC   Document 59-6   Filed 10/24/10   Page 372 of 485

JA2743

183

GENE PARSHALL - DIRECT

A.    Yes.

Q.    Were you able to listen as Mr. Rivera and Mr. Ramos were there in the room together?

A.    Someone did listen to them speaking in the room.

Q.    Did you have a Spanish speaking officer there to assist with that?

A.    Yes.

Q.    Was he providing real-time or current translations as to what was being said?

A.    I don't know if we got it a little bit later or it was immediate -- immediately upon, you know, him listening.

Q.    But it was that day?

A.    Yes.

Q.    Or that afternoon.

A.    Yes.

Q.    What -- what, if anything, did you learn from the conversations that Mr. Ramos and Mr. Rivera were having in the holding cell?

A.    Well, it appeared that they were afraid.  They were talking about, you know, we're going to do a lot of time for this.  We're going to do a thousand years.  We're going to do two hundred years for this.

      They talked about -- they discussed whether they should -- they discussed telling detectives about what happened that day.  And they talked about not wanting to do a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 373 of 485
Case 3:08-cv-00734-RJC   Document 59-6   Filed 03/23/17   Page 373 of 485
JA2744

bunch of time because of someone else.

Q.   Did Mr. Rivera tell Mr. Ramos that he had already made a complete statement to law enforcement?

A.   Yes.

Q.   At some point later, several days later, were you and Agent Telis contacted by Mr. Ramos or his attorney?

A.   By Mr. Ramos.

Q.   What happened on that occasion?

A.   Myself and Detective Corona, who's a Spanish speaker, we learned that Mr. Ramos now wanted to talk.  So we got him out of the jail cell and re-Mirandized him and clarified if he wanted to talk at this point, and he said that he did.

Q.   Describe what he said, then, during that interview.

A.   Basically said the same thing that Mr. Rivera had said, you know, about the gold Ultima.  Driving on Fairfax.  That Moe was the driver.  That Umana, or Wizard, had gotten out and shot the victims.  And he talked about the -- he identified the same people being in the back seat of the car.  And he described the confrontation with the two victims.

Q.   Did you present photographs for him to see if he could make any identifications?

A.   Yes.

MS. ROSE:  May I approach the witness, Your Honor?

THE COURT:  You may.

MS. ROSE:  May I approach?

GENE PARSHALL - DIRECT

THE COURT:  You may approach.

Q.   I'm going to hand you what's been marked as Government's Exhibit 505.  There are numerous pages within that exhibit.  Are you able to recognize Government's Exhibit 505?

A.   Yes.

Q.   How are you able to recognize this exhibit?

A.   These are photographic six packs that I prepared and that I showed to Mr. Ramos, and they contain photographs of each of the five people in the gold Ultima.  And each one of these Mr. Ramos circled, signed, dated, and wrote monikers of each of the suspects.

MS. ROSE:  I would move to admit Government's Exhibit 505, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let them be admitted.

MS. ROSE:  And publish -- if I may publish to the jury?

THE COURT:  You may.

(Government's Exhibit No. 505 was received into evidence.)

Q.   What do you -- this is one sheet of Exhibit 505.  What is on the screen there before you?

A.   That is a photographic lineup containing a photograph of Rene "Moe" Arevalo in position number 4, which would be the

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 375 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 275 of 385
JA2746

bottom left circled photograph.

Q.   And that shows the signature and date of Mr. Ramos?

A.   Yes.

Q.   Now, just briefly explain for the jury how you go about putting together a photographic lineup such as this.

A.   When we put together a photographic lineup, the purpose is to eliminate or identify a possible suspect of a crime.  We insert six similar looking photos, basically same sex, descent, age, obvious facial hair, et cetera, identifiers into a photo six pack.

Q.   Second part of Government's Exhibit 505, if you would take a look at what's on the screen there.  What is -- what do you see on the screen relative to this portion of 505?

A.   That's another photographic six pack containing a picture of Eddie -- I keep forgetting his last name.  If I can look at my follow-up.

Q.   Mr. Ruiz?

A.   Yes.  In the number 5 position.  Again, signed, circled, and dated.

Q.   And what was his name?

A.   They called him Blackie or Negro.

Q.   Third page of Exhibit 505.

A.   That is a photographic six pack containing a photograph of defendant Umana.  He is in position number 5.  Again, Mr. Ramos signed, circled, dated, and wrote what I believe he

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 376 of 485
Case 3:08-cr-00134-RJC   Document 1356   Filed 10/04/10   Page 22 of 34

JA2747

GENE PARSHALL – DIRECT

meant to be Wizard on that photograph.

MR. FOSTER:  Objection.

THE COURT:  Sustained as to what he believed.

Q.   All right.  What is spelled out there on the photograph?

A.   It reads Guizard with a G.  G-u-i-z-a-r-d.

Q.   In his prior interview, had he used that name or another name to identify the defendant?

A.   Well, Wizard.

Q.   Did he also, as he was going through these and identifying them, indicate who he was identifying verbally?

A.   Yes.

Q.   And what did he call the individual written here as Gizard or Guizard?

A.   Wizard.

Q.   Another page of Exhibit 505.  Are you able to identify the exhibit?

A.   Yes.  That's a photographic six pack with a photograph of Luis Rivera in the number 6 position.  Again signed, dated, and circled by Mr. Ramos.

Q.   And finally, the last page, fifth page of Exhibit 505.

A.   That's a photographic six pack of -- I believe that's Mr. Ramos himself.

Q.   And did he put a nickname underneath?

A.   Yeah.  Looks like Liro, L-i-r-o, M-o-o.

Q.   Did -- were -- did Mr. Ramos identify each of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 377 of 485
Case 3:08-cr-00734-RJC   Document 5250   Filed 10/04/10   Page 377 of 485
JA2748

GENE PARSHALL - DIRECT

individuals as having a relationship with any particular group?

A.   Mr. who?

Q.   Mr. Ramos.

A.   Yes.  I don't know if he identified them all or each one, but he said they were related to the MS gang.

Q.   After you had interviewed Mr. Ramos, what next did you do, then, in your investigation?

A.   After Mr. Ramos, we decided we needed to talk to Rene Arevalo.  We put a want in the system and informed Hollywood Division officers that we were looking to arrest him.

Q.   And ultimately, did you and Detective Telis have an opportunity -- or Detective Telis have an opportunity to interview Mr. Arevalo?

A.   Yes.

Q.   After the interview of Mr. Arevalo, what then did you and Detective Telis do relative to this investigation?

A.   After Arevalo we put -- we had the want in for Mr. Arevalo, and we put a want in the system for Mr. Umana as well.

Q.   And when you say you put a want in the system, what specifically is that?

A.   That's basically a kind of a wanted for questioning, a want in the system.  If you run someone's name, it comes up that he has a want and he can be detained for us to question

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 378 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 2 of 8
JA2749

GENE PARSHALL – DIRECT

him regarding a particular crime.  It's different than a warrant in that there's no charges filed with the district attorney's office.

Q.    Ultimately, did you or Detective Telis seek criminal charges against any of the individuals involved in the July 27th --

MR. FOSTER:  Objection.

THE COURT:  Sustained.

Q.    At some point did you get -- have the opportunity to speak with the defendant?

A.    Yes.

Q.    When was that?

A.    I believe it was April of 2008.

Q.    And where did that interview take place?

A.    In North Carolina.

Q.    Was the defendant given his Miranda warnings?

A.    Yes.

Q.    Did he speak with you and other officers?

A.    Yes.

Q.    Did the defendant indicate when he had arrived in Los Angeles?

A.    Yes.  He stated he came to Los Angeles.  Then he went to New York.  Then he returned to Los Angeles in sometime around March or April of '05.

Q.    Did he indicate when he first arrived in -- when he first

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 379 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 29 of 134
**JA2750**

GENE PARSHALL – DIRECT

arrived in Los Angeles?

A.   I don't recall.  He did.  I don't remember what the date was.

Q.   Would it refresh your recollection to look at the transcript of interview?

A.   Yes.

Q.   Do you have that with you?

A.   I believe so.

Q.   Approximately page 19 may help you a little bit to narrow.

A.   Yes.  He said he arrived October 26, 2004.

Q.   As you talked to the defendant, did you talk to him about his -- would he be willing to cooperate or was he in a position to cooperate and provide information relative to just the Los Angeles cases?

A.   Yes, we did.

Q.   What did he say?

A.   He basically invited us to ask some questions about any Los Angeles stuff.

Q.   Did he at any point indicate concerns about any cooperation?

A.   Not that I recall.

Q.   All right.  What did the defendant tell you about what occurred first of all on July 25th of '05 there on Fairfax?

A.   If I can just check that date again, the 25th.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 380 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 280 of 485
JA2751

GENE PARSHALL - DIRECT

Q.   I'm sorry, it was the 27th.

A.   He said that he was in a vehicle when two individuals came up towards the vehicle.  He stated that they approached the vehicle.  That some of the occupants got out of the vehicle.  That he had a gun.  And that the two individuals were shot and killed that day.

Q.   Did he, in response to specific questions about someone firing shots and two people dying, do you recall specifically what he said?

A.   Yes.  We asked him -- one of the questions was did you shoot them and he said, "You can say that."

Q.   Did he describe for you whether -- what kind of signs or hand signals that the victims were making?

A.   He said that they were making the W sign for either White Fence or West Side.

Q.   Did he demonstrate those signs for you?

A.   Yes.

Q.   Did you ask him specifically about his membership in MS?

A.   Yes.

Q.   What did he say?

A.   He stated that he did -- was a member of MS and had been jumped into the Park View clique in El Salvador.

Q.   Did the defendant tell you whether he saw the -- whether the victims had a weapon?

A.   He stated he didn't see them with a weapon.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 381 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 27 of 63

JA2752

GENE PARSHALL – DIRECT

Q.   Did he indicate what, if anything, Mr. Arevalo did?

A.   He said that Mr. Arevalo was driving the car.

Q.   Did he indicate whether Mr. Arevalo stayed in the car or got out of the car or had any involvement?

A.   He said that Mr. Arevalo stayed in the car.

Q.   Did he say who the other occupants of the car were?

A.   Yes.  He said it was Chipis, Negro, and Luis Rivera were in the back seat.

Q.   Did he tell you what kind of car they were riding in?

A.   I believe he said brown or tan Nissan.

Q.   At some point was he asked did anybody -- did the guys say anything or what, if anything, he recalled the victims saying?  Do you recall his response?

A.   I recall he said one of the victims approached the car and said something about what's up.

Q.   And did the defendant tell you what he did in relation to that?

A.   He said that he was the only one to speak back to them.

Q.   Did the defendant tell you where he had had the weapon?

A.   Yes.  He said he had it inside his pants.

Q.   Did he tell you how far away the victims were at the time they were shot?

A.   Yes.  About 10 meters.

Q.   Did he say anything about killing rivals?

A.   Yes.  He talked about enemies of his gang, MS.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 382 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 28 of 31
JA2753

GENE PARSHALL – DIRECT

Q.   At some point during your interview with the defendant, did he begin to sing or talk about a rap song?

A.   Yes.

Q.   Do you recall reading what the defendant told you or was saying to you during your interview?

A.   It was some type of rap song, and during it he would say the name of his gang.  He would -- he would -- it was in Spanish and he would recite like a poem rap -- rap-style poem and would be repeating Mara Salvatrucha over and over.

Q.   Was that translated at some point for you --

A.   Yes, it was.

Q.   -- as that was happening?

     Have you also seen a written translation of what was said?

A.   Yes.  I don't remember some of the exact words offhand; but if I can look at the transcripts, it would refresh my memory on what he said.

Q.   All right.  It's about page 126.

A.   (No response.)

Q.   If you can't locate it at this time, that's fine.  But you recall the Mara Salvatrucha part of that?

A.   Oh, yes.  Yes.

Q.   At some point, did -- was there another investigator present other than the one who was translating for you?

A.   Yes.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 383 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 29 of 43
JA2754

GENE PARSHALL – DIRECT

Q.   Who was present?

A.   Detective Small from Hollywood Division.

Q.   And did Detective Small have an opportunity to ask the defendant any questions?

A.   Yes.

Q.   Do you recall the instance or what circumstances Detective Small was asking the defendant about?

A.   Yes.  He was questioning him about the Hollywood murder at Lemon Grove Park.

Q.   And what did the defendant tell Detective Small about that incident?

A.   He eventually admitted that he was there when it happened, but denied actually being the shooter.

Q.   Did he provide information about how many shots there were, if you recall?

A.   I believe -- I believe he said pow pow at one point, indicating two.

Q.   And did he indicate that after everything happened, that he assisted those individuals in getting away?

          MR. FOSTER:  Objection.  Leading.

          THE COURT:  Sustained.

Q.   What did he say about, after the shooting there at the Lemon Grove Park, what he did?

A.   He said that one of the individuals or both the individuals ran across the park and he -- he said he picked

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 384 of 485
Case 3:08-cv-00534-RJC   Document 52-6   Filed 10/24/10   Page 384 of 485
JA2755

GENE PARSHALL - CROSS

them up, I believe, in a car.

Q.   The individual you interviewed and who you called the defendant through your testimony, do you see him here today?

A.   Yes.

Q.   Could you identify that individual.

A.   He's seated over here wearing a light blue, long sleeve shirt with his hand against his cheek.

        MS. ROSE:  If the record could reflect the identification of the defendant, Your Honor.

        THE COURT:  It will.

Q.   Does the defendant look different today than he did when you initially met him?

A.   Yeah.  His hair has grown out.

        MS. ROSE:  All right, sir.  Thank you.

        I don't have any other questions of this witness at this time, Your Honor.

        THE COURT:  Any cross?

        MR. FOSTER:  Yes, Your Honor.

                    CROSS EXAMINATION

BY MR. FOSTER:

Q.   Detective Parshall -- is that how you pronounce it?

A.   Yes, sir.

Q.   Okay.  You started off testifying about this incident on Fairfax Boulevard.  The only witness you interviewed on the scene that day was -- was it Noe Bautista?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 385 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 385 of 485
JA2756

A.    That's the one that I remember.  We may have talked to other people that were there, but he's the one that provided notable information to me.

Q.    Okay.  And he was the one that -- his -- his story was that basically three people -- there were a total of three people in the car that contained the shooter, correct?

A.    Yes, that's what he said.

Q.    And you were working this investigation with your partner, Detective Telis?

A.    Yes, sir.

Q.    Okay.  And -- I'm going to pull up what, if my memory is correct, would be Defense Exhibit 3 for identification.  Do you see something on your screen?

A.    Yes.

Q.    Do you recognize what that is?

A.    Yes.

Q.    What is it?

A.    That is a drawing that was done during an interview with him, with Mr. Bautista.  That's my partner's handwriting.

Q.    Okay.

A.    And there's a diagram showing the suspect vehicle.  And during this interview, it appears that he identified the driver as the shooter and put two individuals in the back seat, for a total of three.

Q.    Okay.  All right.  Thank you.

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 386 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/24/10   Page 32 of 34
JA2757

MR. FOSTER:  All right, you can take that down.

Did you capture that?

THE CLERK:  Yes.

Q.    Now, didn't Mr. Bautista say something about seeing a knife in the hand of one of the victims laying on the ground?

A.    No, not that I remember.

Q.    Now, the two victims you identified in the photographs, your investigation also revealed that they themselves were gang members, correct?

A.    That they were taggers.

Q.    And a tagger is like a junior version of a gang?

A.    It depends on what you mean by junior.  They are not gang members.  Some tagging groups do become absorbed into an actual gang or become a gang.  Some taggers just are part of a tagging crew and move on to...

Q.    A tagging crew is a group of people who are working together to go put their graffiti around a certain neighborhood, correct?

A.    Not necessarily the neighborhood, but to put -- put their graffiti, put their marks on -- up so people can see them.

Q.    Okay.  And so the purpose of doing so is to sort of stake out some sort of turf, correct?

A.    Not so much as a gang would.  But at times, yes, it's not uncharacteristic for them to do that for turf reasons

Q.    So the statement that these guys supposedly flashed gang

JA2758

GENE PARSHALL - CROSS

signs, including a W or something, that would indicate that they themselves were gang members, wouldn't it?

A.   Well, taggers can also have hand signs or make gestures as well.

Q.   Did your investigation reveal that these two victims were members of a tagging crew or a gang called Posted on Fairfax?

A.   A tagging crew called POF, Posted on Fairfax, yes.

Q.   In fact, didn't your investigation reveal that approximately two months before this incident, one of the ultimate victims, Gustavo Porras, was involved in some sort of fight in a building in that same location, that same area?

A.   Yes.

Q.   And that that was gang related.

A.   I don't remember if it was -- I don't remember any gangs being involved in that confrontation.

Q.   But in that instance, Gustavo Porras was armed with a knife.

A.   I don't remember.

Q.   Well, do you remember writing in your report that on September 7, 2005, you and someone named Cade interviewed a person named Michael Cann regarding that incident?

A.   If I can refer to my report, that would refresh my memory.

Q.   Okay.

A.   Is it my chronological report or is it my --

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 388 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 348 of 385
JA2759

GENE PARSHALL – CROSS

Q.   Well, it's a murder investigation progress report.

A.   Progress report.

Q.   And it's on page 7, top third of that report.

A.   Thank you.

Yes, that refreshes my memory.

Q.   Okay.  So was that accurate that Gustavo Porras was armed with a knife during this fight I was referring to?

A.   It's accurate that Mr. Michael Cann said that he was armed with a knife on that incident.

Q.   And didn't your investigation also involve an interview of somebody named Henry Alverado?

A.   Again, if I can refer to -- is it the same progress report?

Q.   Yeah, bottom third.

A.   Okay.  Yes.

Q.   Okay.  Didn't Mr. Alverado tell you that the other victim, Jose Herrera, used to belong to a tagging crew called CTM?

A.   Yes.

Q.   And that while he was a member of that crew, he had numerous fights and run-ins with members of the TCA tagging crew?

A.   Yes.

Q.   And that he later then moved -- left that group and joined the Posted on Fairfax tagging crew.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 389 of 485
Case 3:08-ct-00734-RJC   Document 52-6   Filed 10/24/10   Page 39 of 84

JA2760

A.   Yes.

Q.   A couple times you were asked about speaking with Luis Rivera and Luis Ramos on April 21st, 2008.  But actually, it was 2006, correct?

A.   Yes.

Q.   And you said Mr. Rivera, as you put it, was initially evasive.

A.   Yes.

Q.   In fact, in the beginning he denied that he ever even exited -- he denied exiting the car, correct?

A.   Yes.

Q.   Okay.  And he denied that he was a member of MS initially, correct?

A.   Yes.

Q.   And you knew this was not true, didn't you?

A.   My -- my determination was that he never did exit that car.

Q.   No, I'm asking about the MS membership.

A.   I don't know about MS membership.  He was clearly an MS associate.  Whether he was an actual member, I don't know if he was categorized as an actual member by anyone.

          MR. FOSTER:  One moment, Your Honor.

          THE COURT:  All right.

          (Defense counsel conferred.)

BY MR. FOSTER:

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 390 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/24/10   Page 390 of 485
JA2761

Q.   Detective Parshall, didn't you indicate in your investigation report regarding this investigation that Luis Rivera was a documented Mara Salvatrucha gang member?

A.   Yeah, if I can refresh my memory by my report.

Q.   If you can look at the section right in front of you, which I guess we would mark as Defense Exhibit 4 for identification.  Middle of that page.

A.   Okay.  I stand corrected.  Yeah, I must have queried our CalGang database which would have documented gang members in there and he must have been in there.

Q.   But nevertheless, when you first spoke to him, he denied being an MS member, correct?

A.   Yes, he did.

Q.   And then he also claimed that he had never exited the car during this incident at Fairfax Avenue, correct?

A.   Yes.

Q.   And you, based on your investigation, took the view that that was false, correct?

A.   At one point -- I need to explain that if I may.  At one point we had made some deductions and I believed, and I put in my report that I believed he did exit the car because of one of the witness's observation of someone walking around with two crutches.  However, after talking with the other people in the car, I changed my opinion on that and believed that he never did exit the car.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 391 of 485
Case 3:08-cv-00574-RJC   Document 52-6   Filed 10/04/10   Page 391 of 485

JA2762

GENE PARSHALL - CROSS

Q.   Well, didn't you write in your report, in this very same report that Mr. Rivera lied about being in the vehicle until confronted with evidence that he could not deny.  And in fact, that both eye witnesses stated that three suspects exited the vehicle when Rivera said only two suspects exited, and that one witness observed the third suspect to be holding two crutches.  Detectives determined that Rivera was the third person to exit the vehicle.

A.   Correct.  That was my deduction at that time.

Q.   And in that same section of the report, didn't you write that detectives opined that Rivera denied getting out of the car in order not to further implicate himself and his statements were largely self-serving?

A.   Yes.

Q.   And in your investigation of this -- these murders on Fairfax Avenue, you've put together lots of documents with the history of each of the suspects and that sort of thing, correct?

A.   Yes.

Q.   I mean, their involvement, prior police contacts, that sort of thing.

A.   Some of them previous arrest reports.

Q.   Okay.  Well, let me ask you this.  In your materials did you come across a report regarding Luis Rivera regarding an arrest on February 19th, 2006, by Officer Solis, S-o-l-i-s?

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 392 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/04/10   Page 392 of 485
JA2763

GENE PARSHALL – CROSS

A.    Off the top of my head, I don't recall that, but I can probably find it if it's in here.

Q.    Okay.  Well, let me see if I can pull it up for you. Maybe that will be quicker.

(Defense counsel conferred.)

MR. FOSTER:  I'm sorry, Your Honor, one moment.

(Pause.)

THE WITNESS:  May I look in my book to attempt to locate that?

Q.    That's fine with me.

A.    Are you talking about an arrest report --

Q.    Yeah.

A.    -- of Mr. Rivera?

I don't have that in here.

Q.    I found it.  Let me see if I can just get it up on this thing here.

Are you able to see that at all?

A.    Yes.

Q.    Okay.  It appears to be a report 2/19/06 by an Officer M. Solis in the Hollywood Division.  And it appears to be, up at the top left, Luis Enrique Rivera on Mariposa Avenue.  Is that the same Luis Rivera we've been talking about?

A.    If I can check his identifiers.

Q.    Okay.  Date of birth 8/19/87.

A.    It appears to be the same individual.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 393 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 393 of 485
JA2764

Q.   Okay.  And then down in the little brief little arrest description here, it says, During detention for drinking in public, defendant gave false information to police officers in an attempt to delay the investigation/lie.  Were you aware of that before?

A.   No, not that I know.

Q.   Does this appear to be a true and accurate copy of an LAPD police department report?

A.   Yes.

Q.   Okay.

     MR. FOSTER:  I would ask to have that marked as Defense Exhibit 5 and captured.

Q.   Now, what happened when -- after you interviewed Luis Rivera, shortly thereafter Luis Ramos was brought in also, correct?

A.   Yes.

Q.   And you indicated that he had invoked his right to have an attorney, correct?

A.   Initially he talked and then during the interview he invoked, yes.

Q.   And when he initially talked, he denied knowing anything about the Fairfax Avenue murders, correct?

A.   Correct.

Q.   And he also denied knowing Wizard, correct?

A.   Correct.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 394 of 485
Case 3:08-cv-00573-RJC   Document 59-6   Filed 10/24/10   Page 40 of 034
JA2765

GENE PARSHALL - CROSS

Q.   And he also said that day he took -- took the bus to the beach.

A.   Yes.

Q.   Okay.  Then he clammed up, asserted his attorney rights, correct?

A.   Correct.

Q.   Okay.  And then you put him in a room together with Luis Rivera --

A.   Yes.

Q.   -- right?

     Okay.  And you were able to get translation as you listened in or somewhat later and a conversation took place where they had a conversation about what to tell the police, right?

A.   Yes.

Q.   And during that conversation, isn't it true that Luis Rivera said, Let's say what -- let's say that we did what we did because we felt threatened because -- because they were both armed.

A.   Yes.

Q.   And isn't it true that Luis Ramos during the same conversation talked about a plan to tell the police a story? He said, I will say you did not do anything.  Isn't that correct?

A.   Yes.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 395 of 485
Case 3:08-cv-00734-RJC   Document 59-6   Filed 10/24/10   Page 395 of 485
JA2766

GENE PARSHALL - CROSS

Q.   And then he also said, This is what we're going to say. I did not do anything and you did not do anything.  Right?

A.   Words to that effect, yes.

Q.   And then he also said, I'm going to say that you remained inside the car and did not do anything and that they threatened us.  Right?

A.   Yes.

Q.   Okay.  And something about, I will not -- I won't -- I won't do a thousand years for a son-of-a-bitch.

A.   Yes.

Q.   And so the two were then -- after this session where they were in the same room, the decision was made to -- that they were booked into jail, spend the weekend in jail and to be in the same cell and have a recording device in there, correct?

A.   Yes.

Q.   But for whatever reason, the recording device disappeared and did not record anything.  Or there was some sort of --

A.   Yes, they destroyed it.

Q.   And then when they came back out on the 24th, on Monday, that is when they changed their mind and now Mr. Ramos was willing to speak, correct?

A.   Yes.

Q.   In fact, Mr. -- and Mr. Rivera wanted to speak again, correct?

A.   Correct.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

207

GENE PARSHALL - CROSS

Q.   And now this time, Mr. Rivera's story had changed and he gave another version of a story, correct?

A.   Yes.  He changed a couple things on his story.

Q.   He changed what the role of Luis Ramos was in the incident, didn't he?

A.   Yes.

Q.   And what was the change?

A.   He kept him in the car and put the other guy out of the car.  And then I believe he also said, He did get out of the car, but it was only to get my crutch.

Q.   Yeah, he claimed that he got -- that Ramos got out of the car after the shooting and only got out to retrieve the crutch, correct?

A.   That's correct.

Q.   Which was contrary to what he told you the first time.

A.   That's correct.

Q.   Actually, wasn't the second time he -- the switch was that he was now at this time saying that Ramos exited the car along with Ruiz and Wizard to confront the two other guys?

A.   I need to look at my follow-up to get the details.

Q.   Okay.

         (Defense counsel conferred.)

BY MR. FOSTER:

Q.   Okay.  I'm pulling up that same report of yours that we pulled up earlier.  There's a section there just a little bit

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 397 of 485
Case 3:08-cv-00734-RJC   Document 59-6   Filed 10/04/10   Page 397 of 485
JA2768

GENE PARSHALL - CROSS

from the top, the second full paragraph says, On April 24th, 2006.  Maybe you can take a look at that and see if it refreshes your recollection about what he said.

A.    Yes.  Okay.

Q.    All right.  So didn't he now claim that Ramos got out and was one of the ones confronting the victims?

A.    Yeah.  He said that Ramos and Ruiz both got out of the car and confronted the victims.  And at that time, defendant Ramirez exited the car and shot both victims.  And then after the shooting Ruiz dropped the crutch and got back in the car and was now in the middle.  And then Ramos -- as Ramos was getting ready to come back in the car, Rivera yelled at him to grab his crutch from the parkway.  So Ramos went back, picked up the crutch, got back in the car and was now seated in the right rear passenger seat position.

Q.    So the switch in the stories was this time Rivera was saying Ramos had gotten out of the car twice.

A.    Yes.

Q.    And now on the same occasion, on April the 24th, after this weekend in jail with Mr. Rivera, Mr. Ramos was now willing to speak also, correct?

A.    Yes.

Q.    And now on this occasion, contrary to what he said before, he admitted that he was present, correct?

A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 398 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 448 of 485

JA2769

GENE PARSHALL - CROSS

Q.   And however, his story was that he denied exiting the car until after the shooting, correct?

A.   If I can refresh my memory here.

Q.   Okay.

A.   Can you give me a couple more lines on that.

Q.   Yeah.

A.   Okay.

Q.   So does that refresh your memory that Ramos, when he finally talked to you, claimed he only got out of the car once and that was after the shooting to retrieve the crutch?

A.   Yes.

Q.   So what Ramos and Rivera were telling you about Ramos's role in this event conflicted, correct?

A.   Yes.

Q.   And then you've testified today about interviewing Rene Arevalo.

A.   Yes.

Q.   Also known as Moe.

A.   Yes.

Q.   Now, when you interviewed Mr. Arevalo, that was, I think you said, on May 16th, 2006.  Is that right or am I...

A.   If I can refer to my follow-up.

Q.   Okay.

A.   It was May 25th, 2006.

Q.   Okay.  All right.  So you had interviewed him under what

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 399 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 189 of 485
JA2770

GENE PARSHALL - CROSS

circumstances?

A.   We were investigating this murder.

Q.   Okay.  How did you find him?

A.   He was arrested by Hollywood Division officers.

Q.   For something else or for this?

A.   Well, our intention was to arrest him for this.  He may have had a parole violation or something going on, but I'm not -- I'm not quite sure.

Q.   And before -- when you went to interview him, you knew that he had been previously deported and illegally returned to the country?

A.   I don't recall that.

Q.   And you had investigated Mr. Arevalo earlier in the year of 2005 for an assault with a deadly weapon.

A.   No.

Q.   On the date that you interviewed him on May 26th, 2006, did he have any contraband on him?  Strike that.  I'm sorry, strike that question.

     At the time that you interviewed Mr. Arevalo, had you uncovered information that indicated that he himself had previously shot a White Fence gang member?

A.   Yes.  We received information from Luis Ramos that Mr. Arevalo had been involved in a shooting or two.

Q.   And isn't it true that when you interviewed Mr. Arevalo on May 25th, 2006, his version of what happened on July 27th,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 400 of 485
Case 3:08-ct-05734-RJC   Document 52-6   Filed 10/04/10   Page 400 of 485

JA2771

GENE PARSHALL – CROSS

2005, like the others, he admitted that he was the driver of the vehicle, correct?

A.   Yes.

Q.   However, he said that the three people exited the car while he was stuck in stop-and-go traffic, correct?

A.   Yes.

Q.   And he claims the three people got out and it was after that that he pulled over, correct?

A.   Yes.

Q.   So he denied any awareness in advance that anything violent was going to take place, correct?

A.   Correct.

Q.   So his statement avoided any admission of criminal liability on his part, correct?

A.   Um...

Q.   Let me ask you this.

A.   I'm trying to remember everything that he said.

Q.   I mean, he was claiming that he didn't know what was going to happen.  He was driving the car and they got out before he had any opportunity to stop the car, correct?

A.   His -- his story was that he did not know that Mr. Umana was going to do a shooting.

Q.   And that he didn't know the other three guys were going to get out of the car because he hadn't even pulled over, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 401 of 485
Case 3:08-cr-00134-RJC   Document 527   Filed 10/04/10   Page 401 of 485

JA2772

GENE PARSHALL - CROSS

A.   Correct.

Q.   And didn't he also tell you that Ramos, Luis Ramos, was one of the ones who got out of the car, correct?

A.   I don't recall a whole lot of details about his interview.  I didn't read it or listen to it prior to --

Q.   Okay.

A.   -- coming up here.

Q.   We can pull that up and put that in front of you.  The second page of it is -- well, why don't you start at the bottom of the previous page just to...

     Does this appear familiar to you as being a report you would have written regarding an interview of Mr. Arevalo?

A.   Yes.

Q.   And starting at the last two lines at the bottom of page 1 there -- by the way, I guess we'll call this Exhibit 6.  Talks about how at 2215 hours you and Detective Telis interviewed Mr. Arevalo.  Do you see that part?

A.   Yes, I do.

Q.   Okay.  I'm going to flip to the second page now, okay.  I'd like you to read that and see if it refreshes your memory about what he said.

          (Witness complied.)

A.   Okay.

Q.   Okay.  So does that refresh your memory that, in fact, Mr. Arevalo told you that Luis Ramos got out of the car along

                  Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 402 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 402 of 485
JA2773

GENE PARSHALL - CROSS

with the two others?

A.    Yes.

Q.    And that he also said that Mr. Ramos yelled La Mara?

A.    Yes.

Q.    Now, going back to -- you said that when you interviewed Luis Ramos, you showed him five photo lineups and you said it was of five people involved in the incident on Fairfax Avenue.

A.    Yes.

Q.    And the one you identified as the nickname written on there, it was the fifth one we looked at.

MR. FOSTER:  Actually, can you pull up the fifth page of Exhibit 505, please.

THE WITNESS:  Yeah, I may be mistaken about who that is.  I haven't seen the pictures in quite some time.

Q.    Okay.  Well, you testified that this is one of the people he identified and it looks like the same date.  Is that -- is that a picture of himself or is that a picture of somebody else?

A.    I thought that was Ramos, but I'm not sure.  I need to look at his photo to confirm.

MR. FOSTER:  All right.  Thank you.

Q.    Now, on the day of the -- the investigation report that we've looked at...

(Defense counsel conferred.)

MR. FOSTER:  I'm sorry, one moment, please.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

GENE PARSHALL – CROSS

(Pause.)

BY MR. FOSTER:

Q.   All right.   In investigating this murder on Fairfax –– these two murders on Fairfax Avenue, you and Detective Telis, who is your partner, worked together and prepared an investigative report, correct?

A.   Yes.

Q.   Okay.   And so in doing this investigation, you also incorporate information that is obtained by other officers and detectives, right?

A.   Yes.

Q.   Okay.   So one of the witnesses that was interviewed and information provided in your report was regarding an interview on the day of the murder, July 27, 2005, with an eye witness named Oscar Santiago, correct?

A.   Yes.

Q.   Okay.   And according to Detective Urina, Mr. Santiago said he was driving southbound on Fairfax Avenue when he observed three males arguing with one male.   Do you recall that?

A.   Yes.

Q.   And then he told the detective that he heard a shot and then observed three suspects enter what looked like a tan 1994 Lexus four door, right?

A.   Yes.

Cheryl A. Nuccio, RMR–CRR (704)350–7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 404 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/04/10   Page 56 of 85
JA2775

GENE PARSHALL - CROSS

Q.   Okay.  And then he also told Detective Urina, the suspects drove southbound on Fairfax Avenue to eastbound Packard Street, right?

A.   Yes.

Q.   He also told the detective that he observed the shooter who was also the driver of the suspect vehicle, correct?

A.   Yes.

Q.   And described the shooter as a male Hispanic, 18 to 20, 5'10", 180 pounds, white T-shirt, blue collar, white and blue New York baseball cap, right?

A.   Yes.

Q.   And it was a stainless steel semi automatic handgun, right?

A.   Yes.

Q.   So Oscar Santiago then identified the shooter as being the same person who was the driver of the vehicle.

A.   Yes, that's what he said.

Q.   When you interviewed Mr. Arevalo -- sorry to keep switching between players here.  But Mr. Arevalo, when you interviewed him, you were trying to get him to tell the truth and you confronted him with a few things, one of which was that a witness had said that the driver of the vehicle was the shooter, correct?

A.   I need to refresh my memory on that.  Do you have the report?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 405 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 54 of 84
JA2776

GENE PARSHALL – CROSS

Q. Yeah, if you'll give me a minute here.

All right. Detective Parshall, do you recall testifying in a hearing in Los Angeles on Mr. Arevalo's case?

A. Arevalo. Yes.

Q. And you testified -- or do you recall there being an issue as to the admissibility of his statement and that's why you were testifying?

A. Yes.

Q. And would it refresh your memory as to what you might have said, if I can show you a page from that transcript?

A. Yes.

Q. Showing you what should be now Defendant's Exhibit 7 for identification. If you can just take a look at this. See if that refreshes your memory at all.

I'm sorry, go ahead and look at that page. The next page is the one I'm going to ask you about.

A. Okay.

Q. Okay. And then the next page.

MR. FOSTER: We'll make this part of the same Exhibit 7, or Exhibit 8?

THE CLERK: (Affirmative nod.)

MR. FOSTER: Okay. Exhibit 8.

Q. All right. Keep going. See if that refreshes your memory.

A. It doesn't refresh my memory as to saying that, but it

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 406 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 52 of 63
JA2777

wouldn't -- it wouldn't be an impossible statement to make. I may have made that statement.

(Defense counsel conferred.)

BY MR. FOSTER:

Q. And so of the people that you were investigating for the Fairfax Avenue double murder, the only one who was alleged to be in that car who you could not find in Los Angeles during the time of these interviews was Alejandro Umana, correct?

A. Correct.

Q. Now, when you first interviewed Mr. Arevalo, you asked him if he knew anything about the Lemon Grove Park shooting.

A. I don't know if I asked him about Lemon Grove or not.

Q. Well, didn't he deny any knowledge of it at one point?

A. I don't remember talking to him about it. I may have, but I don't recall that right now. That wasn't my case, so...

Q. Do you remember that you -- that you interviewed him and it was recorded and a transcript made?

A. Yes.

Q. If I can put that up as Defendant's Exhibit 9 for identification and ask you to take a look at that. See if that refreshes your memory.

A. Okay. I did ask him about Lemon Grove Park.

Q. And so at that point he denied knowing anything about it, correct?

A. Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 407 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 53 of 84
JA2778

Q.   And during that same interview of Mr. Arevalo, he denied to you that he was a member of MS, correct?

A.   Yes.

Q.   Now, when you came out here to North Carolina to interview Mr. Umana, he was then in custody in Guilford County jail, correct?

A.   Yes.

Q.   Up in Greensboro or High Point.

A.   Yes, sir.

Q.   And at that point, as far as you knew, he had a lawyer representing him on his North Carolina charges, right?

A.   I believe so.

Q.   Okay.  And neither you nor anyone else contacted his lawyer before that interview, correct?

A.   I don't know if anyone did or not.

Q.   You didn't, though, correct?

A.   I did not.

Q.   Now, the interview had -- it started at about 11:30 in the morning.

A.   That's about accurate.

Q.   Okay.  And do you recall that Mr. Umana had not had any food or lunch yet at that point?

A.   I don't know.

        MR. FOSTER:  One moment, Your Honor.

        (Pause.)

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 408 of 485
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 540 of 613
JA2779

GENE PARSHALL - CROSS

BY MR. FOSTER:

Q.   Earlier you had been looking at a transcript up there, referring to it a little bit when you were testifying about this interview on April 23rd, 2008, correct?

A.   Which interview -- which one was that?  Of Mr. Umana?

Q.   Yeah.

A.   Yes.

Q.   Is that a complete transcript you have up there or is it a portion?

        (Counsel conferred.)

A.   I have a 183-page transcript here.

        (Counsel conferred.)

        MR. FOSTER:  One more moment, Your Honor.

        THE COURT:  All right.

BY MR. FOSTER:

Q.   You mentioned at the end of your direct examination about Detective Small asking at this same interview about Mr. Umana's involvement in the Lemon Grove Park incident and you said something about Mr. Umana saying he picked them up after -- after the shooting or whatever.  Do you remember saying that?

A.   Yes.

Q.   Okay.  But what he said was that he wasn't the driver. The driver of the vehicle was this person known as Sin, correct?

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 409 of 485
Case 3:08-cr-00134-RJC   Document 52-6   Filed 10/24/10   Page 533 of 854
**JA2780**

GENE PARSHALL – REDIRECT

A.   Yes.

MR. FOSTER:  No further questions.

THE COURT:  Any redirect?

MS. ROSE:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   A couple of things you've been asked about, Officer Parshall.  First is Government's Exhibit 522.  Are you able to identify Exhibit 522?

A.   It is a transcript of myself, Officer Flores, and Detective Small's interview with Mr. Umana.

Q.   And have you had an opportunity to review that transcript?

A.   Somewhat, yes.

Q.   Is it a fair and accurate representation of the interview you conducted?

A.   Yes.

MS. ROSE:  I'd move 522, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 522 was received into evidence.)

Q.   You were also asked about what I'm going to hand to you marked as Government's Exhibit 520.  What is Government's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 410 of 485
Case 3:08-cr-00134-RJC   Document 52-6   Filed 10/24/10   Page 369 of 485

JA2781

GENE PARSHALL – REDIRECT

Exhibit 520?

A.   This is a transcription of my interview with Luis Ramos. Yeah, let me just double check that.

It's actually Luis Rivera's.  My interview with Luis Rivera.  Although it says Ramos, it's Rivera.

Q.   Well, apparently you or someone else put Rivera on the face sheet of the translation.

A.   Yes.  This is Rivera.

Q.   Okay.  And you had an opportunity to -- at some point to review this.  Is it fair and accurate?

A.   Yes.

MS. ROSE:  I'd move 520.

THE COURT:  Any objection?

MR. FOSTER:  I would just make the same objections that have been made earlier in the case, Your Honor, as to that.

THE COURT:  Very well.  Overruled.  Let it be admitted.

(Government's Exhibit No. 520 was received into evidence.)

Q.   Now, we heard about one person having crutches, another having crutches.  What was consistent among all the individuals that you interviewed?

A.   That Mr. Rivera --

MR. FOSTER:  Objection.  Calls for conclusion.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 411 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 57 of 85
JA2782

BARRY TELIS - DIRECT

THE COURT:  Overruled.

A.   That Mr. Rivera is the one who had the crutches and did not get out of the car at any point.

Q.   What else was consistent among all the interviews?

A.   That Mr. Arevalo was the driver of the vehicle and never got out of the car.

Q.   Anything else?

A.   That Mr. Umana was the front right passenger and was the one that got out of the car and shot the two victims in the head.

Q.   Those facts never changed?

A.   No.

        MR. FOSTER:  Objection.  Argumentative.

        THE COURT:  Sustained.

        MS. ROSE:  I don't have any other questions.

        THE COURT:  You may step down and be excused.

        Call your next witness.

        (Witness stepped down.)

        MS. ROSE:  Barry Telis.

                        BARRY TELIS,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. ROSE:

Q.   If you would, please, sir, state your name.

A.   It's Barry Telis.  B-a-r-r-y T-e-l-i-s.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 412 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 56 of 83
JA2783

BARRY TELIS - DIRECT

Q.   Where are you employed, Mr. Telis?

A.   I'm a detective with the Los Angeles Police Department in California.

Q.   How long have you been with the police department?

A.   I've been a police officer for 23 years.

Q.   During that time, where have you been employed?

A.   I've been employed several areas throughout the city. Wilshire area, Hollywood area, Harbor area.

Q.   But that 23 years has always been with the LA police department?

A.   Yes.

Q.   What have been your positions there?

A.   I have been a patrol officer and a detective.

Q.   How long have you been a detective?

A.   Ten years.

Q.   And are you assigned -- what assignments have you had as a detective?

A.   I've worked a homicide unit in Wilshire.  I have worked a burglary unit in Hollywood.  And I'm currently assigned to LAPD's robbery/homicide division.

Q.   Back in July of 2005, what position were you working?

A.   I was an investigator assigned to the Wilshire area as a homicide investigator.

Q.   And with whom were you working?  Did you have a partner?

A.   I did.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 413 of 485
Case 3:08-cv-00734-RJC    Document 52-6    Filed 10/04/10    Page 59 of 83
JA2784

BARRY TELIS - DIRECT

Q.    Who was that?

A.    That was Detective Parshall.

Q.    Did you and Parshall together work a shooting on July 27th of 2005?

A.    Yes.

Q.    What were the circumstances?

A.    It was a shooting that had just occurred on a street called Fairfax.  I believe it's the 1100 block.  Detective Parshall and I heard this on a police radio and both of us responded to the scene.

Q.    When you -- when you got there, what did you see?

A.    Several police officers were about the street.  There were several police cars in the street.  I noticed there was some blood that appeared on the sidewalk.  There was some items scattered on the sidewalk also in the parkway and actually on the sidewalk.  And then I spoke with the first unit that was there -- the first patrol officers that were there.

Q.    And ultimately, did you and Detective Parshall begin interviews trying to determine what had occurred?

A.    Yes.  Detective Parshall and I assumed as lead investigators on this particular case.

Q.    And was it -- is it fair to say that it was some time before you actually made some forward progress in the case?

A.    Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 414 of 485
Case 3:08-cv-00734-RJC   Document 52-6   Filed 10/24/10   Page 50 of 85
JA2785

BARRY TELIS - DIRECT

Q.   And what precipitated -- what precipitated that?

A.   The investigation came to a halt upon interviewing witnesses, possible suspects.  We came to a dead end.

Q.   And ultimately, what reinvigorated your investigation?

A.   We received -- I received a phone call from Detective Small, which is a homicide investigator for the Hollywood area, which is adjacent to the Wilshire area, that a ballistic casing from a firearm had matched some ballistic evidence recovered from our scene on Fairfax.

Q.   Thereafter, what did you do in your investigation?

A.   We followed up the lead.  We investigated that particular murder, the Hollywood one.  Met with Detective Small.  We found out what gang had committed their crime.  And we just kind of ran with it at that point.

Q.   Ultimately, what was the next significant event in your investigation?

A.   We spoke with -- Detective Parshall spoke with Detective Motto which is an area in the Rampart area which is also adjacent to the Wilshire area.  And Detective Motto relayed some information regarding a shooting victim had been shot in Rampart and he was from the MS -- he was an associate of the MS gang.

Q.   Ultimately, did you track down that individual and conduct an interview?

A.   Detective Parshall did.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 415 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/24/10   Page 415 of 485
JA2786

BARRY TELIS - DIRECT

Q.   Who was that?

A.   That was Luis Rivera.

Q.   At some point later did you participate in interview meetings?

A.   Yes.

Q.   When was that?

A.   It was a few months after the interview with Luis Rivera. Sometime in April of 2006, I believe.

Q.   And who did you interview on that occasion?

A.   Maurice Arevalo.

Q.   How did -- how was it that you came to be in contact with Mr. Arevalo?

A.   Mr. Rivera had told us that during the shooting on Fairfax, Mr. Arevalo was the driver of a gold Nissan Ultima. We verified that through DMV records.  And we put what we call a felony want in the system.  It's our computer database alerting agencies from all over California and all over the United States that this person is wanted for a homicide.

Q.   Did you have a warrant?

A.   No, it wasn't a warrant.  It was a want.  And basically, what a want is is something that the investigators, once they determine they have enough probable cause to arrest somebody, you place it in the system in order for him to be captured.

Q.   Ultimately, did he come to meet you at your department?

A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

227

BARRY TELIS – DIRECT

Q.   Under what circumstances?  Did you call him and ask him to come in or what particularly happened?

A.   Detective Parshall and I received a phone call from the Hollywood Division, which is once again adjacent to Wilshire area, that Maurice Arevalo had been arrested, and we had informed the patrol officers to meet us at Wilshire station so we could talk to him.

Q.   And what was the nature of that arrest, if you know?

A.   I'm sorry?

Q.   What had Mr. Arevalo been arrested for, if you know?

A.   Well, I believe the officers -- I don't know.  I don't know.

Q.   When you -- did he come and meet with you, though?

A.   Yes.

Q.   Willingly?

A.   No.

Q.   How did you meet with him?

A.   Well, the officers transported him in handcuffs.  They arrested him and brought him to meet with us at Wilshire station.

Q.   But at that point, did he willingly meet with you or did he refuse to speak?

A.   Oh, no.

Q.   I wasn't clear in my question.

A.   Oh, yes, he spoke to us freely.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:08-cv-00574-RJC   Document 52-6   Filed 10/24/10   Page 63 of 84
**JA2788**

BARRY TELIS - DIRECT

Q.   On that particular occasion did you advise him of his Miranda rights?

A.   Yes.  I believe Detective Parshall read it to him while I was in the room with him.

Q.   And thereafter, did you begin interviewing Mr. Arevalo?

A.   Yes.

Q.   If you would just describe initially how you began that interview.

A.   When we first began to speak to -- when I first began to speak to Mr. Arevalo, we basically -- I basically confronted him with what we knew regarding the investigation of the shooting, the double homicide on Fairfax.  Mr. Arevalo was a little evasive.  He didn't want to tell us the truth.  But he succumbed to the interview and he told us basically what happened.

Q.   And when you say he succumbed to the interview, what do you mean?

A.   Well, once we confronted him, he waived his rights and he told -- gave us a statement -- a statement freely.

Q.   And in that statement, what did he describe as the events of July the 27th of '05?

A.   He said that he and his friends from the same gang were driving down Fairfax on their way to the beach.  He had picked them up in an area in Hollywood on a street called Mariposa.  They were on their way to the beach driving down Fairfax.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BARRY TELIS - DIRECT

Fairfax is a major thoroughfare linking the north and the south part of the city.

As he -- as they continued down Fairfax, they were stopped in traffic. Mr. Arevalo, he was driving. There was another gang member in the car named -- he referred to him as Wizard. And there were three additional gang members in the back seat.

As they were driving down the street, they came in contact with two other persons who were walking down the sidewalk. Some gang signs, hand gestures were exchanged among the two. He says that Wizard and two of his friends in the back seat got out of the car. He pulled to the curb and Wizard was upset and Wizard shot the two guys.

Q.   Now, did he describe initially what he observed as the gang signs or hand signals that were being made?

A.   Yes.

Q.   What were they?

A.   The people in the car had thrown the MS gang sign up. It's -- it's this fashion (witness demonstrated).

Q.   And you're demonstrating with your two middle fingers down, your pinky finger and your pointer finger up.

A.   Yes.

Q.   Okay.

A.   And then the other people on the sidewalk flashed their gang sign. I do not know what that is. And that's when the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 419 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 65 of 85
JA2790

BARRY TELIS - DIRECT

confrontation took off.

Q.   What happened next after the second set of signs was thrown, the MS sign and then whatever the other gang sign was?

A.   The people on the street, the guys walking down the street said that -- they used a gesture by using their middle finger and the MS sign, which according to Mr. Arevalo meant fuck MS, excuse my French.

Q.   And at that point what happened?

A.   At that point Wizard exited the vehicle along with the two other persons in the back seat and the shooting occurred.

Q.   How did Mr. Arevalo describe the shooting?

A.   He said that Wizard went crazy.  That he was out of control.  And that he just lost it.  Approached these two guys, pulled out the gun and shot them both.

Q.   Then what did they do?

A.   Then all three of them returned to the vehicle.  Got in the car, and they continued on to the beach.

Q.   Was that interview recorded?

A.   It was.

Q.   I'm going to show you what's been marked as Government's Exhibit 518.  Are you able to identify Exhibit 518?

A.   Yes.

Q.   What is Exhibit 518?

A.   It's a transcript of the interview done by Detective Parshall and myself of Mr. Arevalo.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 420 of 485
Case 3:08-cr-00134-RJC   Document 52-6   Filed 10/24/10   Page 420 of 485
JA2791

BARRY TELIS – DIRECT

Q.    And have you had an opportunity to review the transcript?

A.    Yes.

Q.    Is it fair and accurate?

A.    Yes.

MS. ROSE:  I'd move that Exhibit 518.

THE COURT:  Any objection?  Same objection?

MR. FOSTER:  Just the same continuing one, Your Honor.

THE COURT:  Overruled.

(Government's Exhibit No. 518 was received into evidence.)

Q.    Did you also have an opportunity while you were interviewing Mr. Arevalo to present what's known as a six pack?

A.    Yes.

Q.    If you would describe for the jury what six pack means.

A.    Yes.  A six pack is six photographic -- I'm sorry, six photos in what we call a photo spread, and it's used to identify or also eliminate a suspect involved in a particular crime.

Q.    I'm going to show you what I've marked as Government's Exhibit 517.

MS. ROSE:  If I may approach, Your Honor?

THE COURT:  You may.

Q.    517 has four pages contained within that one exhibit.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 421 of 485
Case 3:08-cr-00734-RJC   Document 52   Filed 10/04/10   Page 421 of 485
JA2792

BARRY TELIS - DIRECT

Are you able to identify 517?

A.    Yes.

Q.    How so?

A.    This is a photo lineup that was presented to Mr. Arevalo.

Q.    And at the time that it was presented, did he make identifications?

A.    Yes.

Q.    And actually, is this the original from your records of those identifications?

A.    Yes, it is.

        MS. ROSE:  Your Honor, at this time I would move to admit Government's 517.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let them be admitted -- or let it be admitted.

        (Government's Exhibit No. 517 was received into evidence.)

Q.    Are you able to see that on your screen?

A.    Yes.

Q.    This is the first page of Government's Exhibit 517.  What is shown in the six photographs here?

A.    Six photographs.  Photograph number 3 is circled, with the initials RA.  And handwritten is Chip -- Chipis.

Q.    Chipis.  And what is -- first of all, what are the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 422 of 485
Case 3:08-cr-00734-RJC    Document 52-6    Filed 10/04/10    Page 564 of 485
JA2793

BARRY TELIS - DIRECT

initials RA?

A.   It's Rene Arevalo.

Q.   And what is his nickname?

A.   Moe.

Q.   And what did he indicate was Mr. Ramos's nickname?

A.   Chipis.

Q.   Show you the second page of Government's 517.  Are you able to identify the second part of this particular exhibit?

A.   Yes.

Q.   What is shown in page 2 of Exhibit 517?

A.   It's also a photographic lineup.  Picture number 5 is circled, with the initials RA.  And the handwritten says Negro Omar.

Q.   RA being whose initials?

A.   Rene Arevalo.

Q.   And then the Negro?

A.   I'm sorry?

Q.   Is -- Negro, is that Mr. -- this individual's nickname?

A.   Yes.

Q.   Third page of Government's Exhibit 517.

A.   Yes.

Q.   What is shown in this page of the exhibit?

A.   Once again, it's also a photographic lineup with the picture number 5 circled, with the initials RA.  And also handwritten it says Wizard.

                  Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 423 of 485
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 693 of 485

JA2794

BARRY TELIS - DIRECT

Q.   And finally, the fourth page of Government's Exhibit 517.

A.   Yes.  It's once again a photographic lineup with the picture number 6 circled, the initials RA.  And handwritten is Luis.

Q.   Whose writing was on the particular -- the circling there?  Who wrote those notations?

A.   Mr. Arevalo did.

Q.   After the interview of Mr. Arevalo, what did you then do?

A.   I'm sorry?

Q.   After you completed the interview of Mr. Arevalo, did you have any further contact with him?

A.   I did, yes.

Q.   When was that?

A.   That was in September -- I'm sorry, August, September of last year.

Q.   And was that in relation to proceedings in Los Angeles?

A.   No, it was in proceedings here in North Carolina.

Q.   And you -- where did you see Mr. Arevalo?

A.   At the county jail here in North Carolina.

Q.   And what was your purpose in going to speak with him?

        MR. FOSTER:  Objection.  Irrelevant.

        THE COURT:  I'm not sure where this is going so I'll overrule the objection at this point.

        MR. FOSTER:  Could we have a sidebar on this, Your Honor?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BARRY TELIS - DIRECT

THE COURT: Yes.

(Side-bar conference as follows:)

MR. FOSTER: Your Honor, the reason I objected and asked for a sidebar, I believe where this is going, I believe this witness is going to testify that he came out here to interview Mr. Arevalo who claimed he was not going to testify because he's been threatened or he's in fear of retaliation or something along those lines. And so we would object to that as being unfairly prejudicial and outweighing any probative value.

MS. ROSE: That is true. And there --

MR. BRYSON: Okay. We're done.

MS. ROSE: Only to the first part, not as to the basis for your objection.

There are jail mail communications between Mr. Umana and others wherein he is directing other individuals in the jail to make contact with Moe and Chipis and making some threatening statements in there to -- that he wants to make contact with them. And I think it's relevant for those purposes as to the witness intimidation.

THE COURT: I don't think it's relevant. I let you go a long way with putting in testimony of participants -- alleged participants in the shooting because I made certain findings with respect to the reliability. I think I've gone as far as I want to go --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 425 of 485
Case 3:08-cr-00134-RJC    Document 52-6    Filed 10/04/10    Page 425 of 485
JA2796

BARRY TELIS - DIRECT

MS. ROSE:  Okay.

THE COURT:  -- in that direction.  Although I find that information probative, I'm going to sustain the objection going down this line on 403 grounds.

MS. ROSE:  And I'll --

THE COURT:  Not 403 grounds, but it being more unfairly prejudicial than probative.

MS. ROSE:  I will elicit this information in another way at trial.

THE COURT:  We are at trial.

MS. ROSE:  I mean not at trial.  I mean at another time in this proceeding.

THE COURT:  All right.  We'll take it up then.

MS. ROSE:  Yes.

MR. NAZZARO:  Your Honor, would they be precluded from arguing why they aren't testifying, then, in their closing statements?

THE COURT:  We're not arguing about that right now.

MR. NAZZARO:  Okay.  Thank you.

(End of sidebar conference.)

BARRY TELIS

DIRECT EXAMINATION (Cont'd.)

BY MS. ROSE:

Q.   Did you conduct any other interviews relative to this investigation either participating with Detective Parshall

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BARRY TELIS - CROSS

with Mr. Ramos or Mr. Rivera or Mr. Arevalo?

A.    Yes.

Q.    Not in -- I'm talking about in Los Angeles, were there any other interviews?

A.    Oh, no.

Q.    Did you do anything further in the investigation in Los Angeles?

A.    I'm sorry, could you repeat the question.  I didn't hear it.

Q.    After you had completed the interviews in Los Angeles, did you do anything else to further the investigation there in Los Angeles?

A.    Yes.

Q.    What?

A.    I presented the case to the district attorney's office for filing.

Q.    And after that, anything further?

A.    No.

        MS. ROSE:  All right, sir.  Thank you very much.

        THE COURT:  Cross.

        MR. FOSTER:  Yes.  Thank you, Your Honor.

                    CROSS EXAMINATION

BY MR. FOSTER:

Q.    Detective Telis, you testified about getting a call from Detective Small regarding the Lemon Grove Park murder,

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

BARRY TELIS – CROSS

correct?

A.    Yes.

Q.    And he notified you that the -- there was a match between the casings in that crime scene and the Fairfax Avenue killings.

A.    Yes.

Q.    And that match was between .22 caliber casings, correct?

A.    Yes.

Q.    And when you interviewed Mr. Arevalo that you've testified about, he was in custody at the time, correct?

A.    Yes.

Q.    And at first he was denying involvement, denying MS membership, everything, correct?

A.    Yes.

Q.    Okay.  And then you testified that he was confronted with certain things.  One of those things that he was confronted with was that a witness had said that the shooter in the Fairfax Avenue killings was the driver of the vehicle, correct?

A.    Yes.

Q.    And so that was one of the things that caused him to succumb -- in your words, succumb to the questioning, correct?

A.    I don't know if that was the reason.

Q.    Okay.  But that was one of the things you confronted him with, right?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

BARRY TELIS - CROSS

A.   Yes.

Q.   And then you said he succumbed and he talked, right?

A.   Yes.

Q.   Okay.  And then, of course, denied being the shooter.

A.   Correct.

Q.   And then he, as you testified, claimed that Wizard was the shooter.

A.   Yes.

Q.   And didn't he tell you that the gun that Wizard had was a big gun?

A.   I don't recall him saying that.

Q.   I'm going to show you something that's a transcript page from the interview you had with Maurice -- I'm sorry, with Mr. Arevalo.  This would be Defense Exhibit 10, I believe.  If you could just take a look at that.

     Is it out of focus?

A.   I can read it.

Q.   Okay.  Can you take a look at that and then I'm going to move it down a little bit and then ask you about it.

         MS. ROSE:  What page is that, Mr. Foster?

         MR. FOSTER:  Page 85 of the transcript.

Q.   Okay.  Does that refresh your memory about him saying that it was a big gun?

A.   Yes.

Q.   Okay.  In fact, Detective Parshall reacted by saying,

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 429 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 429 of 485
JA2800

BARRY TELIS - CROSS

That's a freaking rifle, right?

A.    Yes.

Q.    That was in response to Mr. Arevalo showing with his hands how big the gun was.

A.    Yes.

Q.    Now, Mr. Luis Ramos and Luis Rivera, they gave their statements in this investigation during a basically three-day period of time between April 21st and April 24th, 2006, correct?

A.    Yes.

Q.    And then Mr. Arevalo's statement came the following month, right?

A.    Yes.

Q.    And Mr. Umana was the only one of the five people that you determined to be in the car for the Fairfax Avenue shooting that was not locatable in Los Angeles during the time of these investigations, correct?

A.    Yes.

Q.    And when you -- you also, during this interview of Mr. Arevalo, you asked him whether he had any knowledge -- or Detective Parshall, one of the two of you, asked whether he had any knowledge about the Lemon Grove Park murder, correct?

A.    I don't remember specifically asking about Lemon Grove Park.

Q.    Do you recall that he denied knowing anything about the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 430 of 485
Case 3:08-cr-00134-RJC   Document 50-6   Filed 10/24/17   Page 430 of 485
JA2801

BARRY TELIS - CROSS

Lemon Grove Park murder?

A.   I don't remember if he did or not.  If you have a page of the transcript, I could review it.

Q.   Showing you what's page 101 which was already identified previously -- sorry, lost track.

        MR. FOSTER:  Do you want me to just give it a new number, then?  What number are we on?

        THE CLERK:  It would be 11.

        MR. FOSTER:  Okay, 11.

Q.   If you could take a look at that and see if it refreshes your memory.

A.   You know, I don't have any independent recollection of asking him about Lemon Grove Park.  I see that Detective Parshall did.

Q.   Uh-huh.  So it doesn't refresh your memory?

A.   No, it doesn't.

Q.   Were you aware that when you interviewed Mr. Arevalo, that he had been previously deported and had returned to the United States?

A.   I didn't know that at the time.

Q.   Did you learn later?

A.   Yes.

Q.   Okay.  So he was deported and then illegally returned to the country.

A.   Yes.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 431 of 485
Case 3:08-cv-00574-RJC   Document 50-6   Filed 10/04/10   Page 431 of 485

JA2802

BARRY TELIS - REDIRECT

Q.   Now, didn't Mr. Arevalo tell you that -- when he was talking about what happened on Fairfax Avenue, didn't he tell you that the first ones to throw up gang signs were the two guys -- the two guys on the sidewalk, not the people in the car?

A.   Yes.

MR. FOSTER:  I have no further questions.

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   I'm going to show you --

THE COURT:  Before you go there, I think we're going to take our afternoon break.

Members of the jury, we're going to take our afternoon break.  We've been going at it since 1:45.  So don't talk about the case.  Keep an open mind.  And we'll see you at 4:15.

(Jury exited the courtroom.)

THE COURT:  Ms. Rose, if you want to examine this witness -- is that door closed?

THE COURT REPORTER:  No.

(Pause.)

THE COURT:  If you want to examine this witness outside the presence of the jury on Mr. Arevalo, you can do so at this time.

VOIR DIRE EXAMINATION

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 432 of 485
Case 3:08-cv-00734-RJC    Document 50-6    Filed 03/23/17    Page 76 of 485
**JA2803**

BARRY TELIS - REDIRECT

BY MS. ROSE:

Q.   Detective Telis, earlier you indicated that in September or August of last year, that you came to Charlotte and you had an opportunity to speak to Mr. Arevalo.

A.   Yes.

Q.   Where did that conversation take place?

A.   In the county jail here.  Mecklenburg County jail, I believe.

Q.   And what was your purpose for going to see Mr. Arevalo?

A.   To talk to him about our case.  To talk to him about testifying here today.

Q.   And what did he tell you at that time about potentially testifying in this case?

A.   He said he didn't want to.

Q.   Did he tell you why he didn't want to?

A.   Yes.

Q.   What did he say?

A.   He said he was worried for his family's safety and his own safety.

Q.   Did he tell you why he was particularly worried about his safety or his family's safety?

A.   Specifically he said that he was afraid of Wizard.

        MS. ROSE:  All right.  Thank you.

        THE COURT:  Any cross?  Actually, you don't have to cross.  I'm not going -- I heard the testimony.  I'm not going

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 433 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 03/23/17   Page 433 of 485

**JA2804**

BARRY TELIS – REDIRECT

to change the ruling rendered at sidebar.

So after our break we'll come back and you can finish redirect and call your next witness.

(Brief recess at 4:04 p.m.)

THE COURT:  Are we ready for the jury?

(No response.)

THE COURT:  Call the jury.

(Jury entered the courtroom.)

THE COURT:  Ms. Rose, you may continue.

MS. ROSE:  Thank you, Your Honor.

BARRY TELIS

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   I'll just show you briefly.  Take a look at what's on the screen before you.  That's part of Government's Exhibit 518. Do you recognize that?

A.   Yes.

Q.   The defense asked you on cross examination about the size of the gun and left it with that's huge.  Was there more that Mr. Arevalo said regarding the size of the gun?

A.   Yes.

Q.   What else did he say?

A.   I actually stood up and displayed my gun that I was carrying, and I carry a .40 caliber Glock.  And he said it was round, wasn't like that.  But it was roughly the same size.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 434 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 10/24/10   Page 434 of 485

JA2805

WILLIAM MOORE – DIRECT

Q.   And did he indicate that it was like a revolver?

A.   Yes.

MS. ROSE:  All right, sir.  Thank you.  I don't have any other questions.

MR. FOSTER:  No further questions.

THE COURT:  You may step down and be excused.

THE WITNESS:  Thank you, Your Honor.

(Witness stepped down.)

THE COURT:  Call your next witness.

MS. ROSE:  The government would call William Moore.

                    WILLIAM MOORE,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. ROSE:

Q.   Good afternoon.  If you would introduce yourself to the jury, please, sir.

A.   Good afternoon.  My name is William Moore.  William, W-i-l-l-i-a-m, Moore, M-o-o-r-e.

Q.   Where are you employed, Mr. Moore?

A.   I'm currently employed at the scientific investigation division laboratory of the Los Angeles Police Department, and I have been assigned to the firearms aanalysis unit since July of 2000.

Q.   Were you in law enforcement or working in the capacity in which you now find yourself prior to 2000?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 435 of 485
Case 3:08-cv-00734-RJC   Document 90-6   Filed 10/24/10   Page 435 of 485
JA2806

WILLIAM MOORE – DIRECT

A.    Yes, ma'am.

Q.    Where was that?

A.    At the same location.  I began my employment in May of 1984 assigned to the narcotics analysis unit.

Subsequently, I earned opportunities to work in the alcohol analysis unit which is responsible for the analysis of bodily fluids for alcohol, particularly as it relates to driving under the influence of alcohol, as well it was sometimes my responsibility to manage evidential breath testing devices located throughout the city of Los Angeles.

Subsequently, I worked in the serology unit of the crime laboratory.  At what time -- at one time, rather, I was the acting supervisor of the unit.

Subsequent to the period of time in that unit, I spent some additional time in the narcotics analysis unit as the lead chemist, returning to the serology unit.

And then subsequently finding my way to the firearms analysis unit in July of 2000.

Q.    If you would just detail your training and experience as it relates to the analysis of firearms or ballistics.

A.    My training as it relates to the formal education as a firearms examiner took place approximately two years into my assignment to the firearms analysis unit.  It was at that time that we received new computer imaging equipment courtesy of the Bureau of Alcohol, Tobacco and Firearms.  This equipment,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 436 of 485
Case 3:08-cv-00734-RJC    Document 50-6    Filed 03/23/17    Page 32 of 33

JA2807

WILLIAM MOORE – DIRECT

known as the NIBIN equipment, was able to capture digitized images of cartridge cases and bullets, providing them to a national database so they could be compared to like images in that database for a subsequent inclusion as possible candidates of similar origin and perhaps the solution of crimes.

Later on, approximately 2004, my training began in earnest, studying various calibers of firearms, various types of cartridge case evidence and bullet evidence, culminating in a series of practical exams which allowed me to begin doing firearms examination in full in January of 2006.

Q.   And since that time, has that been your position?

A.   Once again, I found myself in a lead role in the laboratory.  Not only do I do the bench work as many of the other unit members perform, but I'm also responsible for assigning such work and reviewing the work product when it's completed and prepared for publication.

Q.   Do you also have others review your work?

A.   Yes, ma'am.

Q.   And is that part of the procedure within your laboratory?

A.   Yes.

        MS. ROSE:  I would tender the witness as an expert, Your Honor, in ballistics firearms analysis.

        THE COURT:  Any objection?

        MR. BRYSON:  No, Your Honor.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 437 of 485
Case 3:08-cr-00734-RSC   Document 50-6   Filed 03/23/17   Page 437 of 485
JA2808

WILLIAM MOORE - DIRECT

THE COURT:  He'll be allowed to offer an opinion in that area.

Q.   As it relates to this matter, did you receive some items for examination there within your laboratory?

A.   Yes.

Q.   What were the items that you received?

A.   Of particular interest were .22 caliber cartridge case exhibits from two different investigations.

Q.   Where did you retrieve those exhibits?

A.   They were retrieved from the nearby property room at the northeast area station.  At this point in the laboratory's history, we were at a building outside of the northeast area police station.  Subsequently we have moved to a new facility.

Q.   Nonetheless, your evidence maintenance facility is a secure one.

A.   Yes, ma'am.

Q.   And what was your purpose in retrieving these .22 caliber casings from the two separate crime scenes?

A.   There was an indication that the evidence cartridge cases were fired through -- or fired in the same firearm by virtue of the compatible images that were observed in this NIBIN database that I mentioned previously.

Q.   So if you would just describe for the jury the process. Whenever, particularly shell casings, are retrieved or seized at a crime scene, how are they then documented for this NIBIN

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 438 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/24/10   Page 438 of 485
JA2809

WILLIAM MOORE - DIRECT

system?

A.   There are a couple different pathways that can provide these items of evidence to the laboratory.

One pathway, which is the pathway which both investigations found there way to us, I believe, was a program known as Walk-In Wednesday.  This is a term that we've applied to a condition where detectives can, by appointment, walk in and have their crime scene evidence imaged while in their presence, therefore minimizing the chain of evidence issues and the delays that go along with it should we take the alternate pathway which is by the ordinary request to process.

Q.   And when you say imaged, imaged for what purpose?

A.   The images that are captured from the cartridge case evidence entails a digitized image of a firing pin impression. And in the case of centerfire ammunition, the larger image of the cartridge case head depicting the breech face impressions and perhaps an ejector mark.

Q.   You gave us a couple of different terms there.  Would you -- would you define some of them.  One of them being breech markings.

A.   May I use a scale model for illustrative purposes?

Q.   Sure.

A.   Thank you.  I've brought with me to court today a larger-than-life scale model of a 9 millimeter Lugar cartridge.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 439 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 439 of 485
JA2810

WILLIAM MOORE - DIRECT

Q.   Let me stop you before you go on.  Why particularly a 9 millimeter Lugar?

A.   Because I don't have a model that represents a .22 caliber cartridge.

Q.   All right.

A.   So we'll start here and go to the .22.

In general terms, an ammunition cartridge has a limited number of components.  To begin with, we have the case.  The case contains a propellant powder, and at the mouth of the cartridge case there is a bullet which will become the projectile that's fired through the barrel of a firearm.

On the head of the cartridge in a centerfire cartridge, there is a primer cup.  Within that primer cup is a pressure sensitive material which, upon receiving the impact of a firing pin, detonates and ignites that propellant powder.  That propellant powder generates large volumes of gas under great pressure causing that barrel (sic) to leave the mouth of the cartridge and travel down the barrel to the target.

If you imagine for a moment a cartridge case without the center primer cup, you begin to see what a .22 caliber cartridge looks like.  Instead of there being primer in a specialized capsule on the head of the cartridge, the primer material is contained within the rim of the cartridge head.  And thusly, it's also known as a rimfire cartridge such that when the firing pin strikes the rim, while supported by an

WILLIAM MOORE – DIRECT

underlying piece of material or metal, rather, it crushes the primer material in the rim, igniting the propellant just as it would as if it was a centerfire cartridge.

Q.    And going back to the officers bringing in shell casings or cartridges which have been recovered at crime scenes.  Why are they imaged and what are you -- what are the images capturing, if anything?

A.    In the case of a .22 rimfire cartridge case, the imaging process is limited to that area impacted by the firing pin of the responsible firearm.  It's captured with illumination or lighting from one side and then from a 90-degree angle so that there is adequate contrast in the impression of the firing pin that upon review a technician can gather greater information about the likelihood that that firing pin impression of one exhibit compared to another exhibit could safely be concluded that it likely came from the same firearm, prompting a request for additional work.

Q.    And this -- is this then -- these images are put into your NIBIN system?

A.    Yes.

Q.    Ultimately, it was the NIBIN system, then, that alerted you to the potential presence of comparisons between the casings recovered?

A.    Yes.

Q.    Thereafter, what did you do?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 441 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 374 of 485
JA2812

WILLIAM MOORE - DIRECT

A.   Once the request for analysis had been completed, the supervisor of the unit at that time determined that it needed to be worked sooner than later and thusly the comparison between the two investigations was assigned to me.

Q.   And did you actually request the cartridges or the shell casings for comparison?

A.   It was subsequently my responsibility to request the evidence be transferred through the property division of the police department.  Subsequently, I received the evidence, obeying the chain of custody issues involved with such items. I then completed the examination and produced a report reflecting my conclusions.

Q.   What items did you request from your property control section for analysis?

A.   I requested two cartridge cases booked under one investigation number and one cartridge case booked under the alternate investigation number.

Q.   What two -- what were the first two shell casings, what was the investigation related to those?

A.   I don't have any notes in front of me to reflect -- to refresh my recollection.  Can you help me with that, please.

Q.   Sure.

        MS. ROSE:  If I may approach the witness?

        THE COURT:  You may.

Q.   Mr. Moore, is this your complete report?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 442 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 03/23/10   Page 36 of 3485

**JA2813**

WILLIAM MOORE - DIRECT

A.   It is.

THE COURT:  When you say this, counselor, have you marked it?

MS. ROSE:  I will.

We have marked his report as Exhibit 504?

MR. NAZZARO:  504.

Q.   If you would just look at Exhibit 504 to tell me if it is, in fact, your complete report that would help refresh your recollection.

A.   Yes.  As it reflects to this comparison of investigations.

MS. ROSE:  I would move to admit Exhibit 504, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 504 was received into evidence.)

Q.   The two shell casings about which you've testified, from which investigation were they requested?

A.   From the Wilshire investigation under the so-called DR number 050-723188.

Q.   And you say the Wilshire investigation.  Is that the July 27th, '05, investigation?

A.   Yes, ma'am.  Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 443 of 485
Case 3:08-cr-00734-RJC   Document 50-6   Filed 03/23/17   Page 443 of 485
JA2814

WILLIAM MOORE - DIRECT

Q.   The other shell casing which you requested was from which investigation?

A.   The Hollywood investigation under DR number 050-629018.

Q.   Is that the events of 9/28/05?

A.   Yes.

Q.   Once you had retrieved these exhibits, what did you then do to begin your analysis?

A.   I ensured that each exhibit was properly marked for identification.  Made some notes about the general appearance of these exhibits.  And then proceeded to the comparison microscope to complete my evaluation of the items.

Q.   What is a comparison microscope?

A.   A comparison microscope is a specially designed type of microscope, much like you may have seen as a child in grade school or middle school where there's a set of objective lenses through which the eye observes the subject material. But in a comparison microscope, the optics split images from two different stages and not just from one.  Thusly, simultaneously the observer can look at what's on a left stage and a right stage simultaneously through the series of optics. By virtue of that ability, one is able to compare various types of tool marks to determine the possibility of common origin.

Q.   What do you mean by tool marks?

A.   In the case of firearms evidence, I'm specifically

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 444 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 96 of 137
JA2815

WILLIAM MOORE – DIRECT

looking for the types of tool marks that are transferred from a subject firearm to the fired components, the cartridge case and/or the bullets if they're presented for examination.

Q.   And how would tool markings be transferred from the firearm to the shell casings or the cartridges as you call them?

A.   In this particular instance we're discussing .22 rimfire cartridge cases of particular interest, and what usually precipitates a comparison from this NIBIN evaluation is the firing pin impression.  Additionally, some marks that are not captured in the NIBIN process, such as ejector marks and chamber marks, can be very useful in determining a common source of two items.

Q.   And how are chamber marks made and what are you referring to specifically as chamber marks?

A.   Referring back to my model for illustrative purposes, when a semi automatic firearm is involved, in other words, one that auto loads a live cartridge and then by virtue of the firing action extracts it and ejects it clearing a space for a fresh round to enter the chamber if so loaded, the case body marks that appear as a result of firing are known as chamber marks.

When a firing pin falls on the rim of a .22 cartridge case and detonates the primer material, great volumes of gases are generated in that case creating great pressure, causing

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA2816

the case body to seal tightly against the chamber wall. This is a process known as obturation, o-b-t-u-r-a-t-i-o-n. Obturation is what ensures that a modern firearm works as designed, thus that the gas that is generated by that cartridge is used only exclusively for propelling that bullet down the barrel of the firearm.

In a semi automatic firearm, particularly a modern .22 semi automatic firearm, even though obturation is actively going on with that firearm, the case body is already being extracted from that chamber. And thusly, those imperfections around the perimeter of that cartridge case in the chamber wall transfer scratches to the case body.

This is kind of what happens to a bullet when it goes down the barrel, actually. It's just that it's not going down a long distance gathering all kinds of interesting marks along the way. These marks are usually of short duration because the case body being brass, it's elastic. And about the time extraction is fully underway, that elastic case body shrinks back to approximately its original size and the case body marks stop being engraved on the body of the cartridge case. Thusly, as one might reference it to the firing pin impression, we have a 360-degree area around the cartridge case and almost the entire length of the cartridge case to evaluate for marks of common origin, highly individualizing among the tool marks that could be imparted to firearms

JA2817

WILLIAM MOORE – DIRECT

evidence.

Q.   Did you then -- were you able, based upon these analysis -- this analysis, to make a comparison between the shell casings from each of the two crime scenes?

A.   Yes.

Q.   What was your conclusion?

A.   That the single cartridge case from the Hollywood investigation was fired from the same firearm that fired the two cartridge cases from the Wilshire investigation.

Q.   Now, did you also look at some expended lead bullets to determine if there were any comparisons among the bullets?

A.   I did.

Q.   Where did you recover those bullets?

A.   They were received with the cartridge case evidence from the Wilshire investigation.

Q.   Were you able to, upon your analysis, make any comparisons regarding the bullets?

A.   Very limited in nature, yes.

Q.   Why is -- what was your -- what were the comparisons you noted, those limited comparisons?

A.   Bullet evidence has a number of physical features that help the examiner determine the type and caliber.  Most notable would be the diameter of the projectile revealing the caliber of the bullet.  As well there are the so-called lands and grooves impressed upon the body of the bullet as created

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 447 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/24/10   Page 93 of 485
JA2818

WILLIAM MOORE - DIRECT

passing down the barrel of that firearm.  These are known as general rifling characteristics.  Typically you'll hear about a bullet that's been engraved with five lands and grooves with a right hand twist or a bullet that's been engraved with six lands and grooves with a left hand twist.  Those are marks that are determined by the manufacturer.  Those possibilities that I mentioned, for example, are indicative of Smith & Wesson firearms or Colt firearms, back to their origins, back in the 19th century.  This allows the examiner to determine whether or not bullets collected from a crime scene can be grouped together for subsequent examination using that comparison microscope.

Unfortunately, particularly in the case of .22 bullets, they're usually lead and they usually don't engrave very well. So quite often we can only go so far as to say these two exhibits are similar and may have originated from the same firearm; whereas, we would need to look at the friction marks, particularly in the land engraved areas, to determine common origin.

In this case I could only determine that they may have occurred from the same firearm.

Q.   And that was based upon the limited characteristics which were left behind?

A.   Yes.

MS. ROSE:  All right, sir.  Thank you.  I have no

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 448 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/24/10   Page 448 of 485
JA2819

WILLIAM MOORE - CROSS

other questions.

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS EXAMINATION

BY MR. BRYSON:

Q.   With regard to the cartridge casings, the .22 casings, you are giving the opinion that they are -- they were fired from the same gun, correct?

A.   Yes, sir.

Q.   Okay.  You're not saying they are fired from the same type of gun or the same model of gun.  You're saying they were fired from the same gun.

A.   These exhibits possess individualizing features sufficient to identify them to having been fired in the same firearm.

Q.   That's a yes?

A.   That is a yes.

Q.   All right.  And that is your subjective opinion.

A.   That is my opinion based upon the objective evidence presented to me as verified and validated by a second examiner.

Q.   Okay.  But still, it's a subjective decision that you make, correct?

A.   Based upon my education and experience, yes.

Q.   Okay.  But there is no objective criteria that you were

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 449 of 485
Case 3:08-cv-00734-RJC   Document 58-6   Filed 10/24/10   Page 93 of 134
JA2820

WILLIAM MOORE - CROSS

required to rely on before you can make that call that there's a match, correct?

A.    That is correct.

Q.    Okay.  That's one of the criticisms of your field is that there is no objective standard you're required to apply before you can call a match, correct?

A.    That is correct.

Q.    And your -- you are saying it's from the same firearm based on your belief that all firearms make unique tool marks, correct?

A.    Yes.

Q.    Okay.  And another criticism of your field is that there's not enough knowledge or evidence about firearms to say that all firearms make unique tool marks, correct?

A.    You could say that, yes.

Q.    Okay.  In addition to comparing the cartridge casings, you were also asked to look at a bullet fragment from the Abarca case; is that correct?

A.    In answering a separate request for analysis, that's correct.

Q.    Now, the casings that you looked at were for a .22, correct?

A.    Yes.

Q.    The bullet fragment that you got was not a .22 bullet fragment, correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 450 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/24/10   Page 450 of 485
JA2821

SUSAN SELSER – DIRECT

A.   That is correct.

Q.   In fact, when you were making comparisons, you were comparing that to -- excuse me.  You were comparing the bullet fragment to a couple of .357 magnums; is that correct?

A.   That was the submitted request, yes.

          MR. BRYSON:  Those are my questions.

          THE COURT:  Any redirect?

                    REDIRECT EXAMINATION

BY MS. ROSE:

Q.   Were you aware from the request that there were two potential types of firearms used?

A.   Yes.

          MS. ROSE:  Thank you, sir.

          THE WITNESS:  Thank you.

          THE COURT:  You may step down and be excused.

          Call your next witness.

          (Witness stepped down.)

          MS. ROSE:  Susan Selser.

                    SUSAN FRANCES SELSER,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MS. ROSE:

Q.   If you would, please, state your name.

A.   Susan Frances Selser.

Q.   Where are you employed?

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 451 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 10/04/10   Page 475 of 485
JA2822

SUSAN SELSER - DIRECT

A.    In Los Angeles County.

Q.    In what position?

A.    As a medical examiner for the Department of the Coroner.

Q.    How long have you held that position?

A.    Over 25 years.

Q.    What are your duties in relation to your position at the coroner's office?

A.    Basically, perform autopsies to determine the cause and the manner of death.

Q.    Do you then record your findings relative to those evaluations?

A.    Yes.

Q.    And did you have the opportunity to perform two examinations, autopsy examinations relative to events of July the 27th of '05?

A.    I have been only given one report of a case done on July 31st of '05.

Q.    And what is your file number relative to that -- relative to that report?

A.    2005-05686.

Q.    And who was the deceased noted on your report?

A.    Jose Herrera.

Q.    And you indicated that you received that body for examination on July the 25th, 2005?

A.    The autopsy was performed on July the 31st of 2005.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 452 of 485
Case 3:08-cv-00573-RJC   Document 50-6   Filed 10/04/10   Page 452 of 485
JA2823

Q.    When did you receive the body?

A.    That was the day on which I was assigned the case to do the autopsy.

Q.    What is your -- if you would just describe your procedures in performing an autopsy on a deceased.

A.    Basically in homicide cases, the body has already been photographed.  I will do an external examination and then an internal examination documenting the findings and recovering any projectiles if there are any.

Q.    And did you follow that procedure relative to this particular case?

A.    Yes.

Q.    What -- what were your findings and conclusions?

A.    The cause of death was a gunshot wound to the head. There was a single gunshot wound that entered the forehead and the bullet passed through the brain and was recovered from the back of the brain.

        MS. ROSE:  And I would, Your Honor, move to have -- tender Mrs. -- Dr. Selser as an expert witness.

        THE COURT:  Any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  She'll be allowed to offer an opinion.

Q.    You indicated that the entrance wound was the forehead?

A.    Yes.

Q.    And that it passed completely through?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 453 of 485
Case 3:08-cv-00734-RJC   Document 50-6   Filed 03/23/17   Page 453 of 485

JA2824

SUSAN SELSER – DIRECT

A.   Toward the back of the brain, yes.

Q.   And what did you determine, then, the cause of death to be?

A.   A gunshot wound to the head.

Q.   Any other gunshot wounds to that particular body, Mr. Herrera?

A.   No, there were not.

Q.   Now, did you note any other injuries?

A.   No.

Q.   You indicated that you recovered a bullet?

A.   Yes.

Q.   That was at the back of the skull?

A.   Yes.  From in the occipital lobe which is the posterior aspect of the brain.

Q.   And did you save that and turn it over as evidence?

A.   Yes.

Q.   Now, if you would -- and you may need to refer to your report.  Where on the forehead was the entrance wound specifically?

A.   It was located, referring to my report, two-and-a-quarter inches below the top of the head and one-quarter inch left of midline.

Q.   And if you would just demonstrate the approximate location on your forehead.

A.   Certainly.  I'm referring to my diagram.  Basically,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 454 of 485
Case 3:08-cv-00164-RJC   Document 528   Filed 10/04/10   Page 456 of 485
JA2825

SUSAN SELSER – DIRECT

along the mid to upper forehead and very slightly toward the left side (indicating).

Q.   Did you indicate generally the center of your forehead slightly to the left?

A.   Yes.

        MS. ROSE:  May I approach?

        THE COURT:  You may.

Q.   I'm going to show you what I have marked as Government's Exhibit 523.

        MS. ROSE:  May I approach, Your Honor?

        THE COURT:  You may.

Q.   If you would, please, review Government's Exhibit 523.

        (Witness complied.)

A.   I have.

Q.   What is Government's Exhibit 523?

A.   It's also an autopsy report on coroner's case number 2005-5694.

Q.   And who is noted as the decedent in that particular case?

A.   Gustavo Aguero.

Q.   Did you perform the autopsy on this victim?

        MR. FOSTER:  Objection.  Irrelevant.

        THE COURT:  May I see the attorneys at sidebar -- well, I'll sustain the objection at this point.  Lay a stronger foundation.

BY MS. ROSE:

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 455 of 485
Case 3:08-cv-00164-RJC   Document 528   Filed 10/04/10   Page 455 of 485
JA2826

SUSAN SELSER - DIRECT

Q.   You've reviewed Government's Exhibit 523?

A.   Yes.

Q.   When did you receive the individual listed in Exhibit 523 for examination?

A.   According to the report, August the 2nd, 2005.

Q.   And was that the date that you were assigned?

A.   Yes.

Q.   After receiving -- or after this case was assigned to you, what did you then do?

        MR. FOSTER:  I'd object on the grounds that this is a different last name.  I don't know if this is the same person.

        THE COURT:  That's the foundation I'd hoped you would lay.

Q.   Did you also receive some documentation along with your autopsy report which you reviewed prior to your examination?

A.   I would have, yes, ordinarily.  And I would expect so in this case as well.

Q.   If you would look at your report there before you and see if you have additional documentation that you received with the...

A.   Yes.  Ordinarily, the investigator's coroner's case report is present, and that would ordinarily be available before the autopsy.

Q.   Do you have the paperwork with you as part of your file

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 456 of 485
Case 3:08-cv-00164-RJC   Document 53-6   Filed 10/04/10   Page 456 of 485
JA2827

SUSAN SELSER - DIRECT

which is labeled or headed Investigator's Case Assignment
Form, County of Los Angeles, Department of Coroner?

A.   I was not looking at that particular document, but I
would expect it would be in this paperwork and, yes, I do have
it.

Q.   And the decedent's name on that document which is part of
your report?

A.   Yes.

Q.   What is the decedent's name?

A.   It's listed as Gustavo, last name Porras.

Q.   And spell the last name, please.

A.   P-o-r-r-a-s.

Q.   All right.  Did you then perform an examination on the
body of Mr. Porras?

A.   Yes.

Q.   Who was also identified as Herrera or Aguero.

A.   Gustavo Aguero.

Q.   The investigative paperwork also showed Gustavo Porras,
P-o-r-r-a-s.

A.   On the form 1 it's listed as Gustavo Porras Aguero.

Q.   Did you have an opportunity, then, to perform the
examination on this body?

A.   Yes.

Q.   What examinations did you perform?

A.   Similar examination.  External examination and internal

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 457 of 485
Case 3:08-cv-00154-RJC   Document 52-9   Filed 10/04/10   Page 458 of 485

JA2828

SUSAN SELSER - DIRECT

examination with recovery of any projectile material, in this case a bullet.

Q.   What did your external examination reveal?

A.   There was a gun -- referring to my report.  There was a gunshot wound to the head, entered the back of the head and passed through the brain and was recovered from the brain at autopsy.

Q.   Where was that projectile recovered in the brain?

A.   The impact point was along the right side of the head on the frontal bone, and the bullet was recovered -- found near the mid portion of the brain.

Q.   If you would, describe where on the back of the head the bullet made entry.

A.   Referring to my report, on the back of the head located four-and-a-half inches below the top of the head and one-half inch left of midline, which would be along the back of the head approximately the level of the mid ear and slightly toward the left side (indicating).

Q.   The projectile that you recovered from that victim's brain, was that then seized as evidence and turned over to the investigators?

A.   According to my information on the report, yes.

Q.   In your professional opinion, what was the cause of death?

A.   A gunshot wound to the head.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 458 of 485
Case 3:08-cv-00164-RJC   Document 529   Filed 10/04/10   Page 458 of 485
**JA2829**

SUSAN SELSER – DIRECT

Q.   Any other gunshot wounds on the body?

A.   No.

Q.   Any other injuries that you noted?

A.   There was some hemorrhage along the -- the mid aspect in the left eye, probably related to the effects of the gunshot wound.  Other injuries, referring to my report, only noted older, healing abrasions on the nose, bridge of the nose, tip of the nose, and crusted abrasion on the left cheek, which were healing at the time of my exam.

Q.   Now, when you receive a body for examination, do you receive any of the crime scene photos that assist you in seeing how the body was found at the scene?

A.   Usually not.

Q.   And you did not in this case.

A.   I don't recall.

        MS. ROSE:  I would move, Your Honor, Government's Exhibit 523 as well.

        THE COURT:  523, any objection?

        MR. FOSTER:  No, Your Honor.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 523 was received into evidence.)

        MS. ROSE:  I don't have any other questions of this witness.

        THE COURT:  Have you moved admission of the autopsy

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 459 of 485
Case 3:08-cv-00154-RJC   Document 528-6   Filed 10/04/10   Page 459 of 485
JA2830

SUSAN SELSER - DIRECT

of Jose Herrera?

MS. ROSE:  That is Government's Exhibit 525.  And if I have not, Your Honor, I would do so at this time.

THE COURT:  Very well.  525 and 523 will be admitted at this time.

(Government's Exhibit No. 525 was received into evidence.)

THE COURT:  Any cross?

MR. FOSTER:  No, Your Honor.

THE COURT:  You may step down and be excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Call your next witness.

(Witness stepped down.)

MR. NAZZARO:  Your Honor, could we have a sidebar?

THE COURT:  Sure.

(Side-bar conference as follows:)

THE COURT:  Do we need to go back here?

MR. NAZZARO:  Judge --

MS. ROSE:  Do you want to go to the back?

MR. NAZZARO:  Yeah, I think it would be better.  Thank you.

Judge, I just want to let the court know, at this point we have some other witnesses that are still in transit, but we do have three or four witnesses that we're going to call from the jail about some jail incidents at this time and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 460 of 485
Case 3:08-cv-00154-RJC   Document 538-7   Filed 10/24/10   Page 460 of 485
JA2831

I just wanted to bring that up.  I think the court's already ruled on that, but I just wanted to bring that issue up.  And that's going to probably be all we have for today, and we believe that we will be finished before the end of the day tomorrow, if not sooner.

THE COURT:  What's the proffer on the witnesses that you have to call today?

MR. NAZZARO:  The proffer is to the future dangerousness --

THE COURT:  No, just tell me what the evidence is.

MR. NAZZARO:  The evidence -- the evidence will show that -- the first one is a striking of another inmate, a fight that Mr. Umana was in.

The other one is an issue where he was not compliant with some of the officers.  He was later -- also possessed some MS 13 graffiti.

The other one is where he flooded -- he purposefully flooded his cell because of an issue he had with some of the officers.

And there's a couple others, but those are the ones that we were going to present for today.  The other ones deal with the MS 13 graffiti that he had in his cell.  Also, the possession of other contraband in his cell, including a mini sharp object, as well as the contraband that the court noted on the first day of jury selection.  We were also going to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 461 of 485
Case 3:08-cr-00134-RJC    Document 529    Filed 10/04/10    Page 461 of 485
JA2832

present that.

And we were also going to present a jail officer, Mr. Clarkson, to relate the -- where he has been housed and the result of his disciplinary actions from some of these incidents and other incidents.  So it would be approximately, I guess, five or six witnesses in that category of evidence that we would present.

THE COURT:  All right.

MR. BRYSON:  Before he goes, can I -- the other day, Sam, you gave us this stuff on the incident reports.  And in looking at your exhibits, I only find two in here that match up, the 18th and the 20th.  And I don't -- I don't -- there's something from September 11th which is the razor blade.  He's using somebody else's razor blade.  And then I don't have one from February 22nd.  Is that the flooding?

MS. ROSE:  You're talking about out of this latest exhibit we gave you?  Because that was in former exhibits.

MR. BRYSON:  I'm sure that, you know, I probably have it somewhere, but he gave me this stuff the other day and I was just -- I thought that's what you guys were sticking to, and it looks to me like there's different stuff.  These are different things.  February 22nd --

MS. ROSE:  Yes.

MR. BRYSON:  -- tell me which one that is.

MS. ROSE:  I don't have -- I don't have it in front

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 462 of 485
Case 3:08-cv-00154-RJC   Document 52-3   Filed 10/04/10   Page 462 of 485
JA2833

of me.  I know one of those is where he was noncompliant with the guards.

MR. BRYSON:  That's 7/20.

MR. NAZZARO:  We don't have that officer here yet.  That's 7/20.

MR. BRYSON:  I'm well versed on 7/20, 4/18.  I'm not sure what 2/22 and 9/22 are

MR. NAZZARO:  I have those.

MR. BRYSON:  If you can tell me what those are, I can look them up.

MR. NAZZARO:  I'm not sure I have that one in front of me, the last one you just mentioned.

MR. BRYSON:  Okay.  That one actually says September 21, but that's where he had the soup and the razor in his room.

MR. NAZZARO:  And I don't know if you want us to forecast the rest of the evidence.

THE COURT:  Well, hang on.  Let's not get too far ahead of ourselves.

MR. BRYSON:  Do you want us to respond?

THE COURT:  Yeah, objection?

MR. BRYSON:  Obviously, on future dangerousness I think we're stuck with the assault.  There's probably not much we can say about that.  I don't -- I would argue that the one where he verbally barked at the guard does not rise to the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 463 of 485
Case 3:08-cv-00164-RJC   Document 52-6   Filed 10/04/10   Page 463 of 485

JA2834

level of future dangerousness.  But some of the other ones that they're talking about, I think are really just infractions in the rules and disobedience of the rules, but don't really indicate any evidence of future dangerousness.

Do you want to say something?

MR. FOSTER:  I mean, things like, you know, having soup in your cell and being noncompliant.

MS. ROSE:  We're not offering that.

MR. FOSTER:  Oh, you're not offering that?

MR. BRYSON:  That's the one he -- maybe -- I thought that was the one he just gave me.

MS. ROSE:  The ones that we would be offering relate to -- yes, the assault.  The interaction with the guards; the one where he particularly disobeyed the guards, got in their face and was aggressive with them.

MR. BRYSON:  That's two.

MS. ROSE:  The other one off the top of my head was the MS -- the contraband in his cell.

MR. BRYSON:  That being the soup and the razor.

MS. ROSE:  No, the --

THE COURT:  The MS graffiti that you mentioned.

MS. ROSE:  -- MS graffiti.  There was other contraband in his cell.  That happened on numerous occasions that they were removing that and he had disciplinary procedures.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 464 of 485
Case 3:08-cv-00164-RJC   Document 58-6   Filed 10/04/10   Page 146 of 345
**JA2835**

It's all, Your Honor, not following the rules.  Not being compliant with the rules of the institution.  He was moved on several occasions to higher level security areas.  He was in maximum, you know, ultra security.

THE COURT:  You can put on evidence of assault.  You can put on evidence of any sharp object that he's got in his possession or in his cell without authority, and any MS related stuff.

MS. ROSE:  What about arguments or getting aggressive with guards?

THE COURT:  And you can do that.

MR. NAZZARO:  Flooding the cell?

THE COURT:  No.

MR. NAZZARO:  Okay.

MS. ROSE:  Well, part of -- I think the evidence would show that these actions take place so that the person is removed from their cell.  They then present a whole nother level of --

THE COURT:  So far the four things are what you can get into, and then you have the witness with respect to the contraband on the first day of jury selection.

MS. ROSE:  Yes.

THE COURT:  Is that witness here?  You can do that.  What else is there?

MS. ROSE:  Apparently -- I have not seen it.  I was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 465 of 485
Case 3:06-cv-00154-RJC    Document 328-6    Filed 10/04/10    Page 465 of 485

JA2836

told -- you may have.  I was told there was contraband in his cell this morning.  Another sharpened object.

THE COURT:  Well, we'll just -- we won't do that tonight.  And if there is something to that, bring it to my attention before the jury comes in tomorrow.

MR. FOSTER:  I don't know anything about that.

THE COURT:  All right.  So do you know what you've got permission to do?

MR. NAZZARO:  Yes, Your Honor.  For purposes of this afternoon, we may only have two of those witnesses.  And then if we could ask to have a -- to recess after that.

THE COURT:  Why wouldn't you be able to put on the folks with respect to the first day of jury selection incident?  I mean --

MR. BRYSON:  Save that for the big crescendo.

THE COURT:  I want to go to 6 o'clock with this jury, so...

MS. ROSE:  Even if we finish early tomorrow?

THE COURT:  I do not want you lengthening the examination so we go to 6 o'clock.  If you have witnesses here, I want to use the time effectively.

MR. NAZZARO:  Yeah, we really objectively anticipate that we will not go all day tomorrow, Your Honor.

THE COURT:  Well --

MR. NAZZARO:  Just -- you can hold us to that if you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 466 of 485
Case 3:08-cv-00164-RJC   Document 58-6   Filed 10/04/10   Page 466 of 485
JA2837

J. SAGE - DIRECT

want.  Based on --

THE COURT:  Let's just go out there and call your witnesses and see where we are at the end of that.

MR. NAZZARO:  Okay.

THE COURT:  But do you have a clear idea of what's okay and what's not okay in terms --

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  All right.

MR. NAZZARO:  I'm going to -- yes, Your Honor.

(End of sidebar conference.)

MR. NAZZARO:  The United States calls Officer Sage.

<u>J. SAGE</u>,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NAZZARO:

Q.   Please state your name, sir.

A.   Officer J. Sage.

Q.   And how are you employed?

A.   I'm a detention officer with Mecklenburg County Sheriff's Office.

Q.   What are your duties as a detention officer?

A.   Couple main duties is, one, we run a pod.  There's a housing facility which houses 56 inmates.  We're in there with them for about 12 hours.

And then another duty is we're escort officers so we

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 467 of 485
Case 3:08-cv-00164-RJC   Document 58-6   Filed 10/04/10   Page 116 of 134

JA2838

J. SAGE - DIRECT

escort the officers -- or escort the inmates to medical, throughout the facility.

Q.   Okay.  And that's your -- in Mecklenburg County jail; is that right?

A.   That's correct.

Q.   Okay.  You mentioned a pod.  What exactly is a pod?

A.   Like I said, it's more like a -- it houses 56 individual cells.  It's got two TV areas.  It's got a sink.  It's like a general living area.

Q.   And were you working in a particular pod in Mecklenburg County on April 18th, 2009?

A.   No, I wasn't.  I was an escort officer.

Q.   Okay.  Were you in that area at the time?

A.   Yeah, that's correct.

Q.   I'd like to show you what's been previously marked as Government 547.  Do you -- are you able to recognize 547?  You can -- we can make it bigger.

A.   Yes.

Q.   Okay.  And what is that document?

A.   That's an incident report.

Q.   Is that an incident report related to Alejandro Umana?

A.   Yes.

        MR. NAZZARO:  Your Honor, at this time I would move Government 547.

        THE COURT:  Objection?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 468 of 485
Case 3:08-cv-00134-RJC   Document 538-6   Filed 10/04/10   Page 468 of 485
JA2839

J. SAGE - DIRECT

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 547 was received into evidence.)

Q.   And that particular incident -- what is an incident report?  When do you fill out an incident report at the jail?

A.   Well, really anything that we feel that needs to be put on paper.  That way we cover ourselves.  We fill out an incident report.  It can be from a missing mop head.  It could be from something is broken.  It's a very large range that it could be filled out for.

Q.   This one refers to Mr. Umana.  Do you see him here in the courtroom today?

A.   Yes, I do.

Q.   Could you identify him.

A.   (Witness indicated.)

Q.   What does he have on?

A.   A blue shirt.

MR. NAZZARO:  If the record could reflect...

THE COURT:  It will.

Q.   Now, this particular incident report, it involved Mr. Umana; is that right?

A.   Yes.

Q.   And could you, based on the report and your recollection, could you explain what happened on that particular occasion.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 469 of 485
Case 3:08-cv-00134-RJC    Document 538-6    Filed 10/04/10    Page 469 of 485
JA2840

J. SAGE – DIRECT

A.   Well, the pod supervisor was -- I think he needed supplies that day.  So he called the escort station for some paperwork.  And I was bringing the paperwork in and I gave it to him and, you know, we were talking for a minute.  That's when we looked out in the rec yard and we saw, you know, a fight between Mr. Umana and an African-American gentleman.

Q.   Okay.

A.   It was very quick.

Q.   When you say we, you both saw the fight?

A.   Yes.  At that point the officer called 1040, which is a fight in progress.  So we just generally -- they tell us not to, you know, jump in and break it up.  You know, they just tell us to watch and wait for escorts to come in.

It happened -- it was really quick.  Maybe four or five punches thrown.  Mr. Umana stepped out of the rec yard, you know, put his hands behind his back, and I handcuffed him at that time.

Q.   Okay.

A.   The fight was over.

Q.   You said you don't go in and break it up right away.  Why is that?

A.   Because it could be set up where they start a fight and then when we go in to break it up, they jump us.  So you never want to go in.  You wait for, you know, escorts to come in. It could be staged.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 470 of 485
Case 3:08-cv-00134-RJC   Document 528   Filed 10/04/10   Page 470 of 485

JA2841

J. SAGE – CROSS

Q.    Now, with respect to this incident and Mr. Umana, the -- was there ultimately a disciplinary hearing in that regard, do you know?

        MR. BRYSON:  Objection.

        THE COURT:  Sustained.

Q.    You can't answer the question.

    Do you know if there was any other action taken?

        MR. BRYSON:  Objection.

        THE COURT:  Sustained.

Q.    Now, after the fight was broken up, what did you do?

A.    Nothing.  The fight -- we didn't break it up.  He -- like, he hit the gentleman a couple times.  He walked out of the rec yard and put his hands behind his back.  So he voluntarily put his hands behind his back and I handcuffed him.

        MR. NAZZARO:  Thank you.  I have no further questions.

        THE COURT:  Any cross?

                CROSS EXAMINATION

BY MR. BRYSON:

Q.    The other inmate, Mr. Price, was -- also threw some punches back at Mr. Umana; is that correct?

A.    I don't recall.

        (Defense counsel conferred.)

        MR. BRYSON:  Those are my questions.

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 471 of 485
Case 3:08-cv-00134-RJC    Document 520    Filed 10/04/10    Page 471 of 485

JA2842

L. GOODMAN – DIRECT

THE COURT:  You may step down and be excused.

Call your next witness.

(Witness stepped down.)

MR. NAZZARO:  Officer Goodman.

L. GOODMAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NAZZARO:

Q.    Could you please state your name, ma'am.

A.    Officer L. Goodman.

Q.    And how are you employed?

A.    At Mecklenburg Sheriff's Office.

Q.    And what do you do for the sheriff's office?

A.    Detention officer.

Q.    And were you working as a detention officer on September 22nd, 2008?

A.    Repeat that, I couldn't hear.

Q.    Were you working in that capacity on September 22nd, 2008?

A.    Yes.

Q.    Okay.  I'd like to show you what's been previously marked as Government 545.  And do you see 545?

A.    Yes.

Q.    Does that refresh your recollection about an incident that you had with Mr. Umana?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 472 of 485
Case 3:08-cr-00134-RJC   Document 528   Filed 10/04/10   Page 473 of 485
JA2843

L. GOODMAN - CROSS

A.    Yes.

Q.    And could you describe what happened with any contraband that you recovered -- let me strike that question and just ask you, did you recover anything as a result of that incident from Mr. Umana?

A.    When the officers came in to get Mr. Umana and some other inmates out of the pod that night because we had a disturbance in there, they didn't want to lock down, because the pod was being very disruptive, they -- once they took him out, they searched the room and found some MS 13 gang, I think drawings on a piece of paper.

        MR. NAZZARO:  Thank you.  I have no further questions.

        THE COURT:  Any cross?

                    CROSS EXAMINATION

BY MR. BRYSON:

Q.    What started this was somebody found some bags of soup in the upper level restroom; is that correct?

A.    Yes.

Q.    And when they were collected, the whole pod -- you call -- a pod is a group of inmates; is that correct?

A.    Right.

Q.    They all became disruptive.

A.    Right.

Q.    Okay.  It wasn't just Mr. Umana; the whole pod was

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 473 of 485
Case 3:08-cv-00134-RJC    Document 586    Filed 10/04/10    Page 473 of 485

JA2844

L. GOODMAN - CROSS

disruptive, correct?

A.   The whole pod was disruptive because they didn't want a lock down.  Once we found the soup -- inmates tend to get real disruptive and irate because they don't want you to throw their soups away when they know they're not supposed to make the soups in the sink.  They have sink water where they can get it from their rooms.

Q.   Okay.

A.   So they take their belongings back to their rooms.
     So during this time when the pod was instructed to be locked down after a few inmates started beating, banging and kicking on the door.

Q.   Okay.

A.   So what I recall is Mr. Umana and another -- one or two other inmates, I don't remember their names, that they were saying different things and kicking on the doors when the officers and sergeants and captains and everybody was in there.  So one of the sergeants, I think, had him removed --

Q.   Okay.

A.   -- from the pod.

Q.   And that's when they went in the room and found the stuff.

A.   Right.

          MR. BRYSON:  Those are my questions.

          THE COURT:  You may step down and be excused.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 474 of 485
Case 3:08-cv-00134-RJC   Document 538   Filed 10/04/10   Page 476 of 485
JA2845

A. THORNWELL - DIRECT

(Witness stepped down.)

THE COURT:  Call your next witness.

MR. NAZZARO:  Your Honor, I would move 535 -- 545.

THE COURT:  545?

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 545 was received into evidence.)

MR. NAZZARO:  Officer Thornwell.

A. THORNWELL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. NAZZARO:

Q.   Please state your name and your employment.

A.   Officer A. Thornwell, detention officer.

Q.   And where are you a detention officer?

A.   Mecklenburg County jail central.

Q.   I want to direct your attention to April of this year.  I believe the date is April 13th, 2010.  Were you working as a correctional officer at the jail on that day?

A.   Yes, I was.

Q.   And were you involved in a search of Mr. Umana's cell on that day?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 475 of 485
Case 3:08-cr-00134-RJC   Document 538   Filed 10/04/10   Page 475 of 485
JA2846

A. THORNWELL – DIRECT

A.   Yes.

Q.   And could you please identify for the record, is the person I refer to as Mr. Umana, is he here in court today?

A.   Yes.

Q.   Could you identify him, please.

A.   In the light blue shirt.

Q.   Point in his direction.

        (Witness indicated.)

        MR. NAZZARO:  If the record will so reflect.

        THE COURT:  It will.

Q.   And was Mr. Umana at that time, was he housed with any other inmate in that cell?

A.   Yes, he was.

Q.   On April 13th of this year?

A.   Yes.

Q.   2010.

A.   Yes.  He was housed in a unit at central.

Q.   With respect to his cell, was there anybody else in the cell?

A.   I can't recall.  Thirty-one, I can't recall.  Or 32, I can't recall.

Q.   I'd like to show you a photo which was previously marked as Government's Exhibit 112.  Do you recognize Government 112?

A.   Yes.  That was in his cell.

Q.   Okay.  How do you recognize Government 112?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 476 of 485
Case 3:08-cr-00134-RJC   Document 528   Filed 10/04/10   Page 476 of 485
JA2847

A. THORNWELL - DIRECT

A.   When we did a search of his cell, this just -- it was broadcast right -- just right in front of the door across the whole wall of the unit.

Q.   And did that search occur on or about April 13th of this year, 2010?

A.   Yes.

Q.   Okay.  And Mr. Umana was the only person occupying the cell at the time?

A.   Yes.

MR. FOSTER:  Objection.  Leading.

THE COURT:  Overruled.

MR. NAZZARO:  I would move Government 112.

THE COURT:  Any objection?

MR. BRYSON:  No, your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 112 was received into evidence.)

Q.   So could you describe what we're looking at, where this was located in the cell.

A.   Okay.  If -- if this was -- this is the door, the outside of the door and this is the inside of the cell, and that back wall at the back of his cell.  You can look straight in the room door and just see it on the wall in front of you.

Q.   And were you able to identify through your search if there was any item that was used to make these drawings?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 477 of 485
Case 3:08-cr-00134-RJC   Document 538-6   Filed 10/04/10   Page 25 of 345
JA2848

A. THORNWELL - DIRECT

A.   Yeah.  I found two pencils in the hooks where they hang their clothes.  It was slid in between the holes of the hooks.

Q.   And did you find other items in the cell that day that were determined to be contraband?

A.   It looked like a sharp -- I want to say a spork.  I can't be for sure.  About so long (indicating) with thread attached to it.  He had his boxers that was sewn up with the same color thread.

Q.   Okay.  I'd like to show you what's been previously marked as Government 549A.  Do you see 549A?

A.   Yes.

Q.   Does that depict one of the objects that you just referred to?

A.   Yes.

          MR. NAZZARO:  Move 549A and ask that it be published.

          THE COURT:  Any objection?

          (No response.)

          THE COURT:  Let it be admitted.

          (Government's Exhibit No. 549A was received into evidence.)

Q.   And what is depicted in 549A?  What is that in 549A?  Can you describe what that is for the jury.

A.   I really didn't look at it when I found it.  I just assumed it was a piece of a spork.  So when I retrieved it, I

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 478 of 485
Case 3:08-cv-00164-RJC   Document 538-9   Filed 10/04/10   Page 478 of 485
JA2849

just handed it over to the sergeant.  I didn't try to identify what it was.

Q.   And when you say piece of -- what object are you referring to that it was a piece of?

A.   The white piece?  It could have been a spork.

Q.   What is that?

A.   Like a spoon -- spoon/fork.  It's a spoon with edges.

Q.   Was that item that -- considered contraband?

A.   Yes.

Q.   And was it seized also?

A.   Yes.

Q.   And I'd like to show you what's been previously marked as Government 550.  Are you able to recognize Government 550?

A.   Yes.

Q.   And is that an area of the cell that you searched that day?

A.   I didn't search that area.  Another officer found that piece.

Q.   Okay.  You were present and --

A.   And he found that piece, yes.

         MR. NAZZARO:  I would move Government 550.

         THE COURT:  Any objection?

         (No response.)

         THE COURT:  Let it be admitted.

         (Government's Exhibit No. 550 was received into

              Cheryl A. Nuccio, RMR-CRR (704)350-7494

A. THORNWELL - CROSS

evidence.)

Q.    What exactly is the piece you're referring to?

A.    It looked like a piece of a wall, brick piece of the wall in a creviced area.

Q.    Okay.  Was that -- what we're seeing in 550, was that -- was there something covering that?

A.    I didn't retrieve that item, sir.

Q.    So you don't know what was behind that particular item?

A.    No.

Q.    And the wall, what is the composition of the wall?  What is it made out of?

A.    I don't know, sir.

        MR. NAZZARO:  I have no further questions.

        THE COURT:  Any cross?

        MR. BRYSON:  Briefly.

                    CROSS EXAMINATION

BY MR. BRYSON:

Q.    The drawing that we saw, that was done in pencil, correct?

A.    Yes.

Q.    All right.  And the little piece of thread that was attached to the spork piece, he was weaving something with that; is that correct?

A.    I can't say what he was doing with it.

Q.    It wasn't attached to something that was being created?

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-6    Filed 03/23/17    Page 480 of 485
Case 3:08-cv-00174-RJC    Document 589    Filed 10/04/10    Page 480 of 485

JA2851

A. THORNWELL - CROSS

A.   The little piece of spork?  It was attached to that --
the item that I found, the little white piece --

Q.   Right.

A.   -- it was attached to that.

Q.   The thread.

A.   Right.

Q.   And nothing attached to the thread?

A.   No.

        MR. BRYSON:  No questions -- no further questions.

        THE COURT:  You may step down and be excused.

        (Witness stepped down.)

        MR. NAZZARO:  Your Honor, as we indicated, that's
all we would present for today.

        THE COURT:  Members of the jury, the -- we are at a
good stopping point.  I'm going to let you go 25 minutes early
today.

        The usual instructions.  Don't talk about the case.
Keep an open mind.  Do everything possible to avoid any
contact or exposure to media coverage or any other talking
about this case.  And we will see you again at 9:30 in the
morning.  Thank you.

        (Jury exited the courtroom.)

        THE COURT:  Ms. Rose, you've tried enough cases in
Judge Thornburg's court to know that this is highly irregular
to quit at 5:35 with 25 minutes more of jury time.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 481 of 485
Case 3:08-cv-00164-RJC   Document 538-5   Filed 10/04/10   Page 298 of 485

JA2852

MS. ROSE:  But we have more.

THE COURT:  Pardon me?

MS. ROSE:  I wanted to take up a matter at the end of the day.

I've asked Mr. Lashley to come up.  As we indicated in chambers, there may have been additional evidence that we have not seen nor has the defense, and I wanted to -- you said we would address that at a later time.

THE COURT:  This is a good time now if you've got --

MS. ROSE:  I asked them to have him come up just a moment ago.

THE COURT:  Very well.

MS. ROSE:  We would have called Mr. Lashley, but with the uncertainty about what this additional item is, I didn't want to get into it.

It's been secured.  It will take just a moment, Your Honor.

THE COURT:  Has the defense reviewed the proposed exhibits of the government with respect to the jail correspondence?  And are there any objections that haven't already been argued?

MR. BRYSON:  There is -- I'm sorry -- they were on the original exhibit list.  Can I have just one moment, Your Honor?

THE COURT:  Sure.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 482 of 485
Case 3:08-cv-00134-RJC   Document 58-9   Filed 10/04/10   Page 283 of 345
**JA2853**

MR. BRYSON:  There was -- there is one in particular that I can recall where he -- and I -- it's one of the ones in the -- that were, I think, admitted but not published we were going to save for the penalty phase.  And one of them is where he is describing the event that was just testified to.  And there's some racial description --

THE COURT:  Yeah, and I think we kept that out of evidence in the guilt phase of the case.  And is there a mechanism to sanitize what you're publishing to the jury so that -- trying to balance the need for the probative evidence which I think is there with the concern I have about injecting into this case any concerns about racial aspects.

MS. ROSE:  And I understand that, Your Honor.  The only thing the government would indicate to the court is if -- if the defendant is having difficulties with other inmates regardless of their race, I think it's relevant to the jury.

THE COURT:  Well, I'll take a look at that exhibit overnight and rule on it in the morning.  But I would like to -- the government to consider attempting to sanitize it in a way that it still has probative effect for you but takes away the court's concern about unfair prejudice and confusion of the issues.  And -- because after sanitizing it, it's an all or nothing proposition for you.  So take a look at that and see, having heard the court's concerns, again, see if there's a way that is -- that you can sanitize the exhibit

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 483 of 485
Case 3:08-cv-00154-RJC   Document 389   Filed 10/29/10   Page 293 of 345
JA2854

that's agreeable to both sides or less problematic for me. And if not, I'll just make a ruling on the exhibit as is.

MS. ROSE:  I will do that and present a copy to the court in the morning and also have one for defense.

THE COURT:  All right.  Are you ready to do whatever you plan to do at this time?

MS. ROSE:  After looking at that item and looking at it with defense, Your Honor, it's not something that the government -- it looks like broken up plastic that's sharpened, but it's not something that the government would choose to highlight in any way during its presentation of the evidence.  But I certainly didn't want to get into a situation where neither one of us had seen that evidence prior to putting on that witness.

THE COURT:  All right.  Well, anything else we need to discuss tonight before we break and reconvene in the morning?

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  Then we'll stand in recess. I'll see you all at 9:30, ready to go at 9:30.  Don't trust lawyers' predictions of when they're going to finish and that's why I tried to get as much out as we could tonight. But it appears from the government's proffer of the time they need that the government will be finished by the end of the day tomorrow.  We'll start right at 9:30.  If there are any

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 484 of 485
Case 3:05-cr-00174-RJC   Document 529   Filed 10/04/10   Page 306 of 348
JA2855

legal issues that we need to discuss before we call the jury, let my chambers know so we can address those before 9:30 and be ready to go at 9:30.  With that, we stand in recess until then.

(Evening recess at 5:45 p.m.)

*****

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

Dated this 21st day of April, 2010.

                              s/Cheryl A. Nuccio
                              Cheryl A. Nuccio, RMR-CRR
                              Official Court Reporter

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-6   Filed 03/23/17   Page 485 of 485
Case 3:08-cv-00134-RJC   Document 538-9   Filed 10/04/10   Page 485 of 485

JA2856