No.  10-6

## UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) |
| | ) |
| Defendant-Appellant. | ) |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix**
**Volume 7 of 11**

> VINCENT J. BRUNKOW
> ZANDRA L. LOPEZ
> JANET C. TUNG
> Federal Defenders of San Diego, Inc.
> 225 Broadway, Suite 900
> San Diego, California  92101-5030
> Telephone:  (619) 234-8467
> Attorneys for Defendant-Appellant
>
> -and-
>
> MALCOLM RAY HUNTER, JR.
> Attorney at Law
> P.O. Box 3018
> Chapel Hill, N.C. 27515-3018
> Telephone:  (919) 929-9655

## TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

### VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

iii

Defendant's Reply to Government's Response to Defendant's Motion for Court to
Determine the Admissibility and Reliability of Evidence Before Allowing
Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . . 1202

    Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

    Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

        By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
        By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne                      Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet             Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette    Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn                Direct Examination . . . . . . . . . 1239

    J.E. Brown                    Direct Examination . . . . . . . . . 1243

    Frank Flores                Direct Examination . . . . . . . . . 1247
                                   Voir Dire Examination . . . . . . . 1255
                                     Redirect Examination . . . . . . . . 1257
                                     Cross Examination . . . . . . . . . . 1316

    Charles Barkley           Direct Examination . . . . . . . . . . 1332
                                     Cross Examination . . . . . . . . . . 1338

Jeff Bruner             Direct Examination . . . . . . . . . . 1339

Eduardo Vasquez       Direct Examination . . . . . . . . . . 1344

Lenny Moriera          Direct Examination . . . . . . . . . . 1352
                                         Cross Examination . . . . . . . . . . 1369

John Sloane            Direct Examination . . . . . . . . . . 1371
                                         Cross Examination . . . . . . . . . . 1391

Gene Richey           Direct Examination . . . . . . . . . . 1391

Juan Ruben Vela Garcia   Direct Examination . . . . . . . . . . 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341) . . . . . . . . . . . . . . . . . . . . . . . . . . 1485

Juan Ruben Vela Garcia   Direct Examination . . . . . . . . . . 1492
                                         Cross Examination . . . . . . . . . . 1498
                                         Redirect Examination . . . . . . . . 1529

Officer James K. Griffen   Direct Examination . . . . . . . . . . 1530

Ann Hamlin           Direct Examination . . . . . . . . . . 1537

T.J. Miller            Direct Examination . . . . . . . . . . 1544
                                         Cross Examination . . . . . . . . . . 1566

Marie Terrell          Direct Examination . . . . . . . . . . 1570
                                         Cross Examination . . . . . . . . . . 1576

Officer Benjamin Altizer    Direct Examination . . . . . . . . . . 1576
                           Cross Examination . . . . . . . . . . 1584

Officer Ryan Dutko         Direct Examination . . . . . . . . . . 1586

Abel Santos                Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256) . . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos                Cross Examination . . . . . . . . . . 1644

Marco Antonio Guzman Mejia Direct Examination . . . . . . . . . . 1651
                           Cross Examination . . . . . . . . . . 1663

Teresa Ketner              Direct Examination . . . . . . . . . . 1666
                           Cross Examination . . . . . . . . . . 1703
                           Redirect Examination . . . . . . . . 1705

Barry Whitlow              Direct Examination . . . . . . . . . . 1707

John D. Butts              Direct Examination . . . . . . . . . . 1715
                           Cross Examination . . . . . . . . . . 1733

James Cayton               Direct Examination . . . . . . . . . . 1735

Amy Wilde                  Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342) . . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde                  Direct Examination . . . . . . . . . . 1765
                           Cross Examination . . . . . . . . . . 1773

Doreen Huntington          Direct Examination . . . . . . . . . . 1780
                           Cross Examination . . . . . . . . . . 1797

vi

Susan Conrad                    Direct Examination . . . . . . . . . . 1804
                                Cross Examination  . . . . . . . . . . 1840

Jeff Strohm                     Direct Examination . . . . . . . . . . 1846
                                Cross Examination  . . . . . . . . . . 1851

Officer Renee Quiles            Direct Examination . . . . . . . . . . 1851
                                Cross Examination  . . . . . . . . . . 1856

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1856

## VOLUME 5 (1900 - 2390)

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1903
                                Cross Examination  . . . . . . . . . . 1953
                                Redirect Examination . . . . . . . . 1987
                                Recross Examination . . . . . . . . . 1988

William Chuck Hastings          Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)  . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings          Direct Examination . . . . . . . . . . 2034
                                Cross Examination  . . . . . . . . . . 2044

Alexandra Hirsch                Direct Examination . . . . . . . . . . 2049
                                Cross Examination  . . . . . . . . . . 2054

Michele Scheuerman              Direct Examination . . . . . . . . . . 2055
                                Cross Examination  . . . . . . . . . . 2064

Gene Rivera                     Direct Examination . . . . . . . . . . 2065
                                Cross Examination  . . . . . . . . . . 2086

vii

Andrew Cheramie            Direct Examination . . . . . . . . . . 2090
                           Cross Examination  . . . . . . . . . . 2095

Jose Romero                Direct Examination . . . . . . . . . . 2095

Alexander Granados         Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2133

Alexander Granados         Direct Examination . . . . . . . . . . 2136
                           Cross Examination  . . . . . . . . . . 2138
                           Redirect Examination  . . . . . . . . 2158

Maricruz Medina            Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie          Direct Examination . . . . . . . . . . 2166

Chris Tyndall              Direct Examination . . . . . . . . . . 2173
                           Cross Examination  . . . . . . . . . . 2190

Mark Young                 Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson    Direct Examination . . . . . . . . . . 2208
                           Cross Examination  . . . . . . . . . . 2213
                           Redirect Examination  . . . . . . . . 2213
                           Recross Examination . . . . . . . . . 2215

Jeffrey Taylor             Direct Examination . . . . . . . . . . 2216
                           Cross Examination  . . . . . . . . . . 2247
                           Redirect Examination  . . . . . . . . 2254

Denise Daniels             Direct Examination . . . . . . . . . . 2255
                           Cross Examination  . . . . . . . . . . 2257

viii

William Chuck Hastings    Direct Examination . . . . . . . . . . 2259
                         Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

Sergeant Scott Clarkson    Direct Examination . . . . . . . . . . 2323
                          Cross Examination  . . . . . . . . . . 2330

Denise Daniels    Direct Examination . . . . . . . . . 2332
                 Cross Examination  . . . . . . . . . . 2333

Jeffrey Taylor    Direct Examination . . . . . . . . . . 2333
                 Cross Examination  . . . . . . . . . . 2356
                 Redirect Examination  . . . . . . . . 2359

William Chuck Hastings    Direct Examination . . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . 2391

Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

ix

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . 2540

    Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
    Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
    Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

    Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . 2559

    Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

    Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

    Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

        By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
        By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

        Ismar Sanchez          Direct Examination . . . . . . . . . . 2574
                               Cross Examination . . . . . . . . . . 2584
                               Redirect Examination . . . . . . . . 2590

        David Henderson       Direct Examination . . . . . . . . . . 2590

x

Carlton Phoenix                    Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2648

Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

Thomas Small                    Direct Examination . . . . . . . . . . 2651
                                Cross Examination . . . . . . . . . . 2677

Roberto Ramos                   Direct Examination . . . . . . . . . . 2680
                                Cross Examination . . . . . . . . . . 2694

Juan Lara                       Direct Examination . . . . . . . . . . 2699
                                Cross Examination . . . . . . . . . . 2706

Raffi Djabourian                Direct Examination . . . . . . . . . . 2709
                                Cross Examination . . . . . . . . . . 2715

John Maloney                    Direct Examination . . . . . . . . . . 2716
                                Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall             Direct Examination . . . . . . . . . . 2730
                                            Cross Examination . . . . . . . . . 2756
                                            Redirect Examination . . . . . . . . 2781

        Barry Telis                 Direct Examination . . . . . . . . . . 2784
                                            Cross Examination . . . . . . . . . . 2798
                                            Redirect Examination . . . . . . . . 2803

        William Moore           Direct Examination . . . . . . . . . . 2806
                                            Cross Examination . . . . . . . . . . 2820
                                            Redirect Examination . . . . . . . . 2822

        Susan Selser              Direct Examination . . . . . . . . . . 2822

        J. Sage                   Direct Examination . . . . . . . . . . 2838
                                            Cross Examination . . . . . . . . . . 2842

        L. Goodman            Direct Examination . . . . . . . . . . 2843
                                            Cross Examination . . . . . . . . . . 2844

        A. Thornwell           Direct Examination . . . . . . . . . . 2846
                                            Cross Examination . . . . . . . . . . 2851

**VOLUME 7 (2857 - 3373)**

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

xii

Carlos Alfredos
Dominguez Gonzalez          Direct Examination . . . . . . . . . . 2874
                           Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper            Direct Examination . . . . . . . . . 2902
                           Cross Examination  . . . . . . . . . . 2908

Luis Amaro                  Direct Examination . . . . . . . . . . 2911
                           Cross Examination  . . . . . . . . . . 2917

Russell Lashley             Direct Examination . . . . . . . . . . 2919
                           Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 2930
                           Cross Examination  . . . . . . . . . . 2931
                           Redirect Examination  . . . . . . . . 2935
                           Recross Examination . . . . . . . . 2936

Douglas Friend              Direct Examination . . . . . . . . . . 2938
                           Cross Examination  . . . . . . . . . . 2944

Jean Garcia                 Direct Examination . . . . . . . . . . 2946
                           Cross Examination  . . . . . . . . . . 2952

Carmen Garcia               Direct Examination . . . . . . . . . . 2953
                           Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia            Direct Examination . . . . . . . . . . 2959
                           Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2975

      Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham  Direct Examination . . . . . . . . . . 2986
          Cross Examination  . . . . . . . . . . 3050

Richard McGough  Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260)  . . . . . . . . . . . . . . . . . . . . . . . 3096

 Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

  Richard McGough  Direct Examination . . . . . . . . . . 3099
          Cross Examination  . . . . . . . . . . 3157

  Selena Sermeno  Direct Examination . . . . . . . . . . 3167
          Cross Examination  . . . . . . . . . . 3189
          Redirect Examination  . . . . . . . . 3203

  Maria Santacruz Geralt  Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350)  . . . . . . . . . . . . . . . . . . . . . . . . 3234

 Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

  Maria Santacruz Geralt  Voir Dire Exam. by Defendant  . . . 3237
          Voir Dire Exam. by Government . . 3250
          Direct Examination . . . . . . . . . . . 3256
          Cross Examination . . . . . . . . . . . . 3263

  Mark Bezy  Direct Examination . . . . . . . . . . . 3276
          Cross Examination . . . . . . . . . . . . 3289

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 15 of 536

James R. Merikangas,
Ph.D.                          Direct Examination . . . . . . . . . . . . 3294
                               Cross Examination  . . . . . . . . . . . . 3317

Government's Rebuttal Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

Helen Mayberg                  Direct Examination . . . . . . . . . . . . 3336
                               Cross Examination  . . . . . . . . . . . . 3358

## VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . 3374

        Defendant's Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

                Richard McGough        Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

xv

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

**VOLUME 9 (3705 - 4209)**

**EXHIBITS**

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3,  School Records . . . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . . 3919

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home  . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael  . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia  . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D.  . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana  . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana  . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez  . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez  . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification  . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation  . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting  . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique  . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana  . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA          )DOCKET NO. 3:08-CR-134-2
                                  )
                                  )
     vs.                          )VOLUME III-A
                                  )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____  )


TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 21, 2010

APPEARANCES:

On Behalf of the Government:
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204



LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 20 of 536
Case 3:08-cr-00134-RJC   Document 235-7   Filed 01/30/11   Page 1 of 112

JA2857

297

I N D E X

GOVERNMENT'S WITNESSES:

CARLOS ALFREDOS DOMINGUEZ GONZALEZ
       Direct Examination by Mr. Nazzaro            313
       Cross-Examination by Mr. Foster              320

SHAROD CULPEPPER
       Direct Examination by Mr. Nazzaro            341
       Cross-Examination by Mr. Bryson              347

LUIS AMARO
       Direct Examination by Ms. Rose              350
       Cross-Examination by Mr. Bryson              356

RUSSELL LASHLEY
       Direct Examination by Ms. Rose              358
       Cross-Examination by Mr. Foster              367

RONY MAGANA LOPEZ
       Direct Examination by Ms. Rose         369, 374
       Cross-Examination by Mr. Foster        370, 375

DOUGLAS FRIEND
       Direct Examination by Mr. Nazzaro            377
       Cross-Examination by Mr. Bryson              383

JEAN GARCIA
       Direct Examination by Ms. Rose              385
       Cross-Examination by Mr. Bryson              391

CARMEN GARCIA
       Direct Examination by Mr. Nazzaro            392
       Cross-Examination by Mr. Bryson              397

ELIZABETH GARCIA
       Direct Examination by Mr. Nazzaro            398
       Cross-Examination by Mr. Bryson              404

* * * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 21 of 536
Case 3:08-cr-00134-RJC   Document 304   Filed 01/30/11   Page 21 of 112
JA2858

298

E X H I B I T S

GOVERNMENT'S EXHIBITS:

| NO. | | RECEIVED |
|---|---|---|
| 152 | ......................................... | 350 |
| 153 | ......................................... | 350 |
| 158 & c & b | ..................................... | 350 |
| 171 | ......................................... | 350 |
| 172 & b | ..................................... | 350 |
| 174 | ......................................... | 350 |
| 175 | ......................................... | 350 |
| 176 & b | ..................................... | 350 |
| 177 | ......................................... | 350 |
| 506 | ......................................... | 333 |
| 507 | ......................................... | 330 |
| 544 | ......................................... | 347 |
| 551 | ......................................... | 398 |
| 553a | ......................................... | 361 |
| 556 | ......................................... | 393 |
| 563 | ......................................... | 403 |
| 570 | ......................................... | 403 |
| 574 | ......................................... | 395 |
| 578 | ......................................... | 396 |

\* \* \* \* \* \*

Government rests  ............................. 405

INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

\* \* \* \* \* \*

Laura Andersen, RMR 704-350-7493

JA2859

299

P R O C E E D I N G S

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  We're still waiting on the defendant.

(Defendant present.)

THE COURT:  All right.  I have reviewed for probative value, unfair prejudice, confusion of the issues and misleading the jury, as well as authenticity, the Government Exhibit Numbers 152, 153, 158, 167, 171, 172, 174 through 177.  And I find that each of the letters is probative on the issue of future dangerousness and deal, in general, with attempts to run MS from inside prison, to intimidate and control potential witnesses, to engage in acts of violence, and direct acts of violence.

And for those reasons and others, it seems to the Court that each of the letters is probative, some of them extremely so.

And 158, for example, talks about being Mara to the day we die, and refers to that principle, while being even in prison.  And 174 talks about putting a light on certain cooperating witnesses.  And all the letters have similar comments that would indicate a future danger.  Would indicate an attempt to operate the enterprise from within prison.

And so that coupled with the authenticity analysis

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 23 of 536
Case 3:08-cr-00134-RJC   Document 1242   Filed 01/30/11   Page 4 of 112
JA2860

that I made about the letters that were admitted in the guilt phase, the experts indicating strong probability on the letters that were compared -- strong probability that the author was the defendant.

And the other indicia that they are what they purport to be, the name, pin number and address that appeared on most of the exhibits, all indicate to me that the -- except for, I guess, 177 and 177 (sic.) they all contained a combination of an expert opinion. And indicia in the letters themselves, the envelopes, that they were from the defendant himself, and his writing.

And so for all the exhibits except for 171 and 177, the Court finds that they are authenticate, that they are probative on issues before the jury at this time.

The Court will, on 403 grounds, exclude Exhibit Number 167 which has racial references that are of concern to the Court. And the exhibit itself is cumulative to other letters that serve the same purpose, in terms of probative value, that Exhibit Number 167 does.

And so as a cumulative exhibit, probative value is somewhat less and outweighed by the confusion of issues that might arise with respect to the potential for injecting race into this deliberation.

Has the government considered redacting the racial comment in Exhibit Number 152?

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 24 of 536
Case 3:08-cr-00134-RJC   Document 341   Filed 01/30/11   Page 5 of 112

**JA2861**

301

MS. ROSE:  Yes, I did that, Your Honor.

THE COURT:  May I see that?

MS. ROSE:  Yes, sir.  (Handing paper writing up to the Court.)

THE COURT:  With that redaction, the Court will find that the probative value outweighs any unfair prejudice, confusion of issues and misleading the jury.

With respect to 175, there is a reference to a black dude.  I don't think that reference causes the Court -- the concern about injecting race in any way in the case, it's descriptive.  And it's descriptive of a beating that the jury may conclude was the same beating that was testified to by the sheriff's guard -- detention guard yesterday.

And so I think it's a brief reference.  It doesn't overly inject the issue of race into the case.  The reference to black dude is descriptive, not pejorative, and I'm going to admit that exhibit as is, that's Government Exhibit 175.

And so with respect to Government Exhibit 171, which is the letter addressed from Wilmer Rivera to Jaime Sandoval, what is the evidentiary foundation for that letter?

MS. ROSE:  This was obviously one of the letters that was seized in the jail between conspirators, Jaime

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 25 of 536
Case 3:08-cr-00134-RJC   Document 2342   Filed 01/30/11   Page 6 of 112
**JA2862**

302

Sandoval and written under Wilmer H. Rivera.

The significance of this, Your Honor, is --

THE COURT:  Well, before you get to the probative value, I'm trying to figure out, was this one of the letters provided to Detective Hastings by the attorney for Sandoval or how did --

MS. ROSE:  I don't believe so.  I would err on the side of caution, looking at the date, it is from January of this year.

THE COURT:  And so this was a letter that was captured by the process described by the sheriff's employees?

MS. ROSE:  It was, Your Honor.

THE COURT:  In terms of reviewing letters from certain designated people?

MS. ROSE:  Right.  And one of the reasons that it was significant to them, was because of the contents relating to the threats, and the injury to a individual in the jail that actually there was an assault on that individual.  And that was the significance of this letter.

THE COURT:  With respect to authenticity, it appears to the Court that the letter was captured by law enforcement in the manner described previously in the guilt phase.

That is, there is a list of defendants that

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 26 of 536
Case 3:08-cr-00134-RJC  Document 324  Filed 01/30/11  Page 7 of 112
**JA2863**

303

letters going in and out with certain names were copied by jail personnel provided to Detective Hastings. This appears to be one of those letters.

It's not from or to the defendant, as far as the envelope is concerned. But it is to a person who has been identified by the evidence as being a co-conspirator of the defendant.

The letter itself bears references to gang names that has been -- substantial evidence has been received that are part of the same enterprise, Pelon, Chipi, Wizard, reference to MS.

And it purports to be communications intended to come back to the defendant or the person known as Wizard -- there's plenty of testimony that that moniker is in reference to the defendant -- with respect to a beating of a witness known to -- or suspected of cooperating with the government.

I think it is very probative evidence of the defendant's ability to control and intimidate from prison on the issue of future dangerousness.

And it is also probative on the explanation of absence of witnesses, and shows an ongoing violent activity of the MS gang, even inside of prison.

And so the Court will find that there's sufficient indicia of authenticity, and that the probative value of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 27 of 536
Case 3:08-cr-00134-RJC   Document 544   Filed 01/30/11   Page 8 of 112

JA2864

Exhibit 171 is great, and outweighs any concerns of unfair prejudice, misleading to the jury or confusion of the issues.

With respect to Government Exhibit 177, what is the evidentiary foundation for that?

MS. ROSE:  This as well, Your Honor, was a letter seized during the procedures that have been outlined and about which the Court heard testimony.

You will see it is from a Carlos Figueroa, who we heard during testimony was Drogo, a co-defendant of -- the significance of -- I will say this as well, although we did not go into -- we did not go into great detail, if any, I don't remember, with Mr. Taylor.

This was a defendant who submitted to a handwriting exemplar, and was determined to be Mr. Figueroa.

Nonetheless, the significance of it is -- at the very beginning he talks about -- he -- Mr. Figueroa writes to co-defendant Umana and says to him, what an honor it is to be able to speak with him and help him in any way.

And certainly goes to, once again, the defendant's ability to control others, future dangerousness.  That's only significant for that.

MR. FOSTER:  Your Honor, as far as authenticity, there is no evidence in this trial that anyone has identified his handwriting, Carlos Figueroa.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 02/23/17   Page 28 of 536
Case 3:08-cr-00134-RJC   Document 2342   Filed 01/30/11   Page 9 of 112
JA2865

305

THE COURT:  Right.  And I won't take that into consideration in my analysis.  But I do believe that there's evidence that Figueroa was a co-conspirator involved in this organization.  The letter appears to be addressed to the defendant.  It makes reference to a request of the defendant to check on a certain homie, and seems to be responsive to that request.

The Court is satisfied that there is a sufficient predicate for admitting the letter, and that it is probative on the issue of future dangerousness, and the ability to attempt to intimidate or control, or otherwise operate the ongoing conspiracy while incarcerated.  And so the Court will permit the government to introduce that letter.

So the net result of the Court's review, is that the Court has made the authenticity findings that it has; has admitted all but Exhibit Number 167.

And with the limited exception that in Exhibit Number 152, the Court will admit it in its redacted form, in terms of the publishing to the jury.

MR. FOSTER:  Your Honor, just so the record is clear, I'm not sure the government actually offered these exhibit numbers at a time when we objected.  But just so the record is clear, we do object to all these exhibits.

In addition, 169 that was excluded during the --

THE COURT:  That's not -- I don't think the

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 29 of 536
Case 3:08-cv-00134-RJC   Document 1917   Filed 01/30/11   Page 29 of 115
**JA2866**

Government's intending to offer 169.

MS. ROSE:  No, Your Honor.

THE COURT:  So what is the objection, Mr. Foster?

MR. FOSTER:  Well, just the objections we made earlier, I just want to make sure they related to each of the exhibit numbers.

The objection is, it's unreliable evidence under 3593(c) and that the probative value is outweighed by unfair prejudice, misleading the jury and confusing the jury, as well as authenticity.

THE COURT:  All right.  Anything further we need to discuss before we call the jury?

MR. FOSTER:  Yes, Your Honor.  I sent an e-mail to your clerk last night about a new issue that had come up and requested we come in early on that.

We were notified yesterday that -- or last evening that the government had new evidence in the form of, apparently Rony Lopez stating that as he was exiting the courtroom, our client said some sort of threatening words to him, and apparently they intend to call him back to the stand.

We object to that on the grounds that it's not reliable evidence.  And we believe that needs to be determined outside the presence of the jury.

THE COURT:  When do you intend to call Mr. Lopez?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 30 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 30 of 115

JA2867

MS. ROSE:  It would be later in the morning.  I was informed by that it would be later before he would be here, Your Honor.

THE COURT:  After our morning break?

MS. ROSE:  I think that would be safe to say.

THE COURT:  Well, we will have Mr. Lopez examined outside the presence of the jury during our break, and I will make a ruling at that time.

MR. FOSTER:  One more issue, Your Honor.  We have been informed this morning that the Government intends to call Freddy Gonzalez, one of the witnesses or victims to the Lemon Grove Park murder and assault.

And this is the gentleman who the Court excluded, the hearsay rendition of him, but said it would be otherwise if he came in person.

What we want to do is object to any attempt by the government to have him identify our client in court.  It's highly suggestive, based on his two previous photo lineups where he said it was tentative and he couldn't be sure, he resembles the guy, but he's not sure.

We submit that then bringing him into the courtroom and asking him to -- asking if he sees the person in the courtroom five years after the event, is highly suggestive when there is only one defendant sitting over here.  So we would object to that being done.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 31 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/17   Page 32 of 115
JA2868

308

THE COURT: What says the government?

MR. NAZZARO: Your Honor, I think it is highly relevant for him to be given the opportunity to determine whether he can identify the defendant. They can cross examine him on that. And I don't think a fair reading of the two -- he picked him out of the line up on two different occasions. And certainly any of those issues that they want to raise can be done on cross examination.

THE COURT: When you say, picked him out of a lineup. He picked him out, he indicated it most looked like --

MR. NAZZARO: I think the words were, one he said, he resembles the guy who killed him. And the other one he said, he wasn't 100 percent sure.

But certainly that's something, you know, whether he's 99 percent sure or 95 percent sure, he certainly should have the opportunity to see if he sees the person in person, rather than a photo, which is -- which was done in this case.

And I think we certainly have the right to ask him if he sees the person that reassembles that person in the courtroom. They can cross examine him. And also to show him his previous identifications. They have now become very relevant and are not hearsay testimony anymore, because these are his actual documents in which he identified the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 32 of 536
Case 3:08-cv-00134-RJC   Document 2047   Filed 01/30/11   Page 33 of 115
JA2869

309

defendant on two separate occasions. And they were several months apart, also.

THE COURT: I don't think the defense is making an objection to the prior identifications. The defense objection is to an in-court identification.

MR. NAZZARO: I understand that.

THE COURT: Let's talk about that. Let's not talk about --

MR. NAZZARO: Well, I think that's -- I don't know that there's anything to suggest that that is unduly suggestive. He was in the park. He witnessed the shooting. He was shot at. And if the defendant is one of the shooters, then I think he should have the opportunity to identify him. They're certainly going to argue that nobody identified him.

And certainly if he's able to do that, they can cross examine him on the passage of time, on whether he was sure of it at the time, on the lighting conditions.

But certainly we have, I think, the right to ask for an in-court identification. There's nothing to suggest that it's unduly suggestive at this point. He hasn't seen the defendant, been exposed to the defendant in court. He's been precluded from the courtroom. And so I think that's highly relevant and probative in this situation.

And we've alleged, Your Honor, as one of the

Laura Andersen, RMR 704-350-7493

310

statutory aggravating factors, Mr. Umana's participation in this event.

MR. BRYSON:  May I respond, briefly?

THE COURT:  You may.

MR. BRYSON:  Just in terms of the courtroom setting being unnecessarily suggestive.  I think there's case law about this, I believe.  I don't have the cite, but it's Illinois versus Moore.  It's a U.S. Supreme Court case back in the seventies where they did in fact hold that a courtroom setting where the defendant is the only one there sitting at the table with his lawyer, is an unnecessarily suggestive setting.  We do think this is an unnecessarily suggestive setting.

With regard to Mr. Gonzalez's identification, if I'm wrong about this, someone point this out.  But as I recall the evidence, he made a tentative identification and he said that the defendant looked something like him.  But the other person that he did identify was the Alex Montez person that he had robbed on the prior occasion.  He had a beef with this person that was called Guanaco, I believe, Alex Montez.  And he was later convicted of a robbery with -- involving, Guanaco as the victim.

Again, if I'm not mistaken, when he made this identification, he also identified Alex Montez, the other person present at the shooting.  If I'm wrong about that

Case 3:16cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 34 of 536
Case 3:08-cv-00134-RJC   Document 2046   Filed 01/30/11   Page 35 of 115

JA2871

311

then point it out.

MR. NAZZARO:  I think he is wrong about that.

MR. BRYSON:  It's on page 9 of 15 from the Lemon Grove summary that says -- it says on the third paragraph down, "On photo lineup card 11876, he selected number four, Alex Montez, as being suspect he saw in the park earlier. He said the suspect got up and left the park shortly after he played basketball."

I'm sorry, he didn't pick him out as the shooter.

MR. NAZZARO:  Right.

MR. BRYSON:  He said he was there that night. No -- then he says, Gonzalez says the suspect Montez then returned to the park later with the shooter, so he did.

THE COURT:  Well, I'll require the government to lay a foundation for the in-court identification, and then make a determination at that point.

I don't believe, based upon the testimony that I have heard, that the out of court six-pack displays to the witness, were in any way impermissibly suggestive.

And so I will listen to the witness' testimony with respect to what he observed at the time of the shootings, and engage in the impermissibly suggestive analysis once I've heard that evidence.

I will preserve -- I will permit Mr. Gonzalez to have; certainly an eyewitness to the shooting.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 35 of 536
Case 3:08-cv-00134-RJC   Document 1946   Filed 01/30/11   Page 36 of 115
JA2872

312

I will permit the government to present the pretrial identification evidence.  And I will withhold ruling on an in-court identification until I've heard all of that.

When is Mr. Gonzalez expected to testify?

MR. NAZZARO:  He will be the first witness, Your Honor.

THE COURT:  Very well.  Well, I will -- before you ask him for an in-court identification, request a side bar with the Court.

MR. NAZZARO:  I will, Your Honor.  I just don't want the argument then to be that he's now seen him in a line up twice, and that's even more suggestive.

So I will show him the line ups as prior identification first.  And then at that point I will ask for side bar for the court's ruling on the in-court identification.

THE COURT:  Well, let's do it this way.  Lay the foundation for his ability to identify the defendant.  And then if you want an in-court identification at that time -- that's probably the best way to do it.  I'll make a determination on whether he's allowed to make an in-court identification.

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  And then you can, if you want, you can

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000573-MOC    Document 59-7    Filed 03/23/17    Page 36 of 536
Case 3:08-cv-00134-RJC    Document 191-6    Filed 01/30/17    Page 37 of 115
JA2873

follow that up with any pretrial show ups.

In other words, I want to hear the factual predicate for his ability to identify the defendant before I make this ruling. So set that out and I'll make a ruling at that point.

All right. Are we ready for the jury?

MR. BRYSON: Your Honor, Mr. Umana is requesting to confer. Can we have just a moment?

THE COURT: Sure.

(Pause.)

THE COURT: Are we ready?

MR. BRYSON: Yes, Your Honor.

THE COURT: Call the jury.

(The jury was returned to the courtroom.)

THE COURT: Call your next witness.

MS. ROSE: United States calls Carlos Alfredos Dominguez Gonzalez.

THEREUPON, CARLOS ALFREDOS DOMINGUEZ GONZALEZ, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good morning. Could you please state name for the court, sir?

A.   Freddy Gonzalez.

Q.   Freddy, is that -- what's your full name?

A.   Carlos Alfredo Dominguez Gonzalez.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 37 of 536
Case 3:08-cv-00134-RJC   Document 1946   Filed 01/30/11   Page 13 of 115
JA2874

314

Q.    You go by Freddy; is that right?

A.    Yes.

Q.    Where were you born, Freddy?

A.    Guatemala.

Q.    Where do you currently live?

A.    Los Angeles.

Q.    How long have you lived in Los Angeles?

A.    Twenty-six years.

Q.    And what part of Los Angeles do you live in?

A.    Koreatown.

Q.    It's Koreatown?

A.    Yes.

Q.    Where is that in Los Angeles?

A.    Hollywood, by Hollywood.

Q.    Now, Mr. Gonzalez, you've had some other prior convictions in California; is that right?

A.    Yes, sir.

Q.    And did some of those involve concealed weapons charges?

A.    Yes.

Q.    And did they also -- one of those involve a robbery that occurred in May of 2005, or at least you are accused of that; is that right?

A.    Yes.

Q.    And did that robbery involve an MS 13 member?

Laura Andersen, RMR 704-350-7493

**JA2875**

315

A.   Yes.

Q.   Now, are you a member or associated with a gang or organization known as TPC?

A.   Yes.

Q.   And what is the TPC?

A.   Stands for Perfect Criminals.

Q.   And what do they do?  What kind of organization is that?  Is that a gang?

A.   It's like a tagging group -- crew.

Q.   How long have you been associated with it?

A.   Not long, probably two years.

Q.   You said tagging, what do you mean by that?

A.   Tagging, like writing on the walls.

Q.   Now, did the TPC have a particular problem with the MS 13 in the Lemon Grove area?

A.   They didn't want us in the park.

Q.   Who's they?

A.   MS 13.

Q.   What do you mean, they didn't want you in the park?

A.   They didn't want us in the park because they thought supposedly it was their park.

Q.   Now, I want to direct your attention to an evening when the murder occurred on September 28, 2005; were you at Lemon Grove that day?

A.   Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 39 of 536
Case 3:08-cv-00134-RJC   Document 216   Filed 01/30/11   Page 39 of 115
JA2876

316

Q.   When did you arrive?

A.   Approximately 5:30, 6 in the afternoon.

Q.   What was going on, do you remember?

A.   I just went to the park to play basketball.

Q.   Were there various people playing basketball?

A.   Yeah.

Q.   Did you participate at any time in any basketball games earlier in the evening?

A.   Yeah, earlier, till probably 8, 9:00.

Q.   Now at some point in the evening did you -- were you on the bleachers that are located in Lemon Grove Park?

A.   Yes.

Q.   And who was -- was there with you at that time?

A.   Couple of friends, Andy, victim, another guy we call him Flaco and Leapo.

Q.   Now those individuals that you mentioned Andy, Flaco, Lipo -- Leapo, excuse me, did you know them?

A.   Yes.

Q.   Okay.  How did you know them?

A.   From the park, playing basketball.

Q.   Okay.  Were they -- they weren't part of this TPC or the gang, were they?

A.   No.  No.

          MR. FOSTER:  Objection, leading.

          THE COURT:  Sustained.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 40 of 536
Case 3:08-cv-00134-RJC   Document 59-16   Filed 01/30/11   Page 21 of 115
JA2877

317

Q.    (By Mr. Nazzaro) Were they part of any gang?

A.    No.

Q.    Were they part of TPC?

A.    No.

Q.    Now, at some point in the evening when you mentioned you were on the bleachers, did you notice anything or notice anybody approaching you?

A.    We saw two guys approaching where we were sitting at the park, yeah.

Q.    While you were sitting?

A.    At the bleachers.

Q.    Right.

A.    Yeah.

Q.    What did you notice?

A.    I noticed that they were walking towards us.

Q.    Okay.  And did that cause you to be suspicious in any way?

A.    Yeah.  Yes, sir.

Q.    And what was your reaction, did you say anything as this was occurring?

A.    When they got really close to us, one of them pulled out a gun.

Q.    Okay.

A.    I told them that I don't bang.  I put my hands up like that (indicating.)  And he just pulled it out and he started

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 41 of 536
Case 3:08-cv-00134-RJC   Document 216   Filed 01/30/11   Page 22 of 115

**JA2878**

shooting and we just ran -- we ran from there.

Q.   When you pulled your hands out, you were looking at -- you were looking at the guy with the gun?

A.   Yeah.

Q.   And was he looking at you?

A.   He was looking at all of us.

Q.   And did the individual with the gun say anything?

A.   Nothing.

Q.   After you said that?

A.   Nothing.

Q.   Why did you say you don't bang anymore?

A.   Cause I knew they were from MS 13, cause I seen one before, earlier at the day.  And I knew they were coming to do something, you know.

Q.   And what happened next?

A.   It just started shooting at us.  And we just ran.

Q.   You ran?

A.   Fast as possible, yeah.

Q.   And where did you run to?

A.   Towards the street named Harvard, behind the park.

Q.   And did you hear any gunfire?

A.   Yes.

Q.   How many -- how much did you hear?

A.   Approximately five, six shots.

Q.   Did you actually get hit by any of the gunfire?

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 42 of 536
Case 3:08-cv-00134-RJC   Document 19-6   Filed 01/30/11   Page 23 of 115

JA2879

319

A.   Yes, I got hit on the leg.

Q.   And did you get injured?

A.   No.  Luckily they hit my key.  I had my car keys, it hit my keys and it ricochet.  It broke my key.

Q.   Now, with respect to the park that evening, are there lights at the baseball field?

A.   They turn the lights off at 9:00.

Q.   The lights at the baseball field?

A.   All the lights, the baseball field and basketball courts.  There's two basketball courts there.

Q.   How far were you when you saw the person with the gun? How far away were you from the person?

A.   Like, approximately where you are right now.

Q.   Okay.  Which is?

A.   Probably like --

Q.   Okay.  Which -- how many -- can you estimate how many feet that is?

A.   Maybe like 15, say 20 feet.

Q.   And that's the person who pulled out the gun?

A.   Yes.

Q.   And you pulled your hands up at the time?

A.   Yeah, like such (indicating).

Q.   And after -- was it after you put your hands up that the firing started or --

A.   No.  I put my hands -- I knew.  He kind of pulled the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 43 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 24 of 115
JA2880

320

gun out.  I say, I don't bang no more.  And then that's when he got pulled it out and started shooting, we started running.

Q.   And where did you run to?

A.   Towards the back of the park by the baseball field.

Q.   And did you see anybody else get hurt or injured while you were running?

A.   No.  Just ran as possible -- quick as possible.

MR. NAZZARO:  Your Honor, if I could approach the bench at this time?

THE COURT:  You want to conduct any cross on the conditions?

MR. FOSTER:  Yes, Your Honor.

THE COURT:  You may.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Mr. Gonzalez, when this took place, when the -- was it two guys or one guy that approached?

A.   Two guys.

Q.   At this point the lights on the basketball court had gone off, correct?

A.   Yes.  It was past 9:00.

Q.   Right.  And so it was dark outside?

A.   It's still lights in there.

Q.   What?

A.   It's still lights at the park.  The field lights are

Laura  Andersen,  RMR  704-350-7493

**JA2881**

321

still on.

Q.    Field lights?

A.    Yeah.

Q.    But the basketball court lights were off, correct?

A.    Yes.

Q.    And that's where you were?

A.    Yes, by the bleachers.

Q.    Okay.  And so, it was -- the -- it was -- you're saying it was partially lighted?

A.    Yes.

Q.    Okay.  But it was dark outside, correct?

A.    You can still see.

Q.    Okay.

A.    There's lights on the sides of the park.

Q.    Okay.  But there was no --

A.    The big lights for the basketball courts, those are off, but there's few lights.

Q.    Okay.  So there's no direct overhead lighting where you were?

A.    Yes.  There's one behind.

Q.    But not on the court?

A.    In front -- in front of the courts.

Q.    And so you only got a very quick look at the person who is pulling out the gun, correct?

A.    Yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 45 of 536
Case 3:08-cv-001344-RJC   Document 59-7   Filed 01/30/11   Page 26 of 115
JA2882

322

Q.    And that person was roughly the distance between you and the prosecutor?

A.    That's right.

Q.    And you said 15 to 17 feet, but isn't that distance more like 25 feet?

A.    Probably.

Q.    And so you had a brief opportunity to see this person's face and then you were running, right?

A.    That's right.

Q.    Okay.  And that was your only look at the person?

A.    Excuse me, can you say that again?

Q.    That was your only look at the person?

A.    Yes.

MR. FOSTER:  Could we have a side bar at this point, Your Honor?

THE COURT:  Yes.  Let me ask a question.

When -- you said that there were two guys.

THE WITNESS:  Yes, sir.

THE COURT:  And that you had seen one of the guys earlier in the day.

THE WITNESS:  Earlier.

THE COURT:  Was that -- the one guy that you had seen, was that the guy that you were describing as pulling out the gun?

THE WITNESS:  No.

Laura Andersen, RMR 704-350-7493

**JA2883**

323

THE COURT:  It was the other guy?

THE WITNESS:  Yes, sir.

THE COURT:  So the guy that was pulling out the gun, is not the guy that you had seen earlier in the park?

THE WITNESS:  No.

THE COURT:  Let me see the attorneys at side bar.

(Bench conference as follows:)

MR. FOSTER:  Your Honor, I guess I was just getting -- not sure how far the court wanted us to go at this point.

We would submit that, you know, if the witness is -- if the government's allowed to go show him the photo line ups that he earlier used, is he looking at the photograph which obviously includes our client, it seems like that's really suggestive.

THE COURT:  I'm going to make this decision right now based upon the examination today.

MR. FOSTER:  Okay.

THE COURT:  And the prior evidence that I have before -- it's not evidence before the jury, but evidence before me, in terms of the prior identifications.  And so make your argument based upon that.

MR. FOSTER:  Okay.  Well, we would just submit that, you know, it was dark.  He didn't have an opportunity to see the guy.  It was a brief moment and, you know,

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 47 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 23 of 115
**JA2884**

324

just -- and based on those prior identifications which were so tentative in which the actual translations were his first -- the first one that was done, he said that when he circled the photograph of our client, he said photo number two looks like or reassembles the guy who came to the park the day they killed Andy.  I remember seeing this guy.  But I'm not sure he is the one who came to the park that day with the pistol and shot us.

Then when they came back and did this again, a new line up on April 15th, 2008, the translation of what he wrote when he circled our client's name on that date is that, my first impression was photo number five.  The way that he has his hair is -- looks the same, but everything happened so fast, I'm not 100 percent sure.  He came to the park.  He seemed small.  And what I saw was the gun.  And after that I began to run.  This is the first and last time that I saw the young man.

Can I just add, from my point of view you have a guy who's in a rival gang.  And with regard to the other person that's present, it would really have to be the other shooter, since all the evidence shows only two people there.  Yet he has clearly identified somebody that is, at least the rest of the evidence shows, was not the shooter.

And in fact, has identified somebody that he had a prior -- another MS member he had a problem with in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 48 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 29 of 115
JA2885

past.

So to the extent that goes to his reliability, he's clearly made a misidentification regarding the other person present in the park.  And for, you know, taking this logically back in 2005 when everything was fresh in his mind, and this was -- he was part of the investigation, he could never make a positive identification of Mr. Umana.

And now five years later to bring him into court where he's the only one present sitting in the courtroom and say, that's the man, we just think that's a leap of faith that should not be made.

THE COURT:  All right.  What says the government?

MR. NAZZARO:  Your Honor, first of all with respect to the lighting, I think there's been sufficient testimony that there was sufficient lighting not only from this testimony, but from Tom Small who said there was still ambient lighting in the park at the time of the shooting.

As far as the, you know, reliability, I think that's all issues on cross examination.

He, on two different occasions, he picked out two different photos of the defendant from a six pack of similar photos.  He didn't make a misidentification.  He identified another individual as being in the park earlier that day. And they can ask him about that.

But as far as the shooter goes, he picked him out.

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000057-MOC   Document 59-7   Filed 03/23/17   Page 49 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 50 of 115

JA2886

He wasn't 100 percent sure. I think that's, you know, those are photos, that's not in person.

I think the government should have the right to see if he's able to do it in person. He may not be able to do it. But I think I have the right to ask him that. And then show him, obviously, the two prior identifications and ask him questions about that.

And certainly the defense can cross him on all those issues that they're raising. I don't think they go to reliability as much as the weight of the evidence.

MS. ROSE: Well, the other thing is, he would testify -- I know when he was interviewed he said, I will never forget that face. If I can -- you know, I will never forget that face.

MR. NAZZARO: I mean, I think the other thing I would add, Your Honor, of the witnesses that testified based on what he said, he had the best opportunity to see the guy. He actually put his hands up to the shooter and said, I don't bang anymore, and was looking at him at the time. I think that's been the testimony.

And I think the others testified they saw it and they started running. And I think he was in the best opportunity to see the guy.

MS. ROSE: He watched him walk across the court. He said he watched them as they walked toward them.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 50 of 536
Case 3:08-cv-00134-RJC   Document 194-7   Filed 01/30/11   Page 51 of 115
**JA2887**

THE COURT: All right. I heard from everybody. Applying the *Brathwaite -- Manson V Brathwaite* factors, I think the opportunity of the witness to view the defendant at the time of the crime was limited under poor lighting conditions.

There was some light, but the basketball court lights and baseball court lights were off. It was from a distance of somewhere between 15 and 27 feet. Distance from the witness stand to the prosecutor's table. The Court -- regardless of what that distance is, the Court is able to observe it.

The witness had a brief opportunity to observe the shooter at that time he's pulling the gun out of his waist. The witness is throwing up his hands and claiming he's not a -- he's not banging anymore.

The accuracy of the prior description of the criminal, I think, is suspect. He did have two, six-pack show-ups, neither one was he positive that the photo of the defendant was the shooter. He gave less than certain responses to say it.

There's some evidence, but in terms of the accuracy of the prior description, it's less than a positive identification.

The level of certainty demonstrated at the confrontation, I think I discussed that. And the time

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 51 of 536

**JA2888**

328

between the crime and the confrontation, the show-ups were some time later.

The concern for the Court today is that this is the only witness that identifies the defendant. There was some testimony from Arevalo that the defendant is the shooter, but no -- he wasn't present at the time the shooting occurred. No real basis for why he made that statement. This is the only witness that identifies the defendant in some way as the shooter.

The Court does not have confidence in the pretrial identification, and does believe that five years later he has even less of an ability to identify the shooter. And the courtroom structure lessens the likelihood of an accurate description.

This is a very serious matter, and I don't think the government has met its burden to permit this witness to make an in-court identification, and the Court will prohibit it at this time.

MR. NAZZARO: With respect to the prior I.D., Your Honor.

THE COURT: Prior identifications I will allow you to get into that with respect to what he was able to say.

MR. NAZZARO: I intend, just so the court knows, to show him the two prior identifications as exhibits, if that's permitted.

Laura Andersen, RMR 704-350-7493

JA2889

THE COURT: It is.

MR. NAZZARO: Okay thank you.

(The bench conference was concluded.)

Q. (By Mr. Nazzaro) Now, Mr. Gonzalez, after this occurred, did you have some discussions with the investigator in this case, Detective Tom small?

A. Yes.

Q. And you met with him on a couple of occasions, at least?

A. Yeah. Yes, sir.

Q. I want to direct your attention to December 29th of 2005. At some point on that date, did you meet with Detective Small, and did he show you a series of photographs?

A. Yes.

Q. I would like to show the witness now what's been previously marked as Government 507.

Mr. Gonzalez, do you see that on your screen in front of you? Are you able to see that?

A. Yes.

Q. Do you recognize what I identified as Government 507?

A. Yes.

Q. How do you recognize it? Do you recognize the writing?

A. Yes.

Q. Is that your name, Freddy Gonzalez?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 53 of 536
Case 3:08-cv-00134-RJC   Document 191-4   Filed 01/30/11   Page 54 of 115
JA2890

A.   Yes.

Q.   When I said is that your writing, the writing -- there's writing in Spanish, do you see that?

A.   Yes.

Q.   And that's your writing?

A.   Yes.

Q.   And this document has two pages.  And I think on the backside, if I can show you that page, please.

Do you see what's exhibited on the backside of this page?  Do you see these photographs?

A.   Yes.

Q.   And were those photographs shown to you by Detective Small on -- in December of 2005?

A.   Yes.

Q.   And the markings on one of the photographs, is that your marking?

A.   Yes.

Q.   And the name, it says, Freddy Gonzalez, is that your initials or your name?

A.   That's my name.

MR. NAZZARO:  Your Honor, at this time I would move Government 507 I believe.

THE COURT:  Let it be admitted.

(Government Exhibit 507 was received into Evidence.)

MR. NAZZARO:  Ask it to be published.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 54 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 55 of 115
JA2891

331

THE COURT:  You may.

Q.   (By Mr. Nazzaro) I would like to show you the first page again so the jury can see.

And this is the page I had showed you before; is that right?

A.   Yes.

Q.   And that's your statement?

A.   Yes.

Q.   Okay.  And what were you being shown at the time?  Do you remember the circumstances what Detective Small told you at the time that he showed you the photographs?  He asked you to identify -- try to identify the shooter from that evening?

A.   Yes.

Q.   And the person you picked is on the other side, is that the person that you picked that resembled the person?

A.   Yes.

Q.   Were you sure of it or what was your statement to him at that time?

A.   Yeah, it was him.

Q.   And the person you circled, was the person that you previously testified about someone pulling out a gun when you held your hands up?

A.   Yeah.

Q.   Was that the person that you saw?

Laura Andersen, RMR 704-350-7493

**JA2892**

A.   Yes.

Q.   Now, at some point later did you -- did Detective Small show you yet another line-up of other individuals?

A.   Yes.

Q.   And I'd like to show you what's been previously marked as Government 506.  Are you able to recognize Government 506?

A.   Yes.

Q.   How are you able to recognize it?

A.   It's my writing.

Q.   Is that your writing?

A.   My writing.

Q.   Okay.  And the date on this is April 15th, '08, was that the date you met with Detective Small?

A.   Yes.

Q.   And the backside of this particular photo I.D. report, has another series of photos, do you see that?

A.   Yes.

Q.   And did he show you this series of photos on that day?

A.   Yes.

Q.   And were you asked to identify the shooter from this series of photos?

A.   Yes.

Q.   And the circle that is depicted in person number five, was that a person that you selected?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 90-7   Filed 03/23/17   Page 56 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 57 of 115
JA2893

A.   Yes.

Q.   And that date, is that your writing?

A.   My writing and my initials.

MR. NAZZARO:  Your Honor, I would move Government 506.

THE COURT:  Let it be admitted.

(Government Exhibit 506 was received into Evidence.)

Q.   (By Mr. Nazzaro) And this is the second page, and that's the person you circled as the shooter?

A.   Yes.

Q.   And once again, the first page of that document -- if I can show you that.  And that's your writing; is that right?

A.   Yes.

Q.   Now you wrote in Spanish; is that right?

A.   Yes.

Q.   And why did you do that?  Do you write in English?

A.   My writing in English is not that good.

Q.   From reviewing the two documents, what did you convey in your writings to Detective Small about the particular identifications that you made?  Do you remember by reviewing what's Government's 506 again.  Like to show you 506.

What were you saying in that particular statement?

A.   That the guy in photo number five was the shooter that night.

Q.   Did you indicate to him at any point that you weren't

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 57 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 58 of 115
JA2894

334

100 percent sure, or what was your statement to him about that?

A.   That was -- it was -- it was the guy.

Q.   Now, you mentioned -- when you say the guy, the shooter?

A.   On picture, yes.

Q.   Now, you mentioned another guy that was at the park earlier?

A.   Earlier that night.

Q.   Okay.

A.   That evening.

Q.   Okay.  And that's not the guy in these two exhibits?

          MR. FOSTER:  Objection; leading.

          THE COURT:  Sustained.

          THE WITNESS:  No.

          THE COURT:  I sustained the objection, if you wanted to --

          MR. NAZZARO:  Yes, Your Honor.

Q.   Did he show you other photographs of other individuals?

A.   Yes.

Q.   And were you able to pick out, if you recall, any photographs of the person you indicated was at the park earlier that day?

A.   Yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 58 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/17   Page 59 of 115
JA2895

335

MR. NAZZARO:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Mr. Gonzalez, would you put Exhibit 507 back up, the page one.

Now, Mr. Gonzalez, did you have a chance to read what you wrote before taking the stand today?

A.   No.

Q.   Well, you just testified a moment ago that what you told the detective and what you wrote was that this was the shooter, right?

A.   Yes.

Q.   But isn't it true that what that says in Spanish there, a translation of that would be, "photo number two looks like or resembles the guy who came to the park" that -- I'm sorry.  "Who came to the park the day that they killed Andy. I remember seeing this guy, but I'm not sure if he is the one that came that day to the park with the pistol and shot us".

A.   Yeah.

Q.   That's what it says, right?

A.   Yes.

Q.   And if you could pull up Exhibit 506, please.  This was done on April 15, 2008.  This was two and a half years after

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 59 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 40 of 115
**JA2896**

the crime occurred, right?

A.   Yes.

Q.   Okay.  And you testified again a minute ago you were asked what you told the detective and you said, this is the guy, this is the shooter, right?

A.   Yes.

Q.   And taking a look at what you've written there in Spanish, isn't it true that what you wrote on this occasion, translates in English as follows:

"My first impression was photo number five.  The way that he has his hair is, looks the same.  But everything happened so fast, that I'm not 100 percent sure.  He came to the park, he seemed small.  And what I saw was the gun, and after that I began to run.  This is the first and last time I saw the young man".

Isn't that what you wrote?

A.   Yes.

Q.   And so the first identification, the one that was much closer to the events in question, that was done December 29th, 2005, which was basically three months after the event, correct?

A.   Yes.

Q.   At that time, as we just asked you, all you're able to say is that he looked like, he resembled the guy.  And you weren't sure if he was the shooter, correct?

JA2897

337

A.   Yeah.  Yeah.

Q.   And you, yourself, you said that you're a member of Tree -- well, The Perfect Criminals, correct?

A.   Yes.

Q.   At some point in time was it known as Tree Park Criminals?

A.   No, not that I know.

Q.   Now, you were asked how long you have been associated with that group and you said for two years?

A.   Yes.  I met them right there at the park, Lemon Grove Park.

Q.   Two years ago?

A.   Oh, no.  More than that.  Not right now, but say like seven years.

Q.   Okay.  When were you associated with them, what years?

A.   Maybe seven, eight years ago.

Q.   Okay.  So at the time of this event in 2005, you were -- you were park of that gang, right?

A.   Yes, you could say that.

Q.   Okay.  And as you said, that gang had a beef with MS 13 over that park, right?

A.   They have beef with, because we used to go play basketball right there.

Q.   But there was conflict between the two gangs, right?

A.   Yes.

                    Laura Andersen, RMR 704-350-7493

**JA2898**

338

Q.   And, in fact, that's related to why you robbed Alex Montez, correct?

A.   Yes.

Q.   And you were convicted of that felony robbery, weren't you?

A.   Yes.

Q.   And you also testified on direct, something about being convicted for some concealed weapon offenses too?

A.   Yes.

Q.   When were those?

A.   That was a long time ago, maybe 15, 17 years ago.

Q.   Were they felonies?

A.   Yes.

Q.   So how many felony convictions do you have?

A.   Maybe two.

Q.   And so one of the people that you identified as being out there that night was Alex Montez, the same guy you had robbed, correct?

A.   That night, no, he wasn't there.

Q.   You never told the police he was out there?

A.   No, not him.

        MR. FOSTER:  If I could have a moment, Your Honor?

        THE COURT:  You may.

Q.   (By Mr. Foster) Are you sure that you didn't tell Detective Small in a photo line-up in December 29, 2005,

                Laura Andersen, RMR 704-350-7493

JA2899

339

that Alex Montez, as somebody you identified in the photo line-up, as being the other person that he was in the park that night with the shooter?

A.   I don't know him by name.  I don't know the guys by name.

Q.   Okay.  How about Guanaco, do you know that --

A.   Nope.

Q.   -- nickname?

Well, do you know who the person is that -- you testified earlier that you robbed that certain person, Alex Montez; was that the person you saw the other --

A.   No.

Q.   No?

A.   No.

Q.   Is that what you told the detective?

A.   Nope.

Q.   Well, let me show you something and ask if this refreshes your memory, or whether you -- what you have to say about this.

Do you see something on the screen there, this is page 9 of 15 of Detective Small's report, which I would have marked as Defense Exhibit next in order, whatever that is.

If you can look at the sections that we're marking with the red.  Those two paragraphs to the right of that red line, just read it to yourself and then I want to ask you

Case 3:16-cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 63 of 536
Case 3:08-cv-00134-RJC   Document 201-7   Filed 01/30/11   Page 44 of 115
JA2900

some questions.

(Pause.)

Q.   Okay.  You read that?

A.   Yeah.

Q.   Okay.  Isn't it true that you identified Alex Montez as being the second guy that came back with the shooter?

A.   Yeah.

Q.   Okay.  Was that just something you'd forgotten or were you --

A.   No.  I just read it right now, and I remember what I told detective.

MR. FOSTER:  No further questions.

THE COURT:  Any redirect?

REDIRECT EXAMINATION BY MR. NAZZARO:

Q.   The guy he was just asking you about was not the shooter, right?

A.   No.

Q.   The guy you picked out in the two other ones was the one you believe --

A.   Yes.

Q.   -- the shooter?

No questions.

THE COURT:  You may --

MR. FOSTER:  I'm sorry.  I do have one more question based on that.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 64 of 536
Case 3:08-cv-00134-RJC   Document 29-7   Filed 01/30/11   Page 45 of 115
JA2901

341

THE COURT: All right.

RECROSS-EXAMINATION BY MR. FOSTER:

Q. Are you saying there was only one shooter then, and not two?

A. I never saw it was two shooters. It's only one shooter that I saw with a gun.

Q. The other guy, where was he?

A. Next to him.

Q. You only saw one guy with a gun, is that what you're saying?

A. Yes.

MR. FOSTER: No further questions.

THE COURT: You may step down and be excused.

Call your next witness.

MR. NAZZARO: Sharod Culpepper. Sharod Culpepper. I'm sorry, Your Honor.

THEREUPON, SHAROD CULPEPPER, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q. Good morning. Please state your name, sir?

A. Sharod Culpepper.

Q. And Mr. Culpepper, how are you employed?

A. (Indicating.)

Q. How are you employed, sir?

A. Mecklenburg County Sheriff's Office.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 65 of 536
Case 3:08-cv-00134-RJC    Document 59-7    Filed 01/30/11    Page 65 of 115
JA2902

Q.   And what do you do for the sheriff's office?

A.   I'm a detention officer.

Q.   And what facilities do you work at as a detention officer?

A.   Jail Central.

Q.   And Jail Central is here in Charlotte?

A.   Yes, sir.

Q.   And were you -- how long have you been working there, I'm sorry?

A.   Since December of '07.

Q.   And so were you working there in July of 2008?

A.   Yes, sir.

Q.   I would like to specifically direct your attention to July 20th, 2008 and ask about an incident that occurred on that day; do you remember that incident?

A.   Yes, sir.

Q.   I would like to show you first what's been marked as Government 544.  Do you recognize Government 544?

A.   Yes, sir.

Q.   Is that an account of that incident that occurred on July 20th, 2008?

A.   Yes, sir.

Q.   And did that incident involve a person by the name of Umana; Mr. Umana?

A.   Yes, sir.

                    Laura Andersen, RMR 704-350-7493

**JA2903**

343

Q.   A prisoner by the name of Umana?

A.   Yes, sir.

Q.   Is he here in the courtroom today?

A.   Yes, sir.

Q.   Could you please identify him?

A.   Right over there.

Q.   What's he have on?

A.   He has on a white shirt.

          MR. NAZZARO:  The record could so reflect.

          THE COURT:  It will.

Q.   (By Mr. Nazzaro) Could you tell the jury what happened that day with respect to Defendant Umana?

A.   Well, basically that day, there was several other inmates sitting in the TV area.  Inmate Umana was sitting outside the TV area in a chair.

     The inmates was talking in the TV area.  Which facility rules, policy states, there's no talking in the TV area at all.

     I already had warned the inmates, do not talk.  I told them the next time they talk, the TV area would be shut off.  So the inmates continued to talk.  I went over there to shut the TV off, and told the inmates to proceed to go to the rec yard.

     Several of the inmates proceeded to go the rec yard, except for Inmate Umana.  He stood up, he said something in

Laura Andersen, RMR 704-350-7493

**JA2904**

344

Spanish to the inmates going to the rec yard, they stopped, they turned back around, and walked back over to the TV area.

I don't know what he said in the language, because I didn't understand the language he said it in. But they turned around stopped, turned around, came back to the TV area.

Q. How many people?

A. It was approximately about 10.

Q. And they followed him back to the TV area?

A. Yes, sir.

Q. And then what happened?

A. Then, I reinstated again, and told them to go back to the recreation yard, in which they stopped, turned right back around went back to the recreation yard, but he still stood there.

At that time he proceeded to come at me in an aggressive manner. He was talking, but he was talking in Spanish to me, but his whole demeanor was in a threatening manner in which he was coming towards me.

So he proceeded to come towards me. I asked him to stop where he was at. He continued to come towards me in an aggressive manner.

So he came all the way up to my podium, in which he crossed the red line that inmates are not allowed to cross

Laura Andersen, RMR 704-350-7493

**JA2905**

without permission from the pod supervisor, which was I.

Q.    And they know that, right?

A.    Yes.  They know that.  I state that in orientation.
They all was aware of that.

Q.    How close was he from you at this point?

A.    He was approximately within arm's reach.  The podium is
approximately about a foot wide in width.

So if you're on the podium, you can reach over and
pretty much almost touch the officer, depending on how far
the officer is leaning, or how far the officer is close to
the podium if they're sitting down.

Q.    And then what happened at that point when you saw him
approaching you?

A.    At that point he was still -- he was still upset.  I
could see in his demeanor, in his facial expressions that he
was upset.  And he was talking to me in Spanish.  But I was
unaware what he was saying.

All I know is, I could see in his body language he was
upset and started to approach the podium, and come around
the podium.  Because there's two gaps in the podium where
you can enter and exit the podium.

So, as he started to come around, before he came
around, I asked him to stop again.  At that time he stopped.
He stopped there, and he was just talking, talking in
Spanish.  So I called for escorts.  Escorts came in there

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 69 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 50 of 115
JA2906

346

as -- right as he was about to enter into the podium area where I was sitting.  Escorts came in there, my sergeant, my captain, and two other escorts came in there, and they proceeded to handcuff him.

As they was handcuffing him, he -- he then tried to lunge at me as he was getting handcuffed.  As his arms were behind his back he tried to lunge at me.  Then my sergeant then pulled him back and refrained him from lunging at me and continued to cuff him and then escort him out of the pod.

Q.    How many people responded to assist you?

A.    It was four people total.  It was my sergeant, my captain, and two escorts.

Q.    And this area you described back in 2008 where Mr. Umana was, this was a -- I think you called it a general housing area?

A.    Yes.  It's a general housing pod.

Q.    What does that mean?

A.    That means he's pretty much in population, general population around other inmates who are -- who are already classified.  And that's when -- where they're housed. Regular general inmates, where they are housed, in the general housing pod, until they either go to trial or get sentenced.

Q.    And when they are -- after an incident like this, do

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 70 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 03/30/11   Page 170 of 115
JA2907

347

they remain in that area?

A.   No.  Actually when an incident like such as mine, they get removed from general housing, and they get put in -- they get put on DDU status.  And they get put in a DDU housing unit, which is for disciplinary detention housing unit for other issues or noncompliance of the facility rules.

        MR. NAZZARO:  Your Honor, at this time I would move Government 544.

        THE COURT:  Let it be admitted.

(Government Exhibit 544 was received into Evidence.)

Q.   (By Mr. Nazzaro) Do you know where Mr. Umana is housed at this point?

A.   He's still in the DDU housing unit at this point.

        MR. FOSTER:  Objection.

        THE COURT:  Sustain the objection.  Ask the jury disregard that last answer of the witness.

        MR. NAZZARO:  No further questions.

        THE COURT:  Any cross?

        MR. FOSTER:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q.   Looking at 544, is that the report that you wrote?

A.   No, sir.  I did not write that.

Q.   Another officer who was present wrote that?

A.   No.  Actually my sergeant, at the time, wrote the

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 71 of 536
Case 3:08-cv-00134-RJC   Document 1317   Filed 01/30/11   Page 352 of 1115
JA2908

348

report.

Q.   But he was present at the time what happened?

A.   Yes.

Q.   And he witnessed what happened?

A.   Yes.

Q.   Okay.  It doesn't say in the report that he lunged at you, does it?

A.   I'm telling you what I -- what I seen.

Q.   Okay.  My question is though, in the report it doesn't say that he lunged at you; is that correct?

A.   Okay.  Yes, sir.

Q.   Now, this happened July 20, 2008; is that correct?

A.   Yes sir.

Q.   You said they get an orientation?

A.   Yes, sir.

Q.   Do you know when he got his orientation?

A.   Yes, in the morning.

Q.   That morning?

A.   That morning.

Q.   This was the first day he came in, wasn't it?

A.   First day he came in where?

Q.   To Mecklenburg County jail.

A.   No, this is not, to my knowledge, the first day he came to the Mecklenburg County jail.

Q.   Okay.  I mean, he had just come in earlier that month,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 72 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 01/30/11   Page 53 of 115
JA2909

349

didn't he?

A.   I have no recollection of that.  That day I came in there and did orientation, he was already present there.  I don't know when he actually got arrested and admitted into the facility.  But that day I was pod supervisor, he was in there.

Q.   Okay.  You gave him the orientation?

A.   Yes, sir.

Q.   You don't speak Spanish?

A.   No.

Q.   Okay.  So the orientation was in English?

A.   Yes.

MR. BRYSON:  Okay.  Those are my questions.

THE COURT:  Any redirect?

MR. NAZZARO:  No, Your Honor.

THE COURT:  You may step down and be excused.

Call your next witness.

MS. ROSE:  Luis Amaro.

While we're waiting, I can take cake of a moment's business, Your Honor.

The Government would move to admit Government Exhibit 152, 153, 158, 171, 172, 174, 5, 6 and 7.

THE COURT:  Those are the exhibits we discussed earlier today?

MS. ROSE:  Yes, they are, Your Honor.

Laura Andersen, RMR 704-350-7493

350

THE COURT:  I will admit those.

MS. ROSE:  And I will move to publish them at a later time.

THE COURT:  Very well.

(Government Exhibits 152, 153, 158, 171, 172, 174, 175, 176 and 177 were received into Evidence.)

THEREUPON, LUIS AMARO, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.    If you would, please state your name.

A.    Luis Amaro.

Q.    Mr. Amaro, you are obviously in custody.  Where are you being housed?

A.    Mecklenburg County Jail.

Q.    How long have you been in custody?

A.    Since January 11.

Q.    And prior to that time -- what were you in custody for beginning January 11?

A.    For probation violation.

Q.    Prior to that time were you in custody?

A.    Before then?

Q.    Yes.

A.    Yes, ma'am.

Q.    When?

A.    Around September.

Q.    Of last year?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 74 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 55 of 115
JA2911

351

A.    Yes, ma'am.

Q.    September of '09?

A.    Yes.  The end of August, the beginning of September.

Q.    Where were you initially housed?

A.    I was in jail north, but then they moved me to jail central.

Q.    At some point while you were in custody, did you meet an individual by the name of Jaime Sandoval known as Pelon?

A.    Yes, ma'am.

Q.    Where did you meet him?

A.    In jail north.

Q.    How did you meet Mr. Pelon?  What were the circumstances?

A.    I was put in the same jail as him -- well, we talked. He told me he was a part of the gang.

Q.    What gang?

A.    MS 13.

Q.    Now had you ever been involved in any way with a gang?

A.    Yes, ma'am.

Q.    In what way?

A.    I was from the West Side Locals back in Florida.

Q.    And what kind of gang is that?

A.    It's a street gang.

Q.    Is it affiliated with any other --

A.    No, ma'am.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 75 of 536
Case 3:08-cv-00134-RJC   Document 201   Filed 01/30/11   Page 56 of 115
JA2912

352

Q.   It's not part of MS?

A.   No, ma'am.

Q.   You were not affiliated with that particular gang here in North Carolina in any way?

A.   No, ma'am.

Q.   Now, as you were being transferred to central, did Mr. Pelon speak with you about making contacts in the central jail?

A.   Yes, ma'am.  We exchanged information, writing information.  He gave me his info and I gave him mine.

Q.   When you came to the central jail, at some point did you meet Alejandro Umana?

A.   Yes, ma'am.

Q.   Do you see him here today?

A.   Yes, ma'am.

Q.   Where he is?

A.   Sitting over there.

Q.   What's he wearing?

A.   White T-shirt, white long sleeve shirt, sorry.

        MS. ROSE:  If the record would so reflect the identification of the defendant.

        THE COURT:  It will.

Q.   (By Ms. Rose) When you first met the defendant, what did he do?  What kind of conversation did he have with you?

A.   He was sitting in the TV area, and I got on the phone.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 76 of 536
Case 3:08-cv-00134-RJC   Document 2012   Filed 01/30/11   Page 75 of 115
JA2913

And after we came up to each other, we conversated. He told me he was from MS. I told him I was from West Side Locals.

Q. What did he say in relation to your mentioning being affiliated or in the past being affiliated with someone other than MS?

A. I mean, he just said that he was MS and that we were straight. It was all right. We were cool.

Q. Did he try and convert you, as it were, or ask you to become an MS member?

A. Yeah. But that was later on. It wasn't that day.

Q. Later on, what did he say?

A. Probably couple days later he asked me why won't I join MS. Why won't I join MS.

Q. What did you tell him?

A. I told him that's why I came to Charlotte, to get out of the gang.

Q. And what did he say about that?

A. He said it was all right. If I ever wanted to get in, that it was open for me to get in.

Q. Do you recall whether you saw the defendant speaking with another gang member at some point there in your pod, a Sureno?

A. Yes.

Q. What did you see the defendant do?

A. He asked him to go in the room and fight with him for

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 77 of 536
Case 3:08-cv-00134-RJC   Document 2047   Filed 01/30/11   Page 58 of 115
JA2914

13 seconds.

Q.   For what purpose?

A.   The other guy had problems with some of his friends. And he got sliced up around the face, around the lips.

Q.   Problems with who's friends?

A.   With one of Umana's friends.

Q.   As a result, what did you see Umana say to this individual?

A.   Well, he asked him to go step in the cell with him. But the other -- he got scared and he told the corrections officer that he had problems.  So they took him out of the pod.

Q.   Do you know whether at any point the defendant wrote letters to Mr. Sandoval, this Pelon, using your name and prisoner identification number?

        MR. BRYSON:  Object.

        THE WITNESS:  He asked me --

        THE COURT:  Hang on.

        MR. BRYSON:  Object; outside personal knowledge.

        THE COURT:  Go ahead and lay a foundation. Sustained.

Q.   (By Ms. Rose) If I may approach, I'll show you what's been marked as Government's Exhibit 153.  Ask you to take a look, if you will, at 153.  Whose name appears as the writer of the return address?

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 78 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 59 of 115
JA2915

A.    Sandoval.

Q.    The writer, the return.

A.    Pelon -- well -- no, this?  That's -- that's my name.

Q.    Was that your prisoner identification number at the time?

A.    Yes, ma'am, still is.

Q.    Did you write that letter?

A.    No, ma'am.

Q.    Did you give anybody else permission to write a letter using your name and prisoner identification number?

A.    No, ma'am.

Q.    At some point did the defendant speak with you about correction officers and --

A.    Yes, ma'am.  He said that the day he lost trial he was going to beat them down with the chair he sit on.

Q.    Did he say anything else about that?

A.    No.

Q.    Did you encounter the defendant yesterday here at the courthouse?

A.    Yes.

Q.    Did he speak to you?

A.    Yes.

Q.    What did he say?

A.    He told me not to say nothing in court.

Q.    Did he say anything else if you did?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 79 of 536
Case 3:08-cv-00134-RJC   Document 261-7   Filed 01/30/11   Page 80 of 115
JA2916

356

A.   No.  He just said, you already know.

Q.   He say anything about your sister?

A.   He said that his home boys write my sister.

Q.   What did that mean to you?

A.   I mean, I took it as --

          MR. BRYSON:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  I took it as -- I mean, as a threat.  Because they do have my address.

          MS. ROSE:  All right, sir.  Thank you.

          I don't have any other questions.

          THE COURT:  Cross.

CROSS-EXAMINATION BY MR. BRYSON:

Q.   You were in custody in September of 2009, correct?

A.   Yes, sir.

Q.   And that was for probation violation?

A.   Yes.  I had to do a 45 day sentence.

Q.   Okay.  Earlier that year or the year before you had been convicted of conspiracy to commit armed robbery, correct?

A.   Yes.

Q.   And did you get probation for that?

A.   Yes.

Q.   And so you got locked up on a probation violation, correct?

                    Laura Andersen, RMR 704-350-7493

**JA2917**

A.    Yes.

Q.    All right.  Now did you get out at some point?

A.    From the probation violation?  That's why I had to do 45 days when I got out on the bracelet, ankle bracelet.

Q.    All right.  So you went to court and actually had your probation violation hearing?

A.    Um-hmm.

Q.    They found you in violation but they didn't revoke your sentence, correct?

A.    They put me on the bracelet.

Q.    And now you're back on another probation violation?

A.    Yeah.

Q.    Okay.  And so you're cooperating with the government here, correct?

A.    Yes.

Q.    And you're hoping that they're going to help you with this, correct?

A.    I mean, not -- I'm not expecting nothing.

Q.    You're not expecting anything?

A.    No.

Q.    If your probation gets revoked, how much time do you have to serve?

A.    I'm already in DOC.

Q.    So you're already serving time?

A.    Yes.

358

Q.   How much time are you serving?

A.   I got a 20 to 33 month sentence.

Q.   All right.  You're actually a Sureno, aren't you?

A.   No.  No.  I'm West Side.

Q.   You're a rival member of MS, aren't you?

A.   No.  In Florida, I never heard of MS until I got out here.

        MR. BRYSON:  Those are my questions.

        THE COURT:  Redirect.

REDIRECT EXAMINATION BY MS. ROSE:

Q.   You're in state custody, right, not federal charges?

A.   No.  State.

        MS. ROSE:  All right.  Thank you, sir.

        THE COURT:  You may step down.

        Call your next witness.

        MS. ROSE:  Russell Lashley.

THEREUPON, RUSSELL LASHLEY, being first duly sworn,

testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   Good morning, sir.  If you would, please state your name.

A.   Russell Lashley.

Q.   With whom are you employed?

A.   United States Marshals Service.

Q.   How long have you been with the U.S. Marshals Service?

A.   Eight years.

                  Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 82 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/17   Page 83 of 115

JA2919

Q.    What are your duties in the Marshals Service?

A.    U.S. Marshals do a number of things; witness protection, produce prisoners, judicial security, hunt fugitives.  It's a wide range of things.

Q.    All right, now, do you also conduct bringing inmates from other facilities or security here in the courtroom and the courthouse?

A.    Yes, ma'am.  That's part of judicial security.  And production of prisoners just means bring a prisoner to court.

Q.    Have you, on occasions, done that with this particular defendant, transported him here to the courthouse?

A.    Yes, I have.

Q.    On or about March the 22nd, were you responsible for bringing the defendant to the courthouse?

A.    I was.

Q.    If you would -- and was that the first day of jury selection?

A.    Yes, ma'am, it was.

Q.    All right.  Now, on that particular date describe what you did?

A.    That would be a normal day going to a jail, to bring prisoners down.  And they're searched for security, and then loaded into a van and then brought to the courthouse for hearings.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 83 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 64 of 115
**JA2920**

360

Q.   And on that date did you conduct that same procedure with the defendant Umana?

A.   Yes, ma'am, I did.

Q.   What -- which facility did you go to, to pick up the defendant?

A.   It was the Mecklenburg County Jail here locally.  I guess it's about a mile away.  It's called Jail Central.

Q.   And there at the jail what did you do when you saw the defendant?

A.   As a normal routine, I call the prisoner out, have them, you know, remove anything from their pockets.  It's a complete search from top to bottom, as you would expect in looking for any contraband.

Q.   And did you do that on this particular occasion, March 22nd with the defendant?

A.   Yes, I did.

Q.   And what did you -- what did you see?

A.   During the course of my search, when I got to his groin area, I felt something that was not normal, and at that point I stopped my search.

Q.   And what did you -- what did you recover?

A.   As I looked further, he had a knife strapped to his penis.

        MS. ROSE:  Now if I may approach the witness, Your Honor?

                    Laura Andersen, RMR 704-350-7493

JA2921

361

THE COURT:  You may.

Q.    (By Ms. Rose) Do you have the item there with you, Marshal Lashley?

A.    Yes, ma'am, I do.

Q.    If you would, please, remove the items you retrieved from the defendant.

THE COURT:  Actually go ahead and label it so the record is complete.

MS. ROSE:  I do have a complete composite of those items that I will refer to, if I may, Your Honor.

THE COURT:  All right.

MS. ROSE:  All right.  Thank you.

I'm going to show you what has been marked as Government's Exhibit 553a.  Are you able to see that on the screen?

A.    Yes, ma'am, I can.

Q.    (By Ms. Rose) And is that a fair and accurate representation of the items that you just removed from your evidence package and displayed?

A.    Yes.  Those are the items I just pulled out.

MS. ROSE:  I would move to admit 553a, Your Honor.

THE COURT:  Any objection?

MR. FOSTER:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government Exhibit 553a was received into Evidence.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 85 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 86 of 115
JA2922

362

Q.   When you locate the items shown in 553a, what did you do?

A.   As soon as I identified that it was a knife, I had another marshal hold his hands behind his back, and I removed the knife.

And then I took the defendant to a separate room.  And it's our standard procedure if you find contraband in this form.  You know, not, you know, a pack of matches, necessarily, or like phone numbers or something that he's not suppose to have, maybe that would just be pulled out.  But a weapon like this, it would require a strip search.

I pulled him to a separate room, conducted the strip search, and that is -- during the original search I pulled the knife out.  In the strip search I was able to recover these items.  I didn't take those off right there at the scene.

Q.   Looking at the photograph before you, 553a, the item at the top, is that what you're referring to as a knife?

A.   Yes, ma'am.  This item right here is the knife.

Q.   Was it a sharp instrument?

A.   Yes.  You can see right in this area, it's actually -- has an edge.

Q.   Obviously, not something permitted in the jail?

A.   No, ma'am.

Q.   The next item, the middle item, describe what is shown

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 86 of 536
Case 3:08-cv-00134-RJC   Document 5042   Filed 01/30/11   Page 86 of 115
JA2923

in Government's 553a in the middle?

A.    Yes.  That -- that item appears to be an envelope, a simple envelope that was used to hold the knife in, so that, I suppose you wouldn't cut yourself.

Q.    Does the knife fit in that envelope as if it were a sheath?

A.    Yes.  It acts just as a sheath would in a typical knife.

Q.    And then the third item shown in Government's 553a there at the bottom, what is that item?

A.    That item is some type of a, I believe hair ribbon. Like it's a flexible -- like a rubber band, but it's clothed covered.

Q.    And what -- how was that item used?

A.    And that item -- can I demonstrate?  The knife is inside of the sheath as you can see, and then his penis had the rubber band wrapped around it and the knife held to it just like that (indicating).

Q.    Thereafter, did you have an opportunity to go to the jail facility and conduct a search of the defendant's cell?

A.    Yes, I did.

Q.    With whom did you do that?

A.    Myself and another Deputy Marshal Forrest Laxton, and a few of the jail staff.

Q.    After conducting a search of the defendant's cell, what

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 87 of 536
Case 3:08-cv-00134-RJC   Document 596   Filed 01/30/11   Page 363 of 1115
JA2924

did you see or what did you find?

A.   When I went to his cell, it had been searched prior. So there really was nothing left in there except some drawings on the wall, and everything else is just sterile. Everything's removed, mattress, everything.  There's nothing left in the cell.  We did a thorough search.  There is a metal table that doesn't have a bottom to it.  It's attached to the wall.  It's a metal table.  It's a security table. Doesn't have drawers or anything like that.

During the search I made a fist, and I hit the table (indicating) like that.  When I did that, a pouch fell out of a hole that was in this metal table.  You couldn't see it with your eyes at the bottom.  When you look up under it, you'd see a little crevice; by pounding it, a pouch fell out.

Q.   And what if anything did you notice about that pouch?

A.   It appeared to be common silver duct tape folded in. And it had what appeared to be the -- you know, the writing portion of the pencil is made of graphite, or commonly called lead, but it's graphite.  And it was full of that material.

Q.   And what if any significance did you determine that material had?

A.   After looking around the cell, there were several places that you would find black marks, that when I used my

Case 3:16cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 88 of 536
Case 3:08-cv-00134-RJC   Document 58-12   Filed 01/30/11   Page 89 of 115

JA2925

365

finger to rub it, it was clear that was the pencil, you know, the graphite.

And it appeared that he used the graphite, the concrete, and then the knife like a typical wet stone would be used to sharpen it up against the concrete.

There were two parts of concrete, one was rough in a corner that probably started to get it very sharp. And then the smooth part of a concrete just like a wet stone is sharpened any typical knife.

MR. FOSTER: I would object to this as speculation.

THE COURT: Overruled.

Q. (By Ms. Rose) Was anything else located in the cell at that time? Did you see any other items?

A. There was a picture that was drawn with the pencil.

Q. Show you what's previously been identified as Government's Exhibit 112, been previously admitted. What is shown in Government's 112?

A. That is a mural that was drawn in the cell.

Q. Now, is this a single cell?

A. This is a single cell.

Q. What area of the jail?

A. This is in an area that is commonly referred to as ADU. It's a security area where they house people that have a higher security classification. A person that writes bad

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 89 of 536
Case 3:08-cv-00134-RJC   Document 3042   Filed 01/30/11   Page 70 of 115
**JA2926**

366

checks wouldn't be housed in the same area that a person that does something else.  They classify them differently.  This was a maximum security area.

Q.   And where in the defendant's cell was the -- where the items on the wall shown in Government's Exhibit 112?

A.   It's -- if you look at the bottom left where I just made a mark, that's a door that enters into the cell.  And above it is where you would find the actual mural.

Q.   Now, so if you were in -- outside of the doorway of the cell, would you be able to see this mural?

A.   You would not see this as the officers look into the cell.  If you walked into the cell, turned around, you'd be facing the doorway.  If you looked up, you would see it then.  It's inside the cell that you would have access to that.

Q.   Now, was anything else located on that occasion during the search of the defendant's cell?

A.   No.

Q.   Were you able to determine the origin of the metal used in the item you described as a knife?

A.   I was not.

Q.   Did you recover at any other time, items from the defendant's cell?

A.   No.

Q.   All right, sir.  Thank you very much.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 90 of 536
Case 3:08-cv-00134-RJC   Document 59-12   Filed 01/30/11   Page 190 of 115
JA2927

367

THE COURT:  Any cross?

MR. FOSTER:  Thank you, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Deputy Lashley, you conducted the search in the Mecklenburg County Jail Central, correct?

A.   Yes, sir, I did.

Q.   So this -- these items that were on Mr. Umana's body never made it to the federal courthouse, correct?

A.   Yes.  They made it to the federal courthouse, but I took them.

Q.   They never made it on his person?

A.   Yes, sir, I'm sorry.

Q.   Now, you're aware that the jail, Mecklenburg County jail houses over 1,000 people at central jail, correct?

A.   It's a lot of people.  I wouldn't know how much, but it's full.

Q.   It contains many different people, including members of gang that are rival gangs to MS 13?

A.   Yes, sir.

Q.   And when you found this and removed it from Mr. Umana that day, he did not resist your efforts, he let you do it peacefully, correct?

A.   No, sir.  He did not resist me at all.  He did let me do it peacefully, yes.

Q.   And other than finding the item, you're not in a

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 91 of 536
Case 3:08-cv-00134-RJC    Document 1619    Filed 01/30/11    Page 72 of 115
**JA2928**

position to say whether this item was possessed for self-defense or some other purpose, correct?

A.   No, sir.

Q.   Now, the knife itself from the tip of the blade to the handle that was wrapped with some sort of material, that was only 4 inches, correct?

A.   Yes, sir.  It -- four, four and a half.  I think total it's almost five and a half with the handle included.  I think four, four and a half, something like that.

MR. FOSTER:  Let me just put this up here.

Q.   (By Mr. Foster) This will be Defense Exhibit next in order.

COURT CLERK:  Twelve.

MR. FOSTER:  Okay.  Twelve.

(Defendant Exhibit 12 was marked for identification.)

Q.   (By Mr. Foster) Does this appear to be another photo of the same items you've identified?

A.   Yes, sir.  Those are the photos that I took.

Q.   Okay.  And so there's a ruler down at the bottom there. So it looks like from the tip of the blade to where that cloth handle begins is 4 inches?

A.   Yes, sir.

Q.   And, all right.  Thank you.  That's all I need.

MR. FOSTER:  I have no further questions.

THE COURT:  Any redirect?

Laura Andersen, RMR 704-350-7493

Case 3:16cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 92 of 536
Case 3:08-cv-00134-RJC   Document 59-12   Filed 01/30/11   Page 93 of 115

**JA2929**

369

MS. ROSE:  No, Your Honor.  Thank you very much.

THE COURT:  You may step down and be excused.

Call your next witness.

MS. ROSE:  I would like to publish the items previously admitted, Your Honor.

THE COURT:  You may.  We may take our morning break at this time.  Members of the Jury, don't talk about the case.  Keep an open mind and we will see you back around 11:20.

(The jury was escorted from the courtroom.)

THE COURT:  Why don't we take a short break and then come back.  If you would have the witness Rony here for purposes of examination outside the presence of the jury.

We'll take a 10 minute break, see you a little bit before 11:15.

(A brief recess was taken in the proceedings.)

PREVIOUSLY SWORN, RONY MAGANA LOPEZ, TESTIFIED AS FOLLOWS ON DIRECT EXAMINATION BY MS. ROSE, OUTSIDE THE PRESENCE OF THE JURY:

THE COURT:  I don't know who is going to do the examination outside the presence of the jury.  Let's par it down and get right to the four essentials.

Q.   (By Ms. Rose) State your name for the record.

A.   Rony Magana Lopez.

Q.   You testified before this Court last week?

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 93 of 536
Case 3:08-cv-00134-RJC    Document 3612    Filed 01/30/11    Page 47 of 115
JA2930

370

A.   Yes, I did.

Q.   At the time you were testifying, did you note any actions on the part of the defendant toward you?

A.   Yes, I did.

Q.   What did you see?

A.   He started throwing up MS signs at me.

Q.   And then shortly after that was reflected for the record, I think we took a luncheon break?

A.   Yes, we did.

Q.   As you were being escorted across the front of the courtroom in front of counsel table and then back into the side chamber, what if anything did the defendant say or do?

A.   He said your family's going to pay you mother --

Q.   Did he say it in English or Spanish?

A.   Said it in Spanish.

Q.   Immediately thereafter did you advise individuals with you what had happened?

A.   Yes, I did.

        MS. ROSE:  I don't have any other questions.

        THE COURT:  Any cross?

        MR. FOSTER:  Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q.   Who did you immediately advise?

A.   I told -- I believe it was you, right, and you contacted Chuck.

                Laura Andersen, RMR 704-350-7493

**JA2931**

371

Q.   So that was back on the day it happened?

A.   Yes, it was.

Q.   So that was back last Thursday, April 15th?

A.   Yeah.

Q.   So that's when you told agents of the government that this happened?

A.   Yes.

Q.   Now, you say this happened when you were being escorted across the courtroom right in front of our table is that where it was?

A.   Yeah.

Q.   And when you went through there, you were escorted by a number of U.S. Marshals, correct?

A.   That's right.

Q.   And they all would have been able to hear what heard, correct?

A.   I don't know if they heard it, I know I heard it.

Q.   You were surrounded by at least three or four marshals escorting you, correct?

A.   That's right.

Q.   Now, you're aware that Mr. Umana in this trial here is the last of the -- other than Chacua down in El Salvador prison, this is the last of the people in this 26 defendant indictment to be prosecuted, correct?

A.   Yeah.

                    Laura Andersen, RMR 704-350-7493

**JA2932**

372

Q.   And so, all the people that you cooperated against when you were undercover for the most part, were indicted in this case and the case is closing out, correct?

A.   That's right.

Q.   And the reason you've been in the witness protection program is protection due to your cooperation in this very case, correct?

A.   That's correct.

MR. FOSTER:  No further questions.

THE COURT:  If you all would take the witness back into the side room for a moment.

(Witness exits witness stand.)

THE COURT:  Glad to hear from you.

MR. FOSTER:  Yes, Your Honor.  I would submit that this is unreliable evidence.  It seems to me that if -- if this had really happened, there would have been other witnesses to corroborate words were spoken by the escort staff.  We haven't heard from any other witnesses to corroborate that whatsoever.

He told the government this, allegedly back on the 15th and we didn't find out about it until last night.  And this witness does have a motive to convince the government that there's a continuing threat, so that he can maintain his and his family's financial support and all the benefits that come with the Witness Protection Program.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 96 of 536
Case 3:08-cv-00134-RJC   Document 50-7   Filed 01/30/11   Page 97 of 115
JA2933

373

He realizes the case is coming to an end, this is the last defendant to be prosecuted. He may have concerns that perhaps the Government will no longer see a need for the Witness Protection Program, and those benefits will cease, therefore he has a motive to now claim that a new threat has been made.

So we would assert that this new uncorroborated testimony is unreliable, and that it's unfairly prejudicial, misleading and confusing to the jury and outweighs any probative value.

THE COURT: I disagree. I observed, personally, the defendant throwing the signs at the witness during the in-court identification that caused me to recess court at that time to minimize the prejudice -- any prejudice to the defendant. Took a break. As the witness was leaving, I heard something audible from that area of the courtroom myself.

And I didn't like the conduct of the defendant. I reprimanded him at that time. I find that the testimony is probative, reliable. And although prejudicial to the defendant, it's certainly not unfairly prejudicial. And I'm going to permit the testimony. And the arguments made against it are in large part, arguments that go to the weight, not to the admissibility. And so I'll overrule your objection to the testimony. Is this the next witness to be

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 97 of 536
Case 3:08-cv-00134-RJC    Document 59-12    Filed 01/30/11    Page 97 of 115
**JA2934**

374

called?

MS. ROSE: We'll do that, Your Honor, so that they can wrap him up, yes.

THE COURT: All right. Let's call the jury.

(The jury was returned to the courtroom.)

THE COURT: Call your next witness.

MS. ROSE: The Government will call Rony Lopez.

COURT CLERK: You're still under oath.

RONY LOPEZ, previously sworn, testified as follows during

DIRECT EXAMINATION BY MS. ROSE:

Q. You are Rony Lopez?

A. Yes, sir.

Q. You testified here before this court last week?

A. Yes, I did.

Q. During the course of your testimony, what if anything did you notice the defendant doing?

A. He was throwing up MS at me.

Q. Shortly thereafter did we take a recess?

A. Yes, we did.

Q. And as you left for the recess, where were you escorted?

A. Out that way (indicating).

Q. And you're indicating before the bench and to the chamber to the Judge's left?

A. That's right.

Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 98 of 536
Case 3:08-cv-00134-RJC   Document 59-8   Filed 01/30/11   Page 99 of 115

JA2935

Q. As you were going -- being escorted that direction, what if anything did you see the defendant do?

A. He said -- he put his fingers like that (indicating) throwing up MS and he said, your family's going to pay, mother --

Q. And did he say it in English or Spanish?

A. Spanish.

Q. Did you immediately then thereafter let one of the officers with you know what had occurred?

A. Yes, I did.

Q. And how did the threat affect you if at all?

MR. FOSTER: Objection; irrelevant.

THE COURT: Sustained.

MS. ROSE: Thank you, Mr. Lopez.

THE COURT: Any cross?

MR. FOSTER: Yes, Your Honor.

CROSS-EXAMINATION BY MR. FOSTER:

Q. This happened six days ago, last Thursday April 15th?

A. That's right.

Q. And it happened as you say you were being escorted across the courtroom?

A. That's right.

Q. And when you were being escorted, you had three or four marshals in very close proximity to you, correct?

A. That's right.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 99 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 80 of 115
**JA2936**

376

Q.   And so they were located right next to you when you heard these words spoken, correct?

A.   Yeah.

Q.   Now, you're aware that this prosecution going on here against Mr. Umana, is the last of the 26 defendants in this indictment other than Chacua who's down in prison in El Salvador, correct?

A.   Yes, sir.

Q.   And so basically, the people that you cooperated against when you were undercover cooperating with the police, this basically wraps up the case against all the people that were charged, based on your cooperation, right?

A.   That's right.

        MR. FOSTER:  No further questions.

        THE COURT:  Any redirect?

        MS. ROSE:  No redirect.  Thank you, Mr. Lopez.

        THE COURT:  You may step down.  Call your next witness.

        MS. ROSE:  The government would like to publish exhibits already admitted, Your Honor.

        THE COURT:  You may.  And as you do, call out the exhibit numbers.

        MS. ROSE:  Yes.  This is Exhibit 153, Your Honor, cover -- Exhibit 153, and 153b.

        Exhibit 158.  Exhibit 158c.  Exhibit 158.  Exhibit

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/30/17   Page 100 of 536
Case 3:08-cr-00134-RJC   Document 1073   Filed 01/30/11   Page 81 of 112
JA2937

158b.  Exhibit 172.  Exhibit 172b.  Exhibit 174.  Page two of this Exhibit 174b.  Exhibit 175.  175b is two pages.

MR. FOSTER:  Is that from the same exhibit?

MS. ROSE:  That's the second page of 175b. Exhibit 176.

(Exhibits published.)

MS. ROSE:  That's all at this time, Your Honor, regarding publishing.

THE COURT:  Call your next witness.

MR. NAZZARO:  Yes, Your Honor.  United States calls Doug Friend.

THE COURT:  Who?

MR. NAZZARO:  Doug Friend.

THEREUPON, DOUGLAS FRIEND, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good afternoon, could you please state your name, sir.

A.   Douglas Friend.

Q.   And Mr. Friend, where do you live?

A.   I live in Troutman, North Carolina.

Q.   And are you from that area originally?

A.   I lived in Greensboro for about 30 years, and then moved to Troutman in the last year and a half.

Q.   What do you do, what's your occupation?

A.   I work for Volvo Truck Corporation.  I've been in the truck manufacturing business for about 30 years.  And I also

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 101 of 536
Case 3:08-cr-00134-RJC   Document 59-7   Filed 01/30/11   Page 2 of 12
JA2938

378

have a general contractor's license.

Q.   And with respect to your general contractor's license, what type of work do you do as a general contractor?

A.   I build about two years a home since about 1994.

Q.   And those homes, are they in the Lake Norman area?

A.   No.  They were in Kernersville, Winston-Salem and Greensboro.

Q.   What is your educational background?

A.   Excuse me?

Q.   Your educational background?

A.   I have a BS degree from Indiana University in finance.

Q.   Now, do you know a Manuel Garcia?

A.   Yes, I do.

Q.   How did you first get to know him?

A.   Manuel, about 12 or 13 years ago, did one of the foundations on one of my homes.  And he did brick work for probably about eight of my properties that I built.

Q.   And how long did you know him before he was murdered?

A.   About 12 or 13 years.

Q.   And did he work with you or for you during that time period?

A.   Excuse me?

Q.   Did he work with you during that time period, that 12 or 13 years?

A.   Yes.  During that time period, like I said, I built

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 102 of 536
Case 3:08-cr-00134-RJC   Document 967   Filed 01/30/11   Page 84 of 112
JA2939

379

about eight homes where he did the brick work on those homes.

Q.   Do you remember the first time you met him?

A.   Yes, I do.  I was building a home in a subdivision called Tredegar which was in Kernersville, North Carolina. And another contractor recommended him to me.  I hired him for the job, and he did very good work.

Q.   What type of work did he do that first time?

A.   He put a foundation in and did the front facie of the house.  It was not fully brick, just the front side of it.

Q.   On that occasion was he working by himself or did he have others that worked with him?

A.   He had a small crew, and when the job was finished, I remember I paid him immediately.  He was kind of surprised because most contractors make him wait 60 or 90 days.

Q.   Did your relationship then with building homes continue after that with Manuel?

A.   Yes, it did.

Q.   What specifically type of work did he do?  You mentioned brick, he also did foundation work?

A.   Yes foundation work which would be block, and then brick on the outside.

Q.   And over the years, did you have occasion to see his business grow?

A.   Yes.  Yeah --

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/28/17    Page 103 of 536
Case 3:08-cr-00134-RJC    Document 90-7    Filed 01/30/11    Page 84 of 112
**JA2940**

380

Q.   Tell us about that.

A.   -- he went from running like one crew to multiple crews.  In fact, I think at times he was doing apartment complexes, and grew to be quite a large businessman.

Q.   What kind of person was he?

A.   Very congenial, very nice, very happy-go-lucky.

Q.   Did you ever have any problems with him on any of the jobs he worked with you?

A.   Never.

Q.   How many were there?

A.   There was about eight, I believe.

Q.   And they were all new home construction?

A.   Yes.

Q.   And was he reliable, as far as a worker?

A.   Very reliable.

Q.   And did he ever work with his brother Ruben?

A.   Yes.  I didn't really know Ruben as well.  Ruben was kind of quiet.  In fact, it was probably about the third home that he worked on that I even knew it was his brother.

Q.   Was Ruben a good worker also?

A.   Yes.

Q.   And when you -- when he would work on a home, did you have any sort of tradition that you had with him at the end of the job?

A.   Yeah, it was funny, because I had worked in Mexico with

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 104 of 536
Case 3:08-cr-00134-RJC   Document 58-7   Filed 01/30/11   Page 85 of 112
JA2941

381

my other job for about a two year period off and on.  And at the end of each job I would bring a cooler of Mexican beers to the job site and give beers to each of the workers that were on the job site.

Q.   And did that include Manuel?

A.   Yeah.  In fact, the nickname was Mr. Cerveza.

Q.   That was your nickname?

A.   Yeah.

Q.   Did you ever see him drink the beers?

A.   I saw him only drink one.  He never drank more than one beer.

Q.   Did he give it to his co-workers?

A.   Yes.

Q.   Now, over the years that you knew Manuel, did you get to know some of his other interests that he had, sports and other things?

A.   Yeah.  He liked Corvettes.  And he liked buying a new pickup truck about every other year.  And he loved the Dallas football team.

Q.   He loved the Dallas football team?

A.   Yes.

Q.   Did that ever lead you to exchange any gifts with him?

A.   About three years before he died, he came over to my house one time at Christmas and dropped off a bottle of Cognac, which I was quite surprised, as a gift.  And I

Laura Andersen, RMR 704-350-7493

JA2942

382

didn't think much of it at the time, and I went to the liquor store and realized that the bottle of Cognac was worth about 5 or $600.  Which I thought was kind of a compliment.

And so, a few weeks before he died, I had given him two tickets for the Dallas football game.  They were playing the Panthers here in town, for him and his brother to go to that game.  And he never got to go to the game.

Q.   And that game occurred after he died?

A.   Yes, it did.

Q.   And did you actually have some discussion with him shortly before he was murdered?

A.   Yes.  He was over at my house, and that's where I gave him the tickets, because I was getting ready to build my home on Lake Norman, and he was going to do the brick work on the home.  And then we rode down there to look at the site, to go over what the plans were going to be on the house.

Q.   So he actually had been at your house before?

A.   Yes.

Q.   And had you ever been to his house?

A.   Yes, I have.

Q.   And what was that occasion?

A.   I built his garage.

Q.   Did you have occasion to meet his family at that time?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 106 of 536
Case 3:08-cr-00134-RJC   Document 50-7   Filed 01/30/11   Page 87 of 112
JA2943

383

A.   Yes.  I've met his family before.

Q.   And based on your business associations and your knowledge of the community where you live, what was Manuel's reputation in the community?

A.   I can't speak to his reputation, but I mean, every contractor that worked with him thought he was very friendly, very reliable, and did very good work.

Q.   You had discussion with other contractors?

A.   Oh, that's correct.  Quite a few people used Manuel.

Q.   When did you find out that he had been murdered?

A.   I think it was a day or two after it happened, his wife called and left a message on my phone, which went to my voice mail, and I couldn't understand the message, and I called her back.  And she indicated that he had died.  And I thought maybe he had fallen off a scaffolding or something and didn't realize what had happened.

          MR. NAZZARO:  No further questions.

          THE COURT:  Any cross?

          MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q.   You say you are now retired from Volvo Truck; is that correct?

A.   No, I'm not retired from Volvo Truck.

Q.   You still work for them?

A.   That's correct.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 107 of 536
Case 3:08-cr-00134-RJC   Document 50-7   Filed 01/30/11   Page 84 of 112
**JA2944**

384

Q.    What do you do?

A.    I do what they call, commercial sales development for dealerships throughout the United States.

Q.    It's completely unrelated to your construction business?

A.    That's correct.

Q.    And you say -- that in your -- so you have a little construction business on the side?

A.    I put myself through college working construction.  And then in about '94 I did it as a hobby and made a little business out of it, yes.

Q.    Okay.  And you said during much of that time you were building about two houses a year?

A.    That's correct.  I built about 20 some homes.

Q.    And are you still doing that?

A.    No.

Q.    Okay.  And is that because of the economy?

A.    Two reasons, because of the economy and I will be 60 in a few months, and I'm looking into retirement.

              MR. BRYSON:  Those are my questions.

              THE COURT:  You may step down, be excused.

              Call your next witness.

              MS. ROSE:  Jean Garcia.

                          Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 108 of 536
Case 3:08-cr-00134-RJC  Document 58-7  Filed 01/30/11  Page 89 of 112
JA2945

385

THEREUPON, JEAN GARCIA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.    If you would please, state your name.

A.    Jean Garcia.

Q.    Miss Garcia, where do you live?

A.    Stokesdale, North Carolina.

Q.    How long have you lived there?

A.    About six, seven years.

Q.    Did you grow up in that particular area?

A.    No.  I grew up in Greensboro, North Carolina.

Q.    Did you go to school there?

A.    I did.

Q.    Ultimately, did -- were you married to Manuel Garcia?

A.    I was.

Q.    And Ruben Garcia was your brother-in-law?

A.    Yes, he was.

Q.    How long were you and Manuel Garcia married?

A.    Almost 20 years.

Q.    You have children?

A.    I do, two girls.

Q.    How old are your daughters?

A.    Right now they're 14 and 19.

Q.    How old were they at the time of their father's death?

A.    Eleven and 17.

Q.    You indicated that you had written down some of your

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 109 of 536
Case 3:08-cr-00134-RJC  Document 1078  Filed 01/30/11  Page 90 of 112
JA2946

386

thoughts that you wanted to share relative to your life and your loss in this matter?

A.    Yes.

Q.    You may read those.

A.    December 8, 2007 was the worst night my daughters and I ever experienced.  Not only did I lose my husband that night, but I also lost my best friend, provider and father of my two daughters.  Having to tell them that their dad had died, and then realized he would never again walk through the door, and never again answer his phone to say good night sweetie, or I love you, was the hardest thing I have ever had to do.

I am 40 years old.  Can you imagine how difficult it is for my 14 and 19 year old daughters.  The sleepless nights for all three of us, sadness throughout the day and the lack of desire to move forward without him can be unbearable at times.

There have been countless times Carmen has come to me upset and crying.  She needs her daddy to feel safe and happy.  And she needs her daddy to know that she loves him and she still needs him, and even though she is 19 years old.  She and her father had a small argument over the phone right before he died.  Typical father/daughter disagreement.

However, Manuel was killed, Betsy has been left with guilt because her last conversation with her father was a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 110 of 536
Case 3:08-cr-00134-RJC    Document 59-7    Filed 01/30/11    Page 111 of 112
JA2947

fuss.  Imagine the guilt and remorse she feels every day because that was the last time she talked with her father.

We had all made plans to go out to dinner that next week so that Manuel could meet Betsy's first boyfriend. Daddy was a very protective father to both his girls.  The idea of his first baby dating for the first time was difficult for him, but he wanted Betsy to be happy.  He wanted to talk to her boyfriend and try to get to know him. Unfortunately that never happened.

Almost two years later her grandfather from Mexico met her boyfriend and his family.  This brought tears to all of us.  It should have been her daddy there.

There are so many situations that should have been happy ones but instead were very sad.  For example, high school graduation, 18th birthday, acceptance into college and nursing school, and making the Dean's list every semester and so much more.  Her dad would have been so very proud -- her dad would have been so very proud of his first born daughter.

There are so many sad times for Carmen as well, having to celebrate her 12th birthdays six days after her daddy's death, and swimming in the ocean without her daddy holding her hands to make sure the waves did not knock her down. She only trusted her daddy to do that because he was so strong and he had always protected her.  Her dance recitals

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 111 of 536
Case 3:08-cr-00134-RJC   Document 1573   Filed 01/30/11   Page 92 of 123
**JA2948**

were never the same since her daddy wasn't there to applaud her and give her roses.

Her first season of playing basketball, her first shot in a championship brought tears to her and to all of us.  We hurt when she hurts, because we feel her pain, in addition to our own.  These are just a few special times in her life that were saddened due to the loss of her daddy.

She sees her daddy's face when she looks at other young fathers.  She had mentioned this in counseling and no one has any answers for her.  I tell her that this was her dad's way of letting her know that he will also be with her.  But still these experiences frighten her.  This is something a 14 year old should not have to experience.

Our lives have changed quite a bit due to the senseless act.  I no longer have the opportunity to spend as much time with my girls as I did in the past, when my husband provided everything we ever needed.

Betsy has had to take on more responsibility for her sister, helping to get her from school and to her extra curricular activities.  This puts an extra strain on her. She is a full time dedicated student.  She made a promise to her daddy that she would graduate from college and become a professional.  And she is very much determined to keep that promise.

My husband and I were separated at the time of his

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/28/17  Page 112 of 536
Case 3:08-cr-00134-RJC  Document 50-7  Filed 01/30/11  Page 93 of 123
JA2949

389

death.  I now have to live with these feelings of guilt; if he was home with us, he would not have been at that restaurant.  The what ifs are enough to kill me.  I loved him so much I wanted the four of us to continue to be a family.  I would have welcomed him home with open arms, and I know we were going to reconcile.  We all wanted that.

Manuel was my whole life since I was 16 years old.  He had tears in his eyes when I graduated from high school.  It's a shame that he attended my graduation but is not here to attend that same Carmen's graduation.  He was a hard-working, kind and good-hearted person who didn't deserve to have his life ended so young.

Now the girls and I get through each day as best as possible with lots of nice memories to cherish.  These same memories still bring tears to our eyes instead of happiness.  All the special moments in our lives will never be the same without him.  So much was taken from us that tragic night in December 2007.

Manuel accomplished much in the 20 years since leaving his native Mexico as a young man in search of a better life for himself and assistance to the family he left behind.  He grew up very poor, planted seeds and harvested before and after school.  He did not have a great life growing up, but he came to the U.S. and worked hard and honestly.  He struggled not only to find work, but also to get paid when

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 113 of 536
Case 3:08-cr-00134-RJC   Document 596-7   Filed 01/30/11   Page 94 of 112

JA2950

he did work from unscrupulous contractors who found it too easy to take advantage of his lack of legal status.

With the help of my parents he returned to Mexico applied and was granted a green card and returned to U.S. as a legal immigrant.

Manuel's father lost two sons and he is devastated; two sons gone for nothing. A year or so before Manuel's death, his mother died of cancer. Manuel and Ruben's parents had been married 40 years, and the family was still reeling from her death. Now Ruben and Manuel's father is a broken man. He told me all he can do now is pray to God each day that Alejandro Umana does not hurt someone else. That is all he can do.

Manuel was a husband and father, a son and brother, a respected hard-working masonry contractor. He developed his skills as a brick mason and learned to read architectural drawings, and in short time gained the respect of many of the top commercial contractors in this area who helped him set up his own business. With the help of 15 plus employees and several subcontractors, his reputation for clean and dependable work grew tremendously.

Ruben was younger than Manuel. Ruben worked in Manuel's business and they are very close. For a time he lived with us and had a very close relationship with my oldest daughter Betsy. Ruben's son Alex was 4 years old

Case 3:16-cv-00057-MOC Document 50-7 Filed 03/23/17 Page 114 of 536
Case 3:08-cr-00134-RJC Document 957 Filed 01/30/11 Page 95 of 112
**JA2951**

391

when his father was killed.  Alex and Ruben were inseparable.  The loss of his father has been devastating for him.  He now struggles in almost everything.

Because of one act of senseless violence, the act of my husband and his brother was cut short long before it should have.  He accomplished so much in such a short time, and no doubt would have accomplished so much more, had his life not been taken long before its time.

MS. ROSE:  Thank you, Ms. Garcia.

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q.   Have you sought counseling for your daughters?

A.   Yes, I have.

Q.   Okay.  And are they getting counseling?

A.   Only my youngest was willing to do counseling.  And she did for a while.

Q.   Did they get counseling after the separation occurred between you and Manuel?

A.   Did my girls get counseling?

Q.   Yes, ma'am.

A.   No, they did not.

Q.   The separation was also something that was very difficult for your children, wasn't it?

A.   Yes, it was.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 115 of 536
Case 3:08-cr-00134-RJC   Document 976   Filed 01/30/11   Page 96 of 112
**JA2952**

392

Q.   He -- even though you were separated your husband continued to provide support?

A.   Yes.

Q.   He had been a successful businessman?

A.   Yes.

        MR. BRYSON:  Those are my questions.

        THE COURT:  You may step down and be excused.

        Call your next witness.

        MR. NAZZARO:  Carmen Garcia.

THEREUPON, CARMEN GARCIA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Could you please state your name for the record.

A.   Carmen Garcia.

Q.   And Carmen, Manuel was your father; is that right?

A.   Yes.

Q.   And Jean is your mother?

A.   Yes.

Q.   How old are you?

A.   I'm 14.

Q.   And did you have occasion to write something concerning your feelings about what happened to your father?

A.   I did.

Q.   And do you have that in front of you?

A.   It's not on right now.

Q.   I would like to show you, it's been previously marked

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 116 of 536
Case 3:08-cr-00134-RJC   Document 977   Filed 01/30/11   Page 97 of 112
JA2953

393

as Government 556.  Do you recognize that?

A.   Yes.

Q.   Is that something you wrote that you want to share with the jury and the court today?

A.   Yeah.

        MR. FOSTER:  Excuse me.  It's not coming up on our screens.

        Thank you.

        MR. NAZZARO:  Your Honor, I would move, at this time, 556.

        THE COURT:  Let it be admitted.

(Government Exhibit 556 was received into Evidence.)

Q.   And you can read it.

A.   Okay.  "So imagine you're walking into a bedroom around 3 or 4 in the morning, you see a 14 year old girl sitting up in bed staring into space.  She has a blank look upon her face.  But the question is, how did you know she was up so late at night?  Why isn't she asleep around this time yet? The answer is, you can hear her crying from all the way down the hallway.  The cries are ringing of mourning tears.  As you walk into her room, you see those tears sliding down her face.  Suddenly you wonder why she is in so much grief, so you ask her.  The girl replies with, I miss my daddy.  As you look into her lacerated eyes, she begins to tell you what happened to her father.  Then you just look at her and

Case 3:16-cv-00057-MOC   Document 90-7   Filed 03/23/17   Page 117 of 536
Case 3:08-cr-00134-RJC   Document 597   Filed 01/30/11   Page 93 of 112
**JA2954**

think to yourself, wow, this girl is really tearing up from devastation.  But what all is she thinking about?  Then again you ask her and her response is, everything.  I need him here for my basketball games, my high school graduation, college graduation, my wedding and when I have kids.

"Then she rambles on about all the time she spent with him.  She talks about how she can't have him beside her in the ocean at the beach to help protect her from the big waves.  She talks about going to the job site to watch him brick buildings and houses.  She talks about watching basketball games with him, washing the cars together on hot sunny days outside in their driveway, and the way they would spray each other back and forth with the water hose.

"The girl would keep continuing on and on about everything they can't do anymore.  She talks through her tears trying so hard to hold them back, but it looked impossible for her.  She takes a pause from her cries and then she looks out and says, what do you do when your daddy's gone and you're only left with the, "we should haves", in the back of your memory?  All you can do is comfort her and tell her everything is going to be okay, when the truth is, it really won't be.

"This girl was raised by a hard-working dad and a loving mom with a broken heart, with an empty hole right in the middle.  But you know what, that 14 year old girl is

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 118 of 536
Case 3:08-cr-00134-RJC   Document 197   Filed 01/30/11   Page 93 of 112

JA2955

395

me."

Q.    I would like to show you what's been previously marked as Government 574.  Do you see that on the screen?

A.    Yes.

Q.    Do you recognize that photo?

A.    I do.

MR. NAZZARO:  I would move 574.

THE COURT:  Let it be admitted.

(Government Exhibit 574 was received into Evidence.)

Q.    Can you describe for everybody what's depicted in what's marked as Government 574?

A.    Well, the picture in the top left corner is my dad sitting in the chair with me holding me on his lap.

And then to the right side of that is my dad holding me up in his arms in front of the house when I was a little bit older.

And then the one below that is my dad holding me in his arms when we were at Myrtle Beach in South Carolina that we would go to every once in a while, mostly every year with him.

And then to the left of that is my dad and me when I was real young, I was like two or three.  And he would just give me his shades, I would just like, mess around with him and act like him, being daddy's girl.

Q.    Where it says written on there, "Cool Shades Carmen,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 119 of 536
Case 3:08-cr-00134-RJC    Document 594    Filed 01/30/11    Page 200 of 215
JA2956

396

Myrtle Beach" and it says "Duke"?

A.    Yeah.  We were both really strong Duke fans.  That's how we became so close, pretty much we've always been really close.

Q.    Like to show you one other, Exhibit 578.  And are you able to recognize 578?

A.    Yes.

        MR. NAZZARO:  We would move 578.

        THE COURT:  Let it be admitted.

(Government Exhibit 578 was received into Evidence.)

Q.    (By Mr. Nazzaro) What does 578 mean to you, that photograph?

A.    The top left one is at South Padre Island in 2006.  To the left is my sister, then me, and my little cousin Alex and my dad beside him.  Once again, me and my dad are wearing sunglasses again.

        And then to the right of that is my cousin Alex Garcia, which is Ruben's son.

        And then in the middle is him again in 2006.  And he's just acting like a typical cowboy, just like his daddy.

        And then below that to the right is my dad in my house holding Alex.  He was like two or three, around there.

        And then the small picture in the middle is my cousin Alex and his little sister.

        And then to the left of that is me sitting on the floor

                    Laura  Andersen,  RMR  704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 120 of 536
Case 3:09-cv-00134-RJC   Document 58-7   Filed 01/30/11   Page 120 of 115
**JA2957**

397

with my cousin in the house.

Q.   So you were pretty close to all your cousins --

A.   Yeah.

Q.   -- and other family members?

A.   All of us are really close.

Q.   Thank you, Carmen.  I have no other questions.

          THE COURT:  Any cross?

          MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q.   You've been dealing with the loss of your father now for over two years; is that correct?

A.   Yes.

Q.   And you have been seeking counseling; is that correct?

A.   I did, but then I just kind of like dropped out of it.

Q.   But you did seek counseling --

A.   I did, yeah.

Q.   And you would agree that growing up without one of your parents is a difficult thing, isn't it?

A.   Yes.

          MR. BRYSON:  Those are my questions.

          THE COURT:  You may step down be excused.

          Call your next witness.

          MR. NAZZARO:  Betsy Garcia.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 121 of 536
Case 3:08-cr-00134-RJC   Document 594   Filed 01/30/11   Page 102 of 115
**JA2958**

398

THEREUPON, ELIZABETH GARCIA, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. NAZZARO:

Q.   Good afternoon.  Please state your name.

A.   Elizabeth Garcia, but I go by Betsy.

Q.   Betsy Garcia.  How old are you Betsy?

A.   I'm 19.

Q.   Manuel was your father?

A.   Um-hmm.

Q.   And did you also have occasion to write some of your thoughts out on paper after he died?

A.   I did.

Q.   I would like to show you what's been previously marked as Government 551.  It's dated 2/19/08.  And it says, "Victims Impact Statement".  Is that a statement you wrote?

A.   Yeah.

        MR. NAZZARO:  I believe it's two pages or three pages.

        Your Honor, at this time I would move 551.

        THE COURT:  Let it be admitted.

(Government Exhibit 551 was received into Evidence.)

Q.   (By Mr. Nazzaro) And ask that, Betsy, if you would please publish it to the jury by reading it.  Are you able to read it from the screen?

A.   Yes.

Case 3:16cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 122 of 536
Case 3:08-cv-00134-RJC    Document 594    Filed 01/30/11    Page 109 of 115
JA2959

Q.   Okay.  Do you want it a little larger?  Are you able to read it?

A.   Yes.

Q.   Okay.

A.   "On December the 9th, at 4:00 in the morning my life changed forever.  Happiness thrown out the window.  Emotions all over the board.  A shattered life that will take years to mend.  Pain and sorrow for years to come.  My heart in a million pieces.  Nights spent tossing and turning and crying.  A lump in my throat, fear everywhere I go.  A pessimistic view of life.  Anger bottled up inside me.  Relaxation impossible.  Senior year ruined forever.  Waiting for the phone to ring and hear him say, "I love you".  The fact that I'm never going to see my father ever again.  Why?  Questions unanswered.  Lost in a world of confusion.  Living a nightmare.  Waiting to wake up from a bad dream.  Stuck in a dark room trying to find the way out but can't.  A black cloud over my head.  Guilt that I can't get rid of.  Ultimately, a life not worth living without him.  These are just a few things about my life since Daddy was killed.

     Before that horrid night, I was a happy, outgoing, hard-working, eager to graduate, and worry-free teenager and had a positive outlook on life.  Now my friends and family can't say that about me.  I used to look forward to graduation, family-get-togethers were exciting, at least

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 123 of 536
Case 3:08-cv-00134-RJC   Document 59-8   Filed 01/30/11   Page 124 of 115

JA2960

most of the time. Holidays were eventful, birthdays were so much fun. I don't look forward to any of that whatsoever. Why? Because I know my father will not be there for any of it. He won't be there to congratulate me on graduation day, or just to say, "I love you" and give me a big old bear hug. He will have to watch from above, a place where I can't see or touch him. Why? An answer I will never come to know.

Senior year in high school provides the happiest memories that will last forever. It's supposed to be about being happy, seizing happy moments with friends and just having fun. It only happens once and you can't turn back time. Unfortunately, I have lost my senior year. I don't remember December as hanging out with my friends goofing off. I remember it as the worst month of my entire life, ruining my senior year forever. Memories that have a great deal of emotion are often remembered very vividly. Bad memories override the good ones. Years from now, I won't be able to say that I enjoyed my senior year. The only memory I associate with senior year is that year I lost my dad. I have lost one of the happiest memories that a kid could have, senior year and graduation.

My outlook on life has changed so much, my mom used to say that I was the only one who had an optimistic view of life. I was the one who could make a Heaven of Hell. I saw the good in bad situations, and the glass as half full not

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 124 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 105 of 115
JA2961

401

empty.  I used to be able to look at a situation and make something of it.  Momma was always the one to see the worst in things.  Now, I'm right along side mom.

When my mom left that night to go to the restaurant at 11:00 p.m, I told myself that everything would be okay.  I made a Heaven of a possible Hell.  When my mom walked through that front door Sunday morning and told me what happened, my optimistic view of life didn't bring a good outcome.  For once in my life, optimism did not bring out a Heaven of Hell.  Ever since that incident, I don't see the good in anything.  There's no such thing as a Heaven and a Hell in my life anymore.  Because of that, I worry about the future constantly.  I don't foresee anything good in my path at all.  I see no happiness whatsoever.

How am I ever suppose to feel right about going out with someone and get married?  Dad's always had to approve of boyfriends before they let him take hi little girls out. We all know that if daddy didn't approve, drop him.  It feels so weird going out with someone that Daddy didn't approve because he never got the chance to.  How am I suppose to get married?  Who will walk me down the aisle? Who will join me in the father-daughter dance?  How do you explain to your kids that they don't have a grandpa because of one's senseless actions?  Who do I turn to do the handywork?  When I turn around I see children spending time

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 125 of 536
Case 3:08-cv-00134-RJC   Document 59-8   Filed 01/30/11   Page 106 of 115
JA2962

with their fathers and they look so happy.  Every time I see someone with their dad I long even worse for my father.  It's just not fair.  Why do I only get 16 years with my dad and others watch their dads die of old age, yet have so many memories?  Why?  I see people turn to their dads for advice, money, solutions, company, and most importantly love.  Who do I run to for fatherly love?  Yeah, I have my mom and the rest of my family, but a mother's love is so different.  The relationship between a father and daughter is so unique.  I looked up to my dad with great respect for everything that he had accomplished and for everything that he provided.  He was an amazing father.  I never got to say "Thank You", and that I appreciated everything he did for us.  He started from ground zero and worked his way to the top, living the American dream.  More importantly, I will never be able to tell him "I love you".  I don't want anything else in this world but my father, and the sense that everything is okay.  Without him here, I feel so lost, empty and worthless.  How do I continue with my life?  How do I go on and try to find happiness when he's not here to share with me?  How?

Q.   I would like to show you a couple pictures that are marked as 563; do you recognize 563?

A.   I do.

        MR. NAZZARO:  Your Honor, I would move 563.

        THE COURT:  Let it be admitted.

                    Laura Andersen, RMR 704-350-7493

Case 3:16cv-000573-MOC   Document 59-7   Filed 03/23/17   Page 126 of 536
Case 3:08-cr-00134-RJC   Document 594   Filed 01/30/11   Page 107 of 115

**JA2963**

403

(Government Exhibit 563 was received into Evidence.)

Q.   What is the meaning that 563 has for you?

A.   This is back in 2006 when we took a trip to Mexico with my cousin Alex to meet his grandparents for the first time. And on the way back we stopped in South Padre Island, which is a beach in Texas.  And in this picture my dad is trying to build a dolphin out of the sand for Alex.  And that's Carmen to the right of him, digging her hands in sand and water.  And Alex is just standing by with -- looks like my daddy's sunglasses on, just watching him.

Q.   And Government's 570.  Do you recognize 570?

A.   I do.

        MR. NAZZARO:  Move 570.

        THE COURT:  Let it be admitted.

(Government Exhibit 570 was received into Evidence.)

Q.   Where was that taken, if you remember?

A.   This is the same year, 2006.

Q.   It was on the same trip?

A.   Um-hmm.

Q.   Who's in 570?

A.   That's me on the left, and then my sister.  And then beside her is my cousin Alex, which is Ruben's son.  And that's my dad on the right.  And we're all in dolphin watch boat, where you go out and you look at the dolphins, and Alex and Carmen really enjoyed it.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 127 of 536
Case 3:08-cr-00134-RJC   Document 5947   Filed 01/30/11   Page 208 of 215

JA2964

404

MR. NAZZARO:  Thank you.  I have no further questions.

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q.  Ma'am, you have not sought counseling; is that correct?

A.  No.

Q.  Even though you have not sought counseling, you would agree that growing up without one of your parents is a very difficult thing, correct?

A.  Definitely.

Q.  And you were very affected by your parents separation, correct?

A.  I was.

Q.  I'm sorry.

A.  I was.

Q.  Okay.  I'm sorry.  I apologize.

You had seen a change in your father about the time that the separation occurred, correct?

A.  I did.

Q.  And as a teenager, that was very difficult for you to deal with; isn't that correct?

A.  Yes.

MR. BRYSON:  Those are my questions.

THE COURT:  You may step down, be excused.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 128 of 536
Case 3:08-cv-00134-RJC    Document 50-8    Filed 01/30/11    Page 109 of 115

JA2965

405

Call your next witness.

MR. NAZZARO:  United States rests, Your Honor.

THE COURT:  Very well.  Let me see the lawyers at side bar.

(Bench conference as follows:)

THE COURT:  You guys ready -- be ready Monday morning.

MR. BRYSON:  Yes, sir.

MR. FOSTER:  Yes.

THE COURT:  Why don't you all get together with the deputy clerk and make sure that there's no dispute about what's in, what's not in.

And if there is, we'll deal with it.  I don't know if there's anything else to do this afternoon.

MS. ROSE:  I don't think so.

THE COURT:  So I guess instead of cutting them loose for lunch, I'll ask them to go home, be back Monday morning at 9:30.  Make sure there was nothing I was not thinking of that we need them to be here this afternoon.

MR. FOSTER:  Not I'm aware of.

MS. ROSE:  I don't have anything.

MR. BRYSON:  I said something, I haven't had a chance to respond.  I'm in the hotel and it's hard to respond.  Some we're not contesting, we're not interested in residual doubt, and we don't want allocution either.  I do

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 129 of 536
Case 3:08-cr-00134-RJC   Document 594   Filed 01/30/11   Page 110 of 115
**JA2966**

406

want to file a response to the Cunningham Motion in Limine, and was there one other one?

MS. ROSE:  Didn't you already rule on that?

MR. BRYSON:  I think you ruled on the discovery part of it.

MR. NAZZARO:  Is there any other discovery, other information we haven't received yet, reports or anything?

MR. BRYSON:  I'm going to try and get one other summary to you.  You got the videos, right?

THE COURT:  Well, you all can work that out.  It doesn't seem like there's anything for the Court or jury to do at this time.  If there are legal issues and we need to start up before 9:30, let us know.  We will get in early on Monday.

Any responses that will be helpful to the Court, let's get them in by the end of the day Friday.  All right. Let's go back in and cut them loose for the weekend and tell them to come back at 9:30.

(The bench conference was concluded.)

THE COURT:  Members of the Jury, we're near lunch time.  The government has rested.  The defense will not begin its case in mitigation until Monday morning.  And so you're going to be excused until Monday morning at 9:30.

As you go home and as you go about your daily affairs, remember not to talk about the case, keep an open

Case 3:16-cv-00557-MOC   Document 59-7   Filed 03/23/17   Page 130 of 536
Case 3:08-cr-00134-RJC   Document 1243   Filed 01/30/11   Page 130 of 115
JA2967

407

mind.  And do everything possible to avoid any of the local news coverage of this case.

And with those instructions, I'll ask you to come back, ready to come into court at 9:30 Monday morning.

(The jury was escorted from the courtroom.)

(End of the day, April 21, 2010, 12:36 p.m.  Court to reconvene on Monday, April 26, 2010 at 9:30 a.m.)

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER

I, Laura Andersen, Official Court Reporter, certify that the foregoing transcript is a true and correct transcript of the proceedings taken and transcribed by me.

Dated this the 25th day of April, 2010.

s/Laura Andersen
Laura Andersen, RMR
Official Court Reporter

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 131 of 536
Case 3:09-cv-00134-RJC   Document 50-7   Filed 01/30/11   Page 112 of 115
JA2968

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>ALEJANDRO ENRIQUE RAMIREZ<br>　　UMANA,<br>　　　　　　Defendant. | DOCKET NO. 3:08-cr-134-RJC<br><br>UNITED STATES'S MOTION *IN LIMINE* REGARDING DEFENSE CASE IN-CHIEF AND ARGUMENT |

Based on certain cross-examination by defendant Alejandro Umana, and Court rulings before and during trial, the United States moves *in limine* regarding defense presentation of information or argument on the following matters.

### 1. Argument predicated on information precluded by Court rulings

The United States next moves to prohibit, in argument by counsel, any reference to the non-identification of defendant (in court) by Freddy Gonzalez, the fact that "Moe" or "Chipis" did not testify, or the absence of any evidence of crimes or violence in El Salvador. As to all three categories of information, the Court precluded the evidence as not reliable or prejudicial. It would be unfair to allow the defense, having prevailed in shielding relevant factual information from the jury, to use those rulings as a sword. *See United States v. Wilcox*, 487 F.3d 1163 (8th Cir. 2007). In that case, the district court suppressed physical evidence against the defendant, the defendant commented on its absence, and the district court sustained the government's objection to closing argument questioning the lack of such evidence. *Id.* at 1173. The Eighth Circuit affirmed, though it ultimately did not pass on the defendant's claim of error and noted that it could not find authority either way regarding such an argument. *See id*.

Case 3:16-cv-00057-MOC-JCD Document 50-7   Filed 03/23/17   Page 132 of 536
Case 3:08-cv-00134-RJC Document 507-8   Filed 04/23/10   Page 132 of 6
**JA2969**

Regardless of the lack of authority (other than the trial court in *Wilcox*), such argument is certain to mislead and confuse the jury in this case, and ultimately leads it astray from its truth-finding function. It's one thing, as in *Wilcox*, for a defendant to comment on the lack of evidence for which the government bears legal culpability — *i.e.*, in a suppression context where some government agent has erred. Argument in that context would be misleading, but at least it might be thought of as balancing the playing field between the state and the defendant. In contrast, here there has been no such government misconduct, and the Court's primary reason for excluding such information appears to have been protecting the defendant (in the case of "Moe" and "Chipis," from himself). Such argument would therefore be more unfair in this case than the argument prohibited in *Wilcox*, doubly so since this is a sentencing hearing at which as much information as possible is intended to reach the jury. Alternatively, if the Court plans to allow such argument, the government requests a ruling in time to allow the government to put on evidence probative of the issues on rebuttal.

In the government's case in chief, the government presented evidence that Mr. Gonzalez identified Umana as the shooter at Lemon Grove Park on two occasions several years before trial. Those identifications were not "100%," however, which was both conceded and re-established on cross-examination. The Court prohibited the United States from seeking an in-court identification, finding that such procedure was "unduly suggestive." It also found that a photo-lineup identification of defendant shortly before trial — which featured more than 6 photos — was suggestive because it was too close to trial, despite the fact that the witness was not told (or shown names) and did not know which person was on trial until he took the stand.

Defendant should not be allowed to argue that Mr. Gonzalez did not, or could not, identify Umana in court. The defendant was the party who sought to prohibit such identification,

**JA2970**

and having prevailed in keeping such information from the jury, it would be inequitable to allow commentary on it.  Defendant should of course be free to argue about the facts in evidence and fair inferences therefrom.

Likewise with "Moe" and "Chipis," who — based on the government's proffer and information presented to the Court outside the jury's presence — refused to testify truthfully because they were afraid of defendant, and one of whom had been assaulted in jail on defendant's command.   The Court excluded this information not, in the government's understanding, because it was unreliable, but because it was prejudicial to the defendant.  Yet the defense might conceivably say to the jury something along the lines of "if Moe (Arevalo) wasn't the shooter, why didn't you hear from him?"  As with Gonzalez, pointing to information that the government has but was not allowed to present, and in this instance information that the defendant's own conduct suppressed, would be grossly unfair.

The same principle applies to the information from El Salvador.   Although the government understands the Court's concern to be about reliability, which concern applies to rebuttal evidence as well as case-in-chief evidence, the defense's videos are no more reliable than a live witness from El Salvador (who would present hearsay).  Moreover, the Court could still restrict some of the El Salvador testimony, by limiting it to general information about participation in MS-13 and "crimes," in order to make sure it is not unduly prejudicial.  If the focus is on the defendant, as it should be, the limited point here is that it would be misleading to allow the defendant to paint only a partial picture of his Salvadoran life.

### 2.  <u>Selection deliberation</u>

Based on certain questions by the defense at *voir dire*, the government anticipates that defendant will either argue, or seek instruction, or both, to the effect that "the decision of each

Case 3:16-cv-00057-MOC-DCK   Document 50-7   Filed 03/23/17   Page 134 of 536
Case 3:08-cv-00134-RJC   Document 671-3   Filed 04/23/10   Page 3 of 6

**JA2971**

juror as to the selection of punishment is his or her own regardless of the views of the other jurors." Such argument or instruction should not be permitted.

In *Jones v. United States*, 527 U.S. 373 (1999), the defendant had asked for an instruction regarding the "effect of [the jurors'] inability to agree" on the defendant's sentence. *Id.* at 379-80. The trial court refused to give that instruction. *Id.* at 379. In the Supreme Court, the defendant asserted that the court's failure to instruct the jury on the consequences of deadlock violated the Eighth Amendment. *Id.* at 382-83. The Court disagreed. As relevant here, the Court commented that such an instruction might have undermined a significant government interest "in having the jury express the conscience of the community on the ultimate question of life or death," which was the fruit of a process that includes "a comparison of views" among jurors and "arguments among the jurors themselves." *Id*. at 382. For this proposition, the Court cited *Lowenfield v. Phelps*, 484 U.S. 231 (1988), which in turn had reaffirmed the hoary principle that "[i]t cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself." *Id.* at 237 (quoting *Allen v. United States*, 164 U.S. 492, 501-02 (1896)).

These cases together stand for the proposition that selection, in a capital case, is a collective deliberation like any other, in which each individual's views matter but the group as a whole must decide. Just as a juror cannot be told to compromise for compromise's sake, he cannot be told that firmly held views entitle him to disengage from the deliberative process. That is essentially what an "individual selection deliberation" argument or instruction does.

The government acknowledges, of course, that under the Act a single juror can "find" a mitigating factor. The verb "find" differs, however, from "consideration" of mitigating factors.

Case 3:16-cv-00057-MOC-JC  Document 50-7-1  Filed 03/23/17  Page 135 of 536
Case 3:08-cv-00154-RJC  Document 673-3  Filed 04/23/10  Page 4 of 6
**JA2972**

And "selection" is different conceptually — it's what happens <u>after</u> the aggravating and mitigating factors have found — and statutorily — the Act directs that "the jury . . . shall consider" how they balance out, 18 U.S.C. § 3593(e) — from the finding phase.  Moreover, the jury's decision, under the Act, is required to be by "unanimous vote."  *Id.*  For these reasons, defendant should not be allowed to argue, or to obtain an instruction, along the lines stated above.

RESPECTFULLY SUBMITTED this 25th day of April, 2010.

EDWARD R. RYAN
UNITED STATES ATTORNEY

**s/ Jill Westmoreland Rose**
NC Bar Number: NA
Assistant United States Attorney
United States Attorney's Office
100 Otis Street
Asheville, North Carolina 28801
Phone: (828) 271-4661
Fax: (828) 271-4670
Email:  jill.rose@usdoj.gov

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

Case 3:16-cv-00057-MOC-JCJ Document 50-7-3 Filed 03/23/17 Page 136 of 536
Case 3:08-cv-00134-RJC Document 66-3 Filed 04/25/10 Page 5 of 6
JA2973

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 25th day of April 2010, the foregoing document was served electronically through ECF filing upon defense counsel at the following email addresses:

Mark Foster
mpfosterjr@bellsouth.net

John Bryson
jbryson@wehwlaw.com

> **s/ Adam Morris**
> DC Bar Number: 486635
> Assistant United States Attorney
> United States Attorney's Office
> 227 West Trade Street, Suite 1650
> Charlotte, North Carolina 28202
> Telephone: (704) 344-6222
> Fax: (704) 344-6629
> Email: adam.morris@usdoj.gov

– 6 –

**JA2974**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA               )DOCKET NO. 3:08-CR-134-2
                                       )
                                       )
      vs.                              )VOLUME IV-A
                                       )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA        )
_____ )



TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 26, 2010

APPEARANCES:

On Behalf of the Government:
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204




LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 138 of 536
Case 3:08-cr-00134-RJC  Document 597  Filed 01/30/11  Page 1 of 121

JA2975

409

I N D E X

DEFENDANT'S WITNESSES:

MARK CUNNINGHAM
        Direct Examination by Mr. Bryson          419
        Cross-Examination by Ms. Rose             483

RICHARD MCGOUGH
        Direct Examination by Mr. Bryson          513


                    * * * * * *

DEFENDANT'S EXHIBITS:
NO.                                               RECEIVED
14   .........................................       429


INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

                    * * * * * *

                Laura Andersen, RMR 704-350-7493

JA2976

410

P R O C E E D I N G S

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  Do we have issues to take up before we call the jury; either side?

MS. ROSE:  We do.

MR. NAZZARO:  We do, Your Honor.

MR. FOSTER:  Yes, Your Honor.

THE COURT:  Who wants to go first?

Mr. Foster, it's your side of the case, Mr. Bryson, we'll hear from you first.

MR. FOSTER:  Well, we filed two motions in Limine, Your Honor.  One was to preclude cross examination of defense witnesses on the unadjudicated conduct in El Salvador.  It's a very brief motion just premised on the Court's earlier rulings, and the fact that we do not intend to do anything we offer to open the door such that would be appropriate rebuttal.  And since that being the case, we assert that should be --

THE COURT:  What says the government?  Government?  Mr. Nazzaro.

MR. NAZZARO:  I think it's just going to depend on what comes up, Your Honor.  We aren't intending to get into that area at this point.

THE COURT:  Very well.  Make sure before you do,

Laura  Andersen,  RMR  704-350-7493

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 140 of 536
Case 3:08-cv-00134-RJC  Document 59-7  Filed 03/30/11  Page 3 of 121
JA2977

411

if you feel you have relevant questioning in that area, to run it by me at side bar before we --

MR. NAZZARO:  Yes, Your Honor.

THE COURT:  What else, Mr. Foster?

MR. FOSTER:  The other one, Your Honor, was to restrict cross examination of Dr. Merikangas regarding intelligence issues and mental retardation.  That was an issue that was in his report because when we called him during mental retardation hearing --

THE COURT:  You all don't intend to do that, do you?

MS. ROSE:  No.

THE COURT:  So you're done.  The government have any issues?

MR. NAZZARO:  Yes, Your Honor.  We had three issues that we filed in our Motion in Limine.  There are two experts and their investigator. With respect to their two experts, Your Honor, they apparently intend to call --

THE COURT:  I looked at that motion, and I'm going to give the defense a lot of latitude with this background information.  And so I've considered the government's motion in opposition.  But the summaries that you presented to me in your motion, I'm going to let the defendant put that evidence in.

MR. NAZZARO:  Okay.

Laura Andersen, RMR 704-350-7493

**JA2978**

THE COURT: What else?

MR. NAZZARO: Well, Your Honor, there's also the issue of the investigator.

And we were provided an investigatory report by their investigator, Mr. McGough. And we also were given five videos, which are actually interviews with particular people that were interviewed in El Salvador by the defense.

And although we don't have an objection to those videos, we do have an objection to the investigator drawing conclusions, going beyond what's in the videos, and testifying about other issues and other witnesses.

Because I think it's highly not reliable. And there's a lot of different conclusions that he reaches about the war, about defendant's upbringing. It's his own conclusions as if he's an expert.

When merely if he's just going to recount what people said, the best evidence of that are the videos that the defense gave us. And I think anything above and beyond that, other than him getting up and laying a foundation for the videos, is not reliable hearsay, and should not be admitted.

THE COURT: What says the defense?

MR. FOSTER: Your Honor, there are the videos, but prior to those videos being made in El Salvador, Mr. McGough was down there and interviewed some of these people on

Case 3:16-cv-00057-MOC-JC Document 50-7 Filed 03/23/17 Page 142 of 536
Case 3:08-cr-00134-RJC Document 504 Filed 03/30/11 Page 5 of 121
JA2979

413

previous occasions.  The summary of his findings are what we turned over to the government, I didn't necessarily think we had to but we did.

But he's testifying to other things beyond what's just on the video.  He's not going to get up and interpret what's on the video.  He's testifying to other information he obtained from these people on previous occasions.  He's not giving any opinion evidence.  He's talking about things that he's found down there and it's -- you know, it's --

THE COURT:  I guess I have to deal with it when it comes up, but it sounds permissible to me.  What else?

MR. NAZZARO:  Yes, Your Honor.  We'll take it up -- there's a lot of objectionable things in his report. And I don't know if he's going to be talking about all those things, I just wanted to bring it up ahead of time to the Court.  I don't know if you've seen his report that we were provided.

THE COURT:  I have not.

MR. NAZZARO:  But it has a number of conclusions. In fact, one of the paragraphs is labeled a conclusion.  He speculates about --

THE COURT:  Well, the defense has indicated that they're not going to ask him about opinions, and so we just have to --

MR. NAZZARO:  Okay.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-7   Filed 03/23/17   Page 143 of 536
Case 3:08-cr-00134-RJC   Document 50-7   Filed 03/30/11   Page 6 of 121
JA2980

414

THE COURT:  If they do, raise the objection, we'll deal with it.  Anything else?

MS. ROSE:  Just on -- the government filed a motion relative to Dr. Cunningham's testimony, Your Honor. Included -- Your Honor had a chance to review that one.  But we were also provided two videotapes.  One of a cell extraction, or actually I think it's a recreation yard extraction that's 9 or 10 years old.  There's really no background information about this cell extraction.

There's also a three-person guarded move from a cell to a visitation area; it's 9 or 10 years old.  There's really no information about the circumstances of that individual.  Why that person is being housed in that particular fashion.

They're just kind of in a vacuum, and I think that's confusing and misleading to the jury regarding maximum security prisons, and the security that's undertaken in those prisons.  It's just in a vacuum and not related in any way to this defendant and it's not relative to the daily life in the U.S. Penitentiary.

The other thing is, there are some slides that Dr. Cunningham would show the jury, most of those relate to ADMAX, which, I don't know really how it's relative to this -- relevant to this particular defendant.

There is one particularly troubling slide, it's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-7 Filed 03/23/17 Page 144 of 536
Case 3:08-cr-00134-RJC Document 597 Filed 03/30/11 Page 74 of 121
JA2981

415

slide three or four that talks about juries and their findings of life versus death and future dangerousness. And it's a slide talking about what other juries have done. And I do not think that is appropriate for this jury to consider what other juries have done.

His actuarial tables, if the Court finds that's admissible, regarding prison, and how lifers act in prison. But what other juries have done relative to life and death and those percentages I would contend is not appropriate for this jury's consideration.

THE COURT: What says the defense?

MR. BRYSON: What he has done is, there's really two after avenues of his testimony. One is that he's done studies to address the idea that a person who has committed a murder is in himself more dangerous than having committed a murder.

In that regard his studies have considered how people got to where they are. It's certainly -- it's not the thrust of his testimony to talk about whether a prior jury has done the appropriate thing or anything like that. He just discusses how they got to the circumstances that they did.

THE COURT: I'm not going to let -- I issued an order that apparently got hung up in electronic limbo on Dr. Cunningham's testimony. But I am going to let

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 145 of 536
Case 3:08-cr-00134-RJC   Document 597   Filed 03/30/11   Page 8 of 121
JA2982

416

Dr. Cunningham testify.  And I'm going to try to get a copy of the order to you.  When do you anticipate calling Dr. Cunningham?

MR. BRYSON:  We were going to start with him.  We hadn't really planned on that.  But he has a scheduling issue and he's trying to get out of here today.

THE COURT:  Very well.  I will let him testify, but not to these videos on cell extraction or guarded moves. I do think it's misleading and confusing, and that outweighs the probative value.

And I'm not going to let him get anywhere near talking about what other juries did.  So if he has a slide that says this jury sentenced so and so to life in prison --

MR. BRYSON:  I think he only does it in statistical analysis.  He says, these prisoners got here. And it's very early in his presentation.  And if the Court wants to go through it quickly, just so you can hear what it is, I'll be glad --

THE COURT:  No.  I'm saying, if there is a slide that has something about what some other jury did, this jury is not going to see that.

MS. ROSE:  It's slide number three or four, I think, on your slide.

MR. BRYSON:  He does talk about in evaluating -- I'm sorry.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC  Document 50-7  Filed 03/23/17  Page 146 of 536
Case 3:08-cr-00134-RJC  Document 597  Filed 03/30/11  Page 9 of 121
**JA2983**

417

THE COURT:  Go ahead.

MR. BRYSON:  -- in evaluating who -- you know, what capital defendants are in prison and what they did, he does talk about who was found to be -- where there was a future dangerousness allegation and where there wasn't.

THE COURT:  It's not coming in.

MR. BRYSON:  All right.

THE COURT:  If he needs time to get that slide out of his presentation, but my guess is he can just manipulate around it.  He's ordered not to show it.

MR. BRYSON:  All right.

THE COURT:  But if you need time to go over that with him --

MR. BRYSON:  I would like a minute just to talk with him about it.  I probably -- what I can do is just cut off the jury thing at that point and skip through it.

THE COURT:  What we'll do is, we'll start at 10:00.  That should give you enough time to talk to him.

MR. NAZZARO:  Your Honor, one other thing.  We may call a couple experts in rebuttal, but we would like to have them in the courtroom during the defense presentation.  We just wanted to --

THE COURT:  Any objection?

MR. NAZZARO:  -- bring that up.

MR. BRYSON:  Would that just be rebuttal

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 147 of 536
Case 3:08-cr-00134-RJC   Document 1647   Filed 01/30/11   Page 147 of 215
**JA2984**

418

witnesses?

THE COURT:  Right.  If it's an expert witness and not a fact witness in any respect, that's what they're requesting.  That expert witness be allowed to be in court during your presentation of mitigating evidence.

MR. BRYSON:  Our expert witnesses in case in chief should still be subject to sequestration order?

THE COURT:  What's that now?

MR. BRYSON:  Our expert witnesses are still subject to the sequestration order?

MR. NAZZARO:  Yes.

MR. BRYSON:  -- or are you saying all experts.

THE COURT:  They made a motion to except rebuttal expert witnesses from the sequestration order.  So I'm just asking the defense if you have an objection to it.

And if, you know, what sauce is for the goose is sauce for the gander.  If your expert -- if there's any surrebuttal, you want your experts to be in court during the presentation of their rebuttal, what I would rule for one side, I would apply as well to the other.

MR. BRYSON:  Thank you, Your Honor.

THE COURT:  Any objection?

MR. BRYSON:  No, Your Honor.

THE COURT:  Very well.  That will be granted.

MR. NAZZARO:  That's all we have.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/20/17   Page 148 of 536
Case 3:08-cr-00134-RJC   Document 56-7   Filed 01/30/11   Page 11 of 121
JA2985

419

MS. ROSE:  That's all we have, Your Honor.  Thank you.

THE COURT:  Why don't we stand in recess until 10:00.

(A brief recess was taken in the proceedings.)

THE COURT:  Ready for the jury?

ALL COUNSEL:  Yes.

(The jury was returned to the courtroom.)

THE COURT:  Good morning, Members of the Jury.  I hope you enjoyed your extended weekend, ready to get back to work.

The case is with the defense at this time. Mr. Bryson, Mr. Foster, if you would call your first witness.

MR. BRYSON:  Your Honor, we would call Mark Cunningham.

THEREUPON, MARK DOUGLAS CUNNINGHAM, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. BRYSON:

THE COURT:  Dr. Cunningham, you can put that screen down and raise it back and forth.

THE WITNESS:  Yes, sir.  Thank you.

THE COURT:  Mr. Bryson.

Q.   (By Mr. Bryson) Would you tell the jury what your name is?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 149 of 536
Case 3:08-cr-00134-RJC   Document 157   Filed 01/30/11   Page 12 of 121
JA2986

420

A.    Mark Douglas Cunningham.

Q.    And what is your occupation?

A.    I'm a clinical and forensic psychologist in private practice, and also an independent research scientist.

Q.    How long have you been a psychologist?

A.    About 32 years.

Q.    Can you explain what a clinical psychologist is?

A.    Yes, sir.  Clinical psychology is the evaluation and treatment of psychological disorders.  It's what you would expect a psychologist to do in terms of interviewing, testing, diagnosis, counseling services, that sort of thing.

Q.    What is a forensic psychologist?

A.    Forensic psychology is any way that psychology as a science can be helpful to some issue that's before the court.  All the way from evaluating parenting capabilities in child custody cases, or psychological injuries in civil cases.

Or in criminal cases, things like competency to stand trial, or mental state at time of offense, or a sentencing determination such as they're being considered today.

Q.    Are you board certified in any particular area?

A.    Yes, sir.  I'm board certified in clinical psychology. And I'm also board certified in forensic psychology by the American Board of Professional Psychology.  That's the board certification organization that's recognized by the American

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 150 of 536
Case 3:08-cr-00134-RJC   Document 96-7   Filed 01/30/11   Page 13 of 121
**JA2987**

Psychological Association.

Q.    And could you explain the board certification process in either clinical or forensic psychology?

A.    Yes, sir.  I'll describe that in forensic psychology.

Board certification in psychology, unlike medicine, is a certification that typically occurs at a mid-career level, as opposed to being -- what happens in medicine where a physician becomes board certified at the end of their residency or their specialized training period.

And so in psychology, you're typically not allowed to sit for the boards until you're at least five years out from your Ph.D, and often maybe 10 or 15 or 20 years out.

In forensic psychology, board certification is intended to represent the highest sophistication of practice.  And so it's a very arduous process of required training, experience, providing forensic or court-related evaluations.

You submit a work sample, which are a couple of reports that are extensively supplemented by case law and ethics and scientific findings to demonstrate your ability to bring those to bear in the evaluations that you do -- to bring that sophistication to bear.

If that work sample, which is then critically evaluated by three board certified forensic psychologists, if they find that meets that standard, you're then allowed to sit for an oral exam.  An exam where three board certified

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 151 of 536
Case 3:08-cr-00134-RJC   Document 1376   Filed 01/30/11   Page 144 of 121
JA2988

422

forensic psychologists could ask me anything in the field of forensic psychology.

I spent 8 to 10 months studying 30 to 40 hours a week for that exam, which has a historic failure rate of about 40 percent, even after people get to that threshold.

Q.   How many board certified clinical psychologists are there in the United States?

A.   About 1,200.

Q.   How many board certified forensic psychologists are there in the United States?

A.   Approximately 250.

Q.   And where are you licensed as a psychologist?

A.   I'm licensed as a psychologist in Texas, Oklahoma, Arkansas, Louisiana, Alabama, South Carolina, New York, County, Illinois, Indiana, Colorado, Idaho, Oregon, Arizona, New Mexico, I think I -- 16 states.  I think I may have left a few out.

Q.   Your practice is national in scope?

A.   Yes, sir, it is.

Q.   Have you received any recognition or awards for your research activities in publications?

A.   Yes, sir, I have.

Q.   What award did you receive in 2005?

A.   In 2005 I was recognized with the Texas Psychological Association Award for outstanding contribution to science,

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 152 of 536
Case 3:08-cr-00134-RJC   Document 1067   Filed 01/30/11   Page 15 of 121
**JA2989**

for having made a particular outstanding contribution to the body of knowledge in psychology.

Q.    And did you receive an additional award in 2006?

A.    Yes, sir.  In 2006 I was recognized with the American psychological association award for distinguished contributions to research in public policy.  That's research that informs some issue of importance before the court or legislative bodies or the public at large.

Q.    How many members are there in the American Psychological Association?

A.    Approximately 160,000.

Q.    And you received -- you were one to receive this award?

A.    Yes, sir.  An award is typically given to a single psychologist each year.

Q.    What is your research in scholarship focused on?

A.    It focuses primarily on rates of violence in prison, factors that are predictive of violence in prison, the behavior of murderers and capital offenders in prison.  Also on capital inmates and characteristics about them.

Q.    Can you give a brief summary of your educational background?

A.    Yes, sir.  I received my undergraduate degree with majors in psychology and master in communications from Allen Christian College and graduated with high honors in 1973.

     I then went to graduate school at Oklahoma State

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 153 of 536
Case 3:08-cv-00134-RJC   Document 90-7   Filed 01/30/11   Page 16 of 121
JA2990

424

university in the doctoral training program in clinical psychology, that was accredited by the American Psychological Association.  And I received both my masters and doctorate degrees in clinical psychology from Oklahoma State.

I then did a one year clinical psychology internship at the National Naval Medical Center in Bethesda, Maryland, where I was an active duty naval officer and clinical psychology intern then.

I was then assigned as a staff psychologist at the Naval Submarine Medical Center in Groton-New London, Connecticut.  At that time, the sub base in Groton-New London was the primary sub facility for the Navy on the Atlanta Coast.

While I was there, I did two years of part-time post-doctoral study at the Yale University School of Medicine.

Q.    What did you do after you left the Navy?

A.    I took a full time academic position at a small private university in West Texas, and was an assistant professor of psychology for a couple of years.  I also started a practice during that same time.  At the end of a couple of years, I resigned the academic position and I've exclusively been in practice since 1983.

Q.    And have you ever been published in the areas of

Laura Andersen, RMR 704-350-7493

**JA2991**

425

clinical and forensic psychology?

A.   Yes, sir, I have.  On many occasions, with peer reviewed articles, about 30 peer reviewed articles in leading forensic or professional psychology publications that I've authored or co-authored, as well as chapters in edited textbooks.  There is a text that I was invited to author that will be printed here within a couple of months, regarding capital sentencing evaluations.  And then there are other scholarly papers as well.  I think there are about 46 in all.

Q.   Can you describe briefly some of your publications?

A.   Yes, sir.  To give you an example of some of the research that my colleagues and I have done.

In one of our studies we were interested in the question of whether murderers are more violent in prison than inmates who have been convicted of other offenses.

And so we looked at everybody in the Florida Department of Corrections; 51,000 inmates, of whom about 5,000 had been convicted of first degree murder.

And we then compared the disciplinary records of those 5,000 murderers, with about 11,000 property offenders, as well as the prison population as a whole, to identify whether or not the offense and the seriousness of it that sent somebody to prison, is associated with how often they get in trouble in prison, and how much violence they're

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 155 of 536
Case 3:08-cv-00134-RJC   Document 50-7   Filed 01/30/11   Page 13 of 121
JA2992

426

engaged in.

There are other studies that we've done that have looked at samples of 3,000 inmates in high security prisons. 25,000 inmates in another prison system. Other studies are smaller, might only involve 145 inmates. But are all of the inmates of a particular category. For example, all federal capital inmates serving life sentences, to track them in prison to see how they do.

Q. Is it fair to say that the bulk of your published works relate to prison violence?

A. Yes, sir, that's correct.

Q. And do you participate in continuing education?

A. Yes, sir I do.

Q. And how do you do that?

A. Well, I'm a student in continuing education. I attend seminars heavily as a student. And then I also teach continuing education.

I'm on the teaching faculty of the American Academy of Forensic Psychology. Which is the scholarly association of board certified forensic psychologists.

One of the primary aims of the academy is to raise the standard of practice of psychology as it comes into the courtroom.

I teach full day seminars to psychologists on capital sentencing evaluations, to equip them with the best

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 156 of 536
Case 3:08-cr-00134-RJC   Document 567   Filed 01/30/11   Page 15 of 121
JA2993

427

understanding of the issues they're evaluating, and to inform them about the best research that will help them understand the findings that they're gathering in these evaluations.

Q.   To what professional organizations do you belong?

A.   Well, I'm a fellow of the American Psychological Association.  I'm a fellow of the American Academy of Clinical Psychology and the American Academy of Forensic Psychology.

I hold -- I'm listed in the National Register of Health Service Providers in psychology.  Which means that my training was in an organized medical setting, in a hospital setting, so that I'm better equipped to evaluate and treat more serious disorders.

I'm a member of the Texas Psychological Association, American Correctional Association, and some others as well.

Q.   Have you ever testified in any military, criminal or family court proceedings before?

A.   Yes, sir, on many occasions.

Q.   And in what courts have you testified?

A.   Well, I've testified in state or federal courts here in North Carolina, as well as in South Carolina, Virginia, New York, Connecticut, New Jersey, Pennsylvania, Massachusetts, West Virgina, Illinois, Indiana, Missouri, Colorado, Idaho, Washington, California, Arizona, Nevada, New Mexico, Texas,

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 157 of 536
Case 3:08-cr-00134-RJC   Document 50-7   Filed 01/30/11   Page 20 of 121
**JA2994**

428

Arizona -- Texas, Arkansas, Oklahoma, Louisiana, Mississippi, Alabama, Florida, Tennessee, about 35 jurisdictions.

Q.    Have you familiarized yourself with the rates of violence in federal prison?

A.    Yes, sir I have.  I've been provided with extensive statistical data from the Bureau of Prisons that my colleagues and I have analyzed in some of our scientific studies that have been published.

Q.    Are you also familiar with the procedures available in federal prison to reduce and control inmate violence?

A.    Yes, sir I am.  Both by reviewing the instructions that are published by the Bureau of Prisons from reviewing the testimony of wardens who have testified about those capabilities, from tours of high security federal institutions.

I have been on -- received three tours and intensive briefings at the super-maximum federal facility, ADX Florence in Colorado.  I've been given a tour and briefing of USP Marion.  And in the course of my practice I've gone into federal prisons on many occasions to do evaluations.

Q.    Have you previously been recognized as an expert by the courts in testifying regarding violence, risk assessment for prisons and also the capabilities of Federal Bureau of Prisons to control inmates?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 158 of 536
Case 3:08-cr-00134-RJC   Document 1161   Filed 01/30/11   Page 21 of 121
JA2995

429

A.   Yes, sir I have, on many occasions.

Q.   I'm going to -- all right.  If you would look at the screen in front of you.  I'm going to show you what I'm going to ask to be marked as Defense Exhibit Number 14 and ask if you can identify that?

A.   Yes, sir.  This is my current curriculum vitae, which is simply a fancy word for a resume, that describes my education, recognitions, publications, scholarly associations, that sort of thing --

Q.   Is it current and does it accurately reflect your qualifications and experience?

A.   Yes, sir it does.

      MR. BRYSON:  Your Honor, I would, One, move to introduce Defense Exhibit Number 14.

      I would also move to have Dr. Cunningham recognized as an expert in clinical forensic psychology, and also as an expert in rates of violence in federal prisons and procedures available in the Bureau of Prisons to limit the occurrence of prison violence.

      THE COURT:  With respect to the CV, any objection?

      MS. ROSE:  No objection.

      THE COURT:  Let it be admitted.

(Government Exhibit 14 was received into Evidence.)

      THE COURT:  With respect to qualification, the government wish to voir dire?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 159 of 536
Case 3:08-cr-00134-RJC   Document 155-7   Filed 01/30/11   Page 22 of 121
**JA2996**

430

MS. ROSE:  No, Your Honor.  Thank you.

THE COURT:  Very well.  Then I will allow this witness to render an opinion in the areas of clinical forensic psychology and the rates of violence in prison.

MR. BRYSON:  Thank you, Your Honor.

Q.   (By Mr. Bryson) Dr. Cunningham, in preparation for your testimony today, what information did you gather or review?

A.   I reviewed scientific studies that my colleagues and others have done regarding rates of violence in prison, and factors that are associated with that violence.

I reviewed materials from the Bureau of Prisons and updated statistical information, where I was able to about that.  As well as procedures for controlling and containing violence within federal prison.

Q.   Are these the kind of sources that an expert such as yourself would reasonably rely on in coming to opinions?

A.   Yes, sir they are.

Q.   Have you also prepared demonstrative exhibits to assist with your testimony here today?

A.   Yes, sir I have.

Q.   And would it assist your testimony if the jury would be allowed to view that in conjunction with your testimony?

A.   Yes, sir, it would.

MR. BRYSON:  Your Honor, we would ask for permission to -- for Dr. Cunningham to rely on his slide

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/28/17    Page 160 of 536
Case 3:08-cr-00134-RJC    Document 1570    Filed 01/30/11    Page 23 of 121
JA2997

presentation during his testimony.

THE COURT: You may.

Q. (By Mr. Bryson) Dr. Cunningham, have you -- first of all, in your research, have you examined what happens with federal capital offenders who have been sentenced to life without the possibility of release rather than death, in determining effectiveness in Federal Bureau of Prisons in managing those inmates?

A. Yes, sir, I have. In a study that was published just about a year and a half ago, in one of the leading scientific forensic psychology journals, Law and Human Behavior, my colleagues and I, Dr. Tom Reidy and Jon Sorensen, looked at 145 federal capital inmates who had been death penalty charged, and then were serving life sentences in prison.

We looked at two groups. In 104 of the 145 cases, the government had alleged future dangerousness, or a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

They alleged that as a non-statutory aggravating factor. So we looked both at the group as a whole that these inmates, that's all inmates. And we also looked at the ones for whom the government had alleged future dangerousness.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 161 of 536
Case 3:08-cr-00134-RJC   Document 50-7   Filed 01/30/11   Page 24 of 121
JA2998

432

And we examined their disciplinary records from the time that they were admitted on these life sentences to the Federal Bureau of Prisons.

Now at the point that we did our examination of their files, they had averaged serving about six years in prison. Clearly, that's not the whole lifetime they're going to serve. All of them are facing life without possibility of release. But it is a meaningful period of time.

Our research has found that if an inmate is going to be violent, he is likely to do so within the first several years that he's in prison. And the longer he's in prison without violence, the less likely it is to ever occur.

It's not unlike drivers. If someone has been driving for four, five, six years and they've never gotten a ticket for going 30 miles an hour over the speed limit, the likelihood that they're going to get a ticket now for doing 100 in a 65 zone is pretty low. And so this period of time, I think, is a significant one.

We broke out -- or examined separately, different levels of misconduct. And those are reflected here along the left hand side.

Q.    Why did you do that?

A.    Well, because if you want to know how -- the likelihood of something occurring, you need to specify what it is that you're talking about. That's one of the reasons. The rates

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/28/17    Page 162 of 536
Case 3:08-cr-00134-RJC    Document 1547    Filed 01/30/11    Page 25 of 121
JA2999

433

are very different depending on how serious the violence is.

And one of the things that we repeatedly identified in our research is, the more serious the violence is in prison, the dramatically less likely it is to occur.

The other reason this becomes important in a capital proceedings, is the notion of proportionality. And that is, to the extent that the death penalty is considered as an intervention to prevent some future violence, than the severity of the violence that's being prevented, is important to look at.

In other words, would you impose the death penalty to prevent a mutual fistfight. Or would the death penalty be imposed with the idea that it's going to prevent an assault that killed somebody or sent them to the hospital with a life-threatening injury.

And so we broke out, or separated out the rates of these different levels of severity, so that it would provide the most information about this that future juries could use. And also the best information about the accuracy of the government's assertion of future dangerousness in these cases.

As you look at the follow up about -- first, there was no difference between the inmates as a whole, and those for whom the government alleged future dangerousness. Statistically, there's no difference between the two groups.

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 163 of 536
Case 3:08-cr-00134-RJC   Document 1167   Filed 01/30/11   Page 26 of 121
JA3000

434

Between the group as the whole, and the ones the government said would be violent in prison.

As we look at how their rates were different depending on the seriousness, about 1 in 5 engaged in an assault of some kind.

About 1 in 11, or 9 percent, engaged in a serious assault.

Now in the federal system, a serious assault is not one that results in serious injury, necessarily. It's one that has that potential.

So if I drop a padlock in a sock and swing it at you and miss, that's a serious assault in the federal system, even though there's no injury at all; not even any contact in that case.

So in this instance, there were about 1 inmate in 11 who did do that. And of course there are 91 percent who did not.

At the next level, assaults with moderate injuries. That means an injury that sent somebody to the hospital but it wasn't life threatening. Less than 1 percent of these inmates committed an assault of that severity.

None of them committed an assault that sent somebody to the hospital with a life-threatening injury. None of them killed anybody else in prison. None of them engaged in any serious assaults on staff members.

Laura Andersen, RMR 704-350-7493

**JA3001**

435

And so, again, 20 percent had an assault. But when we move into the zone of greatest certain, injuries that would send somebody to the hospital, those again only happened with less than 1 percent of these inmates.

We're not only interested in what their rates were, we're also interested in how do they compare to the other inmates in federal penitentiaries, the highest security setting where most capital inmates are currently confined.

And so we looked at everybody in the U.S. Penitentiaries over a five year period of time, so it would match up the follow up of most of these capital inmates.

So we looked at, on average, 18,561 inmates in U.S. Penitentiaries.

These capital inmates, convicted capital murderers serving life sentences, were no different than the other people they were in prison with, in terms of their rates of any severity of violence, whatever the category was, assaults, serious assaults, assaults with moderate or serious injuries, homicides, serious assaults on staff.

The capital inmates looked just like, had the same equivalent rates, as the other inmates they're in prison with.

So not only were they unlikely to be involved in violence in prison, and extraordinarily unlikely to be involved in violence that significantly hurt somebody. They

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 165 of 536
Case 3:08-cv-00134-RJC   Document 150-7   Filed 01/30/11   Page 24 of 125
JA3002

436

also weren't disproportionately likely to be involved in violence. In other words, they weren't not more likely than the other inmates they were side-by-side with.

Now, these same findings had been identified before in state capital cases. State inmates in state prison.

This is the first study that tracked federal capital inmates and found results that were consistent with that prior body of research.

Q. Have you looked at other -- are there other studies that you've looked at? Not the one you just talked about, but are there other studies that you've examined?

A. Yes, sir there are. This is another study that I did with Dr. Jon Sorensen and Dr. Tom Reidy.

This time we looked at almost 2,600 inmates in high security in state prison in Missouri. And we looked at these inmates over an 11 year period of time; from 1991 until 2002.

And one of the things we were interested in was looking at whether inmates who were serving either life without parole sentences or death sentences, were more likely to be violent in prison.

In other words, again, we're looking at this idea of whether the seriousness of the offense that sends somebody to prison, is predictive of their violence in prison.

Now, this prison in Missouri, represented a unique

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 166 of 536
Case 3:08-cr-00134-RJC   Document 1617   Filed 01/30/11   Page 29 of 121
**JA3003**

437

setting to do this research in for this reason:

Since 1991, Missouri has been mainstreaming their death sentenced inmates in the general prison population. That means, rather than putting their death sentenced inmates on a segregated death row, their death sentenced inmates are in the general population of this high security prison.

In other words, they're celled with non-death inmates, on units with non-death inmates, out in the yard with non-death inmates, at programming and education with non-death inmates, in contact visitation with non-death inmates.

In other words, the inmate's housing is determined by his conduct in prison, not the sentence that sent him to prison.

Now Missouri has been happy with their experience of this, with mainstreaming their death sentence inmates. But nobody has gone in to actually look at what the rates of misconduct were among these death sentenced inmates, or inmates they were side-by-side with, serving either life without parol or parolable sentences. So that's what my colleagues and I did.

And what we found was, is, the life without parole inmates, were half as likely to be involved in assaults as the parole eligible inmates they were side-by-side with in the same facility over the same period of years; half as

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 167 of 536
Case 3:08-cv-00134-RJC   Document 10-7   Filed 01/30/11   Page 30 of 121
JA3004

438

likely as the parole eligible.

The death sentenced inmates looked just like the life without parole inmates. Despite the severity of the obvious tragic severity of the offense that sent them to prison, they were half as likely to be involved in assaults, as the parole eligible inmates they were side-by-side with over the same period of time.

This is the only study that's done an apples to apples comparison of death sentenced inmates, life without parole inmates, and life -- and parolable inmates, inmates maybe going to be paroled after five or six years. This is the only apples to apples comparison that's been published like that.

Q.   So the murderers were not more likely to be assaultive --

MS. ROSE:  Objection.

THE COURT:  Sustained.

Q.   (By Mr. Bryson) Are there other studies that look at this question?

A.   Yes, sir. Then we were interested in whether these findings in Missouri were just a fluke. So we went to the Florida Department of Corrections. And this time we did a study on 9,000 inmates that were all serving long sentences.

Now, in that Missouri study, you might have inmates that were only serving five or six years in some cases.

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 168 of 536
Case 3:08-cv-00134-RJC   Document 187-2   Filed 01/30/11   Page 31 of 121

**JA3005**

439

Now all of the inmates are serving long sentences, more than 10 years.

So there are almost 1,900 that were serving life without parole sentences. There were almost 2,000 that were facing 30 years or more. And there were 5,000 that were facing 10 to 29 year sentences.

And this time we found that the life without parole inmates, look just about like other long term inmates. They weren't quite as good as the guy serving 30 years or more, they're better than the guy serving 10 to 20. But the differences were very slight.

In other words, the key issue seemed to be that this person is going to be in prison for a long time. And if that's the case, then their rates of assaults are pretty similar to each other.

In this case, looking at a six year period of time that this study encompassed, only about one life without parole inmate in 200, only about half a percent, one in 200, committed an assault resulting in serious injury.

And so it happens, but it happens extremely infrequently.

Q. Would you not expect someone serving life without parole to have nothing to lose?

A. Well, that's what we were interested in examining. And that's the idea, that an inmate who doesn't have the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 169 of 536
Case 3:08-cv-00134-RJC   Document 136-7   Filed 01/30/11   Page 21 of 121
JA3006

440

incentive of parole, is that guy going to be unmanageable, does he have nothing to lose.

And in fact, in this research we found just the opposite. And our findings were consistent with a researcher named Flanagan, who first wrote about this in 1979 and 1980. Timothy Flanagan who went on to be the Director of the Bureau of Statistics at the Department of Justice.

Flanagan identified that inmates facing long sentences, take a different approach to doing time. And here's how that works:

That if I'm going to have to eat institutional food for the next 20, 30, 50 years, then my ability to purchase a package of potato chips or a can of beans becomes extraordinarily important. If I'm just going to be here for two, three, four years, okay, take my commissary away.

But the longer an inmate will be there, the more important that small privilege is.

In the same way an inmate can comply and go along with the program, and then he gets to come out of his cell and have a job to go to, to help the time pass, and to give some sense of productivity. Or he can act out, be a problem, and spend the rest of his life in a walk in closet.

Again, the longer the inmate's going to be there, the more important those small incentives are. So rather than

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 170 of 536
Case 3:08-cr-00134-RJC   Document 1367   Filed 01/30/11   Page 33 of 121
**JA3007**

441

having nothing to lose, these life without parole inmates have more to lose. Because they're looking at, what can they do to make this lifetime in prison, even just a little bit less horrible on themselves.

Q. Have you collected any larger scale data on the behavior of convicted murderers in prison?

A. Yes, sir we have. This was that study I described to you earlier, that looked at 50,000 inmates -- 51,000 inmates in a large state prison system.

And we were looking at whether the murderers, there were 5,000 of them been convicted of first degree murder. How they compared to property offenders or to this prison population as a whole.

We looked at different severities of misconduct, all the way from disciplinary write-ups for anything, to potentially violent misconduct. Potentially violent misconduct are threats against staff, weapons contraband, assaults of any severity.

Then we're looking at assaults, all assaults, assaults with injuries, and assaults with serious injuries. And here's how the groups compared.

In terms of disciplinary write-ups for anything, about one of the murderers in three got a disciplinary ticket for something in any given year. But that's about 20 percent less than the inmate group as a whole, where 40, almost

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 171 of 536
Case 3:08-cv-00134-RJC   Document 167-7   Filed 01/30/11   Page 34 of 125

JA3008

442

45 percent got a disciplinary ticket, or 48 percent for the property offenders.

So the first conclusion is that the murderers, in terms of general adjustment are better adjusted in prison. They're getting tickets less often than the other inmates they're side-by-side with.

When we went to potentially violent infractions, remember that was threatening an officer, weapons, contraband, escape, rioting, fighting, assault with no weapons, assault with weapon, robbery, those are defined here in this section.

When we look at those again, the murderers have lower rates of those than the other inmates that they're side-by-side with.

Now we used a statistical technique called a regression analysis to hold all other factors constant, like age, education, and that kind of thing. And even when we did that, the murderers were about 20 percent less likely to be involved in potentially violent misconduct.

Once you get out to assaults, assaults with injuries, or assaults with serious injuries, the murderers look just like the other guys they're in prison with. The seriousness of the offense did not identify who was going to commit assaults more often.

Now we looked at this and we said, wait a minute, the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 172 of 536
Case 3:08-cr-00134-RJC   Document 1192   Filed 01/30/11   Page 35 of 121

**JA3009**

443

murderers have probably been in prison longer, and maybe that's why their rates are lower. They've had more time to acclimate or they've gotten older.

So we looked at everybody that came to prison the year before in 2002, and served the whole year of 2003. So we controlled for how long they had been in prison. The murderers looked just like the other inmates in terms of their assault rates.

Then we said, wait a minute. The murderers, maybe they've gone to a higher security level, and that's why their rates are lower.

So we looked at everybody that came to prison in 2002, and went to close custody, or high security. And again, the murderers looked just like the other guys they're serving time with in terms of assaults rates.

However we sliced and diced it, the murderers looked just like the other guys they're in prison with. They were not a disproportionate source of violence in prison, and had a little bit better disciplinary histories.

Q. Has this study been published?

A. Yes, sir it has. This was published just this year in 2010 in a leading scientific criminal justice journal called Crime and Delinquency.

Q. Is there anything else important about this study, other than the fact that murderers don't have any higher

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 173 of 536
Case 3:08-cr-00134-RJC   Document 1167   Filed 01/30/11   Page 36 of 125
JA3010

444

rates of violence in prison?

A.    Yes, sir.  There's one other thing that I would point out here, and that is, it illustrates that the more serious the misconduct is, the dramatically less likely it is to occur.

So, for example, with these first degree murderers, you have about 1 in 3 that get a disciplinary ticket for something.  You have about 1 in 11 who are involved in potentially violent misconduct.  About 1 in 40 that's involved in an assault.  About 1 in 200 that's involved in assault with injuries.  And about 1 in 500 that's involved in assault with serious injuries.

And so as you can see it, as the severity increases, its likelihood dramatically decreases.

Now, these numbers are often a surprise to the public, because they've been watching Oz on HBO or Lockup or something.  They're thinking folks are getting stabbed up in prison all the time.  When you actually look at the rates, that's something that was happening 1 in 500 inmates a year.

Q.    Has the Department of Justice ever looked at this issue?

A.    Yes, sir, they have.  These are conclusions of agencies, sub-agencies, associated with the Department of Justice.  These are conclusions that were published back in the early 1990s before my colleagues and I did our own very

Laura Andersen, RMR 704-350-7493

**JA3011**

445

large research on prison violence that confirmed this earlier body of research.

And here's what those agencies -- that was the National Council on Crime and Delinquency, and the National Institute of Corrections, both either sponsored by or affiliated with the U.S. Department of Justice.  Here's what those conclusions were.

Number one, past violence in the community is not strongly or consistently associated with prison violence.

Number two, current offends, prior convictions and escape history are only weakly associated with prison misconduct.  In other words, not a very strong relationship.

Number three, the severity of the offense that sent somebody to prison, is not a good predictor of prison adjustment.

All conclusions that our own research has very strongly supported.

Q.    Can you talk about what misconduct in the community is not a good predictor of violence?

A.    Yes, sir.  And this is a concept that a researcher, a very important researcher by the name of Jon Monahan published a very influential paper about in 1980 and that's this.

Violence is almost never a function of just the person.  It's almost never a function of just this person.  Instead,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 175 of 536
Case 3:08-cr-00134-RJC   Document 116-7   Filed 01/30/11   Page 34 of 121

**JA3012**

446

it's a person who is in a particular interaction, a particular type of interaction in a specific context.  And it's out of that whole matrix that you get violence.

Now, when you put somebody in prison, now you have an inmate who is in interaction with other inmates and vigilant staff.

Now that's a critically important differential, because you see out in the community the person can tell himself, these guys will never know who I am, or I will never be caught.

Well, in prison, there is not anything you do to somebody that they don't know who you are.  And now you have to deal with them and their friends and their cousins, who you don't even know, from now on.  And this is somebody else who's in prison for a reason.

So it's a very different pool of people that you're there with.  And highly vigilant, highly trained staff, staff that you're going to have to deal with for the rest of your life.

And so if you go off on one of them, now these are the guys you still have to deal with who are controlling a tremendous amount of your life experience for decades to come, in a highly restrictive context.

Now, the effect of this is to essentially form a barrier against the most serious violence.  So that even

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 176 of 536
Case 3:08-cr-00134-RJC   Document 1617   Filed 01/30/11   Page 33 of 121
**JA3013**

447

though we have this seriously criminal and seriously violent group of individuals that are in custody, well-run prison systems are remarkably effective in minimizing serious violence among these offenders.

Q.    Can we turn now towards talking about what the Bureau of Prisons does specifically to deal with prison violence?

A.    Yes, sir.  Within the Federal Bureau of Prisons there are a range of custodies, and these are from the least level of security, up through the greatest level of security.

At that lowest level there are U.S. minimum security prisons, then low security prisons, then medium security, then U.S. Penitentiaries, which are considered high security.

Now, within U.S. Penitentiaries, there is the general population, and then there are Special Housing Units or the SHU, which is like a prison within the prison where somebody can be locked down more securely.

Then either in U.S. Penitentiaries, or in these medium security prisons but operating at a much enhanced level of security that's a little beyond even the U.S. Penitentiaries, there are Special Management Units.

And there are now two types of Special Management Units within the Bureau of Prisons.  One of those is Special Management.  That's a level that is a mid level of security between the U.S. Penitentiaries and ADX Florence or

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 177 of 536
Case 3:08-cr-00134-RJC   Document 1571   Filed 01/30/11   Page 40 of 125
**JA3014**

448

Supermax. Where it's a mid range. Where you may have inmates that are not adapting to the general prison population. They need more security, but may not need the security of a super maximum setting. So that's Special Management Units.

And then there are also Communication Management Units. This is for individuals where the concern is not so much how are they going to interact with other inmates, but are they going to try to order criminal activity or violence in the open community.

So they are then their own contained prison within a prison, where they have interaction with each other, but their phone calls are gravely restricted, and contemporaneously monitored in the same language.

In other words, if they're a Spanish speaker, if they get a phone call, there is a staff member who is Spanish speaking, who is real time, listening to that conversation with them. And their mail is also extremely restricted and read.

In other words, these are individuals who have been identified as being at risk of having criminal and violent communications with the outside community, so that then is effectively curtailed.

Then even beyond that, in terms of security level, there's ADX Florence or Supermax. Then there's the control

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 178 of 536
Case 3:08-cr-00134-RJC   Document 1367   Filed 01/30/11   Page 41 of 121
JA3015

449

unit, which is again a prison within a prison at ADX.  And then there are special security arrangements that may also be imposed.

So that's the range of custody options within the Bureau of Prisons.

Q.    What distinguishes the different levels of security?

A.    These are distinguished by the nature of the outer wall or fence.  In other words, is there a fence around the facility?  How many fences are there?  With what degree of fortification.  The presence of gun towers and also external patrols around the outside of the fence.  Perimeter detection devices.  Those are devices that detect someone approaching the fence, having contact with the fence, or being between the double fences.

By concentric layers of security.  In other words, as you move into higher levels, it isn't that the person has to get past one barrier between the inmate and the outside world.  Instead, there are layers of security that the person has to penetrate one barrier after another after another, in order to get to the outside.

They're also differentiated by the type of housing.  At the lowest security there may be almost like a dorm room where the inmate has a key to his own door.  Or where they're in an open bay housing area where you might have 30 inmates in bunk beds in a large room.  Then moving into

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 179 of 536
Case 3:08-cr-00134-RJC   Document 1347   Filed 01/30/11   Page 42 of 125
JA3016

450

cells.  And ultimately even into being single celled behind two doors.  And we'll look at some cells like that in a little while.  So the type of housing changes as you move into greater security.

Also there's increasing control over the movement of inmates.  In other words, how much do you get to range within this facility and under what type of supervision.  The intensity of staffing and supervision increases as you move up in security.

And also the control and monitoring of communications varies dramatically depending on what level of security is applied.

Q.   At what level would a federal capital inmate be housed, if he were sentenced to life without parole?

A.   A federal capital inmate would be housed in the area that I have highlighted in yellow.  They would be at least at a USP level of security, high security or higher.

Q.   Is there a regulation that prescribes that?

A.   Yes, sir, there is.  This is a program statement entitled 5100.08.  And it says, a male inmate with more than 30 years remaining to serve, including non-parolable life sentences, shall be housed in a high security level institution, that's a USP, unless the PSF, which stands for public safety factor has been waived.

In other words, unless there's a decision that's made

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 180 of 536
Case 3:08-cr-00134-RJC   Document 1517   Filed 01/30/11   Page 43 of 125
JA3017

451

at a regional level in the Bureau of Prisons that this person does not require high security for the safety of the public, both within and outside that prison, otherwise they're going to be at a USP level facility or higher.

Q.   So when you're saying USP, you're talking about a United States penitentiary?

A.   Yes, sir.  That's this -- that's an abbreviation of those first three letters, U.S. Penitentiary, USP.

Q.   That's a specific type of prison?

A.   Yes, sir.  That is a U.S. Penitentiary.  And so -- I'll show you in a moment, I think there are somewhere over 20,000 inmates that are currently confined in BOP in a USP. That's out of about 170,000 inmates in the Bureau of Prisons under their active control in their own facilities.  There are another 30,000 or so that are in contract facilities.

But 170,000 that are under active BOP facilities control.  And of those, right now, about 25,000 are in USP. So it's a segment of the prison population.

Q.   What about people who are involved in gangs, gang membership in prison?

A.   Well, there are two different designations that are made for gangs in the Bureau of Prisons.  One are called Security Threat Groups or STGs.  Another is called Disruptive Groups or DGs.  So they take the gangs and they divide them into those two categories.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 181 of 536
Case 3:08-cr-00134-RJC   Document 1347   Filed 01/30/11   Page 44 of 125
JA3018

452

If the gang somebody's affiliated with is an STG, a Security Threat Group, then that's flagged on their jacket, you know, on the file that travels with them and in the computerized system.

But it doesn't affect their classification. In other words, you could be in an STG and still be in low security. So they're going to be tracking you, but it doesn't -- it's not an override. It's not a security override.

But if you are a member of a disruptive group -- and that's only a portion of all the different gangs that are out there. But if you're a member of a disruptive group, then that is an override to a USP, to a high security facility.

Whereas it doesn't matter how little time you have to go, or how good you've been in prison, or those kind of things. If you're a member of the Disruptive Group, you're going to be held at a USP level facility or higher.

So it's critical, are we talking about an STG, Security Threat Group, or are we talking about a DG, a Disruptive Group.

Q. How many -- excuse me -- how many U.S. Penitentiaries are there?

A. There are 18 facilities that are operating as U.S. Penitentiaries.

Now, there are a couple of others. There is USP

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 182 of 536
Case 3:08-cr-00134-RJC    Document 111-7    Filed 01/30/11    Page 45 of 121
JA3019

453

Leavenworth and USP Marion, that still have the name, USP, but they have been downgraded to medium security facilities.

So if we're talking about the ones that are operating currently as high security facilities, there are 18 of these. And I've listed those facilities and the number of inmates, the census, the number of inmates that each of them housed as of about 11 days ago.

As of April the 15th for a total of 25,438 inmates that are currently being held in USPs. That represents 14.7 percent of the BOP inmate population of 172,000.

Q. When you say BOP, you're talking about the Bureau of Prisons?

A. Yes, sir, I'm sorry. That's the use of initials. That's the Bureau of Prisons, the federal prison system.

Q. And do you have any photographs of any of these of prisons?

A. Yes, sir, I do. This is USP Allenwood in Pennsylvania. You'll notice the gun towers, that's what those are. There is a double fence that runs the perimeter of the facility. This is the entrance building here. That, where you check in. Where some of the administrative offices are.

To actually gain entrance into the prison itself, which is this area -- all this area back here, the corridor is actually underground.

What you can't see from this is the whole -- this whole

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 183 of 536
Case 3:08-cr-00134-RJC   Document 117   Filed 01/30/11   Page 46 of 121
JA3020

454

prison structure that the fence is on, is up on a plateau that is 20 or 30 feet up and on a plateau.

So the corridor that goes into the prison is actually underground. So there's no break in the fence line, it's an unbroken perimeter around the facility.

This is another view. This time we're going to be looking at this section right here, and we're going to be looking at it from this direction.

Q.   And what is it? What are you focusing on?

A.   And this is the Secure Housing Unit, or Special Housing Unit, the SHU, which is the prison within the prison at USP Allenwood. And this area has its own small recreation yard.

And in fact, what you're saying right here, at the tops of the recreation cages. In other words, the inmates, instead of coming out in an open yard, are actually put in metal mesh cages, so that they're exercising.

There can be other inmates out there that they can speak to, but they can't actually physically get at inmates that are in other cages.

And that's what you're looking at right here, are the tops of those cages.

Now, an inmate may be placed in this Secure Housing Unit or Special Housing Unit for misconduct, as a punishment, or because they've been identified as requiring greater security, may well then be transferred up stream to

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 184 of 536
Case 3:08-cr-00134-RJC   Document 1572   Filed 01/30/11   Page 47 of 121
JA3021

455

a higher security facility if that's the case.

This is USP Lee, in Virginia. And you notice the gun towers around the facility, and the double fencing.

What you're seeing between the fencing is a no man's land that has razor wire in it. These are coils of wire that are made of flattened strips of metal, that are sharp on the edges, and at regular intervals there is a protrusion that is shaped like this. So that not only will the wire cut you if you get entangled in it, but those barbs then impale you or your clothing.

And those are typically in stacks where there will be four coils, then three coils on top of that, then two coils on top of that, and one coil on top of that. So it's an array of wire that is almost impossible to penetrate to get to the next fence.

These are the housing units here, of this facility. You can see there's an open yard area here. And also an interior gun tower that is in this area.

Q. Can you describe what prisons look like on the inside?

A. Yes, sir. This is a diagram of a typical cell in a U.S. Penitentiary. This is a diagram of a cell at USP Florence.

Now at Florence, Colorado, there is a campus of prisons that are all on the same very large property. So there is a Supermax Maximum Prison, Administrative Maximum Florence

Laura Andersen, RMR 704-350-7493

**JA3022**

456

within its own fence, and there's a U.S. Penitentiary within its own fence. And there is some lower level security institutions there as well. This is at that U.S. Penitentiary.

Now, the hallway is out here. And there is of course a sliding door that is controlled, that either allows the inmates to come out of their cell or not.

The cell is about as wide as the double bunk. You can see there is a small slit window in the back of the cell. There is a book case for storage. There's a small stand. There's a toilet that's there in the cell.

This area is a pipe chase. This allows maintenance staff to go in and work on the plumbing, or even change out this light fixture without physically entering the cell, and risking leaving tools behind or that kind of thing.

Now, inmates in a U.S. Penitentiary do not spend most of the day in the cell. They're out of the cell at jobs, and programming, most of the day. Get locked down at intervals to count them. And then they're locked in over night, depending on the day of the week, from about 10:30 until about 6:00 in the morning.

And then at that point they're in the cell for the night unless there is a medical emergency, for example.

So if it's after 11:00 at night and those inmates are locked in, if one of them needs to defecate, the other

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 186 of 536
Case 3:08-cr-00134-RJC   Document 1612   Filed 01/30/11   Page 43 of 121
**JA3023**

457

inmate is there in the bathroom with him for the night.  And so this is very close quarters.

Q.   How does the Bureau of Prisons describe the type of inmates that are in these facilities?

A.   Well, they describe them in this way, and this is from a publication describing the state of the bureau in 2008.

BOP staff members who work at high security institutions, face the most difficult inmates, many of whom have histories of violent predatory behavior, gang affiliations and/or are serving long prison terms.

That's how they're describing their inmate population, these 25,000 that are in U.S. Penitentiaries.

Q.   How successful is the Bureau of Prisons in preventing prison violence among these prisoners?

A.   They -- they are very successful.  The Bureau of Prisons is potentially the finest prison organization in the world.  And they're staffed by dedicated professionals that are very good at what they do.

And you can see this by looking at their success in limiting the rate of assaults, particularly given who's in these U.S. Penitentiaries.

And so, for example, if we look at the year 2005.  In that year, about 1 percent of the inmates engaged in serious assaults.  Those are those 101 assaults.

Now, remember, that's not one that necessarily results

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 187 of 536
Case 3:08-cr-00134-RJC   Document 1672   Filed 01/30/11   Page 50 of 125
**JA3024**

458

in serious injury but it had that potential.  Might have been no injury, but it had that potential.

About 1 percent.  That means 99 percent didn't assault anybody in that year, despite being at that level of security.

If we look at assaults with major injuries.  Now that is about two inmates in 1,000 in these U.S. Penitentiaries that engage in assaults at that level.

That means 99.755 percent did not commit a major assault on an annual average across a five year period of time that you can see 2001 to 2005.

Q.   Do you have a graph that shows the rates of serious assaults at the various U.S. Penitentiaries?

A.   Yes, sir.  This takes 10 of the penitentiaries to illustrate this.  And what you're looking at here are the rates of those serious 101 assaults.  The blue is 2003-2004.  The red is 2004-2005.  And you're looking at the rate per 5,000 inmates per year.

Now here's what's important about this graph:

The same basic type of inmates are at the different U.S. Penitentiaries.  In other words, the population is pretty consistent from one U.S. Penitentiary to another.

So if violence was just a function of the inmate, and they have the same kind of inmates in these facilities.  Then you would expect that the rate of violence would be

Laura Andersen, RMR 704-350-7493

**JA3025**

459

pretty much the same from year to year within a given facility, and particularly from one facility to another.

Instead what you see is just the opposite.  For example, at Atwater where the rate of those 101 assaults is about 15 or so, per 5,000 inmates per year.

As compared to Beaumont, where the rate was over 140 per 5,000 inmates per year.  In other words, the rate of those serious assaults was tenfold more often at Beaumont than it was at Atwater.

Now what this demonstrates is what criminal justice researchers have recognized for many years.  And that is, as we try to account for why violence in prison occurs, most of the factors that explains why the violence occurs are not about the inmate; they're about the prison that the inmate is in.  How effectively is it being managed?  What's the staff moral?  What's going on in that prison, in the world that the inmate is in?  Less about the inmate, more about the world that the inmate is in.

That's what these variations in assault rates from one facility to another.  And even in the same facility from year to year.  What that demonstrates is, that what's happening in the prison is more powerful than who is this inmate and what's going on with him.

Q.    Has the Bureau of Prisons ever weighed in on what you just said?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 189 of 536
Case 3:08-cr-00134-RJC   Document 1247   Filed 01/30/11   Page 52 of 121
**JA3026**

460

A.   Yes, sir, they have.  This is a study that was published by the Office of Research and Evaluation in the Federal Bureau of Prisons.

In other words, this is a study from Bureau of Prisons researchers that then was also published in the scientific or peer reviewed literature.  And here's what it says, in a more eloquent way than I just described.

We clearly demonstrated that the compositional and contextual effects of staff, inmate and ecological variables, impact the probability of many forms of misconduct, in addition to and separate from individual level characteristics of inmates.

In other words, they demonstrated the world that the inmate is in, has a very significant effect on the violence, as opposed to who's this guy, what's his history, what's going on with him.

Q.   Can you go to the slide that lists the different prisons?

A.   Yes, sir.  The different severities of levels?

Q.   Yes.

A.   Yes.

Q.   Now, one of the things that the jury has heard in this case is that Mr. Umana is a member of MS 13?

A.   Yes, sir.

Q.   Does the Bureau of Prisons have anything to deal with

Laura Andersen, RMR 704-350-7493

**JA3027**

461

gang members?

A.    Well, yes, sir, as I described.  First, there is gonna be an identification of, is this a Security Threat Group or a Disruptive Group.  And what's the nature of this person's activities within that gang.

Q.    Okay.

A.    Now, if they believe that because of the gang participation, this person requires an increase level of security because of how they might be aggressive against other inmates or staff, then they would be assigned to a Special Management Unit, if the concern is violence they're going to perpetrate there in prison, or they can be sent to ADX.

If the concern is that they would order violence on the outside, then they can be placed in a Communication Management Unit, or they could be placed at ADX with communication restrictions on them.

Q.    Can you -- what's the criteria for the Special Management Units?

A.    Well, this is from regulation 5217.01.  The designation to an SMU -- SMU is a Special Management Unit -- may be considered for any sentenced inmate whose interaction requires greater management to ensure the safety, security or orderly operation of bureau facilities, or protection of the public because the inmate meets any of the following

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 191 of 536
Case 3:08-cr-00134-RJC   Document 59-7   Filed 01/30/11   Page 54 of 121
**JA3028**

462

criteria:

Has participated in disruptive geographical group/gang-related activity.

Has a leadership role in disruptive geographical group/gang-related activity.

Has a history of serious and/or disruptive disciplinary infractions.

Committed any 100 level.  Those are the most serious of the disciplinary offenses.

Those disciplinary offenses within the Bureau of Prisons are arranged by 100 level most serious, 200 level, 300 level, 400 level.  Becoming less serious as those numbers increase.

Committed any 100 level prohibited act according to 28 CFR part 541, after being classified as a member of a disruptive group, pursuant to 28 CFR part 524.

Participated in, organized or facilitated any group misconduct that adversely affected the orderly operation of a correctional facility.

Or the last one, otherwise participated in or was associated with activity, such that greater management of the inmate's interaction with other persons is necessary to ensure the safety, security or orderly operation of bureau facilities or protection of the public.

In other words, this last one is a catchall category

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 192 of 536
Case 3:08-cr-00134-RJC   Document 1312   Filed 01/30/11   Page 55 of 121
**JA3029**

463

that essentially says, if the Bureau of Prisons believes that it's necessary to escalate the security of this person, for the protection of folks in or out of the prison, they can assign this level of security.

Q.    Does the Bureau of Prisons provide additional descriptions of these SMUs, Special Management Units?

A.    Yes, sir, they do.  This is describing the formation of the Special Management Units.

The first one developed in fiscal year, or opened in fiscal year 2008, was at USP Lewisburg.

Describing, to manage the most aggressive and disruptive inmates from USP general populations.  Inmates from penitentiaries across the country are identified for transfer to USP Lewisburg, which will operate as a more controlled and restrictive environment.

Moving the disruptive inmates out of general USP populations, allow the other penitentiaries to operate in a more safe and orderly manner.

The large majority of USP inmates, those who follow rules and do not engage in misconduct, will remain at their designated institutions, where they will be able to participate freely in programs, and benefit from the many self-improvement opportunities that exist in BOP facilities.

Q.    Is there more?

A.    Going on.  U.S. Lewisburg's transition is expected to

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 193 of 536
Case 3:08-cr-00134-RJC   Document 1517   Filed 01/30/11   Page 56 of 121
JA3030

464

begin in early 2009.  Institution staff works closely with the BOPs DC -- I'm sorry, DSCC, to identify appropriate transfers, taking into account separation and programming needs, gang affiliations, projected release dates, and other variables.

Recommendations are made to the regional and central offices where final approval is given regarding transfers to the SMUs or Special Management Units.

Two other SMUs are planned for FCC Oakdale and FCI Talladega.

Currently on the books there will be three of these Special Management Units.

Q.   And these provide even greater restriction than a U.S. Penitentiary?

A.   That's correct.  This is a mid level of security and restrictions between the USPs and ADX Florence.

In other words, where the inmates may have interaction in either solo rec or just two or three others as opposed to just being out on a yard.

Q.   And at least part of the criteria that could get you there is gang-related activity?

A.   That's correct.

Q.   All right.  This jury has already heard evidence that Mr. Umana has been attempting to send out communication, letters written in code, in attempts to have people injured

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/28/17   Page 194 of 536
Case 3:08-cr-00134-RJC   Document 1517   Filed 01/30/11   Page 57 of 125
JA3031

465

or hurt or killed?

A.   Yes, sir.

Q.   What does the Bureau of Prisons have to deal with that?

A.   That's the rationale -- those sorts of situations for the creation of Communication Management Units.  There are currently two Communication Management Units.

One of them is operating at Terre Haute.  FCI Terre Haute.  FCC Terre Haute, as I recall.  And the other at USP Marion.

Here's what it describes about these:

The bureau established the CMU at FCC Terre Haute, Indiana, to house inmates who due to their current offensive conviction, offense conduct or other verified information, require increased monitoring of communications with persons in the community, to ensure the safe, secure and orderly running of bureau facilities and to protect the public.

The CMU is an open unit that operates separately from the general population of the main institution.  With a capacity of housing 90 inmates, the CMU's operational procedure reduce inmate's ability to circumvent existing mail and telephone monitoring procedures.

Types of inmates who may be housed there include those convicted of or associated with international or domestic terrorism, convicted of sex offenses who repeatedly attempt to contact their victims, who attempt to coordinate illegal

Laura Andersen, RMR 704-350-7493

**JA3032**

466

activities while incarcerated via approved communication methods. That would be like telephone calls or letters. And those who have received extensive disciplinary actions due to their continued misuse/abuse of approved communication methods.

Q. All right. So the SMUs and CMUs provide a higher degree of security than a USP, correct?

A. In terms of communication restriction.

Q. Okay.

A. The inmates in the CMUs are allowed to have interaction with each other. The concern is not that they're going to hurt another inmate, it's what they may order out in the community.

Q. Okay. What does the bureau have beyond the Special Management Units?

A. Well, the highest level of security is at ADX Florence. Administrative Maximum Florence, also called Supermax.

Q. And have you been to that facility?

A. Yes, sir, I have. I've been given tours and briefings at that facility on three occasions. The first back in about 1997 or '98. The last time was a couple years ago.

Q. How does an inmate get designated to ADX?

A. Well, he gets designated to ADX by demonstrating that he -- that he cannot be safely managed in a less secure facility. Either because of the risk of what he might

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/28/17   Page 196 of 536
Case 3:08-cr-00134-RJC   Document 510-7   Filed 01/30/11   Page 59 of 121
**JA3033**

467

order, or what violence he might personally perpetrate.

The corrections professionals in the Bureau of Prisons have identified, he needs a greater degree of security applied to him.

Q.   Do you have a picture of ADX?

A.   Yes, sir.  This is the entrance building of the facility.

Q.   And where is it located?

A.   It's located in southwestern -- southeastern, I'm sorry, southeastern Colorado.  This is Denver here. Colorado Springs here.  And ADX is here, where this sun pattern is.  It's in the foothills of the Rocky Mountains. It's about an hour, hour and a half drive southwest from Colorado Springs into the foothills of the Rockies which are right along here.

Q.   And have you got a picture of the gun towers?

A.   Yes, sir this is looking at the facility from a nearby hill.  And you can see how large the gun towers are. Massive gun towers surrounding the facility.

This is a facility that's designed to not only keep inmates from breaking out, but also to defeat inmates who might have external resources, who desire -- who could bring an outside group to try to break them out.

And so the staff there at ADX trains with military units to be prepared to repel that kind of assault as

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/28/17   Page 197 of 536
Case 3:08-cr-00134-RJC   Document 1347   Filed 01/30/11   Page 60 of 125
**JA3034**

468

needed.

Q.    And --

A.    This is a close-up of the fence line and gun towers. And you see in this area, those coils of razor wire that I described, are stacked on top of each other, four and five and four and three and two and one.  So you have this array of razor wire that is stacked between the fences here.

Q.    Do you have pictures of the inside?

A.    Yes, sir I do.  This is in the middle of one of the housing units there at ADX Florence.  Let me go to the next slide to orient you.

This is that control bubble that we were just looking at right here.

And what you see is, radiating off of that are four wings.  And these wings radiating off are two story.  And that control bubble sits midway between.  So that there's a half a flight up and a half a flight down.  And this cutaway you're simply seeing, of course, one level of that.

These are the cells.  And you'll notice that they each -- two characteristics of these.  One, they're only on one side of the hall.  So an inmate can't stand at his window and signal or try to communicate with an inmate across from him.

It also makes it much more difficult to cadillac, which is to attach a string to a weighted object and slide it out

Laura Andersen, RMR 704-350-7493

**JA3035**

469

in the hall and have somebody else throw something out to hook it and thereby exchange contraband.  It makes it much more difficult.  Particularly because there are two doors on these cells as well.

The other feature is that the windows of these cells all face here into this recreation yard that is surrounded by a two-story wall.

So the inmates never have a vantage of the exterior of the facility, or the frequency of the patrols or that kind of thing.

Standing in the cell, if you crane your head up, you can just see a little bit of sky.  But otherwise all they see is this interior court.

So here you see the control bubble, and these are the stairs, half a flight down and half a flight up.  That's what you're looking at in this picture is then down those runs.

And of course blocking each of those is a sliding wall of bars or a grill.

Q.   Have you got a close-up of the doors?

A.   Yes, sir.  This is looking down one of those runs.  And the sliding wall of bars.  That's one of the concentric layers of security that's within this facility.

Q.   What do the cells look like?

A.   Well this is a drawing of a typical cell in ADX

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 199 of 536
Case 3:08-cr-00134-RJC   Document 1517-7   Filed 01/30/11   Page 62 of 121
**JA3036**

Florence. Now this cell is made from a single pour of rebar reinforced concrete.

In other words, the concrete bed that you see right here, is poured at the same time as the floor, and so is the concrete stool, and so is the concrete TV stand. So there are no seams. It's a continuous pour, seamless concrete.

At the back of the cell there is a stainless steel shower. This is that window that faces out into the interior recreation area. This is a stainless steel sink, bubbler toilet.

Now the toilet doesn't have a seat on it, so there's nothing to tear loose to use as a weapon. And in fact the toilet paper goes in a little hollowed out slot there, as opposed to having an axle that it turns on, again, for security reasons.

The inmate is locked in this cell 22 to 23 hours a day. Takes his meals there in the cell. Exercises alone. In other words, is escorted out of the cell into a recreation area where he exercises by himself, that hour a day, and then is put back into his cell.

Anytime he's taken out of his cell, he backs up to the cell door there, and gets his hands handcuffed behind his back. And then is double escorted, with one officer holding on to those handcuffs, behind his back, and another officer holding a wooden baton, that you'll see a photograph of in a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 200 of 536
Case 3:08-cr-00134-RJC   Document 107   Filed 01/30/11   Page 63 of 121
**JA3037**

471

few minutes.

The inmates are allowed one to two 15 minute phone calls a month. Those be are monitored. There's no contact visits. We'll look at the visitation setting in a moment.

The glass that separates the inmate from the visitor where he's speaking to at the phone on that visitation, has a very high hammer rating. Means you can beat on that glass for an hour with a hammer to create a hole the size of a quarter. And their mail is x-rayed opened and read.

The cell dimensions, I've indicated. Across the back it's about seven and a half feet wide. And then here at the front of the cell it's a little bit less than 6 feet wide.

So standing here in a cell, I could almost touch the walls by leaning either direction. Now notice that there are two doors on this cell. There is a sliding steel door. And then a vestibule that's about, that's 2 feet 9 inches. And then there is a sliding wall of bars or a grill.

So there are two doors that separate this inmate from the corridor.

This is a cutaway of one of those cells. And I display this because the photographs that you'll see in a moment are taken with wide angle lens, and they make the cell seem much wider than in fact it actually is. And so you get a better sense of the proportions from this drawing, in terms of the narrowness of the cell, particularly when you see how much

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/28/17   Page 201 of 536
Case 3:08-cr-00134-RJC   Document 1272   Filed 01/30/11   Page 64 of 121
**JA3038**

472

of it is taken up by the bed, which is right there.

Q.    This showed the two levels?

A.    Yes, sir.  Now there are a -- of course there is a floor that extends all the way across this second level.  So it's not open to below.  But this is a cutaway as if that second story hallway is not there.

Q.    And do you have an actual photograph of the actual cell?

A.    Yes, sir.  This is standing there in the doorway looking back into the cell.  And you see that there is a, this concrete bed that is poured into the floor of the cell, and also poured into the wall, that then has kind of a rubberized mattress on it.

The storage area for the inmate is this shelf that's created within that concrete bed.  This is the concrete stool that again is poured into the floor of the cell, and the shower.  Here's that window that looks into the outdoor recreation area.

This is standing in the shower looking toward the front of the cell.  And you'll notice this area with the red dots around it.  That's a cutaway in that sliding wall of bars.  And the purpose of that is this:

Before that door is opened, the inmate backs up to cuff up.  In other words, backs up, puts his hands behind his back, and his hands are handcuffed behind his back.

Laura Andersen, RMR 704-350-7493

**JA3039**

The staff member then holds on to those handcuffs and gives the signal for the door to be opened.  The door then opens right past his hands.  So he doesn't have to turn loose of the inmate like you would if there was a bar there.  That way the inmate can't spin around on him.

Same way when he puts the inmate back into the cell.  Has him stop, gives the signal for the door to be closed electrically, and that slides right past his hands.  So that he doesn't turn loose of the inmate until the inmate is securely within the bars of the cell.

Q.   Can you demonstrate the double escort?

A.   Yes, sir.  This is a photograph of a double escort.  You have one officer holding on to those handcuffs behind the inmate's back.  And you see the other officer is holding this wooden baton.

The wooden baton has a round metal cap to it.  And this is an instrument that can be used to bring an inmate under control, either as a blocking instrument like this.  Or as a thrusting instrument into the rib cage.  Sometimes also called a rib spreader.  And so that's the function of that baton.

Q.   You say they do not get contact visits?

A.   That's correct.  This is a visitation booth from the inmate side.  The inmate comes in, sits down on the stool, picks up the phone.  The visitor comes from the other side

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 203 of 536
Case 3:08-cr-00134-RJC   Document 131-7   Filed 01/30/11   Page 66 of 121
**JA3040**

474

and sits down on the other side of this glass and picks up the phone that's on -- oops -- that's on the visitor's side right there.

Q.    Of course anybody coming to visit, would have to go physically to Colorado?

A.    That's right.  They have to fly to Florence, Colorado -- to fly to Colorado Springs.  And then make that 70, 80-mile drive out to Florence.

Q.    Now, they do get recreation?

A.    Yes, sir they do.  And let me show you some of those recreation areas.

This is an indoor single recreation area.  This would be one of those rooms that's across from the cells.  This is a single outdoor recreation area that is surrounded by these two story concrete walls and then has a metal mesh over the top of it.

This is the large outdoor recreation area.  This is the two story wall that we saw that completely surrounds that outdoor recreation area.  And these are the metal individual recreation cages that the inmates are placed in.

In other words, when I was there this last time, there were four inmates out in this area.  Some were talking to each other, others were exercising in unison, but they can't have any physical contact.  So they can have some conversation, but that's as far as it gets.

Laura Andersen, RMR 704-350-7493

**JA3041**

475

Now that's a change.  Previously when I been to the facility, the recreation areas looked like this.  They were open recreation areas.  At that time inmates were allowed in the general population to have recreation in small groups. That's since been replaced with individual recreation in general population.

Q.    Is ADX intended to be a permanent placement for the inmates that are sent there?

A.    Well, ideally, no.  Ideally, an inmate in response to how arduous a place this is to do time, thinks better of their conduct and begins to try to rehabilitate.  And so the idea is that the minimum period of time somebody could be there, would be three years.  That's the minimum period of time.

Now, in fact, the last briefing that I had from Chris Sinval, he's one of the administrators there.  Virtually nobody leaves the facility in three years.  The things are serious enough that sent them there.  Or there's misconduct after they get there, that people in fact are not making it out in three years.

There are some inmates who have been there since the facility opened in 1994 and '95.  So they have now been in this facility for 15 years.  There are other inmates who are there for whom there is no prospects of them going somewhere else.

Laura Andersen, RMR 704-350-7493

**JA3042**

476

One of the inmates that was placed there on extreme communication restrictions, Luis Phillipe, who had gang affiliations and was placed under extreme communication restrictions back in about '97.  He is still at ADX.  I ran his name on the BOP locater, Luis Felipe is still there.

And so there are individuals who are going to be there until the Bureau of Prisons are satisfied that they no longer represent a threat.

This is an example, though, of under the best of circumstances, the progression that someone would have to work their way out.  And here's how that works.

There is at least a year in the general population.  Of course general population is kind of a misnomer, because it's solitary confinement and exercise alone.

And an inmate has to be there at least a year with no disciplinary problems at all.  And the prison administration has to believe that it isn't there just pretending to be good.  The reason that required their custody at that level is resolved enough that they can now have contact with other inmates.

So you can't just manipulate your way and progress out of this system.

MS. ROSE:  Objection.  You just can't manipulate your way.

THE COURT:  Sustained.  The jury is to disregard

Laura Andersen, RMR 704-350-7493

**JA3043**

477

that last comment.

Q.    (By Mr. Bryson) How is the progression suppose to work?

A.    The subsequent level, if you're deemed to not require this level of security, the general population, is an intermediate unit.

There you're in cells that have a single door, like you see in this picture.  They still take their meals in the cell, but they take showers in a common area at the back of the unit.  And 21 hours a week they're out with other inmates, up to seven inmates at a time.

They have to be at that level for a minimum of a year, with clear conduct, and with the staff being satisfied that the reason to hold them at an intermediate level or a higher level security is no longer there.

Now, about a third that make it to the intermediate level, get sent back to general population.  They go back to go and start all over again.

If the staff is satisfied that they can go on to the next unit, they then go to a transitional unit.  Now they're out of their cell for six hours a day, they eat their meals with up to 15 other inmates.  Now they're no longer in handcuffs when they interact with staff.  And they may be escorted off that unit in small groups, without handcuffs on.

They're at that level for at least 12 months, of clear

Laura Andersen, RMR 704-350-7493

JA3044

478

contact.  That means no disciplinary write-ups at all, and the staff being satisfied now that they are ready to exit the facility.

At that level one fourth go all the way back to the beginning and start over again.

In other words, if you screw up, you don't just go back one step.  You go all the way back to start and you start into this again.

Q.   Is there something more restrictive than general population at ADX?

A.   Yes, sir, there is.  There's what's called the Control Unit.  Which is a prison within the prison there at ADX. And it operates under a higher level of security, even than general population.

And this requires the assignment of the Control Unit as a decision that's made at a regional level in Bureau of Prisons.  And there is some due process aspects to that.

Placement on the Control Unit can be driven by -- that recommendation to send somebody there can be in response to one of seven different factors that the Bureau of Prisons will look at, including an incident that caused injury to other persons, has expressed threats to the life or well-being of other persons, possession by the inmate of deadly weapons or dangerous drugs, disruption of the orderly operation of the prison, escape from a correctional

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 208 of 536
Case 3:08-cr-00134-RJC   Document 1670   Filed 01/30/11   Page 71 of 121
**JA3045**

institution, an escape attempt.  And the nature of the offense for which the person has been sentenced to prison.

That offense alone is not enough to get to the control unit.  It would be that offense that sent you to prison, along with some other factors.

Now, again, this not to get to ADX, this is to be escalated to be placed on the Control Unit at ADX.

Q.    What are the security differences from being in the Control Unit?

A.    Well, at this point, the security differences on the Control Unit are pretty small by comparison to the general population.

Primarily, now when you are taken out of your cell, you're escorted by three people instead of two.  And for the inmates on the control unit, their feet are shackled, as well as their hands.

And instead of getting about 10 hours a week outside the cell of recreation, solitary rec, now they get seven hours solitary rec.

So A little bit less recreation, three staff members instead of two escorting, and feet shackled instead of hands.

Otherwise the cells they're in look just like the cells that I showed the diagram and picture of, and the other procedures are the same.

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 209 of 536
Case 3:08-cr-00134-RJC   Document 1517   Filed 01/30/11   Page 72 of 121
**JA3046**

480

Q.    Do you have information about the frequency of the assaults by inmates in the Control Unit?

A.    Yes, sir, I do.  This is looking at a seven year period of time from when the Control Unit opened there at ADX in 1994, up through June of 2001.  So about a seven year period of time that we obtained data that we analyzed for the Control Unit.

     During those seven years, and there are about 70 cells on the Control Unit.  During those seven years, there were 17 incidents; 17.  Which is about two or three per year.

     Now, 10 of those involved one guy.  So one guy did 10 of them, and everybody else who is on the control unit was responsible for seven.

     Now of those, 14 were minor assaults on staff.  Now remember staff is the only person they have contact with.  There's no contact with other inmates.  So any assault would have to be on a staff member.

     Nine of those involve throwing unknown liquid or feces or spitting in the face of the officer.

     One involved kicking the foot forward as the leg shackles are being applied so it scraped the officer's hands.

     One was pulling away there at the cell front, and then throwing an ice tray full of water and a carton of milk at the officer.

Case 3:16-cv-00057-MCGC  Document 50-7   Filed 03/23/17   Page 210 of 536
Case 3:08-cv-00134-RJC  Document 107   Filed 01/30/11   Page 73 of 121
JA3047

481

One was throwing the head back against the officer's face.

One was attempting to pull away from the officer while being escorted causing the cuffs to scrape the officers hands.

One was grabbing the officer's shirt and pulling him into the bars.

Then there were three attempted or threatened minor assaults on staff.

Two attempting or threatening to throw liquid, and one attempted head butt.

Among the worst of the worst of the worst in the Bureau of Prisons, these levels of security that are in the Control Unit and now in fact pretty close to that represent the general population at ADX Florence, reduced the violence to this level.  Where it not only was infrequent, but also was, by proportional standards, minor.

Q.   Is there even a higher level security at ADX beyond the Control Unit?

A.   Yes, there is.  There is a unit called Range 13 at ADX that involves four, of what I characterize as super cells. And those cells are here, here, here and here (indicating).

Now these are cells that allow minimum contact, physical contact with the inmate.  Now, here is the hallway out here.  And of course the slots that you see here, those

Laura Andersen, RMR 704-350-7493

**JA3048**

482

represent doors that would otherwise be closed.

Now the inmate is in this cell area here.  And so if the desire is to send him to outdoor rec, than the door of his cell is opened electrically.  And then the door to the outside recreation area is opened electrically.  And he steps into this area, and he's at outdoor rec.

You can also open doors electrically to allow him to go to the indoor rec yard, which is right here.

For visitation, the visitor comes down the hall and enters this little closet right here.  The inmate comes out of his cell, comes around and sits down at that stool on the other side of the thick glass, and now he's at visitation with his attorney or a visitor.

In other words, now the movement of this inmate to recreation or visitation, doesn't require the staff to physically handle this inmate.

Now for many years these cells sat vacant at ADX, and no one was placed in them at all.  A policy was then developed that they would be reserved just for terrorists.

But subsequently in fact, someone else has gone there. Most recently there has been a terrorist who is on one of those cells, and then an individual who is not a terrorist, who was in another one of those cells.

So they are not restricted just to terrorism suspects.

            MR. BRYSON:  Those are my questions.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 212 of 536
Case 3:08-cr-00134-RJC   Document 109-7   Filed 01/30/11   Page 73 of 121
**JA3049**

483

THE WITNESS:  Thank you, sir.

THE COURT:  Members of the Jury, we're going to take our morning break at this time.  Don't talk about the case amongst yourselves.  Keep an open mind until all the evidence is in and we will see you in 15 minutes.

(The jury was escorted from the courtroom.)

(A brief recess was taken in the proceedings.)

THE COURT:  Are we ready for the jury?

ALL COUNSEL:  Yes, sir.

THE COURT:  Ready for somebody to call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Any cross?

MS. ROSE:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION BY MS. ROSE:

Q.   Dr. Cunningham, I believe you said that there were 18 Bureau of Prisons, high security facilities?

A.   Yes, ma'am.  There are 18 USPs at this point in time.

Q.   And those are -- USPs are the high security facilities about which you testified?

A.   Yes, ma'am.  There are a couple others, USP Leavenworth and USP Marion that are only USPs because of historical name.  They're no longer functioning as high security institutions.

Q.   But there are 18 that are now functioning?

A.   Yes, ma'am.

Laura Andersen, RMR 704-350-7493

**JA3050**

484

Q.   And the individuals sent to 18 -- any one of those 18 high security prisons are people who have been sentenced to 30 years or more?

A.   No, ma'am.  That's one of the criteria.  If you're sentenced to 30 years or more, than you are designated, absolutely, to a USP, unless the public safety factor is waived.

There is a whole classification matrix that is otherwise used to assign individuals to various levels of security within the Bureau of Prisons.  And the length of their sentence and the nature of it is only one factor, unless they are going to face 30 years or more remaining to be served, or unless they're a member of a disruptive group.

Q.   And so it's true that someone who receives life without parole, that could be waived -- the public safety factor could be waived?

A.   Yes, ma'am.

Q.   And they could go to a medium security prison?

A.   Yes, ma'am.  There are a few capital inmates at the time of our study that had been placed in FCIs, because they were no longer medium security, because they were no longer considered to represent a public safety factor risk.

Q.   And looking at the slides that you showed us, it showed that there had -- in the time period of your study, there were no murders in prison?

Laura Andersen, RMR 704-350-7493

**JA3051**

485

A.   No, ma'am.  There were no murderers among these 145 inmates who had been sentenced to life at entrance into the Bureau of Prisons.

Q.   It is true that there are murders within the prison system?

A.   Yes, ma'am, there are.

Q.   The prisons are actually a very violent place, are they not?

A.   It's relative.  I described the statistics that showed that violence is infrequent.  The murder rate in prison will vary by the security level of the facility.

For the Bureau of Prisons as a whole, that rate is about six, per 100,000 inmates per year.  The rate is higher at the U.S. Penitentiary level for the most serious offenders, and also offenders who have gotten into disciplinary trouble in the system are sent.

Q.   So actually the more high security prisons that had the higher level of murders and serious assaults?

A.   Yes, ma'am.

Q.   Now you showed us a lot of information about ADMAX which as you said is the most secure prison within the federal prison system?

A.   Yes, ma'am.

Q.   And how many beds is that -- how many inmates are sent to ADMAX, or how many can they hold there?

**JA3052**

486

A.   The capacity is 490.  The most recent census is about 430.

Q.   And I believe you showed on one of your slides that it was over 800.  Is that at the -- not ADMAX, it's at the other USP in Florence?

A.   That's correct, there is what's called USP High.  In other words, there is a U.S. Penitentiary at Florence that is somewhat higher security than the other 17 U.S. Penitentiaries.  And so it's called USP Florence High, or High Florence.  And there are about 800 in that facility. That's an entirely separate facility, separate perimeter, separate fence line, that kind of thing, from ADX.

Q.   So of the 25,000 or so inmates who are in the high level or the highest security penitentiaries, only about 500 or so can go to ADMAX?

A.   Yes, ma'am.  Of the 172,000 in the Bureau of Prisons, there are just less than 500 slots at ADX.  Somebody might commit a very serious offense who was in an FCI and get themselves escalated to ADMAX without ever having gone through a USP.  That's conceivable.  ADX could draw from the entire bureau.

Q.   Right.  So, it's basically 500 of those who have either committed very serious offenses somewhere else in the Bureau of Prisons; is that correct?

A.   Yes, ma'am.  About 6 percent are direct court

Laura Andersen, RMR 704-350-7493

**JA3053**

487

commitments.  In other words, they go straight from court to ADX.  Of the individuals who are currently there, about 6 percent are there on a direct commitment.  The others have earned their way there by misconduct in the system.

Q.   And so all the fail-safes that you talked about within the system really don't factor out the violence, assaultive behavior, and the murders?

A.   No, ma'am.  I didn't characterize them as fail-safe.  I described them as extremely effective in minimizing it.

Now, it isn't perfect.  It doesn't entirely eliminate it, but it is extraordinarily effective particularly in light of the offenders who are there.

Q.   And actually at -- you talked about at ADMAX, you showed a slide, was it slide 29?

A.   I'd be glad to turn to that if you'd pull up the screen.  Twenty-nine.

Q.   This Communication Management Unit that you talked about, there's only one of those within the Bureau of Prisons?

A.   No, ma'am.  This is -- there are actually two at this point.  There's one at FCC Terre Haute.  And there is another one at USP Marion.  Now there may be others that are on the drawing boards, but those are two that I know to be operating.

Q.   And once again, this does not relate in any way to the

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/28/17  Page 217 of 536
Case 3:08-cr-00134-RJC  Document 121-7  Filed 01/30/11  Page 84 of 125
JA3054

488

general population at the U.S. Penitentiaries?

A.    This is a separate unit that is designed specifically for those communication restrictions.

Now it's possible for the Bureau of Prisons to apply communication restrictions in addition to the inmates that are here.

In other words, those restrictions could be applied to individuals who are in other facilities elsewhere in the Bureau of Prisons.  This is now a dedicated unit that are -- or two units that are tasked primarily with defeating that threat.

Q.    All right.  And that you have to meet a certain criteria as is shown here to even be sent to that unit?

A.    Yes, ma'am.

Q.    It has to be violations elsewhere, one of those.  And it talks about, you know, sex offenders they attempted to coordinate illegal activities while incarcerated via approved communication methods.

So, in other words, there has to be a violation before someone is considered for this particular unit?

A.    Well, there has to be good reason to believe that they are going to use those communications for ill purposes. That's what this portion of it right here says, who attempt to coordinate illegal activities while incarcerated via approved communication methods.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 218 of 536
Case 3:08-cr-00134-RJC   Document 1317   Filed 01/30/11   Page 81 of 121
**JA3055**

489

So, you know, for example, if an inmate has been sending coded letters out trying to effect violence in the open community, that's an example of attempting to coordinate illegal activities. That is a rationale for placement on a unit like this.

Q. So it's a violation to get there?

A. Yes, ma'am. There is misconduct or the threat of that.

Now there are individuals who may be placed in Communication Management -- in fact there are -- for whom there is no history, at this point, of them doing that.

For example, there are individuals who are identified as being affiliated with terrorists organizations, who are now on Communication Management Units whose disciplinary records have been clear up to now. In terms of -- there's no evidence that they have been misusing their communications.

But because of their status and the threat that that could represent, those communication restrictions are being imposed on them.

So it essentially is formed by best intelligence, not simply that there has to be a problem before somebody goes there.

Q. Well you've given us the example of terrorists, that's a very unique situation?

A. Well --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 219 of 536
Case 3:08-cv-00134-RJC   Document 151-7   Filed 01/30/11   Page 82 of 121
**JA3056**

490

Q.   There's a national security interest in that?

A.   Yes, ma'am.  Yes, ma'am.  It is a different situation. But it speaks to the idea that intelligence is being used preemptively.

And so if somebody is seen as representing a threat of some kind, then this can be applied to them.

Q.   Now, in general, at the Bureau of Prisons, the photograph that you showed us -- you can take that down -- thanks.

A.   Yes, ma'am.

Q.   -- of ADMAX, that's not how it is.  That's not representative of a cell in a high security, Bureau of Prisons institution?

A.   No, ma'am.  That's a cell at ADX.  I showed a diagram of a standard cell in a U.S. Penitentiary.  That was the one that had the bunk bed at the back, and the toilet was there in the cell.  And I showed where the corridor was, said that inmates could come out of their cell most of the day. That's a typical cell in a U.S. Penitentiary.

The double door cell, the continuous pour of concrete, that's the typical cell Supermax at ADX Florence.

Q.   At every facility there is a law library, right?

A.   Yes, ma'am.

Q.   There's a commissary?

A.   Yes, ma'am.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 220 of 536
Case 3:08-cr-00134-RJC   Document 1217   Filed 01/30/11   Page 83 of 121
**JA3057**

491

Q.   There are dining halls where the inmates eat together?

A.   Not at ADX.  But in the typical prison, there are group dining facilities.

Q.   And let's again make this very clear.  Five hundred people out of close to 200,000 or 175,000 are sent to ADMAX after all these procedures are in place.  So let's talk about the Bureau of Prisons penitentiaries.  Isn't that more relevant to what we're talking about here.  So let's focus on that.

A.   No, ma'am.  It's not necessarily more relevant.  If in fact Mr. Umana is considered to be such a risk of violence that the death penalty should be imposed as an intervention, than he is a prime candidate to go to ADX.

     If in fact this allegation is authentically held by the U.S. Department of Justice, than he would be designated to that kind of facility.

Q.   You're telling me, that if he is not found -- if this jury doesn't return a verdict of death, he's going to ADX; is that what you're telling this jury?

A.   I'm telling the jury that the U.S. Department of Justice --

Q.   Answer the question, yes or no.

A.   -- has total control of his designation.

     THE COURT:  Hang on a second.  Listen to the question that was asked, and answer responsibly to it.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 221 of 536
Case 3:08-cr-00134-RJC   Document 1517   Filed 01/30/11   Page 84 of 125
JA3058

492

Go ahead and repeat your question.

Q.   (By Ms. Rose) You spent lot of time on this ADX.  So are you telling this jury that if they return a verdict of life in prison, he's going to ADX right out of the box?

A.   No, ma'am.

Q.   The -- the -- in general population, inmates have full access to communication; they can send letters and they can talk on the telephone?

A.   Yes, ma'am.  There's a limit to it.  But if they are not under restrictions, then they have access to mail and telephone calls.

Q.   And they can send out mail?

A.   Yes, ma'am.

Q.   And they can have contact visits?

A.   Yes, ma'am.

Q.   And describe for the jury what a contact visit is, please?

A.   Well, a contact visit is, there is a large open room that has tables, typically that are bolted to the floor. And stools that are also bolted to the floor.

The family who's been processed through the entrance of the prison, and gone through metal detectors, had searches and that kind of thing.  You know, if for example, a wife and maybe a couple of kids are there, the inmate comes in. They are allowed to embrace briefly.  And then sit at that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 222 of 536
Case 3:08-cr-00134-RJC   Document 1317   Filed 01/30/11   Page 83 of 121
JA3059

493

table and talk to each other.  They're allowed to hold hands.  That's as much physical contact is allowed.  They are then allowed to embrace briefly at exit time.

But they may sit and talk, play games, there are vending machines that are around the side of the room.

There's a staff member, one or more who are present, observing and scrutinizing this scene.

And depending on the facility, those visitations may be of varying length.

Q.   One of the things you talked about in your studies was, there are risk factors in determining the violence that you talked about?

A.   Yes, ma'am.

Q.   What are those risk factors?

A.   There are a number of factors that serve to modestly raise or lower the likelihood of violence in prison.

The likelihood of violence is low -- mostly what we're talking about, things that make it more or less improbable. It's improbable for the group as a whole.  Now we're just talking about somewhat more or less improbable.

The factors that are associated with a lower probability against that low rate that we saw, are increasing age, the older an inmate is at entrance to prison and as he ages in prison, the less likely he is to be violent in prison.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 223 of 536
Case 3:08-cr-00134-RJC   Document 161-7   Filed 01/30/11   Page 86 of 121
**JA3060**

494

Q.   And did your studies in fact show that that was the age of 30 or greater?

A.   No, ma'am.  It falls continuously from about age 18 on.  And so the inmates that are 25, have lower rates than the inmates that are 18 or 19.  The ones that are 30, are lower than 25, and 35, and so on, until you get out to about age 45, then the age effect seems to kind of plane out.  So age is a very important factor.

Another factor is education level.  If an inmate has a GED, high school diploma, or even ninth grade literacy, depending on the study -- in many studies, those inmates have lower rates of disciplinary infractions and assaults in prison.

Now if the person has less education than that, they aren't more likely, it's that greater education has a reducing effect.

If they have continued contact with community members through correspondence or calls or visits, those inmates do better in prison.  And that's a factor that lowers the risk somewhat.

If they have a history of community employment, particularly of a more extended tenure, that's a factor that tends to lower the risk somewhat.

If in their time in jail, pretrial, or in a prior prison sentence, their adjustment has been very positive,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 224 of 536
Case 3:08-cr-00134-RJC   Document 150-7   Filed 01/30/11   Page 87 of 125
JA3061

495

that's a factor that lowers the risk.

On the side of factors that serve to increase the risk somewhat, if they're younger, particularly less than 21; if they are a member of a bona fide prison gang, and greatest concern is with the disruptive groups, with that end of it. Then that's been associated with an increased risk.

If the offense -- if the murder that sent them to prison is associated with a robbery or burglary, that's a factor that serves to raise the risk somewhat.

On the other hand, if they kill more than one person, that's not associated with an increased risk of violence in prison.

And the most recent research that we did, if the gun was -- if a gun was the only weapon that was used --

MS. ROSE:  Well I'll object as to going beyond the scope of the question.

THE WITNESS:  These are still factors, ma'am.

THE COURT:  I will sustain the objection as to -- I'll sustain the objection.

Q.    (By Ms. Rose) You indicated that an important part of adjustment within the high security prisons, is that they're able -- the inmates are able to work, they have a job there in prison?

A.    Yes, ma'am, in the U.S. Penitentiaries most of the inmates if they're not on disciplinary restriction are

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 225 of 536
Case 3:08-cr-00134-RJC   Document 1079   Filed 01/30/11   Page 83 of 121
**JA3062**

496

required to work.

Q.   They are paid, actually?

A.   Yes, ma'am.  If they work for Unicore, they're paid. I'm not sure that all prison jobs are compensated, but at least some of them are.

Q.   And they can use the money that they earn, you know, to go to the commissary or send it to family members or whatever the case may be?

A.   Yes, ma'am.

Q.   There's no restriction particularly on that?

A.   No, ma'am.  But the hourly rate is very low, it might be 10 or 20 cents an hour.  But there are not restrictions, assuming it's a lawful person that they are sending it to, they can send it our out.

Q.   Now, one of the things in your slides, you didn't talk much about weapons in prison.  Are weapons present in the Bureau of Prisons?

A.   Yes, ma'am.  In fact, some of the studies that we have tracked weapons contraband as one of those potentially violent categories.  In other words, we were identifying the frequency of that as well.

Q.   And what type -- in that study what type of weapons did you see there even within the maximum security prisons?

A.   I don't recall -- in the studies that we did in the Bureau of Prisons, I don't think we were provided -- let me

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 226 of 536
Case 3:08-cr-00134-RJC   Document 1370   Filed 01/30/11   Page 89 of 121
**JA3063**

497

think about this.  We were not provided with the actual disciplinary write-up that would describe the weapon among those 145.  We had the computer-generated description of all the disciplinaries, and we were provided with the actual disciplinary write-ups of the assaults, but I don't think that included the weapons.

In other research that we've done, weapons contraband is usually some instrument that is fashioned into a cutting or stabbing instrument of some kind, some sort of manufacturing of a shank from a piece of metal or plastic or wood.  That's the most typical weapons contraband that's identified.

Q.    And you said something about a lock in a sock?

A.    Yes, ma'am.  A padlock that the inmates are often allowed padlocks that they can then use to lock their property.  They have a little locker that they keep it in. If that lock is put into like an athletic sock, and then the person would swing it, then that can be used as a weapon, as can any weighted object.  You can also use bars of soap at the end of a sock and use it in that way.

Q.    And razors, are they ever modified in dangerous ways?

A.    Yes, ma'am.  That's what I described about a cutting instrument.  It may be that a razor is disassembled, and then with a flame is melted back on to the handle, and then there is an instrument that can be used to cut someone.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 227 of 536
Case 3:08-cv-00134-RJC   Document 157-7   Filed 01/30/11   Page 90 of 121
**JA3064**

498

Q.   But you're also familiar with the murders that have occurred in the Bureau of Prisons where it was just a towel or a bed sheet?

A.   Yes, ma'am.  That can be used.  I don't know the specifics of that.  But certainly within prison homicides, that's one way in some instances that homicides have occurred.

Q.   And in fact, at ADX there were two murders?

A.   Yes, ma'am.  Before they went to the solo rec, there were two individuals that were beat to death.

Q.   Stomped to death?

A.   Yes, ma'am in group recreation.

Q.   Did you have an opportunity to interview this defendant?

A.   I did not interview this defendant.

Q.   Did you interview any of the investigators in this case?

A.   No, ma'am.

Q.   Did you review any of the discovery materials that were provided?

A.   No, ma'am.

Q.   Did you interview jail personnel at the Mecklenburg County jail?

A.   No, ma'am.  I did not do an individualized risk assessment in this case.

                    Laura Andersen, RMR 704-350-7493

**JA3065**

499

Q.   So the information that you're providing is not individualized to this defendant?

A.   It is to the extent of the prison setting that he's going into.  But I did not do an individualized risk assessment of him.

Q.   You indicated that there are some pretty ingenious ways inmates communicate between one another even when they're in a segregated fashion; what are those ways?

A.   They can cadillac materials between them.  That's where you attach something to a -- you weight an object, attach it to a string, slide it out under your door.  Then another inmate slides it out under his door and hooks on to that and pulls it.  And so you can transmit a note that way.

Certainly inmates that are out on the yard together simply have a conversation with each other to communicate.

Inmates sending mail out of the facility could develop some sort of code to do that, or in their verbal conversations to speak in code.

If the telephone calls are not monitored in the inmate's language, than simply speaking another language may be enough to defeat the monitoring.

Those are the primary ways that inmates would try to bypass the communication restrictions.

Q.   And is there the ability for inmates to communicate between facilities?

Laura Andersen, RMR 704-350-7493

JA3066

500

A.   Yes, ma'am.  Potentially, again, defeating those communication restrictions.  If they call somebody in the community, and then somebody else from another prison calls that person, then the information could be relayed.  Or if letters might be rerouted or recopied from one person to another.

Q.   And in fact, in your studies, did you not learn about inmates who ordered murders on inmates in other facilities?

A.   Not in our studies.  I have -- I'm aware that there have been concerns with that.  I'm not familiar with the state of those investigations.  But I'm aware that there have been allegations regarding that.

Q.   And individuals who have contact with the outside community, have the opportunity to direct, or to -- well, to direct a murder to occur outside the facility?

A.   Yes, ma'am.  If they have the resources to do that, and an organization that will do their bidding, that's what these communication units were designed to defeat.  That's what special communication restrictions that may be ordered by the Department of Justice or by the court are intended to defeat.

Q.   And they had to create those because of that problem?

A.   Because a concern could occur, yes, ma'am.

Q.   And your statistics here do not reflect murders that have been ordered or have occurred as a result of a request

501

by someone inside of a facility, that has occurred outside of that facility, none of that is reflected in your statistics?

A.   Generally, that's correct.  There are individuals who we have tracked in prison who were convicted of that sort of offense.  But otherwise, I don't have data on how often that has occurred.

Q.   You talked about security groups in relation to gangs?

A.   Security Threat Groups and Disruptive Groups.

Q.   And the highest level of those is which?

A.   Disruptive Group.

Q.   And the Disruptive Group is the one where Bureau of Prisons have put some additional protections in place?

A.   Yes, ma'am.  There is an automatic override to a high security facility.  In the classification systems, that's an override to a U.S. Penitentiary.

And also if you look at the criteria for the Special Management and Communication Management Units are those mentioned Disruptive Groups.

Q.   Now everything, however, that's done within the Bureau of Prisons, it's a multi-level step.  As you said, there are a number of considerations in where an inmate is placed, correct?

A.   Well, yes and no.  There are -- there is a classification system that would be used in the instances of

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/28/17  Page 231 of 536
Case 3:08-cr-00134-RJC  Document 1567  Filed 01/30/11  Page 94 of 121
**JA3068**

502

most inmates.  The Department of Justice can specify what level of security somebody is held at, or what communication restrictions are placed on them.

In other words, the Bureau of Prisons is a sub agency of U.S. Department of Justice.

Q.   That's not what I asked you.  What I asked you was, is there a mechanism where they look at a number of factors to determine the placement for individuals?

A.   Yes, ma'am.  Unless the Department of Justice orders a particular level of security be brought to bear.

Q.   And in making those determinations, including moving someone to the Administrative Maximum, there's a whole procedure that has to be followed that's set out by the statute or by the regulations?

A.   Yes, ma'am.  There is a procedure that has to be followed.  You'll notice the definitions of those procedures have a catchall category that includes, essentially, whatever the bureau believes is necessary to maintain a safe and orderly operation of the prison and protect the public.

So it gives substantial discretion to the Department of Justice to effectively intervene in instances of clear risk.

Q.   And all of that however is balanced by the inmate's statutory rights.

In other words, the Bureau of Prisons has -- they give the inmates a list of rights?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 232 of 536
Case 3:08-cr-00134-RJC   Document 1767   Filed 01/30/11   Page 93 of 121
JA3069

503

A.   You've asked a compound question.  Yes, the inmates have rights.  And get a list of those.

The prison system is able to do whatever is related to a legitimate penological interest.  The case is *Turner V Safely* and if --

Q.   I'm not asking you for legal opinions.  What I was asking you is, whenever the Bureau of Prisons is making these decisions, they have to balance it against the rights that they have given to inmates, because inmates have rights, is that true?

A.   No, ma'am.  Again you've asked a compound question.

Q.   Do inmates have rights?

A.   Yes, ma'am.  But they don't override security concerns. And if there are security concerns, those can be applied and have not been found to violate inmate rights.  And so it is a security driven system.

Q.   They have a right to expect that as a human being they will be treated respectfully, impartially and fairly by all personnel?

A.   Yes, ma'am.

Q.   Is that overridden by security interest?

A.   No, ma'am.  You can lock somebody down at Super-maximum with full security restrictions and still address them with respect.

Q.   You have a right to be informed of the rules,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 233 of 536
Case 3:08-cr-00134-RJC   Document 1527   Filed 01/30/11   Page 96 of 125
JA3070

504

procedures and schedules concerning the operation of the institution?

A.   Yes, ma'am.

Q.   You have the right to freedom of religious affiliation?

A.   Yes, ma'am.

Q.   You have a right to health care?

A.   Yes, ma'am.

Q.   Which includes nutritious meals, proper bedding and clothing, a laundry schedule for cleanliness, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles and medical and dental treatment?

A.   Yes, ma'am.

Q.   Those are not overridden necessarily by security concerns, they just take additional security measures?

A.   Yes, ma'am.  Those are all independent of the security measures that are brought to bear.

Now the toilet articles someone is provided like a razor blade might be restricted, or might be used under a monitored -- or in a monitored fashion.

But security needs are not the same as -- as cruel and unusual punishment.  It's not like -- you're not -- you're not being deliberately cruel to this person.  You are doing what's legitimately required to maintain security, and that's allowed, while you treat this person with respect and

Laura Andersen, RMR 704-350-7493

**JA3071**

505

provide them nutrition and medical care and ventilation.

Q.   And as you said, while inmates have the right to visit and correspond with family members and friends and correspond with others, that can be regulated?

A.   Yes, ma'am, it can.

Q.   And they have the right to unrestricted and confidential access to the courts by correspondence with their legal counsel?

A.   Yes and no.  The typical inmate would have correspondence and contact with counsel that is not monitored.  There are provisions for monitoring those communications.

And so, for example, in the case of Luis Felipe, the court ordered and the Department of Justice was prepared to impose monitoring, even if his conversations with his attorney, if he ever changed from the attorney that had represented him in the court before the judge who was known to the judge.  If he ever changed attorneys, than a magistrate was going to monitor his communications with that counsel.

And so provisions can be put in place, even for the monitoring of conversations and communications with an attorney.

Q.   And in that vain they have the right to use the law library reference materials, to assist him in resolving

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 235 of 536
Case 3:08-cr-00134-RJC   Document 1517   Filed 01/30/11   Page 98 of 121
**JA3072**

506

legal problems, and also to receive help when its available through some legal assistance program there in the prison?

A.   Yes, ma'am.  Not to go down to the hall to the library. But they can order legal books that may be brought to them at a certain schedule to use in their cell.

For example, if they're locked down at ADX, they don't wonder down the hall to the library.  They can order legal materials that they will have the opportunity to review in their cell.  And those will be controlled in terms of the number of those they can possess.

Q.   And again, you're referring to ADX.  But in general, they're able to go to the law library to check out or spend time doing research, or even not even legal books, just other reading material?

A.   Yes, ma'am.  If they're not restricted from that activity, they would have access to it.

Q.   And inmates in the Bureau of Prisons have a right to a wide range of reading materials for educational purposes and for their own enjoyment, which include magazines, newspapers, sent from the community?

A.   Yes, ma'am.  Again, unless there are restrictions that have been applied for security reasons.

Q.   And you talked about that it's also a requirement that they participate in education, vocational training and employment, consistent with their needs and abilities?

Laura Andersen, RMR 704-350-7493

**JA3073**

A.   Yes, ma'am.  And security needs.

          MS. ROSE:  All right, sir.  Thank you?

          THE WITNESS:  Thank you, ma'am.

          THE COURT:  Any redirect?

          MR. BRYSON:  Yes.

REDIRECT EXAMINATION BY MR. BRYSON:

Q.   You were asked a question about whether or not some murder rate within USPs are higher than for other facilities?

A.   Yes, sir.

Q.   And you said it was, correct?

A.   That's correct.

Q.   And there are -- is USPs housed with only murderers?

A.   No, sir.  The U.S. Penitentiaries are going to have inmates that are facing longer sentences, and have committed more serious offenses.

     They also house inmates that have worked their way up to that level of security.  And so the individuals that are bad actors at lower levels of security, graduate over time up to a USP level of security.

     So you've maximized the number of individuals at that level of security who have had prior misconduct problems in prison.

     Remember being a member of a Disruptive Group is an automatic override to USP.  So now your Disruptive Group

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 237 of 536
Case 3:08-cv-00134-RJC   Document 224-6   Filed 01/30/11   Page 106 of 121
**JA3074**

508

members who are not locked down in even higher security or they're in a USP.

And so for that reason, you're -- the risk factors associated with this setting are greater.

Q. Is it the presence of murderers in U.S. Penitentiaries that makes the murder rate higher there?

A. No, sir. No we identified that in fact among those 145 federal capital inmates, there were no murders that they committed. There was no category of disciplinary misconduct that they participated in that was greater than the inmates around them. And that was the finding of that very large study of the 5,000 murderers in Florida as well.

There are -- in fairness, there are a couple of studies that have identified that murderers were somewhat more likely to be found guilty of a murder in prison. But here's the critical issue that you have to pay attention to in interpreting this.

If the murder rate is 6 inmates out of 100,000, and there's a factor that increases the risk of murderers by 25 percent, now their likelihood is 8 out of 100,000. We went from 6 out of 100,000 to 8 out of 100,000. That is still infinitesimally small.

And that's the critical issue about those factors that I described earlier that raise and lower the risk. If a factor increased the risk by threefold. Remember our

Laura Andersen, RMR 704-350-7493

**JA3075**

509

likelihood of a federal capital inmate sending someone to the hospital was less than 1 percent.  If the rate was three times that much, it would only be just over 2 percent.  That still is extraordinarily unlikely, it's two guys out of 100.

And so you want to be careful as you interpret those risk factors when the incident is so low, so unlikely, even if you have a factor that increases it on a practical basis, it's still extremely unlikely.

Q.   You mentioned direct court commitments?

A.   Yes, sir.

Q.   What is that?

A.   That means that this individual did not go into the Bureau of Prisons to go through the usual classification system or screw up in prison and then graduate to ADX.  They were sent from their trial to ADX Florence.

Q.   How is that done?

A.   That is done by a decision of the Department of Justice and it's sub agency, the Bureau of Prisons, that this individual needs to be at an ADX level of security.

Q.   You were asked if -- if you could guarantee that he could go to ADX?

A.   Yes, sir.

Q.   You can not?

A.   No, sir.  The Department of Justice can guarantee he goes to ADX.

Laura Andersen, RMR 704-350-7493

**JA3076**

510

MS. ROSE:  Objection.

THE COURT:  Sustained.  The jury should disregard the last answer of the witness.

Q.   (By Mr. Bryson) Can you guarantee that he won't go to ADX?

A.   No, sir.  He will go to whatever level of security the Department of Justice and Bureau of Prisons have identified as being reasonable to secure him and protect individuals in prison and out of prison.  And they'll make a determination if that is a USP general population, if that's a Communication Management Unit, a Special Management Unit, or ADX Florence.  That's a determination that will be made by the Department of Justice and its agency, the Bureau of Prisons.

Q.   That is an eligibility for him.  He is eligible to go to ADX?

A.   Yes, sir.

Q.   Inmates have mail privileges, correct?

A.   Yes, sir.

Q.   Okay.

A.   Again, depending on the mail restrictions applied to them.

Q.   Does the Bureau of Prisons maintain the right to restrict those privileges?

A.   Yes, sir.

Laura Andersen, RMR 704-350-7493

**JA3077**

Q.    What about telephones?

A.    Yes, sir.

Q.    Can the Bureau of Prisons restrict an inmate's phone privileges?

A.    Yes, sir.

Q.    I mean, short of being in a Communication Unit, can they restrict someone's privileges even though they're not in a Communication Unit?

A.    Yes, sir.  That's routinely done as a disciplinary procedure.  And remember that communication restrictions can be applied to inmates elsewhere besides on a Communication Management Unit.  Those are simply units that have been created to more effectively do that within a given unit. But those restrictions can be applied to inmates elsewhere in the Bureau of Prisons.

Q.    Okay.  The same thing with visitations; can they be restricted by the Bureau of Prisons?

A.    Yes, sir.  They're always restricted in terms of who is eligible to come and visit.  In other words, it has to be somebody who is on the approved list, and that will vary depending on who this inmate is and what the security concerns are.

Q.    You were speaking before about -- you were asked a question about factors that -- factors relating to a person's likelihood to violence, and you said something

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 241 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 01/30/11   Page 104 of 121
**JA3078**

512

about use of a gun?

A.    Yes, sir.

Q.    What was that?

A.    Well, there is research that identifies that if in their murder, their capital murder, only a gun was used, as opposed to a knife, a stick, a stone --

MS. ROSE:  Objection.

THE COURT:  I sustained that objection to this earlier.

Q.    (By Mr. Bryson) All right.  The individuals that were killed at ADX, you said were killed in group recreation; is that correct?

A.    Yes, sir.  They were -- one was on the transit -- well, there was a -- there was a pre-transfer unit at ADX that no longer exists there, where inmates even had a little factory they worked in.

One of the homicides occurred there on the pre-transfer unit.  It has now been completely removed from ADX.

The other occurred in general population when inmates were at joint recreation with each other.  Joint recreation and general population no longer occurs.

And so the facility has responded dynamically, which is what prisons do to respond to the security issues that occurred.

MR. BRYSON:  Those are my questions.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 242 of 536
Case 3:08-cv-00134-RJC    Document 59-7    Filed 01/30/11    Page 105 of 121
**JA3079**

513

THE COURT:  Any recross?

MS. ROSE:  No.  Thank you.

THE COURT:  You may step down, be excused.

Call your next witness?

THE WITNESS:  Thank you, sir.

MR. FOSTER:  Richard McGough.

MR. BRYSON:  Your Honor, may Dr. Cunningham be released?

THE COURT:  Yes.  I said he could be excused.

MR. BRYSON:  Oh, I'm sorry.

THEREUPON, RICHARD MCGOUGH, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. FOSTER:

MS. ROSE:  May we approach the witness, Your Honor -- I mean, approach the Court?

THE COURT:  You may.

MS. ROSE:  I'm sorry.

THE COURT:  That's a compound question.

(Bench conference as follows:)

MS. ROSE:  I thought we had a sequestration -- he sat in court quite a bit.

THE COURT:  Is he an expert?

MR. BRYSON:  No.  He's a mitigation investigator.

MR. FOSTER:  We didn't realize he sat in on Tuesday morning with all the California stuff.

Laura Andersen, RMR 704-350-7493

**JA3080**

514

MS. ROSE:  He was in, I thought he was in more than one day.  I didn't realize that's who he was.

MR. FOSTER:  He's not testifying to anything presented during your case at all.

THE COURT:  Laura, can you hear all this?

COURT REPORTER:  Yes.

MR. FOSTER:  He's not testifying to anything at all --

THE COURT:  If he sat in on court, don't ask him any questions on stuff he heard, unless we talk about it beforehand.

MR. FOSTER:  All right.

(The bench conference was concluded.)

DIRECT EXAMINATION BY MR. FOSTER:

Q.    (By Mr. Foster) Can you please state your name?

A.    Richard McGough.  It's M-C-G-O-U-G-H.

Q.    Okay.  And do you live and work in North Carolina?

A.    Yes.

Q.    What's your occupation?

A.    I'm a mitigation investigator.

Q.    Okay.  What's your educational background?

A.    I have a master's degree in anthropology from the University of North Carolina, Chapel Hill.

Q.    Okay.  Are you also a licensed private investigator?

A.    Yes.  I'm licensed in North Carolina since 1990.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 244 of 536
Case 3:08-cv-00134-RJC    Document 59-7    Filed 01/30/11    Page 107 of 125

**JA3081**

515

Q.   And are you also fluent in Spanish?

A.   Yes.  I've lived and worked in Latin America for quite a while.

Q.   How many years have you spoken Spanish?

A.   Since the mid seventies.

Q.   And so you consider yourself fluent in Spanish?

A.   Yes, I work in Spanish.

Q.   And what is a mitigation investigator?

A.   A mitigation investigator is a person who assists the defense counsel in a capital case to try to bring out or develop information that will be used during the sentencing phase of trial.  Information about the client or the defendant's background, his family history, and the history of mental illness or things that would be used during trial to -- towards -- in the sentencing phase, for showing why this particular person is deserving of a sentence of life, rather than a sentence of death.

Q.   And how long have you been doing mitigation work?

A.   Since 1990.

Q.   How did you get into that field?

A.   I did -- well, this is a little long-winded, but I'll try to be brief.

    I did all of my field work as part of my work in my graduate work in anthropology in Latin America.  And when I stopped graduate work, I began to work using the same

                    Laura Andersen, RMR 704-350-7493

**JA3082**

516

skills, and the same sub skills for working with defense counsel around the state and around the country on representing clients in capital cases.

Q.   Okay.  And have you worked on cases in the past involving Salvadoran Nationals charged in capital cases in the United States?

A.   Yes.

Q.   And through those case assignments, have you made travels down to El Salvador where you conducted mitigation investigations?

A.   Yes.

Q.   Roughly how many times have you done that?

A.   It's either 15 or 16.  I tried looking in my passport last night to see.  I couldn't quite make out all the stamps.  But in the last three years it's 15 or 16 trips.

Q.   And at some point in time were you appointed -- or brought on as a court-appointed mitigation investigator for the attorneys representing Alejandro Umana?

A.   Initially when the case was still in state court, in early 2008.

Q.   Okay.  And so at that point he was facing potentially capital charges --

        MR. NAZZARO:  Objection, Your Honor.

        THE COURT:  Sustained.

Q.   (By Mr. Foster) Were those charges located in Guilford

Laura Andersen, RMR 704-350-7493

**JA3083**

517

County?

A.    Yes, Guilford County.

MR. NAZZARO:  Objection, Your Honor.

THE COURT:  I'll sustain that as being irrelevant, ask you to move on counsel.

Q.    (By Mr. Foster) Did you thereafter, when you were brought on the case, meet with and interview Alejandro Umana in person?

A.    Yes.  I've spoke with Alejandro on many occasions.

Q.    And have those contacts been in jail?

A.    Yes.

Q.    And when you met with him, did you observe the tattoos on his face?

A.    Yes, I did, of course.  Initially we didn't talk about much about that.  But then later we began to talk about what the significance of that was for him and --

Q.    And what did he tell you about that?

A.    Well, it's a phrase.  You can't tell unless you look at it very closely.  But it's a phrase that starts at the beginning of one side of his -- underneath his brow, crosses his nose to the other side and it says, "no pude mas home boys".  Which roughly translated is, I couldn't do it any more, home boys.

Q.    And did he tell you why he had that done?

A.    Yes.

Laura Andersen, RMR 704-350-7493

**JA3084**

518

Q.   What did he tell you?

A.   He told me that it was a message to his home boys, meaning his fellow gang members, that when he's dead and in his --

MR. NAZZARO:  Objection, Your Honor.

THE COURT:  Basis?

MR. NAZZARO:  I'm not sure exactly the relevance of this.

THE COURT:  Overruled.

THE WITNESS:  That it was a message to his fellow home boys or his fellow gang members, that when he's in his coffin and dead, that they would be able to see that it was only in death that he would stop leading "La Vida Loca" or the crazy life.

Q.   (By Mr. Foster) And did you discuss with him that he was in fact a member of the MS 13 gang?

A.   Yes, I did.

Q.   When was the first time you ever had any -- or attempted to make any contact with any of his family members in El Salvador?

A.   My first initial trip to El Salvador was in May of 2009 in this case.

Q.   Previous to your first official trip on this case though, did you have occasion that you were there on another case?

Laura Andersen, RMR 704-350-7493

**JA3085**

519

A.   Yeah.   I was there on another case in late 2008, I want to say October.   And I traveled over to Santa Ana, which is where Alejandro was raised.

And based on the information I had gotten from Alejandro as to where I could locate his father.   His father Rafael is a street vendor.   Meaning he has a stand on the street where he sells small things, such as nail clippers or key chains and small items like this.   And he's always located in the same place, which is across from the National Museum in Santa Ana.

I found him mostly just to make contact, knowing that I would be going back down there in early 2009 to spend more time.   I wanted to just meet him and take a photograph, bring it back to Alejandro.

Q.   And did you in fact do that?

A.   Yes, I did.

Q.   And did you have the opportunity to speak with him on that occasion for some period of time?

A.   Not for a very long time.   I only had maybe an hour, hour and a half that day that I could just spend there.   It was en route to another place, and we spoke some.

I explained to him the charges that Alejandro was facing.   I asked a little bit about his history, and had him confirm some things that I had learned from Alejandro.

And just a brief discussion standing there on the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 249 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 01/30/11   Page 112 of 121
**JA3086**

520

street.

Q.   Okay.  And so did you obtain or seek to obtain any information at that time regarding other family members that you would try to contact in the future?

A.   Yes.  I let him know that one of the things I would want to do, would be to contact as many members of Alejandro's family as possible when I returned later on in 2009.  At that time I anticipated it was going to be earlier in 2009, but it turned out to be May before I could get there again.

Q.   Okay.  And was he generally cooperative with you at that point in your first visit in the fall of 2008?

A.   Yes.  He was -- I think that he understood -- I feel fairly safe in saying that he understood the charges that Alejandro was facing.  And it's difficult because the difference between the legal systems here and there, to explain what is involved in a case like this, in a capital case.

Q.   Okay.

A.   But I believe he understood that.

Q.   And did you then travel back there again solely for this case in sometime, 2009?

A.   In May of 2009, yes.

Q.   And did you make contact with him again?

A.   I did.

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 250 of 536
Case 3:09-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 113 of 121
JA3087

521

Q.   And what is his name again?

A.   Rafael Umana.

Q.   Okay.  And were you able to obtain -- were you able to meet with him and obtain information that you were seeking on this occasion?

A.   We had, yes.  I mean, up to a point.  We had -- on that occasion we had one sort of lengthy sit down talk at a cafe near where his place is in front of the museum.  And we began to talk about Alejandro's history, the family history.

And as I got more into the family history, this is when Rafael said, no, we're not going to talk about this.  I can't introduce you.  I won't introduce you to other members of Alejandro's family, such as Alejandro's maternal grandmother, or maternal aunt as well, and other folks that I had identified as being potentially important in trying to develop Alejandro's history.

Q.   And what did you at that point developed about who raised him and what their involvement was?

A.   Alejandro's father, Rafael was -- the word they use there is abandoned by his own mother at the age of 1 or 2.  And his mother had gone to live with another man --

Q.   This is Rafael you're talking about?

A.   Rafael.  Rafael was abandoned by his mother.  And she, his mother, who's name is Ana, went to live with another man in San Salvador leaving Rafael, Alejandro's father in the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 251 of 536
Case 3:08-cv-00134-RJC   Document 594   Filed 01/30/11   Page 145 of 121
**JA3088**

522

care of his grandmother, Francisca Gonzalez. Francisca, Alejandro's great grandmother, essentially raised Alejandro from the age of -- it was unclear from what age, but until the time she died when Alejandro was about seven years of age.

Q. And what were -- at this point in time, what had you been able to ascertain about the presence of Alejandro's mother in his life?

A. My understanding at that time was that his mother, Leticia Ramirez --

MR. NAZZARO: Objection, his understanding, Your Honor, I don't know --

THE COURT: I sustain as to form.

Ask you to lay a foundation.

THE WITNESS: I was -- sorry.

Q. (By Mr. Foster) What had Rafael told you about the presence of Alejandro's mother in his upbringing?

A. Rafael told me that he no longer had contact at all with Alejandro's mother, Leticia. That they had grown estranged when Alejandro was maybe as young as seven months to a year of age.

Q. And then what happened?

A. And that she, Leticia, maybe still lived in Santa Ana. Rafael wasn't sure where she might be found.

Q. And so did he tell you about whether after they had

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 252 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 115 of 121
JA3089

523

there estrangement, whether she was involved in raising Alejandro at all?

A.    No.  From the time that Alejandro was seven months old, thereabouts, he was raised with his great grandmother as his mother figure.

Q.    And was -- had you ever spoken with Alejandro about that subject as well?

A.    Yes.

Q.    Did he confirm or dispute that?

A.    No, he confirms it.  Of course it's not based on his recollection, it's what he's been told as he's been raised.

Q.    But as far as when he was older --

A.    Yes.

Q.    -- did he discuss with you that his mother was not in his life?

A.    Yes.  His mother was not in his life at all from the age of seven months to a year of age.

Q.    Okay.  So when you were talking with Mr. Rafael Umana on this occasion in May of 2009, were you attempting to get contact information on these other women, such as maternal grandmother and Alejandro's own mother?

A.    Yes, I was -- yes.

Q.    And did Rafael Umana give that information to you?

A.    No.  He never told me how I could locate or give me phone numbers for his own mother.  Which is Alejandro's

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 253 of 536
Case 3:08-cr-00134-RJC    Document 2247    Filed 01/30/11    Page 16 of 121
**JA3090**

524

maternal grandmother, who had a hand in raising him from the time he was about seven years old forward, or to a maternal aunt -- or two maternal aunts.  One who lived -- both of who lived at that time in El Salvador, who also had a hand in raising him from the age of seven forward.

The age of seven being about the time that Francisca the great grandmother passed away.

Q.   What did -- you were just getting to this point.  What did Rafael Umana tell you, or did he tell you why he was not going to give you this information?

A.   Yes, he did.

Q.   What did he tell you?

A.   He told me that in a period between the time that I was there in 2008, and in 2009, he, Rafael, was approached by members of the local national police, who identified themselves as detectives from the national police.  That were working in conjunction with members of the FBI on the case of Alejandro Umana here in the United States.

Rafael said that these two agents wanted him to go and be interviewed by an FBI agent identified by the name of "Joe" only.  And that would he, Rafael, get into a car with them and drive to a local hotel so that he could be interviewed.  And he refused to do that.

He told me that because of that, and because he refused, he said that he was told by these two detectives

Laura Andersen, RMR 704-350-7493

**JA3091**

525

that they --

MS. ROSE:  Well --

MR. NAZZARO:  Objection, Your Honor.  This is --

THE COURT:  I'll sustain the objection.

Q.  (By Mr. Foster) So based on these -- and what he told you -- did he ever, from that point forward, ever provide you any information that you were seeking to enable your contact to other family members

A.  No.  He never provided that information because he said that he was concerned about --

MR. NAZZARO:  Objection.

THE COURT:  You can ask questions about his state of mind, but not questions about what they told him that he told this witness.

MR. FOSTER:  Okay.

Q.  (By Mr. Foster) What did he tell you that his state of mind was as to why he wasn't going to talk to you.  Not what the other details, but just what his concerns were?

A.  He was concerned by his own well-being and the safety of his family.

Q.  Did you ever undertake independent steps yourself to try to locate and interview these other family members?

A.  Yes.  Principally the mother Leticia.

Q.  Did you ever succeed in finding or contacting any of them?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 255 of 536
Case 3:08-cv-00134-RJC    Document 59-7    Filed 01/30/11    Page 116 of 121
**JA3092**

526

A.   No.

Q.   What other means did you use to try to find them?

A.   I consulted with the Salvadoran Consul to try to obtain the mother's national identity records.  That did not work out.

I consulted, trying to look through birth records and other available records in Santa Ana to try to locate, or get some handle on where the mother might reside, but I was unable to do that.  I was unable to obtain any information that would help me to locate her.

I'm sorry.  Could I have a glass of water.  I'm just --

THE COURT:  Mr. Foster, approximately how much more?

MR. FOSTER:  Well, Your Honor, there are a number of videos that we will seek to introduce so it's going to be quite a while.

THE COURT:  Might be a good time to take our lunch break.

MR. FOSTER:  Okay.

THE COURT:  Members of the Jury, we will take our lunch break at this time, be out for roughly an hour.  And if you would be ready to come back in the court at 2:00, we will see you then.

(The jury was escorted from the courtroom.)

(Lunch recess.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 256 of 536
Case 3:08-cv-00134-RJC   Document 224   Filed 01/30/11   Page 119 of 121

JA3093

* * * * * *

Appeal: 10-6    Doc: 90-7    Filed: 08/14/2013    Pg: 257 of 536

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 257 of 536
Case 3:08-cr-00134-RJC   Document 534-7   Filed 01/30/11   Page 120 of 121

JA3094

528

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER


        I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

        Dated this the 26th day of April, 2010.




                        s/Laura Andersen
                        Laura Andersen, RMR
                        Official Court Reporter

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 258 of 536
Case 3:08-cv-00134-RJC    Document 32-7    Filed 01/30/11    Page 124 of 125
JA3095

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA          )    DOCKET NO. 3:08-CR-134-2
                                  )
     vs.                          )    VOLUME IV-B
                                  )    AFTERNOON SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA,  )
                                  )
          Defendant.              )
_____)

TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 26, 2010

APPEARANCES:

On Behalf of the Government:

     JILL WESTMORELAND ROSE
     Assistant United States Attorney
     100 Otis Street
     Asheville, North Carolina 28801

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue, NW
     Washington, DC 20530

On Behalf of the Defendant:

     MARK P. FOSTER
     Law Offices of Mark Foster, PC
     1011 East Morehead Street, Suite 300
     Charlotte, North Carolina 28204

     JOHN DAVID BRYSON
     Wyatt Early Harris & Wheeler, LLP
     P.O. Box 2086
     High Point, North Carolina 27261

CHERYL A. NUCCIO, RMR-CRR
United States District Court Reporter
Charlotte, North Carolina

**JA3096**

I N D E X

                                                            PAGE

DEFENDANT'S WITNESSES

RICHARD McGOUGH
        Direct Examination by Mr. Foster..............    532
        Cross Examination by Mr. Nazzaro..............    590

SELENA SERMENO
        Direct Examination by Mr. Bryson..............    600
        Cross Examination by Mr. Nazzaro..............    622
        Redirect Examination by Mr. Bryson............    636

MARIA SANTACRUZ GERALT
        Direct Examination by Mr. Foster..............    637

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 260 of 536
Case 3:08-cr-00134-RJC  Document 507  Filed 10/04/10  Page 2 of 126

JA3097

INDEX OF EXHIBITS

|  | OFFERED | RECEIVED |
|---|---|---|

DEFENDANT'S EXHIBITS

| | OFFERED | RECEIVED |
|---|---|---|
| No. 15...................................... | 536 | 536 |
| No. 16...................................... | 543 | 543 |
| No. 17...................................... | 545 | 545 |
| No. 18...................................... | 550 | 550 |
| No. 19...................................... | 557 | 557 |
| No. 20...................................... | 563 | 563 |
| No. 21...................................... | 564 | 564 |
| No. 22...................................... | 568 | 568 |
| No. 23...................................... | 572 | 572 |
| No. 24...................................... | 573 | 573 |
| No. 25...................................... | 576 | 576 |
| No. 26...................................... | 578 | 578 |
| No. 27...................................... | 579 | 579 |
| No. 28...................................... | 580 | 580 |
| No. 29...................................... | 582 | 582 |
| No. 30...................................... | 583 | 583 |
| No. 31...................................... | 584 | 584 |

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 261 of 536
Case 3:08-cr-00134-RJC  Document 50-7  Filed 10/04/10  Page 3 of 126
JA3098

Appeal: 10-6    Doc: 90-7    Filed: 08/14/2013    Pg: 262 of 536

MONDAY AFTERNOON, APRIL 26, 2010

THE COURT:  We ready for the jury?

MR. FOSTER:  Yes, Your Honor.

THE COURT:  Call the jury.

(Jury entered the courtroom.)

(Witness resumed the witness stand.)

THE CLERK:  You're still under oath.

THE WITNESS:  Yes, thank you.

THE COURT:  Mr. Foster, when you're ready.

MR. FOSTER:  Thank you, Your Honor.

RICHARD McGOUGH

DIRECT EXAMINATION (Cont'd.)

BY MR. FOSTER:

Q.    Mr. McGough, were you able in your -- the times you were able to speak with Mr. Rafael Umana about his son, were you able to determine -- I think you testified before the lunch break that Francisca, who was Alejandro's great grandmother, passed away when Alejandro was roughly seven?

A.    Yes.

Q.    Were you able to determine from Rafael who raised him from that point on?

A.    He was raised -- according to Rafael, he was raised by Rafael, and at that time for periods of time they lived with Rafael's mother, biological -- that would be Alejandro's maternal grandmother, and a maternal aunt as well.  They lived

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA3099

RICHARD McGOUGH - DIRECT

nearby and was partly responsible for taking care of Alejandro.

Q. Okay. And in your interviews that you were able to do with Rafael Umana, were you able to get any information about his birth circumstances?

A. According to Rafael during my interviews with him?

Q. Yes.

A. According to Rafael, Alejandro was born in Santa Ana at the hospital there.

Q. Okay. And did you ever succeed in getting any more information about -- to confirm that or anything?

A. Typically in El Salvador a birth is --

MR. NAZZARO: Objection, Your Honor, to a typical situation.

THE COURT: Overruled.

A. Typically in El Salvador a birth is registered by one or both parents at the mayor's office. A person will go some days after the birth, two or three days, and sit down and explain to the clerk there the circumstances of the birth, the date, the time. It's then registered there at the mayor's office. And that's the official birth record. There is no record from the hospital like we would have here in the states. That's carried over to be the basis for that information. It's from the parents.

In Alejandro's case, there is no birth certificate or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 263 of 536
Case 3:08-cr-00134-RJC    Document 1616    Filed 10/04/10    Page 5 of 126

JA3100

RICHARD McGOUGH – DIRECT

registration of birth like that in the Santa Ana mayor's office.  What is there is what is called a supplementary birth certificate.  This was typical during the civil war when a lot of records were destroyed all over the country in various mayors' offices, that after the war, during the period after 1992, the people would go to the -- to hire a notary or a lawyer to go and register, re-register their birth at the courthouse or at the mayor's office.  These were supplementary birth certificates based on information gathered from the person that's seeking to have their birth now registered.

A supplementary birth certificate like that exists for Alejandro that shows a date of birth of November of 1984.

Q.   Okay.  And were you able to get any more information from Rafael and/or Alejandro about where he was born and anything else about his early years?

A.   Yes.

Q.   And what was that?

A.   That he lived with -- now you're talking -- I'm sorry, you're referring to information that came from Rafael?

Q.   Yes.

A.   Okay.  According to Rafael, Alejandro lived with him until -- they lived in the house where Rafael and his grandmother resided until Rafael's grandmother -- great grandmother -- Rafael's grandmother died and then they moved to another part of Santa Ana.  This is roughly when Alejandro

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC-C   Document 50-7   Filed 03/23/17   Page 264 of 536
Case 3:08-cr-00134-RJC   Document 1566   Filed 10/04/10   Page 6 of 126
JA3101

RICHARD McGOUGH - DIRECT

was seven to eight years old.  And they resided there for -- until Rafael changed residences again when Alejandro was about 15 or 16 years of age.

Q.   And at the time you did have your interviews with Rafael, did he ever actually show you one of the residences that they had lived in?

A.   Yes.  He showed me -- he took me by a -- what's called a meson, m-e-s-o-n.  That's roughly a tenement house that -- where Rafael was living with his grandmother when Alejandro was -- came to live with him or was born.

Q.   Okay.

A.   And this is in Santa Ana.

Q.   And when you were down in Santa Ana, did you take a photograph of that residence that he showed you?

A.   Yes.

Q.   Showing you what's going to be marked as Defense Exhibit 15 for identification.  Do you recognize what that is?

A.   That's the house that Rafael indicated they were living in when Alejandro was born.

Q.   Okay.

        MR. FOSTER:  At this time I would move that into evidence, Your Honor, and seek to publish it.

        THE COURT:  Any objection?

        MR. NAZZARO:  No, Your Honor.

        THE COURT:  Let it be admitted.

        Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 265 of 536
Case 3:08-cr-00134-RJC   Document 1566   Filed 10/04/10   Page 72 of 126

JA3102

RICHARD McGOUGH – DIRECT

MR. FOSTER:  Publish?

THE COURT:  And you may publish.

(Government's Exhibit No. 15 was received into evidence.)

Q.   Looking at 15 there, Mr. McGough, is that a picture you took of that meson?

A.   Yes, it is.

Q.   And that word again translated -- I mean, what does it mean in English?

A.   Roughly a tenement house.

Q.   And did Rafael tell you what the conditions were living in that house?

A.   Yes.  This -- he couldn't remember how many rooms -- or how many families lived in this house at the time, but multiple families would have lived in this building and sharing one room.  A family would occupy a room and they would share a common kitchen and bathroom.

Q.   And did you ever speak with Alejandro about this?

A.   Yes.

Q.   What did he tell you about it?

A.   He says that this is the house that he remembers living in when he was a child.

Q.   And so the section of Santa Ana where this tenement house was located, is that a part of the city that's a poor part of the city, a rich part of the city?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 266 of 536
Case 3:08-cr-00134-RJC  Document 1606  Filed 10/04/10  Page 8 of 126
JA3103

RICHARD McGOUGH - DIRECT

A.   It's a -- it's an area -- the house is now abandoned. And the mesons are not as common as they used to be. They've been replaced by multiple family housing units that are located and built on the outside of town or the outskirts, the equivalent of the outskirts. This area is an area that's located near the hospital in Santa Ana. And it's not -- it's not a rich or poor, exclusively poor or rich neighborhood at this point. I guess we would term it as mixed. But it -- sorry, go ahead.

Q.   And did Rafael tell you anything about head injuries that he recalls his son Alejandro suffering from at an early age?

A.   Yes.

Q.   What did he tell you?

A.   He told me that when Alejandro was two or three years old, that he fell quite a distance. He as a child was climbing up apparently on -- he was climbing up, according to Rafael, to grab something that was high up on a shelf and fell over and hit his head.

Rafael then later told me that he -- he thought that maybe it was this injury or another injury to his head that caused him, Rafael, to carry -- physically carry Alejandro to the hospital. They lived near the hospital and he carried him running to the hospital. He had a -- he still has a visible scar on his forehead, Rafael -- I mean, Alejandro does from this injury.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 267 of 536
Case 5:08-cr-00134-RJC   Document 1606   Filed 10/04/10   Page 9 of 126
**JA3104**

RICHARD McGOUGH – DIRECT

Q.   You've seen that yourself?

A.   Yes.

Q.   And did Rafael also tell you anything about whether after those injuries, there was any -- he observed his son suffering from headaches?

A.   From that point forward, Alejandro has suffered from headaches periodically.  Rafael described it as head -- head injury -- head pain so severe that at times even as a teenager that Alejandro would weep because it would be so painful.  There was nothing -- there was no real treatment that was given to him.  There was no visit to a specialist that I was able to ascertain.  And it was treated with common pain medications like aspirin.  The equivalent of aspirin.

This has persisted and to the point where Alejandro, for instance, when he played football or soccer, he never could head the ball because of these injuries to his head.

Q.   And who told you that?

A.   Alejandro told me that.  Rafael told me that.

Q.   They both told you that?

A.   Yes.

Q.   Okay.  And did you -- based on that information, did you conduct any search when you were down in Santa Ana to find any kind of medical records that would substantiate this?

A.   Yes.  I tried to corroborate that through hospital records at the hospital in Santa Ana is San Juan De Dios.  And

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 268 of 536
Case 3:08-cv-00734-RJC   Document 34-7   Filed 10/04/10   Page 100 of 126

**JA3105**

RICHARD McGOUGH – DIRECT

I went there knowing from past cases that the policy in most hospitals that I've worked in in El Salvador is to maintain records only for five years, but there's always a hope that there will be some records that were overlooked.  And I searched through the hospital.  Had some help with folks there looking through there -- I was at least looking for a registration of the visit, but I could never find anything.

Q.   And in your contacts with Alejandro Umana himself in this case, have you discussed with him whether he's continued to have headaches past his childhood years?

A.   Yes.

Q.   What's he told you?

A.   He's told me that he does.  And I've been visiting with him when he's having a headache or having severe head pain.

Q.   Back when you interviewed Rafael, did he tell you about Alejandro's childhood, that it took place during certain conditions that were going on in a civil war that was taking place?

A.   Yes.  Alejandro was born during -- well, in the first years of the civil war --

MR. NAZZARO:  Objection.  Objection what he was told by his father, Your Honor.  I'm not sure if this is his opinion of what the war was or he was told this.

THE COURT:  I'll sustain the objection.  Ask you to rephrase the question.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 269 of 536
Case 3:08-cr-00134-RJC   Document 312   Filed 10/04/10   Page 4 of 126

JA3106

RICHARD McGOUGH – DIRECT

Q.   As far as what Rafael might have told you about the conditions that his son was raised in in his early years as far as the civil war goes, do you recall what he told you?

A.   Yes.  He told me that Alejandro was born, according to Rafael, in 1984 and that this was during the period of the civil war that lasted in El Salvador roughly from 1979, 1980 until the peace accords in 1992.

Santa Ana was an area, according to Rafael, that saw quite a bit of violence at the beginning of the civil war and that it was like -- all the country was subjected to a mandatory curfew usually starting at 6:00 p.m.  This lasted -- this would be something that would go on periodically, but during -- throughout the entire war.  Rafael told me that regardless of the curfew, that he would lock his family inside their house at sunset and that this was common practice.

And when asked about what atrocities or what he himself, Rafael, may have seen during the war, he told me about seeing --

MR. NAZZARO:  Objection to what Rafael saw.

THE COURT:  Sustained.

Q.   What did he tell you about the -- you know, the self imposed lock-in at sunset and what he said about its effects on Alejandro?

A.   The effects on Alejandro as observed by Rafael was that Alejandro as a child was very afraid.  The adults around him

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 270 of 536
Case 3:08-cv-00574-RJC   Document 34-20   Filed 10/04/10   Page 12 of 12

JA3107

541

RICHARD McGOUGH - DIRECT

were afraid, according to Rafael, and the -- that Alejandro himself felt fear even as a child from the conditions of the civil war.

Q.   Did Rafael also tell you about a situation he recalled where his son and some friends observed some violence or a dead body?

A.   Yes.

Q.   What did he tell you?

A.   Rafael told me that he -- that Alejandro came home and told him, Rafael, that he had seen a dead body.  This is when the family was living in an area at that time a little further away from the center of Santa Ana near a coffee plantation. And that Alejandro observed a body in the coffee plantation trees.

Alejandro's recollection is that --

Q.   Well, let me just stop you.

A.   I'm sorry.

Q.   So did you also speak with Alejandro about this?

A.   Yes, I did, I'm sorry.  Yes.  And Alejandro's recollection is that he had actually -- he and a friend or perhaps two friends witnessed five men attacking another man with machetes and killing him in the coffee trees, in that area, and then going home and telling Rafael about this.

Q.   What did -- in your discussions with Rafael, did he tell you anything about Alejandro's school attendance and how far

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 271 of 536
Case 3:08-cr-00734-RJC   Document 327   Filed 10/04/10   Page 3 of 126

JA3108

RICHARD McGOUGH - DIRECT

he went in school?

A.   Yes.  Rafael told me that Alejandro attended school at a primary school called Santa Ana de California which is located maybe two to three blocks from the area where Alejandro was living as a child.

Q.   Let me -- I'm sorry, let me -- before we get into that subject.  In your travels down there, did you obtain some family photographs from Rafael?

A.   Yes.

Q.   And did you bring those back to this country?

A.   Yes.  Copies of them I brought back.

Q.   And would they show Alejandro and his family, those photographs?

A.   Yes, they do.

Q.   Okay.  If I can show you what's been marked as Defense Exhibit 16 for identification and ask if you recognize that exhibit?

A.   Yes.  These are the three photographs that Rafael gave me.

Q.   Okay.  And do they depict Raf -- I'm sorry, Alejandro and his family?

A.   The top picture is a picture of Alejandro as a child alone.  The other two are --

Q.   Hold on here.

A.   I'm sorry.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 272 of 536
Case 3:08-cr-00734-RJC   Document 312   Filed 10/04/10   Page 4 of 126

JA3109

RICHARD McGOUGH -- DIRECT

Q.   Do you recognize those as the family photographs that Rafael gave you?

A.   Yes, they are.

        MR. FOSTER:  I would offer those into evidence at this time.

        THE COURT:  Any objection?

        MR. NAZZARO:  No, Your Honor.

        THE COURT:  Let it be admitted.

        MR. FOSTER:  And publish to the jury.

        THE COURT:  You may.

        (Government's Exhibit No. 16 was received into evidence.)

Q.   Mr. McGough, if you can start off with the top photograph.  What is that photograph -- or what were you told that's a photograph of?

A.   This is a photograph of Alejandro as a child.

Q.   Okay.  And how about the lower left photograph?

A.   This is a photograph of Alejandro in the middle, of course, as a child and his great grandmother Francisca and his father, Rafael.

Q.   So -- in that photograph, Francisca on the left, is that the great -- Alejandro's great grandmother who you testified you were told she died when Alejandro was seven?

A.   Seven years of age, right.

Q.   And what about the right photograph?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 273 of 536
Case 3:08-cr-00734-RJC   Document 31-7   Filed 10/04/10   Page 18 of 126
**JA3110**

RICHARD McGOUGH - DIRECT

A.   It's the same three people and it's unclear to me where this one is taken.  The one on the left is taken in front of the cathedral in Santa Ana.

Q.   All right.  And I'm going to show you another exhibit marked -- I believe we're on 17, I hope.

THE CLERK:  Yes.

Q.   Show you another photograph and ask if you recognize what that is.

Do you see it yet?

A.   No, there's nothing here.

Here we go.

Q.   Do you recognize what that photograph is?

A.   Yes.

Q.   Did you take that photograph?

A.   Yes.

Q.   And is that depicting something in Santa Ana?

A.   Yes.  This is the school that -- primary school that Alejandro attended.

MR. FOSTER:  Okay.  I would --

A.   It's the outside gate.

MR. FOSTER:  I would move Exhibit 17 into evidence and ask that it be published.

THE COURT:  Any objection?

MR. NAZZARO:  No, Your Honor.

THE COURT:  Let it be admitted and published.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA3111

RICHARD McGOUGH – DIRECT

(Government's Exhibit No. 17 was received into evidence.)

Q.   Mr. McGough, how do you know he attended that school? Who told you that?

A.   I went to -- well, Rafael told me he attended that school.

Q.   All right.  And let's move on to...

Okay.  So based on what Rafael told you, you identified that school there.  What was the name of that school?

A.   Santa Ana de California.

Q.   And --

A.   That's the short name, yeah.

Q.   Okay.  What kind of school is that?

A.   It's a primary school.  First through ninth grade.

Q.   Okay.  Is it a public school?

A.   First through ninth grade, yes.  It is a public school, yes.

Q.   Okay.  So other than telling you that he went to that school, what else did Rafael tell you about Alejandro's school years?

A.   Rafael told me that Alejandro had to repeat grades.  He didn't know how many.  That he struggled in school.  That Alejandro struggled with school.  And Rafael thought that Alejandro had repeated the third grade at least twice.

Q.   Okay.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 275 of 536
Case 3:08-cr-00734-RJC   Document 31-6   Filed 10/04/10   Page 17 of 126

JA3112

RICHARD McGOUGH - DIRECT

A.   Now, this -- I'm sorry.

Q.   And so based on that, and I'll get to this at a later point in time.  But did you later go to that school and seek to obtain more information yourself?

A.   Yes.  I went and obtained what records are available in a public school in El Salvador.

Q.   Okay.  I'll come back to that, but...

A.   Okay.

Q.   Did Rafael also tell you about at some point in time that he remarried or, I guess, got married for the first time to a woman other than Alejandro's mother?

A.   Yes, he did.

Q.   What did he tell you about that?

A.   He told me that he married his wife, whose name is Yanira, Y-a-n-i-r-a.  And that when he married Yanira, Yanira was 15 years of age.  And Rafael, I think at that point, was close to 30.  Thirty-one or 32.  And that from that point they lived together as husband and wife.  They -- the two of them, Rafael and Yanira, have two other children together.  Two daughters.

Q.   Did he tell you how old Alejandro was when he married Yanira?

A.   He told me that there were not many years separating them in age at the time that he married Yanira, and that they related more as brother and sister with the sort of -- the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 276 of 536
Case 3:08-cv-00734-RJC   Document 50-7   Filed 10/04/10   Page 18 of 128

JA3113

RICHARD McGOUGH - DIRECT

kind of tension and whatnot that might exist between brother and sister of the same age.

Q.   Now, did he tell you anything about them having difficulties getting along?

A.   They did have difficulties getting along, according to Rafael, and also according to Alejandro and other people that I spoke with in El Salvador.

Q.   Did Rafael tell you anything about whether that played any role in at some point Alejandro leaving the home?

A.   Rafael said it did play a part in that.  He did not give me a lot of details about that.

Q.   What age did he say Alejandro was when he left home?

A.   Between 16 and 18.

Q.   And in -- all right.  Tell us about your efforts to obtain any kind of documentation or corroboration of Alejandro's school attendance.

A.   Well, I made several visits to the school and the -- I need to explain a little bit about how records are maintained.

Q.   Well, do you have the background in determining that from your previous trips?

A.   Yes.  I've worked -- all the cases that have taken me to El Salvador -- most of them, I should say, have taken me to various schools, and through that I have learned what to ask for and how records might be kept.

Q.   Okay.  And what did you ask for at the school?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 277 of 536
Case 3:08-cv-00734-RJC   Document 316   Filed 10/04/10   Page 19 of 128

JA3114

RICHARD McGOUGH - DIRECT

A.    I asked to see the registration book or the registry book for the school and estimating the years that I would need to see.

Q.    Okay.

A.    And the way the registry book is set up is if a child finishes a school year -- and a school year in El Salvador runs from February to late November.  So when you ask for the school year, unlike here, you don't have to say '91/'92.  You just ask for the one year.  So it's a calendar year.  If a child finishes a grade or a year, their grades are entered into this large registry book for all of the classes.

       There's two shifts at the schools as well, so you have to make sure that you are looking in the right shift.  The morning shift and the afternoon shift.  Children typically -- and in this school in Santa Ana de California, it's run the same way.  Children attend school in the morning and have the afternoon off.  Many of them work.  Or they attend school in the afternoon and have the morning off.  So I was able to pull the records for Alejandro for three school years.

Q.    And which years were those?

A.    '91, '9 -- I'm sorry.  '91 was when his name first appeared as registered for the first grade.

Q.    Okay.  What was the next year?

A.    The next year was '92, I believe.  Let me make sure.
       '92 was the second grade.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 278 of 536
Case 3:08-cv-00734-RJC   Document 322-6   Filed 10/04/10   Page 20 of 126

JA3115

RICHARD McGOUGH – DIRECT

Q. Okay.

A. And then we find his name again registered in 1994 for the third grade.

Q. Okay. And did you find any records for the 1993 school year?

A. No, there were no records for the 1993 school year.

Q. And the -- what you've been referring to up there, did you bring back copies of those records and provide them to us in this case?

A. Yes.

Q. And if we can pull that up and you can take a look at it on the screen. This will be Defense Exhibit 18 for identification. And if you could just maybe veri -- page through --

A. Okay. Mine is upside down.

Q. One moment.

A. That's right side up.

Q. Okay. Do you recognize those documents as the ones you've been referring to?

A. Yes, those are the --

Q. Okay.

A. These are them.

MR. FOSTER: I would offer the Exhibit 18 into evidence and ask to publish it to the jury.

THE COURT: Any objection?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 279 of 536
Case 3:08-cr-00734-RJC  Document 326  Filed 10/04/10  Page 247 of 126

JA3116

RICHARD McGOUGH - DIRECT

MR. NAZZARO:  No, Your Honor.

THE COURT:  Let them be admitted -- or let it be admitted and published.

(Government's Exhibit No. 18 was received into evidence.)

Q.   We're looking at, Mr. McGough, page 1.  Is this the page from the first year you testified to which would be 1991, I believe, or not?

A.   Well, I can't quite see it.  If you can scroll down so I can see the top right corner.

Yeah, that's 1991.

Q.   And does Alejandro Umana's name appear on a certain line on this document?

A.   It will take me a minute to recognize this.

THE COURT:  You can adjust that screen up and down.

A.   It's upside down again.

Q.   Yeah, we're working on that.  Just a minute.

A.   Okay.  His name is in position number 21 on the second page of the 1991 records.

Q.   Okay.  So that's the top row on the screen we're looking at now?

A.   Yes.

Q.   Okay.  So the grading system that's used there as you read across is a combination of a number and then a letter; is that correct?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 280 of 536
Case 3:08-cr-00134-RJC   Document 2167   Filed 10/04/10   Page 22 of 126

JA3117

RICHARD McGOUGH - DIRECT

A.    Yes, uh-huh.

Q.    And scrolling through, then, to the -- can we go to the next page, page 3.

      Is this for the -- do you recognize this page as being from another school year or the same school year?

A.    It's from -- it's from 1992, yes.

Q.    Okay.  So this would be the second grade year.

A.    Yes.

Q.    Okay.

A.    Second grade.

Q.    And looks like down on line...

A.    Twenty-one again.

Q.    Okay.  And once again, if you read across for grades, it has a series of numbers and letters, correct?

A.    Yes.

Q.    And...

A.    Next page.

      MR. FOSTER:  Go one more.

A.    This is 1994.

Q.    Okay.

A.    Third grade.

Q.    And it looks like his line -- his name is on, looks like line 7 maybe.

      Do you see his name there?

A.    Yes.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA3118

Q.   And so this is for the third grade in 1994?

A.   Yes.

Q.   Okay.  And the far right column through your interviews and through your experience down there, what does that column say?

A.   The last column?

Q.   Yes.

A.   The second to last column.  Resultado.

Q.   What does that mean?

A.   It means the results for that year.

Q.   And what's marked under -- for Umana?

A.   For Alejandro's name there's an R, which means retenido, which means retained or kept back.

Q.   And as part of your work down there, did you -- this exhibit was admitted and published, correct?

         THE COURT:  Yes.

         MR. FOSTER:  One moment, Your Honor.

Q.   Mr. McGough, in addition to the trips you've already testified in May of 2009, you've been back twice or more than once on other dates on this case to El Salvador?

A.   On this case specifically, once in October.

Q.   Okay.

A.   And then in February of this year.

Q.   In February of this year, did you conduct a videotaped interview of the director of that school?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 282 of 536
Case 3:08-cv-00734-RJC   Document 3170   Filed 10/04/10   Page 24 of 126

JA3119

RICHARD McGOUGH - DIRECT

A.   Yes, I did.

Q.   Okay.  And have you viewed it to see if it's an accurate depiction of what he said when he was interviewed?

A.   Yes.

        MR. FOSTER:  Your Honor, at this time we would seek to introduce that and play that at this time.

        THE COURT:  Any objection?

        MR. NAZZARO:  Your Honor, we object to part of that tape which doesn't talk about the school.  There's other things that he just -- he's in a conversation with him about, so...

        THE COURT:  Let me see you all at sidebar.

        (Side-bar conference as follows:)

        THE COURT:  All right.  Your objection?

        MR. NAZZARO:  Yes, Your Honor.  The tape we saw, this was one of the interviews, was the director of the school and he talks about the meaning of the transcripts, explaining what they mean.  We don't have an objection to that.

        But there's all these other discussions about the war and about this.  And he doesn't personally know Umana.  He just is interpreting the transcripts.

        And so we don't object to that part of the video. But all the other extraneous stuff I don't think is relevant in their mitigation or to any part of this case.

        THE COURT:  What do you say, Mark?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 283 of 536
Case 3:08-cr-00134-RJC   Document 1250   Filed 10/04/10   Page 283 of 536

**JA3120**

RICHARD McGOUGH - DIRECT

MR. FOSTER:  Well, I think it was basically background as to what was going on in Santa Ana during the time he went to school.  It's nothing...

MR. NAZZARO:  He wasn't his principal.

MR. FOSTER:  Right.

MS. ROSE:  And he also said he lived in a different town, I thought.  That he was from a town nearby.  Also, that this guy spent part of the wartime in the United States.

THE COURT:  I'll sustain the objection to that part of the video.  If you want to ask him -- or play it about what that transcript means, that's certainly relevant and you can do that.

MR. FOSTER:  I'm not sure --

MR. BRYSON:  Logistically...

MR. FOSTER:  I don't remember if that's the end or the -- do you remember where it is on it?

THE COURT:  Well, can --

MR. BRYSON:  We can play it and stop it when it gets to an objectionable point.

THE COURT:  I mean, can you just have this witness testify to -- what's the probative value of the videotape of that if Mr. McGough can --

MR. FOSTER:  Well, I mean, I guess -- I assume he's able to remember everything that he was told.

THE COURT:  I'm perfectly willing to let you play

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 284 of 536
Case 3:08-cv-00734-RJC   Document 1260   Filed 10/04/10   Page 26 of 126

**JA3121**

RICHARD McGOUGH - DIRECT

the video on that if you can find it and only play that part. But if you're having trouble playing that part...

MR. FOSTER:  Well, it will just take time to watch it again and realize exactly where that part is that shouldn't be shown, so -- that would take time to do that.  Or else we can just play it and stop it when we get there.  Or else I can just try to ask him to testify to it.

THE COURT:  I don't care how you do it as long as it's consistent with the court's ruling.

MR. FOSTER:  Okay.

THE COURT:  And so whatever is the most effective way for you to present it is fine with me.

MR. FOSTER:  All right.  Well, let's --

MR. BRYSON:  I'm kind of deferring to you on this one.

THE COURT:  Why don't we do this.  Why don't you have McGough testify to what he can --

MR. FOSTER:  Okay.

THE COURT:  -- in terms of what the witness told him and if there's -- you feel a need --

MR. FOSTER:  Okay.

THE COURT:  -- to follow up with the video at a later point --

MR. FOSTER:  Okay.

THE COURT:  -- properly sanitized, I'll let you do

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 285 of 536
Case 3:08-cv-00734-RJC   Document 322-6   Filed 10/04/10   Page 27 of 126

JA3122

RICHARD McGOUGH - DIRECT

that.

MR. FOSTER:  All right.

(End of sidebar conference.)

RICHARD McGOUGH

DIRECT EXAMINATION (Cont'd.)

BY MR. FOSTER:

Q.   All right.  Mr. McGough, do you recall the conversation where you interviewed the school director --

A.   Yes, I do.

Q.   -- in February 2010?

A.   Yes.

Q.   And what's his name.

A.   Carlos Arcides, A-r-c-i-d-e-s.

Q.   And when you interviewed him in February 2010, what did he tell you his position was?

A.   He is the -- he's currently the director of that school, of the Santa Ana de California school.

Q.   Mr. McGough, showing you what's coming up hopefully on your screen as Exhibit Number 19 for identification.  Do you recognize that photograph?

A.   Yes.  That's the director of the school.

Q.   That's the man you interviewed?

A.   Yes, it is.

MR. FOSTER:  Okay.  I would ask that that be admitted and published at this time, Your Honor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16cv-000573-MOC   Document 50-7   Filed 03/23/17   Page 286 of 536
Case 3:08-cv-00734-RJC   Document 3450   Filed 10/04/10   Page 286 of 536

JA3123

RICHARD McGOUGH – DIRECT

THE COURT: You may.

(Government's Exhibit No. 19 was received into evidence.)

Q. And did you interview Mr. Arcides -- is that how you say it?

A. Right.

Q. Did you interview him about the school records?

A. Yes, I did.

Q. Was he the principal during the time that Alejandro was a student at that school?

A. No, he was not.

Q. Okay. And did you have him try to interpret these school records and tell you what it really meant?

A. Yes, I did.

Q. And did you go through each of the school years?

A. Yes.

Q. Okay. Can you tell us what you recall that he told you about the meaning of the records for the 1991 first grade school year.

A. Yes, I can.

Q. Okay.

A. I'm going to review my notes.

Q. Would it help you to have that exhibit back up, the school records or...

A. I think I have it condensed here.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA3124**

RICHARD McGOUGH - DIRECT

Q. Okay. I'm going to pull it back up anyway.

A. Okay.

Q. Which is Exhibit --

A. I need to correct his name.

Q. Okay.

A. It's P-e-r-a-z-a. It's Peraza Arcides.

Q. Okay.

A. It's P-e-r-a-z-a.

Q. Did he tell you about the grading system that is used -- or that is commonly used in elementary schools in El Salvador?

A. Yes, he did.

Q. What did he tell you?

A. Well, it's based on a series of numbers and letters; ten being the maximum and, of course, zero being the lowest. And then there's a series of letters that are employed, sometimes differently in some schools, but he told me how they used the letter grades in his school.

Q. Okay. What did he tell you about that?

A. Well, I'm going to have to read from my notes.
    Nine to ten is considered excellent or excelente.

Q. And what's the letter that corresponds?

A. E, I'm sorry.

Q. Okay.

A. Seven to eight is considered MB, which means muy bueno or very good. I'll just say it in English if that would be best.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 288 of 536
Case 3:08-cr-00734-RJC   Document 52-6   Filed 10/04/10   Page 30 of 126

JA3125

RICHARD McGOUGH – DIRECT

Q.   You can do both.

A.   Five to six is B for bueno, which is good.

     Three to four is R for regular, not very good.  Also means so-so.

     And one to two is NM, which means necesita mejorar or needs to improve.  That's basically a failing grade.

Q.   Okay.  So --

A.   Below four is actually a failing grade.

Q.   Okay.  And so did you also discuss with him the fact that you could find no records for the 1993 school year?

A.   Yes, I did.

Q.   What did he tell you about what that might mean?

A.   It could mean one of two things.  One is that Alejandro's parents or father did not enroll --

     MR. NAZZARO:  Objection, Your Honor.  Speculation or what he actually knows?

     THE COURT:  Overruled.

A.   It means one of two things.  One is that Alejandro's father did not register him in school that year or he was not registered in school that year, or he did not complete the school year and therefore was not entered into the registry book for that school year.

Q.   And what did he tell you about the 1994 third grade school records?

A.   1994?

                 Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 289 of 536
Case 3:08-cv-00734-RJC   Document 1256   Filed 10/04/10   Page 34 of 126

JA3126

RICHARD McGOUGH - DIRECT

Q.   Yes.

A.   He told me that looking at these grades and this sheet for this year, he noted -- he, the director, noted that there's very few students in that class compared to what would be a normal number of students for a class.  You can see on the other pages, there's 20, 21, 23.  That this appeared to him -- he doesn't know because he wasn't the director at this point, but it appeared to him based on his information and knowledge that this was a special, maybe what we might want to call a remedial class.  And that it is -- you can see at the top right-hand corner that it says -- where it says nivel de educacion, level of education, it says primero, segundo y tercero grados.

          THE COURT REPORTER:  I'm sorry.

          THE WITNESS:  I'm sorry, should I spell this for you?

          THE COURT REPORTER:  Well, I can't speak Spanish and I can't take it down, so I'm having a hard time with that.

          THE WITNESS:  I'm sorry.  Primero, p-r-i-m-e-r-o, segundo, y tercero, t-e-r-c-e-r-o grados.  It's first, second and third grade.

          So this -- to the director, this was very different because it's a combination of first, second and third graders together in one class.  And that he observed -- the director observed and saw on these records that Alejandro had not

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 290 of 536
Case 3:08-cv-00734-RJC   Document 31-6   Filed 10/04/10   Page 32 of 126

JA3127

passed this grade.  He had failed.

Q.   And that's -- was that based on the grades that are recorded there?

A.   Yes.

Q.   Okay.  And did he tell you anything about that -- the meaning of the last column, the one that says result or resultado?

A.   Yes.

Q.   What did he tell you?

A.   He told me that an R entered into there would mean that the kid -- the child was retained or kept back.  Would have to repeat that grade.

Q.   And in your own conversations with Alejandro himself, did he tell you about whether -- did he ever tell you anything about whether he had to repeat the third grade?

A.   Alejandro has told me that he attempted the third grade at least twice.

Q.   And so would the 1994 school records, was that the end of any records you could find of him being in school?

A.   That was all I could find.

Q.   Now, were you able to determine in your interviews of Rafael what his son Alejandro ended up doing after he wasn't in school anymore?

A.   Yes.

Q.   What did he tell you?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 291 of 536
Case 3:08-ct-00734-RJC   Document 31-6   Filed 10/04/10   Page 33 of 126

JA3128

RICHARD McGOUGH - DIRECT

A.   He told me that Alejandro tried a number of different jobs.  Rafael couldn't remember it exactly what age this was, but it was sometime after he had finished school.  So sometime after 1994 Alejandro tried various trades.

Q.   And what trades did he work in or try to work in?

A.   He worked for a period of time in a shoe repair shop.  He worked for a period of time in a tire repair garage.

Q.   Okay.

A.   And he also worked as an assistant on a Coca-Cola delivery truck.

Q.   Okay.  Did he tell you what age Alejandro was when he worked as an assistant on the Coca-Cola delivery truck?

A.   Rafael estimated that he was between 15 and -- 15 and 16.

Q.   And did you also speak with Alejandro about that?

A.   Yes, I did.

Q.   Did he also confirm that he had that job?

A.   Yes, he did, yes.

Q.   And were you able to determine from Alejandro or Rafael how long he worked in that type of work?

A.   Alejandro has estimated that he worked doing this -- being an assistant to the Coca-Cola delivery for about a year, maybe a year-and-a-half.

Q.   And did Rafael have any recollection?

A.   Rafael recalled that he worked for a period of time, but he didn't know at what age it was that he quit working for

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 292 of 536
Case 3:08-cv-00534-RJC   Document 1266   Filed 10/04/10   Page 349 of 426

JA3129

RICHARD McGOUGH - DIRECT

Coca-Cola.

Q.   And in doing your work trying to confirm or find people that could corroborate various things, did you find anyone who Alejandro had worked for in this Coca-Cola delivery truck business?

A.   Yes.

Q.   And who was that?

A.   His name is Miguel Eduardo Castaneda.

Q.   Okay.  And before I do that, if you can look at what's coming up on your screen as Exhibit 20 for identification. I'll ask if you recognize what that is?

A.   Yes.

Q.   What is that?

A.   This is a photograph that Rafael gave me that shows Alejandro here on the left and another person who's name is not known that Alejandro also assisted as a worker on the Coca-Cola truck.

        MR. FOSTER:  At this time I would move Exhibit 18 -- I'm sorry, Exhibit 20 into evidence and ask it be published.

        THE COURT:  Any objection?

        MR. NAZZARO:  No objection.

        THE COURT:  Let it be admitted and published.

        (Government's Exhibit No. 20 was received into evidence.)

Q.   So that's the photo you obtained from Rafael?

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 293 of 536
Case 3:08-cr-00734-RJC   Document 3256   Filed 10/04/10   Page 38 of 126

JA3130

RICHARD McGOUGH - DIRECT

A.   Yes.  Well, it's a copy.  I made a copy in El Salvador, yes.

Q.   Okay.  And did you -- in February 2010, did you conduct a videotaped interview of Eduardo --

A.   Yes, I did.

Q.   -- Castaneda?

A.   Uh-huh.

Q.   And he was who again?

A.   He was the person that had hired Alejandro to be his assistant on the Coca-Cola delivery truck.

Q.   And have you reviewed the video to see if it accurately depicts what he told you on that date?

A.   Yes.

Q.   And does it?

A.   Yes, it does.

         MR. FOSTER:  Okay.  At this point, Your Honor, we would move that video into evidence as Exhibit 21 and ask that it be published.

         THE COURT:  Any objection?

         MR. NAZZARO:  No, Your Honor.

         THE COURT:  Let it be admitted.  You may publish.

         (Government's Exhibit No. 21 was received into evidence and published to the jury.)

BY MR. FOSTER:

Q.   All right.  Mr. McGough -- Mr. McGough, you, as you've

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 294 of 536
Case 3:08-cr-00734-RJC   Document 31-26   Filed 10/04/10   Page 36 of 126

JA3131

RICHARD McGOUGH – DIRECT

already stated, are fluent in Spanish, correct?

A.   Yes.

Q.   Why was that interview conducted in English with a translator?

A.   Just to facilitate it being played in court.

Q.   Now, in speaking with -- you mentioned soccer, and you also testified earlier that Alejandro's father, I believe, told you about him playing soccer.  Did Alejandro also tell you about any attempts to make it on to a regional soccer team or something and how that went?

A.   Yes.

Q.   What did he tell you about that?

A.   Alejandro told me that he had an opportunity to participate in what's called the selection.  I don't quite understand how the system of soccer and the selection up to the national level works, but this was a selection from various teams throughout the region to play on one team, to represent a specific area.  But that he was not able to do that.

Q.   Did he tell you why?

A.   Yes, he did.  He had the skills, he was a good player, but he didn't have proper identification.  He didn't have an identity card.  He didn't have a birth certificate in order to obtain the identity card when he was a kid, a teenager.  And his family also -- his father didn't have the funds to buy him

Case 3:16-cv-00573-MOC   Document 50-7   Filed 03/23/17   Page 295 of 536
Case 3:08-cv-00734-RJC   Document 94-6   Filed 10/04/10   Page 37 of 126
**JA3132**

RICHARD McGOUGH - DIRECT

the necessary equipment.

Q.   And did you determine from speaking with Rafael and Alejandro that -- I think you mentioned earlier that Rafael had said that Alejandro moved out of the home somewhere between ages 16 and 18.

A.   Yes.

Q.   And did you also speak to Alejandro about that too?

A.   Yes.

Q.   And did either one of them tell you where he went to live when he moved out?

A.   Yes, Alejandro did.

Q.   What did he tell you?

A.   Alejandro told me that he went to live with a family that he had met, a friend whose name was -- he had a friend from football, from soccer whose, name was Carlos Yovani, Y-o-v-a-n-i, Herrera, H-e-r-r-e-r-a.  And that he went to stay with Carlos.  At that time he also with Carlos and a fella -- a couple other young guys were participating and practicing and doing break dance and that's how they also became friends. But that based on that friendship, he asked -- or was asked to go and stay with Carlos' family.

Q.   And so did he tell you that he in fact moved in with Carlos' family?

A.   He did tell me that.

Q.   And did he give you any indication of how long he lived

Case 3:16-cv-00573-MOC   Document 50-7   Filed 03/23/17   Page 296 of 536
Case 3:08-cv-00734-RJC   Document 50-7   Filed 10/04/10   Page 38 of 126
JA3133

RICHARD McGOUGH - DIRECT

with them?

A.   Alejandro estimated that he lived and worked with them for as much as a year.

Q.   And who did you interview in the Carlos Herrera family to get this information, if anyone?

A.   I also interviewed Carlos Aqino, A-q-i-n-o, Herrera, who is the father, and also the sister Karla, K-a-r-l-a, Herrera.

Q.   Anyone else?

A.   In that family?

Q.   Yes.

A.   About him living with them?

Q.   Yes.

A.   Just the three of them.

Q.   Okay.  The three -- who was the third person?  The son?

A.   I'm sorry, yes, Carlos Yovani.  I'm sorry, yes, I thought I had mentioned him.  The friend that had brought him over to live with him, Carlos Yovani.

Q.   And did they confirm that, in fact, Alejandro had lived with them?

A.   Yes, they did.

Q.   Showing you what's been marked and coming up as Exhibit 22 for identification.  I ask if you recognize what that is?

A.   Yes.  That's a photograph taken in October of last year of Karla Herrera on the right, of course, and her brother Carlos Yovani taken in front of their house.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 297 of 536
Case 3:08-cv-00574-RJC   Document 31-60   Filed 10/04/10   Page 39 of 126

JA3134

RICHARD McGOUGH – DIRECT

Q.    Okay.

A.    In a neighborhood just outside of Santa Ana.

Q.    Did you take that photograph?

A.    Yes, I did.

Q.    Okay.

MR. FOSTER:  At this time I would offer into evidence Exhibit 22 and ask to publish.

THE COURT:  Any objection?

MR. NAZZARO:  No, Your Honor.

THE COURT:  Let it be admitted and published.

(Government's Exhibit No. 22 was received into evidence.)

Q.    So the person on the left, then, would that have been the friend of Alejandro who asked him to move in with his family?

A.    Yes.  And I should mention there's another brother that was also -- played football with him, but I never got a chance to meet him.

Q.    Okay.  And so did you also interview this gentleman's father about some work that Alejandro did for him?

A.    Yes.

Q.    And was that Carlos...

A.    To distinguish them, I call them Carlos Aqino and Carlos Yovani.

Q.    Which one is the older or father?

A.    Aqino.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 52-7   Filed 03/23/17   Page 298 of 536
Case 3:08-cr-00734-RJC   Document 1266   Filed 10/04/10   Page 40 of 126

JA3135

RICHARD McGOUGH – DIRECT

Q.    Did you speak to him about Alejandro ever working for him?

A.    Yes, I did.

Q.    What did he tell you?

A.    He told me that at that time he, Carlos Aqino, had a construction company.  And that in the period of 1999 and 2000 –– 1998, '99 and 2000, he had a lot of work around the country constructing communication towers, cell phone towers and television towers or antennas.  That his job was –– and what he contracted with the providers of cell phone coverage and television was he contracted to build a base for these enormous towers made out of concrete and that his major work was in block and concrete.  And he –– he, Carlos Aqino, identifies himself as a mason.  And his sons –– this son, Carlos Yovani, and his other son, whose name, I'm sorry, is slipping my mind right now, worked with him and that Alejandro came to work with them as well as an assistant or a helper.

Q.    Okay.  And did he tell you about a certain place they went to or certain project they worked on at some point in time?

A.    The project that Alejandro worked on for a period of about six months was located near the coast, the Pacific coast in El Salvador near a town called Metalio, M-e-t-a-l-i-o.  That they had the job there of constructing, like I said, a base for a television tower or an antenna.  And that work

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 299 of 536
Case 3:08-cv-00734-RJC   Document 316-7   Filed 10/04/10   Page 44 of 126
JA3136

required Carlos Aqino to have a crew there for a period of time for as much as -- it was estimated five to six months that they were there on the ground working.  They would commute sometimes.  The drive between Metalio and Santa Ana is maybe an hour, hour and 15 minutes now, and they would commute some, but mostly they stayed there during the week and worked out there in Metalio.

Q.    And where did they stay when they were out there?

A.    Well, Carlos Aqino rented a small house from the family that owned the land on which the tower was constructed.  This family rented a house so that they could sling up their hammocks and stay there.  Some of them slept in the big truck as well.  And they all took their meals from this family, from the woman who lived there whose family owned the property where the tower was built.

Q.    When you say they all took their meals, who are you referring to?

A.    I'm sorry, I'm referring to all the workers that worked for Carlos Aqino, including Alejandro.

Q.    What else did Carlos Aqino tell you about that project and Alejandro's part of it?

A.    He told me that Alejandro worked there for that period of time and that he worked as an assistant which involved, you know, carrying and stringing rebar for concrete construction.

Q.    Okay.  And did you also travel out to that town Metalio

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 300 of 536
Case 3:08-cr-00734-RJC   Document 31-6   Filed 10/04/10   Page 42 of 126

JA3137

RICHARD McGOUGH – DIRECT

and interview the family that provided the housing and some of the meals during this period of time?

A.   Yes.  I did, yes.

Q.   And who was the -- did you interview a woman who recalled Alejandro being there back in those years?

A.   Yes.

Q.   And what was her name?

A.   Her first name is Bernardina, B-e-r-n-a-r-d-i-n-a, Rivera.

Q.   How were you able to locate and identify her?

A.   Alejandro was able to describe to me roughly where this place was located.  It's located in the department -- El Salvador, instead of states, has departments.  It's located in the Department of Sonsonate which is one of the departments that touches the coast or runs along the coast.  He was able to describe to me that it was located on the road leading to the border with Guatemala from Metalio.  And so there's maybe 15 of these towers on that road, and just the process of elimination.

Q.   So you eventually found -- found the family that remembered this project and remembered Alejandro?

A.   Yes.  Now, they remembered it by remembering that Carlos Aqino had constructed the tower and that Alejandro had worked there with Carlos Aqino.

Q.   And did you record an interview with this woman

Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD McGOUGH – DIRECT

Bernardina in February 2010?

A.   Yes.

Q.   And have you reviewed that to see if it accurately reflects what she told you during that interview?

A.   Yes, I did.

Q.   And once again, was it conducted in English and translated to her and then back to you in English?

A.   Yes.  Again, using a local translator from El Salvador.

Q.   Okay.

          MR. FOSTER:  And I would mark that as Exhibit 23 and ask to introduce that and publish that at this time, Your Honor.

          THE COURT:  Any objection?

          MR. NAZZARO:  No, Your Honor.

          THE COURT:  You may -- it's admitted.  You may publish it.

          MR. FOSTER:  Thank you, Your Honor.

          (Government's Exhibit No. 23 was received into evidence and published to the jury.)

BY MR. FOSTER:

Q.   Mr. McGough, a couple times in that interview it said something about -- you said something referring to we've talked before.  What were you referring to?

A.   I was referring to a visit that I made there in May of 2009.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 302 of 536
Case 3:08-cr-00734-RJC   Document 322   Filed 10/04/10   Page 44 of 126

JA3139

RICHARD McGOUGH – DIRECT

Q.   And during the same -- during those other -- well, during both visits, did you also meet someone named Judy Vanessa Rivera?

A.   Yes.

Q.   And who is she?

A.   She is the person we just saw, Bernardina's granddaughter.

Q.   And did you also talk to her about her recollections of Alejandro?

A.   Yes, I did.

Q.   Okay.  And did you also videotape a quick interview of her?

A.   I did.

Q.   Okay.  And have you reviewed it to see if it accurately shows what she said to you?

A.   Yes.

Q.   And does it?

A.   Yes, it does.

        MR. FOSTER:  At this time, Your Honor, I would offer that as Exhibit 24 and ask to introduce it and publish it.

        THE COURT:  Any objection?

        MR. NAZZARO:  No, Your Honor.

        THE COURT:  It's admitted.  You may publish it.

        THE WITNESS:  Shall I spell her name?

        (Government's Exhibit No. 24 was received into

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-000573-MOC   Document 50-7   Filed 08/23/17   Page 303 of 536
Case 3:08-cr-00734-RJC   Document 1260   Filed 10/04/10   Page 49 of 126

JA3140

RICHARD McGOUGH – DIRECT

evidence and published to the jury.)

BY MR. FOSTER:

Q.   Okay.  Mr. McGough, did you also have occasion at some point to interview this person named as Alfredo or Freddy?

A.   Yes, I did.

Q.   And was that in person or over the phone?

A.   That was in person.

Q.   Okay.  And what did he tell you about his recollection of this time period?  Is this the Alfredo they were referring to in these videos?

A.   That's right, Alfredo Rivera.

Q.   All right.

A.   Alfredo told me that Alejandro had come down to Metalio with Carlos Aqino and his sons -- or son to work on the tower. Stayed there while he constructed -- they constructed a tower. And then would periodically come back to visit.  But there was a period of time estimated by Freddy to be maybe six months, three to six months in which Alejandro stayed and helped Alfredo in his job which was taking care of the cattle -- or cows on a small farm located just across the road from where this family lives.

     Alfredo also told me the same as the other folks mentioned, about the tattoo.  That he came back after having been gone -- Alejandro came back after having been gone for a period of time and had a tattoo on his shoulder and that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 304 of 536
Case 3:08-cv-00734-RJC   Document 1250   Filed 10/04/10   Page 46 of 126

JA3141

RICHARD McGOUGH - DIRECT

Alfredo gave him a hard time about that.

Q.   And did Alfredo say why he gave Alejandro a hard time about the tattoo?

A.   He said because to be tattooed like that is an indication that you are a member of a gang, a mara, and that that carries with it all kinds of problems in El Salvador.

Q.   Did he tell you when he -- when he reacted -- or when he said this to Alejandro, did he say how Alejandro reacted?

A.   He said that Alejandro hung his head down, put his head down and didn't fight, didn't react, didn't come back at him with any kind of argument.  And he described Alejandro as being a person that is humble.  Humilde is the word in Spanish, h-u-m-i-l-d-e, which has a lot of different meanings, but it means a person who is humble and quiet, and that he reacted -- Alejandro reacted to his criticism in that way.

Q.   And did Alfredo tell you whether he ever saw Alejandro again?

A.   Never saw him again, he said.

Q.   So basically, was he saying that Alejandro never returned to the family residence there, that area?

A.   From that time forward, no one in his family saw Alejandro.

Q.   And from your contact with Alejandro Umana yourself, did he ever tell you what year he joined MS 13?

A.   He told me that he joined MS 13 in 2001 in Santa Ana.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 305 of 536
Case 3:08-cr-00134-RJC   Document 1250   Filed 10/04/10   Page 47 of 126

JA3142

RICHARD McGOUGH - DIRECT

Q.   I'm going to ask you to take a look at what I'm pulling up as Exhibit 25 and see if you -- ask if you recognize that?

A.   Okay.  I don't see anything yet.

Q.   Okay.  Hold on.  It's coming.

     Do you see that now?

A.   Yes, I do.

Q.   And do you recognize that photograph?

A.   I do, yes.

Q.   Did you take that photograph?

A.   I did.

Q.   And who's in that picture?

A.   On the right is Alejandro's father, Rafael, and to his right is his wife, Yanira, and their daughter.

Q.   What's the daughter's name?

A.   (No response.)

Q.   That's all right.

A.   Sorry.

     MR. FOSTER:  At this time I would offer Exhibit 25 into evidence and ask to publish.

     THE COURT:  Any objection?

     MR. NAZZARO:  No, Your Honor.

     THE COURT:  Let it be admitted.

     (Government's Exhibit No. 25 was received into evidence.)

Q.   So this is Rafael, the father of Alejandro, that you've

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 306 of 536
Case 3:08-cr-00734-RJC   Document 3250   Filed 10/04/10   Page 48 of 126
**JA3143**

been referring to throughout your testimony today.

A.   Yes.  This was a photograph that I took -- yes, it is.

Q.   And when did you take this photograph?

A.   It's a photograph that I took when I visited there briefly on another -- when I was there in El Salvador on another case in 2008.

Q.   So that's when you testified earlier you were there in the fall of 2008 and came by and found him?

A.   That's right, yeah.  And this was taken on the street. If you can imagine, behind the telephone booth is -- on the street is where Rafael has his stand.  His -- he's a street vendor and that's where he has his stand permanently.

Q.   Now, did you also, from talking with Alejandro, determine whether he had had any relationships, romantic relationships that led to children?

A.   Yes, I did.

Q.   And what did he tell you about that?

A.   Alejandro has had two children by two different mothers, two different women.  His first son is -- his name is Rafael Enrique.  And the mother's name is Monica Reyes.

Q.   Okay.  And what did he tell you about...

A.   He told me that he met Monica when -- Alejandro told me that he met Monica when Alejandro was visiting friends and hanging out with friends that lived in a place just behind where Monica's family -- or Monica lived with her mother at

Case 3:16-cv-00573-MOC   Document 50-7   Filed 08/23/17   Page 307 of 536
Case 3:08-cv-00734-RJC   Document 50-60   Filed 10/04/10   Page 49 of 126
JA3144

RICHARD McGOUGH – DIRECT

the time.

Q.   Okay.

A.   And at that time that he met her, Monica was still a student in the eighth or ninth grade.  She was 14 when they met.

Q.   Okay.  And showing you what's been marked as Exhibit 26 for identification.  If you can take a look at that.  Do you recognize that photograph?

A.   Yes, I do.

Q.   Did you take that photograph?

A.   I did.

Q.   And who's portrayed in that?

A.   That is Monica.  And that is Alejandro's son, Rafael Enrique.

        MR. FOSTER:  I would offer Exhibit 26 and ask to publish.

        THE COURT:  Any objection?

        MR. NAZZARO:  No, Your Honor.

        THE COURT:  Let it be admitted.

        (Government's Exhibit No. 26 was received into evidence.)

Q.   And did you also at some point in time in 2010 in February come back and conduct a videotaped interview of Monica?

A.   Yes, I did.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16cv-000573-MOC   Document 50-7   Filed 03/23/17   Page 308 of 536
Case 3:08-cr-00734-RJC   Document 52-60   Filed 10/04/10   Page 50 of 128

JA3145

RICHARD McGOUGH - DIRECT

Q.   And have you reviewed that video to see if it accurately reflects what she said?

A.   Yes, I did.

MR. FOSTER:  I would offer that at this time as Exhibit 27 into evidence and ask to publish that, Your Honor.

THE COURT:  Any objection?

MR. NAZZARO:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 27 was received into evidence.)

BY MR. FOSTER:

Q.   Mr. McGough, did you, as part of your work down in El Salvador, did you try to locate a -- earlier you testified about this supplemental birth certificate thing that you said that Alejandro told you that he had obtained.

A.   Yes.

Q.   And did you obtain a copy of that?

A.   Yes.

Q.   Okay.  Showing you what's been marked as Exhibit 28 for identification.  Is it on your screen?

A.   No.

Q.   Not yet.

Now?

A.   Yes, it is, uh-huh.  That's it.

Q.   Do you recognize that exhibit?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 309 of 536
Case 3:08-cr-00734-RJC   Document 1260   Filed 10/04/10   Page 51 of 126

JA3146

RICHARD McGOUGH – DIRECT

A.   Yes.

Q.   Okay.  Is that a copy of the supplemental birth certificate type item that you recovered in El Salvador?

A.   Yes, it is.

Q.   And is this the one you testified about earlier that Alejandro told you he had obtained?

A.   That's right.

Q.   And did Alejandro tell you why he had obtained this?

A.   He obtained this so that he could obtain a DUI, a D-U-I, which in El Salvador is the national identity document, and he wanted to obtain that document so that he could then go and register the birth of his son, Rafael Enrique.

Q.   Okay.

     MR. FOSTER:  I would at this time offer into evidence Exhibit 28 and ask to publish.

     THE COURT:  Any objection?

     MR. NAZZARO:  No, Your Honor.

     THE COURT:  Let it be admitted and published.

     (Government's Exhibit No. 28 was received into evidence.)

Q.   It's in Spanish, correct, Mr. McGough?

A.   Yes, it is.

Q.   But that's the document that you've been referring to that is essentially some sort of...

A.   Supplementary.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 310 of 536
Case 3:08-cr-00734-RJC   Document 3260   Filed 10/04/10   Page 52 of 126

**JA3147**

RICHARD McGOUGH – DIRECT

Q.   Okay.  And that's what you testified about earlier about a way you can sort of go in after the fact and get a certificate issued as to your date of birth?

A.   Yes.

Q.   And then you say he did this in part so he could register his son?

A.   Yes.

Q.   His birth certificate?

A.   That's right.  In order to go to the mayor's office and register his son's birth, he would need -- he, Alejandro, would need to have an identity document.

Q.   And when you were down in Santa Ana, did you also retrieve a copy of the birth certificate of Alejandro's son Rafael?

A.   Yes.

Q.   Do you see that on your screen, Mr. McGough?

A.   Yes.

Q.   Showing you what's marked as Defense Exhibit 29 for identification.  Do you recognize that?

A.   Yes.

Q.   What is that?

A.   This is a registration of the birth of Alejandro and Monica's son, Rafael.

Q.   Okay.  And what is the date of birth shown on the document?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-000573-MOC    Document 50-7    Filed 03/23/17    Page 311 of 536
Case 3:08-cr-00734-RJC    Document 1260    Filed 10/04/10    Page 53 of 126

JA3148

RICHARD McGOUGH – DIRECT

A.   The 12th of February of that year which was -- I don't remember the year.  It's at the bottom of the document.

MR. FOSTER:  Okay.  Scroll down.

A.   2004.

Q.   Okay.  And so that, as far as you were told by Alejandro and what this document says, this birth certificate is for the boy that was in the video we just watched?

A.   It is.  It is for his son, that's correct.

Q.   All right.  Did you also --

MR. FOSTER:  Oh, I would move that into evidence and ask to publish it, I'm sorry.

THE COURT:  Any objection?

MR. NAZZARO:  No, Your Honor.

THE COURT:  Let it be admitted.

(Government's Exhibit No. 29 was received into evidence.)

Q.   Now, again, Mr. McGough, this is in Spanish so the jury may not be able to make sense of it.  But this is what you just testified about was the birth certificate for Alejandro's son Rafael, correct?

A.   That's correct.

Q.   Thank you.  And did Alejandro also tell you that he had another child with another lady?

A.   Correct.

Q.   And what's -- what did he tell you about the woman and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 312 of 536
Case 3:08-cr-00734-RJC   Document 1350   Filed 10/04/10   Page 54 of 126

JA3149

RICHARD McGOUGH – DIRECT

the child?

A.   He told me that the mother of the child, her name is Wendy Alvarez.

Q.   Okay.

A.   And that his son with Wendy, Dennis, was born in the United States in Hempstead, New York, which is on Long Island.

Q.   All right.  Pulling up Exhibit 29 for identification.  I ask if you recognize what that is?

          THE CLERK:  Thirty.

          MR. FOSTER:  Thirty, I'm sorry.

A.   This is a birth certificate for Alejandro's son Dennis with his -- with Wendy Alvarez.

Q.   Did you obtain that birth certificate?

A.   Actually, Wendy Alvarez gave this to me and we made a copy.

Q.   Okay.  And where did you obtain that from her?

A.   In Hempstead, New York.

Q.   Okay.

          MR. FOSTER:  I would offer that into evidence and ask to publish it, Your Honor.

          THE COURT:  Any objection?

          MR. NAZZARO:  No, Your Honor.

          THE COURT:  Let it be admitted.

          (Government's Exhibit No. 30 was received into evidence.)

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 313 of 536
Case 3:08-cr-00734-RJC    Document 5125    Filed 10/04/10    Page 58 of 125

JA3150

RICHARD McGOUGH – DIRECT

Q.   So this would indicate that the baby, the child Dennis, was born in May of 2005.

A.   That's correct.

Q.   In the United States.

A.   Correct.

Q.   Okay.  Now I'm going to pull up what's marked as Defense Exhibit 31 for identification and ask if you can take a look and tell me if you recognize that?

A.   Yes.

Q.   What is that?

A.   That's a photograph that I took of Wendy Alvarez and Alejandro's son, Dennis.

     MR. FOSTER:  I would move that into evidence and ask to publish that, Your Honor.

     THE COURT:  Any objection?

     MR. NAZZARO:  No, Your Honor.

     THE COURT:  Let it be admitted.

     (Government's Exhibit No. 31 was received into evidence.)

Q.   So you took that picture of Wendy and Alejandro's son, Dennis.

A.   Yes, I did.

Q.   And the various information that you've testified during the course of this day, have you provided that to Dr. Selena Sermeno and Maria Santacruz Geralt?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 314 of 536
Case 3:08-cv-00734-RJC   Document 31-6   Filed 10/04/10   Page 58 of 126

JA3151

RICHARD McGOUGH – DIRECT

A.    I provided them with a summary of my work in this case to date.  Well, almost to date, yes.

Q.    And now, in the last ten days or so, have you also received a copy of another birth certificate that was provided by the government for Alejandro Umana?

A.    Yes, I did.

Q.    Okay.  And what -- what does that indicate?

A.    Let me just grab it here quickly.

Q.    Looking at -- we're pulling it up on the screen -- Exhibit 32 for identification.  Do you see that?

A.    Yes.

Q.    Okay.  Now, did you in your investigation in El Salvador ever obtain this certificate yourself?

A.    No, I didn't.

Q.    And was it provided to you in the last ten days through this case from the government?

A.    That's right.  It was in the last week or so.  That's right.

Q.    Okay.  And does this conflict with the other information that you'd been provided about the date of birth of Alejandro Umana?

A.    It does.

Q.    And how?

A.    By two years.

Q.    Okay.  What date does this indicate?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 315 of 536
Case 3:08-cr-00134-RJC   Document 360   Filed 10/04/10   Page 57 of 126

JA3152

RICHARD McGOUGH - DIRECT

A.   This indicates that Alejandro was born in 1982, on November 25th of 1982.

Q.   So the date of birth is just two years earlier.

A.   Two years earlier.

Q.   And what about the location of the birth?

A.   This is a registration of birth in Guatemala in an area known as Escuintla, which is located maybe an hour or so above -- or to the north of Santa Ana, Guatemala.

Q.   And your working assumption throughout this case prior to receiving this, your information about the year that Alejandro Umana was born, where -- who provided that to you?

A.   Alejandro.

Q.   Okay.

A.   And also his father, Rafael.

Q.   Okay.

A.   And according to the supplementary birth certificate, it also had the year of birth of 1984.

Q.   And so assuming this current one is accurate, the difference would be everything -- he'd be two years older during each event rather than the age you thought he was --

A.   Exactly.

Q.   -- is that accurate?

A.   Yes.

Q.   And so have you -- strike that.

          MR. FOSTER:  I have no further questions.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 316 of 536
Case 3:08-cr-00134-RJC   Document 1450   Filed 10/04/10   Page 58 of 126
JA3153

RICHARD McGOUGH – DIRECT

THE COURT:  We'll take our afternoon break at this time, members of the jury.  Don't talk about the case.  Keep an open mind.  Take a 15 minute break.  See you at 4:30.

(Brief recess at 4:15 p.m.)

THE COURT:  Ready for the jury?

MR. FOSTER:  Just one thing, Your Honor.  I would request leave of court to ask a few more questions of the witness regarding the last exhibit I failed to --

THE COURT:  Sure.

MR. FOSTER:  Thank you.

THE COURT:  Call the jury.

THE MARSHAL:  We need the prisoner.

THE COURT:  Well, that would help.  Thank you.

(Defendant entered the courtroom.)

THE COURT:  All right.  Let's call the jury.

(Jury entered the courtroom.)

THE COURT:  I want to thank the jury for your attention.  We have one more segment to go this afternoon so if you'd pay close attention for this remaining hour-and-a-half.

Mr. Foster, you have some brief concluding questions?

MR. FOSTER:  Yes, Your Honor.  Thank you.

RICHARD McGOUGH

DIRECT EXAMINATION (Cont'd.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 317 of 536
Case 3:08-cr-00734-RJC   Document 3156   Filed 10/04/10   Page 59 of 126

JA3154

RICHARD McGOUGH – DIRECT

BY MR. FOSTER:

Q.   Mr. McGough, directing your attention back to Exhibit 32, the last certificate we looked at.  That's the birth certificate from Guatemala that we received from the government.  Do you remember looking at that earlier?

A.   Yes.

Q.   When that came to you, did it also have a third page that is some sort of narrative written in Spanish?

A.   Yes.

Q.   And did you review that as part of reviewing the birth certificate?

A.   Yes, I did.

        MR. FOSTER:  At this time I would move into evidence 32 and ask to publish.

        THE COURT:  Any objection?

        MR. NAZZARO:  Your Honor, the narrative, I don't know that that's relevant.  The birth certificate is.

        THE COURT:  I'll admit the birth certificate at this time, excluding the narrative.

        MR. FOSTER:  All right.  Well, we have it all in one document electronically so we'll have to figure that out later.

        THE COURT:  All right.  For purposes of admission and publication, we'll admit the birth certificate sans the narrative.

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 318 of 536
Case 3:08-cr-00734-RJC   Document 2167   Filed 10/04/10   Page 60 of 125

JA3155

RICHARD McGOUGH - DIRECT

MR. FOSTER:  Well, I was going to ask Mr. McGough some questions about what's in the narrative.  Is that --

THE COURT:  Let me see the attorneys at sidebar.

(Side-bar conference as follows:)

THE COURT:  This would have been a good thing to take up before we got the jury here.

MR. FOSTER:  Sorry.

THE COURT:  We've got an official record with some narrative attached to it.

MR. FOSTER:  Right.

THE COURT:  What is the probative --

MR. FOSTER:  Well, the narrative is from the El Salvadoran police.  They tracked down Leticia Diaz Ramirez, our client's mother, who we were never able to find or contact.  And she provided a story about -- she's the one that provided the birth certificate to the police and explained why it is they were down in Guatemala.

THE COURT:  What's the relevance?

MR. FOSTER:  It just completes the life story and why -- the conditions of his birth and the issues with his family in mitigation.  I mean, that they -- outside the -- I mean, that there's doubt -- issues about when he was really born and where he was really born, going to his personal identity.

THE COURT:  I think you have that with the birth

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 52-7   Filed 08/23/17   Page 319 of 536
Case 3:08-cv-00734-RJC   Document 31-6   Filed 10/04/10   Page 61 of 126

JA3156

RICHARD McGOUGH - CROSS

certificate.  And I'm not sure I understand the effect of the narrative and I'm worried that it would confuse and mislead the jury.  And so I'm going to stick with the ruling I made in court that you can admit the birth certificate, but I'm going to exclude the narrative from the jury's consideration.  And I don't know how we do that electronically, but we'll worry about that --

MR. FOSTER:  Okay.

MR. BRYSON:  We can work that out.

THE COURT:  -- later.

MR. FOSTER:  All right.

(End of sidebar conference.)

MR. FOSTER:  No further questions.

THE COURT:  Any cross?

MR. NAZZARO:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. NAZZARO:

Q.   Mr. McGough, I didn't see in your report the date when Mr. Umana, Wizard, joined the MS 13.  You testified about it, but I didn't see it in your report.  Is it in there?

A.   No, it's not.

Q.   Okay.  So that's not something you put in your report, is it?

A.   No.  It's something I asked him about yesterday.

Q.   You just asked him about it yesterday?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 320 of 536
Case 3:08-cr-00134-RJC   Document 507   Filed 10/04/10   Page 62 of 126
**JA3157**

RICHARD McGOUGH – CROSS

A.   Yes.

Q.   You thought it was relevant yesterday?

          MR. FOSTER:  Objection.  Argumentative.

          THE COURT:  Sustained.

Q.   Now, there's been some videos you showed that contradict that; isn't that true?

A.   I'm sorry, contradict the date?

Q.   Yes.  There's -- grandma said that in 2002 he was coming freely and voluntarily there and visiting with the cattle and his friends and working on a tower.  Isn't that what she said, basically?

A.   I believe that she -- I may be wrong.  I don't know that she put a date to that.  Did she put a year to that in the video?

Q.   I'm asking you.  You interviewed her.

A.   Well, my understanding from having talked to her is that she didn't make a precise date about that.  She recalled that it was something like six months to a year for a period of time that he came to visit after the construction of the tower.  It was -- I'm sorry.

Q.   No, go ahead.

A.   I was going to say it was the daughter or granddaughter who put a year of 2002.

Q.   Okay.  Which would have made him 18; isn't that correct?  Even under your birth certificate.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

RICHARD McGOUGH - CROSS

A.   My birth certificate?

Q.   Yeah, the birth certificate you obtained.  That would have made him 18 when he joined the gang?

A.   You mean the supplementary birth certificate?

Q.   Yeah, the supplementary birth certificate.

A.   Which has a 1984 date of birth, correct.

Q.   According to the Guatemala one, that would have made him 20 --

A.   That's right.

Q.   -- isn't that true?

A.   That's true.

Q.   In fact, isn't it true in your report you indicate that he was, in fact, living with this family when he was 17 or 18, the family that was providing work on the towers.

A.   Yes.

Q.   Okay.  So he was not in the MS 13 at that time; isn't that true?

A.   That's -- that's what I have come to understand.

Q.   And you've investigated this pretty thoroughly as far as that goes.

A.   As far as the date of when he was jumped in?

Q.   Well, he wasn't associated with a gang at that point in his life, was he?

A.   I don't think so, no.

Q.   Now, he also told you that he -- why he joined the gang;

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 50-7   Filed 08/23/17   Page 322 of 536
Case 3:08-cr-00734-RJC   Document 3156   Filed 10/04/10   Page 642 of 126

JA3159

RICHARD McGOUGH - CROSS

isn't that true?

A.   Yes.

Q.   And that was because of a girl.

A.   That's what he said.

Q.   That's what he said.  Well, that's what you have in the report; isn't that true?

A.   That's correct, yes.

Q.   Now, with respect to the women in his life, there were -- there were two that were mothers of -- or he fathered children by; is that correct?

A.   Yes, sir.

Q.   According to your investigation.

A.   Yes, sir.

Q.   And who was the one that was on the video?  What was her name again?

A.   Monica.

Q.   Monica.  And he had that baby in '04, according to the birth certificate; is that correct?

A.   2004.

Q.   And that's the same year he left El Salvador and illegally entered the United States; isn't that true?

A.   I believe that's the same year, yes, sir.

Q.   And I think from the -- if I understand the testimony and your interviews, is that he's never communicated with Monica or his child for -- until he became incarcerated here in North

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 323 of 536
Case 3:08-ct-00734-RJC   Document 132-50   Filed 10/04/10   Page 68 of 126

JA3160

Carolina.

A.    That's what Monica said, yes.

Q.    And isn't it also true that at the same time he left Monica and his child behind, he got Wendy pregnant in El Salvador in the same year, 2004?

A.    It would appear so, yes.  I think you're right.

Q.    And then he left Wendy there also; isn't that correct?

A.    Left her in El Salvador?

Q.    I suppose that's where she -- I know she had the baby in New York, but she got pregnant in El Salvador, I think, according to her testimony.

A.    That's right.

Q.    And he left in 2004.

A.    He left in 2004, yes, sir.

Q.    And the baby was born in New York.

A.    In 2005.

Q.    And we didn't see Wendy on a video; is that correct?

A.    That's correct.

Q.    She's now, I guess, pregnant with another man; is that true?

A.    I don't know that, no.

Q.    Did you interview her?

A.    I did interview her.

Q.    Did you ask her that?

A.    I didn't ask her if she was pregnant, no, sir.  I

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 324 of 536
Case 3:08-cv-00734-RJC   Document 31-60   Filed 10/04/10   Page 64 of 126

JA3161

RICHARD McGOUGH - CROSS

interviewed her in April of 2009.

Q.   And do you have any other videos that you haven't played here today?

A.   No.

Q.   So these were the ones you selected to play.  You made that decision; is that correct?

MR. FOSTER:  Objection.  Misstates the testimony.

THE COURT:  Sustained.

Q.   Now, with respect to the birth of his first child, that birth certificate indicates that Wizard indicated he was a bricklayer at the time; is that right?  That was his employment.

A.   Bricklayer and helper.

Q.   With respect to your report, you had a lot of conversations with Rafael; is that right?

A.   Yes, sir.

Q.   More than one.

A.   Many.  Many small ones.

Q.   And with respect to this whole idea that -- of the atrocities during the war, that Wizard may have seen some, Rafael couldn't recall that, right?

A.   (No response.)

Q.   I think the words you used in your report are Rafael couldn't recall whether or not Alejandro would have personally witnessed some of the common atrocities associated with the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 325 of 536
Case 3:08-cv-00734-RJC   Document 52-50   Filed 10/04/10   Page 67 of 126

JA3162

RICHARD McGOUGH – CROSS

war.

A.    That's correct.

Q.    Okay.  So there was nobody that said that.  His father said he can't recall one way or the other.

A.    His father said that he can't recall if Alejandro saw the kind of atrocities that he, Rafael, saw.

Q.    And this whole other story you presented on your direct examination about the machetes, you also note in your report that was not necessarily connected to the war.

A.    Rafael doesn't know if it's connected to the war.

Q.    Well, you don't know either.

A.    No, I don't.  No, you're absolutely right, I don't know.

Q.    Okay.  And you talked to Rafael and he doesn't know.

A.    That's right.

Q.    And you obviously talked to the defendant and he doesn't know either.

A.    He doesn't recall at what age he saw that.

Q.    With respect to his schooling and his school records, isn't it true, Mr. McGough, that there were others in that same class who fared as well or worse than he did in that class?

A.    That's true.

Q.    And you've explained the grading system and the system in El Salvador.  And the scale, then, is if you get three or above you pass; is that correct?

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 326 of 536
Case 3:08-cr-00734-RJC    Document 512-0    Filed 10/04/10    Page 584 of 726

JA3163

RICHARD McGOUGH – CROSS

A.   No, it's -- I'd have to give you some detail to explain that.  It's not a yes or no answer.

Q.   Well, in your report you indicate that three or four is a regular, not very good, so-so.

A.   Right.

Q.   Can that be passing?

A.   No.  An overall score of four by an average, depending on the school and depending also on the year, is a failing grade.

Q.   Okay.  But it could be a passing grade, a four.

A.   Not normally.  In the first three years, what they call the first cycle, they will promote a child up to the third grade if they have a four.  But beyond the third grade normally -- and I'm talking in the present -- the present period of time in which Alejandro was a child, which was the war years, they were regularly promoting children even beyond the third -- the first cycle.

Q.   Now, none of those other people -- we saw the interviews with the Coke supervisor.  He only worked with the defendant for six months, if I recall; is that correct?

A.   It was a short period of time.

Q.   He's not a member of MS 13, is he?

A.   No.

Q.   Okay.  And we saw the other family that he lived with that was a construction -- constructed these towers throughout El Salvador.  We saw a picture of his son.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00573-MOC   Document 50-7   Filed 03/23/17   Page 327 of 536
Case 3:08-cv-00673-RJC   Document 1257   Filed 10/04/10   Page 69 of 126

JA3164

RICHARD McGOUGH – CROSS

A.   That's right.

Q.   He's not a member of MS 13, is he?

A.   No, not to my knowledge.  And I don't believe he is, no.

Q.   And he worked with the defendant during those years; is that correct?

A.   Yes, sir.

Q.   Do you have any other summaries of any other interviews you've conducted?

A.   No.

Q.   Okay.  This report that you provided is your summary document.

A.   That's right.

Q.   And so it would be this report that you would have provided to the other witnesses that were referenced in your testimony.

A.   This is -- this is the report that I provided to Selena Sermeno and -- is that who you're asking about?

Q.   That's who I'm asking about.

A.   Yes.  Yes, sir.

Q.   Okay.  And did you provide the videos to them?

A.   No.

Q.   Did you provide any other information?

A.   I provided a copy of this latest document concerning the birth in Guatemala and the police narrative that accompanies it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 328 of 536
Case 3:08-cr-00734-RJC   Document 1250   Filed 10/04/10   Page 704 of 726

JA3165

Q.   Okay.  Did you provide any other -- any other information?

A.   No.

Q.   Other than what you just testified about?

A.   No.  I've talked to them about what's in the report and that's it.

Q.   And so whatever they have to say is based on what you provided, as far as you know.

A.   Yes.  Yeah, well, I'm sure they'll say more, but what they'll say concerning what I provided them will be based on this report, yes, sir.

Q.   Okay.  Based on the facts of his upbringing and all that are based on your report and some of the things you testified here today.

A.   That's correct.

          MR. NAZZARO:  I have no further questions.

          THE COURT:  Any redirect?

          MR. FOSTER:  I have no further questions.

          THE COURT:  You may step down and be excused.

          Call your next witness.

          THE WITNESS:  Thank you.

          (Witness stepped down.)

          MR. BRYSON:  We'll call Selena Sermeno.

                    SELENA SERMENO,

being first duly sworn, was examined and testified as follows:

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 329 of 536
Case 3:08-cr-00734-RJC   Document 5267   Filed 10/04/10   Page 749 of 126

**JA3166**

SELENA SERMENO - DIRECT

DIRECT EXAMINATION

BY MR. BRYSON:

Q.   Would you tell the jury what your name is, please.

A.   Selena Sermeno.

Q.   And where were you born?

A.   I was born in El Salvador.  San Salvador, the capital of the country of El Salvador.

Q.   Are you a citizen of El Salvador?

A.   I am a naturalized citizen of the United States.

Q.   Okay.  And were you raised in El Salvador?

A.   I was raised in El Salvador until I was 18 years of age.

Q.   And is that when you came to the United States?

A.   I came to the U.S., yes.  I was -- it was 1977.  I was 18 years old.

Q.   Why did you come to the United States?

A.   I obtained a scholarship to an American -- a liberal arts college in the U.S.  It was an American baptist school.  And the war -- the circumstances that led to the civil war were beginning to brew.  I was a teenager and my parents thought that I would probably be safer outside of El Salvador.

Q.   Where do you currently reside?

A.   I -- I divide my time between Santa Fe, New Mexico, and Ridgeway, Colorado.

Q.   And what is your occupation?

A.   I'm a psychologist.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 330 of 536
Case 3:08-cv-00734-RJC   Document 31-60   Filed 10/04/10   Page 230 of 286

JA3167

SELENA SERMENO - DIRECT

Q.    What is your educational background?

A.    I have a bachelor's in botany from Ottawa University in Ottawa, Kansas.

I have a master's of divinity from Central Baptist Theological Seminary focusing on pastoral counseling.

I have a master's in guidance counseling and psychology from the University of Northern Colorado at Greeley.

And I hold a PhD in counseling psychology from Temple University in Philadelphia.

Q.    Can you briefly explain your work history since taking your PhD in 1994.

A.    I have worked -- a great deal of my work has been with children, families and teenagers in the state of New Mexico. I have also worked as an administrator, as a clinical director. I have worked as a -- and I also do a great deal of work as a consultant. Most of my work has been clinical in nature.

Q.    What does that mean?

A.    Clinical in nature basically means that I have done a great deal of work serving children, treating children, adolescents and families.

Q.    Have you done any work with the early child programs, like Head Start?

A.    Yes. Yes. I -- I firmly believe that the foundations of who we become in life begin with the early years. I -- and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 331 of 536
Case 3:08-cv-00734-RJC   Document 122-7   Filed 10/04/10   Page 331 of 536
JA3168

SELENA SERMENO - DIRECT

I -- so I'm very committed to the study, the treatment, the advocacy of young children, particularly to the birth of empathy and the birth of conscience in young children.  And so I have a foot in the early childhood world and then I have a foot in the adolescent world.  I also work as a consultant for the Children, Youth and Families Department of the State of New Mexico.

Q.   What is that?  What is the Children...

A.   I'm not quite sure what the equivalent would be in North Carolina, but it would be like perhaps the child -- the state -- the department of child welfare, perhaps.  Children, Youth and Families in New Mexico oversees child welfare, juvenile justice, early childhood.  And I consult to the juvenile justice programs.

Q.   And does that involve correctional facilities?

A.   Yes.  Yes.  I have a contract with the juvenile justice system.  The name of the facility where teenagers are incarcerated or held in New Mexico -- in the state of New Mexico is called the Youth Development and Diagnostic Center, YDDC.  And that's the place where I provide a great deal of consultation services.

Q.   While you were in New Mexico, you worked as a child therapist; is that correct?

A.   Yes.

Q.   And did you do a doctoral psychological internship?

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 332 of 536
Case 3:08-ct-00734-RJC   Document 50-7   Filed 10/04/10   Page 43 of 126

JA3169

SELENA SERMENO - DIRECT

A.   Yes.  In order to obtain a PhD in psychology, in clinical counseling psychology, one is required to do a certain number of internship hours.  And so because of my interest in childhood trauma and moral development in children, I chose the University of New Mexico, the Department of Child Psychiatry because they had good programs focusing in those categories.

Q.   You also worked as a child psychologist at the St. Vincent Hospital in Santa Fe, New Mexico.

A.   Yes.  St. Vincent Hospital is the main hospital for Santa Fe County, and I worked there in collaboration with a pediatric clinic.

Q.   And at that facility were you responsible for diagnostic assessments for children and adolescents?

A.   Yes.

Q.   You were also in the private practice as a psychologist from 1990 to 2004?

A.   Yes.

Q.   And during that time, have you specialized in the treatment of children and families?

A.   Yes, as well as consultation.  I think that as my clinical experience grew, I was -- I began to be asked to do training and consulting services to organizations serving children and youth.

Q.   Have you also specialized in treatment of victims of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 333 of 536
Case 3:08-cv-00734-RJC   Document 42-7   Filed 10/04/10   Page 9 of 126

JA3170

SELENA SERMENO – DIRECT

traumatic events?

A.   Yes.

Q.   Have you conducted forensic evaluations on juvenile delinquents?

A.   I did as part of my training when I was a doctoral intern.

Q.   You've been the recipient of grants in the past; is that correct?

A.   Yes.

Q.   Is there one that you had that went from 1996 to 2002?

A.   Yes.  A former mentor teacher of mine, her name is Virginia Satir.  She was a very well-known family therapist. And I had the privilege of being one of her translators and one of her students.  And when she died -- she came to El Salvador with me at some point.  And when she died, she left monies for me to go back to El Salvador and other Central American countries after the cease fires and to offer my knowledge on a pro bono basis to organizations working with children and youth there.

Q.   You have also recently been working with Salvadoran youth; is that correct?

A.   Yes.  This February, about eight weeks ago.  Something like that.

Q.   And what were you doing at that time?

A.   I was working in collaboration with the Peace Corps and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 334 of 536
Case 3:08-cv-00734-RJC   Document 326-1   Filed 10/04/10   Page 76 of 126

JA3171

SELENA SERMENO - DIRECT

with volunteers from the U.S. government Peace Corps program, and I was -- we were -- we provided a camp which was, in essence, a violence prevention, again, prevention camp for youth from marginalized areas of El Salvador.  We provided leadership development and conflict resolution skills for teenagers.

Q.   What was the subject of your dissertation?

A.   It was the impact of -- I'm sorry, the impact of political violence on the moral development of youth on the potential for antisocial behavior and on the symptomatology or the degree of post traumatic stress disorder among adolescents.

Q.   Can you explain the work that you did in your dissertation.

A.   Yes.  I looked at -- for many years I had been concerned about the level of violence that so many Salvadoran children had been born into.  And so as part of my doctoral work, I went back to El Salvador to look at -- to study the impact of political violence on their capacity to make decisions of a moral nature, as well as to look as to whether or not being exposed to such degrees of violence made a teenager much more vulnerable to commit acts of delinquency or acts of violence.

     I also looked at whether or not these teenagers exhibited the diagnosis of post traumatic stress disorder and whether or not there was a link between having post traumatic stress

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 335 of 536
Case 3:08-cv-00734-RJC   Document 342-6   Filed 10/04/10   Page 73 of 126

JA3172

disorder, one's moral development or the teenager's moral development that I was studying as well as their potential for antisocial behavior.

Q. Is the moral development of children something that you have concentrated on?

A. Yes. Yes, very much.

Q. And also, have you spent a lot of time investigating Salvadoran history and culture?

A. Yes.

MR. BRYSON: Your Honor, we would ask that Dr. Sermeno be qualified as an expert in the field of Salvadoran culture and the moral development of children and be allowed to give an opinion in those fields.

THE COURT: Any voir dire?

MR. NAZZARO: Just a couple questions.

VOIR DIRE EXAMINATION

BY MR. NAZZARO:

Q. What did you say about your expertise on Salvadoran culture? Is that just from growing up there or do you have other --

A. Well, also from my study. And I would say it's -- you know, I studied the culture as it related to these factors to moral development of youth, degree of traumatization.

Q. Okay. So --

A. I studied the history of El Salvador as well.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA3173**

SELENA SERMENO – DIRECT

Q.   And the last subject that you mentioned about the moral development, that's based on your dissertation; is that correct?

A.   Yes.  But also on my focus, my clinical focus and my belief that when we treat children and adolescents, particularly those who have been exposed to extreme violence, that we need to be looking not only as -- to the reduction of symptoms, but that we also need to be looking at raising their moral character.  In other words, if children are incarcerated or are detained for whatever reason, it is my belief that treating them should involve not just reducing their flashbacks or their anxiety conditions, but that they should also be able to come out of those experiences, you know, with a heightened sense of what's right or wrong and how to behave in social ways.

Q.   Just so I'm clear, your clinical practice, is that still in effect or not?

A.   I'm sorry?

Q.   Your clinical practice, are you still seeing patients?

A.   Right now I'm not seeing patients because I -- I have -- I'm pretty occupied right now with this consulting contract to children, youth and families in New Mexico.  But I am basically teaching how to help children.

Q.   Okay.  And most of your clinical practice was with U.S. residents; is that fair to say?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 337 of 536
Case 3:08-cv-00734-RJC   Document 342   Filed 10/04/10   Page 79 of 126

JA3174

A.   Yes.  Yes.  I would say my professional career has been entirely -- most entirely in the U.S.  Although I have -- you know, I do quite a bit of international work as well.

Q.   I understand.

A.   But in terms of...

Q.   But as far as your clinical practice was U.S. residents.

A.   Yes.  And then --

Q.   People in the United States.

A.   Yes.

Q.   Okay.  And this study that you referenced, that's a study of El Salvador or United States?

A.   El Salvador.  Salvadoran teenagers.

Q.   Do you have any other studies other than the one you referenced that you've done --

A.   No.

Q.   -- in El Salvador?

A.   No.

Q.   Okay.  That was your dissertation.

A.   That was my doctoral dissertation.

Q.   Okay.  And so other than that, you haven't done any other studies?

A.   Not -- not -- no.

          MR. NAZZARO:  Okay.  Thank you.

          THE WITNESS:  You're welcome.

          THE COURT:  We'll allow this witness to offer an

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 338 of 536
Case 3:08-cv-00734-RJC   Document 32-6   Filed 10/04/10   Page 30 of 126
JA3175

SELENA SERMENO – DIRECT

opinion in the area of the impact of political violence on the moral development of children.

MR. BRYSON:  Thank you, Your Honor.

DIRECT EXAMINATION (Cont'd.)

BY MR. BRYSON:

Q.   In preparation for this case, you received information regarding Alejandro Umana; is that correct?

A.   Yes.  A brief summary, yeah.

Q.   And as part of that, you learned that he was born -- or excuse me.  You learned that he was raised in El Salvador beginning --

MR. NAZZARO:  Objection to leading.

THE COURT:  Sustained.

Q.   When did you -- when have you been informed that he was raised in El Salvador?

A.   I don't remember exactly the date.

Q.   Okay.  Can you -- a general time frame.

A.   I say about a year ago.

Q.   No, no, no, no.  I'm sorry.

THE COURT:  I'll let you lead to a point.

Q.   You learned that Mr. Umana was born around 1982, between 1982 and 1984; is that correct?

A.   Yes.

Q.   And was raised in El Salvador around that time.

A.   Yes.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 339 of 536
Case 3:08-cr-00134-RJC   Document 1266   Filed 10/04/10   Page 31 of 126

JA3176

SELENA SERMENO - DIRECT

Q.   Okay.  What was happening in El Salvador at that time?

A.   Oh, I get it.  Okay.  El Salvador was brewing.  The civil war was -- had really escalated at that point.  And I mean, in terms of details of the civil war, El Salvador is a very, very small country.  It's the size of Massachusetts.  So the state of Texas is ten times bigger than El Salvador.  And it's also the most populated country in Latin America.  And so the civil war in El Salvador caused this state of constant vigilance in people because it was hard to hide and there was no way of telling who the enemy -- the so-called enemy was.  And so people were constantly exposed to all kinds of terrifying circumstances such as disappearances, killings, bombings, forceful recruitment, armed forces, you know, cars being burned.

     And so all the circumstances that we associate with war in El Salvador was very, very difficult for families to escape them because the country just -- just didn't allow any space for, you know, for -- to get away from it, basically.

Q.   And without going into great detail, what -- what caused the civil war?  I mean, how did it -- how was it -- politically what was happening?

A.   It was -- well, it's a complex history, but basically in a nutshell, the civil war was a struggle for land and food and for just basic, you know, basic survival needs.  The country had been led by a military dictatorship for many, many years

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 340 of 536
Case 3:08-cv-00734-RJC   Document 52-7   Filed 10/04/10   Page 32 of 126
JA3177

SELENA SERMENO - DIRECT

and people wanted democratic elections.

And so it was a struggle between the group that attempted to overthrow the government, where we refer to as leftist guerrillas and then the military was referred to as the right wing, the right wing group.

Q.   And you specifically studied the impact of this violence on the children of El Salvador?

A.   On a particular sample, yes.  Teenagers.

Q.   And what did your study discover?

A.   In order to -- let me explain a little more about how I went about the study so it makes more sense.  But it was very hard to find youth in El Salvador who had never been exposed to war because -- just because of the size of the country. And so I was a student at Temple University and I had to do a study that compared one group to another.  And for it to be good research, I needed to find a group with low -- or hardly any exposure to war or none.  And so I had to compare Salvadoran teenagers to Costa Rican teenagers because I couldn't use Guatemalan teenagers because they also had their own civil war, and then Honduras also had their own type of violence.

And so basically, what I did was looked at -- I'm sorry, can you repeat that question again.  I don't want to get -- I don't want to confuse people.

Q.   I was just -- I was asking how you went about your study.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

SELENA SERMENO - DIRECT

A.    Yes.  So I mean, specifically in terms of logistics, I lived at the parish hall in one of the war torn regions of El Salvador right after the cease -- well, shortly after the cease fire ended and I lived in a rural area where the war had hit pretty hard, and I interviewed teenagers in that rural area.  And then I interviewed teenagers in San Salvador.  And then I went to Costa Rica and I did the same thing in Costa Rica.  I interviewed rural and urban teenagers.  I used different questionnaires to measure moral judgment.  I used questionnaires to measure post traumatic stress reactions, as well as potential for delinquency.

Q.    And what specifically did you conclude about the impact of the civil war on Salvadoran youth?

A.    Salvadoran teenagers were -- had lower moral development scores, basically.  That meant that their capacity to make decisions of a moral nature or to reason about these decisions was much lower than the capacity of Costa Rican teenagers. I -- go ahead.

Q.    Go ahead.

A.    I also found that the Salvadoran youth, almost like 88 percent of them, met full criteria for post traumatic stress disorder versus the Costa Rican youth where it wasn't significant.  But I also found that Salvadoran teenagers were much more likely to commit acts -- were much more vulnerable to commit acts of delinquency than Costa Rican youth were.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA3179

SELENA SERMENO - DIRECT

Q.   You talked about moral development.  Explain that.  What do you mean when you talk about that?

A.   Moral development is a process, it's a lifelong process of learning to make decisions of -- you know, to decide between right and wrong.

In sort of nonacademic, nonjargon terms I would say moral development is a journey of development, of birthing a conscience.  And I would refer to a conscience as, you know, that voice that tells us how to behave and especially when people aren't watching us.

And so moral development is a process that -- that requires a certain level also of cognitive understanding.  And it requires a process of biological maturation of our brain.  And it's the product of, you know, biological maturation, circumstances, people available to us, and it goes on.  You know, it's still -- I hope it's still going on in at least my own life.

Q.   How does a person acquire moral development?

A.   You know, there's different methods -- there's different models for explaining how we acquire the capacity to make reasons of a moral nature, but basically the -- it's a fundamental belief that we all need attachments.  We all need to develop relationships in order for us to develop a conscience.  If a conscience is that voice that tells us how to behave, we all need people that we feel accountable to who

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 343 of 536
Case 3:08-cv-00734-RJC   Document 3266   Filed 10/04/10   Page 35 of 126

JA3180

SELENA SERMENO - DIRECT

have leverage over us for us to then be able to experience remorse.

And so I would say that moral development is acquired primarily in the context of relationships and that as we grow older, the circle of who those relationships are expands and that as that circle expands, we are then challenged to keep growing in our understanding of right and wrong.

Q.   How does an event such as the Salvadoran civil war affect the child's ability to develop morality?

A.   Well, it can affect it in many different ways.  One of them is that the civil war in El Salvador was characterized by chronic and ongoing trauma.  And so a child -- in order for a child to develop a capacity to understand, to make decisions of right or wrong, a child needs to be able to, first of all, to feel secure in the love and care of adults around him or her.  But also the brain needs to mature enough to where the brain can begin -- to where that maturation can help a child understand, for instance, consequences.

The capacity, for instance, to exercise impulse control which is rooted in the capacity to self sooth is a capacity that is well established by the age of three or four years of age.  And so, you know, certain environmental circumstances of extreme trauma make it hard for that child's brain to mature in such a way that he or she can, you know, can make sense of the world around him or her.  As well as I would say that in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 344 of 536
Case 3:08-cr-00734-RJC   Document 517-6   Filed 10/04/10   Page 36 of 126

JA3181

SELENA SERMENO – DIRECT

order for a child to develop a moral conscience, a child needs people to mediate, to buffer the impact of these traumatic events.

And so because our world views begin to, you know, get established pretty early in early childhood in terms of rigidity and acceptance of differences and those kinds of things.

Q.   What are -- what are attachments?

A.   By attachments I mean people who we love and care.  You know, people who we are close to.

Q.   And what is the importance of attachments in developing morality?

A.   Well, it's, you know, again, if we think of morality also as -- or moral development as the process also of learning to feel remorse, for instance.  It's hard to feel remorse if we don't care for somebody else.

And so in children, children rely on attachment figures to interpret the world to them.  Children rely on attachment figures to provide consistency, to provide predictability or a sense that the world is a place where he or she can have hopes and dreams.  And without attachment figures that are consistent, you know, children are going to draw their own conclusions about the type of world they live in.

And also, they're going to -- you know, children, all of us, I believe, although the question's about children, all of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA3182**

us need people to guide us, you know, to be our moral compass in times of extreme -- in times of difficulty. And without attachment figures to be that moral compass, it's very hard for children to develop an internal moral compass. The younger we are, the more we need outside resources, you know, to be that moral compass for us. And as we grow older, we internalize the values and beliefs of those people. Without their availability to us, we -- you know, children can become more externally referenced rather than internally referenced.

Q. Can you explain the concept of resiliency.

A. Resilience is the capacity to -- I refer to as the capacity to bounce back from difficulty. The capacity to survive adversity. The capacity to make meaning out of a terrible event and, you know, come out ahead.

Q. And how does that factor into moral development?

A. You know, moral development also implies that one can learn perspective. That one can eventually -- you know, that one can kind of take a step back and think about what -- you know, how to behave, how to act under certain circumstances. It's very hard to gain perspective again if we don't have attachment figures at an early age. Or even as we grow older, you know, people -- if we don't have people to turn to to help us think through a situation. And -- or people we -- if we don't have people to turn to who can help us basically, you know, figure it out. Figure it out how to man -- how to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 346 of 536
Case 3:08-cv-00734-RJC   Document 312-7   Filed 10/04/10   Page 38 of 126

JA3183

SELENA SERMENO – DIRECT

discern a particular situation.

Q.   What are protective factors?

A.   So back to resilience.

Q.   Okay.

A.   So I would say resilience is also -- you know, nobody is born resilient.  Nobody is born with the capacity to just bounce back without life experiences or without anybody to help us.  And so resilience is basically an accumulation of protective factors.  There is -- you know, if we were to deconstruct a resilient person, we would find that there are certain factors there that have -- that help -- that have helped that person overcome difficulty.

Q.   What specifically are -- are there identifiable things that are protective factors?

A.   Yes.  Availability -- the younger the child, of course, availability of family.  It's crucial.  You know, availability of food and clothing and good schooling, safe neighborhoods. Having a spiritual faith is one of the protective factors that we're now paying a lot more attention to.  For instance, being raised going to church.  You know, just -- having the capacity to play and have -- have a space where we can -- where children can imagine and have free play is very, very crucial to the development of resilience and also to moral development because if children don't have that space to explore and to, you know, kind of put themselves in the shoes of another

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 347 of 536
Case 3:08-cv-00734-RJC   Document 132-2   Filed 10/04/10   Page 89 of 126

JA3184

SELENA SERMENO - DIRECT

through their toys and their dolls, a conscience doesn't grow, basically.

Q.   You've never met Alejandro Umana.

A.   No.

Q.   Okay.  You looked at the summary provided to you by Mr. McGough.

A.   Yes.

Q.   Okay.  Based on that, can you draw any conclusions about factors in his life that would have impacted his ability to develop morality.

A.   Yes.

Q.   And what -- what are they and what are your conclusions?

A.   Yes.  Among them and some of these factors have been studied by different institutes, different people.  The Department of Justice, for instance, has sponsored studies looking at -- looking at protective and risk factors in children and looking at predicters of violence.

     And so I would say Mr. Umana was born into circumstances of extreme danger.  There were no -- I conclude from the summary that there were very few opportunities for play or exploration.  There is experience of maternal separation and, you know, not very consistent schooling.  Not very -- not doing very well in school.  Possible head injuries, from what I hear from the summary.

     I -- but just the war alone, just the level of trauma

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA3185

SELENA SERMENO - DIRECT

that was happening in the area where he lived and in the country at large, that alone, I conclude, is enough to make a child very, very vulnerable to the development of the delinquent behaviors later in life.

Q.   You mentioned risk factors studied by the Department of Justice.  What are you talking about there?

A.   The poor family dynamics.  Low availability of -- you know, low emotional involvement from parental adult figures. Poverty.  You know, unsafe neighborhoods.

Q.   What's your source for this?

A.   The -- well, there's two studies that I looked at.  The one was done in 2000 and it's basically a meta-analysis.  And a meta-analysis is like a review of other studies.  And then one done in 2003.  And I'm referring right now particularly to the one done in 2003, I believe, yeah.

Q.   And who sponsored the study?

A.   The Department of Justice.

Q.   Okay.

A.   And there is other studies also by the Center for Disease Control.  And there's also, you know, universities that have concluded -- have also developed research in these categories.

Q.   And what do they conclude about risk factors?

A.   Basically, what they conclude about risk factors is that, you know, having one risk factor alone does not make a person a violent person.  That -- and it's hard to -- you know, it's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 349 of 536
Case 3:08-cv-00734-RJC   Document 324   Filed 10/04/10   Page 94 of 126

JA3186

SELENA SERMENO – DIRECT

hard to determine with, you know, a hundred percent perfection which risk factor is going to determine what kind of behavior somebody develops later.  But that risk factors basically make a person more vulnerable, more prone.  And that as -- that they are cumulative.  Their impact is cumulative.  And as they go up in number, so does the risk for delinquent or violent activity.

Q.    And can you give some examples of risk factors.

A.    Risk factors would be, you know, weapons in the neighborhood.  Witnessing violence.  Paternal -- not paternal, I'm sorry.  Parental separation.  Parental loss.  Lack of proper schooling.  You know, head injuries.  Lack of proper nutrition.  Lack of proper health services.  A neighborhood that -- unsafe neighborhoods.

Q.    Do you have a conclusion as to whether or not Alejandro Umana had risk factors?

A.    Yes.

Q.    And what's your conclusion?

A.    I would say, you know, again, based on my understanding of the summary, there's been, you know, maternal -- I believe there was maternal abandonment, in addition to the circumstances of extreme danger and war.  It seems like he struggled with school.  It seemed like he had two -- two accidents that led to head trauma.  There were -- it's hard for me to tell exactly, you know, how many other adults were

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-7    Filed 08/23/17    Page 350 of 536
Case 3:08-cr-00134-RJC    Document 1367    Filed 10/04/10    Page 92 of 126
**JA3187**

involved in his life.  The conditions in which he lived where -- you know, could -- in El Salvador would be considered very, very poor conditions.  Poor living conditions.

Q.   And so these risk factors made him what?

A.   I would say they made him much more vulnerable to -- to become -- you know, to exercise delinquent activities, to behave in delinquent, violent ways.

Q.   As part of your studies in El Salvador and morality in youth, do you have any knowledge of the existence of gangs in El Salvador?

A.   Yes.

Q.   And what have you been able to determine about --

MR. NAZZARO:  I'm going to object.  This is beyond what he qualified her as an expert.

THE COURT:  I'll sustain the objection.

Q.   Do you see any connection between Salvadoran culture, the lack of moral development in Salvadoran youth, and the existence of gangs in El Salvador?

A.   I see a connection.  I will say I'm not a gang expert --

Q.   Right.

A.   -- but I do know -- I know gang -- you know, gang literature and I know the problem.  But I would say that --

MR. NAZZARO:  I'm going to object, Your Honor.

THE COURT:  I'll sustain the objection.

THE WITNESS:  So can I --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 08/23/17   Page 351 of 536
Case 3:08-cv-00734-RJC   Document 342-6   Filed 10/04/10   Page 93 of 126

JA3188

SELENA SERMENO - CROSS

THE COURT:  Don't answer.

THE WITNESS:  Huh?

THE COURT:  So don't answer.  Wait for the next question.

THE WITNESS:  Okay.  Thank you.

(Defense counsel conferred.)

MR. BRYSON:  Those are my questions.

THE COURT:  Any cross?

MR. NAZZARO:  Yes, Your Honor.  Thank you.

                    CROSS EXAMINATION

BY MR. NAZZARO:

Q.   Good afternoon, Ms. Sermeno.

     Now, you didn't live in El Salvador during the war; is that correct?

A.   No.  I went back and -- I went back to visit, though, my family.

Q.   Did you ever go to Santa Ana between the years 1986 and 1992?

A.   Was I there?  Yes.  My grandmother lived there.  My parents are from there.

Q.   When were you last in Santa Ana?

A.    I was in Santa Ana last -- I'm trying to think.  Well, I was -- I was actually through Santa Ana, technically speaking I was there in February.  But in terms of the city of Santa Ana, I was there last in the year -- the year 2000.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

**JA3189**

SELENA SERMENO - CROSS

Q.   Okay.  But were you there during the years 1984 to 1991?

A.   Yes, at times.  I wasn't living there, but I visited there.

Q.   Okay.  When were you there?

A.   I was there -- oh, boy, specifically.  I mean, let's see. I was there in 1981.  I was there in 1982.  I was there in 1983.  I was there in 1985.  I was there in 1986.  I was there in -- I'm trying to recall all my trips, sir, so just bear with me.  I was there in 19 -- I was there in 1988.  I was there in -- trying to think here.  I know I was there in 1994. I was there in 1997.

Q.   Okay.

A.   I was there in 19 --

Q.   I think you answered the question for the period of time I was referring to.  Were those just for short visits?

A.   Yes.

Q.   Okay.  Now, with respect to your opinion here on -- based on your study, it's all based on this one study you did; is that correct?  I'm talking about El Salvador.

A.   I've also read a lot about El Salvador and I have colleagues down there and I've read periodicals and journals.

Q.   You yourself have only done one study.

A.   Yes.

Q.   And that was in 2004.  The dissertation.

A.   No, my dissertation was done from 1992 to 1994.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 353 of 536
Case 3:08-cv-00734-RJC   Document 312-7   Filed 10/04/10   Page 95 of 126
JA3190

SELENA SERMENO - CROSS

Q.   Okay.  So it was done between 1992 and 1994.

A.   Yes.

Q.   Okay.  And is that published anywhere?  I haven't seen a copy of it.

A.   It's in dissertation abstracts.  There's a --

Q.   It hasn't been published, widely published?

A.   Like in a peer reviewed journal, no.

Q.   That study that you did between -- you actually went to El Salvador between those years, 1992 and '94?

A.   Yes.

Q.   Okay.  And presumably, you've interviewed, you said -- I believe your phrase was -- I thought you used juveniles or something; is that right?

A.   Youth.  Youth.

Q.   Youth.  What is considered youth?

A.   In El Salvador I would say -- the youth in my study were -- the average age was 17 years of age.  But youth would be considered anybody from 12 even to 21 years of age.

Q.   Okay.  And you were trying to determine the impact that the war had on them as teenagers; is that right?

A.   Yes.

Q.   Okay.  You weren't studying the impact it would have on them when they were adults.  You were studying the impact it had when they were teenagers; isn't that true?

A.   That's right.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 354 of 536
Case 3:08-cr-00734-RJC   Document 51-7   Filed 10/04/10   Page 96 of 126

JA3191

SELENA SERMENO - CROSS

Q.   Okay.  Because most of your work is in, I believe you said, adolescents or youth, is how these events impact people while they're growing up as teenagers.

A.   Yes.

Q.   So if someone had normal teenage years and didn't manifest any moral depravity --

A.   Uh-huh.

Q.   -- or moral problems, they wouldn't have been part of what you studied, I guess.  That wouldn't --

A.   No, no.

Q.   -- have been included in your study?

A.   My sample was teenagers who had no history of any kind of trouble.  It was -- I basically -- you know, to be able to get into a post-war area in El Salvador at that time wasn't easy so I consulted with, I believe it was UNICEF and the Red Cross.  And so people who were neutral -- who were considered neutral during the war suggested that I go to the Catholic church because they -- the priests had -- you know, they are -- the Catholic church was kind of where people went for shelter in that area.  And so I -- so they -- the priest made an announcement in the rural area and said there was a researcher there and would people be interested in participating.  And that's how the youth came.  But they had no prior history of offenses or anything like that.

Q.   Did you know that or did you ask them?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 355 of 536
Case 3:08-cv-00734-RJC   Document 94   Filed 10/04/10   Page 97 of 126

JA3192

SELENA SERMENO - CROSS

A.   I don't remember -- it was not a question on the questionnaire, but reportedly by their parents and by -- I mean, I had to get parental consent, you know, to interview them and so --

Q.   And this was all done through questionnaires, is that...

A.   Well, the -- to be able to measure, to quantify war trauma, I had to use a questionnaire, an open-ended questionnaire.  And that was -- it's called the Child War and Trauma Questionnaire that had been developed and used with children in Beirut, Lebanon, and I got permission to adapt it to Salvador -- you know, to the situation -- to translate it to Spanish and contextualize it a little more to El Salvador.

     But did I know for a fact -- I just want to -- sir, I want to make sure I hear you right.  To -- did I know for a fact that none of these kids had committed any infractions, I -- I -- you know, I would say no, I mean, but they didn't -- they didn't have a history of delinquency that I was aware of.

Q.   And have you studied those people since the study to see what they've done in their lives?

A.   No.  I wanted to, but I was not able to.

Q.   Okay.  So you don't really know the results of your study.

A.   On a long-term --

Q.   In other words, you're saying these people don't have -- they were affected by the war and don't have the right moral

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 356 of 536
Case 3:08-cv-00734-RJC   Document 314-7   Filed 10/04/10   Page 98 of 126
**JA3193**

compass, but that -- would that affect them later in life or just affected them during that time?

A.   Yeah, let me clarify that.  I did not say they don't have the right moral compass.  I said that they were lower in their capacity to reason morally.  And -- but I -- and I said that they were vulnerable.  I wasn't looking as to whether or not they were going to actually behave in delinquent ways.  I was looking at vulnerability.

Q.   Okay.  So your opinion doesn't predict that one way or the other.

A.   It just -- I don't believe that any studies would predict with certainty whether or not anybody, any child or youth is going to be a certain way as an adult.  It just -- all that studies tell us is how vulnerable youth are and basically call for certain types of intervention, basically, so we can prevent that vulnerability from manifesting itself.

Q.   Okay.  But it's to prevent that while they're teenagers; is that right?

A.   Yeah.  I mean, actually, we can -- there's prevention. If we can start when they're preschoolers is even better.

Q.   Now, in this particular case, I think your testimony was you've never met the defendant; is that right?

A.   That's right, sir.

Q.   Okay.  You've never talked to him or asked him about any of his experiences --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

SELENA SERMENO - CROSS

A.   No.

Q.   -- growing up or --

A.   Huh-uh.

Q.   And so he wasn't part of your study group or anything like that.

A.   I don't think so, no.

Q.   And he wasn't part of your opinion today.  In other words, your personal discussions with him or your evaluation of him as a clinical psychologist have not factored at all into this particular case.

A.   Yes, I have not evaluated him, no.

Q.   Okay.  And solely based, then, on this report that you received; is that correct, from Mr. McGough?

A.   Yes.

Q.   Okay.  And do you recall in that report where it indicates that his father raised him?

A.   It appears so.  It doesn't --

Q.   Right.  He had a father in his life; is that -- is that -- is that accurate?

A.   Yes.  But it also says that the father then went -- married someone basically the same age as Mr. Umana and that Mr. Umana left home at an early age.

Q.   Well, what do you consider an early age?

A.   Well, in El Salvador where men or women don't leave until -- they're not supposed to leave home until they marry

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 52-7   Filed 03/29/17   Page 358 of 536
Case 3:08-cv-00134-RJC   Document 520   Filed 10/04/10   Page 358 of 536
JA3195

or they find a partner. So for him, you know, for someone to leave as a teen, even 19 would be considered an early age if you're leaving -- if you're making a choice to go on your own.

Q. Okay. So with respect to his upbringing, he had a father in his life. I mean, that's --

A. Yes.

Q. Okay. And he had -- he had women figures in his life. He's mention he's separated from his mother. That was a divorce; isn't that true?

A. I don't know about that. I implied that the mother was not present in his life.

Q. Okay. Well, I know what was implied. But if the evidence is that they divorced and they -- one parent raised one kid and one parent raised the other kid, that's a divorce, separation; isn't that true?

A. Yes.

Q. Okay. And certainly, that has impacts on kids. But he had a father in his life.

A. Yes.

Q. Okay. And he also had someone who he knew as his mom because he was young -- he was -- he was one when this happened -- who was his great grandmother. She raised him. Did you see that in the report?

A. Uh-huh. Uh-huh.

Q. He also had an aunt that was a figure in his life and a

Case 3:16-cv-00057-MOC　Document 52-7　Filed 03/29/17　Page 359 of 536
Case 3:08-cv-00164-RJC　Document 520　Filed 10/04/10　Page 103 of 126

**JA3196**

SELENA SERMENO - CROSS

grandmother.  So he had women and men that -- he wasn't abandoned, in other words.

A.    Yes.

Q.    Okay.  Did you see that in the report?

A.    I did.

Q.    Okay.  And there's no evidence in the report that he didn't have good nutrition anywhere.  I didn't see that in the report, unless you read a different report than I read.

A.    No, I did not specifically about nutrition.

Q.    His father had some sort of store that sold food and they --

A.    Yeah.

Q.    They lived -- isn't that correct?

A.    Yes.  It wouldn't be -- you know, I have -- I'm familiar with the area.

Q.    I'm not talking about the area.  I'm talking about this case because we're talking about one case here.

A.    Uh-huh.

Q.    And you've testified in this case, not about generally in Santa Ana.

      In this case there's no evidence that he was deprived of some nutritional means; isn't that true?

A.    It is true, sir.

Q.    Okay.  And it's also true, at least according to testimony we've already heard, that he grew up in a mixed

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 52-7    Filed 09/29/17    Page 360 of 536
Case 3:08-cv-00164-RJC    Document 52-7    Filed 10/04/10    Page 102 of 126
JA3197

SELENA SERMENO – CROSS

neighborhood.  Meaning it wasn't poor, it wasn't rich.  Do you -- do you disagree with that opinion?

A.   I would -- I would disagree with that statement because the neighborhood where he grew up is a very -- I would say it's a marginal area in Santa Ana.  Marginalized area.

Q.   Well, the investigator testified before this jury that it wasn't either rich or poor --

MR. BRYSON:  Objection what the investigator said.

THE COURT:  Sustained.

Q.   Would you disagree --

THE COURT:  I'll sustain the objection to the form.

MR. NAZZARO:  Okay.

Q.   You disagree, then, with that opinion that it was -- that it was not a mixed neighborhood.

A.   Yeah.  I'm sorry, sir, I want to make sure I understand your question.  I guess my understanding of a mixed neighborhood is a neighborhood where there is different social classes and ethnic groups, and that's how I interpret a mixed neighborhood.

Q.   Do you know exactly where he was raised and born, which street?  Other than just the city, the exact street address.

A.   I don't know the exact street address, no.

Q.   All right.  Thank you.  And the head injuries you talk about were just information you received in the investigator's report.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 52-7   Filed 09/29/17   Page 361 of 536
Case 3:08-cv-00164-RJC   Document 224-7   Filed 10/04/10   Page 108 of 126
JA3198

SELENA SERMENO – CROSS

A.    In the report, yes.

Q.    Okay.  And with respect to the trauma of the war, if -- if he wasn't exposed to that, then, your opinion would be different.

A.    It would be impossible -- I'm sorry, go ahead.

Q.    Would your opinion be different if he wasn't exposed to it as much as other people in El Salvador, would your opinion be different?

A.    I would say that every child in El Salvador that was raised during the civil war who had -- who was exposed to --

Q.    My question is if he was not exposed as the way you believe he was exposed, would that change your opinion?

A.    I would say he was less vulnerable.

Q.    And you actually don't know what he was exposed to during the war between 1986 and 1991.  I mean, you weren't living with him, obviously.  His father was.

A.    That's correct.

Q.    And with respect to the particular neighborhood, you also mentioned -- and I'm really talking about the basis for your opinion.  You mentioned factors and you mentioned that there was an unsafe neighborhood.  Well, you don't even know the neighborhood he grew up in, do you?

A.    Well, I'm saying -- I'm talking about -- when I was saying unsafe neighborhoods, I was referring, sir, at that time to examples of risk factors.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 52-7   Filed 09/29/17   Page 362 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 10/04/10   Page 362 of 536
JA3199

SELENA SERMENO - CROSS

Q.   Yeah.  I understand examples, but I want to refer you to this particular case because you've rendered an opinion in this case.

A.   Uh-huh.

Q.   And you don't have any basis to show that he was born or raised in an unsafe neighborhood, do you?

A.   Well, yes.  But I do have knowledge of the size of El Salvador.  I do have knowledge of the length of the war.  I have knowledge of --

Q.   I understand all that.  I appreciate your cultural history of your country.  But I'm talking about this particular person in this particular case.  You don't have any evidence or cannot rely on any evidence that he grew up, where he was born and raised, in an unsafe neighborhood, do you?  Because you don't even know where he was -- what street he was living on.

A.   Well, I would refer to almost the entire country as unsafe at that time.

Q.   All right.  So it's based on just your general view that the country was unsafe.

A.   Yeah.  You're talking about, you know, was I on that particular street.  It was -- it would be -- I just -- El Salvador was very unsafe for children at that time.

Q.   But you were still -- it was safe enough for you to visit, I suppose, during those years.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 52-7   Filed 03/23/17   Page 363 of 536
Case 3:08-cv-00134-RJC   Document 524-7   Filed 10/04/10   Page 108 of 126
**JA3200**

SELENA SERMENO - CROSS

A.    Well, I -- not necessarily.  I would still --

Q.    But you went back every year and saw --

A.    I went back because of my attachment figures.  I went back because my grandmother was ill and that's -- people did that.  Life didn't stop.  I mean, we were just careful.  Extra careful.  But I wouldn't say that it was safe.

Q.    Okay.  And you also talked -- another factor that you based your opinion on was that there was, I think, weapons in a neighborhood.  Did you see any evidence of that in this particular case?

A.    No.  I mean, like, did I see somebody handling -- handing weapons to somebody?  No.  But it was -- it was a known statistic and a known fact in El Salvador that there were weapons in existence throughout the country.  It was -- it was a civil war.

Q.    I understand that.  The civil war affected different parts of the country differently; isn't that true?

A.    Yes, but virtually by the time it was over, every area in the country had been affected.

Q.    Okay.  Once again, you don't have any specific knowledge about how it affected this person in El Salvador during that time period, do you?

A.    No.  Based on an evaluation, no, I don't.

Q.    And you don't have any specific knowledge -- one of the other factors you mentioned which was a basis for your

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-7   Filed 03/29/17   Page 364 of 536
Case 3:08-cv-00134-RJC   Document 522-7   Filed 10/04/10   Page 106 of 126

JA3201

opinion, this is your expert opinion, is that he didn't have enough play time or something to that nature.  Do you have any evidence of that?

A.   Well, yeah.  And because I -- he was raised in a meson and a meson is like a very -- it would be like a bunch of rooms set together and, you know, people basically -- the people who would live there would be people who have very little money.  It would be -- there would be one bathroom for perhaps ten families, for instance, and most of them are located in circumstances where, you know, they're like either right on the street or where children just don't have -- there's no green space, for instance, for children to play.  There is no -- there are no playgrounds.

Q.   Did you see the photos of him in this case with stuffed animals and with his family members?

A.   I don't -- I saw the photo of him with his grandmother, the great grandmother and the dad.

Q.   Did you also -- were you aware as part of your evaluation that he apparently played soccer rather well and played soccer a lot of times?  That's an activity, isn't it?

A.   Yes.  I was referring to play at an early age, sir.

Q.   What age?

A.   I would say, you know, from the time of birth until six, six years of age, which is the time when imaginary play is so important in child development.

Case 3:16-cv-00057-MOC   Document 59-7   Filed 09/29/17   Page 365 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 10/04/10   Page 365 of 526
**JA3202**

Q.   But once again, you don't have any specific knowledge about how much or how little or how he played from zero to six years old.

A.   No.  No.  But I do have -- but I do recall from colleagues and just the work I was doing in El Salvador at a time that I -- that lack of play opportunities for children was common.

Q.   Yeah, and I'm not debating that.  I'm just asking what your specific knowledge is of this particular person.

A.   Yeah.

Q.   And you really don't have very much personal knowledge of his circumstances, do you?

A.   No, not at that technical level I don't.

        MR. NAZZARO:  Thank you.  No further questions.

        THE COURT:  Any redirect?

        MR. BRYSON:  Just a little.

                    REDIRECT EXAMINATION

BY MR. BRYSON:

Q.   You were asked about the fact that he was raised by his father.

A.   Uh-huh.

Q.   Okay.  Is being raised by your father -- by a father with not ever knowing your mother, is that a good thing or a bad thing in terms of moral development?

A.   It's never a good thing in children.

                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/29/17   Page 366 of 536
Case 3:08-cv-00164-RJC   Document 528   Filed 10/04/10   Page 108 of 126
**JA3203**

MARIA SANTACRUZ - DIRECT

Q.   Okay.  Is that a good thing or bad thing in terms of avoiding risks for delinquency?

A.   It's a risk factor.

Q.   Okay.

A.   I mean, it's just -- it's -- to not have, you know, your mother available, it's -- it makes children vulnerable.  It doesn't mean that it's going to hurt -- you know, affect all children the same.  But that factor in addition to other factors.

Q.   Okay.  If he lost his grandmother -- he was raised by his great grandmother and lost her at an early age.  Is that a good thing or bad thing in terms of --

A.   Well, that's a bad thing.  It's a significant loss to a child.  It's a risk factor.

          MR. BRYSON:  Those are my questions.

          THE COURT:  You may step down and be excused.

          THE WITNESS:  Okay.  Thank you.

          (Witness stepped down.)

          THE COURT:  Call your next witness.

          MR. FOSTER:  Maria Santacruz.

                    MARIA SANTACRUZ GERALT,

being first duly sworn, was examined and testified as follows:

                    DIRECT EXAMINATION

BY MR. FOSTER:

Q.   Could you state your name, please.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 52-7   Filed 09/29/17   Page 367 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 10/04/10   Page 109 of 126
JA3204

MARIA SANTACRUZ – DIRECT

A.    (Interpreter:) My name is Maria Santacruz Geralt.

Q.    And you do speak English, correct?

A.    (Interpreter:) Yes, sir.

Q.    But are you more comfortable for the purposes of testifying doing that in your native Spanish?

A.    (Interpreter:) Yes, sir.

Q.    And what city and country do you live in?

A.    (Interpreter:) I live in San Salvador, El Salvador, in Central America.

Q.    Okay.  And what is your occupation?

A.    (Interpreter:) My basic preparation is in psychology, but right now I am in sociological research and I work at the -- I work at the Instituto Universitario de Opinion Publica at the Central American University.

Q.    Okay.  And what is your educational background?

A.    (Interpreter:) I am a psychologist and I have a background and I have been educated in social and community psychology.

Q.    And what -- what degrees have you obtained in your field?

A.    (Interpreter:) I have my undergraduate degree and also a master's degree.

Q.    And were those in the fields of psychology?

A.    (Interpreter:) Yes, sir.

Q.    And was that something -- your master's degree, was that actually in something called community psychology?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-7   Filed 09/29/17   Page 368 of 536
Case 3:08-cv-00154-RJC   Document 522   Filed 10/04/10   Page 108 of 126
**JA3205**

MARIA SANTACRUZ – DIRECT

A.   (Interpreter:) Yes, sir.

Q.   And could you explain what that is.

A.   (Interpreter:) In general -- in psychology, in general terms, there are many fields.  There is the traditional clinical psychology.  There's -- there are a number of types of psychology that are educational and also corporate.  And there is an area that has to do with psychology for people in their specific situations.

Q.   Okay.  And is that --

A.   (Interpreter:) I would like to specify that social or community psychology is the study of people in their -- or groups in their more broad sense.

Q.   Okay.  And when did you get your master's degree in community psychology?

A.   (Interpreter:) In the year 2003.

Q.   Okay.  And have you -- how long have you been employed with the University of Central America?

A.   (Interpreter:) For 11 years.

Q.   Okay.  And what is your job title?

A.   (Interpreter:) I am called an analyst, which is the way -- is the title given to the research -- for people who do social research.

Q.   Okay.

A.   (Interpreter:) At the university.

Q.   And have you been conducting social research at the

Case 3:16-cv-00053-MOC   Document 59-7   Filed 03/29/17   Page 369 of 536
Case 3:08-cv-00134-RJC   Document 529-7   Filed 10/04/10   Page 13 of 126
JA3206

MARIA SANTACRUZ - DIRECT

University of Central America since you got your master's degree?

A.   (Interpreter:) Actually before that.  Since I had my undergraduate degree.

Q.   Okay.  So approximately how many years have you been conducting social research at the University of Central America?

A.   (Interpreter:) Eleven years.

Q.   Okay.  And you mentioned earlier there's a Spanish name for an institute within the university.  I didn't -- I don't think that got translated.  Can you explain what that is, the institute.

A.   (Interpreter:) It is the Instituto Universitario de Opinion Publica.

THE INTERPRETER:  Which interpreter's interpretation would be the center of -- the -- the University Institute of Public Opinion.

Q.   Okay.

A.   (Interpreter:) It's a department within the university that conducts social studies.

Q.   Okay.  And through your position there, have you conducted research into youth group -- I'm sorry, group violence in El Salvador?

A.   (Interpreter:) Yes, sir.

Q.   And have you studied that field and conducted research in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 52-7   Filed 03/29/17   Page 370 of 536
Case 3:08-cv-00164-RJC   Document 521   Filed 10/04/10   Page 12 of 126
**JA3207**

MARIA SANTACRUZ – DIRECT

that field for the past 11 years?

A.   (Interpreter:) Yes, sir.

Q.   And in addition -- have you conducted your own studies yourself?

A.   (Interpreter:) Well, they are framed in the sense that they pertain to the institute, but I have been directly related to those studies.

Q.   Right.  And in addition to conducting studies, have you also reviewed research and publications done by other people in that field?

A.   (Interpreter:) Yes, sir.

Q.   Okay.  And what was the first study that you yourself were personally involved in?

A.   (Interpreter:) In general terms or do you mean specifically related to gangs?

Q.   In general terms.

     THE COURT:  Let me ask the interpreter to speak more directly into the microphone when you translate.

     THE INTERPRETER:  Yes, Your Honor.

A.   (Interpreter:) The first study in which I participated had to do with child soldiers during the civil war in El Salvador.

Q.   How about your first involvement in any kind of study regarding gang violence, gang behavior in El Salvador?

A.   (Interpreter:) There were two studies that were being

     Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 09/29/17   Page 371 of 536
Case 3:08-cv-00134-RJC   Document 524   Filed 10/04/10   Page 13 of 126
JA3208

MARIA SANTACRUZ - DIRECT

conducted almost simultaneously around the year 2000.

Q.   Okay.  And could you tell me what those -- take them one at a time.  Could you tell me about the first study and what it involved.

A.   (Interpreter:) The first study was conducted at about -- in about the year 2000 and it was a qualitative analysis of gangs.

Q.   And did you prepare a slide that would help you illustrate the different studies that you've reviewed or participated in?

A.   (Interpreter:) Yes, sir.

Q.   Would that help you illustrate your testimony today?

A.   (Interpreter:) Yes, sir.

        MR. FOSTER:  I would mark that as Defense Exhibit 33 for identification, and I've given a copy to the government. I would ask to move this into evidence and allow the witness to use this in her testimony.

        THE COURT:  Any objection?

        MR. NAZZARO:  Your Honor, if it's demonstrative, I'm not sure what her expertise is yet.

        THE COURT:  Yeah, I'll sustain it.  If that's an objection, I'll sustain it at this time.

BY MR. FOSTER:

Q.   Now, looking at what's been marked as Exhibit 33 for identification at this point.  That first page there, did you

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/29/17   Page 372 of 536
Case 3:08-cv-00134-RJC   Document 524   Filed 10/04/10   Page 147 of 426
**JA3209**

MARIA SANTACRUZ – DIRECT

prepare that slide?

A.   (Interpreter:) Yes, sir.

Q.   Okay.  And does this summarize the studies that you've either been involved in or studied regarding juvenile gang activity?

A.   (Interpreter:) It's a summary of the institute's studies, and I have participated in them.  Many of them.

Q.   Okay.  Let's start with --

A.   (Interpreter:) Specifically in two.

Q.   Okay.  The second one listed on that chart right now, 2000 field work, is that the qualitative study that you were just talking about?

A.   (Interpreter:) Yes, sir.

Q.   And what do you mean by a qualitative study?

A.   (Interpreter:) In this case specifically, this had to do with youth who pertained to two different gangs and this study was conducted in focus groups that had to do with their aspects of their composition...

      THE INTERPRETER:  And the interpreter requests the last portion again.

A.   (Interpreter:) There were six focus groups.  Five were composed of the gang members themselves, the youths, and one was composed of their family members.  And the idea of this was to learn through their statements, the statements of the youth and their families more about the aspects of their lives

                Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 09/29/17   Page 373 of 536
Case 3:08-cv-00164-RJC   Document 52-7   Filed 10/04/10   Page 15 of 126

JA3210

MARIA SANTACRUZ - DIRECT

as gang members.

And the reason that it is qualitative is because there aren't any numbers involved. It's a matter of them speaking and then registering what is said and processing that information in the textual sense. It's not measured numerically.

Q.   Okay.  So these results and the responses that were received from the different focus groups, did you review these and study these?

A.   (Interpreter:) Yes, sir.

Q.   And did you -- you said there were -- this qualitative field work involved two different gangs.

A.   (Interpreter:) Yes.  The work we did with these focus groups had to do with a certain gang and another one.

Q.   And what were those gangs?

A.   (Interpreter:) The Mara Salvatrucha and Barrio, interpreter spelling B-a-r-i -- excuse me, B-a-r-r-i-o, Dieciocho, interpreter translation 18.

Q.   And does that mean the second group, is that the 18th Street gang?

A.   (Interpreter:) Yes, sir.

Q.   And what was -- what was -- what was the purpose of the study?  What was sought to be determined from these focus groups?

A.   (Interpreter:) Well, at that time it was a first attempt

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-7   Filed 03/29/17   Page 374 of 536
Case 3:08-cr-00134-RJC   Document 523-7   Filed 10/04/10   Page 116 of 126

JA3211

to approach this and to know more about these groups in a way that was different from a questionnaire.  It was an approach to know more about their lives and the characteristics of these -- of these groups.

Q.   And did you -- based on this study, did you publish some sort of an article or research paper?

A.   (Interpreter:) Yes, sir.

Q.   And was that done in conjunction with someone else or was that done by yourself?

A.   (Interpreter:) Well, the study was coauthored by another individual and all of this was within the framework of a study that was conducted as a regional study amongst four different Jesuit universities in Central America.

Q.   And who was the other individual who coauthored this with you?

A.   (Interpreter:) Miguel Cruz.

Q.   And who is he?

A.   (Interpreter:) At that time he was the director of the institute.

Q.   Is he now located in the United States?

A.   (Interpreter:) Yes, sir.  At this moment he is doing his doctorate in Nashville.

Q.   Tennessee?

A.   (Interpreter:) Yes, sir.

Q.   All right.  And did you also conduct -- or were you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/29/17   Page 375 of 536
Case 3:08-cv-00164-RJC   Document 520   Filed 10/04/10   Page 17 of 126

**JA3212**

MARIA SANTACRUZ – DIRECT

involved in another study in the year 2000?

A.    (Interpreter:) Yes.  Actually, the field work was done in the year 2000, but it was published in the year 2001.

Q.    Okay.  And what type of study was this?

A.    (Interpreter:) This study was a quantitive approach and it was actually a follow-up to a study which was conducted in 1996 as you would be able to see from my slide.  The objective was again to be a follow-up of the situation and it did have to do with gangs.

Q.    Okay.  So on your slide, the first entry on your slide says 1996.  Is that the study that the -- the 2000 study was a follow-up on?

A.    (Interpreter:) Yes, sir.

Q.    Okay.  And did the 19 -- did you study and review the data and the findings of the 1996 study?

A.    (Interpreter:) Yes, sir.

Q.    And what was your involvement in the 2000 study, the quantitative one?

A.    (Interpreter:) Well, my responsibility was to coordinate the study in its different phases.  Also within the institute I was coordinating and collaborating with a group called Homies Unidos and -- who participated in the field work.  And of course, at the -- I was facilitating them, and at the end I was evaluating the results.

Q.    And who's Homies Unidos?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-7    Filed 09/29/17    Page 376 of 536
Case 3:08-cv-00134-RJC    Document 526-7    Filed 10/04/10    Page 136 of 126

JA3213

MARIA SANTACRUZ – DIRECT

MR. NAZZARO: Your Honor, I'm going to object at this point to the relevance. And also, I'm not sure if this is an expert witness --

THE COURT: Hang on a second. There's a question that's been asked and answered and I haven't heard the translator's response. Until I hear that I can't deal with your objection.

A. (Interpreter:) At that time it --

THE INTERPRETER: I'm sorry, the interpreter requests a repetition. My shorthand no longer means anything to me.

Q. Let me just ask you a different question. Do you know who funded that study?

A. (Interpreter:) In 2000 the funds were provided by the Pan American Organization for Health.

Q. Okay.

THE COURT: Mr. Foster, I'm looking at the time. We've gone a little long here. I think we might take a break for the day and then come back in the morning.

Members of the jury, we'll take our evening break. It's really important that you continue not to talk about the case and keep an open mind. We'll start up again at 9:30 in the morning. So if you would be ready to come back in court at 9:30, we will see you at that time.

(Jury exited the courtroom.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/29/17   Page 377 of 536
Case 3:08-cv-00134-RJC   Document 520-7   Filed 10/04/10   Page 19 of 126

JA3214

THE COURT:  The witness may be excused at this time. If you would come back at 9:30 tomorrow.  Actually, ma'am, if you would be ready to come back into court at 8:30.

THE WITNESS:  Yes, sir.

(Witness stepped down.)

THE COURT:  Mr. Foster, we haven't even gotten to the determination by the court as to whether this person is qualified to render an opinion in any area.  And I've got to tell you after listening for quite some time, I'm not sure where -- where you're going or where she's going.

MR. FOSTER:  Well, I was trying to lay the foundation for her qualifications by showing a study she's made.

THE COURT:  Right.

MR. FOSTER:  It's not going as quickly as I hoped, but that's what I'm trying to do.

THE COURT:  Well, proffer to me what she would -- what opinion she would offer that is relevant to this jury.

MR. FOSTER:  Your Honor, the opinion that she would offer would be that her research and research done by others in this field that she's been engaged in the last 11 years has produced findings that there are certain risk factors that makes someone more vulnerable to gang recruitment or more likely to join a gang or get involved in violence or gang activity, and these factors have been developed through these

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/29/17   Page 378 of 536
Case 3:08-cv-00134-RJC   Document 520-7   Filed 10/04/10   Page 20 of 126
JA3215

studies which I was soon to get to in my questioning of her. The one I was questioning her about currently involved, as it will come out, 938 respondents, gang members, active gang members in El Salvador which was following up on a 1996 study that involved about a thousand, and other studies that she's conducted which produced this academic conclusion that there are these risk factors. And that then she's reviewed the report of Richard McGough, giving her opinion that there are certain risk factors, not all of them but there are risk factors on the list that were present in Mr. Umana's life based on the report she obtained from Mr. McGough. And therefore, we think that that is a mitigating factor that based on his life and his upbringing and his childhood, that he was in a position where he was -- had these risk factors present.

THE COURT: I'm going to let you do that. I'm going to ask you in the morning to get quickly through the next report and then to limit your questioning of this witness to any findings she has made with respect to the MS 13 gang in El Salvador. I think the -- the ground has been laid for that. I think anything beyond that is confusing and misleading to the jury. And so when we come back in the morning, you can finish laying the groundwork for this opinion and then concentrate your questioning and her responses to the MS 13 gang in El Salvador, the risk factors associated with that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/29/17   Page 379 of 536
Case 3:08-cr-00134-RJC   Document 520   Filed 10/04/10   Page 379 of 526
**JA3216**

gang. And then -- you know, at this point it's so generalized as to be unhelpful. And so the only point at which it becomes helpful is if she can individualize that to the factors with respect to this defendant. And if she -- your proffer is that she does that through the report, and so I'll permit that very limited inquiry.

MR. FOSTER: All right, Your Honor.

THE COURT: I also have before me -- and I meant to -- I don't know why we didn't raise this with respect to the motions that we took up before the jury came in. But the government has filed a motion in limine to preclude argument about the equally culpable defendants in the proportionality nonstatutory mitigating factor.

Are you intending to put on evidence or argument with respect to crimes other than the murders of the Salinas brothers and related counts?

MR. FOSTER: Well, Your Honor, we're not seeking the statutory mitigating factor about the same offense; however, we were seeking a nonstatutory mitigating factor to the effect that other defendants in the same case who were charged with murder -- or who the evidence has shown committed murder do not face the death penalty -- or were not prosecuted for murder.

THE COURT: I think that is very akin to the statutory aggravating factor of equal culpability and I don't

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 59-7    Filed 09/29/17    Page 380 of 536
Case 3:08-cv-00164-RJC    Document 520-7    Filed 10/04/10    Page 229 of 126

JA3217

see the -- I don't see a constitutional or other basis for establishing a mitigating factor with respect to other crimes committed by members of the gang. And so I am going to prohibit you from putting on -- arguing that mitigating factor and putting on any evidence related to it. I don't think it's constitutionally required. I don't think it's statutorily permitted. And the case law appears to me to be on point that the crime under consideration is the offense of conviction that triggers the capital sentencing hearing, not possibly other crimes committed by other gang members at other times. I think that's a very misleading and confusing thing for the jury. I think it would require us to engage into -- engage in an analysis far afield from the crime at bar. And I think it would hopelessly distract the jury.

And so if you want to argue varying culpability levels of defendants who were charged in the offense of conviction, you can do that. But any other crimes committed by co-conspirators or MS 13 members at other times is beyond the court's ruling here that based upon an analysis that any probative value is greatly outweighed by the danger of confusion and misleading of the jury.

I meant to get into that before jury selection, but I don't think it has affected the presentation of any of the evidence so far. I did want to raise that with you before tomorrow.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/29/17   Page 381 of 536
Case 3:08-cv-00134-RJC   Document 520   Filed 10/04/10   Page 428 of 525
JA3218

Is there anything further we need to discuss before we call it a day?

MR. NAZZARO:  Your Honor, just briefly.  In light of your ruling about Ms. Santacruz, I would still like to voir dire her if possible.

THE COURT:  Sure.

MR. NAZZARO:  And the -- I've been provided a power point slide, but the only CV that we've been provided is in Spanish; and if there's one in English, I would appreciate to have that.

MR. FOSTER:  We don't have one in English either.  I mean --

THE COURT:  Well, y'all have interpreters so...

MR. NAZZARO:  Okay.  But I notice that the slide is in English.

MR. FOSTER:  Right.

MR. NAZZARO:  Okay.

THE COURT:  I haven't made a determination with respect to qualifying her to render an opinion at this point. I certainly will let the government voir dire her before I do that.  And we'll do that -- why don't we do that at 8:30 in the morning before the jury comes in so everybody knows where we're going.  So we'll -- I asked the witness to be here at 8:30 in the morning and we'll take the issue up of her qualifications at that time.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/29/17   Page 382 of 536
Case 3:08-cr-00134-RJC   Document 521   Filed 10/04/10   Page 12 of 25

JA3219

MR. BRYSON:  Will we go -- is 8:30 our start time for everything tomorrow?

THE COURT:  Well, I told the jury to be ready at 9:30.

MR. BRYSON:  Okay.

THE COURT:  Maybe we don't need an hour.  Maybe we can --

MR. BRYSON:  I just want to know whether I should have all of our witnesses here.

THE COURT:  No, no, no.  Why don't we start at 8:30, see how long it takes.  And we won't do anything else before the jury until 9:30.

MR. BRYSON:  All right.  All right.

THE COURT:  Not holding you to it, but do you have any guesstimate as to how much longer your direct will be?

MR. BRYSON:  His direct?

THE COURT:  No, no, not of this witness, but your case in mitigation.

MR. BRYSON:  I would think we'll finish tomorrow. We've got -- after this witness we've got two other witnesses that I don't think will be that long.  Obviously, it depends on cross examination, but I don't think either of them would be terribly long.

THE COURT:  How long -- does the government intend to put a rebuttal case on?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-7   Filed 09/29/17   Page 383 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 10/04/10   Page 128 of 126

**JA3220**

MS. ROSE:  One or two at the most.

THE COURT:  Why don't we do this, then.  Why don't we plan on having a charge conference tomorrow at lunchtime, at 1 o'clock.  And I'll get some proposed instructions out to you all and we'll plan on having a charge conference at that time.  I think if we did that, we could keep going.  I don't know how long the case will last, but we will be prepared for any contingency if we did a charge conference at 1:00.

All right.  Anything else?

MS. ROSE:  No, Your Honor.

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  We'll see you all at 8:30 in the morning.

(Evening recess at 6:22 p.m.)

*****

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

Dated this 27th day of April, 2010.


                        s/Cheryl A. Nuccio
                        Cheryl A. Nuccio, RMR-CRR
                        Official Court Reporter

            Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00053-MOC   Document 59-7   Filed 03/29/17   Page 384 of 536
Case 3:08-cv-00134-RJC   Document 52-7   Filed 10/04/10   Page 126 of 126

JA3221

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:08CR134-RJC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| ALEJANDRO ENRIQUE RAMIREZ | ) | |
| UMANA, | ) | |
| a/k/a "Wizard" | ) | |
| "Lobo" | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the defendant's Motion to Determine the Admissibility and Reliability of Evidence of Unadjudicated Acts (Doc. No. 960) filed March 31, 2010; the government's Response (Doc. No. 967) filed April 5, 2010; the defendant's Reply (Doc. No. 985) filed April 10, 2010; and the government's Sur-Reply (Doc. No. 988) filed April 13, 2010. For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the defendant's motion.

I.    BACKGROUND

The defendant was charged in a Superseding Indictment with multiple federal offenses arising out of his alleged affiliation with La Mara Salvatrucha, also known as the MS-13 gang (hereafter "MS-13"). Count 1 of the Indictment charged the defendant with a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). As an overt act in furtherance of this conspiracy, the Indictment alleged that on December 8, 2007, the defendant murdered two individuals, Ruben Garcia Salinas and Manuel Garcia Salinas, in a restaurant in Greensboro, North Carolina. These murders were also charged separately in Counts 22 and 24 of the Indictment as murder in aid of racketeering, in

1

Case 3:16-cv-00057-MOC-RJC Document 59-7 Filed 03/23/17 Page 385 of 536
Case 3:08-cr-00134-RJC Document 1471 Filed 04/26/10 Page 1 of 12

**JA3222**

violation of 18 U.S.C. § 1959(a)(1), and in Counts 23 and 25 as use of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). The defendant's jury trial began on April 12, 2010. On April 19, the jury returned a verdict convicting the defendant of all charged offenses.

Accordingly, the defendant's capital trial has proceeded to a sentencing hearing as mandated by the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq. The government has filed a Notice of Intention to Seek the Death Penalty (Doc. No. 275), which lists several aggravating factors it contends justify a sentence of death. Several of these are enumerated aggravating factors listed in § 3592(c) (the "statutory aggravating factors"). The government also gave notice of its intent to prove additional aggravating factors which are not enumerated in § 3592(c) (the "non-statutory aggravating factors"), including the following:

> 4.    Participation in Additional Uncharged Murders and Other Acts of Violence.
>
> Apart from the offenses charged in the First Superseding Bill of Indictment, defendant has been involved in other serious acts of violence, which are not reflected in his criminal record. Including but not limited to:
>
> a.    On or about July 27, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras.
>
> b.    On or about September 28, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca.

(Doc. No. 275 at 4-5).[1] In addition to the murders alleged to have occurred in Los Angeles (the "Fairfax Street murders" and the "Lemon Grove murder"), the government has also proffered evidence of the defendant's involvement in the murder of Jaime Samayoa while he resided in his

---

[1] Each aggravating factor is also re-alleged with respect to the other murder victim, Manuel Garcia Salinas. (Doc. No. 275 at 5-8).

2

**JA3223**

native country of El Salvador (the "El Salvador murder").

The defendant filed a pretrial motion (Doc. No. 483) seeking to strike Participation in Additional Uncharged Murders and Other Acts of Violence from the government's Notice. In the alternative, the defendant filed the instant motion for a hearing to determine the admissibility of evidence of unadjudicated conduct. The Court denied the defendant's motion to strike on April 19, 2010. (Doc. No. 1000: Order). In denying the defendant's motion, the Court instructed the parties that it would bifurcate the defendant's sentencing hearing into an initial phase, "eligibility," and if necessary, a second phase, "selection," where the government could present evidence of non-statutory aggravating factors. The Court then held that Crawford v. Washington, 541 U.S. 36 (2000), would apply to the eligibility phase of the defendant's capital sentencing hearing, but not the selection phase. (Doc. No. 1000: Order at 11). Thus, because the defendant's unadjudicated conduct is alleged as a non-statutory aggravating factor, Crawford does not erect a per se bar against testimonial hearsay statements offered by an unavailable witness not subject to an opportunity for cross-examination.

In making these findings, Court deferred ruling on the admissibility of any specific evidence of unadjudicated conduct, requiring instead that the government submit to the Court and the defendant its proffered evidence of the Fairfax Street murders, the Lemon Grove murder, and the El Salvador murder for in camera review. (Id. at 10-11). That proffer is summarized as follows.

The Fairfax Street Murders

The government alleges that on July 27, 2005, the defendant shot and killed Jose Herrera and Gustavo Porras after an altercation on Fairfax Street in Los Angeles, California. An eyewitness who recalled seeing a participant in the shooting holding a crutch led LAPD Detectives Gene Parshall and Barry Telis to Luis Rivera, an MS-13 member who was injured and on crutches when the

3

**JA3224**

murders took place. Rivera gave a statement that he, Eddie Ruiz, Luis Ramos, Rene Arevalo, and the defendant had been riding in a gold colored Nissan sedan on the day of the shooting. Arevalo had been driving. The victims, Porras and Hererra, were seen walking on the sidewalk on Fairfax Street when they displayed rival gang signs to the car. Arevalo then pulled the car over to the sidewalk, and Ramos, carrying one of Rivera's crutches, exited the vehicle to confront the victims. Rivera stated that the defendant also exited the vehicle, drew his firearm, and shot the victims. Rivera made the first of his statements implicating the defendant before police arrested Ramos.

Police then arrested Ramos, who, after initially denying his involvement in the shooting, was placed in a holding cell with Rivera. The holding cell was outfitted with a recording device that allowed police to monitor conversations between Ramos and Rivera. After conferring with Rivera, Ramos gave a statement naming the defendant as the shooter that was largely corroborative of Rivera's, although inconsistent with respect to some details.[2] Months later, LAPD detectives interviewed Arevalo, who gave a similar statement naming the defendant as the shooter.[3]

Rivera, Ramos, and Arevalo were eventually charged in state court as co-conspirators in connection with the Fairfax Street murders. At a preliminary hearing, Parshall and Telis testified subject to cross-examination regarding the statements given by each co-defendant.[4] On April 23, 2008, Los Angeles police conducted a recorded interview with the defendant, who admitted being

---

[2] Ramos denied exiting the vehicle until after the shooting. He also stated that Ruiz, Arevalo, and the defendant displayed gang signs to Herrera and Porras in response to their signs, which Rivera had not admitted.

[3] Arevalo's statement also differed slightly from the statements given by Ramos and Rivera. He told investigators that Ramos shouted "La Mara!" before the defendant shot the victims, which Ramos had omitted from his statement. Arevalo also stated that he did not pull the vehicle over the sidewalk until after the shooting.

[4] The defendant was not present or represented by counsel at this hearing.

4

**JA3225**

present at the Fairfax Street murders, confirmed specific details contained in Rivera, Ramos and Averula's statements but denied being the shooter.[5]

### The Lemon Grove Murder

The government also alleges that on September 28, 2005, the defendant participated or aided and abetted in the murder of Andy Abarca at the Lemon Grove park in Los Angeles, California. The government elicited testimonial statements by eyewitnesses to the murder, including Juan Lara and Freddy Gonzalez, as relayed by LAPD Detective Thomas Small. Juan Lara and Freddy Gonzalez stated to Small that on the night of the shooting they were sitting with Abarca adjacent to a basketball court at the Lemon Grove park. Two males approached from across the court, and at least one drew a weapon and began firing. Andy Abarca was the only person at the park who was killed, but witness statements suggest that Gonzalez was the intended victim. Although he was never able to make a 100% positive identification, Gonzalez tentatively identified the defendant on two occasions as the shooter from two different "six pack" photographic line-ups.

The defendant's April 23, 2008, recorded interview, if believed, establishes his presence at this shooting as well. During this interview the defendant admitted that he had gone to Lemon Grove park on the night of the shooting in a car driven by a friend, but stated that the shooting was carried out by two unnamed individuals they had dropped off at the park, and that he knew they wer going to take care of rivals. A ballistics report analyzing bullet cartridge casings recovered at both the Fairfax Street murders and the Lemon Grove murder determined that the bullets from booth

---

[5] On April 24, 2009, the defendant filed a motion to suppress this recorded statement from introduction into evidence at his trial, claiming the statement was obtained in violation of his constitutional rights. (Doc. No. 490). The Court conducted an evidentiary hearing to determine the admissibility of the statement on August 26, 2009, and thereafter denied the defendant's motion.

5

Case 3:16-cv-00057-MOC Document 59-7 Filed 03/23/17 Page 389 of 536
Case 3:08-cr-00134-RJC Document 1473 Filed 04/26/10 Page 5 of 12
**JA3226**

shootings had been fired by the same .22 caliber handgun.

The El Salvador Murder

Finally, the government alleges that the defendant participated in another murder while residing in his native country of El Salvador. The defendant was prosecuted in an El Salvadoran court on charges alleging that he and co-conspirators decapitated Jaime Samayoa, a purported MS-13 member who had attempted to leave the gang. The government intends to call the prosecuting attorney from the case, who will relay testimonial statements given by witnesses, some of whom testified anonymously.[6]    The El Salvadoran court presiding over the defendant's case found that these witnesses' statements lacked consistency and credibility, and acquitted the defendant along with his co-conspirators.

After reviewing this proffer and hearing written and oral argument from both parties, the Court announced its findings, which are stated below.

II.    LEGAL FRAMEWORK

As is required by the FDPA, the defendant's capital sentencing hearing is a separate proceeding from the guilt phase of his trial. See 18 U.S.C. § 3593. At this hearing, the Federal Rules of Evidence do not apply, but evidence[7] "may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Thus, the FDPA requires the Court to perform a more stringent balancing of probative value against the danger of unfair prejudice than is required under the Federal Rules of Evidence.

---

[6] El Salvadoran court records refer to these witnesses by number only.

[7] The FDPA conspicuously uses the term "information" rather that "evidence," perhaps emphasize that the Federal Rules of Evidence are inapplicable. However, because the parties have often used the term "evidence" in their briefing of these issues, the Court will use that term throughout this Order.

6

**JA3227**

See Fed. R. Evid. 403 (under which evidence may be excluded if "its probative value is <u>substantially</u> <u>outweighed</u> by the danger of unfair prejudice") (emphasis added). The Fourth Circuit has expressly held that "the FDPA provides a capital defendant with constitutionally sufficient evidentiary protection." <u>United States v. Fulks</u>, 454 F.3d 410, 438 (4th Cir. 2006); <u>accord</u> <u>United States v. Lee</u>, 374 F.3d 637, 648 (8th Cir. 2004); <u>United States v. Fell</u>, 360 F.3d 135, 145-46 (2d Cir. 2004) (reaching the same conclusion).

III.    DISCUSSION

    A.    Evidence of Unadjudicated Conduct Must Demonstrate Reliability

As a preliminary matter, the Court recognizes that although evidence of unadjudicated conduct is not <u>per se</u> inadmissible, it must demonstrate reliability prior to its admission before a capital sentencing jury. Two fundamental constitutional principles compel this standard. First, the qualitative difference between capital punishment and other forms of punishment requires the Court to ensure a heightened degree of reliability in the capital sentencing process. <u>See</u>, <u>e.g.</u>, <u>Lockett v. Ohio</u>, 438 U.S. 586, 602-04 (1978); <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976). Second, a capital sentencing jury should be presented with all relevant evidence so that it may make a principled determination of whether the defendant in fact deserves a sentence of death. <u>See</u>, <u>e.g.</u>, <u>Payne v. Tennessee</u>, 501 U.S. 808, 825-27 (1991) (allowing the introduction of victim impact evidence); <u>Barefoot v. Estelle</u>, 463 U.S. 880, 897 (1983) (calling for capital sentencing juries to consider "all possible relevant information" before them) (quoting <u>Jurek v. Texas</u>, 428 U.S. 262, 276 (1976)). The admissibility of unadjudicated conduct at a defendant's capital sentencing hearing often places these fundamental principles in tension with one another. <u>See</u> <u>United States v. Walker</u>, 910 F. Supp. 837, 852 (N.D.N.Y. 1995) ("The issue of unadjudicated criminal conduct lurks squarely at the intersection (read collision) of two powerful but competing principles of death penalty jurisprudence.").

7

Case 3:16-cv-00057-MOC Document 50-7   Filed 03/22/17   Page 391 of 536
Case 3:08-cr-00134-RJC Document 247   Filed 04/26/10   Page 7 of 12

**JA3228**

Drawing upon these precedents, a number of district courts within the Fourth Circuit have required the government to make a threshold showing that evidence of unadjudicated conduct bears sufficient indicia of reliability before it may be submitted to the sentencing jury. See United States v. Cisneros, 363 F. Supp. 2d 827, 838-39 (E.D. Va. 2005); United States v. Breeden, No. 3:03cr13, 2004 WL 1920981, at *4 (W.D.Va. Aug. 27, 2004); United States v. Foster, No. CRIM. CCB-02-410, 2004 WL 903921, at *1 (D.Md. Apr. 9, 2004); United States v. Beckford, 964 F. Supp. 993, 1000 (E.D.Va. 1997).

Thus, the Court recognizes its duty to ensure that only reliable evidence of unadjudicated conduct is admitted at the defendant's sentencing hearing. This is no less true for testimonial hearsay statements that Crawford would otherwise prohibit. Such statements are admissible upon the Court's satisfaction "from the totality of the circumstances that the statement has particularized guarantees of trustworthiness and the requisite indicia of reliability." United States v. Jordan, 357 F. Supp. 2d 889, 904 (E.D.Va. 2005) (applying a pre-Crawford evidentiary standard to testimonial hearsay statements offered at a defendant's selection phase hearing). Although the Court makes a specific inquiry into reliability, the ultimate standard governing admissibility remains as set forth in the FDPA: whether probative value is outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. 18 U.S.C. § 3593(c). See also Cisneros, 363 F. Supp. 2d at 834-35; Breeden, 2004 WL 1920981, at *4; Foster, at *1 (all making reliability inquiries within the overall evidentiary standard provided for in § 3593(c)). It is under this standard that the Court now analyzes the reliability of the governments proffered evidence of unadjudicated conduct.

B.    The Fairfax Street Murders

With regard to the Fairfax Street murders of Jose Herrera and Gustavo Porras, the statements given by co-conspirators Rivera, Ramos, and Arevalo identifying the defendant as the shooter bear sufficient indicia of reliability and trustworthiness. The detectives who will testify as to these

8

Case 3:16-cv-00057-MOC-JC  Document 50-7  Filed 03/23/17  Page 392 of 536
Case 3:08-cr-00134-RJC  Document 247  Filed 04/26/10  Page 8 of 12

JA3229

statements gave prior sworn testimony at a preliminary proceeding subject to cross-examination. Thus, the Court is satisfied that these witnesses will accurately relay the co-conspirators' statements, each of which is a statement against penal interest that names the defendant as shooter and provides other corroborating details, including the make and model of car involved, the presence of crutches, the names of the other participants, the number of victims, and the specific gang signs displayed by the victims. Although there is some evidence that Rivera and Ramos colluded prior to giving some of their statements in an attempt to minimize each other's involvement, police monitored their conversations and were aware of this attempted collusion during subsequent interviews. The fact remains that Rivera identified the defendant as the shooter before ever speaking to Ramos, and many details from each participant's statement are corroborated by the defendant's own recorded statement. To the extent some discrepancies exist between the statements, the defendant will have an opportunity to highlight them during cross-examination of the detective witnesses.

Moreover, other evidence proffered by the government indicates that these statements are trustworthy. The ballistics report linking the Fairfax Street murders to the Lemon Grove murders is especially corroborative: of all the participants present at the Fairfax Street murders, the defendant is only one who, by his own admission, was also present at the Lemon Grove murder. Based on the totality of the facts presented, the Court finds that there is sufficient indicia of reliability in the governments proffered evidence concerning the Fairfax Street murders, and the probative value of this evidence outweighs any danger of unfair prejudice. Accordingly, this evidence is admissible during the selection phase of the defendant's sentencing hearing.

C.      The Lemon Grove Murder

With regard to the Lemon Grove murder of Andy Abarca, the hearsay statements given to detectives in that case bear similar indicia or reliability. It appears from the government's proffer

9

Case 3:16-cv-00057-MOC Document 50-7   Filed 03/22/17   Page 393 of 536
Case 3:08-cr-00154-RJC Document 171   Filed 04/26/10   Page 9 of 12
**JA3230**

that it intends to call some of these witnesses to testify.[8] The defendant will have an opportunity to cross-examine these witnesses for any inconsistencies present in their statements. Moreover, as stated earlier, the defendant's own recorded statement places him at the scene of this murder as well as the Fairfax Street murders, which are further linked together by ballistics evidence connecting both shootings to a single firearm. All of this demonstrates the reliability of the government's proffered evidence such that its probative value outweighs any danger of unfair prejudice. The government's evidence concerning the Lemon Grove murder is therefore admissible at the defendant's selection hearing, with the one exception noted below.

Unlike the rest of the government's proffered evidence concerning this murder, the Court will not allow hearsay testimony about Gonzalez' identification from photographic displays. The officer's were not present when the shooting occurred (which unlike the Fairfax murders did not occur in broad daylight but at night), did not see the length of time it took to do the shootings or the distance between shooters and victims.  If Gonzalez does testify and the government lays an appropriate foundation, the Court will make a determination at trial as to whether his prior photographic identifications will be admitted.  In any event, due to the passage of five years from shooting event to trial testimony, under the particular facts of this case, the Court will no permit the government to elicit an in-court identification by Gonzalez finding that the danger of unfair prejudice outweighs its probative value.

D.      The El Salvador Murder

Finally, with respect to the murder of Jaime Samayoa in El Salvador, the Court finds the government's proffered evidence unreliable. It is almost entirely hearsay evidence of conduct for which the defendant was acquitted, based in part upon a finding that these statements—proffered

---

[8]In fact, between the issuance of the oral order and this written one, witnesses Juan Lara and Freddie Gonzalez did testify, subject to cross examination.

10

**JA3231**

here as reliable evidence—lacked credibility. It does not appear that any eyewitness will offer live testimony to corroborate these statements. Moreover, many of the declarant witnesses remain anonymous. The anonymous quality of these witnesses not only undermines the Court's assessment of their accuracy and truthfulness, but it also unfairly limits the defendant's ability to uncover any impeachment evidence that may exist. For these reasons, the Court finds that the government's proffered evidence of the El Salvador murder lacks sufficient indicia of reliability and its probative value is outweighed by a danger of unfair prejudice to the defendant. Thus, this evidence is inadmissible.

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that the defendant's Motion to Determine the Admissibility and Reliability of Evidence of Unadjudicated Acts (Doc. No. 960) is **GRANTED IN PART** and **DENIED IN PART**, such that:

1.    The government's proffered evidence concerning the July 27, 2005, murders of Jose Herrera and Gustavo Porras is admissible at the defendant's sentencing hearing;

2.    The government's proffered evidence concerning the September 28, 2005, murder of Andy Abarca is admissible at the defendant's sentencing hearing, with the exception of Freddy Gonzalez's prior identifications of the defendant as the shooter, upon which the Court will defer ruling and will bar an in-court identification; and

3.    The government's proffered evidence concerning the murder of Jaime Samayoa in El Salvador is inadmissible at the defendant's sentencing hearing.


Signed: April 24, 2010


Robert J. Conrad, Jr.
Chief United States District Judge

**JA3232**

12

**JA3233**

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA        )DOCKET NO. 3:08-CR-134-2
                                )
                                )
     vs.                        )VOLUME V-A
                                )MORNING SESSION
ALEJANDRO ENRIQUE RAMIREZ UMANA   )
_____ )


TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 27, 2010

APPEARANCES:


On Behalf of the Government:
     JILL WESTMORELAND ROSE
     Assistant United States Attorneys
     100 West Trade Street, Suite 1700
     Charlotte, North Carolina 28202

     SAM G. NAZZARO
     U.S. Department of Justice
     950 Pennsylvania Avenue NW
     Washington, D.C. 20530

On Behalf of the Defendant:
     JOHN DAVID BRYSON
     Wyatt, Early, Harris & Wheeler, LLP,
     P.O. Box 2086
     High Point, North Carolina 27261

     MARK PATRICK FOSTER, JR.
     Law Offices of Mark Foster, PC
     1011 E. Morehead Street, Suite 300
     Charlotte, North Carolina 28204



LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

Case 3:16-cv-00057-MOC-JC   Document 59-7   Filed 03/23/17   Page 397 of 536
Case 3:08-cr-00134-RJC   Document 525-5   Filed 01/30/11   Page 1 of 140

JA3234

656

I N D E X

DEFENDANT'S WITNESSES:

        MARIA SANTACRUZ
                Voir Dire Examination by Mr. Foster        658
                Voir Dire Examination by Mr. Nazzaro       671
                Direct Examination by Mr. Foster           677
                Cross-Examination by Mr. Nazzaro           684

        MARK BEZY
                Direct Examination by Mr. Bryson           697
                Cross-Examination by Ms. Rose              710

        JAMES MERIKANGAS
                Direct Examination by Mr. Bryson           715
                Cross-Examination by Ms. Rose              738

GOVERNMENT'S REBUTTAL WITNESS:

        HELEN MAYBERG
                Direct Examination by Ms. Rose             757
                Cross-Examination by Mr. Bryson            779

                        * * * * * *

E X H I B I T S

GOVERNMENT'S EXHIBITS:
NO.                                                     RECEIVED
581 ........................................ 793

                        * * * * * *

DEFENDANT'S EXHIBITS:
NO.                                                     RECEIVED
34  ........................................ 699
35  ........................................ 717
36  ........................................ 724
37  ........................................ 730
38  ........................................ 733
39  ........................................ 735

                        * * * * * *

Defendant rests                                         756
Government rests                                        793
INTERPRETERS JULIA DAVIS AND MARIA LANDO PRESENT

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 398 of 536
Case 3:08-cr-00134-RJC   Document 597   Filed 01/30/11   Page 23 of 140

JA3235

657

P R O C E E D I N G S

APRIL 28, 2010 MORNING SESSION:

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning.

THE COURT:  Good early morning.  I wanted us to come early because, Mr. Foster, I was troubled by the generalized nature of the background with respect to the last witness.  I kept waiting for something relevant to Mr. Umana, and it just seemed to go on and on about focus groups and other gangs.  And I just don't think any of that is relevant to this jury.  And so I wanted to give you a chance to focus it as both in terms of qualifications and the individualized part of it with respect to Mr. Umana.

If you can't do that, than I don't think this testimony is relevant to this jury.  I don't think it helps them in their individualized assessment.  I think we've had a lot of generalized testimony about conditions in El Salvador and very little connection to the particular defendant on trial in this case.

And so those are the concerns of the Court, and I would be glad to give you a chance to satisfy me that that individualized connection is there.  But that's your task at 8:30 this morning.

MR. FOSTER:  All right, Your Honor.  Do you want to return the witness to the stand, Your Honor?

Laura Andersen, RMR 704-350-7493

**JA3236**

THE COURT:  Yes.

MARIA SANTACRUZ, PREVIOUSLY SWORN, testified as follows IN

VOIR DIRE EXAMINATION BY MR. FOSTER:

Q.   Ms. Santacruz, just trying to focus more on your research and how it might apply to this defendant in this case.

If we could finish up on the quantitative work you did in the year 2000.  How many gang members were involved in that quantitative study?

A.   There were more than 1,000 gang members that participated and we used -- considered the information relating to 938 of them.

Q.   Okay.  And what percentage of those 938, approximately were MS 13 gang members?

A.   Approximately 45 percent of them.

Q.   And was one of the purposes of that study to determine, if possible, what the causes were for gang -- for persons to join gangs?

A.   One of the reasons of the study, yes, was that.  And also, our idea and our mission as an institute, is to provide more complete information about a social phenomenon that's important to our country.  And the information that would allow us to come to know what are the risk factors for entering into a gang in such a way that we would be able to have information that would support policies that are more

Laura Andersen, RMR 704-350-7493

**JA3237**

659

farther reaching.

Q.   Now -- and did you review and study all the data and were you involved in making the findings in that study?

A.   Yes, sir.

Q.   And did those -- did the data and did the findings differ, depending on which gang the survey respondents belonged to?

A.   As I said, there were more than two gangs that were involved in this study, but it was primarily MS and 18th Street Gang.

Q.   Did this study result in findings as to risk factors for someone being susceptible to joining a street gang?

A.   Yes, it did give us that information.  And also gave us information about other types of elements that helped us to know more about this phenomenon.

Q.   And did those findings apply to the entire group of the respondents as a whole?

A.   Yes, sir.

Q.   And was there any evidence to suggest that there was any difference in those findings depending on which gang the members were from?

A.   The gangs are different from one another, but the information about what are the risk factors that would cause a person to join a gang was constant between it.

Q.   And did this -- the findings in this study, did they

Case 3:16-cv-00057-MOC Document 50-7   Filed 03/23/17   Page 401 of 536
Case 3:08-cr-00134-RJC Document 525-3   Filed 03/30/11   Page 5 of 140
JA3238

660

also take into account the results of the previous study in 1996?

A.    Yes, sir.  In fact, there was a comparison between those two studies between those two moments in time.  And --

Q.    Did -- I'm sorry.

A.    And at this time at this study that was done in 2000, one of the phenomenon that was able to be confirmed was that this had -- it had grown more complicated.  That the phenomenon had turned into -- that the situation had become more complex.

Q.    And is it accepted in your field of community psychology and sociological research to conduct studies in this manner?  In other words, to do questionnaires and surveys of individual people, and then tabulate those results and try to draw conclusions?

A.    Yes.  It is a means of study to start with individualized questions and lead to broader conclusions from there.

Q.    And are you aware of whether these two studies in 1996 and 2000 of these gang members, are you aware of whether there have ever been any studies that were involving -- well -- let me start over.

       The studies in 1996 and 2000, are you aware whether there were ever any larger studies done than those ones?

A.    In terms of how many people participated; no.  Not that

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 402 of 536
Case 3:08-cr-00134-RJC   Document 525-3   Filed 03/30/11   Page 6 of 140

**JA3239**

661

I know of.

Q.   And so what were the conclusions of your study as far as what the risk factors were for someone being susceptible to joining one of these street gangs?  Are those on the slide that will help you?

A.   In the study from 19 -- from 2000 I can give some general information.  But in the slides -- but in the slides there is an approach with information that is more complete from the information that we've gathered since then in 2007, that is on the slide.

Q.   Okay.  So showing you what's up on the screen there which is part of -- I believe this is Exhibit 33, do you see that in front of you?

A.   Yes, sir.

Q.   And is this a list of the factors that have been identified as being risk factors for gang membership?

A.   Yes.  This is a group of large categories that have been subdivided into more concrete or specific elements.  And based on or from these elements, there are other variables that present themselves.

Q.   And you mentioned something about this was updated in 2007.  Are you aware of additional research that was done after the publication of your study in 2001 that has furthered the subject matter?

A.   Yes, sir.  There are further studies, for example in

Case 3:16-cv-00057-MOC-JC Document 59-7   Filed 03/23/17   Page 403 of 536
Case 3:08-cr-00134-RJC Document 2250   Filed 03/30/11   Page 403 of 140

**JA3240**

662

2004, 2003, 2004, there were a number of studies done that were not oriented toward gang members themselves, but rather to the community, and communities that had gang presence, or at least general violence present in the community.

And the institute interviewed the residents of that community so we could determine what were the variables that pertained to the presence of violence in these communities.

And it gave me in more precise terms what a concept that is generally known as social capital.  I want to repeat that what we were attempting to measure, what is generally known as the concept of social capital.

Q.    And was there another study done in 2006 that you were involved in?

A.    A study was done in 2006, but I have not participated in that.

Q.    Have you reviewed the results of that study?

A.    Yes, sir.

Q.    And was that also a field work that involved interviews of gang members in prison?

A.    Yes, sir.

Q.    And were those gang members who'd been in prison in El Salvador?

A.    Yes, sir.

Q.    And did those gang members include MS 13 gang members?

A.    Yes, sir.

Case 3:16-cv-00057-MOC Document 59-7  Filed 03/23/17  Page 404 of 536
Case 3:08-cr-00134-RJC  Document 2250-1  Filed 03/30/11  Page 8 of 140

**JA3241**

663

Q.    And have you considered the results of that study as well, in whatever effect it might have on the risk factors that you've identified?

A.    The study in 2006 was done very close to this publication.  The factors that intend to bring about joining in a gang are constant throughout time.

But also in the 2006 study it was shown the importance of the political policies that were put in place to address this phenomenon.  I am saying so because that is not explicit in this slide.

Q.    Okay.  So based on all your research and your examination of studies by everyone else, have you come up or with others, is there a list of identified factors that are risk factors for someone being recruited into a gang, a violent street gang in El Salvador?

A.    They are synthesized, you might say, in the slide.

Q.    And the ones that have been synthesized on the slide, in your opinion, do those apply equally to MS 13 members as to other gang members?

A.    Yes.  Yes.  Because both of the gangs or rather the people that tend to join both of these gangs find themselves in similar circumstances, even though the gangs themselves are different, I reiterate.

Q.    And what are those -- what are those factors that you've identified?

                    Laura Andersen, RMR 704-350-7493

**JA3242**

664

A.    Well, there are four larger categories.  And then it goes from more general into more specific.

Within the social, the area of social structure -- within the social structural area we could mention that there are four primary elements that have to do with the process of social exclusion, cultural violence.

THE COURT:  Mr. Foster, to save time, I can read those things on the slide, so.

Q.    (By Mr. Foster) Okay.  Have you broken down -- for instance, what is social exclusion, is there another slide that breaks down what that is?

A.    Yes, sir, it's the next one.

Q.    Okay.  And so those -- are those things listed off to the side of social exclusion, looks like five different factors, are those the things that define what social -- what factors create social exclusion?

A.    Yes, sir.

Q.    So those include economic instability, inadequacy or lack of basic community services, school drop out, lack of opportunities for technical or professional training, and unemployment or underemployment?

A.    Yes.  The fundamental idea is that the process of social exclusion marginalizes large segments of the population from the possibility of development.  And in our country, all sectors of the population are characterized by

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 406 of 536
Case 3:08-cr-00134-RJC   Document 1350   Filed 01/30/11   Page 104 of 145
**JA3243**

665

being young people.  Or in other words, it's the young people are those that compose principally the group that is exposed to social and economic vulnerability.

Q.   And what about cultural violence, is there another slide that breaks out the factors for that one?

A.   Yes, sir.

Q.   Do you see that in front of you?

A.   Yes, sir.

Q.   And on this slide it indicates that you've got four things listed:  Patterns in the transmission and learning of the use of violence, cultural models regarding personal relations, presence of violent actors, and cultural permissiveness regarding use of firearms.

A.   Yes.  The fundamental idea of this group of elements is to consider that it is fundamental to understanding the environment of gangs.  That violence is an everyday fact of life for people in their relationships with other people in my country.

    We can define a culture of violence as a system of norms -- and norms or values and attitudes that promote and legitimatize the use of violence in interpersonal relationships at a general level.

Q.   Okay.  And moving on to the next factor, rapid unplanned urban growth.  I don't know if there's a slide. For this one you've listed overcrowding meaning urban

Laura Andersen, RMR 704-350-7493

**JA3244**

666

crowding and reduced personal space, lack of recreational areas and inadequate or nonexistent social services. Are those the sub factors that constitute rapid unplanned urban growth?

A.    Yes, sir.

Q.    And moving on to migration. We just have migration in general. What does that refer to in general?

A.    That immigration from -- in this country, which is primarily from people that have been deported, imported a symbolism or a way to be viewed as a gang. But then it also imported specific identities with regards to the groups.

Q.    And moving on to community disorganization on the next slide. You've indicated that that one has sub elements of lack of trust among community members, and lack of citizen participation in local affairs; is that right?

A.    Yes.

Q.    Okay. And then moving down to the next one, presence of drugs, there's not a subcategory for that one.

However, it looks like for problem families you've broken out on this slide, three sub elements, and they would appear to be dysfunctional families, abandonment, neglect and/or abuse by parents or caregivers and history of violence in the family; is that correct?

A.    Yes, sir.

Q.    And so these were, in your opinion, would be risk

Laura  Andersen,  RMR  704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 408 of 536
Case 3:08-cr-00134-RJC   Document 1530   Filed 01/30/11   Page 124 of 145
JA3245

667

factors for someone being recruited into one of these street gangs?

A.    Yes, of course, sir.

Q.    And then moving on to the next category which is friends that are gang members.  You found that the study showed that's also a risk factor?

A.    Yes, sir.

Q.    And the next one is just violence.  And off to the right on this slide it says, perpetuation of the cycle of violence and identity based violence.  Can you briefly explain what those are?

A.    As I mentioned at a general level and at the societal level, there is a presence of violence.  And at this level we're talking about an interpersonal level, in which the violence plays an important role as a mechanism for interaction between people.  As a mechanism to enter into the group and the children and the young people have been socialized in this way.  And they repeat, also, these patterns of relationship.

You should -- one needs to take into account that violence is a cycle that guarantees its' own propagation -- that -- it guarantees its' own existence.

Q.    And then moving on to difficulties in building personal identities.  The last major category on this slide.

Looks like on this last slide here, you've broken out

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 409 of 536
Case 3:08-cr-00134-RJC   Document 1530   Filed 01/30/11   Page 13 of 145
JA3246

668

three subcategories, which would be search for identity through violence, lack of personal role models, personal and societal, and identification with the gangs; is that correct?

A.   Yes, sir.

Q.   And so once again, these would be -- if this was present, these would be risk factors for someone joining one of these street gangs?

A.   Taking into account all of the factors that were previously mentioned and their interaction with them, this is the smallest level, the most individual level.

And when they enter into the contact with the gang, the gang becomes the family.  And the family normally answers the question; who am I?

Q.   And so have you -- with these risk factors in mind, have you reviewed a report provided to you by Richard McGough regarding Alejandro Umana?

A.   Yes, sir.

Q.   And in doing so, did you, in your opinion, did you find any of these risk factors that appeared to have been present in Alejandro Umana's life?

A.   Yes, sir.

Q.   And can you tell us which ones those were?

A.   Once again, I will speak of them starting with the most general and go to the most specific.  Social exclusion; for

Laura Andersen, RMR 704-350-7493

**JA3247**

669

example, in the social conditions in which the family was living.  And the fact that your client did not study or go to school beyond the third grade.  That he had to leave the educational system.  That he studied in a public school.  And in our country there's a huge difference between the public school system and the private school system.  Your client also, like his father, were working in what we could call subemployment with low salaries and without social security.  These are factors of social exclusion.

And with regard to cultural violence, to grow up during a civil war forms or informs the life of people who are living in this way.  They are constantly exposed to violence during the war and after the war.  And they learn about how to relate to one another in the light of violence.

And as I read the information that was provided to me by Mr. McGough, one of the elements or an example of this is when your client could have seen the killing of another person during his childhood.

In terms of community or disorganization, usually when we speak of a meson, this is a place where there are elements of marginalization present.

And now speaking of problem families, from what I could read, there was intergenerational abandonment in this family.  The father of your client, was raised by his grandmother.  The mother of your client, left the family

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 411 of 536
Case 3:08-cr-00134-RJC   Document 1350   Filed 01/30/11   Page 15 of 145
**JA3248**

670

home.  Your client was raised by his grandmother or great grandmother.  And after that, because of conflicts within the home, your client had to leave his home and went on to be part of a multiple -- several different homes.  And it's clear that your client referred to himself at some times as an orphan.

And we can also speak of parental negligence. Especially when the father, the person in charge of the family was not able to provide information about his birth, where it took place or when it took place.

And according to what I was able to read also, there was a moment in which your client was not able to participate in the selection of the soccer selection team, because this information was missing, pertaining to his birth certificate.

And for a child it's the parents or the people in charge of the child who should be responsible to be able to provide this information.

And finally, difficulties with personal identity.  I think that this is clear when we can see that there is questions around the circumstance of his own birth, his age, the country, what year.  This is basic information that allows someone to form their own identity.

And that together with all of the previous factors, can cause a person to seek their identity on the outside, or

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 412 of 536
Case 3:08-cr-00134-RJC   Document 1350   Filed 01/30/11   Page 16 of 145
**JA3249**

671

from an outside source, possibly from by joining a gang.

MR. FOSTER:  Those are the questions I have, Your Honor.

THE COURT:  Very well.  I think I'm going to ask the government to save its cross for the testimony before the jury unless you have a brief cross on qualifications.

MR. NAZZARO:  Just a few questions.

THE COURT:  All right.

MR. NAZZARO:  Thank you.

CROSS-EXAMINATION BY MR. NAZZARO:

Q.   Ma'am, has most of your work been in the field of public opinion, in other words, polling?  That's how I read your resume, is that accurate?

A.   Well, sir, actually in terms of polling and also in the field of social research, sir.

Q.   And is social research different from polling?

A.   Yes, sir.  A questionnaire is one of the tools, one of many that can be used in social research.

Q.   And in this particular study that you're basing your opinion on, did you use polling or social research?

A.   In the year 2000 it was a structured polling and with the use of questionnaires, it was not a social -- social investigation.  Allow me to repeat the answer.

In the study in 2000, we used a questionnaire with open ended and closed-ended questions.  So it was not a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 413 of 536
Case 3:08-cr-00134-RJC   Document 1335   Filed 01/30/11   Page 17 of 145
**JA3250**

672

questionnaire -- it wasn't a poll.

Q.    Okay.  Do you have a copy of that questionnaire?

A.    Not at this time, sir.

Q.    And is this the study that you're referring to because you're -- well, let me rephrase the question.

     The title of your slide is Juvenile Gangs, is that what I'm reading correctly on your English slide?

A.    Yes, sir.

Q.    The focus of your study was to determine why juveniles or young people join gangs?

A.    Yes, sir.  And also to learn more about the phenomenon.

Q.    Okay.  The phenomenon of gangs?

A.    Yes, sir.

Q.    At the time the problem in El Salvador was that young kids and middle school were joining gangs; isn't that true?

A.    Yes.  And it continues to happen.

Q.    And so that was important to El Salvador, was to find out why the youth of their country was joining gangs?

A.    Yes, sir.

Q.    Now, was this the study that was focused just on the problem in San Salvador or was that a different study?

A.    The study from the year 2000 focused on the metropolitan area of San Salvador, but also took into consideration two other areas, two other townships.

Q.    What areas are those?

                    Laura Andersen, RMR 704-350-7493

**JA3251**

673

A.    Actually three municipalities, Cojutepeque, Quezaltepeque, and Nejapa (phonetic spellings).

Q.    Okay.  And I didn't hear you say Santa Ana, that wasn't the focus of those studies; is that correct?

A.    No, sir.

Q.    And the reason for that study was because there was a problem in those areas, and you wanted to find out so you could change public policy in those particular regions of your country where you were having those problems; is that right?

A.    Well, we focused on those areas because those are the areas that had -- that tended to have a permanent gang situation.  But we wanted to be able to apply that knowledge to all other areas.

Q.    And from reading from your conclusion in your study it says, the situation has worsened in San Salvador.  And, a reason for which a major commitment is needed to make changes in social policies with respect to youth and gangs. That was your conclusion, is that right?

A.    Well, my conclusion was that the problem had worsened in the country in general and based on the study -- and since and based on the study of 1996.  And that it was important to make a change and to approach this in a more integrated manner in order to solve the problem with gangs in general.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 415 of 536
Case 3:08-cr-00134-RJC   Document 1367   Filed 01/30/11   Page 19 of 145
**JA3252**

674

Q.   Just one other question about the word, risk factors. I didn't see that word in your study, and maybe I missed it. Is that a word you used or was that provided to you by the attorneys?

A.   Well, it's a term that is used in epidemiology.  And in social sciences we use that word to define those elements that occur in a phenomenon.  Because in social sciences, not everything is precise.  We talk about probabilities more so than cause and effect, direct cause and effect.

Q.   In other words, you can't really say, give an opinion, as to why this particular defendant joined a gang?

A.   I can make an inference based on the information that the defense has provided me.  And based on the information that I know inclines a person or makes a person inclined to join a gang.

Q.   This slide that you prepared, does that appear anywhere in your article?

A.   It doesn't appear in the 2000 study, but it does appear in a publication in English that came out in 2007.  The author of that article was the ex-director of the institute for which I work and with whom I had worked on the subject of gangs.  And this list of information about these factors is -- is the product of a revision or an overview that this author and I have conducted based on all of these studies.

Q.   Just -- I'm sorry -- one more question.

Laura Andersen, RMR 704-350-7493

JA3253

675

THE COURT:  You said one more question about three questions ago.

MR. NAZZARO:  That's all the questions.  I promise that's the last time I say, last question.  Thank you.

THE COURT:  The witness would be excused.

Mr. Foster, I find a lot of this testimony to be general sociological focus group polling type information that has limited probative value.  And is further limited by the study of juveniles, and the study of a city other than Santa Ana where this defendant grew up.

Nevertheless, I'm going to let you conduct a limited examination of this witness.  And it will be limited in time period to the time period of her studies at about the time that the defendant, there's some information joined the gang, the MS 13 gang in El Salvador.

And so the 2000 studies.  I don't want you getting into the 2003 and 4 studies or 2007 study, because that is information gathered at a time that's not relevant to the inquiry with respect to his joining the MS 13 gang.

I want to limit the questioning to MS 13 conclusions.  And I think it's sufficient from the testimony that you've elicited, that MS 13 constituted a substantial portion of the group studied.

And so I will let you go forward with respect to her offering an opinion as to risk factors that caused this

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 417 of 536
Case 3:08-cr-00134-RJC   Document 137-7   Filed 01/30/11   Page 21 of 140
JA3254

676

defendant, or could have been present when this defendant joined the MS 13 gang.

And I'm not going to let you go through all of the risk factors she identified. But those that are based upon her 2000 study and her review of the report that are individualized to this defendant.

And so it's much shorter than what I heard her testify to yesterday and today.

I don't want her offering conclusions as to political policies to address the phenomenon she talks about.

I don't want her going into every factor that she identified, but only those factors that apply, based on the report she reviewed about this defendant.

You indicated in your moving papers that she would testify to the loss of identity once a person is in a gang. I don't think that is relevant. I don't think she is qualified to offer an opinion in that area.

I don't think she can offer the ultimate opinion as to why this defendant joined a gang, but just the risk factors present at the time he did.

MR. FOSTER: All right, Your Honor.

THE COURT: I think -- I understand the government's objection to this testimony. I share a concern with the danger of confusing the jury and misleading the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 418 of 536
Case 3:08-cr-00134-RJC    Document 1357    Filed 01/30/11    Page 24 of 145
**JA3255**

jury.  But I think in this limited scope it has some probative value.  And I think the concerns the government has can be addressed in cross examination, and they go in some respects to the weight of the evidence, not it's admissibility.  That's the court's ruling.  Is anybody unclear about it at this time?

MR. FOSTER:  No, Your Honor.

MR. NAZZARO:  No, Your Honor.

THE COURT:  All right.  We'll take a five minute break and be ready to call the jury.

(A brief recess was taken in the proceedings.)

THE COURT:  We ready for the jury?

ALL COUNSEL:  Yes, Your Honor.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Good morning, Members of the Jury.

THE JURY:  Good morning.

THE COURT:  Mr. Foster, you may continue.

MR. FOSTER:  All right.

MARIA SANTACRUZ, PREVIOUSLY SWORN, testified as follows during CONTINUED DIRECT EXAMINATION BY MR. FOSTER:

Q.   Ms. Santacruz, just try to finish up with your background.

One of the studies you did, I think you were beginning to testify about this yesterday, was a study conducted in

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 419 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 23 of 145
JA3256

678

the year 2000.

A.    Yes, sir.

Q.    And was that a quantitative study involving 938 gang members?

A.    Yes, sir.

Q.    And was one of the purposes of that study to determine why people join gangs and what society can do about that?

A.    Yes, sir.

Q.    And did -- was a result of that -- was that study conducted in such a way that each of the 938 gang members submitted a questionnaire regarding things in their lives that lead them to join the gangs?

A.    Yes, sir.

Q.    And through that study and the studies that you -- research you did prior to that, was a list of risk factors developed indicating -- the presence of which would indicate someone was susceptible to being joined into a gang?

A.    Yes, sir.

Q.    Okay.  And did this study -- what percentage of these 938 gang members were members of MS 13 gang?

A.    Approximately 45 percent, sir.

Q.    And the ages of the respondents in the survey, were they any particular age or was there a range of ages of the people that were surveyed?

A.    The respondents were approximately between 17 and 29

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 420 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 24 of 145
JA3257

679

years of age.

Q.    And have you reviewed a report from Richard McGough provided to you in this case about the life of Alejandro Umana?

A.    Yes, sir.

Q.    And have you, in doing so, have you identified any of the risk factors that came out of that study that appear to be present in this life?

A.    Yes, sir, several.

Q.    Okay.  And before you get into the details, could you tell us what the first risk factor is?

A.    Amongst the social risk factors is social exclusion.

Q.    And was social exclusion one of the factors that you found in his life?

A.    Yes, sir.

Q.    And could you explain generally what is meant by social exclusion?

A.    In general terms it is the marginalization of a large section of society which prevents them from social development.  And in our country it's the youth -- that this group consists of youth, these people who are excluded socially and economically.

Q.    And what did you see in the report of Richard McGough regarding Alejandro Umana, which lead you to conclude that social exclusion was present in his life?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 421 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 25 of 146

JA3258

680

A.   The social conditions in which his family lived --
living in meson, that implies marginalization.

     The fact that your client did not study beyond the
third grade, and that he left the educational system.

     The fact that your client attended a public school.  In
our country there is a big difference between public school
and private school.

     And the fact that your client and his father were
working in what could be called subemployment situations
with low salaries and an absence of social security or
social services.  That's social exclusion.

Q.   And was there another risk factor that you found in
reviewing Mr. McGough's report about Alejandro Umana?

A.   In the social area, a culture of violence.

Q.   And what do you mean by culture of violence?

A.   Well, we can understand a culture of violence as a
system of rules, values and attitudes that prevail in the
society in general.  Which makes violence a mechanism for
every day interaction.

Q.   And what did you see in Mr. McGough's report about
Alejandro Umana which lead you to conclude that that was a
risk factor present in this life?

A.   Well, having been raised during a civil war configures
or establishes who one is.  The exposure that your client
had to violence during and after the civil war.

Laura Andersen, RMR 704-350-7493

**JA3259**

681

And one clear example of this exposure that I read about was a situation in which your client was witness to a killing in his life.

Living in a situation or a society like this creates a learning that violence is a way to conduct interactions.

Q.   And did you find -- other than social exclusion and cultural violence, did you find yet another risk factor that appeared to be present in your review of Mr. McGough's report regarding Mr. Umana?

A.   Within the area, the social area, community disorganization.  I'm talking in an infrastructural context. And about the level of interaction between the members of a community.  Those aspects of life are the very low quality, and reflect an abandonment of certain social and economic aspects.

Q.   What did you see in his life that indicated that?

A.   The fact that he lived in a meson.  The fact that an entire family lived in one room in a meson, leads me to believe that it was a social and economic situation of depravation.

Q.   And other than social exclusion, culture violence and community disorganization, did you identify another factor that appeared present in his life based on Mr. McGough's report?

A.   Well, a very important one, a dysfunctional family.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 423 of 536
Case 3:08-cr-00134-RJC   Document 1250   Filed 01/30/11   Page 27 of 145
JA3260

682

Q.    And what do you mean by a dysfunctional family?

A.    A family that does not fulfill its role of socializing. A family that does not fulfill its role a primary group or nuclear group that provides an identity, affection, and that establishes how you're going to relate to others.

Q.    And what did you find in Mr. McGough's report about Alejandro Umana that would indicate that he did have a dysfunctional family?

A.    Well, first of all, there seems to have been an intergenerational abandonment.  Your client's father was raised by his grandmother.  Your client's mother abandoned him as a child.  And he's raised by his father's mother. And then this lady passes away, your client begins conflicted relationship with his family.  And according to the document he has to leave his home or feels he has to leave his home, and begins to be a member of different homes.  He himself at one point describes himself as an orphan.

And you can note a certain amount of parental negligence.  For example, in -- by the way that basic documentation such as his birth certificate weren't even present or weren't available until recently.  And your client had recurring problems at school and no one seems to have intervened.  And the fact that his home did not provide a protective space for this individual.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 424 of 536
Case 3:08-cr-00134-RJC   Document 1135   Filed 01/30/11   Page 24 of 145
JA3261

Q.   And what do you mean by protective space?

A.   When I talk about dysfunctional families, I'm not necessarily talking about broken homes.  I'm talking about homes in which the quality of the interrelation amongst the members is bad, and that can be direct abuse or it can be negligence.

Q.   But you're saying that those protective factors of having that solid family relationship, is that what you're talking about, that it was not apparently present?

A.   Yes.  Based on what I read, it didn't seem that his family provided a protective space.

Q.   And did you also see anything about his attempt to participate in soccer but being unable to?

A.   In fact, that's another example of negligence.  From what I read, he was a person who was eligible to join a soccer team, but he wasn't able to do so because he didn't have access to basic papers or documentation about his own identity.  And that sort of information is provided to a child by his family.

Q.   And was there a final risk factor that you found present in reviewing McGough's report about Mr. Umana?

A.   The difficulties that he had in configuring his personal identity.

Q.   Okay.  Now, what does that concept mean?  What do you mean by difficulties in creating personal identity?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/28/17    Page 425 of 536
Case 3:08-cr-00134-RJC    Document 1150    Filed 01/30/11    Page 29 of 145

JA3262

684

A.    Considering the factors that I've already mentioned to you, the family usually provides for a person the answer to the question; who am I?

And given the situation in which the family had these characteristics, in addition to the doubt about the circumstances of his own birth, his age, his country of birth, that basic information, all that makes it difficult for a person to answer that question.

In addition to this, the search for the answer to this question, who am I, therefore is conducted outside of the home.

And in the case of the gang, when one belongs to a gang, this subject of looking or searching for identity, the identity is found in the gang.

MR. FOSTER:  I have no further questions.

THE COURT:  Any cross?

CROSS-EXAMINATION BY MR. NAZZARO:

Q.    Good morning, Ms. Santacruz.  This study that you're basing your, I guess, opinion on, this -- was that study done when you were a student at school, if I read your resume correctly?

A.    Good morning.  No, I had already graduated.

Q.    Okay.  But it says here you were still in the university 2000, 2003 getting some degree; is that right?

A.    I earned my undergraduate degree in 1999.  And between

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 426 of 536
Case 3:08-cr-00134-RJC    Document 1350    Filed 01/30/11    Page 36 of 145
JA3263

685

2000 and 2003 I was earning my Master's.

Q.   Okay.  So this study occurred while you were studying for your Master's degree, that was my question.

A.   Yes, sir.

Q.   Okay.  And you weren't in charge of the study, other people that were in charge of the study?

A.   Well, I was coordinating the study but under the direction of the institute.

Q.   Right.  And I thought your testimony yesterday was, you were an analyst or something, is that the word you used?

A.   Yes, sir.

Q.   And this study of approximately 400 MS members, they were members of the MS 13 that were located in San Salvador and surrounding regions; is this correct?

A.   Yes, sir.

Q.   And there were no members of the study that were from Santa Ana; isn't that true?

A.   Well, I don't know, because we didn't ask them where they were from.

Q.   Okay.  But how did you obtain them?  You obtained them from San Salvador and surrounding areas; isn't that correct?

A.   Yes, we did find these people in the area of San Salvador.  But the fact that we found them there at that moment, does not mean that they necessarily came from there.

Q.   Okay.  But principally it was conducted in San Salvador

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 427 of 536
Case 3:08-cr-00134-RJC  Document 1150  Filed 01/30/11  Page 31 of 145
**JA3264**

686

is that -- do you agree with that?

A.   Yes, sir.

Q.   And Santa Ana's a city that's what, about an hour or so away from San Salvador?

A.   Yes, sir.

Q.   And the study involved a questionnaire to gang members; is that correct?

A.   Yes, sir.

Q.   And you don't have a copy of that questionnaire here today, do you?

A.   No, sir.

Q.   Have you given that questionnaire to defendant and had him fill it out?

A.   No, sir.

Q.   In fact, you never had a -- talked to the defendant have you?

A.   No, sir.

Q.   And your opinion today has nothing to do with any personal investigation you've had of the defendant or any of the circumstances of his life?

A.   No.  No, sir.  I've based my opinion on the information provided to me by Mr. McGough.  And what I know about -- excuse me -- what I know about gangs.

Q.   Yes.  And what you know about gangs is in relation to the study is what you've been testifying to; is that

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 428 of 536
Case 3:08-cv-00134-RJC   Document 135-7   Filed 01/30/11   Page 34 of 145

JA3265

correct?

A.   Yes, sir.

Q.   Okay.  And Mr. McGough he's the -- he works for the defendant; is that correct?

A.   Yes, sir.

Q.   And his report had a lot of conclusions in it, didn't it?

A.   Yes, sir.

Q.   Okay.  And you relied on some of those conclusions that were in this written document; is that correct?

A.   Yes, sir.  That is the basis of the information that I had about him.

Q.   Were you in court when he testified the other day?

A.   No, sir.  This was the first time that I had entered this room.

Q.   So you don't know what he told this jury?

A.   No, sir.

Q.   And you also -- do you know that he testified that the birth certificate --

         MR. FOSTER:  Objection.

         MR. NAZZARO:  Let me ask you -- let me rephrase the question.

The birth certificate that you were referring to from -- do you know that that was obtained a week ago?

A.   Yes, sir.

                Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 429 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 33 of 145

JA3266

688

Q.   Okay.  And there had been another one that the defendant had obtained earlier in his life, are you aware of that?

A.   The one that was specified in Mr. McGough's document, yes.

Q.   And most of your work, if I read your CV correctly, has been in the area of polling; is that right, public opinion polls?

A.   Yes.  In the field of public opinion and social research.

Q.   Okay.  And public opinion polls are gathering the information, and then you provide it to your government so they can change social policies; is that the basis of most of your work?

A.   We at the institute, we do social research to acquire information about social phenomenon so that that way we can use this information to support certain policies.

Q.   Okay.  And that is actually one of the reasons you did the study on gangs in El Salvador, so you could change social policy that was the purpose of the study; isn't that true?

A.   Well our purposes were, first of all, to approach the phenomenon of gangs in a more general way.

     Second of all, to obtain this information for academic purposes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MGC   Document 50-7   Filed 03/23/17   Page 430 of 536
Case 3:08-cr-00134-RJC   Document 1530   Filed 01/30/11   Page 34 of 145
**JA3267**

689

And third, to use this information in order to implement or create social policy.

Q.   And the purpose of the study was to, in a general way and for academic purposes, to determine why people joined gangs in El Salvador?

A.   Yes.  To know why people join gangs and what makes them so attractive to these young people.

Q.   All right.  And you said young people, because the focus of the study was to determine why, you know, kids in middle school and younger are joining gangs in El Salvador; is that correct?

A.   Yes.  But I talk about youth in general, because when they initially enter the gang, they tend to be adolescent or preadolescent.

Q.   Preadolescence, I say middle school.  I don't know in El Salvador what age would be preadolescent?

A.   Well, based on the studies that we have conducted, someone enters a gang at around the age of 15, that's the average.

Q.   Sometimes it's younger and I guess sometimes it's older?

A.   Yes.  That's just an average.  In fact, people can join gangs when they're as young as 10 or 11 years old, and of course older.

Q.   And your study, ma'am, had nothing to do about

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 431 of 536
Case 3:08-cr-00134-RJC   Document 1135   Filed 01/30/11   Page 35 of 145
JA3268

690

individuals, crimes they commit once they join gangs, right? It was just why they join gangs, not what they do after they join gangs?

A.    No.  Actually one part of the study had to do with accessing information about the type of violence that they perpetrated or that they experienced.

Well, we weren't as concerned about the specific crimes.  But we were interested in establishing and measuring the impact of violence on these people.

Q.    Okay.  The impact on violence on these people, the gang members.  And this was for purposes of determining why they joined the gang; is that right?

A.    Yes.  And a way to understand this situation, to characterize the phenomenon, because violence is an integral part of the way they work.

Q.    And you've also -- you testified then that there were some factors that you saw present in this written document that you've reviewed; is that right?

A.    Yes, sir.

Q.    One of the things I think you testified about was public versus private schools; do you remember that?

A.    Yes, sir.

Q.    And do you know what percentage of people in Santa Ana go to public school versus private school?

A.    No, sir.  I do not have that specific information.  I

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 432 of 536
Case 3:08-cr-00134-RJC   Document 1350   Filed 01/30/11   Page 36 of 145
JA3269

691

don't know it.

Q.    Thank you.  And with respect, you mentioned something about low salaries.  Do you have any specific information about the salaries that the defendant received based on your opinion?

A.    On page eight of the information that was provided by the defense.

Q.    Okay.  By Mr. McGough, right?

A.    Yes, sir.

Q.    And do you know what the average salary was in Santa Ana at any given time?  Do you have that statistical information?

A.    No.  But the information that I do have and that I could give as a framework, is that the average weekly salary as a minimum salary average -- the average monthly salary -- the average minimum monthly salary would be around $240 --

        INTERPRETER:  The interpreter corrects herself.  The average minimum monthly salary would be 140 to $150.

A.    That's a national level.

Q.    That's a national level today; is that right?

A.    Yes, sir, approximately.

Q.    Okay.  And do you know what the national level was back in 2000?

A.    I wouldn't be able to give you an exact figure, but I don't think it would have been very different.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 433 of 536
Case 3:08-cr-00134-RJC   Document 1236   Filed 01/30/11   Page 37 of 145
JA3270

692

Q.   Wouldn't have been higher, it would have been lower if anything; isn't that correct?

A.   A little less, probably.

Q.   And you didn't see any information in Mr. McGough's material about the average salary of his father, did you?

A.   No.

Q.   Okay.  But yet you concluded that he was raised in a subemployment or low employment area, or that was just a general conclusion then; isn't that correct?

A.   Yes.  I base that on the fact that the client's father had a store, a very small store.  And normally this type of store in my country is owned by a person that has it right in their home and has this type of product for sale.

     And so we're not talking about a store or even a supermarket or something like that, that we might know, but rather we're talking about something on a much smaller scale.  That was what I was able to deduce.

Q.   Okay.  It was an inference, because you actually didn't talk to his father, and Mr. McGough didn't provide you the average salary when the defendant was growing up, did you?

A.   Yes, sir.

Q.   It was not provided to you; is that correct?

A.   Yes, sir, that's correct.

Q.   And with respect to this culture of violence that he grew up in, I think your testimony was that you were talking

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 434 of 536
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 34 of 145

JA3271

693

about the conditions in general at the time in El Salvador;
is that correct?  That was part of your opinion; is that
correct?

A.   Could you please repeat the question, I didn't
understand it.

Q.   One of the other so called risk factors was this
culture of violence that you testified about?

A.   Yes, sir.

Q.   And I believe your testimony was that you were basing
your opinion, in part, on the conditions in general at the
time in El Salvador; is that correct?

A.   Yes, that's correct, as one of the elements.

Q.   And with respect to this -- I think the other thing you
talked about was this community disorganization, I think
those were words you used?

A.   Yes, sir.

Q.   And a dysfunctional family.  And I guess those were
different factors; is that correct?

A.   Yes, sir.

Q.   But isn't it true -- I mean, did you take into account
that he has a very good relationship with his father?

A.   Well, what I took into account was what I read in the
information and testimonies that was provided to me.  And
according to that, what I learned was that he left his home
at an early age because of family conflicts that were

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 435 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 394 of 145
JA3272

694

occurring there.

Q.   Okay.  His father had remarried, is that what you're referring to?

A.   Yes.  I'm referring to the fact that he married a person who had -- was only a couple of years older than the defense's client.

Q.   Did you see any of the photos, the family photos as part of your opinion?

A.   Yes.  The documents that were attached --

INTERPRETER:  Excuse me.  Interpreter correction.

The photographs that were attached to the documents, yes.

Some of those photographs depicted his great grandmother and other women that helped raise him, did you see that?

A.   Yes, sir.  I saw the photographs that were attached.

Q.   And you're not suggesting to this jury that anybody who wasn't raised by their mother, somehow joins a gang in El Salvador, is that what you're saying?

A.   Oh, no, no, no.  I'm not saying that.  What I am saying -- excuse me -- may I continue?

Q.   Yes.

A.   What I am saying is that living in a dysfunctional family is definitively one of the factors that can contribute to a person later on making the decision to join the gang when taken -- also taken together with the other

Laura Andersen, RMR 704-350-7493

695

factors.

Q. Is there a certain amount of factors you have to have before you join a gang?

A. No. But there are an amount or an intensity of these factors that can result when a young person chooses to join a gang.

Q. Did you also review in the report, information that the defendant was a good worker when he was a young boy, young man, did you see that?

A. Yes, sir.

Q. And apparently according to the report, he was respectful to other people including his elders, did you see that?

A. Yes.

Q. That he had friends, some of which appeared in those photos you reviewed; did you see that?

A. Yes, sir.

Q. And none of those friends were gang members, as far as the report reflects; isn't that true?

A. Yes, I got that information.

Q. And he played soccer like most young boys did in El Salvador; is that correct?

A. Yes, sir.

Q. And we've heard testimony that it's not unusual for young boys to work at an early age in El Salvador; isn't

Laura Andersen, RMR 704-350-7493

**JA3274**

696

that true?

A.   Yes that's true.

MR. NAZZARO:  Thank you.  No further questions.

THE COURT:  Any redirect?

MR. FOSTER:  Yes.  Just a few, Your Honor.

REDIRECT EXAMINATION BY MR. FOSTER:

Q.   You were asked about your -- that you conducted this study in 2000 while you were working on your Master's degree, correct?

A.   Yes, sir.

Q.   And did you obtain your Master's degree?

A.   Yes, sir.

Q.   And did you then become a psychologist?

A.   I already was a psychologist while I was studying for my Master's.

Q.   And is it acceptable in the social science field that you're in, to conduct research by means of sampling large groups of people as you did?

A.   Yes.  That's a way of doing social research.  You start with a group, big group of people, and from then you are -- from that you are able to come to -- you can reach more farther reaching inferences.

Q.   And the 938 people that were surveyed -- I'm sorry.  The 938 gang members that were surveyed in the 2000 study, the age spread again of those respondents was what?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 438 of 536
Case 3:08-cr-00134-RJC   Document 1236   Filed 01/30/11   Page 42 of 145
JA3275

697

A.    From 17 to 29 years old, approximately.

MR. FOSTER:  I have no further questions.

THE COURT:  You may step down, be excused.

Call your next witness.

MR. BRYSON:  Call Mark Bezy.

THEREUPON, MARK BEZY, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. BRYSON:

Q.    Can you tell the jury what your name is?

A.    It's Mark A. Bezy, B-E-Z-Y.

Q.    And how are you currently employed?

A.    I own a correctional consulting management service.

Q.    Specifically, what do you do?

A.    I deal with the -- I provide my services to attorneys, federal defenders offices on conditions of confinement and specifically on the operation and procedures in the Federal Bureau of Prisons.

Q.    In the past, have you worked for the Federal Bureau of Prisons?

A.    Yes.

Q.    And for how long?

A.    Over 28 years.

Q.    When did you start?

A.    1978.

Q.    When did you retire?

A.    2006.

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 439 of 536
Case 3:08-cr-00134-RJC   Document 136-7   Filed 01/30/11   Page 439 of 536

JA3276

698

Q.   What was first job at the Bureau of Prisons?

A.   I entered as a correctional officer.

Q.   And were you promoted from there?

A.   Yes.  I was promoted to a 9 Lieutenant in Duluth, Minnesota.  Then I went to 11 Lieutenant in Phoenix, Arizona where I was an investigator also.  And then I moved to California as an assistant correctional services administrator.  Then I moved to Ray Brook New York as a captain.  Then to the Federal Medical Center in Lexington Kentucky as a captain.  Then I was in United States Penitentiary in Marion, Illinois as a captain.  Then I went to the North Central Regional Office as a Correctional Services Administrator.  Then I was the Associate Warden at Leavenworth.  I was a warden at Elkton, Ohio.  Then I retired as a warden at the Federal Correctional Complex in Terre Haute, Indiana.

Q.   You started as a prison guard and finished as a warden?

A.   Yes.

Q.   I'm going to ask you to take a look at what I'm going to ask to be marked as Defense Exhibit Number 34 and ask you if that looks like your CV or resume?

A.   Yes, it does.

Q.   And is it accurate, including your professional biography, what you've done?

A.   Yes.

**JA3277**

699

MR. BRYSON:  Your Honor, I would move for introduction of Defense Exhibit Number 34?

THE COURT:  Any objection?

MS. ROSE:  No objection.

THE COURT:  Let it be admitted.

(Defendant Exhibit 34 was received into evidence.)

Q.   (By Mr. Bryson) Mr. Bezy, have you ever testified in the past in courts as an expert in the Federal Bureau of Prisons practices, policies and procedures?

A.   Yes.

Q.   Approximately how many times?

A.   Twice so far.

Q.   Okay.

MR. BRYSON:  Your Honor, I would move that Mr. Bezy about recognized as an expert in the field of the Federal Bureau of practices, policies and procedures.

THE COURT:  Any voir dire?

MS. ROSE:  No, Your Honor.

THE COURT:  Any objection?

MS. ROSE:  No.

THE COURT:  You may offer an opinion in that area.

Q.   (By Mr. Bryson) You said that you were at Marion at that point; is that correct?

A.   Yes.

Q.   And what kind of facility is that in Marion?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 441 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 45 of 146
JA3278

700

A.   Marion, at the time I was there from '92 to '95 was the bureau most secured facility where they housed the individuals that needed the greatest degree of control and supervision, either based on their violence level or the potential to escape.

Q.   And when were you at Marion?

A.   In '92 to '95.

Q.   And what were your duties there?

A.   I was captain.  I was in charge of the security operation there.  I had approximately 200 correctional officers and a dozen or so lieutenants.

Q.   Under you?

A.   Under me, yes.

Q.   Now, and at that time you say that was the most secure prison in the Bureau of Prisons, correct?

A.   Yes, it was.

Q.   Is that still true today?

A.   No.  They transferred that mission to the ADX in Florence, Colorado, the Administrative Maximum in Florence, Colorado in 1994.

Q.   Are you familiar with the facility at Florence?

A.   Yes, I am.

Q.   Have you been there?

A.   Yes.

Q.   How does the Bureau of Prisons determine where a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 442 of 536
Case 3:08-cr-00134-RJC   Document 1236   Filed 01/30/11   Page 46 of 145
**JA3279**

701

particular inmate should be housed?

A.   It's based on their classification, the nature of their offense, previous offenses and the degree of supervision that's required.

Q.   For an inmate who's been convicted of a capital offense and sentenced to life imprisonment, does that tell you anything about where that person will be incarcerated?

A.   He will probably -- he would end up in a high security United States Penitentiary.

Q.   Can the sentencing courts have any determination as to where an individual is placed?

A.   Yes.  They can recommend in some cases -- there's a -- in some cases they have more than just recommendations.

Q.   And can a prosecutor, can a U.S. Attorney also have input on where an individual is housed?

A.   Yes.  Under certain racketeering crimes they can.

Q.   The Bureau of Prisons is actually part of the Department of Justice; is that correct?

A.   Correct.

Q.   And who is the head of the Bureau of Prisons?

A.   Harley Lappin.

Q.   And what is his position in relation to the attorney general?

A.   He works for the attorney general.

Q.   One of the places that you worked was a facility at

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 443 of 536
Case 3:08-cr-00134-RJC   Document 1136   Filed 01/30/11   Page 443 of 536
**JA3280**

702

Terre Haute; is that correct?

A.    Yes.

Q.    And while you were there, your position was?

A.    I was warden.

Q.    All right.  And is that where federal death row is?

A.    Yes, it is.

Q.    And how -- can you describe to the jury how death -- is death row separate from the rest of the facility?  Can you describe how their death row inmates are kept?

            MS. ROSE:  Well, objection --

            THE COURT:  Sustained.

Q.    (By Mr. Bryson) Well, let me ask you this:  Is death row the most secure facility for inmates in the Bureau of Prisons?

            MS. ROSE:  Objection.

            THE COURT:  Sustained.

Q.    (By Mr. Bryson) Can you describe the level of security at United States Penitentiaries?

            MS. ROSE:  Objection; cumulative.

            THE COURT:  Sustained.

Q.    (By Mr. Bryson) This jury has heard evidence that Mr. Umana has been writing coded letters in attempt to seek the harm or death of other people.  Does the Bureau of Prisons have any experience with that?

A.    Yes, they do.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 444 of 536
Case 3:08-cr-00134-RJC    Document 1357    Filed 01/30/11    Page 48 of 145
JA3281

703

Q.    Okay.  And what does the Bureau of Prisons do for a situation like that?

A.    His correspondence can be restricted.  The warden has the authority to restrict his correspondence to who he writes to and to who he receives correspondence from.

Q.    Now, when a prisoner wants to send a letter, do they get to seal up the envelope and send it out before anybody looks at it?

A.    No.  At a penitentiary, the inmate will write his letter, put it in the envelope, it will be picked up by staff.  Staff will then in turn read it, search it for contraband, and then seal the envelope, and then it would be sent out at that point.

Q.    And if a letter contains something written in code, what does the bureau do?

A.    We have staff that their job is to, as part of the investigative office that we have, they break codes, they work with codes.  And we also have other law enforcement agencies that we can contact to help if we can not break a code or assist us in breaking a code.

Q.    Would the bureau allow an inmate to send out a coded letter without decoding it first?

A.    No.

Q.    What about foreign languages; when inmates write in foreign languages, how does the bureau address that?

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 445 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 49 of 146
JA3282

704

MS. ROSE:  Objection.  That's cumulative as well.

THE COURT:  Overruled.

Q.   (By Mr. Bryson) How does the bureau address when an inmate writes in foreign languages?

A.   The bureau can direct that an inmate write his correspondence in English and only in English.

Q.   Have you yourself ever been involved in that situation?

A.   Yes.  As a warden, I ordered an inmate that he could only write in English in his correspondence.

Q.   As a warden, do you have the authority to do that?

A.   Yes.

Q.   What -- as a warden, what abilities do you have to restrict an individual's right to communicate?  Start with letters first.

A.   Letters, we do monitor their correspondence.  We have staff -- we have correspondence monitoring lists, where certain individuals, all their inmate correspondence goes and is reviewed more thoroughly than regular inmates.

Q.   What about telephone privileges?

A.   Telephones a privilege.  It can be taken as a sanction to a prohibited act for -- based on their conduct, or can be taken as part of -- during an investigation.

Q.   As a warden, have you ever restricted inmates phone privileges?

A.   Yes.  Privileges, the warden has authority to take away

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 446 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 54 of 145
JA3283

705

privileges.

Q.   How long can you take away someone's privileges?

A.   I've taken it for indefinite periods of time.  Through the disciplinary process it can be taken -- we would take it a year at a time.

Q.   And what about visits, can they be restricted?

A.   Yes.  Visits can be restricted.  They can be contact, no contact, or they cannot just have -- or they do not have to have visits.

Q.   This jury has heard evidence that Mr. Umana is a member to MS 13 and is still loyal to its teachings.  Does the Bureau of Prisons have experience dealing with gangs?

A.   Yes.

Q.   First of all, do you know how many MS 13 members are in the Bureau of Prisons?

A.   There's approximately 270.

Q.   Is that a lot compared to other gangs in prison?

A.   No.

Q.   Does the Bureau of Prisons classify gangs?

A.   Yes.

Q.   And how do they classify gangs?

A.   They're either classified as Disruptive Group or a Security Threat Group.

Q.   What's the difference?

A.   Disruptive Group is a status that a group gets by their

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 147 of 536
Case 3:08-cr-00134-RJC   Document 1576   Filed 01/30/11   Page 51 of 145
JA3284

706

rate of incident.  Security Threat Group is just -- we just acknowledge it and we monitor.

Q.   Which one is higher or worse in terms of security?

A.   Disruptive Group status.

Q.   Do you know how MS 13 is classified right now?

A.   Probably be a Security Threat Group.

Q.   And how does the bureau deal with gangs?

A.   We spread them out through the 16 penitentiaries that we have.  Some of the leadership is locked down in our secure facilities, and we monitor them on a daily basis.

Q.   Do you have any personal dealings as a warden, experiences dealing with gangs?

A.   Yes.

Q.   And how have you dealt with gangs in the past?

A.   It depends on their actions and activities.  There's been times when I've locked up every member of a gang because of their behavior.

Q.   Is that something that you're allowed to do as a warden?

A.   Yes.

Q.   Are you familiar with what is known as a Special Management Unit?

A.   Yes.

Q.   Okay.  Do you know how many Special Management Units there are available in the Bureau of Prisons?

                 Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 448 of 536
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 52 of 145
JA3285

707

A.    Currently, I believe there are three.

Q.    And do you know what the criteria is to go to a Special Management Unit?

A.    They're set up to house inmates from Security Threat Groups, gangs and geographic areas.

Q.    And they have a much greater intensive level of security at Special Management Units; is that correct?

A.    Correct.

Q.    Is there increased level of restriction on communications for inmates in Special Management Units?

A.    Yes, there is.

Q.    Do you know what the difference is?

A.    Phone calls are limited and all the correspondence is monitored.

Q.    In order to get out of a Special Management Unit, an individual has to comply with certain restrictions; is that correct?

A.    Correct.

Q.    And it takes between 18 and 24 months to get out of the Special Management Unit; is that correct?

A.    That's the timeframe it's set up for.

Q.    In order to be in compliance with that, they have to cease all gang activities; isn't that correct?

        MS. ROSE:  Objection as to the leading.

Q.    (By Mr. Bryson) What are the requirements to program

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 449 of 536
Case 3:08-cr-00134-RJC    Document 135    Filed 01/30/11    Page 53 of 140
JA3286

708

out of a Special Management Unit in terms of gang activity?

A.   It's a four phase program, and they have to successfully complete each phase of the program.  And as they complete, there's more interaction with other inmates.  And basically it's to prove that they can interact with other inmates without incident.

Q.   Is there a requirement, in order to program out, that relates to gang activity?

A.   No.

Q.   This jury has heard evidence that Mr. Umana has fashioned a homemade knife while incarcerated; is that something the Bureau of Prisons has experience with?

A.   Yes.

Q.   What do the Bureau of Prisons do to reduce weapons in prison?

A.   We utilize a lot of different techniques from eliminating the source of weapons, the material, weapons grade material.  We also use walk-through metal detectors, handheld metal detectors.  And we also do a lot of what we call hands on, pat searches of inmates.

Q.   Mr. Umana has been housed at the Mecklenburg County Jail.  Are you familiar with that facility?

A.   Yes.

Q.   And how are you familiar with it?

A.   Approximately a year or so ago I conducted a review of

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 450 of 536
Case 3:08-cr-00134-RJC   Document 1530   Filed 01/30/11   Page 54 of 145
JA3287

709

that jail for -- I was a subcontractor for a company that housed -- that dealt with ICE detainees.  And we went in and evaluated them based on the contract with ICE.

Q.   And what is ICE?

A.    Immigrations Customs Enforcement.

Q.   Can you compare the level of security at the Mecklenburg County jail As to a United States Penitentiary?

A.    No.  There is no comparison.

Q.   What's the difference?

A.    U.S. Penitentiary is much higher.  We deal with -- a county jail they deal with more of a transient population. They're in and out.  A penitentiary we get them for -- we get them for extended period of time.

Q.   Mr. Umana has been convicted of offenses that involve racketeering.  Does that create any special circumstances for the Bureau of Prisons?

A.   It could, but under the -- under our program statement, the U.S. Attorney at the time of sentencing can, as part of the sentencing motion, order a stricter degree of association and control of the inmate.

Q.   And specifically as to who they can communicate with?

A.   Correct.

Q.   And the only limitation is, involves a person's attorney; is that correct?

A.   Correct.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 451 of 536
Case 3:08-cr-00134-RJC   Document 1536   Filed 01/30/11   Page 55 of 145
**JA3288**

710

Q.   They would be allowed to -- he's been found guilty of a double murder.  He's attempted to arrange other murders through coded messages, and he's shown the ability to fashion a weapon.  Is the Bureau of Prisons prepared to handle someone like him?

A.   In my opinion, yes.

Q.   Have they ever handled people like him before?

A.   On a daily basis.

MR. BRYSON:  Those are my questions.

THE COURT:  Any cross?

CROSS-EXAMINATION BY MS. ROSE:

Q.   You mentioned -- Harley Lapppin is the Director of the Bureau of Prisons?

A.   Yes, ma'am.

Q.   He recently testified before Congress that one in four inmates are gang members, does that sound correct to you?

A.   It's possible, yes.

Q.   That's a high percentage, much higher than the one you just spoke about?

A.   In regarding to what?

Q.   Gangs; 25 percent of the people in U.S. Penitentiaries are gang members.

A.   Okay.

Q.   That's a significant amount to control, isn't it?

A.   But that's what we get paid for.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 452 of 536
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 56 of 145
JA3289

711

Q.    Sixteen -- 16 different penitentiaries to where they can be housed; is that correct?

A.    Yes.  And then there's also mediums, too.

Q.    And you indicated that to your knowledge, there were only 270 MS gang members out of the 200,000 or so in the Bureau of Prisons?

A.    Yes.

Q.    And they were only a security threat?

A.    Security Threat Group.

Q.    So 270 gang members are a security threat in the Bureau of Prisons?

A.    It can be because of their association.  I'm not saying -- we can classify them based on that.

Q.    What about the Mexican Mafia, the MA, where is that in your security threat?

A.    They would be a Disruptive Group.

Q.    And to your knowledge, is MS 13 part of the Mexican Mafia organization?

A.    They run more with the Serranos (phonetic).

Q.    The Surenos?

A.    Yes.

Q.    And the Surenos, are those recognized in any way in the prison?

A.    They're a Security Threat Group.

Q.    You indicated that at the Special Management Unit that

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 453 of 536
Case 3:08-cr-00134-RJC   Document 1135   Filed 01/30/11   Page 57 of 145
JA3290

712

all correspondence is read?

A.    Correct.

Q.    You testified that all correspondence is read for every 200,000 inmates?

A.    With the exception at the -- at a low and a camp it's not.  Inmates can seal their out going correspondence at those levels.

Q.    It's your testimony that every letter that every inmate writes is read and dissected by staff members?

A.    Depending on the staff member, yes.

Q.    What about inmate to inmate communications?  Are inmates monitored in their conversations in the recreation yard?

A.    Can be.

Q.    But not always?

A.    No.

Q.    I mean, there's no way you can do that.  They're out there working out or playing basketball, you're not listening to their conversations?

A.    Correct.

Q.    And the conversations with their visitors, there maybe a guard or two in the room, but you're not standing over each inmate as they converse with their visitors?

A.    Correct.

Q.    You indicated that you had been at Marion.  And at the

Laura Andersen, RMR 704-350-7493

JA3291

713

time that was the most secure facility within the Bureau of Prisons?

A.   Yes.

Q.   And shanks were something you dealt with there?

A.   On a rare occasion, yes.

Q.   Only rarely?

A.   Yes.

Q.   And, so shanks are rare in the Bureau of Prisons?

A.   No.  You said Marion.  And I agreed with you at Marion, yes.

Q.   You had shanks at ADX too?

A.   Very possibly, yes.

Q.   Didn't they have to change the light fixtures at ADX because inmates were able to take the light switch and fashion it into shanks?

A.   That's possible.

Q.   They're pretty ingenious, isn't that fair to say?

A.   Yes, it is.

Q.   Now, you said you had been to the Mecklenburg County Jail.  Did you review their highest security cells there, the individual high security lockdown cells?

A.   If there was an ICE detainee in there, yes, I did.

Q.   You don't recall specifically?

A.   No.  I was a reviewer in charge of a five man -- or a five person team.  And I didn't do every aspect of the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 455 of 536
Case 3:08-cr-00134-RJC   Document 1256   Filed 01/30/11   Page 59 of 145
JA3292

714

review.  I did my section of it.

Q.   Did you know that that highest security there is an individual cell lockdown all the time?

A.   I didn't know.

Q.   That's pretty secure.  Is that more secure than just your average USP that a person is locked down 24 hours a day all alone?

A.   The bureau has people locked down almost all the time, too.

Q.   But you said that the bureau was much more secure?

A.   In my opinion, yes, they are.

Q.   Have you kept up with the rates of homicides within the Bureau of Prisons?

A.   Somewhat, yes.

Q.   Homicides happen in the Bureau of Prisons?

A.   Yes.

Q.   And guards get hurt in the Bureau of Prisons, don't they?

A.   Yes.

Q.   Guards get killed in the Bureau of Prisons?

A.   Unfortunately, yes.

          MS. ROSE:  All right, sir.  Thank you.

          THE COURT:  Any redirect?

          MR. BRYSON:  Just briefly.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 456 of 536
Case 3:08-cr-00134-RJC   Document 1358   Filed 01/30/11   Page 60 of 145
JA3293

715

REDIRECT EXAMINATION BY MR. BRYSON:

Q.   If the Bureau of Prisons is aware that an inmate has attempted to communicate in code, messages to harm others, is that something that they will take notice of?

MS. ROSE:  Objection; asked and answered.

THE COURT:  Sustained.

MR. BRYSON:  Those are my questions.

THE COURT:  You may step down, be excused.

Call your next witness.

MR. BRYSON:  Call Dr. Merikangas.

THEREUPON, JAMES MERIKANGAS, being first duly sworn, testified as follows during DIRECT EXAMINATION BY MR. BRYSON:

Q.   Would you tell the jury what your name is?

A.   James Merikangas.

Q.   How are you employed?

A.   I'm a medical doctor, self-employed.

Q.   And what is your educational background?

A.   Well, I graduated in 1960 from Villanova University with a Bachelor of science and physics.

I then attended the United States Navy Guided Missile School, served three years in the far east on the Aircraft Carrier Kitty Hawk.

When I got out of the Navy, I went to graduate school in Washington, D.C. for year at Catholic University to take

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/28/17   Page 457 of 536
Case 3:08-cr-00134-RJC   Document 1356   Filed 01/30/11   Page 61 of 145
JA3294

716

premedical courses.

I then went to Johns Hopkins University School of Medicine, and then interned in medicine and pediatrics in Washington, D.C, and received my MD, my medical doctor degree in 1969.

I then did residency training at Yale University at New Haven, Connecticut; first in psychiatry and then in neurology.

I was chief resident in neurology at Yale in 1973.

I became board certified in psychiatry in 1974, board certified in neurology in 1978.

And currently I'm Clinical Professor of Psychiatry and Behavioral Neuroscience at the George Washington University Medical School in Washington D.C.

Q.   I'm going to show you what I have marked -- I'll ask to be marked as Defense Exhibit Number 35, and ask you if you can tell me what that is?

A.   It's a copy of my curriculum vitae, that is my resume.

Q.   And is it accurate in displaying your professional biography?

A.   Your version is March 2009, of course this is 2010, but the basic elements are the same.

MR. BRYSON:  Okay.  Your Honor, I would move for introduction of Defense Exhibit 35.

MS. ROSE:  No objection, Your Honor.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 458 of 536
Case 3:08-cr-00134-RJC    Document 1370    Filed 01/30/11    Page 62 of 145
JA3295

717

THE COURT: Let it be admitted.

(Defendant Exhibit 35 was received into evidence.)

Q.    (By Mr. Bryson) In addition to practicing as a physician, have you also been an instructor at various universities?

A.    Yes. I was an instructor at Yale, and then left there to go to the University of Pittsburgh, where I was in charge of the electroencephalographic laboratory, the neuro-diagnostic clinic and the emergency room in the psychiatric hospital.

I then returned to New Haven, joined the faculty of Yale, where I was for 22 years.

When I left there in 2002, I first joined the faculty of Georgetown Medical School in Washington, D.C. and then the George Washington University School of Medicine where I mentioned I'm Clinical Professor of Psychiatry and Behavioral Neuroscience.

I'm also a Clinical Professor at the Virginia Commonwealth University in Richmond.

I've been involved in teaching my entire career.

I'm a member of the board of psychiatry and neurology.

In fact, next week I'm going to be an examiner for the boards in psychiatry.

Q.    And have you published any articles and peer reviewed journals?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 459 of 536
Case 3:08-cr-00134-RJC   Document 135-7   Filed 01/30/11   Page 634 of 140
JA3296

718

A.    I publish about three dozen articles in various medical journals, and about eight book chapters and one edited book.

Q.    Have you previously testified as an expert in the field of neuropsychiatry in the federal courts of the United States?

A.    I have.

Q.    Approximately how many times?

A.    Well, I testified at least a dozen times in federal courts.

Q.    And have you also previously testified as an expert in the field of neuropsychiatry in any state courts?

A.    Yes, I have.

Q.    Approximately how many times?

A.    I've been testified at least 28 states.

Q.    Have you ever testified for the prosecution in a criminal case?

A.    Yes, I have.

        MR. BRYSON:  Your Honor, I would move that Dr. Merikangas -- I would tender him as expert in the field of neuropsychiatry, ask he be allowed to give his opinion in that field?

        THE COURT:  Any objection?

        MS. ROSE:  No objection.

        THE COURT:  He will be allowed to give an opinion in that field.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 50-7    Filed 03/23/17    Page 460 of 536
Case 3:08-cr-00134-RJC    Document 135-7    Filed 01/30/11    Page 64 of 145
**JA3297**

719

Q.    (By Mr. Bryson) You were contacted about being involved in this case back in August of 2009; is that correct?

A.    Yes, sir.

Q.    And you -- where do you live?

A.    I live in Chevy Chase, Maryland.

Q.    And at some point did you travel to Charlotte to conduct an examination of the defendant?

A.    Yes.  I examined him on September 21st, 2009.

Q.    And that was in the jail?

A.    Mecklenburg County Jail.

Q.    Can you tell the jury about your examination?

A.    Well, I had a Spanish interpreter with me because I don't speak Spanish.  And I did a brief interview.  And then I conducted a physical exam, that's a neurological examination, in which you look for the integrity of the nervous system, that is the brain, the spinal cord and the nerves.

Involves a general physical examination looking at his body and the shape of his head.  His head circumference is 58 and a half centimeters, which is within the normal range.

I did an exam see how he walked, how he moved, what his strength was, what his reflexes were.

I examined the cranial nerves, that is the nerves in the head, the sense of smell, vision, hearing, taste, ability to speak and the like.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MGC   Document 50-7   Filed 03/28/17   Page 461 of 536
Case 3:08-cr-00134-RJC   Document 135-7   Filed 01/30/11   Page 65 of 145
JA3298

720

As well as sensation, his ability to perceive pin-pricks, light touch, vibratory sensation. These are all elements of the neurological, physical examine.

I also took his blood pressure, listened to his heart and lungs, observed his skin. That's the exam I performed.

Q. And did you make any specific findings as a result of the examination?

A. I did. He has some abnormalities which are of interest. One is that the pattern of the hair on his head is abnormal. He has more than one swirl.

If you look at the back of anybody's head, generally there's a -- hair rotates either clockwise or counterclockwise. It's clockwise in right-handed people. And sometimes counterclockwise in left-handed people.

If you have more than one swirl, this is related to the cortex of the brain, that is the surface of the brain itself. Because the brain and the skin come from the embryologic tissue of the fetus.

People who have more than one, more than two, can sometimes have abnormalities of the cortex. That is the surface of their brain where the gray brain cells are.

So he had this, what is called a soft neurologic sign. It's not clear exactly what it means, we just know that it's not normal.

Q. What else did you find?

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 462 of 536
Case 3:08-cr-00134-RJC   Document 1359   Filed 01/30/11   Page 66 of 145
JA3299

721

A.    I also found that when asked to close his eyes, he was able to close his eyes independently.  When he tried to close his left eye, the right eye also closed simultaneously.

You should be able to close each eye and wink, sort of like Sarah Palin does.

But if I have to close both eyes instead of just one, that's a weakness in the seventh cranial nerve.  The nerve that controls your eye muscles.  And that's generally the result of some kind of brain damage.  People who have had strokes or Bell's Palsy or some other condition have that.

Q.    Okay.  What other observations did you make?

A.    The other thing, when testing the reflexes in his legs, hitting his knee with the reflex hammer, there was an excessive amount of reflex.  And when testing his arms, they were normal.

When hitting the ankles with the reflex hammer, there was an excessive reflex which also included clonus.  That is, say if this is my foot and this is my leg.  And if I hit the Achilles tendon, there's a reflex where the foot contracts.  Clonus means you hit that and it bounces back and forth a few times.  That's an abnormality of excessive reflexes.

And when you have more reflexes in your legs than in your arms, this can be a sign of disinhibition by the brain.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 463 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 67 of 145
JA3300

722

You see this in underdeveloped children, or people with attention deficit disorders, or some other neurologic diseases.

If he had increased reflexes everywhere, that would be a different kind of abnormality.

But this one having increased reflexes in the legs, is generally a sign of some disinhibition in the brain.

Q.    Any other findings?

A.    The rest of his neurologic examination was within normal limits.

Q.    And did these -- the findings suggest anything to you, or did you take any course of action as a result of these findings?

A.    These findings suggested -- plus the history that he had had numerous head injuries and had a deprived childhood. And that he had had a car accident and the like, indicated that he should have some imaging of his brain.  He already had a CAT scan of his brain after his accident, and that was normal.

So I thought the best thing to do would be to do a functional brain image.  That is something, in other words something like a PET scan, a positron emission tomogram. Where a radioactive substance, labeled glucose, the glucose is sugar, it's fuel that the brain uses.  So that you give this radioactive sugar to the brain.  It settles in the

Laura Andersen, RMR 704-350-7493

**JA3301**

723

brain according to the amount of metabolism.  In other words, how hard that part of the brain is working.

You then get a picture that is generated on a computer, similar to a CAT scan or an MRI scan, except instead of just looking at the anatomy, that is the structure and shape of the brain, you're looking at the amount of brain activity.

So this was done to determine if there were defects in his brain activity.

Q.   Is that something that you yourself did?

A.   No.  That was done at an imaging center here in North Carolina by the radiologist and nuclear medicine people that do that kind of test.

Q.   Were you present when it was done?

A.   No, I simply ordered it.  It was done as any other test is done.

Q.   Did you direct that it be done by a specific location?

A.   No, I didn't.  I let the court choose.

Q.   Did you direct that it be done by a specific doctor?

A.   No, I did not.

Q.   And at some point did you get the results of the PET scan?

A.   I did, yes.

Q.   I'm going to ask you to look at the screen, and I'm going to show you what I'm going to ask to be marked Defense Exhibit Number 36 and ask if you can identify that?

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 465 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 64 of 145
**JA3302**

724

A.    This is the report from the Carolinas Medical Center of the PET scan of the brain of Mr. Umana.  That was done in November of 2009.

Q.    Now, did you prepare this report?

A.    No, I did not.

Q.    But have you reviewed it?

A.    I have.

Q.    And have you relied upon it in forming your opinion of Mr. Umana?

A.    I've relied upon it, but I've also reviewed the images myself.

MR. BRYSON:  First of all, I would move for introduction of Defense Exhibit 36?

THE COURT:  Any objection?

MS. ROSE:  No objection.

THE COURT:  Let it be admitted.

(Defendant Exhibit 36 was received into evidence.)

MR. BRYSON:  May it be published to the jury?

THE COURT:  It may.

Q.    (By Mr. Bryson) And this was done by a Dr. Shah; is that correct?

A.    Yes.

Q.    Do you know Dr. Shah?

A.    No.

Q.    Have you ever met him?

Laura Andersen, RMR 704-350-7493

**JA3303**

725

A.    No.

Q.    All right.  And did Dr. Shah himself come to certain findings regarding this PET scan?

A.    Yes, he did.

Q.    And have you reviewed those findings?

A.    Yes, I have.

Q.    All right.  And can you tell the jury what Dr. Shah's findings were?

A.    Well, first of all he found that this was an abnormal scan.  Do you want me to just read them?

Q.    If that's what you --

A.    Let me read what Dr. Shah, as the doctor at the Carolinas Imaging Center said about the scan which he himself directed.

"There's mild decreased FDG".  That is fluoro deoxy glucose.  That's the radioactive sugar that was given in the vein.

"There is mild decreased FDG update localizing to the bilateral posterior frontal convexities, bilateral frontoparietal, bilateral parietal, bilateral posterior parietal, bilateral parieto-occipital, as well as bilateral anterior and posterior temporal and temporoparietal regions.

"These areas of mild decreased FDG uptake, are somewhat heterogeneous, and some degree of asymmetry.

"Normal uptake pattern within the bilateral frontal

Laura Andersen, RMR 704-350-7493

**JA3304**

726

cortices.  Normal uptake pattern within the cerebellar cortices.  Normal uptake pattern within the deep gray structures.

"There are no definite regions of abnormal increased uptake.

"CT, that is CAT scan images reveal no evidence of subdural or epidural fluid collections.  No hydrocephalus. No space-occupying mass lesion.  Gray-white differentiation is preserved.  No evidence of focal encephalomalacia".

Q.   Can you interpret that for the jury, what that means, in English?

A.   Well, what that means is that the working parts of his brain are working differently.  That there are areas --

Q.   Differently from what?

A.   Differently from normal.  That there are some areas of decreased, that is reduced brain activity, quite widespread around his brain.

And that they're also, in addition to being widespread are asymmetrical.  So that the front part of his brain, the posterior -- I mean rather the anterior frontal cortex, that is the part here behind your forehead, is working with a good rate of metabolism activity.

And a lot of the other parts in the back part of his brain, sides of his brain and the temporal lobes, are working less than those areas.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 468 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 72 of 145
JA3305

727

In other words, it's relative that you're comparing one part of the brain with another. There should be a uniform brain activity with some slight differences in normal people.

And that these areas, particularly the temporal areas, abnormalities have been related to changes in behavior. There's not a direct relationship.

This simply says that his brain is not normal, and that he has some deficiencies in his metabolism, how it works.

Q. Did Dr. Shah go on and make some impressions as to his findings?

A. Yes, he did. Well, first of all he says that this is not from a stroke. This is not from a collection of blood outside the brain. This is not something completely within the brain. So his impression, he gives three impressions.

One, "Mild, somewhat heterogeneous, and slightly asymmetric, regions of decreased FDG uptake involving the bilateral posterior frontal, frontoparietal, parietal, posterior parietal, parieto-occipital, anterior temporal, and temporoparietal regions".

And then his opinion, "These findings can be seen in sequelae of traumatic brain injury, diffuse axonal injury, or secondary to a chronic headache disorder such as migraine".

"Second, No evidence of Frontotemporal Dementia.

Case 3:16-cv-00057-MGC   Document 50-7   Filed 03/23/17   Page 469 of 536
Case 3:08-cr-00134-RJC   Document 135-7   Filed 01/30/11   Page 73 of 145
**JA3306**

728

"Third, No evidence of multi-infarct or vascular compromise.

"Third", should be fourth, but it's a misprint. "No space-occupying mass on CT images. No subdural or epidural fluid collections".

Q.   Again, can you interpret those findings for the jury? What does that mean in layman's terms?

A.   What we had given as the clinical information when we ordered the scan, that he had cognitive decline. In other words, his thinking was not as good as it should be.

That he had migraine headaches, and that he had an abnormal neurologic examination.

So armed with that, the doctor came to these impressions based upon looking at his scan of brain activity.

And he says that there are all of these areas that are abnormal on the brain. And then he goes on to say that this could be seen after a brain injury, or after what he calls diffuse axonal injury, another way of saying brain injury. Or secondary to a chronic headache disorder such as migraine.

Now, I disagree that this could be the result of migraine. Because the kind of spreading depression and reduced activity you see in migraine, is generally during the attack of migraine. There is no evidence he was having

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 470 of 536
Case 3:08-cr-00134-RJC   Document 1357   Filed 01/30/11   Page 470 of 536
JA3307

729

an attack at the time.  And it is usually just on one side.  This is very widespread.

The unusual part about this is that there's very bright activity, increased activity you might say in his frontal lobes, then decreases in all these other places, with the exception of the cerebellum.

So this is most likely something that came from damage to the brain at a time we can not determine.

It could be from his head injuries when he was four or five.  It's not likely to be from his automobile accident of a few years ago, because that accident was relatively minor.

Q.    Now you yourself have looked at the images from the PET scan?

A.    Yes, I have.

Q.    I'm going to show you what I'll mark as Defense Exhibit -- or ask to be marked as Defense Exhibit Number 37.  And ask you if you can identify that?

A.    Well, this -- these are called sagittal images.  If you look at, for instance, the image in the middle of the row on the right that has a box around it.

Q.    The jury hasn't seen it yet.

A.    I'm sorry.

Q.    First of all, just tell me what this is?

A.    Well, these are color prints of the images which had appeared on the computer when Dr. Shah was reading this PET

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/28/17  Page 471 of 536
Case 3:08-cr-00134-RJC  Document 1535  Filed 01/30/11  Page 75 of 145
JA3308

730

scan.

Q.   And this is actually what you get when you get a PET scan?

A.   Yes.

Q.   Okay.  And have you used this in forming your opinion about this case?

A.   Yes, I have.  I, of course, have relied also on what the radiologist said about it.

Q.   Would it be helpful to explain your testimony if the jury would be allowed to see this?

A.   Yes.

MR. BRYSON:  Your Honor, I would move to introduce Defense Number 37, and ask that it be published to the jury.

THE COURT:  Any objection?

MS. ROSE:  No objection.

THE COURT:  Let it be admitted and published.

MS. ROSE:  Demonstrative purposes as I understand.

MR. BRYSON:  Yeah.

THE COURT:  You're offering this as illustrative of the testimony?

MR. BRYSON:  Yes.

THE COURT:  Let it be admitted.

(Defendant Exhibit 37 was received into evidence.)

Q.   (By Mr. Bryson) Can you go ahead and explain to the you're what they're looking at?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 472 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 76 of 145
JA3309

731

A.    Well, each one of the images here would have appeared on a large computer screen.  They're like slices through the brain.  These are sagittal slices.  In other words, if you cut from the front to the back in the plane that is between the ears, down the nose and the mouth, like side views of the brain.

And up the top left is just outside.  Then you move different slices all the way through, like a meat slicer might do it, until you come out the other side.

And I was going to say, for instance, the picture in the right row, the right column, third row down has a little box around it, is the bright red, which is to the right of the picture, is the frontal part of the brain.  And then the back part is where there's a band of red with green around it.

Q.    Doctor, if you want me to zoom in on one of these, let me know?

A.    Why don't you zoom in on that one to start with.

Q.    The one with the box?

A.    Why don't you stop there.  Because we can go from there.

Q.    All right.

A.    If you look on to the right, you'll see there's the rainbow, there's red, orange, yellow, green, blue, indigo.

Q.    If you can point, you can touch on the screen --

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 473 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 7 of 145
**JA3310**

732

A.   Okay.  Will that do it?  I wanted to touch on here. Oops.  Just lost the picture altogether.  I think it's -- it's not working there.  There we go.

You see the red as I go down further it becomes yellow, green.  High activity is the red.  Lower activity is the yellow and the green.

And generally the scale could be set by the doctor reading it.  These are not absolutes.  These are adjustments can be made.  So that you can see that the bright red in the frontal cortex is an area of high radioactivity, and there are various spotty green areas.

If you then look at the picture below that one with the box, which is 153-156, the picture.  One right below it.

This doesn't -- hard for me to indicate on the screen.

Anyway, you'll see there's a lot of green, the left side of the picture which is the back of the brain, there's red in the front.  That just shows the difference between the areas that are actively working and those that are working less.

We can probably move on to a different set of pictures.

Q.   Okay.  You want to go to -- you want to get away from this set of photos altogether?

A.   Yeah, the whole --

Q.   All right.

A.   Those are the sagittal views.

Laura Andersen, RMR 704-350-7493

**JA3311**

733

Q.    Let me lay a foundation here first.

A.    Right.

Q.    I'm going to show you what I'm going to ask to be marked as Defense Exhibit Number 38, and ask you if you can tell the Court what that is?

A.    This is also images of the PET scan of Mr. Umana. These are called coronal views.  This is a cut as if you cut from the left to the right, across the person's head.  And you're looking at the front of the brain, as seen from the front.

And again, they're different slices starting at the top and going to the right, progressively cuts through the forehead moving backwards.

Q.    Let me stop you right there.  The jury hasn't seen it yet.  Would this again assist the jury in understanding your testimony if they were allowed to see Defense Exhibit Number 38?

A.    Yes.

        MR. BRYSON:  Your Honor, I would move that it be admitted and published to the jury.

        THE COURT:  Any objection?

        MS. ROSE:  No objection.

        THE COURT:  Let it be admitted and published.

(Defendant Exhibit 38 was received into evidence.)

Q.    (By Mr. Bryson) Okay.  Now the jury can see it.

                    Laura Andersen, RMR 704-350-7493

**JA3312**

734

A.   All right.  And the same thing.  There's the color scale on the right that shows the high intensity radioactivity or increased brain activity is red.  Then down to the lower levels of blue in the absence of activity at all which is black.

It's normal to have the areas within the brain to have no activity, because that's just spinal fluid in there, it's hollow.  That's why it looks that way.

If you want to hone in on a picture, I would take the third row down, and the third picture in from the left.

THE COURT:  Doctor, you can adjust that screen if it helps you, back and forth.

THE WITNESS:  How do I do that?

Q.   (By Mr. Bryson) 113-116?

A.   113-116, yes.  That's probably big enough there.  If you look at -- can you see the numbers on the jury, 113-116. There it is right in the middle, top middle.

You could see across the top of this picture, the bright red of the cortex in the frontal lobes.  And as you move around to the bottom, you see two structures which are bright red in the middle.  These are nuclei within the basal ganglia of the brain which are also normal.  But below them you'll see the rims of green with blue inside.  Those are the temporal lobes in which there is decreased activity of radioactivity and decreased brain activity.  That's one of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 476 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 84 of 145
**JA3313**

735

the findings Dr. Shah described when he read these films.

Do you want to go on to the next set of films?

Q.   Sure will.  I'm now showing you what I will ask to be marked as Defense Exhibit Number 39, and ask if you can identify that?

A.   Yeah.  These are the axial views of Mr. Umana's PET scan of the brain.  That's views that are made in the plane of a hat.  If you were to just cut off the top of the head in the plane of a hat.

Q.   Would it assist your testimony if the jury were allowed to look at this exhibit?

A.   Yes.

MR. BRYSON:  I would move to introduce Defense 39 and ask it be published to the jury.

THE COURT:  Let it be admitted and published.

(Defendant Exhibit 39 was received into evidence.)

Q.   (By Mr. Bryson) Okay.  Now the jury can see it, Doctor.

A.   Okay.  Well, it's the same thing.  There's the color scale on the right.  And if you look at these brain images, you'll see that there's bright areas on the brain on the top which is the frontal cortex.  And then towards the bottom of each one of the pictures in general there's green, less activity.  That just shows the differences in brain activity in different parts of the brain that were described by Dr. Shah.  This type of picture can be seen when areas of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 477 of 536
Case 3:08-cr-00134-RJC   Document 1537   Filed 01/30/11   Page 81 of 145
JA3314

736

the brain are not functioning properly.

Q.   Is there a particular one you want to look at on this one or?

A.   Well, I guess right in the middle would be a good one. That's 86-88.

Q.   86-88?

A.   That one.

Q.   Okay.

A.   Again, this just shows the -- that there's a lot of activity in the frontal cortex, and there's less in the other parts of the brain.  That itself is an abnormality.

Q.   And other than the physical examination that you did of the defendant and ordering and reviewing the PET scan, is there anything else that you considered in this case?

A.   I considered the neuropsychological testing by Ricardo Weinstein, which showed that this man's --

THE COURT:  Hang on a second.  Listen to the question and respond directly to the question.

THE WITNESS:  Oh, I'm sorry.  Yeah.  I read the neurological psychological testing --

Q.   (By Mr. Bryson) Well --

A.   -- and I read the electroencephalograph --

Q.   Doctor, hang on a second.  Hang on a second. physically, personally, anything else you did in this case?

A.   No.

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 478 of 536
Case 3:08-cr-00134-RJC   Document 130   Filed 01/30/11   Page 82 of 145
JA3315

737

Q.   And as a result of your own testing, what you did in this case and the PET scan, did you come to any conclusions about Mr. Umana?

A.   I did.

Q.   And what was your conclusion?

A.   That his brain is not functioning normally.  And that this was probably the result of some developmental problem or injury early in life.

Q.   And did you come to any conclusion as to how that would affect him?

A.   I came to some general conclusions.

Q.   What were they?

A.   That he would be less able than normal people to control his conduct.  He would be more subject to duress, that is control by others, who are perhaps smarter or more capable than he is.  That he be more likely to be a -- lead, easily lead by stronger people.

MR. BRYSON:  Those are my questions.

THE COURT:  Members of the Jury, I think we'll take a break before the government has an opportunity to cross examine this witness.

As we take a break, don't talk about the case at all.  Keep an open mind, and we'll see you back at 11:40.

(The jury was escorted from the courtroom.)

(A brief recess was taken in the proceedings.)

Laura Andersen, RMR 704-350-7493

**JA3316**

738

THE COURT:  Ready for the jury?

ALL COUNSEL:  Yes, sir.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Ms. Rose.

MS. ROSE:  Thank you, Your Honor.

CROSS-EXAMINATION BY MS. ROSE:

Q.   I was looking, Dr. Merikangas, through your CV, and did not see any specific training relative to PET scans?

A.   That's correct.  I didn't list anything -- all the courses I've been to on my CV.

Q.   So you are specifically trained in, I guess, making and reading PET scans?

A.   I have been continuously using PET scans after taking a course in PET scans.  And after having been on the investigational drug license for amphetamine, which is one of the first isotopes used for brain scanning, and have constantly in my practice used PET scans, read them in consultation with radiologists and nuclear medicine specialists and have continuing education courses.  I don't list all my continuing education courses on my CV.

Q.   I did not note in your report that you had actually run the variables here?

A.   I did not.  I depended upon the doctors here in North Carolina.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 480 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 84 of 145
JA3317

739

Q.   And could I just see 37, please?

While they're pulling that up, when did this defendant become your patient?

A.   He's not my patient.  It's strictly a consultation for these forensic purposes.

Q.   And when you say forensic purposes, what do you mean?

A.   Having to do with his legal problems.

Q.   So you weren't called in, necessarily, because he had any physical complaints?

A.   No, I wasn't.

Q.   You came just because of his criminal charges?

A.   No, that's not true either.  I was called in to see whether there was something wrong with his brain that might help to explain his situation.

Q.   And is -- I didn't see that you had any specific forensic background.  How did you specifically get involved in this case?

A.   The lawyers contacted me and asked me to become involved.

Q.   And so they called you from Maryland to do this?

A.   Yes.

Q.   Is that because you've been going to federal defender courses, teaching about brain imaging and death penalty cases and how to represent a death client and mitigating evidence in death penalty cases related to these kind of

Laura Andersen, RMR 704-350-7493

**JA3318**

740

scans?

MR. BRYSON:  Objection; outside the scope of this knowledge.

THE COURT:  I'll sustain as to form.

Q.   (By Ms. Rose) Have you been presenting lectures about use of brain imaging as mitigation evidence in death penalty cases?

A.   Yes.  And also to medical students and to residents and fellows and trainees in neurology and psychiatry.

Q.   And this is an area of interest for you?

A.   Brain imaging is an area of interest.

Q.   What about brain imaging in death penalty cases?

A.   Well, I've been asked to consult in a number of death penalty cases; it is an area of interest, yes.

Q.   Going back to 1984, talking about insanity defenses, do you remember putting on a lecture about that?

A.   I don't remember, but I imagine if you're looking at my resume, I did that.

Q.   Neuropsychiatry and death row, do you remember that one?

A.   It's familiar.

Q.   Neuropsychiatric considerations and insanity?

A.   Yes.

Q.   Neuropsychiatric evaluations in death row criminals?

A.   Yes.

Laura Andersen, RMR 704-350-7493

**JA3319**

741

Q.    Mental health issues and death penalty defense?

A.    Yes.

Q.    Habeas Corpus seminars, that's post-conviction, correct?

A.    Yes.

Q.    So you're teaching legal seminars using this evidence?

A.    Yes.

Q.    Representing a death client post-conviction proceedings, you've taught that several times?

A.    I have.

Q.    So it was in that context that you became to evaluate this defendant?

A.    I was called to evaluate his patient because I have expertise in evaluating violent behavior.  And I published a chapter on the neurology of violence, and have taught in medical schools since 1973.

Q.    But isn't it true that there is no literature which supports the use of PET scans to determine motive or intent and violent behavior?

A.    That's true.  That's not what the test is for.

Q.    So you became to see him regarding these legal issues and said you did a, somewhat of a cursory neurological exam?

A.    It wasn't cursory.

Q.    You measured his head?

A.    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 483 of 536
Case 3:08-cr-00134-RJC   Document 1330   Filed 01/30/11   Page 74 of 145
**JA3320**

742

Q.   You had him walk around?

A.   Yes.

Q.   Was he shackled?

A.   No.

Q.   You had him speak?

A.   Yes.

Q.   You said you checked his taste and hearing?

A.   I tested his sense of smell and his hearing.

Q.   His skin was normal?

A.   Well, it wasn't cyanotic or jaundice or edematous or pale.

Q.   And then you said you did this eye test, the winking test?

A.   Among other eye tests, yes.

Q.   What's the -- you're saying the defendant can't wink. He can't close his eyes independent of one another?

A.   He can't close his left eye without simultaneously closing his right eye, a sign of seventh motor nerve weakness.

Q.   Can he close his right eye without closing his left eye?

A.   Yes.

Q.   And is that -- you said it was neurological, can it also be some kind of nerve damage in some way?

A.   Well, the definition of neurological is nerve.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 484 of 536
Case 3:08-cr-00134-RJC   Document 1361   Filed 01/30/11   Page 84 of 145
JA3321

743

Q.    Right.  So is it nerve damage in some way?

A.    Yes.

Q.    And could tattoos somehow have affected that?

A.    Not likely.

Q.    All right.  And then the cowlick test.

A.    Well, it's not a cowlick test.  It's an observation of the occipital and other hair swirls on the scalp.

Q.    Are hair swirls cowlicks?

A.    Cowlicks are the result of hair swirls.

Q.    And that's significant in that if you have a lot of cowlicks or hair swirls, that could indicate a problem, neurologically?

A.    It can, yes.

Q.    But it's not a certainty?

A.    It's what you call a soft neurological sign.  It doesn't have a specific result of it.  But if you look at people who -- and I can't use the word to describe those people whose intellects are not as good as other people -- the more cowlicks you have, the worse shape you're in.

Q.    Mr. Gast is sitting behind me is a colleague, Assistant U.S. Attorney who went to Duke has short hair because he has a lot of cowlicks.  I mean, it's really not indicative of a whole lot.

A.    I would like to take a look and see if that's true. You know cowlick is a common term.  Hair swirl is a more

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 485 of 536
Case 3:08-cr-00134-RJC   Document 1337   Filed 01/30/11   Page 89 of 145
JA3322

744

accurate term.

Q.   Okay.  So based upon these examinations you did with Mr. Umana, you then requested some additional follow-up?

A.   Yes.

Q.   And what specifically did you see as the neurological problem after your evaluation of him there at the jail?

A.   Well, you didn't mention the increased reflexes in his lower extremities, in his legs and knees and ankles, and very increased deep tendon reflexes, which were a sign of disinhibition of the motor area of the brain.  That's why I wanted to look at the functioning of his brain with the PET scan.

Q.   And the PET scan was used specifically in this case because?

A.   There was a suspicion in my mind that we might be able to demonstrate the basis of the problem with the reflexes in his legs, and might also tend to explain aggressive, impulsive and imprudent behavior.

Q.   And you're saying PET scans help explain impulsive and imprudent behavior?

A.   Only when they're part of a comprehensive evaluation.

In other words, you can't look at a brain scan and tell somebody's I.Q. or what they're thinking about in this kind of a scan, or very much at all about their behavior.  It's only a test, like any other test.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 486 of 536
Case 3:08-cr-00134-RJC   Document 1537   Filed 01/30/11   Page 94 of 145
JA3323

745

Like you can't look at someone and know what their blood sugar is.  But it's very important to know what their blood sugar is if they have diabetes or if you have some bizarre behavior that might be the result of low blood sugar.

So it's a test like any other test.  Itself does not explain anything except in the context of someone who understands the test and who understands the patient.

Q.   But you said that you formed general conclusions based upon this test that he cannot control his conduct, that he would be controlled by others, and that he would be easily lead based on your review of these brain scans?

A.   And my physical examination, and my knowledge of his entire history, and my knowledge of the other kind of testing which was done which I'm not allowed to mention.

Q.   So you learned about his history from whom?

A.   I learned about it from him, and from a mitigation specialist who had taken a history and actually gone to Central America, and from other people who interviewed him, and from the neuropsychologist who tested him.

Q.   And you said based upon all that, that you believe that this damage to his brain that you have told us exists, was a result of his head injury at approximately four to five years of age?

A.   I said that was a likely cause.  But just general

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 487 of 536
Case 3:08-cv-00134-RJC   Document 135   Filed 01/30/11   Page 91 of 145
**JA3324**

746

abuse, malnutrition, poor treatment and the terrible life he's had can also result in impaired brain functioning. It's been shown now that child abuse can retard someone's development.

Q.    Well, you're going very far afield of the evidence in this case, Doctor.  You're here to talk about these brain scans, and that's what you testified --

A.    I was answering your questions.  You're the one who's going off into these other areas.  I simply said that this is a sign of an abnormal brain.  There's something wrong with his brain.  That my neurologic examination is abnormal and suggested that he has disinhibition.  That is less ability to control his behavior than other people or normal people.

Q.    Did you -- now at the time that you requested this specific test, this PET scan, you then had information that he had had a fall as a child?

A.    He had a number of falls, including one that took him to the hospital and required stitching in his head when he was a child.

Q.    And given that, was your concern that he had some kind of traumatic brain injury?

A.    That was my concern.  I treat traumatic brain injury, including veterans come being back from the Gulf.  It's a constant part of my practice for the last 40 years to treat

Laura  Andersen,  RMR  704-350-7493

**JA3325**

747

children and adults who have had brain injuries.

Q.   And would -- so -- would you have seen the type of head trauma that had been explained to you -- how would you, what would you call that, a minor or mild closed head injury?

A.   Well, fortunately -- unfortunately we don't have the medical records.  We just have, as you point out, what other people have said.  And it would be much better if we had good hospital records.

But unfortunately, El Salvador in the middle of the war, was not retaining records on children who had head injuries.

Q.   But my question to you was, did a head fall, which required stitches, that created this concern for you of a traumatic brain injury, what -- how would you have classified that injury regarding the type of testing?

A.   Well, I wouldn't classify it because I don't have that information.  But children can just fall and hit their head off their skateboard and die.  I mean, you can't classify things like that.  Brain swelling occurs in children much greater frequency than adults.

Q.   All right.  But my question is, if somebody comes in and has an old head injury, the first test that you request is a PET scan?

A.   Wrong.

Q.   Well, isn't that the case here?

Case 3:16-cv-00057-MOC  Document 50-7  Filed 03/23/17  Page 489 of 536
Case 3:08-cv-00134-RJC  Document 133  Filed 01/30/11  Page 93 of 145
JA3326

748

A.   No, I mean --

Q.   Someone has presented with an old head injury and you requested a PET scan?

A.   After -- as you have pointed out, I had all this other information and had conducted a physical exam of the patient.

Q.   So typically, whenever somebody has a head trauma, a CT scan is what is medically recommended, right?

A.   Wrong a CT scan is useful on the day of the trauma and right after, because it will show the presence of blood or fracture of the skull.  It's not useful a long time later to look for the things which may affect thinking, behavior, intelligence, emotions and all of those things.  Other scans are better for that.

Q.   A PET scan tells you about the emotions?

A.   A PET scan --

Q.   That's a yes or no question.  Does a PET scan tell you about a person's emotions?

A.   Some people think so.  But I don't.

Q.   So a CT scan or MRI is not the first line of defense when you're trying to determine a head injury, old or new?

A.   Those are two questions.  You mean CT?

Q.   I do a lot of compound questions.

     A CT, is that used with head trauma?

A.   Yes.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 490 of 536
Case 3:08-cr-00134-RJC   Document 1530   Filed 01/30/11   Page 94 of 145
JA3327

749

Q.   MRI with head trauma?

A.   Yes.

Q.   And you're indicating that they're not used for old injuries?

A.   No, I'm not indicating that.  They are used for old injuries.  They're used for Alzheimer's disease.  They're used for old injuries.  They're used for strokes.  They're used for all those things.

Q.   And you're saying that in this particular case, that a CT scan was not the best test?

A.   I'm saying he had one already.

Q.   And it was shown as normal?

A.   I haven't seen it, but it was read as normal, yes.

Q.   So --

A.   But it's not the best test to look at what you're capable of thinking or whether you're even paralyzed.  People with cerebral palsy can have normal --

Q.   We're not talking about cerebral palsy, Doctor.  I appreciate that.  We really do need to narrow the focus to this case and this defendant and what you testified about.

     And you said two different times, that this test is used is used to see what people are thinking, but you also told us it can't be used for that?

          MR. BRYSON:  Object; not a question.

          THE COURT:  Sustained.

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 491 of 536
Case 3:08-cr-00134-RJC   Document 1332   Filed 01/30/11   Page 95 of 145
**JA3328**

750

Q.   (By Ms. Rose) What about an MRI?  Would an MRI have been helpful here

A.   Yes?

Q.   Why was an MRI not requested?

A.   Because I was told that the government wouldn't pay for it.

Q.   PET scan costs about 10 times as much as an MRI?

A.   No.

Q.   That's not your understanding?

A.   Well, I don't -- I don't do them and charge for them. I know you can get a PET scan where I live for about $1,500, and an MRI scan is probably 800.

Q.   So an MRI is cheaper?

A.   Yeah, about half as much.

Q.   Why didn't you request an MRI?

A.   I did.

Q.   Did you get one?

A.   No.

Q.   Where on your request to Carolinas Medical Center does it show that you asked for an MRI?

A.   I didn't ask them.  I asked the attorneys whether the government would do an MRI and they said that they didn't think they had enough money.  And I should just do one test, and if I had to choose a test, what would I choose.  So I said well, the most relevant thing here would be a

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 492 of 536
Case 3:08-cr-00134-RJC   Document 135   Filed 01/30/11   Page 96 of 145
JA3329

751

functional test like the PET scan.

Q.   So the request here -- so the attorneys made the decision on what brain test -- it's your testimony they made the decision on the brain test?

A.   No.  They asked me what test -- if I had only one test to pick, which one would I pick.  So I said a PET scan.

Q.   That's not recommended though, by the American College of Radiologists in this type of instance looking at a head injury?

A.   The American College of Radiologists when?  Because you're referring to a position paper 10 years ago or do you have something more recent.

Q.   I have the American College of Radiology appropriateness criteria dated 2008.

A.   Well, that was several years ago.  I'm sorry.

Radiologists don't see patients and evaluate them as doctors in practice like neurologists or psychiatrists do.

Radiologists do the test, they don't go out and find patients and say what they're going to do with them.

There are many journal articles, and many references and many books who recommend that the PET scan is the best way to see a functional image after a head injury.

Q.   Now, do testing conditions matter?

A.   They do.

Q.   How do they matter?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/28/17   Page 493 of 536
Case 3:08-cr-00134-RJC   Document 133   Filed 01/30/11   Page 97 of 145
JA3330

752

A.   They matter if you have someone who is on a lot of drugs, or someone who is, you know, in some way impaired other than their resting state, scans can be different. This type of scan isn't going to change very much with having someone concentrate or relax.  General thing would be to just lie there, close your eyes and relax.  That's what they would tell someone getting this kind of a test.

Q.   And do you know whether that happened here?

A.   I don't.  But I presume these are competent doctors here in North Carolina or I wouldn't have ordered the test here.

Q.   Did you talk to Dr. Shah?

A.   I have never spoke to Dr. Shah.

Q.   You don't know what the testing conditions were?

A.   That's correct.  Except as described, they say that they did this scan 88 minutes after administration of the isotope.  That's in the description.  But I presume they know what they're doing here.

Q.   Would it make a difference if a person was -- you said something about lying there with their eyes closed, what if they're blinking or moving their eyes around?

A.   That wouldn't affect this very much.

Q.   Very much or at all?

A.   Very much.  Significant.  It wouldn't be significant.

Q.   And you've indicated that you did not speak to Dr. Shah

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 494 of 536
Case 3:08-cv-00134-RJC   Document 135-7   Filed 01/30/11   Page 94 of 140
JA3331

753

as a follow-up once you had read this report?

A.    That's right.

Q.    Did -- you indicated that the prior scan showed no irregularities, the prior CT scan?

A.    They read as normal.

Q.    Ultimately, after reviewing the scans, what was your -- what was your treatment recommended for this defendant?

A.    I'm not the treating doctor.  I made no treatment recommendations.

MS. ROSE:  All right, sir.  Thank you.

THE COURT:  Any redirect?

MR. BRYSON:  Briefly.

REDIRECT EXAMINATION BY MR. BRYSON:

Q.    Doctor, I want to refer back to Defense Exhibit 36 and ask you if you would take a look at that.

As part of the PET scan that was done at the Carolinas Medical Center, they actually included CT imaging, did they not?

A.    They did, yes.

Q.    Now, the PET scan shows the way the brain is functioning; is that correct?

A.    Yes.

Q.    And in this case, it showed a decreased function certain parts of the brain; is that correct?

A.    Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-7   Filed 03/23/17   Page 495 of 536
Case 3:08-cr-00134-RJC   Document 130-3   Filed 01/30/11   Page 99 of 140
JA3332

754

Q.   And do doctors know what parts of the brain are believed to control different behavior or functions of the human body?

MS. ROSE:  Well, object; that's outside the scope of cross.

THE COURT:  Sustained.

MR. BRYSON:  Those are my questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. BRYSON:  Can we have a side bar.

THE COURT:  Side bar, sure.

(Bench conference as follows:)

MR. BRYSON:  I think I was going to need a doctor in a few minutes for my heart attack.  We're done with live witnesses, probably need a couple exhibits we put in, in the beginning that we need to admit.

We have one issue, I don't want to wear anybody down on this, when McGough was at the end of his testimony, we tried to get into the narration, the Court ruled against that, we understand that.

Our concern is, at this point, for the record, it's simply a Spanish document, and we were wondering, we don't have to do it now, but at some point when it's appropriate, put him on the stand and do a brief offer of proof as to what he would say on that.

**JA3333**

755

THE COURT:  I wonder if we can just have a translator just translate it.

MS. ROSE:  What are you talking about, the police report?

THE COURT:  Police report on the birth certificate.

MS. ROSE:  How they got it.

MR. FOSTER:  Essentially it's an interview with his mother.

MR. BRYSON:  Isn't that right?

MR. FOSTER:  Interview of the mother.

THE COURT:  During some break, put him on the stand, plus he speaks Spanish, and he could interpret it.

MR. BRYSON:  That was my thought.  Other than that, we're ready to rest.

MR. FOSTER:  A few exhibits we need to move in.

THE COURT:  Are you prepared to go with the rebuttal?

MS. ROSE:  Yes, sir.

THE COURT:  How long do you think your rebuttal will take?

MS. ROSE:  Thirty, 45 minutes.

THE COURT:  Is there, I mean -- the exhibits you want to admit.

MR. BRYSON:  They were, from the, you know, when

Laura Andersen, RMR 704-350-7493

**JA3334**

756

we were cross examining in the government's case, a couple exhibits, most for impeachment.  We're not moving to introduce all of them, but a couple of them.

MR. FOSTER:  There's three, that I --

MS. ROSE:  We'll take a look at them.

MR. FOSTER:  I mean -- well, better make sure before I -- I need to look at the list.

THE COURT:  Why don't you all -- let's start out with your rebuttal evidence.  And then see if there's -- see if there's an issue as to admission on any of these things.  And I'll make rulings on it.  You just need them admitted by the time the case goes to the jury.

MR. BRYSON:  Okay.

MR. FOSTER:  Okay.

THE COURT:  You all rest with the understanding that there's some exhibits yet to be discussed --

MR. BRYSON:  Okay.

THE COURT:  And ruled on.  Then you all put on your rebuttal evidence.  We'll see how far we go to 1:00.

(The bench conference was concluded.)

MR. FOSTER:  That's the defense showing, Your Honor.

THE COURT:  Very well.  The government have any rebuttal evidence?

MS. ROSE:  Yes, Your Honor.  One witness,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 498 of 536
Case 3:08-cr-00134-RJC   Document 235-7   Filed 01/30/11   Page 102 of 140
**JA3335**

757

Dr. Helen Mayberg.

THEREUPON, HELEN MAYBERG, being first duly sworn, testified

as follows during DIRECT EXAMINATION BY MS. ROSE:

Q.   Good afternoon.  If you would, please introduce

yourself to the jury.

A.   My name is Dr. Helen Mayberg.

Q.   And where are you employed?

A.   I'm employed at the Emory University.

Q.   And in what position?

A.   I'm Professor of Neurology and Psychiatry.  And I'm the

Dorothy C. Fuqua Chair in Psychiatric Neuroimaging and

Therapeutics.

Q.   If you would, just tell the jury a little bit about

your training and experience and your education?

A.   I come from California.  I went to college at UCLA.  I

got a degree in psychobiology.  I then went to medical

school at University of Southern California.

I did a medical internship at the USC, LA County

Medical Center in Los Angeles.  And then I moved to New York

City, and I trained in neurology at the Neurological

Institute in New York at Columbia Presbyterian, Columbia

College of Physicians and Surgeons.

After I trained in neurology, I moved to Baltimore

where I did a post-doctoral fellowship in nuclear medicine

and PET scan imaging training at Johns Hopkins.

**JA3336**

758

And then I stayed on the faculty at Johns Hopkins as a young junior faculty member.

Q.   What brought you then to Emory University?

A.   Well, actually I didn't go straight to Emory.  I stayed on at Hopkins on the faculty in neurology, psychiatry, and radiology for seven years.

And then I moved to Texas.  I was in San Antonio again, neurology, psychiatry and radiology in San Antonio.

And then recruited I was recruited to Toronto to be the first Sandra Rotman chair in neuropsychiatry.  And I was there for five years and I moved and was recruited to Emory in 2003.

Q.   At Emory, what is your position?

A.   I'm academic faculty and research, predominantly faculty at Emory.  My team is interested in the study of depression, predominantly.

As a neurologist, I'm interested in the neurobiology of depression, the causes of depression, the treatments of depression.  And we study it with various forms of imaging, started the many years ago with PET scanning.  It's evolved to structural and functional MRI scanning.

I'm also involved, actually developed a new treatment for vary and tractable depressed patients using brain surgery and stimulation of the brain and I do that as well.

So I both teach, predominantly in psychiatry and

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 500 of 536
Case 3:08-cv-00134-RJC   Document 295-7   Filed 01/30/11   Page 104 of 140
**JA3337**

759

neuroscience.  I'm on the graduate school in the neuroscience department.

I have graduate students, post-docs.  I have engineering students that train with me in terms of new methods for imaging that we can study behavior in the brain for purposes of understanding what's wrong in the brain when people are depressed or have other behavioral problems.  How to optimally treat them.  How to use imaging to actually match treatments for what patients' brains needs.  And I teach and I think about those problems.

MS. ROSE:  Your Honor, at this time I would tender Dr. Mayberg as an expert in -- you're a psychiatrist, you're a neurologist, and you also conduct radiologic studies, exams and tests.  So I would tender her as an expert in all of those areas.

THE COURT:  Any voir dire or objection?

MR. BRYSON:  Brief voir dire.

THE COURT:  You may.

VOIR DIRE EXAMINATION BY MR. BRYSON:

Q.  Dr. Mayberg, you are a neurologist, correct?

A.  Yes, I am.  I just did want to correct.  I'm not a psychiatrist.  Thank you.

Q.  Okay.  And you're not a radiologist either?

A.  I'm trained in nuclear medicine, but no I'm not a radiologist.

Laura Andersen, RMR 704-350-7493

**JA3338**

760

Q.   Okay.  You're not certified in nuclear medicine?

A.   Correct.  I'm board eligible but not certified.

          MR. BRYSON:  We have no objection to her being able to offer her opinion in neurology, Your Honor.

          THE COURT:  Is that what you're offering?

          MS. ROSE:  Well, neurology, but also her expertise in brain imaging.  Because apparently that's her course of study.

          THE COURT:  I think she has specialized knowledge and can offer an opinion in that area.

          MS. ROSE:  Thank you, Your Honor.

CONTINUED DIRECT EXAMINATION BY MS. ROSE:

Q.   You said that on a daily basis or as part of your studies, you use brain scans in various ways to understand what's going on in the brain?

A.   That's what we study, yes.

Q.   And did you have an opportunity to review some brain scans which were conducted in this particular case?

A.   Yes, I did.

Q.   Did you also review the conclusions of Dr. Shah who did the radiologic -- who is the radiologist who actually performed the scans?

A.   Yes, I did.

Q.   And also a report of Dr. Merikangas and his conclusions?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 502 of 536
Case 3:08-cv-00134-RJC   Document 225-6   Filed 01/30/11   Page 106 of 140
JA3339

761

A.    Yes, I did.

Q.    First of all, what specifically did you review?

A.    I reviewed, actually first and foremost, the CD that your office provided me.  It was two CDs.  One was a CD from an emergency room in Georgia when the defendant had a car accident and had a CT scan.  So I had those images on a CD and could review the films.

And then I had more important second CD that was basically had a number of files.  But predominantly files that were similar to what was shown in court, images of the PET scans.  They're actually various forms of the images, different views.

As well as some captured files that described, it had Dr. Merikangas' order for the PET scan, his request.  Had the file from the medical center, the kind of patient intake form that they do and the report.

And I also had some Dr. Merikangas' exam, the Gwinnett County medical records from the emergency room visit, and three psychologists that have examined the defendant.  I had those reports to review as well.

Q.    Now, the -- regarding the Gwinnett County exams, I believe they were referenced in Dr. Merikangas' testimony as a car wreck.  Was a CT scan performed then?

A.    Yes, it was.

Q.    That was in 2007?

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 503 of 536
Case 3:08-cv-00134-RJC   Document 235-7   Filed 01/30/11   Page 107 of 140
JA3340

762

A.    Yes, it was.

Q.    When in 2007?

A.    I'll tell you exactly.  The admit date was 5/16/2007.

Q.    And the result of that scan?

A.    It was a normal scan and a normal exam.

Q.    And on that occasion it was a CT scan?

A.    Yes.  A CT scan without contrast.

Q.    What is a CT scan?

A.    CT scan is fancy kind of x-ray.  It's a three dimensional x-ray that allows you to get information about the tissue and not just the bone.

So it's a way to look -- it's a very standard way to get an idea of the structure of the brain.  You can see blood.  You can see bone.  You can see the cracks in bone. You can see strokes.

Looks different in different situations.  It's good for, as you heard, acute head trauma.  There's blood in the brain.  Swelling in the brain.  Scars on the brain.

But it's fairly low level kind of picture of the anatomy of the brain, compared to some of the other available techniques.  But it's fast and quite efficient and relatively cheap.

Q.    And that scan was normal?

A.    Yes, it was.

Q.    Prior brain injury, say a brain injury if one existed

Laura Andersen, RMR 704-350-7493

**JA3341**

763

from age three, four or five, would that have been present if there had been such an injury?

A.    Well, it all depends if you have a very severe injury where you had bleeding into the brain or damage to the brain or scar left in the brain from trauma, you could see loss of tissue, large ventricles, changes in the brain that happened because the brain had died.

In the absence, if you had an accident that damaged the white matter of the brain, that's referred to as diffuse axonal injury on the reports, that means the stretching of the wires that connect the different cells of the brain that do all the heavy lifting.  When that's damaged, it can show abnormalities on a CT scan.  It has to be pretty abnormal people.  Generally there's no question of whether or not they were injured or not.

So if the brain dies, a CT scan can pick it up, but it needs to be quite abnormal.  You know, oftentimes with mild head injuries, CT scan is totally normal.  That's why we don't use it after the early stages of head injury, we use other tests.

Q.    Dr. Merikangas testified that after a neurological exam of the defendant, he requested a PET scan.  Did you see that in Dr. Merikangas' report?

A.    Well, actually in his report, which was done after the time of the scan, it's not written in a way to know his

Laura  Andersen,  RMR  704-350-7493

764

thinking.

I'm presuming that he did examine him, because he did say in his report that he examined him, I think in August or September. And then the PET scan was done in November. And the report was written after the PET scan.

So that obviously he had ordered the PET scan and was interested in having that before he formulated his final report.

Q.   And what is a PET scan?

A.   A PET scan is a generic term for a type of functional picture of the brain. Positron emission tomography is a way to describe the technology.

I mean, basically, positrons are a type of radioactive particle that can, when it decays -- it's unstable. When it decays, it produces a particular kind of light that can be detected by certain kinds of scanner; positron emission tomography scanner.

Positrons are very special particles that can be incorporated into chemicals that are helpful to understand how living things work.

So positrons emitting tracers, carbon, oxygen, fluorine, and they can be attached by a chemist to things like water, to measure brain blood flow; to derivatives of glucose, which is the brain's main energy source. You attach a fluorine. And which means that a chemist makes a

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 506 of 536
Case 3:08-cv-00134-RJC   Document 225-7   Filed 01/30/11   Page 10 of 140
**JA3343**

positron emitting particle, attaches it to a chemical, sterilizes it, and then it can be injected into the body in a vein. And it will go anywhere in the body, and then you can put someone in this PET scanner or camera that will pick up the radioactive decay. You can do the whole body.

So it's a type of technology. You can tag other chemicals. You can tag drugs. And you can look to see how they go in the body. You can use the sugar metabolism to look for cancers anywhere in the body. You can look at the general metabolism in the brain with sugar. You can look at the blood flow in the brain with radioactive water. You can tag dopa and measure the dopamine levels in the brain.

So it's just a general principle of using these positron emitting isotopes attached to chemicals of interest that you know can get to an organ, in this case the brain, take a picture of what it's doing. So it's a way to get a picture of various kinds of activity, depending on what you tag.

Q. All right. And the PET scan shows up in color?

A. Well, color is convenience. The radioactive decay is giving off thousands, millions of particles of light every second. And it's accumulated by this machine. So not to give you a physics lesson. But when you --

Q. Yeah. Don't give us a physics lesson. It gives us colors, is that easy to say?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 507 of 536
Case 3:09-cv-00134-RJC   Document 259-7   Filed 01/30/11   Page 115 of 140
**JA3344**

A.   Color is an indicator of the amount of radioactive decay.  So the picture is really numbers in a computer.  And that the numbers will be different in different parts of the brain.

The cortex of the brain tends to have higher metabolic activity than the white matter of the brain or the spinal fluid in the brain.  And it will be reflected by different amount of decayed particles that are emanating from that area after the radioactivity is injected.

And so if there's 1,000 particles of light coming from one area of the brain, that can be illustrated, if you will, by virtue of a picture that can show the relative gradation.  You can look at it in gray scale, black and white, just like you can any other picture.

You can make it funny colors.  You can make a rainbow scale, you can make it gray on white, white on gray.  It really is a reflection of relative activity in different parts of the brain.

So the color is convenient, but not really meaningful.

Q.   Okay.  Well, if we could, could you pull up 37, please.

Do testing conditions matter for this scan?

A.   Oh, it's extremely important, because this is the brain in action.  And more importantly, the chemical behavior of sugar, when you inject it into the body in the form of this Deoxy Glucose, the FDG, it will be taken up throughout the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 508 of 536
Case 3:08-cv-00134-RJC   Document 225-7   Filed 01/30/11   Page 12 of 140
**JA3345**

767

body.  In this case to the brain, proportional to the brain's demand for energy.

If you're lying quietly with your eyes closed, it will -- different parts of the brain are all using energy, but differently from if you're moving your finger, or doing a task, or singing a song.

If you're in a quiet room, it will be different than if you're in a noisy room.  If the lights are on, pattern in the brain will be different than if the lights are off.

And so, it definitely matters what the conditions are, in order to give a meaningful read of a brain scan when you're just looking at it.

Q.    And did you actually contact Dr. Shah about the testing conditions used in the scans before the jury?

A.    Well, I did.  Because in order to actually do my own evaluation of the scan, it's very imperative to know exactly what the defendant was doing.  Was he in shackles, was he not.  Was he in a quiet room.  Was he lying down.  Was he sitting up.  Were his eyes closed.  Was he in a separate scanner room.  Was he in the scanner room.  Was he nervous. You know, was he supervised.

Basically this picture will tell you what the brain was doing for the 30 minutes after you inject the isotope.  And in the report, all that was available was, how much radioactivity was injected; useful.

Laura Andersen, RMR 704-350-7493

JA3346

768

Second, is that the scan was taken 83 minutes after the injection. Kind of a long time, it doesn't really matter. It's like when you inject the sugar, it goes up in the brain. And as long as you keep the behavior of the subject stable for about 30 minutes, anything after that it's locked in the brain, and if they do something else it doesn't matter. But it's imperative to know what the conditions were for that first 30 minutes. And because it wasn't written anywhere here. It wasn't written on the requisition. And there was no information that described it. I actually called the medical center to ask if it was a standard protocol. And I actually did speak to Dr. Shah and asked him. And he said that he wasn't there. He presumed it was a standard protocol. They have a number of different protocols in the lab, because they do specialized studies for epilepsy. They do specialized studies for cancer. And they have different protocols. But for other things they have a separate room that they put people in. They lie there. The room is dark, according to Dr. Shah. Although he wasn't there. Usually a technologist will set the subject up and let them know. I was curious to know because someone who had come from the jail would be shackled and that might be uncomfortable. I didn't know how it might be arranged, you know, did he talk. Was he nervous. Sometimes people will make notes. He said there were no notes. That

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 510 of 536
Case 3:08-cv-00134-RJC   Document 22-7   Filed 01/30/11   Page 14 of 140
**JA3347**

769

generally the techs are running back and forth, he really didn't know.  It was his experience that -- well he didn't know in this case.  That his experience was that a guard would have been stationed outside the room.  There was a small window in the room that the guard could look through, but the guard couldn't really see everything that was going on.  He presumed that he followed instructions.  He also shared with me that at times, you know, you do the best you can, but you can come back --

MR. BRYSON:  Object, Your Honor.  Commenting on something that he wasn't even present on, Your Honor.

THE COURT:  Pardon me?

MR. BRYSON:  Commenting on something he wasn't even present on.

THE COURT:  Well, I sustain the objection to the narrative form of the question -- or the narrative form of the answer and ask you to ask another question.

THE WITNESS:  Sure, sorry.

Q.   (By Ms. Rose) What is a PET scan typically used for?

A.   Well, it's been validated.  Meaning it's been tested and verified that it's useful for a given patient for three basic indications.  Very useful if someone has certain forms of epilepsy to figure out which side of the brain it's coming from.  Particularly when you want to remove -- surgically remove that side of the brain.  Saves the patient

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 511 of 536
Case 3:08-cv-00134-RJC   Document 225-7   Filed 01/30/11   Page 15 of 140
**JA3348**

770

a number of other more invasive surgical procedures to verify the side of the epilepsy.

It's used most predominantly for cancer. And in brain cancer, one of the big problems is, once they take the cancer out and you are treated with radiation, the question is, sometimes you have symptoms that recur, and the question for the treating doctor is whether or not the cancers come back or you have side effects from actually the radiation treatment. And PET scan can be very useful for making that distinction that saves you another brain surgery.

It's also useful to do surveys of the whole body, if you have cancer that's metathesized.

The third well-validated use of PET scanning in the brain is someone who has deterioration in their thinking. So when they have memory problem and dementia is suspected. So it has well-validated patterns for Alzheimer's disease. And so it can be used to distinguish Alzheimer's disease forms of dementia.

Other indications are research oriented. I said we study depression, we can't use these kind of scans to diagnose depression. Depression can show different patterns in the brain in people who look comparably depressed, it's not helpful.

It's been studied in schizophrenia, but it isn't validated to be useful for the diagnosis, people examine

**JA3349**

771

psychiatric patients.

So there are a lot of research uses and studies to know how these diseases might affect the brain. But in terms of how it's used for a given person going to the doctor with a well-validated pattern, to say when I see this pattern I know this is -- this is a scan pattern of this particular disease, it's quite limited.

Q. To those three things that you just described?

A. Yeah.

Q. Did you have an opportunity then to review the PET scans which were conducted in this case?

A. I did.

Q. If you would describe the review that you did of these scans and your conclusions?

A. Well, what I had was on the CD, I was able to read the files into an image reading program that I have that can read these kind of diacom (phonetic) files. That allows me to look at the pictures in different orientations. And I can also look at the provided pictures on the disk that match up, one of them being the picture that I'm looking at on the screen now.

An orientation from the side view, the sagittal slices, the front view, the coronal slices. And the top down view, the transverse slices.

And so I could look at those pictures. I also did ask

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 513 of 536
Case 3:08-cv-00134-RJC   Document 229-7   Filed 01/30/11   Page 217 of 140
**JA3350**

772

Dr. Shah if he had comparative data from healthy people of any age, to which he could quantitatively compare the defendant, or that I could use to know how does the defendant's scan quantitatively compare to healthy controls, to know other than just looking at the pictures, whether or not these are normal scans.

Because healthy people actually all don't look the same. There is a fair amount of normal variation even in healthy people following instructions and doing the scan.

Q. So in order to actually appropriately read a scan used in this circumstance, you need normal controls to match it to; is that fair to say?

A. It's sort of fair. May I elaborate?

So if someone asks you to read a scan, or you say, I think someone might have Alzheimer's disease. It's been well-tested to know what the pattern of Alzheimer's disease looks like. So one can just look at a scan, and if you see the pattern of Alzheimer's disease, you can offer that as an opinion.

If you're asked to look at the scan for something as in this case, migraine headache, history of head injury, there is no validated scan pattern for migraine. So anything you see on the scan, you would have no idea if that would be consistent with migraine or not.

And same with head injury. There have been studies of

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 514 of 536
Case 3:08-cv-00134-RJC    Document 296    Filed 01/30/11    Page 18 of 140

**JA3351**

773

head injuries.  It's not recognized to be a reliable test of chronic effects of head injury.  And so there's no bona fide pattern to match to.  But you have another way to do it.

If you want to ask a question, is there anything wrong with the scan.  You see a big no metabolism in the scan, you can feel pretty confident that something's wrong.  You may not know what it is.  But you can at least say where the abnormality is.

But a sort of unbiased way to do it is to say, I can measure because the activity is quantified.  What the activity in the frontal lobe should be, compared to healthy people could be statistically compared.

You could have normal range of activity and actually compare the brain of one individual, in this case the defendant, to healthy controls and say, I can't tell you why it's abnormal.  But I can tell you with statistical certainty that it deviates from the normal range.

So if you really don't have a pattern that you know to match for a well-validated indication to do the scan, but you want to know if there might be anything on the scan that's abnormal, than one way to do it, that would at least make sense, would be to compare it to healthy controls.

Dr. Shah says they do not use healthy control comparisons.  He just looked at the picture.  So I had no healthy comparisons.  I had no numbers to compare.  If the

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 515 of 536
Case 3:08-cv-00134-RJC   Document 229-7   Filed 01/30/11   Page 119 of 140

**JA3352**

774

defendant's metabolism is different from healthy people, I can just look at it and -- as everyone else did.

Q.   And after your review, what did you determine?

A.   Well, a few things.  First of all, I mean the bottom line I happen to think the scan is normal.

I can appreciate the heterogeneousness of how these scans look.  That they are in-foldings of the brain.  The gray matter is always about three to four times higher than the white matter.  You don't have blank areas in the brain. The deep areas, the white matter has very low metabolism, but it has metabolism.  The spinal fluid really has no metabolism that would just be noise.

And because of something I saw in these images which was very high activity in the eye muscles.  As I told you, when you inject the sugar, it goes everywhere in the body. And so anything that's using sugar, and muscles use sugar as well, will show activity.

And in his images, in all the orientations, the eye muscles, the muscles that move the eyes, which are right in front of the brain and in the pictures, are actually quite active.  Which causes me to then look at the scan a slightly different way.

Because if the eye muscles are very active, it's an indicator that the eyes may be moving.  And another indicator that the eyes may be moving, is the fact that the

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 516 of 536
Case 3:08-cv-00134-RJC   Document 255-7   Filed 01/30/11   Page 120 of 140
**JA3353**

frontal lobes are very, very active. And are not just very active all over, they're very active in an area of the brain called the frontal eye fields. Which is sort of on either side of the frontal lobes. Not all the way to the very front. But not all the way to the very back of the frontal lobes.

And that's a part of your brain that as you move your eyes, that's the part of the frontal lobe that controls your eye movements.

So with the high activity in the eye muscles, combined with the very high activity in the frontal eye fields, I have to look at the scans with the point of view that the pictures have the colors that are displayed in the way that the highest area of the brain will be brightest color, and everything else that might even be of normal activity, is proportionally lower.

And if the scan was supposedly done, eyes closed resting quietly. No one is supervised. There is evidence that the defendant may have been moving his eyes, I don't know. I wasn't there. But the brain scan is telling me that the frontal lobes are quite active, relative to everything else.

And in the computer, with the software package I have looking at the scans that were provided, I can look at the activity numbers of the frontal lobe within the frontal

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 517 of 536
Case 3:08-cv-00134-RJC   Document 225-7   Filed 01/30/11   Page 21 of 140
JA3354

776

lobe.

I can look at the activity in the numbers of the temporal lobe, the partial lobe.

And I went to look to see what is the relative activity. Because in healthy people, there are many published studies over the last -- since the early eighties on what normal resting metabolism is. And it's usually not the same all over the brain.

Even someone following instructions, eyes closed resting, quiet room, dark lights; left side is always a little less than the right. Very characteristic. So the mild asymmetry that Dr. Shah reported; expected.

Second, that the temporal lobes is always about 20 -- 15 to 20 percent less than the frontal lobe even when you're just resting doing nothing.

So the activity that I'm seeing in these scans, follows the general trend of activity of frontal lobe being more than temporal and parietal.

I'm not impressed by any significant asymmetry. There's certainly no gross defects.

The white matter that might go with the axonal degeneration is perfectly normal.

So again, the conclusion that there's diffuse axonal injury, isn't supported by findings in the white matter on the PET scan. Wouldn't be the test I would use if I really

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 518 of 536
Case 3:08-cv-00134-RJC   Document 335-7   Filed 01/30/11   Page 122 of 140

JA3355

cared about that, but PET scan can help me with that.

And so between knowing that he was unsupervised. Seeing the eye movements. Seeing the evidence of the frontal lobe being overactive. Knowing the relative numbers. Checking the relative numbers. I'm -- I don't see any abnormalities in this that would cause me concern that he has brain damage, problems in his brain.

The pattern is more of a person that's awake, alert, might be looking around in a dark room. That's all I can say about it.

Q.    It's normal?

A.    It's normal.

Q.    If you had a concern about brain injury, either an old or a new brain injury, traumatic brain injury, is the PET scan the test to run?

A.    Well, again, I mean, again in context. If one is concerned about subtleties that might have occurred at some time in the past. What's happened since the beginning of PET scanning it was thought, PET scanning should be better than CT, because the CT scan isn't very sensitive. And A brain in action should be much more helpful.

Problem is, in the ensuing last 15 years or so, MRI scanning has developed very rapidly. And there are sequences or scan types that can be done in a session with MRI that have been developed to be specifically sensitive to

Case 3:16cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 519 of 536
Case 3:08-cv-00134-RJC    Document 225-7    Filed 01/30/11    Page 123 of 140
**JA3356**

778

old effects of head injury.

There are sequences that are specifically designed and can pick up what's called hemosiderin, old blood that might be in the head.  If there's been damage or stretching to the white matter, which is what diffuse axonal injury means, that they have very characteristic patterns on an MRI.

And this is why the American College of Radiology makes recommendation.  They charge for all these studies.  They do all these things that they've looked to evaluate the evidence from research as to what kinds of scans are best for what purposes.

And it's generally recommended and it's pretty routine that if you really looking for subtleties from an old brain injury, your best chance of being confident of seeing an old injury is to do an MRI scan with these special sequences.

Q.    Under any circumstances though, can a PET scan tell you what somebody's thinking?

A.    Well, again, the short answer is no.  I mean, it's telling you, if you control what they're thinking.  If you have people do a task.  If you say I want you to do this specialized psychological test while I'm doing the scan, than the scan will reflect that particular test.

But to turn it in reverse and say, I didn't give you instructions but I know you were thinking at the time.  I mean, it's not a mind reader.

Case 3:16-cv-00057-MOC    Document 59-7    Filed 03/23/17    Page 520 of 536
Case 3:08-cv-00134-RJC    Document 225-6    Filed 01/30/11    Page 224 of 140

**JA3357**

779

Q.   Dr. Merikangas' general conclusions were that the defendant can't control his conduct.  That he's controlled by others.  And that he's lead easily based upon his reading of these materials.

A.   Well, that's just an impossibility.  You can make no inferences about anybody's proclivity in the past, in the future, even at the present time from the scan.

I mean, you may have some opinions.  One can have an opinion about someone's behavior from interviewing them. But the scans give you no information to that regard in any way, shape or form.

Q.   And again, you saw no brain damage in either the CT scan or the PET scan?

A.   I think these are normal studies.

MS. ROSE:  Thank you.  I don't have any other questions?

THE COURT:  Any cross?

MR. BRYSON:  Yes.

CROSS-EXAMINATION BY MR. BRYSON:

Q.   Your primary practice or what you focus on is depression; is that correct?

A.   Yes.

Q.   And you are developing a technique to combat depression where what electrodes are inserted into a person's brain?

A.   That's something I do, yes.

Laura Andersen, RMR 704-350-7493

**JA3358**

780

Q.   Okay.  And you do not treat patients with traumatic brain injury?

A.   Well, at the present time I'm -- my practice is predominantly research.  But as a neurologist, over the last -- and I finished my training in 1985, I've certainly treated many people with traumatic brain injury, and have ordered tests, evaluated them, and I've consulted people in terms of --

Q.   But that's not your specialty though?

A.   No, not my specialty no.

Q.   In fact, you said you're not a radiologist, correct?

A.   No, I'm not a radiologist, I'm a neurologist.

Q.   Now in this case, this PET scan was read by a radiologist, correct?

A.   Correct.

Q.   Dr. Shah?

A.   Correct.

Q.   And Dr. Shah has not been retained by any -- excuse me.  Dr. Shah has not been retained by anybody in this case has he?

A.   I have no idea.

Q.   Okay.  Well, you spoke with him?

A.   Yes.  I didn't ask whether or not he was testifying or not.

Q.   Okay.

                    Laura Andersen, RMR 704-350-7493

**JA3359**

781

A.   Or if he had been retained.  He said he had done the scan.  He didn't actually seem to know that Mr. Umana was actually on trial.

Q.   Okay.

A.   Because it actually wasn't in his report.

Q.   Right.  He was just the guy who was working that day that this PET scan was read, correct?

A.   It would appear to be, yes.

Q.   Okay.  Now you have been retained, correct?

A.   Yes, I have.

Q.   The government is paying you to be here?

A.   Yes, they are.

Q.   You get $500 an hour?

A.   Yes, I do.

Q.   And you've testified in many, many criminal cases before?

A.   Yes, I have.

Q.   You always have testified for the government?

A.   Generally speaking, yes.

Q.   I mean, you always have testified for the government?

A.   Testified, yes.

Q.   Thank you.

A.   Consulted, no.  But you're correct.

Q.   And you disagree with Dr. Shah's reading of the PET scan?

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 523 of 536
Case 3:08-cr-00134-RJC   Document 1257   Filed 01/30/11   Page 127 of 140
**JA3360**

782

A.    Yes, I do.  And in speaking with Dr. Shah, he let me know that he didn't compare it to any normal controls.

Q.    Right.

A.    And --

Q.    He's a radiologist, correct?

A.    Correct.

Q.    And it's his job to read these PET scans, correct?

A.    Yes, it is.

Q.    And he issued a report in this case.

A.    Yes, he did.

Q.    And he stated his opinion.

A.    Yes he did.

Q.    And he found this to be an abnormal PET scan.

A.    Yes, mildly abnormal, yes.

Q.    In various parts of the brain.

A.    That's what he said, yes.

Q.    And have you reported Dr. Shah to the North Carolina medical board?

A.    No.  Why would I?

Q.    Well, you just said that he's misread this PET scan.

A.    No, that's not what I said.  I said, my opinion is this is normal.  And given the information that I obtained.  And in the absence of being able to tell if this is normal variability or not, we disagree on the interpretation.

Q.    Okay.  But then again, he is the radiologist.

Laura Andersen, RMR 704-350-7493

**JA3361**

783

A.    Yes, he is.

Q.    Now, you said you would not order a PET scan if you wanted to know if someone had suffered from head trauma, correct?

A.    It's not -- doesn't have a recognized pattern to be specific to head trauma.  And in the absence of an MRI, any finding I had, couldn't be attributed to the head trauma anyway.  So it wouldn't be helpful in and of itself.

Q.    Well, it does show brain function, correct?

A.    Yeah.  But brain function can differ depending on if you're actually -- had some coffee, had a cigarette.  I mean brain function is quite sensitive and would be variable to those conditions.  It really has no specificity, particularly, this kind of finding, to head trauma at all.

Q.    You're familiar with the publication or actually it's a book, I guess, Guide To Neuropsychiatric Therapeutics, by C. Edward Coffey?

A.    I'm not familiar with the particular book, but I know Dr. Coffey well.

Q.    Okay.  Is there a chapter in the book by Robin Hurley that says that "PET", PET scan "is used in the evaluation of many neurological conditions, particularly epilepsy, central nervous system malignancies, head trauma and cerebrovascular disease"; isn't that correct?

A.    Well, I don't know the book, and I'm listening to what

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 525 of 536
Case 3:08-cv-00134-RJC   Document 285-7   Filed 01/30/11   Page 129 of 140
JA3362

784

you say.  That's one person's opinion in a book.  I can't comment, I don't know the year.

Q.   Well, your opinion that PET is not as good as MRI, is disagreed with by other doctors; isn't that correct?

A.   Well, again, I would like to know the year to be able to answer your question.  I mean --

Q.   It was 2000 --

A.   -- people.

Q.   I'm sorry.  Go ahead.

A.   I was just going to expand that how people use these. I'm actually basing my opinion based on the published literature telling me how sensitive and specific a test is for a given diagnosis.  And what data has been generated and published to show the reliability of the test for that diagnosis.

The fact that people with head injury can have abnormalities, is certainly true.  Whether or not you use it when you don't have the documentation of the injury, and it's done very remote in time, that is not something that's generally accepted.

So I need to see the details of Dr. Hurley's opinion in the book to know how it's relevant to this particular case.

So it really depends on the nature of the question with head injury and it's not a general opinion.

Q.   All right.  Are you familiar with publication in the

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 526 of 536
Case 3:08-cv-00134-RJC   Document 229-7   Filed 01/30/11   Page 30 of 140
**JA3363**

785

Journal of Neuropsychiatry Clinical Neuroscience, Winter, 2007. An article entitled, "Recent Neuroimaging Techniques in Mild Traumatic Brain Injury", by H.G. Belanger, R.D. Vanderploeg, G. Curtiss and D.L. Warden?

A.   No.  I need more information than that.

Q.   You don't need more --

A.   I don't know the paper.

Q.   Okay.  Didn't they conclude that "PET studies have consistently found abnormalities that have significant clinical correlates and are demonstrated in those with normal MRI/CT scans"?

A.   Well, again, I need to see the paper.  See the nature of the study they did.  Again, I'm speaking to, not a given research study with well-characterized patients where you document the time of injury and you do the other studies to know how clinical signs and symptoms relate to the scans.

I'm talking about the general use, where a first line scans is a PET scan done when you suspect head injury that's 20 years old.

I don't believe that without -- even without seeing the paper that that paper is discussing purported head injury from a remote past with no documentation about any of the clinical features of the disease.

Q.   Okay.  But you're giving your opinion and you're saying it's based on published literature, correct?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 527 of 536
Case 3:08-cv-00134-RJC   Document 225-7   Filed 01/30/11   Page 131 of 140
**JA3364**

786

A.   I'm talking about the general accepted -- there is no published study demonstrating the sensitivity and specificity of an FDG PET scan to diagnose or confirm traumatic head injury in the past.

As it's being used here, there is no scientific evidence that it's reliable to confirm that diagnosis as it's being used in this case.

Am I saying that there are not studies about traumatic head injury in people who have funny symptoms after being in a car accident and you study them and the PET scan is abnormal and the MRI is normal; sure there are cases like that and papers like that.

That's very different from sending someone from a scanner, not having documentation of whether or not they were injured; what the degree of the injury was; when it exactly was; were the findings that you see at the present time related to that or not.

There's not a paper like that that shows that's how we use PET scans.  That's what I'm testifying to.

Q.   In the Journal of Head Trauma Rehabilitation, June 2001, in an article entitled, "Quantitative PET Findings in Patients with Post-traumatic Anosmia".  N.R. Varney, J.B. Pinkston and J.C. Wu, stated that their "Findings also underscore the value of functional neuroimaging, quantitative" P-E-T, "PET in particular, as a useful adjunct

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 528 of 536
Case 3:08-cv-00134-RJC   Document 92-7   Filed 01/30/11   Page 132 of 140
JA3365

in the evaluation of chronic head injury".

A.    So that's a single case in someone that had well-documented head injury, to the point that they loss their sense of smell.  Which means there's damage to the front of their frontal lobe and stretching of the olfactory nerve.  They studied that person after exhaustive neuropsych testing because they had all kinds of problems and found a correlation.

I want to make it very clear what my opinion is.  I'm basing my opinion on -- there are ways in which one verifies.  How do I know that this is useful for a brain tumor or epilepsy or Alzheimer's.

They took people that had well-characterized disease described by the researchers.  They knew they had that diagnosis, no question.  No one was debating it.  They did the scans.

They then found a statistically difference in people with that disease compared to healthy controls, as I described.

Then they went back and they verified that a given doctor could actually look at the scans and see the scan pattern that the research had verified.

And they discovered that even in people who had epilepsy, only 80 out of 100 times do you actually see the abnormal scan when they have the problem.  That's called

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 529 of 536
Case 3:09-cv-00134-RJC   Document 229-7   Filed 01/30/11   Page 133 of 140
JA3366

788

determining the sensitivity and the specificity of the test. For the diagnosis.

All I'm saying is, for the purpose of doing the PET scan to say, I think the brain is abnormal. And I think in any event, without comparing it to any healthy controls, you can't say it's abnormal in the absence of healthy controls, if you don't have a diagnosis in which you know the scan pattern to expect.

And traumatic head injury in the remote past has never been put to the test that I've said. There's no published paper that talks about sensitivity and specificity of FDG PET scanning to diagnose remote effects of head injury using that criteria. And that's the criteria I'm using here.

I don't know if the defendant had a significant head injury that's been described. There's no hospital records. He has a scar on his forehead. A scar on his forehead, I might at least expect some findings in the frontal lobe which we don't have.

I don't have an abnormal exam that points to any particular area of the brain to help me.

MR. BRYSON: I'll object as narrative at this point and nonresponsive.

THE COURT: I'll sustain the objection to the narrative form; ask you to ask your next question.

Q.   (By Mr. Bryson) In PET study that I was asking you

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 530 of 536
Case 3:08-cv-00134-RJC   Document 59-7   Filed 01/30/11   Page 534 of 140
**JA3367**

789

about, they also found, "In this regard, present findings support the conclusion that functional neuroimaging is more informative in traumatic brain imaging than CT or MRI"; isn't that correct?

A.    That's in that case.

Q.    Okay.

A.    That's what they found.

Q.    But that's a published study, correct?

A.    A published study does not speak to the generalizability of test.  That's a published study that someone would need to replicate.

And again, I was using the criteria of how do practicing radiologists decide that a scan is normal/abnormal, and to assign the differential diagnosis of what they think it's due to.

And what paper do they point to that says what degree of certainty can they know that this finding is related to that diagnosis or not.  That's all I'm saying.

Q.    All right.  A Lance Neurological Journal, August 2007, Z. Metting, L.A. Rodiger, J. DeKeyser, J. Van der Naalt. Article, "Structural and Functional Neuroimaging in Mild-to-Moderate Head Injury".  "In general SPECT" S-P-E-C-T, "and PET seem to be more sensitive in lesion detection comparted with structural imaging techniques such as CT and MRI".

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 531 of 536
Case 3:08-cv-00134-RJC   Document 235-7   Filed 01/30/11   Page 135 of 140
JA3368

790

A.    Again, "seem to be" is not quantitative to me.  I'm looking for general recommendations that are offered by learned bodies and not individual papers.

I grant you, there are papers that in those patients that they studied show variations.  I have no idea if those kinds of patients are in any way, shape or form comparable to Mr. Umana, and circumstances of this case.  So true, true and unrelated.

Q.    You yourself have used PET to diagnose depression?

A.    No.  I guess you misunderstood my testimony.

I do research to try to study the brain in groups of patients who have depression.  If I want to know if someone's depressed, I will do an interview.

We have not yet determined a scan pattern in the same way I'm speaking of, that is reliable, that in the absence of an exam, to diagnose depression.

I can have people who are depressed have overactive frontal lobes.  I can have patients who are depressed have underactive frontal lobes.  So which pattern is it; overactive/underactive?

It's not helpful, doesn't have a reliable pattern to diagnose that problem.  I don't use it for diagnosis.

Q.    You don't use it for diagnosis?

A.    Correct.

Q.    Okay.  In 1990, did you co-author a paper entitled,

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-000573-MOC    Document 59-7    Filed 03/23/17    Page 532 of 536
Case 3:08-cv-00134-RJC    Document 2257    Filed 01/30/11    Page 536 of 140
**JA3369**

791

Mania After Brain Injury:  Neuroradiological and metabolical findings -- Metabolic Findings?  Excuse me.

A.    Yes, I did.

Q.    And in that, did you not use a PET scan and write that the results of the PET scan suggested "a major role for the basal region of the right temporal lobe in the modulation of mood"?

A.    I did.  Let me explain what I did, because that wasn't used for diagnosis.

We took people who had documented injury.  They had abnormalities on their CT scans with isolated dead brain in the right side deep in their brain.

We wanted to know how that lesion in the brain on CT affected metabolism that might help us understand why those people with those strokes developed mania after their strokes.

And so we did FDG pet scans to investigate it.  And we found that they had big changes in their metabolism in addition to the structural lesion in the brain.  And that's what we reported.

We didn't use it to diagnose their mania.  We didn't use it to diagnose their head injury.  We knew they had head injuries.  And they developed problems they didn't have before the head injury, namely mania.  They developed the mania after they damaged their brain.  And we wanted to

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 533 of 536
Case 3:08-cv-00134-RJC   Document 225-6   Filed 01/30/11   Page 137 of 140
JA3370

Appeal: 10-6   Doc: 90-7    Filed: 08/14/2013    Pg: 534 of 536

792

understand how the metabolism was affected.

I can't use the scan then and say, gee, if your temporal lobe is down, you must have mania.  You must have had a head injury.  That's not what our paper said.

Q.   Did you write a paper in 2007 entitled, The Role of Neuroimaging in United States Courtrooms, in which you said, "In sum, neuroimaging evidence has become an increasingly important tool of proof in criminal and civil cases in the United States.  Although subject to constraints of reliability and relevance, results of neuroimaging scans can and do help courts to understand the nature, causes, and behavioral implications of injuries to the brain"?

A.   Could you give me the title of that paper?

Q.   "The Role of Neuroimaging In United States Courts"?

A.   What journal is that in?

Q.   Neuroimaging Clinical North America.

A.   What year do you have that journal?

Q.   2007?

A.   Oh, you said 1997.

Q.   2007.

A.   Yes.  That was a paper that talked about MRI and PET, but made very explicit statements in a setting of well-characterized injury.

MR. BRYSON:  Those are my questions.

THE COURT:  Any redirect?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 534 of 536
Case 3:08-cv-00134-RJC   Document 225-6   Filed 01/30/11   Page 138 of 140

**JA3371**

793

MS. ROSE:  No.  I would just -- I will mark as an exhibit, Dr. Mayberg's CV and ask to admit that.

THE COURT:  What number are you giving it?

And any objection?

MS. ROSE:  581.

THE COURT:  Any objection to the CV?

MR. BRYSON:  No.  No.

THE COURT:  Let it be admitted.

(Government Exhibit 581 was received into Evidence.)

MS. ROSE:  I have no other questions.  Thank you.

THE COURT:  You may step down and be excused.

Call your next witness.

MS. ROSE:  The government has no other witnesses, Your Honor, in rebuttal.

THE COURT:  Members of the Jury, we are going to take our lunch recess at this time, and the same admonitions are in place and we will see you at 2:00.

(The jury was escorted from the courtroom.)

THE COURT:  Need to meet with the lawyers in chambers do you want to do that immediately, or do you want to take a 15 minute break; do it either way.  Why don't we meet at 1:15.

Stand in recess.  I'll see the lawyers in chambers at 1:15.

(A brief recess was taken in the proceedings.)

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 59-7   Filed 03/23/17   Page 535 of 536
Case 3:08-cv-00134-RJC   Document 229-7   Filed 01/30/11   Page 139 of 140
JA3372

794

* * * * * *

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER


        I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

        Dated this the 28 day of April, 2010.


                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

                Laura Andersen, RMR 704-350-7493

**JA3373**