No.  10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix
Volume 8 of 11**

VINCENT J. BRUNKOW
ZANDRA L. LOPEZ
JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467
Attorneys for Defendant-Appellant

-and-

MALCOLM RAY HUNTER, JR.
Attorney at Law
P.O. Box 3018
Chapel Hill, N.C. 27515-3018
Telephone:  (919) 929-9655

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

iii

Defendant's Reply to Government's Response to Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence Before Allowing Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . . . 1202

    Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

    Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

        By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
        By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne                 Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet         Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette   Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn           Direct Examination . . . . . . . . . 1239

    J.E. Brown                Direct Examination . . . . . . . . . 1243

    Frank Flores            Direct Examination . . . . . . . . . 1247
                              Voir Dire Examination . . . . . . . 1255
                              Redirect Examination . . . . . . . . 1257
                              Cross Examination . . . . . . . . . . 1316

    Charles Barkley          Direct Examination . . . . . . . . . . 1332
                              Cross Examination . . . . . . . . . . 1338

Jeff Bruner .......................... Direct Examination .......... 1339

Eduardo Vasquez .................. Direct Examination .......... 1344

Lenny Moriera ..................... Direct Examination .......... 1352
                                     Cross Examination .......... 1369

John Sloane ........................ Direct Examination .......... 1371
                                     Cross Examination .......... 1391

Gene Richey ........................ Direct Examination .......... 1391

Juan Ruben Vela Garcia ......... Direct Examination .......... 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) ................................... 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341) ........................... 1485

Juan Ruben Vela Garcia ......... Direct Examination .......... 1492
                                     Cross Examination .......... 1498
                                     Redirect Examination ........ 1529

Officer James K. Griffen ......... Direct Examination .......... 1530

Ann Hamlin ......................... Direct Examination .......... 1537

T.J. Miller ........................... Direct Examination .......... 1544
                                     Cross Examination .......... 1566

Marie Terrell ....................... Direct Examination .......... 1570
                                     Cross Examination .......... 1576

v

Officer Benjamin Altizer    Direct Examination . . . . . . . . . . 1576
                            Cross Examination  . . . . . . . . . 1584

Officer Ryan Dutko          Direct Examination . . . . . . . . . 1586

Abel Santos                 Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos                 Cross Examination  . . . . . . . . . 1644

Marco Antonio Guzman Mejia  Direct Examination . . . . . . . . . . 1651
                            Cross Examination  . . . . . . . . . . 1663

Teresa Ketner               Direct Examination . . . . . . . . . . 1666
                            Cross Examination  . . . . . . . . . . 1703
                            Redirect Examination  . . . . . . . . 1705

Barry Whitlow               Direct Examination . . . . . . . . . . 1707

John D. Butts               Direct Examination . . . . . . . . . . 1715
                            Cross Examination  . . . . . . . . . . 1733

James Cayton                Direct Examination . . . . . . . . . . 1735

Amy Wilde                   Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342)  . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde                   Direct Examination . . . . . . . . . . 1765
                            Cross Examination  . . . . . . . . . . 1773

Doreen Huntington           Direct Examination . . . . . . . . . . 1780
                            Cross Examination  . . . . . . . . . . 1797

Susan Conrad         Direct Examination . . . . . . . . . . 1804
                                   Cross Examination   . . . . . . . . . . 1840

Jeff Strohm         Direct Examination . . . . . . . . . . 1846
                                   Cross Examination   . . . . . . . . . . 1851

Officer Renee Quiles         Direct Examination . . . . . . . . . . 1851
                                   Cross Examination   . . . . . . . . . . 1856

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1856

## VOLUME 5 (1900 - 2390)

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)   . . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1903
                                   Cross Examination   . . . . . . . . . . 1953
                                   Redirect Examination . . . . . . . . 1987
                                   Recross Examination . . . . . . . . . 1988

William Chuck Hastings         Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)   . . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings         Direct Examination . . . . . . . . . . 2034
                                   Cross Examination   . . . . . . . . . . 2044

Alexandra Hirsch         Direct Examination . . . . . . . . . . 2049
                                   Cross Examination   . . . . . . . . . . 2054

Michele Scheuerman         Direct Examination . . . . . . . . . . 2055
                                   Cross Examination   . . . . . . . . . . 2064

Gene Rivera         Direct Examination . . . . . . . . . . 2065
                                   Cross Examination   . . . . . . . . . . 2086

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 8 of 350

Andrew Cheramie                 Direct Examination . . . . . . . . . . 2090
                                Cross Examination  . . . . . . . . . 2095

Jose Romero                     Direct Examination . . . . . . . . . . 2095

Alexander Granados              Direct Examination . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . 2133


Alexander Granados              Direct Examination . . . . . . . . . . 2136
                                Cross Examination  . . . . . . . . . 2138
                                Redirect Examination  . . . . . . . . 2158

Maricruz Medina                 Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie               Direct Examination . . . . . . . . . . 2166

Chris Tyndall                   Direct Examination . . . . . . . . . . 2173
                                Cross Examination  . . . . . . . . . . 2190

Mark Young                      Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson         Direct Examination . . . . . . . . . . 2208
                                Cross Examination  . . . . . . . . . . 2213
                                Redirect Examination  . . . . . . . . 2213
                                Recross Examination . . . . . . . . . 2215

Jeffrey Taylor                  Direct Examination . . . . . . . . . . 2216
                                Cross Examination  . . . . . . . . . . 2247
                                Redirect Examination  . . . . . . . . 2254

Denise Daniels                  Direct Examination . . . . . . . . . . 2255
                                Cross Examination  . . . . . . . . . . 2257

viii

William Chuck Hastings          Direct Examination . . . . . . . . . . 2259
                                Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

Sergeant Scott Clarkson          Direct Examination . . . . . . . . . . 2323
                                 Cross Examination  . . . . . . . . . . 2330

Denise Daniels                   Direct Examination . . . . . . . . . 2332
                                 Cross Examination  . . . . . . . . . . 2333

Jeffrey Taylor                   Direct Examination . . . . . . . . . . 2333
                                 Cross Examination  . . . . . . . . . . 2356
                                 Redirect Examination  . . . . . . . . 2359

William Chuck Hastings           Direct Examination . . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258)  . . . . . . . . . . . . . . . . . . . . . . . . . 2391

Closing Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

By the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
Rebuttal by the government  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

Jury Instructions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . . . 2540

    Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
    Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
    Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
    Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

    Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . . 2559

    Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

    Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

    Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

        By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
        By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

        Ismar Sanchez                Direct Examination . . . . . . . . . . 2574
                                    Cross Examination . . . . . . . . . . 2584
                                    Redirect Examination . . . . . . . . 2590

        David Henderson           Direct Examination . . . . . . . . . . 2590

x

Carlton Phoenix                  Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . 2648

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

        Thomas Small              Direct Examination . . . . . . . . . . 2651
                                  Cross Examination . . . . . . . . . . 2677

        Roberto Ramos             Direct Examination . . . . . . . . . 2680
                                  Cross Examination . . . . . . . . . . 2694

        Juan Lara                 Direct Examination . . . . . . . . . . 2699
                                  Cross Examination . . . . . . . . . . 2706

        Raffi Djabourian          Direct Examination . . . . . . . . . . 2709
                                  Cross Examination . . . . . . . . . . 2715

        John Maloney              Direct Examination . . . . . . . . . . 2716
                                  Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall                Direct Examination . . . . . . . . . . 2730
                                                      Cross Examination . . . . . . . . . 2756
                                                      Redirect Examination . . . . . . . . 2781

        Barry Telis                     Direct Examination . . . . . . . . . . 2784
                                                         Cross Examination . . . . . . . . . . 2798
                                                       Redirect Examination . . . . . . . . 2803

        William Moore              Direct Examination . . . . . . . . . . 2806
                                                         Cross Examination . . . . . . . . . . 2820
                                                       Redirect Examination . . . . . . . . 2822

        Susan Selser                 Direct Examination . . . . . . . . . . 2822

        J. Sage                        Direct Examination . . . . . . . . . . 2838
                                                       Cross Examination . . . . . . . . . . 2842

        L. Goodman              Direct Examination . . . . . . . . . . 2843
                                                     Cross Examination . . . . . . . . . . 2844

        A. Thornwell              Direct Examination . . . . . . . . . . 2846
                                                     Cross Examination . . . . . . . . . . 2851

## VOLUME 7 (2857 - 3373)

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

xii

Carlos Alfredos
Dominguez Gonzalez      Direct Examination . . . . . . . . . . 2874
                        Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper        Direct Examination . . . . . . . . . 2902
                        Cross Examination  . . . . . . . . . . 2908

Luis Amaro              Direct Examination . . . . . . . . . . 2911
                        Cross Examination  . . . . . . . . . . 2917

Russell Lashley         Direct Examination . . . . . . . . . . 2919
                        Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez  Direct Examination . . . . . . . . . . 2930
                        Cross Examination  . . . . . . . . . . 2931
                        Redirect Examination  . . . . . . . . 2935
                        Recross Examination . . . . . . . . 2936

Douglas Friend          Direct Examination . . . . . . . . . . 2938
                        Cross Examination  . . . . . . . . . . 2944

Jean Garcia             Direct Examination . . . . . . . . . . 2946
                        Cross Examination  . . . . . . . . . . 2952

Carmen Garcia           Direct Examination . . . . . . . . . . 2953
                        Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia        Direct Examination . . . . . . . . . . 2959
                        Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2975

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham     Direct Examination . . . . . . . . . . 2986
             Cross Examination  . . . . . . . . . . 3050

Richard McGough     Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260)  . . . . . . . . . . . . . . . . . . . . . . . 3096

  Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

    Richard McGough     Direct Examination . . . . . . . . . . 3099
               Cross Examination  . . . . . . . . . . 3157

    Selena Sermeno     Direct Examination . . . . . . . . . . 3167
               Cross Examination  . . . . . . . . . . 3189
               Redirect Examination  . . . . . . . . 3203

    Maria Santacruz Geralt   Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350)  . . . . . . . . . . . . . . . . . . . . . . . 3234

  Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

    Maria Santacruz Geralt   Voir Dire Exam. by Defendant  . . . 3237
               Voir Dire Exam. by Government . . 3250
               Direct Examination . . . . . . . . . . . 3256
               Cross Examination . . . . . . . . . . . 3263

    Mark Bezy      Direct Examination . . . . . . . . . . . 3276
               Cross Examination . . . . . . . . . . . 3289

James R. Merikangas,
Ph.D.                            Direct Examination . . . . . . . . . . . . 3294
                                 Cross Examination  . . . . . . . . . . . . 3317

        Government's Rebuttal Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

        Helen Mayberg            Direct Examination . . . . . . . . . . . . 3336
                                 Cross Examination  . . . . . . . . . . . . 3358

## VOLUME 8 ( 3374 - 3704)

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . . . 3374

        Defendant's Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

             Richard McGough        Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

xv

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

## VOLUME 9 (3705 - 4209)

## EXHIBITS

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3,  School Records . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home  . . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael  . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia  . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D.  . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana  . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana  . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez  . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez  . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 18 of 350

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 19 of 350

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:08-CR-134-2 |
| | ) | |
| vs. | ) | VOLUME V-B |
| | ) | AFTERNOON SESSION |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 27, 2010

APPEARANCES:

On Behalf of the Government:

    JILL WESTMORELAND ROSE
    ADAM MORRIS
    United States Attorney's Office
    100 Otis Street
    Asheville, North Carolina 28801

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue, NW
    Washington, DC 20530

On Behalf of the Defendant:

    MARK P. FOSTER
    Law Offices of Mark Foster, PC
    1011 East Morehead Street, Suite 300
    Charlotte, North Carolina 28204

    JOHN DAVID BRYSON
    Wyatt Early Harris & Wheeler, LLP
    P.O. Box 2086
    High Point, North Carolina 27261

          CHERYL A. NUCCIO, RMR-CRR
      United States District Court Reporter
        Charlotte, North Carolina

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 20 of 350
Case 3:08-cr-00134-RJC   Document 59-8   Filed 03/24/17   Page 20 of 32

JA3374

TUESDAY AFTERNOON, APRIL 27, 2010

(In chambers with the court and counsel.  Defendant not present.)

THE COURT:  Have you had a chance to look at the instructions and are there any initial objections to the general instructions?

MR. FOSTER:  We must confess, we haven't had time to look at it carefully because we've been scrambling to get witnesses and things like that.

THE COURT:  Here's the one substantive issue that I have and I've wrestled with this.  Counts twenty-two and twenty-four provide for two options:  The death penalty or life without parole.  Counts twenty-three and twenty-five, the actual language of the statute is a sentence of death or a sentence of up to life.  Doesn't mandate imposition of a life sentence.  And so the way I've composed these instructions is in line with that statute.  And so you'll see that indicated first on page 1, carry over 2.

MR. FOSTER:  I'm sorry, where are you, Your Honor?

THE COURT:  Page 1 of the proposed penalty phase or selection phase instructions.  Starting at the section -- the first paragraph talks about just death or life without parole.  The second paragraph talks about counts twenty-three and twenty-five, which is the 924(j) -- or 924(c) -- I guess it's (j).  And it says up to life without the possibility of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 21 of 350
Case 3:08-cr-00134-RJC   Document 53-8   Filed 03/24/10   Page 24 of 82
JA3375

release which the court will decide.

The instructions for these counts are the same except that the court will determine the length of sentence if you decide that a sentence of death is not justified.

And so (j) says a person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm shall, if the killing is a murder, be punished by death or by imprisonment for any term of years or for life.  That's the language of the statute.

MR. FOSTER:  I guess, as a practical matter, it's kind of a moot point because on the other two counts he's got to get life without parole no matter what.  I guess the court's instructions have to be accurate.

THE COURT:  And you can have inconsistent verdicts. And so my -- you know, theoretically you could have...

My concern is that if I instruct the jury that way hearing a sentence other than life, they would be motivated to impose a sentence of death and that would be an improper motivation.

MR. FOSTER:  Yes.

MR. BRYSON:  Also, it sends a mixed message that we've been telling them the whole time that these are the only two options.

THE COURT:  The alternative to doing it as I proposed is to engage in a legal fiction of the two options

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 22 of 350
Case 3:08-cr-00573-RJC   Document 52-8   Filed 03/24/17   Page 23 of 352
**JA3376**

being only the options of death or life without the possibility of parole, which would avoid the concern for an unconstitutional purpose in imposing the death penalty.

MR. FOSTER:  We would be fine with that, Your Honor.

THE COURT:  Do you all object to that?  So I would --

MS. ROSE:  Your Honor, turning cocaine into pot, basically, is legal fiction.

THE COURT:  I hope I'm not doing that.  That will be reserved for another day.

But I would instruct on all the counts as I did in the first paragraph.  So I'd just take out the second paragraph.  Then I would revise the verdict form.

MS. ROSE:  I think that is the safest thing to do.

THE COURT:  I do too.  And do the parties agree to doing it that way?

MR. FOSTER:  Yes.

MR. BRYSON:  Yes.

THE COURT:  All right.

MS. ROSE:  It does say -- I remember reading it somewhere that they should still consider the aggravators that they have already found.

THE COURT:  Yes, it does say that.

MR. FOSTER:  What page is that on?

MS. ROSE:  Well, it says you've already found them.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 23 of 350
Case 3:08-cr-00734-RJC   Document 52-8   Filed 06/24/10   Page 23 of 32
JA3377

It doesn't specifically say -- I mean, I think it's important -- it's on draft page 2 of the instructions. Just because those have been previously found does not mean that they can -- that they're precluded from continuing to consider them in this weighing process.

THE COURT: I do say at the end of the paragraph on two, you're not required to find additional aggravating factors in order to impose a sentence of death.

MR. NAZZARO: I think we're suggesting maybe you may rely solely on those if you find that they outweigh any mitigating.

THE COURT: On seven I say the United States has alleged several aggravating factors in this case. During the eligibility stage you found unanimously two statutory aggravating factors, and I spell them out.

MS. ROSE: Right, but it still doesn't tell them that they're allowed to consider those in this weighing process, and certainly we're going to argue that and it is an important part.

THE COURT: Let's see what I say on the weighing part of it. I have separate instructions on the weighing.

MR. FOSTER: Where was the section we were just on? I got lost.

MS. ROSE: Seven.

THE COURT: Page 7.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 24 of 350
Case 3:08-cv-00573-RJC   Document 52-8   Filed 03/24/10   Page 24 of 32
JA3378

MR. FOSTER:  I'm sorry.

THE COURT:  On page 13 I discuss the weighing process.

After "found to exist" I could add that, including the two statutory factors you have already found in the eligibility phase.  Do you all see where -- page 13 at the end of the second sentence.  I said, In this process you must consider only those aggravating factors that you unanimously found to exist.  I would insert:  Including the two statutory aggravating factors you found in the eligibility phase of the trial.

Any objection?

MR. BRYSON:  No.

THE COURT:  Does that do it for the government?

MS. ROSE:  Yes, sir.

THE COURT:  All right.  Any other additions or deletions with respect to the instructions before we consider the defendant's request for instructions on mitigating factors?

MS. ROSE:  I don't see that.

MR. BRYSON:  We don't need to reobject to the aggravators that are present because we already litigated those.

THE COURT:  No.

MR. BRYSON:  Okay.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 25 of 350
Case 3:08-cr-00134-RJC   Document 52-8   Filed 03/24/17   Page 25 of 32
JA3379

THE COURT:  You have that for the record.

Government object to any of the proposed mitigating factors?

MS. ROSE:  Yes.  Number 6, Department of Justice.

MR. MORRIS:  I think there's also, both six and seven, factors one through five are the factors that they're talking about.

THE COURT:  I'm going to strike six and --

MR. FOSTER:  Would it matter if we took out the words "Department of Justice?"  Is that the issue?

THE COURT:  It's sort of duplicative on six and seven.  And I'm -- I propose to insert the word "risk" before "factors" in seven.  To take out six and insert "risk" before "factors."  But I'll be glad to hear from you on that.

MR. BRYSON:  Well, on six -- I think six and seven come both from Dr. Sermeno and I just think that's what her testimony was.  And we saw it as two different things.  One is risk factors that increased his risk to violence and the other one was factors that lessened his ability to develop morally.

MR. NAZZARO:  She only testified about the moral aspect.

MR. BRYSON:  That was the first part of her testimony.

THE COURT:  What I'm proposing to do is to reconsider that and to amend six, take out "have been

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 26 of 350
Case 3:08-cr-00573-RJC   Document 932   Filed 03/24/10   Page 7 of 82
JA3380

identified by the Department of Justice" and replace it with "that increase the risk of criminal activity later in life." Changing -- deleting from "have" through "as," changing "increasing" to "increase."

MR. BRYSON:  All right.  Marked by many factors that --

MR. FOSTER:  Increase the risk of criminal activity later in life.

MR. BRYSON:  Okay.

MR. FOSTER:  Okay.

THE COURT:  And leave seven as is.

What says the government?

MS. ROSE:  "May increase."

THE COURT:  You want "may?"

MS. ROSE:  (Affirmative nod.)  "Marked by many factors that may increase."

THE COURT:  Do you all object to that?

MR. BRYSON:  Yeah.

THE COURT:  Instead of "increase," I should put "increased."

MR. MORRIS:  So "may have increased."

MR. FOSTER:  Well, if they find it, then aren't they finding that the factors did --

THE COURT:  I'm not going to put "may" in there. I'm just going to instruct as is.  "Factors that increase the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 27 of 350
Case 3:08-cr-00734-RJC   Document 53-8   Filed 08/24/10   Page 27 of 32

JA3381

risk of criminal activity later in life."  They may find it didn't.

What other mitigating factors does the government object to?

MR. MORRIS:  Number 10.  In the sentencing phase there hasn't been any further evidence about the murder for one thing.  And that applies to number 11 as well.  The emotionally charged argument was the defense's position with respect to him not being a vicar at the guilt phase.

MR. BRYSON:  We're allowed to rely on evidence from the first phase of the trial just like you guys do.

MR. MORRIS:  Not evidence that's inconsistent, Your Honor, in the government's view, inconsistent with the verdict.  I believe that statement is inconsistent with the verdict.

MR. FOSTER:  I don't think it's inconsistent with the verdict.  I mean, you can still have both.  You can have what the jury found, that this was an intentional killing to further his position in the gang, yet nevertheless it still happened during an emotionally charged argument.  They're not mutually exclusively.

THE COURT:  I'll -- I'll instruct on both 10 and 11.

MS. ROSE:  Twelve is going a long way.  There wasn't any evidence that he was -- as to indoctrination into the ways and thinking of MS 13.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 28 of 350
Case 3:08-cr-00134-RJC   Document 1329   Filed 08/24/10   Page 28 of 32
JA3382

THE COURT: I think there's sufficient evidence that the jury could find that. I'll instruct on that.

I don't intend to instruct on either 13 or 14.

MR. BRYSON: And we knew you'd already essentially ruled on 13, but we just put it in there for the record.

THE COURT: Okay. I don't intend to instruct on 14. I don't think that that is relevant, history and characteristics are circumstances of the offense mitigating factor.

MS. ROSE: Fifteen is a matter of law.

MR. MORRIS: I don't think the jury cannot find 15, Your Honor. It's a -- it's already mentioned at least five or six times in the preliminary instructions.

MR. FOSTER: I've seen it in another capital MS 13 case where the court in those exact words granted the defense use of it as a mitigating factor. And actually, it went to the jury and eight jurors found --

THE COURT: It's kind of a circular reasoning. If you find a mitigating factor, the result is that it's life without the possibility of release. So to find that as a mitigator and the result, it does seem to be very confusing.

MR. FOSTER: Well, it's sort of the same thing that happens with the first aggravating factor. It's really the elements of the offense all over again, to protect and maintain -- the killing was to protect and maintain the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-8   Filed 03/23/17   Page 29 of 350
Case 3:08-cv-00134-RJC   Document 255-2   Filed 10/04/10   Page 29 of 32

JA3383

reputation of the criminal enterprise and to advance his reputation.

THE COURT:  I'm not so sure.  It seems like that was exactly the argument you made to me in the guilt phase, that it was a positional thing, not a -- I mean, I actually added a sentence in the jury instructions at your request that it wasn't the reputation of the organization in the community.

I'm going to strike 13, 14, and 15.

MR. MORRIS:  Your Honor, may I just -- on number 12, Your Honor has already ruled on it.

THE COURT:  I'll be glad to reconsider it.

MR. MORRIS:  I think the word "indoctrination" comes from -- the only evidence of that could come from the second expert this morning whose testimony was rather truncated.  I also think the word "indoctrination" is quite loaded.

THE COURT:  What nonloaded word would convey --

MR. MORRIS:  His adoption of the ways and thinking of MS 13.

MS. ROSE:  How about his membership?

THE COURT:  I hear your argument, but I'm going to instruct on that.  There is sufficient evidence to -- for the jury to conclude that.  And indoctrination is a strong word. I think it actually in some ways heightens the burden on the defense.  It's a word they've proposed so...

MR. MORRIS:  So we can argue indoctrination in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-8   Filed 03/23/17   Page 30 of 350
Case 3:08-cv-00164-RJC   Document 292   Filed 10/04/10   Page 30 of 32
**JA3384**

rebuttal as future dangerousness?

THE COURT:  Say what?

MR. MORRIS:  That he's been indoctrinated which is...

THE COURT:  I don't know that I understand what you're saying.

MR. MORRIS:  He's more --

MS. ROSE:  He has less rehabilitative potential if he is indoctrinated than if he's just a member.

THE COURT:  I don't know why you wouldn't argue that.

MS. ROSE:  That's what we're saying.  It's a dialogue.  We're having a dialogue about -- we're reconsidering the indoctrination word, in other words.

THE COURT:  I'd be surprised if you didn't argue that.

Is everybody clear on what is going to be included?

MR. FOSTER:  Yes.

MR. BRYSON:  Modifying six.  Are you modifying seven --

THE COURT:  No.

MR. BRYSON:  -- by putting the word "risk" in before factors?

THE COURT:  No, unless you want it.

MR. BRYSON:  Okay.  I'm sorry, I thought that's --

Cheryl A. Nuccio, RMR-CRR (704)350-7494

THE COURT:  I did say that at first, but then I kind of reconsidered everything and the only changes are going to be to six.

MR. BRYSON:  Okay.

THE COURT:  And I'm taking out in its entirety 13, 14, and 15.

Anything else?

(No response.)

THE COURT:  And then special verdict forms.  Do you all have those?

We're going to have to modify those based upon the change and approach.  So they would all -- twenty-three and twenty-five would read exactly like twenty-two and twenty-four.

Any objections to that special verdict form?

MR. BRYSON:  Not -- we've already -- we've already complained about that.

THE COURT:  That I haven't otherwise ruled on.

MR. BRYSON:  I've seen some other ones where they have the answer yes, no, unable to agree on the ultimate determination sentence of death.  Yes, no, unable to agree. They have a blank for that.

MS. ROSE:  No.

THE COURT:  I'm not going to put that in there.  If we come to that point in the trial, I'll consider arguments on

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 32 of 350
Case 3:08-cv-00134-RJC    Document 1525-8    Filed 10/04/17    Page 32 of 32
JA3386

what instruction I should give to them.

MS. ROSE:  We had a couple of motions still outstanding.  We filed one on the nullification argument.

MR. MORRIS:  There was a motion with respect to some of the evidence that was excluded at the defendant's request and commenting on the lack of that evidence in closing arguments.

THE COURT:  The witnesses who are not here?

MR. MORRIS:  The witnesses that -- well, two parts of that ruling.  First, the identification --

MR. BRYSON:  We're not going to do that.  We're not going to talk about Freddy Gonzalez being unable to identify him in the courtroom.

THE COURT:  Freddy is out.

MR. MORRIS:  Then the other part was the failure of, for lack of a better term, Moe and Chipis to testify.

MR. BRYSON:  Well, you know, I assume that based on what's been presented, that you guys are going to argue that they weren't here because they were threatened.  Now, you know, I certainly don't want to go in there and say that's not the case, but I do want to make an argument to the jury that the weight, if any, that they should give to these aggravators should be lessened by the fact that the evidence presented was not sufficient to support an actual conviction.

THE COURT:  I think you can argue the weight of the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 33 of 350
Case 3:08-cv-00164-RJC   Document 275-8   Filed 10/04/10   Page 43 of 132

JA3387

evidence based upon the testimony coming in through the officers and not through Moe and Chipis, and I think you all can argue that they're not here because the defendant successfully intimidated them into not being present.  I anticipate both of those arguments being made.

MS. ROSE:  And then the whole nullification argument.  Limit the nullification argument.

MR. BRYSON:  You don't mean nullification; you mean hold out, right?  Jury nullification was the jury just disregards the law and does what they want.

THE COURT:  So articulate what you're...

MS. ROSE:  Well, the whole, you know, to undermine the court's instruction that the jury -- the instructions that the court has given.  Anything beyond that, I think, is inappropriate regarding that a jury sits together and deliberates.  Yes, you should consider the views of your other jurors.  You don't have to do -- I don't remember the word.  Insult to your own...

MR. MORRIS:  You address it on page 16 of the draft instructions.  Don't hesitate to re-examine but do not surrender your honest conviction.

THE COURT:  Right.

MR. MORRIS:  And we --

MS. ROSE:  I think anything beyond that is improper.

THE COURT:  Improper and imprudent.  I mean, I'm

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 34 of 350
Case 3:08-cv-00164-RJC   Document 2928   Filed 10/24/17   Page 34 of 32

JA3388

going to instruct on this after you all argue and so if there's an argument made --

MR. BRYSON:  We can -- I'm sorry.

THE COURT:  Go ahead.

MR. BRYSON:  So we should not argue to the jury that, remember, they have the right to make up their own minds about the case?

THE COURT:  No, you can argue that.

MR. BRYSON:  Okay.

THE COURT:  How much time?  An hour each?

MS. ROSE:  No, because --

MR. NAZZARO:  We'd like an hour and a half, Your Honor.  Well, we just want to reserve an hour and a half for both -- beginning and rebuttal.  We don't think we'll need that.  We think it will be closer...

MR. BRYSON:  Yeah, we -- we were going to ask for even more.  Not that --

THE COURT:  No way.

MR. BRYSON:  Keep in mind I'm the guy who said I wanted an hour and only argued for 35, 40 minutes.  Coming from my point of view, this is, you know, very, very important and we don't really want to be rushed.  And at least -- and this isn't binding --

THE COURT:  I'll give you both an hour and a half.

MR. BRYSON:  Okay.  When are we going to do it?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 35 of 350
Case 3:06-cv-00154-RJC    Document 275-8    Filed 10/24/13    Page 78 of 132

**JA3389**

Right away?

THE COURT:  Yes.

MR. BRYSON:  I mean, I wouldn't ask for in the morning, but I was hoping we could take a little bit of time.

THE COURT:  Yeah, we will.  Do either one of you want an alarm or notice at a certain time?

MR. BRYSON:  Can we get back to you after we figure out how...

THE COURT:  Sure.

MR. FOSTER:  By the way, Your Honor, we intend to split our argument.  I assume that's okay with the court.

THE COURT:  That's fine.  You both have an hour and a half.

Let me know if you want any reminders, Sam.  A motion in limine preventing Sam from going more than X number.

MS. ROSE:  Left me like seven minutes last time.

MR. NAZZARO:  I want to see what the record shows on the time because I still think it was 45 minutes.  But if the record says something otherwise.  I certainly would -- 45 minutes -- I'd like notice at 45 minutes, that would be fine.

THE COURT:  2:30 be fine?  Reconvene in court.

MR. NAZZARO:  Reconvene at 2:30?

THE COURT:  At 2:30 and you'll make arguments and then I'll instruct.

MS. ROSE:  All right.

          Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 36 of 350
Case 3:08-cv-00184-RJC   Document 252   Filed 10/04/10   Page 36 of 132
JA3390

MR. NAZZARO:  Judge, are we still -- we still haven't gone through those exhibits.  We can do that after.

THE COURT:  That's right.

MR. NAZZARO:  We still haven't sort of scrubbed the exhibit list, but I assume we can do that after the arguments.

THE COURT:  We could.  Probably be cleaner -- it took a long time in the trial phase, so I guess we could do it at that point.

MS. ROSE:  There's not as many.

MR. FOSTER:  We're going to do it when?

MR. BRYSON:  Like we did last time, go through the exhibit list.

THE COURT:  You all want to admit some exhibits.  Let's talk about that.  What exhibits do you want?

MR. FOSTER:  It's the -- once again, I didn't bring the notes.  I looked.  It's the -- I think it's Exhibit 3.  It's the diagram drawn by Noe Bautista Detective Parshall identified.

THE COURT:  Any objection?

MR. NAZZARO:  No.

THE COURT:  All right.

MR. FOSTER:  I believe it's Exhibit 5 was the February 16th, 2006, police report where Juan Rivera lied about his name and date of birth, and that was identified by, I believe, Detective Parshall as well.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 37 of 350
Case 3:08-cv-00154-RJC   Document 256   Filed 10/04/10   Page 37 of 32

JA3391

THE COURT:  Any objection?

(No response.)

THE COURT:  All right.  What's the third one?

MR. FOSTER:  The third one was --

MS. ROSE:  You read it out loud in court.

MR. FOSTER:  I'm sorry, Luis Rivera.  The third one was the photograph of the knife with the ruler.  It's a different photograph taken --

THE COURT:  All three of those will come in.

MR. FOSTER:  So do we need to do that in front of the jury or...

THE COURT:  Yeah, if you choose to do that.  You can do it either way.  We'll just have them admitted without publishing or if you want to publish, we'll allow you to do that.

MS. ROSE:  Some of -- you marked some exhibits that were not introduced that you just used for --

MR. FOSTER:  Impeachment.

MS. ROSE:  -- impeachment or cross examination purposes.

THE COURT:  We're going to go over all of those. We're going to go over what's admitted and not admitted once the jury starts deliberation.

MR. FOSTER:  We're not offering those otherwise.

MS. ROSE:  My question was the completeness of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 38 of 350
Case 3:08-cv-00164-RJC    Document 253    Filed 10/04/10    Page 38 of 52
JA3392

814

those, was the only thing I was going to raise.

THE COURT:  All right.  See you at 2:30.

(End of chambers conference at 1:49 p.m.)

TUESDAY AFTERNOON, APRIL 27, 2010

(Jury not present.)

THE COURT:  All right.  When we call the jury, I think, Mr. Foster, Mr. Bryson, you want to admit three documents.

MR. FOSTER:  Yes, Your Honor.  But there was something else we found in the jury instructions, I believe, that we had not addressed.

MR. BRYSON:  Your Honor, I apologize for not catching this earlier.  Under -- under the aggravating circumstance of future dangerousness, 4B, it says the defendant poses a future danger to the lives and safety of others as demonstrated by his, first it's his lack of rehabilitation after prior incarceration and -- to our recollection, we don't recall there being any evidence of that.

THE COURT:  I don't recall that either.  What says the government?

MS. ROSE:  Well, I guess it's his current incarceration would be more appropriate.  Given his behavior during his current incarceration.

MR. BRYSON:  I think that comes from the allegation

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 39 of 350
Case 3:08-cv-00154-RJC   Document 256-8   Filed 10/04/10   Page 39 of 32
JA3393

from the death notice.

THE COURT:  There's no evidence of prior incarceration.

MS. ROSE:  Just current incarceration.  And it may be easier just to say demonstrated by his actions during incarceration.  Because there's been so much evidence.

THE COURT:  There has been.  My concern is that's not what the notice -- what notice was given to the defendant?

MS. ROSE:  Well, at the time the notice was filed, he was incarcerated and had -- the evidence showed that after he was arrested on December the 12th of '07, that it was after that that he procured the intimidation of witnesses.  So he was incarcerated at the time that this notice was filed.

THE COURT:  I'm going to strike the word "prior" from the notice.

I'm also suggesting to y'all that I give the first six pages before you argue and then give the instructions from page 7 -- from 7 on after you argue.  I'd be glad to hear from you on that.  I don't have to do that, but I think it would break it up so that the jury's really focused on the aggravating and mitigating weighing process after you all argue.  Any objection?

MR. FOSTER:  No, Your Honor.

MS. ROSE:  No, Your Honor.

THE COURT:  All right.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-8   Filed 03/23/17   Page 40 of 350
Case 3:08-cv-00164-RJC   Document 29-8   Filed 10/04/10   Page 40 of 32
JA3394

MR. FOSTER: Your Honor, when would the court -- we discussed the issue of, I believe, putting that proffer on the record about that police narrative that goes with the birth certificate. Did you want to do that? When did you want to hear that, I guess?

THE COURT: You know, why don't we do this. After the jury begins deliberations, we'll figure out what's in. Make sure everybody is in agreement as to what's in, what's not. And then we'll do it after that.

MR. FOSTER: And then we still have the three exhibits we're going to move in.

THE COURT: I'll let you do that first thing when the jury comes in and then go from there.

Are we ready for the jury?

MS. ROSE: Yes, Your Honor.

MR. NAZZARO: Yes, Your Honor.

THE COURT: Call the jury.

(Jury entered the courtroom.)

THE COURT: Does the defense wish to reopen to admit certain documents?

MR. FOSTER: Yes, Your Honor. At this time we would move into evidence Defense Exhibit Number 3 for identification. Do you want me to describe what they are or just go by the numbers?

THE COURT: Go ahead and give the number and a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-8   Filed 03/23/17   Page 41 of 350
Case 3:08-cv-00164-RJC   Document 252   Filed 10/04/10   Page 22 of 32
**JA3395**

description.

MR. FOSTER:  Defense Exhibit 3, which was the diagram from Noe Bautista.

Exhibit Number 5, which is the police report from February of 2006 regarding Luis Rivera.

And Exhibit Number 12, which is the photograph identified by Russell Lashley, a photograph of the blade, the sheath, and the ruler.

THE COURT:  Let those exhibits be admitted.

(Defendant's Exhibits Nos. 3, 5, and 12 were received into evidence.)

THE COURT:  Members of the jury, you've heard the evidence and you must now consider whether imposition of a sentence of death is justified or whether the defendant should be sentenced to life imprisonment without the possibility of release on counts twenty-two and twenty-four, which charge murder in aid of racketeering, and counts twenty-three and twenty-five, which charge using a firearm in a crime of violence resulting in death.

Those are the only choices of punishment available under the law for those counts.  There is no parole in the federal system.

The law leaves this decision exclusively to you, the jury.  If you determine that the defendant should be sentenced to death or to life imprisonment without possibility of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

release, the court is required to impose that sentence.

I will now instruct you as to the process you must follow in making your verdict. I will begin with a broad summary and then I will discuss specific matters in more detail. Regardless of any opinion you may have as to what the law may be or should be, it would be a violation of your oath as jurors to base your verdict upon any view of the law other than that which is given to you in these instructions.

Because you have found unanimously that the defendant is eligible for the death penalty, we proceeded to what is called the selection stage of the sentencing hearing. Evidence at this stage focused on all relevant aggravating and mitigating factors. You may also recall any or all of the evidence which was admitted during the guilt phase of the trial.

Your consideration of that evidence is broken down into two steps.

First, you must determine what factors have been proved. During the eligibility stage, you found unanimously two statutory aggravating factors. You must now determine unanimously whether the government has proved any other aggravating factors beyond a reasonable doubt. You are not required to find additional factors in order to impose a sentence of death.

Mitigating factors, that is, factors that tend to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 59-8   Filed 03/23/17   Page 43 of 350
Case 3:08-cr-00134-RJC   Document 257   Filed 10/04/10   Page 43 of 32
JA3397

show the defendant should not be sentenced to death, must be proved only by a preponderance of the evidence. There is no requirement that you find mitigating factors unanimously. Thus, it is up to each juror to decide individually whether any mitigating factors exist.

The second step involves a weighing process. You must decide whether the proved aggravating factors outweigh the proved mitigating factors sufficiently to justify the death sentence. If you do not find any mitigating factors, you must still decide whether the aggravating factors are sufficient to justify imposition of a death sentence.

Weighing aggravating and mitigating factors is not a mechanical process and the judgment involved is exclusively yours. For that reason, a jury is never required to impose a sentence of death. Any decision to impose a sentence of death must be unanimous. You will be called upon to make findings on various matters which you will record on a special verdict form. It is important that you make your findings in a specific order. Therefore, be sure to follow the instructions on the form as you conduct your deliberations. In doing so, you are to consider only the testimony and exhibits admitted into evidence during the trial and sentencing proceeding that has just concluded.

I remind you that the statements, questions, and arguments of counsel are not evidence. Anything else you may

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 44 of 350
Case 3:08-cv-00064-RJC   Document 252   Filed 10/04/10   Page 25 of 32

JA3398

have seen or heard outside the courtroom is not evidence and must be disregarded.

During these proceedings I have ruled on objections to certain testimony and items of evidence, and the admissibility of evidence is a legal matter for the court to resolve and you must not concern yourself with the reasons for my rulings.  In your deliberations you may not draw any inferences from my decision to exclude or admit evidence.

The rules of evidence provide that if specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may testify and state his or her opinion concerning such matters. You should consider each such opinion received in evidence in this case and give it the weight you may think it deserves. If you should decide that an opinion of such a witness is not based upon sufficient education and experience or if you should conclude that the reasons given in support of the opinion are not sound or that the opinion is outweighed by other evidence, then you may disregard the opinion in whole or in part.

Although it is left solely to you to decide whether the death penalty should be imposed, the law has narrowed and channeled your discretion in specific ways.  Particularly by directing you to consider and weigh aggravating and mitigating

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 45 of 350
Case 3:09-cv-00174-RJC   Document 255-8   Filed 10/04/10   Page 26 of 32
JA3399

factors presented by the case. These factors guide your deliberations by focusing on certain circumstances surrounding the crime and personal traits, character and background of the defendant.

Aggravating factors are considerations that tend to support imposition of the death penalty. The government is required to specify the factors it relies on and your deliberations are strictly limited by its choice. Even if you believe that the evidence reveals other aggravating factors, you must not consider them.

Mitigating factors are considerations that suggest that a sentence of death should not be imposed. They need not justify or excuse the defendant's conduct, but they do suggest that a punishment less than death is sufficient in the case.

Your task is not simply to decide whether, which or how many aggravating and mitigating factors are present in the case. You also must evaluate and weigh such factors and ultimately make a judgment about the justification for and appropriateness of the death penalty or of life imprisonment without possibility of release as a punishment for the defendant.

Now, after the attorneys make their closing arguments to you, I will come back and instruct you specifically on the aggravating factors and mitigating factors that have been set forth by the parties and will give you

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 46 of 350
Case 3:08-cv-00154-RJC   Document 52-2   Filed 10/24/17   Page 76 of 32
JA3400

further instructions to control your deliberations -- to guide your deliberations in this case.

Are the parties ready to make their closing arguments?

MR. NAZZARO:  We are, Your Honor.

THE COURT:  You may do so.

MR. NAZZARO:  Thank you, Your Honor.

May it please the court:

Ladies and gentlemen of the jury, it was December 8th, 2007, in Greensboro, North Carolina.  Manuel Garcia had reached midlife in his life.  Thus far he had achieved well.  He was from Mexico originally.  He went back to Mexico and came back to the United States to gain his citizenship.  And he had built a successful career.  He was a bricklayer, a mason, and he had built a business from little to something big.  He was a success in the business world by all accounts.

Mr. Friend, one of his -- one of the people he worked for and built homes for had indicated that.  He started with a small crew, went to a big crew.  He was so impressed with his ability, he was going to build his own home.  They had exchanged gifts.  In fact, on December 8th, 2007, Manuel was looking forward to going to his first pro football game, a game that was supposed to occur in December between his favorite team Dallas and the Carolina Panthers.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Manuel was a person who was a generous man. He had two lovely children, Carmen and Betsy. One in middle school, one in high school at the time. And he was looking forward to his life. He was looking forward to a lot of things.

That particular evening he was looking forward to an evening with his friends and co-workers at the Las Jarochitas restaurant. And he was there with his friends, co-workers, and his brother Ruben.

Ruben, his younger brother, was also a good worker. By all accounts, a good man who had a young son who he often would bring to the restaurant.

The restaurant in Greensboro was a family restaurant. A place that any of us could have been and would visit. It was family owned. It was worked by the members of the family. By Abel, Ismar, and their parents owned it. And they were working that evening, that evening on December 8th, 2007. The evening, ladies and gentlemen, that Wizard and the MS 13 that he represents walked in. The man who demands respect, who earned respect by killing, and wanted respect that evening, December 8th, 2007.

And you know the story, ladies and gentlemen, about a dispute over a juke box in a restaurant in Greensboro. A dispute over some music.

But what wasn't known at the time was that Wizard had killed before. He had killed before and had earned his

Cheryl A. Nuccio, RMR-CRR (704)350-7494

respect. He had earned those two letters on his forehead and he earned them by killing. He earned them by living a life with the MS 13. And, of course, nobody in the restaurant knew that that evening.

And so when Wizard was offended or his friends were offended by some dispute over music, well, what did he do? Well, you saw him do it. He put the old MS sign up. Hey, this means something. I can do it in the restaurant. I can do it in court. I do it because it means something. And it means you must respect me.

Of course, reaction at the time, obviously, was a fatal one. Hey, we don't care for your gang. But no, wait a second. You don't understand. I'm Wizard. I earned this respect. I earned this respect and I deserve this respect. And if you don't believe in my gang, this is the answer. This is the answer. This is the only answer.

And that was the answer that night, ladies and gentlemen, as he pulled out the .45. What did Abel say? He froze them. Froze them. And you can only think, ladies and gentlemen, what was going on in their mind when you're frozen in fear as a .45 is pointed at you.

You can only think of what, you know, what Manuel was thinking: Would he miss the graduations, the beaches, the time with his family. You can only think what Ruben was thinking: Thank God I didn't have my son there that night and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

I'll never see him again at this point.

But it didn't matter to Wizard. None of that mattered to Wizard because he had killed before. And he was going to kill again that night and he did kill that night, ladies and gentlemen.

As he pulled the trigger, as he froze them and pulled the trigger, imagine the chaos. And you heard about the chaos. You heard from Marco. Remember Marco? There was a wall just about this size in the jury box and Marco is on one side of the wall and he's running to the bathroom with his wife as fast as he can. He runs to the bathroom thinking the bathroom is a safe haven. Well, it was for him that night, but there was a bullet right in the bathroom. It didn't hit him, but it could have hit him.

And what's Abel doing? Well, Abel is thinking, jeez, maybe I should have called 911 a minute ago but I didn't. He runs on the other side of the partition. He runs for cover. As he's running, what's he see? He sees people diving for cover in the restaurant. Diving for cover. Out of the hail of gunfire.

Meanwhile, Ismar, as she sees what's happening, Ismar, she's running through the hail of gunfire as anyone would do because she's trying to save her baby. Her baby is right up there.

But none of that mattered to Wizard. None of that

mattered to Wizard because he had been disrespected. He was a big shot. He was an MS 13 member and none of that mattered. It didn't matter then and it doesn't matter now to him. And the chaos that he caused that night means nothing to him.

And ladies and gentlemen, what's -- what's he automatically do? Well, hey, I've seen -- I've done this before. I know what I have to do. I have to escape. Call my buddies. MS members. They're going to help me escape. I got to get out of here. Run, make a few calls, get into the car, the white Neon, and we got to get out of here. We're going to go to Charlotte because we got some homies down there. We had been sent to Charlotte to do a mission. We've got to go down to Charlotte.

And that's what he does. He goes to Charlotte. And what's he doing? Well, he's on the phone calling girls. Finding out the status. Just living it up on that ride down as two dead bodies, Manuel and Ruben, are laying on that tile floor. He goes to the taco stand. Hey, I'm hungry. I didn't really get a chance to eat in the restaurant that night. I need a taco or I need a burrito. Whatever I need, I'm going to have something to eat. And hey, it's business as usual.

I need -- hey, want to take a ride, Rony. Let's go. Man, you got some problems. I saw your car shot up. Let's go down to see some rivals and get them. I've got my old trusted .45 here. This is what I need. If the cops show up, they're

going to get it too.  They're going to get it too.

And as Jean is seeing her dead husband and thinking about how she's going to relate that to her two children, her two girls, what's he doing?  He's extorting some drug dealer in the bathroom.  And says, hey, this is the life.  That means nothing to me.

And his only regret, his only regret -- and we heard it on his own voice, is, hey, I went pow pow and I hit the two people, but I didn't get the other son-of-a-bitch.  Jorge, who you later saw, just got shot in the shoulder.  I mean, that's some presence of mind.  I know what I did to those two guys.  I saw them fall right there.  I know they were dead because I know what dead is.  I've killed before.  I couldn't -- I know I didn't hit the other guy enough to kill him.  He dove for cover.  He just got hit in the shoulder.  That was his only regret.

Ladies and gentlemen, that was the statutory aggravator that you have found.  You have already found it.  As the judge just told you and is instructing you, that is enough to impose the sentence that Congress has prescribed in this.  As long as you weigh that.  And I would submit to you, ladies and gentlemen, now and throughout this argument, that that outweighs anything you have heard and will hear from the defense.  That alone is sufficient to impose the death sentence, the death penalty.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 52 of 350
Case 3:05-cv-00174-RJC   Document 52-2   Filed 10/24/10   Page 52 of 32
JA3406

But there's more to the story and that's why we had the other part of the trial. There's more to the story, what they call -- what's called in the law statutory nonaggravators. Other things you can consider and weigh in addition to what you just -- you already found and what you just heard. These are other evidence of things that Wizard has done. And we presented evidence of that, ladies and gentlemen.

And we know he's killed before. We know in July '05 what he did. We know on Fairfax, busy place in Los Angeles, the middle of the day, bunch of MS guys. Wizard is in the car. His other MS buddies were going to the beach. And what happens? Well, hey, there's a couple kids there. It didn't matter who they were. Jose and Gustavo. You saw who they actually are. They're real human beings, and they were live people that day. Young kids. Taggers, as they're called. Who, you know, were maybe a little bit wannabes, a little bit cocky young kids. Just came from a video store.

You know, here's that famous MS sign. You could just see him doing it because you saw him do it. That's a famous MS sign. Well, they just said the heck with the MS, F the MS, and they showed that. Hey, it's a busy street. It doesn't matter.

Now, wait, you forgot something, didn't you, Gustavo and Jose? I'm the Wizard. I earned my respect. You can't do

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 53 of 350
Case 3:08-cv-00164-RJC   Document 52-2   Filed 10/24/10   Page 53 of 32
JA3407

that to me. This is the answer. This is the answer (indicating). It's called it's your day for execution. As he walked out of the car, pulled out the gun. Boom, right in the head to Jose. And hey, what's his friend doing? He's running. Gustavo, sure, he's running. Didn't matter. Hey, I'm a good shot. Boom, right in the back of the head.

That's what respect is. That's what it's all about to Wizard. And that's what he did on that day in July, ladies and gentlemen. We know that. We heard -- we heard the statements from the witnesses. You heard what -- the other MS players that were in the car. Everybody pointed to him. And we know it was him. He even said it. I had the gun. I pulled it out, is what he told the detectives in the interview. I mean, he's proud of what he's done. And the chaos, that sounds -- does it sound familiar? Does that story sound familiar? Oh, you disrespected me and I pulled out a gun. Sure it sounds familiar because that's exactly what happened later in Greensboro.

And what happens later? Well, we're in LA with my MS buddies and, hey, there's some business that has to be done. Okay. You can disrespect me in person or I can hear about you disrespecting me.

And so let's flash to September, Lemon Grove. Lemon Grove. Hey, what are you telling me? I'm the Wizard. You're telling me Lemon Grove is controlled by some other little

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 54 of 350
Case 3:08-cv-00154-RJC   Document 522   Filed 10/04/10   Page 54 of 132
JA3408

gang? I'm Wizard from the MS 13. We need to go out and we need to take care of that park and we need to take care of the people in that park. And that's exactly what he did. And that's exactly even what he said he did in his statement. We're going out there and we're going to take care. Because, you know, we had a little beef. One of these guys, I don't care who it is. Freddy was the guy. You saw him testify. It didn't matter if it was Freddy or anybody, it was somebody that had disrespected one of the members of our gang and they think they can control that park.

Lemon Grove Park where people play basketball. Where Andy Abarca plays and lives and plays basketball. He's not a gang member. He's a real estate broker. And he was very successful at it. And his other friends. You heard from some of his friends who were there that night playing basketball. It didn't matter to Wizard because wait a second, you had not respected me. And I came there to do a job.

And it doesn't matter if you're going to run when I pull out that gun because I'm going to hit you. I'm going to hit you and you're going to fall and then I'm going to hit you again, as happened to Andy, right in the back of the head. And hey, I might have missed a couple, but I got somebody that night. And I made them run. I made them fear. I made them see what Wizard is all about. What the MS 13 is all about.

Oh, and coincidentally, not just what he says and

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 55 of 350
Case 3:08-cv-00134-RJC    Document 592    Filed 10/04/10    Page 55 of 132
JA3409

how Freddy picks him out twice. But the ballistics match. Shell casing there, shell casing over on Fairfax. It's just a coincidence. And it's just a coincidence story that -- it's the same old story that, hey, you disrespected me and I shot you. He's the only one fingered in all of them. It's just something that you can't believe. That's what the defense is going to come up and say.

Ladies and gentlemen, I submit to you those have been proven. They've been proven beyond a reasonable doubt and you certainly can consider those and should consider those when you weigh the sentence in this case.

And what do we know -- what happens next? We know what happens next. He flees to New York. I mean, we know that other part of the story. Maybe it didn't come in chronologically, but we know what happens next. He flees to New York. And where does he go in New York? Remember what Lenny said. You know, hey, I'm in New York now with my other homies. I got homies all over the place because I'm the Wizard. I'm respected. They like me. They respect me. I go to New York and I'm in New York now with Coyote. He's got some problems with some people out there. I'm there with Sentinela. He's got some problems with the law.

Hey, I might shoot down to Atlanta to get some -- as he told Rony on the thing, to get some coke or grenades. We now know he was in Atlanta. He had a little car accident down

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 56 of 350
Case 3:06-cv-00164-RJC   Document 52-8   Filed 10/24/17   Page 56 of 32

JA3410

there. I'm the Wizard. Hey, wait a second. I get the call. The big guy, the guys from down below, as they say, we got business to do in Charlotte. I'm the man. I got to organize these guys. I got to show them how to live the life of a .45 and the MS 13. I got to show them. I'm one of the strong, loyal soldiers, one of the leaders. I got to show them what to do. And that's exactly what he did, ladies and gentlemen, because we know the rest of the story. And those are the statutory nonaggravators.

There's other ones too, ladies and gentlemen. There's other ones, as the judge indicated, that you've already found. That it's a gang motivated killing. One that you have to find. There's other ones. But the two that you heard a lot of the evidence on, the two additional -- the three additional murders we've proven beyond a reasonable doubt.

And what else did you hear about? One of the other so-called statutory nonaggravators is evidence -- all this evidence about his future dangerousness. Now, you heard a lot of that evidence at the trial, ladies and gentlemen. And you heard some things then -- later that you didn't know then. I mean, but let me remind you of what you already had heard. All right.

Here's a man in jail for the Greensboro murders. He's waiting trial. Okay. Remember -- remember Abel that was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 57 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/24/10   Page 58 of 132
JA3411

up here. He's one of the cameras. He's one of the eyes on. Okay. We got to get Abel. I'm going to send some of my MS buddies. You already found that. He did that from jail. Okay. He didn't do it from on the street. He did it from incarceration. And that, ladies and gentlemen, is certainly evidence of future dangerousness. And you didn't hear any evidence that that will stop in federal prison versus the local jail. That he's not going to have the ability to communicate. He's Wizard. He's smarter than that. They break my code, I'll do a new code. If they try to read my mail, I'll put a message out to one of my other MS buddies in jail, he'll put a message to someone else and we'll take care of that problem.

Do you think he's going to stop from getting Rony? Rony walks out of the courtroom, right here, and he has something to say to him. Hey, your family. You think he's going to stop? You think that's all over with? I submit to you it isn't, ladies and gentlemen. It's only the beginning as far as Wizard is concerned because that's his commitment. And nothing you heard changed that. Whatever facility, whatever else, that's his commitment, ladies and gentlemen.

And it's his writing. It's his belief. And you have many of his letters and you can read those letters. We put more in at the sentencing phase. But, you know, the hood is large and worldwide. The government may not accept it, but

they have to put up with it because we're always going to listen to the Mara Salvatrucha and they're never going to be able to break us up no matter what they do.  No matter what they do.  No matter where I'm at.  We are the Mara Salvatrucha.  Born to control and make others understand that no other hood, much less the F'ing cops can stop us.  Now they have arrested us and they think they finished us off.  Ha ha ha.

How many times does he say that in his letters?

Ha ha ha.  They're wrong.  They arrested 26, but there's going to be a hundred more jumped in.

And he does it from jail, ladies and gentlemen.  And you know, you didn't know it at the time but you know it now.  You know about this (indicating).  Think about this.  I mean, think about this.  You're in solitary confinement and you find a way to do this.  You find a way to make this.  You find a way to attach it to your penis and you find a way to get it out.  Oh, because he's scared of other gang members?  That's what it is.  Because he's scared of other -- so he's going to kill other gang members?  He kills who he wants to kill for his own reasons, ladies and gentlemen.  And he's not going to stop.  And that's Government's Exhibit 553.  He's not going to stop, ladies and gentlemen.  He made this for a reason.  Just to see if he could get caught.  And he's not going to stop trying to make it.  And it ain't going to matter where he's at

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 59 of 350
Case 3:08-cv-00134-RJC   Document 528   Filed 10/24/17   Page 60 of 32
JA3413

because you know whether he can get -- stomp somebody to death as they did in the highest security facility or not, if it serves his needs, he's going to do it again. And the evidence has shown that, ladies and gentlemen.

The process, as the judge said, is a weighing process. Once you find -- you've already found some of the statutory aggravators. That's enough. You still have to weigh it. It's a weighing process. It's not a mathematical formula. It's not anything -- it's using your own common sense and your own ability to weigh the evidence. And that's what the judge will instruct you and that's what you have to do in this case.

And ladies and gentlemen, certainly, yeah, you also have to weigh the mitigating evidence. And the mitigating evidence is part of what they presented. And that's a lower burden of proof. You can find the mitigating evidence even and you still can impose the death penalty because it's a weighing process, and you'll have a list of the factors of the mitigating evidence that the defense wants you to believe.

But what is a mitigating -- it's not mitigating just because some person on the stand says I'm a mitigation expert. I do mitigation. Just because you say it mitigates or lessens doesn't make it so. It doesn't make it so. And just because you want to believe or you want to fashion it so he had a terrible life and he was just in a war torn country and let's

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 60 of 350
Case 3:08-cv-00134-RJC    Document 52-8    Filed 10/24/17    Page 60 of 32
JA3414

Appeal: 10-6   Doc: 90-8   Filed: 08/14/2013   Pg: 61 of 350   836

just make this sort of fit this -- this square peg in a round hole doesn't make it so. You don't throw your common sense out.

And by every account, ladies and gentlemen, he had a normal life. He had a father. He had women figures in his life. Sure, he grew up in a war torn country. But with a lot of other people at the time. Not all that became murderers and MS 13 members. And he worked and he was apparently respectful when he worked. Had all these great attributes and all, but this was such a terrible life. It was a life in poverty. It was a life in war.

And then you have to hear about two studies. Two studies that had nothing to do with him. Nobody studied him.

He earns respect. Nobody studies me, the Wizard. Because I'm the Mara. You know, I don't -- you don't come here and study me. So you put on some other people trying to extrapolate this study from that study. Nothing to do with him. Why you join a gang in El Salvador. Why you do this.

Why he joined a gang. He told the investigator, I joined it for a girl. Whatever reason he joined a gang is not relevant, ladies and gentlemen. It's what he did, his life in the gang. And by all accounts he was an adult when he joined the gang. He wasn't some young, deprived kid. He was an adult.

And this whole thing about his moral compass. Well,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 61 of 350

Case 3:08-cv-00164-RJC   Document 52-8   Filed 10/04/10   Page 24 of 32

**JA3415**

ladies and gentlemen, you know, everyone has factors that affect our life. But this whole thing is we did a study on people that grew up in a war and their moral compass -- well, you know, there's a lot of people with a lot of different circumstances, but they don't all grow up to be the Wizard. Those are just excuses, ladies and gentlemen, and that's excuses for what they want you to believe.

And the same thing with the BOP, the Bureau of Prisons. The guy shows all the slides and, yeah, maybe it's interesting. You haven't seen the way prisoners live, where they live.

But what's the common theme on all of those people? What's the common theme? Hey, yeah, I'm at the BOP. We can contain them and we can control them, but -- we do the best job we can. But, yeah, does information still get out? Yes. Do murders still happen? Yes. Do we still recover shanks? Yes. And do you think he's ever going to stop? Has there been any evidence that he will stop? There's been evidence that he won't stop, ladies and gentlemen.

And then comes the grand finale. The grand finale of the mitigation. All the different colors on the screen. The brain. Now, we can see what's in his brain. That's the grand finale. There's the colors. Oh, boy, look at these colors. It looks interesting. There has to be something wrong. That's what they want you to believe. Common

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 62 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/24/17   Page 63 of 32
JA3416

reaction. Nobody can just be a murderer the way he is. There's got to be something wrong.

There's nothing wrong with him. He knows what he's doing. There's nothing wrong with his brain. There's a couple experts. And it's not so much, okay, your brain looks a little bit like this. My brain looks like this. Maybe there is some abnormalities. Whatever you believe on the experts, the government expert said there's nothing wrong with that scan. Another said, well, there's some abnormalities with the brain.

Ladies and gentlemen, that's irrelevant. What they want you to believe, they want you to make the leap, make the jump. The jump is, well, wait a second. It's this brain that made him do it. There's something wrong there that made him do it. Well, there's no evidence of that. His brain functioned fine when he was growing up. He's working. He's playing soccer. Nothing is wrong with him. All of a sudden his brain went bad? No, he went bad. All right. Ladies and gentlemen, his brain didn't go bad; he went bad. And he became all about a .45, revenge and retaliation. That's how he chose to live his life, ladies and gentlemen. He chose. He made the individual decision. Nobody made him do it. No one forced him to do it. He chose. And that's why we're in court today because he chose. He chose to join the gang. He chose to father two babies in El Salvador and then desert them

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 63 of 350
Case 3:06-cr-00174-RJC   Document 523-8   Filed 10/24/17   Page 43 of 132
**JA3417**

for the MS 13. His brain didn't make him do it; he chose that. He chose to go to LA, join up with the MS and murder people in LA, Fairfax Avenue and Lemon Grove. He chose that. He chose to go to New York. He chose to answer the call of the MS to come to Charlotte. He chose to murder in Greensboro, North Carolina, Manuel and Ruben. He made that decision. That was his decision. It's his individual responsibility, ladies and gentlemen, and nothing short of that. Everything else is just a pure excuse.

And at the beginning of this case, ladies and gentlemen, at the beginning of this case -- remember, go all the way back when you came in here one by one. We were asking all those questions. And the questions that were asked of you: Would you be able to impose the death penalty if the law and the facts fit the crime? That was the question you were asked. And every one of you said you could. And now it's your decision, ladies and gentlemen. It's your decision -- time to choose. And everything that's been presented, the facts and the law that you have to apply weighs in no other answer, ladies and gentlemen. No other conclusion. No other conclusion but the death sentence for Wizard, Alejandro Umana.

Thank you.

THE COURT: Mr. Bryson.

MR. BRYSON: Very shortly you are collectively going to make the decision as to whether or not another human being

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 64 of 350
Case 3:08-cv-00134-RJC   Document 528   Filed 10/04/10   Page 45 of 32
**JA3418**

lives or dies. And whether you ultimately decide to do that or whether you ultimately decide not to do that, I would hope that you would all understand the true importance of this. You probably will go the rest of your life and never make a decision as important as deciding whether or not a human being should live or die.

Now, how do you do that? I would suggest to you that if you're going to do that, you shouldn't do it out of anger. You should do it after having carefully thought out the process and make the right decision.

And what I would like to do for you with my time is to go through the process that the judge will go through with you or tell you that you should go through. And I'm going to argue to you that if you do this process, if you find the aggravating factors and the mitigating factors, that ultimately when you come down to it at the end of this case, you will not find that the aggravating factors outweigh the mitigating factors. You will not reach that conclusion. You will not find beyond a reasonable doubt the aggravating factors outweigh the mitigating factors. And therefore, the right decision in this case will be to impose a life sentence.

Now, I'm going to start by talking about the aggravating factors. You actually already found two. You did that in the selection process. We didn't argue them because they're clear. Most of them are clear from your verdict in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

the first part of the case. They were that -- one, that he murdered two people. That two people were killed. Obviously, you found that right away. And the other is that created a risk of death to others. I would argue to you that when you weigh these, and they are aggravating factors, that you -- they're essentially the same thing. He exposed more people to danger and violence in the shooting, and I would argue to you that you should give them weight, but not a lot of weight. Not two separate factors, but count them as one because they're essentially the same thing.

Now, let's move to the nonstatutory aggravating factors. The first one is -- and the judge will tell you that you should consider -- here's the first nonstatutory aggravating factor. Do you, the jury, unanimously find that the government has proved beyond a reasonable doubt that the defendant killed Ruben Garcia Salinas -- and, of course, there will be one for each case so there will be one for the other case, there will be one for Manuel -- to protect and maintain the name and reputation of the criminal enterprise MS 13 and to advance his position and reputation within the criminal enterprise?

Well, you've already found that. Okay. So I assume that you'll find that again. But what I want to argue to you is when you get to the process of weighing this aggravating factor, I would argue to you you should give it no weight

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 66 of 350
Case 3:08-cv-00134-RJC    Document 52-8    Filed 10/24/17    Page 76 of 132
JA3420

because you've already found it. It was part of the offense. When I was up here arguing to you last time, I was arguing to you that you should not find that he did this to advance his position. You disagreed with me. Okay. But you did that already. When we talked about aggravating factors, we said it's something that makes it even worse. This doesn't make it even worse. We wouldn't be here. If you agreed with me in the first phase, we wouldn't be here right now. Okay.

So find it. I think you have to because you've already found it. But when you get to the point of weighing it, I say you give it no weight because you've already found it. This isn't making it any worse. This is part of the offense. You've already determined this. Had you -- had you rejected this, we wouldn't be here right now. Okay.

So let's go to the next aggravating factor. Do you unanimously find that the government has proven by proof beyond a reasonable doubt that the defendant caused injury, harm and loss to Ruben Garcia Salinas' family and friends? And then there will be a like one for the other case that will be for the family and friends of Manuel Garcia Salinas.

Now, again, find it. Okay. And what I'm about to say, again, I mean no disrespect to the victims' families in this case and I don't mean to make light of this. But what we're doing here, when you're evaluating this case to determine whether this case merits the death penalty, you're

Cheryl A. Nuccio, RMR-CRR (704)350-7494

determining whether this is -- look, all murders are bad. Okay.  There are no good murders.  But we don't give the death penalty to every murder.  Okay.  We reserve it for the worst. All right.  Now, in every murder there's a victim.  In every murder the victim's family suffers loss.  How does this distinguish this from any other murder?  And I say this with sincere respect to the victim's family.  But if you're driving a car with your wife and you're careless and crash the car and kill your wife, your wife is dead.  Okay.  There's the loss. There's the family loss.  You know, we don't execute people for that.  And to say that it's worse because these were good people, is that really the kind of society that we want to live in?  Where we say that, you know, if you kill a homeless person, then you can't get the death penalty.

MS. ROSE:  Objection.

THE COURT:  Sustained.

MR. BRYSON:  I argue to you that this factor, find it, you know.  It's true.  But in giving it weight, I would not give it a lot of weight because it's true for every murder.  And it doesn't make this murder any worse than any other.

All right.  Now, the next one:  The defendant has been involved in other serious acts of violence which are not reflected in his criminal record, and they reference the July 25th Los Angeles killing of Jose Herrera and Gustavo

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Porras and then the September 25th, 2005.

Let me just say, if he had been convicted of these murders, I would agree -- I would agree with the government that these would be terrible aggravators. Okay. But he has not been convicted of these aggravators and I would argue to you based on what you've heard today, you should know that they could not convict him of these cases. I'm going to take them out of order for argument purposes.

I want to talk to you about September 25th. This is the Lemon Grove incident. All right. What is the evidence against him that he was involved in this incident? First of all, I think the most important evidence is that the two eye witnesses there who was not -- who's not a gang member himself, Mr. Lara, and Mr. -- I can't remember his name -- Dominguez. I'm sorry. But both of them were present at the scene. Both of them told the police immediately afterwards that they wanted to cooperate. That they got good looks at the people and they thought they could identify them. And both of them were shown photo arrays. I would argue to you you didn't present -- they showed you the ones they showed to Freddy Gonzalez, but I would argue to you they're the same ones that included his picture on two different occasions. And they looked at them and they said, I don't see the guy in here.

So you have two witnesses, eye witnesses who say

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 69 of 350
Case 3:08-cv-00174-RJC   Document 52-8   Filed 10/04/10   Page 69 of 132
**JA3423**

that they can identify the person and they did not identify him. Did not pick him out. Okay.

The only person who said that there was somebody there who looked like him was the other gang member who clearly, according to the police, erroneously identified the other person as the guy he had a beef with before. Okay.

So if the eye witnesses don't identify him, how does -- how do they put him into this case? Well, one, they say the ballistics is the same gun that's used in the other crime. I'll come back to that in a minute because I argue to you the evidence in that crime is better to prove that Rene Arevalo committed that crime. But their own evidence is that these MS 13 people share guns all the time. Okay.

So what's the other evidence they say? They say, well, he admitted to his involvement. He did not. Okay. And I think the exhibit is 135. It's his statement that he gave to the police officer when he was in the High Point jail in April of 2008. He did not admit to being involved in it. What he does say is that he was present in the car that was ultimately used to drive the people over there. He says he didn't know anything about it until after it was done. Read it. Okay. Before you take a man's life, read what he says. Don't take anybody's word for it. He does not say that he assisted or aided and abetted. He says that he was present. He said he didn't find out about the shooting until after it

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 70 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/04/10   Page 71 of 32

**JA3424**

happened. Present in the car. Not present on the street where the shooting occurred. That's all he says. Read it.

Now, let's go to the Fairfax shooting. First of all, two people are shot on the street. There are eye witnesses here too. Okay. Noe Bautista and Oscar Santiago. They have one thing in common. They both say that the shooter was the driver of the car. Now, according to everybody, he's the passenger. So the eye witnesses there, the eye witnesses say he's not the shooter.

Who does say he's the shooter? The other gang members, including the driver who was implicated as the shooter. Now, he's -- you know, when the investigation happened, he's not in California anymore. These guys are in California. They all get together and cook up their story and say, well, it was the guy that's not here. And this is the evidence that you've heard, okay. Nobody came in here and said I saw him and pointed him out in court and said that was -- he's the guy that did it. It was just the word of some other gang members. The primary one who's the best suspect in the case.

The government's evidence in this case is best against Rene Arevalo. They wanted to prosecute somebody in this case. Their best evidence was against Mr. Arevalo. But here they would rather use the word of Rene Arevalo to say that he did it. And they could not convict him of either of

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 71 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/04/10   Page 2 of 32
JA3425

these crimes in court.  They couldn't do it.

MS. ROSE:  Objection.

THE COURT:  Sustained.

MR. BRYSON:  Now, they say, well, he admitted to this one too.  Again, he did not.  Read the statement.  What he says to them, and I'm going to talk more about the statement in just a minute.  But what he says to them is that he was there.  He knows who did the shooting.  But he's not going to tell.  And he ultimately says to them, well, if you want to put me down as the shooter, go ahead.  But they ask him is that the truth.  That's not the truth.  Now, why does he say that?  Again, it's a long statement.  It's a long read, I'm sorry.  But if you're going to take this man's life, take the opportunity to look at what happens here.  He's in the High Point jail on April 23rd.  He has a lawyer for his North Carolina cases.  And three Los Angeles detectives fly in. They show up at the jail.  They don't talk to his lawyer ahead of time.  They go straight and talk to him.

MS. ROSE:  Objection.

THE COURT:  Overruled.

MR. BRYSON:  They go straight and talk to him.  And they start talking to him.  And first of all, they say, well, we want to talk.  And he says, well, listen, we're not recording anything.  He says, if I'm going to talk to you, it's not going to be recorded.  Okay.  Okay.  We won't record

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 72 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/04/10   Page 72 of 32

JA3426

anything.  Of course, they're secretly recording the whole thing.

And then in the conversation he says, well, look, he says, you know, I don't really want to talk because I'm afraid that anything I'm going to say is going to affect my North Carolina cases and I don't want to do that.  And they proceed to tell him repeatedly, over and over again -- read the transcript -- that you got nothing to lose.  Look, you're never getting out of jail on these North Carolina cases. You've got nothing to lose here.  You can go ahead and cop to these and it's not going to hurt you because you can't get more than a life sentence.  They actually say that.  You can't get double life.  You can't get triple life.  And you're going to get a life sentence here, so you're done.  You're done. You've got nothing to lose.

And this goes on for a long period of time.  Hours. Hours.  And ultimately, that's what he says to them.  He says, well, okay.  I was there.  I didn't do it.  I know who did it. I'm not going to tell.  If you want to put me down for it, go ahead.  And that's the statement.  Okay.  That is the context in which he gives the statement.  He repeatedly tells them that he didn't do it.  But they -- they keep telling him you got nothing to lose.  They don't tell him we're going to use this against you to get the death penalty.  They tell him you got nothing to lose.  You can't get anything more than a life

Cheryl A. Nuccio, RMR-CRR (704)350-7494

JA3427

sentence. That's what they tell him. And so that's the value of his statement.

Now, what's the other aggravating factors? Future dangerousness. Did the government prove beyond a reasonable doubt that he is likely to commit criminal acts of violence in the future? Now, the first way they intend to prove this is they say he's engaged in a pattern of violence, including but not limited to the crime with which he's indicted.

Well, that was Dr. Cunningham. Okay. One of the first things Dr. Cunningham testified to, he told you is that he studied this. Okay. And while you would think, your common sense would tell you, gee, a guy who murders somebody is more likely to murder somebody in prison, Dr. Cunningham says, look, we've studied this. That's not true. Okay. There is no basis for that. People convicted of murder are no more likely, in fact even less likely to commit murders in prison or violence in prison than anybody else. Okay.

So just because you have someone who has been convicted of murder does not make them any more likely to commit violence in the future. All right.

And the other thing that's most important here is where is he going to go? Okay. If we were talking about life where he would be eligible for parole, okay. You know, we can talk about future dangerousness. But he's never getting out of prison. So the idea if he's going to be a future danger

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 74 of 350
Case 3:08-cv-00174-RJC   Document 58-8   Filed 10/04/17   Page 75 of 132
JA3428

means that it has to be is he going to be a future -- is he likely to be a future danger in the Bureau of Prisons?  Okay.

And that's why we spent a lot of time talking to Dr. Cunningham and Mark Bezy, people who have experience in the Bureau of Prisons, to let you know that the Bureau of Prisons is more than prepared for somebody like him.  The Bureau of Prisons goes out of their way to protect the public and the other inmates and their own staff.  They have all sorts of resources that they can bring to bear on anybody who's a problem.  You know, take him all the way from just a regular U.S. penitentiary prison setting all the way up to the controlled unit, ADMAX.  They can do what is necessary.  If he wants to write coded letters, okay, they're going to break his coded letters.  They're going to look at his coded letters. They can put him in a communications management unit.  They can put him in a special management unit.  They have all sorts of things to bring to bear on him.  He is not anything special.  He is not anything new.  He's not anything that they don't deal with on a daily basis.  That's what Mark Bezy said. Mark Bezy is a guy who spent 28 years in the Bureau of Prisons, worked his way up from prison guard to the warden at Terre Haute.

Part of their allegation of future dangerousness is the fact that he's a member of MS 13.  What did mark Bezy tell you?  There's only two hundred and some people of MS 13 in the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 75 of 350
Case 3:06-cv-00164-RJC   Document 52-8   Filed 10/04/10   Page 76 of 132
JA3429

Bureau of Prisons. We don't even consider them a disruptive group. We consider them a security threat group. They haven't even caused enough problems to get up on our high radar scale. We've got bigger problems dealing with the Mexican Mafia.

Here's another thing. You heard a lot about how he performed in the Mecklenburg County jail. They want to argue to you that see how terrible he is. He didn't do well in the Mecklenburg County jail. That's not the only jail he was in. When he got arrested, he went to the jail in Guilford County first. Did they bring any jailers down here from Guilford County to tell you how terrible he did up there? You didn't hear anything about that. Heard no problems from the Guilford County jail. Why is it he can be managed in one place and not the other?

That's exactly what Dr. Cunningham was saying. He's saying, you know, violence incarceration has a lot less to do with the person than the other circumstances. And I would argue to you based on the evidence that you've heard here is that he obviously was managed very well in the High Point jail and can be managed very well in a place like the Bureau of Prisons that has tremendous more resources to bring to bear on an individual than a local jail.

So is he a future danger? I think you argue -- you know he's not. They have not proved that he is likely to be a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

future danger. And even if you find that he is, I would not give it that much weight based on what you know.

Now, those are the aggravating factors. And other than the statutory aggravating factors, at this point I argue you really don't have much weight left there to put on anything else other than the statutory aggravating factors that you've already found. And I argue to you that they're only one.

Now, let's move to the mitigating factors. And before I do, let me just tell you what -- what are -- what are mitigating factors? Mr. Nazzaro said they are excuses. They are not excuses. Okay. They are not excuses. In -- if they were excuses, we would have talked to you about them in the first phase. They are not excuses.

In our criminal justice system, we have a wide range of punishments. You can get a speeding ticket where you have to pay a fine or court costs. If you commit a minor assault or you steal something, you could get a suspended sentence. You could be put on probation. You can -- we have special kinds of probation: Electronic house arrest, all sorts of things. Then you reach the point where you start to go to prison. Okay. You get in enough trouble, now you have to start doing time. You go to prison. You do a year. You do two years. Get some more serious offenses, you start doing some heavy time. Okay. And all the way up to the death

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 77 of 350
Case 3:08-cv-00354-RJC   Document 52-8   Filed 10/04/17   Page 78 of 132
JA3431

penalty.

And if you would just for a minute, if you would imagine the speedometer in your car. Okay. And see it as a range of possible punishments. Starting with, you know, pay the court costs all the way up to the death penalty. All right. And what we're asking you to do is to tick one notch back. Okay. Not death, but life without the possibility of parole.

And what mitigating factors are, reasons why you might want to tick back one notch. Why this guy shouldn't get the absolute worst punishment but the next absolute worst punishment. That's all mitigating factors are. All right.

Now, I'm going to go through them and I'm also going to argue to you why you ought to give them weight.

First one is that he was raised in poverty. Okay. Now, the first several deal with his upbringing. And before I talk about that, let me just -- let me try and put this in context. It's very easy for you at this point to be saying to yourself, well, look, maybe he didn't have the best life. But so what. That doesn't excuse his crimes. And that's not what we're talking about at all. Okay. We're not offering these as excuses for his crimes. And when you think about his upbringing, try and think not about him, but think about in terms of is this important. Is his upbringing important.

Think about yourself as parents. When we think

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 78 of 350
Case 3:08-cv-00134-RJC    Document 52-8    Filed 10/04/10    Page 79 of 132
JA3432

about our own kids, we're very protective of them. We wouldn't want them exposed to certain things. I mean, you wouldn't want your six-year-old kid to watch an R rated movie. You'd feel bad if your six-year-old kid went to somebody else's house and you found out they watched a violent R rated movie or they played some violent video games. You wouldn't want them exposed to that. Why? Because you would think that might have a bad effect on him. You might think that you exposed your kid to the wrong thing and it might have a negative effect on him.

And all we're saying is, look, look at the negative things that happened to this guy. Things that you would never want to happen to your own kid because you would be worried that it would affect him negatively. And as I go through these things, what I want you to think of is at any point would you feel comfortable having had your child go spend the night at their house? Would you want that? Would you ever want to send your kid down to El Salvador for the summer to spend the summer with Alejandro and his family when they lived in a meson? You wouldn't do that. Because you would be worried about the effect that it would have on your kid. And all I'm saying to you is that was his life. He lived that life.

Now, he was raised in poverty, okay. He was. There's no doubt about that. These people were poor.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Doesn't -- and again, does it excuse this murder?  No.  We're not asking for that.  Does it form the person that he is now?  Yes.

I'm going to talk when I get to some of these about risk factors.  All right.  It's like smoking.  Okay.  Everybody that smokes a cigarette doesn't get cancer.  In fact, there are people that can smoke cigarettes for 40 years and never get cancer.  So you can't really say smoking causes cancer.  We think that.  Okay.  But we can't say that smoking causes cancer because if it actually caused cancer, if you smoked you would get cancer.  What it does do is greatly increase the risk that you get cancer.

And the same thing I'm going to talk about with these life factors.  Okay.  It doesn't make you a murderer.  Okay.  But it greatly increases the chance that you will be.  You go around to the prisons in this country, there aren't a lot of people there that had two loving parents.  Had all sorts of resources.  Parents took them to school --

MS. ROSE:  Objection.

MR. BRYSON:  -- they were involved in the PTA.

MS. ROSE:  No evidence of that.

MR. BRYSON:  I'm not saying there is.

THE COURT:  Yeah, I'll sustain the objection to that.

MR. BRYSON:  I argue to you that these are important

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 80 of 350
Case 3:06-cv-00164-RJC   Document 52-8   Filed 10/04/10   Page 80 of 32
JA3434

because they increase the risk that he would be exactly where he is now.

Now, he grew up very poor. Okay.

The other one is that he was raised without the care of his mother. Again, think about your own kids. Would you -- would anyone choose to be -- raise their child without the love of their own mother? And you wouldn't choose that. Yet, he was raised that way. And they say, oh, yeah, there were other women in his life. Yeah. I mean, his mother figure died when he was seven. I mean, you know, going back to their victim impact when they had Manuel's children on the stand. Okay. Very tough. Very tough to grow up without your father. Absolutely. We don't deny that. In fact, we embrace that because that's exactly what happened to him. He grew up without knowing his mother. That's a difficult circumstance for a kid. That's what formed his life. And the one mother that he knew died when he was seven. These are tough circumstances to grow up under. That forms the rest of your life.

He was exposed to violence of a civil war in his native El Salvador at an early age.

Now, aside from the experts telling you how damaging that is to kids and how it, you know, increases the risk that they're going to get into gangs and going to be delinquent and not develop a good moral code. In addition to that, you know,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 81 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/04/10   Page 82 of 132
JA3435

listen to what the other witnesses said. You know, the government's own witness Rony Lopez, how did he get here? He was from El Salvador too. He came here because his own family fled the civil war. What did he say? Parents were worried about the death squads, weren't they? Yes. That's why we came here.

So I mean, this -- this is very -- I mean, they can downplay it and say, oh, it's just a civil war in El Salvador. This is very serious, chilling stuff to raise your kids in. Rony Lopez's family decided we're going to get out of here. We're not going to do this. We're not going to expose our kids to this.

His family didn't. He did not have the benefit of schooling beyond the third grade. Again, you know, if your kid is in school and is struggling, what are you going to do? You're going to go to the school. You're going to try and get him extra resources, tutoring, whatever needs to be done. You want your kid to succeed. Okay. He got -- had trouble, couldn't pass the third grade. And that was it. Did you ever hear any stories about, you know, his dad going the extra mile to help sure -- make sure that he had all the resources he needed? No. It just is the way it was there. It was a very difficult time. And that was his life. Okay.

And the conclusion of all this is that his childhood was marked by factors that increased the risk of criminal

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 82 of 350
Case 3:08-cv-00164-RJC   Document 52-8   Filed 10/04/17   Page 83 of 32
JA3436

activity later in life. I mean, this has been studied. It's been documented. If you have a certain amount of factors, you increase the risk that you are going to be engaged in criminal behavior. And he had those. He had an upbringing which made it much more likely that he would be here today.

And the other one to that is that it was marked by factors that impeded his moral development. That was Dr. Sermeno who testified that she studied the moral development of children and her conclusion is that if you have certain risk factors present, it impedes your moral development, and they were present for him.

His early life experiences made him more susceptible to recruitment into MS 13. That was Maria Santacruz, the next to last witness that you heard from. And that she explained what the gang phenomena is going on down in El Salvador. Again, the government says, you know, so what. They had a civil war. You know, the civil war is very important down there and it explains why they're having such problems with gangs down there, and he's just one part of this. It was unfortunately predictable that he could be recruited into MS 13.

I skipped one and I want to go back because it was important and I missed it.

He suffered head injuries early in life that resulted in damage to the areas of his brain related to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 83 of 350
Case 3:08-cv-00154-RJC   Document 52-8   Filed 10/24/17   Page 43 of 32
JA3437

behavior. Now, this is three doctors, really. You only heard from two of them. You heard Dr. Merikangas who testified that he gave him a neurological exam. Physically examined him. And when he did, he found things that were wrong with him. Things that he suspected might be indicative of brain damage. Okay. And so he orders the PET scan. The PET scan, they hook him up to the machine and they inject him with radioactive dye and it goes to his brain and they monitor it and they can see how his brain functions. And those were the colored pictures that we got to see.

And the doctor who read the radiologist -- the radiologist who read the report said there's something wrong with his brain. His brain is not working properly. Okay.

Now, we heard from the government's doctor, Dr. Mayberg who came in here and said, no, it's a normal PET scan. Okay. Dr. Merikangas said, no, it's an abnormal PET scan and, you know, what I see is indicative of brain damage and affected his behavior, his ability to control himself, control his behavior. All right.

You want to cancel them out, that's fine with me. Because there was another doctor. Okay. Dr. Shaw, who wasn't hired by anybody. Who had nothing to gain by this. He was just -- he was there the day when his PET scan came in and he read it and what did he say? He said this guy's brain isn't working properly and it's indicative of the kind of thing that

Cheryl A. Nuccio, RMR-CRR (704)350-7494

you see with post-traumatic brain injury. Okay. Forget Dr. Mayberg if you want. Forget Dr. Merikangas if you want. The most neutral, most impartial person says his brain isn't working and it's indicative of brain damage. Okay. That's not in dispute. That is not in dispute. And Dr. Mayberg is not in a position to come in here and say he's wrong. She can disagree with him if she wants. Okay. But she's not a radiologist. He's the radiologist, not her.

And this is probably the most important thing when you evaluate his culpability is the fact that his brain isn't working right. This is pretty critical stuff when you're going to be evaluating whether or not to take a man's life because of what he did. You would like to think that his brain was at least functioning; that there's not anything wrong with his mind that could have led to this. This is really important and critical stuff.

All right. The murder did not involve substantial planning. And what we're saying to you here -- again, all murders are bad. Okay. Nobody is arguing about that. But this is not the kind of murder where a guy who had every advantage in life decides that, you know, he's tired of his wife and doesn't want to go through the hassle of a divorce so he plans to poison her and gets an insurance policy ahead of time. I mean, that's -- that's really truly preplanned, evil thinking. This was not. This was spontaneous. There was no

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 85 of 350
Case 3:05-cv-00164-RJC   Document 52-8   Filed 10/24/17   Page 86 of 132
JA3439

planning. No substantial planning. Nobody said we want you to go in there and shoot those guys. It's spontaneous.

And the other one is the murder occurred during an emotionally charged argument. Now, you found that he did it to increase his position. But there's no denying that this all happened within seconds of this argument, this fight at the restaurant. And again, when compared to other murders, it makes it not as bad as one that's planned out, calculated, taken a long time to conceive and put into action.

The murder did not involve cruelty or excessive infliction of pain or suffering. Again, as compared to other murders, kidnapping children, torturing people, really bad stuff that you hear on the news. Compared to other murders, there's no -- he didn't torture anybody. There's no lengthy death, prolonged death. Two gunshots, one to each, and that was it.

Number 12, Alejandro Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS 13. Now, obviously, nobody here is pro MS, but you kind of have to look at how this all comes about. Think about some of the other people that testified in this case. Think about Rony Lopez. Okay. He didn't seem like a bad guy from the way he presented on the witness stand. Okay. Now, we all know what he did. He did a lot of terrible things. Okay. But he saw MS as an attractive thing. He

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 86 of 350
Case 3:08-cv-00134-RJC    Document 525-8    Filed 10/04/10    Page 76 of 132

JA3440

joined.  He talked about how -- and of all people, you know, his parents moved away from El Salvador to get away from the civil war and then they moved away from Los Angeles to get him away from the gangs and he still joined MS.  And he even said, well, you know, my parents were working all the time.  They weren't around, you know.

So, you know, there is an attractive quality out there depending on who you are.  Okay.  And for him, somebody who didn't have a mother, lost the only mother figure that he had early in life, left home at an early age when his father married a much younger woman who was more like a sister to him.  He didn't have a family and it was attractive to him and he got involved in it.  And you know, you've read his own writings.  Very corrupted.  Very corrupted.

Now, there's another one where the court will allow you to find mitigating circumstances that you believe are important whether we've mentioned them at all.  It may have been something in the case that you think is mitigating.  Some feature, some fact of the case that you think makes him not deserving of the death penalty.  You are allowed to do that.  You know, there will be a space on the form for you to write them and there will be a space -- a place for you to weigh them and calculate.

And what I want you to do -- again, I think you've got the statutory aggravators.  I think there's two of them,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

but I think essentially they're one.  And I think if you find the other nonstatutory aggravators, I don't think they carry a lot of weight for the reasons that I've just described.  I do think that when you add up all these mitigating factors, they do have weight.  They are substantial.  This is not the kind of guy that had every opportunity in life and still did something really terrible.  This is a very different circumstance.

During the government's argument, you heard a lot about choice.  He had the choice to do this.  He had the choice to do that.  Well, nobody's denying that, but that's not the proper inquiry.

During the first part of the case, you were asked to determine his criminal responsibility.  And that's where choice came in to the picture.  Could he control himself?  Did he have a choice?  Did he know right from wrong?  What did he do?  You've already decided that.  That's been decided.  Okay.  If he didn't have a choice and if he committed the crime without choice, you would have found him not guilty.  If he didn't know right from wrong, you would have found him not guilty.

MS. ROSE:  Objection.

THE COURT:  Sustained.

MR. BRYSON:  We're beyond that.  Okay.  We are beyond that.  We are now determining moral culpability.  And

Cheryl A. Nuccio, RMR-CRR (704)350-7494

4Appeal: 10-6   Doc: 90-8   Filed: 08/14/2013   Pg: 89 of 350

864

the questions now are not what was his choice or whether he had a choice, but what diminished his control?  What shaped the choice?  What shaped his morality and his value system?  How did we get here?  And how was he damaged?

So criminal responsibility has been decided.  It was done in the guilt phase.  You already have determined he had control over himself and he had a choice and he knew right from wrong and what he did.  And we're left now with the moral culpability.  That other part about choice is gone.  And when determining choice, you have to put it in perspective of the moral culpability.  Somebody who committed these acts with every benefit in life, who had loving parents and had schooling and parents that took them to soccer games and grew up and still did something terribly evil would be much more culpable than somebody who had damaged or impairing factors.  It reduces his culpability, his moral culpability.  And the greater the factors, the lower his moral culpability.

And all we're saying is that that's why these mitigating factors are important.  That's why they should have weight.  And when you compare them to the aggravating factors, I think you should have to say I'm not convinced beyond a reasonable doubt the aggravating factors outweigh the mitigating factors and therefore my verdict in this case without anger and with true contemplation of the evidence is that in this case a life sentence is the appropriate sentence.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 89 of 350

JA3443

Thank you.

MR. FOSTER:  Ladies and gentlemen, because this is a capital case, in the sentencing phase, the defendant has two attorneys, and we each take our turn arguing during this phase of the argument.

You've decided the facts in this case as far as guilt and innocence.  Now your decision, once again, is structured as factual findings.  But really, when you get down to it, it's a more personal human situation of what are you going to do with Alejandro Umana?  Are you going to decide that he's going to spend the rest of his life in prison until he dies naturally there or are you going to decide that you're not willing to do that; you must give him the death penalty? That is the question before you.

And at no point in this process, as we've told you way back in jury selection, and it's come up again and it's included in the judge's instructions, I believe, that he just gave you or will just give you -- or will give you momentarily, there's no point in this process where your findings will ever require you to vote for the death penalty. It's always up to your judgment.  It's up to you to weigh the aggravating factors and the mitigating factors and decide what weight you give to them.  There's no formula.  There's no numerical value that you're going to be instructed about. That's your decision.  And you as a jury alone decide whether

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 90 of 350
Case 3:08-cr-00134-RJC   Document 523-8   Filed 10/04/10   Page 90 of 32
JA3444

it's appropriate that he get the death penalty or appropriate that instead he receive life imprisonment without possibility of release.

Now, I apologize if I tread some of the same ground that my co-counsel did, but this is a very important matter and we want to make sure we don't miss anything. Our client's life is on the line.

Let's look first at, in logical fashion, the aggravating factors. And I'm not going to repeat some of the things here. The two that you've already found in what we call the eligibility phase, I'm not going to address those. And I'm not going to address the first one about the protecting and maintaining the name and the reputation of the MS 13 gang, et cetera.

What I want to do is start off with the one that talks about the defendant causing injury, harm and loss to the victims' families and friends. Now, again, we know that Juan and Manuel Garcia did not deserve to die. They absolutely were innocent victims. They did not deserve to be shot. They did not deserve to die. Their families did not deserve to suffer their loss and to be without their loved ones the rest of their lives. But does that in and of itself make this, either one of these murders, worse than the average murder? No. Everyone has loved ones. Everyone has family. Loss is always suffered. I submit to you that that in and of itself

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 91 of 350
Case 3:08-cv-00154-RJC   Document 528-1   Filed 10/04/10   Page 2 of 32

JA3445

is not sufficient reason to impose the death penalty.  I would request that you assign that very little weight because that does not take this murder, either one of them, and make it any worse than a typical murder.

We are asking that you decide this issue about our client's future objectively, calmly, rationally, and not emotionally.  You know, a lot of anger can come out of this case about how terrible it was.  It was Christmas season in the restaurant and the Christmas decorations were up and they were in there, Manuel and Ruben and their employees, and that sort of thing.  And it sounds like the sweet family scene and then this terrible thing happens.  And yes, you can get angry at that.  You can think this is totally unjustified.  This is wrong.  It's a crime.  It's a terrible first degree murder.  And indeed, that's what you've already found.

Now the question is not how bad it is.  You found that.  The question is is it so much worse than other murders that the only just punishment is the death penalty?  We submit not.

One of the main things that they've hung their hat on, the prosecution, for aggravating factors here to justify the death penalty is that when Wizard walks into that bar in Greensboro on December 8th, 2007, he'd earned his respect by killings in the past.  Those killings in the past are these alleged murders in Los Angeles.  And the prosecution argues

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 92 of 350
Case 3:08-cv-00164-RJC    Document 52-4    Filed 10/04/10    Page 73 of 132
JA3446

these as though they've been proven to you. I submit that they have not been. The evidence that you've been provided is simply inadequate for you to find either the double murder on Fairfax Avenue or the Lemon Grove killing beyond a reasonable doubt as aggravating factors.

What is the evidence that we have first for Fairfax Avenue? We have the statements made by the three people who get caught. They're arrested. They're in custody. They've got every motive in the world to push the responsibility for the killing on to someone else. And what a big surprise. That's exactly what they do. In fact, when Juan -- I'm sorry, not Juan. Luis Rivera gets arrested, he initially lies to the police. Denies MS membership and some other things. And eventually comes around, changes his story. But when does he change his story? Only after he and his fellow gang member Mr. Ramos, Luis Ramos, gets arrested the same day. They both get arrested on April 16th, 2006. They're brought down to the police department. The police get their initial story from Luis Rivera.

They bring in Luis Ramos who also denies MS membership. Claims he doesn't know anything. He claims to the police initially he took a bus to the beach that day. Doesn't know anything. Doesn't know Wizard. Then he says he wants to see an attorney. That's the end of that interview.

But the police, wanting to further this

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 93 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/24/10   Page 93 of 132

JA3447

investigation, decide to put Luis Rivera and Luis Ramos in a cell together and listen in.  And what they hear is very interesting because as Detective Parshall testified to, they were in there trying to get their story straight.  Talking about how they would say this, they would say that.  They would basically cook up a story.  And they said they weren't going to do any time for some son-of-a-bitch.  They were referring apparently to who the government wants you to believe is Wizard.

But it's clear they're getting their story together to get themselves so they're not liable for this murder. They're staying in the car.  We're good guys.  Luis Rivera says he never got out of the car.  Had the crutches.  Never got out of the car.  Didn't do anything.  He's totally innocent.

But, you know, supposedly Wizard is the shooter. Luis Ramos -- well, and then Luis Rivera, you know, changes stories, too, from his initial story.  Next time he comes back, he's got Luis Ramos and Eddie Ruiz, their position switched in the back of the car.  And his second story has Luis Ramos getting out and being part of the confrontation that goes against these two other gang members.

Yet when Luis Ramos comes back and finally talks after he and Luis Rivera have gotten their stories straight, not only that day, but they got to spend the weekend in jail

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 94 of 350
Case 3:08-cv-00134-RJC   Document 525-8   Filed 10/24/17   Page 95 of 132

JA3448

together.  Then they come back and want to talk.  At that time Luis Ramos is claiming he only got out of the car at the end to get the crutch that was left behind by one of the other guys.

So their stories conflict.  They were clearly trying to get their stories straight.  And Luis Rivera, as you heard, about two months previous to this arrest in April 2006, he was arrested in February 2006.  Gave a false name and a false date of birth to the police.  And this is someone who the government wants you to trust his statement to the police as far as implicating Mr. Umana in this case.

The other person, Rene Arevalo, he's also interviewed in May 2006.  What does he say?  Well, of course, typical.  He lies too and says he's not MS.  And he cooks up a story that is -- that contradicts Luis Rivera and Luis Ramos.  They both claim that this was a group effort.  The car pulls over and the guys get out to confront the other two gang guys.

Mr. Arevalo, on the other hand, cooks up a story that completely minimizes his responsibility.  According to him, they don't pull over and he let's them out.  This is stop and go traffic.  He's driving along.  He's in traffic on Fairfax.  Next thing he knows, they get out of the car and do the thing and then he pulls over.  I mean, that's a completely exculpatory statement from him.  It's very unreliable.  He's distancing himself from involvement.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 95 of 350
Case 3:08-cr-00134-RJC   Document 1528   Filed 10/24/10   Page 95 of 132
JA3449

So how trustworthy is that? How trustworthy are any of these three statements from Luis Rivera, Luis Ramos, and Rene Arevalo? They're all self-serving. They're all minimizing their own responsibility or completely avoiding any responsibility. It's totally unreliable.

On the other hand, there were two eye witnesses who there's no indication were involved in gang activities whatsoever. They just happened to be there. One was Oscar Santiago who was interviewed by Detective Urina. And you heard Detective Parshall indicate that was in his report. And he told you what Oscar Santiago had said. He said that he saw this incident take place. That three guys got out of the car and the shooter was the driver. That's what Oscar Santiago told the police. Who was the driver? Rene Arevalo.

And Defense Exhibit 3 for identification, that I had Detective Parshall identify during my cross examination of him, was a little exhibit that Noe Bautista had drawn and given to the detectives that day. Take a look at it in evidence. This is Defendant's Exhibit Number 3 for identification which was admitted. And in that drawing there's a little note pointing to the driver position on the car and it says "shooter."

So who's more reliable? The two eye witnesses who are not gang members. Who had no apparent ax to grind. No reason to influence things one way or the other. Who say the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 96 of 350
Case 3:06-cv-00164-RJC   Document 52-8   Filed 10/24/17   Page 76 of 132
**JA3450**

driver was the shooter. Or three guys who are in custody trying to save their own rear ends and minimize their own responsibility. What's -- what has more weight to you? I submit to you that that is totally insufficient evidence to convince you of Mr. Umana's involvement in those murders as the shooter. Totally insufficient beyond a reasonable doubt.

Now, the other criminal conduct that they're trying to get you to find as an aggravating factor is what we've been referring to in this trial as the Lemon Grove Park murder. This is the one that happens about two months later in another part of Los Angeles up in Hollywood.

As you recall, this is the one at the basketball court. And the prosecution has argued here this afternoon that Freddy Gonzalez picked Mr. Umana out of a lineup. Well, that's true. But remember exactly what Mr. Gonzalez said in court.

As to the -- as to the first one, I cross examined him about what the Spanish statement was that he had written on the identification form. I read it to him and he agreed. What he had written is that photo number 2, the one of Mr. Umana, "looks like or resembles the guy who came to the park the day that they killed Andy. I remember seeing this guy, but I'm not sure if he is the one that came that day to the park with the pistol and shot us." This is proof beyond a reasonable doubt?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 97 of 350
Case 3:08-cv-00134-RJC   Document 526   Filed 10/24/11   Page 98 of 132
JA3451

He did another photo lineup and testified to that. This one was much more recent. This was done in April of 2008. And again, I cross examined him about what his Spanish handwritten statement was. And what he agreed to is that he had written, "My first impression was photo number 5," that being Mr. Umana, "the way that he has his hair looks the same. But everything happened so fast that I'm not a hundred percent sure. He came to the park. He seemed small. And what I saw was the gun and after that I began to run. This is the first and last time I saw the young man."

This is proof beyond a reasonable doubt that he's present in that park, present for the shooting? No. Not even close.

His statement to the police that day again, as my co-counsel brought up, that's not an admission of any involvement in this thing on any kind of knowing basis. Basically, what he told the police is he was a passenger in the car. This guy named Sin was the driver. He didn't know what they were going to go do. He wasn't the shooter. He wasn't in the park. And he was not the driver of the car. So he's not aiding and abetting in any way.

So the government fails completely on proving that aggravating factor beyond a reasonable doubt.

Let's talk about future dangerousness. They've alleged this in a generic form and then there's some sub

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 98 of 350
Case 3:08-cr-00134-RJC   Document 526-8   Filed 10/04/10   Page 98 of 132
**JA3452**

findings below that, but I'm just going to deal with the basic general allegation which is that the allegation is whether the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others as evidenced by at least one or more of the following, and then they list several things.

Now, the issue is is he likely to commit future acts of violence in the future if he's given life without parole such that the only just punishment is the death penalty? In other words, he's so dangerous we just can't imprison him safely. He must be given the death penalty.

The government's argument, basically, is that Alejandro Umana is essentially superhuman. There is no way to contain this guy. There's no way to stop him, to control him. But you heard the testimony of Mark Bezy and Mark Cunningham. The government didn't call anybody to rebut their testimony. The Bureau of Prisons has plenty of methodologies and varying skills of increasing security to deal with anybody, no matter how dangerous they are. They've got terrorists. They've got gang members. They've got everybody. But the government would have you believe that this one guy over here is far worse than anyone else. They can't make his cell safe. They can't make sure there's no weapons. They can't control his communications. They can't keep him from making phone calls.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 99 of 350
Case 3:08-cr-00134-RJC    Document 526    Filed 10/24/17    Page 99 of 132

JA3453

Well, you heard evidence of all those things; that the Bureau of Prisons can do those things and does do those things. They can make sure he does not communicate. That he does not get in any kind of trouble. They can make it safe.

Now, it's kind of interesting when you hear the government as part of their argument in court come in and say -- what it boils down to is saying we can't really do our job. We can't safely keep this guy. It's sort of a strange argument to be making. Clearly this is the federal Bureau of Prisons. It's the most highly trained group of custodial people in the country, if maybe not the world. They know their job. They can keep him safe. And I would submit to you that that is not a basis to select the death penalty in this case.

You may recall towards the end of the trial Rony Lopez was being brought -- brought back in to testify very briefly about something that he said that Alejandro Umana said as he was leaving the courtroom. You may recall that Rony said as he was being escorted this way at the end of his testimony, going through here (indicating), my client said something about your family will pay for this or something. But ask yourselves how credible that is. How many -- I think I -- I did, I cross examined Mr. Lopez about this. You know, he was escorted across the courtroom by three or four marshals who have been right next to him. Did you hear any of them

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 100 of 350
Case 3:08-cr-00134-RJC    Document 50-8    Filed 03/23/17    Page 100 of 350
**JA3454**

testify about hearing anything, any words spoken by the defendant? No.

And I also cross examined Mr. Lopez about the fact that Mr. Umana here is the last of the 26 defendants in this indictment. The last of the people he cooperated against undercover to have their case resolved. So doesn't it stand to reason that he might be a little bit concerned that his benefits and protection for he and his other six family members might be at an end and therefore that it might be to his advantage to have the government believe that the threat is still alive, it's still current even though the case is coming to an end. Ask yourselves that question.

But in any event, Alejandro Umana is not Superman. His case is over. He is not superhuman. He cannot break through walls. He cannot do things that other humans can't. He's just another person who would be detained, incarcerated for the rest of his life and the Bureau of Prisons can handle him. So I would submit to you that that is not sufficient justification to take his life in this case.

Now, let's talk about mitigating factors. The government in their argument a couple times used the word excuse. That some of these things were excuses. Let's be clear about this. My co-counsel said it, but I'm going to say it again. None of the things we've offered during the mitigation part of this trial did we put to you as excuses.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 101 of 350
Case 3:09-cr-00134-RJC   Document 50-8   Filed 10/24/10   Page 32 of 132
JA3455

You've made the finding that he's guilty of these murders. The excuse period is over. We're not offering any excuses. But you must determine whether or not this person lives or dies based on looking at the aggravating factors, looking at the mitigating factors.

Mitigating factors are not excuses. They're explanations. They're reasons why you might decide to give Mr. Umana life imprisonment without the possibility of release rather than death. If you had just a blank slate and you didn't know anything about the person but had just convicted him of the crimes as you've done in this case, you wouldn't simply decide whether he gets death or life. You don't have enough information. That's why we presented what we presented during the mitigation phase. You, as a human being, want to know who the person is before you decide whether the death penalty is appropriate or life without the possibility of release is the appropriate punishment. We would submit to you that our client's background is very, very important.

Now, the government's approach is basically it doesn't matter. Yes, he had whatever -- he grew up in civil war, but basically it doesn't matter. People make choices.

But the issue is what options were open to him and how did he make his choices? What influences in his life led him to make the choices that he made? And does that matter to you in deciding whether he lives and dies? I mean, you'll be

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 102 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 10/24/10   Page 85 of 132
**JA3456**

the ones who decide whether it matters.  Obviously, you're required to consider all these things.  You're required to consider the mitigating factors and determine whether you find any of them.  And you're required to consider the aggravating factors and whether you find any of those.  But ultimately, it is your decision in weighing these factors to determine what is the just punishment.

If everyone was treated the same for each type of crime, we wouldn't have to go through this process.  It really wouldn't make much difference.  But it does matter.  A person's background matters.  And you've heard about the life he had.  Being raised during civil war in El Salvador. Growing up in a violent world, which is not just the violence itself, it's the effect that it has on everyone's perceptions, on everyone's values and how you resolve disputes.  The security you feel in your own home.  Safety, security.

You heard evidence that when he was growing up as a child, his father would -- even the nights when the curfews were not in place, he would voluntarily lock the family in. And he told Mr. McGough that his son Alejandro exhibited a lot of fear during those times.  With good reason.

You also heard evidence that Alejandro Umana, when he was a child, had the unfortunate experience of witnessing a murder by four or five people of a victim killed by machetes and saw the dead body up in the coffee fields.  Try to imagine

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 103 of 350
Case 3:08-cr-00134-RJC    Document 502-8    Filed 03/23/10    Page 34 of 82
**JA3457**

what effect that would have on you growing up and your ability to govern yourself and live a lawful life and value human life. What kind of value do you put on human life if you grow up seeing these sorts of things?

I would submit to you that that is a substantial disadvantage that Alejandro Umana had that the rest of us don't have. We did not grow up with that.

Not only that, no mother in his life. And in fact, he said on that interview to Monica -- that you heard from Monica, his former girlfriend and the mother of his son down in Santa Ana, she said something to the effect that his mother loved only his brother and did not love him. Clearly that was something that he had told her one or more times. That was her strong impression, that she believed that. So you can imagine that that is exactly how Mr. Umana felt to have said that to someone like that.

Not only that, he told other people, such as Judy Vanessa Rivera who was also on the videotape. You'll recall she was the granddaughter of Bernardina Rivera who was also on the video. It was Judy Vanessa Rivera who said that during the time that Alejandro was working there and sort of staying there, he told the family there that he was an orphan and that he'd sort of been adopted by Don Carlos Aquino's family. You can imagine the low self-esteem and the sadness that would be in your heart to tell another family that you're becoming

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 104 of 350
Case 3:08-cr-00134-RJC   Document 592-8   Filed 10/04/10   Page 85 of 82
JA3458

friends with that you're an orphan. That you -- that you really feel that you are an orphan. You've been abandoned.

And he had been abandoned. His mother, under whatever circumstances, was not part of his life. She was not there. And yes, he had some replacement in his great grandmother, but she passed away at seven. Another shock to a young child.

So this is someone who did not have stability. Did not feel love. And there are signals that he expressed that to others in saying that he was an orphan and saying that his mother didn't love him.

So he's already starting out life with some substantial weighty disadvantages. Are we saying he's a victim? No, he's not a victim. But these are things that you should consider in deciding whether he lives or dies.

The rest of us go through elementary school. Most everybody -- well, most everybody makes it to high school. Not all people graduate, but just about the majority of people do in our country at least. What we're used to. Alejandro Umana did not complete third grade. The evidence is from he and his father that apparently he repeated it a couple times. The school records kind of drop off at the end of '94 with the indication being he was retained for the following year. And that's where the trail kind of ends.

Now, you know, what is the point of this? The point

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 105 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 10/24/10   Page 86 of 92
**JA3459**

of this is that he did not have the opportunities available to him that others had. With a third grade education at best, you know, he was limited to what he could do. He was doing manual labor type jobs as the assistant to the assistant to the Coca-Cola driver. Then he was at the bottom of the food chain doing masonry helper work on that cell tower. And a couple other jobs. Nothing really over any sustained period of time. So this is where he is in life.

And then after school, he -- it's really unclear what happens to him at that age. Of course, we have the issue of how old he really was at that age. His father had told him he was born in '84. Recent evidence suggests that perhaps he was actually born in 1982 and was actually older. And what does that tell you if he was actually born in '82? That means during the 1994 school year he's older -- he's older. He's 12, at least at the end of that school year, for third grade, which is obviously a couple years older than typically one is. And yet, still he has problems.

Again, does this make him a victim? No. Does it excuse what he did? No. But does it mitigate this case, this crime and enable you to understand how someone can get themselves into a situation where they end up getting jumped in to the MS 13 gang?

We have inner-generational abandonment. The father did not have his mother raise him. And this was repeated

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 106 of 350
Case 3:08-cr-00734-RJC    Document 50-8    Filed 03/23/17    Page 106 of 350
**JA3460**

again in Alejandro's life. And you heard Maria Santacruz testify about the significance of that. We have parental negligence. The father and whoever else was acting as the motherly role in Alejandro's life, no one took care to get him beyond the third grade. His father never took care to get him registered with a birth certificate during his youth. He had no DUI, which is the national identity card in El Salvador. Thus, when it came time, due to some soccer skills and he was trying out to go to the regional team, he couldn't do it because he didn't have the right form of identification. He had no papers.

So, you know, what kind of effect would that have on you as a kid? You're growing up. You're excited about soccer. You have something you're good at, but because your father doesn't seem to care enough to take the right steps, you hit a roadblock and you're done.

These things would lead one to have insecurity and doubt about their personal identity. And in fact, these were various risk factors that were identified by Maria Santacruz based on the study she did in El Salvador in 2000 with 938 gang members, 45 percent of whom were MS 13. She found five broad categories of risk factors that were present in his life. The social exclusion based on the living in a meson, one of these very small tenement homes where multiple families share a single bathroom and kitchen. The poverty. No school

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 107 of 350
Case 3:08-cr-00134-RJC  Document 50-8  Filed 10/24/10  Page 85 of 132
**JA3461**

beyond third grade. And that what she called the sub employment: Working in very low wage employment without social security. That sort of thing.

The next one, culture of violence. Growing up in a civil war. Experiencing the murders that -- the murder that he witnessed reportedly.

Those are two of them. The third one was the community disorganization. The fact that he lived in this meson. No indication of any kind of opportunity for play in any kind of green areas or any kind of discovery, as she put it. Another risk factor.

And the biggest one, the one that she spent the most time on was the dysfunctional family. This, of course, is common sense. And I don't want to repeat myself too much, but again, what do we have here? We have abandonment by his mother. His caretaker -- the female caretaker dies when he's only seven years old. We have inner-generational abandonment. His father was abandoned and now it extends down to him. We have conflict in the home when Alejandro's father marries a woman -- or actually, she was a girl at the time two or three years older than Alejandro himself. Evidence is there is some sort of conflict. Eventually he does not feel comfortable at home and leaves at an age earlier than typically one does in El Salvador unless one is getting married. And again, we have the parental negligence I just referred to.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 108 of 350
Case 3:08-cv-00573-RJC   Document 50-8   Filed 10/24/10   Page 89 of 132
JA3462

So these are all the dysfunctional family things: The lack of family support, the lack of security that most of us have growing up that he did not have.

And then we have his difficulties with personal identity. This is the thing about the doubts and questions about when he was born. How old he really was. Where he was born. You know, how come he doesn't have a relationship with his mother. All these things. Another risk factor. So these were five risk factors that, according to Maria Santacruz, would be consistent with someone being susceptible to being recruited into a violent street gang. Which is exactly what happened.

Does that excuse him joining? No. Does that make him a victim? No.

The prosecution will argue constantly that he made his choices. But who was he when he made the choice? Apparently he joined in about 2001. We have the new birth certificate. If that one is accurate, he's 19 or he was 17 if the '84 one is accurate. Either way he's still young even if you're 19. Yes, you may be an adult, but you heard Eduardo, the Coca-Cola driver, in his interview, talk about how immature Alejandro seemed for his age.

So this is still a decision by a young person at a point in time when he's not fully matured. He's not -- he may not be making the best decisions of his life. And reportedly,

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 109 of 350
Case 3:08-cv-00734-RJC    Document 50-8    Filed 03/23/17    Page 90 of 132
JA3463

the reason he joined was because there was some girl associated with the gang who he wanted to get close to.

And of course, you've heard evidence from the government's own witnesses.  Once you're in, you're in.  That decision made perhaps for a frivolous reason branded him for life and sent him on a course that may not have been one he fully contemplated, we don't know.  But in any event, it's had lifelong consequences.

And we would submit the fact that he was raised in this environment with these risk factors is a mitigating factor.  It is a reason for you to give life rather than death.

Another thing about his childhood is according to both Rafael, his father, and Alejandro himself, he had a couple of falls where he got some fairly serious head injuries.  One of which required his father to carry him to the hospital.  And he still has a scalp wound from that incident.

And the history of his life since then has been recurring headaches with nausea and pain.  So that's not something that's just been brought up out of the blue.  So when Dr. Merikangas does his neurological evaluation and finds things that aren't quite normal and does the PET scan and finds that, yes, indeed, the radiologist report independently finds that there are abnormalities and Dr. Merikangas agrees

Cheryl A. Nuccio, RMR-CRR (704)350-7494

there's abnormalities, and these are things that would affect his ability to control his behavior. It's all consistent.

It's another reason to give Alejandro Umana life rather than the death penalty. He was not operating under all the benefits and advantages that most of us have.

The question between the death penalty and life imprisonment without parole as far as mitigating factors, as my co-counsel indicated, it's one of moral culpability. Is someone with these disadvantages growing up and being vulnerable to being jumped into a gang and being led down that path, are they as morally culpable as someone who has all the advantages, makes rational decisions and still chooses to commit murders? We would submit no.

We would submit that death is not the only answer in this case. You can give life. You can exercise your judgment and exercise mercy and decide that you're going to meet these violent crimes which you've convicted Mr. Umana of, you're going to respond with nonviolence. That he's going to be incarcerated for the rest of his life without possibility of release, and that there is -- it is not necessary that the death penalty be imposed.

No matter what you've heard from this -- from the witnesses from the government or the government attorneys or anything else, the life of Alejandro Umana has value. He's not completely bad. He's not completely evil. You've

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 111 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 10/04/10   Page 92 of 132

JA3465

heard -- you know his life pretty well now.  There are reasons why you should feel that there's not a need for him to receive the death penalty.

So we would ask you to spare his life.  To objectively look at all the factors in this case, not in an emotional manner, not in an angry manner, but in a manner that does justice, and a manner that recognizes that each of us has our own backgrounds that explain why we do certain things. And that this young man deserves a punishment of life without possibility of release.  To spend the rest of his life in prison, never to be released again no matter how long he lives, that that is the appropriate punishment, that that is a sufficient punishment and that you can give that sentence of life imprisonment without parole to my client, Alejandro Umana.

THE COURT:  Members of the jury, I think we're going to take our afternoon break before you hear the last rebuttal closing argument from the government.  So if you would keep an open mind until you've heard all the arguments and the instructions from the court.  We'll take a 15 minute break. Be back at ten to 5:00.

(Brief recess at 4:33 p.m.)

THE COURT:  We ready for the jury?

MS. ROSE:  Yes, Your Honor.

THE COURT:  Call the jury.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 112 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 10/24/10   Page 93 of 132

JA3466

(Jury entered the courtroom.)

THE COURT:  Ms. Rose.

MS. ROSE:  Thank you, Your Honor.

May it please the court, members of the jury:

Let's bring something back to the front here and that's that this defendant is compared with other MS 13 members according to what they would have you believe, because all those MS 13 members were framed and formed and created out of El Salvador.

But you know what we heard today from one of their witnesses?  There are only 240 MS 13 members in prison.  And I can promise you that if one of them was there for life and was behaving, we would have heard all about it.

MS 13, yes, we heard a lot about the violence and we heard a lot about the gang.  But think about what you heard here as well.

Rony.  He grew up somewhat like the defendant.  He left and came to the United States.  And he joined the gang. Certainly.  But he didn't kill.

They questioned Gorilon who grew up just like he did.  Came to the United States later.  Was a member of the gang.  He bought into it.  But he didn't kill.

Stiler, his number one friend.  We heard him on tape.  We heard how deep into MS Stiler was -- Stiler is.  No evidence of killing.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 113 of 350
Case 3:08-cr-00734-RJC   Document 50-8   Filed 10/04/10   Page 113 of 182

JA3467

Compare him to those around him.  Was it bad?  Sure. Did it help form who they were?  Sure.  Anybody, whether you join a gang in America, it's because of certain factors.  But not every gang member is a killer.  And he is.

So let's compare him to the people around him and quit taking him out and separating him and looking at him as if he is only this way because of factors.  He's here because of who he is.  And he's a killer.  He's shown it over and over and over again.  And he's a killer among killers.  They talk about killing, yeah.  But we haven't had any evidence of it. And of all the people that were around him, he was the killer. He rose to the top as the killer.

So, yes.  Is MS bad?  Sure is.  We've put on a lot of evidence about that.  Are they violent?  Yes.  But of everything you've heard from all the people you've heard about from both sides and all their cross examination, he's the only killer.  So you remember that.  Compare that.  He's risen to the top.

And as you think about his history and as you think about his background -- I'm not going to say he had a great life.  He had the life that other boys in El Salvador had at the time.  But everything you've heard about him has been framed through whom?  The mitigation expert.  Every bit of evidence everyone relied on here, even the doctor, except for the scan, was based upon what?  It was filtered through their

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 114 of 350
Case 3:08-cv-00734-RJC    Document 50-8    Filed 10/24/10    Page 95 of 132
JA3468

mitigation expert. You're going to base your decision on that? Hearsay from a hired mitigation expert. Those psychiatrists, psychologists made their decisions, formed their conclusions based on what? What I was told by Mr. McGough's report. None of them interviewed the defendant.

Are you going to base all these mitigating factors that you've heard about as it's been filtered through whom? The hired mitigation expert. Mitigation. Hired to do what? Mitigate. Hired to do what? Convince you to do other than what you know you need to do and what you said you would do when you were selected as jurors.

Let's talk about mitigation evidence. Because the judge told you back at the beginning of this trial that you should always judge the credibility of the witnesses and the believability of the witnesses.

Number one mitigation: Mark Cunningham. He couldn't give a straight answer to me if he wanted to. He tells you that no murderers murder in prison. What wasn't on his slide? The two people that were stomped to death at the highest security prison in the United States. What wasn't on his slide was about how they've had to go through all these security features because the inmates there keep finding ways to get around it.

Mark Cunningham. You got his CV. I don't know, probably the first two or three pages talk about what?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 115 of 350
Case 3:08-cv-00734-RJC   Document 50-8   Filed 03/23/10   Page 96 of 132
JA3469

Capital sentencing cases. Competency to waive appeals. Forensic psychology evaluations at capital sentencing. Sentencing determination in death penalty cases. Best practices in capital sentencing cases. He's on the circuit for the defense attorneys. He's on the circuit to help them come up with mitigation and tell you killers don't kill. Prison is safe.

If prison -- if everybody could be contained, why do we hear about all these multi levels of security that they have to have in prison? Because it's violent.

And then what about Dr. Merikangas? Well, you heard about him. He comes from Maryland to see this defendant not to render a diagnosis, not to offer treatment, but because he has been forever going to these death penalty conferences, defense attorney conferences and saying call me. I'll help you out. I got the ticket. It's real pretty. It's colorful. It's called a brain scan and we can convince them that he can't formulate a thought and thus they shouldn't put him to death.

I think, members of the jury, if you look back at these mitigating factors, you need to consider the credibility of the information that was provided to you. The credibility of the people that they brought here to give you this information.

You know why Dr. Merikangas couldn't give him a

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 116 of 350
Case 3:08-cv-00734-RJC   Document 50-8   Filed 10/04/10   Page 97 of 132
JA3470

diagnosis? Well, I wasn't brought here to diagnose or treat him. Well, if he's that bad off, you're a doctor, shouldn't you do something? Couldn't you have ordered him some medication for his headaches. Couldn't you have recommended something? No. Because you can't diagnose evil. You can't diagnose bad. That's why he didn't diagnose him. There wasn't any other diagnosis. He didn't bother. He was here for one reason. Is that credible?

We heard about broad generalizations, all of it based through their filtered mitigation expert.

So yeah, choice. I think choice is a very important thing for you to think about. They want you to think he didn't have a chance. That he didn't have a chance. Therefore, he had no choice.

He had a choice to join the gang. He did it for a girl. Don't you think it's interesting that we heard about him joining the gang. We heard it was for a girl. And then there's this whole vacuum of information. You know why? They don't want to talk about it. It's none of your business. Just trust us on this. They didn't want to give you that information about those choices.

He chose to join the gang. He chose to get tattooed. He earned those tattoos. You heard how you get those tattoos. He earned his tattoos. He chose to come to the United States.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 117 of 350
Case 3:08-cv-00734-RJC    Document 50-8    Filed 10/24/10    Page 95 of 82
JA3471

Now, here was his chance. Here was his chance. He came to the United States. Yes, he came with whatever his baggage was, but he came to the United States. He had a chance for a fresh start. He had a chance to make a new life. He had a chance. But what was his choice? His choice was to continue with MS. He immediately joined with the MS in LA. He was identified with other gang members in LA. He chose to follow MS across the country. He chose to follow MS wherever they wanted him to go. Those are choices. And he had every chance. Along the way, members of the jury, he had every chance to say no just like anybody does. It wasn't about a chance; it was about a choice. And that's why we're here to hold him accountable. It's for those choices.

The victim in this case, you heard about Manuel. He grew up poor. He farmed. Planted seeds. Harvested before and after school. He didn't get a good education. He grew up poor. He came to the United States. And he built a life. And he came back and he made it legal. How much different is Manuel's story than this defendant's? He was poor. He was uneducated. But he made a choice. He took the chance. When he was given the chance for a new life, he took it. And you all heard about the life that he made.

So ask yourself when we're comparing people here, look at the life Manuel and Ruben made from sad circumstances and deprived circumstances. It's about a choice. And it was

Cheryl A. Nuccio, RMR-CRR (704)350-7494

about a choice to kill and keep killing.

Noe Bautista said, I think it was the driver.

The guy driving by said, I think it was the driver, but I didn't see anybody else in the car.

Noe Bautista said three people in the car.

Here's what's significant, and you've got the transcripts. All of those individuals were interviewed separately. And I don't know if you remember the officer talking about after one was interviewed and told the story, put the other two together. And they're like, man, I don't want to talk about him. I do not want to talk about him. Read those transcripts. I don't want to talk about Wizard. That dude is a killer. They were scared.

And Arevalo's interviewed at a totally different time. And they point out some inconsistencies about who was sitting in the middle, who was sitting on this side. The facts, as the officer told you, were consistent across the board. This is how we pulled up. This is what happened. And man, he went off. Sound familiar? They flipped off the gang and he went off. And he froze them. Just like he did in Greensboro. That's a consistency you need to consider.

Same thing with the park. Yeah, the ballistics mattered. They'd like to discount them. But who's the only person that's at those two places? The defendant. And guess why those people died? Because of the gang.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 119 of 350
Case 3:08-cv-00134-RJC   Document 52-1   Filed 10/04/10   Page 119 of 132
JA3473

So they'd like you to discount that evidence, but let me ask you this. Gustavo Porras, one of those little spray painting tagger guys. A teenager. He flipped off the gang. And he was shot between the eyes. His friend Jose Herrera turned to run and he was shot square in the back of the head. Somebody had the presence of mind. This wasn't a wild, reckless shooting. This was deadly and on point.

What happened in Greensboro? Right through the middle of the chest. Perfect. Ruben got shot through the middle of the chest and he fell. And his brother apparently turned to look because he gets shot through the side of the head and it exits all the way through. Deadly shot. He doesn't play.

But what does that show you? It shows deliberation and it shows intent. This was not reckless action. This was a choice. This was with thought. It was deliberate. And that murder, those murders, all of those murders, whether you want to talk about LA or talk about Ruben and Manuel Garcia, a murder transforms a living person, a person with hopes and with dreams and with a life, into a corpse. It takes away everything special and unique. Everything special and unique about Ruben and Manuel was wiped from this earth by his actions. But they want to stand up here and talk to you about how special and unique he is and that he doesn't deserve to die because of it.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 120 of 350
Case 3:08-cv-00154-RJC   Document 523-8   Filed 10/04/10   Page 120 of 132
JA3474

So what are the aggravators?  You've heard about that.  That it was a gang killing.  I'm not going to go over that with you.  The uncharged murders.  You just think about the evidence you heard and about the consistencies between those.

And you heard a little bit about the defendant's statements to law enforcement in April of '08.  If you get a chance to look at that, look at the cat and mouse game he played.  The brain damaged guy over there, he played an awesome cat and mouse game with the investigators.  Yeah, I was there.  Pulled it out of my pants.  I don't know.  I shot it.  Read it.

Just like the codes, just like his letters.  This isn't some brain damaged individual over here.  He's cold, he's calculating, and he's very savvy.  And I think you saw that in his letters.  He's very, very savvy.

Let me ask you something.  Why did he leave LA?  Apparently things were going well there.  He had the gang.  He was doing okay.  He fled.  Everybody else is there around those murders.  Why did he leave?  What was he running from?

And what did he do here?  He fled.  Evidence of guilt.  Flight is evidence of guilt.

I want you to look closely at one of those aggravating factors that you'll see.  It's called callous disregard.  It's a reason to weigh in favor of death.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 121 of 350
Case 3:08-cv-00164-MRJC   Document 50-8   Filed 10/04/10   Page 121 of 350
JA3475

MR. BRYSON:  Object.

MS. ROSE:  Callous disregard.

MR. BRYSON:  Object.

THE COURT:  Basis?

MR. BRYSON:  That's not one of the aggravators.

THE COURT:  Sustained.

MS. ROSE:  The car ride.  Remember the car ride? You heard the tape.

THE COURT:  Ms. Rose, before you continue.

Members of the jury, disregard any comments about callous disregard.

MS. ROSE:  Remember the car ride from Greensboro or when -- I guess when they were picked up in Concord to Charlotte.  One of the comments of the defendant was, yeah, they're dead.  We left them there dead and they can suck my... That's remorse?

And then he goes and gets a burrito or a taco. That's remorse?

Smell my gun.  Smell the gunpowder.  I just killed two people with it.  He was proud because that's who he is. And he'd done what he had chose to do.

Then what does he do?  He goes out looking for more rivals.  Let's kill some more.

And then he talks about the cops.  And you probably listened to these earlier and they're talking about him having

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 122 of 350
Case 3:08-cv-00164-RJC   Document 522-8   Filed 10/04/10   Page 108 of 132
JA3476

the gun. And Rony says, you know, that gun in this car, those cops over there stop us.

The defendant says: They're only going to stop you. That's not a problem. Let them stop us. Just let that son-of-a-bitch try and that's it. Get back. I'm going to give them one. Just lean back and pop. He's going to receive a big blow.

Members of the jury, is that remorseful? Or is that who this defendant is? Is that who he is?

He threatens witnesses. You've heard about that. You found him guilty of that. You saw it in court. You read it in those letters. Wonder why Moe and Chipis aren't here? Do you wonder? Do you wonder why they weren't here? You saw it in those letters. One of them got beaten up on order of this defendant.

And then he comes to court with a shank. And what do they tell you is the reason for him to have this shank? Very ingeniously sharpened, I might add. Did you know that graphite and pencil lead would help you sharpen an instrument? I sure didn't. But he did. You know, the brain dead guy over here, he knew. He knew to sharpen that pencil, get out that lead and rub that blade, that piece of metal against concrete and sharpen it. Is that calculating?

But they say he did it to fight off rivals. Over here at the federal courthouse. There were a lot of rivals in

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 123 of 350
Case 3:08-cv-00134-RJC    Document 52-1    Filed 10/04/10    Page 143 of 132
**JA3477**

the courthouse.  You know who the rivals were?  They're the marshals.  Those are his rivals.  The judge is his rival.  I'm his rival.  Anybody in this courtroom is a rival.  You're his rival.  He brought it on the first day of jury selection.

MR. BRYSON:  Objection.

THE COURT:  Sustained, Ms. Rose.

MS. ROSE:  Rivals.  He's got to fight off rivals.  And you know why we're rivals?  Because we stand for justice.

MR. BRYSON:  Objection.

MS. ROSE:  We are against him.

THE COURT:  Overruled.

MS. ROSE:  We stand for justice.  Because we're the justice system.  We stand between MS, we stand between this defendant and their goals.  The crazy life.  La vida loca.  I want to live the crazy life, he said.

You want to live the crazy life?  You need to be ready for some American justice.  You want to bring El Salvador here, you want to bring your gang from El Salvador here, you want to kill us, you want to live your crazy life here, well, you'd better be ready for some American justice if you're going to do it.

And that's why you're here.  You tell them -- you think MS is listening?  You think they're watching?  What are they going to say when all this is over?  When you've made your decision?  Justice in this case is not prison.  Prison to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 124 of 350
Case 3:08-cr-00134-RJC   Document 522   Filed 10/04/10   Page 124 of 132

**JA3478**

this defendant, it's the playground. He's going to be there -- 25 percent of the people there are gang members. He'll be with his homies.

You know what prison is for him? It's like sending your child to their room. I'm going to send you to your room. And if you're bad, I'm going to lock you down in your room. That's what prison is to him. And you hear where the worst of the worst is? When you're really, really bad, you get sent to ADMAX in the foothills of the Rockies. You go to the foothills of the Rockies to live your life and look outside when you're the worst of the worst.

You all saw a lot of letters that the defendant had written. I want to share one with you. And you remember as he wrote in code, as he gave all these ciphers, he knew the government was reading his mail. That's why he wrote in ciphers and code. That's how he sent these messages about get Moe, get Chipis, organize this gang out there, organize this gang out here. He wrote that in code. But because he knew we were watching, he sent a few words to us.

This one is called -- it's got a title. One more day with the beast. Do you remember who the beast is? It's tattooed on his body. It's in his heart. It's the devil. It goes like this:

"One more day has now begun and I thank the beast that we keep on standing here with a joint of weed and a fully

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 125 of 350
Case 3:08-cv-00164-RJC    Document 522    Filed 10/04/10    Page 126 of 132
JA3479

loaded gun, ready and prepared to go out into the streets like I have always planned. I don't know the fate of this day, but let me tell you, I'm still here in this world and belong to my gang. Mara Salvatrucha 13 is what I belong to. Day by day I go out into the streets to look for those F'ing gangs and the only thing I find is the F'ing police who want to arrest and F with my gang. That is the risk I take every day with these F'ing good for nothings and these F'ing police who want to finish off the destiny of my gang. But I tell them it can't be done yet because now we have come to control. Because now we have come to belong to Mara Salvatrucha 13, to represent so all these fags can listen to us and know that they don't have to play and that they have to respect the Mara Salvatrucha. Damn F'ing good for nothings and that F'ing authority. They will have to suck up to us and even though they don't believe it, the Mara Salvatrucha 13 has to triumph. On the streets or in the prisons, we are always going to control."

That's his message to you. Those are his words, his thoughts and his message to you. It's his challenge to you. He's mocking justice.

As he stood facing Manuel and Ruben, you heard all about it. As he stood there and as they froze, for every second or moment or click of time that they stood there facing death is one more thing to put -- for you to put on that scale in favor of death.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 126 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/04/10   Page 126 of 132
JA3480

And for each act of bravado following those murders, smell my gun, let's eat tacos, let's chase girls, let's kill some more, for every one of those actions, put that on the scale in favor of death.  He's eating burritos and they're dead on the floor.  Think about that.

His tattoo says it all.  And we heard one of the defense experts say he didn't want to leave the gang because he liked living the life.  And his tattoo says it all.  I will live the crazy life until I'm dead.  I think that's how it was translated.  I will live the crazy life until I'm dead.  That's your decision.  That's your decision.

So we have Carmen and Betsy, two young girls who came in here and poured their hearts out to you.  Think about those girls.  So you can say to Carmen and Betsy when you look at them out there, we saw your pain and we felt your sorrow and we heard your grief.  I want you to put their tears on that scale, that weighing that you're going to do, put that on your scale.

The defendant, if you give him life, is going to have his inmate bill of rights.  I read them out to Dr. Cunningham.

He took lives.  Are you going to give him his bill of rights?  Manuel and Ruben didn't have a bill of rights.  They didn't have a thought, they didn't have a chance.  You going to give him his bill of rights?  And all the benefits

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 127 of 350
Case 3:08-cv-00164-RJC   Document 52-8   Filed 10/04/10   Page 66 of 132
JA3481

that come with it.  You heard them all.

If his life in El Salvador was as bad as they painted it, prison looks good.  It's clean.  Dental, healthcare, meals, the commissary.  Like Dr. Cunningham said, if he's good -- he's going to be good.  You know why?  Because he wants to make sure he gets his beans and potato chips.

You going to send him to the commissary?  I want you to weigh that bill of rights that Manuel and Ruben didn't have but that you're going to give him.  Is that justice?  Is that justice?  Is that justice?

Manuel and Ruben, you know, this is a sad thing.  This is what you know other than what you heard about Manuel and Ruben Garcia (indicating).  That's what you know.  You know that ultimate act of depersonalization.  They cease to become living, breathing humans and became a corpse.  Well, they're a corpse.  And they're a corpse and you're going to send him to the dining hall.  Is that justice?

Are you going to send him to the recreation yard?  Are you going to let him step outside and talk to his homies?  Is that justice?  He's going to see sunshine.  He's going to watch the sunset.  He's going to see flowers.  He's going to feel spring breezes.  Is that justice?

You don't look at those little girls out there and say that's justice.  He got what he deserved.  We're going to send him to the Rockies if he's bad.  Is that justice?

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 128 of 350
Case 3:06-cv-00154-RJC    Document 52-8    Filed 10/04/10    Page 128 of 132
JA3482

Every one of you said I can do it and I will do it. We have given you the evidence.  The law supports it.  And you know it's the right thing to do.

You going to give him the minimum?  Does he deserve the minimum sentence?  Because life is the minimum sentence in this case.  Does he deserve the minimum sentence?

Do not by your verdict be the water that washes the blood from his hands.  Don't let him live the crazy life.  You send him a message.  You send the community a message.  You send MS a message because they're listening and they're watching.  And you give this family and you give this community justice.

Thank you.

THE COURT:  Members of the jury, as I said, I'll give you some final instructions to guide your deliberation from this point forward.  You will have a copy of these instructions with you in the jury room along with special verdict forms for each of the counts twenty-two through twenty-five, and each of the aggravating factors and the mitigating factors that I read to you will be applicable in your consideration of each count.

The United States has alleged several aggravating factors in this case.  During the eligibility stage you found unanimously two statutory aggravating factors.  That is, that the defendant created a grave risk of death to one or more

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 129 of 350
Case 3:08-cv-00164-RJC   Document 52-8   Filed 10/04/10   Page 129 of 132
**JA3483**

persons other than the victims of the offense, and that the defendant killed more than one person in a single criminal episode.

The additional aggravating factors alleged by the government in this case are as follows. As I said, the same factors are alleged for each count and I instruct you to consider each count separately.

One, gang motivated killing. The defendant killed Ruben Garcia Salinas and Manuel Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS 13 and to advance his position and reputation within the criminal enterprise.

Two, victim impact evidence. As demonstrated by each victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family and friends, the defendant caused injury, harm and loss to Ruben Garcia Salinas and Manuel Garcia Salinas' family and friends.

Three, participation in additional uncharged murders and other acts of violence. Apart from the offenses charged in the indictment, defendant has been involved in other serious acts of violence which are not reflected in his criminal record, including but not limited to:

(A), on or about July 27th, 2005, in Los Angeles, California, defendant knowingly, intentionally and unlawfully

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 130 of 350
Case 3:08-cv-00164-RJC    Document 52-8    Filed 10/04/10    Page 130 of 132
JA3484

killed Jose Herrera and Gustavo Porras.

(B), on or about September 28th, 2005, in Los Angeles, California, defendant knowingly, intentionally and unlawfully participated and aided and abetted the killing of Andy Abarca.

Four, future dangerousness. Defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others as evidenced by at least one or more of the following:

(A), continuing pattern of violence. Defendant has engaged in a continuing pattern of violence, attempted violence and threatened violence including but not limited to the crimes charged against the defendant in the indictment.

(B), low rehabilitative potential. Defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct and his allegiance to and membership in MS 13.

(C), lack of remorse. Defendant has never expressed any remorse for killing Ruben Garcia Salinas and Manuel Garcia Salinas as indicated by defendant's statements to fellow gang members during the course of and following the offenses alleged in the indictment.

(D), gang membership. Defendant has demonstrated an

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 131 of 350
Case 3:08-cv-00134-RJC   Document 521-8   Filed 10/04/10   Page 131 of 132
JA3485

allegiance to and an active membership in MS 13, a violent criminal enterprise.

I previously instructed you that the defendant has a constitutional right not to take the stand and testify and not to speak at all or offer any evidence and that you must draw no adverse inferences of any kind from his exercise of his privilege not to testify.  Therefore, silence standing alone does not indicate a lack of remorse.

These aggravating factors are set out in the special verdict form for each count and you must consider them separately.  You must decide for each one whether you unanimously agree that it has been proved by the government beyond a reasonable doubt, indicate your answer on the form, and continue until you have finished with them all.

Regardless of your findings on these aggravating factors, you must proceed to the next step in your deliberations which involves consideration of mitigating factors.

The law never assumes or presumes that a defendant should be sentenced to death.  Accordingly, the defendant is under no obligation to establish the existence of any mitigating factors or to disprove the existence of any aggravating factors.  A defendant may, of course, choose to argue specific mitigating factors, and the defendant has offered evidence on the following factors in this case:

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 132 of 350
Case 3:08-cv-00134-RJC   Document 522   Filed 10/04/10   Page 133 of 132

JA3486

One, that Alejandro Enrique Umana was raised in poverty.

Two, that Alejandro Enrique Umana was raised without the care of his own mother.

Three, that Alejandro Enrique Umana was exposed to the violence of civil war in his native El Salvador at an early age.

Four, that Alejandro Enrique Umana suffered head injuries early in life that resulted in damage to areas of the brain related to behavior.

Five, that Alejandro Enrique Umana did not have the benefit of schooling beyond the third grade.

Six, that Alejandro Enrique Umana's childhood was marked by many factors that increased the risk of criminal activity later in life.

Seven, that Alejandro Enrique Umana's childhood was marked by factors that impeded his moral development.

Eight, that Alejandro Enrique Umana's early life experiences made him more susceptible to recruitment into MS 13.

Nine, the murder did not involve substantial planning.

Ten, the murder occurred during an emotionally charged argument.

Eleven, the murder did not involve cruelty or

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 133 of 350
Case 3:08-cv-00134-RJC   Document 522-8   Filed 10/04/10   Page 133 of 132
**JA3487**

excessive infliction of pain and suffering.

Twelve, Alejandro Enrique Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS 13.

Thirteen, any other factor in the defendant's background, record or character or any other circumstance of the offense that mitigates against imposition of a death sentence.

The defendant need only prove these mitigating factors by a preponderance of the evidence, that is, by evidence sufficient to persuade you that the factor is more likely present than not present.  The law does not require unanimous agreement with regard to mitigating factors.  Any juror may find the existence of a mitigating factor and must then consider that factor in weighing the aggravating and mitigating factors even though other jurors may not agree that the particular mitigating factor has been established. Moreover, any juror may consider a mitigating factor found by another juror even if he or she did not concur in that finding.

Your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors.  The law permits you to consider any other relevant mitigating information presented in this proceeding in addition to the specific factors cited above so long as its

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 134 of 350
Case 3:08-cv-00134-RJC   Document 52-8   Filed 10/24/10   Page 135 of 352
JA3488

existence was proved by a preponderance of the evidence.

Relevant mitigating information includes anything in the defendant's background, record, character or any circumstance of the offense which suggests to you that a sentence of death should not be imposed.

Throughout these instructions references to mitigating factors should be understood to include other relevant mitigating information.

Record your findings -- you should record your findings as to the mitigating factors as indicated by the special verdict form. Regardless of your finding as to these factors, however, you must proceed to the next step in your deliberations which involves weighing aggravating and mitigating factors.

After completing your findings regarding aggravating and mitigating factors, you must engage in a weighing process to determine whether a sentence of death is justified. In this process, you must consider only those aggravating factors that you unanimously found to exist, including the two statutory aggravating factors you previously found during the eligibility phase of the sentencing hearing.

Each of you must also consider any mitigating factors that you individually found to exist. And you each may consider any mitigating factors found by any of the other jurors. You must determine whether the proven aggravating

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 135 of 350
Case 3:08-cv-00164-RJC   Document 52-8   Filed 10/04/10   Page 165 of 132
**JA3489**

factors sufficiently outweigh any proven mitigating factors to justify a sentence of death.

The task of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone if there are no mitigating factors is not a mechanical process. You must not simply count the number of factors, but consider the particular character of each which may be given different weight or value by different jurors. What constitutes sufficient justification for a sentence of death in this case is exclusively left to you. Whatever aggravating and mitigating factors are found, a jury is never required to conclude the weighing process in favor of a sentence of death. But your decision must be a reasoned one, free from the influence of passion, prejudice or arbitrary consideration.

In considering whether a sentence of death is justified, you shall not consider the race, color, religious beliefs, national origin or gender of the defendant or of the victim. You are not to impose the death sentence unless you conclude that you would do so no matter what the race, color, religious beliefs, national origin or gender of the defendant or the victim may be.

Whatever sentencing decision you reach, each of you is required by law to sign a certification attesting to the fact that you have followed this instruction. This certification is set out in section 4 of the special verdict

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 136 of 350
Case 3:08-cv-00164-RJC    Document 32-8    Filed 10/04/10    Page 136 of 132
JA3490

form.

At the end of your deliberations, if you unanimously decide that the defendant be sentenced to death or to life imprisonment without possibility of release, the court is required to impose that sentence. Remember, that these are the only two choices of punishment available in this case.

Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to it. In other words, your verdict must be unanimous.

It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but only after impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

The defendant did not testify. The law gives him that right. There is no burden upon a defendant to prove that he should not be sentenced to death. The burden is entirely on the government to prove that a sentence of death is justified. Accordingly, the fact that the defendant did not

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 137 of 350
Case 3:08-cr-00134-RJC    Document 528    Filed 10/04/10    Page 136 of 132
JA3491

testify must not be considered by you in any way or even discussed in arriving at your decision.

As before, if you should desire to communicate with the court at any time during your deliberations, please write down your message or question and pass the note to the court security officer who will bring it to the court's attention.

Also, the exhibits will be available in electronic form on the computer system in the deliberation room.  If you would like to review an exhibit not listed on the computer, or if you would like to see a document or -- to see a document or object itself, please make that request in writing.  However, in any message or question you might send, you should not reveal any details of your deliberations or how any juror member is leaning in his or her decision.

Again, nothing I have said in these instructions and nothing that I have said or done during the trial has been said or done to suggest to you what I think your decision should be.  What the decision should be is your exclusive duty and responsibility.

Does either side wish to have a sidebar on these instructions?

MS. ROSE:  No, Your Honor.

(Defense counsel conferred.)

MR. BRYSON:  Briefly.

THE COURT:  Very well.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 138 of 350
Case 3:08-cv-00164-RJC    Document 52-8    Filed 10/04/10    Page 138 of 132
JA3492

(Side-bar conference as follows:)

THE COURT: Yes.

MR. BRYSON: Earlier in the proceedings, the government had filed a motion asking that we not be allowed to pursue evidence or argument about equally culpable co-defendants in the case. And we indicated to the court that while we were not going to pursue the statutory mitigator, we did think there was a nonstatutory mitigator based on Rony's statement involving himself and Solo, and Mr. Foster indicated we intended to introduce a document regarding the Tigre murder. The court granted that motion. We were not allowed to get into that and our proposed mitigator was not submitted.

During the government's closing argument, on one of the arguments that they made in -- in support of a sentence of death was that the defendant was the only MS 13 member that was a killer. And we feel disadvantaged at this point that we were not able to pursue that.

MS. ROSE: I argued that on the evidence in the case.

MR. FOSTER: And they should be --

MS. ROSE: Those witnesses that testified.

MR. FOSTER: And they should be compared to other MS 13 members, which is --

THE COURT: I think she did make that argument. And as I listened to that argument, it was in reference to other

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 139 of 350
Case 3:08-cv-00134-RJC   Document 53-8   Filed 10/04/10   Page 139 of 132
JA3493

MS members charged with the crime or accessories after the crime.

I know you mentioned Stiler.  Who were the other defendants that were mentioned?

MS. ROSE:  I mentioned Gorilon, Stiler, and Rony.

THE COURT:  And so the defense objection is that you were not allowed to argue --

MR. BRYSON:  We couldn't put in evidence of it and we couldn't argue it.  We couldn't get our mitigator in.  And now we feel like we've been -- you know, an argument has been made that, you know, he's the only one that killed in this gang and that's not true.

MR. NAZZARO:  I think it was specified to this case.

MS. ROSE:  I specified the individuals that were asked.  They testified.

MR. BRYSON:  Well, Gorilon --

MS. ROSE:  You asked him about death squads and you cross examined him on the made up story about --

MR. BRYSON:  I mean, Gorilon wasn't involved in the actual murder itself.

MR. NAZZARO:  No, but I think the argument was and there was evidence, there were questions about his background and whether he ever killed anybody and he testified about that.

MS. ROSE:  You asked Gorilon and Rony about the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 140 of 350
Case 3:08-cv-00164-RJC    Document 32    Filed 10/04/10    Page 140 of 132
JA3494

death squad.

MR. FOSTER:  That's not what we're talking about. We're talking about Rony being an aider and abettor to a robbery/murder that was committed by Solo which was part of the case.  He's a co-defendant.  And also the murder by Tigre.

THE COURT:  The -- my ruling with respect to the equally culpable statutory and nonstatutory factors stands.  I don't think it's relevant to the jury's individualized assessment of the defendant's culpability in this murder.  And I think that the government's comparison of his conduct to the conduct of others, I believe, was appropriate.  It was limited to co-conspirators who were involved in -- with respect to Stiler and Rony, were involved in being accessories after the fact to the murder charged in the indictment, and Gorilon was charged in other overt acts related to the conspiracy.

And so to the extent that the defense believes it was unfairly prejudiced by the argument of counsel, I don't think you were.

To the extent you argue it opened the door to the submission of a nonstatutory aggravating factor of the fact that other MS 13 defendants were not charged capitally, I just stand by my ruling.  I think it's the appropriate one in the case.

I am going to instruct this jury before they retire that they are to base their decision in the case on the

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 141 of 350
Case 3:05-cr-00174-RJC   Document 522-8   Filed 10/04/10   Page 224 of 332
JA3495

ultimate punishment on the jury's individual assessment of the defendant's -- of the appropriate sentence for this defendant and not to send any particular message to anybody else.  I think that cautionary instruction to the jury is warranted in light of the arguments made by counsel in closing.  And so I will instruct them on that.

But as to the argument with respect to the inability to put on a nonstatutory aggravating factor as argued, the ruling the court's made stands.

Anything else?

MR. BRYSON:  No, Your Honor.

MR. FOSTER:  No, Your Honor.

(End of sidebar conference.)

THE COURT:  All right.  Members of the jury, I'm going to send you back with the jury instructions both in hard copy and electronic form as well as the special verdict forms as to each count.  And as I do that, I want to remind you that your -- you're to follow the instructions of the court.  That you are to make an individualized assessment of the appropriate punishment for this defendant in this case on the counts before you and that you should not, in doing that, consider any other message that you might send to any other group or individuals.  Your determination is to be an individualized assessment of the appropriate punishment in this case for this defendant and that's what I instruct you to

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 142 of 350
Case 3:06-cv-00154-RJC   Document 592-2   Filed 10/04/10   Page 23 of 32
JA3496

deliberate on at this time.

Thank you.

Oh, yeah, the usual request for the four of you on the right to step aside.

(Jury, excluding the alternates, exited the courtroom at 5:42 p.m.)

THE COURT:  Do you all have any personal effects in the deliberation room?

(Negative nods.)

THE COURT:  You thought ahead.

THE COURT:  Jurors 179, 127, 22, and 89, you've heard this before and so I'll give you the same instruction I gave you earlier.  Your service as alternates and potential jurors in this case is not over yet, but there does appear to be 12 jurors who are capable of deliberating and so your services are not needed at this time.

What I'm going -- what I'm going to do is allow you to go home, go about your daily affairs with the instruction not to talk about the case with anyone, amongst yourselves, with any family or friends, and not to -- and to avoid any exposure to media coverage of this case on the radio, on TV, over the internet.  Do everything you can to keep from getting exposed to any coverage of the case.  And to keep an open mind in case, for whatever reason, the court has to call you back and engage your services in the deliberative process.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 143 of 350
Case 3:05-cr-00074-RJC    Document 522-8    Filed 10/04/10    Page 143 of 132
JA3497

And so you're free to go home at this time with those instructions.  You've heard those instructions in the guilt phase of the case.  I repeat them now and they will stay in effect until further notice of the court.

But with those instructions, if the marshal would escort the alternates from the courtroom at this time.

Thank you.

(Alternates exited the courtroom.)

THE COURT:  Y'all want to take a break before we go through the process of verifying the electronic capturing of the evidence or do you want to do that at this time?

Let's go ahead and get that done.  Why don't we do that.

Madam Clerk, would you...

THE CLERK:  I'll start with the government's first.  Starting with Exhibit 501, 502, 503.

MR. FOSTER:  My screen is not coming up here for some reason.

THE COURT:  Start again.

(Pause.)

MR. FOSTER:  I'll just go over to this screen.  Can you start over.  I didn't see the first one.

THE COURT:  We'll start at 501.

THE CLERK:  Okay.  501.

(Knock on the jury room door.)

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 144 of 350
Case 3:08-cv-00157-RJC   Document 320-8   Filed 10/04/10   Page 25 of 32
JA3498

THE COURT REPORTER:  We don't have a CSO.

THE COURT:  Do you want to go.

(A note was tendered to the court.)

THE COURT:  They want to go home for the evening.

MR. BRYSON:  I'm shocked.

THE COURT:  Madam Clerk, if you would tell the jury they can go home for the evening.  And so having -- go ahead -- instructed them to do that, do you want to continue with this process tonight or would you rather come in at 8:30 -- I guess 8:45 tomorrow morning?  Actually, we could do it at 9:30.  I mean, the jury will start deliberating at 9:30, but we could supply any requested exhibits that they ask for while we go through the process.  So let's start at 9 o'clock. Let's come in here at 9 o'clock and start this process.

MR. BRYSON:  Oh, we had that proffer issue.

THE COURT:  Yes.  And is your witness here?

MR. FOSTER:  He's been here all day.  If we could --

THE COURT:  We could do it now or in the morning.

MS. ROSE:  If he's not, Ms. Conrad is here and could read the Spanish.

THE COURT:  Yeah, let's go ahead and take his testimony at this time.

Mr. McGough, if you would come forward.  Remind you you're still under oath.

THE WITNESS:  Okay.  Thank you.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 145 of 350
Case 3:08-cv-00154-RJC   Document 52-8   Filed 10/04/10   Page 26 of 32
JA3499

RICHARD McGOUGH,

having been previously duly sworn, was examined and testified

further as follows:

VOIR DIRE EXAMINATION

BY MR. FOSTER:

Q.   Mr. McGough, I think it was yesterday -- it seems like a

long time ago, but I think it was just yesterday you testified

about this birth certificate that had been recently received

from the government regarding Guatemalan birth.

A.   Yes.

Q.   And when you received it, did it also have a document

associated or attached to it that was some sort of a

narrative?

A.   Yes, it does.

Q.   And is it written in Spanish?

A.   Yes.

Q.   And have you reviewed it?

A.   Yes.

Q.   And what does it appear to be?

A.   It is a report from a member of the National Civil Police

of El Salvador that reports on a conversation that he had with

Letishia Ramirez who is Alejandro's mother.

Q.   Does it indicate when this conversation took place?

A.   In 2008.  I can't see the top, but it has an exact -- oh.

14th of June of -- yeah, 14th of June 2008.

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 146 of 350
Case 3:08-cv-00164-RJC    Document 58-8    Filed 10/04/10    Page 146 of 132
JA3500

Q.    Up at the top right, what's the date -- oh, I'm sorry.

A.    The top -- it's a report that's given over apparently -- it's a date of 13th of April 2010, which I presume is when the report was sent to the prosecutor.

Q.    Okay.  So go back to what -- the date that she was interviewed and what she told the police.

A.    He reports on an interview that he had with Letishia on the 14th of June of 2008.

Q.    And what did he -- what did she tell him according to the report?

A.    The report is a narrative of her account to the -- to the officer whose name is at the bottom, and I can't tell who that is at this point.  I'm assuming that it was this Corporal Carlos Alberto Moreno who was an investigator for the CAT, which is the transnational gang unit formed by the -- part of the National Civil Police of El Salvador in consultation with the FBI.

Q.    And so what is it that she told him according to that report?

A.    She goes into the circumstances of Alejandro's birth in Guatemala.  And what it says is that Rafael Enrique Umana, the father of Alejandro, took the family -- or took to live in a place called La Parrillada, which is located in an area of Guatemala called Escuintla.  And that in this place Don Rafael or Mr. Rafael Umana had some of his family with him.  Among

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 147 of 350
Case 3:08-cv-00134-RJC   Document 55-8   Filed 10/04/10   Page 126 of 132
**JA3501**

them his grandmother whose name is Francisca, the mother -- his mother, meaning Rafael's mother, whose name is Ana, and an aunt whose name is Carmen. They went to live in Guatemala and that is where Alejandro Enrique Umana Ramirez was born.

And to prove the situation, it goes on to say, she, meaning Letishia, gave us a copy of a certification of birth, and it goes into identifying it by the number, meaning the number that it would be found in the folio in this place in Escuintla, Guatemala. It goes on and explains more and more about, you know, the location of it and its number.

And then it says that this birth certificate that's identified above says that Alejandro Enrique Gonzalez Ramirez, which is given as the name for Alejandro, was born in the hospital -- National Hospital of Escuintla on the 25th of November of 1982 at 11 o'clock -- 11:30 in the morning. And he was the son -- it says that he is the son of Luis Armando Gonzalez, meaning the father, and Letishia Ramirez, the mother. And that this certification, in other words, the certification of this birth was given over -- or a copy was given over on the 12th of May in 2003.

Q. Given over to who?

A. Letishia. She's the one who's giving it to this official, this officer.

She also told us, meaning Letishia, also told us on that date that it was -- that it was Rafael Enrique Umana who went

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 148 of 350
Case 3:08-cv-00134-RJC   Document 535   Filed 10/04/10   Page 148 of 350
**JA3502**

to take out or to register the birth of his son and that for this reason -- or for that use or for that purpose, he utilized an identification with the name of Luis Armando Gonzalez. And that this name, Luis Armando Gonzalez, is the name of a cousin of Rafael. And that the only thing that she, meaning Letishia, knows about Luis Armando is that he lived in the Department of Sonsonate, which is in El Salvador.

Q. Does it say anything else?

A. Let me just catch up with myself here.

It goes on to say that in one of his -- some statement or some words attributed to him, identifying Rafael -- I mean Alejandro as Wizard, mentioned that his place of birth was in Santa Ana; but however, they have asked for a birth certificate from this place. And they found that Alejandro Enrique Umana Ramirez is not registered -- his birth is not registered.

And he goes on, he, the police officer from El Salvador, goes on to say I'm adding to this report a copy of the Guatemalan birth certificate that I refer to in this narrative.

Q. And so this is the -- that's basically what the document says.

A. Yes, that -- yeah. Yes.

MR. FOSTER: Your Honor, that's our proffer that we would have -- that was what we were trying to introduce during

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 149 of 350
Case 3:08-cv-00164-RJC    Document 52-8    Filed 10/04/10    Page 149 of 132
JA3503

our mitigation phase, Your Honor.

THE COURT:  Is there any cross?

MS. ROSE:  No.

THE COURT:  All right.  You may step down and be excused.

THE WITNESS:  Thank you.

(Witness stepped down.)

THE COURT:  Anything further from either side?

MR. FOSTER:  No, Your Honor.

THE COURT:  All right.  We'll come back at 9:00 in the morning to begin the check off process with the evidence captured electronically.

And until then, we'll stand in recess.

(Evening recess at 5:56 p.m.)

*****

Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 150 of 350
Case 3:08-cv-00134-RJC   Document 58-8   Filed 10/04/10   Page 150 of 132

JA3504

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

          I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

          Dated this 6th day of May, 2010.


                              s/Cheryl A. Nuccio
                              Cheryl A. Nuccio, RMR-CRR
                              Official Court Reporter


                    Cheryl A. Nuccio, RMR-CRR (704)350-7494

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 151 of 350
Case 3:08-cv-00164-RJC    Document 52-8    Filed 10/04/10    Page 32 of 32

JA3505

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | **DEFENDANT'S REQUEST FOR** |
| | ) | **INSTRUCTION ON MITIGATING** |
| ALEJANDRO UMANA | ) | **FACTORS** |
| | ) | |

Defendant, through undersigned counsel, hereby requests that this Honorable Court instruct the jury that the following mitigating factors can be considered during their deliberations on the penalty selection phase:

1.      That Alejandro Enrique Umana was raised in poverty.

2.      That Alejandro Enrique Umana was raised without the care of his own mother.

3.      That Alejandro Enrique Umana was exposed to the violence of civil war in his native El Salvador at an early age.

4.      That Alejandro Enrique Umana suffered head injuries early in life that resulted in damage to areas of the brain related to behavior.

5.      That Alejandro Enrique Umana did not have the benefit of schooling beyond the third grade.

6.      That Alejandro Enrique Umana's childhood was marked by many factors that have been identified by the Department of Justice as increasing the risk of criminal activity later in life.

7.      That Alejandro Enrique Umana's childhood was marked by factors that impeded his moral development.

8.      That Alejandro Enrique Umana's early life experiences made him more susceptible to recruitment into MS-13.

9.      The murder did not involve substantial planning.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 152 of 350
Case 3:08-cr-00134-RJC   Document 504   Filed 03/23/10   Page 152 of 3
**JA3506**

10.      The murder occurred during an emotionally charged argument.

11.      The murder did not involve cruelty or excessive infliction of pain and suffering.

12.      Alejandro Enrique Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS-13.

13.      No other defendants who committed gang-related murders as part of this conspiracy will receive the death penalty.

14.      The execution of Alejandro Enrique Umana would cause grief and loss to his son Rafael and to Monica Reyes.

15.      If he is not sentenced to death, Alejandro Enrique Umana will be incarcerated for the rest of his life in federal prison without the possibility of release or parole.

16.      Any other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence.

Respectfully submitted,

April 27, 2010

s/ Mark P. Foster, Jr.
Attorney for Defendant
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Phone 704-347-1809
Fax 704-332-2716
e-mail:  mpfosterjr@bellsouth.net

s/ John Bryson
Wyatt Early Harris Wheeler, LLP
1912 Eastchester Drive, Suite 400
High Point, NC 27261
336-819-6016
Fax 336-819-6076
jbryson@wehwlaw.com

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 153 of 350
Case 3:09-cv-00134-RJC Document 50-8-1 Filed 04/27/10 Page 153 of 350
JA3507

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above **DEFENDANT'S REQUEST FOR INSTRUCTIONS ON MITIGATING FACTORS** has been duly served on the attorney listed below by e-mail service through ECF on this date as follows:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

April 27, 2010

s/  Mark Foster
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Pone704-347-1809
Fax 704-332-2716
E-mail:  mpfosterjr@bellsouth.net

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 154 of 350
Case 3:08-cv-00154-RJC   Document 50-8   Filed 04/27/10   Page 3 of 3
JA3508

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


UNITED STATES OF AMERICA    )    DOCKET NO. 3:08-CR-134-2
                            )
    vs.                     )    VOLUME VI
                            )
ALEJANDRO ENRIQUE RAMIREZ UMANA )
_____ )


TRANSCRIPT OF SENTENCING PHASE
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES CHIEF DISTRICT COURT JUDGE
APRIL 28, 2010


APPEARANCES:

On Behalf of the Government:
    JILL WESTMORELAND ROSE
    Assistant United States Attorneys
    100 West Trade Street, Suite 1700
    Charlotte, North Carolina 28202

    SAM G. NAZZARO
    U.S. Department of Justice
    950 Pennsylvania Avenue NW
    Washington, D.C. 20530

On Behalf of the Defendant:
    JOHN DAVID BRYSON
    Wyatt, Early, Harris & Wheeler, LLP,
    P.O. Box 2086
    High Point, North Carolina 27261

    MARK PATRICK FOSTER, JR.
    Law Offices of Mark Foster, PC
    1011 E. Morehead Street, Suite 300
    Charlotte, North Carolina 28204

                    LAURA ANDERSEN, RMR
                    Official Court Reporter
                 United States District Court
                  Charlotte, North Carolina

Case 3:16-cv-00057-MOC Document 50-8  Filed 03/23/17  Page 155 of 350
Case 3:08-cr-00134-RJC Document 50-8  Filed 01/30/11  Page 1 of 26
JA3509

928

<u>I N D E X</u>
<u>E X H I B I T S</u>

GOVERNMENT'S EXHIBITS:

| NO. | | RECEIVED |
|---|---|---|
| 501-504 | .......................................... | 929 |
| 505-505d | .......................................... | 929 |
| 506-507 | .......................................... | 929 |
| 509 | .......................................... | 929 |
| 510 | .......................................... | 930 |
| 515-516 | .......................................... | 930 |
| 517-517c | .......................................... | 930 |
| 518 | .......................................... | 930 |
| 520 | .......................................... | 930 |
| 522-523 | .......................................... | 930 |
| 525 | .......................................... | 930 |
| 531-535 | .......................................... | 930 |
| 536-536c | .......................................... | 930 |
| 541 | .......................................... | 930 |
| 544-545 | .......................................... | 930 |
| 547 | .......................................... | 930 |
| 549-549a | .......................................... | 930 |
| 550-551 | .......................................... | 930 |
| 535a | .......................................... | 930 |
| 556, 563, 570, 574, 578, 581 | .......................... | 930 |
| 152-152b | .......................................... | 937 |
| 153 | .......................................... | 938 |
| 1158-158b | .......................................... | 938 |
| 171-171b | .......................................... | 938 |
| 172-172b | .......................................... | 938 |
| 174-174b | .......................................... | 938 |
| 175-175b | .......................................... | 938 |
| 176-176b | .......................................... | 938 |
| 177-177a | .......................................... | 938 |

* * * * * *

DEFENDANT'S EXHIBITS:

| | | |
|---|---|---|
| 3, 5, 12, 14-24 | .................................... | 933 |
| 25 | .......................................... | 934 |
| 26-32 | .......................................... | 935 |
| 34-39 | .......................................... | 936 |

* * * * * *

| | |
|---|---|
| QUESTION #1 | 930 |
| JURY VERDICT | 938 |

* * * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 156 of 350
Case 3:08-cr-00134-RJC Document 50-8   Filed 01/30/11   Page 2 of 26

JA3510

929

P R O C E E D I N G S

THE COURT:  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  We're ready to run through the exhibits so we're all on the same page as to what's in what's out.

Madam Clerk, could you start at 501?

COURT CLERK:  This is 501.  And also look at the description as well.  If there's something there that needs to be changed; 502; 503; 504.

Should I go ahead and mark these for release at the same time?

THE COURT:  Yes.  We'll go through all these.  And if there's something that can be cleared up with just a comment, we'll do it at that time.  But if there's an extended objection or concern, we'll come back and deal with that.

But go ahead and mark them as released unless we unmark them.

COURT CLERK:  This is 505.  This is the one I did from the document camera, so 505a is page two of that; 505b is page three; c is page four; and d is page five.

THE COURT:  And that's all indicated in the description page.

COURT CLERK:  Here is 506; 507; 509.

Laura Andersen, RMR 704-350-7493

JA3511

930

MR. NAZZARO: Is there two pages to 506 and 507?

COURT CLERK: Yes, 506 is page one of three. Then 507 is also three pages; 509 was the photo; 510. And I do not show 511 admitted; 515; 516; 517. And then again 517a, b, c is page two, three and four; 518, 149 pages; 520; 522; 523; 525; 531; 532; 533; 534; 535; 536; 536a; 536b; 536c; 541; 544; 545; 547; 549a; 550; 551; 553a; 556; 563; 570; 574; 578 and 581.

Do you want me to do the defense or stop at the government? That's all the government exhibits.

THE COURT: Everybody agreed to the exhibits so far?

MR. BRYSON: Yes, Your Honor.

MS. ROSE: Of course the Guilt Phase exhibits are still back there?

COURT CLERK: They're still released.

THE COURT: They're released.

MR. NAZZARO: What about the sentencing letters, are they listed separately?

MS. ROSE: They were on the other exhibit list, but they were admitted during the sentencing phase.

THE COURT: We'll go back to those. Let's do the defense and go back to the letters.

MR. NAZZARO: Only thing is on the Freddy, there were three pages to that exhibit. I'm not sure that all

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 158 of 350
Case 3:08-cr-00134-RJC   Document 551-8   Filed 01/30/11   Page 4 of 26
JA3512

931

three of those were moved to admit.

COURT CLERK:  Which number is it?

MR. NAZZARO:  The last one was the translation. I'm not sure that was part of the exhibit.

MRS. RENEE HENSLEY:  They're 506, 507.

COURT CLERK:  506.

MR. NAZZARO:  The last page was just the translation.  I don't believe I showed him that part of the exhibit.  I did ask him what he meant when he said it, but I don't think that was part --

THE COURT:  I don't recall the translation being admitted.

Mr. Foster, what were you quoting from when you were --

MR. FOSTER:  Well, I was reading directly from those English translations as part of my cross-examination. When I did so, I was not referring to their exhibit number. I just asked him if in fact those were the truthful translations.  He agreed with me on both, which is verbatim what those exhibits said.

THE COURT:  I just don't recall them being moved for admission or admitting them.

MR. NAZZARO:  I don't think I did.  Just two pages on each of the items.  I think I just pulled off the last page, because he didn't do the translation.  So I just

Laura Andersen, RMR 704-350-7493

**JA3513**

932

showed him what he stated and what the photo spread was and then asked him about --

THE COURT:  Mr. Foster, do you recall moving admission?  I know you crossed and argued from, but I don't know that you moved admission of it.

MR. FOSTER:  Well, I did not.  But I thought that was part of the whole package, but I can't remember specifically what -- how it was moved into evidence, to be honest with you.  I think it was presented as a three-page document.  And I don't recall that when you moved it in you limited it, but I --

MR. NAZZARO:  I never showed the witness the third page and then moved that page.  That's my recollection.

THE COURT:  I'm going to admit the whole three page document.  I think it was -- if it was separated, I don't recall it being separated.  Certainly it was crossed on and argued from.

So to the extent it wasn't moved during the trial of the matter, I think that's as a result of a misunderstanding by the defense as to what was actually moved.  And it was crossed on, and the witness did indicate that's what was written.

And so I'm going -- if I have to reopen to admit, I'll do that.  But I'm going to admit that part of the exhibit.

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 160 of 350
Case 3:08-cr-00134-RJC Document 334   Filed 01/30/11   Page 160 of 260
**JA3514**

933

All right.  Let's go to the defense exhibits.

And would one of the prosecution team try to figure out which letters we're dealing with when we get to that.

COURT CLERK:  Defense Exhibit 3 is admitted. Exhibit 5, Exhibit 12.

THE COURT:  Why don't you relabel that the Foster exhibit, since Mr. Foster always finds some way to bring a ruler into any trial he conducts in this court.

COURT CLERK:  Exhibit 13 is not in.  Exhibit 14. Exhibit 15.

And pay close attention to the descriptions on these, because I didn't have an exhibit list to go by.

Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19, Exhibit 20, Exhibit 21.  And it will have sound, my computer's muted.  Exhibit 22, Exhibit 23, Exhibit 24.

MR. BRYSON:  Her name is Judy Vanessa.

MR. FOSTER:  Judy Vanessa Rivera.

(Jury knocks at 9:32 a.m.)

THE COURT:  Let me tell you all what the question is, and then you tell me whether your client needs to be here before we discuss it.

They can't find electronic copy of instructions nor verdict sheets.  And then they want multiple hard copies.  And also missing defense exhibits too, which we're

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 161 of 350
Case 3:08-cr-00134-RJC   Document 592   Filed 01/30/11   Page 161 of 26
JA3515

934

in the process of getting for them so.

MR. BRYSON:  I don't think we need the defendant here for that.

MR. FOSTER:  No, we don't.

THE COURT:  The question is, "Can't find electronic copies of instructions", and then it skips a line, "nor verdict sheets-multiple copies hard".  So I think they want hard copies of the verdict sheets and electronic copy of the instructions.  We're also providing a single hard copy of the instructions.

COURT CLERK:  The electronic copy of the instructions is number four.  We haven't released it yet. We have it, we haven't released it.

THE COURT:  All right.  Let's go through this process and then send it all back to them.

COURT CLERK:  They won't be able to see it yet, but I can go ahead and mark it.

THE COURT:  Yeah.

COURT CLERK:  Did you see Exhibit 25?

MR. FOSTER:  Yes.

MR. BRYSON:  Yes.

THE COURT:  Okay.

MR. BRYSON:  Actually her name is Yanira.

MR. FOSTER:  Yeah.  It's not Inira, it's Yanira. It's Y-A-N-I-R-A.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 162 of 350
Case 3:08-cr-00154-RJC  Document 50-8   Filed 01/30/11   Page 162 of 26

JA3516

935

COURT CLERK:  Spell that again, please.

MR. FOSTER:  Y-A-N-I-R-A.

COURT CLERK:  Thank you.

Then 26, 27 and 28.

MR. BRYSON:  Wait.  Wait.  Wait.  You got that down to two pages, right?

THE COURT:  Which exhibit?

MR. BRYSON:  I'm sorry.  I'm sorry.  Never mind. I'm ahead of myself.

COURT CLERK:  That was 28.

MR. FOSTER:  Okay.

COURT CLERK:  29.  29 is two pages.

MR. FOSTER:  Okay.

MR. BRYSON:  I'm thinking of 32.  I'm sorry.

COURT CLERK:  30, 31.

MR. FOSTER:  Okay.

COURT CLERK:  32 is two pages.

MR. BRYSON:  Two pages.  Okay.

COURT CLERK:  32a is a one-page narrative.

MR. BRYSON:  That's not it.

COURT CLERK:  Okay.  32 is in.  32a is not in.

MR. BRYSON:  Right.

COURT CLERK:  Okay.  Look at 34.

MR. FOSTER:  I think you missed a click on 29.

THE COURT:  Like at 29.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 163 of 350
Case 3:08-cr-00154-RJC   Document 54-3   Filed 01/30/11   Page 3 of 26

**JA3517**

936

COURT CLERK:  Look at 29 -- oh, thank you.  34, 35, 36, 37, 38, 39.

MR. BRYSON:  You got coronal and axial, why didn't you have the first one?

COURT CLERK:  I didn't hear what anybody said what it was.

MS. ROSE:  Sagural (sic.) or something.

THE COURT:  Sagittal.

MR. BRYSON:  He said something but I didn't pick it up.

MR. FOSTER:  I think it was sagittal.

COURT CLERK:  Do you want me to put that?

MR. BRYSON:  I'm just kidding.

THE COURT:  No.  No.  No.  That's fine.

All right.  Now with respect to the letters.

MS. ROSE:  Well, there were two photographs we used from the guilt phase but that's already in.

THE COURT:  Already in.

MS. ROSE:  Yeah, right in the graffiti.  152.

COURT CLERK:  That should be redacted, right?

MS. ROSE:  152 should be --

THE COURT:  I think you started at 153.

Do ours indicate -- are you going back to what's already been released?

COURT CLERK:  Yes.

Laura Andersen, RMR 704-350-7493

**JA3518**

937

THE COURT:  And the last numbered release is what, 147?

COURT CLERK:  147b.

THE COURT:  Okay.

COURT CLERK:  And then she's saying now to look at --

THE COURT:  152.

COURT CLERK:  Jail letter.

MR. FOSTER:  Were these -- was 152 admitted during the guilt phase, now the issue is --

THE COURT:  No.  No.  We've marked as released everything that was admitted in guilt phase.  Now we're dealing with the letters that were offered in the sentencing phase.

MR. NAZZARO:  Okay.  They were marked in the guilt phase but they weren't moved until the sentencing phase.

MR. FOSTER:  Okay.

MS. ROSE:  152a and b.

COURT CLERK:  152, 152a and 152b?

MR. FOSTER:  So those were offered during the sentencing phase?

THE COURT:  Yes.

MS. ROSE:  Yes.  And then 153, 153a and b.

COURT CLERK:  Okay.  So 153 -- do you want to see a and b?

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 165 of 350
Case 3:08-cr-00134-RJC   Document 598-1   Filed 03/30/11   Page 116 of 26
JA3519

938

THE COURT:  Yes.

COURT CLERK:  A and b.

MS. ROSE:  158 was the next one.

COURT CLERK:  158, 158-a, 158-b.

MS. ROSE:  Will they be moved into the guilt since they were admitted in this phase?

THE COURT:  Will they what?

MS. ROSE:  Will they be moved into the sentencing exhibits?  Because they were marked in guilt but admitted in sentencing they should probably be moved into the sentencing exhibits.

THE COURT:  Well, let's go through them and we'll talk about that.

MS. ROSE:  Okay.  I'm sorry.  The next one I have is 171.

COURT CLERK:  171, 171a, 171b.

MS. ROSE:  172.

COURT CLERK:  172, 172a, 172b.

MS. ROSE:  174.

COURT CLERK:  174a and 174b.

MS. ROSE:  175.

COURT CLERK:  175a, 175b.

MS. ROSE:  176.

COURT CLERK:  176, 176a, 176b.

MS. ROSE:  And 177.

Laura Andersen, RMR 704-350-7493

939

COURT CLERK:  177, 177a.

THE COURT:  Everybody agree that those are the exhibits to be moved --

MR. BRYSON:  Yes.

THE COURT:  -- and admitted?

Now, the question is, is there a way of, Madam Clerk, in the list, is there a way of moving 152 through 176 or 177 from where they're located to the sentencing?

COURT CLERK:  Not unless they are renumbered. They would have to be renumbered.  Because they're going to fall in line numerically.  They're just going to fall into the list, numerically.

MS. ROSE:  Can we put at the bottom of government sentencing not assign a number, but just Government's Exhibit Guilt Phase -- you know, in your descriptor?

COURT CLERK:  We can put a --

MS. ROSE:  Add a descriptor like Government Exhibit Guilt Phase 152 admitted sentencing.  Just put a descriptor so at least we can refer it back.

THE COURT:  In the description line?

MS. ROSE:  Yes.

THE COURT:  Sure.  That seems like -- so for the ones we've just gone through, if we put a parenthetical, admitted at sentencing, that would do it.  Or admitted in sentencing hearing.

Laura Andersen, RMR 704-350-7493

**JA3521**

940

MS. ROSE:  But will we also have a parenthetical on the sentencing list in the descriptors below the government exhibits to note government's exhibit 152, guilt. So that it also shows on the sentencing list.  Not with a number, but just in the descriptor line so there's a reference back to it.  Not assign a new number, but just a descriptor line for that, is that possible?

THE COURT:  I guess we could -- I guess maybe instead of doing this individually on each one, we could have a description line that says, Government's Exhibits and list all of these --

MR. NAZZARO:  Were admitted during sentencing.

THE COURT:  We could do that.

MR. NAZZARO:  That might be easier.

THE COURT:  Do you understand, Madam Clerk? Instead of doing it individually, just have a description line.

MS. ROSE:  On the sentencing --

MR. NAZZARO:  On the sentencing -- at the end of the sentencing.

MS. ROSE:  At the end of the government's list.

THE COURT:  At the end of the government's exhibit list, a listing of all these.

COURT CLERK:  After Exhibit 581?

THE COURT:  Right.

Laura Andersen, RMR 704-350-7493

**JA3522**

941

COURT CLERK:  So I could make it Government 582.

THE COURT:  Sure.  Just for purposes --

MS. ROSE:  Or if you have to, or if you can get a line in there.

THE COURT:  Probably can't do that.

COURT CLERK:  Not without a number, I can't.

THE COURT:  We can put the number 582.

MR. NAZZARO:  That's fine.

THE COURT:  Then have a description that lists these exhibit numbers.

COURT CLERK:  Okay.  This is what it looks like. Government 582.  What would you like it to say here?

MR. NAZZARO:  Our screen is black.

COURT CLERK:  Sorry.

THE COURT:  Government's Exhibits, Ms. Rose, if you would read those out.

MS. ROSE:  152, 153, I guess we need to do the a's and b's.

COURT CLERK:  I can go back and put those in.

MS. ROSE:  Okay.  158.  Then 171, 172, 174, 175, 176, and 177.

THE COURT:  "Listed in guilt phase evidence but admitted during sentencing phase".  Unless anybody has any better language.

MS. ROSE:  Do you want me to call out the a's and

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 169 of 350
Case 3:08-cr-00134-RJC   Document 502-8   Filed 03/20/11   Page 15 of 26
JA3523

942

b's?

COURT CLERK:  153 had a and b, right?

MS. ROSE:  Yes, a and b in 153.

COURT CLERK:  158 had a and b, 171a and b.

MS. ROSE:  Yes.

COURT CLERK:  174a and b.

MS. ROSE:  Yes.

THE COURT:  175a and b.

COURT CLERK:  Okay.

MS. ROSE:  Just 177, there was no a and b.

COURT CLERK:  I think we used up all the space.

THE COURT:  Shorten letters or just delete the parenthetical.  Take out the parenthetical.  Finish the listing and we'll shorten our description.

COURT CLERK:  Take out the numbers?

THE COURT:  No, leave the numbers there.  The description of it at the end.

COURT CLERK:  Okay.

Okay.  175a, 175b, 176a and b.

MS. ROSE:  A and b.  177 just had a; b was not admitted.

COURT CLERK:  Let me go back and take out all these spaces.

MR. BRYSON:  You can abbreviate "exhibits" too.

THE COURT:  Just put E-X-H.  Just put admitted

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-8   Filed 03/23/17   Page 170 of 350
Case 3:08-cr-00134-RJC  Document 504   Filed 03/30/11   Page 170 of 26
**JA3524**

943

during sentencing.

MS. ROSE:  I also had 170.  Let me double check.

THE COURT:  I don't.

COURT CLERK:  I don't either.

THE COURT:  All right.  Everybody agree?

MR. BRYSON:  Yes, Your Honor.

MR. FOSTER:  Yes, Your Honor.

MS. ROSE:  170 was also admitted.

THE COURT:  I don't have it as being admitted.

MS. ROSE:  You don't?

THE COURT:  All right.  So we're going to release electronically shortly, the instructions, the verdict form -- all right.  We're ready to release all the exhibits, the instructions, the selection instructions and the selection verdict forms, agreed?

MR. NAZZARO:  Yes, Your Honor.  No objection.

MR. FOSTER:  Yes, Your Honor.

MR. BRYSON:  Yes, Your Honor.

THE COURT:  And Madam Clerk, if you would take the hard copies of the verdict sheets and the hard copy -- the one hard copy of the instructions, take them back to the jury and indicate that all of the exhibits have been released to them.

COURT CLERK:  Okay.

(9:56 a.m. requested items go into the jury room.)

Laura Andersen, RMR 704-350-7493

**JA3525**

944

THE COURT:  And we'll stand in recess.

(The Court stood at ease waiting for a response from the jury.)

(The jury knocks at 5:00 p.m. with verdict.)

THE COURT:  The jury has indicated they reached a verdict.  I propose to have them come out and publish the verdict in open court.

The ultimate questions are contained in Section III, A and B, which are the sentence of death or sentence of life in prison without possibility of release.

I can have the verdict published in its entirety as to each count, or I can have the clerk, after I've inspected the verdict, publish the ultimate determination. It just depends upon what you all want me to do.

And I guess before we answer that question, we better wait.  You all should consider that.

(The defendant is present.)

THE COURT:  Any preference on how the verdict ought to be published in open court?

MR. BRYSON:  Our preference would be to go right to number three.

MS. ROSE:  Same for the government, Your Honor.

THE COURT:  Very well.  That's what I'll do.

Are we ready for the jury?

MS. ROSE:  Yes.

                    Laura Andersen, RMR 704-350-7493

**JA3526**

MR. BRYSON:  Yes.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Mr. Foreman, has the jury reached a verdict on Counts 22 through 25?

FOREPERSON:  We have, Your Honor.

THE COURT:  And have you recorded that verdict on the special verdict forms as to each count?

FOREPERSON:  Yes, we have.

THE COURT:  And with respect to that verdict form, have you signed each of the findings of the jury?

FOREPERSON:  I have.

THE COURT:  And has every member of the jury signed the certification that consideration of race, color, religious belief, national origin or sex of the defendant or victim was not involved in reaching his or her individual decision?

FOREPERSON:  Yes, they have.

THE COURT:  Very well.  Would you at this time hand the verdict forms to the deputy clerk?

FOREPERSON:  (Complies.)

COURT CLERK:  (Handing same to the Court.)

THE COURT:  Members of the Jury, I'm going to ask the deputy clerk to publish Section III of the verdict in open court, which is the ultimate determination in the case.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 173 of 350
Case 3:08-cr-00134-RJC   Document 500-8   Filed 03/30/11   Page 173 of 26

JA3527

946

And I would ask you to listen carefully to the publishing of that verdict because either side may wish to poll you individually, to make sure it is your own individual decision in the matter.

Madam Clerk, with respect to Counts 22, 23, 24 and 25, would you publish Section III of the special verdict form.

COURT CLERK: Ladies and gentlemen of the jury, in the case of United States of America versus Alejandro Umana. Docket Number 3:08-CR-134, you've returned the following verdict:

"Special Verdict Form Penalty Selection Count Twenty-two:

"Section III. Determination:

"A. Sentence of Death:

"Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the defendant for the murder of Ruben Garcia Salinas in aid of racketeering."

You answered, "Yes".

"Special Verdict Form Penalty Selection Count Twenty-three:

"Section III. Determination:

"Sentence of Death.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 174 of 350
Case 3:08-cr-00134-RJC  Document 508  Filed 03/30/11  Page 20 of 26
JA3528

947

"Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the defendant for using a firearm in the crime of violence resulting in the death of Ruben Garcia Salinas."

You answered, "Yes".

"Special Verdict Form Penalty Selection Count Twenty-four.

"Section III.  Determination:

"Sentence of Death.

"Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the defendant for the murder of Manuel Garcia Salinas in aid of racketeering."

You answered, "Yes".

"Special Verdict Form Penalty Selection Count Twenty-five.

"Section III.  Determination:

"Sentence of Death:

"Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the defendant for using a firearm in the crime of violence resulting in the death of Manuel Garcia Salinas."

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-8    Filed 03/23/17    Page 175 of 350
Case 3:06-cr-00154-RJC   Document 508    Filed 03/23/11    Page 217 of 26
**JA3529**

948

You answered, "Yes".

THE COURT:  Does either side wish to have the jury polled?

MR. FOSTER:  Yes, Your Honor.

THE COURT:  Madam Clerk, would you poll the jury.

COURT CLERK:  Ladies and gentlemen, you've heard the verdict as published as to Counts 22, 23, 24 and 25.

Juror number 1, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 2, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 3, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 4, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 5, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 6, was this your verdict; is this still your verdict?

JUROR:  Yes.

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 176 of 350
Case 3:08-cr-00134-RJC   Document 501   Filed 03/30/11   Page 22 of 26
JA3530

949

COURT CLERK:  Juror number 7, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 8, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 9, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 10, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  Juror number 11, was this your verdict; is this still your verdict?

JUROR:  Yes.

COURT CLERK:  And Juror number 12, was this your verdict; is this still your verdict?

JUROR:  Yes.

THE COURT:  Members of the Jury, this is the last time I will speak to you as a jury, and I want to thank you for your contribution to our criminal justice system.

We've taken a lot of your time, and I have noticed that you have been conscientious throughout the entire time of the trial.  There is no more difficult case in the federal criminal justice system than the type of case that

Laura Andersen, RMR 704-350-7493

**JA3531**

950

you have been asked to deliberate on.  And your willingness to do so, your sacrifice of time and your conscientious attention to the evidence and to your duty to deliberate is greatly appreciated by the Court.

You will have noticed that every time you came into the court and left the court, that everybody in the courtroom stood, out of respect for your role as judges of the facts, and ultimate sentencers in this case.  And it is a small token of the respect that we have for the jury in our criminal justice system.

And at this time, your service is complete and you are discharged, and you are discharged with the gratitude of the Court.  You may go at this time.

(The jury was escorted from the courtroom.)

THE COURT:  We will make copies of the verdict available to -- the verdicts available to counsel right after we're done here.

There are other counts in the indictment that were not subject to capital sentencing, and the Court will set a date for the imposition of sentencing sometime in the future, and that date will be dependent upon whether a full Presentence Report needs to be done on the other counts, or whether an expedited report would be agreed to and the normal time periods waived by counsel.

So you will all have to get back to me on that at

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 178 of 350
Case 3:08-cr-00134-RJC Document 50-8   Filed 03/30/11   Page 247 of 26
**JA3532**

951

a later time, and I will set a date for imposition of sentence.

If the parties choose to have an expedited Presentence Report prepared, I think we could set sentencing within two to three weeks. And if you don't waive the normal process, then we will just order the Presentence Report and set the sentencing hearing at sometime after the time period for objections have run.

And so all of that will be determined at a later date, after I've gotten your input.

Is there anything further from either side at this time?

MS. ROSE:  Not from the United States, Your Honor.

MR. FOSTER:  No, Your Honor.

THE COURT:  Very well. Then I will set a sentencing date to occur sometime in the future. I don't think there's anything further we can do at this time and so we will stand adjourned.

(Concluded 5:17 p.m.)

(End of Proceedings.)

* * * * * *

Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 179 of 350
Case 3:08-cr-00134-RJC  Document 50-8  Filed 03/30/11  Page 25 of 26

JA3533

952

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CERTIFICATE OF REPORTER


          I, Laura Andersen, Official Court Reporter,
certify that the foregoing transcript is a true and correct
transcript of the proceedings taken and transcribed by me.

          Dated this the 8th day of November, 2010.


                              s/Laura Andersen
                              Laura Andersen, RMR
                              Official Court Reporter

                    Laura Andersen, RMR 704-350-7493

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 180 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 03/30/11   Page 26 of 26
JA3534

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:08CR134-RJC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) | |
| a/k/a "Wizard" | ) | |
| "Lobo" | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on the government's "Motion in Limine to Preclude

Information and Argument regarding 'Equally Culpable' Defendants and Proportionality" (Doc. No.

996) filed April 19, 2010. For the reasons stated below, the Court **GRANTS** the government's

motion in limine.

I.      BACKGROUND

The defendant was one of 26 co-defendants charged in a Superseding Indictment (Doc. No.

623) with multiple federal offenses arising out of his affiliation with La Mara Salvatrucha, also

known as the MS-13 gang. Count 1 charged each co-defendant with a RICO conspiracy, in violation

of 18 U.S.C. § 1962(d). As an overt act in furtherance of this conspiracy, the defendant was charged

with murdering Ruben Garcia Salinas and Manuel Garcia Salinas on December 8, 2007, in a

restaurant in Greensboro, North Carolina (the "Greensboro murders"). The Greensboro murders

were also charged separately in Counts 22 and 24 as murder in aid of racketeering, in violation of

18 U.S.C. § 1959(a)(1), and in Counts 23 and 25 as use of a firearm during and in relation to a crime

of violence resulting in death, in violation of 18 U.S.C. § 924(j). As required by the Federal Death

Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq., the government gave notice of its intention to seek

1

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 181 of 350
Case 3:08-cv-00134-RJC   Document 996   Filed 04/28/10   Page 1 of 9
JA3535

the death penalty in the event the defendant was found guilty on Counts 22, 23, 24, or 25. (Doc. No. 275: Notice).

The Indictment also charged several of the defendant's co-conspirators with homicide offenses related to the underlying RICO conspiracy charged in Count 1. As an overt act of the RICO conspiracy, Johnny Elias Gonzalez, a.k.a. "Solo," was charged with the commission of a robbery resulting in death. Count 26 charged Julio Cesar Rosales Lopez, a.k.a. "Stiler," and Cesar Yoaldo Castillo, a.k.a. "Chino," as accessories after the fact to the Greensboro murders, in violation of 18 U.S.C. §§ 3 and 2. Counts 51 and 52 charged Elvin Pastor Fernandez-Gradis, a.k.a. "Tigre," with a different murder in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) and 924(j). Count 53 charged Santos Anibal Caballero Fernandez, a.k.a. "Garra," with being an accessory after the fact to that murder, in violation of 18 U.S.C. § 3. Each of these co-defendants has either entered into a plea agreement with the government or was found guilty after a jury trial conducted before the Court. None, however, faces a possible sentence of death.

The defendant's case proceeded to trial. On April 19, 2010, a jury returned a guilty verdict convicting the defendant of all counts. Thus, the defendant's trial is now in a capital sentencing phase governed by the FDPA. See 18 U.S.C. §§ 3591-93. At his sentencing hearing, the defendant may present evidence of mitigating factors that weigh against imposition of the death penalty. See 18 U.S.C. § 3592(a). The government now moves in limine to preclude the defendant from arguing, as a mitigating factor, that certain of his co-conspirators, including the co-defendants described supra, have committed comparable crimes in furtherance of the same underlying RICO conspiracy, but will not be sentenced to death.

II.    LEGAL FRAMEWORK

The Eighth Amendment requires that a defendant facing a possible capital sentence be given the opportunity to present evidence of "any aspect of a [his] character or record and any of the

Case 3:16-cv-00057-MOC-JC   Document 50-8   Filed 03/23/17   Page 182 of 350
Case 3:08-cv-00154-RJC   Document 685   Filed 04/28/10   Page 2 of 9
JA3536

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604 (1978). The FDPA lists a number of statutory mitigating factors for which a defendant may present evidence, including whether "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." 18 U.S.C. § 3592(a)(4). Additionally, a defendant may present any "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8).

III.   DISCUSSION

The government's motion in limine challenges whether the defendant may offer mitigating evidence of other crimes committed by his co-conspirators in furtherance of the same RICO conspiracy underlying the defendant's capital offenses. The Court considers whether the defendant may argue evidence of these acts as a statutory mitigating factor under § 3592(a)(4) or, in the alternative, as a non-statutory mitigating "circumstance of the offense." 18 U.S.C. § 3592(a)(8); see also Lockett, 438 U.S. at 604. The first inquiry is one of statutory construction; the second is constitutional.

A.   Evidence of Other Crimes as a Statutory Mitigating Factor

Section 3592(a)(4) of the FDPA requires the sentencing jury to consider mitigating evidence that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death," but the term "crime" is not defined therein. To discern the correct meaning of this term, the Court "must begin with the plain language of the statute, and absent ambiguity or a clearly expressed legislative intent to the contrary, the statute must be given its plain meaning." United States v. Bell, 5 F.3d 64, 68 (4th Cir. 1993) (citing United States v. Sheek, 990 F.2d 150, 152 (4th Cir. 1993)). A plain reading of the FDPA indicates that the term "crime" as it appears in § 3592(a)(4) means the specific offense or offenses for which the government seeks the death penalty.

3

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 183 of 350
Case 3:09-cv-00154-RJC   Document 56-8   Filed 04/23/10   Page 3 of 9

JA3537

With the limited exception of certain drug trafficking offenses not charged here, the FDPA does not itself authorize the death penalty for any particular offense. See 18 U.S.C. § 3591. It merely establishes a special sentencing procedure for offenses that are already categorized as capital. Id. Upon the defendant's conviction of an "offense for which a sentence of death is provided," section 3591(a)(2) requires a sentencing jury to determine first whether the defendant has committed a homicide with one of four death-eligible mens rea. If this threshold is met, the jury must then consider aggravating and mitigating factors authorized in § 3592, and perform an ultimate balancing of these factors at the conclusion of a special hearing required under § 3593. 18 U.S.C. § 3591(a). Clearly, the procedures outlined in §§ 3592 and 3593 relate back to the capital offense that triggers the FDPA in the first place. These provisions have no applicability whatsoever to non-capital offenses. Thus, when § 3592(a)(4) refers to other "defendants, equally culpable in the crime," the term "crime" plainly means the capital offense or offenses for which the defendant has been convicted.

Here, the defendant's capital offenses are two counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and two counts of use of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). The essential elements of these crimes alleged the defendant's commission of the Greensboro murders. By the plain language of the FDPA, these murders are the "crimes" for which the defendant may present mitigating evidence of equally culpable defendants. See United States v. Regan, 221 F. Supp. 2d 659, 660 (E.D.Va. 2002) ("The plain language of section 3592(a)(4) limits the jury's consideration to co-defendants, co-conspirators, or accomplices of the defendant in the capital crime before the jury, not any similar crime."). Consistent with this approach, capital cases in which courts have approved of an "equally culpable" mitigating instruction involved an accomplice in the actual capital offense against whom the government had declined to seek the death penalty. See United States v. Higgs,

4

Case 3:09-cv-00154-RJC   Document 58-35   Filed 03/23/10   Page 184 of 350
JA3538

353 F.3d 281, 326 (4th Cir. 2003); United States v. Llera Plaza, 181 F. Supp. 2d 414, 421 (E.D.Pa. 2002).

To the extent that any ambiguity exists, it is due to the fact that the Greensboro murders, while charged separately as capital offenses, were also alleged as an overt act of the RICO conspiracy. The Court considers whether this connection between the underlying RICO conspiracy and the capital offenses should incorporate the underlying RICO conspiracy into the definition of "crime" for purposes of § 3592(a)(4). In United States v. Beckford, 962 F. Supp. 804 (E.D.Va. 1997), a district court within this circuit addressed a nearly identical issue. There, a defendant had been charged with multiple federal offenses arising out of a drug conspiracy, including the capital offense killing in furtherance of a Continuing Criminal Enterprise ("CCE"), in violation of 21 U.S.C. § 848(e). At that time, sub-sections 848(g)-(r) governed the sentencing procedure for capital offenses under § 848(e).[1] Identical to the FDPA's parallel provision, sub-section 848(m)(8) required the sentencing jury to consider, as a mitigating factor, evidence that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death." In preparation for trial, the defendant requested pursuant to Brady v. Maryland, 373 U.S. 83 (1963), any evidence in the government's possession related to any other crimes committed by his co-conspirators in furtherance of the underlying CCE. Beckford, 962 F. Supp. at 812. The object of this request was to gather mitigation evidence of "equally culpable" defendants pursuant to § 848(m)(8).

After analyzing the statute, the district court in Beckford determined that "[t]he plain language of Section 848 clearly supports the proposition that the 'crime' referred to in (m)(8) is the capital murder charged under 848(e)(1)." Id. at 814. Although other co-conspirators may have

---

[1] These sub-sections were repealed in 2006, see Pub.L. 109-177, 120 Stat. 231, 232, and sentencing procedures for capital offenses under § 848(e) are now governed by the FDPA. See United States v. Stitt, 552 F.3d 345, 352 (4th Cir. 2008).

5

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 185 of 350
Case 3:08-cv-00134-RJC Document 50-8 Filed 03/23/10 Page 5 of 9
JA3539

committed crimes in furtherance of the same CCE underlying the defendant's capital offenses, the district court ultimately relied upon the plain language of § 848(m)(8) and denied the defendant's Brady request to the extent it attempted to address other crimes than the defendant's capital offenses. Id. at 815.

Applying the plain language of the FDPA and the well-reasoned Beckford decision, the Court finds that the plain language of § 3592(a)(4) should control: statutory mitigating evidence of equal culpability includes only evidence of complicity in the capital offenses for which the defendant is charged. Evidence of other crimes in furtherance of the same underlying RICO conspiracy are outside the scope of § 3592(a)(4). Thus, in this case, any mitigating evidence under § 3592(a)(4) relates only to co-defendants Lopez and Castillo, charged under 18 U.S.C. §§ 3 and 2 as accessories after the fact to the Greensboro murders. Although the evidence has shown that neither participated directly in the murders, their liability as accessories after the fact is sufficiently similar to that of an accomplice[2] to allow the defendant to present mitigating evidence of their conduct under § 3592(a)(4). Other crimes, even those committed in furtherance of the same underlying RICO conspiracy, are outside the scope of § 3592(a)(4).

B.    Evidence of Other Crimes as a Non-Statutory Mitigating Factor

Ineligible as a statutory mitigating factor, the Court next considers whether the defendant may present evidence of other crimes committed by co-conspirators as a non-statutory mitigating factor. It is clear that he may not. The need for "proportionality review" in capital sentencing—a comparative study of penalties sought in other, even similar, crimes—has been flatly rejected by the Supreme Court and the Fourth Circuit. See Pulley v. Harris, 465 U.S. 37, 43-44 (1984) (holding that

---

[2] See 18 U.S.C. § 3 ("Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.").

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 186 of 350
Case 3:09-cv-00154-RJC   Document 586   Filed 04/23/10   Page 6 of 9
JA3540

the Eighth Amendment does not require state capital sentencing schemes to review penalties imposed in similar cases); <u>Higgs</u>, 353 F.3d at 321 (applying <u>Pulley</u> to reject a defendant's claim that the FDPA's lack of proportionality review violates the Eighth Amendment).

Advancing as a mitigating circumstance the penalties sought for other offenses, even those related to the defendant's underlying RICO conspiracy, amounts to a request for proportionality review. Neither the FDPA nor the Constitution grants the defendant a right to such review. Moreover, it would likely confuse and mislead the jury, requiring an analysis far afield from the defendant's characteristics or circumstances of his offenses. <u>See</u> <u>United States v. Taylor</u>, 583 F. Supp. 2d 923, 935-36 (E.D. Tenn. 2008);<u>United States v. Caro</u>, 461 F. Supp. 2d 459, 465 (W.D.Va. 2006). <u>See also</u> <u>Lockett</u>, 438 U.S. at 604 n. 12 (preserving "the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"). Because evidence of other crimes committed by the defendant's co-conspirators is irrelevant to his character or the circumstances of his offenses, and is likely to confuse and mislead the jury, the defendant may not present such evidence as a non-statutory mitigating factor.

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that the government's "Motion in Limine to Preclude Information and Argument regarding 'Equally Culpable' Defendants and Proportionality" (Doc. No. 996) is **GRANTED**. The defendant may not present mitigating evidence related to crimes other than the capital offenses for which the defendant has been charged.

Signed: April 28, 2010

Robert J. Conrad, Jr.
Chief United States District Judge

8

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 188 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 04/28/10   Page 8 of 9

JA3542

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

UNITED STATES OF AMERICA )
)
v. )
)          SPECIAL VERDICT FORM
ALEJANDRO UMANA, )          PENALTY SELECTION
    a/k/a "Wizard" )          COUNT TWENTY-TWO
    "Lobo" )
_____ )

## I.  **AGGRAVATING FACTORS:**

**Instructions**:  For each of the following, answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established the existence of the following aggravating factors beyond a reasonable doubt relating to the offense committed in Count Twenty-Two, that is the murder of Ruben Garcia Salinas in aid of racketeering?

1.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed Ruben Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise?

Yes:_____✓_____        No: _____

                                               FOREPERSON

Final 1.1 Page 1

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 189 of 350
Case 3:08-cv-00134-RJC Document 833   Filed 03/23/10   Page 189 of 350
JA3543

2.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused injury, harm, and loss to the Ruben Garcia Salinas family and friends?

Yes:_____    No:_____



FOREPERSON

3.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that, apart from the offenses charged in the Indictment, the defendant has been involved in other serious acts of violence, which are not reflected in his criminal record, including but not limited to:

a.    On or about July 27, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras?

Yes:_____    No:_____



FOREPERSON

b.    On or about September 28, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca?

Yes:_____    No:_____



FOREPERSON

Final 1.1 Page 2

Case 3:16-cv-00057-MOC-JC Document 50-8 Filed 03/23/17 Page 190 of 350
Case 3:09-cv-00154-RJC Document 50-8 Filed 04/26/10 Page 2 of 9

JA3544

4.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

    a.      The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.

Yes:_____✔_____          No: _____



FOREPERSON

    b.      The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct, and his allegiance to and membership in MS-13?

Yes:_____✔_____          No: _____



FOREPERSON

    c.      The defendant has never expressed any remorse for killing Ruben Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?

Yes:_____✔_____          No: _____



FOREPERSON

Final 1.1 Page 3

Case 3:16-cv-00057-MOC Document 50-8  Filed 03/23/17   Page 191 of 350
Case 3:09-cv-00154-RJC Document 50-8  Filed 04/28/10   Page 191 of 350
**JA3545**

d.    The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes: _____    No:

FOREPERSON

**Instructions**: Regardless of whether you answered "Yes" or "No" with respect to the additional aggravating factors in this Section I, then proceed to Section II, which follows:

II.    **MITIGATING FACTORS:**

**Instructions**:  For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such factor as established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The mitigating factors that the defendant contends have been proved by a preponderance of the evidence are:

1.    That Alejandro Enrique Umana was raised in poverty.
Number of jurors who so find: _____

Final 1.1 Page 4

**JA3546**

2.    That Alejandro Enrique Umana was raised without the care of his own mother.

Number of jurors who so find:_____12_____

3.    That Alejandro Enrique Umana was exposed to the violence of civil war in his native El Salvador at an early age.

Number of jurors who so find:_____9_____

4.    That Alejandro Enrique Umana suffered head injuries early in life that resulted in damage to areas of the brain related to behavior.

Number of jurors who so find:_____0_____

5.    That Alejandro Enrique Umana did not have the benefit of schooling beyond the third grade.

Number of jurors who so find:_____1_____

6.    That Alejandro Enrique Umana's childhood was marked by many factors that increased the risk of criminal activity later in life.

Number of jurors who so find:_____0_____

7.    That Alejandro Enrique Umana's childhood was marked by factors that impeded his moral development.

Number of jurors who so find:_____3_____

8.    That Alejandro Enrique Umana's early life experiences made him more susceptible to recruitment into MS-13.

Number of jurors who so find:_____2_____

9.    The murder did not involve substantial planning.

Number of jurors who so find:_____12_____

Final 1.1 Page 5

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 193 of 350
Case 3:09-cr-00134-RJC   Document 508   Filed 04/28/10   Page 5 of 9
JA3547

10.    The murder occurred during an emotionally charged argument.

Number of jurors who so find:_____ *12*

11.    The murder did not involve cruelty or excessive infliction of pain and suffering.

Number of jurors who so find:_____ *1*

12.    Alejandro Enrique Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS-13.

Number of jurors who so find:_____ *12*

13.    Any other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence.

Number of jurors who so find:_____ *0*

The following extra spaces are provided to write in additional mitigating factors, if any, found by one or more jurors. If none, write "None." If more space is needed, write "Continued" and use the reverse side of this page.

1.    _____

_____

_____

Number of jurors who so find:_____

2.    _____

_____

_____

Number of jurors who so find:_____

**Instructions**: Regardless of your written findings regarding mitigating factors in Section II above, proceed to Section III and Section IV which follow:

Final 1.1 Page 6

Case 3:16-cv-00057-MOC-RJC Document 50-8 Filed 03/23/17 Page 194 of 350
Case 3:09-cr-00134-RJC Document 50-8 Filed 03/23/10 Page 6 of 9
JA3548

III.    **DETERMINATION**:

A.    **Sentence of Death**:

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of death shall be imposed</u> on the defendant for the murder of Ruben Garcia Salinas in aid of racketeering.

Yes:_____✓_____        No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV. If you

Date:____Apvil 28, 2010____

Final 1.1 Page 7

**JA3549**

## OR

B.    **Sentence of Life in Prison Without Possibility of Release:**

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a sentence of life in prison without possibility of release shall be imposed on the defendant for the murder of Ruben Garcia Salinas in aid of racketeering.

Yes:_____                    No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV.

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____
                                                    FOREPERSON

Date:_____

Final 1.1 Page 8

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 196 of 350
Case 3:09-cv-00154-RJC Document 50-8 Filed 04/28/10 Page 9 of 9
**JA3550**

IV.    **Certification**:

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

Date: _____ April 28, 2010 _____

Final 1.1 Page 9

**JA3551**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | SPECIAL VERDICT FORM |
| | ) | PENALTY SELECTION |
| ALEJANDRO UMANA, | ) | COUNT TWENTY-THREE |
| a/k/a "Wizard" | ) | |
| "Lobo" | ) | |
| | ) | |

## I.    **AGGRAVATING FACTORS:**

**Instructions**: For each of the following, answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established the existence of the following aggravating factors beyond a reasonable doubt relating to the offense committed in Count Twenty-Three, that is using a firearm in a crime of violence resulting in the death of Ruben Garcia Salinas?

1.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed Ruben Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise?



Yes:_____✓_____          No:_____

                                      FOREPERSON

Final 1.1 Page 1

Case 3:16-cv-00057-MOC Document 50-8  Filed 03/23/17  Page 198 of 350
Case 3:08-cv-00154-RJC Document 50-8  Filed 03/23/10  Page 198 of 9
JA3552

2.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused injury, harm, and loss to the Ruben Garcia Salinas family and friends?

Yes:_____    No:_____



FOREPERSON

3.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that, apart from the offenses charged in the Indictment, the defendant has been involved in other serious acts of violence, which are not reflected in his criminal record, including but not limited to:

a.    On or about July 27, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras?

Yes:_____    No:_____



FOREPERSON

b.    On or about September 28, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca?

Yes:_____    No:_____



FOREPERSON

Final 1.1 Page 2

Case 3:16-cv-00057-MOC Document 50-8    Filed 03/23/17    Page 199 of 350
Case 3:08-cv-00134-RJC Document 50-8    Filed 03/23/10    Page 199 of 9
JA3553

4.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a.    The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.

Yes:_____    No:_____



FOREPERSON

b.    The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct, and his allegiance to and membership in MS-13?

Yes:_____    No:_____



FOREPERSON

c.    The defendant has never expressed any remorse for killing Ruben Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?

Yes:_____    No:_____



FOREPERSON

Final 1.1 Page 3

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 200 of 350
Case 3:09-cv-00154-RJC    Document 50-8-9    Filed 04/23/10    Page 3 of 9
JA3554

d.    The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes:_____        No:_____

FOREPERSON

**Instructions**: Regardless of whether you answered "Yes" or "No" with respect to the additional aggravating factors in this Section I, then proceed to Section II, which follows:

II.    **MITIGATING FACTORS:**

**Instructions**:  For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such factor as established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The mitigating factors that the defendant contends have been proved by a preponderance of the evidence are:

1.    That Alejandro Enrique Umana was raised in poverty.

Number of jurors who so find:_____

Final 1.1 Page 4

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 201 of 350
Case 3:08-cr-00134-RJC Document 495 Filed 04/23/10 Page 201 of 350
JA3555

2.    That Alejandro Enrique Umana was raised without the care of his own mother.

Number of jurors who so find: _____12_____

3.    That Alejandro Enrique Umana was exposed to the violence of civil war in his native El Salvador at an early age.

Number of jurors who so find: _____9_____

4.    That Alejandro Enrique Umana suffered head injuries early in life that resulted in damage to areas of the brain related to behavior.

Number of jurors who so find: _____0_____

5.    That Alejandro Enrique Umana did not have the benefit of schooling beyond the third grade.

Number of jurors who so find: _____1_____

6.    That Alejandro Enrique Umana's childhood was marked by many factors that increased the risk of criminal activity later in life.

Number of jurors who so find: _____0_____

7.    That Alejandro Enrique Umana's childhood was marked by factors that impeded his moral development.

Number of jurors who so find: _____3_____

8.    That Alejandro Enrique Umana's early life experiences made him more susceptible to recruitment into MS-13.

Number of jurors who so find: _____2_____

9.    The murder did not involve substantial planning.

Number of jurors who so find: _____12_____

Final 1.1 Page 5

Case 3:16-cv-00057-MOC  Document 50-8    Filed 03/23/17    Page 202 of 350
Case 3:09-cv-00134-RJC  Document 526-9  Filed 04/28/10  Page 3 of 9
**JA3556**

10. The murder occurred during an emotionally charged argument.

Number of jurors who so find: _12_

11. The murder did not involve cruelty or excessive infliction of pain and suffering.

Number of jurors who so find: _1_

12. Alejandro Enrique Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS-13.

Number of jurors who so find: _12_

13. Any other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence.

Number of jurors who so find: _0_

The following extra spaces are provided to write in additional mitigating factors, if any, found by one or more jurors. If none, write "None." If more space is needed, write "Continued" and use the reverse side of this page.

1. _____

_____

_____

Number of jurors who so find: _____

2. _____

_____

_____

Number of jurors who so find: _____

**Instructions**: Regardless of your written findings regarding mitigating factors in Section II above, proceed to Section III and Section IV which follow:

Final 1.1 Page 6

Case 3:16-cv-00057-MOC-JC Document 50-8 Filed 03/23/17 Page 203 of 350
Case 3:09-cv-00134-RJC Document 50-8 Filed 03/23/10 Page 203 of 350
JA3557

III.    **DETERMINATION**:

A.    **Sentence of Death**:

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of death shall be imposed</u> on the defendant for the murder of Ruben Garcia Salinas in aid of racketeering.

Yes:_____✓_____            No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV. If you

Date: _____April 28, 2010_____

Final 1.1 Page 7

Case 3:16-cv-00057-MOC  Document 50-8   Filed 03/23/17   Page 204 of 350
Case 3:09-cv-00154-RJC  Document 90-8   Filed 04/26/10   Page 7 of 9
**JA3558**

## OR

B.    **Sentence to be Determined by the Court:**

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of life in prison without possibility of release shall be imposed</u> on the defendant for using a firearm in a crime of violence resulting in the death of Ruben Garcia Salinas.

Yes:_____        No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                              FOREPERSON

Date:_____

Final 1.1 Page 8

JA3559

IV.    **Certification**:

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

Date: _____April 28, 2010_____

Final 1.1 Page 9

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 206 of 350
Case 3:08-cv-00134-RJC Document 50-8   Filed 03/23/10   Page 9 of 9
JA3560

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

UNITED STATES OF AMERICA     )
     )
v.     )
     )     SPECIAL VERDICT FORM
ALEJANDRO UMANA,     )     PENALTY SELECTION
     a/k/a "Wizard"     )     COUNT TWENTY-FOUR
     "Lobo"     )
     )

I.    **AGGRAVATING FACTORS:**

**Instructions**: For each of the following, answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established the existence of the following aggravating factors beyond a reasonable doubt relating to the offense committed in Count Twenty-Four, that is the murder of Manuel Garcia Salinas in aid of racketeering?

1.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed Manuel Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise?

Yes:_____     No:_____

FOREPERSON

Final 1.1 Page 1

JA3561

2.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused injury, harm, and loss to the Manuel Garcia Salinas family and friends?

Yes:           No: _____

FOREPERSON

3.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that, apart from the offenses charged in the Indictment, the defendant has been involved in other serious acts of violence, which are not reflected in his criminal record, including but not limited to:

a.      On or about July 27, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras?

Yes:           No: _____

FOREPERSON

b.      On or about September 28, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca?

Yes:           No: _____

FOREPERSON

Final 1.1 Page 2

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 208 of 350
Case 3:09-cv-00154-RJC Document 50-8 Filed 03/23/10 Page 2 of 9
JA3562

4.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a.    The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.

Yes: _____    No: _____

FOREPERSON

b.    The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct, and his allegiance to and membership in MS-13?



Yes: _____    No: _____

FOREPERSON

c.    The defendant has never expressed any remorse for killing Manuel Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?



Yes: _____    No: _____

FOREPERSON

Final 1.1 Page 3

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 209 of 350
Case 3:08-cv-00134-RJC Document 50-8 Filed 03/23/10 Page 209 of 9

JA3563

d.    The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes:     No: _____

FOREPERSON

**Instructions**: Regardless of whether you answered "Yes" or "No" with respect to the additional aggravating factors in this Section I, then proceed to Section II, which follows:

II.    **MITIGATING FACTORS:**

**Instructions**:  For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such factor as established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The mitigating factors that the defendant contends have been proved by a preponderance of the evidence are:

1.    That Alejandro Enrique Umana was raised in poverty.

Number of jurors who so find: _____4_____

Final 1.1 Page 4

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 210 of 350
Case 3:09-cv-00134-RJC   Document 50-8   Filed 04/28/10   Page 210 of 350
JA3564

2.      That Alejandro Enrique Umana was raised without the care of his own mother.

Number of jurors who so find:____12____

3.      That Alejandro Enrique Umana was exposed to the violence of civil war in his native El Salvador at an early age.

Number of jurors who so find:____9____

4.      That Alejandro Enrique Umana suffered head injuries early in life that resulted in damage to areas of the brain related to behavior.

Number of jurors who so find:____0____

5.      That Alejandro Enrique Umana did not have the benefit of schooling beyond the third grade.

Number of jurors who so find:____1____

6.      That Alejandro Enrique Umana's childhood was marked by many factors that increased the risk of criminal activity later in life.

Number of jurors who so find:____0____

7.      That Alejandro Enrique Umana's childhood was marked by factors that impeded his moral development.

Number of jurors who so find:____3____

8.      That Alejandro Enrique Umana's early life experiences made him more susceptible to recruitment into MS-13.

Number of jurors who so find:____2____

9.      The murder did not involve substantial planning.

Number of jurors who so find:____12____

Final 1.1 Page 5

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 211 of 350
Case 3:08-cv-00134-RJC Document 505 Filed 04/28/10 Page 5 of 9
JA3565

10.    The murder occurred during an emotionally charged argument.

Number of jurors who so find:_____12_____

11.    The murder did not involve cruelty or excessive infliction of pain and suffering.

Number of jurors who so find:_____1_____

12.    Alejandro Enrique Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS-13.

Number of jurors who so find:_____12_____

13.    Any other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence.

Number of jurors who so find:_____0_____

The following extra spaces are provided to write in additional mitigating factors, if any, found by one or more jurors.  If none, write "None."  If more space is needed, write "Continued" and use the reverse side of this page.

1.    _____

_____

_____

Number of jurors who so find:_____

2.    _____

_____

_____

Number of jurors who so find:_____

**Instructions**: Regardless of your written findings regarding mitigating factors in Section II above, proceed to Section III and Section IV which follow:

Final 1.1 Page 6

Case 3:16-cv-00057-MOC-JC Document 50-8  Filed 03/23/17  Page 212 of 350
Case 3:08-cv-00134-RJC  Document 356-6  Filed 04/23/10  Page 212 of 350
JA3566

III.    **DETERMINATION**:

A.    **Sentence of Death**:

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of death shall be imposed</u> on the defendant for the murder of Ruben Garcia Salinas in aid of racketeering.

Yes:_____        No:  _____

If you answer "Yes," sign your names here, and then proceed to Section IV.  If you

Date:_____

Final 1.1 Page 7

Case 3:16-cv-00057-MOC-JC  Document 50-8  Filed 03/23/17  Page 213 of 350
Case 3:05-cv-00154-RJC  Document 520  Filed 04/23/10  Page 213 of 350

JA3567

## OR

B.    **Sentence of Life in Prison Without Possibility of Release:**

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of life in prison without possibility of release shall be imposed</u> on the defendant for the murder of Manuel Garcia Salinas in aid of racketeering.

Yes:_____          No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____
                                  FOREPERSON

Date:_____

Final 1.1 Page 8

**JA3568**

IV.    **Certification**:

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

Date:    April 28, 2010

Final 1.1 Page 9

JA3569

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08cr134

UNITED STATES OF AMERICA          )
                                  )
            v.                    )
                                  )         SPECIAL VERDICT FORM
ALEJANDRO UMANA,                  )         PENALTY SELECTION
      a/k/a "Wizard"              )         COUNT TWENTY-FIVE
      "Lobo"                      )
                                  )
_____)

## I.    AGGRAVATING FACTORS:

**Instructions**: For each of the following, answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established the existence of the following aggravating factors beyond a reasonable doubt relating to the offense committed in Count Twenty-Five, that is using a firearm in a crime of violence resulting in the death of Manuel Garcia Salinas?

1.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant killed Manuel Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise?

Yes: ____✓____                    No: _____

                                          _____
                                            FOREPERSON

Final 1.1 Page 1

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 216 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 03/23/10   Page 216 of 350
JA3570

2.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused injury, harm, and loss to the Manuel Garcia Salinas family and friends?

Yes:___✓___          No:_____



FOREPERSON

3.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that, apart from the offenses charged in the Indictment, the defendant has been involved in other serious acts of violence, which are not reflected in his criminal record, including but not limited to:

a.      On or about July 27, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras?

Yes:___✓___          No:_____



FOREPERSON

b.      On or about September 28, 2005, in Los Angeles, California, the defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca?

Yes:___✓___          No:_____



FOREPERSON

Final 1.1 Page 2

Case 3:16-cv-00057-MOC-JC   Document 50-8   Filed 03/23/17   Page 217 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 04/28/10   Page 2 of 9
JA3571

4.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more of the following:

a.      The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.



Yes:_____                    No:_____

FOREPERSON

b.      The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct, and his allegiance to and membership in MS-13?



Yes:_____                    No:_____

FOREPERSON

c.      The defendant has never expressed any remorse for killing Manuel Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?



Yes:_____                    No:_____

FOREPERSON

Final 1.1 Page 3

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 218 of 350
Case 3:05-cv-00154-RJC Document 50-8-1 Filed 03/23/10   Page 3 of 9
JA3572

d.     The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes:_____✓_____

No:_____



FOREPERSON

**Instructions**: Regardless of whether you answered "Yes" or "No" with respect to the additional aggravating factors in this Section I, then proceed to Section II, which follows:

II.     **MITIGATING FACTORS:**

**Instructions**:  For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such factor as established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The mitigating factors that the defendant contends have been proved by a preponderance of the evidence are:

1.     That Alejandro Enrique Umana was raised in poverty.

Number of jurors who so find:_____4_____

Final 1.1 Page 4

2. That Alejandro Enrique Umana was raised without the care of his own mother.

Number of jurors who so find: _12_

3. That Alejandro Enrique Umana was exposed to the violence of civil war in his native El Salvador at an early age.

Number of jurors who so find: _9_

4. That Alejandro Enrique Umana suffered head injuries early in life that resulted in damage to areas of the brain related to behavior.

Number of jurors who so find: _0_

5. That Alejandro Enrique Umana did not have the benefit of schooling beyond the third grade.

Number of jurors who so find: _1_

6. That Alejandro Enrique Umana's childhood was marked by many factors that increased the risk of criminal activity later in life.

Number of jurors who so find: _0_

7. That Alejandro Enrique Umana's childhood was marked by factors that impeded his moral development.

Number of jurors who so find: _3_

8. That Alejandro Enrique Umana's early life experiences made him more susceptible to recruitment into MS-13.

Number of jurors who so find: _2_

9. The murder did not involve substantial planning.

Number of jurors who so find: _12_

Final 1.1 Page 5

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 220 of 350
Case 3:08-cv-00134-RJC Document 50-8-1 Filed 03/23/10 Page 220 of 350
JA3574

10.    The murder occurred during an emotionally charged argument.

Number of jurors who so find: _____12_____

11.    The murder did not involve cruelty or excessive infliction of pain and suffering.

Number of jurors who so find: _____1_____

12.    Alejandro Enrique Umana's commission of the offense occurred as a result of his indoctrination into the ways and thinking of MS-13.

Number of jurors who so find: _____12_____

13.    Any other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence.

Number of jurors who so find: _____0_____

The following extra spaces are provided to write in additional mitigating factors, if any, found by one or more jurors. If none, write "None." If more space is needed, write "Continued" and use the reverse side of this page.

1. _____

_____

_____

Number of jurors who so find:_____

2. _____

_____

_____

Number of jurors who so find:_____

**Instructions**: Regardless of your written findings regarding mitigating factors in Section II above, proceed to Section III and Section IV which follow:

Final 1.1 Page 6

Case 3:16-cv-00057-MOC-JC   Document 50-8   Filed 03/23/17   Page 221 of 350
Case 3:09-cv-00134-RJC   Document 50-8   Filed 04/28/10   Page 221 of 350
JA3575

III.    **DETERMINATION**:

A.      **Sentence of Death**:

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of death shall be imposed</u> on the defendant for the murder of Ruben Garcia Salinas in aid of racketeering.

Yes:_____        No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV.  If you

Date:_____

Final 1.1 Page 7

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 222 of 350
Case 3:08-cv-00134-RJC  Document 55-8  Filed 04/26/10  Page 222 of 350
**JA3576**

## OR

B.    <u>**Sentence to be Determined by the Court:**</u>

Based upon our consideration of the evidence and in accordance with the Court's instructions, we find by unanimous vote that a <u>sentence of life in prison without possibility of release shall be imposed</u> on the defendant for using a firearm in a crime of violence resulting in the death of Manuel Garcia Salinas.

Yes:_____    No: _____

If you answer "Yes," sign your names here, and then proceed to Section IV.

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____
                                                      FOREPERSON

Date:_____

Case 3:16-cv-00057-MOC-JC   Document 50-8   Filed 03/23/17   Page 223 of 350
Case 3:09-cv-00154-RJC   Document 50-8   Filed 04/26/10   Page 223 of 9

**JA3577**

IV.    **Certification**:

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

Date:    April 28, 2010

Final 1.1 Page 9

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 224 of 350
Case 3:09-cv-00154-RJC    Document 50-8    Filed 04/28/10    Page 9 of 9
JA3578

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **NEW TRIAL ON GUILT AND** |
| ALEJANDRO UMANA | ) | **SENTENCING PHASES** |
| | ) | |


NOW COMES Defendant ALEJANDRO ENRIQUE RAMIREZ UMANA, by and through counsel, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, and hereby moves for a new trial on both the guilt and sentencing phases of the trial. Defendant herein sets forth the various grounds which entitle him to either a new trial or a new sentencing hearing. Additionally, without restating them, Defendant reasserts and maintains every motion, objection, and request previously made, but highlights in this motion the following bases for a new trial and new sentencing hearing.


1.    **INTRODUCTION**

Defendant was convicted by a jury on April 19, 2010, of four death-eligible offenses. On April 28, 2010, the penalty phase ended with the jury recommending death on each of the four offenses. On April 30, 2010, Defendant moved for an extension of time to file motions for new trial. On May 3, 2010, this Honorable Court granted the motion and set June 14, 2010, as the deadline for Defendant to file motions for new trial.

1

Case 3:16-cv-00057-MOC Document 50-8  Filed 03/23/17   Page 225 of 350
Case 3:08-cr-00134-RJC Document 50-8  Filed 06/14/10   Page 1 of 40
JA3579

**2.   THE COURT'S JURY INSTRUCTION ON MURDER IN THE AID OF RACKETEERING ALLOWED THE JURY TO RETURN A VERDICT OF GUILTY AGAINST THE DEFENDANT WITHOUT FINDING THAT HE HAD COMMITTED THE MURDER TO MAINTAIN OR INCREASE "HIS" POSITION WITHIN THE ENTERPRISE.**

The Court's jury instruction for murder in the aid of racketeering, which deleted the pronoun "his" from the instruction as it related to the maintaining or increasing of Defendant's position within the enterprise eliminated the requirement that the Defendant's purpose for committing the crime was for self-promotion.  This instruction allowed the jury to convict the Defendant of murder in the aid of racketeering without a finding that Defendant's purpose was  self-promotion.  This violates the meaning of the statute, 18 U.S.C. § 1959 and entitles the defendant to a new trial.

During the charge conference the Government asked the Court to modify the charge on murder in the aid of racketeering to allow the jury to convict the Defendant of murder in aid of racketeering if they found that the Defendant's purpose in committing the murder was to maintain or increase his or <u>another's</u> position within the enterprise.

> MR. ADAMS:  May I ask then, also, for one add addition on page 62, or anywhere really that Your Honor – I have as the first line of page 62, maintain or increase his position or another's – or another member's within the enterprise.  ("MR. ADAMS" should be Mr. Adam Morris)
>
> THE COURT:  And what is the basis for that?
>
> MR. ADAMS:   That the theory of defense that Stiler was the leader.  And the law allows a conviction if the defendant committed the crime to please Stiler.

April 16 Transcript p. 1076.  While the Court declined to insert the phrase "or another's" the Court did omit the word "his" from the proposed instruction.  Accordingly, the Court's final instruction to the jury on the element regarding the Defendant's purpose in committing the alleged murder was as follows:

2

Case 3:16-cv-00057-MOC Document 50-8  Filed 03/23/17   Page 226 of 350
Case 3:08-cr-00134-RJC Document 50-8  Filed 06/14/10   Page 2 of 40
JA3580

In determining whether a person's purpose in committing the alleged murder, assault with a deadly weapon, or other crime was to maintain or increase position within the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all the facts and circumstances in making that determination. For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position already held, this element would be established. These examples are only illustrations.

Conversely, it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise. The defendant had to have had the conscious purpose to maintain or enhance position within the organization. The statute prohibits murders that are committed with the purpose of maintaining or enhancing a defendant's or another's relative position with the enterprise, vis-à-vis other members of the enterprise. In the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute.

April 16 Transcript, pp. 1246-1247. In each instance where the Court referred to maintaining or increasing position, the Court eliminated the personal pronoun "his". The Court's modification of the instruction allowed the jury to convict the Defendant of murder in the aid of racketeering without finding that he committed the crime to maintain or increase "his" position within the enterprise.

In prior decisions regarding the elements of a violation of 18 U.S.C. § 1959, the Fourth Circuit Court of Appeals has set forth that the purpose element of the crime must relate to the defendant's own position in the gang.

To establish a § 1959 claim, the government must prove beyond a reasonable doubt,

(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as

3

**JA3581**

defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that <u>his</u> general purpose in so doing was to maintain or increase his position in the enterprise.

*United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994) (emphasis supplied) citing *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992), *cert. denied*, 126 L. Ed. 2d 124 (1993).

The Fourth Circuit has emphasized that the element in question relates to self-promotion.

So considered, the evidence sufficed to show the requisite purpose as to each of these appellants. We agree with the Second Circuit that this purpose can be shown by proof that "a defendant who holds a position in a RICO enterprise . . . committed an underlying crime of violence with a motive of retaining or enhancing that position"; that such "<u>self-promotion</u>" need not be "the defendant's only or primary concern"; and that evidence suffices if from it a jury "could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership."

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) (emphasis supplied) citing *United States v. Concepcion*, *supra*.

Here, the modified instruction allowed the jury to convict the Defendant of murder in the aid of racketeering even if they found the Defendant's purpose was to increase the position of another within the enterprise. This contravenes the Fourth Circuit's ruling that the purpose element of 18 U.S.C. § 1959 relates to the defendant's "self-promotion". Accordingly, the modified instruction eliminated the Government's responsibility of proving one of the elements to the offense. Accordingly, the Defendant is entitled to a new trial.

**3.    THE GOVERNMENT PRESENTED INSUFFICIENT EVIDENCE TO SUBMIT THE CHARGES OF WITNESS TAMPERING AND CONSPIRACY TO COMMIT WITNESS TAMPERING TO THE JURY.    THE JURY'S VERDICT ON THESE OFFENSES PREJUDICED THE DEFENDANT'S SENTENCING HEARING BY ALLOWING THEM TO CONSIDER THIS AS EVIDENCE OF FUTURE DANGEROUSNESS.**

In counts 61-63 the Defendant is charged with conspiracy to obstruct justice and tamper with witnesses, obstruction of justice and tampering with witnesses.  At the close of the Government's evidence, upon Defendant's motion under Rule 29, the Court dismissed count 62, obstruction of justice, and the obstruction of justice object of the conspiracy under count 61.  The jury was nevertheless allowed to consider conspiracy to tamper with witnesses and the substantive tampering with witness counts.  The evidence to support the jury's finding Defendant guilty of these offenses was insufficient to support those convictions.   Further the jury's verdict of guilty to these offenses prejudiced Defendant in his sentencing hearing in that the jury was allowed to consider this as evidence of future dangerousness in determining the appropriate sentence.

Counts 61 and 63 charge the defendant with entering into a conspiracy with other MS-13 members to prevent the testimony of any person in an official proceeding and to have willfully intimidated another person to prevent their testimony in an official proceeding.  The allegations stem from an event that occurred on June 12, 2008 where three MS-13 members went to Las Jarrochitas restaurant in Greensboro in an attempt to dissuade witnesses from participating in any legal proceedings arising out of the murders which occurred on December 8, 2007 at Las Jarrochitas.  The Government's evidence did show three MS-13 members traveled from Charlotte to Greensboro on June 12, 2008.  One member entered the restaurant and attempted to deliver a message to restaurant

5

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 229 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 08/14/10   Page 3 of 40
**JA3583**

personnel for the purpose of preventing the testimony of witnesses at further proceedings regarding these homicides. However, the Government's evidence was insufficient to connect the Defendant with the June 12 event.

The only evidence which the Government could present that connected the Defendant to this event was the testimony of the cooperating witness, Alexander Granados. Granados testified that he attended a meeting that occurred on June 7, 2008 which was attended by other MS-13 members. During his testimony about the meeting, Granados said the following:

Q.    And what specifically was discussed?

A.    Well, specifically that he had a court date the following week and he sent a message to Misterio so that there won't be somebody speaking out at the court.

April 15 Transcript, p. 890. This single sentence was the only evidence that the Government presented to connect the Defendant in any way to these offenses. The Government presented nothing to corroborate Granados' claim. In fact, the Government's own evidence showed that they were monitoring the Defendant's communications while incarcerated. The Government presented many letters the Defendant had written while incarcerated. Their evidence further showed that they monitored all of his jail phone calls while incarcerated. Yet the Government could present no evidence to support Granados' claim that another MS-13 member claimed to have received a message from the Defendant. The sole basis for the submission of this evidence to the jury was this single line of testimony of one cooperating MS-13 member claiming he heard another MS-13 member claim that the Defendant had sent a message. Clearly this evidence was insufficient to submit these charges to the jury.

6

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 230 of 350
Case 3:08-cr-00134-RJC Document 1414   Filed 06/14/10   Page 230 of 40
JA3584

The Court's failure to dismiss these charges resulted in the jury returning verdicts of guilty on these two counts.  This same evidence was then used by the jury in Defendant's sentencing hearing to support a finding of future dangerousness. Accordingly, the Defendant's sentence of death must be set aside and he must be granted a new sentencing hearing in that the jury was allowed to consider evidence on the issue of future dangerousness that was insufficient to be submitted to the jury for their consideration.

**4.    ADMISSION OF EVIDENCE OF UNADJUDICATED MURDERS DURING THE SENTENCING PHASE DENIED DEFENDANT A FAIR CAPITAL SENTENCING HEARING AND DUE PROCESS OF LAW, REQUIRNG A NEW SENTENCING HEARING.**

In its effort to obtain the death penalty against Defendant on Counts 22 through 25, the government filed a "Notice of Intention to Seek the Death Penalty" (Document #273) on September 23, 2008.

As to all four counts, the Notice alleged a non-statutory aggravating factor of "Participation in Additional Uncharged Murders and Other Acts of Violence".  The allegations as to this unadjudicated conduct were as follows:

> Apart from the offenses charged in the First Superseding Bill of Indictment, defendant has been involved in other serious acts of violence, which are not reflected in his criminal record.  Including but not limited to:
> a.  On or about July 27, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully killed Jose Herrera and Gustavo Porras.
> b.  On or about September 28, 2005, in Los Angeles, California, defendant knowingly, intentionally, and unlawfully participated and aided and abetted the killing of Andy Abarca.

In pretrial motions, Defendant sought to strike these aggravating factors from the government's death notice and to exclude such evidence from the sentencing phase of

7

**JA3585**

trial (Document 483 filed 4/24/09, Document 960 filed 3/31/10, Document 985 filed 4/10/10). This Honorable Court denied Defendant's motions and allowed the government to pursue these nonstatutory aggravating factors by introducing evidence of these uncharged murders during the sentencing phase.

The evidence on these aggravating factors presented to the jury during the death penalty selection phase can be readily summarized. As to the alleged July 27, 2005 murders of Jose Herrera and Gustavo Porras, the evidence implicating Defendant as the shooter consisted of LAPD officers testifying to hearsay statements made to them by three suspects who were identified as being present in the car from which the attack came. Luis Rivera, Luis Ramos, and Rene Arevalo each initially lied to the police, denying membership in MS-13. Rivera and Ramos were allowed a weekend in jail to converse and get their stories straight. Thereafter, they minimized their involvement and claimed the shooter was the absent Defendant. Similarly, Rene Arevalo, in minimizing his role, claimed that the others jumped out of the car while it was stopped in traffic, denying advance knowledge of their intent, thereby maintaining that he was not criminally liable. He too conveniently blamed the actual shooting on the one absent suspect, Defendant.

The most reliable of the hearsay evidence presented by the government was that from the two independent eyewitnesses, Noe Bautista and Oscar Santiago. Each of them indicated to the police that the shooter was the driver. Since none of the government witnesses or hearsay declarants claimed that Defendant was the driver, the government's evidence was unworthy of supporting any conclusion that Defendant was the shooter and

8

**JA3586**

was clearly insufficient to support this act as aggravating factor beyond a reasonable doubt.

Similarly, the evidence as to the September 28, 2005, murder of Andy Abarca at Lemon Grove Park was weak. Two eyewitnesses, Roberto Ramos and Juan Lara, were shown six-pack photo lineups containing Defendant's photo and failed to pick out his photograph as being one of the assailants. The only evidence putting Defendant in the park at the time of the shooting was the "identification" by Freddy Gonzalez. However, on both occasions that he was presented with Defendant's photo in a six-pack photo array, Gonzalez was unable to positively identify Defendant. As established during cross-examination of Gonzalez, his handwritten explanation of his first "identification" was as follows: "Looks like or resembles the guy who came to the park the day that they killed Andy. I remember seeing this guy, but I'm not sure if he is the one that came that day to the park with the pistol and shot us." His handwritten explanation of his second "identification" was as follows: "My first impression was photo number 5, the way that he has his hair looks the same. But everything happened so fast that I'm not a hundred percent sure. He came to the park. He seemed small. And what I saw was the gun and after that I began to run. This is the first and last time I saw the young man."

The government also elicited conclusory hearsay testimony from Detective Small that Rene Arevalo told him that Defendant was the Lemon Grove Park shooter, but Detective Small did not testify as to any basis for believing that Arevalo, who was not present for that incident, had any personal knowledge as a basis for such claim. Defendant's own statement to police constituted an admission of merely being present as a passenger in the car driven by "Sin" but a denial of being the shooter. Thus, the

9

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 233 of 350
Case 3:08-cr-00134-RJC Document 51-8 Filed 06/14/10 Page 9 of 40

JA3587

evidence offered by the government to prove that Defendant was the shooter, or even a knowing aider and abettor of the shooting, was insufficient for a jury to be convinced of this aggravating factor beyond a reasonable doubt.

"[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." Caldwell v. Mississippi, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231, 239 (1985).  A criminal conviction meets this exacting standard of reliability by establishing that the underlying criminal activity was proved beyond a reasonable doubt to the satisfaction of an unbiased jury in conformity with constitutional safeguards.  However, a finding of other criminal acts that have not resulted in convictions does not involve the same indicia of reliability.  Allegations of unadjudicated criminal conduct lack, *ipso facto*, the reliability necessary to ensure a constitutional sentence.  This manifest unreliability is compounded by the relaxed evidentiary standards applicable during the sentencing phase.

"In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," Morgan v. Illinois, 504 U.S. 719, 727 (1992) (quoting Irvin v. Dowd, 366 U.S. 717, 721-22 (1961)).  A jury that has already decided that the defendant is guilty of first-degree murder cannot be expected to impartially and objectively evaluate allegations of unadjudicated criminal behavior in the penalty phase. For this reason, a number of state courts have concluded that admitting evidence of unadjudicated offenses in a capital sentencing hearing violates a defendant's right to due process of law:  "[T]o permit the State to present evidence sufficient to convince the jury beyond a reasonable doubt that the defendant had committed murders for which he has

Case 3:08-cv-00134-RJC   Document 15-8   Filed 08/13/10   Page 10 of 40

**JA3588**

not yet been convicted and before the very jury that has just returned a guilty verdict for first degree murder, violates the concept of fundamental fairness embodied in due process of law . . ."  State v. Bobo, 727 S.W.2d 945, 952-53 (Tenn.), *cert. denied*, 484 U.S. 872 (1987).  See also State v. Bartholomew, 101 Wash.2d 631, 640-42, 683 P.2d 1079, 1086 (1984) ("[a] jury which has convicted a defendant of a capital crime is unlikely fairly and impartially to weigh evidence of prior alleged offenses"); State v. McCormick, 272 Ind. 272, 279-80, 397 N.E.2d 276, 281 (1979) ("[t]he facts regarding this alleged aggravating crime will never have been presented to an impartial, untainted jury, and the risk that the previously tainted jury will react in an arbitrary manner is infinitely greater").

The Supreme Court held in Johnson v. Mississippi, 486 U.S. 578, 585, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575, 584 (1988) that the presumption of innocence applies to evidence of other criminal acts at the penalty phase unless the presumption has been rebutted by a conviction after a jury trial.  See also Cook v. State, 369 So.2d 1251, 1257 (Ala. 1978) ("Until the State proves him guilty of this charge in accordance with appropriate legal procedures Cook is presumed innocent.  This fundamental tenet of our system of justice prohibits use against an individual of unproven charges in this life or death situation.").  In Johnson v. Mississippi, the Supreme Court reversed the defendant's death sentence because a prior conviction that had been used as an aggravating circumstance was overturned after the defendant had been sentenced to death.  The Court explained that because the prior conviction was reversed, the defendant must be presumed innocent of that charge "unless and until the [defendant] shall be retried." Johnson v. Mississippi, supra, 486 U.S. at 585.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 235 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 08/13/10   Page 11 of 40
**JA3589**

Here, fears that the jury's finding of Defendant's guilt of the charged gang-related double-murder would influence its ability to fairly determine whether Defendant had committed a previous uncharged gang-related double-murder turned out to be well-founded. In its closing argument, the government tacitly acknowledged the weakness of its evidence and the government's reliance on the guilt phase verdict for convincing the jury that Defendant had committed the Fairfax Avenue double-murder: (1) "Does that story sound familiar? Oh, you disrespected me and I pulled out a gun. Sure it sounds familiar because that's exactly what happened later in Greensboro" (April 27 transcript, page 829); (2) "This is what happened. And man, he went off. Sound familiar? They flipped off the gang and he went off. And he froze them. Just like he did in Greensboro. That's a consistency you need to consider" (April 27 transcript, page 894); (3) "His friend Jose Herrera turned to run and he was shot square in the back of the head. Somebody had the presence of mind. This wasn't a wild, reckless shooting. This was deadly and on point. What happened in Greensboro? Right through the middle of the chest." (April 27 transcript, page 895). Thus, Defendant's right to the presumption of innocence on the unadjudicated murders was violated when the jury was told by the government that Defendant must have committed the unadjudicated murders in Los Angeles because he committed the Greensboro murders in the same manner.

Therefore, in the present case, admission of evidence of alleged murders that had not resulted in convictions against Defendant during the penalty phase of this capital trial denied him Due Process of law during the sentencing phase and violated his presumption of innocence on these untried charges. Defendant also submits that admission of evidence of these unadjudicated murders violated 18 U.S.C. Section 3593(c) by unfairly

12

**JA3590**

prejudicing Defendant in that it permitted the jury to rely on evidence lacking indicia of reliability after it has already adjudged him guilty of capital murder.  Therefore, Defendant submits that he is entitled to a new trial on the sentencing phase where admission of such evidence will not be allowed.

**5.   THE PENALTY PHASE VERDICT FORM COVERING THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS FAILED TO PROVIDE FOR THE JURY TO ACTUALLY FIND THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS.**

The Government's death notice was filed on September 23, 2008.  In it the Government alleged identical statutory and non-statutory aggravating factors for each of the four capital counts.  For each capital count under non-statutory aggravating factors the Government alleged, as the fifth non-statutory aggravating factor, future dangerousness.  The Government specifically alleged that future dangerousness was evidenced by four subcomponents:  a continuing pattern of violence, low rehabilitative potential, lack of remorse, and gang membership.

In the special verdict form submitted to Defendant's capital jury, the trial court submitted the issue of future dangerousness to the jury in written form as follows:

> 4.      Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidence by at least one or more of the following:

> a.      The defendant has engaged in a continuing pattern of violence, attempted violence, and threatened violence, including but not limited to the crimes alleged against the defendant in the Indictment.

> Yes:_____        No:_____

> _____

13

**JA3591**

FOREPERSON

b.      The defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct, and his allegiance to and membership in MS-13?

Yes:_____          No:_____


_____          FOREPERSON

c.      The defendant has never expressed any remorse for killing Ruben Garcia Salinas as indicated by defendant's statements to fellow gang-members during the course of and following the offenses alleged in the Indictment?

Yes:_____          No:_____


_____          FOREPERSON

d.      The defendant has demonstrated an allegiance to and active membership in MS-13, a violent criminal enterprise?

Yes:_____          No:_____


_____          FOREPERSON

While the verdict form submitted to the jury allows the jury to make a factual finding regarding the four subcomponents of future dangerousness, it does not permit the jury to make a specific conclusion that the Defendant "is likely to commit criminal acts of violence in the future." Hence, the jury has never made an actual determination that the Defendant poses a future danger. Regretfully, the Court's instructions to the jury did not clarify this issue for the jury. The Court's instructions mirrored the special verdict

14

form and never informed the jury that they had to determine whether the Defendant presented a future danger in order to find the non- statutory aggravating factor. The Court's instruction is set out here.

> Four, future dangerousness. Defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others as evidenced by at least one or more of the following:
>
> (A), continuing pattern of violence. Defendant has engaged in a continuing pattern of violence, attempted violence and threatened violence including but not limited to the crimes charged against the defendant in the indictment.
>
> (B), low rehabilitative potential. Defendant poses a future danger to the lives and safety of other persons as demonstrated by his lack of rehabilitation after incarceration, his pattern of criminal conduct and his allegiance to and member in MS 13.
>
> (C), lack of remorse. Defendant has never expressed any remorse for killing Ruben Garcia Salinas and Manuel Garcia Salinas as indicated by defendant's statements to fellow gang members during the course of and following the offenses alleged in the indictment.
>
> (D), gang membership. Defendant has demonstrated an allegiance to and an active membership in MS 13, a violent criminal enterprise.

April 27 Transcript, pp. 906-7. The special verdict form submitted to Defendant's jury did not require the jury to determine whether Defendant constituted a future danger. Given that the court's instructions did not clarify this for the jury, the Court must conclude the Defendant was sentenced to death based on an insufficient verdict form which allowed Defendant's jury to make factual findings regarding his conduct yet not reach the ultimate conclusion as to the existence of an aggravating factor. Accordingly, the Defendant is entitled to a new sentencing hearing.

15

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 239 of 350
Case 3:08-cr-00134-RJC   Document 568   Filed 08/13/10   Page 15 of 40
JA3593

6.    **THE COURT'S EXCLUSION OF AN INTERVIEW OF DEFENDANT'S MOTHER PREJUDICED DEFENDANT'S PRESENTATION OF HIS CASE IN MITIGATION.**

During the sentencing hearing, Richard McGough testified that, while the trial was proceeding, Defendant had received through discovery a copy of a birth certificate from the Government indicating the Defendant had been born in Guatemala. This birth certificate showed Defendant's date of birth preceded his previously known date of birth by two years. The birth certificate also showed that Defendant was not born in El Salvador as had previously been believed, but had actually been born in Guatemala. The birth certificate was received along with another document that contained a narrative, written in Spanish, which summarized an interview of the Defendant's mother, Leticia Diaz Ramirez, by Salvadoran police. The Court excluded Defendant's presentation of this narrative from evidence.

Defendant made an offer of proof of the narrative. The narrative stated that Defendant's mother had been interviewed on June 14, 2008 by Carlos Alberto Moreno. She stated that the Defendant's father, at the time of the Defendant's birth, had moved the family to an area called La Parrillada located in Guatemala. The Defendant's father moved his grandmother, his mother and an aunt named Carmen all to this location which is where Defendant was born. She further describes the Defendant was born in the National Hospital of Escuintla on the 25th of November 1982 at 11:30 a.m. The birth certificate reports that the Defendant's father is Luis Armando Gonzalez. His mother explains that Rafael Umana, Defendant's father, actually registered the birth but that he used the name of his cousin in registering his birth as the father of the Defendant.

16

**JA3594**

This narrative was important to the Defendant's case in mitigation in a variety of ways. The Defendant presented evidence that he was born in El Salvador during the violent civil war of the 1980s and early 1990s. The evidence demonstrating that the Defendant's family was moved to Guatemala during this time corroborates that his family was displaced by the violence that was going on in El Salvador. The fact that Defendant's father was required to move his entire family to Guatemala due to the civil war is mitigating evidence that Defendant's jury should have heard. The fact that Defendant's father falsified the name on the Defendant's birth certificate is also important evidence that Defendant's jury should have heard. It was consistent with Defendant's presentation of evidence showing Defendant's father as non-cooperative with defense counsel's investigation of Defendant's background and was significant to an understanding of the Defendant's father's role in his life.

7.  **THE ADMISSION OF DEFENDANT'S APRIL 23, 2008 STATEMENT MADE TO LOS ANGELES POLICE DETECTIVES VIOLATES DEFENDANT'S FIFTH AND SIXTH AMENDMENT RIGHTS.**

Defendant acknowledges that he has previously filed a Motion to Suppress his April 23 statement (document 490) and that the Court denied that motion after conducting an evidentiary hearing on August 26, 2009. Defendant asks the Court to re-examine this issue as a motion for a new sentencing hearing, citing further facts and authorities which support his contention that defendant's Constitutional rights were violated requiring the exclusion of this statement from Defendant's sentencing hearing.

Defendant was arrested and charged with two counts of first degree murder in state court proceedings on December 12, 2007. On December 14, 2007, in state court proceedings, the Defendant specifically requested the appointment of counsel on these

17

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 241 of 350
Case 3:08-cr-00134-RJC  Document 508a  Filed 08/13/10  Page 17 of 40

JA3595

homicide charges (see Exhibit A, p. 1, affidavit of indigency)[1]. The Honorable Linda L. Falls, presiding at this proceeding, found that the Defendant was charged with first degree murder, that he was not financially able to provide for his own legal counsel, and ordered he was entitled to the services of counsel (see Exhibit A, p. 4, order of determination of counsel). On December 19, 2007, the North Carolina capital defender, Robert M. Hurley, appointed John D. Bryson as Defendant's legal counsel (see Exhibit A, p. 5, assignment of counsel). Guilford County jail records demonstrate that John Bryson met with the Defendant on December 21, 2007 and then on four more occasions prior to the arrival of the Los Angeles detectives at the jail on April 23, 2008 (see Exhibit A, pp. 6-11, jail records). Bryson also retained the services of Richard McGough, who would later testify at Defendant's sentencing hearing as a mitigation specialist. Guilford County Jail records reflect that McGough met with Umana on February 8, 2008, also prior to the arrival of the Los Angeles detectives (Exhibit A, p. 11, jail record).

Los Angeles police detectives arrived at the Guilford County Jail in High Point on April 23, 2008 and interviewed Defendant regarding allegations of his involvement in three homicides in California from the year 2005. John Bryson did not receive prior notification of the interview by the Los Angeles detectives (August 26, 2009 Transcript, p. 67).

Defendant will not set out his entire claim again as it is contained in his original Motion to Suppress and supporting Memorandum of Law (Documents 490 and 491). However, in addition to the foregoing additional facts showing the Defendant had requested counsel on these homicides, had received counsel, and that counsel and

---

[1] The third page of the Affidavit of Indigency contains the Defendant's statement made under penalty of perjury: "I now request the Court to assign a lawyer to represent me in this case."

18

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 242 of 350
Case 3:08-cr-00134-RJC Document 50-8a Filed 08/23/10 Page 18 of 40
JA3596

Defendant were actively engaged in the course of legal representation, Defendant would also submit additional authority supporting his claim.

The United States Supreme Court has recognized that when the prosecution in a capital case attempts to interview a defendant regarding evidence of future dangerousness, both the defendant's Fifth and Sixth Amendment rights are implicated. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L. Ed. 2d 359 (1981), *Satterwhite v. Texas*, 486 U.S. 249 (1988); *Powell v. Texas*, 492 U.S. 680, 109 S.Ct. 3146, 106 L. Ed. 2d 551 (1989). While these cases deal specifically with psychiatric examinations, the decisions clearly require notice to defense counsel when the client is to be interviewed regarding issues that would "encompass the issue of their client's future dangerousness." The Court has consistently ruled that the failure to notify defense counsel of such an interview violates the defendant's Sixth Amendment right to counsel. Here, while the Los Angeles police detectives came to interview the defendant regarding other crimes having occurred in California, this was nevertheless an interview in which the defendant was to be questioned about evidence that would be used in his capital sentencing hearing on his future dangerousness. Accordingly, applying the rule of *Estelle v. Smith*, defense counsel was entitled to notification of the interview. The failure to notify Defendant's attorney violates defendant's Sixth Amendment right to counsel. This violation requires the suppression of the statement. Given that the statement was admitted in evidence during sentencing, Defendant is entitled to a new sentencing hearing.

Responding to Defendant's original Motion to Suppress alleging a Sixth Amendment violation, the Government relied almost exclusively on *McNeil v. Wisconsin*, 501 U.S. 171 (1991). However, *McNeil v. Wisconsin*, 501 U.S. 171 (1991) is clearly

19

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 243 of 350
Case 3:08-cr-00134-RJC    Document 50-8    Filed 06/13/10    Page 19 of 40
JA3597

distinguishable from the instant case. Defendant acknowledges *McNeil* holds that a defendant's Sixth Amendment right is case specific and that having a lawyer in one case doesn't prevent the police from interviewing a defendant regarding another crime. However, in *McNeil*, the Court dealt with the admissibility of the defendant's statement in the prosecution of the crimes to which the statement related and to which the defendant was not represented by counsel at the time of the statement. Here, unlike *McNeil*, Defendant's statement was introduced in the case in which the Defendant was represented by a lawyer at the time of the statement. Defendant would agree that *McNeil* holds that defendant's April 23, 2008, statement would otherwise be admissible in future prosecutions against him in the state of California. However, *McNeil* does not address the facts of this case where the statement is introduced at the sentencing hearing in the case in which the defendant was represented by counsel at the time the interview took place. Here, Defendant's lawyer was actively representing him at the time of the interview and yet he received no notice of the interview, the contents of which would be used to support Defendant's sentence of death.

Additionally, Defendant's case is distinguishable from *Montejo v. Louisiana*, 129 S.Ct. 2079 (2009). In *Montejo*, while the defendant had been appointed counsel, he had not requested counsel.

> When a court appoints counsel for an indigent defendant in the absence of any request on his part, there is no basis for a presumption that any subsequent waiver of the right to counsel will be involuntary. There is no "*initial* election" to exercise the right, *Patterson,* 487 U.S., at 291, 103 S. Ct. 2389, 101 L. Ed. 2d 261, that must be preserved through a prophylactic rule against later waivers. No reason exists to assume that a defendant like Montejo, who has done *nothing at all* to express his intentions with respect to his Sixth Amendment rights, would not be perfectly amenable to speaking with the police without having counsel present. And no reason exists to prohibit the police from inquiring. *Edwards* and *Jackson* are

20

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 244 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 08/13/10   Page 20 of 40

**JA3598**

meant to prevent police from badgering defendants into changing their minds about their rights, but a defendant who never asked for counsel has not yet made up his mind in the first instance.

Montejo at 2086-7.  Additionally, Montejo had never met with his attorney at the time he was interviewed by police.  Here, Defendant had not only requested the appointment of counsel, he had received counsel and had been working with counsel for a period of months at the time he was interviewed by police.

Additionally, the Los Angeles detectives provided Defendant with standard Miranda warnings.

> You have the right to remain silent.  If you refuse the right to remain silent, whatever you say can be used against you in a court of law.  You have the right to speak with a lawyer and have a lawyer present at any interview.  If you so desire and don't have the money to pay for a lawyer, a lawyer will be obtained for you at no cost before any interview. . . if you. . .so wish.  Do you understand what I explained to you?

April 23, 2008 statement, p. 19.  These Miranda warnings were insufficient for Defendant to waive his Sixth Amendment right to counsel under the facts of this case.  The Miranda warnings provided by the Los Angeles police detectives only advised Defendant that he could receive a lawyer and did not advise him that detectives would contact his lawyer regarding the statement.  This is significant in that the Defendant had told the detectives that he did not want to do anything that would affect his North Carolina case.

Additionally, on the issue of waiver of his Sixth Amendment right to counsel, Defendant notes that the Los Angeles police detectives, prior to reading Defendant his Miranda rights, told Defendant that he would not be leaving North Carolina and therefore, had nothing to lose by speaking with them.  Prior to reading Defendant his Miranda rights, the Los Angeles detectives informed Defendant  that they had consulted

21

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 245 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 08/13/10   Page 21 of 40
JA3599

with North Carolina authorities and had reviewed the statement that he made to North

Carolina law enforcement regarding the murders for which he was being prosecuted.

CARSHELL:  He knows that we spoke to him about his current thing and.
. .

FLORES:     Right.

CARSHELL:  and. . . and, and we've reviewed his interview and that he.
. . you know. . .

FLORES:     Yeah, [UI] understand…

April 23, 2008 statement, p. 16.  Shortly thereafter, detectives informed Defendant that he

would never be leaving North Carolina.

CARSHELL:  We just wanna. . ., we just wanna, you know, have him just
clean, clean the slate here, I mean, you know, if he's gonna
stay here on this.  You know, it sounds like he's gonna stay
here on this and, you know, we don't  wanna bother him or
anything but. . .

FLORES:     Yes, mm-mm. . .

CARSHELL:  . . . let's clear some stuff up in the past, uh. . .

FLORES:     What he wants to verify is. . .there are things that happened
in the past, and that, well, that's in the past, but, uh. . .there
are many things that we want to clarify.  We know that
you're here, and well, you know [UI] that you're going to
stay here.  Understand?  [UI] in New York where perhaps
you want to.  We don't. . .don't know, but it's your. . .
those things can be talked about. . .right?

April 23, 2008 statement, p. 17.  And, finally, before reading Defendant his rights, the

Los Angeles detectives also advised Defendant that he had nothing to lose by speaking

with them.

FLORES:     But they are things that. . .[UI] we have to resolve to get
that weight off ourselves.

AU:          Yes.

> FLORES:    Right?  And so. . . a composition [PH], [UI], well, it doesn't cost you anything.  Right?  So. . .

April 23, 2008 statement, p. 18.  That Defendant was to receive a life sentence in North Carolina and, therefore, had nothing to lose by speaking with the Los Angeles police detectives was something that would be repeated to him throughout the interview.  The cited portions all occurred prior to the detectives reading the Defendant his Miranda rights, and therefore, taint any waiver of his right to counsel.  Defendant's April 23, 2008, statement was taken in violation of his Fifth and Sixth Amendment rights.    The introduction of that statement at his sentencing hearing requires Defendant be granted a new sentencing hearing.

**8.    THE ADMISSION OF THE TESTIMONY OF FRANK FLORES VIOLATES THE DEFENDANT'S RIGHT TO CONFRONT AND CROSS EXAMINE WITNESSES, AND CONSTITUTES BOTH HEARSAY AND EVIDENCE INADMISSIBLE UNDER RULE 404(b).**

Defendant acknowledges that he has previously raised, by a Motion In *Limine,* [Document 962] his request to exclude the testimony of Frank Flores on the grounds that it would constitute hearsay, violate Defendant's right to confrontation and that it would be inadmissible under *Daubert v. Merrell Dow, Pharmaceuticals, Inc*., 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The Court denied Defendant's motion by order filed April 9, 2010 [Document 981].  However, Defendant now cites to a critical portion of Detective Flores' testimony in support of Defendant's claim that his testimony was inadmissible hearsay in violation of Defendant's right to confrontation.  Additionally, Defendant notes this testimony constitutes specific factual occurrences from his prior experience as a law enforcement officer, admitted in violation of Rule 404(b).

**JA3601**

During the direct testimony of detective Flores, the government sought to have Flores testify regarding his prior experiences rather than giving his expert opinion on the aspects of the case.

Q:    Well, have you had, in your experience has there been any situations where a civilian has been killed out of disrespecting the gang?

A.    Yes, I mean –

MR. BRYSON:    Object.

THE COURT:    Hang on a second.    I'll overrule the objection.

THE WITNESS:    Violence is generally very common.    A lot of things happen unplanned or may happen on very short notice.

Disrespect, somebody is confronted, they react.    Yes, they're required to act appropriately, whether confronted or disrespected by rival gang member, by somebody from the general public who they have taken some kind of disrespect from.    It's part of the normal, everyday activities.

April 12 Transcript, p. 63.

This testimony was a critical response in the Government's case.    The Government was attempting to prove that Defendant committed the killings to increase his position in the gang.    It was the Government's theory that Defendant committed the murders to increase his reputation in the gang, thereby increasing his position in the gang. The above-quoted testimony supported the Government's theory of the case.    However, the Government was not eliciting expert testimony from the witness regarding the rules of MS-13, but instead, was simply having him repeat prior experiences that had occurred to him.    This type of evidence is inadmissible character evidence under Rule 404(b). Nevertheless, this court overruled counsel's objection, and allowed the witness to testify as to prior cases and experiences that he had involving situations where civilians had

24

**JA3602**

been killed for disrespecting a gang member.  Federal Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  *United States v. Weaver*, 282 F.3d 302 (4th Cir. 2002).  The sole reason for admitting this evidence of other crimes that occurred in California was to show that the Defendant acted with the same motivation as other gang members had acted in other crimes.  This is the exact type of evidence that Rule 404(b) is meant to exclude.  Defendant again renews his challenge to the testimony of Frank Flores as hearsay testimony which violates the Defendant's right to confrontation.  Defendant asserts that Flores' testimony is essentially based on prior cases and prior conversations that he has had with other gang members and is not the type of expert testimony contemplated by Rule 703 of the Federal Rules of Evidence.

9.    **THE GOVERNMENT'S SENTENCING REBUTTAL ARGUMENT WAS DESIGNED TO INFLAME THE JURORS' EMOTIONS AND PASSIONS AND WAS OTHERWISE IMPROPER.**

The government's rebuttal argument during the sentencing phase contained numerous instances where the government made statements that were designed to inflame the emotions and passions of the jury in order to obtain a death sentence or were otherwise improper.

The government, after successfully objecting to Defendant's discovery motion seeking data from the Bureau of Prisons regarding the behavior of MS-13 members in prison, argued the following:  "There are only 240 MS-13 members in prison.  And I can promise you that if one of them was there for life and was behaving, we would have heard all about it."  (April 27 transcript, page 888).  This was unfair, misleading, and

25

**JA3603**

prejudicial because the defense had been disabled from obtaining such information by the government's successful objection to Defendant's discovery motion.

The government, after successfully objecting to Defendant's offering of the mitigating factor that "no other defendants who committed gang-related murders as part of this conspiracy will receive the death penalty", argued the following:

> So let's compare him to the people around him and quit taking
> him out and separating him and looking at him as if he is only
> this way because of factors.  He's here because of who he is.  And
> he's a killer.  He's shown it over and over and over again.  And he's
> a killer among killers.  They talk about killing, yeah.  But we haven't
> had any evidence of it.  And of all the people that were around him, he
> was the killer.  He rose to the top as the killer.
> So, yes.  Is MS bad?  Sure is.  We've put on a lot of evidence
> about that.  Are they violent?  Yes.  But of everything you've heard
> from all the people you've heard about from both sides and all their
> cross-examination, he's the only killer.  So you remember that.
> Compare that.  (April 27 transcript, page 889).

Not only did the government unfairly take advantage of the Court's ruling excluding the defense mitigating factor, but argued to the jury that Defendant was the only killer among the MS members involved in this case, which is simply untrue.  The evidence showed that the following MS-13 members who were involved in this case had committed murder:  (1) Codefendant Johnny Gonzalez, AKA Solo, was one of two perpetrators of a robbery-murder in August, 2005; (2) Rony Lopez, a cooperating MS-13 witness for the government, was an aider and abettor of that robbery-murder and would thus be criminally liable for murder in North Carolina.  Additionally, the indictment charged codefendant Elvin Pastor Fernandez-Gradis AKA "Tigre" with murder, of which he was convicted in January, 2010.  Thus, the government's argument that Defendant was the only MS member that committed murder was misleading, untrue, and prejudicial to Defendant.  Defendant's attorneys again objected at sidebar to the exclusion of their

26

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 250 of 350
Case 3:08-cr-00134-RJC   Document 1248   Filed 06/14/10   Page 26 of 40

JA3604

proposed mitigating factor and also objected to the government's argument that Defendant was the only MS murderer. (April 27 transcript, p. 914). Because the improper argument was not remedied, Defendant submits that a new sentencing phase of trial is required.

The government argued that one of the aggravating factors was "callous disregard" and that is was "a reason to weigh in favor of death." (April 27 transcript, page 896-897). Defendant's counsel immediately objected and the Court instructed the jury to disregard the statement because the Court had previously stricken this as an aggravating factor. Nevertheless, Defendant submits that this statement, in conjunction with the other arguments cited herein, combined to inflame the jury with emotion and passion to the prejudice of Defendant, requiring a new sentencing trial.

The government argued that Defendant "comes to court with a shank". (April 27 transcript, page 898). In truth, the evidence showed that Defendant was found with a shank at the jail before being transported to the courthouse, and never brought a shank to court. The government went on further to argue that he brought the shank to court to "fight off rivals" and then argued as follows: "You know who the rivals were? They're the marshals. Those are his rivals. The judge is his rival. I'm his rival. Anybody in this courtroom is a rival. You're his rival. He brought it on the first day of jury selection." (April 27 transcript, page 899). Again, not only did the government again incorrectly state that Defendant brought the shank into the courthouse, the government sought to improperly inflame the jury with fear and passion by claiming, without evidentiary support, that Defendant was a potential threat to the jurors themselves. Although Defendant's attorneys immediately objected and the Court sustained it, the government

27

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 251 of 350
Case 3:08-cr-00134-RJC   Document 248   Filed 08/13/10   Page 273 of 350
JA3605

continued in its effort to create feelings of fear and hostility towards Defendant from the jury, arguing that "[W]e're rivals . . . [b]ecause we stand for justice." (April 27 transcript, p. 899).

The government also appealed to anti-immigrant beliefs, appearing to try to exploit jury animosity towards Defendant based on his ethnicity and national heritage when it argued as follows:

> You want to live the crazy life? You need to be ready for some
> American justice. You want to bring El Salvador here, you want
> to bring your gang from El Salvador here, you want to kill us,
> you want to live your crazy life here, well, you'd better be ready
> for some American justice if you're going to do it.
> And that's why you're here. (April 27 transcript, p. 899).

Defendant submits that such argument was likely to create the risk of a death verdict based on Defendant's ethnic and national origin in violation of Fifth Amendment Equal Protection, Eighth Amendment protection against cruel and unusual punishment, and the anti-discrimination provision of the Federal Death Penalty Act, 18 U.S.C. §3593(f).

The government also argued during its sentencing rebuttal argument that the jury should, through its death verdict, send a message to MS-13:

> You tell them—you think MS is listening? You think they're
> watching? What are they going to say when all this is over?
> When you've made your decision? Justice in this case is not
> prison. (April 27 transcript, p. 899).
>
> . . . .
>
> Do not by your verdict be the water that washes the blood from
> his hands. Don't let him live the crazy life. You send him a
> message. You send the community a message. You send MS
> a message because they're listening and they're watching.
> (April 27 transcript, p. 904).

28

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 252 of 350
Case 3:08-cr-00134-RJC Document 2468 Filed 06/13/10 Page 28 of 40
JA3606

The Court, sua sponte, instructed the jury that in determining what sentence to impose, it should not consider any message that might be sent by its verdict. (April 27 transcript, pp. 916-918). However, Defendant submits that such repeated argument was likely to cause the jurors to return a death verdict to deter MS-13 crimes rather than as an individualized sentence appropriate for this Defendant.

Further, the government argued sympathy for the victims' families as a basis for imposing the death penalty:

> So we have Carmen and Betsy, two young girls who came
> in here and poured their hearts out to you. Think about those
> girls. So you can say to Carmen and Betsy when you look
> at them out there, we saw your pain and we felt your sorrow and
> we heard your grief. I want you to put their tears on that scale,
> that weighing that you're going to do, put that on your scale.
> (April 27 transcript, p. 902).

Such an argument improperly asks the jury to impose the death penalty out of sympathy or revenge as opposed to a proper weighing of factors to determine a sentence individually appropriate for this Defendant.

Finally, the government argued that the rights Defendant would have as a federal inmate in the Bureau of Prison are a reason to impose the death penalty:

> The defendant, if you give him life, is going to have his inmate
> bill of rights. I read them out to Dr. Cunningham.
> He took lives. Are you going to give him his bill of rights? Manuel
> and Ruben didn't have a bill of rights. They didn't have a thought,
> they didn't have a chance. You going to give him his bill of rights?
> And all the benefits that come with it. You heard them all.
> If his life in El Salvador was as bad as they painted it, prison looks
> good. It's clean. Dental, healthcare, meals, the commissary. Like
> Dr. Cunningham said, if he's good—he's going to be good. You know
> why? Because he wants to make sure he gets his beans and potato
> chips.
> You going to send him to the commissary? I want you to weigh that
> bill of rights that Manuel and Ruben didn't have but that you're going
> to give him. Is that justice? Is that justice? Is that justice?

29

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 253 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 08/13/10   Page 29 of 40

**JA3607**

> . . . .
> Manuel and Ruben, . . . they're a corpse and you're going to send him to the dining hall.  Is that justice?
> Are you going to send him to the recreation yard?  Are you going to let him step outside and talk to his homies?  Is that justice?  He's going to see sunshine.  He's going to watch the sunset.  He's going to see flowers.  He's going to feel spring breezes.  Is that justice?  (April 27  transcript, 902-903).

Such an argument is an improper reference to Defendant's exercise of constitutional and other rights.  Additionally, to argue that it is not justice for Defendant to live while the victims are dead "creates a *super-aggravator* applicable in every death case.  No amount of mitigating evidence can counter this argument, and if the jury agrees they may not even consider mitigating evidence."  *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002) (citations omitted) (emphasis in original).  In the *Le* case, the prosecution had argued as follows:

> [Y]ou can sentence [the defendant] to life or life without parole.  . . . He'll be well-cared for, well-fed.  What about [the victim]?
>  . . .
> Ladies and gentlemen, justice needs to be done in this case.  Defense counsel asked you to sentence a punishment of life imprisonment or life without parole, but do you really think that justice would be done if this man goes to prison, gets three meals a day and a clean bed every night and regular visits from his family while [the victim] lays cold in his grave[?]

*Id.*, at 1014-1015.  The Tenth Circuit Court of Appeals found this argument to be an improper emotional appeal to impose death out of sympathy for the victims and that it over-emphasized the inevitable permanency of the victim's death while possibly encouraging the jury to disregard mitigating factors.  *Id.*, at 1016.  The Court of Appeals stated that "a hallmark of a fair and civilized justice system" is that "verdicts be based on reason, not emotion, revenge or even sympathy."  *Id.*, at 1015.

30

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 254 of 350
Case 6:08-cr-60134-RJC   Document 50-8   Filed 08/13/10   Page 30 of 40
JA3608

The case of *United States v. John Johnson*, 2010 WL 2010476, __ F.Supp.2d __ (E.D.La.), is instructive as the District Court in that case was faced with a motion for a new capital sentencing hearing based on, *inter alia*, improper government argument during the sentencing phase. Many of the same types of arguments were made by the government in that case as were made by the government in the rebuttal sentencing argument in this case. The court found that the government's rebuttal argument comparing the circumstances of life imprisonment with the permanency of the victim's death "was clearly an improper appeal to the emotions of the jury and their sympathy for the victim and the victim's family in this matter." The court stated that such argument also encourages the jury to disregard mitigation evidence. In conjunction with other improper rebuttal arguments made by the government at the sentencing hearing, the court granted a new penalty phase hearing. *Id.*, at p. 34.

The court in *Johnson* found three separate and independent improper arguments by the government:

> (1) the emotionally inflammatory directive to the jury that a verdict of life imprisonment would mean that they valued the life of the defendant above that of the victim; (2) the emotionally inflammatory appeal to sympathy for the victim and the victim's family by comparing the life of the defendant in prison to the permanency of the victim's death; and (3) the emotionally intimidating pressure imposed upon the jury to bring in a verdict of death on behalf of the Zaffuto family or else be perceived as capitulating, lacking in will, and "washing the blood" from the defendant's hands.

*Id.*, at 37. Similarly, in this case the government's sentencing rebuttal argument was an improper emotional and inflammatory appeal to impose the death penalty based on sympathy, revenge, and a comparison of the life of Defendant in prison to the permanency of the victims' deaths and their loved ones' grief. Therefore, Defendant

31

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 255 of 350
Case 3:08-cr-00134-RJC Document 1248 Filed 08/13/10 Page 34 of 40
JA3609

submits that his constitutional rights were violated and a new sentencing hearing is required.

**10.    DEFENDANT WAS DENIED DUE PROCESS AND HIS MIGITATION CASE WAS UNFAIRLY PREJUDICED BY THE EXCLUSION OF DEFENDANT'S PROPOSED MITIGATING FACTOR OF EXECUTION IMPACT ON DEFENDANT'S FAMILY.**

Among the mitigating factors on which Defendant sought instruction to the jury during the sentence selection phase was the following: "14.  The execution of Alejandro Enrique Umana would cause grief and loss to his son Rafael and to Monica Reyes."  (See Defendant's Request for Instruction on Mitigating Factors filed 4/27/10, Document 1024).  The government objected to this mitigating factor and the Court ruled against Defendant, striking it as a mitigating factor.  However, Defendant submits that this is a valid mitigating factor and that its exclusion denied Defendant due process during the sentence selection phase.

During the sentencing selection phase, Defendant presented testimony from Richard McGough, Defendant's court-appointed mitigation investigator, regarding Defendant's life in El Salvador, which included information about his young son Rafael and his son's mother, Monica Reyes.  A videotaped interview of Monica Reyes was played.  In the interview, she was seated next to her son Rafael and expressed her feelings about Defendant, from which it was apparent that she and Rafael deeply cared for Defendant and that the execution of Defendant would cause them grief and suffering.  However, the Court's striking of the execution impact mitigating factor prevented the jury from considering this as a reason for giving the Defendant life without parole rather than execution.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 256 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 08/13/10   Page 32 of 40
**JA3610**

Defendant submits that execution impact evidence is circumstantial evidence of Defendant's character and was thus properly admitted by the Court during the sentencing selection phase. However, the Court's denial of execution impact as a mitigating factor violates Defendant's right to Due Process, the Eighth Amendment, and the Federal Death Penalty Act.

A defendant is entitled to present evidence about the grief and loss his family would suffer if he were executed under two well-established constitutional rules governing the admissibility of mitigation in capital cases. The first is that the Eighth Amendment "requires . . . the sentencer not be precluded from considering . . . any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina*, 476 U.S. 4, 6 (1986), *quoting Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The second, corollary rule, is "that the sentencer may not . . . be precluded from considering 'any relevant mitigating evidence'." *Skipper*, *supra*, 476 U.S. at 6 (quoting *Eddings*, 455 U.S. at 14). Of course, "relevant" means having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quotation omitted); Fed.R.Evid. 401. A fact of consequence is simply one the sentencer "could reasonably deem to have mitigating value." *Tennard*, 542 U.S. at 284. Thus, this "low threshold," *Id.,* licenses any evidence from which the sentencer "could . . . draw[] . . . inferences" about the defendant or the crime that "might serve as a basis for a sentence less than death." *Skipper*, 476 U.S. at 6 (quotation omitted).

33

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 257 of 350
Case 3:08-cr-00154-RJC   Document 262   Filed 08/23/10   Page 33 of 40

JA3611

The Federal Death Penalty Act tracks this broad standard and arguably broadens it further.  At a sentencing hearing, "[t]he defendant may present any information relevant to a mitigating factor," without being constrained by the Rules of Evidence.  18 U.S.C. §3593(c).  The Act lists eight factors, including a catch-all of "other factors in the defendant's background, record or character or any other circumstance of the offense that mitigate against imposition of the death penalty."  Another listed factor, that an equally culpable codefendant will not receive the death penalty, has nothing to do with the defendant or of the offense.  *See* 18 U.S.C. §3592(a)(4).  Additionally, the preface to the statute suggests that the seven specific factors and the one catch-all factor are not exclusive, and that a capital defendant can rely on additional mitigating factors.  *See* 18 U.S.C. §3592(a) (directing sentencer to "consider any mitigating factor, *including the following* . . . ") (emphasis added).  Finally, Section 3593(c) provides that "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592").

Accordingly, a number of courts have held that the FDPA requires that the fact finder consider any mitigating factor, including those other than the defendant's character and record and the circumstances of the offense.  *See, e.g., United States v. Caro,* 433 F.Supp.2d 726, 727-28 (W.D.Va. 2006); *United States v. Bodkins*, 2005 WL 1118158 *8 (W.D.Va May 11, 2005); *United States v. Sampson*, 335 F.Supp.2d 166, 194-95 (D.Mass. 2004); *United States v. Bin Ladin*, 156 F.Supp.2d 359, 370 (S.D.N.Y. 2001); *United States v. Davis*, 132 F.Supp.2d 455, 464-65 (E.D.La. 2001).

Under these broad concepts of relevance, it is clear that if a defendant has been a loving father, brother, husband, etc. to his family and has established an emotionally

34

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 258 of 350
Case 6:08-cr-00154-RJC   Document 50-8   Filed 08/13/10   Page 34 of 40
JA3612

close relationship with them, this is a positive aspect of his character or background that constitutes a legitimate mitigating factor. *See, e.g., Porter v. McCollum*, 130 S.Ct. 447, 449 (2009) (noting mitigating evidence that the defendant had a "good relationship with his son"); *Williams v. French*, 146 F.3d 203, 207 n.3 (4th Cir. 1998) (noting mitigating factor that defendant "was a loving father").

Family members' indication that they would suffer grief and loss can help establish something circumstantially about the defendant's character and background: that he has demonstrated love and forged an emotional bond with them. From such evidence, a reasonable juror could legitimately conclude that family members love the defendant and feel a strong attachment to him, and that they do so because there is something positive about the relationship he has established with them. This analysis has led some courts to allow execution impact mitigating evidence. In *United States v. Mitchell*, 502 F.3d 931, 991 (9th Cir. 2007), the Court of Appeals held that the district court drew an "appropriate line" when "[it] allowed witnesses to testify regarding their affection for the defendant *and their wish for his life to be spared*, but did not allow them to offer an opinion about what they thought the jury's verdict should be." The former, ruled the Court, was "relevant mitigating evidence" because it "tended[ed] logically . . . prove" something about Mitchell's "record and character." *Id.*

Similarly, in *United States v. Fell*, 2005 WL 1634067 (D.Vt. July 5, 2005), the court refused to strike the mitigating factor "Donald Fell's execution would detrimentally affect persons who care about him." The court explained that this factor "may shed light on Fell's background and character," including his "positive qualities, his capacity to be of emotional value to others, and the nature of his interpersonal relationships." *Id.*, at *2.

The court rejected the government's argument that such mitigation would "invite the jury to consider sympathy for Fell's loved ones," which it agreed was not an appropriate factor. *Id.*; *see United States v. Wilson*, 493 F.Supp.2d 491 (E.D.N.Y. 2007) ("the sort of evidence the Government seeks to preclude, *i.e.,* how Wilson's family would feel if he were executed, may fairly be considered part of Wilson's "background"); *see also United States v. Rodriguez*, 2007 WL 466752 *43 (D.N.D. Feb. 12, 2007) ("The Court recognizes that execution impact evidence is relevant mitigating evidence under the Federal Death Penalty Act").

A decision by the Third Circuit Court of Appeals actually found defense counsel ineffective for failing to present execution impact evidence. That decision did not characterize the evidence as proof of the defendant's character, but rather deemed it independently mitigating. *See Marshall v. Cathel*, 428 F.3d 452, 470 (3rd Cir. 2005) (defense counsel should have interviewed and called to the stand each of the defendant's sons to "plead[] for the jury to spare his father's life"), *affirming* 313 F.Supp.2d 423, 456-57 (D.N.J. 2004) (highlighting counsel's failure to present mitigating evidence of the "harmful impact [defendant's] execution would have on his family, particularly his then fifteen-year old son").

Furthermore, excluding execution impact on the theory that it does not directly bear on the defendant's culpability flies in the face of well-established law and practice allowing aggravating evidence of a capital defendant's future dangerousness, which jurors may weigh even if it flows from factors outside his control and therefore irrelevant to his moral blameworthiness. *See Perry v. Lynaugh*, 492 U.S. 302, 324 (1989). In that sense, execution impact mitigation simply mirrors such aggravation: each calls upon

36

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 260 of 350
Case 3:08-cr-00134-RJC   Document 52-8   Filed 08/23/10   Page 36 of 40
**JA3614**

jurors to weigh how allowing the defendant to live in prison or executing him would affect those around him. It makes no sense to allow jurors to consider only one side of this equation (the likelihood that the defendant would harm fellow prisoners or guards) and not the other (the likelihood he would benefit his family). *See Jackson v. Dretke*, 450 F.3d 614, 620 (5th Cir. 2006) (Dennis, J., dissenting) ("Testimony that a defendant is beloved and valued by family and friends outside of prison is directly relevant to the question of whether he can lead a 'useful life' if sentenced to life imprisonment because it tends to show that other people consider the defendant valuable as a human being and would benefit from the defendant's survival.").

Indeed, the ABA Guidelines, a recognized standard for adequate representation in capital cases, instructs defense lawyers to consider calling "[w]itnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones." *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* Guideline 10.11.F.4, *reprinted in* 31 Hofstra L.R. 913, 1056 (Summer 2003).

In this case, the government was allowed to present extensive, emotional victim family impact testimony towards establishing the following aggravating factor: "As demonstrated by each victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family and friends, the defendant caused injury, harm, and loss to the Ruben Garcia Salinas and Manuel Garcia Salinas family and friends." Yet, Defendant was prevented from presenting the jury with execution impact on his family as a mitigating factor. The admissibility of victim impact evidence totally undermines the theory that evidence regarding the defendant's family's

37

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 261 of 350
Case 3:08-cr-00134-RJC Document 50-8 Filed 08/14/10 Page 37 of 40

JA3615

grief and loss suffered if he is executed tells the jury something about the family but nothing about the defendant. The core premise of allowing family members of a murder victim to testify about the grief and loss they suffered is that this illuminates the victim's unique individuality. The same must be true of execution impact testimony. Thus, to allow one to be an aggravating factor but not allow the other to be a mitigating factor violates fundamental fairness.

The Supreme Court has allowed victim impact evidence to avoid "unfairly weight[ing] the scales in a capital trial," where "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Payne v. Tennessee*, 501 U.S. 808, 822 (1991). "The State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered an individual, so too the victim is an individual whose death represents a unique loss . . . in particular to his family." *Id.,* at 825.

Accordingly, some judges have recognized the contradiction in allowing such victim impact aggravation while at the same time preventing execution impact mitigation. *See, e.g., Jackson v. Dretke,* 450 F.3d 614, 621 (5th Cir. 2006) (Dennis, J., dissenting) (exclusion of execution impact was particularly unfair where "the State introduced potent evidence of the effects of the murders on the victims' relative"); *Wilcher v. State,* 697 So.2d 1123, 1144 (Miss. 1997) (Sullivan, P.J. and McRae, J., dissenting) ("I cannot agree with the majority that allows victim impact statements but does not allow a defendant's family to testify as to the impact upon them of the defendant's execution"); *State v. Rhines*, 548 N.W.2d 415, 446 (S.D. 1996) (analogizing execution impact to victim impact

38

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 262 of 350
Case 3:08-cr-00134-RJC   Document 52-8   Filed 06/13/10   Page 36 of 40

**JA3616**

and holding that both were properly presented below).  Defendant submits that a double standard for victim impact and execution impact "unfairly weight[s] the scales", *Payne*, *supra,* 501 U.S. at 822, thereby violating Defendant's Due Process right to fundamental fairness and the Eighth Amendment.

Thus, here, where the government relied heavily on the impact of the victims' deaths on their families as an aggravating factor, it was fundamentally unfair to prevent the jury's consideration of the impact of Defendant's execution on his family as a mitigating factor.  Therefore, Defendant submits that he is entitled to a new sentencing selection phase hearing where such mitigating factor would be allowed.

## 11.    CONCLUSION

For the above reasons, Defendant submits that he is entitled to a new trial on both the guilt and sentencing phases of trial and hereby respectfully requests this Honorable Court to grant his motion for new trial on both phases of the case.

Respectfully submitted,

June 14, 2010

s/ Mark P. Foster, Jr.
Attorney for Defendant
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Phone 704-347-1809
Fax 704-332-2716
e-mail:  mpfosterjr@bellsouth.net

s/ John Bryson
Wyatt Early Harris Wheeler, LLP
1912 Eastchester Drive, Suite 400
High Point, NC 27261
336-819-6016
Fax 336-819-6076
jbryson@wehwlaw.com

39

Case 3:16-cv-00057-MOC  Document 50-8   Filed 03/23/17   Page 263 of 350
Case 3:08-cr-00134-RJC  Document 246   Filed 06/14/10   Page 39 of 40

JA3617

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above **DEFENDANT'S MOTION FOR NEW TRIAL ON GUILT AND SENTENCING PHASES** has been duly served on the attorney(s) listed below by e-mail service through ECF on this date:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

June 14, 2010

s/  Mark P. Foster, Jr.
NC State Bar #22717
Law Offices of Mark Foster, P.C.
1011 E. Morehead Street, Suite 300
Charlotte, NC 28204
Pone704-347-1809
Fax 704-332-2716
E-mail:  mpfosterjr@bellsouth.net

s/ John Bryson
Wyatt Early Harris Wheeler, LLP
1912 Eastchester Drive, Suite 400
High Point, NC 27261
336-819-6016
Fax 336-819-6076
jbryson@wehwlaw.com

40

**JA3618**

NOTE: THIS FORM MUST BE COMPLETED IN ENGLISH
NOTA: SE DEBE COMPLETAR ESTE FORMULARIO EN INGLÉS

(TYPE OR PRINT IN BLACK INK)
(ESCRIBA EN TINTA NEGRA O A MÁQUINA)

File No.
Expediente No. 07CRI09085,7

Additional File No(s)/
Otros No. de Expediente

STATE OF NORTH CAROLINA
ESTADO DE CAROLINA DEL NORTE
Guilford _____ County
Condado de _____

In The General Court Of Justice
En los Tribunales Generales de Justicia - División de:
☑ District
Tribunales de Distrito
☐ Superior Court Division
Tribunales Superior

Name Of Applicant
Nombre de el/la solicitante
Alejandro Enrique Umaña Díaz

Street Address Of Applicant
Domicilio de el/la solicitante
50 Jackson, Apt 603 Home
Hamster, NY 11550

Permanent Mailing Address Of Applicant (If Different Than Above)
Dirección postal permanente de el/la solicitante (si es diferente al domicilio)

AFFIDAVIT OF INDIGENCY/
DECLARACIÓN JURADA DE INDIGENCIA

G.S. 7A-450 et seq.

Offense(s)
Delito(s)

☑ Defendant
Demandado/a
☐ Parent/Guardian/Trustee
Padre/Tutor/Fideicomisario
☐ Other
Otro

Telephone Number Of Applicant
Número de teléfono de el/la solicitante

Date Of Birth
Fecha de nacimiento
11/25/84

Applicant: Do you have other pending criminal charges in which a lawyer has been appointed?
Solicitante: ¿Tiene otros cargos penales pendientes para los cuales se le ha nombrado un abogado?
☐ Yes / Si   ☑ No / No

Social Security No.
Número del Seguro Social
__-__-__
☑ Has No Social Security No
No tiene No. de Seguro Social

Name Of Lawyer
Nombre del Abogado

| MONTHLY INCOME INGRESOS MENSUALES | | MONTHLY EXPENSES GASTOS MENSUALES | |
|---|---|---|---|
| Employment - Applicant: Empleo del Solicitante: | $ 0 | Number Of Dependents: Número de Dependientes: 6 in El Salvador & NY | |
| Name And Address Of Applicant's Employer Nombre y Dirección del Patrono del Solicitante (If not employed, state reason; if self-employed, state trade) (si no trabaja, diga por qué; si trabaja por su cuenta, indique su oficio.)

Unemployed (1 month) | | Shelter/Vivienda/Alojamiento: ☐ Buying Comprando ☐ Renting Arrendando | $ 0 |
| | | Food Comida | $ 200 |
| | | Utilities Servicios Públicos (electricidad, gas, agua) | $ 0 |
| | | Health Care Atención de la Salud (Seguro médico) | $ 0 |
| Other Income (Welfare, Food Stamps, S/S, Pensions, etc.) Otros Ingresos (prestaciones sociales, estampillas para la comida, Seguro Social, jubilación, etc.) | $ 0 | Installment Payments Pagos a Plazos ☐ Vehicle Vehiculo ☐ Other Otros | $ 0 |
| Employment - Spouse Empleo del Cónyuge | $ 0 | Support Payments Pagos de Mantenimiento/ Sustento Para Niños o Cónyuge | in NY $ 600 |
| Name And Address Of Spouse's Employer Nombre y Dirección del Patrono del Cónyuge | | Other: (specify) Otros: (especifique) | $ 0 |
| | | sends to El Salvador | $ 600 |
| Total Monthly Income Total de Ingresos Mensuales | $ 0   00 | Total Monthly Expenses Total de Gastos Mensuales | $ 1400   0.00 |

AOC-CR-226 Spanish, Rev./Revisado 4/06
© 2006 Administrative Office of the Courts/Oficina Administrativa de los Tribunales

(Over)

1

**JA3619**

NOTE: THIS FORM MUST BE COMPLETED IN ENGLISH
NOTA: SE DEBE COMPLETAR ESTE FORMULARIO EN INGLÉS

| DESCRIPTION OF ASSETS AND LIABILITIES DESCRIPCIÓN DE ACTIVOS Y PASIVOS | ASSETS ACTIVOS | LIABILITIES PASIVOS |
|---|---|---|
| Cash On Hand And In Bank Accounts (List Name Of Bank & Account No.) Efectivo en mano y en cuentas bancarias (Dé el nombre del banco y el no. de la cuenta) | $ 0 | |
| Money Owed To Or Held For Applicant Dinero debido al o guardado para el solicitante | $ 0 | |
| Motor Vehicles (List Make, Model, Year) Vehículos motorizados (Dé marca, modelo, año) | (Fair Market Value)/(Valor justo de mercado) $ 0 | (Balance Due)/(Saldo debido) $ 0 |
| Real Estate Bienes inmuebles o raíces | (Fair Market Value)/(Valor justo de mercado) $ 0 | (Balance Due)/(Saldo debido) $ 0 |
| Personal Property Bienes muebles o personales | (Fair Market Value)/(Valor justo de mercado) $ 0 | (Balance Due)/(Saldo debido) $ 0 |
| Total Owed On Other Installment Accounts Total debido en otras cuentas que se pagan a plazos: | | $ 0 |
| Last Income Tax Filed _____ ☐ Refund ☐ Owe Última declaración de impuestos Reembolso Debo sobre la renta presentada en _____ (año) | $ 0 | $ 0 |
| Other Otros | $ 0 | $ 0 |
| Total Assets And Liabilities Total de Activos y Pasivos | ▶ $ 0    0.00 | ▶ $ 0    0.00 |

| Bond Type Tipo de Fianza | Amount Cantidad $ | By Whom Posted ¿Fiado/Garantizado por quién? |
|---|---|---|

**NOTICE TO PERSONS REQUESTING A COURT-APPOINTED LAWYER**
AVISO A LAS PERSONAS QUE SOLICITAN UN ABOGADO NOMBRADO POR EL TRIBUNAL:

1.  When answering the questions on the Affidavit Of Indigency above, please do not discuss your case with the interviewer. The interviewer can be called as a witness to testify about any statements made in his/her presence. Please wait and speak with your lawyer. Do not ask the interviewer for any advice or opinion concerning your case.
     Cuando contesta las preguntas en la Declaración Jurada de Indigencia (el frente de este formulario), sírvase no hablar de su causa con el entrevistador porque se podrá llamarlo/a para testificar acerca de cualquier comentario que usted pudiera haber hecho en su presencia. Por favor, espere y hable con su abogado. No le pida consejos, opiniones o asesoría al entrevistador (ni al intérprete) con respecto a su causa.

2.  **A court-appointed lawyer is not free.** If you are convicted or plead guilty or no contest, you may be required to repay the cost of your lawyer as a part of your sentence. The Court may also enter a civil judgment against you, which will accrue interest at the legal rate set out in G.S. 24-1 from the date of the entry of judgment. Your North Carolina State Tax Refund may be taken to pay for the cost of your court-appointed lawyer. In addition, if you are convicted or plead guilty or no contest, the Court will charge you a $50 attorney appointment fee and may enter an additional $50 civil judgment against you.
     Un abogado designado por el tribunal no es gratuito. Si es condenado o si se declara culpable o que no se opone o admite culpa, es posible que se le exija reembolsar el costo de su abogado como parte de su condena. El Tribunal también podrá interponer una resolución civil en su contra, que acumulará intereses al tipo legal establecido en G.S. 24-1 a partir de la fecha en que se registra su condena. Se podrá tomar posesión del reembolso de su impuesto sobre la renta del estado de Carolina del Norte para pagar el costo de su abogado designado por el tribunal. Además, el Tribunal le cobrará a usted $50 por designarle un abogado y podrá interponer una resolución civil adicional en su contra por $50.

NOTE: Read the notice on the reverse side before completing this form.
NOTA: Lea el aviso al dorso antes de llenar este formulario.

AOC-CR-226 Spanish, Side Two/Página Dos , Rev./Revisado 4/06
©2006 Administrative Office of the Courts/Oficina Administrativa de los Tribunales

Solamente para información - no tiene la parte en español

2

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 266 of 350
Case 5:05-ct-00054-RGC   Document 50-8   Filed 06/21/10   Page 266 of 350

JA3620

NOTE: THIS FORM MUST BE COMPLETED IN ENGLISH
NOTA: SE DEBE COMPLETAR ESTE FORMULARIO EN INGLÉS

**STATE VERSUS**
**EL ESTADO CONTRA**

File No.
Expediente No.

Name Of Defendant
Nombre de el/la Demandado/a

3. The information you provide may be verified, and your signature below will serve as a release permitting the interviewer to contact your creditors, employers, family members, and others concerning your eligibility for a court-appointed lawyer. A false or dishonest answer concerning your financial status could lead to prosecution for perjury.

La información que usted da se verificará y su firma al pie servirá como autorización para que el/la entrevistador/a se comunique con sus acreedores, patronos/empleadores, familiares y otros para ver si usted reúne las condiciones para recibir un abogado designado por el tribunal. Toda respuesta falsa o deshonesta con respecto a su situación económica podrá causar que se lo enjuicie por perjurio.

Under penalty of perjury, I declare that the information provided on this form is true and correct to the best of my knowledge, and that I am financially unable to employ a lawyer to represent me. I now request the Court to assign a lawyer to represent me in this case. I authorize the Court to contact my creditors, employers, or family members, any governmental agencies or any other entities listed below concerning my eligibility for a court-appointed lawyer.

Bajo pena de perjurio, declaro que la información dada en este formulario es verídica y correcta a mi mejor saber y entender y que no tengo los medios económicos para poder contratar un abogado para que me represente. Por el presente, solicito al Tribunal que asigne un abogado para representarme en esta causa. Autorizo al tribunal que se comunique con mis acreedores, patronos/empleadores o familiares, así como con cualquier dependencia gubernamental u otra entidad listada a continuación con respecto a mi derecho a recibir un abogado designado por el Tribunal.

I further authorize my creditors, employers, or family members, any governmental agencies or any other entities listed below to release financial information concerning my eligibility for a court-appointed lawyer upon request of the Court.

Además, autorizo a mis acreedores, patronos/empleadores o familiares, así como a cualquier dependencia gubernamental u otra entidad listada a continuación para que, a solicitud del tribunal, dé a conocer datos financieros con respecto a mis condiciones para recibir un abogado designado por el tribunal.

Governmental Agencies Or Other Entities Authorized To Be Contacted And/Or To Release Information
Dependencia gubernamental u otra entidad autorizada para que se contacte y/o dé a conocer información

**SWORN/AFFIRMED AND SUBSCRIBED TO BEFORE ME**
**JURAMENTADO Y SUSCRITO ANTE MI**

Date
Fecha   12-14-07

Date
Fecha   12407

Signature
Firma

☑ Deputy CSC
Administrador Adjunto del Tribunal Superior

☐ Assistant CSC
Administrador Asistente

☐ Clerk of Superior Court
Administrador del Tribunal Superior

☐ Magistrate
Juez magistrado

Signature Of Applicant
Firma de el/la Solicitante

Name Of Applicant (Type Or Print)
Nombre de el/la Solicitante (en letra de imprenta o molde)

Alejandro Enrique Ramiro Diaz

☐ Notary
Notario

Date My Commission Expires
Fecha en que cesa mi mandato

☑ Defendant
Demandado/a

☐ Parent/Guardian/Trustee
Padre/Tutor/Fideicomisario

☐ Other
Otros

**SEAL**
**SELLO**

County Where Notarized
Condado en que se notarizó

NOTE: If you are less than 18 years old, or if you are at least 18 years old but remain dependent on and live with a parent or guardian, state name and address of parent, guardian or trustee below.

NOTA: Si usted tiene menos de 18 años de edad, o si tiene por lo menos 18 años de edad pero depende de y vive con un padre o tutor, dé el nombre y la dirección de su padre, tutor o fideicomisario a continuación.

Name Of Parent/Guardian Or Trustee
Nombre del padre, tutor o fideicomisario

Address
Dirección

City, State, Zip
Ciudad, Estado, CP

AOC-CR-226 Spanish, Page Two/Paginá Dos, Rev./Revisada 4/06
© 2006 Administrative Office of the Courts/Oficina Administriva de los Tribunales

Solamente para información – no tiene la parte en español

3

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 267 of 350
Case 3:08-cv-00513-RJC   Document 51-8   Filed 06/24/10   Page 36 of 130

JA3621

(TYPE OR PRINT IN BLACK INK)

In The General Court Of Justice
☑ District ☐ Superior Court Division

**STATE OF NORTH CAROLINA**

GUILFORD _____ County

File No. 07CR109085

Additional File Nos. 07CR109087

Name of Defendant
ALEJANDRO UMANA-DIAZ

Social Security No.
☐ ☐ ☐ - ☐ ☐ - ☐ ☐ ☐ ☐    ☑ Has No Social Security No.

**NOTICE AND DETERMINATION
OF COUNSEL IN FIRST-DEGREE MURDER
(OR UNDESIGNATED DEGREE OF MURDER)
CASES AT THE TRIAL LEVEL**

G.S. 7A-451(c), (d); 7A-452

**INSTRUCTIONS:** *The Court completes this form at the defendant's first appearance in district court (or equivalent appearance in superior court) in any case in which the defendant is charged with first-degree murder or a charge of murder where the degree is undesignated. The Court also completes this form when a case is declared capital at a Rule 24 hearing to notify IDS of the need to appoint second counsel, or if an attorney of record withdraws to notify IDS of the need to appoint substitute counsel. The Court also should complete this form for any other offenses brought contemporaneously with or subsequently joined with the principal offense. Do not use this form to appoint counsel for direct appeal of a sentence of death; use AOC-CR-350 to appoint the Office of Appellate Defender in such a case.*

**I. TRIAL FINDINGS**

**NOTE:** *Upon receiving notice pursuant to Section II below that the defendant is indigent and is charged with first-degree murder or an undesignated degree of murder, or with other related offenses, the Office of Indigent Defense Services/Office of the Capital Defender uses form AOC-CR-624 to appoint counsel for the defendant. See IDS Rules for Providing Legal Representation in Capital Cases, Part 2A, Rule 2A.2 (2001).*

Upon the defendant's affidavit and the inquiry made by the Court, the Court finds as follows:

☑ 1. The defendant is charged with: ☑ first-degree murder or ☐ an undesignated degree of murder in this case.

☐ 2. The defendant is charged with the following other offenses, which were brought contemporaneously with or have been joined with the first-degree murder or undesignated degree of murder charge(s) in this case:

_____

_____

☑ 3. The defendant is **not** financially able to provide the necessary expenses of legal representation and, therefore, is indigent and entitled to the services of counsel as contemplated by law.
   ☐ a. The $50 attorney appointment fee is due pursuant to G.S. 7A-455.1 and shall be paid to the Clerk of Superior Court; or
   ☐ b. The defendant has other pending criminal case(s) in which an attorney has been appointed; therefore, no appointment fee shall be assessed pursuant to G.S. 7A-455.1(e).

☐ 4. The defendant is financially able to provide the necessary expenses of legal representation and, therefore, is not presently considered to be indigent.

☐ 5. The defendant waived appointed counsel at the first appearance and is, therefore, responsible for obtaining legal representation in this matter.

☐ 6. A Rule 24 hearing has been held and this case has been declared capital as defined by law. The Office of Indigent Defense Services/Office of the Capital Defender shall appoint a second attorney. The following attorney was previously appointed as counsel of record in this matter:_____

☐ 7. The following attorney has moved to withdraw from this case, and the undersigned Judge has granted that motion and released the attorney: _____
The Office of Indigent Defense Services/Office of the Capital Defender shall appoint substitute counsel. The following attorney remains as counsel of record in this matter:_____

Date 12|4|07

Name Of Judge (Type Or Print)
LINDA FALLS

Signature Of Judge
_Linda L. Falls_

**II. NOTICE TO OFFICE OF INDIGENT DEFENSE SERVICES**

**NOTE:** *Because of the need for immediate action in such cases, this Section provides the Court with several ways of notifying the Office of Indigent Defense Services/Office of the Capital Defender of the Court's determination that a defendant is entitled to counsel in a first-degree murder case or undesignated degree of murder case. The Court shall direct or otherwise ensure that notification is given immediately.*

The Court has notified the Office of Indigent Defense Services/Office of the Capital Defender, by one of the following methods, of the defendant's name, the file numbers of each of the cases for which the defendant needs appointed counsel, and the offenses charged.

☐ email: capital.notice@nccourts.org

☑ fax: (919) 560-6900

☐ telephone (name of contact):_____ (919) 560-5837

Date 12|7|07

Signature _Hall_

☐ Judge  ☑ Deputy Clerk  ☐ Asst. Clerk  ☐ Clerk Of Superior Court

AOC-CR-427, Rev. 12/02
© 2002 Administrative Office of the Courts

4

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 268 of 350
Case 9-08-00013-RQC   Document 50-8   Filed 06/14/10   Page 268 of 350

JA3622

(TYPE OR PRINT IN BLACK INK)

In The General Court Of Justice

☒ District  ☐ Superior Court Division

**STATE OF NORTH CAROLINA**

_____ Guilford-G _____ County

File No.

07CR109085

Additional File Nos.

07CR109087

Name of Defendant

Alejandro Enrique Umana

Social Security No.

☐ Has No Social Security No.

NOTE: The Office of Indigent Defense Services or Office of the Capital Defender completes this form.

**ASSIGNMENT OF COUNSEL**
**BY OFFICE OF INDIGENT DEFENSE SERVICES**
**IN FIRST-DEGREE MURDER**
**(OR UNDESIGNATED DEGREE OF MURDER)**
**CASES AT THE TRIAL LEVEL**

G.S. 7A-451(c), (d); 7A-452

**I. TRIAL APPOINTMENTS**

NOTE: The IDS Office or the Office of the Capital Defender will complete this form in any first-degree murder case or murder case where the degree is undesignated. See IDS Rules for Providing Legal Representation in Capital Cases, Part 2A, Rule 2A.1 (2001).

☐ 1. Having found that the defendant has been charged with first-degree murder (or an undesignated degree of murder), the IDS Director/Capital Defender appoints the attorney named below on a provisional basis to conduct a preliminary investigation, determine whether the defendant is indigent and needs appointed counsel, and protect the defendant's rights pending appointment of trial counsel by the IDS Director/Capital Defender.

| Name And Address of Attorney | Telephone | Fax |
|---|---|---|
| | Email | |

☒ 2. The Court having determined that the defendant is indigent and has been charged with first-degree murder (or an undesignated degree of murder), the IDS Director/Capital Defender appoints the attorney named below as trial counsel for the defendant.

| Name And Address of Attorney | Telephone | Fax |
|---|---|---|
| John D. Bryson<br>P.O. Drawer 2086<br>High Point NC 27265 | 336-884-4444 | 336-889-5232 |
| | Email | |

☐ 3. The Court having determined that the defendant is indigent and has been charged with first-degree murder (or an undesignated degree of murder), and the IDS Director/Capital Defender having determined that the case will likely proceed capitally as defined by law, the IDS Director/Capital Defender appoints the attorney named below as second trial counsel for the defendant.

| Name And Address of Attorney | Telephone | Fax |
|---|---|---|
| | Email | |

☒ 4. Having appointed the attorney(s) named above to represent the defendant in this case, the IDS Director/Capital Defender also appoints the attorney(s) to represent the defendant on the following related charges, which were brought contemporaneously with or have been joined with the principal offense:

2 counts murder

**II. NOTIFICATION**

The Office of Indigent Defense Services/Office of the Capital Defender has provided a copy of this assignment of counsel order to the Clerk of Superior Court where the charges are pending, the District Attorney, the appointed attorney(s), and the defendant.

| Date | Name Of IDS Director/Capital Defender (Type Or Print) | Signature Of IDS Director/Capital Defender |
|---|---|---|
| 12-19-2007 | Robert M. Hurley | |

AOC-CR-624, Rev. 9/02
© 2002 Administrative Office of the Courts

ID #686856
scanned

# INMATE VISITATION FORM

NAME: Umana Alexandro E.    DATE: 12/19/07
LAST        FIRST        M.I.

LOCATION / CELL ASSIGNMENT: 7A29

You may list two (2) visitors on this form. These two relatives and or friends are the only people that will be able to visit you for the next thirty (30) days. The two individuals placed on your list must be able to show a valid photo I.D. to the Detention Staff each time they visit. Each person placed on this list will be allowed one (1) visit per week. The two names placed on your list must be 18 years of age or older. Any visitor under 18 must be accompanied by an adult who is on your visiting list. You may only have two (2) visitors under the age of 18 per visit.

## VISITATION LIST

## PRINT LEGIBLY

| VISITORS NAME | RELATIONSHIP | ADDRESS (Include City and State) |
|---|---|---|
| Atty Office | | |
| Special | | Visits |

GC - 885

You May Change This List Every 30 Days

6

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 270 of 350
Case 3:08-cr-00134-RJC   Document 201-8   Filed 08/11/10   Page 270 of 350

JA3624

## VISITORS SIGN IN LOG scanned

| | Visitor Name | Date | Staff Init. | Visitor Name | Date | Staff Init. |
|---|---|---|---|---|---|---|
| X | J. DRYSIN | 12/21/07 | 845 a (b) | | | |
| X | VO | 12/28/07 | 955 a (b) | | | |
| X | | 12/28/07 | 955 a (b) | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

7

**JA3625**

ID#686856
scanned

# INMATE VISITATION FORM

NAME: Umana   Alejandro   E   DATE: 12/28/07
      LAST       FIRST      M.I.

LOCATION / CELL ASSIGNMENT: 7A29

You may list two (2) visitors on this form. These two relatives and or friends are the only people that will be able to visit you for the next thirty (30) days. The two individuals placed on your list must be able to show a valid photo I.D. to the Detention Staff each time they visit. Each person placed on this list will be allowed one (1) visit per week. The two names placed on your list must be 18 years of age or older. Any visitor under 18 must be accompanied by an adult who is on your visiting list. You may only have two (2) visitors under the age of 18 per visit.

## VISITATION LIST

## PRINT LEGIBLY

| VISITORS NAME | RELATIONSHIP | ADDRESS (Include City and State) |
|---|---|---|
|  | Officials 4 Special Visits |  |
|  |  |  |
|  |  |  |

GC - 685

You May Change This List Every 30 Days

8

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 272 of 350
Case 3:08-cr-00134-RJC   Document 58   Filed 06/11/10   Page 272 of 350
JA3626

# VISITORS SIGN IN LOG

| Visitor Name | Date | Staff Init. | Visitor Name | Date | Staff Init. |
|---|---|---|---|---|---|
| J. Bryson | 12/28/07 | 955 a CB | | | |
| V. JM | 12/28/07 | 955 a CB | | | |
| J. Bryan | 01-28-08 | 2:25 D BA | | | |
| J. Gryson | 01/30/08 | 1324 B3 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

9.

JA3627

I.D. # 686 856

# INMATE VISITATION FORM

NAME: UMANA    ALEJANDRO                    DATE: 1/30/08
      LAST      FIRST        M.I.

LOCATION / CELL ASSIGNMENT: 7A29

You may list two (2) visitors on this form. These two relatives and or friends
are the only people that will be able to visit you for the next thirty (30) days.
The two individuals placed on your list must be able to show a valid photo
I.D. to the Detention Staff each time they visit. Each person placed on this
list will be allowed one (1) visit per week. The two names placed on your
list must be 18 years of age or older. Any visitor under 18 must be
accompanied by an adult who is on your visiting list. You may only have
two (2) visitors under the age of 18 per visit.

## VISITATION LIST

## PRINT LEGIBLY

| VISITORS NAME | RELATIONSHIP | ADDRESS (Include City and State) |
|---|---|---|
| WILFREDO LANDAVERDE | FRIEND | ? |
| WENDY ELIZABETH ALVAREZ | mother of child | 50 Jackson ST AM 603 HAMPSTEAD, N.Y. |

GC-885                  You May Change This List Every 30 Days          10

## JA3628

## VISITORS SIGN IN LOG

| Visitor Name | Date | Staff Init. | Visitor Name | Date | Staff Init. |
|---|---|---|---|---|---|
| John Bryson | 2/8/08 | 920 a Cb | | | |
| Richard McCoy | 2/8/08 | 920 a Cb | | | |
| William | 3/3/08 | 330 a Cb | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

11.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 275 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 06/14/10   Page 275 of 350

**JA3629**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>        Plaintiff,<br><br>    v.<br><br>ALEJANDRO ENRIQUE RAMIREZ<br>    UMANA,<br>        Defendant. | DOCKET NO. 3:08-cr-134-RJC<br><br>UNITED STATES'S RESPONSE TO<br>DEFENDANT'S MOTION FOR A<br>NEW TRIAL |

Defendant Alejandro Umana moves this Court for a new trial on multiple grounds. Several of those grounds the Court has already considered and rejected. Others are new, in that defendant did not preserve any objection now made. And what is new, cognizable, and properly preserved is either factually or legally unsupported, or both. The motion's claims, addressed serially herein, should all be denied.[1]

## ANALYSIS

### A.  Standards of review applicable to defendant's claims.

First, in this context, as under Rule 29, where challenges to the evidence are at issue, the Court must consider that evidence in the light most favorable to the government, *i.e.*, assume that the jury resolved any factual issue in the government's favor. *See United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1401-02 (4th Cir. 1993).

---

[1]    The government will not discuss all the facts of this prosecution and sentencing, and instead will set forth any facts as necessary to rebut defendant's contentions in the analysis portion of this memorandum. The government has not yet obtained transcripts and, therefore, some of the factual assertions are based upon the joint recollections of the prosecutors involved.

Case 3:16-cv-00057-MOC-RJC Document 50-8   Filed 03/23/17   Page 276 of 350
Case 3:08-cr-00134-RJC   Document 528   Filed 03/09/10   Page 1 of 99
JA3630

Second, Rule 33 of the federal rules of criminal procedure provides that a trial court "may" vacate any judgment and grant a new trial "if the interest of justice so requires." Courts have interpreted this broad standard to refer to "exceptional" circumstances. *See, e.g.*, *United States v. Scroggins*, 379 F.3d 233, 239 (5th Cir. 2004). Thus, a court should exercise its discretion to grant a new trial "sparingly," *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985), and the court's rejection of all or part of the testimony of a witness does not automatically entitle a defendant to a new trial, *see United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). Rather, a court should grant a new trial based on the weight of the evidence "only when the evidence weighs heavily against the verdict." *Arrington*, 757 F.2d at 1486. Stated otherwise, the "evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997).

To the extent a motion hinges upon "newly discovered evidence," instead of other grounds, "(a) the evidence must be, in fact, newly discovered, *i.e.*, discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; <u>and</u> (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal." *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1989) (emphasis added). Finally, this Court's decision whether to grant a new trial, on appeal, will be reviewed for abuse of discretion. *See United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001); *United States v. Wilson*, 118 F.3d 228, 237 (4th Cir. 1997).

Third, in order to preserve any claim of error, Rule 51(b) requires a party to "inform[ ] the court — when the court ruling or order is made or sought — of the action the party wishes

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 277 of 350
Case 3:08-cr-00134-RJC Document 2847   Filed 03/23/10   Page 277 of 350

**JA3631**

the court to take, or the party's objection to the court's action <u>and</u> the grounds for that objection." Rule 52 establishes that errors not "affect[ing] substantial rights <u>must</u> be disregarded," and conversely that "plain errors affecting substantial rights <u>may</u>" be considered even if there was no objection.    (Emphases added.)    In criminal cases, to show that an (objected-to) error is "harmless," the government must show, beyond a reasonable doubt, that the error did not affect the verdict. *See United States v. Forrest*, 429 F.3d 73, 81 (4th Cir. 2005).   On the other hand, it is the non-objecting party's burden to establish a plain error, which requires showing (1) an error, (2) that is plain (*i.e.*, not subject to reasonable dispute), and (3) that affected the defendant's substantial rights.  *See United States v. Olano*, 507 U.S. 725, 732 (1993).

Although plain- and harmless-error are often viewed as standards applied only by reviewing courts, the contemporaneous-objection rule codified in Rule 51, like the other rules of criminal procedure, applies at all stages of federal criminal litigation.  *See Puckett v. United States*, 129 S.Ct. 1423, 1428-29 (2009); *United States v. Carpenter*, 494 F.3d 13, 30, 32 (1st Cir. 2007) (Campbell, J., dissenting) ("Without having been contemporaneously alerted by a Rule 51(b) objection, the district court was obliged, when it ruled on defendant's post-verdict motion for a new trial, to employ plain error review under Rule 52(b)."); *United States v. Heron*, 525 F. Supp. 2d 729, 751 n. 48 (E.D. Pa. 2007) ("Although plain error analysis is usually the province of the Court of Appeals, the Rule — which is contained in the Federal Rules of Criminal Procedure, not the Federal Rules of Appellate Procedure — is not limited to appellate practice."), *rev'd on other grounds*, 2009 WL 868017 (3d Cir. Apr. 2, 2009).

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 278 of 350
Case 3:08-cr-00134-RJC Document 52-8   Filed 03/09/10   Page 3 of 39
**JA3632**

**B. Defendant's claims pertaining to guilt are factually and legally unsupported.**

1. <u>The VICAR instruction was proper.</u>

Defendant's first salvo concerns the jury instruction for the murder in aid of racketeering, and specifically the Court's deletion of the pronoun "his" at the government's request. (Mot. at 2-4.) Basically, defendant contends that this deletion allowed the jury to convict defendant without finding the requisite connection between the act and status in the enterprise. (*Id.*) This contention is both legally and factually unsupported.[2]

A "district court should give the instruction that a criminal defendant requests as to any defense as long as the instruction: (1) has an evidentiary foundation; and (2) accurately states the law applicable to the charged offense." *United States v. Stotts*, 113 F.3d 493, 496 (4th Cir. 1997). Even if these factors are satisfied, failure to give the defendant's instruction is not reversible error unless a defendant can show that the record as a whole demonstrates prejudice. *See United States v. Ellis*, 121 F.3d 908, 923 (4th Cir. 1997). The court of appeals will review *de novo* the legal question of whether a court has properly instructed the jury on the elements of an offense. *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996). The reviewing court will "accord the district court much discretion and will not reverse provided that the instructions, taken as a whole, adequately state the controlling law." *Teague v. Bakker*, 35 F.3d 978, 985 (4th Cir. 1994).

The government does not dispute that courts often have used the pronoun "his" in describing the elements of the VICAR offense. But in the cases defendant cites, and in others, there are contrary examples of appellate courts using the phrase without a pronoun. *E.g.*, *United*

---

[2]    The undersigned AUSAs do not recall whether defendant lodged an objection based specifically on the deletion of the pronoun, or concede the point, but the government assumes for present purposes that they did so by having proposed their own instruction, which utilized the word "his."

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 279 of 350
Case 3:08-cr-00134-RJC Document 52-8   Filed 03/23/10   Page 279 of 350
JA3633

*States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) ("we reject any suggestion that the 'for the purpose of' element requires the government to prove that maintaining or increasing position in the RICO enterprise was the defendant's sole or principal motive"); *see also United States v. Bruno*, 383 F.3d 65, 82 (2d Cir. 2004) (quoting statute but adding bracketed "[his]"). Thus, in those cases using the pronoun-based formulation, the "his" appears to have included because it is slightly unusual to use the phrase "maintain or increase position" in everyday writing. There is no fair argument, however, that those cases have held the presence or lack of a pronoun to be legally significant, must less the sort of legal error that justifies jettisoning a jury verdict. *Cf., e.g.*, *United States v. Fiel*, 35 F.3d 997, 1004-05 (4th Cir. 1994) (deciding whether evidence was sufficient to show that VICAR was expected of defendant by reason of gang membership).

Defendant's contention cannot be correct for a related reason: irrespective of the courts' usage, Congress did not include a pronoun in the statute. *See* 18 U.S.C. § 1959. That has led at least one court to identify the "elements" of VICAR using that statutory language. *See United States v. Carson*, 455 F.3d 336, 369 (D.C. Cir. 2006). And, more broadly, an instruction worded in the language of a statute cannot constitute <u>legal</u> error. *See, e.g.*, *United States v. Williams*, 299 F.3d 250, 258 (3d Cir. 2002) ("A district court's instruction tracking the exact language of a statute is not plain error, or indeed error at all."); *United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000) (holding proper an instruction tracking the language of the statute); *United States v. Martin*, 704 F.2d 515, 518 (11th Cir. 1983) (per curiam) ("Moreover, the words . . . in the court's instruction were taken directly from [the statute], and there is little danger of prejudice when the instruction tracks the language of the statute."). As the government argued at the charge conference, Congress's choice had to have been deliberate: there are other uses of the possessive pronoun "his" (and other possessive pronouns) in the Code, including in RICO-related statutes,

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 280 of 350
Case 3:08-cr-00154-RJC Document 52-8   Filed 03/23/10   Page 280 of 350
**JA3634**

*e.g.*, 18 U.S.C. § 1951(b), indicating that Congress knew how to use pronouns when it wanted to, *cf. Chapman v. United States*, 500 U.S. 453, 459 (1991) (holding that Congress knew the difference between "pure" drugs and "mixture and substance" for drug-amount purposes). The legislative history supports this by explaining in broad terms that the key to a conviction is murder committed "as an integral aspect of membership." *See also* S. Rep. No. 98-225 at 304 (Section 1959 "proscribes murder and other violent crimes committed . . . as an integral aspect of membership in an enterprise engaged in racketeering activity").

Factually speaking, defendant's motion incompletely captures the government's rationale for proposing an instruction in the language of the statute. At that time, the technical legal defense (as opposed to the not-the-shooter defense), suggested by the defense's cross-examination and later by its argument, was that Julio Rosales-Lopez, a/k/a "Stiler," was the leader, and that defendant could not be convicted under section 1959 unless he (also) was a "leader." This argument is not supported by any law, which is why the government later objected to closing argument along those lines. At all events, to rebut that contention, the government proposed an instruction capturing the idea that, if defendant had been only a "lieutenant," for lack of a better term, and committed the shooting solely to please his leader "Stiler," or to allow his leader "Stiler" to brag to other gang members, then that <u>could</u> suffice to "maintain or increase position," for at least two reasons: defendant's position would advance along with "Stiler's," and such an act would keep defendant in "Stiler's" good graces. After all, Congress intended the VICAR statute (and RICO) to be construed broadly to effectuate its remedial purposes. *See Concepcion*, 983 F.2d at 381 (quoting legislative history and Supreme Court); *United States v. Rahman*, 189 F.3d 88, 127 (2d Cir. 1999) (holding that the "maintaining or increasing position" language in § 1959 "should be construed liberally").

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 281 of 350
Case 3:08-cr-00134-RJC Document 52-8   Filed 03/09/10   Page 281 of 99
JA3635

These inferences, to the extent that the omission of "his" even bears upon them, were supported by substantial other evidence in the case. Most important of that evidence was the undisputed testimony that defendant and "Stiler" were sent — together — by leaders in El Salvador, conducted meetings — together — to organize the gang, and socialized — together — in Greensboro. In other words, the two MS-13 leaders both had positions in the enterprise; because they were joined at the hip, and what would benefit one would benefit the other. *See Carson*, 455 F.3d at 371 ("The jury could fairly infer from [defendant's] willingness to assist his coconspirators that he joined them because this was expected of him. It makes no difference whether Coates shared [three of his coconspirators'] motive [to benefit the gang] or whether his interest in maintaining his position was his sole motivation."). For similar reasons, a murder committed to increase "another's" position in the gang can still be a VICAR. *See United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004) (holding "that at the time Johnson assaulted Henry, he [Johnson] knew that Frampton was seeking to increase his position in the 41 Ingalls enterprise and acted toward that end" would be sufficient under the statute). (Defendant here was charged under section 2 as well as section 1959(a)(1).)

In sum, the government's rationale for seeking a pronoun-less instruction was both fair and responsive to the defense's muddling of the legal picture by using the term "leader." In any case, there is no likelihood at all that the pronoun made any difference, because the eventual instruction's reference to "expectations" of and "discipline" within the enterprise, approved many times over by the courts — and which defendant does not challenge — were the core of the case. *See, e.g.*, *Concepcion*, 983 F.2d at 381 (holding that "the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership").

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 282 of 350
Case 3:08-cr-00134-RJC Document 52-8 Filed 03/09/10 Page 282 of 350
JA3636

Indeed, the phrase "maintain his position" has been equated with "the expectations of the gang." *See Carson*, 455 F.3d at 371 ("A rational jury could properly find that Coates accompanied his coconspirators in an effort to maintain his position in the enterprise — that is, because the other members expected him to assist them."). And this case was about nothing if not the expectations of MS-13. The Fourth Circuit's *Tipton* case, 90 F.3d 861 (4th Cir. 1996), cited by defendant, supports the government in this regard. As relevant here, in that case a defendant named Johnson claimed that he was merely assisting his friend (a fellow gang member) who had a private grievance. The court found the evidence sufficient because the enterprise "treat[ed] affronts to any of its members as affronts to all . . . thereby furthering the reputation for violence essential to maintenance of the enterprise's place . . . ." *Id.* at 891. The same can be said about MS-13 — and it was said, including by defendant on tape.

In addition to offering a crabbed reading of the VICAR statute, defendant's motion ignores the law governing jury instructions. An instruction is assessed as a whole rather than read in isolation, and it must adequately state the controlling legal principles. *E.g.*, *United States v. Novak*, — F.3d —, 2010 WL 2377055, at *4 (4th Cir. June 15, 2010). The instruction given in this case satisfies those requirements for all of the foregoing reasons. In addition, however, the paragraph beginning with "conversely" — added at defendant's request — contained (among others) two phrases that reinforced the concept of maintaining or increasing position: (1) "it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise," and (2) "[i]n the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute." The instruction given, particularly with defendant's addition,

**JA3637**

emphatically focused the jury on the connection between the murder and maintaining or increasing position in the gang. [3]

Finally, even if the instruction were erroneous, such error would be harmless beyond a reasonable doubt. *See Tipton*, 90 F.3d at 899-901 (applying harmless-error standard in federal capital case, and finding error to have been harmless). Here, the evidence about MS-13's expectations, the importance — really, primacy — of respect, and of defendant's "indoctrination" (defendant's proposed word in mitigation) into the gang's program, was overwhelming and uncontroverted. Likewise, defendant's statements seeking to promote the gang "program," his leadership role, and his bragging about the double-murder to his cohorts were unchallenged. And, finally, there was no dispute about the sequence of events in the murder: the argument with the murder victims started over a jukebox, but escalated to (1) a gang insult by the victims, and (2) gang braggadocio by the defendant and the other MS-13 members present, all <u>before</u> defendant pulled the trigger. Afterward, defendant, who had just been sent to North Carolina with "Stiler" to get things in order, used the incident to (tacitly) instruct other gang members along the lines of "that's what happens when someone messes with the Mara," and then he attempted to extort another victim in a nightclub, which was also part of the gang program he had urged upon his fellows at his earlier gang meetings.

---

[3]    The government objected to defendant's proposed "Conversely" paragraph as cumulative, and in part because of the vagueness of the phrase "in the broader community." For example, if a murder committed by an MS-13 member made others in the broader community fear him, and/or fear the gang, more, and instilling fear were one of the goals of the gang, it would be fair for a jury to infer that the murder satisfied the "maintain or increase position" element. *See, e.g.*, *Tipton*, 90 F.3d at 891. The standard instructions in publicly available manuals do not appear to contain that paragraph, and the government has identified no case giving an instruction with that language.

Thus, the instruction given in this case was favorable to defendant in a way not supported by any precedent. The government is content to let a sleeping dog lie, but the favorableness (to him) of defendant's addition is part of the context in which the instruction, as a whole, should be examined.

Case 3:16-cv-00057-MOC-DSC Document 50-8   Filed 03/23/17   Page 284 of 350
Case 3:08-cr-00134-RJC Document 1343   Filed 03/30/10   Page 2 of 33
**JA3638**

For these reasons, not only is there no reasonable doubt about the VICAR convictions, there is no doubt at all that the murders were committed mostly, if not entirely, for the purposes proscribed by Congress. *See Bruno*, 383 F.3d at 83 (observing that court had "reversed or vacated defendants' racketeering convictions in cases where the evidence showed that the murders (or other racketeering acts) were 'purely mercenary,' and in cases where the defendant was neither a member of the enterprise nor involved in its criminal activities") (citation omitted). Neither reason for reversal discussed in *Bruno* remotely exists in this case.[4]

### 2. The evidence was sufficient to convict defendant of witness tampering.

Defendant's next guilt-phase claim is that the evidence was insufficient to establish his guilt of witness tampering and conspiracy to commit that crime.  (Mot. at 5-7.)  The apparent basis for the motion is that the government presented the testimony of a single witness and did not present other types of corroborating evidence (such as wiretaps).  (Mot. at 6.)[5]

---

[4]    Defendant has not contested his conviction under 18 U.S.C. § 924(j).  Since those counts were death-eligible and the jury unanimously voted to impose a death sentence on those counts, as well, even if the Court were to conclude that the VICAR instruction were an egregious and non-harmless error, it could impose judgment.

[5]    Though the government understands defendant to be referring only to certain types of corroboration, there was other corroboration.  First, the testimony:  the witness, co-conspirator Alexander Granados attended two meetings relating to this matter.  At the first meeting, several other MS-13 members were in attendance and led by MS-13 leader "Misterio," an MS-13 leader who had been sent to replace defendant after defendant's arrest.  At that meeting, Granados testified that Misterio indicated that he had been sent a message from Umana to kill the witnesses in Greensboro.  Three MS-13 members, "Chicago," "Pelon," and "Peligroso," were then selected to do the mission. At a later meeting, Granados saw those three members with weapons — a .38 and a .380 among them — as well as the vehicle they were to drive.  After the tampering plot and participants had been arrested by Greensboro police, Granados testified that he had discussions with Misterio, and he told of other crimes subsequently committed to attempt to "raise" money to assist those three jailed MS-13 members by placing money in their commissary account.

There was substantial testimony rendering Granados' account credible.  Specifically, the co-conspirators were captured after an unsuccessful attempt to kill the witnesses.  The government presented testimony of two Greensboro Police officers whose surveillance included seeing Pelon enter the restaurant, and the subsequent traffic stop and recovery of the types of weapons previously described by Granados.  Also, the new owner of the restaurant and another worker who was present when MS-13 member "Pelon" came into the restaurant testified about statements he made to them about their mission that day.  Furthermore, there was testimony from MS-13 member "Mariachi" that, after the event, he helped pick up the car left by the three arrestees and that he later spoke to Misterio on the telephone about the plot.  Such testimony about the car that had been left, and its location, was substantiated by the testimony of the police as well as Granados.  Finally, there was substantial evidence, including defendant's own letters and his hand-signed threats to Rony Lopez, about his relationship to the co-conspirators involved in the plot and his propensity to kill or intimidate cooperating witnesses.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 285 of 350
Case 3:08-cr-00134-RJC   Document 1484   Filed 03/25/10   Page 185 of 99

JA3639

Contentions like defendant's are routinely rejected by the appellate courts: the Fourth Circuit has repeatedly held that the uncorroborated testimony of a single witness may be sufficient to support a jury verdict. *See, e.g.*, *United States v. Wilson*, 115 F.3d 1185, 1190 & n.9 (4th Cir. 1997). The *Jackson v. Virginia* standard under which all courts must assess evidentiary claims simply does not permit the Court to substitute its own credibility determinations for the jury's. Defendant, apparently aware of these principles, invokes the Court's Rule 29 dismissal of the related obstruction counts as support for his claim on the section 1512 count. (Mot. at 5.) That dismissal is legally irrelevant, however, because it had nothing to do with the witness's credibility or with any lack of corroboration, and instead concerned a distinguishing element of a section 1503 offense, the specific intent to obstruct a <u>federal</u> proceeding. This claim should be rejected.

   3. <u>The testimony of Frank Flores was properly admitted.</u>

Defendant last challenges the admission of Detective Frank Flores' testimony, arguing that it was hearsay and that it violated Rule 404(b). (Mot. at 23-25.) The hearsay issue was already decided after briefing, and correctly so; the trial testimony of Detective Flores did not violate the Court's prior order or approach the impermissible. (*See* Docket No. 981.) *See United States v. Ayala*, 601 F.3d 256, 275 (4th Cir. 2010) ("While *Crawford* forbids the introduction of testimonial hearsay as evidence in itself, it does not prevent [ ] expert witnesses from offering their independent judgments merely because those judgments were in some part informed by their exposure to otherwise inadmissible evidence.") (quotations omitted). The government therefore sees little need to revisit those issues. Defendant's alternative, Rule 404(b) founders on the same shoal.

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 286 of 350
Case 3:08-cr-00134-RJC Document 992 Filed 03/23/10 Page 116 of 139
**JA3640**

First, any claim that Rule 404(b) was implicated, let alone violated, by Detective Flores' testimony is subject to plain-error review because it was not raised before, or at, trial. Defendant objected to the testimony at issue, but certainly not on Rule 404(b) grounds, and apparently more on relevance or competence grounds. Evidentiary objections must be specific, Fed. R. Evid. 103(a)(1), and this one was not.

Irrespective of the non-objection, Rule 404 does not apply. The rule refers to the character of a "person," and in some instances the "accused." The rule then proscribes evidence about "the character" of such "a person." "Person," in the context and grammar of the rule, means the subject of the evidence, not the testificant. Indeed, the test for admitting Rule 404(b) evidence, which requires evidence sufficient to find that the defendant committed the similar act, *Huddleston v. United States*, 485 U.S. 681, 685 (1988), is sheer nonsense unless "person" as used in the rule means the defendant (or subject of the evidence). Further, the rule only proscribes testimony offered for this purpose of proving "bad character"; otherwise it is a rule of inclusion. *United States v. Queen*, 132 F.3d 991, 994-95 (4th Cir. 1997).

If Rule 404(b) rendered a witness unable to testify about his own prior experiences, it would bar much percipient-witness testimony, and most expert testimony of any stripe. Defendant's view also would eviscerate the principle, codified in Rule 703, that an expert may rely on inadmissible evidence. Surely that is why defendant identifies no case, and the government can find none, applying Rule 404(b) in the fashion proposed by defendant. Although, as with hearsay, it might be held that an expert cannot "smuggle in" Rule 404(b) information about a defendant just because he is an expert, that is a far cry from what happened here. Whatever the rule at issue, the principle — that nothing Detective Flores said may come,

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 287 of 350
Case 3:08-cr-00134-RJC   Document 228-1   Filed 07/29/10   Page 128 of 99

**JA3641**

in this Court's words, "from his involvement with the defendant's specific investigation," (Docket No. 981, at 5) — was followed to the letter.

In addition, Detective Flores' testimony, especially the quotation in defendant's motion, was at a highly generalized level.  Statements about his experience with numerous gang members throughout his career did not refer to any person in particular, much less to defendant or this investigation.  Nor was it offered for the purpose of demonstrating anyone's "bad character," much less defendant's.  Based on the selection quoted in his brief, (Mot. at 24), defendant's objection really seems to be that the expert testimony touched upon the elements of a VICAR in that it rebutted the suggested defense that gang members don't kill civilians.  But Detective Flores' opinion was well within Rule 704's bounds.  It also was later confirmed by numerous gang members:  every gang member who testified explicitly and emphatically rejected the suggestion, on defendant's cross-examination, that killing a "civilian" was against gang rules. Thus any conceivable error was harmless beyond a reasonable doubt.

### C. Defendant's sentencing claims, for the most part, have already been litigated, and they lack merit anyhow.

1. The Los Angeles murders were supported by reliable information.

Defendant's first sentencing-phase claim is that the evidence of the Los Angeles murders was not reliable.  Defendant acknowledges that this claim is the same claim he made before, which the Court rejected after considering the paper evidence.  (Mot. at 8.)  The government therefore incorporates its prior pleadings and arguments.  (*See* Docket Nos. 967, 988.)  The Court's order dealt with almost all of defendant's contentions.  (Docket No. 1021.)  The only new information before the Court is the fact that the government referred to the murders in its closing argument.  (Mot. at 10-12.)  Of course it did.  But that does not change the analysis.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 288 of 350
Case 3:06-cr-00154-RJC   Document 50-8   Filed 03/23/10   Page 13 of 39

**JA3642**

If anything, the trial only confirmed the correctness of the Court's reliability finding. Not only did defendant cross-examine the witnesses on the bases of the inconsistencies he now re-raises, and argue them to the jury, but the jury unanimously rejected those contentions and unanimously found, beyond a reasonable doubt, that defendant had committed the murders in question. Significantly, all the evidence — including, most importantly, the ballistics match, putting defendant alone at the scene of both murders, firing a gun — came in at trial just as the government proffered. Defendant also ignores the fact that his own admissions strongly corroborate the evidence that was admitted, rendering the information all the more reliable.

With respect to the Fairfax murders, at trial the Court received additional corroboration. Namely, the government proffered evidence (although the Court did not allow presentation of that evidence) that defendant had a role in intimidating and assaulting at least one witness to those murders, Ruben Moreno, a/k/a "Chipis." Such witness intimidation strongly supports the inference that defendant was involved in the acts about which the witness would testify. Furthermore, the government put on substantial proof of defendant's involvement in that witness intimidation at a recent sentencing of co-conspirator Heverth Castellon, a/k/a "Misterio," which proof consisted of evidence about defendant Umana's coded language, introduction of letters written by defendant (and authenticated in the same fashion), and ultimately admission by "Misterio" (after the Court made its finding) to having helped defendant locate the witnesses. Although defendant was not present, the government understands that the "totality of the circumstances" analysis, evidence Rule 104, the identity of interests between himself and "Misterio," and their co-conspiratorial relationship to allow the Court to consider the information presented at that hearing for present purposes. Certainly, at any re-sentencing such information would be a proper part of a pre-admission reliability analysis.

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 289 of 350
Case 3:08-cr-00134-RJC  Document 2248  Filed 03/29/10  Page 148 of 39
JA3643

The information about the Lemon Grove murders similarly became more reliable, not less, with trial. Specifically, the United States called two civilian eyewitnesses. (The Court noted as much in its written order on the reliability issue. (Docket No. 1021, at 10 n.8.)) Defendant therefore had the opportunity — which he took — to highlight inconsistencies in their testimony. The identification testimony of Freddy Gonzalez in particular was subject vigorous to cross-examination. Defendant even successfully moved to preclude an in-court identification by Freddy Gonzalez, which non-occurrence cannot have been lost on the jury.

Defendant's motion for a new trial, on these grounds, is nothing less than a challenge to the jury's determination, which this Court should be loathe to second-guess, and to the use of unadjudicated conduct at all in a federal capital sentencing. There is little legal support for defendant's position, and this Court should reject it (again).

2.  <u>The verdict form was not deficient, certainly not prejudicially so.</u>

Defendant next claims that the future-dangerousness part of the verdict form was insufficient because it contained spaces for the jury to find the sub-factors, but not to make the ultimate finding. (Mot. at 13-15.) Defendant did not, however, object to the verdict form in this regard. Thus he can only prevail if he shows an error, that is plain, that affected his substantial rights. *See supra.* Not every error affects substantial rights, not even — as *Tipton*, *supra*, made clear — in a federal capital case.

Defendant's position is well-taken to the extent that there is no space to indicate the ultimate finding. But that does not mean, even as a textual matter, that the jury made no ultimate finding. The question asked "do you, the jury, unanimously find" future dangerousness, "as evidenced by at least one or more of the following:" This language can just as easily be interpreted, and should be interpreted, as qualifying as a jury finding on the ultimate issue if "one

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 290 of 350
Case 3:08-cr-00134-RJC   Document 524   Filed 03/23/10   Page 13 of 39

**JA3644**

or more" of the sub-factors was checked. Moreover, the Fourth Circuit has recently held that errors in (capital) verdict forms do not require reversal where the Court's instructions can clarify any ambiguity in a verdict form. *United States v. Basham*, 561 F.3d 302, 337 (4th Cir. 2009) (holding that instructions cured omission of a catch-all mitigator on the verdict form). The Court's instructions in this case, both before the penalty phase and before deliberations, made clear what the jurors were tasked with finding.

Even assuming some error, or at a minimum that the form could have been better-designed, there is little to no chance that the jury's verdict would have been different. First and foremost, defendant effectively waived his sentencing-hearing contention that the prisons could control him — ostensibly supported by the testimony of Dr. Mark Cunningham — by submitting a list of mitigating factors to be presented to the jury that said nothing about future dangerousness or prisons (other than the instruction required by law, that he would serve life if not sentenced to death). (*See* Docket No. 1024.) The government recognizes that defendant bears no burden with respect to aggravating factors, such as future dangerousness, which must be found unanimously beyond a reasonable doubt; rather, this is <u>factual</u> evidence that defendant surrendered the fight. So, too, is defendant's submission of an "indoctrination" mitigator, because it closely mirrored three of the four future-dangerousness sub-factors (a, b, and d, referring to "allegiance" to MS-13). Not coincidentally, all 12 jurors found indoctrination and found the future dangerousness sub-factors related to it. (This confirms the comment at the charge conference, in response to the government's objection, that the word "indoctrination" might not help defendant.)

Procedural issues and tactics aside, the evidence of future dangerousness was overwhelming. The analysis must start (and arguably could end) with defendant's in-court hand-

**JA3645**

signing and threat to Rony Lopez during the guilt phase, about which Mr. Lopez testified at sentencing. The shank (really, a knife) that defendant honed, fastened to his penis, and attempted to bring to federal court also is enough to sustain the verdict regarding future dangerousness. Then there were defendant's many jail writings, mostly with co-conspirators, plotting future acts of violence in graphic, gangster-like terms. Finally, it's not as if the verdict split the sub-factors. By unanimously finding all four sub-factors proved beyond a reasonable doubt, the jury left no doubt as to what it thought of defendant's prognosis.

    3.   The Court properly excluded a narrative provided by defendant's mother.

Defendant next claims that the Court improperly excluded a single document, containing a narrative given by defendant's mother to Salvadoran police, and thereby prejudiced his mitigation case. (Mot. at 16-17.)

First, as with all sentencing information, the issue for the Court was whether the information was reliable, relevant, and not cumulative. This information fails all three tests. The narrative was not particularly reliable because it was a summary of an interview conducted by Salvadoran police, 26 years after the events in question, the purpose of which interview was unclear. (Notably, the Court precluded the United States from using similar interviews conducted by Salvadoran police. (*See* Docket No. 1010 at 10-11.)) More importantly, defendant's explanation of why the narrative was important, referring to the document itself, is incredible. Defendant claims that, by indicating defendant's Guatemalan birth, corroborates that his family was "displaced by the violence that was going on in El Salvador." (Mot. at 17.) That is overstating matters in two ways: first, when defendant's father departed El Salvador for Guatemala, defendant was not yet born, and therefore was unaffected by anything that had happened before. Second, more simply, the narrative says nothing about the reasons for going to

**JA3646**

Guatemala.   Therefore it is marginally relevant and not particularly reliable.   And it was cumulative because defendant's investigator was allowed to testify to defendant's Guatemalan birth.

Even assuming that an inference favorable to defendant's "civil war" theory could be drawn, admission of the narrative would not have made any difference, and very well could have damaged his case.  Namely, the jury found — not unanimously, but overwhelmingly (9/12) — that defendant was in fact exposed to the violence of civil war in El Salvador as a youth, demonstrating that the information actually presented was accepted and considered by the jury. Moreover, if defendant's parents in fact went to Guatemala "due to" the civil war, then their return a few years later, with toddler Alejandro in tow, in the midst of that same war would have fatally undermined the very point defendant sought to make:  that El Salvador was an unfit place to raise a child.[6]   In addition, the jury unanimously found in mitigation defendant's core contention, that he was raised without the care of his own mother.  Yet presentation of the narrative also would have undermined his claim of maternal abandonment by confirming that his father moved defendant's grandmother and aunt, too, which would have highlighted the government's counter-argument that defendant had other maternal influences in his life.

Defendant last claims that the narrative was consistent with his father's non-cooperation and to that extent also should have been introduced. (Mot. at 17.)  But that non-cooperation was established, and undisputed — although defendant's attempt to portray it as a result of improper conduct by the FBI was baseless.  The non-cooperation occurred sometime after 2008, and the narrative pertained to the early 1980s, rendering any connection between the two simply

---

[6]     In addition to his investigator's being allowed to testify about much of what the narrative said, defendant was allowed to call two witnesses, neither of whom had ever spoken to defendant and neither of whom knew anything about him other than what the defense had told them, including, presumably, his Guatemalan birth, to testify about civil war and its sociological effects.  His mother's narrative would have added very little to the picture they painted.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 293 of 350
Case 3:08-cr-00134-RJC   Document 268   Filed 03/29/10   Page 169 of 99

JA3647

impossible.  And defendant never pursued or even suggested paternal abandonment at any other time in the trial.

    4.  <u>There was no violation of the Fifth or Sixth Amendment.</u>

Defendant argues that his Fifth and Sixth Amendment rights were violated by the Los Angeles Police Department (LAPD) detectives who questioned him without his counsel being present.  (Mot. at 17-23.)  Defendant specifically alleges that the *Miranda* warning was given after the interrogation began and that the defendant was not notified he was entitled to his lawyer.  (Mot. at 21-22.)  The Defendant also contends that, because the LAPD Detectives, in essence, told him that any statement he made concerning the California murders would not affect his North Carolina case, his statements presented to the jury to support the non-statutory aggravating factor of un-adjudicated crimes were improperly admitted.  (Mot. at 21-23.)  For all these reasons, defendant moves for a new sentencing hearing.

Defendant acknowledges that this argument is the same as the one brought before and already decided.  (Mot. at 18.)  He alleges new "facts" — meaning, documentary confirmation that Mr. Bryson had been appointed in his state case — and supplemental authorities.  With respect, this is insufficient to change the analysis.  The facts that are "new" were essentially assumed, before.  And the supplemental authorities are the same cases previously addressed.

Defendant first contends that in a capital case, when being interviewed about "future dangerousness," a lawyer, like a psychologist, must be consulted.  (Mot. at 19.)  But defendant here was not being interviewed about his future dangerousness, and a psychological assessment is different in kind from a past-looking interrogation.  While defendant claims that in this case the "evidence would be used about future dangerousness," (*id.*), that simply was not the case: the future dangerousness argument, as noted above, revolved around defendant's "allegiance" to

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 294 of 350
Case 3:08-cv-00134-RJC  Document 52-8  Filed 03/23/10  Page 19 of 35
**JA3648**

the gang and his post-incarceration activities.  The Los Angeles murders stood on their own accord (and were a separate part of the verdicts).

Defendant next asserts that since he had appointed counsel on the Guilford County, North Carolina murder charges prior to the Detectives questioning him, his Sixth Amendment right to counsel was violated because his counsel was not notified of the questioning.  This is an incorrect statement of law.  In *Montejo v. Louisiana*, 129 S.Ct. 2079 (2009), the Court held that "in determining whether a Sixth Amendment waiver was knowing and voluntary, there is no reason categorically to distinguish an unrepresented defendant from a represented one."  *Id.* at 2092 (citing *Patterson v. Illinois*, 487 U.S. 285 (1988), which had held: "the *Miranda* warnings adequately inform him [defendant] 'of his right to have counsel present during the questioning,' and make him 'aware of the consequences of a decision by him to waive his Sixth Amendment rights.'").  Here, defendant received his full *Miranda* warning prior to the actual questioning by the detectives and, as the Court previously found, he made a knowing and intelligent decision to waive his right to counsel.

*Patterson* itself also shows that the only warning that must be given to defendants is a *Miranda* warning; it did <u>not</u> hold that the defendant, if represented by counsel, must be notified that he is entitled to his already-appointed attorney.  *Patterson*, 487 U.S. at 300.  This understanding derives from the Court's reasoning, which emphasized the importance of keeping the waiver procedure simple and limited.  *Id*.  Additionally, in *Michigan v. Harvey*, 110 S.Ct. 1176 (1990), the Court held "that nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney."  *Id.* at 1181.  Therefore, because defendant was apprised of his *Miranda* rights before questioning by the LAPD Detectives, and he then knowingly and

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 295 of 350
Case 3:08-cr-00134-RJC Document 824 Filed 03/29/10 Page 295 of 350
**JA3649**

intelligently waived his right to counsel before he was questioned by LAPD Detectives on his California charges, his Fifth and Sixth Amendment rights were not violated.

Defendant nevertheless contends that statements made by the LAPD Detectives regarding the effect on his North Carolina case of any statement he made concerning the California murders retroactively rendered that statement taken in violation of his Fifth and Sixth Amendment rights. This claim, along with the foregoing constitutional principles, has already been considered and rejected by the Court, and correctly so. First, the Supreme Court has held that "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might affect his decision to confess'." *Moran v. Burbine*, 475 U.S. 412, 422 (1986). The Court further explained that "we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Id.* Further, "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 577 (1987). The Supreme Court has clearly held that the Sixth Amendment right to counsel is "offense specific": "It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversarial judicial criminal proceedings." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Nor has the Supreme Court has ever embraced the related theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness. To the contrary: "We have not held that the *sine qua non* for a knowing and voluntary waiver of the right to remain silent is a full and complete appreciation of all the

**JA3650**

consequences flowing from the nature and the quality of the evidence in the case." *California v. Beheler*, 463 U.S.1121, 1125 (1983).

Here, in addition to the legal arguments, and looking at defendant's statements in context, he, by his own admission, was aware that anything he said theoretically could affect his North Carolina case. For instance, at one point in the interview, the defendant advised the detectives "[f]rom this, from this interview that you are doing on me, well, the, the . . . other detective is going to grab it in order to, to . . . intensify my case here in, in the state that I'm also in, but also . . . ." (Umana 4/23/08 Interview Tr. at 172.) The detective then (again) advised that "[w]e're not involved in this investigation. We don't know any more than the details. Okay? We're not involved in any way. That's why . . . ." (*Id.*) Defendant interrupted, and the detective finished by saying "we haven't asked you anything about that case." (*Id.*) Defendant again stated, "[w]hat I want to, to tell you is that, that because of this . . . he's going to grab [onto it]." (*Id.*) The detective asked, "[w]hat do you mean grab onto it?" (*Id.*) Defendant responded "I was . . . about that thing. Well, about what happened right now and for which I'm being held here. . . . You understand? . . . That he's going to grab onto, they are going to grab onto the same thing. That I was also present there that day, and for the same . . . ." (*Id.*)

The above colloquy demonstrates that defendant was aware of the consequences, or at least potential consequences, of his decision to speak to the LAPD detectives. Defendant suggests, however, that he was misled by them when they assured him that they only wanted to talk about the unrelated Los Angeles murders. (Mot. at 21, 23.) There are (at least) two flaws with this claim. The first is that, while the Los Angeles murders turned out to be a part of the government's case here, the statement, when made, was undoubtedly true, and therefore it cannot be said that only a "lie" overcame defendant's will. Second, and relatedly, there is no evidence

**JA3651**

— and these issues were explored at a lengthy suppression hearing — that the LAPD detectives were acting in bad faith. Thus, the exclusionary rule's prophylactic purposes, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), would be unnecessary and ill-served by suppression. *Cf. United States v. Sweets*, 526 F.3d 122, 129 (4th Cir. 2007) (plurality holding, where defendant was admittedly coerced into revealing another person's whereabouts, that the government did not compel the defendant into being "a witness against himself," and observing generally that "[e]fforts to protect against such a violation, therefore, must not degenerate to a judicially-created code of pretrial police conduct"); *id.* at 133-34 (Michael, J., concurring in part) (reasoning that there was a Fifth Amendment violation, but that the testimony admitted was "sufficiently attenuated" from the misconduct); *id.* at 135 (Goodwin, J., concurring in part) (concluding that there was no Fifth Amendment violation <u>and</u> sufficient attenuation). Here, there was no violation of either the Fifth or Sixth Amendment, and no prophylactic purpose would be served by suppression.

For all these reasons, most of which have already been addressed, the Court should not deny defendant's motion based on alleged violation of his Fifth or Sixth Amendment rights.

    5.  <u>Taken as a whole, the rebuttal argument did not inflame or prejudice the jury.</u>

Defendant next asseverates that his death sentence violates the Constitution, and 18 U.S.C. § 3595(c)(2)(A), because (he alleges) it was imposed, following rebuttal argument, under the influence of passion or prejudice of the jury. (Mot. at 25-31.) This is a crabbed view of the record. Before turning to specifics, the government will provide an overview of the governing principles.

To determine whether the jury was inflamed or prejudiced, under the Act, "the Court must look to the record to see if these factors motivated the jury's recommendation of the death

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 298 of 350
Case 3:08-cr-00134-RJC   Document 528   Filed 03/29/10   Page 298 of 350

**JA3652**

penalty, including an analysis of the aggravating factors to see if the jury had an abundance of evidence to support imposition of the death penalty." *United States v. Barnette*, 211 F.3d 803, 821 (4th Cir. 2000) (remanding due to evidentiary error).[7] The court in *Barnette* noted that there was little case law pertaining to this particular part of § 3595 and considered two cases from the Fifth Circuit as examplars: *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), and *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *abrogated on other grounds*, *United States v. Martinez-Salazar*, 528 U.S. 304 (2000). In all three cases the courts rejected claims similar to defendant's. More recently, the Fourth Circuit has held that several factors should be considered in determining if a death sentence was imposed under an improper influence, specifically, "whether sufficient evidence supported the aggravating factors, whether the jury's verdict indicates that it considered the evidence dispassionately, and whether the trial was conducted fairly." *Basham*, 561 F.3d at 338 (citations omitted). A sentence should be vacated only when an "arbitrary factor" "most likely" influenced the death sentence. *Id.* (quoting other circuits). In this case, all three factors stated in *Basham* weigh against defendant's contentions.

Looking at the entire record in this case, the jury was presented with ample evidence to reach its particular findings on the aggravating factors. Much of that evidence is discussed herein, and the Court is familiar with the particulars. Just as important, though, is the lack of any indication whatsoever that the jury did not weigh the evidence. *See Barnette*, 211 F.3d at 821. On the contrary, the verdict forms on the death-eligible counts reflect thoughtful deliberation rather than a passion-driven verdict. (*See* Docket No. 1048 (one of four identical verdict forms).) For instance, at least one juror found 10 out of 12 mitigating factors (excluding the catch-all); the jurors found 4 mitigating factors unanimously; and they found one more by substantial majority.

---

[7]    The government omits the complex procedural history of the *Barnette* case because none of the post-conviction proceedings have called this standing or holding into question.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 299 of 350
Case 3:08-cr-00134-RJC   Document 1248   Filed 03/23/10   Page 24 of 35

**JA3653**

The mitigating factors largely rejected by the jury, though with different vote tallies — poverty, head injuries, schooling, the two sociological factors, and the lack of cruelty — indicate close attention to the trial, as on those factors the defense evidence was relatively weaker than it was on the factors found by the most jurors. Moreover, the trial was clearly fair in other respects — the Court "bent over backward" to ensure that defendant's own actions did not hurt him, and it kept significant evidence from the jury, largely on prejudice grounds. It therefore is clear that the jury's verdict was not influenced by passion or prejudice. *Basham*, 561 F.3d at 339; *see also Barnette*, 211 F.3d at 821 ("a death penalty case will not be emotionless"). The record in this case, taken as a whole, shows no statutory or constitutional error. *See Basham*, 561 F.3d at 339 ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.") (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)).

That leaves defendant's specific cavils about the arguments. Generally speaking, whether improper argument has prejudiced the trial process to such a degree to require reversal depends on the facts; thus, courts consider (1) the degree to which the remarks had a tendency to mislead the jury and prejudice the accused, (2) whether the remarks were isolated or extensive, (3) absent the remarks, the strength of competent proof of guilt, and (4) whether the comments were deliberately calculated to divert the jury's attention to extraneous matters. *See United States v. Harris*, 498 F.3d 278, 293 (4th Cir. 2007). For all the reasons discussed herein, the third factor strongly favors the government. Most of the other arguments were isolated, not misleading, or both, and thus there is no indication that they were calculated to divert the jury's attention from the issues of the case at hand.

First, defendant claims that the government appealed to the anti-immigrant beliefs. (Mot. at 28.) There is no evidence that the jurors, as opposed to the public at large or jurors in

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 300 of 350
Case 3:08-cr-00134-RJC   Document 2448   Filed 03/29/10   Page 299 of 99

JA3654

Phoenix, AZ, in fact had such beliefs, and in fact weeding out generalized antipathy for immigrants was an important function of *voir dire*. Moreover, the Court instructed the jury at the close of the case not to consider nationality, an instruction that the jurors are presumed to follow. *E.g.*, *United States v. Johnson*, 114 F.3d 435, 444 (4th Cir. 1997) (holding that, absent extreme circumstances, juries are presumed to follow instructions to disregard potentially prejudicial evidence). Not only is there that presumption, but each juror also signed the verdict form indicating that "consideration of the race, color, religious beliefs, national origin, or sex of the victim was not involved in reaching his or her individual decision."

And the government's mention of immigration was hardly gratuitous. Indeed, defendant's claim is rich with irony, since so many of the mitigating factors (7, by the government's estimation, of defendant's proposed mitigators) he proposed involved defendant's national origin and sought sympathy for his immigrant upbringing. To take just one example, the defense labored to characterize his early life as one of "poverty," although it appears to have been somewhat average by the standards of El Salvador. The bulk of his sentencing case was an effort to blame circumstances in El Salvador, from the 1980s until about 1995, for the fact that two men were dead in Greensboro for disrespecting a Salvadoran gang member. Taken in that context, the statement that defendant is a member of a gang from El Salvador and that he will receive American justice in the American legal system is not an inflammatory statement — it is a statement of fact responsive to the arguments advanced by defendant. Furthermore, among the many charges considered by the same jury in the guilt phase were several immigration-related crimes, and a significant amount of evidence at trial concerned deportation to, unlawful re-entry from, and control of the gang from El Salvador. Viewed in that light, as well, the government's arguments were proper summation connected to the facts of the case.

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 301 of 350
Case 1:06-cr-00154-RJC Document 502-8 Filed 03/23/10 Page 26 of 99

JA3655

Second, defendant also argues that the government unfairly took advantage of earlier rulings of the Court, namely the discovery motion and the ruling that no other MS-13 defendants were similarly situated for purposes of a mitigator. (Mot. at 25-26.) These claims are meritless for several reasons. First, the challenged statements were relatively isolated in the context of the entire closing. Second, defendant took advantage of earlier rulings, too, for example by arguing that "Moe" and "Chipis" hadn't shown up for court — when it was defendant who had one of them beat up, proof of which the government was not allowed to present — and that Freddy Gonzalez never identified defendant. In other words, the Court makes legal rulings on the evidence, and then both sides argue from the facts that are admitted under law.

In addition to these principles, context shows that the government's argument about other defendants was offered not to point out that defendant was worse than other MS-13 members, but to "quit . . . looking at him as if he is only this way because of factors," meaning that there are a lot of people who grew up like he did. In fact, the government expressly acknowledged that MS was violent. Defendant offers examples of others who killed — "Solo," Rony Lopez (felony murder), and "Tigre." But the jury heard about Lopez's felony murder, which was the same one that "Solo" committed. They heard, from the defense, that unnamed other MS-13 members had committed the Los Angeles murders. There is simply no possibility that the jury believed that defendant was the only MS-13 member who had "killed." Moreover, the government did not state that "defendant was the only MS member that committed murder," (Mot. at 26), but called him a "killer," a "killer among killers." The word "killer" was not being used in a technical, legal sense, but rhetorically for emphasis, and there was no untruth to it at all. Finally, the Court's ruling was not that defendant could not mention other killings by MS members, it was that defendant was not entitled to a mitigating factor that invited jury

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 302 of 350
Case 3:08-cr-00134-RJC  Document 524  Filed 03/29/10  Page 23 of 39

**JA3656**

consideration of (a) entirely different cases about which they knew no facts, and (b) the Attorney General's charging decision.  By way of analogy, had the government argued that "the Attorney General himself believes that only this defendant is worthy of a death sentence" then defendant's claim would ring true.  But that's simply not what the argument was.

Third, turning to the shank, defendant claims that the government's argument was riddled with untruths and provoked fear.  (Mot. at 27.)  First, defendant did "come[ ]to court with a shank," in that he attempted to bring a shank that would not have been discovered but for the extra search conducted by a federal Marshal, after the transfer of custody.  (Notably, the government used the present tense, not the past, to emphasize this as part of a pattern rather than an isolate incident.)  Second, the government was entitled to rebut in kind the farcical suggestion that defendant had the shank for the purpose of fighting rivals, by pointing out that there were no rivals in the holding cell, the Marshals' van, or federal court.  And, although the last statement "you're his rival" was exaggeration, it was cured by an immediate instruction from the Court.  To the extent it was improper, it was (a) isolated, and (b) part of a broader argument, certainly meritorious and supported by the evidence, that MS-13 considers anyone standing in its way to be a rival.  The entire VICAR case revolved around that concept, in fact, because defendant continually suggested that the fact that the victims were civilians was a bar to conviction.

Fourth, defendant assails the government's use of the phrase "send a message."  (Mot. at 28-29.)  He acknowledges that the Court issued a curative instruction, but then calls the argument "repeated."  The argument was not made after that point.  In context, the comment, if improper, was isolated, and then cured.[8]

---

[8]    The government says "if" because courts appear to be split about such comments.  *Compare Jackson v. Johnson*, 194 F.3d 641, 655 & nn. 54-56 (5th Cir. 1999) (rejecting, on habeas review, claims that "tell [defendant] and the likes of him that you're not going to tolerate these sorts of people and these sorts of acts," and observing specifically that the prosecution "may emphasize the importance of deterrence"), *with Sinisterra v. United States*,

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 303 of 350
Case 3:08-cr-00134-RJC   Document 528   Filed 07/29/10   Page 28 of 39
JA3657

Fifth, defendant contests the government's rebuttal argument about the impact on the victims' families. (Mot. at 29.) But, as the Court is aware, the Eighth Amendment does not bar this type of argument by the government. In *Payne v. Tennessee*, the Supreme Court held that under the Eighth Amendment the defendant has the right to introduce mitigating evidence based on character and background of the defendant and that government may introduce evidence about the victim and about the impact of the murder on the victim's family as an aggravating factor. 501 U.S. 808, 827 (1991). There is no authority — and defendant does not cite any — for the proposition that, although such evidence may be introduced, it may not be argued in summation. The reason no such authority exists is clear: that position, if accepted, would render *Payne* nonsensical.

Sixth and finally, defendant argues that it was improper for the government to argue that it would be unfair for defendant to receive the benefits conferred in prison when the two victims are dead. (Mot. at 29-30.) But the Fourth Circuit has held that similar prosecutorial comments on the defendant's life in prison did not violate his rights or create a substantial error that would warrant reconsideration. *See United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003). In that case, the prosecutor made arguments during the sentencing phase about the life Higgs would have in prison and all the benefits of life in prison to include food, entertainment, friendship, and possibly family contact. *Id.* at 332. The court found such arguments to be proper counters to notions that the defendant would be in a "high security place of confinement where [he] would be continuously monitored." *Id.*

---

600 F.3d 900, 910 (8th Cir. 2010) (finding similar comments improper as a predicate to considering whether counsel was ineffective for failing to object). At all events, and tellingly, the comments in *Sinisterra* were much more extensive and much more evocative than those here, and there was no curative instruction by the trial court like there was in this case. *See id.*

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 304 of 350
Case 3:08-cr-00134-RJC   Document 218   Filed 03/23/10   Page 29 of 35
**JA3658**

The arguments in this case were almost identical to those in *Higgs*, and were responses to a nearly identical mitigation contention about the prisons — and they certainly were not a reference to defendant's exercise of his constitutional rights. (*See* Mot. at 30.) The only difference between *Higgs* and this case is that the government asked the jury what "justice" would be and in so doing mentioned, briefly, the victims. For that reason, defendant argues that this case should be re-tried. (Mot. at 30 (citing *Le v. Mullin*, 311 F.3d 1002, 1015-16 (10th Cir. 2002) (per curiam).) *Le*, however, is inapposite. In that case, not only did the prosecutor make the comment quoted in defendant's brief, but "[t]he prosecutors made a number of remarks during both stages of the trial that appear to have been meant to elicit sympathy for the victims. These remarks include comments contrasting the state of the Nguyen family before and after Mr. Nguyen's death, comments repeating Mr. Nguyen's dying words, comments suggesting the victims — and not Mr. Le — deserve the jury's sympathy, and comments highlighting the impact on Mrs. Nguyen and her daughter." *Id.* at 1014. Thus, the court observed that a prosecutor "should not seek to inflame the jury through needless repetition" of such matters, nor engage in "[r]epeated attempts to . . . contrast the living defendant with the dead victim." *Id.* at 1016. Just as importantly, it observed that (a) there was "overwhelming evidence" of guilt and the aggravating factors, (b) defendant's counsel "effectively countered" the borderline arguments, and (c) defendant had failed to object to many of the comments at issue. *Id.* at 1016. It then held that the trial was <u>not</u> fundamentally unfair. *Id.* In this case, too, there was no needless repetition, defendant similarly failed to object, defendant had offered contrary arguments, and the evidence of guilt was overwhelming.

Furthermore, the Fourth Circuit has never recognized the "super-aggravator" concept, instead holding, in *Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005), that "[w]e know from our

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 305 of 350
Case 3:08-cr-00134-RJC   Document 52-8   Filed 07/29/10   Page 305 of 350
JA3659

review of *Payne* and other relevant Supreme Court authority that comparisons between the defendant and the victim are inevitable in any capital case in which the jury is asked to assess the persuasive force of the defendant's mitigating evidence and the victim-impact evidence." *Id.* at 226. Indeed, the court in that case pointed out that *Payne* did not disapprove of such comparisons, *id.* at 224 & n.8, although it did offer some critique of *Payne*, *id.* at 225 n.9, which of course is a case that only the Supreme Court can modify. In the end, here, as in *Humphries*, 397 F.3d at 220, "the bulk of the solicitor's argument was devoted to the evidence in aggravation, Humphries's lack of character, the absence of mitigating evidence in the case, and an explanation how these facts, along with the victim-impact evidence, warranted the imposition of a death sentence." And here, as in *Humphries*, *id.* at 222, the evidence in aggravation "was not close."

Applying the *Harris* framework to this claim, the government merely related the fact that the victims were dead and by not sentencing defendant to death he would continue to enjoy some of the pleasures of life. This is a fact no doubt evident to the jury and in no way was misleading. Second, the comment was isolated and in response to evidence presented by a defense expert during the sentencing hearing. Third, there is strong evidence of the guilt of the defendant. Fourth, the comment was not deliberately placed before the jury to divert attention to extraneous matters precisely because it related to the evidence in the case. *See Harris*, 498 F.3d at 290.

For all these reasons, defendant received a fundamentally fair trial that was free of both prejudice and passion, and his motion should be denied.

6. <u>Execution impact</u>

Last, defendant claims error in the exclusion of an "execution impact" mitigating factor on the verdict form, referring to the feelings of his girlfriend (Monica Reyes) and his son

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 306 of 350
Case 3:08-cr-00134-RJC   Document 248   Filed 03/23/10   Page 31 of 39

**JA3660**

(Rafael). (Mot. at 32-39.) Before the defense's case, the government moved to preclude such information from being presented to the jury. (Docket No. 1020.) The defense, at that time, did not respond in writing, and it orally represented that it did not plan to offer any evidence along those lines. Defendant did not do so, playing only a video in which Reyes indicated that defendant was a good guy. This representation and course of conduct pretermitted a Court ruling on the government's motion *in limine*. After trial, however, in his proposed list of mitigating factors, defendant proposed just what the government had sought to be excluded. (Docket No. 1024.) The government objected and the Court struck the factor.

Defendant's resuscitation of this claim should first be barred on the grounds of estoppel and waiver. Indeed, defendant presented no information supporting the mitigating factor, as worded, as causing "grief and loss" to his son Rafael and his son's mother. In fact, there was little evidence at all about how they felt. Defendant's description of their feelings is that it is "apparent" how they felt. (Mot. at 32.) That is true enough; the videotaped interview is fairly characterized as painting defendant as a decent person, from Reyes' point of view. But that is not the mitigating factor that defendant proposed. And mitigating factors, though broad in concept, still must be tethered to information that the jury actually hears, rather than something distilled from the ether. *See* 18 U.S.C. § 3593(c) & (d).[9] The distinction relevant here is that testimony should focus on defendant's character, not his relatives' feelings about his sentence. *Cf. Williams v. French*, 146 F.3d 203, 207 n.3 (4th Cir. 1998) (jury was allowed to consider that the defendant was "a considerate and loving father" as a mitigating factor).

---

[9]    Moreover, there is substantial factual information countering the inference defendant wishes to draw from the atmospherics of the videotaped interview: defendant has never met his son, and he abandoned his son's mother (and another woman), never to be heard from again. There is not even a fair inference that his son, in particular, felt any loss, or that Monica Reyes' "apparent" loss was particular to defendant's execution, or his personality traits, as opposed to his years-ago abandonment of her.

**JA3661**

In the present matter, whatever information that defendant proposed regarding his capability as a father, and all other matters regarding defendant's conduct in his domestic life, was presented to the jury, including the evidence about his relationship with Reyes (*i.e.*, the videotaped interview). Had defendant requested a mitigating factor along the lines of "defendant is a good friend and father," that would have been required to be given. (*See* Mot. at 35.) But his proposed mitigating factor expressly referred to, and only to, others' emotions. And it expressly referred to the sentence to be imposed, beginning with the words "the execution of Alejandro Enrique Umana." (Docket No. 1024.)

A pure "execution impact" mitigator of this type amounts to alerting the jury of defendant's relatives' opinion on the sentence. Of course, there is no dispute that a jury must be able to consider all relevant mitigating evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 117 (1982). The Supreme Court has defined relevant mitigating evidence as evidence relating to the character and record of the defendant and the circumstances of the crime. *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). "The sentence imposed at the penalty phase should reflect a reasoned, moral response to the defendant's background, character and crime rather than mere sympathy and emotion." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). The dispute here lies instead in the phrase "character of the defendant."

Defendant's characterization of the information, that Ms. Reyes "expressed her feelings about Defendant . . . that she and Rafael cared deeply for Defendant and that the execution would cause them grief and suffering," (Mot. at 32), shows how this was a direct emotional appeal of the type of the Court rejected in *California v. Brown*. 479 U.S. at 545. Even his motion's words focuses on <u>her</u> feelings, rather than on <u>his</u> traits. Defendant, relying on *Eddings*, contends that the "sentencer may not be precluded from considering any relevant mitigating evidence." (Mot.

at 33.)  But that is an overbroad reading of *Eddings*.  In that case, the state court refused to allow in relevant background evidence and testimony from family members regarding the defendant's violent background and abused upbringing.  455 U.S. at 114.  In contrast, here, defendant's girlfriend only expressed her <u>feelings</u> about defendant and did not provide information on his character itself, or other relevant background information.  Furthermore, ample evidence about defendant's background was admitted in this case through those and other witnesses, in support of various other mitigating factors.  Thus, *Eddings* does not support defendant's specific contention here.

Defendant also contends that the court's denial of the admission of the emotional impact statement of Reyes and his son also was inconsistent with the FDPA.  (Mot. at 34-36.)  The Act, however, simply parallels the Supreme Court's capital jurisprudence, and does not provide any broader (or narrower) protection.  Taking its language straight from *Lockett*, section 3592(a)(8) permits the defendant's "background, record or character" to be entered as mitigating evidence.  But statements from a defendant's relatives and family indicating that they love or care for him do not qualify.  *See Coleman v. Saffel*, 869 F.2d 1377, 1393 (10th Cir. 1989) (holding that testimony by the defendant's mother and wife that they loved him was properly excluded because it "in no way concerned any aspect of [defendant's] character or record and any circumstance of the offense") (quoting *Lockett*).  This appears to be the majority, if not unanimous, position of the circuit courts.  *See Robison v. Maynard*, 829 F.2d 1501, 1504 (10th Cir. 1987) (holding that the testimony of a relative of the victim, urging the jury to reject the death penalty, was not relevant mitigating evidence), *overruled on other grounds*, *Romano v. Gibson*, 239 F.3d 1156, 1169 (10th Cir. 2001).  *See also Stenson v. Washington*, 504 F.3d 873, 892 (9th Cir. 2007) ("Stenson cannot point to any federal case requiring admission of 'execution

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 309 of 350
Case 3:08-cr-00134-RJC   Document 524   Filed 03/29/10   Page 309 of 350
**JA3663**

impact' testimony because there are no such cases. *Lockett* does not stand for that principle"). At least one court has applied these principles in a federal death penalty case. *See United States v. Jackson*, 549 F.3d 963, 970 n.3 (5th Cir. 2008) ("And although Jackson suggests that his mother could have effectively pleaded for her son's life, the district court properly ruled that general pleas for mercy would not be permitted.") (*citing Jackson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir. 2006)). State courts also have concluded that mere sympathy for the defendant's family, *i.e.*, execution impact testimony, is not permissible. *See, e.g.*, *People v. Ochoa*, 966 P.2d 442, 454-56 (Cal. 1999) (distinguishing sympathy pleas from family-provided evidence about a positive quality of the defendant, which is admissible); *Burns v. State*, 699 So.2d 646, 654 (Fla. 1997); *State v. Loftin*, 680 A.2d 677, 713 (N.J.1996).

Defendant identifies some cases in support of his view. (Mot. at 34-36.) Much of what he cites, however, consists of dissenting views. And the other cases cited simply do not stand for any proposition directly relevant to the mitigator defendant is challenging. *See United States v. Caro*, 461 F. Supp. 2d 459, 465 (W.D. Va. 2006) (precluding pleas for mercy), *aff'g in part and overruling in part*, 433 F. Supp. 2d 726, 727-28 (W.D. Va. 2006) (Sargent, M.J.); *United States v. Bodkins*, 2005 WL 1118158, at *8 (W.D. Va. May 11, 2005) (concerning life-without-parole-instruction, not execution impact); *United States v. Sampson*, 335 F. Supp. 2d 166, 194 (D. Mass. 2004) (discussing mitigation evidence generally); *United States v. Bin Laden*, 156 F. Supp. 2d 359, 370 (S.D.N.Y. 2001) (same); *United States v. Davis*, 132 F. Supp. 2d 455, 464-65 (E.D. La. 2001) (same, and approving "residual doubt" as mitigator).

The first (in time) in this line of cases, *Davis*, amounts simply to a "death is different" analysis and has been discussed at length in the government's prior pleadings in this case. It is true that the Ninth Circuit, in *United States v. Mitchell*, 502 F.3d 931 (2007), approved of a

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 310 of 350
Case 3:08-cr-00154-RJC   Document 504-8   Filed 03/29/10   Page 33 of 99
**JA3664**

district court's having allowed witnesses "to ask the jury to spare [defendant's] life," *id.* at 990-91; but that court's differentiating between a witness's "asking" the jury to spare life but not "offer[ing] an opinion" about the verdict is unpersuasive on its face. In any case, that comment cannot be read to mean that the Constitution <u>required</u> the same result. True, also, in *United States v. Fell*, 2005 WL 1634067 (D. Vt. July 5, 2005), and in two other cases, courts have refused to strike such a factor. (*See* Mot. at 35-36.) The court in *Fell* held that such information may be considered "so long as it relates to a defendant's background or character." *Id.* at *1. It simply held that the mitigating factor on the verdict form did not "directly invite the jury to consider sympathy for Fell's loved ones." *Id.* at *2. Tellingly, the mitigator in that case used the phrase "detrimentally affect," whereas defendant's in this case used the terms "grief and loss." The latter words are much more obviously calculated to induce sympathy. And, again, the jury in this case was allowed to consider the information, through Ms. Reyes, about his character. Her "grief and loss" is oranges to that apple.

Defendant last raises the specter of unfairness, since victim-impact testimony was admitted in this case. (Mot. at 37-38.) But the Act specifically contemplates such testimony, which is a big distinction. 18 U.S.C. § 3593(a). Moreover, victim-impact testimony, while emotional, is not unrestricted: *Payne v. Tennessee*, 501 U.S. 808 (1991), endorsed victim-impact testimony but it also upheld part of *Booth v. Maryland*, 482 U.S. 496 (1987), prohibiting introduction of opinions about the appropriate sentence by the victim's family. 501 U.S. at 830, 833, 836 n.1. Again, the issue is not emotion, *per se*, but whether the evidence amounts to a plea for a particular sentence. Had Monica Reyes cried on the stand, when talking about defendant's good traits, that would be one thing. But, to draw the analogy the other way, what if the government had attempted to elicit a statement (or argue) about Jean Garcia's "grief and loss" if

**JA3665**

defendant's life were spared?  The impropriety is obvious.  Hence the government did not offer (or attempt to offer) such opinions or characterization.[10]

In sum, defendant was allowed to establish, via family members or otherwise, mitigating facts about him as an individual.  The mere fact that he has a family, and that his family will be saddened by his execution, does not, standing alone, have anything to do with him, and is therefore tantamount to an improper plea for a particular sentence.  Had he asked for a "good father" mitigator, the analysis would be different.  But he did not do so, focusing instead on the emotional detriment that a specific sentence would cause his loved ones.  This is not a mitigating factor but a plea for mercy.  *See Lockett*, 438 U.S. at  605.  Therefore, the court ruled correctly that the "execution impact" testimony should be stricken.

### CONCLUSION

For all the foregoing reasons, defendant's motion for a new trial should be denied in its entirety.

RESPECTFULLY SUBMITTED this 9th day of July, 2010.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

**s/ Jill Westmoreland Rose**
NC Bar Number: NA
Assistant United States Attorney
United States Attorney's Office
100 Otis Street
Asheville, North Carolina 28801
Phone: (828) 271-4661
Fax: (828) 271-4670
Email:  jill.rose@usdoj.gov

---

[10]    In addition, contrary to the spirit of defendant's claims, neither the Act nor the Constitution requires some sort of strict balance simply to offset or minimize any victim-impact testimony.  While such testimony cannot be allowed to overwhelm the jury, it bears remembering that *Payne* overruled *Booth* in part because it is the murderer who creates the imbalance, by murdering innocents.  *See Payne*, 501 U.S. at 825-26 ("*Booth* deprives the State of the full moral force of its evidence . . . ."); *id.* at 827 ("[J]ustice, though due to the accused, is due to the accuser also.  The concept of fairness must not be strained till it is narrowed to a filament.  We are to keep the balance true.") (quoting Justice Cardozo).

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 312 of 350
Case 3:08-cr-00134-RJC   Document 3248   Filed 07/29/10   Page 37 of 39

**JA3666**

**s/ Adam Morris**
DC Bar Number: 486635
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
Fax: (704) 344-6629
Email: adam.morris@usdoj.gov

Case 3:08-cr-00134-RJC   Document 52-8   Filed 03/29/10   Page 38 of 39

**JA3667**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of July 2010, the foregoing document was served electronically through ECF filing upon defense counsel at the following email addresses:

Mark Foster
mpfosterjr@bellsouth.net

John Bryson
jbryson@wehwlaw.com

        **s/ Adam Morris**
        DC Bar Number: 486635
        Assistant United States Attorney
        United States Attorney's Office
        227 West Trade Street, Suite 1650
        Charlotte, North Carolina 28202
        Telephone: (704) 344-6222
        Fax: (704) 344-6629
        Email: adam.morris@usdoj.gov

**JA3668**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08-cr-134

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| ALEJANDRO UMANA (2) | ) | |
| | ) | |

**THIS MATTER** is before the Court upon motion of the defendant for a new trial (Doc.

No. 1103) and the government's response (Doc. No. 1147). For the reasons stated below, the

Court will **DENY** the defendant's motion.

I.      BACKGROUND

The defendant, along with 25 co-defendants, was charged with multiple federal offenses

arising out of his affiliation with La Mara Salvatrucha, also known as the MS-13 gang. (Doc.

No. 623: Third Superseding Indictment). Among other offenses, Count One charged the

defendant with a RICO conspiracy, in violation of 18 U.S.C. § 1962(d). The defendant was also

charged with the murders of Ruben and Manuel Salinas on December 8, 2007, in Greensboro,

North Carolina (the "Greensboro murders"), as overt acts in furtherance of the RICO conspiracy.

The Greensboro murders were charged separately in Counts Twenty-two and Twenty-four as

murders in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1), and in Counts Twenty-

three and Twenty-five as use of a firearm during and in relation to a crime of violence resulting

in death, in violation of 18 U.S.C. § 924(j). Counts Sixty-one, Sixty-two, and Sixty-three also

charged the defendant with conspiracy to commit obstruction of justice and witness tampering,

in violation of 18 U.S.C. §§ 371, 1503, and 1512(b)(1), as well as those substantive offenses. As

required by the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 et seq., the government

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 315 of 350
Case 3:08-cr-00134-RJC Document 1262   Filed 03/23/10   Page 1 of 28
JA3669

gave notice of its intention to seek the death penalty for Counts Twenty-two through Twenty-five. (Doc. No. 275: Notice).

The defendant's case proceeded to a jury trial. With the exception of Count Sixty-two,[1] the jury returned a verdict on April 19, 2010, finding the defendant guilty of all offenses charged. (Doc. No. 1043: Verdict Form). After presentation of aggravating and mitigating evidence in a separate sentencing hearing that immediately followed, the jury returned verdicts recommending a sentence of death for each charge for which the government had sought it. (Doc. Nos. 1048-51: Penalty Selection Verdict Forms). The defendant has yet to be sentenced, but filed this motion after receiving an extension of time in which to do so.

The defendant raises a number of claims supporting his motion for a new trial, many of which were previously raised at some point during these proceedings. The defendant contends that the Court improperly instructed the jury on the elements of murder in the aid of racketeering; that there is insufficient evidence to support his conviction of witness tampering; that evidence of unadjudicated crimes was improperly admitted during the defendant's sentencing proceeding; that the penalty selection verdict forms did not include a finding that he was likely to commit acts of violence in the future; that the Court improperly excluded a police report summarizing an interview with the defendant's mother; that admission of the defendant's April 2008 recorded interview with law enforcement violated his Fifth and Sixth Amendment rights; that expert testimony given by Detective Frank Flores was inadmissible character

---

[1]   The Court granted the defendant's Fed. R. Crim. P. Rule 29 motion with respect to the conspiracy's object to obstruct a federal investigation (Count Sixty-one) and the actual or attempted obstruction of a federal investigation (Count Sixty-two), in violation of 18 U.S.C. §§ 2, 371, and 1503. The Court found that the government had failed to prove that the defendant knew the investigation was a federal, not a state, matter. (Trial Tr. vol. V-A at 1133-1134, Apr. 16, 2010).

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 316 of 350
Case 3:08-cr-00134-RJC Document 50-8   Filed 03/23/10   Page 2 of 28
JA3670

evidence; that the government's rebuttal argument at the conclusion of the defendant's sentencing hearing was improper; and that the Court improperly struck the defendant's proposed mitigating factor stating that his execution would cause grief and loss to his family.

## II.   LEGAL STANDARD

Upon motion of the defendant, a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).[2] A district court "'should exercise its discretion to award a new trial sparingly,' and a jury verdict is not to be overturned except in the rare circumstance when the evidence 'weighs heavily' against it." United States v. Smith, 451 F.3d 209, 217 (4th Cir. 2006) (quoting United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003)). The defendant, as movant, carries the burden of showing that the interest of justice requires a new trial.

## III.   DISCUSSION

### A.   Jury Instruction for Murder in the Aid of Racketeering

The defendant argues that he should be granted a new trial on Counts Twenty-two and Twenty-four because the Court failed to instruct the jury that in order to find him guilty of murder in aid of racketeering, he must have committed the murders to maintain or increase his own—not another's—position in MS-13. (Doc. No. 1103: Motion at 2).  The applicable criminal statute reads, in pertinent part:

> Whoever, . . . for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity, murders, . . . assaults with a dangerous weapon, . . . or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States [commits an offense].

---

[2]   The Court assumes without deciding that its authority to grant a new trial under Fed. R. Crim. P. 33(a) applies equally to the guilt phase of the defendant's trial and the sentencing hearing that followed.

3

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 317 of 350
Case 3:08-cr-00134-RJC Document 50-8   Filed 03/23/10   Page 3 of 28

**JA3671**

18 U.S.C. § 1959(a). The Court gave the following instruction to the jury:

> In determining whether a person's purpose in committing the alleged murder, assault with a deadly weapon, or other crime was to maintain or increase position within the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all the facts and circumstances in making that determination. For example, you may consider evidence that the crime, if proved, was committed in order to maintain discipline within the enterprise and served to maintain position in the enterprise. If the defendant committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime because he thought it would enhance position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position already held, this element would be established. These examples are only illustrations.
>
> Conversely, it is not sufficient for the murder to be in furtherance of or consistent with the purposes of the enterprise. The defendant had to have had the conscious purpose to maintain or enhance position within the organization. The statute prohibits murders that are committed with the purpose of maintaining or enhancing a defendant's or another's relative position with the enterprise, vis-a-vis other members of the enterprise. In the absence of that specific prohibited purpose, a murder with the purpose of advancing a defendant's or the enterprise's reputation in the broader community is not covered by the statute.

(Trial Tr. vol. V-B at 1246-47, Apr. 16, 2010).[3] The defendant argues that the Court's instruction should have been drawn from Fourth Circuit precedents describing a defendant's purpose of increasing or maintaining "his" position in the enterprise as an element of the offense. United States v. Tipton, 90 F.3d 861, 891 (4th Cir. 1996); United States v. Fiel, 35 F.3d 997, 1004 (4th Cir. 1994) (both quoting United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992)).

Although these cases assumed that the position to be maintained or increased in the racketeering organization was the defendant's own, each addressed the sufficiency of evidence admitted at trial showing that to be the case. Neither held that violent crimes committed for the purpose of maintaining or advancing another's position in a racketeering enterprise would fall

---

[3] Transcripts of the guilt phase of the trial will be designated as "Trial Tr.," and transcripts of the penalty phase sentencing hearing will be designated as "Sent. Tr."

4

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 318 of 350
Case 3:08-cr-00134-RJC Document 50-8   Filed 03/23/10   Page 4 of 28
JA3672

outside the scope of 18 U.S.C. § 1959(a). Moreover, the defendant cannot assign error to a jury instruction that accurately tracks the language of the applicable criminal statute. United States v. Wills, 346 F.3d 476, 494 (4th Cir. 2003); accord United States v. Williams, 299 F.3d 250, 258 (3d Cir. 2002); United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000). Thus, the defendant has not shown that the jury was improperly instructed on the elements of the offenses charged in Counts Twenty-two and Twenty-four.

B.       Witness Tampering Convictions

Next, the defendant claims the evidence was insufficient to support the jury's verdict on charges of conspiracy to tamper with witnesses (Count Sixty-one) and actual or attempted tampering with witnesses (Count Sixty-three), in violation of 18 U.S.C. §§ 2, 371, and 1512. (Doc. No. 1103: Motion at 5).

To sustain a conviction for conspiracy to commit witness tampering, the government was required to prove beyond a reasonable doubt: (1) that the defendant and at least one other person made an agreement to commit witness tampering; (2) that the defendant knew the unlawful purpose of the agreement and joined in it willfully; and (3) that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy. United States v. Kingrea, 573 F.3d 186, 198 (4th Cir. 2009) (§ 371 elements).  Witness tampering is established if the government proves beyond a reasonable doubt: (1) that the defendant or co-conspirator used threats or intimidation against a person; and (2) that the defendant or co-conspirator acted knowingly and did so for the purpose of influencing, delaying, or preventing that person's testimony in an official proceeding. United States v. Thompson, 76 F.3d 442, 453 (2d Cir. 1996).

5

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 319 of 350
Case 3:08-cr-00134-RJC Document 1200   Filed 03/23/10   Page 5 of 28
JA3673

The defendant's claim centers on the allegation that only one witness linked him to the conspiracy which led to armed MS-13 gang members traveling to Greensboro, North Carolina to intimidate witnesses at the restaurant where the murders at issue were committed.[4] (Doc. No. 1103: Motion at 6). That witness was Alexander Granados, a.k.a. "Gorilon," an illegal alien from El Salvador who joined MS-13 in Boston, Massachusetts when he was sixteen or seventeen years old. (Trial Tr. vol. IV-A at 866-68, Apr. 15, 2010). He came to Charlotte, North Carolina in 2006 after being deported and became active with the gang here. (Id. at 873). After the defendant was arrested for the Greensboro murders, Granados attended a gang meeting led by "Misterio." According to Granados, Misterio told the group that the defendant told him that the defendant had a court date the following week and sent a message to Misterio so that "there won't be somebody speaking out at the court." (Id. at 890). He identified the types of handguns the group planned to carry, (Id. at 891), which were later found on the gang members in Greensboro after one of them went into the restaurant to intimidate the owner. (Trial Tr. vol. IV-B at 925-26, 948, Apr. 15, 2010).

The uncorroborated testimony of a single witness may be sufficient evidence of guilt, even if the witness is an accomplice, a co-defendant, or an informant. United States v. Wilson, 115 F.3d 1185, 1189-90 (4th Cir. 1997). Although no other participants in the meeting led by Misterio testified at the trial, details consistent with Granados's account were established by other evidence, such as the recovery of the guns in Greensboro. Counsel for the defendant cross-examined Granados about the defendant's alleged statement to Misterio. (Trial Tr. vol. IV-B at 915-17, Apr. 15, 2010). While he hoped to receive benefits from his plea agreement, Granados

---

[4] He admits the other elements of the offenses were satisfied. (Doc. No. 1103: Motion at 5-6).

6

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 320 of 350
Case 3:08-cr-00134-RJC Document 271-8   Filed 03/23/10   Page 6 of 28
JA3674

took a considerable risk of physical harm by breaking the gang's rule about providing information and testimony about a fellow member. The Court had the opportunity to observe the demeanor of Granados and finds that his testimony was credible. Thus, the evidence does not weigh heavily against the verdict and the Court will not grant a new trial based on the sufficiency of the evidence presented to the jury as to Counts Sixty-one and Sixty-three.

C.      Evidence of Uncharged Murders

The defendant next argues that the Court erred by admitting evidence during his sentencing hearing that he had committed three murders in 2005 while living in Los Angeles. (Doc. No. 1103: Motion at 7). Evidence was received that on July 27, 2005, the defendant shot Jose Herrera and Gustavo Porras on Fairfax Street following a gang-related altercation (the "Fairfax Street murders"), and on September 28, 2005, the defendant shot Andy Abarca at Lemon Grove Park (the "Lemon Grove murder"). These murders were not charged as separate crimes, but were alleged by the government as part of a non-statutory aggravating factor ("Participation in Additional Uncharged Murders and Other Acts of Violence"). (Doc. No. 275: Notice at 4 & 7). See also 18 U.S.C. § 3592(c) (directing a capital sentencing jury to consider a number of enumerated statutory aggravating factors, as well as "any other aggravating factor for which notice has been given"). The jury unanimously found this aggravating factor and, specifically, that the defendant had committed both the Fairfax Street and Lemon Grove murders. (Doc. Nos. 1048-51: Penalty Selection Verdict Forms at 2).

In his motion for new trial, the defendant makes a number of objections to the admissibility of evidence related to these murders, chiefly that evidence relating to unadjudicated criminal conduct is per se unreliable; that a jury that has already found a defendant guilty of underlying capital offenses cannot impartially consider evidence of uncharged crimes; and that

7

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 321 of 350
Case 3:08-cr-00134-RJC Document 1525 Filed 03/23/10 Page 7 of 28
JA3675

allegations of unadjudicated criminal conduct violate a defendant's constitutional right to a presumption of innocence during the penalty phase of a capital trial. The defendant raised the same arguments in his motion to strike this factor from the government's Notice (Doc. No. 483), which the Court considered and denied prior to the defendant's sentencing hearing. (Doc. No. 1000: Order).

The defendant argues for a different result in light of the government's sentencing hearing summation argument, where it drew similarities between the commission of the Greensboro murders and all three Los Angeles murders. He contends that the jury was effectively told to find the defendant guilty of the Los Angeles murders because he committed the Greensboro murders, a violation of his right to a presumption of innocence. However, by arguing the that the charged and uncharged murders were committed in a similar manner, the government did not invite the jury to disregard the defendant's presumed innocence of the uncharged allegations. The Greensboro murders were referenced not as evidence of the defendant's propensity to commit bad acts but to show a series of shootings committed in a similar manner. See United States v. Haney, 914 F.2d 602, 607 (4th Cir. 1990) (citing Fed. R. Evid. 404(b), holding evidence of "a string of robberies committed in the same manner" admissible as "evidence of a signature crime"). The government's reference to the Greensboro murders during its summation argument provides no reason for the Court to retreat from its previous ruling allowing evidence of uncharged conduct during the sentencing hearing.

Similarly, the defendant attempts to resurrect his objection to the admission of this evidence on the ground that it fails to meet a threshold standard of reliability. This issue was already raised in a motion in limine filed by the defendant (Doc. No. 960), which the Court granted in part and denied in part on the basis of the government's proffered evidence (Doc. No.

8

Case 3:16-cv-00057-MOC Document 50-8   Filed 03/23/17   Page 322 of 350
Case 3:08-cr-00134-RJC Document 50-8   Filed 03/23/10   Page 8 of 28
JA3676

1021: Order). After conducting an in camera review, the Court determined that, with the exception of proposed testimony by police officers relating eyewitness Freddy Gonzalez' prior identification of the defendant from a photograph line-up as the Lemon Grove shooter, the government's proffered evidence bore sufficient indicia of reliability to warrant admission under the applicable evidentiary standard set out in 18 U.S.C. § 3593(c). (Id.).[5] The Court permitted Gonzalez to testify live as to his prior identifications of the defendant, but prohibited him from making an in-court identification, finding the totality of circumstances unduly suggestive. (Sent. Tr. vol. III-A at 327-35, Apr. 21, 2010).

The Court finds no grounds to re-examine its prior ruling on this matter, as the evidence introduced by the government at the sentencing hearing was consistent with its proffer. With regard to the Fairfax Street murders, Los Angeles Police Department ("LAPD") Officer John Maloney relayed statements by an eyewitness, Noe Bautista, who stated that on the day of the murders,

> He observed two young men walking south on the west side of the street. I guess arguing with three suspects in a vehicle, in a gold Altima, Nissan Altima. And that the vehicle pulled over. They got out, walked passed them. One of the suspects removed the handgun from his waistband and shot the two victims, and then fled back into the vehicle, southbound on Fairfax.

(Sent. Tr. vol. II-A at 161, Apr. 26, 2010). LAPD Detective Gene Parshall testified that two .22 caliber shell casings were recovered from the scene. (Sent. Tr. vol. II-B at 174, Apr. 20, 2010). He also testified that Bautista further stated that one of the occupants who exited the Altima had been on crutches. (Id. at 178). This lead Det. Parshall to Luis Rivera, a known MS-13 member

---

[5] In the same Order, the Court also determined that proffered evidence of the defendant's participation in another murder, the beheading of Jaime Samayoa in El Salvador, lacked sufficient indicia of reliability necessary for admission at the defendant's sentencing hearing. This evidence was never presented to the jury.

9

Case 3:16-cv-00057-MOC-JC Document 50-8   Filed 03/23/17   Page 323 of 350
Case 3:08-cr-00134-RJC Document 52-8   Filed 03/23/10   Page 9 of 28

JA3677

who was on crutches when the Fairfax Street murders occurred. (Id. at 178). Rivera was brought in for questioning and eventually stated to Det. Parshall that he and Rene Arevalo, Luis Ramos, Eddie Ruiz, and the defendant had been driving down Fairfax Street in a Nissan Altima on the day of the murders. Arevalo was driving, the defendant was sitting in the front passenger seat, and Rivera, Ramos, and Ruiz were in the back. (Id. at 180). Rivera then gave an account of the shooting and identified the defendant as the shooter. (Id. at 181).

Det. Parshall then testified that Ramos was subsequently brought in for questioning, and after he refused to cooperate, he was put in a holding cell with Rivera. Det. Parshall testified that he and other LAPD personnel had installed audio surveillance in the cell, and observed Rivera and Ramos discussing their desire to avoid serving a prison sentence for a murder they did not commit. (Id. at 183). Several days later, Ramos came forward with a statement identifying the same occupants in the Altima and naming the defendant as the shooter. (Id. at 185). Det. Barry Telis, Det. Parshall's partner, testified that they eventually located Arevalo, who gave a statement that was largely corroborative of Rivera's and Ramos'. (Id. at 229).

Det. Parshall also testified that in April 2008, he and Det. Telis interviewed the defendant regarding the Fairfax Street murders, and the defendant admitted that he had been at the scene with a gun. When asked if he was the shooter, Det. Parshall testified that the defendant responded, "You can say that." (Id. at 191). The defendant also demonstrated to Detectives Parshall and Telis the rival gang signs that the victims had displayed immediately prior to the shooting. (Id.).

As the Court recognized in its previous ruling, cross-examination of Detectives Parshall and Telis revealed that Rivera's, Ramos', and Arevalo's statements were somewhat self-serving in that each attempted to minimize his own involvement in the shooting. The statements were

10

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 324 of 350
Case 3:06-cv-00154-RJC   Document 50-8   Filed 03/23/10   Page 10 of 28

JA3678

also inconsistent with respect to some details, such as who exited the automobile and whether they did so in the middle of Fairfax Street or after the Altima had pulled over the side of the road. However, each statement identified the defendant as the shooter and gave details of the shooting that were largely corroborative of each other and of the eyewitness account given by Bautista. Det. Parshall's accuracy in relating these statements to the jury was further ensured by the fact that the defendant was able to cross-examine him with his prior testimony in a state court proceeding. (Id. at 216). Moreover, the defendant's own statements during his April 2008 interview placed him at the scene and, at the very least, tacitly admitted his involvement in the Fairfax Street murders.

With regard to the Lemon Grove murder, Roberto Ramos and Juan Lara gave eyewitness accounts of the shootings and were subject to cross-examination. (Sent. Tr. vol. II-A at 119-48, Apr. 20, 2010). LAPD Det. Thomas Small also testified that he interviewed the defendant, and although the defendant denied being a shooter, he admitted to driving to Lemon Grove Park on the night of the murder with Giovani Rhodus, a.k.a. "Sin," and two other unknown males. According to the defendant, the Lemon Grove shooting was carried out by the two unknown males, while he and Sin stayed in the car. (Id. at 115-16). Det. Small further testified that he recovered .22 caliber shell casings from the scene and submitted them for ballistics analysis. (Id. at 108-09). This testimony was also subject to cross-examination by counsel for the defendant. (Id. at 116-19).

Finally, and perhaps most importantly, LAPD Officer William Moore was tendered by the government as an expert in ballistics firearms analysis. He testified that he had performed ballistics tests comparing the .22 caliber shell casings recovered from the Fairfax Street and Lemon Grove murders. Officer Moore stated that as a result of this testing, he concluded that the

11

**JA3679**

shell casings from both crime scenes had been discharged from the same firearm. (Sent. Tr. vol. II-B at 246-57, Apr. 20, 2010). No evidence was received suggesting that any person other than the defendant was present at both the Fairfax Street and Lemon Grove murders.

As the record reflects, the admitted evidence implicating the defendant in the Los Angeles murders largely matched that which was proffered by the government in response to the defendant's motion in limine. There are no inconsistencies between the government's proffer and what was actually admitted into evidence that warrant a reconsideration of the Court's prior Order finding this evidence admissible.

The defendant also argues that the evidence presented by the government was insufficient to support the jury's finding that he committed the Los Angeles murders. Admittedly, Rivera, Ramos, and Arevalo were vulnerable to credibility attacks stemming from their desire to minimize their own involvement in the Fairfax Street murders. However, the core detail of each statement—that the defendant was the shooter—was sufficiently corroborated by consistencies among their statements and evidence obtained from other sources. Moreover, when evaluating the sufficiency of evidence, the Court reviews "the complete picture that the evidence presents." United States v. Burgos, 94 F.3d 849, 863 (4th Cir. 1996) (citing United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995)). The government also introduced the defendant's own incriminating statements, establishing his presence at both murder scenes, and ballistics evidence matching both shootings to a single firearm. Viewed as a whole, this evidence weighs in favor of the jury's finding, not against it. The defendant has therefore failed to show an insufficiency in the evidence supporting the jury's finding that he committed the Los Angeles murders to warrant a new trial on the matter.

12

**JA3680**

D.    Future Dangerousness Finding

The defendant claims that he is entitled to a new sentencing hearing because the penalty selection verdict forms (Doc. Nos. 1048-1051) did not require the jury to find the non-statutory aggravating factor of future dangerousness. (Doc. No. 1103: Motion at 15). The government provided notice to the defendant that it would seek the death penalty, in part, based on future dangerousness "as evidenced by" his alleged engagement in a continuing pattern of violence, low rehabilitative potential, lack of remorse, and gang membership. (Doc. No. 275: Notice at 5). After the jury found that the defendant was eligible for the death penalty, the government presented evidence relating to these allegations. The Court proposed instructions and verdict forms that tracked the government's notice, and the defendant voiced no objections to them. (Sent. Tr. vol. V-B at 800, Apr. 27, 2010). Accordingly, this issue is subject to plain error analysis. United States v. Olano, 507 U.S. 725, 732 (1993).

Here, there was no error in the verdict forms. They asked the jury to give "yes" or "no" answers whether "the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would constitute a continuing and serious threat to the lives and safety of others, as evidenced by at least one or more" of the four alleged factual circumstances. Thus, the jury necessarily found the non-statutory aggravating factor of future dangerousness when it answered "yes" to each of the four circumstances on each of the four verdict forms. The phrasing of the issue protected the defendant from the jury going beyond the specifically alleged circumstances in finding this aggravating factor. Even if the phrasing was in error, it can not be said that it affected the defendant's substantial rights because

13

**JA3681**

the jury was not required to find future dangerousness in order to return death verdicts.[6]

Accordingly, a new trial is not required based on the penalty selection verdict forms.

      E.      Exclusion of Police Report

The defendant claims the Court's exclusion of a police report documenting an interview with his mother in 2008 prejudiced his mitigation case. (Doc. No. 1103: Motion at 16-17). At the time the evidence was offered, defense counsel stated the purpose was to complete the defendant's life story, establish when and where he was born, and address his personal identity. (Sent. Tr. vol. IV-B at 589, Apr. 26, 2010). The defendant now claims that the report would have strengthened his claims that the family was displaced by violence in El Salvador and that the defendant's father was uncooperative with the defense investigation, and would have explained the defendant's father's role in his life. (Doc. No. 1103: Motion at 16-17). The defendant made an offer of proof on the contents of the report, which was written in Spanish, outside the presence of the jury. (Sent. Tr. vol. V-B at 921-24, Apr. 27, 2010).

A capital defendant is entitled to present any information relevant to a mitigating factor. 18 U.S.C. § 3593(c). Relevant evidence is that which tends to make the existence of a fact of consequence more or less probable that it would be without the evidence. Fed. R. Evid. 401. Here, the government provided a birth certificate and Salvadoran police report which alleged the defendant was born in Guatemala, not El Salvador as the defendant's father had reported and another birth certificate showed. The newly-provided birth certificate listed a date of birth two years earlier than the one obtained by the defense mitigation investigator and listed a different

---

[6] In its verdict finding the defendant eligible for the death penalty, the jury found two statutory aggravating factors, either of which, standing alone, could have supported imposition of that sentence. (Doc. Nos. 1044-1047); 18 U.S.C. §§ 3591(a)(2), 3592(c)(5), (16), and 3593(e)(2).

14

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 328 of 350
Case 3:08-cr-00134-RJC   Document 50-8   Filed 03/23/10   Page 132 of 28
JA3682

person as the defendant's father. The Court's admission of this newly-provided birth certificate put that information before the jury.

The interview with the mother did not give the reasons why the family moved to Guatemala for a period of time or why a different person was listed as father, it merely recited the same detail as the newly-provided birth certificate. As such, the police report did not shed light on the effect of the civil war in El Salvador on the family, the role of the defendant's father in his life, or the defendant's personal sense of identity. The mitigation investigator testified at length regarding information provided to him by the defendant's father (Sent. Tr. vol. IV-A at 522-26, Apr. 26, 2010; Sent. Tr. vol. IV-B at 533-47, Apr. 26, 2010). Nothing in the report of the mother's interview in 2008 would have informed the jury why the father refused to introduce the investigator to other family members in 2009, if that were even relevant. (Sent. Tr. vol. IV-A at 521, Apr. 26, 2010). Thus, the police report did not make any facts of consequence relating to the defendant's mitigating factors more or less probable and was properly excluded.

F.      Defendant's Statement to LAPD Detectives

The defendant claims the admission of his statement to LAPD detectives at the time he was in custody and represented by an attorney on North Carolina charges violated his Fifth and Sixth Amendment rights and requires a new sentencing hearings. (Doc. No. 1103: Motion at 17). The defendant raised this issue in a pre-trial motion to suppress (Doc. No. 490), which the Court denied after an evidentiary hearing on August 26, 2009 (Doc. No. 684: Supp. Hr'g Tr. at 98-103). The motion for new trial does not raise any new facts or law to reconsider that ruling. Therefore, a new sentencing hearing is not required in the interest of justice.

G.      Expert Testimony of Frank Flores

During the defendant's trial, Det. Frank Flores of the Los Angeles Police Department

15

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 329 of 350
Case 3:08-cr-00134-RJC   Document 1247   Filed 03/23/10   Page 15 of 28
JA3683

was permitted to testify as an expert in the structure, history, and nature of MS-13. Over the

defendant's objection, the evidentiary basis of which was not articulated, Det. Flores gave the

following testimony:

> Q. Well, have you had, in your experience has there been any situations where a civilian has been killed out of disrespecting the gang?
>
> A. Yes, I mean --
>
>             * * *
>
> Violence is generally very common. A lot of things happen unplanned or may happen on very short notice. Disrespect, somebody is confronted, they react. Yes, they're required to act appropriately, whether confronted or disrespected by rival gang member, by somebody from the general public who they have taken some kind of disrespect from. It's part of the normal, everyday activities.

(Trial Tr. vol. I at 63, Apr. 13, 2010). This specific testimony was relevant, albeit peripherally, to

the government's theory that although the Greensboro shooting victims were not members of a

rival gang, their murders were carried out by the defendant to promote respect for MS-13 and,

thus, aid that racketeering enterprise.

The defendant previously moved to prohibit Det. Flores from testifying on both Daubert

and Crawford grounds. (Doc. No. 962). In support, the defendant argued that Det. Flores'

personal involvement with the investigation of the Los Angeles murders would cause him to

relate inadmissible hearsay evidence to the jury under the guise expert testimony.  The Court

denied this motion prior to trial (Doc. No. 981: Order), citing United States v. Ayala, 601 F.3d

256 (4th Cir. 2010), in which the Fourth Circuit recently upheld the admission of Det. Flores'

and two other experts' testimony concerning the history, structure, and practices of MS-13

against an almost identical Crawford challenge. There, even assuming that the experts had relied

on testimonial hearsay statements to form their opinions, the Fourth Circuit held:

16

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 330 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 03/23/10   Page 16 of 28
JA3684

> That fact alone does not offend the Confrontation Clause because the experts did not act as mere transmitters and in fact did not repeat statements of particular declarants to the jury. Instead, they offered their independent judgments, most of which related to the gang's general nature as a violent organization and were not about the defendants in particular. These judgments resulted from many years of observing the gang, studying its methods, and speaking with its members. Given that each expert was subject to cross-examination about his judgment, we find no error in the admission of their testimony.

Id. at 275. Similar to the testimony he gave in Ayala, the Court permitted Det. Flores to offer expert testimony about the general nature of MS-13, but prohibited him from relating facts or hearsay statements gleaned during his involvement with the defendant's investigation.[7]

Aside from renewing this general challenge to Det. Flores' testimony, the defendant now argues that Flores' testimony concerning his prior experience with gangs was improper character evidence under Fed. R. Evid. 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

"The general rule is that the prosecution may not introduce evidence of extrinsic offenses to demonstrate the defendant's propensity to commit unlawful acts or to prove that the defendant committed the crime with which he is presently charged." United States v. Davis, 657 F.2d 637, 639 (4th Cir. 1981). "Rule 404(b) has been characterized as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." United States v. Percy, 765 F.2d 1199, 1203 (4th Cir. 1985) (citing United States v. Masters, 622 F.2d 83, 85 (4th Cir. 1980)).

---

[7] Flores was not called by the government to testify as a fact witness.

17

Case 3:16-cv-00057-MOC    Document 50-8    Filed 03/23/17    Page 331 of 350
Case 3:08-cr-00134-RJC    Document 524    Filed 03/23/10    Page 17 of 28
JA3685

Essentially, the defendant argues that Det. Flores' testimony suggested that because other gangs condoned the killing of civilians, MS-13 condoned the defendant's commission of the Greensboro murders. However, even if this is true, Det. Flores' response did not run afoul of Rule 404(b). He was well within scope of his expertise to testify about his prior experience with gangs, and the statement was a generalized one that had no direct link to the defendant. Rule 404(b) erects no barrier to evidence of other crimes or bad acts committed by third parties, for such acts cannot bear upon the defendant's own character. Cf. United States v. Smallwood, 306 F. Supp. 2d 582, 587 (E.D. Va. 2004) ("Rule 404(b) prohibits the admissibility of evidence of acts committed by a person, other than the charged act, when offered to show that the person has the propensity or character to commit the same act on another occasion."). Det. Flores' statement that gangs often condoned violence against civilians was therefore outside the scope of character evidence prohibited under Rule 404(b).

H.      Government's Rebuttal Argument

Next, the defendant claims that certain statements in the government's rebuttal argument during the sentencing hearing were improper and were designed to inflame the emotions and passions of the jury. (Doc. No. 1103: Motion at 25). In determining whether improper remarks require corrective action, several factors are considered:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

United States v. Harris, 498 F.3d 278, 293 (4th Cir. 2007). Where there is no contemporaneous objection, comments are reviewed for plain error. Id. at 292.

18

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 332 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 03/23/10   Page 18 of 28
**JA3686**

### 1.    Gang members' behavior in prison

At the beginning of her rebuttal argument, the Assistant United States Attorney (AUSA) referenced the number of MS-13 gang members in federal prison as related by a defense witness and remarked, "And I can promise you that if one of them was there for life and was behaving, we would have heard all about it."[8] (Sent. Tr. vol. V-B at 888, Apr. 27, 2010). The defendant complains this was unfair because the government successfully blocked his attempt in discovery to obtain data from the Bureau of Prisons ("BOP") about MS-13 gang members' behavior in jail. (Doc. No. 1103: Motion at 25). Nevertheless, a former BOP warden called by the defense testified that the BOP did not consider MS-13 a disruptive group (Sent. Tr. vol.V-A at 706, Apr. 26, 2010), and defense counsel highlighted that evidence in arguing against the future dangerousness aggravating factor. (Sent. Tr. vol.V-B at 851, Apr. 27, 2010).

The AUSA's isolated comment, then, was not an unfair response to that evidence and argument, but simply called into question the witness's opinion. Because the Court instructed the jury that it was to make an individualized assessment of the defendant in deciding punishment (Id. at 917), the jury was not misled into considering the behavior of other MS-13 members in jail. Additionally, the evidence was extensive regarding the defendant's own continued violent conduct while incarcerated, including his ability to obtain weapons. Therefore, the defendant was not unfairly prejudiced by the comment.

### 2.    Defendant only killer

Next the defendant complains about the AUSA's argument about him being the "only

---

[8] The defendant did not object to this comment.

19

killer" among the MS-13 gang members mentioned in the trial.[9] (Id. at 888-89). He claims this was unfair because the Court prohibited him from offering evidence of other murders committed by other gang members in support of a proposed mitigating factor that such individuals in the same conspiracy did not receive the death penalty. (Doc. No. 1103: Motion at 26). In context, the AUSA's argument was consistent with evidence that the defendant was the only trigger-man in each of the murders at issue in the trial, that is, at the Greensboro restaurant, on the Fairfax Street sidewalk, and in Lemon Grove Park. The jury had heard testimony about a gang-related murder involving government witness Rony Lopez in which the defendant did not participate. Therefore, it is not likely that they were misled by the argument that stressed the defendant's greater culpability in the murders at issue in the trial, and, thus, urged greater punishment.

### 3. Callous disregard

The government originally sought to establish a non-statutory aggravating factor of callous disregard for the severity of the offense. (Doc. No. 275: Notice at 3). The defense moved to strike that factor (Doc. No. 488: Motion at 2), which the Court granted as potentially duplicative of the lack of remorse sub-part of the future dangerousness factor (Doc. No. 1000: Order at 22). When the AUSA began to mention callous disregard as a mitigating factor, defense counsel immediately objected, and the court immediately instructed the jury to disregard such comments. (Sent. Tr. vol.V-B at 896-97, Apr. 27, 2010). The AUSA immediately went on to argue the issue of lack of remorse, which was proper for the jury to consider. (Id. at 897-98). The defendant was not prejudiced by this fleeting remark, which was an innocent mistake, considering the government's proposed aggravating factor on callous disregard, which the Court disallowed.

---

[9] The defendant did not object when the argument was made, but raised it at side-bar at the conclusion of the jury instructions. (Sent. Tr. vol. V-B at 914, Apr. 27, 2010).

20

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 334 of 350
Case 3:08-cr-00134-RJC   Document 1248   Filed 07/13/10   Page 20 of 28

JA3688

The subsequent jury instructions and verdict forms made no mention of that factor, so there is no risk that the jury misunderstood the was issue it was to decide.

4.    The shank

After the AUSA argued that the defendant's lack of remorse was shown by looking for rival gang members to attack after the Greensboro murders, by insinuating he would shoot police if they tried to stop him, and by threatening witnesses, she added to the list that the defendant came to court with a shank.[10] (Id. at 898). The defendant is correct that this comment overstates the evidence. (Doc. No. 1103: Motion at 27). A deputy United States Marshal testified that he found a knife strapped to the defendant's penis during a search immediately prior to bringing him from the local jail to the federal courthouse for the first day of jury selection. (Sent. Tr. vol. III-A at 359-360, Apr. 21, 2010). So, the defendant was prevented from bringing the knife to the courthouse, but it is a fair inference from the circumstances that the defendant intended to do so. In this context, the Court does not find that the discrepancy was deliberately put before the jury to mislead them. The jury had been instructed to disregard argument of counsel that conflicted with their recollection of the testimony, and there is no reason to find that they did not do so here.

Defense counsel objected when the AUSA went on to question rhetorically what rivals the defendant had at the courthouse[11] and to conclude that his rivals were the marshals, the judge, and the jury. (Sent. Tr. vol. V-B at 898-99, Apr. 27, 2010). The Court sustained the objection (Id. at 899), but does not now find that such comment inflamed the passions of the jury such that their

---

[10] The defendant did not object to this characterization of the evidence.

[11] During cross-examination of the deputy, defense counsel suggested that the knife could have been possessed for self-defense, given the presence of rival gang members in the jail. (Sent. Tr. vol. III-A at 367-68, Apr. 21, 2010).

21

verdicts were impermissibly based on emotion. The evidence of the defendant's possession of the knife while in the transportation process to come to federal court was compelling in itself, as reflected by the jury's visible reaction when the deputy testified. Additionally, the defendant wrote in letters about other shanks he possessed and sought to give to gang members. Thus, absent the remarks, the strength of the evidence was sufficient for the jury to find the non-statutory aggravating factor.

### 5. American justice

Next, the defendant charges that the AUSA appealed to anti-immigrant beliefs, creating a risk that the verdict was based on the defendant's ethnic and national origin. (Doc. No. 1103: Motion at 28). The story in this trial, as presented by both the government and the defendant, centered on the MS-13 gang and necessarily involved descriptions of conduct of those from and in El Salvador and its effect on criminal activity in this country. In their closing argument, defense counsel repeatedly discussed conditions and activity in El Salvador in explaining the defendant's background, character, and participation in the gang.[12] (Sent. Tr. vol. V-B at 854, 856-58, 862, 878, Apr. 27, 2010). It was regrettable, but invited, for the AUSA to argue in response that criminal activity committed by an El Salvadoran gang in this country should be met with American justice.[13] (Id. at 899). As such, the comments were not an appeal to racial animus. Even if they were improper, the defendant was not prejudiced because the jury was instructed that considerations of national origin could not play a part in the verdict (Id. at 911), and each of the jurors certified that it had not (Doc. Nos. 1048-1051: Penalty Selection Verdict Forms at 9).

---

[12] As reflected in the jury's findings regarding mitigating factors, information about El Salvador benefitted the defendant. (Doc. Nos. 1048-1051: Penalty Selection Verdict Forms at 4-5).

[13] The defendant did not object to this argument.

22

JA3690

Accordingly, the AUSA's call for American justice did not affect the defendant's substantial rights.

### 6.    Send a message

In a side-bar conference following closing argument, the Court informed the parties that it would, sua sponte, instruct the jury that it was not to send a message to anybody else in determining the appropriate sentence for the defendant and shortly afterwards gave such direction. (Sent. Tr. vol. V-B at 917, Apr. 27, 2010). That action was in response to the AUSA's urging the jury to send a message to the community and MS-13 by returning death verdicts.[14] (Id. at 899, 904). The defendant now argues that this line of argument likely caused the jury to sentence him to death to deter MS-13 crimes. (Doc. No. 1103: Motion at 29). The Court's instruction was sufficient to remedy this improper appeal which occurred at near the end of the AUSA's summation. Given the weight of the evidence and the individualized determination shown in the verdict forms, it is clear that the jury did not return death verdicts to send a message to the community or the gang.

### 7.    Tears on the scale

Next, the defendant claims the AUSA argued sympathy for the victims' families as a basis for imposing the death penalty. (Id.). The Supreme Court has held that the Constitution does not prohibit consideration of the harm to the family of a victim in determining whether the death penalty should be imposed, Payne v. Tennessee, 501 U.S. 808 (1991), and Congress has specifically provided for it in federal prosecutions, 18 U.S.C. § 3593(a). Therefore, it was not improper for the AUSA to use the rhetorical device of asking the jury to place the tears of the

---

[14] The defendant did not object to this argument.

23

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 337 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 03/23/10   Page 23 of 28
JA3691

daughters of one of the victims "on the scale" as aggravating and mitigating factors were weighed. (Sent. Tr. vol. V-B at 902, Apr. 27, 2010). In doing so, she was asking the jury to consider the extent and scope of the loss suffered by the victims' families, which is clearly authorized by federal law.

        8.      Inmates' bill of rights

Seeking to counter the government's evidence of future dangerousness, the defendant presented testimony during his mitigation case from Dr. Mark Cunningham, a psychologist, who was offered as an expert in the procedures used by the BOP to control prison violence. (Sent. Tr. vol. IV-A at 429, Apr. 26, 2010). On direct examination, he testified about the environment for prisoners at the BOP's highest security prison, located in Florence, Colorado. He opined that inmates sentenced to life without parole have a greater incentive than the average prisoner to behave to protect their institutional privileges, like buying potato chips and beans at the commissary. (Id. at 440). Additionally, he detailed restrictions that could be placed on inmates who posed a security threat. (Id. at 461, 466, 476-79). On cross-examination, the government sought to highlight circumstances that would limit the ability of privileges and restrictions to control an inmate's behavior. Among those circumstances was the list of rights to which inmates are entitled that are balanced against security concerns. (Id. at 503-07).

The defendant relies on Le v. Mullin, 311 F.3d 1002 (10th Cir. 2002), for his argument that the AUSA's comments about the life the defendant would lead even in the most restrictive prison (Sent. Tr. vol. V-B at 902-03, Apr. 27, 2010) were improper.[15] (Doc. No. 1103: Motion at 29-30). That court was concerned that the over-emphasis of the permanency of the death of the

---

[15] The defendant did not object to this argument.

JA3692

victim compared to the continued life of the defendant might cause the jury to disregard mitigating factors. Id. at 1016. Nevertheless, the court found that the overwhelming evidence of the defendant's guilt, the strength of the aggravating factors, and the trial court's instructions rendered the error harmless. Id.

Here, the findings on the penalty selection verdict forms shows that the jury did not disregard the mitigating factors. (Doc. Nos. 1048-1051: Penalty Selection Verdict Forms at 4-6). The context in which the evidence was presented related to the aggravating factor of future dangerousness, as in United States v. Higgs, 353 F.3d 281, 332 (4th Cir. 2003) (comments about comfortable life defendant would lead in prison were proper to counter argument that he would serve sentence in high-security environment with constant monitoring). Additionally, the strength of the evidence of guilt and aggravating factors renders any error in such argument harmless. The Court instructed the jury that it could not take any adverse inference from the defendant's exercise of his constitutional rights during the trial; therefore, there was no risk that the jury would confuse those rights with those applicable while incarcerated.

A death verdict may not be imposed under the influence of passion, prejudice, or any other arbitrary factor. 18 U.S.C. § 3595(c)(2)(A). Having considered each of the government's alleged improper arguments and the record of the trial and sentencing hearing as a whole, the Court finds that the comments separately and collectively provide no basis to conclude that the jury returned the verdicts under improper influence. Thus, a new sentencing hearing is not required in the interest of justice.

I.       Execution Impact Evidence

The defendant next argues that he was denied due process when the Court refused to instruct the jury on the following proposed mitigating factor:

25

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 339 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 03/23/10   Page 25 of 28

**JA3693**

> 14. The execution of Alejandro Enrique Umana would cause grief and loss to his son Rafael and to Monica Reyes.

(Doc. No. 1024 at 2). This factor was subject to a motion in limine filed by the government (Doc. No. 1020), which the Court granted, finding "execution impact" evidence irrelevant to the defendant's characteristics, his history, or the circumstances of the offense. (Sent. Tr. vol. V-B at 804, Apr. 27, 2010). See also Lockett v. Ohio, 438 U.S. 586, 604 n.12 (1978) (authorizing the trial court to exclude "as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense").

As a preliminary matter, because the Court's ruling came after the defendant had rested his case in mitigation, he was in no way prevented from presenting mitigating evidence to the jury related to his family. The mitigation investigator testified at length about the defendant's life in El Salvador and his family. (Sent. Tr. vol. IV-B at 577-86, Apr. 26, 2010). The defendant published a video recording of an interview that the investigator had conducted with Monica Reyes, allowing her statements about the defendant's characteristics to reach the jury. (Id. at 573-74). By granting the government's motion in limine, the Court did not prevent the jury from considering this evidence; the Court simply declined to give an instruction that execution impact was a stand-alone, non-statutory mitigating factor.

In the instant motion, the defendant argues that a mitigating factor directing the jury to consider execution impact evidence should have been allowed as relevant to the defendant's character and background. A few federal courts have held that execution impact evidence is a valid mitigating factor under this theory. See United States v. Wilson, 493 F. Supp. 2d 491 (E.D.N.Y. 2007); United States v. Fell, No. 2:01cr12-01, 2005 WL 1634067 (D.Vt. July 5, 2005). However, these decisions are not controlling within the Fourth Circuit, and the Court finds their

26

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 340 of 350
Case 3:08-cr-00134-RJC   Document 1246   Filed 03/23/10   Page 26 of 28
JA3694

reasoning unpersuasive. Permitting a capital defendant to argue execution impact as a mitigating factor would run contrary to the principles underpinning Payne where the Supreme Court overruled in part Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989), to allow the admission of victim impact evidence as an aggravating factor. However, Payne reaffirmed Booth and Gathers to the extent they prohibit victim impact testimony that advocates for a sentence of death. 501 U.S. at 830 n.2. Applying these principles to mitigating evidence, a logical extension of Payne would allow family of the defendant to testify about his life and characteristics, but prohibit them from specifically advocating against the death penalty or its likely impact on their lives. See United States v. Taylor, 583 F. Supp. 2d 923, 944 (E.D. Tenn. 2008) (citing Payne, 501 U.S. at 827) ("The parallel between defendant and victim supports prohibiting witnesses from opining on their desired sentence, regardless of their preference."). That is exactly what occurred in this case.

Finally, the Court notes that the jury remained free to find the existence of "[a]ny other factor in the Defendant's background, record, or character or any other circumstance of the offense that mitigates against imposition of a death sentence." (Doc. Nos. 1048-51: Penalty Selection Verdict Forms at 6). Even if the defense counsel could not raise the notion of execution impact during summation argument, the jury was not necessarily prohibited from doing so on its own. No juror elected to make such a finding. (Id.). Thus, the defendant has not shown that the Court's ruling striking execution impact as a mitigating factor violated his right to due process or otherwise mandates a new trial.

27

**JA3695**

IV.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that the defendant's motion for new trial (Doc. No.

1103) is **DENIED**. The Clerk is directed to certify copies of this order to the defendant, counsel

for the defendant, and to the United States Attorney.

Signed: July 27, 2010

Robert J. Conrad, Jr.
Chief United States District Judge

28

**JA3696**

SAO 245B (WDNC- Rev. 4/09) Judgment in a Criminal Case

# United States District Court
## For The Western District of North Carolina

UNITED STATES OF AMERICA

V.

ALEJANDRO ENRIQUE RAMIREZ UMANA

**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: DNCW308CR000134-002

USM Number: 23077-058
John Bryson, Mark Foster, Jr.
Defendant's Attorneys

THE DEFENDANT:

__ Pleaded guilty to count(s) .

__ Pleaded nolo contendere to count(s) which was accepted by the court.

X was found guilty on count(s) <u>1sss, 22sss-25sss, 27sss,28sss, 61sss, 63sss</u> after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18:1962(d) | Conspiracy to commit racketeering | 7/27/09 | 1sss |
| 18:1959(a)(1) | Murder in aid of racketeering and aiding and abetting same | 12/8/2007 | 22sss & 24sss |
| 18:924(c); 924(j)(1) | Use and possession of firearm during and in relation to a crime of violence resulting in death | 12/8/07 | 23sss & 25sss |
| 18:922(g)(5) | Alien in possession of firearm | 12/8/07 | 27sss |
| 18:1951 | Hobbs Act robbery and aiding and abetting same (18:2) | 12/8/07 | 28sss |
| 18:371 | Conspiracy to tamper with witnesses and aiding and abetting same (18:2) | 6/12/08 | 61sss |
| 18:1512(b)(1) | Tampering with witnesses and aiding and abetting same. (18:2) | 6/12/08 | 63sss |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984, <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

X The Court entered judgment of acquittal on count <u>62sss</u>.

X Count(s)<u>1,1s,1ss,21,22,22s,22ss,23s,23ss,24s,24ss,25s,25ss,27s,27ss,28s,28ss,48,51,52,53,58s,58ss,58sss,61s,61ss,62s, 62ss,,63s,63ss</u> are dismissed on the motion of the United States.

**IT IS ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence: 7/27/10

Robert J. Conrad, Jr.
Chief United States District Judge

Date: _____ July 27, 2010 _____

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 343 of 350
Case 3:08-cv-00134-RJC Document 50-8 Filed 07/27/10 Page 1 of 6
JA3697

AO 245B (WDNC Rev. 4/09) Judgment in a Criminal Case.

Defendant: ALEJANDRO ENRIQUE RAMIREZ UMANA                          Judgment-Page 2 of 6
Case Number: DNCW308CR000134-002

## DEATH AND IMPRISONMENT

Pursuant to the Federal Death Penalty Act of 1994, Title 18 U.S.C. §§ 3193, et seq., the special findings of the jury, returned on April 20 and 28, 2010, and the jury's unanimous vote recommending that the defendant shall be sentenced to death, it is the judgment of the Court that the defendant Alejandro Enrique Ramirez Umana is sentenced to death on each of Counts 22sss, 23sss, 24sss, and 25sss: The sentences for Counts 22sss and 24sss are concurrent.  The sentences for Counts 23sss & 25sss are consecutive.

Pursuant to the provisions of 18 U.S.C. § 3196, the defendant is committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of sentence.

When the sentence is to be implemented, the Attorney General shall release the defendant to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by the law of North Carolina.

Further, the defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of Count 1sss: Life.  Count 27sss: One Hundred Twenty (120) months.  Counts 28sss & 63sss: Two Hundred Forty (240) months on each count.  Count 61sss: Sixty (60) months.  All such terms are to be served concurrently.

 X   The Court makes the following recommendations to the Bureau of Prisons:
        Support dependents from prison earnings.
        Participation in Inmate Financial Responsibility Program.

 X   The defendant is remanded to the custody of the United States Marshal.

__   The defendant shall surrender to the United States Marshal for this district:

     __   At _____ On ___ .
     __   As notified by the United States Marshal.

__   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     __   Before 2 pm on .
     __   As notified by the United States Marshal.
     __   As notified by the Probation or Pretrial Services Office.

### RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____


Defendant delivered on _____ To _____

At _____ , with a certified copy of this Judgment.


                                              United States Marshal

                                    By

                                              Deputy Marshal

Case 3:16-cv-00057-MOC  Document 50-8  Filed 03/23/17  Page 344 of 350
Case 3:08-cv-00134-RJC  Document 1268-8  Filed 07/27/10  Page 2 of 6
JA3698

AO 245B (WDNC Rev. 4/09) Judgment in a Criminal Case

Defendant: ALEJANDRO ENRIQUE RAMIREZ UMANA
Case Number: DNCW308CR000134-002

Judgment-Page 3 of 6

## SUPERVISED RELEASE

In the event the defendant is released from imprisonment, he shall be on supervised release for a term of <u>Counts 1sss, 22sss - 25sss: five (5) years each count. Counts 27sss, 28sss, 61sss & 63sss: three (3) years each count. All such counts are concurrent</u>.

___ The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

## STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.

1. The defendant shall not commit another federal, state, or local crime.
2. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.
3. The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release on a schedule to be established by the Court.
4. The defendant shall provide access to any personal or business financial information as requested by the probation officer.
5. The defendant shall not acquire any new lines of credit unless authorized to do so in advance by the probation officer.
6. The defendant shall not leave the Western District of North Carolina without the permission of the Court or probation officer.
7. The defendant shall report in person to the probation officer as directed by the Court or probation officer and shall submit a truthful and complete written report within the first five days of each month.
8. A defendant on supervised release shall report in person to the probation officer in the district to which he or she is released within 72 hours of release from custody of the Bureau of Prisons.
9. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
10. The defendant shall support his or her dependents and meet other family responsibilities.
11. The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other activities authorized by the probation officer.
12. The defendant shall notify the probation officer within 72 hours of any change in residence or employment.
13. The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as duly prescribed by a licensed physician.
14. The defendant shall participate in a program of testing and treatment or both for substance abuse if directed to do so by the probation officer, until such time as the defendant is released from the program by the probation officer; provided, however, that defendant shall submit to a drug test within 15 days of release on probation or supervised release and at least two periodic drug tests thereafter for use of any controlled substance, subject to the provisions of 18:3563(a)(5) or 18:3583(d), respectively.
15. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.
16. The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
17. The defendant shall submit his person, residence, office, vehicle and/or any computer system including computer data storage media, or any electronic device capable of storing, retrieving, and/or accessing data to which they have access or control, to a search, from time to time, conducted by any U.S. Probation Officer and such other law enforcement personnel as the probation officer may deem advisable, without a warrant. The defendant shall warn other residents or occupants that such premises or vehicle may be subject to searches pursuant to this condition.
18. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed by the probation officer.
19. The defendant shall notify the probation officer within 72 hours of defendant's being arrested or questioned by a law enforcement officer.
20. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
21. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.
22. If the instant offense was committed on or after 4/24/96, the defendant shall notify the probation officer of any material changes in defendant's economic circumstances which may affect the defendant's ability to pay any monetary penalty.
23. If home confinement (home detention, home incarceration or curfew) is included you may be required to pay all or part of the cost of the electronic monitoring or other location verification system program based upon your ability to pay as determined by the probation officer.
24. The defendant shall cooperate in the collection of DNA as directed by the probation officer.
25. The defendant shall participate in transitional support services under the guidance and supervision of the U.S. Probation Officer. The defendant shall remain in the services until satisfactorily discharged by the service provider and/or with the approval of the U.S. Probation Officer.

## ADDITIONAL CONDITIONS:

25. The defendant shall surrender to a duly authorized Immigration official for deportation.
26. If ordered deported the defendant shall remain outside the U.S.

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 345 of 350
Case 3:08-cv-00134-RJC Document 50-8 Filed 03/23/17 Page 345 of 350
JA3699

AO 245B (WDNC Rev. 4/09) Judgment in a Criminal Case

Defendant: ALEJANDRO ENRIQUE RAMIREZ UMANA                    Judgment-Page 4 of 6
Case Number: DNCW308CR000134-002

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | FINE | RESTITUTION |
|---|---|---|
| $900.00 | $0.00 | $0.00 |

### FINE

        The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

__X__        The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

__X__        The interest requirement is waived.

_____        The interest requirement is modified as follows:

### COURT APPOINTED COUNSEL FEES

__X__        The defendant shall pay court appointed counsel fees.

_____        The defendant shall pay $_____ Towards court appointed fees.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 346 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 07/27/10   Page 4 of 6
JA3700

AO 245B (WDNC Rev. 4/09) Judgment in a Criminal Case

Defendant: ALEJANDRO ENRIQUE RAMIREZ UMANA                           Judgment-Page 5 of 6
Case Number: DNCW308CR000134-002

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A    __    Lump sum payment of $ _____ Due immediately, balance due

     __    Not later than _____ , or
     __    In accordance    __ (C),    __ (D) below; or

B    X    Payment to begin immediately (may be combined with   __ (C),   __ (D) below); or

C    __    Payment in equal _____ (E.g. weekly, monthly, quarterly) installments of $ _____ To commence _____
       (E.g. 30 or 60 days) after the date of this judgment; or

D    __    Payment in equal _____ (E.g. weekly, monthly, quarterly) installments of $ _____ To commence _____
       (E.g. 30 or 60 days) after release from imprisonment to a term of supervision.   In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. Probation Officer shall pursue collection of the amount due, and may request the court to establish or modify a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

__    The defendant shall pay the cost of prosecution.
__    The defendant shall pay the following court costs:
X    The defendant shall forfeit the defendant's interest in the following property to the United States:
      Property identified in the Preliminary Order of Forfeiture entered in this case 7/26/10

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment.  All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 210, Charlotte, NC 28202, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.  All criminal monetary penalty payments are to be made as directed by the court.

The Defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 347 of 350
Case 3:08-cv-00134-RJC   Document 50-8   Filed 07/27/10   Page 5 of 6
JA3701

AO 245B (WDNC Rev. 4/09) Judgment in a Criminal Case

Defendant: ALEJANDRO ENRIQUE RAMIREZ UMANA                                    Judgment-Page 6 of 6
Case Number: DNCW308CR000134-002

## STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____ .

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or ammunition, and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)    _____    Date: _____
                Defendant

(Signed)    _____    Date: _____
                U.S. Probation Office/Designated Witness

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 348 of 350
Case 3:08-cr-00134-RJC   Document 508   Filed 03/21/10   Page 6 of 6
JA3702

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:08CR134-2-RJC** |
| | ) | |
| v. | ) | NOTICE OF APPEAL |
| | ) | |
| ALEJANDRO UMANA | ) | |
| | ) | |

NOW COMES Defendant ALEJANDRO UMANA, by and through undersigned counsel, and hereby gives notice that he appeals the judgment of his conviction and sentence entered July 27, 2010 in this case to the United States Court of Appeals for the Fourth Circuit.

August 9, 2010                                    Respectfully submitted,

                                                s/  Mark P. Foster, Jr.
                                                NC State Bar #22717
                                                Attorney for Defendant
                                                Law Offices of Mark Foster, P.C.
                                                1011 E. Morehead Street, Suite 300
                                                Charlotte, NC 28204
                                                704-347-1809
                                                Fax 704-332-2716
                                                E-mail:  mpfosterjr@bellsouth.net

                                                s/ John Bryson
                                                Attorney for Defendant
                                                Wyatt Early Harris Wheeler, LLP
                                                1912 Eastchester Drive, Suite 400
                                                High Point, NC 27261
                                                336-819-6016
                                                Fax 336-819-6076
                                                jbryson@wehwlaw.com

Case 3:16-cv-00057-MOC   Document 50-8   Filed 03/23/17   Page 349 of 350
Case 3:08-cr-00134-RJC   Document 90-8   Filed 08/09/10   Page 1 of 2
JA3703

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above **NOTICE OF APPEAL** has been duly served on the attorney listed below by e-mail service through ECF on this date as follows:

Jill Rose
Jill.Rose@usdoj.gov

Sam Nazzaro
Sam.Nazzaro@usdoj.gov

Adam Morris
Adam.Morris@usdoj.gov

August 9, 2010                    s/ Mark P. Foster, Jr.
                                  NC State Bar #22717
                                  Law Offices of Mark Foster, P.C.
                                  1011 E. Morehead Street, Suite 300
                                  Charlotte, NC 28204
                                  Ph 704-347-1809
                                  Fax 704-332-2716
                                  E-mail: mpfosterjr@bellsouth.net

Case 3:16-cv-00057-MOC Document 50-8 Filed 03/23/17 Page 350 of 350
Case 3:08-cv-00154-RJC Document 50-8-1 Filed 08/09/10 Page 2 of 2

**JA3704**