Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 1 of 524

No.  10-6

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellee, | ) |
| v. | ) |
| ALEJANDRO ENRIQUE RAMIREZ UMANA, | ) |
| Defendant-Appellant. | ) |

Appeal from the United States District Court
for the Western District of North Carolina

**Joint Appendix**
**Volume 9 of 11**

VINCENT J. BRUNKOW
ZANDRA L. LOPEZ
JANET C. TUNG
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California  92101-5030
Telephone:  (619) 234-8467
Attorneys for Defendant-Appellant

-and-

MALCOLM RAY HUNTER, JR.
Attorney at Law
P.O. Box 3018
Chapel Hill, N.C. 27515-3018
Telephone:  (919) 929-9655

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 1 of 524

# TABLE OF CONTENTS

## VOLUME 1 (1-482)

District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CJA 20 Appointment of Counsel
(July 10, 2008, DE 140) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

Notice of Intention to Seek the Death Penalty
(September 23, 2008, DE 275) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

Motion to Change Venue, Motion to Dismiss for Improper Venue by
Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 480) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Motion to Strike Notice of Nonstatutory Aggravating Factor, Motion
to Exclude Evidence of Unadjudicated Criminal Acts by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 483) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Motion to Suppress Defendant's April 23, 2008 Statement by Alejandro Enrique
Ramirez Umana
(April 24, 2009, DE 490) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Memorandum in Support by Alejandro Enrique Ramirez Umana
(April 24, 2009, DE 491) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Government's Consolidated Response to the Motions of the Defendant Filed
April 24, 2009
(May 8, 2009, DE 503) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

Memorandum and Recommendation and Order
(May 20, 2009, DE 527) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

i

Objection to Memorandum and Recommendation by
Alejandro Enrique Ramirez Umana
(June 4, 2009, DE 543) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

Defendant's First Motion to Continue Trial
(June 11, 2009, DE 549) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 307

Third Superceding Indictment
(July 27, 2009, DE 623) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318

Ex Parte Attachment Supporting Defendant's Motion to Continue or
Alternatively to Strike Death Penalty
(August 19, 2009, DE 662) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 424

Excerpt (pp. 46-73, 78-82, 89-103), Transcript of Motion Hearing
(August 26, 2009, DE 684) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 434

## VOLUME II (483-985)

Defendant's Renewed Motion to Continue Trial or to Alternatively Strike the
Death Penalty
(September 22, 2009, DE 689) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 483

Motion for Pretrial Hearing on Mental Retardation in the Event Trial is
Continued
(September 22, 2009, DE 690) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 512

Excerpt (pp. 12-13), Transcript of Status Conference, Continuance of Trial
(September 28, 2009, DE 1254) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 516

Transcript of Mental Retardation Hearing
(November 30, 2010, DE 932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 519

Excerpt (pp. 27-59), Transcript of Opening Statements of Co-Defendants
(January 12, 2010, DE 1466) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 952

## VOLUME 3 (986-1474)

Verdict Form for Co-Defendant Elvin Pastor Fernandez-Gradis
(January 26, 2010, DE 843) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 986

Order Denying Motion to Dismiss Re: Venue
(March 18, 2010, DE 933) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 988

Order Denying *Atkins* Relief
(March 19, 2010, DE 934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 998

Excerpt (pp. 17-30, 40-46), Transcript of Jury Selection (Re: Juror 119)
(March 22, 2010, DE 1353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

Excerpt (pp. 399-416), Transcript of Jury Selection (Re: Juror 119)
(March 23, 2010, DE 1354) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1040

Excerpt (pp. 1114-1158, 1194-1217), Transcript of Jury Selection
(Re: Juror 286)
(March 25, 2010, DE 1356) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1059

Excerpt (pp. 1502-1533) , Transcript of Jury Selection (Re: Peremptory
Challenges and Seating of Jury)
(March 29, 2010, DE 1358) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1099

Defendant's Supplemental Motion Re: Reliability of Unadjudicated Murders
(March 31, 2010, DE 960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1132

United States's Response Regarding the Applicability of
*Crawford v. Washington* at Sentencing Hearing
(April 5, 2010, DE 967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1138

Motion to Strike the Non-Statutory Aggravating Factor of Future
Dangerousness From the Notice of Intent to Seek the Death Penalty
(April 6, 2010, DE 968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1169

Defendant's Reply to Government's Response to Defendant's Motion for Court to Determine the Admissibility and Reliability of Evidence Before Allowing Evidence to be Presented to Jury in Sentencing Phase
(April 10, 2010, DE 985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1183

Transcript of Jury Trial - Opening Statements
(April 12, 2010, morning session, DE 1339) . . . . . . . . . . . . . . . . . . . . . . . 1202

    Jury Empaneled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

    Court's Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1205

        By the Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1212
        By the Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1218

Government's Case in Chief

Transcript of Jury Trial
(April 12, 2010, afternoon session, DE 1340) . . . . . . . . . . . . . . . . . . . . . . 1222

    Dan Horne                    Direct Examination . . . . . . . . . . 1226

    Jeffrey T. Courtet         Direct Examination . . . . . . . . . . 1232

    George Marshall Barnette   Direct Examination . . . . . . . . . . 1235

    Andrew Wrenn           Direct Examination . . . . . . . . . 1239

    J.E. Brown                Direct Examination . . . . . . . . . 1243

    Frank Flores            Direct Examination . . . . . . . . . 1247
                              Voir Dire Examination . . . . . . . 1255
                              Redirect Examination . . . . . . . . 1257
                              Cross Examination . . . . . . . . . . 1316

    Charles Barkley         Direct Examination . . . . . . . . . . 1332
                              Cross Examination . . . . . . . . . . 1338

iv

Jeff Bruner                    Direct Examination . . . . . . . . . . 1339

Eduardo Vasquez               Direct Examination . . . . . . . . . . 1344

Lenny Moriera                 Direct Examination . . . . . . . . . . 1352
                              Cross Examination  . . . . . . . . . . 1369

John Sloane                   Direct Examination . . . . . . . . . . 1371
                              Cross Examination  . . . . . . . . . . 1391

Gene Richey                   Direct Examination . . . . . . . . . . 1391

Juan Ruben Vela Garcia        Direct Examination . . . . . . . . . . 1407

## VOLUME 4 (1475 - 1899)

United States Sur-Reply Regarding Reliability
(April 13, 2010, DE 988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1475

Transcript of Jury Trial
(April 13, 2010, morning session, DE 1341)  . . . . . . . . . . . . . . . . . . . . . . . . 1485

Juan Ruben Vela Garcia        Direct Examination . . . . . . . . . . 1492
                              Cross Examination  . . . . . . . . . 1498
                              Redirect Examination  . . . . . . . . 1529

Officer James K. Griffen      Direct Examination . . . . . . . . . . 1530

Ann Hamlin                    Direct Examination . . . . . . . . . . 1537

T.J. Miller                   Direct Examination . . . . . . . . . . 1544
                              Cross Examination  . . . . . . . . . . 1566

Marie Terrell                 Direct Examination . . . . . . . . . . 1570
                              Cross Examination  . . . . . . . . . . 1576

v

Officer Benjamin Altizer　　　Direct Examination . . . . . . . . . . 1576
　　　　　　　　　　　　　　Cross Examination . . . . . . . . . . 1584

Officer Ryan Dutko　　　　　Direct Examination . . . . . . . . . . 1586

Abel Santos　　　　　　　　Direct Examination . . . . . . . . . . 1604

Transcript of Jury Trial
(April 13, 2010, afternoon session, DE 1256) . . . . . . . . . . . . . . . . . . . . . . . . . 1641

Abel Santos　　　　　　　　Cross Examination . . . . . . . . . . 1644

Marco Antonio Guzman Mejia Direct Examination . . . . . . . . . . 1651
　　　　　　　　　　　　　　Cross Examination . . . . . . . . . . 1663

Teresa Ketner　　　　　　　Direct Examination . . . . . . . . . . 1666
　　　　　　　　　　　　　　Cross Examination . . . . . . . . . . 1703
　　　　　　　　　　　　　　Redirect Examination . . . . . . . . 1705

Barry Whitlow　　　　　　　Direct Examination . . . . . . . . . . 1707

John D. Butts　　　　　　　Direct Examination . . . . . . . . . . 1715
　　　　　　　　　　　　　　Cross Examination . . . . . . . . . . 1733

James Cayton　　　　　　　Direct Examination . . . . . . . . . . 1735

Amy Wilde　　　　　　　　Direct Examination . . . . . . . . . . 1739

Transcript of Jury Trial
(April 14, 2010, morning session, DE 1342) . . . . . . . . . . . . . . . . . . . . . . . . . 1762

Amy Wilde　　　　　　　　Direct Examination . . . . . . . . . . 1765
　　　　　　　　　　　　　　Cross Examination . . . . . . . . . . 1773

Doreen Huntington　　　　　Direct Examination . . . . . . . . . . 1780
　　　　　　　　　　　　　　Cross Examination . . . . . . . . . . 1797

Case 3:16-cv-00057-MOC　　Document 50-9　　Filed 03/23/17　　Page 7 of 524

Susan Conrad            Direct Examination . . . . . . . . . . 1804
                                   Cross Examination  . . . . . . . . . . 1840

Jeff Strohm             Direct Examination . . . . . . . . . . 1846
                                   Cross Examination  . . . . . . . . . . 1851

Officer Renee Quiles      Direct Examination . . . . . . . . . 1851
                                   Cross Examination  . . . . . . . . . . 1856

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . 1856

## VOLUME 5 (1900 - 2390)

Transcript of Jury Trial
(April 14, 2010, afternoon session, DE 1256)  . . . . . . . . . . . . . . . . . . . . . . . . . . 1900

Rony Antonio Magana Lopez   Direct Examination . . . . . . . . . . 1903
                                   Cross Examination  . . . . . . . . . . 1953
                                   Redirect Examination  . . . . . . . . 1987
                                   Recross Examination . . . . . . . . . 1988

William Chuck Hastings     Direct Examination . . . . . . . . . . 1989

Transcript of Jury Trial
(April 15, 2010, morning session, DE 1343)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2031

William Chuck Hastings     Direct Examination . . . . . . . . . . 2034
                                   Cross Examination  . . . . . . . . . . 2044

Alexandra Hirsch         Direct Examination . . . . . . . . . . 2049
                                   Cross Examination  . . . . . . . . . . 2054

Michele Scheuerman      Direct Examination . . . . . . . . . . 2055
                                   Cross Examination  . . . . . . . . . . 2064

Gene Rivera             Direct Examination . . . . . . . . . . 2065
                                   Cross Examination  . . . . . . . . . . 2086

Andrew Cheramie         Direct Examination . . . . . . . . . . 2090
                        Cross Examination  . . . . . . . . . 2095

Jose Romero             Direct Examination . . . . . . . . . . 2095

Alexander Granados      Direct Examination . . . . . . . . . . 2102

Transcript of Jury Trial
(April 15, 2010, afternoon session, DE 1257)  . . . . . . . . . . . . . . . . . . . . . . . . . . 2133

Alexander Granados      Direct Examination . . . . . . . . . . 2136
                        Cross Examination  . . . . . . . . . 2138
                        Redirect Examination  . . . . . . . . 2158

Maricruz Medina         Direct Examination . . . . . . . . . . 2159

Jasmine Dinwiddie       Direct Examination . . . . . . . . . . 2166

Chris Tyndall           Direct Examination . . . . . . . . . . 2173
                        Cross Examination  . . . . . . . . . 2190

Mark Young              Direct Examination . . . . . . . . . . 2191

Sergeant Scott Clarkson Direct Examination . . . . . . . . . . 2208
                        Cross Examination  . . . . . . . . . 2213
                        Redirect Examination  . . . . . . . . 2213
                        Recross Examination . . . . . . . . . 2215

Jeffrey Taylor          Direct Examination . . . . . . . . . . 2216
                        Cross Examination  . . . . . . . . . 2247
                        Redirect Examination  . . . . . . . . 2254

Denise Daniels          Direct Examination . . . . . . . . . . 2255
                        Cross Examination  . . . . . . . . . 2257

viii

William Chuck Hastings     Direct Examination . . . . . . . . . . 2259
                           Cross Examination  . . . . . . . . . . 2261

Transcript of Jury Trial - Government Witnesses
(April 16, 2010, morning session, DE 1344) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2278

Sergeant Scott Clarkson    Direct Examination . . . . . . . . . . 2323
                           Cross Examination  . . . . . . . . . . 2330

Denise Daniels             Direct Examination . . . . . . . . . 2332
                           Cross Examination  . . . . . . . . . . 2333

Jeffrey Taylor             Direct Examination . . . . . . . . . . 2333
                           Cross Examination  . . . . . . . . . . 2356
                           Redirect Examination  . . . . . . . . 2359

William Chuck Hastings     Direct Examination . . . . . . . . . 2361

## VOLUME 6 (2391 - 2856)

Transcript of Jury Trial
(April 16, 2010, afternoon session, DE 1258) . . . . . . . . . . . . . . . . . . . . . . . . 2391

Closing Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392

By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2392
By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2420
Rebuttal by the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2444

Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2450

United States Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionality
(April 19, 2010, DE 996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2505

Order on Defendant's Objection to the Admission of Exhibits
(April 19, 2010, DE 998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2510

Order Denying Motion to Strike
(April 19, 2010, DE 1000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2517

Transcript of Trial
(April 19, 2010, morning session, DE 1345) . . . . . . . . . . . . . . . . . . . . . . . . . 2540

      Jury Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
      Jury Question #1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2542
      Jury Question #2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2544
      Jury Question #3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2547
      Jury Question #4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

      Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2550

Verdict Form
(April 19, 2010, DE 1043) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2556

Transcript of Sentencing Phase
(April 19, 2010, afternoon session, DE 1346) . . . . . . . . . . . . . . . . . . . . . . . . . 2559

      Motion to Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2561

      Court's Opening Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2568

      Opening Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571

          By the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2571
          By the defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2573

      Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2574

          Ismar Sanchez                  Direct Examination . . . . . . . . . . 2574
                                     Cross Examination . . . . . . . . . . 2584
                                     Redirect Examination . . . . . . . . 2590

          David Henderson           Direct Examination . . . . . . . . . . 2590

x

Carlton Phoenix                     Direct Examination . . . . . . . . . . 2596

Excerpt (pp. 71-87), Transcript of Eligibility Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2610

Special Verdict Form Death Penalty Eligibility Count Twenty-Two
(April 20, 2010, DE 1044) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2628

Special Verdict Form Death Penalty Eligibility Count Twenty-Three
(April 20, 2010, DE 1045) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2633

Special Verdict Form Death Penalty Eligibility Count Twenty-Four
(April 20, 2010, DE 1046) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2638

Special Verdict Form Death Penalty Eligibility Count Twenty-Five
(April 20, 2010, DE 1047) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2643

Excerpt (pp. 88-164) - Transcript of Sentencing Phase
(April 20, 2010, morning session, DE 1347) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2648

Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2651

Thomas Small                     Direct Examination . . . . . . . . . . 2651
                                 Cross Examination . . . . . . . . . . 2677

Roberto Ramos                    Direct Examination . . . . . . . . . . 2680
                                 Cross Examination . . . . . . . . . . 2694

Juan Lara                        Direct Examination . . . . . . . . . . 2699
                                 Cross Examination . . . . . . . . . . 2706

Raffi Djabourian                 Direct Examination . . . . . . . . . . 2709
                                 Cross Examination . . . . . . . . . . 2715

John Maloney                     Direct Examination . . . . . . . . . . 2716
                                 Cross Examination . . . . . . . . . . 2724

Transcript - Sentencing Phase
(April 20, 2010, afternoon session, DE 1259) . . . . . . . . . . . . . . . . . . . . . . . . . 2727

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2730

        Gene Parshall              Direct Examination . . . . . . . . . . 2730
                                        Cross Examination . . . . . . . . . 2756
                                        Redirect Examination . . . . . . . . 2781

        Barry Telis                 Direct Examination . . . . . . . . . . 2784
                                        Cross Examination . . . . . . . . . . 2798
                                        Redirect Examination . . . . . . . . 2803

        William Moore            Direct Examination . . . . . . . . . . 2806
                                        Cross Examination . . . . . . . . . . 2820
                                        Redirect Examination . . . . . . . . 2822

        Susan Selser              Direct Examination . . . . . . . . . . 2822

        J. Sage                   Direct Examination . . . . . . . . . . 2838
                                        Cross Examination . . . . . . . . . . 2842

        L. Goodman            Direct Examination . . . . . . . . . . 2843
                                        Cross Examination . . . . . . . . . . 2844

        A. Thornwell           Direct Examination . . . . . . . . . . 2846
                                        Cross Examination . . . . . . . . . . 2851

## VOLUME 7 (2857 - 3373)

Transcript - Sentencing Phase
(April 21, 2010, DE 1348) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2857

    Government Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2874

Case 3:16-cv-00057-MOC   Document 50-9   Filed 03/23/17   Page 13 of 524

Carlos Alfredos
Dominguez Gonzalez          Direct Examination . . . . . . . . . . 2874
                           Cross Examination  . . . . . . . . . . 2881

Sharod Culpepper           Direct Examination . . . . . . . . . 2902
                           Cross Examination  . . . . . . . . . . 2908

Luis Amaro                 Direct Examination . . . . . . . . . . 2911
                           Cross Examination  . . . . . . . . . . 2917

Russell Lashley            Direct Examination . . . . . . . . . . 2919
                           Cross Examination  . . . . . . . . . . 2928

Rony Antonio Magana Lopez  Direct Examination . . . . . . . . . . 2930
                           Cross Examination  . . . . . . . . . . 2931
                           Redirect Examination  . . . . . . . . 2935
                           Recross Examination . . . . . . . . 2936

Douglas Friend             Direct Examination . . . . . . . . . . 2938
                           Cross Examination  . . . . . . . . . . 2944

Jean Garcia                Direct Examination . . . . . . . . . . 2946
                           Cross Examination  . . . . . . . . . . 2952

Carmen Garcia              Direct Examination . . . . . . . . . . 2953
                           Cross Examination  . . . . . . . . . . 2958

Elizabeth Garcia           Direct Examination . . . . . . . . . . 2959
                           Cross Examination  . . . . . . . . . . 2965

United State's Motion *In Limine* Regarding Defense Case In-Chief and Argument
(April 25, 2010, DE 1018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2969

Transcript - Sentencing Phase
(April 26, 2010, morning session, DE 1349)  . . . . . . . . . . . . . . . . . . . . . . . . . 2975

    Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2986

xiii

Mark Cunningham              Direct Examination . . . . . . . . . . 2986
                            Cross Examination  . . . . . . . . . . 3050

Richard McGough             Direct Examination . . . . . . . . . . 3080

Transcript - Sentencing Phase
(April 26, 2010, afternoon session, DE 1260)  . . . . . . . . . . . . . . . . . . . . . . . 3096

   Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3099

Richard McGough             Direct Examination . . . . . . . . . . 3099
                            Cross Examination  . . . . . . . . . . 3157

Selena Sermeno              Direct Examination . . . . . . . . . . 3167
                            Cross Examination  . . . . . . . . . . 3189
                            Redirect Examination  . . . . . . . . 3203

Maria Santacruz Geralt      Direct Examination . . . . . . . . . . 3204

Order Granting in Part and Denying in Part Motion to Determine the
Admissibility and Reliability of Evidence of Unadjudicated Acts as to
Alejandro Enrique Ramirez Umana
(April 26, 2010, DE 1021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3222

Transcript - Sentencing Phase
(April 27, 2010, morning session, DE 1350)  . . . . . . . . . . . . . . . . . . . . . . . 3234

   Defendant's Witnesses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3237

Maria Santacruz Geralt      Voir Dire Exam. by Defendant   . . . 3237
                            Voir Dire Exam. by Government . . 3250
                            Direct Examination . . . . . . . . . . . . 3256
                            Cross Examination . . . . . . . . . . . . 3263

Mark Bezy                   Direct Examination . . . . . . . . . . . . 3276
                            Cross Examination . . . . . . . . . . . . 3289

James R. Merikangas,
Ph.D.                      Direct Examination . . . . . . . . . . . . 3294
                          Cross Examination  . . . . . . . . . . . . 3317

Government's Rebuttal Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3336

Helen Mayberg             Direct Examination . . . . . . . . . . . . 3336
                          Cross Examination  . . . . . . . . . . . . 3358

**VOLUME 8 ( 3374 - 3704)**

Transcript - Sentencing Phase
(April 27, 2010, afternoon session, DE 1261)  . . . . . . . . . . . . . . . . . . . . . . . . 3374

Defendant's Witness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3500

Richard McGough           Voir Dire Exam. by Defendant  . . . 3500

Defendant's Request for Instruction on Mitigating Factors
(April 27, 2010, DE 1024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3506

Transcript - Sentencing Phase
(April 28, 2010, DE 1351) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3509

Order Granting Motion *In Limine* to Preclude Information and Argument
Regarding ''Equally Culpable'' Defendants and Proportionately as to Alejandro
Enrique Ramirez Umana
(April 28, 2010, DE 1025) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3535

Special Verdict Form Penalty Selection Count Twenty-Two
(April 28, 2010, DE 1048) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3543

Special Verdict Form Penalty Selection Count Twenty-Three
(April 28, 2010, DE 1049) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3552

Special Verdict Form Penalty Selection Count Twenty-Four
(April 28, 2010, DE 1050) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3561

Special Verdict Form Penalty Selection Count Twenty-Five
(April 28, 2010, DE 1051) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3570

Defendant's Motion for New Trial on Guilt and Sentencing Phases
(June 14, 2010, DE 1103) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3579

United States's Response to Defendant's Motion for a New Trial
(July 9, 2010, DE 1147) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3630

Order Denying Motion for New Trial as to Alejandro Enrique Ramirez Umana
(July 27, 2010, DE 1165) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3669

Judgment in a Criminal Case
(July 27, 2010, DE 1168) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3697

Notice of Appeal
(August 9, 2010, DE 1171) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3703

## VOLUME 9 (3705 - 4209)

## EXHIBITS

August 26, 2009 Suppression Hearing Ex. . . . . . . . . . . . . . . . . . . . . . . . . . . 3705

*Atkins* Hearing Def. Ex. 1, Curriculum Vitae for John Gregory Olley . . . . . . . 3888

*Atkins* Hearing Def. Ex. 2, Psychological Evaluation of Alejandro Enrique
Ramirez Umana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3902

*Atkins* Hearing Def. Ex. 3, School Records . . . . . . . . . . . . . . . . . . . . . . . . . 3912

*Atkins* Hearing Def. Ex. 4, Photographs of Mr. Umana's Primary School . . . . 3917

*Atkins* Hearing Def. Ex. 5, Photograph of School Courtyard . . . . . . . . . . . . . 3918

*Atkins* Hearing Def. Ex. 6, Photograph of School Director . . . . . . . . . . . . . . 3919

*Atkins* Hearing Def. Ex. 7, Photograph of Rafael Umana . . . . . . . . . . . . . . . . 3920

*Atkins* Hearing Def. Ex. 8, Photograph of Mr. Umana's Home  . . . . . . . . . . . . 3921

*Atkins* Hearing Def. Ex. 9, Photograph of Miguel Eduardo Castaneda,
Mr. Umana's Former Employer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3922

*Atkins* Hearing Def. Ex. 10, Photograph of Carlos Yovani Herrera and Karla
Herrera . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3923

*Atkins* Hearing Def. Ex. 11, Photograph of Monica Reyes and Rafael  . . . . . . 3924

*Atkins* Hearing Def. Ex. 12, Letter from Interpreter Freida de Garcia  . . . . . . . 3925

*Atkins* Hearing Def. Ex. 13, Curriculum Vitae for Ricardo Weinstein, Ph.D.  . 3926

*Atkins* Hearing Def. Ex. 14, Letter from Ricardo Weinstein, Ph.D. . . . . . . . . . 3931

*Atkins* Hearing Def. Ex. 15, Curriculum Vitae for
James R. Merikangas, M.D.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3960

*Atkins* Hearing Def. Ex. 16, Radiologist Report for Mr. Umana  . . . . . . . . . . . 3988

*Atkins* Hearing Def. Ex. 17, Neuropsychiatric Evaluation of Mr. Umana  . . . . 3990

*Atkins* Hearing Def. Demonstrative Exhibit, PowerPoint Demonstration
by John Gregory Olley  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3992

*Atkins* Hearing Gov't Ex. 1, Slides by Dr. Suarez  . . . . . . . . . . . . . . . . . . . . . . 4017

*Atkins* Hearing Gov't Ex. 2, Curriculum Vitae of Enrique M. Suarez  . . . . . . . 4023

*Atkins* Hearing Gov't Ex. 3, Psychological Evaluation for Mental
Retardation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4030

Govt Trial Exhibit 506, 4-15-08 Gonzalez Pre-Trial Identification . . . . . . . . . 4055

Gov't Trial Ex. 507, 12-28-05 Gonzalez Pre-Trial Identification . . . . . . . . . . 4058

Gov't Trial Ex. 518, Transcript of Arevalo Interrogation . . . . . . . . . . . . . . . . 4061

**VOLUME 10 (4210 - 4500)**

Gov't Trial Ex. 520, Transcript of Rivera Interrogation . . . . . . . . . . . . . . . . . 4210

Gov't Trial Ex. 522, Transcript of Umana Interrogation . . . . . . . . . . . . . . . . 4258

Defense Trial Ex. 3, Drawing Fairfax Shooting . . . . . . . . . . . . . . . . . . . . . . . 4492

Defense Trial Ex. 28, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4493

Defense Trial Ex. 29, Birth Certificate of Rafael Enrique . . . . . . . . . . . . . . . 4495

Defense Trial Ex. 30, Birth Certificate of Denis Umana . . . . . . . . . . . . . . . . 4497

Defense Trial Ex. 31, Photograph of Monica Reyes and
son Rafael Enrique . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4498

Defense Trial Ex. 32, Birth Certificate of Mr. Umana . . . . . . . . . . . . . . . . . . 4499

**VOLUME 11 (4501 - 4537)**

**SEALED VOLUME**

Sealed documents, reproduced separately and filed Under Seal

Presentence Investigation Report for Alejandro Enrique Ramirez Umana
(June 8, 2010, DE 1088) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4501

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION



400 South Tryon Street, Suite 900
Charlotte, North Carolina 28285

| | |
|---|---|
| File Numbers: | 245D-CE-92434 |
| Task Number#: | 3249 |
| Date of recording: | 04/23/2008 |
| Time of recording: | Unknown |
| CD#: | MS-13 |
| Languages: | English/Spanish |
| Linguist: | LA Carmen C. Galvez |

**VERBTATIM TRANSLATION**

**Participants:**

| | | |
|---|---|---|
| Alejandro Umaña Ramirez, aka Wizard | = | AU |
| Los Angeles Policeman 1 | = | LA 1 |
| Ruben Flores, aka Los Angeles Policeman 2 | = | LA 2 |
| Unknown Male | = | UM |

JA3705

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

**Abbreviations**

| *Italics* | *English* |
|---|---|
| IA | Inaudible |
| UI | Unintelligible |
| PH | Phonetic |
| [ ] | Noise notations or Translator's Notes |
| OV | Overlapping Voices |
| [RC] | Recorded Message |

|  | [Noises] |
|---|---|
| LA 1: | *You got a separate room?* |
| UM: | *Yeah. In the back.* |
|  | [UI section][noises] [pause] |
|  | *Go inside.* |
|  | *Thank you.* |
|  | *Uh-mm.* |
|  | *What time is it there?* |
| LA 1: | *How are you?* |
| LA 2: | How are you? |
| AU: | Fine. |
| LA 2: | Yeah? |
| LA 1: | You speak only Spanish? *Okay.* |
| LA 2: | [UI] cut your hair here or what? |
| AU: | Huh? |
| LA 2: | Do they cut your hair here or what? |
| AU: | Yes, but I don't like to get it cut. |

2

**JA3706**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:      No?

AU:        [UI]. . .

LA 2:      [UI] Griz-Grizzly Adams. Do you know Grizzly Adams?

AU:        Huh?

LA 2:      Grizzly Adams?

AU:        No, no [UI]

LA 2:      Okay, they cut [UI].

AU:        [UI]

           [UI section]

LA 2:      [UI] natural, right?

AU:        Really bad, but a lot, a lot. . . I feel like they pulled [UI].

LA 2:      Yes, yes.

AU:        [UI]

LA 2:      [UI] a little.

AU:        Uh-huh.  In reference to the case here?

LA 2:      Not the case here. It's a different one.

LA 1:      *[UI] this door.*

LA 2:      *[UI] door right here.*

LA 1:      *To get some privacy.*

           [UI section]

LA 1:      *How's it going?*  Alejandro.

LA 2:      Eh, did you already have lunch?

AU:        Huh?

LA 2:      Did you already have lunch?  No, not yet?

3

JA3707

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| AU: | No. |
| LA 2: | Okay.  You know what today is? Do you know what today's date is? April 23. |
| AU: | Okay. |
| LA 2: | Not lunch.  It's already 11:30, no, no. . . |
| AU: | Right now [UI] just passed by. . . |
| LA 2: | What were they going to pass out for lunch? |
| AU: | Huh? |
| LA 2: | What were they going to pass out for lunch today? |
| AU: | I don't know. |
| LA 2: | *Okay.* |
| AU: | The same.  All week. |
| LA 2: | *Okay.* |
| LA 1: | *What's the red for?* |
| LA 2: | Why do they have you in red? |
| AU: | Huh? |
| LA 2: | Why do they have you dressed in red? |
| AU: | Only God knows the, the reason. |
| LA 2: | Uh-huh, *okay.* What, what *colors* of uniforms do they here for all the people? |
| AU: | Uh, blue. |
| LA 2: | Blue. |
| AU: | Orange and, and, and red. |
| LA 2: | *He says he doesn't know why, but they--they [UI] either blue, orange, or red uniforms.  He doesn't know why.* |

4

**JA3708**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 1: | *Oh, he doesn't know why.  Do they keep. . .* |
| LA 2: | [OV][UI]. . . |
| LA 1: | *. . .south siders separate?* |
| LA 2: | Do you have you [plural]here. . . se-separate or what? |
| AU: | Yes. |
| LA 2: | *Okay.* |
| AU: | [UI] since I came, I've been like this, punished. . . but already four months here. |
| LA 2: | *Okay.* |
| AU: | And it's possible. |
| LA 2: | Do you have [UI] or. . .? |
| AU: | Ah, no. Normal people. |
| LA 2: | *Okay.* [UI] |
| AU: | Huh? |
| LA 2: | [UI] or regular [UI]? |
| AU: | [UI] separate cells.  I have been alone in the cell. [UI section] And it's always been like that. |
| LA 2: | *Okay.  Uh, he doesn't who [UI] David Carshell [PH], uh, David Small.  I'm Ruben Flores. I don't know if you remember me.* |
| AU: | No. |
| LA 2: | We're people from Los Angeles. |
| AU: | From Los Angeles? |
| LA 2: | Los Angeles. |
| AU: | No. |
| LA 2: | *Okay.  Has it been a long time that you arrived with, uh, Chipie. . .* |

5

**JA3709**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:             Uh-huh.

LA 2:           . . .from El Salvador.  Remember?  It happened there in Hollywood.

AU:             Uh-huh.

LA 2:           They arrested you.

AU:             Uh-huh.

LA 2:           You remember the first time that. . .that [UI] the police. . .

AU:             What is your name?

LA 2:           Flores.

AU:             Flores.

LA 2:           You spent some time over there [UI]. You met up with us.

AU:             Uh-mm. [UI].

LA 1:           Show me [sic] the photos?

LA 2:           Remember the photos that we took some time ago?

AU:             [UI]

LA 2:           [UI]

AU:             [UI]

LA 1:           *He remembers you taking photos of him?*

LA 2:           Don't you remember?

AU:             More or less.

                [UI section]

AU:             I had about four days.

LA 1:           It's very different here in the, the photos.

AU:             Ah! [UI] perhaps four days.

LA 2:           [UI] with all the beard and everything [UI].

6

**JA3710**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


LA 1:        *[UI] April 23rd.  I'm gonna use our time, right?  I'm using our time.*

LA 2:        *8:20.*

LA 1:        *8:25.*

LA 2:        Uh-huh. [UI]

AU:          [UI section] Ah, was Marlin [PH] there? [UI section]

LA 2:        Okay.  When you first arrived?

AU:          Yes.

LA 2:        You remember? [pause] [UI]

AU:          Yes.

LA 2:        You remember?

AU:          My brother. Uh-huh.

             [UI section]

AU:          Yes.

LA 2:        I remember when, when you told me [UI].

AU:          Yes.  He hadn't been born [UI].

LA 2:        No, that she was, was pregnant at that time, right?

AU:          Yes.

LA 2:        How old?  Around four years now?

AU:          Perhaps that.  I don't think not yet. . . When was that?  About the 26th or 30 [UI].

LA 2:        When was she born?  Your daughter?

AU:          In May.

LA 2:        2000. . .

AU:          [UI] In May. . .2005.

7

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 2: | *Okay.* |
| AU: | Yes, but. . . |
| LA 1: | *How many kids does he have?* |
| LA 2: | How many children do you have? |
| AU: | Huh? |
| LA 2: | How many children do you have? |
| AU: | Me?  Two. |
| LA 2: | Two? |
| AU: | One here in New York and one in El Salvador. And [UI] four years also. |
| LA 2: | One of [OV]. |
| AU: | He's going to be three, the one in New York, and the other one is four years. |
| LA 2: | *Okay.  He has one in El Salvador that's four and one that, uh, one in New York that's gonna be three.* |
| LA 1: | *Uh, his, his. . .his baby is three.  Three years?* |
| AU: | Yes. |
| LA 1: | *Okay.  And your wife?  What, what is her name?  Is it Al-Alvarez?* |
| AU: | It's Wendy. |
| LA 1: | Wendy? |
| AU: | Yes. |
| LA 1: | *Okay.  How long have they been together?* |
| LA 2: | How long have you been together as a couple? |
| AU: | About. . .it's almost four years. |
| LA 2: | *He says it's about four years.* |
| LA 1: | *And she lives in New York?  New York City?* |

8

**JA3712**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | She lives in New York. . .what part? |
| AU: | *Long Island.* |
| LA 2: | *Long Island.* Are there people around there? |
| AU: | Yes. |
| LA 2: | *Okay.* |
| LA 1: | Do you like New York? Yes? |
| AU: | It's good. . .well, on the work, but that's why we moved over here to see what we could do if we could work, but. . .we got involved in, in crimes. . .but had more crimes placed on us [UI] by being merely present there in the event. |
| LA 2: | *Okay. He said he'd come down here and tried to look for work. . .only he got caught up in this for what he's here for. So. . .*Wendy Elizabeth Alvarez is your [UI]. Is she Salvadorian or is she from here? |
| AU: | Salvadorian. |
| LA 2: | Okay. She's from, from El Salvador. |
| AU: | Yes. |
| LA 2: | What part? From what part of El Salvador. |
| AU: | [UI] From Santa Ana. |
| LA 2: | Okay. Santa Ana. |
| LA 1: | And, and, and where were you born? |
| AU: | In El Salvador. |
| LA 1: | What, what city? |
| AU: | The same place, Santa Ana. |
| LA 1: | And when did you come here to the United States? |
| AU: | About four days when this detective here arrested me. |

9

**JA3713**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 1: | *Oh, four years [sic] before you talked to him?* |
| AU: | *Four days.* |
| LA 1: | *Oh, four days!  Oh, okay.* |
| LA 2: | [UI section] |
| AU: | When I was asleep. |
| LA 2: | [UI] |
| AU: | Yes. |
| LA 1: | *Did you get the, uh, the PVLS tattoo in El Salvador?  Was he Parkview, Park View, Park View Locos in El Salvador?* |
| AU: | All the tattoos are from El Salvador. |
| LA 1: | Okay.  Who's. . . |
| AU: | Eh. . . |
| LA 2: | You have something on the chest, right?  That one isn't from El Salvador. |
| AU: | Huh? |
| LA 2: | That, that tattoo isn't from El Salvador because you don't have it here. |
| AU: | [UI] another place. [noise] No, no. |
| LA 2: | Okay. |
| LA 1: | *Did he have it in those photos?* |
| LA 2: | He said, no.  He doesn't. |
| LA 1: | *Yeah, I thought so.  So* you are a member of, uh, *Park View* in El Salvador? |
| LA 2: | Are you a clique member of *Park View?* |
| AU: | Yes. |
| LA 2: | *Okay.* |
| AU: | But we're different. |

10

# JA3714

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


LA 2:        Different in what?

AU:          Than, than, uh, *Park View* from *LA*.

LA 2:        *Okay. Yeah.*

AU:          Yes.

LA 1:        *And did he ever get jumped into any place over here when he came to a clique?*

LA 2:        Did they jump you into another clique when you arrived here?

AU:          No. No.

LA 2:        No? [OV]

AU:          Damn that [UI]!  [chuckles]

LA 2:        [UI] here at. . .

AU:          Huh?

LA 2:        That in Santa Ana they changed that rule that they had to jump into a clique here when you arrived.

AU:          Nothing of that.

LA 2:        *Yeah.* [UI]

AU:          [UI section] I'm really alone, man.

LA 2:        [UI] *Park View* is a big clique here [UI] there were no problems.

AU:          [OV]

LA 2:        Because it's a clique that exists there and here, *so. . .*

AU:          We have been in [UI].  Yes.

LA 2:        *[UI] Park View [UI] Explain it a little bit. Park View, 'cause Park View on both sides, it's not a clique that. . .*

LA 1:        *Right.*


11

**JA3715**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:  *. . .is solely established in Salvador. So. . .* We know you're here for a few things and perhaps you've repented for what has happened and, you know, right? Once we have children [UI] we feel that, well, many things we wish to change. . .many things [UI]. There are a lot of bad things that, well, we've done that we'd like to change and we hope that in time, we'll be able to be responsible and, uh, perhaps do something good [UI] to change. . .

AU:  But before anything, what is this visit of yours for?

LA 2:  That's why, that's why we're going to talk to you about it now. [OV]

AU:  Uh-huh.

LA 2:  We know that we are unable to change anything that is here, but there are also things that we can, uh, find out and change. . . try, try to help out the situation, uh, of all that is happening, uh, but we're here to talk about our cases. Things that happened in Los Angeles that perhaps we would like to talk to you about. Uh, there are things that have been said, uh, that this thing happened, but we know there are always two sides to a story, right? There are many people who because perhaps they want to get out of a problem, well, maybe this person is no longer here so we can put the finger on that person because he's no longer here.

AU:  Okay.

LA 2:  Do you understand?

AU:  Yes.

LA 2:  We want to clear it. . .and, uh, if you don't have a problem, uh, we want to talk about any case, and if you don't want to talk about anything, that's your choice. We can stop. Nothing, nothing is forced. Nothing, uh, all here. . .calmly. . .

AU:  The only thing is for you not to be recording things. . .

LA 2:  No. . .

AU:  . . .because no, no, no. . .it may affect me someday. . .for my children [UI].

12

**JA3716**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | Look, what we're going to do, we're not going to talk about anything on your case here. Nothing about your case for tomorrow. . .about what's going to happen tomorrow. We're not, we're not going to talk about this case at all, and that. . .that's why [UI] was the first thing that I told you when we came in. |
| AU: | And, and the purpose for, for that detective? |
| LA 2: | No. . .because here we're [UI]. We got lost when we arrived at the airport. So he had to bring us. |
| AU: | Okay. |
| | [UI section] |
| LA 2: | You know that the streets here are very different, right? |
| AU: | Yes. |
| LA 2: | *He's just asking me. You know, he just doesn't want anything to affect, uh, tomorrow's court date so I explained to him we're not here to talk to him about anything having to do with his case.* |
| LA 1: | [UI] |
| LA 2: | *And he made reference to. . .he, "Well, why is the detective here?" So I said," Well, 'cause we got lost coming from the airport so we basically needed somebody [UI] and bring us here."* |
| LA 1: | *He knows that we spoke to him about his current thing and. . .* |
| LA 2: | *Right.* |
| LA 1: | *And. . .and, and we've, we've reviewed his interview and that he [UI]. . .* |
| LA 2: | *Yeah, [UI] understand. . .* |
| LA 1: | [clears throat] |
| LA 2: | *. . . that, that just so that he knows we're not [UI]* |
| LA 1: | *He understands that we're not, we're not part of that.* |
| LA 2: | [UI] we have nothing to do with that case. |

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1:        [clears throat]

AU:          [UI]

LA 2:        No, not any part.  He only chauffeured us to, uh, and only brought us here because. . .

AU:          Were you the one that arrested me, me then?

LA 2:        Yes.  Yes, I was the one who interviewed you the first time and [UI] explained all, all that.  We don't have anything.  We know, well, what happened, but we're not here to talk about that case or. . .

AU:          Okay.

LA 2:        . . .ask you anything about that case.  Uh [OV].

LA 1:        *We just wanna. . ., we just wanna, you know, have him just clean, clean the slate here, I mean, you know, if he's gonna stay here on this.  You know, it sounds like he's gonna stay here on this and, you know, we don't wanna bother him or anything but. . .*

LA 2:        Yes, mm-mm. . .

LA 1:        *. . .let's clear some stuff up in the past, uh. . .*

LA 2:        What he wants to verify is. . .there are things that happened in the past, right?  And that, well, that's in the past, but, uh, there are many things that we want to clarify. We know that you're here, well, [UI] that you're going to stay here.  Understand? [UI section] in New York where perhaps you want to.  We don't, don't know, but [UI] those things can be, uh. . .

AU:          Mm.

LA 2:        . . .those things can be talked about, right?

AU:          Uh-huh.

LA 2:        It's a little outside of [UI].  Those are things that are, that are, that are done. I know that there are people that can be moved [UI] lo-local, uh, different areas.

AU:          Uh-huh.

14

**JA3718**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | It all, all depends, right, on what is said, on what is done, on what can be done, without making any commitments, right? [UI] but for the cases' benefit, uh, but it's also nothing that can be committed to. |
| AU: | Well, no. |
| LA 2: | We're here to, also to clear up the past. It doesn't cost us anything to come and talk to clear this up. Uh, well, we know that you're not the same person that you were three, four years ago. Right? |
| AU: | [UI] |
| LA 2: | You have two children, a wife, uh, looking for work, more responsible. Uh, [UI]. . . |
| AU: | [UI] |
| LA 2: | . . .we have all had things, as I've told you, in the past that we have done that, well, perhaps it'll be four, five years and, uh, we think better and, well, hey! Well. . .and perhaps, uh, better thought of, I would have never been involved in such a thing. Right? |
| AU: | Of course. |
| LA 2: | But they are things that. . .[UI] we have to respond to get that weight off ourselves. |
| AU: | Yes. |
| LA 2: | Right? And then [UI], well, it doesn't cost you anything. Right? *So. . .* |
| UM: | *It's the first thing. . .* |
| LA 2: | Uh, I'm going to read. . .uh, they're your rights. I know that. . .I know they've done it, but these are things that we have to do, right? |
| AU: | Yes. |
| LA 2: | They've read these to you before, right? Your rights? |
| | [UI section] |
| LA 1: | *I'm just looking for my card.* |

15

**JA3719**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | He's looking for his card. |
| AU: | [UI]<br><br>[sounds] |
| LA 2: | They've read you the rights before [UI]? |
| AU: | Yes. |
| LA 2: | [UI] |
| AU: | [UI section] |
| LA 2: | *I asked him if he has been read his rights before. He said, yes. You know,* [UI]. I, uh, [UI] you have understood? *Okay.* [UI] read it in Spanish. *Okay?* |
| AU: | Uh-huh. |
| LA 2: | "You have the right to be remain silent. If you refuse the right to remain silent, whatever you say can be used against you in a court of law. You have the right to speak with a lawyer and have a lawyer present at any interview. If you so desire and don't have the money to pay for a lawyer, a lawyer will be obtained for you at no cost before any interview. If you so, uh, desire it." Do you understand what I'm saying? |
| AU: | Yes. |
| LA 2: | Do you want to talk about, uh, what we want to talk about here of things that happened in Los Angeles. . .freely? |
| AU: | I already told you, let's see about it. |
| LA 2: | *Okay.* |
| AU: | Yes. |
| LA 2: | Yes? *Okay. Yes.* [UI] *before. We'll see what goes on.* |
| AU: | You will be explaining more things [UI]. |

**JA3720**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 2:       Yes.  We're going, going to explain more, but do you want, uh. . .we didn't, didn't arrive here to try to, to pull a, a trick on, or a trap against you. Everything is open. That's why we explained to you your rights, but [UI] the rights now that [UI] that you already understand them [UI] again.

AU:         Uh-huh.

LA 2:       *I'm just telling him we're being wide, uh, wide open that's why.  Uh, I asked him first that,, you know, he'd been read his rights.  He understood his rights. . .and I re-read him his rights which he understood and he waived again.*

LA 1:       *Right.*

LA 2:       *Uh, he just says, "Yeah."  He goes, "I just need some more background information on what you guys want to talk about."*

LA 1:       *Okay.  Uh, well, first of all, when he'd gotten to LA four days before you photographed him, then when, when did he leave?*

LA 2:       When you arrived, four days before I took those photos of you and. . .

AU:         Uh-hum.

LA 2:       . . .Chipies [Ph].

AU:         I arrived, arrived 26 of, of. . .

LA 2:       November?

AU:         . . .October.

LA 2:       October? 2004?

AU:         Yes.

LA 2:       *He says, roughly he arrived October 26, 2004, in LA.*  When was it that you left Los Angeles?

AU:         About. . .about two weeks, maybe.  Or three, something like that.

LA 2:       Three weeks from there?

AU:         Uh-huh.

17

**JA3721**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *Okay.* Did you return? |
| AU: | I returned. |
| LA 2: | *Okay.* |
| AU: | I was working at [OV] |
| LA 2: | You stayed here. . .how long?  In Los Angeles before [OV]. |
| AU: | Some two months. |
| LA 2: | *Okay.* And then you left? |
| AU: | Uh-huh. |
| LA 2: | Where to? |
| AU: | To New York. |
| LA 2: | And how long did you stay there? |
| AU: | [UI] about six months. |
| LA 2: | Six months. *Okay.* And then you returned.  Okay. *He says he-he got here. . .* |
| AU: | [UI] around two months. [UI] two, I was there about two months.  And I was there two more months, and I returned again to [UI] to Los Angeles. |
| LA 2: | *Okay.*  So you arrived, you stayed for two months? |
| AU: | Uh-huh. |
| LA 2: | You left for six months and then you returned to Los Angeles? |
| AU: | Uh-huh. |
| LA 2: | *He is explaining that he arrived in LA.  He stayed for two months, approximately, went to New York, stayed there for six months, roughly, and then came back to LA.* |
| AU: | To LA? |
| LA 2: | Uh-huh. *So* you returned more or less in May?  May of 2005? |

18

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        No.

LA 2:      For when? June?

AU:        It could have been.

LA 2:      *Okay.*

AU:        No, no, I don't remember well.

LA 2:      No, no, uh, don't get [UI] for the date, but more or less? *Just trying roughly
           if he can [OV].*

AU:        [UI section]  The Greyhound where. . .

LA 2:      Is that was you traveled in?

AU:        Uh-huh.

LA 2:      You went by Greyhound?

AU:        Uh-huh.

LA 2:      *Okay. He says. . .*

LA 1:      *In the bus?*

LA 2:      *Yeah, he said he traveled with the Greyhound.  Just trying to lock him down
           when he came back.  He says, roughly. . .I asked him, "May or June?"  He
           says, "Yeah, that sounds about right."*

AU:        From there, I [UI].  I returned because a, a. . .a detective, an, an official, but
           he told me here that he wouldn't rest until he could deport me.

LA 2:      [UI]

AU:        When I was at, at La Mariposa.  Uh-mm.

LA 1:      *He was living at La Mariposa.  And what street?*

LA 2:      Did you stay there at La Mariposa?

19

**JA3723**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:     There. . .at, at times, yes, well, since I didn't have a house, well, you understand? When they arrested Roberto, the only one that would help us out because I don't, don't have. . . Yes, I do have family there, but it's like I don't have it.

LA 2:   *Yeah.* Ah, well, it's a family matter.

AU:     Yes. It's said that one's only family [OV].

        [UI section]

LA 2:   You know that a family [UI section] that is your family.

AU:     [UI] for you. [UI section]

        [UI section]

LA 2:   Things change. At times, you have an enemy. At the end, that is the only one that can help you.

AU:     Yes.

LA 2:   Right? Well, the *homeboys*. . .all that changes.

AU:     No, but. . .[UI] it's a pity that because no, no, you know, you need to have papers, but [UI section] without any family member.

LA 2:   *He says, uh, yeah, he was kinda homeless so he kinda stayed wherever after we arrested this guy Humberto [sic] Galan that he was with initially when he first arrived four days. That's how we kinda ran into him. We took Roberto into custody, and he kinda, after that, kinda bounced around. He didn't have a stable place. He says, "Although, I did have some family in LA, but it's like not having family because they were nonexistent."*

LA 1:   *But he did mention Mariposa though?*

LA 2:   You stayed there at La Mariposa here? At the *Destroyers* [PH] there in the apartments [UI section] or with certain people?

AU:     Nah-uh. At the *Destroyer* [PH].

LA 2:   *He says he stayed at the Destroyer* [PH]. Did you know a lot of people there on that. . .on that street?

20

**JA3724**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| AU: | [OV] [UI] |
| LA 2: | Well, you were only there two months, right? |
| AU: | Only the, the [UI] our help was the, the, the little broad of, of. . . |
| LA 2: | Chipies' [PH]? |
| AU: | Yeah.  No, no.  No, he didn't have anyone there either. |
| LA 2: | And you [plural] arrived together, huh? |
| AU: | Uh-huh. |
| LA 2: | *Okay.* |
| AU: | [UI] it's just one without family also, well, understand, and the same as one. |
| LA 2: | [UI] have it there on the corner at La Mariposa? |
| AU: | Ah, [UI] *Destroyer* [PH] and one day [UI] a lady stayed there. |
| LA 2: | *He says, yeah, they stayed mainly in, at Destroyers [PH] abandoned apartment that's on Mariposa and, uh, there was a woman there that helped them from time to time.* |
| AU: | It's there where we stayed at night. |
| LA 2: | That's where he stayed at. |
| AU: | [UI] it was where they arrested Chipies [PH] the, the, the second time. |
| LA 2: | They arrested him? |
| AU: | Uh-huh. Because we were at a house. I remember that a lady told us she was the owner there that. . .that because she found us at the outside walkway, well, with a blanket. |
| LA 2: | Uh-huh. |
| AU: | And. . .and then she told us that she was the owner and that. . . |
| LA 2: | Which building there?  Do you remember?  *He's telling us about the time he got kicked out.* |

21

**JA3725**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | I don't remember which it was. |
| LA 2: | *He said they were crashing out there by a, by a woman who identified herself as the, uh, the owner.* |
| LA 1: | *Okay. He stayed [UI]. . .* |
| | [OV] |
| LA 1: | . . .at Mariposa? |
| LA 2: | *Yeah.* |
| LA 1: | *Okay, did he say he knows, did he mentioned someone's name?* |
| LA 2: | Chipie [PH]. |
| LA 1: | *Okay. He knows him?* |
| LA 2: | *Yeah.* You know Chipie [PH]? Do you know him by his name, name? Real name? How do you know it? |
| AU: | Luis Mario [UI]. |
| LA 2: | Luis Mario. Do you know the last name? |
| AU: | Huh? |
| LA 2: | Do you know the last name? |
| AU: | [pause] He's name is [UI]. Ramos, [UI]. |
| LA 2: | Ramos? |
| AU: | [UI] |
| LA 1: | *Is this Chipies [PH]?* |
| LA 2: | Is, is it Chipies [PH]? |
| AU: | Shrek! [chuckles] |
| LA 2: | How do you call him? |
| AU: | We called him Shrek because he looks like the donkey that comes out in, in. . .with Shrek. |

22

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


| | |
|---|---|
| LA 2: | *He says, "I call him Shriek because he looks like the donkey from Shriek."* |
| AU: | Yes. |
| LA 1: | *But does he know that he's in jail right now?* |
| LA 2: | Do you know that, uh, he's in jail right now? |
| AU: | No.  Since I came here, I no, no longer had communication with him there. |
| LA 2: | *He says he's had no communication with him since he left LA.* |
| LA 1: | *Does he know who this is?* |
| LA 2: | Do you know this, this individual? |
| AU: | It seems he lives there at La Mariposa. |
| LA 2: | *He says he thinks he lives out in Mariposa as well.* |
| LA 1: | *Okay.  Does he know him as Blackie or. . .?* |
| LA 2: | Do you know, do you know a *Blackie*, or. . .? |
| AU: | *Blackie?* |
| LA 2: | Uh-huh. |
| AU: | No. |
| LA 2: | Negro? |
| AU: | Ah, that one, yes.  As, as Negro. . .we called him Negro. |
| LA 2: | *He says, "I think it's Negro."* |
| LA 1: | Negro? |
| LA 2: | *Right.* |
| LA 1: | *Okay.* |
| LA 2: | Well, it's that Negro is *Blackie* in English. |
| AU: | Okay. |
| LA 1: | *Does he know who that is?* |

23

**JA3727**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 2: | Do you know that dude? |
| AU: | Yes. |
| LA 2: | Uh, how is it, how do you know this guy? |
| AU: | Uh, he has the name Luis. |
| LA 2: | *Okay.  He knows him by Luis.* |
| LA 1: | *Does he know that he's in jail right now?* |
| LA 2: | Do you know that he is in jail right now? |
| AU: | No. |
| LA 2: | *Okay.* |
| AU: | Only. . .when I was there, only, only. . .I was only present when he was shot. |
| LA 2: | *He says he was there when they shot him.* |
| AU: | *He was there when. . .?* |
| LA 2: | You were there when they shot him? |
| AU: | No.  When, when they shot him, no.  Well, we were inside. . .no, no, uh, on the street of La Mariposa. They shot him at *Normandie* [PH]. |
| LA 2: | *Okay.  He says. . .* |
| AU: | [OV] |
| LA 2: | You, you were there close by? |
| AU: | Uh-huh. |
| LA 2: | *He says he was in a, in a pad on Mariposa. When he got shot right on Normandie [PH], he was near-by but not, uh, actually with him when he got shot.* |
| LA 1: | *Did he see him right after he got shot?* |
| LA 2: | Did you see him after they shot him? |

24

**JA3728**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:         Huh?

LA 2:       Wh[en]. . .did you see him after they shot him?

AU:         But when, when, when, uh, he was, was with, with crutches that they had
            shot him before and then that happened to him that [when] they were going
            to buy some ta[cos]. . .some, some burritos.

LA 2:       Uh-huh.

AU:         And it was when the shots were heard. . .around six rounds.

LA 2:       *Okay. He says he heard about six shots. And when. . .*

AU:         He was with another, another, another guy, but nothing happened to the
            other guy there. [UI] I don't remember what they called him.

LA 2:       But he already had crutches?

AU:         Uh-huh.

LA 2:       *Okay. He's saying, uh, at the point that this, specifically he's not involved.
            Luis was already on crutches. He's. . . And [UI] that he was on [UI].*

AU:         On crutches.

LA 2:       . . .with crutches. [UI]?

AU:         Yes. Yes.

LA 2:       *He says that he. . .*

AU:         And it was when, when they, they, they [UI]. . .

LA 1:       [coughs]

LA 2:       *He says that Luis was with, with somebody else. Luis was already on
            crutches, walking, when he got shot at. He said he heard the shots. . .from
            the pad that they were crashed out on Mariposa, and Luis was at,
            somewhere right off Normandie [PH], and he heard about six shots.*

LA 1:       *He knows him as Luis?*

LA 2:       Do you know him by his name, Luis?


25

JA3729

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


| | |
|---|---|
| AU: | Luis. |
| LA 2: | *Yes.* |
| LA 1: | *He's a friend, right?* |
| LA 2: | *Yes.*  A known friend? |
| AU: | Yes.  He was there.  He lived at La Mariposa, and we also stayed there. |
| LA 2: | He says he, he lived on Mariposa and he goes, "That's where we stayed too." Yes. |
| LA 1: | *Do you know who this is?* |
| LA 2: | Do you know this dude? |
| AU: | Yes. |
| LA 2: | *Yes.* |
| LA 1: | Who is he? |
| AU: | Yes. I don't remember his name. |
| LA 2: | *He can't remember the name.* Uh, if I tell you, maybe you'll recognize it?  *I asked him, "If I give you the name, will, eh, will it ring a bell?"*  Do you know him as, uh, as Moe [PH] or Mauricio? |
| AU: | Yes. |
| LA 2: | Which one?  How do you know him? |
| AU: | By Ma-Mauricio. |
| LA 2: | *Okay.* Mauricio. |
| LA 1: | Or Moe [PH]? |
| LA 2: | Or maybe you know the name Moe [PH]? |
| AU: | Well, maybe he told me one.  Well, yes.  It's rare here, right, also the, also the. . . one's nickname. |
| LA 2: | Yeah, it's rare, mm, Mauricio. |

26

**JA3730**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


LA 1:       *Okay.*

LA 2:       *It's him.*

LA 1:       *He knows him?*

LA 2:       You know him?

AU:         Huh.

LA 1:       *Okay.*

AU:         But [UI] by, by sight, but. . .

LA 1:       [clears throat]

LA 2:       *Kno-knows him by sight.*

LA 1:       *Does he know that he's in jail too right now?*

LA 2:       Do you know that, that he's also in jail right now?  Yes?

AU:         No, no,  about the United States, I don't know.

LA 2:       *Okay.  He doesn't know that?*

LA 1:       *Okay.  Well, three of these four guys are in jail right now.*

LA 2:       Three of the four are, uh, in jail right now.

LA 1:       Not him.

LA 2:       He is the only one that's not, but those, uh, those three are in jail.

AU:         How?

LA 1:       *And, and they're in jail for a shooting that you did.*

LA 2:       Have you had communication with, with any of them?

AU:         No.

LA 2:       No. *Okay.*  The three are in jail for an activity of, uh, a shooting that is said
            you were also involved in.

AU:         [UI]?

27

**JA3731**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1:      *On Fairfax [PH].*

LA 2:      There on Fairfax [PH] street is where it happened?

AU:        Fairfax [PH]?

LA 2:      Fairfax [PH]. It's a big street that runs from Hollywood to almost the beach.

AU:        No.

LA 1:      Yes.

AU:        [UI], but. . .

LA 1:      [OV] [UI].

AU:        . . .about that, about that which, which you are telling me about, well, I don't, don't know.

LA 1:      Uh-huh.

AU:        I'm not, not involved in that.

LA 1:      *We wanna try to wipe this slate clean here. I'm not looking to, you know, taking him in my car today back to Los Angeles. I understand his family is here. I understand that he just admitted to doing a double murder here in Greensboro, and Greensboro has, you know, is gonna deal with him and, as he can imagine, it's a very serious charge out here, and he's not gonna be, you know, released.*

LA 2:      Look, what he wants to inform you here, uh, we are not going to try to take you back to California. We understand you want, you prefer to stay here or perhaps closer to your family in New York, and the charges which you are here for are very serious, and our intention is not to take you back to California or anything to move you. *Okay?*

AU:        Uh-huh. But. . .

LA 2:      If, if. . .

AU:        . . .but to my country, perhaps.

LA 2:      But if, uh. . .

28

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:   Because there's not even a privilege here.

LA 2:   Well, uh, the things already. . .

AU:   You know that, that they treat you worse than a dog here, well, you understand.

LA 2:   [UI] they're, they're not like the jails in El Salvador but, uh, the things, the rules here, yes, are very strict.

AU:   Yes.

LA 2:   *Okay.* But, uh, my intention is not to get you out. . .to take you to California. The charges here we know, uh, of a case, well, that they say is strong, and that is something else. But our intention is not to get you out to take you somewhere else.

AU:   [OV] [UI]

LA 2:   Further away from your family, uh, from here, from people that you know.

AU:   But it's the same, uh, they were accusing me, but for the fact perhaps of, of being close by, well, understand, from there from LA. From about here [U].

LA 2:   Well, that's why, that's why we want to know. . .what was it that happened. Perhaps. . .that's why I told you when there's investigations like that, there's, there's a lot of people involved, and well. . . If a person does something, uh, and it wasn't that person that we know. It was another person, well, that's why, we want the. . .whole the story from everyone that was there. Right? To know. . .

AU:   Which people?

LA 2:   Well, perhaps who is a witness. Who is a, a suspect. Understand?

AU:   Yes.

LA 2:   Because we know that, it's that you were with them when this happened. Understand? We know that because of, of fingerprints, through evidence, through witnesses because of everything, and what we want. . .

AU:   [UI] fingerprints, fingerprints of what?

LA 2:   Fingerprints from the car.

29

**JA3733**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        Huh?

LA 2:      From the car. From the car that was involved in, in the crime.

AU:        That's the. . .in, in the, in the. . . one you're going to talk to me about, the car that belongs to, to, to Moe [PH]?

LA 2:      Yes.

LA 1:      Uh-mm.

AU:        No, but, but. . .I haven't done any, any, anything with them. . .well, understand that perhaps I was. . .perhaps I got into the car, or perhaps I touched it to play music.

LA 2:      *Okay!* And that's why we want to talk. *Okay?*

AU:        [OV] [UI]. . .

LA 2:      And there's also. . .because there are many things. There are many things, right? Well, witnesses that. . .we saw [UI] this person got out of the car, and this person is you, and what is not clear is who is the person that did the shooting. Understand? So even though we can put all these people there outside of the car when this crime happened, well, the, the small details are the details that we want to clear up. . .of everything. . .to know. Well, [UI] here, well, it doesn't, doesn't cost you anything, right?

           [UI section]

AU:        . . .that it doesn't cost me anything there to say that, that it wasn't me or something like that, well, understand.

LA 2:      No, no. We only [UI], uh, is to know the small details. Because we know for a fact, and you know, is that you [plural] were there, you [plural] got out of a car, and, uh, uh, something happened. What we don't know are the details of who, who did such-and-such a thing or what it was. Understand?

AU:        But is it that you are telling me about, about the beach? Are you telling me about close to the beach?

LA 2:      No, no, no. Fairfax [PH] Street is closer to. . .it runs all through the area of Hollywood up to Wilshire [UI].

30

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 1:     *They went to the beach afterwards.*

LA 2:     Yes.  Yes, you [plural] even went to the beach. . .you [plural] went to the beach that day.

LA 1:     *I don't wanna feed him too much, but they went to the beach afterwards, and he knows what I'm talking about.*

AU:       [UI] only once that I went to the beach at Santa Monica.

LA 2:     *Okay.*

AU:       But I went with, with another person who, who was close to, to, to Roberto that, that, that lived in front.  Understand?  I went to the beach with him, with him, and, and that we even took some photos of ourselves there at the beach.

LA 1:     *Hey, if he's going to dick around with, with, uh, you know, denying all that stuff, let's not even let him get a foothold doing that.  Uh, you know, unless you're going somewhere with it.  But what, what I'm saying is that, you know, this thing happened in broad daylight on a, on a very busy street.  Okay?*

LA 2:     *Well, [UI] we know that he was there.*

LA 1:     *Right.  And. . .*

LA 2:     *And, uh, we know that they got out of the car.  We know that his prints were in the car.*

LA 1:     *Yeah.*

LA 2:     *And we know that he was identified as being there.  We're just trying to get the details out it [OV].*

LA 1:     *Right, and these guys are in jail for over two years. . .in jail.  Sitting in jail for something that he did, and he manned-up to what he did here in North Carolina, and he needs to man-up for this because these guys are all sitting in jail right now for something that he did.  Now if he's got a reason for this happening. . .*

LA 2:     [OV][UI].


31

**JA3735**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1:          *. . .you know, we're not giving him all the details we know, but we know that there was a confrontation and that these other people may have started it. We don't know who started it. We don't know if it was him who started it and just wanted to kill him, you know, in cold blood or if these victims or victim started it initially if they, if they had a weapon. I don't know. He's gotta tell me that. That's it not a matter of if, it's a matter of, of why, you know.*

LA 2:          Do you understand a little of what he was explaining?

AU:          [UI].

LA 2:          It's that we already know that you were there. We know what they have, they have told us. They already have more, almost two years in jail for this case. *Okay?* And what happened at daytime in front of a street very. . .[chuckle] with a lot of people and a lot of traffic. . .

AU:          Uh-huh.

LA 2:          Right? And there's no question that you were there. The only question is, perhaps, if there's another detail that we don't know about.

LA 1:          *There's not a whole lot of guys that have tattoos on his eyelids. So it's. . .*

LA 2:          And there not too many people that, well, at that time, looked like you. Understand? With the tattoos and all that. Uh. . .

AU:          But. . .but how, how. . .my tattoos are not visible [OV].

LA 2:          No, no, but the, the. . .

AU:          If you get close to me, you will see my tattoos, but how are people going to give my characteristics that, that, that. . .that I was there?

LA 1:          *But, you know, the other people are making identifications. Is that what he's talking about? The identifications?*

                     [OV section]

AU:          . . .yes, they know me, but because I'm there day and night, and they know me.

32

**JA3736**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:     *He says, "Yeah, they do know him." And he, he actually did mention before that, yeah, he had been in Moe's car.*

LA 1:     Uh-mm.

LA 2:     *You know.*

AU:       When I, when I got down was when they had shot this guy, that they had shot his leg, but they also killed an-another guy that was a *GM.*

LA 2:     Uh, you're talking about the other time when they shot Luis. The first time?

AU:       Uh-huh. The first time. [UI] like, like, about. . .[UI] days, like, like about a month, maybe. After that thing, it was when that thing happened to him also, but he had died about, about. . .when they shot Luis in the leg. . .

LA 2:     Uh-huh.

AU:       . . .another, another guy had died. . .

LA 2:     Yeah. Yes.

AU:       . .. there at La Mariposa.

LA 2:     Yeah. I understand that. You were there. . .

AU:       Uh-huh.

LA 2:     . . .when it happened?

AU:       No, no.

LA 2:     *Okay.*

AU:       I wasn't. I was here in New York.

LA 2:     *Okay. All right. He's, he's bringing up the other incident when Luis was shot in the leg, but he was in New York at the time.* We're not talking about that. It's about the, the case of what happened there on Fairfax [PH] Street that day when you, Moe [PH], Luis, and El Chipies [PH], El Negro. . .and you [plural] went to the beach going by way of Fairfax [PH]. You [plural] had words or something with. . .

LA 1:     [clears throat]

33

**JA3737**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:         . . .two individuals there on the street. You [plural] got out in, at midday. *Okay?* With a lot of people, with traffic.

LA 1:         Two *victims.*

LA 2:         Two victims, and something happened. *Okay?*

LA 1:         *And I don't know if the, the victims started things or not.*

LA 2:         And we don't know, well, who started it that, well, that neighborhood signs were thrown or what was it that happened.

LA 1:         *It makes a difference to me if they started.*

LA 2:         [OV] [UI] to him, uh, if it was them that threw neighborhood signs or something like that to. . ..

LA 1:         *It's just like the shooting that happened in-in here in-in North Carolina.*

LA 2:         It's like the thing that happened here in this area.

AU:         If here, here is what they said that the problem is that, it was about some music.

LA 2:         Yes, but no, we're not going to talk about this case. No, it's a different one.

LA 1:         *We've talked to the detective here. We've, we've gone over his interview.*

LA 2:         We have talked to the detective. We've seen the interview that they had with you.

LA 1:         *And I-I admire him for, for, uh, stepping up and, and taking. . .*

LA 2:         And he, and he wants to give you merit because *he. . .*on seeing that [UI] they saw that well, more responsibility [UI].

AU:         [UI]

LA 1:         *And, and. . .*

34

**JA3738**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

AU:  [OV]. . .I have not taken responsibility. The only thing that I said, "That, well, yes, that sometimes things happen because one is provoked," and. . . and it wasn't what, that I told him that I accepted that I had done that. Understand? They have taken things, things as if, perhaps I had accepted it, but I haven't accepted anything.  Understand? They asked me a question, "Why did you do it?"  "I didn't do it."  "Why did you do it?"  "I didn't do it." People say, "What was the motive? And what was the reason that you did it."  One is provoked, and that's why sometimes things happen and, well, I didn't tell him, "It was me." And I did accept it, that, that I said that, that one is provoked and that's why things happen, but I haven't accepted that it was I who did the shooting.  They say that they have confiscated a weapon from me.  Have the detective tell me or the agent from the FBI that came to take me out.  Who was it that took out the weapon from, from, from my, from my waistband or who was it that took it from my hands?

LA 2:  *Okay.*  I think they can explain that to you.  We don't want, uh, we don't want to talk about your case. *He's saying he didn't, uh. . .uh, he readily admits to taking charge and he explains it that he didn't do it, he didn't do it, but he understands why things like that happen when people are provoked.  But he never took responsibility for it.*

LA 1:  *Okay, but everyone ID him.  Huh!  His friends ID'd him, and witnesses ID'd him.  Um, and it's the same thing with this. . .is it's these guys here all, you know, identified him.  Did you already tell him that?*

LA 2:  *Right.*

LA 1:  *Okay.  And, you know, and I know he's done stuff in El Salvador as well, and if you wanna throw that stuff about, you know, him being a good shot, I mean. . .*

LA 2:  *Yeah.*

LA 1:  *. . .then, we, we know by the. . .*

35

**JA3739**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | You. . .in your past, right? What you do now with your future, *okay?* For the good of your wife, for the good of your children. . .now, if they, perhaps, one day, they can see you. [UI] say, "Well, hey! *Yeah,* he's a father. He's done bad things but at one time he was. . . Right? And he had his responsibility for his things and, and he tried to do a good thing." A good thing, at least, because they also--also identified. .. Moe, Luis, El Chipies [PH]. |
| LA 1: | *And they're supposed to be his friends.* |
| LA 2: | They. . .you [plural] were all friends, right? |
| LA 1: | *And they're in jail for something he did.* |
| AU: | [OV]. . .[UI]. |
| LA 1: | *Unless one of them did it.* |
| AU: | . . .[OV] or that. . .or--or that they haven't talked, well, that's their problem. Understand? Everyone, everyone has their own version as you say. [OV] |
| LA 2: | And you also know that many of the things are different here in the United States from El Salvador. Investigations are very different. Things that can be done with, uh, science, uh, with things dealing from, from the smallest hair, to. . . |
| AU: | In that. . . |
| LA 2: | . . .things dealing with the skin, uh, there are many, many things that can be taken from here. Right? And it has taken some time, but we've arrived at this point. *Okay?* And now talking with all these people, it's known that. . . Well, you were at least, at least, that you were there. . . |
| AU: | [UI]. |
| LA 2: | . . .at that time. *Okay?* |
| | [OV section] |

36

**JA3740**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

LA 2:  . . .and that's why we want to know. Look, Alejandro, everyone. . . we know that you were there. Just tell us, what was it that happened. Only that, *okay?* I'm not saying that it was you who did the shooting or such-and-such a thing. *Okay?* We know that you were there. We only want to know what, uh, it was that happened. *Okay?* Because I have the mothers of those sons that just want to know. *Okay? All right.* [UI] also lots of people. . .hey! Even though they've done bad things. They haven't been, well, uh, good people all the time. They also have mothers. They have sons. They have people that want a respons. . .[UI] what was it that happened. Only that, so that they can live well. Understand? You know that, right? You have sons. . .

AU:  [OV] [UI]. . .

LA 2:  . . .if something, something had happened to one of your sons, you would want to know, well, what was it that happened.

AU:  [OV] [UI]. . .

LA 2:  If something would have happened to Wendy, you would have responded the same. *Okay.* We know that you were there. We only want to know what happened. How did it all come down. You, you [UI]. Look, who do you have more loyalty to. . .your family or the gang?

LA 1:  *Yeah.*

LA 2:  If, if you're with the family, well, we'll leave [UI].

AU:  You know the situation.

LA 2:  What is the situation? Tell me.

AU:  The situation is heavy in that one also finds himself in the, at the moment one is a member of a gang.

LA 2:  Yes.

AU:  Understand? [UI] because, well, yes, more or less one has knowledge because I know that you arrested me.

LA 2:  Uh-mm.

37

**JA3741**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:              Yeah, and you have the knowledge that each member of the gang has here.
                 It doesn't run the same as it runs in, in our country. Understand? The laws
                 are more forceful over there for a member of a gang.

LA 2:            Uh-huh.

AU:              Yeah, and, and we know that it is much of a risk for our family and as much
                 for our children.

LA 2:            *Okay.*

AU:              Understand, and that's why. . .

LA 2:            [OV] [UI]. . .

AU:              . . .at times one it's best to shut up his mouth.

                 [OV section]

LA 2:            *He says that he, he knows that the way [UI] I asked him, right. "What more
                 loyalty do you have to the gang or to your family?" And he says, "Well," he
                 goes, "I know, but there are certain gang rules and I know that, you know, I
                 have to fear for more than myself and," you know, like his family.* But. . .
                 You also know that things. . .done in the past are very different. We have,
                 uh, laws, uh, different powers to try, uh, to protect people, family. We don't
                 want any harm to happen either to a family here or in El Salvador. That's
                 why we have. . . we always work with the PNC of El Salvador. *Okay?*
                 And they. . .as they want help, they need help from the United States. .
                 .they're very good friends with the United States. Understand?

LA 1:            *Does his wife and kid need help from us? If, if, if he's. . .because of stuff
                 that he can tell us. . .that he wants to tell us, would that, would that make a
                 difference if we could. . .?*

LA 2:            [UI] does you family need help, protection. . .your wife, your children?

AU:              Nothing [UI].

LA 2:            Huh?

AU:              [UI] with--with that type of protection.

LA 2:            What type [UI] our protection?

38

Case 3:16-cv-00057-MOC    Document 59-9    Filed 03/23/17    Page 57 of 524
**JA3742**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Nah. . .to start investigations, to see what, what is going on with oneself, it's just that it makes, it makes, it makes the family feel bad. Understand? |
| LA 2: | *Yeah,* I, I. . . |
| AU: | You know that perhaps one's family is suffering right now. Perhaps my family is. . . that is the only thing that, that [UI section] |
| | [OV section] |
| AU: | Understand? [UI section] he already, already is. . . I think he's almost like-- like this gentlemen that's present here. |
| LA 2: | Uh-mm. |
| AU: | In addition, he still has [UI] has my little sister.  Understand? And [UI] his wife, but  [UI] my grandmother also. |
| LA 2: | *He still has his, uh, his godfather in El Salvador.* |
| LA 1: | *Well, he-he's not going to help them.* |
| AU: | No, that's the only thing. . . |
| LA 1: | *Listen. . .* |
| | [OV section] |
| LA 2: | . . .you have your family. |
| AU: | Yes. |
| LA 2: | Right? |
| AU: | It's, uh. . . |
| LA 2: | Your sister, when did you see your sister there? |
| AU: | Fuck, [UI]. . .yes, about five years [UI]. |
| LA 2: | Uh-huh.  She's five years old. |
| AU: | Yes. |

39

**JA3743**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:    *Okay.* And you know that there is help there. One that helps, can be helped. Understand? Things are very different, but many times people don't feel that we try. We help equally our victims and the families because it's not also the victims that, that died, but it's also their families, and your families. Everybody suffers. Understand? What we are trying to do is to stop the suffering, and if we have to help somebody for good, so that you fe[el]...perhaps you'll feel, feel right to help, uh, explain, uh. . .there are things that can, that can be done to help the family. We're not going to leave a family in danger. Understand? I'm not going to get and leave a family in danger. *Okay?* [UI] a commitment with you [UI]. *Okay?* And I don't have a, a magic stick that I can use, but with the families, with things of, of danger, that can be helped. If you tell me, yes, my family is in danger that needs, needs help for such-and-such a thing, and we investigate and find that, well, hey! It's. . .that there's, there's a danger for the family, we can certainly act. Understand? But there is a lot of suffering. There is a lot of suffering. Imagine if something had happened to your sister, to your dad, to your grandmother. *Okay?* At least. . .*okay*, what is needed is, is simply an explanation. Understand? And I don't want to make you [UI section] place more on your mind. [UI section] Well, hey! You have to pay, you have to pay. We just want. . .what happened. Do you understand?

AU:    Yes.

LA 2:    *Okay.*

[OV section]

LA 2:    The most, the most that you can remember. *Okay?* I'm not going to ask you for days [UI] where you went, where you were at, what you ate that day. Only that. *Okay?*

AU:    *Fairfax.* The only *Fairfax* that I know [UI]

[noises]

LA 2:    [UI] the school, *the high school.*

AU:    There [UI] I lived with, with Chipie [PH] when I first arrived.

LA 2:    *Okay.*

AU:    That we were gathering cans throughout the street. . .

40

**JA3744**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


| | |
|---|---|
| LA 2: | *Okay.* |
| AU: | . . .all of, of *Sunset*. |
| LA 2: | And *Sunset* runs [UI] *Fairfax* [UI]. . . |
| AU: | All of that. |
| LA 2: | . . .goes downwards. |
| AU: | All of that. Well, all the streets from there [UI].  All, all [UI] those ones like bones that are there. |
| LA 2: | Yes. |
| AU: | [UI] little mothers that were there. |
| LA 2: | Yes, yes, there are many women there. |
| AU: | Yes, but. . .we would go around 9:00 at night and sleep until about 1:00 in the morning to continue gathering cans on all the. . .on all the street. |
| LA 2: | Gathering cans of what? |
| AU: | Cans. |
| LA 2: | What are, what are "latas" [cans]? |
| AU: | Cans, cans, well, aluminum. |
| LA 2: | *Oh, yeah.* |
| AU: | To see what, what, what we could do. . .[UI] or a meal. |
| LA 2: | *Okay.* |
| AU: | Yes. |
| LA 2: | But what, what we want you to explain what is. . . What happened that day when you were in that car and you [plural] stopped.  Did you have a fight with two guys on the street?  It was midday and. . . |
| LA 1: | *Eh, we don't need to feed him anything, you know.  He knows exactly what we're talking about.* |

41

**JA3745**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | You know [UI] tell us what was it that happened.  You remember that day. |
| LA 1: | *We've been looking, looking for him for all this time.* |
| LA 2: | [UI] trying to find you for a long time, and they have been almost two years in jail also. |
| AU: | Yes. |
| LA 2: | [UI section] but I--I don't know if all they say is one hundred percent. |
| AU: | It's that, it's that, it's that, as I tell you again, whatever they say, whatever they've said, well, only they know what, what [UI] [OV]. |
| LA 2: | *Okay.*  And that's why it doesn't matter to me.  But what matters is what you tell me. |
| AU: | And the other person also that's not arrested.  What's also the reason that he's not arrested. |
| LA 2: | Let's see. . . |
| | [OV section] |
| AU: | . . .he must be the one that's, that's talking. |
| LA 2: | No. |
| AU: | And, and there, there. . . |
| LA 2: | Everyone has talked. [UI] everyone has talked.  Everyone.  *Okay?* |
| AU: | Uh-huh. |
| LA 2: | It all depends how the thing is charged. |
| AU: | Yes. |
| LA 2: | Right?  And, well, you now. . .what you're here for is now a case we cannot change.  We will not be able to change, and we don't want to change it so that it affects you.  But what we want is the details about what happened that day. |
| AU: | The truth I, I. . . as I tell you, I don't remember that day. |

42

**JA3746**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 1:    *Listen, hold on a second. Uh, unless you think you're close. Uh, listen, yeah. We-we know you're a tough guy. He knows he's a tough guy. You know that he's, he's a violent, violent guy. We know that he's wanted in El Salvador, and it's not our intention to send him back there. He's wanted in San Salvador for many violent crimes. What he did here is a very violent crime as well, and he's done on the case here. In my opinion, I've looked at the, the identifications. I know who's identified him. There's no way out of this case here. I mean, he's done. And I know he's a tough guy. I know he's a shooter. I know he's an enforcer. I know he's a gangster. And he does these violent acts, you know, to, to put down his enemies, to show that he's tough and whatnot, but for someone that's a man, like he is, and someone who's as tough as he is, he's hiding behind these three guys while they sit in jail for him. He's hiding behind them. And, and that doesn't seem characteristic of what he's all about. . .to be hiding behind these guys here. And then. . .*

LA 2:    Yeah.

LA 1:    *. . .he looking he looking at their photos, and he knows all these guys. And he's hiding behind them for something that he did. Now if they all knew that he was gonna do this, or they all planned that he was gonna do this, then they need to stay there. That's fine with me. But he needs to take responsibility for he's-he's done.*

LA 2:    You understand that. . .

LA 1:    *And if he needs us to help his family or help him with, you know, where he's gonna serve his custody and stuff. You know, we can look into that. But he's gotta be a straight-shooter with us and we can sho. . . we can be a straight-shooter with him too.*

LA 2:    Understand, that we only want the truth. We know that, eh, this case you're here for is very serious here. Eh, [UI section] and it's going to be finished, and we don't want you for that. We don't want to affect that. And we know about, about your past, your time in El Salvador that they were looking for you for homicide also in El Salvador.

AU:    They also got me for. . .I was arrested there for homicide, for intended. . . supposedly, kidnaping, and for everything. [UI] in El Salvador. You know how the situation is there.

43

JA3747

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 2:       I know.  But you also know that, that they looked for you.  They're waiting
            for you there also. . . to, to this present day. And [UI section] they. . .

AU:         [OV][UI]. . .

LA 2:       In your time, that's true, you are a tough man, a gunman.

AU:         Huh!

LA 2:       *Okay?*

AU:         Yeah.

LA 2:       And then they all, all were afraid of you. They had respect for you because
            you were good with the gun.

AU:         Huh!

LA 2:       *Okay?*

LA 1:       *People talk about him.  He's a legend.*

LA 2:       And everyone, everyone. . .and everyone talked, uh, talk about you.

AU:         Ah, [UI].

LA 2:       Yes, they talk about you. . .about your past.  The things that you [plural]
            have done that. . . well. . .

AU:         That's, that's strange. . .

LA 2:       . . .without fear.  That. . .that you've confronted the enemies and you've
            done your part. Have represen--you've represented the family well.

AU:         [UI].

LA 2:       And they know that.  *Okay?*

AU:         Yes.

LA 2:       But. . .  Look, if you're going to hide behind those three.  And if you're the
            person that we think you are. . .you're a man, uh, uh, to do your things. [UI]
            there's no way that you can get out of this problem.  *Okay?*  You're finished
            in this case here.

44

**JA3748**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Uh-huh. |
| LA 2: | We want to know.  If they're not involved, if they didn't know what was going to happen that day, if they're innocent people, we want to know. . .at least about you.  Say what happened. |
| LA 1: | *He. . .he's got a baby.* |
| LA 2: | He has a baby? |
| AU: | I know. |
| LA 2: | Chipies [PH] has a baby. |
| LA 1: | *And he sat there in the interview room and cried over not seeing his, his baby.* |
| LA 2: | He was crying the day that we arrested him. . .for his baby.  Chipies [PH] already has a baby now with Luis' sister also.  *Okay?*  And Chipies [PH] hasn't seen his baby. Understand? |
| AU: | [UI] |
| LA 1: | *His, his baby is probably like two or three years old by now. . .or older maybe by now.* |
| LA 2: | [UI] is almost three years. |
| AU: | Yes. |
| LA 2: | *Okay?*  Chipies [PH] hasn't seen his little girl. |
| LA 1: | *And, and if [UI] take the wrap, man.  Tell him, "Hey.  We-we already filed a case in Los Angeles.  We already have a warrant for his arrest."  I wanna make sure he knows that.  We already have a warrant for his arrest.  It's not a matter if he did it.  It's-it's a matter of why.  It's makes a difference to me if. . .who started this thing and what these guys all did.* |
| LA 2: | [OV][UI]. . . |
| LA 1: | *And if one of these guys is the shooter, and they're just trying to pin it on him, I need to know that.  But take responsibility for what you did.* |
| LA 2: | [UI]. |

45

**JA3749**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 1:    *You're done. He's done. He's gotta understand that he's done here. I have no problem. I mean, the, the. . .from the people that identified him, he's done here on double murder. Okay? And he's probably not gonna go anywhere else, but let's clear this thing up too.*

LA 2:    To clear all this up. He knows that you're done on this case here. It's very strong and he knows it. It's his own opinion. You understand? Of course, they have family, but if they're not responsible, they didn't-didn't know what was going to happen or don't know, the thing is different. If they were also responsible, let them stay where they're at. *Okay?* Because if we wanted to, we could have put you, taken you to Los Angeles. But they know that this charge also. . .

AU:    [UI] that, that it's best to take me over there.

LA 2:    What?

AU:    [UI] take me over there. [UI section] Fuck, because it's rough here.

         [OV section]

AU:    . . .[OV] they want to take over one's mind. Well, yes.

LA 2:    But you understand what you think that's here and there, it's different. There, at the county. . .you're not going to go to the county. You understand me?

AU:    [OV][UI]. . .

LA 2:    No, things are very different there. There you [UI] you don't have, don't have, uh. . .from one, one, one hour of yard. Calls and visits are at, at a minimum. And. . .

AU:     Fuck, here. . .fifteen minutes [UI] to my wife. . .

LA 2:    Telephone is fifteen minutes. It's the same thing.

AU:    Yes. *Okay.*


46

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | But the important thing is to take responsibility for what happened. They also have families. If they're culpable, let them stay. Right? If not, well, we have to take responsibility with what happened that day. Just that, *okay?* If you're a gunman, you don't have, eh. . . hey! I, I know you very well [UI]. *Okay,* one suddenly changes. I understand that. *Okay.* People have children, they change, and their life changes, but we can't erase the past. And this time about the past is what we want to clarify. The things that happened in the past. You understand me? |
| AU: | Uh-mm. |
| LA 2: | People. . .things that happened to these individuals in the car. You tell us what happened. |
| AU: | Ohh. . .what happened, happened. |
| LA 2: | What was it that happened? |
| AU: | What they say. |
| LA 2: | Huh? |
| AU: | What they say. . . shootout or something like that. |
| LA 2: | *Okay.* And, and how, how, how did it really happen? |
| AU: | I don't know. |
| LA 2: | And what happened to the gun afterwards? |
| AU: | I don't know. I don't know which gun then. |
| | [UI section] |
| AU: | Understand? Well, yes. . .what they're saying or I don't know if they, they, they say things about. . . |
| LA 2: | They don't say things. Only, look, if you erase what they said. . .the witnesses there. The case goes there. It's, it's already done. |
| AU: | Uh-huh. |

47

**JA3751**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *Okay?* We just expect that. . .Well, we-we don't want to take you because the case here is strong.  We know we can close the case by knowing the truth. . . and whatever happens here, it happens here if that, that is necessary.  You understand me? [pause] *Okay?*  But. . .it's to know.  It's to know the whole truth.  To know who was it, what part did they have in it also.  If they didn't take part, it's to know the truth.  If they didn't know what was going to happen, eh, for us it's to know the truth.  *Okay?*  There are two dead persons there with family, with children. *Okay?*  With mom, with dad, with sisters. . . |
| LA 1: | Uh-mm. |
| LA 2: | . . .and that they have-have suffered only to know what was it that happened.  Who are the guilty ones.  *Okay?*  Doing a life [sentence] in a jail over there or here [UI] it doesn't-doesn't change things.  *Okay?* |
| AU: | [UI] |
| LA 2: | They can't give double life, double life, triple life to a person.  There's just one life that we can change, uh, take to prison.  Understand? |
| AU: | Nothing of the. . . |
| LA 2: | *Okay?* And we know that. . . |
| AU: | Yes. Yes. Well, the whole life, they're throwing me the problem, well. It depends there on you [plural].  Understand?

[UI section] |
| LA 2: | I know. . .this case, the case can, the case can be proved.  Nothing is not 100 percent. |
| AU: | Yes. |
| LA 2: | *Okay?*  But in reality, I'm here spending my time to know what I'm, I'm going to do. . .to prove it.  *Okay?* |
| AU: | Yes. |
| LA 2: | We're here only for the truth because the truth. . . |
| AU: | Eh. . .counts. |

48

**JA3752**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| LA 2: | Yes, counts for something.  You understand me? |
|---|---|
| AU: | I know. |
| LA 2: | It counts for something. |
| AU: | [UI] |
| LA 2: | One is not going to only jail a person [UI] just to jail him. . . but to get the truth out.  Only.  And here, it doesn't cost you anything. |
| AU: | [UI] |
| LA 2: | [UI] Do it for yourself. . .being a father, being a brother, being a son that if the same thing had happened to your family, you would also like to, well, know. |
| AU: | Fuck, I'm going to take it as, as, as things come to pass. |
| LA 2: | Well, that family. . .you think that mother can [UI section] fix things up as she would like? |
| AU: | But each. . .Okay, each, each, each member that we get into the gang, we know, we know. . . |
| | [OV] |
| LA 2: | . . .they-they-they were not gang members. |
| AU: | Huh? |
| LA 2: | The two there were not gang members.  They were *taggers*. |
| AU: | Okay. |
| LA 2: | You know what, what, what are *taggers*? |
| AU: | Yeah. |
| LA 1: | *Oh, they're, they're [UI]* |
| AU: | The ones that are marking [things]. |
| LA 2: | Uh-mm. |

49

**JA3753**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        Right?

LA 2:      *Well, he's just [UI] out the name, uh, all over there. All gangsters know that when they get into, uh, a gang they know that there are consequences.*

LA 1:      *They were taggers?*

LA 2:      *Long time. When you grow with gangsters, they were taggers.*

LA 1:      *Right. Yeah. They were taggers. They were sixteen and seventeen years old?*

LA 2:      Sixteen, seventeen years. Young guys.

LA 1:      *Juan. . .Juan wasn't even a tagger. He was just thinking about it and. . .*

LA 2:      Juan wasn't . . .

LA 1:      *. . .he was just with. . .*

LA 2:      *. . .a tagger* [UI] a friend.

           [sound]

LA 1:      *I need to know. Did they, did they start it?*

LA 2:      Who, who [UI]? Did they start the fight?

LA 1:      *Or, or did Negro start it?*

LA 2:      Or was it Negro that started everything.

AU:        [chuckle]

LA 1:      *Or did you start it? I-I don't know.*

LA 2:      Or you started it?

AU:        It was Negro. [UI] .

LA 1:      *Or Shrek?*

AU:        Shrek! [chuckle]. Chipies [PH].

LA 1:      Chipies [PH].

50

JA3754

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:  Ah, no. And Negro knows what happened there. Understand? He [OV]

LA 2:  [OV] [UI]. . .

AU:  He knows who got out and who didn't get out.

LA 2:  *Okay.* If. . .all right.

  [UI section]

LA 2:  You've said it. The truth is already known. The truth that they have told us, is already known.

AU:  If they say that [UI], it's too bad. What-what can I do? Understand.

LA 2:  The truth! Was it you?

AU:  Nothing.

LA 1:  *I'll be honest with him if he can be honest with [UI].*

LA 2:  Did you get out of the car?

AU:  No.

LA 2:  You didn't get out of the car? You stayed inside the car?

AU:  Not either.

LA 2:  Well, what was it?

AU:  I don't know.

LA 2:  *Okay.* You know that we know that you're lying. Simply because there are. . .

AU:  [UI]

LA 2:  . . .I tell you, there are witnesses. Besides there are witnesses, well, they have told us, there are witnesses that place you there.

AU:  Uh-huh.

LA 2:  That you were there. You got out of the car. They saw you get out of the car.

<center>51</center>

<center>**JA3755**</center>

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| AU: | Uh-huh, but how, how, how, how are there witnesses if there aren't people that were even near to where I was or where I. . .I don't even know about where you're telling me. |
| LA 2: | Uh-huh. |
| AU: | Or I don't even know or where the problem happened there also.  And how, how can the people know some-something when, when they weren't present. |
| LA 2: | There were people there that were present on the street on that day.  People saw you. People from the area. |
| AU: | [chuckle] |
| LA 2: | *Okay?*  People that saw you when the car stopped. . .you [plural] got off. They were seen together with the, with the two, and they fired at and killed both of them.  You think that in the middle of the day that it's not going to come to people's attention?  *Okay?*  They don't even have to know you, but they recognized you in the photo.  Perhaps like. . .the others also. |
| AU: | I came out in a photo? |
| LA 2: | A photo. *Okay?* No, [UI]. . . |
| AU: | What area is it?  The, the, the. . .the *Fairfax* [PH]? |
| LA 2: | You know where you were that day. |
| LA 1: | *Exactly where it happens is where it happened.* |
| LA 2: | That's where it happened. |
| AU: | Uh-huh.  [UI] the photos were from you [plural] from, from Hollywood? |
| LA 2: | Uh-mm. |
| AU: | Understand? |
| LA 2: | Yes. |
| AU: | You were the only ones who had a photo like that. [OV] |

52

JA3756

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | That's where it is. . .it's the City of Los Angeles there. Hollywood is in Los Angeles. |
| AU: | I know. |
| LA 2: | I'm a policeman from there. |
| AU: | Like if you were going to tell me about the case that happened also at another places, huh. |
| LA 2: | What other places?  Huh? Which other ones? |
| AU: | From other places that, that could have happened, and then you [plural] are going to look for me right now.  You're going to say that, that it's me, me. |
| LA 2: | Look, I want to clear up this case and another.  And that's it. |
| AU: | Yes. |
| LA 2: | *Okay?* Look, I-I don't want to take your time any more, your life, but I also want-want to know. . . We also-also know that you have someone in New York and you want to stay there.  You also have, eh, perhaps, your family needs help for protection.  *Okay?*  That is what I understand [from] what you have told me.  *Okay?* |
| AU: | Protection. [UI] economically [UI]. |
| LA 2: | *Okay.*  But there are things that we also can do it if it's necessary to do it.  *Okay?* And no. . .[UI] it's things that we know about a case that have to be done.  *Okay?*  But it doesn't cost us here. It costs us time. We already know the details. We know. . . we have more evidence than what we need.  But it's not our. . .that's not, not. . .we're not looking for it.  What we're looking for is the truth.  *Okay?*  Because we know 100 percent that you [plural] were there and you [plural] got out of the car.  There were people from the area that saw what happened. . .that recognized you [plural].  *Okay?* |
| AU: | Uh-huh. |
| LA 2: | And there's no question on that.  *Okay?* There are people there that. . .well, don't, don't know you.  They didn't know anything.  It's nothing, it's not that they have something against you.  You understand? |
| AU: | Yes. |

53

Case 3:16-cv-00057-MOC    Document 59-9    Filed 03/23/17    Page 72 of 524
JA3757

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | The told us, "Hey, they got out. . .that person, that person, that person." *Okay?* And yes, it took work, but we had the photos. You had photos. *Okay?* You think that the photos we took of you there were for our pleasure? It's to have a record to know. |
| AU: | [UI] Miguelito had been recognized at that time. Understand? |
| LA 2: | *Okay.* |
| AU: | And you [plural] made a big scene so that the people would say, "Hey!" [OV] |
| LA 2: | No, we don't, don't. . .it's not, we don't do that work to make a scene. *Okay?* That, that is [UI]. . . |
| AU: | That, that day. . .that day Rufa [PH] went down. . . |
| LA 2: | [OV] Uh-huh. |
| AU: | . . .when, when they arrested him, I told him, "It seems like it was [UI]." If they're going to take him and they're going to. . .going to beat him, I told him, well, we're used to that. It's all shit over there. . .our authorities. Understand? And, well, yes, we are used to that. |
| LA 2: | [UI] but the thing is different, and that is not what happened here. |
| AU: | Yeah, I know. I know that didn't, didn't happen. |
| LA 2: | Uh-huh. |
| AU: | No, but, eh, you told me, "Come here. We're going to ask you some questions." [UI] you told me, "We're going to [UI] you or we're going take several photos from here and there." You're going to hold me here. Because you even arrested Chipie [PH]? |
| LA 2: | Yes. |
| AU: | [OV]. |
| LA 2: | [UI] that is Intelligence's job to know. . .recognize the gang members, to recognize the people that are in the area. And if people don't get involved in crime, there's nothing to be afraid of. Understand? |
| AU: | Yes, [UI]. |

54

**JA3758**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 2: | But it's Intelligence. . .to know which gang members we have in the area. Who is with whom.  Who knows who. *Okay?*  That is what the work involves. |
| AU: | Oh, yes. |
| LA 2: | But, you know that, that is Intelligence, those photos, that in the end is what is against you. *Okay?*  People, people from. . . |
| AU: | Okay, when that happened about, about. . .  Do they really recognize me? |
| LA 2: | Yes. |
| AU: | When they shot at him. . . |
| LA 2: | Uh-mm. |
| AU: | . . .what they did to the truck. |
| LA 2: | Yes. |
| AU: | If it's because of that, how did that turn out? |
| LA 2: | *Yeah.* What. . . |
| AU: | Understand? |
| LA 2: | . . .what happened with that? |
| AU: | That they shot him. |
| LA 2: | Who? |
| AU: | Huh? |
| LA 2: | Which ones. |
| AU: | No. . .I'm not, not aware. . .no, nothing.  Some dudes. |
| LA 2: | Mm. |
| AU: | From another, from another gang.  I know that they fired an Uzi at him. Yes, huh! [UI] No, and luckily that. . . |

55

**JA3759**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 2: That's, uh, that's life. But also you know that there is, there are [UI]. . . people in jail. . .responsible for that case also. Right? All cases are important, be they gang members or regular persons. Right?

AU: All [UI].

LA 2: There's no difference. Everything, everything is investigated the same way. A life is a life. . .it has value. *Okay?* But. . .

AU: Let me look at the photos.

LA 2: There are many known ones, you know. Uh, it's not a question here that if you were involved or not involved or weren't implicated. That is already known. It's only the, the, the details. It's the details. And many people, "Well, ah! Well, why do they want to know the details," and that if. . .

AU: Of course, that. . . *You want*. . .as you lay it out, the way, they way they said things were done, then. It so happened that we all got out and what happen, happened.

LA 2: *Okay.*

AU: Yeah.

LA 2: So you [plural] got off. . . you--you're telling me that you [plural] got off and then, well, what happened, happened.

AU: Uh-huh. It's, it's what they say.

LA 2: *Okay.* What. . .what the witnesses say?

[OV section]

AU: It's what, it's what, it's what you were explaining to me that. . .

LA 2: I haven't explained anything to you. Only that you [plural] got out and it was. . .

AU: [coughs]

LA 2: . . .uh, someone fired shots. . .

AU: Uh-huh.


56

**JA3760**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | . . .and that two died. |
| AU: | Uh-huh. |
| LA 2: | So that day, you were in the car. . . |
| AU: | Uh-huh. |
| LA 2: | Yes?  You [plural] got out of the car. |
| AU: | Uh-huh. |
| LA 2: | *Okay.*  Everyone or. . .four, the five. . .how many? How many got out of the car? |
| AU: | How many of us were there? |
| LA 2: | You tell me.  You were there. |
| AU: | [chuckles] [UI section] |
| LA 2: | All the photos that they showed you. . .you and those persons. . . |
| AU: | Uh-huh. |
| LA 2: | . . .how, how many got out of the car? |
| AU: | Four. |
| LA 2: | Four got out of the car. |
| AU: | Uh-huh. |
| LA 2: | And the two on the street, where were they? |
| AU: | I don't know. |
| LA 2: | On the sidewalk near the car, I mean, where you [plural] stopped the car? [pause] *Okay.* |
| AU: | I don't remember. |
| LA 2: | *Okay.* Did you [plural] walk a lot when you got out of the car. . .did you walk a lot? |

57

JA3761

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:  No. . .well, if, if. . .am I not telling you that. . . Well, yes, what you [plural] are saying.

LA 2:  Uh-mm.

AU:  I'm doing this like this because. . .Well, yes. What can I tell you if I don't, don't remember anything?

LA 2:  *Okay.* I just want what you can remember.

AU:  Yes.

LA 2:  Wasn't it that you [plural] ran after them?

AU:  [sighs]

LA 2:  You [plural] got out. . .from the car. You [plural] got into a word-fight or what was it that happened?

AU:  It was an argument or something was what must have happened.

LA 2:  *Okay.* And then from there. . .?

AU:  What happen, happened.

LA 2:  *Okay.* And what was it that happened?

AU:  There were two dead persons there.

LA 2:  There were two dead persons. *Okay.*

AU:  Uh-huh.

LA 2:  And who, who fired at the two dead persons?

AU:  I don't know that.

LA 2:  You don't know. Did you see it?

AU:  Look. . . perhaps my hands, perhaps someone else's hands, perhaps Negro's hands, perhaps Chipie's [PH] hands.

LA 2:  *Okay.* . .but you, you know. I only heard two [UI]

58

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

AU:     Or you know what?  Better still, I'll do one thing.  Let me go and give me the problem if you want.

LA 2:   *Okay.*

AU:     [UI] yes, simply so that. . .I have another case which is almost the same.

LA 2:   No, look. . .

        [UI section]

LA 2:   *Okay?*  You, you say, well, perhaps it's this person, perhaps it's that person, perhaps another person. . .a person that fired. *Okay*, that's fine. But if there's one in those four, who is not guilty and is in jail and shouldn't be in jail, that's, that's the reason why I ask you who was it that fired.  You understand? You understand?  I'm not one who that, "Well, hey! Well, all are gang members. You [plural] have, have to get arrested." *Okay?*  That is the only difference there.  Guilty. . .everyone is guilty.  If the gang member is guilty, he's guilty.  If he's not a gang members and is guilty, he's guilty.

AU:     If, if. . .ah, if he was. . .if he was or not. . .[UI]. . .perhaps I had been, I had been there, and perhaps if they would have stared at my face perhaps I wouldn't have been involved in, in the case. *Okay?*

LA 2:   *Okay.*

AU:     Understand? Like in the case that I am in right now.

LA 2:   But, but you know that there, there are also cases in which, well, the, *home boys* get out or they see that you got out [of the car].  They get out because . . .hey! Well, it's our *home boy*, and well, what happen, happened. . .and, uh, and perhaps they knew, maybe they didn't know you were armed.  Did they-they know you were armed?

AU:     [chuckles] [UI]

LA 2:   Do you understand?

AU:     Yes.

59

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | I don't know.  But you know, because if there's. . .they're fathers.  *Okay*, and that also.  You have, have to know it.  If there's a chance that they're not responsible and they can go back to their lives with their children for a time, I owe them at least that. . .guilty. *Okay?* |
| AU: | [UI] |
| LA 2: | I can't [UI] well, hey, I feel something for them.  I feel something for the truth.  *Okay?* And the, the good that has to be done.  If they're not responsible. . . if they didn't know anything about, uh, what was going to happen or maybe what was going to happen, and, and they're in jail. |
| AU: | Fucking Negro. |
| LA 2: | Why fucking Negro? |
| LA 1: | *He's the one. . .that started it.* [clears throat]  *Yeah?* |
| LA 2: | Was he the one who started everything? |
| AU: | Uh-hum.  And he was the only one. . .the only one that is opening his mouth.  You understand? |
| LA 2: | Well, help us. |
| AU: | Huh!  He knows what happened and he, he, he, he has his fingerprints also, well, understand. |
| LA 2: | *Okay.* I know.  I know.  And do you think. . . You think that we want here. . .? |
| AU: | Like that. . .how, how. . .I know.  Maybe. . .see, maybe he could have talked if he's not arrested. |
| LA 2: | You, you think that we want to finish with you?  If you already have this case, you [UI] person very important. |
| AU: | No, [UI]. . . |
| LA 2: | You are of service to us to. . .because you don't have anything to lose and to, to say nothing. . . to tell us the truth.  Right?  *So* okay, that day, uh. . . [UI] |
| AU: | Imagine. . . |

60

**JA3764**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:       Tell us. . .

AU:         Imagine. . .I have this problem here and now, now I'm involved in this
            thing.  How, how do you think that I'm going to get into the, of the case
            that's we have here.

LA 2:       We don't-don't want to affect the case here at all.

AU:         But you know that it's already, already affected.  Understand?

LA 2:       No.

AU:         And, and then too bad, I have to face up to the, the things.  Understand?
            And it's a pity, my-my children are, are little, well. . . If I have an
            opportunity, well, I'll be able to see them again.

LA 2:       *Okay.*

AU:         And if not, well. . .

LA 2:       Yes. . .

            [OV section]

LA 2:       Opportunity. Opportunities are made. [UI]

AU:         It's a lie that, that, that I can accept something [from you] that. . . Well, if
            one hasn't committed it.

LA 2:       *Okay.*

AU:         Understand, and someday in the future when. . .as in the case here, someday
            when you [plural] want to let me go, well. . .It's best that, that you [plural]
            give a weapon to the, the person, the family members, and that they shoot
            me as, as they say that I've shot at their family member.  Understand?

LA 2:       Huh.

AU:         So that. . .Well, in reality, no, I'm not afraid of death.  I'm not afraid of
            anyone.  Understand? [OV]

LA 2:       *[OV] the victims' families want. . .*

AU:         [OV] The only thing. . .

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 80 of 524

**JA3765**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *. . .if they want to harm him, the victim's family is to shoot him, but, yeah, he's not afraid of death.* |
| AU: | . . .the only thing. . . |
| LA 1: | *Okay, but what else did he. . .?* |
| LA 2: | *He, he, he was going into the [UI].  He was there.  He did get out of the car, and that two people did die, but we're trying to get into the details.* |
| LA 1: | *Yeah.  Please.* |
| LA 2: | *[OV] out there.* |
| LA 1: | *But he say, he's like " pinche Negro" [Fucking Negro].  Uh, he's the only one that's not in jail.  He's not, not in, in jail.* |
| LA 2: | He knows that he's not in jail? |
| AU: | Yes. |
| LA 2: | But he could be in jail. . .if we know everything that happened. *Okay?* Because we know. . . |
| LA 1: | *I, I don't think the families want to kill him.* |
| LA 2: | Look, but he knows that it's something. . .a fantasy that the people . . . |
| LA 1: | *His, his sister calls me every day. . .almost every day.* |
| LA 2: | The family doesn't, doesn't. . . it's a Christian family. |
| AU: | Uh-huh. |
| LA 2: | They're not ones that want. . .I mean, want to kill a person. |
| LA 1: | *They just want to know why.* |
| LA 2: | They rather just want the truth. They want to know the reason, and maybe, if there's something else that they can forgive. |
| AU: | The only thing that happened there was that one of them came, came near. He threw neighborhood signs and, you know, that when, when. . . |
| LA 2: | *Okay.* |

62

Case 3:16-cv-00057-MOC   Document 59-9   Filed 03/23/17   Page 81 of 524

**JA3766**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


|         | [OV Section]                                                                                                                  |
|---------|------------------------------------------------------------------------------------------------------------------------------|
| LA 2:   | *Okay.*                                                                                                                       |
| AU:     | Bah, that he almost, almost hit us in the, the. . . He didn't, didn't hit us to [UI], but [UI]  He just got close-by and [UI] |
| LA 2:   | How [UI] that?                                                                                                                |
| AU:     | [UI]. *West side.* [UI]                                                                                                       |
| LA 2:   | They threw out *West side* at you.                                                                                            |
| AU:     | *West Side* or *White Fence*, I don't know what [UI] they are.                                                               |
| LA 2:   | One, one or the two of them?                                                                                                  |
| AU:     | One.                                                                                                                          |
| LA 2:   | *Okay.  So one of the guys threw [UI] threw a W.*                                                                            |
| LA 1:   | Uh-huh.                                                                                                                       |
| LA 2:   | *He said he didn't know gang or what, but he saw a W.  He thought maybe it was White Fence.   And what, what was it?  What sign?* |
| LA 1:   | *And he, he had another incident with White Fence if we want him to get into that now or later.  Okay?*                      |
|         | [OV in background]                                                                                                           |
| AU:     | Uh-huh.                                                                                                                       |
| LA 1:   | *But. . .so one of them threw up at. . .*                                                                                    |
| AU:     | [in background] [UI] understand?                                                                                              |
| LA 2:   | [in background]  *Okay.*                                                                                                      |
| LA 1:   | *Which one?*                                                                                                                  |
| LA 2:   | You know which one was that threw the *W?*                                                                                   |
| AU:     | Hum?                                                                                                                          |
| LA 2:   | Which one was it that threw *W.*                                                                                             |

63

**JA3767**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:         Didn't I tell you that I don't remember.

LA 2:       *Okay.* You don't know if it was the tallest one or the shortest one? Don't you remember which one?

AU:         I think it was the tallest one.

LA 2:       *He believes it was the taller one. Okay.*

LA 1:       *Okay.*

LA 2:       And but you didn't see what, what gang or what? You just saw a *W*?

AU:         One. . .

LA 2:       And you thought *White Fence* [UI]

            [UI Section]

AU:         Two Ws.

LA 2:       Two Ws?

AU:         Yes.

LA 2:       With both hands? Like this?

AU:         Yes.

LA 2:       *He says he threw up two Ws like this with both hands.*

LA 1:       Huh!

LA 2:       *Okay*, and what followed after that?

LA 1:       *Has, has he had problems with White Fence in the past. . .or?*

LA 2:       Have you had problems with *White Fence* with those gang members of [UI]?

AU:         Huh?

LA 1:       *Did that put him on the defensive, I mean. . .?*

LA 2:       You were on the defense. . .on, on the defensive there.

64

**JA3768**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | All the gangs are against the *MS-13*. |
| LA 2: | *He says, yes, 'cause all the gangs are against MS.* |
| LA 1: | *Okay.* |
| LA 2: | But only *White Fence* because [UI].<br><br>[OV section] |
| AU: | Whatever guy or neighborhood.  Understand?  Whoever, whoever it is. |
| LA 2: | Mm. |
| LA 1: | *See I. . .and I can understand him reacting the way they did if they're throwing up a W because I. . .we know about White Fence.  We know what kind of activities they. . .* |
| LA 2: | He, he understands that, uh. . . |
| LA 1: | *And I can explain that to the family.  Hey, when you throw up a W, this is what it means.* |
| LA 2: | [UI] he can explain it to their family that. . .Hey, well. . .  You know, when someone throws a neighborhood sign, you put some gang members on the defensive.  That, "Well, hey!" It's a mentality that changes. |
| AU: | Yes. If, if if he. . .if he had had a weapon, how do you think he would have left everyone inside the car? |
| LA 2: | *Okay.* Well, but he didn't have a weapon. |
| AU: | I don't know if, if he had it and maybe he didn't want to take it out or what. |
| LA 2: | *Okay.* But you didn't know that, but you perhaps. . .once you saw a neighborhood sign, you already knew that you were going to confront a, a gang member. . .that maybe was armed.  Yes or no? |
| AU: | Yes. |

65

**JA3769**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:    *Okay. I ask him and he says, "Yeah," he goes, I ask him, "So in, in your mind once you start to throw gang, gang signs. You got put on the defensive," and he say [UI], "Yeah, you know, I didn't know if he was gonna be armed or not." He goes. . .he asked me. He goes, "What would you think?" Uh, if he would've had been armed then, you know, it would have us in the car that would've gotten it.*

LA 1:    Uh-mm.

LA 2:    *I go, "Well, did you ever see at all, a gun?" He said, "Well, no." Maybe he was afraid to pull it, or maybe he just didn't get to pull it.*

LA 1:    *Okay. Well, that, that makes a difference to me. [UI]. . .*

LA 2:    That, that changes everything in his mind. And those are also very difficult things that can be explained. . .but to the family.

LA 1:    *It's hard for me to go to the family and, and tell them. . .*

LA 2:    Because. . .

LA 1:    *. . .these things, but they need to know the truth about it.*

LA 2:    It's, it's only the truth. The, the truth changes everything for the family.

LA 1:    *And if they are every gonna face him, then I want them to know what you were really thinking during this time.*

LA 2:    And if at some time they come to, they want to, or possibly they want to talk to you to ask you something if. . .but that's one day if, if you also want. . .

LA 1:    [clears throat]

AU:    Uh-mm.

LA 2:    . . .talk to the family, for, for forgiveness or whatever. . .that they also know what was on your mind when everything happened. Understand? It wasn't for evil. It wasn't for because, "Hey, it was only two guys there that you [plural] wanted to hit them [just] to hit them." Understand?

AU:    Yes, well.

LA 2:    It's, it's only at the moment.

66

**JA3770**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| AU: | Yes. |
|---|---|
| LA 2: | I don't know your mind if, if you don't tell me. And that. . .well, you know that. . . him knowing that. . . |
| AU: | Yes. |
| LA 2: | . . .and also changes his opinion. But it's how they tell you, small details. *Okay?* [pause] *So* the four got out of the car and of those. . .five, who stayed in the car? |
| AU: | Moe. He doesn't have, he didn't participate in anything. [OV] |
| LA 2: | Moe stayed, stayed in the car? |
| AU: | Yes. |
| LA 2: | *Moe stayed in the car.* |
| AU: | No, you know what? Put that case on me if you want to, *man.* |
| LA 2: | Look. . . |
| AU: | Understand? The, the problem is that [UI], well. If they are going to say something or [UI] have said. . . |
| LA 2: | As I've told you, I don't care right now what they have said. The reason that I. . .that I, I think that it is you who is telling me the truth. I have more faith in. . . |
| AU: | Yes. |
| LA 2: | . . .eh, in you than them. *Okay? So* Moe stayed in the car. . . |
| AU: | [OV] Luis. . . |
| LA 2: | . . .who else stayed in the car? Or Moe was the only one? |
| AU: | Only Luis stayed. |
| LA 2: | *So* everyone got out? |
| AU: | Uh-huh. |
| LA 2: | Did anyone, anyone have suitcases [sic]? |

67

**JA3771**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Luis was still with crutches. |
| LA 2: | And did he get out or he didn't get out? |
| AU: | Huh? |
| LA 2: | Is it him? *Luis got out of the car as well.* |
| AU: | Ah, no, no, he didn't get out. |
| LA 2: | Okay, Luis didn't get out. |
| AU: | No. |
| LA 2: | *Okay.* So you got out with, uh, Negro? |
| AU: | Uh-huh. |
| LA 1: | And? |
| LA 2: | And Chipies [PH]? |
| AU: | Yes. |
| LA 2: | *Okay. So. . .* |
| AU: | [UI] there was, there was another person there. |
| LA 2: | Uh, another person? |
| AU: | Yes. |
| LA 2: | Yes?  Where did you have him? |
| AU: | Huh? |
| LA 2: | There were. . .how many were in back with you [plural]? |
| AU: | Four. |
| LA 2: | Four in back? |
| LA 1: | No. |
| AU: | And two in front.  Yes. |
| LA 1: | Four in, in the back? |

68

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| AU: | Eh, *yeah.* |
| LA 1: | *I thought it was just Luis, Chipies [PH], and Negro. . .in back.* |
| LA 2: | He knew that. . .that there were three in back.  Luis, Chipies [PH] and Negro. |
| AU: | Uh-huh.  But there was another person.  I don't remember what the. . . |
| LA 2: | *He says there was a fourth person that. . .* |
| AU: | [OV] [UI] but I don't remember. |
| LA 2: | *He can't remember him.* |
| LA 1: | *Does he. . . He doesn't remember his name or. . .?* |
| LA 2: | No. . .with the nickname [UI]? |
| AU: | Huh? |
| LA 2: | Was it *JM* [PH]?  Was it *MS*? |
| AU: | It was JM [PH]. |
| LA 2: | Was it another dude from JM [PH]? |
| AU: | Yes. |
| LA 2: | *Another guy from JM [PH].* |
| LA 1: | Huh. |
| AU: | Eh. . . |
| LA 1: | *What the. . . Well, who got out of the car?* |
| LA 2: | *So* who got out of the car? |
| LA 1: | *So* Negro and Chipies [PH]? |
| LA 2: | Negro, Chipies [PH], you. . .? |
| AU: | Uh-huh.  And the other guy. |

69

**JA3773**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *And the other one. He's saying it was him, Negro, Chipies [PH] and this other guy.* |
| LA 1: | *Did someone have anything in their hands?* |
| LA 2: | Did someone have, someone have something in their hands? |
| AU: | The crutch. |
| LA 2: | *Okay.* Who got out with the crutch? |
| AU: | I don't remember if it was Negro or, or. . . |
| LA 2: | *He says somebody got out with a, with a crutch. He doesn't remember who it was.* |
| LA 1: | Is it possible. . .Negro? |
| LA 2: | Possibly Negro? *Possibly* Negro. |
| LA 1: | And Luis? |
| AU: | But Luis couldn't walk at that time. |
| LA 2: | *He says Luis couldn't really walk at that time.* |
| LA 1: | *'Cause he had the, the thing on his leg.* |
| LA 2: | Because he had the thing there . . .on his leg. |
| AU: | Yes. [UI]. |
| LA 1: | What, what kind of car? |
| AU: | An *Altima.* |
| LA 1: | What color? |
| AU: | A gray, something like that. I don't remember. |
| LA 2: | *Grayish.* |
| LA 1: | Yes. |
| AU: | Or brown, something like that. |

70

JA3774

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *Brown. Grayish-brown.* |
| LA 1: | *Grayish-brown. Altima. Okay.* |
| AU: | Yes. |
| LA 1: | Is it a Nissan?  Yes? |
| AU: | Yes. |
| LA 1: | *Okay.* |
| AU: | [UI]. |
| LA 1: | *Well. . .* |
| AU: | [UI section] that I didn't drive, but. . .  Understand?  [UI]. . . |
| LA 2: | After that? |
| AU: | Yes. We went to a, a funeral. . .in North Hollywood. |
| LA 2: | *Okay.* But later on, later on after the two were shot? |
| AU: | Yeah. [UI] |
| LA 2: | Where did you [plural] go? |
| AU: | After that, yes. You were talking about, about, about going to the beach. |
| LA 2: | That is what we had heard, but no. Do you, you remember? |
| LA 1: | *Did they eat anything at the beach?  Did they stop anywhere and. . .* |
| LA 2: | Did you [plural] stop to eat at some place there after you [plural] left there. . .uh, uh, from that encounter with those two dudes. |
| AU: | I remember that we bought something there. |
| LA 2: | *Uh-mm.  He remembers stopping to get something from around there.* |
| AU: | I don't remember now. |
| LA 2: | *He doesn't remember well.* |

71

**JA3775**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 1: | *Did someone go back later on to see what happened?  Who, who, who went back later on to check it out?* |
| LA 2: | After everything happened on that, that night. . .later on, uh, later on, did someone return to that area to see what it was that happened? |
| AU: | No. |
| LA 2: | To investigate? |
| AU: | No. |
| LA 2: | That you know of? |
| AU: | No one that I know. |
| LA 2: | *Nothing. . .nobody that he knows.* |
| LA 1: | *Did these two guys say anything?  What did they say?  That's important to me?  What did they say?* |
| LA 2: | *Okay.*  He wants [UI] a little more.  If you remember that the two guys, if they said something?  Something in English that maybe you, you remember. |
| AU: | Okay, yes, they only spoke in English. |
| LA 2: | But you don't know. |
| AU: | [UI] no, no, I don't remember. |
| LA 1: | *Did  they say, "Fuck  MS." Did they say. . .?* |
| LA 2: | You don't remember anything? |
| AU: | About, about what. . .? |
| LA 2: | Did they throw neighborhood signs or did they throw. . .or perhaps they said, *"Fuck MS!"* or something like that? |
| AU: | The one they spoke to was with, with that black guy. . .[chuckles] with Negro, well. |
| LA 2: | *Okay.* |

72

**JA3776**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:            Bah, it was with him that he was, was there with.  He was the only one that
               knew a lot of English.

LA 2:          *Okay.* And where was he sitting?

AU:            Who?

LA 2:          In the car. . .Negro? He was with them. Where was he at?

AU:            No, we got out, got out.

LA 2:          *Okay. So* he was the one that, that got closer?

AU:            Uh-mm.

LA 2:          And did he have something in his hands?

AU:            Who?

LA 2:          Negro?

AU:            I don't know if the crutches or I don't know what else?

LA 2:          *Okay.*  But someone else had something in their hands?  Did he have
               something in his hands?  Do you know if it was the crutch or something
               else?

AU:            Uh-uh.

LA 2:          But he did have something in his hands.  Okay?

AU:            Yes.

LA 2:          *He says when they got out of the car, Negro did a lot of talking because
               Negro is fluent in English, and he had something in his hands. . .for sure.*

LA 1:          Who?

LA 2:          Negro.

LA 1:          Uh-mm.

LA 2:          *But he's isn't sure if it was crutch or something else.  But he's the one that
               had something in his hands.*

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 1:        Uh-mm.

LA 2:        *He, he. . . But you don't, don't remember if they said. . .you know, "Fuck this or fuck that,"* or something perhaps, uh, [UI ].  You threw a neighborhood sign at them, right?

AU:        [UI].

LA 1:        Do you want water?

AU:        Yes.

LA 1:        Do you want water?

AU:        [UI] Do you have soda there?

LA 1:        Soda?  Mm, what?

AU:        [chuckle]  [UI] three months that no. . .

LA 2:        What kind of soda?

AU:        Any kind [UI].

LA 2:        Huh. . .*I've got some change.*

LA 1:        Huh?

LA 2:        *I got some change.*

LA 1:        *Let me see what I got.* [clears throat] [pause]

            **[7:57:38]** [*Summary:* [pause][sounds] LA 1 talks to another individual about buying AU a soda.  LA 1 states that they're still on it.]

LA 1:        **[7:58:45]**  No soda, only lemon.

AU:        Lemo. . .Lemonade?

LA 2:        Right?

AU:        *Thank you.*

LA 1:        [UI]

LA 2:        [laughs]

74

**JA3778**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


|       | [UI section] |
|-------|--------------|
| LA 2: | Vitamin. It's not done that way. |
| LA 1: | Is it all right? |
| LA 2: | Here, everything is done very fairly.  Understand? First of all [UI] their work.  We're. . .that's what we do with the people from the Los Angeles. Right? |
| AU:   | Yes. |
| LA 2: | We have enough experience that. . .eh, eh, here we don't do things with beatings and, and with threatening people. |
| AU:   | No, man, also here when, when one does a crime. . .they send one to a prison. Understand? |
| LA 2: | Uh-mm. |
| AU:   | If, if [UI] because you know that over there. . . |
| LA 2: | [OV]. . . |
| AU:   | . . .each. . .each little mark there is, a head comes. . .comes rolling off [UI]. . . |
| LA 2: | But things are changing there [UI] the other pri- the other prison [UI]. |
| AU:   | Los Barrios. |
| LA 2: | La Cuidad Barrios but the other one, the new one. . .the other, the other new prison that they have over there. Where they have Diablito. |
| AU:   | Huh! |
| LA 1: | *We need to establish. . .* |
| AU:   | El Zacate. |
| LA 1: | *. . .um. . .* |
| LA 2: | Zaca. . .*yeah,* Zacate. |
| LA 1: | *. . .you know. . .* |

75

**JA3779**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:  Okay, well, they took me there.  Understand?  They have the privilege also there to receive their family even for. . .

LA 2:  *Yeah,* but also here, you know, here in the States you have the same privilege. . .but right now because. . .

AU:  But [UI] I haven't [UI] my papers, I haven't gotten into [UI]

LA 2:  No, but [UI section] Everything is going to end because right now the case is still pending.  Let everything end and, eh. . .wherever you wind up is when visitation can be arranged.

AU:  [UI]

LA 2:  Your wife has come to. . to see you, right?

AU:  She can't.  No, no, no.  She's very young, well. . .

LA 2:  How old is she?

AU:  Ten. . .nineteen, I think she's going to be.

LA 2:  *Okay.* She's an adult.  She can get an *ID.*

AU:  No, but. . .you know that, that it's not the same. [UI] she could have the certificate, but she needs the, she needs the signature or, or, or something from the father.

LA 2:  Yes. [yawns] That is done. [UI] if she's an adult. . .she doesn't need the signature any longer.  She just needs to get her *ID* from the city. . . whichever city that she lives in, there in Hempstead.

AU:  *So, okay.*

LA 2:  What he wants, what we to finish. . . is to talk about this case.  *So* you said that, that Negro got closer because he had something in his hands, perhaps the crutch.

AU:  Yes.

LA 2:  You're not sure what, what it was, but you're sure that he had something in his hands.  Yes?

AU:  Yes.

76

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *Okay.* And the, he got closer because he spoke more English. Right? |
| AU: | Uh-huh. |
| LA 2: | [UI] you can tell me? |
| AU: | Yes. |
| LA 2: | Eh. *Okay.* |
| LA 1: | *You know. . .he's. . .out of. . .there was only five people in the car. There wasn't four. Okay?* |
| LA 2: | [UI section in background] |
| LA 1: | *There's, there's video that only shows three people in the back seat.* |
| LA 2: | What, what he says [OV]. |
| LA 1: | *It's not clear enough to see who's who.* |
| LA 2: | There's evidence there that were only three people in back. That, well, eh, eh, we can talk more about it, but what we know, at least, is that these, these four individuals were in the car with you. |
| LA 1: | *The question is. . .* |
| LA 2: | The question is. . . |
| LA 1: | *. . .who, who, who shot these two guys?* |
| LA 2: | Who. . . |
| LA 1: | *'Cause he's told us everything else. He admitted to being in the car.* |
| LA 2: | Look, he's has a lot of respect for you. You've told us everything. . . what happened, that they threw neighborhood signs, that you [plural] got out, that you [plural] had a crutch. The only thing that we need is, eh, who was it that did the shooting? |
| LA 1: | *And, and, and show us some respect.* |
| LA 2: | [OV] [UI]. . . |
| LA 1: | *We've tried to be respectful to you.* |

77

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:        We've given, given you respect.

LA 1:        *Show me some respect and don't lie to me about it.*

LA 2:        And that's all. . .we ask the same thing from you. Give us respect. Don't lie
             to us.

LA 1:        *Now, now is the time to, to. . .*

LA 2:        It's the time right now to, to. . .

LA 1:        *. . .be done with this.*

LA 2:        . . .to clear it up and fin-finish just with you. . . to talk about this topic with
             you.

AU:          There was other person. Right?

LA 1:        *Okay. That's not. . . I knew he was gonna say that because he, he, he, he,
             he's trying to be smart and set this thing up way ahead of time by saying
             there was an unknown person that did it. And he's gotta know by now that
             all three of us weren't just born yesterday. Okay? Um, none of these
             people said that there was anyone else in the car. We know there was only
             five people in the car. Okay? Him and these four people.*

LA 2:        He knows that only you five were in the car.

LA 1:        *Okay. Three of these guys have already said that he did the shooting.*

LA 2:        Three of. . .

LA 1:        *And they didn't get a chance to talk to each other before we arrested them.*

LA 2:        Three of the four have said it was you that were the one that fired the shots.
             . .the rounds. *Okay?* And they didn't have time to talk together or have
             time together to clarify on their, their story.

LA 1:        *And he. . .it's none, I don't think it's any of these guys. He's, he needs to be
             honest with us. . .*

LA 2:        [OV] And. . .and we know that. . .

LA 1:        *. . .and, and show me some respect we can. . .*

78

**JA3782**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:       We know that it wasn't them that fired the shots. [UI] *Okay?* And. . .

LA 1:       *Let's, let's be done with this. Let's end this right now, and, and. . .*

LA 2:       [OV] [UI] and he has only one question. Eh, did you fire the shots?

AU:         It's all right like that.

LA 2:       *He says, "You could put it that way." I asked him, "Did you shoot. . .at them?"*

AU:         [UI].

LA 1:       *Well, where did learn how to. . .? Did he lea[rn]. ..? Where did he learn how to shoot? Is what I wanna know because he's, he's a. . .*

LA 2:       [OV] What he wants to know. . .

LA 1:       *. . .damn good shot.*

LA 2:       What he wants to know is where did, uh, you learn how to shoot? Because, uh. . .

LA 1:       *In El Salvador or. . .?*

LA 2:       [OV] He told me. . . Look, hey, and I don't want, and I don't want to be funny, but understand, he knows that you are a very good shot.

AU:         With the [UI]. [chuckles]

LA 2:       [UI] *he is basically saying. . .with the, with- with the sights.*

LA 1:       *Just use the sights to shoot that's, uh, the [UI]. Did he practice in El Salvador like a BB gun or. . .?*

LA 2:       Have you practiced before in a. . .in the forest or something.

AU:         No, man. [UI] Where are going to practice there?

LA 2:       Where? In El Salvador, it's a different matter. [OV] There's, there's forests. . .

AU:         [OV] No, but, but to get a weapon and when I was young and. . .How old am I? [UI] My father had weapons, but he had his permit, but and no, no, no, he never let one [use it.]

79

**JA3783**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | But how, how, how, how is it that you are so, are so good [chuckle] with the, with the gun? |
| AU: | Well, it turned out that way that I'm good. |
| LA 2: | But with. . .you know what it is. . .just using them. . .but what are they called?  The things on top to, to aim? |
| AU: | The what? |
| LA 2: | On top of the gun, the, the marks [sic] to be able to shoot well. |
| AU: | Oh. . .you also mark [sic] there.  Like the trigger or what? |
| LA 2: | You know, the gun, the things here on top. . .to mark [sic]. |
| AU: | And what is it called, well? |
| LA 2: | [UI] to know, well, what's up? |
| AU: | [chuckles] |
| LA 2: | What are those things called in Spanish. . .these things? |
| AU: | Of what, well? |
| LA 2: | Of the gun?  The things on top to be able to aim. |
| AU: | Sight or what? |
| LA 2: | No, no, no, don't put on a Lasser [PH]. |
| AU: | Laser? |
| LA 2: | Huh? |
| AU: | Laser? |
| LA 2: | No, no, no *Laser*. |
| AU: | No, man, I [UI] only the laser [UI]. |
| LA 2: | Here. . .the, the *sights* of the gun.  The things on top to be able to aim.  Right? |
| AU: | The, the "mira" [sight]? |

80

# JA3784

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | Those are the things on top of the gun. |
| AU: | The "mira" [sight]. |
| LA 2: | Uh-huh. The "mira" [sight]. |
| LA 1: | *What kind of gun was it?* |
| LA 2: | What type of gun was it? |
| AU: | No, I don't know. No, no. |
| LA 2: | You don't know the caliber? Was it a *revolver* or was it, uh, an automatic, the gun? |
| AU: | Only the shots were heard. |
| LA 2: | Huh? |
| AU: | Only the shots were heard. |
| LA 2: | *He said he only heard the shots.* |
| LA 1: | *Well. . . Okay.* |
| AU: | Like what happened here in this case. . . |
| LA 2: | Uh-mm. |
| AU: | . . .no one remembers how many shots there were, but. . . |
| LA 2: | But do you remember. . .but in this case. . .We're not, not talking about the case here, but the case in Los Angeles. . . |
| LA 1: | *He needs to. . .* |

81

**JA3785**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 2:    . . .and no only. . .no only were the shots were heard. Everything that happened was seen. Right? But we know that, uh, who was the person that did the shooting. We just want to hear it from your mouth. That perhaps if you do repent a little. . . *okay?* You repent a little. Now, you, you have already told us everything about what happened. Who was in the car? [UI] got out of the car? Who had the crutch? They threw a neighborhood sign. You threw a neighborhood sign. *Okay.* You [plural] got out. You think that maybe they had something. Uh, you've told me that, well, hey, maybe if they had been armed, perhaps you five would have been killed., but. . . Have you told me everything? Or only that, uh, that you fired? *Okay?*

AU:    Uh-uh.

LA 2:    Look, here. . .look, I-I'm not a cleric, I'm not a priest, I'm not. . .

AU:    [chuckles]

LA 2:    . . .a person from the, the church. *Okay?*

AU:    Yes.

LA 2:    About that, you are going to [UI] afterwards. *Okay?* I don't know if you're religious or, or. . . What's, what's your faith?

AU:    Nothing.

LA 2:    *Okay.* But, uh, here you can't. . . There's nothing to be embarrassed about with me. *Okay?*

AU:    Yes.

LA 2:    I'm not going to think worse or, or badly of you. *Okay?* A person who takes responsibility will tell me the truth knowing that it's hard to do. Why? "Well, hey, what are they going to think of me? They're going to think that. . .well, I'm a person that. . .without, without a heart and that, well, [UI]." I understand.

AU:    [UI]

LA 2:    Right?


82

JA3786

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:    The only thing I tell you is that each one who gets into the gangs knows the situation and the, the risks that one takes.

LA 2:    *Yeah. . .that's right. That, that. . .*

AU:    [OV][UI]. . .

LA 2:    . . .that's understandable, but at least one of those two boys [UI]. . .

AU:    [OV] [UI] kill there as like one could kill someone or that all of a sudden one gets shot. They'll do a knifing on you, perhaps killed by stoning, or by whatever means, hanging, whatever and. . . What can I do?

    [UI section]

LA 2:    *[UI] explaining that, "Hey, it's the lifestyle, we know, we all get jumped in. You can be, you can kill or you can be killed at any point, and, uh, that's, that's just the way it goes."*

LA 1:    *I mean, he's, he's gonna take us down the right street, in the right car, and name everybody in the car, tell us about who these kids were and what they were doing. Which is all true, which we all verified.*

LA 2:    Everything you have told us up to right now is the truth. . . that you [plural] were, you were in the car with [UI].

LA 1:    *He, he. . .*

LA 2:    You [plural] got out. He threw neighborhood signs. You threw neighborhood signs.

LA 1:    *He admits he got out of the car.*

LA 2:    [OV] You got out [UI]. . .

LA 1:    *And witnesses say that. . .*

LA 2:    [OV] [UI]. . .

LA 1:    *. . .front passenger got out of the car.*

LA 2:    *Okay.* You got out of the car. You [plural] [UI] neighborhood with them.

LA 1:    *And in, in broad daylight. . .*

83

**JA3787**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


LA 2:        [UI]. . .

LA 1:        *. . .so he knows, uh, uh, that--that. . .people identified him 'cause [UI]. . .*

LA 2:        You went during the day [UI]. . .

LA 1:        *. . .and I'm sure.*

AU:          [UI]. . .

LA 2:        . . .when, when there's people and lots of traffic. . .where people saw.  You
             didn't think there were going to witnesses either, but they saw what
             happened.

LA 1:        *And-and, and he's gonna stay hiding behind these guys and not tell me the
             truth about it.  He's told me the truth the whole time.  Let's stay, let's stay
             honest about this.*

LA 2:        We only want to stay on the truth.  Don't, don't lie at this point. [UI]

LA 1:        *Let me tell the family that. . .*

LA 2:        [OV] Just to. . .

LA 1:        *. . .the person responsible for their sons is. . .sorry.*

LA 2:        [OV] [UI] only that.

             [OV section]

LA 2:        . . .we are right now.  That's all.

AU:          [chuckles] Then later on you're going to come to me with another case.

LA 2:        Look, [UI] what does it cost you here?  It doesn't cost you anything.

AU:          Uh-huh.  Yes sir, it does cost me everything.  [UI] I'll tell you everything.

LA 2:        Uh-mm.

AU:          The, the basic and the essential that. . .that happened there, well.

LA 2:        *Okay.*  Yes, and you said the truth only to go to the family to advise them
             that, well, hey. . .


84

**JA3788**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:          Yes.

LA 2:        We have a person [UI]. . .

AU:          [UI] the maj- the majority of the family members, at times, don't want to accept that maybe one is a member of a gang.

LA 2:        Oh, no! Look. . .

AU:          [OV][UI]. . .

LA 2:        . . .that, that, eh, eh, we don't have to explain to them that, "Well, hey, your sons weren't little angels either."

AU:          Yes.

LA 2:        Right? But this is what happened. *Okay?* It's to tell a mother so she will feel. . . not, not for her to feel better, it's only, perhaps so that she will understand. So she will be at peace, her heart will be at peace by saying, "Well, hey, this is what happened." And my son was not a little angel. . .

AU:          Huh.

LA 2:        . . .but also. . .no, no, eh, what happened there wasn't right, and the person responsible is going. . .

AU:          Uh-mm.

LA 2:        Look. . .is going to do his time at another place for another case, and that's, that's all. Right? Only for us. . .that's, that's all as, as I have explained to you. If anything had happened to one of your sons, I. . .I have to answer to you as a father. Right? Right or wrong. . ."Hey, Alejandro, well, this is what happened with your. . . One of them got into, eh, and did a bad thing and what happened wasn't, wasn't good, but this is what happened." Understand?

AU:          Yes.

LA 2:        Okay. And to tell them, at least, because, see, what is owed to them, at least, is the truth. Understand? It's the truth. That's the only thing. It's something very small.

AU:          It's just that it was a gang fight. It was that. [UI]. . .

85

**JA3789**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:          [IU] things about gangs. . .

AU:            Uh-huh. [OV] [UI]. . .

LA 2:          But only one, one. . .only one of the two was a gang member.

AU:            Well, you know that, that the one that one finds there. . .

LA 2:           I know.

AU:            . . .among the. . .among the bees, honey will always fall on you.

LA 2:          *Yeah.* I know. But also, uh, eh, uh, eh, the thing is not right also with that [UI].

AU:            No, I know, but each, each. . . like clearly we have a, a very different appearance, and clearly, well, we decide to, to get a career or perhaps, let's say a career. Understand? You [plural] have the privilege to have your family perhaps. . .or perhaps you [plural] decided on that, well. [UI]. . .

LA 2:          It's a choice. We all, we all have to make our choices. Am I going to school or am I not going to school? I'm going to work or I'm not going to work? Am I going to joke around with them. . .with my friends or an I not going to joke around with my friends? They are, everything is a choice. Right?

AU:            Damn! If I had had money, brother, perhaps I wouldn't be around here. Perhaps I would be playing. Understand?

LA 2:          Yes.

AU:            I would have been a soccer player, but unfortunately when I was in soccer school, I didn't have the, the, the, the necessary resources. Well, so then. . . and, and I stared to work after that.

LA 2:          *Okay.* And what, what situation do you want your sons to have?

AU:            Huh?

LA 2:          In what situation?

AU:            What [do you mean] in what situation?

LA 2:          In the [UI]. Do you want them to follow your footsteps or. . .

86

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


AU:        No.

LA 2:      . . .that, that. . .they go to school, that they follow a life, that they have a life [UI]. . .

AU:        [OV][UI]. . .

LA 2:      . . .that they have an new opportunity to be the best possible.

AU:        Of course.  Even though [UI] whatever I do here, but, [UI] kill me anywhere.  Understand?

LA 2:      Yeah, but here in the States, it's very-very different.

AU:        If one is from here. Understand?  Or that, that she raises him how, how she wants to raise him, to do whatever can be done.  Always, some day in the future, well, by being Hispanic, one is one of first that, that, that [UI].  Yes.

LA 2:      *Okay.*

AU:        [UI]. . .

LA 2:      . . but tell me. . .my point, to finish up with all of this. You got out. . .

AU:        Uh-huh.

LA 2:      . . .armed. . .

AU:        Uh-huh. He's going to say so that. . .well, yes.

LA 2:      *Okay.*  You got out armed.

AU:        Uh-huh.

LA 2:      And was one of the others in the car armed or only with a cane [sic]?

AU:        I don't know.

LA 1:      *Did he say that they all touched. . .  Okay.*

LA 2:      Uh-huh.  Yes.  What kind of weapon?

AU:        I don't know.  No, no, no.

LA 2:      Automatic?


87

**JA3791**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

AU:  I don't know if it was a revolver or [UI].

LA 2:  You don't remember?  But you got out armed?

AU:  Uh-huh.

LA 2:  You had the weapon outside of your pants or did you have it at, at your side?

AU:  Inside.

LA 2:  *Okay.*    At the time when you got out of the car, you took it out?

AU:  Yes.

LA 2:  *Okay.  I'm trying to kinda skip around as much as I can.  I asked him, uh,"Were you armed?"  "Yes." "[UI] did you, did you get out of the car armed?"  "Yes."  "Where did you have it?"  In the waist band.*

LA 1:  Uh-huh.

LA 2:  *Okay. Trying to split hairs here.*

LA 1:  *Okay.  Did he show it to other people in the car?*

LA 2:  Hey, did you know [if] the others in the car were armed?

AU:  I don't know.  Each one. . .  I can't say.  At times, it's whatever presents itself.

LA 2:  But at, at that time. . .you, uh, you are very well known to be always armed, right?

AU:  No. [OV][UI]. . .

LA 2:  [OV] [UI] with so many fights [UI] so many neighborhoods there?

AU:   [UI] something. . .something I'm going to tell you. . .

LA 2:  Uh-huh.

AU:  How am I going to get a weapon, at times, there if I don't know anyone.  I don't know the sectors.  How. . .knowing what, what, what the United States authority is like.

88

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:           Uh-mm.

AU:           How, how, how am I going to carry one?

LA 2:           Ah! [UI]. You know that.

AU:           Anyone. . .truthfully, one. . .

LA 2:           [UI].  You know that [OV]

LA 1:           *Come on!*

LA 2:           You're not going to have to explain that to me *that shit.*  Even if you don't know the laws, you don't have money, there are home boys, there are neighborhood gangs, there are going to be guns.

AU:           Yes.

LA 2:           That doesn't change.  *Okay?*

AU:           Okay. [UI] [OV]

LA 1:           *Why did Moe, why did Moe pull over?*

LA 2:           Why did he get out. . . why did Moe stop?

AU:           Well. . .

LA 2:           Because he wanted to throw gang signs or what was it?

AU:           Well, why. . .?

LA 2:           Why did Moe stop the car?

AU:           Because of that.

LA 2:           Because they threw gang signs?

AU:           Uh-huh.

LA 2:           *Yeah, because they threw up their gang sign.*

LA 1:           *That's why Moe pulled over?  Did you tell him to pull over?*

LA 2:           And you told him to wait or what, what was it?

89

**JA3793**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU: [UI] that, that what's up, that, that what's up with the dude.

LA 2: *Okay.*

LA 1: *Who was throwing the gang signs in the car?*

LA 2: *He's saying, what he's saying that he, he. . .when he started throwing, when he saw the guys on the street throwing, he says, "Hey!" Well, he pointed him out. "Hey, what's up with those guys?" And. . . Who was throwing gang signs in the car? You. . .or him?*

AU: Well, someone there.

LA 2: But. . and then after that. . .?

AU: [UI] we went to the beach, well.

LA 2: *Okay.* Well, after they threw gang signs, you [plural] in the car threw gang signs?

AU: Yes.

LA 2: *Okay.* Who threw gang signs in the car? You?

AU: Huh, the ones in back. I'm in front. I was in the front, yes.

LA 2: But you didn't [UI] . . .

AU: [OV] [UI section] I said, "What's up?"

LA 2: *Okay. He says the three guys in the car were initially made eye contact with the guys on the sidewalk, and, uh. . .the guys in the back.*

LA 1: *The three guys in the back?*

LA 2: The three in back were the ones who started to throw gang signs?

AU: The, uh, the [UI]. . .

LA 2: The three who were sitting in back?

AU: Yes.

LA 2: The Chipies [PH], you mean, Luis, and Negro?

90

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Yes. |
| LA 2: | They started to, to throw gangs signs to ones on the sidewalk, and there. . . |
| LA 1: | *Who was where?* |
| LA 2: | How were they sitting there in the back? Behind you. . . Were you in front as a passenger? |
| AU: | Uh-huh. |
| LA 1: | Uh-mm. |
| LA 2: | *He was the front passenger.* Who was behind you if you remember? |
| AU: | Luis. |
| LA 2: | In, in back of you? At the door? Near the door? |
| AU: | How? |
| LA 2: | There were three in the back. Where were they sitting in the back? Who was in the middle? |
| AU: | Luis. |
| LA 2: | *Luis was in the middle back.* Who was behind. . . |
| LA 1: | Are you, are you sure? |
| AU: | Yes. |
| LA 1: | That Luis in, in the middle. *And, and when he said Luis, we got two Luises right?* |
| LA 2: | *Okay.* Luis, El Chipie [PH] or Luis, the Luis? |
| AU: | Ah, he's also named Luis. . |
| LA 2: | Yes. |
| AU: | Chipie [PH] also. Yes. |
| LA 2: | Who, who was in the middle? |
| AU: | Luis, the, the other one who had been shot. |

91

**JA3795**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *Okay. Luis the one that was shot.* |
| LA 1: | *He was in the middle?* |
| LA 2: | Was he in the middle? |
| LA 1: | *Or behind Moe?* |
| LA 2: | Or was he behind the, the passenger [sic]. . .Moe? |
| AU: | I really don't, don't, don't remember who was it was very well, well. |
| LA 2: | *He says [UI] [OV]. . .* |
| AU: | [OV] [UI]. |
| LA 2: | *. . . how they were situated in the back.* |
| LA 1: | *Who was next to the sidewalk on the, in the back?* |
| LA 2: | Who was closer to the sidewalk on the side of the car?  Because they got out from your side, right? |
| AU: | Uh-huh. |
| LA 2: | Or did they get out on the side of the [UI] |
| AU: | [UI] perhaps even Luis got out. |
| LA 2: | *Okay.* |
| AU: | I don't remember, but I truthfully don't remember. |
| LA 2: | *He says he doesn't want throw. . .* [UI] know.  You [plural] stopped the car. *Okay?* And then the two were on the sidewalk. |
| AU: | Yes. |
| LA 2: | Did you stop close by or far away. . .from the two on the sidewalk? |
| AU: | What sidewalk? |
| LA 2: | The sidewalk where you stopped because. . .where Moe stopped. . .the sidewalk where they were standing. |
| AU: | The, the dudes? |

92

**JA3796**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 2:         Uh-mm.

AU:         I don't remember if it was a sidewalk or what there.

LA 2:         *Okay,* but you [plural] stopped there?  How near by?  Ten feet?  Here, uh, how, how far away was the car stopped?

AU:         I don't know. . .some ten meters, perhaps.

LA 2:         *Ten meters.  He said. . . I asked him how. . .what kind of distance you guys stopped the car from, from the two guys on the sidewalk.  He says, ten meters.*

LA 1:         Uh-mm. *Okay.*  Uh. . .

AU:         But that young guy came back.  He had already left [UI]. . .

LA 2:         What happened?

AU:         I mean,. . .he came back still.

LA 2:         Who?

AU:         The, the. . .supposedly the person who died.

LA 2:         One of the two persons who died, returned?  How was it that he returned?

AU:         Returned to, to. . [say], "What's, what's up?" Well.

LA 2:         Oh, he got near to the car?

AU:         Uh-huh.

LA 2:         And, and, and. . .and what. . .and what was it?

AU:         [UI] "What's up," we said.  Right?

LA 2:         *He said as they stopped the car, one of the two guys approached, started approaching the car and they said, "Oh. Oh, what's up?"  And then one man in the car made a comment.*  And, and what was it that happened?

AU:         Nothing. [UI] He was like arguing. [OV][UI]. . .

LA 2:         [OV][UI]. . .

93

**JA3797**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | All of a sudden, [UI] Pow! Pow!. . .was heard. |
| LA 2: | Then you [plural] got out of the car. |
| AU: | Yes. |
| LA 2: | And immediately when he stopped. . .  When Moe stopped the car, did you [plural] get out of the car immediately? |
| AU: | We didn't stop.  No. . .we didn't even stop. . .I mean, it's that I got out also. |
| LA 2: | *Okay.  So* you [plural] got out like that quickly. |
| AU: | Yes. |
| LA 2: | And you [plural] confronted them and. . . |
| AU: | What happen, happened. |
| LA 2: | *He says, yeah, he stopped the car about ten meters away.  He...he goes, they got out of the car immediately, and he kinda walked up to each other and. . .what-what happen, happened.* |
| LA 1: | *Okay.  Uh. . .so is he telling me that I'm wrong when I say that he shot this guy?  Am-am I totally off on my investigation?  Am I off on my details?* |
| LA 2: | [OV] [UI] if, if he is wrong.  Look. . . |
| AU: | [UI] he had stopped there [UI] |
| LA 2: | No, no, but that's why. . .but, but that's why because [UI] not playing, right? |
| AU: | Well, [UI] |
| LA 2: | Did you shoot him? Tell me, face to face. . . Did you shoot him? |
| AU: | For me to say that, that I did it?  Right?  I didn't, I didn't do it. |
| LA 2: | Bah, you did it? |
| AU: | To say it like that. |
| LA 2: | No. Not just to say it, but to say the truth. |
| AU: | But. . . |

94

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | What is the truth? |
| AU: | . . .to say the truth? |
| LA 1: | Yes, the truth! |
| AU: | Okay. Yes, the truth. *Shit!* |
| LA 1: | *Shit!* |
| AU: | [chuckles] |
| LA 2: | *Okay, so* in order to say the. . . |
| LA 1: | [chuckles] |
| LA 2: | . . .you did it?  Not out of meanness, but because you thought they were gang members. |
| AU: | Ah. . . |
| LA 2: | Is that right? |
| AU: | Yes. |
| LA 2: | *Okay.  Yes.* |
| LA 1: | *Okay.  All right.* |
| AU: | [UI] Is that the, the point that you [plural] wanted to get to? |
| LA 2: | No, it's, it's. . . Look. . .you know that it's not to, uh, run around or to joke around. It's the whole truth.  If you shot him, well, you shot him.  But what changes, supposedly, is that it was not out of meanness, it was because you [plural] thought they were gang members and that changes everything.  Understand? |
| AU: | Yes. |
| LA 1: | *Are you telling him. . .?* |
| LA 2: | All the circumstances change of what, of how it happened because. . . |
| AU: | Ah, one of us knows how, how it happened. |

95

**JA3799**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:      No, that [UI]. . .

AU:        [UI] you know, and. . .and you [plural] [UI]. . .

LA 2:      *[UI] What I'm saying is, you know, we understand what you said, [UI], but
           what changes the story is you tell us that, hey! They were gang members.
           They threw up a gang sign. He's kinda going back into the, "Hey! You
           know, us gang members know that when. . ."*

LA 1:      *I, I understand that. That makes a difference. That makes a difference to
           me.*

LA 2:      And that changes everything.

LA 1:      *I understand now.*

LA 2:      And that thing, now it can be understood how it happened.

LA 1:      *I know what a. . .*

LA 2:      And the reason this thing happened.

LA 1:      *I know what it means when someone throws up gang signs. I know what's
           gonna happen.*

LA 2:      And they. . .we know that when two gang members throw up gang signs at
           each other. . .

AU:        [UI]. . .

LA 2:      . . .it's, it's that something is going to happen.

LA 1:      *And, and those two kids probably knew it was gonna happen too.*

LA 2:      And they also perhaps thought that something was going to happen to them.
           Perhaps, uh, they weren't prepared. Right? Because lots of kids here are
           very slow and they think that, well, [OV][UI]. . .

AU:        [UI] that life is easy [UI]

LA 2:      That it's an easy life. That it's a life of, of te-television, right?

AU:        Yes. [UI]. . .

LA 2:      Eh, but the thing is that you come from. . .eh. . .

96

**JA3800**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1: *And what, what helps his story is that, I believe, uh, we have information about he had a run-in with White Fence. You know what? Let's ask him before that. . .*

AU: People say that. . .

LA 1: *. . .does he remem. . .*

AU: . . .they know me. [UI] they hear that we are [UI]. They always mention our names. . .and because we belong, we are members of the Mara Salvatrucha, they think that we're going to hide from the law. And when this criminal was wanted by society, you should ask the old guys, but as long as things here don't change, even the authorities are spilling blood, They're the same. It's just an illegal organization of paramilitaries of the government.

LA 1: *What is he talking about?*

UM: *He's reciting. . .?*

AU: [OV] [UI] [laughs]

LA 2: *He's repeating a rap song where it's uh. . . I, I can explain to you guys later.*

LA 1: *Okay.*

AU: But [UI]

LA 2: *[UI] gangs' are being persecuted.*

LA 1: *Persecuted?*

LA 2: *Persecuted.*

AU: No one has caught the Trucha.

LA 2: [UI] who, who sings it?

97

JA3801

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:  Even the authorities are spilling blood. They the same. They're just an illegal paramilitary organization of the government sent to [UI] us. They say that I'm hard. Annoying people that get into my business. [UI] a joint of marijuana to toast. [UI] they themselves criticize, but they don't see that they're there. Don't you remember that in the civil war, peace came. [UI] the City of Santa Ana and I remember a guitar, and I continue rolling with the Mara.

LA 2:  *Okay*, who sings that song?

AU:  The moment arrived here that I tried to heal and calm myself, but the past did not let me move forward and much less change or no longer shoot. When death wants to get close, one has to know when to use one's head and when to go into action [with] the shotgun. One bad decision or movement will leave me in the cemetery or in jail doing a life sentence. [UI] that's why I'm respected by the pricks that go around the mouths of those whores. I don't give a damn. My enemies from there, [UI].

LA 2:  *Yeah.* Who sings that song?

AU:  El Bala from [UI].

LA 2:  El Bala from Tiny White Horse [PH]?

AU:  Uh-hum.

LA 2:  Does he have. . .does he have a *CD* or *records* or something like that?

AU:  [UI] *CD*.

LA 2:  *Okay.* Is Tiny from Los Angeles?

         **[8:25:51] [Summary:** AU continues to sing his Mara song. Policemen joke around about having AU make a video.]

LA 1:  **[8:27:23]** *What's gonna ha. . . What's gonna happen to you because of all the bad things you've done?*

LA 2:  That what is going to happen to you or. . .?

LA 1:  *What do you think?*

AU:  That, uh. . .

98

**JA3802**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

LA 2:        In the end. . .in the end what, what is, is going to happen to your life?

AU:          Nothing.  That they kill me or that perhaps I'll be jailed here for all eternity.

LA 2:        *He says, "No, nothing," and then he goes, "Eventually it will end with me in jail for the rest of my life or death."*

LA 1:        *You gonna dance with the devil after you're dead?*

LA 2:        Are you going to dance with the devil once you're [UI]?

AU:          That's what we're going to do to continue annoying from down there.

             [UI section]

AU:          There's no forgiveness [UI].  There's no forgiveness, well. . .understand?

LA 2:        *He says, "There's no forgiveness."*

LA 1:        *Well. . .*

LA 2:        But [UI] the forgiveness of a mother?

AU:          Huh?

LA 2:        The forgiveness of a mother that. . .

AU:          But there's only, only that.

LA 2:        But, you know, that there. . .there is forgiveness?

AU:          Yes, there's forgiveness.  Okay, then.

LA 2:        Understand? It's all a joke, but we'll see when [UI], but the love of a mother and father is, is big. *Okay?*

AU:          *Okay*, I know, and also the son's, well. Well, what of it?

LA 2:        But, but, but there is, there is forgiveness. There's forgiveness from [UI]. There's  forgiveness in the mind, right?

AU:          [UI]

LA 2:        And in prison or not in prison, it's something else, but inside your mind, [UI].

99

**JA3803**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU: [UI] that's how authority is like. Ah. . .one thinks that someday when one is in prison, well, it's going to change me.

LA 2: No, no, eh, I know that one thing is not going to change from one day to the next.

AU: Understand? And, and here, here inside is where, where. . .where it's more. . .

UM: [IA]

AU: . . .where it's more that you get [UI].

UM: [IA]

LA 1: *What?*

[UI section]

LA 2: One changes if a persons wants to it at some time.

AU: Yes.

LA 2: So. . .no matter what it is. . .it takes time.

AU: Yeah.

LA 2: You had, eh, eh, your past, but everyone tries to [UI] things from the past. Things which we have done.

AU: Yes.

LA 2: If, if I have a child here or there, well, now when that child has [UI] . . .

[UI section]

LA 1: *I'll-I'll show him in a minute.*

LA 2: [UI] right now.

LA 1: *Uh, did, did he remember, uh, did you ever visit, uh, Luis Rivera? What does he call him? Does he call him something else than Luis Rivera?*

LA 2: Luis. . .Luis. . .

100

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 1: | *No, the one he already identi. . .said he, he knew.* |
| LA 2: | Luis Rivera, the one that had the, the crutches. |
| LA 1: | *Remember he got shot?  Did he visit him in the hospital?* |
| LA 2: | Did you go visit him when he was in the hospital? |
| AU: | Yes. |
| LA 2: | *Yes.* |
| LA 1: | *Okay.  And that was after he did another shooting for White Fence . .?* |
| AU: | [UI]. . . |
| LA 1: | *. . .for him?* |
| LA 2: | [UI] You went to visit him after, after he was shot? |
| AU: | Yes. |
| LA 2: | You know who shot him? |
| AU: | No. |
| LA 2: | *Okay.* |
| LA 1: | *Did he tell him something like, "I got him for you" or "We got him."* |
| LA 2: | Did you tell him that, Well, hey, I got those guys that hit you?" |
| AU: | Hum? |
| LA 2: | You went there, there. You told him something there in the hospital that you got the guys responsible that shot him? |
| AU: | No. |
| LA 2: | No? |
| LA 1: | *Did he, did he do a shooting with. . .?  Did he, did he shoot the White Fence guy?  Let's talk. . . I know he's done a ton of shootings.  Let's just. . . Hel, help us just clear these cases, you know, in LA.  It's not like, you know, I'm going after him, but, you know, let's-let's clear these things so. . .* |

101

**JA3805**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

LA 2:       There's. . .there's. . .

LA 1:       *. . .so they don't show up later on.*

LA 2:       No, there are things he wants [UI] take this opp-opportunity to clear up other and gang things.  Yes, but okay, talking about the event where [UI] from *White Fence* [UI] and we know that they also had a gun, and no one, no one died there.  No one there was. . .

AU:         How?

LA 2:       . . .but you [plural] got into a, a shoot-out.

AU:         Yeah.

LA 2:       Do you remember the event where you, you. . .you. . .

AU:         Uh. . .

LA 2:       . . .where you [plural] started a shoot-out with some dudes from *White Fence?*

AU:         No.

LA 2:       After Luis got shot . .at that time?

AU:         No.

LA 2:       There around Hollywood?

AU:         No.

LA 2:       No?  Do you know Pelon from Hollywood?

AU:         [UI]

LA 2:       It's Carraso [PH]?

AU:         Nothing.

LA 2:       They call him, Mayote.

AU:         [UI]

LA 2:       [UI]

102

**JA3806**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:             A black man?

LA 2:           Yes.

AU:             Yes.

LA 2:           [UI]

LA 1:           *Well, tel-tell us about the, uh, tell us about what happened at, at the park. . . [UI] Park.*

AU:             [UI]

LA 2:           You [plural] went to. . .[UI]. . .

                [sounds]

LA 2:           . . .with the black man.  You remember?

AU:             [UI]

LA 2:           It was there. . at that time where, when they shot Luis.  You remember that they shot at Luis?

AU:             At him?

LA 2:           No.  No, no.  No, it wasn't.  Some dudes from White Fence around Hollywood.  You remember?

AU:             No. [UI]  When, when I was there, perhaps it was also that, that it was when they shot at that guy. . .that, that. . . I also went to see him also then.

LA 2:           Yes, they shot at him.  *I'm trying to get kind of go around. . .*

LA 1:           *Hospital?*

LA 2:           *Trying to go in the, uh, shooting of the [UI].*

LA 1:           *Yeah.  Yeah, well. . . Yeah.*

LA 2:           Hum.  *So. . .*you never went to a. . . You [plural] never get to shoot, uh, you [plural] didn't do it against guys from *White Fence?*

AU:             No.


103

**JA3807**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:       No?

LA 1:       *Doesn't know how a bunch of guys got shot and then, you know.*

LA 2:       *Yeah.* You [plural] knew where, where the gang members are there and. . .

AU:         They were?

LA 2:       No, well, they're alive, but, uh, it was a group of, well, *MS* and *White Fence* there. And they had guns. You had guns there, and there was shooting. Some were hit, but no one died.

AU:         How. . .

LA 2:       Do you remember an event like when [UI].

LA 1:       [clears throat]

LA 2:       [UI] perhaps [UI] that lived there around that area?

AU:         Hum?

LA 2:       You [plural] were [UI] that lived around that area?

AU:         Not there.

LA 2:       As the house. . .

AU:         No, Luis sort-of knows them. Understand? The only one that perhaps knows them because perhaps they went there at, at. . .that's where he met him at La Mariposa.

LA 2:       Don't you remember going over there, well, how it was. . .that he had a problem with some dudes from White Fence [UI]?

AU:         No.

LA 2:       You don't remember? *Okay.* And the only [UI], the only other event was [UI] only at the park, on Lemon Grove [PH] Park.

AU:         Not even.

LA 1:       *Mm, same gun.*

LA 2:       Do you remember?

104

JA3808

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:  [UI] I don't know.

LA 2:  [UI] same gun.

AU:  Huh?

LA 2:  It's the same gun that you used here at the, the. . .

AU:  [UI].

LA 2:  The other one. And I think that it was one of the things, uh, also. . .a gang member that, that you [plural] were looking for.

AU:  Yes.

LA 2:  Will you remember if I show you a photo of him? Will you remember?

AU:  How?

LA 2:  The one that, the one that you wanted to hit.

AU:  [UI] Are you now putting another case on me, understand?

LA 2:  No, [UI].

AU:  Because you just. . .

LA 2:  It's not that we want to put on other cases on you, but the thing [UI].

AU:  [UI] I wanted to hit him, I mean, that there, there, you're saying that I, I was there or perhaps looking for him [UI].

LA 2:  No! I know that. . .you-you were there but also those are things [UI] where perhaps they put you on the defensive. Understand? One thing, well, you know that when. . . As we have said. . .there were two gang members that see each other that maybe one throws a gang sign. . .throws a gang sign. People change [UI].

AU:  But, but about. . .you talking about the park?

LA 2:  There in Lemon Grove [PH] and Hollywood where you met there when [UI].

AU:  [UI] Mauricio?

105

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| LA 2: | Yes.  When you [UI] with the guys from [UI]. Ah, to go to. .. |
| | [UI section] |
| LA 1: | *Oxford and, uh, Lemon Grove.* |
| LA 2: | Oxford and Lemon Grove.  It's a small park that's there by the *freeway.* |
| LA 1: | *Where you at with him?* |
| LA 2: | *I'm just gonna get into it.* |
| AU: | [UI section]  I sometimes went there, but not, not [UI]. |
| LA 2: | *He's, he's been to that park before.*  How many times, more or less? Around. . . |
| AU: | Around three times that [OV]. |
| LA 2: | *How many times he went to that park?* |
| AU: | But I didn't. . .I no longer wanted to help them [UI] that, that they stopped, uh, uh. . .  How to say it? [UI section.] It was him. . .that crazy guy. [UI] in a wheelchair and he can't get out of the car [UI section] |
| LA 2: | But King [PH] has already been in a wheelchair for more than 15 years. |
| AU: | Uh-huh.  No, but he was there-there.  He was there when, when we went. And, and the officials there wanted him to get out to, to. . . [UI], but how could he get out if he didn't even move, that to get out [UI] he was going to shoot. |
| LA 2: | *Okay.* |
| AU: | Okay, well, yes. |
| LA 2: | *Okay.* |
| AU: | And there as best he could, and he [UI] with, with the officials that he couldn't get out, well, he said it was because he had things in his hands [UI] and it was the, the, the [UI] crutches with which he had come in the car and everything [UI]. |
| LA 2: | Uh-mm. |

106

**JA3810**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | No, but about that case you're also talking to me about there. I don't have anything to do with it. |
| LA 2: | And you don't remember that you had a fight there with a dude from *TBC*? |
| AU: | [OV] don't remember anyone. |
| LA 2: | Do you recognize the gang there. . . that gathers there. . .TTC?. |
| AU: | No. |
| LA 2: | No? |
| AU: | Yes, yes, I remember the gangs but. . . |
| LA 2: | Okay, [UI]. |
| AU: | But if, but, but. . .[UI] as, as far as having problems to, to be looking for them [UI]. |
| LA 2: | But no, [UI] I haven't said that you went there looking for a fight. |
| AU: | Uh-mm. |
| LA 2: | But we know that. . . Well, where there are gang members, they meet at some place the ones you [plural] are looking for.  It's that something is going to happen. |
| AU: | Yes. |
| LA 2: | *So* you know, you know the gang *TBC [PH]*.  Do you know what. . . |
| AU: | Something like that. |
| LA 2: | . . .what it is that . . TBC [PH] represents. . . what is it? |
| AU: | Gangs. |
| LA 2: | *Okay.  He says he recognized PTBC [sic].  He's familiar with the gang.* |
| LA 1: | *Okay.* |
| LA 2: | So you remember that at that time, you [plural] were, you had a fight, and then *TBC* [PH]. . . |

107

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| AU: | Not there. I don't, don't remember.  I wouln't be able to tell you because, well, at that time, you know that [UI] and also, also that from overnight to the next, I'm going to know all [OV]. |
| LA 2: | Oh, yeah, but at that time, it was already almost a month after the other incident. |
| | [UI section] |
| LA 2: | . . .and it's also a perfect situation where the people recognized you also. |
| AU: | Who, me? |
| LA 2: | Yes.  People recognized . . .the, the other group of people also. |
| AU: | Tsk! How could they recognize me if I wasn't present.  Perhaps, okay, because I was there, yes, in the evenings at times but. . . |
| LA 2: | No, but you remember [UI] what happened because it happened that day.  Understand? |
| AU: | Uh-huh. |
| LA 2: | And moreover perhaps because you have been there before.  But people recognized you that day that such a thing happened.  This person was here also. Let's go identify him [UI] they saw you at another place and perhaps here also..  And that [UI]. . . |
| AU: | I was aware of that, but no, no. . .no.  Th-that was. . . [pause] No, I don't, don't remember if it was at night or in the afternoon too. |
| LA 2: | What happened? |
| AU: | I don't know.  [UI] there was a shoot-out, but about dead people, I don't, don't remember.  I didn't, didn't know about that. |
| LA 2: | *Okay.* I haven't said anything. . .I haven't said anything about dead people. |
| AU: | No, but that's why, but, but. . .you were telling me that there were persons that recognized me and. . .when [UI section] I'm telling you that it wasn't, wasn't me, but you [plural] want by, by. . .perhaps by the law, that, that they had said this and that. |
| LA 2: | No. |

108

JA3812

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | No? |
| LA 2: | It's. . .look.  It's not about us talking, but [UI]. . . |
| AU: | No, I know [OV] |
| LA 2: | . . .it's about the truth. |
| AU: | I know [OV]. . . |
| LA 2: | If you've said anything, you've said it because it's the truth under oath. |
| AU: | Uh-huh. |
| LA 2: | That's what, what we ask for. We don't ask for lies.  We ask for the truth. |
| AU: | Uh-huh. |
| LA 2: | But we also know that it's very difficult that sometimes people don't want to talk.  They are. . .well, uh. . .for whatever reason.  They feel bad.  They don't want to. They don't want to tell the truth so we begin to, to talk and they begin with a bit of the, a, a piece of the, of the truth. . .a half truth. |
| AU: | Uh-mm. |
| LA 2: | And then later on, uh, that, that everything is done, uh, we know [UI section]<br><br>[UI section] |
| AU: | But, but that's so [UI].  No, no, no, I don't have anything to do with it, well, you say that with the same weapon.<br><br>[OV section] |
| LA 2: | *Okay*. And if, if I explain that situation that we also have our witnesses. . . |
| AU: | Uh-huh. |
| LA 2: | . . .and then the other persons that were. . . |
| AU: | Yes, I can confront them there, my brother, and say. . .uh-huh, "Tell me to my face that it was me or [UI]." |

109

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *He, he's familiar with the park where all the gangs. He says he was familiar with an incident where there was a shooting at park , but. . .* |
| LA 1: | *Yeah.* |
| LA 2: | *. . .he, he's denying everything else.* |
| LA 1: | *Who was involved in that shooting?* |
| LA 2: | Do you know who and who was involved? |
| LA 1: | *Do you know that guy?* |
| LA 2: | Do you know that dude? |
| AU: | Guanaquito. |
| LA 2: | Guanaquito. |
| AU: | Uh-mm. |
| LA 1: | *What they call him?* |
| AU: | Huh? |
| LA 2: | Guanaco. |
| AU: | Yes. |
| LA 1: | From. . .which clique? |
| AU: | Harvard [PH] [UI]. |
| LA 2: | Guanaco from [UI]. |
| AU: | [UI]. |
| LA 1: | *Is that what you're talking about the incident. . .with him?* |
| LA 2: | Was he involved in that incident that. . .you heard about? |
| AU: | Huh? |
| LA 2: | Was he involved in an incident that you heard about at the park? |
| AU: | Him? |

110

**JA3814**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


LA 2:     [UI]?

AU:       Well, it was late and I didn't have anything to do [with it].  Don't be accusing me of that.

LA 2:     No, no, uh. . .

AU:       But it's that [UI]. . .you [plural] are saying. . .

LA 2:     No, what we want to explain, what we want to explain is what happened to see if maybe you'll remember something.

AU:       No, [UI][OV]. . .

LA 2:     To give, to give you more information that we have. . .

AU:       [UI] something, something that, that [UI]

LA 2:     Look.

LA 1:     *How about that guy?*

LA 2:     Do you know that dude?

AU:       No, [UI].  Eh, I didn't [UI] with him.

LA 2:     No?

          [UI section]

LA 2:     Do you know him from *TBC [PH]?*

AU:       No. I don't know him.

LA 2:     [UI]

AU:       Okay, I think he's from another gang.  How [chuckle] am I going to know someone from another gang?

LA 2:     *Okay.* How do you know he's from another gang?

AU:       Huh?

LA 2:     How do you know something?

AU:       Well, you were telling me that he's from *TBC.* [UI]

111

**JA3815**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| UM: | *He says he doesn't recognize him.* |
| LA 1: | *Okay. When was he last at the park? [OV]* |
| LA 2: | When was the last time that you were there at the park around 2005? |
| AU: | I don't remember. No, no, I don't remember [UI]. |
| LA 2: | When did you leave Los Angeles? |
| AU: | [I don't remember that] either. |
| LA 2: | You don't know when it was the last time when you went, when you went to. . . when you left Los Angeles, did you return to New York or another place? |
| AU: | Yes. To New York. |
| LA 2: | Don't you know when it was? |
| LA 1: | [UI]. . . |
| AU: | Huh? |
| LA 2: | Don't you know when it was? |
| AU: | No. |
| LA 2: | October, November, December, September? |
| LA 1: | *He said he was in New York.* |
| LA 2: | And. . . |
| LA 1: | *Let's see. . .He was here in October of '04.* |
| LA 2: | *Right.* |
| LA 1: | *Stayed a couple of months, then went to New York for six months. That brings him back here in June. . .* |
| LA 2: | [yawns] [UI] |
| LA 1: | *. . .of '05.* |

112

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | And you stayed. And how, how long did you stay the second time when you came from New York? |
| AU: | The second time? I don't remember. |
| LA 2: | No? [OV] |
| AU: | [OV] |
| LA 1: | [UI] after that, [UI] with him, right? |
| LA 2: | *He says he stayed about two or three months.*  And then you went back to New York? |
| AU: | Uh-huh. |
| LA 2: | *And he went back to New York.* |
| LA 1: | *After three months. . .so we're talking. . .maybe the end of September or the beginning of October.* |
| | [UI section] |
| LA 2: | . . .from, from September, October that. . . |
| AU: | [UI section] |
| LA 2: | *He doesn't remember [UI].* |
| AU: | [UI section] you know that. . .that [UI section] sometimes someone picks me up. |
| LA 1: | *So he was at LA at least through October?* |
| LA 2: | So you were in Los Angeles by. . .until October? |
| AU: | Maybe. |
| UM: | Mm. . .*maybe.* |
| LA 2: | *Okay.* |
| AU: | [nasal sounds] |
| LA 1: | *All right.  You know this guy here?* |

113

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 132 of 524
**JA3817**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

|  | [sounds][pause] |
|---|---|
| LA 2: | Do you know him? |
| AU: | [pause] Yes. |
| LA 2: | Who is he? |
| AU: | El Sin [PH]. |
| LA 2: | From which clique? |
| AU: | From Harvard [PH], it's the other [UI]. |
| LA 2: | *He said from Harvard [PH].* He's a runner for Harvard [PH]? |
| AU: | That I don't know. |
| LA 1: | *You know where Sin's at?* |
| LA 2: | Do you know where Sin's at? |
| AU: | Huh? |
| LA 1: | *Do you know where he is?* |
| AU: | No, no, no. |
| LA 1: | *No? When did you last see him?* |
| LA 2: | When was the last time that you saw him? |
| AU: | Uh, about. . .in 2005. |
| LA 2: | *Sometime in 2005.* Maybe? Ah, no! Before summer? |
| AU: | [pause] I think that in the summer that. . .when I was working in, in a *car wash.* |
| LA 2: | *Okay.* What *car wash* did you work at? |
| AU: | The one that was on *Sunset* and the, the. . . |
| LA 2: | Uh-mm. The *Sunset* and what? |

114

**JA3818**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


AU:          [chuckles]  *Sunset* and the. . .and the. . .St. Andrews, it's called something like that.

LA 2:        *Melrose [PH] and St. Andrews?*

AU:          Yeah.

LA 2:        Melrose?

AU:          Uh-huh.

LA 2:        *And St. Andrews.*

LA 1:        *Okay.*

AU:          [UI] that goes to [UI].

LA 2:        Yes.

AU:          [UI] before getting to Western.

LA 2:        Yes.

             [OV]

LA 2:        But [UI] the neighborhood of *MS* there.

AU:          Huh?

LA 2:        It's *MS'* neighborhood there.

AU:          Yes.

LA 2:        *Car wash. Okay.*

LA 1:        *You were in the park with Sin.*

LA 2:        That, that night we've heard that you [plural]. . .

LA 1:        *When was that?*

LA 2:        . . . were in the park with Sin.  Do you remember when, when that was?

AU:          No. [pause] With which Sin?

LA 2:        With Sin?


115

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:         With Sin?

LA 2:       Yes.

LA 1:       *That guy.*

AU:         Uh-huh.

LA 1:       *He says you were in the park with him.*

LA 2:       He says that you were in the park with him.

AU:         No.

LA 2:       Were you ever in the park with him?

LA 1:       Uh-hum.

AU:         If [UI].

LA 1:       *And that guy says you were in the park with him.*

LA 2:       He says you were in the park with him.

AU:         With this other dude?

LA 1:       Uh-mm.

LA 2:       No. Not with that, that dude. That dude says that you were in the park with Sin. And Sin also says that [OV]. . .

AU:         How, how, how can he say that? Sin, Sin says that, that I was with him there with the other guy, but the, but the other guy. . .

LA 2:       Also. Both say the same thing.

AU:         And how could the other dude say that if, if I don't know him and he doesn't know me.

LA 2:       No, but he knows you by sight.

AU:         Huh! Okay, but. . .

LA 2:       Because he's from another gang.

116

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:  Uh-huh, but. . .how, how is he going to think that, that. . .one comes from, from our country and he's not going to accept that other, other people are there from, from another. . .

LA 2:  Neighborhood.

AU:  . . .from other neighborhood there with one and that they going to recognize or something like that. Understand? [UI] no, no, no. But what they say has happened there, no, I wasn't present. Understand? I'm sincere, and I wasn't present.

LA 2:  *He's saying that he wasn't there.* Have you ever, ever been in the park with this individual?

AU:  No. Maybe we were there a few afternoons.

LA 2:  At some time at the park?

AU:  At some time, but. . .

LA 2:  *He says. . .*

AU:  . . .in that neighborhood. . .

LA 2:  *. . .I, I asked him if they were at the park at some point during the day.*

AU:  That was there. Almost recently, recently there in the afternoon that, in that. . .

LA 2:  *[UI] he says [UI] that was close to the time. . .*

AU:  . . .[UI] before you [plural] arrested me maybe a month afterwards.

LA 2:  *That's closer to the time when he first arrived here from El Salvador, back in '04.*

LA 1:  *He says you were in the park with him at night. You remember the basketball court?*

LA 2:  He says that, eh, eh, Sin says that you with him at, at the park one night.

    [OV section]

LA 2:  . . .at the *basketball* courts.

117

**JA3821**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        Yes. But we weren't, weren't. . .it wasn't, wasn't, perhaps that day when, when that thing happened.

LA 2:      *Okay.*

LA 1:      *Yeah.*

LA 2:      *He says, yeah, he goes, maybe that's true but that's not the day that this happened.*

AU:        Yes, yes, I tell you, at times we were playing with, with, with Guanaquito there.  He. . .at times and all of a sudden [UI].

LA 2:      And [UI]  you [plural] played *basket* there also.

AU:        *Basket*. Because. . .

LA 2:      *He says. . .*

AU:        [OV]

LA 2:      . . .*'cause he played basket*. . .

AU:        . . .I was the only *homie* that was there.

LA 2:      . . .*with* Guanaco.

LA 1:      *What is his version of what happened?*

LA 2:      You. . .what?  Another version of what happened.  What, what is it?

AU:        None at all, but. . .

LA 2:      There's none.

AU:        [UI] you [plural] are telling me that, of the, the. . .of the problem, but I. . .

           [OV section]

AU:        . . .as for me that I was there, well, I wasn't me.  But the truth is I don't have anything to do with it. [sniff]

LA 2:      *Okay.*

AU:        Okay.

118

**JA3822**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:   *He's just denying it.* During that time. . . *Okay,* you hung out with Sin and other, with other, other cliques there at Hollywood and Harvard.

AU:   Uh-huh.

LA 2:   And [UI section] every so often.

[UI section]

LA 2:   And if something had happened to Guanaquito. . .and you [UI]. You. You were with him, with him, right?

AU:   Yes. Perhaps yes, but. . .[UI] because [UI] when they got him and beat him up.

LA 2:   *Okay.* And what happened with that?

AU:   Nothing. No, [UI] against him.

LA 2:   *Okay.* Did he tell you?

AU:   Uh-huh. He went, he went to La Mariposa, but [UI]

LA 2:   *He remembers an incident when Guanaco was beat up and Guanaco went and found him on Mariposa and told him what happened.*

LA 1:   *Okay. What'd you do about that?*

LA 2:   And what was it that happened or what? How did you [plural] respond?

AU:   [UI]

LA 2:   How did you [plural] respond to, to that?

AU:   Huh?

LA 2:   How did you [plural] respond to that?

AU:   No, they only know about it there, but no, no, no. We didn't have anything to do with it.

LA 2:   *Okay.* Can I tell you the version. . .

AU:   Uh-huh.

119

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2: . . .that, that they have said? *Okay?* And what Sin, Guanaco have said. And there were people also there in the park that were playing. . .

AU: Uh-huh.

LA 2: . . .*basketball. Okay?* And there are also other persons from the other gang that were there also.

AU: Uh-mm.

LA 2: But you only. . .this is, this is a case that you are not going to be the only. . . the only one.

LA 1: *Okay.*

LA 2: . . .that have told you, right? But the important thing has already been said.

AU: Huh?

LA 2: In this case that someone comes. . .something happened. They arrived there that they recognized Sin [UI] and have already identified him. You, they've also identified you. . .and dudes from the other gang also, they have also identified him. And that you [plural] had a fight, uh, some shots were fired there in the park. And that everything happened because there had been a fight, a fight before that happened with Guanaco or something. Someone beat him up.

AU: Yes.

LA 2: *Okay? So*, uh, we only want to know. . .Did you arrive there with Sin? Did maybe Sin do something?

AU: No, man, if. . .I haven't done anything with him. Understand.

LA 2: *He says he hasn't done anything with Sin. I kinda explained to him the background.*

 [UI section]

LA 2: *. . .they identified not only from MS side, but people from the other gang as well.*

LA 1: Uh-mm.

120

**JA3824**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *And we know there were shots fired on the basketball court and there was problems. I'm asking him, you know, to, eh, to tell me what, what he knows about that.* |
| LA 1: | *And also the. . .what kinda car Sin was driving.* |
| LA 2: | What kind of car was Sin driving at that time? Do you remember? |
| AU: | It was a black one maybe, but I don't remember [UI]. |
| LA 2: | *Is it a Honda, Toyota. . .Volvo?* |
| AU: | I don't remember. |
| LA 2: | *He says it's a black car. He doesn't remember any other details.* |
| LA 1: | *Okay. Little, little car, right?* |
| LA 2: | A small car? |
| AU: | Uh-huh. |
| LA 2: | *Yes.* [pause] Can I show you the photos? *I'm gonna show him [UI].* |
| LA 1: | *Yeah.* |
| LA 2: | I'm going to show you the photos that the people have identified. |
| AU: | If you want to. |
| LA 1: | *Let him know first, I admire him. He's finally. . .* |
| LA 2: | Huh! He also has respect for you. He says, well, it's an important case that you have talked about with the other detective. He has respect for you and. . . |
| LA 1: | *And I'm just trying to clear a case that. . .* |
| LA 2: | It's just that he also wants to clear up this case that, well. . .it's not something that [UI] importance, but it's something that. . .well, I think is the truth. |
| LA 1: | *I've talked to lots of people.* |
| LA 2: | He has talked to many people, huh, who are from the area. [UI] |

121

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1:      *Okay?  And I have evidence linking two cases.*

LA 2:      And he has the evidence that, well, he has the same gun that's from the case and from this case also.

LA 1:      *And I have eyewitnesses that saw you.*

LA 2:      And there are witnesses that. . .

AU:        [chuckles]

LA 2:      . . .there are witnesses that place you.  [UI] witnesses. . .but Sin also.

LA 1:      Mm.

LA 2:      And Sin has already, already, already talked.

AU:        And the majority of the people perhaps [UI] saw that I was here. Yes, he was here also.

           [UI section]

LA 2:      *. . .had been in the park.*

AU:        But it was at some time.  Whichever people. . .

           [UI section]

AU:        . . .for. . .for money like. . .

LA 2:      Shh!

AU:        I'll give, I'll give you so much.

LA 2:      You think [UI] doesn't give us money?

AU:        Ha-ha!

LA 2:      No, uh, it doesn't work like that.

AU:        Ay ![UI]

           [OV section]

AU:        . . .when there's money. . .

122

**JA3826**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 1: | *Show pictures.* |
| LA 2: | We showed photos of you. |
| LA 1: | *Who's that?* |
| LA 2: | Who is that person? |
| AU: | Fuck! Uh-mm. |
| LA 2: | It's you. |
| AU: | Well, yes. |
| LA 2: | *Okay.* |
| LA 1: | *Okay? You know who that is, huh?* |
| LA 2: | Who is he? |
| AU: | And all those are some dogs tattooed like that. |
| LA 2: | They mark them all so that everyone. . .so that it's not only one person identified that [UI] that has a mole.  *So* if there's a person that has large mole like that, we have to put a large mole on everyone.  Understand? |
| AU: | Okay. |
| LA 2: | It's not only just because, well, hey, [UI section].  But it's, it's. . .if one of the persons has, it's one of the identifications that [UI].  There are others. |
| LA 1: | Flaco [UI]. |
| | [sounds][pause] |
| AU: | Yes. |
| | [UI section] |
| LA 1: | *Here's the other one.* |
| LA 2: | Here's the other. |
| LA 1: | Yes? |
| AU: | It's the same one. |

123

**JA3827**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | No, it's, it's another one.  It's another identification. |
| LA 1: | *It's different.* |
| LA 2: | Identical photo, but it's. . . |
| LA 1: | *Same* photo, *different person.* |
| LA 2: | It's a different person from what was identified. |
| | [UI section] |
| AU: | [UI] to do more harm to me [UI] then. |
| LA 2: | No, it's not that someone wants to do more harm.  Look, in your position right now. . . |
| AU: | Okay, well, yes, in, in that case that you're telling me about. |
| LA 2: | Uh-huh. |
| AU: | I don't know [UI]. . . |
| LA 1: | *This is evidence.* |
| LA 2: | That is the evidence. |
| LA 1: | *Evidence. . .* |
| LA 2: | And the evidence. . . |
| LA 1: | *. . .my case, the park.* |
| AU: | Uh-huh. |
| LA 1: | *Evidence, his case.* |
| LA 2: | The evidence given which is the same. . . |
| LA 1: | *Same gun.* |
| AU: | Uh-huh. |
| LA 2: | . . .well, it was the. . .in both cases. |
| LA 1: | *Same gun.* |

124

**JA3828**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        [UI]

LA 1:      *So. . .*

AU:        What?  One weapon. . .only one, only one weapon did he say?

LA 2:      Oh, yes.  Well, what happened to the weapon after it was used against. . .?

AU:        [UI]

LA 2:      *Okay.*

LA 1:      *What is the worst that can happen?*

AU:        Uh-huh.

LA 1:      *You're here.*

LA 2:      What is worst that can happen to you here?

AU:        Here?  Nothing.

LA 2:      He's asking [UI].

LA 1:      *So. . .*

AU:        To be arrested here. . .

LA 2:      [UI]

AU:        . . .but it's going to be a sure thing.

LA 1:      *You're here.*

AU:        Or perhaps that they, that they see me in a wheelchair. [UI]. [chuckles]

LA 1:      *You probably wanna stay here too.*

LA 2:      Perhaps you want to stay here also.  You want to stay.

AU:        What?

LA 2:      Here on this side.

AU:        [UI] I would like [UI section] my family. Understand, that, that [UI].

125

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 144 of 524

**JA3829**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *He said. . .he would, he would prefer to get [UI] sentence he's gonna get and serve it in El Salvador.* |
| AU: | [UI section] to be able to touch my children, my family. [UI section] even though it's a, a, a little while [UI]. Understand? Without, without them forgetting me perhaps there and that they'll be humiliating my family then. |
| LA 1: | *Well, all I want is the truth in this.* |
| LA 2: | He only wants the truth as to what happened in the park. |
| LA 1: | *And I have evidence and I have witnesses that say you. . .* |
| LA 2: | [OV] [UI] witnesses that. . . |
| LA 1: | *. . .shot.* |
| LA 2: | . . .[UI] shot there in the park that day. |
| | [UI section] |
| LA 2: | . . .[UI] it's something big. |
| | [OV section] |
| LA 1: | *He says you shot. He. . .* |
| LA 2: | [UI] that you were armed that day also. |
| AU: | But, uh, it wasn't him either and it wasn't me. |
| LA 1: | Uh-mm. |
| LA 2: | That's right. He said so. He already said so. |
| AU: | But if he already says so, well [UI]. . . |
| LA 2: | That, that he was there. That he was the one that also. . .was one of the ones that, that shot. I only want to know if you were there with him. |
| AU: | No. |
| LA 2: | That's what he says. |
| AU: | But I wasn't there. |

126

**JA3830**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | [UI] that's what he says. |
| AU: | But if he says that [UI] . . . |
| LA 2: | But not only. . . |
| AU: | [UI]. . . |
| LA 2: | Not only. . . |
| | [UI section] |
| LA 2: | [UI] he can't tell you anything. What we're asking is for you to be a human being and tell us the truth because [UI]. |
| AU: | [UI] and "Umaña" [UI]. |
| LA 2: | "Human." |
| AU: | [chuckles] |
| LA 2: | [chuckles] |
| AU: | Look, since you don't pronounce the, the, the ñ, [UI]. . . |
| LA 2: | Yes. |
| AU: | . . .I'm Umana. |
| LA 2: | Yeah. |
| AU: | Huh! |
| LA 1: | *I know you have a reputation. I respect that. I'm dealing with you with respect.* |
| LA 2: | And he has respect for you. He knows that it's something that is. . . it's not an easy thing to be responsible, to take responsibility for something like that. |
| AU: | Of course, yes, but. . .[chuckle] we're not correct there. . .because I didn't. . . it wasn't, wasn't me then. |
| LA 2: | *He says it wasn't him.* |

127

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:        No, no, I wasn't present there in that case.

LA 2:      And why would Sin say that you were there and. . . He's going to say, but that's what he, eh, that's what Sin says. Sin says, "I was there. There was a problem. We arrived there. I arrived armed. Wizard arrived with me." *Okay?* And not only that. . .

AU:        [laughs]

LA 2:      Not only that. . .

AU:        What does Sin say?

LA 2:      Not only that. . .but people at the park that don't have anything to do with, with you or even with the other gang. People that were just gathered there to play at the courts.

AU:        Oh.

LA 2:      They say, "Listen, this guy arrived, Sin," . . . they don't, don't know you [plural]. . . "and Sin arrived armed and the other, this other person arrived," and [OV]. . .

AU:        Uh-huh. And who else, who else was there?

LA 2:      Uh-huh. [UI], after him and you, I don't know. Were there others? You tell me.

AU:        [laughs] [UI section]

LA 2:      No. That. . .that is. . . Look. . .

AU:        [UI section] take out the. . .

LA 2:      I'm not going to ask you about that unless you want. *Okay?*

AU:        To take out the soap from, from the, from the foam they have there [UI]?

LA 2:      No! Look, I don't, don't want to get more people from you on that case. *Okay?* I only want to deal with the people that have been identified. *Okay?* Maybe it was three. Maybe it was four. Maybe it was five. The only persons that have been identified to us are two. *Okay?* We have already talked to one. And right now we're talking to the second person which is you. *Okay?*

128

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| UM: | The two witnesses say. . . |
| AU: | Sin, have-have they arrested him? |
| LA 2: | Yes. |
| AU: | For another similar case in which he fired a shot at one of them. |
| LA 2: | Uh-huh. |
| AU: | But it wasn't, it wasn't at the park, but near a restaurant where they worked. |
| LA 2: | No. Yes, yes.  That's another case that, that, eh, for which he's imprisoned. . . . |
| AU: | [UI] |
| LA 2: | . . .on top of this case. |
| AU: | But . . .but at that time, since that time when, when they arrested him, he remained in jail, and I left, and that thing had already happened.  You can't be accusing me of that because he was also detained on that, on that. . . |
| LA 2: | On the case? |
| AU: | Remember, sir.  Remember [OV]. . . |
| LA 2: | No, I, I have evidence. . . |
| AU: | . . .review the, review the case on him because that. . was like that and it's always going to be like that, and I don't have anything to do with that case and much less with the other that I have to accept so that perhaps, perhaps they're going to get their freedom or something like that, but. . . Understand?  You are accusing me here.  Here, you're going to, you're going to guide yourselves on that case and, and about the same. . .well. . . |
| UM: | *Now, now he's going backwards completely and everything.* |
| AU: | You understand? |
| UM: | *He's, he's denying.  He's saying, "I ain't lying.  I didn't do that. . .anything."* |
| LA 1: | *In denying, everybody there says, JM, MS, even TPC, they all say, "Wizard shot."* |

129

**JA3833**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


| LA 2: | That is what people say. The witnesses. . . |
|---|---|
| AU: | How, how are they going to know? How, how are they going to know even my nickname or. . .? |
| LA 2: | No. No, no, no. No. |
| AU: | [OV] You understand me? |
| LA 2: | The only person. . . |
| AU: | How, how are they going to. . .? |
| LA 2: | Let me explain it to you. The only person that says that you, eh, that Wizard was there, was Sin. *Okay?* The only one that recognized you by, by nickname and by name was Sin. *Okay?* And from there, the only persons that recognized you by eyesight, by photo, were other witnesses there in the park. |
| AU: | But. . . |
| LA 2: | Who. . .who also recognized the gang members from the other gang. . . |
| AU: | . . .were there. . . |
| LA 2: | . . .who were also there in the park. |
| AU: | But maybe someone had recognized my appearance where maybe there, uh, maybe I had been there. . . |
| LA 2: | Beforehand. |
| AU: | . . .but maybe, maybe there, I had gone there. |
| LA 2: | No, [UI]. . . |
| AU: | But in, in actuality that day, I wasn't present at the event that happened there, understand. |
| LA 2: | *He's saying maybe people miss-ID'd just because he's been in the park before and they identified him, but he wasn't there on that day.* |
| AU: | Understand? But like that if, if. . . |
| LA 1: | *That's not what they're telling me.* |

130

**JA3834**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:    . . .what, what you want to say on that case, yes. That's cool. On the other, well, I have to accept it so that, so that it'll be okay, and maybe they'll be able to get out or something. It doesn't matter. Understand? From this, from this, from this interview that you [plural] are doing on me, well, the, the. . .the other detective is going to grab [onto] it in order to, to. . .to intensify my case here in, in the state that I'm also in, but also. . .

LA 2:    No. About the case here, eh. . .

AU:    It's, it's different.

LA 2:    No, we. . .eh, look, truthfully, we don't, don't care.

AU:    I know, but, but. . .

LA 2:    *Okay?* We're not involved in this investigation. We don't know any more than the details. *Okay?* We're not involved in any way. That's why. . .

AU:    [OV] [UI]. . .

LA 2:    . . .we, we haven't asked you anything about that case.

AU:    What I want to, to tell you is that, that because of this. . .

LA 2:    Uh-mm.

AU:    . . .he's going to grab [onto it], well. . .understand?

LA 2:    What [do you mean] grab [onto it]?

AU:    I was. . .about that thing. Well, about what happened right now and for which I'm being held here.

LA 2:    Uh-huh.

AU:    You understand?

LA 2:    What is going to happen to. . .?

AU:    Huh? That he's going to grab onto, they are going to grab onto the same thing. That I was also present there during the day, and for the same. . .

LA 2:    And that [OV]

131

**JA3835**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:      People remember no one, no one. . .it's just because they only see some tattooed people.

LA 2:    No, but, but. . .

AU:      And, and. . .

LA 2:    . . .I'll tell you this, the people didn't, didn't recognize the tattoos. . .on you.

AU:      And how, and how are they are going to recognize me by my face?

LA 2:    By the face.  Only, by face.

AU:      How are they going to recognize me by face and, and they always show the tattoos.

LA 2:    [OV] [UI]. . .

AU:      [chuckles]

LA 2:    It's dif. . .it's different when, when there are outside lights and it's, it's a little late at night.  Understand?

AU:      [UI section]

LA 1:    *Hey.  You know what?  Ask him if, uh, tell, tells us about all the murders that he's done.  Clear the air right now.  And if he says he's never done any murders th. . .uh, then we don't believe that.  How are we gonna believe this?  You know, if he, if he's [sic] wants us to believe him on this other case, what has, what has he done?  Let's clear the air about them all.  A murder is a murder.  He's done on these two already.*

LA 2:    What he wants to know, well, if there are other homicides or other shootings that you have done in Los Angeles besides what we have talked about here.  That if, well, if you're going to spend your time. . .

LA 1:    *It's almost two.*

LA 2:    . . .in the. . .here in Greensboro on this case. . .

LA 1:    *New York.*

132

**JA3836**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2: . . .perhaps in, in New York when there's going to be. . .you're going, going to finish doing your time. . . Why don't we go ahead and clear up everything in the past that you've done in Los Angeles. It doesn't cost you anything.

AU: Like what? For us to go over there?

LA 2: No, no. But, but to. . .uh, to help out, uh, clear up everything that you've done in the past. . .

AU: But, but, but. . .

LA 2: . . .other homicides. How, how many shootings have you done. . .?

AU: Ahh. . .

LA 2: . . .in Los Angeles?

AU: [OV][UI]. . .

LA 1: *Let's clear the air so we don't come back later on.*

LA 2: To...to clear up here.

AU: In Los Angeles, I was there [UI]. No, I wasn't. . . I wasn't even messing up or even saying a lot of foolishness there, but the only thing that I did there was smoke marijuana, and that one day, I don't know what. . .the detec. . .the, the officials from, from Rampart were the ones that arrested me and they found on me-me maybe, maybe cocaine, but they said that I was selling and this and that.

LA 2: Uh-hum.

AU: And that, that because I was smoking marijuana and because I was with like half an ounce. . .

LA 2: *He's just...he's just going back for all the...the [UI]. . .*

AU: Ah, the only crimes. . .

LA 2: *. . .you know, things he got booked for sale was by Rampart.*

LA 1: *Shootings and stuff.*

LA 2: Shootings.

133

**JA3837**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1:       *Come on!*

AU:         Ah-huh.

LA 2:       Homicides.

LA 1:       *So this. . .*

AU:         [OV] One [UI]. . .

LA 1:       *. . .so these two are the only one.  This is the only one that he did. . .is this one here?*

LA 2:       It's the only one that you've done is. . .?

AU:         [IA]

LA 2:       . . .the one we talked about?

AU:         The one, the one, the one that is ongoing.

LA 2:       *He says [OV]. . .*

AU:         And now you [plural] are accusing me of this one.

LA 2:       *. . .[OV] that one.  He goes, "Now you're talking about another one."*

LA 1:       *Well, now we to. . .   Well, he's saying he didn't do this other one.  What about all these ones in El Salvador that he's wanted for?*

LA 2:       And the ones that you've done in El Salvador in the past?

AU:         It's different there.  Understand?

LA 1:       *I'm not. . . We don't prosecute him for those.*

            [OV section]

LA 2:       We can't, can't [UI] in El Salvador.

AU:         I was imprisoned there also for the same thing, well.

LA 2:       *Okay.*

AU:         For being around and for being, for being present at the event. It's the same thing.

134

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 2: | *He says [OV] El Salvador. . .* |
| | [OV section] |
| LA 2: | *. . .being at the wrong place at the wrong time.* |
| AU: | Always [UI] all in my hands.  Look at me, I'm here.  Let's see and if it was me. . . |
| LA 1: | *That he's falsely accused is that, that's what he's saying?* |
| LA 2: | *Yes.* |
| LA 1: | *Except for this one?* |
| LA 2: | *Except for that one.* |
| AU: | Yes.  I have always told you that, but if, if it was me, well, it's here in my hands, and we'll go see.  We'll go confront the people, but if it was me, that they tell me directly to my face. |
| LA 2: | *Okay.* |
| AU: | Understand? |
| LA 2: | But you know that people are afraid, and here [UI] |
| AU: | [OV] it's not a matter of fear, but here [UI] and then you as detectives are different because. . .and [UI] that, that try in a way. . . to, to, to give protection and everything.  Accuse him, accuse him with whatever, but [UI] |
| LA 2: | No, I don't, don't accuse you. . . |
| | [OV section] |
| LA 2: | . . .that they feel okay to tell us the truth. |
| AU: | No, I know. [UI] |
| LA 2: | If one tells the truth, everything comes out okay. |
| AU: | But, but. . . |
| LA 2: | The truth is the truth.  It never changes. |

135

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 154 of 524

**JA3839**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:      Uh-huh. But it's the way how, how they try to bury one. . .that so-and so said this and so-and-so said the other.

LA 2:    No! Look, I don't know how they work in El Salvador, but I. . .if I tell you something, it's because. . .that is what we know. *Okay?* Whatever it is, but I know. . .

AU:      [UI section] what you tell me about the people that [UI] going to say the truth, that they're going shoot you, that they're going to kill you. . . Huh!

LA 2:    No, because I know. . . Look. . .

AU:      [UI].

LA 2:    [UI] we [UI] here. *Okay?* I have told you that, hey, well. . .

         [UI section]

LA 2:    But I know that, eh, t-this case. . . Look, what, what will happen, happens. If they give you life, if they give whatever, eh, I don't know what [UI.

AU:      Uh-mm.

LA 2:    What has happened, happened in the past in Los Angeles, uh, are things that we can help to clear up. *Okay?* And to take away the, the negative idea [UI] with you. *Okay?*

AU:      Yes.

LA 2:    And to go simply with the truth. [UI] I haven't told you, eh, well, I don't want to scare you, "Hey, well, I'm going to. . . Look, here they're going to send you to, uh, well, up to Alaska. . .a, a prison in Alaska so you can be, to be away from your family, and when you're in the cold. . ." Look, what I have merely asked of you are two things. . .the truth, and, and if your family is afraid or needs help. . .let me know. Those are the only two things. Without threats, without anything. *Okay?* I ask two things from you. Well, [UI] in this room.

AU:      Uh-huh.


136

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:     The truth and-and if truly your family is in need of help, we are in a position to help them. *Okay?* Because if someone helps me, comes through with the truth, I, at the minimum, is what I owe them. *Okay?* Now I don't want that an innocent person is, uh, has, has fear or have something happen to them because, uh, a person has helped me. My conscience will not, cannot accept that. *Okay?* I have never lost a person, a witness, a victim, or someone's family member that has helped me. . .that something has happened to them. *Okay?* And that I take with a lot of faith and with a lot of work that. . . is what I. . .will never happen to me. But if I sit here with you, I only ask the truth from you. Only that. Look, it doesn't cost you anything. We want to know only what happened. But we're not, not going start to accuse you of cases where you entered, uh, a house of, of children without parents and killed all the children. They're, they're not crimes like that which are, well, of cold blood. Understand?

AU:      Yes.

LA 2:     Those are crimes, those are crimes that, well. . .from the life of a ga-gang member. *Okay?* Not that you molested two children or a young girl or. . .you raped a [UI] or whatever. You understand? Only crimes that you did while being a gang member. . . things that happened. *Okay?* For whatever reason. Like his case here. In the beginning. . .Hey! Maybe he thought that. . . Well, you killed them both for, in cold blood. I'm understanding the details and [UI] Well, the boys threw gang signs. Well, those are things that happen when the gang members throw gang signs. *Okay?* It's understood.

AU:      Uh-mm.

LA 2:     *Okay?* And now we just have this case that. . .it's almost the same situation. And that Sin. . .

AU:      [UI]

LA 2:     . . .and that [UI] only your side after knowing what, what Sin has said [UI] the other wit-witnesses have said. It time to know what Alejandro says.

AU:      To begin with, that day both of us were not there. Understand?

LA 2:     What day. . .?

137

**JA3841**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        We didn't take part on that day.

LA 2:      What?  Which day was it? I haven't told you [UI].

AU:        That death was at night.

LA 2:      *Okay*.  What date was it?

AU:        I don't know.  I don't remember.  But. . .it was [UI].

LA 2:      Did you hear [UI section]?

AU:        Huh?

LA 2:      Did you hear what it was. . .?

AU:        Fuck, that I heard it was like a shooting [UI] at the park [UI].

LA 2:      And what happened?

AU:        Nothing, that I came back.

LA 2:      *Okay*.

AU:        Uh-huh.

LA 2:      And, and. . .and how did that thing happen?

AU:        I don't know.

LA 2:      Who was mixed up in those things?

AU:        What?

LA 2:      Well, why does Sin say that, that you were. . .that you were the one that was with him. . .that, that night?  Why you above everyone else is he going to say that. . .that you. . .

AU:        Because at times I. . .I'd met up with him.  Understand? Because. . .maybe I was playing or maybe I was making food deliveries with him.  Understand, because he had [UI] he was there in a business of, of, of some Chinese, and he-he made *deliveries*, and at times he'd come to look for me so that I would go with him. Understand? That's why at times. . .the, the situation is confused by something like that. Understand?  Maybe he didn't say what perhaps [UI]. Perhaps I could have talked to him.

138

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


LA 2:    Uh-mm.

AU:    And, and. . .but no, no [UI] that kind of, of, of crime.

LA 2:    *Okay.* I have not said that you shot.

AU:    No. [UI]

        [UI section]

AU:    No, but you're telling me that it's the same weapon.  Then now [UI]. . .?

LA 2:    No. . .

AU:    [UI] something else on me.

LA 2:    No, only that the same weapon was used that night.  Not that it was you.

AU:    Okay, not me?

LA 2:    *So.* . . Only knowing that, uh, that day that. . .let me explain it again. . . that there were witnesses that place you there in the park with Sin.

AU:    Uh-mm.

LA 2:    And they also place another gang members at the park on the same night. . . there at that court.  And we have talked with Sin who has told us everything that happened . . .without involving other people, just you.  Because you also. . .when, when we talked to him, he also heard the same things that we had him identified. . .

AU:    Mm.

LA 2:    . . .and we had you identified. *So* he, he told us what happened. *Okay?* He has told us. . .

AU:    He, he told you that I or he was shot at. . .

LA 2:    He has told us that he was. . .  He told us that he was armed.

AU:    How many shots were there?

LA 2:    Ahh. . .I can't tell you that.

AU:    And, and the ones that were heard there?

139

**JA3843**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | I don't know how many. We don't have the details.  They [UI]. |
| AU: | Why don't you have that? You [plural] should know the details. [UI section] |
| LA 2: | Ah, yes! |
| AU: | [UI section] |
| LA 2: | No, he. . .he  always.  [UI] they're not, they're not with the details that he can give you here right now. |
| AU: | Uh-huh.  And, and how did we do it to leave from there?  Where did we go to or what [UI]? |
| LA 2: | [UI] in Sin's car? |
| AU: | But at what, what place?  At what place was the car?  We, we only went to ride around there or [UI]. |
| LA 2: | [UI section] that it's. . .that it's. . .what is important here is that. |
| AU: | Huh? |
| LA 2: | That they saw Sin's car. . .after-after. . . |
| AU: | [sighs]  Ayy! |
| LA 2: | . . .the shooting. |
| AU: | Well, the only thing that, that I can say about that case is that I didn't have a part of anything and it wasn't I in that case.  Understand? [UI section] sincere, and, well, yes. [UI] but I don't have anything to do with it, and, well, yes [UI section] accepted that I did it. Yes, I was there or anything because I wasn't, wasn't present.  Understand? |
| LA 1: | *What's he saying?* |
| LA 2: | *He's saying that, uh, he wasn't there.  He wasn't there.  He had no part in it.* |
| LA 1: | *He doesn't know anything about it at all?* |
| LA 2: | *He says he heard about it, but he doesn't know anything [UI]. . .* |
| LA 1: | *What. . .what did he. . . ?* |

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 159 of 524

**JA3844**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


LA 2:       *He says, yeah, he's been around, you know, he's been around with Sin. Sin worked as a delivery driver at times for a restaurant. . .some Chinese restaurant. And, uh, you know, at times he'd take him with him. And yes, he had been at the park with him previously, but he wasn't over there on that night.*

LA 1:       *But why is Sin giving him up?*

LA 2:       Uh-mm. It's that perhaps. . . Why do you think, why do you think that Sin is saying what he's saying?

LA 1:       *He's not the only one.*

AU:         Perhaps because Sin [UI section] Understand? But perhaps he-he knows that no one. . .not him or, or I are the ones who shot and nothing like that. Understand?

LA 2:       Uh-mm.

LA 1:       *There are others. There's too many for me to bring all the books.*

LA 2:       *Yeah.*

LA 1:       *They're all pointing at you.*

LA 2:       There are other people that have come [UI]. . .

AU:         Yes.

LA 2:       . . .that, uh, you were there with him. . .

AU:         Uh-huh.

LA 2:       . . .on top of the people that, that have identified you.


141

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU: But as I say, perhaps the, the, the, the persons at the, at the, at the park, the one. . .the ones that check there because at times [UI section]. I don't know if, if they'd throw at the. . .the basketballs at one. [UI section] And I'd arrive perhaps in the afternoons. At night, it was rare because I don't like to be out at night because it was very, very ugly, well. . . Understand, that suddenly it would end like, like what happened there. That suddenly everyone is [UI], well, yes. It's bad luck to be there. That is what happens to me [UI] something similar. Understand? I don't remember that area from there then.

LA 2: *[UI] he doesn't remember, remember being at night 'cause he don't like it around there. . .*

LA 1: *Okay.*

LA 2: *. . .at nighttime, 'cause it was ugly.*

LA 1: *The park is owned by MS.*

LA 2: The park is a territory [UI].

AU: But beforehand it wasn't *MS.*

LA 2: Whose was it before?

AU: I don't know. It belonged to another gang.

LA 2: *He says it wasn't MS before.*

AU: *Yeah.*

LA 1: *That's true.*

LA 2: That is the truth.

LA 1: *But it's MS now. It was MS then.*

LA 2: It's. . .*MS'* park right now and it was a *MS'* park [UI].

AU: [OV] [UI] *MS,* the same.

LA 1: *And you went there to take care of MS business.*

LA 2: You [plural] arrived there to take care of business for MS.

142

**JA3846**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 1: | *Looking out for your homie.* |
| AU: | Mm [IA] |
| LA 2: | Keeping an eye for a. . .[UI] who did something bad to you [plural]. |
| AU: | Uh-mm. |
| LA 1: | *Because of the other incident.* |
| LA 2: | Because of what happened to, uh, to Guanaquito. |
| LA 1: | *I know the story.* |
| LA 2: | Uh, the story is already kno-known because it's already, already been told. |
| LA 1: | *Lots of people told me the story.* |
| LA 2: | Many people have told him the story of what happened. |
| AU: | Well, perhaps I'm the only one because I didn't know.  Truthfully, I wasn't present on that day. |
| LA 2: | [UI] who told you that someone died there? |
| AU: | Huh? |
| LA 2: | Who told you someone died there? |
| AU: | [UI section] How could I not know being close to La Mariposa there, and that they'd get together there.  Maybe the others [UI] told me [UI].  Understand? |
| LA 2: | *I asked him how was it, uh, I never mentioned that anybody was killed at the park.  How is it that he knows that somebody was killed at the park.  He says, "Well, you know, [UI] words run around," and, and hanging out there at Mariposa all the time, they got, they heard that somebody had gotten killed at the park.* |
| AU: | That's why. And I don't have anything to do with that. |
| LA 2: | *Okay.* |
| AU: | Understand? |

143

**JA3847**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| LA 2: | All the truth.  What I detect. . . |
| AU: | [OV][UI] . . . |
| LA 2: | I, I detect something from you. |
| AU: | Uh-huh. |
| LA 2: | *Okay.*  I feel, uh, uh. . .I have a lot of years doing this. |
| AU: | Uh-huh. |
| LA 2: | And sitting down here [UI] and saying that [UI] the other. |
| AU: | No. |
| LA 2: | *Yeah.* |
| AU: | The only thing is perhaps that some people figure out who the person was, but [UI] how, how, how can Sin say that, but what I want to tell you is that it wasn't me and it also wasn't Sin.  Understand?  And although he says whatever he wants to say because. . . |
| LA 2: | *Okay.*  And Sin was, he says that he was there. |
| AU: | But he wasn't, wasn't the one who did the shooting. |
| LA 2: | Okay. But he was there.  He has told us that. |
| AU: | Uh-huh. If, if he was there, well. . . |
| LA 2: | *Okay.* |
| AU: | [UI] |
| LA 2: | And. . .and also that you, that you were there. |
| AU: | Uh-huh. |
| LA 2: | And who, who was the third person?  Here, between us. . .no one else. . . |
| AU: | [OV section] |
| LA 2: | . . .no one else was here. . .no one.  There's no, no fucking recording [UI]. . . |

144

**JA3848**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:         [UI] No one else and none of us have committed that crime. Understand? And the persons that are talking, whatever they're saying. . .it's foolishness and, and what, whatever they want to say, that's on their part and to be mouthing off because I wasn't there that day.  I was there a day before playing *basket*, but. . .

LA 2:       The day before they killed him?

AU:         Uh-huh.

LA 2:       You remember?

AU:         I don't know.  I think that, that it was the day before or two days before that thing happened.

LA 2:       *He-he says, he. . .he says that [UI section]. . .*

AU:         [UI section]

LA 2:       *. . .park about a day or two before the incident.*

AU:         I was [there] like from 3:30, until around 5:00.  From there, we went to La Mariposa because. . .

LA 2:       *He said he was there. . .*

AU:         Mm.

LA 2:       *. . .but not until 3:30 'til about 5:00 o'clock, and then they went back to hang out at Mariposa [UI].*

LA 1:       *And he was looking for somebody.  Who was he looking for?*

LA 2:       Were you looking there in the park for something or [UI] play or what?

AU:         [OV] Nothing. [UI] to smoke.

LA 2:       Did you [plural] smoke in the park?

AU:         Yes, well, yes. [UI section]  because at times we go to, to play and at times [UI].

LA 2:       *They were playing. . .and smoking.*

LA 1:       *With all the trouble he's in now. . .*

145

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:        With all the problems that you are involved here in this area. . .

LA 1:        *. . .and the things that he has admitted to us.*

LA 2:        . . .and the, the two things that, that you've said that is. . .

LA 1:        *Why does he hide from this?*

LA 2:        . . .[UI]. . . He wants to know if there is a reason why you are hiding the truth about this case. *Okay.*

LA 1:        *Why not go all the way. Just finish it.*

LA 2:        Why [UI]. . . Why not finish? This thing is. . .

AU:          Uh-mm.

LA 2:        . . .the last thing that we want to talk to you about.

AU:          Okay.

LA 2:        Uh-huh.

AU:          Because [UI] in, in that thing. . .may he rest in peace. Understand? Bah. . . I have crimes from El Salvador also. Understand. And it was, was the same, uh, the same cellular from the, from the. . .

LA 2:        Huh?

AU:          It's good that I don't like it that, that, that you put, that you put that ball.

LA 2:        Really, it's the telephone. It's a telephone. It's not a recorder.

AU:          That also records. I know, but it doesn't matter.

LA 2:        Uh-huh.

AU:          I also know we haven't committed a crime. [UI].

LA 2:        Well, who-who do you say that. . . who appeared there. Who is he?

AU:          They called him, eh, everybody called him El Loco.

LA 2:        Who?

146

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Castor [PH]. He has the same, the same physical appearance of, as Sin. He was very small and the other person. . . I don't remember what they called him. Understand? Because I can't remember. It was someone similar. Understand. |
| LA 2: | Similar to you? |
| AU: | Uh-huh.  But no, no, no it wasn't El Loco.  That's true. |
| LA 2: | *He says [UI] he says [UI] one of the guys was a guy named. . .*<br>Cartolon [PH]. |
| AU: | Huh? |
| LA 2: | Cartolon [PH].  What's his name? |
| AU: | Castor [PH]. |
| LA 2: | Cartolo [PH]? From what group? |
| AU: | [UI]. |
| LA 2: | What group is that one? |
| AU: | *Park View* Nueve. [Park View Nine] |
| LA 2: | Huh? |
| AU: | *Park View* Noveno [Park View 9th] |
| LA 2: | *Park View.* |
| AU: | Ninth. |
| LA 2: | And that, that was the one who did the thing at the park? |
| AU: | Yes. Perhaps.  And it's a pity they killed him in Guatemala because they [UI]. |
| LA 2: | *He says there's this guy Carto, Cartonan [PH] from Park View that killed him  but he himself was killed in El Salvador after him. . .and, uh. . .* |
| LA 1: | *It sounds like he's doing . . .* |
| UM: | *Right.* |

147

**JA3851**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 1: | *. . .it sounds like he is doing the same thing he did last time with the fourth person in the back seat.* |
| UM: | *Yeah!* |
| LA 1: | *You know.* |
| UM: | *Yeah, it's just a process of, uh. . .* |
| AU: | [UI] |
| LA 2: | No, no, that it's, it's similar to what you said before. |
| AU: | [UI] |
| LA 2: | That perhaps it was another person. . . |
| AU: | [UI] |
| LA 2: | . . .for. . .for. . .[as] not to throw a problem on a person. |
| AU: | But, but. . .well, yes. |
| LA 2: | *Yeah,* but this thing, I. . . |
| | [OV section] |
| AU: | . . .that he rest in peace.  What did you hear? That I was doing something.  That, that, well, yes. |
| LA 2: | Look. . . |
| AU: | [UI] permitted, but [UI]. . . |
| LA 2: | Look. . . |
| AU: | . . .and we can't get him on anything about that.  Understand? |
| LA 2: | That's why. . . |
| AU: | [OV][UI]. . . |
| LA 2: | . . .and, and that's why I ask you. . . |
| AU: | And that he rest in peace. |

148

**JA3852**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

[UI section]

LA 2: . . .not that other people have done it. . . because I know this is harder than, than admitting that you have done. . .that admitting to something that you have done.

AU: Yes.

LA 2: Understand? I know it's harder to throw something at a *home boy* or other members of the gang.

AU: Uh-huh.

LA 2: That. . .well, you taking the responsibility. That's why I said to you, "Tell me what you have done." Because I don't want that. . .at some point if you don't feel right. . .eh, putting a [sic][the] finger on a person. I understand [UI]. . .

AU: No, the, the, the only thing that, that, that happened there, well, and if not [UI] that you just told me that he got out, but no, no. . .not any time [UI]. . .

LA 2: *Okay.* Were you in the car that day?

AU: Uh-huh.

LA 2: Yes?

AU: But I didn't [UI]. I didn't fire, well. I didn't fire [a shot] in that problem.

LA 2: *Okay*, but let's [UI]

AU: Because we came to, to, to. . .suddenly when that happened. . .

LA 2: *Okay.* Let me finish, let me finish.

[fingers snapping]

LA 2: *Okay. We're around there. He's saying he. . ."Yeah, he didn't get out the car." He and Sin didn't get out the car that night.*

LA 1: *Didn't get out the car?*

LA 2: *Didn't get out of the car, yeah. So. . . All right.*

LA 1: *Okay.*

149

JA3853

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *[UI] turn around.* Um, so that night you [plural] arrived there at the park? Was Sin driving? |
| AU: | Uh-huh. |
| LA 2: | Were you in the front with him or in the back? |
| AU: | No, in front. |
| LA 2: | *Okay.* And. . .one or two. . .other persons got out of the car. One or two? |
| AU: | Two persons. Yes. |
| LA 2: | Two persons got out of the car? |
| AU: | Yes. |
| LA 2: | *Okay.* Armed? *Yes. Okay.* |
| AU: | [UI] it's the same outcome. |
| LA 2: | Okay. [UI]. |
| LA 1: | *Where'd they. . .?* |
| LA 2: | [UI]? |
| AU: | [UI] I think. |
| LA 2: | Slowly. |
| LA 1: | *Where'd they pull up to?* |
| LA 2: | Where did you [plural] stop the car? |
| LA 1: | *What street?* |
| LA 2: | The street that's by. . . |
| AU: | [OV][UI]. . . |
| LA 1: | *Next to the courts?* |
| AU: | . . .in front. [UI] the other dudes from. . .from [UI section]. |
| LA 2: | [UI] If you run, can you arrive at La Mariposa? |

150

JA3854

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        Yes.

LA 2:      You [plural] parked there at [UI].

AU:        Yes, but on the other street because. . .

LA 2:      *He's describing the tunnel over off of, uh, Kingsley.*

LA 1:      *Right.*

LA 2:      *The tunnel that leads to the other side of he bridge.*

LA 1:      *Right. Takes you over by Mariposa on the other side.*

LA 2:      *Right.* And you [plural] stopped there. . .in Sin's car.

AU:        Uh-mm.

LA 2:      And knowing what they were going to do?

AU:        [UI] but I didn't know.

LA 2:      *Okay.* You [plural] knew that there had been a fight earlier with, with Guanaquito [PH] or. . .

AU:        Yeah. Yes, [UI] about a month before that.

LA 2:      *Okay.* But. . .and, uh, did you get information that someone was there at the, the court? The truth. We've already started, started. Why are we going to lie?

AU:        [UI] what happened [UI] all of a sudden [UI] probably and that something was going to happen.

LA 2:      Did he, did he tell you why you were going to the park armed? That. . .that someone was at the park [UI] that, that there were enemies in the park or . .

AU:        Uh-huh, but they weren't there the, the ones that were going to do that around there.

LA 2:      *Okay.*

AU:        Understand? And all we did was just stop there.

LA 2:      To wait for them there.

151

**JA3855**

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

AU:          Uh-huh.

LA 2:        *So. . .but you [plural] got out?*

AU:          [UI]

LA 2:        You saw that they got out?

AU:          I saw them.

LA 2:        How?

AU:          Uh, on the other side, they also got out.

LA 2:        *Well, okay. So*, uh, [UI] someone got out and you [plural] left them there, and then where did you [plural] go to wait?

AU:          Here, around the [UI].

LA 2:        *Okay.*

AU:          [UI section]

LA 2:        *He's describing. . .he says that they dropped them off. . .*

AU:          [UI section]

LA 2:        *. . .and they waited at the other side of the park.*

AU:          Perhaps [UI] right now because. . .

LA 2:        *Okay.*

AU:          [UI] . . .

LA 2:        [UI] that's why we want the truth.

AU:          Perhaps that, that, that. . .

LA 1:        *The other side of the park by the courts?*

LA 2:        *Okay.* Look, if I, if I draw for you. . .

             [sounds]

LA 1:        Huh.

152

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | [UI] something. If I remember correctly, [UI]. |
| LA 2: | Look, I'm, I'm going to explain to you. |
| | [sounds] [UI section] |
| LA 2: | Here you have the courts. *Okay?* This one is *Lemon Grove.* This one is *Oxford. Okay?* |
| | Uh-huh. |
| LA 2: | Here on this side of the park. |
| | Yeah. |
| LA 2: | Here is the park. Here is the *baseball* field. |
| AU: | *Yeah.* |
| LA 2: | *Okay?* And here starts the [UI], and here is the *east tunnel* that goes to La Mariposa. |
| AU: | But before here, before that, there's another street here. |
| LA 2: | *Okay.* Yes. Here's where, uh, Kingsley is at. |
| AU: | There's another street here. |
| LA 2: | *Okay.* You [plural] left him [sic] there? |
| AU: | Uh-mm. [UI]. |
| LA 2: | There's where you [plural] waited. |
| AU: | Uh-huh. |
| LA 2: | Where did you [plural] leave them? |
| AU: | There at the park. [OV] [UI]. |
| LA 2: | What. . .? |
| AU: | [OV] at the end of the park. [UI] |
| LA 2: | Where, where did you [plural] leave them? |

153

**JA3857**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

| | |
|---|---|
| AU: | After passing the hill, well, around there. |
| LA 2: | *Okay.*  Here on this side of the park? |
| | [sounds] |
| AU: | Here. |
| LA 2: | You [plural] left them here? And then they arrived.  Here. . .and you [plural] waited here? |
| AU: | Yes. |
| LA 2: | *Okay.* |
| LA 1: | *Ask him what kind of car it was?* |
| LA 2: | In what-what kind. . .you don't remember the type of car? |
| AU: | [UI section] |
| LA 2: | What color? |
| AU: | Black. |
| LA 2: | *It was black.* |
| AU: | [UI] just two doors. |
| LA 2: | *Two-door.  So. . .they get there on the. . .west side of Lemon Grove from Oxford.  They get dropped off there and then they drive over to. . .what he's describing is Kingsley, and they waited for them on Kingsley.* |
| LA 1: | *How many?* |
| LA 2: | Two got out of the car? |
| AU: | Yes. |
| LA 2: | *Okay. Two guys got off at Kingsley.* |
| AU: | Uh-hum.  And then they came. . .and other persons also came there also [UI] and that. [UI]. |
| LA 2: | There were other people, other, uh, more dudes in the park? |

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:            Yes.

LA 2:          *He says there were other guys [UI] at the park.*  But they. . . those two got out. . . armed?

AU:            Yes.

LA 2:          Did you see the weapons? [pause]  No?  How did you know that they were armed?

AU:            Well, because, uh, they already, already knew what they were going for.

LA 2:          *Okay.  He say. . . I asked him, "Did you know they were armed?"  He said, "Yes."  I go, "Did you see the arms?"  He said, "No."  "Then how did you know they were armed?"  He goes, "Because we knew what we were going there for."*

LA 1:          *Okay.  Who. . .How many are in the car, total, over here?*

LA 2:          How many were in the car?

AU:            *Four.*

LA 2:          *Four.*

LA 1:          *And two got out on Oxford.*

LA 2:          Two got out at there on the side, closer to *Oxford*?  The two in back?

AU:            Yes.

LA 2:          *Yes.*

LA 1:          *Did he see where they walked to?*

LA 2:          And did you see where they were going?

AU:            Yes.  They come on the, on the. . .*Western.*  From *Western*, we turned around towards. . .

LA 2:          *Lemon Grove?*

AU:            Is that one *Lemon Grove?*

LA 2:          Uh-huh.  The street that goes right there by the park.

155

**JA3859**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

AU:        Uh-huh, that, that curves around like that.

LA 2:     Uh-mm.

AU:        And they got out there and [UI].

LA 2:     But they arrived at the park [by] walking?

AU:        Uh-huh.

LA 2:     *Okay.*

AU:        They got out here and they [UI] they did that thing, [UI].

LA 2:     *Okay.*

AU:        And then suddenly, well. . . But [UI] to park at. . .

LA 2:     And you already knew that you [plural] were going to wait for [UI].

AU:        Uh, I didn't know [UI] just what the, what the. . .what the, suddenly, well, only, "What's going on here?"  That those crazies are going to do something there."  Well, they knew [UI] and wait. . .well.

LA 2:     You [plural] knew that they were coming to this side to do something?

AU:        [OV][UI]. . .

LA 2:     Before you [plural stopped the car here for, for them to get out.

AU:        I don't remember [UI] about that.

LA 2:     What did you [plural] know?  What, what, what did they say?  What, what was said in the car?

AU:        Nothing, only that, that for us to just let them out there.

LA 2:     *Okay.*

AU:        And that, that, that they were going to walk.

LA 2:     Why?

AU:        Huh?

LA 2:     Why?

156

**JA3860**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:            Only that and that. . .

LA 2:          What [UI]. . .?

AU:            . . .we then went to park.

LA 2:          Did they have information that there was someone in the park?

AU:            Yes.

LA 2:          Other gang members in the park?

AU:            Yes, in the car.  That has also happened. . .and suddenly that we are going to park [UI]  What's going on?

LA 2:          *Okay.  So* [UI]. . .

               [UI section]

LA 2:          . . .over here and they. . .and you [plural] parked here.

AU:            Uh-huh.

LA 2:          And. . .how long did you [plural] stay here before. . .that something happened?

AU:            Around. . .fifteen minutes, twenty minutes, perhaps.

LA 2:          Fifteen minutes?

AU:            Maybe less.

LA 2:          *Okay.*  Five, ten. . .you know, you know the time. . .?

AU:            The time, more or less, well, we were in the car [UI].

LA 2:          *Okay.  He thinks. . . He's not sure. Uh, he first says fifteen minutes.  He says, "Well, maybe. . ."  It's a, it's a sure estimate [UI] when they dropped them off to the point that they picked them up.*

LA 1:          *What happened during that time?*

LA 2:          And what did you hear. . . What was, what was it that you heard or you saw when you waited here on this street?

157

**JA3861**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:             Nothing, just the shots that were heard.

LA 2:           *He just heard the shots.*

LA 1:           Uh-huh.

LA 2:           "Vergazos". . .slang term.

LA 1:           *Now he's. . .okay. Okay.*

LA 2:           [UI] and then, then they. . . they arrived here with, with you [plural]?

AU:             Uh-mm. [UI].

LA 2:           Walking, running?

AU:             Running.  [UI] walked there.

LA 2:           *And then they, the guys ran to the car.*  They got in and where did you [plural] go?

AU:             [UI] by 3rd [UI].

LA 2:           *He says they-they got in the car and they went somewhere off 3rd Street.*

LA 1:           *Where did they get out?  Where'd they come. . .from?*

LA 2:           [UI]. . .

LA 1:           *They come through. . .*

LA 2:           [UI]

LA 1:           *. . .this area?*

LA 2:           Yes. . .where did they come from. . .if, if you remember when they came? If here, if here are the *basketball* courts. ..

AU:             Uh-huh.

LA 2:           *Okay.*  Did they come through here [noises] to be on the sidewalk or did they go through there?

AU:             Through the park.  In the middle. . .

LA 2:           *Okay.*

158

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:          . . .though the middle of the court.

LA 2:        *He says, he says through the basketball court.*

AU:          Supposedly that. . .

LA 1:        *Okay.*

AU:          The court is here.

LA 2:        *Right.*

AU:          [UI] through this route supposedly [UI].

LA 2:        *[UI] to the point, a crossing point behind kind of a baseball backstop. There's a cab there.*

LA 1:        *Was the. . .?*

AU:          Well, he was supposedly there [UI] around there in the neighborhoods.

LA 1:        *Was the park open or closed?*

LA 2:        Was the park open or closed?

AU:          It was open, yes [UI section] let's say at 9:00 perhaps [UI]. . .

LA 2:        *He says, "It was open."  He goes, "I'm not sure it was 9:00 just yet."*

AU:          I don't remember what time it was. . .yes.

LA 1:        *So around 9:00 o'clock?*

AU:          Mm.

LA 1:        *Okay.  Who was in the car?*

LA 2:        There. . . [noises]  Who was it that was in the car?

             [UI section]

LA 2:        And the ones that got in?

AU:          [UI] and another, another dude that I didn't know.  I only recognize him by [his] face and [his] hair.

159

JA3863

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2: *He's, he's not sure. That's where, that's where we getting, uh. . .lost again. That's where. . .yes, he's having, he's having issues with identifying, uh, fingering other people who haven't already fingered themselves.*

LA 1: *Did the other one finger you?*

AU: What?

LA 2: That one of them was the one that, that put the finger on you? It's that we only want to know the persons that were in the back that day that they did the shooting. *Okay?* Knowing. . . You know that already someone. . .

AU: Uh, about knowing on what we were going for, they knew. But [UI section].

LA 2: Now. . .you were there when they let them out. . .when they drop them out here, you were there?

LA 1: Sin.

AU: Sin. He was the only one that, that was with me in the car. He was the one that drove.

LA 2: *He says he only one in the car.*

LA 1: *Right. Sin and you?*

AU: Uh-huh. We were the ones that were in the car.

LA 1: *I talked to Sin. He gives you up.*

AU: Uh-huh. We're not correct there. [UI] Always. . .me!

LA 2: Sin said you were there.

AU: Well, yes, but as I tell you. I [UI][OV]. . .

LA 2: Are we correct in that?

AU: Yes, we are correct on that, but that [UI].

LA 2: *I asked him if Sin [UI][OV]. . .*

AU: . . .if someone had seen me there, it wasn't us. Understand.

160

**JA3864**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| LA 2: | *Okay.* |
|---|---|
| AU: | No, no, understand? |
| LA 2: | You say that it wasn't you the one who fired. |
| AU: | Uh-huh. |
| LA 2: | But you were there, right? |
| AU: | Well, that. . .but that I went to the park there that night, it's a lie that [UI]. |
| LA 2: | *[OV] Well, he admits his part, but he's not the one that got off and, and. . . fired.* |
| LA 1: | *He's denying that he was the one that fired.* |
| LA 2: | *Right.  But he was there in the park.* |
| LA 1: | *But he admits being there. . .* |
| LA 2: | *Right.* |
| LA 1: | *. . .to do it.* |
| LA 2: | *Correct.* |
| AU: | At no time was I there present.  I don't know. |
| LA 2: | In the park to do the shooting? |
| AU: | Uh-huh. |
| LA 1: | *Well, where exactly. . .?* |
| AU: | [UI] in the afternoon [UI]. . . |
| LA 2: | No. . . |
| AU: | I was at La Mariposa when suddenly. . . |
| LA 2: | But you were, were here when you [plural] left them. The two dudes got out here? |
| AU: | [UI] it was here before he crossed into the park. |

161

**JA3865**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:    And-and you already, already knew that they were there. And then you [plural] parked here to wait for them.

AU:    Uh-huh.

LA 2:    And then when they got into the car, you [plural] went to 3rd and. . .?

AU:    How?

LA 2:    When, when. . .after they got into the car after doing the deed.

AU:    Uh-huh.

LA 2:    Eh, they got into the car and they went to the thre. . .3rd and. . .[UI].

AU:    No, no, no. 3rd and. . .No, no, I don't remember well, very well.

LA 2:    Uhm.

AU:    Uh-huh. But. . .

LA 2:    If you can't say who was in the back, I prefer that you don't lie to me.

AU:    Okay, and how, how. . .I'm telling you that it was ["el finado"] the person who died, well.

LA 2:    "Finado." What's that?

AU:    "Finado," that he's already, already [UI]. . .

LA 2:    [OV] died.

AU:    That he has already died. That guy, "Finadito" Castorcito [UI].

LA 2:    What's his name?

AU:    Castor.

LA 2:    Castor.

AU:    Yes. He was the one that was. . . He was very small. . .also the same as Sin Perhaps it was [UI]. It was, was [UI].

LA 2:    Castor. What's, what's, what's his name? His name?

AU:    Amilcar, it seems. I don't remember very well.

162

JA3866

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | Amilcar. |
| AU: | Uh-huh. |
| LA 2: | His last name? |
| AU: | Canales. . .it seems. |
| LA 2: | Amilcar Canales. *Okay.* |
| LA 1: | Amil-Amilcar, *yeah.* Amilcar, *that's common name, I guess.* |
| LA 2: | *Yeah.* |
| LA 1: | *Well, see, I don't think he's afraid of naming his homies because he laying out these guys, right? On my, on this case. So I think he's still. . .you know.* |
| LA 2: | *Right.* |
| LA 1: | *He's saying he was in the ride.* |
| LA 2: | *He's, he's saying that he's one of the shooters. It was this guy who he says is dead and killed in Guatemala.* |
| LA 1: | Uh-mm. |
| LA 2: | *. . .and the other guy who doesn't know who. . .* |
| LA 1: | Amilcar Carnales [sic]? |
| LA 2: | Canales. |
| AU: | Canales. |
| LA 1: | Canales. |
| AU: | [UI] |
| LA 1: | *And he's dead?* |
| LA 2: | *Yes. He's. . .he-he learned that he's been killed in El Salvador [sic].* |
| LA 1: | *They called him Castor?* |
| AU: | *Yeah.* |

163

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 182 of 524
**JA3867**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008


| LA 1: | *C,A,S T,O,R,E?* |
|---|---|
| AU: | [UI section] |
| LA 1: | *That's convenient.* |
| | [UI section] |
| LA 1: | *See. . .* |
| LA 2: | How old was he? |
| AU: | Around 24 or 25, I don't know. |
| LA 1: | *We-we've gone from. . ."I don't know what you're talking about. . .this murder." All the way to, "I was there and know who did it." You know, here's the deal. Here. . . You understand a little English?* |
| LA 2: | Do you understand enough English? |
| AU: | No, no. |
| LA 1: | No? [A] little? |
| AU: | But no, no. . .when he talks to me, no, no, I don't understand. |
| LA 1: | *[UI] not to push.* [chuckles] |
| AU: | [UI] No, but no. |
| LA 1: | *Okay. I have you identified in the park.* |
| LA 2: | He has, has you there in the park. |
| LA 1: | *I have Sin identified in the park.* |
| LA 2: | He has Sin identified in the park. |
| LA 1: | *I have ballistic evidence in the park.* |
| LA 2: | He has evidence of bullets that were. . . |
| LA 1: | *The same ballistics. . .* |
| LA 2: | Do you know what ballistics are? |

164

**JA3868**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

AU:         Ballistics. Yes.

LA 1:       *Gun evidence. . .*

LA 2:       The evidence of. . .

LA 1:       *The same evidence links you. . .*

LA 2:       The same weapon. . .

LA 1:       *. . .here. . .*

LA 2:       . . .connects you with this case . . .

LA 1:       *. . .with this case.*

LA 2:       . . .with that case.

            [UI section]

AU:         With regards to the weapons, anybody can have them [UI]. The weapon was not mine.

LA 2:       He says the gun is [UI] the gun. . .

LA 1:       Did you let. . .did you let one of them. . .

            [OV section]

LA 1:       *That would explain it.*

LA 2:       Look, what is going to explain that. . .

AU:         [UI] before anything, before anything, I want , eh, want it to be known that you [plural] yourselves know that the weapons of a gang [UI]. . .

LA 2:       No!  That, that I understand that, but. . .

AU:         . . .and I want. . .

LA 2:       . . .if you lent him the gun to one of them.

AU:         Not at any time did I lend the gun. Understand?  Each one knows where they are going to place it, and where they kept the weapons.

165

**JA3869**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2: We know that you used the, the gun in, in the other case. Did you place the gun in a common area or what?

AU: Common, how, I don't know. [UI] know where [UI] the weapons are kept [UI]. . .

LA 2: *[UI] I asked him, what happened after your case. . . What happened to the gun? Uh, did you put it somewhere in a common area or something?*

 [OV][UI section]

LA 1: *[UI] They take care of their guns. They know where they're at [UI]. They, they're valuable things. They [OV][UI]. . .*

LA 2: Who came to see the, the weapons is what he says. Well, you [plural] know that. . . well, [UI] just leave them there because anyone in the gang can use them [OV].

LA 1: *Ask him how many guns were here.*

LA 2: How many weapons did you have. . .

AU: When I saw them . . .

LA 2: . . .that night?

AU: There were two.

LA 2: *He says two.*

LA 1: *How does he know that?*

LA 2: How do you know that?

AU: Huh?

LA 2: How do you know?

AU: From a dude that. . .

LA 2: How?

AU: . . .[UI] only, only [UI] . . .

LA 2: Is it something you heard or something you saw or what?

166

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:         Huh?

LA 2:       Was it something you saw?  Something you heard?

AU:         Only what, what was heard.  That it wasn't. . .that it wasn't. . . only, only
            from two to six shots.

LA 2:       *He says there's something from. . .then I go,"What was it based on?  On
            something that he saw or something that he heard?"*

AU:         And you well know, and you know that the shots that they had [UI] weren't.
            . .weren't from the weapon that, that. . .that supposedly you say that I had, I
            had.

LA 1:       *What color were his guns?*

LA 2:       No?

AU:         Understand?

LA 2        *He says that, he says that he knows that the person that was killed wasn't
            killed with a 45.*

LA 1:       *Wasn't killed. . .*

LA 2:       *Yeah. . .*

LA 1:       *. . .with a 45?*

LA 2:       *Not a 45.*

LA 1:       *That 45?*

LA 2:       *Yes.*

UM:         *How does he know it?*

LA 1:       *How does he that?*

LA 2:       How do you know that?

AU:         Because you know that, that, the one always finds out about things.

LA 2:       *He says people, you know, he goes, you know, we just find out.*

167

**JA3871**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 1:        *Who did he give his gun to, his 22?*

LA 2:        [OV] And the, the. . .Your weapon. . .the 22, uh, did you give it to somebody in particular?

AU:          No.

LA 1:        *Eh. . .he's the one. You're the one who had the 22.*

LA 2:        *Okay*, you are the person that. . .

LA 1:        It's obvious. . .

LA 2:        . . .you know well that . . .you were, you. . .

LA 1:        *Hey!. . .*

LA 2:        . . .used the, the 22.

LA 1:        *. . .I wanna tell you. . .*

AU:          [UI] if, if it's like, like, like he says that, that, that I'm the one, well. . . understand, and there are more cases, and they already found more cases, but. . . understand. . .in, in Los Angeles there are, there are, there are areas where, like the way one is in El Salvador, if I would have done a million things, if I had, eh, doing these things. Understand? A weapon would exist, a crime would exist, would exist [UI section] who was there and who wasn't. Understand, and you know how, how. . .how it is in, in, in one's country.

LA 2:        Uh-mm.

LA 1:        And wherever one is located, in whatever country, if the authorities are not present at the event, you know that, that [UI] each one. [UI]. . .

LA 2:        *[OV][UI] if in the cases work, you know, and-and unless the police are there, the cases, cases are more difficult to prove and if he wanted to, he could have been involved in a lot more crimes.*

LA 1:        Mm.

LA 2:        *He's just kind of. . .*

LA 1:        *What, what was the reason for them going there? Why did they go there?*

168

File #: 245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

LA 2:    Eh. . .Did they call you beforehand or did you hear something that. . .look, the. . .Guanaquito's incident when they beat him. . .was it before you [plural] arrived at the park?

AU:    Yes, but that was before. . .about a month before, didn't I tell you?

LA 2:    A month before?

AU:    I think perhaps it might have been less.

LA 2:    Less? *He says roughly somewhere around a month's time prior he-he knew that, uh, Guanaco had gotten beat up there.*

LA 1:    *So they went to get the guy?*

LA 2:    *So* you [plural] arrived there, arrived at the park to, to locate the enemies?

AU:    How?

LA 2:    When you [plural] got into the car. . .*Okay?* You [plural] never [UI]. You get into a car with low-lifes because there is. . .

AU:    [OV][UI]. . .

LA 2:    . . .there's a fight or, or you [plural] are going to look for the enemies. Yes or no?

AU:    [UI section]

LA 2:    But in, in the neighborhood. . .Of course, if you're going, going to joke around, you go to a club or, or. . .where to chase women. Yes or no?

AU:    Uh-mm.

LA 2:    You in that situation, you [plural] are not going to go to a place where there's only dudes, right?

AU:    If they [UI] suddenly come out [UI] like, like what happened there that you said. Well, yes.

LA 2:    Yes? But going, going to the park. . . *Okay?* You didn't go to look there to find women. And I know that Sin already had his girlfriend that almost, almost [UI] that guy was, was almost married.

169

**JA3873**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Yeah. [UI] |
| LA 2: | He didn't [UI]. |
| AU: | The, the girlfriend [UI]. . . |
| LA 2: | Sin's? |
| AU: | Yes. The girlfriend [UI] at the restaurant and everything [UI]. What did they have to worry about? |
| LA 2: | Uh-huh. |
| AU: | [UI section] with food.  Understand? |
| LA 2: | Yeah, she. . . |
| AU: | She had a little rice or something that, that. . .mixed with, with eggs [UI] that she would take to us [UI] she'd take to us that day because they paid us yesterday.  Understand? |
| LA 2: | [UI]. . .she's Hernandez [PH] , right? |
| AU: | Yes. |
| LA 2: | *Okay.* And, and, and knowing about things. . .you knew, well, what was happening in that area. . .the problem you [plural] had with *TPC [PH],* the Calzones [PH] and the [UI]. |
| AU: | [UI] all gangs and. . .[UI] Los Angeles [UI] [OV]. . .<br><br>[UI section] |
| LA 2: | *. . .he thinks they were going around in the park, the rivalries with Carton [PH], they call Calzones [PH] and, uh, [OV].* |
| LA 1: | Calzones [PH]? |
| LA 2: | *Yeah.* |
| LA 1: | Calzones [PH]. Huh. |
| LA 2: | *And he says, "Yeah," he goes, "Yeah," he goes. . .again he goes back to making reference that, you know, MS doesn't get along with anybody.* |

170

**JA3874**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        *So* anybody [UI section]

LA 1:      *But that night, they went there for a reason. What was the reason?*

LA 2:      And then that day when you [plural] were going to the park that night, you [plural] already knew. . .you [plural] had an idea. . .

AU:        They, perhaps. And [UI] about that, but I didn't know [UI]

LA 2:      *They-they did, but he-he knew. He did n't know until the point that they dropped them off. They dropped off the two guys.*

LA 1:      *But he knew?*

LA 2:      *Yeah.*

LA 1:      *What did he know?*

LA 2:      What did you know? What-what did you know. . .at this point when, when they got off? That you let them get out, and you [plural] were going towards here. What did you know at that point?

AU:        Nothing, nothing, I just heard that they said that we were going to leave them off here and going to wait for them over there.

LA 2:      Where? [UI] and what else? [UI] or other things. . .something else?

AU:        [UI] . . .

LA 2:      What else was said there?

AU:        Nothing. Just that. I went to drop them off [UI section]. [UI] I waited for them there. As we were going there, it was when he told me, "Well, we're going to wait for them here."

LA 2:      Why?

AU:        Too much of a problem there. . .in that neighborhood there. There are som-some dudes there who are from another neighborhood.

LA 2:      *Okay.* When you [plural] had already arrived here?

AU:        Uh-huh. It was before the, the. . .

LA 2:      Here?

171

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        No, when, when we arrived over there.

LA 2:      *Okay.*

AU:        When we had already parked.

LA 2:      *All right. He says [UI] get off. . .and, and they dropped them off. He says, he doesn't know anything. Not until they get here. He says that all of a sudden they like, "Hey, let us off and wait for us." And then as they're driving here and getting parked on this side, he asks Sin, "Well, hey, what's going on?" He says, "Yeah, they're gonna go do something. There are some other guys from the other, another gang in the park." And he said, "Okay."*

LA 1:      *What did they say about who. . .and who, who shot who? What happened during that shooting?*

           [OV section]

LA 1:      *. . .[UI].*

LA 2:      *Yeah.* After, after they got into the car, after the thing. . .wh[at]. . .they said, the ones in the back, "Yeah, what was it that happened? How, how did it happen?"

AU:        Ahh! The ones in back, didn't tell me.

LA 2:      Why? Arriving already, already at 3rd, you [plural] talked? Maybe?

AU:        No, sir. [UI].

LA 2:      They just shot and they hit up to two or three or five or six?

AU:        No.

LA 2:      They said. . .someone said something?

AU:        Only that, that. . .

LA 2:      What?

AU:        That one was already laying down there.

LA 2:      *Okay.*

172

**JA3876**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU: Understand? And that, well [UI] to go leave them there at 3rd.

LA 2: *He knows that they. . .*

AU: And after that. . .

LA 2: *They had left one there, dropped one and, uh, to take. . .they directed him to go take him to somewhere off 3rd Street.*

LA 1: *Mm. They didn't talk about it at all?*

LA 2: You [plural] didn't say anything else in the car. . .

AU: No.

LA 2: . . .about something that. . .

AU: Nothing else but to leave them [UI].

LA 2: *Just to get them out of there.*

LA 1: *So how does he explain all these witnesses and Sin?*

LA 2: How do you explain all those witnesses. . .

LA 1: *Saying you were the guy that was cool about the shooting.*

LA 2: . . .and al[so], and also information that, that Sin has said that, that you were one of the persons that could have fired.

LA 1: *You're the only one that could make that shot.*

AU: I don't think that, that he has talked because he knows that. . .no, no, no. . .

LA 2: *He says that's one thing he questions. It's like, you know, if, if Sin did talk. . .*

[UI section]

LA 2: *. . .why does he say something when he knows that. He says. . .*

LA 1: *'Cause he got, he got pick out too.*

LA 2: Because Sin also was one who went down. . .that's why, for this case.

AU: That's why, but. . .

173

**JA3877**

File #:  245D-CE-92434
CD #:  MS-13
Date :  04/23/2008

|  |  |
|---|---|
|  | [UI section] |
| AU: | [UI] because the persons, if there are any, where they describe me and that perhaps they accuse one and it doesn't mean that it was one that fired. |
| LA 2: | *Yeah,* but it's precisely what you said. |
| AU: | No, no. |
| LA 2: | Other people placed you there at the park. |
| AU: | Me? |
| LA 2: | Yes. |
| AU: | Like, like I tell you. . . |
| LA 2: | Now, now that can be explained, but now, now you saying that. . .hey, well, you knew what was going to happen before it happened and. . . |
| AU: | No. [UI] I didn't know what, what was going to happen. |
| LA 2: | [UI] but during. . .before, before. . . |
|  | [OV section] |
| LA 2: | . . .before the, before the shots, you knew what had happened.  What was going to happen. |
| AU: | Well, yes, but. . . |
| LA 2: | Once they got into the car, you already knew.  Well, the truth is. . .  That, that one went down.  Pow! Pow! Pow! Pow-pow-pow-pow-pow! |
| AU: | When one starts the [UI]. |
| LA 2: | Uh-mm. |
| AU: | Well, yes. |
| LA 2: | And the. . .and Sin, uh, has told us. . . |
| AU: | Uh-huh. |
| LA 2: | . . .things and that's why we are confused.  *Okay?* |

174

**JA3878**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:        [OV][UI]. . .

LA 2:      The difference is that you were in the car. . .

AU:        [UI]. . .

LA 2:      . . .or, or. . you were one of the men that, that just, well, got out of the car. It doesn't, doesn't change too much.

AU:        Well, yes.

LA 2:      It doesn't change.

AU:        But something changes?

LA 2:      Because, eh, whatever you [plural] knew. . .

AU:        They knew there. Not for one moment. . .but. . .if, if Sin says that, that, that. . .that he was also there that day?

UM:        Yeah, but he, he was there.

AU:        But that. . .

UM:        But that he says that you got out.

AU:        That I fired?

LA 2:      That you were one of the men that, that got out.

AU:        Huh!  For him to remember well, tell him.

LA 2:      *I asked him, "Well, Sin says you got out of the car," and you were nervous.*

AU:        And to remember well that I [OV]

LA 2:      [OV][UI].

LA 1:      *But how did it take an, an hour and a half if he was just a passenger in the car and didn't have any involvement in this?  Why did he lie about it for an hour and a half?*

LA 2:      *Okay.*

LA 1:      *And then tell us this?*

175

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | *Okay.* He, he wants to know is why if everything that you have done. . . |
| LA 1: | *Motherfucker!* |
| LA 2: | Uh-huh. . .why did you lie. . .for an hour, hour and a half before telling us this? |
| LA 1: | *Unless you're a suspect.  Makes you a shooter.* |
| LA 2: | Because. . .if only. . .you weren't in the car. |
| LA 1: | *I got enough.  Why is it that everybody talks about you.* |
| LA 2: | Everybody [UI/OV section] |
| AU: | That doesn't matter to me. |
| LA 1: | *They say that you are. . .* |
| AU: | . . .fucking people [UI] [OV]. |
| LA 1: | *. . .good at what you do.  All right.* |
| LA 2: | [UI/OV section] but you pretend. |
| LA 1: | *[UI section] that's a good shot.* |
| LA 2: | [UI] that a shot that, that was made the other night. |
| AU: | [OV][UI]. . . |
| LA 1: | *I've never seen Marines make shots like this.* |
| LA 2: | [UI] Marines that do that. |
| LA 1: | *I respect your ability.* |
| AV: | No, no [UI]. . . |
| LA 2: | [UI] with the gun. |
| LA 1: | *But I don't respect, I don't respect if you're lying to me here.* |
| LA 2: | But he can't respect you if you're lying. |
| LA 1: | *If you did it, you did it.* |

176

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| LA 2: | If you did it. .. you've done what. . . only [UI]. . . |
| LA 1: | *It can't get any worse.* |
| LA 2: | [UI]. |
| LA 1: | *It can't get worse for you.* |
| LA 2: | That it can't get worse for you. |
| LA 1: | *Okay? So just. . .* |
| AU: | Uh-mm. |
| LA 1: | *. . .tell me the truth.* |
| AU: | If people, people can say whatever they like. Understand? And that, that some [UI] here, that others there. It's only because one is going there. . . |
| LA 2: | I know, but, look. . .[UI] |
| | [UI section] |
| LA 2: | Did you fire [weapon] that night? |
| AU: | No, I didn't fire. |
| LA 2: | Did you get out of the car that night? |
| AU: | No, I didn't get out. [sniff] Yes. [UI][OV]. . . |
| LA 2: | You got out that night. |
| AU: | I didn't get out of the car. And he can. . .if he's saying that, uh, it's because he was. . .he was [UI] perhaps he took it that they were going to [UI]. Understand? [OV] [UI]. . . |
| LA 2: | But nothing changes for Sin. Sin is already. . .going down. |
| AU: | No. I already, already know. |
| LA 2: | And Sin is in for, for [his] whole life. |
| AU: | And I know, but . . .but the only thing that I remember Sin saying is that, that I didn't fire and he didn't either. Understand? |

177

**JA3881**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

LA 2:        *[UI] all I can say was that. . .*

AU:          Maybe [UI]. . .

LA 2:        *. . .him and Sin were not the ones that fired.*

LA 1:        *But they were there?*

LA 2:        *But they were there.  And he-he described their role.*

AU:          Yes.

LA 1:        *All right.  He's, he's so embarrassed, he-he doesn't, you know, he-he can't bear to talk about all the things that he's done.*

AV:          [UI]. . .

LA 2:        [OV][UI]. . .

LA 1:        *. . .[UI] did not shoot.  You're saying, [UI]. . .*

AU:          I know that. . .

LA 1:        . . .uh, Canales?

LA 2:        Amilcar Canales.

LA 1:        *Is that the shooter? Is that what you're saying?*

LA 2:        *Twenty, twenty-five years old. . .killed in Guatemala.*

LA 1:        *Okay.*

LA 2:        *From. . . But from what clique is that guy? Salva Mara?*

AU:          Who?

LA 2:        Amilcar?

AU:          No.

LA 2:        Which clique?

AU:          From the *Park View* clique.

LA 2:        *Park View*

178

**JA3882**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

AU:         Yes.  They also knew him and he was also from El Salvador.

LA 2:       Had he been arrested here in the States?

AU:         In Alabama.

LA 2:       Only?

AU:         Uh-huh.

LA 2:       Here in Los Angeles?

AU:         No.

LA 1:       *When did he get killed in El Salvador [sic]?*

LA 2:       When did they kill him in . . .No, Guatemala?

LA 1:       [OV] Guatemala.

LA 2:       When did they kill-kill him in Guatemala.

AU:         About a year and half ago perhaps around there.  Hum, okay, perhaps about
            a year ago.

UM:         *About a year ago?*

AU:         Around there. [UI].

LA 1:       *Does he know where?*

LA 2:       Do you know what place in Guatemala?

AU:         In, in. . .perhaps [UI].  I don't know if it was in. . .

LA 2:       *He's not sure.* [OV]

LA 1:       *It's not true. It's not true.*

LA 2:       He doesn't believe that it's true.

AU:         Huh?

LA 2:       He doesn't believe that it's true.

LA 1:       *It's not true!*

179

**JA3883**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Shh! I can give him his name if he wants  [UI] when they shot him. [UI] |
| LA 1: | *That's why they call you Wizard.  You pull stuff out of hats.* |
| LA 2: | Well, the reason [chuckle] [UI]. . . |
| AU: | No, no, no. |
| | [OV section] |
| LA 2: | . . .because you have been. . . you make up stories. *Yeah.* |
| LA 1: | Alejandro! |
| AU: | [UI]. . . |
| LA 1: | *I know you did it.* |
| LA 2: | [OV] He knows that you fired. |
| AU: | If [OV]. . . |
| LA 1: | *Otherwise you, your friend . . .* |
| AU: | Look, look. . .if you, if you say so and you saw me, you have. . . |
| LA 2: | [UI/OV section] |
| AU: | . . . you have the truth and you can accuse me of whatever you want to accuse me.  Understand? |
| LA 2: | But you know that [UI]. |
| AU: | But no, no. . .  Well, that's why, but how, how. . .people don't know in reality, they have given you description perhaps of me.  And perhaps they recognized me from viewing a photo, but it wasn't I who fired in that case. |
| LA 2: | *He says he's not the one that. . .* |
| AU: | Understand? |
| LA 2: | *. . .fired. And that [UI].* |
| AU: | Bah! How. . .I can't, I can't. . . not even, I can't [UI]. . . |
| LA 2: | You were there.  You participated, but you weren't the one that fired. |

180

**JA3884**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008

| | |
|---|---|
| AU: | Fuck, but now, now. . . I participated now when the shots had just been fired, and that they told me [UI], "This is going to happen." Until the shots were heard. . .well. Huh? What could I do there? |
| LA 1: | [OV][UI]. . . |
| AU: | I couldn't let them down either. |
| LA 2: | *Okay. [UI].* |
| LA 1: | *Mm, no go?* |
| LA 2: | *No go now.* |
| LA 1: | *Show the pictures. But. . .* |
| LA 2: | *No, I don't wanna go into it too much without the [UI] video [UI].* |
| LA 1: | *Right.* |
| LA 2: | *. . .[UI].* |
| LA 1: | *But he visited, uh, uh, Luis in the hospital, and Luis said he was in the hospital and he told him that he did it. And Luis didn't even leave the hospital so [UI] a bit. And he thought of White Fence. . .thinking these guys were White Fence and. . .* |
| LA 2: | Uh-huh. |
| LA 1: | *. . .he's pro, problems with White Fence. So. . .* |
| LA 2: | *Oh, uh. . . [UI] that case. He threw two-two Ws and. . .first thing came out of his mouth was White Fence.* |
| LA 1: | *Yeah, that one went first. That one went second.* |
| LA 2: | Mm. |
| LA 1: | *This is, this. . . I mean, we gotta go 'cause. . .but, yeah, tell him, "Hey, now is your chance to come clean with your stuff."* |
| LA 2: | This is your opportunity to come out with the truth. Your last opportunity. |
| AU: | [UI]. . . |

181

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


| | |
|---|---|
| LA 1: | *We're gonna fly back to LA today.* |
| | [OV section] |
| AU: | What do you want me to tell him if I didn't participated. . . |
| LA 2: | No! |
| AU: | . . .in that [UI] |
| LA 2: | [UI] the truth [UI]. |
| AU: | The only thing I participated in was that I was there that day, and I was waiting in the car. |
| LA 2: | *He says his participation was that [OV].* |
| AU: | [OV] but not even I, but not even I or him. . .not even Sin has fired any of those weapons. |
| LA 2: | [UI] Sin did not fire a round that night. |
| LA 1: | *Okay.  But him admitting that he's there and the people's ID. . .* |
| | [OV section] |
| UM: | *Well, that's it.  That's all I need.* |
| AU: | But whatever Sin says, or whatever people said, well. . . |
| LA 2: | [UI]. |
| LA 1: | *Whatever!* |
| LA 2: | All right. |
| AU: | [UI]. |
| LA 1: | *All right.  Good luck with your life.* |
| LA 2: | Good luck. |
| AU: | If it had been me alone in the car, understand? |
| LA 2: | Uh-huh. |

182

**JA3886**

File #: 245D-CE-92434
CD #: MS-13
Date : 04/23/2008


AU:              And it wasn't us.

LA 1:            *Tell him if he's got, he's got more to talk then. . .*

LA 2:            [UI section] if there's something that you want to say, [UI]. . .

AU:              [UI] only where can I call you.

LA 2:            [UI] you can communicate with [UI], *okay?*

                 [UI section]

AU:              [UI] the detective.  [UI] a card or something [UI].

LA 1:            *I'm gonna stop this.*

                 **[End of CD]**

183

**JA3887**

# VITA

## John Gregory Olley

### Address

Clinical Center for the Study of Development and Learning
CB# 7255
University of North Carolina at Chapel Hill
Chapel Hill, North Carolina 27599-7255
(919) 966-4613       FAX (919) 966-2230
E-mail: greg.olley@cdl.unc.edu

### Education

College of William and Mary
Williamsburg, VA, A.B., 1966, Psychology

Wake Forest University
Winston-Salem, NC, M.A., 1968, General-Experimental Psychology

George Peabody College for Teachers (now George Peabody College of Vanderbilt University)
Nashville, TN, Ph.D., 1973, Mental Retardation Research - Clinical Psychology; "Related Area"
- Special Education

### Current Position

Psychologist, Clinical Scientist, Center for Development and Learning and
Clinical Professor, Division of Rehabilitation Psychology and Counseling, Department of Allied
Health Sciences, School of Medicine, University of North Carolina at Chapel Hill

### Positions Held

Program Director, Behavioral Associates of Massachusetts, Inc., Attleboro, MA and
Associate Clinical Director, The Groden Center, Inc., Providence, RI, June 1986 to July 1988.

Clinical Associate Professor, Department of Psychiatry, and Director of Training, Division
        TEACCH (Treatment and Education of Autistic and related Communication
        handicapped CHildren), and
Clinical Associate Professor, Division of Special Education, School of Education, University of
        North Carolina at Chapel Hill, March 1978 to June 1986.

Assistant Professor, Department of Psychology, University of Massachusetts, Amherst, MA,
        September 1972 - March 1978.

Director, Preschool Intervention Project, Psychological Services Center, University of
        Massachusetts, June 1973 - June 1975.

### Professional Preparation

Graduate Assistant in Psychology, Developmental Evaluation Clinic, Bowman Gray School of
Medicine of Wake Forest University, Winston-Salem, NC, September 1966 - August 1968.

JA3888

Fellow, Training Program for Research Behavioral Scientists in Mental Retardation, George Peabody College, Nashville, TN, September 1968 - August 1971.

Clinical Psychology - Mental Retardation Intern, Division of Medical Psychology, Neuropsychiatric Institute, Center for the Health Sciences, University of California, Los Angeles, CA, June 1970 - August 1970.

Clinical Child Psychology Intern, Children's Rehabilitation Unit, University of Kansas Medical Center, Kansas City, KS, September 1971 - August 1972.

**Editorial Work**

Served as Guest Editor for: *American Journal on Mental Retardation, American Journal of Psychiatry, Behavior Therapy, Journal of Applied Behavior Analysis, Applied Research in Mental Retardation, Child Development, Journal of Autism and Developmental Disorders, Journal of Child and Family Studies, Journal of Clinical Child Psychology, Merrill-Palmer Quarterly, Research in Developmental Disabilities, Journal of the Association for Persons with Severe Handicaps, Journal of Policy and Practice in Intellectual Disabilities, Journal of Intellectual Disabilities Research*

Book Review Editor: *Journal of Autism and Developmental Disorders*, August 1982 - June 1986.

Consulting Editor: *Preventing School Failure* (formerly *The Pointer*), 1979 - present.

Consulting Editor: *Focus on Autism and Other Developmental Disabilities*, 1995 - present

**Grants and Contracts**

Principal Investigator: Youth for Advocacy, a Project of National Significance funded by the U. S. Administration on Developmental Disabilities.  (October 2007-September 2010)

Principal Investigator: Work Group on the Role of Psychologists in *Atkins* Hearings, funded by the American Psychological Association (January 2007-November 2008)

Principal Investigator: Next Generation: Acting for Advocacy, a Project of National Significance funded by the U. S. Administration on Developmental Disabilities. (October 2004-September 2007)

Principal Investigator (with Anne Wheeler): Linking Learning with Neurodevelopmental Functioning: Management Strategies for Children with Prader-Willi Syndrome. Grant from the Prader-Willi Research Foundation. (May 2006-April 2007)

Principal Investigator: 5-Year Plan Project, grant from the North Carolina Council on Developmental Disabilities. (October 2005-June 2006)

Principal Investigator: Transition to Community, contract with the NC Division of Mental Health, Developmental Disabilities, and Substance Abuse Services. (June 2005 – September 2007)

Principal Investigator: Shifting the Power, a Project of National Significance funded by the U.S. Administration on Developmental Disabilities.  (October 2000 – September 2003)

Principal Investigator: Steps Toward Independence and Responsibility funded by the North Carolina Council on Developmental Disabilities (September 2001 – August 2004)

JA3889

Principal Investigator: contracts with Developmental Disabilities Section of NC Department of Health and Human Services for surveys associated with the Core Indicators Project (September 2000-June 2003), Summer Apprenticeship (April 1998-June 2000), Behavioral Supports Clearinghouse (August 1998 – June 2000), training in Problem Solving for Life (August 1998 –June 2000), Self-Determination and Self-Advocacy (April 1998 – present), and consultation to community programs (September 1995 – June 2000).

Principal Investigator:  "Learning for Life," U.S. Administration on Developmental Disabilities, October 1994-June 1997; July 1997-June 2001.

Contract with *Thomas S.* Section of NC Department of Human Resources, Screening of Adults for Eligibility in the *Thomas S.* Class, February 1995-March 1996.

Principal Investigator: "Survey of Summer Campers with Spina Bifida and Their Siblings," University Research Council, University of North Carolina at Chapel Hill, June 1991 - May 1992.

Principal Investigator, Grumman Grant for continuing education for teachers to use the TEACCH communication and social skills curricula, from Division of Extension and Continuing Education, University of North Carolina, July 1, 1984 - June 30, 1985.

Early Education Component Director, "Model Educational Program for Autistic Children and Youth," contract from Office of Special Education, October 1980 - January 1984.

One of the Participating Trainers, "National Personnel Training Program for Teachers of Children with Autism," grant from Office of Special Education to National Society for Children and Adults with Autism, August 1981 - May 1985.

Co-Director (with Eric Schopler): "Special Project: Comprehensive Inservice Training Program for Personnel Serving Autistic Children," Office of Special Education, June 1979 - May 1982.

Co-Principal Investigator (with R. J. Simeonsson and L. M. Marcus): "An Observational Approach to the Investigation of Educational Skills of Autistic Children," Research Grants in Education for Young Scholars in the Behavioral Sciences, School of Education, University of North Carolina at Chapel Hill, July 1978 - June 1979.

Co-Director (with Beth Sulzer-Azaroff): "Training Grant for Educational Change Strategists for the Severely Handicapped," Bureau of Education for the Handicapped, July 1974 - March 1978.

Principal Investigator: Faculty Research Grant, University of Massachusetts, "Investigation of Effects of Modeling on Diversity of Children's Drawings" (in collaboration with Richard Dubanoski, University of Hawaii), June 1976 - May 1977.

Principal Investigator: Broadened Faculty Research Grant, University of Massachusetts, "Relaxation as a Self-Control Procedure for Children," fall semester, 1975.

Principal Investigator: contract between University of Massachusetts and Massachusetts Department of Public Welfare for the Preschool Intervention Project, May 1973 - June 1975.

**Honors**

Recipient of the North Carolina Arc LIFEguardianship Distinguished Service Award, 1994

**JA3890**

Recipient of the Excellence in Applied Behavior Analysis Award from the North Carolina
Association for Behavior Analysis, 1991

Recipient of the Distinguished Teacher in Psychology Award from Council of Undergraduate
Students in Psychology, University of Massachusetts, Amherst, 1974 and 1976.

## Publications

Olley, J. G. (1968). The effect of ready signal contingency and partial reinforcement on eyelid
    conditioning.  Unpublished master's thesis, Wake Forest University, Winston-Salem, NC.

Stedman, D. J., & Olley, J. G. (1969). Bibliography of the world's clinical and research literature
    on Down's syndrome: Behavioral, social and educational studies through 1968 (IMRID
    Papers and Reports, Vol. 6, No. 2). Nashville, TN: George Peabody College, Institute on
    Mental Retardation and Intellectual Development.

Olley, J. G.  (1971). Sex differences in human behavior in the first year of life. (Peabody
    Papers on Human Development, Vol. 9, No. 1). Nashville, TN: George Peabody College.

Johnson, J. T., & Olley, J. G. (1971). Behavioral comparisons of mongoloid and nonmongoloid
    retarded persons: A review. American Journal of Mental Deficiency, 75, 546-559.

Olley, J. G. (1974).  Mother-infant interactions during feeding (Doctoral dissertation, George
    Peabody College for Teachers, 1973). Dissertation Abstracts International, 34, 347B.
    (University Microfilms No. 73-32646).

Olley, J. G., & Fremouw, W. J. (1974). The voting rights of the mentally retarded:  A survey of
    state laws.  Mental Retardation, 12(1), 14-16.  Reprinted in:  (1974). Behavior Today, 5,
    112.  Reprinted in:  Office of Handicapped Individuals (1976). Handicapping conditions:  A
    resource book.  Atlanta:  Transaction Systems.

Olley, J. G.  (1977). Another influence on the direction of school psychology. American
    Psychologist, 32, 779. (Comment).

Olley, J. G., & Ramey, G. D. (1978). Voter participation of retarded citizens in the 1976
    presidential election.  Mental Retardation, 16, 255-258.

Loveland, K. K., & Olley, J. G. (1979). The effect of external reward on interest and quality of
    task performance in children of high and low intrinsic motivation. Child Development, 50,
    1207-1210.

McHale, S. M., & Simeonsson, R. J., Marcus, L. M., & Olley, J. G. (1980). The social and
    symbolic quality of autistic children's communication. Journal of Autism and Developmental
    Disorders, 10, 299-310.

Novak, M. A., Olley, J. G., & Kearney, D. S. (1980). Social skills of handicapped children in
    integrated and separate preschools. In T. M. Field (Ed.), High-risk infants and children:
    Adult and peer interactions (pp. 327-346). New York: Academic Press.

Olley, J. G.  (1980). Organization of educational services for autistic children and youth.  In B.
    Wilcox & A. Thompson (Eds.), Critical issues in educating autistic children and youth (pp.
    13-23).  Washington, DC: US Department of Education, Office of Special

**JA3891**

Education/Division of Innovation and Development.  Reprinted in (1981). Counterpoint, 2(1), 1, 31-33.

Olley, J. G.  (1980). Report of a survey on licensure of psychologists in mental retardation. Mental Retardation Newsletter, 1, 6.

Schopler, E., & Olley, J. G.  (1980). Public school programing for autistic children. Exceptional Children, 46, 461-463.

Marcus, L. M., McHale, S. M., Olley, J. G., & Simeonsson, R. J. (1981). A Piagetian approach to investigate educational skills of autistic children.  In P. Mittler (Ed.), Frontiers of knowledge in mental retardation.  Proceedings of the Fifth Congress of IASSMD, Vol. 1, Social educational, and behavioral aspects (pp. 91-99). Baltimore: University Park Press.

McHale, S. M., Olley, J. G., Marcus, L. M., & Simeonsson, R. J. (1981). Nonhandicapped peers as tutors for autistic children. Exceptional Children, 48, 463-465.

Olley, J. G., DeVellis, R. F., DeVellis, B. M., Wall, A. J., & Long, C. E. (1981). The Autism Attitude Scale for Teachers. Exceptional Children, 47, 371-372.

Schopler, E., & Olley, J. G.  (1982). Comprehensive educational services for autistic children: The TEACCH model.  In T. B. Gutkin & C. R. Reynolds (Eds.), The handbook of school psychology (pp. 629-643). New York: Wiley.

Sulzer-Azaroff, B., & Olley, J. G. (1982). Training of psychologists in mental retardation: A graduate training program. Psychology in Mental Retardation: Division 33 Newsletter, 7(3), 6-7.

McHale, S. M., & Olley, J. G. (1982). Using play to facilitate the social development of handicapped children. Topics in Early Childhood Special Education, 2(3), 76-86.

Olley, J. G., & Marcus, L. M. (1984). Considerations in the assessment of children with autism. In S. J. Weaver (Ed.), Testing children: A reference guide for effective clinical and psychoeducational assessments (pp. 71-84). Kansas City, MO: Test Corporation of America.

Olley, J. G. (1985). Social aspects of language in autistic children. In E. Schopler & G. B. Mesibov (Eds.), Communication problems in autism (pp. 311-328). New York: Plenum.

Olley, J. G., & Rosenthal, S. L. (1985). Current issues in school services for students with autism. School Psychology Review, 14, 166-170.

Schopler, E., Olley, J. G., & Lansing, M. (1985).  Jiheisho no chiryo-kyoiku purogurame [Remedial-education program for autism].  Tokyo:  Budou-sha.

Olley, J. G. (1986). The TEACCH curriculum for teaching social behavior to children with autism.  In E. Schopler & G. B. Mesibov (Eds.), Social behavior and autism (pp. 351-373). New York:  Plenum Press.

Olley, J. G. (1987). Classroom structure and autism. In D. J. Cohen, & A. M. Donnellan (Eds.), Handbook of autism and pervasive developmental disorders (pp. 411-417). Silver Spring, MD: Winston.

Simeonsson, R. J., Olley, J. G., & Rosenthal, S. L. (1987). Early intervention for children with autism.  In M. J. Guralnick & F. C. Bennett (Eds.), *The effectiveness of early intervention for at risk and handicapped children* (pp. 275-296). Orlando, FL: Academic Press.

Marcus, L. M., & Olley, J. G. (1988). Developing public school programs for autistic and other severely developmentally disabled students. In M. D. Powers (Ed.), *Severe developmental disabilities: Expanding systems of interaction* (pp. 179-197). Baltimore: Brookes.

Olley, J. G., & DiLavore, P. C. (1989). Special education. In T. B. Karasu (Ed.), *Treatments of psychiatric disorders:  A task force report of the American Psychiatric Association (pp. 123-* 129). Washington, DC: American Psychiatric Association.

Olley, J. G., & Marcus, L. M. (1989). Education for children with autism.  In T. B. Karasu (Ed.), *Treatments of psychiatric disorders:  A task force report of the American Psychiatric Association* (pp. 192-201). Washington, DC: American Psychiatric Association.

Olley, J. G., & Stevenson, S. E. (1989). Preschool curriculum for autistic children:  Addressing early social skills. In G. Dawson (Ed.), *Autism: Nature, diagnosis and treatment* (pp. 346-366).  New York: Guilford.

Olley, J. G. (1992). Autism: Historical overview, definition, and characteristics. In D. E. Berkell (Ed.), *Autism: Identification, education, and treatment* (pp. 3-20). Hillsdale, NJ: Lawrence Erlbaum.

Olley, J. G., Robbins, F., & Morelli Robbins, M. (1993). Current practices in early intervention for children with autism.  In E. Schopler, M. E. Van Bourgondien, & M. Bristol (Eds.), Preschool issues *in autism* (pp. 223-245). New York: Plenum.

Hooper, S. R., & Olley, J. G. (1996). Psychological comorbidity in adults with learning disabilities. In N. Gregg, C. Hoy, & A. F. Gay (Eds.), *Adults with learning disabilities: Theoretical and practical perspectives* (pp. 162-183). New York: Guilford.

Olley, J. G., & Reeve, C. E. (1997). Curriculum and classroom structure. In D. J. Cohen (Ed.), *Handbook of autism and pervasive developmental disorders* (2nd ed., pp. 484-508). New York: Wiley.

Baroff, G. B., with Olley, J. G. (1999). *Mental retardation: Nature, cause, and management* (3rd ed.). Philadelphia: Brunner-Routledge.

Olley, J. G. (1999). Curriculum for students with autism. *School Psychology Review, 28*, 595-607.

Olley, J. G., & Gutentag, S. S. (1999). Autism: Historical overview, definition, and characteristics. In D. E. Zager (Ed.), *Autism: Identification, education, and treatment* (2nd ed., pp. 3-22). Hillsdale, NJ: Lawrence Erlbaum.

Paraschiv, I., & Olley, J. G. (1999). Problem Solving for Life: A training program in interpersonal skills. *The NADD Bulletin, 2*, 107-109.

Olley, J. G. (2005). Curriculum and classroom structure. In F. R. Volkmar, R. Paul, A. Klin, & D. Cohen (Eds.), *Handbook of autism and pervasive developmental disorders* (3rd ed., Vol. 2, pp. 863-881). Hoboken, NJ: Wiley.

Olley, J. G., Greenspan, S., & Switzky, H. (2006). Division 33 *Ad Hoc* Committee on Mental Retardation and the Death Penalty. *Psychology in Mental Retardation and Developmental Disabilities*, *31*(2), 11-13.

Olley, J. G. (2006). The assessment of adaptive behavior in adult forensic cases: Part 1. *Psychology in Mental Retardation and Developmental Disabilities*, *32*(1), 2-4.

Olley, J. G. (2006). The assessment of adaptive behavior in adult forensic cases: Part 2. The importance of adaptive behavior. *Psychology in Mental Retardation and Developmental Disabilities*, *32*(3), 7-8.

Olley, J. G. (2007). The assessment of adaptive behavior in adult forensic cases: Part 3. Sources of adaptive behavior information. *Psychology in Mental Retardation and Developmental Disabilities*, *33*(1), 3-6.

Everington, C., & Olley, J. G. (2008). Implications of *Atkins v. Virginia*: Issues in defining and diagnosing mental retardation. *Journal of Forensic Psychology Practice*, *8*, 1-23.

Larson, K. A., Griffin, M. P., & Olley, J. G. (2008). Competency to be sentenced. In B. L. Cutler (Ed.), *Encyclopedia of psychology and law* (Vol. 1, pp. 116-118). Thousand Oaks, CA: Sage.

Olley, J. G., & Cox, A. W. (2008). Assessment of adaptive behavior in adult forensic cases: The use of the Adaptive Behavior Assessment System-II. In T. Oakland & P. L. Harrison (Eds.), *ABAS-II: Clinical use and interpretation* (pp. 383-400). New York: Elsevier.

Macvaugh, G. S., Salekin, K. L., & Olley, J. G. (2009). Mental retardation and the death penalty. In  A. Jamieson & A. Moenssens (Eds.), *Wiley encyclopedia of forensic science* (pp. 1730-1737). London: Wiley.

Marinos, V., Griffiths, D., Gosse, L., Robinson, J., Olley, J. G., & Lindsay, W. (2009). Legal rights and persons with intellectual disabilities. In F. Owen & D. Griffiths (Eds.), *Challenges to the human rights of people with intellectual disabilities* (pp. 124-154). London: Jessica Kingsley.

Olley, J. G. (2009). Challenges in implementing the *Atkins* decision. *American Journal of Forensic Psychology*, *27*(2), 63-73.

Olley, J. G. (2009). Knowledge and experience required for experts in *Atkins* cases. *Applied Neuropsychology*, *16*, 135-140.

Salekin, K. L., & Olley, J. G. (2009). Mental retardation/intellectual disability. In A. Jamieson & A. Moenssens (Eds.), *Wiley encyclopedia of forensic science* (pp. 1724-1730). London: Wiley.

**Papers presented** (since 1990 only)

Olley, J. G. (1990, March).  Behavioral services for adults with developmental disabilities in the community.  Invited address presented at the meeting of the North Carolina Association for Behavior Analysis, Charlotte.

Olley, J. G. (1990, October). Workshop on assessment and treatment for people with dual diagnosis.  Workshop presented at the meeting of the Berkshire Association for Behavior Analysis and Therapy, Amherst, MA.

Olley, J. G. (1991, February). A behavioral look at dual diagnosis. Invited presentation at the meeting of the North Carolina Association for Behavior Analysis, Greensboro, NC.

Olley, J. G., & Larkins, C. H. (1991, February). Implications of the 'Thomas S.' lawsuit for community services. Invited presentation at the Creative Dimensions in Developmental Disabilities conference, Greenville, NC.

Olley, J. G., & Hooper, S. R. (1991, August). Do people with mental retardation understand what they are asked in personality tests?  Paper presented at the meeting of the American Psychological Association, San Francisco.

Olley, J. G. (1991, October). The future of research and services in autism.  Keynote address at the annual EDEN Institute Conference on Autism, Princeton, NJ.

Olley, J. G. (1994, May). Psychopathology in individuals with mental retardation: A behavioral look at dual diagnosis. Paper presented at the meeting of the North Carolina Psychological Association, Atlantic Beach, NC.

Olley, J. G. (1995, August). Curriculum issues in autism. Invited presentation at the meeting on autism of the Texas Education Agency, Austin.

Olley, J. G., Jens, K. G., & Klindworth, L. M. (1995, November). Learning for Life: Adult Education for Individuals with Mental Retardation. Paper presented at the meeting of the National Association for Adults with Special Learning Needs, Chicago.

Olley, J. G. (1995, December). Psychopathology and mental retardation: Educational and environmental approaches. Invited presentation at the meeting of the Alabama Council for Children with Behavioral Disorders, Birmingham.

Olley, J. G. (1996, February). Behavioral treatment of individuals with Prader-Willi syndrome. Paper presented at the meeting of the North Carolina Association for Behavior Analysis, Asheville, NC.

Olley, J. G., & Jens, K. G. (1996, May). Issues in the education of adults with mental retardation. Paper presented at the meeting of the Commission on Adult Basic Education, Pittsburgh.

Olley, J. G. (1996, May). What information do policymakers need to make policy in developmental disabilities? Symposium chaired at the meeting of the American Association on Mental Retardation, San Antonio.

Olley, J. G., Jacob, A. V., Paraschiv, I., Klindworth, L. M., & Jens, K. G. (1996, May). Diagnosis of mental retardation in adults. Paper presented at the meeting of the American Association on Mental Retardation, San Antonio.

Olley, J. G., & Paraschiv, I. (1996, September). Problem Solving for Life: Instruction for adults with mental retardation. Paper presented at the meeting of the National Association for Adults with Special Learning Needs, New Orleans.

Olley, J. G. (1996, October). Autism: Conventional wisdom, careful research, and controversial approaches. Invited presentation at the 1996 Cornwell Lecture Series, Morganton, NC.

Olley, J. G. (1997, October). Curriculum for children and adults with autism. Paper presented at the meeting of the North Carolina American Association on Mental Retardation, Greensboro.

Paraschiv, I., & Olley, J. G. (1998, April). Problem Solving for Life: Social skills training for adults with mental retardation/developmental disabilities. Paper presented at the conference of the YAI: National Institute for People with Disabilities, New York.

Olley, J. G., Golden, J., & Bailey, J. (1998, May). One act with three players: Turning critics of behavior analysis into partners for positive change. Symposium presented at the meeting of the Association for Behavior Analysis, Orlando, FL.

Olley, J. G. (1998, May). Discussant for symposium The Ralph J. Bauduin Oral School: Research and program design for children with autism. Symposium presented at the meeting of the Association for Behavior Analysis, Orlando, FL.

Olley, J. G. (1998, September). What do we know about autism that is new? Invited paper presented at the meeting of the North Carolina American Association on Mental Retardation, Greensboro, NC.

Olley, J. G., Carswell, R., & Palmer, G. (1998, October). Successful behavior interventions. Invited presentation at Together We Can! Using Positive Behavior Support in the Classroom and at Home. Greensboro, NC.

Olley, J. G., & Paraschiv, I. (1998, November). A program to teach problem solving skills for independent living. Paper presented at the meeting of NADD: An Association for Persons with Developmental Disabilities and Mental Health Needs, Albuquerque, NM.

Olley, J. G., Paraschiv, I., & Carswell, R. (1999, May). Problem solving as a format for supporting self-determination and choice-making. Pre-conference workshop presented at the meeting of the American Association on Mental Retardation, New Orleans.

Olley, J. G. (1999, September). Mental retardation and the criminal justice system.  Paper presented at the meeting of the North Carolina American Association on Mental Retardation, Greensboro.

Olley, J. G. (1999, September). Progress in services and supports for people with disabilities: One person makes a difference. Invited presentation at the meeting of the North Carolina American Association on Mental Retardation, Greensboro.

Olley, J. G. (1999, October). Prader-Willi syndrome and other low prevalence disorders. Paper presented at the meeting of the Community Living Association, Atlantic Beach, NC.

Olley, J. G., Tassé, M., & Havercamp, S. (2000, February). Applications of applied behavior analysis in community settings serving people with disabilities. Paper presented at the meeting of the North Carolina Association for Behavior Analysis, Asheville, NC.

Olley, J. G., Carswell, R., Finks, W., & Dorton, R. (2000, April). <u>Sex and relationships: When to say yes and when to say no</u>. Workshop presented at the North Carolina Self-Advocacy Convention, Winston-Salem.

Olley, J. G. (2000, May). <u>Activity schedules as a guide to community consultation: A call for research</u>. Paper presented at the meeting of the Association for Behavior Analysis International, Washington, DC.

Dykeman, C., Pennell, R. L., Dawkins, B., Holden, J., & Olley, J. G. (2001, May). <u>Factors associated with problem behavior in the Special Olympics World Summer Games.</u> Paper presented at the meeting of the Association for Behavior Analysis International, New Orleans.

Holburn, C. S., Vietze, P. M., Olley, J. G., & Baer, D. M. (2001, May). <u>Is applied behavior analysis adapting to the changing DD environment?</u> Panel discussion at the meeting of the Association for Behavior Analysis International, New Orleans.

Golden, J. A., Strickland, D., Olley, J. G., & Cripe, M. (2001, May). <u>Trauma in foster children: Perspectives and contributions from behavior analysis.</u> Pannel discussion at the meeting of the Association for Behavior Analysis International, New Orleans.

Olley, J. G., & Yates, L. (2001, May). <u>Criminal justice initiatives: A report from the DD/Criminal Justice Work Group</u>. Paper presented at the Best Practices in Developmental Disabilities Conference, Greensboro, NC.

Olley, J. G. (2002, February). <u>Effective services for students with autism: What do we know and what do we need to know?</u> Invited presentation at the Alaska Statewide Special Education Conference, Anchorage.

Olley, J. G. (2002, April). <u>Autism and developmental disorders</u>. Invited presentation at the meeting of the Maryland School Psychology Association, Baltimore.

Paraschiv, I., & Olley, J. G. (2003, February). <u>Teaching problem solving for community living</u>. Paper presented at the meeting of the Council on Exceptional Children's Division on Developmental Disabilities, Koloa, HI.

Olley, J. G. (2003, April). <u>Autism: What do we know and what do we need to know</u>? Invited paper presented at the 19th Annual Sharing Our Best Conference, Hastings, NE.

Olley, J. G. (2003, May). <u>Cautions in evaluating alternative therapies and approaches</u>. Paper presented at the Best Practices in Developmental Disabilities Conference, Greensboro, NC.

Olley, J. G. (2003, November). <u>Mental retardation and the death penalty: The psychologist as expert witness</u>. Invited presentation at the meeting of the Virginia Bar Association, Richmond.

Everington, C., & Olley, J. G. (2004, March).  <u>An analysis of forensic psychological evaluations in capital cases involving defendants with mental retardation:  Has Atkins made a difference?</u> Paper presented at the meeting of the American Psychology-Law Society, Scottsdale, AZ.

**JA3897**

Olley, J. G. (2004, May). <u>Psychological assessment of mental retardation in capital cases</u>. Invited presentation at the Capital Habeas Unit Conference, Administrative Office of the U.S. Courts, Ponte Vedra Beach, FL.

Olley, J. G. (2004, October). <u>Recent advances in the education of children with autism</u>. Presentation at the Fall NCAAMR Institutes, Morganton, NC.

Olley, J.G. (2006, May). *The death penalty: Issues in expert testimony in Atkins hearings.* Paper presented at the meeting of The International Summit for the Alliance on Social Inclusion, Montreal.

Olley, J. G. (2006, August). Symposium Chair*: Mental retardation and the death penalty: Challenges facing psychologists.* Symposium at the meeting of the American Psychological Association, New Orleans.

Olley, J. G. (2006, August). *Search for professional standards in Atkins hearings.* Paper presented at the meeting of the American Psychological Association, New Orleans.

Olley, J. G., & Everington, C. (2007, March). *The measurement of adaptive behavior in Atkins cases.* Paper presented at the Off the Witness Stand conference, John Jay College of Criminal Justice, New York.

Salekin, K. L., & Olley, J. G. (2008, March). *Conducting an "Atkins" evaluation: What we know, what we don't know, and what we need to find out.* Workshop presented at the meeting of the American Psychology-Law Society, Jacksonville, FL.

Olley, J. G. (2008, August). *Psychology training in developmental disabilities at the University of North Carolina at Chapel Hill.* Paper presented at the meeting of the American Psychological Association, Boston.

Olley, J. G. (2008, August). Symposium Chair: *Intellectual disability and the death penalty: Current and future contributions of psychologists in Atkins cases.* Symposium at the meeting of the American Psychological Association, Boston.

Salekin, K. L., & Olley, J. G. (2008, August). *What does research tell us, and what research do we need in Atkins cases?* Paper presented at the meeting of the American Psychological Association, Boston.

Olley, J.G. (2008, November). Symposium Chair: *Challenges facing professional organizations in developmental disabilities.* Symposium at the Annual Meeting of the Association of University Centers on Disabilities, Washington, DC.

### Posters

Olley, J. G., Hooper, S. R., & Flagler, S. (1990, October). <u>Assessment of the social-emotional status of adults with mental retardation using self-report</u>. Poster presented at the meeting

# JA3898

of the American Association of University Affiliated Programs in Developmental Disabilities, Madison, WI.

Olley, J. G., Hooper, S. R., & Flagler, S. (1990, October).  Personal adjustment counseling for young adults with mental retardation. Poster presented at the meeting of the American Association of University Affiliated Programs in Developmental Disabilities, Madison, WI.

Olley, J. G., Paraschiv, I., Allison, J., & Jacob, A. V. (1996, September). Problem Solving for Life: Adult education for individuals with mental retardation. Poster presented at the meeting of the North Carolina chapter of the American Association on Mental Retardation, Raleigh.

Olley, J. G., Paraschiv, I., & Jacob, A. V. (1997, May). Learning for Life: A training program to assist the Compensatory Education of adults with mental retardation. Poster presented at the meeting of the American Association on Mental Retardation, New York.

Paraschiv, I., & Olley, J. G. (1997, May). Effectiveness of a training program in social problem solving skills. Poster presented at the meeting of the American Association on Mental Retardation, New York.

Olley, J. G., & Carswell, R. (1998, September). The behavioral supports clearinghouse. Poster presented at Together We Can! Using Positive Behavior Support in the Classroom and at Home, Greensboro, NC.

Paraschiv, I., Olley, J. G., & Carswell, R. L. (1999, April). A program to teach problem solving as a skill for independent decision making. Poster presented at the meeting of the Council for Exceptional Children, Charlotte, NC.

## Book Reviews

Olley, J. G.  (1979).  Review of Mental Retardation:  A developmental approach by C. C. Cleland, Mental retardation:  The changing outlook by R. P. Ingalls, and Retardation: Issues, assessment, and intervention by J. T. Neisworth & R. M. Smith.  Journal of Autism and Developmental Disorders, 9, 131-133.

Olley, J. G.  (1986).  Review of Annotated bibliography of autism:  1943-1983 by A. J. Tari, J. L. Clewes, & S. J. Semple.  Journal of Autism and Developmental Disorders, 16, 245-246.

Olley, J. G.  (1986).  Review of Classic readings in autism by A. Donnellan (Ed.).  Journal of Autism and Developmental Disorders, 16, 394-395.

Olley, J. G.  (1987).  Review of Management of autistic behavior:  Information service for educators.  Edited by R. L. Simpson & M. Regan.  Journal of the Association for Persons with Severe Handicaps, 12, 72-73.

Olley, J. G. (2006). Review of Lessons learned from a lawsuit: Creating services for people with mental illness and mental retardation,  Social Science & Medicine, 62, 523-524.

## Instructional Materials

Olley, J. G., Paraschiv, I., Allison, J., & Jacob, A. V. (2000). Problem solving for life: Teaching problem solving to adolescents and adults with developmental disabilities. Clinical Center

for the Study of Development and Learning, University of North Carolina at Chapel Hill: Chapel Hill, NC.

## Memberships in Professional Associations

American Psychological Association (Divisions 25, 33, 41) Present-Elect, Division on Intellectual and Developmental Disabilities

American Association on Intellectual and Developmental Disabilities (formerly American Association on Mental Retardation) (Fellow, Life Member)

North Carolina Chapter, American Association on Intellectual and Developmental Disabilities (Chair, Committee on Research)

Academy on Intellectual and Developmental Disabilities

Association for Behavior Analysis International

North Carolina Association for Behavior Analysis (President 1992-93)

## Licensure

Licensed Psychologist, North Carolina, license number 587.

## Community and Professional Service (since 1990 only)

| | |
|---|---|
| 1990 - 1993 | Member, Exceptional Children's Advisory Council, Chapel Hill-Carrboro City Schools |
| 1992 - 1993 | President, North Carolina Association for Behavior Analysis |
| 1992 - 2007 | Behavioral consultant to NC Arc Lifeguardianship |
| 1993 - 1998 | Member, National Community Education Directors Council, American Association of University Affiliated Programs |
| 1994 - 2002 | Member, Area Board of the Orange-Person-Chatham Mental Health, Developmental Disabilities, and Substance Abuse Services (Secretary 1999-2002); Committee on Developmental Disabilities (1994-2002); Client Rights Committee (1994-2008) |
| 1995 - 2006 | Consultant: The North Carolina Mentor Network |
| 1995 - 2000 | Consultant: Southeastern Regional MH, DD, and SA Services, *Thomas S.* Section |
| 1996 - 1998 | Consultant: Piedmont Area MH, DD, and SA Services, *Thomas S.* Section |
| 1998 | Grant Application Panel Review Member.  National Institute on Disability and Rehabilitation Research, U.S. Dept. of Education |
| 1998 - 2008 | Member, North Carolina Council on Developmental Disabilities |
| 2000 – present | Chair, Committee on Research, North Carolina American |

JA3900

July 2009
14

Association on Intellectual and Developmental Disabilities

| | |
|---|---|
| 2002 – 2007 | *Ex Officio* Member, Governor's Advocacy Council for Persons with Disabilities |
| 2002 | Member, NC Health Choice Task Force |
| 2000 – 2007 | Member, North Carolina Partners in Justice Advisory Committee |
| 2005 - present | Chair, *ad hoc* Committee on Mental Retardation and the Death Penalty, Division 33, American Psychological Association |
| 2008 | *Ex Officio* Member, Disability Rights North Carolina |
| 2008 - present | Member, North Carolina Commission on Mental Health, Developmental Disabilities, and Substance Abuse Services |

**JA3901**



THE UNIVERSITY
*of* NORTH CAROLINA
*at* CHAPEL HILL

CLINICAL CENTER FOR THE
STUDY OF DEVELOPMENT
AND LEARNING

THE EXCHANGE AT MEADOWMONT    T 919.966.5171
1450 RALEIGH ROAD, SUITE 100    F 919.966.2230
CHAPEL HILL, NC 27517-8833    www.cdl.unc.edu

*Mailing Address*
CAMPUS BOX 7255
CHAPEL HILL, NC 27599-7255

# PSYCHOLOGICAL EVALUATION

RE: UMAÑA, Alejandro           DATE OF BIRTH: November 25, 1984
AGE: 24 11/12                  DATE OF REPORT: November 18, 2009

This evaluation was conducted at the request of Mr. Umaña's attorneys in connection with a hearing to determine whether Mr. Umaña has mental retardation as that relates to his eligibility for the death penalty. This report is a more complete version of my preliminary report of November 16, 2009

Information on which I relied in my evaluation of Mr. Umaña:

- Interview of Alejandro Umaña at Mecklenburg County Jail, November 6, 2009, accompanied by Kursten Hensl (forensic psychology intern) and Jaclyn S. Gonzalez (interpreter)
- Interview with Rafael Enrique Umaña (father of defendant), Santa Ana, El Salvador, November 13, 2009
- Interview with Carlos Aquino Herrera (former employer), Santa Ana, El Salvador, November 12, 2009
- Interview with Carlos Yovani Herrera (former co-worker and friend of defendant) Santa Ana, El Salvador, November 13, 2009
- Interview with Karla Herrera who had lived in the same household with the defendant, Santa Ana, El Salvador, November 13, 2009
- Interview with Miguel Eduardo Castaneda (former employer) Santa Ana, El Salvador, November 12, 2009
- Interview with Monica Tatiana Reyes (former girlfriend and mother of defendant's first child) Santa Ana, El Salvador, November 12, 2009
- Interview with Carlos Alacides Peraza Alarcon, Director of Centro Escolar Santa Ana California, Santa Ana, El Salvador, November 12, 2009

Interviews in Santa Ana were conducted with Spanish language interpretation by Frieda C. de Garcia, General Manager of CG&A Translations, San Salvador

UMAÑA, Alejandro          Psychological Evaluation                    2

- Report of Examination from FBI Laboratory titled Mara Salvatrucha-13. et al., 8-24-09, containing transcripts of telephone calls by Alejandro Umaña, copies of letters sent by Alejandro Umaña in Spanish with comments by FBI cryptologist

Background

Alejandro Umaña was born in Santa Ana, El Salvador to Rafael Enrique Umaña and Leticia Ramirez Diaz and raised primarily by his father. His mother left the family when Alejandro was very young. His father remarried. He is one of two children born to his mother and father. He attended school at Centro Escolar Santa Ana California but failed to complete the third grade. By his father's report, Alejandro sustained two serious head injuries at about age 5 followed by a history of frequent severe headaches. Alejandro Umaña has two sons by two different women born in 2004 and 2005. Mr. Umaña continued to live primarily with his father and worked in various unskilled jobs until leaving the country to go to the United States at about age 19.

# Interview with Mr. Umaña

I met with Alejandro Umaña at Mecklenburg County Jail in Charlotte, NC on November 6, 2009. He is an almost 25-year old, Salvadorian man with short dark hair and a mustache and goatee who was wearing jail clothing. He was cooperative and appropriately mannered during our conversation.

I informed Mr. Umaña of the non-confidential nature of our conversation and stressed the importance of my providing accurate information to the court. I asked if he remembered speaking to another psychologist a few months ago, and he said that her remembered a Dr. Winston (actually Weinstein). He said that another doctor came from Washington, DC and conducted a physical exam. He reported seeing another psychologist, probably sent by the government.

Mr. Umaña remembered the names of his parents and siblings. He said that he has a brother who was raised by his mother, while his father raised Alejandro. He acknowledged that he attended school to 3rd grade and accurately gave the name of his school. In my opinion, Mr. Umaña tried hard to make a good impression and put the best face on all of the events of his life.

He indicated that he would have liked to get a diploma but had to go to work with his father. He acknowledged that he did not read quickly and said that he was trying to learn English. He said that it was important to know English in jail to protect himself from other inmates. In contrast, he also said that he got along well with the other inmates.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

UMAŇA, Alejandro          Psychological Evaluation                    3

Mr. Umaña described various jobs that he had while in El Salvador.  He described helping his father and other jobs, such as painting buildings and working with farm animals.  His most animated emotions came when he described his love for nature and the outdoors.  The jobs that Mr. Umaña described were all unskilled work that did not last long.  When he was younger, he said that he did not work, but just hung out with other children and watched the cockfights or went with the other children who were taking care of the sheep and cattle.  He also mentioned brief jobs fixing flat tires in a garage and at "Tropi Gas," which was just a few steps from where he lived.  I saw his home and the nearby propane gas company during my visit to Santa Ana.  Neither of these jobs lasted more than a few weeks and were part-time when the employer needed help.

The first substantial job that Mr. Umaña described was one that his father helped him to obtain as a helper making deliveries on a Coca-Cola truck.  He described the job as primarily carrying cases of bottles of soft drinks from the delivery truck into the store.  He reported that this job lasted about 2 years.

When asked about other employment, Mr. Umaña described work in construction that involved primarily assisting a mason in building footings for a bridge and building the base of cellular phone towers.  He said that the job involved mixing cement and breaking rocks, and this job lasted one or 1 ½ years.  He reported a later job helping with cattle, cleaning houses, harvesting corn, and milking cows.  He expressed the greatest interest in this job, commenting, "It's so natural there."

When I asked Mr. Umaña about other things that were going on in his life during his teenage years, he responses were more vague.  When I asked specifically how he became engaged in gang activity, he said that he did it to impress a girl.  Then when the girl still showed no interest in him, he was committed to the gang.  He said that they would not let him out of the gang and tattooed his chest.  Despite repeated questions, he minimized the criminal nature of gang life and emphasized how the authorities were always after gang members.  Although he described the gang as like a family, he noted, "Once in, they don't let you out.  It's like you signed your death."  He did not offer a clear or plausible reason for his leaving El Salvador to go to the United States.  He simply said that he was being arrested often in El Salvador.

I asked Mr. Umaña to do some simple tasks to get some estimate of his practical abilities.  On a map of the world, he could locate El Salvador.  He located the United States and continents by reading the largest letters on the map.  He could not give the approximate location of Charlotte within the United States.  He could not identify the name of the ocean that borders El Salvador, but he said that he knew the names of some rivers.  He could not identify a map of North and South Carolina and guessed that it was a map of the world.  He did not know North, South, East, or West but could indicate that route 85 was the way to get from Greensboro to Charlotte.

When given a 12-inch ruler, he measured accurately to the inch but was often incorrect, because he did not reliably place the ruler in a position to start from zero.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**JA3904**

UMAÑA, Alejandro        Psychological Evaluation                          4

In other words, he put the ruler down randomly and sometimes counted from 12, instead of zero.

I administered to Mr. Umaña four questions from the Verbal Absurdities subtest of the Stanford-Binet Intelligence Scale (Form L-M). These questions were not for the purpose of measuring intelligence but to get a rough idea of Mr. Umana's understanding of abstract language. The typical 8-year old should answer these questions, but Mr. Umaña answered only 2 of the 4 correctly and tended simply to repeat the question when he could not produce the answer to the question.

I asked Mr. Umaña to write a letter for me, and he did so. I have not had the opportunity to secure an independent evaluation of the literacy level of his letter. Given his 3rd grade education, his writing would not be expected to be at a high level.

## Diagnosis of Mental Retardation

North Carolina law and all contemporary definitions of mental retardation refer to three required elements for a diagnosis of mental retardation: (a) significantly impaired intelligence, (b) significant impairment in adaptive behavior, and (c) origin of these impairments in childhood.

Authoritative sources on the diagnosis of mental retardation (a.k.a. intellectual disability) include publications by the American Psychiatric Association and the American Association on Intellectual and Developmental Disabilities (formerly American Association on Mental Retardation). The information gathered in the determination of mental retardation for Mr. Umaña has relied heavily on these authoritative sources.

## Level of Intelligence

Mr. Umaña's school did not offer psychological assessments for children with learning difficulties, so the only available data on Mr. Umaña's intelligence was provided by a psychological evaluation by Ricadro Weinstein, Ph.D. in July 2009. Dr. Weinstein administered two intelligence tests that would be appropriate for a Spanish-speaking individual living in the United States. On the Wechsler Adult Intelligence Scale-III (Spanish version published in Mexico), Mr. Umaña achieved a Full Scale IQ of 66 using the US norms. These are the appropriate norms to use, because Mr. Umaña was living in the United States at the time of his alleged crime, and he is being judged by United States' standards. Of course, Mr. Umaña is not from Mexico, but also research has shown that the Mexican norms inflate IQ scores inappropriately. Even given these cautions, the Mexican norms yielded a Full Scale

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**JA3905**

UMAŇA, Alejandro          Psychological Evaluation                    5

IQ of 68, which is still below the customary cutoff of 70 for the diagnosis of mental retardation.

Dr. Weinstein also administered the Comprehensive Test of Nonverbal Intelligence (C-TONI). As its name implies, this test does not required that Mr. Umaña use language to reply to questions, and it taps some aspects of fluid intelligence that the WAIS-III does not. Thus, the two tests are complementary. The C-TONI yields three IQ scores as indicated below.

Nonverbal Intelligence Quotient:              53
Pictorial Nonverbal Intelligence Quotient:    55
Geometric Nonverbal Intelligence Quotient:    57

In addition, Dr. Weinstein administered the Dot Counting Test, the Rey 15-Item Test, and the Computerized Assessment of Response Bias in order to determine whether Mr. Umaña was malingering (or faking) low scores. These tests indicated that Mr. Umaña was not malingering.

## Level of Adaptive Behavior

Adaptive behavior refers to the typical behavior displayed by the individual in his community (AAMR, 2002). Mr. Umaña has been incarcerated for nearly two years, so it is not possible to conduct a thorough or valid assessment of his current adaptive functioning. The deficits associated with mental retardation, by definition, must originate in childhood. Thus, assessment of adaptive functioning must look at available information from childhood to the time of Mr. Umaña's current incarceration.

Unlike the measurement of intelligence, there is no single measure of adaptive behavior that is generally regarded as sufficient evidence of impairment of typical functioning. The American Association on Mental Retardation (now American Association on Intellectual and Developmental Disabilities) identifies three areas of adaptive functioning (Conceptual, Social, and Practical) and requires a significant impairment in at least one of these three areas in order to make a diagnosis of mental retardation. The assessment of adaptive behavior customarily relies on information from several sources (AAIDD, 2007; AAMR, 2002; American Psychiatric Association, 2000). Archival information, such as school records, and information from people who knew the defendant in childhood and near the time of the crime are valuable sources of information. The American Association on Mental Retardation (AAMR, 1992, 2002) recommends the use of an adaptive behavior measure standardized on the general population. The information is customarily drawn from family members and others who knew the individual well. In Mr. Umaña's case, the only available individuals who knew him from childhood are in El Salvador, and there are not standardized tests of adaptive behavior suitable for administration in El Salvador. Thus, the assessment of Mr. Umaña's adaptive functioning must rely on

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

UMAÑA, Alejandro          Psychological Evaluation                    6

records (such as school and medical records) and interviews with individuals who knew him in El Salvador.

I interviewed the individuals listed on the first page of this report in Santa Ana, El Salvador. Mr. Carlos Alarcon, Director of the Centro Escolar Santa Ana California, showed me the original school records indicating Alejandro Umaña's attendance, subjects taught, and grades. He indicated that it is not the policy to retain a student in grades 1 or 2. In fact, the law does not allow it. Mr. Alarcon also explained to me the grading system and went over Mr. Umaña's grades. His grades were poor from the beginning of school. His attendance was good in first and second grade, but he was retained in 3rd grade, and his attendance declined. In his last year, he was in a combined 1st, 2nd, and 3rd grade classroom, which Mr. Alarcon explained was the format for a class for remedial students. Records indicate that Mr. Umaña did not complete the 3rd grade. Mr. Alarcon indicated that the remedial curriculum that Mr. Umaña did not pass included basic sight words, combining words into simple sentences, writing one's name, and simple addition.

Mr. Miguel Eduardo Castenada and Mr. Carlos Acquina Herrera were both employers of Alejandro Umaña. Carlos Herrera is Mr. Carlos Acquina Herrera's 27-year-old son who worked with Mr. Umaña. They each gave accounts of the work that Mr. Umaña did. Their reports were consistent in indicating that Mr. Umaña did unskilled or "helper" jobs and never advanced to a higher level of responsibility or complexity of work. He delivered soft drinks from a truck under Mr. Castenada's supervision, and he carried materials and mixed the ingredients for concrete under Mr. Herrera's supervision.

Mr. Casteneda confirmed that he employed Alejandro Umaña, because he knew his father through deliveries to a store that Rafael Umaña had at that time. Mr. Casteneda describe the work as a "simple job" that primarily involved carrying heavy loads. It was the helper position as part of a 3-man team that delivered Coca-Cola products to local stores. Mr. Casteneda, himself, had started out in such a position and rapidly worked up to being the head of the team and driver. I asked Mr. Casteneda whether Alejandro had moved up or showed potential for advancement. Mr. Casteneda replied, no. He said that Alejandro did hand out flyers at a promotion for new products, but he was always supervised, and the job required no special skill. When I asked whether Alejandro had difficulty with any aspect of the job that might have kept him from advancing, Mr. Casteneda said that Alejandro had difficulty collecting money for the products. He also said that Alejandro got along well with others and was close to his father.

Mr. Umaña lived most of his childhood in his father's home. When he left his job delivering Coca-Cola products, Mr. Umaña went to live with Mr. Carlos Aquino Herrera's family and to work under his supervision. Mr. Umaña was assured of getting to work reliably, because the family lived near the job site, and he lived with his supervisor and family. Ms. Karla Herrera is the daughter of Mr. Carlos Aquino

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

UMAÑA, Alejandro    Psychological Evaluation    7

Herrera and lived in the household with Mr. Umaña. Although she is several years younger, she reported having a good social relationship with Mr. Umaña.

I interviewed Carlos Aquino Herrera and his two adult children separately at the father's home in a very poor neighborhood of Santa Ana. The younger Carlos reported that a gang had controlled the neighborhood until the day before when they were driven out by police. The gang demanded "rent" or extortion from shop owners and collected money from every vehicle that went in or out of the neighborhood.

The two men confirmed that Alejandro had lived with them while he worked for Carlos Aquino Herrera and that his job was a construction assistant. Their description of the job was consistent with what Alejandro Umaña told me. They said that Alejandro picked up bricks, prepared concrete, and mixed it. They said that he learned the job, including measurement. (Alejandro Umaña told me that he had difficulty with measurement and, in fact, had difficulty when I asked him to use a ruler to measure.) The job involved measuring and cutting rebar. The only other measurement was by the bucketful. Carlos Aquino Herrera noted that Alejandro Umaña had difficulty learning on the job but noted his limited schooling. He said that Mr. Umaña did not do the skilled part of masonry and was limited to a helper role. He said that Mr. Umaña was dependable but required supervision. Mr. Herrera provided transportation and lodging. He said that Mr. Umaña got along with others but never had the responsibility of teaching others on the job. He was not able to read blueprints.

It was noted that Mr. Umaña had frequent headaches but did not take medication. He was noted to be a good soccer player. His other interests included dancing. With regard to home living, it was noted that he helped around the house. These interviewees denied that Mr. Umaña was involved in any gang activity at the time that they lived together.

They described Mr. Umaña as playful and when pressed further, acknowledged that he was socially like someone younger.

Monica Tatiana Reyes is the former girlfriend of Mr. Umaña and mother of his first son. She and her son met me in a coffee shop in Santa Ana to discuss Mr. Umaña. She said that they met when she was about 14. She and Mr. Umaña always lived apart (with their respective parents). Monica Tatiana Reyes expressed her continuing affection for Mr. Umaña and indicated that he was respectful and caring toward her and toward his son and never asked her to do anything that was wrong. She said the he loved dancing and was good at soccer, but she was unable to provide information about Mr. Umaña's skill level in most areas related to adaptive functioning. She did acknowledge that he had difficulty with reading and writing. She pointed out that Alejandro had some memory problems. She said, for example, that he hid money and forgot where he had hidden it.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

UMAÑA, Alejandro        Psychological Evaluation        8

Rafael Enrique Umaña, father of Alejandro Umaña, agreed rather reluctantly to meet for an interview at a coffee shop in Santa Ana. He is a street vendor with a location nearby. He reported that Alejandro had two serious head injuries at about 5 years of age. In the first accident, he fell from a mango tree while cutting mangos. Rafael Umaña said that he carried his son, who was bleeding, to a nearby hospital. He said that Alejandro was dizzy and "out of it" but did not appear to lose consciousness. A few days later, Alejandro fell again and hit his head on furniture, again causing bleeding. Rafael Umaña indicted that from that time, Alejandro was "hyper." Rafael Umaña described problems in development that included having to repeat directions and problems in memory, such as forgetting things when sent to the store, even with a list. This was at about age 12 or 13.

Rafael Umaña said that he was aware of Alejandro's school problems and recalled that he stopped going to school at about age 10. He said that after that time, he tried to find jobs for Alejandro. The first job was with a shoemaker, but it only lasted a few days, because the shoemaker said that Alejandro could not learn the task. Rafael Umaña said that he thought his son just didn't understand how to do the tasks of putting the shoe together. Rafael Umaña tried to employ his son in the small store that he operated at the time, but he could not send Alejandro to get things, because he would forget. Rafael Umaña described the job with the Coca-Cola delivery truck and confirmed that Alejandro could carry the boxes of bottles but could not do the math required to help with the bills.

When I asked about Alejandro's involvement in gang activity, Rafael Umaña said that he tried to keep Alejandro at home and away from the gangs. Shortly after I brought up this topic, Rafael Umaña abruptly stood up and ended the interview. Through interpretation, I learned that he perceived that interpreter's cell phone was a recording device and was convinced that we were recording the interview. It is unfortunate that I was not able to gather further information from him.

<u>Writing and Speaking in Code</u>

I have reviewed materials provided by the FBI cryptologist regarding transcripts of telephone calls and letters by Alejandro Umaña while in jail. The FBI report indicates that the phone calls and letters were done in code. I have not had time to obtain a complete English translation of these materials, although I did obtain from Frieda de Garcia, the interpreter whom I used in El Salvador, her impressions of the literacy level of Mr. Umaña's letters. She wrote that, "Alejandro does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other, and writes guided by the phonetic sound of words." This assessment is not surprising, given Mr. Umaña's low level of education. One of the FBI cryptologists referred to "Umaña speak," which is an apparent reference to the low level of Mr. Umaña's written language.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

**JA3909**

UMAŇA, Alejandro                Psychological Evaluation                9

With regard to Mr. Umaňa's coded speech and writing, the spoken code appears to be a simple reversal of syllables. This is similar to, although simpler than, "Pig Latin" used by children in the United States.

The written code appears to be a substitution of one letter for another. Assuming that Mr. Umaňa had the code in front of him while writing, this is a task very similar to the "Digit Symbol-Coding" subtest of the Wechsler Adult Intelligence Scale-III, which Mr. Umaňa completed for Dr. Weinstein. The Digit Symbol-Coding subtest of the WAIS requires entering a symbol for each letter, rather than a letter-for-letter substitution, as the coded letters appear to require. On the Digit Symbol-Coding subtest of the WAIS, Mr. Umaňa made 41 substitutions in 120 seconds. Thus, he worked slowly but could do the task. His score on this subtest of the WAIS was in the 2nd percentile, which is compatible with Mr. Umaňa's overall level of intelligence.

Although I do not have an exact translation, after writing in code for a couple of pages, Mr. Umaňa wrote something to the effect that he was tired and did not want to do this anymore. Thus, he appeared to find the coding task tedious, as would be expected for someone of low intelligence who writes poorly and makes letter transformations slowly.

## Conclusions

My involvement in this case is quite recent and has allowed me time only to interview Mr. Umaňa and to make one trip to El Salvador to interview witnesses. Thus, this case presents unique challenges in gathering adaptive functioning information. Nevertheless, information gathered from several sources is quite consistent. The available information addresses Mr. Umaňa's level of intelligence and many aspects of his adaptive functioning as he grew up in El Salvador. Based on the available information, assessment of adaptive functioning can be made using the 2002 criteria of the American Association on Mental Retardation.

**Conceptual** skills involve language, reading and writing, money concepts, and self-direction. Alejandro Umaňa had significant difficulty in school and in later application of functional academics. He had no plan for self-direction in that he always relied on others for a place to live and appeared to have no plan beyond day-to-day survival.

**Social** skills involve interpersonal relations, responsibility, self-esteem, gullibility, naiveté, following rules, obeying laws, and avoiding victimization. The available evidence in this category is mixed. Mr. Umaňa had good relationships with others and was reported to be responsible. In some aspects of his life, he followed rules, but with regard to gang activity, her certainly did not follow rules or obey the law.

**Practical** skills involve activities of daily living, occupational skills, and maintaining a safe environment. Mr. Umaňa never lived on his own or assumed the responsibilities of adulthood. He worked at brief, unskilled jobs, and did not advance.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

UMAÑA, Alejandro                Psychological Evaluation                10

The 2002 AAMR standards require impairment in at least one area of adaptive skills for a diagnosis of mental retardation.  Mr. Umaňa has clear deficits in conceptual skills and probable deficits in both social and practical skills.  Thus, he meets the criteria for significant impairment in adaptive functioning, and reports from people who knew him from childhood indicate that these deficits originated in childhood.  Dr. Weinstein's testing results indicated significant impairment in intelligence.  Thus, the available information confirms that Alejandro Umaňa meets the definition of a person with mental retardation by having significant impairment in intelligence and adaptive functioning that originated in childhood.

J. Gregory Olley, Ph.D.
NC Psychology License # 587

## References

American Association on Intellectual and Developmental Disabilities (2007). *User's guide: Mental retardation: Definition, classification and systems of supports – 10th edition.* Washington, DC: Author.

American Association on Mental Retardation (1992).  *Mental retardation: Definition, classification, and systems of supports* (9th ed.). Washington, DC: Author.

American Association on Mental Retardation (2002).  *Mental retardation: Definition, classification, and systems of supports* (10th ed.). Washington, DC: Author.

American Psychiatric Association (2000). *Diagnostic and statistical manual of mental disorders* (4th ed., text revision).Washington, DC, Author.

*A University Center for Excellence in Developmental Disabilities Education, Research, and Service*

# CUADRO RESUMEN ANUAL

REGION Occidental

AÑO 1 9 9 [ ]

SUBREGION Occidental Norte SEDE Santa Ana DISTRITO EDUCATIVO Nº 0102    SEDE DEL DISTRITO

ESCUELA Urbana de Varones Unificada: Santa Ana California Nº 1º    GRADO Primero . SECCION

LOCALIDAD Santa Ana    MUNICIPIO Santa Ana    DEPARTAMENTO Santa Ana

| NOMBRE DE LOS ALUMNOS 1º | IDIOMA NACIONAL CALIFICACION | CONCEPTO | ESTUDIOS SOCIALES CALIFICACION | CONCEPTO | IDIOMA INGLES CALIFICACION | CONCEPTO | MATEMATIC CALIFICACION | CONCEPTO | ESTUDIO DE LA NATURALEZA CALIFICACION | CONCEPTO | EDUC. MUSICAL CALIFICACION | CONCEPTO | EDUCACION FISICA CALIFICACION | CONCEPTO | ARTES MANUALES CALIFICACION | CONCEPTO | PROMEDIO DE EDUC ESTET | RESPONSABILIDAD | HABITOS DE SALUD Y PROTECCION | RELACIONES PERSONALES DE COOPERACION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Acevedo, Roberto Jonatán | 6 | B | 6 | B | — | — | 5 | B | 6 | B | 7 | MB | 6 | B | 6 | B | 6 | B | B | B |
| 2 Campos, Juan Carlos | 3 | R | 4 | R | — | — | 3 | R | 4 | R | 7 | MB | 5 | B | 6 | B | 6 | R | B | B |
| 3 Chilcas, Mauricio Ernesto | 3 | R | 4 | R | — | — | 3 | R | 4 | R | 7 | MB | 7 | MB | 5 | B | 6 | R | B | B |
| 4 Espinoza José Enrique | 6 | B | 6 | B | — | — | 6 | B | 6 | B | 8 | MB | 9 | E | 7 | MB | 8 | B | B | B |
| 5 Gallardo Arelas José Antonio | 9 | E | 9 | E | — | — | 10 | E | 8 | MB | 6 | B | 10 | E | 7 | MB | 8 | B | B | B |
| 6 Herrera Mendez Oscar Alexander | 6 | B | 6 | B | — | — | 6 | B | 6 | B | 7 | MB | 8 | MB | 6 | B | 7 | B | B | B |
| 7 Gutierrez Santos Tomás | 9 | E | 10 | E | — | — | 10 | E | 8 | MB | 7 | MB | 9 | E | 9 | E | 8 | MB | MB | E |
| 8 Guzman, Luis Roberto | 4 | R | 7 | MB | — | — | 7 | MB | 6 | B | 8 | MB | 7 | MB | 7 | MB | 7 | B | B | B |
| 9 Herrera Julio Alberto | 6 | B | 6 | B | — | — | 6 | B | 6 | B | 6 | B | 7 | MB | 6 | B | 6 | R | B | B |
| 10 Luna Rafael Alberto | 3 | R | 6 | B | — | — | 3 | R | 3 | R | 6 | B | 6 | B | 4 | R | 5 | R | R | R |
| 11 Martinez, Carlos Hernán | 6 | B | 6 | B | — | — | 7 | MB | 6 | B | 7 | MB | 6 | B | 5 | B | 6 | B | B | B |
| 12 Martinez Julio Adalberto | 3 | R | 3 | R | — | — | 3 | R | 3 | R | 7 | MB | 6 | B | 5 | B | 6 | R | B | B |
| 13 Menjivar Polanco Jeffry Rafael | 5 | B | 5 | B | — | — | 4 | R | 5 | B | 8 | MB | 6 | B | 6 | B | 7 | R | B | B |
| 14 Mezquita Tayrin Youdier | 7 | MB | 5 | B | — | — | 7 | MB | 6 | B | 7 | MB | 3 | R | 8 | MB | 6 | B | B | B |
| 15 Moraga, Edwin de Jesus | 7 | MB | 6 | B | — | — | 7 | MB | 6 | B | 7 | MB | 8 | MB | 7 | MB | 7 | B | MB | B |
| 16 Peralta William Oswaldo | 5 | B | 6 | B | — | — | 6 | B | 6 | B | 6 | B | 8 | MB | 6 | B | 6 | R | B | B |
| 17 Rivera Jose Mario | 3 | R | 4 | R | — | — | 4 | R | 4 | R | 5 | B | 4 | R | 6 | B | 5 | R | B | B |
| 18 Rivera Oswaldo Antonio | 5 | B | 6 | B | — | — | 6 | B | 6 | B | 6 | B | 5 | B | 7 | MB | 6 | B | MB | B |
| 19 Rivas Cardona Carlos Ernesto | 5 | B | 5 | B | — | — | 4 | R | 4 | R | 6 | B | 6 | B | 6 | B | 6 | R | B | B |
| 20 Salazar Carlos Ramos | 5 | B | 5 | B | — | — | 5 | B | 5 | B | 6 | B | 6 | B | 6 | B | 6 | B | MB | B |

JA3912

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 228 of 524

| # | Nombre | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|--------|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Umaña Alejandro Enrique | 4 | R | 5 | B | – | – | 5 | B | 5 | B | 7 | MB | 6 | B | 5 | B | 6 | R | B | B | B | R | R | B | 9? |
| | Aguirre Maraza Norma Elizabeth | 5 | B | 5 | B | – | – | 5 | B | 5 | B | 7 | MB | 8 | MB | 5 | B | 7 | B | B | B | B | R | R | B | 92 |
| 23 | Alcantara Carla Carolina | 4 | R | 4 | R | – | – | 4 | R | 4 | R | 6 | B | 5 | B | 5 | B | 5 | R | B | B | B | R | R | B | 92 |
| 24 | Alcantara Tania Zuleima | 6 | B | 5 | B | – | – | 6 | B | 5 | B | 7 | MB | 7 | MB | 6 | B | 7 | B | B | B | B | R | R | B | 90 |
| 25 | Diaz Linares Magali Adriana | 7 | MB | 8 | MB | – | – | 7 | MB | 6 | B | 6 | B | 8 | MB | 7 | MB | 7 | B | B | B | B | B | B | B | 93 |
| 26 | Hernandez Vanessa del Carmen | 9 | E | 8 | MB | – | – | 8 | MB | 8 | MB | 7 | MB | 6 | B | 8 | MB | 7 | MB | MB | E | MB | MB | MB | MB | 94 |
| 27 | López Jaqueline Beatriz | 7 | MB | 8 | MB | – | – | 8 | MB | 8 | MB | 8 | MB | 7 | MB | 7 | MB | 7 | MB | MB | E | MB | MB | MB | MB | 96 |
| 28 | Maque o Murga Ana Carolina | 4 | R | 4 | R | – | – | 4 | R | 5 | B | 6 | B | 7 | MB | 6 | B | 6 | B | B | B | B | R | R | B | 9? |
| 29 | Mendez Mirna Elizabeth | 6 | B | 4 | R | – | – | 5 | B | 5 | B | 7 | MB | 9 | E | 5 | B | 7 | R | B | B | B | R | R | B | 92 |
| 30 | Monroy Carla Graciela | 6 | B | 5 | B | – | – | 5 | B | 6 | B | 7 | MB | 9 | E | 6 | B | 7 | B | B | MB | B | B | R | B | 9? |
| 31 | Peralta Maritza Yanira | 3 | R | 3 | R | – | – | 3 | R | 4 | R | 6 | B | 7 | MB | 5 | B | 6 | B | B | B | B | R | R | B | 9? |
| 32 | Pineda Sarai Carolina | 8 | MB | 7 | MB | – | – | 6 | B | 7 | MB | 7 | MB | 8 | MB | 6 | B | 7 | B | MB | B | B | B | B | MB | 95 |
| 33 | Pinto Blanca Daisy | 9 | E | 10 | E | – | – | 8 | MB | 9 | E | 6 | B | 7 | MB | 8 | MB | 7 | MB | E | E | E | MB | MB | E | 9? |
| 34 | Pinto Yuliana Belen | 3 | R | 3 | R | – | – | 3 | R | 3 | R | 6 | B | 6 | B | 5 | B | 6 | R | B | B | B | R | R | B | 9? |
| 35 | Rivas Cardona Sandra Marlene | 10 | E | 8 | MB | – | – | 10 | E | 7 | MB | 6 | B | 8 | MB | 7 | MB | 7 | MB | MB | E | E | MB | MB | E | 9? |
| 36 | Sanchez Geovanna Jazmin | 3 | R | 3 | R | – | – | 3 | R | 3 | R | 6 | B | 7 | MB | 5 | B | 6 | R | R | R | B | R | R | B | 4? |
| 37 | Vasquez Maria Elizabeth | 10 | E | 9 | E | – | – | 7 | MB | 9 | E | 7 | MB | 10 | E | 10 | E | 8 | E | E | E | E | E | E | E | |
| | Total de Puntos | | | | | | | | | | | | | | | | | | | | | | | | | |
| | Promedio | | | | | | | | | | | | | | | | | | | | | | | | | |

OBSERVACIONES:

FECHA _____ Santa Ana, Sept_____ de 1991

_____
PROFESOR

Maria Ana de Jesus Magaña
NOMBRE

Luis Orlando Alarcón
REVISADO

_____
DIRECTOR

Jorge Alberto Estrada
NOMBRE

### ESTADISTICA

| SEXO | MATRICULA MAXIMA | EGRESADO | MATRICULA FINAL | RETENIDOS | PROMOVIDOS |
|------|------|------|------|------|------|
| MASCULINO | 25 | 4 | 21 | | 21 |
| FEMENINO | 16 | · | 16 | | 16 |
| TOTAL | 41 | 0 | 37 | | 37 |

DIAS TRABAJADOS POR EL MAESTRO DURANTE EL AÑO

REGIÓN: Occidental.  SEDE: Santa Ana.  DISTRITO  CUADRO RESUMEN EDUCATIVO N° 0102  ANUAL  SEDE DEL DISTRITO: Santa Ana.  AÑO 1991.
SUBREGIÓN: Occidental Norte.
ESCUELA: Urbana de Va

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 228 of 524

JA3913

REGION _____
SUBREGION _____ SEDE _____ DISTRITO EDUCATIVO No. _____ SEDE DEL DISTRITO _____
ESCUELA _____
LOCALIDAD _____ MUNICIPIO _____ GRADO _____ SECCION _____
DEPARTAMENTO _____

| Nombre de los Alumnos | ASIGNATURAS | | | | | | EDUCACION ESTETICA | | | | | | | ASPECTOS DE CONDUCTA | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Idioma Nacional | Estudios Sociales | Idioma Ingles | Matemáticas | Estudio de la Naturaleza | Educación Musical | Educación Física | Artes Manuales | Promedio | Responsabilidad | Hábitos de Salud y Protección | Relaciones Personales | Fomento de Costumbres | Iniciativa | Hábitos de Estudio y Trabajo | Asistencia |
| 1 Acevedo Roberto Jonathan | 5 B | 5 B | | 5 B | 5 B | 6 8 | 8 MB | 5 B | G | R | B | B | B | B | R | B |
| 2 Avelar Gallardo Joel Antonio | 5 B | 5 B | | 5 B | 6 B | 6 B | 7 MB | 6 B | G | R | B | B | B | B | R | B |
| 3 Espinoza, José Enrique | 5 B | 6 B | | 5 B | 5 B | 7 MB | 10 E | 9 E | 9 | B | B | B | B | B | B | MB |
| 4 Flores López Carlos Alberto | 4 R | 4 R | | 4 R | 4 R | 7 MB | 3 R | 5 B | 5 | R | B | B | B | R | B |
| 5 Guevara Méndez Oscar Alexander | 6 B | 6 B | | 6 B | 6 B | 6 B | 9 E | 6 B | 7 | R | B | B | B | R | B |
| 6 Gutiérrez Santos Tomás | 6 B | 6 B | | 7 MB | 7 MB | 8 MB | 10 E | 8 MB | 9 | MB | MB | MB | MB | MB | MB |
| 7 Guzmán Luis Roberto | 6 B | 6 B | | 5 B | 7 MB | 7 MB | 9 E | 7 MB | 8 | B | B | B | MB | B | B |
| 8 Hernández William Alexander | 4 R | 5 B | | 5 B | 4 R | 5 B | 7 MB | 5 B | 6 | R | B | B | B | R | B |
| 9 Hernández Herrera Julio Alberto | 4 R | 3 R | | 4 R | 3 R | 5 B | 9 E | 5 B | 6 | R | B | B | B | R | B |
| 10 López Alberto Stivenson | 5 B | 6 B | | 5 B | 5 B | 5 B | 7 MB | 6 B | 6 | B | B | B | B | B | B |
| 11 Martínez Carlos Hernán | 4 R | 5 B | | 3 R | 4 R | 6 B | 7 MB | 5 B | 6 | R | B | B | B | R | B |
| 12 Martínez Jorge Alberto | 3 R | 3 R | | 5 B | 4 R | 5 B | 3 R | 6 B | 5 | R | R | R | B | R | B |
| 13 Menjívar Polanco Jeffry Rafael | 4 R | 5 B | | 4 R | 4 R | 5 B | 6 B | 5 B | 5 | R | B | B | B | R | B |
| 14 Mezquita Tayron Youdiues | 5 B | 5 B | | 5 B | 5 B | 6 B | 3 R | 5 B | 5 | R | B | B | B | R | B |
| 15 Moraga Edwin de Jesús | 6 B | 4 R | | 4 R | 6 B | 6 B | 6 B | 5 B | 6 | R | B | B | B | R | B |
| 16 Morán Pedro Luis | 6 B | 6 B | | 6 B | 6 B | 7 MB | 7 MB | 6 B | 7 | B | MB | B | B | B | B |
| 17 Peralta William Oswaldo | 5 B | 4 R | | 4 R | 4 R | 5 B | 10 E | 5 B | 7 | B | B | B | B | R | B |
| 18 Rivas Cardona Carlos Ernesto | 5 B | 4 R | | 4 R | 4 R | 5 B | 5 B | 4 R | 5 | R | B | B | B | R | B |
| 19 Salazar Carlos Roberto | 5 B | 5 B | | 4 R | 5 B | 6 B | 6 B | 7 MB | 6 | B | B | B | B | R | B |
| 20 _____ | 9 E | 9 E | | 9 E | 9 E | 10 E | 6 B | 10 E | 9 | MB | E | E | B | MB | E |
| 21 Umaña Alejandro Enrique | 4 R | 4 R | | 4 R | 4 R | 5 B | 7 MB | 4 R | 5 | R | R | B | B | R | B |
| 22 Valencia _____ | 4 R | 4 R | | 4 R | 4 R | 5 B | 6 B | 4 R | 5 | R | B | B | B | R | B |

Orlando Alarcón

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 230 of 524

| Nombre | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...z Linares Magali Herlinda | R | 3 | R | | 3 | R | 3 | R | 5 | B | 4 | R | 4 | R | 5 | R | B R | B | B | X |
| Figueroa Noemí Elizabeth | 5 | B | 4 | R | | 4 | R | 5 | B | 5 | B | 7 | MB | 4 | R | 5 | R | B B | B | B | X |
| Hernández Vanessa del Carmen | 5 | B | 5 | B | | 4 | R | 5 | B | 6 | B | 7 | MB | 5 | B | 6 | B | B B | B | B | B |
| Magico Ana Carolina | 4 | R | 4 | R | | 4 | R | 4 | R | 5 | B | 8 | MB | 5 | B | 6 | B | B B | B | B | B |
| Mendez Mirna Elizabeth | 4 | R | 4 | R | | 3 | R | 3 | R | 5 | B | 10 | E | 5 | B | 7 | R | B B | B | B | X |
| Monroy Carla Graciela | 4 | R | 4 | R | | 3 | R | 4 | R | 5 | B | 7 | MB | 5 | B | 6 | R | B B | B | B | X |
| Moraga Norma Elizabeth | 3 | R | 3 | R | | 3 | R | 3 | R | 5 | B | 6 | B | 4 | R | 5 | | B B | B | B | X |
| Pineda Sarai Carolina | 5 | B | 4 | R | | 5 | B | 4 | R | 6 | B | 10 | E | 5 | B | 7 | B | B B | B | B | X |
| Pinto Blanca Daisy | 5 | B | 4 | R | | 4 | R | 4 | R | 6 | B | 7 | MB | 5 | B | 6 | B | B B | B | B | X |
| Ramos Alcántara Tania Zulema | 4 | R | 3 | R | | 4 | R | 3 | R | 5 | B | 5 | B | 5 | B | 5 | R | B B | B | B | X |
| Rivera Cardona Sandra Marlene | 5 | B | 5 | B | | 4 | R | 4 | R | 6 | B | 7 | MB | 6 | B | 6 | B | B B | B | B | X |
| Vásquez Maria Elizabeth | 5 | B | 5 | B | | 4 | R | 4 | R | 6 | B | 7 | MB | 6 | B | 6 | B | B B | B | B | X |

## Estadistica

| Sexo | Matrícula Inicial | Egresados | Matrícula Final | Retiradas | Promovidos |
|---|---|---|---|---|---|
| Masculino | 26 | 3 | 23 | | 23 |
| Femenino | 13 | 1 | 12 | | 12 |
| Total | 39 | 4 | 35 | | 35 |
| Dias trabajados por el maestro durante el año | | | | | |

## OBSERVACIONES

FECHA Noviembre 12 de 1992

F. _____
PROFESOR

Maria Ana de Jesús Magaña
NOMBRE

E. _____
DIRECTOR

Luis O. L. Alarcón
NOMBRE

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 230 of 524

JA3915

MINISTERIO DE EDUCACION    CUADRO DE EVALUACION FINAL.    NIVEL DE EDUCACION
REGION OCCIDENTAL    PRIMERO, SEGUNDO Y TERCER GRADO
3-REGION _Occidental Norte_
ESCUELA _Urbana Unificada de Varones Sta Ana Californnia n°2_  SECCION "A"    LUGAR _Santa Ana._
DISTRITO N° _0202_    MUNICIPIO _Santa Ana_    DEPARTAMENTO _Santa Ana_

| N° DE ORDEN | NOMBRE DE LOS ALUMNOS | ASIGNATURAS | | | | | | | | | | | | | TOTAL DE PUNTOS | PROMEDIO FINAL DE GRADO | | RESULTADO | OBSERVACIONES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LENGUAJE | | MATEMATICA | | CIENCIA SALUD Y MEDIO AMBIENTE | | ESTUDIOS SOCIALES | | EDUCACION ARTISTICA | | EDUCACION FISICA | | | | | | |
| | | CALIFICACION | CONCEPTO | CALIFICACION | CONCEPTO | CALIFICACION | CONCEPTO | CALIFICACION | CONCEPTO | CALIFICACION | CONCEPTO | CALIFICACION | CONCEPTO | | CALIFICACION | CONCEPTO | | |
| 1 | Aldana Campos, Luis Alberto | 2 | NM | 2 | NM | 1 | NM | 2 | NM | 6 | B | 5 | B | 18 | 3 | R | R | |
| 2 | Arauz Murillo, Pablo Stevenson | 4 | R | 6 | B | 4 | R | 4 | R | 8 | MB | 4 | R | 30 | 5 | B | A | |
| 3 | Henriquez, José Alfredo | 4 | R | 5 | B | 3 | R | 4 | R | 7 | MB | 6 | B | 29 | 5 | B | A | |
| 4 | Méndez López, Eder Iván | 3 | R | 3 | R | 3 | R | 3 | R | 7 | MB | 9 | E | 28 | 5 | B | A | |
| 5 | Portales, Jonnathan Stanley | 4 | R | 3 | R | 3 | R | 3 | R | 8 | MB | 9 | E | 30 | 5 | B | A | |
| 6 | Torres Casco, Misael Antonio | 3 | R | 3 | R | 3 | R | 3 | R | 7 | MB | 7 | MB | 26 | 4 | R | R | |
| 7 | Umaña, Alejandro Enrique | 3 | R | 2 | NM | 2 | NM | 3 | R | 6 | B | 5 | B | 21 | 3 | R | R | |
| 8 | Linares Martínez, Karla Yaneth | 5 | B | 5 | B | 4 | R | 3 | R | 7 | MB | 8 | MB | 32 | 5 | B | A | |
| 9 | Marroquín Hernández, Dalila Aracely | 5 | B | 4 | R | 4 | R | 5 | B | 6 | B | 4 | R | 28 | 5 | B | A | |
| 10 | Soriano, Paz Idalia | 6 | B | 6 | B | 6 | B | 6 | B | 9 | E | 9 | E | 42 | 7 | MB | A | |

ESTADISTICA

| SEXO | MATRICULA MAXIMA | EGRESADOS | MATRICULA FINAL | RETENIDOS | PROMOVIDOS |
|---|---|---|---|---|---|
| MASCULINO | 7 | - | 7 | 3 | 4 |
| FEMENINO | 3 | - | 3 | - | 3 |
| TOTAL | 10 | - | 10 | 3 | 7 |

DIAS TRABAJADOS POR EL MAESTRO DURANTE EL AÑO _204_

OBSERVACIONES: _____

FECHA: _Noviembre 14 de 1904_

(F) _____
PROFESOR (A)

Dinora Elizabeth Aguirre de Linares
NOMBRE

(F) _____
DIRECTOR (A)

Celso Rafael Fuentes Quezada.
NOMBRE

**JA3916**



JA3917



JA3918

Appeal: 10-6   Doc: 90-9   Filed: 08/14/2013   Pg: 234 of 524



Case 3:16-cv-00057-MOC   Document 50-9   Filed 03/23/17   Page 234 of 524

JA3919



**JA3920**



JA3921









**CG & A**
TRANSLATIONS

- **Inglés Audiovisual**
- **Traducción de Documentos**
- **Interpretación Simultánea de Conferencias**
- **Inglés en su empresa**
- **Ingles Técnico**

Dear Dr. Ollie

Attached you will find the translation of the documents you requested, although you might not find much sense in them since Alejandro does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other, and writes guided by the phonetic sound of words.

*Frieda de Garcia*
Frieda de Garcia

Calle Teotl No. 19, Polígono Zona 10, Cumbres de Cuscatlan, Antiguo Cuscatlan, El Salvador
Tel: (503) 273 9563 Fax: (503) 257 8986  E mail: frieda.garcia@gmail.com

# RICARDO WEINSTEIN, PH.D.

**Neuropsychology**
**Bilingual/Bicultural. English/Spanish**
**Ca Lic. PSY 8954**

1202 Quail Gardens Court
Encinitas, Ca 92024
Tel. (760) 753-1890
Fax. (760) 942-4004
e-mail: rweins@pacbell.net

## CURRICULUM VITAE

### PRESENT PROFESSIONAL ACTIVITIES:

- Licensed Psychologist in Private Practice:
  Clinical, Forensic and Neuropsychology; assessment and treatment.

- Forensic Neuropsychological, Psychological and Cultural Expertise evaluations and consultation to attorneys and their clients in death penalty cases.

- Member of the San Diego County Superior Court Panel of Approved Psychologists for Criminal Court referrals. (Inactive.)

- Qualified Expert Witness for Federal Court, Superior Court, Family Court, Juvenile Court.

- Qualified Medical Evaluator of the State of California Industrial Medical Council. (Inactive)

- Consultant and educator in Psychological and Neuropsychological Assessment, Cultural Competency, Quantitative Electroencephalography, Child Abuse, Drug Abuse and Suicide Prevention.

JA3926

Curriculum Vitae
Page 2

## EDUCATION:

- Quantitative Electroencephalography (QEEG), trained under the supervision of M. Barry Sterman, Ph.D.; Professor, School of Medicine, University of California Los Angeles 1999-2002

- Post-Doctoral Certificate Program in Neuropsychology. Fielding Institute, Santa Barbara, California – 1998

- Ph.D. Clinical Psychology, International College, Los Angeles, California – 1981

- M.A. Clinical and Humanistic Psychology, Merril Palmer Institute, Detroit, Michigan – 1979

- Licenciado en Administracion de Empresas, Universidad Nacional Autonoma de Mexico, Mexico City, Mexico – 1968

## PAST WORK EXPERIENCE:

| | |
|---|---|
| 1992-2000 | Baker Elementary School. Psychologist for the Comer Program. |
| 1994 – 1996 | Adjunct Professor; San Diego State University |
| 1988 – 1989 | Children's Therapeutic Communities. Consulting Psychologist.<br>- Treatment of adolescent sex offenders. |
| 1986 – 1988 | Home Start Inc.; SOS Program Director<br>- Assessment and in-home treatment of abused children and their families. |
| 1979-1983 | Suicide Prevention Center, Los Angeles, California. Director of the Hispanic Outreach Program<br>- Planned and implemented a demonstration program for the treatment of PCP abuse.<br>- Individual and group psychotherapy.<br>- Crisis intervention trainer. |

2

JA3927

Curriculum Vitae
Page 3

| | |
|---|---|
| 1978 – 1979 | Henry Ford Hospital, Department of Substance Abuse. Detroit, Michigan.<br>• Intern and research assistant. |
| 1977 – 1978 | Camelback Hospital, Phoenix, Arizona.<br>• Psychodramatist. |
| 1972 – 1976 | Management Consultant. Mexico, Central America, Ecuador, and Dominican Republic |

**PROFESSIONAL AFFILIATIONS:**

- National Academy of Neuropsychology
- American Neuropsychiatric Association
- International Neuropsychological Society
- A Division 41, American Psychological Association,
- California Psychological Association
- San Diego Psychological Association
- American Association on Mental Retardation
- The Reitan Society
- Coalition of Clinical Practitioners in Neuropsychology

**PUBLICATIONS:**

Weinstein, J. & Weinstein, R., *I Know Better Than That: The Role of Emotions and the Brain in Family Law Disputes* "I Know Better Than That":The Role of Emotions and the Brain in Family Law Disputes, 7 J. OF L. & FAM. STUDIES 351 (2005).

Neuro-Jurisprudence: The Brain and the Law. Abstract. XXIXth International Congress on Law and Mental Health, Abstracts (2005)

Before It's Too Late: Neuropsychological Consequences of Child Neglect And Their Implications For Law and Social Policy. J. Weinstein, J.D. and R. Weinstein, Ph.D. University of Michigan Journal of Law Reform. Volume 33. Summer 2000

Consequences of Child Neglect on Brain Development: A Case Study. Abstract. Journal of the International Neuropsychological Society. Volume 8, Number 4

3

JA3928

Curriculum Vitae
Page 4

QEEG in Death Penalty Evaluations. Abstract. Journal of Neuroptherapy. Volume 7, Number 1 2003

The Neuropsychology of Child Neglect: Developmental Consequences, Case Examples and Legal and Societal Implications. Janet Weinstein, J.D. and Ricardo Weinstein, Ph.D. Journal of Neurotherapy. Volume 7, Number 1 2003

Comparison of Skil QEEG and Neuropsychological Evaluation of Death Row Inmates. Abstract. Ricardo Weinstein, Ph.D. and M.B. Sterman, Ph.D. Journal of Neurotherapy Volume 7, Number 1 2003

## RECENT PRESENTATIONS:

Neuro-Jurisprudence:  The Brain and the Law, XXIXth International Congress on Law and Mental Health, Paris, France (2005)

Symposium, Association of Family and Conciliation Courts 42nd Annual Conference, Neuro-Jurisprudence: The Brain, Emotions and Their Role in Family Custody Disputes Seattle, Washington (2005)

 Symposium, "Neuro Jurisprudence: A New Look at the Law through the Lens of the Current Brain Research", American Psychology & Law Society Annual Conference, La Jolla, CA (2005)

Comprehensive Evaluations of Brain Function in Forensic Cases. Australia Society for Neuronal Regulation.  Sydney, Australia (September 2004)

The Mind Personality, and Brain Development: Its Relevance to Disorder Behavior and the Death Penalty. NASA Conference. Albuquerque, NM (2003)

QEEG in Death Penalty Evaluations. Society for Neuronal Regulation, 10th Annual Conference, Scottsdale, AZ (2002)

Neuropsychological Consequences of Child Neglect and Implications for Social and Legal Policy:  A Case Study, International Neuropsychological Society Meeting, Stockholm (2002)

Neuropsychological Consequences of Child Neglect: Implications for Social and Legal Policy, International Congress on Law and Mental Health, Amsterdam (2002)

4

Curriculum Vitae
Page 5

Neuropsychological Consequences of Child Neglect and Implications for Social and Legal Policy, 13th Annual APSAC Colloquium, New Orleans (2002)

Cultural Competent Evaluations in Death Penalty Cases. Secretaria de Relaciones Exteriores, Mexico City, Mexico (2002)

Neuropsychological Consequences of Child Neglect and Implications for Social and Legal Policy:  A Case Study, SABA Society Retreat (organization of professionals engaged in brain research and neurofeedback treatment), Saba, Netherlands, Antilles (2002)

Comparison of SKIL QEEG and Neuropsychological Evaluations of Death Row Inmates. SABA Society Retreat. Saba, Netherlands, Antilles (2002)

Cultural Competent Evaluations in Death Penalty Cases. Consulado General de Mexico. San Francisco, CA (2002)

Neuropsychological Consequences of Child Neglect and Implications for Social and Legal Policy, Thirteenth National Conference on Child Abuse and Neglect, Albuquerque (2001).

Cultural Competent Evaluations in Death Penalty Cases. Consulado General de Mexico. Houston, TX (2001)

Quantitative Electroencephalogram (QEEG) in Death Penalty Evaluations, Society for Neuronal Regulation, Monterey, CA (2001)

Comprehensive, Cultural Competent Neuropsychological Evaluations. San Francisco, CA (2001)

Neuropsychological Consequences of Child Neglect and Social Policy Implications, International Conference of Psychology and Law, Dublin, Republic of Ireland (1999).

January 2007

5

# RICARDO WEINSTEIN, PH.D.

**NEUROPSYCHOLOGY**

1202 QUAIL GARDENS COURT
ENCINITAS, CA 92024
TEL: (760) 753-1890
FAX:(760) 942-4004
E-MAIL: ricardoweins@gmail.com
CAL. LIC.: PSY8954

July 17, 2009

John Bryson, Esq.
Wyatt Early Harris Wheeler, LLP.
1912 Eastchester Drive
Suite 400
P.O. Box 2086
High Point, NC 27261

Re: Alejandro Umana

Dear Mr. Bryson,

At your request I interviewed and tested Mr. Umana on July 1st and 2nd, 2009 at the Charlotte, NC jail. I conducted a comprehensive evaluation of brain function including the following:

Clinical Interview
Mental Status Examination
Wechsler Adult Intelligence Scale III, Spanish version published in Mexico
Comprehensive Test of Non verbal Intelligence (C-TONI)
Dot Counting Test (DOT)
Rey Fifteen Item Test
Word Memory Test (WMT)
Computerized assessment of Response Bias (CARB)
WRAT4
    Math Computation
CNS Vital Signs
    Verbal memory
    Visual Memory
    Finger Tapping Test
    Symbol Digit Coding
    Stroop Test
    Shifting Attention Test
    Continuous Performance Test
Rey Complex Figure Drawing
    Copy
    Immediate recall
    Delayed Recall
Delis Kaplan Executive Function System (D-KEFS)
    Trail making Test

Neuropsychological Assessment Battery (NAB)
> Attention Module
> Spatial Module
> Executive Function Module (partial)

Multilingual Aphasia Examination (Spanish version)
> Visual naming
> Sentence Repetition
> Verbal fluency
> Token Test
> Oral Comprehension
> Verbal Comprehension

\* Category Test  (Computer Version)
\* Wisconsin Card Sorting Test (Computer Version)
Quantitative Electroencephalogram (QEEG)

\* Due to a computer technical problem I was unable to obtain the results of these tests.

Mr. Umana was informed of the limits of confidentiality and he acquiesced to participate.  He provided a good effort, he obtained excellent scores in all test that measured his cooperation.  He obtained similar scores in tasks measuring similar constructs and he was cooperative, attentive and self disclosing during the evaluation.  The results are considered a valid representation of his present neuro cognitive functioning.  A summary of the findings follows.

Mr. Umana Full Scale IQ score in the WAIS II is 66 at 95% confidence interval 63 to 71, if the Flynn effect is applied his score would be approximately 4 points lower.  On the C-TONI he obtained a non verbal IQ score of 53.  Print outs of the analysis of some of the results are attached.

Overall Mr. Umana presents with brain dysfunction in a generalized pattern with particular compromise to the frontal lobes.  He is likely mentally retarded.  His academic skills (math) are very limited (2nd grade level), his language skills in Spanish are in the average range.  The results of the neuropsychological testing were validated by the QEEG, a QEEG report is attached.

Please let me know if and when a full report of the findings is necessary.  If you have questions do not hesitate to contact me.

Sincerely,

Ricardo Weinstein, Ph.D.

# WAIS-III Statistical Report
## The Psychological Corporation

NAME: Alejandro Umana  
AGE: 24 years, 7 months, 7 days  
DATE OF BIRTH: 11/25/1984  
SEX: Male  
ID:

REPORT DATE: 07/15/2009  
EXAMINER: R. Weinstein Ph.D.  
TITLE:  
LIC/CERT:  
TEST SITE:

**Test Administered:** WAIS-III (07/02/2009)

## IQ Scores Summary

| Scale | Sum of SS | IQ Score | 95% Conf. Interval | PR | Qualitative Description |
|---|---|---|---|---|---|
| Verbal | 30 | 70 | 66-76 | 2 | Borderline |
| Performance | 24 | 68 | 63-77 | 2 | Extremely Low |
| Full Scale | 54 | 66 | 63-71 | 1 | Extremely Low |

Difference between VIQ and PIQ = 2 (ns, Freq = 88.3%).

## Index Scores Summary

| | Sum of SS | Index Score | 95% Conf. Interval | PR |
|---|---|---|---|---|
| Verbal Comprehension | 17 | 76 | 71-83 | 5 |
| Perceptual Organization | 15 | 70 | 65-79 | 2 |
| Working Memory | 14 | 67 | 62-76 | 1 |
| Processing Speed | 9 | 71 | 66-83 | 3 |

Alejandro Umana                    07/15/2009                    Page 2

## Subtest Scores Summary

| Verbal Subtests | Raw Score | Age SS | PR | Ref SS |
|---|---|---|---|---|
| Vocabulary | 22 | 7 | 16 | 6 |
| Similarities | 9 | 4 | 2 | 4 |
| Arithmetic | 8 | 6 | 9 | 6 |
| Digit Span | 8 | 4 | 2 | 4 |
| Information | 7 | 6 | 9 | 6 |
| Comprehension | 5 | 3 | 1 | 3 |
| Letter-Number Sequencing | 5 | 4 | 2 | 4 |

| Performance Subtests | Raw Score | Age SS | PR | Ref SS |
|---|---|---|---|---|
| Picture Completion | 11 | 4 | 2 | 4 |
| Digit Symbol-Coding | 41 | 4 | 2 | 4 |
| Block Design | 20 | 6 | 9 | 6 |
| Matrix Reasoning | 7 | 5 | 5 | 5 |
| Picture Arrangement | 5 | 5 | 5 | 5 |
| Symbol Search | 20 | 5 | 5 | 5 |
| Object Assembly | | | | |

## IQ and Index Differences

| Discrepancy Comparisons | Score 1 | Score 2 | Diff. | Signif. | Cumulative Percentage |
|---|---|---|---|---|---|
| Verbal IQ-Performance IQ | 70 | 68 | 2 | ns | 88.3% |
| Verbal Comprehension-Perceptual Organization | 76 | 70 | 6 | ns | 63.6% |
| Verbal Comprehension-Working Memory | 76 | 67 | 9 | .15 | 47.7% |
| Perceptual Organization-Processing Speed | 70 | 71 | -1 | ns | 96.6% |
| Verbal Comprehension-Processing Speed | 76 | 71 | 5 | ns | 75.9% |
| Perceptual Organization-Working Memory | 70 | 67 | 3 | ns | 83.6% |
| Working Memory-Processing Speed | 67 | 71 | -4 | ns | 81.0% |

Individuals from the standardization sample represented by the percentages in the Cumulative Percentage column received scores that were greater than or equal to the absolute value of the amount shown in the Difference column.

Alejandro Umana                          07/15/2009                                Page 3

## *Differences Between Subtest and Mean of Subtest Scores*

| Verbal Subtests | Scaled Score | Mean Score | Diff. | Signif. | S/W | Cumulative Percentage |
|---|---|---|---|---|---|---|
| Vocabulary | 7 | 4.86 | 2.14 | .05* | S | 10-25% |
| Similarities | 4 | 4.86 | -0.86 | ns | | >25% |
| Arithmetic | 6 | 4.86 | 1.14 | ns | | >25% |
| Digit Span | 4 | 4.86 | -0.86 | ns | | >25% |
| Information | 6 | 4.86 | 1.14 | ns | | >25% |
| Comprehension | 3 | 4.86 | -1.86 | ns | | >25% |
| Letter-Number Sequencing | 4 | 4.86 | -0.86 | ns | | >25% |

Difference from Verbal Mean used to determine strengths (S) and weaknesses (W).

Scatter = 4 (p<.05, Freq = 82.4%).

* significant at the .05 level.

| Performance Subtests | Scaled Score | Mean Score | Diff. | Signif. | S/W | Cumulative Percentage |
|---|---|---|---|---|---|---|
| Picture Completion | 4 | 4.83 | -0.83 | ns | | >25% |
| Digit Symbol-Coding | 4 | 4.83 | -0.83 | ns | | >25% |
| Block Design | 6 | 4.83 | 1.17 | ns | | >25% |
| Matrix Reasoning | 5 | 4.83 | 0.17 | ns | | >25% |
| Picture Arrangement | 5 | 4.83 | 0.17 | ns | | >25% |
| Symbol Search | 5 | 4.83 | 0.17 | ns | | >25% |
| Object Assembly | | | | | | |

Difference from Performance Mean used to determine strengths and weaknesses.

Scatter = 2 (ns, Freq = 99.3%).

## *Digit Span Discrepancies*

| Subtest Level | Raw Score | Cumulative Percentage |
|---|---|---|
| Longest Digit Span Forward* | 4 | 99.50% |
| Longest Digit Span Backward* | 2 | 99.00% |
| Digits Forward - Backward** | 2 | 56.00% |

* A low cumulative percentage reflects a relatively high span capacity.

** A low cumulative percentage reflects a higher scatter.

Alejandro Umana                                07/15/2009                                      Page 4

## *Digit Symbol Optional Procedures*

| Optional Procedure | Raw Score | Cumulative Percentage |
|---|---|---|
| Incidental Learning - Pairing | | |
| Incidental Learning - Free Recall | | |
| Copy | | |

Portions of this report are protected by Copyright
Copyright 1999 by The Psychological Corporation
WAIS-III-WMS-III Writer version 1.1.0.3

**JA3936**



# Score Report

Name: Alejandro Umana

Test Date: 7/2/2009

## Trail Making Test

| | Raw Score | Scaled Score |
|---|---|---|
| **Primary Measure: Completion Times** | | |
| Condition 1: Visual Scanning | 25 | 9 |
| Condition 2: Number Sequencing | 43 | 6 |
| Condition 3: Letter Sequencing | 51 | 3 |
| Condition 4: Number-Letter Switching | 142 | 2 |
| Condition 5: Motor Speed | 34 | 9 |

| | Sum of Scaled Scores | Composite Scaled Score |
|---|---|---|
| **Primary Combined Measure: Completion Times** | | |
| Combined Number + Letter Sequencing | 9 | 4 |

| | Scaled Score Difference | Contrast Scaled Score* |
|---|---|---|
| **Primary Contrast Measures: Completion Times** | | |
| Switching vs Visual Scanning | -7 | 4 |
| Switching vs Number Sequencing | -4 | 6 |
| Switching vs Letter Sequencing | -1 | 9 |
| Switching vs Combined Number + Letter Sequencing | -2 | 8 |
| Switching vs Motor Speed | -7 | 3 |

*A low or high contrast scaled score may reflect different cognitive problems; see examiner's manual.

THE PSYCHOLOGICAL CORPORATION

A Harcourt Assessment Company

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.

Case 3:16-cv-00057-MOC   Document 50-9   Filed 03/23/17   Page 252 of 524

JA3937

# CTONI SCORES FOR ALEJANDRO UMANA

**Standard Scores**

| | |
|---|---|
| Pictorial Analogies: | 1 |
| Geometric Analogies: | 1 |
| Pictorial Categories: | 7 |
| Geometric Categories: | 6 |
| Pictorial Sequences: | 1 |
| Geometric Sequences: | 3 |

Sum of Standard Scores:  19
Sum of Pictorial Standard Scores:  9
Sum of Geometric Standard Scores:  10

**Nonverbal Intelligence Quotient:  53**
**Pictorial Nonverbal Intelligence Quotient:  55**
**Geometric Nonverbal Intelligence Quotient:  57**

# CTONI SCORES FOR ALEJANDRO UMANA

**Name:** ALEJANDRO UMANA
**School:**
**Grade:**
**Sex:** M
**Referred by:**
**Reason for Referral:**
**Examiner:** R. Weinstein
**Date Testing:** 07/01/2009
**Date of Birth:** 11/25/1984

**Test Age:** 24 - 8

---

**Raw Scores**

| | |
|---|---|
| Pictorial Analogies: | 1 |
| Geometric Analogies: | 1 |
| Pictorial Categories: | 12 |
| Geometric Categories: | 10 |
| Pictorial Sequences: | 0 |
| Geometric Sequences: | 4 |

**Percentiles**

| | |
|---|---|
| Pictorial Analogies: | <1 |
| Geometric Analogies: | <1 |
| Pictorial Categories: | 16 |
| Geometric Categories: | 9 |
| Pictorial Sequences: | <1 |
| Geometric Sequences: | 1 |

**Age Equivalents**
Pictorial Analogies:
Geometric Analogies:
Pictorial Categories:
Geometric Categories:
Pictorial Sequences:
Geometric Sequences:

**JA3939**

| CNS Vital Signs Clinical Report | Test Date: July 01 2009 10:12:38 |
| --- | --- |
| Subject Reference/ID: umanaalejandro | Administrator: administrator |
| Language: Spanish (Latin America) | Age: 24 |

Above average domain scores indicate a standard score in that domain of greater than 109. Average is 90-109. Low Average is 80-89. Below Average is 70-79. Very Low is less than 70. Reaction times are in milliseconds. An * denotes that "lower is better", otherwise higher scores are better.

| Patient Profile: | Percentile Range | | | > 74 | 25 - 74 | 9 - 24 | 2 - 8 | < 2 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Standard Score Range | | | > 109 | 90 - 109 | 80 - 89 | 70 - 79 | < 70 |
| Domain Scores | Subject Score | Standard Score | Percentile | Above | Average | Low Average | Low | Very Low |
| Neurocognition Index (NCI) | NA | 62 | 1 | | | | | x |
| Composite Memory | 94 | 88 | 21 | | | x | | |
| Verbal Memory | 56 | 111 | 77 | x | | | | |
| Visual Memory | 38 | 74 | 4 | | | | x | |
| Processing Speed | 36 | 64 | 1 | | | | | x |
| Executive Function | 29 | 67 | 1 | | | | | x |
| Psychomotor Speed | 84 | 34 | 1 | | | | | x |
| Reaction Time* | 812 | 62 | 1 | | | | | x |
| Complex Attention* | 19 | 62 | 1 | | | | | x |
| Cognitive Flexibility | 27 | 65 | 1 | | | | | x |
| Total Test Time (min:secs) | 40:11 | | | Total time taken to complete the tests shown. | | | | |

| Neuropsych Questionnaire (NPQ) SF-45 | Score | Standard | Percentile | |
| --- | --- | --- | --- | --- |
| Attention | 180 | | | The Neuropsych Questionnaire Short Form asks patients (or an appropriate observer) a series of questions about their clinical state. The questions are about the symptoms of various neuropsychiatric disorders. The terminology is similar to that used in the diagnostic manuals, and in many familiar clinical questionnaires and rating scales; but it has been simplified, and all symptoms are scored on the same metric. Scores are reported on a scale of 0 (not a problem) to 300 (severe). As a rule, scores above 225 indicate a severe problem; scores from 150-224 indicate a moderate problem; and scores from 75-149, a mild problem. A high score on the Neuropsych Questionnaire Short Form means that the patient is reporting more symptoms of greater intensity. It doesn't necessarily mean that the patient has a particular condition; just that he or she (or their spouse, parent or caregiver) are saying that they have a lot of intense symptoms. Conversely, a low score simply means that the patient (or caregiver) is not reporting symptoms associated with a particular condition, at least during the period of time specified. It does not mean that the patient does not have the condition. Just as some people over-state their problems, others tend to under-state their problems. The Neuropsych Questionnaire Short Form is not a diagnostic instrument. The results it generates are only meant to be interpreted by an experienced clinician in the course of a clinical examination. |
| Impulsive | 100 | | | |
| Memory | 175 | | | |
| Anxiety | 133 | | | |
| Panic | 0 | | | |
| Depression | 140 | | | |
| Mood Stability | 75 | | | |
| Aggression | 50 | | | |
| Fatigue | 200 | | | |
| Sleep | 300 | | | |
| Suicide | 0 | | | |
| Pain | 175 | | | |
| Verbal Memory Test (VBM) | Score | Standard | Percentile | |
| Correct Hits - Immediate | 15 | 118 | 88 | Memory test: Subjects have to remember 15 words and recognize them in a field of 15 distractors. The test is repeated at the end of the battery. "Correct Hits" refers to the number of target words recognized. Low scores indicate verbal memory impairment. Deficits in delayed recognition occur in patients with early dementia. |
| Correct Passes - Immediate | 15 | 111 | 77 | |
| Correct Hits - Delay | 12 | 103 | 58 | |
| Correct Passes - Delay | 14 | 95 | 37 | |
| Visual Memory Test (VIM) | Score | Standard | Percentile | |
| Correct Hits - Immediate | 10 | 80 | 9 | Memory test: Subjects have to remember 15 geometric figures, and recognize them in a field of 15 distractors. The test is repeated at the end of the battery. "Correct Hits" refers to the number of target figures recognized. Low scores indicate visual memory impairment. Deficits in delayed recognition occur in patients with early dementia. |
| Correct Passes - Immediate | 8 | 70 | 2 | |
| Correct Hits - Delay | 8 | 79 | 8 | |
| Correct Passes - Delay | 12 | 100 | 50 | |
| Finger Tapping Test (FTT) | Score | Standard | Percentile | |
| Right Taps Average | 27 | 44 | 1 | Motor speed and fine motor control test: There are three rounds of tapping with each hand. Low scores indicate motor |

file://C:\Documents and Settings\All Users\Documents\CNS Vital Signs\Data\results.html    7/15/2009

JA3940

| | Score | Standard | Percentile | |
|---|---|---|---|---|
| Left Taps Average | 21 | 43 | 1 | slowing. Most people are faster with their preferred hand but not always. |
| **Symbol Digit Coding (SDC)** | **Score** | **Standard** | **Percentile** | |
| Correct Responses | 36 | 62 | 1 | Psychomotor speed and visual-motor coordination test: Errors may be due to impulsive responding, misperception or confusion. SDC is very sensitive to aging and drug effects. SDC is a two minute test. |
| Errors* | 0 | 112 | 79 | |

file://C:\Documents and Settings\All Users\Documents\CNS Vital Signs\Data\results.html      7/15/2009

| CNS Vital Signs Clinical Report | | | | Test Date: July 01 2009 10:12:38 |
|---|---|---|---|---|
| Subject Reference/ID: umanaalejandro | | | | Administrator: administrator |
| Language: Spanish (Latin America) | | | | Age: 24 |

| Stroop Test (ST) | Score | Standard | Percentile | |
|---|---|---|---|---|
| Simple Reaction Time* | 382 | 75 | 5 | Processing speed, cognitive flexibility, and inhibition/disinhibition test: Prolonged reaction times indicate cognitive slowing/impairment. Errors may be due to impulsive responding, misperception or confusion. Reading disabilities may be apparent in this test. The ST generates simple and complex reaction times. |
| Complex Reaction Time Correct* | 718 | 71 | 3 | |
| Stroop Reaction Time Correct* | 905 | 62 | 1 | |
| Stroop Commission Errors* | 2 | 83 | 13 | |
| **Shifting Attention Test (SAT)** | **Score** | **Standard** | **Percentile** | |
| Correct Responses | 37 | 61 | 1 | Executive control and set shifting test: Subjects have to adjust their responses to randomly changing rules. The best scores are high correct responses, few errors and a short reaction time. Normal subjects may be slow but accurate, or fast but not so accurate. Attention deficit may be apparent. |
| Errors* | 8 | 91 | 27 | |
| Correct Reaction Time* | 1474 | 52 | 1 | |
| **Continuous Performance Test (CPT)** | **Score** | **Standard** | **Percentile** | |
| Correct Responses | 34 | -15 | 1 | Sustained attention, or vigilance, and choice reaction time test: Most normal subjects obtain near-perfect scores on this test. A long response time may suggest cognitive slowing and/or impairment. More than 2 errors (total) may be clinically significant. More than 4 errors (total) indicate attentional dysfunction. |
| Omission Errors* | 6 | -15 | 1 | |
| Commission Errors* | 3 | 57 | 1 | |
| Choice Reaction Time Correct* | 513 | 66 | 1 | |

JA3942

file://C:\Documents and Settings\All Users\Documents\CNS Vital Signs\Data\results.html        7/15/2009

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 258 of 524

# NAB Index Score Summary Table

| Module Index | Standard Score | Percentile Rank | Confidence Interval 95% | Interpretive Category |
|---|---|---|---|---|
| Attention Index (ATT) | 62 | 1 | 54 - 70 | Moderately impaired |
| Language Index (LAN) | --- | --- | --- | --- |
| Memory Index (MEM) | --- | --- | --- | --- |
| Spatial Index (SPT) | 63 | 1 | 53 - 73 | Moderately impaired |
| Executive Functions Index (EXE) | --- | --- | --- | --- |
| Total NAB Index (T-NAB) | --- | --- | --- | --- |

*Note.* "---" indicates a score that could not be calculated due to missing data.

# NAB Index Score Profiles



*Note.* "---" indicates a score that could not be calculated due to missing data.

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 258 of 524

JA3943

*Patient: Alejandro Umana*

# Executive Functions Module Score Table

## Form 1

| Score | Raw Score | z Score | T Score | %ile | Interpretive Category |
|---|---|---|---|---|---|
| Mazes (MAZ) | 12 | 0.28 | 36 | 8 | Mildly impaired |
| Judgment (JDG) | 7 | -2.51 | 22 | < 1 | Moderately-to-severely impaired |
| Categories (CAT) | --- | --- | --- | --- | --- |
| Word Generation (WGN) | --- | --- | --- | --- | --- |
| Word Generation Perseverations (WGN-psv) | --- | | | --- | --- |

*Note.* "---" indicates a score that could not be calculated due to missing data.

## Qualitative Features

**Mazes Qualitative Features:**

☐ Long latency before beginning mazes    ☐ Impulsive/quick start
☐ Haphazard approach                      ☐ Crossing line errors

# Executive Functions Index Score Table

| Score | Sum of T Scores | EXE Standard Score | Percentile Rank | Confidence Interval 95% |
|---|---|---|---|---|
| **Executive Functions Index (EXE)** | --- | --- | --- | --- |

*Note.* "---" indicates a score that could not be calculated due to missing data.

**JA3944**

# SKIL QEEG Report

**Name:**      Alejandro Umana
**DOB:**       11.25.1984
                Male
                Right-Handed

**Reason For Study:** Comprehensive Evaluation of brain function

**Prepared by:** Ricardo Weinstein, Ph.D.

**Report Date:** July 17, 2009

**Medications:** None at the time of the evaluation

**Methodology:**

Nineteen-channel EEG was recorded using conventional 10-20 electrode placements and linked-ears reference. Impedance was below 5 Ohms at each electrode. EEG was digitized 128 times a second with high and low pass filters of 2 Hz and 40 Hz, respectively, during replicated eyes closed and eyes open resting states. Data records underwent automated artifact detection along with manual review and removal. Spectral coefficients of uncorrupted data were statistically compared to age-matched normative values.



**Legend 1. International 10-20 electrode placements are shown against associated MRI slices.**

**JA3945**

An evaluation of cortical function based on Brodmann areas (cytoarchitectural features such as cell type and distribution) was also performed. Higher cognitive functions are served by specific regions and networks of the cortex. Executive functions include goal–directed behaviors such as planning behaviors, initiating behavior, sequencing behavior, and ceasing behavior, as well as evaluating behavior and changing a behavioral approach or mind set (see yellow areas, below). Emotional regulation is served by orbitofrontal and temporal pole regions (orange, below).



**Legend 2. Cognitive functions associated with Brodmann areas. Only the left hemisphere is shown but the areas of the right hemisphere serve analogous and often complementary functions.**

2

**JA3946**

# INFORMATION ABOUT STATISTICAL EVALUATION



Legend 3. Careful data collection and redundant findings assure validity and reliability of an evaluation.  Only spectral coefficients that exceed 2 standard deviations in two or more replicated recordings (or halves of a recording) were considered reliable. Any exception to this criterion is noted.  As normal distributions of spectral coefficients are anticipated in healthy individuals, a 1 in 20 (5%) chance of deviation from a healthy age-matched comparison group may indicate abnormal EEG functionality for an individual.



**Legend 4. Evaluation of cortical module activity. Each brain map consists of 19 electrode sites evenly spaced across the head. Color indicates microvolts (data or raw view) or statistical deviation from a comparison group average (stat view). Spectral magnitude coefficients that exceed +/- 2 standard deviations are indicative of localized hyper- or hypo-excitability in cortical neuronal pools, depending upon the frequency of interest.**

3

**JA3947**



**Legend 5. <u>Evaluation of cortical network activity.</u> Each network map of 19 heads consists of 171 unique site pairings (e.g., Fp1-Fp2, Fp1-T3, F3-T3). Each brain map presents 19 pairings of one site (labeled above left) and all sites including itself. Every auto-pairing (a site to itself, e.g., Fp1-Fp1) appears statistically normal (green, i.e., z-score of 0.0). Statistical hyper-connectivity is indicated by pink and hypo-connectivity by blue in most circumstances.**

**History:**

Mr. Umana is presently detained awaiting legal proceedings, he has been charged with murder and potentially he could receive the death penalty. He has a long history of brain insults.

**Findings and Conclusions:**

The results of this study are valid and reliable as witnessed by the very similar results obtained from the analysis of multiple replications (reliability). Very significant abnormalities were identified when compared to the normal population. There is a generalized and diffused pattern of hypo activity with particular compromise to the frontal lobes, more markedly so in the left hemisphere. These abnormalities would be reflected in impulsive behaviors, pure judgment, limitations in abstract reasoning and the inability to fully understand the cosequences of ones actions.

The findings are consistent and supportive of the results obtained through neuropsychological testing.



FIGURE 1:   Sample of EEG during eyes closed.



FIGURE 2:  Spectral distribution of eyes closed 2 and 3 replications.  Notice similarity between replications attesting to the reliability of the data and the abnormal bilateral asymmetry.

5

**JA3949**



Eyes Closed (Lap.)    Clinical Bands, Magnitude   [aumec2]

Sterman-Kaiser Imaging Laboratory, Inc.

FIGURE 3:   Clinical bands eyes closed magnitude map showing abnormal hypo activity in a generalized pattern at theta, alpha and SM

6

**JA3950**



FIGURE 4:   Eyes closed Entropy clinical bands map showing severe (more than 2 standard deviations from the mean of the normative population) hypo activity at alpha and severe hyper activity at beta 1.



Eyes Closed (Lap.)    Alpha 8-12 Hz, Comod.    [aumec1]

Sterman-Kaiser Imaging Laboratory, Inc.

FIGURE 5:  Eyes closed Alpha Comodulation (cross correlation between sites) map showing abnormal left-right and anterior-posterior dissociation.



**Eyes Closed (Brodmann)    Alpha   8 - 12 Hz, Comodulation   [aumec1]**

Sterman-Kaiser Imaging Laboratory, Inc.

FIGURE 6:  Eyes closed Alpha Comodulation Brodmann map showing abnormal dissociation in the frontal regions of the brain.

Eyes Closed (Brodmann)    Theta   4 - 8 Hz, Unity   [aumec2]

Sterman-Kaiser Imaging Laboratory, Inc.

FIGURE 7:   Eyes closed theta Unity Brodmann map showing significant dissociation in the dorsolateral bilateral regions and the bilateral temporal (auditory) regions of the brain.

10

JA3954



Eyes Closed (Exec.)    Theta   4 - 8 Hz, Unity   [aumec2]

Sterman-Kaiser Imaging Laboratory, Inc.

FIGURE 8:  Eyes closed theta Unity Brodmann Executive Area (frontal lobes) brain map showing hypo abnormality in the left hemisphere.

Eyes Closed (Exec.)    Alpha  8 - 12 Hz, Comodulation   [aumec1]

Sterman-Kaiser Imaging Laboratory, Inc.

FIGURE 9:  Eyes closed Executive Brodmann map Comodulation at Alpha showing a pattern of abnormal hypo cross correlation in the frontal lobes.



FIGURE 10:  Eyes closed Brodmann map at Alpha showing a generalized hypo function bilaterally.



FIGURE 11: Eyes closed Brodmann map at Theta showing significant hypo function in the posterior and temporal regions of the brain bilaterally.

13



FIGURE 12:   Eyes open Brodmann map at SMR showing significant abnormal hypo activity in a generalized pattern with the exception of the right temporal lobe.



FIGURE 13:   Eyes closed Executive Functions Brodmann map at Alpha showing abnormal hypo activity with particular compromise to the left hemisphere.

14

JA3958



FIGURE 14:  Eyes open Executive Functions Brodmann map at SMR showing abnormal hypo activity in a generalized pattern with particular compromise to the left hemisphere.

15

**JA3959**

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 275 of 524

March, 2009

# *Curriculum Vitae*

## *James R. Merikangas, M.D.*

**Address:**        J.R. Merikangas, M.D., L.L.C.
                    4938 Hampden Lane, # 428
                    Bethesda, MD. 20814

**Phone:**          301-654-1934
**Fax:**            301-654-1834
**Email:**          neuropsych2001@hotmail.com

**Citizenship:**    USA

**Education:**      B.S., Physics, Villanova University, 1960
                    M.D., Johns Hopkins University, School of Medicine, 1969

**Licenses:**

| | | |
|---|---|---|
| 1969 | Diplomate, National Board of Medical Examiners | #107478 |
| 1974-1976 | California M.D. License | #23318 |
| 1969-2002 | Connecticut M.D. License | #14074 |
| 1974-1981 | Pennsylvania M.D. License | #014082 |
| 2001- 2006 | Washington, D.C. M.D. License | #MD-33036 |
| 2001- | Maryland M.D. License | #D57622 |

**Military:**

1960-1963           United States Navy, LT(J.G.)

**Career**

2009-               Consultant, Family Study of Affective Spectrum Disorder, Genetic
                    Epidemiology Research Branch, Intramural Research Program,
                    National Institutes Health, Bethesda, MD

2009-               Clinical Professor of Psychiatry, Virginia Commonwealth
                    University School of Medicine Inova Campus, Falls Church, VA

2006-2008           Guest Researcher, National Institutes of Health, Bethesda, MD

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 275 of 524

JA3960

James R. Merikangas, M.D.                **Curriculum Vitae**                2

| | |
|---|---|
| 2008 | Neuropsychiatrist, War Related Injuries and Illness Study Center, Washington Veteran's Hospital, Washington, District of Columbia |
| 2002- | Clinical Professor of Psychiatry and Behavioral Sciences, George Washington University School of Medicine and Health Sciences, Washington, D.C. |
| 2002- | Clinical Associate Professor of Psychiatry Georgetown University School of Medicine, Washington, D.C. Georgetown University Hospital, Washington, D.C. |
| 2002-2003 | Director, Neuropsychiatry Program, Department of Psychiatry, Georgetown University School of Medicine, Washington, D.C. |
| 1980-2002 | Practice of Neuropsychiatry, Neurology and Psychiatry Temple Medical Center, New Haven and Woodbridge, CT. |
| 1980-2000 | Yale University School of Medicine, New Haven, CT: Lecturer (1994-2002); Assistant Clinical Professor (1980-1994) |
| 1973-1979 | University of Pittsburgh School of Medicine, Pittsburgh, PA.: Associate Professor of Psychiatry and Assistant Professor of Neurology (1977-1979); Assistant Professor of Psychiatry and Neurology (1973-1977) |
| 1969-1973 | Yale University School of Medicine, New Haven, CT; Chief Resident in Neurology (1972-1973); Assistant Resident in Neurology (1971-1972); Assistant Resident in Psychiatry (1969-1971) |
| 1968-1969 | Medical and Pediatric Internship, Washington Hospital Center, 110 Irving Street, NW, Washington, D.C. |

## Professional Honors or Recognition:

| | |
|---|---|
| 1979 | Elected Fellow, American College of Physicians |
| 1987- | Elected Counselor, Connecticut Psychiatric Society New Haven – Middlesex Chapter |
| 1988-1990 | Director, American Neuropsychiatric Association |
| 1990-2001 | Advisory Board, American Neuropsychiatric Association |

**JA3961**

James R. Merikangas, M.D.    **Curriculum Vitae**    3

| | |
|---|---|
| 1991 | Elected Fellow, The Royal Society of Medicine |
| 1993 | Elected Fellow, American Psychiatric Association |
| 1996 | Elected to the Board of Directors, American Academy of Clinical Psychiatrists |
| 1996 | Exemplary Psychiatrist Award, National Alliance for the Mentally Ill |
| 1998 | Elected President, New Haven-Middlesex Chapter, Connecticut Psychiatric Society |
| 1998 | Elected President, American Academy of Clinical Psychiatrists |
| 1999 | Elected Treasurer, American Academy of Clinical Psychiatrists |
| 2000 | Elected Fellow, American Neuropsychiatric Association |
| 2004 | Elected Distinguished Life Fellow, American Psychiatric Association |
| 2005 | Elected Consultant of the Scientific Program Committee, American Psychiatric Association |
| 2008 | Elected Representative of District Branch in Assembly, American Psychiatric Association |

## Boards and Specialty Certification:

| | |
|---|---|
| 1974 | American Board of Psychiatry and Neurology  # 13424<br>Diplomate, Certified in Psychiatry |
| 1978 | American Board of Psychiatry and Neurology    # 17744<br>Diplomate, Certified in Neurology |
| 1991 | Diplomate, American Academy of Pain Management  # 2431 |

## Hospital Staff Appointments:

| | |
|---|---|
| 1973-1979 | Western Psychiatric Institute & Clinic, Pittsburgh, PA. |
| 1973-1979 | Presbyterian University Hospital, Pittsburgh, PA. |

**JA3962**

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 278 of 524

James R. Merikangas, M.D.                 **Curriculum Vitae**                                  4

| | |
|---|---|
| 1979-1988 | Waterbury Hospital, Waterbury, CT. |
| 1979-2001 | Hospital of St. Raphael, New Haven, CT. |
| 1980-2001 | Yale-New Haven Hospital, New Haven, CT. |
| 1983-1993 | Veteran's Memorial Medical Center, Meriden, CT. |
| 1995-1997 | Yale Psychiatric Institute, New Haven, CT. |
| 1995-2001 | Masonic Geriatric Healthcare Center, Wallingford, CT. |
| 2001-2003 | Georgetown University Hospital, Washington, DC. |
| 2001- 2005 | The George Washington University Hospital, Washington, DC. |
| 2004- | Suburban Hospital, Bethesda, MD. |
| 2008- | Veteran's Administration Hospital, Washington, D.C. |

## Consultation:

| | |
|---|---|
| 1974-1977 | Forbes Hospital System, Pittsburgh, PA. |
| 1974-1977 | Mayview State Hospital, Bridgeville, PA. |
| 1974-1977 | Veterans Administration Hospital, Pittsburgh, PA. |
| 1978-1979 | Monogahela Valley Hospital, Pittsburgh, PA. |
| 1980-1982 | Yale Psychiatric Institute, New Haven, CT. |
| 1981-1982 | Shirley Frank Foundation, Bridgeport, CT. |
| 1983-2001 | Connecticut Mental Health Center, New Haven, CT. |
| 1985-1986 | Veterans Administration Health Center, New Haven, CT. |
| 1985-2001 | Connecticut Peer Review Organization |
| 1987- 1988 | Whiting Forensic Institute, Middletown, CT. |
| 1987-1990 | Altobello State Hospital for Adolescents, Middletown, CT. |
| 1987-2001 | Saint Francis Care Behavioral Health, Portland, CT. |
| 1996-2000 | Professional Advisory Board of the Diagnostic and Assessment Center, Landmark College, Putney, VT. |

James R. Merikangas, M.D.                **Curriculum Vitae**                              5

| | |
|---|---|
| 2006-2007 | Consultant of the Scientific Program Committee, American Psychiatric Association, Arlington, VA |

## Administrative Appointments:

| | |
|---|---|
| 1973-1975 | Western Psychiatric Institute and Clinic, Pittsburgh, PA. Senior Physician, Neurodiagnostic Clinic |
| 1973-1975 | Western Psychiatric Institute and Clinic, Pittsburgh, PA. Director, Emergency Services and Brief Treatment |
| 1973-1976 | Western Psychiatric Institute and Clinic, Pittsburgh, PA. Senior Physician, Mental Retardation Service |
| 1973-1978 | Western Psychiatric Institute and Clinic, Pittsburgh, PA. Director, Electroencephalographic Laboratory |
| 1976-1977 | Western Psychiatric Institute and Clinic, Pittsburgh, PA. Director, Office of Diagnostic Services |
| 1977-1979 | Western Psychiatric Institute and Clinic, Pittsburgh, PA. Director, Behavioral Neurology Program |
| 2002-2003 | Georgetown University Hospital, Washington, DC. Director, Neuropsychiatry Program |

## Membership:

| | |
|---|---|
| 1969- | The Johns Hopkins Medical and Surgical Society |
| 1973- | American Academy of Neurology |
| 1973- | American Psychiatric Association |
| 1973- | American College of Physicians |
| 1979-2001 | Connecticut Psychiatric Society |
| 1982- | The New York Academy of Science |
| 1982-2001 | New Haven County Medical Association |
| 1984-2001 | Connecticut State Medical Society |
| 1986- | American Academy of Psychiatry & the Law |

Appeal: 10-6   Doc: 90-9      Filed: 08/14/2013    Pg: 280 of 524

| | |
|---|---|
| 1988- | American Academy of Clinical Psychiatrists |
| 1988- | American Neuropsychiatric Association |
| 1990- | World Federation of Neurology |
| 1991- | Royal Society of Medicine |
| 1994- | American Academy of Child and Adolescent Psychiatry |
| 1996- | American Society of Clinical Psychopharmacology |
| 1997- | International Society of Transcranial Magnetic Stimulation |
| 2000- | American Academy of Immunotherapy |

## Consultation to State and Federal Courts and Agencies:

| | |
|---|---|
| 1977-1978 | Consultant, Neuropsychiatric Evaluation of Juvenile Offenders, Allegheny County Juvenile Court, Pittsburgh, PA. |
| 1977-1979 | Member, Acute Psychiatric Task Force Emergency Health Services Council, Commonwealth of PA. |
| 1977-1985 | Chairman, Committee on Psychotropic Medication for the Retarded, Department of Public Welfare, Commonwealth of PA. |
| 1985-1990 | State of Connecticut, Governor's Task Force on Aging |
| 1986-1987 | Superior Court of Waterbury, CT., Court Appointed Expert |
| 1990-2001 | State of Connecticut Department of Mental Health and Addiction Services, Evaluation Psychiatrist, Probate Court for Commitment Hearings |
| 1997-1998 | Human Rights Committee, Department of Mental Retardation, South Central Region, Connecticut |

## Committees, Boards and Consultantships:

| | |
|---|---|
| 1977-1985 | Research Committee on Neuroepidemiology, World Federation of Neurology, Geneva, Switzerland |

James R. Merikangas, M.D.                **Curriculum Vitae**                                    7

| | |
|---|---|
| 1982-1999 | Medical Advisory Board, Easter Seal Goodwill Industries Rehabilitation Center, New Haven, CT. |
| 1984-1988 | Board of Directors, Alzheimer's and Related Diseases Association of Southern Connecticut |
| 1985-1988 | Board of Directors, Parkinson's Disease Association of Southern Connecticut |
| 1985-1997 | Board of Advisors, Burch House, Littleton, New Hampshire |
| 1985 | American Psychiatric Association's Task force on Treatment of Psychiatric Disorders |
| 1986-1987 | Chairman, Program Committee, New Haven-Middlesex Chapter, Connecticut Psychiatric Society |
| 1987-1990 | Membership Chair, New Haven-Middlesex Chapter, Connecticut Psychiatric Society |
| 1987-2001 | Counselor, New Haven-Middlesex Chapter, Connecticut Psychiatric Society |
| 1988-1990 | Alternative Care Committee, Connecticut Psychiatry Society |
| 1988-1992 | Convening Member, National Task Force for Children's Constitutional Rights, Philadelphia, PA. |
| 1992-1997 | National Task Force for Children's Constitutional Rights, Director and Treasurer |
| 1992-2000 | National Board of Medical Examiners, American Board of Psychiatry and Neurology, Part I Psychiatry Written Examination Sub Committee III |
| 1992-2001 | Physician Advisory Committee of Medicare, Connecticut Neurological Society |
| 1992- | Examiner, National Board of Medical Examiners, American Board of Psychiatry and Neurology Part II Psychiatry, Oral Examination |
| 1994-1996 | Scientific Advisory Board, Neurobiological Disorders Society |
| 1994-1998 | Treasurer, New Haven/ Middlesex Chapter, Connecticut Psychiatric |

**JA3966**

James R. Merikangas, M.D.                    **Curriculum Vitae**                    8

| | |
|---|---|
| | Society |
| 1996- | Examiner, National Board of Medical Examiners, American Board of Psychiatry and Neurology, Part II Neurology Oral Examination |
| 1996-2003 | Board of Directors, American Academy of Clinical Psychiatrists |
| 1997-2001 | Private Practice Committee, Connecticut Psychiatric Society |
| 1998-1999 | Committee Member, New Haven Jewish Federation Housing Corp., Tower One/ Tower East |
| 1999-2001 | Board of Directors, Albert Schweitzer Institute for the Humanities |

## Editorial Consultant:

| | |
|---|---|
| 1979- | American Journal of Psychiatry |
| 1983- | Psychosomatics |
| 1983- | American Psychiatric Association Press |
| 1987- | International Journal of Psychiatry in Medicine |
| 1987- | Toxic Emergency Medical Information Sheet, Jonathan Borak and Company, Inc. |
| 1990-2003 | Annals of Clinical Psychiatry |
| 1994- | Neurology |
| 1996- | Clinical Child Psychology and Psychiatry |
| 1998- | Harvard Review of Psychiatry |
| 2002- | Journal of the American Academy of Psychiatry and the Law |

## Editorial Boards:

| | |
|---|---|
| 1990-1997 | Annals of Clinical Psychiatry, Editor, Special Treatment Section |
| 1997-2003 | Annals of Clinical Psychiatry, Editorial Board |

James R. Merikangas, M.D.                **Curriculum Vitae**                                9

| | |
|---|---|
| 1999-2003 | Psychiatric Update, Editorial Advisory Board |

## University Activities:

Teaching:

| | |
|---|---|
| 2009 | The Fielding Graduate School, Bethesda, MD. Neuropsychology Course |
| 1983-2000 | Connecticut Mental Health Center, New Haven, CT. Neuropsychiatric Consultant |
| 1984-1985 | Yale University School of Medicine, Physicians Associate Program Thesis Supervision |
| 1985 | Geriatric Psychiatry, Elective for Psychiatric Residency Program, Yale University School of Medicine |
| 1985-1987 | Consultation-Liaison Rounds, Yale-New Haven Hospital |
| 1985-1987 | Yale University School of Medicine, Supervision of Medical Student Thesis |
| 1985-1988 | Yale University Third-Year Medical Students, Supervision of Neurology Clerkship |
| 1986-1987 | University of Connecticut School of Social Work, Clinical Internship Supervisor |
| 1987-2001 | Yale University School of Public Health, Division of Chronic Disease Epidemiology, Supervision of Clinical Practicum |
| 1989 | Institute of Living Residency Program, Neuropsychiatry Elective |
| 1992-2001 | Yale University School of Medicine, Department of Psychiatry, Genetic Epidemiology Research Unit, Supervision of PGY III and PGY IV Residents on Neurological Examination |
| 1993 | Yale University School of Medicine, Department of Psychiatry, Neuropsychiatry, PGY II Integrated Psychopathology Course |
| 1993-2001 | Yale University School of Medicine, Neurology Training Rotation Psychiatry Residents |

James R. Merikangas, M.D.    **Curriculum Vitae**    10

| | |
|---|---|
| 1994-1996 | Connecticut Mental Health Center, Dual Diagnosis Clinic, Training and Supervision of Psychiatry Residents |
| 1996-1998 | Connecticut Mental Health Center, Yale Medical Students, Psychiatry Clerkship |
| 1998-2001 | Yale University of Medicine, Psychiatric Residency, Neuropsychiatry Elective |
| 2000-2001 | Yale University School of Medicine, Neuropsychology Fellows, Neuropsychiatry Elective |
| 2002 | Georgetown University School of Medicine, Neuropsychiatry, Medical Students and Residents |
| 2007-Present | Inova Fairfax Hospital/George Washington University Psychosomatic Medicine Fellowship, Residents |

## Research:

| | |
|---|---|
| 1965 | Medical Student Training Grant "Sensory Motor Feedback in the Temporal Lobe of the Brain"  Neurocommunications Laboratory, Department of Psychiatry, Johns Hopkins Hospital, Principal Investigator – Richard Chase, M.D. |
| 1966 | Principal Investigator, Grant form the Moses Family Fund for Research On Myasthenia Gravis, "The Elctromyographic Effect of Guanidine" Department of Medicine, Johns Hopkins Hospital |
| 1977 | Co-Investigator, "Involvement of Cholinergic Mechanisms in Mental Disease," MH26320, National Institute of Mental Health, University of Pittsburgh School of Medicine Principal Investigator: I. Hanin, Ph.D. |
| 1977 | Consultant. "Mental Health Clinical Research Center for Affective Disorders," MH30915, National Institute of Mental Health, University of Pittsburgh School of Medicine, Principal Investigator: David Kupfer, M.D. |
| 1977 | Consultant, "Multi-Institutionalized Controlled Study of Brain Resuscitation," Resuscitation Research Institute, University of Pittsburgh School of Medicine, Principal Investigator: Peter Safer, |

**JA3969**

James R. Merikangas, M.D.                **Curriculum Vitae**                                11

M.D.

| | |
|---|---|
| 1978 | Consultant, "Environmental Personal Treatment Interaction in the Course of Schizophrenia," MH30750, National Institute of Mental Health, University of Pittsburgh School of Medicine, Principal Investigator: GE Hogarty, M.S.W. |
| 1986 | Consultant, "Alcoholism and Anxiety: A Genetic Epidemiologic Approach," AA 07080, January 1, 1987 – December 31, 1991, Yale University School of Medicine, Principal Investigator: Kathleen R. Merikangas, Ph.D. |
| 1987 | Consultant, "Specificity of Transmission of Substance Abuse," DA0534, October 1, 1987 – September 30, 1992, Yale University School of Medicine, Principal Investigator: Kathleen R. Merikangas, Ph.D. |
| 1989 | Consultant, "Family Study of Co-Segregation of Affective Disorders and Migraine," MacArthur Foundation Research Network I on the Psychobiology of Affective Disorder, Principal Investigator: Kathleen R. Merikangas, Ph.D. |
| 1994 | Consultant, "Minority Children at High Risk for Alcohol-Related Problems," Department of Health and Human Services, Principal Investigator: Kathleen R. Merikangas, Ph.D. |
| 1996 | Co-Investigator "Bipolar Affective Disorder in Migraine," Collaborative study at Harvard University and Yale University, Principal Investigator: Kathleen R. Merikangas, Ph. D. |

## Grant Reviews:

| | |
|---|---|
| 1991 | Ad Hoc Reviewer, the Harry Frank Guggenheim Foundation for a Research Grant 1991 |

## Publications:

James R. Merikangas, M.D.    **Curriculum Vitae**    12

## Original Articles:

Merikangas JR, Johns RJ.  The effect of guanidine on the muscle action potential.  *Johns Hopkins Med. J.*; 1968; 122:37-41.

Foster G, Coble P, Merikangas JR, McPartland R, Ingenito G, Kupfer D. Disorder of arousal or psychomotor epilepsy; differential diagnosis and treatment of a rare heredofamilial disease. *Sleep Research*. 1975; 4:214.

Glass J, Kennerdell J, Merikangas JR.  Frontal and occipital visual evoked potentials in visually deprived humans.  *Neurosci Abst.* 1975; 1:93.

Merikangas JR.  Common neurologic syndromes in medical practice. *Med Clin North Am.* 1977; 61:723-736.

Glass J, Crowder J, Kennerdell J, Merikangas JR.  Visually evoked potentials from occipital and pre-central cortex in visually deprived humans.  *Electroencephalog Clin Neurophysiol*. 1977; 43:207-217.

Hanin I, Kopp U, Zahniser NR, Shih TM, Spiker DG, Merikangas JR, Kupfer DG, Foster FG. Acetylcholine and choline in human plasma and red blood cells: A gas chromatograph/mass spectrometric evaluation.  *Cholinergic Mechanisms and Psychopharmacology*.  New York: Plenum. 1977:181-195.

Merikangas, JR, Merikangas KR, Katz L, Pan S. Chromosome banding analysis in cornelia deLange syndrome. *Hum Genet*. 1977; 39:217-219.

Merikangas JR, Auchenbach R.  Carbamazepine in raynaud's disease. *Lancet*. December. 1977; 3:2:1186.

Neil JF, Merikangas JR, Davies RK, Himmelhoch JM.  Validity and clinical utility of neuroleptic-facilitated electroencephalography in psychotic patients. *Clin Electroencephalography*. 1978; 9:38-48.
Merikangas JR.  Neurodiagnostic methods for the aged. *Audio-Digest* Glendale, Psychiatry, Vol. 7, Number 12, Side B, June 26, 1978.

Merikangas JR.  Skew deviation in pseudotumor cerebri. *Ann Neurol*. 1978; 4:583.

Hanin I., Merikangas JR., Merikangas KR., Kopp U.  Red cell choline and Gilles de la Tourette syndrome. *N Engl J Med,* 1979; 1301:661-662.

Merikangas JR, Reynolds CF.  Blepharospasm: Successful treatment with clonazepam. *Ann Neurol*, 1979; 15:401-402.

Merikangas JR, Marasco JA, Feszko W. Basal ganglia calcification in Down's syndrome. *Computerized Tomography*. 1979; 13:111-113.

**JA3971**

James R. Merikangas, M.D.                  **Curriculum Vitae**                              13

Neil JF, Merikangas JR, Glew RH.  EEG findings in adult neuronopathic Gaucher's disease. *Clinical Electroencephalography*. 1979; 10:198-205.

Neil JF, Hanin I, Merikangas JR, Merikangas KR, Foster G, Spiker DG, Kupfer D. Walking and all-night sleep EEG's in anorexia nervosa.  *Clinical Electroencephalography*. 1980; 11:9-15.

Merikangas KR, Risch NJ, Merikangas JR, Weissman MM.  Association between depression and migraine.  *Amer J Epid (Abst)*. 1985; 122:538-539.

Manuelidis EE, Kim JH, Merikangas JR, Manuelidis L.  Transmission to animals of Creutzfeldt-Jacob disease from human blood. *Lancet ii*. 1985; 8460:896-897.

Merikangas JR, Merikangas KR, Kopp U, Hanin I.  Blood choline and response to clonazepam and haloperidol in Gilles de la Tourette's syndrome. *Acta Psychiatrica Scand*. 1985; 72:395-399.

Merikangas KR, Risch NJ, Merikangas JR, Weissman MN, Kidd KK.  Migraine and depression: Association and familial transmission. *J Psychiatric Res*. 1988; 22:119-129.

Merikangas JR, Merikangas KR, Calcium channel blockers in MAOI-induced hypertensive crises. *Psychopharmacology* 96 (supp): 1988: 229.

Merikangas KR, Merikangas JR.  Advances in the pharmacologic treatment of migraine. Psychopharmacology, 96 (supp): 1988: 145.

Katz LJ, Lester RL, Merikangas JR, Silverman JP.  Ocular myasthenia gravis after D-penicillamine administration. *Brit J Ophthalmology*. 1989; 73:12:1015-1018.

Merikangas JR, Seminars in Treatment: Introduction to serotonergic drugs. *Annals Clin Psychiatry*. 1990; 2:3:2-3.

Merikangas JR.  Seminars in Treatment: Introduction to child psychiatry. *Annals Clin Psychiatry*. 1991; 3:1:1-3.

Merikangas JR. Routine tests of drugs. *Am J Psychiatry*. 1991 Jul; 148 (7):947.

Merikangas JR.  Seminars in Treatment: Introduction to hospital psychiatry. *Annals Clin Psychiatry*. 1992; 4:1:1.

Merikangas KR, Merikangas JR, Angst J.  Headache syndromes and psychiatric disorders: Association and familial transmission. *J Psychiat Res*. 1993; 27:197-210.

Sananes C, Grillon C, Merikangas JR, Merikangas KR.  Eyeblink reflex and migraine. Proceedings Vlth Congress of the International Headache Society. 148, 1993.

James R. Merikangas, M.D.                    **Curriculum Vitae**                    14

Merikangas KR, Stevens D, Merikangas JR, Cooper T, Glover V, Sanlder M. Tyramine conjugation deficit in migraine and tension type-headache. Proceedings Vlth Congress of the International Headache Society. p. 236, August 26-29, 1993.

Merikangas JR, Rojahn J. Seminars in Treatment: Introduction to the treatment of the mentally retarded. *Ann Clin Psychiatry*. 1993; 5:3:149-150.

Merikangas KR, Stevens D, Merikangas JR, Katz C, Glover V, Sandler M. Tyramine conjugation deficit in migraine, tension-type headache and depression. *Biol Psychatry*. 1995; 38:730-736.

Merikangas KR, Merikangas JR. Combination monoamine oxidase inhibitor and beta-blocker treatment of migraine with anxiety and depression. *Biol Psychiarty*. 1995; 38: 603-610.

Merikangas JR, Stevens D, Merikangas KR, Enalapril prophylaxis of migraine. *Schwizer Archiv for Neurologie and Psychiartie*. 1996; 147:118-123.

Merikangas KR, Stevens D, Merikangas JR. Treatments of migraine and tension-type headaches with concomitant depression. Directions in Psychiatry, Vol. 17. Summer, 1997.

Davalos D, Merikangas JR, Bender S. Psychosis in hypomelanosis of Ito. *Jounal of the Royal Society of Medicine*. 2001; 94:140-141.

Shur-Fen SG, Merikangas JR, Merikangas KR. Specificity of neurological and neurocognitive function in children with attention-deficit/hyperactivity disorder. J Neuropsychiatry Clin Neuroscience. 2002; 14:1:105.

Low NCP, Merikangas JR, Merikangas KR. Migraine and mood disorders. Psychiatric Annals. 2004; 34:1:33-40.


**Chapters, Books**:

Merikangas JR (Ed.) Brain-behavior relationships. Lexington: Health 1981.

Merikangas JR. The neurology of violence. In Merikangas JR (Ed.) Brain-behavior relationships. Lexington: Health 155-185, 1981.

Merikangas JR, Merikangas KR, Black HR. Clonidine and beta-blockers in psychiatry. In Giannini J (Ed.): Biological Foundations of Clinical Psychiatry, New York: Elsevier, 289-309, 1986.

**JA3973**

James R. Merikangas, M.D.                    **Curriculum Vitae**                                   15

Merikangas JR.  Headache syndromes. In Stoudemeier A. Fogel B, (Eds.) medical Psychiatric Practice Vol. 1, Washington D.C.: American Psychiatric Press, 393-424, 1991.

Stevens DE, Merikangas KR, Merikangas JR.  Comorbidity of depression and other medical conditions. In Weingarten S. (Ed.) Handbook of Depression, New York: Guilford Publications, 147-199. 1995.

Merikangas KR, Stevens DE, Merikangas JR.  Migraine and headache disorders.  In Robinson RG and Yates WR (Eds.) Psychiatric Treatment of the Medically Ill. New York, Marcel Dekker, Inc., 425-442. 1999.

Davalos, D.B., Hayes, A. & Merikangas, J.  Autism and Hypomelanosis of Ito.  In O. Ryanskin,   (Ed.),  Focus on Autism Research.  (pp. 309-338).  New York: Nova Science Publishers. 2005.

Merikangas KR, Merikangas JR.  Neuropsychiatric aspects of headache.  In Comprehensive Text Book of Psychiatry.  Lippincott, Williams and Wilkins, 480-487. 2006.
Merikangas JR. Forensic Neuropsychiatry. In Guide to Neuropsychiatric Therapeutics. Lippincott, Williams and Wilkins, 388-402. 2006.

Wise, T., Merikangas, JR. The Interface of Neurology & Internal Medicine. Somatoform Disorders. Lippincott, Williams and Wilkins, 969-977. 2008.

**Book Reviews:**

Merikangas JR. Gilles de la Tourette Syndrome. Shapiro AK, Shapiro ES, Bruun RD, Sweet RD. *J Clin Psychiatry*, 1981; 42:482-483.

Merikangas JR.  Progress in Aphasiology.  Rose CR (Ed.), New York: Raven, *Am. J. Psychiatry,* 1986; 143:1046-1047.

Merikangas JR. The Bridge Between Neurology & Psychiatry.  In Reynolds EH and Trimble MR, *Am. J. Psychiatry*, 1991; 148:1.

Merikangas Jr.  Merritt's Textbook of Neurology Eighth Edition, Rowland LP (Ed.), *Am. J. Psychiatry*, February 1992; 149:2.

Merikangas JR.  Brain and Behavior in Child Psychiatry, Rothenberger A (Ed.) *Am. J. Psychiatry*, January 1993; 150:1.

Merikangas JR.  The Butcher Boy, Patrick McCabe. *Am. J. Psychiatry*,  December 1994; 151:12.

**JA3974**

James R. Merikangas, M.D.            **Curriculum Vitae**                                    16

Merikangas JR.  Johnny, I Hardly Knew You, Edna O'Brien in "Edna O'Brien Reader," *Am. J. Psychiatry*, December 1994; 151:12.

Merikangas JR.  Molecular and Genetic Basis of Neurological Disease, Ronsenberg R, Prusnier S, DiMauro S, Barchi R, Kunkel L. (Eds.) *Am. J. Psychiatry*, January 1995; 152:1.

Merikangas JR.  Marabou Stork Nightmares: A Novel, Irvine Welsh, *Am. J. Psychiatry*, December 1996; 153:12.

Merikangas JR.  The Eighties: A Reader, Gilbert T. Sewall (Ed.), *Am. J. Psychiatry*, February 1999; 156:2:329-330

Merikangas JR.  The Law & Mental Health Professionals – Connecticut, Sheila Taub. *Connecticut Psychiatrist*, Summer 1999; 41:3:13

Merikangas JR.  Bad Boys, Bad Men: Confronting Antisocial Personality Disorder, Donald W. Black and C. Lindon Larson. *Am. J. Psychiatry*, December 1999; 156:12:2011-2012.

Merikangas JR.  Child and Adolescent Neurology, Ronald B. David (Ed.), *Am. J. Psychiatry*, August 2000; 157:8:1356-1357.

Merikangas JR.  Neurodevelopmental Approach to Specific Learning Disorder:  Clinics in Developmental Medicine 145, Kingsley Whitmore, Hillary Hart and Guy Willems (Eds.), *Amer J Psychiatry*, March 2001; 158:3:510-512.

Merikangas JR.  The Brain and Behavior An Introduction to Behavioral Anatomy, David I. Clark and Nashaat N. Boutros. *J Neuropsychiatry Clin Neurosci*, Fall 2001; 13:4:525-526.

Merikangas JR.  Translated Accounts: A Novel, by James Kelman. *Am. J. Psychiatry*, 2002; 159:12:2120.

Merikangas JR.  The Curious Incident of the dog in the Night-Time: A Novel. *Am. J. Psychiatry*, Dec 2003; 160:2245-2246.

Merikangas JR.  The Developmental of Psychopathology: Nature and Nurture, Bruce f. Pennington. *Am. J. Psychiatry*, October 2004; 161:10:1932-1934.

Merikangas JR.  Hitler: Diagnosis of a Destructive Prophet. *Am. J. Psychiatry,* Jun 2002; 159: 1760-1766.

Merikangas JR.  The Cave. *Am. J. Psychiatry*, Dec 2004; 161: 2335-2336.

Merikangas JR. Transmission: A Novel. *Am. J. Psychiatry,* Dec 2005; 162: 2411-2412.

James R. Merikangas, M.D.                **Curriculum Vitae**                              17

Merikangas JR. Neuropsychiatry and Behavioral Neurology Explained. *Psychosomatics,* March-April 2007; 48.2: 181-182

**Miscellaneous Publications:**

Merikangas JR.  Neuropsychiatrist – Who qualifies as one? Letter to the Editor. *J Neuropsychiatry*. 1990; 2:3:354.

Merikangas JR.  Routine tests of drugs. Letter to the Editor. *Amer J Psychiatry*. 1991; 148:7:974.

Merikangas JR.  Violence and the Brain. Letter to the Editor. *The Sciences*. November/December 1992.

Merikangas JR.  Commentary regarding "The Treatment of Clinical Aggression: An Integrative Approach" by Ratey JJ and Leveroni CL. *Integrative Psychiatry*. 1992; 8:75-176.

Merikangas JR.  "Changing over-the-counter drugs while retaining the brand name." Letter to the Editor. *Annals of Internal Medicine*. 1993; 118:12:988.

Merikangas JR.  "Resolved: Managed Care Violates Medical Ethics", Letter to the Editor, *Connecticut Medicine*. August 1996:60:8:505-509.

Merikangas JR.  "Confidentiality: A Vanishing Right?", Letter to the Editor, ACP Observer, p 6. December, 1996.

Merikangas JR.  "Ethics in Managed Care-A Response to Maria Lenaz's Article", Letter to the Editor, *Connecticut Medicine*, 62, 2, p 108. February 1998.

Merikangas JR.  "Shortfall of Physicians?" Letter to the Editor, *Connecticut Medicine*, 62, 7. July, 1998.

Merikangas JR.  "Das Warten auf den Tod ist Folter", "Waiting for Death is Torture" Interview, *Der Spiegel*, Vol. 48, pp 176-180, October 18, 1999.

Merikangas JR.  "A Review of Stephen Soderbergh's Movie Traffic", *J Amer Acad Psychiatry Law*, 29.2, pp 241-242, 2001.

Merikangas JR.  "Commentary: Alcoholic Blackout – Does It Remove Mens Rea?", *J Am Acad Psychiatry Law*, 32:375-7, 2004.

Merikangas JR. "A Lesson of Columbine, 10 Years Later" Letter to the Editor, *New York Times*, 18 April, 2009.

James R. Merikangas, M.D.                    **Curriculum Vitae**                    18

## National and International Lectures:

"Frontal and Occipital Evoked Potentials in Visually Deprived Humans", Society of Neurosciences, New York, December 5, 1975.

"Diagnosis and Management of Pain", American Psychosomatic Society, Continuing Education Course, Pittsburgh, P.A. April 1976.

"Psychosis and Movement Disorder: Interrelations", American Psychiatric Association Annual Meeting, Miami, FL, May 1976.

"Total Care of the Psychiatrically Ill Retarded", American Psychiatric Association Annual Meeting, Miami, FL, May 1976.

"Medication of the Mentally Retarded in an Outpatient Setting: Rationale and Consistencies", American Psychiatric Association Annual Meeting, Miami, FL, May 1976.

"Medical Considerations at Intake", The Association Psychiatric Outpatient Centers of American, Regional Meeting, Pittsburgh, PA, October 1977.

"Seizure Disorder and Headache", Practical Medicine for the General Psychiatrist. Western Psychiatric Institute and Clinic, University of Pittsburgh, Pittsburgh, PA, November 6, 1977.

"Neurodiagnostic Methods for the Aged", American Psychiatric Association Annual Meeting, Atlanta, GA, May 8, 1978
Industrial Health Foundation, Inc., Pittsburgh, PA, September 18, 1978.

"Seizure Disorder", Practical Medicine for the General Psychiatrist, Western Psychiatric Institute and Clinic, University of Pittsburgh, Pittsburgh, PA, November 9, 1978.

"Psychosomatic Illness-Evaluation and Treatment", Industrial Health Foundation, Inc. Pittsburgh, PA, May 1979.

"Psychological Aspects of Stress and "Overview of Psychosis and Neurosis", Industrial Health Foundation, Pittsburgh, PA, September 1980.

"Children with Neurological Problems Presenting as Psychiatric Problems", Continuing Educational Program, Dartmouth Hitchcock Medical Center, Brattleboro Retreat, Brattleboro, VT, October 1980.

"Neurophysiology of Violence", Psychosomatic Grand Rounds, Yale-New Haven Hospital, New Haven, CT, February 18, 1981.

James R. Merikangas, M.D.                **Curriculum Vitae**                                19

"Behavioral Emergencies", Connecticut Emergency Medical Services Annual Educational Seminar, New Britain, CT, March 13, 1981.

"Mental Retardation", Yale Law School, Yale University, New Haven, CT, April 2, 1981.

"Organic Brain Disorders", South Central Community College, New Haven, CT, April 29, 1981.

"Behavioral Manifestations and Treatment of Chronic Organic Brain Syndrome", Chapel Haven Center for Brain Damaged Adults, New Haven, CT, November 10, 1981.

"Neurological and Psychiatric Considerations in Parkinson's Disease", East Shore Parkinson's Support Group, East Haven, CT, November 19, 1981.

"Psychiatric Complications of Medical Treatment", Neurology and Psychiatry Board Review Course, Department of Psychiatry, Yale University School of Medicine, New Haven, CT, March 15, 1981.

"Psychiatric Complications of Medical Treatment", Neurology and Psychiatry Board Review Course, Department of Psychiatry, Yale University School of Medicine, New Haven, CT, March 19, 1982.

"Psychiatric Problems of Epileptics" and "Atypical Psychiatric Syndromes and Pharmacological Treatment", Course on Psychopharmacology in Children and Adolescents. American Psychiatric Association, Toronto, Canada, May 20, 1982.

"Neurological Complications of Alcohol", Shirley Frank Foundation, New Haven, Ct, June 4, 1982.

"Psychotropic Medication", Conference on Mental Health and Developmental Disability Consortium of New Haven, Clifford Beers Child Guidance Center, New Haven, CT, October 9, 1982.

"Medical Problems in Arbitration", National Academy of Arbitrators, Northeast Regional Meeting, Southbury, CT, October 20, 1982.

"Pharmacology of Neuroleptic Induced Movement Disorder, II", Institute of Living, Hartford, CT, November 8, 1982.

"Headaches", Healthwise Television Broadcast, Storer Cable TV, Channel U-24, New Haven, CT, November 16, 1982.

"Psychiatric Complications of Medical Drugs", Board Review Course, Department of Psychiatry, Yale University School of Medicine, New Haven, CT, March 14, 1983.

James R. Merikangas, M.D.              **Curriculum Vitae**                        20

"Choline and Drug Response in Tourette's Syndrome", VII World Congress of Psychiatry, Vienna, Austria, July 15, 1983.

"Psychiatric and Family Aspects of Parkinson's Disease", Parkinson Enlightenment Program, Hamden, CT, February 1, 1983.

"Headaches", Healthwise Television Broadcast, Storer Cable TV, Channel U-24, New Haven, CT, February 16, 18, 1983.

"Violence and Atypical Psychosis", Connecticut Valley Hospital, Middletown, CT, March 9, 1983.

"Hysteria and Neurological Conditions", Mental Health Clinic, Hospital of St. Raphael, New Haven, CT, March 11, 1983.

"Neuropsychiatric Assessment in Childhood", West Haven Division of Connecticut Mental Health Center, West Haven, CT, April 14, 1983.

"Parietal Lobe Disorders, Part I", Integrated Seminar in Psychiatry and Psychosomatic Medicine, Yale-New Haven Hospital, New Haven, CT, April 18, 1983.

"Parietal Lobe Disorders, Part II", Integrated Seminar in Psychiatry and Psychosomatic Medicine, Yale-New Haven Hospital, New Haven, CT, April 25, 1983.

"Stress and Headache in Business", Combined Resources, Stone School of Business, New Haven, CT, May 26, 1983.

"Job Stress", Hospital of St. Raphael, New Haven, CT, June 3, 1983.

"Neurological Considerations in Psychiatry", Connecticut Valley Hospital, Middletown, CT, November 17, 1983.

"Psychiatric Complications of Medical Treatment", Neurology and Psychiatry Board Review Course, Department of Psychiatry, Yale University School of Medicine, New Haven, CT, March 14, 1984.

"Psychopharmacology of Children and Adolescents", Course Presentation at Annual Meeting of the American Psychiatric Association, Los Angeles, CA, May 10, 1984.

"Temporal Lobe Epilepsy", Connecticut Mental Health Center, New Haven, CT, January 12, 1984.

"Face Pain", Grand Rounds in Oral Surgery, Hospital of St. Raphael, New Haven, CT, March 13, 1984.

James R. Merikangas, M.D.　　　　　**Curriculum Vitae**　　　　　21

"Beta Blockers in Psychiatry", Connecticut Valley Hospital, Middletown, CT, April 11, 1984.

"On the Insanity Defense", University of Bridgeport School of Law, Bridgeport, CT, April 19, 1984.

"Altered Mental States and the Interface Between Neurology and Psychiatry", Griffin Hospital, Derby, CT, November 10, 1984.

"Distinguishing Neurologic and Psychiatric disease", Consultation Liaison Service, Yale-New Haven Hospital, New Haven, CT, December 18, 1984.

"Association Between Depression and Migraine", Annual Meeting of The Society for Epidemiologic Research, Chapel Hill, NC, June 20, 1985.

"Altered States", Consultation Liaison Service, Yale-New Haven Hospital, New Haven, CT, January 17, 1986.

"Anticonvulsants in Psychiatric Disorders", Jefferson Medical College, Philadelphia, PA April, 1986.

"Facial Pain", Residents in Oral and Maxillofacial Surgery, Hospital of St. Raphael, New Haven, CT, July 15, 1986.

"Seizures and Affective Disorder", Consultation Liaison Service, Yale-New Haven Hospital, New Haven, CT, July 25, 1986.

"Management of the Difficult Patient", Memorial Hospital, Meriden, CT, September 18, 1986.

"Psychological Consequences of Multiple Trauma", International Rehabilitation Associates, Inc., Berlin, CT, November 1986.

"Mental Status Examination", Consultation Liaison Service, Yale-New Haven Hospital, New Haven, CT, January 16, 1987.

"Altered States of Consciousness", Neuropsychiatric Rounds, Yale-New Haven Hospital, January 17, 1987.

"The Neuropsychiatric Work-Up", Consultation Liaison Service, Yale-New Haven Hospital, New Haven, CT, January 23, 1987.

"Blepharospasm", Connecticut Blepharospasm Support Group Annual Meeting, Southbury, CT, April 26, 1987.

James R. Merikangas, M.D.                **Curriculum Vitae**                22

"Neuropsychiatry on Death Row", Rhode Island Hospital, Brown University, Providence, RI, October 27, 1987.

"MRI, Thermography and Evoked Potentials in the Evaluation of Low Back Pain", International Rehabilitation Associates, November 17, 1987.

"Neuropsychiatric Manifestations of Migraine", Connecticut Valley Hospital, Middletown, CT, February 3, 1988.

"Advances in the Pharmacologic Treatment of Migraine", Collegium Internationale Neuro-Psychopharmacologicum, Munich, West Germany, August 16, 1988.

"Calcium Channel Blockers in MAO-I Induced Hypertensive Crisis", Collegium Internationale Neuro-Psychopharmacologicum, Munich, West Germany, August 17, 1988.

"A Review of Physical Diagnosis for Psychiatrists", American Psychiatric Association Annual Meeting, San Francisco, CA, May 8, 1989.

"Dangerous Headaches", Swiss Headache Society, Solothurn, Switzerland, December 2, 1989.

"Neuropsychiatry and the Violent Criminal", The Institute of Living, Hartford, CT, February 8, 1989.

"Medical Testimony in Malpractice Actions", Connecticut Trail Lawyers Association, New Haven, CT, April 1989.

"Objective Testing to Determine Rehabilitation Potential for Appropriate Therapy for Traumatic Brain Injury", Intracorp, Glastonbury, CT, May 24, 1989.

"Neuropsychiatry", CROSSTALK, Television broadcast, Channel 28, New Haven, CT, May 24, 1989.

"Medical Ethics and the Care of Children", University of Pennsylvania School of Nursing, Philadelphia, PA, December 5, 1989.

"Thermography", Trial Strategies Seminar, Travelers Insurance Company, Orlando, FL, February 14, 1990.

"Death Row Criminals", Breakthrough with Dr. Larkin, Radio broadcast, Pastoral Theological Institute, Hamden, CT, March 21, 1990.

"Alcoholism", Breakthrough with Dr. Larkin, Radio broadcast, Pastoral Theological Institute, Hamden, CT, March 21, 1990.

James R. Merikangas, M.D.                  **Curriculum Vitae**                           23

"A Review of Physical Diagnosis for Psychiatrists", American Psychiatric Association Annual Meeting, New York City, New York, May 13, 1990.

"A Practical Clinical Laboratory Guide for Psychiatrists", American Psychiatric Association Annual Meeting, New York City, NY, May 15, 1990.

"Neuropsychiatric Considerations and the Insanity Defense for Murder", Georgia Resource Center, Atlanta, GA, July 12, 1990.

"Painful Neuropathies", Bristol Hospital, Bristol, CT, January 29, 1991.

"Painful Neuropathies", Charlotte Hungerford Hospital, Torrington, CT, February 1, 1991.

"Behavioral Management for the TBI Client Via Pharmacological Intervention", New Medico Head Injury Systems, Meriden, CT, March 22, 1991.

"Children as Witnesses in Child Abuse Cases", Eyewitness News, WFSB Channel 3, April 29, 1991.

"A Review of Physical Diagnosis for Psychiatrists", American Psychiatric Association Annual Meeting, New Orleans, LA, May 14, 1991.

"Serial Killers", Eyewitness News, WFSB Channel 3, July 26, 1991.

"The Neuropsychiatric Evaluation of Violent Behavior", National Alliance for the Mentally Ill Children & Adolescent Network, Woodbridge, CT, November 13, 1991.

"Homicide Task Force", Eyewitness News, WFSB Channel 3, November 19, 1991.

"A Review of Physical Diagnosis for Psychiatrists", American Psychiatric Association Annual Meeting, Washington, DC, May 3, 1992.

"Evaluation and Treatment of Violent Youth", Community Action for the Mentally Ill Offender, Seattle, WA, May 28, 1992.

"Neuropsychiatric Evaluation of Juvenile Offenders", National Coalition for the Mentally Ill in the Criminal Justice System, Seattle, WA, May 28, 1992.

"The Phoenix Park Murders", James Joyce Symposium, Dublin, Ireland, June 18, 1992.

"The Neurological Basis for Violent Behavior: Children and Adults", National Alliance for the Mentally Ill National Meeting, Washington, DC, September 12, 1992.

"Who's on Death Row? Psychiatric Portraits", Violence in America Psychological and Sociological Perspectives, Washington, DC, October 16, 1992.

**JA3982**

James R. Merikangas, M.D.                **Curriculum Vitae**                24

"Radiology and Neurology Consultation", PGY II Integrated Psychopathology Course, Veterans Administration Hospital, West Haven, CT, February 18, 1993.

"Epilepsy", PGY II Integrated Psychopathology Course, Veterans Administration Hospital, West Haven, CT, February 22, 1993.

"Diagnostic Imaging", PGY II Integrated Psychopathology Course, Yale-New Haven Hospital, New Haven, CT, March 15, 1993.

"Epilepsy", PGY II Integrated Psychopathology Course, Yale-New Haven Hospital, March 22, 1993.

"A Review of Physical Diagnosis for Psychiatrists", American Psychiatric Association Annual Meeting, San Francisco, CA, May 23, 1993.

"Post Traumatic Headaches", Swiss Neurological Society, Flims, Switzerland, June 5, 1993.

"Pharmacotherapy of Traumatic Brain Injury in Children", American Academy of Child Psychiatry National Meeting, San Antonio, TX, October 28, 1993.

"Specialty Clinics in Child Psychiatry", American Academy of Child Psychiatry National Meeting, San Antonio, TX, October 28, 1993.

"Evaluation of the Violent Offender", Second International Conference on Treatment and Diversion of Mentally Disordered Offenders, Tempe, AZ, November 8, 1993.

"The Clinton Health Care Package", with Senator Joseph Crisco, Commissioner Donald Pogue and Professor Theodore Marmer. Public Service Cable Television broadcast, Seymour, CT, November 12, 1993.

"The Neurobiology of the Attention Deficit Disorder and Learning Disabled Brain", Children and Adults with Attention Deficit Disorders Support Organization, Berlin, CT, November 13, 1993.

"The Clinton Health Care Package – Part II", with Senator Joseph Crisco, Commissioner Donald Pogue, Professor Robert A. Burt and State Senator Kenneth Przybysz. Public Service Cable Television broadcast, Seymour, CT, January 24, 1994.

"A Review of Physical Diagnosis for Psychiatrists", American Psychiatric Association Annual Meeting, Philadelphia, PA, May 22, 1994.

"Pharmacotherapy of Traumatic Brain Injury in Children", American Psychiatric Association Annual Meeting, Philadelphia, PA, May 23, 1994.

**JA3983**

James R. Merikangas, M.D.    **Curriculum Vitae**    25

"SPECT, CT, MRI & EEG in Psychiatry", Yale University Psychiatric Residents, March 31, 1994.

"Anticonvulsants in Psychiatry", Yale University PGY III and PGY IV students, Veterans Administration Hospital, West Haven, CT, May 17, 1994.

"Preparing for a Career in Neuropsychiatry", American Psychiatric Association Annual Meeting, Miami, FL, May 24, 1995.

"Managed Care: The Psychiatrist and Neurologist in Private Practice", Department of Psychiatry, University Hospital, Bern, Switzerland, June 20, 1995.

"Mental Health Services to Youth Detained in Juvenile Justice Facilities", American Academy of Child and Adolescent Psychiatry Annual Meeting, New Orleans, LA, October 19, 1995.

"Vulnerability for Substance Abuse and Anxiety: A Family Study", American Academy of Child and Adolescent Psychiatry Annual Meeting, New Orleans, LA, October 21, 1995.

"Neuropsychiatric Evaluation of Death Row Criminals", University of Texas Medical Branch, Galveston, TX, January 31, 1995.

"Chronic Pain", Masonic Home and Hospital, Wallingford, CT, February 2, 1995.

"Swiss Psychiatry and the Mental Illness of Lucia Joyce", 15th Annual James Joyce Symposium, Zurich, Switzerland, June 21, 1996.

"Update on Headache", University of Massachusetts Medical Center, Worcester, MA, January 16, 1996.

"Medico-Legal Aspects of Headache Treatment", Headache Consortium of New England, Stowe, VT, March 2, 1996.

"Traumatic Brain Injuries and Its Consequences", Child Neurology and Psychiatry Conference, Vilnius, Lithuania, June 27, 1997.

"Behavioral Problems of Epileptics", Child Neurology and Psychiatry Conference, Vilnius, Lithuania, June 28, 1997.

"Neuromuscular Disorders", Child Neurology and Psychiatry Conference, Vilnius, Lithuania, June 29, 1997.

"Traumatic Brain Injury and Its Consequences", Child Neurology and Psychiatry Conference, Tartu, Estonia, July 1, 1997.

**JA3984**

James R. Merikangas, M.D.          **Curriculum Vitae**                    26

"Behavioral Problems in Epileptics", Child Neurology and Psychiatry Conference, Tartu, Estonia, July 2, 1997.

"Neuromuscular Disorders", Child Neurology and Psychiatry Conference, Tartu, Estonia, July 3, 1997.

"Serial Killers", Eye Witness News, WFSB News, Hartford, CT, July 18, 1997.

"Brain Abnormalities in Violent Criminals", Dateline NBC, July 20, 1997.

"Genetics of Crime", MSNBC, July 21, 1997.

"Cortical Stimulation and Response-Brain Behavior Relationships", Transcranial Magnetic Stimulation Conference, Interlaken, Switzerland, August 14, 1997.

"Mental Health Issues in Death Penalty Defense", National Institute for Trail Advocacy Meeting, Temple University School of Law, Philadelphia, PA, January 31, 1998.

"Mental Health Issues in Habeas Appeals", National Institute for Trail Advocacy Meeting, University of Texas School of Law, Austin, TX, June 27, 1998.

"James Joyce: Manic Genius and the Family Triangle", The Program for Humanities and Medicine, Yale University School of Medicine, May 7, 1998.

"Koskoff Inn of Court: Admissibility of Evidence: Porter and Daubert Decisions", Tyler, Cooper, and Alcorn, 205 Church Street, New Haven, CT, November 17, 1988.

"Introduction to the Multi-Axial System of DSM-IV", Federal Defender Training Group, Atlanta, GA, August 28, 1999.

"Personality Disorder Diagnosis", Fourth Annual National Habeus Corpus Seminar, Federal Defender Training Group, Atlanta, GA, August 28, 1999.

"Substance Abuse: A Medical Disease", Fourth Annual National Habeus Corpus Seminar, Federal Defender Training Group, Atlanta, GA, August 28, 1999.

"The Mental Illness of Lucia Joyce", Neurosciences and Psychiatry Congress of History, Joint Meeting of European Association for the History of Medicine, International Society for the History of the Neurosciences and European Club for the History of Neurology, Zurich, Switzerland, September 15, 1999.

"The Adolph Meyer Lecture: Crossing, Uncrossing, and Re-crossing of Neuropsychiatry in the USA", Neurosciences and Psychiatry Congress of History, Joint Meeting of European Association for the History of Medicine, International Society for the History of the Neurosciences and European Club for the History of Neurology, Zurich, Switzerland, September 16, 1999.

**JA3985**

James R. Merikangas, M.D.                 **Curriculum Vitae**                          27

"Representing a Death-Sentenced Client in Federal Post-Conviction Proceedings",
National Institute for Trial Advocacy Meeting, University of Houston Law Center,
Houston, TX. January 20-23, 2000.

"Representing a Death-Sentenced Client in Federal Post-Conviction Proceedings",
National Institute for Trial Advocacy Meeting, University of North Carolina School of
Law, Chapel Hill, NC, January 18-20, 2001.

"Understanding Forensic Mental Health Issues", National Defender Investigator
Association 2001 National Conference, Kansas City, MO, March 28, 2001.

"A New Look at Forensic Mental Health Issues, Missouri State Public Defender 2001
Capital Conference, Kansas City, MO. May 17, 2001.

"Understanding Forensic Mental Health Issues", National Defender Investigator
Association, Northeast Regional Conference, Philadelphia, PA, September 27, 2002.

"How the Brain Works", Third National Seminar on Mental Health in Criminal Law,
Atlanta, GA, November 2, 2002.

"Neuroscience of Music", Humanities in Medicine Series, Yale University School of
Medicine, New Haven, CT, March 20, 2003.

"Mental Health Issues in Criminal Defense", D.C. Association of Criminal Defense
Attorneys, Washington, DC, April 5, 2003.

"Applying Brain Imaging to Clinical Practice: A Master Clinician's View-Opening the
Mind – The Clinical Application of Brain SPECT Imaging in Psychiatry", University of
California Irvine College of Medicine and the Amen Clinics, Irvine, CA, May 3, 2003.

"Familial and Longitudinal Patterns of Comoborbidity of Migraine and Mental
Disorders", XXIV CINP Congress, The International Journal of
Neuropsychopharamacology, Paris, June 20-24, 2004

"Prosecutorial Misconduct in Capital Cases- Hubris, Arrogance and the Abuse of
Power", XXIXth International Congress on Law and Mental Health, Paris, France, July 8,
2005

"Neurodiagnosis of Child Murderers" and "US Supreme Court Revisits the Juvenile
Death Penalty" panel member, 36th Annual Meeting of American Academy of Psychiatry
and the Law, Montreal, PQ, Canada October 30, 2005.

"Brain Behavior and Cognition", National Seminar on the Development and Integration
of Mitigation Evidence, Washington D.C., April 1, 2006

**JA3986**

James R. Merikangas, M.D.                **Curriculum Vitae**                28

"Brain Imaging" and "Prosecutorial Misconduct", National Seminar on the Development and Integration of Mitigation Evidence, Washington D.C., March 30, 2007

"Migraine and Depression", Annual Meeting for American Academy of Clinical Psychiatrists, Washington D.C., March 31, 2007



# CAROLINAS MEDICAL CENTER

Carolinas HealthCare System       RADIOLOGICAL  SERVICES          (704) 355-2270

**Patient Name: UMANA, ALEJANDRO**       **MRN: 0005441139**    Accession #: 15026482
Patient Location: ,                      Patient Type:PRO    Visit #:   0931401921
**Exam:  8986, PET/CT  BRAIN IMAG**                 Completed: 11/12/09   4:06 pm

Clinical     |-- PET BRAIN -- DX COGNITIVE DECLINE, MIGRAINE HEADACHES, ABNORMAL NEURO EXAM, HX
Information: |-

Requesting Provider: NO,PVT CARE PHYSICIA, DEFAULT
               PO BOX 32861,
               CHARLOTTE, NC 28236

## FINAL  REPORT

DATE OF SERVICE: 11/12/2009 4:06:00 PM

EXAM: PET / CT Imaging Brain

HISTORY: Migraine headaches and cognitive decline. History of head
injuries.

TECHNIQUE: 83 minutes following intravenous administration 13.2 mCi
F-18 FDG, PET imaging from skull vertex to the skull base. CT
images in the same patient positioning for two purposes, attenuation
correction and anatomic reference for fusion with PET imaging.
Blood glucose 97 mg/dl prior to scanning.

FINDINGS:

There is mild decreased FDG uptake localizing to the bilateral
posterior frontal convexities, bilateral frontoparietal, bilateral
parietal, bilateral posterior parietal, bilateral parieto-occipital,
as well as bilateral anterior and posterior temporal and
temporoparietal regions. These areas of mild decreased FDG uptake
are somewhat heterogeneous, and some degree of asymmetry.

Normal uptake pattern within the bilateral frontal cortices. Normal
uptake pattern within the cerebellar cortices. Normal uptake
pattern within the deep gray structures.

There are no definite regions of abnormal increased uptake.

CT images reveal no evidence of subdural or epidural fluid
collections. No hydrocephalus. No space-occupying mass lesion.
Gray-white differentiation is preserved. No evidence of focal
encephalomalacia.

IMPRESSION:

CAROLINAS MEDICAL CENTER  1000 BLYTHE BLVD,  CHARLOTTE, NC  28203  (704) 355-2270
Patient Name: UMANA, ALEJANDRO              DOB: 11/25/1984    Age: 24 Y    Sex: M    *Page 1 of 2*



# CAROLINAS MEDICAL CENTER

Carolinas HealthCare System

## RADIOLOGICAL SERVICES

(704) 355-2270

---

**Patient Name: UMANA, ALEJANDRO**  
**Patient Location: ,**  
**Exam: 8986, PET/CT BRAIN IMAG**

**MRN: 0005441139**    Accession #: 15026482  
Patient Type:PRO    Visit #:  0931401921  
Completed: 11/12/09  4:06 pm

Clinical | -- PET BRAIN -- DX COGNITIVE DECLINE, MIGRAINE HEADACHES, ABNORMAL NEURO EXAM, HX
Information: | -

1. Mild, somewhat heterogeneous, and slightly asymmetric, regions of decreased FDG uptake involving the bilateral posterior frontal, frontoparietal, parietal, posterior parietal, parieto-occipital, anterior temporal, and temporoparietal regions. These findings can be seen in sequelae of traumatic brain injury, diffuse axonal injury, or secondary to a chronic headache disorder such as migraines.
2. No evidence of Frontotemporal Dementia.
3. No evidence of multi-infarct or vascular compromise.
3. No space-occupying mass on CT images. No subdural or epidural fluid collections.


Report ID: 1220626  
D: 11/13/2009 8:33:41 AM SC: 163  
Dictated by: Nirav Pravin Shah, MD


Transcribed By:  SpeechQ                    Friday, November 13, 2009  8:58:44AM  
Signed By:    NIRAV SHAH                    Friday, November 13, 2009  8:58:44AM

---

CAROLINAS MEDICAL CENTER  1000 BLYTHE BLVD,  CHARLOTTE, NC  28203  (704) 355-2270  
Patient Name: UMANA, ALEJANDRO                    DOB: 11/25/1984    Age: 24 Y    Sex: M    *Page 2 of 2*

Neuropsychiatric Evaluation                        November 17, 2009

Alejandro Umana
Date of Birth 11/25/1984
Date of examination 9/21/2009

Mr. Umana was examined at the Mecklenberg County Jail in Charlotte, North Carolina.  I was assisted by a Spanish-English translator for the interview.  I conducted a neurological physical examination and directed the performance of a CT scan (computerized tomogram) and a PET scan (Positron Emission Tomogram) which were accomplished at the Carolinas Medical Center on 11/12/2009.  Prior to my examination I reviewed medical, psychological, and social/family records including those of Ricardo Weinstein, PH.D., who examined Mr. Umana in July of this year.

Mr. Umana was born in Santa Ana, El Salvador during the ongoing civil war.  He had a chaotic childhood, having been illegitimate and left to be raised by his maternal grandmother.  He had a severe head injury when he was 3 or 4 following which he suffered severe headaches that have persisted to the present. He was held back in school and left school when he was 10 years old.

He had another head injury on 5/16/2007 in an automobile accident.  He was treated at Gwinnett Hospital in Lawrenceville, Georgia.  Records indicate he had head trauma and a scalp laceration which was sutured.

Neuropsychological testing by Dr. Weinstein disclosed a full scale I.Q. of 66 with a non-verbal I.Q. of 53 on the C-TONI.  Dr. Weinstein concluded that Mr. Umana had a generalized pattern of brain dysfunction with particular compromise to the frontal lobes and the left hemisphere of the brain.

My neurological examination revealed an alert young man with multiple tattoos. Head circumference was 58 ½ cm. His occipital hair swirl was clockwise and e had an additional swirl on his forehead.  His blood pressure was 140/80 with a pulse of 100. He had a scar on his left forehead. Gait, strength, coordination and tone were normal .Sensory examination showed reduced sensitivity to pin-prick on the left leg and hyperaesthesia on the left face. His deep tendon reflexes in the knees and ankles were abnormal with hyperreflexia and ankle clonus.  The cranial nerve examination was abnormal with the inability to close the left eye without simultaneously closing the right. Plantar responses were down going and palmomental reflexes were absent.

He described his headaches as being mainly on the right behind the forehead, pounding, and accompanied with nausea.  His vision is "cloudy" with the headaches and he sees

scintillating scotomata. He also has trouble with his hearing during a headache.  Because of the headaches being exacerbated by alcohol he does not drink. He does not use tobacco.

The PET scan of the brain was interpreted by Nirav Pravin Shah, M.D. at the Carolinas Medical Center.  His report, with which I agree, having personally reviewed the scans, reads as follows:
 "Mild, somewhat heterogeneous , and slightly asymmetric, regions of decreased FDG uptake involving the bilateral posterior frontal , frontoparietal, parietal, posterior parietal, parieto-occipital, anterior temporal, and temperoparietal regions  These findings can be seen as sequelae of traumatic brain injury, diffuse axonal injury, or secondary to a chronic headache disorder such as migraines."

CONCLUSION:

Alejandro Umana is a brain-damaged man with developmental cognitive impairments in the mentally retarded range.  He has an abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and an abnormal quantitative EEG.  These brain impairments, to a reasonable degree of medical probability, render his less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals.  These brain impairments stemming from early childhood are not his by choice, but are the result of environmental causes beyond his control.

James R. Merikangas, M.D.
Clinical Professor of Psychiatry and behavioral Neuroscience
The George Washington University School of Medicine

# Mild Mental Retardation
## (A.K.A. Mild Intellectual Disability)

**JA3992**

# Questions to Be Answered

- What is mental retardation?

- How do you diagnose mental retardation?

- What factors affect the diagnosis?

- Why is it hard to detect mild mental retardation?

- What are people with mild mental retardation capable of doing?

**JA3993**

# US SUPREME COURT DECISION: Atkins v. Virginia (2002)

- Mentally retarded people should not be executed because they have a reduced capacity for "reasoning, judgment and control of their impulses" even though they can generally distinguish right from wrong.

# Defining Mental Retardation

**JA3995**

# Diagnostic Criteria for Mental Retardation: American Psychiatric Association (2000)

A.   Significantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test.

B.   Concurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by the general culture) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.

C. The onset is before age 18 years.

**JA3996**

DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS
FOURTH EDITION
TEXT REVISION
DSM-IV-TR™
AMERICAN PSYCHIATRIC ASSOCIATION

# American Association on Mental Retardation (2002)

- Mental retardation is defined as a disability characterized by significant limitations in both:

- intellectual functioning and

- adaptive behavior as expressed in conceptual, social, and practical adaptive skills.

- This disability originates before age 18."

(AAMR, 2002, p. 1)



**JA3997**

# Causes of Mental Retardation

- Mental Retardation is associated with many causes:
  - Heredity (5%)
  - Chromosomal or prenatal toxins (30%)
  - Problems during pregnancy or delivery (10%)
  - Infections, trauma, or poisoning after birth (5%)
  - Environmental influences (15 – 20%)
  - Unknown: (30 – 40%)

# The Normal Curve



# 4 Levels of Intellectual Deficits







**JA4000**

# Mild Mental Retardation (DSM IV TR)

- This group constitutes the largest group (85%).
- Typically develop social and communication skills during the pre-school years (0-5 years old)
- Have minimal impairment in sensori-motor areas
- Often indistinguishable from children without MR until later childhood and may not be identified
- May acquire academic skills up to 6th grade level
- Usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under stress.
- With appropriate supports, can usually live successfully in the community, either independently or in supervised settings.

**JA4051**

10

# People with Mild Mental Retardation CAN–

- Have strengths and abilities
- Tell right from wrong
- *Try very hard to hide their disability*
- Look and act smart (e.g., "street smart")
- Have a varied, up-and-down IQ/adaptive behavior profile

**JA4002**

# ASSESSING PRONG 1

## Significant Deficits in Intellectual Functioning

# Diagnostic Criteria for Mental Retardation

*DSM-IV-TR:*

*Significantly subaverage intellectual <span style="color:magenta">functioning</span>: an IQ of approximately 70 or below on an individually administered IQ test.*

**AAMR:**

*The intellectual <span style="color:magenta">functioning</span> criterion for diagnosis of mental retardation is approximately two standard deviations below the mean, <u>considering the SEM</u> for the specific assessment instruments used and the instruments' strengths and limitations (page 58).*

**JA4004**

# ASSESSING PRONG 2

## Significant Deficits in Adaptive Functioning

**JA4005**

# Adaptive Behavior

- Adaptive behavior is the individual's performance in meeting the requirements of everyday life.

- People with mild mental retardation evidence <u>deficits</u> in adaptive behavior judged by their <u>typical</u> performance in community living.

**JA4006**

# Adaptive Behavior
## AAMR, 1992

- Communication
- Self-care
- Home living
- Social
- Community Use

- Self-direction
- Health & Safety
- Functional Academics
- Leisure
- Work

**JA4007**



**JA4008**

# Conceptual Skills:

- •Receptive and expressive language

- •Reading and writing

- •Money concepts

- •Self-direction

**JA4009**

# Social Skills:

- Interpersonal
- Responsibility
- Self-esteem
- Gullibility (likelihood of being tricked or manipulated)
- Naiveté
- Follows Rules
- Obeys laws
- Avoids victimizations

**JA4010**

# Practical Skills:

- Personal activities of daily living, such as eating, dressing, mobility, and toilet use.
- Instrumental activities of daily living, such as preparing meals, taking medication, using the telephone, managing money, using transportation and doing housekeeping activities.
- Occupational skills
- Maintaining a safe environment

**JA4011**

# Why it is difficult to measure adaptive behavior in MR

- People with MR can do many things.
- Assessment depends upon understanding that an individual's typical behavior goes beyond what can be observed in a formal testing situation.
- Adaptive deficits are not obvious in casual conversation or in structured environments, such as correctional facilities.
- Individuals do not have differences that are readily observed, such as gait, speech, or physical stigmata.

**JA4012**

# Assessment Should Include

- Standardized measure of adaptive behavior – preferably – more than one respondent;
- Interviews for corroborating information on adaptive behavior:
  - individuals who lived with the person – collateral information about skills/deficits;
  - individuals who interacted with the person in one or multiple contexts;
- Evaluation of records/files for indication of skills/deficits;
- In the case of adaptive behavior – the examiner's direct observation of the individual "performing" adaptive behavior is essentially non-productive.

(AAMR User's Guide, 2007)

**JA4013**

22

# Caveats

- Accepting self-report without additional probing is likely to lead to over estimation of abilities.

- Don't ask parents, family members, corrections officers, teachers, etc. if they think this person has "mental retardation" – lay people CANNOT diagnose MR.

- It's not because your expert is a licensed professional that he/she is competent to diagnose mental retardation => clinical judgment in MR.

**JA4014**

# Caveats

- Adaptive skills are measured in reference to meeting the demands of society – not prison.
- School Records: a "B" is not always a "B."

# Challenging Diagnostic Conditions and Situations

1. Individuals with MR in higher IQ ranges;
2. Retrospective diagnosis;
3. Situations in which formal assessment is less than optimal; and
4. Dual diagnosis.

American Association on Intellectual and Developmental Disabilities (2007). *User's guide: Mental retardation definition, classification, and systems of supports*. Washington, DC: Author.

**JA4016**

# Standard Derivation Of WAIS-III Scores For All Editions



| A | B | C |
|---|---|---|
| Total Raw Scores for Each Subscale | Transform Raw Score Totals to Standardized Subscale Scores | Transform the Sum of Subscale Scores Totals to IQ & Index Scores |

Figure 1



**JA4017**

# Optional Derivation Of IQ Scores For The WAIS-III Mexican Edition



A

Total Raw Scores for Each Subscale

B

Transform Raw Score Totals to Subscale Scores Using Norm Specific Tables

$C_1$ Mexican Norms

$C_2$ U.S.A. Norms*

Transform Subscale Scores Totals to IQ & Index Scores

*Used When Clinician Suspects IQ & Index Scores are Underestimates

**JA4018**

# Dr. Weinstein's Procedure To Calculate The IQ Scores for the WAIS-III Mexican Edition



Figure 3

JA4019







# CURRICULUM VITAE

# ENRIQUE M. SUAREZ

GOVERNMENT EXHIBIT A-2

## BUSINESS ADDRESS AND TELEPHONE
1450 Madruga Avenue, Suite 205, Coral Gables, Florida 33146
(305) 667-4101 (Office)
(305) 661-7222 (Fax)

## EDUCATION
Residency - V.A. Medical Center, Waco, Texas, 1975-1976
Internship - V.A. Medical Center, Waco, Texas, 1974-1975
Ph.D. - Baylor University, 1974
M.A. - Baylor University, 1973
B.A. - Boston University, 1971, Cum Laude
A.A. - Miami Dade College Junior-South Campus

## CERTIFICATIONS, LICENSURES AND MEMBERSHIPS
American Psychological Association
National Academy of Neuropsychology
State of Florida, License No. PY 2933 (Psychologist)
State of Texas, Certificate No. 1342 (Psychologist-License Retired in 1998)
State of Texas, License No. 1342 (Psychologist-License Retired in 1998)
National Register for Health Service Providers in Psychology (No. 41191)
Certificate of Professional Qualification in Psychology (No. 3302) issued by the Association of State
        and Provincial Psychology Boards
Vocational Rehabilitation Panel of Psychologists, State of Florida, Department of Health and
        Rehabilitative Services, Tallahassee, Florida
Panel of Physicians who may perform independent medical examinations, Florida Department of Labor
        & Employment Security, Division of Workers' Compensation
Expert Witness Panel for the Eleventh Judicial Circuit of Florida -Criminal Court
Examining Committee Member for the Eleventh Judicial Circuit of Florida -Probate Court

## HOSPITAL PRIVILEGES-MEDICAL STAFF
Baptist Health Doctors' Hospital of Coral Gables
University of Miami Hospital
GEO/Care South Florida Evaluation & Treatment Center

## HONORS, APPOINTMENTS & AFFILIATIONS
1969 Athlete of the Year Award, Miami Dade College-South Campus
Adjunct Faculty, University of Miami, School of Medicine, Department of Medicine
Guest Speaker, University of Miami School of Nursing Convocation Ceremony, December 19, 1985

## EMPLOYMENT HISTORY IN PSYCHOLOGY
December, 1988 to Present: Private practice in clinical, forensic and neuropsychology. Additional
Activities include providing clinical and corporate consulting services to major corporations.

January, 1981 to December, 1988: Founder, Executive Director, Mental Health Clinic. Activities
included developing and implementing psychological, chemical dependency, Employee Assistance and
management consultation services to government, the general public, private and public corporations
and health care facilities. Duties included: administrative and professional supervision over clinical,

Page 1

and health care facilities. Duties included: administrative and professional supervision over clinical, research and educational training. Professional activities included acquiring continuing education providership status with the American Psychological Association (APA) and the State of Florida Board of Nursing as well as Florida Department of Health and Rehabilitative Services certification as an outpatient drug and alcohol treatment and prevention center.

December, 1977 to May, 1981: Clinical Psychologist, Spinal Cord Injury Unit; Surgical wards and Intensive Care Unit. Duties included providing in and out-patient diagnostic clinical services (psychological and neuropsychological), stress and management consultation, research and clinical supervision of pre- and post-doctoral clinical and counseling psychology interns in medical, surgical, and rehabilitation rotation of APA approved internship program. Specialized programs included psychological screening of all spinal cord injured patients being considered for GU prosthetics and statistical consultation to Infection Control Department. V.A. Medical Center, Miami, Florida.

July, 1976 to December, 1977: Clinical Psychologist, Mental Hygiene Clinic, V.A. Outpatient Clinic. Duties included the assessment and treatment of psychiatric and neurological patients. Riviera Beach, Florida.

September, 1975 to May, 1976: Psychology Instructor, McLennan County Community College, Waco, Texas. Undergraduate courses in Introductory and Abnormal Psychology.

January, 1975 to July, 1976: Clinical Psychologist, V.A. Neuropsychiatric Hospital, Waco, Texas. Duties included evaluation and treatment of psychiatric and/or neurological in-patients. Director of the Neuropsychology Lab (Halstead-Reitan Battery) and the Psychophysiology Lab; supervision of two lab technicians as well as pre- and post-doctoral psychology interns from APA approved clinical and counseling graduate psychology programs.

January, 1974 to January, 1975: Internship in Clinical Psychology, V.A. Neuropsychiatric Hospital, Waco, Texas. Verner S. Baugh, Ph.D., ABPP, Psychology Training Director; Clifford Knape, Ph.D., Chief of Psychology Service. Duties included personality, intellectual, behavioral and neuropsychological assessment and evaluation; individual and group psychotherapy and biofeedback.

August, 1973 to May, 1974: Instructor, undergraduate experimental psychology lab, Department of Psychology, Baylor University, Waco, Texas.

May, 1973 to June, 1973: Instructor, undergraduate statistics and computer programing, Department of Psychology, Baylor University.

January, 1973 to May, 1973: Instructor, undergraduate neuroanatomy and stereotaxic laboratory course in Physiological Psychology, Department of Psychology, Baylor University.

August, 1971 to December, 1972: Graduate Research Assistant, and Instructor for Undergraduate Introductory Statistics Course, Department of Psychology, Baylor University.

## COMMITTEE EXPERIENCE
Hospital Committee on Equal Employment Opportunity (EEO), VA Medical Center, Waco, Texas.

Chairman, Vietnam Era Veterans Committee, VA Medical Center, Waco, Texas.

Hospital Committee for the Treatment of Spanish Speaking/Spanish Surnamed Veterans, VA Medical Center, Waco, Texas.
Psychology Training Committee (APA Approved Internship), VA Medical Center, Miami, Florida.
Page 2

JA4024

Psychology Training Committee (APA Approved Internship), VA Medical Center, Miami, Florida.

Psychology Staff Development and Continuing Education Committee, VA Medical Center, Miami, Florida.

Committee and Inspection Team for Controlled Substances, Alcoholics and Precious Metals, VA Medical Center, Miami, Florida.

Professional Library Committee Member, VA Medical Center, Miami, Florida.

Hospital Organizing Committee for the Palliative Care of the Terminally Ill, VA Medical Center, Miami, Florida.

## RESEARCH SKILLS

Experience in Psychophysiological Recording and Measurement in Biofeedback Laboratory at the Massachusettes Mental Health Center of Harvard University.

Experience with experimental design, statistical analyses, computer programing and the programing of electromechanical or solid state laboratory logic equipment.

Experience in the administration, interpretation and teaching of neuropsychological testing.

Research and teaching experience in surgical animal preparations for nervous system recording and ablation.

Basic histological procedures including electron microscopy.

Experience in psychophysiological measurement and recording, and equipment.

## SPECIALIZED EXPERIENCES

Independant Research in Biofeedback at the Massachusettes Mental Health Center of Harvard University under supervision of David Shapiro, Ph.D. and Bernard Turskey, Ph.D. Boston University Faculty Sponsor: Professor Robert Chin, Ph.D. 1970-1971

Independent Medical Examination Provider, Bell South Telecommunications, Inc. 1995 to 1997

Development and implementation of Employee Assistance Program for Eastern Airlines and Pan American Airways as it relates to DOT/FAA mandated drug testing program in the airline industry.

Federal Aviation Administration Flight Deck Admission Authorization (FAR 121.547 (c) (6)). Oct. 1989 to Dec. 1990 & June 11-22, 1990).

Aviation psychology consultant.  Experience includes fitness for duty and post-incident/accident psychological evaluations and debriefing of pilots & flight attendants.  Design & participation in psychological training module for airline captains ; training consultant for Flight Operations ground school & flight simulator training.  Training consultant for flight attendant training.  Crisis hotline & intervention for pilots and other employees during labor strike.

Inflight observation of cockpit crews on flight deck of major U.S. carriers as part of design and implementation of training programs for pilots involving stress, communication and leadership. Observation of FAA regulated airline simulator briefings, oral exams and check rides as part of design and implementation of training programs for check airmen. 1989 to 1992

Page 3

**JA4025**

Training in Executive Selection and Coaching. Training in the use of Personnel Decision International's Executive Success Profilor (ESP), and SHL's Occupational Personality Questionnaire (OPQ-32) with training programs for top senior level executives (i.e., CEO's).

Consultant to First Data Corporation 1999 - 2002
Consultant to Knight Ridder Corporation 1992 - 2003
Consultant to American Airlines 1992 - Present
Consultant to VITAS Hospice Care 1992 - 1995
Consultant to Ryder Corporation 1992 - 1995
Consultant to Pan American Airways 1988 - 1995
Consultant to Eastern Airlines 1989 - 1993

United States Civil Service Commission Training on Equal Employment Opportunity (EEO) legislation and counseling process. Dallas, Texas. June 30-2, 1975.

Designed and implemented management training program for Medical Administration Service, VA Medical Center, Miami, Florida. 1980.

Designed and implemented in-house stress management programs for the Surgical Intensive Care, Spinal Cord Injury, Hemodyalysis units as well as the Laboratory Service, Infection Control Nursing Team and Surgical Wards at the VA Medical Center, Miami, Florida, 1978-81.

Designed and implemented a 16 hour human relations in-service program for the professional and support staff (approximately 200) of the VA Outpatient Medical Center, Riviera Beach, Florida, 1978.

Designed and implemented 8 hour management workshop for the Tampa Bay Police Chiefs Association. October, 1987 (contact Robert Smith, Public Safety Administrator, City of Tampa).

Designed 4 hour management workshop for supervisory level sworn personnel and 40 hour human relations course for sworn Tampa Police Department personnel and their families (Contact: Detective Scott Cunningham, Tampa Police Academy).

## PUBLICATIONS, PAPERS AND PRESENTATIONS
Kirk, Roger E., Olmedo, Esteban L. and Suarez, Enrique M. Effects of environmental variation on arousal during vigilance performance. Perceptual and Motor Skills, 1973, 36, 1251-1272.

Suarez, Enrique M. The effect of cerebral cortical spreading depression on conditioned suppression in the albino rat. Unpublished Masters Thesis, Baylor University, 1973.

Barker, Lewis M., Suarez, Enrique M. and Gray, Don. Backward conditioning of taste aversion using cyclophosphamide (Cytoxin) as the US. Physiological Psychology, 1974, 2, 117-119.

Suarez, Enrique M. The effect of pre-conditioning exposures to the UCS (LiCl) on the subsequent establishment of a conditioned taste aversion. Doctoral Dissertation, Baylor University, 1974.

Suarez, E. M. and Barker, L. M. Effects of water deprivation and prior LiCl exposure in conditioned taste aversions. Physiology and Behavior, 1976, 17, 555-559.

Suarez, Enrique M. Paper presented at Baylor University Symposium on "Learning Mechanisms in Food Selection." Paper entitled: Water scheduling state dependent effects in a UCS preconditioning

Page 4

exposure taste aversion paradigm using LiCl and ETOH.  March 4-5, 1976.

Barker, Lewis M., Smith, James C. and Suarez, Enrique M. "Sickness" and the backward conditioning of taste aversions.  In Learning Mechanisms in Food Selection, Barker, L. M., Best, M. and Domjan, M. (Eds.), Baylor  University  Press,  1977.

Suarez, Enrique M.  Presentation entitled:  "The psychological rehabilitation of the neurologically impaired patient".  Florida State Association of Rehabilitation Nurses Meeting.  Fort Lauderdale, Florida.   April  27,  1979.

Suarez, Enrique M.  Paper presented at Mercy Hospital Post-Graduate Conference for Physicians entitled:  "Psychological counseling in the treatment of obesity".  Miami, Florida.  February 28, 1980.

Suarez, Enrique M.  Invited presentation entitled:  "Dis-ease' and the spread of disease".  Annual Florida Practitioners in Infection Control Conference.   Sanibel Island, Florida.   September 24-25, 1981.

Suarez, Enrique M.  Keynote Address at conference entitled:  "A Scientific Understanding of Mental Health".  Sponsored by the Department of Conferences, Continuing Education and Extension; Alcohol and Drug Abuse Counseling Education Program, School of Public Health, University of Minnesota, Minneapolis, Minnesota.   March 9-10, 1983.

Suarez, Enrique M.  Invited presentation of workshop:  "The Psychological Common Denominator of Culture".  Ninth Annual Meeting of Georgetown University's Society for Intercultural Education, Training and Research (SIETAR).  San Gimiagnano, Italy.  May 9-10, 1983.

Suarez, Enrique M.  The efficacy of a neo-cognitive approach to psychotherapy.  Paper presented at Hawaii Psychological Association Annual Convention.  Honolulu, Hawaii, 1985.
Suarez, Enrique M.  The intercultural dynamics of neo-cognitive psychotherapy.  Workshop presentation at Hawaii Psychological Association Annual Convention.  Honolulu, Hawaii, 1985.

Suarez, E. M., Mills, R. C. and Stewart, D.  Sanity, Insanity and Common Sense (2nd Edition).  New York:  Ballantine Books (Random House).  1987.

Suarez, Enrique M., Phelps, Janis L. and Blevens, James K.  Thought as agency:  A neo-cognitive view of an unrecognized dimension.  A paper presented at Division 24  Symposium:  Context of Agency.  95th Annual Convention of the American Psychological Association, Division 24, New York, New York, September 1, 1987.

Suarez, E. M.  Neo-cognitive psychotherapy:  Understanding the nature of thought is the essence of mental health.  Paper presented at a the 1987 Annual Convention of the Texas Psychological Association, San Antonio, Texas. November 6-7, 1987.

Suarez, E. M.  A neo-cognitive dimension.  The Counseling Psychologist.  April, 1988.

Suarez, E. M.  Neo-Cognitive Psychotherapy:  The temporal decontamination of therapy.  Paper presented at Division 24 and 32 sponsored symposium entitled:  Theoretical and Therapeutic Implications of Time and Temporality.  96th Annual Convention of the American Psychological Association, Atlanta, Georgia.  August, 1988.  (Tape of above presentation available from APA, Tape No. 63).

Page 5

**JA4027**

Suarez, C. A., Blandford, J. M., Suarez, E. M. and McMillin, R.D.  Limited incision cholecystectomy. Research Paper presented at the Southeast Surgical Congress Meeting, Tarpon Springs, Florida. January, 23-27, 1989.

Suarez, Enrique M.   Presentation at Mercy Hospital of Miami Post-Graduate Conference for Physicians entitled: "Psychological counseling in the treatment of obesity".  Miami, Florida.  May 20th, 1989.

Suarez, E. M.  What is stress: New concepts and treatments. Miami Medical Letter, 1988, 2, 3-6.

Suarez, E. M.  Parental attitudes toward children with behavior problems. Miami Medical Letter, 1989, 3, 3-6.

Suarez, E. M. One day seminar entitled "ALPA Stress Reduction Seminar" sponsored by the TWA Master Executive Council, Family Awareness Committee of the Airline Pilots Association (ALPA). St. Louis, Missouri.  June 15th, 1990.

Suarez, E. M. One day seminar presented at Jefferson College entitled  "The function of thought: the common denominators of damaging behaviors among our youth."  Hillsboro, Missouri.  June 18th, 1990.

Suarez, E. M.  Invited address to 21st Annual Chemical Dependency Conference, State of Minnesota, entitled "The evolution of addiction theory:  Converging on the 21st century".  Minneapolis, Minnesota. October, 1990.

Suarez, C. A., Blandford, J. M., Suarez, E. M., Ocariz-Monzon, H.B and Suarez, D.L. and McMillin, R.D., Limited incision cholecystectomy.  The Journal of the Florida Medical Association.  1992, 79, 459-463.

Suarez, E. M., The need for a basic psychological curriculum to augment CRM training. Proceedings of the Seventh International Symposium on Aviation Psychology. 1993, 2, 707-710. Ohio State University.

Suarez, E. M., The psychology of communication (Part I). American Airlines Airmail. 1994, 1, 16-17, 11-13.

Suarez, E. M. and Sumner, R., The psychology of communication (Part II). American Airlines Airmail. 1994, 2, 14-15.

Suarez, E. M. and Sumner, R., Safety, survival and communication. (Part III). American Airlines Airmail. 1994, 3, 14-17.

Suarez, E. M., The social psychology of winning and losing. Dade County Medical Association Miami Medicine. 1994, November, 11-13.

Suarez, E. M., Leadership: From The Inside Out. Manual for the Foundations of Effective Management Program. Manual and Program presentation for Worldwide Learning Services of Motorola Corporation. June, 1995.

Suarez, E. M., The Psychological Foundations of Communication and Conflict Resolution. Clear Dynamics, Inc. Manual and Program presentation to IBM Aviation Department.  February-March, 2003.

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 343 of 524

**JA4028**

Suarez, E. M., The Psychological Foundations of Communication and Conflict Resolution. Program presentation to TAG Aviation, May, 2004.

Page 7



GOVERNMENT EXHIBIT A-3

### *E. M. Suarez, Ph.D.*

Clinical, Forensic and Neuropsychology
Florida Lic. No. 2933
1450 Madruga Ave. Suite 205
Coral Gables, Florida 33146

Tel:(305) 667-4101                                    Fax:(305) 661-7222

## PSYCHOLOGICAL EVALUATION FOR MENTAL RETARDATION

**NAME:** Alejandro Umana
**D.O.B.:** 11/25/84
**DATES OF EVALUATION:** 9/28/09, 9/29/09 and 9/30/09
**PROCEDURES:** Interview, Mental Status Examination, Escala Intelligencia Wechsler Para Adultos-Third Edition (EIWA-III), Test of Nonverbal Intelligence-Third Edition (TONI-3), Individualized Spanish Spelling Test, Validity Indicator Profile (VIP), Test of Memory Malingering (TOMM), Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-2), Criminal Indictment, Transcripts of Mr. Umana's Statements to Police Investigators (12/12/07 and 4/23/08), Copies of Mr. Umana's Handwritten Letters and Accompanying Envelopes, Audio Recordings of Telephone Calls made by Mr. Umana (12/22/07 and 12/31/07), Medical and Administrative Records from the Mecklenburg County Jail, and Interview of Three Mecklenburg County Jail Officers
**DOCKET NO.:** 3:08CR134
**FACILITY:** Mecklenburg County Jail
**EXAMINER:** E. M. Suarez, Ph.D.

### INTRODUCTION

Alejandro Umana is a 24-year-old Hispanic male who was evaluated to determine if he meets the criteria for a diagnosis of mental retardation.

There are two main sources of guidance that impact the diagnosis of mental retardation: the book, Mental Retardation, published by the American Association on Intellectual and Developmental Disabilities (AAIDD; formerly the American Association on Mental Retardation) and the Diagnostic and Statistical Manual-Fourth Edition-Text Revision (DSM-IV-TR) published by the American Psychiatric Association (APA). In the DSM-IV, mental retardation is defined as a disorder with an onset before 18 years, that is characterized by "significantly subaverage intellectual functioning" and "concurrent deficits or impairments in present adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health and safety" (p 49). In the AAIDD publication, mental retardation is likewise defined as a disability originating before age 18, "characterized by

**JA4030**

Umana, Alejandro
Page 2 of 25

significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills" (P. 39).

At the outset of the evaluation, Mr. Umana was informed that the undersigned has been appointed to carry out the present evaluation on behalf of the United State Attorney's Office and that the results of the evaluation were not confidential and would be made available to his attorneys, the prosecutors and the Court.

**PERTINENT HISTORY**

Mr. Umana relates that he is a native of Santa Ana, El Salvador. He states that Santa Ana is approximately 50 kilometers from the San Salvador, the capital of El Salvador. He noted that his last name is actually Umaña and not Umana, but noted that here in this country they do not use the diacritical tilde over the letter N (also known as the "Spanish N"). He indicated that he entered this country illegally in 2004.

When asked about his journey from El Salvador to this country, Mr. Umana states that he came to this country on "October 26, 2004." He states that he was accompanied by "a friend." Mr. Umana states that he originated his journey to this country in Santa Ana on "September 26, 2004." He states that he began his journey to this country with $103.00 U.S. dollars and notes that he purposefully did not take any identifying documents (i.e., passport). However, he states that his father later sent him his identification card from El Salvador ("Documento Unico De Identidad"). He states that he also obtained an identification card issued by New York City. He states that these two identification documents were taken when he was arrested on the current charges. Mr. Umana relates that he began his journey in Santa Ana, El Salvador and traveled by bus to the border of El Salvador and Guatemala, where he crossed into Guatemala. Mr. Umana relates that he and his friend then traveled by bus to the border of Guatemala and Mexico. He states that he and his friend crossed into Mexico by swimming across the "Suchiate River." When asked how they were able to cross these borders without having passports, Mr. Umana states that the border between Guatemala from El Salvador is not well patrolled. Likewise, he states that the border between Guatemala and Mexico is also not very secure, and noted that there are Guatemalan women who cross the border daily to sell vegetables in Mexico. He states that he and his friend worked for a few days helping the women push their carts across the border. Mr. Umana noted that after crossing into Mexico they went to the city of Tapachula, where he and his friend were advised by people, who knew they were headed for the United States, that they should purchase medium chain cutters. He states that they next traveled through Mexico by freight trains. He states that they would open the freight cars by cutting the seals on the doors using the chain cutters that they bought in Tapachula. He states that it took them 26 days to travel to the U. S. border. He states that they crossed a river into the

Umana, Alejandro
Page 3 of 25

U.S. near the city of "Algodones" at approximately 3:00 PM and
went to a park in Yuma, Arizona, where he used a public telephone
to call a friend in El Salvador, who relayed information to a
contact in California. He states that they then crossed a freeway
before finding train tracks at approximately 9:00 PM. He states
that, sometime between 3:00 and 4:00 AM, he and his friend were
able to board a freight train and used the wire cutters to cut the
seal on the boxcar doors. He states that he and his friend
traveled from Arizona to San Diego, where they boarded another
freight train, on which they traveled to North Hollywood. He
states that once they were in Hollywood, they made a telephone
call to a friend in Los Angeles, who was to pick them up. He
states that they contacted their friend at 6:00 AM and they were
picked up at an agreed location, a supermarket, at approximately
6:00 PM. Mr. Umana states that they were given lodging in the
house of his friend's mother for 15 days. He states that he
quickly began looking for work, but was arrested when he
interfered with the arrest of one of his friends. He explained
that when he saw police hitting his friend, who is also an MS-13
gang member, he questioned why he was being hit, and that this led
to him being arrested as well. He states that he was handcuffed,
taken to a police station, strip searched, fingerprinted and
questioned. He states that he was released from custody sometime
between 12:00 and 1:00 AM and notes that he requested that police
drive him back to the neighborhood where he had been arrested.
When asked why he made this request, Mr. Umana explained that the
police station was more than 20 blocks from the neighborhood where
he had been arrested and that in order to walk back to the house
where he was staying it would require him to go through numerous
streets that were controlled by different gangs that were not
friendly to MS-13. He states that the police denied his request
and that he had to walk back to the house where he had been
staying.

In terms of his psychosocial history, Mr. Umana states that he is
oldest of two brothers and noted that he has a younger maternal
half-sister and a maternal half-brother. Mr. Umana states that his
parents are both in El Salvador. He states that he was raised by
both of his parents until they separated when he was seven months
old. He states that after his parents separated, he was raised by
his father and his paternal grandmother and great grandmother.
Mr. Umana denied any history of physical or sexual abuse during
his childhood upbringing. Mr. Umana relates that, although he has
never married, he has two sons, ages five and four, from two
nonmarital relationships. He states that his five-year-old son
resides with the mother in El Salvador, and that his four-year-old
son resides with the mother in Long Island, New York. He explained
that he had been in the relationship with the mother of his four-
year-old son since April of 2004. When asked if he has financially
supported his children, Mr. Umana states that after arriving in
this country, during periods when he was working, he has sent
approximately $100.00 per month to his five-year-old son's mother,

**JA4032**

Umana, Alejandro
Page 4 of 25

via his father. When asked how he sent the funds to El Salvador, Mr. Umana states that he would go to a "Western Union" and send a "moneygram." He states that when he was residing in New York, he would send money via the Commerce Bank. Mr. Umana relates that he was also providing some support for the mother of his four-year-old son, who is living with her mother in New York City. He noted that his girlfriend (the mother of his four-year-old son) has never worked and that he and her mother were her sole source of financial support.

When questioned about his educational and employment history, Mr. Umana relates that he discontinued his education after the 3rd grade. He describes himself as having made "5 to 6" grades in his academic classes and explained that students in El Savadoran schools are graded on a scale of "1 to 10." No educational records were available for review. When asked why he discontinued his education, Mr. Umana explained that he dropped out of school after the death of his great grandmother, who was his primary caretaker, and that there was no one to supervise him. When asked about his involvement in out of school activities, Mr. Umana contributed that as an adolescent and early teenager he played soccer. He states that his position was "volante" [midfielder] and noted that he was good enough to be chosen to travel to other nearby countries to play. However, he states that he needed to obtain travel papers (i.e., passport) and his family did not have the money to acquire the needed documentation. Mr. Umana states that he continued to play soccer with friends, noting that he owned soccer shoes ("Tacos"), and that they would sometimes hire a referee ("arbitro"), whom they would pay 30 Salvadoran Colones to officiate games. When asked what 30 colones would be equivalent to in U.S. currency, Mr. Umana responded that the rate of exchange was "8.75 colones" per 1.00 U.S. dollar. Mr. Umana also indicated that he became involved with the MS-13 gang in El Salvador, an association he continued until the time of his arrest. He contributed that he was arrested on three occasions while living in Los Angeles, and noted that one arrest was for possession of cocaine. Mr. Umana states that, while residing in El Salvador, he sold marijuana. He states that he tried to sell marijuana in Los Angeles, but was not to successful in this endeavor.

In terms of his employment history, Mr. Umana states that he began going to work with his father, who was a painter. Mr. Umana states that his first employment was on a part time basis by Tropigas Company. He states that his job was to help deliver propane gas tanks. He states that he worked for three months for Tropigas, but quit when they asked him to do extra cleaning chores, as well as deliveries. Mr. Umana states that, between the ages of 15 and 17, he worked on a part time basis delivering soft drinks for the local Coca Cola bottling company. Mr. Umana contributed that, although he did not have a driver's license, the driver of the delivery truck taught him to drive the truck, which had a manual transmission, when they were on roads where there was little

**JA4033**

Umana, Alejandro
Page 5 of 25

traffic. Mr. Umana states that he next worked for one month as a salesman at a tire store. He states that he quit this job because he could not make enough money. Mr. Umana states that he subsequently worked for a construction contractor, Carlos Aguirre, for two years. He states that during this approximately two-year time period, he worked on construction projects involving the building of houses and bridges. He states that after this job, he then worked again for the Coca Cola company for a brief time, after which time he resumed working for the construction contractor (Carlos Aguirre). He relates that, during approximately 18 months of this job, he was involved in the construction of five telecommunication transmission towers with their adjacent control houses where the electronic equipment is kept. Mr. Umana states that he left this employment to come to this country in 2004. Mr. Umana relates that, after arriving in Los Angeles he found a part-time job at a flower shipping company ("Flowers Express") for approximately one month, after which time, he left California to take his pregnant girlfriend, who had arrived two days earlier, to New York, where her mother resided. He states that they traveled by Greyhound bus and he states that he spent two months at his girlfriend's mother's home before returning to Los Angeles. He states that on his return, he worked for approximately two weeks in construction, digging ditches for the placement of plumbing pipes. He states that he then returned to New York City approximately one month before the birth of his son. Mr. Umana states that, when his wife went into labor, he took her to the Nassau County Hospital by taxi. He states that she was in the hospital for three days before being discharged. He states that he was involved in taking his son to the doctor for check-ups, vaccinations, and appointments when the child was ill. Mr. Umana states that he spent approximately one year in New York City. He states that he initially worked at a car wash for several weeks, but then obtained another job working for a roofing contractor. He states that he worked for the roofing contractor for approximately one year. He states that he was paid between $100.00 and $120.00 per day working as a roofer. When asked how he commuted to the work sites while he worked in New York, Mr. Umana states that the contractor who hired him would pick him and other workers up each morning at no charge. Mr. Umana relates that, although he never obtained a driver's license, he acquired two automobiles. He explained that his boss in New York gave him a 1996 Ford van. He states that the van had transmission problems, which he could not afford to have repaired, so he sold the automobile for $350.00. He states that in 2007, he obtained a 1984 Mercedes Benz automobile. He states that this car had an 8-cylinder engine, which consumed a great deal of gasoline and also had some mechanical problems. He states that, on two occasions, he used the car to take his wife and his son to appointments with the pediatrician. He states that he finally gave this car away to a friend because he could not afford the gasoline and the upkeep. He states that his friend offered to give him $200.00, but never gave him the money. Mr. Umana states that after the birth of his son, he began to travel

JA4034

Umana, Alejandro
Page 6 of 25

to Atlanta, Georgia, to work. He states that he made three separate trips to Atlanta, where he worked in construction. He states that there was a great deal of ongoing construction projects in Atlanta, making it easy for him to obtain employment. He states that he worked installing doors, windows, and wall ornaments. He states that he would make $200.00 to $385.00 per week. He noted that he would work until he had saved $500.00 to $1,000.00, so he could travel to New York to spend some time with his girlfriend and his son. He states that when he returned to Atlanta, the third time, he brought his girlfriend with him. When asked how he commuted to work when working in Atlanta Mr. Umana states that the contractors would pick workers up, but he notes that they had to pay a fee for the transportation. He states that after returning to New York City from Atlanta, he spent one to two weeks there and then traveled to Greensboro, North Carolina, where he worked painting and installing fencing. He states that he made only $300.00. He states that he was arrested in Greensboro on 8/6/07 for possession of drugs and spent 20 days in jail until his friends bailed him out on a $10,000.00 bond. He states that he was taken into custody on the current charges when he came to Charlotte to help a friend (a codefendant) who had been arrested. Mr. Umana denies ever receiving any disability income benefits or ever serving in the military.

When asked about how he managed such things as his accommodations, meals, laundry, and communication when he worked in Georgia and North Carolina, Mr. Umana states that he would sometimes stay in motels or share a room with other co-workers. He states that motel rooms would cost him approximately $130.00 per week. He states that he would wash his clothing by hand when he had no money to spare, but otherwise, he would go to a coin laundry to wash his clothes. Mr. Umana relates that when he had the ability to cook, he could make soups and combine whatever was available to make a meal. He states that he liked to eat breakfast at Burger King, McDonald's or Wendy's restaurants. He states that he would do his shopping for basic items at the 99 Cent Store, and his clothing at Clothing USA and second-hand clothing stores. He states that, with the exception of shoes, which he purchased at malls, he never shopped for clothing at regular retail stores. He states that he was able to purchase a radio and television set during the time he was working in New York City, In terms of communicating with others, Mr. Umana states that he utilized public telephones and cellular telephones. He states that while he was in New York he obtained a cellular telephone ("Boss Mobile Phone"). He notes that he had a cellular telephone when he was arrested in 2008.

When asked about his mental health history, Mr. Umana denied ever receiving any psychiatric treatment, including psychotropic medication. Mr. Umana denied ever experiencing any type of hallucination. He denied ever making any attempt to harm or kill himself. He denies experiencing the symptoms of a depressive or anxiety disorder. When asked about substance abuse, Mr. Umana

**JA4035**

Umana, Alejandro
Page 7 of 25

states that, at the age of 17, he began smoking marijuana on a daily basis. He notes that, at the age of 17, he also began consuming alcohol. He states that he discontinued drinking alcohol when he was 19, and he notes that he recalls being intoxicated on only two occasions. When asked if he has ever used cocaine, Mr. Umana states that he smoked a mixture of marijuana and cocaine on one occasion. He denies the use of the crack form of cocaine and hallucinogens. When asked if he ever used inhalants, Mr. Umana states that, on one occasion while en route to this country, he inhaled some paint thinner that was given to him by two adolescents who where riding in a freight boxcar. He explained that temperature was very cold that night and inhaling the thinner eased the sensation of being cold. Mr. Umana denies ever attending any type of substance abuse treatment program.

When asked about his general medical health, Mr. Umana contributed that he has suffered from periodic "migraine" headaches since the age of four or five. He later noted that, betwwen the ages of four and six, he fell and hit his head. He relates that during his headaches, he experiences hypersensitivity to light and sounds. He notes that smoking marijuana gave him some relief when he had headaches. When asked about his fall, he explained that, sometime between the ages of four and six, he climbed on top of a box in order to reach for a bottle of medicinal syrup from a cabinet. He states that he fell from the box and that the bottle of syrup broke. He states that he hit his head on part of the bottle and sustained a cut to the left side of his forehead. Mr. Umana denies any loss of consciousness as a result of his fall. He states that he was treated at the San Juan de Dios Hospital in Santa Ana, where his cut required 21 sutures to close, and then he was released. Mr. Umana reports sustaining a closed head injury in May of 2007, when he was involved in an automobile accident in Atlanta, Georgia. He states that his friend was driving and fell asleep, causing a head-on collision. Mr. Umana states that he experienced a 10 to 15 minute loss of consciousness, and sustained injuries to his left shoulder and experienced a loss of sensation in his legs. He states that he was taken to a hospital in Gwinnett County at about 8:00 PM, where he was treated and released sometime between 1:00 AM and 2:00 AM. Mr. Umana states that, since that time, he has experienced episodes where he loses sensation in his arms. Mr. Umana also informed the undersigned that, after his incarceration, he tested positive for tuberculosis and subsequently was prescribed medication to treat this condition. He states that he has also received "Tylenol" for his headaches, "amoxicillin" (an antibiotic), and "Ibuprofen" for dental pain, and a wisdom tooth extraction.

When asked about his current situation, Mr. Umana states that he has been charged with four counts of "homicides", two in Los Angeles, California, and two in Greensboro, North Carolina. He states that "there is a fifth, but they don't have any proof." He noted that he is being represented by "public defenders" who are

**JA4036**

Umana, Alejandro
Page 8 of 25

being paid by the "government." When asked about the seriousness
of his case, Mr. Umana responded that he is facing the "death
penalty", but noted that, "My attorneys said if I plead guilty, I
might get two life sentences." Mr. Umana explained that he knows
the individual who is accusing 26 MS-13 gang members, including
himself, of the murders. He states that he only talked with the
individual accusing him for approximately one hour. When asked
what he hopes will be the outcome of his legal proceedings, Mr.
Umana states that he would be willing to serve his time in a
"maximum security prison" in his country because he has family
there.

When asked about his adjustment and functioning in the jail
environment. Mr. Umana contributed that he has adjusted well to
the jail. When asked what problems he has encountered with the
criminal justice system in this country, Mr. Umana replied that he
believes that people are prejudiced against him due to his gang
affiliation and his tattoos. When asked about his daily life in
prison, Mr. Umana states that he wakes up at approximately 5:00
AM. He states that at 7:00 AM they have "head count". He notes
that he usually showers daily sometime between 9:00 AM and 11:00
PM. He states that he gets dressed and eats breakfast. He states
that he showers by himself and uses soap and shampoo. He states
that he brushes his teeth daily and trims his finger and toe nails
every few weeks. When asked if he engages in any routine to
maintain his physical fitness, Mr. Umana states that he usually
does push-ups in his cell. He states that his cell is too small
for him to do sit-ups. He states that he has played basketball "a
little", because he does not like this sport. He states that his
preferred sport is soccer. When asked whether he has played any
type of card games while in custody, he states that he has not,
but noted that he plays "Rummy, Poker, and Con Quien." He also
described playing the card game 21 (Blackjack). When asked if he
has maintained contact with others via written letters, Mr. Umana
states that he has corresponded in writing with other inmates in
the Mecklenburg County Jail. When asked if he has ever contacted
the Salvadoran Embassy or Consulate in writing, Mr. Umana denied
ever writing to either office. When asked about his use of the
telephone since being incarcerated, Mr. Umana responded that he
does not use the telephone regularly. He states that he has made
four to five calls since being incarcerated. He explained that he
has to make "collect" calls and notes that it costs approximately
$3.00 for a 5 to 10 minute call. He contributed that one of those
calls was to his girlfriend in New York. When questioned about his
finances, Mr. Umana responded that he has an account that he uses
to make purchases from the commissary. He states that the funds he
has received have come from his girlfriend in New York and the
Salvadoran Embassy. He states that his girlfriend deposited $70.00
into his account. He states that he does not recall how much the
Salvadoran Embassy contributed. Mr. Umana was then asked about his
commissary purchases. He states that in order to make purchases,
he is required to fill out a form in a computer kiosk that lists

**JA4037**

Umana, Alejandro
Page 9 of 25

the products. He states that he has to enter his inmate jail number to access his account and then specify the quantity of each product he wishes to purchase. Mr. Umana states that he believes he has a balance of 4 cents in his commissary account. When asked if he has ever been erroneously overcharged for products he has purchased from the commissary, Mr. Umana responded that he had not. However, he states that, on occasion, he had been fined $5.00 for rule infractions, which was deducted from his account. When asked about visitation, Mr. Umana states that, besides investigators and his attorneys, his only other visitors have been representatives of the Salvadoran Embassy, who visited him five to six months ago. He notes that he had asked his attorneys to contact the Salvadoran Embassy, but that he finally obtained the embassy telephone number from another inmate and called them. He states that an embassy representative called him one to two months before their visit. When asked about his religious/ spiritual needs, Mr. Umana states that he has become interested in studying Islam. He states that he has ordered a Koran.

The undersigned reviewed Mr. Umana's medical records from the Mecklenburg County Jail. The medical records indicate that Mr. Umana was booked into the jail on 7/14/08. During the time period that Mr. Umana has been incarcerated he has not been prescribed any psychotropic medications. He has been prescribed INH (Isoniazid; is a medication used in the treatment of tuberculosis), Amoxycillin (an antibiotic), Tylenol (an analgesic), Ibuprophen (a nonsteroidal analgesic medication), and Orabase Gel (an anesthetic paste with 20% benzocaine used to treat oral pain). A Health Evaluation (HE) form dated 8/23/08 indicates that Mr. Umana gave a history of having sustained head trauma, severe headaches, vertigo and dizziness, and dental problems. The HE form indicates that he has a healed head laceration, but notes that Mr. Umana denied any history of loss of consciousness. The HE form reflects that Mr. Umana has a third-grade education, was not taking any medications, and denied any history of having been treated with psychotropic medications. As far as his mental status, the HE form describes Mr. Umana as being oriented to person, place, and time, calm and cooperative, and exhibiting a normal affect. The HE form indicates that there were no delusions, hallucinations, suicidal thoughts, and no impairments in his memory, speech or ability to communicate. An entry dated 10/21/08 reflects that Mr. Umana had a positive tuberculosis test (PPD) and began treatment (INH) on 10/23/08 with scheduled monthly LFT's (liver function tests). The undersigned reviewed two Inmate Medical Request Forms (IMRF), dated 9/8/08 and 9/23/08, which were apparently written by Mr. Umana. The IMRF dated 9/8/08 notes, "One of my tooths is been bothering me alot and I wanted to get it pull out as soon as possible because I can't stand the pain." In the IMRF dated 9/23/08, Mr. Umana states, "I was prescribed pain pills but problems persists and I would like to get my tooth pulled because I am in extreme pain." A 9/17/08 entry in the Dental

JA4038

Umana, Alejandro
Page 10 of 25

Treatment Record quotes Mr. Umana as stating, "My tooth has a hole that I don't know how long. It has pain."

A notable entry on 5/6/09 reflects that on this date Mr. Umana refused his treatment INH treatment for tuberculosis. Through an interpreter Mr. Umana is noted to have complained of,

> H/A [headache], and nausea since he began medications. Symptoms getting worse. Medications last taken this past Friday. Requesting turkey to be removed from diet because he gets nausea at the smell of the meat.

A subsequent entry reflects that Mr. Umana was counseled regarding his refusal. The entry, also on 5/6/09, notes the following:

> Counseled patient on medical condition. Patient information on LTBI [latent tuberculosis infection] was given. Once informed that he only has a couple of months left for treatment, [patient] decided to continue medication.

A Periodic Health Assessment dated 7/25/09, notes that Mr. Umana states that he has had "constant H/A [headache] since he was a child from getting hit in the head." An entry on 8/19/09 notes the following:

> Pt [patient] states he has had h/a [headaches] for several yrs [years]. Pt [patient] states his h/a are assoc[iated] with photophobia, phonophobia, and/with occas[ional] emesis [vomiting]. Pt. states tylenol usu[ally] helps with his h/a.

Another entry involving Mr. Umana's complaint of headache notes the following: "Aware of s/s [symptoms] to report to medical. Also counseled on use of medication for h/a [headache] and not abusing medication risk of rebound h/a." According to the medical record, Mr. Umana has been prescribed significant amounts of various analgesics (up to 60 pills/capsules at a time) and he has been approved to "KOP" [keep on person]. There are no entries that suggest that Mr. Umana exhibited any confused or otherwise abnormal behavior, or that he has required any supports or assistance in order to function within the jail setting during this period of incarceration at the Mecklenburg County Jail.

**MENTAL STATUS EXAMINATION**
The defendant is a well-nourished Hispanic male with no obvious physical deformities or handicaps. His appearance is consistent with his stated age. He exhibits good hygiene and his attire is appropriate to the setting. He has noticeable tattoos on both arms, both eyelids, the upper bridge of his nose, and his left hand. On interview, Mr. Umana's speech is fluent and coherent. He

JA4039

Umana, Alejandro
Page 11 of 25

was pleasant, cooperative and nonguarded in his responses to
questions. Mr. Umana is alert and oriented to person, place, time
and situation. When asked to describe his present mental state,
Mr. Umana responded, "Pensive with regards to what is happening to
me in my case." His mood is calm and relaxed and he displayed
appropriate affect. His psychomotor activity level was within
normal limits. There were no gross perceptual, motor, memory or
intellectual deficits noted or reported. Mr. Umana does not
exhibit any bizarre behaviors or motor disturbances. He denies
experiencing hallucinations and he did not show any signs of
responding to internal stimuli at any time during the evaluation.
His thinking is well organized and goal directed, and there are no
delusions noted or elicited. Mr. Umana's reality testing ability
is adequate. He reports sleeping approximately three hours per
night and six hours during the day. He noted that this sleep
pattern "is normal for me." He describes his appetite as "normal."
Mr. Umana denies any harmful ideation for self or others. The
above mental status findings were consistent for both face to face
evaluation sessions (9/29/09 and 9/30/09).

A review of the administrative records from the Mecklenburg County
Jail reveals that, in the time period between 7/20/08 and 5/24/09,
Mr. Umana has been involved in ten (10) incidents, some of which
have resulted his being placed in disciplinary confinement. The
incident reports note the following:

1.    On July 20, 2008 at approximately 2155 Sgt Hammacher and
      escorts Fortin and Wheatley were called to pod 3300 for
      inmate Umana, Alejandro Enrique PID # 362221 a (Federal
      Inmate) walked behind the "Officer's podium" and when
      questioned by the Pod supervisor Culpepper, Inmate Umana
      got up in the Officer's face in an aggressive manner.
      "Upon our arrival, Inmate Umana refused to comply to my
      commands to turn around to be handcuffed as officer
      Fortin began to place handcuffs on the inmate, he pulled
      away in an aggressive manner towards Officer Wheatly. I
      took hold of the Inmates right arm and escorted him out
      of the pod." This was witnessed by Captain D. Smith.
      Inmate Umana was cleared by the medical Nurse Renfro and
      was assigned to Pod 5800-46 by Classification. The
      inmate violated the following rules: Category A#11
      Threatening Staff and Category B#19 Failure to obey and
      follow orders.

      On July 21, 2009 Inmate Umana stated the following to
      Investigator McCray: "The officer was being very
      disrespectful towards the Latinos in there. It made me
      mad. I did cross the red line and got into the officers
      face. The officer seemed not to like Latinos." Inmate
      Umana was found guilty and received 30 days in DDU.

Umana, Alejandro
Page 12 of 25

2.  I [Officer M. A. Pearson] was assigned to duties as pod supervisor in pod 6300. At approximately 1235, on September 1, 2008 I was conducting lunch roll. The following inmates were warned several times (in English and Spanish), after the pod was given an hour of lock down time for talking, to stop talking but continued to do so: [6 inmates] and Umana, Alejandro #362221. I am requesting that their visits be taken for one week (9/2-9/8). Sgt. Angello was notified of the incident. Sanction was approved.

3.  I [Officer M. Chong] was assigned the duties as Pod Supervisor of pod 6300. At approximately 2200 on 11 September 2008 while conducting a Pod tour on the Second level showers, I noticed Inmate Umana, Alejandro PID#362221 shaving. Inmate Umana was not issued a razor because he was not on the Razor Log list. Inmate Umana was using Inmate Hernandez, Daniel PID#364625 razor. I instructed both inmates to go to their cells. Inmate Hernandez returned the razor. I request that both inmates visits be taken. Sgt. J. Sartin was notified of the incident. The sanction was approved. Both inmates will lose [their] visits from 9/12-9/18/08.

4.  I [Officer L. A. Goodman] was assigned the duties as pod supervisor of pod 6300. At approximately 2253 on 21 September 2008, while conducting a pod tour D/O Allen noticed that there [were] several bags of soup in the upper level restroom. I immediately went up to the restroom to remove the soups. However, one inmate came out of his room and ran towards D/O Allen. I advised him along with her to go back to his cell. I immediately called for all available escorts. The whole pod has been noncompliant with pod rules and regulations. I advised them in my pod orientation that the pod would be on lockdown until razors have been completed. At approximately 2210, I instructed the inmates on the floor to get [their] bunks because I still had razors to distribute. The inmates began kicking and banging on the cell doors and using profanity. Inmate [name] and Inmate Umana, Alejandro PID#362221 continued to kick, bang, and use profanity while the Captains, Sergeants, and other escorts were in the pod. Inmate Umana had MS-13 Graffiti in his possession which will be forwarded to STGU [Security Threat Group Unit]. They were escorted out of the pod by D/O D. Gladden, D/O A. Sanders, and D/O R. Simpson and placed in the hallway holding cell.

5.  On 18 October 2008, I [Officer H. N. Thomas] was the Pod Supervisor for Pod 5600. The following inmates refused their breakfast meal: [3 inmates] and Umana, Alejandro #362221.

**JA4041**

Umana, Alejandro
Page 13 of 25

6.  I [Officer T. P. Williams] was assigned the duties of
    14-Man Squad member on 31 December 2008. At
    approximately 0903, while conducting a mass shakedown of
    the pod the following inmates refused to stay of[f] of
    their cell windows after being told. These inmates are:
    [6 inmates] and Umana, Alejandro #362221. I am
    recommending that these inmates be lockdown 2 hours
    after lunch. Sgt. Booth will be notified. Sgt. Booth
    spoke to those involved, concur with lockdowns.

7.  I [Officer C. L. Smith] was assigned the duties of
    movement control officer 402 on 3 January 2009. At about
    1000 hours while conducting Saturday Pod inspection in
    pod 3900. I noticed that Inmate Umana, Alejandro
    PID#362221 had a torn bed sheet. Inmate Umana will be
    charged for the replacement of one bed sheet. Sergeant
    J. Street notified of incident. Inmate given a copy of
    the replacement cost sheet.

8.  I [Officer S. N. Flint] was assigned the duties as pod
    supervisor for pod 3900. At approximately 1100 hours on
    22 February 2009 I conducted a pod tour. During my pod
    tour I heard talking in the TV area, I told the Inmates
    in that area that they needed to stop talking. Inmates
    did not comply so they were told once again. When the
    Inmates did not comply after the second time they were
    told the TV would be shut off. At which time Inmate
    Umana, Alejandro PID#362221 replied "GOOD." When I shut
    the TV off Inmate Umana began yelling at me in
    [S]panish. I told Inmate Umana to go to his cell. Inmate
    continued to yell on his way up the stairs and began to
    disrupt the pod. I told him to go to the sliders. Inmate
    continued to yell and call me a "pu-ta." The pod became
    loud so I put Inmate in the sliders to be picked up by
    movement control. Inmate Umana apologized for his
    actions, he will be locked down in his cell for the rest
    of the shift. Sgt. Houpe was notified of the incident.
    Inmate locked down in room for four hours.

9.  I [[Officer E. Ross] was assigned the duties as pod
    supervisor of pod 3900. At approximately 1447, on 18
    April 2009, while sitting at the officers podium with
    officer Sage, I observed inmate Umana, Alejandro
    PID#362221 strike inmate [name] with a closed fist in
    the facial area while on the recreation yard. I called
    "10-40" (fight in progress) via radio, third floor
    movement entered the pod. Officer Sage handcuffed inmate
    Umana and escorted him out of the pod and Officer
    Ciaccia handcuffed inmate [name] and escorted the
    inmates out of the pod. Sgt. Talford was notified of the

**JA4042**

Umana, Alejandro
Page 14 of 25

incident due to responding. Nurse Joy cleared both inmates for single cell confinement. Both inmates sent to single cell confinement. Inmate Umana made a statement on 4/21/09 to Investigator McCray, "I was fighting. I hit him first." Inmate Umana was found guilty of Physical Assault on Staff/Inmate and Interfere/Obstruct Performance and received 15 days in DDU.

10. On Sunday 24 May 2009, I [Officer R. A. Rose] was assigned the duties as Pod Supervisor for Pod 3600. At approximately 2035 hours while Officer Harrell and I were conducting a pat down and cell search on Inmate Umana, Alejandro PID#362221 housed in cell 52, I found a purple cigarette lighter hidden in Inmate Umana's groin area. I asked Inmate Umana where he got the lighter, he stated "I got it from another inmate that left the pod." Inmate Umana [will] be cited for a rule violation. Sgt. Sawyer was notified. Inmate Umana was cleared by Nurse Shankle and transferred to Single Cell Confinement pending hearing.

Jail library records reflect that on two occasions, Mr. Umana has checked out the book, Ingles En 10 Minutos Al Dia (English In 10 Minutes Per Day).

## TESTS ADMINISTERED
As part of the evaluation, Mr. Umana was administered the Escala Intelligencia Wechsler Para Adultos-Third Edition (EIWA-III), Test of Nonverbal Intelligence-Third Edition (TONI-3), Individualized Spanish Spelling Test, Validity Indicator Profile (VIP), Memory Fifteen Item Test (MFIT), Test of Memory Malingering (TOMM), and Minnesota Multiphasic Personality Inventory-Second Edition (MMPI-2). The MMPI-2 was administered in Spanish using an audio cassette player, but Mr. Umana was also provided with the Spanish version of the MMPI-2 item booklet.

## Test Results
The Escala Intelligencia Wechsler Para Adultos-Third Edition (EIWA-III) is a Spanish translated version of the Wechsler Adult Intelligence Test-Third Edition (WAIS-III) that was standardized and normed on the Puerto Rican population. Based on his performance on the EIWA-III, Mr. Umana obtained a Full Scale I.Q. score of 93 (32nd percentile; 95th % Confidence Interval=89-97) which places him in the Average range when compared to individuals in his age range. He achieved a Verbal I.Q. of 95 (Average range; 37th percentile; 95th % Confidence Interval=90-100) and a Performance I.Q. of 93 (Average range; 32nd percentile; 95th % Confidence Interval=89-97). His subtest scaled scores, corresponding percentile rankings and qualitative descriptors are as follows:

JA4043

Umana, Alejandro
Page 15 of 25

| Verbal Subtests | Scaled Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| Vocabulary | 7 | 16 | Low Average |
| Similarities | 8 | 25 | Average |
| Arithmetic | 11 | 63 | Average |
| Digit Span | 10 | 50 | Average |
| Information | 9 | 37 | Average |
| Comprehension | 10 | 50 | Average |
| **Performance Subtests** | | | |
| Picture Completion. | 11 | 63 | Average |
| Digit Symbol | 8 | 25 | Average |
| Block Design | 10 | 50 | Average |
| Matrix Reasoning | 7 | 16 | Low Average |
| Picture Arrangement | 9 | 37 | Average |

The two point difference between Mr. Umana's Verbal and Performance IQ scores is not significant, suggesting an equal development of his verbal and perceptual-spatial motor abilities.

On the Verbal portion of the EIWA-III, Mr. Umana scored in the Average range on the following subtests: Similarities, which measures the ability to utilize previously learned information and apply it in abstract reasoning; Arithmetic, which measures numerical reasoning; Digit Span, which is a measure of his attention, concentration and short-term numerical memory; Information, which measures the culturally acquired fund of general information; and Comprehension, which is a measure of social judgment and conventionality, and involves problem solving using socially acquired information. He scored in the Low Average range on Vocabulary, which measures his recognition and understanding of words.

On the Performance portion of the EIWA-III, Mr. Umana scored in the Average range on the following subtests: Picture Completion, which measures visual discrimination; Digit Symbol, which measures the ability to integrate visual information processing with graphomotor speed; Block Design, which measures the ability to integrate visual organization with the reproductive aspects of visual motor coordination; and Picture Arrangement, which involves sequential reasoning and concept formation utilizing visual information. He scored in the Low Average range on Matrix Reasoning, which measures abstract reasoning, concept formation and problem solving utilizing visual information.

Based on the DSM-IV-TR and AAIDD diagnostic criteria noted at the beginning of this report, Mr. Umana's Full Scale Score of 93 is not sufficiently low for him to be diagnosed with mental retardation. Moreover, based on his performance on symptom validity testing (see below), his score on the EIWA-III may represent an underestimate of his ability.

Umana, Alejandro
Page 16 of 25

On the Test of Nonverbal Intelligence-Third Edition (TONI-3), which measures abstract reasoning and problem solving using nonverbal visual stimuli, Mr. Umana obtained an IQ score of 85 (Low Average range; 16th Percentile; 95% Confidence Interval = 77-93). Mr. Umana's score suggests that he is functioning in the Low Average range of Intelligence as measured by the TONI-3. As was the case with his EIWA-III scores, symptom validity testing (see below) suggests that his TONI-3 test score may be an underestimate of his actual ability. Moreover, his score on the TONI-3 is not sufficiently low for him to be diagnosed as being mentally retarded.

Finally, Mr. Umana was administered a spelling test comprised of a sample of words taken from letters he has written. The words were presented to him in a format in which each word was read to him, the word was then used in a simple sentence, and then the word was repeated once again, after which he was asked to write the word on an answer sheet. Fifty one (51) words, which he spelled correctly, were chosen from letters which Mr. Umana wrote in the time period during which he has been incarcerated. Of the 51 words, Mr. Umana was able to correctly spell/write all 51 words.

## Symptom Validity Tests Administered
A valid neurocognitive assessment is predicated on the assumption that the test taker is motivated to provide his or her best effort on the various psychological and neurocognitive tasks such as intelligence tests. In the criminal forensic arena this is not a plausible assumption to make, due to the potentially negative consequences of doing well on tests which measure psychological or cognitive functioning. Moreover, psychological tests that are used to measure cognitive functioning (i.e., intelligence) do not have built-in measures of honesty or effort. Thus, two symptom validity tests were utilized in the present evaluation: the Test of Memory Malingering (TOMM) and the Validity Indicator Profile (VIP). The TOMM is an objective measure of memory malingering, and the VIP is an objective measures of effort and malingering of impairments in the realms of cognitive functioning (i.e., non-verbal reasoning). Because the VIP is sensitive to low or insufficient effort or malingering of neurocognitive impairments in the nonverbal reasoning domain, it makes it a particularly good validity indicator for concurrently administered tests of intellectual and cognitive ability. When symptom validity tests indicate invalidity, concurrently administered tests are probably underestimates of the test-taker's ability.

## Symptom Validity Test Result
Mr. Umana's scores (48 out of 50, 50 out of 50, and 50 out of 50 correct answers) on the three trials of the TOMM fall well within expected values, suggesting that he intended to respond correctly on this measure of symptom validity.

Umana, Alejandro
Page 17 of 25

Mr. Umana's responses to the VIP were scored by Pearson
Assessments, which generated an interpretive report on which this
report is partially based. Mr. Umana's performance on the VIP was
categorized as "invalid" for both the Nonverbal and the Verbal
subtests. In describing Mr. Umana's performance, the VIP Pearson
Assessments narrative report notes the following:

> In conclusion, this individual's performance should be
> considered invalid. His Performance Curve
> characteristics indicate that he intended to do well on
> at least some of the items, but his performance was
> sufficiently inconsistent to warrant concern. His total
> scores are probably lower than they would have been with
> better effort. Such inconsistent responding can result
> from many factors, the most probable of which is an
> insufficient effort to do well. Occasionally, however,
> Performance Curve that are classified as inconsistent
> can result from an individual's deliberate attempt to do
> poorly but not poorly enough to be classified as
> Suppressed or Irrelevant. A careful evaluation of how he
> approached the testing session is critical to determine
> if it would be useful to interpret any tests that were
> administered concurrently.

The results of the VIP test suggest that Mr. Umana's scores on
concurrently administered cognitive tests (EIWA-III and TONI-3)
may be underestimates of his actual abilities. In other words, it
is highly probable that Mr. Umana's performance on the VIP
exemplifies his overall approach to the current evaluation.

**Psychological Adjustment**
Mr. Umana's responses on the Minnesota Multiphasic Personality
Inventory-Second Edition (MMPI-2) were scored by the Pearson
Assessment service, which generated a Pre-trial Criminal
Interpretive Report for Forensic settings. Mr. Umana's responses
produced a clearly invalid profile (T-scores; VRIN=54, TRIN=65T,
L=52, F=107, Fb=116, Fp=84, K=33, S=38, F-K=16) characterized by
extreme exaggeration, in which he endorsed a wide variety of rare
and extreme symptoms. The Pearson Assessment narrative report
notes the following concerning Mr. Umana's profile validity:

> He responded to the MMPI-2 items in an exaggerated
> manner, endorsing a wide variety of symptoms and
> attitudes. These results may stem from a number of
> factors, including indiscriminantly claiming extreme
> psychological problems, low reading level, a "plea for
> help", or severe psychological deterioration or
> psychosis. His responses were probably not random
> because he was consistent in his item responses. The
> resulting MMPI-2 profile is not likely to be a valid
> indication of his personality and symptoms. The
> interpreter is cautioned against making clinical or

JA4046

Umana, Alejandro
Page 18 of 25

> administrative decisions on the basis of this MMPI-2
> protocol without determining the reasons for the extreme
> responding.

Of these four hypotheses, the most probable is that Mr. Umana is
indiscriminantly claiming extreme psychological problems in an
attempt to appear psychologically disturbed. A clinical profile is
not provided by the Pearson Assessment service due to the
invalidity of Mr. Umana's protocol.

### Adaptive Functioning

As noted at the beginning of this report, both the DSM-IV and the
AAIDD definitions of mental retardation require that, in addition
to significant impairment in intellectual functioning, the
individual must exhibit impairments in adaptive behavior. The
American Association on Intellectual and Developmental
Disabilities (AAIDD) notes that, "Adaptive behavior is the
collection of conceptual, social, and practical skills that have
been learned by people in order to function in their everyday
lives" (Mental Retardation, 2002, AAMR, P.73). The AAIDD also
stresses that,

> adaptive behavior must be examined in the context of
> the individual's own culture that may influence
> opportunities, motivation, and performance of adaptive
> skills.

It should be noted that adaptive behavior involves behavioral
skills that are performed by approximately 98 percent of the
population on a daily basis beginning in childhood and are so
basic to everyday life that they are completely taken for granted.
Such behaviors involve showering, shaving, brushing one's teeth,
dressing oneself, putting on one's shoes on the correct foot,
preparing and eating meals, purchasing food, clothing, soap and
toothpaste, managing money, acquiring housing, maintaining
employment, being able to travel within the community, utilizing
public resources such as transportation, libraries, assistance,
and recreational areas, obtaining needed medical assistance,
interacting and maintaining  social relationships with family,
coworkers, or acquaintances, and managing available financial
resources. In other words, sophisticated or technical skill sets
(e.g., acquiring a driver's license, driving an automobile, having
the ability to write creatively, do technical work, solve mildly
complex arithmetic computations, having an extensive vocabulary,
or possessing the degree of social competence required for dealing
with the public in an employment setting) involve levels of
adaptive behavior that exceed the standards required to function
independently in everyday life. Therefore, anyone who functions
independently in everyday life is not impaired in his or her
adaptive behavior. Indeed, as noted in the User's Guide: Mental
Retardation (2007, AAIDD, P.24-25),

JA4047

Umana, Alejandro
Page 19 of 25

> To meet the requirements for significant limitations in
> adaptive behavior, a person's intellectual impairment
> must have produced real-world disabling effects in
> his/her life. The purpose of this component is to ensure
> that the individual is not merely a poor test-taker, but
> rather is a truly disabled individual in everyday life
> functioning.

Similarly, the AAIDD has noted,

> If MR [mental retardation] is real, then it must be
> grounded in the demonstrated incompetencies, needs, and
> vulnerabilities that cause individuals as needing
> supports and protections. (Mental Retardation, 2002,
> AAMR [AAIDD], P.33).

Mr. Umana's adaptive functioning was assessed using self-report
information obtained during his present interview (see above) and
reviewing collateral sources of information (see first page of
report), all of which reflect in detail the range and scope of
Mr. Umana's adaptive behavior skills prior to his arrest and
during his subsequent incarceration. Additionally, the undersigned
interviewed three corrections officers from the Mecklenburg County
Jail, who are familiar with Mr. Umana. Officers D. McIntyre, M.
Farley, and C. Holly were each interviewed independently in the
conference room of the administrative offices of the Mecklenburg
County Jail on 9/28/09.

**Officer D. McIntyre**
Ofc. McIntyre states that he has been with the Mecklenburg County
Sheriff's Office for 2 1/2 to 3 years. He relates that he has
known Mr. Umana for six months. He states that Mr. Umana was
initially in the general population of the jail, but was then
moved to the Protective Custody Unit (Unit 5630). He noted that
this unit is where inmates are housed when they are going to
testify against others and would be in danger of being harmed by
other inmates. Ofc. McIntyre states Mr. Umana has been in the
Protective Custody Unit for one month. Ofc. McIntyre states that
Mr. Umana does not speak a lot of English, but he does speak
phrases. For example, "Can I watch television?", "Can I come out?"
or "What time is it?" Ofc. McIntyre states that, when he saw Mr.
Umana in 5640 Unit he appeared to have a gang affiliation,
specifically, MS 13. He notes that while Mr. Umana was being
housed in the general population he mingled with other Hispanic
inmates without any noticeable problems. Ofc. McIntyre states that
since being transferred to the protective custody unit (5630), he
noted that Mr. Umana slept a lot or watched television with
another inmate (there were only two inmates in the unit). When
asked about Mr. Umana's daily adaptive behavior functioning in the
jail, Ofc. McIntyre states that Mr. Umana has not exhibited any

JA4048

Umana, Alejandro
Page 20 of 25

difficulty in any area of functioning. He states that Mr. Umana
routinely requests to shower regularly and is well groomed. He
eats and returns his tray, dresses himself and turns in his
clothing for laundering. Ofc. McIntyre relates that Mr. Umana
keeps his cell clean and asks for cleaning supplies with which to
clean the window, cell, desk area, toilet, and sink. Ofc. McIntyre
states that he has not seen anything that would suggest that Mr.
Umana cannot do these duties. When asked about Mr. Umana's ability
to order personal hygiene supplies and food from the commissary,
Ofc. McIntyre notes that commissary related transactions are done
by the inmates using a kiosk machine on the units. He states that
inmates can order products or check their account balances at the
kiosk. Ofc. McIntyre states that he has seen Mr. Umana at the
kiosk typing on the keyboard, but he does not know whether he was
ordering or checking his account. In terms of his ability to
communicate his needs and access other services within the jail
(i.e., medical), Ofc. McIntyre states that he has seen Mr. Umana
submit request forms but does not know which type of forms (i.e.,
sick call forms, request, grievances, library). He notes that Mr.
Umana receives mail, but he has not seen him writing. He states
that he has also seen Mr. Umana making telephone calls but does
not know to whom or if he is successful in reaching the party he
was trying to contact. Ofc. McIntyre states that he has never seen
Mr. Umana play board games, but notes that he does go out for
recreation yard, plays basketball, jogs or walks laps, and does
push-ups and sit-ups. When asked about Mr. Umana's overall level
of behavioral adjustment to his current incarceration, Ofc.
McIntyre states that Mr. Umana has not been aggressive towards
toward him. He added, "He was fine today [9/28/09] after Court."
Based on his observations, Ofc. McIntyre states that Mr. Umana
appears to him to be an "average inmate" and describes him quiet
and respectful. He states that he is not aware of Mr. Umana having
received any disciplinary reports. When asked if he has any reason
to believe that Mr. Umana may be mentally retarded, Ofc. McIntyre
states that Mr. Umana does not seem to have any intellectual
impairment. He further notes that Mr. Umana has not required any
special adaptive support or assistance in order to function in the
jail.

**Officer M. Farley**
Ofc. Farley states that he has been with the Mecklenburg County
Sheriff's Office for 2 1/2 years. He relates that has known Mr.
Umana for 1 1/2 months. Ofc. Farley contributed that he has some
experience working with disabled adults, having worked in a group
home for approximately a year and a half sometime around 2000. He
states that Mr. Umana was initially in the general population of
the jail, but was then moved to the Maximum Security Unit (Unit
3640) and then to the Protective Custody Unit (Unit 5630) after he
was designated as "keep separate from other inmates." Ofc. Farley
states that Mr. Umana did not want to be placed in the protected
custody unit, preferring to be in the general population of the
jail. He states that Mr. Umana questioned why he was being

**JA4049**

Umana, Alejandro
Page 21 of 25

transferred him to Protective Custody. When asked about Mr. Umana's verbal communication ability, Ofc. Farley states that Mr. Umana speaks "broken English", but notes that he is able to communicate his needs and concerns. For example, Ofc. Farley states that he has communicated to him that he has headaches. He states that Mr. Umana has asked him for request forms and grievance forms. Ofc. Farley does not know if he has asked for medical request forms. He states that the duration of his verbal interactions with Mr. Umana have been two to three minutes. When asked about Mr. Umana's daily adaptive behavior functioning in the jail, Ofc. Farley states that Mr. Umana has not exhibited any deficits or impairments in his functioning in the jail. He states that Mr. Umana showers regularly, shaves with a jail issued razor, and is well groomed. He states that Mr. Umana sends out clothes for laundry, by putting clothes inside a bag, which is returned with the laundered clothing during breakfast on Fridays. Ofc. McIntyre states that Mr. Umana puts his laundered clothes away and that he dresses independently. Ofc. Farley states that Mr. Umana eats and returns his meal tray independently. He relates that Mr. Umana cleans his cell, noting that he sweeps, mops, and uses disinfectant spray to clean sink, toilet, and desk. When asked about Mr. Umana's use of the commissary service, Ofc. Farley notes that he does order and receives commissary products. He states that when Mr. Umana went to the Protective Custody Unit, he observed him at the commissary kiosk checking his commissary account and placing orders. In terms of his ability to communicate his needs and access jail services, Ofc. Farley reiterated that Mr. Umana has asked for forms to request services and that he has seen him writing requests. He states that he has not seen Mr. Umana writing letters. Ofc. Farley states that he has not see Mr. Umana reading any periodicals (i.e., magazines). He states that Mr. Umana mostly watches television and sleeps. He states that he has not seen Mr. Umana in the recreational yard. Ofc. Farley describes Mr. Umana as being "respectful" and notes that he tends to "stay to himself." He states that, based on his observations of Mr. Umana, he appears to be "an average inmate by comparison to other inmates."

### Officer C. Holly
Ofc. Holly states that he has been with the Mecklenburg County Sheriff's Office for about 2 1/2 years. He states that he has known Mr. Umana for approximately six months. Ofc. Holly contributed that he has worked in law enforcement at schools with special education/special need children and adults. Ofc. Holly states that he has interacted regularly with Mr. Umana and he estimates the duration of his longest conversation him to have been 15 to 20 minutes. He states that Mr. Umana speaks "partial English" and added that he "will ask you to talk slow because of the language barrier." Ofc. Holly states that Mr. Umana has "a decent vocabulary in English". He states that he asks about food. He states that Mr. Umana has never talked about his case. Ofc. Holly relates that, when Mr. Umana was sent to the Protective

**JA4050**

Umana, Alejandro
Page 22 of 25

Custody Unit, he questioned why he was placed there and asked the officer to find out the reason for his transfer. He states that in their last encounter, approximately two weeks ago, Mr. Umana had refused a meal. Ofc. Holly states that when asked why he was refusing the meal, Mr. Umana responded that "It was a fast for God." [It should be noted that Ramadan (8/21/09 to 9/19/09) is the Islamic month of fasting. During the present evaluation, Mr. Umana voiced his intention of studying Islam - see above.] Ofc. Holly also noted that Mr. Umana has been observed teaching another inmate Spanish. He states that Mr. Umana had written Spanish words, by syllables, and had taught other inmates how to say the alphabet in Spanish. Ofc. Holly states that he would put written Spanish words up to the cell window for the other inmates to read. He states that, while in the Recreation Yard, he observed Mr. Umana teaching other inmates how to  pronounce Spanish words. In terms of recreational activities, Ofc. Holly states that he has seen Mr. Umana run the perimeter of the Recreation Yard. He has also observed him doing push-ups. He states that he has not seen him playing basketball because, at the time of his contact, he was housed on a disciplinary unit and was not allowed to play basketball. When asked about Mr. Umana's daily adaptive behavior functioning in the jail, Ofc. Holly relates that Mr. Umana is clean, exhibits good hygiene and attire, and he notes that he always has his uniform "tailored." Ofc. Holly states that Mr. Umana keeps his cell clean. He completes all personal hygiene activities independently. He states that in order to clean his cell, Mr. Umana is given an orange cleaner with which to clean the toilet, sink, desk, and mirror. He states that he is also given a brush, latex gloves, broom, mop, paper towels, and garbage bags. He states that Mr. Umana has no problems with laundry noting that he places it in the laundry bag. He states that when his clothing is washed and returned, he puts it away. Ofc. Holly states that he has also seen Mr. Umana using the telephone, which requires the inmate to first input his prisoner identification number, followed by another identification number, and finally to input the telephone number they are calling. Ofc. Holly states he has also seen Mr. Umana at the commissary kiosk, but does not know if he was ordering items or checking his account. When asked about Mr. Umana's interpersonal behavior, Ofc. Holly contributed that Mr. Umana is an "easy going guy and is very cognizant of rules." He states that Mr. Umana was never been disrespectful to him, but rather, has been "very cooperative." Ofc. Holly contributed that Mr. Umana has been on a cleaning team, which affords the inmate one day of credit-time-off from the disciplinary unit (DDU, "the hole") for each day they are on the cleaning team. Ofc. Holly noted that, on one occasion, Mr. Umana voluntarily avoided conflict when both he and another inmate were both mistakenly assigned to do cleaning. Ofc. Holly states that Mr. Umana voluntarily withdrew so as not to take the other inmate's opportunity to get time off. When asked if Mr. Umana has exhibited any behavior which might suggest that he is mentally retarded, Ofc. Holly responded that he has had contact with special

JA4051

Umana, Alejandro
Page 23 of 25

education children and adults, and that Mr. Umana does not exhibit any of the deficits seen in mentally retarded adults or special needs children. He further noted that Mr. Umana is very much like any other average inmate in terms of behavior, noting, "He is very average except for language." Ofc. Holly states that Mr. Umana is not being given any special adaptive support or assistance in order to function on a daily basis. Records from the Mecklenburg County Jail reflect that Mr. Umana participated and successfully completed an inmate educational course on Domestic Violence that began on 4/13/09 and ended on 4/17/09.

Jail medical records indicate that Mr. Umana has been acutely aware of his own health needs and has been a proactive participant in his own health care. Of particular note is his decision to discontinue his treatment for latent tuberculosis because of the medication side-effects he was experiencing. The medical record notes that when he was given information regarding the risks and the length of time remaining to complete the treatment, Mr. Umana decided to resume his treatment.

A review of Mr. Umana's statements to police investigators on 12/12/07 and 4/23/08 reflects a broad range of verbal and mental abilities. Mr. Umana is able to disclose a wide variety information about his life activities, family, events with associated time frames. His disclosures reflect an awareness of his legal situation, group/subculture  dynamic (i.e., gangs), popular culture, and his ability to adapt to a foreign environment, travel using commercial transportation, and to engage in leisure activities. Moreover, his disclosures to police indicate the ability to engage in abstract reasoning and an understanding of a variety psychological interpersonal concepts.

A review of recorded telephone calls made by Mr. Umana reflects an ability to utilize the telephone service, but also indicates that he has the ability to verbally exchange information, communicate his personal experiences to others in an rational and understandable manner, and coordinate future communications.

A review of numerous letters written by Mr. Umana to acquaintances and to consular officials at the Consulate of El Salvador in Atlanta, Georgia, clearly shows an ability to effectively communicate in writing in his native language (Spanish). The contents of his writings reflects sophisticated communications involving his attempts to manipulate his associates for the purpose of improving his legal predicament. His written communications also disclose abstract reasoning involving his views of his allegiance to the MS-13 gang, his perceptions of being mistreated by jail officers, and his future plans for seeking retribution for his perceived mistreatment. Most impressive is Mr. Umana's use of encrypted writing, which reflects a highly developed sense of the use of a systematic coding process designed to conceal his communications from anyone other than the

JA4052

Umana, Alejandro
Page 24 of 25

intended recipient. Mr. Umana's use of coded writing indicates
that Mr. Umana is keenly aware of how his written communications
are likely to be viewed by those outside the realm of the gang
subculture.

Finally, information obtained during the present evaluation and
available collateral information clearly indicates that Mr. Umana
is an adaptively resourceful individual who was able to make a
month-long journey to this country, involving the illegal crossing
of three international borders and successfully evading
immigration authorities. Mr. Umana was able to utilize
conventional commercial forms of travel (i.e., buses), as well as
unconventional improvised forms of travel (i.e., gaining entry to
freight cars on trains). He utilized a cellular telephone to make
contacts with people in El Salvador and in this country, making
social contacts in order to acquire lodging and food, gain
employment, and make trips to cities across the United States,
including Los Angeles, California New York City, Atlanta, Georgia,
and Greensboro and Charlotte, North Carolina. Mr. Umana was able
to purchase Greyhound bus passage as a means of travel, and
acquire  lodging, food, and clothing. He financially assisted the
mothers of his two children (one in El Salvador and the other in
New York City) and was able to send currency via conventional
means (Moneygrams). He was able to acquire two automobiles, one
which he sold, and one which he utilized.

As noted on the first page of this report, assuming intellectual
deficits exist, in order to diagnose an individual with mental
retardation, it must also be demonstrated that significant
limitations in adaptive behavior exist, and that such impairments
existed before the age of 18. The undersigned could not find any
information or reports that indicate that Mr. Umana has ever been
diagnosed mentally retarded or that he ever received any adaptive
supports during his life to allow him to function on a daily
basis.

**CONCLUSIONS:**
Alejandro Umana is a well-nourished Salvadoran male with no
history of psychiatric difficulties or of having received any type
of community-based assistance or supports due to an intellectual
deficiency. He is presently not exhibiting any signs or symptoms
of any mental illness and there is nothing in Mr. Umana's jail
medical chart to suggest that he has manifested any psychiatric
disorder. An MMPI-2 that was administered to assess Mr. Umana's
current level of psychological functioning resulted in an invalid
protocol characterized by an extreme endorsement of psychological
problems suggestive of malingering. The results of intelligence
testing indicate that he is clearly not mentally retarded. Two
measures of intelligence (WAIS-3 and TONI-3) estimate Mr. Umana's
intellectual functioning to be in the Average and Low Average
range, respectively. Measures of symptom validity suggest that Mr.
Umana may not have exerted sufficient effort to do well on the

**JA4053**

Umana, Alejandro
Page 25 of 25

tests that were administered to measure his intellectual level of functioning. Consequently, his obtained scores are probably underestimates of his actual abilities. Measures of his current adaptive functioning using information provided by Mr. Umana during the present evaluation, letters authored by Mr. Umana, a review of two of Mr. Umana's telephone calls, and interviews of jail officers, do not suggest that he has any significant impairments in his adaptive behavior. As noted above, the undersigned could not find, and is not aware of, any information or reports that indicate that Mr. Umana has ever been diagnosed as being mentally retarded or that he ever received any adaptive supports during his life. Moreover, it is implausible that a mentally retarded individual with significant adaptive impairments, possessing a third grade education, could become affiliated with a street gang such as MS-13, and be able to have successfully work and traveled throughout his home country, and speaking only Spanish, successfully cross three international borders en route to another country (U.S.A.), enter that foreign country illegally, travel within that foreign country, acquire housing and employment, obtain an automobile, establish a network of social relationships and live independently day to day without any type of institutional intervention, support or assistance. The magnitude of such an extreme adaptation would, in and of itself, bring into serious question a hypothesis that Mr. Umana is mentally retarded. It is the opinion of the undersigned that Mr. Umana is not mentally retarded.

E. M. Suarez, Ph.D.                                    11-2-09

                                                        Date

PHOTO IDENTIFICATION REPORT

| DETECTIVE | | LOCATION | DATE |
|---|---|---|---|
| T. SMALL | 24086 | Hollywood | 4-15-08 |

ADMONITION ACKNOWLEDGEMENT: I fully understand the admonition read to me regarding the viewing of these photos. The admonition was read to me before being shown these photos.

SIGNATURE OF WITNESS X FREDDY GONZALEZ

ADDITIONAL COMMENTS REGARDING PHOTOGRAPHS —

Mi Primera inPrecion Fue la Foto #5 La manera que Tine el Pelo Semioa Semioa igoal Pero todo Paso TAn RaPido gueno es 100/10 El Vino al Paoke Semioaba Pequeño yo lo que Vi Fue la PisTola y Des Pues de eso yo EnPese a Cooreo.

EsTA Fue la Poime y unica Ves que Vi al joben.

| SIGNATURE OF WITNESS | INITIALS | DATE | TIME |
|---|---|---|---|
| X FREDDY GONZALE | F.G. | 4-15-08 | 1:35 pm. |

70-15.50.4 (9/93)

## PHOTOGRAPHIC SHOW-UP ADMONITION

"In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person—it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone."

## ADMONICION ACERCA DE FOTOGRAFIAS EXHIBIDAS

En un momento le voy mostrar un grupo de fotografías. Este grupo de fotografías puede o no puede contener la imagen de la persona que cometió el crimen que ahora se está investigando. Tenga en cuenta que estilos de la cabellera, barbas y bigotes pueden cambiarse facilmente. También, fotografías no muestran siempre el verdadero color de piel de una persona — podría ser másclaro o más obscuro de lo que se ve en la fotografía. No preste atención si las fotografía muestran marcas o números o cualquier diferencia en tipo o estilo. Después de haber mirado todas las fotografías, digame si Ud. ve o no ve a la persona que cometió el crimen. No diga a otros testigos si Ud. ha identificado o no identificato a alguien.

GOVERNMENT EXHIBIT 506



**CONTINUATION SHEET**

Los Angeles Police Department

| PAGE NO. | TYPE OF REPORT | | | | BOOKING NO. | DR NO. |
|---|---|---|---|---|---|---|
| 2 | | | | | | |

| ITEM NO. | QU AN | ARTICLE | SERIAL NO | BRAND | MODEL NO. | MISC DESCRIPTION (EG. COLOR, SIZE, INSCRIPTIONS, CALIBER, REVOLVER, ETC) | DOLLAR VALUE |
|---|---|---|---|---|---|---|---|

Below is a translation of Freddy Gonzalez's statement during photo six-pack conducted on 04-15-08 at approximately 1335 hours. I Detective Rodriguez Serial No. 30733 a Department certified Spanish speaker translated the statement.

My first impression was photo number five. The way that he has his hair is looks the same, but everything happened so fast that I'm not 100% sure. He came to the park, he seemed small and what I saw was the gun and after that I began to run.

This is the first and last time that I saw the young man.

Freddy Gonzalez

**JA4057**

## PHOTO IDENTIFICATION REPORT

| DETECTIVE | LOCATION | DATE |
|---|---|---|
| Small / Estupinian | Hollywood | 12-29-05 |

**ADMONITION ACKNOWLEDGEMENT:** I fully understand the admonition read to me regarding the viewing of these photos. The admonition was read to me before being shown these photos.

SIGNATURE OF WITNESS    FREDDY GONZALEZ

ADDITIONAL COMMENTS REGARDING PHOTOGRAPHS —

la foto #2 Se Parese o da la sesenblencia al muchacho que Hego al Parque el dia que mataron a anny. llo me recuesdo aber bisto a este muchacho Pe no estoi Seguro que Se el el que llego ese dia al Parque con una Pistola i nos disparo.

| SIGNATURE OF WITNESS | INITIALS | DATE | TIME |
|---|---|---|---|
| Freddy Gonzalez | F.G. | 12-29-05 | 11:50 am |

70-15.50.4 (9/93)

### PHOTOGRAPHIC SHOW-UP ADMONITION

"In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hair styles, beards, and moustaches may be easily changed. Also, photographs may not always depict the true complexion of a person—it may be lighter or darker than shown in the photo. Pay no attention to any markings or numbers that may appear on the photos or any other differences in the type or style of the photographs. When you have looked at all the photos, tell me whether or not you see the person who committed the crime. Do not tell other witnesses that you have or have not identified anyone."

### ADMONICION ACERCA DE FOTOGRAFIAS EXHIBIDAS

En un momento le voy mostrar un grupo de fotografías. Este grupo de fotografías puede o no puede contener la imagen de la persona que cometió el crimen que ahora se está investigando. Tenga en cuenta que estilos de la cabellera, barbas y bigotes pueden cambiarse facilmente. También, fotografías no muestran siempre el verdadero color de piel de una persona — podría ser mássclaro o más obscuro de lo que se ve en la fotografía. No preste atención si las fotografía muestran marcas o números o cualquier diferencia en tipo o estilo. Después de haber mirado todas las fotografías, digame si Ud. ve o no ve a la persona que cometió el crimen. No diga a otros testigos si Ud. ha identificado o no identificato a alguien.

GOVERNMENT
EXHIBIT
507

Freddy Gonzalez
12·29· 05

THE UNIVERSITY OF ARIZONA.

ID:118737    Name:

Freddy Gonzalez
(In reference to suspect #2)

The photo #2 looks like or resembles the guy who came to the park the day that they killed Andy- I remember seeing this guy but I'm not sure if he is the one that came that day to the park with a pistol and shot at us.

Translated by
Detective Vargas #26342
Hollywood Homicide
01/16/06

PHOTO LINE-UP
# 118737

JA4060

scanned

## LOS ANGELES POLICE DEPARTMENT

In the Matter of:                          )    DR No. 0507-23188
187 P.C. Murder                            )    Tape No. 350383
Transcription of taped interview )    Case No. BA285657
of Rene Arevalo.                           )
_____ )

## Transcription Of Tape-Recorded Interview Of

### RENE AREVALO



**Court Reporters**
**Lynden J.**
**and associates, inc.**

*When Accuracy is Everything*

Transcribed by:                          207 West 20th Street
Maria Gallucci                           Santa Ana, California, 92706
                                         800/972-3376
Job Number:                              714/542-6500
TP41690                                  FAX 714/542-8025
                                         www.lyndenj.com

Appeal: 10-6     Doc: 90-9          Filed: 08/14/2013     Pg: 377 of 524                    00010522

**LOS ANGELES POLICE DEPARTMENT**

In the Matter of:                     )  DR No. 0507-23188
187 P.C. Murder                       )  Tape No. 350383
Transcription of taped interview )  Case No. BA285657
of Rene Arevalo.                      )
                                      )

Transcription Of Tape-Recorded Interview Of

RENE AREVALOB BY DETECTIVE PARSHALL

AND DETECTIVE TELIS

2

LYNDEN J. AND ASSOCIATES, INC.     (800) 972-3376

Case 3:16-cv-00057-MOC     Document 50-9     Filed 03/23/17     Page 377 of 524

JA4062

RENE AREVALO:  Yeah.  Please.

DETECTIVE PARSHALL:  You'd like some water?

RENE AREVALO:  Yeah, because I haven't had a drink of water since I got out of work.

DETECTIVE PARSHALL:  All right.

DETECTIVE TELIS:  Where do you work?

RENE AREVALO:  I work in Costa Mesa, sir.

DETECTIVE TELIS:  Costa Mesa?

RENE AREVALO:  Yeah.

DETECTIVE TELIS:  In Orange County?

RENE AREVALO:  Yes, sir.

DETECTIVE TELIS:  What do you do there?

RENE AREVALO:  Right there by Newport Beach.  We -- I do log sets and we install --

DETECTIVE TELIS:  You do what set?

RENE AREVALO:  Log set, you know for the chimneys.

DETECTIVE TELIS:  Oh, okay.

RENE AREVALO:  Yeah, we do all the log sets, the decoration inside.  We'll paint the inside of the chimney.  We don't install it.  We sell the -- the pre -- pre-factor chimneys.

DETECTIVE TELIS:  Uh-huh.  Oh, okay.

RENE AREVALO:  But we do the inside of it, you know, like, connect the piping and everything for the

14

Case 3:16-cv-00057-MOC     Document 50-9     Filed 03/23/17     Page 378 of 524
**JA4063**

scanned

log sets -- decorating and everything.

DETECTIVE TELIS:  Oh, yeah?  Okay.

RENE AREVALO:  Yeah.  That's my job.

DETECTIVE TELIS:  How long have you been doing that?

RENE AREVALO:  About probably three and a half months.  My little girl was about two-weeks when I got that job.  I was doing car detailing --

DETECTIVE TELIS:  Oh, okay.

RENE AREVALO:  Yeah.  My little girl's four month birthday is today.  That's why I was telling --

DETECTIVE TELIS:  Today?

RENE AREVALO:  Yeah.  That's why I was telling them, you know, it's like, I mean, I don't know why things happen sometimes, you know.

DETECTIVE TELIS:  Okay.  Well, we're going to explain everything to you -- what's going on.

RENE AREVALO:  Yeah, then I got scared, you know, but at the same time I told him, you know, I don't got to nothing to be scared because I know that I'm not that kind of person.

DETECTIVE TELIS:  Well, we're going to talk to you.  We're going to ask you some questions.  What we're going to do -- what we want you to do is we want you to be honest.

15

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

RENE AREVALO:  Yeah, that's fine.

DETECTIVE TELIS:  Just tell us the truth.

RENE AREVALO:  Yeah.

DETECTIVE TELIS:  That's all we want to know.

RENE AREVALO:  Okay.

DETECTIVE TELIS:  Okay.  All right.

DETECTIVE PARSHALL:  I'm Detective Parshall, okay.

RENE AREVALO:  All right, sir.

DETECTIVE PARSHALL:  And you already talked to my partner.

RENE AREVALO:  Oh, (Inaudible)

DETECTIVE TELIS:  I'm Detective Telis?

RENE AREVALO:  Telis?

DETECTIVE TELIS:  Yes.

RENE AREVALO:  Okay.

DETECTIVE TELIS:  I'll give you my card too.

RENE AREVALO:  Okay.

DETECTIVE TELIS:  Okay.  (Inaudible)

DETECTIVE PARSHALL:  Okay.  I want to explain to you what's going in here first before we really get into the nuts and bolts of thing.

Basically, the way I do my investigations is -- and my interviews is I try to take the honest approach, okay.

16

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO:  Okay.

DETECTIVE PARSHALL:  To be perfectly honest with you, I'm not going to tell everything that I know, okay.

RENE AREVALO:  Of course.

DETECTIVE PARSHALL:  I'll tell you what's going on, why you're here, why we need to talk to you, the importance of being able to talk to you.  I'm not going to tell you everything of course, but I'll be honest with the stuff that I do tell you, okay.  And in the turn I expect the same --

RENE AREVALO:  Okay.  All right.

DETECTIVE PARSHALL:  -- in return, okay.

RENE AREVALO:  I appreciate that.

DETECTIVE PARSHALL:  So, you know, you probably heard from the watch commander that you're here for a 187.  Everybody knows --

RENE AREVALO:  Yeah, I heard it down there.

DETECTIVE PARSHALL:  Right.

RENE AREVALO:  That's when I got scared because I didn't know because it -- that's what I told him. Like, when I seen him -- when I seen the officers over there I even said, Hi, you know, because --

DETECTIVE PARSHALL:  Yeah.

RENE AREVALO:  -- I felt like, you know, I could

17

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4066

approach them because I don't -- I don't have nothing to hide. And he was like -- he goes, I'm just going to check you. Because he felt like I got deported, but I didn't. You know, because I was in the -- in the INS, but I --

DETECTIVE PARSHALL: Hey, you know what?

RENE AREVALO: -- pulled a lawyer and everything.

DETECTIVE PARSHALL: I know the whole story. I know the whole story about how you were going to get deported and you were able to stay and --

RENE AREVALO: Yeah, you know, and I got my little -- because I was telling him that my little girl was born. That was my whole --

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: Like my whole thing to stay.

DETECTIVE PARSHALL: I know -- I know you got a little girl. I know you got girl -- a lady and all that.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Yeah. The problem -- the problem that we have is, I mean, I wish you would have come forward right after this thing happened and told us about what happened, because that would have -- that would really indicate that --

RENE AREVALO: But I don't know --

18

scanned

DETECTIVE PARSHALL: Well, let me get -- I'll get into it.

RENE AREVALO: (Inaudible)

DETECTIVE PARSHALL: I'll just -- I'll tell you basically what's going on.

RENE AREVALO: Yeah, because right now I'm blind about the thing, you know.

DETECTIVE PARSHALL: Okay. Well, let me tell you. Sometimes you hang around with guys, something happens, you get caught up, okay.

RENE AREVALO: Yeah, that I understand that.

DETECTIVE PARSHALL: You know, you can't go around shooting people and killing people, okay.

RENE AREVALO: Oh, hell no. I don't know --

DETECTIVE PARSHALL: I'm not saying that you shot anybody.

RENE AREVALO: Oh, okay.

DETECTIVE PARSHALL: All right. I'm saying you got caught up with somebody who did shoot somebody. And the reason I know that, okay, it's not a matter of I don't need you to tell me you don't know anything about it because, you know, this whole investigation is -- is into the murder, okay.

So basically what happened is, there was a car going down Fairfax Avenue -- your car -- your

19.

JA4068

gold Altima that you don't have any longer, and what happened is you were loaded up with four of your friends, or people that you know, in the car, okay. You're driving the car. And you're going down -- you guys are going to the beach, okay.

And I know who all the four guys are in the car, and I may tell you their names later on, but I'm hoping to get it from you so to make sure that you're being honest with me. You're going down the street, a couple of knuckleheads on the side start doing the hand sign bit, okay.

I realize that you guys are from MS and a lot of the guys claim MS that are in your car, okay. You get into something. I know that these guys on the sidewalk started this whole thing, okay. I'm not going to go into whether I know if they had weapons or not or what the exact details of it because I want to hear that from you, okay.

What happened is the car stopped. I don't have a problem with that. A couple of guys got out, maybe one, maybe three guys got out. A confrontation took place. I'm not going to tell you exactly who pulled what when, or who did what when, okay. But a guy -- I don't think it's you -- pulled out a gun and shot these two guys dead, okay. Everyone got back

20

scanned

in --

RENE AREVALO: Two guys?

DETECTIVE PARSHALL: Yeah, two guys. Two. It's a double murder, okay. The two guys dead, you guys got back in the car, you went on to the beach, you hung out at the beach, okay.

Basically, I got to gold Nissan Altima. The last three of the license plate, 225, okay. That's a little note we have right here. This is in broad daylight. So you know that of course someone would have written down your plate and seen everyone get out. Not an issue of who was there.

DETECTIVE TELIS: Lots of cars.

DETECTIVE PARSHALL: Because it's broad daylight, and as you know that street's very busy. This person thought it was an Altima or a Lexus. They wrote down the last three of the license plate, looks like 225.

Basically, what happened next, I couldn't find that car for a long time, but we know that one of the suspects had a couple of pairs of -- had a pair of crutches. All I had to do was find someone from MS who had crutches. I found someone who had crutches and basically it went from there, okay. That's how your name came up. That's how the other three guys' names came up, okay.

21

We've already arrested two guys, all right. We got their stories. They gave me statements on this thing and really it's kind of up in the air what's going to happen with them right now, okay. Because they gave me a story, and the story kind of puts -- separates you from doing the shooting, which is good on your behalf that they gave me the story, okay.

The problem is, they're putting you in the car. The problem is, one of the witnesses say that the drive got out and did the shooting -- one of the witnesses.

Now I don't -- I think -- my theory is that that witness is wrong because he missed a couple of other things too. I'm going with what these two guys said because these guys gave me the exact same story and it didn't put you as a shooter, okay. It put another person as a shooter, all right. I really want the person that did this shooting because he's responsible for it.

RENE AREVALO: But -- but see -- the thing is that my car -- my car a lot of times I would lend it to people.

DETECTIVE PARSHALL: Okay. The problem is --

RENE AREVALO: And -- and I would never be around

22

scanned

shooting, you know, like --

DETECTIVE PARSHALL: I know. And you know what, Rene? I don't blame you. I understand. I can see what your temperament is. I can see what your personality is all about. You don't seem like the guy that did that, and that's cool.

But the problem is you were driving the car because there two guys said you were, okay, and a person that -- that saw the shooting -- busy street, okay -- described you to a T, okay. Just hold up. So when I get a description of someone like you -- remember I asked you how big you were?

RENE AREVALO: Uh-huh.

DETECTIVE PARSHALL: 6'3", you know, 200 and something pounds, okay.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: With your type of hairstyle.

RENE AREVALO: Well, (Inaudible) and everything because I was not -- I was not -- I know (Inaudible)

DETECTIVE PARSHALL: That's not an issue. That's not an issue.

RENE AREVALO: See, I'm going to tell you, I know that happened, but I was not -- I was not --

DETECTIVE PARSHALL: Rene --

RENE AREVALO: -- a part of it.

23

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

DETECTIVE PARSHALL:  -- I don't have a -- it's okay, okay.  It's okay.  But, you know, we did a little title history on the car.  Yeah, it's your car.  All that.  This is a -- I know you bought it when it was brand new.  It got repo'd at some point.  And you sold it to --

RENE AREVALO:  (Inaudible)

DETECTIVE PARSHALL:  And you sold it to this girl here, and now you have a Honda Civic, two-door hatchback, okay.  So basically I've done my homework, okay.  I mean, I know what's going on here, okay.

So the person that I'm trying to get, okay, and I'm trying -- what I'd like to get from you is I'd like to get a phone number on this guy, a location where he's at, and I'm hoping that your story matches up with what these other two guys said, okay.

One guy's saying he was in the backseat, he never got out.  The other guy said, Yeah, I got out and it started, you know, we were going to fight with these guys and this other guy, out of nowhere, pulls out a gun and shoots.  They didn't even know what was going on, okay.  Were still investigating this.  Right now they're in custody, okay.

So I'm just telling you, I'm trying to get

24

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

**JA4073**

scanned

your side of the story on this. And to be perfectly honest with you, if you don't tell me the truth on this thing then it looks for you. Because I'm not telling you everything that I know, okay.

RENE AREVALO: I know.

DETECTIVE PARSHALL: All right. So I need you to be totally honest with me, okay, and -- and that's where we stand right now. You have any questions of me, I'll answer them.

RENE AREVALO: (Inaudible)

DETECTIVE PARSHALL: If you don't want to answer a question at some point, don't answer the question. Say "skip it" and I'll pass, I'll go to another question. If a question makes you feel uncomfortable, we don't need to ask it. We don't need to talk about it.

But the point is, I got -- you need you to be honest, okay, about this thing because I've got a person saying that the driver is the shooter. I know you're the driver. But then I've got three other people saying it's someone else. And so I'm kind of up in the air. Could this guy be right in saying you're the shooter? Could these other guys be right saying you're not? And if your story matches up with these guys then I know for sure you're not the

25

**JA4074**

shooter, okay.

RENE AREVALO: (Inaudible)

DETECTIVE PARSHALL: I want to advise you right now that if you are the shooter, I wouldn't say anything to me. I wouldn't talk at all, okay.

RENE AREVALO: I'm not -- I'm not the shooter.

DETECTIVE PARSHALL: Okay. Okay.

RENE AREVALO: I'm not -- I'm not --

DETECTIVE PARSHALL: Well, hold on a second. I need to you your rights because you're in custody right now, okay. You're not free to go at this point. I need to read you your rights.

RENE AREVALO: I'm going to be held -- arrested today; right?

DETECTIVE PARSHALL: Well, that depends. That depends, okay. I want to find out what your story is, okay. There's a very strong likelihood that you will be arrested, it's what happens after that I don't know. That -- that may depend on what you tell me today.

RENE AREVALO: Oh, yeah.

DETECTIVE PARSHALL: Okay. As I told you, I told you that I know everything. You know that I know that I know everything about this, okay. I understand. The easy thing to say, I wasn't there.

26

scanned

But we both know that's not the truth.

RENE AREVALO: Can I tell you one thing? The only thing is that, like -- like, when you say things and everything, do you go through -- like, you know, if I get arrested and everything inside everybody's going to find out I'm going to be getting, you know, beat up everywhere for telling people things and everything. And I might say something that's just going to, like, probably try to get me off the hook.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And probably get somebody else into it and everything. When I know that I was -- I got -- they could put me in a lot because I was -- I was -- I was -- I wouldn't kill nobody. Trust me. I'm not that kind of person that would kill somebody because I was raised in, like, you know, I was raised in the Christian church and everything.

And like you said, the only bad thing I did is I -- I hang around the wrong -- the wrong people.

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: And I chose that. I know that probably that that's the reason why I'm here, you know, because I didn't listen to my parents when I -- especially my mom. My mom is the only one that used to talk to me real nice and everything.

27

DETECTIVE PARSHALL: Try to get you to change your ways?

RENE AREVALO: Yeah. Like, I was not -- I was really never into, like, you know, like, I never jumped into MS or nothing. I just hanged around them because, like, I grew up right there in Santa Monica on Mariposa.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And that's probably somebody from there knows that that's my car and everything -- or it was my car because I usually I don't have it.

DETECTIVE PARSHALL: Everyone knows that's your car.

RENE AREVALO: Yeah. So -- but I never -- like, if you talk to people, I never bother nobody. I never deal with nothing like -- my -- my thing was just drinking --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- and smoking weed. And that's -- that's what got me into this thing, you know. And --

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: And I can't tell you anything about nothing. The only thing I could tell you, that I wouldn't kill nobody. And I know that I know in my

28

scanned

heart, and I could put it on my little baby's life, which I shouldn't, that I wouldn't -- that I have never ever killed nobody, even stabbed nobody.

Like I was telling -- you know, I'm a big guy. I'm big guy. And the only thing I don is drink and I used to go -- I used to be for like a party crew. That is one thing I used to be for, you know, I used to be for Looney Ones (Phonetic) the party crew, you know, we used to do DJs and throw parties under -- like raves.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And the most that I've done is fight. Like, that's one thing -- I'm a man, you know, of course. I'm not going to go and say I won't fight you or nothing, I will of course, but I won't kill nobody. And I know deeply inside that I know that I didn't -- I didn't kill nobody and that's all I could tell you, that I know that I didn't kill nobody --

DETECTIVE PARSHALL: Well, let me tell you -- let me tell you this. Because one of the guys that's arrested right now, okay --

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: I don't think he had anything to do with this, all right. And I think you

29

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 393 of 524
JA4078

could get his butt off the line, okay. The only problem is that he's in the car and we got someone else saying something else.

But based on what he's telling me, he never got out of the car. Now if that's the truth, then he's -- he's out of this thing. We can get him out of this thing. I'm sure his family would be happy to have him back, okay.

I'm not going to tell you who I'm talking about because I think you know who I'm taking about, okay. This guy is locked up right now, okay. This guy talked to us and told us what happened. Both these guys that are in custody right now told us exactly what happened. They named you, they named the shooter, they named the other guy, Negro (Phonetic) that was on the car, okay. These two guys are in custody right now, all right.

RENE AREVALO: Negro is?

DETECTIVE PARSHALL: The person -- the person that -- the person that did the shooting is the person that we're trying to find our right now. We're trying to find out where he is.

If he's in custody and you're in custody and these other guys are in custody, and he finds out that you said something, yeah, you probably would be

30

scanned

in some danger in the prison, okay, or in the county jail. What we could possibly do is get you on the green light. That's a segregated way from everybody.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Because I don't want anything to happen to you either.

RENE AREVALO: That's one thing --

DETECTIVE PARSHALL: But the point is --

RENE AREVALO: That's one thing --

DETECTIVE PARSHALL: Hold on, Rene. Hold on.

RENE AREVALO: I don't -- I don't know them by their names. I don't know them.

DETECTIVE TELIS: Well --

DETECTIVE PARSHALL: Well, I got their pictures here. But Rene, you got to understand that he put himself in this. He got you guys all in this jam.

RENE AREVALO: Yeah, because I never --

DETECTIVE PARSHALL: This guy got you into the jam.

RENE AREVALO: Like -- like they said, like, when that happened I was like, you know, What the fuck did these guys do, you know.

DETECTIVE PARSHALL: Hey, if this is a self-defense deal -- if these guys had something on him or something, it changes the whole thing around,

31

JA4080

okay.

RENE AREVALO: All right. Yeah.

DETECTIVE PARSHALL: But I haven't heard anything about that yet. I heard one thing, but I want to hold back on that right now. But I heard one thing about these -- what these guys did, okay.

RENE AREVALO: Which guys?

DETECTIVE PARSHALL: Well, the two guys that were on the side walk, okay. So I'm trying to find out the truth about this thing. I mean, that's what we're all about. I don't want to put a case on anybody.

Just like this guy that said he never got out of the car, right now the case is on him. And if I can prove that he never got out of that car, then I can get him out of jail, okay. I'm after the truth on this thing. I don't care if you're -- if you're a thirst striker, okay. If you didn't do this, you didn't do this, and I want to find out. But the guy I want to get --

RENE AREVALO: What happens -- what happens --

DETECTIVE PARSHALL: The guy who got you all into this --

RENE AREVALO: What happens --

DETECTIVE PARSHALL: -- is the guy we need to

32

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4081

scanned

get.

RENE AREVALO: What happens to the other ones? Like me, I never got out of the car either; right?

DETECTIVE PARSHALL: Well, these guys -- we know that -- well, supposedly three guy got out of the car.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: So I know the guy -- one guy in the backseat didn't get out, okay, for obvious reasons. The other two guys next to him got out and the front passenger got out, okay. Those three guys are in trouble. And the one guy who was in the backseat, he's locked up for this right now. There's charges filed on him. We're get ready for prelim on this thing, okay. But the other guy, scared to death -- scared to death.

RENE AREVALO: I know.

DETECTIVE PARSHALL: And -- and I don't want him to be in here any longer than -- than he has to.

RENE AREVALO: Who -- who is that?

DETECTIVE PARSHALL: I'm not going to tell you because I want to make sure that you're being honest with me. Because I don't to want to throw that name and you go, Yeah, that was him.

RENE AREVALO: Oh, no, no, no. I know -- because

33

I know that the guy that supposedly shot somebody, he's not in here.

DETECTIVE PARSHALL: Yeah, I know.

RENE AREVALO: He's not in here. And the other one --

DETECTIVE PARSHALL: I need some help finding him.

RENE AREVALO: And the other one --

DETECTIVE PARSHALL: And if he gets in custody and --

RENE AREVALO: I think -- I think he left to El Salvador.

DETECTIVE PARSHALL: Okay. Well --

RENE AREVALO: That's what I think.

DETECTIVE TELIS: Well, that's what we want to find out. But before we have to -- before we start asking you questions, we have to -- we have some procedural stuff that we have to do.

DETECTIVE PARSHALL: Okay.

DETECTIVE TELIS: Okay.

DETECTIVE PARSHALL: Let me read this real quick, okay.

You have the right to remain silent. Do you understand?

RENE AREVALO: Yes.

34

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

DETECTIVE PARSHALL: Okay. That means you don't have to talk to me, all right.

RENE AREVALO: So that means I'm being placed under arrest.

DETECTIVE PARSHALL: It does not mean that -- you're under arrest right now for this investigation, okay.

RENE AREVALO: Okay.

DETECTIVE PARSHALL: It doesn't mean --

RENE AREVALO: How come never (Inaudible)

DETECTIVE PARSHALL: Because I read you these rights -- because I read you these rights doesn't mean you're going to get booked, okay. It doesn't mean you're going to get filed on. It doesn't mean anything. It just means that because you have handcuffs on, I have to read you this, okay.

RENE AREVALO: Because the officers never read them when I asked them.

DETECTIVE PARSHALL: They don't have to read them to you.

DETECTIVE TELIS: They don't -- yeah.

RENE AREVALO: Oh, because --

DETECTIVE PARSHALL: Only if I ask you -- only if I ask you questions do I have to read this to you.

RENE AREVALO: Oh.

35

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4084

DETECTIVE PARSHALL: I'm straight up by the book here.

RENE AREVALO: Okay.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: No, I'm just wondering because I asked him -- because I know him. I know Sanchez and that's what I told him. I approached him. I go, What's up? And I was going to tell him, Hey, guess what? They didn't deport me. Because he was like, What's up? On the way over there and everything, you know, and like he goes (TAPE CUT OUT) and this so, you know, good luck and I -- and that's when I seen him and I was like, hey I'm going to go say what's up to him.

DETECTIVE PARSHALL: Well, I seen him --

RENE AREVALO: See, I didn't --

DETECTIVE PARSHALL: I think you just got caught up in this thing. And I'm trying to find out. These guys gave me a story about you not getting out of the car and so that's what I'm trying to find out.

I need to have everyone's story match. If everyone's story matches (TAPE CUTS OUT) the truth and I know who is not responsible for this stuff and who is, okay. I need to find out what everyone did. I'm not telling you who else was in the car because I

36

scanned

want to make sure you're telling me the truth about it, okay. I told you one person already, okay. I just need to get the other information.

If there's a question that you don't want to answer, say you don't want to answer it, okay. All right. So let me continue here.

RENE AREVALO: See --

DETECTIVE PARSHALL: Anything you say may be used against you in court. Do you understand?

RENE AREVALO: Yes, sir.

DETECTIVE PARSHALL: You have the right to the presence of an attorney before and during any questioning. Do you understand?

RENE AREVALO: Yes, sir.

DETECTIVE PARSHALL: If you cannot afford and attorney, one will appointed for you free of charge before any questioning if you want. Do you understand?

RENE AREVALO: Yes, sir.

DETECTIVE PARSHALL: Okay. Do you want to tell me about what happened that night -- that day? Do you want to tell me about this guy in the backseat and -- and who did what on this thing?

RENE AREVALO: Well, I don't know. Because the thing is that I don't --

37

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4086

DETECTIVE PARSHALL: Because I don't think this guy should be in custody for this thing?

RENE AREVALO: Who? (Inaudible)

DETECTIVE PARSHALL: Well, I'll show you some photos.

RENE AREVALO: Yeah. And the thing is -- if I don't -- if he shouldn't be, I shouldn't be. Because none of us, like, knew that he was going to do that, you know.

DETECTIVE PARSHALL: But see, that's what I need to find out from you.

RENE AREVALO: Because you know, like, one thing that I always had it was like -- I always used tell everybody, like, Fuck. If you're going to ride with me, don't bring nothing, you know. Like, no weed, no drugs, no nothing, especially no fucking guns. And we were going to the beach.

What makes you think we were going out to do something like that, you know. My plans was to go to the beach.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And -- and that happened and I -- I just hope everybody that was in -- I mean, I don't know what to tell you, like (TAPE CUTS OUT) like, you know, like, he was -- he was -- he just -- he just

38

00010559

scanned

got in and, like, what can we do about it, you know, and like (TAPE CUTS OUT) and that guy is like the kind of guy that if you say something, he'll probably shoot you too. He -- you know how those guys are and shit?

He's like real -- he's real into the devil and he must do that because that's what he was brought over here to do and everything. That's the kind of person that he is, you know.

DETECTIVE PARSHALL: Okay. Well, let's make sure we're talking about the right person because I want to make sure that we catch the right person and put the right person in jail. Are you with me on that at least?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. You have the -- and you're going to recognize these guys and you're going to know, you know, that I know what I'm talking about and -- all right.

In a moment I'm going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated.

Keep in mind that hairstyles, beards, and mustaches may be easily changed. Also photographs

39

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

**JA4088**

may not always depict the true complexion of a person.  It may be lighter or darker than shown in the photograph.

Pay no attention to any markings or numbers that may appear on the photos, or any other differences in the type or style of the photographs. When you've looked at all the photos tell me whether or not you see person who committed now being investigated.

Do not tell other witnesses that you have or have not identified anyone.  Do you understand that?

RENE AREVALO:  Yes, sir.

DETECTIVE PARSHALL:  Do we got the right guy?

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Which number?

RENE AREVALO:  Five.

DETECTIVE PARSHALL:  Okay.  Who's Five?

RENE AREVALO:  Who's?

DETECTIVE PARSHALL:  How -- what do you know him as?

RENE AREVALO:  (Inaudible) because I only met him a couple of times.

DETECTIVE PARSHALL:  But what do they call him?

RENE AREVALO:  He has this name -- I don't know. He has his name on -- right here.

40

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 404 of 524

JA4089

00010561

scanned

DETECTIVE PARSHALL:　What did he do?

DETECTIVE TELIS:　Come on.　You know his name.

RENE AREVALO:　Yeah, I know.　But I was trying -- because they call him a wizard -- what do they call a -- a (SPANISH)

DETECTIVE PARSHALL:　(SPANISH)

RENE AREVALO:　(SPANISH) like a wizard.

DETECTIVE PARSHALL:　(SPANISH) Wizard?　Okay.

RENE AREVALO:　Wizard, yeah.

DETECTIVE PARSHALL:　Okay.　What did he do?

RENE AREVALO:　He got off the car and supposedly the two guys that got off the car in the back, they were supposed to go out and fight, you know.

DETECTIVE PARSHALL:　Yeah.

RENE AREVALO:　This guy got off the -- and he just shot him.

DETECTIVE PARSHALL:　Okay.　(TAPE CUTS OUT) I need you --

RENE AREVALO:　He shot like two or three times.

DETECTIVE PARSHALL:　Okay.　And then what?

RENE AREVALO:　Huh?

DETECTIVE PARSHALL:　What did he do then?

RENE AREVALO:　And then he just -- and I was like, you know, and then he just came to the car and he said, Come on.　Let's go.　Let's drive.　So -- and

41

the guy in the back, which I know you're talking about Omar, he was shitting in his pants.

DETECTIVE PARSHALL: Really?

RENE AREVALO: Not literally shitting. But he was like, I mean, we just barely passed to buy some sodas and everything --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And he had drank one already and he said, Oh, come on. Give me a soda. Give me a soda. And he had this other one right here in between his legs. I mean, he got really scared.

And I hope that you do let him -- because he -- I feel bad. And I feel -- I feel bad because of his mom. And I feel I fell like he -- he's a -- he's not a -- he's a -- he's an all right kid.

He's not a perfect kid, you know. He grew up without a dad and everything and -- and I told him to do better when he was growing up.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: You know, and --

DETECTIVE PARSHALL: Do me a favor and circle his photo, please. You can put it on the -- oh, you can't reach the table.

DETECTIVE TELIS: Go ahead and put your initials next to -- next to the pictures and today's date.

42

00010563

scanned

Today's May 25th.

RENE AREVALO: Am I going to have to go to court and everything for this? Yeah?

DETECTIVE TELIS: Probably.

RENE AREVALO: Would I be placed on (Inaudible). Like, if I go or if I get out and everything, would my family be okay like -- like because -- like, I want to be with my family, you know. That's the one thing that I want to do is just -- like, I would never do something that I did.

And I know that I fucked up by having people like that, and that's what I'm saying, because of people like that, you know, for the bad choices I made in life. And I wouldn't -- I wouldn't care. I'll leave the state. I'll go somewhere else and live with my family and everything.

I just don't want to lose my little girl, you know, that's all I have.

DETECTIVE PARSHALL: If something like that were to happen, you'd probably have to come back and testify though.

RENE AREVALO: I would testify just to be with my family. Because I don't think that my little girl deserves, you know, not to have me and me not to be with her --

43

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4092

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- because of somebody lese chose to do something bad like that. And I wouldn't -- I would leave, you know. I would go and just go to a small place where nobody knows me and everything because, I mean, I love my little girl and I'm feeling this right now and I know that I could get in trouble.

I know that if you guys arrest me and if I go inside whatever, I could do whatever. But I'd rather try to do the right thing than just know that I could have at least said the truth and be with little girl, you know, and my wife, you know because --

DETECTIVE PARSHALL: Well, I -- I -- I'm hoping your story matches up with -- with everything else and that's why I'm having you tell me where everyone was and who did what.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Because I think we're -- we're slowly getting to the truth on this thing.

RENE AREVALO: Yeah. And I don't think that like --

DETECTIVE PARSHALL: And I want the blame to be placed on who deserves the blame.

44

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 408 of 524

JA4093

00010565

scanned

RENE AREVALO: Yeah. And I don't think none of us had the idea of doing what he -- what he was going to do.

DETECTIVE PARSHALL: Right.

RENE AREVALO: You know, like I told you, like, I'm the type of guy that -- and I even told him, Let's roll. You know, and then the other fool goes like, Yeah. Let's go. Let's go. You know, Let's just go to the beach.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: But you know, this guy just goes like, No. Because he -- because when he threw MS. That guy -- that guy went like this. When he went like that this guy went crazy, you know, like, Fuck that shit, you know, get him up. But he don't speak English, you know --

DETECTIVE PARSHALL: Who was throwing hand signs in your car?

RENE AREVALO: Who? Him.

DETECTIVE PARSHALL: You got to be honest with me. Even if you like these other guys, you got to be honest with me about this.

RENE AREVALO: No. Because the other guys -- the other -- there's one other guy that from MS and there's one -- there's two guys that are not MS.

45

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

JA4094

DETECTIVE PARSHALL: Okay. Well, let me -- let me find out who those are, okay.

RENE AREVALO: Okay. These are the four guy I'm telling -- he was literally shivering. Like, I was in the same situation he was because, like, about a week -- like, we -- I saw him growing up. Like, I'm 28 years old, he's, like, about -- he's like about 16 right now or 15.

DETECTIVE TELIS: Do you know his name?

RENE AREVALO: Omar.

DETECTIVE TELIS: Omar? Do you know his last name?

RENE AREVALO: No, I don't know his last name, sir. But I know his name's Omar. We call him "Negro".

DETECTIVE PARSHALL: Negro?

RENE AREVALO: We call him Negro. Yeah, like, Negro. You know, What's up, Negro? Because he's black, you know. And he's always like, I'm a nigga. You know, like -- like --

DETECTIVE PARSHALL: Right.

RENE AREVALO: -- we used to play around and everything. And, like, I'm telling you, like, I grew up with all these kids, you know, and --

DETECTIVE PARSHALL: Initials.

46

scanned

DETECTIVE TELIS: Where was Omar sitting in the car?

RENE AREVALO: He was sitting in the back side (Inaudible)

DETECTIVE TELIS: In the back? Directly behind you?

RENE AREVALO: Yeah, directly me.

DETECTIVE TELIS: And Wizard was sitting in the front seat?

RENE AREVALO: Yeah, in the front.

DETECTIVE TELIS: Right next to you?

RENE AREVALO: Yeah, right next to me.

DETECTIVE TELIS: And Omar was sitting directly behind you?

RENE AREVALO: Behind me, yeah.

DETECTIVE TELIS: Okay.

RENE AREVALO: I just -- I just hope that I get --

DETECTIVE TELIS: Hey, you just have to be honest with us, okay.

RENE AREVALO: I am.

DETECTIVE TELIS: Just tell the truth.

RENE AREVALO: Like I'm telling you, I'd rather leave the state --

DETECTIVE TELIS: I know.

47

JA4096

RENE AREVALO: And I'd rather go and -- shit, I'd rather do whatever I have to do but just to be with my little girl. And I told my girl, you know --

DETECTIVE PARSHALL: Which number?

RENE AREVALO: Three.

DETECTIVE TELIS: Who's that?

RENE AREVALO: I don't know. I don't know his name. I know that -- Cheapies (Phonetic).

DETECTIVE PARSHALL: Cheapies?

DETECTIVE TELIS: Cheapies?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: What does that mean?

RENE AREVALO: I don't know. It's like a Salvadorian nickname, I guess.

DETECTIVE PARSHALL: Okay. Where was he sitting?

RENE AREVALO: He was sitting on the window behind -- behind --

DETECTIVE TELIS: Behind Wizard. And you were in your car? You were in the Altima?

RENE AREVALO: Yeah.

DETECTIVE TELIS: Okay.

RENE AREVALO: I was. I was in the (Inaudible) I'd rather -- like I'm telling you, I'd rather just, you know --

DETECTIVE PARSHALL: Well, you know that we

48

00010569

scanned

already know what's going on.

RENE AREVALO: Yeah, I know.

DETECTIVE PARSHALL: So there's really no use to try to make things worse for yourself by lying, so --

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. Can you circle him.

RENE AREVALO: I just hope that you guys, like, help me out too, you know, like --

DETECTIVE PARSHALL: Well, we're going to -- we're going to talk to the D.A. about this, explain to him your story, explain to you as long as you stay honest with us -- that you're honest and straight up with us and basically you're saying that you didn't have any idea that this guy was going to do that so --

RENE AREVALO: No, I didn't know that he had a -- we didn't -- none of us knew, like, at least I didn't. I don't know if -- I don't know if Cheapies knew because that's like -- they're friends from over there from El Salvador.

DETECTIVE PARSHALL: Uh-huh.

DETECTIVE TELIS: Who? Cheapy and Wizard?

RENE AREVALO: Yeah.

DETECTIVE TELIS: Okay.

RENE AREVALO: Yeah. (Inaudible)

49

JA4098

DETECTIVE PARSHALL:  Number?

RENE AREVALO:  Six.

DETECTIVE PARSHALL:  Okay.  You want to hear -- you want to write on something here?

DETECTIVE TELIS:  What's -- what's his name?

RENE AREVALO:  Luis.

DETECTIVE TELIS:  Luis?

RENE AREVALO:  Yeah.  I don't know his last name.

DETECTIVE PARSHALL:  Where does he live?

RENE AREVALO:  He lives on Mariposa and so does Omar.  Like, I seen them growing up, you know.

DETECTIVE PARSHALL:  Where's -- where's --

RENE AREVALO:  And that's what I told him -- and the only reason I took the other two was because they were -- they were right there and they didn't have a -- they don't have house.  They don't have nowhere, you know.

DETECTIVE TELIS:  What do they call Luis?

RENE AREVALO:  I don't know.  I just call him Louie.

DETECTIVE TELIS:  You just -- you just know him as Louie.

RENE AREVALO:  Louie, yeah.  Luis.

DETECTIVE TELIS:  Where was he sitting?

RENE AREVALO:  He was sitting in the middle.

50

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4099

scanned

DETECTIVE PARSHALL: Okay. Just to make sure --

RENE AREVALO: And he's the guy with the crutches.

DETECTIVE PARSHALL: -- we're talking about the right people, what I'll do is I'll have you write their name right next to it, and then I'll have you write their name in the car so we know where everyone was sitting. So we got it firmly implanted here where everyone was, okay.

So I'll take that. Let me get around here. So on him, write his -- what his name is so I can read it. Wizard, okay. And then on this -- do you want to move your chair up, or move the table back? On this write where Wizard was sit -- seated in the car. And then write your name for the driver.

Okay, then the next person we have is this guy, and then write -- what else do you call him?

RENE AREVALO: La Negro.

DETECTIVE PARSHALL: Okay. Put that below there. And then write his name just on there -- somewhere next to (Inaudible). Okay. Okay, write Negro on that one too just so I know -- we don't get confused here. And then write what you call him, where he was sitted -- seated. (Inaudible) with and S, huh?

RENE AREVALO: Yeah. Well, I don't know. I

51

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 415 of 524

JA4100

(Inaudible)

DETECTIVE PARSHALL: Okay. Then right where -- you said he was Luis?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. Now backing up, everything's looking like it's matching up here. Where -- who -- who did you pick up first?

RENE AREVALO: They were all -- no, they were all on Mariposa. I had came from work early.

DETECTIVE PARSHALL: You came home from work.

RENE AREVALO: No. Well, I live with my sister and I passed by there. And I -- because I wanted to go to the beach and I had told -- because I was actually looking for Carlos, that guy that got murdered there.

DETECTIVE PARSHALL: Oh, okay.

RENE AREVALO: You know what I'm talking about?

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: Okay. That was --

DETECTIVE PARSHALL: Was he a friend of Luis's?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: He was -- he was -- he was best friends with -- with the other -- with Omar most, you know.

52

LYNDEN J. AND ASSOCIATES, INC.　(800) 972-3376

Case 3:16-cv-00057-MOC　Document 50-9　Filed 03/23/17　Page 416 of 524

JA4101

scanned

DETECTIVE PARSHALL: Okay.

RENE AREVALO: He was more friends with Omar.

DETECTIVE PARSHALL: Right. This was down by the liquor -- or where was this by? This is --

RENE AREVALO: In the building right there inside the -- inside the --

DETECTIVE PARSHALL: Oh, at the end of Mariposa?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. Okay. Yeah.

RENE AREVALO: Yeah. So I was looking for him but he was not there. And he was like -- I don't really talk to him that much.

DETECTIVE PARSHALL: Who?

RENE AREVALO: Luis.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Like, Luis, I don't really, like -- the one I always talk to -- well, I do, but, like, I'm not really, you know, because he's really kind of like not there all the way.

DETECTIVE TELIS: Is he an MS member?

RENE AREVALO: No, he's not.

DETECTIVE PARSHALL: He's not?

RENE AREVALO: No. His brothers are.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: Yeah.

53

**JA4102**

DETECTIVE PARSHALL: And has he lived there, like, all his life or something?

RENE AREVALO: Yeah. We grew up right there. Like me, I grew up right there since '85 -- '86 actually.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: '86 when I came from El Salvador and I moved out like in '97 then I moved back there in 2001 for like about a year and then I moved out again to my -- with my sister because there was too -- too drama right there, you know, everybody shooting and everything.

DETECTIVE PARSHALL: Not a -- not a good area to grow up in.

RENE AREVALO: No. And that's why, you know, right now I was like -- today I was supposed to move my things to my new apartment because I barely -- and I'm stressing that and everything. I don't know what's going to happen.

But like tomorrow I was going to get my check, hopefully, you know, if I -- you know, if you guys don't book me, I'm going to go to work still and get my check and move my -- my last things to my new apartment because I was going to move to Crenshaw and Florence --

54

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

00010575

scanned

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And that's for the same thing, you know, it's not, like, a great neighborhood, but it's an okay neighborhood because it's like up and away from the main streets. And it's a single apartment, and just me my girlfriend and my baby, and that's -- and it's going to be closer to my job, and like less gas, and --

DETECTIVE TELIS: Where are you working?

RENE AREVALO: Where am I working? I work in Wilshire Fireplace --

DETECTIVE PARSHALL: Oh, okay.

RENE AREVALO: -- in Costa Mesa.

DETECTIVE PARSHALL: Oh, okay.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Do you install fireplaces?

RENE AREVALO: No. Actually we sew the pre-fabrics and we do all the installations, like log sets and the piping and we paint the inside, you know, decorate, like, the decorations of it.

DETECTIVE PARSHALL: Right.

RENE AREVALO: And like -- like some -- like sometimes we go do, like, apartments.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Like, big -- like, condos and

55

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

everything.

DETECTIVE PARSHALL: Oh, put in like hundreds of --

RENE AREVALO: Yeah, like, (Inaudible) and pipes and gas logs and there, like, wood -- wood logs runners.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And those --

DETECTIVE PARSHALL: The gas -- the gas fireplaces with the --

RENE AREVALO: Well, there's natural gas and there's wood burning, you know --

DETECTIVE PARSHALL: Okay.

RENE AREVALO: Like, the wood burning's are different. The fire's different. There's more of, like, torch --

DETECTIVE PARSHALL: Right. Right.

RENE AREVALO: Because it's going to have to burn the wood.

DETECTIVE PARSHALL: Oh, okay. How long have you been working there?

RENE AREVALO: It's going to be like three -- three months and a half because my baby was already born --

DETECTIVE PARSHALL: Okay.

56

scanned

RENE AREVALO:  -- when I got that job.

DETECTIVE PARSHALL:  Okay.  So you had a steady job?

RENE AREVALO:  Oh, yeah.  I have -- I always worked, sir.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  I always worked.  I -- I always worked even if I have to work with my brother-in-law or something like that.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  And I worked as an electrician.

DETECTIVE PARSHALL:  Oh, so you have some electrical skills, huh?

RENE AREVALO:  Yeah.  Like --

DETECTIVE PARSHALL:  So you got some work skills and -- and you've had a steady job.  So that's good, okay.

RENE AREVALO:  I mean, I always done my things, you know, like --

DETECTIVE PARSHALL:  Okay.  Well --

RENE AREVALO:  -- hanging around was like an after work thing for me.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  And because I grew up on Mariposa, that's where I used to kick it, you know.

57

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: But it's not because I was like -- and everybody thinks that I'm a -- that I jumped in and stuff like that and I -- you know, it was just the way you grew up and they way -- like, you look at right now -- like if you see my shirt from this side, it's like super dirty.

DETECTIVE PARSHALL: Oh, yeah.

RENE AREVALO: But I changed it because I went straight from my job to my program because --

DETECTIVE PARSHALL: And you've been going to your program?

RENE AREVALO: Yeah. I'm -- I'm --

DETECTIVE PARSHALL: Okay.

RENE AREVALO: I'm doing real good.

DETECTIVE PARSHALL: All that's good. All that's good. I'm glad to hear all that.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Tell you what. Let's get back to -- you showed up on Mariposa.

RENE AREVALO: Yeah, I --

DETECTIVE PARSHALL: You saw who?

RENE AREVALO: I saw him, and I saw Omar.

DETECTIVE PARSHALL: You saw Luis?

RENE AREVALO: Yeah. I saw Omar and Negro.

58

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 422 of 524

JA4107

scanned

DETECTIVE PARSHALL:  You saw --

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  -- Omar?

RENE AREVALO:  Yeah, them two.

DETECTIVE PARSHALL:  These two are hanging out together?

RENE AREVALO:  Yeah.  They're -- they're outside. They're outside because they live right there.

DETECTIVE PARSHALL:  Right.

RENE AREVALO:  And then -- well, when I told them, Oh, let's go to the beach and everything.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  Them and him -- they come out from a vacant apartment because they didn't have nowhere to -- they didn't have nowhere to live, you know.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  They barely moved, came from El Salvador.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  So they're staying in all the empty apartments that they were have in Mariposa.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  So I figure, you know, like, you guys want to go to the beach, you know, because that's where we're going?  And they go, All right.

59

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

Let's go. And that's where we were going, you know, to the beach. And when the -- when the guy -- because the --

DETECTIVE PARSHALL: Did they all get in -- when they got in the car on Mariposa, were they all in those seated positions, the same ones you showed me?

RENE AREVALO: Yeah, yeah, yeah.

DETECTIVE PARSHALL: And it never changed?

RENE AREVALO: Yeah. Even when we got to --

DETECTIVE PARSHALL: Okay. Where did you stop to get drinks?

RENE AREVALO: I stopped in an AM/PM, but I don't remember exactly where.

DETECTIVE PARSHALL: Was it right on that same street where that shooting happened?

RENE AREVALO: No.

DETECTIVE PARSHALL: No.

RENE AREVALO: It was before.

DETECTIVE PARSHALL: Okay. So you stopped at an AM/PM.

RENE AREVALO: Yeah, because I bought -- I even bought some sodas and some chips so we could eat over there --

DETECTIVE PARSHALL: Right.

RENE AREVALO: -- at the beach, you know, that's

60

00010581

scanned

why I stopped.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: It was hot. It was burning hot. And I even --

DETECTIVE PARSHALL: Well, it's not like you guys are looking at to go kill somebody.

RENE AREVALO: No.

DETECTIVE PARSHALL: You bought sodas and chips. You guys are going to the beach.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: See, that's the thing. And the thing, like, damn, you know, like, I don't know. The devil or whatever, but -- and there -- it was traffic time, you know, because it was, like, around 4:00 o'clock.

DETECTIVE PARSHALL: Well, Fairfax is one of the busiest streets in -- in Wilshire.

RENE AREVALO: Yeah. So -- so it was real slow, you know. And that's when the guys right there started going, like, What? What? And I'm all, like, looking, and I'm all like, Damn. You know, and then the guy -- like, Omar was, like, Hey, let's just go. Let's just go, you know.

And then this guy -- no, this guy started

61

looking at them and the guys were, like, you know, they started throwing their gang signs.  So he starts throwing his gang.  And then guy looks at him and he went like this, you know.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  You know, like, fuck MS.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  And that's when this fool went crazy.  And he's all like, No.  Stop, stop.

DETECTIVE PARSHALL:  What did he say to you?

RENE AREVALO:  Huh?

DETECTIVE PARSHALL:  What did he say to you?  Did he tell you to stop?

RENE AREVALO:  He's all, Stop the car.  Stop the car.  Well, I couldn't do shit about it because it was stopped anyways, you know.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  And the only -- like, when I -- when, like, it was not -- I didn't even stop.  He just got off the car because it was so slow.  We going bumper-to-bumper.

DETECTIVE PARSHALL:  You pulled over to the curb though.

RENE AREVALO:  And then when everybody got off I just pulled over, you know, because I figured, like,

62

scanned

that's when Avid (Phonetic) -- oh, where did he go?

DETECTIVE PARSHALL: Who?

RENE AREVALO: This fool. Luis.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Oh, Avid.

DETECTIVE PARSHALL: Avid?

RENE AREVALO: Avid.

DETECTIVE TELIS: Avid?

RENE AREVALO: Luis. David. You know, like, Avid? David?

DETECTIVE TELIS: David?

RENE AREVALO: David. Yeah.

DETECTIVE PARSHALL: But they just call him Avid? No D?

RENE AREVALO: Yeah. Oh, I don't know.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: I don't know. I don't know if he writes or not, because I don't really talk to him that much.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: Yeah. See, because that's -- and that's when he's like, Let me go. I'm -- I'm going to hit him -- I'm going to hit him with a --

DETECTIVE PARSHALL: He said that?

RENE AREVALO: Yeah.

63

LYNDEN J. AND ASSOCIATES, INC.     (800) 972-3376

JA4112

DETECTIVE TELIS:  He gets out of the car?

RENE AREVALO:  Yeah.  Like this guy gets out -- this guy gets out first.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  He gets out, and then this guy gets out.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  And then he goes like, No.  I'm going to go hit him.  And Omar never got out, and me never got out.

DETECTIVE TELIS:  Okay.  Hold on.  He gets out of the car first?  Wizard?

RENE AREVALO:  Wizard.

DETECTIVE TELIS:  And then --

RENE AREVALO:  And then he gets out of the car.

DETECTIVE TELIS:  -- he gets out of the car.

RENE AREVALO:  And then he gets out.  He never got out.

DETECTIVE TELIS:  He gets out --

DETECTIVE PARSHALL:  He got out?

RENE AREVALO:  He got out, yeah.

DETECTIVE PARSHALL:  With both his crutches?

RENE AREVALO:  Yeah.  That's why they -- that's why they know they had crutches.

DETECTIVE PARSHALL:  Uh-huh.  So Omar stayed in

64

Case 3:16-cv-00057-MOC     Document 50-9     Filed 03/23/17     Page 428 of 524

**JA4113**

scanned

the back the whole time?

RENE AREVALO: Yeah, Omar stayed in the car. Yeah, he was the one that was, like, shitting it, you know. He was the one that was like, Oh, my god. You know. And he was -- I'm telling you, he was -- he had already finished one soda --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- and he goes, Hey, can I have soda? Can I have soda? And -- and then the guys go, You dumb ass, you have it right there. Because he had it on his lap.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: So --

DETECTIVE PARSHALL: So Wizard gets out first.

RENE AREVALO: Yeah, he never -- I didn't --

DETECTIVE PARSHALL: Then he jumps out, and jumps out with both crutches?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. He stays in the car the whole time?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: You stay in the car the whole time?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Did you pull over after he

65

got out, or after all three got out?

RENE AREVALO: After all three got out.

DETECTIVE PARSHALL: All three got out, you pull over to the curb?

RENE AREVALO: Yeah, because I'm not going to leave them there.

DETECTIVE PARSHALL: What do you see -- when you're looking back, what do you see happen at that point? What does each person do?

RENE AREVALO: Well, this guy -- this guy -- this guy right here --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- goes up to him -- no, and this guy. Both of them go up to him.

DETECTIVE PARSHALL: These two?

RENE AREVALO: Yeah. These guys just go up to him and this fool's already out, but he had to like -- that's when I seen him. He already had the gun out, and I'm like, What the fuck? And then this fool -- like, Omar even told me, Let's go. Let's go. Let's go.

DETECTIVE PARSHALL: Omar said, Let's go away.

RENE AREVALO: Yeah. No, but he was telling them, you know, not me.

DETECTIVE PARSHALL: Right.

66

00010587

scanned

RENE AREVALO: He was --

DETECTIVE PARSHALL: He was trying to get them back in the car?

RENE AREVALO: Yeah. He was like, Come on. Let's go. Let's go. And that's when he -- that's when this guy -- like, this guy and this guy were like, you know, like, boom, you know, because this fool goes, Let's go -- let's go fuck them up, you know, let's go -- let's get down. And this fool was like, Yeah. Let's go.

DETECTIVE PARSHALL: What did he do -- what did you see him do when he got out of the car?

RENE AREVALO: He just put -- like -- like, walked over there.

DETECTIVE PARSHALL: Like this with his crutches?

RENE AREVALO: No, with one of them. Because he was, like, shot in the leg or something. I don't know. He got shot like three times already. Dumb ass. He still don't learn, you know.

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: And he just got off and then this fool was like, you know --

DETECTIVE PARSHALL: What did he do?

RENE AREVALO: He didn't actually do anything because there was nothing to -- because this guy just

67

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4116

froze everybody.

DETECTIVE PARSHALL: What -- he froze everyone --

RENE AREVALO: Like, in the way that -- I don't think -- like, I don't think -- like, I don't even think he knew he had a gun. I don't know if he knew, you know. But I know that this fool just froze -- everybody goes, What did you say? And like a guy -- and the guy -- the other guy was just like looking at him and he just shot him. Boom.

And then some guy was right there, like, cutting branches or something. That fool just flew. And then I even go, Hey, let's go. You know, I started saying, Let's go. And he, like, turned around and then he turned around again.

And the other guy was just standing there and when he turned around he shot him like that -- like behind.

DETECTIVE PARSHALL: Where did he hit him on?

RENE AREVALO: I don't know. Like, I don't know.

DETECTIVE PARSHALL: You didn't see?

RENE AREVALO: I know that the first guy got hit in the face.

DETECTIVE PARSHALL: You saw him get hit?

RENE AREVALO: I mean, he had him like this.

DETECTIVE PARSHALL: Oh, that close?

68

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO: Yeah. I mean, like, you know, because the other guys never ran.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Like, they stayed right there, you know.

DETECTIVE PARSHALL: Okay. He got out of the car. He said what? Let's go fuck them up?

RENE AREVALO: Yeah. Let's go -- like, you know, like get down. You know, like, let's go -- let's go get down with those fools, you know.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: And this guy goes, Okay.

DETECTIVE PARSHALL: And this guy goes, Okay.

RENE AREVALO: This fool -- this fool had already got out.

DETECTIVE PARSHALL: What else did this guy say?

RENE AREVALO: Nothing. Like --

DETECTIVE PARSHALL: Did he ever -- did you ever see him throwing hand signs?

RENE AREVALO: No.

DETECTIVE PARSHALL: Did he ever yell anything about MS?

RENE AREVALO: No, because he's not.

DETECTIVE PARSHALL: Did he ever throw hand signs?

69

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4118

RENE AREVALO:  I didn't see him doing anything.

DETECTIVE PARSHALL:  Did he ever yell anything about MS?

RENE AREVALO:  When he was outside.

DETECTIVE PARSHALL:  What did he say?

RENE AREVALO:  La Mara (Phonetic).  La Mara.

DETECTIVE PARSHALL:  At what point?  Before or after the shooting?

RENE AREVALO:  Before.

DETECTIVE PARSHALL:  Before the shooting?

RENE AREVALO:  When he was -- when they were getting out.

DETECTIVE PARSHALL:  La Mara.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  What does he -- you see him throw MS?

RENE AREVALO:  Yeah.  He -- he just got -- the other -- the other guy started throwing gang signs first.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  You know, this fool goes just like that.  And then -- at first he, like, I told him, you know, (Inaudible) let's just go.  Let's just go.  And then after, like, yeah, let's just go.  But then the guy started walking.  He says -- we -- we -- because

70

scanned

actually -- the other guys actually followed them, you know, they're deaf I guess, you know.

DETECTIVE PARSHALL: They what?

RENE AREVALO: They follow it. They're deaf. They put it -- like, put that way, you know. Because we went like half a block still, and they followed the car.

DETECTIVE PARSHALL: Oh, before the shooting happened?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: They're walking along next to you?

RENE AREVALO: Yeah, yeah. Like, they were standing like -- like this.

DETECTIVE PARSHALL: Well your guy -- you're going this way.

RENE AREVALO: Okay.

DETECTIVE PARSHALL: And here's -- here's the sidewalk right here.

RENE AREVALO: Okay. This is the --

DETECTIVE PARSHALL: There's actually -- let me draw this.

RENE AREVALO: This is -- this the street. This is the street right here.

DETECTIVE PARSHALL: Right.

71

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 436 of 524

00010592

RENE AREVALO:  So we were -- this is the street. This is the -- this is the building and like --

DETECTIVE PARSHALL:  That's on the wrong side of the street.  Look.  You guys are going down the street this way.  Look it.  This is --

RENE AREVALO:  Yeah, yeah, that's right.  Like, we were going down on Fairfax going towards, like, Pico.

DETECTIVE PARSHALL:  Right.

RENE AREVALO:  We were coming from -- from Melrose --

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  -- towards Pico; right?

DETECTIVE PARSHALL:  Right.

RENE AREVALO:  So this is the right side of us.

DETECTIVE PARSHALL:  But I'm saying this is your car right here; right?

RENE AREVALO:  Yeah, see --

DETECTIVE PARSHALL:  It's pointing this way.

RENE AREVALO:  Yeah.  So we were going down that way too.  I'm not putting it that way.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  I'm -- you know what I mean?

DETECTIVE PARSHALL:  Okay.  Well, keep going then.

72

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 436 of 524

JA4121

scanned

RENE AREVALO: Okay. This is the car; right?

DETECTIVE PARSHALL: Right.

RENE AREVALO: So we're going down that way.

DETECTIVE PARSHALL: Right.

RENE AREVALO: So this is the street. We're going down --

DETECTIVE PARSHALL: But you guys are over here.

RENE AREVALO: Yeah. This is Fairfax.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: You know, this is Fairfax and we're going down to Pico; right? You know, this is Pico right here.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: And this is the road -- whatever other street.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And they started doing the gang signs right here.

DETECTIVE PARSHALL: They're on the side walk right here?

RENE AREVALO: On the -- on the -- yeah, on the sidewalk by like -- by a building.

DETECTIVE PARSHALL: Right.

RENE AREVALO: And then we pass by, and then this guy goes and throws MS; right? So -- but I just keep

73

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4122

on going.

DETECTIVE PARSHALL:  They started the hand signs?

RENE AREVALO:  Yeah, they started hand signs. Well, yeah, we're passing by them, you know, so I mean, we're going super slow -- why, you know --

DETECTIVE PARSHALL:  Yeah, I know how traffic is.

RENE AREVALO:  Yeah.  So they started -- they looked at us and, like, they looked back and everything.  So they started, like, they started throwing gang signs, then this guy throws MS.  And then they looked at us and I go, No.  Let's just go.

And this guy, Omar, says, Let's go.  You know, like, we all said, like, Let's just go to the beach.  Because that's where we're going.  And then he -- he even said, All right.  Let's just go then. Let's just go.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  So he -- but he starts looking back, you know, so this guy starts following, like -- like, he starts looking back to go like, Hey -- like, in Spanish he goes, (SPANISH).  Like, those fools must have a gun, you know.

And I looked back and I go, No.  They just little -- because they looked young, you know.  And I go, Just, you know, they're -- they're stupid fools.

74

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

Just leave them.  So that's where the -- that's when he catches up, like, when we stopped at the, like, there's a red light in front.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  That's when we get stopped, then he just goes and that's when he does this.  That's when he gets out the car.

DETECTIVE PARSHALL:  That's when he lost it?

RENE AREVALO:  Yeah.  Well, I guess because the neighborhood shit.

DETECTIVE TELIS:  Do you know the guys who were walking on the sidewalk?

RENE AREVALO:  No.

DETECTIVE TELIS:  No, no.  I know.  I know.  The guys that were walking on the sidewalk, did you see their faces?  Would you recognize them do you think --

RENE AREVALO:  No.

DETECTIVE TELIS:  -- if we showed you some pictures of them?

RENE AREVALO:  No.  Because I don't -- I don't -- I'm not -- I never paid attention to them because I was driving.  And we were driving too slow that I had to be always looking forward so I don't hit the car in front.

75

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

DETECTIVE TELIS: Okay.

RENE AREVALO: You know what I mean? When you're driving through -- you can't be like this and expect to be driving.

DETECTIVE TELIS: So this guy Wizard tells you, Pull over.

RENE AREVALO: Well, he just gets off the car.

DETECTIVE TELIS: Because you guys were stopped in traffic?

RENE AREVALO: Yeah. Because he just -- like, you know, basically he doesn't have to jump or anything. He just gets off the car --

DETECTIVE TELIS: Uh-huh.

RENE AREVALO: Then -- then this guy and this guy gets off the car.

DETECTIVE TELIS: Uh-huh.

RENE AREVALO: And that's when like -- that's when I pulled over, you know. Obviously, I'm not -- I mean, that's a person -- you're not going to leave somebody just like that, you know.

DETECTIVE TELIS: Uh-huh.

RENE AREVALO: But in my -- in my mind, I never expected him to do that. Like, I never thought he was going to do that, you know.

DETECTIVE TELIS: He never showed you guys the

76

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

**JA4125**

scanned

gun --

RENE AREVALO:  No.

DETECTIVE TELIS:  -- in the car at any point?

RENE AREVALO:  Hell, no.  Because he knows -- he like -- like they know that I don't carry shit like that.  I'm not that kind of, you know, I'm don't -- like, I tell them, A man is a man, like, you know, you fight, whatever, but you show -- you know, you get your get your ass kicked, fuck it.

You know, like, but you don't go and, like, you know, and start killing people or like -- I don't -- I don't know.  I don't do things like that and I don't -- I don't -- I feel -- I feel remorse like because like I know that I grew up in an environment where, you know, okay, you got yourself in this situation, you know you got to be fucking a man.

But damn, I feel like, you know, like, I know that I didn't want to do those things, you know, and I feel like I got -- I got a responsibility, which is my little girl, and I'd rather take this chance of doing whatever I got to do just to be with her, you know, and be there for her.  Because my girl, you know, she's -- she's 20 years old.  She don't work.  She don't have no responsibilities, you know what I mean?

77

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

DETECTIVE TELIS: Uh-huh.

RENE AREVALO: And, like, she doesn't know how to -- I mean, right now that she finds out, she's going to go crazy, you know, she's going to go like, you know, What am I going to do now? What am I -- because I'm the only one for her and my sister -- that she helps me out a lot, you know.

DETECTIVE TELIS: Right. Let me ask you something. After this thing went down and you got -- and they jump back in the car; right?

RENE AREVALO: Yeah.

DETECTIVE TELIS: You guys drove off. What -- what did you guys say in the car?

RENE AREVALO: Well --

DETECTIVE TELIS: Who said what? Because you had to have said something.

RENE AREVALO: Like, I go -- like me and like -- well, first of all we started --

DETECTIVE TELIS: Who?

RENE AREVALO: -- -- tripping on him.

DETECTIVE TELIS: (Inaudible) who?

RENE AREVALO: Yeah, him. Because he was nervous and then I told him -- and then this guy told him, "Don't be a pussy." You know? And this guy --

DETECTIVE TELIS: Who?

78

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4127

scanned

RENE AREVALO: -- goes -- Wizard. Because he's like -- you know, he's just the type, you know. Like, he's just like that, you know.

DETECTIVE TELIS: Okay.

RENE AREVALO: So -- so he just goes like, Oh, you know what? Like, you know, Don't -- don't be a pussy. Just take it. And then I go, No, fool. Just leave him alone. And then that's when I told him, The soda's right there, fool. Just drink it. And don't -- and I go, Let's just go back. And he goes, No. Don't go back. Let's just go straight because the cops are on that side.

And I figured that true because if you up the street -- up in the -- up Glen -- Glen Boulevard. You know how like --

DETECTIVE TELIS: Up what?

RENE AREVALO: You know Glen and Beverly? You know Glen?

DETECTIVE PARSHALL: Beverly Glen.

RENE AREVALO: Beverly Glen. There you go.

DETECTIVE PARSHALL: Oh.

RENE AREVALO: Beverly Glen. You know how you go up there that where like, you know, like, the -- do you know the TV sets right there --

DETECTIVE PARSHALL: Uh-huh.

79

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 443 of 524
JA4128

RENE AREVALO:  -- like, and the golf course?

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  So we just went up that street -- up.  And then I -- we just got to the beach and I didn't -- we didn't even -- I didn't even take a shower or anything.  And -- and this fool was like nothing, and this fool was kind of like whatever.  He was -- they were just talking.  This fool and that fool and me, we were just like, What the fuck?  You know.

Like -- like -- the other -- like, the young fools they were like -- Omar is the one that, you know, I feel bad for.

DETECTIVE TELIS:  Omar was nervous?

RENE AREVALO:  Omar was like --

DETECTIVE TELIS:  He felt really --

RENE AREVALO:  -- scared, yeah.  He was like --

DETECTIVE PARSHALL:  How do you know he was scared?  What kinds of things was he saying to you?

RENE AREVALO:  Like, Why -- why did you do that for?  Why -- why -- why would you fucking do that shit for?  You know, you could have just hit him or something.

DETECTIVE PARSHALL:  But he wasn't -- he wasn't afraid of -- of questioning Wizard?  I mean, he

80

scanned

wasn't afraid of saying, Why did you do that? He was asking him that? Why did you do that?

RENE AREVALO: Yeah. But like, he was nervous. I mean, he was just like, you know, like, literally, like, he was asking himself, like, you know, and he was telling me, Let's just -- let's go home. Let's go home. You know, he was scared.

DETECTIVE TELIS: Instead of going to the beach, he wanted to skip the beach and just go home?

RENE AREVALO: I wanted to go home too. I go like, Let's go home better, you know.

DETECTIVE TELIS: But you didn't? You went to the beach.

RENE AREVALO: We went, like, towards the beach. We didn't go to the beach no more. We just went towards the beach.

DETECTIVE TELIS: Uh-huh. You went to Beverly Glen.

RENE AREVALO: Like, we went, like, almost -- we jumped on the 10 and then we turned around like -- I don't know. We just -- we turned around on Lincoln or something.

DETECTIVE TELIS: Uh-huh.

RENE AREVALO: We went by Pico --

DETECTIVE TELIS: Right. Right.

81

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

**JA4130**

RENE AREVALO:  You know, like around there.  We just parked around there for a while.  You know, like on Pico where --

DETECTIVE PARSHALL:  Oh, you took the 10 towards the beach?

RENE AREVALO:  Yeah.

DETECTIVE TELIS:  Did you get the 10 at Fairfax?  Or where did you catch the 10?

RENE AREVALO:  No.  We got it, like --

DETECTIVE TELIS:  When you left -- like right when you pulled off --

RENE AREVALO:  Like Overland -- you know, like Overland --

DETECTIVE TELIS:  Right.

RENE AREVALO:  Like, I use -- like, I'm -- I always worked as a driver.  I worked for John and Pete's liquor store on La Cienega.

DETECTIVE TELIS:  So when you --

RENE AREVALO:  So I know that area.

DETECTIVE PARSHALL:  You made -- did you turn at the first street -- after the shooting did you turn at the first little street in the neighborhood?

RENE AREVALO:  No, the main street.

DETECTIVE PARSHALL:  Pico?

RENE AREVALO:  Yeah.

82

scanned

DETECTIVE PARSHALL:  You turned at Pico?

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Okay.  And where did you take Pico to?

RENE AREVALO:  All the way down to, like, Overland or something.

DETECTIVE PARSHALL:  All the way down to Overland?

RENE AREVALO:  Uh-huh.

DETECTIVE PARSHALL:  And then you turned left on Overland?

RENE AREVALO:  I don't -- like, I don't -- well --

DETECTIVE PARSHALL:  (Inaudible) right?

RENE AREVALO:  No.  It's a right --

DETECTIVE TELIS:  Right to the freeway.

RENE AREVALO:  To the freeway, yeah.  To the freeway.

DETECTIVE TELIS:  Yeah, right to the freeway.

DETECTIVE PARSHALL:  Pico?

RENE AREVALO:  Yeah.

DETECTIVE TELIS:  Yeah, Pico to Overland.

RENE AREVALO:  Because Pico and then we got off again and we went in the street again and then we took Pico to, like, where I'm telling you.

83

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

DETECTIVE TELIS:  Right.

RENE AREVALO:  Do you know Pico Uno (Phonetic)?
The motel?

DETECTIVE TELIS:  No.

RENE AREVALO:  The hotel?

DETECTIVE TELIS:  Uh-huh.

RENE AREVALO:  Because we used to go do
electrical stuff right there --

DETECTIVE TELIS:  Oh, okay.

RENE AREVALO:  And I know that --

DETECTIVE TELIS:  In Santa Monica?

RENE AREVALO:  Yeah, in Santa Monica.

DETECTIVE PARSHALL:  Well, Pico and Overland --

RENE AREVALO:  By the pier.

DETECTIVE PARSHALL:  You got to turn left on
Overland to get to that --

RENE AREVALO:  No.

DETECTIVE TELIS:  (Inaudible)

DETECTIVE PARSHALL:  No.

DETECTIVE TELIS:  You turn right.

DETECTIVE PARSHALL:  That's Venice.

DETECTIVE TELIS:  No.  It's Pico.

RENE AREVALO:  Pico and Overland -- you go
because Pico's like this and the freeway's over here.

DETECTIVE TELIS:  Okay.  Yeah.  It crosses over

84

scanned

right at La Cienega and then it becomes on the other side.

DETECTIVE PARSHALL: Okay. All right. SO you get on the freeway and you take it all the way to Santa Monica, you get off at Lincoln you said or something?

RENE AREVALO: Yeah. By around Lincoln and then we go back to, like, Pico.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: You know, because right there and then that's where the little hotel and everything -- and then he gets off and he goes around, he goes and he cleans his shit and then --

DETECTIVE PARSHALL: What do you mean? Who cleans what?

RENE AREVALO: The gun. Him. He never lets it go.

DETECTIVE TELIS: What kind of gun was it?

RENE AREVALO: I don't remember.

DETECTIVE TELIS: What did it look like?

RENE AREVALO: It looked like -- like this big.

DETECTIVE TELIS: It was that big?

RENE AREVALO: Yeah. It was like this big.

DETECTIVE TELIS: Was it a --

DETECTIVE PARSHALL: That's a freaking rifle.

85

JA4134

DETECTIVE TELIS: That's huge. Was it a revolver or was it a semi-auto?

RENE AREVALO: No. It was like a clip thing. It was like clip --

DETECTIVE PARSHALL: It was like a clip thing?

RENE AREVALO: Yeah.

DETECTIVE TELIS: Was it a big caliber gun? Like -- like this?

RENE AREVALO: I don't know.

DETECTIVE TELIS: Like 40 caliber?

RENE AREVALO: I don't know.

DETECTIVE TELIS: Okay.

RENE AREVALO: Because I never saw it. It just looked like a (Inaudible). Like a revolver is the one with the little --

DETECTIVE TELIS: Cylinder, right.

RENE AREVALO: Like with the round thing.

DETECTIVE PARSHALL: Draw me a picture of this thing because I -- I'm way off. What does this thing look like?

DETECTIVE TELIS: That's --

RENE AREVALO: (Inaudible) it looked like, okay, like this is the clip.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: This is the gun on the thing.

86

LYNDEN J. AND ASSOCIATES, INC.     (800) 972-3376

scanned

DETECTIVE PARSHALL:  So it looked just like a pistol?  A regular -- a regular gun?

RENE AREVALO:  Yeah.  I mean, it looked big though.

DETECTIVE TELIS:  Did it look like this?

RENE AREVALO:  It looked like that but skinny and longer.

DETECTIVE TELIS:  Skinny and longer?

DETECTIVE PARSHALL:  Really?  Okay.

RENE AREVALO:  And -- and it was chrome.

DETECTIVE PARSHALL:  Did anyone make any --

DETECTIVE TELIS:  It was chrome?

RENE AREVALO:  Yeah.  I mean, when we got to the beach he took it out and he started cleaning it and everything.

DETECTIVE PARSHALL:  Well, you got to the beach or not?  Did you go to the beach or not?

RENE AREVALO:  That what I'm -- I'm telling you right there by Pico Uno that's the beach already. But we didn't go to the -- like the beaches -- well, what I'm telling you we didn't go swimming no more or stuff like that.

DETECTIVE PARSHALL:  Did you get out and walk in the sand?

RENE AREVALO:  No.  We got out by the grass.

87

DETECTIVE PARSHALL: So you just kicked back there by the grass --

RENE AREVALO: For like --

DETECTIVE PARSHALL: And you ate your food and you got some beers and you got some tacos.

RENE AREVALO: No.

DETECTIVE PARSHALL: No?

RENE AREVALO: We didn't -- we didn't have no beers. We only -- we were right there and what I did was smoke a lot. I smoked like half a pack right there.

DETECTIVE PARSHALL: Oh, okay.

RENE AREVALO: Like, every cop I saw, I thought (Inaudible). You know, we went on -- on Pico -- when we were going on Pico towards Overland we even saw like two cops passing. And I was like, Oh, my god. That's it for us.

You know, because I knew that if they catch me in the moment they were going to -- there was no doubt, you know. And I mean, I was just -- I mean, I never thought I would get myself in this kind of situation.

DETECTIVE PARSHALL: Let me ask you this. Did anyone make any phone calls from the car?

RENE AREVALO: No.

88

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 452 of 524

**JA4137**

scanned

DETECTIVE TELIS:  Did anybody have a cell phone?

DETECTIVE PARSHALL:  Did anyone have anyone --

RENE AREVALO:  I think I had a cell phone, but I don't remember, but nobody used my phone.

DETECTIVE PARSHALL:  What was your cell phone number?

RENE AREVALO:  I don't remember.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  I'm not good with, like, I'm not that good --

DETECTIVE PARSHALL:  Did anyone go back by the area where the shooting occurred to see what was going on?

RENE AREVALO:  I didn't.  We didn't.

DETECTIVE PARSHALL:  Do you know about anyone asking anyone to go check what happened?

RENE AREVALO:  No.  No.

DETECTIVE PARSHALL:  Straight up.

RENE AREVALO:  No, I don't.  But like --

DETECTIVE PARSHALL:  You didn't call anybody?

RENE AREVALO:  No.  When -- when I dropped them off on Mariposa I just went home.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  To my house.  And I -- and this guy, the only thing that he told everybody was like,

89

if you know, just shut up. Don't tell nobody about this. And --

DETECTIVE PARSHALL: Did you ever tell anyone, You better not talk.

RENE AREVALO: No. Hell -- no, because I feel like I was in the position that I got, you know, that they put me in that position that I better not --

DETECTIVE PARSHALL: So if someone said that you had threatened them a couple of times and said, You better not say anything, the police, they know what happens. They'd be lying?

RENE AREVALO: Yeah, because I don't, I mean, them, you know, why would I be --

DETECTIVE PARSHALL: I got to ask you that because these are some of the things that --

RENE AREVALO: Yeah. I mean --

DETECTIVE PARSHALL: -- that -- that -- the D.A.s going to say did you ask him about this? Did you clear this up? Did you ask about this?

RENE AREVALO: Yeah. No. But I (Inaudible)

DETECTIVE PARSHALL: Did you ever tell Wizard to get out of the car to fight these guys, to shoot them, anything like that?

RENE AREVALO: No. Hell, no. I never -- I never -- I even told him, Let's go. Like, I told him,

90

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

Let's just --

DETECTIVE PARSHALL:  What does -- what does (SPANISH) mean?

RENE AREVALO:  Huh?

DETECTIVE PARSHALL:  What does (SPANISH) mean?

RENE AREVALO:  (SPANISH)?  Tell him.

DETECTIVE PARSHALL:  Okay.  How do you say "do it" in Spanish?  How do you say "do it"?

RENE AREVALO:  Do it?  Aselo (Phonetic).

DETECTIVE PARSHALL:  Aselo?  Okay.  Would you ever say (SPANISH) if you were telling someone to "do it"?

RENE AREVALO:  (SPANISH)?

DETECTIVE PARSHALL:  It's just -- yeah.  It doesn't mean "do it", or -- or --

RENE AREVALO:  (SPANISH) is "tell him".

DETECTIVE PARSHALL:  Tell him.  Tell him.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Okay.  All right.  You never said (SPANISH) to anybody?

RENE AREVALO:  No.  What would I do that for?  I mean --

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  What I wanted to do was just to get out from there, you know, I'm telling you, man,

91

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

like, I was looking, then I don't know why they kept on following the car.

DETECTIVE PARSHALL: Is there any reason a witness would say that you said something like (SPANISH)?

RENE AREVALO: No.

DETECTIVE PARSHALL: No? Okay. You didn't say anything like that?

RENE AREVALO: No, no. I know -- I know -- I know what I -- that I -- what I know what I do and I know what I -- what I'm capable of. If -- if I'm going to do something, I'd rather get and off and like, you know, if I'm going to fight somebody, I'll (Inaudible). If I don't -- if I saw two kids like going one my age and --

DETECTIVE PARSHALL: You're going to fight them. There's no reason to shoot them.

RENE AREVALO: Yeah. And I'm not --

DETECTIVE PARSHALL: And they didn't have any weapon?

RENE AREVALO: I don't know.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: I don't know.

DETECTIVE PARSHALL: Okay. You didn't see a weapon?

92

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO: I didn't see a weapon.

DETECTIVE PARSHALL: Okay. I want to make sure you didn't see a weapon.

RENE AREVALO: No, I didn't see a weapon.

DETECTIVE TELIS: Did any of these guys who got out of the car say they had a weapon?

RENE AREVALO: No. The only one that --

DETECTIVE TELIS: Are you sure?

RENE AREVALO: The only one that said, I'm going to hit him with the crutches is him.

DETECTIVE TELIS: And he got out of the car?

RENE AREVALO: (Inaudible) (SPANISH).

DETECTIVE TELIS: Okay.

DETECTIVE PARSHALL: I'm going to hit him with a crutch?

RENE AREVALO: Yeah. That's about the only violent thing that I could say that any of us said in the car that we were going to do, you know.

DETECTIVE PARSHALL: I'm talking about weapons on the -- on the two guys. Did -- what did Wizard say? Did Wizard say, Hey, one of them might have a gun.

RENE AREVALO: He -- he said --

DETECTIVE PARSHALL: Honest. You got to be truthful about this.

RENE AREVALO: Well, what do you mean

93

**JA4142**

(Inaudible)?

DETECTIVE PARSHALL:  Did -- did Wizard ever say anything about the two guys?  Because everyone's saying, Let's go.  Let's go.  You had mentioned to me earlier that --

RENE AREVALO:  Yeah, yeah.  But see, the weird -- see that's why it weird because he's the first one who got off.

DETECTIVE PARSHALL:  Right.

RENE AREVALO:  So that's why I feel like he -- like -- since he was the one that -- he knew he had a gun and everything; right?

Obviously he was -- because these guys didn't get off until he got off.  But I mean, we were going and, like, these guys kept on following, like, you know, they followed for like half a block --

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  -- at least, you know.

DETECTIVE PARSHALL:  Right.

RENE AREVALO:  But they didn't follow like straight.  They just went -- like when -- when -- they were like, behind, you know, and that's when, like, he turned around and the guy goes like this. That's when he really just got off the car.  And I go like, No, dude.  You know, like, and, like, I don't

94

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

know why he did that, man.

DETECTIVE PARSHALL:  Uh-huh.

DETECTIVE TELIS:  Uh-huh.

DETECTIVE PARSHALL:  Yeah, he --

RENE AREVALO:  I mean, he's just -- I mean, the things that they are, like, the way they are in El Salvador -- it's like, that's why I was scared to go to El Salvador too right now when they were trying to deport me because these guys don't -- don't, I mean, they'll kill your whole family if they have to, you know, that's what I'm telling you.

DETECTIVE PARSHALL:  Where is he now?  How can we get him?

RENE AREVALO:  I don't know, sir.  The thing is I -- I haven't -- like, I haven't seen none of them. The only one I seen is this guy.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  And I haven't even seen Omar because he got arrested like last year.

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  I don't know.  Yeah.  For being -- for smoking weed, I guess.  And being out late.  And they told him -- but the only guy I seen is this guy. I haven't seen neither one of them since I got out of jail because  -- the only reason why I seen him is

95

because my girl -- when I was locked -- when I locked up in INS my girl was staying at my cousins house and he lives on Mariposa.

So I went -- I went there before I moved -- before she moved back with me --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: You know, I used to go see her there because she was still pregnant, you know, and other than that, I don't -- I haven't seen none of them like my old acquaintances that I seen before, you know. The only guy I know is my friend Alex and that's it, you know.

DETECTIVE PARSHALL: Who's your friend Alex?

RENE AREVALO: Alex.

DETECTIVE PARSHALL: Alex who?

RENE AREVALO: Alex. I don't -- he's not involved in this. He wasn't even there.

DETECTIVE PARSHALL: Okay. Let me make sure.

RENE AREVALO: Okay. I don't want to get him something that he was not involved in.

DETECTIVE PARSHALL: No.

RENE AREVALO: Because --

DETECTIVE PARSHALL: No, but --

RENE AREVALO: And he's the only guy that I talk to once in a while --

96

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4145

scanned

DETECTIVE PARSHALL:  No one is --

RENE AREVALO:  -- and on the phone (Inaudible)

DETECTIVE PARSHALL:  Well, that's what I'm saying.  It's possible that you talked to him, or talked to somebody.

RENE AREVALO:  No.  No.  It's nothing.

DETECTIVE PARSHALL:  Alex is not there?

RENE AREVALO:  No.

DETECTIVE PARSHALL:  You don't know Alex's last name?

RENE AREVALO:  Alex Rosales.  Yeah, he's my good friend.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  He's 19.  He's like -- he's my same age as my girl and I know that --

DETECTIVE PARSHALL:  What does he look like?

RENE AREVALO:  Huh?

DETECTIVE PARSHALL:  What does he look like?

RENE AREVALO:  He has -- he's always got a fade.

DETECTIVE PARSHALL:  Oh, okay.

RENE AREVALO:  And he works, you know.

DETECTIVE PARSHALL:  And where is he right now?

RENE AREVALO:  Maybe at his house.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  Or maybe at his --

97

DETECTIVE PARSHALL:  He's not locked up?

RENE AREVALO:  No, no.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  I mean, he's not -- like, he's not -- he's not a trouble maker.  He's just, you know, a kid that grew up like me, you know, in the gang activity things, you know, like gang (Inaudible).

But he works and he's the only -- he's the only kid.  He only has an older sister and his brother got killed in El Salvador and his mom -- he was born here.  So he's the only kid that his mom has and she goes -- like she's always looking for him and he's always nice to his mom, you know.

DETECTIVE PARSHALL:  Alex?

RENE AREVALO:  Yeah, my friend.

DETECTIVE TELIS:  Let me ask you something.  After this happened why didn't you call the police and tell them what happened?  Because you had to have known that two people were killed.

RENE AREVALO:  Well, I didn't know that --

DETECTIVE TELIS:  It was all over the news.

RENE AREVALO:  Oh, yeah?

DETECTIVE TELIS:  Yeah.  It was all over the news, the newspapers, everywhere.  Everybody knew that two people were murdered on -- on Fairfax.  And

98

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

how come you didn't come forward and tell anybody this? We had to arrest you for this.

RENE AREVALO: The truth. I don't -- I don't -- I mean, I don't know if you see and understand my point, but I -- I just -- like I told you, you know, if I -- if I said anything before, like, I would have, like, you know, like, they would have known one of us said something, you know.

And I feel like -- I feel -- I feel -- I feel guilty in a way, but at the same time I know that I didn't even -- that I didn't even know that this person was going to do that, you know, I didn't even think, like, he had -- I was not -- in my knowledge I didn't know that he had the weapon, you know, like, I just -- my point of view is like we were going to the beach, that happened, and the only thing I didn't do is like communicate with them at all, like, I didn't -- I didn't -- I didn't -- I didn't -- I didn't go around looking for him or anything like that, you know.

I was -- I'm actually, you know, why -- I'm actually scared of this person.

DETECTIVE TELIS: Like who?

RENE AREVALO: Like, this person right here. I -- I fear him because I know that he would not, like,

99

think about --

DETECTIVE TELIS: Not hesitate to do something to you?

RENE AREVALO: -- twice. Yeah.

DETECTIVE TELIS: How many times did you talk to him after this incident happened would you say?

RENE AREVALO: Like, twice.

DETECTIVE PARSHALL: How many times did you talk to him before this incident happened?

RENE AREVALO: Maybe -- because I used to -- I smoke weed. So I used to smoke weed whenever I used to see him. But he was never around that much. I probably --

DETECTIVE PARSHALL: But you hung out with him before this thing happened?

RENE AREVALO: Like, on Mariposa, yeah. But not like somewhere else. That was the first time I ever went out with him.

DETECTIVE PARSHALL: Did you know that he was that kind of person before?

RENE AREVALO: I had an idea.

DETECTIVE PARSHALL: Why?

RENE AREVALO: Because they always talking about it, you know, like -- like -- shit like if you fucking (Inaudible)

100

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

scanned

DETECTIVE PARSHALL: Hey, hold on. Yeah.

RENE AREVALO: And all that shit.

DETECTIVE PARSHALL: Be honest with me about this because that's going to lead us into another thing that -- that I'm looking at him at.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. And I think you know about that thing too.

RENE AREVALO: Well --

DETECTIVE PARSHALL: Anything else that you know that he did that could help us out?

RENE AREVALO: Well, that -- that I know of? That I -- no. Because the only time is that time where I went out and that's --

DETECTIVE PARSHALL: Do you know about the murder at Lemon Grove Park?

RENE AREVALO: No.

DETECTIVE PARSHALL: Do you know Freddie?

RENE AREVALO: Freddie?

DETECTIVE PARSHALL: The guy at Lemon Grove Park? There was a guy killed -- it wasn't Freddie, but there was a guy killed at Lemon Grove Park.

RENE AREVALO: No. I haven't gone to Lemon Grove Park since I was like 10, 11 years old.

DETECTIVE PARSHALL: But the circle -- the circle

101

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4150

of people -- The Hollywoods. You hang out with the Hollywoods; right?

RENE AREVALO: Yeah, I know a couple of them, yeah.

DETECTIVE PARSHALL: And Hollywoods and Harvards hang out together.

RENE AREVALO: Yeah, they're in, like, the same area.

DETECTIVE PARSHALL: Right.

RENE AREVALO: That's why he was like (Inaudible)

DETECTIVE PARSHALL: Who was responsible for -- without naming any names -- who was -- what clique was responsible for the Lemon Grove murder?

RENE AREVALO: (Inaudible) the Lemon Grove -- well, that's where Canton (Phonetic) kicks it at; right?

DETECTIVE PARSHALL: No.

RENE AREVALO: No?

DETECTIVE PARSHALL: Huh-uh.

RENE AREVALO: That's where I know them before and there's no -- and like -- in -- like --

DETECTIVE PARSHALL: Isn't it TCA or something like that, or --

DETECTIVE TELIS: I don't know. It's one of those monikers.

102

scanned

RENE AREVALO:  Oh, yeah?  Because I know that like Canton used to --

DETECTIVE PARSHALL:  Did he ever talk about that gun being hot, or that gun doing any other murders?

RENE AREVALO:  No.

DETECTIVE PARSHALL:  Did he ever say how long he had that gun?

RENE AREVALO:  No.  Because I never -- like me -- like I never -- like I don't -- I don't -- I don't be in that kind of like thing, you know.

DETECTIVE PARSHALL:  Did he ever say anything -- when you talked to him after the murder, did he ever say anything to you about talking to the police or anything about the murder?

RENE AREVALO:  No, he told us right there and then.  And then after that --

DETECTIVE PARSHALL:  What did he say?

RENE AREVALO:  That he -- he just told everybody, you guys better shut the fuck up.  You know, like, whatever happens, you know, like, you guys just, you know, you guys want to be in this shit, like, you know, like, get your -- you know (SPANISH) --

DETECTIVE TELIS:  Balls.

RENE AREVALO:  Yeah, get your balls in, you know, and how to handle it.  Because, like, he was telling

103

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

**JA4152**

Omar mostly.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Because Omar was the one that was like -- and I was just like, Just leave him alone. You know, and like -- you know, well, we'll just, you know, we're not going to say nothing. And -- and this guy and this guy were -- they were just quiet.

DETECTIVE TELIS: What was Omar saying?

DETECTIVE PARSHALL: These two guys were quiet?

RENE AREVALO: Yeah.

DETECTIVE TELIS: What was Omar saying that was -- that was --

RENE AREVALO: I mean, he was just like, you know, like nervous. I mean, I'm telling you, he was just like, Why? Why? You know. Like, just like, I mean, when you see somebody that just got so --

DETECTIVE TELIS: Did he start crying or anything like that?

RENE AREVALO: Almost. Not really. He didn't -- he didn't -- tears didn't come out of his eyes because I think he was embarrassed, but I think he felt like crying. And I feel like, you know, just like --

DETECTIVE TELIS: Did you and Omar talk about this afterwards?

104

scanned

RENE AREVALO: Yeah, me and Omar. Yeah, I told him Omar, like, don't worry about it, you know, and just like, you know, like that teaches us to, you know, like, not to fuck around with this mother fucker.

DETECTIVE TELIS: Did you ever say anything, Don't worry about it, man. The cops are not going to find us. They're not going to know who did it.

RENE AREVALO: No. I never -- I never thought about it. I never -- I never -- I never figured I was going to be in this position.

I never thought about it because I told him, like, you know, because he goes like, Damn, you know, that's fucked up we did that. And I told -- I go, Don't feel guilty.

I didn't know he was going to that, so don't feel -- I mean, let's -- like -- and that's what I told him. You know, that's why you got to listen you your mom. And like be around, you know, if you're like going to mess up, then mess up in different ways, but don't mess up in like -- you know, like, Go ahead and, like, smoke weed if you want to, or you know, get into fights. But don't do that because that's -- that's -- that's what you feel, you know.

DETECTIVE PARSHALL: So you're not MS?

105

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

RENE AREVALO: No.

DETECTIVE PARSHALL: But you hang around the Hollywoods?

RENE AREVALO: They're the -- see, like, I don't hang around -- like they moved right there to Mariposa --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: When I was still living there.

DETECTIVE PARSHALL: But you're in a car with Hollywoods?

RENE AREVALO: With -- yeah, with these guys.

DETECTIVE PARSHALL: These are the only two guys that are gangsters?

RENE AREVALO: But they're not -- yeah. But I don't think they even, like, yeah, like, I know -- I know he is. I don't know if he is yet. But I know that --

DETECTIVE PARSHALL: But he's got (SPANISH) tattooed on his forearms -- this guy.

RENE AREVALO: This guy?

DETECTIVE PARSHALL: Yeah. (SPANISH) on his arms.

RENE AREVALO: Oh, yeah?

DETECTIVE TELIS: Yeah, he's just --

RENE AREVALO: So I guess he just barely got it

106

JA4155

scanned

because his -- when I met him he didn't have no tattoos.

DETECTIVE TELIS: Okay.

RENE AREVALO: Because he used to walk around with -- because I met him in the summer, you know, like, that's when I met him. Because when I -- when -- when that happened I had barely met him. I hadn't -- I hadn't, you know, like, known him for years or nothing like that.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: I barely met him like -- for like a month or a month and a half. And all they would do is just go and sleep there and -- and then they would just leave, you know.

DETECTIVE PARSHALL: Okay. So this is real important that we got everyone down right. This is -- this is -- you swear to god that is --

RENE AREVALO: I put it on my baby.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: That I -- like -- that I, you know.

DETECTIVE PARSHALL: Because we -- we thought that this guy was maybe one of the guys that got out.

RENE AREVALO: No.

DETECTIVE PARSHALL: So that was maybe this guy

107

lying about it, huh?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: So this guy never got out of the car?

RENE AREVALO: No.

DETECTIVE PARSHALL: And did this guy have a cast on or anything?

RENE AREVALO: I don't remember.

DETECTIVE PARSHALL: Did he have Velcro cast on?

RENE AREVALO: Yeah, there you go. Like a boot.

DETECTIVE PARSHALL: A boot?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: And so he got out with both crutches. Did he hold a crutch like a baseball bat or anything?

RENE AREVALO: No, he just hold it -- and he even forgot one.

DETECTIVE TELIS: He forgot one?

DETECTIVE PARSHALL: He forgot one?

RENE AREVALO: Yeah.

DETECTIVE TELIS: He forgot one outside the car?

RENE AREVALO: Yeah, I think so.

DETECTIVE TELIS: You think so. What -- what -- how do you know that?

RENE AREVALO: Because I think -- because he was

108

scanned

talking about, Oh shit, I forgot a crutch. I forgot a crutch. I don't know if he -- I don't know if he forgot it or he thought he forgot it.

But I don't -- I don't remember because I'm telling you, like, but I know he got out and he got out and he got out. And Omar and me stayed in the car.

DETECTIVE TELIS: And they're all talking about, Let's go fuck them up. Basically.

RENE AREVALO: Yeah.

DETECTIVE TELIS: Right. You told me that he said, you told me that he said, and you told me that he said; right?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay.

DETECTIVE TELIS: What's the matter? You're thinking about something.

RENE AREVALO: Yeah. You know what?

DETECTIVE TELIS: What?

RENE AREVALO: I don't -- like --

DETECTIVE PARSHALL: Don't change anything because you think someone's going to be in more trouble or less trouble.

RENE AREVALO: No, no, no. You know what? No. You know what?

109

JA4158

DETECTIVE TELIS:  What?

RENE AREVALO:  I think -- I think that he didn't get off the car.  Now that I -- because I could tell you honestly that he was nervous.  Honestly, I know that he was nervous.

DETECTIVE TELIS:  Did he get out of the car?

RENE AREVALO:  I think so.  I think that I messed up by -- by doing that.  I'm serious.  I'm sorry.

DETECTIVE TELIS:  I don't want you to make things worse for you.

RENE AREVALO:  No, no, no.  I know.  I'm telling you this guy -- I know.  This guy's the shooter. This got out.  But I don't remember because I know that -- I -- but I -- damn.  Because I -- I think he got off but I'm not -- but I could tell you that this guy was behind me though.

DETECTIVE TELIS:  Right.

RENE AREVALO:  But I don't know if he got of to this side and this guy -- that I don't -- I don't -- I'm starting to --

DETECTIVE TELIS:  Well, how could -- if they got out on one side of the car --

RENE AREVALO:  Because he's in the middle.

DETECTIVE TELIS:  I know.  But if he got out on one side of the car, he would have had to climb over

110

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4159

scanned

him; right?

RENE AREVALO:  No.

DETECTIVE PARSHALL:  No.  He could have got out of the left side.

RENE AREVALO:  Because he could have got out because it's four doors.

DETECTIVE TELIS:  Oh, you didn't know if he got out and --

RENE AREVALO:  Yeah.  That's what I'm telling you, that I don't remember because he -- I think that's what -- right now that he's -- you're talking about -- that mentioned the crutches, I don't remember if he got out or he got out.

DETECTIVE PARSHALL:  Was he yelling, "Get my crutch.  Get my crutch."

RENE AREVALO:  Yeah.  I think so.

DETECTIVE PARSHALL:  So you don't know if he got out or not.

RENE AREVALO:  That's what -- no.  But one of -- one of them stayed in because only -- because -- and this fool was shitting it like crazy.

DETECTIVE PARSHALL:  These two got out?

RENE AREVALO:  Yeah, this fool got out.  So I think that he didn't get out and that's why I was remembering right now that he was telling him, like,

111

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

you know, to get his crutch.

DETECTIVE PARSHALL:  Who got his crutch?

RENE AREVALO:  To -- for him.  Because I think that he told him, Let's get -- let's get down and beat him up.  Yeah, you're right.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  I'm -- I'm sorry.

DETECTIVE PARSHALL:  So who did not get out of the car?

RENE AREVALO:  He didn't get out of the car?

DETECTIVE PARSHALL:  For sure?

RENE AREVALO:  For sure.

DETECTIVE PARSHALL:  Never got out of the car?

RENE AREVALO:  No.

DETECTIVE PARSHALL:  Did he get out of the car?

RENE AREVALO:  Yes, he did.

DETECTIVE PARSHALL:  Why did he get out of the car?

RENE AREVALO:  Because he -- like he told him go fuck him up.  Because he gave him the crutch, like --

DETECTIVE TELIS:  He gave who the crutch?

RENE AREVALO:  Him.  Like because they were --

DETECTIVE PARSHALL:  Did he take the crutch, or did he give him the crutch?

RENE AREVALO:  I don't -- I'm not --

112

JA4161

scanned

DETECTIVE PARSHALL: If you don't know --

RENE AREVALO: I don't know.

DETECTIVE PARSHALL: -- don't commit to anything. Because I want you to -- I want this --

RENE AREVALO: Yeah, the truth -- the truth, I don't know if he told him "here" or --

DETECTIVE PARSHALL: Did he have a crutch -- was he going to fight with these guys with a crutch?

RENE AREVALO: Yeah, yeah. He was --

DETECTIVE PARSHALL: He was going to fight with them with a crutch?

RENE AREVALO: Yeah, yeah. So yeah, he was. Because that's the reason why, you know, that he took it out was for that; right?

DETECTIVE PARSHALL: Did he throw the crutch down at some point?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: And then this guy --

RENE AREVALO: Yeah, yeah, that's when he fucking was shitting it. That's why he forgot it because he didn't know what to do.

DETECTIVE PARSHALL: Did he get back out of the car, or did this guy get back out of the car and get the crutch?

RENE AREVALO: I think this guy got back out of

113

the car.

DETECTIVE PARSHALL: Okay. Are you satisfied with that?

DETECTIVE TELIS: Huh?

DETECTIVE PARSHALL: Okay.

RENE AREVALO: Yeah.

DETECTIVE TELIS: You're positive?

RENE AREVALO: Yeah.

DETECTIVE TELIS: Because you were -- you were pretty adamant --

RENE AREVALO: Yeah, yeah, yeah.

DETECTIVE TELIS: -- that this guy got out of the car.

RENE AREVALO: Yeah.

DETECTIVE TELIS: But you know what -- but you know what?

RENE AREVALO: Now -- now you're thinking about it.

DETECTIVE TELIS: Yeah.

RENE AREVALO: But you know what? That was my mistake because right now, you know, because it was something that I didn't -- like, I mean, this is not something that you want to remember everyday.

Like, if it something -- a birthday or something, you know, like, I'm not going to -- and

114

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4163

scanned

the only thing that I remember is the reaction of this guy. That's what I remember. Wizard.

DETECTIVE PARSHALL: Okay. You haven't made any mistakes about anything else?

RENE AREVALO: No, sir.

DETECTIVE PARSHALL: Definitely Wizard did the shooting?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. And this guy got out of the car? No other mistakes?

RENE AREVALO: No other mistakes.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: That was my mistake and I'm sorry about that. Because he was shitting it, I mean, he was really, really scared though.

DETECTIVE PARSHALL: Okay. But he got out of the car ready to fight.

RENE AREVALO: Yeah.

DETECTIVE TELIS: He wasn't that scared.

RENE AREVALO: I mean, he was going to fight. But he -- that's what I'm telling you that we never that he was going to do that.

DETECTIVE PARSHALL: Right. No, I understand. I understand. I just want to make sure --

RENE AREVALO: Yeah.

115

DETECTIVE TELIS: We just want to make sure you're straight on your facts.

RENE AREVALO: Yeah. And I'm sorry. I'm -- that was my --

DETECTIVE TELIS: Okay. That's all right.

DETECTIVE PARSHALL: What I need you to do on this is when I read you this admonition about different colors and what not, signing it here means that you understood what I read to you about, you know, the color, the hair could be longer, shorter, et cetera, et cetera.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. So just sign there. Okay. Then I showed you all these six-packs, okay, these are six-packs. The first one -- what number's the first one there?

RENE AREVALO: 8737871.

DETECTIVE PARSHALL: Okay. Just put Number Five is -- or Number Five, you know, shot the guy or whatever. Whatever he did.

RENE AREVALO: Shot --

DETECTIVE PARSHALL: Shot the guys or shot the gun.

RENE AREVALO: How do you spell "shot"?

DETECTIVE PARSHALL: S-h-o-t. G-u-y-s. Okay.

116

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 480 of 524

**JA4165**

00010637

scanned

And what's the next six-pack there?

RENE AREVALO:  13 double O 75.

DETECTIVE PARSHALL:  Okay.  Number Five what did -- whatever he did.  Got out of the car or whatever you were saying.  Okay.  What's the next one?

RENE AREVALO:  130102.

DETECTIVE PARSHALL:  Number Three.  And (Inaudible).  What does that say?

RENE AREVALO:  Stay in the car.

DETECTIVE PARSHALL:  Okay.  And then sign right here that's the truth about it.

RENE AREVALO:  Right here?

DETECTIVE PARSHALL:  Yeah.  Inside the box there, yeah.  Your initials.  The date is 5/25/05.  I'm sorry.  It's '06.

RENE AREVALO:  I know, huh?  I'm dumb too.

DETECTIVE PARSHALL:  Yeah.  And then the time I got is 11:28 p.m.

RENE AREVALO:  11?

DETECTIVE PARSHALL:  28 p.m.  Why do you do that right there at the end?

RENE AREVALO:  I don't know.

DETECTIVE PARSHALL:  Is that -- are those exclamation points?

RENE AREVALO:  Yeah.  Just my own way of, like,

117

your own signature.

DETECTIVE PARSHALL: Okay. Yeah, I noticed that on your -- when you signed for the vehicle documents.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: I was wondering what that is.

RENE AREVALO: Yeah, just a little thing, you know, out of --

DETECTIVE PARSHALL: Do they call you "Mo" or "Momo" (Phonetic)?

RENE AREVALO: No. They -- well, when I was little because my name is Rene Mauricio (Phonetic).

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Maurice (Phonetic).

DETECTIVE PARSHALL: Maurice.

RENE AREVALO: Maurice.

DETECTIVE PARSHALL: They call you "Mo" for short?

RENE AREVALO: Yeah. But not because I don't gang bang or anything like that.

DETECTIVE PARSHALL: Any other --

RENE AREVALO: But they never -- they usually call me Rene though.

DETECTIVE PARSHALL: Okay. And other shootings you know about?

118

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO: No, sir. I don't.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: I mean, because I'm telling you, I'm not involved in that.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: I'm not involved in their lifestyle. I'm telling you I always work and everything. And now that's my main priority. Like I'm telling you, I would do anything for my little girl (Inaudible) like I have to testify and be out of state and be on protective custody, I will because I didn't -- I don't know if he has kids of his own and if he doesn't and he does and if he doesn't care about them, or if he doesn't see life as you know other people's life that's not -- that's not for me to put my little girl, you know.

DETECTIVE PARSHALL: No, I know. You got to look out for yourself at some point. This guy put you guys in this situation. A-r-e-v-a-l-o?

RENE AREVALO: Yes, sir.

DETECTIVE PARSHALL: Your date of birth?

RENE AREVALO: 8/2/77.

DETECTIVE PARSHALL: What's your address right now?

RENE AREVALO: My address right now is 1005 Oak

119

JA4168

Grove Drive.

DETECTIVE PARSHALL: Oak Grove Drive?

RENE AREVALO: Yeah. It's going to be changed.

DETECTIVE PARSHALL: You haven't been staying there though.

RENE AREVALO: Huh?

DETECTIVE PARSHALL: You haven't been sleeping there.

RENE AREVALO: I stay with -- with my girlfriend sometimes.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: But I don't know -- like I don't know the address there because I don't --

DETECTIVE PARSHALL: What's your girlfriend's name?

RENE AREVALO: Her name's Denise Barragan (Phonetic).

DETECTIVE PARSHALL: I'm not -- I'm not going to contact her. Denise --

RENE AREVALO: Barragan.

DETECTIVE PARSHALL: B-a-r-r --

RENE AREVALO: Yeah

DETECTIVE PARSHALL: -- a-g-a-n?

RENE AREVALO: Yes, sir.

DETECTIVE PARSHALL: What's her date of birth?

120

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO: It's 30 -- the -- what's the October the 10th month.

DETECTIVE PARSHALL: 10.

RENE AREVALO: 10/31/85.

DETECTIVE PARSHALL: 10/31?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Halloween?

RENE AREVALO: Halloween.

DETECTIVE PARSHALL: Denise. D-e-n-i-c-e?

RENE AREVALO: Oh, yeah. Denise or S I think. Denise.

DETECTIVE PARSHALL: Okay. And you don't know where she lives?

RENE AREVALO: Yeah, I know, but I don't know the address.

DETECTIVE PARSHALL: Okay. What's her phone number?

RENE AREVALO: She only has a cell phone.

DETECTIVE PARSHALL: What's her cell phone?

RENE AREVALO: Which I use too.

DETECTIVE PARSHALL: I'm not going to call her.

RENE AREVALO: Okay.

DETECTIVE PARSHALL: What's her cell?

RENE AREVALO: 517 --

DETECTIVE PARSHALL: 517.

121

**JA4170**

RENE AREVALO: Yeah. 323. I mean, the area code. Sorry.

DETECTIVE PARSHALL: Okay. Yeah.

RENE AREVALO: And it's 0968.

DETECTIVE PARSHALL: What's your phone number at home?

RENE AREVALO: At home? It's 323-344-8318.

DETECTIVE PARSHALL: What's your daughter's name?

RENE AREVALO: Her name is Mia Monice.

DETECTIVE PARSHALL: Mia.

RENE AREVALO: Monice.

DETECTIVE PARSHALL: M-o-n --

RENE AREVALO: Yeah. I-c-e.

DETECTIVE PARSHALL: Last name?

RENE AREVALO: Arevalo-Barragan.

DETECTIVE PARSHALL: Arevalo-Barragan?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: And what's her date of birth?

RENE AREVALO: 1/25/05.

DETECTIVE PARSHALL: Okay. And she lives with Denise and you've been staying with Denise?

RENE AREVALO: Yeah. And today I was supposed to go and move the last things.

DETECTIVE TELIS: Like (Inaudible)

122

scanned

DETECTIVE PARSHALL: That's a (Inaudible)

DETECTIVE TELIS: Oh, do you want me to get you a form?

DETECTIVE PARSHALL: No.

DETECTIVE TELIS: Are you sure?

DETECTIVE PARSHALL: Yeah.

DETECTIVE TELIS: Okay.

DETECTIVE PARSHALL: You were supposed to move --

RENE AREVALO: -- the (Inaudible) because she moved all the stuff today and I was supposed to go after my class and move the bed to the house.

DETECTIVE PARSHALL: Oh, okay. To her house?

RENE AREVALO: No, to our house.

DETECTIVE PARSHALL: To Oak Grove?

RENE AREVALO: No. To the new apartment.

DETECTIVE PARSHALL: Oh, the new apartment?

RENE AREVALO: Yeah, yeah.

DETECTIVE PARSHALL: And you don't know where that is?

RENE AREVALO: Well, I know it's on -- it's by Crenshaw but I don't know exactly because I haven't -- we haven't moved there yet.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: And I don't -- in my car I have a card where the place -- there's the place -- the

123

lady's name or the place where we're going to move --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- is Margaret Newman.

DETECTIVE PARSHALL: Okay. I'm sorry. Denise's date of birth 10/31 --

RENE AREVALO: '85.

DETECTIVE PARSHALL: '85. Okay. And what's your mom's name?

RENE AREVALO: My mom. She's -- she passed away already.

DETECTIVE PARSHALL: Okay. What's your dad's name?

RENE AREVALO: Luis Arevalo.

DETECTIVE PARSHALL: And where does he live?

RENE AREVALO: I don't know. I don't talk to him.

DETECTIVE PARSHALL: Who's on Oak Grove then?

RENE AREVALO: My sister.

DETECTIVE PARSHALL: Who's your sister?

RENE AREVALO: Mayra. Mayra.

DETECTIVE PARSHALL: M-y-r-a?

RENE AREVALO: Yeah. M-a-y --

DETECTIVE PARSHALL: M-a-y --

RENE AREVALO: -- r-a.

DETECTIVE PARSHALL: Mayra --

124

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO:  DeLaCruz.

DETECTIVE PARSHALL:  How old is she?

RENE AREVALO:  She's like 35.  She's 35 right now.

DETECTIVE PARSHALL:  And she is at 1005 Oak Grove.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Why did you sell -- okay. You didn't sell the -- it got repossessed; right?

RENE AREVALO:  Yeah, because I was ion immigration and --

DETECTIVE PARSHALL:  Okay.  You couldn't --

RENE AREVALO:  I couldn't keep on paying it because I had to pay a lawyer and my sister helped me out with that.

DETECTIVE PARSHALL:  Okay.  Do you have any other sisters?

RENE AREVALO:  No, sir.

DETECTIVE PARSHALL:  Brothers?

RENE AREVALO:  No, sir.

DETECTIVE PARSHALL:  Just one?

RENE AREVALO:  It's just me and my sister.

DETECTIVE PARSHALL:  Just you and your sister?

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Okay.

125

JA4174

RENE AREVALO:  That's it.

DETECTIVE PARSHALL:  And where were you born?

RENE AREVALO:  El Salvador.

DETECTIVE PARSHALL:  What city?

RENE AREVALO:  Huh?  Oh, Santa Ana.

DETECTIVE PARSHALL:  Santa Ana?

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Isn't that where Wizard's from?

RENE AREVALO:  I don't know.  That's where he's from too?

DETECTIVE PARSHALL:  I believe so.  Santa Ana --

RENE AREVALO:  Oh.  I was raised in Chatrapa (Phonetic).

DETECTIVE PARSHALL:  What school did you go to? Did you go to school in El Salvador?

RENE AREVALO:  No, I went to school here.

DETECTIVE PARSHALL:  When did you --

RENE AREVALO:  Well, I went over there, but I don't -- like to the first grade.

DETECTIVE PARSHALL:  When did you come to the US?

RENE AREVALO:  In '86.  I was like 10 years old. Like nine years old.  I was born in 1977 and I came in 76 so I was nine years.

DETECTIVE PARSHALL:  You came in --

126

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

RENE AREVALO:  '86.

DETECTIVE PARSHALL:  -- '86?

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  What school did you go to?

RENE AREVALO:  Right here?

DETECTIVE PARSHALL:  Uh-huh.

RENE AREVALO:  I went to Hancock Park.

DETECTIVE PARSHALL:  Hancock Park.

RENE AREVALO:  Yeah, right there behind Target.

DETECTIVE PARSHALL:  Is that a high school or a middle school?

RENE AREVALO:  No.  Elementary.

DETECTIVE PARSHALL:  Elementary?

RENE AREVALO:  Yes.

DETECTIVE PARSHALL:  And then what high -- what's the next one?

RENE AREVALO:  Junior?  Le Conte Junior High.

DETECTIVE PARSHALL:  Le Conte?

RENE AREVALO:  Yeah.  And then from there I got transferred to Richard Ebert Junior High.

DETECTIVE PARSHALL:  Richard Ebert?

RENE AREVALO:  Yeah, Richard Ebert in the valley.

DETECTIVE PARSHALL: What city is that in?

RENE AREVALO:  I think it's -- Sheldon Street.  That's on Valley.

127

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

**JA4176**

DETECTIVE PARSHALL: Oh, okay.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: And then what high school?

RENE AREVALO: I went to Hollywood High. And from there I got --

DETECTIVE PARSHALL: Did you graduate?

RENE AREVALO: No. I went to Texas, and over there they tried to kill me too so I just left school.

DETECTIVE PARSHALL: What -- what grade did you go to Hollywood High School?

RENE AREVALO: 11th grade.

DETECTIVE PARSHALL: Who tried to kill you in Texas?

RENE AREVALO: The gang members because they thought I was like, you know, from the opposite.

DETECTIVE PARSHALL: What kind -- what gang members? MS?

RENE AREVALO: No, no. Not MS. Like gangs from over there --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- in school because I was from L.A. and I used to wear colors that they don't wear. Because over there even they're Hispanics they still run with colors.

128

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4177

scanned

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Not like here. Here only black people run with colors, you know, like, Bloods and Crips.

DETECTIVE PARSHALL: Right.

RENE AREVALO: Over there -- no, but -- then I just started working and since then I started working and I never stopped.

DETECTIVE PARSHALL: And where are you working now? (Inaudible) that chimney place.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: What's the name of the business?

RENE AREVALO: Wilshire Fireplace.

DETECTIVE PARSHALL: Do you have the address for them?

RENE AREVALO: Yeah. It's 1522 --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Newport Boulevard. The zip code I don't know it.

DETECTIVE PARSHALL: What city?

RENE AREVALO: Costa Mesa.

DETECTIVE PARSHALL: Where did you work before that?

RENE AREVALO: Before that I was working with my

129

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

friend Alex in -- when I barely got out of jail, you know, I was working in a car wash. We -- we do, like, mobile --

DETECTIVE PARSHALL: Detail.

RENE AREVALO: Yeah, detailing. But mobile.

DETECTIVE PARSHALL: Oh, okay.

RENE AREVALO: Like, you know, from office to office.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Mobile car detail. Who would you like contacted in the case of emergency?

RENE AREVALO: Am I going to be arrested, sir?

DETECTIVE PARSHALL: I think so.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Yeah. I don't know what's going to happen after that because I can't make you any promises. I can't tell you, you know, what we could possibly do for you at this point, okay. I can't -- I can't make you any promises about anything, okay.

The -- the problem that I have here is you chose -- it's your bad decision; hanging around MS gang members, okay. You got to know that these guys are violent guys, something like this could happen.

130

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

scanned

RENE AREVALO: Yeah, I know.

DETECTIVE PARSHALL: Okay. You went over there, they got in your car. The issue I have is you pulled over, okay. You're saying they got out and you pulled over and waited for them, which I understand.

But I've got to -- I've got to explain everything to the district attorney before, you know, before anything else can happen, whether you're filed on or let go, it's got to go through the district attorney, okay.

If I were to let you go today and then they -- the district attorney's going to say, Oh, heck no. We have enough to file on him. I get in a lot of trouble, okay. So at least need to present your case to the district attorney, okay.

RENE AREVALO: Well, how do you think it looks, you know, like --

DETECTIVE PARSHALL: I can't give you my opinion because I'm not a lawyer and I'm not in the position to -- to tell you.

RENE AREVALO: But you said you would help me in this. You said you were going to --

DETECTIVE PARSHALL: Well first of all, I never said I'd help you; right?

RENE AREVALO: You said that it would be better

131

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

for me to be honest with you because that was the only way you could help me to see my, you know, to see what's best for me, you know.

DETECTIVE PARSHALL: That -- I never said anything like that. What I said is I want you to be honest with me so I can match up everyone's story, okay.

RENE AREVALO: Okay.

DETECTIVE PARSHALL: Okay. And I want to put -- I want to get the right person who did the shooting, okay.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: I'm not here to put a case on you or anything, you know, I understand your story, okay.

RENE AREVALO: Does it go with everybody else's?

DETECTIVE PARSHALL: It does. It does, okay. And I'm not in a position -- I can't tell you, Hey, that looks good. Or that will work for you. I can't tell you anything like that. I can't make you any promises, okay. You spoke to me --

RENE AREVALO: But I'm facing --

DETECTIVE PARSHALL: Huh?

RENE AREVALO: I'm facing years, huh?

DETECTIVE PARSHALL: I don't know. Because I

132

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 496 of 524
JA4181

scanned

have to present this to the district attorney, okay. No one has filed any charges on you at this point, okay. I just need to get your story, okay. I -- all I'm allowed to do is point out to you the benefits of being honest.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: And I'd rather be honest because I, like, I believe that whatever happens to me right now -- that's why the lady -- that lady that was screaming downstairs and everything --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: You know that black girl?

DETECTIVE PARSHALL: Yeah, that you were talking to.

RENE AREVALO: Yeah. She was like, How come you (Inaudible)? How come you're so -- like so calm and everything? I go, Because -- I go, I know that inside of me I feel that I haven't done nothing wrong.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: I go, But if -- like, because I'm a very vow believer. You know, I believe in God. That's why I --

DETECTIVE PARSHALL: So do I.

133

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

RENE AREVALO: So I'm -- I'm like -- my mom was a pastor in church.

DETECTIVE PARSHALL: Oh really?

RENE AREVALO: She was Christian. Yeah. She used to like love Jimmy Swaggert, you know --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: I used to play the drums in church.

DETECTIVE PARSHALL: Oh really?

RENE AREVALO: That's why I could tell you, like, I could be violent in a fighting way, but I could never go and kill nobody because I know the consequences with God. And the consequences is that it will bring me, you know.

And like -- and the bad choice that I did and -- but later on that was going come to me or my family was that if I would have left -- which I couldn't anyways because there was traffic.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: I mean, it's not like I'm going to peel out and leave them, you know, like I couldn't because they were going to catch up to me and probably shoot me right there too.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: I mean, obviously you would

134

scanned

JA4184

understand that.

DETECTIVE PARSHALL: No, I do.

RENE AREVALO: And like -- then the bad choice -- like you said, you know, that's what -- like, I told her and I go like, You know what? I think that my bad choice is that I know that I shouldn't have done --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: That this was God to me. But I know that God knows the best, you know, and God will -- God will -- God will take care of the rest and God will know that, like -- like, if I was -- if I was to go to jail -- if -- if it's going to save my life from being outside --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: -- then somebody could kill me outside, then if I'm on here and safe, probably that's what God wants.

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: You know, because God has many, many different things for people sometimes, you know. And like I feel like -- like I feel that sometimes things happen to you and it doesn't happen for nothing because like --

DETECTIVE PARSHALL: Well, there's a reason;

135

right?

RENE AREVALO: Yeah. Because like right now it's like, Damn. This is the time where I'm like doing the best that I can. I mean, I get up at 7:00 in the morning, I don't --

DETECTIVE PARSHALL: Working.

RENE AREVALO: I get home like around 10:00 o'clock sometimes because I go -- look. I go from my -- my work, I jump on the freeway, I go to my programs. And then when I don't go to my programs I get home like around 8:30, 9:00 o'clock because I don't have to go to my classes.

But I still got to go to my AA meetings. And those meetings have helped me to a certain point. I'm not going to say they're right, but they make me realize that if I drink, I'm going to (Inaudible)

DETECTIVE PARSHALL: So you're -- you're -- yeah. You're doing good now, you got a job, you got a family, you're trying to do right. That all counts, okay.

RENE AREVALO: Yeah. And then that's what I'm saying --

DETECTIVE PARSHALL: You're making --

RENE AREVALO: -- it's not that I'm -- that I'm -- that I see the point in my life where like -- like

136

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

scanned

I don't want to have nothing to do with nothing that the street has to provide for you.

Like I even -- like we -- I cut it off -- like, boom. That's it. My baby is more important. (Inaudible)

DETECTIVE PARSHALL: So let me stop you, Rene. So you're making good decisions here.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. You're making decisions that you think are going to help yourself.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: And isn't that -- that's why you decided to talk to me about this --

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: -- because you thought it was in your best interest to tell me about what happened; correct?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Am I right?

RENE AREVALO: Yeah, because --

DETECTIVE PARSHALL: I didn't force you to say anything; right?

RENE AREVALO: No, you didn't.

DETECTIVE PARSHALL: You didn't feel like you had to talk to me; right?

137

RENE AREVALO: No, I could have stayed quiet and then things would have been looking more bad for me because you guys would have thought, Okay.

They're lying. Who's lying? And that you know that I told you the truth because -- and even though I made the mistake that I thought that the other --

DETECTIVE PARSHALL: You cleared it up.

RENE AREVALO: Yeah. But I know that I made a mistake, you know, I know that I made a mistake and -- and because -- and it came back to me when the crutches.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: When I remembered the crutches because the guy was like, Where's my crutch? Where's my -- and that's all. I was like, Wait a minute. He couldn't get out because he had the boot, you know.

DETECTIVE PARSHALL: Right.

RENE AREVALO: So I cleared it. But I -- I thought he didn't get off because I never -- like, I never expected it because he was shit, I mean, he was like --

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: Literally, you know, like nervous. He was scared.

138

scanned

DETECTIVE PARSHALL: Yeah.

RENE AREVALO: And he's still in jail? All three of them?

DETECTIVE PARSHALL: Yeah. But, you know, I appreciate you being honest with because I'm after the truth on this thing, okay.

RENE AREVALO: Yeah. And I'm -- and like I told myself --

DETECTIVE PARSHALL: And based on what you told me, I can't just let you go.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Because this is what we have. You're the driver of the vehicle that pulled over, guys got out, started a fight, and two guys ended up dead, okay.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: You didn't come to the police right away.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: If -- if you -- you would have come to the police, like, right away, You wouldn't believe what happened. I was in my car -- I can't believe it. These guys got out, they were shooting, I didn't know what's going on. Well then, it's a little more believable that you're on the

139

JA4188

right side here.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: That you're on the -- on the good side, and this is a shock to you, and you're so surprised this happened. It's more believable than when I had to finally track you down and get you, you know, after months and months. You know, it's been almost a year now.

See this thing happened in July so it's been almost a year, you know, this thing's going on -- this investigation's going on. You never came forward. I think that would have helped you out if you would have come forward.

I understand it's hard to come forward. I understand. But you know what? It would have been a little more believable that you didn't know what --

RENE AREVALO: I know. I understand, sir.

DETECTIVE PARSHALL: Okay. And hanging around these guys, knowing what MS is all about, okay, you still chose to hangout with these guys and go around. It still doesn't take a way the fact that you didn't know -- you're saying you didn't see that, which is believable.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: I mean, you got a gun this

140

LYNDEN J. AND ASSOCIATES, INC.     (800) 972-3376

scanned

big, hard to hide.

RENE AREVALO:  No, no.

DETECTIVE PARSHALL:  You're going to have to explain that.

RENE AREVALO:  No, no.  Yeah.  It was like -- like -- it was like this big.  I mean --

DETECTIVE PARSHALL:  Yeah.

RENE AREVALO:  I mean, it was -- and he just had it right here.  It's not like he showed it -- and he had a big shirt on, you know, he had a shirt and he had like a flannel on.  Because I'm telling you they didn't have nowhere to stay so they were --

DETECTIVE PARSHALL:  Was anyone wearing a hat?

RENE AREVALO:  My -- he was.

DETECTIVE PARSHALL:  Wizard was?

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  What did the hat say?

RENE AREVALO:  I don't remember.

DETECTIVE PARSHALL:  The color on it?

RENE AREVALO:  Like black I think.

DETECTIVE PARSHALL:  Okay.  Anyone else wearing a hat?

RENE AREVALO:  No.  I don't remember.

DETECTIVE PARSHALL:  How was your hair at the time?

141

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

RENE AREVALO:  I had -- I always have it like this with a fade.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  I never go -- I like --

DETECTIVE PARSHALL:  And you always had the goatee?

RENE AREVALO:  Yeah.  I always have this.

DETECTIVE PARSHALL:  Okay.  That's good.  No one described anyone getting out of the car with a goatee.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  We got a witness saying the driver got out and did the shooting.

RENE AREVALO:  No.

DETECTIVE PARSHALL:  So I'm thinking that's got to me Mo.  But you got a goatee.  He didn't describe him with a goatee.  Your story matches with everyone else.  I think that you're telling me the truth.

RENE AREVALO:  I know I am, sir.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  Because I --

DETECTIVE PARSHALL:  I believe you because I do this for a living, I interview people.  I know when people are lying.

I can see you're a very genuine person.

142

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

scanned

I can tell by your eyes and your mannerisms, okay. I -- I, you know, I regret you being in the situation, but you know you got --

RENE AREVALO: I regret (Inaudible)

DETECTIVE PARSHALL: But you know that you got to take responsibility.

RENE AREVALO: I do.

DETECTIVE PARSHALL: For -- for things that you've done. And -- and I know that you're saying that you didn't know that this was going to happen. But the circumstances with you being the driver of the car, pulling over, never reporting this to the police, okay.

RENE AREVALO: Yes, sir.

DETECTIVE PARSHALL: Hanging out with these guys on a regular basis, all right.

RENE AREVALO: I don't -- like that's another thing --

DETECTIVE PARSHALL: I know. But I'm saying --

RENE AREVALO: I don't hang around with them.

DETECTIVE PARSHALL: -- based on that, okay. And based on some of these statements that these other guys made, I've got to book you, get you in the system, present it to the district attorney, and then who know what they're going to do, okay. All right.

143

RENE AREVALO:  They're going to give me time for doing this.

DETECTIVE PARSHALL:  They might do that.  I don't know.  I -- I can't speculate or guess on anything like that, okay.  But you'll be able to consult with your attorney and -- and, you know, have more of a feel for that.  Sometimes these things take a while to resolve.  Sometimes things can be done later on down the line, okay, as far as testifying against the other people.  That's a possibility also, okay.  It's possible things could get dropped.  It's possible things could get filed, okay.

So what I did, I'm taking your statement, this whole interview is videotaped, okay.  So I can't -- I'm not putting any words in your mouth.  I can't come back, you know, no one can accuse me of -- of -- of saying things that aren't true because everything is documented on video.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  And then now where am I going to go to when I go --

DETECTIVE PARSHALL:  You're going to be --

RENE AREVALO:  When I go to --

DETECTIVE PARSHALL:  You're going to be booked

144

scanned

here probably at Wilshire Division. Now the information that you told me is not going to be -- is eventually going to be -- probably within a month, is probably going to be provided to the other two people that are in custody -- their attorneys, okay.

But the thing is, these guys told on you too. You all three told me exactly what happened. So no one's the rat here snitching on everybody else. You guys all told me what happened. Everyone's pointing the finger at Wizard, okay. That's the guy I really want -- that I really want. Do you guys -- is there some --

RENE AREVALO: I want (Inaudible)

DETECTIVE PARSHALL: You'd like to be put in green light? The protective custody?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Regardless of when this information's going to be --

RENE AREVALO: Yeah, I want to be there.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: Because I want -- I want to be --

DETECTIVE PARSHALL: You know they're like locked up like 23 hours a day if you're in protective custody?

RENE AREVALO: That's okay.

145

DETECTIVE PARSHALL: That's okay?

RENE AREVALO: Because I don't, I mean, their -- they have their own dorms; right?

DETECTIVE PARSHALL: Yeah. Oh, yeah. They're kept away from general population. But it's kind of hard because those beds are hard -- it's hard to get into the green light because there's so many people that want in there. But what I'll do is I'll tell the sheriffs about the situation here, okay, and see what they can do.

RENE AREVALO: (Inaudible) see that's why I didn't want to because now I know that other people are going to find out. They're -- they're going to say I'm a rat. They're going to say --

DETECTIVE PARSHALL: Those guys said the exact same thing about you -- that everyone told on each other. Luis told me the same story you told me -- named you, named Wizard, named everybody. So did -- so did Cheapies. Cheapies told me the exact same thing you did.

So these guys can't call you a rat without calling themselves a rat. So they're -- they're not bringing attention to who's saying what because there's paperwork saying that you all told on each other. But it's only among your attorneys, it's not

146

scanned

going out to anyone else, okay.

RENE AREVALO: The cops won't know, the sheriffs or nothing?

DETECTIVE PARSHALL: No.

RENE AREVALO: Because that's one of the things that they said, when you're inside the sheriffs find out and that's -- and then they start saying things.

DETECTIVE PARSHALL: No. They -- they better not be saying anything like that. They're not supposed to endanger you guys or anything like that.

RENE AREVALO: Well, they do that. That's what -- how do you think they find out?

DETECTIVE PARSHALL: Well -- well, because attorneys get the paperwork and then they give it to their clients and, you know, these guys have done stuff and then they start telling other people, Oh so and so did -- so and so did this.

But in this case these guys -- these guys did the same thing you did. They were honest about this, okay. And they're saying, you know, they're saying that they weren't involved, that they never got out of the car and they're coming up with these stories and they're trying to blame other people.

RENE AREVALO: So what I could say, is that I said -- all I said was I never got out of the car.

147

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

**JA4196**

DETECTIVE PARSHALL: You tell them that you never said anything. Tell them that you didn't talk, okay. They're going to get the paperwork eventually and -- and you can accuse them of talking because they talked too, and you're attorney is going to give you the paperwork and you're going to know what they said. Their statements are going to be given to you.

The things that those two guys said are going to be given to you, okay. So -- and Omar's in juvenile custody. He's not even in there. So do you want be -- because if request green light then it's obvious that you've -- you want green light for whatever reason, okay.

RENE AREVALO: And they're not in green light? They're in general --

DETECTIVE PARSHALL: No. They're in general population. So would you like me to see if I can get you segregated -- away from away from everybody? Because I'll try. If you feel like you're in danger --

RENE AREVALO: Yeah, I feel --

DETECTIVE PARSHALL: -- then I will. I'll try to do that. I can't guarantee it, but I'll ask.

RENE AREVALO: I don't know --- I don't know what to think. I don't -- I don't know. I just hope -- I

148

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

JA4197

scanned

just -- you know what?  All I think about is my little girl.

DETECTIVE PARSHALL:  I know.

RENE AREVALO:  And what I'm going to do.

DETECTIVE PARSHALL:  Well, you know what?  I -- I -- you know there's a lot of things that I'd like to say to you, but I can't because I don't want to give you a false -- false sense of anything here.

But, you know, but if what you're telling me is true, you know, hopefully this thing will get resolved and hopefully we can just go after the people that -- that were responsible for this, okay.  But people are going to say you were responsible because you pulled over, and you were the driver of the car, so that something that we're going to have to go to court to resolve.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  Okay.

RENE AREVALO:  But the reason that I pulled over is because they got off, you know, because I, I mean, when -- when, I mean, honestly -- honestly even when I -- when I saw that I started going and, I mean, but of course they jumped in back of the car, you know.

DETECTIVE PARSHALL:  Right.  Well, I understand you -- oh, you thought they were just going to fight;

149

right?

RENE AREVALO: Yeah. That's -- that's my --

DETECTIVE PARSHALL: The problem is you're riding around with MS gang members. And you know that the gang is violent; correct?

RENE AREVALO: I mean, the old gangs are violent, but I didn't -- I don't -- I don't, like, I didn't -- I was going to the beach.

DETECTIVE PARSHALL: You know that -- you know that MS does murders, drive-bys, robberies, shooting; right? You know all that; right?

RENE AREVALO: I mean, yeah on the news and everything and --

DETECTIVE PARSHALL: Okay. You know what MS is all about; right? You've seen stuff in your neighborhood.

RENE AREVALO: Yeah. Yeah. Yeah.

DETECTIVE PARSHALL: You're afraid of this guy but you're still in the car with him, you know.

RENE AREVALO: But at the time I wasn't like, you know, I didn't know he was that type, you know.

DETECTIVE PARSHALL: I know. I know. But the thing is you know what this gang is --

RENE AREVALO: I mean (Inaudible) it's like daytime, everybody and there's like traffic out and

150

LYNDEN J. AND ASSOCIATES, INC.     (800) 972-3376

**JA4199**

scanned

everything.

DETECTIVE PARSHALL: Stupid. Stupid. It's so stupid of him to do something like that. He dumped -- he jumped you all into this thing. He got -- he brought you guys all into this.

But hopefully we can separate the people who didn't do this out of this thing and didn't have anything to do with this out. But that's not for me to do. I'm -- I'm to gather the facts in the matter and get your story and present it to the district attorney, okay.

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Without your story, I got, Yeah, you saw these guys, you pulled over, you waited, they did the shooting, come on, you got back in.

But you're -- you're giving me an explanation for everything. You're telling me you didn't know this guy did that. That's clear now. You're saying that; right?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Where before if you didn't give me your story, I would have to assume that hey, you pulled over. That's what we know. We know you pulled in the car, these guys got out and did it,

151

**JA4200**

you're involved.

RENE AREVALO: And I --

DETECTIVE PARSHALL: But now that you gave me your story, your story matches --

RENE AREVALO: How come you guys never went to the house?

DETECTIVE PARSHALL: We did. We didn't door knock the house because we didn't want you to know that we were looking for you. We sat on your house and never saw you come out, because you're not staying there.

RENE AREVALO: You guys were going to arrest me there?

DETECTIVE PARSHALL: Yeah. Yeah. I put a want in the system, which means I tell any officers that run your name that there suppose to bring you to me. And I got a team of officers who -- who, you know, go out and do these things, to go out and look for you and so they sat over there on Oak -- Oak --

RENE AREVALO: Last time, like, about two Sundays you guys weren't over there.

DETECTIVE PARSHALL: Two Sundays ago?

RENE AREVALO: On Mother's Day. On Mother's Day.

DETECTIVE PARSHALL: Two Sundays ago? No. Huh-uh. They first started going to your house about a

152

scanned

week ago.

RENE AREVALO:  Oh yeah?

DETECTIVE PARSHALL:  Yeah.  Yeah.  And it was only for a couple of days.  They only worked there for a couple of days because they got pulled off on some other stuff, so -- but that's irrelevant, you know, I mean --

RENE AREVALO:  That means that --

DETECTIVE PARSHALL:  I knew that finally someone would have contact with you and they'd bring you in.

RENE AREVALO:  And you know what?  (Inaudible) and it's funny because it's like me approaching the officers to tell them what's up.  And I didn't even know he was going to --

DETECTIVE PARSHALL:  Yeah.

RENE AREVALO:  But he -- like he knows and then he goes, I'm just going do it just to know that you're clean because I want you to -- because I told him, No.  I'm doing good and I'm --

DETECTIVE PARSHALL:  Yeah.

RENE AREVALO:  -- I'm going to my classes and (Inaudible)

DETECTIVE PARSHALL:  But the problem is you knew you were involved somehow in a murder and you hadn't told anybody.  And you probably knew t his was going

153

to catch up to you; right?  At some point it was going to come back; right?

Because what goes around, I mean, it goes around and it comes around; right?  You knew this is something weighing on your mind.  It's probably something that you think about every so often because you got two young kids who -- yeah, they're stupid.  They made a stupid decision to get into an argument, you know, they were just little tagger guys.

RENE AREVALO:  Follow -- follow the car.

DETECTIVE PARSHALL:  These guys are like 16, 17 years old.

RENE AREVALO:  They were that young?

DETECTIVE PARSHALL:  Yeah, yeah.  They were that young.

RENE AREVALO:  That's what I even told them.

DETECTIVE PARSHALL:  You got understand, they got mothers who their sons are gone.

DETECTIVE TELIS:  You see.  Do you take any medication?

RENE AREVALO:  No, sir.  I'm not.

DETECTIVE TELIS:  You're a pretty healthy guy?

RENE AREVALO:  Yeah.

DETECTIVE TELIS:  Okay.

DETECTIVE PARSHALL: Okay.  Okay.  Okay.  All

154

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 518 of 524

JA4203

scanned

right. So I got to get started on some paperwork and stuff.

The officers are probably going to take you -- you might get booked here at Wilshire Division, you might go downtown. You're not sick, ill, injured, hepatitis, diabetes, AIDS, nothing like that; right?

RENE AREVALO: No.

DETECTIVE PARSHALL: Okay. So you're -- you're in good health?

RENE AREVALO: Yeah.

DETECTIVE PARSHALL: Okay. All right. Well, let me step out and I'll be right back with you in a few minutes, okay.

RENE AREVALO: Just try to help me out a little but, please, because I --

DETECTIVE PARSHALL: Well, you understand that I never made you any promises; right?

RENE AREVALO: No, no. I'm asking you just --

DETECTIVE PARSHALL: Okay.

RENE AREVALO: -- like you -- for like you to look in back in my -- like, look back into my -- like my files and everything and look how much -- how much really like I done. Like -- like and people have tried --

155

DETECTIVE PARSHALL: No. I pointed out the good things that you're doing. You got a job, you got a kid, okay. I don't remember exactly what you've been arrested for before.

RENE AREVALO: I've been -- I've been arrested -- like they did -- like last year they tried to do -- like they said I assault with a deadly weapon --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And I -- and I proved that they were lying, you know.

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: Because they -- they attacked me. I had to -- I had a baseball bat hit me right here --

DETECTIVE PARSHALL: Uh-huh.

RENE AREVALO: And I guess --

DETECTIVE PARSHALL: Okay. That's fine.

RENE AREVALO: But I was never charged. I was never convicted of that -- nothing.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: And the only thing that --

DETECTIVE PARSHALL: No. You know what? I kind of get a feel for the kind of guy you are. At the same time, you're hanging out with these guys, you never told anyone what happened, okay.

It's kind of like you're trying to get in

156

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 520 of 524

**JA4205**

scanned

this in between area.  With me, there's a -- there's a good side and there's a bad side.  The good side, you know, doesn't get involved in crimes.  And if something does happen they tell -- they go to the police for it.

The bad side is the gangsters, the people that hangout with t he gangsters, and the people who see the gangsters do something and don't -- and keep it a secret and don't tell on them when they're doing stuff like this.  That's the bad side.

RENE AREVALO:  (Inaudible)

DETECTIVE PARSHALL:  And you're trying to find an area somewhere in between here.  Huh?

RENE AREVALO:  At least I told you now even though it's too late.

DETECTIVE PARSHALL:  You did.  But you know what? You only told me because the pressure was on; right? The pressure was on because I already had -- I already had you.

RENE AREVALO:  Yeah.

DETECTIVE PARSHALL:  You told me because I -- I had you in the corner.

RENE AREVALO:  You know why I told you?

DETECTIVE PARSHALL:  And -- and -- and you thought that it would --

157

LYNDEN J. AND ASSOCIATES, INC.     (800) 972-3376

**JA4206**

Appeal: 10-6    Doc: 90-9    Filed: 08/14/2013    Pg: 522 of 524

00010678

RENE AREVALO: You know why -- you know why I told you?

DETECTIVE PARSHALL: Why?

RENE AREVALO: Because I want -- I want -- I want at least an opportunity to at least be with my daughter.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: That's the reason why I told you, because --

DETECTIVE PARSHALL: Well, I think being honest about it is the best choice.

RENE AREVALO: Because my daughter is the most important thing for me. And I feel like -- and that if I can't -- that if I can't do this for her, then I will never do anything for her.

DETECTIVE PARSHALL: Okay.

RENE AREVALO: You know because --

DETECTIVE PARSHALL: Well, you stood up, you told me exactly what happened, you told me the truth about things, and I hope you can see your daughter soon. I really do.

RENE AREVALO: Thank you, sir.

DETECTIVE PARSHALL: But it's not really up to me, okay. All right.

RENE AREVALO: But if you could do something for

158

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

Case 3:16-cv-00057-MOC    Document 50-9    Filed 03/23/17    Page 522 of 524

**JA4207**

scanned

me, please give a good word for me. I'd appreciate that.

DETECTIVE PARSHALL: Okay. I hear you.

RENE AREVALO: Thank you, sir.

DETECTIVE PARSHALL: All right. All right, man.

OFFICER SANCHEZ: That's yours I think; right?

RENE AREVALO: Yeah.

OFFICER SANCHEZ: Okay. Just put that in your pocket. Let me get in here real quick. Just put your hand on the other side. Okay. Stand up.

OFFICER VALENZUELA: (Inaudible)

OFFICER SANCHEZ: Turn around and face the wall.

RENE AREVALO: Can I keep it? The card?

OFFICER VALENZUELA: Well, I have to probably put it on your property, but you'll have it, I mean, it will be yours.

RENE AREVALO: Like --

OFFICER SANCHEZ: Okay. Come on.

OFFICER VALENZUELA: All the way down. Follow him. This right here.

///

///

159

**JA4208**

STATE OF CALIFORNIA     )
                        )        SS.
COUNTY OF ORANGE        )

I, Maria Gallucci, a transcriber for Lynden J. And Associates, Inc., do hereby certify:

That said proceedings were listened to by me and were transcribed into typewriting under my direction and supervision; and I hereby certify that the forgoing transcript of the proceedings is a full, true, and correct transcript to the best of my ability.

I further certify that I am neither counsel for nor related to any party to said action, not in anywise interested in the outcome thereof.

In witness whereof, I have hereunto subscribed my name this_____10th_____day of September, 20_07_____.

Maria Gallucci

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376