# TABLE OF CONTENTS

## DISCOVERY POLICY
## WESTERN DISTRICT OF NORTH CAROLINA
## OCTOBER 2010

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    OVERVIEW OF THE POLICY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

           The "Prosecution Team". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   WHAT MUST BE PRODUCED AND DISCLOSED. . . . . . . . . . . . . . . . . . . . . . . . 4

           Expanded File Discovery. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                Policy Considerations Regarding Expanded File. . . . . . . . . . . . . . . . . 6

                What is not in the Expanded Discovery File. . . . . . . . . . . . . . . . . . . . . 6

           Fed.R.Crim.P Rules 12 and 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           Jencks Act, Rules 26.2, 12 and 5.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           Exculpatory Evidence: *Brady v. Maryland*. . . . . . . . . . . . . . . . . . . . . . . . . 10

                AUSA's Duties Pursuant to *Brady*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           National Security and Terrorism Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                Duty to Search and Disclose. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                No Duty to Search. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                Prudential Searches. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                Coordination of Search Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                Content of Search Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                FISA Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                Contact information for NSD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.   GATHERING DISCOVERY MATERIALS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           Investigative Agency Files. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

           Confidential Informant, Witness and Human Source Files. . . . . . . . . . . . . . . 20

           Evidence and Information Gathered During Investigation. . . . . . . . . . . . . . . 20

           Documents of Evidence Gathered by Civil Attorney's. . . . . . . . . . . . . . . . . . 21
                and/or Regulatory Agencies in Parallel Proceedings

Case 3:16-cv-00057-MOC     Document 50-14     Filed 03/23/17     Page 1 of 41

Substantive Case-Related Communications. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

AUSA Responsibilities under *Giglio*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Examples of *Giglio* Material. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Specific Instances of Misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Prior Inconsistent Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Untruthful Character. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Incapacity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Contradiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Civilian Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

What to Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Law Enforcement Witnesses (*Giglio*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Giglio* Questions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Handwritten Notes of Agents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Pre-Sentence Reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29


V.      CONDUCTING THE REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI.     TIMING OF THE DISCLOSURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Pre-Charge Disclosures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Grand Jury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Exculpatory Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Impeachment Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Affidavits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Exculpatory Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Impeachment Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Post-Charge Disclosures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Pre-Trial Hearings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Guilty Pleas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Post-Conviction Evidentiary Hearings. . . . . . . . . . . . . . . . . . . . . . . . 32

Information Obtained in Witness Interviews. . . . . . . . . . . . . . . . . . . . . . . . . 33

AUSA Notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Case 3:16-cv-00057-MOC     Document 50-14     Filed 03/23/17     Page 2 of 41

Agent Notes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Trial Preparation Meetings with Witnesses. . . . . . . . . . . . . . . . . . . . . . . 34

Witness Statement Variation and Duty to Disclose. . . . . . . . . . . . . . . 35

Correspondence Practices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Email Correspondence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VII.   MANNER OF PRODUCTION AND RECORD KEEPING. . . . . . . . . . . . . . . . . . . . 36

Manner of Production. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Record Keeping. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Privacy Protection: Redacting Documents. . . . . . . . . . . . . . . . . . . . . . . 36

Disclosure of Confidential Informants. . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII.  RECIPROCAL DISCOVERY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# DISCOVERY POLICY
## WESTERN DISTRICT OF NORTH CAROLINA
## OCTOBER  2010

## I.  INTRODUCTION

This guide sets forth the policy of the United States Attorney's Office for the Western District of North Carolina regarding discovery practices and rules related to disclosure in criminal cases.[1]  While this policy does not undertake to address every issue an AUSA will confront when making discovery disclosure decisions, it is designed to facilitate compliance with disclosure obligations, to identify common discovery related issues of which AUSAs should be aware, and to ensure that AUSAs have adequate resources and guidance available to enable them to make appropriate disclosure decisions, either on their own or in consultation with the leadership of supervisors.

AUSAs must produce all discoverable information in accordance with federal law, the local rules, the court's standing discovery order in criminal cases and DOJ policy.  For the purposes of this policy, "discovery" or "discoverable information" is not limited to Fed.R.Crim.P 16 information, but includes all information and materials the government must disclose to the defendant pursuant to Fed.R.Crim.P 12, 16 and 26.2, the Jencks Act (18 U.S.C. § 3500), Federal Rules of Evidence 404(b) and 413-414, *Brady, Giglio*, USAM § 9-5.001 (*Attachment 1*), USAM § 9-5.100 (*Attachment 2*), and the Local Rules of Criminal Practice. (*Attachment 3*).

## II.  OVERVIEW OF THE POLICY

The discovery obligations of AUSAs are established by the Federal Rules of Criminal Procedure, 18 U.S.C. § 3500 (the Jencks Act), *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), relevant case law, the Department of Justice's policy on the disclosure of exculpatory and impeachment information, applicable Local Rules of Criminal Procedure, discovery orders entered in particular cases, and the rules governing professional

---

[1]This policy guidance is intended to satisfy the January 4, 2010 directive from the Deputy Attorney General to develop a discovery policy with which AUSA's in the WDNC must comply. (Jan. 4, 2010 letter in incorporated at the conclusion of this Policy).  This guidance, which is solely prospective, is for internal WDNC  use only and does not create any privileges, benefits, or rights, substantive or procedural, enforceable by any individual, party, or witness in any administrative, civil or criminal matter.  See *United States v. Caceres*, 440 U.S. 741 (1979).

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 4 of 41

conduct.  All AUSAs must comply with the authorities set forth above.

This policy incorporates the expansive interpretation of the United States Attorneys Manual (hereinafter USAM) § 9-5.001 "Policy Regarding Disclosure of Exculpatory and Impeachment Information".  In short, § 9-5.001 directs AUSAs to interpret the constitutional requirements of *Brady* and *Giglio* broadly directing "while ordinarily evidence that would not be admissible at trial need not be disclosed, this policy encourages prosecutors to err on the side of disclosure if admissibility is a close question".

If an AUSA has any doubt whether a piece of evidence is exculpatory, the evidence should be disclosed.  While there may be important reasons – such as the need to protect a witness or to safeguard ongoing investigations or other subjects of other crimes – for withholding information that does not have to be disclosed, as a general rule, AUSAs should provide expansive discovery whenever and wherever possible, recognizing that this approach may facilitate plea negotiations or otherwise expedite litigation.

Significantly, USAM §9-5.001 dispenses with *Brady*'s materiality requirement and mandates disclosure beyond what is material to guilt.  Under the Department's policy, the government must disclose:

(1)     information inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense; and,

(2)     impeachment information that either casts a substantial doubt upon the accuracy of any evidence on which the prosecution intends to rely to prove an element of any crime charged or which might have a significant bearing on the admissibility of the government's evidence.

The policy applies to information (not just evidence) regardless of whether the information itself would constitute admissible evidence.

USAM § 9-5.001 also directs the disclosure of items of information that, while viewed in isolation may not meet the standards of the policy, taken together can have such an effect.

**The "Prosecution Team"**

DOJ policy requires that, in preparing for trial, federal prosecutors "seek all exculpatory and impeachment information from all members of the prosecution team", an entity that "**include[s] federal, state, and local law enforcement and other government officials participating in the investigation and prosecution of the criminal case against the defendant".** USAM §9-5.001. The duty to search is not limited to exculpatory and impeachment information under *Brady* and *Giglio*, it also extends to information required to be disclosed under Fed.R.Crim.P 16 and 26.2 as well as the Jencks Act.

In determining whether an entity should be deemed a part of the Prosecution Team and thus whether and to what extent the records of another federal agency should be searched for discoverable information, the following should be considered:

- Whether the prosecutor and the agency conducted a joint investigation or shared resources relating to the investigation.

- Whether the agency plays an active role in the prosecution, including conducting arrests or searches, interviewing witnesses, developing prosecutorial strategy, participating in targeting discussions, or otherwise acting as part of the prosecution team.

- Whether the prosecutor knows of and has access to discoverable information held by the agency.

- The degree to which information gathered by the prosecutor has been shared with the agency.

- Whether a member of an agency has been made a SAUSA.

- The degree to which decisions have been made jointly regarding civil, criminal, or administrative charges.

- The degree to which the interests of the parties in parallel proceedings diverge,

such that information gathered by one party is not relevant to the other party.[2]

In cases arising from investigations conducted by multi-agency task forces or otherwise involving state and local law enforcement agencies, ASUAs should consider whether: 1) state or local agents are working on behalf of the prosecutor or are under the prosecutor's control; 2) the extent to which state and federal governments are part of a team, are participating in a joint investigation, or are sharing resources; and, 3) whether the prosecutor has ready access to the evidence.

When in doubt as to whether certain individuals or entities qualify as members of the prosecution team for discovery purposes, AUSAs must "err on the side of inclusiveness" and should consult with their supervisors.

In some cases, there may be *Brady* or *Giglio* material that an agent knows about but the AUSA does not. In 1995, the U.S. Supreme Court made clear that a defendant is entitled to the disclosure of all *Brady* and *Giglio* material known to any member of the prosecution team. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995). The prosecution team, as defined in that case, includes all "others acting on the government's behalf in the case". *Id*. at 437. However, it is important to note that the AUSA does not have a constitutional duty to search for and disclose information possessed by other federal or local agencies that ARE NOT involved in the investigation or prosecution of the case.

**Thus, if any member of the prosecution team knows of any *Brady* or *Giglio* material, the AUSA is legally responsible for disclosing that evidence to the defendant, whether or not the AUSA actually knows about the evidence.** That is, **the AUSA's ignorance of such evidence will may not prevent a court from penalizing the government** by suppressing evidence, vacating a sentence, reversing a conviction, or recommending that the AUSA be sanctioned.

### III.     WHAT MUST BE PRODUCED AND DISCLOSED

**Expanded File Discovery**

The scope of WDNC's Expanded Discovery Policy is stated in the Expanded File

---

[2]DAG Jan. 4, 2010 memo at 3.

<u>Statement</u> which is attached to and incorporated by reference into the District's Discovery Agreement. (*Attachment 4*). The Discovery Agreement must be signed by defense attorneys AND the defendant before expanded discovery is provided.

AUSAs should never describe the discovery being provided as "open file." Because the concept of the term "open file" is imprecise, such a representation exposes the AUSA to broader disclosure requirements than intended or to sanctions for failure to disclose documents, e.g., agent notes or internal memos, that the court may deem to have been part of the "open file". However, the Court's Standing Discovery Order (CSDO) (*Attachment 5*), unless revised, refers to WDNC's "open file" policy. The scope of the Expanded File is the same as that under the term "Open File." The "Expanded File" discovery policy for the WDNC requires greater discovery than under Fed.R.Crim.P 16.

AUSAs must obtain supervisory approval and file a notice with the Court within 10 days of the defendant's arraignment to opt out of standard discovery.

Certain defense counsel and their firms will not be accorded expanded file discovery as a matter of WDNC policy because the U.S. Attorney has determined that such counsel has materially breached the terms of the Expanded File Agreement by allowing defendant(s) to possess expanded discovery or copies thereof under circumstances that jeopardize the safety of witnesses, or victims, or the integrity of the judicial process. The names of defense counsel and firms who may not receive expanded file discovery will be posted on the WDNC Intra-Net. AUSAs must obtain supervisory approval to grant expanded file discovery to such counsel and firms.

*Pro se* defendants will ordinarily not be accorded Expanded File Discovery, particularly if they are held without bond and disclosure would require their unsupervised possession of discovery materials. AUSAs shall consult their supervisor(s) as to the most prudent method of discovery if a defendant is accorded *pro se* representation. AUSAs should seek a court order for the return of all discovery materials produced to defense counsel in the event a represented defendant is later granted permission to proceed *pro se.*

AUSAs who become aware of violations of the District Expanded Discovery file should immediately notify a supervisor so that steps can be taken to ameliorate any harm or danger to witnesses, victims, and cooperators.

If expanded file discovery is not permitted by USAO policy or under supervisory approval, AUSAs will arrange to comply with Rule 16 and all other *Brady*, *Giglio* and Jencks Act disclosures through supervised inspections.

### Policy Considerations Regarding Expanded Discovery

WDNC's Expanded File Policy confers no substantive rights on the defendant but rather operates as an expeditious and efficient facilitator of the resolution of cases. Defense counsel and defendant's ultimate decision to proceed to trial or to plead guilty often is facilitated by the candor of an AUSA and the demonstrated strength of the government's case.

In a particular case, such as where Expanded Discovery will create a potential risk of injury to a cooperating witness or where it would jeopardize ongoing investigations, a USAO supervisor may approve deviations from WDNC's Expanded Discovery.

### What is in and NOT in the Expanded Discovery File?

i.     Sensitive materials such as victim/witness names, telephone numbers, addresses, dates of birth, social security numbers, bank account and/or financial information may be redacted and certain impeachment material withheld from the Expanded File without supervisory approval.

ii.    Obviously, not all evidence is contained in the "Expanded File" (e.g., guns, drugs and other contraband, physical evidence, and biological specimens). Such evidence is generally maintained by the investigative agencies. Thus separate arrangements must be made to review them.

iii.   AUSAs have a duty to supplement and update the Expanded Discovery File as new material becomes available.

### Federal Rules of Criminal Procedure 12 and 16

In accordance with the Court's Standing Discovery Order (CSDO), no later than 10 days following arraignment, the government must provide discovery.

Rule 16 provides for the discovery of the following, of which AUSAs have a due diligence and affirmative duty to inquire of investigating agencies:

A. Recorded and written statements made by the defendant before or after arrest, including:

    i. Defendant's grand jury testimony, and

    ii Recorded telephone calls, body wires, T-III electronic surveillance (subject to protective order if necessary);

B. The substance of any oral statements made by the defendant to any person then known to the defendant to be a government agent;

C. The defendant's prior criminal history;

D. Documents and tangible things, where disclosure is material[3] to the defense, the government intends to use in case-in-chief; and/or the evidence was obtained from or belonged to the defendant. (**Note**: the Government is only required to produce what is in their possession, custody or control; but, control may depend on whether the state and local law enforcement or federal, state and local regulatory agencies are involved)**;**

E. Reports of scientific tests and medical examinations;

    i. Where defendant shows materiality; or

    ii. The government intends to use in case-in-chief. (*See* CSDO ¶ 3).

F. Reciprocal discovery from the defense is required if Rule 16 discovery has been provided and the government shows materiality and reasonableness or the defendant intends to offer in case in chief or to call expert. (*See* CSDO ¶20).

G. Limitations on Discovery

---

[3]The standard for materiality is whether disclosure would enable the accused to substantially alter the quantum of proof in his favor.

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 10 of 41

i.  Rule 16(a)(2) excludes agent reports and witness statements except as provided under Jencks Act;

.

ii.  No right to grand jury testimony except if it constitutes Jencks material.

iii.  No right to the government's witness list unless defendant makes specific showing of reasonableness and materiality.

iv.  Witnesses to be used at trial who are in "protective custody or otherwise under government control" must be made available to defense counsel one week before trial.  *(See also* CSDO ¶10).

DOJ's online USABook has an excellent section on the Government's Responsibilities under Rule 16.  A copy of those materials is incorporated by reference and included in this Policy as *Attachment 6*.

**The Jencks Act (18 U.S.C. §3500) and Fed. R. Crim. P. 26.2, 12(i) and 5.1**

Due process requires production of prior statements of a witness, in the possession of the United States, which relate to the events to which the witness testifies, to be produced upon request after the witness testifies.  *Jencks v. United States*, 353 U.S. 657 (1957); codified at 18 U.S.C. §3500.  Jencks disclosure is a statutory, not Constitutional,  requirement and should be read in conjunction with *Brady* requirements.  Congress intended that the Jencks Act prescribe the <u>exclusive</u> means by which production of witness statements could be compelled, and that other federal procedural rules not be a vehicle for compelling production of witness statements and reports broader than what the Act allowed.[4]

Notwithstanding the exclusivity feature of the Jencks Act, **Rule 26.2** and other Federal Rules of Criminal Procedure have guided production of witness statements, including beyond the parameters of the Jencks Act.  For example, the Rules now require production of witness statements at suppression hearings (Fed.R.Crim.P. 26.2(g)).

---

[4]Congressional Debate of August 26, 1957, at 85 Cong. Rec. S15920-15923.  *See also, Palermo v. United States,* 360 U.S. 343 (1959).

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 11 of 41

**Rule 12 (h)** (notes of Advisory Committee also addresses 12(i)) applies Rule 26.2 to suppression hearings and **Rule 5.1** applies Rule 26.2 to preliminary hearings.  At such hearings, a law enforcement officer shall be deemed a witness called by the government.  Privileged material shall be excised.  Pursuant to Rule 5.1, if the government fails to produce Jencks material, the magistrate cannot consider the testimony from that witness.[5]

Jencks applies to statements in the possession of the Government, but possession may depend on whether state and local law enforcement or federal, state and local regulatory agencies are involved.  For example:  Pre-Sentence Reports and documents of the Probation Office as well as personal diaries of defendants have been held by the Courts not to be in the possession of the United States.

The writing must be a statement attributable to the witness to fall within the Jencks Act.

Notes and reports of an investigator are not Jencks statements of the interviewee.  *United States v. Hinton*, 719 F.2d 711, 722 (4th Cir. 1983).  Interview notes that contain verbatim quotes do not constitute Jencks statements unless the interviewee approves or adopts the notes or report.  *United States v. Foley*, 598 F.2d 1323 (4th Cir. 1979).   Most circuits permit routine destruction of an agent's notes after they have been incorporated into a formal report, *i.e.* a DEA-6 or FBI-302.  If the witness read and approved the notes, they must be preserved.  *United States v. Crowley*, 586 F.2d at 1028. ( *See also* CSDO ¶ 11).

A tape recorded interview <u>is</u> the witness' Jencks statement and must be preserved.

It should be emphasized that the restrictions and exclusivity aspect of the Jencks Act and rules do not, and could not, in any way abrogate constitutional and due process production and disclosure obligations such as are embodied in *Brady* and *Giglio*, as to favorable impeachment information.

The standard of review on appeal for Jencks violations is harmless error.  In the absence of bad faith or prejudice, the failure to disclose Jencks Act material will not result in reversal.  *United States v. Schell*, 775 F.2d 559, 567 (4th Cir. 1985).

---

[5]Fed.R.Evid 612 (Material Used to Refresh Recollection) explicitly references the Jencks principle but does so in a way that appears as, but may not always operate as, a limitation on production.

DOJ's online USABook has an excellent section on the Jencks Act. A copy of those materials is incorporated by reference and included in this Policy as *Attachment 7*.

**Exculpatory Evidence**: *Brady v. Maryland*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court announced:

> We now hold that the suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady* is not a rule of discovery but rather one of fundamental fairness and due process. The *Brady* rule imposes an affirmative duty on the prosecutor to produce, at the appropriate time, requested evidence that is materially favorable to the accused either as direct or impeaching evidence. *Brady* applies to sentencing as well as to guilt/innocence determinations. "The obligation to disclose is measured by the character of the evidence, not the character of the prosecutor". *United States v. Agurs*, 427 U.S. 97, 110 (1976).

**AUSA Duties Pursuant to *Brady***

In any given case, it is the AUSA who decides, based upon professional judgment, what evidence is covered by *Brady* and must, therefore, be disclosed to the defendant. The case AUSA has a **duty to learn** of any favorable evidence known to the others acting on the government's behalf in the case, including the police. *Kyles*, 514 U.S. at 437. Accordingly, the AUSA **must** ask the case agent if he or any other member of the prosecution team knows of any *Brady* material. **The AUSA must document the fulfillment of this duty** to "learn of any favorable evidence known to the others acting on the government's behalf in the case." *Id.* It is a best practice to repeat this inquiry orally, before all suppression hearings, trials, and sentencing hearings.[6] It is suggested that the documentation or notation of such inquiry be maintained in the file.

The primary responsibility for obtaining *Brady* material and providing it to the AUSA lies with the case agent, which in turn means that the case agent must make sure that every member

---

[6]There is no controlling legal authority holding that *Brady* and *Giglio* applies to other adversarial proceedings. *Brady* does not apply to ex parte proceedings, *e.g.* search warrants.

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 13 of 41

of the prosecution teams knows the *Brad*y rule.  It is important however to make sure that the case agent(s)  understand(s) that *Brady* material provided to the AUSA will not necessarily be disclosed to the court or the defendant [7] and that such evidence may not necessarily be admissible at trial.

It is impossible to list all of the different kinds of evidence that the government might be required to disclose under *Brady*, but the following general categories probably describe most *Brady* material:

- Evidence tending to show that someone else committed the criminal act

- Evidence tending to show that the defendant did not have the requisite knowledge or intent

- Evidence tending to show the absence of any element of the offense, or evidence which is inconsistent with any element of the offense (e.g., evidence showing that an alleged interstate wire transfer was actually an intrastate wire transfer)

- Evidence that casts a substantive doubt upon the accuracy of evidence.  This includes, but is not limited to, witness testimony the AUSA intends to rely on to prove an element of any crime charged, or which may have a significant bearing on the admissibility of prosecution's evidence.  (*USAM § 9-5.001(C)*) (AUSA must disclose this information even if he/she does not believe such information will make the difference between conviction and acquittal for a charged crime)

- Evidence tending to show the existence of an affirmative defense such as entrapment or duress

DOJ policy recognizes that a fair trial will often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the

---

[7] The AUSA may conclude that the evidence in question is simply not exculpatory, or even if it is arguably exculpatory, the AUSA may choose not to disclose it because of certainty that the evidence is inadmissible and will not lead directly to admissible *Brady* material. *Cf. Wood v. Bartholomew*, 516 U.S. 1, 6 (1995)(per curiam)(because law of state in question barred use of polygraph evidence to impeach witnesses, state was not required by *Giglio* to disclose to defendant polygraph evidence concerning key prosecution witness).

court, but that may not, on its own, result in an acquittal or, as is often colloquially expressed, make the difference between guilt and innocence.  As a result, this policy requires disclosure by prosecutors of information beyond that which is "material" to guilt as articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).  (*USAM § 9.5-001*).

Additionally, a prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.  (*USAM § 9.5-001*).

A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.  (*USAM § 9.5-001*).

To establish a *Brady* violation, a defendant bears the burden to show that non-disclosed materials were:

> i.     favorable to the defendant;
>
> ii.     material; and,
>
> iii.     that the prosecution had the materials and failed to disclose them. *Moore v. Illinois*, 408 U.S. 786, 794, 795 (1972);
>
> iv.     Mere speculation fails to meet the burden. *United States v. Crowell*, 586 F.2d 1020, 1029 (4th Cir. 1978).

*United States v. Agurs*[8] identified three types of situations implicating a duty to disclose under *Brady*:

---

[8]*United States v. Agurs*, 427 U.S. 97 (1976).

Case 3:16-cv-00057-MOC   Document 50-14   Filed 03/23/17   Page 15 of 41

i.      Where the prosecution knew or should have known its case contained perjured testimony.  Non-disclosure requires reversal where there is any reasonable likelihood that the false testimony could have affected the jury's judgment.  *Id*. at 103.

ii.      Where the prosecution fails to respond to a defendant's specific request for information, a new trial must be granted if the suppressed evidence "might have affected the outcome."  *Id*. at 104.  Mere possibility not enough.

iii.      Where the defendant does not request exculpatory evidence, reversal is necessary only if the undisclosed evidence "creates a reasonable doubt that did not otherwise exist".  *Id*. at 112.

Evidence which impeaches government witnesses must be disclosed. *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Crowell*, 586 F.2d at 1020.   This includes any plea agreement, grant of immunity, criminal history, pending indictments, etc.

The government is required only to disclose the *Brady* and *Giglio* material about which the  prosecution team has knowledge.  The prosecution team is not required to look for unknown *Brady* and *Giglio* material, but it is wise and prudent for the prosecution team to seek out *Giglio* material on key civilian government witnesses.  However, anytime the government has reason to question a witness's credibility, inquiry should be made.

DOJ's online USABook has an excellent section on the Government's responsibilities and obligations pursuant to *Brady* and *Giglio*.  A copy of those materials is incorporated by reference and included in this Policy as *Attachment 8*.

**National Security and Terrorism Cases**

National security and other cases[9] that may rely on or relate to classified information in the  possession of the intelligence community (IC)[10] or other information in the possession of the

---

[9]Although discovery issues relating to classified information are most likely to arise in national security cases, they may also arise in a variety of other criminal cases, including drug cases, human trafficking cases, money laundering cases, and organized crime cases.

[10]The IC includes the Office of the Director of National Intelligence, the Central Intelligence Agency, the National Security Agency, the Defense Intelligence Agency, other

military pose unique discovery challenges.  When it is appropriate, AUSAs are encouraged to make a general practice of discussing with agents, and the prosecution team in general, whether they have a specific reason to believe that the IC may be in possession of information that relates to their case and if so, to follow the procedures set forth in this policy. An individualized assessment of the specific factors in a case may lead to the determination that a deviation from the discovery policy might need to occur in order to protect national security or classified information.  Cases targeting corrupt or fraudulent practices by a middle or upper official of a foreign government, those involving alleged violations of the Arms Export Control Act or the International Emergency Economic Powers Act, those involving trading with the enemy, international terrorism, or significant international narcotics trafficking, especially if they involve a foreign government or military personnel, other significant cases involving international suspects and targets, and cases in which one or more targets are, or have previously been, associated with an intelligence agency are cases in which the AUSA should be particularly aware.

National security interests will often militate against disclosing more than the law requires or disclosing it earlier than the law requires in national security cases.  The Classified Information Procedures Act, 18 U.S.C. Appendix 3 (CIPA) sets forth procedures for protecting national security information.  AUSAs who handle national security cases should be fully familiar with CIPA.  Moreover, disclosure of classified information, by definition, poses a risk to national security.  Accordingly, decisions regarding the scope, timing, and form of discovery disclosures in national security cases must be made with these risks in mind, in consultation with the National Security Division (NSD) at DOJ, the Intelligence Community, and law enforcement agencies, taking full account of the need to protect against unnecessary disclosure of classified or unclassified information.

### Duty to Search and Disclose in National Security Cases

Case law indicates that the government has a duty to search the relevant files of an IC or

---

offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs, the intelligence and counterintelligence components of the Department of State, FBI, DEA, Department of Treasury, Department of Energy, Department of Homeland Security, and the respective military services.

Page 14 of  38

military component which has taken steps that significantly assist the prosecution.  For example, if an IC or military component actively participates in the overseas aspects of a criminal investigation, captures the suspect, detains or interviews the suspect or a witness that the prosecution uses in its criminal case, or provides criminal investigators with inculpatory information that establishes the factual basis for a warrant or charging instrument, the prosecution will likely have a duty to search the files of the IC or military component.

Additionally, the government has a duty to search when the prosecution knows or has a specific reason to know[11] of discoverable information in the possession of the IC or military, has or reasonably should have searched a database accessible to the prosecution team that is maintained by the IC or military, or is responding to a specific and reasonable request for information from a defendant.

- *Database Searches*: when the prosecution team has searched Intelink or another IC database, for background or inculpatory information that may be relevant to its case, an obligation to search that same database for discoverable information will generally be triggered.[12]

- *Close cooperation with an IC Component*: when an IC component shares the results of interviews of the suspect with the prosecution team or actively participates in the criminal investigators' interviews of the suspect while the suspect is in the custody of a foreign government, the information is generally discoverable. In these instances, close coordination with NSD is especially important.

---

[11]Case law provides little guidance regarding how specific the government's belief must be in order to trigger a duty to search.  AUSAs should not assume that their knowledge of IC activities or collections is not sufficiently specific to trigger a duty to search; rather, prosecutors are encouraged to raise any questions they have in this regard with NSD.

[12]*See, e.g., United States v. Auten*, 632 F.2d 478, 481 (5th Cir.1980) ("That the prosecutor, because of the shortness of time, chose not to run an FBI or NCIC check on the witness, does not change 'known' information into 'unknown' information within the context of the disclosure requirements.").

- *Joint Terrorism Task Force (JTTF)*: when the suspect is investigated by a JTTF, the AUSA must search for discoverable information in the possession of that JTTF. The AUSA has no obligation however to search each agency participating in the JTTF or to search other JTTF's unless there is a specific reason to believe that a particular agency or JTTF possesses discoverable information or assisted in the investigation of the case.

- *Participation of Main Justice Supervisors*: DOJ officials, who advise on or are involved in decision making regarding the defendant's capture, detention, or prosecution, may be considered part of the prosecution team thereby triggering a duty to search for discoverable information in their possession or control.[13]

**No Duty to Search**

AUSAs do not have a duty to search an IC or military component that was not involved in the investigation or prosecution unless there is a specific reason to believe that the IC or military possesses discoverable material. The government does not have a duty to search in response to an over broad request by the defendant that amounts to a "fishing expedition", i.e., a speculative, unsubstantiated assertion by the defendant that an IC or military component may have discoverable information. For instance, when the prosecution team is generally aware of intelligence collection programs, but has no specific reason to believe that the IC possesses information on the suspect or any of the witnesses the government intends to use a trial, there is no duty to search.

When the defendant is held and interrogated by a foreign government before being transferred to United States custody, and U.S. officers did not actively participate in the interrogations, then there is no duty to search. If however, a foreign government has provided the

---

[13]*See. e.g., United States v. Ghailani*, 687 F.Supp.2d 365 (S.D.N.Y. 2010). In evaluating the defendant's Rule 16 request, the court concluded DOJ officials who "participated in advising on or making the decisions" to hold Ghailani in a CIA detention center, transfer him to Guantanamo Bay, prosecute him in a military commission, and subsequently transfer him to the SDNY for prosecution in an Article III court were part of "the government" for Rule 16 purposes and were obligated to produce and disclose relevant documents, even if they were not otherwise involved in prosecuting the criminal case. *Id*. at 372.

prosecution team with information relevant to the case, AUSAs have an obligation to search the material provided to them for potentially discoverable documents or information.

**Prudential Searches**

A prudential search is a search of the files of an IC agency, usually prior to indictment, undertaken because the prosecution team has a specific reason to believe that the agency's files may contain classified information that could affect the government's charging decisions. An AUSA should contact the NSD to coordinate if there is a specific reason to believe that:

- the agency or department likely possesses information that could affect the decision whether, against whom, or for what offense to charge;

- the IC or military likely possesses documents that will fall within the scope of the AUSA's affirmative discovery obligations. In such cases, pre-indictment discussions about how to handle the documents and information could avoid conflicts, surprises, and disclose-or-dismiss dilemmas; or

- the case may raise other questions regarding classified evidence that should be resolved pre-indictment.

While not legally required, prudential searches assist the prosecution team in identifying and managing potential classified information concerns before indictment and trial. They may also permit the prosecution team to tailor an indictment in a way that will reduce or eliminate the relevance of any classified information, and thereby reduce or eliminate the likelihood of facing a disclose-or-dismiss dilemma after the indictment is returned when the Classified Information Procedures Act (CIPA) and other protective measures do not provide sufficient protection. AUSAs should contact the NSD about the possibility of conducting a prudential search as soon as it becomes evident that information in the possession of the IC or military may be relied on or may be discoverable in a case.

**Coordination of Search Requests**

All search requests to a component of the IC and military by any AUSA handling an

investigation or prosecution that involves an identifiable link to national security or to information within the possession of the IC or military should be made through the NSD and the Assistant Attorney General for the Criminal Division as follows:

- The Counterterrorism Section (CTS) should be contacted regarding search requests for investigations and prosecutions involving offenses that CTS is responsible for coordinating pursuant to the U.S. Attorney's Manual. *(USAM §§ 9-2.136 - 9-2.139)*

- The Counterespionage Section (CES) should be contacted regarding search requests for investigations and prosecutions involving offenses that CES is responsible for coordinating pursuant to the USAM. *(USAM §§ 9-90.020, 9-59.100)*

- All other requests should be directed to NSD's office of Law and Policy (L&P).

Requests should be made at the earliest opportunity and before any contact by the AUSA with the IC.  (*See, USAM §9-90.210*).  NSD will then coordinate with the AUSA, the IC, and the military to ensure that potentially discoverable classified material is provided to the prosecution team for review.

**Content of Search Requests**

Search requests should be focused, carefully reasoned, and based on case-specific facts, and should include the following:

- the nature of the charges or likely charges, and potential defenses;
- all available identity information with respect to each known defendant/suspect and potential witness;
- the type of information sought;
- the time period to be covered;
- the components of the IC and/or military that have been involved in the case and a discussion of the nature of the involvement; and,
- the grounds for the search request.

Once this information is received, only those with the necessary security clearances will review the materials provided.  If, after review, it appears that the response does not include all of the material that would be expected given the facts of the case, the AUSA should again coordinate with NSD prior to making any additional requests to the IC or military component.

If the AUSA concludes that any of the classified information is relevant and arguably discoverable, they should coordinate with the appropriate element at NSD to determine how to proceed.  NSD will facilitate communication between the AUSA and the IC or military regarding declassification requests.  Only the IC or military component that originally classified the material can declassify it, and its decision to do so must be based upon specific findings that use or disclosure will not result in harm to national security.

**Foreign Intelligence Surveillance Act (FISA) material**

As with other classified evidence, potentially discoverable information obtained pursuant to FISA must be reviewed and disclosed in accordance with applicable law and DOJ policies.  FISA provides specific procedures designed to facilitate the use of intelligence information in criminal proceedings while at the same time protecting sources and methods of intelligence collection.

**Contact numbers for NSD**:

CTS: 202-514-0849
CES: 202-514-1187
L & P: 202-514-1057

## IV.    GATHERING DISCOVERY MATERIALS

The AUSA should seek out discoverable information from the prosecution team.  The following potential sources of discoverable information should be reviewed:

**Investigative Agency's Files**

<u>All</u> substantive case-related information in the possession of an agent who is part of the investigative team should be reviewed by the AUSA or case agent to determine whether it should

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 22 of 41

be disclosed as part of discovery.  The search for information should not be limited to formal investigative reports such as FBI 302's, DEA-6's, IRS MOI's, etc.  The investigative agency may also have substantive case-related information in other formats or locations that an agent may not consider to be part of the "investigative" file, such as electronic communications (EC's), searchable electronic databases, inserts, emails, or other forms of electronic communications.  It may not be necessary to disclose the information in its original format, but AUSA and case agents should review the information in its original format, whenever possible.

### Confidential Informant (CI) / Witness (CW) / Human Source (CHS) Files

The credibility of cooperating witnesses or informants will always be at issue if they testify during a trial.  These files will likely contain *Giglio* information which should be disclosed to the defense, or to the court for a ruling on whether it should be disclosed to the defense. AUSAs should make arrangements with the investigative agency possessing the file(s) to review the file(s) personally whenever possible. The entire CI, CW, CHS file should be reviewed, not just the portion relating to the current case.  Review all proffer, immunity, and/or other agreements, validation assessments, payment information, and other potential witness impeachment information.  If the file is located outside the district, AUSAs may consider asking an AUSA in the district where the file is located for assistance in reviewing the file.

Steps should be taken to protect the non-discoverable, sensitive information found within a CI, CW, CHS file.  Discovery obligations may be fully discharged, while protecting government or witness interests such as security or privacy, via a summary letter to defense counsel.

AUSAs must always be mindful of security issues which may arise with respect to disclosures from confidential source files.  These risks should be evaluated in consultation with the agency.

### Evidence and Information Gathered During the Investigation

AUSAs should review all the evidence and information gathered during the course of the investigation, including, but not limited to, information and evidence gathered via search warrant, subpoena (grand jury, administrative, inspector general, etc.), Title III wiretaps, consensual monitorings, surveillance and witness interviews.  If the volume of evidence makes it impractical for the AUSA to review all the evidence, this obligation may be satisfied by making the evidence available to the defense for inspection and copying.

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 23 of 41

With respect to electronically stored evidence, including e-mails, sufficient time must be allotted for a search of hard drives, discs, and other storage hardware.

### Documents or Evidence Gathered by Civil Attorney's and/or Regulatory Agencies in Parallel Civil Investigations

If civil attorneys and/or regulatory agencies involved in parallel civil investigations are deemed to be a part of the prosecution team, AUSAs should also gather and review any and all information and evidence from them that could be discoverable.

### Substantive Case-Related Communications

Substantive case-related communications (emails, tweets, text messages, memoranda, notes) are communications which include factual reports about investigative activity, factual discussions of the relative merits of evidence, factual information obtained during interviews or interactions with witnesses/victims, and factual issues relating to credibility. Substantive case-related communications are most likely to occur among prosecutors and/or agents, between prosecutors and/or victims, between agents and other witnesses, and, between victim witness coordinators and witnesses and/or victims.

Communications involving case impressions or investigative or prosecutive strategies without more would not ordinarily be considered discoverable, but substantive case-related communications should be reviewed carefully to determine whether all or part of a communication (or the information contained therein) should be disclosed.

### Impeachment Information Relating to Witnesses: *Giglio v. United States*

In *Giglio v. United States*, 405 U.S. 150 (1972), the Supreme Court held that *Brady* material includes material that might be used to impeach key government witnesses, stating:

> When the "reliability of a given witness may well be determinative of "guilt or innocence, non-disclosure of evidence affecting [the witness's] credibility falls with the general rule" of *Brady*. *Id*. At 154.

The Supreme Court has explained that *Brad*y material and *Giglio* material are not two distinct kinds of evidence under the Constitution, but rather, *Giglio* material is merely one form of *Brady* material. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Still, it is often useful to

keep *Brady* and *Giglio* analytically distinct.

First, *Brady* and *Gigli*o are, at a more specific level, conceptually different kinds of evidence. They are commonly referred to separately: *Giglio* material being the label for impeachment evidence, and *Brady* material being the label for every other kind of evidence that would be helpful to the defendant's efforts to create a reasonable doubt (exculpatory evidence) or receive a lower sentence (mitigating evidence).

Second, the AUSA's duties under *Giglio*, at least with respect to law enforcement witnesses (discussed below) are somewhat different and more complicated that the duties under *Brady*. Thus, for purposes of this policy, "*Brady* material" refers to evidence or information – other than *Giglio* material – that could be used by a defendant to make his conviction less likely or a lower sentence more likely. The term "*Giglio* material" refers to evidence or information that could be used by a defendant to impeach a key government witness.

### AUSA's Responsibilities under *Giglio*

The government's constitutional duty to disclose evidence favorable to the defendant includes "evidence affecting the credibility" of key government witnesses. *Giglio*, 405 U.S. at 154. This duty exists with respect to suppression hearings, trials and sentencing hearings. As with *Brady* material, an AUSA is constitutionally required to disclose all *Gigli*o material of which he/she or any other member of the prosecution team is aware. The AUSA thus "has a duty to learn of any [*Giglio* material] known to the others acting on the government's behalf in the case, including the police. *Kyles*, 514 U.S. at 437. Accordingly, the AUSA must ask the case agent if <u>he/she or any other member of the prosecution team</u> knows of any *Giglio* material on any government witness. This inquiry should be repeated orally before all suppression hearings, trials, and sentencing hearings. Under *Kyles*, the AUSA is <u>required</u> to make these inquiries.

### Examples of *Giglio* Material

To decide what evidence is covered by Giglio, one needs to know the ways in which a witness can be impeached. AUSAs should be especially alert to the existence of evidence relating to the first two forms of impeachment described below, namely, a witness's bias and a witness's prior misconduct involving dishonesty.

### 1. <u>Bias</u>

A witness can be impeached with evidence (including extrinsic evidence) that he has a bias against the defendant or in favor of the government. *See generally United States v. Abel*, 469 U.S. 45 (1984). The sources of such bias are too numerous and varied to catalogue, but here are a few illustrations:

- A witness might dislike the defendant because of some unrelated previous encounter between the two or because of the defendant's race;

- A witness who has some actual or potential exposure to criminal penalties arising from the subject matter of the prosecution may have a pro-government bias resulting from his getting some form of leniency from the government, which may take many forms such as: a plea agreement reducing the witness's potential sentence, an agreement not to seek forfeiture of his property, a decision to place him in the witness security program, or a decision to grant him full transactional immunity;

- Favorable treatment of a relative or friend who has criminal exposure;

- Fear of unfavorable treatment in a related or unrelated proceedings pending before another government agency or court, or, because he fears that such a proceeding will be instituted.

### 2. <u>Specific Instances of Misconduct Involving Dishonesty</u>

A witness can be impeached with evidence (not extrinsic) of a prior act of misconduct involving dishonesty, even if it has not resulted in a criminal charge or conviction. (FRE 608(b)).

Examples include lying – or failing to disclose material facts– on a job application, a tax return, or search warrant affidavit, lying to criminal investigators or in a court proceedings, stealing or otherwise misappropriating property, and using an alias.

A witness can be impeached with evidence, including extrinsic, of a prior felony conviction. (FRE 609(a)(1)). He can also be impeached with a prior misdemeanor conviction involving false statements or any other form of dishonesty. (FRE 609(a)(2)).

### 3. Prior Inconsistent Statements

A witness can be impeached with evidence (including extrinsic evidence in most situations) of prior inconsistent statements. (FRE 613). We generally include this information under the Jencks Act.

### 4. Untruthful Character

A witness can be impeached by the testimony of a second witness that he has a reputation in the community for being untruthful. Similarly, a witness can be impeached by the testimony of a second witness that, in the opinion of the second witness, and based upon that second witness' dealings with and observations of the witness, that the witness is generally untruthful. (FRE 608(a)).

### 5. Incapacity

A witness can be impeached with evidence (including extrinsic) of defects in his physical or mental capacities at the time of the offense or when he testifies at a hearing or trial. An example of a physical incapacity is the myopia of an eyewitness to a bank robbery, or drunkenness of an eyewitness, use of controlled substances, and a mental disease or defect.

### 6. Contradiction

A witness can be impeached with evidence (including extrinsic) of facts that contradict the witness's testimony.

**Civilian Witnesses**

First, the decision to disclose or not disclose impeachment evidence on a civilian government witness ultimately rests with the AUSA. Thus, evidence that is identified as *Giglio* material by the case agent and provided to the AUSA will not necessarily be disclosed to the court or the defendant. The AUSA may conclude, after review, that the evidence in question simply has no bearing on the witness' credibility. Or, the AUSA may choose not to disclose the evidence, even if relevant to credibility, because he/she is absolutely, positively certain that the evidence is inadmissible for purposes of impeachment and will not lead directly to admissible *Giglio* material. *Wood*, 516 U.S. at 6.

Second, evidence that is disclosed to the defendant will not necessarily be admissible at trial.  For instance, extrinsic evidence of specific instances of misconduct involving dishonesty is admissible.  Fed.R.Evid. 608(b).  In addition, impeachment evidence, though relevant, may be excluded as being too remote, speculative, confusing, or too much of a distraction from the main issue (i.e., the defendant's guilt).  Fed.R.Evid. 403.  Impeachment evidence might also be inadmissible as hearsay.  Fed.R.Evid. 802.  Therefore, when the AUSA does disclose *Giglio* material to the defendant, he/she should consider whether grounds exist for filing a motion *in limine* to exclude or limit the evidence.

Once the agency discloses any *Giglio* information to the *Giglio* officer or AUSA, and the review of the materials is concluded, the determination must be made as to whether there exists any information which must be disclosed to the court for an *ex parte in camera* review or disclosed to defense counsel.

### What To Review

All potential *Giglio* information known by, or in the possession of the prosecution team, which relates to non-law enforcement witnesses, should be gathered and reviewed.  That information includes, but is not limited to:

- Prior inconsistent statement (possibly including inconsistent attorney proffers; *see United States v. Triumph Capital Group*, 544 F.3d 149 (2d Cir.2008);

- Statements or reports reflecting witness statement variations (*see below*);

- Benefits provided to witnesses including:
    - Dropped or reduced charges
    - Immunity
    - Expectations of downward departures or motions for reduction of sentence
    - Assistance in a state or local criminal proceeding
    - Considerations regarding forfeiture of assets
    - Stays of deportation or other immigration status considerations
    - S-Visas
    - Monetary benefits (how are they calculated by agency?)
    - Non-monetary benefits or services
    - Assistance in obtaining benefits or services
    - Non-prosecution agreements

- Letters to other law enforcement officials (e.g., state prosecutors, parole boards) setting forth the extent of a witness' assistance or making substantive recommendations on the witness's behalf)
- Relocation assistance
- Consideration or benefits to culpable or at risk third-parties

- Other known conditions that could affect the witness' bias such as:
  - Animosity toward the defendant
  - Animosity toward a group of which the defendant is a member or with which the defendant is affiliated
  - Relationship with victim
  - Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor)

- Prior acts under Fed.R.Evid. 608

- Known substance abuse. mental health issues, or other issues that could affect the witness' ability to perceive and recall events.

**Law Enforcement Witnesses**

In some cases, AUSAs may encounter *Giglio* issues with respect to law enforcement witnesses who will be the affiant or a witness at a hearing or trial. For example, an agent may have been found to have committed misconduct, or may be the subject of a pending internal or criminal investigation. USAM 9-5.100 contains the Department's policy on obtaining and disclosing *Giglio* information relating to law enforcement witnesses.

The Criminal Chief is the repository for all *Giglio* materials on law enforcement witnesses in the District. Any AUSA who becomes aware of *Giglio* material concerning a law enforcement witness, especially an explicit or implicit finding by a judicial officer that a law enforcement witness has made false or misleading statement in an affidavit or while testifying, must provide that information to the Criminal Chief.[14]

---

[14]A Civil Division AUSA must inform the Criminal Chief about any information or evidence discovered in the course of a civil case which may be used to impeach a law enforcement witness. The Criminal Chief must also be notified whenever any personnel file or

The Criminal Chief is the "Requesting Official" under Department policy which means that he/she is the only person authorized to request potential *Giglio* material regarding a law enforcement witness directly from that witness' agency.

Finally, the Criminal Chief is the arbiter of any dispute between the case AUSA and the agency as to whether any particular material is covered by *Giglio* or whether any particular material is close enough to the sweep of *Giglio* to warrant its submission to the court *in camera* for the court's review and determination.

Throughout this process, AUSAs should appreciate the fact that the disclosure of *Giglio* material may adversely affect the law enforcement witness' privacy interests and reputation.

All potential impeachment information obtained from a law enforcement witness or the witness' agency should be carefully protected and only disclosed to those with a need to know.

If *Giglio* information is disclosed to the USAO, a review will occur to determine whether the materials should be disclosed to the court for an *ex parte, in camera* review or whether disclosure to the defense is apparent. An AUSA should have a discussion with his/her supervisor concerning disclosure. If an *ex parte* disclosure is made to the court, such disclosure and pleadings or documents regarding a law enforcement witness' potential impeachment information, as well as any court rulings regarding such disclosure, should be sealed as a part of the case file for appellate purposes.

AUSAs should seek protective orders of sensitive potential impeachment information in appropriate cases to prohibit disclosures by defense counsel or the defendant to third parties not involved in the case.

All potential impeachment information received from an agency pursuant to a *Giglio* request should be securely maintained and should not be shared with any person who does not have a need to know. The AUSA should keep a copy of all potential *Giglio* information received in the case file. This information should be placed in a sealed envelope and clearly marked, for

---

similar material concerning an employee of a law enforcement agency is disclosed to another party or to the court.

appellate purposes, as *Giglio* information.

When potential impeachment information received from an agency has been disclosed to the court or defense counsel, the information disclosed, along with any judicial rulings and related pleadings, shall be provided, through the Criminal Chief, to the agency official who provided such information.

When potential impeachment information received from an agency has been disclosed to the court or defense counsel, the information disclosed, along with any judicial rulings and related pleadings will be maintained by the Criminal Chief.

### *Giglio* Questions

AUSAs should have candid conversations with the officers and agents with whom they work regarding any potential *Giglio* issues whenever necessary before calling that agent or officer as a witness.

The following questions, among others, should be asked of all testifying law enforcement witnesses. You will note that the following questions are quite broad. An affirmative answer to any of these questions does not necessarily mean that a *Giglio* disclosure is necessary. The issue of when and whether a *Giglio* disclosure is required is governed by USAM § 9-5.100:

- Are you or have you ever been the subject of any allegation or finding of misconduct?
- Are you or have you ever been the subject of any administrative allegation of bias or untruthfulness, including any finding of lack of candor in response to an administrative inquiry?
- Are you or have you ever been the subject of any administrative allegation of bias or untruthfulness that was resolved with a lesser finding, e.g., conduct unbecoming of an officer?
- Has any court ever found your testimony to be untruthful (including in civil proceedings)?
- Are you, or have you ever been, the subject of any allegations of excessive force?
- Have any criminal charges ever been filed against you (regardless of outcome)?
- Have you ever been named in a lawsuit, i.e., sued anyone or been sued (including domestic matters)?

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 31 of 41

- Did anything happen during this case that could be argued as evidence of your bias against the defendant(s)?
- Do you currently have, or have you ever had ,any significant personal relationship with any of the victims, witnesses (including other police officers, social workers or medical professionals), lawyers, judge(s), or defendant(s) in this case?  A significant relationship is a relationship, beyond being mere acquaintances or work colleagues, that could potentially influence your testimony or create a possible bias toward or against any victim, witness, lawyer, judge or defendant.

### Handwritten Notes of Agents

AUSAs should review the agent's notes of crucial interviews that the AUSA did not attend, if the accuracy of the report is questioned, which of course would include any interviews of a defendant.

### Pre-Sentence Reports (PSR's)

If an AUSA has a witness who is or was a defendant in federal court, in most cases there will be a PSR relating to that witness.  The PSR may contain *Brady, Jencks*, or *Giglio* information which may need to be disclosed at the appropriate time.  It would be prudent to obtain the court's permission prior to the disclosure of any relevant information contained in a PSR.

If, after review of a PSR, the AUSA identifies information that he or she believes should be disclosed, and that information has not been disclosed elsewhere and is not readily available from another source, the AUSA should prepare a disclosure motion and order requesting either an *in camera* review or disclosure.

With regard to Jencks material, the case law is clear that a testifying witness' entire PSR is NOT the witness' Jencks material.  However, the testifying witness' PSR may contain the witness' version of the offense conduct – and thus the potential for Jencks material.  The statement however may not fall within the Jencks Act definition of a statement (written by the defendant, a quote, or a substantially verbatim recital of an oral statement and relates to the subject matter of the witness's testimony).

## V.      CONDUCTING THE REVIEW

Having gathered the information described herein, AUSAs must ensure that the material is reviewed to identify discoverable information.  It would be preferable to review the information personally, but such review is not always feasible or necessary.  The review, by necessity, may occur via the case agent or a paralegal; however, the AUSA is ultimately responsible for compliance with discovery obligations.  Clearly, coordination between these parties is essential.

## VI.     TIMING OF DISCLOSURE

Providing broad and early discovery often promotes the truth-seeking mission of the Department and fosters a speedy resolution in many cases.  When considering providing discovery beyond that required, countervailing concerns in the particular case should be considered, including, but not limited to: protecting victims and witnesses from harassment or intimidation, protecting the privacy interests of witnesses, protecting privileged information, protecting the integrity of ongoing investigations, protecting the trial from efforts at obstruction, protecting national security interests, investigative agency concerns, enhancing the likelihood of receiving reciprocal discovery by defendants, any applicable legal or evidentiary privileges, and, other strategic considerations that enhance the likelihood of achieving a just result in a particular case.  It is the practice, in the WDNC, to produce discoverable materials even if no request is made by the defense.

DOJ Policy, as set forth in USAM §9-5.001, provides that "the government's disclosure will exceed its constitutional obligations".  As such, AUSAs are directed to disclose exculpatory information "reasonably promptly after it is discovered", and that the disclosure of impeachment information must be made before trial.  An AUSA must obtain the approval of the Criminal Chief not to disclose impeachment information before trial or not to disclose exculpatory information reasonably promptly because of its sensitive nature.  Upon such approval, notice must be provided to the defendant of the time and manner by which disclosure of the exculpatory or impeachment information will be made.

The Jencks Act and Fed.R.Crim.P. 26.2 do not require production of witness "statements" until after the direct examination of the witness has concluded.  However, AUSA's who adhere

to the literal timing requirements of the Jencks Act run the risk that the trial will be delayed, resulting in the judge's displeasure. The courts have encouraged earlier production of Jencks materials in order to prevent delay at trial and so that defense counsel may have an adequate opportunity to examine that which is not in dispute.  It is the general practice of this office to provide Jencks Act material at or near the beginning of trial.

If an AUSA has concerns about witness safety, misuse of interview reports by the defense, or other legitimate concerns which outweigh early disclosure, the AUSA may default to the literal timing guidance of the Jencks Act or Rule 26.2.  AUSAs are discouraged from practices that routinely create trial delays, or would adversely affect other AUSAs, or set an improper precedent for the office.

### Pre-Charge Disclosures

#### 1.    Grand Jury

**Exculpatory information**.    Although the Supreme Court has held that there is no constitutional requirement that the government disclose exculpatory information to the grand jury, see *United States v. Williams*, 504 U.S. 36, 52-54 (1992), USAM 9-11.233 requires AUSAs to disclose to the grand jury "substantial evidence that directly negates the guilt of a subject of the investigation."

**Impeachment information**.   Although there is no legal duty to seek out impeachment information from the prosecution team or present impeachment information to a grand jury, if an AUSA is aware of significant impeachment information relating to a testifying witness, the AUSA should consider disclosing it to the grand jury, talking into account the witness' role in the case and nature of the impeachment information, among other things.

#### 2.    Affidavits

**Exculpatory information**.  If an AUSA is aware of substantial exculpatory information at the time he or she is preparing an affidavit in support of a search warrant, complaint, seizure warrant, or T-III, the AUSA should disclose the information in the affidavit unless the AUSA obtains supervisory approval not to do so.

**Impeachment information**.  If, at the time an AUSA is preparing an affidavit in

support of a search warrant, complaint, seizure warrant or T-III,  the AUSA is aware of impeachment information relating to the affiant or other person relied upon in the affidavit, such as a confidential informant, and that impeachment information is sufficient to undermine the court's confidence in the probable cause contained in the affidavit, the AUSA should disclose the information in the affidavit unless the AUSA obtains supervisory approval not to do so.  A prior judicial finding of a lack of credibility of an affiant or person relied upon in the affidavit should be disclosed in the affidavit.

### Post-Charge Disclosures

Impeachment information should be disclosed as follows:

**Pre-Trial Hearings**:  Impeachment information relating to government witnesses who will testify at a preliminary / detention hearing, motion to suppress, or other pre-trial hearing should be disclosed sufficiently in advance of the hearing to allow the hearing to proceed efficiently.

**Guilty Pleas**:  The Supreme Court has held that there is no constitutional requirement that the government disclose impeachment information prior to a guilty plea. *United States v. Ruiz*, 536 U.S. 622 (2002).  Nonetheless, if the AUSA is aware of impeachment information so significant that it undermines the AUSA's confidence in the defendant's guilt, the AUSA should disclose the information to the defense and advise their supervisor.

**Trial**:  Impeachment information should be disclosed "at a reasonable time before trial to allow the trial to proceed efficiently."  (*USAM §9-5.001 D.2*).

**Sentencing**:  USAM §9-5.001 D.3 requires: "exculpatory and impeachment information that casts doubt upon proof of an aggravating factor at sentencing, but that does not relate to proof of guilt, should be disclosed no later that the court's initial presentence investigation."  Thus, an AUSA should make disclosures within this time frame.  If additional favorable information becomes apparent after the initial PSR is issued, it should be disclosed promptly.

**Post-Conviction evidentiary hearings:**  These include probation / supervised release revocations, and habeas actions.  Impeachment information should be disclosed at a

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 35 of 41

reasonable time before the hearing to allow the hearing to proceed efficiently.

**Information Obtained in Witness Interviews** :  Absent unusual circumstances such as potential serious threats to witness safety, national security, or an ongoing criminal investigation, AUSAs should produce reports of testifying witness interviews and witness statements to the defense prior to the hearing or trial.  These reports should be produced sufficiently in advance of the witness' testimony to permit defense counsel to make effective use of the information.  AUSAs have the discretion to determine how far in advance of the testimony the reports will be disclosed based upon the particular circumstances of the case and any reciprocal discovery agreements which may have been reached with defense counsel.

Production of witness interviews reports is required regardless of whether the reports qualify as statements as defined by the Jencks Act, contains *Brady* or *Giglio* information, or is discoverable under any other law, rule or policy.

Interview memoranda of witnesses expected to testify, and of individuals who provided relevant information but are not expected to testify, should be reviewed.

Although not required by law, generally speaking, witness interviews [15] should be memorialized by the agent.  Agent and prosecutor notes and original recordings should be preserved, and AUSAs should confirm with agents that substantive interviews will be memorialized.  When an AUSA participates in an interview with an investigative agent, the AUSA and agent should discuss note taking responsibilities and memorialization before the interview begins (unless of course the AUSA and agent have established an understanding through prior course of dealing).  Whenever possible, AUSAs should not conduct an interview without an agent present to avoid the risk of making themselves a witness to a statement and thus disqualified as the case attorney should the statement become an issue.  If exigent circumstances make it impossible to secure the presence of an agent during an interview, AUSAs should have another office employee present.

---

[15]"Interview" as used herein refers to a formal question and answer session with a potential witness conducted for the purpose of obtaining information pertinent to a matter or a case.  It does not include conversations with a potential witness for the purpose of scheduling or attending to other ministerial matters.

Page 33 of  38

### AUSA notes

A prosecutor's notes of witness interviews are usually protected from discovery by privilege rules and Fed.R.Crim.P 16(a)(2). AUSAs should be mindful however that notes which contain substantially verbatim quotes of what a witness said during an interview (potential Jencks Act), or favorable information (*Brady / Giglio*) may contain information that is discoverable. If the discoverable information in the AUSA's notes is contained in other materials provided to the defense (e.g., 302's, letter to defense), this will often be sufficient. It is possible however, that if the exact nature of the information contained in the notes becomes an issue in the case, the court may review the notes in camera.

AUSAs should avoid having substantive interaction with witnesses without an agent or other person present who can serve as a witness to the exchange.

### Agent Notes

Agents should be asked to retain all rough notes of interviews (whether taken by hand or on the computer), even if notes are described, consolidated or otherwise formalized in a final investigative report including a final MOI, FBI 302, DEA 6, or ROI.

Agent notes should be reviewed if there is a reason to believe that the notes are materially different from the memorandum, if a written memorandum was not prepared, if the precise words used by the witness are significant, or if the witness disputes the agent's account of the interview. AUSAs should pay particular attention to agent notes generated during an interview of the defendant or an individual whose statement may be attributed to a corporate defendant. Such notes may contain information that must be disclosed pursuant to Fed.R.Crim.P 16(a)(1)(A) - (C) or may themselves be discoverable under Fed.R.Crim.P 16(a)(1)(B).

### Trial Preparation Meetings with Witnesses

Trial preparation meetings with witnesses should generally not be memorialized. However, AUSAs should be particularly attuned to new or inconsistent information disclosed by the witness during a pre-trial witness preparation session. New information that is exculpatory or impeachment information should be disclosed consistent with the provisions of USAM §9-5.001, even if the information is first disclosed in a witness preparation session. Similarly, if the new

information represents a variance from the witness' prior statement(s), AUSAs should consider whether memorialization and disclosure is necessary or consistent with the provisions of the preceding paragraph.

### Witness Statement Variations and the Duty to Disclose

Some witness' statements will vary during the course of an interview or investigation. For example, they may initially deny involvement in criminal activity, and the information they provide may broaden or change considerably over the course of time, especially if there are a series of debriefings that occur over several days or weeks.  Material variances in a witness' statement(s) should be memorialized, even if they are within the same interview, and they should be provided to the defense as *Giglio* information.

### Correspondence Practices

Agents should be instructed that all substantive correspondence relating to the investigation must be retained with the case file.  Substantive correspondence includes: formal written correspondence, informal written correspondence, and emails (other than those addressing routine matters such as scheduling), to include any emails to or from witnesses. Likewise, AUSAs should maintain substantive emails relating to the matter and review for potential disclosure.

### E-Mail Correspondence

Because email communications may not be as complete as investigative reports and may have the unintended effect of circumventing an agency's procedures for writing and reviewing reports, agents should be encouraged to memorialize all substantive written communications between agents and prosecutors in the form of an MOI or similar formal investigative report, not in the form of an email.  Substantive written communications include: factual reports about investigative activity, factual discussions of the relative merits of evidence, factual information obtained during interviews or interactions with witnesses / victims, and factual issues relating to credibility.

Agents should be instructed that this policy is not intended to discourage emails between agents and AUSAs, nor is it intended to discourage the efficient practices of sending formal investigative reports as email attachments to AUSAs, or of using email for scheduling (e.g., a

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 38 of 41

witness interview, grand jury time, etc).

If, notwithstanding the AUSAs requests to the agent, substantive information pertaining to a case or witness is communicated in an email, the AUSA should save and print the email and maintain such in the case file for review and possible production.  Alternatively, the agent who authored or received the email should be advised to write an MOI that reflects the substantive information contained therein.

### VII.   MANNER OF PRODUCTION AND RECORD KEEPING

**Manner of Production**

Documents:   AUSAs (paralegals if applicable) should maintain a record of discovery provided to the defense.   Generally, all documentary evidence should be bates numbered.  Discs containing electronic data should be well labeled so that they can be readily identified.

Non-documentary evidence:  should be made available to the defense for inspection.

**Record Keeping**

AUSAs (paralegals if applicable) should keep a written record in the criminal file of all discovery produced to the defense, and all evidence made available for inspection and copying. When discovery is provided or made available by an AUSA, the AUSA should use a discovery production letter to memorialize in detail the discovery that was provided or the items or material that was made available for inspection or copying.  All production letters should be maintained in the criminal case file.

**Privacy Protection: Redacting Documents**

All personal identifiers should be redacted in whole or in part prior to production.  This includes: names of minors, dates of birth, social security numbers, taxpayer identification numbers, home street addresses, telephone numbers, Medicare or Medicaid ID numbers, financial account numbers, or any other identifier which may improperly disclose private or sensitive information.  Fed.R.Crim.P 49.1, which contains direction for redacting documents filed with the court, should also be used as a starting point for the redaction of documents that will be produced in discovery.   In cases where the documents are so voluminous as to make this practice overly burdensome, additional disclosure restrictions should be agreed upon with

defense counsel.

### Disclosure of Confidential Informants.

The standard for disclosure of the identity of a non-testifying confidential informant is "reasonable probability that the informant can give relevant testimony material to the defense". The informant must be "active participant" and not "mere tipster."

Disclosure not required where:

> i.  the informant played only a small or passive role in the offense charged or
>
> ii. the informant would be in personal danger and the potential testimony of the informant is not exculpatory.

Disclosure of the identity of a confidential informant is required when the informant is substantially involved in the charged offense(s). However, the government has no duty to produce such an informant at trial.

If disclosure is required under case law, the identity of any confidential informant, who participated in or is otherwise a material witness to the commission of the offense(s) alleged in the indictment, shall be disclosed no later than one week before trial. *(See CSDO ¶ 5)*.

## VII.    RECIPROCAL DISCOVERY

The purpose of reciprocal discovery is to assure fair and expeditious criminal proceedings. In several situations, including where the defense has requested discovery from the government, Rule 16(b) and other provisions of the Fed.R.Crim.P impose on the defendant a reciprocal duty to produce discovery.

If a defendant requests disclosure under Rule 16(a)(1)(E) and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies of items within the defendant's possession, custody, or control, and, if the defendant intends to use the item in the defendant's case-in-chief at trial. *(See also CSDO)*.

Additionally, DOJ's online USABook has an excellent section on the Defendant's Discovery Obligations.  A copy of those materials is incorporated by reference and included in this Policy as *Attachment 9*.

### VIII.  CONCLUSION

Our goal is always to pursue justice fairly, consistently, with honesty and integrity.

October 2010

Case 3:16-cv-00057-MOC    Document 50-14    Filed 03/23/17    Page 41 of 41