# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

| | |
|---|---|
| ALEJANDRO UMAÑA,<br>         Movant,<br><br>      v.<br><br>UNITED STATES,<br>        Respondent. | 3:16-CV-00057-RJC<br><br>CAPITAL § 2255 PROCEEDING<br><br>HON. ROBERT J. CONRAD, JR. |

**PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE
TO MOTION FOR LEAVE TO CONDUCT DISCOVERY**

KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: April 24, 2017

ZANDRA L. LOPEZ
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Tel: 619-234-8467
Zandra_Lopez@fd.org

# Table of Contents

I. The Proper Legal Standards ...................................................................................... 1

    A.    The government's attempts to elevate the standard to entitlement to relief as opposed to good cause for discovery fail. ...................................................................... 1

    B.    The government's injection of procedural defenses fails. ................................................. 3

II.    Mr. Umaña Has Demonstrated Good Cause for Discovery Requests Nos. 1-85 Relating To The Los Angeles Homicides (Claims V, VI, and VII). .......................................... 5

    A.    Applicable legal principles require discovery. .................................................. 5

        1.    The government's attempts to minimize its *Brady* obligations must fail. .................... 6

        2. The government's attempts to avoid *Napue*'s proscription against presenting materially misleading and false evidence and argument fail. ............................................. 8

        3. The government's attempts to portray trial counsel's failure to examine all of the extraordinarily voluminous discovery or conduct an independent investigation as strategic, prior to any factual development of the record, also fails. ................................... 9

        4. The government's attempts to minimize the importance of the Los Angeles homicides to its case in aggravation and to exaggerate the strength of its case must fail. ..................... 10

    B.    Mr. Umaña's specific discovery requests should be granted. ....................................... 12

        1.    Witness Interviews ............................................................................... 12

        2.    Photographic Arrays ............................................................................. 15

        3.    Alternate Suspects ............................................................................... 16

    4.     Witness Benefits ............................................................................... 17

III.  Mr. Umaña Has Demonstrated Good Cause for Discovery Requests Nos. 86-95 Relating to The Presentation of An Inaccurate and Incomplete Story of His Life History (Claims I, VI, VII, and XIII). .................................................................................................. 18

    A.    Good cause exists to obtain discovery in support of his *Brady* and *Napue* claims. ........ 18

    B.    Good cause exists to obtain discovery in support of Mr. Umaña's ineffective assistance of counsel claims. ..................................................................................................... 21

    C.    There is a reasonable probability of obtaining relief under Claims I, VI, VII, and XIII in relation to the incomplete and inaccurate presentation of Mr. Umaña's life history. ........ 22

IV.  Mr. Umaña Has Demonstrated Good Cause for Discovery Requests Nos. 82-85 Relating to The Materially Misleading and False Evidence of Gang Tattoos (Claims VI, VII, and XI). 24

V.    Mr. Umaña has good cause to obtain discovery Requests Nos. 121-29 regarding the grand and petit jury venires in order to support his claim that trial counsel failed to challenge the underrepresentation of African Americans, Hispanics, Asians, and Women in the grand and petit jury venires. (§ 2255 Motion, Claim XVII). ................................................................. 25

VI.  Mr. Umaña Has Good Cause To Obtain Discovery Requests Nos. 130-36 About The Government's Jury Selection Process To Support His Claim That Trial Counsel Failed To Adequately Object To The Government's Race-Based Exercise Of Peremptory Strikes. (Claim Xviii). ............................................................................................................ 26

VII.  Mr. Umaña has demonstrated good cause to obtain discovery Requests Nos. 111-20, 139 about jurors to support his claim that he was denied the right to a fair and impartial jury (Claim XV). ............................................................................................................ 27

ii

VIII. There is good cause to grant discovery Requests Nos. 96-110, 141-44, 162-63 regarding Mr. Umaña's claims pertaining to intellectual disability, race and geography, and the Vienna Convention. ................................................................................................................... 30

IX. Mr. Umaña's general requests for disclosure of *Brady* material, Nos. 164-180, were made in good faith ................................................................................................................... 32

Certificate of Service ................................................................................................................... 35

Case 3:16-cv-00057-MOC    Document 61    Filed 04/24/17    Page 4 of 39

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

| | |
|---|---|
| ALEJANDRO UMAÑA,<br>　　　　　　　　Movant,<br><br>　　　　v.<br><br>UNITED STATES,<br>　　　　　　　　Respondent. | 3:16-CV-00057-RJC<br><br>CAPITAL § 2255 PROCEEDING<br><br>HON. ROBERT J. CONRAD, JR. |

**PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE
TO MOTION FOR LEAVE TO CONDUCT DISCOVERY**

Petitioner, Alejandro Umaña, through counsel, hereby submits his Reply to the Government's Response to the Motion for Leave to Conduct Discovery Pursuant to Rule 6(a) of the Rules Governing §2255 Proceedings, Federal Rules of Civil Procedure 26 - 37, Federal Rules of Criminal Procedure 15 - 17, and Local Rules 26.1, and, in support thereof, states the following:

The government lodges a number of objections to Mr. Umaña's Motion for Leave to Conduct Discovery. For the reasons described below, those objections are unavailing. This Court should reject the government's contentions and grant Mr. Umaña's Discovery Motion.

**I.　THE PROPER LEGAL STANDARDS**

　　**A.　The government's attempts to elevate the standard to entitlement to relief as opposed to good cause for discovery fail.**

As it did previously, *see* Doc. 43, the government confuses and conflates entitlement to relief with the requirements for discovery. Throughout its response, the government (erroneously) contends that discovery is not warranted because the allegations in the 2255 Motion – without benefit of discovery and full evidentiary development – fail to demonstrate that relief is required.

1

*See, e.g.*, Doc. 50 at 49, 52, 59-61, 65-66, 70, 71-73, 76-77, 80, 81, 89, 93, 94, 95, 97, 102, 126, 130, 132.

Entitlement to relief is not a prerequisite for discovery. Instead, all that is required is that the "specific allegations before the court show reason to believe that the petitioner *may,* if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (*quoting Harris v. Nelson*, 394 U.S. 286, 299 (1969)) (emphasis added). *See also* Doc. 47 at 2.

In *Bracy*, the Court recognized that: the petitioner's Due Process theory of case-specific judicial bias was "quite speculative" (*Bracy,* 520 U.S. at 906); the allegations offered by the petitioner "might be equally likely" to support a theory contrary to petitioner's (*id.*); there was no "solid evidence" supporting the petitioner's theory that the court had appointed a specific attorney to represent him in order to further the goal of camouflaging the judge's corruption, *id.* at 908; and that "[i]t may well be" that Bracy will not succeed on the merits of his claim. The Court nevertheless found the good cause requirement was met because Bracy had proffered evidence "that lends support to his claim" of case-specific judicial bias. *Id.* at 909.[1]

For each of his requests, Mr. Umaña has provided specific factual and legal bases for disclosure and described how the requested materials will support his claims of constitutional violations. That is all that is required and the government's attempts to alter the standard in a

---

[1] Indeed, Bracy did not obtain full relief. After discovery was provided, the District Court denied guilt-phase relief but granted penalty-phase relief. *Bracy v. Gramley*, 79 F. Supp. 2d 898 (N.D. Ill. 1999). A panel of the Seventh Circuit found that Bracy had failed to demonstrate his entitlement to relief even for the penalty phase, *see Bracy v. Shomig*, 248 F.3d 604 (7th Cir. 2001); however the *en banc* court ultimately agreed that penalty phase relief was warranted. *Bracy v. Shomig*, 286 F.3d 406 (7th Cir. 2002).

manner which requires the Court to determine the merits of claims before granting the discovery to which Mr. Umaña is entitled is unavailing and contrary to controlling authority.

### B.     The government's injection of procedural defenses fails.

Throughout its response, the government raises various (meritless) procedural defenses as reason to deny discovery.  *E.g*., Doc. 50 at 56, 62, 112, 113, 115-17, 118, 127, 130.  In *Bracy*, any facts developed through federal discovery would have been unexhausted, *see Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9-10 (1992), and it appears that the judicial bias claim itself was unexhausted. *Bracy*, 520 U.S. at 902; *United States ex rel. Collins v. Wellborn*, 868 F. Supp. 950, 991 (N.D. Ill. 1994) (indicating bias claim raised for first time on post-conviction appeal in state court).

The *Bracy* Court's focus on the "good cause" requirement alone makes clear that even the possible existence of a procedural impediment that could ultimately prevent the Court from granting relief does not alter the availability of discovery.  *See also Jones v. Wood,* 114 F.3d 1002, 1009-10 (9th Cir. 1997) (allowing discovery on apparently unexhausted claim); *McDaniel v. U.S. Dist. Court for the Dist. of Nevada*, 127 F.3d 886, 888 (9th Cir. 1997) (relying solely on "good cause" requirement of *Bracy*); *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000) (noting Rule 6(a) permits discovery to "develop those claims which are properly before the court, to obtain a factual basis on which to excuse procedural default, or to determine whether to request an evidentiary hearing").  Thus, the government's contention that this Court should determine procedural questions before granting discovery fails.

One procedural defense raised by the government involves a purported failure to raise various claims on direct appeal.  Doc. 50 at 56, 63, 113-14, 117.  This bar is not applicable to "claims that could not be presented [on direct appeal] without further factual development." *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *Waley v. Johnston*, 316 U.S. 101 (1942) (*per curiam*). As explained in Mr. Umaña's §2255 Motion and his Discovery Motion, many of the

3

facts and documents underlying his claims are outside the scope of the record on direct appeal and could not have been properly considered at that stage. *Waley*, 316 U.S. at 104.

Moreover, as noted in Doc. 57, until this Court appointed the Harrisburg Federal Defender, Attorney Kelly Miller appearing, all counsel representing Mr. Umaña in these 2255 proceedings also represented him on direct appeal, none of whom could be reasonably expected to investigate, develop, or assert claims of their own ineffectiveness, if any such claims in fact exist. *See Christeson v. Roper*, 135 S.Ct. 891, 894 (2015). Since the Harrisburg Defender Office's appointment on February 22, 2017, and Ms. Miller's entry of appearance on March 28, 2017, counsel have made reasonable efforts to obtain and review the record of the proceedings. Due to the size and complexity of the record of the proceedings, that process is not complete, despite diligent efforts. As a result, counsel is not in a position to adequately assess the validity of the government's procedural defenses regarding appellate counsel's conduct, nor is counsel in a position to adequately consult with or advise Mr. Umaña regarding these complex legal and factual issues.

For these reasons, counsel requested an extension of time in which to reply to the government's response to the discovery motion. Doc. 57. The Court has not yet ruled on counsel's request. In an exercise of caution, counsel submits this reply in order to avoid any sanctions against Mr. Umaña for a failure to comply with this Court's scheduling order. Counsel will continue to make every diligent effort to conduct the necessary independent record review, investigation, and assessment to determine what, if any, further submissions are required in order to protect Mr. Umaña's rights. *See* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, 31 Hofstra L. Rev. 913, 968 (2003), Guideline 6.1; Guideline 10.8; Guideline 10.15.

**II.    MR. UMAÑA HAS DEMONSTRATED GOOD CAUSE FOR DISCOVERY REQUESTS NOS. 1-85 RELATING TO THE LOS ANGELES HOMICIDES (CLAIMS V, VI, AND VII).**

### A.  Applicable legal principles require discovery.

In his 2255 Motion, Mr. Umaña presented three constitutional claims regarding the Los Angeles homicides, collectively requesting relief under *Brady, Napue,* and *Strickland*. Mr. Umaña demonstrated that the prosecution presented materially misleading and false evidence inculpating him in the Los Angeles homicides, including evidence that Freddy Gonzalez was able to identify Mr. Umaña, and only Mr. Umaña, as the Lemon Grove Park shooter (Doc. 22 at 206-08; Doc. 36 at 19-22). At the same time, this Court and the jury never heard exculpatory and impeachment evidence undermining the government's case in aggravation and tending to show that: (1) Mr. Umaña was not the park shooter (Doc. 22 at 128-37; Doc. 36 at 25, 29, 32); (2) Mr. Umaña was not the Fairfax shooter (Doc. 22 at 120-21, 136-37; Doc. 36 at 43); (3) Freddy Gonzalez identified someone other than Mr. Umaña as the park shooter: Geovanni Rodas (Doc. 22 at 129-30); (4) Rodas was arrested near the time and place of the park shooting with the same caliber weapon that killed the victim (Doc. 22 at 120 & Doc. 22 Appx. 61); (5) other witnesses told detectives in recorded interviews that Mr. Umaña was not involved in the park shooting (*e.g.*, Doc. 22 at 136-38; Doc. 36 at 36); (6) at least two people other than Mr. Umaña had possession of the weapon that was matched to both Fairfax and Lemon Grove Park (Doc. 22 at 141-42; Doc. 36 at 41); and (7) the LAPD used coercive and suggestive investigation techniques and identification procedures to obtain evidence against Mr. Umaña and to suppress exculpatory evidence.  Doc. 22 at 144-49, 179; Doc. 36 at 35, 47.

This Court and the jury never heard this evidence undermining the government's aggravation for one of two legal reasons: either, as demonstrated in Claim V, trial counsel could have obtained this evidence through reasonable investigation (such as examining all of the

extraordinarily voluminous discovery, independently subpoenaing records from the LAPD, and interviewing the witnesses), but ineffectively failed to do so; or this evidence was not reasonably available to trial counsel because the government suppressed it in violation of *Brady*, as demonstrated in Claim VI, and affirmatively misled counsel, this Court, and the jury to believe such material did not exist, as demonstrated in Claim VII. The government faults Mr. Umaña for presenting his discovery requests by subject matter rather than by constitutional claim, Doc. 50 at 41, but then attempts to ensnare Mr. Umaña in a Catch-22. The government urges this Court to reject his requests for discovery in support of the *Brady* and *Napue* allegations because the material was available to counsel through reasonable investigation, Doc. 50 at 46-29, 49-52, while simultaneously urging this Court to find, without any of the necessary evidentiary development, that counsel's failure to investigate was reasonable. Doc. 50 at 71-93.

Both scenarios cannot simultaneously be true when Mr. Umaña has made a good faith demonstration that there is, in fact, exculpatory material that remains undisclosed. Moreover, neither legal issue can be resolved prior to discovery to obtain these materials and further evidentiary development to determine whether the Court and the jury were deprived of this information as a result of the prosecution's failure to disclose, counsel's failure to investigate, or a combination of both.

### 1. The government's attempts to minimize its *Brady* obligations must fail.

The government focuses this Court's attention on the second *Brady* element, claiming that the favorable evidence was not suppressed because the defense knew or was made aware of the "essential facts" of the undisclosed evidence. Doc. 50 at 46-52. The government's reliance on *United States v. Catone*, 769 F.3d 866, 872 (4th Cir. 2014), and *United States v. Todd*, 920 F.2d 399 (6th Cir. 1990), in support of its arguments, Doc. 50 at 47-48, 50, 51, is misplaced. In *Catone*, the Fourth Circuit found no *Brady* violation where the government did not disclose a form *that*

6

*was created and filed by the defendant* to the Department of Labor and was publically available. 769 F.3d at 872. In *Todd*, the Sixth Circuit affirmed the district court's finding of no *Brady* violation *only after* the district court reviewed the confidential documents and determined that the defense was aware of the facts, the defense could obtain the information through other means, and the documents contained inculpatory evidence. 920 F.2d at 405, fn. 3. The evidence regarding the Los Angeles homicides sought by Mr. Umaña does not fall within either *Catone* or *Todd*. Mr. Umaña did not create the evidence, nor are the materials publicly available, nor has an in camera review occurred.

Asking this Court to speculate that the undisclosed evidence was known to the defense or would be limited to facts that were previously disclosed in pretrial discovery, prior to anyone being able to see the evidence, places the proverbial cart before the horse. A "defendant cannot demonstrate that suppressed evidence would have changed the trial's outcome if the government prevents him from ever seeing that evidence." *United States v. King*, 628 F.3d 693, 702 (4th Cir 2011). In cases where "an accused cannot possibly know, but may only suspect, that particular information exists" to support a claim, "he is not required to make a particular showing of the exact information sought and how it is material and favorable." *Id*. at 703 (internal quotation marks omitted). Rather, "[i]n such circumstances, a defendant need only 'make some plausible showing' that exculpatory material exists." *Id*. (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 n 15 (1987)).

Contrary to the government's assertions, Doc. 50 at 48, 51-52, 59-61, trial counsel's limited impeachment and rebuttal of the government's case does not excuse the government from its constitutional obligation to disclose *all* exculpatory materials. The fact that some favorable evidence had already been produced is simply not enough. The Fourth Circuit has expressly held

7

that it is "the prosecution's duty to disclose material even if it may seem redundant. Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations." *Monroe v. Angelone*, 323 F.3d 286 (4th Cir. 2003).

Mr. Umaña has made a good faith demonstration that relevant, exculpatory evidence obtained by the government has not been produced. While the government calls the allegation of non-production "dubious," Doc. 50 at 49, 35 fn. 4, it never affirmatively asserts that the materials requested were produced and has been unable to produce a pre-trial discovery log confirming what was or was not disclosed to trial counsel. *See* Doc. 50 at 61 fn. 8 (asserting that no such log was maintained). Because Mr. Umaña has presented more than sufficient evidence to support his claim that the evidence was not produced, the government is required to produce it or prove that it was in fact produced at the time of trial. *See United States v. Chapman*, 524 F.3d 1073, 1079 (9th Cir. 2008) (affirming misconduct finding when government initially asserted that it had produced discovery, but, when the district court asked for evidence of such production, the government "changed course" and stated that "in an abundance of caution" it would provide the defense with a copy).

### 2. The government's attempts to avoid *Napue*'s proscription against presenting materially misleading and false evidence and argument fail.

As with the *Brady* claim, the government again urges this Court to deny discovery on Mr. Umaña's *Napue* claims because, the government asserts, trial counsel were aware of the essential facts surrounding the false evidence. Doc. 50 at 68-71. The government's reliance on *Meinster*, a case in which trial counsel *took affirmative steps to learn the information prior to trial* and made a strategic decision not to address it with the jury, *United States v. Meinster*, 619 F.2d 1041, 1045-46 (4th Cir. 1980), is completely irrelevant to this case. There is no evidence in the record that Mr. Umaña's trial counsel looked into the exculpatory information and decided not to address it.

8

Moreover, the prosecution's capitalization on false or misleading evidence voids any alleged waiver of a *Napue* claim. *See United States v. Barham,* 595 F.2d 231, 243 fn. 17 (5th Cir. 1979) (no waiver where the prosecutor's "misleading questions . . . reinforced the deception"); *DeMarco v. United States,* 928 F.2d 1074, 1077 (11th Cir. 1991) (no waiver where the prosecution's capitalizing on the testimony "contributed to the deprivation of due process").

> **3. The government's attempts to portray trial counsel's failure to examine all of the extraordinarily voluminous discovery or conduct an independent investigation as strategic, prior to any factual development of the record, also fails.**

The government again asks this Court to put the cart before the horse, by attempting to litigate the merits of Mr. Umaña's ineffectiveness claims prior to any factual development of the record. *See* Doc. 50 at 75-93. Without a developed record, the government claims Mr. Umaña fails to demonstrate good cause for discovery because there were *theoretical* strategic reasons counsel could have had for their actions and omissions. This, however, creates a disputed issue of material fact that entitles Mr. Umaña to discovery on the issue of deficient performance. *See* 28 U.S.C. § 2255(b) (requiring evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . ."). This Court can only make a determination about counsel's strategy after it has heard from counsel about what they did and did not do and why; assessed the credibility and weight of their testimony; and made a factual finding about the reasonableness of their actions.

This could not be clearer from the very cases cited by the government in its response. For example, the government relies on *Sallahdin v. Mullin (Sallahdin II)*, 380 F.3d 1242, 1252 (10th Cir. 2004), to urge this Court to make a merits finding against Mr. Umaña, while ignoring the case's procedural history, which clearly demonstrates that full development must precede any merits determination. In *Sallahdin*, the Tenth Circuit originally determined that the petitioner had

9

asserted a possible ineffective assistance of counsel claim and remanded to the district court for an evidentiary hearing since the court was not privy to counsel's strategic reasons or lack thereof. *Sallahdin v. Gibson (Sallahdin I)*, 275 F.3d 1211, 1240 (10th Cir. 2002). It was not until the "conclusion of the evidentiary hearing" that the district court was justified in finding that the petitioner had not met his burden of proof. *Sallahdin II*, 380 F.3d at 1251-52; *see also Chandler v. United States*, 218 F.3d 1305 (finding that the petitioner had not met its burden *after* the district court held a "series of evidentiary hearings").

### 4. The government's attempts to minimize the importance of the Los Angeles homicides to its case in aggravation and to exaggerate the strength of its case must fail.

The government's attempt to downplay the importance of the Los Angeles homicides as aggravators in support of the death sentence defies common sense. *See* Doc. 50 at 60-61, 92-93. Evidence of an additional murder is "the worst kind of bad evidence." *Wong v. Belmontes*, 558 U.S. 15, 26 (2009). Moreover, at least two Fourth Circuit judges recognized that the unadjudicated homicides were the "difference between Mr. Umaña living and dying." *United States v. Umaña*, 762 F.3d 413 (2014) (Gregory, J. dissenting from denial of rehearing en banc, joined by Wynn, J.). They explained:

> The conviction supporting the death sentence was a gang-related double murder that occurred after an argument in a bar. Though this crime was appalling, it is unlikely that it alone would have supported a death sentence, given Mr. Umaña's lack of previous convictions. Rather, the reason Mr. Umaña now faces execution is that the prosecutor was able to introduce out-of-court accusations from police informants that accused Umaña of several previous murders. An examination of the government's summation argument at sentencing demonstrates this: nearly every page of the transcript references these past murders.

*Id*. If at least two reasonable jurists believed that the Los Angeles homicides were the crux of the government's case for death, then it is reasonably probable that at least one juror felt the same.

10

These two murders were so intertwined that any weakness in one of the aggravators undermines the other. As the Court of Appeals noted, there were "legitimate arguments" regarding the lack of reliability of the hearsay statements of suspects used to support the government's allegation that Mr. Umaña was the Fairfax shooter. *United States v. Umaña*, 750 F.3d 320, 348-49 (4th Cir. 2014). The court, however, determined that the reliability of the suspect statements was bolstered by the fact that Mr. Umaña was identified as the shooter at Lemon Grove Park and there was a ballistics match between guns used at both incidents. *Id.*; 3:08-cr-00134-RJC ECF Doc. 1021 at 10. Thus, favorable evidence that undermines the government's case in one of the homicides also creates doubt as to the other.

In support of its meritless prejudice argument, the government contends that Mr. Umaña "confessed" to "substantially participating" in those homicides, Doc. 50 at 60, 90. This contention is remarkable in light of the government's argument on direct appeal that "nobody in the room that day viewed that as an admission of guilt" and that it was "anything but a true 'confession,'" GB 113. The Court of Appeals relied on the government's position as a basis for denying relief. *United States v. Umaña*, 750 F.3d 320, 345 (4th Cir. 2014) (finding that Mr. Umaña "never did" confess and "never admitted to committing any of the murders").

Accordingly, the government should be estopped from making the opposite argument now in an effort to avoid discovery and grant of relief. *See In re Breibart*, 325 B.R. 724, 727 (Bankr.D.S.C. 2004) (finding that a party can be estopped from "accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects."); *Siddiqui v. United States*, 98 F.3d 1427 (2d Cir. 1996) (manifestly unjust for government to pursue inconsistent positions in a criminal case). Likewise, the government cannot now suggest that being the actual trigger-man versus a non-triggerman-

11

accomplice are equal in aggravation, when the government repeatedly argued at trial that Mr. Umaña deserved death because he was different than the other gang members because he was a killer. Doc. 50, Exhibit 1 at 3467-68. Finally, as Mr. Umaña will demonstrate at an evidentiary hearing, his mental impairments undermine the reliability of any so-called confession. *See* Doc. 22, Claim XIX.

### B. Mr. Umaña's specific discovery requests should be granted.

Most of the government's response regarding Mr. Umaña's specific discovery requests is dedicated to arguments that Mr. Umaña has not already established his entitlement to relief on his claims. This is not the issue currently before the Court, and Mr. Umaña will not address those arguments here, but instead confines his response to the issue of whether he has demonstrated good cause for discovery to further develop facts in support of his entitlement to relief.

Despite the length and complexity of the prior pleadings, the majority of Mr. Umaña's discovery requests regarding the Los Angeles homicides can be boiled down to four categories: records (including recordings) of witness interviews; color copies of the individual photographs and photographic arrays shown to witnesses; information on alternative suspects; and benefits promised and/or provided to cooperating witnesses. This is precisely the kind of evidence trial counsel could have obtained directly from the Los Angeles authorities had they conducted their own independent investigation, *see* Doc. 22 Appx. 25, and discovery should be granted, independent of whether the government also has a *Brady* obligation to disclose the materials, as discussed above.

#### 1. Witness Interviews

Mr. Umaña has requested leave to conduct discovery to obtain records, including audio and video recordings, of witness interviews pertaining to the Los Angeles homicides. Discovery Motion at 24, 27, 30-31, 33-34, 37-38, 45. Mr. Umaña has identified several audio and video-

12

recorded interviews of testifying witnesses (and of Rene Arevalo, whose statements were introduced through hearsay testimony) that were not produced pretrial. *See* Doc. 13 at 11, Doc. 22 at 114, 257, and Doc. 37 at 9. Although the government has produced some of these materials in response to informal discovery requests, the government opposes Mr. Umaña's request that *all* of these materials be produced. Doc. 50 at 48-49. For example, while the government has produced the audiotape of the December 29, 2005 interview during which Freddy Gonzalez allegedly made his first "identification" of Mr. Umaña, the government has refused to disclose the videotape, arguing that Mr. Umaña "cannot plausibly contend that any video contains undisclosed exculpatory material evidence not included in the audio recording of the same interview." Doc. 50 at 35 fn. 5. However, video recordings of photographic identifications hold substantial value and should be produced. *See United States v. Constant*, 814 F.3d 570, 577 (1st Cir. 2016);. *see also* Doc. 22 at 149 (noting coercive and suggestive interrogation techniques), 179 (claim that recordings of interviews may show impermissibly suggestive procedures used by LAPD); Doc. 24, 37 at 35, 47 (requesting recordings and documentary evidence regarding the photo line-ups shown to witnesses).

Moreover, as the government slowly discloses additional evidence, new facts (that directly contradict evidence and argument presented by the government at trial) are revealed. For example, while the government argues that Mr. Umaña should not get discovery because the defense was aware of the "essential facts" that Gonzalez was not "100% sure" and claimed that Mr. Umaña "only *resembled* the shooter," Doc. 50 at 50-51, the audio-recorded interviews of Gonzalez reveal the new detail that Gonzalez did not see the shooter's face, which makes it impossible for him to have made any credible identification, not even a tentative one, based on the photo line-ups showing only the faces of suspects. *See Walker v. Kelly*, 195 Fed.Appx. 169, 173-74 (4th Cir.

13

2006) (unpublished) (finding that although defendant was provided with a report stating the witness did not see the shooting, it did not satisfy the prosecutor's duty to disclose other *Brady* material that she only recognized the suspect's voice).

When Gonzalez pointed to the picture of Mr. Umaña, it was not an identification, it was at most a guess. In fact, the audio recording revealed that the word "resembled" that wound up in Gonzalez's written statement did not originate from Gonzalez but the detective. Exh. 21b to Doc. 37 at 17 (Detective Small after repeatedly being told by Gonzalez that he did not remember the person's face, instructs Gonzalez "You can say photo number two either is or resembles, looks like" the person). These are a different set of facts than previously disclosed. The government capitalized on this non-disclosure by proffering to the Court that Gonzalez stated "I will never forget that face" and that, out of the three testifying witnesses, he "had the best opportunity to see the [shooter]," PPT at 326, when the government had in its possession an undisclosed recording demonstrating that Gonzalez did not see the shooter's face at all. This demonstrates the need for production of both the audio and video of all witness interviews.

The government further claims that Mr. Umaña is not entitled to the recorded statements of non-testifying witnesses to the Lemon Grove and Fairfax homicides because Mr. Umaña was already aware of any exculpatory statements made based on notes by detectives. Doc. 50 at 49. The government points to the fact that the detective notes produced in discovery show that witness Alejandro Rodriguez stated Mr. Umaña was not at the park on the night of the shooting. Doc. 50 at 49; *See also* Motion at 136, 166, and 178; Doc. 37 at 36-38 (Rodriguez also tells detectives Geovani Rodas is involved in the shooting). The detective's summary, however, does not explain how Rodriguez claimed he knew this and discredits any value to the statement by inserting the

14

detective's own opinion that it was "self-serving" and Rodriguez "had no reasonable explanation as to how he knew" that Mr. Umaña was not present. Doc. 22 App'x 69, at 11; Doc. 50 at 49.

Moreover, as demonstrated in the Discovery Motion, Detective Small provided hearsay testimony regarding his interview with non-testifying, cooperating witness Arevalo that went far beyond what was documented in the notes of that interview disclosed pretrial.[2] Doc. 36 at 32-33. Review of the actual statements may lead to credible and persuasive evidence that exculpates Mr. Umaña, such as evidence undermining Arevalo's claim that Mr. Umaña was the park shooter or demonstrating the basis for Rodriguez's belief that Mr. Umaña was not the park shooter. Finally, the fact that the detective's memorialization of the Gonzalez interview failed to include exculpatory information contained in the recording, as discussed above, demonstrates precisely why such discovery is necessary. *See* Doc. 36 at 22 (on the day of the interview, detective inaccurately annotated Gonzalez stating that Mr. Umaña "strongly resembled the shooter");

### 2. Photographic Arrays

Mr. Umaña has requested discovery of color copies of the photographs and photographic arrays shown to the Lemon Grove and Fairfax Avenue witnesses. Doc. 36 at 24, 27, 30-31, 46-48. Mr. Umaña has alleged that the LAPD detectives engaged in suggestive and coercive practices while investigating the Los Angeles homicides. *See* Doc. 22 at 149, 179. Production of true and correct copies of the arrays, if proven to be suggestive, may enable Mr. Umaña to show that he is entitled to relief, which is all *Bracy* requires. Discovery should be granted.

---

[2] Whether or not these facts regarding Detective Small's testimony, standing alone, substantiate a *Napue* claim on the current state of the record, they do demonstrate good cause for discovery to determine what Arevalo actually told the police. *See* §I.A

15

### 3. Alternate Suspects

In his 2255 Motion, Mr. Umaña presented evidence regarding three alternate suspects in the Lemon Grove Park homicide: Geovani Rodas; Juan Miguel Cortez; and Alex Montes. Doc. 22 at 118-21, 126-38. In support of his claims regarding these alternate suspects, Mr. Umaña seeks discovery of three categories of evidence: Rodas's prior criminal history, which may provide circumstantial evidence of his involvement in the Lemon Grove Park homicide; evidence developed during the investigation regarding Rodas, Cortez, and/or Montes's involvement in the Lemon Grove Park homicides; and evidence that is uniquely in the possession of the government or State of California necessary to locate suspects Rodas, Cortez, and Montes and witness Alejandro Rodriguez to further develop lay witness evidence in support of this claim (their prison records and A-files). Doc. 36 at 39-40.

Contrary to the government's assertions, Doc. 50 at 76, evidence that Rodas was the shooter is exculpatory as to Mr. Umaña. While evidence that Rodas (or Montes or Cortez) were the shooter may not have completely absolved Mr. Umaña of any role in the park homicide, it would have absolved him of being the actual murderer, and, as demonstrated above, there is a reasonable probability that this distinction would have made a difference to at least one juror. Moreover, contrary to the government's assertions (Doc. 50 at 76), trial counsel's failure to introduce conflicting statements from Gonzalez regarding the identity of the park shooter was clearly deficient performance. *See Nixon v. Newsome*, 888 F.2d 112, 115 (11th Cir. 1989); *Berryman v. Morton*, 100 F.3d 1089, 1098-99 (3rd Cir. 1996). Discovery should be granted.

Likewise, in his 2255 Motion, Mr. Umaña presented evidence that others in the car on the day of the Fairfax homicides could have been the actual shooter. Doc. 22 at 138-49. In support of this, Mr. Umaña has requested discovery of information regarding Fairfax witness Alex Barrera, including his prior arrests; his interviews with police and prosecution; and his A-file. Doc. 36 at

16

45. Contrary to the government's assertions, Doc. 50 at 82-28, it is illogical to assume that counsel had a strategic reason not to introduce statements of Alex Barrera who had personal knowledge of the Fairfax incident. Barrera provided a convincing statement that suspect Luis Ramos was the shooter and provided evidence that someone other than Mr. Umaña was in possession of the murder weapon. According to the government, it is reasonable for an attorney to ignore this exculpatory evidence because it would have "contradicted" other exculpatory evidence that Rene Arevalo was the shooter. *Id.* However, it was not the defense's burden to prove the aggravating circumstance was untrue; it was the government's burden to prove it was true beyond a reasonable doubt. All of the government's evidence that Mr. Umaña was the Fairfax shooter came from cooperating MS-13 gang members. Therefore, introducing apparently unbiased evidence that one of those same cooperating gang members was the actual shooter rather than Mr. Umaña could only have helped the defense theory. Discovery should be granted.

Finally, Mr. Umaña has requested discovery of evidence regarding other shootings in Lemon Grove Park between July 28, 2005 and September 29, 2005 on the theory that the park was the site of a gang turf war and the .22 shell casing recovered from the park could have been deposited there during a shooting that occurred prior to the homicides. Doc. 36 at 42. This coupled with evidence that people other than Mr. Umaña may have possessed the weapon is a theory that, if proven, would tend to create reasonable doubt about the government's theory of this homicide. Discovery should be granted.

### 4. Witness Benefits

Several of the witnesses who cooperated against Mr. Umaña faced possible criminal charges and/or immigration action at the time they were interviewed by the police and/or when they testified. Thus, in his Discovery Motion, Mr. Umaña requested the disclosure of any benefits promised or provided to Freddy Gonzalez, Luis Rivera, and Rene Arevalo in exchange for their

17

cooperation. Doc. 36 at 24, 34. The law is clear that Mr. Umaña is entitled to any benefits promised or provided to witnesses in exchange for their cooperation. *See generally Brady v. Maryland,* 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972). Mr. Umaña should be granted leave to conduct discovery.

### III. MR. UMAÑA HAS DEMONSTRATED GOOD CAUSE FOR DISCOVERY REQUESTS NOS. 86-95 RELATING TO THE PRESENTATION OF AN INACCURATE AND INCOMPLETE STORY OF HIS LIFE HISTORY (CLAIMS I, VI, VII, AND XIII).

#### A. Good cause exists to obtain discovery in support of his *Brady* and *Napue* claims.

In his 2255 Motion, Mr. Umaña alleges that his mother, Leticia Ramirez, provided the government critical information regarding his family history, birth, trauma, and abuse that were not known to the defense and which the government still has not fully disclosed. Motion at 180-90. Mr. Umaña has further alleged the reasonable inference that the government possesses additional mitigation evidence that it has not disclosed. *Id.* Thus, in support of his *Brady* and *Napue* claims, Mr. Umaña requests the production of mitigating evidence obtained by the government during its investigation. Doc. 36 at 50-56.

Contrary to the government's assertions, Doc. 50 at 53, the information learned from Ms. Ramirez was not confined to three narrow facts. Although Ms. Ramirez's declaration provides examples of the information she gave to the prosecution, it was by no means an exclusive list. In fact, she specifically stated that she spoke to the government on at least two occasions and had a formal extended interview with the prosecution in a hotel room where she told them a lot of what is contained in the declaration including the listed examples. Doc. 22, Appx 10. She also spoke to a local police officer who went to her home to obtain information on behalf of the FBI. *Id.*, Doc. 22 Appx 44. Mr. Umaña has presented sufficient evidence that the government learned far more mitigating evidence than they have been, to this point, willing to concede. *See King*, 628 F.3d at

18

702-03 (holding that a different standard applies when the "Government prevents him from ever seeing that evidence" and "an accused cannot possibly know, but may only suspect, that particular information exists which meets [the Brady] requirements"). *See* Doc. 36 at 51-54.

Moreover, the undisclosed evidence was not "known by the defendant" (Doc. 50 at 55) simply because it concerned his life. Although Mr. Umaña would know that he was not raised by his mother, he likely did not know, or was not able to understand, that his father was a monstrously abusive man to his mother; that while she was pregnant with Mr. Umaña, the abuse did not end; and that she had to flee to escape his father. Nor can it be said that Mr. Umaña knew or understood the reasons why his family fled to Guatemala prior to his birth. Moreover, what Mr. Umaña "knew" about his life history has to be viewed in the context of a man who has suffered significant trauma, neglect, and abuse from before birth, which impaired his ability to understand and report on his life history. *See Rompilla v Beard*, 545 U.S. 374 (2005) (finding that a competent mitigation investigation involves information outside of the defendant's self-reporting).

In fact, at trial the government was on notice that the defense *did not know* the facts surrounding important details of Mr. Umaña's life history. The government was first notified when counsel moved to continue trial because the defense "has only met with one member of defendant's family"; that person (the father) appears unwilling to assist because of the government's attempts to interview him; and the defense was left "with very little to present to the defendant's capital jury about defendant's life and background." Doc. 50, Exhibit 1 at 486-88. Subsequently, when the prosecutor referred to Mr. Umaña's father as a drug dealer in El Salvador, defense counsel informally requested any evidence of this from the government because the defense had no evidence and believed that it would be mitigating. Doc. 22 Appx 49. On yet another occasion, the defense advised the government that they had not received any information about what was learned

19

during the government's interview with Ms. Ramirez. Doc. 22 Appx 74. Despite being put on notice, the government continued to suppress evidence. Mr. Umaña should be granted leave to conduct discovery to obtain any and all mitigating evidence in the government's possession.

Finally, regarding the Guatemalan birth certificate,[3] while it is an open question in the Fourth Circuit whether the government's *Brady/Napue* obligations apply to pretrial hearings, *see United States v. Williams*, 10 F.3d 1070, 1077 (4th Cir. 1993), the United States Supreme Court has been clear that due process is violated when the withheld evidence had "any adverse effect" upon the defendant's ability to prepare for trial or present a defense. *United States v. Bagley*, 473 U.S. 667, 683 (1985) ("the reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case"). Contrary to the government's assertions, all of the evidence in the record, including documents from the Guatemalan consulate (Doc. 22 Appx. 43), demonstrate that the Guatemalan birth certificate is true and correct, and, therefore the El Salvador birth certificate is false. Moreover, there is no question that due process is violated when the government presents false evidence through an expert witness, as was the case here. *See Miller v. Pate*, 386 U.S. 1, 7 (1967). The government's assertion that it would not have been in possession of the Guatemalan birth certificate until April 13, 2010, Doc. 50 at 95, creates a disputed issue of material fact that may be resolved through the requested discovery of communications with the Guatemalan government and related documents regarding Mr. Umaña's birth or citizenship. Doc. 36 at 55 (line item 88). Discovery should be granted.

---

[3] The government's assertion that this claim is procedurally defaulted is addressed in section I.B., *supra*.

The government asserts that Mr. Umaña has not established good cause to conduct discovery in support his claims that counsel were ineffective for failing to request this information from the government because counsel purportedly made a strategic decision not to investigate Mr. Umaña's life history further. The government is wrong. As described in greater detail above at section II.A.3, *supra*, it is premature to create theoretical strategic reasons counsel could have had for their acts and omissions prior to factual development of the record.

Moreover, the strategic reasons assumed by the government have been found invalid by the Supreme Court. The government, for example, claims that counsel acted reasonably in not attempting to contact additional witnesses because "counsel could reasonably have expected *Umaña himself* to know this information" and it was likely after consultation with the client that they made a "reasonable decision" to not proceed further. Doc. 50 at 96-97, 102 (emphasis in original). If this were the test, the defendants in *Williams*, *Wiggins*, and *Rompilla* would have been precluded from obtaining relief. *Williams v. Taylor*, 529 U.S. 362 (2000) (ineffectiveness for failing to present evidence that defendant was "borderline mentally retarded," had not advanced beyond sixth grade, and had suffered a nightmarish childhood); *Wiggins v. Smith*, 539 U.S. 510 (2003) (counsel ineffective for failing to present deprivation and abuse in the first six years of his life in the custody of his chronic alcoholic, absentee mother, being "shuttled from foster home to foster home," and frequent, lengthy absences from school); *Rompilla*, 545 U.S. at 392 (counsel failed to uncover evidence from defendant's childhood, alcoholism, and mental capacity and health). All of these cases involved the failure to present evidence of parts of the defendants' lives that they themselves were presumably aware of. Finally, the Supreme Court has been clear that, in order to be a reasoned strategic decision, it must be an informed one made only after

21

investigation, *Wiggins*, 539 U.S. at 522 (citing *Williams v. Taylor*, 529 U.S. 362 (2000)), and such investigation did not occur here.

Nor can the government claim that not requesting discovery or a continuance was a reasonable tactical decision by counsel because prevailing on these requests was a "long-shot." Doc. 50 at 88. There were numerous red flags that the government had mitigating evidence that would assist the defense, yet counsel did not pursue these leads. Once the defense team had reason to believe that the government had located Mr. Umaña's mother and spoken to her; had discovered that Mr. Umaña had been born in 1982 in Guatemala; and had raised the specter that Mr. Umaña's father was a drug dealer; the team had a duty to pursue these leads further, and performed deficiently when it failed to do so. When defense counsel was put on notice of these "pertinent avenues for investigation," counsel was obligated to follow up on those leads. *Porter v. McCollum*, 558 U.S. 30, 40 (2009); *accord Wiggins*, 539 U.S. at 525.

A defendant's life history is the cornerstone of any capital penalty phase proceeding. *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). There can be little doubt that trial counsel were ill prepared to present the most critical component of their case. The government's attempts to avoid the required discovery on the basis of its speculation regarding counsel's purported strategic decisions fail. *See* Doc. 50 at 98-101.

C. **There is a reasonable probability of obtaining relief under Claims I, VI, VII, and XIII in relation to the incomplete and inaccurate presentation of Mr. Umaña's life history.**

Mr. Umaña has demonstrated that, with full factual development, he will prove that there is a reasonable probability that his sentence would have been different had the government disclosed all exculpatory information in its possession and trial counsel conducted a constitutionally-adequate investigation. He meets this burden under the *Brady*, *Napue*, or *Strickland* claims.

22

The government's argument that the mother's account of Mr. Umaña's life adds little because it is hearsay or lacks personal knowledge is nonsensical. *See* Doc. 50 at 100. Mr. Umaña directs the Court's attention to the mother's declaration and the wealth of other lay witness declarations that corroborate that fact that Mr. Umaña had a very troubled and traumatic childhood. There is little doubt that the mother's story would have led trial counsel to important mitigation. The jury and the Court, however, heard an incomplete and inaccurate account of his life and never learned about the significant trauma, poverty, malnutrition, and abuse he suffered as a child and in his youth, or about his developmental delays and the adaptive deficits he displayed in childhood. There is no doubt that such mitigation would have better informed the Court in regards to the issues of adaptive functioning for intellectual disability and would have made a difference to at least one juror when determining the sentence.

Given the jury's understanding that the offense did not involve planning and resulted from an emotionally charged argument, this is exactly the type of situation in which the failure to have put on a genuine case in mitigation is the most prejudicial – because this is a jury to whom this mitigation genuinely is likely to have mattered. *See* ECF Doc. No. at 1048 at 4-6 (unanimously found as mitigating factors that the Greensboro homicides involved no substantial planning and resulted from an emotionally charged argument). Certainly, the wealth of mitigating evidence presented in the 2255 Motion that Mr. Umaña's jury never heard is sufficient to "undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Because of the above, Mr. Umaña has asserted sufficient good cause to conduct discovery under these claims.

Mr. Umaña has demonstrated good cause to conduct discovery about how MS-13 members "earn" MS tattoos and the government's knowledge of that process. *See* Doc. 36 at 48-50. In Mr. Umaña's co-defendants' trial, conducted and transcribed prior to Mr. Umaña's trial, cooperating witness Rony Lopez testified to a variety of different ways in which an MS-13 member could "earn" the "MS" tattoos. 3:08-cr-00134-RJC, ECF Doc. 1080 at 567-68. At Mr. Umaña's trial, the government elicited testimony from cooperating witness Alexander Granados that "you have to kill someone" to "earn" the "MS" tattoos. GPT at 920. The government then capitalized on Granados's testimony at both the guilt and penalty phases, repeatedly arguing that Mr. Umaña had earned his "MS" tattoos because he killed people in the past. GPT at 1157, 1170, 1171; PPT at 824, 892.

While the government disputes that Mr. Umaña has proven the government knew Granados's testimony was false, Doc. 50 at 67, these discrepancies, and the government's closing arguments, do create a material issue of disputed fact and establish good cause for discovery under *Bracy*, to determine both what the government actually knew about how individuals "earn" MS tattoos and what evidence was available to defense counsel to rebut Granados's testimony, had counsel actually investigated.

The government's assertion that explaining that an MS-13 member could receive an "MS" tattoo by doing something that fell short of killing someone would be "at best, a double-edged sword," Doc. 50 at 94, defies both common sense and law. Robbing people, committing crimes, and putting in work for MS-13 is hardly admirable conduct (3:08-cr-00134-RJC, ECF Doc. 1080 at 567-68), but it undoubtedly would have been more palatable to the jury than the alternative inference that Mr. Umaña had earned his "MS" tattoos because he killed people in the past. GPT

24

at 1157, 1170, 1171; PPT at 824, 892. Moreover, as the United States Supreme Court has recognized, evidence of an additional murder is "the worst kind of bad evidence." *Wong*, 558 U.S. at 26.

Finally, as demonstrated above, allegations of procedural default are not a bar to obtaining discovery under *Bracy.* Section I.B., *supra.*

**V.     MR. UMAÑA HAS GOOD CAUSE TO OBTAIN DISCOVERY REQUESTS NOS. 121-29 REGARDING THE GRAND AND PETIT JURY VENIRES IN ORDER TO SUPPORT HIS CLAIM THAT TRIAL COUNSEL FAILED TO CHALLENGE THE UNDERREPRESENTATION OF AFRICAN AMERICANS, HISPANICS, ASIANS, AND WOMEN IN THE GRAND AND PETIT JURY VENIRES. (§ 2255 MOTION, CLAIM XVII).**

In Claim XVII, Mr. Umaña alleged that trial counsel unreasonably failed to challenge the composition and selection of the grand and petit jury venires. Doc. 22 at 305-308. Mr. Umaña further alleged that distinct groups, including but not limited to African Americans, Hispanics/Latinos, Asians, and women were underrepresented in the grand and petit jury venires presiding over Mr. Umaña's case, and that this underrepresentation was due to a systemic exclusion of these groups in the jury selection process utilized. *Id*.

The government's contentions that Umaña's claim is "conclusory" and "insufficient" (Doc. 52 at 106) fails for two reasons. First, as noted previously, determination of the merits is not the standard for discovery. *See* section I.A. Second, the allegations proffered by Mr. Umaña satisfy the good cause requirement for discovery. Mr. Umaña has alleged that counsel's performance was deficient because investigating the records and procedures used for jury selection is a standard component of competent performance by defense counsel in a capital case, ABA Guideline 10.10.2, and that trial counsel "has essentially an unqualified" right to inspect and copy the relevant jury lists in order to determine whether the venire was drawn in compliance with statutory and constitutional law. *Test v. United States*, 420 U.S. 28, 29-30 (1975). *See also* 28 U.S.C. § 1867(f); *United States v. Curry*, 993 F.2d 43, 44 (4th Cir. 1993) ("Under *Test*, Curry was entitled to inspect,

25

reproduce, and copy the master jury list to support a motion for a new trial based upon a substantial failure to comply with the provisions of 28 U.S.C. §§ 1861-68 ('the Act') in selecting the grand or petit jury."). Mr. Umaña has also specifically alleged – based on a review of the district's juror plan, general population and voter registration demographics and data from Juror Qualification Questionnaires – that there is an underrepresentation of African Americans, Hispanics/Latinos, Asians, and women in the grand and petit jury venires, demonstrating prejudice. *See Rose v. Mitchell*, 443 U.S. 545 (1979) ("A claim of racial discrimination in the grand jury process, moreover, is not subject to harmless error analysis."). Indeed, similar requests have been granted in other capital § 2255 proceedings. *See United States v. Runyon*, 4:08-cr-00016-RBS-DEM, Doc. Entry 475 (E.D. Va. Oct. 2, 2015). Accordingly, good cause is demonstrated and discovery is warranted.

## VI. MR. UMAÑA HAS GOOD CAUSE TO OBTAIN DISCOVERY REQUESTS NOS. 130-36 ABOUT THE GOVERNMENT'S JURY SELECTION PROCESS TO SUPPORT HIS CLAIM THAT TRIAL COUNSEL FAILED TO ADEQUATELY OBJECT TO THE GOVERNMENT'S RACE-BASED EXERCISE OF PEREMPTORY STRIKES. (CLAIM XVIII).

In Claim XVIII, Mr. Umaña alleges that the government engaged in unconstitutional strikes of jurors under *Batson v. Kentucky*, 476 U.S. 79 (1986), and that trial counsel were ineffective for failing to properly object. *See* Doc. 22 at 308-11. The government claims that Mr. Umaña has failed to allege facts of deficient performance and prejudice. The government is wrong on both accounts.

The circumstances demanded that trial counsel make a full, rather than insufficient, *Batson* objection. The prosecution used peremptory strikes to remove 66 percent of the African-Americans (8 out of 12) who could have served. When asked for its reasons for its strikes, the government presented a common theme that the juror had expressed some type of uncertainty about being able to impose the death penalty, favored life imprisonment over the death penalty, and/or expressed a

belief that the death penalty should have a higher burden of proof or be reserved for only exceptional circumstances such as a serial killer. *See* VDT 1505-32. There were also other white and other non-African-American jurors – not struck by the government – that fit this common theme. Under these circumstances, counsel had a constitutional obligation to fully and adequately raise all aspects of a *Batson* objection, including challenging that the reasons given were pretext for purposeful discrimination, and government counsel's history of discrimination, jury selection preparation, in-court note taking and *Batson*-related training demonstrate purposeful discrimination.

The government's prejudice argument ignores that the Fourth Circuit has recognized that "the prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc).[4] Intentional discrimination in the exercise of peremptory strikes is structural. *See Batson*, 476 U.S. at 100; *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005).  Because the materials requested may provide direct evidence of race-based strikes or circumstantial evidence based on prior practice and training, Mr. Umaña's request should be granted.

**VII.    MR. UMAÑA HAS DEMONSTRATED GOOD CAUSE TO OBTAIN DISCOVERY REQUESTS NOS. 111-20, 139 ABOUT JURORS TO SUPPORT HIS CLAIM THAT HE WAS DENIED THE RIGHT TO A FAIR AND IMPARTIAL JURY (CLAIM XV).**

Case 3:16-cv-00057-MOC    Document 61    Filed 04/24/17    Page 31 of 39



Case 3:16-cv-00057-MOC     Document 61     Filed 04/24/17     Page 32 of 39





**VIII.** **THERE IS GOOD CAUSE TO GRANT DISCOVERY REQUESTS NOS. 96-110, 141-44, 162-63 REGARDING MR. UMAÑA'S CLAIMS PERTAINING TO INTELLECTUAL DISABILITY, RACE AND GEOGRAPHY, AND THE VIENNA CONVENTION.**

The government once again attempts to inject procedural defenses into the determination of whether or not discovery is warranted. Doc. 50 at 113. As noted previously, the presence or absence of a procedural defense is irrelevant to the current inquiry and Mr. Umaña will address the government's meritless procedural defenses at the appropriate time. *See* § I.B. Nor, as the government contends (Doc. 50 at 113-15), is proof that relief on the allegations currently pled required under Rule 6. *See* § I.A. Instead, the standard is whether the petitioner met the good cause requirement. *Id.* Mr. Umaña has done that. *See* Doc. 36 at 56-61 (articulating how the requested materials would provide evidence demonstrating that Mr. Umaña may be entitled to relief on the basis of his intellectual disability); Doc. 36 at 69 (articulating how the requested materials would demonstrate that he may be entitled to relief on the basis of racial/geographical bias in charging and seeking death); Doc. 36 at 76-77 (same regarding the Vienna Convention ("VCCR") violation).

Mr. Umaña has alleged that the decision to charge him with the death penalty was based on impermissible considerations including his Hispanic race and his national origin in Latin America. Doc. 36 at 69. The government contends that Mr. Umaña has not made a showing that individuals similarly situated to him, but of a different race, are not charged with the death penalty.

30

Doc. 50 at 130-31. That showing is precisely what Mr. Umaña intends to unearth with his discovery requests and controlling precedent supports disclosure. *See Bracy*, 520 U.S. at 908 (allowing discovery for claims that were "only a theory at this point" and "not supported by any solid evidence").

Mr. Umaña alleged in his § 2255 motion that his rights under the VCCR were violated due to the fact that the government was aware of his Guatemalan citizenship, yet failed to honor its treaty obligations of notification and that counsel also failed to contact the consulate. Doc. 22 at 359-72. He has requested specific documents reasonably likely to contain information regarding Mr. Umaña's Guatemalan citizenship (including Immigration, State Department and FBI/police records containing information about Mr. Umaña's birth/citizenship) as well as the policies of the relevant government agencies responsible for interrogating, arresting and incarcerating Mr. Umaña. Doc. 36 at 76-77. These requests bear directly on whether the government knew Mr. Umaña was a Guatemalan national at the time of his arrest and whether his trial counsel were ineffective in failing to assert Mr. Umaña's rights under the Vienna Convention. Therefore, there is good cause to conduct discovery as to these limited items.

The government contends that the VCCR does not create individual rights (Doc. 50 at 131), but the Fourth Circuit has not yet decided that issue and at least one circuit has found the government to be incorrect. *See Jogi v. Voges*, 480 F.3d 822, 834 (7th Cir. 2004) ("We conclude … Article 36 [of the Vienna Convention] confers individual rights on detained nationals."). The Supreme Court has not squarely addressed the issue, but it has acknowledged that the VCCR may in fact confer individual rights. *Bread v. Greene*, 523 U.S. 371, 377 (1998) (the VCCR "arguably confers on an individual the right to consular assistance following arrest"); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 337 (2006) (assuming without deciding that the Vienna Convention creates

judicially enforceable rights). Mr. Umaña has connected the VCCR violation to his claim involving the constitutionally inadequate mitigation presentation. *See, e.g.,* Doc. 22 at 364, 372. It is in precisely this context – a violation of the VCCR coupled with an incomplete presentation of mitigation evidence – that at least one court has found "a reasonable probability that the sentencer might 'have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002) (quoting *Strickland*, 466 U.S. at 695). Accordingly, the government's contentions fail and the discovery requested is warranted.

### IX. MR. UMAÑA'S GENERAL REQUESTS FOR DISCLOSURE OF *BRADY* MATERIAL, NOS. 164-180, WERE MADE IN GOOD FAITH

Because of the exculpatory evidence Mr. Umaña has uncovered thus far, and because he expects to obtain more, he has made a general request for all *Brady* material. Doc. 36 at 77-89. The government remains under a continuing duty to disclose all exculpatory evidence in its possession regarding both the issue of guilt/innocence and the sentencing determination. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing"); *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.") (citing ABA Code of Professional Responsibility § EC 7-13 (1969); ABA Standards for Criminal Justice, Prosecution and Defense Function § 3.11 (1971); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419 at 437 (1995); *Banks v. Dretke*, 540 U.S. 668 (2004).

The government takes issue with Mr. Umaña's general requests for *Brady* material, insisting that it has no "postconviction *Brady* obligation." Doc. 50 at 132-33. It cites to three

cases for the proposition that "'*Brady* does not apply in the post-conviction context.'" *Id.*, *quoting In re Bolin*, 811 F.3d 403, 409 (11th Cir. 2016). What the government does not explain is that in each of those three cases the purported *Brady* material was not even in existence at the time of trial. First, the Supreme Court found no *Brady* violation in a §1983 lawsuit where advancements in DNA testing that "had been unavailable at trial" cast doubt on the claimant's conviction. *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). Second, the Eleventh Circuit found no *Brady* violation where statements that cast doubt on the defendant's conviction did not occur until twelve years after his conviction. *Brolin*, 811 F.3d at 409.. Third, the Fourth Circuit found no *Brady* violation based on "an amorphous statement made . . . after the trial had been completed." *Watkins v. Rubenstein*, 802 F.3d 637, 642 (4th Cir. 2015).

Unlike the cases cited by the government, however, Mr. Umaña is seeking disclosure of evidence that was in possession of the prosecution team at the time of his trial. For evidence that was available before and during a defendant's trial, the individual prosecutor's duty to disclose material, favorable evidence is "inescapable," *Kyles*, 514 U.S. 437-38, and "ongoing." *Ritchie*, 480 U.S. at 60.

33

WHEREFORE, Mr. Umaña respectfully requests that this Court grant his Motion for Leave to Conduct Discovery.

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

*/s/ Zandra L. Lopez*
ZANDRA L. LOPEZ
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Tel: 619-234-8467
Zandra_Lopez@fd.org

Dated: April 24, 2017

34

**CERTIFICATE OF SERVICE**

I, Kelly D. Miller, hereby certify that I have electronically filed the foregoing Reply with the Clerk of Court using the CM/ECF system and a copy of the foregoing document has been served this day upon the following via CM/ECF:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
anthony.enright@usdoj.gov


*/S/ KELLY D. MILLER*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org


Dated: April 24, 2017