# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

ALEJANDRO UMAÑA,

          Movant,

      v.

UNITED STATES,

          Respondent.

3:16-CV-00057-RJC

CAPITAL § 2255 PROCEEDING

HON. ROBERT J. CONRAD, JR.

---

## SUPPLEMENTAL/AMENDED MOTION TO VACATE AND SET ASIDE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

*/s/ Zandra L. Lopez*
ZANDRA L. LOPEZ
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Tel: 619-234-8467
Zandra_Lopez@fd.org

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Preliminary Statement .................................................................................................... 1

Supplemental Grounds for Relief ................................................................................. 2

31.	As a Result of Court Error and Counsel's Ineffectiveness, Mr. Umaña was Incompetent During his *Atkins* Hearing, Trial, and Sentencing, in Violation of the Fifth, Sixth, and Eighth Amendments. .................................................................................................... 2

32.	██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .................................................................... 13

33.	██████████████████████████████████████████████████████████████████████████████ . ................................................................................................... 37

34.	The Government's Disregard For Mr. Umaña's Right to Counsel Once it Had Attached Violated the Sixth and Eighth Amendments.  Counsel were Ineffective. ................................... 40

35.	The Jury Considered Unconstitutionally Speculative and Unreliable Evidence, Due to Prosecutorial Misconduct, Court Error, and Counsel's Ineffectiveness, in Violation of the Fifth, Sixth, and Eighth Amendments. ............................................................................... 44

i

36.     The Government's Use of Communications Between Mr. Umaña and the El Salvadoran Consulate Against Mr. Umaña During the Pretrial and Capital Trial Proceedings Violated the Vienna Convention and the Fifth, Sixth and Eighth Amendments.............................................. 67

37.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████. 72

38.     Counsel's Failure to Move for the Trial Judge's Recusal Due to His Prior Professional Role as United States Attorney for the Western District of North Carolina Violated Mr. Umaña's Fifth, Sixth, and Eighth Amendment Rights. ...................................................................... 86

39.     The Imposition of the Death Penalty on Alejandro Umaña was Based on Race and Geography, Two Constitutionally-Impermissible Sentencing Factors, In Violation of the Fifth, Sixth, and Eighth Amendments. .................................................................. 91

40.     The Government Presented Unconstitutional Victim Impact Evidence, in Violation of the Fifth, Sixth, and Eighth Amendments; Counsel Were Ineffective. .............................................. 94

41.     Prosecutorial Misconduct During All Phases of Mr. Umaña's Capital Trial, Individually and Collectively, Violated the Fifth, Sixth, and Eighth Amendments........................................ 101

42.     Mr. Umaña was Denied His Fifth, Sixth, and Eighth Amendment Rights During the Atkins Hearing and in the Resulting Order. ........................................................................ 107

43.     Trial Counsel Ineffectively failed to Investigate, Develop and Present all Reasonably available Mitigating Evidence and Request all Appropriate Instructions in violation of the Fifth Sixth and Eighth Amendments. ...................................................................... 123

44.     The Government Failed To Disclose Mitigating Information Regarding The Civil War In El Salvador in Violation Of The Fifth, Sixth, And Eighth Amendments. .................................. 139

45.     The Court Erred by Excluding the Narrative on the Back of Mr. Umaña's Guatemalan Birth Certificate that Contained Important Details Regarding His Family History in Violation of the Fifth, Sixth, and Eighth Amendments.  Counsel were Ineffective. ........................................... 139

46.     Jurors' Failure to Find Undisputed or Conceded Mitigating Circumstances Violated the Eighth Amendment.  Counsel Were Ineffective. ........................................................................ 141

47.     The Government's Failure to Provide the Constitutionally Required Notice As to Non-Statutory Aggravation Violated the Fifth, Sixth and Eighth Amendments. .............................. 144

48.     Trial Counsel Ineffectively Failed to Investigate and Challenge the Government's Unconstitutionally Overbroad, Vague, and Duplicative Aggravating Factors, Which Violated the Fifth, Sixth, and Eighth Amendments. ........................................................................................ 148

49. The Court's Penalty Phase Jury Instructions Violated the Fifth, Sixth, and Eighth Amendments. Counsel Were Ineffective. ....................................................................................... 156

50.     The Trial Court's Guilt Phase Instructions Violated the Fifth, Sixth and Eighth Amendments.  Counsel were Ineffective. ................................................................................... 164

51.     ████████████████████████████████████████████████████
████████████████████████████████████████ ........ 168

52.     The Court's Reliance on Extra-Record Evidence in Reaching Pretrial and Trial Determinations Violated the Fifth, Sixth, and Eighth Amendments. ......................................... 191

53.     The Government's Use of Evidence From Select Translations of Letters/Taped Calls Against Mr. Umaña Pretrial and at Trial While at the Same Time Denying Mr. Umaña Access to

Funding to Develop Evidence Disputing the Government's Evidence Arising From Thousands of Untranslated Letters and Tapes Violated the Fifth, Sixth and Eighth Amendments. .................. 195

54. Forcing Mr. Umaña to Proceed to the Eligibility and Sentencing Hearing Absent Adequate Notice of the Charges and Evidence to Be Admitted Against Him in Aggravation Violated the Fifth, Sixth and Eighth Amendments. Counsel was Ineffective. ............................................... 200

55. Counsel's Failure to Develop and Present a Coherent Theory of Defense Violated the fifth, sixth, and eighth amendment rights. ....................................................................... 202

56. Appellate Counsel were Ineffective in Violation of the Fifth, Sixth, and Eighth Amendments. ....................................................................................................................... 205

57. The Fourth Circuit Court of Appeals violated Mr. Umana's Fifth, Sixth, and Eighth Amendment Rights to a reliable Capital conviction and Sentence by Materially Misstating the record and Relying on Invalid Factual Propositions to Affirm the Verdicts. ............................. 208

58. ██████████████████████████████████████████████
██████████████████████████████████████. .............. 211

Request for Relief .............................................................................................................. 214

Certificate of Service ......................................................................................................... 216

iv

Mr. Umaña incorporates all of the factual and legal allegations of his initial Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Convictions and Sentences of a Person in Federal Custody, Doc. 24, as if set forth fully herein.

Mr. Umaña is not, nor has he ever been, competent to assist counsel in his own defense. *See* Claim 31. Mr. Umaña alleges that this incompetence constitutes an impediment external to the defense, which prevents a court from imputing the acts and omissions of counsel to him. Counsel do not intend to represent by the filing of this Supplement/Amendment that Mr. Umaña is competent to assist in connection with these proceedings. Mr. Umaña hereby expressly reserves the right to move this Court for a stay of these proceedings.

As demonstrated in Claim 58, Mr. Umaña has never had access to the full court record. Mr. Umaña hereby expressly reserves the right to Amend or Supplement his 2255 Motion when he obtains access to the full record.

1

**31. AS A RESULT OF COURT ERROR AND COUNSEL'S INEFFECTIVENESS, MR. UMAÑA WAS INCOMPETENT DURING HIS *ATKINS* HEARING, TRIAL, AND SENTENCING, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

1.     The allegations in this claim relate back to the legal and factual averments of Claims 1-4, 8, 20, and 24 of the initial 2255 Motion.

**A.  The Law.**

2.     It is well-settled that a conviction obtained against an incompetent defendant is a violation of the constitutional guarantee of substantive due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). To determine whether a defendant is competent to stand trial, the Court should "ascertain whether a criminal defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (quoting *Dusky v. United States*, 362 U.S. 402 (1960)). Where a preponderance of the evidence demonstrates that a defendant lacks the requisite understanding and ability to participate in the proceedings, the defendant may not be tried or admitted to punishment. *Cooper v. Oklahoma*, 517 U.S. 348 (1996).

3.     Competency claims can also raise issues of procedural due process. *Beck v. Angelone*, 261 F.3d 377, 387 (4th Cir. 2001). Where the evidence before the trial court raises a "bona fide doubt" as to a defendant's competence to stand trial, the judge on his own motion must conduct a competency hearing. *Pate*, 383 U.S. at 385. Thus, pursuant to 18 U.S.C. § 4241(a), a court "shall order" a competency hearing on its motion "if there is reasonable cause to believe that the defendant may be presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable . . . to assist properly in his defense." *See also United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995). In determining whether inquiry into a

2

defendant's competency is necessary, a court may look to several factors for guidance including, evidence of a defendant's irrational behavior, his demeanor, and any prior medical opinion on competency to stand trial. *Drope*, 420 U.S. at 180. None of these factors is determinative and any one of them may be sufficient to raise reasonable doubt as to a defendant's competence. *See id*. When a movant raises a procedural due process violation, he is presumed to be incompetent, and the Government bears the burden of proving his competency. *Beck*, 261 F.3d at 387-88.

**B. Mr. Umaña was Incompetent at Critical Stages of the Trial Court Proceedings.**

4. At an evidentiary hearing, Mr. Umaña will present testimony from mental health experts and lay witnesses demonstrating by a preponderance of the evidence that, as a result of his brain damage (due to a host of factors including traumatic brain injury, Fetal Alcohol Spectrum Disorder, neurotoxin exposure, and the neurodevelopmental effects of poverty and trauma); cognitive impairment; psychotic disorder; and complex trauma history, Mr. Umaña lacked the ability to consult with his lawyers with a reasonable degree of rational understanding and lacked a rational as well as factual understanding of the proceedings against him at critical stages.

**1. The Mental Health Evidence**

5. Mr. Umaña will present expert testimony, consistent with the allegations in Claims 3-4, 42, 43, that Mr. Umaña is cognitively impaired, with IQ scores well-within the range of intellectual disability. Mr. Umaña will further demonstrate that these cognitive impairments included adaptive deficits in the areas of communication, self-care, social skills, self-direction, health and safety, and functional academics, all of which individually and cumulatively impaired his ability to consult with counsel and to understand the court proceedings.

6. Mr. Umaña will present expert testimony, consistent with the allegations in Claims 1-4, 42, 43, that Mr. Umaña has brain damage. Mr. Umaña has experienced numerous risk factors for brain damage during his life, including, but not limited to: his mother's consumption of alcohol

3

(including moonshine) during pregnancy; his mother's suicide attempt with rat poison during pregnancy; additional neurotoxin exposure, beginning in utero when his mother lived adjacent to a pesticide warehouse and drank and consumed fish from the nearby polluted waters, continuing through childhood and his teen years when he was exposed to pollution, leaded gasoline, and, again, pesticides from the fields; traumatic brain injury as a child due to falls; traumatic brain injury as an adult due to a car accident; and the well-established neurodevelopmental effects of malnutrition, poverty, and trauma.

7.     Mr. Umaña will present expert testimony, consistent with the allegations in Claims 1-4, 42, 43, that neuropsychological testing, neuropsychiatric examination, and brain imaging conducted on Mr. Umaña demonstrate, *inter alia*, frontal lobe damage consistent with impairment in executive functioning, judgment, and impulse control.  Appx. 27, ¶7-10; Appx. 72 at 3; Appx 70 at 2; Appx 81 at 2; Appx. 29 at 2-3.  Moreover, glucose metabolism testing further demonstrates "abnormalities in regions that are very important for regulating emotions and behavior," including "reduced metabolism in the amygdala and hippocampus, combined with hyper-metabolism in cortical regions."  Appx 29 at 3.  This "compromise[s] his ability to modulate his behavior under stress," "could lead to severe emotional dysregulation," can cause him to "misinterpret danger signals," compromises his frontal lobe's "ability to do its job to regulate . . . primitive emotional impulses," and "can lead to deficits in integrating verbal reasoning and analytic processing modes . . . with intuitive, integrative, and affect-related processing modes" which "would greatly impair speed of processing across cognitive and affective domains."  Appx. 29 at 3.

8.     Mr. Umaña will present expert testimony, consistent with that alleged in Claims 1-2, demonstrating that he has an extensive trauma history.  In addition to being a risk factor for the brain damage described above, Mr. Umaña's complex trauma history has resulted in a multitude

4

of trauma symptomology, including avoidance of traumatic experiences, extreme anxiety and other emotional dyscontrol, dissociation when discussing painful topics, and disruption of normal social development.

9.      Finally, Mr. Umaña will present expert testimony, consistent with the allegations in Claims 1-2, demonstrating symptomology consistent with a psychotic disorder.  Mr. Umaña life history was replete with red flags of psychosis, including the facts that he has hallucinated demons and other apparitions; zoned out and heard voices of angels, devils, or demons; believed his dreams and visions were things that actually happened; and believed his dreams and visions foretold real-world events.  Mr. Umaña communicated his hallucinations to others orally, through his art and through his letters.  Appx 12 at ¶13; Appx 22 at ¶¶36-39; Appx 112 at ¶¶38-41.

**2.      Mr. Umaña's Brain Damage, Intellectual Disability, and Mental Illness Impaired His Ability to Consult with Counsel and Understand the Proceedings.**

10.      Mr. Umaña expects to present evidence at a hearing from his defense team and other lay witnesses that he lacked the ability to consult with his lawyers with a reasonable degree of rational understanding and lacked a rational as well as factual understanding of the proceedings against him.  For example, mitigation specialist McGough (who is bilingual and was able to communicate with Mr. Umaña directly in Spanish) has described Mr. Umaña as "slow and paranoid," Appx 26, ¶8, and further stated that:

> In my meetings with Alejandro he appeared not to have a real appreciation of the circumstances that he faced.  He often talked about being transferred to El Salvador, even though I explained to him that that was not how our legal system worked. In the middle of discussions about his case, he would suddenly break into songs and rap. Based on my contact with him and the information I had regarding his history, I had substantial questions about his mental illness, and about his overall intellectual functioning. I shared my questions and concerned with trial counsel.

Appx. 26, ¶17.  *See also* PPT at 193; Gov. Ex. 522 (Mr. Umaña breaking into rap song during April 2008 interrogation by LAPD).  Mr. Umaña further expects to present evidence from at least

5

one representative of the El Salvadoran consulate (who was also bilingual and able to communicate with Mr. Umaña directly in Spanish), with extensive experience consulting with Salvadoran nationals facing criminal prosecution in the United States, corroborating Mr. Gough's recollections and explaining that Mr. Umaña's inability to assist counsel and understand the proceedings was not merely cultural. *See also* Gov. Ex. 151a at 4 (letter from Mr. Umaña to consulate requesting he be returned to El Salvador).

11. Mr. Umaña further expects to present evidence demonstrating that foreign language interpreters will often, unconsciously and unintentionally, "fill in" gaps when interpreting. Thus, it is not uncommon for attorneys in the position of Mr. Umaña's trial counsel to be unaware of the full extent of their client's limitations, as what they hear is filtered through the lens of an educated interpreter. Thus, it becomes crucial for them to rely on and credit the observations of team members who speak their client's native language.

12. Mr. Umaña further expects to present evidence at a hearing that his own pretrial communications demonstrated his inability to consult with his lawyers and lack of a rational understanding of the proceedings. As demonstrated in Claim 8, Mr. Umaña's written correspondence was demonstrative of the brain damage, cognitive, and psychiatric impairments described above. Representatives of both the Government and the defense have indicated that Mr. Umaña's letters did not make sense. *E.g.*, GPT at 1048 (defense counsel arguing against admission of one of Umaña's letters into evidence, characterizing it as "it's just a rambling, this is just not probative of anything."); Appx. 76 (FBI Linguist Conrad's characterization of Mr. Umaña's written correspondence as "Umaña-speak" that gave her "headaches"). Moreover, upon information and belief, the jails monitored Mr. Umaña's communications with members of the legal team. *See* Appx. 169. Following full discovery, Mr. Umaña expects these recordings to

6

further demonstrate his inability to consult with counsel and understand the proceedings. For example, the Guilford County Sherriff's Deputy who originally listened to a call between Mr. Umaña and his trial mitigation specialist advised the joint task force investigating MS-13 that: "It sounds, according to a quasi-Spanish speaker, that Umaña is talking to a preacher or something to that affect. He is not speaking in his normal 'gang' talk, it is straight up Spanish." (Appx.169) The deputy's characterization is consistent with the call containing the religious themes of Mr. Umaña's psychiatric illness, and demonstrates his inability to rationally communicate with his trial team.

13. Mr. Umaña's communications prior to trial also demonstrate an ongoing perseveration with getting transferred to El Salvador, despite being repeatedly told that that is not an option. *E.g.*, Appx. 157 (in March 2009 jail call with his father, Mr. Umaña relays that the investigator told him "they have no way to transfer, uh, like that."); Appx. 158 (April 2009 letter to Castellon where he says he hopes the people from El Salvador's embassy tell him he can go to the Maximum Security prison); Appx. 159 (April 2009 letter where he says he received his visit from the consulate and can't be transferred because he is still being processed); Appx 71 at 8 (Mr. Umaña told Dr. Suarez he would do his time in an El Salvador prison); Gov. Ex. 522 (telling L.A. detectives during April 2008 interrogation that he wants to serve his sentence in El Salvador). Mr. Umaña expects to demonstrate at a hearing that this preservative fixation on being returned to El Salvador prevented counsel from having any meaningful consultation with their client regarding the objectives of the representation, which impaired not only their ability to represent him at the *Atkins* hearing and at trial, but directly impaired their ability to adequately communicate the Government's plea offer. *See* Claim 24.

7

14.     Mr. Umaña's words at his arraignment further support his incompetence as they tend to demonstrate that he did not understand the charges against him.  At his initial appearance and arraignment, the prosecutor read the charges against Mr. Umaña and the Court asked him if he understood.  Mr. Umaña responded "Yes. More or less." Initial Appearance 7/28/08 at 3-9.  No further inquiry was made.  When Mr. Umaña was arraigned on the superseding indictment, approximately two months later, the magistrate court relied on counsel's representation that Mr. Umaña understood the charges and no personal inquiry was made of him at all regarding his understanding of the charges or his plea.  *See generally* Arraignment 10/03/08.

15.     Mr. Umaña's inability to communicate with counsel and understand the proceedings is also supported by the testimony of two defense experts at the *Atkins* hearing that Mr. Umaña probably did not understand his *Miranda* rights. *See Atkins* Hearing. at 83 (Dr. Olley stating "I think he probably did not understand his Miranda rights"); *id.* at 195 (Dr. Weinstein stating "I expressed my concern to them over the fact that he probably did not understand his Miranda rights"). Moreover, Dr. Olley characterized Mr. Umaña's responses to the Greensboro detectives' questions during their interrogation as "extraordinarily unsophisticated" and "naïve."  *Id.* at 83-84.

16.     Mr. Umaña will further demonstrate that he was unable to consult with counsel or understand the proceedings during his *Atkins* hearing.  Around 5:30 p.m. during the *Atkins* hearing, this Court took a brief recess prior to Dr. Suarez's testimony.  *Atkins* Hrg. at 285.  The Court then addressed a "scheduling matter," informing counsel:  "The Marshals have told me that your client is downstairs throwing up. So I don't know. We need to go forward. We're going to be here a while. Or in light of his condition do something else. You all might want to just talk with him and then just let me know." *Id.* at 285.  After a pause in the proceedings, counsel informed the Court:

MR. BRYSON: He's having migraine headaches.

MR. FOSTER: Which he tends to have --

8

MR. BRYSON: As you heard, that's why he's throwing up. It's pretty normal for him to throw up quite a bit. He doesn't expect he will throw up anymore. He says it's painful, but this is customary for him. And he says he feels okay, and is ready to keep going.

*Id.* at 285. The Court then proceeded with the *Atkins* hearing.

17.     Mr. Umaña expects to demonstrate at a hearing that counsel's representation to this Court that Mr. Umaña "says he feels okay, and is ready to keep going" is directly contradicted by the expert evidence that counsel had in their possession. In his November 17, 2009 report, neuropsychiatrist Dr. Merikangas noted that Mr. Umaña "described his headaches as being mainly on the right behind the forehead, pounding, and accompanied with nausea. His vision is 'cloudy' with the headaches and he sees scintillating scotomata. He also has trouble with his hearing during a headache." Appx 72 at 1-2. Moreover, it is characteristic of an individual with Mr. Umaña's cognitive impairments to want to please an authority figure such as his counsel or the Court by telling them that he is okay to proceed, even though he is experiencing a migraine headache that is clouding his vision, disrupting his hearing, and causing him to vomit. *See, e.g.,* Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 431-32 (1985). Under these circumstances, his statement to counsel cannot be taken at face value without further investigation.

18.     Had the *Atkins* proceedings been paused for a competency evaluation, such an evaluation would have demonstrated that Mr. Umaña was not competent to proceed. In fact, the day immediately after the *Atkins* hearing, neuropsychologist Ricardo Weinstein conducted additional testing of Mr. Umaña. In a follow up letter to counsel, Dr. Weinstein observed that Mr. Umaña "did not have a good recollection of what had occurred at the hearing the day before and could not report the nature or purpose of the proceedings commenting only that it appeared to him that the prosecutor really wanted him to get the death penalty and was 'fighting very hard'." Appx.

9

81 at 1-2. Dr. Weinstein reiterated his belief "that it is unlikely that Mr. Umaña understood the content and consequences of waiving the *Miranda* warnings. I also reiterate my concern that Mr. Umaña may lack the legal competency to understand the legal proceedings in which he is participating and to assist in a rational way in his defense." *Id.* at 2.

19. The record demonstrates that Mr. Umaña experienced debilitating headaches on at least one additional day of trial. Following the lunch break on the first day of liability-phase evidence, defense counsel informed the Court that "Mr. Umaña is experiencing one of his headaches." GPT at 127. However, instead of pausing to determine Mr. Umaña's competency, a trash can was brought to counsel table in case he had to vomit. *Id.*

20. As with his pretrial correspondence, Mr. Umaña also expects to demonstrate at a hearing that his attempts at communication with counsel during trial (to the extent such communication was even possible, *see* Claim 20) further demonstrate his incompetency. Many of Mr. Umaña's communications with counsel during the proceedings bore no connection to what was actually going on in the courtroom. For example, Mr. Umaña appears to have been creating religious drawings (historically a manifestation of his hallucinations), *e.g.*, Appx. 155 (drawing representing God, Jesus, and the Holy Spirit), and to have written love songs, *e.g.*, Appx. 154, during trial.

21. Finally, at formal sentencing, Mr. Umaña addressed the Court: "Well, for the rest of it, this is the destiny that God has given me and, well, right here, La Mara Salvatrucha." Sentencing 07/27/10 at 5. This statement was again consistent with the religious themes of his mental illness.

### C. Mr. Umaña's Procedural Due Process Rights were Violated when the Court Failed to Inquire of His Competency.

22. Both this Court and the magistrate court should have been aware that Mr. Umaña lacked the ability to consult with his lawyers with a reasonable degree of rational understanding

10

and lacked a rational as well as factual understanding of the proceedings against him. As demonstrated above, at his initial arraignment, Mr. Umaña gave an answer that was vague, at best, when asked if he understood the charges in the indictment. Initial Appearance 7/28/08 at 3-9 ("Yes. More or less."). During the *Atkins* hearing, the Court knew Mr. Umaña was having a headache so severe that it caused him to vomit. *Atkins* Hrg. at 285. At the time of the vomiting incident, this Court had heard testimony that Mr. Umaña had brain damage. *Id.* at 270-78. During trial, this Court was made aware that Mr. Umaña was, again, suffering from a debilitating headache. GPT at 127. These indicia of incompetency were more than sufficient to cast doubt on Mr. Umaña's competency and required that the Court order a competency hearing.

### D. Mr. Umaña was Denied the Effective Assistance of Counsel.

23. In guaranteeing a defendant's due process right not to be tried or sentenced while mentally incompetent, "judges must depend to some extent on counsel to bring [competence] issues into focus." *Drope*, 420 U.S. 176-77. Despite the clear indications of mental illness, trial counsel failed to seek a competency evaluation, and that failure fell below objective standards of reasonableness. *See Hummel v. Rosemeyer*, 564 F.3d 290, 302 (3rd Cir. 2009); *Burt v. Uchtman*, 422 F.3d 557, 567 (7th Cir. 2005).

24. As demonstrated above, counsel were aware (or should have been aware from records in their possession) of numerous red flags necessitating a competency evaluation, including the concerns of their Spanish-speaking mitigation specialist; that Mr. Umaña's pretrial correspondence was in "Umaña speak"; that Mr. Umaña was perseveratively stuck on being transferred to El Salvador; that two defense experts believed that Mr. Umaña probably did not understand his *Miranda* rights; and that Dr. Weinstein expressed concerns about Mr. Umaña's competency when he evaluated him the day after the *Atkins* hearing. Moreover, while counsel failed to conduct a full social history investigation that would have uncovered all of the deficits,

11

signs, and symptoms of mental illness that have been developed in these 2255 proceedings, trial counsel were aware that their client was brain damaged, cognitively impaired with a very low I.Q., had a trauma history, would lose focus and start to rap at inappropriate moments, and often described demonic imagery. Finally, counsel were aware that their client suffered vomit-inducing headaches, both during the *Atkins* hearing and on at least one occasion during trial, which impaired both his vision and hearing, and that their client drew religious themed pictures and wrote love songs during the course of trial. Under these circumstances, it was objectively unreasonable for counsel not to request a full competency evaluation.

25. Indeed, even the Government appeared to recognize the necessity of a competency evaluation. After receiving Dr. Weinstein's letter, firewall counsel inquired of defense counsel whether they planned to raise Mr. Umaña's competency. Counsel indicated they did not, pointing the Government to their personal belief that there was no basis to challenge competency and to the report of the Government's expert, Dr. Suarez. (Appx. 161) However, the law is clear that "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation." *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990) (citing *Wood v. Zahradnick*, 578 F.2d 980, 982 (4th Cir. 1978)). As demonstrated above and in Claims 1-4, 42,43, counsel did not conduct a reasonable investigation into Mr. Umaña's background, mental condition, and competency. Moreover, counsel's reliance on Dr. Suarez to reject all of the red flags of incompetence in the record was patently unreasonable when Dr. Suarez had not evaluated Mr. Umaña for competency purposes; counsel were aware of numerous bases for challenging the credibility of Dr. Suarez's opinion, *see* Claim 42; both Drs. Olley and Weinstein questioned Mr. Umaña's ability to understand his *Miranda* rights; and Dr. Weinstein questioned Mr. Umaña's competency when he evaluated him the day after the *Atkins* hearing.

12

26. Mr. Umaña was prejudiced by counsel's deficient performance as there is a reasonable probability that he would have been found incompetent to proceed at the *Atkins* hearing and/or during trial had counsel raised this issue with the Court. Because counsel failed to litigate this issue, Mr. Umaña was forced to stand trial when he lacked the ability to consult with his lawyers with a reasonable degree of rational understanding and lacked a rational as well as factual understanding of the proceedings against him in violation of the Fifth, Sixth, and Eighth Amendments. Relief is required.

32.



14





Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 21 of 221



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 22 of 221



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 23 of 221



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 24 of 221



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 25 of 221





Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 27 of 221



23



24

25





26



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 32 of 221



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 33 of 221



29



30



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 36 of 221



32



33



34





Case 3:16-cv-00057-MOC   Document 69   Filed 02/22/18   Page 41 of 221





Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 43 of 221



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 44 of 221

**34.** **THE GOVERNMENT'S DISREGARD FOR MR. UMAÑA'S RIGHT TO COUNSEL ONCE IT HAD ATTACHED VIOLATED THE SIXTH AND EIGHTH AMENDMENTS. COUNSEL WERE INEFFECTIVE.**

87. The allegations in this claim relate back to the legal and factual averments of Claims 5, 12, 27, 29, and 30 of the initial 2255 Motion.

88. On April 23, 2008, months after Mr. Umaña's Sixth Amendment right to counsel had attached, law enforcement officers interrogated Mr. Umaña at the Guilford Jail about the Fairfax and Lemon Grove homicides knowing that his right to counsel had attached and knowing that the subject matter of the interrogation involved aggravation the Government intended to use as support for the death sentence in violation of the Sixth and Eighth Amendments. After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that over the course of time between Mr. Umaña's arrest and trial, this was not the sole incident in which the cooperative law enforcement team engaged in conduct that failed to honor Mr. Umaña's right to counsel and that the Government benefitted from those instances in violation of the Sixth and Eighth Amendments.

### A. The Law.

89. Once the Sixth Amendment right to counsel attaches, the Government is precluded from interrogating the accused, even on matters relating to penalty-phase aggravation, unless the accused has had an opportunity to consult with counsel. *See Estelle v. Smith*, 451 U.S. 454, 469-70 (1981) (Sixth Amendment violated where counsel "were not notified in advance that the [State's] psychiatric examination would encompass the issue of their client's future dangerousness") (*citing Powell v. Alabama*, 287 U.S. 45, 57, 71 (1932)); *Satterwhite v. Texas*, 486 U.S. 249, 255-56 (1988) (constructive notice that State expert would be interviewing accused for purposes of developing aggravation evidence does not satisfy Sixth Amendment right to counsel). The Sixth Amendment right to counsel attaches "at or after the time that adversary judicial

40

proceedings have been initiated against him ... whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972) (plurality opinion); *see also Moore v. Illinois*, 434 U.S. 220, 226-29 (1977).

### B. The Joint Investigation.

90.     Following a joint investigation between the FBI MS-13 Task Force, state and local police, Mr. Umaña was apprehended on December 12, 2007 and arrested for the homicides in this case.  The cooperation between the FBI task force and local police in Greensboro and Charlotte began long before the December 8, 2007 homicides, continued during the four days between the homicides and Mr. Umaña's apprehension, and remained at all times thereafter.  Indeed the joint investigation of MS-13 activities that culminated in the co-defendant indictment in this case began in 2003, if not earlier.  *See* Claim 38.  By October of 2007, Safe Streets Task Force members, including CMPD Officers Charles Hastings and Carlos Lopez and FBI Agent Attard, were conducting active surveillance of MS-13 activities in Charlotte and Greensboro that occurred over the course of many months, through their work with informant Rony Lopez and others. GPT at 757-59; 776.

91.     On December 8, 2007, the night of the shooting in Greensboro, the FBI task force (Attard and Hastings) was conducting surveillance with informant, Rony Lopez, as he went to Greensboro to pick up the suspects and take them to Charlotte.  *United States v. Rosales-Lopez, et al*, 3:08CR134 Doc. 1072 at 260-61; Gov. Ex. 144.

92.     After the shooting, the cooperation continued, and increased.  In December of 2007, Officer Hastings contacted Greensboro Police Officer John Sloane seeking assistance obtaining a court order to track Mr. Umaña's cell phone. GPT at 165.  Following the shooting, the task force was aware of Mr. Umaña's location in Charlotte and continued their surveillance of him. GPT at 785-789; Gov. Ex. 144.  The FBI obtained a state search warrant for forcible entry of the home

41

where Mr. Umaña was located to effectuate the arrest. GPT at 788. On December 12, 2007, Attard and Hastings wired Rony Lopez for surveillance prior to responding to arrest Mr. Umaña. Appx. 151. Mr. Umaña's arrest was the result of coordination with the state police and the FBI task force, GPT at 788, and the task force members conducted an investigation at the home and collected evidence after the arrest. GPT at 790. Greensboro police took custody of Mr. Umaña, while Officers Lopez and Hastings interviewed four witnesses that were found with him in the home. Appx. 120. Mr. Umaña was interviewed by both Greensboro and Charlotte police, including Task Force Officer Carlos Lopez. *See* Appx. 206 (Dec. 12, 2007 Interview, Greensboro Officer Mike Terry); *see also* Appx. 124 (waiver of rights with Carlos Lopez's name on it); CR 684 at 24 (8-26-2009 Motion Hearing Transcript).

93. Although Mr. Umaña was initially charged and confined in Greensboro, the task force continued to lead the investigation and there was no question that federal homicide charges were imminent. Appx. 119 (12-14-2007: Hastings supplemental police report entry indicating "This case is pending US Attorney prosecution..."); Appx. 119 (Report regarding co-defendant with entry by Hastings that this "case will be prosecuted federally"); Appx. 156 (April 15, 2008 letter from AUSA Zolot to CMPD crime lab requesting drug analysis be sent to him and indicating that one of the co-defendant's drug case had been accepted for federal prosecution).

94. On April 17, 2008, Agent Attard informed LAPD Officer Small that the federal government would be indicting Mr. Umaña within the next week. *See* Appx. 51 from 2255 at 39. On April 23, 2008 LAPD Det. Flores (deputized member of the MS-13 task force), along with LAPD officers Thomas Small and Eugene Parshall met with Detective Terry in Greensboro and "exchanged info" regarding MS-13 activity. *See* Appx. 51 from 2255 at 39. Following the debriefing with Terry, the LAPD officers interrogated Mr. Umaña. Gov. Ex. 522. The next day,

on April 24, 2008, the Government convened a grand jury in the Western District of North Carolina and several witnesses testifed about the Greensboro shooting, including FBI Agent Attard. April 24, 2008 Grand Jury Testimony of Attard at Appx. 150; April 24, 2008 Grand Jury Testimony of Angel Granados at Appx. 149.

95.     Upon information and belief, this was not the only instance in which law enforcement working with the prosecution interrogated or attempted to interrogate Mr. Umaña despite the attachment of his Sixth Amendment right to counsel. After full discovery, Mr. Umaña expects to demonstrate a pattern of disregard for his right to counsel throughout the time between December 2007 and April 2008 including but not limited to January 9, 2008.

96.     Upon information and belief, the Government was also intercepting attorney-client privileged communications and monitoring wiretaps where surveilled persons called Mr. Umaña's attorney. *See* Appx. 185; Appx. 204; Appx. 169; *see also* Appx. 202.

97.     After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate additional evidence demonstrating that law enforcement and prosecutors from Greensboro, Charlotte, the LAPD and the federal government were working in concert with the common goal of collecting and developing evidence supporting the federal capital prosecution and that all members of these agencies were aware of the federal capital prosecution and plans for admitting evidence of the Lemon Grove and Fairfax Avenue homicides as aggravation in that prosecution.

**C. The Conduct of the Cooperative Law Enforcement and Prosecutorial Team Violated the Sixth and Eighth Amendments.**

98.     Mr. Umaña's Sixth Amendment right to counsel attached at the point of his arrest and charge in Greensboro. All law enforcement agencies were working in tandem before, during and after the investigation of the murders that formed the basis for this capital prosecution. All were charged with knowing that, once Mr. Umaña was arrested and charged by the team partners

43

in Greensboro that a federal capital prosecution was imminent and that evidence regarding the Lemon Grove and Fairfax Avenue incidents would be used in aggravation. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (finding that for *Brady* purposes, prosecution is charged with knowledge of "evidence known to others acting on the government's behalf in this case"); *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006) (finding constructive knowledge where the individuals are acting on the Government's behalf or under the control of the Government; are involved in a joint investigation; and have joint access to the evidence).

99.     Because this was a team prosecution, Mr. Umaña's Sixth Amendment right applied to circumstances arising from the federal capital prosecution. The failure to afford Mr. Umaña his right to consult before the April 23, 2008 interrogation, or any other interrogations conducted after December 12, 2007 violated the Sixth Amendment. It also violated the Eighth Amendment heightened procedural safeguards required in capital cases.

100.     Counsel's failure to develop, raise and litigate these claims at trial and on appeal constitutes prejudicially deficient performance in violation of the Sixth and Eighth Amendments. Counsel sought to suppress the April 23, 2008 statement pretrial on Fifth Amendment grounds but failed to raise the clear Sixth Amendment violation. As a result, counsel can have no reasonable strategic basis for failing to raise these meritorious bases for achieving precisely what counsel sought to achieve. As there is a reasonable probability that, had counsel litigated these issues, the results of the trial and/or appeal would have been different, prejudice is demonstrated and relief is required.

**35.     THE JURY CONSIDERED UNCONSTITUTIONALLY SPECULATIVE AND UNRELIABLE EVIDENCE, DUE TO PROSECUTORIAL MISCONDUCT, COURT ERROR, AND COUNSEL'S INEFFECTIVENESS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

101.     The allegations in this claim relate back to the legal and factual averments of Claims 5, 6, 7, 10, 11, and 12 of the initial 2255 Motion.

44

**A. The Jury Considered Unconstitutionally Speculative and Unreliable Evidence in the Guilt Phase.**

102. Due process affords a criminal defendant the "right to a verdict based solely upon the evidence and the relevant law." *Chandler v. Florida*, 449 U.S. 560, 574 (1981). Due process also mandates that all criminal convictions be based upon proof beyond a reasonable doubt of each element of the charged offense. *In re Winship*, 439 U.S. 1001 (1970); *Sandstrom v. Montana*, 442 U.S. 510 (1970); *Mullaney v. Wilbur*, 421 U.S. 684 (1975).

103. These rights are protected not only by due process, but also the Sixth Amendment. *United States v. Gaudin*, 515 U.S. 506, 514 (1995). And when a defendant is on trial for his life, the Eighth Amendment requires the state to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

104. Here, the admission of speculative and unreliable evidence was so unduly prejudicial that it rendered his trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 179–183 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). Moreover, the arbitrary determination of the legal and factual issues in his trial violated his due process, equal protection, and Eighth Amendment rights. *E.g., Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Griffin v. Illinois*, 351 U.S. 12, 13-14 (1956); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980); *California v. Ramos*, 463 U.S. 992, 998-99 (1983).

105. Moreover, the prejudice caused by the unconstitutionally speculative, unreliable evidence carried over to the penalty phase, where jurors were free to consider evidence and information they received in the guilt phase. PPT at 12, 15, 818. But for this unconstitutionally speculative, unreliable evidence, there is a reasonable probability of a different guilt-phase or

45

penalty-phase result.  Had counsel objected and fully litigated this issue at trial and on direct appeal, there is a reasonable probability of a different outcome.

### 1. Unproven allegations of co-conspirators' serious violent felonies were presented to the jury.

106.    Mr. Umaña and 25 co-defendants were charged in a 70-count third superseding indictment.  In the counts that applied to  Mr. Umaña, including Count 1, the Government alleged that the co-defendants participated in a RICO conspiracy.  The Government alleged 68 overt acts in furtherance of the RICO conspiracy, of which only 6 overt acts allegedly involved Mr. Umaña.  CR 623.  Numerous serious acts of violence, unrelated to Mr. Umaña, were alleged as co-defendants' RICO overt acts—including at least 2 other homicides, 5 robberies, 3 shootings (involving 6 victims), 4 assaults, and a conspiracy to commit homicide.  CR 623.

107.    The District Court provided the indictment to Mr. Umaña's jury during guilt phase deliberations, and instructed that the jury need only find Mr. Umaña knew of or committed two racketeering activities to convict on Count 1.  GPT at 7, 1213, 1221, 1224-25, 1239.  But the Court failed to instruct the jury on how to apply the 68-item list of alleged RICO overt acts contained in Count 1.  Counsel for the Government and Defense did not provide any guidance in closing argument as to how to apply the list of overt acts either.

108.    The jury's review of this list, without any guidance from the Court or parties, prejudiced Umaña.  The list of RICO overt acts contained numerous allegations of co-defendants' violent crimes—such as the 2 other homicides and several robberies, shootings, and assaults.  Jurors reasonably likely drew a negative inference against Mr. Umaña based on their review of the RICO overt acts list, and jurors reasonably likely were more prone to find him guilty based on "guilt by association" or the alleged violent acts of his co-defendants.  Submission of the overt acts list, without any meaningful guidance, injected arbitrariness and caprice into the jury's

46

deliberations, and increased the risk that jurors would return a verdict not "based solely upon the evidence and the relevant law." *Chandler*, 449 U.S. at 574.

109. The Court erred in failing to give adequate instructions explaining how to apply the Count 1 RICO overt acts list. Counsel unreasonably failed to move to strike or redact overt acts which were not supported by the evidence presented in Mr. Umaña's trial or which were unfairly prejudicial—such as the 2 other homicides or the multiple robberies, assaults, or shootings. Counsel also unreasonably failed to request reasonable jury instructions or explain to the jury in closing argument how to favorably apply the overt acts list. Finally, the Government likewise committed misconduct in condoning this unproven highly prejudicial list to be presented to the jury. Had the highly prejudicial violent RICO overt acts--which Umaña was not involved in--not been presented to the jury, there is a reasonable probability the guilt-phase or penalty-phase outcome would have been different.

### 2.     An unrelated attack on the Bloods gang was presented to the jury.

110. In the guilt phase, Government witness Leny Moriera testified about an uncharged alleged prior bad act of Mr. Umaña. Over defense objection, Moriera testified that in Hempstead, New York his MS clique had an incident with the Bloods gang: the Bloods shot an MS member, and "Coyote" (the clique leader) later told Moriera that Coyote and Wizard "went in and rolled on the Bloods." GPT at139-41. The government then asked Moriera if Coyote and Wizard's retaliation was successful: "Do you know if they got them?" and Moriera responded, "Yes." *Id.* Moriera admitted on cross-examination that he had not been present for any alleged retaliation and his basis of knowledge was hearsay supplied to him by "Coyote." GPT at 146.

111. This incident was not alleged in any of the indictments (*see* CR 3, 276, 355, 623), and, despite defense demand (CR 466), the Government did not provide notice of intent to present evidence of this uncharged alleged prior bad act or the proffered purpose for presenting this

evidence. *See* FRE 404(b) (2009) (*e.g.*, limited purposes of "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

112. This incident occurred in New York. It was temporally and geographically unrelated to any conspiracy or overt act in North Carolina. It was not an overt act alleged in the indictment. It did not involve any of the co-conspirators in this case, and it did not establish any of the narrow purposes in Rule 404(b). The evidence served no relevant purpose. The Government's theory was: an eye-witnesses identified Mr. Umaña as the Greensboro shooter, an undercover informant surreptitiously recorded him discussing and admitting to the shooting, and he confessed during police interrogation to being the shooter. *Cf. United States v. Sanders*, 964 F.2d 295, 298-99 (4th Cir. 1992) (reversing assault conviction, as evidence of prior assault lacked probative value under Rule 404(b) and merely showed propensity to commit assaults or violent crimes). An extraneous shooting, with an amorphous bad result could not be tied to the Government's theory.

113. The Government's surprise other-crime evidence violated not only evidence rules FRE 404(b) and 403, but also FRE 802, due process, and the Sixth and Eighth Amendments. Due process compels the Government to refrain from improper methods, as well as false or misleading evidence, to obtain a conviction. *See Giglio*, 405 U.S. 150 (1972) (failure to correct false testimony violates due process); *Napue*, 360 U.S. 264 (1959) (failure to correct testimony that creates false impression violates due process); *Brady*, 373 U.S. 83 (1963); *Berger*, 295 U.S. at 88. Due process also encompasses the right to appropriate notice and an opportunity to be heard. *Morgan v. United States*, 304 U.S. 1, 18 (1938).

114. Here, the Government intentionally skipped the procedural safeguard of Rule 404(b) notice and denied counsel an opportunity to be heard on this evidence prior to presenting it to the jury, thereby obviating the requirement that the Government address the hearsay and Confrontation

48

problems presented by this evidence, reliably prove the evidence, and identify the purpose for which it would be offered. The Government's tactic paid off: trial counsel was ambushed by this constitutionally unreliable, prejudicial evidence, and the District Court and counsel were forced to consider the Government's objectionable evidence mid-trial without fully addressing its evidentiary and constitutional implications. Moriera's testimony was uncorroborated, speculative, and unproven. And the multiple layers of hearsay presented in Moriera's testimony violated Mr. Umaña's Sixth Amendment right to adversarial testing of the evidence in his case. *Cf. Wong Sun v. United States*, 371 U.S. 471, 489-91 (1963); *Crawford*, 541 U.S. at 62-64. Moreover, following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the Government did not fully fulfill its obligations under *Brady* and *Giglio* regarding this uncharged conduct.

115. Mr. Umaña was prejudiced, as Moriera's testimony encouraged jurors to draw the negative inference that Mr. Umaña had a propensity to commit assaults or violent crimes, rather than proving any relevant issue in the case. *Sanders*, 964 F.2d at 298-99 (reversing conviction, as defendant was prejudiced by inappropriately admitted evidence of prior assault).

116. Finally, the prejudicial impact of Moriera's untrustworthy hearsay testimony carried over to the penalty phase, where the jury was instructed that it could consider evidence presented in the guilt phase (PPT at 12, 15, 818) and that it must consider the non-statutory aggravator that Mr. Umaña had been involved in other serious acts of violence "including but not limited to" the Los Angeles homicides (PPT at 905-06; CR 1048-1051 at 2). Moriera's hearsay testimony was uncorroborated, unproven, and constitutionally unreliable information about other unadjudicated conduct—precisely the type of evidence the District Court took painstaking steps to carefully consider and exclude. *See, e.g.*, PPT at 3-8; CR 1000 at 11-12; CR 1021. His testimony encouraged jurors to conclude that Mr. Umaña had committed a serious act of violence with

49

"Coyote" in New York.  *See Zant*, 462 U.S. 862, 884-85 (due to "qualitative difference between death and any other permissible form of punishment, 'there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment,'" (quoting *Woodson*, 428 U.S. at 305)).

117.  The Government committed misconduct by presenting this constitutionally unreliable evidence; the Court erred in overruling counsel's objection; and counsel ineffectively failed to further litigate this issue, remind the Court of the reliability standard necessary in the penalty proceeding, seek a curative instruction in the penalty phase, or raise the issue on appeal.

### 3.  Unreliable information about possible sexual assault or predatory behavior was presented to the jury.

118.  The Government injected the specter of rape and sexual assault into the case when, in opening statement, the Government alleged that MS-13's motto was to "murder, rape, [and] control."  GPT at 15.  The Government then presented zero evidence of rape or sexual assault in trial.

119.  Indeed, the Government's "gang expert" was forced to clarify on cross-examination the motto's meaning and the gang's rule against rape:  "rape in the sense of more of a pirate sense. Robbery, rape and pillage, in the sense of how it's defined.  But I know rape is, obviously, at least in California, a little bit more of a taboo there in the gang world."  GPT at 106.  Due to counsel's ineffectiveness, the "MS expert's" clarification was ambiguous and limited to how gangs (not necessarily MS) operate "in California" (not necessarily North Carolina).  Also due to ineffectiveness, this was the closest the defense came to pointing out that there was no link between Mr. Umaña or his co-conspirators and the specter of rape or sexual assault.

120.  Quite the opposite, the Government later insinuated that Mr. Umaña and his associates were involved in some level of sexual assault or predatory behavior, when Greensboro

50

police officer John Sloane testified about the arrest of MS member Cordova at a North Carolina hotel, the related stop and frisk of Mr. Umaña and others in the hotel parking lot, and the resulting arrest of Mr. Umaña for marijuana and cocaine possession.

121. During Ofc. Sloane's testimony, the Government encouraged Sloan to testify about unproven, speculative information: "I had to go back to the hotel [where Cordova and other MS-13 members had been seen] *because there were two minor females that were believed to be missing or in danger that were believed to be with him*." GPT at 159 (emphasis added). Trial counsel objected early in the line of questioning that led up to that point, and the Court sustained counsel's objection. In a manner suggesting misconduct, however, the Government persisted in the line of questioning and encouraged its witness to testify to the unproven, constitutionally unreliable allegation that the officer eventually managed to blurt out: "two minor females" were "missing or in danger" in close proximity to Mr. Umaña. *Id.* Although the Court sustained counsel's immediate objection to this incredulous allegation, rather than a stern condemnation of the Government for treading into prejudicial unproven allegations that had nothing to do with Mr. Umaña's case or any of the RICO overt acts, the Court merely "Ask[ed] the jury to disregard the statement about minor females." *Id*.

122. Worse yet, the Court then permitted the Government, over repeated defense objection, to immediately return to this extremely prejudicial, constitutionally unreliable evidence. On the very next transcript page, the Government encouraged its witness to testify that he and other officers entered Cordova's hotel room and "found two females." GPT at 160-61. The prosecutor then insinuated that the two females were victims by asking the officer "And was any assistance given to those females?" Over defense objection, Ofc. Sloane answered "We did try to speak with them to determine what their status was, because they were underage." Next, the

prosecutor had Ofc. Sloane assure jurors that the girls were not arrested, completing the Government's narrative that the underage females were victims of Mr. Umaña of some sort. *Id.*

123. This insinuation was extremely prejudicial, especially combined with the allegation that the gang's motto included rape. The Government insinuated Mr. Umaña was engaged in behavior that put two missing underage females in danger, possibly sexual assault consistent with the gang's motto. The Court's request, "Ask[ing] the jury to disregard the statement about minor females" did little to curb the prejudicial impact of this non-noticed, unproven, constitutionally unreliable information. The maxim that jurors presumably follow limiting instructions is rooted more in pragmatism than certitude, *see Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and is not applicable when the risk is great that jurors will not be able to follow the instruction "and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Simmons v. South Carolina*, 512 U.S. 154, 157 (1994) (plurality opinion). The Government then obliterated any curative effect the instruction had by asking Ofc. Sloane to convey that same unconstitutionally unreliable information, just in a different manner, over defense objection. GPT at 159-61.

124. Finally, the prejudicial impact of the Government's rape/sexual assault insinuation carried over to the penalty phase, where the jury was instructed that it could consider evidence presented in the guilt phase (PPT at 12, 15, 818) and that it must consider the non-statutory aggravator that Mr. Umaña had been involved in other serious acts of violence "including but not limited to" the Los Angeles homicides (PPT at 905-06; CR 1048-1051 at 2). The Government's rape/sexual assault narrative was uncorroborated, unproven, and constitutionally unreliable information about other unadjudicated conduct—precisely the type of evidence the District Court

52

took painstaking steps to carefully consider and exclude prior to the penalty phase. *See, e.g.*, PPT at 3-8; CR 1000 at 11-12; CR 1021.

125. The Government committed misconduct by presenting this constitutionally unreliable evidence; the Court erred in overruling counsel's objections; and counsel ineffectively failed to seek an *in limine* order to exclude unproven allegations of rape or sexual assault from the trial, further litigate this issue mid-trial, remind the Court of the reliability standard necessary in the penalty proceeding and seek curative instructions in the penalty phase, or raise the issue on appeal. Moreover, following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the Government did not fully fulfill its obligations under *Brady* and *Giglio* regarding the uncharged conduct described below. Had the specter of rape or sexual assault not been injected into the trial, there's a reasonable probability the outcome would have been different.

### 4. Unrelated RICO overt acts were presented to the jury.

126. The Eighth Amendment guarantees an individualized sentencing decision: "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant,* 462 U.S. at 879 (emphasis in original). The focus must be on the defendant's conduct and culpability, not on that of his accomplices. *See, e.g.*, *Enmund v. Florida*, 458 U.S. at 798. In recognizing this principle, the unrelated criminal acts of other gang members or the gang at large cannot serve as evidence in aggravation against a particular defendant. *See, e.g.*, *United States v. Rivera*, 405 F. Supp. 2d 662, 670-71 (E.D. Va. 2005); *United States v. Grande*, 353 F. Supp. 2d 623, 638 (E.D. Va. 2005). Indeed, the District Court recognized this principle. CR 1000 at 8.

127. But no one informed the jury. Specifically, counsel failed to request--and the Court did not offer *sua sponte*--an instruction informing the jury that the overt acts of other co-defendants in furtherance of the RICO conspiracy could not be considered in aggravation against Mr. Umaña

in the penalty phase. Quite the opposite, the jury was instructed in the penalty phase that it could consider evidence presented in the guilt phase (PPT at 12, 15, 818), and that it must consider in aggravation Mr. Umaña's "allegiance and active membership in MS-13" and his involvement in other serious acts of violence. PPT at 905-06; CR 1048-1051 at 2-3.

128. Without specifically limiting the jury's consideration to Mr. Umaña's conduct, an unconstitutional risk ensued that the jury would consider the crimes of others or the gang at large as aggravation against Mr. Umaña. *See* CR 1000 at 8 (Court cites with approval cases striking non-statutory aggravators that attempted to impute to defendant the acts of violence committed by the gang at large). Indeed, in closing argument, the Government encouraged jurors to do just that. The Government implored jurors to punish Mr. Umaña for the community's MS problem writ large, to "send the community a message" and "send MS a message" by returning a death verdict against Mr. Umaña. PPT at 904.

129. For example, Juan Ruben Vela Garcia was a Charlotte MS-13 clique leader. He engaged in or ordered multiple instances of violent criminal conduct that Mr. Umaña was not involved in. Before Mr. Umaña even came to North Carolina, Vela Garcia's MS-13 clique controlled several bars and clubs in Charlotte and taxed or extorted anyone who sold drugs in those establishments. They also sought out rival gangs to get into fights and "show them that we weren't scared of them." GPT at 191-97. Vela Garcia and other MS members administered punishment, a 13-second group beating, to fellow MS member "Drogo" for breaking a gang rule. GPT at 198-99. Without any input from Mr. Umaña, Vela Garcia twice ordered his MS clique members to execute an armed robbery and home invasion of a prostitution house (GPT at 226-33, 279); planned and ordered other MS members to rob a drug dealer named Gordo for his failure to pay extortion

54

money (GPT at 233-34); and discussed with "Chicago" plans to kill fellow MS member Rony Lopez, a suspected informant (GPT at 243-44).

130. Rony Lopez's testimony reiterated these violent RICO overt acts—that is, the jury heard this prejudicial information twice. Lopez's testimony confirmed though that Mr. Umaña was not involved in any of these acts. He reiterated that, before Mr. Umaña came to North Carolina, Charlotte MS members taxed and extorted drug dealers who sold in MS controlled bars and clubs, and MS members sought out rivals to get into fights. GPT at 645-48. Lopez also testified that--unrelated to Mr. Umaña--Vela Garcia ordered Lopez and others (not including Mr. Umaña) to commit an armed robbery of a prostitution house; and after the first attempt failed, ordered them to try again. Vela Garcia also ordered the same group to rob Gordo, a drug dealer who operated in one of the MS controlled clubs but had failed to pay his extortion tax. GPT at 669-75, 682-86.

131. The jury also watched a video of a violent MS-13 "jump in" or "beat in" (initiation of new member by subjecting her/him to a timed beating by current members) in Durham, North Carolina in March 2006--long before Mr. Umaña ever came to the North Carolina. GPT at 109-14; Gov. Exs. 30, 30a.

132. Finally, the jury also heard about at least six incidents of police documenting "MS-13" graffiti on various buildings, including a particularly prejudicial incident where the words "cop killin'" were written in graffiti. No gang nickname, artist monikers, or clique names connected Umaña to the graffiti incidents. GPT at 3-21.

133. Without a limiting instruction, the Court failed to constitutionally narrow and channel the jury's discretion to consider only Umaña's behavior. *See Zant*, 462 U.S. at 877; *Enmund*, 458 U.S. at 798; *Tuilaepa*, 512 U.S. at 972. Counsel ineffectively failed to request such

55

an instruction or litigate this issue on appeal. But for counsel's error, there is a reasonable probability of a different outcome. Had counsel requested a limiting instruction ordering jurors to consider only the conduct and actions of Mr. Umaña, and not these incidents attributable to other gang members or the gang at large, there is a reasonable probability the Court would have given such an instruction, *cf.* CR 1000 at 8, and there is a reasonable probability the sentencing outcome would have been different.

### B. Unconstitutional Aggravation Presented in the Penalty Phase.

134. The qualitative difference between capital punishment and other forms of punishment requires a heightened degree of reliability in the capital sentencing process. *See Lockett v. Ohio*, 438 U.S. 586, 602-04 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also* 18 U.S.C. § 3593(c). The Eighth Amendment requires the state to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

135. In *limine*, the District Court carefully considered the reliability of the Government's proffered evidence of unadjudicated conduct and explicitly limited the information the Government could present to prove non-statutory aggravation. PPT at 3-8; CR 1000 at 11-12; CR 1021. From there, the penalty-selection phase devolved into an evidentiary free-for-all, in which the Government repeatedly committed misconduct by presenting constitutionally unreliable information about Mr. Umaña's alleged prior unadjudicated violent acts and character and reputation. This information was highly prejudicial, non-noticed, unproven, and unreliable. Moreover, following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the Government did not fully fulfill its obligations under *Brady* and *Giglio* regarding the uncharged conduct described below. And counsel ineffectively failed to object to the jury's

consideration of this unconstitutionally unreliable information or otherwise raise these issues in the district court or on appeal. In isolation, and cumulatively, there's a reasonable probability the sentencing outcome would have been different without the unconstitutional, unreliable, improperly admitted information presented to the jury.

### 1. Two Other Homicides and a Shooting.

136. The Government presented evidence to the jury that Mr. Umaña had been involved in "2 other Homicides" in Los Angeles--at "Hollywood and Garfield" and "Western and Fountain." Gov Ex. 520 at 64-65. During the penalty phase, LAPD Det. Parshall testified about his interrogation of Luis Rivera, an alleged accomplice in the Fairfax Avenue homicides of July 27, 2005. The Government moved into evidence the transcript of Det. Parshall's interrogation of Rivera. Gov. Ex. 520; PPT at 220-21 (Det. Parshall explains the name "Ramos" in transcript is a typo and the interview was actually with Rivera). The defense lodged "the same objections that have been made earlier in the case" (*id*.) as to the reliability and admissibility of any evidence about the Fairfax homicides. *See, e.g.*, PPT at 3-8, 77-79; CR 1021. The transcript exhibit was available to the jury during deliberations. PPT at 819, 929-30, 943-44 (Court instructs jury it can review exhibits, in electronic or hard-copy format, during deliberations; Gov. Ex. 520 released to jury for review).

137. In the interrogation transcript exhibit, Det. Parshall indicated he had information that Mr. Umaña was involved in "2 other Homicides," at "Hollywood and Garfield" and at "Western and Fountain." Gov. Ex. 520 at 64-65. These two incidents were separate and unrelated from the unadjudicated homicides the Government gave notice of: the Fairfax homicides of July 27, 2005 and the Lemon Grove Park homicide of September 28, 2005. CR 275 at 4, 7.

138. A hand-written notation in the margin drew the reader's attention to the fact that Det. Parshall had information that Umaña was involved in "2 other Homicides":

MALE DETECTIVE:  When did this Hollywood and Garfield thing with Wizard happen?

LUIS RAMOS:  It was -- let's see, --

64

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

scanned

2 other
1 Homicides

MALE DETECTIVE:  Oh, that was while you were in the hospital?

LUIS RAMOS:  Yeah, when I was in -- I got shot on the 24th.

MALE DETECTIVE:  And when did the one on Western and Fountain, with Wizard and Chakal --

LUIS RAMOS:  That was, like, a month later after that.  You can look them up on Hollywood.  Just help me.  I will give you everything, (Phonetic) sir.  I just don't want to -- because it could -- or I'm just giving you free information --

Gov. Ex. 520.

139.  The mention of "2 other Homicides"--unrelated to the Fairfax or Lemon Grove incidents--was highly inflammatory, prejudicial, non-noticed, unproven, and unreliable "other serious acts of violence" evidence.  CR 275 at 4, 7.  The notation clarified the incidents were not minor events, fist fights, or traffic stops – they were "2 other Homicides."  Either law enforcement or the prosecution wrote the notation on the document, which was then submitted to the jury *without redaction* and available for review during deliberations; *or* a juror wrote the note on the

58

transcript during deliberations, which would prove the jurors considered and relied upon this alleged extraneous offense.

140. These incidents were unproven and unreliable. Mr. Umaña was never charged in the incidents and the prosecution did not allege them in its notice of intent to seek death – all indicating the police investigation did not prove any reliable connection between Umaña and these "2 other Homicides."

141. The Government committed misconduct in presenting these unproven, highly unreliable allegations that Mr. Umaña had been involved in "2 other Homicides." Particularly where the District Court had carefully considered and limited the scope of unadjudicated conduct that would be permitted in the penalty-selection phase, the Government's misconduct appears flagrant and intended to unfairly prejudice Umaña. *See, e.g.*, PPT at 8 (excluding El Salvador other-crimes evidence), 72-79 (excluding transcript from accomplices' California court case regarding Fairfax homicides), 235-36, 242-44 (excluding detectives' testimony that Arevalo and Ramos refused to testify in penalty phase for fear of retaliation). Given how carefully the Government reviewed and selected its trial exhibits, it is exceedingly unlikely the misconduct was unintentional. *See, e.g.*, PPT at 931-33 (AUSA argues that exculpatory pages--English translations of witness's Spanish-language statements in which he explains that his identification was only tentative--were never submitted into evidence and thus should not be made available to jury during deliberations).

142. The Government also presented evidence to the jury that Mr. Umaña had been involved in an unrelated "shoot-out" with the White Fence gang in Los Angeles. Gov. Ex. 522 at 135-39. During their April 23, 2008 interrogation, Det. Flores and Det. Parshall told Mr. Umaña they had information that he and other MS members had been involved in a "shoot-out" with the

59

White Fence gang in retaliation for White Fence's non-fatal shooting of Luis Rivera. *Id.* The Government submitted Umaña's interrogation transcript into evidence; and the full transcript was released to the jury during deliberations. PPT at 79, 220; Gov. Ex. 522; PPT at 220, 819, 929-30, 943-44.

143. Mr. Umaña's connection to this incident was speculative and constitutionally unreliable. He was never charged; and the prosecution did not allege this incident in its notice of intent to seek death. Indeed, it is questionable whether Mr. Umaña was even involved in the incident. *See* CR 1000 at 8 (Court cites with approval cases striking non-statutory aggravators that attempted to impute to defendant the acts of violence committed by the gang at large). The Government committed misconduct by presenting such speculative, unreliable information to prove its "other serious acts of violence" aggravator.

144. The prejudice to Mr. Umaña was particularly acute. The Government alleged multiple non-statutory aggravators bearing on Mr. Umaña's alleged dangerousness and reputation for violence. CR 1048-1051 (aggravators #1, 3, 4). The Court's instructions and the special verdict forms invited jurors to consider all evidence of prior bad acts, not just the Fairfax and Lemon Grove incidents. CR 1048-1051 (aggravator #3 regarding other serious acts of violence "including but not limited to" Fairfax and Lemon Grove); PPT at 905-06. And during deliberations, jurors had no way of cross-referencing the information in this transcript exhibit, which they had full access to in the deliberation room, with the testimony actually presented in court. *Compare* PPT at 819, 929-30, 943-44 (Gov. Ex. 522 released to jury during deliberations), *with* GPT at 1273-74 (court denies jury's request to review transcripts of testimony of in-court witnesses and instructs jurors to rely on their recollection of the witnesses' testimony instead). Counsel also ineffectively

failed to review these exhibits, identify this glaring unreliable unadjudicated conduct evidence, and raise the issue with the Court or on appeal.

### 2. Non-testifying witness's opinion of Mr. Umaña's character and reputation.

145. The Court repeatedly excluded information about non-testifying accomplices' opinions of Mr. Umaña's character and reputation for violence. The Government presented that evidence anyway and drew the jury's attention to it in closing argument.

146. Trial counsel moved in limine to exclude portions of the preliminary hearing transcript of the Fairfax homicide accomplices' California court case. Specifically, counsel objected to, as being unfairly prejudicial and lacking an appropriate reliable foundation, detectives' hearsay testimony about the accomplices' opinions of Mr. Umaña's character and reputation for violence. CR 1002 at 1-2. The District Court granted the motion on the alternative ground that the transcript was cumulative because the detectives who investigated the Fairfax homicides, Det. Parshall and Det. Telis, were available for live testimony. PPT at 72-79.

147. Later, outside the jury's presence, the Government proffered similar evidence that Fairfax accomplices Arevalo ("Moe") and Ramos ("Chipis") refused to testify in the penalty-selection phase due to their alleged opinions of Mr. Umaña's character and reputation for violence, and their alleged fear of retaliation. *But see* Appx. 76 (FBI analyst described Mr. Umaña reaching out to Ramos as a call to help based on an old friendship and specifically not a threat). The Court sustained counsel's objection to this evidence, finding that the detectives' hearsay testimony about the accomplices' alleged fear and opinions of Umaña was not as reliable as the detectives' hearsay testimony about the accomplices' statements describing the Fairfax homicides, and that the hearsay opinion evidence was irrelevant and "more unfairly prejudicial than probative." PPT at 235-36, 242-44.

148. The Government then asserted it would "elicit this information in another way" later in the proceeding, without specifying or proffering how the Government intended to elicit this "unfairly prejudicial" evidence. PPT at 236. The Government later submitted into evidence the transcript of Arevalo's interrogation by Det. Parshall and Det. Telis, in which Arevalo repeatedly gave his opinion about Mr. Umaña's character and reputation for violence: Umaña "is like the kind of guy that if you say something, he'll probably shoot you too"; "he's real into the devil"; "he must do that [shootings] because that's what he was brought over here to do"; when another accomplice acted nervous after the shooting, Umaña "told him, 'Don't be a pussy'"; he would not "hesitate" or "think about it" "twice" before doing something to you. Arevalo even indicated that Umaña would try to retaliate by killing his whole family:

00010615

scanned

know why he did that, man.

DETECTIVE PARSHALL: Uh-huh.

DETECTIVE TELIS: Uh-huh.

DETECTIVE PARSHALL: Yeah, he --

RENE AREVALO: I mean, he's just -- I mean, the things that they are, like, the way they are in El Salvador -- it's like, that's why I was scared to go to El Salvador too right now when they were trying to deport me because these guys don't -- don't, I mean, they'll kill your whole family if they have to, you know, that's what I'm telling you.

DETECTIVE PARSHALL: Where is he now? How can we get him?

RENE AREVALO: I don't know, sir. The thing is I

PPT at 930; Gov. Ex. 518 at Bates 10558-59, 10598-99, 10615, 10619-20, 1067.

62

149. Arevalo's statements to the detective about Mr. Umaña's character and reputation for violence were self-serving and unreliable, as he used his alleged fear of Mr. Umaña to explain and excuse his role in the Farifax homicides and to avoid deportation: his fear and opinion of Mr. Umaña were the reasons he claimed he participated in the confrontation in the first place, drove Umaña from the Fairfax scene, and failed to report the incident or aid police in their investigation. Arevalo's self-serving statements suffered the same reliability problems the District Court identified in its earlier ruling, and were irrelevant and "more unfairly prejudicial than probative." *Cf.* PPT at 235-36, 242-44.

150. The Government committed misconduct in presenting this constitutionally unreliable evidence of Mr. Umaña's character and reputation, particularly in light of the District Court's explicit ruling that it could not present the exact same evidence in a different manner. PPT at 235-36, 242-44. Counsel unreasonably failed to object, ask for redaction to comport with the Court's earlier ruling on this issue (PPT at 235-36, 242-44), or otherwise raise the issue with the court or on appeal.

151. The failure to exclude or redact prejudiced Mr. Umaña. In rebuttal closing, the Government implored jurors to read the interrogation transcripts of the Fairfax accomplices, including Arevalo's, because they repeatedly commented on Mr. Umaña's character and reputation for violence: "And they're like, man, I don't want to talk about him. I do not want to talk about him. Read those transcripts. I don't want to talk about Wizard. That dude is a killer. They were scared." PPT at 894. *See also* PPT at 898 ("You read it in those letters. Wonder why Moe and Chipis aren't here? Do you wonder? Do you wonder why they weren't here? You saw it in those letters. One of them got beaten up on order of this defendant."); *but see* Appx. 112, ¶49, p. 11 (Declaration of Luis Ramos denying that Mr. Umaña ordered his beating). Jurors had access to

the entire Arevalo interrogation transcript during deliberations. PPT at 819, 929-30, 943-44 (Court instructs jury it can review exhibits during deliberations, and released Gov. Ex. 518 to jury). The prejudice to Mr. Umaña was severe, as the Government alleged multiple non-statutory aggravators bearing on his alleged dangerousness and reputation for violence. CR 1048-1051 (aggravators ##1, 3, 4). Without the improper evidence--unreliable opinion about Umaña's character and reputation indicating that even other gang members were frightened of him --there's a reasonable probability that at least one of the jurors would have returned a verdict less than death.

### 3. False information about the Fairfax and Lemon Grove investigations was presented to the jury through Mr. Umaña's unredacted interrogation transcript.

152. During their April 23, 2008 interrogation, Det. Flores and Det. Parshall repeatedly lied to Mr. Umaña, falsely stating that the evidence against him was much stronger than it actually was. The Government submitted a transcript of this interrogation into evidence, without clarifying or correcting the detectives' repeated false statements, and without defense objection. The full transcript was submitted into evidence, and released to the jury for review during deliberations. PPT at 220; Gov. Ex. 522; PPT at 220, 819, 929-30, 943-44.

153. During deliberations, jurors had no way of cross-referencing the (false) information in this transcript exhibit, which they had full access to in the deliberation room, with the testimony actually presented in court. *Compare* PPT at 819, 929-30, 943-44 (Court instructs jury it can review exhibits during deliberations, and releases Gov. Ex. 522 to the jury for review), *with* GPT at 1273-74 (Court denies jury's request to review testimony of in-court witnesses and instructs jurors to rely on their recollection of the witnesses' testimony instead).

154. The detectives' false statements were the definition of unconstitutionally unreliable information. *See Napue*, 360 U.S. at 269 (false information presented to the jury which goes

uncorrected violates due process). There's a reasonable probability the detectives' false statements in the transcript affected jurors' deliberations.

155. Regarding Fairfax, the detectives repeatedly falsely told Mr. Umaña that bystanders or eye-witnesses (and not just the accomplices) identified him as the shooter. Gov. Ex. 522 at 6, 39-40, 73, 112, 143-44. In reality, only accomplices implicated Mr. Umaña as the shooter, and only after those accomplices had been arrested and threatened with being charged as the shooter themselves. The detectives also falsely told Mr. Umaña that the victims were both juveniles ages 16 and 17 (*id*. at 68), when their actual ages were 17 and 20. (Gov. Exs. 523, 525).

156. Regarding Lemon Grove, the detectives repeatedly falsely told Mr. Umaña that an accomplice named "Sin" talked to the detectives and implicated Umaña in the shooting. Gov. Ex. 522 at 167, 171, 181-82, 207. The detectives repeatedly falsely told Mr. Umaña that bystanders or eye-witnesses at Lemon Grove Park also identified him as the shooter (Gov. Ex. 522 at 160-62, 170-71, 212, 226-27), and that other people verified he was there (Gov. Ex. 522 at 186). In reality, the Government's evidence consisted of victim Freddy Gonzales tentatively identifying Umaña and multiple other people (Gov. Exs. 506, 507; 2255 Motion Claims 5 & 6 (Doc. 24, Pet. at 128-36, 177-80)); and ballistics evidence linking a .22-caliber casing from the Lemon Grove Park scene to two .22-caliber casings found at the Fairfax Avenue scene.

157. There's a reasonable probability the detectives' false statements contained in the interrogation transcript contributed to the verdict, and without the statements, the verdict would have been different. The prosecution committed misconduct in presenting this exhibit to the jury and in failing to correct or redact the false facts contained therein; and counsel were ineffective in failing to demand redaction or otherwise raise this issue with the court or on appeal.

65

### 4. Detectives' opinions--including the Government's "gang expert"--as to Umaña's guilt, veracity, and character and reputation were presented to the jury.

158. During their April 23, 2008 interrogation, Det. Flores and Det. Parshall repeatedly stated their opinions as to Mr. Umaña's veracity and culpability in the Farifax and Lemon Grove homicides. *See, e.g.*, Gov. Ex. 522 at 32-33, 38, 45, 47, 59, 69, 105, 110-12, 125-26, 165, 174, 211-12, 228, 230, 233. *Cf. Umaña*, 750 F.3d at 349-50 (on direct appeal in this case, counsel litigated a related claim that detectives' statements in Umaña's interrogation transcript constituted "improper government vouching"). The detectives also repeatedly commented on Mr. Umaña's character and reputation: "They all were afraid of you. They all had respect for you because you were good with the gun"; "People talk about him. He's a legend"; "[Y]ou know, and I know he's done stuff in El Salvador"; "I know you have a reputation"; "We know that he's wanted in El Salvador . . . for many violent crimes"; "And we know about … about your past, your time in El Salvador that they were looking for you for homicide." Gov. Exs. 522 at 44, 58-60, 167, 176.

159. The full transcript was submitted into evidence, and made available and released to the jury during deliberations. PPT at 220; Gov. Ex. 522; PPT at 220, 819, 929-30, 943-44. Jurors had no way of cross-referencing the information in this transcript exhibit, which they had full access to in the deliberations room, with the testimony actually presented in court. *Cf*. GPT at 1273-74 (Court denies jury's request to review transcripts of testimony of in-court witnesses and instructs jurors to rely on their recollection of the witnesses' testimony instead).

160. While both the detectives' opinions reasonably likely carried much weight with jurors, Det. Flores's opinion reasonably likely carried additional weight, as the Government offered, and the Court had accepted, him as a "gang expert," who could "render opinions on La Mara Salvatrucha, including its history, structure, rules and organization." GPT at 30-32. *United States v. Mejia*, 545 F.3d 179, 192 (2d Cir. 2008) (DEA agent's status as expert witness was "likely

66

to give his factual testimony an 'unmerited credibility' before the jury"). Far from merely translating, moreover, Det. Flores played an active role in inserting his opinion into the interrogation.

161. There's a reasonable probability the detectives' false statements contained in the interrogation transcript contributed to the verdict, and without the statements, the verdict would have been different. The prosecution committed misconduct in presenting this exhibit to the jury and in failing to correct or redact the false facts contained therein; and counsel were ineffective in failing to demand redaction or otherwise raise this issue with the court or on appeal. Relief is required.

**36. THE GOVERNMENT'S USE OF COMMUNICATIONS BETWEEN MR. UMAÑA AND THE EL SALVADORAN CONSULATE AGAINST MR. UMAÑA DURING THE PRETRIAL AND CAPITAL TRIAL PROCEEDINGS VIOLATED THE VIENNA CONVENTION AND THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

162. The allegations in this claim relate back to the legal and factual averments of Claims 3, 5, 6, 7, 8, 10, 12, 26, and 30 of the initial 2255 Motion.

163. In support of its claim that Mr. Umaña is not intellectually disabled, the Government introduced and relied on correspondence Mr. Umaña sent to the El Salvadoran Consulate as a basis for the absence of intellectual and adaptive deficits. *E.g.*, *Atkins* Hearing. 11/30/09 at 319 (Government expert Suarez relying on statements Mr. Umaña made regarding Consular communications); *id.* at 321 (Suarez relying on Mr. Umaña's communication with Consulate); *id.* (Suarez relying on contents of letter Mr. Umaña sent to Consulate); *id.* at 328 (Suarez relying on contents of letter to Consulate to determine testing results).

164. The Government also introduced and relied on Mr. Umaña's communication with the El Salvadoran Consulate in support of its theory of guilt. *E.g.,* GPT at 600 (introduction of Mr. Umaña's letter to Consulate (Gov. Ex. 151) during testimony of Susan Conrad); 960-61

67

(Government indicating admission of the contents of Gov. Ex. 151 in evidence as a standard for handwriting comparison);[2] *id.* at 982-83 (introduction of another letter to the Consulate (Gov. Ex. 235) during testimony of Forensic Document Examiner Jeffrey Taylor); *id.* at 1037-38 (Court and counsel discussion of the letter to the Consulate in determining its admissibility); *id.* at 1058 (Court discussion of the contents of Exhibit 151 in regards to admissibility).

165.    As described in the Motion, the Vienna Convention on Consular Relations (VCCR), binding on the Government at the time of Mr. Umaña's trial (*see* U.S. CONST. Art. VI, cl. 2), confers certain rights on foreign nationals.  Doc. 24 at 355-359.  A critical right afforded detained foreign nationals is the right to meaningful communications with the consulate.  VCCR Art. 36 (1)(a); *id.* Art. 36(2) (directing that states "must enable full effect to be given to the purposes for which the rights accorded under this Article are intended").

166.    The purpose of the provisions in Article 36 is to "facilitat[e] the exercise of consular functions relating to [foreign] nationals."  *Id.* Art. 36 (1).  The VCCR also provides that "official correspondence of the consular post shall be inviolable." VCCR Art. 35 (2).  *See also* VCCR Art. 33 ("The consular archives and documents shall be inviolable at all times and wherever they may be").  The VCCR defines "official correspondence" as "all correspondence relating to the consular post and its functions," *id.* Art. 35 (2), and specifically provides that protecting its citizens in a foreign state is a critical consular function.  *Id.* Art. 5 (a).  The VCCR requires that "[a]ny communication addressed to the consular post by the person arrested, in prison, custody or

---

[2] The Government used these letters as the baseline for Mr. Umana's handwriting as opposed to moving for handwriting exemplars as it did in the co-defendants' case. *See United States v. Lopez, et al*, 3:08-CR-134-RJC, Doc. 717 (Government's Motion for an Order Compelling the Pretrial Production of Handwriting Exemplar); *id.* Doc. 727 (Order granting the Government's motion to compel handwriting exemplars).

detention *shall also be forwarded by the said authorities without delay.* *Id.* Art. 36 (1)(b) (emphasis added). *See also Osagiede v. U.S.*, 543 F.3d 399, 402 (2008).

167. Recognizing the "chilling effect on the foreign national's ability to communicate freely with the consular officer about issues that go to the core of consular assistance," the State Department specifically advises law enforcement that, absent any security concerns, consular communications should be private and unmonitored. US Dept. of State, CONSULAR NOTIFICATION AND ACCESS at 34 (3rd Ed. 2010). Likewise, the Federal Bureau of Prisons (an agency of the Department of Justice) designates mail to or from the Consulate as "Special Mail" (28 C.F.R. § 540.2(c)) that can only be inspected in the presence of the inmate and "may not be read or copied." 28 C.F.R. § 540.18(a). Having established specific procedures surrounding the preservation of meaningful Consular communications, the Government's failure to follow those procedures violates federal due process. *E.g., Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures)

168. Similarly, an accused has an absolute Fifth Amendment right against self-incrimination. *See Maness v. Meyers*, 419 U.S. 449, 461 (1975) ("This Court has always broadly construed [the Fifth Amendment's] protection to assure that an individual is not compelled to produce evidence which later may be used against him as an accused in a criminal action") (citations omitted); *see also id.* ("The protection does not merely encompass evidence which may lead to criminal conviction, but includes information which would furnish a link in the chain of evidence that could lead to prosecution"); *Brown v. Walker*, 161 U.S. 591, 596-97 (1896); *Miranda v. Arizona*, 384 U.S. 436, 458-63 (1966). Furthermore, the Eighth Amendment requires heightened procedural safeguards in capital cases. *See, e.g., Beck v. Alabama*, 447 U.S. 625

69

(1980); *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987).

169.    Mr. Umaña was in the custody and control of the Government at the time the letters were sent to the Consulate.  He had no other manner of sending a letter to the Consulate other than through the prison mail system.  After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the Government instructed prison officials to delay forwarding communications between Mr. Umaña and the Consulate, copy those communications and turn those copies over to the prosecution despite the absence of any security basis for doing so.  As a result, the Government was able to provide those letters to its mental health and forensics experts to develop evidence against Mr. Umaña.

170.    In short, the Government capitalized on Mr. Umaña's custodial status and his status as a foreign national to compel Mr. Umaña to incriminate himself.  The Government's complete disregard of its treaty and constitutional obligations to preserve meaningful communications between Mr. Umaña and the Consulate for the sole purpose of developing evidence against Mr. Umaña violated federal Due Process, the Fifth Amendment right to be free from self-incrimination and the Eighth Amendment heightened procedural safeguards required in capital case.

171.    As described above, the contents of the letters formed the basis of opinions offered by Dr. Suarez with regard to Mr. Umaña's adaptive and intellectual skills during the *Atkins* hearing. The Court relied on the letters and Dr. Suarez's opinions arising from those letters in reaching its conclusion that Mr. Umaña is not Intellectually Disabled.  CR 934 at 8.  Also as described above, at trial, these letters formed the basis for forensic document expert opinions as support for the Government's contention that Mr. Umaña was the author of other letters offered as evidence in

support of the Government's theory of guilt. Accordingly, prejudice is demonstrated and relief is required.

172. Counsel's failure to raise and litigate these claims at trial and on direct appeal constitutes prejudicially deficient performance in violation of the Sixth and Eighth Amendments. Effective counsel, having learned that the Government had provided Dr. Suarez with communications obtained in violation of the VCCR and the Fifth and Eighth Amendments and that Dr. Suarez relied on those communications in reaching his opinion that Mr. Umaña did not meet the requirements for Intellectual Disability, would have moved to preclude Dr. Suarez's testimony. As there is a reasonable probability that, had counsel performed effectively, the results of the *Atkins* hearing would have been different, prejudice is demonstrated and relief is required.

173. Similarly, effective counsel, having learned that the government forensic document experts relied on communications obtained in violation of the VCCR and the Fifth and Eighth Amendments, would have moved to preclude the admission of the letters as well as the expert opinions relying on those communications. The issue of authorship of letters formed a critical part of the Government's case against Mr. Umaña. As there is a reasonable probability that, had counsel performed effectively, the results of the trial would have been different, prejudice is demonstrated and relief is required.

174. Counsel's failure to fully raise and litigate the constitutional violations arising from the Government's violation of the VCCR and the Fifth and Eighth Amendments on appeal also constitutes prejudicially deficient performance in violation of the Sixth and Eighth Amendments. As there is a reasonable probability that, had counsel raised these issues the results of the appeal would have been different, prejudice is demonstrated and relief is required.

**37.**





Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 79 of 221



75



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 81 of 221



77



78



79

Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 84 of 221



80



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 86 of 221



82



83



84



[black redaction bars]

**38. COUNSEL'S FAILURE TO MOVE FOR THE TRIAL JUDGE'S RECUSAL DUE TO HIS PRIOR PROFESSIONAL ROLE AS UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF NORTH CAROLINA VIOLATED MR. UMAÑA'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

207. The allegations in this claim relate back to the legal and factual averments of Claims 4, 5, 6 , 7, 9, 10, 11, 12, 27, and 29 of the initial 2255 Motion.

    A. **While the Trial Judge was the United States Attorney for the District, the Government Initiated the Investigation that Culminated in this RICO Prosecution.**

208. The Trial Judge served as the United States Attorney for the Western District from October 2001 to June 2004. Appx. 210. The RICO conspiracy alleged by the Government began in 2003, *see* CR 3, and the Government's evidence at trial included testimony regarding MS-13 activity in Charlotte as early as June 2003. GPT at 2-7; Gov. Ex. 1.

209. The Trial Judge was the United States Attorney when MS-13 emerged as a criminal threat in Charlotte, and was the United States Attorney when the federal government began collaborating with local police to combat this problem and both local and federal offices created dedicated gang units. *See*, *e.g.*, Gangs of Charlotte: Their Numbers are Growing, More are Armed: A New Police Unit Gets More Work. Is it Enough?, Charlotte Observer, Oct. 5, 2003, 2003 WLNR 3062697; Police Unit Created to Combat Gangs' Growth; Issue Linked to About 100 Violent Offenses, Charlotte Observer, June 14, 2003, 2003 WLNR 3038835; Police Link Gang Slayings Suspects Charged in 4 Mecklenburg Killings Since April At Least 6 Additional Murders Also Connected, Internal Memo Says, Charlotte Observer, May 31, 2003, 2003 WLNR 3074667.

86

Specifically, the new gang unit formed by federal prosecutors and announced by United States Attorney Conrad was described by the press to "include agents from the FBI, the Charlotte-Mecklenburg Police Department, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Drug Enforcement Administration, the Department of Homeland Security's Immigration and Customs Enforcement, the State Bureau of Investigation and the Mecklenburg district attorney's office." Federal Gang Unit Formed to Fight Crime in Charlotte; Tougher Laws to be Used to Combat Organizations, Charlotte Observer, Nov. 13, 2003, 2003 WLNR 3061243. CMPD Sgt. Beth Boggess, head of CMPD's newly created gang intelligence unit, "said the federal unit will focus not only on the gang leaders and those committing crimes but on entire gang structures and their operations." *Id.*

210. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the investigation of this RICO conspiracy began when the trial judge was the United States Attorney. Upon information and belief, based on records provided in pretrial discovery, the federal government began investigating this RICO conspiracy as part of Operation Fed Up, which in June 2003 and October 2004 targeted members and associates of MS-13. Gang Sweep in City Nets 62 Suspects: Federal Agents, Police Conduct Crackdown Against Street Violence, Charlotte Observer, Oct. 8, 2003, 2003 WLNR 3066465; Anti-Gang Campaign Pays Off in Crime Drop Less Violence Attributed to Key Gang Following Multi-Agency Sweep, Charlotte Observer, Oct. 3, 2004, 2004 WLNR 3274074.

211. As CMPD Detective Tim Jolly explained at Mr. Umaña's co-defendants' trial, "Operation Fed Up" was an operation involving "Immigration Custom Enforcement, ATF, and our department," "where we targeted foreign born gangs that were operating in and around the Charlotte area . . .." *Unites States v. Rosales-Lopez, et al*, 3:08-cr-134, Doc. 1072 at 10. Law

87

enforcement "started gathering intelligence on these gang members. And we targeted them . . . in October 2003, we did a full scale operation where we arrested, either on immigration violations, state warrants, or federal firearm violations, 63 gang members in and around the Charlotte area. *Id*. A second operation was conducted in 2004. *Id*. at 10-11.

212. Operation Fed Up I & II targeted at least three of the defendants in this RICO case. Manuel DeJesus Ayala ("Chacua") "was one of the targets we were looking for and arrested in 'Operation Fed Up.'" *United States v. Rosales-Lopez, et al*, 3:08-cr-134, Doc. 1072 at 11. CMPD Detective Hastings testified at Mr. Umaña's trial that he came across Manuel Ayala "right around 2003. He escaped the initial Fed Up roundup." GPT at 755-56. However, Hastings saw him again not "long after that. He was picked up on a state charge and he was deported for that charge." *Id*. at 756. ICE Agent Jose Romero testified in the codefendants' trial that codefendant Elvin Pastor Fernandez Gradis "was arrested by the local Charlotte ICE office on October 30th, 2004. Along with the assistance of CMPD, the ATF, along – during an operation we call 'Fed Up', which was dealing with gang members here in the country illegally." *United States v. Rosales-Lopez, et al*, 3:08-cr-134, Doc. 1077 at 1067-68.

213. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the investigative groundwork for these operations was laid months in advance. For example, documents in the pretrial discovery indicate that, on June 18, 2003, records of Manuel Ayala and Nelson Hernandez-Ayala's arrests by CMPD for gang-related graffiti at a local Blockbuster were faxed from the Charlotte Group I of the Bureau of Alcohol, Tobacco and Firearms to Immigration and Customs Enforcement. Appx. 144, Appx. 148, Appx. 125, Appx. 147, Appx. 126. The receipt of these CMPD records from the ATF appears to have prompted

additional ICE investigation of the two men, as there are additional investigative documents in the ICE file that were generated on June 18.  Appx. 145, Appx. 146.

214.   In addition to these investigations leading to deportation, Mr. Umaña expects to demonstrate, following full discovery and an evidentiary hearing, that there were additional investigations and/or arrests of his RICO co-defendants, as a result of joint local, state, and federal investigation, that occurred during the Trial Judge's tenure as the United States Attorney.  For example, the pretrial discovery indicates that RICO codefendant Carlos Figueroa Pineda was arrested for narcotics possession on February 13, 2004, following a CMPD knock and talk at an address from which a known MS-13 member had been deported during Operation Fed Up.  Appx. 115.  In addition, as part of "Operation Los Treces," the ATF, North Carolina State Bureau of Investigation, and CMPD Violent Crime Task Force were jointly investigating RICO co-defendant Mario Guarjardo-Garcia (under the alias Iran Guerrero-Gomez) as early as April 8, 2004.  *See* Doc. 623 Third Superseding Indictment at ¶23b-e; Appx. 143.  Finally, pretrial discovery indicates that the ATF was developing sources, information from whom it would share with CMPD, *see* Appx. 117, and actively monitoring radio traffic to protect those sources (regarding whom CMPD would take ATF direction).  Appx. 114; Appx. 116.

### B.  Controlling Precedent Requires Judicial Recusal Under These Circumstances.

215.   28 U.S.C. § 455(a) requires that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned."  28 U.S.C. § 455(b) further provides that any judge "shall also disqualify himself under the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . (3) Where he has served in governmental employment and in such capacity

participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy . . ..”

216. Likewise, due process requires an unbiased tribunal. The question is “not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, ‘the average judge in his position is ‘likely’ to be neutral, or whether there is an unconstitutional ‘potential for bias.’” *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. 868, 881 (2009)); *see also Tumey v. Ohio*, 273 U.S. 510, 532 (1927); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 822 (1986). This due process requirement takes on even greater significance in a capital case such as this, because of the Eighth Amendment’s heightened due process requirements. *E.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

217. As the United States Supreme Court recently recognized in *Williams*:

> No attorney is more integral to the accusatory process than a prosecutor who participates in a major adversary decision. When a judge has served as an advocate for the State in the very case the court is now asked to adjudicate, a serious question arises as to whether the judge, even with the most diligent effort, could set aside any personal interest in the outcome. There is, furthermore, a risk that the judge “would be so psychologically wedded” to his or her previous position as a prosecutor that the judge “would consciously or unconsciously avoid the appearance of having erred or changed position.” *Withrow*, 421 U.S., at 57, 95 S.Ct. 1456. In addition, the judge’s “own personal knowledge and impression” of the case, acquired through his or her role in the prosecution, may carry far more weight with the judge than the parties’ arguments to the court. *Murchison*, supra, at 138, 75 S.Ct. 623; *see also Caperton, supra*, at 881, 129 S.Ct. 2252.

*Williams*, 136 S. Ct. at 1906. The Court further held that “The involvement of multiple actors and the passage of time do not relieve the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences that his or her own earlier, critical decision may have set in motion.” *Williams*, 136 S. Ct. at 1907.

218.   In this case, based on the facts described in Section A, after full discovery[5] and an evidentiary hearing, Mr. Umaña expects to demonstrate that this RICO prosecution was the culmination of a continuous investigation that began in 2003 or earlier involving the same pattern of criminal activity by the MS-13 clique led by Manuel Ayala, many of the same alleged conspirators, and many of the same law enforcement agents.  Under these circumstances, recusal was required under the statutory and constitutional law described above.

### C.  Relief Is Required.

219.   Claims of judicial disqualification constitute structural error that can be raised at any time during the proceedings.  *Fowler v. Butts*, 829 F.3d 788, 794-95 (7th Cir. 2016) (citing *Williams* and *Nguyen v. United States*, 539 U.S. 60 (2003); overruling prior circuit precedent); *but see United States v. Owens*, 902 F.2d 1154 (4th Cir. 1990) ("Timeliness is an essential element of a recusal motion.", specifically addressing 455(a)); *Kolon Industries v. DuPont*, 748 F.3d 160, 168 (2014) (extending *Owens* to recusal motions under 455(b)).

220.   However, if this Court finds that Mr. Umaña's counsel were required to raise this claim earlier, all prior counsel were ineffective.  There can be no reasonable strategic basis for counsel's failure to raise, investigate, and litigate this claim when the investigation that culminated in this RICO prosecution began when the Judge was the United States Attorney.  Relief is required.

**39.   THE IMPOSITION OF THE DEATH PENALTY ON ALEJANDRO UMAÑA WAS BASED ON RACE AND GEOGRAPHY, TWO CONSTITUTIONALLY-IMPERMISSIBLE SENTENCING FACTORS, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

221.   The allegations in this claim relate back to the legal and factual averments of Claim 25 of the initial 2255 Motion.

---

[5] To the extent that Mr. Umaña requires additional facts to fully prove this claim, those facts are in the unique possession and control of the Government.

222. It is well-established that the Government may not base its decision to seek the death penalty on a defendant's race. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986); *McCleskey v. Kemp*, 481 U.S. 279, 291-98 (1987).

223. Mr. Umaña expects to demonstrate, following full discovery and an evidentiary hearing, that the death penalty was sought and imposed on the basis of Mr. Umaña's race and national origin, because, among other reasons, the Government's use of RICO to prosecute street gangs is based on racial bias. Despite the broad reach of RICO to apply to any organization regardless of race and ethnicity, an empirical study shows that that over 80% of the prosecuted gangs and individuals under RICO are tied to one or more racial minority group. *See* Jordan Blair Woods, Systemic Racial Bias and RICO's Application to Criminal Street and Prison Gangs, 17 Mich. J. Race & L. 303, 335 (2012). Hispanics account for the highest percentage of prosecuted racial/ethnic groups. *Id*.

224. This is in part due the creation of transnational anti-gang units, which form partnerships between local, state, and federal law enforcement agencies and Immigration and Costumes Enforcement (ICE) and focus resources on the immigrant Hispanic communities. *See* Gangs and Crime in Latin America, Hearing Before the Subcomm. on the W. Hemisphere of the H. Comm. on Int'l Relations, 109th Cong. 22-25 (2005) (testimony of John P. Torres, Deputy Assitant Director, Human Smuggling and Public safety Division, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security) (describing Operation Community Shield, one such partnership, as a response to problems concerning "alien gang crime" in the United States); *see also* Claim 38. The focused resources combined with the broad application of RICO have allowed for sweeping arrests of alleged gang members and gang affiliates in immigrant communities. Moreover, RICO's focus on the criminal activity of the group enterprise, as opposed

92

to the criminal activity of the individual, allows law enforcement and the prosecution to group people based on similar behaviors based on culture, historic origins, and geographic considerations.

225. The use of RICO to target "alien gang criminals" not only allows the Government to prove the element of an "enterprise" but creates a dangerous theme of the American jury versus the foreign invader. That is precisely what happened in Mr. Umaña's case. The prosecution used the enterprise/gang's ties to El Salvador as a justification for the death penalty, stating:

> You need to be ready for some American justice. *You want to bring El Salvador here, you want to bring your gang from El Salvador here,* you want to kill us, you want to live your crazy life here, well, you'd better be *ready for some American justice if you're going to do it.*
>
> And that's why you're here. You tell them – you think MS is listening? You think they're watching? What are they going to say when all this is over? When you've made your decision? Justice in this case is not prison.

PPT at 899 (emphasis added).[6]

226. That improper argument was by no means isolated. For example, the gang's connection to El Salvador allowed the government to demonize the very fact that Mr. Umaña was from there: "If his life in El Salvador was as bad as they painted it, prison looks good. It's clean. Dental, healthcare, meals, the commissary. Like Dr. Cunningham said, if he's good -- he's going

---

[6] Despite evidence showing that the MS-13 gang was created in the United States and became transnational with the deportation of several of its members, the prosecution seemed to emphasize the role of El Salvador above all else. Interestingly, several of the MS co-defendants joined the gang as children while living in the United States. *See United States v. Heverth Ulises Castellon*, 3:08-cr-134-3 Doc. 1293 at 117, 119; *United States v. Cesar Yoaldo Castillo*, 3:08-cr-134-15, 12/21/2010 at 18-19; GPT at 621-23 (Rony Lopez); *United States v. Rosales Lopez, et al*, 3:08-cr-134, Doc 1074 at 325 (Juan Vela-Garcia came to the US as baby and joined in the US as an adult).

93

to be good. You know why? Because he wants to make sure he gets his beans and potato chips." PPT at 903.[7]

227. The government again encouraged death because of national origin and immigration status by comparing Mr. Umaña's undocumented status to that of one of the victims. PPT at 893. Manuel Garcia "came to the United States. And he built a life. *And he came back and he made it legal*. How much different is Manuel's story than this defendant's?" *Id*. (emphasis added). The improper purpose of this statement was reinforced by the government omitting any reference to the undocumented status of the other victim, Ruben Garcia.

228. Because Mr. Umaña's death sentence was sought and imposed based on racial bias it cannot stand. To the extent counsel should have raised these issues regarding race and geography at trial or on direct appeal, counsel's failure to raise such issues constitutes ineffective assistance of counsel. Relief is required.

**40.** **THE GOVERNMENT PRESENTED UNCONSTITUTIONAL VICTIM IMPACT EVIDENCE, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS; COUNSEL WERE INEFFECTIVE.**

229. The allegations in this claim relate back to the legal and factual averments of Claims 8, 10, 11, 12, 25, and 27 of the initial 2255 Motion.

230. Counsel ineffectively failed to object to unconstitutional victim-impact evidence and argument, make a record of participants' demeanor, and otherwise litigate these issues on direct

---

[7] Had Mr. Umaña been a black man from a black gang, the jury may have heard: "If his life in in the black ghetto was as bad as they painted it, prison looks good. It's clean. Dental, healthcare, meals, the commissary. Like Dr. Cunningham said, if he's good -- he's going to be good. You know why? Because he wants to make sure he gets his fried chicken and potato chips."

appeal.  Had counsel objected, made a record, and fully litigated these issues at trial and on appeal, there is a reasonable probability of a different outcome at the penalty phase or appeal.

### A.  The Law.

231.  The Eighth Amendment does not *per se* prohibit evidence about the victim and the impact of the murder on the victim's family. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991).  But admission of such evidence violates due process when it is so "unduly prejudicial" that it renders the sentence fundamentally unfair. *Id.* at 825.  Victim impact evidence is admissible to give the jury a "glimpse" of the victim's life, *id.* at 822, but should constitute only a "quick" glimpse, *id.* at 830 (O'Connor, J., with whom White and Kennedy, JJ., join, concurring).  The Eighth Amendment prohibits, however, "admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence."  *Id.* at 830 n.2 (majority opinion); *see also Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam).

232.  The Eighth Amendment also requires clear standards to channel the exercise of discretion at all stages of the process.  *Zant*, 462 U.S. at 877.  Aggravating factors must not be unconstitutionally vague, overbroad, or standardless.  *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (citing *Arave v. Creech*, 507 U.S. 463, 471 (1993)); *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).

### B.  The North Carolina and Los Angeles Victim-Impact Evidence Violated the Eighth Amendment and Due Process.

233.  The Government violated these mandates by eliciting the Garcia Salinas family's "characterizations and opinions . . . about the crime [and] the defendant."  *Bosse*, 137 S. Ct. at 2; *Payne*, 501 U.S. at 830 n.2.  The Government elicited testimony from Jean Garcia (Manuel's wife and Ruben's sister-in-law), reading from a prepared victim-impact statement, in which she opined that the offense was a "senseless act" and "one act of senseless violence."  She also relayed another

family member's opinion of Mr. Umaña: "Now Ruben and Manuel's father is a broken man. He told me all he can do now is pray to God each day that Alejandro Umana does not hurt someone else." PPT at 388, 390-91. Elizabeth Garcia (Manuel's oldest daughter and Ruben's niece) also read from a prepared statement, in which she opined that her father had died due to Umaña's "senseless actions." PPT at 401.

234. The Government knew or should have known that its victim-impact witnesses would testify to these opinions, as it had previously represented to the Court that it would "appropriately advise any victim impact witnesses regarding such statements." CR 504 at 6. *See also* CR 999 at 6 (Court's Order that: "[T]he government recognizes that victim impact testimony giving an opinion of the defendant, the crime, or the appropriate punishment would be improper, and the government will advise its witnesses against making such statements.").

235. The Government then capitalized on this improper evidence in closing, by arguing to jurors that these were senseless killings that meant nothing to Umaña; the family's tears weighed on the scale toward a death verdict; unless a death verdict was returned, Umaña would hurt or kill again, "if it serves his needs, he's going to do it again"; "And you give this family and you give this community justice." PPT at 824-25, 827, 833-35, 889, 902, 904.

236. Moreover, the Government also relied on this improper evidence to draw an inappropriate comparison between the victims and Mr. Umaña. The Government portrayed Manuel and Ruben Garcia as "good immigrants" from Mexico. Manuel lived in the country under documented status, worked lawfully, and paid taxes. He married his high school sweetheart (a White woman from North Carolina), had two kids, and was a hard-working skilled brick-layer and contractor. Ruben was "a good man who had a young son." PPT at 385, 389, 822-23. Additionally, although his testimony was entirely cumulative of Manuel's wife's and daughters',

the Government also called as a witness Douglas Friend, a White, Non-Hispanic general contractor to convey through both his mere presence and word that the brothers were the good kind of immigrants. Mr. Friend had hired Manuel and his crew for several construction jobs. Friend provided cumulative testimony that: Manuel was friendly, reliable, and did good work; that he and Manuel had even exchanged gifts before; and that Ruben was also a good worker PPT at 380, 383.

237. Mr. Umaña, in contrast, was an unwanted, undocumented immigrant from El Salvador. He survived violent protracted civil wars that destabilized the region; entered the U.S. illegally; thrived, by the Government's theory, in Los Angeles gangland; preferred beans and burritos to work and remorse; and was merely a gangster and shank-maker. PPT at 826, 828-30, 836, 897-98, 902. The Government repeatedly minimized, and argued that the jury should ignore, the traumas and dysfunction Umaña had suffered: "[B]y every account . . . he had a normal life [in El Salvador]." So send a message, the Government argued, that the community does not want him and those like him here. PPT at 836, 899, 904.

238. In addition, without notifying defense counsel of its intent to do so, the Government elicited victim-impact information about the Los Angeles homicide victims and argued that evidence in closing. The Government elicited testimony that Lemon Grove Park decedent Andy Abarca was "a nice person," not a gang member, who "was working in the real estate business," and was killed while playing basketball with friends, some of whom were very close to him and attended his funeral. PPT at 123, 128, 139. The Government capitalized on this non-noticed victim-impact evidence in closing argument: "Lemon Grove Park . . . [w]here Andy Abarca plays and lives and plays basketball. He's not a gang member. He's a real estate broker. And he was successful at it. . . . [But that] didn't matter to [Umaña] because wait a second, you had not respected me. And I came there to do a job." PPT at 830.

97

239.    Incorrectly, the Government also repeatedly argued that the Fairfax Avenue decedents were "a couple of kids," "[y]oung kids."  Actually, they were 20 and 17 years old.  PPT at 828; Gov. Exs. 523, 525.  (In contrast, the Government called Umaña "an adult when he joined the gang" at age 18. PPT at 591-592, 836.)  Again in closing, the Government argued that the decedents' individualizing qualities did not matter to Umaña.  PPT at 828-29.  This evidence and argument was completely irrelevant and inadmissible at Mr.  Umaña's penalty hearing as there is no legal basis for the admission of victim-impact evidence regarding the impact on victims of crimes used in aggravation, and its admission violated not only basic rules of evidence, but Mr. Umaña's Fifth, Sixth, and Eighth Amendment rights.

240.    By comparing Mr. Umaña's life to the victims', the Government erected an arbitrary formula whereby the jury should return a death verdict if it found the victims' lives worth more than Mr. Umaña's.  *See United States v. Johnson*, 713 F. Supp. 2d 595, 630-32 (E.D. La. 2010); *Hall v. Catoe*, 601 S.E.2d 335, 341 (S.C. 2004).  Such comparisons of relative worth violate the Eighth Amendment by injecting arbitrary and capricious value judgments into the sentencing decision.  *Cf. Hayden v. State,* 296 S.W.3d 549, 552 (Tex. Crim. App. 2009) ("evidence that draws comparisons between the victim and other members of society based on the victim's worth or morality should usually be excluded under Rule 403. This is true regardless of whether the evidence suggests that the victim was of greater or lesser worth than other members of society"); *Knight v. State,* 721 So.2d 287, 297 (Fla. 1998) (prosecutor's comments regarding value of defendant's and victims' lives were "clearly improper"); *State v. Carter,* 888 P.2d 629, 652 (Utah 1995) ("The worth of a human life is inestimable, and we do not condemn those who take life more or less harshly because of the perceived value or quality of the life taken."); *State v. Williams,* 550 A.2d 1172, 1202 (N.J. 1988) ("our law does not regard a crime committed against a particularly

virtuous person as more heinous than one committed against a victim whose moral qualities are perhaps less noteworthy or apparent. The law exists to protect all persons equally."). Unlike the situation in *Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005) (en banc), the Government here made this argument -- comparing the "good" immigrant to the "bad" immigrant – a central theme of its case for death. *See, e.g, Umaña*, 750 F.3d at 351-53 (finding Government's argument imploring the jury to administer "American justice" on Mr. Umaña to be improper).

241. The prejudice to Mr. Umaña was compounded by the Court's ruling that comparable defense evidence could not be considered as a mitigating factor. The Government's victim-impact witnesses testified at length about the family events that Manuel and Ruben Garcia would miss-- school graduations, birthdays, sporting events, weddings, and other milestones. *See generally* PPT at 377-404. Umaña, too, had a family that loves him; and he too was doomed to miss similar life events, either while incarcerated or executed. *See, e.g.*, 2255 Motion Appx. 12 ¶¶ 1, 15; Appx. 18 ¶¶ 24-25; Appx. 19 ¶ 18. A key rationale for the holding in *Payne* was the observation that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Payne*, 501 U.S. at 822. While the Court's ruling preventing counsel from presenting execution impact evidence may have been proper under circuit precedent, *see Umaña*, 750 F.3d at 355 (affirming denial of execution impact mitigator based on *United States v. Hager*, 721 F.3d 167, 194 (4th Cir. 2013)), it prejudiced Mr. Umaña's ability to respond to the Government's comparable, improper victim-impact evidence.

### C. The Victim-Impact Aggravator Was Unconstitutionally Vague and Standardless.

242. Mr. Umaña's death sentence also must be reversed because the jury was urged to find victim-impact aggravation in a clearly unconstitutional manner, and the aggravator was unconstitutional as applied in this case. The Government argued victim-impact evidence in a

manner that was so broad and standardless that it would apply in every homicide case, arguing that the victims' family members "poured their hearts out to you," so put their tears, sorrow, and grief on the weighing scale. PPT at 902.

243. The District Court also could not meaningfully guide jurors' consideration of this highly prejudicial evidence, and instead gave merely a tautological instruction: "As demonstrated by each victim's personal characteristics as an individual human being and the impact of the death upon the victim and the victim's family and friends, the defendant caused injury, harm and loss to Ruben Garcia Salinas and Manuel Garcia Salinas' family and friends." PPT at 905.

244. As such, the aggravator was unconstitutionally broad as applied and failed to provide a principled basis to distinguish between those defendants who were sufficiently morally culpable to justify imposition of death and other defendants who lacked that degree or moral culpability. *E.g., Godfrey*, 446 U.S. 420 (1980) (death penalty must "genuinely narrow" the class of defendants upon whom the death penalty may be imposed and provided a principled, objective basis for distinguishing between those defendants who should live and those who may be sentenced to die); *Clemons*, 494 U.S. 738 (1990). Thus, the near-universality of the applicability of victim-impact evidence rendered it an inappropriate factor in the penalty selection.

### D. Counsel Ineffectively Failed to Make a Record

245. Counsel ineffectively failed to make an adequate record of the trial proceedings to protect Mr. Umaña's rights to appellate and post-conviction review. The full prejudice of victim-impact evidence cannot be read from a cold transcript. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the courtroom atmosphere further contributed to the prejudice from the impermissible victim impact evidence and argument described above. Relief is required

100

**41. PROSECUTORIAL MISCONDUCT DURING ALL PHASES OF MR. UMAÑA'S CAPITAL TRIAL, INDIVIDUALLY AND COLLECTIVELY, VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

246. The allegations in this claim relate back to the legal and factual averments of Claims 6, 7, 11, 12, 15, 18, 26, 28, and 30 of the initial 2255 Motion.

247. The government's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger*, 235 U.S. at 88. As such, the prosecutor has a special duty to avoid improper methods for securing a conviction. *See, e.g.*, *Giglio*, 405 U.S. 150; *Napue*, 360 U.S. 264; *Brady*, 373 U.S. 83. Due to the prosecutor's prominent role as representative of the Government--and the mantle of respect and authority this role creates in the eyes of the jury--jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88.

248. Likewise, due process does not tolerate government action designed to mislead opposing counsel or the factfinder regarding material issues. *E.g., Mooney*, 294 U.S. at 112 ("deliberate deception of court and jury . . . is inconsistent with rudimentary demands of justice"); *see also Napue*, 360 U.S. at 264 ("implicit in the concept of ordered liberty" is the due process requirement that the Government not premise its case on the veracity of a particular witness who testifies falsely). Prosecutors have a heightened duty to avoid conduct designed to inflame jurors' passions and prejudices. When the prosecutor's argument infects the trial with unfairness, due process is violated. *Donnelly*, 416 U.S. 637 (1974). These principles are even more compelling in light of the heightened safeguards required in capital cases. *Beck*, 447 U.S. 625 (1980); *Caldwell*, 472 U.S. 320 (1985). The very nature of a capital case demands heightened scrutiny. *Woodson*, 428 U.S. at 305.

101

249. Cumulatively, and in isolation, the government's actions crossed the line into misconduct and infected Mr. Umaña's trial with unfair prejudice, violating due process and the Eighth Amendment. *See Berger*, 295 U.S. at 89 (reversing conviction, as prosecutor's misconduct "was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential"); *Runyon*, 707 F.3d at 520 (cumulative effect of two or more individually harmless errors has the potential to prejudice defendant to the same extent as single reversible error); *United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002) (identifying factors to consider).

250. As described throughout the original 2255 Motion and this Supplement, from investigation, indictment, and pretrial proceedings, to trial, the penalty hearing, and post-trial proceedings, the Government engaged in a persistent pattern of misconduct, depriving Mr. Umaña of his constitutional rights under the Fifth, Sixth, and Eighth Amendments. To the extent counsel failed to fully litigate this issues in the trial court and on direct appeal, counsel's failure to do so constituted ineffective assistance. Relief is required.

### A.  Misconduct Already Found By the Fourth Circuit.

251. In evaluating the cumulative effect of prosecutorial misconduct, the Court must consider the instances of misconduct already identified by the Fourth Circuit. On direct appeal, the Fourth Circuit found that certain Government arguments in the penalty-phase summation were improper, namely the argument that the jury was Mr. Umaña's rival and the nationalistic rhetoric about administering "American justice" to a Salvadoran. *Umaña*, 750 F.3d at 351-53. The Circuit concluded the two lone instances were not sufficiently prejudicial to deprive Mr. Umaña a fair sentencing proceeding. *Id.* These incidents, however, were not unique, and instead formed a larger pattern of misconduct in the penalty phase. Combined with other instances of misconduct asserted throughout Mr. Umaña's 2255 case, relief is required.

102

### B. Other Prosecutorial Misconduct in the Penalty Phase.

252. The Government committed other persistent acts of misconduct in its penalty-phase argument. First, the Government also improperly argued that the jury should compare the Garcia Salinas' brothers' societal worth and assimilation against Umaña's lack thereof. *See* Claim 140.

253. Second, after the Court excluded the Government's flimsy evidence of witness intimidation of "Moe and Chipis," PPT at 235-36, 242-44, the Government improperly testified to inflammatory facts not in evidence, when it argued in closing that "Moe and Chipis" did not testify in the penalty phase because "One of them got beaten up on order of this defendant." PPT at 898. While Moe's Los Angeles interrogation transcript arguably purported to show that he was afraid of Umaña (because counsel and the Government prejudicially failed to redact the exhibit, Gov. Ex. 518, *see* Claim 37; and Mr. Umaña's jail letters allegedly showed he solicited others to try to jump Moe and Chipis (because counsel ineffectively failed to investigate and mitigate the damage caused by the letters, *see* 2255 Motion Claim VIII (Doc. 24 at 210-33)), no evidence showed that either had actually gotten beat up: the Government presented no jail medical report, no photographs, and no incident report. The prosecutor's argument testifying to evidence that the Court had excluded was improper. *See United States v. Wilson*, 135 F.3d 291, 297-98, 302 (4th Cir. 1998) (government improperly argued facts of not in evidence, as it had presented no evidence of *corpus delicti*, its unreliable testimony was excluded, and argument came as last-minute surprise); *see also Berger*, 295 U.S. at 88 (improper suggestions by prosecutor are apt to carry much weight when they should properly carry none).

254. Third, the Government improperly misled the jury when it commented on the assumed adequacy of counsel's mitigation investigation. In rebuttal closing, the Government argued: "Don't you think it's interesting that we heard about him joining the gang. We heard it was for a girl. And then there's this whole vacuum of information. You know why? They don't

103

want to talk about it. It's none of your business. Just trust us on this. They didn't want to give you that information about those choices." PPT at 892. The Government lacked a good faith basis for making this argument: no discovery had been provided about "this whole vacuum of information." Indeed, due to ineffectiveness, trial counsel possessed no additional information with which to fill the vacuum or void. *See Berger*, 295 U.S. at 88 (improper suggestions by prosecutor are apt to carry much weight against the accused).

255. This lack-of-evidence argument also inferentially commented on Mr. Umaña's exercise of his right to silence. *See United States v. Hardy*, 37 F.3d 753, 756-57 (1st Cir. 1994) (prosecutor's comment need not directly address constitutional right, but rather may run afoul of Constitution by making such comment inferentially (citing *Griffin v. California*, 380 U.S. 609, 615 (1964))). Here, by arguing that there was more background information somewhere, the prosecutor naturally directed the jury to infer that Mr. Umaña held that information but chose not to present it by exercising his right to silence. Compounding the error, the Government had withheld information from trial counsel that would have assisted the defense in filling the holes upon which the Government capitalized. *See* 2255 Motion Claim VI(C) (Doc. 24 at 180-91).

256. Fourth, the Government improperly commented on Mr. Umaña's exercise of his constitutional rights to counsel, to call witnesses, and to present a defense. *See Hall v. Luebbers,* 341 F.3d 706, 717 (8th Cir. 2003) ("Prosecutorial comments made during closing argument related to a defendant exercising his constitutional rights may violate due process."). The Sixth Amendment right to counsel encompasses the right to effective counsel, who must diligently investigate mitigating information. *See Wiggins*, 539 U.S. at 522-23. Despite this constitutional mandate, the Government lambasted Mr. Umaña for hiring a mitigation investigator and argued that jurors could not trust any information the investigator presented:

> Are you going to base all these mitigating factors that you've heard about as it's been filtered through whom? The hired mitigation expert. Mitigation. Hired to do what? Mitigate. Hired to do what? Convince you to do other than what you know you need to do and what you said you would do when you were selected as jurors.

PPT at 890. The argument amounted to improper comment on the exercise of his constitutional rights. *Cf. Kirkpatrick v. Blackburn*, 777 F.2d 272, 284 (5th Cir. 1985) (it is improper for prosecutor to argue that defendant's exercise of constitutional rights is a reason for discrediting his defense, or to imply that system coddles criminals by giving them more rights than victims); *Marshall v. Hendricks*, 307 F.3d 36, 70-79 (3d Cir. 2002) (prosecutor improperly commented on rights to counsel and to call witnesses in defense, but error was harmless due to strong curative instructions).

257. Fifth, the Government improperly argued that returning a death verdict was the jurors' duty and improperly shifted the burden of proof to the defense. The Government argued that the defense mitigation expert's job was to "convince you to do other than *what you know you need to do*"--return a death verdict. PPT at 890. The Government further argued against mercy or life by imploring the jurors, "Do not by your verdict be the water that washes the blood from his hands." PPT at 904. Arguments suggesting that the jury has a duty to decide a case a certain way, or that a particular verdict would be weak or capitulation, are an improper attempt to stir passions and, in effect, intimidate the jurors into returning a particular verdict. *See United States v. Young*, 470 U.S. 1, 5-6, 18 (1985) ("The prosecutor was also in error to try to exhort the jury to 'do its job' [by returning a guilty verdict]; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice."); *United States. v. Mandelbaum*, 803 F.2d 42, 44 (1st Cir. 1986) ("There should be no suggestion that a jury has a duty to decide one way or the other; such an appeal is designed to stir passion and can only distract

105

a jury from its actual duty: impartiality."). Moreover, the defense never had the burden to prove that Mr. Umaña should live. *See* Claim 49.B.

258. Sixth, the Government repeatedly incorrectly argued that the Los Angeles Fairfax Avenue homicide victims were "a couple of kids," "[y]oung kids," when they were actually 20 and 17 years old. PPT at 828, 895; Gov. Exs. 523, 525. (In contrast, the Government called Mr. Umaña "an adult when he joined the gang" at age 18. PPT at 591-592, 836.) The argument that Mr. Umaña killed "kids" was extremely prejudicial, and was compounded by the Government's argument that the decedents' youth did not matter to Mr. Umaña. PPT at 828-29. *See Napue*, 360 U.S. at 264.

259. Seventh, the Government also repeatedly asked jurors to stand in the victims' shoes and imagine what they were thinking at the time of the homicides. PPT at 824, 834. *See, e.g.*, *United States v. Susi*, 378 Fed. Appx. 277, 283 n.5 (4th Cir. 2010) (unpublished per curiam) (Golden Rule argument, where counsel asks jurors to put themselves in shoes of party and do what they would want done in that position, "is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence"). Such argument was specifically calculated to inject emotion and caprice into the jury's sentencing decision.

260. Finally, the Government also improperly made light of the lengthy serious sentence of life in prison by stating that prison is Umaña's "playground" and LWOP would be "the minimum sentence," the equivalent of "sending your child to their room," or a room with a view in the Rockies where all your needs are taken care of. PPT at 899-900, 903-04. *See Berger*, 295 U.S. at 88 (improper arguments by prosecutor "are apt to carry much weight against the accused when they should properly carry none"). During cross-examination of defense expert Mark

Cunningham, the Government essentially recited, and had the expert confirm, what it called the Prisoner Bill of Rights. These rights included the right to fair treatment; to be informed of the rules and procedures with which they would be expected to comply; to freedom of religion; to adequate medical care and dental treatment; to nutrition; to proper bedding, clothing, laundry, showers, warmth, fresh air, exercise, and toiletries. PPT at 503-05. In closing, the Government argued that Mr. Umaña did not deserve his Prisoner Bill of Rights because he took lives: "He took lives. Are you going to give him his bill of rights? Manuel and Ruben didn't have a bill of rights. They didn't have a thought, they didn't have a chance. You going to give him his bill of rights? And all the benefits that come with it. You heard them all." PPT at 902-03.

261. While Mr. Umaña litigated certain aspects of this argument on direct appeal (*U.S. v. Umaña*, 10-6, Appellant's Brief at 108), counsel did not raise, nor did the Court consider, the fact that the argument improperly commented on what amount to constitutional rights--not elective privileges--that all prisons must accord their prisoners. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730 (2002); *Wolff v. McDonnell*, 418 U.S. 539 (1974); *Estelle v. Gamble*, 429 U.S. 97 (1976); *Holt v. Hobbs*, 135 S. Ct. 853 (2015); *Helling v. McKinney*, 509 U.S. 25 (1993). Moreover, this fact would apply in every death penalty case, where one of the options is to send the defendant to a prison that must meet federal constitutional standards for the rest of his life, and thus the argument fails to rationally narrow the jury's sentencing discretion and injects caprice into the sentencing decision. Relief is required.

**42. MR. UMAÑA WAS DENIED HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS DURING THE ATKINS HEARING AND IN THE RESULTING ORDER.**

262. The factual and legal allegations and exhibits set forth in the 2255 Motion and those contained throughout this Amendment/Supplement, are incorporated herein as if fully stated. *See*

Fed. R. Civ. P. 10(c), 15(a). The allegations in this claim relate back to the legal and factual averments of Claims 3 and 4, pp. 97-110 of the initial 2255 Motion.

263.    After a contested hearing on the issue of Intellectual Disability including the presentation of expert witnesses, the Court entered a written Order, finding that trial counsel failed to prove the Adaptive Deficits element of Intellectual Disability. CR 934 ("Order" hereafter). Trial counsel were ineffective in failing to investigate and present all available evidence of Adaptive Deficits. Had counsel performed effectively, there is a reasonable probability the outcome would have been different.

264.    Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. This can be done only if counsel actually investigates, *id*. at 691; ABA Standards for Criminal Justice, 4-4.1(a) (3d ed. 1993). As described in the Motion and below, counsel conducted a limited, constitutionally inadequate witness investigation regarding Mr. Umaña's adaptive deficits (*see* ABA Guidelines, 11.4.1, Investigation, §§ D.2.C, D.3.B & D.3.C); failed to obtain available records establishing adaptive deficits (*see* ABA Guidelines 11.4.1, Investigation, §§ 2C & 2D); failed to adequately consult with and prepare their own expert (*see* ABA Guidelines, 11.8.3); and failed to adequately challenge Government expert testimony (*see* ABA Guidelines 11.4.1(C). Had counsel performed effectively, they would have been able to provide the Court with a completely different, more extensive understanding of the full nature and extent of Mr. Umaña's adaptive deficits.

### A. Counsel failed to investigate, present and prepare lay witness evidence that would have established Adaptive Deficits.

265.    In the Atkins hearing, counsel presented no lay witness testimony and, instead, relied on experts to proffer and interpret a few lay witness statements as support for adaptive deficits. *Atkins* Hearing 11/30/09, CR 932. "Adaptive functioning refers to how effectively individuals

cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 41 (4th ed. 2000).

266. Lay witnesses have the best vantage point to observe and report how a subject functioned on a day-to-day basis in a free, unstructured society. American Association for Intellectual Development Disorders, *Intellectual Disability, Definition, Classification and Systems of Support*, at 47 (11th Edition, 2010) (hereinafter "Manual") (Recommending the use of knowledgeable respondents that saw the subjects' day to day functioning "across community settings and times."). Counsel's failure to develop available lay witness testimony regarding Mr. Umaña's adaptive deficits constitutes prejudicially deficient performance.

267. As Mr. Umaña will demonstrate at an evidentiary hearing, although counsel was aware of Mr. Umaña's Intellectual Disability long before, they did not provide notice of intent to pursue an *Atkins* claim until August, 2009 and did not retain an Adaptives Deficits expert until October, 2009, one month before the *Atkins* hearing. *See* CR Doc. 710.

268. Counsel ultimately retained Dr. Olley even though he did not speak Spanish and was not familiar with Salvadoran culture. In November 2009, Mitigation Specialist Richard McGough (who did speak Spanish) and Dr. Olley traveled to El Salvador and conducted some interviews, but failed to identify or interview available witnesses who would have provided significant evidence of adaptive deficits.

269. After full discovery and an evidentiary hearing, Mr. Umaña will demonstrate that Mr. McGough limited the El Salvador investigation to reliance on Mr. Umaña's father, Rafael Umaña, to provide access to family witnesses and identify other potential lay witnesses for

purposes of developing adaptive deficits evidence. Had counsel conducted a full investigation of the entire family, extended family, friends, and neighbors, counsel would have learned that Mr. Umaña's father, by virtue of his own dysfunction, was not a reliable reporter to Mr. Umaña's adaptive deficits. *See* Doc. 24 at 32. After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that other family witnesses could have told counsel that Mr. Umaña's father was "horrible to Alex" (Appx. 15 at ¶20). He would beat Mr. Umaña for the slightest infraction: if he got wet when it rained, if he went out looking for food, if he got dirty. Mr. Umaña's father not only beat Mr. Umaña but also withheld food as a form of punishment and would beat Mr. Umaña for taking things from his father's store, even food. *See also* Appx. 20.

270. While Mr. McGough did photograph the *mesóns* where Mr. Umaña had lived in El Salvador, Def. Tr. Ex. 15, he did not speak with any of the neighbors. Appx. 26 at ¶12. Mr. Umaña expects to demonstrate at an evidentiary hearing that neighbors, including Vilma Araceli Salazar de Argueta, Roxana Cruz Torres, Vilma Elizabeth Torres de Cruz, Luis Munroy, Zoila Olana, and family, including Saul Umaña, and Leticia Ramirez Diaz, who would have been able to describe the violence of Mr. Umaña's father and how he otherwise neglected Mr. Umaña by paying little attention him, leaving him uncared for and was often observed dirty, wearing the same clothes day after day, and with rotten, broken teeth. Appx. 1 at 15, 19, 23; Appx. 3 at 10-15; Appx. 4 at 12-18, 30; Appx. 7 at 5-8; Appx. 8 at 11-12; Appx. 10 at 20; Appx. 22 at 22-29.

271. In light of his own dysfunction, it is not surprising that Mr. Umaña's father was only able to provide limited information regarding individuals who could describe Mr. Umaña's adaptive skills, and, as Mr. Umaña expects to demonstrate at an evidentiary hearing, even that well went dry when his father refused to provide any further information to the investigator.

272. Had counsel conducted a constitutionally adequate investigation, they would have discovered additional, more reliable witnesses regarding Mr. Umaña's adaptive deficits. As noted in the motion and as Mr. Umaña expects to demonstrate at an evidentiary hearing, multiple witnesses would have told counsel about multiple adaptive deficits surrounding self-care, including his inability to prepare meals, care for clothes, and maintain personal hygiene. *See* Appx. 15 at 15 (still unable to put each shoe on the correct foot at fifteen years of age); *id.* at 24 (eating a cooked bird without removing the feathers or guts); Appx. 12 at 14. *See also* Doc. 24 at 98.

273. After full discovery, Mr. Umaña also expects to demonstrate that, had counsel investigated witnesses provided by the Government, they would have discovered others who could describe Mr. Umaña's adaptive deficits, including, but not limited to, Luis Ramos brought to North Carolina as a potential aggravation witness regarding the Los Angeles incidents. Had counsel spoken to Ramos, they would have learned that Ramos knew Mr. Umaña when he was sixteen, but in the third grade in night school, demonstrating clear academic skills deficits. Appx. 112 at 2. Ramos recalls how, even at eighteen years of age, Mr. Umaña acted "like a little boy," and by the time he was twenty-two, he was on the level of fifteen year old children. Appx. 112 at 2, 10, 34. Ramos describes how there is something wrong with Mr. Umaña's brain, how it stopped developing at an early age; how Mr. Umaña was simple minded and unable to analyze things; and, how he told immature jokes at inappropriate times and as well as other social deficits. Appx. 112 at 37.

274. In addition, Mr. Umaña expects to demonstrate after full discovery and an evidentiary hearing that witnesses existed who knew Mr. Umaña while he was living in New York who could have provided substantial evidence of adaptive deficits including, but not limited to: evidence that he had difficulties communicating and understanding; evidence that he was not a

111

leader; would not be able to drive long-distances, much less across the country; would disappear for periods of time; and, struggled to find and keep a job, struggled and often was unable to support himself or his family. Witness will describe how it would have been surprising that Mr. Umaña was even a low-level leader in the gang in light of his inability to function, let alone lead.

275. Counsel's failure to develop and present this readily available witness testimony establishing significant adaptive impairments constitutes prejudicially deficient performance in violation of the Sixth and Eighth Amendments.

### B. Failure to identify and present records evidencing Adaptive Deficits.

276. Counsel failed to identify, develop, and present evidence of adaptive deficits contained in readily available institutional and court records. For example, counsel obtained Mr. Umaña's school records (*Atkins* Hearing 11/30/09 at 49), but failed to develop and present evidence interpreting the contents of those records that supported adaptive deficits. Although the mitigation specialist spoke with Ana Gladys Magana, a teacher at Mr. Umaña's school, he failed to ask her to interpret the school records. Had he done so, he would have learned that the records indicate that Mr. Umaña was nine years old when he was in the first grade; barely passed second grade and, even then only because of physical education and music grades while he failed in all other academic classes; and, that he was placed in a "remedial . . . integrated" class of 1st, 2nd and 3rd graders when he was twelve years old. Appx. 6. Thus, the records demonstrate significant deficits in academics. The records also show that Mr. Umaña's poor academic performance was not due to lack of attendance as was identified as a potential possibility by the Court.

277. Moreover, the record notations provide social and functioning deficits. Mr. Umaña's conduct marks on his school records are roughly broken into two areas: manners and functional/practical conduct. Mr. Umaña earned good marks in the manners areas: personal relations and cooperation, promotion of customs and beliefs, and practice of moral and civic

values. But, Mr. Umaña earned poor marks in the functional/practical conduct areas: responsibility, health and protection, initiative and self-confidence, and work habits. These practical conduct areas relate to the Adaptive Deficits that Dr. Olley identified. For example, responsibility and initiative are conduct areas that Mr. Umaña had failed, and equivalent to the Adaptive Deficit, Self-Direction. Health and protection are a conduct area, and his poor marks are equivalent to the Adaptive Deficit, Health and Safety.

278. There is no reasonable basis for counsel's failure to present these records to a witness the mitigation specialist had interviewed. Appx. 36 at 5. Trial counsel ineffectively missed the opportunity to construe Mr. Umaña's school records as evidence of Adaptive Deficits in an area other than the skill cluster of Functional Academics.

279. Likewise, there was evidence contained in the pretrial discovery that counsel failed to develop. As noted elsewhere, Mr. Umaña was interrogated (in violation of his Sixth and Eighth Amendment rights) on April 23, 2008. Although the transcript of that interrogation was admitted in the *Atkins* hearing by the Government (*Atkins* Hearing 11/30/09 at 424, Gov. Ex. A-4), counsel failed to develop and present the adaptive deficits contained in that transcript.

280. Mr. Umaña expects to demonstrate at an evidentiary hearing that he exhibited cognitive/adaptive deficits from the beginning of the interrogation including, but not limited to: his not knowing the date; his inability to determine what the jail would be serving for lunch; his inability to explain why he was in a red uniform as opposed to an orange or blue uniform worn by other inmates. Gov. Ex. A-4, Tx at 2-3; *see also* Appx. 208 at 15. Further along in the interview, when the detectives are pressuring him to admit to murder, after he has denied their accusations many times, Mr. Umaña sings an inappropriately timed rap song about being a persecuted but

violent and dangerous member of MS-13. *Id.* Tx. at 97-98. The song seems out of place and contradicts Mr. Umaña's denials of their accusation.

281. In short, Mr. Umaña exhibited a limited awareness of his setting both by not knowing what was going on in the jail and by breaking out in an arguably inculpatory song while denying criminal culpability. His knowledge and actions showed a deficiency in abstract thinking, a recognized criteria for a diagnosis of intellectual disability.

282. Mr. Umaña's conduct and statement during the interrogation also reflected adaptive deficits in Community Use. For example, Mr. Umaña described arriving in Los Angeles from El Salvador and being homeless for several months, both before and after he travelled to New York and described how he (and Ramos) slept either outside or in an abandoned apartment and gathered cans in the street for food and money. Gov. Ex. A-4. Had counsel reasonably reviewed the transcript and consulted with their mental health expert regarding the contents of the interrogation, they would have been able to provide evidence demonstrating that these statements reflect adaptive deficits.

283. Similarly, there existed evidence regarding the travel from El Salvador to the United States that would have supported Dr. Olley's testimony and contradicted the Government's expert conclusions. Dr. Olley testified that, because Mr. Umaña relied on help from others throughout the travel, his immigration to this country did not diminish Mr. Umaña's deficits. Mr. Umaña expects to demonstrate at an evidentiary hearing that, contrary to the Government's contentions (and this Court's finding), Mr. Umaña received considerable assistance on his journey. For example, Alexandro Granados testified in the co-defendant's trial that his journey to the United States, taken a few months after Mr. Umaña, assisted and was managed by MS 13 members. *United States v. Rosales Lopez, et al.*, 3:08-cr-134, Doc. 1078 at 1252-53. Mr. Umaña expects to

114

demonstrate at an evidentiary hearing that other witnesses, including witnesses who travelled with Mr. Umaña, will testify that Mr. Umaña was only able to complete the travel with assistance. Counsel's failure to marshal this evidence, particularly where the Government's expert relied on the travel as anti-adaptive deficits, constitutes prejudicially deficient performance.

284. Finally, at a hearing, Mr. Umaña will demonstrate that counsel failed to supplement the record with testing conducted by Dr. Weinstein after the *Atkins* hearing had concluded. That testing demonstrate that Mr. Umaña scored in the 55-62 IQ range and obtained a 5th grade reading level. Appx. 81.

285. As described in the Motion and above, there was substantial evidence demonstrating adaptive deficits that counsel failed to develop and present. Counsel can have no reasonable basis for failing to develop evidence supporting their chosen defense theory. As there is a reasonable probability that had counsel performed effectively the results of the *Atkins* hearing would have been different, prejudice is demonstrated.

### C. Counsel's failed to effectively challenge the Government's expert.

286. The Government's expert, Dr. Suarez, testified that the Validity Indicator Profile (hereinafter "VIP") testing estimated Mr. Umaña's reasoning ability "to be, at least low average" but then corrected himself by testifying that the scoring indicated his reasoning ability "at least significantly below average or higher." PTH 11/30/09 at 331, 409. In actuality, the testing estimated Mr. Umaña's reasoning as "at least significantly below average or better." Appx. 207 at 6. Counsel failed to recognize or acknowledge the contradiction or confirm that the lower of the two wordings "at least significantly below average" correctly represented Mr. Umaña's reasoning ability.

287. Counsel also failed to point out that the computer scoring report on the VIP testing indicated that Mr. Umaña scored well, ten out of ten, on the easier items but "progress[ed] towards

115

random [responses] for the harder items." Appx. 207 at 4; *Atkins* Hearing at 332, 411. Counsel asked Dr. Suarez about the VIP test result but allowed him to explain that Mr. Umaña's scores "showed a dip in an area that he probably had the ability to answer correctly," (*Atkins* Hearing at 411) without requiring explanation of why Mr. Umaña "probably had the ability to answer" the questions correctly. In addition to progressing towards random responses, Mr. Umaña got fewer of the hardest questions correct than of questions of medium difficulty. Appx. 207 at 3 (chart). Progressing towards random response when the test items become more difficult, and scoring poorer on the harder questions than on the medium questions while doing quite well on the easy questions, coincides with at least significantly below average reasoning and intellectual deficiency. Counsel should have exposed Mr. Umaña's actual performance on the VIP testing.

288. Dr. Suarez testified that Mr. Umaña claimed he learned how to drive from the person that supervised him during his job with Coca-Cola. *Atkins* Hearing at 309, CR 932. As Mr. Umaña will demonstrate at an evidentiary hearing, witness could have testified that Mr. Umaña could not drive.

289. Nor did counsel cross-examine Dr. Suarez on the dangers of relying on self-report, particularly with individuals suffering from Intellectual Disability in light of the high instance of those individuals to conceal deficits. *See* AAIDD Manual at 51-52 (describing two dangers: the common practice of persons with Intellectual Disability to "mask" deficits and the "strong acquiescence bias or a bias to please" by persons with intellectual disability that leads them to respond in a manner that pleases the interviewer regardless of the truth).

290. Counsel also failed to confront Dr. Suarez on improprieties in other cases and his biases in conducting testing. At an evidentiary hearing, Mr. Umaña expects to demonstrate that Dr. Suarez's conduct during testing has been sanctioned by courts for engaging in conduct outside

the scope of his evaluation; failing to disclose the true nature of testing conducted; and, for administering inappropriate tests. Mr. Umaña also expects to demonstrate at an evidentiary hearing that counsel also failed to cross-examine Dr. Suarez about improprieties in the testing he conducted in this case including, but not limited to, reading testing materials to Mr. Umaña when it became clear that Mr. Umaña was unable to read the test questions and recording Mr. Umaña's oral responses.

291. Counsel also failed to thoroughly crossexamine Dr. Suarez regarding Mr. Umaña's writing in code contained in some of his letters. Counsel asked Dr. Suarez about his conclusion that writing in code "erodes" the diagnosis of Intellectual Disability. *Atkins* Hearing at 416-419. Counsel specifically asked if the "code," was similar to the digit symbol testing on which Mr. Umaña scored in the bottom two percent of all test takers. *See id*. at 72 (Dr. Olley testimony). Dr. Suarez denied that the digit symbol testing and Mr. Umaña's writing were the same intellectual process and insisted that code writing was much more complicated of the two processes.

292. Counsel failed to ask Dr. Suarez if Mr. Umaña used a simple code that children use in El Salvador. *Atkins* Hearing at 71-2 (testimony of Dr. Olley). Trial counsel also failed to present information to Dr. Suarez that Mr. Umaña failed to successfully use what was described by the FBI's own linguist as "quite simple to see" " code, even with the cipher. While writing in code to keep his thoughts hidden from his jailers, Mr. Umaña included the key to the code in one of the coded letters. By including the key to the code in a coded letter, that is, by giving the key to the jailers who read his letters, Mr. Umaña defeated the purpose for writing the letter in code in the first place. *See* GPT at 583 (testimony of Susan Conrad). Mr. Umaña never successfully kept his thoughts or plans secret with any code. *See United States v. Rosales Lopez, et al.*, 3:08-cr-134, Doc. 1080 at 547 (FBI Linguist's testimony that the code MS-13 used was "quite simple to see.")

293. Further, when writing a letter about acquiring a homemade weapon in the jail, something Mr. Umaña had every reason to keep secret, he not only did not use a code, but also signed his own name to the letter. *United States v. Castellon*, 3:08-cr-134-3 Doc. 1293 at 100, Gov. Ex.. 8a (Mr. Umaña letter to Sandoval from Castellon's sentencing). Counsel's failure to cross-examine Dr. Suarez left the Court with the inaccurate impression that Mr. Umaña communicated in a sophisticated way that allowed him to escape punishment for nefarious activities.

294. Counsel's failure to develop and present this evidence supporting adaptive deficits and disputing the Government's anti-deficit evidence constitutes prejudicially deficient performance in violation of the Sixth and Eighth Amendments.

### D. The Supreme Court decisions in *Hall v. Florida* and *Moore v. Texas* require a different determination regarding the presence of adaptive deficits sufficient to meet the requirements for Intellectual Disability in Mr. Umaña's case.

295. Three Supreme Court cases define the parameters for an adjudication of Intellectual Disability in capital cases, *Atkins v. Virginia,* 536 U.S. 304 (2002),*Hall v. Florida,* 134 S. Ct. 1986 (2014) and *Moore v. Texas,* 137 S. Ct. 1039 (2017). In *Atkins* the Court recognized the Eighth Amendment proscription against executing the intellectually disabled and allowed states to develop their own standards for identifying Intellectual Disability. In *Hall*, the Court clarified that the states were not free to completely disregard the medical community guidelines in defining the intelligence quotient parameters of intellectual disability. In *Moore*, the Court applied the concepts developed in *Atkins* and *Hall* to the analysis of adaptive deficits.

296. The *Moore* Court found that by relying on strengths, the Texas court skewed medical community guidelines, which focused on the adaptive-functioning inquiry. *Moore*, 137 S. Ct. at 1050 (citing, e.g., AAIDD–11 Manual, at 47 ("significant limitations in conceptual, social, or practical adaptive skills [are] not outweighed by the potential strengths in some adaptive skills")), DSM–5, at 33, 38 (inquiry should focus on "[d]eficits in adaptive functioning"; deficits in only

118

one of the three adaptive-skills domains suffice to show adaptive deficits). The Court held "disregard[ing] established medical practice violated the Eighth amendment." *Moore* at 1049, (2017) (citing *Hall* at 134 S.Ct. at 1995).

297. Here, the District Court violated the Eighth Amendment in a similar fashion when it disregarded established medical practice by, *inter alia*, focusing on strengths to deny Adaptive Deficits. Trial Counsel and Appellate Counsel were ineffective for failing to challenge the Court's Order on this basis.

298. For the cluster of skills that fall into the Communications category of Adaptive Deficits,, the Court relied on examples of perceived strengths in communication as a basis for finding no deficits. The Court specifically looked at Mr. Umaña's ability to successfully communicate information about his past to Drs. Olley and Suarez. CR 934 at 6. The Court also relied on Mr. Umaña's cooperation with corrections officers and Dr. Weinstein's comment that Mr. Umaña enjoyed "strengths" in communications. *Id.* at 6-7. Finally, the Court directly reviewed some of the raw material the experts assessed and came to an independent conclusion that Mr. Umaña "is able to communicate cogently in writing, including expressing feelings." *Id.* at 7. Additionally, the Court unreasonably found that Mr. Umaña communicated cogently in writing (*id.*), when, in fact, Mr. Umaña repeats his thoughts over and over, follows no sequence of thought, and spells words phonetically. *Atkins* Hearing, Def. Ex. 12.

299. In addition to depending on strengths to rule out a deficit in communications, the Court ignored clear deficits. Dr. Olley testified that Mr. Umaña did not separate words, that he spelled words incorrectly, and that there was no sequence to his thoughts in his letters but the Court ignored these deficits in the Order. *Id.* The Court's reliance on strengths while ignoring deficits violates the directives of *Hall* and *Moore*.

300.    Also, the Court directly reviewed the letters and relied on its own lay conclusions with regard to the significance of the contents of those letters in violation of the medical community guidelines. American Association of Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* at 51 (10th ed. 2002); Manual at 21; *Ybarra v. Filson*, 869 F.3d 1016, 1026–27 (9th Cir. 2017).

301.    Moreover, counsel believe and expect to prove at a hearing that the Court relied on the translations of those letters, as opposed to the original Spanish versions.  In Mr. Umaña's original writings, he "does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to another and writes guided by the phonetic sound of words." *Atkins* Hearing, Def. Ex. 12.  When the Government linguist translated Mr. Umaña's letters into English, the translator inserted punctuation, paragraph breaks, cleaned up misspellings and eliminated repetition. *See* Gov. Ex. 166 and compare with Gov. Ex. 166a (original, 166, has margin to margin block printing with no punctuation or paragraph breaks while 166a has paragraphs, orderly punctuation, proper spelling.); *see also* Appx. 78), GPT at 568 (testimony of Susan Conrad). The Court's reliance on translations that resolved the very characteristics that would have demonstrated deficits violates the directives of *Hall* and *Moore*.  *See also* AAIDD Manual at 47 ("the assessment of adaptive behavior focuses on individual's typical performance and not their best or assumed ability or maximum performance").

302.    For the skills cluster of Self Care, the Court relied on strengths of Mr. Umaña's reported ability to drive himself around the country, his being able to report a headache and the testimony of corrections officers.[8]  CR 934 at 8-9.  Once again, and contrary to the directive of

---

[8]As noted previously, counsel ineffectively failed to develop evidence demonstrating that Mr. Umaña could not drive.

*Hall* and *Moore*, the court focused on strengths as opposed to deficits. Similarly, and contrary to medical community standards, the Court relied on conduct that occurred within a structured setting. The AAIDD Manual explains that when standard assessments of behavior cannot be used, then the evaluator must rely on observations of behavior with great caution. Specific behaviors represent only a narrow measure of actual adaptive behavior and may misrepresent a subject's typical performance. AAIDD Manual at 48. The evaluator must also specifically consider the opportunity for the subject to behave normally. *Id.* at 52.

303. When the Court observed Mr. Umaña's narrow behavior of reporting a headache, the Court was not observing how Mr. Umaña cares for himself throughout a complete day or across any significant portion of time. The Court, by observing one instance of reporting a problem, could not rule out a lack of self-care. By making a narrow observation of a single behavior and extrapolating that to all of Mr. Umaña's abilities or functions, violated the medical community standards and *Atkins, Hall* and *Moore*.

304. The Court also failed to consider the context of either the courtroom or the prison for the behaviors the Court relied on to deny Self Care. AAIDD Manual at 52. Neither of these contexts gives Mr. Umaña a setting in which he can freely make mistakes or ignore his personal needs. In both settings, if Mr. Umaña has a serious problem, someone – whether it is his attorney or a corrections officer – will intervene. In both settings, authority figures are responsible for keeping Mr. Umaña safe. He is not responsible for his own safety and cannot freely ignore a health or safety need that is apparent to an authority figure. Mr. Umaña's behavior in these confined, structured settings is not a basis for determining any Adaptive Deficit.

305. For the skill cluster of Home living, the Court relied on Mr. Umaña's self-reported strengths of being able to live in or share a motel room with a co-worker, being able to eat

breakfast, purchasing clothes and basic items and washing clothes. The Court again relied on reports from corrections officers that Mr. Umaña cleaned his cell, took care of his prison uniform and used the phone in prison. Relying on strengths is error as described above. Relying on reports of narrow observations of behavior in a structured setting fails to meet the medical community and legal standard, as described above. The Court also relied on self-reported behavior, something the medical community cautions against to avoid unreliable reports. AAID Manual at 51-52. Thus, the Court's conclusions violated medical community standards and *Atkins*, *Hall* and *Moore*.

306. In determining the cluster of Social Skills, the Court relied on its "review[ of] the defendant's interactions with others, reflected in his interviews with law enforcement, telephone calls from jail, letters." CR 934 at 11. Once again, the Court cannot impose its own lay opinion in disregard of expert testimony. Instead, the Court must apply the "medical community's diagnostic framework." *Moore* 137 S. Ct. at 1053. Where lawmakers deliberately incorporate clinical standards into legal definitions, the courts strain the limits of reasonableness by rejecting expert opinions based exclusively on the courts' own inexpert analysis. *Van Tran v. Colson*, 764 F.3d 594, 610 (6th Cir. 2014). Supplanting its own opinion over expert evaluation violates the medical community standards, *Atkins*, *Hall* and *Moore*.

### E. Conclusion

307. For the reasons described in the Motion and above, Mr. Umaña has demonstrated that the determination that he is not Intellectually Disabled violates the Fifth, Sixth, and Eighth Amendments.

308. Counsel's failure to develop, raise and litigate these claims at pretrial, at trial and on appeal constitutes prejudicially deficient performance. Counsel can have no reasonable strategic basis for failing to marshal the readily available evidence demonstrating that Mr. Umaña is ineligible for a death sentence due to his Intellectual Disability. As there is a reasonable probability

that but for the constitutional errors described above the results of the *Atkins* hearing, the trial/penalty hearing and the appeal would have been different, prejudice is demonstrated and relief is required.

**43. TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE, DEVELOP AND PRESENT ALL REASONABLY AVAILABLE MITIGATING EVIDENCE AND REQUEST ALL APPROPRIATE INSTRUCTIONS IN VIOLATION OF THE FIFTH SIXTH AND EIGHTH AMENDMENTS.**

309. The allegations in this claim relate back to the legal and factual averments of Claims 1-4, 8, 19, 20, 24, and 28 of the initial 2255 Motion.

### A. Trial counsel failed to recognize and investigate symptoms of Fetal Alcohol Syndrome.

310. Competent trial counsel would have investigated, developed and presented evidence that Mr. Umaña suffers from Fetal Alcohol Spectrum Disorder (FASD). Trial counsel possessed photographs, expert reports, school records and anecdotal information that raised several red flags indicating the need to explore FASD in this case.

311. Trial counsel possessed photographs of Mr. Umaña as a child that show the facial stigmata of FASD: wide set eyes, epicanthal folds in the corner of the eyes, low hanging ears and a flat philtrum. Appx. 113. Expert reports that Dr. Merikangas and Dr. Weinstein provided to counsel contained medical evidence that, by itself should have raised red flags. Dr. Merikangas provided a report in November 2009 that described Mr. Umaña as a brain-damaged man with developmental cognitive impairments apparent from early childhood that stemmed from environmental causes beyond his control. Appx. 72. As argued below, FASD is a neurological developmental disorder present during childhood and caused by the environment in the womb. Dr. Weinstein provided trial counsel with a letter report, also in December 2009, that identified Mr. Umaña's generalized brain dysfunction and very limited cognitive skills in math. Appx. 81. Dr. Weinstein also sent counsel a QEEG report that showed abnormal electrical activity in the brain,

123

specifically abnormal left right and anterior posterior dissociation. Appx. 70 at p. 8. A failure in math skills and a poor functioning bridge between the hemispheres of the brain (the corpus callosum) are also markers for FASD. *See* below. Trial counsel's mitigation specialist retrieved school records from El Salvador that documented Mr. Umaña's generally poor academic abilities but specifically his deteriorating ability to perform grade level mathematics. Appx 31. Finally, trial counsel's mitigation specialist and the expert in adaptive deficits talked to several people in El Salvador who identified Mr. Umaña's cognitive difficulties and described Mr. Umaña as a very social person that everyone liked, prior to joining MS-13. *Atkins* hearing at 65; Appx. 8, 10, 12, 15. 22, 28. Children suffering from FASD are often extroverted, overly social and have no fear of strangers.

312. Given all these FASD symptoms, counsel should have investigated Mr. Umaña's mother for drinking during pregnancy. The mitigation specialist spoke with Mr. Umaña's father several times prior to trial but apparently failed to ask him about Mr. Umaña's mother's drinking during her pregnancy. Had they asked, they would have discovered that Mr. Umaña's mother drank throughout her pregnancy with him. Appx. 18, ¶6 at 1.

313. Based on the information in trial counsel's possession, competent trial counsel would have consulted a mental health or medical professional with specific expertise regarding FASD. Such an expert would have further elaborated that the facial stigmata, a poor developed brain, evidence of inhibited communication between the spheres of the brain, an inability to perform mathematical functions and an exaggerated friendliness as a child were hallmarks of FASD.

314. A mental health professional with expertise in FASD would have testified that FASD is a permanent birth defect caused by maternal consumption of alcohol during pregnancy.

315.   *See* Bookstein, F.L., Sampson, P.D., Streissguth, A.P., & Connor, P.D., *Geometric Morphometrics of Corpus Callosum and Subcortical Structures in the Fetal-Alcohol-Affected Brain*, Teratology, 64, 4-32 (2001); Bookstein, F.L., Streissguth, A.P., Sampson, P.D., Connor, P.D., & Barr, H.M., *Corpus Callosum Shape and Neuropsychological Deficits in Adult Males with Heavy Fetal Alcohol Exposure*, NeuroImage, 15(1), 233-251 (2002); Bookstein, F.L., Sampson, P.D., Connor, P.D., & Streissguth, A.P., *Midline Corpus Callosum is a Neuroanatomical Focus of Fetal Alcohol Damage*, The Anatomical Record, The New Anatomist, 269(3), 162-174 (2002).

316.   Alcohol is a teratogen that inhibits and disrupts fetal development by causing structural and functional damage to developing organs and systems, including the brain and central nervous system. The damage begins at the cellular level, where alcohol can induce excessive cell death and disrupt cell responses to molecules that regulate neuron proliferation, migration and differentiation. Because alcohol causes widespread damage throughout the developing fetus, there is a broad array of physical anomalies and neurobehavioral defects. Hence, medical science labelled the condition a "syndrome." Although the effects of prenatal alcohol exposure may range from subtle to serious, the negative consequences are lifelong. The most serious and pervasive damage occurs in the central nervous system (CNS). Brain imaging studies over the last two decades have revealed that prenatal alcohol exposure causes significant malformation in structures throughout the brain (e.g., corpus callosum, basal ganglia, cerebellum) that are necessary for normal development and functioning. F. L. Bookstein, *et. al.*, *supra*, Teratology, 64, 4-32 (2001); F. L. Bookstein, *et. al*, *supra*, NeuroImage, 15(1), 233-251 (2002); F. L. Bookstein, *et. al.*, *supra*, The Anatomical Record, The New Anatomist, 269(3), 162-174 (2002).

317.   Fetal Alcohol Syndrome (FAS) is a severe manifestation of prenatal alcohol exposure, and is only one of several identifiable disorders associated with maternal alcohol abuse.

125

The terms Fetal Alcohol Effect (FAE) and Alcohol-related Neurological Disorder (ARND) are used to classify the manifestation of *in utero* alcohol poisoning that are not as apparent as the symptoms of FAS. Clarren, S.K., & Smith, D.W., *The Fetal Alcohol Syndrome*, New England Journal of Medicine, 298, 1063-1067 (1973). While individuals with FAE or ARND may not display all of the primary facial abnormalities associated with FAS (i.e., short palpebral fissures, flat philtrum, and thin upper lip), research consistently revealed that compared to individuals diagnosed with FAS, those with FAE could suffer from as many or more of the neurodevelopmental deficits. *See* Streissguth, A.P., & O'Malley, K., *Neuropsychiatric Implications and Long-term Consequences of Fetal Alcohol Spectrum Disorders*, Seminars in Clinical Neuropsychiatry, 5(3), 177-190, (2000). Thus, even without the growth deficit and facial evidence evident in full FAS, brain damage and problems in cognitive behavior could be as severe in individuals with FAE as in individuals with FAS. *Id.*

318. Beginning more than thirty-five years ago, scientists have published at least two thousand scientific papers regarding the teratogenic effects on the brain of prenatal alcohol exposure. *See* Department of Health and Human Services, *Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis* at 5 (2004). These papers explore and describe the course and effects of FAS on the fetus and child. The brain and central nervous system form throughout the full nine months of pregnancy. *Id*. at 24. Thus, alcohol consumption at any point during gestation can cause damage to this system. *Id*. The damage is permanent and the deficits caused by that damage persist throughout an individual's life span. *Id*.; *see also* A. P. Streissguth, et. al., *Fetal Alcohol Syndrome in Adolescents and Adults*, 265 Journal of the American Medical Association 1961-67 (1991). For example, longitudinal studies have found that many individuals with FASD have complex, lifelong mental health disorders and are never able to sustain independent living. *See* Dept. of Health and

Human Services, *Fetal Alcohol Syndrome* at 24; *see also* A. P. Streissguth, et. al., *Neuropsychiatric implications and long-term consequences of fetal alcohol spectrum disorders*, 5 Sem. in Clin. Neuropsychiatry 177-190 (2000).

319. Criminality can be one of the long-term consequences of FAS. Sixty-percent of adolescents and adults in the 1996 secondary disabilities study experienced trouble with the law (for example, involvement with police or being charged and/or convicted of crime). *See* A. P. Streissguth, et. al., University of Washington Publication Services (1996), *supra*. The most common crimes committed (by almost half of individuals with FASD ages 12-20) were crimes against persons (for example, theft, burglary, assault, murder, domestic violence, child molestation, running away). *Id.* Property damage, drug possession or selling, sexual assault, and vehicular crimes also dominated the study. *Id.*

320. Criminal behavior in individuals with FASD stems in large part from impaired executive functioning. Research has shown that the corpus callosum (the brain structure that separates the two hemispheres and relays information via electrical impulses between the right and left sides of the brain, which functions poorly for Mr. Umaña according to Dr. Weinstein's QEEG) and the frontal lobe of the brain, particularly the prefrontal cortex (the area of the brain linked to executive functioning), are particularly sensitive to the effects of prenatal alcohol exposure. *See* F. L. Bookstein, et. al., *Corpus Callosum Shape and Neuropsychological Deficits in Adult Males with Heavy Fetal Alcohol Exposure* (2002); *see also* Akins hearing 11/30/09 (testing by Drs. Weinstein and Merikangas, showing severe deficits in Mr. Umaña's executive functioning). When executive functions are compromised by prenatal alcohol exposure, an individual will: have difficulty perceiving, prioritizing, and storing information; have difficulty processing and retrieving that information; be unable to generalize and apply consequences from past actions to potential future

127

actions; need external motivators such as frequent cues or guidance from others; be unable to perceive the effect of his/her actions on others or the social inappropriateness of those actions; display exaggerated emotions; be unable to control behaviors that stem from emotion-evoked urges; and, consequently, engage in a wide range of socially (and often legally) inappropriate behaviors. *Id.*

321.  Executive functioning is also critically important in unfamiliar situations where established ways of behavior are not useful or appropriate. *See* PD Connor, *et. al*., *Direct and Indirect Effects of Prenatal Alcohol Damage on Executive Function*, 18 Developmental Neuropsychology 331-354 (2000). Executive functions involve development of plans, implementation of intentions, and weighing whether a proposed solution to a problem is a feasible option. *Id.* Executive functions play a critical part in acting in accordance with complex social behaviors such as understanding and caring how our actions impact others; intact executive functioning is a prerequisite for appropriate pro-social behavior. *Id*. While those with intact executive functioning can make choices about their behavior and consider consequences before acting, those with impaired executive skills have no such choice. *Id*. They are able to function only to the level that their impairments permit. *Id*.

322.  Other confirmed Cognitive-Behavioral/Functional Deficits from FAS include deficits in functional skills that may vary widely depending on the amount, timing, and pattern of alcohol exposure. *See* AP Streissguth, *et. al.*, *Understanding the Occurrence of Secondary Disabilities in Clients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE): Final Report*; University of Washington Publication Services (1996). Functional deficits that meet FASD criteria involve a global cognitive deficit (e.g., decreased IQ), significant developmental delay, and/or deficits in three of the following functional domains:

a. <u>Cognitive Deficits</u>: Sixteen percent of individuals affected by prenatal alcohol exposure are mentally retarded, although some individuals diagnosed with FASD have above average IQs. *Id.* Individuals with FASD may perform in the average range on IQ tests but show significant discrepancies between Verbal and Performance skills, reflecting learning disorders and underlying brain damage. They may achieve good school performance in the lower grades but show increasing problems or inconsistent performance as subjects become more complex in higher grades. Mathematics seems to be a particular problem because it requires good working memory skills (i.e., the ability to hold complex information in mind and manipulate it) and increasing abstraction skills as math subjects become more complex. *Id.*

b. <u>Attention and Hyperactivity Problems</u>: Difficulties in these areas manifest as increased activity level, distractibility, difficulty calming down, difficulty completing tasks, and trouble with transitions or novel stimuli. Self-soothing deficits in infancy often evolve into overactivity in childhood. *Id.*

c. <u>Social Skills Deficits</u>: Problems in this area include lack of stranger fear, a tendency to be scapegoated and easily taken advantage of by peers, naiveté and gullibility, inappropriate choice of friends, preference for younger friends, immaturity, superficial interactions, adaptive skills significantly below cognitive potential, inappropriate sexual behaviors, difficulty understanding the perspective of others (for example, empathy), poor social cognition, and clinically significant inappropriate initiations or interactions. Social skills deficits first manifest in early childhood as problems in perceiving, interpreting, and responding appropriately to social cues. In middle childhood, these children have significant difficulty making friends because their social perception deficits interfere with their ability to detect verbal and non-verbal communication from others, assimilate that information, and respond appropriately. The result is chronic impairment in interpersonal interactions. In an effort to participate in social communication with peers, such children often blurt out comments unrelated to the conversation at hand or fabricate stories in order to hold the interest of peers and fit in. Because they lack awareness of social boundaries, they sometimes stand too close to others or touch them inappropriately. As a result of these skill deficits, the childhood histories of individuals affected by FASD typically reflect loneliness and social isolation, and in their teens, these youth tend to gravitate toward antisocial peers who accept them as long as they go along with the activities of their peers. *Id.*

323. Secondary disabilities associated with fetal alcohol impairment are not just modifiable but preventable when an individual receives an early diagnosis and appropriate intervention. *See* A. P. Streissguth, et. al., *Understanding the Occurrence of Secondary Disabilities in Clients with Fetal Alcohol Syndrome (FAS) and Fetal Alcohol Effects (FAE): Final report*, University of Washington Publication Services (1996). Specific "risk factors" increase the

129

probability that a fetal alcohol impaired individual will go on to develop secondary disabilities, and specific "protective factors" reduce that probability. *Id*. The risk and protective factors apply to an individual's childhood up to 18 years of age and are mutually exclusive. *Id*. These mediating factors include the quality of a person's home, intervention, and the extent of a person's disorder. *Id*. Childhood sexual or physical victimization was an additional mediating factor that affected the later expression of inappropriate sexual behavior. *See* A. P. Streissguth, *Risk Factors for Adverse Life Outcomes in Fetal Alcohol Syndrome and Fetal Alcohol Effects*, 4 J Dev Behav Pediatr. 228-38 (2004).

324. Mr. Umaña did not receive the nurturing environment or the clinical intervention necessary to mitigate the primary and secondary effects of the fetal alcohol spectrum disorder that ensued because of his mother's drinking during pregnancy. Neglect and physical abuse by his father exacerbated his problems.

325. Because trial counsel ignored the evidence in their possession indicating the possibility of FASD, which included expert evaluations that indicated a developmental problem, the jury that sentenced Mr. Umaña to die never heard the above-evidence regarding the long-lasting negative impact his mother's drinking had on him. Further, the deficits in executive functioning Mr. Umaña experienced, probably from FAS, could have played a crucial role in his trial because the government accused him of committing murder in furtherance of his gang. Someone with executive functioning deficits may not be able to assess the consequences of their behavior as they act. Mr. Umaña, because of FAS, possibly was not neurologically capable of considering the social consequence of enhanced status in the gang at the moment he pulled the trigger. Trial counsel were ineffective for failing to recognize FAS and develop and present the impact of FAS on Mr. Umaña's development and actions.

**B. Trial Counsel Failed to Investigate the Impact of Toxic Chemicals on Mr. Umaña's Gestation and Development**

326. The factual and legal allegations and exhibits set forth in the 2255 Motion and those contained throughout this Amendment/Supplement, are incorporated herein as if fully stated. *See* Fed. R. Civ. P. 10(c), 15(a). The allegations in this claim relate back to the legal and factual averments of Claim 1, p. 56-57 and Claim 2, pp. 62-97 of the initial 2255 Motion.

327. The Sixth Amendment obligated trial counsel to conduct a thorough investigation into Mr. Umaña's background and development to try to expose all reasonably available mitigating evidence. *See* Doc. 24 at 7. Despite this obligation, trial counsel failed to recognize, gather and present evidence of Mr. Umaña's exposure to, and poisoning by, toxic chemicals during his gestation, infancy and childhood.

328. At an evidentiary hearing, Mr. Umaña will present testimony from medical doctors and / or public health experts and lay witnesses demonstrating by a preponderance of the evidence that, because of exposure to toxic chemicals, Mr. Umaña suffered mitigating short term and long-term damages to his development and consequent abilities.

**1. Toxic Chemicals Such as Pesticides and Fertilizers Disrupt Human Development with Both Short and Long Term Consequences.**

329. Pesticides have detrimental effects on human health, with young children among the particularly vulnerable. Children's organs are not fully developed until later in life. They continually experience critical periods in development; adverse exposures to toxic chemicals within pesticides can cause permanent damage, particularly in utero. Chalupka S, Chalupka AN, *The impact of environmental and occupational exposures on reproductive health*. Journal of Obstetric, Gynecologic, and Neonatal Nursing. 39(1):84 100 (2010). Researchers have demonstrated that the developing brain is sensitive to pesticide at levels that would not be toxic to adults and that levels necessary for neurological effects in children are lower than those required

131

to cause systemic toxicity. Colburn, T, *A Case for Revisiting the Safety of Pesticides: A Closer Look at Neurodevelopment*, Environmental Health Perspectives 114(1):10-17 (2006); Slotkin TA, Levin ED, Seidler FJ. *Comparative developmental neurotoxicity of organophosphate insecticides: Effects on brain development are separable from systemic toxicity*. Environmental Health Perspectives, 114(5):746–751 (2006). In essence, a level of toxicity that damages a child's brain might not cause any symptom in an adult.

330.    In children, evidence shows a link between pesticides and diminished reflexes, degraded psychomotor and mental development, and attention-deficit hyperactivity disorder. Jianghong Liu, PhD, Associate Professor and Erin Schelar, *Pesticide Exposure and Child Neurodevelopment*, Workplace Health and Safety 60(5): 235–243 (2012 May). Pesticide is also associated with developmental delay in children. Harari R, Julvez J, Katsuyuki M, Barr D, Bellinger DC, Debes F, et al., *Neurobehavioral Deficits and Increased Blood Pressure in School-age Children Prenatally Exposed to Pesticides*, Environmental Health Perspectives, 118(6):890–896 (2010).

### 2.    Mr. Umaña was exposed to pesticides *in utero* and throughout his childhood.

331.    Mr. Umaña was born in Escuintla, Guatemala, during a period when crop dusters freely applied pesticides to fields full of farm workers and adjacent waters.  Near the time of his birth, local health authorities in Guatemala treated as many as forty farmworkers a day for acute toxicity derived from the pesticides. Appx. 165 (Allan Riding, *Free Use of Pesticides Take Deadly Toll*, NY Times (Nov. 9, 1977); Def Ex. 32 (birth certificate).  His family moved to El Salvador several years later. At that time, El Salvador consumed twenty percent of the world's supply of pesticides. Daniel Faber, *A Sea of Poison*, NACLA A report of the Americas (2010). Misa Kishi, MD, DrPH, *Initial Summary of the Main Factors Contributing to Incidents of Acute Pesticide*

*Poisoning* IFCS Workgroup (2002). Mr. Umaña spent his infancy and childhood in communities that struggled with pesticide poisoning.

332.    Prior to his birth, during gestation, Mr. Umaña's mother drank a pesticide named Gamexane in a suicide attempt. Appx. 10, ¶41, p. 5.  Additionally, she was constantly hungry during pregnancy, eating little fish out of ponds and green bananas directly from the fields.  *Id.* ¶51, p. 6.  Thus, Mr. Umaña had two sources of pesticide in his bloodstream, albeit one much larger and more acute than the other, before he was even born.

333.    After he was born, his family lived in a structure with a dirt floor and no running water, adjacent to a fertilizer and pesticide warehouse. Appx. 105 ¶19, p.4. Fields of crops like sugarcane and mangoes stood near their home. *Id.*  His family subsisted by scavenging from the fields and spending what little money they had on local food. Mr. Umaña experienced pesticide exposure throughout his time Guatemala based on the location and condition of his home and his family's diet.

334.    Mr. Umaña's family moved to El Salvador when he was two or three years old, but they fared little better. In El Salvador, Mr. Umaña scavenged pesticide-coated fields and ate what he could find or gather. One of Mr. Umaña's neighbors told current counsel: "Alex went hungry. He often went without eating. His family did not help him with food. I never heard anyone call him to eat. They just left him alone to find food on his own. He would go out to look for small animals like doves or iguanas or to pick mangos and ice-cream beans." Appx. 1 at ¶ 14.  As his abject poverty forced him to scavenge through fields and eat wild animals in El Salvador, a place that consumed tons pesticide each year, Mr. Umaña was exposed to toxic pesticides.

335.    Mr. Umaña's intellectual deficits further exacerbated his exposure to pesticides from scavenging. Apparently, as a child, he did not know to take precautions against pesticides by

133

cleaning his food before he ate.  His family observed, "Alex would hunt pigeons and other birds for food. I would sometimes help him prepare the fire, as did my grandma Paca. Alex would look for a piece of plastic from the trash, and we would set fire to it using the firewood we gathered from the trees. Alex did not even clean the bird before eating it. He also ate iguanas and opossums. Alex would climb trees to pick fruit. He would eat the outsides of almonds, the part other people do not eat."  Appx. 15, ¶24.  Mr. Umaña inadvertently increased his exposure to pesticides and other toxins by not cleaning animals before he ate them and by eating the outsides of nuts that other people would not eat.

### 3. Mr. Umaña suffered symptoms of toxic exposure.

#### a. Mr. Umaña suffered immediate, short-term symptoms from exposure to toxins during childhood.

336.   Exposure to toxic pesticides can impose immediate symptoms of rash, fatigue and fevers in children. *Symptoms of Pesticide Poisoning*, Cooperative Extension System, available at http://articles.extension.org/pages/17854/symptoms-of-pesticide-poisoning.

337.   Mr. Umaña suffered a strange rash at a very young age. Mr. Umaña's mother recalls that at about three months old, "He started breaking out in red blotches and they kept getting bigger until all of his skin turned red. It was as though they had skinned him. His skin looked raw. It was very sad to see my son like that. At the hospital, they took samples of Alejandro's skin to analyze. At the hospital they did not give me an explanation or any treatment for Alejandro." Appx. 10, ¶56. *See also* Appx. 105 at p.4 and Appx. 111 at p. 2.  A grandmother who lived with him in El Salvador recalls Mr. Umaña was a sickly child.  He would often get high fevers; the fevers would cause him fatigue. Appx. 16, (Declaration of Ana Umaña, ¶20, p.3). Medical literature identifies rashes, fevers and fatigue as symptoms of acute toxic poisoning.

## C. Mr. Umaña still suffers long-term symptoms from exposure to toxins.

338.  Exposure to toxic substances such as pesticides causes long-term cognitive decline as well as damage to reflexes and psychomotor processes. *See* Jianghong Liu; Savage EP, Keefe TJ, Mounce LM, Heaton RK, Lewis JA, Burcar PJ, *Chronic neurological sequelae of acute organophosphate pesticide poisoning*, Arch Environ Health 43(1):38-45 (Jan-Feb 1988).  Expert evaluations conducted for trial counsel revealed damaged reflexes, diminished psychomotor control and cognitive decline.

339.  Dr. Merikangas evaluated Mr. Umaña as part of his claim of Intellectual Disability. Dr. Merikangas found damage to Mr. Umaña's reflexes, specifically that "His deep tendon reflexes in the knees and ankles were abnormal with hyperreflexia and ankle clonus." Dr. Merikangas also found that the palmomental reflexes were absent. Atkins hearing 11/30/09, Def. Ex. 17, CR 932. Similarly, regarding psychomotor control, Dr. Merikangas also found an aberration in Mr. Umaña's abilities in that he cannot close the left eye without simultaneously closing the right. *Id.* Counsel reasonably believes and expects to present expert testimony at an evidentiary hearing that current scientific study suggests that these symptoms results from Mr. Umaña's exposure to toxin such as pesticides.

340.  Further, another mental health professional, Dr. Weinstein also examined Mr. Umaña prior to trial. Dr. Weinstein found that Mr. Umaña suffers from cognitive decline. Dr. Weinstein specifically found "brain dysfunction in a generalized pattern with particular compromise to the frontal lobes," and low I.Q. Atkins hearing 11/30/09, Def. Ex. 14. Counsel reasonably believes and expects to present expert testimony at an evidentiary hearing that the low I.Q. and general brain dysfunction discovered by Dr. Weinstein qualifies as cognitive decline and could have been cause by toxic exposure.

135

### 4.    Conclusion

341.    The Sixth Amendment entitled Mr. Umaña to effective assistance of counsel including a thorough examination of his background for mitigating evidence.  *Wiggins v. Smith*, 539 U.S. 510 (2003). Trial counsel failed to conduct such an examination. Had counsel performed reasonably, and interviewed Mr. Umaña's mother, aunt and cousin, they would have discovered that Mr. Umaña was likely poisoned by exposure to pesticides, from gestation through childhood. Once trial counsel realized Mr. Umaña was exposed to toxic pesticides, they had to look no further than the expert evaluations conducted for the hearing on Intellectual Disability for proof that Mr. Umaña still suffers symptoms of toxic exposure.

342.    Exposure to pesticides and the long-term damage they cause is certainly mitigating. *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002) (ineffective assistance for failing to investigate an extraordinary history of exposure to pesticides and toxic chemicals). Mr. Umaña in no way purposefully exposed himself to poison but he carried the consequences of that exposure, in diminished cognitive abilities throughout his whole life.  The jury that decided if he should live or die should have been informed of Mr. Umaña's exposure to the toxins in pesticide and his consequent disabilities. If they had been so informed, at least one juror would have insisted on a penalty less than the death sentence. Trial counsel were ineffective.

**D.    Trial counsel failed to request readily available jury instructions regarding a statutory mitigating factor that would have compelled the jury to weigh low intelligence and brain damage without regard to specific behaviors.**

343.    The factual and legal allegations and exhibits set forth in the 2255 Motion and those contained throughout this Amendment/Supplement, are incorporated herein as if fully stated.  See Fed. R. Civ. P. 10(c), 15(a).  The allegations in this claim relate back to the legal and factual averments of Claim 2, pp. 64-69 of the initial 2255 Motion.

344. Federal law, specifically 18 U.S.C. §3592(a), provides statutory mitigating factors that the Court must instruct the jury to consider, provided trial counsel has supplied evidence of the fact and requested the instruction. *Id.; Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *See also Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The first mitigating factor recognized in the statute impaired capacity, which is defined as "The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge." *Id.* Trial counsel neither recognized he possessed evidence fitting this factor nor asked the Court to instruct the jury on this factor.

345. As argued in the 2255 Motion, (pp. 64-66) counsel possessed and even presented, during the penalty hearing, extensive evidence of Mr. Umana's low intellectual capacity. Counsel's evidence and testimony derived from the pre-trial *Atkins* hearing and supporting evaluations and from their own investigation. Dr. Weinstein tested Mr. Umaña's intelligence and found, among other things, that his performance on a test of executive function ranked him in the lowest one percent of test takers. On a test of his judgment, as a subpart of the executive function test, he scored as moderately to severely impaired. Appx. 72 CNS Vital Signs Clinical Report at 1, 8. Another expert, Dr. Merikangas, independently reported that Mr. Umaña suffered "brain impairments, to a reasonable degree of medical probability, [that] render hi[m] less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals." *Atkins* hearing 11/30/09, Def. Ex. 17. Dr. Merikangas reiterated this during penalty hearing when he testified Mr. Umaña "would be less able than normal people to control his conduct. He would be more subject to duress, that is control by others, who are perhaps smarter or more capable than he is. That he be more likely to be a -- lead, easily lead by stronger people."

137

PPT at 737. Despite possessing Dr. Merikangas' report and presenting his testimony, counsel failed to seek an instruction on §3592(a)(1). *See* CR 1024, filed 04/27/10 (Proposed Jury instructions); PPT 04/27/10 p.m. at 801 (charge conference).

346. Counsel failed to recognize this evidence and other available but not investigated evidence (*See* Claim 42) supported a request for this instruction. The omitted yet available instruction required jurors to consider evidence that Mr. Umaña had an impaired capacity to appreciate the wrongfulness of his conduct and to consider any evidence that he was impaired in his ability to conform his conduct to the law. Dr. Merikangas specifically testified that Mr. Umaña was less able to modulate his behavior compared to normal people. He reported that Mr. Umaña was less able to form executive judgments. These two disabilities described by Dr. Merikangas perfectly fit the instruction. A person that suffers an inability to form executive judgements does not appreciate an abstract concept such as fully appreciating the wrongfulness of his conduct. A person that has a disability in modulating his behavior certainly has less capacity to conform his conduct to the law than a person without those disabilities. Trial counsel should have, and reasonably effective counsel would have, sought this instruction.

347. Trial counsel's unreasonable behavior prejudiced Mr. Umaña. The jury unanimously found, as mitigating evidence, that the offense did not involve substantial planning and occurred during an emotionally charged argument. CR 1050, Mitigators #9, 10 (Jury Penalty Verdict). Based on these findings, had the jury been asked, they also would have found that Mr. Umana was impaired in his ability to appreciate the wrongfulness of his conduct and that he was impaired in his capacity to conform his conduct to the law. After finding these mitigating factors, there is a reasonable probability that at least one juror would insist on a sentence less than death. Relief if required.

138

**44. THE GOVERNMENT FAILED TO DISCLOSE MITIGATING INFORMATION REGARDING THE CIVIL WAR IN EL SALVADOR IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

348. The allegations in this claim relate back to the legal and factual averments of Claim 6 of the initial 2255 Motion.

349. The Due Process Clause requires a prosecutor to disclose favorable evidence to the accused that is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). *Brady* itself was a sentencing case.

350. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the Government had in its possession, and failed to produce, mitigating evidence regarding the civil war in El Salvador, including evidence regarding events and conditions in Santa Ana, El Salvador during the period of the civil war and Mr. Umaña's childhood; information relating to military engagements, forced disappearances, and extrajudicial killings; and records regarding immigration to Guatemala during the war. Had this evidence been disclosed, there is reasonable probability that the outcome of the proceeding would have been different, as only nine jurors found that Mr. Umaña "was exposed to the violence of civil war in his native El Salvador at an early age." CR 1048 at 4-6. Relief is required.

**45. THE COURT ERRED BY EXCLUDING THE NARRATIVE ON THE BACK OF MR. UMAÑA'S GUATEMALAN BIRTH CERTIFICATE THAT CONTAINED IMPORTANT DETAILS REGARDING HIS FAMILY HISTORY IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. COUNSEL WERE INEFFECTIVE.**

351. The allegations in this claim relate back to the legal and factual averments of Claim 6 of the initial 2255 Motion.

352. Rooted in the premise that death is different, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), the Constitution guarantees a capital defendant an opportunity to present evidence of character, including evidence of a difficult family history, in mitigation. *Lockett v. Ohio*, 438

139

U.S. 586, 604 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982); *see also Hutchins v. Garrison*, 724 F.2d 1425, 1437 (4th Cir. 1983).

353. During the penalty phase, counsel sought to introduce a copy of Mr. Umaña's Guatemalan birth certificate and an accompanying narrative that was created as a result of an interview between Salvadoran police and Mr. Umaña's mother. PPT at 588-89. The narrative explained that Mr. Umaña's father moved the family from El Salvador to Guatemala prior to Mr. Umaña's birth and the father provided false information on the birth certificate. The Court admitted the birth certificate, but it excluded the narrative, finding that it was cumulative of what was already contained in the certificate itself, and that it may confuse and mislead the jury. *Id.* at 589-90, 921-25; *see also* CR 1165 at 14-15.

354. The information in the narrative was mitigating family history evidence that Mr. Umaña was constitutionally-entitled to present. Mr. Umaña's case in mitigation was based in large part on the idea that he grew up during a tumultuous, violent civil war in El Salvador. *See* PPT at 541-43; 610-14; 669; 680-81; 856-58. The statement of Mr. Umaña's mother in the narrative demonstrates that the family left El Salvador for Guatemala during the height of the war. *See id.* at 133, 540, 600. Thus, the evidence of the family fleeing to a neighboring country corroborated the idea that the civil war had a major impact in the life of Mr. Umaña and his family.

355. The narrative also demonstrated that the father provided false information on Mr. Umaña's birth certificate. The father hid his own identity and gave the name of someone else as being Mr. Umaña's father. This implied that the father had something to hide at the time of Mr. Umaña's birth. It also corroborated defense evidence at trial that the father appeared unwilling to both put Mr. Umana's needs ahead of his own and later to assist in obtaining information that

140

could help save his son from the death penalty. This was important considering he was the parent that raised Mr. Umaña, while his mother was not involved.

356. The evidence was also necessary to properly assess Mr. Umaña's character. The defense penalty case was built around the trauma Umaña suffered growing up in poverty stricken and war-torn El Salvador, and his subsequent induction into a violent street gang. PPT at 535-36, 540-41, 600, 610-22, 638, 668-71. Evidence of his family fleeing from the war and his father's lies at the time of his birth would have lent support to the fact that Umaña was more a product of his environment rather than, as the prosecutor argued, an inherently "evil" person. PPT at 892.

357. Had the jury heard the evidence and argument, there is a reasonable probability at least one juror would have voted for life. Had counsel fully litigated this issue at trial and on direct appeal, there is a reasonable probability of a different outcome. Relief is required.

**46.** **JURORS' FAILURE TO FIND UNDISPUTED OR CONCEDED MITIGATING CIRCUMSTANCES VIOLATED THE EIGHTH AMENDMENT. COUNSEL WERE INEFFECTIVE.**

358. The allegations in this claim relate back to the legal and factual averments of Claims 1 and 2 of the initial 2255 Motion.

359. At the penalty phase, the defense presented evidence in support of its proposed mitigating circumstances including evidence of lack of education and growing up in the midst of a brutal civil war. Although the prosecution presented no evidence to dispute the existence of these circumstances, and in some respects conceded their existence, none of these factors was found unanimously by the jurors. The jurors' findings violated Mr. Umaña's Eighth Amendment rights. Had counsel objected and fully litigated this issue at trial and on direct appeal, there is a reasonable probability of a different outcome at penalty phase or on direct appeal.

**A. Despite Undisputed Evidence, Jurors Failed to Find or Weigh Uncontested Mitigating Factors Arising from Mr. Umaña's Lack of Education and Exposure to Violence During the Civil War.**

**1. Relevant Evidence**

360. Mitigation specialist, Richard McGough, testified for the defense that he went down to El Salvador to interview Mr. Umaña's father and staff at Mr. Umaña's elementary school. The evidence showed that Mr. Umaña had difficulties in school and repeated grades. PPT at 545. Mr. Umaña repeated third grade at least twice. PPT at 545. His last year of school was in a remedial classroom for first, second, and third graders. PPT at 545, 549-552. Mr. Umaña's grades in this class showed he failed. PPT at 552. Mr. Umaña did not go back to school and went to work in remedial jobs. PPT at 562.

361. The prosecution presented neither evidence nor argument disputing this fact. In closing argument, the government conceded the lack of education. Comparing Mr. Umaña to one of the victims, the government noted that the victim also grew up poor and did not receive a good education. PPT at 893.

362. The defense also presented evidence that Mr. Umaña was exposed to the violence of civil war in his native El Salvador at an early age. Mr. Umaña was born during the El Salvador Civil War, which lasted between the years 1979 to 1992. PPT at 540. Mr. Umaña's father told mitigation specialist, Richard McGough, that he himself witnessed atrocities during the war. PPT at 541. There were mandatory curfews throughout the country and significant violence in Santa Ana. *Id*. According to his father, Mr. Umaña, like the adults in his family, was fearful because of the war. *Id*. Mr. Umaña told McGough that as a child and during the war, he witnessed five men attacking another man with machetes and killing him in the coffee fields located in front of the meson where they lived. *Id*. Expert Selena Sermeño also testified that it was impossible for anyone in El Salvador not to be impacted by the violence of the civil war. PPT at 610. The people of El

142

Salvador were in a constant state of vigilance and people witnessed disappearances, killings, bombings, and forceful recruitment. PPT at 610.

363. The prosecution did not rebut the evidence. Indeed, the prosecution conceded in its closing argument "Sure, he grew up in a war torn country." PPT at 836.

### 2. Jury's Findings

364. Thirteen mitigating circumstances were submitted to the jury. CR 1048. Only nine jurors found that Mr. Umaña "was exposed to the violence of civil war in his native El Salvador at an early age" and only one found "he did not have the benefit of schooling beyond the third grade." CR 1048 at 4-6.

### B. The Jurors' Failure to Find and Weigh Undisputed or Conceded Mitigating Circumstances Violated the Eighth Amendment.

365. Under the Eighth Amendment, "is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (citing *Hitchcock v. Dugger*, 481 U.S. 393 (1987)). While the sentencer is free to "determine the weight to be given relevant mitgating evidence" it "may not give it no weight." *Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982).

366. In Mr. Umaña's case, the sentencer heard relevant mitigating evidence but "g[a]ve it no weight." 455 U.S. at 115. Although the Government either conceded its existence or did not contest it, a significant number of the jurors failed to find these factors. Having not found them, the jury gave them no weight in reaching the sentencing determination. The jury's failure to actually weigh relevant, uncontroverted mitigating evidence violated the Eighth Amendment. Relief is required.

### C. Counsel were Ineffective.

367. Counsel's failure to raise and litigate these issues at trial and on appeal constitutes prejudicially deficient performance in violation of the Sixth, Eighth and Fourteenth Amendments. Mr. Umaña expects to demonstrate at an evidentiary hearing that counsel had no reasonable strategic basis for failing to object to the jury's failure to consider and give effect to relevant mitigation evidence and for failing to preserve and raise these issues at trial and on appeal. As there is a reasonable probability that, had counsel performed effectively, the results of the sentencing hearing and appeal would have been different, prejudice is demonstrated and relief is required.

**47. THE GOVERNMENT'S FAILURE TO PROVIDE THE CONSTITUTIONALLY REQUIRED NOTICE AS TO NON-STATUTORY AGGRAVATION VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

368. The allegations in this claim relate back to the legal and factual averments of Claims 5 and 8 of the initial 2255 Motion.

369. "No principle of procedural due process is more clearly established than that notice of the specific charge . . ." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *see also In re Oliver*, 333 U.S. 257, 273 (1948); *Lankford v. Idaho*, 500 U.S. 110, 126 n. 22 (1991) (in a "variety of contexts, [this Court's] cases have repeatedly emphasized the importance of giving the parties sufficient notice to enable them to identify the issues on which a decision may turn"); *Morgan v. United States*, 304 U.S. 1, 18 (1938).

370. The core of this principle includes the also long-standing constitutional requirement that a defendant have a meaningful opportunity to contest issues determinative of the state's case. *E.g., Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *In re Gault*, 387 U.S. 1, 34 (1967) ("one of the purposes of notice is to clarify the issues to be considered"); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right

144

to a fair opportunity to defend against the State's accusations."); *Davis v. Alaska*, 415 U.S. 308 (1974). Nor does the due process clause tolerate government action intentionally designed to mislead opposing counsel or the factfinder regarding determinative trial issues. *E.g., Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). As the Supreme Court noted long-ago, the state's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

371. The denial of adequate notice also deprives the accused of his right to effective assistance of counsel. *E.g., Lankford*, 500 U.S. at 124 ("inadequate notice concerning the character of the hearing frustrated counsel's opportunity to make an argument that might have persuaded the trial judge to impose a different sentence, or at least to make different findings than those he made"); *Strickland v. Washington*, 466 U.S. 668, 684-685 (1984); *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *Rock v. Arkansas*, 483 U.S. 44, 51 (1987); *Smith v. Estelle*, 602 F.2d 694 (5th Cir.1979), *aff'd on other grounds*, 451 U.S. 454 (1981) ("Surprise can be as effective as secrecy in preventing effective cross-examination, in denying the 'opportunity for [defense] counsel to challenge the accuracy or materiality of' evidence, and in foreclosing 'that debate between adversaries [which] is often essential to the truth-seeking function of trials'")(*quoting Gardner v. Florida*, 430 U.S. at 357, 360).

372. These principles are even more critical in light of the heightened safeguards required in capital cases. *E.g.*, *Beck v. Alabama*, 447 U.S. 625 (1980); *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

373. In its Notice of Intention to Seek the Death Penalty, the Government offered as non-statutory aggravation under 18 U.S.C. § 3593 (a)(2) additional criminal conduct, specifying two separate homicide incidents, one that occurred on July 27, 2005 (the Fairfax incident) and another on September 28, 2005 (Lemon Grove). CR 275 at 4 (aggravation as to Counts 22 and 23); *id.* at 7 (Counts 24 and 25). As to the Fairfax incident, the Government alleged that Mr. Umaña "unlawfully killed Jose Herrera and Gustavo Porras." *Id.* As to the Lemon Grove incident, however, the Government alleged that Mr. Umaña "*participated and aided and abetted* the killing of Andy Abarca." *Id.*

374. The discovery provided to counsel regarding the Lemon Grove incident was, at best, ambiguous regarding evidence that Mr. Umaña was anything other than an accomplice. Indeed, as demonstrated in the Motion, the overwhelming evidence arising from that discovery (including evidence trial counsel failed to develop) indicated that someone other than Mr. Umaña actually shot the victim. Doc. 24 at 122-38.

375. Nevertheless, and having led counsel down the primrose path that it intended to pursue this aggravator on an accomplice theory, the Government offered testimony purporting to support a theory that Mr. Umaña was the shooter. *See* PPT at 110, 117-18 (double hearsay testimony contending Mr. Umaña was the shooter); *id.* 329-31 (two less than positive out-of-court six-pack show-up identifications).[9] In closing, the Government directly argued that Mr. Umaña was the shooter, not an aider and abettor. *See* PPT at 830-31; 839 (same). As a result, the jury was asked to consider this aggravator in terms of him being the actual shooter instead of the accomplice.

---

[9] *See also* PPT at 327 (Court finding that in "neither one [of the two six-pack show-ups] was [Gonzalez] positive"); *id.* (Court finding "it's less than a positive identification").

146

376. While counsel attempted to challenge the Government's at-trial theory that Mr. Umaña was the shooter, as demonstrated in the record (*see* Doc. 24 at 122-38), and as Mr. Umaña will demonstrate after full discovery and an evidentiary hearing, had counsel had the constitutionally required notice and opportunity to prepare a defense, the jury would have heard a great deal other evidence directly disputing the Government's at-trial theory of culpability. The failure to provide Mr. Umaña with adequate notice violated the Fifth, Sixth and Eighth Amendments. As there is a reasonable probability that, had the Government provided sufficient notice allowing counsel the requisite time and opportunity to develop defense evidence the jury would have either rejected this aggravator or applied less weight to that aggravator in reaching its sentencing determination, prejudice is demonstrated and relief is required.

377. Similarly, with no notice whatsoever, the Government admitted evidence indicating Mr. Umaña's purported involvement in two additional homicides and a gang shoot out unrelated to Fairfax, Lemon Grove Park, North Carolina, or El Salvador. *See* Gov. Ex. 520 at 64-65 (Detective Parshall questioning Rivera about homicides that occurred at "Hollywood and Garfield" and at "Western and Fountain"); *id.* (Parshall's handwritten note in the margin of the transcript of the Rivera interview indicating that Parshall had information that Mr. Umaña was involved in two additional homicides); Gov. Ex. 522 at 135-39 (Dets. Flores and Parshall telling Mr. Umaña they had information implicating him in shoot out with White Fence gang).

378. As described elsewhere, the admission of this patently unreliable non-statutory aggravation violated the Fifth, Sixth and Eighth Amendments. *See* Claim 35. Also as described elsewhere, after full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the Government withheld material exculpatory evidence directly disputing the reliability of this evidence. *See* Claim 6. For the reasons described above, because the Government offered no

147

notice whatsoever of its intent to seek death on the basis of this non-statutory aggravation, the Government's admission of that evidence also violated long-standing Fifth, Sixth and Eighth Amendment law requiring notice and an opportunity to defend.

379. After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the failure to provide proper notice prevented counsel from both developing evidence directly disputing the evidence implicating Mr. Umaña in two additional murders and a gang shoot out and raising valid and proper legal bases for exclusion of this inherently unreliable evidence. As there is a reasonable probability that, had the Government honored its constitutional obligations, the evidence would have been excluded and/or the jury would have rejected it or applied less weight to that evidence in reaching its sentencing verdict, prejudice is demonstrated and relief is required under the Fifth, Sixth and Eighth Amendments.

380. Counsel's failure to raise and litigate these claims at trial and on direct appeal constitutes prejudicially deficient performance in violation of the Sixth, Eighth Amendments. After full discovery and an evidentiary hearing, Mr. Umaña expects to present evidence demonstrating that counsel had no reasonable strategic basis for failing to raise these claims. As there is a reasonable probability that, had counsel performed effectively the results of the penalty hearing and/or appeal would have been different, prejudice is demonstrated and relief is required.

**48. TRIAL COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE AND CHALLENGE THE GOVERNMENT'S UNCONSTITUTIONALLY OVERBROAD, VAGUE, AND DUPLICATIVE AGGRAVATING FACTORS, WHICH VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

381. The allegations in this claim relate back to the legal and factual averments of Claims 5, 8, 9, 10, and 22 of the initial 2255 Motion.

382. The jury's consideration of overbroad, vague, and duplicative aggravating factors, which failed to properly narrowly its sentencing discretion, violated Mr. Umaña's Fifth, Sixth, and

148

Eighth Amendment rights. While the Court overruled similar objections pre-trial (CR 1000), counsel ineffectively failed to fully present these issues and the trial record elucidated the duplicativeness, vagueness, and overbreadth of the Government's aggravators, *per se* and as applied to Umaña. To the extent these issues were not previously raised, counsel were ineffective. As there is a reasonable probability of a more favorable outcome at trial or on direct appeal had these issues been fully raised and litigated, relief is required.

383. In capital sentencing, the Eighth Amendment requires clear standards to channel the exercise of discretion at all stages of the process. A capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Aggravating factors must not be unconstitutionally vague or overbroad, and the court must "determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer." *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (citing *Arave v. Creech*, 507 U.S. 463, 471 (1993)).

384. Due process is violated when a criminal law "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015). The vagueness doctrine applies not only to statutes defining elements of crimes, but also to statutes fixing sentences. *See Johnson*, 135 S. Ct. at 2557. Death-eligibility findings, moreover, qualify as elements of the offense. *See Ring v. Arizona*, 536 U.S. 584 (2002).

385. Duplicativeness, or double counting, of an aggravating factor "has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *United States v. McCullah,* 76 F.3d 1087, 1111 (10th Cir.), *cert.*

*denied*, 520 U.S. 1213 (1997) (relying on *Stringer v. Black*, 503 U.S. 222, 230-32 (1992)). The Fourth Circuit follows this approach, and has held that submission of multiple overlapping aggravating factors "that permits and results in cumulative findings" of what amounts to one aggravating factor is constitutional error. *See United States v. Tipton,* 90 F.3d 861, 899 (4th Cir. 1996). Duplicativeness can prejudice a defendant "by causing the jury to assess the weight of [the four duplicative aggravating] circumstances it found on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor," or "by allowing the jury to find a more morally culpable circumstance than was supported by the [evidence] before it." *Id.* at 899-900. Duplicativeness occurs when the factors in question substantially overlap, or when one factor's elements necessarily include elements of another factor. *See United States v. Jones,* 132 F.3d 232, 250 (5th Cir. 1998); *Tipton,* 90 F.3d at 899; *McCullah,* 76 F.3d at 1111.

### A. The "Grave Risk" Mental State and Aggravating Factor Were Unconstitutionally Broad, Vague, and Duplicative, and Failed to Genuinely Narrow and Guide the Jury's Sentencing Discretion.

386. In Counts 23 and 25, the Government alleged Umaña unlawfully used a firearm during a "crime of violence," namely the racketeering conspiracy (Count 1) or the murders in aid of racketeering (Counts 22 and 24). CR 623 at ¶¶ 51, 56; *see also* 18 U.S.C. § 924(c), (c)(3) (defining "crime of violence"). The Court instructed the jury "that racketeering conspiracy and murder in aid of racketeering are crimes of violence," without further explanation. GPT at 1249.

387. In the death-eligibility phase, the Government alleged all four death-eligible mental states, including that Umaña acted "knowing that the act created a grave risk of death to a person . . . such that participation in the act constituted a reckless disregard for human life." CR 275 at 2, 6; CR 1044-1047 at 3; PPT at 47; *see also* 18 U.S.C. § 3591(a)(2)(D). The Government also alleged the statutory aggravator that Umaña "knowingly created a grave risk of death to one or more persons in addition to [the decedent]." CR 275 at 3, 6; CR 1044-1047 at 4; PPT at 48; *see*

150

*also* 18 U.S.C. § 3592(c)(5). The Court did not give further instruction or guidance on the definitions of "grave risk of death" or "reckless disregard for human life." PPT at 47-48.

388. Here, the "grave risk" mental state and statutory aggravator merely rephrased a necessary element of the § 924(c) homicide counts: using a firearm during a crime of violence, or a felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Compare* 18 U.S.C. §§ 924(c), (c)(3), *with* § 3591(a)(2)(D), 3592(c)(5). By doing so, the "grave risk" mental state and statutory aggravator were unconstitutionally broad, merely duplicated an element of the offense, and thus failed to genuinely narrow the class of death-eligible defendants. *Cf. Maynard v. Cartwright*, 486 U.S. 356, 364 (1988) (invalidating an aggravating factor that "an ordinary person could honestly believe" applied to every eligible defendant).

389. Similarly, the "grave risk" statutory aggravator was merely duplicative of the "grave risk" mental state, encouraging jurors to double count Umaña's alleged mental state. Thus, the aggravator was unconstitutionally broad and failed to genuinely narrow the class of death-eligible defendants.

390. Finally, the "knowingly created a grave risk of death" mental state and statutory aggravator are void for vagueness, both *per se* and as applied. Federal courts have long acknowledged that instructions are required to clarify for the jury what amounts to "knowingly created a grave risk of death." *See Gregg v. Georgia*, 428 U.S. 153, 202 (1975) (plurality acknowledged that state-law grave-risk aggravator may be unconstitutionally vague depending on the facts); *United States v. Barnette*, 211 F.3d 803, 819-20 (4th Cir. 2000) (affirming, under the circumstances, where district court carefully defined "grave risk of death to others" as "a significant and considerable possibility" and as placing others in a "zone of danger"). Indeed, the

151

Supreme Court struck similar language--"serious potential risk of physical injury to another" in a prior conviction--as unconstitutionally vague for sentencing enhancement purposes. *See Johnson*, 135 S. Ct. at 2555-56.

391. Here, the "knowingly created a grave risk of death" mental state and statutory aggravator were unconstitutionally vague, leaving jurors to rely on standardless discretion. *Cf. Johnson*, 135 S. Ct. at 2556; *Tuilaepa*, 512 U.S. at 972. It is unclear what constitutes a "knowing creation of grave risk of death," as opposed to, for example, a knowing creation of gross or criminally negligent risk of death; or a reckless creation of a certain risk of death. The vague provisions are not saved, moreover, merely because some conduct would hypothetically fall under the provisions. *See Johnson*, 135 S. Ct. at 2560-61 ("our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp"). The District Court provided no definition or appreciable guidance on what constituted a "knowing creation of a grave risk of death." *See* PPT at 47-48. Thus, jurors were left with no appreciable standard to channel their sentencing discretion.

### B. The Statutory Aggravators Were Unconstitutionally Broad, Vague, and Duplicative, and Failed to Genuinely Narrow and Guide the Jury's Sentencing Discretion.

392. On each of the four homicide counts, the Government submitted to the jury the "grave risk" statutory aggravator and the "multiple killings" statutory aggravator. CR 1044-47 at 4; *see* 18 U.S.C. § 3592(c)(5), (16). Although the District Court stated its reasons for finding the aggravators non-duplicative, namely that the "grave risk" aggravator applied to bystanders and the "multiple killings" aggravator applied because there was more than one decedent (PPT at 3), the Court failed to instruct jurors that they must engage on a similar non-duplicative analysis. PPT at 46-49. Indeed, jurors may have reasonably concluded that Umaña "knowingly created a grave risk of death [only to the Garcia Salinas brothers]" and "killed and attempted to kill [only the Garcia

152

Salinas brothers]" (CR 1044-47 at 4); and disagreed with the Government's theory that he "knowingly created a grave risk of death" or "attempted to kill" any bystanders. PPT at 16-44. *See, e.g.*, *United States v. Glover*, 43 F. Supp. 2d 1217, 1221-22 (D. Kan. 1999) (ordering government, so as to avoid constitutional duplicativeness error, to amend death penalty notice to allege either "grave risk" statutory aggravator or "multiple attempted killings" statutory aggravator).

### C. Non-Statutory Aggravator # 1 Was Unconstitutionally Broad, Vague, and Duplicative, and Failed to Genuinely Narrow and Guide the Jury's Sentencing Discretion.

393. Non-statutory aggravator # 1--killing "to protect and maintain the name and reputation of [the RICO], and to advance his position and reputation within the [RICO]" (CR 1048-1051)--merely rephrased a necessary element of the four homicide counts: killing in furtherance of the RICO "for the purpose of . . . maintaining or increasing position in [the RICO]." 18 U.S.C. § 1959(a)(1); *see also* CR 623 ¶¶ 8, 9, 11, 23(kk), 49, 54, 51, 56; GPT at 1242-47. By doing so, this aggravator was unconstitutionally broad, merely duplicated an element of the offense, would apply in every RICO murder, and thus failed to genuinely narrow the class of death-eligible defendants. *See Maynard*, 486 U.S. at 364 (invalidating an aggravating factor that "an ordinary person could honestly believe" applied to every eligible defendant); *Zant*, 462 U.S. at 877 (capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty").

394. Count 1 alleged that Umaña participated in a RICO, in which members "were expected to protect the name, reputation, and status of the gang and its members"; "members [were] expected to use any means necessary to get respect from those who show disrespect, including acts of intimidation and violence"; "[p]articipation in criminal activity by an MS-13 member . . . increased the level of respect accorded that member, resulting in that member maintaining or increasing his position in the gang"; and members' illegal activity would be

153

reported back to the RICO at meetings. Count 1 further alleged that the homicide of the Garcia Salinas brothers was an overt act in furtherance of the RICO conspiracy. CR 623 ¶¶ 8, 9, 11, 23(kk).

395. Counts 22 and 24 re-alleged the Count 1 RICO conspiracy allegations, and alleged that Umaña, "for the purpose of maintaining and increasing position in [the RICO], unlawfully and knowingly murdered [Mr. Ruben Garcia Salinas and Mr. Manuel Garcia Salinas]." The Court specifically instructed that the murder must be, not only "in furtherance of or consistent with the purposes of the enterprise," but also for the purpose of maintaining or enhancing his position. GPT at 1246-47. And Counts 23 and 25 alleged that Umaña used a firearm while committing homicides for the purpose of maintaining or increasing position in the RICO. CR 623 ¶¶ 49, 54, 51, 56. *See* 18 U.S.C. § 1959(a)(1) (RICO murder includes element: "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity").

396. Thus, all five counts required the government prove Umaña killed the Garcia Salinas brothers in furtherance of the RICO and to maintain or advance his position in the RICO. The government then recapitulated the exact same fact as non-statutory aggravator # 1: he killed in furtherance of the RICO ("to protect and maintain the name and reputation of the [RICO]"), and "to advance his position and reputation" therein. CR 1048-1051 at 1; PPT at 905.

397. By merely recapitulating elements of the substantive offense, non-statutory aggravator # 1 was unconstitutionally broad and vague, and failed to genuinely narrow the class of death-eligible defendants or channel the jury's sentencing discretion. *Cf.* Little, The Federal Death Penalty: History & Some Thoughts About the Department of Justice's Role, 26 Ford. Urb. L.J. 347, 402 (1999) (due to commonality of FDPA's statutory aggravators and ability to invoke

non-statutory aggravators, "it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense").

### D. Multiple Non-Statutory Aggravators Were Unconstitutionally Broad, Vague, and Duplicative, and Failed to Genuinely Narrow and Guide the Jury's Sentencing Discretion.

398. Non-statutory aggravators 1, 3, and 4 are unconstitutionally duplicative of one another, as there is substantial overlap between the factors, and some factors' elements necessarily include elements of other factors. CR 1048-1051. *See Jones,* 132 F.3d at 250; *Tipton,* 90 F.3d at 899; *McCullah,* 76 F.3d at 1111.

399. Umaña's alleged pattern of conduct and "allegiance to" and "membership in MS-13" are listed in three of the four "future danger" sub-factors (sub-factors a, b, and d). These elements substantially overlapped with or were subsumed by elements of the substantive offenses (allegiance to and membership in the RICO in Count 1, killing in furtherance of the RICO in Counts 22-25, tampering with witnesses in Count 63), and substantially overlapped with or were subsumed by elements of other aggravators and each other. Fourth Circuit precedent identified the concern that jurors would make cumulative findings in light of multiple overlapping aggravators and thus give multiplying effect to what was essentially a single fact. *See Tipton*, 90 F.3d at 899-900. The same concern is present in repeatedly alleging the same fact in multiple sub-factors: the jury is more likely to find the aggravator met on an "unfair quantitative basis that gave four-fold effect to what was essentially a single factor." *Id.*

### E. Relief is Required.

400. Because the jury relied on invalid aggravation in reaching its sentencing determination, a new sentencing hearing is required. *Sochor v. Florida*, 504 U.S. 527, 532 (1992) (citing *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990)) ( "there is Eighth Amendment error when the sentencer weighs an 'invalid' aggravating circumstance in reaching the ultimate decision

155

to impose a death sentence"); *see also Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992); *Stringer v. Black*, 503 U.S. 222, 230 (1992).

**49. THE COURT'S PENALTY PHASE JURY INSTRUCTIONS VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. COUNSEL WERE INEFFECTIVE.**

401. The allegations in this claim relate back to the legal and factual averments of Claims 1, 2, and 25 of the initial 2255 Motion.

402. Had counsel objected and fully litigated this issue at trial and on direct appeal, there is a reasonable probability of a different outcome at penalty phase or on direct appeal.

**A. The District Court's Color-Blind Instruction Precluded Jurors From Giving Full Consideration of Umaña's Cultural Mitigation, the Government Committed Misconduct By Exploiting the Instruction, and Counsel Was Ineffective**

403. The District Court's color-blind instruction under 18 U.S.C. § 3593(f) precluded the jury from giving full meaningful consideration to Mr. Umaña's cultural mitigation, in violation of the Fifth, Sixth, and Eighth Amendments.

404. Mr. Umaña grew up in Guatemala and El Salvador, two impoverished Central American countries that experienced violent civil wars during his childhood, which devastated the economy, infrastructure, government, education system, standard of living, and all aspects of life. To make matters worse, his parents coped by abusing drugs and alcohol, even during pregnancy. Environmental toxins and pesticides were rampant. So too was the violence, first between the military and insurgents, then between the gangs, with ordinary citizens--including Umaña before he joined MS--caught in the crossfire. Meaningful work was hard to find, especially for someone with less than a third-grade education, like Umaña. Without family support or an education, it's little surprise he turned to a meager but steady source of shelter, food, and camaraderie: MS-13.

405. A sentencing jury must be permitted to give full meaningful effect to mitigating evidence offered by the defendant. *Brewer v. Quarterman*, 550 U.S. 286, 289 (2007); *Mills*, 486

U.S. at 374-75; *Lockett*, 438 U.S. 586 (1978). This is particularly true when the evidence could be viewed as a double-edged sword that supports mitigation and aggravation alike. *Brewer*, 550 U.S. at 289, 292-93, 296 (2007). The Eighth Amendment is violated "whenever a statute, or a judicial gloss on a statute, prevents a jury from giving meaningful effect to mitigating evidence that may justify the imposition of a life sentence rather than a death sentence." *Brewer*, 550 US at 289. Any "barrier to the sentencer's consideration of all mitigating evidence" violates the Eighth Amendment. *Mills*, 486 U.S. at 375. Thus, factors relating to his national origin and race are relevant to provide meaningful evidence about his life. It is also self-evident that the presence of such evidence by the defense does not authorize the government to seek the death penalty because of race, ethnicity, and national origin. *Zant v. Stephens*, 462 U.S. 862, 88 (1983) (state may not attach "aggravating" label to constitutionally-protected status, beliefs or conduct).

406.    Equal protection prohibits discrimination on the basis of race, color, ethnicity, or national origin in criminal proceedings. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867-68 (2017) (collecting cases). The Sixth Amendment prohibits jurors from arriving at a verdict on such bases. *See id.* at 869; *cf. Tharpe v. Sellers*, 138 S. Ct. 545 (2018) (per curiam). Race, color, and ethnicity are also prohibited from factoring into sentencing and any future dangerousness analysis. *See Buck v. Davis*, 137 S. Ct. 759, 778 (2017) (That defendant "may have been sentenced to death in part because of his race . . . is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are.").

407.    The color-blind § 3593(f) instruction required, or at the very least encouraged, jurors to disregard mitigation tied to Umaña's "race, color, religious beliefs, [and] national origin." PPT at 911. Ironically, the instruction did nothing to insulate Umaña--or the jury--from the thinly veiled xenophobic, race-based comments espoused by the prosecution in closing argument. *E.g.*, PPT at

157

899 ("You want to live the crazy life? You need to be ready for some American justice. You want to bring El Salvador here, you want to bring your gang from El Salvador [sic[10]] here, you want to kill us, you want to live your crazy life here, well, you'd better be ready for some American justice if you're going to do it"); PPT at 903 ("If his life in El Salvador was as bad as they painted it, prison looks good. . . . he's going to be good [in prison]. You know why? Because he wants to make sure he gets his beans and potato chips").

408.   Simultaneously, the instruction reinforced the prosecutor's arguments that the jury should ignore Mr. Umaña's experiences as a poverty-stricken marginalized ethnic minority, who was damaged by living through an era of bloody civil wars and widespread violence and socio-economic distress in Central America, and left his homeland believing his only viable option was to enter this country without inspection.  *E.g.,* PPT at 836 ("And by every account, ladies and gentlemen, he had a normal life"); 889-90 (arguing to ignore mitigation investigation, asking "You're going to base your decision on that? Hearsay from a hired mitigation expert. . . . Hired to do what? Convince you to do other than what you know you need to do and what you said you would do when you were selected as jurors"); 895 (Murder "takes away everything special and unique. Everything special and unique about Ruben and Manuel was wiped from this earth by [Umaña's] actions. But [his lawyers] want to stand up here and talk to you about how special and unique he is and that he doesn't deserve to die because of it").

409.   The prosecution's "us versus the foreigner" theme resonated with jurors, as none of his cultural mitigation was found unanimously, and only 9 jurors even believed he was exposed to

[10] MS-13 originated in Los Angeles, California, according to the Government's own gang expert, to protect the newly arrived Salvadoran immigrant community from harassment and extortion by street gangs from other settled Hispanic communities.  GPT at 33.

violent civil war from an early age.  CR 1048-1051.  The theme was reiterated throughout the government's duplicative aggravators, which repeatedly punished him based on one overarching fact:  his reliance on and membership in an ethnic Salvadoran street gang for survival.

410.   The Supreme Court's timeless words cannot be squared with what occurred in this trial:  "Race discrimination is 'especially pernicious in the administration of justice.'  And public respect for our system of justice is undermined when the system discriminates based on race." *Johnson v. California*, 543 U.S. 499, 511 (2005) (citing *Rose* v. *Mitchell*, 443 U.S. 545, 555 (1979), and *Batson* v. *Kentucky*, 476 U.S. 79, 99 (1986)).  The color-blind § 3593(f) instruction did nothing to cure the racial and ethnic overtones of this prosecution, and instead only blunted the jury from giving full meaningful consideration of Umaña's cultural--"race, color, religious beliefs, and national origin"--mitigation.

**B.  The Penalty-Phase Instructions Violated the Presumption of Life, Shifted the Burden of Persuasion, and Diminished the Government's Burden of Proof; Prior Counsel were Ineffective.**

411.   Mr. Umaña is entitled to a new sentencing hearing because the penalty-phase instructions erroneously erected a presumption of death that shifted the burden of persuasion at sentencing. These instructional errors, individually and in combination, together with counsel's failure to object and offer constitutionally correct alternative instructions, rendered the resulting death sentence imposed in this case arbitrary and unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

412.   During the guilt phase of trial, the District Court instructed the jury on the presumption of innocence. GPT at 6-7, 1141.  The Court did not, however, instruct the jury at any time during the penalty phase that Mr. Umaña also enjoyed a statutory and constitutional presumption of life.

159

413.  Instead, the first words the Court spoke to the jury at the outset of the penalty phase suggested that the presumption of innocence had been extinguished.  PPT at 10.  Having been told that Umaña was presumed innocent, "[t]he presumption will end only if . . .  the government has shown to your satisfaction that the defendant is guilty beyond a reasonable doubt" (GPT at 1141), and the penalty phase was being conducted after finding him guilty (PPT at 10), the jury was reasonably likely to believe that there was no penalty-phase equivalent to the guilt-phase presumption of innocence.

414.  Additionally, the Court's description of the sentencing options, as "death or imprisoned for life," erected a presumption of death that pervaded the entire penalty phase and impermissibly shifted the parties' burdens of persuasion.  *See, e.g.*, PPT at 10, 12, 88, 817-18, 912. Even in its penalty-selection phase instructions, the Court repeatedly instructed jurors on the aggravating circumstances--the reasons for death--first.  PPT at 821, 904-11.

415.  The failure to give a presumption-of-life instruction was exacerbated by the Government's inflammatory misconduct in penalty-selection summation, when it argued, *inter alia*, that LWOP was tantamount to a child's timeout or a vacation in the Rockies (PPT at 900), and the "minimum sentence" that he didn't "deserve" (PPT at 904); and that the mitigating information gathered by his investigator was contrived and dubious and should be ignored (PPT at 889-90).

416.  The presumption of life upon which Mr. Umaña relies is constitutionally compelled. In *Ring v. Arizona*, the Supreme Court held that death penalty aggravating circumstances "operate as 'the functional equivalent of an element of a greater offense.'" 536 U.S. 584, 609 (2002); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 112 (2003) ("'murder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter*"). Thus, the Sixth Amendment and

160

due process compel a corollary presumption of life in the penalty phase of a capital case. Here, there is a reasonable probability the jury logically concluded that it must first reject death if it was to impose life, because the court failed to instruct on the presumption of life and gave structurally misleading instructions suggesting the primacy of and preference for the death-sentence option. This false presumption of death violated due process and the Sixth Amendment.

417.   The lack of a presumption-of-life instruction effectively shifted the burden onto Mr. Umaña. The Supreme Court has acknowledged that a jury instruction that shifts the burden of persuasion to the defendant or implies a conclusive presumption violates due process. *See Sandstrom v. Montana*, 442 U.S. 510, 524 (1979). Here, the false presumption of death "conflict[s] with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime, and would invade [the] factfinding function which in a criminal case the law assigns solely to the jury." *Id*. at 523 (internal quotations and citations omitted). If a presumption is not conclusive but effectively shifts the burden of persuasion to the defendant, it also violates due process. *Id*. at 524. Here, the trial court's instructions shifted the burden of persuasion to Mr. Umaña to show why he should not be sentenced to death. Because the jury "may have interpreted the judge's instruction as constituting either a burden-shifting presumption . . . or a conclusive presumption," the lack of a presumption-of-life instruction violated Mr. Umaña's right to due process. *Id*.

418.   Mr. Umaña was also denied his Sixth Amendment right to a jury determination of his sentence beyond a reasonable doubt. In *United States v. Gaudin*, the Supreme Court held the "Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." 515 U.S. 506, 522-23 (1995); *see also Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000). In *Ring v. Arizona*, the Court

161

held that death penalty "aggravating factors operate as the functional equivalent of an element of a greater offense, [and thus] the Sixth Amendment requires that they be found by a jury." 536 U.S. at 609. Because jurors require instruction on applicable legal standards, the Sixth Amendment compelled an instruction on the presumption of life in this case. Here, the court's instructions denied Mr. Umaña the jury determination to which he was entitled by failing to provide a presumption-of-life instruction and instead implying that the jury should consider death first, consider non-statutory aggravation before mitigation, prefer the death option to the life option, and reject death before considering life.

419. This also violated Mr. Umaña's right to an impartial capital sentencing jury as guaranteed by the Sixth Amendment and due process. "[T]he decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." *Witherspoon v. Illinois*, 391 U.S. 510, 523 (1968). Indeed, deliberate or not, a juror's views that substantially impair his or her ability to follow the law and to return a life verdict render the juror partial to the government. *See Morgan v. Illinois*, 504 U.S. 719, 739 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Adams v. Texas*, 448 U.S. 38, 47 (1980). Here, the court's instruction misdirected the jury to consider death first, prefer the death option to the life option, or reject death before considering life. This false presumption tipped the scales toward death, in violation of impartial-juror guarantees.

420. Finally, in a capital case, the sentencer may not be precluded from giving full effect to mitigating evidence offered by the defendant as a reason to spare his life. *See Mills v. Maryland*, 486 U.S. 367, 374-75 (1988); *Lockett v. Ohio*, 438 U.S. 586 (1978). The court's instructions prevented the jury from giving full mitigating effect to the evidence presented in this case, by creating a presumption of death that the mitigating evidence had to overcome. This "barrier to the

sentencer's consideration of all mitigating evidence," violated Mr. Umaña's Eighth Amendment and due process rights. *Mills*, 486 U.S. at 375. Relief is required.

### C. The Court's Failure to Define "Reasonable Doubt" at the Penalty Phase Violated the Fifth, Sixth, and Eighth Amendments.

421. As demonstrated in Claim 50, the Court's reasonable doubt instruction was unconstitutional. Mr. Umaña incorporates the evidence and argument from that Claim as if set forth fully herein. The Court made no additional attempt to define reasonable doubt at the penalty phase.

422. Where, as here, a great deal of the Government's evidence involved allegations of uncharged conduct and Mr. Umaña was not able to confront the witnesses against him, the jury's understanding of the concept of beyond a reasonable doubt was critical. As the Court's instruction failed to adequately define that legal principle, there is a reasonable likelihood that, had the jury been properly instructed, it would have reached a different verdict. Accordingly, relief is required.

### D. The Court's Failure to Instruct the Jury that It Must Consider Uncontested Mitigation Evidence.

423. As described in Claim 46 (uncontested mit claim) Mr. Umaña presented mitigation evidence that not contested by the Government, but not found by sentencing jurors in violation of the Fifth, Sixth and Eighth Amendments. Mr. Umaña incorporates the evidence and argument from that Claim as if set forth fully herein.

424. Counsel's failure to request, and the Court's failure to provide the jury with an instruction indicating that it must find uncontested mitigating factors and then determine what weight, if any, to apply to its sentencing determination violated the Fifth, Sixth and Eighth Amendments. *See Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982) (while the sentencer is free to "determine the weight to be given relevant mitigating evidence" it "may not give it no weight").

425. Counsel can have no reasonable strategic basis for failing to request an instruction that prevents the jury from considering and giving effect to relevant mitigation evidence as required under the Fifth and Eighth Amendments. Prejudice is demonstrated because, had the jury been properly instructed there is a reasonable probability that the consideration of uncontested mitigation by all the jurors would have affected the weighing process and resulted in a different verdict. Relief is required.

**50. THE TRIAL COURT'S GUILT PHASE INSTRUCTIONS VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. COUNSEL WERE INEFFECTIVE.**

426. The allegations in this claim relate back to the legal and factual averments of Claims 7, 8, 25 and 27 of the initial 2255 Motion.

427. Due process requires that the Government, through properly admitted evidence interpreted in accordance with the law, must prove beyond a reasonable doubt each and every element of the crimes with which the defendant has been charged. *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000); *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993); *Francis v. Franklin*, 471 U.S. 307, 315 (1985); *Chandler v. Florida*, 449 U.S. 560, 574 (1981) *Sandstrom v. Montana*, 442 U.S. 510, 520-22 (1979); *Mullaney v. Wilbur*, 421 U.S. 684, 692-96 (1975); *In re Winship*, 397 U.S. 358, 364 (1970). The Sixth Amendment right to trial by jury also "indisputably entitle[s]" a defendant to a jury determination of all the elements of each offense beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476-77; *see also United States v. Gaudin*, 515 U.S. 506, 514 (1995) ("the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion"). "[T]he presumption of innocence . . . is a basic component of a fair trial under our system of criminal justice," and "courts must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle v. Williams*, 425 U.S.

501, 503 (1976). Relief is required if "there is a reasonable likelihood that the jury has applied the challenged instructions in a way" that reduces the Government's burden. *Boyde v. California*, 494 U.S. 370, 380 (1990).

428. A number of aspects of the instructions violated these fundamental principles. For example, the instructions with regard to what the Government must prove in order to meet its burden as to murder for Counts 22 and 24 (arising from the December 8, 2007 incident) created a reasonable likelihood that the jury reached its determination on less than the required proof of every element beyond a reasonable doubt.

429. In its instructions, the Court defined the elements of murder under North Carolina law once, in its charge as to Count One (GPT at 1235-38) and then for Counts 22 and 24, simply referred the jury back to its instructions for Count One. GPT at 1246-47. During the instructions on Count One, in addition to instructing on the elements of intentional first degree murder under North Carolina law (GPT at 1236), the Court also instructed on felony murder, including:

> One, that the defendant committed a felony offense, including robbery, in violation of North Carolina General Statute 87.1 and robbery with a firearm or dangerous weapon in violation of North Carolina General Statute 87.1.

GPT at 1237.

430. There was no evidence that the incident on December 8, 2007 involved a murder in the course of a robbery. Nor was there any evidence, or allegation presented by the Government that Mr. Umaña had been involved in a felony murder. The only way that the jury could have found Mr. Umaña guilty on a theory of felony murder would have been if it engaged in rank speculation that the December 8, 2007 incident involved a murder in the course of a robbery when no such robbery had occurred. As there is no way to determine under what theory the jury found Mr. Umaña guilty of these counts, there is a reasonable likelihood that the jury reached its verdict on the basis of speculation (that this was a murder committed in the course of a robbery) as opposed

165

to competent reliable evidence in violation of the Fifth and Sixth Amendments. As there is a reasonable likelihood that, had the jury been properly instructed it would have reached a different verdict, relief is required.

431.   Similarly, the Court defined reasonable doubt as follows:

The term "reasonable doubt" means just what it says. It is a doubt based upon reason and common sense. Its meaning is no doubt self-evident and understood by you, and the Court will not attempt to define the term further.

GPT at 1141-42.[11]

432.   Mr. Umaña recognizes that this Circuit has held that "a district court should not attempt to define the term 'reasonable doubt' in a jury instruction absent a specific request for such a definition from the jury." *U.S. v. Oriakhi*, 57 F.3d 1290, 1300 (1995) (*citing United States v. Headspeth*, 852 F.2d 753, 755 (4th Cir. 1988), *overruled on other grounds* by *Taylor v. United States*, 495 U.S. 575, 597 (1990)). The Circuit reached this determination after concluding "that efforts to define reasonable doubt are likely to confuse rather than clarify the concept," *United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998), and "that the term reasonable doubt has a self-evident meaning comprehensible to the lay juror which judicial efforts to define generally do more to obscure than to illuminate." *Headspeth*, 852 F.2d at 755. The Circuit has also concluded that "only a jury can truly define reasonable doubt," and that, through the deliberative process, "the jury itself defines reasonable doubt and applies its own definition to the specific case before it." *United States v. Walton*, 207 F.3d 694, 699 (2000).

433.   However, as Justice Ginsburg noted in her concurrence in *Victor v. Nebraska*, the Supreme Court has "never held that the concept of reasonable doubt is undefinable, or that trial

---

[11] The Court also precluded counsel from arguing any definition of reasonable doubt "other than what [the Court] give[s]." GPT at 1062-63.

courts should not, as a matter of course, provide a definition." *Victor v. Nebraska*, 511 U.S. 1, 25 (1995) (Ginsburg, J. concurring). Justice Ginsburg also disagreed with the majority's "suggestion . . . that the Constitution does not require trial courts to define reasonable doubt." *Id.* at 26.

434. Justice Ginsburg further noted that "the argument for defining the concept is strong" because as studies show, "the words 'beyond a reasonable doubt' are not self-defining for jurors." *Id.* at 26 (*citing* Note, Defining Reasonable Doubt, 90 Colum.L.Rev. 1716, 1723 (1990)). The studies support Justice Ginsburg's recognition of the "uninstructive circularity" of an instruction that 'defines' reasonable doubt as 'doubt ... that is reasonable.'" Yet that is precisely what the Court's instruction in this case did.

435. The *Victor* Court recognized that longstanding Supreme Court precedent requires that the trial court's instructions must "correctly convey[] the concept of reasonable doubt to the jury." *Victor*, 511 U.S. at 22 (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)). While the *terms* "reasonable" and "doubt" may appear self-explanatory, that does not mean that the *concept* of "beyond a reasonable doubt" is readily apparent to the typical juror.

436. Finally, Justice Ginsburg rejected the notion that the only two choices are not defining beyond a reasonable doubt or providing a poor definition of that term, citing the Federal Judicial Center Standard Instruction as an example of an instruction that conveys the meaning in a manner that avoids confusion. *Victor*, 511 U.S. at 26-27 (Ginsburg, J. concurring). For each of these reasons, Mr. Umaña submits that not defining the legal concept of beyond a reasonable doubt violates the Fifth and Sixth Amendments.

437. Moreover, applying a standard that permits an individual jury to decide on its own definition of this fundamental legal principle based on the circumstances of a particular case (*see Walton*, 207 F.3d at 699) renders the resulting verdict arbitrary and capricious in violation of the

Fifth and Sixth Amendments as well as the Eighth Amendment heightened procedural safeguards required in capital cases.

438. Where, as here, a great deal of the Government's evidence involved allegations of uncharged conduct and testimony from multiple informants with clear biases to lie to curry favor with the Government, the jury's understanding of the concept of beyond a reasonable doubt was critical. As the Court's instruction failed to adequately define that legal principle, there is a reasonable likelihood that, had the jury been properly instructed, it would have reached a different verdict. Accordingly, relief is required.

439. Counsel's failure to preserve, raise and litigate these issues at trial and on appeal constitutes prejudicially deficient performance in violation of the Fifth, Sixth and Eighth Amendments. Counsel could have no reasonable strategic basis for failing to ensure that the jury was properly instructed. As there is a reasonable probability that had counsel performed effectively the results of the trial and/or appeal would have been different, relief is required.

51.



169





171



172



173

174



175



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 181 of 221



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 182 of 221



178



Case 3:16-cv-00057-MOC     Document 69     Filed 02/22/18     Page 184 of 221



Case 3:16-cv-00057-MOC    Document 69    Filed 02/22/18    Page 185 of 221



181



182



183



184



185



186



187



188



189



190



**52. THE COURT'S RELIANCE ON EXTRA-RECORD EVIDENCE IN REACHING PRETRIAL AND TRIAL DETERMINATIONS VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

517. The allegations in this claim relate back to the legal and factual averments of Claims 1-10, 19, 20, 22, 24 and 28 of the initial 2255 Motion.

518. Due process affords a criminal defendant the right to a judgment "based solely upon the evidence and the relevant law." *Chandler v. Florida*, 449 U.S. 560, 574 (1981). Both Due Process and the Confrontation Clause also require that an accused be afforded the right to "confront and cross-examine witnesses." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). *See also Crawford v. Washington*, 541 U.S. 36, 50 (2004); *Washington v. Texas*, 388 U.S. 14, 23 (1967); *Davis v. Alaska*, 415 U.S. 308 ( 1974); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *Rock v. Arkansas*, 483 U.S. 44, 51 (1987). Furthermore, the Eighth Amendment requires that the defendant's rights to be heard and present a defense be given even greater protection in a capital case. *See, e.g.*, *Beck v. Alabama*, 447 U.S. 625 (1980); *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987).

191

519.    The Court relied on extra-record considerations and evidence in reaching rulings pretrial and at-trial in violation of the Fifth, Sixth and Eighth Amendments.  For example, in reaching its determination that Mr. Umaña is not intellectually disabled, the Court found the absence of adaptive deficits based on testimony and exhibits presented in the co-defendants' trial that the Court had presided over in January 2010.  (CR 934 at 17-18).  The Court provided no notice of its intent to consider this evidence and testimony and neither Mr. Umaña nor counsel were provided any opportunity to confront, cross-examine or otherwise challenge this evidence. [13] The Court's consideration of this evidence and testimony violated the Fifth, Sixth and Eighth Amendments.

520.    In rejecting adaptive deficits regarding communication skills, the Court also relied on "[e]vidence regarding . . . letters and telephone conversations of the defendant," Doc. 934 at 6, and noted that the Government had "provided some of the defendant's letters and telephone calls intercepted by jail officials which had been decoded and translated." *Id* at 7.  With the exception of one letter admitted by Mr. Umaña (*see* Atkins hearing 11/30/09 at 70) that Dr. Olley explained reflected communication deficits (*id.* at 71-72), no letters or taped telephone conversations were admitted into evidence during the hearing, although Dr. Suarez discussed letters and telephone conversations he reviewed in reaching his conclusions.  *See* NT 11/30/09 at 322, 328, 361, 365, 373, 381, 416.

---

[13] The Court's conclusion that consideration of evidence at a completely different proceeding involving completely different issues, with completely different parties was appropriate because the evidence "was subject to cross-examination by those sharing an interest with the defendant" fails.  (CR 934 at 17, n.16)  The issue of Mr. Umaña's adaptive deficits was neither relevant nor material in the co-defendants' trial.  Moreover, while the co-defendants  may have shared a desire the challenge some aspects of the Government's evidence indicating criminality, that does not mean that the co-defendants had a "shar[ed] interest" in challenging evidence the Court found disputed Mr. Umaña's adaptive deficits.

521. Instead, at the close of the hearing, the Court requested that the Government provide it "any writings or recordings that were relied upon by [the Government's] expert," and "make that an exhibit, introduce it at some point." *Id.* at 425. There is no apparent record that the Government ever filed these documents/recordings but the Court's opinion indicates that the Government did provide them as requested.

522. The Court referenced six specific letters it reviewed in reaching its conclusion that Mr. Umaña was not intellectually disabled. *See* CR 934 at 7 (JMU 148); *id.* at 8 (JMU 2; JMU 22; JMU 56); *id.* at 11 (JMU 13; JMU 18). After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that there existed expert and other evidence directly disputing the Court's conclusions that these letters indicated the absence of adaptive deficits. The failure to disclose the Court's consideration of these materials in reaching its determination violated the Fifth, Sixth and Eighth Amendments.

523. While the Court did list six letters, it did not specify whether these were all the letters provided or, if not, what other letters were reviewed by the Court. After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that the contents of letters, recordings and other extra-record evidence the Court possessed, but did not identify, contained material evidence contradicting the Court's rulings. The Government's and the Court's failure to disclose exculpatory evidence violated the Fifth and Eighth Amendments. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987).

524. Similarly, in reaching its determination regarding Mr. Umaña's pretrial motion to strike the allegations of unadjudicated murders from the Government's Notice of Intent to Seek Death (CR 483) the Court considered documents provided by the Government in ex parte communications. Counsel did not become aware that the Government had provided those

193

documents in support of its objection to Mr. Umaña's motion under after the Court had ruled. GPT at 8-9; *see also* Appx. 160. After full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that there existed expert and other evidence directly disputing the Court's conclusions arising from these documents and supporting Mr. Umaña's motion to exclude. The failure to disclose the Court's consideration of these materials in reaching its determination violated the Fifth, Sixth and Eighth Amendments.

525. Following full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that additional circumstances in which the Government provided information to the Court outside the presence or knowledge of Mr. Umaña and/or his counsel and that the Court relied on that information in rulings against Mr. Umaña. The Court's exposure to other not-of-record information and evidence and its reliance on those materials in reaching evidentiary and other rulings violated the Fifth, Sixth and Eighth Amendments. Relief is required.

526. Counsel's failure to fully raise and litigate at trial and on appeal the constitutional violations arising from the Court's consideration of extra-record information in ruling on critical issues constitutes prejudicially deficient performance in violation of the Sixth and Eighth Amendments. Counsel can have no reasonable strategic basis for failing to protect and preserve Mr. Umaña's rights to due process, confrontation and cross-examination, particularly where the Court repeatedly relied on ex parte and/or not-of-record information in reaching critical determinations, particularly the determination of whether or not the death penalty was inapplicable. As there is a reasonable probability that, had counsel performed effectively, the results of the trial motions and appeal would have been different, prejudice is demonstrated and relief is required.

194

**53.** THE GOVERNMENT'S USE OF EVIDENCE FROM SELECT TRANSLATIONS OF LETTERS/TAPED CALLS AGAINST MR. UMAÑA PRETRIAL AND AT TRIAL WHILE AT THE SAME TIME DENYING MR. UMAÑA ACCESS TO FUNDING TO DEVELOP EVIDENCE DISPUTING THE GOVERNMENT'S EVIDENCE ARISING FROM THOUSANDS OF UNTRANSLATED LETTERS AND TAPES VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

527. The allegations in this claim relate back to the legal and factual averments of Claims 6, 7, and 8 of the initial 2255 Motion.

528. A criminal defendant may not be denied the right to a fair opportunity to defend against the state's accusations. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Davis v. Alaska*, 415 U.S. 308 (1974); *United States v. Cronic*, 466 U.S. 648, 656 (1984); *Strickland v. Washington*, 466 U.S. 668, 684-685 (1984); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Rock v. Arkansas*, 483 U.S. 44, 51 (1987). Clearly established federal constitutional law requires that the Government provide an indigent defendant with the "basic tools of an adequate defense." *Britt v. North Carolina*, 404 U.S. 266, 277 (1971). *See also Ake v. Oklahoma*, 470 U.S. 68, 70 (1985). Likewise, in a capital case, the Eighth Amendment requires that the defendant's rights to be heard and present a defense be given even greater protection. *Beck v. Alabama*, 447 U.S. 625 (1980); *Ake v. Oklahoma*, 470 U.S. 68 (1985); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987).

529. Indeed, the federal constitutional right to counsel includes the right to *adequate* legal assistance. *See Evitts v. Lucey* 469 U.S. 387, 395 (1985) ("[W]e have held that the trial-level right to counsel, created by the Sixth Amendment and applied to the States through the Fourteenth Amendment, comprehends the right to effective assistance of counsel") (citations omitted); *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980) ("Our decisions make clear that inadequate assistance does not satisfy the Sixth Amendment right to counsel made applicable to the States through the Fourteenth Amendment"); *id.* at 344 ("The right to counsel prevents the States from conducting

195

trials at which persons who face incarceration must defend themselves without adequate legal assistance").

530. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. This can be done only if counsel actually investigates, *id*. at 691; ABA STANDARDS FOR CRIMINAL JUSTICE, 4-4.1(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). The duty to investigate is especially exacting in a capital case, where "counsel's duty to investigate all reasonable lines of defense is strictly observed." *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997); *see also* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 10.7, Investigation (rev. ed. 2003); ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1, Investigation (1st ed. 1989). A critical part of the defense function is developing evidence challenging the prosecution's evidence and where the prosecution presents, and the factfinder relies on, materially misleading and/or false evidence or testimony, due process is violated. *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Townsend v. Burke*, 334 U.S. 736, 741 (1948).

531. If – for whatever reason – the court does not provide the funding necessary to develop available evidence disputing the prosecution's evidence, permitting the prosecution to present that evidence against the accused violates the Fifth, Sixth and Eighth Amendments.

532. Prior to trial, counsel filed a motion for funding to obtain translations of over 7000 pages of handwritten letters and over 300 minutes of taped phone calls that counsel had received from the Government during pretrial discovery. *See* CR 686. Counsel provided the Court with an

estimate of the cost for translating these materials at \$320,630.00. *Id.* Following notification from the Court of its intent to deny the request, counsel filed a supplement indicating that they had reduced the number of pages from over 7000 to 301 reducing the cost to \$6902.00.[14]

533. From the thousands of documents/recordings disclosed pretrial, the Government provided the Court with a select number of its own translated versions of letters and calls during the Atkins proceedings and the Court relied on those materials in rejecting Mr. Umaña's *Atkins* claim. CR 934 at 6-11. Trial counsel did not present any evidence disputing the Government's translations or its interpretation of the context of these letters and calls. Mr. Umaña expects to demonstrate after full discovery and an evidentiary hearing, that there existed evidence in the materials provided to the Court as well as other calls and letters not presented to the Court and not translated by defense counsel that would have disputed both the literal and contextual translations provided by the Government on material facts relied on by this Court in reaching its determination that Mr. Umaña did not meet the requirements for Intellectual Disability and on admitting evidence.

534. Also from these thousands of documents/recordings, the Government admitted its own translations of at least 61 letters (Gov. Exs. 151-177; 235-250; 253-283); at least 10 recorded calls (Gov. Exs. 143-44; 146-147; 178-179; 582); and at least two videos (Gov. Exs. 30; 145). Trial counsel did not present any evidence disputing the Government's translations or its interpretation of the context of these letters and calls. Mr. Umaña expects to demonstrate after full discovery and an evidentiary hearing, that there existed evidence both in the materials admitted by the Government and those not translated by defense counsel that would have disputed both the

---

[14] Counsel subsequently filed a motion for an additional \$650.00 to complete the project. It is unclear from the documents current counsel have whether or not those funds were approved.

197

literal and contextual translations provided by the Government on material facts relied on by the jury in reaching its guilt and sentencing determination.

535.   In order to effectively and adequately challenge the Government's translation and view of the context of the letters and audio/video recordings admitted at trial and provided (ex parte) to the Court during pretrial proceedings, counsel was constitutionally obligated to investigate the translations/context of all materials provided by the Government and challenge all instances in which the Government's translation and context interpretation was materially misleading and/or false in order to protect Mr. Umaña's Fifth, Sixth and Eighth Amendment rights.

536.   Finally, Mr. Umaña expects to demonstrate, following full discovery and a hearing, that funding for these translations, had it been made available to counsel, would not have been futile, but instead would have developed evidence in support of the defense and undermining the Government's theory of the case.  As demonstrated in more detail in Claims 214, English-language summaries of Spanish-language calls intercepted on government wiretaps; English-language translations of Spanish-language correspondence; and English-language translations of Spanish-language surveillance, all provided in pretrial discovery, contained evidence that counsel ineffectively failed to develop and present demonstrating Mr. Umaña's intellectual disability, challenged the Government's evidence, and supported his guilt and penalty phase defenses.

537.   Counsel's requests for funds in order to achieve that purpose was deemed cost-prohibitive.  While counsel's endeavor to substantially reduce the cost may have been fiscally laudable, it failed to ensure that Mr. Umaña was provided the necessary resources to fully and adequately challenge the Government's translations and contextual interpretations of the conversations, letters, videos and audio recordings as required by the Fifth, Sixth and Eighth Amendments.

538. Where the cost of developing an adequate defense against the Government's evidence is prohibitive, the remedy is not to deny adequate funding but instead either providing the funding or limit or preclude the Government from admitting the proposed evidence. Counsel's election to attempt to compromise Mr. Umaña's constitutional rights to the tools for developing a defense rather than fully and litigate the impropriety of allowing the Government an unfair advantage, particularly where Mr. Umaña's life was in the balance, constitutes prejudicially deficient performance in violation of the Fifth, Sixth and Eighth Amendments.

539. Moreover, after full discovery and an evidentiary hearing, Mr. Umaña expects to demonstrate that by the time trial began, the Government had disclosed: 21946 fifteen-minute Spanish language jail calls; 21978 pages of Spanish language letters; and 495 hours of surveillance including police interviews involving Spanish speakers. The estimated cost to obtain an accurate translation of these materials exceeds two million dollars. While undersigned counsel continue in their efforts to obtain the necessary funding to conduct the full investigation and translation necessary to fully and adequately assess the errors arising from the Government's select admission of letters, videos and audio recordings, the likelihood that the funding will be obtained is slim. As Mr. Umaña is entitled to a full and fair review of the constitutional violations presented that compromised the reliability of the jury's verdict and sentencing determination, for this reason as well, relief is required.

540. Counsel's failure to fully raise and litigate these issues at trial and on appeal constitutes prejudicially deficient performance in violation of the Fifth, Sixth and Eighth Amendments. Counsel can have no reasonable strategic basis for failing to protect and preserve Mr. Umaña's rights to the resources required for an adequate defense. As there is a reasonable

probability that, had counsel performed effectively, the results of the pretrial, trial and appellate proceedings would have been different, prejudice is demonstrated and relief is required.

**54.** **FORCING MR. UMAÑA TO PROCEED TO THE ELIGIBILITY AND SENTENCING HEARING ABSENT ADEQUATE NOTICE OF THE CHARGES AND EVIDENCE TO BE ADMITTED AGAINST HIM IN AGGRAVATION VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. COUNSEL WAS INEFFECTIVE.**

541. The allegations in this claim relate back to the legal and factual averments of Claims 5 and 8 of the initial 2255 Motion.

542. As described elsewhere, *see* Claim 17, the failure to provide adequate notice and an opportunity to be heard violates clearly established due process law, *see Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Lankford v. Idaho*, 500 U.S. 110, 126 n. 22 (1991); the Sixth Amendment right to effective counsel, *see Strickland v. Washington*, 466 U.S. 668, 685 (1984); *Gardner v. Florida*, 430 US 349, 360 (1977); and the Eighth Amendment heightened procedural safeguards, *see Beck v. Alabama*, 447 U.S. 625 (1980).

543. On April 24, 2009, Mr. Umaña filed a motion to strike the allegations of unadjudicated murders from the Government's Notice of Intent to Seek Death as unconstitutionally unreliable. CR 483. By the time jury selection had begun, the Court had not yet ruled.

544. On March 31, 2010, the defense filed a supplemental motion requesting that should the Court refuse to strike the evidence, there be a reliability determination prior to admission. CR 960. On April 5, 2010, the Government submitted its first evidence proffer that consisted of a three-paragraph statement alleging three murders from two incidents in Los Angeles and – for the first time – notice of a murder that had occurred in El Salvador. CR 967. The Government failed to even mention that Mr. Umaña had been acquitted of the El Salvador case. *Id*.

545. Testimony for trial began on April 12, 2010 and concluded on April 19, 2010. On the last day of trial, the Government provided the Court with an *ex parte* submission in support of admitting the evidence. PPT at 4. That same day, after the jury had found Mr. Umaña guilty and as the eligibility hearing was about to begin, the Court issued an oral ruling denying the motion to strike, indicating that, based on the Government's *ex parte* submission, it would allow the admission of evidence regarding the Los Angeles incidents but exclude the El Salvador incident. PPT at 4-8. When counsel raised the issue of the Government providing the Court materials *ex parte*, the Court indicated that counsel could review the Government's submissions and offer any objections the following day, presumably during a break in the eligibility proceedings. PPT at 8. The Court issued a written order later that day. CR 1000.

546. During the penalty hearing, the Government made the evidence of the Los Angeles murders the centerpiece of its argument for death. PPT at 90-270, 313-323, 329-341, 825, 827-30, 832-34, 889, 893-96.

547. Without adequate notice of what incidents, let alone what evidence of those incidents the Court would ultimately permit the Government to present, trial counsel was not in a position to adequately prepare for this capital sentencing proceeding. Having delayed a decision on critical issues that involved the heart of the Government's aggravation presentation until the day the penalty hearing was set to begin, the Fifth, Sixth and Eighth Amendments required a continuance and/or recess to allow counsel an opportunity to adequately prepare. Similarly, having learned that the Government had failed to provide counsel with a copy of its submission of materials in support of admission prior to the Court's ruling, the Fifth, Sixth and Eighth Amendments required a recess and/or continuance to permit counsel an adequate opportunity to review and object to that submission rather than requiring counsel to do that while at the same time

preparing for a penalty hearing in which he has also just learned of the nature and extent of the evidence the Court intended to permit the Government to present.

548. Counsel's failure to request a recess and/or continuance and raise and litigate these issues at trial and on appeal constitutes prejudicially deficient performance in violation of the Fifth, Sixth and Eighth Amendments. Counsel can have no reasonable strategic basis for failing to ensure that Mr. Umaña had the constitutionally required adequate notice and opportunity to be heard. As described elsewhere and in the Motion, counsel failed to challenge a great deal of the Government's aggravation case surrounding the other murders that directly impacted the reliability of the jury's sentencing determination. Accordingly, because there is a reasonable probability that, had counsel performed effectively, the results would have been different, prejudice is demonstrated and relief is required.

## 55. COUNSEL'S FAILURE TO DEVELOP AND PRESENT A COHERENT THEORY OF DEFENSE VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

549. The allegations in this claim relate back to the legal and factual averments of Claims 1-10, 19, 20, 22, 24 and 28 of the initial 2255 Motion. Mr. Umaña alleges the following facts, among other to be presented after full discovery, access to this Court's subpoena power, and an evidentiary hearing.

550. As described in the Motion and herein, counsel failed to develop and present a coherent defense theory that adequately challenged the Government's case and supported the trial defense and the case for life in violation of the Fifth, Sixth and Eighth Amendments. From jury selection, where counsel failed to conduct an adequate voir dire (*see* Claim 21); to trial where counsel failed to develop and present evidence supporting the chosen defense and providing the jury with a clear picture of the flaws in the Government's case (*see* Claims 2 and 3); to the eligibility proceeding where counsel did little to nothing to dispute the Government's case and

even failed to provide argument (*see* Claims 1, 2, and 3); to the penalty hearing, where counsel failed to develop readily available evidence challenging aggravation or supporting mitigation and either failed to argue, or inadequately argued the case for life (*see* id), counsel's preparation and presentation failed to provide the jury with a coherent theory why it should question the Government's case and reach a different verdict.

551. As a result, at trial, the jury was left with a misleading picture that Mr. Umaña was a cold-hearted, sophisticated gang leader who had committed multiple violent crimes to advance his status within the gang as opposed to an intellectually impaired, brain-damaged individual who was suffering from extreme trauma arising from growing up in poverty and the middle of a civil war in El Salvador. At the Eligibility hearing, the jury was left with the clear impression that there was nothing to rebut the Government's Eligibility factors when, in fact, there existed a great deal of mental health and social history evidence directly disputing those factors; and, at the penalty hearing, the jury was left with a picture of an evil killer as opposed to the damaged, traumatized, psychologically and intellectually impaired individual who could no more run a gang than a ten year old child.

552. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court's opinions "long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable [attorney conduct].'" *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010) (quoting *Strickland*, 466 U.S. at 688) (citations omitted); *Wiggins v. Smith*,

539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000)); see *also Rompilla v. Beard*, 545 U.S. 374, 387 & nn.6-7 (2005).

553.    Effective advocacy includes developing and presenting a coherent, viable defense and articulating that theory to the jury through evidentiary presentation and argument.  *See* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, GUIDELINE 10.10.1.  As the Comment to Guideline 100.10.1 notes:

> [I]t is critical, that well before trial, counsel formulate an integrated defense theory that will be reinforced by its presentation at both the guilt and mitigation stages. Counsel should then advance that theory during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing arguments.

*See also* ABA Guideline 4.1, Commentary ("the presentation to be made at the penalty phase [should be] integrated into the overall preparation of the case rather than being hurriedly thrown together"); *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989) (counsel must make a significant effort to ably present the defendant's fate to the jury and to focus the attention of the jury on any mitigating factors); cf. *Herring v. New York*, 422 U.S. 853, 862 (1975) ("[n]o aspect of [trial] advocacy could be more important than the opportunity finally to marshal the evidence for each side before submission of the case to judgment").

554.    As demonstrated above, counsel failed to develop or present a coherent theory of defense at all phases of Mr. Umaña's capital trial directly impacting the reliability of the guilt, eligibility and sentencing verdicts in violation of the Sixth and Eighth Amendments.

555.    Counsel's failure to raise and litigate these issues at trial and on appeal constitutes prejudicially deficient performance.  As there is a reasonable probability that, had counsel performed effectively, the results of the proceedings would have been different, prejudice is demonstrated and relief is required.

204

**56. APPELLATE COUNSEL WERE INEFFECTIVE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

556. At the time he filed his initial 2255 Motion, Mr. Umaña was represented by the same attorneys who represented him on direct appeal who could not raise claims of their own ineffectiveness. *See Christeson v. Roper*, 135 S.Ct. 891, 894 (2015).

### A. The Law

557. It is well settled that the Fifth, Sixth, and Eighth Amendments entitle individuals to meaningful appellate review of their conviction and sentence. *See Hardy v. United States*, 375 U.S. 277 (1964); *see also Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *Mayer v. City of Chicago*, 404 U.S. 189, 195 (1971); *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976).

558. When, as here, the law provides for appellate review of a conviction and sentence as of right, the due process clause of the Fifth Amendment requires that the defendant be afforded the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387 (1985).[15] The substantive standard for reviewing the effective assistance of appellate counsel is identical to the Sixth Amendment ineffectiveness inquiry under *Strickland v. Washington*, 466 U.S. 668 (1984).

### 1. Deficient Performance

*559.* In assessing Appellate Counsel's performance, the Fifth Amendment asks whether counsel had a reasonable strategic basis for his challenged action or inaction. The adequacy of counsel's performance is measured against an "objective standard of reasonableness," *Strickland*, 466 U.S. at 688, "under prevailing professional norms." *Id.*; *Wiggins v. Smith*, 539 U.S. at 521; *Rompilla*, 545 U.S. at 380. The courts "long have referred" to national standards such as the

---

[15] *Evitts* was decided under the Due Process Clause of the Fourteenth Amendment, but the substance of that clause is identical to the due process protections of the Fifth Amendment.

American Bar Association Standards for Criminal Justice and the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases "as 'guides to determining what is reasonable.'" *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688); *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010) ("these standards may be valuable measures of the prevailing professional norms of effective representation"); *Rompilla*, 545 U.S. at 387 & n.7. These norms unquestionably apply to counsel's performance on direct appeal in this case. *E.g.*, *Wiggins*, 539 U.S. 510 (2003) (applying ABA Standards and Maryland local norms to counsel's performance at trial in 1989); *Rompilla*, 545 U.S. 374 (2005) (applying ABA Standards to counsel's performance in November 1988 trial); *Williams*, 529 U.S. 362 (2000) (applying ABA Standards to counsel's performance in 1986 trial).

560.   The ABA Guidelines "in circulation at the time of [Mr. Umana's] direct appeal describe[ ] the obligation in terms no one could misunderstand in the circumstances of a case like this one," *Rompilla*, 545 U.S. at 387: "[a]ppellate counsel should seek, when perfecting an appeal, to present all arguably meritorious issues." AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 11.9.2.(D), Duties of Appellate Counsel (1989 ed.).

561.   As the Commentary to this Guideline clearly explained:

> Traditional theories of appellate practice notwithstanding, appellate counsel in a capital case should not raise only the best of several potential issues. . . . When a client will be killed if the case is lost, counsel (and the courts) should not let any possible ground for relief go unexplored or unexploited.

*See also* AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCEOF DEFENSE COUNSEL IN CAPITAL CASES, Guideline 10.15.1.(C), Duties of Post-Conviction Counsel (2d ed. 2003) (appellate "counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious"); *id*. Comment, Direct

Appeal ("[I]t is of critical importance that counsel on direct appeal proceed . . . in a manner that maximizes the client's ultimate chances of success. . . . When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.").

562. As a result, counsel in a capital case can have no reasonable basis for failing to present a meritorious issue on direct appeal. As described more fully below, counsel's appellate performance was deficient when they failed to properly raise numerous meritorious issues that had been preserved for direct appeal or that were otherwise cognizable on appeal despite trial counsel's failure to preserve them.

### 2. Prejudice

563. Prejudice is proven when there is a reasonable probability, but for counsel's errors or omissions, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (applying Strickland standard to consideration of appellate counsel's ineffectiveness). On appeal, prejudice is demonstrated whenever a petitioner would have been entitled to relief had appellate counsel raised the claim or claims on direct appeal.

### B. Counsel's Ineffectiveness

564. Although counsel raised some facet of a number of issues on appeal, counsel failed to raise all constitutional violations arising from the errors. As such, should the Court find that any issue raised in the original *Motion* or this *Supplement* is meritorious and should have been raised earlier but was not, counsel was ineffective and Mr. Umana is entitled to relief.

**57.** **THE FOURTH CIRCUIT COURT OF APPEALS VIOLATED MR. UMANA'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE CAPITAL CONVICTION AND SENTENCE BY MATERIALLY MISSTATING THE RECORD AND RELYING ON INVALID FACTUAL PROPOSITIONS TO AFFIRM THE VERDICTS.**

565. The allegations in this claim relate back to the legal and factual averments of the Claims 1-10, 1, 20, 22, 24 and 28 in the initial 2255 Motion.

566. It is well-settled that the Fifth, Sixth and Eighth Amendments entitle capital defendants meaningful appellate review of their conviction and sentence. *See Hardy v. United States*, 375 U.S. 277 (1964); *see also Griffin v. Illinois*, 351 U.S. 12, 19 (1956); *Mayer v. City of Chicago*, 404 U.S. 189, 195 (1971); *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990); *Gregg v. Georgia*, 428 U.S. 153, 195 (1976). Similarly, the consideration of false and/or misleading evidence in reaching a determination, violates Due Process and the Eighth Amendment's heightened reliability standards. *E.g. Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Gregg*, 428 U.S. at 195.

567. The Circuit relied on a number of misstatements of the record and materially misleading factual determinations in affirming Mr. Umaña's convictions and death sentence which violated the Fifth, Sixth and Eighth Amendments.

568. For example, in determining Mr. Umaña's claim involving the improper admission of unreliable hearsay evidence in support of aggravation arising from the Fairfax Street shooting, the Circuit recognized that Mr. Umaña's reliability arguments were "legitimate." *United States v. Umaña*, 750 F.3d 320, 348 (4th Cir. 2010). Nevertheless, the Court rejected this claim on the basis that "other evidence" corroborated reliability, particularly "undisputed ballistics evidence" purportedly "indicating that the same gun was used for both the Fairfax Street and Lemon Grove Park murders." *Id*. at 348-49, 343 ("the same gun was used to commit all the murders"). However, nothing in the record, ballistics or otherwise, established that the same gun was used in both

shootings.  On the contrary, the gun used in the Fairfax Street shooting was a .22 caliber weapon (PPT at 174) while the weapon used in the Lemon Grove shooting was not that caliber.  PPT at 260-61 (testimony that a recovered bullet fragment was not a .22 but similar to a .357 magnum); *see also id.* at 341 (witness indicating only one shooter at the Lemon Grove incident).

569.   The Circuit also relied on its false impression of the ballistics evidence as well as Freddie Gonzalez's purported in-court identification (that did not occur) as a basis for rejecting Mr. Umaña's claim that the evidence supporting the Lemon Grove was inherently unreliable. *Umaña*, 750 F.3d at 349.  Indeed, this Court specifically precluded Gonzalez from making an in-court identification  (PPT at 328) and the record demonstrates that Gonzalez "saw the shooter from twenty feet away at night with at best partial lighting" and never made an identification nearing any certainty. *Id.* at 363 (Gregory, J., dissenting) (describing the eyewitness testimony as weak). Absent the non-existent ballistics match and a reliable in-court identification, the was no "other evidence that rendered the hearsay testimony [of other suspects] sufficiently reliable." *Id*. at 348.

570.   In rejecting Mr. Umaña's argument that the proper venue for prosecution was the Middle District of North Carolina, the Circuit found that "Umaña's actions *in Charlotte* were sufficient to satisfy [the conduct element of 18 U.S.C. § 1959]. Umaña was *sent to Charlotte* with orders to shape up the North Carolina cliques. *Upon arriving in Charlotte*, he instructed the local MS 13 members at length about weapons and ammunition. He passed around his own gun. He discussed maintaining respect." *Id*. at 353 (emphasis added).  The Government's own evidence regarding these circumstances directly disputes the Circuit's factual conclusions.  Instead, during the questioned meeting, on November 30, 2007 Charlotte meeting,  (forming the basis for some aspects of these findings) Mr. Umaña made no mention of weapons or ammunition, did not pass around his own gun, and did not discuss maintaining respect. *See* Gov. Ex. 143b (Government

Informant Rony Lopez's audio recording of November 30, 2007 meeting).  That recording also demonstrates that Julio Rosales-Lopez, also known as Stiler or Styler, was the person sent to organize the clique and Stiler indicated that he had been in communication with people in El Salvador. *Id*. at 16:00 to 22:00.  Stiler also gave instructions for the next Charlotte MS 13 meeting; he told Informant Lopez that Charlotte MS 13 needs to be fixed so things go "smoothly;"  he expressed concerns about police attention; and he warned MS 13 members to be careful, low key and come to the next meeting unarmed.  *Id*.   In short, the true record demonstrates that Mr. Umaña's actions in Charlotte were, at best minimal and certainly not sufficient to satisfy the conduct element requirement for venue.

571.   The Circuit also misstated the facts relating to Mr. Umaña's Commerce Clause argument. Mr. Umaña argued on appeal that Congress exceeded its Commerce Clause authority when it enacted 18 U.S.C. 18 U.S.C.§ 1959 ("VICAR"), which punishes purely noneconomic, noncommercial conduct and does not require the prohibited activity to have any effect on interstate commerce.  The Circuit rejected this argument, finding that Congress could have rationally "concluded that intrastate acts of violence, such as murder, committed for the purpose of maintaining or increasing one's status in an interstate racketeering enterprise, would substantially affect the interstate activities of that enterprise." *Umana*, 750 F.3d at 336. The Circuit found that the facts of this case fit that rationale "[b]ecause of Umaña's substantial reputation in MS–13, which he seems to have built up partly through acts of violence in Los Angeles, MS–13 leadership—through international telephone calls—sent him from New York to North Carolina to instruct the cliques there on how more effectively to deal drugs, steal cars, and extort money." *Id*. at 337.

572. However, there was no evidence of "acts of violence in Los Angeles" during the guilt phase proceedings. Indeed, this Court had not even ruled on the admissibility of that evidence until the close of the guilt-phase proceedings. *See* PPT at 4-7. Thus, the Los Angeles allegations could not have formed the basis for the VICAR counts. Nor did the Government introduce any evidence that Mr. Umaña had received calls from El Salvador to leave New York to go to North Carolina to organize the gang activities.

573. Individually or collectively, the Circuit's reliance on inaccurate, misleading and/or false factual conclusions in affirming Mr. Umaña's convictions and death sentence violated the Fifth, Sixth and Eighth Amendments. Relief is required.

58. █████████████████████████████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████████



212



213



## REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, all other proceedings and submissions, Movant, Alejandro Umaña, respectfully requests that the Court grant him the following relief:

A)     That Movant be granted such discovery as is necessary for full and

fair resolution of the claims contained in this Motion;

B)     That leave to amend this Motion be granted;

214

C)      That an evidentiary hearing be conducted on all claims involving

disputed issues of fact;

D)      That Respondents be Ordered to respond to this Motion; and

E)      That Movant's convictions and sentences be vacated.

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

*/s/ Zandra L. Lopez*
ZANDRA L. LOPEZ
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Tel: 619-234-8467
Zandra_Lopez@fd.org

Dated: February 22, 2018

215

## CERTIFICATE OF SERVICE

I, Kelly D. Miller, hereby certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and a copy of the foregoing document has been served this day upon the following via CM/ECF:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
anthony.enright@usdoj.gov

*/S/ KELLY D. MILLER*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: February 22, 2018

216