# APPENDIX 122

## REPORTING OFFICER NARRATIVE

scanned

| Greensboro Police Department | | OCA 2007-0806-310 |
| --- | --- | --- |
| Victim | Offense | Date-/-Time-Reported |
| Society | DRUG LAW - SALE COCAINE | Mon 08/06/2007 16:00 |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

NO NCIC

NO JUVENILE

ON 08/06/2007 AT APPROXIMATELY 1400HRS OFFICERS M.T. YOUNG, C.R. FRANKLIN, C.S. PEACH CPL. M.C. BITNER AND SGT. J. A. HAFKEMEYER AND I RESPONDED TO THE AREA OF ███████ ████████ TO ASSIST SGT. M. RICHIE WITH AN INVESTIGATION. SGT. RICHIE INFORMED US THAT HE RECEIVED INFORMATION THAT THERE MAY BE EVIDENCE (GUN) AND TWO MISSING/ RUN A WAY HISPANIC JUVENILE FEMALES IN ███████ OF THE BEST VALUE INN AT ██████ ██████ SGT. RICHIE ALSO STATED THAT THERE MAY BE SOME HISPANIC MALES IN THE ROOM. THE HISPANICS WERE BELIEVED TO BE ASSOCIATED WITH THE GANG MS 13.

WE RESPONDED TO THE BEST VALUE INN AND ATTEMPTED TO MAKE CONTACT WITH THE OCCUPANTS IN ███████████ IS LOCATED ON THE NORTH WEST SIDE OF THE HOTEL ON THE SECOND FLOOR. WHILE WE WERE AT OUTSIDE OF ███████ WE OBSERVED A RED IZUSU RODEO N.C. REGISTRATION SSP-6064 OCCUPIED BY THREE HISPANIC MALES DRIVE INTO THE PVA OF THE HOTEL AND DRIVE NEAR ███████ . OFFICER J.D. SLOAN INFORMED US THAT HE HAD SEEN THE VEHICLE AT THE HOTEL EARLIER THIS MORNING.

SGT. RICHIE STOPPED THE VEHICLE AS IT WAS DRIVING TOWARDS THE ENTRANCE OF THE HOTEL PVA. I RESPONDED FROM MY LOCATION FROM ███████ TO ASSIST SGT. RICHIE. WHEN I ARRIVED SGT. RICHIE CPL. BITNER AND OFFICER FRANKLIN HAD ALL THREE SUBJECTS OUT OF THE VEHICLE AND DETAINED.

SGT. RICHIE INFORMED ME THAT HE SAW THE FRONT RIGHT PASSENGER OF THE VEHICLE MAKE A MOVEMENT WITH HIS HANDS TO THE FLOOR OF THE VEHICLE. I ASSISTED SGT. RICHIE WITH A PROTECTIVE SWEEP OF THE LUNGE AREA OF THE VEHICLE. WHEN I APPROACHED THE FRONT PASSENGER SIDE OF THE VEHICLE THE DOOR WAS OPEN. I LOOKED INTO THE VEHICLE AND COULD SEE A GREEN COLORED SUBSTANCE WRAPPED IN PLASTIC ON THE FLOORBOARD UNDER THE EDGE OF THE SEAT.

I RECONIZED THIS SUBSTANCE WITH MY TRAINING AND EXPERIENCE TO BE MARIJUANA. MARIJUANA IS TYPICALLY WRAPPED IN PLASTIC. I RETREIVED THAT SUBSTANCE FROM THE VEHICLE AND OPENED THE PLASTIC AND CONFIRMED THAT IT WAS MARIJUANA. I BEGAN TO SEARCH THE VEHICLE AND LOCATED NOTHING ELSE ILLEGAL.

THE FRONT RIGHT PASSENGER WAS IDENTIFIED AS ALEJANDRO ENRIQUE UMANA H/M DOB ███████ MR. UMANA HAD A POORLY MADE ID CARD THAT SHOWED AN ADDRESS OF ███ ███████████████████████████ . I ARRESTED MR. UMANA AND SEARCHED HIM FURTHER. I LOCATED SIX SMALL ZIP LOCK BAGGIES CONTAINING A WHITE POWDER SUBSTANCE FROM INSIDE HIS WALLET. I RECONIZED THIS SUBSTANCE TO BE COCAINE. I TESTED SOME OF THE WHITE POWDER WITH A FIELD COCAINE TEST KIT AND IT TESTED POSITIVE FOR COCAINE. I

---

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 2 of 600

| Victim | Offense | Date / Time Reported |
|---|---|---|
| Society | DRUG LAW - SALE COCAINE | Mon 08/06/2007 16:00 |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

LOCATED NOTHING ELSE ILLEGAL ON MR. UMANA.

THE OTHER TWO MALES WERE ID AS ███████████ H/M DOB ████ AND ████████ H/M DOB ██████ I SEARCHED ████████ AND ██████ WITH THEIR CONSENT AND LOCATED NOTHING ILLEGAL ON THEIR PERSON. ██████ AND ██ WERE DETAINED UNTIL THE INVESTIGATION OF ██████ WAS COMPLETED. FIELD INTERROGATION REPORTS WERE FILLED OUT ON ALL THREE SUBJECTS AND ████████ AND ████████ WERE RELEASED. ALL THREE SUBJECTS HAD GANG TATTOOS AND WERE BELIEVED TO BE IN THE MS 13 GANG. ████████ AND ████████ WERE FROM GREENSBORO AND MR. UMANA WAS DETERMINED TO BE FROM NY.

████████ WAS DRIVING THE VEHICLE AND MR. ALEMAN WAS THE REAR PASSENGER. MR. ████████ DRIVERS LICENSE IS REVOKED BUT HE WASN'T CHARGED DUE TO NOT HAVING WITNESSED HIM DRIVING ON THE ROAD.

████████ STATED THAT THE IZUSU RODEO BELONGED TO HIS BROTHER. THE REGISTERED OWNER IS LISTED AS ████████ H/M ████████ NCDL# ████████ HIS ADDRESS IS LISTED AS ████████

OFFICER M. NERO TRANSPORTED MR. UMANA TO THE GUILFORD COUNTY MAGISTRATE'S OFFICE AND I CHARGED HIM WITH PWIS/D COCAINE AND POSSESSION OF MARIJUANA. MR. UMANA HAD APPROXIMATELY 6 GRAMS OF POWDER COCAINE AND 14GRAMS OF MARIJUANA.

MR. UMANA WAS SEARCHED FURTHER AT THE JAIL AND NOTHING ELSE ILLEGAL WAS LOCATED ON HIM. MR. UMANA WAS GIVEN A $100,000.00 BOND BY MAGISTRATE JAMESON AND WAS TAKEN INTO CUSTODY BY THE GUILFORD COUNTY DETENTION CENTER.

I COLLECTED, SECURED, PACKAGED AND PROCESSED ALL EVIDENCE. I TURNED IN ALL EVIDENCE AT THE DISTRICT THREE SUBSTATION ON THIS DATE. I PLACED THE EVIDENCE INTO LOCKER SR 1.

EVIDENCE TURNED IN IS AS FOLLOWS:

ITEM #1, GREEN VEGETABLE MATTER WRAPPED IN PLASTIC

#2, SIX BAGS OF WHITE POWDER

[08/07/2007 14:09, GRIFFINJ, 591]

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 3 of 600

# APPENDIX 124

# RENUNCIA A DERECHOS (ADULTOS) / ADULT WAIVER OF RIGHTS
## (18 años de edad o mayor)

Yo, (name) __Alejandro Umana__ , tengo (age) __25__ años de edad. Nací el (date of birth) ▮▮▮▮▮▮ . Mi domicilio está en (address) ▮▮▮▮▮▮▮▮▮▮▮ . He finalizado el (grade) __3__ grado escolar y sé/no sé leer. (Officer/Detective name) __Lopez__ , quien entiendo es oficial de policía/detective, me ha comunicado que desea hacerme preguntas. El oficial de policía/detective también me ha informado y he comprendido lo siguiente:

__A U__
(iniciales)
(1) Tengo derecho a permanecer en silencio. Lo que significa es que no estoy obligado a decir nada ni a contestar ninguna de las preguntas.

__A U__
(2) Cualquier cosa que yo diga puede ser usada en mi contra.

__A U__
(3) Tengo derecho a hablar con un abogado y a que esté presente aquí conmigo en este momento para aconsejarme y asistirme cuando se me hagan preguntas.

__A U__
(4) Si deseo que un abogado esté a mi lado mientras me hacen preguntas, pero no tengo dinero para pagar un abogado, se me dará uno de manera gratuita antes de que me hagan preguntas.

Conozco mis derechos, los cuales han sido explicados por el Oficial/Detective (Officer/Detective) __Lopez__ .
Declaro en el presente que SÍ deseo contestar las preguntas en este momento.

Tomo libremente la decisión de contestar preguntas en este momento y es una decisión que he tomado por mí mismo. No he recibido amenazas ni promesas de trato especial. Para mostrar mi decisión, firmo en el espacio que se indica a continuación.

Firmado: _____  Fecha: __12/12/07__ Hora: __7-08 P m__

Testigo: (firma) __2572__

Testigo: (firma) __M. D.__

Nombre: __C. Lopez Jr. 2572__
(en letra de molde)

Nombre: __M. G. Terry__
(en letra de molde)

# APPENDIX 125

# CHARLOTTE-MECKLENBURG ARREST PROCESSING CENTER
## ARREST WORK SHEET

Revised 6-59

COMPLAINT # 20030613004501  ARREST # 1160339  PID # _____

NAME: Aleman    Manuel    DeJesus ____
LAST    FIRST    MIDDLE    SUF

ALIAS: _____ _____ _____ _____
LAST    FIRST    MIDDLE    SUF

SSN: ___-__-___  DR LICENSE # ST. NC #. ███████ RACE H  SEX M  AGE 22

DOB ███████  HEIGHT: 5-6  WGT: 150  HAIR BLK  EYES BRN  POB: El Salvador

HOME BLOCK: █████  DIR. ____  STREET: ███████  TYPE R  APT: ███

CITY: Charlotte  STATE: NC  ZIP: ███████  PHONE ___-___

EMPLOYER: _____  DEFENDANT'S OCCUPATION _____

BLOCK: _____  DIR ____  STREET: _____  TYPE _____  APT: _____

CITY: _____  STATE: _____  ZIP: _____  PHONE ___-___

SCHOOL NAME: _____

DATE 06-13-03  TIME: 0045  **ARREST DATA**  IMPAIRED: YES / NO  ARREST TYPE (Visual) / Warrant / Both

LOCATION APPROX: Y (N) BLK: 5720  DIR: E  STREET: Monroe TYPE: RD APT: _____

CITY: Charlotte  TYPE OF PREMISES: PARKING LOT

VEHICLE TOWED BY: _____

### ARRESTING OFFICERS

| | | | |
|---|---|---|---|
| OFFICER ID#: 1821 | C (CW) W / (N) | OD: (YES) / NO | |
| OFFICER ID#: 2196 | C (CW) / W / N | OD: YES / NO | |
| ASSIST ID#: 2270 | W / (N) | OD: (YES) / NO | |
| ASSIST ID#: 3102 | W / (N) | OD: (YES) / NO | |
| ASSIST ID#: 2298 | W / (N) | OD: YES / NO  2270 | |

BOOKED BY ID# 1821 2270  SEARCHED BY: ID# 1821  TRANSPORTED BY: ID# 1821 2270

**Legend**
C: COMPLAINANT (No Court)
CW: COMPLAINANT/WITNESS (Court)
W: WITNESS (Court)
N: NONE (No Court)
OD: ON DUTY

### CHARGE CODES

| CHARGE CODE | CHARGE | REPOSITORY # |
|---|---|---|
| 292000 | DAMAGE TO PROPERTY | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Continued on Reverse Side

scanned

# CIVILIAN VICTIMS OR WITNESSES ONLY

**VICTIM / WITNESS #1 OR BUSINESS LEGAL NAME:** (circle one)

LAST: █████████████████████     MIDDLE:_____   · SUFFIX:_____

HOME BLOCK:_____   DIR____   STREET:_____   TYPE:____·____   APT:·____

CITY_____   STATE____   ZIP:_____   HOME PHONE: ████ ████ ██ ██

EMPLOYER /BUSINESS LEGAL NAME: *Blockbuster Video*

BLOCK:·██████   DIR:██   STREET:██████████   TYPE:████   APT:_____

CITY: *Charlotte*   STATE *NC*   ZIP:████████   · WORK PHONE:██████ ████ █████

---

**VICTIM / WITNESS #2 OR BUSINESS LEGAL NAME:**   (circle one)

LAST:_____   FIRST:_____   MIDDLE:_____   · SUFFIX:_____

HOME BLOCK:_____   DiR____   STREET:_____   TYPE:_____   APT:____ ·

CITY_____   STATE____   ZIP:_____   HOME PHONE_____ - ____

EMPLOYER /BUSINESS LEGAL NAME_____

BLOCK:_____   DIR____   STREET:_____   TYPE:_____ ·   APT:____

CITY:_____   STATE____   ZIP:_____   WORK PHONE:_____ - ____

---

**VICTIM / WITNESS #3 OR BUSINESS LEGAL NAME:**   (circle one)

LAST:_____   FIRST:_____   MIDDLE:_____   SUFFIX:_____

HOME BLOCK:_____   DIR____   STREET:_____   TYPE:_____   APT:____

CITY_____   STATE____   ZIP:_____   HOME PHONE_____ - ____

EMPLOYER /BUSINESS LEGAL NAME:_____

BLOCK:_____   DIR:____   STREET:_____   TYPE:_____   ·APT:____

CITY:_____   STATE____   ZIP:_____   WORK PHONE:_____ - ____

**REASON FOR THE ARREST**

*d. was arrested for Damage to Property* _____

_____

_____

_____

DEFENDANT'S VEHICLE: _____

YEAR       MAKE       MODEL       COLOR       TAG       STATE

# APPENDIX 126

```
06/13/03 02:41 ******  ****************************** scanned
               * CTSV POST-MAGISTRATE INTERVIEW *
               ******************************
```

CHARLOTTE            NC              000 000 0000      5  6  1..  ..      ERO

                                                      000 000 0000

                    ELSALVADOR

                                      CHARLOTTE                    X

PVA          06 13 03 0045              X                X

                                      CHARLOTTE            NC      28212

                                         000 000 0000    000 000 0000

                                         000 000 0000    000 000 0000

292000 M DAMAGE TO REAL PROPERTY

X2928 DEF WAS ARRESTED FOR DAMAGE TO PROP
VEH INFO 97 NISSAN MAXIMA BLACK ████████ NC

HORNE, D.N.              P2196    (COURT)   CMPD B3

PAYNE, A.L.             P1821

WRIGHT, D.A.            P2270           ADAM: 06 13 03  0240

LATTIMORE, D.W.         P3102

BRANAN, S.M.            P2298

```
06/13/03 02:41 ********************************
```

# APPENDIX 127

SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
KATHERINE A. RYKKEN (Cal. Bar No. 267196)
Assistant United States Attorney
General Crimes Section
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-3659
     Facsimile: (213) 894-0141
     E-mail:    katherine.rykken@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>            v.<br><br>LUIS VEGA,<br>  aka "Lil One,"<br><br>        Defendant. | No. CR 13-817-CAS-3<br><br>GOVERNMENT'S RESPONSE IN SUPPORT OF LOS ANGELES CITY ATTORNEY'S MOTION TO QUASH SUBPOENAS DUCES TECUM<br><br>Hearing Date: June 12, 2017<br>Hearing Time: 12:00<br>Location:    Courtroom of the Hon. Christina A. Snyder |

     Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Katherine A. Rykken, hereby files its opposition to defendant LUIS VEGA's ("defendant") application for subpoenas duces tecum.  To the extent defendant seeks to use the requested subpoenas pursuant to Rule 17 of the Federal Rules of Criminal Procedure as discovery requests, the government objects to such subpoenas as an improper use of Rule 17 and asks the Court to deny defendant's request.

This response is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 9, 2017                    Respectfully submitted,

                                       SANDRA R. BROWN
                                       Acting United States Attorney

                                       LAWRENCE S. MIDDLETON
                                       Assistant United States Attorney
                                       Chief, Criminal Division


                                       _____/s/_____
                                       KATHERINE A. RYKKEN
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

On November 19, 2013, a federal grand jury sitting in the Central District of California indicted defendant LUIS VEGA ("defendant") on two counts of possession with intent to distribute at least fifty grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and one count of possession with intent to distribute at least five grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii).  (Dkt. 1.)  On March 17, 2017, defendant served Los Angeles Police Department ("LAPD") with a subpoena duces tecum ("subpoena"), pursuant to Federal Rule of Criminal Procedure 17, that demanded "unredacted copy of all records of any type . . . in the Internal Affairs records/file" about LAPD Detective Frank Flores that relate to "honesty, credibility, veracity, fitness for duty, moral turpitude, dishonesty, misconduct and violations of law."  (Mot. to Quash, Dkt. 189 at 9.)  Trial in this matter is set for October 3, 2017.

On March 28, 2017, the Los Angeles City Attorney ("LACA"), on behalf of the LAPD, filed a motion to quash the subpoena.  The government respectfully requests that the Court quash defendant's subpoena because it is overbroad, seeks inadmissible and irrelevant material, and is an abuse of Rule 17, thus constituting a veiled fishing expedition for impeachment information of nontestifying witnesses.

**II.   ARGUMENT**

Defendant misuses the Rule 17 subpoena power by unjustifiably seeking an irrelevant, inadmissible, non-specific set of documents that the defense has already requested in the Rule 16 discovery

process.  Indeed, the government has already responded to the defense's Rule 16 requests under United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991), which requires the government to examine personnel files of testifying officers and disclose material information favorable to defense about those testifying officers. 931 F.2d at 31 & n.2; see also United States v. Herring, 83 F.3d 1120, 1121 (9th Cir. 1996) (reciting the Henthorn rule as applying to law enforcement officers expected to testify at trial); United States v. Jennings, 960 F.2d 1488, 1489 (9th Cir. 1992) (same).  The government is aware of its discovery obligations under Rule 16, Brady, Giglio, and Henthorn and will continue to comply with those obligations.  As trial in this matter is four months' away, the government will produce any additional relevant Henthorn material when it decides which law enforcement witnesses will testify and after completing updated Henthorn requests for each testifying law enforcement officer.  Importantly, however, the government does not intend to call Detective Frank Flores as a trial witness, thereby mooting defendant's subpoena.[1]  Of the three counts charged against defendant, Detective Flores was only nominally involved in one count -- Count Six.  Detective Flores was part of a surveillance team of eight law enforcement officers that watched the methamphetamine transaction that is charged in Count Six.

---

[1] Defendant has also moved ex parte in an unrelated case, United States v. Garcia, CR 13-824-CAS, to take depositions of two prospective law enforcement witnesses for the Sparks Police Department in Sparks, Nevada.  (CR 13-824-CAS, Dkts. 251, 252.) Defendant in that case asserts that the two law enforcement officers purportedly would provide testimony that would apparently be offered only to impeach the confidential informant Stella and Detective Flores.  To the extent that defendant here intends the ex parte motion to apply to this case as well, the government joins the Opposition filed in United States v. Garcia, CR 13-824-CAS, Dkt. 253.

2

Instead of filing a motion to compel early disclosure of any Henthorn information, the defense has instead elected to use a Rule 17 subpoena duces tecum as a back-up discovery device.  But subpoenas duces tecum are not for the purpose of preparing the defense, as is the purpose of Rule 16 discovery.  See Fed R. Crim. P. 16(a)(1)(E)(i).  Rather, subpoenas duces tecum are used only to procure documents that will be introduced at the attendant proceeding, usually trial.  United States v. Nixon, 418 U.S. 683, 698-99 (1974); Fed. R. Crim. P. 17.  In this way, subpoenas duces tecum are intended to expedite the trial by providing a time and place before trial for the inspection by both parties of evidence to be admitted at trial.  Id. at 698-99.  This is not the defense's intent here.

Not only has the defense misused the Rule 17 subpoena process, but the defense's subpoena does not pass muster under the standards set forth by the Supreme Court in Nixon, as laid out below. Accordingly, the defense's subpoena should be quashed.

### A.   The Defense Implicitly Concedes that the Information It Seeks is Available by Other Means

To justify the issuance of a subpoena duces tecum, defendant must show that the subpoenaed items are not available from any other source, such as through a discovery request to the government. Nixon, 418 U.S. at 702.  Here, the defense cannot show that the information it seeks is not available from any other source.  Namely, the defense has already requested via Rule 16 the information it has now sought via Rule 17 subpoena.  The similar nature of these requests is a tacit concession that the defense is seeking via Rule 17 subpoena what it has already sought in Rule 16 discovery.  That

3

fact also makes clear that the information the defense seeks is available through other means -- that is, via discovery from the government.  But the government has already advised defendant that it has and will comply with its obligations under Henthorn, which operates under the umbrella of the government's broader obligations under Brady v. Maryland, 373 U.S. 83 (1963).  The government's representation that no Henthorn materials exist for expected testifying witnesses does not justify the issuance of a Rule 17 subpoena for precisely the same information.  Accordingly, the defense cannot show that the subpoenaed items are unavailable from any other source such as through discovery requests to the government, and the defense has failed to meet the burden of the initial threshold requirement under Nixon.

**B.    The Information Subpoenaed is Non-Specific, Irrelevant, and Inadmissible**

For the defense's use of the Rule 17 subpoena to be valid, the defense must "clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  Nixon, 418 U.S. at at 700.  Courts have noted that the failure to show relevance, admissibility, and specificity indicates the requested Rule 17 subpoena constitutes an impermissible fishing expedition.  See United States v. Noriega, 764 F. Supp. 1480, 1493 (S.D. Fla. 1991) ("If the moving party cannot reasonably specify the information contained or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused."); see also Nixon, 418 U.S. at 700.  Here, the defense's subpoena request does not seek specific, admissible, or relevant material.

4

First, the defense's subpoena language lacks specificity insofar as it demands "unredacted copy of all records of any type . . . in the Internal Affairs records/file" relating to LAPD Detective Frank Flores. (See Mot. to Quash, Dkt. 189 at 9.)  This request is unbounded in time, scope, or jurisdiction.  This lack of specificity bespeaks a fishing expedition and is unduly burdensome on the LAPD, as it may sweep into its ambit every piece of paper at LAPD that could possibly contain any information that might somehow be used to impeach investigating officers who may not testify at trial.

The breadth of the request may also sweep into its ambit information that is very old, or has been deemed unfounded or unsubstantiated.  The evidentiary value of the requested material -- let alone its relevance for witness impeachment -- is circumspect, at best.  Furthermore, it is unclear how the defense will establish the admissibility of the array of materials sought.  The defense's request would include, for example, stale and unsubstantiated complaints made by anonymous complainants that have been disposed of as meritless.  In those circumstances, the anonymous complainant could not testify as to the veracity of the facts underlying the complaint, and the prejudice to the accused officer would far outweigh the probative value of a dismissed, anonymous complaint from years ago.  The breadth of information sought by the defense's subpoena has little or no evidentiary value in the case, and rather, has the potential to cause grave and damaging effects on the privacy rights of the officers.

**C.   The Defense's Subpoena is an Abuse of Rule 17**

Even if a Court were to find that the subpoena does seek relevant, admissible, and specific evidence -- which the defense's

5

subpoena does not do -- the subpoena proponent must also show that the materials requested are "not otherwise procurable reasonably in advance of trial by exercise of due diligence;" that "the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial;" and that "the application is made in good faith and is not intended as a general 'fishing expedition.'"  Nixon, 418 U.S. at 699-700.  The defense cannot make any of these showings, as the information sought in the defense's subpoena is, in fact, an impermissible attempt to gain discovery that is available through the government.

The defense's subpoena attempts to use a Rule 17 subpoena to access material that falls under the government's Brady or Giglio disclosure obligations.  See Brady, 373 U.S. at 83; Giglio v. United States, 405 U.S. 150 (1972).  But, as discussed below, numerous Courts of Appeal have held that information in the possession, custody and control of the government that falls under its Brady or Giglio disclosure obligations is not the type of material a Rule 17 subpoena was designed to reach.  Accordingly, the defense may not circumvent Rule 16 by seeking more discovery using Rule 17(c) subpoenas to government entities, and the Rule 17 subpoena is not a follow-up or back-up discovery-seeking device, even as the defense finds itself disappointed by the results of the government's Rule 16 disclosures.  This abuse of Rule 17 is independent grounds for the Court to quash the defense's subpoena.

Courts of Appeal have routinely affirmed district courts' decisions to quash Rule 17 subpoenas that seek pre-trial discovery such as material otherwise governed by the Jencks Act, Brady, and

Giglio.  See, e.g., Nixon, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); United States v. Carter, 65 F. App'x 559, 561 (7th Cir. 2003)(upholding a quashed subpoena where the government already intended to disclose impeachment information consistent with Brady); United States v. Fields, 663 F.2d 880, 881 (9th Cir. 1981) (where defendant's purpose for seeking Rule 17(c) subpoena was to obtain impeachment material, subpoena was improper); United States v. Hughes, 895 F.2d 1135, 1145-46 (6th Cir. 1990) (finding a Rule 17(c) subpoena to a third party for impeachment material improper); United States v. Cuthbertson, 651 F.2d 189, 195 (3d Cir. 1981) (Rule 17(c) subpoenas not available to obtain exculpatory (Brady) material in possession of prosecution or hearsay evidence that could only be used for impeachment);  United States v. Beckford, 964 F. Supp. 1010, 1031 (E.D. Va. 1997) (holding that "a Rule 17(c) subpoena duces tecum is improper where it calls for the production of Brady, Jencks, or Giglio material"); see also Fed. R. Crim. P. 17(h) (precluding from production via Rule 17 subpoena a witness's prior statements, which are governed by Rule 26.2 and the Jencks Act, 18 U.S.C. § 3500).

Relatedly, the Supreme Court cautioned against conflating Rules 16 and 17 in Bowman Dairy Co. v. United States when it held that "[i]t was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms. . . . Rule 17(c) was not intended to provide an additional means of discovery."  341 U.S. 214, 220 (1951).  As a result, Rule 17(c) subpoenas are not "intended as a general 'fishing expedition.'"  Nixon, 418 U.S. at 700.

7

In this case, the defense's Rule 17 subpoena is a disguised discovery request.  The subpoena seeks quintessential <u>Henthorn</u> and <u>Brady</u> material, including records that relate to "honesty, credibility, veracity, fitness for duty, moral turpitude, dishonesty, misconduct and violations of law."   (See Mot. to Quash, Dkt. 189 at 9.)  This is simply a misuse of Rule 17.  The defense attempts a second bite at the apple by inappropriately subpoenaing the same <u>Henthorn</u> material from the LAPD.  Not only is the subpoena improper, it is also unnecessary, as government trial counsel has already reviewed such records related to Detective Flores as part of the government's obligations under <u>Brady</u> and <u>Henthorn</u>, even though the government will not call Detective Flores as a witness at trial.

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court grant the LACA's Motion to Quash defendant's March 17, 2017, subpoena to the LAPD.

8

# APPENDIX 128

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR13-817-CAS-3 | | Date | June 13, 2017 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER, U.S. DISTRICT JUDGE | | | |
| Interpreter | N/A | | | |

| CONNIE LEE | N/A | NOT PRESENT |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond. | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 3) Luis Vega | NOT | | | 3) Mark Windsor | NOT | | |

**Proceedings:**     (IN CHAMBERS) LOS ANGELES POLICE DEPARTMENT'S MOTION TO QUASH SUBPOENA DUCES TECUM (Filed March 28, 2017, Dkt. 189)

The Court is in receipt of the motion to quash a subpoena duces tecum filed by real party in interest, the Los Angeles Police Department Custodian of Records.  Dkt. 189.  The Court has reviewed LAPD's in camera submission of the personnel records at issue.  On June 12, 2017, the Court held a status conference on this matter.  Counsel for the Los Angeles Police Department ("LAPD") was present.  Defendant, defense counsel, and the Government were also present.

For the reasons stated on the record, the motion to quash the subpoena is **GRANTED in part** and **DENIED in part**.

Records relating to an investigation of complaints made by the Sparks, Nevada Police Department ("Sparks PD") about Officer Flores and a confidential informant used in this case are material to this case and should be produced to the defense.  With respect to the investigation of complaints by Sparks PD, LAPD's motion to quash the subpoena is **denied**.  Counsel for LAPD requests that any disclosures be provided "in the identical format as would be provided by the prosecuting U.S. Attorney with appropriate redactions."  Dkt. 191 ¶ 6.  The foregoing request is granted.  The Government shall draft an appropriate disclosure document or redact the existing records for disclosure directly and provide it to defense counsel.[1]  The Government shall simultaneously provide the

---

[1] Documents disclosed to the defense from Officer Flores's LAPD records shall be subject to a protective order that will issue separately.

CR-817 (06/17)                    **CRIMINAL MINUTES – GENERAL**                    Page **1** of 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

Court with a copy of any documents disclosed to defense counsel pursuant to this order by filing a copy under seal.

LAPD's motion to quash is **granted** with respect to the other records not discussed herein.

IT IS SO ORDERED.

|                          |    00    00    |
| ------------------------ | :-----------: |
| Initials of Deputy Clerk |      CL       |

# APPENDIX 129

SANDRA R. BROWN
Acting United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
KATHERINE A. RYKKEN (Cal. Bar No. 267196)
Assistant United States Attorney
General Crimes Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3659
    Facsimile: (213) 894-0141
    E-mail:    katherine.rykken@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>                v.<br><br>MARIO RENE MORALES,<br>   aka "Plucky," and<br>LUIS VEGA,<br>   aka "Lil One,"<br><br>           Defendants. | No. CR 13-817-CAS<br><br>GOVERNMENT'S EX PARTE APPLICATION TO DISMISS COUNTS FIVE, SIX, AND SEVEN OF THE INDICTMENT AS TO DEFENDANTS MARIO RENE MORALES AND LUIS VEGA PURSUANT TO FED. R. CRIM. P. 48(a) |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Katherine A. Rykken, hereby moves ex parte, pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, to dismiss counts Five, Six, and Seven in the above-captioned case as to defendants Mario Rene Morales, also

///

///

///

known as ("aka") "Plucky," and Luis Vega, aka "Lil One," with prejudice and in anticipation of the October 3, 2017 trial date. Defense counsel has been informed of, and does not object to, the ex parte filing.

Dated: August 16, 2017                   Respectfully submitted,

                                         SANDRA R. BROWN
                                         United States Attorney

                                         LAWRENCE S. MIDDLETON
                                         Assistant United States Attorney
                                         Chief, Criminal Division


                                         _____/s/_____
                                         KATHERINE A. RYKKEN
                                         Assistant United States Attorney

                                         Attorneys for Plaintiff
                                         UNITED STATES OF AMERICA

# APPENDIX 130

MARK WINDSOR, Cal. Bar No. 190589
1 South Fair Oaks Avenue, Suite 401
Pasadena, CA 91105
Tel: (626) 792-6700
Fax: (626) 956-8900
Email: mark@windsorlaw.us

Attorney for Defendant LUIS VEGA

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.

LUIS VEGA,

        Defendant.

Case No.: 13CR817-CAS-3

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY

Date: September 18, 2017
Time: 10:00am

TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO THE UNITED STATES OF AMERICA AND ITS ATTORNEYS:

PLEASE TAKE NOTICE THAT on Septenber 18, 2017 at 10:00 a.m., or as soon thereafter as counsel may be heard, defendant Luis Vega, by and through his attorney of record, Mark Windsor, will move to compel further discovery.

Dated: August 25, 2017       Respectfully submitted,

                           /s/
                         Mark Windsor
                         Attorney for Defendant Luis Vega

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO COMPEL DISCOVERY

### I.
### STATEMENT OF FACTS

Mr. Vega is charged in two counts with knowingly and intentionally distributing methamphetamine on November 11, 2009 (Count 2), and March 18, 2010 (Count 4), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii). The combined amount of drugs alleged is approximately 94 grams. Mr. Vega was also charged in Count 6, but that count has been dismissed with prejudice per government motion. The government's motion to dismiss did not indicate a reason for the motion, but based on the record it appears the motion likely occurred because of problems with the government's confidential informant code-named "Stella," who had engaged in obstructing a murder investigation with the assistance of her handler, Detective Frank Flores of the Los Angeles Police Department, among other criminal activity.

Counts 2 and 4 do not involve Stella, as Count 6 had, but they do involve a cooperating informant code named Jaguar, who at one point had Detective Flores as his handler as well. The evidence the government will use at trial will include an under cover audio-video file produced by a camera worn by Jaguar, as well as recordings of phone calls purported to be between Jaguar and Mr. Vega.

- 2 -

## II.
## DISCOVERY REQUESTS

### A. THIS COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE ALL GRAND JURY TRANSCRIPTS TO THE DEFENSE.

On December 19, 2013, in a similar case to this one, the government filed a complaint charging Luis Campos Martinez with distribution of methamphetamine as a result of an undercover buy involving CI Stella on December 5, 2013. This case would ultimately be filed in the Central District of California as *United States v. Campos Martinez*, 14CR007-R. Special Agent James Ruben of the FBI swore to the affidavit filed to demonstrate probable cause for the issuance of the complaint. In this affidavit, SA Rubin indicates that FBI SA Tyler Call was involved in this investigation. Ex A paragraph 17 p. 9.  SA Tyler Call will likely be a witness in the case against Mr. Vega. Additionally, SA Rubin states "I am currently assigned to a criminal squad tasked to investigate Hispanic street gangs, with a specific manadate (sic) to investigate the Mara Salvatrucha (MS-13) street gang." Ex A Paragraph 2 p. 2. All of this indicates that SA Rubin is part of the same task force responsible for the investigation in the case against Mr. Vega in this case, 13CR817.

SA Rubin further discusses under oath the activities of CHS-1, who was instrumental in convincing Mr. Campos Martinez to sell her the methamphetamine in the case. In particular, SA Rubin swears,  "CHS-1 has been

- 3 -

operating as a paid confidential informant for the FBI since July 2010. CHS-1 has no prior felony convictions, but does have misdemeanor convictions for driving without a license and driving under the influence." Ex. A p. 3 n.1. Based on the informant's start date, the circumstances of the investigation, and the defense investigation in this case, it is clear that CHS-1 is, in fact, the cooperator code-named Stella. That being the case, the above sworn statement, made on December 19, 2013, is false. Stella was convicted of a felony in 2008, before she began work for the task force as an informant, as many members of Agent Rubin's task force were aware at the time the affidavit was sworn. The case against Mr. Campos Martinez was ultimately brought before a grand jury and indicted.

Based upon the fact that the same task force responsible for Mr. Vega's case, and that Mr. Vega's case was likely indicted pursuant to testimony based in whole or in part from information provided by this same task force, and this task force has already been responsible for a material misrepresentation under oath in support of charges against a similarly situated defendant, Mr. Vega believes that misconduct likely occurred in front of the grand jury before the indictment in this case. This issue cannot be resolved without reviewing the transcripts. Therefore, disclosure of the grand jury transcripts is permissible under FRCrP 6. Accordingly, Mr. Vega asks this Court to order immediate disclosure of all grand jury transcripts in this case.

- 4 -

## B. THIS COURT SHOULD ORDER IMMEDIATE PRODUCTION OF ADDITIONAL ITEMS.

Counsel for Mr. Vega is continuing to work with government counsel to obtain all discovery in this case, and conversations between the parties are ongoing. However, as trial is approaching Mr. Vega also requests this Court order immediate production of the following:

1. All items requested in the discovery request letters lodged with government counsel dated October 9, 2014 (Exhibit B) and April 17, 2017 (Exhibit C) that have not already been provided.

2. Immediate production of all *Jenks*, *Giglio*, and *Henthorne* material.

3. Immediate production of a final witness list and final exhibit list.

4. Immediate production of any documents or information indicating that task force or other law enforcement members new of Jaguar's continued criminal activity while an informant, and any indication of task force members cooperation or use of the products of this criminal activity.

5. Whether any informant or witness: has worked for the government in the past; has a prior criminal record; was paid for his or her efforts in this case or any other related case and if so, how much; has any pending cases anywhere, and if so, whether any assistance or consideration was offered or suggested, formally or informally, or is intended by the government to be offered on behalf of the informant with respect to any

pending case the informant has; has family members with any pending cases against them (*see United States v. Lankford*, 955 F.2d 1545, 1549 (11th Cir.) (error to preclude cross-examination into arrest of witness's sons on state drug charges because, despite lack of any federal agreement to help the sons, witness may have believed and hoped that his cooperation would persuade federal authorities to assist sons or to forego taking the state prosecutions to federal court); whether any informant or witness requested of the government anything of value or any assistance or consideration in any legal matter; any agreement, promise, or suggestion made by the government or its agents to any prospective informant offering assistance to the informant in obtaining leniency in any court, or lack of prosecution or arrest, or any other favorable treatment or consideration for the efforts made in connection with any aspect of this case by the informant.

6.  All prior written recorded or oral statements of any government witness relating to this case, to whoever made, as well as agents' or investigators' rough draft notes of interviews with such prospective witnesses. *See United States v. Rivera*, 6 F.3d 43 1,440 (7th Cir. 1993). This request also includes transcripts of any prior testimony of these potential witnesses.

- 6 -

7.   Any and all evidence related to activities of Mr. Vega the government will allege as relevant conduct at sentencing, or 404(b) evidence at trial.

In addition, to the extent it is not covered in the above requests, Mr. Vega requests production of all exculpatory information or evidence known or discoverable by reasonable means by the government that is relevant to guilt or punishment in this case.

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." The Supreme Court has emphasized that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *United States v. Bagley,* 473 U.S. 667 (1985). In *Giglio v. United States,* 405 U.S. 150, 151 (1972), the Supreme Court found a *Brady* due process violation by the government's suppression of evidence of a leniency agreement with an accomplice-witness. Such evidence if disclosed and used effectively may make the difference between conviction and acquittal. *See Napue v. Illinois*, 360 U.S. 264 (1959).

In acknowledging that the prosecution has a duty to disclose any favorable evidence that could be used at trial, it is frequently overlooked that the prosecution also has a duty to disclose any favorable evidence that could be used

"in obtaining further evidence." *Giles v. Maryland*, *supra*, 386 U.S. at 74. Favorable evidence need not be competent evidence or evidence admissible at trial; it is that evidence likely to lead to favorable evidence that would be admissible at trial. *United States v. Kennedy*, *supra*, 890 F.2d at 1059; *United States v. Sudikoff*, *supra*, 36 F. Supp at 1200.

If it is to competently discharge its duties under *Brady* and its progeny, the government must actively search its files and the files of its investigatory agencies reasonably expected to have such information. *Kyles v. Whitley, supra*, 514 U.S. 419. Information is in the government's possession if the prosecutor has knowledge of and access to the documents sought by the defendant. *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995). "Where doubt exists as to the usefulness of evidence [the government] should resolve such doubts in favor of full disclosure..." *United States v. Van Brandy*, 726 F.2d 548, 552 (9th Cir. 1983).

The Supreme Court has never precisely pinpointed the time at which disclosure under *Brady* must be made. It is clear, however, that disclosure by the government "...must be made at such a time as to allow the defense to use favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criteria requires pre-trial disclosure." *United States v. Pollock*, 5324 F. 2d 964, 973 (D.C. 1975). Accord *United States v. Starusko*, 759 F.2d 256 (3rd Cir. 1984); *United States v. Higgs,* 713 F.2d 39 (3rd

Cir. 1983). A more lenient disclosure burden on the government would drain *Brady* of all vitality. *United States v. Elmore*, 423 F.2d 775, 779 (4th Cir. 1970). The Ninth Circuit has clearly pronounced that "under *Brady*, the government must disclose *before* trial 'evidence [that is] material either to guilt or punishment which is favorable to the accused..." *United States v. Nagra*, 147 F.3d 875, 881 (9th Cir. 1998) (quoting *United States v. Hanna*, 55 F.3d 1456, 1459 (9th Cir. 1995)).

Furthermore, widely recognized standards of professional conduct require a prosecutor to disclose "at the earliest feasible opportunity" the existence of all evidence which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused. ABA Standards for Criminal Justice: Prosecution and Defense Function 3d. Edition 1993 § 3-3.11.

*Brady* and its progeny arose in a post-trial context. Specifically these cases addressed, after trial, whether the failure to disclose favorable material evidence in violation of a defendant's due process rights justified a new trial. In that context, only suppression of evidence that cumulatively rises to the level of "material" violates defendant's due process rights. *United States v. Bagley, supra*, 473 U.S. 667.

*Brady's* concern whether a constitutional violation occurred after trial is a

- 9 -

different question than the scope of a prosecutor's duty to disclose evidence pretrial. In *Strickler v. Greene*, 527U.S. 263, 281 (1999) the Supreme Court recognized that the duty to disclose is broader than the question of whether failure to disclose violates the Constitution. In the context of pretrial disclosures, the government is "...obligated to disclose all evidence relating to guilt or punishment which might reasonably be considered favorable to defendant's case." *United States v. Sudikoff*, *supra*, 36 F. Supp at 1199-1200.

"Favorable" evidence is that which relates to guilt or punishment and which tends to help the defense by either bolstering the defense's case or impeaching prosecution witnesses. *Id.* (citations omitted). "Evidence" is material that is either admissible or likely to lead to admissible evidence. *Id.*

III.
CONCLUSION

Mr. Vega respectfully requests this Court order immediate production of all discovery covered by the above requests.

Respectfully Submitted,

DATED:      August 25, 2017            _____/s/_____
                                       MARK WINDSOR
                                       Attorney for Defendant
                                       LUIS VEGA

- 10 -

# APPENDIX 131

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 39 of 600

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Criminal No.  08-167 (RJL)** |
| | : | |
| v. | : | |
| | : | |
| **WILLIAM CORDOVA,** | : | |
| also known as Centinella, | : | |
| also known as Mario, | : | |
| | : | |
| **JOSE GUTIERREZ,** | : | |
| also known Astuto, | : | |
| also known as Marco, | : | |
| | : | |
| **WILLIAM OSORIO-RIVAS,** | : | |
| also known as Macklin, | : | |
| | : | |
| **MELVIN SORTO,** | : | |
| also known as Killer, | : | |
| also known Fantasma, | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S NOTICE AND MOTION**
**TO ADMIT EVIDENCE OF OTHER CRIMES AND BAD ACTS**

The United States, by and through its attorney, the United States Attorney for the District of

Columbia, respectfully files this notice and motion of its intent to admit evidence of other crimes and

bad acts committed by the defendants.  In support of this motion, the Government submits the

following.

**I.**    **The Instant Violent Crimes Conspiracy**.

1.____The indictment in this matter is the result of a long term investigation into the violent

activities of a criminal organization that has operated in Washington, DC, Maryland, Virginia, and

Page 1 of 33

elsewhere.  The four defendants named in the 19-count indictment are charged with conspiracy to commit violent crimes in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5).  Count One of the indictment charges that, on or about June 2006 and continuing through June 2007, William Cordova, also known as Centinella, also known as Mario (hereinafter "Cordova"), Jose Gutierrez, also known as Astuto, also known as Marco (hereinafter "Gutierrez"), William Osorio-Rivas, also known as Macklin (hereinafter "Osorio-Rivas"), and Melvin Sorto, also known as Killer, also known as Fantasma (hereinafter "Sorto"), were members and associates of a criminal enterprise known as La Mara Salvatrucha 13 (hereinafter "MS-13") who conspired to commit a variety of criminal activities including assaults, threats, extortion, witness intimidation, aggravated assault, assaults with intent to kill, and murder in the District of Columbia, Maryland, Virginia, and elsewhere.  (See Indictment 08-167, page 2, ¶ 1).  Count one further charges that, as members and associates of MS-13, the defendants engaged in a variety of criminal activities in furtherance of their MS-13 criminal enterprise.  Those criminal activities included, but were not limited to, "jumping-in"[1] new recruits by physically beating new members, confronting, fighting, assaulting, and killing rival gang members, in Washington DC, Maryland, Virginia, elsewhere in the United States, and in foreign countries, including but not limited to, El Salvador.  (Id., page 2, ¶ 2, and  page 3 ¶ 3).

2. Although the defendants are charged in the indictment with conspiring to commit violent crimes in furtherance of the MS-13 enterprise from June 2006 to June 2007, the indictment also charges that the MS-13 enterprise "operated in the District of Columbia since at least 2005," and that it "was established in El Salvador [but] . . . . has spread throughout the United States."  (Id.,

---

[1]      Being "jumped-in" to MS-13 means having to endure 13 seconds of a physical beating at the hands of other MS-13 members.  This is an initiation practice.

page 2, ¶ 2).

3.      As members of the MS-13 enterprise, the defendants advanced and promoted the objectives of the enterprise through, but not limited to, the following means and methods: intimidation, extortion, violence, and threats of violence, including murder and assault, in order to (i) preserve, expand, and protect the enterprise's territory and activities; (ii) promote and enhance the enterprise's prestige, reputation, and position in the community; (iii) promote a climate of fear; (iv) attack various individuals, including known and suspected members of rival gangs; (v) discipline enterprise members and associates who violated enterprise rules, (vi) punish enterprise members and associates who were disloyal to the enterprise; and (vii) use vehicles and firearms, and transport them in interstate commerce, to attend and promote enterprise activities.  (Id., page 5-6, ¶ 8).

4.      As a result of their membership and active participation in the MS-13 enterprise, the indictment further charges the defendants with committing various violent crimes in aid of racketeering such as (i) the July 30, 2006, Assault with a Dangerous Weapon of Dennis Diaz-Gutierrez in Alexandria, Virginia; (ii) the April 22, 2007, murder of Edwin Ventura; (iii) the Assault with a Dangerous Weapon of Nelson Maldonado;[2] (iv) the threats to commit murder against Feliciana Esquina-Flores; (v) the extortion of the Esquina-Flores family; and (vi) the June 1, 2007, Maiming of Feliciana Esquina-Flores.  In addition, the defendants are also charged with committing various other weapons offenses.

II.     **Violence and Other Crimes and Bad Acts in Furtherance of the Conspiracy**.

A.      **In El Salvador**

_____

[2]      Both Ventura and Maldonado were members of MS-13's rival gang Money Over Bitches, hereinafter referred to as MOB.

5.      The government's evidence, by way of a cooperating witness, will expose that defendants Cordova and Gutierrez conspired often times with the cooperating witness to commit murders in furtherance of the MS-13 enterprise.  With respect to defendant Cordova, the evidence will expose that defendant Cordova was "jumped-in" to the MS-13 clique "San Cocos Locos Salvatrucha" (hereinafter SCLS) in 2002-2003.[3]  The evidence will further expose that in May of 2005, defendant Cordova and other members of MS-13 murdered a rival gang member.  Defendant Cordova was armed with an Uzi machine gun while the other members were armed with a .45 caliber and a .9 millimeter handguns.  Cordova and the other MS-13 members located a rival gang member, followed him to his residence, and shot him.  That same year, sometime in the middle of  2005, defendant Cordova and another MS-13 member murdered a rival gang member in an area near Sonsonate, El Salvador.  The murder was observed by local enforcement.  Cordova and the other MS-13 member fled and the officers gave chase.  The MS-13 member that was with Cordova was apprehended while Cordova made good his escape.  Defendant Cordova later fled to the United States to avoid prosecution.

6.      With respect to defendant Gutierrez, the government's evidence, by way of a cooperating witness, will expose that defendant Gutierrez was "jumped-in" to the MS-13 SCLS clique in 2004.  The evidence will further expose that, on one occasion,  defendant Gutierrez arrived to a location where MS-13 members had committed a murder to assist.  Upon his arrival, defendant Gutierrez put the decedent in the fetal position, placed him inside a black bag, and then left the body

---

[3]      MS-13 is made up of numerous local factions called "cliques," that are spread across the United States.  While local MS-13 cliques operate and manage themselves independently, all cliques have strong and mandatory allegiance to the MS-13 enterprise, with an enormous amount of allegiance to the MS-13 enterprise in El Salvador.

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 43 of 600

on the side of the street.  Defendant Gutierrez later fled to the United States to avoid prosecution.

**B.      In the United States**

7.      The government's evidence will expose that defendant Cordova arrived to the Washington DC area sometime in the spring to early summer 2006 and began living with the Esquina-Flores family.  Defendant Gutierrez arrived to the Washington DC area in early 2007 and also began living with the Esquina-Flores family.  Defendants Cordova and Gutierrez quickly associated themselves with local area MS-13 members.  Government witnesses will testify that they knew defendants Cordova and Gutierrez when they resided in El Salvador and that they knew Cordova and Gutierrez to be members of the MS-13 SCLS clique.  Cordova's and Gutierrez's SCLS clique had no local members in the DC area so they quickly aligned themselves with the DC based MS-13 Sailors clique.  Although Cordova and Gutierrez were not leaders of the MS-13 Sailors, they were allotted much respect by its members and instantly became enforcers because of the violence they bragged about committing in El Salvador, see paragraphs 5 and 6, *supra*.  Government witnesses will testify that because of their strong allegiance to MS-13, and in particular MS-13 members from El Salvador, many members of the MS-13 Sailors extended great respect to defendants Cordova and Gutierrez due to them being "jumped-in" to MS-13 SCLS in El Salvador.

8.      Soon after his arrival to the Washington DC area, on July 30, 2006, defendant Cordova and other members of MS-13, while armed with a firearm, shot at a car that contained Dennis Diaz-Gutierrez, Josue Levia, and Jhosimar Alvarez-Torrez, in the City of Alexandria, Commonwealth of Virginia.  Defendant Cordova and the other members of MS-13, believed the occupants of the car were members of a rival gang.  During this shooting, Dennis Diaz-Gutierrez was shot in the leg.  (See Indictment, Count 17).  The government's evidence will expose that after

committing this shooting, defendant Cordova regularly possessed a .40 caliber semiautomatic and also a smaller hand gun, and, that defendant Cordova often times possessed the hand guns while attending MS-13 meetings. At the meetings, defendant Cordova repeatedly ordered members of the MS-13 Sailors to commit murders they way they committed murders in El Salvador. Defendant Cordova told government witnesses that he had committed murder in El Salvador and that he was on the run from the El Salvador police. In addition, defendant Cordova threatened to harm an MS-13 associate and his family if anything happened to the guns. While living with the Esquina-Flores family, defendant Cordova often times brought other MS-13 gang members, many of whom had visible MS-13 tattoos on the their bodies, to the Esquina-Flores residence.[4]

9.      In the fall of 2006, defendant Cordova was actively promoting increased violence and testing the loyalty of the new MS-13 Sailors recruits. For example, on three separate occasions, defendant Cordova ordered an MS-13 recruit to get packages that were hidden in various parks located in Washington DC. On each occasion, the MS-13 recruit complied with orders, picked up the packages, and delivered them to defendant Cordova. On two of the occasions, the packages contained marijuana and on the other occasion the package contained marijuana and a .38 caliber handgun. On each occasion, the MS-13 recruit saw the contents of the packages when delivered to defendant Cordova and stood present as defendant Cordova examined the contents of each package. Defendant Cordova threatened the MS-13 recruit with physical harm if the contents of the packages

---

[4]      Defendant Cordova also has the letters "MS" tattooed across his chest, on the back portion of his neck, and the letters "SCLS" standing for his clique "San Cocos Locos Salvatruchos" tattooed across his stomach.

were short.[5]

10.     Around this time period, defendant Melvin Sorto was the leader of the MS-13 Sailors.[6] Government witnesses will testify that defendant Sorto carried "La Palabra" for the Sailors, meaning he was the clique leader.[7]  In this role, defendant Sorto also promoted the increased level of violence with Cordova and often times told other MS-13 Sailors that they had to represent the "MS" letters in a higher capacity.  Both defendants Cordova and Sorto participated in the "jumping-in," meaning the physical beating, of an MS-13 recruit.  In addition, defendant Sorto participated in an assault on a rival gang member that occurred at a park near Sacred Heart Church, located in Washington DC.  On that occasion, defendant Sorto and other members of the MS-13 Sailors encountered members of rival gang MOB who were armed with baseball bats.  A physical assault between the two gangs followed.

11.     In early 2007, defendant Gutierrez arrived to the Washington DC area.  Upon his arrival, defendant Gutierrez united himself with defendant Cordova and the MS-13 Sailors.  Cordova and Gutierrez knew each other previously in El Salvador and were members of the same MS-13 SCLS clique.  The government's evidence will expose Cordova's knowledge that defendant Gutierrez was traveling to the United States and the plans Cordova made to accommodate the arrival of his fellow MS-13 SLCS gang member.  Soon after arriving, defendant Gutierrez attended MS-13 meetings and also promoted an increased level of violence.  Defendant Gutierrez told government

---

[5]     Due to serious witness security concerns, the name of the MS-13 recruit is not listed.

[6]     Defendant Sorto also has MS-13 tattoos on his body.

[7]     The literal translation of "La Palabra" is the word.  This is MS-13 vernacular used to identify a clique's leader.

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 46 of 600

witnesses that he had committed murder in El Salvador and was on the run from the El Salvador police.  Both Gutierrez and Cordova claimed their membership to "La Mara" or MS-13 in the presence of other MS-13 Sailors.  Gutierrez made clear his allegiance to MS-13 by bragging that he and defendant Cordova were going to do something different so that the local "Mara," meaning gang, could see how it was done.  In making this statement and others alike, defendant Gutierrez mad known his intent to carry-out greater violence.  Defendant Gutierrez maintained a notebook that contained his MS-13 drawings.  Gutierrez maintained the notebook to display his artwork to fellow MS-13 gang members.  The members often times had Gutierrez tattoo MS-13 symbols on them.  Defendant Gutierrez was observed by government witnesses in possession of hand guns as well.

12.     Throughout 2007, both defendants Gutierrez and Cordova lived with the Esquina-Flores family and threatened to murder Feliciana Esquina-Flores and her family.  (See Indictment, Count 11).  The two men extorted the Esquina-Flores family, stored weapons at the residence, and were in constant conflict with the family over rent money, food, and smoking marijuana in the Esquina-Flores home.  Defendant Gutierrez often times threatened an MS-13 recruit to be careful about what the recruit said about, or did with, the guns that were stored at the Esquina-Flores residence.

13.     On April 22, 2007, shortly after midnight, defendants Cordova, Gutierrez, Osorio-Rivas, and Sorto conspired and planned to kill members of rival gangs: Latin Criminals, also known as LC (hereinafter referred to as LC), 14th Street, and MOB, in retaliation for earlier attacks on MS-13 members and associates.  In so doing, the defendants murdered Edwin Ventura, and shot and injured Nelson Maldonado, both members of rival gang MOB, (See Indictment, Count 2).  The government's evidence will expose that on the day before, on April 21, 2007,  MS-13 was engaged

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 47 of 600

in a series of assaults with rival gangs.  The first assault occurred during the day when defendant Cordova and other MS-13 members were assaulted by a rival gang.  In this first assault, one of the MS-13 recruits was injured.  The second assault occurred later that evening when members of 14 Street were assaulted by MS-13.  In this second assault, one of the 14th Street members was injured. The third assault occurred later that night when the members of MS-13 were assaulted by members of 14th Street in retaliation for the second assault.  In this third assault, no injures resulted but the assault prompted the immediate retaliation, that resulted in the eventual murder of Edwin Ventura and shooting of Nelson Maldonado, by defendants Cordova, Gutierrez, Osorio-Rivas, and Sorto. Finally, the government's evidence will further expose that two days later, on April 24, 2007, MS-13 members were assaulted by members of 14th street in retaliation for the murder of Edwin Ventura. In this fourth assault, MS-13 members were shot at but no injuries resulted.

14.     In the months following the murder of Edwin Ventura, defendants Cordova, Gutierrez, and Sorto continued to promote an increased level of violence by members of MS-13. Defendants Cordova and Gutierrez continued to threaten to kill Feliciana Esquina-Flores and her family and they also continued to possess handguns.  As the conflict with the Esquina-Flores family escalated, Defendant Cordova told members of MS-13 that the orders from El Salvador were to kill Feliciana Esquina-Flores because she was a threat to MS-13.

15.     On June 1, 2007, defendants Cordova and Gutierrez carried out their threats on Feliciana Esquina-Flores.  Defendants Cordova, Gutierrez, and another MS-13 member drove up to Feliciana Esquina-Flores as she stood at abus stop located on Georgia Avenue, NW, Washington. Defendant Cordova emerged from the vehicle and shot Feliciana Esquina-Flores two times in the head.  Mrs.  Esquina-Flores survived the shooting but is now blind due to the gun shots.  (See

Indictment, Count 10).

16.     After shooting Mrs. Esquina-Flores, defendants Cordova and Gutierrez fled the Washington DC area.  In their flight, the defendants traveled various states, including the states of New York and later North Carolina.  In New York, defendants Cordova and Gutierrez aligned themselves with NY MS-13 members and made known to them that they (defendants Cordova and Gutierrez) had "put in work" in Virginia and were on the run.  Cordova and Gutierrez admitted and bragged that they were on the run from El Salvador because of murder and that they were in the United States with orders to lift the level of violence committed by MS-13 members.  Defendants Cordova and Gutierrez further admitted (i) shooting rival gang members that were in a car in Virginia, (referring to the July 30, 2006, shooting of Dennis Diaz); (ii) shooting a "chavala" (or a rival gang member) in DC, in the head, while the chavala was at an intersection where a traffic light was located because defendant Cordova was beaten earlier in the day by members of the chavala's gang, (referring to the April 22, 2007, murder of Edwin Ventura); and (iii) doing something to a lady in DC but that she did not die (referring to the June 1, 2007, shooting of Feliciana Esquina-Flores).  In making this known about themselves, defendants Cordova and Gutierrez were, as they had previously done while in the Washington DC area, once again enhancing and maintaining their positions within the MS-13 enterprise, but this time while in the presence of NY MS-13 members.  In addition, while in New York, defendant Cordova called a member of the DC MS-13 Sailors and made reference to needing to return to the area for a shooting of an old lady.  In making this statement, defendant Cordova was again referring to Feliciana Esquina-Flores.  The government's evidence will expose that during this time period, both defendants Cordova and Gutierrez had active arrest warrants in Washington DC.

17.     After establishing themselves in New York, defendants Cordova and Gutierrez once again continued to commit murder in furtherance of the MS-13 enterprise.  On July 12, 2007, defendants Cordova and Gutierrez and other members of MS-13 murdered a rival gang member. In this murder, defendant Cordova and another MS-13 member shot and killed the rival gang member while defendant Gutierrez and another MS-13 member aided and abetted.  In this murder, Cordova was armed with .357 caliber handgun while the other MS-13 member was armed with .38 caliber handgun.

18.     Between July 12, and July 18, 2007, Cordova, Gutierrez, and other members of MS-13, including but not limited to, MS-13 member Alejandro Enrique Umana, traveled from New York to Greensboro, NC via a automobile.  In their travels, Cordova and Gutierrez repeatedly asked to stop in DC so they could finish off the lady whom they had done something to but did not die.  When they arrived in NC, Cordova, Gutierrez, and other members of MS-13 obtained a .45 caliber hand gun, a .38 caliber hand gun, and grenades.  In the their travel back to New York, Cordova and Gutierrez again repeatedly asked to stop in DC so they could finish off the woman.

19.     Back in New York, on July 18, 2007, defendants Cordova, Gutierrez, and another MS-13 member murdered another rival gang member.  In this murder, Cordova, armed with the .45 caliber handgun obtained in NC, and Gutierrez, armed with a .38 caliber, shot at rival gang members, and in so doing, murdered a rival gang member as he sat in his a car. After committing this murder, defendant Gutierrez admitted shooting at the driver of the car but that the driver tried to escape by driving away.  Defendant Cordova admitted shooting the driver in the head as the driver drove

away.[8]

20.      On July 19, 2007, shortly after committing the murder on July 18, defendant Gutierrez was arrested inside a residence located at ████████████████████████████████. Defendant Gutierrez was arrested based on the active arrest warrant in Washington DC.

21.      On August 6, 2007, defendant Cordova was arrested in Greensboro, NC.  At the time of his arrest, defendant Cordova was a front seat passenger inside a vehicle that was stopped on Lynwood Street, Greensboro, NC.  Officers observed the vehicle driving away from the Best Value Inn and Suites Motel, located at ████████████████████████.  Prior to stopping the vehicle, the officers observed defendant Cordova make furtive movements as if concealing an object. After arresting defendant Cordova for the outstanding arrest in Washington DC, officers found a loaded .38 caliber revolver between the driver's seat and the transmission floor shift lever.  The government's evidence will expose that defendant Cordova fled from New York to NC with other MS-13 members following the arrest of defendant Gutierrez.  Defendant Cordova traveled to North Carolina via automobile with other MS-13 members, including but not limited to, Alejandro Enrique

---

[8]      With respect to the other crimes described in paragraphs 17, 18, and 19, the government appreciates that the detail documenting these other crimes is somewhat general.  We respectfully submit that the general description is warranted due to the (i) nature of the pending investigation; (ii) serious safety concerns of a cooperating witness who would testify to these crimes- indeed, the government is aware of a threat by MS-13 against a federal officer who was assisting the investigation in New York; and (iii),the uncertainty of whether these other crimes will be presented by the government in the instant case or in a separate prosecution.  Our notice therefore, is intended to place this Court and the defendants on notice that these other crimes exist and to preserve the government's right to introduce these other crimes at trial in the instant case.  Towards this end, the government requests that this Court take the other crimes listed in paragraphs 17, 18, and 19, under advisement at this juncture and not render a decision until after August 1, 2010.  After that date, the government would be in a better position to advise the Court and the defendants with a more detailed account of the other crimes and furnish additional discovery to the defendants.

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 51 of 600

Umana.  In their travel, defendant Cordova and other MS-13 members stopped in Washington DC and picked-up two minor females.  Cordova and the other MS-13 members transported the minor females to the Best Value Inn and Suites Motel for the purpose of prostituting them.  After defendant Cordova was arrested, officers returned to the Best Value Inn and Suites Motel and observed a red SUV vehicle drive up to the motel room where the two minor females were believed to be located.  Inside the vehicle, officers observed MS-13 member Alejandro Enrique Umana making furtive movements as if to conceal an object.  After Umana exited the vehicle, officers observed a green colored substance, wrapped in plastic, on the floorboard under the edge of the seat.  The substance was seized and confirmed to be marijuana.  Mr. Umana was searched and on his person officers found six small bags each containing cocaine inside of his wallet.  Mr. Umana was arrested and photographed.[9]

22.     While detained at the District of Columbia Jail (DC Jail), defendant Cordova maintained contact with other members of MS-13, both in the United States and in El Salvador, and conspired with them to kill persons considered threats to the MS-13 enterprise.  On June 5, 2008, while detained at the DC Jail, defendant Cordova spoke on the telephone to El Salvador MS-13 member "Spyder."  The telephone call was recorded.  Defendant Cordova spoke to Spyder about defendant Cordova and other MS-13 members in DC waiting additional time before assaulting a local woman who could incriminate MS-13 members in El Salvador.  On June 7, 2008, while detained at the DC Jail, defendant Cordova spoke on the telephone to Maryland MS-13 member "Cuervo."  The telephone call was recorded.  Defendant Cordova and Cuervo discussed plans to tamper, threaten, and interfere with the testimony of MS-13 members suspected of cooperating with

---

[9]     Mr. Umana has the letters "MS" tattooed on his body.

the government against defendant Cordova.

23.    In addition, while detained at the DC Jail in the 2008, defendants Cordova and Gutierrez, continued to assault and threaten, this time fellow inmates, in furtherance of the MS-13 enterprise.  In 2008, defendants Cordova and Gutierrez threatened to kill inmates if they did not pay dues or give-up their food to Cordova and Gutierrez.  On one occasion, a victim-inmate was confronted inside his cell by inmate members of MS-13.  Defendant Gutierrez stood guard by the inmate-victim's cell door.  Two MS-13 inmate members, one armed with a shank, entered the cell and assaulted the inmate-victim.  Defendant Cordova ordered the assault.  On a second occasion, DC Jail officers found a shank inside a cell occupied by two inmate MS-13 members.  Defendant Cordova and another inmate accused a victim-inmate of telling the officers about the shanks.  Defendant Cordova, armed with a shank, assaulted the victim-inmate and attempted to pull him into a cell to better assault and stab him.[10]

24.    After Cordova's and Gutierrez's arrest, defendant Sorto continued to be leader of the MS-13 Sailors.  In so doing, defendant Sorto participated in additional crimes in furtherance of the MS-13 enterprise.  On October 27, 2007, defendant Sorto and other members of MS-13 participated in the stabbing of rival gang member Pablo Rene Castillo-Chavez.  Mr. Castillo-Chavez was assaulted because he was a member of the rival gang "La 18."  The assault occurred outside the El Salvadoreno Restaurant located on 14th Street, NW, Washington DC.  Prior to the assault, Mr. Castillo-Chavez was inside the restaurant where he was noticed by MS-13 members.  The MS-13 members noticed a tattoo on Castillo-Chavez' neck depicting the numbers "18" in Roman numerals.

---

[10]    With respect to the two DC Jail incidents, the names of the victim-inmates are not listed due to the serious witness security risks that would result in publishing this information at this time.

The MS-13 members conspired to attack Castillo-Chavez and called defendant Sorto and requested he come to the restaurant to assist and bear witness.  When defendant Sorto arrived, the MS-13 Sailors conspired further to assault Castillo-Chavez.  After Castillo-Chavez walked out of the restaurant, he was surrounded by several MS-13 members, assaulted, and stabbed 5 times.

25.      On October 28, 2007, defendant Sorto participated in the stabbing of Celso Curiel in the ████████████████████████████████████  In this assault, Curiel was walking home when he noticed MS-13 members sitting in front of a red brick building.  Curiel walked by the men but quickly noticed that the MS-13 members started to follow him.  One of them was talking on a cell phone.  Curiel was apprehended, repeatedly beaten, and then stabbed in the back.  The MS-13 members made good their escape.  The following day, defendant Sorto admitted and bragged about participating in this stabbing to government witnesses.

26.      In January 2008, defendant Osorio-Rivas was arrested by agents from Immigration Customs and Enforcement (ICE) for being an illegal immigrant.  When he noticed law enforcement that day, Osorio-Rivas fled on foot and was chased by officers .  When arrested, defendant Osorio-Rivas was in possession of a hand written MS-13 letter proclaiming, *inter alia*,  that MS-13 "Sailors are controlling the 'District of Crime,'" and that "we're Big Time Mara Salvatrucha.  You should have never fucked with us, you paid the consequences and now your in the grave."  Defendant Osorio-Rivas admitted to ICE Agents that he wrote the letter.

27.      Thereafter, defendant Sorto continued to employ threats and violence in furtherance of the MS-13 enterprise.  In January or February of 2008, in Washington DC, defendant Sorto entered the apartment of a woman and confronted her disobedience and loyalty to MS-13. Defendant Sorto demanded that the female make arrangements to prostitute herself and others for the benefit

of MS-13.  When the female refused, defendant Sorto placed the barrel of his hand gun to her head and threatened to kill her if she did not comply.  Defendant Sorto withdrew his handgun upon seeing another gang member intervene.[11]

**III.    Authorities.**

####    A.    Other Crimes and Bad Acts are Inextricably Intertwined and Direct Proof of the Crimes Charged

28.    Many of the other crimes and bad acts referenced *supra* are not the type of evidence that needs to be analyzed under Federal Rule of Evidence 404(b).  Rather, the evidence exposes direct proof of the crimes charged.[12]  This proof, which the government intends to introduce at trial, is offered to prove the charged offenses of the conspiracy to commit violent crimes in aid of racketeering (VCAR).  As noted *supra*, the government seeks to present substantial evidence of criminal wrongdoing and bad acts by the defendants that does not relate to specific dates and/or incidents charged in the indictment, but, the evidence is independently admissible as direct proof of the charged offenses of the conspiracy with which the defendants are charged.

29.    Indeed, evidence of acts which are part of, or "inextricably intertwined" with, a charged crime is direct proof of that crime and is not subject to a Rule 404(b) analysis.  United States v. Badru, 97 F.3d 1471, 1474-75 (D.C. Cir. 1996), *cert denied*, 520 U.S. 1213 (1997); United States

---

[11]    As is the case with the other victims and witnesses noted *supra*, serious witness security issues would result in releasing the name of this victim at this time.

[12]    The government brings much of this notice and motion using the mechanism of a Rule 404(b) analysis as well.  That is, although much of this evidence (in particular the other crimes and bad acts evidence dated within the time range of the indicted conspiracy and shortly before and after) is direct proof of the crimes charged, in the event this Court determines that an analysis under Fed. R. Evid. 404(b) is necessary, the government also advances a Rule 404(b) analysis as well for the Court's consideration and to allow defense counsel to respond to both theories of admissibility.

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 55 of 600

v. Allen, 960 F.2d 1055, 1058 (D.C. Cir. 1992), *cert denied*, 506 U.S. 881 (1992); United States v. Diaz, 878 F.2d 608, 614-16 & n.2 & 3 (2d Cir. 1989), *cert denied*, 493 U.S. 993 (1989).  This rule applies with even greater force where the crime charged is a conspiracy and the so-called "other crimes" are, in fact, direct evidence of the existence of the conspiracy.  *See* Badru, 97 F.3d at 1475 ("In cases where the incident offered is a part of the conspiracy alleged in the indictment, the evidence is not admissible under Rule 404(b) because it is not an 'other' crime.  The evidence is offered as direct evidence of the fact in issue, not as circumstantial evidence requiring an inference as to the character of the accused.");  United States v. Castro, 659 F. Supp.2d 415, 420-421 (E.D.N.Y. 2009)(in MS-13 case where defendant charged with, inter alia, conspiracy to commit assaults with dangerous weapons in aid of racketeering activity, evidence of a prior uncharged shooting was admissible at defendant's trial to show the existence of a racketeering enterprise and also separately admissible under Rule 404(b) to show defendant's motive in both the charged and uncharged shootings; although evidence presented a risk of prejudice, it was manifestly probative on critical, disputed issue of whether defendant's gang engaged in acts and threats of murder). United States v. Mejia, 545 F.3d 179, 206-207 (2d Cir. 2008)(in MS-13 case where defendant charged with conspiracy to commit assaults with a dangerous weapon in aid of racketeering activity and where existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by defendants themselves, is admissible to prove the existence of a criminal enterprise in which the defendants participated);  United States v. Thai, 29 F.3d 785, 812-13 (2d Cir. 1994) (evidence of uncharged crimes admitted in RICO trial was not 404(b) evidence; these crimes were independently admissible since they were in furtherance of the RICO conspiracy), *cert denied*, 513 U.S. 977 (1994); *see* United

States v. Escobar-De Jesus, 187 F.3d 148, 168 n.17 (1st Cir. 1999) ("[b]ecause we conclude that the Lajas incident was not 404(b) evidence, but rather was direct evidence of the conspiracy charged, we have no occasion to decide whether [the witness's] testimony went beyond matters included in the notice required by Rule 404(b)"); *see also* United States v. Green, 175 F.3d 822, 831 (10th Cir.), *cert denied*, 528 U.S. 852 (1999); United States v. Garcia Abrego, 141 F.3d 142, 175 (5th Cir.), *cert denied*, 525 U.S. 878 (1998); United States v. Miller, 116 F.3d 641, 682 (2d Cir. 1997), *cert denied*, 524 U.S. 905 (1998); United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996); United States v. Maceo, 947 F.2d 1191, 1198-99 (5th Cir. 1991), *cert denied*, 503 U.S. 949 (1992);  United States v. Coiro, 922 F.2d 1008, 1015-1016 (2d Cir. 1991), *cert denied*, 501 U.S. 1217 (1991);  United States v. Tejada, 886 F.2d 483, 486-87 (1st Cir. 1989); United States v. Angelilli, 660 F.2d 23, 39 (2d Cir. 1981), *cert denied*, 455 U.S. 910 (1982); United States v. Salazar, 485 F.2d 1272, 1276-1277 (2d Cir. 1973), *cert denied*, 415 U.S. 985 (1974); McCormick on Evidence § 190 at 800 & n.17.

30.     In addition, where evidence of the defendants' acts are either inextricably intertwined with a charged conspiracy, or are evidence of the conspiracy itself, it is admissible without Rule 404(b) analysis, regardless of whether those acts fall outside the period during which the indictment alleges the conspiracy existed.  United States v. Diaz 878 F.2d at 614-16 & n.2 (crimes, wrongs or acts occurring *before* alleged inception date of conspiracy were relevant and admissible in drug conspiracy prosecution and did not raise Rule 404(b) question); United States v. Navarro, 169 F.3d 228, 233-34 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 117 (1999) and *cert. denied,* 120 S.Ct. 312 (1999) (evidence of narcotics found at co-conspirator's home in another state *after* the alleged conclusion of the conspiracy was inextricably intertwined with the evidence used to prove the

conspiracy, and therefore, was not subject to a Rule 404(b) analysis); United States v. McLean, 138 F.3d 1398, 1404 (11th Cir. 1998) (defendant's alleged membership in a drug organization *prior to* his indictment for the charged offenses, including conspiracy, was inextricably intertwined with the charged offenses and provided important context for the charged conspiracy); United States v. Bates, 600 F.2d 505, 509 (5th Cir. 1979) (testimony concerning acts and backgrounds of co-conspirators, including evidence of behavior *antedating* period covered by indictment, was not extraneous evidence of other crimes, but admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior); United States v. Bermudez, 526 F.2d 89, 95 (2d Cir. 1975), *cert denied*, 425 U.S. 970 (1975) (upholding admission of traces of narcotics and narcotics-related equipment seized in home six weeks *after* conspiracy to distribute cocaine ended).

31.     There is also case authority holding that in conspiracy cases evidence that the accused had, on other occasions, entered into unlawful agreements with alleged co-conspirators may be introduced for the purpose of showing that the defendant conspired with these same persons on the particular occasion in question. See, e.g., United States v. Alamo, 872 F.2d 202, 207 (7th Cir.1989); United States v. Fields, 871 F.2d 188, 197 (1st Cir. 1989), *cert. denied*, 493 U.S. 955 (1989); United States v. Traitz, 871 F.2d 368, 389 (3d Cir. 1989), *cert. denied*, 493 U.S. 821 (1989).  "In a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged." Nye & Nissen v. United States, 168 F.2d 846, 857 (9th Cir.1948), *aff'd*, 336 U.S. 613 (1949). See also United States v. Apker, 705 F.2d 293, 298 (8th Cir.) (wide variety of items may be admissible in conspiracy trial; district court has "particularly broad discretion"), *modified on reh'g en banc on other grounds sub nom.* United States v. Fitzgerald, 724 F.2d 633 (8th Cir.1983), *cert. denied*, 465

U.S. 1005 (1984).

### B.      Federal Rule of Evidence 404(b)

32.     Rule 404(b) of the Federal Rules of Evidence governs the admission of other

crimes, wrongs or acts of a defendant.  The rule reads as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

(Emphasis supplied).  The rule is one of inclusion, not exclusion and the evidence may be offered

for any purpose, so long as the evidence is not offered solely to prove character. See United States

v. Crowder, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*); United States v. Johnson, 802 F.2d

1459 (D.C. Cir. 1986).

33.     To the extent that it is not already admissible due to it being direct and substantive

evidence of the charged offenses, evidence of other crimes, wrongs or acts is admissible under Fed.

R. Evid. 404(b) if offered for a permissible purpose.  Such permissible purposes include proof of

intent, motive, opportunity, plan, knowledge, identity or absence of mistake or accident.  "[U]nder

Rule 404(b), *any* purpose for which bad acts evidence is introduced is a proper purpose so long as

the evidence is not offered *solely* to prove bad character." United States v. Miller, 895 F.2d 1431,

1436 (D.C. Cir. 1990), cert. denied, 498 U.S. 825 (1990) (italics in original); see also United States

v. Clarke, 24 F.3d 257, 264 (D.C. Cir. 1994) (evidence of prior sales of cocaine by defendants

admissible to establish intent regarding their possession of large amounts of cocaine on dates charged

in the indictment); United States v. Washington,  969 F.2d 1073, 1080-81 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 922 (1993) (when defendant charged with distribution and possession with intent to distribute drugs, 404(b) evidence of his prior drug transactions was admissible to demonstrate intent, knowledge, plan and absence of mistake); United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982) (evidence of defendant's prior drug trafficking admissible in trial of charges of possession with intent to distribute drugs to show intent, preparation, plan and knowledge); United States v. (Michael) Johnson, 40 F.3d 436, 441 n.3 (D.C. Cir. 1994), *cert. denied*, 514 U.S. 1041 (1995) (proper to admit evidence of a prior drug transaction as bearing on intent to possess); United States v. Brown, 16 F.3d 423, 431 (D.C. Cir.), *cert. denied*, 513 U.S. 900 (1994) (evidence of the defendant's possession of a gun at the time of arrest was relevant to show his intent, knowledge or absence of mistake with respect to the firearms found in a safe during a search three months earlier); United States v. Williams, 895 F.2d 1202, 1205-06 (8th Cir. 1990) (evidence that defendant was found with guns and drugs in 1986 and 1987 was relevant to show that it was no mistake or accident that defendant had guns and drug paraphernalia in his apartment during execution of search warrant in 1988, and to show knowledge).

34.     Additionally, defendant's involvement in prior large scale cocaine trafficking that involved a co-conspirator in the charged offenses is relevant to show their relationship.  United States v. Gaviria, 116 F.3d 1498, 1532-33 (D.C. Cir. 1997), *cert. denied*, 522 U.S. 1082 (1998) (other crimes evidence properly admitted where "'it shows or tends to show the existence of a relationship between the defendants, and whether it shows or tends to show the defendants had a common scheme or plan which included the offenses for which they are now charged.'"); United States v. Graham, 83 F.3d 1466, 1472-1473 (D.C. Cir. 1996), *cert. denied*, 519 U.S. 1132 (1997)

(evidence of the criminal activity preceding the charged conspiracy helped explain the subsequent

formation of the larger conspiracy); United States v. Edmonds, 69 F.3d 1172, 1175 (D.C. Cir. 1995)

(evidence of prior narcotics activities of conspirators admitted pursuant to Fed. R. Evid. 404b to

show roles in conspiracy); Clark, supra, 24 F.3d at 265 (evidence of prior narcotics activities of

conspirators admitted pursuant to Fed. R. Evid. 404b to show intent to join charged conspiracy).

Professor Imwinkelried, a leading commentator on Fed. R. Evid. 404(b) and "other crimes" evidence

issues, has explained:

> Numerous cases allow the prosecutor to do precisely that [offer evidence of the defendants' prior illegal dealing to prove the act of entering into the conspiracy] (footnote citing cases omitted).  In principle, this is a legitimate use of uncharged misconduct evidence.  The prosecutor is not merely offering evidence of the defendant's prior misconduct with third parties and arguing that since the defendant once entered into an illegal transaction, he or she probably entered into the charged illegal agreement.  Rather, the prosecutor is offering evidence of the defendant's special relationship with the same coconspirator involved in the charged conspiracy and contending that the earlier, special relationship increases the likelihood that they entered into the later, charged conspiracy.  This theory of logical relevance is tenable.  It is unlikely that a criminal would approach a complete stranger with a proposal for an unlawful conspiracy.  It is much more plausible that the defendant will approach someone the defendant trusts (footnote omitted) and someone whom the defendant knows is willing to engage in illegal activity (footnote omitted).  This is a permissible noncharacter theory of logical relevance.

Imwinkelried, *Uncharged Misconduct Evidence*, § 4.22 and n.2 (1984 ed. and 1988 supp.).

35.     In addition, where, as here, certain defendants commit their crimes in a particular or

similar manner or pattern, it is also appropriate to introduce evidence of this.  Indeed, these activities

are relevant to establish their identities, intent, motive, and *modus operandi*.  See, e.g., United States

v. Cassell, 292 F.3d 788, 792-96 (D.C. Cir. 2002) (prior instance of firearm possession by defendant

relevant to show his knowledge and intent to possess firearm recovered from his bedroom); United

States v. Bowie, 232 F.3d 923, 926-33 (D.C. Cir. 2000) (similar holding involving counterfeit bills);

United States v. Howard, 245 F. Supp.2d 24, 30 (D.D.C. 2003) (evidence relating to money laundering admissible regarding mail and wire fraud counts to show defendant's intent to defraud); United States v. Morrow, 2005 WL 3159572, at *20 (D.D.C. April 7, 2005) (theft of ten cars used in bank robberies showed defendants' plan, preparation, and *modus operandi* of the RICO enterprise and conspiracy).  This is so even where some of these activities pre- and post-date the criminal acts specified in the indictment.  See, e.g., United States v. Procopio, 375 F.3d 21, 29 (1st Cir. 1996); United States v. Schardar, 850 F.2d 1457, 1463 (11th Cir.), *cert. denied*, 488 U.S. 932 (1988); United States v. Terebecki, 692 F.2d 1345, 1349 (11th Cir. 1982); United States v. Hadaway, 681 F.2d 214, 217-218 (4th Cir. 1982).   *Cf.* United States v. Pindell, 336 F.3d 1049, 1057 (D.C. Cir. 2003)(defendant, a former-police officer, charged with robbing prostitutes's customers, told his former-girlfriend that he had been robbing these customers and that he would hurt her if she told anyone: "district court properly admitted the statement pursuant to the rule for the purpose of proving Pindell's intent to rob the prostitutes' customers and to rebut the suggestion that he was present at the scene of the robberies by mistake or accident"); United States v. Fountain, 768 F.2d 790, 796-97 (7th Cir. 1985) (evidence of previous use of knife in prison was for attack rather than self defense was relevant to show defendant's purpose); Watkins v. Meloy, 95 F.3d 4, 7 (7th Cir. 1996) (state equivalent of Rule 404(b) did not preclude evidence of defendant's rape of another victim, where both victims were acquaintances and defendant snuck into their apartments in the middle of the night and proceeded to rape them).

36.     The probative value of the evidence is not substantially outweighed by the unfair risk that the jury would infer each defendant had a propensity to commit criminal acts. *See* Fed. R. Evid. 403.  Much of the proffered evidence is inculpatory either as direct evidence or on the issue of

motive, opportunity, intent, preparation, plan, knowledge, identity and association.  Furthermore, Fed. R. Evid. 403 only bars "unfair prejudice" which is "the sort of prejudice which calls upon a fact finder to decide a case, not on the evidence, but on some improper motivation." Old Chief v. United States, 519 U.S. 172, 180 (1997).  Here, the pointed relevance of the proposed evidence to contested issues at trial, the brevity of the proof, and the safeguards engendered by a limiting instruction are sufficient to prevent the kind of unfair prejudice proscribed by Fed. R. Evid. 403.  *See, e.g.,* United States v. Long, 328 F.3d 655, 662 (D.C. Cir. 2003)("limiting instructions ordinarily sufficient to protect the defendant's interest"); United States v. Moore, 732 F.2d 983, 990 (D.C. Cir. 1984) (any prejudice arising from 404(b) evidence could have been cured with appropriate limiting instruction).

37.     Finally, where other crimes or bad acts are committed past the time period charged in the indictment, it is not essential that the prosecution prove that a conspiracy began or ended on the specific dates set forth in the indictment.  What must be shown is that at least one of the overt acts was committed in furtherance of the conspiracy within the period charged.  See United States v. Spaeni, 60 F.3d 313, 315 (7th Cir. 1995)(only in rare circumstances is time a material element of the charged offense, even where continuing offenses such as conspiracy are alleged, and thus it is generally sufficient to prove that the offense was committed on any day before the indictment and within the statute of limitations); United States v. Ramirez, 482 F.2d 807, 817 (2d Cir. 1973), *cert. denied*, 414 U.S. 1070 (1973); United States v. Henderson, 434 F.2d 84, 86 (6th Cir. 1970).

## III.    Arguments.

38.     We begin first with the other crimes evidence of murders committed in El Salvador. The government's evidence that defendants Cordova and Gutierrez committed murder in El Salvador is direct proof of the existence of the MS-13 enterprise, its ties to El Salvador, and Cordova's and

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 63 of 600

Gutierrez's self-serving proclamations, during their later participation in the enterprise's criminal activities in the United States, to enhance and maintain their positions within the enterprise. That the murders pre-date the charged period of the conspiracy in the indictment does not preclude the evidence's admissibility when the evidence is offered as direct proof of the crimes charged in the conspiracy. Diaz, *supra*, 878 F.2d at 614-16 & n.2. Here, proof of defendants Cordova's and Gutierrez's membership in the MS-13 enterprise in El Salvador will corroborate the defendants' own admissions to local MS-13 members in the United States that (i) the defendants' did in fact commit murder as they claimed, and (ii) the existence of the MS-13 enterprise in El Salvador and the defendants direct ties to it which garnered them a greater command of local MS-13 members and the violence employed by them in the United States. The previously committed uncharged evidence will expose the existence of the racketeering enterprise and would therefore be admissible. See Mejia, *supra*, 545 F.3d at 206. ([w]here, as here, the existence of a racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible "to prove an essential element of the RICO crimes charged-the existence of a criminal enterprise in which the defendants participated.)(internal quotations and citations omitted). In addition, the evidence is inextricable intertwined to the charged offense of conspiracy as the evidence will corroborate government witnesses explanations as to why defendants Cordova and Gutierrez were allotted greater respect within the MS-13 enterprise, whey they committed violence in the United States, and why local members of MS-13 followed Cordova's and Gutierrez's instructions.

39.     In the event the Court finds that the uncharged murders in El Salvador are not direct proof of the charged offenses in the conspiracy, the evidence would nonetheless be admissible under

a Rule 404(b) analysis as well.  This evidence exposes defendants Cordova's and Gutierrez's motive, intent, preparation, plan, and knowledge.  That is, the government's evidence will expose the defendants' membership in the conspiracy and the crimes and bad acts, particularly confronting and assaulting members of all rival gangs, that members of the conspiracy must comply with in order to maintain and enhance their membership in the conspiracy.  Where, as here, the proof of the defendants committing murders in El Salvador exposes their knowledge of the enterprise rules and their intent and motive to comply with the rules by committing assaults and murders, both charged and uncharged, in furtherance of the conspiracy, the evidence is admissible under Rule 404(b) as well.  See Castro, *supra*, 659 F. Supp.2d at 420 (evidence of a prior uncharged shooting admissible at defendant's trial under Rule 404(b) to show defendant's motive in both the charged and uncharged shootings; although evidence presented a risk of prejudice, it was manifestly probative on critical, disputed issue of whether defendant's gang engaged in acts and threats of murder).  See Graham, *supra*, 83 F.3d at 1472-1473 (evidence of the criminal activity preceding the charged conspiracy helped explain the subsequent formation of the larger conspiracy).  Moreover, under Fed. R. Evid. 403, the probative value of this evidence coupled with a limiting instruction would not raise the level of unfair prejudice proscribed by Rule 403.  The probative value of this evidence is great because the evidence directly proves allegations contained in the indictment.  There is no unfair prejudice that results from the admission of this evidence.  The defendants are charged with actively participating in a violent enterprise and certainly the admission of evidence that the defendants perpetrated acts of violence in furtherance of the enterprise s in no way "unfairly" prejudicial.

40.     Should this Court find the evidence of the uncharged murders in El Salvador inadmissible under either a direct proof of the crimes charged analysis or Rule 404(b), due to the

prejudice that may attach, this Court should find, at the very at least, that the defendants' own admissions, that is the admissions themselves without additional evidence- of committing murders in El Salvador are admissible against the defendants for the same reasons cited above.  Such a finding would partly sanitize the evidence against the defendants but at the same allow for the introduction of their own admissions regarding the previous murders they committed.  Such a finding would allo the government to present the complete, inextricably intertwined story for the jury.  Moreover, the admissions of these statements would be admissible pursuant to Fed. R. Evid. Rule 801(d)(2)(A) and (E) as both admissions of party opponents and also as statements by coconspirators made in furtherance of the conspiracy.[13]

41.     Throughout the course of he indicted time period charged in the conspiracy June 2006 to June 2007, defendants Cordova and Gutierrez admitted to committing murder in El Salvador, possessed weapons at various times, initiated new recruits by having them "jumped-in," possessed and consumed marijuana, participated in on-going violence with rival gangs, ordered other MS-13 members to commit greater violence, including murder, and threatened the lives of others all in furtherance of the MS-13 enterprise.  See, supra, ¶¶ 7 through 9 and 11 through 14.  These other crimes, while not charged, and bad acts are admissible because they are direct proof of the crimes charged in the conspiracy.  The evidence further proves the objectives of the MS-13 enterprise and the manner and means these defendants, and other MS-13 members alike, utilized in order to achieve the enterprise's objectives, protect it from threats, and instill a sense of fear among

---

[13]     Fed. Rule Evid. 801(d)(2) states in relevant part that a statement is admissible as non-hearsay when "[t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or . . . . (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy. . . "

the community.  The evidence, therefore, would be admissible as direct proof of the conspiracy.  See

Badru, *supra*, 97 F.3d at 1475 ("[i]n cases where the incident offered is a part of the conspiracy

alleged in the indictment, the evidence is not admissible under Rule 404(b) because it is not an

'other' crime.  The evidence is offered as direct evidence of the fact in issue, not as circumstantial

evidence requiring an inference as to the character of the accused").   Notwithstanding, this same

evidence would be admissible under a Rule 404(b) analysis as well because the evidence proves

defendants Cordova's and Gutierrez's motive, intent, preparation, plan, and knowledge.  That is, the

evidence exposes the motive, intent, preparation, plan, and knowledge of defendants Cordova and

Gutierrez, in possessing weapons, assaulting and murdering others, threatening others, and

possessing drugs.  Moreover, under Fed. R. Evid. 403, the probative value of this evidence coupled

with a limiting instruction would not raise the level of unfair prejudice proscribed by Rule 403.  The

probative value of this evidence is great.  The defendants are charged with actively participating in

a violent enterprise and the admission of this can in no way be "unfairly" prejudicial.

42.     Throughout the course of the indicted conspiracy and periods thereafter,

defendant Sorto also participated in other crimes and bad acts that are direct proof of the crimes

charged and inextricably intertwined to the conspiracy.  For instance, defendant Sorto was the leader

of the MS-13 Sailors, he participated in initiating new recruits by having them "jumped-in,"

promoted the commission of greater violence by the MS-13 members, and participated in assaults

on rival gangs.  See ¶10 *supra*.  Defendant Sorto also participated in violent assaults against rival

gangs and assaults on persons he sought to utilize in furtherance of the enterprise.  See ¶¶ 24, 25 and

27, *supra*. This evidence is, both within the charged time period of the conspiracy and thereafter,

equally admissible as direct proof of the charges in the conspiracy as it also exposes and proves the

existence of the enterprise, defendant's Sorto membership in the enterprise, and the conspiratorial actions he employed in furtherance of the enterprise.  See Badru, *supra*, 97 F.3d at 1475; and also Navarro, *supra*, 169 F.3d 228, 233-34 (5th Cir. 1999), *cert. denied*, 120 S.Ct. 117 (1999) and *cert. denied,* 120 S.Ct. 312 (1999) (evidence of narcotics found at co-conspirator's home in another state *after* the alleged conclusion of the conspiracy was inextricably intertwined with the evidence used to prove the conspiracy, and therefore, was not subject to a Rule 404(b) analysis).  Notwithstanding, this same evidence against defendant Sorto would also be admissible under a Rule 404(b) analysis as it would be offered to show his motive, intent, preparation, plan, and knowledge in possessing weapons, assaulting, and threatening others both during and after the time period charged in the conspiracy.  Moreover, under Fed. R. Evid. 403, the probative value of this evidence coupled with a limiting instruction would not raise the level of unfair prejudice proscribed by Rule 403.  The probative value of this evidence is great.  The defendants is charged with actively participating in a violent enterprise and certainly the admission of evidence that he perpetrated acts of violence in furtherance of the enterprise s in no way "unfairly" prejudicial.

43.     After shooting Feliciana Esquina-Flores in June 2007, defendants Cordova and Gutierrez continued committing other crimes and bad acts in furtherance of the MS-13 enterprise and in furtherance of the conspiracy to commit violent crimes directly linked to the crimes committed in the Washington DC area.  During June 2007 to July 2007, defendants Cordova and Gutierrez, admitted their fugitive status for having committed crimes in the Washington DC area, committed additional murders in New York, possessed weapons, and transported the weapons throughout various states. See ¶¶ 17 through 19.  Thereafter, defendant Cordova, transported minor females throughout various states for purposes of prostitution, continued to possess a handgun, and

conspired, with local MS-13 members and MS-13 members in El Salvador, to threaten and harm persons that were threats to the MS-13 enterprise. See ¶¶ 21 through 23. First, the mere fact that the other crimes and bad acts occurred after the time period charged in the indictment alone does not render this evidence inadmissible. See Spaeni, *supra*, 60 F.3d at 315 (only in rare circumstances is time a material element of the charged offense, even where continuing offenses such as conspiracy are alleged, and thus it is generally sufficient to prove that the offense was committed on any day before the indictment and within the statute of limitations). Second, this evidence is admissible against the defendants, despite the other crimes and bad acts occurring after the time period charged in the conspiracy, because it is direct proof of the continuing conspiracy to commit violent crimes in furtherance of the MS-13 enterprise. See Navarro, *supra*, 169 F.3d at 233-34 (evidence of narcotics found at co-conspirator's home in another state *after* the alleged conclusion of the conspiracy was inextricably intertwined with the evidence used to prove the conspiracy, and therefore, was not subject to a Rule 404(b) analysis); Bermudez, *supra*, 526 F.2d at 95 (upholding admission of traces of narcotics and narcotics-related equipment seized in home six weeks *after* conspiracy to distribute cocaine ended). The evidence is inextricably intertwined with the charged conspiracy as it exposes the existence of the continuing conspiracy, its purpose, and the reasons for the defendants behavior during the charged conspiracy and thereafter. Notwithstanding, this same evidence is admissible under Rule 404(b) as it would be offered to show the defendants motive, intent, preparation, plan, and knowledge in possessing weapons, assaulting, and threatening others both during and after the time period charged in the conspiracy. See e.g., Brown, *supra*, 16 F.3d at 431 (evidence of the defendant's possession of a gun at the time of arrest was relevant to show his intent, knowledge or absence of mistake with respect to the firearms found in a safe during a search

three months earlier).   Moreover, under Fed. R. Evid. 403, the probative value of this evidence coupled with a limiting instruction would not raise the level of unfair prejudice proscribed by Rule 403.  The probative value of this evidence is great.  The defendants are charged with actively participating in a violent enterprise and the admission of this evidence could in no way be "unfairly" prejudicial.

44.     Finally, the other crimes evidence of defendant Osorio-Rivas' flight when he was arrested in January 2008, and his possession of hand written MS-13 letter proclaiming, *inter alia*, that MS-13 "Sailors are controlling the 'District of Crime,'" and that "we're Big Time Mara Salvatrucha.  You should have never fucked with us, you paid the consequences and now your in the grave," is also admissible as evidence of the existence of the conspiracy, his membership in the conspiracy, and the charged crimes in the conspiracy.  Moreover, the defendant's flight exposes his consciousness of guilt. The government's evidence will expose that in the weeks before defendant Osorio-Rivas' arrest, he was visited by law enforcement in connection with the investigation into the murder of Edwin Ventura.  The evidence will further expose that a search warrant was executed on defendant Osorio-Rivas' residence and that he was aware of law enforcement's interest in speaking to him.  Moreover, the MS-13 letter found on defendant Osorio-Rivas' person exposes the existence of the enterprise, its objectives, the violence they instilled on the community, and the defendant's association in the enterprise.   Hereto, the evidence is not barred simply because it post dates the time period charged in the conspiracy as the evidence is inextricably intertwined with the charged conspiracy and is direct proof thereof.  Notwithstanding, as with the other intrinsic evidence in this case, this evidence is also admissible under Rule 404(b) as it exposes defendant Osorio-Rivas' motive, intent, preparation, plan, and knowledge in the conspiracy.  Moreover, under Fed. R. Evid.

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 70 of 600

403, the probative value of this evidence coupled with a limiting instruction would not raise the level of unfair prejudice proscribed by Rule 403. Here too, the probative value of this evidence is great and the admission of this evidence could in no way be "unfairly" prejudicial.

**IV.    Conclusion**.

45.    Most of the other crimes and bad acts evidence noted *supra*, can be established at trial without the need for too many additional witnesses to be called. In other words, in many instances, the government can establish the other crimes and bad acts evidence at trial through the witnesses that will already be testifying about charged crimes specified in the indictment. Although additional questions regarding these other crimes and bad acts would be needed, the questions would not overly extend the witnesses testimony, the trial itself, or confuse the jury. Where additional witnesses would be needed to further establish the other crimes and bad acts evidence, that number would be relatively minor.

WHEREFORE, for the foregoing reasons, the United States respectfully requests that this Court enter an Order granting the government's notice and motion to introduce other crimes and bad acts evidence.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

/s/

NIHAR R. MOHANTY
Assistant United States Attorney

BY:    /s/

GILBERTO GUERRERO, JR.
Assistant United States Attorney
KS Bar No. 19271
Organized Crime and Narcotics Trafficking Section
555 4th Street, N.W., Room 4814
Washington, D.C. 20530
(202) 514-7298 (desk)
gilberto.guerrero@usdoj.gov (email)

CERTIFICATE OF SERVICE

I hereby certify that, on the 3rd day of May, 2010, a copy of the foregoing Notice and Motion to Admit Evidence of Other Crimes and Bad Acts was served by electronic mail on all defense counsel.


/s/
GILBERTO GUERRERO, JR.
Assistant United States Attorney

# APPENDIX 132

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       :       Docket No. CR08-167
                                :       (RJL)
            Plaintiff,          :
                                :       November 17, 2010
                                :
v.                              :       10:15 a.m.
                                :
WILLIAM CORDOVA, JOSE           :
GUTIERREZ, AND MELVIN SORTO,    :
                                :
            Defendants.
. . . . . . . . . . . . . . . . .


DAY 17 - MORNING SESSION
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE, and a jury


APPEARANCES:


For the Plaintiff:              GILBERTO GUERRERO, JR.
                                NIHAR RANJAN MOHANTY
                                U.S. Attorney's Office
                                555 4th Street, NW
                                Washington, DC 20530


For the Defendant
William Cordova:                THOMAS ABBENANTE
                                Law Offices of Thomas Abbenante
                                1919 Pennsylvania Avenue, NW
                                Suite 200
                                Washington, DC 20006

APPEARANCES (Continued):

For the Defendant
Jose Gutierrez:                    ANTHONY D. MARTIN
                                   7501 Greenway Center Drive
                                   Greenbelt, Maryland 20770


For the Defendant
Melvin Sorto:                      MITCHELL M. SELTZER
                                   717 D Street, NW
                                   Suite 310
                                   Washington, DC 20004


Court Reporter:                    PATTY ARTRIP GELS, RMR
                                   Official Court Reporter
                                   Room 4700-A, U.S. Courthouse
                                   Washington, D.C. 20001
                                   (202) 962-0200


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

P R O C E E D I N G S

COURTROOM DEPUTY:  Calling criminal case 08-167 United States of America versus William Cordova, Jose Gutierrez and Melvin Sorto.  Would counsel please come forward and identify yourself for the record?

MR. MARTIN:  Good morning, your Honor. Anthony Martin on behalf of Mr. Gutierrez who is present.

THE COURT:  Welcome back.

MR. MARTIN:  Thank you.

MR. SELTZER:  Good morning, your Honor, Mitchell Seltzer on behalf of Melvin Sorto.

THE COURT:  Welcome back.

MR. ABBENANTE:  Good morning, your Honor, Thomas Abbenante on behalf of Mr. Cordova and he is present.

THE COURT:  Welcome back.

MR. MOHANTY:  Good morning, your Honor, Nihar Mohanty for the United States.  I believe Mr. Guerrero stepped out to the restroom, your Honor. Mr. Tracz is with us as well.

THE COURT:  Welcome back.  All right, counsel.  Mr. Abbenante, you and some of the other defense counsel had mentioned you might have some additional thoughts or positions you might want to put on the record on the issue of the use of the letter in question here that was found in the jail cell of Mr.  Gutierrez.

MR. ABBENANTE:  Your Honor, I think we made our

positions clear before.  I guess in light of what your Honor said yesterday, I will just wait and see if the Government has anything that I want to respond to.

THE COURT:  That sounds prudent.  Mr. Seltzer, do you want to add anything?

MR. SELTZER:  Well, only to me it is clear the theory that they are still co-conspirators and everything comes in against them I think is not really a fair one any more.  They are not -- the conspiracy in the indictment has ended.  They are not co-conspirators.

There is absolutely no evidence at all that my client had any knowledge of that letter, participated in it, anything of that nature.  I do think that the prejudice is severe because it is almost an admission in a sense and for an admission by the other party to come in against all three of them I just think it is prejudice that cannot be cured.  It really poisons the whole trial in a lot of ways.

THE COURT:  Thank you, sir.  Mr. Martin, do you have anything to add?

MR. MARTIN:  No, not really, your Honor. Based on the arguments I made yesterday, I have done some reading and my position is still the same.  It is not a furtherance of the conspiracy, assuming you find one, and even if you thought so, there is not a continuity of purpose.  It is something that is outside I think this conspiracy.

The young lady in question may very well be associated with MS.  She didn't share it with anybody who is part of MS and, to be frank with you, I think the prejudice that then spills over to the other two is just unfair.  So I would ask under 403 on Mr. Gutierrez's behalf that it not come in; but I would ask the Court to weigh heavily the impact that it is going to have on the other two.

THE COURT:  Mr. Mohanty.

MR. MOHANTY:  Your Honor, we respectfully disagree with counsel on the co-conspirator issue.  To perhaps speed things up a little bit, your Honor, the Government is willing to forego that and ask that it be admitted as an admission only as to the Defendant Gutierrez.  I want to make something clear for the record that I think may have got lost yesterday right before the lunch hour.

What the Government intended to do and what I told defense counsel on Friday afternoon in an e-mail was that we would redact your Honor's name, not just your name but any references to the Judge, the prosecutors so Mr. Guerrero and me would all be out and, your Honor, I am sure the Court is well aware that threats are routinely admitted as consciousness of guilt evidence, your Honor.

I would point to actually two cases that were cited in the recusal Motion in our opposition to that, your Honor, the Basciano case at 542 F.3d 950.  And in particular in that case

footnote seven, the Second Circuit suggested to the District Court that if the letter, the threat letter, in that case were to come in, that the District Court consider redacting the names of the Judge and the prosecutor to alleviate any potential prejudice.

That's why we sort of followed the lead of the Second Circuit, the suggestion in the Second Circuit in that case and telling defense counsel we were going to redact the names.  In the Gamboa case, your Honor, another case cited in our opposition to the Motion To Recuse at 439 F Third, in particular at page 817, in that case there was a threat letter that named the Judge and named the prosecutor and the District Judge in that case let it in without any redactions; and it was affirmed by the Eighth Circuit and the Eighth Circuit said the very experienced District Court Judge made a careful record pursuant to Federal Rule 403 before admitting the testimony, excuse me, it was testimony, not a letter in that case.

THE COURT:  How could this be admitted against Mr. Gutierrez alone? I mean obviously I would have to give some kind of special instruction.

MR. MOHANTY:  Yes, your Honor, but as I am sure this Court is well aware that routinely happens with a limiting instruction.  The letter in no way implicates Mr. Cordova, in no way implicates Mr. Sorto; and with regard to the 403 analysis, your Honor, as the Court is also well aware  --I know counsel

and me and counsel for the Government use shorthand when they are speaking to Court sometimes because we are all lawyer, but as the Court is well aware the test is unfair prejudice under 403. Of course, it is prejudicial in the sense that it is probative evidence.

THE COURT:  Exactly.

MR. MOHANTY:  But it has to be unfair prejudice that would somehow lead to sort of a knee jerk reaction by the jury unfairly in this case.  So we simply think the probative value by far outweighs the potential prejudice, your Honor, especially with a limiting instruction.

I would point out, your Honor, I know counsel yesterday had argued in part that because the letter was subject to interpretation, that was one reason the Court should keep it out.

THE COURT:  Well, the letter really isn't very clear on its face as to what exactly, at least it isn't very clear to me, maybe to Mr. Gutierrez it is clear, but I mean he is asking on the face of the letter, he seems to be asking this person, Lilliana, to come and see him because he wants to discuss things with her and then he kind of adds at end another thing I would like you to help me with this person, Lady of Sivar, I don't know who that person is obviously, but there seems to be some information out there that this person is some kind of a witch doctor.

I don't know if she is or she isn't, and I don't know to what extent Lilliana is witting as to whether she is or she isn't. I know Mr. -- well, I am not sure it was Mr. Martin, it might have been Mr. Abbenante -- made some comment to the effect that this could be interpreted to be a green light. If this letter got into the possession of the wrong hands of people in El Salvador, this could be viewed as some kind of a green light for people in MS in El Salvador to be energized or empowered in some way to act out the wishes that it reflected in this letter.

You know, I don't know where that would take me, but on its face, it is confusing in the sense that it is appears to be giving a list of people he wants silenced that include his fellow Defendants.

MR. MOHANTY: I appreciate that, your Honor.

THE COURT: Mr. Sorto, Mr. Cordova and I believe at the time Mr. Osorio-Rivas was one of the Defendants. He was not -- at that point he hadn't pled and cooperated with the Government. Because this letter, as I recall it, is over a year old and as I recall the investigation that arose out of this letter by the Marshal Service, this letter Miss Lilliana indicated this was over a year old and so at the time it was written these three were his fellow Defendants. It appears he is asking them to be silenced as well. So --

MR. MOHANTY: Your Honor, may I step away from the podium for a minute to get my copy?

THE COURT:  Sure.

(Pause.)

MR. MOHANTY:  Your Honor --

THE COURT:  I am looking at my copy of the translation that was provided.

MR. MOHANTY:  I am looking at our version of the translation that was included in our Opposition of the Motion To Recuse, your Honor. I will be candid with the Court and I know Mr. Guerrero has indicated to the Court as well that the witness Yazmin Yanes who received this letter interpreted it as -- would testify we believe -- that she interpreted it as a request for her to pay a witch doctor named Lilliana or something like that to put a curse against Mr. Gutierrez.

Whether it is that, whether it is that interpretation that the jury finds believable or a more credible interpretation that our expert witness would put on and indicate that this was actually a more serious threat, whatever the level of the threat whether it is a curse against the people against him or a request for action, more violent action against the person against them, in our view, that's still consciousness of guilt, your Honor.

To the letter itself, the way I had interpreted it, your Honor, and I confess I am speaking only for me here, the letter says in critical -- at the pertinent part: I would like you to help me with the Lady of Sivar to silence everyone

against me.  I believe Mr. Guerrero has explained to the Court that our expert witness would testify that the Lady of Sivar is actually some sort of MS-13 headquarters in El Salvador.

Then it says the names of the prosecutors, the name of your Honor, those who are companions in my case and lists the codefendants in this case.  Then in the last heading is possible testimony where it lists Misael Esquina-Flores, Nelson Maldonado which is spelled incorrectly, Feliciana Flores, Thomas Perez. The last line says:  These are the possible testimonies that will be against me but keep them in your prayers.

It had been my interpretation that the people he wanted silenced would be the possible testimony.  Those are the people against him.  Then that's how we, that's how I had always interpreted the letter.  I would point the Court to a case United States versus McCann Fifth Circuit --

THE COURT:  Is it your position that this Lilliana person is not the person this letter was sent to? Is not the person who --

MR. MOHANTY:  I believe that's a nickname for her. Let me check with Mr. Guerrero.  That's her nickname.

THE COURT:  That's not the witch doctor?

MR. MOHANTY:  No, your Honor.

THE COURT:  No. So it is your belief that you think it was her understanding or impression and she would testify to it that he wanted her to take this letter to someone or get this

letter to someone in El Salvador who was a witch doctor?

MR. MOHANTY:  Exactly, your Honor.  I believe the witness would testify that she did not have the money to pay the witch doctor fees for lack of, a more elegant term, your Honor.

THE COURT:  So she never sent it?

MR. MOHANTY:  She never sent it.

THE COURT:  And Lady of Sivar S I V A R is some kind of a code name for an MS-13 organization in El Salvador?

MR. MOHANTY:  I believe if I recall correctly, your Honor, I am going to turn to Mr. Guerrero to make sure I am correct about this, that is a code name for El Salvador itself.

THE COURT:  Oh.

MR. GUERRERO:  Your Honor, good morning.  Just a few minor points just so the record is clear.  The witness would testify, her name is  Yazmin Yanes, she is also known as Lilliana that she received this letter from Mr. Gutierrez by way of postage mail.

THE COURT:  From the jail?

MR. GUERRERO:  From the jail.  And that she had received previous letters from the Defendant and so she recognizes his handwriting.  She had actually spoken to him in person as well, and that her understanding and when she received this letter was for her to call the Lady of Sivar in El Salvador who from her understanding is a witch doctor; and that the witch doctor, her function, the witch doctor, would be to put a curse

on the witnesses against the Defendant.

The expert that we have shown this letter to, and we showed it to two experts, in particular one directly from El Salvador and the other one from -- who would be testifying this morning interpret the Lady of Sivar to be a possible what they call a shot call or a person who has a La Palabra in El Salvador who can authorize killings of witnesses or attacks on witnesses as well.

So that's the more severe threat that would be subject to interpretation. The rest of the facts would remain the same. The witness never actually completed the action. She didn't have the money to make the phone call. She didn't put in the request to the Lady of Sivar, but that would be the sum and substance of her testimony. I will defer back to Mr. Mohanty.

MR. MOHANTY: Your Honor, I was beginning to cite a case for your Honor. United States versus McCann M C -- capital M, lower case C A N N 613 F.3d at 486. This is a Fifth Circuit case. In that case a Defendant while being arrested said something that could be interpreted as a threat to a police officer, said something to the effect of you better hope when I get out that you have -- that you need to have a strong vest.

The Government moved admission of that as a threat saying that was basically a threat to kill this police officer. The Defendant had only been arrested for possession of a weapon by a felon, and the Government interpreted that as a threat

against the police officer.  The Defendant said, no, that can be interpreted in different ways and he is just angry and he was angry because he was wrongly arrested and it just meant that at some time in the future he might have the chance to have a weapon.

The Fifth Circuit in rejecting that argument very quickly said -- sorry, your Honor, I am at page 499 of the case -- that a statement can be interpreted in two different ways does not negate its probative value.  That's essentially the same thing here, your Honor.  If Mr. Martin wants to argue that this is just a curse attempt, that is certainly fine.  There will be evidence in the record for him to do that because the witness who will sponsor the letter, authenticate the letter will say exactly that, but that doesn't negate its probative value.  It just means that their way of getting at people against -- Mr. Gutierrez's way of getting at people against him was to put a curse on them.

THE COURT:  What about the prejudicial effect on the other two Defendants?

MR. MOHANTY:  Your Honor, we believe the prejudicial effects, any effect against them can be cured by a simple jury instruction.  The Supreme Court in Richardson versus Marsh made clear that except for Bruton issues, the jury is presumed to follow the instructions of the Court.

They will be told this letter was by Mr. Gutierrez.

They are free to point out for this witness or -- there is no evidence that Mr. Cordova or Mr. Sorto even knew it was written. I really don't how they are prejudiced along with a limiting instruction, your Honor. Thank you.

THE COURT:  Mr. Martin, do you have something else?

MR. MARTIN:  Yes.  I don't mean any disrespect to my colleagues on the other side, I don't know that I ever --

THE COURT:  I feel like I am in Congress when I hear that.

MR. MARTIN:  I wish Congress was like that actually. If I used the word curse, I didn't mean to use it.  I think it is more like a spell.  Again, I just go back to the point that, one, I don't think these gentlemen would have to pay any kind of fee to report back to headquarters as the Government is alleging and, two, I really think that these two gentlemen have a greater interest in this particular issue than I do.  I don't want to speak for them, but those two points I wanted to make.

We are not conceding this is a threat.  We are not conceding that this is a curse, some kind of metaphysical threat.  This is a spell at worse, and this is not headquarters.

THE COURT:  Mr. Abbenante.

MR. ABBENANTE:  Your Honor, it is the same, same old story and same old song the Government sings when they want to get something in against one Defendant and say it is not going to be prejudicial to the other two, that a curative instruction

is going to help.  I think Mr. Mohanty and Mr. Guerrero took a very smart move this morning when they got the queue yesterday that you were not going to let this in so  now they backed off on trying to say that it could be admissible against the three of them and they are going to back down from that position and say, okay, well, we have changed our mind about that.  Just let it in against Mr. Gutierrez and then it will all be okay with the curative instruction.

The bottom line is that that's not going to be okay.  If that gets in, it is going to spill over to our clients no matter what the Court says.  With all due respect, your Honor can give them an instruction, but when the jury hears that kind of evidence and what the real problem here is that they are trying -- they are going to sponsor the witness, the original witness who supposedly knows Mr. Gutierrez, who has seen him, talked with him before, written letters to him before.  She is going so say what she believed that letter to be which was basically, you know, get a witch doctor to put a spell on this, but then they are going to come right in with their expert to get the punch that they want and that is, oh, no, this is a threat.  You know, this is, you know, to the higher authority in El Salvador to put a hit on these people and that's the problem.

So in their own case they are going to try to get the letter in to authenticate it and then elevate the impact of it through their expert witness who doesn't even know Mr. Gutierrez

or anything about the relationship between him and this woman.

And whatever curative instruction you give, your Honor, it is going to spill over to Mr. Sorto and Mr. Cordova and it is unfair.  And, in general terms, you know, at least again Mr. Guerrero and Mr. Mohanty are much better on the law than I am, but the bottom line is that in general terms a conspiracy I would submit ends at the time that these people were arrested and incarcerated.

There has to be some, at least in my view, some showing and again they are backing down from that position now because they are saying just enter it for Mr. Gutierrez, but there is no showing or any evidence here that this letter was in the furtherance of the alleged conspiracy between the three of these people.  There is no indication that Mr. Cordova -- they are not even going to get from there witness who is going to authenticate the letter or Mr. Sorto had any knowledge about this letter.  With all due respect to the Government, the curative instruction I don't think is going to work here.

THE COURT:  How about the fact that it looks on the surface of the letter like that he is asking for a curse against your client and Mr. Seltzer's?

MR. ABBENANTE:  Well, that's another ambiguity in it because, according to the Government, there was a photograph of some sort inserted in the letter of Mr. Osorio-Rivas and that too is a problem because then if in fact -- although I assume

that the woman who is going to come in here and authenticate the letter is not going to say that she interpreted that as being a request that the witch doctor put a spell on Mr. Cordova or Mr. Sorto but potentially the witnesses against them, but as you said, it looks -- it would also suggest that there is some conflict between the three of them.

That's another problem that's unfairly prejudicial when there is no evidence of that.  Again, I think your Honor, again that's why I didn't say anything when we first came in here because I thought it was the Government's, you know, ball to carry when you told them yesterday you weren't -- you were inclined not to do it and I wanted to hear what they had to say before I responded.

When I saw -- when I  -- they take a smart position. When they back down in admitting against the three of them, I think that's a clear signal to the Court that your Honor was right with your instinct to go with it in the first place and to deny the admission.

THE COURT:  All right. I am going to keep it out.  I think for all the reasons that have been advocated, not only the facial ambiguity of it, the total lack of clarity as to what exactly was going on here, what was intended, the fact that it may be subject to some interpretation by experts, but to put that in and the prejudicial effect against the other two Defendants I think just the totality of the circumstances is

such here that for all of the reasons that have been advocated that I am not going to permit this to be admitted even as to Mr. Gutierrez.

I am not sure -- I am certainly not confident that a curative instruction could have the effect that would be necessary under the circumstances if it was admitted for the limited purposes against him and, therefore, I am not going to permit its admission and you can spare Miss Yanes the burden of testifying in the case.

All right.  Are we going to go to Flores next?

MR. GUERRERO:  Judge, if we could have a quick two minutes, I think we want to call Dawn Leary on.  She is outside. She will be very brief.

THE COURT:  Before you get to Dawn Leary, I had a question that I forgot to ask you all yesterday.  You have 1 or 2 agents -- excuse me, not Agents -- 1 or 2 witnesses who are gang experts?

MR. GUERRERO:  One.

THE COURT:  One.  That's Flores?

MR. GUERRERO:  Yes, sir.

THE COURT: And has his credentials and everything been shared with the defense counsel?

MR. GUERRERO:  Yes.

THE COURT:  All right.  Do defense counsels have any issue or problem with regard qualifying -- Mr. Flores has been

qualified in other courts before?

MR. GUERRERO:  About 70 times.  He testified in Greenbelt, North Carolina Federal Courts, and many state courts.

THE COURT:  Very good. Are we going to be having any issues with voir diring this expert or is this pretty much a straightforward qualification to be an expert witness? I am not asking about Cross-Exam.  I am just talking about voir diring on the issue of expertise.  I haven't seen the credentials or any of the other stuff.

MR. ABBENANTE:  Well, I don't intend to voir dire him. I am just going to submit to the Court.  I mean I saw in some testimony that -- where he testified before that -- I didn't see in that testimony -- I know that he has been qualified in Greenbelt.  I didn't know about these other qualifications in other Federal Courts that were mentioned.  My understanding was that he was just qualified in the state Federal Courts of California; but obviously if Mr. Guerrero represented that he is in other Federal Courts, so be it.

THE COURT:  Okay. Pretty much in the same place, Mr. Martin and Mr. Seltzer?

MR. MARTIN:  Yes.  Yes, sir.

THE COURT:  I am just trying to anticipate whether there is going to be -- believe me I am not saying there should be -- I am trying to picture how this is going to unfold here.

MR. MARTIN:  We were just looking at his CV. I don't

have any voir dire for him.

MR. SELTZER:  I haven't voir dired any of the experts. I may ask him 1 or 2 questions, but I don't see anything major.

THE COURT:  He is pretty well established it seems like anyway to me.  All right.

MR. ABBENANTE:  We didn't say that, Judge.

MR. GUERRERO:  Judge, I believe his most recent case was in North Carolina --

THE COURT: To be qualified as an expert.

MR. GUERRERO: -- was in North Carolina MS-13 a few months ago on a death penalty case so he has been around.

THE COURT:  Okay. Do you want to take a ten-minute break here to get your witness situation sorted out? Five minutes?

MR. GUERRERO:  Five minutes would be great.

THE COURT: All right. We will take five and then we will bring the jury in.

(Recess at 10:44 a.m.)

(Resumed at 10:59 a.m.)

MR. ABBENANTE:  Can I address the Court for one second?

THE COURT:  What would you like to discuss?

MR. ABBENANTE:  Judge, I want to make the oral Motion to suppress the identification of the testimony by Detective Martinez and submit on the record.

THE COURT:  What's your theory? I am not sure --

MR. ABBENANTE:  The theory was is that the photo array was unnecessarily suggestive.

THE COURT:  Really? You thought that?

MR. ABBENANTE:  I said I would submit on the record.

THE COURT:  Denied.  I don't think it was anything even approaching that necessarily suggestive.

MR. ABBENANTE: Very good.

(Jury present at 11 o'clock a.m.)

COURTROOM DEPUTY:  The jury is present, your Honor.

THE COURT:  Welcome back, everyone.  Have a seat. Thank you for your patience.  We had a legal issue, as you know, we had to deal with.  So we have completed that and now we are ready to move forward.  The Government may call its next witness.

MR. MOHANTY:  Your Honor, the Government calls Dawn Schwarting.

DAWN SCHWARTING, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MOHANTY:

Q.  Good morning.

A.  Good morning.

Q.  Miss Schwarting, could you begin by stating your first and last names and spelling your last name for ladies and gentlemen of the jury?

A.  Sure.  It is Dawn D A W N and last name is Schwarting S C H

W A R T I N G.

Q.   And Miss Schwarting, how are you employed?

A.   I work for a consulting firm of Booz Allen Hamilton.

Q.   How long have you been with them?

A.   Since November of 2007.

Q.   I want to take you back to April of 2007.  Where were you working at that time?

A.   I was working for the D.C. Metropolitan Police Department Mobile Crime Lab.

Q.   Miss Schwarting, during your time as an employee of the D.C. Mobile Crime Lab -- let me ask you how long were you at the Mobile Crime Lab?

A.   For almost ten years.

Q.   I am calling your attention now to is a shooting that happened on April 22, 2007, near intersection of Sherman Avenue and Columbia Road, Northwest.  When you were employed by the Police Department back in April of 2007, did you have occasion to go to that area?

A.   Yes, on Monday, April 23rd, the following day, I was at Columbia Road and Sherman Avenue.

Q.   Why is it that you went to that location?

A.   I was with Sergeant Hays, a supervisor, and her departmental pager went off explaining that we were to respond to that location.

Q.   What did you see when you got to the intersection of Sherman

Avenue and Columbia Road?

A.   There was an area that was taped off with police tape and -- on the sidewalk and the cordoned off area -- inside the cordoned off area there was a cartridge casing laying on the sidewalk.

MR. MOHANTY: Your Honor, may I approach the witness with what's been marked for identification as Government Exhibit 2101 A.  I have shown it to defense counsel, your Honor.

THE COURT:  You may.

(Whereupon, Government's Exhibit No.  2101 A was marked for identification.)

Q.   Could you take a look at that, please?

A.   (Witness complied.)

Q.   Can you tell me what's that a photograph of Miss Schwarting?

A.   This is a photograph I took that evening when I arrived on the scene.  In the center of the photograph is a picture of the cartridge casing and there is a bit of police tape with a rock on it next to it just that was there when we arrived that somebody had placed there.

Q.   Miss Schwarting, does that photo Government Exhibit 2101 A fairly and accurately depict the cartridge casing you saw near Sherman Avenue and Columbia Road on April 23, 2007?

A.   Yes, it is.

MR. MOHANTY:  Your Honor, the Government would move admission of Government Exhibit 2101 A.

MR. MARTIN:  No objection from Mr. Gutierrez.

MR. ABBENANTE:  No objection.

MR. SELTZER:  No objection.

THE COURT:  It will be admitted.

(Whereupon, Government's Exhibit No. 2101 A was received in evidence.)

MR. MOHANTY:  May I retrieve the exhibit and publish it, your Honor?

THE COURT:  You may.

BY MR. MOHANTY:

Q.  Okay.  Miss Schwarting, that photo, Government Exhibit 2101 A is sort of a close up of a casing, correct?

A.  Yes, it is.

Q.  Okay.  I am going to show you Government Exhibit 2101 which has been admitted into evidence which shows a broader view of that area.  Could you point out for the ladies and gentlemen of the jury by referring to landmarks on this exhibit where it was that you recovered -- where it was that you saw that casing?

A.  Yes. If you look at the photograph, there is a light post with the street sign saying Sherman Avenue.  It is a tad fuzzy, but it is the only street sign you can see in this photograph. To the left of that lamp 24 feet on that sidewalk was where the casing was.

So if you look at the photograph, it is between -- there is a big box and then a little to the left there is a no parking sign.  It is a little bit blurry from this view, but if

you can make it out, there is a no parking sign so it was recovered between the no parking sign and the box that's on that sidewalk.  It is a big metal box.

Q.  Thank you.  Miss Schwarting, you were saying that you recovered the casing.  When you recovered it, did you assign an item number to it?

A.  Yes, I did.

Q.  What number was that?

A.  Item number 29.

Q.  What did you do with the cartridge casing after you recovered it?

A.  I submitted it to our lab for a fingerprint analysis and to Officer Hyatt's evidence bin.

MR. MOHANTY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  I am showing you what -- Miss Schwarting, you have in front of you what was marked for identification as Government Exhibit 329.  Can you take a look at that for me, please?

(Whereupon, Government's Exhibit No.  329 was marked for identification.)

A.  Yes.

Q.  Can you tell by looking at that -- well, does it have a number on it?

A.  The item is labeled number 29.

Q.  Is that the item that -- the cartridge casing that you

recovered on April 23, 2007?

A.  Yes, it is.

MR. MOHANTY:  Your Honor, at this time the Government would move admission of Government' Exhibit 329.

MR. MARTIN: No objection for Mr. Gutierrez.

MR. SELTZER: No objection.

MR. ABBENANTE:  No objection.

THE COURT:  It will be admitted.

(Whereupon, Government's Exhibit No. 329 was received in evidence.)

MR. MOHANTY:  Thank you.

Q.  Miss Schwarting, just a few additional questions.  Do you know someone by the name of Edwin Ventura?

A.  No.

Q.  Do you know somebody by the name of William Cordova?

A.  No.

Q.  Do you know someone by the name of Jose Gutierrez?

A.  No.

Q.  Do you know someone by the name Melvin Sorto?

A.  No.

Q.  Do you know someone by the name Nilson Maldonado?

A.  No.

MR. MOHANTY:  Thank you.  No further questions, your Honor.

THE COURT:  Mr. Martin.

MR. MARTIN:  Briefly, your Honor.

                    CROSS-EXAMINATION

BY MR. MARTIN:

Q.  Good morning, ma'am.

A.  Good morning.

Q.  You were working in your official capacity as an MPD technician on that day, right?

A.  Yes, I was.

Q.  And part of your job was to collect evidence, right?

A.  Yes, I was.

Q.  In that capacity you were wearing latex gloves, right?

A.  Yes.

Q.  The reason you were wearing latex gloves was not to get your fingerprints on the cartridge, right?

A.  Yes.

Q.  And then you submitted it to the fingerprint lab, right?

A.  Yes, I did.

        THE COURT:  Slow down.

        MR. MARTIN:  Very well, your Honor.

Q.  You don't know if any fingerprints were ever recovered from that particular cartridge, do you?

A.  I don't recall seeing a report on it.

Q.  Thank you very much, ma'am.

        MR. MARTIN:  Thank you, your Honor.

        MR. SELTZER:  No questions, your Honor.

MR. ABBENANTE:  No questions, your Honor.

THE COURT:  You are excused.

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you.

(Witness excused.)

THE COURT:  Call your next witness.

MR. GUERRERO:  Your Honor, the Government calls Frank Flores to the stand.

THE COURT:  All right.

FRANK FLORES, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GUERRERO:

Q.  Good morning, sir.

A.  Good morning.

Q.  Would you please tell us your full name and spell it for the record, please?

A.  Yes, sir.  Frank Flores F R A N K  F L O R E S.

Q.  Sir, are you employed?

A.  Yes, sir.

Q.  Who do you work for?

A.  I am a Detective with the City of Los Angeles, Los Angeles Police Department.

Q.  How long have you been a Detective with the City of Los Angeles Police Department?

A.  I have been employed by the Police Department going on

15 years.  I have been a Detective in rank since 2006.

Q.  Detective Flores, what is your present position?

A.  I am assigned to a Federal FBI gang task force in the City of Los Angeles working Mara Salvatrucha, the street gang.

Q.  And can you tell us what the acronym or the abbreviation for Mara Salvatrucha is?

A.  Yes, it is abbreviated as MS or MS-13.  It is also sometimes referred to or written as La Mara specifically here in the states.

Q.  Can you spell that for our Court Reporter?

A.  Yes, sir.  L A  M A R A.

Q.  Where did you grow up?

A.  I grew up in East Los Angeles, Boyle Heights area of Los Angeles.

Q.  Were you born in the U.S. or a different country?

A.  Born here in the United States.

Q.  Do you speak any other language other than English?

A.  Yes, I do.

Q.  What language is that?

A.  Spanish.

Q.  How did you acquire your Spanish speaking skills?

A.  Growing up, the area I grew up was predominantly Spanish speaking.  East side of Los Angeles is primarily Hispanic.  My family, my grandparents spoke Spanish as a primary language.  So a lot of my communication in the community with some of my

relatives was in Spanish.  So it is something that I carried through childhood and into my adulthood now where I use it in my everyday assignment as well.

Q.  What country is your family from?

A.  Mexico.

Q.  Did you receive any certifications in speaking Spanish as part of your job?

A.  We have a certification process through the Police Department that we have to pass in order to be certified by the department as a Spanish speaker which involves sitting down with a professor from one of the local colleges who basically runs us through a series of tests and qualifies us or recommends us as a qualified Spanish speakers to the department.

Q.  In your work as a Detective for LAPD and also as part of I think you said the FBI task force, how often do you utilize your Spanish speaking skills in reference to Latino gangs?

A.  Almost daily depending on the specific assignment for the day, but dealing with Hispanic street gangs involves not only dealing with the gang members, but the family, people in the community a lot of whom only speak Spanish so it is almost daily depending on the assignment.

Q.  What about your experience in law enforcement?  Has it always been with LAPD or do you have previous law enforcement experience?

A.  No. My entire time as a police officer has been with the

Los Angeles Police Department.

Q.   Tell us the path you took in order to become or, rather, the path you took in order to obtain the present position you have? What other type of assignments have you done?

A.   Roughly the majority of my career has been spent working gangs.  Initially when I joined the Police Department, there is a six and a half month Police Academy that we have to go through to qualify as any other candidate does.  Once you graduate from the Police Academy you are sent to a specific control area where you spend a year on probation and you work that specific area.

You go through the different various stages of testing to make sure you are progressing as a police officer.  At the end of the year, you are deemed qualified or not qualified. After that first, my initial year I was then transferred which is a mandatory process.  Once you are done with your year you are transferred to a different geographical area of which the Los Angeles Police Department has 21 geographical areas or police stations that patrol the whole entire city.  It is just broken up geographically.

Q.   After your patrol assignment, did you become a member of what's called a Crash Unit out in Los Angeles and, if so, please explain what that is.

A.   Yes.  Once I transferred to the new geographical unit area which was Hollywood, I worked patrol for a small period of time. I worked vice there for about a year and then I was recruited to

work the Crash Unit which is an acronym for the Community Resources Against Street Hoodlums.  It is a gang unit within the Los Angeles Police Department.

Q.   How long did you work in the Crash Unit?

A.   It was roughly a year before it was renamed and revamped.

Q.   And during your experience in the Crash Unit, how often did you investigate Latino gangs specifically MS-13?

A.   The every day assignment as a CRASH officer is -- it is easier to explain -- that's your every day assignment.  You don't handle radio calls or anything else patrol related unless it is gang related.

THE COURT REPORTER: Could you please slow down?

THE WITNESS: Yes, ma'am.

Q.   Could you repeat that for us?

A.   The CRASH officer's duties are primarily to handle gang crimes, gang trends, identify gang members, anything gang related, investigative or intelligence driven.  You are part investigator, part suppression unit component.  So given the area and Hollywood, there are different geographical gangs that are in different parts of the city.

For Hollywood the predominant gangs were Hispanic one of was which Mara Salvatrucha which is one of the gangs that I was assigned because part of which I was a Spanish speaker and the gang was primarily Spanish speaking so that was part of the reason for my assignment specifically to that gang which I was

tasked to monitor, track, keep up intelligence files, learn whose who, trends, aid the investigators with different crimes from vandalism through murders.

Q.   And that's a followup to my next question, Detective.  Did your investigative capacity include murder related cases to Hispanic gangs?

A.   Yes.

Q.   How often did you investigate those types of cases?

A.   Depending on the specific year because specifically Mara Salvatrucha is such a large gang in the City of Los Angeles which is also spread out through other geographical areas and the way that Mara Salvatrucha intertwined within itself within its cliques, or the way the gang is broken up into different geographical areas, there is a lot of crossover within the Los Angeles Police Department and our neighboring divisions.

So some of the homicides we would work pertained only to our geographical area, some of the cases pertained to our neighboring divisions where they had similar gang problems related to Mara Salvatrucha. So some years are very busy.  Other years were so so.

Q.   In your present assignment with the FBI task force, what type of Hispanic gang are you focusing on now?

A.   Our primary focus is Mara Salvatrucha or MS-13.

Q.   How long have you been doing that with the FBI?

A.   I have been assigned to the task force going  on 5 years

now.

Q.   In your course of working with the FBI, do you travel as part of your investigations?

A.   Yes.

Q.   What kind of special training have you received with respect to MS investigations?

A.   A lot of our training comes from working the cases themselves, the every day time that we put into the street dealing with the gang members directly, the victims, the people in the community, going out and observing and doing a hands-on approach.  We also share and deal with a lot of local agencies, Federal, state, probation, parole where we exchange a lot of our information and we will sit down and have an exchange of information to stay current with trends and identify suspects or persons by moniker.

So some of those trainings are very informal.  I have also been a part of other training sessions that tie into associations that I am a member of.  There is a California Gang Investigators Association in California which is an association of officers, detectives, investigators, both Federal and state that work in gangs and there is a yearly convention where they give numerous classes pertaining to Hispanic street gangs.  So I have attended classes there.

I have taught classes there myself specifically Mara Salvatrucha.  I have done this for the Department of Justice,

for the FBI.  I have even traveled down to El Salvador and provided training to the National Police in El Salvador as well.

Q.  Do you belong to an international association as well?

A.  Yes. Besides the CGIA or California Gang Investigators Association, I am also a member of the California Homicide Investigators Association and the International Latino Gang Investigators Association.

Q.  How many -- give us an estimate here -- how many cases would you have been involved in investigating MS-13 cases?

A.  Just giving an estimate, given my time, I would say well over 2,000 cases from murders, other violent crimes down to vandalisms.

Q.  Have you testified as an MS expert in State Court?

A.  Yes, sir.

Q.  Approximately how many times?

A.  I haven't exactly kept track, but I would estimate in my career well over 70 times.

Q.  Which state?

A.  California.

Q.  Have you testified as an expert in Federal Court?

A.  Yes, sir.

Q.  Which jurisdictions?

A.  The neighboring jurisdiction here in Maryland on three occasions on an MS-13 racketeering trial.  North Carolina, Charlotte there on another MS-13 racketeering trial.  I

testified or qualified as an expert in Los Angeles California in Federal Court as well.

MR. GUERRERO: Your Honor, at this point the Government would offer Detective Flores as an expert in Hispanic gangs, specifically MS-13.

MR. MARTIN:  No voir dire, your Honor, for Mr. Gutierrez.

MR. SELTZER:  Similarly no voir dire, your Honor.

MR. ABBENANTE:  Likewise, your Honor.

THE COURT:  Very good.  He will be so qualified.

BY MR. GUERRERO:

Q.  Detective, let's talk a little bit about in your expert opinion and just tell us is there some type of law enforcement accepted definition of what a gang is?

A.  Yes.

Q.  And tell us what that law enforcement accepted definition is?

A.  Something very basic that we teach as part of our training to younger officers that I do all the time, it is simply a group of three or more persons with a common name, sign or symbols whose members individually or collectively engage in a pattern of criminal activity which creates a sense of fear and intimidation within the community.

Q.  And I am going to ask you to speak a little closer to that mic.  We all need to hear you.  Okay?

A.   Yes, sir.

Q.   All right. With respect to that definition in your opinion investigating MS-13, let's focus on that, does MS-13 fit that definition?

A.   Yes, it does.  Absolutely.

Q.   How so? Tell us.

A.   It is defined -- it fits the definition to a tee.  It is group of three or more persons with a common name, sign or symbol whose members individually or collectively --

THE COURT:  Slow down a little bit now.

THE WITNESS:  Yes, sir. Has engaged in a pattern of criminal activity which has created a sense of fear and intimidation in the community or several communities.

Q.   Would it classify as an organized criminal organization?

A.   Yes. It would also fit that definition.

Q.   Now, tell us in your expert opinion, how was it that MS-13 was formed?

A.   MS-13 was originated in Los Angeles.  It was originated out of self-protection, self-preservation.  During the mid-'80s there was a large influx of people migrating to Los Angeles fleeing primarily El Salvador.  The conditions there were -- there was unrest, there was a lot of strife there.  So we had a large population primarily Salvadorians who fled or left El Salvador, came to the United States.  A good majority settled in the greater part of what we call the West Side, the area west of

downtown Los Angeles.

In that area here we had an existing community, primarily Mexican and you had a lot of existing Mexican street gangs.

Q. What were some of the existing street gangs that were rival to MS-13?

A. At that time primarily we had a large street gang there known as Clanton. You had some kind of other smaller rag tag street gangs. 18th Street was also there present at the time.

Q. Let me ask you to spell that first one Clanton.

A. It is C L A N T O N.

Q. And you also mentioned an 18th Street. What's that?

A. 18th Street is another now large Hispanic street gang which also originated in Los Angeles.

Q. Who is the primary rival of 18th Street?

A. Mara Salvatrucha.

Q. Does MS-13 still exist today?

A. Yes, it does.

Q. And has it been confined to California where it originated or has it migrated?

A. No, it has definitely migrated.

Q. Where in your experience, in your expert experience can you find MS-13 having a presence?

A. Through my dealings with law enforcement, abroad, East Coast, Maryland, Washington, North Carolina, New York, down

through Texas, Nevada, Washington State.  In the midwest, it is very widespread to varying degrees.

Q.  Approximately how many states have you become aware that MS-13 has a presence?

A.  Roughly a presence in 40 plus states.

Q.  And why is there a congregation that's greater on either coasts of the U.S.?

A.  I believe in my opinion is it follows the population, the communities.  You have a Central American Salvadorian community that tends to be I guess higher risk that there is going to be a presence of a gang there that has migrated to attach itself to the community.

Q.  How about countries, does MS-13 exist in other countries?

A.  Yes, sir.

Q.  Like which ones?

A.  Various countries through Central America including Mexico, Guatemala, Honduras, El Salvador, of course, up through the United States, Canada, even some reports from as far into Europe, Spain.

Q.  What's the estimate these days as to how large a membership MS has in the U.S.?

A.  In the U.S., again just giving a rough estimate, somewhere in the range of 10,000 plus.

Q.  Now, explain for us the structure of MS.  If there is so many MS members in various parts of the country, in your

experience how have you determined that they are structured?

A.   Well, it is broken down to in the clique.  The best way to kind of describe a clique it is kind of like you take a McDonald's franchise and McDonald's is able to obviously spread itself out throughout the United States and other countries now in the form of a franchise.  So the clique is similar to that where it remains part of the whole and they immediately identify with each other.  Just like a McDonald's, you would recognize it from whether it is here or whether you are in Japan, you recognize those golden arches, the uniforms, the certain things that are uniform to a certain degree.

The clique operates in a similar fashion.  They are all members of the same gang.  They have certain ties, certain allegiances to their ties in El Salvador.  The cliques may vary as far as their sophistication depending upon how long the clique has existed -- law enforcement efforts against the clique in the area, whose in, whose out.  Some cliques may have a larger population because they have more recruits or more of a fertile ground to recruit from, but the cliques remain the same. The best way to compares it to would be as a franchise.

They take the clique names would be adopted from a particular area so given like Los Angeles, for example, we have different cliques.  Leeward clique in Los Angeles that's named after Leeward Street. There is a Hollywood clique in Los Angeles. It is taken after the Hollywood area.

So some of these cliques they adopt based on whether it is a street, a park, something local to identify itself as part of the whole with MS and then locally the Leeward clique. Just like you would find the McDonald's franchise on Sixth Street. So that's probably the best way to describe what a clique is.

Q. And what is the relationship between the various cliques in the U.S. and, say, for instance the country of El Salvador?

A. There are very close ties based on the fact that you have a lot of movement of the gang either through deportation or gang members returning or fleeing from the United States back and forth. You have a lot of ties, family ties. Some of the members here are barely going on second generation so there is a lot of family relationships back to El Salvador.

So, hence, there is a lot of ties, there is a lot of inner workings as far as some of the relationships between some of the gang members themselves. They know so and so's grandmother lives in this part of El Salvador. It tends to be a very small community as far as knowing whose who and who came from where.

Q. What is the  relationship between the various cliques themselves within a geographic region?

A. It has been at least my experience that they tend to work together for a common goal or for common goals to assist one another. They do share obviously common enemies. There is great risk in their lifestyle because they do have a lot of

rivals so the need to communicate and keep each other up on information as far as who they are feuding against or what's going on or who to be careful against, what areas they should or shouldn't go into.  So we see a lot of communicating going on within various cliques because again they are part of the whole.

So if one clique falls or makes -- hurts the reputation by not representing itself in a good light as the gang sees it, then the other cliques also lose face or lose part of the reputation.

Q.   Let me ask you within the clique itself, is there a leadership structure?

A.   Yes, sir.

Q.   And have you become familiar in your experience with what the term La Palabra means within a clique?

A.   Yes.

Q.   What does it mean?

A.   La Palabra is Spanish word for -- it is more of a slang use in this sense for somebody with a certain status.  They are potentially a shot caller.  Somebody significant, somebody with the word, somebody that can speak for the gang.  Generally it refers to somebody of some standing within the gang.  Generally a shot caller.

Q.   How does someone achieve a leadership position within a clique?

A.   It is generally through the time they spent in the gang, the

way they have built up their reputation, the reputation they have built up through their acts of violence, through their acts of loyalty to the gang, what they have done to benefit the gang to prove themselves.

So it is built partially through their reputation and there is some involvement from prior leaders, incarcerated leaders, even influence from El Salvador or Los Angeles that feeds into a person's standing or their reputation.

Q.   Let me ask you this on that note.  Assume for this question the following facts, sir, for the hypothetical.  Assume that in this area there is a clique known as the D.C. Sailors and there is a presence of those members here.  And assume further that two other MS members from El Salvador person A and person B from a different clique come to this area and in this area person A and person B have no members of their own clique.  Let's call that clique San Cocos clique.

Assume also that person A and person B however when they hit the area self-proclaim how their reputation of putting in work for the gang to the local MS Sailors clique.  In that scenario, what would you expect to happen between person A and person B when they arrive and they start to interact with the Sailors clique?

MR. ABBENANTE:  Objection.

THE COURT:  You can approach. Office, if you would step down. There is a chair right over there.

(Bench conference on the record.)

MR. ABBENANTE: Your Honor, I object to what the Government is trying to do is get this expert to comment on the ultimate issues, the facts in this case.  If he confines his testimony to general principles, that's one thing but what Mr. Guerrero is trying to do, and this is the first time he has done it during this examination, but I am sure he has got plans for more, is that -- is to have this expert comment on the general issues of dispute in this case.  And I don't think that's the appropriate role for the expert.

MR. GUERRERO:  Judge, he is an expert.  This is perfectly within the realm of an expert.  This is textbook expert testimony where you present facts to the expert and the expert opines in his expert opinion based on the hypothetical questions that are asked, and that they are issues in the case even make it more relevant for his expert opinion to be heard by the jury.

Then he will be subject to Cross-Examination by the defense where they can dismantle, they can attack his expert opinion and at the very end, the jury is instructed as with all experts, they can disregard that expert's opinion on any number of matters that he opined as an expert.  But the fact that we are presenting hypothetical situations that are in dispute here we would submit fall squarely within this witness' expertise and they are relevant for the jury to hear the type of situations

that he has experienced and what type of outcomes and what situations he would expect.

MR. ABBENANTE:  As I understand the role of the expert is to be able to assist the jury in the determination of certain facts, well, to assist the jury in areas where the jury does not have the same type of expertise and what he has done up to this point  with the examination of this, Mr. Guerrero has done that. He has talked about the general things that this expert has done, but that's the kind of information the jury needs to assist them.

THE COURT:  Mr. Abbenante, wouldn't it seem pretty clear and obvious from his description of his experiences to date and his expertise that he has at least it would appear, now we don't know what he is going to say yet, but he would certainly appear that he has experience and has had experience over the years with situations where MS members have come from El Salvador and arrived on the scene in Los Angeles or perhaps in California that he has been involved in, investigations and the task force, and those MS members who came in his experience were treated or accepted in certain ways or not accepted in certain ways based on his experience.

Now, that's not to say in Cross-Examination you bring this up, that's not to say that necessarily it would go down that way in Washington with the Sailors clique, but he is essentially rendering an opinion and Mr. Guerrero is trying to

get an opinion from him based on his experience as to how cliques of MS-13 have handled and dealt with El Salvadorian MS-13 members who have arrived on the scene and started a relationship or a presence in connection with a local clique or cliques from the Los Angeles area.

I think that's all Mr. Guerrero is trying to get at at the moment.  He is not giving an opinion as to how the Sailors clique in this case, at least that wasn't the impression I got, he is not -- he is using the Sailors -- he has posed the question in such a way that in a hypothetical organization called the Sailors --

MR. ABBENANTE:  But if he asked it in a general way the way your Honor started off your comments, he just asked him in a general way of this witness, that would be one thing but what he has done is he has recited facts that have come from Government witnesses in this case as to allegedly what was said by witnesses -- by Mr. Cordova or Mr. Gutierrez in this case and then he has asked this witness to basically give his opinion or conclusion on that issue; and that's one of the ultimate facts in the case.

If he asks the witness a general question like your Honor started out in the beginning, then that's a different issue.  I don't have an objection to that.  But the way he is doing it or the way he plans to do it throughout this case is to use his experts and to basically comment on facts that may or

may not be in dispute in this case and then give an opinion just like he was going to do with the letter.  Just like --

THE COURT:  Mr. Guerrero, am I misinterpreting what you are trying to do here?

MR. GUERRERO:  No.  That's the scenario that we want him to opine on because that is an issue that's relevant for the jury.  Now, we are not making it specific to these two Defendants.  I haven't named a Defendant by name.  I have only posed it -- I am very careful to pose every question in a hypothetical sense.

THE COURT:  Look, maybe the solution to this, the easiest solution to this would be if you rephrase your hypothetical without mentioning the Sailors clique.  Just ask him based on his experience over many years interacting with and investigating MS-13, when people come from El Salvador or members of cliques from El Salvador and I don't think there is any particular, you know, magic in this hypothetical to San Cocos -- if they come from a clique or one or more cliques from El Salvador and they show up on the scene in a clique in the United States, whether it be in LA or someplace else, based on his knowledge and experience, if they start representing themselves as having membership and experience, how are they, based on his experience, how are they received? How are they integrated or not integrated into the clique in the United States?

So that it appears, it is a hypothetical, but it does not appear to be an attempt to get him to opine on what the Sailors did or didn't do in this situation vis-a-vis these two Defendants.

MR. ABBENANTE:  I have no problem with that, but again his opinion in his hypothetical and let me call the people that came from El Salvador --

MR. GUERRERO:  Person A and person B.

MR. ABBENANTE:  No, but you used the term.

THE COURT:  San Cocos.

MR. ABBENANTE:  I mean that's like a repetition of what the evidence is in this case.  I don't have any problem with what your Honor is  suggesting to Mr. Guerrero to do.  If it is in general terms, that's one thing, but again I think that this Circuit has indicated even in drug cases, and I know your Honor is aware of that, you know, the expert's testimony has to be limited in certain ways.  You can't put an expert on the stand and let them just go crazy and just give opinions about everything.  There has to be a limitation on that.

And this witness should be allowed to testify about -- give his expert opinion about areas that the jury needs his assistance.

THE COURT:  Hold on one second.  Are you going to be, thinking ahead a little bit here, are you going to be asking him questions based on his expertise specific to the San Cocos

clique and its members?

MR. GUERRERO:  No.  I am going to back off and be more general.  I think that is probably the safest thing to do. I am fine with that, Judge.

THE COURT:  All right.

(End of bench conference.)

THE COURT:  Come on back up, sir.  Why don't you proceed consistent with the discussion at the bench and reformulate your question, Mr. Guerrero.

MR. GUERRERO:  Yes, sir.

BY MR. GUERRERO:

Q.  Detective, I want to pose the following hypothetical for you.  Just disregard my earlier one.  I want you to think in general terms in your experience nationwide in the area of MS-13.

When you have the situation and assume these facts, okay, when you have a situation where person A and person B who are from a different country, let's say El Salvador, you mentioned El Salvador is where the origins of MS-13 came from, arrive into the states, into the U.S. and they are members of MS-13, but they don't have their clique here.

Let's say, for instance, they are in Texas and they arrive and their clique isn't present in Texas but there are other cliques there from MS.  And so those members person A and person B start to interact with the other Texas members of MS.

Do you follow me?

A.   Yes, sir.

Q.   Okay. During those interactions person A and person B proclaim to be persons of strong reputations within MS.  They put in work for the gang.  What interaction, if any, would you conclude on your experience would take place between person A and person B and the local members of MS and why?

A.   Well, based on my knowledge and my experience, there would be an immediate acceptance of those members that are coming in from an outside area.  Whether the clique has a presence in that specific area or not, they are still MS.  They are still fellow gang members.

There would obviously be a verification process, whether it is a phone call or some verification with somebody they may know these individuals  either directly to El Salvador or indirectly to El Salvador or where they are coming from, to see who they are and make sure they are not informants or they are not in bad standing, these aren't people they have to worry about and they are who they say they are.

So there is a process but during that time they are accepted in.  They are given -- treated like any other member until the time that their information is verified.

Q.   Let's add to the scenario the same facts and let's add further.  Person A and person B in their interaction that you mentioned you would expect them to be received well notice that

the local Texas members of MS-13 are not committing violence to the level that person A and person B --

MR. ABBENANTE:  Objection, your Honor.  Same position.

THE COURT:  I haven't heard the question yet so I am going to let him ask the question and then you can object.  Go ahead.

Q.  They are not committing violence to the level of what person A and person B expect as members of MS-13 from a different country.  What influence, if any, would person A and person B have with those local Texas MS members with respect to violence?

MR. ABBENANTE:  Objection.  Same position.

THE COURT:  I will overrule that objection.  You can answer it if you can.

THE WITNESS:  Yes, sir.  Based on the interworking of MS as far as the way a person gains status within the gang, it is gained through violence, through their building their individual reputation and that benefiting the overall reputation of the gang as a whole.  If they commit violent acts against rival gang members, it builds their reputation and it builds the reputation of the gang as whole.

So if you have members from the outside who have come in as visitors and they find out the local clique is not representing itself well and it is hurting the overall reputation of the gang, then they will intercede based on their level of power and their level of trust and if they are

significant people with significant reputations and based on what the local status is of the local clique, they can have a lot of influence based on solely their reputation, where they come from and the fact that the gang is intertwined.

Q.   All right.  Now, let's move to a different topic. How does a person become a member of MS-13?

A.   Generally there is a courting period where a person is either targeted for recruitment or a person who wants to join because they are related to a fellow gang member or they have some kind of friendship that they developed or there is some close tie.  Generally there is a courting period, a period of time where the person that wants to join is identified.

They are brought along and at different levels they are trusted as far as some of the workings of what the gang is involved in.

Q.   Let me ask you during that courting period, have you familiarized yourself with a term in Spanish defined in English to be called walking with the gang? Do you know what that means?

A.   Yes.

Q.   What does that mean to you?

A.   Walking with the gang is just exactly kind of what I explained.  It is kind of a training period where they are kind of felt out as far as their willingness to join a gang, what they understand, what the gang life entails which for the most part the person knows or understands at least during that period

before they are officially brought in.

Q. And when is the official period when a person becomes brought in?

A. Generally it is a point where they are either jumped in or they are allowed or they commit some kind of act for the benefit of the gang. They go out to prove themselves. They do something to commit an act for the gang, something that benefits the gang and then at some point they are jumped in.

Q. What does that mean to be jumped in?

A. Jumping in is a physical beating, a ritual that not only MS-13 has but most Hispanic street gangs. It is part of the process of joining the gang and understanding physically that it is a life of pain and suffering and you understand what you are coming into.

MR. SELTZER: Your Honor, may I respectfully ask to witness slow down. I am having some trouble getting it all down. I am missing a little bit.

THE COURT: Okay. Try to speak a little slower, please.

THE WITNESS: Yes, sir.

BY MR. GUERRERO:

Q. Now, during this walking in period or courting period as you have termed it, what kind of proving acts would be expected of a person that's walking with the gang?

A. They may bring them along on certain criminal acts. They

may have them hold weapons.  They may have them sell drugs. They may take them on specific missions -- missions are slang terms that they use for attacks on rivals -- robberies, acts that bring benefit to the gang.

Q.  Speaking about once you become a formal member of a gang, have you familiarized yourself with what the rules of the gang are once you become a member?

A.  Yes.

Q.  What are those rules?

A.  There is some general rules.  There is some variation depending on the specific area where the clique exists, but the general rules are, number one, there is no cooperation with law enforcement, there is no snitching.  No dealing with the police under penalty of death.  That is above all else understood.  A cooperator is seen as the lowest form that a member can be or be referred to as.

Q.  A person who cooperates with whom?

A.  With law enforcement in general or is seen as even, you know, at times being seen with law enforcement or associating with law enforcement.

Q.  What are the consequences for being a cooperator with law enforcement?

A.  Death or targeted for death.

Q.  With respect to rival gangs within MS-13, what are the rules upon seeing?

A.   Again, given the  opportunity to attack, to challenge, to attack on-site.

Q.   Which is the primary rival gang that might be subject to instant attack?

A.   The most recognized rival in my experience because it is almost as widespread as Mara Salvatrucha is the 18th Street gang and the rivalry with 18th Street goes back to its early origins in Los Angeles.  Os it is probably the longest standing rival and chief enemy worldwide.

Q.   If a member of MS-13 encounters an 18th Street member and notices either a visible tattoo or the number 18, what's expected of him within the gang?

A.   Again, given the opportunity to attack.

Q.   Are you familiar with the signs of MS-13?

A.   Yes, sir.

Q.   Take a look at Government's Exhibit 2925 marked and entered. Do you see that?

A.   Yes, sir.

Q.   And what is that? Can you tell us?

A.   It is what I refer to or defined before as the devil's pitchfork.  It is hand sign unique to Mara Salvatrucha and the gang world perspective.  It is also referred to in Spanish as a lagara  or the reg.  Outside of the gang community, the only time I have seen this hand sign used would be by the University of Texas, the Longhorns; but outside of that, if I see this hand

sign, I know it is specific to La Mara Salvatrucha.

Q.  As opposed to a Texas Longhorn?

A.  Yes, as opposed to a Longhorn.

THE COURT:  What was that Exhibit Number you just said there?

MR. GUERRERO:  2925, your Honor.

Q.  Government's Exhibit 2923, do you see that, Detective?

A.  Not entirely.  Yes, I see the bottom half.

Q.  Let's look at the bottom here.  I am pointing to those three letters that I am pointing to in the lower right-hand corner?

A.  Yes.

Q.  What does that mean to you?

A.  The letters M and S signifying Mara Salvatrucha.

Q.  I am going to lower the Exhibit 2923 and if you are looking right at the exhibit on the left-hand side of the screen, you will see three faces.  One at the top and one in the middle and the one on the bottom.  Do you see that?

A.  Yes, sir.

Q.  What does that mean? Let's go with the one on the top.

A.  The one at the top would be see no evil.

Q.  The one in the middle?

A.  Hear no evil.

Q.  And the one at the bottom?

A.  Speak no evil.

Q.  What does that mean speak no evil?

A.   I would take that as obviously not cooperating with law enforcement, not speaking of the gang's criminal activities with anybody outside of their own membership.

Q.   Take a look at Government's Exhibit 2928 and I am pointing to two letters right in the center.  Do you see those two letters?

A.   Yes, sir.

Q.   What do those two letter mean?

A.   M and an S.

Q.   If you are looking right at the M and you look up to the left hand corner of the M,  do you see this sign that I am pointing at now?

A.   Yes, sir.

Q.   What is that on the left-hand, upper left-hand side of the M?

A.   Again, it is a skeletal hand forming the Mara Salvatrucha hand sign in a  skeletal hand form.

Q.   If you are looking at the exhibit, if you are looking at the S, what  is directly on top of the S, this sign?

A.   That's the hand sign for an S so you would combine Mara Salvatrucha.

Q.   And can you also see this E in the left-hand corner?

A.   Yes, I do.

Q.   Do you see the M is the center?

A.   Yes.

Q.   And then the S on the other side?

A.   Yes.

Q.   What's the purpose of these markings?

A.   They are markings that I have seen used to identify obviously gang membership, membership in the gang.  They use these symbols to mark their gang territory, to define their territory.  They are used for intimidation against not only rival gangs but people in the community obviously as a visible sign that they are claiming the area.

It helps the gang operate and maintain control and helps intimidate the majority of the people that live or work within a specific area as far as sometimes their willingness to come forward or cooperate or even to report certain crimes.

Q.   Have you seen these type of markings not only in graffiti form but also tattoo form?

A.   Yes, sir.

Q.   What's the purpose of that?

A.   Again, it is some tattoos are for pride to show their allegiance to the gang.  Over the course of my career, I have seen a definite pattern where, at least with Mara Salvatrucha, they have begun tattooing themselves a little bit less and less than when I first started just based on the fact that it is an immediate identifier to be a gang member.

Q.   Let's talk about within MS and their communications with each other.  Do they communicate with each other and how so?

A. Yes. I mean at a local level, it is fairly easy. Obviously depending upon the area, the amount of cliques within an area, in fact to reign in the rival gangs, communication is paramount just for basic survival.

Q. Do they gather together within a clique?

A. Within a clique, within clique meetings. There are different references for the types of meetings.

Q. What's a clique meeting?

A. A clique meeting would be a meeting of all the particular members of a specific clique so all members of, say, Hollywood clique, that would be a clique meeting.

Q. Have you ever heard it referred to something other than a clique meeting?

A. A lot of slang terms. Misa.

Q. Spell that for us.

A. Misa is Spanish for mass, Misa is spelled M I S A.

Q. Why do they use the term Misa or Mass to reference a clique meeting?

A. Well, there are a lot of coded language, coded words that the gang uses. In my experience, most Hispanic street gangs use a lot of coded language to refer to meetings, guns, varying quantities or types of drugs. It is to avert law enforcement. Basically to try to avoid law enforcement at all costs.

Q. Did you say in your experience you have come across coded language for guns?

A.   Yes, sir.

Q.   What kind of coded language for guns have you come across?

A.   Spanish terms Nina.

Q.   Spell it, please.

A.   N I N A.

Q.   Anything else?

A.   Verbo.

Q.   Spell that.

A.   V E R B O.

Q.   Anything else?

A.   That would be probably the most recent references to guns, handguns.

Q.   Have you ever heard the term teremo?

A.   Yes.

Q.   And can you spell that for us?

A.   T E R E M O.

Q.   And what does that reference to?

A.   A gun.  There is one other one that I just came back into my mind.

Q.   Please tell us.

A.   Mortero.

Q.   Can you spell that?

A.   Mortero is M O R T E R O.

Q.   And is there any relationship between mortero and teremo?

A.   Yes.

Q.   What?

A.   That's part of the coding where they switch the spellings. They will take the first part of for say my last name, as an example Flores, they will take the last three letters and put them had in the front of the first, you know, three letters of my name so my name would be Resflo instead of Flores.

So mortero along the same lines, you are taking some of the first initial letters and putting them in front.

Q.   Both terms are code for what?

A.   Gun.

Q.   At the meetings, is it common for the collection of dues?

A.   Yes. It could be.

Q.   And what are these dues used for?

A.   The dues generally are collected to help support the membership either to purchase weapons to help maintain control of the territory, to assist members that are in custody locally or in state custody or even members that have been deported or may be custody in other countries, El Salvador, Honduras, Guatemala, Mexico.

Q.   If you came across a situation, again back to our Texas hypothetical, where a person A and person B were in custody and there was a third person from the local clique person C that was sending money to persons A and person B, what would that indicate to you?

A.   That there is financial support for a fellow MS-13 member.

Q.   Have you heard the word chavala?

A.   Yes.

Q.   What does that mean?

A.   Chavala is Spanish slang for little girl.  It is a term of disrespect in Spanish, the Spanish gang culture to refer to somebody as a little girl, especially a man.

Q.   Does it refer to a rival?

A.   Yes, it is generally an enemy or somebody who is working against the interests of the gang.

Q.   What are the objectives of MS-13 in your expert opinion?

A.   From my experience, it is to maintain control of their territories, to intimidate, control, to aid in the furtherance of its membership and just to remain in existence through their violent acts, through their control, through their assistance of each other.

Q.   And in your experience along the same lines, have you identified within MS-13 what their motto is?

A.   Yes.

Q.   Can you tell us what that is?

A.   It has been referred to as mata viola controla.

Q.   Spell each, please.

A.   Mata is Spanish for kill M A T A, Viola V I O L A is Spanish for rape, and Controla is C O N T R O L A.  It is Spanish for control.

MR. GUERRERO:  Thank you, your Honor.  We don't have

anything further.

THE COURT:  All right.  Why don't we take the morning recess.  Officer, we are going to take a 15-minute recess.  You remain a witness under oath in the case so you are not at liberty to discuss your testimony so far or what it might be when you return with anyone including the lawyers, the agents, anyone.  So you have to stay independent of all others.  Okay?

THE WITNESS:  Absolutely.

THE COURT:  All right. You can step down.  We will see you back in 15 minutes.

THE WITNESS: Yes, sir.

(Witness excused.)

THE COURT:  Ladies and gentlemen, we are going to take the morning recess.  Keep an open mind.  You haven't heard all the evidence yet. Above all, don't share your impressions of the evidence with your fellow jurors or anyone else.  If anyone tries to talk to you, refuse to do so.  Bring it to my attention.  We will see you in 15 minutes.  We will go to 1 o'clock before we take the lunch break.  Enjoy your break.

(Jury excused at 12:01 p.m.)

THE COURT:  Counsel, do you want to give me just an estimate?

MR. MARTIN:  Five minutes tops.

MR. SELTZER:  I am actually looking over some materials right now, a very short series of questions.

THE COURT:  I am not going to hold you to it.  Just trying to get a rough idea if we should have another witness ready for the morning.

MR. ABBENANTE:  10 or 15.

THE COURT:  All right. So you might have some Redirect, but you should probably have another witness at least in the ready position.  Who would be the next on your list? Remind me.

MR. GUERRERO:  Agent Rob Nieves,  your Honor.

THE COURT:  And he is here, right?

MR. GUERRERO:  We are ready, right.

THE COURT:  All right.  See you shortly.

(Recess at 12:02 p.m.)

(Resumed at 12:22 p.m.)

THE COURT:  All right.  Bring them back.

(Witness resumes the stand.)

MR. MOHANTY:  Your Honor, I believe we lost Mr. Seltzer.

THE COURT:  We will find him.  Put an APB out on him.

(Jury present at 12:23 p.m.)

COURTROOM DEPUTY:  The jury is present, your Honor.

THE COURT:  All right.   Where are the Defendants?

MR. ABBENANTE:  Your Honor, could we excuse the jury for a moment?

THE COURT:  Ken, excuse the jury, please.

COURTROOM DEPUTY:  Oh, I am sorry.

THE COURT:  Tell them not to go far.

(Jury excused at 12:24 p.m.)

MR. ABBENANTE:  I am sorry, your Honor, I was reading. I didn't realize Mr. Cordova wasn't here.

THE COURT:  Yes, well, we are all on the same page here.

MR. SELTZER:  Same here.

THE COURT:  I think they are all drinking the same tea.

MR. MOHANTY:  Your Honor, I was very unsuccessful in finding Mr. Seltzer.

THE COURT:  Hold on, Mr. Cockrell.  Let's find Mr. Seltzer.  He is bit wayward.

(Pause.)

MR. SELTZER:  Sorry, your Honor.

THE COURT:  All right.  I think everyone is here. Bring the jury back in.

(Jury present at 12:26 p.m.)

COURTROOM DEPUTY:  The jury is present, your Honor.

THE COURT:  Welcome back, everyone. Sorry for the inconvenience.  There is a lot of moving parts in this machine. All right.  Mr. Martin, are you ready to get going?

MR. MARTIN:  Yes, sir, I am.

CROSS-EXAMINATION

BY MR. MARTIN:

Q.  Detective Flores, good afternoon, sir.

A.  Good afternoon,  sir.

Q.  My name is Anthony Martin and I represent Jose Gutierrez.

A.  Yes, sir.

Q.  I want to ask you a few questions about gang membership but before I do, how many years did you study gangs?

A.  I have been a police officer almost 15 years now.

Q.  About 15 years.  During the time that you were studying different gangs, did you have occasion to go to El Salvador and study Mara Salvatrucha in particular?

A.  I went there during one conference and provided some training and attended some training provided by the local PNC.

Q.  How long you were there?

A.  I believe it was a four-day conference.

Q.  Four day conference.  And you interacted with I guess members of the police force down there?

A.  Yes, sir, and other Federal agencies from the United States.

Q.  All right. Did you have an opportunity to interact with any former gang members of March Salvatrucha while you were in El Salvador?

A.  No, sir.

Q.  Have an opportunity to interact with any current gang members while you were in El Salvador?

A.  No, sir.

Q.  Okay.  Well, with respect to levels of activity, have you ever encountered any retired members Mara Salvatrucha?

A.   Retired I classify more as inactive or members that have left the gang, yes.

Q.   Well, tell the ladies and gentlemen of the jury what is an inactive member?

A.   An inactive member is a person who no longer interacts with the gang.  Generally it is somebody who has left the gang and fled because leaving the gang is a liability for the other gang members.  The necessity for a person that quote/unquote has left the gang to physically move away is basically a necessity to survive due to the fact that if I am a member of my gang and I know all the inner workings, the crimes we have committed and all of a sudden I want to leave the gang or no longer be an active participant, I am viewed as a liability, somebody who can potentially cooperate, somebody that is seen as being weak.

So the necessity for that person to leave the gang completely meaning cut themselves off and move somewhere else to start a new life, that's what I would consider a person who has left the gang or, you know, retired for the most part.

Q.   Would it be fair to say that most of the gang members that you come in contact with are young men?

A.   The majority, yes.  We do see some of varying ages. Obviously there is other factors that come in.  Incarceration, death and so --

Q.   And you are not telling the ladies and gentlemen of the jury that there is never a circumstance where somebody actually

becomes inactive other than by cooperating?

A.   No.   No.

Q.   Okay.   So then within your experience you have come across people who are inactive not because they are cooperating with the police but just because they have matured?

A.   Matured and physically left the gang, yes.   There is one that I can think of, yes, sir.

Q.   But you wouldn't describe that as being retired?

A.   Well, the way I would classify it is they have left the gang.   They have cut ties with the gang.   So as far as the verbiage of they retired or they have left the gang, I mean they have definitely cut ties and they are no longer what I would consider a member of the gang.

Q.   All right. Well, let's move to the other end now and that is you talked about franchises.   I think of it as a fraternity that has different chapters, if you will.   So let's go to this walking business which is like a pledging status.   Would you agree with that?

A.   Yes, similar would be a way to kind of describe it.

Q.   Okay.   And when somebody is in that pledging status, they have to prove themselves, right?

A.   To a certain degrees depending on again the factors of the clique, what the clique trusts or knows about the member that's pledging at the point that they begin to involve them in a lot of criminal activities.   It is definitely a sign that they are

generally accepted and it is only a formality for them to get physically brought into the gang.

Q. And that physical bringing in would be the jumping in, right?

A. Generally that would be basically the final step but as far as their participation, their acceptance into the gang, at that point generally they are already accepted so it would be more of a formal process at the end.

Q. Like an initiation?

A. Like handing you your diploma -- obviously you have completed your college or high school. It is that final here you are.

Q. Right. Right. With respect to some of those activities while you were in that pledge status, you might be expected to commit crimes of violence, right?

A. Yes, sir.

Q. And you might be expected to commit those against other gang members, right?

A. Quite possibly, yes, sir.

Q. And you might even be expected to commit that against some members within Mara Salvatrucha itself, right?

A. Yes, sir.

Q. You might be expected to commit those acts of violence against even family members?

A. Yes, potentially.

Q.   And your hesitancy or unwillingness to do that could result in what?

A.   Your own targeting for discipline or even death depending on the severity of what is perceived as a violation.

Q.   Let's be a little more specific.  In your experience as an expert on gangs, have you come across a circumstance where an individual actually attacked a family member?

A.   Yes, to varying degrees.  Mostly intimidation, to dissuade family members or relatives.  Like I explained before, in the community sometimes there is a lot of strange family connections or relationships, cousins of cousins, aunt to second cousin so generally we do find that a lot of the victims of some of these MS-13 crimes that I have investigated throughout my career wind up having some physical relationship down the road or at some point with some of the members.

Q.   And they may do that because they want to be part of the gang?

A.   They may do that because, for various reasons, because they are ordered to do so, because it benefits whether they are intimidating a victim of a crime or a person that they perceive as somebody who has been reporting on them.  There could be various reasons of different degrees.

Q.   Okay.  Your patience, sir.

        (Pause.)

Q.   I want to move to a different area now.  In your experience

as a task force member, would it be fair to say that you have had an opportunity to deal directly with cooperating MS-13 members?

A. Yes.

Q. And have you had a chance to debrief some of those members?

A. Yes.

Q. So we are not talking above the jury's head, would you tell them what a debriefing session is, sir?

A. Debriefing is just a basic conversation, in depth conversation with the individual member as far as what they know depending on their knowledge. Their time they spent in the gang will dictate how much they are going to know basically. Crimes, memberships, two monikers of individuals within the gang, some of the other inner intricacies of the individual clique.

So, again, depending on who is doing the debrief and what the person knows that is doing the debrief, as far as their ability to challenge what this person is telling them to validate whether it is a truth or maybe a half truth, but debrief can be very involved, very intense.

Q. And would it be fair to say that typically at those debriefings there is usually more than one Agent and possibly a prosecutor?

A. There are formal settings I have been a part of where that occurs, but the majority over my career that I have been involved with some have been relatively informal. Some members

have wanted to cooperate, but only to a certain degree.  Some are hesitant to go into certain areas or talk about certain areas but willing to talk about others freely.

But there have been some formal settings, but I would say that's probably the smaller portion of my involvement with some of  these debriefings or interviews.

Q.  And usually these debriefings or interviews take place over several sessions; is that correct?

A.  They can be as short as an hour.  They can be as long as a couple days again depending on the resources availability and the person's knowledge or what you know about the person.

Q.  And would it be fair to say, Detective, that typically there are three types of questions that you might present to somebody who is debriefing? One, questions you know the answers to; two, questions that you are looking for verification, you are not quite sure of the answers; and, three, questions that you don't know the answer to at all? Have I confused you with that?

A.  No.  No, sir. It makes sense to me.  It is basically a process of making sure that a person is being truthful.  As counsel described, there is a form of asking certain questions to challenge their knowledge to make sure they are not lying so there is things that you know the answer to that you will ask just for the sake of testing the person, other questions that you obviously want to now more about that you may have a little bit of information on that you want to validate and other things

that you are completely in the dark on and the person that's being questioned doesn't know what you do or don't know.

So there is some technique and some skill involved in some of these debriefs or interviews.

Q. And the reason you do that is because these cooperators when they come in, they have a tendency to minimize their own involvement, right?

A. Some tend to do and some are hesitant. I understand that it is probably quite difficult to go from a career of being a gang member, being a member of a gang and that's your whole life and then all of a sudden understanding that your life is going to completely change. So there is generally a trend to be hesitant, to start off very slowly and kind of warm up to the idea of even talking to law enforcement because it has always been seen as such a taboo, as such immediately you are putting yourself at risk.

So I think part of it has to do with at times their involvement in some of these crimes and a lot of the hesitation also has to do with their personal fear for their safety and the safety of their immediate family and loved ones.

Q. Would it be also fair to say that in addition to minimizing their role, they sometimes shift responsibility for violent acts to someone else?

A. Yes, sir. I mean that has also been at times the situation as far as during some of the debriefs. That's why it is as

important to challenge and be able to validate that the person is telling you the truth through other forms.

Q.  And when you have these debriefing sessions with these folks, you don't have a Plea Agreement with them at that time, right?

A.  No.

Q.  That comes later, right?

A.  Yes, sir.  That's obviously a process that I am not completely familiar with since my job is an investigative nature.

Q.  I see.  So then you would not know or tell me if you do, would you know whether it is typical for somebody to be sentenced before or after they testify?

        MR. GUERRERO:  Objection, your Honor.  Outside the scope.

        THE COURT:  Yes.  I am going to sustain that.

        MR. MARTIN:  You are going to sustain that?  Okay, your Honor.

BY MR. MARTIN:

Q.  Let's move to a different area the, Detective Flores if I may.  You were shown some sketches, some drawings recently, do you remember?

A.  Yes, sir.

Q.  And in those sketches, do you recall whether or not you saw any tombstones?

A.  Yes, sir, I did.

Q.  And those tombstones did you recall seeing any of the names on those tombstones?

A.  Not specifically.

Q.  Not specifically.  But you are familiar with the fact that many of these gang members have monikers or street names, right?

A.  Yes, sir.

Q.  Potos, nicknames, right?

A.  Yes.

Q.  And is it not uncommon for -- well, let me ask you this. With respect to tagging, do you know what that term means?

A.  Yes.

Q.  And would you tell the ladies and gentlemen of the jury what tagging refers to?

A.  Tagging is a form of graffiti generally used by gang members, again, whether it is a hand sign MS-13, it is used to identify territory.  You will find it on walls, notebooks, various forms of personal property that I have been involved in and recovered through searches an other investigations.  So it is generally graffiti, gang graffiti.  It is referred to as tagging.

Q.  Okay. And with respect to this tagging, sometimes would you see these tombstones that I referred to earlier?

A.  From time to time on some tagging and some personal body tattoos as well.

Q.   And that would be like a memorial to a friend who had fallen?

A.   Yes, sir.  Generally it is some high form of respect to memorialize somebody with either graffiti or a personal tattoo.

Q.   With respect to this tagging, do you know whether or not, in your experience, have you ever come across associates who also keep some kind of tribute to a fallen gang member?

A.   Yes.

Q.   All right.  And would that be true of an inactive members as well?

A.   Well, depending on when that person got their tattoo, whether or not when they got tattoo when they were still active and obviously have had the tattoo for an extended period of time until they went inactive.

Q.   Right.  But you are not telling the ladies and gentlemen of the jury that just because somebody has a tombstone sketch that they are an inactive member, are you?

A.   No.  I mean by itself a tombstone with a name on it could be just that.

        MR. MARTIN: The Court's indulgence, please.

        THE COURT:  You may.

Q.   Detective, if you will excuse me.

A.   No problem, sir.

        (Pause.)

BY MR. MARTIN:

Q.   Just one last question, Detective Flores.  Are you an expert on gangs in general or just MS-13?

A.   My primary focus has been on Hispanic street gangs in Los Angeles a lot of which operate in a similar fashion.  I have testified as an expert on not only on Mara Salvatrucha, but 18th Street, Armenian Power,  some local gangs, Rebels, White Fence which are also Hispanic street gangs.

Being born and raised in east Los Angeles gangs were something common to me growing up so I have a general understanding, but it is based primarily in Los Angeles.

MR. MARTIN:  Okay.  Thank you, sir.  Your Honor, I have no further questions.  Thank you.

THE COURT:  Mr. Seltzer.

CROSS-EXAMINATION

BY MR. SELTZER:

Q.   Well, actually my first question was going to be Mr. Martin's last question and good afternoon.

A.   Good afternoon, sir.

Q.   Following up on that question, have you participated in the interview of any gang members in the Washington, D.C. metropolitan area?

A.   No, sir, not that I can recall.

Q.   And have you participated specifically in any MS-13 related investigations in the Washington, D.C. area?

A.   No.

Q.   So basically your experience is in LA and that general area; is that correct?

A.   My only other dealings with some law enforcement but specifically in particular investigations, no.

Q.   And could you just repeat how did you define a gang? What would be consider a gang?

A.   By definition, a simple definition it is a group of three or more persons with a common name, sign or symbol --

THE COURT: Go very slow.

A.   Yes, sir. A group of three or more persons with a common name, sign, or symbol whose members individually or collectively engage in a pattern of criminal activity which creates a sense of fear and intimidation within the community.

Q.   Would it be fair to say that not every gang actually qualifies as an enterprise?

A.   Again, depending upon the sophistication, we do have, as an example, in Los Angeles tag banging groups which are less sophisticated gangs.  They are basically in their infancy which we wouldn't consider criminal organized groups yet.  Basically almost they are almost like babies.

Q.   Specifically as to the MS group, they don't really have a business purpose, is that fair to say?

A.   Well, I would say based on my experience the business is keeping the gang alive through forms of their activities through the extortions, through the robberies, being able to sustain

themselves through some of these criminal acts to not only sustain the local clique but members abroad.

So as far as a legitimate business, I wouldn't call it legitimate, but the business of generating money to support itself through illegal means, yes.

Q. Well, for instance, would it be fair to say that in general MS is not in the business of selling illegal drugs?

A. In my experience in Los Angeles, they are and the manner in which they generate money may vary from clique to clique depending on again the sophistication, the age of the clique, the connections locally that they may have to local drug sources, and their ability to control the territory.

If they have the territory and they have the drug source, then they are able to freely deal drugs within the territory which is one of the primary ways that the gang makes money in Los Angeles because they have that and they have had it defined for many years.

In other areas it may be a little different, maybe more so to the extortion of the local community. It may tend to be property, stealing cars. So again there is other factors that may influence the way the local clique makes its money, but extortion has always been a constant because the gang is generally based within a community and it is the community primarily they focus and pray on the majority of the of the time.

Q.   Let me ask you this.   In the Washington, D.C. area, you are not aware of MS-13 cliques that you have participated in prosecution involving drug distribution?

A.   No, sir, not that I can recall.

Q.   And is it also fair to say sometimes these cliques really don't get along, they have fights amongst each other?

A.   Yes, sir, like most families at times you have guys and even cliques at times that are at odds over anything from girlfriends to guns to territorial issues, names, recruits.   So in a sense it is almost like a dysfunctional family at times.

Q.   Speaking of families, you testified that a lot of times because some family members from El Salvador migrate to the United States and in some instances some of those people might join MS-13, right?

A.   I would say they are probably a higher propensity to be recruited because again throughout my career, people migrate here from a country especially not speaking the language, you know, you look -- they look for some connection to somebody. Unfortunately, at times you have gang members that give them the attention, offer them the immediate acceptance into the community, give them the ability to be popular or have some standing within the community, but that's generally a recruiting tool that most Hispanic street gangs have used back to the time when I was growing up in east Los Angeles.

Q.   But to be fair about it, you are not saying that every

communication between an El Salvadoran immigrant to this country back to his people in his country in El Salvador involve some kind of illegal relationship?

A.  No, absolutely not.  I believe the majority of the community is hard working and has the same aspirations and dreams as probably my grandparents who came here.  That's all.

Q.  Okay.  That's fair.  Just a few more questions.  Talking about jumping in and walking, as I understand it, one of the ways to jump in after you have been walking is to actually go through a process where essentially you are beat up or punched a certain amount of times; is that correct?

A.  It is a physical beating generally by 2 or 3 existing members of the gang of varying -- you know, they basically try to match you up.  If you are big guy, they pick three big guys or their biggest guys.

Q.  But if somebody was in the process of walking and wanted to avoid what you are describing as what sounds like a rather painful process, one way to do that would be to commit an act, a fairly brazen act on behalf of the gang to prove himself without having to get beat up?  Isn't that fair?

A.  No, because generally there  is still a requirement at some point to get jumped in.  The violent acts come as part of the territory of being a gang member, the requirement to put in work is a slang term for committing acts for the gang is a requirement with you wanting to be a member of the gang. So it

generally comes with the territory.

Q.   But if I didn't misunderstand you, I believe you testified on Direct that one alternative to going through the formal jumping in,  the beating up would be to commit an act of violence, some brazen act, something else to prove that you are worthy of being jumped in without being beat up?

A.   That would not be an exception as far as you could commit a violent act you and don't have to get jumped in.  The violent act or any act that you commit as part of your recruitment or part of your testing stage obviously goes to prove that you are willing to be a member of the gang.  It still doesn't, at least in my experience, keep you from having to go through the physical jumping in stage.

Q.   You also talked about dues being collected at meetings; is that right?

A.   Yes, sir.

Q.   Isn't it true that the sums of money -- I know they -- there is probably a range, but quite often the sums of money are relatively small amounts of money that each member is contributing, right?

A.   It could, but depending on the amounts,  the amount of members, collectively they can be significant amounts, at least a significant amount to somebody who is incarcerated and may need 20, 40 dollar to eat for two weeks or buy cosmetics or just sustain themselves and the same for people incarcerated or even

in El Salvador where money may be a little bit more in need or in use.

Q.  We are not quite -- I am sorry -- we are not generally talking about each member at a meeting contributing, say, thousands of dollars or anything like that?

A.  No, sir.

Q.  Okay.

MR. SELTZER:  The Court's indulgence.

THE COURT:  All right.

(Pause.)

BY MR. SELTZER:

Q.  I think you said you testified approximately 70 times altogether?

A.  Approximately I would say in excess of 70 times in State Court in California, Los Angeles specifically.

Q.  In each and every one of those cases, you testified on behalf of the Government; is that correct?

A.  No, sir.

Q.  How many times did you testify on behalf of the defense?

A.  I think I have been called by the defense on two or three occasions.  I know I testified once probably within the past six months.

Q.  So basically 2 or 3 times out of 70, 80 times, something like that?

A.  Yes, sir.  It depends on who is calling you as a witness.

Q.   In this particular case, not that there is anything wrong about it, but your expenses have been paid by the United States, right?

A.   As far as my flight and lodging, yes, sir.

Q.   Have you had any discussions prior to your testimony here about this specific case with either the prosecutors or the ICE agents?

A.   Very small.  As far as the scope of the investigation, I know very little about it.  I know varying degrees of what I am called here to testify on, but not the entire scope of the entire investigation.

Q.   But you have had some discussions?

A.   Minimal, again, pertaining to my testimony.

        MR. SELTZER:  Nothing further, your Honor.

        THE COURT:  All right.  Mr. Abbenante.

                    CROSS-EXAMINATION

BY MR. ABBENANTE:

Q.   Good afternoon, Detective.

A.   Good afternoon, sir.

Q.   Detective, tell me what your definition of an expert witness is.

A.   An expert that -- I mean by my definition, somebody who has a  special training or a special knowledge in a particular area whether it is cooking or gangs or flying kites, somebody who spent a good period of their time focusing on a particular area

that knows the ins and outs of what that job or what that trade entails.  Carpenter, ironworker, welder.

Q.   What's your role as an expert witness in the trial?

A.   To give my opinion and provide whatever answers that I can honestly give based on my training and experience.

Q.   And basically be like neutral, right? In other words, not really someone who would be in favor of the Government as opposed -- or even in favor of the defense, right?

A.   My job is to answer the questions that are asked in a truthful manner and to the best of my ability when I am giving my opinion.

Q.   And without any like bias or bent towards one side?

A.   No.  I mean I am a law enforcement officer and obviously I work for the Police Department, but when I am called as a witness, my job is to give my opinion to the best of my ability or give the facts as I can recall or I best know.

Q.   Well, then let me ask you this since you said it.  Obviously I am a police officer and obviously this is what I have been doing for the past, what, how long?

A.   Closing on 15 years.

Q.   15 years.  So are you conceding that then in that regard you might have a certain bent towards the Government?

A.   No.  I mean just given the fact being honest and open that my job is as a law enforcement officer, it is to investigate crimes, to arrest people and to bring them in front of the Court

or a jury to decide that the facts I bring to the table.

Q.   Yes, but that's when you are in a role as a Detective or as an investigator or someone investigating a crime, right?

A.   Correct.

Q.   Your job in that case then it is clear whose side you are on, right? You are on the side of the Government, right?

A.   Correct.

Q.   And you are telling -- and is it fair to say or are you not saying this, when you come in as an expert witness, you are able to sort of like just put all that aside about your law enforcement background and your investigations and have it not affect your opinion in any way? Are you able to do that?

A.   No.   I utilize my background, my training and my experience to formulate my opinions so that I obviously can't sever from myself.

Q.   So then it is fair to say then that your opinions as an expert do have a certain I guess perspective of law enforcement, right?

A.   Because that's my background.

Q.   Okay.   You know, this is the first time -- I have never met an expert witness before -- I mean a gang expert before so I Googled you last night.   Okay.   So when you -- the bottom line is you are a cop, a Detective, right?

A.   That's correct.

Q.   Okay.   And you have evolved into what you call yourself and

what Mr. Guerrero calls you and has qualified you as a gang expert, right?

A.   Yes, by definition, yes, sir.

Q.   Okay.  And all of your training and certifications if we call them are law enforcement related are they not?

A.   Not necessarily.

Q.   Well --

A.   Again a lot of my experience and background comes from dealing with the community, the day-to-day contacts I have had with victims, people that live in the community.

Q.   As a cop though?

A.   As a cop but as a human being and the fact that people tend to connect with you, they tend to share things with you, they trust you and tell you things that they are definitely afraid of sharing with most other cops.

Q.   But again, like I said, like I am questioning, I am not, like I said, not trying to put words in your mouth, but your training -- I mean these associations that you say you belong to, the California Association of Gang Experts, right?

A.   Gang investigators.

Q.   Gang investigators.  Those are all cops, right?

A.   They are all law enforcement associations where part of the requirement is either you are a law enforcement officer or working in law enforcement.

Q.   Okay.  So they are either cops, detectives or agents or

whatever?

A.   Correct.

Q.   But they are law enforcement?

A.   Yes, sir.

Q.   What's the next one you belong to?

A.   California Homicide Investigators Association, but just to add on to the California Gang Investigators Association, some of those conferences also have a gang intervention, prevention component, classes that are provided by community or civilians as well.  It is not all gang spearheaded.  There is other components obviously that we deal with with our gang work.

Q.   But those are people who come and talk, but they are not members, right?

A.   No, they would not be specifically members.

Q.   Okay.  So, like I said, I am questioning you as an expert, not as a cop.

A.   Okay.

Q.   So the answer to my question is that everybody in that group that you just said is law enforcement, right?

A.   Yes.

Q.   Okay.  Now, give me the next group.

A.   California Homicide Investigators Association.

Q.   Okay.  Same thing there?

A.   Yes, by mere fact of --

Q.   Give me the next one.

A.   International Latino Gang Investigators Association.

Q.   Same thing?

A.   Also.  I mean it is part of our profession just like an attorney would be part of the attorneys Bar Association and the association doesn't restrict you to only training or receiving training or knowledge from other law enforcement officers, it just means you are part of an association like a union which gives you the ability to communicate and then become better through your interconnection with other law enforcement.

Q.   Wait a minute.  You used the term -- you used -- you stuck in there in your explanation like the Bar Association, right?

A.   Correct.

Q.   Okay.  Well, Mr. Guerrero and Mr. Mohanty and I are in the Bar Association together, but we have -- I mean they are law enforcement.  I am not law enforcement.

A.   Right.

Q.   So what I want to ask you is in that last group that you just talked about, they are all law enforcement too, right?

A.   Correct.

Q.   What's the next group?

A.   That's would be the three that I actively belong to.

Q.   Three.  Now, when I was looking last night in Googling gang experts, I noticed that there are gang experts that weren't cops, okay, and you are familiar with those people, right?

A.   Some, yes, sir.

Q.   Some of them.   They have some advanced degrees of some sort, right?

A.   Correct.

Q.   And they have not only the advanced degrees, but they have some types of experience in areas that you don't have, right?

A.   Academically, yes, sir.

Q.   Besides academic?

A.   I wouldn't know.  Based on what I know about the persons that I do know about, it is primarily academic.

Q.   Primarily academic?

A.   Correct.

Q.   Okay. But, for instance, are you a member of the National Gang Crime Research Center?

A.   No, sir.

Q.   Have you ever heard of it?

A.   Not that I can recall.

Q.   Okay.

MR. ABBENANTE:   Your Honor, I have a bit more so do you think this might be a good time to break?

THE COURT:   Yes.  You are not like within a minute or something like that?

MR. ABBENANTE:   No.  No.  No.

THE COURT:   Okay. We will take the luncheon recess.  So you remain a witness under oath in the case.  You are not at liberty to discuss your testimony so far or what it might be

when you return with anyone including the lawyers and the Agents involved in the case.  Stay independent of everyone else, Detective, please.

THE WITNESS:  Yes, sir.

THE COURT:  You can step down.

(Witness excused.)

THE COURT:  Ladies and gentlemen, we are going to take the luncheon recess and reconvene at 2:30.  Keep an open mind.  You haven't heard all the evidence yet.  You are going to be in and out of the courthouse area. Refrain from listening to or overhearing other people's impressions of the evidence and, of course, above all don't share your impressions of the evidence with anyone including your fellow jurors.  Enjoy your recess.  We will see you at 2:30.  We will be going to five today.

(Jury excused at 1:02 p.m.)

THE COURT:  All right.  How much more estimate there, Mr. Abbenante?

MR. ABBENANTE:  About 10, 15 minutes.

THE COURT:  Redirect, Mr. Guerrero?

MR. GUERRERO:  About 15 to 20.

THE COURT:  All right.  So then we will get to Agent Nieves after that?

MR. GUERRERO:  Yes.

THE COURT:  All right.  And then Special Agent Jason --

MR. GUERRERO:  Brumbelow.  No, sir, off the table

because of the Court's ruling earlier.  That was related to that issue.

THE COURT:  Okay.  So he is off the table.

MR. GUERRERO:  So we go to Jose Carlos Ramos which will probably take us some time because he is Spanish speaking.

THE COURT:  Okay. He is Spanish speaking. So that should concluded the day easily, shouldn't it?

MR.  GUERRERO: I think so.

THE COURT:  All right.  Have a good lunch.

(Whereupon, the luncheon recess was taken at 1:03 p.m.)

CERTIFICATE OF REPORTER

I, Patty A. Gels, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

INDEX


GOVERNMENT'S WITNESS                 DIRECT     CROSS

DAWN SCHWARTING
    By Mr. Mohanty                  21
    By Mr. Martin                              27

FRANK FLORES
    By Mr. Guerrero                 28
    By Mr. Martin                              65
    By Mr. Seltzer                             77
    By Mr. Abbenante                           84


E X H I B I T S

GOVERNMENT'S
EXHIBIT NO.                 MARKED                    RECEIVED
2101 A                        23                         24
329                           25                         26

# APPENDIX 133

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 09-cr-00055

UNITED STATES OF AMERICA

Plaintiff,

v.

1.      GERARDO LOPEZ

Defendant.

---

### DEFENDANT LOPEZ' MOTION TO DISMISS BASED UPON DUE PROCESS VIOLATION

---

Defendant Lopez, by and through undersigned counsel, Mark C. Johnson, moves this Court to dismiss the indictment in this case with prejudice and further states:

1.      The Defense asserts that the Government agents in the instant case engaged in a pattern and practice of deception that rose to the level of a due process violation. The Government agents' deceptive practices fell into two broad categories:  the fallacious characterization of Garcia-Sanchez as an MS-13 member and the hiding of an entire parallel MS-13 investigation in California that involved the debriefing of high level MS-13 members.

**THE GOVERNMENT FALSLEY REPRESENTED GARCIA SANCHEZ AS AN MS-13 MEMBER IN ORDER TO USE HIS DRUG DEALING OPERATION AS A BASIS TO SECURE A TITLE III INTERCEPTION ORDER TO TAP DEFENDANT LOPEZ' PHONE**

1

2.      The Government agents intentionally created the ruse that Jose Garcia-Sanchez was a high level member of MS-13 in Denver. The Government had insufficient evidence to support a claim that MS-13 member Gerardo Lopez was engaged in systematic narcotics trafficking facilitated by the MS-13 national organization. Federal agents had pursued Lopez for several years but could not make a case against him in Colorado involving an MS-13 conspiracy. However, state law enforcement agents in Colorado had been aware for a number of years of the existence of a local narcotics trafficker named Jose Garcia-Sanchez.[1] Sanchez was a highly successfully independent drug dealer who ran a narcotics distribution organization in Aurora, Colorado. Jose Garcia-Sanchez was the brother in law of one Kelvin Duran. Duran had assisted Jose Garcia-Sanchez with the drug operation when Garcia-Sanchez was incapacitated.[2]  Duran was also an identified MS-13 gang member and an associate of Defendant Lopez. However, there was no connection between Garcia-Sanchez and Lopez. Garcia-Sanchez was not a member of MS-13, much less a major figure within MS-13 as the Government opined before the grand jury.[3]

---

[1] The Aurora Police Department Special Operations, Narcotics Division noted that on 10/26/05 Investigator Mike Prince, a commissioned Police Officer with Aurora assigned to narcotics unit, was contacted by a previously reliable CI who identified a Honduran who was selling methamphetamine throughout City of Aurora. The Aurora Police Department identified that Honduran drug dealer as Jose Garcia Sanchez. *See* PROCS000260

[2] Confidential Source 7 knew that Garcia-Sanchez had been ill for several months and Duran had run the drug business;  PROCS000125

[3] The proof of this "factual disconnect" is found in the Government's own telephone interceptions. The Government intercepted literally thousands of phone calls involving Lopez, Garcia-Sanchez and MS-13 members both in Denver and in California. However, there is not one call between Lopez and Garcia-Sanchez. It is ludicrous to assert that two controlling members of a tiny clique of MS-13 members in Denver could engage in innumerable phone calls to friends, associates, and family members and never intersect. The unmistakable conclusion of this discovery is that Defendant Lopez never met or spoke with Garcia-Sanchez and was unaware of his existence prior to being charged in this case. Those facts were readily apparent to the Government agents before they sought to indict Lopez.

2

3.        A review of the information about Garcia-Sanchez in the discovery shows that he

was a perfect foil for a wire-tap investigation. He was the classic narcotics trafficker who

operated with a small group of trusted associates and kept tight rein on his organization.

His sources of narcotics were from out of state and included a Mexico connection. Thus,

it was child's play for the Government to gain a Title III order for his phone. However,

the Government agents in this case had no interest in a run of the mill drug dealer. The

Government's goal, was to facilitate the nation-wide investigation of MS-13, by gaining a

wiretap of Lopez' phone.[4]

4.        Government agents were in possession of a substantial body of investigative

materials that clearly established that Garcia-Sanchez was not an MS-13 member but

instead a successful independent drug dealer. A review of the discovery already provided

to the Defense by the Government demonstrates that point. The major investigation of

Garcia-Sanchez was conducted by the City of Aurora Police Department. As previously

noted in this motion, Investigator Prince began pursuing Garcia-Sanchez in October of

2005.  A confidential source told Prince that he did not know the dealer's name or

address but knew the vehicle he used in selling meth. The vehicle described was traced to

Garcia-Sanchez' wife, Elizabeth Vega.[5] On February 28, 2006, the City of Aurora Police

---

[4] The national coordination in this case is undeniable. Contained in the discovery is a single reference to the beginning of an MS-13 investigation in Denver beginning in 2005. The discovery contains a memo generated within the ICE federal agency here in Denver. That document was dated 3/29/05. The document reflected that the Denver ICE was opening an "umbrella case" to document "…activities and membership in MS-13 in Denver…"; the investigation "[would] also attempt to provide **national intelligence** on MS-13's human smuggling and harboring activities as it related to the Denver metro area **and the rest of the US**". The document further noted that "This ROI documents information received from the Aurora Police Department's Gang Intervention Unit." It should be noted that Investigator Prince was working for the Aurora Police Department in 2005 and was investigating Garcia-Sanchez for narcotics activity. *See* PROCS000073.

[5] *See* PROCS000260.

obtained a search warrant to put a GPS tracking device in the vehicle being used by Garcia-Sanchez to sell drugs.

5.        On June 29, 2006, Investigator Yates of the Aurora Police Department, Narcotics Unit, set up a controlled narcotics purchase for a Confidential Informant to buy $100 of methamphetamine from Garcia Sanchez. The Confidential Informant told Investigator Yates that a person known as "Cascata" was selling methamphetamine and had large quantities of methamphetamine in his possession. Investigator Yates had access to Garcia-Sanchez' cell phone number, provided to him by the Informant.[6] The controlled buy was accomplished and Jose Garcia-Sanchez was taken into custody. At the time he was arrested, Jose Garcia-Sanchez was driving a 2005 Toyota Tacoma Truck which was listed to Elizabeth Vega. Using that fact, Investigator Yates engaged in an assets investigation that established that Vega and Garcia-Sanchez were in possession of resources including real estate and vehicles, while having no visible means of support. Additionally, on July 24, 2006, Investigator Yates established that Garcia-Sanchez had been arrested for selling drugs under a false name on February 7, 2006.[7] All the information gathered by the Aurora Police at that point showed Garcia-Sanchez to be an ordinary, albeit successful, drug dealer who was working in concert with his significant

---

[6] *See* PROCS000256.

[7] Presumable, Investigator Prince, who figures prominently in this case, would have been aware of the investigation of Garcia-Sanchez in 2006 given that it was Prince who initially identified Garcia-Sanchez as a drug dealer in Aurora through a CI in 2005 and who was working for the same agency as Investigator Yates.

4

other, Elizabeth Vega.[8] Nothing in the investigation gave any indication that Garcia-Sanchez had any connection to MS-13.

## GARCIA-SANCHEZ' PHONE CALLS FROM JAIL SHOWED HE WAS NOT IN A CONSPIRACY WITH MS-13 TO SELL NARCOTICS

6.      Garcia-Sanchez was incarcerated in the Adams County Jail as the result of his June, 2006 arrest. While in custody, Garcia-Sanchez continued to run his drug operation and he spoke often with his spouse, Elizabeth Vega, who assisted Garcia-Sanchez in keeping the business running during his detention. Garcia Sanchez was recorded by jail authorities telling Vega that their drug runners needed to continue working so that Garcia-Sanchez could pay for the "apartment." They talked about specific drug deals and amounts of money that would be realized from drug sales. Subsequent analysis of Vega's bank account by Investigator Prince showed that significant funds continued to be deposited by Vega and those deposits corresponded to phone conversations between Garcia-Sanchez and Vega about upcoming drug deals. Additional jail calls recorded in July, 2006, showed Garcia-Sanchez talking about where drug proceeds were hidden

---

[8] The Aurora Police engaged in classic investigative techniques regarding Garcia-Sanchez including the use of confidential informants and trash seizures. On February 14, 2006, Investigator Ingui, Aurora Police Special Ops, was contacted by a CI who said there was an individual who was selling meth, known as Alex, who drove a Maroon Chevy Tahoe and "Alex drives the Tahoe while he picks up large shipments of meth in Calif. and Utah." On February 22, 2006 Investigator Prince did a trash hit at 2201 Oakland St. and searched trash; he found an envelope addressed to Elizabeth Vega and an envelope addressed to Alex Herrera (AKA for Jose Antonio Garcia-Sanchez) and six dime baggies with white crystal powder residue that tested positive for methamphetamine. None of these techniques indicated that Garcia-Sanchez was in anyway connected to MS-13.  *See* PROCS000261;

5

within his house, what drug quantities still available for sale, and the use of drug proceeds to pay the mortgage on the Garcia-Sanchez residence.

7.     On July 10, 2006, Vega called Garcia-Sanchez and said she has accounted for all the money, indicating that someone [probably CS-7] had just dropped off some more money. Vega said she counted the money and the total was $32,000. Garcia-Sanchez instructed Vega to hide some of the money in the house and wire the rest to Honduras. Records showed that Vega wired $13,100 dollars to one Kenia Herrera-Torres in Honduras. [9] Again, all of the unguarded discussions about maintaining the narcotics operation contained no references to MS-13, nor any proof that Garcia-Sanchez was acting in concert with MS-13 members in a drug conspiracy.

## CS-7 TOLD AUTHORITIES THAT GARCIA-SANCHEZ DID NOT CONSPIRE WITH THE MS-13 ORGANIZATION

8.     The Government agents in this case obtained an insider's view of the Garcia-Sanchez drug conspiracy from a cooperated individual identified in the discovery as CS-7.  That intimate view of the drug operation clearly established that Garcia-Sanchez was not involved in an MS-13 conspiracy to deal narcotics. On the contrary, the description of day-to-day operations in the Garcia-Sanchez drug ring showed a highly profitable but unremarkable Denver narcotics operation.

9.     On June 8, 2007, Investigator Prince and Analyst Karin Hopper went to Adams County to interview an individual who came to be designated by the Government as CS-

---

[9] *See* PROCS000190;

7. CS-7 displayed significant knowledge of the Garcia-Sanchez drug operation. CS-7 told the investigators that Garcia-Sanchez sold methamphetamine and cocaine while Elizabeth Vega controlled the business issues such as lawyers, finances and "coordinating drug sales with some of the drug sources".

10.     CS-7 was given several photographs during the interview with Prince. CS-4 identified "Sureno gang member" Jose Garcia-Sanchez, Elizabeth Vega, and "MS-13 gang member Kelvin Duran. CS-7 also recognized the photo of Jorge Magana, "…stating that he was a friend of Duran's."[10] CS-7 knew that Garcia-Sanchez had been ill for several months and Duran had run the drug business. CS-7 said he didn't know Duran well and stated that Duran hung out more with his "homies" pointing to the photo of Magana.[11]

11.     GS 7 went on to describe his own relationship with Garcia-Sanchez and how he came to the point of buying a pound of methamphetamine a week from Garcia-Sanchez for a year and a half. CS-7 described Garcia-Sanchez' distribution system and the general location of "stash houses." CS-7 told Investigator Prince that Garcia-Sanchez and Vega owned multiple houses in Denver and that Garcia-Sanchez would rent an apartment for "one or two months" as a location to sell narcotics. CS-7 knew that Garcia-Sanchez kept large quantities of drugs at the "stash house," but sold narcotics out of the other rental property.[12] CS-7 knew that the stash houses and customer houses were located in Aurora.

---

[10] *See* PROCS000125;

[11] *See* PROCS000125;

[12] *See* PROCS000126;

7

12.     CS-7 told Investigator Prince that Garcia- Sanchez had become one of the largest suppliers of methamphetamine in the Denver Metro area. CS-7 knew that Garcia-Sanchez regularly kept 3 cell phones; one for small buyers, one for large buyers, and one for his suppliers.[13] CS-7 informed Investigator Prince that Garcia-Sanchez was getting ten pounds of methamphetamine every two to three days and one to two pounds of cocaine every week from his source. CS-7 further knew that Garcia-Sanchez and Vega used two different sources for the methamphetamine and one source for the cocaine.

13.     Prince reported that CS-7 knew that Garcia-Sanchez had a source for methamphetamine that was Vega's family in Los Angeles. CS-7 stated that Garcia-Sanchez and Vega regularly drove to LA to pick up methamphetamine. The second source was an individual in Mexico. CS-7 also claimed that an additional source of methamphetamine was a Hispanic male who ran a body shop in the area of East Colfax Ave and Airport Boulevard in Aurora.[14]

14.     CS-7 went on to describe the distribution network run by Garcia-Sanchez.  CS-7 knew about where the money was hidden; that Garcia-Sanchez was making a lot of money and paying off a drug source in Arizona. CS-7 said Garcia-Sanchez was making a great deal of money from selling drugs and had bought cars and houses with the drug proceeds. CS-7 reported that when Garcia-Sanchez was arrested in 2006, he would call Vega all the time, and that Vega put Garcia-Sanchez in contact with his buyers and

---

[13] *See* PROCS000126;

[14] *See* PROCS000126;

Case 3:16-cv-00057-MOC    Document 69-5    Filed 02/22/18    Page 176 of 600

sellers.[15] CS-7 related that when Garcia-Sanchez was in jail in Adams County, he instructed CS-7 to remove firearms and a ballistic vest from 2201 Oakland St., Denver. However, before he could remove the weapons, CS-7 was arrested by Aurora Police for selling methamphetamine. Just prior to being arrested, CS-7 had stopped by 2201 Oakland St. to drop off $25,000 in cash and 12 ounces of coke. CS-7 also knew that while Garcia-Sanchez was in Honduras, Vega ran the operation.[16]

## THE INVESTIGATION UTILIZING CS-4 CLEARLY ESTABLISHED THAT THERE WAS NO CONSPIRACY BETWEEN GARCIA-SANCHEZ AND MS-13 MEMBERS

15.     The Government agents in this case brought in an undercover individual with significant criminal history who was identified as CS-4. It is clear that CS-4 had sufficient credentials as an MS-13 member to move easily through the MS-13 community. On September 30, 2007, CS-4 informed Investigator Prince that he had met with a Hispanic man who identified himself as "Puppet." Puppet told the CS that he was a member of the Santa Clarita (SC) gang and was associated with numerous Mara Salvatrucha (MS-13) gang members who lived in the area.[17]

---

[15] *See* PROCS000126;

[16] Much of the information provided by CS-7 was independently verified in other parts of the long standing Garcia-Sanchez investigation. The verified facts included the purchase of houses and cars by Garcia-Sanchez and Vega, the role of Vega in running the operation during Garcia-Sanchez' absence, the fact that Garcia-Sanchez had narcotics sources outside the state, that he made a large amount of money dealing drugs and that he sent money to Honduras.

[17] See Bates #PROCS000023;

9

16.     On October 1, 2007, FBI SA Jonathan Tapp and Investigator Prince met with the CS-4 who provided information on the Denver MS-13 Normandie Locos (NLS) gang members. CS-4 identified photos of Gerardo Lopez, Anthony Aldana, Kelvin Duran, Jorge Magana and Jose Garcia-Sanchez. The CS recognized each photo and referred to them by their aliases. CS-4 told Prince that on September 29, 2007, CS-4 went with Puppet to an apartment where he was introduced to MS-13 gang member Kelvin Duran. Duran told the CS that there were 7 MS-13 NLS gang members in Denver in addition to two or three MS-13 members incarcerated in Colorado. Duran also told the CS that a second clique, San Silva, were present in the state, but that Duran knew only two members.[18]

17.     Duran told CS-4 that if he wanted to sell drugs, he could do so on behalf of Duran's brother-in-law. On September 30, 2007, CS-4 again met with Duran and was introduced to Jose Garcia-Sanchez by Duran. On the same night that CS-4 met Garcia-Sanchez, he accompanied Garcia-Sanchez around the metro area as Garcia-Sanchez sold narcotics.[19] The CS told investigators that Garcia-Sanchez sold primarily to the Sureño gang members.[20]

18.     On this same night, September 30, 2007, after leaving Garcia-Sanchez, Duran and CS-4 drove to a different house where CS-4 was introduced to Defendant Gerardo Lopez and Anthony Aldana. CS-4 told investigators that Lopez told him that they were expecting to purchase a kilogram of cocaine for $16,000 the following week. CS-4 said

---

[18] Bates #PROCS000023;

[19] Bates #PROCS000023;

[20] Bates #PROCS000024;

that Lopez told him that they, Lopez, Magana and Aldana, wanted to avoid law enforcement detection and did not routinely participate in the distribution of the drugs. CS-4 said that Lopez told him they could make a great deal of money working together.[21] The crucial point shown by the examination of this discovery was that CS-4 had totally separate interactions with Garcia-Sanchez before meeting with Lopez. Garcia-Sanchez never mentioned any MS-13 connections. To the contrary, he was selling to Sereño gang members. It was only after Duran and CS-4 left Garcia-Sanchez that CS-4 met with Duran's MS-13 associates, including Lopez. There were no statements made by Lopez, Duran or Garcia-Sanchez that could have led anyone to conclude that they were acting in concert. To the contrary, they could not have been acting in concert because Garcia-Sanchez quickly sold narcotics to CS-4 while Defendant Lopez never gave CS-4 any drugs. If they had all been acting in concert, Lopez would have simply sent CS-4 to Garcia-Sanchez when Lopez said he couldn't get narcotics to sell to CS-4.

19.     On October 4, 2007, CS-4 discussed doing a drug deal with Garcia-Sanchez. The conversation took place at Duran's house during a barbeque attended by Aldana, Aldana's younger brother, Joselito Aldana, Duran, Lesley Duran, Henry Duran, Garcia-Sanchez and Elizabeth Vega.[22] Garcia-Sanchez said he would sell ounces of methamphetamine to CS-4 at $1,400.00 an ounce.[23] Garcia-Sanchez said he was charging a higher price because he needed to make a profit on the deal. On October 5, 2007, CS-4 called Kelvin Duran and asked Duran if Duran could get a better deal for him from Garcia-Sanchez.

---

[21]Bates #PORCS000024;

[22]Bates #PROCS000030;

[23]Bates #PROCS000030;

20.     On October 15, 2007, CS-4 spoke with Defendant Lopez about buying drugs from him and Lopez said that the narcotics he had discussed earlier with CS-4 had not arrived and he had nothing to sell.[24] The CS stated that the Denver NLS members were not suspicious of him, however, they did not completely trust him yet.[25]

21.     On October 19, 2007, Investigators Hodges and Prince met with the CS-4 for the purpose of consensually recording phone calls with Garcia-Sanchez and Lopez. In the presence of Investigators Hodges and Prince, CS-4 called and spoke with Garcia-Sanchez. Garcia-Sanchez reaffirmed that the price was still $1,400 for an ounce. Garcia-Sanchez vouched for the quality of the drugs and said he was buying half pounds of methamphetamine for $11,000.00. After speaking with Garcia-Sanchez, CS-4 called Lopez at a different number. Again, he was being directed and monitored by the Government Agents. During the conversation CS-4 asked Lopez if he had received the "clavo," described as a kilo of cocaine in the report. Lopez told the CS-4 that he had not received anything, but he would let CS-4 know when he did have narcotics to sell.[26]

22.     Again, the Government agents structured their investigation to hide the fact that Lopez and Garcia-Sanchez did not know each other and had never worked together. The Government Agents disguised the fact that there were no connections between Lopez' MS-13 group and Garcia-Sanchez. CS-4 never asked Lopez if Lopez could get a better price from Garcia-Sanchez. If Garcia-Sanchez was really conspiring with Lopez, there is no conceivable reason why CS-4 would not have also talked to Lopez about getting a

---

[24]Bates #PROCS000021

[25]Bates #PROCS000021;

[26] Bates #PROCS000034;

better deal. If this was truly an MS-13 conspiracy, there would have been every reason for CS-4 to ask Lopez why Lopez had no drugs while Garcia-Sanchez was awash in narcotics. The agents carefully managed the interactions between CS-4 and Garcia-Sanchez so that Garcia Sanchez would never be asked about the existence of Lopez or the MS-13.

23.     On October 23, 2007, Prince and MGTF Sgt. Dan Johnson spoke with the CS-4, regarding an October 21, 2007 conversation CS-4 had with Lopez, about Lopez getting two ounces of narcotics for CS-4.[27] On November 14, 2007, at approximately 12:46 p.m., CS-4 received a consensually monitored and recorded call from Lopez. During that conversation Lopez asked CS-4 if he still wanted to buy cocaine. CS-4 told Lopez that he was still interested in the drugs and wanted to buy the drugs the following day, when he also planned to purchase a firearm from Lopez. Again, there was no discussion of why CS-4 was negotiating separately with Lopez and Garcia-Sanchez regarding buying drugs. If Lopez and Garcia-Sanchez were really involved in an MS-13 coordinated conspiracy, there would have been no reason for CS-4 to approach each individual individually. CS-4 basically hid his negotiation with Lopez from his dealings with Garcia-Sanchez because the Government did not want to expose the fact that the two had no knowledge of each other.

24.     On November 14, 2007, at approximately 11:51 p.m., CS-4 made a consensually monitored and recorded call to Garcia-Sanchez. The CS asked Garcia-Sanchez if he could purchase one ounce of methamphetamine and a handgun from Garcia-Sanchez on November 15, 2007. Garcia-Sanchez told the CS that he would send Anthony Rodriguez

---

[27]Bates #PROCS000026;

to make the delivery of the handgun and the drugs to the CS.[28] Garcia-Sanchez advised CS-4 that the price of one ounce of methamphetamine and the handgun would be $1,550.00.

25.     On November 19, 2007, Lopez sold CS-4 a handgun, but gave him no drugs. Agents Tapp and Prince wired CS-4 with monitoring and recording devices. Again, CS-4 had the opportunity to question Lopez as to why he couldn't get drugs for CS-4 given that Garcia-Lopez had readily agreed to sell ounces of methamphetamine. Again, if the real goal of the Government Agents had been to gain evidence of the MS-13 conspiracy involving Lopez and Garcia-Lopez, CS-4 would have questioned both Lopez and Garcia-Sanchez about why Lopez couldn't get drugs from Garcia-Sanchez, who was flush with narcotics. The record establishes that CS-4 never purchased drugs from Lopez. Lopez always had an excuse for not providing narcotics to CS-4.[29] By comparison, Garcia-Sanchez readily agreed to sell drugs to CS-4 and quickly consummated a drug deal with CS-4.[30]

**THE GOVERNMENT KNEW AFTER HEARING THE INTERCEPTIONS ON GARCIA-SANCHEZ' PHONE THAT THERE WAS NO CONNECTION BETWEEN GARCIA-SANCHEZ AND LOPEZ**

---

[28]Bates #PROCS000053;

[29] Bates MS_FBI_PCS0003765-3770;

[30] Bates #PROCS000049-51;

26.     It was obvious to the Government, after listening in on the phone calls of Garcia-Sanchez for a few weeks, that there was no connection between Garcia-Sanchez and Lopez. Further, the calls revealed that Garcia-Sanchez had no connection to MS-13 and was an independent narcotics trafficker.  A review of 413 pages of pertinent call summaries made between December 17, 2007, and January 6, 2008, from Target Telephone 2, Garcia-Sanchez's phone; show that the majority of calls made by Garcia-Sanchez were to his assistant, Juan Serrano-Mendez.[31] Garcia-Sanchez also spoke to numerous unidentified males and a couple unidentified females. Additionally, Garcia-Sanchez spoke with Elizabeth Vega, German Martinez, Oche Padilla, and Marvin LNU (possible Garcia-Sanchez's brother).

27.     The FBI knew within days of "going up" on the Garcia-Sanchez phone [Target Phone No. 2] that Garcia-Sanchez was not an MS-13 member, nor a co-conspirator with Defendant Lopez. An analysis of the calls clearly shows Garcia-Sanchez to be exactly what previous investigation had indicated; an independent drug trafficker. The content of repeated conversations intercepted in early December of 2007 clearly showed the nature of Garcia-Sanchez' drug business:

12/18/07     repeated calls between Garcia Sanchez and Juan Serrano-Mendez openly discussing selling dope and money;

12/18/07     phone conf. with Anthony Rodriguez who is looking for a marijuana supplier;

_____

[31] Bates #MS_FBI_PCS_0000013-0000425;

| 12/19/07 | repeated calls with Serrano-Mendez re:  a supplier arriving  from California with drugs; [Session 154] [Session 156] |
| --- | --- |
| 12/19/07; | personal discussion about a girl who used to live near Garcia-Sanchez; [Session 156] |
| 12/19/07 | Repeated calls between Garcia-Sanchez and Serrano Mendez containing discussion of trying to get the correct number for a customer so they could complete a drug deal; [Session 159] |
| 12/19/07 | Garcia-Sanchez and one Oche Padilla talk; Padilla calling from Florida re:  contacts in Honduras and discussion of doing business in Honduras; [Session 173] |
| 12/19/07 | Garcia-Sanchez and his brother talking about drugs getting wet; [session 177] |
| 12/19/07 | Garcia-Sanchez and Dimas LNU; Dimas is from Honduras; [session 187] |
| 12/19/07 | Garcia-Sanchez and Vega; going to the DMV |
| 12/19/07 | Garcia-Sanchez and Leo LNU; GS wants Tony's number; Tony used to sell narcotics to Garcia-Sanchez; This is Tony from Sinaloa; [Session 207]; [32] |

These on-going calls were consistent with the picture of Garcia-Sanchez that had been developed through the investigation that went back to 2005. Garcia-Sanchez was a successful independent drug trafficker who had his own sources of drugs and a tightly knit group of drug runners. He was not a member of MS-13 who sold drugs through the

---

[32] MS_FBI_PCS_00000136 through 162;

rigid hierarchical MS-13 system. From the beginning, the phone calls intercepted pursuant to the Title III order established that Garcia-Sanchez was exactly what CS-7 said he was; a Denver based narcotics trafficker with a great deal of drugs and his own personal organization.

## THE GOVERNMENT PRESENTED FALSE AND MISLEADING REPRESENTATIONS TO THE GRAND JURY

28.     The Government deliberately ignored the vast and compelling evidence that Garcia-Sanchez was an independent drug dealer in asserting to the Grand Jury that Garcia-Sanchez was an MS-13 member who had conspired with Defendant Lopez in the sale of narcotics. Special Agent Boggess deliberately hid from the Grand Jury the facts that showed Garcia-Sanchez was clearly an independent drug dealer with his own sources of drugs, his own group of "drug runners," and his own system for moving money out of the United States. Instead, Agent Boggess falsified the reality of Garcia-Sanchez' drug operation. Boggess claimed that:

      a.      the case began in Colorado in July, 2006, and that the two main targets were Jose Garcia-Sanchez and Gerardo Lopez;[33] and

      b.      Garcia-Sanchez was originally a target because of his narcotics distribution, but later Boggess and Prince "learned" Garcia-Sanchez "was an MS-13 gang member." [34]

---

[33] (Bates #GJ000004)

[34] (Bates #GJ000088)

29.     Two charts, Grand Jury Exhibits 8 and 9, were used in the Grand Jury to augment and enhance Boggess's testimony.  Both charts were titled, "MS-13 Normandie Locos." Boggess described MS-13 as a criminal street gang.  Exhibit 8 was described by Boggess as the narcotics distribution business and Exhibit 9 was described as depicting the MS-13 membership, leadership and the way the organization was run throughout the United States.[35] Garcia-Sanchez, his suppliers, and his drug runners were pictured on Exhibit 8. These charts were displayed to the Grand Jury during every session.

30.     Assistant United States Attorney Tokarz asked Agent Boggess if Garcia-Sanchez was one of the first identified MS-13 members in the Denver area, and Boggess unequivocally answered, "Correct."[36] In later testimony, Boggess reiterates that, ". . . Jose Garcia-Sanchez is an MS-13 gang member."[37]

**THE GOVERNMENT PRESENTED FALSE TESTIMONY BEFORE THE GRAND JURY IN ORDER TO SUPPORT CLAIM THAT CO-DEFENDANT GARCIA-ESPINOZA DELIVERED DRUGS TO DEFENDANT LOPEZ IN DENVER**

31.     Agent Boggess then went on to give erroneous testimony regarding the claim that Defendant Lopez and Co-Defendant Milton Garcia-Espinoza discussed a large amount of drugs that Garcia-Sanchez had brought from California.[38] The subject call was call

---

[35] (Bates #GJ000004)
[36] (Bates #GJ000089)
[37] (Bates #GJ000186)
[38] This issue was the subject of Document 357 filed in this case: DEFENDANT LOPEZ; MOTION FOR DISCOVERY GOING TO SUPPORT A MOTION UNDER FRANKS V. DELAWARE AND FOR USE

#2368. FBI Agent Boggess testified before the Grand Jury in this case that, in fact, call #2368 was placed by Lopez while Lopez was **at his home** and then the FBI agents located Lopez to the Golden Corral after the call was intercepted by the federal agents.[39] Agent Boggess' testimony is directly contradicted by the transcript of the call, which shows that Lopez was at the Golden Corral at 3:22 p.m., when Agent Boggess asserted that Lopez was at his home looking at the drugs Garcia-Espinoza had just delivered. Agent Boggess testified:

> Yes. While speaking with Magana, Lopez yelled, in the background, that Garcia-Espinoza was displaying something in [sic] doorway of his residence, why it was -- the door was open, which, as investigators, we believed that he was displaying narcotics.[40]

32.     This version of events set out by Agent Boggess was a fiction. The transcript of intercepted call #2368 shows clearly that Lopez and Garcia-Espinoza were already at the Golden Corral restaurant during the interception, not at Lopez' home as portrayed by Agent Boggess. The transcript of call #2368 shows that Lopez specifically stated that he and Garcia-Espinoza were at the Golden Corral restaurant. The transcript states:

> Lopez: No, we're here eating.
>
> Magana: What are you guys doing?
>
> Lopez: We're here eating.
>
> Magana: Oh, you're already eating?
>
> Lopez: Yeah.

AT TRIAL REGARDING EVIDENCE THAT DEFENDANT LOPEZ BEING SURVEILLED ELECTRONICALLY BY LAW ENFORCEMENT;
[39] Agent Boggess made those assertions during her Grand Jury testimony of January 28, 2009, at p. 27;
[40] Id. p. 27;

> Magana: Where at?
>
> Lopez: At the Golden Corral.
>
> Magana: Again?
>
> Lopez: Yes. We arrived here-

Lopez went on to tell Magana that they had gone to the Golden Corral because they had figured out that "...you have to drop by here at 3:30 so you can get dinner and lunch."[41]

33.    Agent Boggess obviously could not have concluded from a review of call #2368 that Lopez was in his home. Further, Agent Boggess' hypothesis that Garcia-Espinoza was displaying narcotics to Lopez would have been a ludicrous theory if, as the transcript shows, both Garcia-Espinoza and Lopez were entering a restaurant at the time of the call.

34.    In fact, the Government agents had surveilled Lopez and Garcia-Espinoza at the Golden Corral Restaurant just minutes after the phone call was intercepted. Agent Boggess clearly testified that surveillance was established after Lopez made the call from his home and that Lopez was "observed" by the surveillance team at a location away from his house. Agent Boggess testified:

> Q.    And at that time, were you able to set up surveillance at Lopez's location?
>
> A.    Yes. The surveillance team did observe Lopez and Garcia-Espinoza parked at the restaurant near the residence.[42]

The Golden Corral restaurant is over two miles from Lopez' residence. A Government surveillance report, generated by one Scott Smith, shows that Investigator Nielsen "located" Lopez' vehicle in the parking lot of the Golden Corral. The time was not noted.

---

[41] Session #: 2368, 02/07/08; 15:22
[42] Id. p. 27;

20

However, the call to which Agent Boggess testified was placed by Lopez from the Golden Corral at 3:22 p.m. as shown by the time set out on the transcript of the call. At 1545 hours [3:45 pm] Investigator Wagner observed Lopez and Garcia-Espinoza leave the Golden Corral restaurant, get in Lopez' car, and drive out of the parking lot.[43]

35.      A review of the transcript of the call clearly showed that Lopez informed the caller that he and his passenger had already arrived at the Golden Corral and were going to eat there. Moreover, this transcript shows that Agent Boggess deliberately misstated the facts to create the fiction that Lopez and Garcia-Espinoza were engaged in a conspiracy to transport drugs from California to Denver. The FBI had to characterize the interaction by Espinoza-Garcia and Lopez as drug related because it was the only time that the Government located Lopez and Garcia-Espinoza together in Denver. Thus, it was the only opportunity for the FBI to assert that these two MS-13 members were acting in concert to deal drugs.

## THE GOVERNMENT AGENTS HID THE FACT THAT HIGH LEVEL MS-13 "SHOT CALLERS" HAD BEEN DEBRIEFED FROM TITLE III JUDGE KANE AND FROM THE GRAND JURY

36.      On June 3, 2010, the Undersigned received a call from Mr. Adam Dawson, a private investigator from California who was working on the Alex Sanchez federal murder case in California.[44] Mr. Dawson told the Undersigned that the Sanchez defense team, in the process of preparing wire tap motions, had found out that a

---

[43] Surveillance Report, MS-13, 245D-DN-66331, 02/07/08
[44] United States v. Alfaro, Central District of California, Docket No. CR-09-466-R

21

Mr. Pineda, aka Dopey from Leeword, had been an operative for the Government in an extensive MS-13 investigation called Gold Dust. Mr. Dawson noted that Pineda had supplied information to federal investigators about MS-13 activity in a number of cities, Including Denver and San Francisco. Mr. Dawson also indicated that in 2006, the Government began debriefing Nelson Comardari, who Dawson characterized as the "CEO" of MS-13, and that those debriefings had taken place in New York. Mr. Dawson Inquired as to the status of Mr. Lopez' case in Denver. Dawson was clearly aware of some of the discovery in the instant case, because his client, Mr. Sanchez, was mentioned several times in connection with the prosecution of Mr. Lopez.

37.     On September 3, 2010, Ms. Wendy Anderson, the paralegal to Defense Counsel Lisa M. Wayne, circulated an article that had appeared in the magazine *The Nation* in August of 2010. The article was entitled *Feds Have Been Hiding Evidence From Wiretap Courts in Their War on Gangs.* The article stated that defense lawyers for Alex Sanchez had identified the Government informants as "Nelson Comandari, described by law enforcement as 'the CEO of Mara Salvatrucha', and his self-described 'right hand man,' Jorge Pineda, nicknamed "Dopey" because of his drug-dealing background." The article went on to highlight that in January of 2006, Comandari started cooperating with Government authorities. The article set out that Comandari was debriefed extensively by an FBI-led team in January of 2006. He was initially questioned for three days in an interview that produced "26 single spaced pages of notes." Comandari, according to the article, was again debriefed in May of 2006, and again in September of 2006. According to the article, extensive notes generated from those interviews were now "sealed." The article identified Mr. Frank Flores of the LAPD and Ms. Elizabeth Carpenter of the US

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 190 of 600

Attorney's Office Los Angeles, California as being present during several of the debriefings with Comandari.[45]

38.     The article also noted that cooperating witness Pineda/Dopey taped as many as 600 phone calls with the FBI listening, beginning in 2001. The article noted that the wiretap information was so valuable that it was described as "gold dust." The article went on to report that Pineda was on the state payroll until 2006.

39.     The information in the *Nation* article was set out with specificity in the motion filed on behalf of Alex Sanchez in his federal criminal prosecution in the Central District of California.[46] In Document 642 filed July 30, 2010, defense counsel for Mr. Sanchez set out with specificity the claims regarding the cooperation of both Comandari and Pineda. Sanchez' defense counsel cited a variety of sources in support of his claim that the Government was in the process of debriefing the "CEO" of MS-13 at the same time those same officials were seeking wiretap authorization without disclosing Comandari's extensive cooperation.[47] That observation mirrors the situation in the instant case. The Government, in an investigation of national scope, deliberately hid a "parallel investigation" of MS-13 from Judge Kane, while seeking telephone interceptions in Colorado. The Government agents continued the deception by hiding the true scope of the investigation from the Grand Jury that heard the evidence in this case.

40.     In December of 2007, when Investigator Prince filed his wiretap affidavit, the Government was debriefing a highly placed MS-13 director who was in a position to give substantial information as to whether an MS-13 chapter was functioning in Denver.

---

[45] The Undersigned asserts, on information that both Mr. Flores and Ms. Carpenter have cooperated with local FBI agents and Investigator Prince in the investigation, which is the subject of this prosecution.
[46] United States v. Alfaro, Central District of California, Docket No. CR-09-466-R;
[47] *Id.,* document 642, Page 34;

23

Moreover, Comandari appears to have given extensive information about the operations of MS-13 in 2006, when the investigation was initiated against Lopez and MS-13 in Denver. Agent Prince and FBI Agent Boggess never informed the issuing Title III judge that the MS-13 investigation had accessed a highly place MS-13 informant. Thus, the information provided by Comandari and Pineda was hidden from the issuing judge and the Grand Jury.

## LEGAL ARGUMENT

41.     The analysis of discovery in the instant case and information from the Sanchez federal murder case shows that the state and federal agents in this case falsely represented the true nature of the Garcia-Sanchez drug organization. The Government manipulated the facts about Garcia-Sanchez in order to have a legal basis to intercept the calls on the phone of Defendant Lopez. The Government further postured their investigation so that undercover individuals such as CS-4 would never expose the absence of connection between Lopez and Garcia-Sanchez during the predicate investigation. The Government agents who directed the activities of CS-4 went to significant lengths to insure that CS-4 would never document the obvious:  that there was no connection between Lopez and Garcia-Sanchez and that Garcia-Sanchez was not a member of MS-13.

42.     The Government agents then failed to disclose an entire "parallel investigation" of MS-13 by the California arm of the investigation. The Government hid the scope of information that the Government had developed about MS-13 in Denver because of debriefs of Comandari and Pineda. The Government continued this calculated deception

24

in the testimony presented to the Grand Jury. Additionally, the Government deliberately misrepresented the "Golden Corral" phone call made by Lopez, claiming it was proof of the transport of drugs from California to Denver.

43.     There are instances in which "a defendant may claim his or her rights under the Due Process Clause have been violated by prosecutorial misconduct occurring prior to indictment." Such a violation only occurs where the "[m]isconduct by law enforcement officials in collecting incriminating evidence ... is outrageous enough to shock the conscience of the court." *See United States v. Thompson*, 518 F.3d 832,861 (10th Cir. 2008) (citing *Rochin v. California*, 342 U.S. 165, 172-74, 72 S.Ct. 205, 96 L.Ed. 183 1952). The record in this case shows a pattern and practice of deception beginning at the investigative level and continuing through the Title III process and the presentation before the Grand Jury. It was carefully calculated to insure that the extensive investigation in California would never come to light and that the federal court would not be able to ascertain the absence of connection between Garcia-Sanchez and Lopez.

44.     Therefore, Defendant Lopez seeks an order from the Court dismissing the instant case due to a pattern and practice of misconduct by law enforcement, which violated the federal Due Process Clause.


**DATED December 20, 2010**

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 193 of 600

Respectfully Submitted,


*s/Mark Cameron Johnson*

Mark Cameron Johnson, Esq.
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
Telephone: (303) 448-8836
Mark.Johnson68@gmail.com
**ATTORNEY FOR DEFENDANT LOPEZ**

26

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2010 I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all the parties connected to this case *via* email:

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the nonparticipant's name:

Mr. Gerardo Lopez *(Via Hand Delivery)*
Jefferson County Detention Center

*s/Mark C. Johnson*

Mark C. Johnson

27

# APPENDIX 134

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No: 09-cr-00055-PAB

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1. GERARDO LOPEZ,
     aka "Clever," "G-Man,"
2. ENRIQUE ALEJANDRO LACALLO,
     aka "Pee-Wee,"
3. MILTON GARCIA-ESPINOZA,
     aka "Pajaro,"
4. ANTHONY ALDANA,
     aka "Trusty,"
5. DAVID GUERRA,
     aka "Danger,"
6. ELIO YANES,
     aka "Caballito,"
7. FEDERICO AMEZQUITA,
     aka "Perico,"

        Defendants.

---

## MOTION TO DISMISS

---

The Office of the United States Attorney for the District of Colorado, by and through

United States Attorney John F. Walsh and Assistant United States Attorneys M.J. Menendez

and Kasandra Carleton moves this Honorable Court to dismiss the entirety of the Indictment

as to all Defendants. The Government has never occasioned a delay of the proceedings, and

has prevailed at hearing on virtually all substantive motions.  Nevertheless, the Government

asks this Honorable Court for dismissal at this time in the interests of justice.

> Respectfully Submitted,
>
> JOHN F. WALSH
> United States Attorney
>
> By:   *s/M.J. Menendez*
> M.J. MENENDEZ
> Assistant U.S. Attorney
> E-mail: M.J.Menendez@usdoj.gov
>
> By:   *s/Kasandra R. Carleton*
> KASANDRA R. CARLETON
> Assistant U.S. Attorney
> E-mail:  Kasandra.Carleton@usdoj.gov
>
> U.S. Attorney's Office
> 1225 17th St., Suite 700
> Denver, Colorado  80202
> Telephone:  (303) 454-0100
> Fax:  (303) 454-0401
>
> ATTORNEYS FOR THE UNITED STATES

2

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of February, 2011, I electronically filed the foregoing **MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record in the case.

s/Diana Brown
DIANA BROWN, Legal Assistant
U.S. Attorney's Office
1225 17th Street, Suite 700
Denver, Colorado 80202
(303) 454-0100
(303) 454-0409 Fax
Diana.Brown@usdoj.gov

3

# APPENDIX 135

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Criminal Case No. 09-cr-00055-PAB

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    GERARDO LOPEZ,
2.    ENRIQUE ALEJANDRO LACALLO,
3.    MILTON GARCIA-ESPINOZA,
4.    ANTHONY ALDANA,
5.    DAVID GUERRA, and
6.    ELIO YANES,

      Defendants.

---

**ORDER**

---

This matter comes before the Court on the Motion to Dismiss [Docket No. 467] filed by the United States on February 17, 2011.  The United States moves to dismiss the indictment as to all defendants in this case in the interests of justice.  Wherefore, it is

ORDERED that the government's Motion to Dismiss [Docket No. 467] is granted. It is further

ORDERED that, pursuant to Federal Rule of Criminal Procedure 48(a), the indictment is dismissed.  It is further

ORDERED that all pending motions are denied as moot.  It is further

ORDERED that defendants Gerardo Lopez, Enrique Alejandro Lacallo, Milton Garcia-Espinoza, Anthony Aldana, David Guerra, and Elio Yanes shall be released as to this case.


DATED February 18, 2011.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

Case 3:16-cv-00057-MOC   Document 69-5   Filed 02/22/18   Page 202 of 600

# APPENDIX 136

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DOCKET NO. 3:15-cr-121

UNITED STATES OF AMERICA,                    )
                                             )
            vs.                              )
                                             )
WILLIAM GAVIDIA, LUIS ORDONEZ-VEGA,          )
JORGE SOSA, MIGUEL ZELAYA,                   )
                                             )
            Defendant.                       )
_____ )

VOLUME III of VII

TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. CONRAD, JR
UNITED STATES DISTRICT COURT JUDGE
APRIL 6, 2016

LAURA ANDERSEN, RMR
Official Court Reporter
United States District Court
Charlotte, North Carolina

APPEARANCES:
On Behalf of the Government:

      ELIZABETH FREEMAN GREENE, ESQ.,
      WILLIAM MICHAEL MILLER, ESQ.,
      Assistant United States Attorney
      227 West Trade Street, Suite 1700
      Charlotte, North Carolina 28202

On Behalf of the Defendant William Gavidia:

      AARON E. MICHEL, ESQ.,
      3736 Surry Ridge Court
      Charlotte, North Carolina 28210-6921

On Behalf of the Defendant Luis Ordonez-Vega:

      JEREMY BARRETT SMITH, ESQ.,
      Smith Horton Law
      118 Matthews Indian Trail Road
      Indian Trail, North Carolina 28079

      HARVEY ALEXANDER CARPENTER, IV
      Law Offices of HA Carpenter, IV
      100 South Elm Street, Suite 430
      Greensboro, North Carolina 27401

On Behalf of the Defendant Jorge Sosa:

      REGGIE E. McKNIGHT, ESQ.,
      1401 East 7th Street, Suite 100
      Charlotte, North Carolina 28204

On Behalf of the Defendant Miguel Zelaya:

      LISA S. COSTNER, ESQ.,
      407 Summit Street
      Winston Salem, North Carolina 27101

      CHRISTOPHER A. BEECHLER, ESQ.,
      Beechler & Tomberlin, PLLC
      380 Knollwood Street, Suite 305
      Winston-Salem, North Carolina 27103

                LAURA ANDERSEN, RMR
               Official Court Reporter
           United States District Court
             Charlotte, North Carolina

502

I N D E X

APRIL 6, 2016; VOLUME III of VII

GOVERNMENT WITNESSES:                                    PAGE

ALBERT VELA GARCIA
  Direct Examination By Mr. Miller                       507
  Cross-Examination By Mr. Michel                        555
  Cross-Examination By Mr. Smith                         560
  Cross-Examination By Mr. McKnight                      568
  Cross-Examination By Ms. Costner                       575

ANDREW MULLER
  Direct Examination By Mr. Miller                       584

TIMOTHY WHITE
  Direct Examination By Mr. Miller                       589
  Cross-Examination By Mr. Michel                        613
  Cross-Examination By Mr. Smith                         614
  Cross-Examination By Mr. McKnight                      621
  Redirect Examination By Mr. Miller                     623

ERICK ARAGON-HERNANDEZ
  Direct Examination By Ms. Greene                       625
  Cross-Examination By Mr. Smith                         654
  Cross-Examination By Mr. McKnight                      665
  Cross-Examination By Mr. Beechler                      675
  Redirect Examination By Ms. Greene                     689

ADAM JONES
  Direct Examination By Mr. Miller                       690
  Cross-Examination By Mr. McKnight                      705

ANDREW CHERAMIE
  Direct Examination By Ms. Greene                       706

JAZMINE SANCHEZ PENADO RIVERA
  Direct Examination By Mr. Miller                       715
  Cross-Examination By Mr. McKnight                      721

TOMAS MARADIAGA
  Direct Examination By Mr. Miller                       723
  Cross-Examination By Mr. McKnight                      747

TRENA CADENHEAD
  Direct Examination By Ms. Greene                       761

GEORGE MARSHALL BARNETTE, JR
  Direct Examination By Mr. Miller                       766
  Cross-Examination By Mr. McKnight                      770

I N D E X

APRIL 6, 2016; VOLUME III of VII

GOVERNMENT WITNESSES:                              PAGE
JD FURR
   Direct Examination By Ms. Greene               771
   Cross-Examination By Mr. McKnight              777

DANIELLE MARESCA
   Direct Examination By Mr. Miller               778

EDWIN MORALES
   Direct Examination By Ms. Greene               781
   Cross-Examination By Mr. McKnight              787

MARISOL IBARRA
   Direct Examination By Ms. Greene               788

OFFICER FONTAINE
   Direct Examination By Mr. Miller               793

JUNIOR McGREGOR
   Direct Examination By Ms. Greene               800
   Cross-Examination By Mr. Beechler              806

* * * * * *

EXHIBITS

GOVERNMENT EXHIBITS:

| NUMBER | ADMITTED |
|--------|----------|
| 4B | 594 |
| 48 | 544 |
| 48A | 544 |
| 48B | 544 |
| 49 | 528 |
| 50 | 587 |
| 51 | 606 |
| 53 | 646 |
| 54 | 692 |
| 55 | 694 |
| 56 | 701 |
| 57 | 703 |
| 57 | 705 |
| 58 | 598 |
| 58 | 746 |
| 59 | 736 |
| 61 | 769 |
| 62 | 774 |
| 62 | 776 |
| 63 | 783 |
| 64 | 779 |
| 65 | 765 |
| 67 | 798 |
| 68 | 795 |
| 83 | 792 |
| 84 | 613 |
| 87 | 600 |
| 88 | 525 |
| 89 | 799 |
| Defendant Sosa Motion | 505 |

P R O C E E D I N G S

APRIL 6, 2016, COURT CALLED TO ORDER 9:31 a.m.:

THE COURT:  Ready for the jury?

ALL COUNSEL:  Yes, sir.

MR. McKNIGHT:  Actually, I do have -- I apologize -- one housekeeping matter to address before the jury.

THE COURT:  Yes.

MR. McKNIGHT:  Your Honor, at this time, Your Honor, pursuant to the Federal Rule of Criminal Procedure, Your Honor, 26.3, I would move for a mistrial.  The basis of this motion, Your Honor, is based on testimony that was received yesterday, Your Honor, from Maria Rodriguez.  Specifically, Your Honor --

THE COURT:  From who?

MR. McKNIGHT:  Ms. Rodriguez.  Specifically, Your Honor, her testimony, as it came out that "They killed Hugo." That testimony came out in response to further questioning by the government as it relates to this particular individual named Hugo.

To give the Court some context, Your Honor -- and, Your Honor, I'm going to talk a little bit, very briefly, Your Honor, citing from *United States V Ramseur*, 378 Fed. Appx. 260 --

THE COURT:  I'm going to deny your motion at this time.  It seems like this is a lengthy motion.  It's 9:30 and

I advised counsel that if there were trial issues to be taken up before the jury that I be notified so we would come in early.

Mr. McKnight, you're welcome to file -- you're in violation of that order because it's 9:30. And had I been notified at 9:00, I would have come in and addressed this.

You're welcome to put your motion in writing, and I will take it up at some later time in the proceedings without any prejudice to you in terms of consideration. But this is not the time to argue a lengthy motion for mistrial.

I'm going to deny it at this time and move forward with the case, but without prejudice to you to renew it by written motion to be considered at a later time.

MR. McKNIGHT: Okay.

THE COURT: Are we ready for the jury?

ALL COUNSEL: Yes, Your Honor.

THE COURT: Very well. Call the jury.

(The jury was returned to the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: The Government ready to call its next witness?

MR. MILLER: Yes, Your Honor. The Government calls Mr. Albert Vela Garcia.

ALBERT VELA GARCIA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Could you please start by stating your name and spelling your last name for us?

A.   My name is Albert Vela.  V as Victor E-L-A.

Q.   And, Mr. Vela, I'm just going to ask that you do your best to keep your voice up because it's kind of hard to hear with the acoustics.  There's also a microphone there in front of you that you should be able to speak to on your right.

A.   Gotcha.

Q.   Mr. Vela, how old are you?

A.   I am 26 years old.

Q.   And where are you currently living?

A.   Jail Central.

Q.   And prior to your arrest, what city did you live in?

A.   I lived in Landis, North Carolina.

Q.   Mr. Vela, how far did you go in school?

A.   I completed the 9th grade.  I was in the 10th grade.

Q.   And did you work before you got arrested?

A.   Yes, sir.

Q.   Where did you work?

A.   I worked at Southern States Feed Mill.

Q.   What did you do for Southern States?

A.   I was a maintenance man.

Q.   Now, Mr. Vela, did you plead guilty as part of this case?

A.    Yes, sir.

Q.    And what did you plead guilty to?

A.    To RICO and attempted murder.

Q.    RICO and attempted murder.

A.    Yes, sir.

Q.    And as part of that plea -- did you enter into a plea agreement with the government?

A.    Yes, sir.

Q.    And did that plea agreement require you to be here to testify today?

A.    Yes, sir.

Q.    I'm going to show you -- up on that screen right there -- what's been previously marked, I believe, as Government's Exhibit 47.  And we'll page through that, then I'm going to ask you if you recognize that document.

MR. MICHEL:  I'm going to object to the introduction of that plea agreement.

THE COURT:  It hasn't been introduced yet.  He's showing it to the witness.

MR. MILLER:  We don't plan on introducing it, Your Honor.

THE COURT:  All right.

Q.    Do you recognize that document there, that's Exhibit 47?

A.    Yes, sir.

Q.    And is this your plea agreement?

A.   Yes, sir.

Q.   Did you review this plea agreement with your attorney?

A.   Yes, sir.

Q.   And is that your signature on the last page of the plea agreement?

A.   Yes, sir.

Q.   Is the plea agreement also signed by Ms. Greene for the government and by your attorney?

A.   Yes, sir.

Q.   Now, Mr. Vela, what is your understanding of what that plea agreement requires of you?

A.   If called upon, I can -- I would be a -- I would have to testify, but that's it.

Q.   And what's your understanding of what the government has agreed to do under that plea agreement?

A.   Absolutely nothing.  They're not obligated to do anything.

Q.   Has the government agreed to dismiss a charge for you, however?

A.   No.

Q.   Has the government made you any guarantee or promise as part of this case?

A.   No, sir.

Q.   What do you hope to get from your testimony today?

A.   Absolutely nothing.  I already plead guilty.

Q.   Have you been sentenced in this case?

A.   No, sir.  I'm waiting for sentencing.

Q.   And what's your understanding of who actually sentences you in this case?

A.   The judge.

Q.   Are you hoping that the government might make a motion on your behalf?

A.   That would be nice, but --

Q.   Has the government made you any promises in that regard?

A.   No, sir.  No.  None whatsoever.

Q.   Mr. Vela, I would like to start talking with you a little about your history with MS-13.  Are you a member of MS-13?

A.   Yes, sir.

Q.   And when did you start hanging around MS-13?

A.   When I was 13 and 14 years old.

Q.   Again, I'll just ask you that you make sure you keep your voice up for us, okay?

A.   Yes, sir.

Q.   Who got you involved with the gang?

A.   My brother.

Q.   Was your brother an MS-13 gang member?

A.   Yes, sir.

Q.   And what are the usual steps that someone would take to become a member of MS-13?

A.   Acts of violence.

Q.   And is there a name or a phrase or a Spanish word for that period?

A.   Yes, sir.  Chequeo.

Q.   Chequeo?

A.   Yes, sir.

Q.   And how would you spell chequeo?

A.   It's c-h-e-k-o.

Q.   Now, when you're in this chequeo period or if you are a chequeo, what happens?  What's expected of you?

A.   You are to start the trouble.  You would fight.  You would -- you will be the first one always to fight, to do the violence.  You're always first.

Q.   And what's the purpose of this trial period or chequeo?

A.   To prove yourself.

Q.   Now, Mr. Vela, were you ever jumped into the gang?

A.   No, sir.

Q.   Why not?

A.   I was, I guess, grandfathered in, I guess, you could say.

Q.   And why were you grandfathered in?

A.   I assumed.  They never said nothing.

Q.   Now, Mr. Vela, were you in a clique?

A.   Yes, sir.

Q.   Which clique were you a member of?

A.   I was in Coronados Little Cycos clique.

Q.   Coronados Little Cycos.

A.    Yes, sir.

Q.    Now, what are the initials for Coronados Little Cycos?

A.    CLS -- CLCS.

Q.    Mr. Vela, do you have any tattoos reflecting MS-13 or your clique?

A.    I have, my stomach, Little Cyco on my stomach.

Q.    Little Cyco on your stomach?

A.    Yes, sir.

Q.    And is that a reference to your clique, Coronados Little Cycos?

A.    Yes, sir.

Q.    Now what are the rules about MS-13 tattoos?

A.    You have to earn it.  You earn every tattoo you get.

Q.    Mr. Vela, were you ever the leader of the Coronados Little Cycos clique?

A.    Yes, sir.

Q.    What is the gang term for a leader of a clique?

A.    He has "the word."

Q.    "The word"?

A.    Yes, sir.

Q.    And when did you have the word for Coronados?

A.    About 2009 to 2010, around there.

Q.    Now when someone has the word for a clique, like, what are his responsibilities?

A.    To organize.  We have to organize all of our people that

were inside of our clique, and we get money for them. We have the amount if they're -- they need food, they need a place to stay, we organize all of that. They need a ride somewhere, we step in.

Q. Now I'm going to ask you some specific questions about people you may know. Do you know an individual who went by the name of Duro?

A. Yes, sir.

Q. And do you know Duro's real name?

A. Yeah.

Q. What is it?

A. It's William Gavidia.

Q. How do you know Duro?

A. I've known him since he was about 15, 16 years old. I jumped him in.

Q. Do you see the individual that you know as Duro in the courtroom today?

A. Yes, sir. He's right there.

Q. Could you point to him?

A. (Indicating.)

Q. And describe an item of clothing he's wearing.

A. He's wearing a black tie.

Q. And which seat is he, relative to the aisle here?

A. Second.

MR. MILLER: Your Honor, will the record reflect

he's identified the defendant William Gavidia?

THE COURT:  It will.

MR. MILLER:  Thank you, Your Honor.

Q.  Who introduced you to Duro?

A.  His cousin.

Q.  And who is his cousin?

A.  His cousin is Kilo.

Q.  Is Kilo an MS-13 gang member?

A.  Yes, sir.

Q.  What clique is Kilo in?

A.  He's from the Centrals clique, Centrales.

Q.  Now, when Kilo introduced you to his cousin Duro, did Duro start hanging around with the gang in that time period?

A.  Yes.

Q.  And was he in that trial period or chequeo that you mentioned earlier?

A.  Yes, sir.

Q.  Do you know if Duro has a Facebook account?

A.  Yes, sir he does.

Q.  Were you friends with him on Facebook?

A.  Yes, sir.

Q.  Do you recall what his Facebook name was?

A.  It was El Salvador or San Salvador.

Q.  Now during Duro's trial period or chequeo, what kind of things did he do?

A.   Well, he would start the fight.  We would tell him to hit a rival gang member; always at the club mostly.

Q.   And these fights at the clubs that Duro was a part of, where were those clubs these things would take place?

A.   Charlotte.

Q.   And what were some of the names of the clubs where you guys hung out?

A.   Rodeo, Calipso, Zima, Cabana, mostly there -- Latoris, too, we hung out.  That's pretty much it.

Q.   Now, did Duro live in that Landis area where you lived?

A.   Yes, sir.

Q.   And you said you hung out in the clubs in Charlotte. Would you guys come down together to Charlotte?

A.   Yes, sir.

Q.   And when you came to hang out in Charlotte in these clubs, did you ever see other MS-13 gang members from other cliques?

A.   Yes, sir.

Q.   And how would you greet them if you saw them?

A.   We have hand signals.  We have a M and a S that we throw.

Q.   And can you just demonstrate how it is you would greet a gang member if you saw them in the club?

A.   We throw the M, and then we throw the S (indicating).

Q.   Just starting with the M, just so I can be clear for the record, is that your pointer finger and pinky angled out and

then your two fingers pushed against your thumb?

A.   Yes, sir.

Q.   And then what's the next part of it?

A.   The S (indicating).

Q.   Then the S is two fingers kind of bent in the shape of an S with your thumb forming the bottom of it.

A.   Yes, sir.

Q.   Thank you.  Now after this chequeo or trial period, was Duro ever jumped into MS-13?  I believe you mentioned a moment ago you jumped him in.

A.   Yes, sir.

Q.   Now when did that jump in take place, approximately?

A.   Maybe 2009, around there; approximately 2009.

Q.   Do you remember where Duro was jumped in?

A.   Yes, sir.

Q.   Where was that?

A.   That was in back of old club named Starlight off of South Boulevard.

Q.   And in addition to yourself, who do you remember being there when Duro was jumped in?

A.   It was Echo, his cousin, me, and I think Pelon was there, Little Pelon.

Q.   And when you say Duro's cousin, is that Kilo?

A.   Yes, sir.

        MR. McKNIGHT:  And I'm sorry, Your Honor.  Could the

witness speak up a little bit.  I could barely hear.

THE WITNESS:  I'm sorry.

THE COURT:  Just try to lean forward.  Speak into the microphone a little louder.

THE WITNESS:  I'm sorry.

Q.   Do you know if Duro has any gang tattoos?

A.   Yes, sir.

Q.   How do you know?

A.   I was present whenever he got his gang tattoo.

Q.   I'm going to show you a picture that's previously been admitted into evidence.  This is Government's Exhibit 16.

Do you recognize that picture there in Government's Exhibit 16?

A.   Yes, sir.

Q.   And what is that a picture of?

A.   That's the 13.

Q.   Is this a tattoo that you saw Duro obtain?

A.   Yes, sir.

Q.   And what does it stand for?

A.   All right.  It's a 13 of MS-13, sir.

Q.   Thank you.  Now you mentioned a moment ago fighting with rivals in clubs.  Could you just explain to the jury what happens when you guys would see rivals in the club?

A.   We would notice how they were dressed, and then we would represent our gangs.  We would throw up our M and S in the sky

to represent.

Q. So you mentioned a moment ago that you do the M and the S when you greet gang members.

A. Um-hmm.

Q. Does it look different when you throw it up to rivals?

A. Yes, sir.

Q. And what does it look like?

A. It's a lot bigger. It's like that (indicating). M and S.

Q. And there, just for the record, you're putting both hands together with your pointer finger sticking out. And then the S is formed by both hands in sort of a copper, C shape.

A. Yes, sir.

Q. And what is that intended to indicate?

A. It means this is ours. We're here.

Q. This is ours. We are here.

A. Yeah.

Q. Do you remember any particular examples of times when Duro fought with rivals or someone else in and around the clubs?

A. We've got in a lot of fights over the weekends. And I think one of them was -- the biggest one that I remember is whenever we were at Don Carlos. Don Pedro, the real name to the bar. We we were chilling outside and there was a false claimer.

Q.   Mr. Vela, can you just try to speak as loudly as possible.

A.   I'm sorry.  There was a false claimer inside.  He was brought outside, and we were out there in the parking lot. And then a lot of MS gang members had come around him and then they were going to beat him up for lying that he was saying that he was part of the gang.

     And me, Duro and Pelon were at the car.  And he, Pelon, had a wooden baton.  And, well, Duro grabbed it and he took it with him in front of the Don Carlos and struck the guy in the head and bloodied him up and chased him down the road to the nearest gas station.

Q.   And I believe you mentioned this guy, who was the victim of the strike with the baton, was "false claiming."  Is that the term you used?

A.   Yes, sir.

Q.   What is "false claiming"?

A.   "False claiming" is whenever you represent MS-13 and not have permission.

Q.   And why does false claiming get you hit in the head with a baton.

A.   Because you earned it.  You earn your jump in.  You earned the MS.

Q.   When you were running around with Duro, did the clique have any ways of making money?

A.    Yes, sir.

Q.    And how does the MS-13 clique make money?

A.    We steal and we sell drugs.  Or we collect -- charge rent.

Q.    I would like to take those one by one, stealing, drugs and rent.  Was Duro involved in any stealing or robberies?

A.    Yes, sir.

Q.    And can you give us an example or does any particular robbery stand out in your mind?

A.    There was one time that we were outside and we noticed a certain individual.  He had a lot of money on him.  Possibly, like, rent money or something like that he was saying.  And well, we had seen it.  And then he asked me if he wanted -- if he should take it from him.  And I was, like, yeah, sure. Let's get it.  And then -- well, he chased him down with Little Pelon and we got $400 that night.

Q.    And when you say "he chased him down with Little Pelon." Are you referring to Duro?

A.    Yes, sir.

Q.    And so Duro was the one in your story there who took the money?

A.    Yeah.

Q.    What about drug dealing?

A.    Drug dealing.  We -- we sold for maybe a period of three to six months, we sell cocaine.  I had a -- got a connect in

Concord and I had started pushing it in China Grove and then we started going to Charlotte and selling individual 20 bags of cocaine in the clubs, mostly Rodeo.

Q. And when you say 20 bags of cocaine, what are you referring to?

A. Individually packed size of $20 worth.

Q. $20 worth of cocaine?

A. Yes, sir.

Q. Was Duro involved in that drug dealing?

A. Yes, sir.

Q. Where was Duro involved in the drug dealing?

A. He's usually distributing it for me.

Q. Is that in the clubs or in China Grove?

A. Both.

Q. And I think you mentioned a moment ago that one of the other ways that MS-13 makes money is by charging rent.

A. Yes, sir.

Q. How does that work?

A. We would go to bars or clubs, both, and then if there was a certain drug dealer in the bathroom selling cocaine or drugs, we would tell him that he had to pay rent for him to sell drugs in here, because this was our club.

Q. And where did you charge rent?

A. We established rent at Don Carlos, Don Pedro.

Q. Was Duro involved in that?

DIRECT - GARCIA
A.   Yes, sir.

Q.   Explain how Duro was involved in that?

A.   Me and him, we confronted a man that was selling cocaine in the bathroom and told him that he cannot sell here unless he pay rent.  And he agreed to pay at least $100 to $140 a night.

Q.   Why did he agree to that?

A.   Because you have to.  If not, we would beat him up.

Q.   If he didn't agree you would beat him up?

A.   Yes, sir.

Q.   Now the money that you get from the robberies and the drug dealing and the charging rent, what did the clique use that money for?

A.   Usually just to help each other out.

Q.   And did all that money sort of come collectively to the clique?

A.   Yes.

Q.   And in addition to helping -- helping each other out with that clique money, did you ever use it to buy other things?

A.   Yeah.  We would usually help each other food-wise, money -- like, clothing-wise.  And then if we -- we had enough money, we try to find some guns.

Q.   Now does Duro have a brother?

A.   Yes, sir.

Q.   And what is Duro's brother's name?

A.    Saul Gavidia.

Q.    Did Duro's brother ever join MS-13?

A.    Yes, sir.

Q.    And what is Duro's brother's gang name?

A.    Scrappy.

Q.    Who recruited Scrappy to join MS-13?

A.    I did.

Q.    And is Scrappy older or younger than Duro?

A.    He is two years, I think, apart, younger than him.

Q.    Two years younger.

A.    Yeah.

Q.    Did Duro also help recruit Scrappy into the gang?

A.    Yes, sir.

Q.    Was Duro's little brother Scrappy ever jumped into the gang?

A.    Yes, sir.

Q.    Do you remember approximately when that took place?

A.    Possibly, maybe two years afterwards.

Q.    Two years after what?

A.    After he got in.

Q.    After Duro was jumped in.

A.    Yes, sir.

Q.    And do you remember where Scrappy was jumped into MS-13?

A.    Yes, sir.  He was jumped in, in the tennis courts of Waterfall Lakes Apartments.

Q. And who was there, if you remember?

A. It was me, Echo, Duro, Pelon.

Q. Now I'm going to show you another picture on your screen there. This is going to be two pictures marked as Government's Exhibit 88.

I'll scroll through those for you. Do you recognize those pictures?

A. Yes, sir.

Q. What are those pictures? Starting with the first one here.

A. That is us from coming back from a club at McDonald's.

Q. And are you in that picture?

A. Yes, sir.

Q. And moving to the second. What is the second page a picture of?

A. Okay. It is us at Duro's house drinking.

Q. And are you also present here?

A. Yes, sir.

Q. Do those pictures, one and two of Government's Exhibit 88, fairly and accurately depict both of those scenes?

A. Yes.

MR. MILLER: All right. Your Honor, at this time the government asks that Exhibit 88 be received and ask for permission to publish.

THE COURT: Any objection?

MR. MICHEL: No objection.

THE COURT: Let them be admitted, published.

(Government's Exhibit No. 88 was received into evidence and published.)

Q. Beginning with this first page here, if you would sort of start on the left side of the screen there, Mr. Vela, and identify who it is in this picture; moving left to right.

A. The left one is Scrappy. I am right beside of him. Duro is under -- on his knees, and that is Gordo and Chava.

Q. Now we haven't talked about Gordo. Is he an MS-13 gang member?

A. No, sir.

Q. Does he have any gang affiliation that you know of?

A. Yes, sir. He's part of 42nd Street.

Q. Now, is it typical -- is 42nd Street a rival of MS-13?

A. Yes, sir.

Q. Would it be typical for a rival to be hanging out with other MS-13 gang members?

A. No, sir.

Q. Did you ever confront Gordo or ask him about that?

A. Yes, sir. I confronted him and asked him if he had any loyalties to his gang still. He told me, No. And that he wanted to be with us, as in MS.

Q. And the other individual I don't believe you've spoken about yet, the individual on the far right. Who did you say

that was?

A.    Chava.

Q.    Is Chava a member of MS-13?

A.    Yes, sir.

Q.    And you guys are doing things with your hand there.  Are those the MS-13 gang hand signs?

A.    Yes, sir.  We all are.

Q.    What about Gordo?

A.    He's throwing up his hood, 42nd.

MR. MILLER:  All right.  We'll move to the second picture, please, Ms. Neill.

Q.    And are these the same -- several of the same individuals we spoke about before?

A.    Yes, sir.

Q.    If you could just, again, working left to right, just tell us who we see here.

A.    Left is Duro.  Next to him is me.  Next to him is Chava. And last on the right is Scrappy.

MR. MILLER:  I would like to go back to the first picture, if I could, Ms. Neill.

Q.    Is there anything about the way you're dressed or the colors that is indicative of MS-13?

A.    Yes, sir.  We wear blue, black and white, that's it.

Q.    Does MS-13 have meetings?

A.    Yes, sir.

Q.   Have you ever attended gang meetings where Duro was there?

A.   Yeah.

Q.   I would like to ask you about a couple of meetings if I could.  Did you attend a meeting in 2011 to discuss organizing or reorganizing a clique in Charlotte?

A.   Yes, sir.

Q.   Where did that meeting take place?

A.   It took place at Guanaco's house.

Q.   What was the purpose of that meeting at Guanaco's house?

A.   He had approached me and asked me to come on down to start reorganizing his clique, Charlotte Locotes.

Q.   So the purpose of the meeting was reorganizing the Charlottes clique?

A.   Yes, sir.

Q.   I'll show you there what's been marked as Government's Exhibit 49 on the screen.  Do you recognize that individual?

A.   Yes, sir.

Q.   Who is that?

A.   That's Guanaco.

Q.   Is that a fair and accurate depiction of the person you know as Guanaco?

A.   Yes, sir.

        MR. MILLER:  Your Honor, the government offers Exhibit 49 and would ask it be published.

THE COURT: Any objection?

MR. MICHEL: No objection.

THE COURT: Let it be published.

(Government's Exhibit No. 49 was received into evidence and published.)

Q. Is Guanaco also a MS-13 gang member?

A. Yes, sir.

Q. And do you recall if Guanaco was breaking or in violation of any rulings of this meeting?

A. Yes, sir. He was drinking.

Q. What is -- why is drinking against the rule?

A. You have to be in your five senses. You can't be intoxicated or under any influence of any drug.

Q. You said you have to be with your five senses?

A. Yes, sir.

Q. Is there a Spanish translation for that?

A. (Witness speaking in Spanish.)

Q. Could you try to spell that?

A. Not good with Spanish, sir.

Q. Okay. How did it make you feel that Guanaco was drunk at this meeting that he called?

A. I was offended. I was, like, if he spit on me.

Q. I would like to move on to another meeting. Did you and Duro ever attend a meeting with gang members from Virginia?

A. Yes, sir.

Q.   And who called that meeting?

A.   Scrappy from Virginia, Coronados Little Cycos.

Q.   So is this the same Scrappy who is Duro's brother?

A.   No, sir.

Q.   So who is this Scrappy?

A.   He was the leader of East Coast Programs.

Q.   And did this Scrappy from Virginia ever call you?

A.   Yes, sir.

Q.   And why did he call you?

A.   He called me to ask me who had "word" of my clique in Charlotte, and to organize -- to make phone calls to him so we could stay in contact.

Q.   Now when Scrappy from Virginia called you to see if you were the -- see if you were the "word," were you actually the "word" of Coronados at that time?

A.   No, sir.

Q.   Who had the "word" then?

A.   It was Echo.

Q.   Where did that meeting with Scrappy from Virginia take place?

A.   It took place in apartments off of Farm Pond.

Q.   Off of what?  I'm sorry, I missed --

A.   Farm Pond.

Q.   Farm Pond?

A.   Yes, sir.

Q.   And who else was there at that meeting?

A.   It was I, Scrappy, Duro, Chava, Little Pelon, Trigger was there, Terror was there, Temper was there, Scrappy of course, and Gatta was there.  And another TLS member I'm not acquainted with.

Q.   Now is TLS another clique of MS-13?

A.   Yes, sir.  Trece Locos.

Q.   And you mentioned Trigger.  Is he an MS-13 gang member?

A.   Yes, sir.

Q.   Do you know his real name?

A.   Oscar.

Q.   Oscar.

A.   Yes, sir.

Q.   And what clique is Oscar or Trigger in?

A.   He's in Hollywood now.

Q.   Were any of the other members at this meeting from the Hollywood clique?

A.   Yes, sir.  Terror.

Q.   Do you know Terror's real name?

A.   Yes, sir.  His name is Erick Aragon.

Q.   What clique is Gatta affiliated with?

A.   She is a Hollywood.

Q.   Is it common to have female MS-13 gang members?

A.   Only the old cliques have female members.

Q.   And, if you know, why were there members from Hollywood

present at this meeting?

A.   It was a general meeting.  We were organizing it, pretty much, for us.

Q.   Now, you said, "general meeting."  Are there different kinds of MS-13 meetings?

A.   Yes, sir.  There's clique meetings and there's general meetings.  Generals is all the cliques in the region that we're in, would be Charlotte, and all of them would assemble.

Q.   Did anyone have a gun at this meeting?

A.   Yes, sir.

Q.   Who had guns?

A.   We did.  Chava had ours, and I'm pretty sure Terror had one too.

Q.   Now, when you say Chava had "ours."  Who are you referring to as "ours"?

A.   Ours is the Coronados Little Cycos clique.

Q.   And was it common for Chava to have the gun for Coronados Little Cycos?

A.   Yes, sir.

Q.   Did things ever get heated during that meeting?

A.   Yes, sir.  At that particular meeting things got really escalated that was about to turn bad.

Q.   Wait a minute.  Explain how that happened.

A.   The individual named Scrappy who came from Virginia to try to organize us and tried to say that we weren't answering

his phone calls, that we had to be more better gang members, more organized.

And, well, I didn't like how he came down here trying to insult us to say that we weren't nothing, that we were just kids, you know.

And, well, things got heated where I took off my shirt and -- to fight this man, and he did not want to. He was on the phone with another -- another one of his clique -- the right hand of his clique. And we pretty much stopped things when the gang unit had arrived.

Q. Was the gang unit you're referring to -- you thought the police had showed up?

A. Yes, sir.

Q. Are you familiar with the term "East Coast Program"?

A. Yes, sir.

Q. What is that?

A. The East Coast Program is a program that the cliques go by. And we organize and we contact, maybe like, three to four times a week.

Q. And these meetings with, like, leaders from different states, is that within the umbrella of the East Coast Program?

A. Yes, sir.

Q. And what is the purpose of having sort of an East Coast Program within MS-13?

A. Structure.

Q.   All right.  I want to go back to the clubs and ask you a couple -- about a couple of specific instances.

Do you remember a night when you ran into some rivals and ultimately wound up at Gold Palacios?

A.   Yes, sir.

Q.   And where did things start off that night?

A.   We had went to Disco Rodeo.

Q.   Is Disco Rodeo another club where MS-13 gang members like to hang out?

A.   Yes, sir.

Q.   Who was out with you that night when you went to Disco Rodeo?

A.   All the members of my clique would be Scrappy, Chava, Duro, myself, Pelon, and Kilo was along too with one of his clique name Jueto (phonetic spelling).

Q.   When you were at Disco Rodeo, did you see any other members of MS-13?

A.   Yes, sir.  We seen some TLS.

Q.   And TLS, like you mentioned earlier, is another clique of MS-13.

A.   Yes, sir.

Q.   All right.  What happened at Disco Rodeo.

A.   We had confronted from South Siders, another rival gang, Sur trece.  And we had gotten into a fight with them and ultimately got beat up really bad.

Q. How many South Siders or Sur13 gang members were there?

A. There were 20 plus.

Q. And how did this fight between the MS-13 guys and the South Siders get started?

A. It always starts with us stacking. We stacked at them, and we told them that we're MS. And then they stacked back their Sureno clique. And we ultimately started off. It was Duro and Scrappy started out.

Q. So Duro and Scrappy were the ones who started the stacking?

A. Yes, sir. The fight.

Q. What is stacking?

A. Stacking is representing your gang. Your hand signals, sir.

Q. All right. What happened next?

A. We had lost the fight. We left Rodeo. We ultimately got kicked out by security. We organized in the parking lot, said that we had to get these guys. Kilo had brought the gun this time, and we went looking for them. We hit Cabana, we hit Zima, and finally, ultimately, we ended up at Golden Palacios, and we sent two guys in to see if the rival gang members were inside the club.

Q. All right. Let me stop you there. Had Kilo gotten kind of the worst of it in this fight?

A. Yes, sir.

Q.   And if I understand you correctly, you just went, sort of, from club to club looking for these guys; is that fair?

A.   Yes, sir.

Q.   And you ultimately ended up at Golden Palacios; is that right?

A.   Yes, sir.

Q.   What happened when you got to Golden Palacios?

A.   We sent two guys in to see if we saw any of them.

Q.   Do you remember who you sent in?

A.   It was -- I'm pretty sure it was Duro and Jueto.

Q.   I'm sorry.  I missed the second name.

A.   Duro and Jueto.

Q.   Who is that second person?

A.   He is Centrals clique.

Q.   Okay.  And what happened after those two went into Golden Palacios?

A.   They had seen the other people from the other Surenos, other side, and they had came back out and they said that they were in there.  So we organized and said that we were going to go in there, beat them up, and then whenever they were coming out, that we were going to shoot them.

Q.   And who was part of this plan to sort of organize to beat up the Surenos and then shoot at them?

A.   All of us were.

Q.   And specifically who?

A.   It was me, Duro, Chava and Kilo.

Q.   Now, were you guys in the parking lot at this point?

A.   Yes, sir.

Q.   And what car or vehicle were you in?

A.   I was with Little Pelon.

Q.   And where was Duro?

A.   He was with his cousin Kilo.

Q.   And what type of vehicle was Duro and Kilo in?

A.   Astro Van.

Q.   And what happened next?

A.   They had came out and we were about to send some individuals in to fight, but the rival gang members had recognized them and came out behind them -- maybe five seconds behind them.  And we were parked directly beside them.

So I told -- we got in the car quick and I told Pelon -- he was driving -- to reverse, to turn around, that way I could shoot them.  So we turned around.  We backed up and tried to turn around and we got -- they started shooting at us right off the bat.

Q.   Now you said a minute ago that Kilo had a gun, but did you also have a gun?

A.   Yes, sir.

Q.   And when the Surenos started firing on you, because -- I guess, they kind of got the jump on up at this point?

A.   Yes, sir.

Q.   And what did you guys do in response?

A.   We had gotten shot in the back of our -- the windshield in the back.  Then we would turn around.  We tried to turn around, me and Pelon, but Kilo had started shooting back that way they would stop shooting.  And they were shooting back and forth.

Q.   Was Pelon driving the vehicle you were in?

A.   Yes, sir.

Q.   And Kilo, you said, was in an Astro van.  So when he started shooting back, was that from the Astro van?

A.   Yes, sir.

Q.   And was Duro there with him?

A.   Yes, sir.

Q.   So what happened next?

A.   They were shooting back and forth, and then we had turned around.  As soon as they turned around, I had shot back at the guys, but they were already gone.  They were going down the street, down North Tryon.

Q.   And was anybody in your group with the MS-13 members hit by any of those shots?

A.   No, sir.  It had pierced the windshield and went straight into the driver's seat and stopped.

Q.   Did you have any conversations with Duro after that shooting at Golden Palacios?

A.   Yes, sir.

Q.   What if anything did Duro say about the shooting?

A.   That Kilo had shot, and that Kilo had thrown him the gun to refill it.

Q.   Did Duro say that he in fact refilled the gun?

A.   Yes, sir.

Q.   Did he ever fire the gun, to your knowledge?

A.   No, sir.

Q.   Now, a few weeks after that shooting at Golden Palacios, did you answer questions from police about the incident?

A.   Yes, sir.

Q.   And did you tell them the whole story of what happened?

A.   No, sir.

Q.   Why not?

A.   Because we can't.  I can't tell.

Q.   You can't tell.  Why do you say you can't tell?

A.   Because I would end up ultimately in punishment or, if not, worse.

Q.   Is it a violation of gang rules to talk to the police?

A.   Yes, sir.

Q.   Are you violating the gang rules right now?

A.   Yes, sir.

Q.   All right.  I want to talk to you about another incident at Mi Cabana on August 11, 2013.  Do you remember that night?

A.   Yes, sir.

Q.   And is that incident on August 11, 2013, is that the

basis for your attempted murder charge?

A.   Yes, sir.

Q.   Who were you with that night when you went to Mi Cabana?

A.   Another big group of us.  But the ones that were in my car was -- well, not my car, Pelon's car, he was driving.  It was Pelon, me, Chava and a female that one of the -- one of the two knew.

Q.   So you Pelon, Chava and a female were in Pelon's car; is that right?

A.   Yes, sir.

Q.   And what type of car did Pelon have?

A.   He had a Acura Integra, I think, it was a '94.

Q.   What color was it at that point?

A.   It was red.

Q.   And were you with individuals in another car?

A.   Yes, sir.

Q.   Who were they?

A.   The others was Crystal, her sister Lexis, I think her name is, Duro, Scrappy, Gordo, Josie and her allegedly cousin -- but not really cousin -- friend.

Q.   Okay.  And you mentioned Gordo.  Is that the same Gordo that we saw in the picture earlier?

A.   Yes, sir.

Q.   And how is he related to anyone in this group?

A.   He is the husband of Crystal.

Q.   And what vehicle was that group in?

A.   They were in a Ford Expedition.

Q.   Whose Ford Expedition?

A.   Crystal's.

Q.   All right.  So where did you guys go?

A.   We went to Rodeo at start, and we had gotten in a fight there, and we ended up coming to Mi Cabana.

Q.   And did anyone in the group have a gun that night?

A.   Yes, sir.  We did.

Q.   And when you say "we did," who brought the gun that night?

A.   Chava.

Q.   Where was the gun initially?

A.   We were all bunched up in the Ford Expedition at the start of the night.  But Pelon had came and we separated.  It was starting off in the Ford Expedition.

Q.   And did this night start, sort of, up in that Landis area?

A.   Yes, sir.

Q.   And did everyone drive down, sort of, together?

A.   Yeah.

Q.   And initially you said the gun was in the Ford Expedition, right?

A.   Yes, sir.

Q.   All right.  What happened when you got to Mi Cabana?

A.   We had gotten there, maybe about 1:50, 1:30 something like that.  And the owner had refused to let us in so we stayed outside talking to the security guards for a while.

Well, Duro had gone inside to use the bathroom and he got in a fight.  But we didn't know nothing about it.  We were all outside.

Q.   Did anyone else from your group go inside?

A.   I think his brother did, Scrappy did.

Q.   What about any of the females?

A.   I think they all went inside, tell you the truth.

Q.   And what is your understanding of what this fight was about?  Or how it got started.

A.   I had not known the true reason behind the fight until afterwards.  It was over rent money -- rent money or money that was owed to Josie, one of the females that was with us.

Q.   And who owed Josie money?

A.   A security guard at Mi Cabana.

Q.   And did Duro have any kind of relationship with Josie or --

A.   Good friend.

Q.   And where were you when this fight started?

A.   I was at the -- already at my car smoking a cigarette.

Q.   So you were still outside.

A.   Yes, sir.

Q.   And what happened once the fight started?

A.   Crystal had ran outside and said Duro was getting jumped.

Q.   What did you do?

A.   Came running.

Q.   And why did you come running when you heard Duro got jumped?

A.   Because we always defend ours.  We defend our clique.  We defend our gang.

Q.   Is "defending ours, defending our clique," part of the rules of MS-13?

A.   Yes, sir.

Q.   And what did you find when you went into the club?

A.   Duro was restrained by the security guards, seemed like he had gotten hit a couple times.  His face was red.

Q.   Was there a big fight?

A.   Yes, sir.

Q.   And did you -- did you join in the fight?

A.   Yes, sir.  I had came off the side.  When the security guard was holding the guy that had fought Duro, I hit him in the face.

Q.   And what ultimately happened inside the club there?  Were you able to get Duro out?

A.   We got him out eventually, but he ran back in.  But we got him out and bad things happened outside.

Q.   All right.  So you got Duro out.  But Duro wasn't finished, he ran back in; is that correct?

A.    Yes, sir.

Q.    And when you finally got Duro out that second time, what happened next?

A.    We all ran outside and we started screaming, "Get the cuete.  Get the cuete.  'Cause they were coming behind us.

Q.    Now, who was saying "Get the --" cuete, is that the word you're using?

A.    Cuete is a term for firecracker, but it is used as slang as gun.

Q.    And who was saying that?

A.    I was, Duro was, Chava.

Q.    And did Duro make any effort to get the cuete or the gun?

A.    Yes, sir.

Q.    What did he do?

A.    He went to the Expedition looking for it.

Q.    Now, at that point was the gun still in the Expedition?

A.    No, sir.  Chava had brought it to Pelon's car with him.

Q.    Did Duro know that Chava had moved the gun from the Expedition to the other car?

A.    No, sir.

Q.    All right.  So after you go out and you're shouting sort of this Spanish phrase for "Get the gun," what happened next?

A.    We all piled in the cars and the guy -- there's a certain individual came running out trying to still fight and --

Q.    Were you driving out of the parking lot at this time?

A.    Yes, sir.  We were driving out.

Q.    Which car was in front and which car was second?

A.    The Ford Expedition was in front.

Q.    And who was in the Ford Expedition at that point?

A.    Crystal, her sister, Josie, her friend/cousin allegedly, Duro, Scrappy, Gordo.

Q.    And was -- were you in Pelon's car at that point?

A.    Yes, sir.

Q.    And were you behind the Expedition?

A.    Yes, sir.

Q.    All right.  So what happened next?

A.    We drove by and I shot -- I shot that man.

Q.    You shot that man.  Who did you shoot?

A.    I shot -- I don't even know his name, sir.

Q.    And why did you shoot him?

A.    Because he was a -- he was throwing a beer bottle at the car that Duro was in, and Scrappy was in.

        MR. MILLER:  At this time, Your Honor, I would like to ask that Government's Exhibit 48, 48A and 48B be received.

        This is covered by one of the stipulations of the parties, that this video surveillance of Mi Cabana is both authentic and admissible.

        MR. MICHEL:  No objection.

        THE COURT:  Let them be admitted.

        (Government's Exhibits No. 48, 48A & 48B were

received into evidence and published.)

Q.   Do you recognize what's depicted here in 48A?

A.   That is Mi Cabana Club.

Q.   Is that the inside of Mi Cabana club?

A.   Yes, sir.

Q.   This is a place where you hung out with MS-13 before?

A.   Yes, sir.

Q.   Do you recognize any of the individuals here?

A.   Yeah.  Josie's right here on the right-hand corner.

Q.   Is Josie the female here in the front?

A.   Yes, sir.

Q.   Let me know when you recognize anyone else.

A.   That's Crystal and Duro walking in -- right there.

Q.   (Indicating.)

A.   Yes, sir.

Q.   The first female here is Crystal?

A.   Yes, sir.

Q.   And what is Duro wearing?

A.   A white shirt.

Q.   Was he behind Crystal?

A.   Yes, sir.

Q.   Now, what are Duro and Josie doing at this point?

A.   I think she was conferring -- confronting him about the money he owed her.

Q.   Who is the person here who has his arm around Duro?

A.   That is a security guard, sir.

Q.   Did you know him before that night?

A.   No, sir.

Q.   Where are you at this point?

A.   I'm outside.

Q.   Who is this walking up here?

A.   That is Crystal.

Q.   And who is she with?

A.   I don't recognize her.

Q.   Do you know this person here?

A.   That's Ray the bouncer outside with us.

Q.   Where is Duro at this point?

A.   Right on corner, sir, right there.

Q.   Let me know when and if you see anybody else you recognize.

A.   There's Scrappy and Scrappy's right there.  And I'm right beside with the cigarette lit.  I'm moving left.  Right there, I hit that, right there.

Q.   And what's going on?  What are you trying to do at this point?

A.   I'm trying to get to -- I was trying to hit him, but there goes Duro hitting him again.  There's Gordo.

Q.   And from watching this video, and you having been in fights before, who threw the first punch there?

A.   He did.  It was Chava.

Q. Who threw the first punch that started this whole thing?

A. It was Duro.

Q. And have you guys gotten Duro out at this point?

A. No, sir. He's right there still. He's coming. There's Gordo taking him out right there.

Q. Okay. So at that point you'd gotten Duro out into the parking lot.

I'm going to show you now what's been marked as 48B. It's just a clip from 48 which the Court's admitted by stipulation.

What is going on here?

A. I'm running in with Scrappy in front of me.

Q. And where -- where is this camera facing?

A. It's directly in front of the entrance.

Q. And, if you know, where were you prior to this video starting, in relation to this camera?

A. I was at the car.

Q. And where was the car?

A. To the left, far left.

Q. And if you could just narrate for us what happens here.

A. Scrappy runs in. I'm coming behind him. They told us that he was getting jumped.

Q. So we moved back now and that's right when you guys ran into the club; is that right?

A. Yes, sir.

The Expedition is parked. You could see the lights right there.

Q. What's happening now?

A. We're trying to get out, trying to get away. The Expedition pulled up.

Q. Are these members of your group here?

A. Yes, sir. That's all us. We run to the car right there. The Expedition is first, and then the Acura where I was in --

Q. Is this when you testified a moment ago that Duro and others in the group are calling for the gun. Is that what's happening off the screen here?

A. Yes, sir.

Q. Do you recognize this individual? (Indicating.)

A. Yes, sir.

Q. Who is that there with the girl pulling back on his shirt?

A. That's the man I shot, sir.

Q. All right. Now what did we just see there?

A. He has a beer bottle. And that's Crystal's Expedition flying by. Whoa. He got shot right there.

Q. And what, if anything, do you see that indicates to you that he's been shot, other than the fact you were there?

A. He fell, sir.

Q. Now, do you know if that individual -- do you know if you killed him?

A.   According to the papers, no.

Q.   Where did you go -- where did you go after the shooting?

A.   We dropped the female that was with Chava and Pelon, and we went straight to Crystal's apartments.

Q.   Where are Crystal's apartments just generally?

A.   It's in Kannapolis.

Q.   And what happened when you got to Crystal's apartments?

A.   We had started talking about it.  And they said that he had fell.  The guy that I had shot.  And they started talking about, why the fight had started.  And we talked about it. And Little Pelon had said that we should paint the car.  And we all agreed amongst each other to go to Wal-Mart and buy some primer and paint the car.

Q.   Why would you paint the car?

A.   To try to, I guess, camouflage it in a different color, that way it can't be recognized.

Q.   Who participated in painting the car?

A.   Everyone did.

Q.   Did Duro participate?

A.   Yes, sir.

Q.   I want to ask you about a couple other folks as well.  Do you know an individual named Jorge Sosa?

A.   Yes, sir.

Q.   Do you know Mr. Sosa by any other names?

A.   I know him by "Koki" and "Loco."

Q. "Koki" and "Loco"?

A. Yes, sir.

Q. Do you see the individual that you know as "Loco" in the courtroom today?

A. Yes, sir.

Q. Can you point out where he's seated and describe something that he's wearing.

A. He's wearing a black jacket.

Q. Which seat is he? Beginning from the left and counting in.

A. Four.

MR. MILLER: Your Honor, will the record reflect that the witness has identified the defendant Jorge Sosa?

THE COURT: It will.

MR. MILLER: Thank you.

Q. Now when did you first meet Loco?

A. I met him a couple years back. I originally known him from his cousin.

Q. Who is his cousin?

A. Osi from Centrales clique.

Q. So his cousin was a gang member?

A. Yes, sir.

Q. What was his cousin's name?

A. Osi.

Q. Osi?

A.   Yes, sir.

Q.   Now when you first met Loco, had you been jumped into MS-13 to your knowledge?

A.   No, sir.

Q.   Was he hanging around MS-13 in that time period?

A.   Yes, sir.  He had told me that he was waiting for the right clique.

Q.   He told you he was waiting for the right clique.

A.   Yes, sir.

Q.   What did you understand that to mean?

A.   Pretty much waiting for the more organized clique to approach him so he could get jumped in.

Q.   Did you ever see Loco get in any fights?

A.   I seen him get in a fight at Rodeo.

Q.   And was that also a fight involving rival gang members?

A.   Yes, sir.

Q.   Was he fighting alongside the MS-13 gang members?

A.   Of course.

Q.   Have you ever known Loco to carry a gun?

A.   Yes, sir.  He's always got the gun.

Q.   Now you testified that Loco was waiting for a more organized clique to get jumped into.  To your knowledge, was he ever jumped in to MS-13?

         MR. McKNIGHT:  Objection.  602, Sixth Amendment.

         THE COURT:  Overruled.

Q.    You can answer the question.  To your knowledge, was he ever jumped into MS-13?

A.    Yes, sir.  He was jumped into Charlotte Locotes clique.

Q.    Charlotte Locotes clique.

I want to ask you about an individual named Miguel Zelaya.  Do you know Miguel Zelaya?

A.    Yes, sir.

Q.    Do you know him by any other names or nicknames?

A.    "Most Wanted."

Q.    "Most Wanted."

A.    Yes, sir.

Q.    Do you see the individual that you know as "Most Wanted" in the courtroom?

A.    Yes, sir.

Q.    Can you point him out, describe something he's wearing, and where he's seated?

A.    He's wearing glasses and a blue striped shirt.

Q.    Where is he seated?

A.    The first chair to the left.

MR. MILLER:  Your Honor, will the record reflect that the witness has identified Miguel Zelaya?

THE COURT:  It will.

MR. MILLER:  Thank you.

Q.    Did Most Wanted ever talk to you about MS-13?

A.    Yes, sir.

Q.    What did he -- what were those conversations about?

A.    I first met him, I think it was in the parking lot of Don Carlos, and he was maybe about 14, 15 years old, and he wanted to get into the gang but he was too young.  I wasn't going to approach him and jump him in.

Q.    Were you "the word" for Coronados at this time?

A.    Yes, sir.

Q.    And why would Most Wanted have been talking to you about getting into the gang?

A.    Because I was "word."

Q.    Did Most Wanted ever tell you whether he was jumped into the gang?

A.    Yes, sir.

Q.    What did he tell you?

A.    He told me in county that he had jumped in.

Q.    He told you he'd been jumped in.

A.    Yes, sir.

Q.    Did he tell you who was there?

A.    He told me that it was Temper, Terror, Lunatic, and if I'm not mistaken, I think it was another individual from TLS clique, sir.

Q.    And Lunatic, is he also known as Lunatico?

A.    Yes, sir.

Q.    Did Most Wanted ever tell you about any crimes he committed?

A. We all brag about stealing outside the club. And he was bragging about that he stole a radio and some speakers from the bar, maybe a previous weekend before.

Q. Why would he brag to you about this?

A. That's how you get status in the gang.

Q. And around the time period when you have this conversation about Most Wanted getting jumped in, did he ever talk to you about any specific crime in that same timeframe?

A. Just a robbery that he had committed, that's it.

MS. COSTNER: Objection.

THE COURT: Overruled.

Q. Did Most Wanted ever talk to you about crimes that he committed as part of this case?

MS. COSTNER: Objection.

THE COURT: Overruled.

THE WITNESS: He had told me that he had killed the guy.

Q. He told you he had killed the guy?

MS. COSTNER: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

Q. And why did he tell you he had killed the guy?

A. For the gang.

Q. Why would Most Wanted have told you in particular about shooting the guy?

MS. COSTNER:  Objection.

THE COURT:  Overruled.

THE WITNESS:  For status.  I have -- I'm one of the oldest.

MR. MILLER:  No further questions at this time, Your Honor.

THE COURT:  Mr. Michel, any cross?

MR. MICHEL:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. MICHEL:

Q.   The information that you provided today, that's fairly consistent with what you told the prosecutor when you met with him and others in March; is that right?

A.   Yes, sir.

Q.   And that information is different from what you told them back in -- shortly after this happened, right?

A.   Yeah.

Q.   I mean, you were cooperating with them back then and told them what happened, but it's not the same as what you're saying today; is that correct?

A.   Yes, sir.

Q.   And back then you said that Duro and Chava and Scrappy and had nothing to do with it, right?

A.   Yes, sir.

Q.   And that basically Pelon was calling the shots that

Q. And that you were the one who shot. I mean, you were being honest about that, right?

A. Yes, sir.

Q. And if you're being honest about that, why wouldn't you be honest about everything else?

A. I had try to take care of him.

Q. And you said that -- that you weren't jumped in because of your brother's grandfather, right?

A. Yes, sir.

Q. And that you were describing your club and saying, we should have started a basketball team or something more productive than this. Were you trying to say that this is more of a social type of group that you all had formed?

A. What we had formed was something -- it was a gang. And we should have put our acts to something better.

Q. Well, you go on to say that we were friends. We never went out on the streets and stole stuff. Did you say that?

A. Yes, sir.

Q. Okay. But that's different from what you're saying today.

A. Yes, sir.

Q. Okay. And at that time you pointed out that there are clear distinctions between the Rowan County MS guys and the

Charlotte MS guys; is that right?

A.   Yes, sir.

Q.   And this isn't the first time you talked to the police who were involved with gang investigations, is it?

A.   No.

Q.   And you talked to them back with the Golden Palacios shooting, right?

A.   Yes, sir.

Q.   And told them what had happened, right?

A.   Yes, sir.

Q.   And you actually met before then and the federal prosecutor for the prior case had talked to you about your need to not get involved with what your brother's involved with; is that right?

A.   Yes, sir.

Q.   So you've had this relationship with the government for some time, for several years, right?

A.   Somewhat, yes, sir.

Q.   And as far as what you're saying today about what happened at Mi Cabana, you had not said anything before about the gun being in the Expedition, had you?

A.   Expedition.  What is that, sir?

Q.   And you never said anything about Duro going to the Expedition to look for the gun before.  You never said that before, had you?

A.    No, sir.

Q.    And we saw the video of people running out of the club. And it's your testimony that Duro ran to the Expedition, right?

A.    Yes, sir.

Q.    And is it your testimony that you ran to the Honda?

A.    The Acura, sir.

Q.    The Acura.

A.    Yeah, it was Acura.

Q.    Okay.  And in the Acura was three guys and two girls?

A.    The Acura was three guys and one girl.

Q.    One girl.

A.    Yes, sir.

Q.    Okay.  And so there really wasn't enough time for you to be with Duro at the Expedition to hear him say anything about where's the gun, right?

A.    We were running out the club saying, "Get the gun," sir.

Q.    Well, wasn't it your testimony that he was saying, "Where's the gun?"

A.    "Get the cuete."

Q.    He couldn't find it.

A.    I said, "Get the cuete.  Get the cuete."

Q.    And he never said that before today, in that meeting with the prosecutor in March, right?

A.    No, sir.

Q.   Okay.  And you started off about your deal with the government.  And are you saying that you really don't expect any benefit from your testimony today?

A.   It's ultimately up to the Judge.

Q.   And, well, I was asking not about the Judge's expectations.  I was asking about your expectations.

A.   I'm hopeful, but there's no --

Q.   Okay.

A.   -- promises.

Q.   So you hope that you'll get some reduction in your sentence, correct?

A.   Yes, sir.

Q.   Okay.  And to do that you have to testify for the government, right?

A.   Yes, sir.  My plea makes me.

Q.   And you understand that the government is the one who makes the recommendation, if any, to the Judge about what, if any, reduction to make?

A.   Yes, sir.

Q.   Okay.  And then the Judge makes that decision.

A.   Yes, sir.

          MR. MICHEL:  Okay.  No more questions.

          MR. SMITH:  Yes, Your Honor.

          THE COURT:  Mr. Smith.

                    CROSS-EXAMINATION

BY MR. SMITH:

Q.   Your gang nickname is Conejo; is that right?

A.   Yes, sir.

Q.   C-o-n-e-j-o?

A.   Yes, sir.

Q.   And you say you were jumped in, in 2009, correct?

A.   I was never jumped in.

Q.   Oh, you were never jumped in.  You were grandfathered in, I apologize; is that right?

A.   Yes, sir.

Q.   Okay.  And ever since then, is it fair to say that the gang was a part of your everyday life?

A.   Yes, sir.

Q.   Everything you did pretty much revolved around loyalty to the gang, right?

A.   Yes, sir.

Q.   In fact, you eventually became what is called a "shot caller" of one of the cliques; is that right?

A.   It's "word."  And I didn't become it.  I was left it, sir.

Q.   Okay.  So other people chose you to be the "shot caller," right.

A.   I was the last one.

Q.   I couldn't understand what you said.

A.   I was the last one, sir.  My brother had left it to me

whenever he got incarcerated.

Q. So your brother left it to you when he got incarcerated.

A. Yes, sir.

Q. And then you were subsequently elected, as you said, to remain "shot caller."

A. Yes. I was "word" in 2009 to 2010.

Q. Is that because you were a good gang member?

A. Yes.

Q. Okay. And after you became the leader, you attended countless gang meetings, right? Do you know how many gang meetings you've attended since you were the leader of that clique?

A. Six.

Q. Six meetings the entire time.

A. Yes, sir.

Q. Okay. And most of those meetings you were concerned as the leader about organization; is that right?

A. We talk about organization every meeting, sir.

Q. That's an important part of a clique of MS, right?

A. Yes, sir.

Q. Making sure you know what's going on within your clique.

A. Yes, sir.

Q. And that you control the image and the fear that your gang is letting off and, particularly, your clique.

A. Yes, sir.

Q.   Okay.  And if something gross wrong in your clique, it goes back to you, right?  In some ways.

A.   Yes.  Some ways.

Q.   Because you weren't organizing it, and you weren't controlling it yourself, right?

A.   Yeah.

Q.   Right?

A.   Yes.

Q.   Okay.  I'm sorry.  I couldn't hear you.

A.   I'm sorry.

Q.   And you say you were the leader of Coronados until when, exactly?

A.   2010.

Q.   2010?

A.   Yeah.

Q.   Who became the leader after you?

A.   I left it pretty much in the wind, and Echo had picked it up afterwards.

Q.   I couldn't hear the first thing you said.

A.   I left it.  Like -- because I had -- my son was coming. He was -- he was about to be born.  And I had gone back and Echo had picked it up then.

Q.   Okay.  So it went from you being leader of Coronados to Echo being the leader?

A.   Yes, sir.

Q.   You know his real name to be Christian Bergamasco or Christian Bergamasco-Suarez?

A.   Yes, sir.

Q.   Why did you choose that guy?

A.   Because he was the most active one.

Q.   You know Echo's brother, don't you?

A.   Yes, sir.

Q.   What's his nickname?

A.   Temper.

Q.   Now, Temper had a nickname of Kilo as well before, correct?

A.   Yes, sir.

Q.   Is that a different Kilo then the one you were just talking about in your direct testimony?

A.   Yes, sir.

Q.   And that's because -- well, first of all, Temper is Juan Bergamasco; is that right?

A.   Yes, sir.

Q.   And that's Christian Bergamasco's brother.

A.   Yes, sir.

Q.   And that's Echo, right?

A.   Yeah.  Christian is Echo.

Q.   Okay.  And so the reason that Juan Bergamasco had to change his nickname from Kilo to Temper is because somebody already had that nickname; is that right?

A.   No.  Kilo was just his nickname.  It wasn't an official gang name.

Q.   So when you became an official gang member, that's when his nickname became Temper?

A.   Yes, sir.

Q.   And that would be Juan Bergamasco.

A.   Yes, sir.

Q.   Okay.  I just wanted to clarify that.

You also testified that you knew what the East Coast Program was; is that right?

A.   Yes, sir.

Q.   And that -- I believe you testified that you met three or four times a year with the leaders of the East Coast Program, correct?

A.   It was organized as a general, yeah, general meeting.

Q.   General meeting.  So you didn't really count that within the six times that you had meetings, correct?  Or before, correct?

A.   No, I counted those in.

Q.   Okay.  So that's included in your meetings.

A.   Yes, sir.

Q.   How many a year?

A.   Six.

Q.   Did you meet with the East Coast Program?

A.   I didn't want to organize with East Coast Program,

therefore I didn't meet with them.

Q. You just testified that you met three or four times with the leaders of the East Coast Program, right? On direct.

A. No. Scrappy came down here trying to organize us to get contact with the East Coast Program.

Q. Okay. You did communicate with leaders in other states, right, about MS? Including Scrappy.

A. Yeah, just Scrappy. That's it.

Q. And that's, again, to better organize; is that right?

A. Yes.

Q. I want to direct your attention back to Government's Exhibit 49. That was a picture of Guanaco. Do you remember that picture?

A. Yes, sir.

Q. Guanaco worked as a sheetrock remodeler also, did he not?

A. I couldn't tell you his real name before I got here, sir.

Q. No, I didn't ask you his real name. I said what he worked for.

A. I don't know.

Q. You don't know what he did?

A. No, sir.

Q. Okay. I believe you testified earlier, also, that Miguel Zelaya was jumped in; is that right?

A. Yes, sir.

Q. And that he admitted that to you; is that right?

A.   Yes, sir.

Q.   And he told you that he was actually jumped in, in the jail; is that correct?

A.   Yes, sir.  In county.

Q.   I believe you testified on direct, in response to Mr. Miller's question, that you're violating the rules of the gang by testifying; isn't that right?

A.   Yes, sir.

Q.   The gang was extremely important in your life, wasn't it?

A.   Yes, sir.

Q.   It's still important in your life, isn't it?

A.   No, sir.

Q.   It's not?

A.   No.

Q.   When did it stop being important?

A.   It stopped being important once you get in here and everybody's -- you got a case on you for something that was crazy.  That you possibly didn't do.  And, you know...

Q.   It stopped being important when you got in trouble.

A.   Exactly.

Q.   When you got caught.

A.   When you get caught you recognize.

Q.   About something you possibly didn't do.  Is that what you said?

A.   Yeah.

Q.   Well, you got convicted of something you did do, right?

A.   Yeah.

Q.   You pled guilty to shooting a man in the back on video, right?

A.   Yes, sir.  I did that.

Q.   So you did that.

A.   Yes, sir.

Q.   And you got caught doing that.

A.   Yes, sir.

Q.   And that's why you're sitting in this courtroom, isn't it?

A.   Yes, sir.

Q.   So you can get in as little trouble as possible for something you did on video, right?

A.   I did do it.

Q.   And you're trying to get in as little trouble for that action as you can, right?

A.   They called upon me, sir.

Q.   They called upon you.

A.   Yes.

Q.   Well, you agreed to be called upon, right?

A.   Yes, sir.

Q.   They couldn't have called upon you unless you said, "Hey, it's in my best interest.  I'm going to sign this paper.  And I'll do anything I can, including come to this courtroom,

violate what is important to me in the gang, because I got caught on video and testify; isn't that right? That's accurate.

A. Yes, sir.

MR. SMITH: No further questions.

THE COURT: Mr. McKnight.

MR. McKNIGHT: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q. Mr. Garcia, along those lines, you testified earlier that you pled guilty to the charge of RICO and attempted murder, right?

A. Yes, sir.

Q. And you earlier stated that -- that there weren't any charges being dismissed. But that's not completely true, is it? You're getting a gun charge dismissed, aren't you?

A. I thought you were -- they were talking about after this.

No. Whenever I signed my plea. Whenever I signed my plea I -- they dismissed the 942(c) or something -- something like that, sir, mandatory ten years.

Q. Is it -- well, is it your understanding that a gun charge has been dismissed for you?

A. Yes, sir. When I signed my plea.

Q. Okay. Now, with regards to Mr. Sosa. You said that you met him with somebody named Oso, right?

A.   Osi.

Q.   Was that on the same occasion that this fight supposedly happened at Rodeo?

A.   No, sir.

Q.   Two different times, right?

A.   Yes, sir.

Q.   Other than those two times, how many other times have you hung out with Mr -- or been around Mr. Sosa?

A.   I never hung out with Mr. Sosa.  We see each other at the clubs, sir.

Q.   Okay.  So how many other times have you -- if you could put a number on it -- do you think you've seen him out at the clubs?

A.   Maybe over five times.

Q.   Maybe five times?

A.   Over times, yeah.

Q.   But you never hung out with him.

A.   When MS gets into a club, we always hang out with each other.  Like, we would go, like, in the same corner.

Q.   But you previously just stated that you never hung out with Mr. Sosa, right?

A.   Yeah, outside the club.

Q.   Okay.  Now when you testified earlier that he was jumped in, you think, around 2011, you weren't present for that, were you?

A.    No, sir.

Q.    So that is based off something that you heard in the street.

A.    Yes, sir.

Q.    Now you talked about that you attended about six meetings, right?

Now is that after you became "the word" or the "shot caller" for Coronados?  Or altogether before you became the "word" and after?

A.    That's after -- after I became "the word," sir.

Q.    And as "the word" it would have been your responsibility to organize meetings, organize any jump ins that the clique may have had, as well as organize or issue any calentones that may need to be issued for the member who got out of line, right?

A.    Yes, sir.

Q.    With regards to -- have you ever participated -- well, so we're clear, a calentone is a beating, right?

A.    Yes, sir.

Q.    Have you ever participated in one?

A.    Yes, sir.

Q.    If you had to put a number on it, how many times have you issued -- joined in issuing somebody a beating?

A.    Twice only.

Q.    Twice.  And in terms of jump ins, how many jump ins have

you participated in?

A.    About seven, sir.

Q.    About seven.  Now, of those times -- I know there's someone who counts, and then there's obviously those who are actually doing the physical fighting portion of it, right?

A.    Yes, sir.

Q.    Okay.  Of those times, how many out of those times were you actually the one physically hitting the other person and not counting?

A.    None, sir.  None of those seven.

Q.    None of those seven.

A.    No, sir.

Q.    So you were just there --

A.    Counting.

Q.    -- you were there and counting all the other times?

A.    No.  Those seven times I was participating in beating -- in the beating.

Q.    Okay.  So we're clear.  Now, you talked about -- you listed a couple of clubs that MS would frequent, right?  Now, these clubs, they are predominantly Hispanic clubs; is that safe to say?

A.    Yes, sir.

Q.    So they're not technically MS clubs.  That's why you would run into sur13 or other gangs.  They're just predominantly Hispanic clubs, right?

A.   Yes.

Q.   And you talked about -- and you talked about when you would see, sometimes, another MS member in public, that you would greet them with a hand sign.  Is that what was said earlier?

A.   Yes, sir.

Q.   So if another MS member said that that was something that you shouldn't do in public, would they be wrong, or they just have a misinterpretation of the rules?

A.   You have to greet the homies with the M and S, sir.

Q.   Okay.  Now, you said that after you left Coronados, you left it to Echo, right?

A.   Yes.

Q.   That was because you said he was active in MS, right?

A.   Yes, he was active.

Q.   When you say "active" you mean he was putting in work?

A.   Yes, sir.

Q.   Okay.  Like what?

A.   He was constantly stealing or at the clubs beating down the rivals.

Q.   Okay.  So he had a level of respect, in your opinion?

A.   Yes.

Q.   Okay.  Now, in terms of those meetings that you were referring to, those six meetings, have you been at meetings with Echo or Christian Bergamasco-Suarez?

A.    Yes, sir.

Q.    Have you been at meetings with Temper or Juan Bergamasco-Suarez?

A.    Yes, sir.

Q.    You also mentioned somebody by the name of Erick Aragon. Did you also know him as Pikachu?

A.    Yes, sir.

Q.    Have you ever been at any meetings with him?

A.    Just one.

Q.    Just one. Okay. And just so we're clear, as the "word" or the "shot caller," what was your position on somebody who wouldn't -- who didn't come to meetings or who didn't show up for meetings that were called for?

A.    You would get a calentone.

Q.    You would get a calentone. So it was considered a serious violation if you didn't participate?

A.    Yes, sir. If there was a clique general.

Q.    Okay. In your time in MS, have you ever attended a meeting with Jorge Sosa?

A.    No, sir.

        MR. McKNIGHT: One moment, Your Honor.

Q.    When you were talking earlier about the whole scenario at Mi Cabana, you had mentioned Pelon. So Pelon is different than Little Pelon; is that right?

A.    No, sir. That was same person.

Q.   The same person.

A.   Yeah.

Q.   Okay.  Do you know that person to be Ulices Morales?

A.   Yes, sir.

Q.   And so it's your testimony that Ulices Morales was present and part of the conversation about, when they came out of the club that there would be a shooting, right?

A.   He was already at the car, sir.

Q.   Okay.  You also mentioned -- you said you became the "word" after your brother left it to you, right?

A.   Yes, sir.

Q.   What's your brother's name?

A.   Mariachi.

Q.   Mariachi.

A.   Yes, sir.

Q.   And did your brother -- was your brother, at some point in time, cooperating with the government as well?

A.   Yes, sir.

Q.   And isn't it true your brother also testified in an MS trial?

A.   Yes, sir.

Q.   And that was prior to you becoming the "word," right?

A.   Yes, sir.

          MR. McKNIGHT:  Okay.  That's all I have.

          THE COURT:  Ms. Costner.

MS. COSTNER:  Yes.

CROSS-EXAMINATION

BY MS. COSTNER:

Q.   Mr. Vela, when you joined -- when you were grandfathered into the MS, was your brother still around, or had he been arrested at that time?

A.   He was already -- he wasn't arrested.  He was out with them.

Q.   I'm sorry.  I didn't understand.

A.   He was out.  He wasn't arrested yet.

Q.   He was out.

A.   Yes, he wasn't --

Q.   He left the gang?

A.   No.  I'm talking about incarcerated, ma'am.

Q.   He was incarcerated.

A.   He wasn't.  He wasn't incarcerated.  I was already grandfathered in.  They know me as Conejo.

Q.   So, when you were grandfathered in, your brother was in jail.  Is that what you're saying?

I can't see your mouth when you talk so that may be why we're having trouble understanding each other.

A.   I'm sorry.  No.  I was already known as Conejo.

Q.   And how long had you been in MS-13 before your brother went to jail?

A.   Possibly, like, not even a year.

Q.   And he went to jail for RICO; is that right?

A.   I don't know his charges, ma'am.

Q.   Were they related to the gang?

A.   Yes, ma'am.

Q.   And so you were aware of that, weren't you?

A.   Yes.

Q.   And after he -- you said you'd been in about six months -- I'm sorry, about a year; is that right?

A.   A little bit under that.

Q.   About how old were you?

A.   He had gotten locked up 16, 17 -- I was about 6 -- 16, 17 -- 16, 17, 18, 19, 20 -- about -- anyway -- a little bit older -- about 17, I guess.

Q.   About 17.

A.   Yes, ma'am.

Q.   And you -- you became the "word" after your brother, the "word" left; is that right?

A.   Yes, ma'am.

Q.   And he -- he made you the "word."

A.   Yes, ma'am.

Q.   Or he recommended you.

A.   Yeah, he left it to me.

Q.   Was it also based on his position as the "word" that you were never jumped in but you were grandfathered?

A.   I think he had something to do with it.  Yes, ma'am.

Q.   And you said that he -- he wanted you to be the "word." But you were also elected by other -- your other fellow gang members, correct?

A.   Yes, sir.  No one opposed.

Q.   So you enjoyed a position of great respect in MS-13, didn't you?

A.   Yes, sir.  Yes, ma'am.  Sorry.

Q.   That's okay.  You've been in a year, right?

A.   Yes, ma'am.

Q.   And already you were in a leadership position.

A.   Yes, ma'am.

Q.   And you remained in that leadership position, I think you said, for about two years; is that right?

A.   Yes, ma'am.

Q.   Were you the only "word" or were there other "words" in the gang?

A.   There's the "right hand."

Q.   The "right hand"?

A.   Yes, ma'am.

Q.   Who was your "right hand"?

A.   At the time it was Pelon.

Q.   Pelon.

A.   Yes, ma'am.

Q.   All right.  And I believe you testified that you stepped down as "word" when your son was born; is that correct?

A.    Yes, ma'am.

Q.    And how old is your son now?

A.    He is four years old.

Q.    And that was -- he's four.  Okay.  And that was around, you said 2010, 2011 --

A.    (Nodding head.)

Q.    -- something like that.  And you continued your membership in the gang, correct?  You just weren't the leader.

A.    Yes, ma'am.

Q.    Did you give up the leadership because it just took too much time for you as a father?

A.    Yes, ma'am.

Q.    But you continued attending meetings, correct?

A.    Yes, ma'am.

Q.    You continued participating in all the gang activities; is that right?

A.    Yes, ma'am.

Q.    And just no longer the "word"?

A.    No longer the "word."

Q.    Did you enjoy continued respect having been the "word"?

A.    Once you lose the "word" you don't really have the respect no more.

Q.    You don't have respect -- you didn't have respect from other gang members.

A.    You build up your respect by the crimes that you do.  But

once you lose "word" -- the "word" has a greater respect
than --

Q.   Okay.  Did you --

A.   -- regular member --

Q.   I'm sorry.  I didn't mean to interrupt.  Did you
continue, though, to participate in the activities of the gang
that earned you respect?

A.   Yeah.

Q.   And I believe you testified that that had -- you stole to
earn respect; is that correct?  You participated in stealing.

A.   Yes, ma'am.

Q.   And you participated in drug sales and drug dealing.

A.   Yes, ma'am.

Q.   Correct.  And, in fact, you -- you testified that you
have the source of cocaine; is that right?

A.   Yes, ma'am.

Q.   And that was -- was it from China Grove, or did you take
it to China Grove to sell?

A.   I had a guy to connect from Concord.  And I was selling
in China Grove and I was starting distributing into -- to
clubs.

Q.   Those were local clubs in Charlotte?

A.   Yes, ma'am.

Q.   How many clubs did you distribute cocaine in?

A.   It was Rodeo and Mi Cabana.

Q.   And you -- I believe, you also testified you were charging rent to other drug dealers at those clubs; is that correct?

A.   Yes, ma'am.

Q.   And you came up with the amount to tax; is that right?

A.   It was based on how much he earned.  But it was $140 to $100.

Q.   That was something you started, correct?  The amount.

A.   The gang always charged rent.

Q.   And did you start that while you were "word"?  While you were the "word"?

A.   2009, 2010 --

Q.   And in doing that, you had money.  You sent it to El Salvador, to the leadership; correct?

A.   No.  I never sent money to El Salvador.

Q.   Where did you send it?

A.   It was distributed to -- between us, my clique.

Q.   And I believe you testified that you used it to purchase firearms.

A.   Yes, ma'am.

Q.   Did you purchase firearms for yourself?

A.   For our clique.  Yes, ma'am.

Q.   For the clique.

A.   Yes, ma'am.

Q.   Everybody shared them.

A. Um-hmm. Yes, ma'am.

Q. You had a firearm.

A. Yes, sir.

Q. And when you -- after you were charged, you decided to cooperate; is that right? Cooperate with the government to testify?

A. After I signed my plea, they came to me, ma'am, yes.

Q. At this point in time you were facing 20 years on the RICO charge; is that right? Is that your understanding?

A. RICO is 20 -- yes, ma'am, I believe.

Q. Ten for shooting that man in the back, that attempted murder.

A. Yes, ma'am.

Q. And in your cooperation, you've made everyone, I'm assuming, the government, all of us aware of these other crimes; is that correct?

A. Yes, ma'am.

Q. All right. Were you ever charged with any of these robberies that you've talked about and testified to?

A. No, ma'am.

Q. How many robberies would you say you committed or participated in?

A. All general, like --

Q. Yes, sir.

A. -- throughout my whole time in the gang?

Q.    Yes, sir.

A.    Over maybe, about 20.

Q.    About 20?

A.    Yes, ma'am.

Q.    Were they armed robberies?

A.    Most of the time.  No, ma'am.

Q.    Were other people armed?

A.    My gang always has --

Q.    Always had arms?

A.    Yes, ma'am.

Q.    Firearms.  And how long did you say you were involved in this cocaine dealing?

A.    It wasn't long.  Maybe about three to six months, that's it.

Q.    In two different cities.

A.    Yes.

Q.    In several different clubs.

A.    Yes.

Q.    You ever charged with any of these -- any drug offenses, drug sales, drug trafficking --

A.    No, ma'am.

Q.    -- anything like that?

A.    No, ma'am.

Q.    That's not a part of this indictment, is it?

A.    No.

Q. Do you expect to be charged with drug offenses now that you're cooperating?

A. Expect to get charged with a lot of stuff. No.

Q. You do expect to be charged with lots of things?

A. Yes, ma'am. Everything.

Q. All right. So you're sitting here testifying, and it's you're understanding that today, after testifying, you're going to pick up a bunch of charges?

A. I feel like everything I've said, you know, incriminates me.

Q. I'm sorry. I didn't understand what you said.

A. I feel like everything that I said incriminates me.

Q. That incriminates you. But you've been told, haven't you, that this is it. This is all you're getting charged with is the RICO and the attempted murder; isn't that correct?

A. To my standing, yes.

Q. I'm sorry. I didn't --

A. Yes.

Q. Yes. And that's a benefit you get from coming in and testifying for the government, isn't it?

A. Yes.

Q. Get sort of a skate on all of those other offenses?

A. Yes, ma'am.

        MS. COSTNER: May I have just a moment, Your Honor?

        THE COURT: You may.

MS. COSTNER:  That's all the questions.

THE COURT:  Any redirect?

MR. MILLER:  No, Your Honor.  Thank you.

THE COURT:  You may step down.

Call your next witness.

MR. MILLER:  The government calls Officer Muller.

ANDREW MULLER, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Officer Muller, could you just start by stating your name, please?

A.   Andrew Muller.

Q.   And it's fairly obvious from how you're dressed, but where do you work?

A.   I work with Charlotte-Mecklenburg Police Department.

Q.   How long have you been with CMPD?

A.   About 14 years.

Q.   And in those 14 years, what divisions have you worked in?

A.   Just North Tryon.

Q.   And where is the North Tryon division?

A.   It's located along North Tryon Street at about Sugar Creek.

Q.   And I'm going to go ahead and call your attention to the night or early morning of August 11, 2013.  Were you working in the North Tryon division at that time?

A.    Yes, I was.

Q.    And did you respond to a call for service at 200 Eastway Drive around 2 a.m.?

A.    Yes, I did.

Q.    And what's located at that address?

A.    Mi Cabana.  It's a club.

Q.    What was the nature of the call that you were responding to?

A.    I believe the exact call was for a person having been shot.

Q.    What did you see when you first arrived at Mi Cabana?

A.    When I got on the scene I saw a large crowd and someone lying -- the victim lying on the ground bleeding.

Q.    What did you do?

A.    Well, we tried to get the crowd back, and then we started to collect evidence.

Q.    And at some point did medic show up?

A.    Yes, they arrived on scene.

Q.    And did they transport the victim?

A.    They did.

Q.    So you said you were looking for evidence.  Where were you looking for evidence?

A.    Well, since we were told that there had been a shooting we started to look in the area where we found the victim to see if we could find any evidence we typically see with

shootings, such as shell casings.

Q. Was crime scene tape put up?

A. Yes, it was.

Q. When you were examining the scene there, what if anything did you find?

A. I remember that there were items of clothing from the victim left there, and three shell casings.

Q. Were you the one who found those shell casings?

A. I was.

Q. What did you do when you found them?

A. Because of what was going on, and there were only so few officers on the scene immediately, I placed business cards to help mark the shell casings.

Q. I'm going to show you what's been marked for identification as Government's Exhibit 50. And I'll just scroll through these here. If you'll just follow along then I'll have a few questions for you.

A. All right.

Q. Do you recognize those three pictures?

A. I do.

Q. And beginning with the first one, what's that a picture of?

A. That's of the club from the front.

Q. How do you recognize that?

A. I've been there before and I was there that night.

Q.   Is this a picture of Mi Cabana on the night of the shooting that you responded to?

A.   Yes.

Q.   And is it a fair and accurate depiction?

A.   Yes.

Q.   And what is the second picture that's part of Government's Exhibit 50?

A.   This is -- I recognize this as the scene that we were on where the evidence was located.

Q.   Is that a fair and accurate depiction?

A.   Yes.

Q.   And what is the third picture in Government's Exhibit 50?

A.   That's a shell casing we found.

Q.   And does that fairly and accurately depict one of the shell casings you found?

A.   Yes.

        MR. MILLER:  Your Honor, at this time the government asks that Exhibit 50 be received, and asks permission to publish.

        THE COURT:  Any objection?

        MR. MICHEL:  No objection.

        THE COURT:  Let it be admitted and published.

        (Government's Exhibit No. 50 was received into evidence and published.)

Q.   And this first page, that's the club, Mi Cabana.

A. Yes.

Q. And just describe for the jury, sort of beginning closest to where this picture was taken, where are we looking here?

A. We're looking from the parking lot of the club, off to the right is the entrance to the club. And looking out back to the street where the police vehicles are is Eastway Drive.

Q. And, if you could tell, where in this picture was the victim when you arrived?

A. Right where you see the blood.

Q. And is the blood indicated with a number?

A. No. 3.

Q. What -- beginning with -- beginning with No. 1, what -- what is that placard identifying?

A. Shell casing I found.

Q. And we see some shell casings kind of off in the distance there -- or excuse me, not shell casings, but placards. What do those placards indicate?

A. Those were where I found the other shell casings.

Q. And, those additional shell casings, were they found as a vehicle would exit onto the road there?

A. I'm not certain. If --

Q. Okay.

A. I'm not certain about a vehicle.

Q. But they're at the back of the parking lot from where this picture was taken.

A.    Yes.

Q.    And what is this a picture of?

A.    One of the shell casings.

            MR. MILLER:  No further questions, Your Honor.

            THE COURT:  Any cross?

            MR. MICHEL:  No cross.

            MR. CARPENTER:  No, Your Honor.

            MR. McKNIGHT:  No, Your Honor.

            MR. BEECHLER:  No, Your Honor.

            THE COURT:  You may step down and be excused.

            Call your next witness.

            MR. MILLER:  The government calls Detective Tim White.

            TIMOTHY WHITE, GOVERNMENT WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. MILLER:

Q.    Good morning.

A.    Good morning.

Q.    Could you start by just introducing yourself to the jury.

A.    Timothy white.  I'm a detective with the Charlotte-Mecklenburg Police Department in their anticrime unit, formally known as the Gang and Firearms Enforcement Division.

Q.    Detective White, how long have you worked for CMPD?

A.    Since 1996.  So almost 20 years.

Q.   And you say your current title is detective.  When did you become a detective?

A.   I became a detective in 2009.

Q.   And I believe you said you're a member of the anticrime unit.  What does anticrime unit do?

A.   The anticrime unit is the new unit that was formed from the old Gang Enforcement Division.  The Gang Enforcement Unit and Firearms Enforcement unit comprise the Gang and Firearms Enforcement Division.

Q.   And within that unit do you have a particular focus for the investigations that you mostly work on?

A.   Yes.  My focus is on gangs, primarily.

Q.   How long have you been focused on gangs?

A.   For the last ten years.

Q.   Now I want to ask you a little bit about gang investigations.  Are there different types of sources that law enforcement uses in gang investigations?

A.   Yes, there are.

Q.   And what are those different types of sources?

A.   You will have your proactive sources which are -- what you usually refer to as informants.  And then you would have cooperating defendants -- or cooperators who have been charged with something.

Q.   And did -- are you involved in an investigation of MS-13 for the past couple years?

A.    I was.

Q.    And did that investigation of MS-13, use both of those types of sources?

A.    Yes.

Q.    What was your role within that MS-13 investigation?

A.    My role was to do historical work, interviewing cooperators, to look for incidents that had been reported through the Charlotte-Mecklenburg Police Department and tie those in to making a timeline for the investigation.

Q.    Was your role to managing proactive sources in this case?

A.    No, sir.  It was not.

Q.    Why use sources in a gang investigation?

A.    There's no way to infiltrate a gang without using actual members.  The -- an undercover, for example, could not gain the access that an actual member can gain.

Q.    And you use the term "undercover."  What does that mean?

A.    An undercover is actually a law enforcement officer who operates in plain clothes capacity and does not identify themselves to bad guys as a police officer.

Q.    And how are undercovers different from proactive sources or informants?

A.    Well, undercovers are bound by our code of ethics.  And they are also bound by their law enforcement jobs.  And the risk for one of them to actually infiltrate a gang is -- outweighs the positives that you would get from that.

An undercover officer can't violate the law or own up to what the gang would want them to own up to, to be able to get them intelligence.

Q.   So in addition to the safety concerns and sort of practical considerations, are there any other reasons why undercover officers or -- are they also referred to as UCs?

A.   They are.

Q.   Is there any other reason why undercover officers or UCs wouldn't be a good tool in a gang investigation?

A.   They can't get the intelligence.  They're not part of the gang.  The gang is not going to share that information with an outsider.

Q.   Switching gears for a minute.  As part of this investigation, did law enforcement obtain records from Facebook?

A.   They did.

Q.   And in your role as one of the investigators, did you review excerpts of those records?

A.   I did.

Q.   Did you review excerpts from a Facebook account with the name MiguelAngel.Zelaya1?

A.   I did.

Q.   Are you familiar with the defendant Miguel Zelaya?

A.   I am.

Q.   And based on your investigation do you know what he looks

like?

A.   Yes.

Q.   Now when you reviewed those excerpts from the Facebook account from MiguelAngel.Zelaya1, did you recognize any other obvious combinations to the defendant you knew as Miguel Zelaya, other than the name?

A.   Photos of Miguel were on the Facebook page.

Q.   Did you also view excerpts from a Facebook account with the name of Trigger.Hollywood.7?

A.   I did.

Q.   Did you see pictures of anyone on that Facebook account who you identified in this investigation?

A.   Yes.  Oscar Trejo, who was the leader -- clique leader of the Hollywood Locos clique.

Q.   And does the individual you know as Oscar Trejo, who was the leader of the Hollywood clique, does he have a gang name?

A.   He does.

Q.   And what is that gang name?

A.   Trigger.

Q.   Now, in reviewing the excerpts from that trigger.hollywood.7 account, did you also review the list of Facebook friends?

A.   I did?

Q.   I'm going to show you an excerpt from what's been conditionally admitted as Exhibit 4B.  And I'll go to page 3

of that. And I'll ask you just to read what's highlighted.

Do you recognize this as a list from Facebook friends that you reviewed when you were reviewing that Facebook account we've been discussing?

A. I do.

Q. I'll ask you just to read for me what the time that's highlighted there.

A. The time is -- the year 2014-5-26. At 17:08:14 Trigger Hollywood and Neptuno Storm are now friends.

MR. MILLER: Your Honor, at this time, subject to the Court's earlier admitting of this, I would ask that it be fully admitted and published to the jury.

THE COURT: Any objection?

MR. SMITH: No objection.

THE COURT: Let it be admitted. You may publish.

(Government's Exhibit No. 4B was received into evidence and published.)

Q. Now, as part of your role in the anticrime unit, did you ever conduct focused or targeted enforcement?

A. We did.

Q. And would that sometimes take place at clubs in Charlotte?

A. It would.

Q. And what clubs have you conducted this sort of focused enforcement on?

A.   Halo, Iguanna, Mi Cabana, Golden Palacios, Mamacita's.

Q.   And why would you do focused enforcement at those clubs?

A.   Generally it's due to the divisions bringing forth the fact that there's gang issues at those clubs.

Q.   And what was the purpose of your focused enforcement?

A.   We would check on specific nights if they had -- had given us a specific night for when they were having problems. We would go out and see if they were actually -- there was gang activity, or if they were having any kinds of problems and to hopefully deter it, if there was, by the anticrime unit being there.

Q.   Now, did you conduct focused enforcement on September 1st, 2011?

A.   We did.

Q.   Where did you conduct it that night?

A.   Club Halo.

Q.   Why did you set up target enforcement on Halo on that particular night?

A.   It was a Thursday night and there was also a phone party going on, which is typically a large draw for Hispanic gang members.

Q.   What, if anything, did you observe at Club Halo on that night?

A.   While we were outside I observed a subject that I know to be Jorge Sosa walk out of club, walk toward the parking lot.

I attempted to speak with him. At which point in time he avoided me and just walked away.

Q. Do you see the individual that you encountered that night in the courtroom here?

A. I do.

Q. Could you point him out and indicate where he's seated.

A. He's seated at the left table wearing the black jacket.

Q. And what number is he, sort of, counting in from the left there, Detective White?

A. Number four.

MR. MILLER: Would the record reflect that the witness identified Defendant Sosa?

THE COURT: It will.

MR. MILLER: Thank you.

Q. Now after you tried to talk to -- well, do you know Jorge Sosa by any other names?

A. I know him by nickname.

Q. What nickname do you know him by?

A. "Loco" and also is "Koki."

Q. Now after you saw Mr. Sosa, what happened next?

A. Approximately a minute later a subject I know by the name of Rosendo Rivas walked out of the club and I spoke with him, and he advised there had been a fight in the club.

MR. McKNIGHT: Objection.

THE WITNESS: That he didn't have anything --

THE COURT: Sustained. The objections is sustained.

Q. What happened after you spoke to Mr. Rivas?

A. Mr. Rivas walked to his truck. At which point in time I observed Mr. Sosa walk to the same truck and get in.

Q. Now, do you know Mr. Rivas by any nicknames?

A. I do.

Q. What nicknames?

A. Demonio and Jester.

Q. Now, after Mr. Rivas and Mr. Sosa got in the truck, did you see anyone else you recognized?

A. Yes. I observed Fec Rodriguez Vareal.

Q. Do you know Mr. Rodriguez Vareal by any other names?

A. Chelito or Chele.

Q. What happened after you saw Mr. Rodriguez Vareal?

A. Spoke to him briefly, and then he walked to Mr. Riva's truck and got in, and a short time later they all drove away in the truck.

Q. So at that point, all three of the individuals you mentioned drove away in the truck.

A. They did.

Q. I'm going to show you what's been previously admitted as Government's Exhibit 28. Do you recognize the individual pictured in Government's Exhibit 28?

A. Yes.

Q. Who is that?

A.   Rosendo Rivas.

Q.   I'm going to show you part of what has been marked as Government's Exhibit 58.  Do you recognize the individual picture there in the second page of Government's Exhibit 58?

A.   That's Fec Rodriguez Vareal.

MR. MILLER:  Your Honor, at this time we would ask to admit just the second page of Government's Exhibit 58.

THE COURT:  Any objection?

MR. MICHEL:  No objection.

THE COURT:  Let them be admitted.

(Government's Exhibit No. 58 was received into evidence and published.)

Q.   Now, in addition to your, sort of, enforcement operations at the clubs, has part of your responsibility been to locate and identify gang graffiti?

A.   It has been.

Q.   And what would you -- what are you looking for in that regard?

A.   Well, we're looking for areas that have been -- where different gangs are trying to put up their symbols to mark their territory.

Q.   And why is that important?

A.   It's a good indicator for us of who is operating in that area, or who may be trying to control that area.

Q.   I'm going to show you what's been previously marked as

Government's Exhibit 87. I'm going to scroll through the two pictures there.

What do you recognize those pictures as?

A. MS graffiti.

Q. And did you take those pictures or were you present when the pictures were taken?

A. I was.

Q. And do you remember approximately when those pictures were taken?

A. Fall of 2014.

Q. And where were those pictures taken?

A. One of them was taken -- this first one that's up now, was taken on Sharon Amity close to Central Avenue behind the Compare Foods.

Q. What about the second one?

A. The second one was taken at the shopping mall that's boarded up now at the intersection of Eastway and North Tryon behind Zima.

Q. And do the two pictures there that comprise Government's Exhibit 87, fairly and accurately depict what you saw?

A. They do.

MR. MILLER: Your Honor, at this time the government asks that Government's Exhibit 87 be received and published.

THE COURT: Any objection?

MR. McKNIGHT: Your Honor, I object as cumulative.

THE COURT: Overruled. It will be admitted and published.

(Government's Exhibit No. 87 was received into evidence and published.)

Q. I'm going to jump straight to the second picture. If you could just describe briefly what's depicted there in the upper left of that.

A. I'm assuming you're referencing the devil horns.

Q. Then what's below what you describe as the devil horns?

A. CLS.

Q. And are you familiar with those initials?

A. Yes.

Q. And what's depicted there on the right portion of the picture?

A. It's M513. But the 5 can also be used as an S to spell out MS-13.

Q. And is there something sort of crossed out there?

A. Sur13 appears to be crossed out.

Q. Thank you. Now during your investigation did you have occasion to interview an individual named William Gavidia?

A. I did?

Q. Did that interview take place on May 20th, 2015?

A. It did.

Q. And where did it take place?

A. The CMPD Law Enforcement Center.

Q.   Who else was present in addition to you and Mr. Gavidia?

A.   Detective Wallin.

Q.   Is Detective Wallin your partner?

A.   He is.

Q.   Now, was the room where you interviewed Mr. Gavidia equipped with recording equipment?

A.   It was both audio and video.

Q.   Are you familiar with how that equipment was set up to operate?

A.   Yes.

Q.   And was it working on May 20th?

A.   It was.

Q.   Have you reviewed the recording from that interview?

A.   I have.

Q.   Both the audio and video?

A.   Yes.

Q.   And, to your knowledge, has a transcript been prepared from that audio and video?

A.   It has.

Q.   Or from the audio.  And have you also reviewed that?

A.   Yes.

          MR. MILLER:  Your Honor, may I approach?

          THE COURT:  Yes, but not right now.

          MR. MILLER:  Okay.

          THE COURT:  I think this would be a good point to

stop and take our morning break. We have been going at it for a while.

So, members of the jury, we're going to take our morning break for 15 minutes. Don't talk about the case, keep an open mind and we'll see you at 11:45.

(The jury was escorted from the courtroom at 11:31.)

THE COURT: Any issues to discuss before we take our morning break?

MR. MILLER: One issue to forecast. The government intends on introducing several certified judgments as an admission of one of the parties. And they're self-authenticating documents pursuant to 902.4. I just wanted to front that with the Court in case there were any issues that we weren't hashing out in front of --

THE COURT: Have you shown those proposed exhibits?

MS. GREENE: I have, Your Honor. I've shown to Mr. McKnight. He's the defendant who these documents relate to.

And should the Court admit them, we've discussed possibilities of how to publish it in a way that would limit the prejudice and the sentence and things like that, that are on there, with redactions.

THE COURT: Mr. McKnight.

MR. McKNIGHT: Your Honor, as far as that's concerned, Your Honor, I do have an objection as it relates to

the JNC or the judgment and commitment involving the 2008 offense. That was the same offense for which there was a pretrial motion and there was discussion about that --

THE COURT: Right. So you're not waiving that objection even though it's been overruled by the Court.

MR. McKNIGHT: Well, Your Honor, I think, as that relates in terms of the government being able to offer facts or information as it relates to that offense. This, however, Your Honor, is a copy of an actual judgment as it relates to a conviction.

So those two things, Your Honor, I would say are slightly different in terms of the Court -- in terms of the ruling in the pretrial motion. Because the way it's couched in the Government's motion in limine is in terms of information as it relates to that particular.

THE COURT: Now they're seeking, not only information, but the defendant's admission of guilt --

MR. McKNIGHT: Correct.

THE COURT: -- and you're opposed to that.

What's the relevance of --

MR. MILLER: The relevance is the defendant's admission to an offense via a guilty plea. So it's very relevant to the facts to establish it. I believe that with the proper redactions we could limit the prejudicial effect as much as possible.

THE COURT: I think what I will do is allow you to question the witness about it, show him the judgment, ask him about the admission, but that's as far as you are going to be able to go with that.

MR. MILLER: Thank you, Your Honor.

THE COURT: Not going to admit the actual document.

MR. MILLER: And does that apply to that 2008 judgment. Because we do have two others, as well. I just don't want to admit something if the Court's ruling also applies.

THE COURT: Is there an objection to the others?

MR. McKNIGHT: Not to 2013, Your Honor.

THE COURT: All right.

MR. MILLER: Thank you, Your Honor.

THE COURT: All right. We'll take a 15 minute break at this time.

(Recess at 11:33 until 11:49.)

THE COURT: Ready for the jury.

MR. MICHEL: Your Honor -- are you planning on introducing the audio?

MR. MILLER: What I'm planning on doing is showing audio and video, just select clips, Your Honor.

THE COURT: I'll give an instruction on that.

MR. MICHEL: My concern, as I'm looking through the transcript is -- in the beginning they're talking about -- we

got -- went to the Grand Jury, we got an indictment so there's probable cause to believe that they're guilty. I think we have enough evidence to make it stick, and things like that. I don't know if that's appropriate.

MR. MILLER: We're just playing certain clips, Your Honor, not the whole interview. And we've done our best to limit that prejudicial evidence based on those clips. And we don't plan on introducing the transcript as evidence -- as an exhibit.

THE COURT: Right.

MR. MILLER: Just as a demonstrative aid.

THE COURT: I'll instruct the jury on transcripts just being an aid to the recording not evidence themselves.

MR. MILLER: Thank you.

THE COURT: Thank you.

Call the jury.

(The jury was returned to the courtroom.)

THE COURT: Mr. Miller.

MR. MILLER: May I approach now?

THE COURT: You may.

MR. MILLER: Thank you, Your Honor.

Q. Detective White, I'm handing you what's been marked as Government's Exhibit 51.

Do you recognize that as a CD containing the audio and video recording of your interview with Mr. Gavidia on May 20,

2015?

A.   I do.

Q.   And how do you recognize it?

A.   It has my initials and the date I reviewed it at the top.

Q.   And when you reviewed it, did you find it to fairly and accurately depict what you heard during that interview and saw?

A.   I did.

MR. MILLER:   Your Honor, at this time the government offers Exhibit 51.

THE COURT:   Any objection?

MR. MICHEL:   No objection.

THE COURT:   Let it be admitted.

(Government's Exhibit No. 51 was received into evidence.)

Q.   And I'm now handing you what's been marked as 51D.   Do you recognize that?

A.   Yes.

Q.   What is 51D?

A.   A transcript of the recorded interview that I just viewed.

Q.   How do you recognize the transcript?

A.   It has my initials on the document?

Q.   And would the transcript of that interview -- is it a fair and accurate transcription of what you reviewed on

Exhibit 51?

A.    Yes, sir, it is.

Q.    And would it assist you in your testimony?

A.    It would.

MR. MILLER:  Your Honor, at this time we would just offer 51D as a demonstrative aid, not as substantive evidence as an exhibit.

THE COURT:  I will admit Government's Exhibit 51D with this instruction to the jury:

That Government's Exhibit 51D purports to be a record of what is said on Government's Exhibit 51, you're instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or the identity of the speakers is entirely for you to determine. You should make this determination based on the testimony regarding preparation of the transcript, your own comparison of the transcript to what you hear on the recording, and any other relevant evidence or testimony.  And should you determine that the transcript is incorrect or inaccurate in any way, you should disregard it to that extent.  It is not the evidence.  The evidence is Exhibit 51.  It is just merely an aid to your understanding of Government's Exhibit 51.

MR. MILLER:  Thank you.

Q.    Detective White, I'm going to ask you to review portions of that interview in a moment.  First I would just like to ask

you a couple of questions about your interview with Mr. Gavidia.

During the interview that you had with Mr. Gavidia, did he admit to you that he was a member of MS-13?

A.    Yes, he did.

Q.    Did he ever tell you if or when he was ever jumped into the gang?

A.    He said he couldn't remember.

Q.    Did Mr. Gavidia, during your interview, talk at all about attending gang meetings?

A.    He did.

Q.    What did he say about that, generally?

A.    One specific meeting he mentioned was when an MS member from Virginia came down, and they had a meeting behind some apartments where ultimately there was an argument over his brother's nickname being the same as the person from -- the MS member's name from Virginia.

Q.    Through your investigation, are you familiar with William Gavidia's brother?

A.    I am.

Q.    Do you know what his nickname is?

A.    Scrappy.

Q.    Now, prior to speaking with Mr. Gavidia, were you already familiar with this meeting through your investigation?

A.    I was, yes.

Q.   And explain that for us.

A.   We had received information there was an MS gang meeting occurring in some apartments off Farm Pond Lane.  I responded there and tried to put eyes on them, but when I pulled in everyone began to scatter and left in different vehicles.

Q.   Now, based on your coming up on this meeting, were you able to identify anyone who was there?

A.   I was not.  It was nighttime.

Q.   Could you tell approximately how many people were at this meeting?

A.   Approximately between 12 and 15.

Q.   All right.  I'm going to play for you now a clip from Government's Exhibit 50 -- 51.  This is 51A.  Excuse me.

     Now, in addition to the meeting that we just heard you discussing with Mr. Gavidia there, did he talk to you about attending any other meetings?

A.   He did.

Q.   What did he say about that?

A.   He talked about when he first got started with the gang that he was a lookout and wasn't in the circle for another meeting.

Q.   Did he refer to himself with any particular term at that time?

A.   He said, "When he was a soldier."

Q.   I'm now going to play for you part of Government's

Exhibit 51C.

MR. MILLER:  We'll come back to this in a moment.

Q.   Now, in addition to discussions about the gang meetings, did Mr. Gavidia ever talk to you about crimes he participated in as a member of MS-13?

A.   Yes, sir.  He admitted to taxing drug dealers in the clubs, a fight at Mi Cabana, and ultimately a shooting at Mi Cabana.

Q.   Now, just to be clear, Mr. Gavidia never said he was the shooter.

A.   No, he did not.

Q.   I'm going to take those kind of in turn, beginning with the taxing of drug dealers.

What did Mr. Gavidia say about that, generally?

A.   Mr. Gavidia explained how it worked and admitted that he participated in it.

Q.   I'm going to play for you now, the beginning of that Government's 51C that we just heard a moment ago.

Now you also mentioned talking about an incident at Mi Cabana.

A.   Yes, sir.

Q.   What did Mr. Gavidia say about that incident?

A.   Mr. Gavidia admitted to being in a fight at Mi Cabana. He stated that the bouncers started it.  And there were approximately 15 people involved in the fight.

Q.   Did he also -- I believe you testified a moment ago that he discussed the shooting in connection with that incident as well?

A.   He did.

Q.   Did he ever identify who the shooter was?

A.   Yes.  He ultimately identified Albert Vela Conejo.

Q.   What if anything did he say about whether he knew that someone in his group had a gun?

A.   He was reluctant at first to talk about it but admitted later on someone had a gun in case something happened that night.

Q.   Based on your interview with Mr. Gavidia, did he ever indicate that he felt responsible for what happened?

A.   He did.  At least three times he said he either felt responsible or felt like it was his fault.

Q.   Did Mr. Gavidia also discuss what happened after the shooting?

A.   He did.

Q.   What did he say about that?

A.   He stated that they went back to Cabarrus Arms in Kannapolis, had a discussion about it, and Pelon's car was painted.

Q.   I'm going to now show you the final clip that we have here from the interview, which I guess would be Government's Exhibit 51B.

Now, were you familiar with the Mi Cabana incident, based on your work as a gang detective?

A. I was.

Q. And had you been involved, at least in some capacity, in the investigation of that shooting?

A. I had.

Q. So when you were talking with Mr. Gavidia about Pelon's car being painted, were you already aware that his car had been painted?

A. I was, yes.

Q. And how were you aware of that?

A. Pelon actually brought the car to the law enforcement center, and it was processed by crime scene and I observed it that day.

Q. I'm going to show you what's been previously marked as Government's Exhibit 84. And this will be two pictures and just scroll through them.

Do you recognize those pictures?

A. Yes, that's Pelon's car after it had been spray painted.

Q. Is that a fair and accurate picture of what you saw at the law enforcement center?

A. It is.

MR. MILLER: Your Honor, at this time the government asks Exhibit 84 be admitted.

THE COURT: Any objection?

MR. MICHEL:  No objection.

THE COURT:  Let them be admitted.

(Government's Exhibit No. 84 was received into evidence and published.)

MR. MILLER:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. MICHEL:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. MICHEL:

Q.   You had mentioned Pelon.  What's his real name?

A.   Ulices Morales Murrano.

Q.   He was somebody who was working with the government at the time?

A.   He was.

Q.   How long had he been working with the government, to your knowledge?

A.   I think, since 2011.

Q.   Okay.  Do you know if he was paid?

A.   He was paid by CMPD.

Q.   And he's never been charged with any of this stuff, has he?

A.   No, sir.

Q.   Is that because of his working for the government in this case?

A.   Partially, yes.

MR. MICHEL: Okay. No more questions.

THE COURT: Mr. Smith.

MR. SMITH: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. SMITH:

Q. You testified you worked a substantial amount of time on this particular MS investigation, right?

A. Yes, sir.

Q. When did this investigation begin?

A. This actual investigation began in 2013.

Q. Okay. There's documents and other incidents and, in fact, the conspiracy as a whole is charged all the way back to 2010; is that right?

A. Yes, sir, it is.

Q. Did you participate from 2010 to 2013 also?

A. As part of my role at CMPD and at Homeland Security Investigations, I -- I'm always trying to track what's going on with MS-13.

Q. You're on the gang unit, right?

A. I am.

Q. That's your job, right?

A. Yes, sir.

Q. Okay. Also -- (electronic device making sounds.)

MS. COSTNER: I'm so sorry. I apologize, Your Honor. I do not know why it did that.

MR. SMITH:  All right.  Now if I can --

THE COURT:  Hang on a second.  Let me make sure we're all right on the technical side.

MS. COSTNER:  I'm sorry, Your Honor.  I turned it off, Your Honor.

THE COURT:  Are we good?

MS. COSTNER:  Yes, I think so.

THE COURT:  You may continue Mr. Smith.

MR. SMITH:  If I may, could we republish Government's Exhibit 87, the second picture in that.

(The exhibit was published to the jury.)

Q.   Directing your attention to the middle portion of that photo.  There's a number of Xs on there, correct?

A.   Are you speaking about the lower middle part of the photo?

MR. SMITH:  If I may, Your Honor.  Am I going to be able to mark on this screen here?

THE COURT:  That's a good question.  You should be able to.

MR. SMITH:  Should be.

There's nothing up there.  Okay.  There it is. Thank you very much.

Q.   This is the portion of the photo that I'm discussing.

A.   Okay.

Q.   Can you describe again, for the jury, what is depicted in

this portion of the picture?

A.   It appears to be the word Sur 13.  With the s-u-r, the paint is starting to fade underneath the new X'ing out paint on the top of it.  The one and the three are over to the right of the screen.

Q.   Would it be fair to characterize the paint with the X's as being similar to the paint in the rest of the picture?

A.   It's more fresh.

Q.   It looks similar to the other paint, right?

A.   Yeah.  It looks like spray paint.

Q.   Okay.  Looks like somebody spray painted over and X'd out Sur 13, right?

A.   Correct.

Q.   That's because Sur 13 is a rival gang of MS-13, correct?

A.   They are.

Q.   They don't like each other, right?

A.   In Charlotte they don't like each other.

Q.   Okay.  And when they see Sur 13 painted on something, it's not uncommon for it to be X'd out as part of their graffiti, correct?

A.   Correct.

Q.   Thank you.  You can take it down.  I appreciate it.

     Also, as a part of this investigation, or as a part of your role with CMPD, on October 24, 2013 you responded to a traffic stop involving Christian Bergamasco; is that right?

A.    I'm not 100 percent on the date, but I have responded to a traffic stop.

Q.    This was the one that involved the gun.  Do you remember that one?

A.    I do.

Q.    And that's -- his nickname is Echo, correct?

A.    Correct.

Q.    And he was driving a BMW that night; is that right?

             MR. MILLER:  Objection to beyond the scope.

             THE COURT:  Overruled.

Q.    He was driving a BMW that night, correct?

A.    I think it was a BMW.  I'm not 100 percent sure.

Q.    And law enforcement, to your knowledge, had made voluntary contact with Echo that night, correct?

A.    Actually, it was in the middle of the afternoon, I think.

Q.    Oh, it was in the middle of the afternoon?

A.    I think so.

Q.    Okay.  Thank you.  And they found a gun lying on the floor of the driver's seat of the car, correct?

A.    They had.

Q.    And you were called out to the scene, right?

A.    I was.

Q.    Isn't it true that Echo, at the time, was a government informant?

A.    No.

Q. He was not.

A. He was not.

Q. On October 24, 2013, he was not a government informant?

A. Not that I'm aware of, no.

Q. When did he become a government informant?

A. It was after the date you're speaking about.

Q. So you don't know when he was -- became one?

A. I don't know exactly when he was signed up as a government informant, no. Because I didn't handle any of the proactive sources in this case.

Q. At that particular point in time, he was on electronic monitoring; is that correct?

A. I don't recall him being on electronic monitoring at that time.

Q. You don't remember him getting arrested because -- because he was on electronic monitoring at that point?

A. I do not.

Q. Okay. And do you remember a blue bandanna being found in his car?

A. I don't remember that.

Q. You don't remember asking it be collected because -- as evidence?

A. I don't remember. If I could see a report to refresh my memory I would be happy to tell the jury what I saw there.

MR. SMITH: Your Honor, if I may -- for

identification purposes I'm putting on the ELMO what's been marked as Defendant Vega Exhibit 1.

Q.   Can you review this document?

A.   I can.

Q.   Let me know when you're done.

A.   Okay.

Q.   Does this help refresh your recollection as to the events?

A.   That Detective Wallin wrote down?  Yes.

Q.   Right.  He was your partner, right?

A.   Yes.

Q.   Direct your attention to page 2, just so that you can refresh your recollection to the whole thing.  Let me know when you're done.

A.   Yes, sir.

Q.   Does that help refresh your recollection?

A.   It does.

Q.   Now -- and do you recall that Mr. Bergamasco, also known as Echo, was arrested that night?

A.   Yes.

Q.   Based on the fact that he was on electronic monitoring; is that right?

A.   I don't think it was for the fact he was on electronic monitoring.  I think it was just immigration took him into custody for violating the terms of his immigration status.

Q.   By having the gun, right?

A.   I don't -- that would be -- yes.

Q.   Yes.

A.   That would be my assumption.

Q.   Pardon me?

A.   That would be, yes, what I assume from that.

Q.   And that would then -- also a blue bandanna was collected as part of evidence, right?

A.   According to Detective Wallin's statement, yes.

Q.   Part of using undercover informants and things like that, you utilize video recordings; is that correct?

A.   We do.

Q.   If you can.

A.   If you can.

Q.   Right.  If it's going to be helpful to the investigation.

A.   Correct.

Q.   Also audio recordings.

A.   We do.

Q.   Hand-to-hand drug buys.

A.   We do.

Q.   Gun buys.

A.   We do.

Q.   And, in fact, all of those things were utilized in this case, correct?

A.   They were.

Q.   In addition, through other sources and through other pieces of information, you try to identify every known gang member in Charlotte, correct?

A.   We do our best.  Yes, sir.

Q.   You try as hard as you can.  That's your job, right?

A.   That's my job, yes.

MR. SMITH:  May I have one second, Your Honor?

No further questions.

THE COURT:  Mr. McKnight.

MR. McKNIGHT:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q.   Detective White, with regards to going back to what you testified to earlier about the incident at Halo -- strike that.  You going to Halo.  The government mentioned focused enforcement.  That, in essence, is another way of saying law enforcement being proactive, is that part --

A.   It is.

Q.   -- of the definition.

So in terms of focused enforcement, you may go to a location not necessarily because a crime was being committed there, but just in terms of showing police presence; is that safe to say.

A.   At times we do use, especially in our position, we would go to an area and actually try to use our presence as a

deterrent.

Q. Understood. As a deterrent to deter something from possibly happening, right?

A. Yes, sir.

Q. And so when you testified earlier about going to -- I do believe you said Club Halo that particular night there wasn't an actual altercation at that time, was there?

A. Not that we observed, sir.

Q. Not that you observed, right.

So you were there just going there to be proactive, right?

A. Yes, sir.

Q. And Mr. Sosa came out of the club, and at that point you attempted to make what would be considered voluntary contact with him, right?

A. I did.

Q. And voluntary contact is, in essence, when a law enforcement officer approaches any citizen and attempts to engage them in a conversation; is that right?

A. Yes, that's correct.

Q. And since it's voluntary contact, any citizen has the right to not engage that law enforcement officer in that conversation and walk away; is that right?

A. Yes, sir. That's his right.

Q. And so with regards to Mr. Sosa, Mr. Fec Rodriguez, and

Mr. Rivas, all of those were voluntary contacts; is that right?

A.    Yes, sir.

Q.    And they got into the car and then they left; is that right?

A.    Yes, sir.

MR. McKNIGHT:  One moment.

Q.    With regard to the best of your knowledge of Mr. Fec Rodriguez, were you aware or did you ever become aware that he actually dates Mr. Sosa's sister?

A.    Yes.

Q.    And so it wouldn't necessarily be unusual for Mr. Sosa to be around Mr. Fec Rodriguez, given that Mr. Fec Rodriguez has a relationship with his sister.  Would you agree with that?

A.    I would say that would be normal for most people, yes.

MR. McKNIGHT:  That's all.

THE COURT:  Mr. Beechler.

MR. BEECHLER:  No questions, Your Honor.

THE COURT:  Redirect.

MR. MILLER:  One question, Your Honor.

                    REDIRECT EXAMINATION

BY MR. MILLER:

Q.    In response to a question that Mr. Smith asked you, you testified that MS-13 and Surenos are rivals in Charlotte.

A.    Yeah.

Q.    Are you aware of any areas where those two gangs are not rivals?

A.    Well, in certain parts of the country, MS members are actually considered Surenos.  So Charlotte's kind of a melting pot, and here Surenos and MS don't get along.

But I've had the opportunity to travel to LA, and we talked to their detectives and gang officers out there.  And if you tell them the Surenos and MS aren't getting along, they look at you funny because out there they're considered one in the same.

MR. MILLER:  That's all, Your Honor.  Thank you.

THE COURT:  You may step down.

MR. SMITH:  Your Honor, may I clarify one thing, and that may make things easier later.

THE COURT:  On recross?

MR. SMITH:  No, sir.  Just as it relates to an exhibit that I showed this witness.

THE COURT:  You may.

MR. SMITH:  May I change Defendant Vega's Exhibit number to 100, as opposed to 1, just for later purposes to refresh his recollection on.

THE COURT:  All right.  Thank you.

MR. SMITH:  Thank you, Your Honor.

THE COURT:  You may step down be excused.

Call your next witness.

MS. GREENE:  The government calls Erick Aragon-Hernandez.

THE COURT:  May I see the attorneys at sidebar.

(Bench conference as follows:)

THE COURT:  I got a note from a juror that the microphones are picking up conversation from counsel.  And so if you're conferring with your client, you need to press the green light off on that microphone.  Otherwise you run the risk of it being picked up by the system.  So I wanted to let the attorneys know that.

MR. MILLER:  Thank you, Your Honor.

(Bench conference was concluded.)

ERICK ARAGON-HERNANDEZ, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GREENE:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   Would you please tell the jurors your name?

A.   Yes, ma'am.  My name is Erick Aragon-Hernandez.

Q.   And, Mr. Hernandez, what's your first language, Spanish or English?

A.   Spanish, ma'am.

Q.   Do you think you're okay today without using an interpreter?

A.   Yes, ma'am.

Q.   Okay.  If you need one, we have interpreters present in the courtroom to assist us; just let us know, all right?

A.   All right.

Q.   Mr. Hernandez, could you please tell the jurors how old you are and where you are originally from?

A.   I'm 23 years old and I'm from Mexico.

Q.   How old were you when you and your family came to the United States?

A.   I came here when I was 10 years old.

Q.   And why did you and your family come to the United States?

A.   To have a better life.

Q.   And did you move here with your parents?

A.   Yes, ma'am.

Q.   Did you have any siblings?

A.   No, ma'am.

Q.   Okay.  Have you always lived in Charlotte here in the United States?

A.   Yes, ma'am.

Q.   This has always been your home here?

A.   Yes, ma'am.

Q.   Mr. Hernandez, how far did you go in school?

A.   Eleventh grade.

Q.   I'm sorry?

A.   Eleventh grade.

Q.   Are you married?

A.   No, ma'am.

Q.   Do you have any children?

A.   Yes, ma'am.

Q.   And prior to your arrest -- which we're getting ready to talk about -- prior to your arrest, did you work?

A.   Yes, ma'am.

Q.   And what kind of work did you do?

A.   Framing -- framing houses.

Q.   Mr. Hernandez, are you a member of MS-13?

A.   Yes, ma'am.

Q.   What clique?

A.   HLS, ma'am.

Q.   What does HLS stand for?

A.   Hollywood Locos Salvatruchos.

Q.   Were you in a clique before in Hollywood?

A.   Yes, ma'am, I was.

Q.   What was your first clique you were in?

A.   TLS.

Q.   What does TLS stand for?

A.   Trece Locos Salvatruchos.

Q.   Why did you eventually jump cliques?

A.   I was having problems with TLS members.

Q.   What kind of problems?

A.   They weren't following the rules.

Q. Did you find Hollywood to be more disciplined?

A. Yes, ma'am.

Q. And do both TLS and HLS have a presence here in Charlotte?

A. Yes, ma'am.

Q. Now, Mr. Hernandez, how did you get to court today?

A. Two federal agents brought me here and they're taking me back home, too.

Q. Why did two federal agents bring you to court and why are they taking you home?

A. I was released by the court under a witness warrant.

Q. A material witness warrant?

A. Yes, ma'am.

Q. And are you under home incarceration?

A. Yes, I am.

Q. And, Mr. Hernandez, are you under home incarceration and here pursuant to a material witness warrant because you pled guilty to some charges and you're required to come here and testify as part of this case?

A. Yes, ma'am.

Q. Do you remember the crimes that you pled guilty to?

A. Yes, ma'am.

Q. And can you tell the jury what you pled guilty to?

A. Assault with a deadly weapon in aid of racketeering activity and trafficking heroin.

Q.   And are both of those charges to which you have pled guilty related to your membership in La Mara Salvatrucha?

A.   Yes, ma'am.

Q.   Now, Mr. Hernandez, I'm going to put up on the screen for you there Government's Exhibit 52.  And I'm just going to take a second and let you -- we're going to review the contents of it.

Mr. Hernandez, can you see what we have marked as Government's Exhibit 52?

A.   Yes, ma'am.

Q.   And we're just going to scroll through each of those pages for you.

A.   All right.

Q.   And do you recognize that document?

A.   Yes, ma'am.

Q.   What is that document?

A.   It's my plea agreement.

Q.   Does your signature appear on it?

A.   Yes, ma'am.

Q.   My signature?

A.   Yes, ma'am.

Q.   Your attorney at the time?

A.   Yes, ma'am.

Q.   And what's the date on this plea agreement?  The date that you signed it.

A.    10/3/14.

Q.    And, Mr. Hernandez, when you pled guilty to assault with a deadly weapon in aid of racketeering and possession with intent to distribute heroin, does that plea agreement require you to cooperate with the government?

A.    Yes, ma'am.

Q.    Do you really have any choice but to be here today?

A.    No, ma'am.

Q.    Now, Mr. Hernandez, has -- has the Court sentenced you?

A.    Yes, ma'am.

Q.    And can you tell the jury what sentence you've already received?

A.    Twenty-eight months.

Q.    Twenty-eight months?

A.    Yes, ma'am.

Q.    And was that sentence based, in part -- your charges and the sentence that you received -- based upon the cooperation that you've provided to the government regarding your gang, MS-13?

A.    Yes, ma'am.

Q.    And what happens -- well, let me ask you this:

      As part of your cooperation have you been interviewed by law enforcement?

A.    Yes, ma'am.

Q.    Do you remember how many times law enforcement has talked

with you?

A.   No, ma'am.

Q.   Several?

A.   Several.

Q.   And what is your understanding of your plea agreement with regard to some of the other crimes that you've committed that we're going to talk about if you lie here today?  What could the consequences be?

A.   If I lie today you can come back and charge me with all the crimes we talked about.

Q.   And, Mr. Hernandez, have you been made any promises -- I mean, I know you've already been sentenced, but has the government made any other promises to you?

A.   No, ma'am.

Q.   Have we given you any money?

A.   No, ma'am.

Q.   Has the government relocated your family?

A.   No, ma'am.

Q.   But did your family, in fact, have to move because of your cooperation in this case?

A.   Yes, ma'am.

Q.   Did your family pay for that move out of their pocket?

A.   Yes, ma'am.

Q.   Mr. Hernandez, other than the crimes that you've pled guilty to in this case, have you been convicted of any other

felonies?

A.   No, ma'am.

Q.   Now, your plea agreement in this case was dated October of 2014.  But would it be fair to say that you began cooperating with the government or providing information to investigators actually prior to the date of your plea agreement?

A.   Yes, ma'am.

Q.   And do you know when that began?  When you began giving information to the government?

A.   Not exactly, ma'am.

Q.   Was it after you got arrested on your state charges?

A.   Yes, ma'am.

Q.   And just so the jury understands, were your charges originally in state court, the shooting and the heroin?

A.   Yes, ma'am, they were.

Q.   Tell the jurors about how many members of MS-13 you provided information about.

A.   About, at least 30.

Q.   And when you provided that information about 30 other MS-13 gang members, did you also admit to other crimes that you had committed?

A.   Yes, ma'am.

Q.   Were those crimes you've never been arrested for?

A.   Exactly.

Q. Crimes the police hadn't solved?

A. Yes, ma'am.

Q. When were you jumped into the Mara?

A. Here in Charlotte.

Q. And do you remember when that was?

A. No, ma'am. I was 14 years old.

Q. You were 14?

A. Yes, ma'am.

Q. And why did you become a member of MS-13?

A. I felt respected and feared by others.

Q. How did you -- how did you become a member of MS-13? What was that process?

A. Well I was -- I had a friend in middle school that was MS and people used to see me with him. He would get into fights. I would be there. So people started seeing me as an MS member and started fighting and stuff like that.

Q. And before you were actually jumped-in, before you got your 13 seconds, did you kind of have a period where you had to prove yourself to the gang?

A. Yes, ma'am.

Q. Does that have a name?

A. Yes, ma'am.

Q. And what is that?

A. Chequeo.

Q. What do you do during your period -- your chequeo period,

or your walk-through period?

A.    Get into fights, assault people.

Q.    And what is the purpose of getting into fights and assaulting people during your chequeo period?

A.    To prove that MS is the most feared gang.

Q.    And is it also you proving something about yourself to MS so that they'll let you in?

A.    Yes, ma'am.

Q.    What are you trying to prove to MS-13 about you so that they will let you in?

A.    That you're ready; you got what it takes to be one of them.

Q.    What is expected of you to become a member of MS-13?

A.    To sell drugs for MS, assault people, rob people.

Q.    Did you do each of those things?

A.    Yes, ma'am.

Q.    And to be fair, you shot at some people too?

A.    Yes, ma'am.

Q.    Now, the money -- did you make some money from selling drugs?

A.    Yes, ma'am, I did.

Q.    What was the drug that you sold for the gang?

A.    Heroin and weed.

Q.    Heroin and weed.  And did you also make some money off robbing people?

A.    Yes, ma'am.

Q.    Did you make some money from your real job?

A.    Yes, ma'am.

Q.    And what, if anything, were you expected to do with your money, whether it was from committing crimes or from your framing job?  What were you expected to do with regard to that money and the gang?

A.    Buy guns and send money to El Salvador.

Q.    And who's in El Salvador?

A.    The main -- the main people from MS.

Q.    Now, Mr. Hernandez, to be fair, did you make a lot of money?

A.    Yes, ma'am.

Q.    You did?  How much would you get from, say, a gram of heroin?

A.    $100 at least.

Q.    Okay.  How much might -- what would be a good lick?  A good robbery.  How much money would you make off a good lick?

A.    Maybe 10,000.

Q.    10,000?

A.    Yes, ma'am.

Q.    Off a good lick.

A.    Yes, ma'am.

Q.    What were you robbing to get $10,000?

A.    Drug dealers.

Q.   Oh, okay.  What about if you weren't robbing drug dealers.  If you were robbing, say, someone just leaving a club at night, how much might you make?

A.   Maybe $500, $1,000.

Q.   And so at least part of that money would go back to the gang?

A.   Yes, ma'am.

Q.   Now, did it go to your -- to your clique, either TLS or HLS at the time?

A.   Yes, ma'am.

Q.   Did the clique have its own guns?  Like, did you share guns?

A.   Sometimes we do.  Sometimes we don't.

Q.   And could you share guns with other cliques?

A.   It all depends.  If everybody agrees.

Q.   If everybody what?

A.   Agrees.

Q.   If everybody agrees.

And, Mr. Hernandez, what if anything do you know about members of the Mara here in the United States talking with members of the Mara in other countries?

A.   Well, they try to hide people from the law, help them out.

Q.   Try to hide people from law enforcement?

A.   Yes, ma'am.

Q. Do gang members -- do MS members here in the United States talk to members of MS-13 in other countries?

A. Yes, ma'am.

Q. Do you talk to MS-13 members in other states?

A. Yes, ma'am.

Q. If I say the words "kill, control" to you, what does that mean?

A. Got to prove you're the most dangerous gang in the world.

Q. So you associate that with MS-13?

A. Yes, ma'am.

Q. If I say the words to you, "What do you bang?" What if anything does that mean to you?

A. Maybe that you're a rival gang member.

Q. When you were running with MS-13 in Charlotte before you got arrested -- and to be clear, you got arrested in the summer of 2013, right?

A. Yes, ma'am.

Q. Prior to your arrest, where in Charlotte was MS-13 hanging out and doing its business?

A. Clubs and bars.

Q. And do you remember any of those specific clubs and bars where you guys would go?

A. Yes, ma'am.

Q. And what were some of those?

A. La Zima, Tornado, Mi Cabana, Don Carlos.

Q. Did you ever go to Mamasita's?

A. Yes, ma'am.

Q. Did -- did MS in Charlotte consider those clubs -- or some of those clubs -- to be its territory?

A. Yes, ma'am.

Q. How would MS-13 make something its territory here in Charlotte?

A. By not letting other gang members in there.

Q. How would you prevent other gang member from being there?

A. You kick them out. You fight them. Try to kill them.

Q. Did you participate in taxing drug dealers in any of those clubs?

A. Yes, ma'am.

Q. Are you aware of other MS-13 members that would tax drug dealers in those clubs?

A. Yes, ma'am.

Q. How would you all tax the drug dealers?

A. Would threaten them with killing their families and stuff like that.

Q. And how much money would they give you?

A. Whatever -- whatever we asked for. At least half of what they get.

Q. Now, we talked about Hollywood Locos Salvatrucha, TLS, being in Charlotte as well. What are some of the other cliques here in Charlotte?

A.   CLS.  CHLS.

Q.   And did you ever talk to or visit with MS-13 members from other states?

A.   Yes, ma'am.

Q.   What states?

A.   Virginia, Maryland, Chicago.

Q.   Did you say Chicago?

A.   Yes, ma'am.

Q.   And what -- what cliques in those states were you speaking with?

A.   Mostly Hollywood.

Q.   And would you talk on the phone to members in those states or did you actually travel to visit with them?

A.   Both.

Q.   Both?

A.   Yes, ma'am.

Q.   And what would be the purpose of talking with MS members in other states?

A.   Whenever somebody was not doing what they were supposed to, or just to make money.

Q.   And when you say they talk about people not doing what they were supposed to, what do you mean by that?

A.   If somebody disrespect another gang member, or if somebody's doing coke, which is prohibited by MS.

Q.   Are you familiar with the East Coast Program?

A.   I know about it, but I was already in jail when that happened.

Q.   Okay.  Did any MS-13 members from other states come here to Charlotte to meet?

A.   Yes, ma'am.

Q.   And what states?

A.   Mostly Virginia.

Q.   You talked about -- you used cocaine as an example of breaking the rules.  What's the number one rule of MS-13?

A.   Don't talk to the police.

Q.   Don't talk to the police?

A.   Yes, ma'am.

Q.   Have you violated that rule?

A.   Yes, ma'am.

Q.   Are you violating the rules of MS-13 by being here today?

A.   Yes, ma'am.

Q.   And who is snitching is always something MS-13 is trying to figure out, right?

A.   Yes, ma'am.

Q.   How do you spot a chavala?

A.   Follow them from the club.  We just is -- if you know where he stay at, we just go to his house and wait there till he show up.

Q.   How do you know who's a chavala, though?

A.   The way they dress.

Q. Anything else about them that would tell you that they're a rival?

A. The colors they wear, their tattoos.

Q. So, Mr. Hernandez, I want to talk to you about a couple of specific people, okay.

A. All right.

Q. So do you know someone named "Duro"?

A. Yes, ma'am.

Q. How do you know this person named "Duro"?

A. I met him at the club and at one meeting.

Q. All right. And the person that you know as Duro, if you would just look around the courtroom and let us know if you see that person here.

A. Yes, ma'am.

Q. Could you please point him out and tell us what he's wearing or where he's sitting?

A. He's right there (indicating) wearing a white T-shirt.

Q. And what seat is he in? Counting over from me, what seat is he in?

A. First one. The second seat.

Q. Okay. And what color shirt is he wearing?

A. White.

Q. Does he have a tie on?

A. Yes, ma'am.

MS. GREENE: Your Honor, if the record could reflect

that Mr. Hernandez has identified defendant William Gavidia.

THE COURT:  It will.

MS. GREENE:  Thank you.

Q.   What if anything do you know about Mr. Gavidia being a member of MS-13?

A.   I don't know much.  I only seen him a few times at the club.

Q.   Was he in a different clique than you?

A.   Yes, ma'am.

Q.   Do you know what clique he was in?

A.   Yes, ma'am.

Q.   What clique?

A.   CLCS.

Q.   Coronados Little Cycos?

A.   Yes, ma'am.

Q.   What club did you see Duro at?

A.   Rhodeo.

Q.   At Rhodeo?

A.   Yes, ma'am.

Q.   Where in Charlotte is Rhodeo?

A.   It's on Albemarle Road.

Q.   When you saw Duro at Rhodeo, who was he hanging out with? What was going on?

A.   He was just there with people from his clique.

Q.   Did you recognize any of the other folks from his clique?

A.   Yes, ma'am.

Q.   And who did you recognize?

A.   Echo, Temper.

Q.   Now, did you ever see Duro at a meeting?

A.   Yes, ma'am, only one time.

Q.   Okay.  And I'm going to direct your attention to on or about December 22, 2012.  Do you remember that?

A.   Yes, ma'am.

Q.   And what happened on December 22, of 2012?

A.   People from Virginia came to fix some problems about their clique, and they asked me and some other guys for help.

Q.   So what clique -- what clique were they trying to fix?

A.   His clique, CLCS.

Q.   CLCS?

A.   Yes, ma'am.

Q.   And why would folks from Virginia come down to assist with that?

A.   He was the main leader.

Q.   The main leader of what?

A.   Of his clique.

Q.   Of CLCS?

A.   Yes, ma'am.

Q.   Do you remember where that meeting was, Mr. Hernandez?

A.   Yes, ma'am.  It was at my apartment.

Q.   Was it inside or outside?

A.   Outside, ma'am.

Q.   Do you remember what other MS-13 members were there, if any?

A.   Yes, ma'am.

Q.   Who else was there?

A.   Scrappy, Temper, Chele, Pelon.

Q.   Who were the members that came down from Virginia?

A.   Scrappy and Lagotta.

Q.   So there was -- was Scrappy from CLCS there?

A.   Yes.

Q.   And then Scrappy from Virginia?

A.   Yes, ma'am.

Q.   And can you tell us whether or not there was an issue over Scrappy from CLCS and Scrappy from Virginia having the same nickname?

A.   Yes, ma'am.

Q.   Was there also someone named Gatta at that meeting?

A.   Yes, ma'am.

Q.   Who is Gatta?

A.   She is a member of Hollywood.

Q.   Was there also an MS-13 member there who goes by the name of Lunatico?

A.   Yes, ma'am.

Q.   I want to show you what we have marked as Government's Exhibit 53, Mr. Hernandez.  And it's going to be three

photographs.

Have you had a chance to look at all three of those pictures?

A.    Yes, ma'am.

Q.    Do you recognize each person shown in those photographs?

A.    Not the girl.

Q.    Not the what?

A.    Not the girl.

Q.    Okay.  Do you recognize the person in that picture?

A.    No, not really.

Q.    No?  Go to the third picture.  Do you recognize that person?

A.    Yes, ma'am.

Q.    And who is that person?

A.    Lunatico.

Q.    Do you know Lunatico's real name?

A.    Yes, ma'am.

Q.    What's his real name?

A.    Daniel.

Q.    And does that third picture of Government's Exhibit 53 fairly show what Lunatico or Daniel looks like?

A.    Yes, ma'am.

Q.    Does that look like him?

A.    Yes, ma'am.

MS. GREENE:  Your Honor, I ask that the third

photograph of Government's Exhibit 53 be received and published.

THE COURT: Any objection?

MR. MICHEL: No objection.

THE COURT: Let it be admitted and published.

(Government's Exhibit No. 53 was received into evidence and published.)

MS. GREENE: Thank you, Ms. Neill.

Q. Now, how did that meeting end?

A. We had to run because the police got there.

Q. Now I want to talk to you about an individual who goes by the either "Koki" or "Loco." Do you know someone that goes by either of those nicknames?

A. Yes, ma'am.

Q. Do you know his government name as well?

A. No, ma'am.

Q. Okay. Would you look around the courtroom and let us know if the person that you know as "Koki" or "Loco" is in the courtroom?

A. Yes, ma'am.

Q. Could you point him out for us, please?

A. He's sitting right there with the black jacket.

Q. And if you would start at the end of the table over there and count down. In what seat is he?

A. Third seat.

Q.   Do you need to stand up and look?

A.   No.  Fourth seat, ma'am.

Q.   Okay.  And what -- what color clothing is he wearing?

A.   Black jacket with tie.

MS. GREENE:  Okay.  And, Your Honor, if the record could reflect he has identified Jorge Sosa as "Loco" or "Koki."

THE COURT:  It will.

MS. GREENE:  Thank you.

Q.   Now, how do you -- what do you call him?  Do you call him Koki or Loco?

A.   Koki.

Q.   You call him Koki?

A.   Yes, ma'am.

Q.   So, Koki, how do you know Koki?

A.   Parties and clubs, and a couple meetings.

Q.   Did you say a couple of meetings?

A.   Yes, ma'am.

Q.   Do you remember where you first met Koki?

A.   Yes, ma'am.

Q.   And where was that?

A.   At Guanaco's house.

Q.   At Guanaco's house.

A.   Yes, ma'am.

Q.   And when you met him at Guanaco's house, do you remember

who else was there?

A.    Yes, ma'am.

Q.    Who else was there?

A.    Muneco, Trigger, Lunatico, Juanna.

Q.    Muneco, Lunatico, Trigger?

A.    Juanna.  He's been deported.

Q.    Okay.  Oh, he's been deported.

A.    Yes, ma'am.

Q.    So when you met him at Guanaco's, had he -- was he -- to your knowledge, had he been jumped in at that time?

A.    No, ma'am.  No, ma'am.

Q.    Did you have any conversation with Koki when you met him at Guanaco's about whether or not he wanted to be in MS?

A.    Not really.

Q.    Okay.  And did he ultimately get jumped in?

A.    Yes, ma'am, from what I know.

Q.    And to what clique did he get jumped in?

A.    CLS -- CHLS.

Q.    What does that stand for?

A.    Charlotte Locos Salvatrucha.

Q.    I just want to show to you make sure we're talking about the same person, Mr. Hernandez, Government's Exhibit 49.  Do you recognize the person in 49?

A.    Yes, ma'am.

Q.    And who is that?

A. Guanaco.

Q. And that's the person whose house in which you met Koki?

A. Yes, ma'am.

Q. Thank you. Now you mentioned that you attended a couple of meetings, I think, with Koki?

A. Yes, ma'am.

Q. Can you tell us what you remember about those?

A. Not much. One time he helped getting me jumped into HLS.

Q. Oh, so when you jumped cliques into HLS, Koki was there?

A. Yes, ma'am.

Q. Did he help beat you or did he count?

A. He helped beat me.

Q. So that was one of the meetings?

A. Yes, ma'am.

Q. Do you remember the second meeting at which you saw Koki?

A. Not really. It's a long time ago.

Q. But you remember seeing him at another meeting?

A. Yes, ma'am.

Q. What, if any, MS-13 clubs do you recall seeing Koki at?

A. Don Carlos, Rhodeo.

Q. And when you would see him at Don Carlos and Rhodeo, would he be with other MS-13 gang members?

A. Yes, ma'am.

Q. What if anything did you see him doing when you would see him at those clubs with MS?

A.   Nothing, but just drinking.

Q.   Do you remember what other MS members you would see him with?

A.   Yes.  Chele, Temper, Echo.

Q.   So now I want to talk to you about someone named "Most Wanted."  Do you know someone who goes by "Most Wanted"?

A.   Yes, ma'am.

Q.   Okay.  And could you look around the courtroom and let us know if you see the person that you know as "Most Wanted."

A.   Yes, ma'am.

Q.   And where is he seated?

A.   In the first seat right here.

        MS. GREENE:  Okay.  Your Honor, if the record could reflect he has identified Defendant Miguel Zelaya.

        THE COURT:  It will.

        MS. GREENE:  Thank you.

Q.   Now how -- do you actually know him by another name?

A.   Nene.

Q.   Nene?

A.   Yes, ma'am.

Q.   Is that spelled N-e-n-e?

A.   Yes, ma'am.

Q.   How do you know "Nene" or "Most Wanted"?

A.   I met him in jail.

Q.   In jail?

A.   Yes, ma'am.

Q.   That was after everybody got locked up on this case?

A.   I think so.

Q.   Okay.  And when you met Nene in jail, how did he introduce himself to you?

A.   As Most Wanted.

Q.   And why did he introduce himself to you?

A.   Because he knew I was MS.

Q.   How do MS members spot one another?  How do you know to go up to somebody and be like, Hey, I'm Beth.  I'm MS.  Like, how do you spot each other?

A.   Tattoos or the way they talk.

Q.   Did -- what if anything did Nene tell you about what clique he was in?

A.   He told me he was in CLCS.

Q.   What if any conversation did you have with Nene or Most Wanted about him being jumped into CLCS?

A.   He just told me he got in.  I didn't know much about it.

Q.   What did he tell you about it?

A.   That he had got jumped in.

Q.   Did he tell you who jumped him in?

A.   No, ma'am.

Q.   Did he tell you who was there?

A.   No, ma'am.

Q.   Did he tell you where it happened?

A.    Not really.  Not really.

Q.    No?  And did he talk to you about why he was locked up?

A.    Yes, ma'am.

Q.    What if anything did he tell you?

A.    That he had killed somebody.

Q.    Did he tell you who?

A.    No, ma'am.

Q.    And do you know someone who goes by the nickname of "Big Boy"?

A.    Yes, ma'am.

Q.    Do you see the person you know as "Big Boy" in the courtroom?

A.    Yes, ma'am.

Q.    And, again, if you would just describe him or if you could point him out to us.

A.    He's wearing kind of like a purple shirt (indicating).

Q.    And could you point at him for us?

A.    Yes, ma'am.  Right there at the corner.

Q.    In the corner?

A.    Yes, ma'am.

          MS. GREENE:  And, Your Honor, if the record could reflect he has identified the Defendant Luis Ordonez-Vega.

          THE COURT:  Can you point to the person --

          THE WITNESS:  Right there, in the corner.

          THE COURT:  It will so reflect.

MS. GREENE:  Thank you, Your Honor.

Q.    Now, how do you know Big Boy?

A.    I met him in jail too.

Q.    And did you and Big Boy have any conversations?

A.    Yes, ma'am.

Q.    And what did you and Big Boy talk about?

A.    About MS things, and his charge.

Q.    So did -- did he tell you that he was MS?

A.    Yes, ma'am.

Q.    Did you see any tattoos on him?

A.    Yes, ma'am.

Q.    Do you remember which ones?

A.    Yes, ma'am.

Q.    Describe for us any tattoos on Big Boy that you saw.

A.    He has MS on his arm and on his stomach.

Q.    What if anything else did he tell you about himself?

A.    That he had been -- he was charged with murder.

MS. GREENE:  Those are all the questions.

THE COURT:  Before Ms. Greene asks further questioning --

MS. GREENE:  I'm done, Your Honor.

THE COURT:  -- I want to remind the jury, the fact that defendants are in or out of custody is not relevant to your consideration at all.  There are many reasons why someone might be or might not be.  You should not consider custodial

testimony in any way in this trial.

Mr. Michel, any cross?

MR. MICHEL:  No questions.

THE COURT:  Mr. Smith?

MR. SMITH:  Yes, Your Honor.  It may take a little bit.  It's going to go past 1.

THE COURT:  Well, let's -- why don't we -- that's a good idea.  Why don't we take our lunch break at this time.  Thank you.

Members of the jury, we'll take our lunch break at this time for an hour.  We'll see you at 2:00.

(The jury was escorted from the courtroom at 12:58.)

(Lunch recess.)

THE COURT:  Are we ready for the jury?

ALL COUNSEL:  Yes, Your Honor.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Mr. Smith, I think you were about to start your cross-examination.

MR. SMITH:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. SMITH:

Q.   Do you go by Mr. Aragon-Hernandez or just Mr. Hernandez?

A.   Either one.

Q.   Neither one?

A.    Yes, sir.

Q.    What do you go by?

A.    Both.

Q.    Oh, either one?

A.    Yeah.

Q.    Okay.  I apologize.  I thought you said neither one.  I'm just trying to call you the right name, that's all.

So, Mr. Hernandez, one of the statements you gave was to Detective Wallin and Detective White on September 4, 2014, as a part of your debriefing; is that right?

A.    Yes, sir.

Q.    And that was with your attorney present, correct?

A.    Yes, sir.

Q.    And you met with him for a long time that day, right?

A.    Yes, sir.

Q.    About how long would you meet with him?

A.    About how long?

Q.    Yeah, how long did you meet with him?

A.    Not sure.  Maybe two hours.

Q.    Okay.  So a number of hours, right?

A.    Yes, sir.

Q.    And in that statement you went into a lot of detail, didn't you?

A.    Yes, sir.

Q.    About the people you knew, right?

A.   I did.

Q.   And the things you had done, right?

A.   Yes, sir.

Q.   Your involvement in MS-13.

A.   Yes, sir.

Q.   That your nickname is Pikachu, right?

A.   Yes, sir.

Q.   And as a part of that statement you admitted to quite a number of crimes, didn't you?

A.   Yes, sir.

Q.   Now you know somebody by the name of Christian Bergamasco-Suarez, right?

A.   I do.

Q.   And a lot of those crimes that you admitted to involved him; is that right?

A.   No, sir.

Q.   They didn't involve him?

A.   No, sir.

Q.   You didn't do things with him that you admitted to on September 4, 2014?

A.   Can you describe the crime?

Q.   Sure.  Now tell me who Echo is?  Or Christian Bergamasco is.

A.   Echo is a part of MS, is a member of MS.

Q.   And which clique?

A.   CLCS.

Q.   And was he a leader of that clique?

A.   Yes.

Q.   You told the detectives that Echo was always bragging about how many people he killed.

A.   Yes, sir.

Q.   Do you know his brother?

A.   Yes, sir, I do.

Q.   What's his name?

A.   Juan.

Q.   Bergamasco?

A.   Yes, sir.

Q.   What's his nickname?

A.   Temper.

Q.   One point you lived with the Bergamascos, didn't you?

A.   Yes, sir.

Q.   And you were involved in the shooting at the same time that Echo and Temper were present for, right?

A.   We got shot at.

Q.   You got shot at.

A.   Yes, sir.

Q.   Was that when -- that had to do with the barber shop?

A.   That -- okay.  That was -- that one crime with Echo.

Q.   That's a different one, right?

A.   That's the only one with Echo.

Q.   That's the only one with Echo?

A.   Yes, sir.

Q.   That was June 26, 2013; is that right?

A.   I can't remember the date, sir.

Q.   Does that sound close?

A.   Yeah.

Q.   So it was summertime?

A.   Yeah.

Q.   And you dropped Temper off at a barber shop on Central Avenue that day, right?

A.   Yes, sir.

Q.   Went back and you met and you picked up his brother Echo, didn't you?

A.   Yes, sir.

Q.   And then you and Echo went back and picked up Temper, correct?

A.   Yes, sir.

Q.   Then you all decided you were going to ride by some Sureno houses, correct?

A.   Yes, sir.

Q.   What does "Sureno houses" mean?

A.   Huh?

Q.   What does that mean?  Who are Surenos?  Those are rival gang members, right?

A.   Yes, sir.

Q.   So you were just going to go by their houses.

A.   Yes, sir.

Q.   You went by a rival member named Juarte, his brother's house, right?

A.   Yes, sir.

Q.   And what time of day or night was this?

A.   I can't remember.  Close to 6, because Temper's curfew was to 6:00.

Q.   Okay.  So this was daylight.  So the sun was out.

A.   Yes, sir.

Q.   There's a family out in the yard, right?

A.   Yes, sir.

Q.   A male.

A.   A male.

Q.   Female.

A.   Female and a kid.

Q.   Some children, right?

A.   One kid, sir.

Q.   Oh, just one.

A.   Yes, sir.

Q.   Oh, okay.  You, Echo, and Temper all were stacking and flashing gang signs, right?

A.   That's correct.

Q.   Then Echo started shooting at the people in the yard, right?

A.    Yes, sir.

Q.    This was with a .38 caliber weapon -- .38 caliber handgun.

A.    Yes, sir.

Q.    This is a gun you had previously, right?

A.    Yes, sir.

Q.    You had been using it for other gang related incidents, right?

A.    Yes, sir.

Q.    Okay.  This gun had previously belonged to Jose Vazquez, correct?

A.    Yes.

Q.    A guy named Muneco?

A.    Yeah.

Q.    And Muneco just so happens to be married to your sister, correct?

A.    That's correct.

Q.    Okay.  And Muneco's in MS, correct?

A.    Yes, sir.

Q.    How many times did you all shoot into that family's yard?

A.    I can't remember.

Q.    That wasn't the only shooting you were involved with Temper in, was it?

A.    Not with Temper.

Q.    In fact, there was one November 23, 2012, correct?

A.   Yes, sir.

Q.   You were riding around with him looking for somebody to rob, right?  You wanted to rob some people or somebody.

A.   Okay.

Q.   Does that sound, right?

A.   Yes, sir.

Q.   Okay.  And you saw several males sitting in a car, do you remember that?

A.   Yes, sir.

Q.   And you thought that that group was a group of Surenos, the rival gang, right?

A.   That's correct.

Q.   They didn't get out of the car, correct?  And then Temper started stacking that time, right?

A.   Yes, sir.

Q.   Throwing gang signs?

A.   Yes, sir.

Q.   That's the time that you're talking about when the other members started shooting at your car; is that right?

A.   That's correct.

Q.   And Temper, again, used your .38 caliber weapon to shoot at him, right?

A.   It was a different .38.

Q.   It was a different gun.

A.   Yes.

Q.   Whose gun was that?

A.   It was his.

Q.   Oh, so that was Temper's.

A.   Yes, sir.

Q.   The gun [sic] you were in got hit by gunfire, right?

A.   Huh?

Q.   The gun [sic] that you were in got hit by bullets, correct?

A.   The car?

Q.   Your car.

A.   Yeah.

Q.   I'm sorry if I misstated.  Let me correct myself.
     The car that you were in, was it hit by bullets?

A.   Yes, it did.

Q.   Okay.  Do you know if anybody in the other group got hit?

A.   I don't know, sir.

Q.   Do you remember another shooting with Temper against rival gang members named Shadow and Bojames (phonetic)?

A.   Yes, sir.

Q.   But do you remember the actual date of that shooting?

A.   No, it's been a long time.

Q.   But, again, that was during a warm weather month, correct?

A.   Yes, sir.

Q.   Now, not just shootings, but you were involved in a

number of robberies with Temper, correct?

A.    Yes, sir.

Q.    Robberies that you told law enforcement about on November 8, 2012.

A.    Yes, sir.

Q.    November 12, 2012.

A.    Yes, sir.

Q.    Were there other robberies, other than just those dates?

A.    No, sir.

Q.    Was that all you could remember?

A.    Yes, sir.

Q.    Now going back to Jose Vazquez; that's Muneco, correct?

A.    That's correct.

Q.    He used to be what's called "The Voice" of TLS, right?

A.    That's correct, sir.

Q.    And he dated your sister, right?

A.    Yes, sir.

Q.    He even lived with your family, right?

A.    Yes, sir.

Q.    I believe you may have answered part of this question before with the government, but I want to be clear.  He would frequently communicate with MS-13 members in other parts of the country and in El Salvador, right?

A.    Yes, sir.

Q.    Now going back to one more shooting that you were

involved in, there was one with Muneco, correct?

A.   Yes, sir.

Q.   And another guy named Oscar Trejo, also known as Trigger, right?

A.   Yes, sir.

Q.   That was on August 19, 2012, right?

A.   Yes, sir.

Q.   And you remember if that was day or night?

A.   It was a night.

Q.   That was at nighttime, and that was when you were a member of the Hollywood Locos clique, correct?

A.   Yes, sir.

Q.   And Muneco actually shot at Surenos with a .38 at that time, right?

A.   That's correct, sir.

Q.   You all did it as a group though, right?

A.   Yes, sir.

Q.   Now, I talked about a lot of different crimes just then, right?

A.   Yes, sir.

Q.   A lot of shootings.  A lot of robberies.

A.   Yes, sir.

Q.   Were you ever charged with any of those?

A.   No, sir.

Q.   In fact, you got a 28-month sentence, right?

A.   Yes, sir.

Q.   And that sentence is over, isn't it?

A.   Yes, sir.  I did the 28 months.

Q.   You're here on what's called "material witness warrant"; is that right?

A.   That's correct, sir.

Q.   That means that there's some people in the courtroom -- or at least they were -- that brought you here, right?

A.   Yes, sir.

Q.   To make sure you come.

A.   Yes, sir.

Q.   Make sure you couldn't avoid testifying today, right?

A.   You could say.

          MR. SMITH:  No more questions of this witness, Your Honor.

          THE COURT:  Mr. McKnight.

                    CROSS-EXAMINATION

BY MR. McKNIGHT:

Q.   Mr. Hernandez, so that we're clear.  So you served all your time as it relates to the 28-month sentence that you got, right?

A.   Yes, sir.

Q.   And you, in fact, you were -- despite all those robberies and shootings that you just discussed, you were not, in fact, indicted in this MS-13 case, were you?

A. No, sir. The police, they know about most of the crimes. I told them about. I have consult them, sir.

Q. Okay. So, along those lines, so there was some of them that you told them about, right?

A. Excuse me?

Q. Did you tell them about all of them or some of them?

A. Most of them.

Q. Most of them. Okay.

And did you tell them about some of these crimes and these things that you had done, a lot of them, with Temper before you -- you told them that before you took your plea, right?

A. Yes, sir.

Q. With regards to your admission earlier that you were -- that you sold drugs, right? In particular, heroin and marijuana or weed, right?

A. Yes, sir.

Q. Did you tell the government who you were getting your heroin from?

A. Yes, sir.

Q. Okay. Who was that?

A. He's a guy from Mexico.

Q. A guy from Mexico. Is that person cartel connected?

A. Yes, sir. I think he is.

Q. You think he is. And what about where you were getting

your marijuana from. Did you tell the Government where you were getting marijuana from?

A. Yes, sir.

Q. Where was that?

A. Some people from New York.

Q. Some people from New York. To the best of your recollection, has anybody been arrested or charged as a result of that information?

A. I don't know, sir.

MS. GREENE: Objection, Your Honor. This witness wouldn't know about any ongoing investigations.

THE COURT: Sustained.

Q. With regards to -- you testified earlier that one of the reasons why you joined MS, you started out when you were young. You were hanging out with a particular MS member, right?

A. Yes, sir.

Q. So that was before you went to the courting process. How old were you about that time?

A. Before I got jumped in?

Q. How old were you when you were hanging out with a MS member, just kind of looking up to him?

A. Maybe 13 or so.

Q. Thirteen or so.

And that MS member allowed you to kind of hang out with

him, for lack of a better term?

A.   Excuse me.

Q.   The MS member that you're referring to, they allowed you to hang out with them, be around them even though you weren't a member?

A.   Yes, sir.

Q.   So you were kind of like a fan of MS, around 13, right?

A.   Yes, sir.

Q.   Is it unusual for young guys to kind of gravitate, or just hang around MS even though they're not members?

A.   Sometimes.

Q.   Okay.  Sometimes.

Now, you were talking earlier about -- you started out in TLS; is that right?

A.   Yes, sir.

Q.   Okay.  And at what age were you jumped into TLS?

A.   At 14, 15 or so.

Q.   Fourteen or 15.

About what year was that?

A.   I can't remember, sir.

Q.   And you left TLS and then you went to HLS, right?

A.   That's right.

Q.   About what year was that?

A.   I was -- I was 18 years old.

Q.   So what -- when you were 18, what year was that?

A.   I can't remember.

Q.   You don't remember.  All right.

When you said that Mr. Sosa was present when you were jumped in, were you talking about TLS or HLS?

A.   HLS, sir.

Q.   So, HLS, but you don't remember what year that was, right?

A.   No, sir.

Q.   Okay.  And based on seeing him around, would it be your opinion that Mr. Sosa -- you and him were about the same age when you first started seeing him?

A.   I never knew his age, sir.

Q.   Now, one moment Your Honor -- you, you were talking about some clubs that MS was known to frequent.  I think you mentioned Mi Cabana and some others, right?

A.   Yes, sir.

Q.   And these are just regular Hispanic clubs, right?

A.   Yes, sir.

Q.   That just Hispanics attend, right?

A.   Most likely.

Q.   All right.  And you would agree that when people go to clubs they tend to gravitate or associate with people that they may know, either personally or from my school or some way shape or form, right?

A.   Yes, sir.

Q. And so when you testified earlier you've seen Mr. Sosa at a club, all he was doing was talking and hanging out; is that right?

A. Yes, sir. That's correct.

Q. Prior to being arrested on this charge or on any charge, did you have a Facebook, Instagram account, anything like that?

A. Yes, sir, I did.

Q. Did you have any photos of yourself and other MS members throwing up gang signs or --

A. Yes, sir.

Q. In that account, you don't have any photos of you and Mr. Sosa doing anything like that?

A. No, sir.

Q. Now you talked about the fact that it was your understanding -- well, strike that.

You talked about the fact that you're here today to tell the truth, right?

A. Yes, sir.

Q. Okay. But you haven't always been honest when talking to law enforcement officers; is that safe to say?

A. Excuse me?

Q. You have not always been honest when talking to law enforcement officers; is that safe to say?

A. That's correct, sir.

Q. And, in fact, there was an instance back in 2012, July of 2012 where you weren't honest with law enforcement. You initially told them Daniel Navarro fired a gun. Then you later changed and said, Well, no, he didn't. Do you remember that?

A. Yes, sir.

Q. And then another instance in July of 2013 involving, specifically, the shooting and heroin case that you were charged with, where you initially said that you didn't commit the shooting, right?

A. Yes, sir. I thought I could get away with it, sir.

Q. You thought you could get away with it.

A. Yes, sir.

Q. And then during the course of the interview with the officers, did they pressure you with more evidence that they had against you?

A. Yes, sir.

Q. And after feeling a little bit cornered, for lack of a better word, or that you had gotten caught, you went ahead and you said, Yeah, I did do the shooting, right?

A. Yes, sir.

Q. Okay. And then there was another instance in 2013 where you were talking -- do you remember an agent by the name of Jenkins?

A. No, sir.

Q.   You don't remember a situation where you were dishonest with him about something, as well?  Do you recall?

A.   I can't remember that person.  So I don't know if --

Q.   Understood.  Now quickly going back to -- Mr. Smith asked you some questions about that scenario where you -- you and Temper -- you were shooting at this house with the family out in front, and you said, Temper was on -- he had his monitor on; is that right?

A.   Yes, sir.

Q.   And monitor means that he was on electronic monitoring. Is that what you understand it to be?

A.   Yes, sir.  That's correct.

Q.   And being on electronic monitoring, what does that mean to you?

A.   That he -- he's -- he got to be home at a certain time.

Q.   Okay.

A.   Can't use drugs.

Q.   Is that typically something that you associate with having criminal charges pending against you?

A.   Excuse me?

Q.   Is that typically something that you would see someone have if they had pending criminal charges?

A.   With people with electronic monitor?

Q.   Um-hmm.

A.   Only seen him and this other guy, that's it.

MR. McKNIGHT: Okay. May I have one moment, Your Honor.

THE COURT: You may.

Q. The 28 months that you did receive, that was based off a recommendation that the government made to the Court for you to receive 28 months; is that your understanding?

A. Yes, sir.

Q. What was your understanding about how much time you were facing prior to entering that agreement with the government? How much time do you think you were looking at?

A. A lot of time, sir.

Q. A lot of time. When you say a lot, would you say more than ten or less than ten?

A. The State offered me 7 years, sir.

Q. Okay. So they initially offered you -- best of your recollection -- seven years, right?

A. The State, sir.

Q. The State.

A. Yes, sir.

Q. And there was some questions earlier about meetings. In your time in MS, either in TLS or HLS, how many meetings would you say that you've attended?

A. I would not be able to say how many. I can't -- I can't think of a number. There were a lot.

Q. Would you say it was more than ten or 20?

A.    More than ten; maybe less than 20.

Q.    More than ten, less than 20.

      And would you agree that as -- would you agree for MS purposes, not attending meetings is considered a serious role violation, right?

A.    Maybe not serious one, but you're not doing something right.

Q.    Have you ever known someone to receive a calentone or a beating for not coming to a meeting?

A.    Yes, sir.

Q.    And when you were asked earlier and you made the statement about seeing Mr. Sosa at a meeting, were you talking -- you weren't talking about an MS business meeting. Were you talking about when you got jumped in?

A.    That time.  There was this other time that it was about MS purposes.

Q.    Now, other than those two times, have you ever seen Mr. Sosa at an MS meeting?

A.    Not really.

Q.    You know him, I think you maybe said, as "Koki," right?

A.    Yes, sir.

Q.    And is "Koki" a nickname that his family gave him?

A.    I don't know, sir.  I was never close to him, sir.

Q.    Okay.  All right.  That's just the name that you heard?

A.    Yes, sir.

MR. McKNIGHT:  That's all I have.

THE COURT:  Mr. Beechler.

MR. BEECHLER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BEECHLER:

Q.   Sir, after you were initially arrested for the shooting in July of 2013, you lied to the police, didn't you?

A.   Yes, sir.

Q.   And you were interviewed a few months after that, and you lied to them again.

A.   Yes, sir.

Q.   But you're here today in this courtroom, telling this jury the complete and utter truth, right?

A.   Yes, sir.

Q.   Is that because you're here to do the right thing?

A.   Yes, sir.

Q.   You just told Mr. McKnight that you were looking at seven years state time, initially, for the charges.

A.   That's right, sir.

Q.   But then the federal authorities came in and you ended up with two years and four months, right?

A.   That is right, sir.

Q.   Because you told them the truth.  You admitted that you informed on approximately 30 MS members?

A.   Yes, sir.

Q. You finished your time in prison -- in jail?

A. In jail.

Q. In county jail here?

A. Yes, sir.

Q. So you never set foot in federal prison?

A. No, sir.

Q. And you live where -- you live at a -- excuse me -- a residence now? Your residence.

A. Yes, sir.

Q. You're on what we call "home confinement" or "house arrest."

A. Yes, sir.

Q. Well, if you finished your time, why are you on house arrest?

A. Because I was supposed to come here. I had to come here.

Q. Of course you had to come here. But that's why you're on house arrest, just so you come to court for this trial.

A. Yes, sir.

Q. Did you say earlier that you were or you are a parent now, a father?

A. Yes, sir.

Q. Are you in the U.S. legally?

A. No, sir.

Q. So what happens to you when this case is over?

A. I'm not sure, sir.

Q. You said before you've been provided no money from the government.

A. No money, sir.

Q. No money at all?

A. Not at all.

Q. Made a big deal about that, right? Haven't been given a cent. Who bought your lunch today?

A. I haven't eaten, sir.

Q. Who bought you some coffee on the ride in this morning?

A. I didn't drink no coffee, sir.

Q. You haven't had a drink or any food since you've gotten here?

A. No, sir.

Q. But you were provided a ride by the government agent?

A. That's right.

Q. You're not being paid.

A. I'm not, sir.

Q. You're living in the United States right now.

A. That's right.

Q. You're not legally entitled to be here, right?

A. Correct, sir.

Q. You have a child here.

A. A child?

Q. You have a child.

A. That's right.

Q.   Would you agree with me that every day that you're with your baby in the U.S. is worth a lot?

A.   Yes, sir.

Q.   And the government is allowing you to be here right now every day with your child, isn't it?

A.   I'm not living with my child, sir.

Q.   I'm sorry?

A.   I'm not with my child.  I can't see my child.

Q.   You're not with your child?

A.   No, I'm not.

Q.   Do you get to talk to your child?

A.   No, sir.

Q.   You get to see your child?

A.   No, sir.

Q.   Do you have any contact at all?

A.   No.

Q.   None.  You don't care about your kid?

MS. GREENE:  Objection, Your Honor.

THE COURT:  Sustained as to the form.

Q.   Do you not have any desire to talk to your child?

A.   I do, sir, but my little girl's mother won't let me see her.

Q.   Would you agree with me that living in house arrest -- under house arrest in the U.S. is better than being deported to Mexico?

A.   Yes, sir.

Q.   So, you say you haven't been given anything by the government, that's not exactly accurate, is it?

A.   I don't understand the question, sir.

Q.   Life is good right now.  You got a house.  You got food to eat.

A.   Yes, sir.

Q.   Who provides the food?

A.   My family.

Q.   Do you work?

A.   No, sir.

Q.   You don't have to do anything but you get to eat, you get to live.  Do you have AC in your house?

A.   If I have what?

Q.   Air conditioning.

A.   Yes, sir.

Q.   Running water.

A.   Yes, sir.

Q.   You don't have a job.

A.   I don't, sir.

Q.   So life isn't that bad for you right now, is it, sir?

A.   No, sir.

Q.   I want to ask you about a person by the name of Christian Pena.  Do you know that name?

A.   I know him, sir.

Q.   Do you know him by another name?

A.   Pit Bull.

Q.   Pit Bull.

You told the jury before lunch today that you met Miguel Zelaya in the county jail here, right?

A.   That's correct, sir.

Q.   And that you also told the jury that he told you that he had been jumped into the gang at some point in jail, correct?

A.   Yes, sir.

Q.   But you told the jury that you didn't know who jumped him in or he didn't tell you who had jumped him in or who was involved with that, right?

A.   He did tell me but I can't remember who the people that jumped him in.

Q.   If Christian Pena told this jury yesterday that you were a part of the group that jumped Miguel into the gang in prison -- excuse me -- in jail, would that be a lie?

A.   He -- he got jumped in on the outside.  That's what I'm talking about.

Q.   You're saying that Miguel was jumped into the gang on the outside?

A.   On the outside.  But there was -- there was an error on that.

Q.   So then he got jumped in again on the inside?

A.   Yes, sir.

Q. So a double jump in.

A. Yes, sir. 'Cause it wasn't valid.

Q. Does that occur often?

A. No, sir.

Q. Did you ever tell the government about that?

A. I did, sir.

Q. But you're still stating today under oath that you had no part of a jumping in of Miguel in the county jail here.

A. Nobody ever asked me that question from me, sir, until now.

Q. But your job is to be honest with the government, right, to tell them everything.

A. I told them before now. Right now nobody asked me that question, sir.

Q. And you're stating to me -- let's be clear -- that you did not have a part in that.

A. I did.

Q. You did have a part in that.

A. Because he was in jail, not on the outside.

Q. You were a part of the jumping in process of Miguel Zelaya?

A. In jail.

Q. Okay. Then right before lunch didn't you tell this jury you didn't know who jumped him in. He didn't tell you. You were asked.

A.   I thought they were talking about the one on the outside -- the one time on the outside, not on the inside, sir.

Q.   You told this jury that he told you in jail he had been jumped in.

A.   Yes, sir.

Q.   Okay.  So you answered the way you wanted to answer it.

A.   The question they asked me, that's what I answered.  He told me he had been jumped in.  That's what I said.

Q.   Mr. Hernandez, you understand you're under oath right now.

A.   Who?

Q.   You're under oath.  You swore to tell the truth today --

A.   Yes, sir.

Q.   -- this jury.  Are you being completely honest?

A.   Yes, sir, I am.

Q.   Because it's a benefit to you or because it's the right thing to do?

A.   Yes, sir.  It's --

Q.   Which one?

A.   It's the right thing to do.

Q.   Because you're all about honor, integrity --

A.   Yes, sir.

Q.   Ethics --

A.   I decided that I don't want that life no more.

Q.   Do you stay in touch with any of the other former members who have also snitched and become informants for the gang?

A.   No, sir.  Not at all.

Q.   I want to ask you about the robberies that Ms. Greene asked you about.

She asked you if you made a lot of money.  And you have started to explain how much you had made from -- I think she referred to as a lick -- and just to be clear, is a "lick" a robbery?

A.   Yes, sir.

Q.   Estimate for us how many licks you did while you were in the gang?  If you can even count.

A.   Maybe six, seven.

Q.   Six or seven.  And you said you might get 10,000 from a lick?

A.   Most -- yeah.  Maybe -- maybe -- yeah, that's an estimate.

Q.   How often would you get that much or more?

A.   Two times a year, three.

Q.   Two times a year.  So maybe if you did six of those -- 60 grand over a couple of years.

A.   It wasn't necessarily $10,000 each time.  But it was just an estimate.

Q.   Okay.  So it may have been a little bit less than $10,000, a little bit more than $10,000?

Case 3:15-cv-00121-RJC-DSC Document 946 Filed 08/27/16 Page 184 of 310

A.   Yes, sir.

Q.   Still a lot of money.

A.   Yes, sir.

Q.   Did you ever tell the government about all that money?

A.   No one asked me till now.  Till she asked me.

Q.   And did you see Ms. Greene's face when you said $10,000?

A.   Yes, sir.

Q.   Did you see the utter shock on her face when you came up with that number?

A.   Yes, sir.

Q.   So you didn't share that with the government before today, did you?

A.   Nobody asked me how much I used to make.

Q.   Mr. Hernandez, I understand what people have not asked you.  But didn't you sign a plea agreement for time served on a possible 40-year maximum sentence to tell the truth at trial, to cooperate?

A.   Yes, sir.

Q.   Do you know what it means to quibble?

A.   No, sir.

Q.   Do you know what it means to prevaricate?

A.   No, sir.

Q.   Do you know what it means to tell the whole truth?

A.   Yes, sir.

Q.   Not half the truth, the whole truth.

A.  The whole truth, sir.

Q.  You know the difference.

A.  Yeah.

Q.  Are you telling the whole truth today?

A.  I am, sir.

Q.  And then the other robberies you mentioned from guys at clubs you would take off 500 or $1,000 a person.

A.  Yes, sir.  It was just one person.

Q.  One person.

A.  Yeah, at the club.

Q.  One time or more than one time?

A.  More than one time.

Q.  And guys walked around with $1,000 in cash in their pockets.

A.  Drug dealers, sir.

Q.  The ones that didn't have the $10,000?

A.  Yeah.

Q.  What did you do with all that money?

A.  Used for weapons for the gang.

Q.  Brand new weapons?  Did you buy new ones all the time?

A.  No, sir.

Q.  That buys a lot of guns on the street, correct?

A.  Yes, sir.

Q.  $60,000 can buy how many handguns?

A.  I'm not sure, sir.

Q. Hundreds. Maybe?

A. Maybe.

Q. How many guys were in your clique when you decided to leave and become an informant?

A. How many guys were in my clique?

Q. Yes.

A. When I decided to talk?

Q. Correct.

A. My understanding, in Charlotte, only one.

Q. I'm talking about in -- I guess in your specific small clique in your neighborhood.

A. In my neighborhood. It was only one guy from my clique in Charlotte.

Q. Okay. And the rest were where?

A. In Virginia.

Q. So you saw Miguel in the county jail a few years back maybe --

A. That's correct.

Q. -- more than a year.

And you wouldn't say that he was a good friend at that time, right? Before you bumped into him.

A. I mean, I didn't really care.

Q. You didn't care.

A. I wasn't judging people or, you know, I was just there.

Q. But you hadn't spent a lot of time with him outside,

right?

A. Yeah.

Q. You did spend a lot of time with him.

A. Yeah, you could say.

Q. And he bumped into you in the jail and just happened to say, Hey, I want to get jumped in. Or I need to get jumped in again. And I killed somebody.

A. No, sir.

Q. How many other members of MS did you come into contact with while you were at the county jail for 28 months?

A. I didn't see none of them until they -- until this indictment. And I seen maybe seven of them.

Q. So you saw seven, approximately, at that point. Is that around the same time you decided that you were going to have this change of heart and do all the right things and come forth with information?

A. No, sir.

Q. Was it after that?

A. It was before that.

Q. Before that.

A. Yes, sir.

Q. So they didn't know that you were an informant at the time they saw you, right?

A. That's correct.

Q. So you were collecting information, trying to make your

value go up with the government.

A.   Not really.  I would not ask them nothing.  Everything I told them was from the past.

Q.   What is your understanding about your personal immigration status at the conclusion of these cases?

A.   I'm not sure, sir.  I couldn't -- I don't know.

Q.   What do you hope happens?

A.   I mean I hope I stay here, you know.  My whole family's here.

Q.   You don't want to be deported, do you?

A.   Not -- no.

Q.   Do you hope that if your assistance is substantial enough that maybe you get a special pass to stay in the U.S. with your family?

A.   To be honest with you, yes.

Q.   Did you say earlier, Mr. Hernandez, that you don't think you're going to get charged with any of the offenses that you admitted to before lunch, for the jury, or that you know you're not going to?

A.   I'm being totally honest; so I'm not.

Q.   You're not going to.

     Have you ever heard the term "a get out of jail free card"?

A.   No, sir.

Q.   Are you familiar with your plea agreement that you

signed?

A.    Excuse me?

Q.    The plea agreement you signed for two years and four months, is a good deal, right?

A.    Yes, sir.

Q.    Everything you said today to this jury is absolutely true.

A.    That's correct, sir.

Q.    Even if it's the first time the government or any defense lawyers have heard it.

A.    Yes, sir.

Q.    Still completely accurate.

A.    Yes, sir.

        MR. BEECHLER:  Thank you, Mr. Hernandez.

        That's all I have, Your Honor.

        THE COURT:  Any redirect?

        MS. GREENE:  Very briefly.

                    REDIRECT EXAMINATION

BY MS. GREENE:

Q.    Mr. Hernandez, just to be clear, under the terms of your home incarceration that have been set by the Court, are you allowed to work?

A.    No, ma'am.

Q.    Are you allowed to leave your house for any reason?

A.    No, ma'am.

Q.   And, also, do you have any immigration benefits in place? Have you and I ever talked to immigration?

A.   No, ma'am.

Q.   And, in fact, aren't you here in the custody of federal agents, because if you weren't you would have already been deported?

A.   Yes, ma'am.

Q.   Has any promise been made to you about what's going to happen when this case is over?

A.   No, ma'am.

          MS. GREENE:  Thank you.  Nothing else.

          THE COURT:  You may step down.

          Call your next witness.

          MR. MILLER:  The government calls Officer Jones.

               ADAM JONES, GOVERNMENT WITNESS, SWORN

                         DIRECT EXAMINATION

BY MR. MILLER:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Could you start by introducing yourself to the jury?

A.   My name is Adam Jones.  I'm an officer with the Charlotte-Mecklenburg Police Department.

Q.   And Officer Jones, how long have you been with CMPD?

A.   Eight years.

Q.   What division are you currently assigned to?

A.   Steele Creek Division.

Q.   Have you ever been assigned any other divisions?

A.   No, I have not.

Q.   I'm going to call your attention to the late night, early morning hours of July 5th, 2012.  Were you working on that day and night?

A.   Yes, I was.

Q.   And did you respond to a call for service around 12:30 at 315 Pineville Point Avenue?

A.   Yes, I did.

Q.   Where had you been prior to responding to that call for service?

A.   My partner and I were sitting in the parking lot of a church that is on Old Pineville Road, just south of Lake Mist Drive and just north of Pineville Point Avenue.

Q.   And you said you were with a partner.  Who was your partner at the time?

A.   It was Officer J.B. Wilson at the time.

Q.   Were you and Officer Wilson on foot, in a marked patrol car?

A.   We were in a marked patrol car 438 as part of a directed patrol for violent crime in the area.

Q.   What was the nature of the call that you and Officer Wilson responded to?

A.   It was a larceny from auto in progress.

Q. And did the call provide a description for a suspect vehicle?

A. It said that the suspects were heading towards a older model white F-150 pickup truck.

Q. And what's located there at that Pineville Point Avenue address?

A. Just the Ashford Place Apartments.

Q. And based on your time in Steele Creek division, were you familiar with this area?

A. Very much so; yes, sir.

Q. I'm going to show you what's been marked as Government's Exhibit 54. It will pop up on your screen there.

What's depicted in Government's Exhibit 54?

A. That is an overhead map of the complex and the surrounding neighborhoods.

Q. Is it a fair and accurate depiction?

A. Yes, it is.

Q. Would that Government's Exhibit 54 help you illustrate your testimony?

A. Yes, it would.

MR. MILLER: Your Honor, the government would offer Exhibit 54 as just a demonstrative aid.

THE COURT: I'll admit it.

(Government's Exhibit No. 54 was received into evidence and published.)

Q. All right. So what did you see when you responded to this call for services?

A. As we were driving down Pineville Point Avenue, approaching the traffic circle that's right in the middle of the apartment complex, we observed a white pickup truck coming from the other side of the traffic circle.

Q. And what happened as you approached that vehicle?

A. As we -- we both approached the traffic circle from opposite directions. I waited until the truck committed to the traffic circle. And I stopped on the east side of that traffic circle. As it entered, we confirmed that it was an older model F-150 white in color pickup truck. As it was coming around the traffic circle, I activated my blue lights and the vehicle slammed on its brakes and came to a sudden stop directly in front of our patrol car.

Q. Was your patrol car equipped with recording equipment?

A. It was.

Q. And are you familiar with how that system is set up to work?

A. Yes, I am.

Q. Was it working properly on July 5th?

A. It was.

Q. And have you reviewed the footage from that recording?

A. Yes, I have.

MR. MILLER: May I approach the witness, Your Honor?

THE COURT: You may.

Q. Showing you now what's been marked as Government's Exhibit 55, do you recognize this as a disk containing the DMVR video?

A. Yes, I do.

Q. How do you recognize it?

A. It's got my initials and date on it that I wrote.

Q. Have you reviewed this disk?

A. I have.

Q. Does it fairly and accurately depict what you saw?

A. Yes, it does.

MR. MILLER: Your Honor, at this time, the government offers Exhibit 55.

THE COURT: Any objection?

MR. McKNIGHT: Your Honor, I would object to the Exhibit 55 and any testimony based on 404(b), Your Honor.

THE COURT: Overruled. Let it be admitted.

MR. MILLER: I just ask to be able to publish it, Your Honor.

THE COURT: You may.

(Government's Exhibit No. 55 was received into evidence and published.)

Q. Can you narrate for us what --

A. This is us approaching the traffic circle, the truck coming from the other side. That is right as it slammed on

the brakes.

Q. Okay. And after this moment here, what happened next?

A. Officer Wilson and I exited the patrol car. I was driving so I'll be on the left side. Officer Wilson was my passenger, he'll be on the right. We drew our weapons and approached the truck, giving verbal commands to stop the truck, put it in park. The driver made eye contact with us, backed up, and drove the vehicle directly towards Officer Wilson.

Q. And is this your partner up here standing in the traffic circle?

A. It is. As the truck started to move forward, I yelled at him to look out. And he ran up on to the median. And then the truck then followed him up on the median striking a traffic directional "Keep Right" sign that's on the median there. So he ran further into the median.

Q. What happened next?

A. I ran and got back into the car, drove to the other side of the traffic circle. Officer Wilson got back in the car with me. And then we continued on following the suspect truck to the back of the complex.

That's the truck that we just passed on the right.

Q. So the truck was to the right of your vehicle as it was --

A. Yes, it was.

Q.   So what happened once you got to the back of the traffic circle here -- or back to the apartments here?

A.   As we were coming down the parking lot, we could see two males running from the truck towards the fence line.  We got out of the car.  We start to chase after them.

Q.   Did they split up?

A.   Yes.  They split up, looked like right before the fence line.  There's a chain-link fence that surrounds that community.  It's about a six-foot chain-link fence with about 2 feet of barbed wire running across the top of it.

They split up right before the chain-link fence.  The passenger scaled the fence and kept running through the woods.  And the driver turned to the left before he got to the fence and ran down the fence line towards the back of the complex.

Q.   I would like to return to Government's Exhibit -- return to Government's Exhibit 54.

A.   Okay.

Q.   Is this the area where you saw the suspects jump and run?

A.   Yes, it is.  The 315 building is the one with the pinpoint on it at the back.  Yes, that's 315.

Q.   And where was your patrol car?

A.   My patrol car was just above --

Q.   You could actually touch that screen there.

Is it approximately in this area here?

A.   The screen went black.

THE COURT: It's back up.

THE WITNESS: Okay. Our patrol car was roughly where the mouse is right now.

Q. Okay. And you mentioned that there was a chain-link fence. Is that running along the edge of the property here?

A. It is. You can kind of see a little bit of the line of the bushes right there. It kind of parallels the parking lot, then it curves right here beside the building.

Q. And when the suspects split up, did you and your partner also split up?

A. We did. We started to run after the same one. And in the video you see me point and direct my partner to go after the passenger.

Q. So you were following the driver.

A. Yes.

Q. Did you ultimately catch up to the driver?

A. Yes, we did. As we were rounding the north side of the 315 building, I observed him run through the weeds and then lie down up against the back fence. I could see his feet in the hole, I guess, that he made through the weeds where he knocked them down as he was running.

Q. And did you take him into custody?

A. We did.

Q. Were you able to identify that individual?

A. He gave us a false name on scene. But after we got him

down to the Mecklenburg County Intake Center we did get a positive identification on him.

Q.   Who was that?

A.   Angel Towbar.

Q.   Now your partner, Officer Wilson, did he ever catch up to the passenger?

A.   Not that -- not at that time.

Q.   What did the passenger do?

A.   The passenger scaled the chain-link and barbed-wire fence and continued running through the woods.  And then the neighborhood -- that's Rabbit's Foot -- on the other side of the fence.

Q.   What did you do after Mr. Towbar was in custody?

A.   After Mr. Towbar was in custody I handed him -- Officer Wilson had caught up to him at that point.  I handed him over to Officer Wilson who led him back to our patrol car.  And then I went back towards the fence where the passenger had jumped over.

Q.   What, if anything, did you find when you went back to where the passenger had jumped over?

        MR. McKNIGHT:  Objection, Your Honor.

A.   I found a black and silver --

        THE COURT:  Hang on a second.  Objection?

        MR. McKNIGHT:  Your Honor, I'm making an objection as it relates to this particular item that was found.  You

know, if I need to be heard outside the presence, I can.

THE COURT:  I'll be glad to hear you at sidebar.

(Bench conference as follows:)

MR. McKNIGHT:  Yes, Your Honor.  This specifically relates to a firearm that was found in a grassy area.  And, Your Honor, our objection to that is that this particular -- it's article 404(b), Your Honor.  Because it's not related to Mr. Sosa.  The weapon was actually attributed and charged to Mr. Angel Towbar.

THE COURT:  Well, I will overrule the objection.  I think it goes to weight, not admissibility.  And who was or wasn't charged is not very relevant to that analysis.  I'll overrule the objection.

MR. McKNIGHT:  It may go to weight as well, Your Honor, that there were actually subsequent testing done as relates to that weapon.  No connection made to Mr. Sosa.

THE COURT:  Whether law enforcement charged or didn't charge a particular crime is not relevant.  And so, again, I'll overrule the objection and let the government make further inquiry on this.

MR. McKNIGHT:  Very well.

(Bench conference was concluded.)

Q.   Now, Officer Jones, I believe your testimony was after Mr. Towbar was in custody you walked back along the path the passenger had taken?

A.    That's correct.

Q.    What, if anything, did you find when you walked along that?

A.    I found a black and silver .40 caliber handgun lying in the mulch behind the bushes -- between the bushes and the fence.

Q.    And what did you do with that firearm?

A.    I had another officer who had a camera with him come and photograph the firearm.  And then I collected it in a cardboard gun box, placed it in the rear of my patrol car in the trunk.  So it was secured.

MR. MILLER:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. MILLER:  I'll show this to the Court Security Officer here, Your Honor.

Q.    I'm showing you a box and contents that have been marked as Government's Exhibit 56.  Do you recognize this?

A.    Yes, I do.

Q.    And how do you recognize it?

A.    It's got my initials, my code number, and the date and time that I packaged it on the outside.

Q.    What is it?

A.    It's the black and silver .40 caliber handgun that was seized from the scene that night.

Q.    Is it in the same or substantially same condition as when

you received it?

A.    Yes.

Q.    Other than having been rendered safe.

A.    Yes.

MR. MILLER:  Your Honor, at this time the government offers Exhibit 56.

THE COURT:  Let it be admitted.

MR. MILLER:  May I publish it with the ELMO, Your Honor?

THE COURT:  You may.

(Government's Exhibit No. 56 was received into evidence and published.)

Q.    I would like to return to Government's Exhibit 55.

Can you explain to the jury what's happening here?

A.    Officer Wilson is leading the driver back to our patrol car.  And myself and another officer are walking back up towards the fence line where the passenger had scaled the fence.

Q.    Did you notice what was on Mr. Towbar around his neck there, at that point?

A.    There was a blue and white braided rosary necklace.

Q.    Now, did you continue to investigate at the scene there the breaking and entering --

A.    Yes, we did.

Q.    -- of the motor vehicle?

Case 3:15-cr-00121-RJC-DSC Document 946 Filed 08/27/16 Page 202 of 310

A.   Yes, sir.  We did.

Q.   Did you ever identify a victim vehicle?

A.   We found a champagne colored Honda with the driver's side window shattered out.

Q.   At this time I would like to show you Government's Exhibit 57.  It will pop up there on the screen again.

Now, do you recognize the first three pictures there of Government's Exhibit 57?

A.   Yes, I do.

Q.   And what are those pictures of?

A.   That is the victim vehicle of the actual break in, the larceny from auto.

Q.   And what's the second picture?

A.   That is a magazine with .40 caliber ammunition in it laying on the curb on the route that the passenger ran.

Q.   And what about the third?

A.   That is the firearm that is between the bushes and the fence.  You can see the bottom of the fence just at the top of that photograph.

MR. MILLER:  At this time the government would offer photographs 1 through 3 of Government's Exhibit 57.

THE COURT:  Any objection?  Same objection?

MR. McKNIGHT:  Same objection, Your Honor.

THE COURT:  Overruled.  Let them be admitted.

MR. MILLER:  May I publish, Your Honor?

THE COURT: You may.

(Government's Exhibit No. 57 was received into evidence and published.)

Q. So this first page here, I believe you testified that's the victim vehicle.

A. That's the victim vehicle from larceny from auto call for service.

Q. Is this the firearm that was Government's Exhibit 56?

A. Yes, it is.

Q. What steps, if any, did you take to identify the passenger who jumped over the fence?

A. We started by running the vehicle registration for the Ford F-150 through our DCI system, which is the Division of Criminal Information. It's a system used to run driver's licenses and vehicle registrations.

We ran the tag. It came back to a subject by --

MR. McKNIGHT: Objection. Hearsay.

THE COURT: Overruled.

THE WITNESS: We ran the tag. It came back to a subject by the name of Santos Sosa. It came back to an address on South Tryon Street. In our investigation we determined that that address was actually a business.

And so we then ran the name Santos Sosa through the DCI again, and we located a residential address of 5510 South Hampton. We knew from previous experience that Mr. Jorge Sosa

lives at 5510 South Hampton.  Later that evening we went back and we reviewed our DMVR footage from our in-car camera with another officer on our unit, Officer Boletic.  He and I both agreed that the passenger resembled Jorge Sosa.

Q.    And did you go to that 5510 South Hampton Road address?

A.    We did.  Later that evening it was a little after 5:30 on the 5th.  So a little bit of time had passed.  But we did go to 5510 South Hampton Drive address.

Q.    Did you see Mr. Sosa there?

A.    Officer Wilson made contact with Mr. Sosa at the door to the house.

Q.    Did you see Mr. Sosa there that evening?

A.    Later that evening, yes, I did.

Q.    What, if anything, did you notice about him?

A.    I noticed scratches on his hands and arms, and I believe on his chest.  He had scratches all over his body.

Q.    What type of fence was it that he jumped over there?

A.    It was about a 6 foot chain-link fence.  It was coated -- black coated.  Then it had about 18 inches to 2 feet of barbed wire running across the top.

Q.    I'm going to show you the remaining two pages of Government's Exhibit 57.

What are those pictures of?

A.    Those are scratches on Mr. Sosa's hand and his arm.

Q.    Do they fairly and accurately depict what you saw when

you saw him later that night?

A.    Yes, they do.

MR. MILLER:  Your Honor, at this time the government offers the remaining pictures in Government's Exhibit 57 and ask they be published.

THE COURT:  I'll admit them and allow you to publish.

MR. McKNIGHT:  Same objection, Your Honor.

THE COURT:  Yes.

(Government's Exhibit No. 57 was received into evidence and published.)

MR. MILLER:  No further questions, Your Honor.

THE COURT:  Mr. Michel, any cross?

MR. MICHEL:  No questions.

THE COURT:  Mr. Smith.

MR. SMITH:  No questions.

THE COURT:  Mr. McKnight.

MR. McKNIGHT:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q.    Officer Jones, with regards to the weapon that was found -- well strike that.

When you charge an individual, either with some type of possession-type-of-crime, there are typically two ways that you decide to make that charge:

Either the person has the item actually on them, what we call actual possession, or if that item is what we call within their dominion or control, i.e., their reach, they can get to it -- constructive possession.  Does that sound about right?

A.   Yes, sir.

Q.   So with regards to this particular firearm that was found that particular night, to the best of your personal knowledge, Angel Towbar was charged with possession of that weapon; is that right?

A.   He was.

Q.   And Mr. Sosa was not charged with possession of that weapon; is that right?

A.   At the time of the incident, that's correct.

        MR. McKNIGHT:  Okay.  That's all I have.

        THE COURT:  Mr. Beechler, Mrs. Costner.

        MR. BEECHLER:  No questions.  Thank you.

        THE COURT:  You may step down and be excused.

        THE WITNESS:  Thank you.

        THE COURT:  Call your next witness.

        MS. GREENE:  The government calls Special Agent Andrew Cheramie.

        ANDREW CHERAMIE, GOVERNMENT WITNESS, SWORN

                    DIRECT EXAMINATION

BY MS. GREENE:

Q.   Good afternoon.

A. Good afternoon.

Q. How are you?

A. I'm good. Thank you.

Q. Could you please tell the jury your name and where you work and what position you hold.

A. Yes, ma'am. My name is Andrew Cheramie. My last name is spelled C-h-e-r-a-m-i-e. I'm a special agent with the Bureau of Alcohol, Tobacco, and Firearms.

Q. And for short is that call ATF?

A. Yes, ma'am.

Q. How long have you been a special agent with ATF?

A. This August will be 15 years.

Q. What are some of your current responsibilities with ATF?

A. I'm currently assigned to Charlotte Group One which is an enforcement group that investigates violations of federal firearms laws that occur in Mecklenburg County.

Q. As part of your responsibilities, are you often called upon to do -- to determine the place of manufacture for certain firearms?

A. Yes, ma'am.

Q. And what does the study of firearms identification and place of manufacture mean?

A. Typically, in the ATF world, we are called by an agent who is allowed to give interstate nexus testimony, or opinion on interstate nexus. And simply what that means is to be able

to come into court and give an opinion about where a firearm was manufactured, and to tell the Court whether or not that firearm affected -- what we call either interstate or foreign commerce. And all that means is that either the firearm moved from one state to another, or it moved from a foreign country into the United States.

And if it does so then we're able to say that that firearm affected interstate or foreign commerce.

Q. And how do you go about doing that?

A. It first starts with the physical examination of a firearm. So, like, in this case I was asked to examine some firearms. So I will physically inspect those firearms.

By law federal firearms licensees or manufacturers, I should say -- companies who make firearms -- are required by federal law under the Gun Control Act to put certain markings on a firearm.

If it's a firearm that's made in the United States, at the minimum it has to include the make, the model, a serial number, and the city and state in which it was manufactured.

If it's a firearm that was made outside of the United States it will say the country of origin, and it is also required to have a marking showing which importer imported that firearm into the United States.

So that's where I'll start with the physical examination.

I've been doing this since 2006. I've testified in

federal court probably on the order of about 30 or 35 times. More often than not when I'm asked to examine a firearm, it's a firearm that I've examined before. A similar make, whether it be a Glock, pistol or a Hi-Point pistol or what have you. So I don't have to do a whole heck of a lot of research because I'm just familiar with -- in the course and scope of my job -- I'm familiar with those firearms.

On the occasion where it may be a firearm that I'm less familiar with or a firearm that I've not examined before, then we have a lot of research materials that are available at our disposal, both in-house and firearms manuals and firearms books that would be available to the general public that assist us with determining where a firearm was manufactured. And, in addition to that, we have a database in-house where we collect conversations that our agents that do this.

There's probably about 200 agents within ATF that do this as a collateral duty, if you will. And they will document conversations.

Let's say I may call ABC Manufacturing Company because I have a question about a gun. If I have that conversation I'll document that. So if another agent runs across the same gun it will say, well, okay. In the file it shows that Cheramie spoke to Joe Smith on A, B, C date and he gave this information about this gun.

So sorry to be so long winded.

Q. And does this study also include determining whether or not an object is actually a firearm as that -- as a firearm is described in 18, United States Code, Section 921?

A. Well, the short answer is, yes. I mean, I've done this for 15 years, and so, much like when you look at a bicycle you know it's a bicycle and it's designed to get you from point A to point B. When I'm asked to examine a firearm, you know, I can tell that it is in fact a firearm and, you know, by definition it's allowed -- it's designed to expel a projectile through the action of an explosive, which is part of the definition of what a 921(a)(3), what the definition of a firearm is under federal law.

Q. Have you -- how many firearms do you think you've examined?

A. In 15 years, several hundred. I would say probably on the order of 3-, 4-, 500.

Q. And I think you just told the jury and the Court that you have been qualified to testify as an expert in this field previously.

A. Yes, ma'am. Both here and the middle district previously.

Q. About how many times?

A. I stopped counting, Ms. Greene. Probably 40 since 2006.

MS. GREENE: Your Honor, at this time I would tender Agent Cheramie as an expert in the field of firearm

identification and place of manufacture.

THE COURT:  Any objections?

ALL COUNSEL:  (No response.)

THE COURT:  He'll be allowed to offer opinion in that area.

MS. GREENE:  Thank you, Your Honor.

Q.  Specifically with regard to this case, Special Agent Cheramie, were you asked to make a determination of whether certain firearms traveled from one state to another or traveled interstate commerce?

A.  Yes, ma'am.

Q.  And, if I could, I'm actually just going to show you what's already been admitted.  Were you asked to look at three guns?

A.  Yes, ma'am.

MS. GREENE:  Your Honor, since these items have already been admitted, may I publish them on the overhead for Agent Cheramie to look at?

THE COURT:  You may.

MS. GREENE:  Thank you.

Q.  So I'm going to start with what has already been introduced and actually published to the jury as Government's Exhibit 42.

And let me know if by looking at it on the screen up there if you can tell me if you looked at this gun.  And if I

need to bring it up there to you, let me know.

A.   No, ma'am.  That's it.  That's one of them that I looked at.

Q.   All right.  And what kind of gun is Government's Exhibit 42?

A.   It's a Beretta Model 92FS.  It's a 9-millimeter pistol.

Q.   And can you tell the jury, in your opinion, where was this firearm manufactured?

A.   Yes, ma'am.  So these are manufactured in Italy.  And they are imported into the United States by Beretta USA Corp. And they operate out of Accokeek, Maryland.

Q.   And based upon its place of manufacture, do you have an opinion as to whether or not this firearm, Government's Exhibit 42, traveled in interstate commerce.

A.   Yes, ma'am.  Based on the fact it was manufactured outside of the United States and was transported into the United States it would have affected interstate and/or foreign commerce.

Q.   I'm now going to publish on the overhead what's already been admitted as Government's Exhibit 43.

     And if you need me to bring it up there for you to look at let me know.

A.   Actually, if you could just rotate it on to the slide. The serial number band is going to be underneath on the front of the frame.  So if you can just rotate it up for me so I can

see the serial number.  Or bring it here.  Whichever is easier for you.  It's on a little metal strip.

Q.   There we go.  It's on the underside.

A.   Yes, ma'am.

Q.   (Indicating.)

A.   Yes, ma'am.  I looked at that one as well.

Q.   Okay.  And can you tell the jury what kind of firearm this is?

A.   Yes, ma'am.  It's a Hi-Point.  It's a Hi-Point Model C9. It's a 9-millimeter pistol.

Q.   Where was this firearm manufactured?

A.   Those are manufactured in the State of Ohio.

Q.   And based upon its place of manufacture, do you have an opinion as to whether or not Government's Exhibit 43 would have traveled in interstate commerce?

A.   Yes, ma'am.  Based on the fact it was manufactured in Ohio and it was present in the State of North Carolina that would necessarily affect interstate commerce.

Q.   Lastly, I put on the overhead Government's Exhibit 56.  I need to do the same thing with this one?

A.   Yes, ma'am.  It will be in the same place.

          MS. GREENE:  This is Government's Exhibit 56.  I think I'm going to need to bring this one up to you.

          Madam Clerk, can you capture that one first?

          COURT CLERK:  Got it.

MS. GREENE:  Your Honor, may I approach the witness?

THE COURT:  You may.

MS. GREENE:  The ties are keeping me from flipping it over.  I don't know if you're going to need to cut those or not.

Q.  Did you take a look at this firearm?  Which again, for the record, is Government's Exhibit 56.

A.  I did.

Q.  And where was this firearm manufactured?

A.  That's also a Hi-Point.  That's a .40 caliber versus the first one you showed me which was a 9-millimeter.  But it also too was manufactured in the State of Ohio.

Q.  And, again, since it was manufactured in the State of Ohio, do you have an opinion as to whether it traveled in interstate commerce.

A.  Yes, ma'am.  It would have.  Based on the fact it was manufactured in Ohio and was present here in the State of North Carolina.

Q.  And are each of those exhibits that we just looked at, Government's Exhibit 42, 43, and 56, all three firearms, are they weapons which will, or is designed to, or may readily be converted to expel a projectile by the action of an explosive?

A.  Yes, ma'am.

Q.  Meaning, that they're a firearm?

A.  Yes, ma'am.

MS. GREENE: Thank you, Your Honor. I have no further questions for this witness.

THE COURT: Any cross?

MR. MICHEL: No questions.

THE COURT: Mr. Smith?

MR. CARPENTER: No questions.

THE COURT: Mr. McKnight.

MR. McKNIGHT: No questions.

MR. BEECHLER: No questions.

THE COURT: You may step down and be excused.

THE WITNESS: Thank you, Your Honor.

THE COURT: The government may call your next witness.

MR. MILLER: The government calls Jazmine Sanchez Penado.

JAZMINE SANCHEZ PENADO RIVERA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q. Good afternoon, ma'am.

A. Good afternoon.

Q. Could you start by introducing yourself to the jury?

A. Yes. My name is Jazmine Rivera. I don't know what else to say, just --

Q. All right. And I'm having a little trouble hearing you already --

A.    Sorry.

Q.    -- you don't mind, keep your voice up as much as you can.
If you need to pull that microphone closer, feel free.

A.    Thanks.  Okay.  My name is Jazmine Rivera.

Q.    Much better.  Ms. Rivera, what city do you live in?

A.    I live in Charlotte, North Carolina.

Q.    How long have you lived in Charlotte?

A.    Twenty-one years.

Q.    And, Ms. Rivera, where are you from, originally?

A.    I was born in Los Angeles, California.

Q.    Did you go to high school in Charlotte?

A.    Yes.

Q.    Where did you go to high school?

A.    Waddell.

Q.    Do you know an individual named Jorge Sosa?

A.    Yes.

Q.    How do you know Jorge Sosa?

A.    It was from, like, friends.  I went to school.  But I met
him at a party when I was 12.

Q.    Do you know him by any nicknames or other names?

A.    No.

Q.    Do you see Mr. Sosa in the courtroom today?

A.    Yes.

Q.    Could you point him out and indicate something that he's
wearing?

A.    He's wearing a suit with brown tie.

Q.    And, Ms. Rivera, which seat is he?  Counting in from the left there.

A.    From the left.  One, two, three, four.

      MR. MILLER:  Thank you.

      Will the record reflect she's identified Mr. Sosa?

      THE COURT:  It will.

      MR. MILLER:  Thank you.

Q.    Now, Ms. Rivera, I would like to call your attention to October 15, 2011.  Do you recall seeing Mr. Sosa at a party on that day?

A.    Yes.

Q.    Where was that party?

A.    That party was near Nations Ford Road.

Q.    Whose party was it?

A.    It was my friend Karen Poseie (phonetic spelling), her daughter's birthday.

Q.    And how many people were at that party?

A.    I'd say between 20 and 30.

Q.    How old was the birthday girl?

A.    She was -- I want to say she was about 5.

Q.    And when did Mr. Sosa show up?

A.    It was -- I don't know how I can explain it.  But basically some -- well, my friend's little brother, he invited some of his friends, and apparently it was put on Facebook

that there was a party at that address.

Q. And when Mr. Sosa showed up, who was with him, if anyone?

A. There was a lot of people.

Q. How many would you estimate?

A. I would say a good 10.

Q. And were they in one car?

A. Different cars.

Q. Multiple cars?

A. Different cars, yup.

Q. And where was Mr. Sosa when you first saw him at that party?

A. Well, he was on the street, like, in front of the house.

Q. What was he doing on the street out in front of the house?

A. By the time I came out, it looked like there were -- they were going back and forth just arguing. So he didn't get there -- I was already outside.

Q. So he was already there when you came outside?

A. Yeah.

Q. What did you observe when you came outside?

A. There was just a whole bunch of arguing back and forth. And once my friend's dad, he -- somebody grabbed his attention that something was going on, he went outside and he started telling him to leave --

MR. McKNIGHT: Objection.

THE WITNESS:  -- with other guys.

THE COURT:  Pardon me?

MR. McKNIGHT:  I was objecting.

THE COURT:  What was the purpose of -- was it offered for the truth?

MR. MILLER:  I'm sorry.  I didn't hear the objection.

THE COURT:  It was a hearsay objection.

MR. MILLER:  It's offered just to explain what happened next.  It wasn't offered for the truth.

THE COURT:  Ladies and gentlemen of the jury, witness describes what someone else says, it's not offered for the truth of the matter asserted, but just what she observed and what she did next.

MR. MILLER:  Thank you, Your Honor.

THE COURT:  I'll overrule the objection but limit it to that consideration.

Q.   Did Mr. Sosa -- what was the nature of the argument as you observed it?

A.   I cannot remember exactly.  I just remember that it was -- that they were arguing between -- I wasn't -- I'm not sure if it had to do directly with my friend's younger brother.  But it definitely was with him, and I guess with his little brother -- not his little brother, but his friends.  Either him or his friends.

Q.   Did you see Mr. Sosa make any signs or gestures during the argument?

A.   I saw him and two other guys do them.  But I don't remember who the other guys were.

Q.   What signs or gestures did you observe Mr. Sosa and these other guys make?

A.   It was the symbols that MS-13 does.

Q.   And how are you familiar with MS-13 hand signs?

A.   Because when I was -- around that age there was a lot of that going on at school and friends.

Q.   Did you ever date anyone who was involved with MS-13?

A.   Yes.

Q.   And who was that?

A.   That was Alexi Ramos.

Q.   Alexi Ramos.

     Now, did Mr. Sosa, in addition to these hand signs, did he say anything that you understood to be an MS-13 slogan or related to MS-13?

A.   It was just, I guess, the sayings of MS-13.  I can't remember word for word though.

Q.   Now during this altercation when Mr. Sosa was flashing the MS-13 gang signs, did anyone ever get a weapon of any kind?

A.   Behind -- I can't remember if it was either a blue or a black car, somebody got a bat but it was not him.  It was

Case 3:15-cv-00121-RJC-DSC  Document 946  Filed 08/27/16   Page 224 of 310

somebody else.

Q. Was it someone in the group with Mr. Sosa?

A. Yeah. Yes.

Q. How did this incident or altercation ultimately end?

A. Because my friend's dad, he came outside and he told them that he would call the police.

MR. McKNIGHT: Objection.

THE COURT: Overruled.

Q. I'm sorry. I didn't catch --

A. My friend's father, he came outside when I was already out there, and he told them to leave. He said that he would call the police. And they started arguing like face-to-face, and eventually they just left.

MR. MILLER: No further questions, Your Honor.

MR. MICHEL: No questions.

MR. CARPENTER: No questions.

THE COURT: Mr. McKnight.

MR. McKNIGHT: Just a few, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q. So we're clear, is it Penado?

A. Rivera. I was not married at the time.

Q. The incident that you just described in terms of somebody going to a car and getting a bat, you were clear that that wasn't Mr. Sosa, right?

A. It was not him.

Q. And when you came up, they were just -- they were arguing, right?

A. Yes.

Q. Okay. About -- at that time were you -- you were still in high school at Waddell?

A. No, I had graduated.

Q. You had graduated. Okay. And is that what you knew Mr. Sosa from? From Waddell High School.

A. High school, but I remember seeing him at a party when I was 12.

Q. Oh.

A. That was the first time I saw him.

Q. Okay. And, predominantly, the conversation that was going on was going on between Mr. Mendoza and the people who were there, right?

A. Mr. Mendoza? It was -- okay. It was him and three other guys -- and two other guys. Excuse me. And then it was -- I can't remember if it was about two or -- between two or four of Gabriel's friends.

So that's who the argument -- that's what the argument was when I got there. But obviously then her father came out and then they started arguing.

Q. And then eventually the people who came, including Mr. Sosa, they got in cars and left, right?

A.   Yes.

MR. McKNIGHT:  That's all.

MS. COSTNER:  No questions.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. MILLER:  Thank you, Your Honor.  The government calls Tomas Maradiaga.

This witness will need an interpreter.

(Interpreter Monica Bew.)

TOMAS MARADIAGA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Mr. Maradiaga, could you start off by stating your name, please?

A.   My name is Tomas Maradiaga.

Q.   And, Mr. Maradiaga, where have you been living for the past few years?

A.   Charlotte.

Q.   Are you in prison, Mr. Maradiaga?

A.   Yes.

Q.   What are you in prison for?

A.   Apparently, for attempted murder.

Q.   What did you do to wind up in prison?

A.   I shot some guys.

Q.   Did you plead guilty?

A.   Yes.

Q.   And what was your sentence?

A.   Four to five years.

Q.   And, Mr. Maradiaga, do you know if you pled guilty in state court or in federal court?

A.   State.

Q.   Now before you pled guilty, did you speak to the police?

A.   Yes.

Q.   And when you spoke to the police for that first time, did you tell them that you were not involved in the shooting?

A.   Uh-uh.

Q.   That wasn't true, was it?

A.   No.

Q.   Why did you tell the police that you weren't involved, initially?

A.   Well, no.  I mean, I said I wasn't.  I was with him, but I was not -- I had not done what I was being accused of.

Q.   Now, Mr. Maradiaga, where are you from originally?

A.   Honduras.

Q.   Did you grow up in Honduras?

A.   Yes.

Q.   And how old are you?

A.   Twenty-seven.

Q.   Do you have any brothers and sisters, Mr. Maradiaga?

A.   Yes, we're ten.

Q.   You have ten brothers and sisters?

A.   Five boys, five girls.

Q.   Mr. Maradiaga, when did you come to the United States?

THE INTERPRETER:   Interpreter needs clarification.

THE WITNESS BY THE INTERPRETER:   2013.

Q.   Did you come to the United States legally or illegally?

A.   Illegal.

Q.   And when you came to the United States, where did you go?

A.   Charlotte.

Q.   And who were you living with?

A.   With my sister.

Q.   Do you have any other family that lives in Charlotte?

A.   The cousin's family that I got arrested with.

Q.   Did you have any family that was living in Charlotte at the time when you first came, other than your sister?

A.   Yes, I had another brother.

Q.   Why did you come to North Carolina to live with your sister?

A.   Well, they were here and my sister was here too.

Q.   And why -- what did you come to do?

A.   To work.

Q.   And what would you do with the money that you made from working?

A.   I would send all of it to my family.

Q.   Where was your family?

A.    In Honduras.

Q.    Now, Mr. Maradiaga, do you know Jorge Sosa?

A.    Yes, he's my cousin.

Q.    What name do you know him by?

A.    Jorge Sosa.

Q.    Does he have a nickname?

A.    Koki.

Q.    Do you see your cousin Jorge Sosa or Koki in the courtroom today?

A.    Yes.

Q.    Would you point to him and describe something that he's wearing?

        THE WITNESS:  (Indicating.)  The one with the jacket by the darker guy.

        MR. MILLER:  Will the record reflect that he's identified the Defendant Jorge Sosa?

        THE COURT:  Ask him how many people down from the left is Mr. Sosa sitting.

        THE WITNESS:  Fourth.

        THE COURT:  It will.

Q.    Now, had you met Jorge before you came to North Carolina?

A.    Only when we were young.  They went to Honduras once.

Q.    And now after you came to North Carolina to live with your sister, how often did you see your cousin Koki?

A.    Fridays, because I used to go with my sister.

Q.   And where would you typically see him?

INTERPRETER:   Interpreter needs clarification.

THE WITNESS:   At my brother's house.

Q.   What types of occasions would you see Koki at?

A.   Fridays and sometimes Saturdays.

Q.   Do you remember meeting any of Koki's friends?

A.   Yes, like two.

Q.   And who do you remember meeting?

A.   Guanaco, Chilito, and Oso.

Q.   When did you meet Guanaco, Chilito and Oso?

A.   One time when we were drinking outside the cousin house and they got -- they arrived there.

Q.   Who arrived there?

A.   Chelito -- no, it wasn't Chilito.  Oso and Guanaco.

Q.   When you first met Guanaco and Oso, was there anyone else with them?

A.   There were like three more people, but I don't know who they were.

Q.   And when Guanaco and Oso arrived, did your cousin greet them in any particular way?

A.   Yes.

Q.   How did he greet them?

A.   I don't know how to do what they did.

Q.   Can you just describe what they did?

THE INTERPRETER:   Interpreter needs clarification.

THE WITNESS: By making signs.

Q. Were they making signs with their hands?

A. Yes.

Q. What did you recognize these hand signs to be, if you did?

A. No, I don't know.

Q. I'd like to show you what's been entered into evidence as Government's Exhibit 49.

Mr. Maradiaga, if you'll just take a look at that screen there in front of you.

A. Yes.

Q. Do you recognize the person in Government's Exhibit 49?

A. Yes.

Q. Who is that?

A. Guanaco.

Q. I'd also like to show you what's been marked as Government's Exhibit 58. Do you recognize the person in Government's Exhibit 58?

A. Yes.

Q. And who is that?

A. Oso.

Q. Is that what Oso looked like, basically, when you met him?

A. Yes.

Q. And what do you remember about Guanaco that day? Did you

have any trouble with him?

MR. McKNIGHT: Objection.

THE COURT: Overruled.

THE WITNESS: Nah. Oh, he didn't like the way I was dressed.

Q. And what did he do about that?

MR. McKNIGHT: Objection. Relevance.

THE COURT: Overruled.

THE WITNESS: Like, he was asking the cousin why was I dressed like that; not the way they were.

Q. And when you say the cousin, are you talking about Koki?

A. Yes.

Q. What did Koki say?

A. No, I did not hear what he said.

Q. Mr. Maradiaga, are you in a gang?

A. No.

Q. Have you ever been in a gang?

A. No. Never.

Q. All right. I want to talk to you about the night of the incident that you pled guilty to. Okay?

A. Okay.

Q. Did you see Koki that night?

A. Yes.

Q. Where did you first see him?

A. We were together.

Case 3:15-cv-00121-RJC-DSC Document 946 Filed 08/27/16 Page 230 of 310

Q. Where were you together?

A. At my brother's.

Q. And did you and Koki go anywhere that night?

A. Yes.

Q. Where did you go?

A. To Las Torres.

Q. What is Las Torres?

A. A disco here in Charlotte.

Q. And how did you and Koki get to Las Torres?

A. To dance.

Q. Did you drive?

A. He did because I don't know.

Q. What kind of car was Koki driving that night?

A. A little red Honda.

Q. And did Koki have any issues with anyone there at Las Torres?

A. No. But all of a sudden there were these weird people that showed up.

Q. And what happened when these people showed up?

A. Well, one approached him to speak with him and I saw like there was going to be a fight.

Q. And who approached who?

A. Both of them approached each other.

Q. And was one of the people Koki?

A. Yes.

Q. And was one -- was the other person someone from that other group?

A. Yes.

Q. And what happened when Koki and the person from the other group approached one another?

A. Well, they started talking and after that -- well, no, before that, the cousin said, like, we were going to fight.

Q. Did he say why you were going to fight?

A. Like, the other guys were Surenos.

Q. And did Koki tell you why it was important that -- why he might have trouble with Surenos?

A. Yes. Because apparently they're a rival.

Q. Rivals with who?

A. Their gang.

Q. Whose gang?

A. Koki's.

Q. Do you know what gang Koki's in?

A. No. But I know it's, like, 13, something like that. I don't know.

Q. What happened when Koki and this member of the Surenos -- as he called them -- confronted one another?

A. No. Nothing happened. And the cousin came and we left.

Q. During the confrontation, did either Koki or the other person make any hand signs?

            MR. McKNIGHT: Object to the leading, Your Honor.

THE COURT: Overruled.

THE WITNESS: No.

Q. All right. What happened next?

A. We left.

Q. Where did you go?

A. Home.

Q. Did you ever go to another place to have drinks that night?

A. Yes, we left, and then from the house we went somewhere else.

Q. Where did you go?

A. To a house to drink.

Q. And what -- can you describe this house where you went to drink?

A. No, but I did hear the name of the Mrs that was in charge.

Q. So what type of place was this?

A. It was, like, an illegal house.

Q. And did you buy drinks there?

A. Yes, beer.

Q. And you said that there was a woman who was the owner. Did I hear you correctly?

A. Yes.

Q. Did Koki know the owner?

MR. McKNIGHT: Objection, Your Honor, as to what he

knew.

THE COURT:  Sustained as to form.  Don't answer that question.

Q.   What interaction, if any, did Koki have with the owner?

A.   What are you saying?  I'm sorry.

Q.   Did Koki interact with the owner at all?

A.   No, not with her.

Q.   What happened at that liquor house?

A.   There were three more -- three or four more people there.

Q.   Did Koki ever have an argument with anyone?

A.   Yes.

Q.   Describe what happened.

A.   There were some people there, and one of them did not want to pay the Mrs so that's when they started arguing.

Q.   And who was arguing?

A.   The cousin with the other person.

Q.   Can you describe this argument?

A.   They were arguing that the other guy didn't want to pay. So the cousin start arguing that he had to pay.

Q.   And did you ever -- did the argument ever move outside?

A.   Yes.  We were leaving already, and like the other guy start following us, and like he pushed him.

Q.   Who pushed who?

A.   The other guy pushed the cousin Koki.

Q.   And what happened after you got outside?

A. They kept arguing outside.

Q. And did anyone ever pick up any objects?

A. Yes, the other guy.

Q. What did he pick up?

A. Like, a big stick that was there in the grass.

Q. What happened at that point?

A. So I came and we had in the car some painting extensions so I pulled one out.

Q. And what happened next?

A. And when I saw that he pulled out a big stick, I said, "Well, no, let's go." I told the cousin.

Q. And did you guys get into a fight at that point?

A. No. There were no blows, but then the cousin got upset and said we were going to fight. But then the other guy didn't want to then.

Q. Okay. So what happened at that point?

A. So the cousin said to start the car. The other guy stopped the other car and we left.

Q. When you got in the car to leave, what did Koki say to you if anything?

A. That he wanted to get back with the guys but he needed to get something -- look for something.

Q. What did you understand that he needed to look for?

MR. McKNIGHT: Objection. Calls for inspection.

THE COURT: Overruled.

THE WITNESS:  Like a weapon.

Q.   And do you recall what his exact words were when you got back in the car?

A.   "Guys, you're gonna pay for this."

Q.   And what happened next?

A.   I went to the back of the car and I fell asleep.

Q.   Did you at some point wake up?

A.   A while back, later.

Q.   And were you still in the car when you woke up?

A.   Yes.

Q.   And did your cousin tell you where you guys were going?

A.   I saw that we were coming back already.

Q.   Back where?

A.   To where the guys were.

Q.   And what if anything was in the car at this point?

A.   A towel, on the floor.

Q.   And do you know what was under the towel?

A.   Yes.

Q.   What was under that towel?

A.   A long weapon.

Q.   Had you seen that long weapon before?

A.   Yes, I had seen that somewhere, but I do not remember where.  I had taken pictures with my cell phone of it.

Q.   So you had seen that weapon before and had taken pictures with your cell phone; is that right?

A.   Yes.

Q.   And that was prior to seeing it there in the car?

A.   Yes.

Q.   I'm going to show you up on that screen there what's been marked as Government's Exhibit 59.  Do you recognize that?

A.   Yes.

Q.   What is that?

A.   The weapon that I took pictures of.

Q.   And is this the weapon that you took pictures of, also the weapon that was in Sosa's car?

A.   Yes.

Q.   And is that a fair depiction of the gun?

A.   Yes.

         MR. MILLER:  Your Honor, at this time the government would offer Exhibit 59.

         THE COURT:  Any objection?

         MR. McKNIGHT:  No, Your Honor.

         THE COURT:  Let it be admitted.

         MS. GREENE:  I ask it be published, Your Honor.

         THE COURT:  You may.

         (Government's Exhibit No. 59 was received into evidence and published.)

Q.   Now, what happened after you saw this gun under the towel?

A.   He told me to grab it.

Q.  Who told you to grab it?

A.  Koki.

Q.  And was there anyone else with you guys in the car at this point?

A.  No.

Q.  And what did Koki tell you to do with the gun?

A.  To shoot.

Q.  And who did he tell you -- why did he tell you to shoot?

A.  He told me for me to shoot.

Q.  And where were you when he told you this?

A.  The back of the car.

Q.  And where was the car?

A.  I'm sorry.

Q.  Where was the car?

A.  It was running.

Q.  Where were you guys at this point?  You and your cousin.

A.  We're on our way.

Q.  On your way where?

A.  Where the guys were.

Q.  And did you ever see the guys again?

A.  Yes.

Q.  And where did you see them?

A.  At the same place where the problem was.

Q.  And is that same place where the problem was, where Koki made the statement to you to shoot?

A.    Yes.

Q.    Did you shoot the gun at that point?

A.    No.

Q.    What happened?

A.    So the guy saw the car coming and they got in their car.

Q.    Could you tell which guys saw your car coming?

A.    The guys that they had the problem with when we were at the Mrs.

Q.    And was the guy that you had the problem with at the Mrs with anyone else at this point?

         INTERPRETER:  I'm sorry.

Q.    Was the guy that you had a problem with, with anyone else?

A.    Yes.

Q.    And what did the guy you had a problem with and the other guy do at that point?

A.    They got in the car and they tried to flee.

Q.    And what kind of car did they get into?

A.    I don't know the brand.  It was black.  A four-door.

Q.    A black four-door?

A.    Yes.

Q.    And what did -- was your cousin still driving at this point?

A.    Yes.

Q.    And so what happened next?

A. He was telling me to shoot him.

Q. And did you and your cousin follow these men?

A. Yes.

Q. Where did you follow them?

A. I don't know. But we were trying to get to them.

Q. How long did you follow to try to get to them, if you remember?

A. I don't know, more or less, but we got to them.

Q. And where did you get to them?

A. There was like a store.

Q. And where were you relative to the store?

A. The store is on the side. It had an exit here and an entrance over here. The guys were coming this way. We came out this way.

Q. And was everyone still in the cars at this point?

A. Yes.

Q. And so what happened when your car met up with the guy you had a problem with car?

A. Cousin was telling me to shoot him.

Q. And what did you do?

A. I didn't not want to shoot him.

Q. Did you shoot?

A. Yes, twice.

Q. And where were you seated in your cousin's car at the time that you shot him?

A.    In the back.

Q.    And which side of the vehicle did you fire out of?

A.    Where the driver was.  The cousin.

Q.    So you were seated behind your cousin and firing out the driver's side?

A.    No.  I was in the back, but behind him.

Q.    Okay.  And did you hit the other car when you shot?

A.    Yes.  Well, I didn't want to shoot at them.  But I -- I got the store.  Maybe I got the rear windows of their car.

Q.    And after you shot those two times, what happened next?

A.    The guys sped up and then the cousin went to -- went around.

Q.    And what happened after the cousin went around?

A.    The guys had stopped and he asked me again to shoot.

Q.    And what happened then?

A.    I did not want to shoot at them.  So he came to me, grabbed the weapon, and he shot at them.

Q.    How many times, approximately, did your cousin shoot at them?

A.    Like seven or eight times.

Q.    And could you tell if when your cousin was shooting at the other vehicle, if he struck the vehicle?

A.    Yes.

          MR. MILLER:  Your Honor, at this time the government offers into evidence what's been previously marked as

Government's Exhibit 60, with 60A and B being clips off of that. This is pursuant to stipulation of the parties that the real time crime center footage, depicting the intersection of Old Pineville and Woodlawn and surrounding area is authentic and admissible.

THE COURT: Let it be admitted.

MR. MILLER: Thank you.

Q. Now, Mr. Maradiaga, I'm going to play a video for you there on the screen. Did you recognize that vehicle there?

A. Yes, that was the guy's vehicle.

Q. What about that car?

A. That was the cousin's car.

Q. And were you and your cousin in the car at this point?

A. Yes.

MR. MILLER: And this is going to be 60B.

Q. Now, where is the area here -- do you see your cousin's car at this point?

A. Yes.

Q. And where is your cousin's car in this picture?

A. Over there.

Q. Is it on the left side or the right side?

A. Left.

Q. And is this your cousin's car here (indicating)?

A. Yes.

Q. And is this the area at the business where you said you

met up with the black car?

A.   Yes.

Q.   Explain what's happening at this point.

A.   That's when the guys are stopped and I shot him twice.

Q.   So was the black car already in the parking lot when this video started?

A.   Yes.

Q.   Now which car is that that we see there leaving the parking lot?

A.   That's the car where the other two guys were.

Q.   And where are you and your cousin at this point?

A.   We're pulling out from the other side behind there.

Q.   So is there another entrance?

A.   Yes.

Q.   Now did you see something flash there?

A.   Yes.

Q.   What was that?

A.   A shot.

Q.   What was that?

A.   A shot.

Q.   And who fired that shot?

A.   The cousin.

Q.   And where is your cousin's car at this point?

A.   Around here, the back.

Q.   Is it to the left or to the right of the black car?

A. Left -- right.

Q. But the car's right?

A. Yes.

Q. And what is that?

A. That's the car we were in.

Q. Now after the shooting, what happened next?

A. We went to the house.

Q. Whose house?

A. We got to an apartment where his girl used to live, some parking lot.

Q. Whose girl?

A. Cousin's wife.

Q. And what did you guys do with the gun?

A. With the gun, I don't know. Once we got there he left the red car and he took his car.

Q. Did your cousin leave the gun in the car at that point?

A. Yes, he left it there.

Q. And did you and your cousin get into a different car?

A. Yes.

Q. And what color was that car?

A. Black.

Q. After you got out of the red car and into the black car, where did you go?

A. To his mother's.

Q. And what happened next?

A.  I stayed there sleeping.

Q.  Did Koki stay there as well, or did he leave?

A.  No, he dropped me off and he left.

Q.  All right.  Now did you hear from Koki again that day?

A.  No, until the evening that he called me.

Q.  And what did he say when he called you that evening?

A.  He called me and he said that the guys did not die.

Q.  What if anything did he tell you that you should do?

A.  To leave.

Q.  And why did he tell you to leave?

A.  I don't know.

Q.  What did you do?

A.  What I did is, I stayed there with my sister only.

Q.  Did you leave?

A.  No.

Q.  Did anyone aside from Koki call you about the shooting?

A.  The next day, yes.

Q.  And what if anything -- who called you?

A.  Chelito.

Q.  And did you know Chelito from before?

A.  Yes.  Because he's the husband of the sister.

Q.  And did you ever work with Chilito?

A.  Yes.

Q.  Do you know if Chelito is in a gang?

A.  No, back then I did not know.

Q.    What did Chilito tell you?

MR. McKNIGHT:  Objection.

THE COURT:  Overruled.

THE INTERPRETER:  I'm sorry?

Q.    When Chilito called you the next day, what did he tell you?

A.    That the cousin had turned himself in and he had blamed me.

Q.    And did -- what did Chilito tell you to do, if anything?

A.    If I could leave.

Q.    But Chilito also told you to leave.

A.    Yes.

Q.    I'm going to show you, at this point, the second page of the exhibit I showed you a moment ago, which I believe is Government's Exhibit 59 -- 58.

      Do you recognize the person there in that picture?

A.    Yes.

Q.    And who is that?

A.    Chilito.

MR. MILLER:  Your Honor, at this time the government would offer Exhibit 58 and ask that it be published.

THE COURT:  Any objection?

MR. McKNIGHT:  No, Your Honor.

THE COURT:  Let it be admitted.  You may publish.

MS. GREENE:  Thank you.

(Government's Exhibit No. 58 was received into evidence and published.)

Q.   Now what happened after Chilito called you?

A.   He hung up and Koki's brother called me.

Q.   Did Koki's brother call you almost right after you hung up with Chilito?

A.   Yes.  Like ten minutes later, more or less.

Q.   And what did Koki's brother tell you?

MR. McKNIGHT:  Objection, Your Honor.

THE COURT:  Hang on a second.

MR. MILLER:  It's not offered for the truth, rather the effect on the listener.

THE COURT: Very well.  Members of the jury, what Koki's brother may have said is offered for the limited purpose of explaining what impact it had on this witness as he listened to it.

Q.   So, Mr. Maradiaga, what did Koki's brother tell you?

A.   The same thing that Chilito told me, the cousin had turned himself in.  He had blamed me, and if I could leave.

Q.   Were you ever -- did you ever get arrested for that shooting?

A.   I turned myself in.

MR. MILLER:  May I have one moment, Your Honor?

Q.   Why did you turn yourself in?

A.   Because I did not -- I did not feel guilty what had

happened.

Q.   Did you eventually tell the police officers that you were involved in the shooting?

A.   Yes.

MR. MILLER:  No further questions.

THE COURT:  I think we'll take an afternoon break before cross-examination of this witness.

Members of the jury, we'll take our afternoon break. Don't talk about the case.  Keep an open mind and we'll see you in 15 minutes.

(Recess at 4:08 until 4:25.)

THE COURT:  Are we ready for the jury?

MR. MICHEL:  Yes, Your Honor.

THE COURT:  Call the jury.

(The jury was returned to the courtroom.)

THE COURT:  Mr. Michel, do you have any cross?

MR. MICHEL:  No cross.

THE COURT:  Mr. Smith.

MR. SMITH:  No, Your Honor.

THE COURT:  Mr. McKnight.

MR. McKNIGHT:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q.   Now, Mr. Maradiaga, you said you know Mr. Sosa by the name "Koki," right?

A.   Yes.

Q.   His family members call him that sometimes as well; isn't that correct?

A.   Yes.

Q.   Okay.  Now you also testified earlier that you -- you pled guilty to attempted murder.  But that's not actually what you were charged with, was it?

A.   No.

Q.   You were actually charged with discharging a weapon into an occupied vehicle and, initially, assault with a deadly weapon with intent to kill.  Do those two charges sound familiar to you?

A.   Yes.

Q.   And you -- eventually, you pled guilty to discharging a weapon into an occupied vehicle and assault with a deadly weapon inflicting serious injury; is that right?

A.   Yes.

Q.   So you were never charged with attempted murder, right?

A.   No.

Q.   Now, this isn't the first time you talked to people about this incident that happened back on June 30, 2013, is it?

A.   No.

Q.   And, in fact, you testified earlier that you voluntarily went to the police station back on July 1, 2013, and voluntarily went in to give a statement to the police, right?

A.	Yes.  They went to get me to the cousin's house.  I told them I was there and they picked me up.

Q.	Okay.  Now, because you pled guilty, you went to the state court process where you were charged, you had a lawyer, and at some point in time you were given or you seen a copy of something called "discovery" or the information or the evidence in your case, right?

A.	They never gave me my discovery.

Q.	So you never saw any of the videos, never saw any audio -- heard any audio recordings of interviews that you did with the police officers; is that your testimony?

A.	No.  Nothing like that.

Q.	But when you went down the first and the second time to interview with the police officers, you knew that it was being recorded, right?

A.	Yes.

Q.	Now, the very first time you went in, do you recall the first thing that you said when they asked you about this situation is, "I wasn't there."  Do you remember you saying that?

A.	Yes.

Q.	And after that the next thing you went on to say, not only that you weren't there, you said that you were drinking, that some boys started a fight with your cousin, but you didn't get involved; remember you saying that?

A.    Yes.

Q.    But that wasn't true, was it?  You -- actually not only were you there, not only were you in the car, but you actually shot at them, didn't you?

A.    Yes.

Q.    Now, you told detectives in that first interview that you actually were drunk before you got to the -- well, it's a little liquor house, right?  Is that what it was?

A.    Yes.

Q.    Now, in the first interview you did, there were two detectives in the room, one spoke Spanish, one didn't.  Do you remember that?

A.    Um-hmm.

Q.    And in that first interview, you never mentioned anything about Mr. Sosa running into any rival gang members or any rivals at the club you went to before you went to the liquor house, right?

A.    No.

Q.    And, in fact, what you told the detective is after you left the liquor house you went back to the house that you guys came from, and you said you went to bed.  Isn't that what you said?

A.    Yes.

Q.    You said you went in the bedroom and laid down.  And you said Mr. Sosa was on the couch, right?

A.   Yes, after that he left.

Q.   Okay.  And then you also told the police in that first interview that you woke up around 11:30, and you said something -- and you said that you went and played ball.  Do you remember telling them that?

          THE INTERPRETER:  I'm sorry, played...

          MR. McKNIGHT:  Played ball.

          THE WITNESS:  Yes.

Q.   Were you talking about soccer?

A.   Soccer, yes.

Q.   Now, do you remember being confronted in that interview about telling the truth?  And do you remember telling them, "He's lying to you.  I wasn't there."  Do you remember saying that?

A.   Yes.

Q.   And do you remember repeatedly telling them that, "Like, I tell you before -- like, I told you before, he left me at the house."  Do you remember saying that?  You were referring to Mr. Sosa leaving you at the house, right?

          INTERPRETER:  I'm sorry, which house?

          MR. McKNIGHT:  The house that he originally came from.

          THE WITNESS:  Yes.

Q.   And do you recall when you were being confronted and told that there are cameras all over the city.  In fact, the video

involving what happened, that your response still was, "I was asleep. I played basket -- or I played ball." Do you remember saying that?

A. Yes.

Q. And do you recall actually telling -- in that first interview on July 1st -- that Mr. Sosa called you and told you about the shooting afterwards. Do you recall telling them that?

A. Yes.

Q. And do you recall being confronted in that first interview, in terms of, you were telling the officers you weren't there, and they confronted you about you having a smile on your face. Do you remember that conversation?

A. Yes.

Q. Do you remember being asked, "Do you think this is a joke?"

A. Yes.

Q. Do you remember during the course of that first interview being asked about -- or strike that.

Do you remember them explaining to you what DNA evidence is because you didn't know. Do you remember that?

A. Uh-huh.

Q. And do you remember having a conversation about the fact that a person may have respect for someone saying, I was drunk and I just made a mistake. Do you remember somebody having a

conversation with you like that?

A.   Yes.

Q.   Would it surprise you that in that first interview, you said over 17 times, "I wasn't there."

A.   Yes.

Q.   Now I'm going to turn your attention because -- about two days later at the request of one of your family members you went back and wanted to talk to the officers some more, right?

A.   Yes.

Q.   And this time it was at your request, right?

A.   Yes.

Q.   And the officers explained to you what you had been charged with -- strike that.  Let's go back.

     Because at the end of the first interview, you were arrested, weren't you?

A.   No.

Q.   So at the end of the first interview that you gave on July 1st, you weren't taken into custody by the officers?  You weren't allowed -- that didn't happen?

A.   Oh, yes.  Yes.  Yes.

Q.   So they didn't believe you.

A.   No.

Q.   Okay.  So going back to some two days later at the request of one of your family members, you asked to go back and talk to them again, right?

A.   Yes.

Q.   And during the second interview you once again told them that you were drunk before you even got to the liquor house, right?

A.   Yes.

Q.   And you also told them -- well, strike that.

In the second interview on July 3rd, you also never mentioned anything about running into any rival gang members at the club before you went to the liquor house, right?

A.   No, I never said that.

Q.   And also on the second interview you gave a little bit more description about what happened inside the liquor house. But you said that it was the other guy who had the argument with the Mrs -- the owner of the house with Mr. Sosa, right?

A.   Yes.

Q.   And, in fact, this person followed you and Mr. Sosa out of the liquor house, right?

A.   Yes.

Q.   And once they got outside, it was this other person who picked up some kind of object out of the yard, right?

A.   Yes.

Q.   Do you remember what he picked up?

A.   It was like a big tip.

Q.   A big tip?

A.   Something like this.

Q.   Okay.  And you were in the car, right?

THE INTERPRETER:  I'm sorry?

Q.   You were in the car.

A.   Yes.

Q.   And eventually you -- you took the handle off the paint roller, didn't you?

INTERPRETER:  I'm sorry?

Q.   You took the handle off a paint roller.

A.   Yes.

Q.   So you basically went and got a stick, right?

A.   Yes.

Q.   Now, in the second interview that you did with the detectives, you never mentioned anything about Mr. Sosa saying he needed to go get something, did you?

A.   No.

Q.   And in the second interview you told them that you climbed into the seat -- you climbed into the back seat and went to sleep; is that right?

A.   Yes.

Q.   Now, let's go back to this -- to the photo of the rifle.

INTERPRETER:  To the photo...

MR. McKNIGHT:  Of the rifle.

Q.   In your first interview on July 1st, you never mentioned to the police that you had a photo, supposedly, of the rifle that you used in your phone, did you?

A.    No.

Q.    And in your second interview with police, you once again never mentioned anything about having a photo in the phone of the rifle that you supposedly used either, did you?

A.    Yes.  No, no, no.

Q.    And, in fact, when you were last interviewed about a week ago by the government, you said that you weren't sure if that was the same weapon; isn't that right?

A.    Yes.

Q.    Now the phone that we're talking about, was that phone taken from you back in 2013?

A.    Yes.

Q.    So that phone has been with the police for two years or more?

A.    Yes.

Q.    And this is the first time you've mentioned anything about the rifle being -- a photo of the rifle being in the phone, right?

A.    Yes.

Q.    Now, do you recall telling the police the second time you were interviewed, that you didn't -- you had never held a gun. You told them that, right?

A.    Yes.  No, no, never.

Q.    Okay.  But the rifle that you fired, did you have to chamber it?  Did you have to cock it?

A.   No.

Q.   Okay.  You testified that when you woke up you were on your way back to the house.  That's what you testified to today, right?

A.   Yes.

Q.   But -- and you testified that Mr. Sosa told you to shoot, right?

A.   Yes.

Q.   But, so we're clear, in the second interview that you did with the police, you never told them when you got back to the house that Mr. Sosa told you to shoot, right?

A.   Yes, I told them, I think.

Q.   In fact, do you recall telling them that Mr. Sosa told you, "We're going to scare them."

A.   Yes.

Q.   Now, in the second interview you stated that you left the liquor house and then you and Mr. Sosa followed the men, right?

            INTERPRETER:  I'm sorry.  You and Mr. Sosa...

            MR. McKNIGHT:  Followed the men.

            THE WITNESS:  Yes.

Q.   But, in the second interview, you told them that you were being insulted by Mr. Sosa and that's why you shot.  Do you remember saying that?

A.   Yes.

Q.   But do you also remember telling them when they asked you later on -- in the second interview when they asked you why you shot you said, "You know, maybe because I was drunk."  Do you remember saying that?

A.   No, I do not remember.

Q.   Now, when you shot at them, though, you were in the back seat; is that right?

A.   Yes.

Q.   And this was, you said, "A little red car," right?

A.   Yes.

Q.   It was a two-door car, right?

A.   Yes.

Q.   And it was a manual or a stick shift, right?

A.   Manual.

Q.   So it was a stick shift, right?

A.   Yes.

Q.   Okay.  And you testified earlier that Mr. Sosa was driving because you don't know how to drive, right?

A.   Yes.

Q.   And so, from the back seat of that two-door car, you stuck a gun out the driver's side window and you shot at them, right?

A.   Yes.

Q.   Okay.  Now today you testified that you only shot two times.  But back on -- back in July of 2013 you said it was

three times; is that right?

A.    No, two times.

Q.    Okay.  So on July -- back in July 2013 -- July 3rd to be exact -- in your second interview, it's your testimony today that you did not tell the detective that you shot three times.

          MR. MILLER:  Objection.  Asked and answered.

          THE COURT:  Overruled.

          THE WITNESS:  First interview I did not.

Q.    What about your second interview?

A.    Yes.

Q.    Did you remember telling the police after your second interview, at first, that you didn't hit the car.  Do you remember telling them that?

A.    Uh-huh.

Q.    And do you remember changing it afterwards and saying, yes, you did in fact hit the car when you shot at it?

A.    Yes, I thought I had hit it.

Q.    Now going back to the incident inside the liquor house. Based on what you saw, would you say the -- what you describe as the tall guy, or the other guy, was he the one being the aggressor towards your cousin?

A.    The tall guy.

Q.    Back at the liquor house you never saw Mr. Sosa or any of the other guys involved do anything with their hands that may have been a gang sign, did you?

A.   No.

Q.   And to the best of your recollection, the argument was around the other guy not paying a bill, right?

A.   Yes.

Q.   And when they walked outside and they confronted your cousin, again, you didn't see anybody flash any gang signs, did you?

A.   No.

Q.   And after you got in the car -- well, you said after you got in the car you went to sleep; is that right?

A.   Yes.

Q.   After you woke up, between the time that you woke up and the time that you went back -- or dropped off back at the house -- did you ever hear Mr. Sosa talking on the phone with anybody that sound like anything concerning anything involving a gang?

A.   No.

Q.   Now, how long have you been in custody, Mr. Maradiaga?

A.   33 months.

Q.   And is it safe to say that when you thought you were being solely blamed for the shooting you were upset, right?

A.   Yes.

Q.   You were a little angry, felt betrayed, right?

A.   Yes.

          MR. McKNIGHT:  One moment, Your Honor.

That's all I have.

THE COURT: Ms. Costner, Mr. Beechler.

MR. BEECHLER: No questions, Your Honor.

THE COURT: You may step down.

Call your next witness.

MS. GREENE: The government calls Trena Cadenhead.

TRENA CADENHEAD, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GREENE:

Q. Good afternoon.

A. Hi.

Q. Would you please tell the jurors your name.

A. Trena, T-r-e-n-a. Cadenhead, C-a-d-e-n-h-e-a-d.

Q. And, Ms. Cadenhead, where do you work?

A. I was employed by the City of Charlotte. Charlotte-Mecklenburg Police Department, and I retired last August 1st.

Q. So you recently retired?

A. Yes, ma'am.

Q. And how long were you employed by CMPD?

A. Thirty-one years.

Q. And what did you do for CMPD for all those years?

A. I was a supervisor in the crime scene search unit. And when I originally went to the police department I dispatched, and then two years later I transferred to the crime scene

unit.

Q.   Ms. Cadenhead, were you employed with CMPD as a crime scene investigator on June 30, 2013?

A.   I was employed as a supervisor in the crime scene unit, yes, ma'am.

Q.   And on that date, did you respond to a call, specifically go to CMC at the Blythe Boulevard address?

A.   Yes, ma'am, I did.

Q.   And do you remember about what time you were sent out on that call and what time you got there?

A.   I don't exactly remember the time I got the call.  But I got to the hospital around 7 or 7:05.

Q.   In the morning?

A.   Yes, ma'am.

Q.   And when you arrived at the hospital about 7:00 that morning, who was there?

A.   There were two victims in the emergency room, an officer. Officer Barnette had put a request in for crime scene to respond there to take photographs and collect clothing and complete gunshot residue tests.

Q.   Did you in fact do those items that day?

A.   Yes, ma'am, I did.

Q.   To do those items, did you personally observe the two victims?

A.   Yes, I did.

Q.   I am going to show you what has been marked as Government's Exhibit 65.  And Government's Exhibit 65 is actually going to be comprised of four photographs and we're going to scroll through there for you.

Have you had a chance to look at all four of those photographs?

A.   I saw three come up.  I'm not sure.  Okay.

Q.   Four.  Okay.  And do each one of those photographs, Ms. Cadenhead, appear to fairly and accurately depict the two gunshot wound victims as you saw and observed them on the morning of June 30, 2013?

A.   Yes, ma'am.  They are.

MS. GREENE:  Your Honor, at this time, I would ask that Government's Exhibit 30, comprised of four photographs, be admitted and published.

THE COURT:  Any objection?

MS. GREENE:  65.  I don't know where I got 30.  65.

MR. McKNIGHT:  I would object, Your Honor.  Ask to be heard briefly at sidebar.

THE COURT:  Yes.

(Bench conference as follows:)

MR. McKNIGHT:  Pursuant to United States v Ham, 998 F.2d 1247, Your Honor, we would object to the admission of the photos regarding -- they are prejudicial in nature.

Your Honor, the photographs in question are

DIRECT - CADENHEAD

photographs of the victim in this particular case.

Your Honor, in terms of what they represent, that can be shown through the testimony of the victim or the medical records.

Admitting these photos at this point, however, do nothing more than to incite emotion to the jury, which we respectfully submit to the Court would render them -- render such prejudicial nature, Your Honor, that they would be unable to render a verdict in this case, Your Honor, without the emotional attachment with regard to seeing these types of photos.  That's what we ask.

THE COURT:  Under 403 you're moving to exclude that?

MR. McKNIGHT:  Correct.

THE COURT:  I looked at the photos as they came up. They appear to be photographs of gunshot wounds.  I don't believe they're unfairly prejudicial.  I don't think they would incite the emotion of the jury.

I will overrule your objection under 403 grounds.

MR. McKNIGHT:  Very well.

(Bench conference was concluded.)

MS. GREENE:  Your Honor, may they be admitted and published?

THE COURT:  They may be admitted and published.

MS. GREENE:  Thank you.

For the record, this is Government's Exhibit 65.

Case 3:16-cv-00057-MOC-DSC Document 69-5 Filed 03/22/18  Page 468 of 600
Case 3:15-cr-00127-RJC-DSC  Document 946  Filed 08/27/16  Page 468 of 600

(Government's Exhibit No. 65 was received into evidence and published.)

Q.   Ms. Cadenhead, is this a photograph of one of the victims that you saw that morning?

A.   Yes, ma'am, it is.

Q.   And obviously this is picture of his face.

A.   Correct.

Q.   Okay.  If we could go to next photograph.  And is this a photograph of his injury or one of his injuries that you photographed?

A.   Yes, it is, to his back.

Q.   All right.  Thank you.  And then -- actually, if we could go ahead to 4.

Is this a photograph of the face of the second victim?

A.   Yes, ma'am, it is.

Q.   If we could go back to 3.

And is this a photograph of the gunshot wound injury that he sustained to one of his legs?

A.   Yes, ma'am, it is.

Q.   Thank you, ma'am.

Thank you, Ms. Neill.

And, Ms. Cadenhead, did you have any further participation in the investigation of this matter?

A.   No, ma'am, I did not.

MS. GREENE:  Thank you.  Those are all the questions

I have for you.

THE COURT:  Mr. Michel, any cross?

MR. MICHEL:  No questions.

THE COURT:  Mr. Smith.

MR. SMITH:  No questions.

THE COURT:  Mr. McKnight.

MR. McKNIGHT:  No questions.

THE COURT:  Mr. Beechler.

MR. BEECHLER:  No questions.

THE COURT:  You may step down and be excused.

THE WITNESS:  Thank you.

THE COURT:  Call your next witness.

MS. GREENE:  The government calls Officer Barnette.

GEORGE MARSHALL BARNETTE, JR, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Please introduce yourself to the jury.

A.   George Marshall Barnette, Jr.

Q.   And Mr. Barnette, what do you do now?

A.   I work part time with the Charlotte-Mecklenburg Police Department after retiring from full time duty.

Q.   When did you retire from full time duty?

A.   July 1st of last year.  It was after 29 years and 3 months.

Q.   You didn't hesitate on that date.

A.    I remember it well.

Q.    And what division were you assigned to in June of 2013?

A.    The Westover patrol division.

Q.    How long had you worked in the Westover division prior to your retirement?

A.    In the Westover division was approximately 19 years.

Q.    And I'm going to call your attention to June 30, 2013. Did you respond to a call for service that morning?

A.    Yes, sir, I did.

Q.    And where did you respond to that call for service?

A.    It was about the 300 block of East Woodlawn. So right approximately at the intersection of Woodlawn and Old Pineville Road.

Q.    What was the nature of the call you responded to?

A.    There were several 911 calls came in about shots fired in that vicinity.

Q.    What did you see when you first arrived on scene?

A.    When I arrived on the scene there was a black car on Woodlawn, just east of the intersection. And the fire truck was there and they were starting to treat what appeared to be two individuals in the roadway.

Q.    And what did you do next?

A.    After I -- shut down the traffic from what I could do, asked for additional units. We secured the area from pedestrian traffic, vehicular traffic so medical people could

tend to the injured.

Q. Did you also, sort of, examine the area?

A. I did. After closer examination of the vehicle and the persons there, it appeared the vehicle had what appeared to be numerous gunshot bullet holes in the vehicle, glass broken, two individuals had apparently sustained -- appeared to have sustained bullet injuries, being shot, found some shell casings on the roadway. And, again, maintained the security of the scene.

Q. Did you examine any of the surrounding businesses or parking lots?

A. I did. While I was there doing a cursory search checking around the area, noticed just on the other side of the street, there was a pile of shattered glass, appeared to be consistent with what you would see from a vehicle window.

And then as I was looking at the overall scene, I noticed that the glass was broken in the vehicle that was in the roadway. And with the glass that was in the roadway, it didn't -- appeared to be enough to be from that window.

So it was a possibility, in my mind, that maybe that glass over in the parking lot just on the other side of the street could have been involved with that vehicle.

Q. I want to show you what's been previously marked as Government's Exhibit 61. It will pop up on your screen there.

A. Yes, sir.

Q.   We'll just scroll through these pictures.

And what are those pictures of?

A.   The scene that I responded to that morning.

Q.   And do they fairly and accurately depict what you saw?

A.   Yes, sir.

MR. MILLER:  Your Honor, at this time the government offers Exhibit 61, and would ask that it be published.

THE COURT:  Any objection?

MR. MICHEL:  No objection.

THE COURT:  Let them be admitted.

(Government's Exhibit No. 61 was received into evidence and published.)

Q.   And where is the parking lot where you found the shattered glass, relative to this picture?

A.   Relative to this picture, if you look at the black vehicle which is just on the left side of the screen.  Yes, sir.  And then just to the right of that, that's the Cash America Pawn building.  Right about where that cursor is, is where that glass was located.

And on that picture you can see the tractor-trailer in the background about the center of the top.  Again, forward of that trailer in that parking lot.

Q.   What is this a picture of?

A.   That's the shattered glass in that parking lot.

MS. GREENE:  No.

MR. MILLER:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. MICHEL:  No.

MR. CARPENTER:  No questions.

THE COURT:  Mr. McKnight?

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q.   Officer Barnette.

A.   Yes.

Q.   With regard to that shattered glass in the parking lot, did you make request from CMPD crime lab for any type of forensic examination of that glass to see -- comparatively -- to see if it came from that vehicle.

A.   I requested crime scene to come to the scene for processing of the overall scene.  I had already left that scene and gone to the hospital before they arrived.  So I can't speak specifically for -- if they collected or compared it or not.

Usually in those circumstances an investigator in charge of the case will usually put in a request for that comparison.

Q.   So as you stated to earlier, you can't say for sure that the glass in that parking lot was associated with that car.

A.   That is correct.  I cannot say for certain.

MR. McKNIGHT:  That's all I have.

THE COURT:  Any cross?

MR. BEECHLER:  No questions, Your Honor.

THE COURT:  You may step down and be excused.

THE WITNESS:  Thank you sir.

THE COURT:  Call your next witness.

MS. GREENE:  The government calls Detective J.D. Furr.

JD FURR, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GREENE:

Q.   Good afternoon.

A.   Afternoon.

Q.   Would you please tell the jury your name and where you work?

A.   Sergeant J.D. Furr.  I'm with the Charlotte-Mecklenburg Police Department.

Q.   How long have you been with the police department?

A.   Eighteen years.

Q.   How long have you been with the homicide unit?

A.   For four years.

Q.   And what types of calls for service does the homicide unit respond to?

A.   We respond to homicides, assaults with deadly weapons, suicide, overdoses, death investigations.

Q.   So I want to direct your attention to June 30, 2013, if I could.  Did members of your particular squad respond to a call

for service at Woodlawn and Old Pineville Road here in Charlotte?

A.    Yes, ma'am.

Q.    And what type of call for service was it?

A.    It was an ADW, assault with a deadly weapon.

Q.    And do you recall what time of day it was?

A.    Approximately, 7 in the morning.

Q.    And what did you do with regards to that particular investigation?

A.    Well, I correspond with patrol, and I get all the information about the call for service.  And then I coordinate our detectives to respond to the scene and investigate.

Q.    And did you personally respond to the scene that morning?

A.    I did.

Q.    Now, when you arrived at the scene of the shooting that morning in terms of law enforcement, who was already on scene?

A.    I met with the current robbery sergeant, at that time, who was Todd Walter.

Q.    And did he kind of get you up to speed with what they were dealing with out there?

A.    He did.

Q.    And can you tell the jury what you observed as you assessed the scene that morning?

A.    I saw a 2002 Chevrolet Cavalier in the turning lane of the roadway of Woodlawn and Old Pineville that had been shot

into several times. There was bloody clothes on the roadway. There was some blood pooling on the roadway. And there was some cartridge casings on the roadway.

Q. Now, had the victims already been taken to the hospital at that point?

A. Yes.

Q. They were already gone. Now, did your crime scene technician folks also respond out there that morning?

A. They did.

Q. And, specifically, did crime scene technician Scheurman respond?

A. Yes, ma'am.

Q. And did you work the scene with that crime scene technician -- walk the scene, as they collected the evidence?

A. I did.

Q. And what, if any, physical evidence did crime scene technician Scheurman collect?

A. She collected the cartridge casings, ballistics evidence, the bloody clothing, swabs of blood. She swabbed the door handles for DNA, samples of glass from a secondary crime scene. And --

Q. Do you remember what caliber the casings were?

A. 7.62.

Q. Do you remember how many casings were collected?

A. There were two.

Q.   I'm going to show you what has been marked as Government's Exhibit 62.  And ask you if you recognize what that's a picture of?

A.   Yes.  That's a picture of one of the cartridge casings that were collected from the roadway that morning.

Q.   Does that photograph fairly and accurately depict one of the cartridge casings that was located and collected at scene that morning?

A.   Yes, ma'am.

MS. GREENE:  Your Honor, at this time I would ask that the first photograph of Government's Exhibit 62 be received and published.

THE COURT:  Any objection?

MR. CARPENTER:  No objection, Your Honor.

THE COURT:  Let it did he admitted and published.

(Government's Exhibit No. 62 was received into evidence and published.)

Q.   Now after you left the scene that morning -- well, about what time did you leave the scene that morning?

A.   9:15 a.m., approximately.

Q.   And do you recall where you went after you left the scene of the shooting?

A.   I went to CMPD headquarters to the real time crime center.

Q.   And for folks who don't know, briefly, what's your real

time crime center?

A. It's a room staffed with detectives with many monitors. And those monitors have feeds to many pole cameras and cameras from around the city so that they can access the footage from those cameras.

Q. And did you observe video or recording at the real time crime center that appeared to show the shooting from that morning?

A. Yes, I did.

Q. And did that video assist you all in identifying a suspect car?

A. Yes.

Q. Can you describe for us the car that CMPD investigators began to look for?

A. It was a red Honda Civic. It had a missing left rear hubcap and a spoiler.

Q. And did officers eventually locate the vehicle?

A. Yes.

Q. And where did you find it?

A. 919 Falls Creek Drive.

Q. Do you know who lived at 919 Falls Creek Drive?

A. No, ma'am, I can't specifically say. I believe it was family of one of the defendants.

Q. And I want to show you the second photograph of Government's Exhibit 62. And do you recognize that

photograph?

A.   Yes.

Q.   And what is that?

A.   That is the defendant vehicle -- suspect vehicle.

Q.   And does the second photograph of Government's Exhibit 62 fairly and accurately depict the car that you were looking for on the morning of June 30, 2013?

A.   Yes.

        MS. GREENE:  Your Honor, I would ask the second photograph of Government's Exhibit 62 be received and published.

        THE COURT:  Any objection?

        MR. McKNIGHT:  No objection.

        THE COURT:  Let them be admitted and published.

        (Government's Exhibit No. 62 was received into evidence and published.)

Q.   And did that car, in fact, match the suspect vehicle that you had seen on the real time crime video?

A.   Yes.

Q.   And, Sergeant, so who was ultimately -- if you know or remember -- who was ultimately arrested and charged in the shooting?

A.   Jorge Sosa and Tomas Maradiaga.

Q.   Sergeant Furr, did you have any further participation in the investigation of this matter?

A.    No, ma'am.

MS. GREENE:  Thank you, sir.

THE COURT:  Any cross?

MR. MICHEL:  No questions.

MR. CARPENTER:  No questions.

THE COURT:  Mr. McKnight.

MR. McKNIGHT:  Just one or two, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q.    Detective Furr, so you're in the homicide unit.  I think you said that you investigate, basically, homicides, suicides, serious assaults; is that kind of the gamut?

A.    Yes, sir.

Q.    And you arrested individuals for murder, correct?

A.    Yes, sir.

Q.    And you've arrested individuals for assault with a deadly weapon, right?

A.    Yes, sir.

Q.    And you arrested individuals for assault with a deadly weapon inflicting serious injury, right.

A.    Yes, sir.

Q.    You would agree that all those offenses, while they are types of assaults, they're different, right?

A.    Yes, sir.

Q.    And with varying degrees of punishment?

MS. GREENE:  Objection, Your Honor.

THE COURT:  Basis?

MS. GREENE:  Going into the province of the Court with regard to the law and punishment.

THE COURT:  Relevance?

MR. McKNIGHT:  I withdraw, Your Honor.

That's all, Your Honor.

THE COURT:  Ms. Costner?

MS. COSTNER:  No.

THE COURT:  Any redirect?

MS. GREENE:  No, Your Honor.

THE COURT:  You may step down and be excused.

Call your next witness.

MR. MILLER:  The government calls crime scene investigator Maresca.

DANIELLE MARESCA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Ms. Maresca, I would like you to start out just by stating your name for the jury.

A.   Danielle Maresca.

Q.   What do you do for a living?

A.   I'm a crime scene investigator for the Charlotte-Mecklenburg Police Department.

Q.   Were you working as a crime scene investigator on

June 30, 2013?

A.    Yes.

Q.    Were you called to the law enforcement center to process a vehicle on that date?

A.    Yes.

Q.    I am going to show you what's been previously marked as Government's Exhibit 63 -- excuse me, 64.

We'll just scroll through those pictures there.  Do you recognize those pictures?

A.    Yes.

Q.    What are they pictures of?

A.    A red Honda Civic.

Q.    What are the other pictures contained in 64 pictures of?

A.    Spent cartridge case.

Q.    And do those pictures fairly and accurately depict the vehicle that you analyzed and evidence found on that date?

A.    Yes.

        MR. MILLER:  Your Honor, at this time the government offers Exhibit 64 and asks it be published.

        THE COURT:  Any objection?

        MR. McKNIGHT:  No objection.

        THE COURT:  Let them be admitted.  You may publish.

        (Government's Exhibit No. 64 was received into evidence and published.)

Q.    Is that the vehicle you processed on June 30, 2013?

A.    Yes.

Q.    And what is that a picture of, the second page of Government's Exhibit 64?

A.    A spent cartridge case underneath the front passenger seat.

Q.    And did you retrieve that cartridge as part of your work as a crime scene investigator?

A.    Yes.

Q.    And what is the third page a picture of?

A.    It's the same picture.  It's the same cartridge case.  I just happened to pull it out from underneath the seat to get a better photograph of it.

Q.    Did the spent cartridge case have any kind of marking or stamp?

A.    It had a headstamp of 3192 on the top.

        MR. MILLER:  No further questions, Your Honor.

        MR. MICHEL:  No questions.

        MR. CARPENTER:  No.

        THE COURT:  Mr. McKnight.

        MR. McKNIGHT:  No questions.

        MS. COSTNER:  No questions.

        THE COURT:  You may step down and be excused.

        Call your next witness.

        MS. GREENE:  The government calls Detective Ed Morales.

Your Honor, may this witness be released?

THE COURT: She may.

MS. GREENE: Thank you.

EDWIN MORALES, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GREENE:

Q. Good afternoon.

A. Good afternoon.

Q. Would you please tell the jury your name, where you work and what you do.

A. My name is Detective Edwin Morales. I work for the Charlotte-Mecklenburg Police Department, Charlotte, North Carolina. I'm currently assigned to the homicide ADW unit as a homicide detective.

Q. How long have you been with CMPD, Detective?

A. Since July 18, 2005.

Q. And how long have you been a homicide detective?

A. Since July 18, 2011.

Q. So I want to talk to you about June 30, 2013, if I could. Were you working as a homicide detective with CMPD on that date?

A. Yes, ma'am.

Q. And did you have a reason to go to the LEC, the law enforcement center that morning?

A. I did.

Q. And for what purpose did you go to the LEC that morning?

A. I have received a phone call from Sergeant J.D. Furr, who requested me to assist crime scene investigator CSI M.L. Scheurman process a vehicle in reference to a shooting investigation.

Q. And did you, in fact, respond to the law enforcement center and begin to help crime scene technician Scheurman in processing the vehicle?

A. I did.

Q. Do you remember what kind of car it was?

A. Yes. It was a two-door black Chevrolet Cavalier.

Q. I'm going to show you, Detective Morales, a series of photographs, they're going to be 15 in all. And it is marked as Government's Exhibit 63. And we're just going to scroll through those and make sure that you recognize them.

Did you have a chance to look at each of those photographs?

A. Yeah -- yes, ma'am. The ones shown to me, yes.

Q. And do you recognize them?

A. I do.

Q. How do you recognize them?

A. Those are the photographs that were taken of the vehicle that we processed on that day.

Q. And do each one of these photographs fairly and accurately depict the car that you and crime scene technician

Scheurman processed on June 30, 2013.

A.   Yes.

          MS. GREENE:  Your Honor, at this time I would ask that Government's Exhibit 63 be admitted and I be allowed to publish them and use them with the witness.

          THE COURT:  Any objection?

          ALL COUNSEL:  No objection.

          THE COURT:  Let them be admitted.

          (Government's Exhibit No. 63 was received into evidence and published.)

Q.   All right.  We're going to start with the first photograph here.  And what is the jury looking at?

A.   They're looking at the rear of the Chevy Cavalier that we processed.

Q.   And is this like a bay that's at the police department that you all use to process cars?

A.   Yes.  This is the -- we have a crime scene division.  And in the crime scene division itself we have a -- we have a vehicle processing bay which we do process our vehicles in.

Q.   All right.  And we're going to go to the second photograph.  And what is the jury looking at in this picture?

A.   They're looking at the driver's side of the vehicle.

Q.   Next.  And what's the jury looking at here?

A.   This is the front of the vehicle.

Q.   Next picture.  What are they looking at here?

A. The passenger side of the vehicle.

Q. All right. Now that we've looked at, kind of, all the angles of the car, I want to talk to you about some of your specific observations that day. If we could go to the next picture.

Could you please tell the jury what this close-up of the car is showing, and what the letters on here are marking?

A. Yes. This is the passenger side of the vehicle, or from my perspective that day I'm looking from the rear of the vehicle front, would be the right side of the vehicle. This would be each of these -- may I touch the screen?

Q. Yes.

A. Okay. I don't know if this -- oh -- if you see the letters here are marking or indicating a suspected projectile hole and several suspected projectile holes in the vehicle itself.

Q. So this particular photograph with letters A, B, C, and E are each showing a suspected projectile hole?

A. Yes, ma'am.

Q. And, again, this is on the passenger side of the car?

A. Yes, ma'am.

Q. All right. Next picture.

And tell the jury what they're looking at in this photograph.

A. Again, it's D labeling a suspected projectile hole in the

window on the passenger side of the vehicle.

Q. Next picture. And what are we looking at in this picture?

A. The letter F -- letter F, again, labeling a suspected projectile hole on the passenger side of the vehicle.

Q. Next photograph. And what is shown in this picture?

A. This is a label of a suspected projectile hole in the hood of the vehicle, over the engine.

Q. And what's the jury seeing in this picture?

A. There's two separate suspected projectile holes. One labeled as H, and one labeled as I, in the windshield of the vehicle.

Q. And is that a close-up of I?

A. That is.

Q. And what are we looking at in this picture?

A. Two suspected projectile holes in the driver's side of the vehicle labeled as J and K.

Q. And that was the driver's side, you said?

A. Yes, ma'am.

Q. And next picture. And tell the jury what's in this photograph.

A. This is the passenger door which is open. So we're viewing through the passenger side of the vehicle. There is shards of broken glass on passenger seat and floor-boards.

Also if you look at the door frame, the lower door frame

there as well as the center console, you see suspected blood.

Q. Next picture. And how about in this photograph, what are we looking at?

A. Again, looking through the passenger side of the vehicle, you can observe suspected projectile holes in the windshield, again, from the interior of the vehicle this time.

Q. And what do we see in this picture?

A. Looking towards the -- this is the rear driver's side floorboard here behind the driver's seat. And there is a suspected projectile, a spent projectile that is on the floorboard.

Q. And, again, what side of the car was that found on?

A. Behind the driver's seat.

Q. And our final picture, what's the jury looking at here?

A. Again, that's the spent projectile labeled as O, this time with scale.

Q. So it's -- you recovered one projectile.

A. Yes.

Q. That's just -- that's a close-up.

A. That's a close-up. Yes, ma'am.

Q. And, Detective Morales, did you have any further involvement in the investigation of this particular shooting?

A. No, ma'am.

MS. GREENE: Okay. Thank you. Those are all the questions I have.

THE COURT: Any cross?

MR. MICHEL: No questions.

THE COURT: Mr. Smith.

MR. SMITH: No questions.

MR. McKNIGHT: Briefly, Your Honor.

CROSS-EXAMINATION

BY MR. McKNIGHT:

Q. Detective Morales, your division, your homicide division, it not only investigates homicide, it investigates assaults, right, serious assaults?

A. Yes, sir. That's correct.

Q. And you qualified what's on those photos as suspected projectile holes, because you can't say with certainty that that's exactly what they are, is that why?

A. That's correct, sir. I was informed that there was a shooting that occurred and that vehicle was involved. So I qualify those as suspected projectile holes, sir.

Q. Okay. Based on your training and experience, can you date -- in other words, a suspected projectile hole -- in other words, do you know if they're there a week, a month or a day?

A. What I can say is they appear to be recent, due to the characteristics of the paint being chipped off. There was no weathering around the holes themselves. Looking for certain types of weathering, rust and additional paint chips and what

not.  They're more recent than older is what I can tell you.

Q.  So when you say "more recent than older" you're speaking about weathering.  You're talking about over a long period of time, perhaps week, month, years, that kind of thing, looking for signs of weathering around, I guess, what would be considered a potential projectile hole, or a hole of some sort.  Is that what you're saying?

A.  Yeah, I couldn't give you an exact date.  I was advised that the shooting occurred on that day.  And looking at those -- looking at those characteristics, that's what...

MR. McKNIGHT:  Okay.  That's all, Your Honor.

MS. COSTNER:  No questions.

THE COURT:  You may step and down be excused.

Call your next witness.

MS. GREENE:  The government calls Marisol Ibarra.

MARISOL IBARRA, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GREENE:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Could you please tell the jury your name.  And if you would spell your name for the court reporter.

A.  Marisol Ibarra.  M A R I S O L.  I B A R R A.

Q.  And, Ms. Ibarra, do you live here in Charlotte?

A.  Yes.

Q.   And do you have family here?

A.   Yes.

Q.   And can you tell the jury whether or not you have any children?

A.   I'm sorry, say that again.

Q.   Do you have any kids?

A.   Yes, I do.

Q.   How many kids do you have?

A.   Three.

Q.   And are they boys or girls?

A.   Boys.

Q.   What are their names?

A.   Steve Ibarra, Danny Ibarra, Jose Ibarra.

Q.   Ms. Ibarra, back in -- in or about December the 18th of 2013, did you receive a phone call that evening that changed your life?

A.   Yes, I did.

Q.   What kind of phone call did you get?

A.   That my son got shot.

Q.   Which son?

A.   Jose Ibarra.

Q.   And do you remember who called you and gave you that news?

A.   That was from my other son Steve Ibarra, girl.

Q.   When you got the news that Jose had been shot did you go

anywhere?

A.   I just left down to the hospital.  I just went down to the hospital.

Q.   And was he at the Pineville location of CMC?  Is that where you went?

A.   Yes.

Q.   When you got to the hospital that evening, Ms. Ibarra, who else was already there?

A.   It was, I guess, it was just me.

Q.   Just you?

A.   Me and my mom.

Q.   Okay.

A.   And my fiance, and Danny Ibarra.

Q.   And who?

A.   Danny.

Q.   Danny.  Did -- did you see Steve that evening?

A.   No, ma'am.

Q.   What is your understanding of how Jose got to the hospital that night?

A.   As far as I know that my son Steve drove down to the hospital.

Q.   And dropped him off there?

A.   Yes, ma'am.

Q.   And why did you not get to see Stevie that evening?

A.   Because he was already down there to the hospital;

probably got there on time.

Q.   Okay.  At some point, Ms. Ibarra, did you receive news that Jose had passed?

A.   Not until I got to the hospital.

Q.   And how did you find out that he had passed?

A.   They took me to the -- to a room.  And so I get -- I was waiting for someone to come out and tell me.  So I guess one of the doctors came out and he told me he pass away.

Q.   How old was Jose when he died?

A.   Seventeen.

Q.   I'm going to show you what we have marked as Government's Exhibit 83 and ask if you recognize it?

A.   Yes.

Q.   Is that Jose?

A.   Yes.

Q.   And does Government's Exhibit 83 show Jose as he was in life?

A.   I'm sorry.  Say that again.

Q.   Does it show him as he was -- as you knew him as your son in life?

A.   Well, he was adorable kid.  He was a sweet kid.

          MS. COSTNER:  Objection.

          THE COURT:  Mrs. Ibarra, listen carefully to the question and try to answer the question, which was --

          THE WITNESS:  He was a good kid.

THE COURT:  The question was:  "Does the photograph show him as he was in life?"

THE WITNESS:  Oh, I'm sorry.  Yes.

THE COURT:  Ask your next question.

MS. GREENE:  Thank you, Your Honor.

I would ask that Government's Exhibit 83 be received and published.

THE COURT:  Any objection?

MS. COSTNER:  No.

THE COURT:  Let it be admitted.  You may publish.

(Government's Exhibit No. 83 was received into evidence and published.)

MS. GREENE:  Thank you, Your Honor.

I have no further questions for this witness.

THE COURT:  Mr. Michel.

MR. MICHEL:  No questions.

THE COURT:  Mr. Carpenter.

MR. CARPENTER:  No questions.

THE COURT:  Mr. McKnight.

MR. McKNIGHT:  No questions.

THE COURT:  Ms. Costner.

MS. COSTNER:  No questions.

THE COURT:  You may step down, ma'am.  You're excused.

Call your next witness.

MR. MILLER:  Your Honor, the government calls Officer Fontaine.

OFFICER FONTAINE, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MILLER:

Q.   Could you please introduce yourself to the jury.

A.   I'm Officer Fontaine, Charlotte-Mecklenburg Police Department.

Q.   If you don't mind just pulling that microphone a little bit closer to you.

Officer LaFontaine, how long have you worked for CMPD?

A.   Correction, it's Fontaine.

Q.   Fontaine.  I'm sorry.

A.   I've worked with CMPD since 2008.

Q.   And did you work in law enforcement prior to joining CMPD?

A.   Prior to CMPD I was employed by a small department in Massachusetts for five years.

Q.   And, Officer Fontaine, what division are you currently assigned to?

A.   Currently Steele Creek division, patrol.

Q.   Have you been assigned to Steele Creek division and patrol for all seven of your years in CMPD?

A.   Yes, I have.

Q.   I would like to call your attention to the night or early

morning of December 18, 2013. Were you on duty that night?

A.    Yes, I was.

Q.    And did you respond to the scene of a shooting at the 7600 block of Sharon Lakes Drive?

A.    I did.

Q.    What led you to that area?

A.    I was on a prior call for service across the street from the 7600 block of Sharon Lakes. I heard a gunshot.

Q.    And where did you go when you heard the gunshot?

A.    I went across the street to the 7600 block of Sharon Lakes, which was known as the Yellow Rose.

Q.    And why did you go to the Yellow Rose?

A.    Based on prior calls for service, high crime area, gang activity. I responded to the place where I thought that the gunshot came from.

Q.    And what type of business is the Yellow Rose?

A.    Yellow Rose is a bar, restaurant, pool hall kind of business.

Q.    I'm going to show you what's been marked as Government's Exhibit 68. Take a minute and let me know if you recognize that.

A.    I mean, that's Steele Creek division highlighted. The 7600 block of Sharon Lakes Road.

Q.    And would Government's Exhibit -- does it fairly and and accurately depict that area?

A.    Yes, it does.

Q.    Would Government's Exhibit 68 help you illustrate your testimony?

A.    Yes.

          MR. MILLER:  Your Honor, at this time we would offer Government's Exhibit 68 as a demonstrative aid.

          THE COURT:  Any objection?

          MR. BEECHLER:  No objection, Your Honor.

          THE COURT:  Let it be admitted.

          (Government's Exhibit No. 68 was received into evidence and published.)

Q.    So, Officer Fontaine, on this picture, where were you when you heard the gunshot?

A.    I would be south of the 7600 block across the street. Correct, right where the arrow is.  That's Waterford Lakes Drive.  I was on a domestic violence disturbance call for service.

Q.    And where is the Yellow Rose indicated on this map?

A.    It would be the yellow highlighted area.

Q.    And what road is that running from north -- from north/south to the left of the Yellow Rose?

A.    That's going to be South Boulevard.

Q.    Just to orient the jury, do you notice any other major roads here?

A.    Further inbound Sweden Road, which is across the street,

southbound going -- outbound would be Westinghouse Boulevard.

Q.   All right.  What did you do when you first arrived at the Yellow Rose after hearing that gunshot?

A.   When I first arrived I was looking for any kind of shell casings or any evidence of a crime that was committed.

Q.   Now were you on foot or in your car at this point?

A.   I drove into the parking lot, circulated the front of the Yellow Rose and eventually did get out of my vehicle.

Q.   And what, if anything, did you observe when you started walking around?

A.   I noticed one shell casing to the right of the Yellow Rose.  I immediately placed a purple domestic violence business card so it wouldn't be disturbed.

Q.   Are there any other businesses there in the row with Yellow Rose?

A.   Yeah.  It's a little strip mall.  There's a laundromat to the right of the Yellow Rose.  There's a -- I wouldn't really call it a convenience store, but there's a Quick Mart or something like that to the left.

Q.   And at any point did you call for backup?

A.   Yes, I did.  Upon noticing the shell casing I determined that I had a crime scene.  I wanted to get the crime scene secure.  I called for additional units.

Q.   How did you secure the crime scene?

A.   In the trunk of my car there's crime scene tape, usually

it's in everyone's marked patrol unit. I began stringing it up, just like you see on television. You just take the crime scene tape, find the nearest point and start circling it off.

Q. Now after you secured the scene, did you see anything else that caught your attention in the parking area?

A. Yes, to the right of the shell casing was a front bumper and a headlight assembly from a car. It looked like there was some kind of vehicle accident inside the PVA.

Q. Did you also observe any tire tracks in that area?

A. There was some tire tracks that led over some woodchips, and that was next to a yellow fire hydrant.

Q. I'm going to show you what's been marked as Government's Exhibit 67 on your screen there.

Do you recognize those pictures there in Government's Exhibit 67?

A. I do.

Q. And what are they pictures of?

A. I believe that's my marked patrol unit with the crime scene tape that I initially strung. The Yellow Rose and the laundromat and the dry cleaners business in the strip mall.

Q. Do the pictures in Government's Exhibit 67 fairly and accurately depict the crime scene as you saw it?

A. Yes.

MR. MILLER: Your Honor, at this time the government offers Exhibit 67 and asks that it to be published.

THE COURT: Any objection?

MS. COSTNER: No objection.

THE COURT: Let it be admitted. You may published.

(Government's Exhibit No. 67 was received into evidence and published.)

Q. Could you point out for the jury, or describe where the Yellow Rose is located in this picture.

A. It would been the farthest business to the left.

Q. And what is the business to the right of Yellow Rose as you face this picture?

A. It would be the laundromat.

Q. And where in relation to those two businesses did you find the shell casings?

A. It was just to the right of the laundromat.

Q. And what is this second picture of Government's Exhibit 67 depict?

A. This is what I noticed that there was possibly a vehicle collision in the parking lot. The front bumper and the tire tracks going over the woodchips next to the fire hydrant.

Q. And so, where on this picture were the tire tracks you saw?

A. They were going over the woodchips, probably right along the treeline, where the tree is.

Q. Now, other than your work at the scene, did you have any other involvement in the shooting investigation?

A.    No, I did not.

Q.    I'm going to show you what's been marked as Government's Exhibit 89.  Do you recognize Government's Exhibit 89?

A.    I do.

Q.    And what is that a picture of?

A.    When I arrived on scene I noticed a shell casing.  I placed a yellow domestic violence business card on the shell casing so it would not be disturbed.

Q.    And is this a fair and accurate depiction of that scene as you just described it?

A.    Yes, it is.

        MR. MILLER:  Your Honor, at this time the government offers Exhibit 89 and ask it to be published.

        THE COURT:  Any objection?

        MS. COSTNER:  No objection.

        THE COURT:  Let it be admitted and published.

        (Government's Exhibit No. 89 was received into evidence and published.)

Q.    And, Officer Fontaine, can you describe where the Yellow Rose is relative to this picture?

A.    It will be to the left of where I found the shell casing. So this spot, and the laundromat, and then the Yellow Rose.

Q.    And can you describe for the jury where the shell casing is in this picture?

A.    It's just outside the parking lines, located in the

farthest to the right business. I'm not really sure what that business is called.

MR. MILLER: No further questions, Your Honor.

MR. MICHEL: No questions.

MR. SMITH: No questions.

MR. McKNIGHT: No questions.

MS. COSTNER: No questions, Your Honor.

THE COURT: Officer Fontaine, before you step down. In your testimony you indicated, I think you said it looked like a vehicle accident inside the -- you used initials "PVA." Did I hear you right?

THE WITNESS: Yes, I'm sorry, sir. That's public vehicular area, also known as a parking lot.

THE COURT: Thanks. You may step down and be excused.

THE WITNESS: Thank you.

THE COURT: Call your next witness.

MS. GREENE: The government calls Junior McGregor.

JUNIOR MCGREGOR, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. GREENE:

Q. Good afternoon.

A. Good afternoon.

Q. Could you speak into the microphone and tell the jury your name please, sir.

A.    My name is Junior McGregor Graham.

Q.    How do you spell your last name?

A.    M-c-g-r-e-g-o-r and my other last name is G-r-a-h-a-m.

Q.    So do you like to be called Mr. McGregor-Gregory?

A.    Just Mr. McGregor.

Q.    Just Mr. McGregor will be fine.

      So, Mr. McGregor, do you live here in Charlotte?

A.    Yes.

Q.    And, sir, do you know someone named Miguel Zelaya?

A.    Yes.

Q.    And how do you know Miguel Zelaya?

A.    We went to middle school together.

Q.    And what middle schooled was that?

A.    Wilson Middle School.

Q.    And how old are you now, sir?

A.    I'm 24 years old.

Q.    And did you and Mr. Zelaya, did you stay friends after middle school?

A.    I would hope so, but after that, you know, after middle school he left the state with his family and we eventually lost touch, you know.

Q.    Did there come a time when you -- when you reconnected with Miguel?  With Mr. Zelaya.

A.    I was more friends with his brother, and his mom, his pop's, you know, and little sisters, you know.

Mrs. Zelaya was -- Mr. Zelaya, we was basically -- we just never, never, like really, really, really close because of the type of lifestyle he chosen.  You know, I wasn't really down with stuff like that.  And his brother was more of a, you know, focused type of guy.  So I hang out more with his brother than -- actually, his little brother.

Q.   Okay.  And what's his little brother's name?

A.   His little brother --

Q.   That you were friends with.

A.   Miguel.  Yeah, that's my friend Miguel.  I used to hang out more with Emerson than Miguel.

Q.   Okay.  And the person that we're talking about, Miguel Zelaya, is -- can you look around the courtroom and let us know if he is in the courtroom today?

A.   No.

Q.   Can you -- would you stand up and look all the way around the room and let me know if you see someone you know as Miguel Zelaya.

A.   This one there (indicating).

Q.   Just let us know if you recognize anybody.

A.   Looks like him.

Q.   Okay.  Who are you pointing to that you say looks like Miguel Zelaya?

A.   The guy all the way at the end over here.

Q.   Could you point and then identify what he's wearing.

A. Over here in the corner. The guy over here with the tie. And he looks like Miguel, but I don't know if that's Miguel.

Q. Okay. When is the last time that you saw Miguel?

A. You want me to tell you like in years and days?

Q. Yeah. Like, if it's been a year, two years, three years the last time you saw him.

A. Probably about -- about a year or two.

Q. Okay. So, Mr. McGregor, I want to direct your attention to December of 2013. Specifically, on or about December 18, 2013, if I could. Was Miguel Zelaya in town at that time?

A. I believe so.

Q. And do you remember receiving a phone call from him that evening?

A. Yes. About what? That was about 12:00 at night.

Q. Okay. And can you tell the jurors about the conversation that you had with Miguel Zelaya that evening.

A. He wanted me to go pick him up because he got himself in trouble. There was a lot of cops and a lot of stuff going on. I said to myself, you know, if he got himself in trouble, I'm not going out there to pick him up. So I told him I didn't have no gas and that I couldn't come pick him up. And after that I hang up the phone. He called me again and he -- from there detectives was looking for me.

Q. All right. Let's back up just one second, if we could. What kind of trouble did Miguel tell you that he was in that

Case 3:16-cv-00057-MOC-DSC Document 69-5 Filed 08/22/18 Page 507 of 600
Case 3:15-cv-00121-RJC-DSC Document 946 Filed 08/27/16 Page 304 of 310

evening?

A.   Well, he told me that he had shot somebody and he don't know if that person is dead or alive, basically.  And he wanted me to come pick him up.

Q.   And what -- what was his demeanor on the phone when he was telling you that he shot someone and he needed you to come pick him up?

A.   He was scared.  He didn't know -- he was basically very nervous and, I guess, everywhere, you know, not in his right mind, I'll say.

Q.   And what -- do you remember specifically what he told you?  I don't know if you used the term "cops" or "police" but what he told you in that conversation about the police.

A.   It's a lot of police around.  A lot of cops around.  And I'm over here by Sharon Lakes.  Can you come get me?  I was like, nah.

Q.   He said he was where?

A.   By Sharon Lakes.

Q.   And, Mr. McGregor, did you in fact go pick up Mr. Zelaya?

A.   No.

Q.   Why didn't you go pick him up?

A.   He just told me he got himself in trouble.  I'm not the type of guy.  I'm not going to go look for trouble, you know.

Q.   And did you have any further conversations with Mr. Zelaya that evening or any other time?

Case 3:15-cv-00121-RJC-DSC Document 946 Filed 08/27/16 Page 305 of 310

A.   No.

Q.   So I want to back up from before the night, before you got the phone call from Mr. Zelaya in which he told you -- in which he called you and asked you for a ride.

Do you recall having a conversation in which Mr. Zelaya participated about trying to obtain a firearm?

A.   I didn't have any direct conversation with him about obtaining a firearm.  It was just, basically, like a group conversation with a whole bunch of guys and, you know, like, when you're in the streets with kids and they talk about a whole bunch of stuff, I really never thought it was gonna be serious.  Because I know the kids --

MR. BEECHLER:  Objection, Your Honor.

THE COURT:  Basis.

MR. BEECHLER:  (Inaudible.)

THE COURT:  I'll sustain it as nonresponsive towards the end.  Ask you to ask your next question.

MS. GREENE:  I will, Your Honor.

Q.   And how many -- let me ask you this:

Was the conversation about guns or obtaining guns?

A.   It was about guns, you know.

Q.   And was Mr. Zelaya one of the participants in that conversation or was he present for that conversation?

A.   Yes.

MS. GREENE:  No further questions for this witness,

Your Honor.

MR. MICHEL:  No questions.

MR. SMITH:  No questions.

MR. McKNIGHT:  No questions, Your Honor.

THE COURT:  Mr. Beechler.

MR. BEECHLER:  Your Honor, I do have a few.  Would the Court allow us to begin our cross tomorrow morning?

THE COURT:  No.  Let me see how far you can get in your cross.

CROSS-EXAMINATION

BY MR. BEECHLER:

Q.  Mr. McGregor, let me ask you about that phone call you just referenced.  You said there were a few voices on the phone?  It was a group call?

A.  I never said it was a group.  It was Miguel calling me to come pick him up.

Q.  I'm talking about the call you just referred to about trying to obtain a firearm.

A.  It wasn't a call.  It was a group of people, group of kids.

Q.  You were there?

A.  Huh?

Q.  You were present?

A.  I was present.

Q.  With some others?

A.    Yeah.

Q.    Who all was there?

A.    I can't recall that.

Q.    Well, were there three guys there?  Five guys there?  Eight guys there?

A.    Probably about -- it was in a corner store, man.  It was a whole bunch of people, you know.

Q.    I'm asking you about how many guys were there during this discussion.

A.    About, say, about seven to ten guys.

Q.    And when did that take place?

A.    I don't recall that.  That was way back.

Q.    All right.  Way back.  What year way back?

A.    Probably in the beginning when all this situation went down.

Q.    All right.  What year would that be?

A.    We're in 2016 now.  So I say by the end of 2014 -- the middle -- middle to the end of 2014.

Q.    The end of 2014.

A.    Middle or the end -- middle or the end of 2014.

Q.    Okay.  So like June, Maybe to December 2014?

A.    Maybe.  I have no idea.

        MR. BEECHLER:  Okay.  That's all I have, Your Honor.

        THE COURT:  Any redirect?

        MS. GREENE:  No, Your Honor.

THE COURT: You may step down. Be excused.

Members of the jury, I think we'll take our evening break at this time. Again, when you go home, don't talk about the case with anyone. And if you would come back in the morning be ready to go at 9:30. We'll start promptly at 9:30. So have a good evening and we'll see you in the morning.

(The jury was escorted from the courtroom at 5:59.)

THE COURT: Everybody have a seat for a moment.

Let me ask the government in terms of where you're at, and a forecast of what happens next.

MS. GREENE: Your Honor, we just have a few more witnesses. And we just need to publish some jail calls and a couple of other items that the Court has already received that have not been published. And I believe, I think there's a strong possibility that we would finish our evidence tomorrow.

THE COURT: Very well.

MS. GREENE: I might -- we may go into Friday, but I would be surprised if we went into Friday at this point.

THE COURT: All right. With that forecast, if there is any defense evidence anticipated, you should be ready to go tomorrow if the government finishes up, and Friday if they don't.

Mr. McKnight, I will hear your motion for mistrial at 9:00 in the morning tomorrow. Assuming that you've -- I've asked you to file written motion. And I'll review that when

it's filed and hear it at 9:00 in the morning.

MR. McKNIGHT: Very well, Your Honor.

THE COURT: And any other issues that come up before evidence is presented at 9:30, we'll take up at 9:00. So if there are any other legal issues we'll take it up then.

Anything else? If the government would provide to defense attorneys a list of witnesses they anticipate calling tomorrow, I think that will help the trial's progress.

Anything else before we reconvene at 9 in the morning?

ALL COUNSEL: (No response.)

THE COURT: All right. We'll see you at 9.

(The Court was in recess for the day at 6:00 p.m.)

# APPENDIX 137

Kerry R. Bensinger, State Bar No. 132178
BENSINGER, RITT, TAI & THVEDT
A Limited Liability Partnership
65 North Raymond Avenue, Suite 320
Pasadena, California  91103
Tel:    (626) 685-2550
Fax:   (626) 685-2562

Attorney for Defendant ALEX SANCHEZ

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | **Case No. CR-09 00466-R-22** |
|---|---|---|
| Plaintiff, | ) | **DECLARATION OF FATHER GREG BOYLE FILED IN SUPPORT OF DEFENDANT SANCHEZ'S APPLICATION FOR REVIEW OF DETENTION ORDER** |
| v. | ) | |
| JOSE ALFARO, et al., | ) | |
| Defendants. | ) | Date:          October 19, 2009 |
| | ) | Time:         1:30 p.m. |
| | ) | Courtroom:  Judge Manuel L. Real |

1

## DECLARATION OF FATHER GREG BOYLE

I, FATHER GREGORY BOYLE, state and declare as follows:

1.     I am Executive Director of Homeboy Industries, an independent nonprofit agency, with a mission of providing positive alternatives to gang-involved youth.

2.     In 1986, I was appointed as Pastor of Dolores Mission in the Boyle Heights neighborhood of Los Angeles.  Shortly thereafter, in 1988, in response to an obvious escalation in the problems and unmet needs of the neighborhood youth, I started "Jobs For a Future" (JFF), which included establishing an alternative school and an employment assistance program for young people.

3.     In 1992, I opened Homeboy Bakery, JFF's first business, with a mission of creating an environment to provide training, work experience, and opportunities for rival gang members to work side by side.  The success of the Bakery created the groundwork for additional businesses under the JFF umbrella.  Today, Homeboy Industries' nonprofit economic enterprises include Homeboy Bakery, Homeboy Silkscreen, Homeboy Maintenance, Homeboy/Homegirl Merchandise, and Homegirl Café.

4.     Since 1988, Homeboy Industries has added a range of free services, including mental health counseling, housing assistance, job counseling and tattoo removal, and is now recognized as the largest gang intervention program in the country and has become a national and international model.

5.     In addition to my daily interaction with gang members through Homeboy Industries, I have also served as Chaplain of the Islas Marias Penal Colony in Mexico and of Folsom Prison, where I have ministered to and counseled gang members.  I have worked with gangs in East Los Angeles, and in prisons throughout California, for over twenty-three years.

6.     In my capacity as Executive Director of the largest gang intervention program in the United States, I have come to know and have been given access to the lives of many

2

thousands upon thousands of gang members. As well, in my nearly a quarter of a century of ministry in detention facilities in Los Angeles and across the state, gang members have allowed me the confidence to know their world, their structure, their way of proceeding and their viewpoint. I have been privileged to not just have contact with their world but to be given access to it. I don't possess "intelligence" on gang operations, nor sporadic information, but have been allowed into their world to have knowledge about it.

7. I have testified perhaps fifty times as a gang expert and have now limited myself only to capital cases, with few exceptions.

8. I have twice traveled to El Salvador to consult with authorities there on their gang issues and have hosted many delegations from El Salvador at Homeboy Industries. I was asked two years ago, by the State Department, to assist a consortium of Central American countries in grappling with their gang problems.

9. I have offered consultation on gangs to nearly every elected official in Los Angeles County and in the State of California. I am a consultant to youth service and governmental agencies, policy-makers and employers. I served on the transition team related to gangs for the new Los Angeles City Attorney Carmen Trutanich.

10. Through my work with Homeboy Industries, I have become an acknowledged expert on the subject of gangs, and more particularly, on the subject of Los Angeles area gangs and on intervention approaches. In addition to my hands-on work in the community over the last twenty years, my expertise in the field of gangs, gang language, gang activities, gang behavior, and gang member identification is based on the following:

a. I am a former member of the State Commission on Juvenile Justice, Crime and Delinquency Prevention and am currently a member of the National Leadership Council of the Iris Alliance Fund.

b. I serve on the Advisory Boards for the National Youth Gang Center and the Loyola Law School Center for Juvenile Law and Policy.

c. I give nearly 200 talks a years at numerous universities and conferences for teachers, social workers, criminal justice workers, and others regarding gang prevention

3

and intervention. I provide Catholic services in twenty-five detention facilities in Los Angeles County.

d. I have received numerous accolades and recognitions on behalf of Homeboy Industries and for my work with former gang members, including the California Peace Prize. In 2007, I received the "Humanitarian of the Year" Award from Bon Appetit magazine during their 10th Annual Awards Ceremony in New York and the Caring Institute's 2007 Most Caring People Award. In 2008, I was honored with the Civic Medal of Honor from the Los Angeles Chamber of Commerce and received a James Irvine Foundation Leadership Award for my comprehensive and effective approach to addressing gang violence and for improving the lives of thousands of disadvantaged youth.

e. At the personal invitation of Mrs. George Bush, I was a featured speaker at the White House Conference on Youth in 2005.

11. Based upon my experience and history working with gangs and gang members over the past 23 years, I have been asked to offer my interpretation and opinion of the meaning and import of the four intercepted phone calls. The transcripts of these calls are attached hereto for the Court's reference. I have also been asked to review the government's supplemental submission as well as Detective Frank Flores's declaration and to offer my opinion in response to the government's conclusions and Detective Frank Flores's opinions.

12. I am fluent in Spanish and I have listened to the tapes of the four recorded calls. I have read and considered the government's Memorandum of Points and Authorities as well as the Declaration of Detective Flores. Based upon my experience, history and qualifications as a gang expert, I believe the government's conclusions and Detective Frank Flores's opinions are mistaken and are based upon a misinterpretation of the language and meaning of these four calls. Similarly, the government and Detective Flores have misconstrued Alex Sanchez's role in these calls, his purpose in participating in these calls and the import of his statements.

13. Before I discuss my review of each of the calls, it is important to highlight the fact the government and Detective Flores completely omit and ignore one of the most

4

important – if not the most important – sections in these calls: the clear and unequivocal statements by participants in the calls that Mr. Sanchez is *not* an active MS-13 gang member. This omission, in and of itself, raises concerns in my mind about the balance and fairness of the government's and Detective Flores's presentation. It is unlikely, if not impossible, the government and Detective Flores overlooked this part of the calls. More likely, they did not make mention of these statements because the recorded statements undermine their conclusions.

14.     Unlike many of the potentially ambiguous statements lifted from the calls by Detective Flores, there is no ambiguity in the statement made by Camaron, during the third call, that Alex Sanchez is not an active member of the MS-13 gang. Camaron states:

CAMARON:     Listen man! Listen! And-and-and-and I don't know why you [stutters] come . . . *you know*, and you get involved in things, **when you are not longer active, man! You see? Better yet, what you should do is to be careful with the "United Homies" and not-not to get involved in our things, you see? [Call breaks][UI] with us, because you are no longer active, see what I mean**?

REBELDE:     If you told him – If you told Boxer that I'm working with the FBI, then you know what, you are getting me involved!

(Call Three–Exhibit C–pg. 8.)

15.     Camaron does not mince words. He says Mr. Sanchez should have no voice in the conversation because he is *not* part of the gang. From Camaron's perspective, Mr. Sanchez is an outsider and should not get involved in *"our things"* because he is *"no longer active."* There is no way to reconcile this statement – that Mr. Sanchez is not an active gang member – with the government's and Detective Flores's position; in fact, it turns their argument on its head. If Mr. Sanchez is not an active gang member, he is certainly not a "shot caller." No one can be a shot caller if they are not an active gang member. It is that simple.

5

16. Relatedly, at several points throughout the calls, Mr. Sanchez gathers steam for his position by saying that he "still" gets some respect from the members of the gang. ((Call One–Exhibit A–pg. 9) ("And you know what? All the cliques over here *still have a lot of respect for me*, . . . ") (emphasis added); (Call Two – Exhibit B--pg. 12) (". . . and these people . . . *still have some respect for me*") (emphasis added).) Use of the word "still" confirms much. Mr. Sanchez was a member of MS-13 years ago and it is precisely because of this history that, even though he is "calmado" or inactive, he can "still" get some respect.

17. For Mr. Sanchez to use this language – noting that he *"still"* gets some respect – references and demonstrates the fact that he is *not* an active gang member; his day has passed. While members may listen to him because of who he *was*, and because he has not betrayed them but has worked to help ex-members with Homies Unidos, they certainly will not take orders from him and he will not be *included* in their criminal activities or discussions thereabout.

18. One might, then, logically ask, "so what is Mr. Sanchez doing on these calls?" In fact, that is exactly what Camaron wants to know. Why is a non-active member even involved? Mr. Sanchez's response is telling, and is entirely consistent with his position and mission with Homies Unidos – he is involved because Camaron has told others Mr. Sanchez is cooperating with the FBI. Given Camaron's allegation that Mr. Sanchez is an informant, Mr. Sanchez has the place, purpose and permission to respond. By participating in the call, Mr. Sanchez is trying to clear his own name, is trying to save Zombie's life, and is seeking to bring a peaceful resolution to a highly inflamed situation. Contrary to Detective Flores's contention, Mr. Sanchez is not plotting to end a life; rather, he is trying to save lives – Zombie's, his, and those of the other targets of Camaron's assassins. The government and Detective Flores ignore these critical pieces of information.

19. This exchange is key in understanding the context of the calls and Mr. Sanchez's participation therein. Mr. Sanchez is the Executive Director of Homies Unidos; he is a nationally recognized and lauded gang interventionist and preventionist. If people were to believe that he was actually cooperating with the FBI, not only would his ability and

6

mission to serve the community as a gang interventionist be over, his life would be in jeopardy.

20. In sum, when viewed as a whole, these four calls directly contradict the government's portrayal and contentions and demonstrate several important points:

a. Mr. Sanchez is not an active gang member;

b. As such, he cannot be a "shot caller" – as an inactive member can never be a "shot caller";

c. Mr. Sanchez's main purpose in these calls is to prevent violence by airing out the issues and trying to protect Zombie, while seeking to isolate and expose Camaron;

d. Mr. Sanchez is involved in these calls to clear his name, to help protect Zombie from Camaron's false accusations and to learn if Camaron, with the blessing of Santos, has sent assassins to kill him and others;

e. In response to Camaron's false accusations and death threats, the "consequences" sought are not to kill Camaron, but rather to publicize Camaron's actions, to isolate him, and to urge others to ostracize and ignore him;

f. Mr. Sanchez urges Zombie to tell others the truth about the papers Camaron falsified to support his unfounded accusations that Zombie is an informant.

21. Before I turn to the calls, a few other observations may also prove helpful. First, throughout the calls, despite the fact he is not an active member of the gang, Mr. Sanchez appears to align himself with the Normandie clique of the MS-13. Given the dynamics of the situation and their history, I do not find this surprising. Mr. Sanchez, like others in the Normandie clique, is facing an apparent death threat from Camaron. Zombie, who is a close friend of Mr. Sanchez's, is also facing threats from Camaron. The groups are naturally divided, and each lobbies the larger community to see their perspective.

22. Camaron seeks to justify his "green light" against Zombie, Skinny, Salty, Morro and Mr. Sanchez by claiming they are informants and/or protecting informants. On the other side, Mr. Sanchez and several others who participate in the conversations endeavor

7

to explain themselves to Santos, as a representative of the larger community, with the purpose of getting their position heard. By so doing, Mr. Sanchez and the others hope to foil Camaron's plot to kill them, to expose his lies and to isolate him, thereby calming everything down, without the loss of any lives.

23. Second, throughout the calls Mr. Sanchez goes by the name "Rebelde." While this may appear to be suspicious to those unfamiliar with gangs, it is actually not surprising nor incriminating in any way. It is common practice for virtually everyone in the gang community – even those who are no longer active members – to communicate with others (active and inactive) by their one-time gang names – the names they were known by in the barrio. "Rebelde" apparently was Mr. Sanchez's name.

24. Finally, Mr. Sanchez's history is well known in the community. His high profile is further reason why active members would not allow, let alone seek to have him participate in the gang's criminal activities. He is far too much of a public figure and a magnet for attention to be included in anything criminal. Mr. Sanchez certainly would be enlisted to calm down a situation because he is a "leader," not because he is a "shot caller." Similarly, he would be enlisted to negotiate and bring some resolution to a volatile situation, but he would not be enlisted or allowed to participate in even a minor crime, much less anything so serious as a conspiracy to murder.

**Exhibit A:  The First Call (Santos, Pellejos, Rebelde, UM)**

25. In the first call, Mr. Sanchez sets out to learn information from Santos – has Camaron put a hit out on him as well as others?; did Santos know about it?; did Santos approve it? Mr. Sanchez has been told he is going to be killed; his anger in response seems appropriate. Mr. Sanchez needs to know the truth. He pushes Santos to learn what has happened.

26. Contrary to Detective Flores's suggestion, these calls do not point out the Normandie "shot callers." There are approximately ten people present for the first call. (Call One – Exhibit A – pg. 3 (Pellejos says there are "10 of us here.").) Rather than a small collection of "shot callers" gathered to order a murder, this is an amorphous group, gathered

8

to bear witness and show support for Zombie. There are certainly not going to be 10 shot callers. This is the opposite of how an order to kill someone would unfold. If the idea were to kill Camaron, the point would be to have as few people know about it as possible. The conversation would be short and quick or not at all; but it would not resemble the drawn out discussions that takes place in these calls.

27.     In this conversation, Mr. Sanchez is concerned and angry, and he speaks up because his reason for being there is to help find out from Santos the truth about what is going on and to explain the history of the conflict between Zombie and Camaron. With this knowledge, Santos will gain an understanding of the situation and can help calm things down when Camaron is confronted.[1] It makes sense that Mr. Sanchez is a spokesman because he knows all of the players – Santos, Zombie, Camaron – and has a history of mediating gang disputes. He also has a legitimate stake in these conversations – his life and reputation are on the line. (Call One – Exhibit A – pg. 4 ("The homies here have gathered because they are already saying that some hired assassins have been sent to take us all out.").)

28.     In response, Santos says he did not approve anything, and that he has plans to talk to Camaron. (Call One – Exhibit A – pg. 5 ("No, I haven't approved shit man. But what I do know, and listen carefully, That's why tomorrow that guy is coming here and I told that guy – I promised that guy that all of us were going to talk.").) Contrary to Detective Flores's conclusion that Mr. Sanchez is ordering Camaron's murder, the facts demonstrate they are making an effort to talk this out, and trying to figure out a way to undo the damage. Talking to Camaron directly and confronting him over the issues is inconsistent with a plan to kill him. In the gang context, alerting the target that he is in jeopardy and that everyone is angry with him makes no sense. If Camaron were truly the target of a murder plot, no one would be inviting him to the table to talk about their grievances.

---

[1] As discussed below, this is exactly what happens in the third call.

9

29.     Detective Flores makes much over the phrase "Tomorrow he has to face the consequences . . . and I want the homies over there to answer, to answer the way they have to answer once they hear about the homies who got the papers here!" (Call One – Exhibit A – pg. 9.) Flores suggests this language is code for an order and plot to kill Camaron. Contrary to Detective Flores's conclusion, the phrase "facing the consequences" does not have any special "gang code" significance and in the context of these calls, facing "the consequences" means that Camaron's false accusations will be exposed to everyone, the Normandie clique will no longer support him financially and he will be isolated.  In fact, in later calls, Mr. Sanchez repeatedly and specifically references that the consequences for Camaron's lies, deceit and threats are that he will be ignored and cut off financially and emotionally.

30.     Similarly, throughout the calls, Mr. Sanchez and others repeatedly state they are going to expose the "papers" to the larger community.  They want everyone to know about the conflict with Camaron.  This kind of publicity is inconsistent with conspiring to commit a murder.  Telling a larger audience, however, is consistent with exposing Camaron's scheme to kill people in Los Angeles and seeking to isolate him.

31.     The murder consequence read-in by Detective Flores is no where to be found in the calls and is inconsistent with the "consequences" actually discussed during the calls. Why urge others not to send Camaron money, if the real plan were to kill Camaron?  Why discuss the "consequences" of cutting Camaron off and isolating him, if the real agenda were to end his life?  Contrary to Detective Flores's conclusions, and as evident in the language of the conversations themselves, the purpose for the calls is not to order the murder of Camaron, but rather to confront Camaron, to expose him, to isolate him, and to obtain the withdrawal of any "green light" against Mr. Sanchez and the others.  Mr. Sanchez is trying to use his leadership and influence to stop the violence.

**Exhibit B:  The Second Call** (Santos, Flaco, Rebelde)

32.     When the second call starts, Mr. Sanchez is quiet for a long time (over 6 pages of transcript).  During this time, Flaco explains to Santos his understanding of what

10

Camaron has done and seeks to learn Santos's position on the issue. At several places, Flaco tries to emphasize they want to do "something positive, nothing negative, homie. Everything has to be good." (Call Two – Exhibit B – pg. 4.) Flaco, like Mr. Sanchez before him, is trying to talk this problem out and reach a calm resolution. He wants to expose Camaron and stop Camaron's assassination plot.

33.     After further discussion, Santos responds:

What-what I'm saying is that when this thing clears up, because – More than anything what are we going to do regarding this thing? Because fuck, this thing can't continue like this . . . I'll call – I'll call this guy right now, homie. I'm going to ask him what's going on, and as a matter of fact, this guy will be here tomorrow, homie. We are all going to talk, man.

(Call Two – Exhibit B – pg. 7.) Santos is saying he has not approved anyone to get hit ("has not given a pass") and wants to clear up the issue. He plans to meet with Camaron and talk. This is exactly what happens in Call Three.

34.     When Mr. Sanchez joins the call, he points out that Zombie has not been involved in anything in El Salvador and did not want the issues between him and Camaron to escalate. (Call Two – Exhibit B – pg. 8 ("this dude is taking it easy.").) But, with a death threat against him and the stigma of being called an informant, Mr. Sanchez wants everyone to know Camaron's statements about him and Zombie are lies. Mr. Sanchez again says he wants others to see these false papers. (Call Two – Exhibit B – pg. 9 ("I'm going to show them to all the homies, to all the homies I can show them to.").) As discussed above, this effort to broadcast information to all the homies is inconsistent with Detective Flores's theory there is a conspiracy to murder Camaron. It is, however, consistent with Mr. Sanchez's stated purposes of trying to clear his name, to get the assassins to back off and to isolate Camaron. If everyone understands, then Camaron's plot will be exposed, the situation deflated and no one hurt. That is the idea being put forward here.

11

35.     During the call, Mr. Sanchez again tells Santos that the "consequence" for Camaron's actions will be that Camaron will no longer receive money or support from the Normandie clique. (Call Two – Exhibit B – pg. 11 ("we are not going to send shit to that motherfucker. The homies from Normandie said that *no one is going to send any money to that motherfucker*, because this motherfucker wherever he goes he has always–he has always talked shit about all of us. About all of us, man. So the homies, for–for a good while put up with this motherfucker's lies, because of the respect they had for him, and they used to send some money, when he was in prison, they would send him some money and still the motherfucker would talk shit. It was then, when this motherfucker sent that message to put out a hit on me. See what I'm saying.").) If the agenda were really to kill Camaron, Mr. Sanchez would not need to explain the Normandie clique's decision not to send Camaron money. Convincing others not to send money to Camaron is a far cry from conspiring to murder him.

36.     In this second call, Mr. Sanchez also discusses broadcasting the clique's decision to people in other penitentiaries so that they will know what Camaron is doing and why the Normandie clique has stopped funding Camaron and has isolated him. (Call Two – Exhibit B – pg. 12 ("those people have not heard our position.").) As further evidence that Mr. Sanchez is not a "shot caller," he repeatedly asks who the people are that he needs to call and how to reach them. If he were a "shot caller," this would be information he would know. (Call Two – Exhibit B – pgs. 11-15.)

**Exhibit C:  The Third Call (Flaco, Santos, Rebelde, Camaron, Salado)**

37.     Camaron participates in the third call. At the outset, Mr. Sanchez is silent and various speakers air out their positions. Camaron understands the Normandie clique and Mr. Sanchez are upset by what they have heard (that Camaron has sent people to kill them and that Camaron has said Mr. Sanchez and Zombie are informants) and learns, that in response, the idea is to cut him off financially.

CAMARON:          You see what I mean?  Because honestly, there is so much – so
                           much shit they are getting me involved in.  That I'm sending

people to do this and then I – without paying attention to this thing, you see. And you know very well. I've talked with you and I've told you, there is no problem. *If they don't want to send me any money*, no problem, I'm going to look after you, and that's what I'm. . .

(Call Three – Exhibit C – pg. 5.) (emphasis added).

38. The call continues with Camaron denying the accusations and culminates with Camaron telling Mr. Sanchez to stay out of the gang's business because he is <u>not an active member</u>:

*when you are no longer active, man! You see? Better yet, what you should do is to be careful [2] with the "United Homies" and not-not to get involved in our things, you see? [Call breaks][UI] with us, because you are no longer active, see what I mean?*

(Call Three – Exhibit C – pg.8.) (emphasis added). This language flatly and convincingly contradicts Detective Flores's and the government's conclusions that Mr. Sanchez is a "shot caller" for the Normandie clique and that he was involved in a conspiracy to murder Camaron. No one has ever met a "shot caller" who is inactive. It just does not happen. Moreover, no one who is inactive can give orders, let alone talk about "green lighting" an active member.

39. As the discussion turns to "the papers" and Zombie, Camaron defends his position, maintaining that Zombie – who Camaron says has been hiding in El Salvador for years and is not active – ratted him out years ago. (Call Three – Exhibit C – pg. 10.) Camaron seeks to rely upon the papers to prove his point and Mr. Sanchez interjects that the papers are fake and Zombie should be left alone. Once again, Mr. Sanchez's point is to stop

---

[2] Perhaps a better translation of this phrase might be that Camaron is telling Mr. Sanchez to take care of "United Homies" in the sense that he should stay with and take care of his own business with Homies Unidos and stay out of and not get involved in the gang's affairs because he is no longer an active gang member.

13

the feud, to back Camaron off his position and keep Zombie safe. Consistent with his role as gang interventionist, Mr. Sanchez is trying to bring some resolution, peace and closure to this old and lingering issue.

40.     Mr. Sanchez's participation in the call ends on page 10 of the 32 page transcript. Although he is no longer speaking, several other parts of the conversation confirm that the point of the call is to clear up these issues by talking it out – (1) to clear Zombie's name[3] and (2) to clear away any doubts about whether there is a "green light" against Morro, Salty, Skinny and Mr. Sanchez.[4]

41.     Santos also tries to bring some peace and closure to the discussion:

SANTOS:          Listen! Camaron!

CAMARON:          Yes.

SANTOS:          Let's come to some agreement and, listen carefully, your word counts, homie. Everybody's word counts.

CAMARON:          Yes

SANTOS:          And the moment you give your word then you have to stick to it and keep word by word. Because if you give your word and don't keep it, what's going to happen? What are going to do? Are we going to continue with this? Or are we going to try to stay together and and see what we can do for for for the big MS?

(Call Three – Exhibit C – pg. 25.)

---

[3] At the end of the conversation, Salado states that they will need to circulate the false papers because they have to clear Zombie's name. (Call Three – Exhibit C – pg. 30 (SALADO: So, as I'm telling you we are going to pass those papers around the barrio and we are going to see what's up. Because we need to clear this homie's name.") Camaron keeps after Salado saying "why are you talking for him? Why don't you let him talk for himself." Salado responds that he will convince Zombie to talk to Camaron directly about their issues. (Call Three – Exhibit C – pg. 27.)

[4] Camaron assures them that there is not. (Call Three – Exhibit C – pg. 27 (CAMARON: "I have stopped all the lights.").)

14

**Exhibit D:  The Fourth Call** (Salado, Zombie, Rebelde)

42.     The fourth call takes place the day after the first three calls.  After some preliminary talk, Mr. Sanchez tells Zombie that Camaron "wants all of us to get hit, you see what I am saying?  And the main topic is the papers the son of a bitch wants to show down there, you see what I am saying."(Call Four – Exhibit D – pg. 9.)  Mr. Sanchez and Salado review with Zombie the history and how Camaron tried previously to convince others that Zombie was a snitch.  Mr. Sanchez tells Zombie they are going to make the papers "public" so that Camaron cannot convince anyone that Zombie is a snitch. (Call Four – Exhibit D – pg. 11.)  Exposing Camaron's lies will prevent deaths and resolve the problems.  It's never about silencing Camaron, but rather about exposing him.

43.     Mr. Sanchez goes on to describe the "consequences" for Camaron's current actions – they are going to isolate him. (Call Four – Exhibit D – pg. 17 ("this guy has nothing to do with us" . . . "No support, no nothing, man!  The guy is alone there, without a clique, man.  You see what I mean?").)  Whereas Detective Flores suggests these comments should be read to mean Mr. Sanchez is telling Zombie to kill Camaron, there is absolutely nothing to support this interpretation.  There is no "gang" language embedded in this part of the conversation that needs to be interpreted.  The language used supports the conclusion the men have resolved that Camaron should be isolated and left alone.

44.     Mr. Sanchez tells Zombie about the previous night's conversation with Santos where they addressed Camaron's green light on them and how they "told him off." (Call Four – Exhibit D – pg. 18).  In the same breath that Mr. Sanchez discusses the green light against himself, he does not say in response that they have decided to "green light" or kill Camaron.  If there were such a plot, (and they have not hesitated to use the terms "hit", assassins, "green lights" so far in these calls), one would expect Mr. Sanchez to have said something like – there is a hit or light against Camaron.  But he says nothing of the kind.  In fact, he says they told Camaron off.  That was the point – confront Camaron, get him to back off and cancel the assassins.

15

45.    When talking about the "consequences" for Camaron's actions, Mr. Sanchez tells Zombie "the homies over there, man – right now– as I was told, man, are going to stop all the activities this guy is involved in, in the barrio, man. You see?" (Call Four – Exhibit D – Pg. 20.) Mr. Sanchez would not talk about isolating Camaron and about ending his activities in the barrio if the idea were actually to kill Camaron. Right afterwards, Mr. Sanchez's explains Camaron "is threatening us, talking shit about us, and now all of us have answered." Mr. Sanchez is telling Zombie, the remedy is to exclude Camaron; their answer is to leave Camaron out of it; not to send him any more money and to cut him loose from the barrio. There is nothing in the calls about killing Camaron. There is no basis for Detective Flores to conclude the comment "all of us have answered" means: go kill Camaron.

46.    "For this problem to end," Mr. Sanchez says "we are going to confront" Camaron. (Call Four – Exhibit D – pg. 23). And this is exactly what happened – they confronted Camaron verbally on the phone. Mr. Sanchez does not say, we are going to "green light" or "hit" or "kill" Camaron. Nothing of the kind.

47.    Mr. Sanchez goes on to urge Zombie to stand up for himself ("because the – topic is you") and explain to everyone that he is not a snitch. Mr. Sanchez tells Zombie his friends, including Mr. Sanchez, have come to his defense, believe in him and support him. (Call Four – Exhibit D – pgs. 24-25 ("We can defend you – we all are doing that. And we have said it, we go to war. Morro told him yesterday, you see?").) This is encouragement for Zombie. This is a figure of speech – a confidence builder – to help Zombie get the courage to speak up. This is not an instruction to kill Camaron. Mr. Sanchez is trying to get Zombie to address Camaron's lies, to stand up for himself and expose Camaron's deceit.

48.    When Mr. Sanchez tells Zombie that Camaron is on his own, that Camaron has nothing to do with the clique, Mr. Sanchez is pressing the same issue – that the consequence for Camaron's lies and deceit is to isolate him. (Call Four – Exhibit D – pg. 25). Mr. Sanchez tells Zombie he has to come out and tell everyone why Camaron should be isolated and ignored. Mr. Sanchez's position – telling Zombie to gather support for his position by talking to the larger community – is inconsistent with the idea of directing Zombie to go kill

16

Camaron. A public display is inconsistent with such a criminal act, especially for gang members, who pride themselves on keeping everything below the radar. If the idea were to instruct Zombie to kill Camaron – the language used would be along the lines of – keep this to yourself; tell no one. That is not what is going on here.

49. Mr. Sanchez does not know the people to whom Camaron is spreading his lies and is worried that anyone out there may act on Camaron's lies. (Call Four – Exhibit D – pg.27 ("So, the thing is that all that shit he is spreading, man, he tells it to somebody that is not going to say anything. But who is just going to act on it, you see? So, then, we actually need you to have the last – the last word, you see?").) Mr. Sanchez exhorts Zombie to come out and tell everyone the truth – he is not a snitch and Camaron is lying. This way, the people to whom Camaron is lying will not believe him and will not attack Zombie or the people in Los Angeles. Zombie needs to have the "last word," meaning the last say in this matter. This is not code for "kill Camaron." This is highlighting how important it is that Zombie speak up and convince others he is not a snitch.

50. In the very next sentence, Mr. Sanchez says "all this people, you see? And to tell them, 'You know what? I'm here.' You see what I'm saying? So these guys hear from your own mouth, the things this son of a bitch is making up. You see what I am saying?" (Call Four – Exhibit D – pg. 27). Later, Mr. Sanchez says again "And and and we are calling you, because they need to hear it from you. You need to speak. You see what I am saying?" (Call Four – Exhibit D – pg. 30).

51. Detective Flores's interpretation that everything being said is code for "go kill Camaron" does not make sense in the context of the conversations. When Mr. Sanchez tells Zombie that Camaron has been cut off and will not get any more money, the plain meaning of the language is clear – isolate him, not kill him. (Call Four – Exhibit D – pg. 30) ("The thing is this. You see, we have told this guy off, man. We are not going to send him money or any other shit! Nothing! Nothing! Man!).)

52. In his Declaration, Detective Flores says the phrase "taking it easy" means they had been planning to kill Camaron all along, but they were waiting until later to carry it

17

out. (Flores Declaration at pg. 17, 4 -10) ("You see, every time this guy would send a threat they would respond here, you see what I'm saying? But not now. That's it, man. You see? Because we wanted to deal with this thing, but we wanted to take it easy, you see? To do what we needed to do, but taking it easy." (Call Four – Exhibit D – pg. 30). There is nothing "coded" or gang language specific about the phrase "taking it easy."

53.    In the context of the calls, Mr. Sanchez is saying Camaron has been a problem and has been making threats, but there was no reason to make a big deal about it or address it until now.  Now, Camaron is sending assassins, going after Zombie again and accusing Mr. Sanchez of being an informant and the Normandie clique of protecting informants.  The targets of Camaron's deceit must now confront Camaron and respond by exposing and isolating him.  The comment "taking it easy" is devoid of any reference to killing Camaron. It does not "decode" the way Detective Flores says it does.

54.    Mr. Sanchez ends the call by saying, "No, no – We already–already don't give a fuck about that son of a bitch, honestly.  And yesterday we told him, we all told him off [Call breaks] [UI] Listen, but [UI] let's leave it like that."  The conclusion is Camaron has been told off.  He has been isolated and no one is going to send him money.  That is the way it is left. That's that.

55.    Mr. Sanchez's goal and that of the others is to resolve this situation.  Besides, killing Camaron does not solve their problems.  The only way to save themselves is to promulgate another view, show unity in opposition to Camaron's view and leave him utterly isolated in his intentions.  Death just eliminates Camaron, but not what he has set in motion. Only his isolation (which is the goal of all these conversations) can stop this in its tracks.  It shines a light on Camaron's designs and Mr. Sanchez and the others know this will make all this go away.

56.    It is a fact Camaron is dead.  He may or may not have been killed by Juan Bonilla.  It is standard operating procedure for law enforcement to  work backwards. From a death to find a conspiracy to commit a murder; to prove this was a planned hit.  But here, these four calls are not about killing Camaron.  They are about exposing his plans and

18

isolating him. The way the government and Detective Flores reach their conclusion regarding these four calls is similar to forcing a square peg into a round hole. Here, based upon these four calls, the square peg does not fit no matter how hard they push.

57. In sum, I disagree with the government's and Detective Flores's interpretations of these four calls. Camaron may have been killed by Juan Bonilla a week after these calls, but that does not change the fact these calls are predominantly about exposing and isolating Camaron and are devoid of any instructions from or orders by Mr. Sanchez to kill Camaron.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _13_ day of October, 2009, at _LOS ANGELES_ California.

FATHER GREG BOYLE

19

# APPENDIX 138

Kerry R. Bensinger, State Bar No. 132178
BENSINGER, RITT, TAI & THVEDT
A Limited Liability Partnership
65 North Raymond Avenue, Suite 320
Pasadena, California 91103
Tel: (626) 685-2550
Fax: (626) 685-2562

Attorney for Defendant ALEXANDER SANCHEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE ALFARO, et al.,<br><br>Defendants. | **Case No. CR-09 00466-R-22**<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO SUPPRESS EVIDENCE DERIVED FROM UNNECESSARY WIRETAP OBTAINED ON FALSE PRETENSES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF COUNSEL**<br><br>Hearing Date: August 30, 2010<br>Time: 1:30 p.m.<br>Courtroom: Judge Manuel L. Real |

**TO UNITED STATES ATTORNEY ANDRE BIROTTE AND ASSISTANT UNITED STATES ATTORNEYS ELIZABETH CARPENTER, ABIGAIL W. EVANS, AND XOCHITL ARTEGA, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 30, 2010, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Manuel L. Real, defendant Alex Sanchez, by and through his counsel of record Kerry R. Bensinger, joined in by defendants Jose Alfaro, Hugo Bolanos, Juan Cendejas, Carlos Cuentas, Yanira Escalante, Juan Fuentes, Jose Gonzalez, Paul Cortez Jovel, Pedro

Lopez, Juan Mancilla, Josue Martinez, Kelvin Melgar, Fernando Morales, David Rivera, and Guillermo Vasquez-Landaver, will and hereby do move to suppress any and all evidence seized or gathered, directly or indirectly, as a result of unlawful electronic eavesdropping and surveillance.

This motion is made on the grounds that the communications intercepted under the authority of wiretap orders 00-119 (May 25, 2000), 00-119(A) (June 30, 2000), 00-119(B) (Aug. 4, 2000), 00-304 (Nov. 20, 2000), 00-304(A) (Jan. 2, 2001), 00-304(B) (Feb. 1, 2001), 03-194 (June 12, 2003), 00-336 (Nov. 5, 2003), 00-354 (Nov. 21, 2003), 06-104 (Apr. 26, 2006), 06-118 (May 17, 2006), 06-194 (July 19, 2006), 06-285 (Nov. 29, 2006), 06-285(A) (Dec. 29, 2006), 06-285(B) (Jan. 26, 2007), 08wt001-JLK (Jan. 8, Feb. 7, Mar. 7, Apr. 4, 2008), and 08wt0012-JLK (Mar. 12, May 10, 2008) were unlawfully intercepted in that the applicants and the affiants failed to provide the court with a full and complete statement of the facts and circumstances relied upon by the applicant to justify his/her belief that an order should be issued including details as to the particular offense that has been, is being, or is about to be committed; the applicants and affiants provided the court with a misleading statement regarding the course and scope of law enforcement's investigation; and the affiants failed to provide the court with a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous, all of which were material to the issuing judge's assessment of whether a wiretap order was necessary and justified.

///
///
///
///
///
///

2

This motion is based upon the attached Memorandum of Points and Authorities, Declaration of Kerry Bensinger, exhibits, all files and records in this case, and any further evidence as may be adduced at the hearing on this motion.

DATED: July 30, 2010                    Respectfully submitted,

                                        BENSINGER, RITT, TAI & THVEDT
                                        A Limited Liability Law Partnership

                                        S/ KERRY R. BENSINGER
                                        _____
                                        KERRY R. BENSINGER
                                        Attorney for Defendant
                                        ALEXANDER SANCHEZ

3

# TABLE OF CONTENTS

**Page No.**

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . 1

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.   The May 2000 Wiretap and its Extensions Are Invalid . . . . . . . . . . . . 5

            1.   The Investigation Disclosed in the May 2000 Affidavit . . . . . . . 5

            2.   Facts Withheld From the Judge in the May 2000 Wiretap Affidavit . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            3.   Because the Government Has Been Unable to Produce Any Evidence Corroborating Many of the Affiant's Allegations, those Allegations Should Be Deemed False and, When Stricken, the Affidavit Fails to Demonstrate Probable Cause, or Genuine Need, for a Wiretap . . . . . . . . . . . 10

            4.   Agent Lucero Affirmatively Misled the Wiretap Judge Regarding the Need for a Wiretap . . . . . . . . . . . . . . . . . . . . . . 11

            5.   The Affidavit Failed to Establish that Reasonably Available Investigative Methods Had Been Attempted in Good Faith to Develop Evidence Regarding the Alleged Conspiracy to Smuggle Drugs into MDC . . . . . . . . . . 14

            6.   The Affidavit Demonstrated that Only a Minimal, Not a "Normal," Amount of Resources Had Been Allocated to a Seven Year Investigation of Mara Salvatrucha . . . . . . . . . . 17

            7.   The Defects in Agent Lucero's Affidavit Were Perpetuated, Instead of Corrected, in the Two Affidavits that Followed . . . . 21

            8.   The May 2000 Wiretap (00-119) and its Fruits Should Be Suppressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        B.   The November 2000 Wiretap and Its Two Extensions Were Not Supported by Necessity, Especially In Light of the Material Information the Government Concealed from the Wiretap Judge . . . . 24

            1.   Because the Government Has Been Unable to Produce Any Evidence Corroborating Many of the Allegations in the Affidavit, those Allegations Should Be Deemed False and, When Stricken from the Affidavit, Fail to Demonstrate Genuine Need to Resort to Wiretap . . . . . . . . . . . . . . . . . . . . . 24

            2.   The Government's Access to CS#6 Undermines Any Claim of Necessity for Wiretap 00-304 . . . . . . . . . . . . . . . . . 25

i

3.    The Government's Concealment of Dopey from the Issuing Judge Constituted an Intentional Material Misrepresentation that Vitiates the Legality of the Wiretap Orders . . . . . . . . . . . . 27

a.    The Government Concealed Evidence from the Wiretap Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

b.    The Government's Concealment Requires Suppression .  33

c.    Extensions of the November 2000 Wiretap Are Also Invalid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

C.    The Government's Intentional or Reckless Concealment of the Scope and Usefulness of Jorge Pineda's (Dopey's) Ability to Gather Evidence for the FBI Vitiates the 2003 Wiretaps  . . . . . . . . . 36

D.    The Government's Intentional or Reckless Concealment of the Scope and Usefulness of Nelson Comandari, "the CEO of Mara Salvatrucha," Vitiates the 2006 Wiretaps . . . . . . . . . . . . . . . . . . . 42

E.    The 2008 Wiretaps Relied on Material Concealment of Evidence No Different Than Its Predecessors and the Evidence  Obtained Therefrom Must be Suppressed  . . . . . . . . . . . . . . . . . . . . . . . 45

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

**Page No.**

**Cases**

Chandler v. U.S. Army, 125 F.3d 1296 (9th Cir. 1997) . . . . . . . . . . . . . . . 24, 34, 45

Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) . . 5, 35, 46

Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357,
    33 L.Ed.2d 179 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34, 45

Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) . . . . . . . 15

Roviaro v. United States, 353 U.S. 53 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Blackmon, 273 F.3d 1204 (9th Cir. 2001) . . . . . . . . . . . . . . passim

United States v. Callum, 410 F.3d 571 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 2

United States v. Carneiro, 861 F.2d 771 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . 16

United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820,
    40 L.Ed.2d 341 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 17

United States v. Gonzalez, Inc., 412 F.3d 1102 (9th Cir. 2005) . . . . . . . . . . . . passim

United States v. Ippolito, 774 F.2d 1482 (9th Cir. 1985) . . . . . 3, 4, 14, 34, 36, 42, 45

United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) . . . . . . . 3

United States v. Lilla, 699 F.2d 99 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Santora, 600 F.2d 1317 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . 4

United States v. Spagnuolo, 549 F.2d 705 (9th Cir. 1975) . . . . . . . . . . . . . . . . 4, 16

United States v. Staffeldt, 451 F.3d 578 (9th Cir. 2006) . . . . . . . . . . . . . . . . 24, 34

United States v. Stanert, 762 F.2d 775 (9th Cir.1985) . . . . . . . . . . . . . . . . . . . . . 5


**Statutes and Regulations**

18 U.S.C. § 2515 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 34

18 U.S.C. § 2518 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

39 C.F.R. § 233.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Other**

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2153 . . . . . . . . . . . . . 17

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Even after the FBI succeeded in recruiting Nelson Comandari, the man described by law enforcement as "the CEO of Mara Salvatrucha," and Jorge Pineda, Comandari's self-described "right-hand man," to serve as government informers against MS, FBI agents sought wiretaps to eavesdrop on conversations pertaining to MS because, the agents claimed, they had no other way to learn the leadership and structure of the organization, the identity of its membership, and its administration and methods of operations. These allegations were unlikely to meet any resistance from a district judge because, despite the statutory requirement that a wiretap order be supported by a full and complete statement of the investigation, the FBI affiants did not disclose to the court that they had captured and coopted these critical figures within the MS organization.

Federal, state and local law enforcement officers comprising the Los Angeles Metropolitan Task Force on Violent Crime began investigating the MS gang in 1993. Ex. 1, at 26, Bates 499; Ex. 2, at 81, Bates 457.[1]  Through a series of 21 separate wiretaps and extensions issued over the course of nearly a decade, the government obtained permission to engage in pervasive eavesdropping on private conversations. From the very beginning, the government made material misrepresentations, or

---

[1] Exhibits 1 through 21 refer to the applications, affidavits, and orders seeking wiretaps in this case and produced by the government during discovery. The Bates numbers referred to in connection with Exhibits 1 through 21 are included to assist in locating the precise page cited in these voluminous exhibits. Other materials referred to herein by Bates number were produced by the government as discovery in this case. For logistical reasons, they have not been designated as specific exhibits but can and will be made available to the court if the court so requests or in the unlikely event there is any dispute about the facts.

Defendants do not intend to endorse the truthfulness or accuracy of any of the assertions contained in the discovery but refer to them as information available to law enforcement at the time of the wiretap applications.

1

concealed material information, about the course and scope of their investigation as well as resources available to the government that, if known to the issuing judge, could reasonably have called into question whether a wiretap was truly necessary.

Although the government claims that it has turned over all discovery relevant to this case, the discovery reveals little (virtually no) evidence relating to the investigation prior to 2000.

Because of the factual complexity of the issues and the extended period of time over which the pertinent events occurred, the facts related to the individual wiretaps being challenged herein are discussed in connection with each wiretap.

## II.

## **ARGUMENT**

"When a law enforcement officer seeks a court order allowing him to set up a wiretap . . . . he has a long and bumpy road ahead of him." United States v. Callum, 410 F.3d 571, 574 (9th Cir. 2005).  Indeed, "the government must overcome the statutory presumption *against* this intrusive investigative method." United States v. Gonzalez, Inc., 412 F.3d 1102, 1112 (9th Cir. 2005) (emphasis added), *citing* United States v. Blackmon, 273 F.3d 1204, 1207 (9th Cir. 2001).

"When Congress enacted the wiretapping provisions of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522, it intended to 'make doubly sure that the statutory authority [for wiretaps] be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications.'" Gonzalez, Inc., 412 F.3d at 1109-10, *quoting* United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).  "These procedures were not to be routinely employed as the initial step in criminal investigation.  Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be

2

unlikely to succeed if tried or to be too dangerous." Giordano, 416 U.S. at 515, *citing* 18 U.S.C. § 2518(1)(c), 2518(3)(c).

In short, the government "must allege specific circumstances that render normal investigative techniques particularly ineffective or the application must be denied." United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985).

> The necessity requirement "exists in order to limit the use of wiretaps, which are highly intrusive." United States v. Bennett, 219 F.3d 1117, 1121 (9th Cir. 2000), *quoting* United States v. Commito, 918 F.2d 95, 98 (9th Cir. 1990). The statute requires that the issuing judge determine whether the wiretap application contains facts that support a finding that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Taken together, §§ 2518(1)(c) and (3)(c) require a full and complete statement establishing necessity. The purpose of these requirements is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). [¶] Thus, we require a full and complete statement of specific allegations indicating why normal investigative procedures failed or would fail in the particular case. *See* United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir.1985).

Blackmon, 273 F.3d at 1207.

Necessity is not demonstrated simply by offering "boilerplate conclusions [that] merely describe inherent limitations of normal investigative procedures." Blackmon, 273 F.3d at 1207. Instead, the statute's "necessity provisions [] require a 'full and complete statement of *specific* allegations' establishing the necessity of the wiretap sought." Gonzalez, Inc., 412 F.3d at 1112, *quoting* Blackmon, 273 F.3d at 1207; *see also* Ippolito, 774 F.2d at 1486. "[W]here traditional investigative techniques would suffice to expose the crime," electronic surveillance is not appropriate. United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

The government may not disavow resort to, or attempt to dismiss the usefulness of, particular investigative methods by simply proclaiming a desire to

3

achieve unattainable goals through use of a single non-existent investigative method. "The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances." Blackmon, 273 F.3d at 1211. Rather, the government must identify reasonably attainable goals that it expects to accomplish through electronic surveillance, lest the necessity requirement be rendered a nullity. Id.

When the government has purportedly attempted to conduct an investigation before resorting to a wiretap, the court must "evaluate the reasonableness of the government's *good faith efforts* to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." Gonzalez, Inc., 412 F.3d at 1112 (emphasis added).

If the application does not satisfy the necessity showing, a warrant based upon such application is invalid and any electronic communications subsequently intercepted must be suppressed as well as the fruit of that illegally obtained evidence. *See e.g.,* United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983), United States v. Spagnuolo, 549 F.2d 705 (9th Cir. 1975); United States v. Santora, 600 F.2d 1317 (9th Cir. 1979).

It should, of course, go without saying that the government may not manufacture necessity by misrepresenting its investigative efforts to the court. "In addition to assessing the application for an adequate showing of necessity, the suppression court must examine it to see whether it contains material misstatements or omissions regarding necessity." Blackmon, 273 F.3d at 1207, *citing* Ippolito, 774 F.2d at 1485-86. "If an application contains inaccuracies or significant omissions, the court must determine the facts relying on credible evidence produced at the suppression hearing to determine whether a 'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" Blackmon, 273 F.3d at 1207-08, *quoting* Ippolito, 774 F.2d at 1486-87.

4

To obtain a hearing under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a defendant is only required to "make a preliminary showing that the wiretap applications contained material misrepresentations or omissions." United States v. Gonzalez, Inc., 412 F.3d 1102, 1110 (9th Cir. 2005). The Ninth Circuit "does not require clear proof of deliberate or reckless omissions or misrepresentations at the pleading stage." Gonzalez, Inc., 412 F.3d at 1111, citing United States v. Stanert, 762 F.2d 775, 781 (9th Cir.1985). "Instead, at this stage we simply require the defense to make a substantial showing that supports a finding of intent or recklessness." Gonzalez, Inc., 412 F.3d at 1111. At the initial stage, when deception relates to the statutory necessity requirement, a showing of materiality requires only that "the alleged misrepresentations and omissions related to the ability of customary investigative tools to produce the evidence sought by the government in its investigation." Gonzalez, Inc., 412 F.3d at 1111.

## A.   The May 2000 Wiretap and its Extensions Are Invalid

### 1.   The Investigation Disclosed in the May 2000 Affidavit

According to the May 25, 2000 affidavit submitted in support of wiretap 00-119, government agents listened to four phone calls that Ricardo Hernandez, an MS member incarcerated at the Metropolitan Detention Center (MDC), placed to defendant Ruben Pineda[2] in the Spring of 2000. Ex. 1, at 27-28, Bates 500-01. Although the discussion contained references to coarse bodily functions, law enforcement assumed the calls related to drug trafficking.[3]

---

[2] Although Ruben Pineda is named as an indicted defendant in this matter, he has not been arrested and has not made an appearance in this case. To avoid confusion between him and Jorge Pineda, who is discussed at great length below, defendant Ruben Pineda is referred to herein by his full name.

[3] Law enforcement agents interpreted the February and March 2000 telephone calls as discussing Ruben Pineda's efforts to smuggle drugs into the MDC with the assistance of his incarcerated MS comrade. Ex. 1, at 27-30, Bates 500-03. Law enforcement reportedly overheard a fourth phone call between Ruben Pineda and an

5

Insinuating that law enforcement learned this information only through the serendipity of monitoring Hernandez's jail calls, FBI Agent Leticia Lucero told a district judge that agents needed to wiretap Ruben Pineda's telephone to find out about smuggling drugs to MDC.

Rather than explain to the court the good faith efforts undertaken to investigate the smuggling of drugs into MDC, Agent Lucero provided the court with some basic, historical information relating to law enforcement knowledge of MS.

Agent Lucero represented that two individuals affiliated with the Fulton clique of MS cooperated with law enforcement between 1994 to 1996, but were terminated for different reasons 4 to 6 years before the wiretap application. Ex. 1, at 33-34, Bates 506-07. The government provided no information to corroborate these allegations by Agent Lucero. Bensinger Decl., ¶ 2.

In 1997, Walter Lacinos-Santos, a.k.a. Camarón, the then-leader of the MS Normandie clique was incarcerated in federal custody. Agent Lucero reported that Camarón continued to direct the gang's activities from inside federal prison through telephone calls with defendant Ruben Pineda and that law enforcement eavesdropped on those calls from prison until May 1998, when Ruben Pineda was himself arrested for the transport and sale of drugs. Ex. 1, at 23, Bates 499. The government has provided no discovery corroborating any of these allegations. Bensinger Decl., ¶ 2.

The only investigative effort undertaken in 1998 that was relayed to the court was an isolated unsuccessful attempt to interview a single MS member. Ex. 1, at 35, Bates 508. Again, there is no information in the discovery corroborating this allegation. Bensinger Decl., ¶ 2.

If one were to credit the affidavit submitted in support of May 2000 wiretap (00-119), law enforcement conducted no investigative efforts between the

---

incarcerated MS member on April 9, 2000, that they interpreted as the MS member inquiring about receiving money from drug sales conducted on the streets. Ex. 1, at 29-30, Bates 502-03.

6

unsuccessful interview on March 4, 1998 and February 2000 when, two days after Ruben Pineda's first call interpreted as involving drug smuggling into MDC, they installed a trap and trace device and pen register on Ruben Pineda's telephone. Ex. 1, at 30, Bates 503. Again, no evidence was produced corroborating the existence of any application or order for a pen register or trap and trace device nor the results generated by any such device. Bensinger Decl., ¶ 2.

Agent Lucero mentioned that on March 15, 2000 – about a month after the first phone call was intercepted – a law enforcement agent saw a vehicle leave Ruben Pineda's residence. Ex. 1, at 43-44, Bates 516-17 ¶ 47(2)-(3). Fifteen days later, ten days after the first two telephone calls were captured, an FBI agent went by Ruben Pineda's home and saw a car drive into the driveway, saw Pineda leave the house and get into the car, and then saw the car drive away with Pineda as a passenger. Ex. 1, at 31, Bates 504. As with the other allegations, no contemporaneous evidence was produced that would corroborate these events. Bensinger Decl., ¶ 2.

Shortly after the pen register and trap and trace devices on Ruben Pineda's phone ended on May 3 and May 14, 2000, Ex. 1, at 30-32, Bates 503-05, on May 25, 2000, law enforcement sought a wiretap on Pineda's telephone.

2.    Facts Withheld From the Judge in the May 2000 Wiretap Affidavit

Unbeknownst to the issuing judge, the FBI successfully recruited informers within MS who were "in a position to testify" about the identity and activities of individuals in MS leadership positions and the gang's alleged involvement in drug dealing. Bates 14,680, 14,681-82. These individuals were available to the FBI in September and October of 1999, and probably before and after as well. Agent Lucero did not alert the issuing judge to the availability of this informer (or these informers).[4]

---

[4] This description is abstract by necessity. Despite the bona fide and justified request by defense counsel, the government has persistently refused to identify or disclose any of the informers used in this case. The defense does not seek this

7

Even though the investigation in this case has been built on the backs of cooperating witnesses – including individuals from the highest echelons of MS and the individual who law enforcement described as "the 'CEO' of Mara Salvatrucha"[5] – in support of the wiretap application, Agent Lucero predicted (wrongly) that cooperating witnesses would "not [be] likely to reveal information" and therefore interviews of the MS "[would] not likely achieve the objectives of the investigation." Ex. 1, at 41, Bates 514.[6]

The government alleged that MS was not only closely affiliated with, but also overseen and controlled by, the Mexican Mafia. Indictment, at 5, 8-9, 64. Agent Lucero herself participated in then recent prosecution of more than three dozen Mexican Mafia members. Ex. 1, at 15, Bates 488. FBI agents informed the court in subsequent wiretap applications that the government succeeded in recruiting several cooperating defendants from the Mexican Mafia, including one who "started cooperating with the government after having been indicted on RICO and RICO related charges in 1999." Ex. 8, at 611, Bates 6796. The individual "provided information on the activities of the [gang], identified individuals who are [gang] members and associates, provided information concerning the inner workings of the

_____

information merely to question the reliability of the informers, but to test the accuracy and reliability of the affiants who submitted an affidavit in support of the wiretap application. The defense is hindered in its ability to more clearly identify or describe the informer who the government had available in September and October 1999 or whether there was actually more than one informer available.

[5] TOM DIAZ, NO BOUNDARIES: TRANSNATIONAL LATINO GANGS AND AMERICAN LAW ENFORCEMENT 203-04 (2009).

[6] This is all the more perplexing given Lucero's admission that she participated in the investigation and prosecution of the Mexican Mafia, Ex. 1, at 15 (00-119, May 25, 2000), Bates 488, an organization described by law enforcement as equally ruthless and intolerant of cooperating witnesses, Ex. 7, at 437-438 (03-194, June 12, 2003), Bates 6619-20, and yet law enforcement nonetheless managed to recruit several informers out of the Mexican Mafia more than a year before Lucero applied for a wiretap against MS. Ex. 7, at 504 (03-194, June 12, 2003), Bates 6686-86.

8

[Mexican Mafia]." Ex. 8, at 611, Bates 6796. Although this individual was in a position to testify about the "inner workings of the EME" and the EME supposedly controlled MS, and this individual eventually "testified in four federal trials,"[7] no mention was made to the issuing judge that such an individual was available as a source who could provide information about MS.

Agent Lucero summarily dismissed the usefulness of consensual calls, claiming they were "subject to the same limitations as the use of confidential sources and undercover agents discussed above" (where she falsely reported that no confidential sources were willing to cooperate, notwithstanding additional individuals who she did not mention). Ex. 1, at 40, Bates 513. Agent Lucero did not mention that the FBI already had informers who were willing and able to place – and who had placed – consensually monitored calls to various MS members (or other means of obtaining recorded conversations of MS members) including some of the defendants herein.[8]

Although Agent Lucero explained that the FBI believed that MS was involved in drug trafficking, Ex. 1, at 24 Bates 497, and the investigation was aimed at discovering the scope of drug dealing in and out of prison, she made no reference to the possibility of conducting controlled purchases of drugs. Had she made references to controlled buys, she would certainly have been remiss if she had not mentioned that an FBI informer "purchased a large quantity of crack cocaine from a MS gang member" in October 1999 at the behest of the FBI. Ex. 4, at 228, Bates 728. Lucero's affidavit makes no reference to the October 1999 controlled buy.

---

[7] The speciousness of the government's continued refusal to clarify who it was referring to in this 2003 affidavit is exemplified by the fact that the government acknowledges that, as of 2003, this person had already testified in four federal trials. Because "the scope of the privilege is limited by its underlying purpose," Roviaro v. United States, 353 U.S. 53, 60 (1957), no reason at all supports the government's continued refusal to identify individuals whose identities are no longer confidential.

[8] Law enforcement obtained recorded telephone conversations of defendant Jose Gonzalez in March 1998. Bates 15,014. In June 1998, Mr. Gonzalez was caught speaking on another wiretap relating to law enforcement's investigation of MS. Bates 15,014.

9

Agent Lucero referred to information provided to her by LAPD Detective Timothy Shur as a source for information about the MS gang. Agent Lucero made no reference to the FBI's access to LAPD Detective Frank Flores, the individual the government has identified as an *expert* on the MS gang. Bensinger Decl., ¶ 6.

On June 30, 2000, the government sought and obtained an extension of the May 25, 2000 wiretap, 00-119(A). Agent Lucero submitted a supporting affidavit that reiterated the factual representations of the earlier affidavit and did not correct any of its distortions or misrepresentations. Based on that affidavit, the court authorized an extension of the wiretap for another month. Ex. 2, at 112-118 (00-119(A), 6/4/00, at 1-7); Bates 437-443.

On August 4, 2000, the government sought a second extension of the May 25, 2000 wiretap. Again the government submitted an affidavit by Agent Lucero. Once again, Agent Lucero's affidavit repeated the historical representations of the May 25, 2000 affidavit. She did not correct or clarify any of the distortions, misrepresentations, or misleading statements contained in the earlier affidavit. Based on the affidavit, the court authorized a second extension of the wiretap for another 30 day period. Ex. 3 at 178-184 (00-119(B), 8/4/00, at 1-7), Bates 418-424.

3. <u>Because the Government Has Been Unable to Produce Any Evidence Corroborating Many of the Affiant's Allegations, those Allegations Should Be Deemed False and, When Stricken, the Affidavit Fails to Demonstrate Probable Cause, or Genuine Need, for a Wiretap</u>

The government informed the issuing judge that the agents had (a) overheard four conversations between Ruben Pineda and an incarcerated member of the MS gang who was then an inmate at MDC and then placed a pen register and a trap and trace device placed on Pineda's phone, (b) drove by Ruben Pineda's residence twice and saw him leave his house, and (c) recruited some MS members as informers many years earlier but had long ago terminated them as informers, followed by a single

unsuccessful attempt to recruit an informer two years before the wiretap application, and then made no further efforts to interview new witnesses or recruit new informers.

Although the government has represented that it has provided the defendants with all the discovery relating to the investigation in this case, these efforts are nowhere documented, corroborated, or even alluded to except in Agent Lucero's affidavit. Each of these incidents, if true, would typically have been documented in a report prepared by a law enforcement member involved. No such reports have been produced, which calls into question the truthfulness of these allegations and the propriety of the government's reliance on these uncorroborated and untestable assertions.

Without these allegations, the affidavit presents no factual basis for authorizing a wiretap nor that any traditional measures were ever attempted. Accordingly, the court should suppress the fruits of the wiretap or, at a minimum, grant defendants a hearing where they can establish the falsity and recklessness of the government's presentation.

4. <u>Agent Lucero Affirmatively Misled the Wiretap Judge Regarding the Need for a Wiretap</u>

The affiant misleadingly presented the wiretap application as being prompted by the intercepted telephone calls between Hernandez and defendant Pineda. By misleadingly suggesting that the wiretap request was prompted by intercepted jail telephone calls that occurred in February, March, and April, the government was able to suggest to the issuing judge that the government had taken reasonable investigative efforts by the time it applied for the wiretap in May.

Had the affiant admitted that the wiretap actually related to a broader, long-term investigation of MS, the issuing judge would have realized that the minimal efforts employed – (a) placing a trap and trace device on Ruben Pineda's phone after serendipitously overhearing a phone call and (b) driving by Ruben Pineda's residence

11

on two occasions – were woefully inadequate efforts to reasonably investigate a suspected drug conspiracy.

In fact, the affiant misled the judge by concealing successful investigative efforts that had not yet been given an opportunity to succeed.

Although Agent Lucero mentioned MS informers recruited from 1994 (6 years before the wiretap application), both of whom had been terminated by 1996 (4 years previously), and an isolated unsuccessful attempt to recruit a single informer in 1998 (2 years earlier), the affiant insinuated that the investigation could not rely on informers because none were available. In fact, the FBI had recruited several informers who were providing information about the MS leadership barely 7 months before the wiretap application was filed. Bates 6796, 14,680, 14,681-82. The affiant *made no disclosure about the recent cooperating informers* and, by concealing their existence, did not need to deny the utility of the information they were providing.

Agent Lucero also withheld from the judge that agents had already captured conversations of several reputed MS members, including two of the defendants herein, using cooperating informers. Bates 15,010, 15,014.

Agent Lucero offered two insubstantial reasons for rejecting consensually monitored telephone calls. First, although factually accurate in stating that consensually recorded phone calls are "recorded conversations of an undercover source or confidential source," Ex. 1, at 37, Bates 513, to categorically reject them as "merely" that ignores that the purpose of such a call is to capture evidence regarding the target who is speaking on the other end of the phone.[9] Consensually monitored phone calls are recorded conversations of the cooperating witness *and an investigative target*. To minimize them as "merely recorded conversations" ignores

---

[9] Indeed, if Agent Lucero's dismissal were truly embraced by the FBI, it certainly would not have devoted so much time and effort to having one of their informers record 500 and 600 calls over the course of several years. *See*, Part II, C., 1., *post*.

12

that phone calls captured on a wiretap are not anything more than that either.[10]

Second, Agent Lucero suggested that consensually monitored phone calls were not a viable technique because "they are subject to the same limitations as the use of confidential sources . . . discussed above." Ex. 1, at 37, Bates 513. Agent Lucero was again capitalizing on the "limitation" that there were allegedly no cooperating witnesses. Agent Lucero concealed that the government had obtained recorded conversations of several MS members, and at least two of the defendants in this case, prior to applying for the May 2000 wiretap. Bates 15,010, 15,014. Agent Lucero also concealed from the issuing judge that the government had cooperating witnesses available who were providing information to the government as recently as September and October of 1999, Bates 14,680, 14,681-82, far more recently than the de-commissioned sources discussed from 1994, and yet the government made no disclosure of their availability and cooperation.

Notwithstanding her categorical dismissal of consensual calls, there remained one type of consensually recorded call that was not subject to either of these criticisms and yet was fully available to the government: calls placed by inmates. Agent Lucero was fully aware that Camarón remained in federal custody and continued to discuss MS operations on phone lines monitored by the Bureau of Prisons, fully available to the government. Agent Lucero also failed to disclose that not only was Camarón still attempting to manage, organize, and oversee MS operations from within federal prison, but that government had unfettered access to

---

[10] Agent Lucero's casual dismissal of consensually recorded disregards the much less efficient method of using a wiretap that is simultaneously a substantially greater invasion of privacy. In a consensually recorded call, the government is able to focus its efforts on a particular investigative target and focus on a particular investigative subject. In a wiretap, by contrast, the government will sweep in all calls by numerous people regardless of whether they are persons of investigative interest and have to sift through calls touching on a wide range of topics that may be far afield from the investigative objectives.

13

monitoring the content of those calls. *E.g.* Ex. 4 at 207, 214, 216-223 (00-304, Nov. 20, 2000, Aff., at 12, 19, 21-28), Bates 707, 714, 716-23.

Agent Lucero's affidavit made no mention of controlled or monitored purchases of drugs. Ex. 4, at 228, Bates 728. Had she done so, she would have had to craft her words carefully to avoid disclosing that another source had successfully been recruited who had "purchased a large quantity of crack cocaine from a MS gang member" in October 1999. Ex. 4, at 228, Bates 728.

The affiant's failure to disclose the FBI's access to *several* informers, its ability to successfully conduct controlled buys, and obtain consensually recorded phone calls, combined with her spurious rejection of other legitimate investigative methods, materially misled the wiretap judge as to the need for a wiretap. By withholding these key facts, the government failed to provide the wiretap judge with a full and complete statement regarding the details of its investigation. By withholding this information, the affiant also deprived the issuing court of critical information upon which a "'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" Blackmon, 273 F.3d at 1207-08, *quoting* Ippolito, 774 F.2d at 1486-87.

> 5. The Affidavit Failed to Establish that Reasonably Available Investigative Methods Had Been Attempted in Good Faith to Develop Evidence Regarding the Alleged Conspiracy to Smuggle Drugs into MDC

Even if the investigation truly was narrowly focused exclusively on Ruben Pineda's scheme to smuggle drugs into MDC – a limited investigative objective denied by the affiant and inconsistent with the general background information provided – the government failed to show it had reasonably undertaken adequate investigative efforts in good faith. As noted, the government could have attempted to set up controlled buys (as they had previously done but did not tell the issuing judge

14

about, Bates 14,681-82; Ex. 4, at 219, Bates 728); the government could have attempted to recruit informers (as they had previously done but concealed from the issuing judge, Bates 6976, 14,680, 15,010, 15014); particularly because the scheme involved smuggling contraband into the jail, the government could have easily conducted searches of Hernandez (the incarcerated MS member allegedly receiving the drugs)[11] or, more expansively, could have attempted to recruit informers from within the inmate population, a group of people facing time in federal prison anxiously looking for ways to minimize their time in custody.

Furthermore, the government's two perfunctory attempts at surveillance – two random visits to Ruben Pineda's residence, apparently disconnected from any actionable intelligence, simply to watch him leave his house – are woefully inadequate.  The Ninth Circuit has repeatedly "rejected the notion that a single incident of failed physical surveillance could establish that any subsequent surveillance could be ruled out as likely to be unsuccessful or too dangerous to pursue."  Gonzalez, Inc., 412 F.3d at 1113, *citing* Blackmon, 273 F.3d at 1209.  Moreover, it is not sufficient that the government make some lackluster attempt to employ a traditional technique.  The court must look only to "the reasonableness of the government's *good faith efforts* to use traditional investigative tactics."  Gonzalez, Inc., 412 F.3d at 1112 (emphasis added).  The circumstances of the purported surveillance attempts are particularly lacking direction and were predictably unlikely to produce pertinent evidence.  There is nothing in the affidavit to suggest that law enforcement was acting on any information when it stationed an agent near Ruben Pineda's house to watch when he left home.  The Ninth Circuit has specifically and repeatedly "refused to condone a wiretap order when the supporting application only established that law enforcement pursued traditional investigative

_____

[11]  Hudson v. Palmer, 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (inmates have no reasonable expectation of privacy while in custody).

15

methods that were unlikely to produce pertinent evidence before seeking the wiretap." Gonzalez, Inc., 412 F.3d at 1113, *citing* United States v. Carneiro, 861 F.2d 771, 1183 (9th Cir. 1988).

To establish the requisite necessity, "the affidavit must reveal that normal investigative techniques have been employed in a good faith effort to determine the identity of those violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts have failed to achieve their ends." United States v. Spagnuolo, 549 F.2d 705, 710 (9th Cir. 1977). Agent Lucero's affidavit fails in this regard. Two perfunctory surveillance attempts and the placement of a trap and trace device and pen register hardly reflect dedication of "normal investigative techniques . . . employed in good faith" before resorting to a wiretap.

Agent Lucero's affidavit failed in a second respect as well. It is not enough merely to note that some investigative efforts have been employed. "What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." Spagnuolo, 549 F.2d at 710. If the government was genuinely interested in investigating the introduction of drugs to MDC, it surely could and would have done more. And three months is hardly a "reasonable period of time" – especially when the government did no more than install a pen register and make two home visits – in which to dismantle a drug conspiracy and smuggling operation.

The facts demonstrate that "the government side-stepped its responsibility to use promising traditional techniques when it began to investigate [Pineda's alleged drug smuggling] and instead conducted only the most cursory investigation before seeking a wiretap." Gonzalez, Inc., 412 F.3d at 1113-14. If, rather than form part of a larger investigation of MS that followed several years of near inactivity, the wiretap was an attempt to investigate the arrangements between Ruben Pineda and Hernandez, it is apparent that the application for a wiretap was "used as the first

16

meaningful step in an investigation." Gonzalez, Inc., 412 F.3d at 1113; Giordano, 416 U.S. at 515 (wiretaps should not be "the initial step in criminal investigation"). As such, the wiretap was not issued in conformance with the Wiretap Act and evidence derived from it must be suppressed.

6.     The Affidavit Demonstrated that Only a Minimal, Not a "Normal," Amount of Resources Had Been Allocated to a Seven Year Investigation of Mara Salvatrucha

If, as the government alleged, the wiretap was in furtherance of a broader effort to infiltrate MS, Ex. 1, at 14, 19-23, Bates 490, 495-99, the efforts described by the affiant were woefully inadequate for an investigation that had supposedly lasted seven years.

As a preliminary matter, it is important to note what the government acknowledged it made no efforts to do in this case before seeking a wiretap. The government categorically disavowed any reliance on witness interviews, consensual recordings, search warrants, trash searches, or use of grand juries.

In enacting the wiretap legislation, Congress elaborated on the types of investigative techniques that should ordinarily precede wire interception:

> Normal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

S. Rep. No. 90-1097, at 101 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2153.

In short, the affidavit rejected out of hand several of the techniques that Congress expected would be regularly attempted before seeking a wiretap.

In rejecting the use of search warrants, Agent Lucero explained that they would not be useful because "search warrants will not identify all Mara Salvatrucha members and associates, nor will they reveal the full nature and scope of Mara

17

Salvatrucha's criminal activity." Ex. 1, at 37, Bates 513. She also expressed concern that a search "would likely prematurely disclose the existence of the investigation." Ex. 1, at 37, Bates 513.

These are almost identical to the allegations the Ninth Circuit has denounced as "boilerplate assertions" that are "simply not enough."[12] When, as here, they are "unsupported by specific facts relevant to the particular circumstances of this case," such far-reaching assertions "would be true of most if not all narcotics investigations." Blackmon, 273 F.3d at 1210.

Even though Congress anticipated that witness interviews would invariably be a preliminary step before resorting to a wiretap, Agent Lucero dismissed them because they "would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the crimes involved, the location of records, drugs and other pertinent evidence regarding the Target Offenses." Ex. 1, at 37, Bates 513.[13] Blackmon similarly rejected a statement that "interviews of witnesses [would] not be successful in developing sufficient evidence to prosecute this entire organization" as similarly inadequate "boilerplate." Blackmon, 273 F.3d at 1210.

Agent Lucero rejected trash searches as "unlikely to produce evidence revealing the identities of all Mara Salvatrucha members and associates, or the full nature and scope of the Mara Salvatrucha criminal activities." Ex. 1, at 37, Bates 513. The truth or falsity of that conclusion is irrelevant: An investigative technique need not be the Holy Grail of law enforcement methods in order to be a "normal investigative technique" that should be employed before seeking a wiretap.

---

[12] The affiant in Blackmon "justifie[d] the lack of use of search warrants by stating that they 'would be unlikely to produce evidence which would identify fully the other members of the organization, the organizational structure, the scope of the narcotics trafficking conspiracy, or the sources of supply.'" Blackmon, 273 F.3d at 1210.

[13] Indeed, Agent Lucero's affidavit rejects not only interviewing members and associates of the gang but even people who are "non-affiliated" with the organization. Ex. 1, at 38, Bates 514.

18

Although Agent Lucero purported to be investigating the financial transfers of money between Ruben Pineda and others, Lucero makes no reference to the possibility of conducting a financial investigation – or, since they knew Ruben Pineda's residence, obtaining a mail cover for Pineda's mail to identify his relationship with any financial institutions.  39 C.F.R. § 233.3.

No different than in Gonzalez, Inc.:

> the affidavit's terse rejection of the possible productive use of grand jury subpoenas or search warrants does not establish that these investigative techniques were reasonably unlikely to work. The affidavit rejects these tools by claiming they would likely reveal the investigation to its targets.  Such statements do not reasonably explain why traditional investigative tools are unlikely to succeed in a particular investigation, but are "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures," which we have found insufficient to establish necessity.

Gonzalez, Inc., 412 F.3d at 1114, quoting Blackmon, 273 F.3d at 1210-11.

In light of Agent Lucero's reasons for rejecting out of hand several of the standard investigative techniques that Congress anticipated would be employed, one might anticipate that this was explained by diligent investigative efforts elsewhere. One would be wrong in so assuming.

Although, according to the affidavit, the investigation opened in 1993, Ex. 1, at 23, Bates 499; Ex. 2, at 81, Bates 457, the affidavit identifies absolutely no investigative efforts undertaken that year.  The discovery does not reveal any investigative effort in 1993 either.  Bensinger Dec., ¶ 2.

Between 1994 and 1996, the only investigative efforts were communications with two unhelpful potential sources, both of whom were eventually terminated.  The discovery does not reveal any investigative effort for this period either.  Bensinger Decl. ¶ 2.

Agent Lucero conceded that, in 1997, government agents did no more than listen to the conversations between Camarón and Ruben Pineda regarding Camarón's oversight of MS activities from within federal custody.  Although reporting that

19

Camarón received and relayed extensive information about his oversight of MS, the affiant does not suggest that any law enforcement agent ever followed up on that information before 2000. The information Camarón obtained by telephone included "the activities of gang members out on the streets [including] the sale of drugs, status of other specific members and the movement of drug proceeds." Ex.1, at 23, Bates 499. The discovery provides no indication that law enforcement made any attempt to follow-up on any of this information before seeking a wiretap. By concealing the substance of the communications from the issuing judge, the affiant could conceal whether the information in those phone calls provided any basis for further investigation or surveillance or questioning of witnesses and could similarly minimize the risk of questions from the judge as to the government's efforts to follow-up on the information learned from the phone calls. For all that appears from the affidavit and the discovery, government agents did nothing during this time other than listen to Camarón's conversations with Ruben Pineda until May 1998.

As of May 1998, the government's efforts apparently remained stagnant, making no attempt to conduct any investigation at all once Ruben Pineda was arrested. Although stating that Camarón's communication with Ruben Pineda ended in May 1998, the government deftly avoided disclosing whether Camarón managed to continue his control over the MS activities from within federal prison as he had done for over a year and a half. Regardless of where he was housed, Camarón apparently managed to exert control over MS; there is no reason to suspect that his efforts waned simply because he had been transferred to another penitentiary, regardless of where it was located since he conducted his oversight of the gang by telephone. Ex. 4 at 207, 214, 216-223 (00-304, Nov. 20, 2000), Bates 707, 714, 716-23. In short, even if Camarón was not regularly talking to defendant Ruben Pineda, that did not mean he was not talking to anybody. The government's own later admissions confirm that they had uninterrupted access to Camarón's telephone conversations overseeing and orchestrating MS notwithstanding Ruben Pineda's incarceration between May and

20

December 1998. Notwithstanding this available source of information, not only did the government not disclose it to the judge, but there is no indication in the discovery that the government made any attempt to make use of this resource. Bensinger Decl., ¶ 2.

Moreover, even if communication between Camarón and Ruben Pineda paused after May 1998, the government acknowledged that Pineda was released from custody in December 1998. Ex. 1, at 22, Bates 498. This was nearly 18 months before the government applied for a wiretap. Law enforcement made no attempt to deny that Camarón continued to attempt to maintain control of MS and that, since Camarón remained in federal custody, law enforcement had unrestricted access to all Camarón's calls to others outside the Bureau of Prisons' institutions nor that Camarón resumed contact with Ruben Pineda when the latter was released in December 1998.

Even if the objective were to ascertain the activities of the MS gang (and not merely Ruben Pineda's own drug dealing activity), the affidavit reveals that agents did absolutely nothing for the nearly two year period between March 1998 and February 2000. The government's utter failure to devote a reasonable amount of resource to use good faith efforts to develop their case through traditional means before seeking a wiretap demonstrates that the government failed to establish the requisite necessity for a wiretap. *E.g.* Gonzalez, Inc., 412 F.3d at 1112-14.

7.     The Defects in Agent Lucero's Affidavit Were Perpetuated, Instead of Corrected, in the Two Affidavits that Followed

When the May 25, 2000 wiretap (00-119) expired, Agent Lucero submitted another affidavit seeking an extension of the wiretap. The June 30, 2000 affidavit in support of the first extension, 00-119(A), recites the same factual background as the affidavit supporting 00-119, adding only references to the calls illegally intercepted under 00-119, and references to three passing attempts at surveillance of Ruben

21

Pineda at his home.  About 10 days before the May 2000 wiretap (00-119) was going to expire, an officer was stationed to conduct surveillance at Ruben Pineda's residence.  Although agents had been to Ruben Pineda's residence on March 15 and 30, 2000, Lucero now added that "do [sic] to the location of the residence, it was very difficult to conduct surveillance."  Ex. 2, at 98, Bates 479.

Notwithstanding Agent Lucero's suggestion that "the location of the residence" impeded surveillance, agents on the scene not only observed Ruben Pineda meeting and talking with some friends of his for about 20 minutes, but agents also decided it was not too much of an impediment since they returned to conduct surveillance there on each of the following two days and then, again, a week later.  Ex. 2, at 104, Bates 480.[14]  On only one of these three occasions did surveillance take place in response to actionable intelligence – investigators were informed that the leaders of Mara Salvatrucha were set to meet at the residence.  Agent Lucero said the surveillance team did in fact witness five men arrive at Ruben Pineda's; although the attendees are identified generically as "Mario Osorio and at least four other Hispanic males," there is curiously no mention whether the individuals arrived by car or if any attempt was made to identify the registered owner of those vehicles.  Ex. 2, at 104, Bates 480. The other two visits to Ruben Pineda's home appear, like the earlier passing visits in March 2000, not to have been preceded by any intelligence and were intended to accomplish anything more than be able to tell the court that surveillance had been unproductive.  The June 14, 15, and 16 feckless attempts of surveillance at Ruben Pineda's home constituted predictably self-defeating surveillance and, by failing to take notes while conducting the surveillance on June 27, the efforts should not be

---

[14]  It is therefore not surprising that Agent Lucero identified no specific facts to support her generic conclusion about any purported "difficulty" in conducting surveillance.  Had the location genuinely impeded surveillance, it is highly improbable that the FBI would have continued sending agents to the area.

22

viewed as a good faith effort to devote a reasonable amount of resources to the task.[15]

Having listened in on Ruben Pineda's phone calls with many people besides Hernandez, even after a half-hearted attempt at meaningful surveillance, the government made no effort to return to traditional investigative techniques. The court should find that the agent did not demonstrate necessity for a *continued* wiretap.

The defects with the May and June 2000 wiretaps were repeated in the second extension in August of that year. Between the June 30, 2000 order (first extension) and the August 4, 2000 application to extend the wiretap a second time, agents made only two attempts to conduct surveillance on Ruben Pineda or his activities – once on July 7 and the next two weeks later on July 24.[16] Again, neither attempted surveillance was reported to have been prompted by any actionable intelligence, but was described as indistinguishable from a random drive by the area. Agents saw Ruben Pineda meeting with someone whose identity was known to LAPD, Ex. 3, at 169-170, Bates 409-10, but there is no indication law enforcement attempted or desired to follow up on that information. Bensinger Decl., ¶ 2

No attempts to conduct any witness interviews or set up any controlled buys were considered. All other traditional investigative techniques were rejected out of hand as insufficient to conclusively resolve all possible questions about the situation. Ex. 3, at 164-71, Bates 404-11.

More importantly, in these supplemental affidavits, Agent Lucero never made any attempt to rectify the errors and omissions from her earlier May affidavit. On the contrary, she expressly incorporated by reference the false and misleading allegations contained therein. Ex. 2 at 76 (00-119(A), June 30, 2000, Aff., at 9), Bates 452; Ex. 3 at 138-39 (00-119(B), Aug. 4, 2000), Aff., at 9-10), Bates 378-79.

---

[15] Moreover, as was the case with the allegations in Agent Lucero's earlier declaration, no corroborating documents have been disclosed to confirm that these events ever took place.

[16] Again, the government has failed to produce any discovery corroborating the instances of surveillance alleged by Agent Lucero, Bensinger Decl. ¶ 2.

23

8.    <u>The May 2000 Wiretap (00-119) and its Fruits Should Be Suppressed</u>

Title III "bars the use as evidence . . . of the contents and fruits of illegal interceptions." <u>Gelbard v. United States</u>, 408 U.S. 41, 46, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). When private communications are unlawfully intercepted "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court." 18 U.S.C. § 2515. By excluding not only the contents of an intercepted communication, but also providing that "no evidence derived therefrom may be received in evidence," "Congress expressly adopted a 'the fruit of the poisonous tree' doctrine for wiretap evidence." <u>Chandler v. U.S. Army</u>, 125 F.3d 1296, 1304 (9th Cir. 1997), *quoting* 18 U.S.C. § 2515. Thus, the court must suppress not only "the primary evidence, [but also evidence] that is otherwise acquired as an indirect result of the wiretap." <u>Chandler</u>, 125 F.3d at 1304.

Because "the factual showing for the subsequent wiretap[s] . . . relied on information obtained from the first wiretap, all evidence gained from that [subsequent] wiretap must also be suppressed." <u>United States v. Staffeldt</u>, 451 F.3d 578, 585 (9th Cir. 2006). The fruits of the illegal November 2000 wiretap includes not only the extensions in January and February 2001 (00-304(A) and 00-304(B)), but also the subsequent wiretaps in 2003, 2006, and 2008.

**B.**    **<u>The November 2000 Wiretap and Its Two Extensions Were Not Supported by Necessity, Especially In Light of the Material Information the Government Concealed from the Wiretap Judge</u>**

1.    <u>Because the Government Has Been Unable to Produce Any Evidence Corroborating Many of the Allegations in the Affidavit, those Allegations Should Be Deemed False and, When Stricken from the Affidavit, Fail to Demonstrate Genuine Need to Resort to Wiretap</u>

The government informed the issuing judge that a source who was a shot caller

24

from the Coronado clique (CS#6)[17] provided information about the MS structure and placed a consensually recorded telephone call to Rebecca Quezada, the person whose phone law enforcement sought to tap, and that Camarón had contacted Quezada several times between May and October 2000. Ex. 4 at 207, 214, 246 (00-304, Nov. 20, 2000), Bates 707, 714, 716. The government also told the wiretap judge that a pen register and trap and trace device had been placed on Quezada's phone and that those records indicated a high volume of telephone calls. Ex. 4 at 216-223 (00-304, Nov. 20, 2000), Bates 716-23.

These efforts are nowhere documented, corroborated, or even alluded to except in Agent Worth's affidavit. Bensinger Decl., ¶¶ 2. Each of these incidents, if true, would typically have been corroborated by a report prepared by a law enforcement member involved. The applications for a pen register and trap and trace device would be substantiated by an actual document filed in court. The fact that no such reports or court filings have been produced calls into question their veracity and the propriety of the government's reliance on these uncorroborated and untested assertions.

Without these allegations, the affidavit presents an adequate factual justification for seeking a wiretap. Accordingly, the court should suppress the fruits of the wiretap or, at a minimum, grant defendants a hearing where they can establish the falsity and recklessness of the government agent.

2.      The Government's Access to CS#6 Undermines Any Claim of Necessity for Wiretap 00-304

The government had been cultivating CS #6 since August 1, 2000. CS #6 was

_____

[17] The government refused defendants' request to disclose the identity of the informers referred to in the affidavits in order to independently investigate the breadth of the misrepresentations in the affidavit. Without that information, not only have defendants been deprived of testing the allegations in the uncorroborated affidavit, but defendants are forced to refer to the individual by uninformative code number.

25

in a position to place calls to Rebecca Quezada and elicit from her details about current activity by and among Mara Salvatrucha members. Bates 715, 726. The agent proffers no specific facts in support of his speculation that CS #6 is of limited value.

The government did not deny that, regardless of a *possible future* transfer, CS#6 was then *currently* available to assist government agents, *was* assisting government investigators as an undercover source, and was not likely to be transferred in the immediate future.

The affiant's suggestion that CS #6's long-term future availability was uncertain is undermined by the fact that the affiant concealed the government's ability to have CS #6 paroled in the United States in order to continue providing information. The government could have detained CS #6 as a material witness under 18 U.S.C. § 3144. The government could have granted CS #6 a visa to remain in the country while additional evidence was collected.

CS #6 had direct access to Rebecca Quezada, the person whose phone conversations the government sought to eavesdrop. CS #6 had already established his ability to engage Ms. Quezada by placing recorded telephone calls to her. CS #6 was a high placed informer and could have provided the government with much of the information the government claimed was the primary objective of its investigation. Ex. 4, at 207 (00-304, Nov. 20, 2000, Aff., at 12), Bates 707.

The government continued, as it had in May through August 2000, to unreasonably reject the use of other normal investigative techniques. Ex. 4, at 233-34, (00-304, Nov. 20, 2000, Aff., at 39-40), Bates 734-35. The affidavit fails to establish the requisite necessity for a wiretap. Gonzalez, Inc., 412 F.3d at 1112-14.

/ / /

/ / /

/ / /

26

3.  The Government's Concealment of Dopey from the Issuing Judge Constituted an Intentional Material Misrepresentation that Vitiates the Legality of the Wiretap Orders

**a.    The Government Concealed Evidence from the Wiretap Judge**

Two weeks before the May 2000 wiretap expired, the government had a significant investigative breakthrough. Jorge Pineda, a.k.a. "Dopey,"[18] the man who had been the leader or "shot caller" of one of the Los Angeles cliques, signed up with the government to become an MS informer. Coopting Dopey was no minor coup. Not only was Dopey a shotcaller, but he was close and intimately connected with Nelson Comandari, the person who law enforcement was to learn *through Dopey* was the shotcaller of all shotcallers in North America. In fact, Dopey was so high up in the chain of command that, he has testified in a previous trial, the lower level members and associates were required to contact him in advance and obtain his permission before they could carry out any significant criminal activity, including not only drug dealing but any inter-gang or intra-gang violence. In September 2000, Dopey was telling law enforcement the identities of the people who ran the gang (both by legal name and by gang moniker), their home addresses and personal telephone numbers, what they looked like (including what tattoos they had), how many people worked had under them, the cars they drove (by make, model and license plate), how much money they made and where, facts about meetings (including times, locations, and who was supposed to attend), plus many other facts of interest to law enforcement. Bates 9798-99, 11,736-37, 12,498, 12,611-12, 13,183, 14,585. Within a matter of months, starting in January 2001 and continuing for several years, Dopey started placing telephone calls to Comandari and others that

---

[18]  Jorge Pineda received the nickname "Dopey," R.T. JP 2410, because he was "selling dope." R.T. JP 2467. To avoid confusion between informer Jorge Pineda and the defendant Ruben Pineda, the informer is referred to by his moniker, "Dopey."

27

he consented to have the government record so that it could gather and develop evidence against other members of the Mara gang.

Dopey was "opened" as an informer in mid-August 2000.[19] Just over a week later, on August 24, 2000, the government filed its second 10-day report. Bates 3101-03. The government requested that "interception should continue" because "the objectives of the investigation have not yet been met." Bates 3102-03. The government made no mention of the possibility that, although the objectives had not been fully satisfied, a wiretap might no longer be necessary because the government had obtained the services of one of the highest ranking members of the gang. *Cf.* Bates 3101-03.

In October, 2000, Dopey was providing information about inter-gang disputes and advising law enforcement the time and place of meetings between the gangs' leaders to iron out their disputes. Bates 11,735. Although provided with specific details, including the name of the business and the address where the meeting was to take place, the government appears to have bypassed any opportunity to conduct audio or visual surveillance of the meeting or people coming to or leaving the meeting place at or around the time of the meeting.

In November 2000, the government sought and obtained another wiretap, this time on the phone of Rebecca Quezada. Three months after Dopey was officially opened as an MS informer (and would prove to be a regular source of information law enforcement routinely relied on to gather information about the leaders and activities of the gang), *the government did not provide the issuing judge with information that it had access to a high ranking official such as Dopey.*[20]

---

[19] While the discovery reveals that Dopey was first "opened" in August of 2000, the discovery does not clarify how long before then he was first approached by the FBI or started providing information about MS.

[20] While it is theoretically possible that the person who provided these important key pieces of information was not Dopey, the ultimate fact of import is that the government concealed from the issuing judge *both* the fact that it had turned

28

Instead of mentioning Dopey, the government mentioned that it had recently opened a different high-level source, the shotcaller of the Coronado clique – another clique that was targeted by law enforcement's investigation. The government advised the issuing judge, however, that the Coronado clique shotcaller was wanted by the El Salvadoran government and they opined that the Coronado clique shotcaller would eventually be deported and therefore unavailable to assist the investigation for the long term. The government also noted that the Coronado shotcaller was "incarcerated" and was therefore "unable to communicate reliably with Target Subjects in furtherance of investigative goals." Ex. 4, at 226 Bates 726.

By contrast, Dopey had no such international criminal problems. And, unlike the head of Coronado clique, Dopey had regular, personal, and direct access to Comandari, the man who law enforcement had learned was the head of all MS activity throughout North America. But the government advised the issuing judge only about the informer who had limited information and who was going to be deported, not the informer with greater access and information who was going to be around for a long time.

The government knew that Dopey would be able to provide a font of extraordinarily useful information for the government. When various shot callers were meeting to discuss whether to kill members of another clique, Dopey informed his government handler that the meeting would take place, the time and location of the meeting, and who was expected to attend from different cliques. Dopey reported the name of the person who called the meeting, whether Comandari knew about the meeting, the names of the persons who were expected to attend the meeting and the cliques they represented. Bates 10,079.[21]

Dopey into a cooperator *and* the fact that it obtained this information *from anyone*.

[21] For example, Dopey talked to Comandari about the murder of Aileen "Nena" Alvarez, R.T. JP 2432-33, one of the events that forms the basis for some of the charges alleged in the indictment. Indictment, at 17-18, 29, 49. Dopey had

29

Dopey was able to tell his government handler how to distinguish false attributions of responsibility for a shooting when a person had been killed. When, as the gang rules required them to do, people reported a shooting to Dopey, he would in turn relay the information to the government. Bates 11,625-26. He also identified sources and locations where the government could find physical evidence to corroborate the events. Bates 11,626.

Dopey's most significant contribution, however, resulted from the fact that he personally knew, and was "a close friend" of, Nelson Comandari. R.T. JP 2308, 2468.[22]

Comandari "had a lot of authority within the [MS] gang." R.T. JP 2309. He was "running the neighborhood." R.T. JP 2423. By the year 2000, Comandari had become "the leader of MS in the Los Angeles area" "around 2000." R.T. JP 2440. Within the gang, even shot-callers had to respond to a higher shot-caller and, at that time, Nelson Comandari had become the shot-caller of shot-callers in all of Los Angeles. R.T. JP 2305-06.

Dopey knew Comandari from before 2000, possibly 1997 or 1998. R.T. JP 2309. He knew Comandari "before he . . . became the leader of MS." R.T. JP 2310. Comandari was one "of the high-ranking leaders of MS 13" and Dopey "had a close relationship" with him. R.T. JP 2410. Dopey was well-placed in that he was connected to another of the local leaders of MS, another person with control over

spoken with Comandari about "paperwork" regarding Nena Alvarez, R.T. JP 2419, another person who Comandari ordered to be killed and whose killing is alleged in the indictment. Indictment, at 17-18, 29, 49. Dopey also recorded conversations with the MS shot caller who not only called for the killing but personally committed the murder. R.T. JP 2417-21.

In addition, Dopey had discussions about "gang politics and the murder of Mousey and Moreno," two other crimes that are alleged in the indictment, Indictment at 18-20, 30-31, 51, that he recorded on calls being listened to by the FBI. R.T. JP 2417.

[22] Citations to "R.T. JP" refer to the testimony of Jorge Pineda, a.k.a. "Dopey," in Los Angeles Superior Court on August 28, 2008. Bensinger Decl. ¶ 3.

several cliques in Los Angeles and El Salvador. R.T. JP 2308. But no one equaled the power Comandari had. Soon, Comandari had control over MS cliques in other cites, in other states, in many other countries. R.T. JP 2301, 2307. Comandari was in charge "everywhere, everywhere there is MS." R.T. JP 2307.

Early on, Dopey had earned Comandari's trust. Dopey was in ongoing, regular, frequent contact with Comandari. This was no secret. Everyone in the gang knew that Dopey was in regular contact with Comandari. Because of Dopey's close relationship with Comandari and other high level MS officials, Comandari told Dopey "hey, you going to receive the phone calls. You're going to be my right-hand man." R.T. JP 2441.

Referring to Comandari and the other co-leaders of MS in Los Angeles, Dopey has testified that he would "talk to them frequently with regards to gang activity" throughout Los Angeles. R.T. JP 2310. Because of his close relationship with Comandari, "various shot-callers would call [Dopey] and give [him] information about gang activities in the streets." R.T. JP 2410-11. In fact, "there [became a] kind of rule" in the gang that a person would "have to call [Dopey] for sure before going to . . . Comandari." R.T. JP 2316. Comandari would relay his instructions or other information to Dopey who would in turn "call back to those people." R.T. JP 2316.

Just as Comandari was in charge of MS "everywhere," R.T. JP 2307, Dopey spoke to MS shot-callers and gang members not just in Los Angeles, or California, but he spoke to MS shot-callers "all over the world." R.T. JP 2319. Dopey would be kept informed by the shot-callers of their "criminal activities like murders and stuff like that" that "were happening in the streets," R.T. JP 2323, which was typical of the conversations he arranged with shot-callers. R.T. JP 2324. Although Dopey was knowledgeable about all the local MS gang members, his regular discussions of gang business were "most likely only [with] the shot-callers." R.T. JP 2315.

In August 2000 – nearly three months before the FBI sought the November 2000 series of wiretaps – the FBI officially opened Dopey as an informer relating to

31

the MS gang. R.T. JP 2311, 2450. As Dopey acknowledged, however, he was not an unknown entity to the FBI. A year earlier, Dopey had assisted the FBI in their investigation of Columbians who were trafficking in stolen jewelry. R.T. JP 2450.

Dopey ended up proving himself to be an invaluable asset to the FBI's investigation. Taking advantage of his unparalleled access to the highest echelons of command in MS, Dopey embarked on a targeted campaign – monitored, directed, overseen *and recorded* by the FBI – of placing phone calls and eliciting information from the shot-callers as to the crimes that they had committed or were planning to commit. R.T. JP 2312. In the calls he recorded for the FBI, "most of the time" the conversation would be about "MS gang activities." R.T. JP 2413. On those recorded phone calls, "the FBI is with me on those phone to be witness this stuff that I'm talking." R.T. JP 2416.

Dopey recorded "a lot of" calls with Comandari. R.T. JP 2314. There were "so many phone calls." R.T. JP 2464. He estimated "wow, between 450 and 500." R.T. JP 2314. "Can be 600." R.T. JP 2444. There were so many people, Dopey could not recall how many different people he recorded calls with other than to affirm that "there are a lot of different people who would call up and give information." R.T. JP 2444, 2571.

Making the recorded calls was not just Dopey's idea. "The FBI give me the tapes and the recording machine with the little head phone, and when people call me [or] when I call [them] . . . , I recorded the conversations." R.T. JP 2314.

The purpose of the calls was "to keep Comandari informed of what's going on on a close basis to the actual time that the thing occurred." R.T. JP 2448. Gang members and shot-callers knew "they [were] supposed to call [Dopey] and relay this information about crimes that they've committed . . . because they know I'm close with Comandari." R.T. 2441. This was not mere happenstance, however. Dopey set up the lines of communication in this way "because I want to pass the information to the FBI." R.T. JP 2316. He established the protocol that the shot-callers had to call

32

him "to get the information, to be close to the shot-caller from the neighborhood, and then I can pass the information to the FBI." R.T. JP 2315.

Dopey was not just good for recording phone calls however. He was intimately close with Comandari and knew Comandari's social schedule and travel schedule as well, *e.g.* Bates 12,611-12, 13,183, from which agents could have conducted surveillance, learned Comandari's associates, managed to intercept him in transit, or obtained a wealth of other information through a variety of means.

Not only did the government have access to Dopey, but it also had access to Detective Frank Flores, a Los Angeles Police Detective and part of the Los Angeles Metropolitan Task Force on Violent Crime, who represents himself as having grown up in the area of MS strongholds, knowing the people who are involved in or associated with the MS cliques, who was specifically overseeing the investigation of all MS criminal activities during the past two years and claimed to have contact with street level members and shot-callers on a daily basis. Bates 18,280, 18,477, 18,559.

### b.   The Government's Concealment Requires Suppression

The government was required to establish that a wiretap was necessary. At the time it applied for the initial wiretap order at the end of November 2000, the government had already had access to Dopey for nearly three months. The government had learned that Dopey was a high ranking official in the Mara Salvatrucha gang. The government easily could have learned that lower ranking members of Mara Salvatrucha were required to consult with Dopey and obtain his permission before committing any serious crimes that could have inter-gang or intra-gang consequences and that the failure for doing so were severe. The government knew, or at a minimum was reckless in failing to know, that Dopey would (as he soon started doing) place phone calls to other high ranking members of the MS gang and consent to the recording of these phone calls, thereby providing the government with specific information without the need for a highly intrusive wiretap order.

33

By failing to inform the issuing judge that Dopey had become a cooperating informer, the government failed to provide the court with a full and complete statement regarding the details of its investigation.

By concealing that Dopey had become a government informer, the government deprived the issuing court of critical information upon which a "'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" Blackmon, 273 F.3d at 1207-08, *quoting* Ippolito, 774 F.2d at 1486-87.

Title III "bars the use as evidence . . . of the contents and fruits of illegal interceptions." Gelbard, 408 U.S. at 46. When private communications are unlawfully intercepted "no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court." 18 U.S.C. § 2515. By excluding not only the contents of an intercepted communication, but also providing that "no evidence derived therefrom may be received in evidence," "Congress expressly adopted a 'the fruit of the poisonous tree' doctrine for wiretap evidence." Chandler, 125 F.3d at 1304, *quoting* 18 U.S.C. § 2515. Thus, the court must suppress not only "the primary evidence, [but also evidence] that is otherwise acquired as an indirect result of the wiretap." Chandler, 125 F.3d at 1304.

Because "the factual showing for the subsequent wiretap[s] . . . relied on information obtained from the first wiretap, all evidence gained from that [subsequent] wiretap must also be suppressed." Staffeldt, 451 F.3d at 585. The fruits of the illegal November 2000 wiretap includes the extensions in January and February 2001 (00-304(A) and 00-304(B)), but also the subsequent wiretaps in 2003, 2006, and 2008.

34

### c.   Extensions of the November 2000 Wiretap Are Also Invalid

When the government applied for an extension of the 00-304 wiretap on January 2, 2001 – nearly five months after Dopey had been opened as an informer in the investigation of MS – the FBI *still made no reference* to the fact that they had access to this high ranking official within MS, let alone a high ranking member who effectively served as the internal Communications Director within the organization and was in a position to record numerous incriminating telephone calls that the FBI would be able to use as evidence in its prosecution.  Ex. 5, at 264-332 (00-304(A), 1/2/01), Bates 617-94.

The situation did not change when the government returned for a second extension on February 1, 2001.  Not only did the affiant fail to mention any of the facts relating to coopting Dopey as an informer as early as August 2000, but he also made no mention that, on the request of his FBI handlers, in January 2001, Dopey wore a body wire and attended a meeting to discuss drug dealing with other MS criminal associates.  This January 11, 2001 meeting not only involved drug dealing, but the discussion of gang politics, murders, and identity of other MS gang leaders.  Not only was Dopey able to capture the other participants' comments on live recording, but this episode also gave the government a perfect opportunity to conduct surveillance of those who attended.  C.D. 16, p. 1043-45.[23]

Once again, no explanation was proffered to the court why a wiretap might still be necessary even though the FBI had obtained Dopey's cooperation.  Such an explanation was avoidable because the FBI made no reference to the fact that they had obtained the cooperation of such a high level member.

"Applying the Franks analysis in this case, we must delete the falsity from the original affidavit . . . and insert instead the finding of the reviewing court  that there was an informer who was both willing to testify and had great potential for

---

[23] Presumably because the FBI was so pleased with this breakthrough in their investigation, Dopey's investigative efforts were referred to as "Gold Dust." C.D. 16.

35

uncovering the entirety of the conspiracy under investigation." Ippolito, 774 F.2d at 1486-87 (footnote omitted). With that finding, "a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown" and all evidence gathered by that wiretap and thereafter should be suppressed. Id.

**C.** **The Government's Intentional or Reckless Concealment of the Scope and Usefulness of Jorge Pineda's (Dopey's) Ability to Gather Evidence for the FBI Vitiates the 2003 Wiretaps**

Even after the set of wiretaps initiated in November 2000 expired, the government continued to use Dopey as a significant resource to advance their investigation. Barely a month after the meeting where Dopey wore a body wire and elicited discussions about gang politics, leadership, and other crimes, starting in February 2001, Dopey started recording calls with MS gang members and shot callers for the benefit of the FBI. As mentioned above, Dopey had been provided with a recorder that he would use to record telephone calls with other MS gang members. R.T. JP 2332.

He continued to conduct monitored, recorded calls from February 2001 through August 2001. In August 2001, Dopey was picked up on a bench warrant for failing to appear. Ex. 7, at 498 (03-194, 6/12/03, at 76), Bates 6680. Dopey went "back to jail in 2001," R.T. JP 2453, 2463, where, insofar as relevant to the 2003 applications, he remained in custody through 2003. But this did not impede his ability to remain extremely useful to his FBI handlers.

Dopey continued to work with the FBI while he was in custody. The conversations continued even though he was in jail. R.T. JP 2324. Instead of having to use his own recorder in his home, the FBI "set [him] up . . . with the kind of a tape or a three-way while [he was] in jail." R.T. JP 2455. Dopey would "call the FBI to the phone number, and the FBI [would] make the three-way" call to whoever he

36

wanted to speak to; Dopey "would talk to the MS gang member" and "the FBI agent would record the call." R.T. JP 2331-32.

Dopey claimed that he was in a position to "[receive] telephone calls from all the members of MS" "because I put myself in that position for the agreement that I have with the FBI. I have to be close with them to get the information to the criminal activities." R.T. JP 2440. His connection with Comandari preceded his relationship with the FBI, R.T. JP 2440, but he exploited that relationship for the benefit of the FBI. Even while incarcerated, Dopey would probe the shot callers during their recorded conversations "because I want to get more information that I take from the criminal activities . . . because the FBI listen to the conversation." R.T. JP 2435.

Indeed, although it was common practice for gang members to refer to each other only by moniker, Dopey was in a position of such authority that he was able to get other members to tell him their full legal name. His purpose in doing so, he explained, was not merely to wield his authority, but to make use of his authority so he could "get the information to the FBI the right name . . . that's why I get the name, the right name, and that's why I have the name in the conversation." R.T. JP 2427.

The government appears to have acknowledged access to information provided by Dopey, by identifying him as CW-1 in the affidavit in support of the June 2003 wiretap application. The affiant minimized Dopey's usefulness, however, by falsely suggesting that "because of CW-1's incarceration, his access to the Target Subjects is severely limited, as is his ability to report illegal activities immediately to his handling agent." Ex. 7 at 498 (03-194, 6/12/03, at 76), Bates 6680. This misleading statement concealed from the court that Dopey remained intimately involved in the oversight and management of MS despite his incarceration and that he was doing so with the affirmative support and technical assistance of the FBI.[24] The FBI's

---

[24] In fact, Dopey managed to continue his role as intermediary for Comandari not simply through access to prison phones, but because he obtained a phone from the FBI that he was able to use to contact MS members and on which the FBI could

37

statement also concealed from the judge that Dopey was, and remained, "the right-hand man" for Comandari despite his incarceration and that messages to Comandari were required to pass through Dopey.

The affiant also informed the court that Dopey was not adequate because he "does not have access to many other EME and/or MS street gang members and associates who are communicating with COMANDARI because they are incarcerated elsewhere within the California Penal System or are on the streets." Ex. 7 at 498 (03-194, 6/12/03, at 76), Bates 6680. This misrepresentation was misleading or insufficient in two significant respects.

The reference to EME is irrelevant and misleading for several reasons. First, the indictment in this case does not relate to EME so EME investigations should hardly be sufficient to negate the usefulness of an informer who can provide significant information about the investigation at issue – an investigation of MS. Second, the reference to EME is misleading because of the 11 targets on the wiretap, the affiant represents that only 3 had any connection to EME. Moreover, "[t]he government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances." Blackmon, 273 F.3d at 1211.

Perhaps more importantly, the assertion that Dopey did not have access to people communicating with Comandari belied the fact that he was the obligatory go-between for all who wished to speak to Comandari, whether they were in or out of custody. Dopey maintained the position of Comandari's intermediary even while in custody, placing calls to shot callers in Boston, San Francisco, New York, Virginia, El Salvador, and Honduras. Bates 9370-71, 9828, 10,077; C.D. 16.

Moreover, the affiant failed to provide the court with a fair representation of what Dopey was capable of – and had shown himself capable of – doing for the government without a wiretap order. Although the government relayed that they

record conversations with Dopey's consent. R.T. JP 2455.

38

learned about one meeting Comandari and another MS leader called to discuss a hit on another gang member, the government concealed not only that Dopey provided information about other meetings to discuss gang hits, Bates 6632, 11,736-39, but also concealed that Dopey also told the FBI the name of the business where the meeting would take place, the location of that business, the time of the meeting and the identity of the people who were expected to attend that meeting. Bates 10,079. Apart from specific meetings, the government failed to inform the judge that Dopey was able to inform agents of the location, meeting days and regular meeting times of MS gang leaders. Bates 12,495-96.[25]

Not only would a reasonable issuing judge be interested to know that the informer was capable of providing that level of detail, but could also reasonably be expected to be interested in knowing whether the government followed up on that lead by, for example, conducting surveillance at the location to aid in identifying the persons who participating.

The issuing judge was not advised that Dopey identified "drug supply residence[s] where drugs are hidden" by specific street address, identified where drugs and guns could be found hidden in cars parked nearby, and identified the specific gang members who were involved in the managing the space and conducting the transactions. Dopey also knew the volume of drug business conducted out of the various residences. Bates 11,629-31. Just as he was able to inform agents were clandestine drug sales occurred, he was similarly able to provide information about the location where gun sales were conducted. Bates 11,736-39.

---

[25] Dopey identified the name of the restaurant, the location, the phone number, and the name of the proprietor where nearly a dozen MS members regularly met. Dopey identified by name nearly a dozen gang members who regularly met at the restaurant and that such meetings usually occurred on "Tuesdays, Wednesdays and Sundays between the hours of 2000 through 0200," and were attended by all "the principal shot-callers for the Leeward clique." Bates 12,496.

39

An issuing judge could also reasonably have been influenced as to the necessity for a wiretap if informed that Dopey was able to not only identify the shot callers of the various cliques but also provide agents with the home addresses of those individuals. Bates 11,736-37.

When guns had been used in police shootings, murders, or other crimes Dopey was able to advise the agents where the gun was hidden – not merely by generic location, but be street address and the location within the building where the gun would be found. Bates 11,627-28, 11,638. The issuing judge was not informed that Dopey could provide this level of detail let alone whether the officers took advantage of such information in any way. Unaware that the source knew where guns were concealed, the issuing judge was also left in the dark that agents in fact retrieved weapons and ammunition from the locations identified by Dopey that they were then able to book into evidence. Bates 11,638.

The government concealed not only the fact that Dopey was knowledgeable about facts relating to gun dealing, but also that Dopey would know about the date, time, and location of the gun sales and *could and would be available to attend those transactions so that he could be a witness* for the FBI. Bates 11,627-28.

Dopey knew the names and addresses of bars and drinking establishments that Comandari frequented, Bates 12,611-12, 13,183, information that, when combined with Dopey's inside access to Comandari's itinerary and appointments, would have made conducting surveillance of him phenomenally easier.

Dopey was so productive, he was paid "almost $130[,000]" for his services between 2000 and 2004. He continued to collect payments from the FBI through 2006. R.T. JP 2451. The $130,000 figure did not include moneys paid after 2004. Criminal charges against Dopey's wife were dropped as a result of the FBI's intercession. R.T. JP 2452. And, perhaps most importantly to a non-citizen, Dopey was granted permission to "stay in the United States" but the FBI also provided immigration assistance to members of Dopey's family. R.T. JP 2452.

40

The very significant benefits that the FBI provided, or arranged to have provided, to Dopey, reflect the extraordinary value that the FBI believed Dopey was able to provide the government's investigation – the fact that they really did believe he was providing them with "gold dust." C.D. 16. Nonetheless, the government did not so inform the wiretap judge.[26]

As an excuse for not relying on Dopey more heavily, the FBI explained that Dopey was "not authorized by the FBI to engage in any acts of violence." Ex. 7 at 498 (03-194, 6/12/03, at 76), Bates 6680. But the affiant offered no explanation why an informer's ability to engage in acts of violence was in any way relevant to whether the informer was able to relay accurate and reliable information that would render a wiretap unnecessary. Ex. 7 at 498 (03-194, 6/12/03, at 76), Bates 6680.

As with the 2000 wiretaps, the government offered only self-defeating over-ambitious objectives, none of which could be completely satisfied by employing only one traditional investigative technique. Because the government concluded *each* investigative technique was insufficient in isolation, the government erroneously rejected *all* traditional investigative techniques before seeking a wiretap. Invoking generic explanations devoid of any facts specific to this case, the government's rationalizations for failing to employ traditional techniques is rightly condemned as mere "boilerplate" that cannot suffice to establish the necessity required for issuing a wiretap. Blackmon, 273 F.3d at 1210.

The government grossly misled the wiretap judge about Dopey's continued usefulness – and resourcefulness – to make himself necessary to the FBI, regardless of his custodial situation. If the judges were aware of all that Dopey was able to do

---

[26] In contrast to one source the FBI said was "paid approximately $3,900" and another the affiant said was "paid approximately $1,395," Ex. 7, at 499-500 (03-194, June 12, 2003, Aff., at 77-78), Bates 6681-82, rather than acknowledge over $100,000 to Dopey, the affiant generically said only that Dopey "has periodically been paid money by the FBI in return for his cooperation." Ex. 7, at 498 (03-194, June 12, 2003, Aff., at 76), Bates 6680. Absolutely no mention was made of the immigration benefits made available to Dopey and his family.

41

for the FBI, a reasonable judge might have dismissed his custodial status as irrelevant and "could have denied the application because necessity for the wiretap order had not been shown." Ippolito, 774 F.2d at 1486-87; Blackmon, 273 F.3d at 1207-08.

The evidence gathered through wiretaps 03-194 (June 12, 2003), 03-336 (Nov. 5, 2003), and 03-354 (Nov. 21, 2003) should be suppressed along with the additional evidence derived therefrom. 18 U.S.C. § 2515; Gelbard, 408 U.S. at 46; Chandler, 25 F.3d at 1304.

**D.     The Government's Intentional or Reckless Concealment of the Scope and Usefulness of Nelson Comandari, "the CEO of Mara Salvatrucha," Vitiates the 2006 Wiretaps**

In January and February, 2006, FBI Agent Jaime Barajas, the agent who swore out the affidavits in support of the wiretap on Comandari in 2003, personally met with Comandari. The occasion was a group meeting in the offices of the United States Attorney. Comandari was present with his lawyer. Bates 17,519.

Over the next three days, Comandari provided the government with extensive information about the crimes committed by MS, the individuals involved in the gang, the identity of the gang's past and present leaders and shot callers, as well as the locations where MS conducted its business and its manner of operations. This three-day proffer session yielded 26 pages of single-spaced typewritten notes. Bates 17,519-44.

It is unclear whether this was the first such meeting. But it certainly was not the last. On May 8, 2006, Comandari again sat down for "the tenth interview in a series of proffers sessions." Bates 17,545. "Numerous individuals were present and/or participated during the course of the three day span of the interview." Bates 17,545. These sessions were attended by, among others, Frank Flores and AUSA Elizabeth Carpenter, the lead AUSA on this case. The proffer sessions were no less

42

fruitful than the January/February sessions, having produced a 44 page single-spaced typewritten report chock full of details.

The government has refused to disclose to the defense whether the earlier January and February 2006 were the first or the ninth in the series of proffer sessions, or somewhere in between. What is clear, however, is that the government certainly knew who Comandari was, and that he was participating as a cooperating witness "under the terms of a signed proffer agreement," when the government applied for another series of wiretaps in April 26 and May 17, 2006 (06-104 and 06-118(rev)), seeking additional wiretaps in furtherance of its investigation of MS.

The government knew by January 2006 that Comandari himself acknowledged his role as the leader of MS and that he had the ability to meet with the leaders and shot callers and to call them in for meetings. Bates 17,525-28. He identified and described MS members and associates and was even able to identify the type of cars they drove. Bates 17,536, 17,539-44. Comandari knew defendants Ruben Pineda, Juan Fuentes, and had a relationship with defendant Juan Cendejas going back nearly a decade. Bates 17,523, 17,543, 17,645.

Comandari freely explained the scope and nature of the drug dealing operation out of Los Angeles, as well as details about more than a dozen murders committed in furtherance of his vision for MS. Bates 17531-38. He explained MS's "rent collection" process and how several different cliques in Los Angeles conducted their operations. Bates 17,550, 17,557, 17,589. Comandari explained where and when MS shot caller meetings were held and that decisions made at these regular meetings of shot callers needed his own approval before they were deemed final and adopted by the organization. Bates 17,562.

Comandari continued to be involved in the gang and connected even though he was meeting with the government. Just weeks before the government applied for its first wiretap of 2006 (06-104, Apr. 26, 2006), Comandari was placing calls to MS shot callers and recording them for the government. Bates 17,628. Comandari made

43

the calls because "government agents wanted him to do so." Bates 17,624. The government-selected topics included the identity of current shot callers in different cliques, current gang operations, and setting up crimes that could be monitored by the government. Bates 17,624, 17,628-29, 17,636.

Notwithstanding the wealth of information that Comandari was able to provide – and had been providing since January 2006 – when the government applied for a wiretap in April 2006, the government *did not disclose that Comandari had been coopted and was now working for the government.* In the June 2003 wiretap application, Agent Barajas informed the court that "all MS clique 'shot callers' in Los Angeles, California respond to Comandari." Ex. 7 at 442 (03-194, 6/12/03, at 20), Bates 6624. Comandari confirmed that description was accurate. Bates 17,525, 17,562.

Although law enforcement officers have said "Comandari was the 'CEO' of Mara Salvatrucha," the government said it needed a wiretap because it had no other reliable source for determining the structure and manner in which the organization operated and functioned . . . even though that is precisely what Comandari was telling the government about during these multi-day proffer sessions.

When the government returned for another wiretap in July 2006 (06-194), the government *still concealed* from the court that Comandari was cooperating in multi-day proffer sessions conducted pursuant to a written agreement.

The government's excuse for failing to do so could not be that Comandari had suddenly ceased cooperating because, in September 2006, accompanied by his lawyer and a paralegal, Comandari met with AUSA Carpenter, Detective Flores, and others for another three-day session, providing investigators with a plethora of information about many of the crimes that are alleged as the specific racketeering acts in the indictment. Bates 17,589-649. Comandari was not running out of information to provide. The report from this eleventh meeting produced a 61 page typewritten single-spaced report.

44

Yet, when the government applied for another wiretap in November 2006, followed by extensions in December 2006 and January 2007 (06-685, 06-685(A), and 06-685(B)), *the government once again failed to inform the issuing judge that they had "the CEO of Mara Salvatrucha" as a government informer.*

It is beyond peradventure of doubt that, when asked for a wiretap to determine "the precise nature and scope of the Target Offenses . . . the names, telephone numbers, and residences, of associates of the Target Subjects, including their narcotics sources, transporters, financiers, manufacturers, distributors, and customers . . . , the identity of other co-conspirators . . . , the administration and disposition of monies obtained as a result of narcotics trafficking . . . , the locations at which narcotics are stored . . . [and] the leadership structure of the organization," if informed that "the CEO of Mara Salvatrucha" was regularly sitting down for extended three-day interviews generating hundreds of pages of investigative reports, "a 'reasonable [issuing] judge could have denied the application because necessity for the wiretap had not been shown.'" Blackmon, 273 F.3d at 1207-08, *quoting* Ippolito, 774 F.2d at 1486-87.[27]

**E.    The 2008 Wiretaps Relied on Material Concealment of Evidence No Different Than Its Predecessors and the Evidence Obtained Therefrom Must be Suppressed**

In January 2008, the government returned for another series of wiretaps. The government sought a wiretap on January 8, 2008 (08wt001-1), followed by three extensions on February 7, March 7, and April 4, 2008 (08wt001-2, 08wt001-3, 08wt001-4). On March 12 2008, the government obtained another wiretap (08wt012), later extended on May 10, 2008 (08wt012). Once again, the government

---

[27] The suppression of the 2006 wiretaps that concealed the government's access to Comandari as a cooperating witness would also result in suppression of the fruits indirectly gathered as a result of this illegal search and seizure. Gelbard, 408 U.S. at 46; Chandler, 125 F.3d at 1304.

45

claimed to need a wiretap in order to learn about the structure and organization of MS.

Comandari was still working for the government throughout this time. Bates 17,650-63. Yet the government made no mention that he was still available.

The concealment of Comandari's availability to the government was clearly material to whether a wiretap was reasonably necessary. The 2008 wiretaps should be suppressed as well as all evidence directly or indirectly derived therefrom.

## III.

## CONCLUSION

For the foregoing reasons, this motion should be granted and the evidence intercepted and gathered as a result of the illegally obtained wiretaps be suppressed. In the alternative, the defendants request that the Court grant the defendants a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

DATED: July 30, 2010

Respectfully submitted,

BENSINGER, RITT, TAI & THVEDT
A Limited Liability Law Partnership

S/ KERRY R. BENSINGER

KERRY R. BENSINGER
Attorney for Defendant
ALEXANDER SANCHEZ

46

# APPENDIX 139

Case 3:16-cv-00057-MOC    Document 69-5    Filed 02/22/18    Page 588 of 600

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ELIZABETH R. YANG (Cal. State Bar No. 196461)
Chief, Violent and Organized Crime Section
GARTH HIRE (Cal. State Bar No. 187330)
JOANNA M. CURTIS (Cal. State Bar No. 203151)
ROBYN K. BACON (Cal. State Bar No. 251048)
Assistant United States Attorneys
Violent and Organized Crime Section
KEVIN L. ROSENBERG (Ohio State Bar No. 0081448)
Trial Attorney
United States Department of Justice
      1500 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone:  (213) 894-1785/0492/0298/4667
      Facsimile:  (213) 894-3713
      E-mail:     Elizabeth.Yang@usdoj.gov
                  Garth.Hire@usdoj.gov
                  Joanna.Curtis@usdoj.gov
                  Robyn.Bacon@usdoj.gov
                  Kevin.L.Rosenberg.usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 09-466-DSF |
|---|---|
| Plaintiff, | REQUEST FOR DISMISSAL WITHOUT PREJUDICE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 48(a) OF: |
| v. | (1) COUNT ONE AS TO DEFENDANT SANCHEZ ONLY; (2) COUNT NINE AS TO DEFENDANTS FUENTES, SANCHEZ, CENDEJAS, AND PINEDA; AND |
| JOSE ALFARO, et al., | |
| Defendants. | (3) COUNT SIXTEEN AS TO DEFENDANT SANCHEZ ONLY; OPPOSITION TO DEFENDANTS SANCHEZ'S AND FUENTES' MOTIONS TO DISMISS INDICTMENT |

1

Pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the United States Attorney for the Central District of California hereby requests leave of Court to dismiss the following counts of the indictment in this case without prejudice:

- Count One as to defendant Alex Sanchez only;
- Count Nine as to defendants Juan Fuentes, Sanchez, Juan Cendejas, and Ruben Pineda; and
- Count Sixteen as to defendant Sanchez only.

The government further requests that the Court strike Racketeering Act 15 and Overt Acts 108 and 109 from Count One.

This request is based on the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may request.

Dated: December 17, 2012          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


          /s/ Elizabeth R. Yang
ELIZABETH R. YANG
Assistant United States Attorney
Chief, Violent and Organized Crime
Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   ARGUMENT**

In their Motions to Dismiss, defendants Alex Sanchez ("defendant Sanchez") and Juan Fuentes ("defendant Fuentes")[1] (collectively "defendants") raise serious questions regarding the evidence presented to the grand jury and the manner in which it was presented.  Although the government disputes defendants' allegations of misconduct and grand jury abuse, the government agrees that the grand jury presentation with respect to the conspiracy to murder Walter Lacinos, aka "Camaron," was flawed.  In order to correct the errors and omissions in the initial presentation, the government asks the Court to dismiss without prejudice, pursuant to Federal Rule of Criminal Procedure 48(a), the following counts of the indictment:

- Count One (RICO Conspiracy) as to defendant Sanchez only;
- Count Nine (VICAR based on conspiracy to murder Lacinos) as to defendants Juan Fuentes, Sanchez, Juan Cendejas,[2] and Ruben Pineda;[3] and

---

[1]   Defendant Fuentes has filed a joinder to defendant Sanchez's motion, but has not articulated separate or independent grounds for dismissal. (<u>See</u> Def. Fuentes' Joinder as to Motion to Dismiss Indictment (CR 1234)).  Defendant Fuentes has also filed a Motion for a Bill of Particulars with respect to Racketeering Act 15 of Count One and Count Nine. (<u>See</u> CR 1231).  Because the government is requesting dismissal of Count Nine and the striking of Racketeering Act 15 and Overt Acts 108 and 109 from Count One, all of which allege  the conspiracy to murder Lacinos, defendant Fuentes' motion for a bill of particulars is moot.  However, defendant Fuentes remains properly charged in Count One.  <u>See</u> footnote 5 below.

[2]   On December 10, 2012, defendant Cendejas entered a guilty plea to Count One of the indictment pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).  The plea agreement calls for the dismissal

1

- Count Sixteen (narcotics trafficking conspiracy) as to defendant Sanchez only.

The government further requests that the Court strike Racketeering Act 15 and Overt Acts 108 and 109 from Count One, as the conspiracy to murder Lacinos forms the basis of these allegations as well.

The government makes this request with the express intention of re-filing certain of the dismissed charges, including certain charges with respect to defendant Sanchez, as part of a superseding indictment in this case.[4]  Accordingly, the government opposes defendants Sanchez's and Fuentes' motions to dismiss the charges specified above to the extent that they seek dismissal with prejudice, and opposes defendant Fuentes' motion to dismiss to the extent that it seeks to dismiss Count One as against defendant Fuentes.[5]

---

of Count Nine as against defendant Cendejas at the time of sentencing.  As a result, the government has no objection to dismissing Count Nine against him at this time without prejudice, with the dismissal to become final should the Court accept the plea agreement.

[3]   Defendant Pineda is a fugitive.  He remains charged in Counts One and Sixteen.  See footnote 5 below.

[4]   A determination of which of the dismissed charges will be pursued will be made only after a thorough re-review of the evidence.

[5]   Although the government does not dispute that there were errors in the presentation of evidence regarding Count Nine of the indictment, defendant Fuentes fails to identify any defects in the grand jury presentation with respect to the allegations in Count One as against him or any prejudice he has suffered as a result of anything which took place before the grand jury in this case that would affect the validity of the charge against him in Count One.

2

A district court should grant a motion to dismiss without prejudice if the court finds that the government is acting in good faith.  See United States v. Hayden, 860 F.2d 1483, 1487 (9th Cir. 1988) ("While the judiciary has been authorized to supervise prosecutorial decisions to dismiss, Rule 48(a) was not enacted for the purpose of usurping the traditional role of the prosecutor to determine whether to terminate a pending prosecution.").  Examples of bad faith dismissals include cycles of dismissal and reindictment for the purpose of harassment.  See id.; see also United States v. Wallace, 848 F.2d 1464, 1468-69 (9th Cir. 1988) (noting bad faith reasons for dismissal, including moving for dismissal moments before trial because the prosecutor did not like the jury or dismissing charges with the intention that defense witnesses would become unavailable).

Here, the government's motion to dismiss demonstrates the good faith contemplated by Rule 48(a).  The government believes that there is sufficient evidence to support certain of the dismissed charges, including certain of the charges against defendant Sanchez, but recognizes and takes very seriously the errors in the initial

---

See Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988); United States v. Chanen, 549 F.2d 1306, 1313 (9th Cir. 1977).

Defendant Pineda has not filed a motion to dismiss.  The flaws in the presentation with respect to Count Nine, however, lead the government to seek dismissal of that count, without prejudice, as to him as well.  As with defendant Fuentes, however, the flaws with respect to Count Nine do not justify dismissal of Counts One and Sixteen as to defendant Pineda.

3

presentation to the grand jury and seeks the opportunity to correct the mistakes made in the previous grand jury presentation by re-presenting this case to a new grand jury, focusing on the facts likely to be in dispute at trial.  Defendants have been provided with tens of thousands of pages of discovery in this case and are on ample notice of the government's intentions.  In addition, the government will provide defense counsel with additional discovery relating to any additional grand jury proceedings as soon as it becomes available.  Under these circumstances, the government has demonstrated that it is acting in good faith and its motion for dismissal without prejudice should therefore be granted.

Where a timely filed indictment is dismissed without prejudice "for any reason after the period prescribed by the applicable statute of limitations has expired," the government has six months to refile a new indictment.  18 U.S.C. § 3288; see also United States v. Peloquin, 810 F.2d 911, 912 (9th Cir. 1987) (the § 3288 "Savings Clause" applies to situations in which the original timely filed indictment was dismissed due to flaws in the grand jury proceedings) (citing United States v. Charnay, 537 F.2d 341, 355 (9th Cir. 1987)).

//

//

//

4

## II.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court dismiss Counts One, Nine, and Sixteen of the indictment, as against the defendants set forth above, without prejudice; strike Racketeering Act 15 and Overt Acts 108 and 109 from Count One; deny defendants Sanchez's and Fuentes' motions to dismiss with prejudice; and deny defendant Fuentes' motion to dismiss Count One as against him.

Dated: December 17, 2012          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____*/s/ Elizabeth R. Yang*_____
ELIZABETH R. YANG
Assistant United States Attorney
Chief, Violent and Organized Crime
Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

5

# APPENDIX 140

AMY E. JACKS (SBN 155681)
amyejacks@sbcglobal.net
315 E. 8th St. #801
Los Angeles, CA 90014
Telephone (213) 489-9025
Facsimile (213) 489-9027

Attorney for Defendant
ALEX SANCHEZ

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>  v.<br><br>JOSE ALFARO et. al.,<br><br>   Defendants. | **CR. No. 09-00466-DSF-22**<br><br>DEFENDANT ALEX SANCHEZ'S RESPONSE TO GOVERNMENT'S REQUEST FOR DISMISSAL WITHOUT PREJUDICE PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 48(a) (CR 1253). |

Defendant, Alex Sanchez, by and through his attorney, Amy E .Jacks, submits the following response to the Government's Request for Dismissal Without Prejudice Pursuant to Federal Rule of Criminal Procedure 48(a) (CR 1253).

Dated: December 19, 2012    Respectfully submitted,

            /s/_____
            AMY E. JACKS
            Attorney for Defendant
            ALEX SANCHEZ

## MEMORANDUM OF POINTS AND AUTHORITIES

In his Motion to Dismiss the Indictment [Filed Under Seal], Mr. Sanchez has made a compelling argument for dismissal of the indictment with prejudice due to the government's violation of his constitutional right to due process of law. The government has not filed an opposition to the Motion to Dismiss and has avoided addressing the factual arguments therein: that the government presented false evidence to the grand jury issuing the indictment; that a government prosecutor lied to the grand jury in subsequent proceedings; that the government failed, for more than three (3) years, to take any action to formally acknowledge or attempt to correct an indictment based on false evidence; and that government prosecutors withheld from Mr. Sanchez favorable and exculpatory evidence.

In response to Sanchez's Motion to Dismiss, the government has requested that this Court dismiss the case without prejudice pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure ("Rule 48(a)"). Mr. Sanchez acknowledges that Rule 48(a) is not intended to usurp the traditional role of the prosecutor to terminate a pending prosecution. See *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975), cert. denied sub nom, *Woodruff v. United States*, 425 U.S. 971 (1976). He recognizes that a district court's denial of a prosecutor's Request to Dismiss pursuant to Rule 48(a) may be based only on an express finding that the government is operating in bad faith by seeking the dismissal. See *United States v. Hayden*, 860 F.2d 1483, 1487 (9th Cir. 1988).

Insofar as newly assigned government prosecutors have finally performed the analysis and evaluation that should have occurred years ago, Mr. Sanchez does not contend that the government's Request to Dismiss, filed December 17, 2012, is in bad faith.

Mr. Sanchez does not waive his right to revisit this issue, should he subsequently become aware of evidence suggesting that the Request for Dismissal is motivated by anything but a desire to fairly seek justice. *United States v.*

- 1 -

*Hayden*, *supra*, 860 F.2d at 1488-1489.  To the extent the government's request asserts that its unconstitutional behavior during the course of the last three (3) plus years is irrelevant to any future prosecution or attempted prosecution of Mr. Sanchez, or that it is automatically entitled to re-indict him, Mr. Sanchez disagrees with and objects to those statements.  He reserves the right to litigate those issues upon the filing of any subsequent indictment.

Dated this 19th day of December, 2012.

Respectfully submitted,

/s/ Amy E. Jacks
Amy E. Jacks
Attorney for Defendant
Alex Sanchez

- 2 -

# CERTIFICATE OF SERVICE

I, Amy E. Jacks hereby declare:

That I am employed in the County of Los Angeles, State of California; that my business address is 315 E. 8th St. #801, Los Angeles, CA 90014; that I am over the age of eighteen and not a party to the within entitled action; that I am a member of the bar of this Court.

On December 19, 2012, I served a copy of:


Service was:

[ ]     Placed in a sealed envelope and mailed via United States Mail, addressed as follows:
[ ]     By hand delivery addressed as follows:
[ ]     By facsimile as follows:
[ ]     By messenger as follows:
[ x]    By email as follows:

AUSA Garth Hire                     DOJ Trial Attorney Kevin Rosenberg
garth.hire@usdoj.gov               kevin.l.rosenberg@usdoj.gov
U.S. Attorney's Office
312 N. Spring St.
Los Angeles, CA 90012

AUSA Joanna Curtis
Joanna.Curtis@usdoj.gov
U.S. Attorney's Office
312 N. Spring St.
Los Angeles, CA 90012

AUSA Robyn Bacon
robyn.bacon@usdoj.gov
U.S. Attorney's Office
312 N. Spring St.
Los Angeles, CA 90012

and all defense counsel


This Certificate is executed on December 19, 2012 at Los Angeles, California.  I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


/s/_____
AMY E. JACKS
Attorney at Law

i