# APPENDIX 141

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 1 of 194

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ELIZABETH R. YANG (Cal. State Bar No. 196461)
Chief, Violent and Organized Crime Section
GARTH HIRE (Cal. State Bar No. 187330)
JOANNA M. CURTIS (Cal. State Bar No. 203151)
ROBYN K. BACON (Cal. State Bar No. 251048)
Assistant United States Attorneys
Violent and Organized Crime Section
KEVIN L. ROSENBERG (Ohio State Bar No. 0081448)
Trial Attorney
United States Department of Justice
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-1785/0492/0298/4667
     Facsimile:  (213) 894-3713
     E-mail:    Elizabeth.Yang@usdoj.gov
                 Garth.Hire@usdoj.gov
                 Joanna.Curtis@usdoj.gov
                 Robyn.Bacon@usdoj.gov
                 Kevin.L.Rosenberg.usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-466-DSF |
| Plaintiff, | ORDER |
| v. | |
| JOSE ALFARO, et al., | |
| Defendants. | |

Upon the request of the United States of America pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the Court HEREBY FINDS that the government's request to dismiss is made in good faith and HEREBY DISMISSES WITHOUT PREJUDICE the following counts of the indictment in this case:

- Count One as to defendant Alex Sanchez only;
- Count Nine as to defendants Juan Fuentes, Sanchez, Juan Cendejas, and Ruben Pineda; and
- Count Sixteen as to defendant Sanchez only.

The Court FURTHER ORDERS that the following allegations be stricken from the indictment in this case:

- Racketeering Act 15 in Count One; and
- Overt Acts 108 and 109 in Count One.

IT IS SO ORDERED.

Dated:  1/17/13

_____
THE HONORABLE DALE S. FISCHER
UNITED STATES DISTRICT COURT JUDGE

# APPENDIX 142

scanned

# MISSION AREA M.S. MURDERS

---

January 23, 2005, ███████████████████████
Victim (deceadent): ██████████ (DSM-"Nautic")
.380 casings recovered
Males exited burgandy Ford F-150, declared "Mara Salvatrucha" then shot.
Suspect Cesar Ruiz (MS gang member) was shot by return fire from the victim's associate (unk which one) but claimed he was being robbed when he was shot. Ruiz was never prosecuted for the murder or any other crime.

Suspect: Cesar Ruiz (MS Tiny Winos) 10/21/82, CII #A25996365

---

April 19, 2005, ████████████████████████
Victim-1 (decedent): █████████ (SOH-"███")
Victim-2 (att murder): ██
Victim-3 (att murder): ████████
.45 caliber casings recovered
Lone male suspect walked past victims and then turned and started shooting.

Suspect: (shooter) Heverth Castellon (MS) 1███████, CII #A25119371
████████████████████
Suspect: (driver) Jose Saavedra (MS) ██████, CII #A25287265
████████████████████
Source: (associate) Sergio Pizano██████, CII #A24893509

V-2 ████████ stated that the suspect was 5'7", 160, dark skinned, NY baseball hat, blk and grey jacket, dark pants. Suspect veh was an old Honda Civic or Toyota Camry w/ tinted windows. UNCOOPERATIVE

V-3 ████████████ said that the suspect veh was a red Toyota Camry 90's, occupied by the driver and left rear passenger. Said that V-1 said that the guy had hit him up in the past and was from MS. Said the shooter was 5'6"-5'7", 160, dark skinned, 16-17 years old, dark blue NY baseball hat, dark blue shirt, black dickies, head appeared shaved, fake diamond earring in left ear.

Witness ████████ heard shots, saw the suspect running W/B Tupper St, M/H, 5'8", thin, 15-19 years, blk jacket. Suspect veh was a greenish Honda Civic. Driver was a M/H shaved head. Believes there was a third person in vehicle.

Witness ██████████ saw a green Honda Civic with tinted windows drive by with 3 M/Hisp occupants. The suspects flipped the victims off and the victims returned the flip and V-1, ██████████ threw the SOH sign. The rear passenger had shoulder length hair, 19-20 years

scanned

old. Later saw an old faded red car with 4 doors and tinted windows drive by. Driver was a male Hisp, late 20's, dark skinned, fat face with goutee.

Witness ██████████ heard shots, saw a M/H, 5'7"-5'8", 130 pounds, wearing a black baseball jersey, NO HAT, running N/B Moonbeam from Liggett St, while holding waistband area. (identified as Source leaving area)

Witness ████████ said that he was parked on Terra Bella and heard gunshots and saw a male/Hisp, 15-18 years, wearing a black baseball hat, and black windbreaker walked across Terra Bella and towards Tupper. POSITIVE ID on suspect Heverth Castellon

Witness ████████ said that he heard shots and saw a male Hisp, 5'06"-5'07", 130, 16-17 years old, wearing a black hat with white lettering, a dark jacket, with both hands in the jacket front pockets.

Witness ████████ supposedly told step-brother ████████ that he knew that ████████ was the one who did the murder. When interviewed by detectives, ████ denied knowing the information, but admitted seeing ████████ driving his red Honda prior to the murder. ████ was living in the same condominium complex as ████████ at the time of the shooting.

Witness ████████████ purchased ████████ red Honda Accord through ████ ████████████. During the sales transaction a male (████) gave witness ████ the car keys and told her that the police were looking for him through the car and she should change the license plates to avoid trouble. On 8/14/06, Parshall met with ████ and she positively identified ████ in a photo six pack but said that he only recommended changing the plates to avoid problems, and said nothing about the police looking for him.

Source ████████ (MS gang member) stated that he was riding in a vehicle with associates ████████████ and Heverth Castellon. They were driving in ████ vehicle, which was a 1990 Honda Accord, red. ████ was front passenger and Castellon was in the back seat. They drove past "Husky" (victim Rivera) and "Husky" flipped them off. ████ said that they parked at ████ s house and Castellon pulled a gun from under the back seat, later told him it was going to go down and to leave the area. ████ said that after hearing the shots, he ran up Moonbeam along side the school and then through the parking lot. He described Castellon as wearing a black windbreaker and a blue "LA" baseball hat. Later, Castellon admitted to ████ that he shot and killed "Husky" with a 45 caliber handgun. ████ identified ████████ ██ as the residence of Saavedra and took detectives to ████████████ as a second possible location for Saavedra and where his red Honda Accord lic #2UMM152 was parked.

Detectives found that Heverth Castellon was also suspected in the murder of ████████ in North Hollywood Division DR# 0515-14735. Detective Townsend #32137, handling the case. Their surveillance confirmed Castellon's address was ████████████. Search warrants were served at both ████████ addresses and the residence of Castellon. Only Castellon was taken into custody. He denied the murder.

scanned

SIX PACKS:

█████████

████████ is still outstanding.

___

May 1, 2005, ██████████ DR# 0509-15617
Victim-1: ████████
Victim-2: ████████

Suspect/s: MS  Heverth Castellon?

___

May 13, 2005, ██████████, DR# 0519-04877
Victim: ██████ (" ██████ " from SOH)
.380 casings recovered.
Lone suspect walked up behind the victim and started shooting.

Witness ██████████ heard the shots and saw a man run to a car.

Witness ████████ heard shots and saw a man run to a long light blue colored car.  Described suspect as 5'9", stalky build, shaved head, 26 years old, "S" tt on right arm above elbow.

Witness ██████████ was walking with the victim when the shooter walked up behind them and started shooting.  She described the suspect as a male Hisp, 5'8", 160, 30 years old, #1 or #2 shaved head, goutee, tt on right arm, tt chest and tt left arm between shoulder and elbow.

██████████ " from SOH)
Was with the victim prior to the shooting.

Distinct composite of shooter (30's M/H, shaved head, goutee) completed and strongly resembles ██████████.  ██████ is associate (arrested with Heverth "Sailor" Castellon prior to the murder).  ██████ has distinct "S" tattoo described by witness ████████ was out of custody when the murder occurred.  ██████ was "the" shot-caller for Los Angeles MS. Now serving 7 years for Federal narco conviction at Lompoc FCI.

# APPENDIX 143





# DEPARTMENT OF THE TREASURY
# BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
# OFFICE OF FIELD OPERATIONS

# Recommendation for Prosecution

**Case Number:** _763015-04-0051    (Supplemental)_

**Judicial District:**

Honorable Gretchen C.F. Shappert
United States Attorney
Western Disctrict of North Carolina
227 West Trade Street, Suite 1700
Carillon Building
Charlotte, North Carolina 28202

**Case Agent:** _Special Agent Andrew J. Cheramie, II_

Special Agent David A. Lierz

(████████
Telephone

**Approved by:** _____ 3/18/05
Signature                                        Date

Zebedee T. Graham
Type Name

Special Agent in Charge
Title

## FOR OFFICIAL USE ONLY



**U.S. Departme●f Justice**

s̶e̶a̶n̶n̶e̶d̶    000001
Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Charlotte Field Division*

Charlotte, NC 28226

www.atf.gov

## Case Number: 763015-04-0051 (Supplemental)

This recommendation for prosecution relates to alleged violations of the Federal narcotics and firearms laws by Iran Salvador GUERRERO, a known member of the Mara Salvatrucha 13 (MS-13) street gang who, on April 8, 2004 possessed and sold approximately one pound of marijuana to an undercover Charlotte-Mecklenburg Police (CMPD) officer; and who, on April 16, 2004 possessed and sold approximately fourteen (14) grams of powder cocaine to the same CMPD undercover officer; and who, on June 15, 2004 possessed and sold approximately fifteen and three-tenths (15.3) grams of powder cocaine and a firearm, to-wit: a Smith & Wesson, Model 68, .38 Special revolver bearing serial number 30K5626, to the same CMPD undercover officer; and who, on July 13, 2004 possessed and sold approximately twenty-four and one-half (24.5) grams of powder cocaine and a firearm, to-wit: a Smith & Wesson, Model 52-2, .38 Special pistol bearing serial number A429429, to the same CMPD undercover officer and an undercover ATF special agent; all of which occurred in the City of Charlotte, North Carolina, Western Judicial District of North Carolina.

### DEFENDANT AND ARREST STATUS

GUERRERO, Iran Salvador - Not Arrested - To Be Indicted

### SYNOPSIS

On 04/08/2004 at approximately 1300 hours, GUERRERO met with undercover CMPD Officer Jesus Rendon and a Confidential Reliable Informant (CRI) in the parking lot of a shopping center in the 800 block of E. Arrowood in Charlotte, North Carolina. On that date GUERRERO sold to the undercover officer approximately one pound of marijuana for $1,000.00.

On 04/16/2004 at approximately 1425 hours, undercover CMPD Officer Rendon and the same CRI met with GUERRERO for the second time that day in the parking of a nightclub at █ ██████████ in Charlotte. During this meeting GUERRERO sold to Officer Rendon approximately 14 grams of powder cocaine for $500.00.

On 06/15/2004 at approximately 1742 hours, the same CRI and CMPD Officer Rendon met with GUERRERO in the parking lot of Hollywood Video, █████████████████████ Charlotte. During this meeting, GUERRERO sold to the officer approximately 15.3 grams of powder cocaine for $500.00 and a Smith & Wesson, Model 68, .38 Special revolver bearing serial number 30K5626 for $550.00.

On 07/13/2004 at approximately 1235 hours, CMPD Officer Rendon and ATF Special Agent Ernesto Diaz met with GUERRERO in the parking lot of Hollywood Video, ████████████████████ in Charlotte. During this meeting, GUERRERO sold to the officer and agent approximately 24.5 grams of powder cocaine for $900.00, and a Smith & Wesson, Model 52-2, .38 Special pistol bearing serial number A429429 for $500.00.

## STATUTES VIOLATED

Iran Salvador GUERRERO:

> Title 18, U.S.C., Section 841(a)(1) - Possession With Intent to Distribute a Controlled Substance (4 counts)

> Title 18, U.S.C., Section 924(c)(1)(A) - Possession of a Firearm During and In Relation to a Drug Trafficking Crime (2 Counts)

## DOCUMENTS SUBMITTED IN SUPPORT OF PROSECUTION

### Criminal History Reports

EXHIBIT 1: Criminal History printout of Iran Salvador GUERRERO.

scanned

## Investigative Reports

EXHIBIT 2: ATF Report of Investigation (ROI) #010, dated 04/09/2004: Report of investigation regarding the undercover purchase of marijuana from Iran Salvador GUERRERO on 04/08/2004.

ATTACHMENTS:
CMPD Vice and Narcotics Bureau Case Report, Complaint Number 04-0408-8133-02, dated 04/08/2004, statement of Officer Jesus Rendon regarding the undercover purchase of marijuana from Iran Salvador GUERRERO
CMPD Property Report, Complaint Number 20040408-1333-02

PHYSICAL EVIDENCE (will be produced as needed for court):

-Approximately one pound of suspected marijuana.

-Audio recording of undercover transaction. (Transcription of audio recording will be forwarded when available.)

EXHIBIT 3: CMPD Vice and Narcotics Bureau Case Report, Complaint Number 04-0416-1443-03, dated 04/16/2004, statement of Officer Jesus Rendon regarding the undercover purchase of powder cocaine from Iran Salvador GUERRERO

ATTACHMENT:
CMPD Property Report, Complaint Number 20040416-1443-01

PHYSICAL EVIDENCE (will be produced as needed for court):

-Approximately fourteen (14) grams of suspected powder cocaine.

-Audio recording and audio/video recording of undercover transaction. (Transcription of audio recording will be forwarded when available.)

scanned

EXHIBIT 4: North Carolina State Bureau of Investigation (SBI) Report, Case Number 2004-01090 (673), dated 04/16/2004: SBI Special Funds Use Report and Surveillance Log of undercover purchase of powder cocaine from Iran Salvador GUERRERO on 04/16/2004.

EXHIBIT 5: ATF ROI #018, dated 06/17/2004: Report of investigation regarding the undercover purchase of powder cocaine and a firearm from Iran Salvador GUERRERO on 06/15/2004.

> ATTACHMENT:
> CMPD Property Report, Complaint Number
>     20040615-1749-02
>
> PHYSICAL EVIDENCE (will be produced as needed for court):
>
> -Smith & Wesson, Model 68, .38 Special revolver bearing serial number 30K5626
>
> -Approximately fifteen and three-tenths (15.3) grams of suspected powder cocaine.

EXHIBIT 6: ATF ROI #021, dated 07/14/2005: Report of investigation regarding the undercover purchase of powder cocaine and a firearm from Iran Salvador GUERRERO on 07/13/2004.

> ATTACHMENT:
> CMPD Property Report, Complaint Number
>     20040713-1242-00
>
> PHYSICAL EVIDENCE (will be produced as needed for court):
>
> -Smith & Wesson, Model 52-2, .38 Special pistol bearing serial number A429429
>
> -Approximately twenty-four and one-half (24.5) grams of suspected powder cocaine.
>
> -Audio recording of undercover transaction. (Transcription of audio recording will be forwarded when available.)

scanned    000005

EXHIBIT 7: ATF ROI #036, dated 03/17/2005: Interim Interstate Nexus determination of the two firearms purchased from Iran Salvador GUERRERO.

EXHIBIT 8: CMPD Laboratory Reports, analyses of narcotics evidence from each of the four undercover transactions, will be provided when available.

## Case Agents

David A. Lierz

Andrew J. Cheramie

scanned    000006

# EXHIBIT 1

scanned   000007

```
    10:47        TECS II EXTERNAL MESSAGE DISPLAY           04152004  T2MD0611
                                                                      T2PD0634
  QUEUE TYPE:   PERSONAL           QUEUE NAME:  QUJQ
                                   MSG STATUS:   NACK
  ******************** TEXT OF MESSAGE **************** PAGE 01 ***************
  FROM NCIC    ON 04/15/04 AT 10:47:15
  NLO1CQUQUJQ06500065
  NCATFCE25
  NO IDENTIFIABLE RECORD IN THE NCIC INTERSTATE IDENTIFICATION INDEX
  (III) FOR PUR/C.NAM/GUERRERO,IRAN SALVADOR.SEX/M.RAC/W.DOB/▮▮▮▮▮▮
  END
```

```
  MESSAGE IS DISPLAYED. DEPRESS PF5(MSG INDEX) PF9(PREV SCRN) PF14(ACKD MSG)
                              PF16(NEXT MSG). PF19(MSG LOG)  PF18=(REROUTE)
  END OF THIS MESSAGE
  (PF1=HELP)(PF3=MAIN MENU)(PF4=PREV MENU)(PF7=PREV PAGE)(PF8=NEXT PAGE)
  4-©            1    Sess-1    10.123.196.81              L8310319         1/1
```

scanned    000008

**EXHIBIT 2**

**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**REPORT OF INVESTIGATION**

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Charlotte Field Division | Charlotte Field Division<br>FY-04<br>Report 010 |

**TITLE OF INVESTIGATION:**
Operation Los Treces

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>10 |
|---|---|

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Andrew J. Cheramie | SUBMITTED BY *(Title and Office)*<br>Special Agent, Charlotte I Field Office | SUBMITTED BY *(Date)*<br>04/09/2004 |
|---|---|---|
| REVIEWED BY *(Name)*<br>John C. DePollo | REVIEWED BY *(Title and Office)*<br>Group Supervisor, Charlotte I Field Office | REVIEWED BY *(Date)*<br>4/9/04 |
| APPROVED BY *(Name)*<br>William E. Spruce | APPROVED BY *(Title and Office)*<br>Acting Special Agent in Charge, Charlotte Field Division | APPROVED BY *(Date)*<br>4/9/04 |

**DESCRIPTION OF ACTIVITY:**

Undercover purchase of marijuana.

**SYNOPSIS:**

On 04/08/04, undercover Charlotte-Mecklenburg Police (CMPD) Officer J.M. Rendon and ▮▮▮▮▮ purchased approximately one pound of marijuana from an MS-13 gang member known only as "Zacatecas".

**NARRATIVE:**

On 04/08/04 at approximately 11:55 hours, ▮▮▮9 placed a tape-recorded telephone call to a subject known only to him/her as "Zacatecas". During this conversation, which was witnessed by Special Agent (S/A) David Lierz and CMPD Officer J.M. Rendon, "Zacatecas" agreed to meet ▮▮▮ and sell to him/her one pound of marijuana for $1,000.00. The meeting was set for 13:00 hours. S/A Lierz acquired the necessary investigative funds and photocopied the money to be used in this transaction.

At approximately 12:50 hours, ▮▮▮▮ and Officer Rendon, who was acting in an undercover capacity, arrived at the pre-arranged meet location, the parking lot of a shopping center in the ▮▮▮▮▮▮▮▮▮▮▮ in Charlotte.

At approximately 13:01 hours, a green Kia Rio driven by an unknown Hispanic female arrived and pulled up to CI-149's vehicle. The subject known to ▮▮▮9 as "Zacatecas" was in the passenger seat and a small child was in the rear seat. S/A Andrew Cheramie, from a position of surveillance obtained the license information (North Carolina, ▮▮▮▮▮▮). "Zacatecas" exited his vehicle and met with the CI and Officer Rendon. They proceeded to the trunk of

ATF EF 3120.2 (5-98)

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Charlotte Field Division | Charlotte Field Division<br>FY-04<br>Report 010 |

| TITLE OF INVESTIGATION: |
|---|
| Operation Los Treces |

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>10 |
|---|---|

the Kia, which "Zacatecas" opened. The Officer Rendon and the CI saw four packages in the trunk, which "Zacatecas" said each held a pound of marijuana.

Officer Rendon produced the ATF investigative funds and counted it out before giving it to "Zacatecas". The suspect then gave the officer and the CI one of the packages of marijuana. Zacatecas then got back into his vehicle and drove away with the female and the child.

The registration on the Kia Rio showed it to be owned by Ivis Aida Suarez, ███████████████████████████████, Charlotte. S/A Cheramie obtained Suarez's driver's license photograph and showed it to Officer Rendon. Rendon stated that the female subject driving the vehicle was not the same subject depicted in the photograph.

At approximately 13:03 hours, Officer Rendon and ███████ drove to a pre-arranged debriefing location and turned the evidence over to CMPD Detective Scott Shipman. Detective Shipman took the evidence to the CMPD Law Enforcement Center Property Control and logged it into evidence under Complaint Number 2004-0408-1333-02, Control Number 7403. The approximate weight of the suspected marijuana was 1.02 lbs.

Officer Rendon was wearing a concealed monitoring device on his person that transmitted the audio portion of the transaction. S/A Andrew Cheramie recorded the audio transmission on a device operated from his vehicle. S/A Cheramie placed the digital mini disc recording into ATF custody.

Officer Rendon stated that this same suspect, known to ███████ as "Zacatecas", has previously sold narcotics to he and another undercover vice officer. During that transaction the suspect used the name "Mario". Officer Rendon described the suspect as approximately 5'6" tall, medium build, short dark hair, and clean-shaven.

**ATTACHMENTS:**

Photocopy of investigative funds.
CMPD Vice and Narcotics Bureau Case Report, dated 04/09/2004, Complaint Number 2004-0408- 1333-02, Statement of Officer J.M. Rendon
CMPD Property Report Number 2004-0408-1333-02.

ATF F 3400.16 x 2

ATF EF 3120.2 (5-98)



| Reporting Officer J. M. Rendon | | | Code Number 2882 | Complaint Number 00-4040-8133-02 | |
|---|---|---|---|---|---|
| Offense(s) Pwisd Marijuana | | | | Property Control Number(s) 7403 | |
| Location 801 East Arrowood Road | | Date 4/8/2004 | Time 1333 | Voucher Number | |

| FUNDS EXPENDED | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amount of Funds Expended for Purchases | City | $0.00 | State | $0.00 | Federal | $1000.00 |
| Amount of Funds Expended for Expenses | City | $0.00 | State | $0.00 | Federal | $0.00 |
| Amount of Funds Expended for Informant | City | $0.00 | State | $0.00 | Federal | $0.00 |

| VICTIM INFORMATION | | | | |
|---|---|---|---|---|
| Victim #1 | | Race | Sex | DOB / Age |
| Victim #2 | | Race | Sex | DOB / Age |

| SUSPECT INFORMATION | | | | | |
|---|---|---|---|---|---|
| Suspect #1 Zacatecas | Arrest Number | Race H | Sex M | DOB / Age 25 |
| Suspect #2 | Arrest Number | Race | Sex | DOB / Age |
| Suspect #3 | Arrest Number | Race | Sex | DOB / Age |
| Suspect #4 | Arrest Number | Race | Sex | DOB / Age |
| Suspect #5 | Arrest Number | Race | Sex | DOB / Age |

| Vehicle #1 Year 2001 | Make KIA | Model RIO | Color GREEN | License/State SSL6683, NC | Other |
|---|---|---|---|---|---|
| Vehicle #2 Year | Make | Model | Color | License/State , NC | Other |

S.B.I. Case Number (if applicable)

**Narrative:**

On 04/08/2004 at approximately 1030 hours, a reliable confidential informant called Zacatecas a suspected Mara Salvatrucha Gang member and arranged to buy a pound of Marijuana from him for $1,000.00. They arranged to conduct the narcotic transaction at 801 East Arrowood Road (Mc Donald's parking lot) at 1300 hours.

On 04/08/2004 at approximately 1204 hours I witnessed a reliable confidential informant call Zacatecas at ▓▓▓▓▓▓ (Zacatecas is a Hispanic male he is about 5"6', 140 pounds and short dark hair). Throughout their Spanish conversation I heard Zacatecas say, I have the stuff (marijuana)

---

Supervisor's Signature

Reporting Officer's Signature
00-4040-8133-02


coming. I will see you at the Mc Donald's on South Boulevard and Arrowood Road. This conversation was recorded in the interview room at the ATF building (Charlotte Division).

On 04/08/2004 at approximately 1250 hours I witnessed the CI call Zacatecas a second time in this conversation I heard the CI tell Zacatecas that we were in a gray Nissan at ███████████ (Mc Donald's) in the parking lot. Zacatecas responded that he was in the area and he would meet us in a couple minutes. Minutes later I observed a green, 2001 Kia drive beside us. The Kia was displaying NC ██████. The vehicle was occupied three times, a Hispanic female was driving. Zacatecas was in the front passenger seat. The third passenger was a child sitting in the rear passenger seat. I observed Zacatecas exit the vehicle. He was wearing a blue LA hat and a blue LA jersey. Zacatecas removed a blue bag containing marijuana (the substance in the bag was green and had a strong odor of marijuana) from his vehicle and gave it to me. I then secured the Marijuana. After securing the Marijuana I gave Zacatecas $1000.00 (8 one hundred dollar bills and 4 fifty dollar bills). After purchasing the marijuana from Zacatecas I got in the government vehicle and drove to the pre arranged debriefing location ███████████) at this location I gave CMPD Violent Crime Task Force Detective S. Shipman the marijuana. Detective S Shipman transported the marijuana (1.02 pounds) to Charlotte Mecklenburg Property Control where it was secured and stored as evidence. The property control number is 7403.

Furthermore, immediately upon meeting Zacatecas I recognized him from and earlier narcotic incident which occurred several months earlier. Several months ago I witnessed CMPD Vice and Narcotics Detective O. Ortiz arranged to buy an ounce of cocaine from Zacatecas. In that incident Zacatecas introduced himself as Mario. This is the second narcotic related incident I have witnessed Zacatecas involved in.

The CI informed me that he met Zacatecas at ███████████. The listed address is where the MS 13 gang holds their meetings.

| Supervisor's Signature | Page 2 of 2<br>Printed: 04/09/04 | Officer In Charge Signature<br>00-4040-8133-02 |
|---|---|---|

# CHARLOTTE MECKLENBURG POLICE
## PROPERTY REPORT
(FORM A-31A 9/00)

| 1. Property Status | ☒ Evidence ☐ Found ☐ Asset Forfeiture ☐ OTHER (Explain) | 2. Control Number | 3. Complaint Number |
|---|---|---|---|
| | | 7403 | 20040408-133302 |

| 4. Date/Time Impounded | 5. Person Impounded From | 6. Location Impounded |
|---|---|---|
| 08 Apr 04 / 1303 | Zacatecas | ▇▇▇▇ |

| 7. Owner's Name | 8. Owner's Address | 9. Owner's Phone # | 10. Property Bureau Shelf No. | Bin No. | Vault |
|---|---|---|---|---|---|
| | | | | | |

| 11. Property Finder's Name | 12. Property's Finder's Address | 13. Property Finder's Phone # |
|---|---|---|
| Off. J. Rendon # 2882 | | |

| 14. Item # | 15. Item | 16. Quantity | 17. Manufacturer | 18. Model | 19. Serial # | 20. Color or Finish | 21. Value | 22. Other Identifying Features |
|---|---|---|---|---|---|---|---|---|
| 1 | Marijuana | (1) pkg | 1.02 | pounds | | Green | $1000.00 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 23. Assignment | 24. Offense Involved | 25. Investigator/Officer Assigned to Case | 26. Laboratory Examination | 27. Does property listed above relate to any case |
|---|---|---|---|---|
| VCTF | PWISD Marijuana | | ☐ Yes ☒ No | other than one identified by block 3 ☐ Yes ☐ No |

| 28. Complaint # of Related Case | 29. Arrest Number | 30. Impounding Officer's Printed Name | 31. Code No. | 32. Impounding Officer's Signature |
|---|---|---|---|---|
| | | S.E. Shipman | 867 | SSJ |

33. I hereby certify that the above list represents all property taken from my possession and that I have received a copy of this report.
Signature _____

| 34. Received By | 35. Reason | 36. Date/Time | 34. Received By | 35. Reason | 36. Date/Time |
|---|---|---|---|---|---|
| *(signature)* | Storage | 4-8-04 / 1358 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 37. Court Disposition: | 38. Released to Clerk of Court: | 40. Returned to Owner/Finder: | 41. Destroyed: |
|---|---|---|---|
| ☐ Confiscate and/or Destroy _____ Item Numbers | _____ Item Numbers | _____ Item Numbers | _____ Item Numbers |
| ☐ Return to Owner _____ Item Numbers | | | |
| ADA Signature/Date | Clerk of Courts Signature/Date | Prop. Employee's Signature/Date | Employee's Signature/Date |
| | 39. Auctioned: | | |
| Judge's Signature/Date | Employee's Signature/Date | Owner/Finder's Signature/Date | Witness's Signature/Date |

scanned 000014

# EXHIBIT 3

 

scanned   000013

| Reporting Officer | | Code Number | Complaint Number |
|---|---|---|---|
| J. M. Rendon | | 2882 | 04-0416-1443-03 |

| Offense(s) | Property Control Number(s) |
|---|---|
| Pwisd Cocaine | 8080 |

| Location | Date | Time | Voucher Number |
|---|---|---|---|
| ████████████ | 4/16/2004 | 1333 | |

### FUNDS EXPENDED

| | City | State | Federal |
|---|---|---|---|
| Amount of Funds Expended for Purchases | $0.00 | $500.00 | $0.00 |
| Amount of Funds Expended for Expenses | $0.00 | $0.00 | $0.00 |
| Amount of Funds Expended for Informant | $0.00 | $0.00 | $0.00 |

### VICTIM INFORMATION

| Victim #1 | Race | Sex | DOB / Age |
|---|---|---|---|
| STATE OF NORTH CAROLINA | | | |
| Victim #2 | Race | Sex | DOB / Age |

### SUSPECT INFORMATION

| | Arrest Number | Race | Sex | DOB / Age |
|---|---|---|---|---|
| Suspect #1    Iran Salvador Guerrero Gomez AKA "Zacatecas" | | H | M | 05/14/1982 |
| Suspect #2 | | Race | Sex | DOB / Age |
| Suspect #3 | | Race | Sex | DOB / Age |
| Suspect #4 | | Race | Sex | DOB / Age |
| Suspect #5 | | Race | Sex | DOB / Age |

| Vehicle #1 Year | Make | Model | Color | License/State | Other |
|---|---|---|---|---|---|
| 2001 | KIA | RIO | GREEN | SSL6683, NC | |
| Vehicle #2 Year | Make | Model | Color | License/State | Other |
| | | | | , NC | |

S.B.I. Case Number (if applicable)

### Narrative:

On 04/16/2004 at approximately 1230 hours, a confidential reliable informant (CRI) called Zacatecas AKA Iran Salvador Guerrero Gomez a suspected Mara Salvatrucha Gang member and arranged to buy an ounce on cocaine from him for $1,000.00. They arranged to conduct the narcotic transaction the █████████████████████████████████████████) at 1400 hours.

On 04/16/2004 at approximately 1350 hours, I witnessed the CRI call Zacatecas a second time at ███████████████ in this conversation I heard the CRI tell Zacatecas that we were in a gray Nissan in

Supervisor's Signature      Page 1 of 3      Reporting Officer's Signature
04-0416-1443-03

Revised 1/99

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 24 of 194



front of the Calypso Night Club in the parking lot. Zacatecas responded that he was in the area and he would meet us in a couple minutes.

Minutes later I observed a green, 2001 Kia drive beside us. The Kia was displaying NC ███████. Zacatecas was driving the Kia. I observed Zacatecas exit the vehicle. He was wearing a white shirt and dark colored pants. He entered the Nissan and sat in the driver's seat, then removed a blue baggie containing marijuana (the substance in the bag was green and had a strong odor of marijuana) from his pocket and gave it to me. I told him that I was not interested in buying marijuana. I told him that the CRI asked him for an ounce of Powder cocaine. He said that he was half asleep and misunderstood the arrangement. He said that he would go back to his place and get the ounce of cocaine and meet me again in 30 minutes.

On 04/16/2004 at approximately 1410 hours, Zacatecas called the CRI and advised him that he only had half an ounce of cocaine. I told the CRI that I would buy the half ounce and buy the other half at a later time.

On 04/16/2004 at approximately 1415 hours Zacatecas returned in the same green Kia. This time he had a Hispanic female in the front passenger seat (the same female I observed driving the Kia on 04/08/2008 to a previous Narcotic transaction). Again Zacatecas exited his vehicle and entered the Nissan this time he sat in the rear left passenger seat beside me. He gave me a clear baggie containing a white powder substance believed to be cocaine. I then told him that I would give him $450.00 for the half ounce. He agreed and I gave him $500.00 (five one hundred dollar bills). He said that he did not have $50.00 and that he would give it to me on our next meeting. He told me that I should call him and arrange a transaction. I told him that I would. Zacatecas then got in his vehicle and drove off the property southbound on N. Tryon Street.

At the conclusion of the narcotic transaction with Zacatecas I got in the government vehicle and drove to the pre arranged debriefing location ███████████████ ) at this location I gave CMPD Violent Crime Task Force Detective P.B. Conner the white powder substance. Detective P.B. Conner

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 25 of 194


transported the white substance to Charlotte Mecklenburg Property Control where it was secured and stored as evidence. The property control number is 8080.

Prior to this transaction I met with Special Agent S. S. Gregory III from the North Carolina State Bureau of Investigation. He provided me with $1,000.00 to conduct this Narcotic transaction (only $500.00 was used). I returned the remaining $500.00 to him after the transaction.

This case remains open.

| Supervisor's Signature | Page 3 of 3<br>Printed: 04/22/04 | Officer In Charge Signature<br>04-0416-1443-03 |
|---|---|---|

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 26 of 194

**LOTTE MECKLENBURG POLICE**
**RTY REPORT** (FORM A-31A 9/00)

| 1. Property Status | [x] Evidence ☐ Found | ☐ Asset Forfeiture | ☐ OTHER (Explain) | 2. Control Number | 3. Complaint Number |
|---|---|---|---|---|---|
| | | | | XOXO | 2004-0416-14430 |

| ime Impounded | 5. Person Impounded From | 6. Location Impounded From |
|---|---|---|
| 16-04/1443 | Mario, LNU | ███ ██ ██ ███ ██ |

| 's Name | 8. Owner's Address | 9. Owner's Phone # | 10. Property Bureau Shelf No. | Bin No. | Vault |
|---|---|---|---|---|---|
| ario, LNU | PSC AAROID Ltd | | | | |

| rty Finder's Name | 12. Property's Finder's Address | 13. Property Finder's Phone # |
|---|---|---|

| 15. Item | 16. Quantity | 17. Manufacturer | 18. Model | 19. Serial # | 20. Color or Finish | 21. Value | 22. Other Identifying Features |
|---|---|---|---|---|---|---|---|
| Cocaine | 14 g | | Powder | | White | $500.00 | Packaged in clear plastic baggie |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| ment | 24. Offense Involved | 25. Investigator/Officer Assigned to Case | 26. Laboratory Examination | 27. Does property listed above relate to any case |
|---|---|---|---|---|
| I/CTF | PWISD - Cocaine | P.B. Conner | ☐ Yes [x] No | other than one identified by block 3 ☐ Yes [x] No |

| plaint # of Related Case | 29. Arrest Number | 30. Impounding Officer's Printed Name | 31. Code No. | 32. Impounding Officer's Signature |
|---|---|---|---|---|
| | | P.B. Conner | 2123 | |

eby certify that the above list represents all property taken from my possession and that I have received a copy of this report.
Signature_____

| Received By | 35. Reason | 36. Date/Time | 34. Received By | 35. Reason | 36. Date/Time |
|---|---|---|---|---|---|
| P. Crawford | Storage | 4/16/4 1528 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Disposition: iscate and/or Destroy ___ Item Numbers | 38. Released to Clerk of Court: ___ Item Numbers | 40. Returned to Owner/Finder: ___ Item Numbers | 41. Destroyed: ___ Item Numbers |
|---|---|---|---|
| rn to Owner ___ Item Numbers | | | |
| ADA Signature/Date | 39. Auctioned: Clerk of Courts Signature/Date | Prop. Employee's Signature/Date | Employee's Signature/Date |
| Judge's Signature/Date | Employee's Signature/Date | Owner/Finder's Signature/Date | Witness's Signature/Date |

OFFICER

scanned

000019

# EXHIBIT 4

CONFIDENTIAL: This is an official file of the North Carolina State Bureau of Investigation. To make public or reveal the contents thereof to any unauthorized person is a violation of the General Statutes of North Carolina.

SBI CASE:        2004-01090 (673)
ACTIVITY:        April 16, 2004
VICTIM:          State of North Carolina
COPIES:          (1) Case Records Management Section
                 (2) SA S. S. Gregory III
                 (3) SAC D. B. Caldwell
                 (4) SA J. DePollo, BATF
                 (5) Sergeant K. C. Scheimreif,
                     Charlotte-Mecklenburg Police Department
                 (6) District Attorney P. S. Gilchrist III

STATE BUREAU OF INVESTIGATION SPECIAL FUNDS USED DURING
UNDERCOVER PURCHASE ON FRIDAY, APRIL 16, 2004:

On Friday, April 16, 2004, Charlotte-Mecklenburg Police
Department Officer Jesus Manuel Rendon used $500 of SBI Special
Funds to purchase approximately one-half ounce of powder Cocaine
from suspect Ivan Salvador Guerrero-Gomez. Prior to the
operation, SA S. S. Gregory recorded the serial numbers on ten
$100 bills that were part of the SBI Special Funds used during
this operation. The special funds were not photocopied due to
time constraints. SA Gregory originally provided Officer Rendon
with $1000 of SBI Special Funds, but only $500 of SBI Special
Funds were used during the operation. The following is a list of
the serial numbers for the U.S. currency used during this
investigation:

AB16810525K
AB85672833B
CB25619584P
AG15772761C
CE05120366A
AB92484122G
CE08167053A
AE64753946A
BK07497742A
CG05721430A

SSG:slp

scanned    000021



CONFIDENTIAL: This is an official file of the North Carolina State Bureau of Investigation. To make public or reveal the contents thereof to any unauthorized person is a violation of the General Statutes of North Carolina.

SBI CASE:        2004-01090 (673)
ACTIVITY:        April 16, 2004
VICTIM:          State of North Carolina
COPIES:          (1) Case Records Management Section
                 (2) SA S. S. Gregory III
                 (3) SAC D. B. Caldwell
                 (4) SA J. DePollo, BATF
                 (5) Sergeant K. C. Scheimreif,
                     Charlotte-Mecklenburg Police Department
                 (6) District Attorney P. S. Gilchrist III

---

**CRIME SCENE: REAR PARKING LOT OF UNIVERSITY LANES BOWLING ALLEY IN CHARLOTTE, NORTH CAROLINA:**

---

The crime scene for this investigation was the rear parking lot of the University Lanes Bowling Alley in Charlotte, North Carolina. The University Lanes Bowling Alley is located on the northeast corner of the intersection of North Tryon Street and Orr Street in Charlotte, North Carolina. This investigation pertains to an undercover purchase of approximately one-half ounce of powder Cocaine made by Charlotte-Mecklenburg Police Department Officer Jesus Manuel Rendon from suspect Ivan Salvador Guerrero-Gomez on Friday, April 16, 2004. Due to the nature of this investigation, no crime scene search was conducted, no crime scene sketch was prepared, and no crime scene photographs were taken.

SSG:slp

scanned   000022

CONFIDENTIAL: This is an official file of the North Carolina State Bureau of Investigation. To make public or reveal the contents thereof to any unauthorized person is a violation of the General Statutes of North Carolina.

SBI CASE:       2004-01090 (673)
ACTIVITY:       April 16, 2004
VICTIM:         State of North Carolina
COPIES:         (1) Case Records Management Section
                (2) SA S. S. Gregory III
                (3) SAC D. B. Caldwell
                (4) SA J. DePollo, BATF
                (5) Sergeant K. C. Scheimreif,
                    Charlotte-Mecklenburg Police Department
                (6) District Attorney P. S. Gilchrist III

---

## SURVEILLANCE OF CHARLOTTE-MECKLENBURG POLICE DEPARTMENT OFFICER JESUS MANUEL RENDON ON FRIDAY, APRIL 16, 2004:

On Friday, April 16, 2004, surveillance was conducted in Mecklenburg County. The purpose of the surveillance was to observe Charlotte-Mecklenburg Police Department (CMPD) Officer Jesus Manuel Rendon work in an undercover capacity in Mecklenburg County. During this operation, Officer Rendon was accompanied by a BATF (Bureau of Alcohol, Tobacco and Firearms) confidential source of information (CSI). Officer Rendon was driving a blue four-door Buick Regal with North Carolina License #KVB-4528. The BATF CSI was driving a tan four-door Altima with North Carolina License Tag SSH-9938. Officer Rendon was dressed in black pants and a tan/navy striped short-sleeved shirt.

At the beginning of the operation, Officer Rendon was provided with $1000 of SBI Special Funds under the control of SA S. S. Gregory. Officer Rendon was also wearing a KEL unit transmitter that was monitored and recorded by the surveillance teams. Prior to the operation, Officer Rendon searched the CSI and the CSI's vehicle with negative results.

Surveillance was conducted by the following law enforcement officers:

**Surveillance Team #1:**

SA S. S. Gregory, SBI
SA J. D. White, SBI
Sergeant K. C. Scheimreif, CMPD

scanned 000023

**Surveillance Team #2:**

   SA A. Cheramie, BATF
   SA D. Lierz, BATF

**Surveillance Team #3:**

   Detective B. Conner, CMPD

**Surveillance Team #4:**

   Detective M. Robson, CMPD
   Officer C. Kimble, CMPD

The following observations were made by SA Gregory while surveillance was conducted:

1:30 p.m. -   The surveillance teams, Officer Rendon, and the CSI met in the parking lot of a staging area on North Tryon Street in Charlotte, North Carolina. SA Gregory transferred $1000 of SBI Special Funds to Officer Rendon. Officer Rendon searched the CSI and the CSI's vehicle with negative results.

1:38 p.m. -   Officer Rendon tested the KEL unit transmitter.

1:46 p.m. -   Officer Rendon, the CSI, and the surveillance teams left the parking lot at the staging area en route to the parking lot of the University Lanes Bowling Alley on North Tryon Street in Charlotte, North Carolina.

1:51 p.m. -   Officer Rendon's and the CSI's vehicles arrive in the parking lot of the University Lanes Bowling Alley. Both vehicles drive to the rear of the parking lot and park behind the University Lanes Bowling Alley.

1:57 p.m. -   Detective Conner advises by radio that a green four-door Kia has parked beside Officer Rendon's car.

1:58 p.m. -   SA Lierz advises by radio that a Hispanic male, the CSI, and Officer Rendon are inside the CSI's vehicle. SA Lierz advises that the CSI's vehicle is backed into a loading dock area behind the

2

bowling alley. SA Lierz also advises that the suspect is driving a green Kia that he and SA Cheramie are familiar with.

2:00 p.m. - Detective Conner advises by radio that the green Kia has left the parking lot of the bowling alley and is on Orr Street.

2:02 p.m. - Officer Kimble advises by radio that the green Kia is stationary at a residence in a mobile home park located to the south of the University Lanes Bowling Alley.

2:04 p.m. - Officer Rendon telephoned Sergeant Scheimreif and advises that he was fronted $500 of SBI Special Funds to the suspect and the suspect had left the University Lanes Bowling Alley to pick up one-half ounce of Cocaine. Officer Rendon also advises that the suspect was in possession of Marijuana during their initial meeting.

2:15 p.m. - SA Cheramie advises by radio that Officer Rendon has arranged to purchase one-half ounce of Cocaine from the suspect with $500 and that Officer Rendon and the CSI are waiting for the suspect to return to the parking lot of the University Lanes Bowling Alley.

2:25 p.m. - Detective Conner advises that another vehicle has arrived in the rear parking lot of the University Lanes Bowling Alley. Detective Conner advisew that the Hispanic male suspect has gotten out of the car and into Officer Rendon's car. Detective Conner then advises that the CSI and the Hispanic male suspect both got out of Officer Rendon's car and returned to their own vehicles.

2:33 p.m. - SA Cheramie advises by radio that the transaction is complete.

2:33 p.m. - Officer Rendon, the CSI, and the surveillance teams meet in the parking lot of the staging area on North Tryon Street in Charlotte, North Carolina. Officer Rendon transfers the remaining balance of SBI Special Funds, $500, to SA Gregory. Officer Rendon then transfers Evidence Item #1, one clear plastic bag containing a white powder substance, to Officer Conner for packaging and storage at the

3

Charlotte-Mecklenburg Police Department Law
Enforcement Center.

Surveillance was concluded at approximately 2:32 p.m.

SSG:slp

4

scammed 000026

**EXHIBIT 5**


| ADDRESSED TO:<br>Special Agent in Charge<br>Charlotte Field Division | MONITORED INVESTIGATION INFORMATION:<br>Charlotte Field Division<br>FY-04<br>Report 018 |
|---|---|

**TITLE OF INVESTIGATION:**
Operation Los Treces

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>18 |
|---|---|

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| | | | |
|---|---|---|---|
| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Andrew J. Cheramie | SUBMITTED BY *(Title and Office)*<br>Special Agent, Charlotte I Field Office | SUBMITTED BY *(Date)*<br>06/17/2004 |
|---|---|---|
| REVIEWED BY *(Name)*<br>John C. DePollo | REVIEWED BY *(Title and Office)*<br>Group Supervisor, Charlotte I Field Office | REVIEWED BY *(Date)*<br>6/21/04 |
| APPROVED BY *(Name)*<br>Zebedee T. Graham | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Charlotte Field Division | APPROVED BY *(Date)*<br>6/21/04 |

## DESCRIPTION OF ACTIVITY:

Undercover purchase of narcotics and a firearm from "Mario", a/k/a Iran Salvador **GUERRERO-GOMEZ**.

## SYNOPSIS:

On June 15, 2004 ▮▮▮ and Charlotte-Mecklenburg Police Officer (CMPD) J.M. Rendon purchased approximately 15.3 grams of powder cocaine and a Smith & Wesson, Model 68, .38-caliber revolver from Iran Salvador-**GUERRERO-GOMEZ**.

## NARRATIVE:

On June 15, 2004 ▮▮▮ arranged to purchase ½ ounce of powder cocaine and a firearm from **GUERRERO-GOMEZ**. **GUERRERO-GOMEZ**, who is known to ▮▮▮ as "Mario", is a member of the MS-13 street gang. During this operation, "Mario" has made prior narcotics sales to ▮▮▮

On June 15, 2004 at approximately 17:30 hours, ▮▮▮ received a telephone call from "Mario" instructing him to come to the Hollywood Video on Central Avenue. Officer Rendon, who was driving a Government Owned Vehicle (GOV) picked up ▮▮▮ from his residence and proceeded to the meet location.

At approximately 17:33 hours, Officer Rendon parked his vehicle across from the Hollywood Video located at ▮▮▮ ▮▮▮ Charlotte, NC. ATF Special Agents (S/A) Andrew Cheramie, David Lierz, and Ernesto Diaz were parked across from Officer Rendon's vehicle and observed the transaction. Members of the CMPD Vice and Narcotics Bureau and Gang Intelligence Unit also provided cover.

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 36 of 194

ATF EF 3120.2 (5-98)

**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**REPORT OF INVESTIGATION**

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Charlotte Field Division | Charlotte Field Division<br>FY-04<br>Report 018 |

| TITLE OF INVESTIGATION: |
|---|
| Operation Los Treces |

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>18 |
|---|---|

At approximately 17:42 hours, "Mario" arrived driving a Green Kia Rio bearing a thirty (30) day NC registration. This is the same vehicle "Mario" has been observed driving during prior undercover transactions with ███. This was however, the first time a temporary registration was displayed on the vehicle.

At approximately 17:43 hours, ███ and Officer Rendon exited the GOV and got into the green Kia with "Mario". At approximately 17:45 hours Officer Rendon exited "Mario's" vehicle carrying a white plastic trash bag. Officer Rendon placed the bag in the back seat of the GOV and sat in the driver's seat. At approximately 17:46 hours, CI-149 returned to the GOV. Officer Rendon then left the area and returned to a pre-arranged de-brief location.

Officer Rendon retrieved the plastic trash bag from the GOV and handed it to S/A Cheramie. S/A Cheramie removed from the bag a blue Smith & Wesson box containing one (1) Smith & Wesson, Model 68, .38-caliber revolver, bearing Serial number 30K5626.

Officer Rendon handed Detective T.A. Jolly a small plastic baggie containing suspected powder cocaine. Officer Rendon advised that he paid "Mario" $550 for the firearm with investigative funds provided by ATF and $500 for the cocaine with investigative funds provided by CMPD.

Detective Jolly took custody of the narcotics under complaint number 2004-0615-1749-02 and transported the package to the CMPD Property Control Bureau. S/A Cheramie took possession of the revolver for it to be entered into ATF custody. A check of firearm's serial number through NCIC found no record of it having been reported stolen.

**ATTACHMENTS:**

ATF F 3400.16

ATF EF 3120.2 (5-98)

# CHARLOTTE MECKLEBURG POLICE
## PROPERTY REPORT
(FORM A-31A 9/00)

| 1. Property Status | ☑ Evidence ☐ Found | ☐ Asset Forfeiture | ☐ OTHER (Explain) | 2. Control Number | 3. Complaint Number |
|---|---|---|---|---|---|
| | | | | 13302 | 20040617 174902 |

| 4. Date/Time Impounded | 5. Person Impounded From | 6. Location Impounded From |
|---|---|---|
| 6-17-04 / 1749 | MARIO | ▮ ▮ |

| 7. Owner's Name | 8. Owner's Address | 9. Owner's Phone # | 10. Property Bureau Shelf No. / Bin No. / Vault |
|---|---|---|---|
| | | | |

| 11. Property Finder's Name | 12. Property's Finder's Address | 13. Property Finder's Phone # |
|---|---|---|
| TA Jolly | ▮ ▮ | ▮ ▮ |

| 14. Item # | 15. Item | 16. Quantity | 17. Manufacturer | 18. Model | 19. Serial # | 20. Color or Finish | 21. Value | 22. Other Identifying Features |
|---|---|---|---|---|---|---|---|---|
| 1 | Cocaine | 15.3gm. | | | | | $500.00 | Purchased from Mario in Parking Lot of Harris Teeter |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 23. Assignment | 24. Offense Involved | 25. Investigator/Officer Assigned to Case | 26. Laboratory Examination | 27. Does property listed above relate to any case other than one identified by block 3 ☐ Yes ☑ No |
|---|---|---|---|---|
| VCTF / GIU | PWISD Cocaine | TA Jolly | ☑ Yes ☐ No | |

| 28. Complaint # of Related Case | 29. Arrest Number | 30. Impounding Officer's Printed Name | 31. Code No. | 32. Impounding Officer's Signature |
|---|---|---|---|---|
| | | TA Jolly | 712 | |

33. I hereby certify that the above list represents all property taken from my possession and that I have received a copy of this report. Signature_____

| 34. Received By | 35. Reason | 36. Date/Time | 34. Received By | 35. Reason | 36. Date/Time |
|---|---|---|---|---|---|
| M Crawford | Storage | 6/18/4 1818 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 37. Court Disposition: | 38. Released to Clerk of Court: | 40. Returned to Owner/Finder: | 41. Destroyed: |
|---|---|---|---|
| ☐ Confiscate and/or Destroy — Item Numbers | Item Numbers | Item Numbers | Item Numbers |
| ☐ Return to Owner — Item Numbers | | | |
| ADA Signature/Date | Clerk of Courts Signature/Date | Prop. Employee's Signature/Date | Employee's Signature/Date |
| | 39. Auctioned: | | |
| Judge's Signature/Date | Employee's Signature/Date | Owner/Finder's Signature/Date | Witness's Signature/Date |

scanned 000636

# EXHIBIT 6

**DEPAR⬤ IT OF THE TREASURY**
**BUREAU OF AL⬤OL, TOBACCO AND FIREARMS**
# REPORT OF INVESTIGATION

scanned    000031

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Charlotte Field Division | Charlotte Field Division<br>FY-04<br>Report 021 |

**TITLE OF INVESTIGATION:**
Operation Los Treces

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>21 |
|---|---|

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | | COLLATERAL REPLY |
|---|---|---|---|---|
| | REPORT OF INTELLIGENCE | | | |

| SUBMITTED BY *(Name)* | SUBMITTED BY *(Title and Office)* | SUBMITTED BY *(Date)* |
|---|---|---|
| Ernesto Diaz | Special Agent, Reno Field Office | 07/14/2004 |
| **REVIEWED BY** *(Name)*<br>John C. DePollo | **REVIEWED BY** *(Title and Office)*<br>Group Supervisor, Charlotte I Field Office | **REVIEWED BY** *(Date)*<br>7/15/04 |
| **APPROVED BY** *(Name)*<br>Zebedee T. Graham | **APPROVED BY** *(Title and Office)*<br>Special Agent in Charge, Charlotte Field Division | **APPROVED BY** *(Date)*<br>7/15/04 |

## DESCRIPTION OF ACTIVITY:

Undercover purchase of suspected powder cocaine and a firearm by Confidential Reliable Informant ▮▮▮▮ ▮▮▮▮ and an ATF undercover agent.

## SYNOPSIS:

On 07/13/04, ▮▮▮▮ and ATF Special Agent Ernesto Diaz, acting in an undercover capacity, purchased approximately 24.5 grams of suspected powder cocaine and a Smith & Wesson .38 caliber pistol from Iran Salvador GUERRERO-GOMEZ (H/M, DOB: ▮▮▮▮ ).

## NARRATIVE:

1. Between 07/12/04 and 07/13/04, ▮▮▮▮ spoke by telephone on several occasions with a Hispanic male known to the CI only as "Mario" (who has been identified as Iran Salvador GUERRERO-GOMEZ). The conversations were in regards to GUERRERO-GOMEZ selling the CI and S/A Diaz an ounce of powder cocaine and a firearm. S/A Diaz assumed the name of "Flaco." During the conversations, GUERRERO-GOMEZ stated that he would sell the firearm for five hundred dollars ($500.00) and the ounce of cocaine for nine hundred dollars ($900.00).

2. On 07/13/04, at approximately 1226 hours, ▮▮▮▮ and S/A Diaz arrived at a predetermined location and telephoned GUERRERO-GOMEZ informing him of their arrival. At approximately 1235 hours, GUERRERO-GOMEZ arrived in a Green Kia Rio, no visible license plate, and met ▮▮▮▮ and S/A Diaz.

**DEPAR▮▮ ▮T OF THE TREASURY**
**BUREAU OF A▮▮ ▮OL, TOBACCO AND FIREARMS**
**REPORT OF INVESTIGATION**

Page 2 of 2

Scanned

000032

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Charlotte Field Division | Charlotte Field Division<br>FY-04<br>Report 021 |

| TITLE OF INVESTIGATION:<br>Operation Los Treces | |
|---|---|

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>21 |
|---|---|

████ entered GUERRERO-GOMEZ'S vehicle and sat on the passenger's seat, S/A Diaz entered the same vehicle and sat behind ████.

3. Once in the vehicle, GUERRERO-GOMEZ produced a shoebox containing a firearm and two firearm magazines (one loaded with ammunition). S/A Diaz reiterated the price for the firearm at five hundred dollars ($500.00); which GUERRERO-GOMEZ stated five hundred. ████ asked GUERRERO-GOMEZ about the other item, referring to the cocaine. GUERRERO-GOMEZ handed S/A Diaz an ounce of suspected cocaine in the form of a white powder substance wrapped in a clear plastic bag. S/A Diaz reiterated the price for the cocaine at nine, referring to nine hundred dollars ($900.00); which GUERRERO-GOMEZ stated an affirmative response.

4. S/A Diaz handed GUERRERO-GOMEZ five hundred dollars ($500.00) of ATF agent cashier funds for the firearm, and nine hundred dollars ($900.00) of Charlotte-Mecklenburg Police Department Vice and Narcotics Bureau funds for the suspected cocaine.

5. S/A Diaz exited the vehicle and waited in his vehicle, ████ immediately called S/A Diaz back to GUERRERO-GOMEZ'S vehicle and asked him when he wanted another firearm. S/A Diaz stated anytime because he was returning to Tijuana (Mexico) in two weeks and could get rid of the guns there. S/A Diaz and ████ returned to their vehicle and GUERRERO-GOMEZ departed the area in his vehicle. The entire conversation was in the Spanish language.

6. S/A Diaz turned over the shoebox containing the firearm, identified as a Smith & Wesson, model 52-2, .38 Special caliber semiautomatic pistol, serial number A429429 and two magazines to ATF Special Agent Andrew Cheramie. In addition, S/A Diaz turned over an audiocassette tape of the recorded conversation to S/A Cheramie. S/A Diaz turned over the suspected cocaine to CMPD Detective Tim Jolly, who weighed the suspected cocaine at approximately 24.5 grams (refer to CMPD Complaint Number 20040713124200, Control Number 16007).

7. On this same date, S/A Diaz positively identified GUERRERO-GOMEZ from a photocopy of his picture from his North Carolina Driver's License, as the individual he purchased the suspected cocaine and firearm from.

**ATTACHMENTS:** three (3) ATF Forms 3400.16

# CHARLOTTE MECKLENBURG POLICE
## PROPERTY REPORT
(FORM A-31A 5/00)

| 1. Property Status | ☑ Evidence ☐ Found | ☐ Asset Forfeiture | ☐ OTHER (Explain) | 2. Control Number | 3. Complaint Number |
|---|---|---|---|---|---|
| | | | | 116057 | 20040713 12.4200 |

| 4. Date/Time Impounded | 5. Person Impounded From | 6. Location Impounded From |
|---|---|---|
| 7-13-04 / 1292 | MARIO | ▮▮▮ / ▮▮ |

| 7. Owner's Name | 8. Owner's Address | 9. Owner's Phone # | 10. Property Bureau Shelf No. | Bin No. | Vault |
|---|---|---|---|---|---|
| | | | | | |

| 11. Property Finder's Name | 12. Property's Finder's Address | 13. Property Finder's Phone # | | |
|---|---|---|---|---|
| T A Jolly | ▮▮▮ ▮ ▮▮▮ | ▮▮▮▮ | | |

| 14. Item # | 15. Item | 16. Quantity | 17. Manufacturer | 18. Model | 19. Serial # | 20. Color or Finish | 21. Value | 22. Other Identifying Features |
|---|---|---|---|---|---|---|---|---|
| 1 | Cocaine | 24.5 grams | | | | | $900.00 | Purchased 1 oz and pistol from Mario |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| 23. Assignment | 24. Offense Involved | 25. Investigator/Officer Assigned to Case | 26. Laboratory Examination | 27. Does property listed above relate to any case |
|---|---|---|---|---|
| VCTF | PWISD Cocaine | T A Jolly | ☑ Yes ☐ No | other than one identified by block 3 ☐ Yes ☑ No |

| 28. Complaint # of Related Case | 29. Arrest Number | 30. Impounding Officer's Printed Name | 31. Code No. | 32. Impounding Officer's Signature |
|---|---|---|---|---|
| | | T A Jolly | 712 | |

33. I hereby certify that the above list represents all property taken from my possession and that I have received a copy of this report. Signature _____

| 34. Received By | 35. Reason | 36. Date/Time | 34. Received By | 35. Reason | 36. Date/Time |
|---|---|---|---|---|---|
| Greenly | Storage | 7-13-04 1140 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| 37. Court Disposition: ☐ Confiscate and/or Destroy ☐ Return to Owner | Item Numbers | 38. Released to Clerk of Court: | Item Numbers | 40. Returned to Owner/Finder: | 41. Destroyed: | Item Numbers |
|---|---|---|---|---|---|---|
| | | | | | | |

INTEL   CRIM.   CMPD/

13:18  FAX 704 353 1940
Scanned
80000033

scanned 000004

EXHIBIT 7


| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent in Charge<br>Charlotte Field Division | Charlotte Field Division<br>FY-05<br>Report 036 |

**TITLE OF INVESTIGATION:**
Operation Los Treces

| CASE NUMBER:<br>763015-04-0051 | REPORT NUMBER:<br>36 |
|---|---|

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| | | | | |
|---|---|---|---|---|
| X | **REPORT OF INVESTIGATION** | | | **COLLATERAL REPLY** |
| | **REPORT OF INTELLIGENCE** | | | |

| SUBMITTED BY *(Name)* | SUBMITTED BY *(Title and Office)* | SUBMITTED BY *(Date)* |
|---|---|---|
| David A. Lierz | Special Agent, Charlotte I Field Office | 03/17/2005 |
| REVIEWED BY *(Name)*<br>John C. DePollo | REVIEWED BY *(Title and Office)*<br>Group Supervisor, Charlotte I Field Office | REVIEWED BY *(Date)*<br>3/18/05 |
| APPROVED BY *(Name)*<br>Zebedee T. Graham | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Charlotte Field Division | APPROVED BY *(Date)*<br>3/18/05 |

## DESCRIPTION OF ACTIVITY:
Interim interstate nexus determination.

## SYNOPSIS:
Interim interstate nexus determination of the firearm purchased from Iran Salvador GUERRERO by Charlotte-Mecklenburg Police (CMPD) Officer Jesus Rendon on 06/15/04 and the firearm purchased from GUERRERO by Officer Rendon and ATF Special Agent Ernesto Diaz on 07/13/04.

## NARRATIVE:
1. The Smith & Wesson, Model 68, .38-caliber revolver bearing serial number 30K5626 that Officer Rendon purchased along with powder cocaine from GUERRERO on 06/15/04, and the Smith & Wesson, Model 52-2, .38-caliber pistol bearing serial number A429429 that Officer Rendon and S/A Diaz purchased from GUERRERO along with powder cocaine on 07/13/04 were both manufactured in Massachusetts.

2. Since neither of these firearms was manufactured in the State of North Carolina, they both had to have traveled in interstate commerce.

ATF EF 3120.2 (5-98)    Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 44 of 194

scammed 000036

**EXHIBIT 8**

CMPD Laboratory Reports, analyses of
narcotics evidence from each of the four
undercover transactions, will be provided
when available.

scanned

# APPENDIX 144



# CHARLOTTE MECKLENBURG POLICE

## DEPARTMENT

# Mugshot Profile

| | |
|---|---|
| **Last Name:** | HERNANDEZ-AYALA |
| **First Name:** | NELSON |
| **Middle Name:** | ALBERTO |
| **Nickname:** | |
| **Arrest #:** | ███ |
| **Date of Birth:** | ███ |



## Physical Description

| | |
|---|---|
| **Race:** | Hispanic |
| **Sex:** | M MALE |
| **Height:** | 5'5" |
| **Weight:** | 140 |
| **Hair Color:** | Black |
| **Eye Color:** | Brown |

## General Description

| | |
|---|---|
| **Hair Length:** | Ear |
| **Hair Style:** | Straight |
| **Facial Hair:** | Mustache |
| **Tone:** | _CLEAR |
| **Glasses:** | N NO |

## Scars/Tattoos/Deformities

scanned



scanned



06/13/03 02:34 ****** ************************* scanned
* CTSV POST-MAGISTRATE INTERVIEW *
*****************************************

HERNANDEZ-AYALA, NELSON ALBERTO        M   H    03 15 80   23
                                        5   5   140    BLK   BRO
CHARLOTTE          NC                000 000 0000

                                              000 000 0000

                EL SALVADO

                                    CHARLOTTE                    X

PVA               06 13 03 0045         X                        X

FREGOISE, PAUL

                                    CHAR                NC

                                        000 000 0000    000 000 0000

                                        000 000 0000    000 000 0000

292000 M DAMAGE TO REAL PROPERTY

X2199   DEF ARRESTED FOR DAMAGE TO PROPERTY

HORNE, D.N.            P2196        CMPD B3

BRANAN, S.M.          P2298

PAYNE, A.L.           P1821        ADAM: 06 13 03   0234

WRIGHT, D.A.          P2270

LATTIMORE, D.W.       P3102

06/13/03 02:34 ***********************************

scanned

## CHARLOTTE-MECKLENBURG ARREST PROCESSING CENTER
### ARREST WORK SHEET

Revised 6-99

COMPLAINT # 20030613-004501    ARREST # ▮▮▮▮    PID # _____

NAME: *Hernandez-Ayala*    *Nelson*    *Alberto* _____
　　　LAST　　　　　　　　　FIRST　　　　　　MIDDLE　　　SUF

ALIAS: _____　　　_____　　　_____　_____
　　　LAST　　　　　　　　　FIRST　　　　　　MIDDLE　　　SUF

SSN: ___-__-___    DR LICENSE # ST. *NL* # ▮▮▮▮    RACE *H*  SEX *M*  AGE *23*

DOB ▮▮▮▮    HEIGHT: *5  5*  WGT: *140*  HAIR *BLK*  EYES *Brown*  POB: *Salvador*

HOME BLOCK: ▮▮▮    DIR. —    STREET: ▮▮▮▮    TYPE ▮    APT: ▮▮

CITY: ▮▮▮▮    STATE ▮▮    ZIP: ▮▮▮    PHONE __-__-__

EMPLOYER: *N/A*    DEFENDANT'S OCCUPATION *N/A*

BLOCK: —    DIR ___    STREET: _____ —    TYPE ___ —    APT: —

CITY: _____ —    STATE ___ —    ZIP ___ —    PHONE __-__-__

SCHOOL NAME: _____

### ARREST DATA

DATE *6-13-03*    TIME: *0045*    IMPAIRED: YES (NO)    ARREST TYPE: (Visual) Warrant / Both

LOCATION APPROX : Y / N  BLK: ▮▮    DIR: ▮    STREET: ▮▮▮▮    TYPE ▮    APT: —

CITY: *Charlotte*    TYPE OF PREMISES: *PVA*

VEHICLE TOWED BY: _____

### ARRESTING OFFICERS

OFFICER ID#: *2196*    (C)/ CW / W / N:   OD: (YES) / NO
OFFICER ID#: *2298*    C / CW / W /(N)   OD: (YES) / NO
ASSIST ID#: *1821*    W /(N)   OD: (YES) / NO
ASSIST ID#: ~~5155~~ *2270* W /(N)   OD: (YES) / NO
ASSIST ID#: *3102*    W /(N)   OD: (YES) / NO

| Legend | |
|---|---|
| C: | COMPLAINANT (No Court) |
| CW: | COMPLAINANT/WITNESS (Court) |
| W: | WITNESS (Court) |
| N: | NONE (No Court) |
| OD: | ON DUTY |

BOOKED BY ID# *2196*    SEARCHED BY: ID# *2196*  TRANSPORTED BY: ID# *2196*

### CHARGE CODES

CHARGE CODE *292000*   CHARGE *Damage to Property*    REPOSITORY # _____
CHARGE CODE _____   CHARGE _____    REPOSITORY # _____
CHARGE CODE _____   CHARGE _____    REPOSITORY # _____
CHARGE CODE _____   CHARGE _____    REPOSITORY # _____
CHARGE CODE _____   CHARGE _____    REPOSITORY # _____
CHARGE CODE _____   CHARGE _____    REPOSITORY # _____

### Continued on Reverse Side

## CIVILIAN VICTIMS OR WITNESSES ONLY

VICTIM / WITNESS #1 OR BUSINESS LEGAL NAME: (circle one)

LAST: _Fregosie_ FIRST: _Paul_ MIDDLE:_____ SUFFIX:_____

HOME BLOCK:_____ DIR____ STREET:_____ TYPE:_____ APT:_____

CITY_____ STATE_____ ZIP:_____ HOME PHONE: ████████

EMPLOYER /BUSINESS LEGAL NAME:_____ ████████

BLOCK:█ DIR █ STREET: ████████ TYPE: █ APT:____

CITY: █ STATE █ ZIP: █ WORK PHONE: ████████

---

VICTIM / WITNESS #2 OR BUSINESS LEGAL NAME: (circle one)

LAST:_____ FIRST:_____ MIDDLE:_____ SUFFIX:_____

HOME BLOCK:_____ DIR____ STREET:_____ TYPE:_____ APT:_____

CITY_____ STATE_____ ZIP:_____ HOME PHONE_____ - ____ -____

EMPLOYER /BUSINESS LEGAL NAME:_____

BLOCK:_____ DIR____ STREET:_____ TYPE:_____ APT:_____

CITY:_____ STATE_____ ZIP:_____ WORK PHONE:_____ - ____ -____

---

VICTIM / WITNESS #3 OR BUSINESS LEGAL NAME: (circle one)

LAST:_____ FIRST:_____ MIDDLE:_____ SUFFIX:_____

HOME BLOCK:_____ DIR____ STREET:_____ TYPE:_____ APT:_____

CITY_____ STATE_____ ZIP:_____ HOME PHONE_____ - ____ -____

EMPLOYER /BUSINESS LEGAL NAME:_____

BLOCK:_____ DIR____ STREET:_____ TYPE:_____ APT:_____

CITY:_____ STATE_____ ZIP:_____ WORK PHONE:_____ - ____ -____

---

REASON FOR THE ARREST

_The defendant was arrested for damage to property_

---

DEFENDANT'S VEHICLE: _1997_    _Nissan_    _Maxima_    _Blk_    ████    _NC_
                      YEAR       MAKE        MODEL      COLOR    TAG     STATE

# APPENDIX 145

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 54 of 194

A#: ███████  NAME: HERNANDEZ ,NELSON DOB ███████

```
                    *    A-NUMBER: 000000000

                *    PERSON/ACTION: INV/REA

          *    FCO REQUESTING TRANSFER: CLT

       *    FCO KEYING TRANSFER REQUEST: CLT

              NRC PRIORITY REQUEST: Y    (ENTER 'Y' TO EXPEDITE TRANSFER)

                                            (* = REQUIRED FIELDS)

    YOU MAY REQUEST TRANSFER OF ANOTHER A-FILE BY KEYING A DIFFERENT A-NUMBER.

     CLEAR EXIT    PF3 REFRESH    PF4 FTS MENU    PF5 HELP    PF6 CIS MAIN MENU

 FILE TRANSFER REQUEST SUCCESSFULLY COMPLETED.    CONTINUE AS DESIRED.
```

# APPENDIX 146

scanned

A#: ███████   NAME: ALEMAN AYALA   :   ,MANUEL         DOB: ███████

```
   LAST: ALEMAN AYALA
  FIRST: MANUEL                                          NATZ DATE:
 MIDDLE: DE JESUS                                            COURT:
ALIASES: ALEMAN                      ,MANUEL             LOCATION:
```

```
SEX:         POE:        COB: ELSAL     DOE: 00000000
FCO: NRC    COA: EWI     COC:           FTC: ██████      FATHER:
PFCO: SSC   SFCO:        DFO: ██████    BIN:             MOTHER:
```

```
        SSN: ██████              CONSOLIDATED A-NOS      --OTHER INFORMATION--
I-94 ADM #:                                             EADS-X
PASSPORT #:
      FBI #:
DRIVER LIC:
FINGER CD#:
```

```
     CLEAR EXIT        PF4 RETURN       PF5 HELP       PF6 CIS MAIN MENU
 PF7 NEXT SEARCH       PF8 VIEW HISTORY  PF9 VIEW EAD   PF10 NAILS     PF11 EOIR
PF10 REQUIRES A SPECIAL SECURITY CLASS - 9106 SOUNDS LIKE/DOB SEARCH USED
```

A#: �as████████     NAME: ALEMAN AYALA           ,MANUEL                DOB: ████████

FARES #: ████████████        SSN #: ████████████          COB: ELSAL    COA: EWI
WORK STATION ID: 0      OPERATOR ID: SRCBATCH       OFFICER ID: SRCPSE0

                           ACTION   DENY        START    EXPIRATION PROVISION OF LAW
SEQ#-------TYPE-------  --DATE--  CODE OFF  --DATE-- ---DATE--- --8CFR 274A.12--
  01 EXTENSION            01182003        SSC  01182003  09092003    (A) (12) ( )
  02 INITIAL ISSUANCE     11102001        SSC  11102001  09092002    (C) (19) ( )




      ***   END OF EADS DISPLAY   ***
CLEAR EXIT  PF1 PAGE AHEAD   PF2 PAGE BACK   PF4 RETURN   PF5 HELP   PF6 MAIN MENU

scanned

```
CONTROL NUMBER = 01089
JNCIC          ████████  09:46:40 06/18/03 xx xx JUINS .
2L01JUINSVTML01089
NCINS01J0
THIS NCIC INTERSTATE IDENTIFICATION INDEX RESPONSE IS THE RESULT OF YOUR
INQUIRY ON NAM/AYALA,MANUEL DEJESUS SEX/M RAC/W DOB/█████████  PUR/C
NAME                          FBI NO.          INQUIRY DATE
AYALA,MANUEL DEJESUS          ████████         2003/06/18
SEX RACE BIRTH DATE   HEIGHT WEIGHT EYES HAIR  BIRTH PLACE          PHOTO
M   W    ████████     506    150    BRO  BLK   UNKNOWN               N
FINGERPRINT CLASS        PATTERN CLASS
                         WU WU RS WU RS WU LS LS WU LS
                            WU    WU    AU
                                        RS
IDENTIFICATION DATA UPDATED 2003/06/13
THE CRIMINAL HISTORY RECORD IS MAINTAINED AND AVAILABLE FROM THE
FOLLOWING:
 NORTH CAROLINA - STATE ID/████████████
THE RECORD(S) CAN BE OBTAINED THROUGH THE INTERSTATE IDENTIFICATION
INDEX BY USING THE APPROPRIATE NCIC TRANSACTION.
END
```



scanned

```
CONTROL NUMBER = 01104
JNLET          ███████   09:54:52 06/18/03 xx xx JUINS .
CR.NCIII0000
06:45 06/18/2003 02735
06:45 06/18/2003 00916        ███████ .*VTML 01104
HDR/2L01QR48331990
ATN/ARTON
THE FOLLOWING RECORD PERTAINS TO
MKE/QR  NAM/AYALA,MANUEL DEJESUS  FBI/█████   SID/████████   PUR/C
NAM/AYALA,MANUEL DEJESUS          SID/NC1027348A  FBI/30460CC6
SEX/M    RACE/W    DATE OF BIRTH/████████   PLACE OF BIRTH/XX
HEIGHT/5 FEET 06 INCHES   WEIGHT/150   EYE/BR0   HAIR/BLK
MISC NUMBERS:          DL-█████████
CYCLE 01 ARREST DATE: 06-13-2003         SID████████   FBI/█████████
   ARREST AGENCY:    NC0600000-MECKLENBURG CO SO - CHARLOTTE
   ARREST NAME:      AYALA,MANUEL DEJESUS
   FINGERPRINT CHECK DIGIT NO:  ███████   SBI CASE NUMBER:
   LOCAL ID:  ████████
   ARREST CHARGE 01- DAMAGE TO REAL PROPERTY
                     MISDEMEANOR      NUMBER OF COUNTS: 001
      OFFENSE DATE:  06-13-2003
   GENERAL STATUTE:  014-127.000(0)(
BASED ON FBI NUMBER ONLY
THIS CRIMINAL HISTORY IS FOR A SINGLE STATE NORTH CAROLINA RECORD.
CERTIFIED AS A TRUE COPY OF CRIMINAL HISTORY RECORD INFORMATION ON THE ABOVE
INDIVIDUAL AS SUBSTANTIATED BY FINGERPRINTS AS IT APPEARS IN SBI/DCI FILES.
STATE/FEDERAL REGULATIONS REQUIRE A ONE YEAR RECORD OF DISSEMINATION.
***CAUTION*** CHANGES TO THIS RECORD MAY OCCUR AT ANY TIME.
RECORD MUST NOT BE USED AFTER 09-15-2003.
END OF RECORD
```

# APPENDIX 147

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 61 of 194



# CHARLOTTE MECKLENBURG POLICE

## DEPARTMENT

# Mugshot Profile

**Last Name:**     AYALA
**First Name:**    MANUEL
**Middle Name:**   DEJESUS
**Nickname:**
**Arrest #:**      ██████████
**Date of**        ████████
**Birth:**

## Physical Description

**Race:**       Hispanic
**Sex:**        M MALE
**Height:**     5'6"
**Weight:**     150
**Hair Color:** Black
**Eye Color:**  Brown

## General Description

**Hair Length:**   Ear
**Hair Style:**    Straight
**Facial Hair:**   Mustache
**Skin Tone:**     _CLEAR
**Glasses:**       N NO



## Scars/Tattoos/Deformities

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 62 of 194

# APPENDIX 148





Case 3:16-cv-00057-MOC     Document 69-6     Filed 02/22/18     Page 65 of 194

# APPENDIX 149

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 66 of 194

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

IN RE:                          )

                                )

Grand Jury Investigation  )

                                )

APPEARING:                      Mr. Kevin Zolot
                                Assistant U.S. Attorney
                                Charlotte, North Carolina
                                      and
                                Mr. Sam Nazzaro
                                U.S. Dept. Of Justice
                                Washington, D.C.


TESTIMONY

OF

ANGEL RIVERA GRENADOS

AT CHARLOTTE, NORTH CAROLINA

REPORTER:   RENEE MARIE HABRACK, CSR, RPR

Notary Public


**ORIGINAL**

*Adams & Holt, inc.*

**Verbatim Court Reporting Services**

401 Rensselaer Avenue / Charlotte, NC 28203 / (704) 334-4602 / (800) 435-0419

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 67 of 194

This is a Grand Jury Investigation that was conducted at the Charles Raper Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina, on April 24, 2008, before Renee Marie Habrack, CSR, RPR, Notary Public.

JACKIE GONZALEZ, English-Spanish interpreter, sworn.

MR. ZOLOT: Wonderful. We will note the presence of Jackie Gonzalez who is now sworn as a Spanish interpreter. There is still a quorum present and we are going to call Angel Rivera Grenados to the stand right now.

ANGEL RIVERA GRENADOS, being first duly sworn by the Grand Jury Foreperson testified as follows:

EXAMINATION BY MR. ZOLOT

Q.  Thank you. Okay. All right. Mr. Grenados, can you please tell the Grand Jurors your full name?

A.  Angel Rivera Grenados.

Q.  And how old are you, sir?

A.  24.

Q.   And you understand you're being -- now you and I have never talked before, correct?

A.   No.

Q.   Okay.  And you're aware you're being called as a witness in front of the Grand Jury?

A.   Yes.

Q.   Okay.  And how long -- where did you live before you got arrested?

A.   In Greensboro.

Q.   And where are you originally from?

A.   Mexico.

Q.   And how long have you been in the United States?

A.   Around seven or eight years.

Q.   Are you legal?  Are you here legally or illegally?

A.   No.

Q.   Okay.  And you were living -- were you living in Greensboro on December 8th of 2007?

A.   Yes.

Q.   And what did you do for a living at that time?

A.   Painting.

Q.   Okay.  And do you remember December 8, 2007 to be a Saturday?

A.   Uh-hum.

          MR. ZOLOT:  And tell him to say yes or no please.

A.    Yes.

Q.    And what were you doing that Saturday?

A.    I went to eat at a restaurant.

Q.    Okay.  Who did you go to that restaurant with?

A.    With two friends -- one friend I have.

Q.    Well who are those two people that you went to the restaurant with?

A.    Jesus and El Choppo.

Q.    Do you know Jesus' last name?

A.    No.

Q.    Do you know Choppo's real name?

A.    No.

Q.    And do you have a nickname?

A.    No.  Millas.

Q.    What does that translate to?

            MS. INTERPRETER:  It depends.

A.    Millas, Miles.

Q.    Are you -- what restaurant did you go to?

A.    Las Jarochitas.

Q.    Okay.  And is that on High Point Road in Greensboro?

A.    Yes.

Q.    And now what time did you go there with your two friends?

A.    It was several times because we went to see some

cars.  It was about two or three.  I am not real sure exactly what time it was.

Q.  So you came back and forth from the restaurant?

A.  Yes.

Q.  Were you drinking alcohol?

A.  I was, yes.

Q.  Beer?

A.  Yes.

Q.  And at some point did some other people join your table?

A.  I think two or three other people came to the table.

Q.  Okay.  Now in the restaurant, what table were you sitting at?  What were you near?

A.  Right next to where the machine that sings the music is.

Q.  Would that be the back left corner?

A.  Yes.

Q.  And who are these three -- or how many people came to your table, new people?

A.  I think two or three.  I am not real sure.

Q.  Did you know any of those people before?

A.  I just had seen them a few times.

Q.  Okay.  Now I want to just explain something to you, sir, before you answer any further questions.

Do you understand what it means to be under oath?

A.   No.

Q.   Okay.  Let me explain to you that when you're sworn in you have sworn on the bible to tell the truth.  That means if you don't tell the truth in here, you're committing a crime --

A.   Uh-huh.

Q.   -- against the United States of America and you could be prosecuted for perjury or false statements or obstruction of justice.  Okay?  So before, I want you to think about that when you answer my questions.  And I caution you that if your answers are not truthful, you could be prosecuted.

A.   There is some things that I don't remember real well because I was drinking, so I can't tell you that well.  I was drunk that day when what happened happened.

Q.   That's fine.  The people who came to the table, had you met them before?

A.   I saw them two or three times.

Q.   Do you remember their names or nicknames?

A.   No.

Q.   Okay.  Which ones, which ones had you seen before?  Describe them.

A.  He was a little bit short, short hair.  He had a tattoo between his eyebrows, that's all.

Q.  Okay.  You don't know his name?

A.  No.

Q.  You don't know his nickname?

A.  No.

Q.  Okay.  He is not a member of a group that you're part of?

A.  Who?

Q.  We will get to that in a minute.  All right.  So what happens when these people come and sit down?  What happens when they come into the restaurant and join your group?

A.  They sat.  I think they sat down to eat.  I wasn't talking to them.  I was talking to my friend.

Q.  Well why did they sit down with you if you didn't know them?

A.  They knew my friend.

Q.  Which friend?

A.  Jesus.

Q.  How did they know each other, do you know?

A.  I really don't know.

Q.  Okay.  So you were sitting, eating, and you weren't really talking to them?

A.  I just greeted them just like you normally greet

somebody when somebody comes in and sits down with you.

Q.    Okay.  And did anything happen while you were all sitting there drinking and eating?

A.    Something like what?

Q.    Didn't an argument ensue?

A.    There was some other people that were over there to the side.  They were eating and drinking also, I think, and they looked at us ugly.

Q.    Okay.  And what happened when they looked at you ugly?

A.    One of the guys looked at me ugly and he got up and came over to my table, and I got up also and I said, calm down.  I don't want any problems.  And then he went back and sat down and I sat down.

Q.    Okay.  Then what happened?

A.    He got up again, came over to us and he started to argue with us again, and then I didn't want to and then I just heard a shot and I -- and I left running.

Q.    Who shot?

A.    I think it was the guy with the tattoos.

Q.    What did you see him do?  Did you see him pull the gun out of his waistband?

A.    We had our backs to each other and I threw one --

I pushed one of the other guys and I think that's probably when it happened.

Q. You pushed who?

A. One of the other guys that came over to us from the table. I think he wanted to hit me.

Q. So you pushed him and then you're saying that this guy with the tattoos just shot him?

A. Yes, I think so. He was -- I had my back to him.

Q. So you never saw the shot?

A. More or less I am pretty sure because he was to my back.

Q. Before the shot happened, did you get kicked out or did you see any of the people sitting with you get kicked out of the restaurant?

A. How do you mean kicked out?

Q. Okay. Did the waitress ask you to leave and brought you outside?

A. No, I didn't see any of that.

Q. Okay. Sir, would you lift up your arms like this? Okay. What do you have written there?

A. The last names of my mother.

Q. Okay. You have a spider web on your arm, right?

A. Uh-huh.

Q. On your left elbow?

A. What is that? What does it have?

Q.  Okay.  Do you have any other tattoos on you?

A.  Yes.

Q.  Where?

A.  On my stomach.

Q.  What does it say?  Why don't you show it to us.

MS. INTERPRETER:  Hecho en Mexico means Made in Mexico.

Q.  Do you have any other tattoos on your back?  What do they say?

A.  It's only a cross.

Q.  Anything else?

A.  One on the legs.

Q.  And what does it say?

A.  Some faces.

Q.  Why don't we see those.

MS. INTERPRETER:  He can't pull it up more because of this.

MR. ZOLOT:  Tell him to push the --

Ladies and Gentlemen of the Jury, it looks like a clown face, to describe it, and it says tomorrow -- what does it say?

MS. INTERPRETER:  L-l-o-r-a, llora manana, which means cry tomorrow.

MR. ZOLOT:  Thank you.

A.  I have another one over here.

Q.   Where?

MR. ZOLOT:   On the other leg, Ladies and Gentlemen.

A.   Some masks I think everyone has.

MR. ZOLOT:   That's a laughing clown face, Ladies and Gentlemen, the other one is a crying clown face, this one is a laughing clown face.

Q.   And what does it take say underneath it?

A.   Rie Hoye.

MS. INTERPRETER:   R-i-e space h-o-y-e. It means laugh today.

Q.   Okay.   Aren't you a member of Mara Salvatrucha?

A.   No, I don't have any tattoo from that.

Q.   That's not what I am asking you, sir.   You're aware that laugh now cry later is a gang tattoo, aren't you?

A.   No.

Q.   Symbolizing my crazy life?  No?

A.   No.

Q.   Well, and the spider web, that means you've been incarcerated, doesn't it, or you're in a web of a gang?

A.   Is that what it means to you?

Q.   What does it mean to you?

A.    Doesn't mean anything to me.  I just like it.

Q.    Okay.  Sir, I remind you you're under oath when you answer these questions.  Isn't it true that you knew the guy with the tattoos on his face as Wizard?

A.    No.

Q.    And he was the leader of your MS clique, wasn't he?

A.    No.

Q.    And isn't it true that when he got up to argue with the guys you told the waitress get your hands off him, he is MS, you don't put your hands on an MS guy?  Do you know who he is?

A.    Can you repeat that please?

Q.    Let me -- that was an unclear question.  Sir, isn't your gang name Spider, your MS-13 gang name Spider?

A.    No.

Q.    Sir, if I have known members of the gang and others who know you as Spider, a member of MS-13, why would they say that if that wasn't true?

A.    I don't know.

Q.    Why do they pick you out and say the guy with the spider web on his elbow is MS-13?

A.    What?

Q. Why are people telling us that know you that you are an MS-13 member and your name is Spider, the guy with the spider web on his arm?

A. I only did it because I like it, that's all.

Q. Okay. And you're aware at least that everyone else at that table was an MS-13 member, correct?

A. I don't know.

Q. How about the guy with MS tattooed between his eyes, you don't know he is MS?

A. No, I didn't see that they said that tattoo.

Q. So the tattoo between his eyes, you didn't see that?

A. Yes, but he was far away. I didn't see what it said.

Q. He sat down at your table.

A. Yes, but I couldn't see what the tattoo said.

Q. You couldn't see the MS looking him straight in the eye, you couldn't see that?

A. I don't think it had an MS. And, yes, I saw him.

Q. Did you see that he had tattoos on his eyelids?

A. Yes, but I didn't see them well because he had his eyes closed.

Q. He had his eyes closed?

A. No, excuse me, eyes open.

Q. Let's start from you're arguing with these guys at

the other table.  And it's your testimony that one of them came over to your table and was about to punch you?

A.   Uh-huh.

Q.   And do you remember a woman who worked at the restaurant putting her hand on your arm?

A.   Uh-huh.

Q.   Do you remember pushing her arm off?

A.   I just said to get off to the side, that's all.

Q.   That's what you said?

A.   I think that's what I remember that I had told her.

Q.   So you were trying to protect her, is that what you are saying?

A.   No.  Just so that she wouldn't get involved if the other guys were going to fight or something.

Q.   So you were trying to make sure she didn't get hurt, that's your testimony?

A.   Yes.  All I wanted to do was separate them.

Q.   Okay.  So you didn't tell her -- you didn't push her away and say nobody touches him, nobody messes with him?

A.   No.

Q.   You know there are lots of witnesses at that restaurant, right?

A.    Witnesses of what?

Q.    What happened that night.  You know there are a lot of people who saw what happened?

A.    Yes, I know there were a lot of people.

Q.    And you realize they saw everything that happened?

A.    Yes, I know a lot of people saw what happened.

Q.    And you know these were good, hard working people who are not criminals of any kind?

A.    I am also a person who has no criminal history.  I have my family.

Q.    Okay.  Well what if I told you they all said -- what if I told you that witnesses said that they heard you say don't touch him and talk about MS-13?

A.    I don't remember having said that to that girl.

Q.    Sir, you're lying, aren't you, to protect -- you're lying, aren't you?

A.    Who?

Q.    You.

A.    I am not lying.  I don't remember having said that to that girl.

Q.    You're a member of MS-13 and you're protecting your respected older member Umana, aren't you?

            MS. INTERPRETER:  Older member what?

            MR. ZOLOT:  Wizard.

A.    No.

Q.    Because the gang is stronger than anything, even your oath not to tell the truth, correct?

A.    I already said I am not a gang member.

Q.    Why does everyone else say you are a gang member?

A.    I don't know.

Q.    Why do they -- why were you showing such respect to the man with the tattoos on his face?

A.    When did I respect him?

Q.    How long did you know Jesus and El Choppo?

A.    It's been a while.  About two or three years.  I worked with Jesus.  We worked painting together.

Q.    How do you know El Choppo?

A.    He's also a painter.

Q.    But you don't know Jesus' last name and you don't know El Choppo's real name?

A.    No.  I think so, I am not real sure, but I think it's Rogelio.

            MS. INTERPRETER:  R-o-g-e-l-i-o.

Q.    Do you know what MS-13 is?

A.    Yes.  It's a gang, right?

Q.    Uh-huh.  You ever come across any MS-13 members in Greensboro?

A.    No.

Q.    Never?

A.   I have seen some people and I know they are gang members, that's all.

Q.   You ever been to any MS-13 meetings?

A.   No.

Q.   All right.  So after the shooting, you ran, right?

A.   Uh-huh.

Q.   Why did you run if you didn't do anything wrong?

A.   I was also -- I was scared that they would also shoot me or something like that.

Q.   Why would he shoot you?

A.   I don't know.  I don't know what with that guy that was there.

Q.   If he didn't know you and you didn't know him, why did he shoot that guy to protect you?

A.   He wasn't protecting me.  I don't know why he shot them.  There were other people that were looking at people ugly.  I don't know why he shot him.

Q.   Did you hear him yell out don't mess with MS-13 and other things related to MS-13?

A.   No.

Q.   So how do you explain it if everyone else in the restaurant heard that but you standing next to him?

A.   I never heard any yell.

Q.   At some point before the shooting occurred did the

one of the woman who worked in the restaurant come over and try to get you to leave the restaurant?

A.   It's -- I think she said that but not exactly to me.

Q.   Did you see any of the other people get escorted out of the restaurant sitting at your table?

A.   No, I didn't see any of that.

Q.   You were sitting there the whole time, right?

A.   I went to the bathroom and that's all.

Q.   So no one ever asked you to leave?

A.   No.

Q.   Okay.  Did you -- were you arguing with the guy over the jukebox?

A.   With who?

Q.   The guy who got shot.

A.   No.

Q.   What were you arguing over?

A.   I didn't argue with him at all.  I just greeted him when he came over.

Q.   Greeted him like, hey, how are you doing?

A.   Uh-huh.

Q.   Well then why were you almost going to get in a fight with him?

A.   Who was at the point of hitting?

Q.   Why, if you were just being friendly to him, why

was he almost going to hit you?

A.    I don't know what state he was in.  I just went.
I don't know.

Q.    So why did he single you out and bother you out of all the people sitting at the table?

A.    Who bothered me?

Q.    Sir, the gentleman who came over who got shot, that person, the one who was giving you bad looks.

A.    He was looking ugly at everybody that was at the table.

Q.    Okay.  And when he came over, what did you say to him?

A.    I got up.  I told him to calm down and to go back to his table.

Q.    And what did he say to you?

A.    I don't remember, he just grabbed -- he went back.

Q.    He had to say something to you.  Do you remember anything he said to you during any of the times he talked to you?

A.    He said something.  I couldn't understand it because the music was very loud.

Q.    But did you ask him what he said?

A.    No, I didn't ask him anything.

Q.    So a guy comes over, what did you think he was coming over for?

A.    I guess to fight because he was looking at us ugly.

Q.    Were you looking back at him ugly?

A.    Yes.

Q.    Okay.  Did you say anything to him that would be other than go back to your table and sit down?

A.    No.

Q.    You never shouted anything between the tables?

A.    Not that I remember.

Q.    So without saying anything the guy comes to your table twice, right?

A.    Uh-huh.

Q.    And you don't say anything to him except calm down?

A.    And some things that I don't remember.

Q.    Okay.  And was anybody else at your table saying anything to him?

A.    No.

Q.    So he just got mad at you because of the way you looked at him?

A.    Uh-huh.

Q.    Isn't it true that you and other people -- let me strike that.  Isn't it true that people from your table were shouting don't mess with us, we are MS, don't fuck with us; isn't that true?

A.    No.

Q.    Where were you born in Mexico?

A.    Veracruz.

Q.    When was the first time you came to the United States?

A.    It's been about seven or eight years.

Q.    Okay.  Where did you go when you first got here?

A.    Here to Carolina.

Q.    Where?

A.    Greensboro.

Q.    Have you lived anywhere else besides Greensboro in the United States?

A.    Yes, in Delaware.

Q.    Okay.  When did you get your tattoos?

A.    It's about been about two or three years.  No, two years.

Q.    What do you think the clowns on your leg mean?

A.    I just like them.

Q.    Well, but they say things, what do they mean?

A.    I don't know.

Q.    You don't know?

A.    I just like them, that's it.

Q.    Okay.  So you tattooed both your legs permanently for something you don't know what it means?

A.    Yes, I just like it, that's it.

Q.    Okay.  Have you ever lived anywhere besides Delaware and Greensboro?

A.    No, that's it.

Q.    Did you get beat in as an MS-13 member in Delaware or Greensboro?

A.    I already told you, I am not a gang member.

Q.    Okay.  So why was your back turned towards the guy when he shot the man?  Why was your back turned to the guy with the tattoos when he shot the man?

A.    Because there was another guy next to me and I pushed him for me to go out.

Q.    What guy?

A.    I don't remember.  I don't remember their faces. I already told you I was drunk.

Q.    Was it one of the guys sitting at your table or one of the guys from the other table?

A.    From the other table.

Q.    So there were -- all right.  Now you're saying something different now.  You said one guy came back over to your table, now you're telling us that there is a second guy from the other table who came back over to your table.

A.    There were five or six people at the other table that got up and came over to us.

Q.    So you're saying there were five or six people

over at your table now?

A.    There were five or six people at the other table. When the shots happened, two of them got up.

Q.    It was only after the shooting that the guys got up out of the table?

A.    When the shots came up.  Because the shots happened, I pushed the other one.

Q.    Okay.  Sir, you're not being clear at all.  Listen to my question.  The guy who was giving you the bad looks --

A.    Uh-huh.

Q.    -- he came over to your table how many times?

A.    One time I pushed someone, told him to calm down, and then he came back another time.

Q.    Okay.  The second time he came back, did he come back by himself or was someone else with him?

A.    He came back with another.

Q.    And what did that person say to you?

A.    They came over, that's when I pushed him because I knew that they were going to hit us.  I heard the shot and I ran.  It wasn't that person that got shot, the one that I pushed.

Q.    Are you aware that two people got shot and killed in that restaurant right in front of you?

A.    I didn't see.  I just left.  I know that there

were two dead because my wife told me.

Q.    And your back was turned when the shot came?

A.    Uh-huh.

Q.    Why was your back turned if you were facing the guy to push him?

A.    What?

Q.    Why was your back turned if you're facing the guys -- where were the guys -- were you standing or sitting?

A.    Sitting down.  When I saw them get up, I got up.

Q.    You stood up.  Where were the two guys in relation to where you were?

A.    Related to what?

Q.    Where were the other guys?  When you stood up, where were they?

A.    They were coming to me.

Q.    Where did they stop?

A.    In front of me.

Q.    Both of them were right in front of you?

A.    One stopped in front of me and I went to push him, the other one stopped in front of the person who shot.  And when I pushed him, I heard the shot and I left running.

Q.    Where was the guy who shot?  Where was he in relation to -- where was he standing in comparison

to where you were standing, the guy who shot?

MS. INTERPRETER:  Who did the shooting?

MR. ZOLOT:  The guy who did the.

A.   Behind me, to my side behind me.

Q.   So how come you didn't get hit with the bullet if he was behind you?

A.   Because he shot in front.

Q.   You were in front of him?

A.   I wasn't in front of him.

Q.   Wasn't he behind you?

A.   Yes, he was behind me.  But when I pushed the other is when I heard the shot, but he shot in front.

Q.   Okay.  Had you ever met this guy with the tattoos before, the one who shot, have you ever met him before?

A.   I had seen him two or three times.

Q.   Where had you seen him?

A.   In some restaurants.

Q.   And in all those times you never noticed that he had a big MS between his eyes?

A.   No.

Q.   Okay.

MR. ZOLOT:  Grand Jurors, do you have any questions for this witness?

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 92 of 194

(WHEREUPO
the Grand Jury

Q. Sir, I am going
tell the truth.
opportunity to tel
there anything you
just told us, now is

A. No, that's it.

Q. And you're telling us t.

A. Uh-huh.

MR. ZOLOT: Oka
anything else?

(WHEREUPON, there
the Grand Jury.)

MR. ZOLOT: Okay.
excuse Mr. Grenados as a witness

(WHEREUPON, the witnes
room.)

Q. Okay. Have you ever lived anywhere besides Delaware and Greensboro?

A. No, that's it.

Q. Did you get beat in as an MS-13 member in Delaware or Greensboro?

A. I already told you, I am not a gang member.

Q. Okay. So why was your back turned towards the guy when he shot the man? Why was your back turned to the guy with the tattoos when he shot the man?

A. Because there was another guy next to me and I pushed him for me to go out.

Q. What guy?

A. I don't remember. I don't remember their faces. I already told you I was drunk.

Q. Was it one of the guys sitting at your table or one of the guys from the other table?

A. From the other table.

Q. So there were -- all right. Now you're saying something different now. You said one guy came back over to your table, now you're telling us that there is a second guy from the other table who came back over to your table.

A. There were five or six people at the other table that got up and came over to us.

Q. So you're saying there were five or six people

STATE OF NORTH CAROLINA    )

                           )    C E R T I F I C A T E

COUNTY OF CABARRUS         )


        I, Renee Habrack, Notary Public, do hereby certify that ANGEL RIVERA GRENADOS was duly sworn by the Grand Jury Foreperson prior to the taking of his testimony; that said testimony was taken and transcribed by me; and that the foregoing pages are a true and accurate transcript of the testimony of said witness.  I further certify that the persons were present as stated.

        I further certify I am not of counsel for or in the employment of any of the parties to this action, nor am I interested in the result of said action.

        IN WITNESS WHEREOF, I have hereunto subscribed my name, this 18th day of May, 2008.


                        _____
                        RENEE M. HABRACK, C.S.R.
                        Registered Professional Reporter
                        Notary Public #20041960006

# APPENDIX 150

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 94 of 194

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

IN RE:                                    )

                                          )

Grand Jury Investigation                  )

                                          )

APPEARING:                    Mr. Kevin Zolot
                              Assistant U.S. Attorney
                              Charlotte, North Carolina
                                   and
                              Mr. Sam Nazzaro
                              U.S. Dept. Of Justice
                              Washington, D.C.


TESTIMONY

OF

MIKE ATTARD


At Charlotte, North Carolina

April 24, 2008

REPORTER:   RENEE MARIE HABRACK, CSR, RPR

            Notary Public


**ORIGINAL**

*Adams & Holt, inc.*

**Verbatim Court Reporting Services**

401 Rensselaer Avenue / Charlotte, NC 28203 / (704) 334-4602 / (800) 435-0419

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 95 of 194

This is a Grand Jury Investigation that was conducted at the Charles Raper Jonas Federal Building, 401 West Trade Street, Charlotte, North Carolina, on April 24, 2008, before Renee Marie Habrack, CSR, RPR, Notary Public.

MIKE ATTARD, upon first being duly sworn by the Grand Jury Foreperson, testified as follows:

EXAMINATION BY MR. ZOLOT

MR. ZOLOT:  Is there a quorum present?

MS. FOREPERSON:  Yes, there is.

MR. ZOLOT:  Thank you.  All right. Ladies and gentleman, I'd like to introduce you to Agent Mike Attard.  His last name is spelled A-t-t-a-r-d.

Q.  Would you introduce yourself to the members of the Grand Jury?

A.  Sure.  I am a special agent with the FBI here in Charlotte, and currently I am assigned to the Safe Streets Gang Task Force, which is a task force that is sponsored by the FBI but involves multiple agencies including local and federal law enforcement.  And what we do is we investigate

criminal enterprises, primarily gangs, and our goal is obviously to dismantle these gangs and these criminal organizations. I have been with the FBI for about approximately three years.

Q. Great. And are you the lead case -- FBI case agent in the case against MS-13?

A. Yes.

Q. In our investigation in Charlotte?

A. Yes.

Q. Now, Agent Attard, first, let's start with what does MS-13 stand for?

A. MS-13 stands for Mara Salvatrucha 13.

Q. And if you would explain, and for the record, are there several different interpretations of what Mara Salvatrucha means?

A. There are.

Q. Why don't you give the most common understanding about what those terms mean.

A. Okay. I think it's first important to understand that Mara Salvatrucha 13 is a gang. It's -- it was created in Los Angeles but it's primarily made up of those descendents of El Salvador. Mara is a word that means clique, clique being a group of individuals, could be any number. But, you know, if you think of a gang, it's usually a group of

members.   In Spanish Mara means clique.

Q.   Or gang?

A.   Or gang, sometimes it's interpreted as gang.
Salvatrucha has some different meanings.  The most
common from what I see, Salvatrucha means a
soldier of Salvador, meaning a Salvadoran,
Salvadoran soldier or fighter.  Some just say it's
a slang for Salvadoran because they are all
fighters in Salvador.

Q.   All right.  And 13, is it fair to say that 13 is a
number of respect because it's the -- M is the
13th letter of the alphabet?

A.   Right.

Q.   And it also has ties to another prison gang,
correct?

A.   Right.  Another criminal organization called La
Eme which is also known as the Mexican Mafia.  So
any street gang that has the number 13 after them
generally means that they are in align or in
corporation with La Eme or the Mexican Mafia,
which is another street gang that primarily deals
with illegal narcotics, primarily cocaine.  And
typically what it means to have -- to be in
corporation is that these street gangs, they
distribute cocaine and they sell it at the street

level and they pay the Mexican Mafia taxes or dues.

Q.    And the Mexican Mafia is primarily a street gang, am I correct about that -- primarily a prison gang?

A.    Right.  Created in prison.  Those who are obviously not incarcerated are on the streets and they typically run cocaine to and from the border.

Q.    Okay.  And why don't we talk about the 1980s and how El Salvadorans -- why and how the El Salvadorans first came to LA and how the gangs started being formed, and we could be brief about this.

A.    El Salvador is a small Central American country. Geographically it's approximately half the size of North Carolina.  It currently has a population of about five or six million, small country.  I think North Carolina has a population of about eight million.  So in the 1980s they went through a very violent civil war, and as a result of that war approximately 700,000 people fled the country.  A lot of them went throughout Central America, many of them went to the Los Angeles area where they pretty much gathered in Eastern LA.  As a result of the poverty levels and the history of the

violence and their familiarity with violence, the street gang became about in the '80s.

Q.   And did it also come as a consequence that other gangs were beating up on some of the El Salvadorans?  Is it fair to say they banded together to form their own gang to protect themselves from other gangs in LA?

A.   Like we did see with any other group of immigrants that come from other nations, typically they stick together.  They take possession of blocks, very territorial.  And like Kevin said, because of the violence that other street gangs, whether they were black or other Hispanic gangs in LA, they created their own gang.

Q.   And just for the record today MS-13 doesn't just comprise El Salvadorans, it has expanded to encompass many other nationalities; is that correct?

A.   Primarily Hondurans and Guatemalans and we also see a big presence of Mexicans.

Q.   Okay.  Thank you.  So when the gang was being first formed in LA, can you talk about in a very brief way the development and how it has spread since that time and gone back to El Salvador?

A.   Right.  These Salvadorans, many of them were

trained to fight, a lot of them have fought in the war, the civil war, many of them just became warriors because they had to defend themselves. So violence was very familiar to them. And over the years MS-13 has taken pride and been known as being the most violent street gang. And in El Salvador a lot of them fought with machetes, and so a lot of times when you will hear about criminal acts or violence conducted by MS-13 you will see that a lot of times they use machetes. They don't have guns. And over the years they evolved to this criminal organization where now they are starting to use different firearms and different tactics. And that was in the '80s, and as time has passed the gang has spread east. We see it as far east as obviously Charlotte, North Carolina here. In the '90s new legislation allowed for immigration to deport a lot of these criminals, and as a result the gangs spread back into El Salvador, Honduras, Guatemala and Mexico. Because those countries have, in many instances, weak law enforcement, they are starting to see that the gang population continues to increase and is almost to the point where it's become very difficult for law enforcement to combat these

gangs.

Q. Now let's talk a little bit about, because it's relevant to our case, how the gang has now developed in El Salvador and how that relates to the United States as far as the leadership and structure of the gang.

A. El Salvador is still a very developing country with much poverty. And unfortunately I got to experience that a few weeks ago when I was down in El Salvador and was able to see the poverty levels, and it's very unfortunate. They are very good people down there. But as we began deporting people back to El Salvador in the '90s and today, those gang members continued to stay in the gang and they continued to grow, many of which have become incarcerated in El Salvador for criminal activity they engaged in in El Salvador. What we are seeing here in Charlotte is those that are incarcerated in El Salvador continue to control the gang in the United States, and we see that in Charlotte. We see these leaders that are incarcerated are using cell phones in prison and they are communicating through people throughout the United States and they continue to control who is in charge of what area and they continue to

attempt to organize the cliques of MS-13 in Charlotte.

Q.   Okay.  Now let's talk about the organization of MS-13.  And is it fair to say that MS-13 does not have the typical hierarchal leadership that we think of when we think of say the mafia with the head person and lieutenants and people under that; is that fair to say?

A.   That's very fair to say.  What we typically see is for each clique --

Q.   And what's a clique?

A.   In a specific area each group, and it can comprise of anywhere between three to, you know, 200 people.  The original cliques started and they take names, sometimes they take names of streets or blocks.  Some of the most --

Q.   In LA, right?

A.   In LA originally.  Here we see it being a little different.  We see a presence of approximately ten to 15 cliques here in Charlotte.  Some of the clique names to give you examples, Noventa which means 90, and that comes from 90th Street in LA. We also see South Boulevard, which everyone is familiar with South Boulevard here in Charlotte, there is a clique.  They are comprised primarily

of those that were -- that are of Hispanic background but grew up here in Charlotte and they created South Boulevard clique.  So those are just some examples of different names.  In order to become a part of MS-13 you typically have to be what we call jumped in or beat in, and that's typically your friends beat you up for 30 seconds. It's sometimes 13, sometimes 30.

Q.  And these beat-ins, that's the gang initiation?

A.  That's the gang initiation.  And then typically what that shows is that you are committed to the gang and that you're willing to give your life and you're dedicated to that gang.  Typically what follows is a mission to show your allegiance to the gang, and that typically involves a shooting or some kind of criminal act, typically a violent act.

Q.  Let's get back to the organizational structure. So is there like one leader of MS-13?

A.  There is not.  There is not.  What we see is there is what they call a voz or a voice, and that voice oversees the clique in a specific area, and that voice will communicate back to El Salvador to those that are incarcerated that may have control over a specific area.  So, for example, there

might be one person incarcerated in El Salvador that oversees Charlotte, and that person will talk to each voice of each clique in Charlotte.  So let's say we have, you know, ten different cliques, well those in Charlotte, those ten voices will communicate back to Charlotte -- or to El Salvador to that person who controls it.

Q.  And, in other words, are they also called shot callers, the leaders in like --

A.  Sometimes they are referred to as shot callers.

Q.  And sometimes the people in El Salvador that are making the calls here are called the voice as well, correct?

A.  That's correct.

Q.  It's kind of a term of leadership?

A.  Yes.

Q.  And --

A.  The way you gain seniority with the gang is based off the number of criminal acts you have engaged, you earn respect.  It's also based on the number of years you have been in the gang, but nobody appoints you.  There is no, you know, it's very different than La Cosa Nostra or the mafia where you have a specific organized structure.  We don't see that.  And it's proven to be very effective

for them because a person is very easily replaced when they are either arrested or they are killed, and that's why they do that.

Q.    And you said they were -- let's talk about the prisons in El Salvador because they become relevant to this investigation.  How does El Salvador deal with the different gang problems and their prison population?

A.    Actually in the '90s the United States actually built them a prison to help them incarcerate a lot of their gang members.  And the way they do it there, they incarcerate by the gang.  So you will see one prison that's completely dedicated to MS-13, and you will see another prison that's completely 18th Street, which is another street gang.  And they do it that way because of the fighting.  Because if you incarcerate them together, they are going to kill each other.  And it's sometimes difficult to understand, but you have to understand the way they incarcerate people down there and their jail system is very different than ours.  They have a lot more freedom than we do in our prisons.  They are able to gain cell phones very easily and a lot of that has to do with the public corruption in the prisons.  When

you look at some of these prison guards, they make no more than $100 a month, and so for them to be paid $100 to smuggle a cell phone in, it's not a big deal to them but the benefits, you know, $100 could go a long way down there.  So what we see is we see a lot of corruption in the jails and we see it's very easy for them to communicate outside to other gang members.

Q.  All right.  Let's switch topics and talk about what is MS-13's main goals that you see in general of the gang?

A.  Well one I think that they are striving to, in Charlotte they are striving to organize and to control specific areas.  What they typically do is they control certain clubs or certain blocks and those people that either live in those blocks or have businesses are required to pay taxes to the gang, and that tax money is used to purchase more weapons.  It's used to pay rent for MS safe houses or it's used to buy drugs and to sell drugs to gain more revenue and to grow.

Q.  All right.  So would it be fair to say the main goals of MS are to grow as a gang, and I am talking nationally here, and to destroy all their rivals?

A.   That's correct.  Big focus for them to is defeat their rival gang members.

Q.   Who are those rivals, the general major rivals of MS-13, the other gangs?

A.   Okay.  Primarily 18th Street which is another street gang that originated in the Los Angeles area, very big in El Salvador, very big in LA, may well probably be the most biggest street gang.  A lot of Hispanic gangs like MS-13 are very opposed to the black gangs too.

Q.   And those being typical black gangs?

A.   Cripps, Bloods.  Other Hispanic gangs we see Matildos here in Charlotte, and --

Q.   What about Sur 13?

A.   Yes, Sur 13, Surenos 13, Sureno meaning southern is another street gang.  In LA they work well with MS-13.  Here we see that there is a very distinct rivalry between the two gangs to the point where we see shootings almost weekly between Sur 13 and MS-13.

Q.   Okay.  And could you explain the role of violence, what the role of violence plays in the gang activities and how they can effectively achieve their goals?

A.   MS takes pride, like I said, in their violent

acts.  They love to intimidate and that's how they are able to extort or gain additional territory. They control by fear, and most people fear them because they are an extremely violent group. Because like most people say you're a product of your environment, a lot of these kids or adults, they grew up in very violent areas of El Salvador. They know nothing but poverty.  They know nothing but violence, and they're only doing what they are used to.  And in order to gain respect, you have to continue that violence.  And like what you see with other criminal organizations, when you're able to intimidate someone and you're able to control with fear, those people aren't -- they are going to fear you.  They are going to pay you. They are not going to go to the police and they are scared and they will do what you say because they fear for their lives.  They fear for their families' lives.

Q. Now let's talk about when gang members commit acts to get -- do gang members commit acts of violent crimes to get status with the gang, to increase or maintain their status with the gang, and then if they do what are those acts and how -- what do you see the pattern of how they commit those acts?

A.   What we see often in Charlotte as soon as you become a member, as soon as you're beat into the gang, typically that same night you will conduct a mission, and that mission is typically a drive-by shooting.  And throughout your membership you have to be able to prove yourself.  You have to be able to show that you are not afraid, that you are willing to commit these acts of violence.  And a lot of times we will see extortions that occur, a lot of beatings, a lot of just different violent acts of different rival gang members or just people who may be drug dealers that refuse to pay MS-13.

Q.   What about robberies?

A.   We see a lot of robberies.  Obviously a lot of these guys don't have jobs, and with the economy slowing down we are starting to see more and more unemployment and we are starting to see some of the criminal acts increasing.  We see a lot of these guys when they are employed, they are often employed in construction jobs.  And since there's been a construction slow down, we see a lot more of them being unemployed.  So they need to do something for money.  They need to do something to eat.  So what we see is they will do a lot of

muggings, especially on the weekends.  Friday and Saturday nights they will mug a lot of the Hispanics because they know a lot of the Hispanics are illegal and they won't go to law enforcement. So they will get them as they are leaving the bars.

Q.   And we are talking in general now about MS, we are not talking specifically about Charlotte now.  We are talking about MS and their pattern of activity.  Let me change topics.  How does one, and you touched on this a little, how does a gang member get that status in the gang that increases their reputation that you say was so important to them?

A.   Well I think, again, they commit acts of violence. They do shootings.  To kill someone, that's huge. If you kill a rival gang member, that's huge too, and you gain a lot of respect by killing a rival gang member.

Q.   And do they have -- talk about in general when an MS goes out to do a shooting, they usually go in pairs of two or more; is that correct?

A.   Right.

Q.   Why is that?

A.   They typically want a witness.  Because I think

what they see often is a lot of gang members don't actually shoot someone, and they want to tell people that they shot someone either because they are scared or because they just don't want to do it.  But they know that if they don't conduct these criminal acts they are going to get killed themselves and we see that a lot too.  If you're scared or if you try to get out of the gang or if you're supposed to shoot and you don't shoot, you're either going to get a beating or you're going to get killed at some point because you're no use to the gang.

Q.  And what is the -- what is MS -- talk about how do they view what we call snitches or people who cooperate with law enforcement and what do they do generally, how do they view snitches, what do they do, and talk about the paranoia within the gang about snitches.

A.  You know, law enforcement has an investigative technique.  When we're able to develop charges on someone, we are able to assist those individuals if they are able to cooperate with us or if they are willing to cooperate with us.  And many times people are willing to cooperate.  They are able to give us names.  They are able to, you know,

describe the criminal acts that are occurring, and what we call being a snitch. MS-13 has historically killed anyone who is suspected of being a snitch. In El Salvador we see homicides every weekend for those that are even suspected. Here often they require paper, which means they want to see a court document. You don't underestimate these guys. A lot of people do, they think they are just a bunch of thugs, and in many cases they are, but sometimes they are very sophisticated. A lot of them are adults. Some of them have some education. And they know how to use the internet. They know how to look to see if someone has been arrested. They know how to look to see if someone has cooperated. And if they find paperwork where a person is mentioned as being a cooperator, that person will die. They will be killed, their family will be killed, and we have seen this over the years numerous times. They will not just kill you. They will kill your brother. They will kill your parents. They will kill your entire, what they call generation, and they aren't afraid to. They don't want to go to jail and they will do whatever it takes, and to kill someone is nothing. It's nothing to them.

MR. ZOLOT:  And, Ladies and Gentleman, I just want to instruct you we're talking generally about MS-13 now.  We are not getting into specifics about any general people.  And Agent Attard has said some things that were his opinion or editorialized about some of the things, I just want to instruct you that they are Agent Attard's opinions.  I'd ask you to stick to the specific facts that he is relaying to you about the gang and how they conduct their business, to ignore any sort of Agent Attard's opinion because of his years of experience in dealing with them.

Q.  Why don't you talk about the network.  Why don't you talk about the network across America and how the different cliques are able to talk to each other and the kind of amazing network they do have --

A.  Uh-huh.

Q.  -- across the country.

A.  We have been able to see from people who were either arrested or people that have cooperated, in many cases they communicate to these clique voices or these clique leaders throughout the country.  Like I mentioned earlier, the gang had started out in LA and has spread itself east.  And it's

primarily because it's so congested in LA and everybody wants new territory, to be able to control new territory.  And Charlotte is one of those newer areas where there is a lot of new construction, new neighborhoods, and what we are seeing is a lot of people from out west coming here because they want to be able to be a leader or be a voice or be a shot caller and --

Q.  Is the gang --

A.  A lot of times it's done in cooperation with those that have a higher status in LA and they communicate.  And often times LA will call different areas and say hey, you know, how many guns do you have?  How many bodies do you have?  We want to do a shooting this weekend.  Can you send some guys our way?  It's a sophisticated network.  And when there is either a mission or some kind of retaliation, they will call a different area.  For example, Boston may call Charlotte and say, hey, we got this, we want to do this big shooting, we want to make a presence up here in Boston.  What kind of guns do you guys have?  What kind of money do you have?  Can you guys come up here this week and can you bring cars?  Can you bring guns?  Can you bring bodies?

You know, like any other criminal organization, they have resources.  They have assets and they use them and they know that's the only way they are going to survive.

Q.  Let's talk about that, the transience, that not only do they talk, communicate, but they also -- is it fair to say that MS-13 members can live in New York for a while, then to Charlotte, then to Virginia, to Boston, and that?  Talk about the transience of the actual membership and the clique structure.

A.  This is real important because as Americans we don't typically think this way.  We don't think people live this way, but it's what Kevin is saying is very true.  They are very transient in that what we see is there is safe houses, either the rent the house and maybe 10, 15 of them stay into a house.  And when things get what they call hot in a certain area, when police are onto them, when they find out there is a warrant issued for them or after they conduct a criminal act like a shooting, they know police are looking for them. So what do they do, they just leave town.  They just go to a different city and they hang out with homeboys or MS-13 members in another city.  It's

not a problem for them.  All they got to do is get a ride to that city and there is already a house for them.  There is already a place for them to stay.  In many cases they share money, because that's what they do.  To them it's a family, and there is a devotion to that.  If they don't, if they don't help out each other, then they get beat or they will get killed.

MR. NAZZARO:  Just to follow-up on you mentioned about the jump-ins and just in general do they, within the cliques, do they regularly have meetings?  Is that part of what they do?  And do they wear -- have they traditionally worn tattoos?  And if you could just generally talk about that a little bit.

A.  Typically they will have weekly meetings and it will be one night of the week they will all get together.  What they like to do is do what they call control the streets.  So they are typically out between midnight and 5 a.m., so we see our most up criminal activity at that time, but that's the time when they meet too.  They meet in the middle of the night.  They will sit around in a circle.  They will -- if there's new people, introduce themselves.  They will talk about how

much money they were able to extort for the week. They will talk about what the rival gang member situation is.  They will discuss shootings.  They will discuss drug dealings, and --

Q.    Cooperators?

A.    And what?

Q.    Cooperators sometimes?

A.    Yeah.  A lot of times they will talk about if there is snitches, who is suspected of being a snitch, and then what they often do is they issue what's called a green light, green light meaning this person has a hit on them or this person needs to be killed, and a lot of this stuff is discussed at weekly meetings.

Q.    Talk about traditional colors and tattoos to follow-up.

A.    The color for MS-13 is blue.  Typically you're required to wear something of a blue nature.  If you're wearing red, then red is a color of 18th Street.  And a lot of times they are able to identify each other by the colors they wear.  And for MS-13 if you're wearing a red shirt, you're typically assumed that you are an 18th Street member.  You're going to shot if your seen in the streets.  So a lot of times what we see is, you

know, people just wearing -- they're Hispanic and they are wearing a red shirt, and they're getting shot because they are thought to be a rival gang member.  So colors are very important to them. Colors show that you are part of the group, shows that you're part of the gang.  And the other thing that we have seen is tattoos.  They are not afraid to tattoo each other, and this shows your allegiance to the gang.  It shows that you are a member.  So if you do go to a new city and you don't know anybody there, you lift up your shirt and a lot of times they will have Mara Salvatrucha written on their chest, MS.  You guys may have seen on TV a lot of them tattoo their faces, and tattooing is very common.  But what we are seeing now is that they know law enforcement is onto them and what CMPD typically does now, their gang unit, when they pull somebody over, when they have identified somebody that's a gang member, they will photograph you and photograph your tattoos so we can identify you as what gang you're part of and try to, you know, just identify you and see what criminal acts you may be wanted for or have engaged in.  So what we are starting to see is the new rules are no more tattoos because some of the

old members have tattoos on their heads and on their faces and you can imagine how they are treated. And there is no way you can hide that from law enforcement. And a lot of times law enforcement will stop them because they know they are gang members and the tattoos can't be hidden.

Q. Of course law enforcement doesn't stop someone just because they are a gang member?

A. Not just because of that, but they are going to question you.

MR. ZOLOT: Just to clarify, and for the record, Ladies and Gentlemen, there is nothing illegal about being a gang member. Okay. The first amendment protects that. I just want to be clear about that so later on you're not confused about this. It's when, as you saw, it's once RICO involves is a group of people who get together to commit criminal acts, that's where the crime, that's where the illegality comes in. So I just want to make that clear, there is nothing illegal in this country about being in a gang or any other group, okay. Is everybody clear about that?

GRAND JURY: Uh-huh.

MR. ZOLOT: Okay. Ladies and Gentlemen, yeah, we are going to open up to

questions now because I think Agent Attard is done with his general.

GRAND JUROR:  I just wondered what symbols that they use.  I know a lot of times that is something that we might see.  Also about recruiting and ages and females too, because I know we have talked a lot about males but --

THE WITNESS:  Very good questions.  A lot of times they will identify each other by gang signs.  I can't do those gang signs.  The most common one is like this.  It's you are making like an M and then there is something where you make an S.

MR. ZOLOT:  For the record, let me do this.  Just for the record I need to describe what Agent Attard is doing.  He is putting his pinkie finger and pointer finger up and holding all other fingers down to sort of form the M in MS-13.  He is also putting his fingers in a way to do an S. Go ahead.

THE WITNESS:  What we are seeing as far as recruiting is they are recruiting at young ages, primarily minors.  And the reason for that is that they know these minors get in trouble, they are treated as minors in the legal system and

they are often not incarcerated.  So what we are seeing is at a very young age, as young as 12, 13, we are seeing these kids being jumped into these street gangs and becoming MS-13 members.  As far as women, women are welcome to join the gang.  There is two ways.  Women who join they are either sexed in or they are beat in.  We are starting to see beat-ins more common.  A lot of women don't want to be sexed in.  Being sexed in typically involves having sex with anywhere between ten and 15 MS-13 members in one night.

Q.  And are women treated as full equals in the gang as the men?

A.  They are not.  Women are not often allowed to be a part of the meetings.  A lot of times they are used as a way of communicating between different cities.  They will coordinate those who are trying to flee one area to go to another.  They will set them up in houses and they will often call and talk about who's been arrested.  They primarily serve as a line of communication for the gang interstate and sometimes internationally.

GRAND JUROR:  Do they also bring folks in from other places like that are specifically to recruit, like recruiter people that might enroll

in school or, you know, be within a neighborhood where there might be a large population of potential members?

THE WITNESS:  What we see often is when areas are unorganized or they need more senior members, those who have experience, El Salvador will order some senior members let's say from New York to come down to Virginia, or sometimes they do it on their own free will and they will call up and say, hey, is it okay, or they will call LA and they will say is it okay, I hear Charlotte, you know, can't get organized, or Atlanta can't get organized, or Virginia, can I go there?  Can I help them out?  And a lot of times they will say, the person who makes the call says, okay, what have you done?  How many have you killed?  How familiar are you with the drug trade?  Yeah, go. We need your help there.  We need to get organized.

MR. ZOLOT:  Any other questions?

GRAND JUROR:  I just had one follow-up question.

MR. ZOLOT:  Sure.

GRAND JUROR:  Like what is their graffiti?  Do they graffiti their territories

or --

THE WITNESS:  Yes, very common.

GRAND JUROR:  -- clothing, that type of thing?

THE WITNESS:  They will graffiti walls. You typically see that with the younger kids, they will do that.  We call tagging.  And they will tag, typically MS-13, they will tag over a rival gang graffiti.  They will also tag their clique. And with every clique follows locos, locos meaning crazy Salvatruchas.  So like I was saying earlier, South Boulevard might be SLS or Noventa might be NLS, and those three letters will get tagged too after MS-13.  Sometimes they tag the fingers.  A lot of times you will see a very common MS-13 tattoo is the hand giving like the M sign.

GRAND JUROR:  Are they citizens or are they --

THE WITNESS:  Some are.  I am going to say just to give you a rough estimate I'd say, you know, definitely the younger generation is.  We see probably 50 percent being El Salvadorans as far as just a general makeup.  The other 50 percent either being born in America or being of Honduran, Guatemalan or Mexican descent.

GRAND JUROR:  Are they here legally though?

THE WITNESS:  I'd say probably half of them are not, maybe more than half.  It depends on the area.

MR. ZOLOT:  You've got a question?

GRAND JUROR:  As far as like how the ring works or with the voices in El Salvador and then they tell there is like a few groups in Charlotte or any given city, do those groups in that city fight each other or...

THE WITNESS:  It occasionally happens, but for the most part they work out their differences because they have the rival gangs that are the bigger problem.  Typically they work out and there is enough area for them to control their own little section.

Q.  And actually this is important to talk about. Agent Attard, are we to look at different cliques as different gangs?  Or really just fair to say someone who lives on another part of town but is still in the enterprise of MS?

A.  It's all one gang.  They are all MS-13.  They have different cliques because they are just from different parts of towns.  And a lot of times we

see them coming from, like I mentioned earlier, from different parts of the country.  So you may only have, you know, two members from one clique but they join each other and --

Q.   Do you see like -- do you see some clique members joining other cliques?  And is it fair to say they are interchangeable when they move, they just join whatever MS clique is there?

A.   Right.  If you're fleeing New York to come down here, you may be the only member of, you know, the Long Island clique.  And you may have that tattooed on you, you know, you're part of the Long Island Loco Salvatruchas.  You come down here, you join another clique.  Or you just, you know, you meet friends and you hang out with another clique, and then eventually you're required to get beat in to that clique.  So typically when you move you're required to get beat in to another clique, join another clique to show your allegiance.

          MR. NAZZARO:  Special Agent, I don't know, you might have said this, has there ever been an estimate nationally about approximately how many members of this organization there are if you know that?

          THE WITNESS:  There has been and, you

know, I don't know the figures exactly. But to give you a rough estimate we are probably looking somewhere around 10,000, 10,000 members in the United States.

Q.   And I just wanted follow-up on the cliques thing for a minute. Would it be fair to say you could look at the cliques like franchises of McDonald's? That there may be a McDonald's on South Boulevard and one on Central Avenue, but they are all McDonald's; is that fair to say?

A.   And the rules are the same with MS. You have to be, it doesn't matter what clique you're part of, a lot of times a clique just has to do with the area that you live or the guys that you hang out with or the ones that you grew up with in high school. The rules are the same with MS. And typically we see that there is 20 set rules, and one, like rule number one, there is no snitching or you're going to get killed. You know, rule two is you treat your homeboys like they are your family and they come before your family. And there is rules like that.

Q.   Okay.

A.   But the rules, no matter what clique you're part of, they are always the same.

MR. ZOLOT:  Yes, sir.

GRAND JUROR:  When they have the meetings, are the meetings done individually as cliques or will a bunch of cliques meet together say in Charlotte?

THE WITNESS:  In LA because there is so many clique members for one particular clique, they will meet as a clique.  And because they are so well-established out there, they got 20 years of experience out there.  They have survived for 20 years.  Those who have been able to avoid law enforcement and stay out of jail and because of just the quantity of gang members out in LA, it's very clique specific.  But what we see here is because you have a few members from this clique and a few members from that clique and people, you know, coming here from different states, you will see, you know, maybe ten different clique representatives at one meeting.

Q.  And something I want to follow up on, Ladies and Gentleman, I am just going to ask the agent if you will indulge me, do MS-13 members have jobs?  Do they have real jobs and do they have lives aside from the gang?

A.  A lot of them do.  I'd say most of them do.  Most

of them have jobs. Most of them, like I mentioned to you earlier, are in the construction business. A lot of them will work ordinary jobs. They blend into society. So other than those who have, you know, tattoos on their face, and that's where we are starting to see less and less of that because they want to blend. And, you know, they may work a job during the day but at night they are gang banging. They are out in the streets. They are mugging people. They are extorting people. They are robbing people. They are selling cocaine at the clubs, and they are shooting. And a lot of times you won't tell. You won't tell. These people don't always stand out. The older generation, they do. They stand out. The younger generation, especially the ones in the United States because they know that law enforcement is trying to be proactive, they are going to hide it.

GRAND JUROR: So essentially -- I am sorry.

MR. ZOLOT: No, go ahead. You had a hand in the back, but go ahead.

GRAND JUROR: Essentially they started this as a preservation of their culture but now they are moving towards --

THE WITNESS:  No.  I don't want you to get a bad idea of -- a bad impression of the Salvadoran people.  These are great people.  But like any group of immigrants, and we have seen it in New York over the years, you see the Irish, you know, they take one particular area.  They generally have their own areas.  You know, Little Italy or Chinatown in New York City.  And there is always a bad group.  And whether it's because of the poverty levels that we have seen from these people having to flee their country and their homes to avoid violence or because they are from Central America and maybe they have, you know, a strong knowledge of the drug field and they know that that's a great source of income in the United States because it's illegal and it's a quick way to make money.  I don't want you to get a bad impression of the El Salvadoran people there. 99 percent of Salvadorans in the United States want to become Americans.  They work very hard and there is, you know, always that one percent that for whatever reason decide to join this gang.  And maybe to them it is preserving with the violence that they have seen or a specific part of their culture, but it's a small percentage.

MR. NAZZARO:  Yes, ma'am.

GRAND JUROR:  Two fold, where are they concentrated in terms of their cliques in this area, and how are they performing, you know, against quota?  I will use my phrasing.  You know, how are they monetarily performing against other --

THE WITNESS:  Other areas of the country?

GRAND JUROR:  Yeah, other areas of the country.

MR. ZOLOT:  Let me say this, we are trying to today to give you an overview of the gang in general.  I intend to later for Agent Attard and others to give you about Charlotte, what we are really trying to do today is give you an overview of what the gang is today.  So I am hesitant to ask Agent Attard because we are not prepared today to talk about Charlotte specifically.  So if you'd like to know how the gang is doing in terms of other rival gangs nationally, I'd -- but if not, I'd ask you to be patient and I promise to answer that question at a later date if that's okay.

GRAND JUROR:  How long have they been

here?

THE WITNESS:  We have seen a significant influx since around 2003.  We are starting to see it grow.

GRAND JUROR:  Once they have the first shooting or whatever, is that it or do they have to continue?

THE WITNESS:  They have to continue. They have to continue to show that you are a member of the gang and that -- and that's the way they manage themselves or the way they put fear in others.

GRAND JUROR:  Do they have a time frame for their next victim?

THE WITNESS:  No, they don't have a specific time frame.  Every weekend they are expected to go out and control the streets.  Every Friday, Saturday night they are expected to go out and control the streets.  And if there is a rival gang member that is seen, they are to be shot, and that's the rule.

GRAND JUROR:  But those are not the only people they are shooting?

THE WITNESS:  No, it's not.  Sometimes robberies or muggings go bad and if somebody pulls

a knife or pulls a gun in self-defense, they are going to kill that person too.

Q. Or they get in arguments; is that fair to say?

A. Yeah, they get in arguments. One of the biggest things about MS-13 is respect, and being part of MS-13 gives you a lot of respect. And the one thing that you don't want to happen is to be disrespected in front of your homeboys because you're forced to do something, because if you don't then you're going to be looked at as a wimp or a wuss and they are going to treat you like that. So if you're, you know, anywhere and you're disrespected and you tell them, hey, listen, I am MS-13, you don't want to mess with me, and they continue to mess with you, you're expected to do something. And if you don't, you're going to get treated differently.

MR. ZOLOT: And, Ladies and Gentleman, I am going to cut Agent Attard off now because this is a perfect segue now to our next FBI witness and the crimes we are presenting to you today. So if there are any other questions, I'd just ask, I want to answer every one but we need -- we have witnesses and a lot of stuff to get to. So if you would hold off, I promise you Agent

Attard will be back.  We have other agents and police officers will be back and we'll make sure that every question is answered.  Like I said, this is going to be a multiple month process with us and I promise we will get everything answered. And I intend to have Agent Attard come back either in May or June and talk specifically about Charlotte and get into the details about what all of what's going on at Charlotte and at that time we will open it up of course for questions about Charlotte.  So if there are no other burning need to ask a question, which I will ask one last time, I will excuse Agent Attard and call the next witness.

GRAND JUROR:  May we have a quick break?

MR. ZOLOT:  Yes, that would be great. Thank you.  If we could break now.

(WHEREUPON, the witness leaves the room.)

STATE OF NORTH CAROLINA    )

                           )    C E R T I F I C A T E

COUNTY OF CABARRUS         )


        I, Renee Habrack, Notary Public, do hereby certify that MIKE ATTARD was duly sworn by the Grand Jury Foreperson prior to the taking of his testimony; that said testimony was taken and transcribed by me; and that the foregoing pages are a true and accurate transcript of the testimony of said witness.  I further certify that the persons were present as stated.

        I further certify I am not of counsel for or in the employment of any of the parties to this action, nor am I interested in the result of said action.

        IN WITNESS WHEREOF, I have hereunto subscribed my name, this 13th day of May, 2008.


                        _Renee M. Habrack_____

                        RENEE M. HABRACK, C.S.R.
                        Registered Professional Reporter
                        Notary Public #20041960006

# APPENDIX 151

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 136 of 194

ILS

CASE NAME:            US V AYALA et al

CD EXHIBIT:           USAO DISC_19_US_V_AYALA_SESSION_2_FINAL

SESSION NUMBER:       2

DATE:                 DECEMBER 12,  2007

TIME:                 11:53 A.M.

LANGUAGE:             SPANISH/ENGLISH

PARTICIPANTS:         SPECIAL AGENT WILLIAM C. HASTINGS
                      UNIDENTIFIED MALE 1
                      RONY ANTONIO MAGANA-LOPEZ AKA NENE
                      UNIDENTIFIED MALE 2
                      UNIDENTIFIED MALE 3
                      UNIDENTIFIED MALE 4
                      UNIDENTIFIED MALE 5
                      AUTOMATED VOICE

ABBREVIATIONS:        [U/I] Unintelligible in English
                      [I/I] Unintelligible in Spanish
                      [PH] Phonetic spelling
                      [English in Italics]


[THIS SESSION NOT REVIEWED BY CHS.  DESIGNATED NON-PERTINENT CONTENT
BY SA ATTARD.]

GOVERNMENT EXHIBIT            1              DISC 19 SESSION 2

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 137 of 194

| PARTICIPANTS | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|
| | [BEGINNING OF RECORDING] | [COMIENZO DE LA GRABACIÓN] |
| | [In Background: Beeps] | [Al fondo: pitos] |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *December twelfth, two thousand seven. Eleven fifty-three A.M. Source Tony, going to meet Alejandro Umana. Case number ninety-two D, CE, nine, one, seven, two, one. Present, TFO William Hastings, Special Agent Michael Attard, and TFO Carlos Lopez.* [Aside: *Put that wherever you want, in your pocket, wherever… you think. Now the money is in your pocket,* [U/I]… *is in your back pocket.*] *You good? You got that twenty-five? And what store are you going to?* |
| MAGANA: | | *Uhm, a Mexican store.* |
| | [Voices Overlap] | [Interposición de voces] |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Are you going on Central Kilborn* [PH]. |
| MAGANA: | | [U/I]… *I have to see. Yes, and now I have to go in to* [U/I] *all the time.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Well, let me know. How old are you?* |
| MAGANA: | | *Me?* |
| SPECIAL AGENT WILLIAM C. | | *Yeah.* |

GOVERNMENT EXHIBIT      2      DISC 19 SESSION 2

| PARTICIPANTS | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|
| HASTINGS: | | |
| MAGANA: | [U/I]. | [I/I]. |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Wow, let me know. If they don't, we'll go… we'll go… will do something different. See what I'm saying? I mean, if you have to go by there and pick them up say, "Hey, I need some beer." Whatever, just let us know.* |
| | [Voices Overlap] | [Interposición de voces] |
| MAGANA: | | *Yeah.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *We'll give them to you. Alright?* |
| MAGANA: | | *But most likely I'll go get them, and they'll sell them to me.  One of them.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Gotcha. Alright, so you gonna go straight over there?* |
| MAGANA: | | *Yeah.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Alright.* [Aside:  U*hm, you wanna go… get your computer, log on real quick before… we let him go?*] |
| UNIDENTIFIED MALE 1: | | *Yeah.  Now I want to make sure its working [U/I] wires popped out, I popped them back in. It should be good but…* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Let me check that for you please.* |
| UNIDENTIFIED MALE 2: | | *Hey  [PH] let's go, [U/I].* |
| UNIDENTIFIED MALE 1: | | *What?* |
| UNIDENTIFIED MALE 2: | | *I want to make sure the GPS is working.* |

GOVERNMENT EXHIBIT          3          DISC 19 SESSION 2

| PARTICIPANTS | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Is it alright?* |
| UNIDENTIFIED MALE 1: | | *Yeah… Sword* [PH] *is [U/I] man.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Sword?* |
| UNIDENTIFIED MALE 1: | | *Yeah.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | [U/I]. | [I/I]. |
| MAGANA: | | *Fucking works?* |
| | | [Laughs] |
| | [Voices Overlap] | [Interposición de voces] |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Oh, OK.* |
| MAGANA: | | [Groans] *They want me doing this new shit, man. Goddamn! Son-of-a-bitches are killing me!* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *I know you get this* [U/I]. |
| | [In Background: Music] | [Al fondo: música] |
| | [2:08-3:55 No Conversation] | [2:08-3:55 No hay conversación] |
| MAGANA: | | *Come on, man. I need a bullet in* [I/I]… *cause I'm going low.* [I/I]. |
| SPECIAL AGENT WILLIAM C. | | *You think you can you go ahead and* [U/I] *on Eastway* [PH]? |

GOVERNMENT EXHIBIT 4 DISC 19 SESSION 2

| PARTICIPANTS | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|
| HASTINGS: | | |
| MAGANA: | | *Yeah.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Alright.* [Stutters] *I'll be around. I won't be with you, but go I won't say nothing to you. Alright?* |
| MAGANA: | | *Uhm-hum. Go ahead and leave after us.* |
| SPECIAL AGENT WILLIAM C. HASTINGS: | | *Yeah, dude just call me before you leave. OK?* |
| | [Voices Overlap] | [Interposición de voces] |
| MAGANA: | | *OK.* [Sighs] |
| | [4:22-7:52 No conversation] | [4:22-7:52 No hay conversación] |
| MAGANA: | | *Hey man.* |
| UNIDENTIFIED MALE 3: | | *What's up nigger?* |
| MAGANA: | | *Hey. Smokey?* |
| UNIDENTIFIED MALE 3: | | *He's not here.* |
| MAGANA: | | *Where is he?* |
| UNIDENTIFIED MALE 3: | | *He getting drinks up over there.* |
| | [Pause] | [Pausa] |
| | [In Background: Voices] | [Al fondo: voces] |
| UNIDENTIFIED MALE 3: | | *Hey what you doing?* |
| UNIDENTIFIED MALE 4: | | *Nothing.* |
| UNIDENTIFIED MALE 3: | | *Huh?* |
| | [Voices Overlap] | [Interposición de voces] |
| UNIDENTIFIED MALE 4: | [U/I]. | [I/I]. |

GOVERNMENT EXHIBIT 5 DISC 19 SESSION 2

| PARTICIPANTS | ENGLISH TRANSLATION | ORIGINAL LANGUAGE |
|---|---|---|
| | [8:30-12:28 No Conversation] | [8:30-12:28 No hay conversación] |
| MAGANA: | [Clears Throat] | [Carraspea] |
| | [Pause] [U/I]. | [Pausa] [I/I]. |
| | [In Background: Voices] | [Al fondo: voces] |
| UNIDENTIFIED MALE 4: | [U/I]. | [I/I]. |
| MAGANA: | I know. | Yo sé oye. |
| UNIDENTIFIED MALE 4: | That is what I am doing here. [U/I]… I am [U/I]… that is the situation. Tell me [U/I]. | Eso es lo que estoy haciendo aquí. [I/I]… estoy [I/I]… es la situación. Dígame [I/I]. |
| MAGANA: | | *Go motherfucker!* |
| | [Pause] | [Pausa] |
| AUTOMATED VOICE: | | *Your call has been forwarded to an automated voice messaging system.* |
| | [Pause] | [Pausa] |
| | [In Background: Cell Phone Rings] | [Al fondo: suena un celular] |
| MAGANA: | | *Yeah?* |
| | | [Pause] |
| | | Alright. |
| | [Pause] | [Pausa] |
| UNIDENTIFIED MALE 5: | | *You good. I got you, go in.* |
| | [In Background: Music] | [Al fondo: música] |
| | [END OF RECORDING] | [FIN DE LA GRABACIÓN] |

GOVERNMENT EXHIBIT 6 DISC 19 SESSION 2

# APPENDIX 152

scanned

I.D. # 686 856

# INMATE VISITATION FORM

NAME: UMANA   ALEJANDRO ___   DATE: 1/30/08

LAST   FIRST   M.I.

LOCATION / CELL ASSIGNMENT: 7A29 ___

You may list two (2) visitors on this form.  These two relatives and or friends are the only people that will be able to visit you for the next thirty (30) days. The two individuals placed on your list must be able to show a valid photo I.D. to the Detention Staff each time they visit.  Each person placed on this list will be allowed one (1) visit per week.  The two names placed on your list must be 18 years of age or older.  Any visitor under 18 must be accompanied by an adult who is on your visiting list.  You may only have two (2) visitors under the age of 18 per visit.

## VISITATION  LIST

## PRINT  LEGIBLY

| VISITORS NAME | RELATIONSHIP | ADDRESS (Include City and State) |
|---|---|---|
| WILFREDO LAMDAVERDE | FRIEND | ? |
| INGNDY ELIZABETH ALVAREZ | MOTHER OF CHILD | 50 JACKSON ST APT 603 HAMPSTEAD, N.Y. |

GC - 885

You May Change This List Every 30 Days

# VISITORS SIGN IN LOG

| Visitor Name | Date | Staff Init. | Visitor Name | Date | Staff Init. |
|---|---|---|---|---|---|
| John Bryson | 2/8/08 | 920 a C6 | | | |
| Richard M'Koy | 2/8/08 | 920 a C6 | | | |
| William | 3/3/08 | 330 a C6 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# VISITORS SIGN IN LOG

| Visitor Name | Date | Staff Init. | Visitor Name | Date | Staff Init. |
|---|---|---|---|---|---|
| Wayne T. Owens | 12-14 | Am | | | |
| Elizabeth Gicrsberg | 12-14 | Am | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

scanned
ID #686856

# INMATE VISITATION FORM

NAME: Umana Alejandro E    DATE: 12/28/07
LAST    FIRST    M.I.

LOCATION / CELL ASSIGNMENT: 7A29

You may list two (2) visitors on this form.. These two relatives and or friends are the only people that will be able to visit you for the next thirty (30) days. The two individuals placed on your list must be able to show a valid photo I.D. to the Detention Staff each time they visit. Each person placed on this list will be allowed one (1) visit per week. The two names placed on your list must be 18 years of age or older. Any visitor under 18 must be accompanied by an adult who is on your visiting list. You may only have two (2) visitors under the age of 18 per visit.

## VISITATION LIST

## PRINT LEGIBLY

| VISITORS NAME | RELATIONSHIP | ADDRESS (Include City and State) |
|---|---|---|
|  |  |  |
| Officials + Special Visits |  |  |
|  |  |  |
|  |  |  |

GC - 885

You May Change This List Every 30 Days

# INMATE VISITATION FORM

NAME: _Umana, Alejandro E_  DATE: _12/13/7_

       LAST       FIRST       M.I.

_AZ_

LOCATION / CELL ASSIGNMENT: _____

_No English_

You may list two (2) visitors on this form. These two relatives or friends are the only people that will be able to visit you for the next thirty (30) days. The two individuals placed on your list must be able to show a valid photo I.D. to the Detention Staff each time they visit. Each person placed on this list will be allowed one (1) visit per week. The two names placed on your list must be 18 years of age or older. Any visitor under 18 must be accompanied by an adult who is on your visiting list. You may only have two (2) visitors under the age of 18 per visit.

## VISITATION LIST

## PRINT LEGIBLY

| VISITORS NAME | RELATIONSHIP | ADDRESS (Include City and State) |
|---|---|---|
|  |  |  |
|  |  |  |

Case 3:16-cv-00057-MQC   Document 69-6   Filed 02/22/18   Page 148 of 194

GC-885      You May Change This List Every 30 Days

# VISITORS SIGN IN LOG

| Visitor Name | Date | Staff Init. | Visitor Name | Date | Staff Init. |
|---|---|---|---|---|---|
| (X) J. Bryson | 12/28/07 | 955 a Cb | | | |
| (X) V. Ali | 12/28/07 | 955 a Cb | | | |
| X J. Brysm | 01-28-08 | 2:25 p CB | | | |
| (X) J. Bryson | 01/30/08 | 1224 p CB | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# APPENDIX 153

Both Umaña & MS-13

10-5-2004

NOT IN IPRO lleed to turn over

"Chacca"

MANUEL AleMAN-AYALA

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 151 of 194

# APPENDIX 154

Hoy me Reclamaron por venir averte no
Quieren que buelva pora qui jamas dicen
que si buelvo en contrare la muerte
Que portila vida mevan a quitar

Piensan asus tarme para que tedeje Pero
nunca nadie lo Podra lograr mientras
tu me quieras yo estare Presente
serca de tu casa Para Platicar

ami no me asustan tipos lenguas largas
Que solo Presumen por apantallar yo soy
de los hombres que no temen nada y
aun que este Perdido no meserrajar

dile atu Pretendiente que Poray lo
espero yo telo aseguro no me Rajare
Yo telo aseguro que yo ati te quiero
y solo Dios la vida me puede
quitar

ami no me asustan tipos lenguas largas
Que solo Presumen por apantallar yosoy
de los hombres que no temen
nada y aun Que este Perdido no
me se rrajar y aunque este
Perdido no me se rrajar

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 153 of 194

# APPENDIX 155



# APPENDIX 156

**Organized Crime Drug Enforcement Task Force**
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202
(704) 344-6222
FAX (704) 344-6629

April 15, 2008

TO:     Tony Aldridge
        Jennifer Mills
        Chemical Analysts
        Charlotte-Mecklenburg Police Crime Lab
        FAX ▮▮▮▮▮▮▮

FROM:   Kevin Zolot
        Assistant United States Attorney

The following cases(s) have been accepted for prosecution by the United States Attorneys Office. Please complete an analysis on suspected controlled substances seized in the case and forward a report to my attention as soon as possible. If you could email me at ▮▮▮▮▮▮▮ when the reports are complete it would be much appreciated. If you encounter any problems please notify me immediately. Thank you for your attention to this matter.

| Defendant's Name | Complaint Number |
|---|---|
| 1. Alexi Ramos | 20080112-221400 (control 1755) |

Please provide a letter of what narcotic base. Thank you

Sincerely,

Kevin Zolot
Assistant United States Attorney








01.13.2008 04.53



01.13.2008 04:54


Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 164 of 194



Case 3:16-cv-00057-MOC  Document 69-6  Filed 02/22/18  Page 165 of 194



| | |
|---|---|
| **Complaint No:** | 20080112221400 |
| **Date of Report:** | 6/6/2008 |
| **Type of Analysis:** | Controlled Substance |
| **Remarks:** | |

---

**CONFIDENTIAL:** This is an official report of the Charlotte-Mecklenburg Police Laboratory and is to be issued in connection with an official criminal investigation. Do not make public or reveal the contents thereof to any unauthorized person.
The form for this report is found to be in compliance with NCGS 90-95(g) and is hereby approved by the Attorney General.

---

### ANALYSIS OF THE SUBMITTED MATERIALS IS AS FOLLOWS:

**Control #: 200801755**

2 : Cocaine, 0.35 grams

**Authority Darrel W. Stephens**
**Chief Of Police**

I certify this to be the results of the tests performed on these items.

# Copy

**Matthew C. Mathis.**

Chief Criminalist

RENUMBERING/REPACKING BY LABORATORY PERSONNEL MAY OCCUR DURING EVIDENCE PROCESSING



| | |
|---|---|
| **Complaint No:** | 20080112221400 |
| **Date of Report:** | 1/28/2008 |
| **Type of Case:** | Controlled Substances |
| **Remarks:** | |

---

**CONFIDENTIAL:**

This is an official report of the Charlotte-Mecklenburg Police Laboratory and is to be issued in connection with an official criminal investigation. Do not make public or reveal the contents thereof to any unauthorized person.
The form for this report is found to be in compliance with NCGS 90-95(g) and is hereby approved by the Attorney General.

---

### Items Received

The following items were removed from the firearms vault on 1/28/08:

Control #0801760
Item 3: 38 Special caliber Smith & Wesson model 36 five-shot revolver, serial number J277698.
Item 9: Five 38 Special caliber Winchester live cartridges

### Results

Item 3 under control #0801760 was examined and test fired. The revolver was found to be in good operating condition. Suitable test standards from Item 3 will be compared to the Open Case File. In the event an identification is made, you will be notified.

Item 2 under control #0517516 and Item 1 under control #0517697 of complaint number 20050702173100 could not be identified or eliminated as having been fired from Item 3 under control #0801760 of complaint number 20080112221400 due to the lack of sufficient individual characteristics.

**Authority Darrel W. Stephens**
**Chief Of Police**

I certify this to be the results of the tests performed on these items.

## Copy

**McBrayer, William S.**

80063          Chief Criminalist

# APPENDIX 157

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION



FBI Headquarters
935 Pennsylvania Ave. N. W.
Washington, DC 20535

| | |
|---|---|
| File number: | 245D-CE-92434 |
| Task number: | 39018.qbv |
| Date of recording: | 03/17/2009 |
| Time of recording: | 14:20:51 |
| CD description: | Umaña, Alejandro #362221 08/17/08–06/05/09 |
| Call number: | 3791984 |
| Telephone number: | 201-211-5556 |
| Languages: | Spanish / English |
| Linguist: | LA María Erlewine |

## VERBATIM TRANSLATION

### Participants

| | |
|---|---|
| Alejandro Enrique Umaña, a/k/a Wizard | AU |
| Rafael Enrique Umaña | RU |

### Abbreviations

| *Italics* | English |
|---|---|
| IA | Inaudible |
| UI | Unintelligible |
| PH | Phonetic |
| [ ] | Background conversation |
| OV | Overlapping voices |
| LNU | Last Name Unknown |

File #: 245D-CE-92434
Date: 03/17/2009
Time: 14:20:51

[Noises / Dialing tone]

"[RC] The services from this pre-paid call are provided by the [UI] Company. Please, enter your *pin* number. [RC]"

[Digits entered]

"[RC] You have 20 dollars. Dial the number you wish to call. [RC]"

[Digits entered]

"[RC] You can talk for 40 minutes, which are guaranteed for this call. [RC]"

[Telephone rings]

RU: *Hello?*

AU: *Hello?* What's up, dad?

RU: [OV] What's up, son?

AU: How are you, dad?

RU: Well, here, man—

AU: So, what's going on?

RU: —at home, son, here, at home. Here, son.

AU: All right. So, what's up, dad?

RU: They didn't... didn't let you call or what?

AU: No, the problem is that, since–since I had–had not–not–not got a card—

RU: Oh.

AU: Yeah, not until now, when a countryman came in, yeah, who—

Page 2 of 19

RU: Yeah.

AU: —did me the favor of buying the card.

RU: Uh—

AU: So, what's up, dad?

RU: Well, I'm here.

AU: What's new?

RU: Here, [UI], here.

AU: All right. So, what's going on? Look, uh...

RU: Uh?

AU: Did they come to visit you?

RU: Yes.

AU: Who went there?

RU: It was very strange. Look, because the detectives came from here.

AU: From—from there?

RU: From El Salvador, yeah.

AU: And, what did they tell you?

RU: Oh, that they wanted to take me to an interview, but— They said that they wanted to take me to a hotel.

AU: To a hotel?

RU: Yes, that the ones who were going to interview me were going to be there.

Page 3 of 19

File #:     245D-CE-92434
Date:       03/17/2009
Time:       14:20:51

AU:     Look, uh... don't talk to--to anyone else but the--the— Only if--if he goes over there again. He--he--he is supposedly going over there one of these days—

RU:     The attorney?

AU:     —the--the guy who visited you— The name of the guy is Richard—

RU:     [OV] [UI]?

AU:     Uh-huh.

RU:     Yes, yes, I know.

AU:     Is a man with glasses.

RU:     Yes, I— Yes, yes, the [UI] with grays, [UI]—

AU:     Uh-huh.

RU:     —tall one?

AU:     Uh-huh.

RU:     The one who took pictures of me. I don't know whether he gave them to you or what.

AU:     Yes, he brought me--me one, but I sent it to Wendy, because, uh, they don't--don't let me keep it, because it was--was big, uh—

RU:     Uh-huh.

AU:     —the one he brought to me.

RU:     Uh-huh. Yes, he took--took two pictures of us.

AU:     Uh-huh.

RU:     He told me that he can send them your way there—

AU:     All right.

Page 4 of 19

RU:     —he said.

AU:     Uh, but only one—

RU:     [OV] [UI]—

AU:     —he gave me only one.

RU:     Uh-huh.

AU:     Uh-huh. The other one is for— It's probably, uh, to present it there, to--to the jury.

RU:     Uh-huh. That is why I didn't want—

AU:     Uh-huh.

RU:     They summoned your mom. Who knows if--if they interviewed her later on.

AU:     All right.

RU:     Because, I got a hold of that guy.... Saúl, and... [UI] with her [UI]—

AU:     All right.

RU:     —then, I didn't feel like talking to her and [UI].

AU:     The problem is that--that--that... Chile [PH] needs to see that dude... If they ask him if I am from--from— 4 [UI]—

RU:     [OV] [UI]

AU:     Huh? From [UI].

RU:     [OV] [UI]? Uh-huh, yes.

AU:     From, uh, 4 8.

RU:     Uh-huh.

Page 5 of 19

AU:     Uh-huh... [Pause] because—

RU:     [OV] Sounds good.

AU:     —because, yes, [UI] the chance and, also, when [UI]—

RU:     Uh-huh.

AU:     —and, uh, a guy is creating me problems—

RU:     [UI]—

AU:     —problems... this guy... the one who–who interviewed me.

RU:     Yes.

AU:     He came over about two days ago to ask me who, who... yes, who [UI]—

RU:     [OV] Uh-huh.

AU:     —in there. No, but, the guy–guy wants to write a–a–a, like... What these guys write here is, like, your history.

RU:     Yes, exactly.

AU:     Like, uh, how could I say?

RU:     Like a *record*.... that they want to have.

AU:     [OV] Uh-huh.

RU:     Yes, that is why it seemed to me that, yes, that [UI]—

AU:     [OV] Look:—

RU:     [OV] —I said.

AU:     Uh, [UI]—

Page 6 of 19

RU:     [OV] Uh-huh.

AU:     Find a way to–to... to look in there if–if someone, uh, can connect you with–with, like, the human rights, uh, in there... and maybe if–if—

RU:     [OV] Yes.

AU: .    —if you could... like, comment to them, uh... about what I am going—

RU:     Uh-huh.

AU:     —through over here... and—

RU:     Yes.

AU:     —maybe they will be able to help me, at least to have me transferred there to maximum.

RU:     The truth is— Yes, because, well, I told you that they wanted to pressure me and, uh, I know that they can't force me, right?

AU:     Uh-huh. No—

RU:     [OV] [UI]

AU:     —[UI] if you don't want to, uh... like, answer—

RU:     [OV] Answer anything, yeah.

AU:     [OV] —[UI]... tell him that he knows that you don't–don't want to talk, and that's it. You know what I mean? 'Cause—

RU:     [OV] Yeah, but, since—

AU:     —they can't force you. I told him not to—

RU:     Yes.

AU:     —to try to pressure you or, even less, to be pressuring, uh, like that, because, well,

Page 7 of 19

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 175 of 194

File #:    245D-CE-92434
Date:      03/17/2009
Time:      14:20:51

uh—

RU:    Yes, uh, [UI]—

AU:    [OV] —[IA].

RU:    —[UI] the thing that bothered me the most was that they were detectives from here, uh,[UI]—

AU:    Uh-huh. Uh, the thing is—

RU:    [OV] —[UI].

AU:    Those guys are–are... in politics too, you know what I mean? They are looking for a way—

RU:    Yes.

AU:    —to find, uh, things.

RU:    Uh-huh, [UI]—

AU:    [OV] [UI]—

RU:    —[UI].

AU:    Huh?

RU:    And... [UI], I said to him, "No, man, how could I go to one of those hotels?"

AU:    All right. Uh, what... what they are trying to do is–is to try to record things, uh, well, to–to grab on to one fucking thing and—

RU:    Yes.

AU:    —and to accuse me.

RU:    Exactly.

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 176 of 194

AU:     That is how this fucking, coward, federal government works.

RU:     [UI]

AU:     Uh-huh.

RU:     That is what they are doing with another countryman there. It was shown that they are accusing him of the death of a—

AU:     Of a woman?

RU:     Yes, of a woman who had [UI] a congressman and stuff—

AU:     Uh-huh.

RU:     That's what the [UI] says—

AU:     [OV] He–he is—

RU:     —that [UI] here.

AU:     —screwed in there, in Los Angeles.

RU:     [OV] Uh— Yes, just to clean up the case. Now they are saying that it was him, that this—

AU:     Uh-huh.

RU:     —and that, and that— It was probably the man, right?

AU:     Yeah. Uh, but this—

RU:     [OV] [UI]

AU:     —this is how they work, *man*, don't you see that–that... like, they are buying a lot of fucking evidence, a lot of people who–who are cowards here, *man*, you know what I mean?, and, well... yeah... uh...

RU:     [OV] That lady in there asked me— Carla also asked me. Haven't you talked to her,

Page 9 of 19

File #:.     245D-CE-92434
Date:     03/17/2009
Time:     14:20:51

          son?

AU:     Huh?

RU:     [UI]

AU:     Uh-huh.

RU:     Haven't you talked to her, son?, 'cause she is worried.

AU:     [OV] No, no problem. The—the homeboy is also screwed right now, you know what I mean? Since—

RU:     [OV] Uh-huh.

AU:     —[UI]—

RU:     Exactly.

AU:     —uh, and—and that is why he hasn't called you. Supposedly, they were going to send him money and they were going to send him a card, but...

RU:     Yes, *man*, but he hasn't called me— he hasn't called me in days.

AU:     Uh-huh. No, but, tell her that the homeboy is fine there.

RU:     Okay. I will tell her.

AU:     [OV] That, I will write to the homeboy as soon as—as soon as I can and, as soon as he can, for him to—to—

RU:     To call him?

AU:     Uh-huh. I will write to him, saying that I was just letting him—him—him know and that they are sending him regards.

RU:     All right, son.

AU:     Uh-huh.

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 178 of 194

File #: 245D-CE-92434  
Date: 03/17/2009  
Time: 14:20:51

RU: The elections are going on.

AU: Uh, man, that's what we were seeing, that that guy won.

RU: Yes, that man won.

AU: I hope that... well, fuck, he does good things.

RU: Uh-huh. Yes, God willing, son.

AU: I hope that, at least, he says to... have those of us –who are here screwed– be sent there.

RU: He has to help somehow, son.

AU: No, man, this–this–this investigator tells me that–that— Well, yes, that right now they have no way to transfer, uh, like that. That the government is not—

RU: Uh— Uh-huh.

AU: Huh?

RU: That it is not authorized to do that, I say.

AU: Bullshit. Don't you see that I am being told that they don't know if—

RU: [OV] Uh-huh.

AU: —El Salvador will take me in?

RU: No, man. Why don't you think so, son?

AU: Huh?

RU: Why wouldn't they take in all the ones being deported?

AU: No, uh, exactly, but that's, uh, the bullshit—

RU: Uh-huh.

Page 11 of 19

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 179 of 194

AU: —they say.

RU: Uh-huh. That's right, son.

AU: Look—

RU: Uh-huh.

AU: [OV] —this is something else–else. Tell that... uh, homeboy to–to–to tell the woman not to say that I was born there... [Pause] uh, in–in Guatemala.

RU: Carla? [UI]?

AU: To–to–to... to... Saúl.

RU: Uh– Uh-huh, yes, okay, okay.

AU: [OV] And for him to tell, uh—

RU: [OV] [UI]?

AU: Uh-huh.

RU: Uh-huh.

AU: 'Cause, uh, yeah.

RU: Yes, uh—

AU: If–if—

RU: I think that—

AU: —if she says that—

RU: [OV] [UI]

AU: [OV] —they will transfer me from here, you know what I mean?

Page 12 of 19

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 180 of 194

File #:      245D-CE-92434
Date:        03/17/2009
Time:        14:20:51

RU:     Exactly.

AU:     They'll–they'll want to, like, see, like... to see if I, uh, had any trouble in there.

RU:     Uh-huh.

AU:     So, yes. No big deal—

RU:     [OV] No. I will talk to that guy. I told him earlier, the complication, and he told me, yes, that he had talked to her about that.

AU:     Yeah. Because—

RU:     Okay.

AU:     —they also want to visit that guy.

RU:     Uh-huh.

AU:     You know what I mean? Because, uh, yeah, I— Any problem that–that, uh, yeah... that he mentions, uh, well—

RU:     Uh-huh.

AU:     —they just accused him of that shit he is in for.

RU:     Yes, yes.

AU:     Do you copy? Because—

RU:     [OV] Uh, he knows.

AU:     Yeah.

RU:     [UI] took care of that [UI]... [Clears his throat] [UI]—

AU:     [OV] Has that homie been given, uh, a possibility to–to–to [UI] yet?

RU:     No. Maybe this upcoming year, son.

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 181 of 194

File #:       245D-CE-92434
Date:        03/17/2009
Time:        14:20:51

AU:     All right.

RU:     [UI]. Let's see what they say.

AU:     Yeah.

RU:     [UI] behavior of his.

AU:     Uh-huh. Uh, he should think about—

RU:     [OV] Uh-huh.

AU:     —saying that, well, uh, if he has the possibility.

RU:     Yes, yes.

AU:     Yes, and, uh, [UI]— I haven't had a way, uh, to-to... to call him, uh, you know what · I mean?, but I will, in a while. Does the son of a bitch have any number...? He better react.

RU:     Exactly, man.

AU:     Do you have any number of his?

RU:     Look... he gave me one the last time but, I don't—

AU:     He'll get caught with that one.

RU:     —I don't know if—

AU:     [Chuckles]

RU:     Yes.

AU:     Look, what about the–the–the girl? Did you find her number?

RU:     Wendy's?

AU:     Mónica's.

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 182 of 194

File #:    245D-CE-92434
Date:      03/17/2009
Time:      14:20:51

RU:    No, I haven't seen her.

AU:    All right. Uh—

RU:    No. They also asked about her— Uh, but since I wasn't able to—

AU:    Uh-huh.

RU:    —locate her...

AU:    Well, if—

RU:    ... because they wanted to interview her—

AU:    —if she... if–if... she [UI], see her–her–her, okay?

RU:    Uh-huh.

AU:    And sort of tell her what they will tell her—

RU:    [OV] Yes.

AU:    —that they will ask her [UI]—

RU:    [OV] Okay, son.

AU:    You know what I mean?

RU:    Yes.

AU:    How I used to be— Uh, and I helped her, so, she should help, [UI] what she will say.

RU:    Uh-huh.

AU:    Did you hear me?

RU:    Look, [UI], *man.*

AU:    Oh, no, that son of a bitch knows now.

Page 15 of 19

RU:     No.

AU:     No.

RU:     And that guy [UI].

AU:     Huh?

RU:     I have a number but... that [UI] doesn't have a *phone*.

AU:     All right. No, there is no problem—

RU:     But, [UI]—

AU:     I am going to see what's up in a little bit. Chihuahua— He called Chihuahua there...

RU:     Sounds good.

AU:     Uh-huh, to–to... to see what's going on there. Maybe the homeboy—

RU:     Sounds good.

AU:     —[UI] reaction where he is at.

RU:     Yes, it's faster.

AU:     Uh-huh. So, what's going on with everything else? What's up with the–the little girl? How is she behaving?

RU:     [OV] Oh, well, she's there. We are fine, son, thank God. Right now, I am here, at home. I came to put cream on [UI] so she takes them to... to school.

AU:     All right.

RU:     And I came to make her some Tang drink

AU:     She goes to school?

RU:     Yes, school, but she is... in–in kindergarten still. She still— You know that she goes

Page 16 of 19

Case 3:16-cv-00057-MOC   Document 69-6   Filed 02/22/18   Page 184 of 194

File #:     245D-CE-92434
Date:      03/17/2009
Time:      14:20:51

to Juan XXIII—

AU:     All right.

RU:     Uh-huh. She still has time before going to—

AU:     [OV] Look—

RU:     Uh-huh.

AU:     [OV] —the pie lady's girls–girls, have you seen them?

RU:     I saw them both... pregnant.

AU:     Which ones? Both?

RU:     [OV] Both of them gave birth... they gave birth.

AU:     Fuck. I fucked up, then.

RU:     Yes, both have already given birth.

AU:     [OV] The girl—

RU:     [OV] Yesterday, uh—

AU:     [OV] —the girl— What about the skinny one?

RU:     Yes, the little one.

AU:     The little one?

RU:     [OV] Yes! All of them— [UI] with the little kid screaming. [Laughs]

AU:     [Laughs] [IA]

RU:     Look, the day before yesterday, when we went out to vote—

AU:     Uh-huh.

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 185 of 194

| | |
|---|---|
| File #: | 245D-CE-92434 |
| Date: | 03/17/2009 |
| Time: | 14:20:51 |

RU: —I saw them there... I saw them at [UI]—

AU: All right.

RU: —and the oldest one asked me about you—

AU: All right.

RU: —whether you had called me, and I told her, "No, [UI]." "Send him my regards," she told me. That was exactly the day before yesterday.

AU: Oh.

RU: [OV] I was talking to them. They were there with their mom...

AU: Ask them for their number when you see them—them—them.

RU: Okay, I will ask them for it.

AU: Did you hear me?

RU: The two of them were with their mom.

AU: All right and, in case you see there— Give them the address I gave you.

RU: How? There—? She was with Pelón.

AU: Uh-huh.

RU: The oldest one.

AU: [OV] [IA]

RU: Yes, she was with Pelón [UI].

AU: Uh-huh. [UI]

RU: Yes, already.

Page 18 of 19

| | |
|---|---|
| File #: | 245D-CE-92434 |
| Date: | 03/17/2009 |
| Time: | 14:20:51 |

AU: All right.

RU: [UI]

AU: All right. Yeah.

RU: But, as soon as I see them, I will ask them for their number.

AU: Tell them to—to—to write to me—me. Tell them.

RU: Yes, but the problem is the address, son, 'cause...

AU: No, [IA]—

RU: ... 'cause I don't know how to wr—

AU: [Laughs]

RU: —how to write the address.

AU: And what about the— Tell—tell them to give you their address.

RU: Okay, and—

AU: And—

[End of the recording]

Page 19 of 19

Case 3:16-cv-00057-MOC    Document 69-6    Filed 02/22/18    Page 187 of 194

# APPENDIX 158

Alejandro Umana
ID #██████21
PO Box 34429       5817
Charlotte, N.C.
28234


CHARLOTTE NC 282
██████ 2009 ██ ██ T
██06

[There appears a stamp]

[Illegible]

Herverth Castellon
██████████
PO Box 34429
Charlotte N.C.
28234


28234$4429       [There appears a bar code]

U009826

Damn, these dudes spread the word fast, don't they? They took me to see like one third of those who are in this building and they asked me where I was from. I told them I was from a small country but with big heart and balls, where the education is the street, right. From El Salvador. And with luck, maybe soon I'll be there alive or in a wooden box, but I have to arrive at the sacred land with faith in God and the beast. In these days people from El Salvador's embassy who come from New York will come to see me. Let's see what they have to tell me. I hope I can be sent to [illegible] the maximum [security prison]. And there's no problem because our big family is there and we are in our territory, where we rule if we stay. But not here, with these fucking cowboys and [illegible]. I hope everything turns out ok. If not, I'll write soon, or maybe not. I hope not and I hope you are given just 5 or 7, time goes by fast. You won't stay here forever. That's better than [illegible line]

U009827

Thursday, April 23, 09

Hey, what's up brother? I hope your health and other things are fine in the small school these mother fuckers are providing. But despite this hole we are fine and happy. Even though we are in these conditions, every now and then we have moments of happiness like in the streets, although one doesn't want this, but it's necessary to [illegible] respect towards these mother fuckers, otherwise they [illegible]. You know what I mean, don't you? But here we are - having a good time with the doll you sent me to do [illegible]. I also saw the juice. It was squeezed and a bit spotted like a raccoon. That guy will stay quiet for a while because I don't think he'll talk again. He just told me you had the same lawyer, right. And I told him to be careful about talking any further. He just said he wouldn't. Ok, I said. Look, I received your letter but I couldn't answer it because I had no more envelopes and I bumped into the "SPIR" and he gave me some envelopes. Now I've received your letter

U009828

Greetings from both.
Big letters.
Dude always      like
El Pez    soon

U009829

# APPENDIX 159

Focus if you leave, man. And be always in sync, ok? [illegible]

Hey, what's up, dude? How are you? I hope your health and mood are fine with *el Loco* and *Manyx*, *Sarco* and *Cruz*. Well, just them, because they were from the [illegible] who was there when I came here. Because *enanin* is here and it's alright because that guy kicked off [illegible] and they have punished him because of that. Look, I have received your letter and I'm answering it today because now I have the pencil *enanin* gave me because yesterday they handed out pencils but I didn't get any. That's why I didn't answer yesterday, but I do now. Look, that guy's number is ▮▮▮▮ and his name is "Hector Molina Alvarado". Hey, look, this number belongs to a guy who likes the good life and I told him about my thing and he told me he would do it, but I didn't mention anything about your thing because that's different, right? It's this "▮▮▮▮▮▮. His name is "Scotties". I have his address here as well if you [illegible]. Look, a doll from the consulate came but I was told that for the time being we cannot talk about a transfer because I'm still being processed and I have to wait for a while.