# APPENDIX 206

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION



Charlotte Field Office
400 S. Tryon St.  Suite 900
Charlotte, North Carolina 28285

File Number:          245D-CE-92434

Date of recording:    12/12/07

Recording mode:       Audio/video [Bosch]

CD#:                  MS78

Language:             English/Spanish

Linguist:             ███████

## SUMMARY AND PARTIAL VERBATIM TRANSLATION
## OF PERTINENT INFORMATION

**Participants**

Alejandro Enrique Umana-Ramirez a.k.a. Wizard      Umana
Detective Terry                                     Terry
Detective Lopez                                     Lopez

**Abbreviations**
[PH]        Phonetic Spelling
[UI]        Unintelligible
[IA]        Inaudible
[ ]         Translator's Note or Noise Notation

**Translator's Note:**

Text appearing in *italics* denotes information communicated in English.

File #: 245D-CE-92434
Date of recording: 12/12/07
CD#: MS78

[Session 1: Umana alone in interview room 4:58 p.m.-4:59 p.m.. No conversation.]
[Session 2: Umana alone in interview room 4:59 p.m.-5:43 p.m. No conversation.]
[Session 3: Umana alone in interview room 5:43 p.m.-5:59 p.m. No conversation.]
[Session 4: Umana alone in interview room 5:59 p.m.-6:42 p.m. No conversation.]
[Session 5: Umana alone in interview room 6:42 p.m.-6:59 p.m. No conversation.]
[Session 6: Umana alone in interview room 6:59 p.m. -7:02 p.m. No conversation.]

Lopez:      [7:02 Enters room with Detective Terry] [To Terry]: *Let's grab a chair. Let's* [UI] *right there.* [To Umana]: I am Detective Lopez. I have already spoken with you. [To Detective Terry]: *What is your last name?*

Terry:      *Terry. I'm from Greensboro.*

Lopez:      [UI].

Terry:      *Terry.*

Lopez:      He is Detective Terry. *From Greensboro. Okay?*

Umana:      Alright.

Lopez:      Before talking with you, I have to read you your rights. *Okay?*

Umana:      [Nods head affirmatively.]

Lopez:      Your name?

Umana:      Alejandro [UI].

Lopez:      Alejandro

Umana:      Yes.

Lopez:      Alejandro--

Umana:      --Umana

Lopez:      [To Terry]: *Let's see the spelling of that.* You...how old are you?

Umana:      Twenty-five.

Lopez:      Twenty-five years old?

Umana:      Yes.

1

Lopez:      Your date of birth is the same?

Umana:      No.

Lopez:      What is it?

Umana:      Twenty-four.

Lopez:      Month and year, please?

Umana:      ███████████████

Lopez:      ███████████

Umana:      Yes.

Lopez:      --of ████.

Umana:      Yes.

Lopez:      *Okay.* Do you have an address. Where do you live right now?

Umana:      No.

Lopez:      You don't have an address or anything?

Umana:      Only in New York.

Lopez:      *Okay.* What is the address in New York?

Umana:      Uh, ██████ [PH].

Lopez:      ████ what?

Umana:      Ja██son.

Lopez:      ██th ████?

Umana:      ██████, ████████ I live there with the woman [possibly wife or girlfriend] and her mother.

Lopez:      ████████, and apartment what?

Umana:      ███.

2

Lopez:        [REDACTED]

Umana:        Yes.

Lopez:        You've finished what grade in school?

Umana:        Just the third.

Lopez:        *Third grade*? Third?

Umana:        Yes.

Lopez:        *Okay.* Can you read?

Umana:        A little bit.

Lopez:        A little?

Umana:        [Nods head slightly]

Lopez:        But, you do know how to read?

Umana:        No, but not fast, but [UI].

Lopez:        But, you do know how to read?

Umana:        Yes.

Lopez:        *Okay.* What it says here is that: "I, Alejandro Umana, am twenty-five years of age. I was born [REDACTED]"

Umana:        [OV] [REDACTED]

Lopez:        [REDACTED]

Umana:        [Nods head.]

Lopez:        *Okay.* The tw[REDACTED]. Is that okay?

Umana:        [Nods head.]

Lopez:        [REDACTED]."

Umana:        Yes.

3

Lopez:          *Okay.* "I have finished third grade in school, and I know how to read. Detective Lopez, whom I understand to be a police officer, has informed me that he wishes to ask me questions. The police officer has also informed me of, and I understand the following...." And I have to read you all the following: "I have the right to remain silent. What is means is that I am not, that I am not obliged to say anything or answer any of the questions." Do you understand this right?

Umana:          Yes.

Lopez:          Okay. "Anything I say can be used against me, used against me." Do you understand?

Umana:          Okay.

Lopez:          "I have the right to speak with an attorney, and for him/her to be present with me to advise and assist me while I am questioned. If I wish for an attorney to be with me while I am questioned, but I don't have the money to pay an attorney, I will be given one free, before they question me."

Umana:          Yes.

Lopez:          Do you understand your right?

Umana:          Yes.

Lopez:          *Okay.* When I need your initials here and here, on each line, saying that you understand your rights. This is not that you are waivering your rights. It's only that you understand them. That's all. *Okay?*

Umana:          What do you mean?

Lopez:          It's just if you understand them. Pure and simple. That you understand them. That every line that I read to you, you say, "Yes, I do understand it." That's what, that's what your initials show. Your initials are: A-U.

Umana:          Alright.

Lopez:          On each line, please. Saying that I read you each right, and that you understand each right. [Writes on paper.] *Okay?*

Umana:          Yes. Is that it?

Lopez:          I am going to read to you right now. We still haven't finished. "I know my rights; those explained by the Detective, Detective Lopez. I, herein declare that I wish to answer questions at this time. I freely make the decision to answer questions at this time, and it is a decision that I, myself, have made. I have not received threats,

4

| | |
|---|---|
| | promises, special treatment. To show my wish to answer questions, I sign in the following space." *Okay?* I need your signature here. |
| Umana: | But, about that...what are the questions going to be about? |
| Lopez: | I can't, I can't tell you about the questions until I know that you are going to waiver your rights. Understand? I can't talk with about "what." |
| Umana: | [UI] whatever comes. What? What? |
| Lopez: | Your signature. |
| Umana: | Yes. [Signs] |
| Lopez: | The date? Hang on. The date is December 12. Put "12-12-07." *Okay.* The time is 7 hours with 8 minutes: "08 p.m." *Okay.* [Signs] [To Terry]: *Witness? Your signature?* |
| Terry: | *Here?* |
| Lopez: | Uh-huh. |
| Terry: | *Is he agreeing to talk?* |
| Lopez: | *And then you can print your name. Uh-huh. Yeah, he's, he's, he's wishing to answer. Answer any questions. That what this means.* |
| Terry: | *Huh?* |
| Lopez: | *That's what this means.* |
| Terry: | *Okay. Uh* |
| Lopez: | [To Umana]: I'm going to translate all of this. [To Terry]: *I'm going to tell him that I'm going to translate everything for you so that you can....* [To Umana]: He [Terry] is going to ask the questions and I am going to translate for you-- |
| Umana: | Okay. |
| Lopez: | *--and then you're going to answer.* |
| Umana: | [Nods affirmatively]. |

5

Terry:          *Just tell him that I know, without a doubt, that he's the person that we're looking for in reference to this murder in Greensboro on Saturday.*

Lopez:          [Interprets]

Umana:          What do you mean by "homicide?"

Lopez:          Homicide.  Do you know what "homicide" is?

Umana:          It's all there in the photos.  So, okay, [UI].

Lopez:          But, you do know what "homicide" is?

Umana:          Yes, yes.

[Lopez starts to interpret what Umana has said and Umana interrupts again.]

Umana:          But, what homicide?

Lopez:          [Interprets]

Terry:          At the restaurant.

Lopez:          At the rest--...in the restaurant.

Umana:          I don't know anything about that.

Lopez:          [Interprets]

Terry:          *Tell him that the only reason I'm here is to give him an opportunity to tell me why.*

Lopez:          [Interprets]

Umana:          And, the cameras tell everything.

Lopez:          [Interprets]

Terry:          *What do they...what should they tell me?*

Lopez:          [Interprets]

Umana:          What do you mean?

Lopez:          What--

6

Umana:      What has happened, well, of course.

Lopez:      [Interprets]

Umana:      Understand?  That's why I'm here, of course.

Terry:      *Tell him the cameras won't be in prison.  He will if he doesn't tell me.*

Lopez:      [Interprets].

Umana:      What does he want me to tell him?

Terry:      *I want him to tell me everything.*

Lopez:      [Interprets]

Terry:      *How he got to the restaurant.*

Lopez:      [Interprets].

Umana:      How-How is that you have gotten there?

Lopez:      [Interprets]

Terry:      *These are all the people I've talked*

Lopez:      [Interprets]

Umana:      That's fine.  No problem.  So, know things better, then.

Lopez:      [Interprets]

Umana:      Understand me?  You all are the Law.  There's nothing else I can do.

Lopez:      [Interprets]

Umana:      Of course, I can't talk about any of that--

Lopez:      [Interprets]

Umana:      --if they already told him everything about what-what they're [you're] accusing me of.

Lopez:      [Interprets]

Terry:      *Then, they're telling me everything but why.  And that's what I need him to do.*

Lopez:          [Interprets]

Umana:          You know that, when they look for you, yeah, they find you, too.

Lopez:          What's that?

Umana:          When they look for you, they find you, too.

Lopez:          [Interprets]

[7:12 p.m.: Detective Terry comments that this questioning is not fruitful and declares the interview done.]

Umana:           And, [UI], yeah, if I am going to held, like, could they not do a transfer to New York?

Lopez:          I didn't understand you.

Umana:          Like, if they transfer me there, serve the time I'm going to do?

Lopez:          [Interprets]

Terry:          Unh-huh. No.

Umana:          [IA].

Terry:          *Um. I'm trying to the [UI]. He didn't tell me anything.*

Lopez:          *Do you want me to for you....*

Terry:          *I don't need*

Lopez:          *Okay.*

Terry:          *No, serious, I'm only here for why. I really don't even need it. I've got so much shit on ya.*

[Detective Terry moves to end the interview.]

Lopez:          This is your chance, your last chance, that they're going to give, you know. Because he's [Terry] going to finish up right now. I'm going to try to help you right now. Him? What he wants to know is why? *Okay?* Why did it happen? Because, him? He has his evidence. He has everything he needs to charge you, to finish with you. *Okay?* But,

the thing is that there are people, there are families that want to know, "why?" Why did it happen? Why? What was it that happened? What happened? Why?

Umana:      They look for you, man.

Lopez:      What was that?

Umana:      They look for you.

Lopez:      They look for it for you?

Umana:      No, they look for you. No, you know that [UI]. Sometimes you have to react.

Lopez:      [Interprets]

Terry:      *I don't understand.*

Lopez:      [Interprets]

Umana:      Of course, I think that the ones in the restaurant are ones that know best.

[Lopez begins to interpret and Umana interrupts.]

Umana:      That's just where I stand on it. Of course, I can't talk any more about it.

[Lopez interprets. Terry moves to leave. Umana continues.]

Umana:      It's just that I just wanted to ask him if they are going to move me there or if I can lie down here.

Lopez:      No, they move you.

[Lopez interprets and, as the two detectives stand to leave, Umana continues.]

Umana:      Well, yeah, anything that can be done there to look out for my little boy. See if he can get him in there [referring to being transferred to New York] or something like that.

Lopez:      *Okay. Look.* Look. You want him to do you a favor and you don't do him a favor. He is asking you, "why?" The thing is that one hand washes the other, doesn't it?

Umana:      I know.

Lopez:      That's just it. Understand me?

Umana:      Well, yes, but, it's like I said, "when they look for you, --"

9

Lopez:      He, he [Terry] doesn't understand that. [Voices overlap]

Umana:      [UI]

Lopez:      He [Terry] doesn't understand that.

Umana:      In the sense that it's like you're being provoked you or something, well, let's see what you do.

[7:16 p.m. Lopez calls Terry back into room and interprets Umana's last statement.]

Umana:      How will all this benefit me?

Lopez:      [Interprets]

Terry:      *Well, we've got two people dead.*

Lopez:      [Interprets]

Terry:      *And, we have the death penalty in North Carolina.*

Lopez:      [Interprets]

Umana:      Alright.

Terry:      *It could be first-degree. It could be second-degree. That's why I asked him why.*

Lopez:      [Interprets]

Terry:      *For the punishment.*

Lopez:      [Interprets]

Terry:      *For the proper punishment.*

Lopez:      [Interprets]

Umana:      Like what? Explain it to me well.

Lopez:       Here, when one is guilty, it can be first-degree homicide, second-degree homicide, right? One is more serious than the other. *Okay?* It depends on which charges they are going to try get you on. *Okay?*

Umana:      Yeah.

Lopez:          Um, another way, is, like he [Terry] explained, here in North Carolina there's the death penalty, right? If one is found guilty of first-degree homicide, the judge may decide to give the death penalty for the crimes one has committed.

Umana:          Yeah.

Lopez:          Do you understand? [Lopez explains what he has said to Terry]

Terry:          Um-huh. *Alright. Let me. I guess, go ahead and give it good shot. Tell him I understand that my victim had a lot of money, and I was told that he kind of carried himself differently. And, it probably pissed him off.*

Lopez:          [Interprets]

Umana:          What do you mean?

[Lopez interprets Umana's last statement and Terry begins to explain. Umana interrupts.]

Umana:          No, but, you know, [UI] because of the money--

Terry:          [UI] *about the music and* [UI] *to change music and all that.*

Lopez:          [Interprets].

Umana:          Nah, at no time did we do anything about that.

Lopez:          [Interprets]

Umana:          It didn't matter to us. I listen to all kinds of music. And--

Lopez:          [Interprets]

Umana:          Not at all. It's just that they, of course, wanted to pick a fight with us--

Lopez:          [Interprets]

Umana:          --to start an argument. They made threats there.

Lopez:          [Interprets]

Umana:          Of course, yes, you know, of course, [UI] of course, you act like that.

Terry:          *How did it start?*

11

Lopez:      [Interprets]

Umana:      Nah, yes, [UI] they started, well, well, anyway, it was, yeah...it was the crime, well, yeah...[UI] confronting whatever. Understand? Yeah, well, to begin with, I don't even drink, neither [UI] drunk. Of course, just about, [UI] it, they get to [UI] it like that. [*sic*]

Lopez:      *Okay.* I didn't understand a thing you have just said to me.

Umana:      Just that, I didn't...that is, I don't like to drink, okay. I [UI] nothing of that, okay.

Lopez:      [Interprets]

Umana:      Understand? Of course, like they got to, like, to say that about the songs.

Lopez:      [Interprets]

Umana:      Of course, they began, like, to [UI]. One and the other one, this thing and that [UI]. Well, they were talking like--

Lopez:      [Interprets]

Umana:      --that, that they were going to get us out.

Lopez:      [Interprets]

Umana:      --and [UI] that [UI]. And, I, what I did is told the ones with me that we should leave. They don't--

Lopez:      [Interprets]

Umana:      --have anything...they don't have anything to do with this.

Terry:      [UI] [Voices overlap]

Lopez:      [Continues interpreting to Terry]

Umana:      Yeah. Of course, you know you get to a point where they make you, make you so mad.

Lopez:      [Interprets]

Umana:      That's it. Of course, what happened, happened.

Lopez:      [Interprets]

Terry:      *Ask him if the guys that he shot were the guys that he thought that were talking.*

12

Lopez:      [Interpreting]:  Were the guys you shot the ones who were talking against you all?

Umana:      Yes.

Lopez:      [Interprets]

Terry:      *All three?*

Lopez:      [Interprets]

Umana:      *I don't know.*

Lopez:      [Interprets]

Umana:      They were the ones at the table.

Lopez:      [Interprets]

Umana:      Of course, you know, one of ___ even hit one of th___ es with us in the head.  Just to mess with him.

Lopez:      [Interprets]

Umana:      Even, whe___ when ___ course...when I told them that we should leave, still, me, I [UI].  Of cour___ I didn't w___ to do anything not anything of the sort.  Understand?  But, of course....

Lopez:      [Interprets]

Umana:      They push___ to our li___, well, yes, and, the result is that [UI] we did it.

Lopez:      [Interprets]

Umana:      ___ of course, w___ en, when...if there is the possibility or something there?

Lopez:      A poss___ity ___ what?

Umana:      Having a transfer.

Lopez:      [Interprets to Terry]

Terry:      [No response]

Lopez:      Do you have a son in New York?

Umana:        [Nods] [Puts head downwards]

Lopez:        [Interprets to Terry] [Brief pause]
              [To Umana]: Do you regret it?

Umana:        [Shakes head] I'm emotional because of my little boy.

Lopez:        [Interprets to Terry]

Terry:        [Nods] *Ask him why did he keep the gun.*

Lopez:        [Interprets]

Umana:        [UI]

Lopez:        Huh?

Umana:        Because of any kind of retaliation.

Lopez:        What do you mean by "retaliation?"

Umana:        Of course, you know that [UI] something else [UI] against you.

Lopez:        Well, then, for your protection?

Umana:        [Nods]

Lopez:        [Interprets]

Terry:        *Alright. Tell him I'm sorry that he's in this position, but thanks for cooperating.*

Lopez:        [Interprets].

Umana:        No problem.

Terry:        *Good luck to him.*

Lopez:        [Interprets]

[As Terry and Lopez begin to exit room, Umana asks Lopez to see if they can do him that favor. Lopez agrees to tell him and exits room at 7:24 p.m.]

              [End of interview]

14

# APPENDIX 207

Case 3:16-cv-00057-MOC    Document 69-8    Filed 02/22/18    Page 17 of 54



Richard I. Frederick, PhD

# MICROTEST Q™
## Assessment System

## NAME (Optional)
A.U.

## IDENTIFICATION NUMBER

## BIRTH DATE
| MONTH | DAY | YEAR |
|-------|-----|------|

## TEST DATE
| MONTH | DAY | YEAR |
|-------|-----|------|
| 0 9 | 2 9 | 2 0 0 9 |

## GENDER
- ● Male
- (2) Female

## EDUCATION
- ● Grade 8 or less
- (2) Grade 9 to 11
- (3) High school graduate
- (4) GED
- (5) One to three years of college/technical school
- (6) Four or more years of college

## DIRECTIONS:

1. When you record your responses on this answer sheet, use a No. 2 pencil only, and fill in the circles with a heavy, dark mark.

2. Print your identification number in the box to the left. Then find the circle below each space that has the same number and blacken it. In a similar way, complete the Birth Date and Test Date boxes.

3. Blacken the appropriate circle for your gender and education.

4. If you want to change a response, erase it carefully and then fill in your new choice.

5. Do not make any marks outside the circles.

### FOR CLINICIAN USE ONLY

TEST OPTION
- (1) Nonverbal Subtest
- (2) Verbal Subtest
- (3) Nonverbal and Verbal Subtest



Pearson Assessments P. O. Box 1294 Minneapolis MN 55440
800-627-7271 www.pearsonassessments.com

Copyright © 1997 NCS PEARSON, INC. All rights reserved.
Published and distributed exclusively by NCS Pearson, Inc.
Printed in the United States of America.
"MICROTEST Q" and the VIP logo are trademarks and "VIP" is a
registered trademark of NCS Pearson, Inc.

PLEASE DO NOT WRITE IN THIS AREA

45207

Product Number
51770

| | |
|---|---|
| **PRACTICE 1** ① ② | **PRACTICE 2** ① ② |

1. ① ②
2. ① ②
3. ① ②
4. ① ②
5. ① ②
6. ① ②
7. ① ②
8. ① ②
9. ① ②
10. ① ②
11. ① ②
12. ① ②
13. ① ②
14. ① ②
15. ① ②
16. ① ②
17. ① ②
18. ① ②
19. ① ②
20. ① ②
21. ① ②
22. ① ②
23. ① ②
24. ① ②
25. ① ②

26. ① ②
27. ① ②
28. ① ②
29. ① ②
30. ① ②
31. ① ②
32. ① ②
33. ① ②
34. ① ②
35. ① ②
36. ① ②
37. ① ②
38. ① ②
39. ① ②
40. ① ②
41. ① ②
42. ① ②
43. ① ②
44. ① ②
45. ① ②
46. ① ②
47. ① ②
48. ① ②
49. ① ②
50. ① ②

51. ① ②
52. ① ②
53. ① ②
54. ① ②
55. ① ②
56. ① ②
57. ① ②
58. ① ②
59. ① ②
60. ① ②
61. ① ②
62. ① ②
63. ① ②
64. ① ②
65. ① ②
66. ① ②
67. ① ②
68. ① ②
69. ① ②
70. ① ②
71. ① ②
72. ① ②
73. ① ②
74. ① ②
75. ① ②

76. ① ②
77. ① ②
78. ① ②
79. ① ②
80. ① ②
81. ① ②
82. ① ②
83. ① ②
84. ① ②
85. ① ②
86. ① ②
87. ① ②
88. ① ②
89. ① ②
90. ① ②
91. ① ②
92. ① ②
93. ① ②
94. ① ②
95. ① ②
96. ① ②
97. ① ②
98. ① ②
99. ① ②
100. ① ②



**VALIDITY INDICATOR PROFILE**

---

# Nonverbal Subtest

---

# VIP®
# Validity Indicator Profile
# Interpretive Report
*Richard I. Frederick, PhD*

---

| | |
|---|---|
| Name: | Alejandro Umana |
| ID Number: | CHAR92909 |
| Age: | 24 |
| Gender: | Male |
| Years of Education: | Grade 8 or less |
| Date Assessed: | 10/04/2009 |



Copyright © 1997, 2003 NCS Pearson, Inc. All rights reserved.
"VIP" is a registered trademark of NCS Pearson, Inc.

**TRADE SECRET INFORMATION**
Not for release under HIPAA or other data disclosure laws that exempt trade secrets from disclosure.

[ 2.8 / 4 / 1.5.12 ]

## INTRODUCTION

The Validity Indicator Profile (VIP®) is a general assessment of response style designed to identify valid and invalid responding. The VIP can be used as a validity indicator for concurrently administered tests of intellectual and cognitive ability, including neuropsychological functioning.

The descriptions, inferences, and recommendations in this report should be evaluated in the context of other information that is available about the client. Such information may include clinician observations, the client's presenting complaint, scores from other assessment instruments, and an evaluation of situational factors that may influence test performance.

## OVERVIEW OF VALIDITY

When the VIP indicates that the test-taker's approach to the assessment was valid, the clinician can generally have confidence that the individual intended to perform well on the test and made a concerted effort to do so. When the VIP indicates invalidity, the clinician should be aware that concurrently administered ability tests probably underestimate the test-taker's ability. In some cases, a finding of invalidity on the VIP indicates insufficient effort to respond correctly or suboptimal attention and concentration during testing. In other instances, invalidity indicates a lack of cooperation, reflecting a deliberate attempt to perform poorly.

|  | Nonverbal subtest | Verbal subtest |
| --- | --- | --- |
| Overall subtest validity: | **Invalid** | **N/A** |
| Subtest response style: | **Inconsistent** | **N/A** |

This individual's performance on the Nonverbal subtest of the VIP is probably not an accurate representation of his maximal capacity to respond correctly. He may have been distracted by internal or external factors, he may have been too tired to do his best, or he may not have been sufficiently invested in the testing process to try very hard to answer the items correctly. Tests that cover similar content areas (for example, abstract reasoning, perceptual accuracy, and attention to detail) that were administered concurrently with the VIP should be interpreted with caution.

## NONVERBAL SUBTEST

**Performance Curve**

Response Style: **Invalid/Inconsistent**



**Running Mean Serial Position**
(average item difficulty)

·············· Expected Curve
——— Actual Curve

### Summary of Scores

Total Score.............................. 69

Adjusted Score.............................. 38

*Performance Curve Measures*

Sector 1 Distance................................. 21
Sector 2 Distance................................. 39
Sector 3 Distance................................. 33
Sector 1 Residual.............................. 0.006
Suppression Sector................................. No

Slope....................................... -0.0075
Point of Entry.............................. 1.0
Peak Performance Interval............................. 18
Patterned Responding.................................. NA

## Performance Curve Interpretation

This individual's invalid performance on the VIP probably has implications for his performance on other tests. It is helpful to evaluate features of his Performance Curve to obtain information relating to the probable response style that generated the invalid response pattern. It should be noted that the response style classification made in the following paragraphs is based only on the individual's VIP results and does not take into account any other information that may be available to the clinician.

Based on the predominant characteristics of this individual's Performance Curve, the best conclusion is that he intended to answer some of the items correctly, but his performance was compromised by insufficient effort. His performance might have been better if he had tried harder. His performance is indicative of **inconsistent responding.** Inconsistent responders do not perform as well as they might have if they had exerted complete and sustained effort. Some individuals respond in this manner when they are distracted or tired or when they are hampered by intense and competing internal stimuli.

His Performance Curve is elevated for the easier items and progresses toward random responding for the more difficult items. His negative Slope indicates that he generally intended to respond correctly to the test items.

His Total Score of 69 (out of 100) is somewhat higher than expected for irrelevant responding, which indicates that he made some effort to answer the items correctly.

The first point on his Performance Curve (the Point of Entry) indicates that he answered all of the 10 easiest items correctly. This is a good indication that he intended to respond correctly to these items. His apparent intention to respond correctly is further evidenced by his continued success on most of the 30 easiest items.

His Sector 2 (the period of responding that should reflect a transition from knowing to guessing) is longer than his Sector 1 (the period of responding that reflects actual knowledge). This pattern is typically seen in individuals who are classified as Inconsistent responders. The second section of his Performance Curve (Sector 2) indicates that he has some potential for responding correctly to the items at that level of difficulty. The fact that he did not choose the correct response for many of these items suggests that he was not making his best effort. This occurs when an individual is not invested in making his best effort, giving up too easily on items that he might have answered correctly with more effort and attention. This may indicate that the test-taker was tired, distracted, or insufficiently motivated to do his best.

### Estimate of Reasoning Ability

The VIP Nonverbal subtest was not designed to generate a measure of reasoning ability or a level of general comprehension. However, the Nonverbal subtest items have a wide range of difficulty, and it is often possible to generate reasonable estimates of ability based on characteristics of the individual's Performance Curve and Adjusted Score. The length of the first section of his Performance Curve (Sector 1), which represents his demonstrated ability, suggests that his reasoning ability is at least significantly below average or higher. This conservative estimate of his ability is supported by his Adjusted Score, which estimates his reasoning ability to be at least below average or higher. His Sector 1 is not as long as expected based on his Total Score (compare his Actual Curve to his Expected Curve). When this occurs, the estimate of ability based on the Adjusted Score may be better than the estimate based on his

Sector 1 Distance.

## SUMMARY OF RESULTS

|  | Nonverbal subtest | Verbal subtest |
|---|---|---|
| Overall subtest validity: | **Invalid** | **N/A** |
| Subtest response style: | **Inconsistent** | **N/A** |

In conclusion, this individual's performance should be considered invalid. His Performance Curve characteristics indicate that he intended to do well on at least some of the test items, but his performance was sufficiently inconsistent to warrant concern. His Total Scores are probably lower than they would have been with better effort. Such inconsistent responding can result from many factors, the most probable of which is an insufficient effort to do well. Occasionally, however, Performance Curves that are classified as Inconsistent can result from an individual's deliberate attempt to do poorly but not poorly enough to be classified as Suppressed or Irrelevant. A careful evaluation of how he approached the testing session is critical to determine if it would be useful to interpret any other tests that were administered concurrently.

## SCORED RESPONSES BY DIFFICULTY

**Nonverbal Subtest**

| 1: 1 | 2: 1 | 3: 1 | 4: 1 | 5: 1 | 6: 1 | 7: 1 | 8: 1 | 9: 1 | 10: 1 |
|------|------|------|------|------|------|------|------|------|-------|
| 11: 1 | 12: 1 | 13: 1 | 14: 1 | 15: 1 | 16: 1 | 17: 1 | 18: 1 | 19: 1 | 20: 1 |
| 21: 1 | 22: 1 | 23: 1 | 24: 1 | 25: 1 | 26: 1 | 27: 1 | 28: 0 | 29: 0 | 30: 1 |
| 31: 0 | 32: 1 | 33: 1 | 34: 0 | 35: 1 | 36: 1 | 37: 1 | 38: 1 | 39: 1 | 40: 1 |
| 41: 1 | 42: 1 | 43: 1 | 44: 1 | 45: 1 | 46: 1 | 47: 1 | 48: 1 | 49: 1 | 50: 1 |
| 51: 1 | 52: 0 | 53: 0 | 54: 1 | 55: 1 | 56: 1 | 57: 1 | 58: 1 | 59: 1 | 60: 0 |
| 61: 0 | 62: 1 | 63: 1 | 64: 1 | 65: 0 | 66: 0 | 67: 1 | 68: 0 | 69: 0 | 70: 0 |
| 71: 0 | 72: 1 | 73: 0 | 74: 0 | 75: 0 | 76: 0 | 77: 1 | 78: 1 | 79: 0 | 80: 0 |
| 81: 0 | 82: 0 | 83: 1 | 84: 0 | 85: 1 | 86: 1 | 87: 1 | 88: 1 | 89: 1 | 90: 1 |
| 91: 0 | 92: 0 | 93: 1 | 94: 0 | 95: 1 | 96: 0 | 97: 0 | 98: 0 | 99: 0 | 100: 0 |

*Note.* 1 = correct response, 0 = incorrect response. In this section, items are listed in order from easiest to most difficult.

**End of Report**

NOTE: This and previous pages of this report contain trade secrets and are not to be released in response to requests under HIPAA (or any other data disclosure law that exempts trade secret information from release). Further, release in response to litigation discovery demands should be made only in accordance with your profession's ethical guidelines and under an appropriate protective order.

## ITEM RESPONSES

### Nonverbal Subtest

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1: 2 | 2: 2 | 3: 2 | 4: 2 | 5: 1 | 6: 1 | 7: 2 | 8: 2 | 9: 1 | 10: 1 |
| 11: 2 | 12: 2 | 13: 1 | 14: 1 | 15: 2 | 16: 2 | 17: 2 | 18: 1 | 19: 2 | 20: 2 |
| 21: 2 | 22: 1 | 23: 2 | 24: 2 | 25: 1 | 26: 1 | 27: 1 | 28: 2 | 29: 2 | 30: 2 |
| 31: 1 | 32: 1 | 33: 2 | 34: 1 | 35: 1 | 36: 2 | 37: 1 | 38: 2 | 39: 2 | 40: 2 |
| 41: 1 | 42: 2 | 43: 1 | 44: 1 | 45: 1 | 46: 1 | 47: 2 | 48: 1 | 49: 1 | 50: 1 |
| 51: 1 | 52: 2 | 53: 2 | 54: 1 | 55: 2 | 56: 2 | 57: 1 | 58: 2 | 59: 1 | 60: 1 |
| 61: 2 | 62: 1 | 63: 2 | 64: 2 | 65: 2 | 66: 2 | 67: 2 | 68: 2 | 69: 1 | 70: 1 |
| 71: 1 | 72: 2 | 73: 1 | 74: 1 | 75: 2 | 76: 1 | 77: 2 | 78: 1 | 79: 2 | 80: 1 |
| 81: 2 | 82: 2 | 83: 1 | 84: 2 | 85: 2 | 86: 1 | 87: 1 | 88: 2 | 89: 1 | 90: 2 |
| 91: 2 | 92: 1 | 93: 1 | 94: 2 | 95: 2 | 96: 1 | 97: 2 | 98: 2 | 99: 2 | 100: 2 |

# APPENDIX 208

| | |
|---|---|
| DISK NUMBER: | USAO Disk #21 FBI Disk #MS-23 |
| JOB NUMBER: | SG001 |
| CLIENT: | |
| TAPE NUMBER/ID: | Umana 2007-12-17 14[1].22.27 |
| | |
| CASE NO: | MS-13 |
| DATE OF INCIDENT: | 12/17/2007 |
| | |
| TELEPHONE: | N/A |
| CALL NO: | N/A |
| INCOMING: | N/A |
| OUTGOING: | N/A |
| DATE: | 12/17/2007 |
| TIME: | N/A |
| DURATION: | 10:20 |
| LANGUAGE: | Spanish |
| PARTICIPANTS: | English |
| | |
| Automated Operator: | A/O |
| Alejandro Umana: | Wizard |
| Wendy: | Wendy |
| | |
| FORMAT: | Microsoft Word |
| WORD COUNT: | N/A |
| | |
| Legend: | U/I= Un-intelligible (English section) |
| | I/I = In-inteligible (Spanish section) |

**PLEASE NOTE**:
THE TRANSCRIPTION BRINGS INTO THE TARGET LANGUAGE WHATEVER GRAMMATICAL ERROR, HESÍTATION OR STUTTERING OCCURRED IN THE SOURCE LANGUAGE.  UNINTELLIGIBLE PARTS WERE RENDERED AS: U/I OR I/I.
**WARNING**:
THIS IS A MICROSOFT WORD FILE, BECAUSE OF THE COLUMNS, DO NOT OPEN IT WITH ANY OTHER WORD PROCESSOR EXCEPT MICROSOFT WORD TO PRESERVE ITS INTEGRITY.

1

| Beginning of Recording | | Beginning of Recording |
|---|---|---|
| A/O:<br><br>Hola. Esta llamada es por cobrar de parte de: | | A/O:<br><br>Hello. This is a collect call from: |
| Wizard :<br>Alex. | | Wizard :<br>Alex. |
| A/O:<br><br>Un preso en The Gilford county jail. Esta llamada puede ser grabada. Para información de cargos marque el cuatro. Para aceptar los cargos marque el tres. Para no aceptar los cargos marque el nueve o cuelgue el teléfono ahora. Gracias por usar Comunicaciones de PayTel, puede empezar a hablar ahora. | | A/O:<br><br>A prisoner from The Gilford County Jail. The call may be recorded. For pricing information press 4. To accept the charges press 3. To not accept the charges press 9 or hang up the phone now. Thank you for using PayTel Communications. You can begin speaking now. |
| Wizard:<br>Aló. Mirabe. No tienes lapicero allí? | | Wizard:<br>Hello. Look. Do you have a pen there? |
| Wendy:<br>Uh huh. | | Wendy:<br>Uh huh. |
| Wizard:<br>Este, este pon allí como puedes hacer para mandar algo? | | Wizard:<br>Write something down, can you to send something? |
| Wendy:<br>Uh huh. | | Wendy:<br>Uh huh. |
| Wizard:<br>Este, si cuando, cuando lo pongas, vas a poner el nombre, va allí. | | Wizard:<br>When, when you write it, you're going to put the name there. |
| Wendy:<br>Uh huh. | | Wendy:<br>Uh huh. |
| Wizard:<br>De allí, entre ponerle algo allí entre variado de allí una A— | | Wizard:<br>Put something there, between parentheses there an A— |

2

| | |
|---|---|
| Wendy:<br>    Una A? | Wendy:<br>    An A? |
| Wizard:<br>    Uh huh. Una A. Un punto. De ahí es un dos. | Wizard:<br>    Uh huh. An A. A period. Then a 2. |
| Wendy:<br>    Espérate, espérate. Una A. Un punto. Un dos. | Wendy:<br>    Wait, wait. An A. Period. A 2. |
| Wizard:<br>    Otro punto. | Wizard:<br>    Another period. |
| Wendy:<br>    Uh huh. | Wendy:<br>    Uh huh. |
| Wizard:<br>    Una H. | Wizard:<br>    An H. |
| Wendy:<br>    Uh huh. | Wendy:<br>    Uh huh. |
| Wizard:<br>    ███████████ | Wizard:<br>    ███ |
| Wendy:<br>    ███████████ | Wendy:<br>    ███ |
| Wizard:<br>    Uh huh. ████ | Wizard:<br>    Uh huh. ████ |
| Wendy:<br>    ████ | Wendy:<br>    ████ |
| Wizard:<br>    No solo ██ | Wizard:<br>    No just ██ |
| Wendy:<br>    Uh huh. | Wendy:<br>    Uh huh. |
| Wizard:<br>    F-Y. | Wizard:<br>    F-Y. |

3

| Wendy: Uh huh. | Wendy: Uh huh. |
| --- | --- |
| Wizard: ███ | Wizard: ███ |
| Wendy: ███ | Wendy: ███ |
| Wizard: Uh huh. | Wizard: Uh huh. |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: █████ | Wizard: █████ |
| Wendy: ████ | Wendy: ████ |
| Wizard: ████ | Wizard: ████ |
| Wendy: █████ | Wendy: █████ |
| Wizard: Uh huh. | Wizard: Uh huh. |
| Wendy: Va. | Wendy: Ok. |
| Wizard: ██- | Wizard: ███ |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: Y de allí pones ██████ ████████████████ ████ | Wizard: Then put ████████ █████████████████ |
| Wendy: ██████ | Wendy: ██████ |



| Wizard: | Wizard: |
|---|---|
| Uh huh? | Uh huh? |
| Wendy: ███████ | Wendy: ███████ |
| Wizard: Uh huh, ██████ | Wizard: Uh huh, ██████ |
| Wendy: █████ — Como? | Wendy: █████ — What? |
| Wizard: ██████. Se escribe, dos, este ███ | Wizard: ████████ Write, 2, ███ |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: ███ | Wizard: ███ |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: ███ | Wizard: ███ |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: ██- | Wizard: ███ |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: ███ | Wizard: ███ |
| Wendy: Uh huh. | Wendy: Uh huh. |
| Wizard: De allí ██████████ y | Wizard: Then ███████████ and |

5

| | |
|---|---|
| de allí el código postal que es ■■■■■ | then and then the zip code which is ■■■■ |
| **Wendy:**<br>■ | **Wendy:**<br>■ |
| **Wizard:**<br>Uh huh. | **Wizard:**<br>Uh huh. |
| **Wendy:**<br>Sí va. | **Wendy:**<br>Ok. |
| **Wizard:**<br>Recibo. | **Wizard:**<br>Got it. |
| **Wendy:**<br>Y tu como estas? | **Wendy:**<br>And how are you? |
| **Wizard:**<br>Allí a ver que pedo. Watchabe. | **Wizard:**<br>We'll see. Look. |
| **Wendy:**<br>Uh huh. | **Wendy:**<br>Uh huh. |
| **Wizard:**<br>Por segundado pues sí. Me diga donde el chavo. Watcha allí, pues sí, que sé Wendy, me entiendes? Si tienes que acaparar jale allí, pues si, watcha allí que, si que, no nadie te vaya a tratar mal ni nada de eso. | **Wizard:**<br>Well yeah the way it is. Tell me where he is. Look, well yeah, what do I know Wendy, you know? You have to get a job, but make sure that nobody's gonna treat you bad or anything. |
| **Wendy:**<br>No me digas eso. | **Wendy:**<br>Don't tell me that. |
| **Wizard:**<br>Uh? | **Wizard:**<br>Uh? |
| **Wendy:**<br>No me digas eso. | **Wendy:**<br>Don't say that. |
| **Wizard:**<br>Te lo digo. No me lo tomes a malo pero vas a ver que pedo tan bien. Entiendes? Watchalo I/I. | **Wizard:**<br>I'm telling you. Don't take it badly, but you'll see too. You understand? Watch out U/I. Got it? |

6

| | |
|---|---|
| Oíste? Hey? Pues sí. | Hey? Yeah. |
| Wendy:<br>    Pues si. | Wendy:<br>    Well yeah. |
| Wizard:<br>    Pues pon mi elemento mi amor. | Wizard:<br>    Well feel better my love. |
| Wendy:<br>    No quieres hablar con el niño? | Wendy:<br>    Do you want to speak to the baby? |
| Wizard:<br>    Uh? | Wizard:<br>    Uh? |
| Wendy:<br>    No quieres hablar con el niño? | Wendy:<br>    Do you want to speak to the baby? |
| Wizard:<br>    A I/I claro. | Wizard:<br>    U/I of course. |
| Wizard's baby:<br>    Hola. | Wizard's baby:<br>    Hello. |
| Wizard:<br>    Hola mi amor. | Wizard:<br>    Hello my love. |
| Wizard's baby:<br>    Regresas cuando? | Wizard's baby:<br>    When are you coming back? |
| Wizard:<br>    Uh? | Wizard:<br>    Uh? |
| Wizard's baby:<br>    Hasta cuando? | Wizard's baby:<br>    When? |
| Wizard:<br>    Que dices? | Wizard:<br>    What was that? |
| Wizard's baby:<br>    Te amo. | Wizard's baby:<br>    I love you. |
| Wizard:<br>    Yo también bebe. Que estas haciendo mi amor? | Wizard:<br>    Me too baby. What are you doing my love? |

7

| | |
|---|---|
| Wendy:<br>    Un I/I | Wendy:<br>    A U/I |
| Wizard:<br>    Uh? | Wizard:<br>    Uh? |
| Wizard's baby:<br>    Te amo mucho. | Wizard's baby:<br>    I love you very much. |
| Wizard:<br>    Yo también mi amorcito. Le I/I? | Wizard:<br>    Me too my little love. U/I? |
| Wizard's baby:<br>    Te amo papi. | Wizard's baby:<br>    I love you papa. |
| Wizard:<br>    Yo también mi amor. | Wizard:<br>    Me too my love. |
| Wizard's baby:<br>    Esta bien. | Wizard's baby:<br>    Ok. |
| Wizard:<br>    Orale. | Wizard:<br>    Ok. |
| Wizard's baby:<br>    Bye. | Wizard's baby:<br>    Bye. |
| Wizard:<br>    Bye bebe. | Wizard:<br>    Bye baby. |
| Wendy:<br>    Pues si. | Wendy:<br>    Well yeah. |
| Wizard:<br>    Pues si. Y entonces? Epa. | Wizard:<br>    Well yeah. So? |
| Wendy:<br>    Voy a I/I con el celular. | Wendy:<br>    I'm going to U/I with the cell phone. |
| Wizard:<br>    Uh? | Wizard:<br>    Uh? |
| Wendy:<br>    Puedes marcar a un celular? | Wendy:<br>    Can you call a cell phone? |

8

| | |
|---|---|
| **Wizard:**<br>Como? | **Wizard:**<br>What? |
| **Wendy:**<br>Que si puedes llamar para celular? | **Wendy:**<br>Can you call a cell phone? |
| **Wizard:**<br>No, no sé, porque? | **Wizard:**<br>No, I don't know, why? |
| **Wendy:**<br>No porque, porque, por si tenias que I/I. | **Wendy:**<br>No, because, because if you have U/I. |
| **Wizard:**<br>Pero y si al menos que le pongas programa por cobrar también. | **Wizard:**<br>But if you at least put on a collect call plan. |
| **Wendy:**<br>Uh huh. | **Wendy:**<br>Uh huh. |
| **Wizard:**<br>Solo así, si puedo llamar. | **Wizard:**<br>I can only call that way. |
| **Wendy:**<br>Hum. | **Wendy:**<br>Hum. |
| **Wizard:**<br>Pues si. Ay I/I si me los das. | **Wizard:**<br>Well yeah. Ay U/I if you give it to me. |
| **Wendy:**<br>I/I si te lo puedo dejar. | **Wendy:**<br>U/I I can give it to you. |
| **Wizard:**<br>Ah pues I/I pásalo que no me acuerdo bien. | **Wizard:**<br>Ah ok U/I give it to me. I don't have a good memory. |
| **Wendy:**<br>█ | **Wendy:**<br>█ |
| **Wizard:**<br>Caramba. I/I— █ | **Wizard:**<br>Shit. U/I— █ |

9

| | |
|---|---|
| Wendy:<br>█ | Wendy:<br>█ |
| Wizard:<br>█ | Wizard:<br>█ |
| Wendy:<br>█ | Wendy:<br>█ |
| Wizard:<br>Ah ah que esta jodido█ | Wizard:<br>Ah ah it's fucked █ |
| Wendy:<br>█ | Wendy:<br>█ |
| Wizard:<br>█ | Wizard:<br>█ |
| Wendy:<br>Uh huh. █ | Wendy:<br>Uh huh. █ |
| Wizard:<br>█ | Wizard:<br>█ |
| Wendy:<br>Uh huh. | Wendy:<br>Uh huh. |
| Wizard:<br>Ah, y yo estaba marcando otro. | Wizard:<br>Ah, I was calling another one. |
| Wendy:<br>Pues sí. | Wendy:<br>Well yeah. |
| Wizard:<br>Pues sí. | Wizard:<br>Well yeah. |
| Wendy:<br>Y entonces? | Wendy:<br>So? |
| Wizard:<br>I/I | Wizard:<br>U/I |
| Wendy:<br>Uh? | Wendy:<br>Uh? |

10

| | |
|---|---|
| Wizard:<br>　　Ah? | Wizard:<br>　　Ah? |
| Wendy:<br>　　I/I | Wendy:<br>　　U/I |
| Wizard:<br>　　Ay que pedo I/I allí I/I | Wizard:<br>　　Ay what's going on U/I there U/I |
| Wendy:<br>　　Uh huh. | Wendy:<br>　　Uh huh. |
| Wizard:<br>　　Allí cuando I/I | Wizard:<br>　　There when U/I |
| Wendy:<br>　　Uh huh. | Wendy:<br>　　Uh huh. |
| Wizard:<br>　　I/I | Wizard:<br>　　U/I |
| Wendy:<br>　　Ya. | Wendy:<br>　　Yeah. |
| Wizard:<br>　　Allí. Claro porque sí que sí. Si me salen que no va a bajar de allí que sí. I/I. Pero si no voy a I/I que sí. I/I pues sí. Mirabe aquel loco, quería que le dijeras al I/I | Wizard:<br>　　There. Of course because yeah, yeah. If I get out, I'm not going to get out. U/I. But if not, I'm going U/I. U/I well yeah. Look, that guy, I wanted you to tell U/I |
| Wendy:<br>　　Uh huh. | Wendy:<br>　　Uh huh. |
| Wizard:<br>　　Que tipo el 29 | Wizard:<br>　　Like around the 29th |
| Wendy:<br>　　Uh huh. | Wendy:<br>　　Uh huh. |
| Wizard:<br>　　De enero. | Wizard:<br>　　Of January |
| Wendy:<br>　　Uh huh. | Wendy:<br>　　Uh huh. |

11

Wizard:
Tengo, tengo, tengo la I/I me entiendes?

Wendy:
Uh huh.

Wizard:
En el, en el, en el 12 decirle al, aquel, a ese loco que se busque aquí, me entiendes?

Wendy:
Uh huh.

Wizard:
Al otro loco al I/I ese.

Wendy:
Uh huh.

Wizard:
Que es en el 12, el, el 920 por allá I/I para decirlo.

Wendy:
Uh huh.

Wizard:
Me entiendes porque la I/I allí pues si solo ni, ni, ni están seguros pues que, que, que decido pero vas a ver que aquí, vas a ver que ya lo han agarrado a uno porque, porque no lo quieren dejar ir a uno.

Wendy:
Allá están todos I/I.

Wizard:
Simón, no decirles que si puede, que si, puede venir ver.

Wizard:
I have, I have, I have the U/I you know?

Wendy:
Uh huh.

Wizard:
On the, on the, on the 12th, tell, that guy, to that guy to come here, you understand?

Wendy:
Uh huh.

Wizard:
The other guy the U/I this one.

Wendy:
Uh huh.

Wizard:
On the 12th, the, the 920 over there U/I to tell him.

Wendy:
Uh huh.

Wizard:
You understand because the U/I there but only they aren't, aren't even safe to decide but you'll see that they got someone, because they want to let someone go.

Wendy:
All U/I are there.

Wizard:
Yeah, no ask if it's possible, if, he can come.

12

| | |
|---|---|
| Wendy:<br>    Uh huh.<br><br>Wizard:<br>    Que le a, que le digas, decirle a este loco de aquí.<br><br>Wendy:<br>    Uh huh.<br><br>Wizard:<br>    Que el le diga pues que, que vengan.<br><br>Wendy:<br>    Uh huh.<br><br>Wizard:<br>    Me entiendes?<br><br>Wendy:<br>    Ya.<br><br>Wizard:<br>    Va porque no, tal vez a vos no te, no, no, no te va a creer o tal vez simón va también decirles, también pues.<br><br>Wendy:<br>    Uh huh, bueno yo no he hablado con él.<br><br>Wizard:<br>    Ahora.<br><br>Wendy:<br>    Hum.<br><br>Wizard:<br>    I/I. A ver que pedo mamacita. Tienes que cuidarte. Dale saludos allá a Turuquita. | Wendy:<br>    Uh huh.<br><br>Wizard:<br>    Tell, tell that guy from here.<br><br>Wendy:<br>    Uh huh.<br><br>Wizard:<br>    To tell him, for them to come.<br><br>Wendy:<br>    Uh huh.<br><br>Wizard:<br>    You understand?<br><br>Wendy:<br>    Yeah.<br><br>Wizard:<br>    Ok because maybe you, aren't, aren't, aren't going to believe or maybe yes, go tell them too then.<br><br>Wendy:<br>    Uh huh, well I haven't spoken to him.<br><br>Wizard:<br>    Now.<br><br>Wendy:<br>    Hum.<br><br>Wizard:<br>    U/I. Let's see what happens mamacita. You have to take care of yourself. Say hello to Turuquita. |

13

| | |
|---|---|
| Wendy:<br>　　Uh huh.<br><br>Wizard:<br>　　Mándale saludos a I/I. Y a tocar I/I. Decirle ya bueno que, me entrene a ese bichito, para que le enseñe, para que le enseñe a defenderse pues.  Y Guachajo que estudie ese hijo de puta para que acaparre una chimba. Oíste?<br><br>Wendy:<br>　　Uh huh.<br><br>Wizard:<br>　　Que no se te olvide, darle unas I/I todo después, siempre cuando se acueste.<br><br>Wendy:<br>　　Ok.<br><br>Wizard:<br>　　Oíste?<br><br>Wendy:<br>　　Vaya.<br><br>Wizard:<br>　　A ver que pedo. Que día es ahora huevón?<br><br>Wendy:<br>　　Lunes.<br><br>Wizard:<br>　　Ah?<br><br>Wendy:<br>　　Lunes.<br><br>Wizard:<br>　　Si es cierto. Puta le va a salir un I/I allí a tu, a tu tío. | Wendy:<br>　　Uh huh.<br><br>Wizard:<br>　　Say hello to U/I. And to U/I. Tell him to train this one, to teach him, to teach him to defend himself. And Guachajo this mother fucker should study so he can get a job. Got it?<br><br>Wendy:<br>　　Uh huh.<br><br>Wizard:<br>　　Don't forget, give him some U/I everything after, after he sleeps.<br><br>Wendy:<br>　　Ok.<br><br>Wizard:<br>　　Got it?<br><br>Wendy:<br>　　Ok.<br><br>Wizard:<br>　　We'll see. What day is it today?<br><br>Wendy:<br>　　Monday.<br><br>Wizard:<br>　　Ah?<br><br>Wendy:<br>　　Monday.<br><br>Wizard:<br>　　Yeah true. Fuck a U/I is going to come there, your, your uncle. |

14

| | |
|---|---|
| **Wendy:**<br>    Voy a ver como  yo para conseguir el dinero I/I. | **Wendy:**<br>    I'm going to see how I can get the money U/I. |
| **Wizard:**<br>    Ah? Watchabe. | **Wizard:**<br>    Ah? Look. |
| **Wendy:**<br>    Hum? | **Wendy:**<br>    Hum? |
| **Wizard:**<br>    Mira allí de pues sí de lo que esperas allí I/I allí, me entiendes? Y pues si. No vayas a echar para atrás bebe. | **Wizard:**<br>    Look, from what you are waiting for there U/I there, you know? Well yeah. You can't go backwards baby. |
| **A/O:**<br>    Le queda un minuto en esta llamada. | **A/O:**<br>    You have one minute left in this call. |
| **Wendy:**<br>    I/I | **Wendy:**<br>    U/I |
| **Wizard:**<br>    El domingo va I/I alli? | **Wizard:**<br>    On Sunday are U/I there? |
| **Wendy:**<br>    Como? | **Wendy:**<br>    What? |
| **Wizard:**<br>    El domingo ya I/I alli? | **Wizard:**<br>    On Sunday are U/I there? |
| **Wendy:**<br>    I/I | **Wendy:**<br>    U/I |
| **Wizard:**<br>    Allí, voy, voy a intentar tal vez pues sí, puedo hacer memoria allí de los días que van pasando. Si porque cuesta, cuesta saber que día es ahora o anoche. Oíste. Cualquier onda escribeme. | **Wizard:**<br>    I'm going to try maybe yeah, I'm going to try to keep track of the days as they go by. Yeah, because it's hard to know what day it is now or last night. Hear that. Write to me for anything. |
| **Wendy:**<br>    Te amo I/I. | **Wendy:**<br>    I love you U/I. |

15

| | |
|---|---|
| Wizard:<br>    Yo también bebe. A ver que pedo. No te pongas así ahorita pues si,  hay que esperar I/I pues si, usar la bestia, que no se te olvide eso, decirle a mi tata que le diga al I/I. | Wizard:<br>    Me too baby. We'll see. Don't get like that right now, we have to wait U/I well yeah, usar la bestia, don't forget to tell my tata to tell U/I. |
| Wendy:<br>    Ya. | Wendy:<br>    Yeah. |
| Wizard:<br>    Please. | Wizard:<br>    Please. |
| Wendy:<br>    Yo lo voy a mandar hacer. | Wendy:<br>    I'll tell her to do it. |
| Wizard:<br>    Órale pues mi amor, cuídate oíste. | Wizard:<br>    Ok my love. Take care of yourself. Got it? |
| Wendy:<br>    Tu también homey. | Wendy:<br>    You too homey. |
| Wizard:<br>    Órale pues. | Wizard:<br>    Ok then |
| Wendy:<br>    Te amo. | Wendy:<br>    I love you. |
| Wizard:<br>    Yo también bebe. Bye. | Wizard:<br>    I do too baby. Bye. |
| Wendy:<br>    Bye. | Wendy:<br>    Bye. |
| **END OF THE CALL.** | **END OF THE CALL.** |

16

# APPENDIX 209

Case 3:16-cv-00057-MOC    Document 69-8    Filed 02/22/18    Page 45 of 54

# UNITED STATES DISTRICT COURT
## Western District of North Carolina

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | (For Offenses Committed On or After November 1, 1987) |
| **V.** | ) | |
| | ) | |
| **ALBERT VELA-GARCIA** | ) | Case Number: DNCW315CR000121-034 |
| | ) | USM Number: 30026-058 |
| | ) | |
| | ) | James Edward Quander Jr. |
| | ) | Defendant's Attorney |

**THE DEFENDANT:**

☒ Pleaded guilty to count(s) 1 & 12.

☐ Pleaded nolo contendere to count(s) which was accepted by the court.

☐ Was found guilty on count(s) after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Counts |
|---|---|---|---|
| 18:1962(d) & 1963(a) | Racketeer Influenced Corrupt Organization – RICO conspiracy | 5/19/15 | 1 |
| 18:1959(a)(5) | Attempted murder in aid of racketeering activity (18:2) | 8/11/13 | 12 |

The Defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984, United States v. Booker, 125 S.Ct. 738 (2005), and 18 U.S.C. § 3553(a).

☐ The defendant has been found not guilty on count(s).

☒ Count(s) 13 (is)(are) dismissed on the motion of the United States.

**IT IS ORDERED** that the Defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay monetary penalties, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Date of Imposition of Sentence: 7/27/2016

Signed: August 31, 2016

Robert J. Conrad, Jr.
United States District Judge

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of
<u>Counts 1 & 12: SEVENTY-EIGHT (78) MONTHS each count to run concurrently</u>.

☐ The Court makes the following recommendations to the Bureau of Prisons:

☒ The Defendant is remanded to the custody of the United States Marshal.

☐ The Defendant shall surrender to the United States Marshal for this District:

    ☐ As notified by the United States Marshal.
    ☐ At _ on _.

☐ The Defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ As notified by the United States Marshal.
    ☐ Before 2 p.m. on _.
    ☐ As notified by the Probation Office.

## RETURN

I have executed this Judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____ at

_____, with a certified copy of this Judgment.

_____
United States Marshal

          By: _____
                Deputy Marshal

Defendant: Albert Vela-Garcia
Case Number: DNCW315CR000121-034

Judgment- Page **3** of **6**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of <u>Counts 1 & 12: TWO (2) YEARS each count to run concurrently</u>.

☐ The condition for mandatory drug testing is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

# STANDARD CONDITIONS OF SUPERVISION

The defendant shall comply with the standard conditions that have been adopted by this court and any additional conditions ordered.
1. The defendant shall not commit another federal, state, or local crime.
2. The defendant shall refrain from possessing a firearm, destructive device, or other dangerous weapon.
3. The defendant shall pay any financial obligation imposed by this judgment remaining unpaid as of the commencement of the sentence of probation or the term of supervised release on a schedule to be established by the Court.
4. The defendant shall provide access to any personal or business financial information as requested by the probation officer.
5. The defendant shall not acquire any new lines of credit unless authorized to do so in advance by the probation officer.
6. The defendant shall not leave the Western District of North Carolina without the permission of the Court or probation officer.
7. The defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer.
8. A defendant on supervised release shall report in person to the probation officer in the district to which he or she is released within 72 hours of release from custody of the Bureau of Prisons.
9. The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
10. The defendant shall support his or her dependents and meet other family responsibilities.
11. The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other activities authorized by the probation officer.
12. The defendant shall notify the probation officer within 72 hours of any change in residence or employment.
13. The defendant shall refrain from excessive use of alcohol and shall not unlawfully purchase, possess, use, distribute or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as duly prescribed by a licensed physician.
14. The defendant shall participate in a program of testing and treatment or both for substance abuse if directed to do so by the probation officer, until such time as the defendant is released from the program by the probation officer; provided, however, that defendant shall submit to a drug test within 15 days of release on probation or supervised release and at least two periodic drug tests thereafter for use of any controlled substance, subject to the provisions of 18:3563(a)(5) or 18:3583(d), respectively; The defendant shall refrain from obstructing or attempting to obstruct or tamper, in any fashion, with the efficiency and accuracy of any prohibited substance testing or monitoring which is (are) required as a condition of supervision.
15. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.
16. The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.
17. The defendant shall submit his person, residence, office, vehicle and/or any computer system including computer data storage media, or any electronic device capable of storing, retrieving, and/or accessing data to which they have access or control, to a search, from time to time, conducted by any U.S. Probation Officer and such other law enforcement personnel as the probation officer may deem advisable, without a warrant. The defendant shall warn other residents or occupants that such premises or vehicle may be subject to searches pursuant to this condition.
18. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed by the probation officer.
19. The defendant shall notify the probation officer within 72 hours of defendant's being arrested or questioned by a law enforcement officer.
20. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court.
21. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.
22. If the instant offense was committed on or after 4/24/96, the defendant shall notify the probation officer of any material changes in defendant's economic circumstances which may affect the defendant's ability to pay any monetary penalty.
23. If home confinement (home detention, home incarceration or curfew) is included you may be required to pay all or part of the cost of the electronic monitoring or other location verification system program based upon your ability to pay as determined by the probation officer.
24. The defendant shall cooperate in the collection of DNA as directed by the probation officer.
25. The defendant shall participate in transitional support services under the guidance and supervision of the U.S. Probation Officer. The defendant shall remain in the services until satisfactorily discharged by the service provider and/or with the approval of the U.S. Probation Officer.

ADDITIONAL CONDITIONS:
26. The defendant shall have no direct or indirect contact, at any time, for any reason, with the victim(s), or affected parties in this matter, unless provided with specific written authorization to do so, in advance, by the U.S. Probation Office.

Defendant: Albert Vela-Garcia
Case Number: DNCW315CR000121-034

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the Schedule of Payments.

| ASSESSMENT | FINE | RESTITUTION |
|---|---|---|
| $200.00 | $0.00 | $0.00 |

☐ The determination of restitution is deferred until. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

## FINE

The defendant shall pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

☒ The court has determined that the defendant does not have the ability to pay interest and it is ordered that:

☒ The interest requirement is waived.

☐ The interest requirement is modified as follows:

## COURT APPOINTED COUNSEL FEES

☐ The defendant shall pay court appointed counsel fees.

☐ The defendant shall pay $0.00 towards court appointed fees.

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A ☐ Lump sum payment of $0.00 due immediately, balance due
      ☐ Not later than_____
      ☐ In accordance ☐ (C), ☐ (D) below; or

B ☒ Payment to begin immediately (may be combined with ☐ (C), ☐ (D) below; or

C ☐ Payment in equal Monthly (E.g. weekly, monthly, quarterly) installments of $50.00 to commence 60 (E.g. 30 or 60) days after the date of this judgment; or

D ☐ Payment in equal Monthly (E.g. weekly, monthly, quarterly) installments of $ 50.00 to commence 60 (E.g. 30 or 60) days after release from imprisonment to a term of supervision. In the event the entire amount of criminal monetary penalties imposed is not paid prior to the commencement of supervision, the U.S. Probation Officer shall pursue collection of the amount due, and may request the court to establish or modify a payment schedule if appropriate 18 U.S.C. § 3572.

Special instructions regarding the payment of criminal monetary penalties:

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court costs:

☐ The defendant shall forfeit the defendant's interest in the following property to the United States

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalty payments are to be made to the United States District Court Clerk, 401 West Trade Street, Room 210, Charlotte, NC 28202, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program. All criminal monetary penalty payments are to be made as directed by the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

## STATEMENT OF ACKNOWLEDGMENT

I understand that my term of supervision is for a period of _____months, commencing on _____.

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

I understand that revocation of probation and supervised release is mandatory for possession of a controlled substance, possession of a firearm and/or refusal to comply with drug testing.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.


(Signed)    _____          Date: _____
                    Defendant

(Signed)    _____          Date: _____
                    U.S. Probation Office/Designated Witness

# APPENDIX 210



**Biographical Information on Robert J. Conrad, Jr.,
Nominee for U.S. Court of Appeals for the Fourth Circuit**

**July 19, 2007**

Robert J. Conrad, Jr. has spent most of his career at the United States District Court for the Western District of North Carolina serving as chief judge (2006-present), judge (2005-2006), the United States Attorney (2001-2004), and an Assistant United States Attorney (1989-2001).[1] In the time between the U.S. Attorney's office and his appointment to the bench, Conrad was a partner at Mayer, Brown, Rowe & Maw (2004-2005).[2] Born in Chicago, Illinois in 1958,[3] Conrad was an Academic All-American in basketball at Clemson University majoring in history;[4] he received his law degree from the University of Virginia (UVA) in 1983.[5] In 2007, Conrad taught at the 26th Annual National Trial Advocacy College at UVA.[6] Judge Conrad is admitted to the North Carolina and Virginia bars.[7] Conrad, a Catholic, serves on the Board of Visitors of Ave Maria Law School.[8]

Judge Conrad has had a number of noteworthy professional accomplishments. While he

---

[1] The Federal Judicial Center, *Conrad, Robert James, Jr.*, *at* http://www.fjc.gov/servlet/tGetInfo?jid=3085.

[2] Press Release, Mayer, Brown, Rowe & Maw, U.S. Attorney Robert Conrad Joins Mayer, Brown, Rowe & Maw LLP Charlotte Office, (June 14, 2004) (on file with Mayer, Brown, Rowe & Maw).

[3] United States Department of Justice, *Robert J. Conrad*, *at* http://www.usdoj.gov/olp/conradrresume.htm.

[4] Clemson World Online, *Federal Judge*, (Summer 2005—Vol. 58, No. 3), *available at* http://www.clemson.edu/clemsonworld/archive/2005/summer05/feature3.htm.

[5] United States Department of Justice, *supra* note 3.

[6] The Trial Advocacy College, *Faculty Biographies*, *at* http://www.trialadcollege.org/bio_conrad.htm.

[7] The Federal Judicial Center, *supra* note 1.

[8] Ave Maria Law School, *CSO Services*, *at* http://www.avemarialaw.edu/prospective/admissions/cso_services.cfm

led the U.S. Attorney's Office, "prosecution of corporate fraud and other white collar matters dramatically increased in both numbers and complexity of cases."[9] Also, in the first trial of its kind, the office prosecuted "a Hezbollah terrorist cell. . . obtain[ing] convictions for providing support to a terrorist organization, RICO, money laundering and conspiracy."[10] After the reinstatement of capital punishment, Conrad was one of the first prosecutors in North Carolina to obtain the death penalty.

As the Department of Justice's Campaign Financing Task Force Chief, Conrad examined President Clinton and Vice-President Gore under oath. Regarding his performance in that capacity, Janet Reno said he was "one person who deserves a great deal of credit for the success of the investigation. I am impressed with his judgment. . . and his knowledge of the law. He is an excellent prosecutor." Conrad served on General Ashcroft's Advisory Committee, "considered by top level [Justice] department officials as one of the most influential U.S. Attorneys in the country."[11] Both North Carolina Senators have applauded his nomination to the Fourth Circuit.[12]

Conrad has published both a law review article and a Letter to the Editor.[13] Conrad wrote an article discussing the need to live life with intentionality recognizing that "God is sought, or forgotten, in the midst of living ordinary lives, and especially in the ordinary activities of daily work."[14] His letter to the editor was criticized by Senator Leahy in 2005 because he called Sister Helen Prejean's book *Dead Man Walking* "liberal drivel."[15]

---

[9] Press Release, *supra* note 2.
[10] *Id.*
[11] *Id.*
[12] Press Release, Office of Senator Richard Burr, *Burr Applauds Nomination of Robert Conrad to Fourth Circuit Court of Appeals* (July 17, 2007) (on file at Senator Burr's office); Press Release, Office of Senator Elizabeth Dole, *Dole Applauds Nomination of Conrad to Fourth Circuit* (July 17, 2007) (on file at Senator Dole's office).
[13] S. Comm. On the Judiciary, 109th Cong., Statement of S. Leahy, Executive Business Meeting, Apr. 15, 2005.
[14] Robert J. Conrad, Jr., *Can the Ordinary Practice of Law be a Religious Calling?*, 32 Pepp. L. Rev. 551, 551 (2005).
[15] Robert J. Conrad, *Letter to the Editor: Habitually Wrong*, Catholic Dossier, Sept-Oct 1998, *available at* http://www.catholic.net/rcc/Periodicals/Dossier/JAN-FEB1999/Letters.html.