IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:16-CV-00057-RJC
(3:08-cr-00134-RJC-2)

ALEJANDRO ENRIQUE RAMIREZ UMAÑA, )
)
    Petitioner, )
)
v. ) **ORDER**
)
UNITED STATES OF AMERICA, )
)
    Respondent. )
)

**THIS MATTER** comes before the Court on Alejandro Ramirez Umaña's Motion to Recuse Trial Judge, filed on February 22, 2018. (Doc. No. 67). Umaña contends the undersigned's prior position as the United States Attorney for the Western District of North Carolina disqualifies him from adjudicating Umaña's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.

    **I.**    **RELEVANT BACKGROUND**

In 2006, the FBI's Safe Street's Gang Task Force opened an investigation of MS-13 activity in the Charlotte area. Trial Tr. Vol. II-B 220-221, United States v. Rosales Lopez, 3:08-cr-00134-RJC-4 (W.D.N.C.), Doc. No. 1074. In addition to the FBI, the Safe Street's Task Force included the Charlotte Mecklenburg Police Department ("CMPD"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Department of Homeland Security's Immigration and Customs Enforcement ("ICE"), and the Gastonia, North Carolina, Police Department. Id. at 220. "In September of 2006, . . . the United States Attorney's Office for the Western District of North Carolina first opened the file under which Umaña and a number of

1

other individuals were eventually indicted." (Gov.'s Resp. to Recusal Mot. 2, Doc. No. 74). The criminal investigation intensified in 2007, when MS-13 member Rony Lopez became a confidential informant for the Safe Streets Task Force. Trial Tr. Vol. II-B, Rosales Lopez, supra, at 221; see also *North Carolina MS-13 Members Sentenced to Prison for Role in Racketeering Conspiracy*, Dep't. of Justice Press Release, June 30, 2010 ("The long-term investigation was initiated by the FBI's North Carolina 'Safe Streets' Gang Task Force when a witness came forward with information about the violent operations of a single MS-13 cell operating out of the Charlotte area."), available at https://www.justice.gov/news.

The investigation culminated in a 70-count indictment against Umaña and 25 co-conspirators on RICO-related and other charges. Third Superseding Indict., Rosales Lopez, supra, at Doc. No. 623. Umaña and his co-conspirators were tried separately in 2010, and Umaña was found guilty by a jury of nine counts and acquitted of one; the United States dismissed the remaining count against him. J., United States v. Umaña, 3:08-cr-00134-RJC-2 (W.D.N.C.), Doc. No. 1168. The undersigned presided over Umaña's trial and sentencing, as well as those of his co-conspirators.

On June 22, 2016, Umaña filed a § 2255 Motion to Vacate. (Doc. No. 22). He has now filed the instant Motion to Recuse alleging judicial bias arising from the undersigned's tenure as United States Attorney which, Umaña contends, overlapped with "a joint federal and state investigation . . . developing evidence supporting the Government's RICO prosecution in this case." (Recusal Br. 1, Doc. No. 67-1). The Government has filed a Response. (Doc. No. 74).

**II.     APPLICABLE LAW**

The Rules Governing Section 2255 Proceedings in the United States District Courts specify that the judge who presided over a petitioner's trial and imposed sentence shall likewise

2

preside over the petitioner's § 2255 motion. § 2255 Rules, Rule 4(a). Under federal law, however, "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned." 28 U.S.C. § 455(a). Recusal is appropriate under § 455(a) only if "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." United States v. Amedeo, 487 F.3d 823, 828 (11th Cir. 2007). Additionally, any judge "shall also disqualify himself under the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . (3) Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy . . . ." 28 U.S.C. § 455(b).

Finally, "[d]ue process guarantees 'an absence of actual bias' on the part of a judge." Williams v. Pennsylvania, 136 S. Ct. 1899, 1905 (2016) (quoting In re Murchison, 349 U.S. 133, 136 (1955)). The inquiry is an objective one. "The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" Williams, 136 S. Ct. at 1905 (quoting Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 881 (2009)).

**III.    DISCUSSION**

**A. Umaña's Motion to Recuse is Untimely**

"Timeliness is an essential element of a recusal motion." United States v. Owens, 902 F.2d 1154, 1155 (4th Cir. 1990); see also Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.,

3

748 F.3d 160, 168 (4th Cir. 2014) (holding that Owens's timely-filing requirement applies to recusal motions under 28 U.S.C. § 455(a) and (b) alike). Umaña was required to raise any basis for recusal "at the earliest moment after knowledge of the facts." Owens, 902 F.2d at 1156 (quoting Satterfield v. Edenton-Chowan Bd. of Ed., 530 F.2d 567, 574–75 (4th Cir. 1975)).

The undersigned served as the United States Attorney for the Western District of North Carolina from March 15, 2001, until June 1, 2004, which was a matter of public record when Umaña and his co-defendants were indicted in 2008. Umaña asserts that the joint federal and state investigation of the RICO conspiracy actually began in June 2003, not 2006. As evidence, he cites newspaper articles from 2003 and 2004, documents he received in pretrial discovery, and testimony from his own trial and that of his codefendants. (Recusal Br. 2-3 (citing Trial Tr. Vol. I 2-7, Umaña, supra, at Doc. No. 1340; Trial Tr. Vol. 1-B, Rosales Lopez, supra, at Doc. No. 1072)). In short, the facts upon which Umaña bases his recusal motion have been known or available to him since before his 2010 trial.

In June 2015, the undersigned appointed post-conviction counsel to assist Umaña in the preparation of a § 2255 motion to vacate. Appt. of Counsel, Umaña, supra, at Doc. No. 1621. The instant civil action was opened on February 2, 2016 (Doc. No. 1), and Umaña filed his Motion to Vacate on June 22, 2016 (Doc. Nos. 22, 24 (sealed)). The undersigned has ruled on more than a dozen motions and approved a budget in this action. Nevertheless, Umaña did not file the instant Motion to Recuse until February 22, 2018. (Doc. No. 67). By any measure, the recusal motion is untimely. See e.g., Kolon Indus., Inc., 748 F.3d at 171 (party who raised recusal nearly a year after relevant facts became known "quite clearly failed" to timely raise recusal motion).

Umaña, however, contends his motion is timely because it was "filed contemporaneously

with his Supplement/Amendment [to the § 2255 Motion] in which his claim of judicial bias is raised." (Recusal Br. 6). He makes no effort to explain why the later renders the former timely, particularly when both rely on the same factual allegations. The Motion to Recuse is untimely and shall be denied as such.

### B. Umaña's Motion to Recuse is Frivolous

In Williams v. Pennsylvania, the Supreme Court held that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." 136 S. Ct. at 1905. In the case of a judge who was a former U.S. Attorney, "a party seeking recusal must show that the judge while serving as U.S. Attorney actually participated as counsel for the government in investigating or prosecuting the specific conspiracy underlying the present indictment." United States v. Norwood, 854 F.3d 469, 471-472 (8th Cir. 2017) (citations omitted).

Umaña seizes upon the facts that the RICO conspiracy itself began in 2003 and that several of his co-conspirators had run-ins with, or were under investigation by, various law enforcement agencies during the undersigned's tenure as U.S. Attorney. He crafts a tortured narrative in which each encounter was part of, what he calls, a "continuous investigation that began in 2003," and was tied to the U.S. Attorney's Office.

According to Umaña, the RICO investigation began when his co-defendant, Manuel De Jesus Ayala ("Chacua") and three associates were arrested on June 18, 2003, by a CMPD patrol officer who caught them spray-painting MS-13 graffiti on the walls of a Blockbuster video store, Trial Tr. Vol. VI-A 1100-1102, Rosales Lopez, supra, at Doc. No. 1077. Because of De Jesus Ayala's connection to MS-13, his arrest paperwork was forwarded to ICE, which opened a

citizenship status investigation. This transfer of information, according to Umaña, was part of Operation Fed Up. (Recusal Br. 3).

Umaña contends that Operation Fed Up was carried out in 2003 and 2004 by a new gang unit created by the undersigned and overseen by the U.S. Attorney's Office. (Recusal Br. 2-3). He further alleges that, "Operation Fed Up conducted extensive investigations" that targeted a number of his RICO co-conspirators and "resulted in [his and his co-conspirators] RICO prosecutions." (Recusal Br. 2, 3). He identifies two co-conspirators – De Jesus Ayala and Elvin Pastor Fernandez Gradis ("Tigre") – who allegedly were targeted in Operation Fed Up.[1] (Recusal Br. 3 & n.3).

The Court referred earlier to this set of allegations as a narrative, and in truth, it is largely fiction. As an initial matter, Operation Fed Up was not initiated or conducted by a new gang unit created by the United States Attorney's Office and announced by the undersigned. See *Federal Gang Unit Formed to Fight Crime in Charlotte; Tougher Laws to be Used to Combat Organizations*, Charlotte Observer, Nov. 13, 2003, 2003 WLNR 3061243. Operation Fed Up's first action was carried out in October 2003, by the CMPD gang unit, ICE, and the ATF. Trial Tr. Vol. I-B 10, Rosales Lopez, supra, at Doc. No. 1072. The gang unit announced by the undersigned had not been formed at that time. See *Federal Gang Unit Formed to Fight Crime in Charlotte . . .* , supra. Umaña has not identified any role played by the U.S. Attorney's Office in

---

[1] Umaña also cites co-defendant Carlos Figueroa Pineda's ("Drogo's") February 13, 2004 arrest by a CMPD officer for possession of cocaine (CMPD Incident Rpt. 8, Ex. 8, Doc. No. 67-2). According to the police report, the CMPD officer conducted a "knock and talk" at a residence known for gang activity and heavy foot traffic. There were several MS-13 members at the residence, including Figueroa Pineda, who consented to a search of his person. The officer found a baggie of cocaine in Figueroa Pineda's pocket. Umaña does not cite evidence that Figueroa Pineda himself was under investigation by any local, state, or federal law enforcement agency or the U.S. Attorney's Office at the time, or that he was a target of the "knock and talk." Nor does he identify any evidence that the "knock and talk" was part of an operation involving the U.S. Attorney's Office. In fact, the only apparent connection between Figueroa Pineda's arrest and a joint local and federal law enforcement action is that the husband of the woman living at the residence was deported as a result of Operation Fed Up in October 2003.

Operation Fed Up.

Next, Operation Fed Up was not conducted for the purpose of pursuing criminal convictions, RICO-related or otherwise. It was a deportation effort. Trial Tr. Vol. I-B 10, Rosales Lopez, supra, at Doc. No. 1072.; see also *Anti-Gang Campaign Pays Off in Crime Drop Less Violence Attributed to Key Gang Following Multi-Agency Sweep*, Charlotte Observer, Oct. 3, 2004, 2004 WLNR 3274074 ("U.S. Immigration and Customs Enforcement agents began targeting Charlotte's illegal MS-13 members for deportation last year, after a fight over leadership of the gang left three people shot, one fatally . . . ."). In the October 2003 action, more than 60 suspected gang members were arrested for immigration violations, federal firearms violations, or on outstanding state warrants. Trial Tr. Vol. I-B 10, Rosales Lopez, supra, at Doc. No. 1072. About a third of those arrested were MS-13 members. Id. "Most of the gang members arrested in the [October 2003] operation . . . - and more quietly since then - have not been charged with a crime. The majority of the arrests are handled as administrative deportations[.]" *Anti-Gang Campaign Pays Off* . . . , supra. The United States Attorney's Office does not conduct deportation investigations or hearings.

Umaña's co-conspirator, De Jesus Ayala, was targeted in Operation Fed Up because he was a gang member in the country illegally, not because he spray-painted graffiti on a building or was suspected of being involved in a RICO conspiracy. Trial Tr. Vol. I-B 11, Rosales Lopez, supra, Doc. No. 1072. Notably, he escaped the October 2003 sweep. Id. ICE was able to detain him in 2005, and he was deported to El Salvador on January 6, 2006. Trial Tr. Vol. VI-A 1060, id. at Doc. No. 1077. De Jesus Ayala was not indicted or prosecuted in federal district court as a result of Operation Fed Up.

Furthermore, contrary to Umaña's assertion, co-conspirator Fernandez Gradis was not a

"target" of Operation Fed Up (Recusal Br. 3 & n.3). On October 30, 2004, CMPD, ICE, and ATF, acting on an informant's tip that MS-13 planned to shoot rivals during Halloween weekend, found MS-13 members in a vacant trailer they had broken and entered; Fernandez Gradis and two others had the misfortune of arriving on the scene after law enforcement did. Trial Tr. Vol. I-B 11-13, 16-18, id. at Doc. No. 1072; Trial Tr. Vol. VI-A 1067-1068, id. at Doc. No. 1077; Trial Tr. Vol. VI-B 1233-1234, id. at Doc. No. 1078; see also *Police Arrest Gang Members Before Rumored Shooting Suspects Face Breaking, Entering Charges; Were Found In Vacant Home*, Charlotte Observer, Nov. 4, 2004, 2004 WLNR 5165163. Umaña points to nothing that indicates law enforcement knew the identities of any of the MS-13 members they would encounter on October 30, 2004. Eight of the ten MS-13 members, including Fernandez Gradis, were charged with immigration violations. Trial Tr. Vol. VI-A 1067, id. at Doc. No. 1077; *Police Arrest Gang Members Before Rumored Shooting*, supra. Fernandez Gradis was deported on March 30, 2005. Trial Tr. 1068, Rosales Lopez, supra, at Doc. No. 1077. Notably, this incident occurred almost five months after the undersigned had left the U.S. Attorney's Office.

     To recap: in 2003, while the undersigned was U.S. Attorney, one of Umaña's co-conspirators was arrested by CMPD, a local law enforcement agency, for damaging property; subsequently, he was charged with immigration violations by the Department of Homeland Security, an organization distinct from the U.S. Attorney's Office and the Department of Justice. After the undersigned left the U.S. Attorney's office, another of Umaña's co-conspirators was charged by the Department of Homeland Security with immigration violations and deported. CMPD and ICE worked together during this time to locate, detain, and deport gang members in the country illegally.

8

The fact that local, state, and federal law enforcement agencies work together to combat gang activity is as unremarkable as the fact that they work together to combat illegal drug activity. Also unremarkable is that gang members involved in criminal activity have multiple, unrelated, contacts with various law enforcement agencies working separately or together. The U.S. Attorney does not "participate[ ] as counsel" to every federal law enforcement agency with respect to every investigation it conducts. See United States v. Miller, 221 F. App'x 182, 185 (4th Cir. 2007) (unpublished) ("The U.S. Attorney's Office and the FBI are organizationally distinct.").

The U.S. Attorney does not become " 'counsel, adviser or material witness' in an investigation prior to the arrival of the matter in his or her office." Id. (finding the undersigned did not err in declining to recuse himself from a case in which the U.S. Attorney's Office opened a file three weeks after the undersigned left the Office). Nor is "disqualification" required "merely because some part of the offense was committed while the judge was the United States Attorney, if he left that position before that office's investigation of the offense began." United States v. Thompson, 76 F.3d 442, 450–51 (2d Cir. 1996) (citation omitted). Even if the U.S. Attorney's Office had opened an investigation in 2003 in connection with Operation Fed Up, that would not require the undersigned's recusal as Umaña has not shown that he or any of his co-conspirators were under investigation by that Office for violations of any federal criminal law, much less under investigation for the crimes alleged in their indictments. See e.g., United States v. Lara-Unzueta, 735 F.3d 954, 959 (7th Cir. 2013) (explaining that "the proceeding" referred to in 28 U.S.C. § 455(b)(3) means the current proceeding).

Umaña has presented not a whit of evidence that while serving as U.S. Attorney, the undersigned was "counsel, adviser or material witness" for the government during the

investigation or prosecution of the RICO conspiracy or any of the crimes charged in Umaña's or his co-conspirators' indictment. See Norwood, 854 F.3d at 472. When filing the instant recusal motion, post-conviction counsel may not have known exactly when the U.S. Attorney's Office opened its file in Umaña's underlying criminal case, but they knew when the Safe Streets Task Force opened its criminal investigation leading to the RICO indictments, see Trial Tr. Vol. II-B 220-221, Rosales Lopez, supra, at Doc. No. 1074. Consequently, they knew the criminal investigation did not begin until at least two years after the undersigned left the U.S. Attorney's Office. Counsel also knew that Umaña's involvement in the RICO conspiracy was not alleged to have begun until August 2007, more than three years after the undersigned left the U.S. Attorney's Office. See Third Superseding Indict. 16 ¶ 23u., Umaña, supra, at Doc. No. 623. None of the facts alleged in the recusal motion support Umaña's argument that the investigation leading to the indictments in his underlying criminal case began in 2003 and involved the participation of the U.S. Attorney's Office, while the undersigned was U.S. Attorney. Accordingly, the undersigned's recusal is not required under 28 U.S.C. § 455(b)(3).

Although the Motion to Recuse also cites §§ 455(a) and (b)(1), and the Due Process Clause, Umaña has not identified any "personal bias or prejudice" against or extrajudicial "knowledge of disputed evidentiary facts" on the undersigned's part that would require recusal under § 455(b)(1). Nor has he identified any basis for questioning the undersigned's impartiality other than that the undersigned is a former U.S. Attorney. Absent any evidence suggesting the undersigned was even aware of Umaña's case prior to taking the bench, the mere fact of his prior service as U.S. Attorney is insufficient to justify recusal under § 455(a). See Miller, 221 F. App'x at 185. Finally, even if all the facts alleged in the recusal motion are true, Umaña has not identified any critical decision the undersigned made as U.S. Attorney in the investigation or

prosecution of Umaña's criminal case.  See Williams, 136 S. Ct. at 1907.  Recusal is not warranted under the Due Process Clause.

**IT IS, THEREFORE, ORDERED** that Umaña's Motion to Recuse Trial Judge (Doc. No. 67) is **DENIED.**  It is both untimely and without merit.


Signed: March 27, 2018

Robert J. Conrad, Jr.
United States District Judge