# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

ALEJANDRO UMAÑA,
          Movant,

v.

UNITED STATES,
          Respondent.

3:16-CV-00057-RJC

CAPITAL § 2255 PROCEEDING

HON. ROBERT J. CONRAD, JR.

**SUPPLEMENT/AMENDMENT TO CLAIM 22 OF MOTION TO VACATE AND SET ASIDE CONVICTION AND SENTENCE UNDER 28 U.S.C. §2255 IN LIGHT OF *UNITED STATES V. DAVIS*, 139 S. CT. 2319 (2019)**

Movant, Alejandro Umaña, through counsel, hereby submits his proposed Supplement/Amendment to Claim 22 of his Motion to Vacate Under §2255 in light of *United States v. Davis*, 139 S. Ct. 2319 (June 24, 2019), and in support offers the following:

**CLAIM 22.**     **MR. UMAÑA'S SENTENCES OF DEATH MUST BE VACATED BECAUSE HIS CONVICTIONS FOR USE AND POSSESSION OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE RESULTING IN DEATH ARE VOID IN LIGHT OF RETROACTIVE SUPREME COURT PRECEDENT *JOHNSON* AND *DAVIS***

1. The claims and factual allegations set forth in all other sections of all prior submissions and exhibits are incorporated by reference and realleged as if set forth entirely herein.

2. Movant, Alejandro Umaña, supplements and amends Claim 22 of his Motion to Vacate under 28 U.S.C. §2255, in light of *United States v. Davis*, 588 U.S. ___, 139 S. Ct. 2319 (June 24, 2019). The Supreme Court in *Johnson* invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(e)(2)(B). *Johnson (Samuel) v. United States*, 576 U.S. ___, 135 S. Ct. 2551, 2563 (2015). Applying the due process principles recognized in *Johnson*, the Supreme Court in *Davis* invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(c)(3)(B). *Davis*, 139 S. Ct. at 2323-24, 2336. *Davis* is supplemental authority that

1

interprets *Johnson*. However, in the event the court determines *Davis* is a new rule, *cf. Coleman v. United States*, 2018 WL 5315216 (W.D. N.C. 10/26/2018) (Order), Mr. Umaña seeks permission to supplement and amend Claim 22 to add this new Constitutional authority.

3.      Mr. Umaña was convicted, inter alia, of two counts of using a firearm during and in relation to a crime of violence, under 18 U.S.C. §924(c) and (j)(1). The predicate "crime of violence" offenses categorically do not meet the elements/force clause of §924(c)(3)(A) and, under *Davis*, cannot be premised on the risk/residual clause of §924(c)(3)(B). As a result, Mr. Umaña's §924(c) convictions violate due process, the Constitution and laws of the United States, result in a miscarriage of justice, and were entered in excess of the Court's jurisdiction. Thus, his unlawful §924(c) convictions and sentences must be vacated under 28 U.S.C. § 2255(a). With those counts vacated, Mr. Umaña's remaining death sentences on Counts 22 and 24 also must be vacated.

**A.      Relevant Background**

4.      Mr. Umaña was charged, as relevant, with:

Count 1: Conspiring to conduct and participate, directly and indirectly, in the affairs of a racketeer influenced corrupt organization (RICO conspiracy), with various racketeering acts occurring in Guilford and Mecklenburg Counties, for a period of time including December 8, 2007, under 18 U.S.C. §1962(d);

Count 22: "[M]urder[ing] Ruben Garcia Salinas, in violation of North Carolina General Statute Sections 14-17" in aid of racketeering, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §1959(a)(1) and §2;

Count 23: Use and possession of a firearm during and in relation to a crime of violence, to wit Counts 1 and 22, resulting in murder, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §924(c) and (j)(1);

Count 24: "[M]urder[ing] Manuel Garcia Salinas, in violation of North Carolina General Statute Sections 14-17" in aid of racketeering, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §1959(a)(1) and §2;

Count 25:  Use and possession of a firearm during and in relation to a crime of violence, to wit Counts 1 and 24, resulting in murder, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §924(c) and (j)(1);

Count 27:  Being an unlawful alien in possession of a firearm, on or about December 8, 2007, in Guilford and Mecklenburg Counties, under 18 U.S.C. §922(g)(5);

Count 28: Committing or aiding and abetting Hobbs Act robbery, in Mecklenburg County, on or about December 8, 2007, under 18 U.S.C. §1951 and §2.

Third Superseding Indictment (Crim. Doc. 623), at 1-25, 47-53.  For both §924(c) counts (Counts 23 and 25), the indictment alleged two predicate offenses as the qualifying "crime of violence": "conspiracy to participate in a racketeering enterprise and murder in aid of racketeering," as set forth in Counts 1, 22, and 24.  *Id.*

5.      At trial, the jury found Mr. Umaña guilty of the above offenses, with a notable exception:  on the VICAR murder counts (Counts 22 and 24), the jury did not specify whether it found Mr. Umana committed the murders as a principal or instead aided and abetted the murders. The verdicts indicate the jury found he was guilty of "murder of [the victim] in aid of racketeering, in violation of 18 U.S.C. §1959, *or aiding and abetting in that offense, in violation of 18 U.S.C. §2*."  Guilt Phase Verdict (Crim. Doc. 1043) (emphasis added).  The Court had instructed the jury that Mr. Umaña could be found guilty on the VICAR counts under either theory, and that guilt may be established without proving "defendant personally did every act constituting the offense." Guilt Phase Transcript,[1] at 1242-45.  And the Court did not give an instruction that, to be convicted of aiding and abetting, the government had to prove Mr. Umaña had advanced knowledge that a

---

[1] Located at Crim. Doc. 1258, No. 3:08-cr-00134-RJC-DSC-2 (W.D.N.C.).

confederate would use or carry a firearm during the dispute that led to the victims' death.  *Cf.*

*Rosemond v. United States*, 572 U.S. 65, 67, 81-82 (2014).

6.      The jury verdict also did not specify whether jurors found first-degree murder,

second-degree murder, felony-murder, or conspiracy to commit murder—either under federal law

or under North Carolina law.  Guilt Phase Verdict (Crim. Doc. 1043).  The jury had been instructed,

however, on each of those theories.  Guilt Phase Transcript, at 1235-38 (North Carolina first-

degree murder, felony murder, second-degree murder, and conspiracy to commit murder), 1219-

21 & 1237-39 (conspiracy to commit murder), 1245-46 (North Carolina murder definitions applied

to VICAR murder charge), 1249 & 1251 (federal murder).

7.      Finally, the jury verdict did not specify, on the §924(c) counts (Counts 23 and 25),

which predicate offense or offenses jurors found Mr. Umaña had used the firearm during and in

relation to.  Guilt Phase Verdict (Crim. Doc. 1043).  The Court had instructed the jury that the

§924(c) counts (Counts 23 and 25) could be premised on using a firearm in relation to the RICO

conspiracy (Count 1) *or* in relation to the VICAR murders (Counts 22 and 24).[2]  Guilt Phase

Transcript, at 1248-51.

---

[2] Specifically, the Court instructed:

> To find that the defendant used a firearm during and in relation to a crime of violence, you must be convinced beyond a reasonable doubt that:
>
> One, the defendant committed the crime alleged in count one, that is, racketeering conspiracy, or the crime alleged in count twenty-two, that is, murder of Ruben Garcia  Salinas in aid of racketeering.
>
> I instruct you that racketeering conspiracy and murder in aid of racketeering are crimes of violence.
>
> Two, that the defendant knowingly used a firearm during and in relation to the crime of violence.

4

8. Thus—based on review of the indictment, jury instructions, and verdict (*Shepard* documents[3])—the least culpable conduct upon which jurors premised their findings was: guilty of RICO conspiracy (Count 1); guilty of using the firearm during the RICO conspiracy generally, which conspiracy led, among other things, to the murders of the Manuel and Ruben Garcia Salinas (Counts 23 and 25 with RICO conspiracy as the predicate); guilty of aiding and abetting a confederate in the VICAR murders of Manuel and Ruben Garcia Salinas (Counts 22 and 24); but not proof beyond a reasonable doubt that Mr. Umaña used the firearm himself or had prior knowledge a firearm would be used in the dispute that led to the VICAR murders of Manuel and Ruben Garcia Salinas (that is, not proof beyond a reasonable doubt that his use of the firearm included VICAR murders as the predicates to Counts 23 and 25).

---

And three, that the defendant caused the death of a person through the use of the firearm in the course of violating 18, U.S.C., Section 924(c).

....

Now, the indictment alleges two different crimes of violence, that is, racketeering conspiracy as alleged in count one and murder in aid of racketeering as alleged in count twenty-two. You must be unanimous in your verdict as to which crime of violence, if either, that the defendant used a firearm during and in relation to.

Guilt Phase Transcript, at 1249-50.

[3] When analyzing whether an offense meets the force/elements clause or risk/residual clause, courts may a consider a narrow range of sources: the statutory elements, charging documents, jury instructions, plea agreements, factual basis from the plea colloquy transcript, or "some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 16, 26-28 (2005) (majority op. & Thomas, J., concurring); *Taylor v. United States*, 495 U.S. 575, 602 (1990).

**B.      The §924(c) Convictions Must Be Vacated Because Neither Predicate Offense Is Categorically a Crime of Violence.**

9.      Conviction for using a firearm during and in relation to a crime of violence requires nexus to a predicate "crime of violence."  18 U.S.C. §924(c), (c)(3).  Under §924(c)(3), "crime of violence" is defined as:

> (3)      For purposes of this subsection, the term "crime of violence" means an offense that is a felony and –
>
>> (A)      has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>>
>> (B)      that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Under *Davis*, 139 S. Ct. at 2323-24, 2336, the risk/residual clause (§924(c)(3)(B)) is invalid, as unconstitutionally vague in violation of due process.  And the elements/force clause (§924(c)(3)(A)) does not categorically encompass Mr. Umaña's predicates.  Thus, his §924(c) counts lack the necessary elements of nexus to a qualifying "crime of violence."

**1.  The risk/residual clause of §924(c)(3)(B) is unconstitutional, and thus convictions resting thereon violate due process.**

10.      Mr. Umaña's §924(c) convictions cannot rely on the risk/residual clause definition of crime of violence.  The Supreme Court in *Johnson*, invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(e)(2)(B). *Johnson (Samuel) v. United States*, 576 U.S. ___, 135 S. Ct. 2551, 2563 (2015).  Applying the due process principles recognized in *Johnson*, the Supreme Court in *Davis* invalidated as unconstitutionally vague the risk/residual clause of 18 U.S.C. §924(c)(3)(B). *Davis*, 139 S. Ct. at 2323-24, 2336.

6

### 2. The force/elements clause of §924(c)(3)(A) does not categorically encompass Mr. Umaña's predicate offenses.

11.    Mr. Umaña's §924(c) convictions cannot rest on the force/elements clause, as Mr. Umaña's predicates are not categorically crimes of violence.  Neither predicate—conspiring to engage in a RICO under 18 U.S.C. §1962(d), or murder in violation of North Carolina General Statutes §14-17 in aid of racketeering under 18 U.S.C. §1959(a)(1)—categorically qualifies as a crime of violence under §924(c)(3)(A).

12.    Section 924(c)(3)(A) defines a crime of violence as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  When interpreting the substantially identical §924(e)(2)(B)(i) (ACCA) force/elements clause, the Supreme Court held "the phrase 'physical force' means violent force—that is, force capable of causing physical pain or injury to another person."[4]  *Johnson (Curtis) v. United States*, 559 U.S. 133, 140-41 (2010); *United States v. Middleton*, 883 F.3d 485, 490 (4th Cir. 2018). Moreover, when interpreting the substantially identical force/elements clause in 18 U.S.C. §16(a), the Supreme Court held the "use … of physical force against the person … of another" requires "actively employ[ing]" force with "a higher degree of intent than negligent or merely accidental

---

[4] Courts "normally presume that the same language in related statutes carries a consistent meaning." *Davis*, 139 S. Ct. at 2329, *citing Sullivan* v. *Stroop*, 496 U. S. 478, 484 (1990). Thus, analysis of identically phrased risk/residual clauses in 18 U.S.C. §§16(b), 924(c)(3)(B), and 924(e)(2)(B)(ii) carries authoritative weight. *See id.*; *Sessions* v. *Dimaya*, 584 U. S. ___, 138 S. Ct. 1204 (2018); *Johnson (Samuel)* v. *United States*, 576 U. S. ___, 135 S. Ct. 2551, (2015).

The ACCA force/elements clause and the §924(c) force/elements clause are identical, except that ACCA omits the phrase "or property" and calls a qualifying crime a "violent felony"; while §924(c)(3)(A) includes the phrase "or property" and calls a qualifying felony a "crime of violence." *See* 18 U.S.C. §924(c)(3), (e)(2)(B).

Additionally, the 18 U.S.C. §16(a) force/elements clause is identical to the §924(c) force/elements clause, except that §16(a) applies to misdemeanors as well while §924(c)(3)(A) applies only to felonies. *See* 18 U.S.C. §16(a), §924(c)(3).

7

conduct." *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004). The elements/force clause requires "intentional employment of physical force against a person or thing." *Garcia v. Gonzalez*, 455 F.3d 465, 468 (4th Cir. 2006). Reckless conduct—even reckless conduct causing serious physical injury with a deadly weapon—does not suffice. *Id.*; *see also United States v. Begay*, 934 F.3d 1033, 1040 (9th Cir. 2019); *Middleton*, 883 F.3d at 490-93.

13.     When analyzing whether an offense satisfies the elements/force clause, the court uses an elements-based categorical approach. *See Davis*, 139 S. Ct. at 2328, *quoting Leocal*, 543 U.S. at 7. The elements clause "requires us to look to the elements . . . of the offense of conviction, rather than to the particular facts relating to petitioner's crime." *Leocal*, 543 U.S. at 7. Under this "elements-based categorical approach," courts "look to whether the statutory elements of the offense necessarily require the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc). "When a statute defines an offense in a way that allows for both violent and nonviolent means of commission, that offense is not 'categorically' a crime of violence under the force clause." *Id.*

14.     Because examination of the conviction does not involve analysis of its underlying facts, the court must presume the conviction rested upon the "least of the acts criminalized" by the statute. *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013). If the "least of the acts criminalized" by the statute of conviction has an element requiring the "use, attempted use, or threatened use of physical force against the person or property of another," then the offense categorically qualifies as a crime of violence. If not, the inquiry ends and the offense does not categorically qualify as a crime of violence. *See United States v. Torres-Miguel,* 701 F.3d 165, 167 (4th Cir. 2012); *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008) ("[W]e look only to the statutory definition

8

of the . . . crime and the fact of conviction to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a 'crime of violence.'" (citation omitted)).

15.     If necessary, courts may employ the modified categorical approach, and consult a select few documents to help "'determine what crime, with what elements,' formed the basis of a defendant's conviction." *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019), *quoting Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). These *Shepard* documents are generally limited to the indictment, jury instructions, and verdict form. *See Shepard*, 544 U.S. at 25-26. In these cases, the modified categorical approach "acts not as an exception [to the categorical approach], but instead as a tool," and the inquiry is similarly confined to the elements of the crime and not the facts of the case. *Descamps v. United States*, 570 U.S. 254, 263 (2013).

16.     Under the modified categorical approach, an offense cannot qualify as a §924(c) predicate unless the *Shepard* documents establish with "certainty" that the defendant was "necessarily" convicted of an offense that meets the elements-based test for "crimes of violence." *Shepard*, 544 U.S. at 21. "[P]lausibility or even likelihood" that the defendant was convicted of a qualifying "crime of violence" is not enough. *United States v. Clay*, 627 F.3d 959, 967 (4th Cir. 2010). This high bar protects against the kind of "evidentiary enquiries into the factual basis for the conviction"—enquiries the Sixth Amendment requires jurors alone make—that the categorical approach was designed to avoid. *Shepard*, 544 U.S. at 20; *see also Fuertes*, 805 F.3d at 498.

17.     When it cannot be conclusively determined that the defendant was convicted of an offense with elements that categorically qualify as a "crime of violence," the court must assume conviction rested on the "least serious" offense criminalized by the underlying statute. *See United States v. Chapman*, 666 F.3d 220, 228 (4th Cir. 2012); *see also United States v. Vann*, 660 F.3d 771, 774 (4th Cir. 2011) (en banc); *Ortiz v. Lynch*, 796 F.3d 932, 935 (8th Cir. 2015).

9

18.     Here, careful examination of Mr. Umaña's predicates shows those offenses are defined in "way[s] that allow[] for both violent and nonviolent means of commission," *Simms*, 914 F.3d at 233, do not have as a necessary element the non-negligent use of violent physical force against another, and thus are not categorically crimes of violence under the elements clause.

### 3. RICO conspiracy categorically is not a crime of violence under the elements clause.

19.     This Court, and the government, have previously determined RICO conspiracy under 18 U.S.C. §1962(d) does not qualify as a crime of violence under the elements clause.  In the 2255 proceeding for one of Mr. Umaña's co-defendants, this Court held that "Racketeering conspiracy [under §1962(d)] does not have as an element the use, attempted use, or threatened use of physical force."  Order, *Sandoval v. United States*, No. 3:16-cv-337-RJC, ECF Doc. 11, at 1, 4 (W.D.N.C. 12/31/19), *citing United States v. Simms*, 914 F.3d 229, 233-34 (4th Cir. 2019) (en banc); *United States v. Jones*, 935 F.3d 266, 269-70, 271, 274 (5th Cir. 2019) (per curiam); *United States v. Davis*, 785 Fed. Appx. 358, 359, 360 & n.2 (9th Cir. 2019) (unpub. memorandum).

20.     RICO conspiracy requires no overt act of violence—no actual "use, attempted use, or threatened use of physical force," *see* §924(c)(3)(A).  Conviction under §1962(d) requires only "an enterprise affecting interstate commerce existed," "defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise," and "defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts."[5] *United States v. Mathis*, 932 F.3d 242, 258 (4th Cir. 2019), *quoting United States v. Mouzone*, 687 F.3d 207, 218 (4th Cir. 2012).  Racketeering acts need not include violence.  For example, racketeering may include acts of bribery, counterfeiting, theft,

---

[5] The Court's jury instructions comported with these elements.  Guilt Phase Transcript, at 1220.

10

embezzlement, or fraud. *See* 18 U.S.C. §1961(1), (5), §1962(c), (d). And "a defendant can conspire to violate RICO and violate [Section] 1962(d) without himself committing or agreeing to commit the two or more acts of racketeering activity." *Mathis*, 932 F.3d at 260, *citing Mouzone*, 687 F.3d at 218, and *Salinas v. United States*, 522 U.S. 52, 65 (1997).

21.    As a result, courts have consistently held that merely conspiring—even when conspiring to commit a target offense that would be a crime of violence—categorically fails to meet the force/elements clause.[6] "This is so because to convict a defendant of [conspiracy], the Government must prove only that the defendant agreed with another to commit actions that, if realized, would violate the [target crime]. Such an agreement does not invariably require the actual, attempted, or threatened use of physical force."[7] *Simms*, 914 F.3d at 233-34. Accordingly, RICO conspiracy under §1962(d) categorically is not a crime of violence under the §924(c)(3)(A) elements clause. This conclusion alone requires vacatur of Mr. Umaña's §924(c) convictions.

### 4. Murder in violation of North Carolina G.S. §14-17 in aid of racketeering is not categorically a crime of violence under the elements clause.

22.    For multiple reasons, VICAR murder in violation of N.C. Gen. Stat. §14-17 is not categorically a crime of violence under the elements clause. Mr. Umana acknowledges, in January 2017, this Court denied his unopposed motion to hold the 2255 action in abeyance pending

---

[6] *See United States v. Davis*, 903 F.3d 483, 485 (5th Cir. 2018) ("conspiracy offense does not necessarily require proof that a defendant used, attempted to use, or threatened to use force"), *aff'd in part by Davis*, 139 S. Ct. at 2324-25, 2336 (affirming vacatur of §924(c) convictions predicated on conspiring to commit Hobbs Act robbery); *In re Matthews*, 934 F.3d 296, 301 (3d Cir. 2019) (government concedes conspiring to commit Hobbs Act robbery does not meet §924(c) elements clause); *United States v. Ledbetter*, 929 F.3d 338, 360-61 (6th Cir. 2019) (government concedes conspiracy to commit Hobbs Act robbery not a crime of violence under elements clause).

[7] The Court's jury instructions on RICO conspiracy indicated no proof of violence was necessary: "The government does not have to prove that any racketeering acts were actually committed at all, or that the defendant agreed to personally commit any such acts, or that the defendant agreed that two or more specific acts would be committed." Guilt Phase Transcript, at 1225.

11

decision by the Supreme Court in *Lynch v. Dimaya*, No. 15-1498, and by the Fourth Circuit in *United States v. Simms*, No. 15-4640, and *United States v. Ali*, No. 15-4433.[8] *Umaña v. United States*, 229 F.Supp.3d 388, 390-91, 397 (W.D.N.C. 1/25/17). In doing so, the Court reasoned that one of Mr. Umaña's predicates—VICAR murder—categorically was a crime of violence.

23. Mr. Umaña respectfully suggests recent guidance from the Fourth Circuit justifies revisiting the Court's prior analysis. In *United States v. Mathis* (2019), the Fourth Circuit analyzed several §924(c) counts predicated on VICAR offenses that incorporated state-law crimes. 932 F.3d at 263-67. The court's analysis indicated courts must consider whether the state-law offense can be committed without use of force. *See id.* at 266-67. If it can, then the VICAR count that incorporates that state-law crime is categorically not a crime of violence under §924(c)(3)(A) and cannot supply the predicate "crime of violence" for a §924(c) conviction. *See id.*

24. For example, the Fourth Circuit analyzed whether "VICAR by committing kidnapping in violation of Virginia law, Virginia Code § 18.2-47" was categorically a crime of violence. *Id.* at 249, 264, 266-67. The court examined the elements of the state-law crime: "seizing or taking another person 'by force, intimidation, or deception' with the intent to deprive that person of his or her liberty." *Id.*, *citing* Va. Code §18.2-47(A). Noting that "by force, intimidation, or deception" were means of committing kidnapping, and not elements of alternative offenses, the court concluded Virginia kidnapping "may be committed in a non-violent manner through deceptive means" and cited Virginia case law affirming kidnapping convictions committed by deception without physical force. *Id.* Thus, defendants' VICAR offense predicated on Virginia kidnapping categorically was not a crime of violence. *Id.*

---

[8] *Dimaya* and *Simms* have been decided, while *Ali* remains pending in the Fourth Circuit.

25.     Additionally, since January 2017, the Supreme Court and Fourth Circuit have provided further guidance in interpreting the elements clause of §924(c)(3)(A) and (e)(2)(B)(i) (ACCA).  The force/elements clause requires violent physical force, which is "force capable of causing physical pain or injury," including force sufficient to overcome a victim's resistance during a robbery, but not the slight amount of force involved in offensive touching or unwanted contact (as in a common law battery).  *Stokeling v. United States*, 139 S. Ct. 544, 550, 552-54 (2019), *citing Johnson (Curtis)*, 559 U.S. at 139-40.  Similarly, the Fourth Circuit has instructed de minimis force or offensive touching (such as that level permissible for the misdemeanor crime of domestic violence definition at issue in *Castleman*) does not meet the elements clause.  *See United States v. Middleton*, 883 F.3d 485, 490 (4th Cir. 2018).  Moreover, use of physical force against the person of another requires a level of non-negligent, non-accidental intentionality, both as to use and as to causation of injury.  *See id.  Accord Leocal v. Ashcroft*, 543 U.S. 1, 9-10 2004).  Causing physical injury does not necessarily mean use of violent physical force. *Middleton*, 883 F.3d at 490.  "[A] crime may result in death or serious injury without involving the use of physical force" if the "crime does not have as an element the intentional causation of death or injury." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019), *citing Middleton*, 883 F.3d at 490-93.

26.     Mr. Umaña's *Shepard* documents do not reveal whether he was convicted of first-degree murder, second-degree murder, felony-murder, or aiding and abetting murder—either under federal law or under North Carolina law; and the jury was instructed on each of these theories.  Guilt Phase Transcript, at 1235-39, 1245-46, 1249 & 125; Guilt Phase Verdict (Crim. Doc. 1043).  If any of these offenses can be committed without proof, as an element, of violent physical force, then Mr. Umaña's VICAR murder counts do not categorically qualify as crimes of violence.

13

### a. Starvation theory

27. Murder under North Carolina General Statutes §14-17 is not categorically a crime of violence. Murder requires no use of violent physical force when accomplished by deprivation, starvation, or dehydration. *See, e.g.*, *State v. Evangelista*, 353 S.E.2d 375, 378-81 (N.C. 1987); *State v. Cheeks*, 833 S.E.2d 660, 673-78 (N.C. Ct. App. 2019).

28. Section §14-17 is an indivisible statute, presenting an indivisible list of means for committing first and second degree murder. To determine whether an alternatively phrased statute sets forth elements (of different offenses) or instead means (of committing one offense), courts must consult "authoritative sources of state law," including the language of the statute itself, pertinent state court decisions, and—if state law fails to provide clear answers—record documents from defendant's conviction. *Mathis*, 136 S. Ct. at 2256. As to a statute's text, statutory alternatives may be "drafted to offer 'illustrative examples,'" in which case the alternatives would be different means of committing the offense. *Id.* Finally, "a statute may itself identify which things must be charged (and so are elements) and which need not be (and so are means)." *Id.*

29. N.C. Gen. Stat. §14-17, as it existed during indictment and conviction, lists various means of committing murder. N.C.G.S. §14-17 (2007).[9] The statute provides first degree murder

---

[9] At all relevant times, North Carolina General Statute §14-17 provided:

> A murder which shall be perpetrated by means of a nuclear, biological, or chemical weapon of mass destruction as defined in G.S. 14–288.21, poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, kidnapping, burglary, or other felony committed or attempted with the use of a deadly weapon shall be deemed to be murder in the first degree, a Class A felony, and any person who commits such murder shall be punished with death or imprisonment in the State's prison for life without parole as the court shall determine pursuant to G.S. 15A–2000, except that any such person who was under 18 years of age at the time of the murder shall be punished with imprisonment in the State's prison for life without parole. All other kinds of murder, including that which shall be proximately caused

14

is murder "perpetrated *by means of* a nuclear, biological, or chemical weapon of mass destruction as defined in G.S. 14-288.21, poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing." *Id.* (emphasis added). According to the statute, "by means of … starving" is one means of committing a "kind of willful, deliberate, and premeditated" first degree murder. *Id.*

30. Further indicating the first-degree statutory list consists of means and illustrative examples (not elements of different offenses), North Carolina law, does not require the prosecution to specify in the indictment under which theory or means it intends to establish murder. "A murder indictment in the [general, short] form prescribed by N.C.G.S. § 15-144 will support a verdict finding the defendant guilty of first degree murder upon any of the theories set forth in N.C.G.S. § 14-17." *State v. Clark*, 386 S.E.2d 191, 194 (N.C. 1989). "The State is not required at any time to elect a theory upon which it will proceed against the defendant on the charge of first degree murder, and it is proper for the trial court to submit the issue of the defendant's guilt of that charge to the jury on each of the theories of first degree murder supported by substantial evidence presented at trial." *Id.*, *citing State v. Strickland*, 298 S.E.2d 645 (1983). The prosecution is not required to decide under which theory or means it plans to establish first-degree murder; it need not plead the theory or means in the indictment, nor inform defense counsel in a bill of particulars. *State v. Garcia*, 597 S.E.2d 724, 732 (N.C. 2004). For example, the prosecution is not required to disclose whether it plans to prove murder by means of "felony murder" or instead by means of

---

by the unlawful distribution of opium or any synthetic or natural salt, compound, derivative, or preparation of opium, or cocaine or other substance described in G.S. 90–90(1)d., or methamphetamine, when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree, and any person who commits such murder shall be punished as a Class B2 felon.

N.C.G.S. §14-17 (eff. June 14, 2007 to Nov. 30, 2012).

"premeditation [and] deliberation." *Id.* Similarly, proof of means, such as starvation, suffices to prove malice required for first-degree murder, without necessity of re-proving additional elements the law presumes starvation establishes. *See, e.g.*, *Evangelista*, 353 S.E.2d at 378-81; *Cheeks*, 833 S.E.2d at 677-78 (proof of starvation implies malice "by law"; "separate showing of malice is not necessary") (quoting *State v. Smith*, 524 S.E.2d 28, 40 (N.C. 2000)). Thus, §14-17's list does not contain different crimes, but means of committing one offense. Section 14-17 is indivisible.

31.     Under North Carolina law, some means for commission of murder require no proof of non-negligent use of violent physical force. For example, first degree murder requires no proof of violent physical force when committed by deprivation, starvation, or dehydration. Inaction is enough. *E.g.*, *Evangelista*, 353 S.E.2d at 378-81; *Cheeks*, 833 S.E.2d at 673-78. This applies both under a "murder by means of starving" theory, *Cheeks*, 833 S.E.2d at 673-78, and under a "murder by willful, deliberate, and premeditated killing" theory, *Evangelista*, 353 S.E.2d at 378-81.

32.     For example, in *State v. Cheeks*, defendant, who was the primary caretaker of his three children, was convicted of murder based on his *inaction* or lack of sufficient action when he did not feed his four-year-old stepson, who had neurological issues and was developmentally delayed, enough for several weeks or months. *Cheeks*, 833 S.E.2d at 664, 667-69. In the victim's last few months of life, the defendant typically fed the victim only once a day, the victim lost a substantial amount of weight, and no one (defendant or his wife) sought medical care for him. *Id.* The victim ultimately died of malnutrition and dehydration. *Id.* At a bench trial, defendant was found guilty of first degree murder. *Id.* The trial court made no findings that defendant ever used force or violence on the victim; instead "starving [the victim] was the proximate cause of the child's death," and defendant was culpable for "failure to take any action to seek medical help, through any means possible, for [the child] as the child wasted away from lack of nutrients needed for the

16

maintenance of life." *Id.* Defendant appealed on sufficiency of evidence grounds. *Id.* at 673-78. The Court of Appeals held the prosecution was not required to prove, as a separate element, that defendant had a legal duty to feed the victim. *Id.* at 676-77. And no separate or additional proof of malice was required, because "murder by starving 'impl[ied] the requisite malice.'" *Id.* at 677-78. Being present during starvation and doing nothing was legally sufficient. Inaction with fatal consequences is legally sufficient for North Carolina first degree murder.

33. The inaction necessary to cause death through starvation or dehydration is also legally sufficient to sustain conviction for murder under a "willful, deliberate, and premeditated killing" theory. *Evangelista*, 353 S.E.2d at 378-81. During a three-day standoff with police, defendant barricaded himself and his family members in a train car. *Id.* at 378-79. Defendant did not accept offers of food and water and did not provide sufficient sustenance to his eight-month-old nephew, who died of dehydration during the standoff. *Id.* A jury convicted defendant of first degree murder of his nephew under a "willful, deliberate, and premeditated killing" theory (along with other charges related to the standoff). *Id.* at 379-81. On appeal, he challenged the trial court's denial of his motion to dismiss the charge of first degree murder. *Id.* The state supreme court held the evidence was sufficient to submit first degree murder to the jury—both under a "by means of starving" theory, and under a "willful, deliberate, and premeditated killing" theory.[10] *Id.* There was no evidence defendant used force or violence on the child. *See id.* at 378-81. Instead, doing nothing during starvation—inaction with fatal consequences—was legally sufficient.

---

[10] In the unlikely event first degree murder under N.C. Gen. Stat. §14-17 (2007) is somehow construed to be a divisible statute, *Evangelista* demonstrates that the amount of force necessary to convict for "willful, deliberate, and premeditated killing" is still the low bar of inaction required to convict for starvation murder. *Evangelista*, 353 S.E.2d at 378-81.

17

34.     The Fourth Circuit's reasoning in *Mathis* again is instructive.  The court considered whether "VICAR in violation of 18 U.S.C. § 1959 by committing murder in violation of Virginia law, Virginia Code § 18.2-32" was categorically a crime of violence, particularly because Virginia murder could be committed by means of poison.  932 F.3d at 264-65.  Although a defendant need not directly touch (much less use physical force on) the victim to poison him, the Fourth Circuit rejected defendants' distinction between direct and indirect action.  Instead, *action* was what was important:  "'physical force is simply force exerted by and through' human action and that, therefore, a person need not 'directly' touch his victim to exert 'physical force.'"  *Id.*, *citing United States v. Castleman*, 572 U.S. 157, 170-71 (2014), and *In re Irby*, 858 F.3d 231, 236, 238 (4th Cir. 2017).  "[S]o long as an offender's use of physical force [that is, human action], whether direct or indirect, could cause a violent result, the force used categorically is violent."  *Id.*

35.     The Fourth Circuit indicated in *Mathis* that human action, whether direct (like shooting someone) or indirect (like slipping poison into someone's food), is the touchstone for "use … of physical force."  *See Mathis*, 932 F.3d at 264-65.  While the Fourth Circuit overlooked the shortcomings of applying the *Castleman* analysis (of a dissimilar, misdemeanor crime-of-domestic-violence elements clause) when interpreting the felony crime of violence elements clause in §924(c),[11] even under the Fourth Circuit's *Mathis* rule, North Carolina murder under §14-17

---

[11] As an earlier panel of the Fourth Circuit acknowledged, *Castleman*—interpreting non-identical language from the definition of misdemeanor crime of domestic violence under §921(a)(33)(A)—is little aid when analyzing the felony level violence defined in the force/elements clause of §924(e)(2)(B)(i).  *United States v. Middleton*, 883 F.3d 485, 490 (4th Cir. 2018).  For similar reasons, *Castleman* is no guide to interpreting §924(c)(3)(A).

The definition at issue in *Castleman* was a misdemeanor offense that "has, as an element the use or attempted use of physical force," *see* §921(a)(33)(A); while ACCA and §924(c)(3)(A) both define violent felonies that have "as an element the use, attempted use, or threatened use of physical force *against* the person [or property] of another," *see* §924(c)(3)(A) & (e)(2)(B)(i).

18

categorically is not a crime of violence. As *Cheeks* and *Evangelista* demonstrate, inaction—neglect with fatal consequences—is enough for first-degree murder in North Carolina, under either a "by means of … starving" theory or a "willful, deliberate, and premeditated killing" theory. *See Evangelista*, 353 S.E.2d at 378-81; *Cheeks*, 833 S.E.2d at 673-78. But inaction is not the *Leocal-*required non-negligent (or the Fourth Circuit required "intentional employment" of, *Garcia*, 455 F.3d at 468) "use … of physical force against the person … of another." *Accord United States v. Del Carmen Gomez,* 690 F.3d 194, 201-03 (4th Cir. 2012) (statute failed to meet elements clause because defendant can be guilty "by committing an affirmative act or by neglecting to act"); *United States v. Scott*, 954 F.3d 74, 87 (2d Cir. 2020) ("New York first-degree manslaughter is not a crime of violence under the force clause of ACCA because it can be committed by inaction"). Because North Carolina first degree murder includes inaction with fatal consequences, it does not

---

The Supreme Court held in *Leocal*, when interpreting the substantially identical crime of violence definition in 18 U.S.C. §16(a), that the phrase "physical force *against the person or property of another*" has special significance. *Leocal* 543 U.S. at 9 (emphasis in original). This difference alone removes *Castleman* from the equation.

But moreover, as Chief Judge Gregory explained, the Supreme Court explicitly stated that *Castleman* does not control the analysis in ACCA (and, consequently, also §924(c)). *Middleton*, 883 F.3d at 490. In *Castleman*, while permitting the common-law, de minimis definition of force to apply for misdemeanor crimes of domestic violence, the Court also noted it had "declined to read the common-law meaning of 'force' into ACCA's definition of 'violent felony,' because we found it a 'comical misfit with the defined term.'" *Id.*, *citing Castleman*, 134 S. Ct. at 1410. Thus, misdemeanor crime of domestic violence "accepts de minimus force, but the ACCA, by contrast, requires violent force." *Id.*

Additionally, causing death or injury does not categorically require the use of violent physical force. *Middleton*, 883 F.3d at 490-93. *Castleman* analyzed a specific intent crime involving "intentionally or knowingly caus[ing] bodily injury." *Id.* "*Castleman* did not abrogate the [Fourth Circuit's causation rule] that 'a crime may result in death or serious injury without involving the use of physical force'" if the "crime does not have as an element the intentional causation of death or injury." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019). Thus, language in *Mathis* equating causation of injury to use of physical force appears to be incorrect. *See Mathis*, at 264-65.

19

categorically require proof as an element of violent physical force.  *See Leocal*, 543 U.S. at 9-10; *Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93; *Garcia*, 455 F.3d at 468.

b.  *Felony murder theory*

36.  Felony murder theory under North Carolina law likewise does not categorically require non-negligent use of violent physical force.  For example, an accidental killing during a kidnapping by fraud/deception or burglary by fraud/deception satisfies North Carolina first-degree murder, but does not require, as an element, the use of violent physical force.

37.  Section 14-17 lists as first degree murder any killing "… committed in the perpetration or attempted perpetration of any arson, rape or a sex offense, robbery, *kidnapping*, *burglary*, or other felony committed or attempted with the use of a deadly weapon."  N.C.G.S. §14-17 (2007) (emphasis added).  Felony murder is merely another means of committing first degree murder.  *See State v. Garcia*, 597 S.E.2d at 732 (prosecution not required to specify in indictment or in bill of particulars whether it plans to prove murder by means of "felony murder" or instead by means of "premeditation [and] deliberation").  *See also, supra*, pp. 14-16.

38.  "The felony murder rule was promulgated to deter even accidental killings from occurring during the commission of or attempted commission of a dangerous felony."  *State v. Richardson*, 462 S.E.2d 492, 498 (N.C. 1995).  Even an accidental killing during a listed felony constitutes first-degree murder.  *Id.*  "Accident" is not a permissible defense to first-degree felony murder unless "predicated upon the absence of an unlawful purpose."  *State v. York*, 489 S.E.2d 380, 390 (N.C. 1997).  "[T]he defense of accident is unavailable if the defendant was engaged in misconduct at the time of the killing."  *State v. Yarborough*, 679 S.E.2d 397, 407 (N.C. App. 2009), *PDR denied*, 693 S.E.2d 143 (N.C. 2010).  Even a struggle over a weapon, that accidentally goes off and results in death, during a burglary constitutes first-degree murder.  *Id.* at 407-08.

20

39.     Thus, an *accidental* killing that occurs during a kidnapping or burglary qualifies as North Carolina first degree murder.  But it does not qualify as a "crime of violence," as crimes of violence require "a higher degree of intent than negligent or merely accidental conduct." *Leocal*, 543 U.S. at 9-11.  "[A] crime may result in death or serious injury without involving the use of physical force" if the "crime does not have as an element the intentional causation of death or injury."  *Battle*, 927 F.3d at 166, *citing Middleton*, 883 F.3d at 490-93.  Moreover, kidnapping and burglary can be accomplished without use of violent physical force.

40.     Like kidnapping under Virginia law—which "may be committed in a non-violent manner through deceptive means" and thus does not categorically qualify as a crime of violence under the elements clause, *Mathis*, 932 F.3d at 266-67—kidnapping under North Carolina law can be accomplished by fraud or trickery, without violent force.  "The offense of kidnapping, as it is defined in G.S. 14-39, includes an unlawful restraint whereby one person's freedom of movement is restricted due to another's fraud or trickery."  *State v. Sturdivant*, 283 S.E.2d 719, 729 (1981).  False and fraudulent representations may constitute a substitute for force.  *State v. Jackson*, 305 S.E.2d 703, 714 (1983).  "[A]s to kidnapping," "consent obtained or induced by fraud or by fear is not consent."  *State v. Sexton*, 444 S.E.2d 879, 903-04 (N.C. 1994).   Thus kidnapping under North Carolina law does not categorically require use of violent physical force under the elements clause.  *Cf. Mathis*, 932 F.3d at 266-67.

41.     Similarly, burglary under North Carolina law may be accomplished through fraud, tricks, or deception.  *State v. Wilson*, 223 S.E.2d 311, 315-16 (N.C. 1976), *citing State v. Henry*, 31 N.C. 463 (1849).  North Carolina burglary requires "breaking and entering during the nighttime of a dwelling or sleeping apartment with intent to commit a felony therein."  *Id.*, *citing State v. Mumford*, 227 N.C. 132, 41 S.E. 2d 201 (1947).  A "breaking" may be actual or constructive.  *Id.*

21

A constructive breaking occurs, for example, when "some process of law is fraudulently resorted to for the purpose of obtaining an entrance" or "some trick is resorted to to induce the owner to remove the fastening and open the door." *Id.*, *quoting Henry*, 31 N.C. 463. "[W]hen no fraud or conspiracy is made use of or violence commenced or threatened *in order to obtain an entrance*, there must be an actual breach of some part of the house." *Id.*, *quoting Henry*, 31 N.C. 463 (original emphasis). As burglary may be accomplished through a constructive breaking using fraud, deception, or trick—instead of through an actual breaking using force or violence—it does not categorically require use of violent physical force.

42. Neither kidnapping nor burglary by fraud, tricks, or deception require use of violent physical force; nor does an accidental death. But an accidental death while committing kidnapping or burglary by fraud, tricks, or deception qualifies as first degree murder under North Carolina law. *See* N.C.G.S. §14-17; *Sexton*, 444 S.E.2d at 903-04; *Wilson*, 223 S.E.2d at 315-16; *York*, 489 S.E.2d at 390; *Richardson*, 462 S.E.2d at 498; *Yarborough*, 679 S.E.2d at 407-08 (accidental discharge that results in death during burglary constitutes first-degree murder). As North Carolina first-degree murder can be satisfied by accidental death, during a kidnapping by fraud or deception or a burglary by constructive breaking using fraud or deception, it does not categorically require non-negligent use of violent physical force.

### c. *Reckless conduct and reckless causation*

43. North Carolina law also permits a murder conviction when reckless conduct causes death, such as when a non-violent sale of a controlled substance results in death. This, categorically, is not a crime of violence.

44. North Carolina Gen. Stat. §14-17 (2007) provides that second degree murder includes drug distribution that causes death: "All other kinds of murder, including that which shall be proximately caused by the unlawful distribution of opium or any synthetic or natural salt,

22

compound, derivative, or preparation of opium, or cocaine or other substance described in G.S. 90–90(1)d., or methamphetamine, when the ingestion of such substance causes the death of the user, shall be deemed murder in the second degree." Once again, this is a means of committing general murder, not a separate offense. *See, supra*, pp. 14-16.

45. But the Fourth Circuit has held that illegal sale of a controlled substance (alcohol), consumption of which results in unintended death, does not satisfy the ACCA force/elements clause. *Middleton*, 883 F.3d at 488-93 (use of violent force must not be conflated with causation of injury) & *id.* at 493 (Floyd, J., concurring) (reckless conduct does not satisfy the force/elements clause). A homicide conviction for selling the controlled substance (involuntary manslaughter under South Carolina law) "does not fit the ACCA's force clause because it can be committed through a non-violent sale." *Id.* at 493. Similarly, North Carolina second degree murder does not categorically require use of force, as it can be accomplished through non-violent sale of a controlled substance, consumption of which results in death. *See* N.C.G.S. §14-17 (2007); *Middleton*, 883 F.3d at 488-93.

46. North Carolina's murder statute also applies to "recklessness of consequences," *State v. Wilkerson*, 295 N.C. 559, 581 (1978), but "a reckless use of force does not satisfy" the elements clause, *United States v. Vinson*, 805 F.3d 120, 125 (4th Cir. 2015), nor does a reckless causation of injury. *Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93. As North Carolina murder can be committed by reckless conduct or reckless consequence (reckless causation of death), North Carolina murder does not require as an element the use of violent physical force.

### d. Generic murder

47. The generic definition of murder also can be committed without proof, as an element, of the *Leocal*-required non-negligent use of violent physical force. Reckless indifference (second degree) murder does not qualify as a crime of violence under the elements clause. *United*

23

*States v. Begay*, 934 F.3d 1033, 1037-41 (9th Cir. 2019).  The §924(c) elements clause requires intentionality, and "[r]eckless conduct, no matter how extreme, is not intentional." *Id.*

48.     Similarly, the Fourth Circuit has held that "a crime may result in death or serious injury without involving the use of physical force" if the "crime does not have as an element the intentional causation of death or injury." *United States v. Battle*, 927 F.3d 160, 166 (4th Cir. 2019); *Middleton*, 883 F.3d at 490-93 (majority op.) & 493 (Floyd, J., concurring).  Intentional conduct (like an intentional sale of alcohol), which recklessly causes death or injury, does not have as an element the use of violent physical force.  *See Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93 (majority op.) & 493 (Floyd, J., concurring).  The "malice aforethought" for second degree murder requires only conduct that is "reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." *United States v. Fleming*, 739 F.2d 945, 947–48 (4th Cir. 1984), *quoting United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir. 1978).  Therefore, second degree murder, reckless indifference murder, or an intentional act that recklessly causes death does not categorically qualify as a crime of violence under the elements clause.

49.     Here, Mr. Umaña's VICAR murder counts encompass both the generic definition of murder and the North Carolina statutory definition.  Because generic murder can be committed without necessarily proving the use of violent physical force, VICAR murder does not categorically require intentional use of violent physical force.  *See* §1959(a); *Begay*, 934 F.3d at 1038-41; *Battle*, 927 F.3d at 166; *Middleton*, 883 F.3d at 490-93.

e.  *Poisoning*

50.     Mr. Umaña respectfully disagrees with the Fourth Circuit's analysis of this issue in *Mathis*, 932 F.3d at 264-65, and *In re Irby*, 858 F.3d 231; and maintains that murder by poisoning

does not require proof of violent physical force. As discussed above, Mr. Umaña respectfully suggests *Mathis* and *Irby*'s reliance on *Castleman* is misplaced. *See, supra*, footnote 11.

### f. Aiding and Abetting

51. Mr. Umaña's convictions for VICAR murder may have rested on aiding-and-abetting liability. Jurors were instructed they could find him guilty on those counts for aiding and abetting. Guilt Phase Transcript, at 1242-45. And the jury verdict does not disclose which theory jurors found proven beyond a reasonable doubt. Guilt Phase Verdict (Crim. Doc. 1043).

52. The government has routinely conceded that conspiring to commit a crime of violence does not qualify as a crime of violence under the elements clause because it does not necessarily require proof of violent physical force. *See, supra*, pp. 10-11 & footnote 6.

53. The proof necessary for conviction of conspiracy is similar to—and just as minimal and categorically non-violent as—the proof necessary for conviction of attempting a crime of violence or aiding and abetting a crime of violence. All three require intent and minimal conduct, which need not include any actual use, attempt use, or threatened use of violent physical force. *Compare United States v. Camara*, 908 F.3d 41, 46 (4th Cir. 2018) (conspiracy elements: unlawful agreement to commit offense, defendant's knowing and willing participation, and overt act in furtherance of); *with Rosemond v. United States*, 572 U.S. 65, 71 (2014) (elements of aiding and abetting: intent to facilitate commission of offense, and affirmative act in furtherance thereof).

54. With no appreciable difference in the proof required for these three types of inchoate offenses—conspiracy, attempt, and aiding-and-abetting—there is no appreciable reason for treating conspiracy offenses as *not* crimes of violence, while treating attempt offenses and aiding-and-abetting offenses as crimes of violence. Aiding and abetting a crime of violence can be proven without necessarily proving that defendant used, attempted to use, or threatened to use

25

violent physical force. Thus, aiding and abetting VICAR murder—Mr. Umaña's convictions on Counts 22 and 24—does not categorically qualify as a crime of violence.

**C. The §924(c) Convictions Must Be Vacated Even if Only One Predicate Is a Crime of Violence.**

55. Even if one of the §924(c) predicates (VICAR murders) constitutes a crime of violence, while the other (RICO conspiracy) does not,[12] the §924(c) convictions must be vacated.

**1. The categorical/modified categorical approach compels relief.**

56. The Court must apply the categorical or modified categorical approach to determine which predicate offense(s) formed the basis for Mr. Umaña's §924(c) convictions. But here, even after examining *Shepard* documents, it is impossible to conclude the jury convicted Mr. Umaña solely of using a firearm during and in relation to a crime of violence (e.g., VICAR murder as principal), rather than convicted him of using a firearm during and in relation to a non-crime of violence (RICO conspiracy). Complicating matters, his conviction for VICAR murder rested on alternative theories: the Court instructed he could be convicted of VICAR murder either as the shooter/principal, or as an aider and abetter of the shooter—without a *Rosemond*[13] instruction that

---

[12] This Court has previously indicated as much, holding that RICO conspiracy is categorically not a crime of violence in *Sandoval v. United States*, No. 3:16-cv-337-RJC, ECF Doc. 11, at 1, 4 (W.D.N.C. 12/31/19), and reasoning that VICAR murder is a crime of violence in a previous order in this proceeding, *Umaña v. United States*, 229 F.Supp.3d 388, 390-91, 397 (W.D.N.C. 1/25/17).

[13] *Rosemond v. United States*, 572 U.S. 65, 67, 81-82 (2014). In *Rosemond*, there were factual issues as to who actually used the firearm—defendant or someone associated with defendant—which is why the government prosecuted defendant using both a principal theory (defendant was the shooter) and an aiding-and-abetting theory (defendant abetted the shooter). *Id.* at 67-68, 83. When the government does this, the Court held, it must prove defendant knew ahead of time a firearm would be employed in the crime. *Id.* at 67, 81-82.

Similarly here, the government recognized there were factual issues as to who was the shooter, and thus prosecuted Mr. Umaña under a theory that he was the principal or an aider and abettor. *See* Guilt Phase Transcript, at 1242-45; Guilt Phase Verdict (Crim. Doc. 1043). An aiding and abetting theory on VICAR murder necessarily requires an aiding and abetting theory for use of a firearm during and in relation to a crime of violence, if the crime of violence is aiding and

26

he knew ahead of time that the shooter intended to use a firearm.  Thus, his indictment, trial jury instructions, and verdict form render it possible the jury convicted him of RICO conspiracy (MS-13 conspiracy) that led to the deaths of Manuel and Ruben Garcia Salinas (Count 1), *aiding and abetting* VICAR murders without use of the firearm nor knowledge ahead of time that a firearm would be used (Counts 22 and 24), and using a firearm during and in relation to the RICO conspiracy generally (such as during meetings or other racketeering acts of robbery or extortion, such as those that occurred within 24 hours after the shooting as charged in Count 28), which conspiracy did result in the murders of Manuel and Ruben Garcia Salinas (Count 23 and 25).[14]

57.    The Supreme Court and Fourth Circuit have made clear that to determine whether an offense qualifies as a "crime of violence" under the §924(c) force/elements clause, the court must "employ the categorical approach or the modified categorical approach."  *United States v. Fuertes,* 805 F.3d 485, 498 (4th Cir. 2015); *United States v. Bryant*, 949 F.3d 169, 172 (4th Cir. 2020); *see also United States v. Simms*, 914 F.3d at 233, 239, 241 (4th Cir. 2019) (*en banc*); *Davis*, 139 S. Ct. at 2328, 2329.

58.    Under this approach, courts can only look to whether the statutory elements—not the facts of the case—meet the crime of violence definition.  *Simms*, 543 U.S. at 233; *Shepard v.*

---

abetting VICAR murder.  And when aiding and abetting a firearm offense is alleged, the government must prove defendant's knowledge ahead of time that the firearm would be employed. *Rosemond*, 572 U.S. at 67, 81-82.

[14] This proposition has record support:  trial counsel explicitly argued to the jury that Mr. Umaña was present but not the shooter.  Guilt Phase Transcript, at 1183-87.  The government recognized there were factual issues as to who was the shooter and thus prosecuted Mr. Umaña under a theory that he was either the principal or an aider and abettor to the shooting.  *See* Guilt Phase Transcript, at 1242-45; Guilt Phase Verdict (Crim. Doc. 1043).  Mr. Umaña in no way waives his argument that the Court's analysis is restricted to the categorical/modified categorical approach.  He merely points out that there is evidentiary, record foundation—and not hypothetical speculation—for his argument that the *Shepard* documents do not conclusively show jurors found him guilty of using a firearm during VICAR murder.

*United States,* 544 U.S. 13 (2005); *Descamps v. United States*, 570 U.S. 254 (2013); *United States v. Vann*, 660 F.3d 771 (4th Cir. 2011) (*en banc*); *United States v. Chapman,* 666 F.3d 220 (4th Cir. 2012) (*en banc*). If the statutory crime is divisible, the court can review certain *Shepard* documents to determine whether the defendant was "necessarily" convicted of an offense that qualifies as a "crime of violence." *Descamps*, 570 U.S. at 261, 262. When the *Shepard* documents do not conclusively establish the elements of which a defendant was "necessarily" convicted, the court must assume the defendant was convicted of the "least serious" of the disjunctive elements. *Vann*, 660 F.3d at 775; *Chapman,* 666 F.3d at 228.

59. The categorical approach applies equally to jury trials and guilty pleas. As the *en banc* Fourth Circuit clarified in *Vann,* similar to guilty pleas*,* "in trials by jury, it has been established that a defendant convicted under a conjunctively charged indictment cannot be sentenced—in the absence of a special verdict form identifying the factual bases for conviction— to a term of imprisonment exceeding the statutory maximum for the 'least-punished' of the disjunctive statutory conduct." 660 F.3d at 774.

60. The categorical/modified categorical approach is not limited to prior convictions. In *Fuertes,* the Fourth Circuit explicitly said both apply to the "crime of violence" element in the instant §924(c) offense. 805 F.3d at 498. In *Bryant*, the Fourth Circuit applied the modified categorical approach to §924(c)'s "crime of violence" element. 949 F.3d at 172. The *Bryant* court reiterated, "To determine whether an offense qualifies as a crime of violence under the force clause of § 924(c)(3)(A), 'we apply the categorical approach or the modified categorical approach, depending on the nature of the offense.'" *Id.* (internal citations omitted). This is consistent with *Chapman*, in which the Fourth Circuit applied the modified categorical approach to an instant offense when the offense had alternative elements. *Chapman*, 666 F.3d at 227-28. "The modified

28

categorical approach is simply a tool for implementing the categorical approach." *See Bryant,* 949 F.3d at 173 (internal citations omitted). Just as the categorical approach applies to §924(c), so too does the modified categorical approach. And when attempting to determine which predicate supplied the crime of violence in question in the instant §924(c) offense, if the *Shepard* documents are inconclusive, *Vann* requires the court to find the predicate was the least serious alternative element—the non-crime of violence of RICO conspiracy.

61. Here, the *Shepard* documents do not conclusively establish Mr. Umaña's §924(c) convictions rested on VICAR murders. *See* Crim. Docs. 623, 1043; Guilt Phase Transcript, at 1213-61. Mr. Umaña was charged under §924(c) in the conjunctive: with use of the firearm during and in relation to RICO conspiracy (Count 1) and murder in aid of racketeering (Counts 22 and 24). Jurors were instructed they could premise conviction on using a firearm during and in relation to the RICO conspiracy (Count 1) *or* during and in relation to VICAR murder (Counts 22 and 24). Guilt Phase Transcript, at 1248-51. The verdict form did not disclose on which predicate jurors premised conviction. Guilt Phase Verdict (Crim. Doc. 1043). Therefore, this Court must assume the §924(c) convictions rested on the least of the predicate offenses—RICO conspiracy. *See Vann*, 660 F.3d at 775; *Chapman,* 666 F.3d at 228.

62. Additionally, the verdict form did not indicate jurors found Mr. Umaña guilty of murder as the shooter. Jurors were instructed they could find Mr. Umaña guilty on Counts 22 and 24 if "the defendant, or someone aided and abetted by [him], committed murder." Guilt Phase Transcript, at 1245; *see also id.* (instructing on fourth element: "the purpose of the defendant, *or someone aided and abetted by the defendant*, in committing the murder was to maintain or increase position in the enterprise"); *see generally id.* at 1242-45. The verdict form indicates his convictions on the VICAR murder counts (Counts 22 and 24) rested on either theory: that he was

29

the shooter, "or aid[ed] and abet[ed] in that offense, in violation of 18 U.S.C. §2." Guilt Phase Verdict (Crim. Doc. 1043). Jurors did not receive a *Rosemond* instruction, so it is impossible to conclude jurors made a finding that Mr. Umaña aided and abetted with knowledge ahead of time that a firearm would be employed. *Cf.* 572 U.S. at 67, 81-82. Thus, review of *Shepard* documents does not conclusively establish jurors found Mr. Umaña guilty of using the firearm in his commission of VICAR murders. To the contrary, jurors may have found him guilty of aiding and abetting VICAR murder without knowledge that a firearm would be used; not guilty of using a firearm during VICAR murder; and guilty of using a firearm during the broader RICO conspiracy.

63.     Because the *Shepard* documents do not conclusively show which predicate his §924(c) convictions rested on, the Court must assume the §924(c) convictions rested on the least culpable conduct*, see Vann*, 660 F.3d at 775; *Chapman,* 666 F.3d at 228, which was:  guilty of RICO conspiracy (Count 1); guilty of using the firearm during the RICO conspiracy generally, which conspiracy led, among other things, to someone murdering Manuel and Ruben Garcia Salinas (Counts 23 and 25 with RICO conspiracy as the predicate); guilty of aiding and abetting a confederate in the VICAR murders of Manuel and Ruben Garcia Salinas (Counts 22 and 24); but not proof beyond a reasonable doubt—and no jury finding—that Mr. Umaña used the firearm, or had (*Rosemond*) prior knowledge that a firearm would be used, in the VICAR murders of Manuel and Ruben Garcia Salinas. There was no jury finding that Mr. Umaña's use of a firearm included Mr. Umaña using a firearm during VICAR murders as the predicates to Counts 23 and 25.

64.     As *Shepard* documents do not reveal a jury finding that Mr. Umaña used the firearm during and in relation to VICAR murders, the Court must presume that his convictions rested on the least culpable conduct.  That is, his §924(c) convictions rested on RICO conspiracy.

30

### 2. Relief is Required Because the Jury's General Verdict Relied on an Unconstitutional Ground.

65. A general verdict which "may have rested" on a constitutionally invalid ground must be set aside. *Stromberg v. California*, 283 U.S. 359, 367-68 (1931); *see also Griffin v. United States*, 502 U.S. 46, 53-54 (1991); *Boyde v. California*, 494 U.S. 370, 380 (1990), *quoting Bachellar v. Maryland*, 397 U.S. 564, 571 (1970). In accordance with this constitutional principle, several courts have granted relief—without conducting a harmless error analysis—when §924(c) convictions were premised on more than one predicate offense and the verdict may have rested on the unconstitutional residual clause definition. *E.g.*, *Wainwright v. United States*, No. 19-62364-CIV-COHN, 2020 U.S. Dist. LEXIS 63247, at \*\*38-43 (S.D. Fl. 4/6/20); *United States v. Berry*, No. 3:09-CR-00019, 2020 WL 591569, at \*3 (W.D. Va. 2/6/20); *Wilson v. United States*, No. CR 98-00975, 2018 WL 5928150, at \*2 (C.D. Cal. 6/4/18); *United States v. McCall*, 3:10CR170-HEH, 2019 U.S. Dist. LEXIS 165744, at \*\*15-16, 19-20 (E.D. Va. 9/25/19) ("jury may have found [defendant] guilty of VICAR based on conspiracy liability"); *United States v. Lettiere*, No. CV 16-157-M-DWM, 2018 U.S. Dist. LEXIS 118284, at \*\*6-13 (D. Mont. 7/16/18) (*Shepard* documents do not show how defendant was necessarily convicted of robbery, and instead show he was convicted of robbery or extortion). Likewise, the Fourth Circuit has warned that use of a special verdict form, in which the jury must indicate the predicate crime of violence for §924(c) counts, is the proper way to ensure the government receives harmless-error review of any *Johnson* error. *See United States v. Hare*, 820 F.3d 93, 105-06 (4th Cir. 2016).

66. Here, the Constitution forbids premising Mr. Umaña's §924(c) convictions on RICO conspiracy as the qualifying crime of violence. RICO conspiracy does not meet the §924(c)(3)(A) force/elements clause and solely meets the §924(c)(3)(B) risk/residual clause. Due process is violated when a §924(c) conviction relies on the risk/residual clause. *Davis*, 139 S. Ct.

at 2323-24, 2336. Moreover, RICO conspiracy—membership in Mara Salvatrucha 13—constitutes racial, religious, and political affiliation in a marginalized group of Salvadoran immigrants who express unpopular political views. *Zant v. Stephens*, 462 U.S. 862, 885 (1983). These are quintessential categories upon which conviction cannot be premised. *Id.* Thus, the Constitution "forbids conviction on a particular ground": the ground that RICO conspiracy—membership in the Salvadoran immigrant gang MS-13—is the qualifying crime of violence under the risk/residual clause for Mr. Umaña's §924(c) convictions. *See id.*; *Griffin*, 502 U.S. at 53-54. The jury instructions permitted jurors to premise the §924(c) convictions on this unconstitutional ground. Guilt Phase Transcript, at 1248-51. And the jury returned a verdict indicating the §924(c) convictions "may have rested" on the unconstitutional ground. Guilt Phase Verdict (Crim. Doc. 1043). Mr. Umaña's §924(c) convictions must be vacated.

67. To counsel's knowledge, the Fourth Circuit has decided only one unpublished, per curiam case in which the §924(c) conviction was predicated on more than one crime, at least one of which is not a crime of violence under *Davis*, and the jury returned a general verdict: *United States v. Steward*, 793 Fed. Appx. 188, 189-90 (4th Cir. 2019) (unpub. per curiam). In *Steward*, defendant-appellant did not argue that *Davis* error in the presence of ambiguous predicates constituted *Stromberg* error or any other type of structural error. *See* U.S. Suppl. Br. 10/1/19 at 5-6 ("Defendant offers no argument that the error here counts as structural error"), *United States v. Steward*, No. 15-4422 (4th Cir.). Moreover, the §924(c)-count (count 3) predicates encompassed the same "coextensive" conduct: Hobbs Act robbery (count 2) and conspiracy to commit the exact same Hobbs Act robbery (count 1). *Id..* Thus, there was no *Stromberg* error in *Steward*.

68. Here, in contrast, Mr. Umaña's predicates were not coextensive. The RICO conspiracy was wide-ranging and encompassed more conduct than the single shooting incident

32

that resulted in the VICAR murders.  Mr. Umaña was accused of extorting or robbing drug dealers, participating in planning meetings, handling and inspecting gang members' firearms, and himself carrying or sharing a firearm with other gang members.  Indeed, jurors saw undercover/informant video evidence of Mr. Umaña (allegedly) handling firearms at meetings.  And jurors convicted him of firearm possession generally (in a different county than the location of the shooting) and of extorting a drug dealer (in a different county than the location of the shooting).  *See* Counts 27 and 28, Third Superseding Indictment & Guilt Phase Verdict (Crim. Docs. 623, 1043).  Unlike in *Steward*, where the conspiracy predicate was coextensive with the substantive-offense predicate, here Mr. Umaña's RICO conspiracy was wide ranging and broader than the single shooting incident that resulted in the VICAR murders.  Mr. Umana's convictions must be vacated.

### 3. Due process and constitutional jury trial rights compel relief.

69.    The jury did not explicitly or implicitly find use of a firearm during and in relation to Mr. Umaña's commission of VICAR murder (or aiding and abetting VICAR murder).

70.    The jury instructions indicated jurors could premise the §924(c) convictions (Counts 23 and 25) on finding use of a firearm during RICO conspiracy or use of a firearm during VICAR murder.  The verdict form did not disclose which fact (which predicate with nexus) the jury found.  The finding of guilt on Counts 22 and 24 did not equate to a finding that Mr. Umaña used a firearm during the VICAR murders, because jurors were permitted to find guilt on Counts 22 and 24 if Mr. Umaña aided and abetted the VICAR murders.  And the jury's finding that Mr. Umaña aided and abetted VICAR murder did not necessarily include a finding that he aided and abetted with knowledge that a firearm would be used, because the jury was not instructed to consider whether he had knowledge (or prior knowledge) that a firearm would be used in the VICAR murders.  *Cf. Rosemond*, 572 U.S. at 67, 81-82.

Case 3:16-cv-00057-MOC   Document 91   Filed 06/23/20   Page 33 of 51

71. Thus, the jury did not explicitly or implicitly find use of a firearm during and in relation to Mr. Umaña's commission of VICAR murder (or aiding and abetting VICAR murder). If the Court finds that Mr. Umaña's §924(c) convictions rested on using a firearm during and in relation to VICAR murders, then that amounts to a judicial factual finding of an element of an offense and of a fact that increases the mandatory minimum. Both kinds of judicial fact-findings are prohibited by due process and the Sixth Amendment. *Alleyne v. United States*, 570 U.S. 99, 103 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 469, 497 (2000). Additionally, due process, the Sixth Amendment, and the Eighth Amendment would be violated because Mr. Umaña is entitled to a jury finding, based solely on the evidence, of proof beyond a reasonable doubt as to every element of the offense, particularly in his capital case. *Hurst v. Florida*, 136 S. Ct. 616, 618 (2016); *Ring v. Arizona*, 536 U.S. 584, 589 (2002); *Apprendi*, 530 U.S. at 476-77; *United States v. Gaudin*, 515 U.S. 506, 514 (1995); *Victor v. Nebraska*, 511 U.S. 1, 5 (1994); *Chandler v. Florida*, 449 U.S. 560, 574 (1981); *In re Winship*, 397 U.S. 358, 364 (1970).

72. The Eleventh Circuit acknowledged this problem when considering a *Johnson* challenge to a §924 conviction premised on multiple predicates:

> The way Gomez's indictment is written, we can only guess which predicate the jury relied on. It's possible that we can make a guess based on the PSI or other documents from Gomez's trial or sentencing. But <u>Alleyne</u> expressly prohibits this type of "judicial factfinding" when it comes to increasing a defendant's mandatory minimum sentence.

*In re Gomez*, 830 F.3d 1225, 1228 (11th Cir. 2016), *citing Alleyne*, 133 S. Ct. at 2155.

73. Here, Mr. Umaña's (alleged) use of a firearm *during and in relation to VICAR murder* is a fact jurors did not explicitly find; and it is not implicit in any of the jury's findings based on the Court's instructions. Any finding he used the firearm during and in relation to VICAR murder constitutes a prohibited judicial factual finding. At best, the jury instructions and verdict form permit no more than guesswork as to what jurors actually found. Judicial guesswork is no

34

substitute for Mr. Umaña's jury trial and due process rights.  Because a finding that Mr. Umaña used a firearm *during and in relation to VICAR murders* was not made, explicitly or implicitly, by the jury, his §924(c) convictions must be vacated.

### 4.      The Davis violations are structural error and compel relief.

74.      The *Davis* violations here are structural.  They fundamentally infected the trial with unfairness and vitiated Mr. Umaña's due process and jury trial rights.  Structural error occurs when effects of error are too hard to measure or error signals fundamental unfairness.  *McCoy v. Louisiana*, 138 S. Ct. 1500, 1511 (2018).

75.      The Government's theory that the RICO conspiracy—membership in the Salvadoran-immigrant gang MS-13—constituted a crime of violence pervaded all aspects of trial and infected jurors' guilt-phase and penalty-phase deliberations.   Mr. Umaña's MS-13 membership and Salvadoran origin were an overwhelming and persistent theme of the evidence presented, an explicit element of most of the charged offenses (RICO conspiracy, VICAR murders, alien with a firearm, Hobbs Act robbery), and two of the four non-statutory aggravating factors (gang-related killing and future dangerousness).  The constitutional error of including RICO conspiracy as a §924(c) predicate signaled fundamental unfairness because the entire case focused on the existence of the MS-13 "enterprise" and its involvement in firearms and other crimes using weapons.  This evidence—of an extensive conspiracy in North Carolina—vastly overshadowed the small amount of evidence showing Mr. Umaña affiliated with the North Carolina cliques for only a small amount of time.

76.      The allegations underlying the RICO conspiracy affected the whole framework of the trial and rendered the trial fundamentally unfair with respect to the §924(c) convictions. *See also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1908 (2017).  The possibility that §924 convictions could be based on the RICO conspiracy affected the "entire conduct of the trial from beginning to

35

end," because the Government only had to connect Mr. Umaña to MS-13 membership generally. *See Arizona v. Fulminate*, 499 U.S. 279, 309-10 (1991). And by producing a prejudicial volume of immigrant-gang evidence throughout trial, the government only had to connect Mr. Umaña to a small amount of gang activity or mere membership in MS-13 more broadly to obtain conviction for the §924(c), RICO, and VICAR counts. The error here was intrinsically harmful and requires automatic reversal of the §924(c) convictions. *See Weaver*, 137 S. Ct. at 1905; *United States v. Davila*, 569 U.S. 597, 611 (2013); *Neder v. United States*, 527 U.S. 1, 7 (1999).

### 5. Harmless error analysis compels relief.

77. Assuming harmless error applies, and it is Mr. Umana's position that it does not, but that the *constitutional* Davis-error is controlled by the principles discussed above, Mr. Umana is still entitled to relief because the *Shepard* documents demonstrate a reasonable probability jurors rested Mr. Umaña's §924(c) convictions on use of a firearm during the RICO conspiracy (Count 1), and not in relation to aiding and abetting the VICAR murders (Counts 22 and 24). *See Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam), *citing Yates*, 354 U.S. 298 (applying *Brecht v. Abrahamson*, 507 U.S. 619 (1993), harmless error standard in the context of *non-constitutional* instructional error).

78. Here, there is a reasonable probability, but for the *Davis* error, the verdict would have been different. There is a reasonable probability Mr. Umaña's §924(c) convictions rested on RICO conspiracy as the predicate. The jury was presented with complicated evidence of a drunken, heated dispute involving multiple men (about twelve in all). As soon as shots fired, everyone scattered. Out of the dozens of people in the restaurant that evening—many of whom were disinterested bystanders not affiliated with either group—the prosecution presented only one witness who claimed Mr. Umaña was the shooter. One would expect a shooter to distance himself from a "hot" weapon used in a murder, so Mr. Umaña's possession of the firearm afterward is not

36

indicative he was the shooter. MS-13 members who turned state's witness, such as Ronny "Nene" Lopez and Juan "Mariachi" Vela Garcia, had insurmountable credibility issues: they "honestly" cooperated while watching their friends indicted for crimes calling for decades in prison—crimes that they too had committed. But, in contrast to this assailable witness testimony, video evidence showed Mr. Umaña possessed a firearm at some points in the conspiracy. And if he wasn't the trigger man the night of the shooting, he was certainly there, participating, and egging on the shooter. Jurors comfortably could find him guilty of aiding and abetting that shooting that resulted in the deaths of Ruben and Manuel Garcia Salinas, and possessing a firearm at various other times in the RICO conspiracy, without believing he was definitely the shooter. After all, the Court's instructions and verdict form told jurors they weren't required to make that call.[15] There is a reasonable probability jurors would not have found, beyond a reasonable doubt, Mr. Umaña used a firearm in the melee-turned-shooting.

79. While the Fourth Circuit has indicated that harmless error can be found when the two §924(c) predicates are *entirely coextensive, see United States v. Steward*, 793 Fed. Appx. 188, 189-90 (4th Cir. 2019) (unpub. per curiam), the RICO conspiracy Mr. Umaña was convicted of participating in was not coextensive with the single shooting incident that resulted in the VICAR murders. Mr. Umaña's case is more like *United States v. Jones*, 935 F.3d 266 (5th Cir. 2019) (per

---

[15] Jurors were instructed they could find Mr. Umaña guilty on Counts 22 and 24 if he "or someone aided and abetted by [him], committed murder," and the VICAR "for purpose of" element included "the purpose of the defendant, or someone aided and abetted by the defendant, in committing the murder was to maintain or increase position in the enterprise." Guilt Phase Transcript, at 1245. Jurors found him guilty on an aiding and abetting theory: guilty of "murder of [the victim] in aid of racketeering, in violation of 18 U.S.C. §1959, *or aiding and abetting in that offense, in violation of 18 U.S.C. §2.*" Guilt Phase Verdict (Crim. Doc. 1043). And jurors were told using the firearm during the RICO conspiracy or during the VICAR murders would suffice for guilt on the §924(c) charges (Counts 23 and 25). Guilt Phase Transcript, at 1249.

curiam). When the RICO-conspiracy predicate and other predicates are not coextensive, and the RICO conspiracy encompasses a broader range of conduct, there is a reasonable probability of a different outcome without the *Davis* error. *See Jones*, 935 F.3d at 272-74.

80. Here, that is precisely the case. The RICO conspiracy that Mr. Umaña was convicted of participating in was wide-ranging and encompassed far more conduct than the single shooting incident. As explained above, there is a reasonable probability jurors could not unanimously agree on whether Mr. Umaña's use of the firearm included the shooting. And the Court's instructions told jurors they did not have to make that call: he could be found guilty of firearm possession generally (at other times during the RICO conspiracy), and *aiding and abetting VICAR murder* (without knowledge ahead of time that a firearm would be used, *see, supra*, footnote 13). There is a reasonable probability jurors premised their §924(c) verdicts on RICO conspiracy rather than the VICAR murders.

**D. Vacatur of the §924(c) Convictions, and of the VICAR Murder Sentences, Is Required Under §2255**

81. For the above reasons, Mr. Umaña's §924(c) convictions (Counts 23 and 25) violate due process because they rely on the unconstitutionally vague residual clause in §924(c)(3)(B). Thus, his §924(c) convictions violate the Constitution or laws of the United States and result in a miscarriage of justice, cognizable under 28 U.S.C. §2255(a). *See Davis v. United States*, 417 U.S. 333, 346-47 (1974) (when intervening decision establishes that prisoner was convicted of "an act that the law [no longer] make[s] criminal," "such a circumstance 'inherently results in a complete miscarriage of justice and presents exceptional circumstances' that justify relief under § 2255"). Additionally, as the indictment charged conduct that was not criminal, this Court lacked jurisdiction of the §924(c) counts alleged in the indictment. Thus, Mr. Umaña's §924(c) convictions were a legal nullity entered in excess of this Court's jurisdiction. *See United States v.*

38

*Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014) (jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); *United States v. Barboa*, 777 F.3d 1420, 1423 n.3 (10th Cir. 1985). To the extent prior counsel could have raised this claim previously, counsel's failure to do so was ineffective. Mr. Umaña's §924(c) convictions and sentences must be vacated.

82. Moreover, vacating the unconstitutional convictions in Counts 23 and 25 also necessitates vacating the death sentences imposed on Counts 22 and 24.

83. In *Johnson v. Mississippi*, 486 U.S. 578 (1988), the Supreme Court held that where a jury imposed a sentence of death, having considered as aggravation a conviction that is later vacated, the defendant is entitled to a new sentencing hearing. The Court reasoned that a sentence of death imposed under such a circumstance is inconsistent with the Eighth Amendment's prohibition against cruel and unusual punishment because "the jury was allowed to consider evidence that had been revealed to be materially inaccurate." *Id*. at 579. The Supreme Court conducted a similar analysis in *United States v. Tucker*, 404 U.S. 443, 449 (1972), a non-capital case. In *Tucker*, the Court affirmed the judgment of the Ninth Circuit ordering resentencing after two prior convictions known to the sentencer were later invalidated. *Id*. at 593. Finding the sentence was imposed "at least in part on misinformation of constitutional magnitude," the Court declared that it would be "callous to assume, now that the constitutional invalidity of the respondent's previous convictions is clear, that the [sentencer] will upon reconsideration 'undoubtedly' impose the same sentence." *Id*. at 447, 449 n.8.

84. The determinative factor is whether the invalidated conviction was known to, and possibly considered by, the sentencer. When a defendant has been convicted and sentenced on multiple counts, and one of the convictions is later determined to be invalid, the defendant must

be resentenced on the remaining valid counts, unless it is established that the sentencer did not rely on the invalid count in imposing the sentence. *See James v. United States*, 476 F.2d 936, 937 (8th Cir. 1973) (citing *Tucker*). Where it "appear[s] possible that [the sentencer] might have relied in part on an unconstitutional conviction," the defendant must be resentenced. *Id. See also Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986); *Jerkins v. United States*, 530 F.2d 1203, 1204 (5th Cir. 1976); *United States v. Pinkney*, 551 F.2d 1241, 1246 n.37 (D.C. Cir. 1976).

85.     For example, the Fifth Circuit followed this rationale in *United States v. Causey*. 185 F.3d 407, 411-12, 423 (5th Cir. 1999).  The defendants were convicted and sentenced to death on three federal capital charges.  *Id*.  Following reversal of one of the convictions, the court ordered resentencing on the two remaining convictions because there was no way to determine whether the jury had been influenced to impose death by the invalidated third conviction.  *Id*.

86.     The principle that a sentence must be vacated if it could have been influenced by an invalid conviction applies with greater force in the case of jury sentencing, because the court can never determine with certainty what factors influenced the jury. *Cf. Wren v. United States*, 540 F.2d 643, 644 (4th Cir. 1975) ("In short, to terminate further inquiry, the district judge must be able to say either from recollection or reconstruction that had he known at the time of sentencing that the earlier convictions were invalid, he would have nevertheless imposed the same sentence.'") (quoting *Gardner v Florida*, 430 U.S. 349, 359 (1977)).

87.     The interest in resentencing is also heightened where, as here, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson,* 486 U.S. at 584 (citation omitted). "The decision to exercise the power of the State to execute a defendant is unlike any other decision

40

citizens and public officials are called upon to make." *Mills v. Maryland,* 486 U.S. 367, 383 (1988). "The *possibility* that [a defendant's] jury conducted its task improperly certainly is great enough to require resentencing." *Id.* at 384 (emphasis added). Even absent any express argument by the prosecutor to consider the invalid conviction, "there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life and a death sentence." *Johnson*, 486 U.S. at 586. This *possibility* is inconsistent with the Eighth Amendment's "special need for reliability in the determination that death is the appropriate punishment." *Id*. at 584 (internal quotations and citations omitted).

88.     Under the possibility standard, resentencing is required when there is a possibility that an invalid conviction influenced even a single juror's weighing or penalty-selection decision. *Johnson*, 486 U.S. at 586; *Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989) (finding a violation of Eighth and Fourteenth Amendment based on "substantial possibility that one or more" jurors was influenced by erroneous jury instruction); *cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (to satisfy *Strickland* prejudice, petitioner must show "a reasonable probability that at least one juror would have struck a different balance"); *Buck v. Davis*, 137 S. Ct. 759, 776 (2017) (same).

89.     Like *Johnson* consideration-of-invalid-conviction error, *Wiggins*, *Buck*, and ineffective-assistance cases require resentencing where a constitutional error may have affected even a single juror's decision to recommend death. Notably, though, the standard for establishing prejudice in the *Johnson/Tucker* context is less stringent than the standard for establishing prejudice in the ineffective-assistance context. Under *Johnson/Tucker*, a capital defendant must show only a *possibility* that an invalid conviction affected at least one juror's penalty determination, whereas a capital defendant claiming *Wiggins* error must show a *reasonable probability* that counsel's deficiency did so. "A 'reasonable probability' [for purposes of an

41

ineffective-assistance claim] is a higher standard than *Johnson*'s 'possibility.'" *Powell v. Kelly*, 531 F. Supp. 2d 695, 732 n.40 (E.D. Va. 2008).

90. Here, there are myriad reasons why, individually and in combination, there is more than a possibility that at least one juror's weighing and penalty-selection decision would have been different without the unconstitutional §924(c) convictions.

91. During deliberations, the jury considered materially inaccurate evidence that Mr. Umaña was guilty of two counts of using a firearm during a crime of violence, when in fact those §924(c) convictions were unconstitutional. There is no basis upon which to conclude the jury's death sentences were not based in part on Mr. Umaña's two additional counts of death-qualifying convictions under §924(c), (j). Those convictions composed two of the four death sentences imposed and undoubtedly garnered substantial discussion and affected deliberation on the remaining counts. *Cf. Causey*, 185 F.3d at 411-12, 423 (reversal of one capital count required reversal of other two capital counts, as there was no way to determine jurors had not been influenced by the invalid conviction when considering sentence on the other two capital counts). There is at least a possibility jurors found each death-eligible count more aggravating because they found Mr. Umaña had committed three other death-eligible counts as well. There is also at least a possibility that, if jurors found the (unconstitutional) §924(c) counts more aggravating, for whatever reason, that additional aggravation of those unconstitutional counts affected jurors' weighing and selection on the VICAR murder counts.

92. During the death eligibility stage, the jury found Mr. Umaña's mental state for the VICAR murder counts (Counts 22 and 24) was the *least culpable* death-eligible mental state: reckless disregard for life. Crim. Docs. 1044, 1046. But for the §924(c) counts, the jury found Mr. Umaña's mental state was the *most culpable*: intentional killing. Crim. Docs. 1045, 1047.

42

That alone requires vacatur of the VICAR murder sentences. While intentional killing is typically associated with first-degree murder, reckless disregard is typically associated with less culpable homicide. Jurors factually found Mr. Umaña's VICAR murders entailed a lesser mental state and a less culpable form of homicide than the §924(c) counts. This finding shows there is more than a possibility, without the more culpable §924(c) counts, at least one juror's weighing and penalty-selection would have been different.

93.     Similarly, jurors believed Mr. Umaña's death-eligible mental state regarding the §924(c) counts was much more culpable than his mental state regarding the VICAR murder counts. This indicates jurors gave special aggravating weight to those two §924 counts of conviction. Mr. Umaña would not be the first federal capital defendant whose jury found that conviction, in and of itself, for using a firearm in connection with a crime of violence was a factor weighing heavily in favor of a death sentence. *See, e.g.*, *United States v. Allen*, 406 F.3d 940, 941 (8th Cir. 2005) (en banc) (in armed bank robbery resulting in death, defendant convicted of 18 U.S.C. §2113 (a) & (e) and §924(c) & (j), but sentenced to death on only the §924(c) & (j) count). Here, Mr. Umaña had two of those unconstitutional §924(c) convictions weighing heavily in favor of a death sentence. There is more than a possibility, without them, at least one juror's weighing and penalty-selection would have been different

94.     In the penalty-selection stage, jurors unanimously found as mitigating the facts and circumstances that tended to support that the killings were committed with reckless indifference: the murders "did not involve substantial planning," "occurred during an emotionally charged argument," and were "a result of [Mr. Umaña's] indoctrination into the ways and thinking of MS-13." Selection Verdicts, at 5-6 (Crim. Docs. 1048-1051). Jurors, however, gave special aggravating weight to the §924(c) counts, as reflected in the death-eligible mental state findings

43

(most culpable on the §924(c) counts and least culpable on the VICAR murder counts). The most logical way to understand the penalty-phase verdicts is that jurors added special weight and culpability to the charge that Mr. Umaña intentionally used a firearm repeatedly throughout his membership in MS-13 (throughout the RICO conspiracy), but any use of the firearm during the incident with Manuel and Ruben Garcia Salinas was less culpable and showed mere reckless disregard for life, during a heated argument without substantial planning. Without the unconstitutional §924(c) convictions, jurors would not have been exposed to or been able to channel as aggravating circumstances, the charge that Mr. Umaña intentionally used a firearm repeatedly throughout his membership in MS-13 (throughout the RICO conspiracy). Even the §922(g) count (Count 27) charged firearm possession in a narrower fashion, on only one occasion. Without this damaging aggravation—firearm use throughout his MS-13 membership (the RICO conspiracy)—channeled solely through the unconstitutional §924(c) convictions, there is more than a possibility at least one juror's weighing and penalty-selection would have been different.

95.     During the guilt-phase instructions, the Court explicitly informed jurors, "that racketeering conspiracy and murder in aid of racketeering are crimes of violence." Guilt Phase Transcript, at 1249. But the Court's explicit label of VICAR murder as a heinous crime—one the law calls a "crime of violence"—added aggravating weight to the VICAR murder counts in the weighing decision. Additionally, RICO conspiracy—simply being in the gang—according to the Court's instruction, was a "crime of violence." Had the unconstitutional §924(c) counts properly been excluded, no instruction defining VICAR murder and RICO conspiracy as heinous "crimes of violence" would have been given. Thus, without the §924(c) counts, there is a possibility at least one juror would have weighed and selected differently.

44

96.     This "crime of violence" label then spilled over into the penalty-selection stage, as the first aggravating factor alleged was a dispositive element in the VICAR murder:  whether the murders were committed to protect and maintain the name and reputation of MS-13 and advance Mr. Umaña's position and reputation within MS-13.  *See* Guilt Phase Transcript, at 1245; Selection Verdicts, at 1 (Crim. Docs. 1048-1051).  But rather than independently determine the weight to give this factor, jurors had already been instructed by the Court that committing homicide in furtherance of the gang (VICAR murder) constituted a specially heinous type of crime, a "crime of violence."  Similarly, jurors were asked to consider whether Mr. Umaña's membership in MS-13 alone carried aggravating weight or factored into the future-dangerousness aggravator.  Selection Verdicts, at 3-4 (Crim. Docs. 1048-1051).  Instead of independently determining what weight to give Mr. Umaña's gang membership, the Court had already instructed that gang membership—RICO conspiracy—was a heinous type of crime, a "crime of violence."  Jurors were therefore left to conclude, based on the Court's §924(c) instructions, that VICAR murders and gang membership (RICO conspiracy) should both receive substantial aggravating weight, based on the Court's instruction that those offenses were "crimes of violence."  Had the unconstitutional §924(c) counts properly been excluded, no instruction defining VICAR murder or RICO conspiracy or both as a "crime of violence" would have been given, and there is a possibility at least one juror would have weighed and selected differently.

97.     Alternatively, "[a]n invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances."  *Brown v. Sanders*, 546 U.S. 212, 220-21 (2006) (original emphasis).  "This test is not … an inquiry based solely on the

45

admissibility of the underlying evidence." *Id.* "If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the [*Sanders*] rule." *Id.* Additionally, "skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty" gives rise to constitutional error "where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." *Id*.

98.     Here, initially, Mr. Umaña's unconstitutional §924(c) convictions are not mere invalidated sentencing factors.  Instead, they were the highest level of aggravation:  additional death-qualifying homicide convictions.  The fact of two additional (§924(c)) counts of death-qualifying conviction was itself evidence that would not have otherwise been before the sentencer.  Thus, due process and the Eighth Amendment require reversal of the VICAR murder sentences.

99.     Similarly, on the §924(c) counts, jurors found the most culpable death-eligible mental state of intentional killing.  In contrast, on the VICAR murders, jurors found the least culpable death-eligible mental state of reckless disregard for life.  Jurors also unanimously found as mitigating that the killings occurred during a heated, emotional argument, without substantial planning, due to Mr. Umaña's indoctrination into the rules of MS-13.  Jurors thus gave special aggravating weight to the §924(c) counts based on their most culpable death-eligibility mental state finding.  As discussed in detail above, the most logical way to understand the penalty-phase verdicts is that jurors added special weight and culpability to the charge that Mr. Umaña intentionally used a firearm repeatedly throughout the RICO conspiracy, but any use of the firearm during the incident with Manuel and Ruben Garcia Salinas was less culpable.  Without the unconstitutional §924(c) convictions, jurors would not have been exposed to or been able to

46

channel as aggravating circumstances, the charge that Mr. Umaña intentionally used a firearm repeatedly throughout the RICO conspiracy. Even the §922(g) count charged firearm possession in a narrower fashion, on only one occasion. As this damaging form of aggravation was channeled solely through the unconstitutional §924(c) convictions, constitutional error infected all Mr. Umaña's death sentences. *See Brown v. Sanders*, 546 U.S. at 220-21.

100. Finally, the Constitution and federal law guarantee Mr. Umaña a jury finding on weighing and a jury finding on sentence-selection, free of constitutional error. Mr. Umaña's right to a jury determination—rather than appellate reweighing or harmless-error reweighing—is guaranteed by Due Process, the Sixth Amendment, and the Eighth Amendment.

101. The Supreme Court held in *Ring v. Arizona* "that capital defendants 'are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment'—in particular, the finding of an aggravating circumstance." *McKinney v. Arizona*, 707-08 (2020), *quoting Ring*, 536 U.S. 584, 589 (2002). In *Hurst v. Florida*, the Supreme Court "applied *Ring* and decided that Florida's capital sentencing scheme impermissibly allowed 'a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty.'" *Id.*, *quoting Hurst*, 577 U.S. ___, 136 S. Ct. 616, 618 (2016). States are not constitutionally required to mandate that juries, rather than judges, weigh aggravation and mitigation or make the ultimate sentencing decision. *Id.* Thus, states that permit trial-judge weighing or sentence-selection may engage in appellate reweighing. *Id.* at 706.

102. But when a state mandates certain trial, capital sentencing, and appellate procedures, it creates Fourteenth Amendment life and liberty interests in those procedures, which are protected under federal due process. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Ford*, 477 U.S. at 428-29. "[I]t would be unthinkable that

47

the same Constitution would impose a lesser duty on the Federal Government." *Bolling v. Sharpe*, 347 U.S. 497, 500 (1954).  Thus, where federal statutory law mandates certain trial, sentencing, or appellate procedures, there is also a federal due process life and liberty interest in that procedure. Here, federal statutory law creates a due process life and liberty interest in jury factual findings on weighing and sentence selection, whether in the first instance or after the mix of the sentencing package has been altered by vacatur of some counts of conviction.

103.    Under the Federal Death Penalty Act, Mr. Umaña has the right to jury weighing of aggravation and mitigation and a *jury fact-finding* as to the ultimate sentence-selection.  Unless the defendant and government both waive jury, the weighing of aggravation and mitigation and the ultimate sentence-selection decision all rest with the jury.  18 U.S.C. §3593(b), (d), (e). Although the jury's penalty-selection decision is called a "recommendation," the trial court must ("shall") impose whatever sentence the jury unanimously selects.  18 U.S.C. §3593(e), §3594.

104.    Because the Federal Death Penalty Act provides Mr. Umaña the right to a jury determination on weighing aggravation and mitigation, and a jury determination on his penalty selection, appellate reweighing and harmless-error analysis are inapplicable, inappropriate, and violative of due process, and the Sixth and Eighth Amendments.  Instead, if there is constitutional error in the penalty selection process, remand for resentencing by jury is required.

105.    Relatedly, the Fourth Circuit has fully endorsed the sentencing package doctrine. *United States v. de Jesus Ventura*, 864 F.3d 301, 309 (4th Cir. 2017).  "'[W]hen a defendant is found guilty on a multicount indictment, there is a strong likelihood that the [sentencer] will craft a disposition in which the sentences on the various counts form part of an overall plan,' and that if some counts are vacated, 'the [sentencer] should be free to review the efficacy of what remains in light of the original plan.'"  *Id.*  Here, if any of Mr. Umaña's counts of conviction are vacated, then

48

application of the sentencing package doctrine is appropriate and necessary. Every aspect of Mr. Umaña's original sentence—from findings on aggravation and mitigation, findings on weighing, and findings as to ultimate penalty selection—was conducted by the jury. If any counts of conviction are vacated, this holistic approach requires the original sentencer—a jury—to review the efficacy of what sentences remain. *See United States v. Stitt*, 552 F.3d 345, 355-56 (4th Cir. 2008).

106. The government did not request to waive jury during the penalty phase, *see* 18 U.S.C. §3593(b)(3) (permitting waiver of jury with both parties' consent); and the government argued to the jury that its findings on Counts 22, 23, 24, and 25 should be interrelated, co-dependent, and consistent. *E.g.*, Guilt Phase Transcript, at 1172. Thus, if relief—in the form of vacating some counts of conviction or sentence—is granted, the government should be estopped from taking a different litigation position at this juncture and arguing the remaining counts and/or sentences are should not be disturbed or may be reweighed without a jury.

107. For the reasons discussed above, Mr. Umaña's §924(c) convictions and sentences (Counts 23 and 25) must be vacated. Mr. Umaña's remaining death sentences on the VICAR murder counts (Counts 22 and 24) also must be vacated.

**REQUEST FOR RELIEF**

WHEREFORE, based upon the foregoing and all proceedings and submissions, Movant, Alejandro Umaña, respectfully requests that the Court grant him the following relief:

A) That Movant be granted such discovery as is necessary for full and fair resolution of the claims contained in his 2255 Motion, as supplemented and amended;

B) That leave to supplement and amend be granted;

C) That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

49

D)      That Respondents be Ordered to respond to the 2255 Motion, as supplemented and

amended; and

E)      That Movant's convictions and sentences be vacated.

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org


Dated: June 23, 2020

I, Kelly D. Miller, hereby certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and a copy of the foregoing document has been served this day upon the following via CM/ECF:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
anthony.enright@usdoj.gov

*/S/ KELLY D. MILLER*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: June 23, 2020

51