



# GEORGETOWN LAW

Criminal Defense & Prisoner Advocacy Clinic
E. Barrett Prettyman Fellowship Program

July 13, 2020

Leane Renee, Esq.
Chief, Capital Habeas Unit
Office of the Federal Public Defender,
Middle District of Pennsylvania
100 Chestnut Street, 3rd floor
Harrisburg, PA 17101

Dear Ms. Renee:

At your request, I have examined materials pertaining to the case of Alejandro Enrique Ramirez Umana v. United States, No. 3:16 CV-00057-RJCl, in order to render an expert opinion on ethical issues raised by the Federal Defenders of San Diego, Inc. (FDSDI) remaining as co-counsel in this matter. I have also reviewed the North Carolina Rules of Professional Conduct and the North Carolina State Bar Formal Ethics Opinions (defense counsel Kelly Miller, from the Office of the Federal Public Defender for the Middle District of Pennsylvania, is a member of the North Carolina bar, which is also the jurisdiction of this litigation), as well as consulting with several legal scholars with expertise in capital defense and/or legal ethics.

In short, it is my opinion that the continued representation of Mr. Umana by FDSDI presents a conflict of interest that can be resolved only through the withdrawal of counsel.

My CV is attached, but let me briefly summarize my qualifications for providing this expert opinion:

I am a Professor of Law, Director of the Criminal Defense & Prisoner Advocacy Clinic, and Co-Director of the E. Barrett Prettyman Fellowship Program at Georgetown University Law Center. In addition to directing these two criminal defense programs, both of which emphasize professional responsibility as well as the skills and law related to criminal law practice—I teach and write about lawyers' ethics. I am the author of two treatises on legal ethics: *Understanding*

*Lawyers' Ethics* (with Monroe H. Freedman) (Carolina Academic Press, 5th edition, 2016) (and the previous three editions) and *Lawyers' Ethics* (with Monroe H. Freedman and Alice Woolley) (Routledge, 2017). I have written or edited other books that focus on criminal defense ethics, including *Guilty People* (Rutgers University Press, 2020), *How Can You Represent Those People* (Abbe Smith & Monroe H. Freedman, eds.) (Palgrave MacMillan/St. Martin's Press, 2013), and *Case of a Lifetime* (St. Martin's Press, 2008). I have also written many scholarly articles on legal ethics and regularly present on ethics at public defender and criminal defense lawyer trainings, continuing legal education programs, and academic meetings and conferences throughout the United States and abroad.

I am also well-versed in the *ABA Model Rules of Professional Conduct*, the *ABA Standards for Criminal Justice*, and the *ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases*, the ABA's Center for Professional Responsibility's Ethics Opinions, the National Association of Criminal Defense Lawyers' Ethics Advisory Committee's Ethics Opinions, and what I regard as the leading treatise on criminal defense, Anthony Amsterdam and Randy Hertz's *Trial Manual for the Defense of Criminal Cases* (American Law Institute, 6th ed., 2017).

The case-related materials I examined include:

| |
|---|
| • Motion for Substitution of Counsel (USCTA Doc. 8) – 9/29/2010 |
| • Order Appointing Malcolm Hunter and the Federal Defenders of San Diego (Doc. 19) – 10/14/2010 |
| • Appearance of Counsel Form (USCTA Doc. 22) – 10/20/2010 |
| • Letter from Malcolm Hunter to Beth Walton - 09/14/2011 |
| • Transcript Order Acknowledgment (USCTA Doc. 55) – 4/13/2012 |
| • Reply re Appellant's Motion for Extension of Time (USCTA Doc. 75) – 6/21/2013 |
| • Memorandum of Law in Support of Motion for Appointment of Counsel for Proceedings Pursuant to 28 U.S.C. 2255 (CR Doc. 1618) – 6/2/2015 |
| • Order Granting in Part and Denying in Part Motion for Appointment of Counsel (CR Doc. 1621) – 6/3/2015 |
| • Memorandum of Law in Support of Proposed Case Budget for Proceedings Pursuant to 28 U.S.C. 2255 *Filed Ex Parte and Under Seal* (CV Doc. 3) - 1/27/2016 |
| • Motion for Substitution of Counsel (CV Doc. 48) – 1/30/2017 |
| • Order Appointing Middle District of Pennsylvania (CV Doc. 49) -2/22/2017 |
| • Motion for Leave to File Supplement/Amendment to Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255 (CV Doc. 68) – 2/22/2018 |
| • Response of the United States to Umana's Motion for Leave to Amend His 2255 Motion (CV Doc. 79)–5/7/2018 |
| • Reply to Government's Opposition to Motion to Supplement/Amend Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255 (CV Doc. 81) – 5/29/2018 |

2

- Motion for Substitution of Counsel (CV Doc. 86) – 12/14/2018

- Order Denying Motion for Substitution of Counsel (CV Doc. 87) – 6/16/2020

- Declaration of Kenneth J. Rose pursuant to 28 U.S.C. §1746 — 7/10/2020

- Motion for Extension of Time submitted by Malcolm R. Hunter, CPDL and Vincent J. Brunkow, FDSDI—6/12/2013

- Letter from Samuel W. Phillips to Malcom Hunter, CDPL, approving proposed budget in light of assistance provided by FDSDI—12/8/2011

- Unopposed First Motion for Extension of Time to File Opening Brief submitted by Steven Francis Hubachek, FDSDI and Malcolm R. Hunter, CDPL—9/14/2012

- Unopposed Second Motion for Extension of Time to File Opening Brief submitted by Vincent J. Brunkow, FDSDI and Malcolm R. Hunter, CDPL—3/6/2013

- Affidavit of Sandy Demeree, Financial Controller, CDPL—7/13/2020

I consulted with Professor John Blume, Cornell Law School; Visiting Lecturer in Law Lawrence J. Fox, Yale Law School; Professor Bruce Green, Fordham University school of Law; Professor Eric Freedman, Hofstra University School of Law; and Ellen Yaroshefsky, Hofstra University School of Law.

### The Rules of Professional Conduct are "Client-centered"

The *North Carolina Rules of Professional Conduct* (2003), https://www.ncbar.gov/for-lawyers/ethics/rules-of-professional-conduct/ [hereinafter *North Carolina Rules*], are client-centered. So are the ABA's *Model Rule of Professional Conduct* (1983, 2020), from which the *North Carolina Rules* are derived. The first sentence in the Preamble states: "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having a special responsibility for the quality of justice." *North Carolina Rules*, Preamble. It is not coincidental that the first lawyerly responsibility listed in the Preamble is the one that relates to clients. Section [2] of the Preamble to the *North Carolina Rules* makes plain the high standard of representation of clients, especially in the context of advocacy: "As advocate, a lawyer *zealously* asserts the client's position under the rules of the adversary system." *Id.* [emphasis added].

Consistent with the client-centered ethos of the American legal profession, a lawyer cannot provide competent representation, much less zealous representation, unless the representation is conflict-free. *See generally* Freedman & Smith, *Understanding Lawyers' Ethics* 265 (5th ed., 2016) (identifying "confidentiality, diligence/zeal, competence, and communication as the ethical requirements typically threatened by conflicts of interest," but also noting that "loyalty," though not a rule per se, is a central concern in conflicts of interest).

3

Loyalty is key to the lawyer-client relationship.  The first Comment to *North Carolina Rule* 1.7, "Conflict of Interest: Current Clients," begins with a paean to loyalty: "Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."  *North Carolina Rules*, 1.7, Comment [1]; *see also North Carolina Rules*, 1.6. Comment [2] (noting that "trust …is the hallmark of the client-lawyer relationship").

Similarly, in a leading case in which a lawyer was disqualified on grounds of conflict of interest, the court referred to the "absolute loyalty" and "undivided fidelity" that a lawyer owes to a client.  *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc*., 113 F. Supp. 265, 268 (S.D.N.Y. 1953) (citing Canon 6 of the 1908 *Canons of Professional Ethics*).  Professor Charles Wolfram, the distinguished scholar of legal ethics and professional responsibility from Cornell University, has recognized "the lawyer's virtual total loyalty to the client and the client's interests."  CHARLES W. WOLFRAM, MODERN LEGAL ETHICS 146 (1986).

Loyalty might be even more important in the case of court-appointed counsel.  *See* ANTHONY AMSTERDAM AND RANDY HERTZ, TRIAL MANUAL FOR THE DEFENSE OF CRIMINAL CASES 100-101 (6th ed. 2017) (on establishing a relationship of trust with a criminal defendant and avoiding giving the client grounds for "suspicion or confusion about the lawyer's…loyalties").  The importance of loyalty is surely elevated in capital defense, because a defendant's life is on the line.

### **A Lawyer *Shall Not* Represent a Client if the Representation involves a Concurrent Conflict of Interest**

Rule 1.7 of the *North Carolina Rules* states explicitly that "a lawyer *shall* not represent a client if the representation involves a concurrent conflict of interest."  Rule 1.7(a) [emphasis added].  A concurrent conflict of interest exists if "the representation of one or more clients *may be* materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or *by a personal interest of the lawyer*."  1.7(a) (2) [emphasis added].  A personal interest of a lawyer would necessarily include his or her reputational interest.

The personal interests of FDSDI are directly at issue in this post-conviction challenge, as several of the claims are based on the competence of FDSDI's lawyers.  *See North Carolina Rules*, 1.7, Comment [1] ("Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests.").

The Comments to Rule 1.7 make plain that, in the face of such a conflict, the conflicted lawyer "must withdraw."  *See North Carolina Rule* 1.7, Comment [4] ("If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b).").

Having conflict-free counsel is essential to the administration of justice.  As the ABA's *Criminal Justice Standards* states:

4

The primary duties that defense counsel owe to their clients, to the administration of justice, and as officers of the court, are to serve as their clients' counselor and advocate with courage and devotion; to ensure that constitutional and other legal rights of their clients are protected; and to render effective, high-quality legal representation with *integrity*.

American Bar Association, *Criminal Justice Standards for the Defense Function*, Standard 4-1.2(b) (4th ed. 2017), at https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/ [emphasis added].

It is important to note that Mr. Umana has at no time waived this conflict of interest, and has certainly not complied with the conditions required for an informed waiver under Rule 1.7 (b) or a "waiver of objection to a possible future conflict of interest" under the one North Carolina State Bar Ethics Opinion that is relevant. *See* RPC 168 (1994) (requiring that a waiver be in writing and in full contemplation of all relevant considerations).

### **FDSDI Was Co-Appellate Counsel to Lawyers Connected to the Center for Death Penalty Litigation and Hence is Equally Responsible for Deficiencies in the Appellate Litigation**

Both Malcolm R. Hunter, Jr. and Kenneth J. Rose worked at the Center for Death Penalty Litigation (CDPL) in Durham, North Carolina during their involvement in this case. *See* Declaration by Kenneth J. Rose dated July 10, 2020. That Hunter left CDPL—years after his appointment and only a few months before the filing of the opening brief—taking Mr. Umana's case with him, does not break his tie to CDPL. Then, Mr. Rose, who worked at CDPL, took over for Mr. Hunter for Mr. Umana's initial habeas review. Both worked with lawyers from FDSDI on Mr. Umana's direct appeal and initial habeas review.

Working with them throughout was CDPL attorney David Weiss, who assisted Mr. Hunter on Mr. Umana's direct appeal and entered his appearance in the Fourth Circuit for that purpose. *See Affidavit of Sandy Demeree*. Mr. Weiss left CDPL in April 2013, but returned a year later and remains employed there. *See id.* Hunter, Rose, and Weiss all worked on the Umana case; Weiss worked with both Hunter and Rose. They were joined in their efforts by CDPL attorney Mark Pickett in 2013. *See id.*

CDPL is not a large office. There are fewer than a dozen full-time staff attorneys employed there. *See id.* Given the nature of the work of CDPL—its complexity and urgency—it stands to reason that CDPL attorneys and staff work closely. *See* Freedman & Smith, *Understanding Lawyers' Ethics*, 272 (6th ed. 2016) (noting that, with regard to imputed disqualification, "we look to experience and common sense"). Indeed, as Mr. Rose states in his sworn declaration:

The nature of our work required us to be all hands on deck. There were no walls between attorneys or between cases at CDPL. Our work was collaborative. We

5

Case 3:16-cv-00057-MOC   Document 95-3   Filed 07/14/20   Page 6 of 8

all had access to one another's files. We shared everything, and we assisted one another on our cases.

*Id*.

Especially from a reasonable client's perspective, Mr. Umana was represented by CDPL, whether through Mr. Hunter, Mr. Rose, Mr. Weiss, or Mr. Picket. Moreover, under these circumstances, most law offices—or at least those that take ethics seriously—would impute a conflict of interest to Rose based upon his and Hunter's affiliation with CDPL. *See id*. (noting that Rose's consultations with colleagues from CDPL, "did not stop because of their change in employment"). Moreover, Mr. Rose's connection to FDSDI could not be clearer as he was actually retained by FDSDI and paid by them for several months prior to his appointment. *See id*. ("Because of the size and complexity of the case, and the statistical improbability that certiorari would be granted, I committed to begin working on the case as soon as possible and to accomplish that, for several months prior to my appointment, I was retained and paid by the FDSDI to begin working on the case.").

Under the ethical rules and standards relating to conflict of interest, the suggestion that FDSDI could effectively explore whether they, Hunter, or Rose missed things that were obvious, or could effectively allege that their own performance was ineffective is troubling. *See North Carolina Rules*, 1.7. Likewise, FDSDI cannot reasonably be expected to explore whether Hunter or Rose was so unreasonable that not only did they overlook significant issues, but they foreclosed the opportunity to raise these issues. Nor can anyone connected to CDPL.

### **Forcing FDSDI to Go Forward as Co-Habeas Counsel with the Office of the Federal Defender for the Middle District of Pennsylvania is Untenable as a Matter of Ethics and Practice**

If FDSDI is not allowed to withdraw from this case and the Office of the Federal Defender for the Middle District of Pennsylvania is forced to go forward with FDSDI as co-habeas counsel and make the claims it has identified, two problems will result: (1) FDSDI will now be both a witness and a lawyer in violation of *North Carolina Rule* 3.7, Lawyer as Witness; and (2) FDSDI will have to raise its own ineffectiveness as a matter of fact and law, which is problematic at best. *Cf. Christeson v. Roper*, 574 U.S. 373, 378 (2015) ("Counsel cannot reasonably be expected to make such an argument [that their own ineffectiveness merits equitable tolling of the statute of limitations], which threatens their professional reputation and livelihood."); *see also* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, §125 (1998).

In order to establish FDSDI's ineffectiveness, together with the ineffectiveness of CDPL, Ms. Miller from the Office of the Federal Defender for the Middle District of Pennsylvania, would inevitably need to call lawyers from both of those offices as witnesses. There will be no problem calling the CDPL attorneys now that they have withdrawn. But calling anyone from FDSDI—if they remain as counsel—would force these lawyers into an inappropriate and unethical dual role as both lawyer and witness.

*North Carolina Rule* 3.7 states that:

(a) A lawyer *shall* not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) The testimony relates to an uncontested issue;
(2) The testimony relates to the nature and value of legal services rendered in the case; or
(3) Disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Based on the discussion of Rule 1.7 above, subpoint (b) is not a way out of this dilemma for FDSDI.

The Comments to Rule 3.7 explain that "[c]ombining the roles of advocate and witness can prejudice the tribunal and the opposing party" and, more relevant here, "can also involve a conflict of interest between the lawyer and client." *North Carolina Rule* 3.7, Comment [1]. When, as here, there is a conflict of interest, "the lawyer must secure the client's informed consent, confirmed in writing" in order to testify. *Id*. Comment [6]. The Comment further notes that "[i]n some cases, the lawyer will be precluded from seeking the client's consent" under Rule 1.7. *Id*.

Moreover, if the Court were to compel FDSDI to continue as co-habeas counsel and a member of the staff of FDSDI were to testify with regard to one of the claims of professional incompetence—called by either Mr. Umana or the Government—one can only imagine the bizarre result. One of Mr. Umana's lawyers would cross-examine another of Mr. Umana's lawyers—perhaps after having the lawyer/witness declared a "hostile witness"—in order to establish that the lawyer/witness unreasonably and with prejudice dropped the ball.

I hope this sufficiently addresses the ethical issues raised in this matter. If I can be of further assistance, please feel free to call on me.

Sincerely,

Abbe Smith
Professor of Law

7