# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

ALEJANDRO UMAÑA,

               Movant,

        v.

UNITED STATES,

               Respondent.

3:16-CV-00057-RJC

CAPITAL § 2255 PROCEEDING

HON. ROBERT J. CONRAD, JR.

**MEMORANDUM IN SUPPORT OF MOTION TO JOIN IN FDSDI'S MOTION TO WITHDRAW AND SUPPLEMENT TO FDSDI'S MOTION REGARDING SUBSTITUTION OF COUNSEL**

Alejandro Umaña, through undersigned counsel, respectfully joins in the FDSDI's motion requesting the Federal Defenders of San Diego, Inc., be granted leave to withdraw (Doc. 94) and moves the Court to reconsider and/or hold in abeyance its order finding that Mr. Umaña is not entitled to substitute counsel, pursuant to 18 U.S.C. §§ 3599 (a) and (c).

### RELEVANT PROCEDURAL HISTORY

Mr. Umaña is an indigent, death-sentenced federal prisoner. His timely Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Conviction and Sentence of a Person in Federal Custody was filed by court-appointed counsel Kenneth Rose, of the Center for Death Penalty Litigation, and Zandra Lopez, of the Federal Defenders of San Diego, Inc., on June 22, 2016. Doc. 22.[1]

---

[1] Citations to the civil 2255 docket are indicated by "Doc." Citations to the underlying criminal docket are indicated by "CR.Doc." Citations to the appellate record are indicated by "ECF."

On January 30, 2017, Mr. Umaña filed a Motion for Substitution of Counsel. Doc. 48. Attorney Rose, who had served as lead counsel since the beginning of the 2255 proceedings, sought to withdraw due to changed personal and professional circumstances. *Id.* at 2. Mr. Umaña sought appointment of the Federal Public Defender's Office for the Middle District of Pennsylvania (MDPA FDO) to assume Attorney Rose's role as lead counsel. *Id.* at 2-4. On February 22, 2017, this Court granted Mr. Umaña's Motion for Substitution of Counsel, relieved Attorney Rose of his duties, and appointed the MDPA FDO, Kelly Miller appearing. Doc. 49.

Until this Court appointed the MDPA FDO, Mr. Umaña's 2255 counsel were the same as his direct appeal counsel – the Center for Death Penalty Litigation and the San Diego Federal Defenders. *See Umaña v. United States*, No. 10-6, Order (4th Cir. Oct. 14, 2010) (appointing Malcom Ray Hunter, then-Executive Director of the North Carolina Center for Death Penalty Litigation, as lead counsel and the San Diego Federal Defenders as co-counsel for Mr. Umaña's direct appeal); *United States v. Umaña*, 3:08-cr-134, Doc. 1621 (appointing the San Diego Federal Defenders and Kenneth J. Rose, of the Center for Death Penalty Litigation, to represent Mr. Umaña in the 2255 proceedings).

Although this provided for continuity of counsel, counsel were ethically precluded from investigating, developing or raising their own ineffectiveness for failing to raise and preserve claims during those proceedings. *Christeson v. Roper,* 573 U.S. 373, 135 S. Ct. 891, 894 (2015) ("Advancing such a claim would have required [counsel] to denigrate their own performance. Counsel cannot reasonably be expected to make such an argument, which threatens their professional reputation and livelihood"); *Gray v. Pearson*, 526 Fed. Appx. 331, 334 (4th Cir. 2013); *Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013). It was not until the MDPA FDO was appointed that Mr. Umaña was provided un-conflicted counsel, able to "take and have a new and

2

fresh perspective on the trial and appellate court records." *United States v. Runyon*, No. 4:08cr16, 2014 U.S. Dist. LEXIS 162488, *6, n. 5 (E.D. Va.) (citing *Juniper*, 737 F.3d at 290).

Counsel identified additional factual and legal averments supporting the claims previously raised in the initial 2255 Motion, and additional legal and factual grounds requiring relief. Currently pending before this Court is Mr. Umaña's motion for leave to supplement and amend his 2255 Motion to include claims not raised by FDSDI and Mr. Rose, including claims that could have been, but were not, raised on direct appeal, and claims of trial counsel's ineffectiveness that FDSDI and Mr. Rose ineffectively failed to investigate, develop, and present. Doc. 68 (Motion for Leave to Supplement/Amend); Doc. 71 (Supplemental/Amended 2255 Motion).

On December 18, 2018, citing the above-described conflict of interest created by the fact that Mr. Umaña had the same counsel for direct appeal and 2255 and that Mr. Umaña was now expressly alleging FDSDI's ineffectiveness, Mr. Umaña filed a motion for substitution of counsel, requesting that Ms. Lopez be permitted to withdraw and that the Federal Defender Services of Eastern Tennessee, Inc. (FDSET), be appointed. Doc. 86.

On June 16, 2020, this Court denied Mr. Umaña's motion to substitute counsel on the grounds that: Mr. Umaña had not factually proven that *all* of his initial 2255 counsel were the same counsel who had represented him on direct appeal; he has no right to effective counsel under 18 U.S.C. § 3599; and, although he has the right to conflict-free counsel under 18 U.S.C. § 3599, his motion was untimely. Doc. 87. The Court also specifically noted that "although the Motion to substitute implies that the FDSDI does not oppose the Motion, the FDSDI itself has not moved to withdraw as counsel." Doc. 87 at 9 n.4.

Today, the FDSDI have filed a Motion to Withdraw based on their conflict of interest. Doc. 94. Undersigned counsel, as the only unconflicted counsel Mr. Umaña has had in these 2255 proceedings, respectfully seeks to join that motion on Mr. Umaña's behalf; suggests to this Court that Ms. Lopez and the FDSDI should be permitted to withdraw to ensure Mr. Umaña's right to conflict-free counsel and to allow him to fully develop and litigate his claims for relief; and further suggests, in supplementation of FDSDI's Motion to Withdraw that, should this Court allow FDSDI to withdraw, substitution of counsel to replace them remains an appropriate remedy at such time as an appropriate substitute counsel may be identified.[2]

ARGUMENT

**A.     Ms. Lopez (and the FDSDI) Should Be Permitted to Withdraw.**

This Court has agreed with Mr. Umaña's assertion that the FDSDI represented Mr. Umaña on both direct appeal and currently on 2255 and is, thus, conflicted. Doc. 87 at 7. As such, they should be permitted to withdraw from the representation. Undersigned counsel have retained the services of an ethics expert, Professor Abbe Smith, who opined in her report (Exhibit 3) that two problems will result if undersigned counsel is forced to proceed with FDSDI as co-counsel. First, FDSDI will have to function as both a lawyer and a witness in the same proceeding, in violation of North Carolina Rule of Professional Conduct 3.7, which generally prohibits a lawyer from acting as an advocate in a proceeding in which she is also likely to be a witness. Exhibit 3 at 6-7. This has already impeded Mr. Umaña's ability to fully develop the claims in the Supplement/Amendment as he cannot develop evidence from FDSDI while they

---

[2] As will be discussed in greater detail below, since the filing of the Motion to Substitute Counsel, FDSET's circumstances have changed and they are no longer in a position to accept appointment in this case.

4

remain as co-counsel. *See* Doc. 94 at 9. Second, FDSDI will have to assert their own ineffectiveness, which both the Rules of Professional Conduct and our courts generally recognize as an inappropriate, unethical, and untenable situation. Exhibit 3 at 6 (relying upon North Carolina Rule of Professional Conduct 1.7; *Christeson v. Roper,* 574 U.S. 373, 378 (2015); and RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, §125 (1998)). This will cause the "bizarre result" of undersigned counsel having to put her co-counsel forward as a witness before this Court to question co-counsel (perhaps as a hostile witness) on their professional incompetence, Exhibit 3 at 7, directly in front of their shared client, which would violate Mr. Umaña's right to conflict-free counsel and compromise counsel's duty of loyalty. *Id.* at 3-6. For these and all the reasons stated in FDSDI's Motion to Withdraw, FDSDI's motion should be granted.

> **B.     The Appointment of Substitute Counsel to Replace Ms. Lopez (and the FDSDI) Serves the Interests of Justice.**

Substitution of counsel under 18 U.S.C. § 3599 should be granted when "the interests of justice" so require. *Martel v. Clair*, 565 U.S. 648, 652 (2012). The United States Supreme Court has noted that whether substitution of counsel is required to serve the interests of justice is "a particularly context-specific inquiry." *Id.* at 663. Due to the extent of the conflict demonstrated here, which goes to the very heart of Mr. Umaña's ability to fully and fairly litigate all of his arguably meritorious claims for relief, and the massive size and geographic scope of this capital case, substitution of counsel is warranted.

> **1.   Both Ms. Lopez and Mr. Rose Were Conflicted.**

While the Court agreed with Mr. Umaña's assertion that Ms. Lopez was conflicted, it found that Mr. Rose was independent and, further, that Ms. Lopez's conflict does not cancel out Mr. Rose's independence. Doc. 87 at 7-8. The attached declaration from Mr. Rose (Exhibit 1),

affidavit from Sandy Demeree (Exhibit 2), expert ethics report of Professor Abbe Smith (Exhibit 3), and the court record demonstrate that Mr. Rose did not function as the independent counsel contemplated by the Fourth Circuit in *Fowler v. Joyner*, 753 F.3d 446 (4th Cir. 2014). As a result, Mr. Umaña was deprived of the ability to investigate, develop, and raise numerous arguably meritorious claims that were raised in the Supplement/Amended § 2255 Motion filed after undersigned counsel was appointed to the case and was able to independently review the record for the first time. Because Mr. Umaña did not have conflict-free counsel for his initial 2255 filing as required by § 3599, substitution of counsel would serve the interests of justice.

The Center for Death Penalty Litigation (CDPL) represented Mr. Umaña for both direct appeal and his initial § 2255 Motion. On October 12, 2010, the Fourth Circuit Court of Appeals appointed Malcolm R. Hunter, Jr., to represent Mr. Umaña on direct appeal when Mr. Hunter was Executive Director of CDPL. ECF 19 (Appointment Order); ECF 22 (Hunter Entry of Appearance); Exhibit 2, ¶4 (Demeree Affidavit, regarding Hunter's dates of employment). CDPL Staff Attorney David Weiss worked extensively on the case while he was at CDPL, and ultimately signed the brief, reply brief, and petition for rehearing en banc on Mr. Umaña's behalf for the direct appeal.[3] ECF 99, 124, 136; Exhibit 1, ¶4 (Rose Decl., regarding Weiss's work on the direct appeal); Exhibit 2, ¶5 (Demeree Aff., regarding Weiss's dates of employment).

---

[3] According to the signature blocks on the briefs and petition for rehearing en banc, which contain Mr. Weiss's private practice address, Mr. Weiss signed those pleadings during a brief hiatus from CDPL. ECF 124, 136. However, it appears that Mr. Weiss had already returned to CDPL when the petition for rehearing en banc was filed. *Compare* Exhibit 2, ¶5 (Demeree Aff., stating that Mr. Weiss returned to CDPL in April 2014) *with* ECF 136 (petition for rehearing en banc filed on May 7, 2014).

Although both Mr. Hunter and Mr. Weiss left CDPL shortly before Mr. Umaña's opening brief was initially filed on August 14, 2013, *see* Exhibit 2, ¶¶4-5 (Demeree Aff. stating that Hunter left in June 2013 and Weiss left in April 2013); ECF 88 (Opening Brief) (stricken), the appellate record demonstrates that, contrary to this Court's finding, *see* Doc. 87 at 7, appellate counsel reviewed the record, identified and, in some instances, had even drafted the claims for Mr. Umaña's appeal prior to either Mr. Hunter's or Mr. Weiss's departure from CDPL. ECF 66 (filed September 14, 2012), ¶7 (noting "many of the issues they have identified and begun to research are highly complex questions," then listing several issues counsel had identified); ECF 71 (filed March 6, 2013), ¶10 (again noting the "many highly complex questions . . . that will be presented in the brief"); ECF 73 (filed June 12, 2013), ¶20 (representing that "counsel have been working diligently on researching and writing the issues involved in Mr. Umaña's appeal" and that "Counsel have completed drafts of several of the issues"). Thus, it is clear from the record that substantial decisions were made regarding the direct appeal during the nearly three years that Mr. Hunter and Mr. Weiss worked for CDPL leading up to the filing of the Opening Brief.

Mr. Rose, who was then employed by CDPL but retained by the FDSDI, began working on Mr. Umaña's 2255 motion in 2015, while Mr. Umaña's Petition for Writ of Certiorari was pending in the United States Supreme Court. Exhibit 1, ¶8. This Court subsequently appointed Mr. Rose, who was still employed by CDPL, to represent Mr. Umaña for the 2255 motion, effective June 2015. CR.Doc. 1621. Mr. Weiss had returned to CDPL in April 2014. Exhibit 2, ¶5 (Demeree Aff.). Thus, one of the attorneys who had appeared on Mr. Umaña's behalf for the direct appeal was employed by CDPL at the time Mr. Rose, of the CDPL, began working on the 2255 motion.

Although only these specific attorneys' names appeared on the pleadings, Mr. Umaña was represented by CDPL as a firm. While it is the courts' general practice to appoint individual attorneys, CDPL is a non-profit, public interest law firm. Exhibit 1, ¶¶2-3; Exhibit 2, ¶2. The attorneys at CDPL worked together collaboratively, assisted one another on cases, and had access to each other's files. Exhibit 1, ¶2. Although individual attorneys were appointed, court fees went to fund the firm, and the attorneys and staff were salaried employees of the firm. Exhibit 1, ¶3; Exhibit 2, ¶2. Thus, at all times that they were employees of CDPL filing documents on Mr. Umaña's behalf, both Mr. Hunter and Mr. Rose signed their pleadings with the signature block of the firm at which they worked and corresponded on the firm's letterhead. *See*, *e.g.*, ECF 22 (Hunter Entry of Appearance); CR.Doc. 1622 (Rose Entry of Appearance); Exhibit 4 (Hunter Budget Letter to Fourth Circuit).

Both Mr. Hunter and Mr. Rose actively sought (and received) court funding to fund the work of their associates at CDPL in Mr. Umaña's direct appeal and 2255, respectively. In his budget proposal to the Fourth Circuit, Mr. Hunter budgeted not only for his time, but also time for "an associate from my office to help primarily with legal research" and for a paralegal. Exhibit 4 at 2 (Hunter Budget Letter to Fourth Circuit). In approving the appellate budget, the Fourth Circuit noted that it would "consider your letter to be a sufficient request to use an associate on your staff." Exhibit 5 at 1 (Letter from Phillips to Hunter). In fact, as discussed above, Mr. Hunter was assisted in the appeal by CDPL Staff Attorney David Weiss. Exhibit 1, ¶4; Exhibit 2, ¶5. As with Mr. Hunter's budget for the direct appeal, Mr. Rose submitted a budget to this Court for the 2255 that requested hours for his own work, the work of an associate attorney, paralegal, and intern. Doc. 3 (Memorandum of Law in Support of Proposed Case Budget) (under seal); Doc. 28 (Order granting budget request) (under seal).

As there were no walls between attorneys or cases at CDPL, all of CDPL's attorneys had access to CDPL's Umaña files during both the direct appeal and the 2255 motion. Thus, Mr. Rose had access to the direct appeal files during the pendency of the direct appeal and Mr. Weiss (who had, by that time, returned to CDPL) had access to the 2255 files during the pendency of the 2255. Exhibit 1 ¶¶5, 9.

As was the general practice of the attorneys at CDPL, they consulted with one another about both Mr. Umaña's direct appeal and his 2255 motion during the pendency of those proceedings. Thus, during the pendency of the direct appeal, Mr. Rose, Mr. Hunter, and Mr. Weiss discussed Mr. Umaña's case. Exhibit 1, ¶6. Mr. Rose "became familiar with the case through their representation of Mr. Umaña and gave advice regarding their legal analysis during the appeal." *Id.*, ¶ 6. Even after Mr. Hunter and Mr. Weiss left CDPL, Mr. Rose and Mr. Hunter continued to consult with one another as they were closely working together on other matters. *Id.*, ¶7. Likewise, during the pendency of the 2255, Mr. Rose discussed the case and received advice from his colleagues at CDPL, including Mr. Weiss. Exhibit 1, ¶10.

Mr. Umaña has consulted with an ethics expert, Professor Abbe Smith, whose report is attached as Exhibit 3. Professor Smith concluded that, in addition to the clear conflict suffered by the FDSDI, Mr. Rose shared the same conflict. Exhibit 3 at 5-6. Under North Carolina Rule of Professional Conduct 1.7, a lawyer is prohibited from representing a client "if the representation involves a concurrent conflict of interest." Rule 1.7(a). Professor Smith explained:

> A concurrent conflict of interest exists if "the representation of one or more clients may be materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or *by a personal interest of the lawyer*." 1.7(a)(2) [emphasis added]. A personal interest of a lawyer would necessarily include his or her reputational interest.

Exhibit 3 at 4. Professor Smith concluded that, "from a reasonable client's perspective, Mr. Umaña was represented by CDPL, whether through Mr. Hunter, Mr. Rose, Mr. Weiss, or Mr. Pickett"; that "most law offices . . . would impute a conflict of interest to Rose based upon his and Hunter's affiliation with CDPL"; and that

> the suggestion that FDSDI could effectively explore whether they, Hunter, or Rose missed things that were obvious, or could effectively allege that their own performance was ineffective is troubling. *See* North Carolina Rules, 1.7. Likewise, FDSDI cannot reasonably be expected to explore whether Hunter or Rose was so unreasonable that not only did they overlook significant issues, but they foreclosed the opportunity to raise these issues. Nor can anyone connected to CDPL.

*Id.* at 6.

Moreover, even if this Court were to find that Mr. Rose was independent from CDPL and Mr. Hunter, despite the above factual proffer, Mr. Rose was not independent from FDSDI. As this Court is well-aware, the record in this case is massive, consisting of over 1,600 entries on the main criminal docket, a trial transcript of over 4,000 pages and discovery that includes over 40,000 pages and 300 hours of audio recordings. Thus, Mr. Rose committed to working on this case prior to his court appointment and was compensated by the FDSDI for that pre-appointment work. Exhibit 1, ¶8. In addition, FDSDI had the team and resources to devote to the case, the expertise in federal trial procedure and substantive law, and the Spanish-language skills/resources to communicate with Mr. Umaña. As a result, Mr. Rose relied heavily on FDSDI's investigation and deferred to their judgment in making decisions about investigation and what claims to present. Exhibit 1, ¶¶11-12. Professor Smith confirms that this pre-appointment compensation arrangement further compromised Mr. Rose's ability to function independently of that office. Exhibit 3 at 6.

Finally, Mr. Rose stated in his declaration that his long professional relationship and friendship with Mr. Hunter "may have impacted my ability to recognize and raise his ineffectiveness." Exhibit 1, ¶13.

Under these circumstances, Mr. Rose did not function as the independent counsel contemplated by the Fourth Circuit in *Fowler*. Both the United States Supreme Court and the Fourth Circuit have held that counsel are ethically precluded from investigating, developing or raising their own ineffectiveness for failing to raise and preserve claims during prior proceedings. *Christeson*, 574 U.S. at 378 ("Advancing such a claim would have required [counsel] to denigrate their own performance. Counsel cannot reasonably be expected to make such an argument, which threatens their professional reputation and livelihood"); *Gray v. Pearson*, 526 Fed. Appx. 331, 334 (4th Cir. 2013); *Juniper v. Davis*, 737 F.3d 288 (4th Cir. 2013). In this case, placing the burden on Mr. Rose to litigate claims of direct appeal ineffectiveness violates these rules. Mr. Rose, Mr. Hunter, and Mr. Weiss were in the same firm at the time Mr. Hunter was appointed to Mr. Umaña's direct appeal. Substantial decisions were made and substantial work was completed on the direct appeal when Mr. Hunter and Mr. Weiss were employees of CDPL with Mr. Rose. Mr. Rose had access to the Umaña files during direct appeal, discussed the case with his co-workers, Mr. Hunter and Mr. Weiss, and provided legal advice. Although Mr. Hunter and Mr. Weiss left CDPL shortly before the opening brief was filed, Mr. Weiss had returned to CDPL prior to the conclusion of the direct appeal, prior to the commencement of Mr. Rose's work on that case, and prior to Mr. Rose's court appointment. At that time, Mr. Weiss had access to the CDPL Umaña files and Mr. Rose discussed the case with him (and other colleagues at their firm). In addition, Mr. Rose's purported independence was further compromised by his initial compensation agreement with FDSDI, his reliance on and deference to FDSDI, and his

11

relationship with Mr. Hunter. Under these circumstances, there can be no question that Mr. Hunter and Mr. Weiss's conflict of interest was imputed to the entire firm and to Mr. Rose and that Mr. Rose would have had to raise his own ineffectiveness to raise claims of ineffectiveness of direct appeal counsel in the 2255 motion. Substitution of counsel is required to serve the interests of justice.

### 2. Mr. Umaña Is Entitled to Effective Counsel

Mr. Umaña respectfully disagrees with this Court's conclusion that he is not entitled to effective counsel during his initial 2255 proceedings. *See* Doc. 87 at 3-4. The Supreme Court has recognized that, Congress's decision to enact § 3599 "'reflec[ted] a determination that quality legal representation is necessary' in all capital proceedings to foster 'fundamental fairness in the imposition of the death penalty.'" *Martel v. Clair*, 565 U.S. 648, 659 (2012) (citing *McFarland v. Scott*, 512 U.S. 549, 855, 859 (1994)). Moreover, under the federal criminal system, these 2255 proceedings are Mr. Umaña's first opportunity to challenge the ineffectiveness of his trial counsel and as such he is entitled to effective counsel. *See Martinez v. Ryan*, 566 U.S. 1 (2012); *Ramirez v. United States*, 799 F.3d 845, 851-54 (7th Cir. 2015) ("in the great majority of federal cases, ineffectiveness claims must await the first round of collateral review"). In his Supplement/Amendment, Mr. Umaña raised substantial claims of trial counsel's ineffectiveness that were not raised in the initial 2255 Motion due to initial 2255 counsel's ineffectiveness. Substitution of counsel is necessary for Mr. Umaña to fully develop and litigate these claims.

Further, it is notable that the Court has already held that Mr. Umaña is entitled under § 3599 to conflict-free habeas counsel. Doc. 87 at 5. As demonstrated herein, current habeas counsel MDPA FDO cannot proceed with FDSDI as co-counsel where FDSDI would be expected to maintain their own performance was ineffective. *See Christeson*, 574 U.S. at 378. Such a

conflict, where current habeas counsel would be put in the untenable position of having to question co-counsel on their professional competence in order to advance Mr. Umaña's habeas claims, can be avoided by adhering to Mr. Umaña's statutory right to conflict-free habeas counsel. *See* 18 U.S.C. § 3599. Accordingly, substitution of counsel would serve the interests of justice because Mr. Umaña did not have conflict-free counsel for his initial 2255 filing as required by § 3599.

### 3. Mr. Umaña's Motion Was Timely.

In assessing whether a motion for substitution of counsel is timely, the primary question before the Court is whether the requested substitution will result in abusive delay. *See Christeson*, 574 U.S. 373, 380 (2015) (citing *Clair*, 565 U.S. at 622). Mr. Umaña's motion was timely under this standard. Undersigned counsel identified and raised the claims (not raised previously due to conflict and/or ineffectiveness) within one year of her appointment, *compare* Doc. 49 (appointment order) (filed February 22, 2017) *with* Docs. 68-69 (Supplemental/Amended 2255 Motion) (filed February 22, 2018), at a time when the government had not yet responded to the claims in the initial 2255 Motion.

At that time, counsel recognized the need to add substitute counsel. Preparing to apprise this Court not only of a significant problem, but also propose a viable solution to that problem, undersigned counsel consulted with her supervisor and they began an exhaustive search with the assistance of Federal Resource Counsel to find substitute counsel willing and able to accept the extraordinary expenditure of time and resources required in this representation. When the Capital Habeas Unit of the Federal Defender Services of Eastern Tennessee, Inc. (FDSET) indicated their capacity to seek appointment in this case, they began the administrative process to allow FDSET

to seek out of district appointment. When that was approved, counsel promptly moved this Court for substitution of counsel.

#### 4. The Interests of Justice Require Appointment of Substitute Counsel.

As demonstrated above, Mr. Umaña has not had conflict-free, independent counsel in these 2255 proceedings until this Court appointed undersigned counsel's office. Also as demonstrated above, Mr. Umaña filed a motion to substitute counsel in this case as timely as his counsel could identify substitute counsel with capital 2255 experience who were willing to accept appointment in this case. Unfortunately, while awaiting appointment to begin working on Mr. Umaña's case, circumstances changed drastically for FDSET. They are no longer able to accept appointment due to recently issued execution warrants for current clients and an increase in workload due to anticipated appointments within the Eastern District of Tennessee.

The record in this case is massive, consisting of over 1,600 entries on the main criminal docket, a trial transcript of over 4,000 pages and discovery that includes over 40,000 pages and 300 hours of audio recordings, with extensive translation needs, in addition to the fruits of the § 2255 investigation. The overwhelming majority of Mr. Umaña's mitigation witnesses are located abroad, primarily in El Salvador. The government's evidence in aggravation originates primarily from Los Angeles. The offense of conviction occurred in North Carolina. And Mr. Umaña himself is physically located in Indiana. While undersigned counsel and her office understood the massive nature of this case at the time they agreed to seek appointment in Mr. Rose's stead, as previously represented to this Court, undersigned counsel and her office are not in the position to represent Mr. Umaña without the appointment of well-resourced, capital-qualified co-counsel to replace the FDSDI. Doc. 86, ¶7.

14

While this Court is certainly correct that nothing in § 3599 *requires* that a court appoint more than one attorney, this Court is also correct that courts customarily *do* appoint more than one attorney in federal capital habeas cases. *See* Doc. 87 at 8. In accordance with that custom, this District's CJA plan advises that, in federal capital 2255 cases, "[d]ue to the complex, demanding, and protracted nature of death penalty proceedings, the court should consider appointing *at least* two attorneys," "should consider the recommendation of the federal public defender, who will consult with the Federal Capital Habeas § 2255 Project," and "[w]hen possible, post-conviction counsel should have distinguished prior experience in capital § 2255 representations." United States District Court for the Western District of North Carolina Criminal Justice Act Plan, approved Feb. 25, 2019, XV.E.2, E.4, E.7 (pg. 34) (emphasis added). Given the massive and complex scope of Mr. Umaña's case, the MDPA FDO asserts a critical need for substitute co-counsel with sufficient resources and experience to adequately replace those that Mr. Umaña will lose through FDSDI's withdrawal.

Despite currently having no substitute counsel to provide this Court, undersigned counsel nonetheless requests that this Court reconsider and/or hold in abeyance its finding that substitution of counsel is not warranted in this case and allow for substitution of counsel at such time as appropriately qualified substitute counsel is identified. Undersigned counsel and her office are actively searching for appropriately qualified substitute counsel, with both the time and the resources to take on this case, within the Federal Defender Organization and through law firm pro bono programs so that adequately resourced, qualified counsel can be found through no cost to this Court. Undersigned counsel will notify this Court immediately upon the identification of such counsel.

15

<strong>CONCLUSION</strong>

For all of the above stated reasons and those stated in FDSDI's Motion to Withdraw, Mr. Umaña, by and through undersigned counsel, respectfully requests that the Court grant the FDSDI's motion to withdraw and reconsider and/or hold in abeyance its finding that substitution of counsel is not warranted in this case until such time as appropriately qualified substitute counsel can be identified.

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: July 14, 2020

16

**CERTIFICATE OF SERVICE**

I, Kelly D. Miller, hereby certify that I have electronically filed the foregoing document with the Clerk of Court using the CM/ECF system and a copy of the foregoing document has been served this day upon the following via CM/ECF:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202
anthony.enright@usdoj.gov

Zandra L. Lopez
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Zandra_Lopez@fd.org

*/S/ KELLY D. MILLER*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: July 14, 2020