# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

ALEJANDRO UMAÑA,

              Movant,

       v.

UNITED STATES,

              Respondent.

3:16-CV-00057-RJC

CAPITAL § 2255 PROCEEDING

HON. ROBERT J. CONRAD, JR.

## APPENDICES IN SUPPORT OF MR. UMANA'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT CONVICTIONS AND SENTENCES OF A PERSON IN FEDERAL CUSTODY AND SUPPLEMENTAL/AMENDED MOTION TO VACATE AND SET ASIDE CONVICTIONS AND SENTENCES

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender, Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated: January 12, 2021

# INDEX OF APPENDICES

| | |
|---|---|
| Appendix 211 | Declaration of Julian Davies, MD |
| Appendix 212 | Toxicology Investigation and Toxicology Assessment of Andres Lugo, M.D., M.P.H., M.S., FACMT |
| Appendix 213 | Affidavit of Antonio E. Puente, Ph.D. |
| Appendix 214 | Declaration of Jennifer Sapia, Ph.D. |
| Appendix 215 | Declaration of Pablo Stewart, M.D. |
| Appendix 216 | Supplemental Declaration of Pablo Stewart, M.D. |
| Appendix 217 | Supplemental Declaration of Leticia Ramirez (02/06/2016) |
| Appendix 218 | Supplemental Declaration of Leticia Ramirez (11/18/2018) |
| Appendix 219 | Declaration of José Wilfredo Herrera Calderón (08/16/2018) |
| Appendix 220 | Declaration of Karla Herrera Calderón (11/16/2018) |
| Appendix 221 | Declaration of María Lidia Calderón (11/16/2018) |
| Appendix 222 | Declaration of Alfonso Cruz (08/16/2018) |
| Appendix 223 | Declaration of Ana Lilian Reyes 08/16/2018) |
| Appendix 224 | Declaration of Carlos Geovanni Herrera (11/17/2018) |
| Appendix 225 | Declaration of José Alfredo Ortiz (11/17/2018) |
| Appendix 226 | Declaration of Josselyn Guevara Reyes (11/17/2018) |
| Appendix 227 | Declaration of Roxana Cruz Torres (11/17/2018) |
| Appendix 228 | Supplemental Declaration of Vilma Elizabeth Torres de Cruz (11/17/2018) |
| Appendix 229 | Declaration of Xiomara Reyes (11/18/2018) |
| Appendix 230 | Supplemental Declaration of Vilma Aracely Salazar de Argueta (11/16/2018) |

| Appendix 231 | Declaration of Kenneth Rose, July 10, 2020 |
|---|---|
| Appendix 232 | Affidavit of Sandy Demeree, July 13, 2020 |
| Appendix 233 | Report of Abbe Smith, July 13, 2020 |
| Appendix 234 | Malcom Hunter Budget Letter to Fourth Circuit, September 14, 2011 |
| Appendix 235 | Samuel Phillips letter to Malcom Hunter, December 8, 2011 |

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 3 of 381

# APPENDIX 211

**JULIAN DAVIES, MD**

4245 Roosevelt Way NE
Seattle, WA 98105

T 206-313-0252
F 206-598-3040
joolian@uw.edu

January 4, 2021

# DECLARATION OF JULIAN DAVIES, MD PURSUANT TO 28 U.S.C. §1746

Alejandro Umaña (DOB 11/25/82) is a 38-year-old man referred to me by his counsel, who asked me to evaluate Mr. Umaña for a Fetal Alcohol Spectrum Disorder.

**Limitations.** Due to the novel coronavirus pandemic's travel and visitation restrictions, my evaluation is currently limited to extensive records review. Accordingly, my conclusions are provisional. I welcome the opportunity to evaluate Mr. Umaña in person or via telehealth should this become possible.

**Medical Expert Opinion.** It is my provisional opinion to a reasonable degree of medical certainty that Mr. Umaña would be diagnosed with a disorder under the umbrella of Fetal Alcohol Spectrum Disorders: **Static Encephalopathy / Alcohol Exposed**, also known as Alcohol-Related Neurodevelopmental Disorder (ARND).

It is highly unlikely that a future in-person evaluation would not confirm this diagnosis—in fact it is possible that such an evaluation would lead to a diagnosis of partial Fetal Alcohol Syndrome (if some of the FAS facial features are confirmed).

In layman's terms, Mr. Umaña was exposed to alcohol prenatally in a high-risk pattern and has both structural and functional evidence of brain damage since childhood. He may have moderate facial features of FAS, but I am unable to measure them formally at this time.

**FASD Background.** Fetal Alcohol Spectrum Disorder (FASD) is an umbrella term used to describe the spectrum of birth defects and neurologic impacts caused by maternal alcohol consumption during pregnancy. One such diagnosis is Static Encephalopathy / Alcohol Exposed (severe ARND).

Static Encephalopathy describes static (neither progressing nor regressing) significant structural and/or functional abnormalities that support the presence of underlying central nervous system (CNS) damage. Alcohol Exposed is used in a patient that was prenatally exposed to alcohol.

The brain injuries caused by drinking during pregnancy are variable, but can include such outcomes as lower IQ, ADHD (attention deficit/hyperactivity disorder),

difficulties with judgment and impulse control, language and social difficulties, learning disabilities, visuospatial deficits, motor and coordination challenges, memory problems, and impairments in executive functions—"higher-level" cognitive skills like flexibility, planning, organization, inhibition, judgment, and novel problem-solving. Individuals with FASDs have daily functioning skills and life outcomes that are often more impaired than their IQ alone would predict.[1]

Fetal Alcohol Syndrome (FAS) is the most familiar diagnosis on the fetal alcohol spectrum. FAS is a permanent birth defect syndrome caused by prenatal alcohol exposure, characterized by prenatal and/or postnatal growth deficiency, a unique cluster of minor facial anomalies, and central nervous system abnormalities.

An evaluation of the effects of prenatal alcohol exposure can result in a number of diagnoses on the fetal alcohol spectrum. A diagnosis of FAS requires all of the above features (growth, face, brain) to be confirmed. For alcohol-exposed individuals who lack one or more of the criteria for an FAS diagnosis (such as the facial features of FAS), a diagnosis on the broader fetal alcohol spectrum like Static Encephalopathy / Alcohol Exposed (SE/AE) may be appropriate. Partial FAS (pFAS) is a diagnosis that applies when a patient has some but not all of the sentinel physical features of FAS.

**History of FASD.** The field of FASD is over 50 years old, and uses well-established diagnostic criteria, most notably the Institute of Medicine (IOM) guidelines,[2] the University of Washington 4-Digit Code,[3] the Centers for Disease Control (CDC) definition of FAS,[4] and the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5).[5]

**Qualifications**. I am a board-certified pediatrician licensed in the State of Washington, and a Fellow of the American Academy of Pediatrics. I am a Clinical Professor of Pediatrics at the University of Washington School of Medicine, where for the past seventeen years I have evaluated children and adults at the longest-running FAS

---

[1] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Young, J. K. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. *Journal of Developmental & Behavioral Pediatrics*, 25(4), 228–238.

[2] Stratton, K. R., Howe, C. J., Battaglia, F. C., Institute of Medicine (U.S.). Committee to Study Fetal Alcohol Syndrome, National Institute on Alcohol Abuse and Alcoholism (1996). *Fetal Alcohol Syndrome: Diagnosis, Epidemiology, Prevention, and Treatment*. National Academies Press.

[3] Astley, S. J., & Clarren, S. K. (1997). *Diagnostic Guide for Fetal Alcohol Syndrome and Related Conditions: The 4-Digit Diagnostic Code, 1st edition*. Seattle, WA. University of Washington Publication Services.

[4] Bertrand, J., Floyd, R., Weber, M., O'Connor, M., Riley, E., Johnson, K., & Cohen, D. (2004). *Fetal Alcohol Syndrome: Guidelines for Referral and Diagnosis*. Centers for Disease Control and Prevention, Atlanta, GA.

[5] American Psychiatric Association DSM-5 Task Force (2013). Diagnostic and Statistical Manual of Mental Disorders : DSM-5. American Psychiatric Association, Washington, DC.

diagnostic clinic in the country. At our clinic we also train FASD diagnostic teams from around the world. Since FAS is a birth defect syndrome, many experts in the field have pediatric backgrounds; the diagnostic criteria for FASDs are the same for children and adults. I was trained at Yale, UCSF, and the University of Washington.

I have published articles in the peer-reviewed literature on prenatal alcohol/drug exposures, and present on these topics at regional and national conferences. I have been retained in cases relating to FASDs by defense counsel in Arizona, California, Georgia, Illinois, Louisiana, Nebraska, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, and Washington State, as well as by the U.S. Attorney's Office in Seattle. I have been qualified as an expert witness in Louisiana, Nevada, Oregon, Pennsylvania, Texas, and Washington. A copy of my CV is attached.

This report is structured with an explanation of the diagnostic process and my provisional diagnostic opinion first, followed by review of supporting materials.

**FASD Diagnostic Process.** When evaluating for a Fetal Alcohol Spectrum Disorder, there are 4 main areas to explore:

- Presence of prenatal alcohol exposure
- History of growth deficiency
- Degree of FAS facial features
- Evidence of brain damage/dysfunction

A process of differential diagnosis is also important, to consider other genetic, prenatal, postnatal, medical, and psychiatric explanations for a patient's outcomes.

**Prenatal Alcohol Exposure.** Mr. Umaña's mother drank alcohol during his pregnancy in a pattern consistent with the medical literature placing the fetus at high risk for fetal alcohol damage. She reported **drinking until drunk at least 3 times per week for the first 7 months of the pregnancy**; his father confirmed prenatal alcohol exposure. Regular drinking to intoxication, especially in the first trimester (before many women know they are pregnant, unfortunately) meets 4-Digit Code criteria for **"high risk" prenatal alcohol exposure**.

**Growth.** Why is growth important in an FASD evaluation? Growth impairment has been shown to be a "sentinel physical feature" of FASD. About 1/3 of individuals seen in our FASD clinic have growth deficiency, and alcohol-exposed children with

significant growth deficiency are 2-3 times more likely to have severe brain dysfunction than those with normal growth.[6]

Other than a maternal recollection of a normal birth weight, we unfortunately lack childhood measurements, which is when growth deficiencies in FASD are most prominent. Alex was described as small in childhood, but we would need actual measurements to diagnose growth deficiency. Adult growth records from Bureau of Prisons show weights well within the typical range, and heights that are at the 18th-28th percentile, which are below average but not growth deficient on the CDC growth charts (we lack adult height charts specific to his ethnicity).[7]

**Face.** The "face of FAS" is a constellation of three facial features that is unique to prenatal alcohol damage—so much so that one can make a diagnosis of FAS when prenatal alcohol exposure is unconfirmed. Research suggests that the facial features of FAS require an alcohol exposure during a very narrow window of opportunity, on approximately days 19 and 20 of pregnancy. Thus, the majority of alcohol-affected individuals do not have the facial features; in fact, only 9% of patients in our FAS clinic have "the face" of FAS.[8]

My review of available non-clinical photographs from childhood to young adulthood show an upper lip thickness that appeared thin (in the FAS range) in early childhood but fuller at older ages, with a borderline philtrum (groove between nose and lip). I am unable to evaluate the third key facial feature which is the width of his eye openings (palpebral fissure lengths).

Thus, I cannot currently conclude that Mr. Umaña has moderate-severe facial features of FAS. It is possible that with an in-person evaluation or adequate clinical facial photographs that Mr. Umaña would show moderate facial features of FAS (two and a half of the three facial features); severe facial features (all three in the FAS range) are less likely.

**Brain.** In an FASD evaluation, we look for structural and/or functional (such as psychometric testing) evidence of brain damage. One or the other can independently satisfy this central nervous system (CNS) criterion. Mr. Umaña has ample evidence of both.

---

[6] Astley, S. J., Bledsoe, J. M., & Davies, J. K. (2016). The essential role of growth deficiency in the diagnosis of fetal alcohol spectrum disorder. *Adv Pediatr Res*, 3:9), 1-20.

[7] Kuczmarski, R. J., Ogden, C. L., Grummer-Strawn, L. M., Flegal, K. M., Guo, S. S., Wei, R., ... Johnson, C. L. (2000). CDC growth charts: United States. *Adv Data*, 314, 1-27.

[8] Astley, S. J. (2010). Profile of the first 1,400 patients receiving diagnostic evaluations for fetal alcohol spectrum disorder at the Washington State Fetal Alcohol Syndrome Diagnostic & Prevention Network. *The Canadian Journal of Clinical Pharmacology = Journal Canadien De Pharmacologie Clinique*, 17(1), e132–64.

Mr. Umaña meets 4-Digit Code criteria for **structural evidence of brain damage**. An evaluation by a neurologist documented an abnormal neurological exam, with hard signs of neurological dysfunction; this alone would qualify as structural evidence. In addition, his PET scan was read as abnormal by the interpreting radiologists, and Dr. Gur's quantitative analysis of the PET scan provided "clear evidence of brain damage that is consistent with several causes, including traumatic brain injury. The reduced metabolism in the corpus callosum is also consistent with fetal exposure to alcohol or other toxins." Dr. Weinstein reported an abnormal QEEG, with "a generalized and diffused pattern of hypo activity with particular compromise to the frontal lobes." I am aware of two normal head CTs, which does not rule out structural evidence of brain damage, as a non-contrast head CT is quite insensitive to FASD brain impacts.

It is unusual in the clinical practice of FASD to have this much neurodiagnostic testing available. This is due to many factors: cost, feasibility for a typically younger and wriggly clinic population, evolving standards of what is a clinical versus research tool (doctors and insurance companies can be quite conservative in this regard), and the plain fact that for the majority of FASD clinical evaluations the neuropsychometric testing data is sufficient and more relevant to that patient's clinical recommendations. In forensic practice where it is common to have concerns of malingering and the desire for additional evidence to support a diagnosis in an inherently adversarial process, such neurodiagnostic testing is more common. In this case, the range of testing information available provides convergent evidence for my provisional conclusions.

A review of Mr. Umaña's records and testing history also supports findings of **severe functional brain impairments**.

A 4-Digit Code analysis looks at domains of central nervous system (CNS) functioning and categorizes domains with standardized testing scores below the 3rd percentile as areas of significant impairment, or "hits." CNS domains with delays or dysfunction in the mild to moderate range (from test scores below the 17th percentile and/or clinical judgment) are classified as "areas of concern." Impairments in adaptive functioning are frequently seen in FASD but are not required for diagnosis, as with intellectual disability.

Mr. Umaña has a history of **significant impairments** in the domains of cognition (according to Dr. Weinstein's results from multiple IQ tests), academic achievement (relative to IQ, should one choose Dr. Suarez's cognitive results and interpretation), visual-motor, attention, and executive skills. Areas of concern include memory (uneven performance, with strength in verbal and weakness in visual) and academics (should one favor Dr. Weinstein's IQ results, which would place academic achievement as an area of concern rather than an impairment). This qualifies Mr. Umaña as having severe CNS dysfunction, or Static Encephalopathy.

Mr. Umaña's profile of impairments is very consistent with FASD in that his challenges became more apparent in early to mid-elementary school, when demands increase. The average age of presentation to our FASD clinic is 1st-2nd grade, which is often when developmental concerns come into focus. Mr. Umaña's testing performance is variable, with diffuse impairments interspersed with more typical performance—a "swiss cheese" pattern of deficits is common in FASD. The very consistent impression from friends, neighbors, and family members was of a slow, "sweet and simple," immature child/adolescent, who struggled greatly with academics and practical living skills. His social-emotional immaturity persisting into young adulthood is classic for FASD, as is his occupational history with many menial jobs that did not progress to positions that require practical academic skills and executive functioning.

**4-Digit Code Diagnosis.** Thus, it is my provisional opinion to a reasonable degree of medical certainty that Mr. Umaña would be diagnosed with **Static Encephalopathy / Alcohol Exposed.** In other words, Mr. Umaña was exposed to alcohol in a high-risk pattern and has structural and functional evidence of brain damage since childhood. This is based on records review and aligns with pandemic clinical practice in 2020.

It is very likely that further in-person or telehealth evaluation would confirm this diagnosis—in fact it is possible that such an evaluation would lead to a diagnosis of partial Fetal Alcohol Syndrome.

**IOM Diagnosis.** Static Encephalopathy / Alcohol Exposed is also known as severe Alcohol-Related Neurodevelopmental Disorder (ARND) using Institute of Medicine terminology.

**Differential Diagnosis.** Diagnostic practice requires a differential diagnosis process to consider other possible competing or comorbid issues that may have led to the current presentation. Like almost all of our FASD clinic patients, Mr. Umaña has a number of other risk factors that may have contributed to his CNS deficits.

**Genetic risks.** Mr. Umaña has a prominent family history of substance use, which may have "stacked the deck" for his own substance use; in addition, prenatal substance exposures appear to multiply any genetic risk for future addiction. That said, Mr. Umaña's history of substance abuse is less prominent than most of my forensic clients, consisting primarily of regular cannabis use starting in late adolescence. Other than a second cousin with suspected intellectual disability and epilepsy, I do not have a clear family history of similar impairments that suggests a genetic etiology.

**Other prenatal exposures.** Prenatal cannabis exposure may increase the risk for executive skills difficulties, as well as subtle deficits in cognition, learning, and memory.[9] Prenatal cannabis exposure may also interact with adolescent cannabis use to increase the risk for psychotic symptoms in young adults.[10] Prenatal exposure to benzodiazepines (such as Rohypnol) has not been associated with a consistent or severe neurodevelopmental impact, although some studies have suggested impacts on motor and mental development in early childhood.[11] Generally speaking, the evidence for and likelihood of neurodevelopmental harm from heavy prenatal alcohol exposure dwarfs the risk from most other prenatal substances of abuse.

Malaria during pregnancy, especially in conjunction with maternal malnutrition and anemia, has been associated with short- and long-term adverse neurodevelopmental outcomes.[12] Acute suicidal ingestion of parathion during pregnancy has not been well-studied but is certainly of concern—this category of pesticides has been linked to neurodevelopmental problems in children, especially after prenatal exposure.[13,14]

**Perinatal complications.** A difficult delivery was described, with one maternal comment about not breathing for a few minutes and turning purple, and another maternal report of Alex swallowing liquid which was removed with suction bulb (which sounds more like routine newborn resuscitation). Without a clearer record of low APGAR scores or postnatal signs of hypoxic-ischemic encephalopathy, it is hard to ascribe Mr. Umaña's adult outcomes to perinatal factors.

**Early childhood malnutrition.** Alex's childhood history provides evidence of both macro- and micro-nutrient deficiencies. Childhood malnutrition, including early

[9] Behnke, M., Smith, V. C., Committee on Substance Abuse, Committee on Fetus and Newborn. (2013). Prenatal substance abuse: short- and long-term effects on the exposed fetus. *Pediatrics*, 131(3), e1009–24.

[10] Day, N. L., Goldschmidt, L., Day, R., Larkby, C., & Richardson, G. A. (2014). Prenatal marijuana exposure, age of marijuana initiation, and the development of psychotic symptoms in young adults. *Psychological medicine*, *45*(08), 1-9.

[11] El Marroun, H., White, T., Verhulst, F. C., & Tiemeier, H. (2014). Maternal use of antidepressant or anxiolytic medication during pregnancy and childhood neurodevelopmental outcomes: a systematic review. *Eur Child Adolesc Psychiatry*, *23*(10), 973-992.

[12] Lawford, H. L. S., Lee, A. C., Kumar, S., Liley, H. G., & Bora, S. (2019). Establishing a conceptual framework of the impact of placental malaria on infant neurodevelopment. *Int J Infect Dis*, *84*, 54-65.

[13] Hertz-Picciotto, I., Sass, J. B., Engel, S., Bennett, D. H., Bradman, A., Eskenazi, B., Lanphear, B., & Whyatt, R. (2018). Organophosphate exposures during pregnancy and child neurodevelopment: recommendations for essential policy reforms. *PLoS medicine*, *15*(10), e1002671.

[14] Muñoz-Quezada, M. T., Lucero, B. A., Barr, D. B., Steenland, K., Levy, K., Ryan, P. B., Iglesias, V., Alvarado, S., Concha, C., Rojas, E., & Vega, C. (2013). Neurodevelopmental effects in children associated with exposure to organophosphate pesticides: a systematic review. *Neurotoxicology*, *39*, 158-168.

childhood iron deficiency, has been linked to lower cognitive abilities, worse academic achievement, poor emotional regulation, and later antisocial behaviors.[15,16]

**Postnatal toxic exposures.** Dr. Lugo's report outlines many chronic neurotoxic exposures during Alex's childhood and adolescence. I concur with his assessment that children are at higher risk for neurodevelopmental harms, especially with the level of poverty and malnutrition that Alex suffered. As an example, poverty increases the risk of lead exposure, and malnutrition (especially iron deficiency anemia) increases the amount of lead absorbed. Childhood lead exposure can cause irreversible neurodevelopmental harms (including decreased IQ, distractibility, and poor organizational skills), and is a risk factor for future antisocial, delinquent behaviors.[17]

**Adverse childhood experiences.** Other postnatal adverse risk factors are extensive and include loss of attachment figures; lack of consistent, nurturing caregivers; neglect; caregiver substance abuse; domestic violence; community violence; physical abuse; poverty; lack of appropriate structure and supervision at home; and adolescent substance use. Any individual with FASD is at high risk for challenges in adolescence and adulthood, regardless of environmental factors. But Alex's life history on top of a "primary disability" of FASD *multiplied* his risk of adverse outcomes such as disrupted school experience, trouble with the law, confinement, mental health diagnoses, and drug/alcohol problems. His life risk factors increased the odds of such "secondary disabilities" in FASD 2- to 4-fold.[18]

Even without prenatal alcohol exposure, adverse childhood experiences (ACEs, also known as complex or developmental trauma) have been shown to affect the life outcomes displayed by Mr. Umaña. "The organization and functional capacity of the human brain … is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences."[19]

---

[15] Grantham-McGregor, S., Cheung, Y. B., Cueto, S., Glewwe, P., Richter, L., Strupp, B., & Group, I. C. D. S. (2007). Developmental potential in the first 5 years for children in developing countries. *Lancet*, *369*(9555), 60-70.

[16] Liu, J., Raine, A., Venables, P. H., Dalais, C., & Mednick, S. A. (2003). Malnutrition at age 3 years and lower cognitive ability at age 11 years: independence from psychosocial adversity. *Archives of Pediatrics & Adolescent Medicine*, *157*(6), 593-600.

[17] Bellinger, D. C. (2004). Lead. *Pediatrics*, *113*(4 Suppl), 1016-1022.

[18] Streissguth, A. P., Bookstein, F. L., Barr, H. M., Sampson, P. D., O'Malley, K., & Young, J. K. (2004). Risk factors for adverse life outcomes in fetal alcohol syndrome and fetal alcohol effects. *Journal of Developmental & Behavioral Pediatrics*, 25(4), 228–238.

[19] Anda, R. F., Felitti, V. J., Bremner, J. D., Walker, J. D., Whitfield, C., Perry, B. D., et al. (2005). The enduring effects of abuse and related adverse experiences in childhood. *European Archives of Psychiatry and Clinical Neuroscience*, 256(3), 174–186.

**Closed head injuries.** Mr. Umaña had some variably described head injuries in the developmental period, but not at a reported severity to be a likely sole etiology for his disabilities. His 2007 car crash would not explain preceding developmental concerns, and I concur with Dr. Merikangas that it was not a likely explanation for the breadth of his structural and functional impairments.

**Academic neglect.** Mr. Umaña would have benefitted from more advocacy and support around schooling, but academic neglect does not seem to be a likely primary cause for his neurodevelopmental impairments. His academic record showed over 90% attendance in first and second grades; his attendance declined *after* he was held back in third grade and placed in a remedial class.

**Substance use.** Substance abuse in adolescence and young adulthood may have further impacted his brain's functioning; daily cannabis use is the main identified risk in Mr. Umaña's case. Based on current literature, a strong association has been found between early, frequent, and heavy adolescent cannabis exposure and poor cognitive (attention, memory, IQ) and psychiatric (mood, psychosis) outcomes in adulthood, "yet definite conclusions cannot yet be made as to whether cannabis use alone has a negative impact on the human adolescent brain."[20] These associations are stronger for early adolescent use, and Mr. Umaña reported daily use of cannabis later in adolescence. In addition, the brain impacts of substance abuse appear to improve with abstinence and time. It is also notable that Alex had evidence of brain dysfunction that preceded his substance abuse.

**Malingering.** Dr. Suarez had some concerns about inconsistent responses on the non-verbal portion of the Validity Indicator Profile (VIP); Dr. Weinstein provided evidence that Mr. Umaña's VIP performance is not at all unusual with mental retardation [*sic*] and concluded that he gave good effort during his evaluation. Research has also shown that justice-involved adults with diagnosed/possible FASD are more likely to "fail" performance validity tests compared to those without FASD.[21]

**Mental health.** Mr. Umaña has a history of PTSD and psychotic symptomatology. Mental health problems are frequently comorbid with FASDs. In one study of adults with FASD, 92% met criteria for an Axis-I disorder such as alcohol or drug dependence (60%), depression (44%), psychotic symptoms (40%), and anxiety or bipolar disorder (20% each).[22]

---

[20] Levine, A., Clemenza, K., Rynn, M., & Lieberman, J. (2017). Evidence for the Risks and Consequences of Adolescent Cannabis Exposure. *Journal of the American Academy of Child and Adolescent Psychiatry*, *56*(3), 214-225.

[21] Mullally, K., McLachlan, K., MacKillop, E., & Pei, J. (2020). Performance Validity Testing in Justice-Involved Adults with Fetal Alcohol Spectrum Disorder. *J Int Neuropsychol Soc*, 1-13.

[22] Famy, C., Streissguth, A. P., & Unis, A. S. (1998). Mental illness in adults with fetal alcohol syndrome or fetal alcohol effects. *The American Journal of Psychiatry*, 155(4), 552–554.

**Differential diagnosis summary.** It is vanishingly rare to see a patient in FAS clinic who does not have some combination of at-risk family history, prenatal alcohol exposure, other gestational influences, and adverse childhood experiences. It is not possible to tease apart the negative influences of all of these factors with precision, particularly in an adult who has a prominent history of other pre- and post-natal neurotoxic exposures, who was raised with unusual degrees of poverty and malnutrition compared to clients from the U.S., who was horribly mistreated even relative to others living in his *mesón*, who has suffered some head injuries, and who used cannabis daily since late adolescence.

In Mr. Umaña's case, however, his history of early school difficulties that precede his period of substance abuse and later head injuries, as well as having both functional and structural evidence of brain impairments in a pattern consistent with FASD, implicate his high-risk prenatal alcohol exposure as a primary cause. I would consider his other risk factors more likely to be co-occurring rather than competing etiologies. When weighing prenatal alcohol exposure (PAE) against other prenatal and postnatal etiologies, a recent study is quite instructive:

In conclusion, individuals with PAE present with a multitude of other prenatal and postnatal risk factors. The prevalence of these risk factors is often 3 to 7-fold higher than in the general population. PAE was the dominant risk factor explaining the largest proportion of variance in brain structural and functional outcomes in this study. Individually, each of the other risk factors explained a statistically significant, but smaller proportion of variance in brain outcome compared to PAE. In combination, however, the proportion of variance explained by the presence of multiple prenatal and postnatal risks rivaled that of PAE.[23]

On an individual basis, it is scientifically impossible to precisely apportion causation to prenatal alcohol versus the multiple other risk factors from Mr. Umaña's developmental period. But alcohol has been shown to be a dominant risk factor and should be weighted accordingly.

**Conclusion.** It is my provisional opinion to a reasonable degree of medical certainty that Alejandro Umaña would be diagnosed with Static Encephalopathy / Alcohol Exposed, also known as severe Alcohol-Related Neurodevelopmental Disorder (ARND).

I welcome the opportunity to meet and evaluate Mr. Umaña in person when pandemic restrictions are relaxed; telehealth may also be a valid option. This future evaluation may find moderate facial features of FAS which are sentinel physical findings associated with prenatal alcohol exposure. As it stands, even without confirmation of facial

---

[23] Astley Hemingway, S. J., Davies, J. K., Jirikowic, T., & Olson, E. M. (2020). What proportion of the brain structural and functional abnormalities observed among children with fetal alcohol spectrum disorder is explained by their prenatal alcohol exposure and their other prenatal and postnatal risks? *Adv Pediatr Res*, 7:41.

features, Mr. Umaña's brain structural and functional outcomes are consistent with severe fetal alcohol impacts. My provisional finding is consistent with the multiple other experts who have suspected FASD in this case.

Thank you for the opportunity to provide this evaluation. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. §1746.

Dated the 4th day of January 2021,

Julian Davies, MD
Vashon, WA

# RECORDS REVIEW

Available for my review at the time of this declaration were the materials listed at the end of this document. At the beginning of my engagement I requested any available family history, pregnancy and prenatal exposure history, childhood and adult medical records, social history, school and developmental records, occupational history, criminal justice history, and mental health records, as well as the results of any neurologic or neuropsychological testing. I have rendered my opinion based on materials available to me at this time and retain the right to revise my opinion should new information become available.

What follows is a brief summary relevant to a provisional medical FASD diagnosis. Childhood-era information will refer to the client as "Alex," with adult references as "Mr. Umaña."

**Pregnancy and Birth History.** Testimony included a certified birth document that listed his year of birth as 1982, at the National Hospital of Escuintla, in Guatemala. *Policia National Civil* records also list 11/25/1982 as his date of birth. On some records his year of birth was listed as 1984, based on a later-issued certificate his father obtained. A certified birth certificate appears more reliable.

Alex's mother described his gestation as marked by "great hardship, anxiety, sadness, and hunger."

As I talked about in my earlier declarations, my life was very hard when I was pregnant with Alejandro. The stress in my life was so bad, I even tried to kill myself. I drank a huge glass of a poison that we used to kill ants mixed with water [Folidol/parathion per subsequent interview with toxicologist].

One of the ways I tried to cope with the stress was to drink. I didn't drink every day. But when I drank, **I drank until I was drunk. I would do this at least three times each week. I drank beer and sometimes aguardiente or other hard liquor. When I drank beer, I would usually have at least eight beers at a time.**

I didn't know I was pregnant with Alejandro until late in the pregnancy. I realized I was pregnant only once I had a big belly so **I continued to drink until about two months before Alejandro was born.** I stopped drinking in September and Alejandro was born in November.

Besides drinking, I also used to take pills called Rohypnol [Rohipnol, also known as flunitrazepam, a benzodiazepine] that Alejandro's father used to give me. I think he wanted to see me completely drunk because he used to have me drink beer with a straw. One gets drunk quicker that way.

When I was pregnant with Alejandro I contracted malaria [paludismo]. I don't remember if I took any medication for it. I do remember that I had very high fever. (Declaration of Leticia Ramirez Diaz)

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 16 of 381

Alex's father told Dr. Lugo that Leticia drank daily during her pregnancy with Alex, which is slightly inconsistent with her recollection but still confirms prenatal alcohol exposure and would qualify as Alcohol Exposed using 4-Digit Code.

At this time in her life, Leticia also described using marijuana regularly, being beaten by Alex's father, and being forced to dance naked and prostitute herself. As for his birth, his mother recalled:

I was 18 years old when Alejandro was born. In the end, Alejandro was born feet first; he weighed over seven pounds and he was long but I do not remember his measurements. When he was born, Alejandro swallowed liquid and they removed it with a suction bulb. My contractions started around eleven in the morning and Alejandro was born at one in the afternoon. To me, he was a beautiful baby. (Declaration of Leticia Ramirez Diaz)

Leticia told Dr. Lugo that it "was an exceedingly difficult and painful delivery. In fact, when Alejandro was born, he could not breathe for few minutes and turned purple."

**Growth History.** His reported birth weight of "over 7 pounds" would be in the average range on WHO growth charts.[24] Others remembered Alex as being a small child, but unfortunately, I have no formal childhood growth records at this time. Bureau of Prisons records from 2010-2011 list his weights as 173-200 pounds, and height as 67-68 inches.

**Medical History.** Medical information from Alex's childhood is very limited and anecdotal. Alex was breastfed for 5 days, and then received baby formula. At 3 months of age, his mother reported a diffuse, blotchy, raw-appearing rash without a clear diagnosis from the doctors, that took months to resolve.

Alex's second cousin recalled that:

A few months after he was born, Alex got very sick. I was a young boy but I remember clearly that the adults were very worried about Alex. His hair was white and his feet and stomach were swollen. We put aloe on his feet for the swelling to go down. People said Alex was anemic due to lack of nourishment. (Declaration of Edwin Esau Umaña)

Alex's prenatal and postnatal environment was notable for many additive and synergistic risk factors, as outlined by Dr. Lugo below, who concluded that, "All of these toxic exposures, in addition to the head injuries, provide a probable etiology for the neuropsychological damage revealed in scans of Alejandro's brain and in neuropsychological testing."

1. Chronic prenatal exposure to alcohol, marihuana, and Rohypnol, a sedative prescription drug banned in the United States, capable to cause fetal alcohol syndrome and problems in brain

---

[24] WHO Multicentre Growth Reference Study Group. (2006). WHO Child Growth Standards based on length/height, weight and age. *Acta Pædiatrica*, Suppl 450.

development, affecting cognitive functions and behavior. 2. Chronic prenatal and postnatal exposure to highly neurotoxic pesticides used in agricultural fields. 3. Prenatal exposure to Malaria, a tropical infectious disease transmitted by mosquito bites, causing high fever lasting days to weeks and destruction of red blood cells, causing anemia, when Alejandro's mother was infected with malaria during pregnancy. 4. Acute, suicidal ingestion of "Folidol" (Methyl Parathion), a highly neurotoxic organophosphate pesticide when Alejandro's mother ingested an unknown amount of Parathion in a glass during the second trimester of her pregnancy with Alejandro. 5. Chronic inhalation exposure to Polycyclic Aromatic Hydrocarbons and Lead Poisoning released from combustion of gasolines and diesel while living few yards away from the main road with high traffic at Santa Ana El Salvador. 6. Also, Alejandro lived under extreme poverty, with unsanitary conditions, and lack of access to healthcare services in a highly contaminated environment while suffering from malnutrition, particularly during early years of life when his brain and other organs were developing. (Toxicology Report from Andrew Lugo, MD, MPH, MS, FACMT)

As for adult health issues, a one-page summary of Alex's Bureau of Prisons Health Services file includes migraine, allergic rhinitis, constipation, knee pain, and shoulder issues with histories of sinusitis, facial cellulitis/abscess, and malaise/fatigue.

**Head Injuries.** Alejandro's father reported 2 serious head injuries at about 5 years of age. The first was a fall from a mango tree, leading to bleeding, dizziness, and acting "out of it" but no reported loss of consciousness; Alejandro's father carried him to the hospital. A few days later Alejandro fell again, hitting his head on furniture which again caused (presumably external) bleeding. His father felt that Alejandro was "hyper" from that time. (Olley) In another interview, Alex's father told a mitigation specialist that when Alex was 2-3 years of age, he fell while climbing to grab something on a shelf and struck his head. (McGough) Dr. Suarez testified that Mr. Umaña reported a head injury at age 4-6 years where he fell, cut his head on broken glass, and needed 21 sutures.

Alex and his father both report that he had severe headaches subsequent to these injuries, which caused him to weep at times and avoid heading the ball in soccer. (McGough) Dr. Merikangas testified that, "These are the headaches which are pretty characteristic of migraine headaches."

In 2007, Alex was brought by ambulance to Gwinnet Hospital after a motor vehicle collision. Alex was unsure about loss of consciousness, and at the ED was alert and oriented, with a hematoma and small laceration noted at the right parietal region of his skull. Cervical spine films and a non-contrast head CT were normal. He was discharged from the ED 3.5 hours after arrival. (Gwinnett records)

**Developmental and Academic History.** Early developmental milestones have not been reliably reported; his great-grandmother who provided care for him in childhood is deceased.

Dr. Olley interviewed the Director of Alejandro's old school:

Mr. Carlos Alarcon, Director of the Centro Escolar Santa Ana California, showed me the original school records indicating Alejandro Umana's attendance, subjects taught, and grades. He indicated that it is not the policy to retain a student in grades 1 or 2. In fact, the law does not allow it. Mr. Alarcon also explained to me the grading system and went over Mr. Umana' s grades. His grades were poor from the beginning of school. His attendance was good in first and second grade, but he was retained in 3rd grade, and his attendance declined. In his last year, he was in a combined 1st, 2nd, and 3rd grade classroom, which Mr. Alarcon explained was the format for a class for remedial students. Records indicate that Mr. Umana did not complete the 3rd grade. Mr. Alarcon indicated that the remedial curriculum that Mr. Umana did not pass included basic sight words, combining words into simple sentences, writing one' s name, and simple addition.

A teacher at his school declared as follows:

If Alejandro was born in the year 1982, he would have started the first grade in 1989, the year he turned seven years old.

The Annual Summary Table shows Alejandro was nine years old when he completed first grade in 1991. In my experience, for a nine-year-old boy to be in first grade was very unusual. It could be that Alejandro attended first grade in 1989 and 1990 but did not advance to the next grade, or that he did not complete the year, or that he never attended until 1991.

Alejandro's grades in first grade in 1991 appear to be passing. Since it appears Alejandro struggled in school the following years, it is likely that his passing grades in 1991 are due to Alejandro having attended school previously and already having the foundation for the first grade.

The Annual Summary Table shows Alejandro barely passed second grade in 1992. A student needs an average of 5 to pass. The Annual Summary Table shows Alejandro had an average of 4.5. A grade-point average above 4.0 was rounded up to a passing grade of 5. Alejandro received the highest grade in physical education, a 7. The 7 in physical education is the grade that saved Alejandro from failing second grade. The only other passing grade Alejandro received was a 5 in music.

Alejandro's poor grades in second grade do not appear to be due to lack of attendance. Alejandro had over 90 percent attendance in first and second grades in 1991 and 1992.

In 1991 and 1992, the Annual Summary Tables also show grades for the student's behavior in several areas. During those years, Alejandro failed in the areas of responsibility, health and protection, initiative and self-confidence, and work habits. Alejandro received good grades in personal relations and cooperation, promotion of customs and beliefs, and practice of moral and civic values.

The Annual Summary Table for 1994 that includes Alejandro is for a remedial class called integrated education for over-age children. These are children who have not yet passed the first level (first, second, and third grade). These are children who are older than usual. They are often embarrassed to be in a class with younger children; they are underperforming children.

If Alejandro was born in 1982, he would have been twelve years old in 1994 when he still had not passed the third grade. This is very unusual. Normally, a child passes third grade by age nine.

The children in these integrated classes do not represent the norm. According to the Annual Summary Table, Alejandro was one of three students of a class of ten students in the remedial class who did not pass the class. (Declaration of Ana Gladys Magaña)

> At age 16, Alex was still only in third grade. Alex's friend from night school was 4 years younger but in 7th grade. He recalled Alex's ongoing academic challenges and social immaturity:

Alejandro struggled with his schoolwork. He had difficulties processing and he did not understand. He wanted to learn but it was hard for him. I tried to help Alejandro with his homework but he would get confused and did not understand what I tried to teach him. He used to tell me that he did not understand. Alejandro would get frustrated and ask why he had to learn those subjects.

Our age difference did not seem to matter to Alejandro. He was not ashamed of being 16 years old and hanging out with a 12-year-old boy. In any event, Alejandro acted more like a boy my age than his own and we got along very well. He made me feel comfortable because he did not act as though he knew more than I did. (Declaration of Luis Mario Ramos Mendez)

> Alex's father and former girlfriend described memory problems, such as losing money he had hidden, and forgetting things at the store (even with a list). (Olley)

> Many declarations from friends and adults that knew Alex consistently recalled struggles with reading (pretending to read the newspaper), sloppy and immature writing (as if written with his feet), misspellings, participating in serious discussions, shopping, ironing, washing clothes, measuring, cutting, sanding, gluing shoes, picking coffee, learning dance moves, thinking he could do magic, and saying that "my brain is small." Adults thought he was "slow," infantile, "sweet and simple," and easily confused.

> Alex was also described as respectful, caring, helpful (in not especially helpful ways), playful, and socially younger than his age. He was reported to be a good soccer player and enjoyed dancing. (Olley)

> Alex's friend that travelled to L.A. with him recalled Alex having visual and auditory hallucinations, intensified by marijuana use. He also reported that:

Alejandro wanted to learn English but he struggled and he did not learn. In Los Angeles, it was essential that you speak some English to survive. When people spoke to us in English, Alejandro would point at me. Just like Alejandro, I did not know any English before I came to the United States. Even so, I listened and I was able to pick it up quickly.

Alejandro used to tell me that he wanted to be smart like me. People would make fun of Alejandro; they called him stupid and dumb. He would be embarrassed, it affected him and he would get angry. …

When we got to Los Angeles, Alejandro was 22 years old. Even though he was an adult, he continued to act like a child. He still watched cartoons and his favorite movies were Shrek and Finding Nemo. He watched Finding Nemo over and over again. He never got tired of seeing it and

he would laugh as though it were the first time he was seeing it. Alejandro liked to hang out with the younger guys in the neighborhood who rode skateboards. They were about 15 years old. Alejandro did not seem to mind the age difference. He would tell immature jokes at inappropriate moments. …

Something was wrong with Alejandro's brain; he had disabilities. It was like his brain had stopped developing at an early age. Alejandro was very simple-minded and he did not analyze things. People who knew Alejandro realized that something was wrong with him. They would ask what was wrong with him and say it seemed like he had a screw loose. (Declaration of Luis Mario Ramos Mendez)

An informal impression of the literacy level of Mr. Umaña's letters from jail was that:

Alejandro does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other, and writes guided by the phonetic sound of words. (Frieda de Garcia, via Dr. Olley)

The spoken code he used appears to be a simple reversal of syllables which is something that children in El Salvador do, and the written code appeared to be a letter-for-letter substitution which was laborious for Mr. Umaña. (Olley)

**Social History.** Alex's parents grew estranged when he was as young as seven months to a year of age. He was left with his father and his paternal great grandmother until she died when Alex was about seven, along with other nearby relatives. At that time they lived in a *mesón*, or tenement house. Alex and his father then moved to another part of Santa Ana. His mother was not in his life after infancy. (McGough)

Alex was neglected, hungry, had rotten teeth, and thick matted hair leading to a nickname of "*Peluca*" (wig). A childhood neighbor recalled:

When I was a girl, I felt sorry for Alex. He was abandoned by all the adults in his life. I felt bad that he lived with his father and never had his mother's love. Even though his grandmother and other family members lived at the *mesón*, nobody took care of him. Nobody took on the role of protector or maternal figure to Alex. And his father was awful. Affection did not exist in that family. To this day, I get emotional when I think about how Alex was abused as a child.

Alex went hungry. He often went without eating. His family did not help him with food. I never heard anyone call him to eat. They just left him alone to find food on his own. He would go out to look for small animals like doves or iguanas or to pick mangos and icecream beans. Sometimes he would ask my mother if she could spare a tortilla. Alex broke our hearts.

Alex's father was a bad, violent man. Quique was horrible. He terrorized everybody. He even scared babies and yelled at them. I wondered what kind of adult, what kind of father acts that way.

Quique drank excessively. He would get drunk right outside his room with many of his friends. (Declaration of Vilma Araceli Salazar de Argueta)

Others confirmed his father's drinking, drug use, violence, and abuse:

Alex's father was very aggressive. When he drank he would get even worse. When Alex's father was drunk, he would go around looking for a fight.

I saw Alex's father selling drugs in front of his room. Lots of men would hang out in front of the room smoking and drinking.

I was afraid of Alex's father. He would shout and threaten my father in front of my family.

Alex's father beat him severely. The room had a door that opened up to the patio, and I saw Alex's father beat him across the back with a belt. I heard the lashings and Alex's shouts and I ran to tell my mom. I remember my mom's face, you could tell that she was afraid for me. My mother told me I had better get in the house, that there was nothing we could do. The beatings Alex's father gave him were very severe. My father hit me sometimes but it was different. Alex's father beat him vigorously and so hard that he left him with marks and bruises. (Declaration of Roxana Cruz Torres)

For the first six years of Alex's life, the violence from a civil war caused the family to lock themselves inside at sunset, which caused Alex to be very afraid. Alex also witnessed men killing a man with machetes in the coffee trees. (McGough). His childhood friend, Melvin Cruz Torres, recalled shooting at and around the *mesón*, and seeing many atrocities with Alex, including many dead bodies in a ditch near where they lived.

Alex's father eventually married a 15-year-old, Yanira, who was close in age to Alex; Alex and his stepmother had difficulties getting along, which contributed to Alex leaving home between 16-18 years of age. He moved in with a soccer friend and his family for about a year. (McGough) Others reported that Yanira would steal from Quique's store to feed her siblings but blame Alex, who would get beaten and kicked out of the house.

Despite the lack of healthy attachment figures, neglect, and abuse, Alex was remembered as sweet, kind, and respectful by his Salvadoran neighbors and friends; he was also described as immature and child-like, even after he joined the gang.

Alex reportedly joined MS 13 either as a teen or young adult, and made his way with others variously to LA, New York, Atlanta, and then North Carolina.

**Occupational History.** According to Dr. Olley's interviews, "Mr. Umana never lived on his own or assumed the responsibilities of adulthood. He worked at brief, unskilled jobs, and did not advance." Alex worked with a shoemaker for a few days but couldn't learn the tasks. Alex was unsuccessful at his father's store, as he would forget things he was assigned to get. He carried boxes of Coca-Cola and handed out promotional flyers but could not do the math to help with the bills. As a construction assistant, Alex picked up bricks, cut rebar, and mixed concrete but could not read blueprints. (Olley)

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 22 of 381

Dr. Suarez also reported a few brief jobs in the U.S.—Flowers Express, car wash, digging ditches, construction, and roofing work.

**Substance Use History.** Dr. Suarez testified that Mr. Umaña recalled he began smoking marijuana at the age of 17 on a daily basis, and that he used alcohol from 17 to 19 years of age but had only been intoxicated twice. He smoked a combination of marijuana and cocaine once. He used an inhalant once. He denied other substance use.

**Psychiatric History.** Alex was not formally diagnosed with mental health conditions in childhood, but several friends noted episodes of auditory and visual hallucinations, and that Alex would at times seem to be conversing with imaginary people. He was reported to cut himself with glass on multiple occasions and tried to give himself a "666" tattoo with glass shard and ink (that unfortunately came out as "999").

Dr. Stewart diagnosed Mr. Umaña with "cognitive impairments; Posttraumatic Stress Disorder; and psychotic symptomatology." He judged Mr. Umaña "incompetent at the time of his pre-trial, trial, and sentencing proceedings and is currently incompetent to proceed in his post-conviction proceedings." (Declaration of Pablo Stewart, M.D.)

**Family History.** His father Rafael Umaña is a street vendor. His mother Leticia Ramirez works as a seamstress. There is a strong family history of alcohol use disorders, on both sides. A second cousin, Claudia, was described as having intellectual disability and epilepsy.

Alex had two children by different mothers: his first son Rafael was born in El Salvador, and Dennis was born on Long Island. (McGough)

**Neurostructural Findings.** A non-contrast head CT for trauma indications was normal in 2007; this type of study is usually normal in FASD, as it is not adequately sensitive for prenatal alcohol damage.

Dr. Weinstein reported a quantitative EEG in a letter to counsel from 2009:

The results of this study are valid and reliable as witnessed by the very similar results obtained from the analysis of multiple replications (reliability). Very significant abnormalities were identified when compared to the normal population. There is a generalized and diffused pattern of hypo activity with particular compromise to the frontal lobes, more markedly so in the left hemisphere. These abnormalities would be reflected in impulsive behaviors, pure judgment, limitations in abstract reasoning and the inability to fully understand the cosequences [*sic*] of ones actions.

The findings are consistent and supportive of the results obtained through neuropsychological testing.

Dr. Merikangas examined Mr. Umaña in 2009 and noted a head circumference of 58.5 cm, which is at the 87th percentile on the Rollins head circumference charts.[25] He noted an additional hair swirl (a "soft neurological sign"), and documented a clearly abnormal neurological exam, with hard signs of neurological dysfunction:

Sensory examination showed reduced sensitivity to pin-prick on the left leg and hyperaesthesia on the left face. His deep tendon reflexes in the knees and ankles were abnormal with hyperreflexia and ankle clonus. The cranial nerve examination was abnormal with the inability to close the left eye without simultaneously closing the right. Plantar responses were down going and palmomental reflexes were absent.

Dr. Merikangas shared the results of a normal head CT and an abnormal Positron Emission Tomography (PET) scan:

The PET scan of the brain was interpreted by Nirav Pravin Shah, M.D. at the Carolinas Medical Center. His report, with which I agree, having personally reviewed the scans, reads as follows: "Mild, somewhat heterogeneous, and slightly asymmetric, regions of decreased FDG uptake involving the bilateral posterior frontal, frontoparietal, parietal, posterior parietal, parieto-occipital, anterior temporal, and temperoparietal regions These findings can be seen as sequelae of traumatic brain injury, diffuse axonal injury, or secondary to a chronic headache disorder such as migraines."

Dr. Merikangas testified that this PET scan showed "a very abnormal brain" in a diffuse pattern representing a general brain impairment, and "you would say this is somebody who's probably had a traumatic brain injury or something congenital, perhaps." He did not feel that the 2007 car accident would cause this degree of dysfunction. His report concluded that:

Alejandro Umana is a brain-damaged man with developmental cognitive impairments in the mentally retarded range. He has an abnormal neurological examination, abnormal neuropsychological test results, abnormal PET scan of the brain and an abnormal quantitative EEG. These brain impairments, to a reasonable degree of medical probability, render his less able to form executive judgments to control his impulses and modulate his behavior compared to normal individuals. These brain impairments stemming from early childhood are not his by choice, but are the result of environmental causes beyond his control.

In testimony, Dr. Mayberg opined for the prosecution that her interpretation of this PET scan revealed no gross defects, and that the radiologist's interpretation was limited by not comparing to a normative database of "healthy" brains.

---

[25] Rollins, J. D., Collins, J. S., & Holden, K. R. (2010). United States head circumference growth reference charts: birth to 21 years. *The Journal of pediatrics*, *156*(6), 907-913.

In 2016, Dr. Gur carried out an analysis of functional neuroimaging using the previously administered PET scan:

Dr. Andrew Newberg read the study clinically: "the scan results demonstrate mild to moderately decreased metabolism in the white matter tracts, the limbic structures such as the hippocampus and amygdala, and the temporal poles. Several cortical areas also have mildly to moderately increased metabolism including the anterior cingulate, dorsolateral prefrontal cortex, dorsal medial cortex, sensorimotor area, caudate, thalamus, inferior frontal lobes, hypothalamus, angular gyrus, superior and medial frontal lobes, superior parietal lobes, and fusiform gyrus." (Dr. Newberg's report of April 14, 2016).

Using quantitative analysis using a standard regions of interest approach that examines regional cerebral metabolic rates relative to whole brain compared to a control group of healthy people (addressing one of Dr. Mayberg's critiques), Dr. Gur found very abnormal patterns of glucose uptake:

These results indicate a pattern of hypo-activation in limbic structures (notably the hippocampus and amygdala) and the corpus callosum. At the same time there is hyper-activation across multiple cortical regions (notably in the entire frontal and parietal lobes) and in the caudate nucleus, thalamus and hypothalamus. The most striking area of hypermetabolism is the right inferior frontal gyrus, which is greater than 8 SDs higher in activation than normal, followed by right midfrontal gyrus, right sensorimotor cortex, superior parietal gyrus, and left thalamus, all between 4 and 6 SDs higher in activation than normal. The most distinct area of hypometabolism is the right amygdala and right posterior corpus callosum, exceeding 3 SDs lower than normal.

… The etiology of these abnormalities is difficult to determine and requires clinical evaluation and integration with history. Mr. Umaña's PET scan shows clear evidence of brain damage that is consistent with several causes, including traumatic brain injury. The reduced metabolism in the corpus callosum is also consistent with fetal exposure to alcohol or other toxins.

**Brain Function.** The following is a summary from expert evaluations and school history.

**Intellectual Functioning.** In 2009, Dr. Weinstein administered the Wechsler Adult Intelligence Scale III, Spanish version published in Mexico, using the WAIS-III U.S. norms. Mr. Umaña's Verbal IQ was 70 (2nd percentile, 66-75 confidence interval), Performance IQ was 68 (2nd percentile, 63-77 confidence interval), and Full Scale IQ was 66 (1st percentile, 63-71 confidence interval). On the Comprehensive Test of Nonverbal Intelligence (C-TONI), Mr. Umaña obtained a non-verbal IQ score of 53. Dr. Weinstein concluded in his letter that:

He provided a good effort, he obtained excellent scores in all test that measured his cooperation. He obtained similar scores in tasks measuring similar constructs and he was cooperative, attentive and self disclosing during the evaluation. The results are considered a valid representation of his present neuro cognitive functioning. …

Overall Mr. Umana presents with brain dysfunction in a generalized pattern with particular compromise to the frontal lobes. He is likely mentally retarded.

Later in 2009, a C-TONI 2 also had a Full Scale IQ of 53, and a Bateria III showed "a GIA Score (equivalent to Full Scale IQ Score) of 59 at 95% Confidence Interval 55–62." (Weinstein)

Dr. Suarez reported in 2009 that:

The Escala Intelligencia Wechsler Para Adultos-Third Edition (EIWA-III) is a Spanish translated version of the Wechsler Adult Intelligence Test-Third Edition (WAIS-III) that was standardized and normed on the Puerto Rican population. Based on his performance on the EIWA-III, Mr. Umana obtained a Full Scale I.Q. score of 93 (32nd percentile; 95th % Confidence Interval=89-97) which places him in the Average range when compared to individuals in his age range. He achieved a Verbal I.Q. of 95 (Average range; 37th percentile; 95th % Confidence Interval=90-100) and a Performance I.Q. of 93 (Average range; 32nd percentile; 95th % Confidence Interval=89-97).

A TONI given by Dr. Suarez resulted in a score of 85 (confidence interval 77-93). Dr. Suarez reported scores on 3 trials of the Test of Memory Malingering (TOMM) that were well within expected values, but responses on the non-verbal portion of the Validity Indicator Profile (VIP) that "indicate that he intended to do well on at least some of the items, but his performance was sufficiently inconsistent to warrant concern." Dr. Suarez opined that Mr. Umaña's self-report, letters and phone calls, and interviews with 3 corrections officers "do not suggest that he has any significant impairments in his adaptive behavior." He concluded that it was his opinion that Mr. Umaña is not mentally retarded. (Suarez)

Dr. Weinstein testified with concerns about Puerto Rican norms being inappropriate in this case, the EIWA having inflated IQ scores relative to other versions of the WAIS (overestimating by approximately 20 points), the need for Flynn effect corrections, as well as practice effect concerns (which could inflate the scoring by 5 points). He also provided evidence that Mr. Umaña's VIP performance is what 45 percent of individuals with mental retardation obtained. Dr. Suarez testified that it was inappropriate to use U.S. norms on the Mexican WAIS-III, and that the publisher norms were problematic. After the Atkins hearing, the Court noted sharp disagreement resulting in divergent IQ scores, and found that: "Given the Court's factual findings below regarding the defendant's adaptive skills, it is not necessary to resolve the conflicting evidence regarding his intellectual functioning."

**Academic Performance.** In 2009, the Bateria III showed academic skills in Reading at the 5th grade level, Spelling at the 3.5 grade level, and Math at the 3.2 grade level. "His academic skills (math) are very limited (2nd grade level), his language skills in Spanish are in the average range." This math score was apparently from the Wide Range Achievement Test 4 (WRAT4) Math Computation test. (Weinstein)

Dr. Suarez did not administer any standardized tests of academic performance but did invent a spelling test for Mr. Umaña using from words from his letters; Mr. Umaña was able to spell the words that he had previously written.

**Visual-Motor.** Mr. Umaña's CNS Vital Signs Psychomotor Speed and Reaction Time scores were at the 1st percentile. On the Finger Tapping Test (a motor speed and fine motor control test), Mr. Umaña scored at the 1st percentile for both right and left hands. On Symbol Digit Coding (a psychomotor speed and visual-motor coordination test), his correct responses were at the 1st percentile. (Weinstein)

On the Neuropsychological Assessment Battery (NAB) Spatial Index (visuoperceptual skills, attention to visual detail, visuoconstruction, right-left orientation, topographical orientation, and visual scanning), Mr. Umaña performed at the 1st percentile. (Weinstein)

**Memory.** Mr. Umaña had very uneven performance in memory testing, with a relative strength in Verbal Memory at the 77th percentile on the CNS Vital Signs test, alongside a 4th percentile Visual Memory. (Weinstein)

**Attention.** Mr. Umaña's CNS Vital Signs Complex Attention score was at the 1st percentile. On the Continuous Performance Test (CPT), all of Mr. Umaña's scores were at the 1st percentile. (Weinstein)

On the NAB Attention Index (attentional capacity, working memory, psychomotor speed, selective attention, divided attention, and information processing speed), Mr. Umaña performed at the 1st percentile. (Weinstein)

**Speech-Language.** Mr. Umaña's Spanish language skills were in the average range, using the Multilingual Aphasia Examination (Spanish version). (Weinstein)

**Executive Skills.** Mr. Umaña's CNS Vital Signs Executive Function and Cognitive Flexibility scores were at the 1st percentile. On the Stroop Test (a measure of processing speed, cognitive flexibility, and inhibition/disinhibition test) his scores ranged from 1st-5th percentile (13th percentile errors). On the Shifting Attention Test (an executive control and set shifting test), his correct responses and correct reaction time were at the 1st percentile (27th percentile errors). (Weinstein)

On the NAB Judgment test, Mr. Umaña scored less than the 1st percentile; on the NAB Mazes test he achieved the 8th percentile. (Weinstein)

On the Delis-Kaplan Executive Function System (D-KEFS) Trail Making Test, his scores ranged from 2nd to 9th percentile, with a 2nd percentile score in Number-Letter Switching. (Weinstein)

## LIST OF RECORDS REVIEWED

1.  Appendix 70 - Neuropsychological Report by Dr. Ricardo Weinstein (7/17/2009)

2.  Appendix 71 - Psychological Report by Dr. Enrique Suarez (11/2/2009)

3.  Appendix 72 - Neuropsychiatric Report by Dr. James Merikangas (11/17/2009)

4.  Appendix 73 - Psychological Report by Dr. Gregory Olley (11/18/2009)

5.  Appendix 81 - Dr. Ricardo Weinstein's Neuropsychiatric Report (12/03/2009)

6.  Appendix 29 - Dr. Ruben Gur's Neurobehavioral Assessment (6/15/2016)

7.  Transcript of Guilt Phase – Volume I (04/12/2010)

8.  Transcript of Opening Statements Taken at Guilt Phase (04/12/2010)

9.  Transcript of Guilt Phase – Volume II A (04/13/2010)

10. Transcript of Guilt Phase – Volume II B (04/13/2010)

11. Transcript of Guilt Phase – Volume III A (04/14/2010)

12. Transcript of Guilt Phase – Volume III B (04/14/2010)

13. Transcript of Guilt Phase – Volume IV A (04/15/2010)

14. Transcript of Guilt Phase – Volume IV B (04/15/2010)

15. Transcript of Guilt Phase – Volume V A (04/16/2010)

16. Transcript of Guilt Phase – Volume V B (04/16/2010)

17. Transcript of Jury Questions and Verdict Guilt Phase – Volume VI (04/19/2010)

18. Transcript of Sentencing Phase – Volume I (04/19/2010)

19. Transcript of Sentencing Phase – Volume II A (04/20/2010)

20. Transcript of Sentencing Phase – Volume II B (04/20/2010)

21. Transcript of Sentencing Phase – Volume III A (04/21/2010)

22. Transcript of Sentencing Phase – Volume IV A (04/26/2010)

23. Transcript of Sentencing Phase – Volume IV B (04/26/2010)

24. Transcript of Sentencing Phase – Volume V A (04/27/2010)

25. Transcript of Sentencing Phase – Volume V B (04/27/2010)

26. Transcript of Sentencing Phase – Volume VI (04/28/2010)

27. Transcript of Atkins Hearing (11/30/2009)

28. Order Denying Motion to Declare Mr. Umana Ineligible for the Death Penalty (03/19/2010)

29. United States Court of Appeals for the Fourth Circuit Opinion (04/23/2014)

30. 2255 Declarations

31. Appendix 30 - School Records for Henri Geovani Ayala Umaña

32. Appendix 31 - School Records for Alejandro Enrique Umaña

33. Appendix 32 - Cemetery Record for Henry Geovanni Ayala Umaña

34. Appendix 33 - Cemetery Record for Tomasa Gonzalez Chicas

35. Appendix 34 - Cemetery Record for Saul Alfredo Ramirez

36. Appendix 35 - Cemetery Record for Alejandro Umaña

37. Appendix 36 - Trial Social History Report by Mitigation Specialist Richard McGough

38. Appendix 37 - Trans National Anti-Gang Discovery - Biographical Information of Alejandro Umaña

39. Appendix 38 - Richard McGough's Invoice

40. Appendix 45 - Alejandro Umaña's Medical Records - Gwinnet Health System (UNDER SEAL)

41. Appendix 46 - 2008 Trans National Anti-Gang Discovery Documents (Spanish)

42. Appendix 47 - 2008 Trans National Anti-Gang Discovery Documents (English)

43. Appendix 50 - Alejandro Umaña's BOP Medical Records (UNDER SEAL) – (3/08/2016)

44. Appendix 105 – Declaration of Edwin Esau Umaña (12/19/2016)

45. Appendix 106 – Declaration of Carlos Alcides Peraza (02/01/2016

46. Appendix 107 – Declaration of Gerardo Arriola Umana (12/17/2016)

47. Appendix 109 – Declaration of Roxana Marisol Ramirez (12/19/2016)

48. Appendix 110 – Declaration of Noe Hernan Rivera (04/25/2016)

49. Appendix 111 – Declaration of Dora Alicia Umaña Gonzalez (12/19/2016)

50. Appendix 112 – Declaration of Luis Mario Ramos Mendez (03/03/2016)

51. Appendix 113 – Photos of Alejandro

52. Supplemental Declaration of Leticia Ramirez (02/06/2016)

53. Supplemental Declaration of Leticia Ramirez (11/2018)

54. Declaration of José Wilfredo Herrera Calderón (08/16/2018)

55. Declaration of Karla Herrera Calderón (11/16/2018)

56. Declaration of María Lidia Calderón (11/16/2018)

57. Declaration of Alfonso Cruz (08/16/2018)

58. Declaration of Ana Lilian Reyes 08/16/2018)

59. Declaration of Carlos Geovanni Herrera (11/17/2018)

60. Declaration of José Alfredo Ortiz (11/17/2018)

61. Declaration of Josselyn Guevara Reyes (11/17/2018)

62. Declaration of Roxana Cruz Torres (11/17/2018)

63. Declaration of Vilma Elizabeth Torres de Cruz (11/17/2018)

64. Declaration of Xiomara Reyes (11/18/2018)

65. Declaration of Vilma Aracely Salazar de Argueta (11/16/2018)

66. Declaration of Pablo Stewart, M.D. (05/23/18)

67. Photos of Danubio Azul Meson

68. Photos of La Fe Meson

69. Toxicology Report from Andrew Lugo, MD, MPH, MS, FACMT (11/10/2020)

70. BOP Vitals Record (6/3/2010)

71. BOP Vitals Record (6/4/2011)

# APPENDIX 212

November 10, 2020

To:    Kelly Miller, Assistant Federal Public Defender
Capital Habeas Unit
Federal Public Defender's Office for the Middle District of Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101

Re:    Toxicology Report
Alejandro Umaña; Case # 3:16-CV00057

Dear Ms. Miller:

Pursuant to your request I've performed a toxicology investigation and toxicological assessment related to Alejandro Umana (Umaña), and I've found that Alejandro suffered from severe and chronic exposure to multiple highly neurotoxic substances, prenatally and postnatally, and illnesses and malnutrition throughout his life.

These neurotoxic exposures and insults include: **1.** Chronic prenatal exposure to alcohol, marihuana, and sedative prescription drug (Rohypnol), **2.** Chronic prenatal and postnatal exposure to highly neurotoxic pesticides used in agricultural fields, **3.** Prenatal exposure to Malaria, a subtropical infectious disease causing high fever lasting days to weeks with the destruction of red blood cells and anemia, **4.** Acute suicidal ingestion of the pesticide "Folidol" (Methyl Parathion), a highly neurotoxic organophosphate when Alejandro's mother purposefully ingested this substance in a suicide attempt during her second trimester, **5.** Chronic inhalation exposure to Polycyclic Aromatic Hydrocarbons and Lead Poisoning released from combustion of gasolines and diesel while living few yards away from the main road with high traffic at Santa Ana, El Salvador, **6.** Living under extreme poverty, in unsanitary conditions, and with a lack of access to healthcare services in a highly contaminated environment while suffering from malnutrition, particularly during early years of life when his brain and other organs were developing. Each of these factors is capable of causing brain damage affecting cognitive functions that control and regulate behavior.

Alejandro suffered chronic exposure to neurotoxic substances throughout his lifetime. The toxic exposure started during prenatal stages of life when he lived in extreme poverty and unsanitary conditions at Escuintla, Guatemala. He was exposed from the time of his conception and throughout the embryonic and fetal stages, continuing postnatally from newborn, infancy and early childhood in Guatemala. The toxic exposure, extremely poor living conditions, and contaminated environment continued in Santa Ana, El Salvador, from preschool years through adolescence, up to approximately 22 years old, when he moved from El Salvador to the United States of America.

All, and each one of these exposures to chemicals and living conditions had cumulative effects to damage Alejandro's brain, diminishing cognitive functions and severely affecting his behavior. These cumulative effects are additive (summatory) and synergistic (described as combined effect greater than the sum of their separate effects), between alcohol, pesticides, polycyclic aromatic hydrocarbons, lead and malnutrition that substantially increased the neurotoxic effects causing greater damage to the brain affecting cognitive functions.

Besides the chronic exposure to neurotoxic substances, Alejandro also had two accidents involving head traumas. The first accident occurred at approximately 3 to 4 years old when he either fell from or was hit by a big branch of a tree, and may have lost consciousness. The second accident happened at age 7. Alejandro fell off while climbing from a table to a shelf on a wall. In this accident Alejandro was taken to a hospital because he was bleeding. After the accident Alejandro has been suffering from frequent severe headaches. In addition to exposure to toxins, these head injuries also could have damaged his brain.

## SOURCES OF INFORMATION

In order to identify toxic substance(s) and provide a comprehensive description and assessment of toxic exposures, I reviewed and investigated multiple sources of information concerning Alejandro Umaña's personal life, as well as the family, social, occupational and environmental conditions in Santa Ana, El Salvador. Alejandro was born in Escuintla, Guatemala, and from approximately age 4 to 22 he was raised Santa Ana, El Salvador. He migrated to the United States of America around age 22.

From November 7 to 11, 2019, I traveled to Barrio San Rafael in Santa Ana, El Salvador, located 60 kilometers North-West from the capital City of El Salvador, San Salvador, Central America. This is an agricultural region dedicated to coffee and cotton production. Also, I traveled from Santa Ana to Escuintla, Guatemala, to see the place where Alejandro was born, and spent several years of infancy before moving to Santa Ana, El Salvador. During the trips to Barrio San Rafael and Escuintla, Guatemala, I investigated environmental and occupational exposure to toxic substances, applying Health Assessment Methodology. **See: ATSDR, 2004**: I began with the identification of toxic substance(s), and the investigation of environmental pathways of exposure, routes of exposure, points of exposure, and susceptible populations. I also interviewed Alejandro Umaña's closest relatives and other significant individuals to learn about the social, economic, and physical environment where Alejandro Umaña was born and raised.

Nov 01, 2020

## 1. CHRONIC EXPOSURE TO ALCOHOL, MARIHUANA AND ROHYPNOL IN-UTERO.

a. **ALCOHOL:** Alejandro's mother, Mrs. Leticia Ramirez, drank alcoholic beverages most days while she was pregnant with Alejandro.

Alcohol, which is described in scientific literature as ethanol, is highly neurotoxic to unborn babies during pregnancy. According to United States Centers for Disease Control & Prevention, Fetal Alcohol-Related Neurodevelopmental Disorders is a group of conditions that can occur in a person whose mother drank alcohol during pregnancy. Alcohol consumed during gestation causes delays in physical development, as well as behavioral and learning problems. It is well known that the most devastating neurotoxic and behavioral effects of alcohol toxicity occur particularly during the first three months (embryonic period) when the brain and other organs are forming and developing. **See: CPS, 2002; Fan 2016; Hoyme, 2016; Subramoney, 2018**.

Ethanol/alcohol is teratogenic and may cause neurobehavioral disorders associated with prenatal alcohol exposure, (ND-PAE), either with or without observable physical malformations. ND-PAE is associated with neurological damages affecting cognitive functions that regulate thinking, social and interpersonal social relations, reasoning, and normal behavior. ND-PAE may be included as a subset of fetal alcohol spectrum disorders (FASDs), a larger group of conditions that occur in a person whose mother drank alcohol during pregnancy. In addition to neurological damage, FASDs can include physical problems. Often, a person with an FASD has a mix of physical and neurological or neurobehavioral problems. **See: CDC, 2019. Alcohol-Related Neurodevelopmental Disorder (ARND)** (People with ARND might have intellectual disabilities and problems with behavior and learning. They might do poorly in school and have difficulties with math, memory, attention, judgment, and poor impulse control); **See: CDC, 2019.** https://www.cdc.gov/ncbddd/fasd/facts.html) (Sedative effect of ethanol works by binding to GABA receptors (Gamma-aminobutyric acid) in the Central Nervous System (CNS), $GABA_A$ receptors are the major inhibitory neurotransmitter in the adult CNS); **See: Barnard, 1998** (Some drugs also bind to GABA receptors such as benzodiazepines); **See: Lobo 2008**

b. **MARIHUANA (THC):** Alejandro's mother, Mrs. Leticia Ramirez, smoked marihuana every day while she was pregnant with Alejandro. The use of marihuana during pregnancy affects the unborn child by causing damage to the areas of the brain that regulate and control behavior. **See: NAS, 2017 (Pp; 249-265)**. Data from preclinical studies show that THC readily crosses the placenta although fetal exposures appear lower than maternal exposures. The neurodevelopmental data in human and preclinical studies suggest that prenatal exposure to THC may lead to subtle, persistent changes in targeted aspects of higher-level cognition and psychological well-being. **See: Grant, 2018**. Prenatal cannabis exposure was found to be correlated with an increased risk of delinquent behavior, and psychotic symptoms later in life. **See: Day, 2015 (2), 1991.** Also, there is a correlation between prenatal marihuana exposure and behavioral problems in early childhood and negative adult roles. **See: Goldschmidt, 2016.** The developing brain undergoes substantial structural remodeling that makes it particularly vulnerable to the harmful effects of bioactive ingredients. **See: Chambers, 2003, Crews, 2007**. Such remodeling occurs in many brain areas involved in vital neuronal function, including sensory inputs and the control of body temperature, as well as higher-order cognitive processes such as learning, memory and decision making. **See: Wise, 2004**.

c. **ROHYPNOL:** Alejandro's mother, Mrs. Leticia Ramirez, consumed Rohypnol almost every day during her pregnancy with Alejandro. Rohypnol is a very potent sedative depressant drug; it belongs to the group of sedatives known as **benzodiazepines**. Rohypnol has a generic name as "Flunitrazepam", and a street name as "Roofies". Rohypnol is not approved for medical use in the United States; it is commonly used by cocaine abusers to relieve side effects and it is also used as a "date rape" drug. This drug causes muscle relaxation, decreased anxiety, drowsiness, amnesia, sleep, slurred speech, loss of coordination, impaired mental function, and confusion, and it is addictive. **See: DEA, 2020**.

Use of sedative drugs during early pregnancy may increase the risk of a congenital malformation, with preterm birth, intrauterine reduced growth disturbances and neonatal morbidity. There is also a possibility that exposure can affect brain development with long-term neuropsychological damages. **See: Kallen, 2013.** The mechanism of sedative effect of benzodiazepines is on Gamma aminobutyric acid (GABA), a major inhibitory neurotransmitter in our brain that

causes sedation. Dysfunctions in GABA- processes may cause a variety of neurological and psychological disorders. **See: Haefely, 1984; Malcom, 2003.**

## 2. CHRONIC EXPOSURE TO HIGHLY NEUROTOXIC AND ENDOCRINE DISRUPTING PESTICIDES.

During Alejandro's prenatal stages of life, his mother Leticia ingested a poison, Folidol, in an attempt to end her life. In addition, she lived with Alejandro's father's family, in close proximity to agricultural fields where neurotoxic pesticides were frequently used. As an infant, Alejandro continued living in close proximity to coffee, cotton and sugarcane plantations. Also, during adolescence and young adult life, Alejandro worked both in coffee fields and on construction of concrete bases for electric towers in the middle of agricultural fields. He had no access to personal protective equipment, showers and other methods of decontamination at the end of the day and spent up to 6 months living in the workers' camp, sleeping outdoors.

Alejandro was specifically chronically exposed to Organophosphates (OP), Carbamates and Organochlorine (OC) pesticides, as well as other agricultural pest control chemicals from gestation, early infancy, childhood, preschool, and adolescence through early adulthood.[1] Organophosphate pesticides (OPs) are known to affect hundreds of enzymes, receptors, and other proteins and it is becoming increasingly evident that some of these targets involve long-

term effects in the Central Nervous System (CNS) and developmental neurotoxicity. **See: Costa 2018; Handel, 2008; Morgan, 1989; Naughton, 2018; PRB, 2001.**

---

**Tabele 1.** The following is a short list of pesticides used in coffee, cotton, sugarcane and other tropical agricultural products in Central America including: Difonate (ORGANOPHOSPHATE) classified as Restricted Use Pesticides (RUP) by the EPA; Dizulfoton (ORGANOPHOSPHATE) classified as Restricted Use Pesticides (RUP), this precaution is taken due to the high toxicity; Aldicarb (CARBAMIC NEMATICIDE) toxic pesticide banned after decades of use, never registered; Phorate (ORGANOPHOSPHATE) not approved for use in EU countries, a U.S. EPA Restricted Use Pesticide (RUP); Fosfamidon (ORGANOPHOSPATE) banned - never registered; Monocrotofos (ORGANOPHOSPHATE) banned in US; Methylparathion (ORANOPHOSPHATE) Banned – never registered; Carbofuran (CARBAMATE) - banned in the USA in 2008; Endosulfan (ORGANOCHLORINE) restricted in the USA 2002, banned in 2008; Chlordane (ORGANOCHLORINE) banned in the USA since 1983; Diphonate (ORGANOPHOSPHATE - Neurotoxic Persistent); Phoxim (ORGANOPHOSPHATE) banned in the EU since 2007; Heptachlor (ORGANOCHLORINE) banned in USA since the 1980's; Metalkamate (CARBAMATE); trichlorfon (ORGANOPHOSPHATE Metrifonate); Toxaphene (ORGANOCHLORINE) banned in USA in 1982; Methyl Parathion (ORGANOPHOSPHATE Highly Neurotoxic); 2-4 D. (NEUROTOXIC HERBICIDE); Diazinon (ORGANOPHOSPHATE) restricted and banned; and Atrazine (SULFAMIC HERBICIDE) restricted. Also, DDT (ORGANOCHLORINE), banned in 1999, was frequently used at Barrio San Rafael to control mosquito infestations carrying malaria and dengue. **See: EPA, 2010, 2020; El Salvador Agriculture, 2020.**

The developing nervous system is highly susceptible to the neurotoxicity of organophosphate insecticides as well as many other types of environmental toxicants. This enhanced sensitivity occurs not only during prenatal development but also postnatally, extending into adolescence. **See: Burns, 2013.** These substances can impact the normal development of the brain, particularly the frontal lobe and sub-cortical areas of the brain in children. These areas are responsible for cognitive functions that control social life and normal behavior; such enhanced sensitivity often predisposes a person to delayed emotional, social and academic development or behavioral problems. **See: Aldridge 2003, 2005; Burns, 2013; Colosio 2003; Hamel , 2003; Goldman, 2007; Segura, 2008; Weiss, 2000, 2012; Willis, 1993; Wilson 2014 & 2014.** Further, there is compelling evidence that adverse neurobehavioral effects are associated with occupational and non-occupational organophosphate pesticides (OPs) exposure in humans. Behavioral studies of pesticide applicators, greenhouse workers, agricultural workers and farm residents exposed repeatedly over months or years to low levels of OPs as adults continue to reveal a relatively consistent pattern of neurobehavioral deficits. **See: Am. Acad. Ped. 2003; Batki 2013; Bernard 1998; Chambers, 2003; Colosio, 2003; Ellenhorn, 1999; Eskenazi, 2008, 2007, 1999; Frye, 2012; Harvey, 2008; Jurewicz, 2008; Labie, 2007; Marks, 2010; NSCDC, 2006; Rohlman, 2011.**

The behavioral dysfunction from early exposure to organochlorine pesticides has been proven through many studies, *e.g.* Heptachlor exposure from gestation to weaning increases locomotor activity at the same dose range that disrupts dopamine system while cholinergic-dependent behaviors are particularly susceptible. Even a single exposure to DDT in the neonatal period leads to cognitive defects in adulthood, such as decreased habituation, a non-associative learning process. **See: Am. Acad. Ped. 2003; ATSDR 2010; Batki 2013; Bernard 1998; Chambers, 2003; Colosio, 2003; Eskenazi, 2008, 2007; Eriksson 2000; Harley, 2008.** Outside of the CNS, organochlorine insecticides (OCs) have also been identified as endocrine disruptors. They interfere with steroid signaling pathways either by binding to intracellular receptors or by inhibiting enzyme activities in steroidogenic pathways, actions which lead to decreased hormones production and increased levels of intermediate precursors. **See: Mrema, 2013.** In addition, OCs such as DDT (and its metabolite DDE), dieldrin, endosulfan, and lindane alter thyroid hormone and thyroid-stimulating hormone (TSH) levels, adrenal corticosterone and the response to adrenocorticotropic hormones. In summary neurotoxic pesticides cause endocrine-disruption and brain development and behavioral outcomes, affecting synaptic plasticity and synaptogenesis in areas of the brain that control and regulate behavior, impulse control, aggressivity, and executive commands that control our social and interpersonal behavior. **See: Parent, 2011; Schantz, 2001; Willis, 1993, Wong, 2008.**

**(*) Neurotoxicity:**      The quality or state of having a poisonous effect on neurons or neural circuits.

**(**) Endocrine Disruptors:**      Endocrine disruptors are chemicals that may interfere with the body's endocrine system and produce adverse developmental, reproductive, neurological, and immune effects in both humans and wildlife. **http://www.niehs.nih.gov/health/topics/agents/endocrine**

**(***) Cognitive**      "…of, relating to, being, or involving conscious intellectual activity (as thinking, reasoning, remembering, imagining, or learning words) <the *cognitive* elements of perception **http://www.merriam-webster.com/medical/cognitive**

# 3. MALARIA INFECTION DURING PRENATAL STAGES OF ALEJANDRO'S DEVELOPMENT

In Escuintla, Guatemala, Leticia Ramirez became pregnant with Alejandro. She was living in extreme poverty with Alejandro's father, Rafael, at Rafael's grandmother's house (Francisca). They lived on a river bend, in a one room shack built with scrap materials, cardboard, laminated sheets, and branches from trees, with a ceiling made with palm tree leaves, on a dirt floor. They had no urban services, no potable water, no indoor plumbing, and poor protection from the environment.

Guatemala and El Salvador are endemic areas for Malaria, Dengue and other mosquito transmitted infectious tropical diseases. **See: Carter, 2015; Cohen, 2017; Herrera, 2015; Lennon, 2016**. Malaria and Dengue cause high fever damage, blood destruction (hemolysis) resulting in severe anemia, and multiple organ damage to include liver and brain damage. Leticia developed Malaria, suffering chronic high fever, headaches, nausea, vomiting and weakness, while she was pregnant with Alejandro. The sickness immobilized her and she spent several weeks laying on the ground because they did not have beds. (She slept on the floor outside the shack). She didn't have access to healthcare, and she received, at best, informal and occasional medical treatment, taking some medicines prescribed by a Doctor from a Hospital at Escuintla Guatemala. After several weeks with fever and headaches she finally recovered.

Malaria infection is caused by several parasites known as "Plasmodium" (P. Falciparum, P. Vivax and P. Knowlesi). These parasites are carried and transmitted by some genus of mosquitoes known as "Anopheles". Malaria infection during pregnancy can cause adverse effects on both mother and fetus, including maternal anemia, fetal loss, premature delivery, and intrauterine growth retardation. It is also a risk factor for death and developmental disorders. **See: CDC, 2018**. There are direct and indirect effects of malaria infection that could impact the course of child development, causing impairment and disability. **See: Holding, 2004; Tapajos, 2019**.

## 4. ALEJANDRO'S MOTHER TRIED TO COMMIT SUICIDE DURING HER PREGNANCY WITH ALEJANDRO, BY INGESTING "FOLIDOL" (METHYL PARATHION), A HIGHLY NEUROTOXIC ORGANOPHOSPHATE PESTICIDE

Besides the chronic environmental exposure to neurotoxic pesticides, Alejandro's mother, Mrs. Leticia Ramirez, tried to commit suicide during the second trimester of her pregnancy with Alejandro. She drank a glass of Folidol (Methyl Parathion) as an act of despair and hopelessness due to physical and emotional abuses inflicted by her husband (Rafael) and Rafael's grandmother (Francisca). She was taken to a hospital in downtown Escuintla, Guatemala, where the doctors performed gastric lavage and provided medical treatment. After being discharged from the Hospital, she remained sick during several days with weakness, nausea, and vomiting.

Methyl Parathion is a highly neurotoxic industrial agricultural organophosphate pesticide that causes neuro-developmental and cognitive problems in children. **See: Abreu-Villaca, 2016; Bouchard, 2011; Burns, 2013; WHO, 2004**. Since December 31, 1999, the US-EPA cancelled the use of methyl parathion on many kinds of crops used as foods because of a concern for exposure risks to children and to workers. During pregnancy, Methyl Parathion crosses the placenta and can affect the developing fetus. The toxic effects from acute ingestion of a large amount of Methyl Parathion most probably affected Alejandro inside the maternal uterus. **See: Ruckart, 2004.**

## 5. CHRONIC INHALATION EXPOSURE TO POLYCYCLIC AROMATIC HYDROCARBONS AND LEAD POISONING FROM TRUCKS AND AUTOMOVILE EMMISSIONS.

From age 7 to 16, Alejandro lived at El Meson at Final 25 Calle Oriente, Santa Ana, El Salvador, a tropical region with hot temperatures during daytime. El Meson is a very poor one-story housing unit built with adobe, with concrete floor and laminated ceiling, located on the main road of Santa Ana with heavy traffic all day long. Alejandro's family lived in a one-room apartment. The room was located on the front of the building facing the high traffic road, with ventilation holes near the roof and a small door that was kept open most of the time to make it feel cooler. Alejandro used to spend daytime playing on the small patio (2 by 3 meters) in the front of his apartment, located few yards away from heavy traffic and loud noise from trucks, breathing automobile and truck exhaust fumes. Alejandro also breathed highly contaminated air during the night. Even today, the traffic is still very heavy, with heavy and choking smoke coming out from automobiles and trucks polluting the area.

During the 1980's and 1990's, when Alejandro was a child and teenager, leaded gasoline and diesel were extensively used in El Salvador by all motor vehicles, releasing to the environment large amounts of highly neurotoxic Polycyclic Aromatic Hydrocarbons (PAH's), Organic Halides, lead and other toxic byproducts from partial combustion of gasolines and diesel. Chronic exposure to all and each one of these toxic chemicals from vehicle exhaust emissions may cause brain damage, affect cognitive functions, cause developmental defects, and other health effects damaging nervous, respiratory, cardiovascular, and immune systems.

It has been well described in scientific literature that road-side exposure to motor vehicle exhausts contains large amount of PAH's, Organic Halides, lead and other toxic substances. Homes located near high traffic roads increase the amount and severity of exposure to PAH's, Halides and lead poisoning. **See: Marks, 2010; Salvi, 2019; Stupel, 1976; Westerholm, 1994; Wigle, 2008**

Due to the nature of many vehicle exhaust systems, pedestrians in close proximity to a vehicle's tailpipe may experience events where diesel particulate matter concentrations are high enough to cause acute health effects for brief periods of time. **See: Buzzard, 2009**. Diesel particulate matter concentrations during drive-by incidents easily reach or exceed the low concentrations that can cause acute health effects for brief periods of time.

Vehicles and particularly diesel vehicles are a major source of the black carbon, Particulate Matter (PM), in urban areas, which is extremely harmful. **See: Grahame, 2014**. Traffic generates airborne particles via exhaust emissions from fuel combustion, as well as the resuspension of non-exhaust PM from road, tire, and brake wear. Non-exhaust PM is predominantly in the coarse fraction between 2.5 and 10 μm in diameter and is an important source of trace metals in PM in urban environments **See: HEI, 2010**. PM2.5 (Particulate Matter 2.5) apportioned to traffic has been associated with all-cause, respiratory, and cardiovascular mortality, and daily hospital admissions for cardiovascular disease, stroke, and heart failure. **See: Heo, 2014; Ostro, 2011**.

## EFFECTS OF LEAD ON COGNITIVE FUNCTION, BEHAVIOR, AND BRAIN STRUCTURE.

Lead occurs naturally in the environment. However, most of the high levels found throughout the environment come from human activities. Environmental levels of lead have increased more than 1,000-fold over the past three centuries as a result of human activity. The greatest increase occurred between the years 1950 and 2000 and reflected increasing worldwide use of leaded gasolines. See: ATSDR Toxicological Profile for Lead, 2007

Case 3:18-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 40 of 381

Lead is widely recognized as a potent neurotoxicant, exposure to which results in cognitive, motor, and behavioral changes. **See: Cecil, 2008**. These negative effects of lead were well-known and documented in scientific literature by the 19th century. One of the most sensitive systems affected by lead exposure is the nervous system and the most severe neurological effect of lead in adults is lead encephalopathy, which is a general term to describe various diseases that affect brain function. **See: ATSDR 2007**. Early symptoms that may develop within weeks of initial exposure include dullness, irritability, poor attention span, headache, muscular tremor, loss of memory, and hallucinations. The condition may then worsen, sometimes abruptly, to delirium, convulsions, paralysis, coma, and death.

The literature contains numerous case reports and studies that show that lead exposure leads to disturbances in reaction time, visual motor performance, hand dexterity, IQ testing and other cognitive functions are affected. **See: ATSDR 2007**. The studies also show that people exposed to lead exhibit greater levels of conflict in interpersonal relationships, compared with unexposed people.

## 6. PHYSICAL INJURIES AND HEAD TRAUMA

At the end of her pregnancy with Alejandro, Leticia could not deliver because Alejandro was in a breech position, with his feet presenting first for delivery. As an emergency, Leticia was taken to a public hospital in Escuintla (Hospital Nacional de Escuintla). Alejandro had fetal suffering during the difficult delivery process. Leticia recalls that it was an exceedingly difficult and painful delivery. In fact, when Alejandro was born, he could not breathe for few minutes and turned purple. This condition is known as cyanosis and is due to lack of oxygen, not breathing. It is well known that fetal distress during labor may cause brain damage. **See: Collins, 2018; Ojumah, 2017.**

Besides the chronic exposure to neurotoxic substances and a difficult delivery at birth, Alejandro also had two accidents involving head traumas. The first accident occurred at approximately 3 to 4 years old, involving a head injury from a tree with him possibly losing consciousness. The second accident happened at age 7. Alejandro fell while climbing from a table to a shelf on a wall. In this accident Alejandro was taken to a hospital because he was bleeding. Since the accident and up to this day, Alejandro has been suffering from frequent severe headaches.

Any of these traumatic injuries, from delivery at birth or early blows to the head, could have independently caused long-term neurobehavioral consequences and they equally could have exacerbated any neurological injury from toxic exposure.

## DESCRIPTION OF THE INVESTIGATION

1. I travelled to Alejandro's birthplace and childhood homes in Escuintla, Guatemala, and Barrio San Rafael, Santa Ana, El Salvador, to identify any toxic substances and research the history of toxic exposures in those locales.

2. I conducted the Exposure Assessment according to methodologies used by ATSDR and the United States Environmental Protection Agency. **See: ATSDR Public Health Assessment, 2004**.

3. I also researched and summarized and described the mechanisms and neurotoxic effects of toxic substances present in Guatemala and El Salvador during Alejandro's time there, including the impact of these substances on cognitive functioning. **See: Burns, 2013; Casarett, 2001; Fox, 2012; Frye 2012; Grandjean, 2006; Hanke, 2004; Jurewicz 2008; Labie 2007; Schettler 2001.**

## INTERVIEWS WITH ALEJANDRO UMAÑA'S RELATIVES AND OTHER SIGNIFICANT PEOPLE

I personally interviewed Alejandro Umaña's mother, Mrs. Leticia Ramirez Diaz. She told me about Mr. Umaña's gestation and early life. In early 1982, she and Mr. Umaña's father's family ran away from the Salvadoran Civil War and fled to Escuintla, Guatemala. There, Leticia lived with Rafael Enrique (Quique) Umaña, Alejandro's father, and Alejandro's great-grandmother Francisca Tomas Gonzalez in a one room shack made with pieces of scrap materials from wood and cardboard, a dirt floor and a roof made with branches of palm trees. Back in 1982 there were no other houses around.

Leticia stated that her living in Escuintla was a true hell. Alejandro's father, Quique, physically and mentally abused her and forced her to dance naked or have sex with other men for money. He collected the money she earned, while she was usually intoxicated with alcohol, Rohypnol, and marijuana that Quique gave her.

Quique never worked and was an alcoholic and drug addict. The only thing available in the shack were alcohol and drugs - food was very scarce. Often Leticia was left to sleep on the ground outside the shack. She developed Malaria and had a high fever for many weeks while living here.

During her pregnancy with Alejandro she drank beer and smoked marihuana frequently. She also took Rohypnol, the "date rape" drug. Not surprisingly, she had no prenatal care and very little food throughout her pregnancy.

Leticia only lived in the shack in Escuintla with Alejandro for 8 months. During that time, at approximately three months old, Alejandro developed redness and large-scale peeling of the skin. Most probably it was Erysipelas, a bacterial infection in the upper layer of the skin. It is like another skin disorder known as cellulitis, an infection in the lower layers of the skin. Both conditions are similar in appearance and are treated in the same way. In Alejandro's case, it took several months to heal because of lack of access to healthcare, but it went away with some medications and remedies provided by some friends.

When Alejandro was about 8 months old, Quique took him away from Leticia and kicked her out of the house. From approximately 8 months old, Alejandro was raised by Francisca, his great-grandmother. They eventually moved back to Barrio San Rafael in Santa Ana, El Salvador to live in "Meson Danubio Azul".

I visited a Meson ("El Meson") where Alejandro lived as a child, "Final 25 Calle Oriente", Barrio San Rafael, a few yards away from the main freeway that communicates Santa Ana with the Capital City of El Salvador, "San Salvador". On the left side of El Meson, the owner, Mr. Martin, runs a mechanic shop where they fix mufflers, tires, perform lube-oil changes, and repair car batteries. This tire shop was already operating when Alejandro was living there. Also, while Alejandro was there, a few yards away and across the road, there was a landfill and an agricultural field, with a large coffee plantation. The land became urbanized in the early 2000's. Alejandro spent his childhood and adolescence in this location under extreme poverty, with poor sanitary conditions, suffering malnutrition, and child abuse.

I also interviewed Mrs. Araceli Salazar, 40 years old, a long-time resident at El Meson. Araceli met Alejandro when he was 7 years old, when he moved to El Meson with his father Quique and his great grandmother Francisca, living in a one-room apartment located on the street front of El Meson, with a small porch or patio on the street where Quique used to drink alcohol and use drugs with his friends. Soon after they moved to this meson, his great grandmother died,

leaving Alejandro without protection and care. Quique was always drinking and fighting, he didn't put much attention or care for Alejandro. Because of the hot climate in Santa Ana most doors and windows are almost always kept open. As a result, the pollutants accumulate in larger amounts indoors.

Alejandro spent part of his childhood and most of his adolescence living in this highly contaminated environment. Alejandro's house was located on the main freeway-road at Santa Ana, with heavy and loud traffic all day, with heavy trucks and all kind of vehicles contaminating the home with leaded gasoline and diesel exhaust (Back in the 1980's and 1990's leaded gasolines were used). Approximately 50 yards away, there was a landfill located near the main road. The community used to dump all kinds of trash and garbage, municipal and industrial wastes, in it. Besides the continuous 24-hour garbage and putrefaction odors, there was a small river running through the landfill carrying raw sewage. Trash was burned every day by trash collectors to recycle metals, glass, and plastics, and to make more room for 'new' trash. Combustion products from burning trash contain large numbers of toxic organic compounds that bio accumulate and affect everybody, particularly children, pregnant women and sick and older people. Years after Alejandro left, the government relocated the landfill and cleaned up the area.

During the 1980's and 1990's, there were only few houses and most of the land was dedicated to agriculture of coffee, and these agricultural fields were usually fumigated by airplane dusters. Highly neurotoxic pesticides capable of causing brain damage and developmental effects in children were used all over Santa Ana and El Salvador.

When Alejandro was there, "El Meson" had 10 apartments. Each apartment had only one small room per family, with a laminated ceiling, either a dirt or cement floor, no indoor plumbing, no electricity, and community restrooms (**SEPTIC TANKS**) (now the apartments have tile ceilings and concrete floors). In the overcrowded apartment with large families, each one with 4 to 6 children or more, some families raised animals to sell (rabbits and doves). Alejandro's father, Rafael also had rabbits, pigeons and chickens in his family's apartment. He raised them to sell. These animals were living in the same room with the family, spread animal fecal matter all over the floors and walls. Also, some families were dedicated to manufacturing shoes, using toxic glues and inks. In summary, living conditions were very poor and unsanitary. Alejandro's one-room apartment was located at the entrance of "El Meson" and there were holes in the walls and ceiling, allowing smoke and noise to accumulate in his room.

I viewed the interior of El Meson; inside we can hear the noise from heavy traffic and smell the gasolines from vehicles. Now with concrete floor (it used to be dirt floor), the walls, edges, and everything else is covered with dust. Each apartment still has only one room, and families share the same 2 filthy and smelly restrooms without running water. Poor housing conditions do

not protect people from outdoor environmental pollution, and it's usually considered a higher risk hazard because all toxic substances are accumulated in larger amounts indoors vs. outdoors. Alejandro lived under these extremely poor sanitary conditions, as well as being subjected to exhaust from the heavy traffic on the nearby freeway. These extremely poor living conditions were a high-risk health hazard for everybody, particularly for children and pregnant women.

I interviewed Rafael Enrique (**Quique**) Umaña, 58 years old, Alejandro's father. Quique confirmed some of the information provided by other witnesses. Quique is an alcoholic and drug addict. Before Alejandro was born, he and Leticia fled from the Civil War in El Salvador and moved to Escuintla, Guatemala, where they lived at the home of his grandmother, Francisca. Quique had 2 children with Leticia - Alejandro and Saul Umaña. He repeated that, during Leticia's pregnancy with Alejandro, Leticia used to drink alcoholic beverages every day. Approximately 7 to 8 months after Alejandro was born, Quique kicked Leticia out of the house, keeping Alejandro with him and away from Leticia, and gave him to his grandmother Francisca, who took care of Alejandro. After spending few years in Escuintla, Guatemala, Quique, Alejandro and his great-grandmother Francisca returned to Santa Ana, to live at the Meson Danubio Azul, an overcrowded very old housing building, built with adobe (clay mixed with straw used as a building blocks material), with laminated ceiling and dirt floor, with one-room apartments where many families lived under extremely poor sanitary conditions. In approximately 1989 they had to vacate "El Danubio Azul" because the building was too old and the walls and ceiling were falling down. They moved to El Meson. Francisca took care of Alejandro until she died, a few months after they had just moved to El Meson. Alejandro lived with his father Quique at El Meson from the death of Francesca until he was a late adolescent.

I interviewed Mrs. Vilma Elizabeth Torres, 59 years old. Vilma Elizabeth lived in El Meson for more than 30 years and met Alejandro there when he was approximately 8 years old. Vilma described living conditions at El Meson in a manner identical to those accounts set forth above. She confirmed that a few yards away, across the road there was a large agricultural field with coffee plants, a small river carrying raw sewage, and a landfill where people dumped and burned every day all kinds of trash and garbage, with dead animals and a pestilent odor. Vilma stated that Alejandro and other children used to play in the landfill and the contaminated river. The air was contaminated with smoke and ashes from burning trash. Some families were dedicated to manufacturing shoes, and other families raised small farm animals, rabbits, pigeons, and chicken, in their rooms. Alejandro's dad had animals.

I spoke with Carlos Yovani Herrera Calderon, 37 years old. Carlos was born and raised at Santa Ana, El Salvador. He has been working as mason in construction since he was 4 years old. Carlos is Alejandro's friend, and was recovering from Dengue (a viral infection transmitted by mosquito bites). Carlos stated that Alejandro was a teenager when they both worked picking

coffee on the coffee plantations and then building electric towers, next to the agricultural fields at Metalio Sonsonate near the Pacific Coast. It was a very hard job. Alejandro worked a little more than 6 months. Carlos recalls that airplane dusters used to fumigate the agricultural fields, flying very close to the ground spraying the insecticides. Alejandro and Carlos worked cleaning the ground and removing weeds and vegetation in order to start building the concrete bases for the electric towers. During that time, they lived at the workers' campground, and slept next to the agricultural fields. They didn't have access to a shower. They were not aware of the dangers of pesticides. Also, Alejandro worked harvesting coffee by hand (Hand pickers) without any personal protective equipment, and unaware of toxicity of pesticides. The only source of water to take a shower was either a water tank open to pesticide spraying or a small river contaminated with raw sewage.

In El Salvador, I spoke with Mr. Luis Mario Martin, 65 years old, an Industrial Engineer, and native from Santa Ana. Mr. Martin owns El Meson and the tire and auto repair shop attached to El Meson, where Alejandro lived with his father and great-grandmother. Mr. Martin recently removed some of the rooms from El Meson to increase the size of the tire shop and auto-repair business. He inherited El Meson and the tire shop from his father a few years ago. Mr. Martin just retired from working with the Salvadoran Government. Mr. Martin knows about the environmental problems and the use of pesticides in agriculture at Santa Ana. He recalls that, in the 1980's and 1990's, a few yards away, across the street, there was a large coffee plantation and a large number of highly toxic pesticides were used in El Salvador without being aware of toxic effects. A large number of agricultural farm workers suffered from kidney problems and other illnesses. Also, because of Malaria and other insect-transmitted diseases during the 1980's and 1990's, DDT was used extensively.

I interviewed Dr. Erik Chacon, epidemiologist and medical doctor. Currently Dr. Chacon is the Director of the Community Health Center (Region Occidental de Salud) located at Barrio San Rafael in Santa Ana, El Salvador. Dr. Chacon stated that pesticide poisoning has been a problem in El Salvador, because of the large number of toxic pesticides used in agriculture, lack of education and no information regarding the use and dangers of pesticides. Also, Dr. Chacon stated that Santa Ana has been an endemic area for Dengue and Malaria and during the 1980's and 1990's the ministry of health used to fumigate the streets and inside homes with DDT.

## TOXIC NEURODEVELOPMENTAL EFFECTS

The mechanisms of developmental toxicity are different from those of acute toxicity. For instance, "acetylcholinesterases" are enzymes that play a direct role in axonal outgrowth and neuronal differentiation. Exposure to organophosphorus pesticides inhibits these enzymes and

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 46 of 381

may therefore interfere with this function. The pesticides chlorpyrifos and diazinon alter axonogenesis, synaptogenesis and programming of synaptic functions (delayed effects). The mechanisms of action postulated are: serotonergic system alteration and inhibition of RNA synthesis in neurons and glial cells. Data suggest that some of the toxicity is from the parent compound rather than the active metabolite and occurs independently of the cholinergic systems that are responsible for acute toxicity. And, these neurodevelopmental toxicities occur at exposure levels too low to cause overt symptoms of cholinesterase inhibition in the pregnant animals. **See: Aldridge JE, 2003, 2005b; Colosio, 2003.**

It may be difficult to differentiate the effects of prenatal exposure to neurotoxic substances from exposure in early childhood, or sequelae of non-fatal acute poisonings, like that of Alejandro's mother ingesting poison during gestation. Chronic neurobehavioral and neurological effects after acute poisoning with neurotoxic pesticides have been reported in adults. Memory and concentration problems, unusual fatigue, irritability and depression, visual difficulties and delayed polyneuropathy have been described. In a well-documented case of chronic organophosphorus pesticide poisoning, the house of an infant with hypertonia, first diagnosed as cerebral palsy, was found to have high levels of chlorpyrifos weeks after a professional application **See: Wagner, 1994**. Studies have examined the neurobehavioral effects of postnatal exposure to pesticides, some describing damage to the frontal cortex, damaging critical neurotransmitter circuits and proteins in the frontal cortex, which may underlie the neurobehavioral deficits observed following developmental exposure to endosulfan and other organochlorine insecticides. **See: Bradner, 2013; Fan, 2010; Frye, 2012; Wilson-Shapiro, 2014 & Wilson-Wellington 2014**.

Subtle changes in short-term memory and attention may be associated with application of organophosphorus pesticides in the home. There is increasing evidence, particularly from animal models, about neurobehavioral effects of long-term exposure to low levels of pesticides. **See: American Academy of Pediatrics Committee on Environmental Health. Pesticides, 2003; Eskenazi, 1999, 2007, 2008; Mississippi and Ohio. Environ Health Perspect, 2004; Wagner, 1994**. Numerous animal studies show delayed brain damage after chronic exposure to neurotoxic pesticides, results consistent with the preferential targeting of late developmental events such as gliogenesis, axonogenesis, and synaptogenesis. **See: Qiao, 2002**.

In addition to both the *in utero* and external exposure to neurotoxic pesticides, Alejandro's mother, Leticia, drank alcohol during her pregnancy with Alejandro, and she used marihuana and Rohypnol, without prenatal care, while herself suffering malnutrition and physical and mental abuse. After Alejandro was born, he lived under extremely poor social, economic and environmental conditions, with deficient basic sanitary services, living in close proximity to agricultural fields where neurotoxic pesticides were used. Alejandro spent his early years of life

suffering from malnutrition, while he was exposed to neurotoxins capable of causing brain damage affecting cognitive functions that control and regulate interpersonal and social behavior, which are known to contribute to severe behavioral problems, to include criminal behavior. The neurotoxic exposure occurred during prenatal stages of life continuing to postnatal newborn, infancy, and childhood, 24 hours a day, every day while living in a highly contaminated environment. The water, soil and air were contaminated with highly neurotoxic pesticides; Alejandro drank water contaminated with pesticides; and he ate food contaminated with pesticides. Alejandro's house was in very close proximity to agricultural fields frequently fumigated either by airplane dusters, or manually using pumps carried as backpacks. Also, the region has been an endemic area for mosquitoes and other insect transmitted infectious diseases (such as Malaria, Yellow fever and Dengue) with frequent government public health fumigations with DDT. During the 1980's and 1990's highly neurotoxic pesticides were used in Barrio San Rafael, to include DDT. **See: Davis, 1987; Jusko, 2012; Needleman, 1988; WHO, 2004.**

## EXPOSURE PATHWAYS

## CHILDREN ARE MORE EXPOSED TO TOXIC SUBSTANCES IN MANY WAYS THAT CAN POSE HEALTH RISKS BY:

1. Prenatal exposure to neurotoxic substances if the mother consumes alcohol, drugs, and is living near agricultural fields or any other contaminated environment. Most of these toxic substances cross the placental barrier carrying the neurotoxins to the embryo or fetus.

2. Children may suffer severe exposure to neurotoxins throughout maternal exposure to alcohol, illicit drugs, pharmaceutical drugs, and environmental chemicals.

3. Breathing contaminated air.

4. Eating contaminated food products such as fish from contaminated waters; meat, milk, or eggs from animals fed contaminated plants; and fruits and vegetables grown in contaminated soil in which air toxins have been deposited.

5. Drinking water contaminated by toxic air pollutants, agricultural runoff, and sewage.

6. Ingesting contaminated soil. Young children are especially vulnerable because they often ingest soil from their hands or from objects they place in their mouths.

7. Touching (making skin contact with) contaminated soil, dust, or water (for example, during recreational use of contaminated water bodies).


## FACTS ABOUT CHILDREN AND NEUROTOXIC SUBSTANCES

Children are much more susceptible than adults to long-term neurotoxic effects caused by exposure to alcohol, drugs, and neurotoxic pesticides. Exposure in the womb is especially threatening. Also, neurotoxic effects may cause major and permanent damages when the toxic exposure continues after they are born, living in a contaminated environment and poor sanitary conditions under poverty and malnutrition due to the following reasons:

1. Prenatal exposure to neurotoxins is inevitable when the mother during pregnancy consumes alcohol, marihuana, sedative prescription drugs or any other neurotoxic substance.

2. Children are unaware of toxic hazards and take more risks than adults.

3. Children eat more dirt, drink more water, and breathe air that is more highly contaminated because of their small size and metabolism, and because the amount of toxic substances is greater closer to the ground (gravity effects).

4. Children who are exposed to neurotoxins and endocrine disrupting chemicals suffer greater organ damage than adults.

5. Children's metabolic rates are more rapid.

6. Children process toxicants differently.

7. Children pass through critical developmental stages during the toxic exposure.

8. Children consume more food in proportion to body size.

9. Children breathe a greater volume of air in proportion to body size.

10. Children's exposure patterns differ and are more severe from that of adults; and

11. Highly toxic substances cause brain damage, behavioral problems and developmental effects.

*Source: US EPA. 2010. The National Pesticide Program. Office of Pesticide Programs. Washington DC. http://www.epa.gov/pesticides/health/protecting-children.pdf. ATSDR Tox Profiles 2007; Esquenazi 2007, 2008; Hanke 2004; Kamel 2004.

## FACTS ABOUT POVERTY AND MALNUTRITION AND INCREASED TOXIC EFFECTS

Poverty provides a major risk for exposure to toxic substances and provides an increased risk of developing more toxic effects, particularly in children and pregnant women:

1. Poor houses are usually built near industrial areas such as agricultural fields, near municipal landfills, abandoned lots and areas with dirt roads without urban services;

2. Poor neighborhoods have limited access to healthcare services; due to economic limitations, houses are built with scrap materials, ceilings are made with cardboard, floors are dirt or sometimes concrete, and windows and doors are made from inappropriate materials;

3. Dirt and toxic substances tend to remain and accumulate longer due to poor hygiene;

4. Lack of access to basic sanitary services results in deficient personal hygiene and house cleaning. Children play more in dirt, contaminated by industrial releases and discharges;

5. Children do not wash their hands frequently before meals.

6. Malnutrition increases the absorption of toxic substances in the gastrointestinal system. Alejandro's childhood diet was poor in proteins and deficient in iron. Calcium and Fluoride decrease the toxic response of the organism. Children with deficient protein and mineral diets are less capable of detoxification.

## EXPOSURE DURING BRAIN GROWTH HAS SUBTLE AND PERMANENT EFFECTS

Alejandro suffered prenatal exposure to alcohol, marijuana and Rohypnol *in-utero* and was born and raised in a contaminated environment and was chronically exposed to neurotoxic substances, particularly during the early years of life when his brain was developing. The level and extent of exposure provides a serious risk of permanent brain damage with associated developmental and delayed cognitive problems. It has been shown that exposure to neurotoxic substances during developmental stages of the brain affects:

➢ Brain structure and function
➢ Neuronal and axonal differentiation
➢ Serotoninergic system
➢ Synaptogenesis
➢ Programming of synaptic function

(See: Aldridge, 2003; 2005b; Colosio, 2003; Slotkin 2004)

## CONCLUSIONS

After performing the toxicology investigation and public health assessment at Barrio San Rafael, Santa Ana, El Salvador, and Escuintla, Guatemala, I've concluded to a reasonable degree of medical certainty that Alejandro Umaña suffered from: **1.** Chronic prenatal exposure to alcohol, marihuana, and Rohypnol, a sedative prescription drug banned in the United States, capable to cause fetal alcohol syndrome and problems in brain development, affecting cognitive functions and behavior. **2.** Chronic prenatal and postnatal exposure to highly neurotoxic pesticides used in agricultural fields. **3.** Prenatal exposure to Malaria, a tropical infectious disease transmitted by mosquito bites, causing high fever lasting days to weeks and destruction of red blood cells, causing anemia, when Alejandro's mother was infected with malaria during pregnancy. **4.** Acute, suicidal ingestion of "Folidol" (Methyl Parathion), a highly neurotoxic organophosphate pesticide when Alejandro's mother ingested an unknown amount of Parathion in a glass during the second trimester of her pregnancy with Alejandro. **5.** Chronic inhalation exposure to Polycyclic Aromatic Hydrocarbons and Lead Poisoning released from combustion of gasolines and diesel while living few yards away from the main road with high traffic at Santa Ana El Salvador. **6.** Also, Alejandro lived under extreme poverty, with unsanitary conditions, and lack of access to healthcare services in a highly contaminated environment while suffering from malnutrition, particularly during early years of life when his brain and other organs were developing.

The source of the toxic exposure came from **a.** Alejandro's mother, Leticia, during pregnancy of Alejandro, living in close proximity to agricultural fields where neurotoxic pesticides were continuously applied, as well as ingestion of drugs and alcohol, infection with malaria during second trimester of pregnancy, and a suicidal attempt by drinking a highly neurotoxic insecticide ("Folidol"), and **b.** after birth by living in contaminated environments, breathing contaminated air with pesticides and automobile exhausts (outdoors and indoors), as well as drinking contaminated water and eating food contaminated with highly neurotoxic pesticides, lead and polycyclic aromatic hydrocarbons while living under extreme poverty and unsanitary conditions in a polluted environment.

**My conclusions of chronic exposure to neurotoxins and exposure to diseases that affect brain functions are based on the following:**

1. Alejandro's mother, Leticia, very frequently during her pregnancy with Alejandro consumed alcohol, marihuana, and Rohypnol. According to United States Centers for Disease Control & Prevention, Fetal Alcohol-Related Neurodevelopmental Disorders are a group of conditions that can occur in a person whose mother drank alcohol during

pregnancy. These effects can include delays in physical development, as well as behavioral and learning problems. In addition, Leticia smoked everyday marihuana, and took a potent sedative prescription drug, Rohypnol, banned in the United States of America due to addiction problems and toxic side effects.

2. Leticia Ramirez suffered from Malaria during the second trimester of her pregnancy with Alejandro, developing high fever during days or weeks and blood destruction (hemolysis). These two effects from malaria cause developmental problems and anemia that would have affected Alejandro's development and brain cognitive functions.

3. Leticia Ramirez suffered from malnutrition, with physical and emotional abuse during her pregnancy with Alejandro.

4. Alejandro lived in poverty, suffering in extremely poor living and housing conditions ranging from a lack of sanitary services to exposure to neurotoxic substances. He was malnourished, uneducated and neglected - he ate contaminated food, drank contaminated water, and breathed contaminated air 24 hours a day. The grade of contamination in poor housing is greater indoors than outdoors, pollutants and contaminated dust and soil accumulate and linger for long periods of time. The room where Alejandro lived was located on the front side of El Meson, a few yards from the main road in Santa Ana, and had ventilation holes on the wall near the ceiling. As a result, Alejandro was exposed to heavy traffic 24/7 that was polluted with byproducts from leaded gasoline and diesel, among other things. These living conditions further increased the susceptibility and severity of exposure to neurotoxic substances, particularly during early years of life.

5. In addition to his living conditions, Alejandro suffered chronic exposure to neurotoxic substances in his surrounding environment. During the 1980's and 1990's highly toxic pesticides and other neurotoxic substances were used in Barrio San Rafael, Santa Ana, El Salvador without any knowledge of their toxicity and associated health hazards. Further, during the 1980's, 1990's and 2000's there were no environmental laws in El Salvador to protect children and pregnant women from neurotoxic substances. There were no laws to regulate and control pesticides.

6. Studies show that exposure to pesticides during early years of life causes damage to the frontal lobes and frontal cortex, damaging critical neurotransmitter circuits and proteins in the frontal cortex, which may underlie the neurobehavioral deficits observed following developmental exposure to endosulfan and other organochlorine insecticides.

Nov 10, 2020

7. When an individual is chronically exposed to these types of neurotoxic and neuroendocrine disrupting chemical substances, this can result in damage to the brain and other areas of the central nervous system affecting cognitive functions. These are functional brain problems that: 1) most times are manifested immediately but sub clinically (i.e., signs and symptoms are very difficult to identify), and 2) develop in people in different ways. For example, developmental problems may not fully express themselves until times of stress, when damage to cognitive and emotional coping mechanisms in the brain is sharply exposed.

8. Alejandro suffered from chronic exposure to a diverse group of neurotoxic substances. Each one of these toxic substances by themselves can cause brain damage affecting cognitive functions that regulate and control behaviors. Alejandro was not only exposed to one neurotoxic substance, he was chronically exposed to many neurotoxic substances at the same time, with cumulative and synergistic effects, potentially causing greater damage to the brain, affecting cognitive functions that regulate and control behavior.

9. From late infancy through young adulthood, Alejandro was chronically exposed to smoke from vehicle emissions containing lead, carbon monoxide and neurotoxic petrochemicals, byproducts from combustion of leaded gasoline and diesel. Also, Alejandro's environment was contaminated with smoke from burning trash every day at the landfill located across the road from El Meson.

10. As a child, Alejandro's home was in close proximity to agricultural fields where neurotoxic pesticides were used. These fields were fumigated either by airplane dusters or manually using pumps carried as backpacks. Also, the region where he lived was an endemic area for mosquitoes and other insect-transmitted diseases such as malaria, yellow fever, and dengue, that the government would fumigate with DDT.

11. When Alejandro was a teenager, he worked on the coffee plantations picking coffee and building electric towers in agricultural fields. He slept in a workers' campground next to the fields and had no access to a shower or personal protective equipment. The only sources of water were a small river contaminated with raw sewage or a reservoir contaminated by pesticide.

12. Besides the extremely poor living conditions and chronic exposure to neurotoxic substances, Alejandro suffered head traumas during childhood, with at least one brain concussion, losing consciousness.

Nov 10, 2020

13. All of these toxic exposures, in addition to the head injuries, provide a probable etiology for the neuropsychological damage revealed in scans of Alejandro's brain and in neuropsychological testing.

I declare under the laws of the United States and under penalty of perjury that the foregoing is true to the best of my knowledge, information and belief. Had I been consulted prior to trial, I would have provided trial counsel with this opinion; had I been called to testify, I would have shared this opinion with the jury.

Sincerely,

Nov 10 2020

Andrés Lugo, M.D., M.P.H., M.S., FACMT

Davenport Florida
(863) 420-7075, & (915); 203-6784 (Cell)
drlugotox@msn.com

## REFERENCES

1. Abreu-Villaca Yael, and Levin D Edward. 2017. Developmental neurotoxicity of succeeding generations of insecticides. Environ Int. 2017 Feb; 99: 55–77.

2. Aldridge JE, Seidler FJ, Meyer A, Thillai I, Slotkin TA. 2003. Serotonergic systems targeted by developmental exposure to chlorpyrifos: effects during different critical periods. Environmental Health Perspectives. 2003; 111:1736–1743.

3. Aldridge JE, Meyer A, Seidler FJ, Slotkin TA. 2005. Alterations in Central Nervous System Serotonergic and Dopaminergic Synaptic Activity in Adulthood after Prenatal or Neonatal Chlorpyrifos Exposure. Environmental Health Perspectives. 2005b; 113:1027–1031.

4. American Academy of Pediatrics Committee on Environmental Health. Pesticides. Chapter 24. In: Etzel R. ed. Pediatric Environmental Health 2nd Ed Elk Grove Village II, American Academy of Pediatrics, 2003.

5. ATSDR. 2004. Public Health Assessment. http://www.atsdr.cdc.gov/hac/pha/index.asp

6. ATSDR, 2001. Methyl Parathion. Toxicological Profile for Methyl Parathion

7. ATSDR. 2007. Toxicological Profile for Lead, U.S. Dep't of Health and Human Services, Agency for Toxic Substances and Disease Registry. Aug. 2007.

8. ATSDR 2010. Agency for Toxic Substances and Disease Registry ATSDR, 2010. Toxicological Profiles for: Heptachlor, Dieldrin, Aldrin, Mercury, DDT, Chlordane. Agency for Toxic Substance and Disease Registry.

9. Batki Bradner M Joshua, Suragh A Tiffanyand Claude W Michael. 2013. Alterations to the circuitry of the frontal cortex following exposure to the polybrominated diphenyl ether mixture, DE-71. Toxicology. 2013 Oct 4; 0: 48–55. Published online 2013 Jul 31. doi: 10.1016/j.tox.2013.07.015

10. Barnard EA, Skolnick P, Olsen RW, Mohler H, Sieghart W, Biggio G, Braestrup C, Bateson AN, Langer SZ. 1998. XV Subtypes of gamma-aminobutyric acid receptors: classification on the basis of subunit structure and receptor function. Pharmacol Rev. 1998 Jun; 50(2):291-313.

11. Bouchard F Maryse, Chevrier Caroline, Harley G Kim, Kogut Katherine, Vedar Michelle, Calderon Norma, Trijillo Celina, Johnson Caroline, Bradman Asa, Boyd Barr Danaand Eskenazi Brenda. Prenatal Exposure to Organophosphate Pesticides and IQ in 7-Year-Old Children. Environ Health Perspect. 2011 Aug; 119(8): 1189–1195.

12. Burns CJ, McIntosh LJ, Mink PJ, Jurek AM, Li AA. 2013. Pesticide exposure and neurodevelopmental outcomes: review of the epidemiologic and animal studies. J Toxicol Environ Health B Crit Rev. 2013;16(3-4):127-283.

13. Carter H Keith, Singh Prabhjot, Mujica J Oscar J. Escalada P Rainier, Ade Maria Paz, Castellanos Luis Gerardo, and Espinal A Marcos. 2015. Malaria in the Americas: Trends from 1959 to 2011. Am J Trop Med Hyg. 2015 Feb 4; 92(2): 302–316

14. Castorina R, Bradman A, McTone TE, Barr DB, Harnly ME, Eskenazi B. 2003. Cummulative organophosphate pesticide Exposure and risk Assessment among pregnant women living in an agricultural community: a case study from CHAMACOS cohort. Environ Health Perspect. 2003. Oct; 111(13): 1640-8.

15. Casarett & Doulls. 2001. Toxicology, The Basic Science of Poisons. 6th Ed. Curtis D Klaassen Editor. McGraw-Hill. USA.

16. CDC 2018. Page last reviewed: July 23, 2018. Content source: Global Health, Division of Parasitic Diseases and Malaria. https://www.cdc.gov/malaria/malaria_worldwide/reduction/iptp.html#:~:text=Malaria%20infec tion%20during%20pregnancy%20can,a%20risk%20factor%20for%20death.

17. Cecil M Kim M Cecil, Brubaker J Christopher, Adler M Caleb, Dietrich N Kim, Altaye Mekibib, Egelhoff C John, Wessel Stephanie, Elangrovan Ilayaraja, Horning Richard, Jarvis Kelly, Lnphear P Bruce. 2008. Decreased Brain Volume in Adults with Childhood Lead Exposure. PLoS Med. 2008 May; 5(5): e112.

18. Chambers RA, Taylor JR, Potenza MN. 2003. Developmental neurocircuitry of motivation in adolescence: a critical period of addiction vulnerability. Am J Psychiatry. 2003 Jun; 160(6):1041-52.

19. Cohen Robert, Sarceño Cardona Joel, Solares Navarro Eliana, Padilla Norma, Reyes Lisette, Pinto Villar Rodrigo Javier, Masouka Penny, Bernart Chris, Peruski Leonard and Bryan P Joe. 2017. Outbreak Investigation of *Plasmodium vivax* Malaria in a Region of Guatemala Targeted for Malaria Elimination. Am J Trop Med Hyg. 2017 Apr 5; 96(4): 819–825.

20. Collins A KIM, Popek Edwina. 2018. Birth Injury: Birth Asphyxia and Birth Trauma. Acad Forensic Pathol. 2018 Dec; 8(4): 788–864.

21. Colosio C et al.2003. Neurobehavioral effects of pesticides. State of the art. Neurotoxicology, 2003, 24:577.

22. *Costa LG. 2018.* Organophosphorus Compounds at 80: Some Old and New Issues. *Toxicol Sci. 2018 Mar 1; 162(1):24-35.*

23. CPS. 2002 Canadian Pediatric Society. 2002. Fetal alcohol syndrome. Pediatr. Child Health. 2002. Mar; 7(3); 161-174.

24. Crews F Hodge C. 2007. Adolescent cortical development: a critical period of vulnerability for addiction. Pharmacol Biochem Behav. 2007 Feb; 86(2):189-99.

25. Day, N. L., and G. A. Richardson. 1991. Prenatal marijuana use: Epidemiology, methodologic issues, and infant outcome. Chemical Dependency and Pregnancy 18(1):77–91. Day, N. L., L. Goldschmidt, R.

26. Day NL, Goldschmidt L, Day R. Larkby C, Richardson GA. 2015 Prenatal Marijuana Exposure, Age of Marijuana Initiation, and the Development of Psychotic Symptoms in Young Adults. Psychol Med. 2015 Jun;45(8):1779-87.

27. Day, C. Larkby, and G. A. Richardson. 2015. Prenatal marijuana exposure, age of marijuana initiation, and the development of psychotic symptoms in young adults. Psychological Medicine 45(8):1779–1787. Dekker

28. Ellenhorn's Medical Toxicology. 1999. 2nd Edition. William & Wilkins U.S.A. Ch 68 pp 1614-1663.

29. El Salvador Agriculture, 2020. https://www.nationsencyclopedia.com/Americas/El-Salvador-AGRICULTURE.html

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 56 of 381

30. Eskenazi Brenda, Rosas Lisa G, Marks Amy R, Bradman Asa, Harley Kim, Holland Nina, Johnson Caroline, Fenster Laura, and Barr Dana B. 2008. Pesticide Toxicity and the Developing Brain. Basic & Clinical Pharmacology & Toxicology. **Volume 102 Issue 2, Pages 228 – 236.**

31. Eskenazi B, Marks AR, Bradman A, Harley K, Barr DB, Johnson C, Morga N, Jewell NP. 2007. Organophosphate pesticide exposure and neurodevelopment in young Mexican-American children. Environ Health Perspect. 2007 May;115(5):792-8. Epub 2007 Jan 4.

32. Eskenazi B et al, Exposures of children to organophosphate pesticides and their potential adverse health effects. Environ Health Perspect, 1999, 107(3):409–419.

33. Eriksson P, Talts U. 2000. Neonatal exposure to neurotoxic pesticides increases adult susceptibility: a review of current findings. Neurotoxicology. Feb-Apr;21(1-2):37-47. Review.

34. Fan CY, Besas J, Kodavanti PR. 2010. Changes in mitogen-activated protein kinase in cerebellar granule neurons by polybrominated diphenyl ethers and polychlorinated biphenyls. Toxicol Appl Pharmacol. 2010 May 15;245(1):1-8. doi: 10.1016/j.taap.2010.02.008. Epub 2010 Feb 19.

35. Fox DA, Grandjean P, de Groot D, Paule MG. 2012. Developmental origins of adult diseases and neurotoxicity: epidemiological and experimental studies. Neurotoxicology. 2012 Aug;33(4):810-6. doi: 10.1016/j.neuro.2011.12.016. Epub 2012 Jan 10.

36. Frye CA, Bo E, Calamandrei G, Calzà L, Dessì-Fulgheri F, Fernández M, Fusani L, Kah O, Kajta M, Le Page Y, Patisaul HB, Venerosi A, Wojtowicz AK, Panzica GC. 2012. Endocrine disrupters: a review of some sources, effects, and mechanisms of actions on behavior and neuroendocrine systems. J Neuroendocrinol. 2012 Jan;24(1):144-59.

37. Grahame T.J., Klemm R., Schlesinger R.B. Public health and components of particulate matter: The changing assessment of black carbon. J. Air Waste Manag. Assoc. 2014; 64:620–660.

38. Goldschmidt Lidush, Richardson A Gale, Larkby Cynthia, Day L Nancy. 2016. Early Marijuana Initiation: The Link Between Prenatal Marijuana Exposure, Early Childhood Behavior, and Negative Adult Roles. Neurotoxicol Teratol. Nov-Dec 2016;58:40-45.

39. Goldman LR. 2007. Managing pesticide chronic health risks: U.S. policies. Agromedicine. 2007;12(1):67-75.

40. Grandjean P, Harari R, Barr DB, Debes F. 2006. Pesticide exposure and stunting as independent predictors of neurobehavioral deficits in Ecuadorian school children. Pediatrics 117: 546–e556.

41. Grant Kimberly, Petroff Rebekah, Isoherranen Nena, Stella Nephi, Burbacher M Thomas. 2018. Cannabis Use during Pregnancy: Pharmacokinetics and Effects on Child Development. Pharmacol Ther. 2018 Feb; 182: 133–151.

42. Haefely W. 1984. Benzodiazepine Interactions With GABA Receptors. Neurosci Lett . 1984 Jun 29;47(3):201-6.

43. Hamel A, Mergler D, Takser L, Simoneau L, Lafond J. 2003: Effects of low concentrations of organochlorine compounds in women on calcium transfer in human placental syncytiotrophoblast. Toxicol Sci. Nov;76(1): 182-9. Epub 2003 Sep 11.

44. Handal AJ, Harlow SD, Breilh J, Lozoff B. 2008. Occupational exposure to pesticides during pregnancy and neurobehavioral development of infants and toddlers. Epidemiology 19:851–859.

45. Hanke W, Jurewicz J. 2004, The risk of adverse reproductive and developmental disorders due to occupational pesticide exposure: an overview of current epidemiological evidence. Int J Occup Med Environ Health. 2004;17(2):223-43

46. Harley KG, Marks AR, Bradman A, Barr DB, Eskenazi B. 2008. DDT exposure, work in agriculture, and time to pregnancy among farmworkers in California. J Occup Environ Med. 2008 Dec;50(12):1335-42.

47. Heo J, Schauer JJ, Yi O, Paek D, Kim H, Yi SM. Fine particle air pollution and mortality: importance of specific sources and chemical species. Epidemiology. 2014 May; 25(3):379-88.

48. HEI. 2010. Health Effects Institute (HEI) Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects. HEI; Boston, MA, USA: 2010

49. Herrera Sócrates, Ochoa-Orosco Sergio-Andres, Gonzalez IvethPeinado Lucrecia, Quinones Martha, and Arevalo-Herrera Myriam. 2015. PLoS Neglected Tropical Diseases. 2015 May; 9(5): Prospects for Malaria Elimination in Mesoamerica and Hispaniola.

50. Holding A Penny, and Kitsao-Wekulo K Patricia. 2004. The Intolerable Burden of Malaria II: What's New, What's Needed: Supplement to Volume 71(2) of the American Journal of Tropical Medicine and Hygiene. Northbrook (IL): 2004 Aug. Supplement to Volume 71(2) *of the American Journal of Tropical Medicine and Hygiene.* https://www.ncbi.nlm.nih.gov/books/NBK3738/

51. Hoyme H Eugene, Kalberg O Wendy, Elliott J Amy, Blankenship Jasomn, Buckley David, Marais Anna Susan, Manning A Melany, Robinson K Luther, Adam P Margaret, Abdul-Rahman Omar, Jewett Tamison, Coles D Claire, Chambers Christina, Jones L Kenneth, Adams M Collem, Shah E Prachi, Riley P Edward, Charness E Michell, Warren R Kenneth, May A Phillip. Updated Clinical Guidelines for Diagnosing Fetal Alcohol Spectrum Disorders. Pediatrics. 2016 Aug; 138(2);

52. Fan Jia, Jacobson W Sandra, Taylor A Paul, Molteno D Christopher, Dodge C Neil, Stanton E Mark, Jacobson L Joseph, Meintjes M Ernesta, 2016. White matter deficits mediate effects of prenatal alcohol exposure on cognitive development in childhood. Hum Brain Mapp. 2016 Aug; 37(8): 2943–2958.

53. Jusko TA, Klebanoff MA, Brock JW, Longnecker MP. 2012. In-utero exposure to dichlorodiphenyltrichloroethane and cognitive development among infants and school-aged children. Epidemiology. 2012 Sep;23(5):689-98.

54. Jurewicz J, Hanke W. 2008. Prenatal and childhood exposure to pesticides and neurobehavioral development: review of epidemiological studies. Int J Occup Med Environ Health. 2008;21(2):121-32

55. Kallen Bengt, Borg Natalia, and Reis Margareta. 2013. The Use of Central Nervous System Active Drugs During Pregnancy. Pharmaceuticals (Basel). 2013 Oct; 6(10): 1221–1286.

56. Kamel F, Hoppin JA. 2004. Association of pesticide exposure with neurologic dysfunction and disease. Environ Health Perspect. Jun;112(9):950-8.

57. Labie D. 2007. Developmental neurotoxicity of industrial chemicals. Med Sci (Paris). 2007 Oct;23(10):868-72.

58. Lennon Shirley Evelyn, Miranda Adolfo, Henao Juliana, Vallejo F Andres Perez Julianh, Alvarez, Arevalo Herrera Miriam y Herrera Sócrates.. 2016. Malaria elimination challenges in Mesoamerica: evidence of submicroscopic malaria reservoirs in Guatemala. Malaria Journal. 2016; 15(1): 441.

59. Lobo A Ingrid and Harris R Adron. 2008. GABA$_A$ receptors and alcohol. Pharmacol Biochem Behav. 2008 Jul; 90(1): 90–94.

60. Marks AR, Harley K, Bradman A, Kogut K, Barr DB, Johnson C, et al. 2010. Organophosphate pesticide exposure and attention in young Mexican-American children. Environ Health Perspect 118:1768–1774.

61. Maurice Stupfel, 1976. Recent advances in investigations of toxicity of automotive exhaust. Environ Health Perspect. 1976 Oct; 17: 253–285.

62. Morgan DP. 1989. Recognition and Management of Pesticide Poisoning. US Environmental

63. Mrema EJ, Rubino FM, Brambilla G, Moretto A, Tsatsakis AM, Colosio C. 2013. Persistent organochlorinated pesticides and mechanisms of their toxicity. Toxicology. 2013; 307:74–88.

64. NAS. 2017. (National Academy of Sciences, Engineering and Medicine, 2017). The Health Effects of Cannabis, and Cannabinoids. The Current State of Evidence and Recommendations for Research. Chapter 10; Prenatal, Perinatal, and Neonatal Exposure to Cannabis. A Report from. Washington, DC: 2017 Jan 12: National Academies Press (US). The National Academies Press. doi: 10.17226/24625.

65. Naughton Sean, Terry V Alvin. 2018. Neurotoxicity in acute and repeated organophosphate exposure. J Toxicology. 2018 September 01; 408: 101–112

66. NSCDC, 2006 (National Scientific Council of the Developing Child). Early Exposure to Toxic Substances Damages Brain Architecture.

67. Ojumah Naomi, Ramdha C Rebecca, Wilson Charlotte, Loukas Marios, Oskouian J Roud, R. Rubbs Shane. 2017. Neurological Neonatal Birth Injuries: A Literature Review. Cureus. 2017 Dec; 9(12): e1938.

68. Ostro B, Tobias A, Querol X, Alastuey A, Amato F, Pey J, Pérez N, Sunyer J. 2011. The effects of particulate matter sources on daily mortality: a case-crossover study of Barcelona, Spain. Environ Health Perspect. 2011 Dec; 119(12):1781-7.

69. Parent AS, Naveau E, Gerard A, Bourguignon JP, Westbrook GL. 2011. Early developmental actions of endocrine disruptors on the hypothalamus, hippocampus and cerebral cortex. Journal of toxicology and environmental health Part B, Critical reviews. 2011; 14:328–345.

70. PRB, 2001. Pesticides: A Threat to Central America's Children and the Region's Future. https://www.prb.org/pesticidesathreattocentralamericaschildrenandtheregionsfuture/

71. Qiao Dan, Seidler Frederic J, Padilla Stephanie, and Slotkin Theodore A . 2002. Developmental neurotoxicity of chlorpyrifos: what is the vulnerable period?. Environ Health Perspect. 2002 Nov; 110(11): 1097–1103.

72. Rohlman S Diane, Anger W Kent, and Lein J Pamela. 2011. Correlating Neurobehavioral Performance With Biomarkers Of Organophosphorous Pesticide Exposure. Neurotoxicology. 2011 Mar; 32(2): 268–276.

73. Ruckart PZ, Kakolewski K, Bove FJ, Kaye WE. 2004. Long-term neurobehavioral health effects of methyl parathion exposure in children in Mississippi and Ohio. Environ Health Perspect 112:46–51

74. Salvi Akita, Salim Samina. 2019. Neurobehavioral Consequences of Traffic-Related Air Pollution. Front Neurosci. 2019; 13: 1232.

75. Schantz SL, Widholm JJ. 2011. Cognitive effects of endocrine-disrupting chemicals in animals. Environmental Health Perspectives. 2001; 109:1197–1206

76. Segura Aguilar, Kostrzewa RM. 2008. Neurotoxins and neurotoxicity mechanisms. An overview. Neurotox Res. 2006 Dec;10(3-4):263-87.

77. Schettler T. 2001. Toxic threats to neurologic development of children. Environ Health Perspect. 2001 Dec;109 Suppl 6:813-6

78. Subramoney Sivenesi, Eastman Emma, Adnams Colleen, Stein J Dan, and Donald A Kirsten. 2018. The Early Developmental Outcomes of Prenatal Alcohol Exposure: A Review. Front Neurol. 2018; 9: 1108.

79. Tapajos Raquel, Castro Daniel, Melo Giseli, Balogun Seyi, James Mark, Pessos Rockson, Almeida Anne, Costa Monica, Pinto Rosemary, Albuquerque Bernardino, Monteiro Wuelcon, Braga Jose, Lacerda Marcus y Mourao Maria Paula. Malaria impact on cognitive function of children in a peri-urban community in the Brazilian Amazon. Malaria Journal. 2019; 18: 173

80. US EPA- B. 2010. United States Environmental Protection Agency. List of Banned or Severely Restricted Pesticides. Pesticides/Regulating Pesticides http://www.epa.gov/opp00001/regulating/restricted.htm

81. US EPA. 2010-. The National Pesticide Program. Office of Pesticide Programs. Washington DC. http://www.epa.gov/pesticides/health/protecting-children.pdf

82. Wagner SL et al. Chronic organophosphate exposure associated with transient hypertonia in an infant. Pediatrics, 1994, 94:94.

83. Weiss B. 2000. Vulnerability of children and the developing brain to neurotoxic hazards. Environ Health Perspect 108(suppl 3):375–381.

84. Weiss B. 2012. The intersection of neurotoxicology and endocrine disruption. Neurotoxicology. 2012 Dec;33(6):1410-9. doi: 10.1016/j.neuro.2012.05.014. Epub 2012 May 31.

85. WHO, 2004, World Health Organization. Children are facing high risks from pesticide poisoning. http://www.who.int/mediacentre/news/notes/2004/np19/en/

86. Wigle DT, Arbuckle TE, Turner MC, Bérubé A, Yang Q, Liu S, Krewski D. 2008. Epidemiologic evidence of relationships between reproductive and child health outcomes and environmental chemical contaminants. J Toxicol Environ Health B Crit Rev. May;11(5-6):373-517.

87. Willis WO, De Peyster A, Molgaard CA, Walker C, MacKendrick T. 1993. Pregnancy outcome among women exposed to pesticides through work or residence in an agricultural area. J Occup Med. 1993 Sep;35(9):943-9.

88. Wilson WW, Shapiro LP, Beadner JM, Caudle WM. 2014. Developmental exposure to the organochlorine insecticide endosulfan damages the nigrostriatal dopamine system in male offspring. Neurotoxicology 2014 Sep; 44:279-87.

89. Wilson W. Wyatt, Wellington Onyenwe, Joshua M. Bradner, Sadie E. Nennig, and W. Michael Caudl. 2014. Developmental Exposure to the Organochlorine Insecticide Endosulfan Alters Expression of Proteins Associated with Neurotransmission in the Frontal Cortex. Synapse. 2014 November ; 68(11): 485–497.

90. Wise RA. 2004. Dopamine, learning and motivation. Nat Rev Neurosci. 2004 Jun; 5(6):483-94

91. Wong Fiona, Henry A. Alegria, Lisa M. Jantunen, Terry F. Bidleman, Miguel Salvador-Figueroa, Gerardo Gold-Bouchot, Victor Ceja-Moreno, Stefan M. Waliszewski, Raul Infanzon. 2008. Organochlorine pesticides in soils and air of southern El Salvador:Chemical profiles and potential for soil emissions. Atmospheric Environment 42 (2008) 7737–7745. http://www.academia.edu/19209603/Organochlorine_pesticides_in_soils_and_air_of_southe rn_El_Salvador_Chemical_profiles_and_potential_for_soil_emissions

92. Westerholm R and Egeback K.E. 1994. Exhaust emissions from light- and heavy-duty vehicles: chemical composition, impact of exhaust after treatment, and fuel parameters. Env Health Perspectives. 1994 Oct;102 Suppl 4(Suppl 4):13-23.

# APPENDIX 213

**Antonio E. Puente, PhD**
Neuropsychology
1508 Military Cutoff Road, Suite 303
Wilmington, North Carolina 28403
Tel. 910.509.9371    Fax.910.509.9372

## AFFIDAVIT PERTAINING TO
## ALEJANDRO UMANA

I, Antonio E. Puente, PhD, declare as follows based on personal knowledge and under penalty of perjury:

1.    I was born in Habana, Cuba and my native language and language preference is Spanish. I am a clinical neuropsychologist licensed to practice in the State of North Carolina. I have been licensed since 1982, with a specialty in clinical neuropsychology and neuropsychological assessments, particularly of Spanish-speakers. I was certified by the American Board of Neuropsychology in 1984 and hold that certification to the present day. In 2014, I was certified by the American Board of Pediatric Neuropsychology. I am a member in good standing of the American Psychological Association (APA), and of the following divisions: 18 (Psychologists in Public Service), 19 (Society for Military Psychology), 22 (Rehabilitation Psychology), 26 (Society for the History of Psychology), 38 (Society for Health Psychology), and 42 (Psychologists in Independent Practice). I am a Fellow in the APA's subspecialty divisions 1, 2, 6, 18, 19, 22, 26, 31, 40, 42, 45, 52, and 55. I served as President of the Division of Clinical Neuropsychology (42) in 1990 and am President-elect for the Division of Behavioral Neuroscience and Comparative Psychology (6). Finally, I served as the APA's President Elect in 2016, President in 2017, and I was Past-President in 2018. I am currently past chair of the APA Advocacy Coordinating Committee and am on the Board of Trustees of the American Psychological Foundation as well as on the Board of Trustees of Albizu University. Further information regarding my qualifications may be found at www.antonioepuente.com.

2.    In addition, I am also a past-president and member in good standing of the National Academy of Neuropsychology (NAN), the Hispanic Neuropsychological Society (HNS), the North Carolina Psychological Association (NCPA), as well as a member in good standing in the International Neuropsychological Society (INS), and the Sociedad Interamericana de Psicología

(SIP). I served on the Executive Board of NAN between 1988 and 2000, and as the President of that organization in 1991. I was a founding board member of the HNS in 2003 and served as its founding President from 2003 to 2005. I also served on the Board of Directors of the North Carolina Psychological Association from 1985 to 1991, and as its President from 1989 to 1990 as well as was founding President of the North Carolina Psychological Foundation in 1991 to 1992.

3. I earned my Bachelor of Arts degree with a major in psychology from the University of Gainesville, Florida, in 1973. I earned my master's and PhD degrees in Psychology at the University of Georgia in Athens, Georgia in 1978. Through the master's and PhD programs, I completed advanced training as well as taught courses and did research in psychopathology, neurocognitive syndromes, neuroanatomy, neurophysiology, memory, and cognitive disorders.

4. I was employed as a Mental Health Technician at St. John's River Hospital in Jacksonville, Florida in 1974, and at St. Vincent's Hospital in the same city, in 1975. In 1976 and 1977, I worked as a Laboratory Instructor/Teaching Assistant at the University of Georgia. In 1978, I served as an Assistant Professor of Neuroanatomy at St. George's University in Grenada, West Indies. Between 1979 and 1981, I was a Clinical Psychologist at Northeast Florida State Hospital and served as an Adjunct Lecturer in Psychology at the University of North Florida. Since 1981, I have been employed at the University of North Carolina Wilmington. I served as a Visiting Assistant Professor of Psychology in 1981, Assistant Professor of Psychology from 1982 through 1985, Associate Professor of Psychology from 1986 to 1990, and I became a Full Professor of Psychology in 1990. I founded Centro Hispano at the University of North Carolina Wilmington in 2005 and served as its director between 2005 and 2007. I am a Visiting Professor of Psychology at the Universidad de Granada in Spain since 1988, at the University of California, Los Angeles since 2009, and at the University of North Carolina at Chapel Hill between 2010 and 2013. I am an Honorary Professor of Psychology at the Universidad Autonoma de Lima in Peru and the Moscow State University in Russia.

5. The relationship with the Faculty of Psychology at the Moscow State University spans three decades. I was the first western psychologist to visit Alexander Luria's Neuropsychological Laboratory at Moscow State University after the demise of the Soviet Union and the opening of Russia to western visitors. During subsequent visits to Moscow and to Wilmington, North Carolina, from individuals that had studied with Luria as well as graduate

students from their Laboratory, I came to understand and adopt the Lurian approach to understanding brain damaged individuals. This perspective places brain functioning within a socio-historical-cultural context. This requires not only to interview and test the individual but to interview collaterals and place the individual in the larger and more complex socio-historical-cultural context. This is best accomplished by delving into life before the age of 18 in which the individual was raised because it is these environments that help shape the neuropsychological abilities of the person. Traveling and studying the context that the individual was raised in is an important addition to the collateral information provided by informants.

6. Since 1982, I have maintained a private practice in clinical neuropsychology in Wilmington, North Carolina, conducting neuropsychological assessments and psychological evaluations and providing rehabilitation services for neuropsychological and neurological disorders. In this capacity, I have trained numerous graduate students in the US and Spain (included served as President of 15 psychology doctoral dissertation tribunals) and 12 post-doctoral fellows as well as having hosted numerous clinicians and scientists from the US and abroad to my clinic and laboratory.

7. I have co-authored and edited several books on neuropsychological assessment, including *A Visual Study Guide of the Nervous System* (published by North Coast Press in 1978); *Item Interpretation of the Luria-Nebraska Neuropsychological Battery* (published by the University of Nebraska Press in 1982); *Handbook of Neuropsychological Assessment: A Biopsychosocial Perspective* (published by Plenum in 1992); *Neuropsychological Evaluation of the Spanish Speaker* (published by Plenum in 1994); *Examen de Inteligencia Wechsler Para Niños - III Edición* (published by The Psychological Corporation in 1997); *Localization of Clinical Syndromes in Neuropsychology and Neuroscience* (published by Peter Publishers in Russia in 2007 and by Springer in New York in 2009); *Contemporary Neurobehavioral Syndromes* (published by Psychology Press in 2011); and *A Brief History of Psychology* (Routledge Press, 2020). Most recently, I was involved in the development of the Spanish version of the Third Edition of the Minnesota Multiphasic Personality Inventory (MMPI-3), published by the University of Minnesota Press/Pearson. In addition, I was on the Committee that wrote the *Standards for Educational and Psychological Tests* (American Psychological Association Press, 2014). I have also authored and co-authored over 90 book chapters and am author of over 110 articles published

in peer-reviewed journals and publications in English, Spanish, Russian, Italian, Arabic and Portuguese. In addition, I have presented approximately 700 times around the nation and the world.

8. I founded and served as Associate Editor of the *Neuropsychology Review* from 1990 to 1996 and served as the Editor from 1996 until 2006. I served as editor of a book series entitled *Critical Issues in Neuropsychology* from 1984 to 2005. I was the editor of the *Handbook of Human Brain Function* from 1995 to 1998. I currently serve on the editorial boards of several peer-review publications, including *Archives of Clinical Neuropsychology* (since 1988), *Revista de Neuropsicología, Neuropsiquiatría, y Neurosciencia* (since 1999), *Applied Neuropsychology - Adult* (since 2011), and *Applied Neuropsychology - Child* (since 2012), *University of Bethlehem Journal* (since 2020) and the *Lurian Neuropsychological Journal* (since 2020).

9. I have been involved in the translation of several psychological and neuropsychological instruments from English to Spanish, including: The Whitaker Index of Schizophrenic Thinking, published by Western Psychological Services in 1985; The Luria-Nebraska Neuropsychological Battery, published by Western Psychological Services in 1990; the Wechsler Intelligence Scales for Children, Third Edition (WISC-III), published by The Psychological Corporation in 1997; the Test of Memory Malingering (TOMM), published by TEA Ediciones in 2011; and the Minnesota Multiphasic Personality Inventory, Third Edition (MMPI-3), in 2020 by University of Minnesota Press/Pearson. I also served as the External Project Director for the Spanish adaptation of the Wechsler Intelligence Scale for Children published by The Psychological Corporation (now Pearson) from 1994 to 1998 and have been assisting Pearson with the translation and adaption of the newer Wechsler Scales, as well as numerous other tests through other psychological test publishers.

10. I have received numerous awards related to my teaching, clinical practice, and other professional activities, including the APA's Karl Heiser Award in 1996 (for promotion and advocacy of the role of psychological professionals in the broader community); the APA's Presidential Award in 2006 and in 2020; the APA's State Leadership Award in 2009; the APA's Award for Distinguished Professional Contributions to Independent Practice in 2011; the North Carolina Psychological Association's Mary C. Clarke Award in 2002, its Sally Cameron Award in 2006, its Lifetime Achievement Award in 2008, and its Presidential Award in 2012, all awards for contributions to the field of psychology in North Carolina. I received the Distinguished Faculty

Scholarship Award from the University of North Carolina, Wilmington, in 2009, and the Discere Aude Award for Outstanding Professor from UNCW in 2011. I have received Lifetime Achievement Awards from the Massachusetts Neuropsychology Society in 2014, the Spanish Forensic Neuropsychological Association in 2017, and the Catalunya Psychological Association in Spain in 2020. I was a Fulbright Scholar to Argentina in 1982. In 2018, I became Honorary Member of the Peruvian Psychological Association, and in 2019 I received the Interamerican Award from the Sociedad Interamericana de Psicologia.

11.     I have been deemed qualified to testify as an expert in psychological and neuropsychological evaluation and the diagnosis of cognitive and intellectual deficits in federal, state, and local courts including the states of Arizona, California, Florida, New York, North Carolina, and Texas. I have testified numerous times in civil and criminal cases involving issues of brain damage and dysfunction, cognitive and intellectual deficits, and adaptive functioning limitations on behalf of the plaintiff, the prosecution, and the defense. In the last five years, I have testified 8 times.

12.     As part of my practice, I conduct forensic neuropsychological evaluations on individuals involved in the judicial system. I am well versed in the standards and practices for the administration of such evaluations, especially those involving Spanish speakers.

13.     As part of those evaluations, there are four segments: review of records, interviews of both the client, significant others, and related informants, comprehensive testing, and integration of all of the preceding to develop a comprehensive analysis and report.

14.     I have testified numerous times in civil and criminal cases involving issues of brain damage and dysfunction, cognitive and intellectual abilities, and adaptive functioning on behalf of the plaintiff, the prosecution, and the defense.

REFERENCE QUESTION AND PROCEDURE

15.     The testing data obtained by Drs. Ricardo Weinstein, Enrique Suarez, and Leo Shea during their neuropsychological evaluations of Alejandro Umana, DOB 11.25.1982 were reviewed.

16.     Dr. Ricardo Weinstein tested Mr. Umana on July 1 and 2 of 2009 as well as December 1 of 2009. Dr. Suarez tested Mr. Umana on September 29 and 30 of 2009. Dr. Shea

tested Mr. Umana on March 14 and 15 of 2016 as well as May 20 of 2016. As a consequence, each evaluation is reviewed in the order that they occurred.

17. Each psychologist administered a variety of neuropsychological and intellectual tests assessing both intellectual abilities as well as different neurocognitive domains.

18. However, only tests assessing intellectual functioning which yielded an Intellectual Quotient (IQ) will be discussed in this affidavit.

19. All raw scores obtained from the three separate evaluations were scored and double scored by trained psychometric technicians under my supervision and were reviewed by me.

20. The final set of scores and conclusions provided in this affidavit as well as the actual affidavit were developed by me.

PURPOSE OF ASSESSMENT

21. I was retained by defense counsel to evaluate whether the testing and test results for intellectual functioning indicated that Mr. Umana falls within the scientifically and professionally accepted range of intellectual disability as defined by the standards and science of the profession. These are outlined in sections #22 through #34.

DEFINING INTELLECTUAL DISABILITY

22. There are three systems currently used by the scientific and professional communities in the United States and the world to diagnose Intellectual Disability (ID; also known as Mental Retardation).

23. The three systems are the International Classification of Diseases, Tenth Edition (ICD-10; 1990), which is published by the World Health Organization; the Diagnostic and Statistical Manual, Fifth Edition (DMS-5; 2013), which is published by the American Psychiatric Association; and the American Association of Intellectual and Developmental Disabilities Classification of Intellectual Disabilities, Eleventh Edition (AAIDD; 2010), published by the American Association of Intellectual and Developmental Disabilities.

24. All three of these diagnostic systems apply a three Prong approach to diagnosing Intellectual Disability or ID.

25.     The first Prong involves the measurement of an individual's Intelligence Quotient (IQ) using a psychological test. Though there are several widely used tests of intelligence, the most common one for adults is the Wechsler Adult Intelligence Scale (WAIS) which has been translated and adapted into Spanish for Spanish-speaking individuals from several countries namely Mexico, Puerto Rico, and Spain. Specifically, the score must be in the lower second percentile of the population. That is, out of 100 individuals, the IQ must be in the lowest second percentile to fulfill the criteria of Prong 1 Intellectual Disability. In addition, a standard error of measurement (SEM) is applied. This indicates that in 95 out of 100 cases, the obtained score falls plus or minus a predetermined scientifically specific amount. For many IQ tests, including the Wechsler scales, the SEM is typically plus or minus 5 points. In terms of the WAIS, for a score to fulfill Prong 1 of Intellectual Disability, the IQ must be below 70 with an SEM of +/- 5 or 75.

26.     The second prong involves the measurement of an individual's adaptive abilities using records, observations, and interviews.

27.     The third prong involves the determination of whether the deficits outlined in Prong 1 and 2 emerged prior to the age of 18.

28.     In the present case, the focus is on assessing whether the IQs obtained by Drs. Weinstein, Suarez, and Shea indicate that Mr. Umana's IQ falls in the Intellectual Disability range (i.e., Prong 1) as defined by the ICD, DSM, and/or AAIDD.

29.     In order to satisfy Prong 1, based on the definition provided in the latest version of the *International Classification of Disease* (ICD-10), the individual must have significantly below average intellectual functioning that is approximately two or more standard deviations below the mean (approximately at or below the 2nd percentile), based on appropriately normed as well as individually administered standardized tests.

30.     In order to satisfy Prong 1, based on the definition provided in the latest version of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5), the individual must exhibit deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience confirmed by both clinical assessment and individualized standardized intelligence testing, resulting in scores significantly subaverage.

31. In order to satisfy Prong 1, based on the most current definition provided by the *American Association on Intellectual and Developmental Disabilities* (AAIDD, 11th Edition), the individual must exhibit significant deficits in general mental capability involving the ability to reason, plan, solve problems, think abstractly, comprehend complex ideas, learn quickly, and learn from experience. Limitations in intellectual functioning are generally thought to be present if an individual has an IQ test score approximately two standard deviations below the mean, considering the standard error of measurement.

CULTURALLY APPROPRIATE TESTS, NORMS, ADMINISTRATION, AND INTERPRETATION

32. All psychological tests, such as those that involve the measurement of an IQ, need to reflect correct measurement of the construct in question. To do otherwise would result in error in measurement, technically referred to as construct irrelevance. Incorrect measurement would result in a modification of the test and its construct. Such error would prove unfair and incorrect which would result in inaccurate conclusions.

33. As a consequence, the test must be developed, administered, and interpreted in a manner that reduces error in order to obtain the correct measurement and, hence, correct diagnosis. When testing an individual whose first acquired or preferred language is not English, appropriate accommodations need to be made. This would involve having the test not only scientifically translated but also adapted to make sure that what is being measured is correct. Also, the test should be administered and interpreted by individuals trained in these linguistic and cultural variables and who understand the socio-cultural-history of the client.

34. Interpretation of the findings are best accomplished when those findings are compared with data that has been obtained from a reference sample with a similar linguistic and cultural background. To do otherwise will increase error in measurement or construct irrelevance.

REVIEW OF TESTING DATA

35. Drs. Ricardo Weinstein, Enrique Suarez, and Leo Shea administered a range of tests assessing intellectual functioning. The following table provides the tests administered to Mr. Umana and the abbreviations of the tests that will be used hereafter.

| ABBREVIATION | TEST |
|---|---|
| WAIS-III | Escala Wechsler de Inteligencia Para Adultos, Third Edition (Mexican version) |
| CTONI | Comprehensive Test of Nonverbal Intelligence |
| EIWA-III | Escala de Inteligencia Wechsler Para Adultos (Puerto Rican version) |
| TONI 3 | Test of Nonverbal Intelligence, Third Edition |
| CTONI 2 | Comprehensive Test of Nonverbal Intelligence, Second Edition |
| WAIS-IV | Escala Wechsler de Inteligencia Para Adultos, Fourth Edition (Spaniard version) |

NOTE: All the Spanish translations of the Wechsler scales were completed under the license of the Wechsler Adult Intelligence Scale copyright (Pearson) but are published by different companies. The Mexican version is published by Manual Moderno (Mexico City, Mexico). The Puerto Rican version is published by Pearson (Psychological Corporation, San Antonio, Texas). The Spaniard version is published by TEA Ediciones (Madrid, Spain).

36. Each test is comprised of several subtests which when aggregated produce a Full-Scale IQ. This is the IQ score used to determine whether an individual meets Prong 1 of Intellectual Disability according to one or more of the diagnostic criteria.

37. Since there were three different versions of the WAIS in Spanish administered, comparison across the different obtained IQs was accomplished by comparing them to other versions of the tests, including the standard American version.

38. In addition, to address the veracity of each of the IQs, each item score was checked to determine whether the raw score was correct since the aggregate of these scores comprises the different subtests of the WAIS which in turn produces the Full-Scale IQ. The process of determining whether the raw score was correctly converted into a statistically appropriate derived score is referred to as rescoring.

39. Each of the Wechsler IQ tests were rescored twice by trained psychometric technicians and reviewed by me according to the manual used by the psychologist who administered the IQ test. The scorings were done blindly so each technician did not know the scores obtained by the previous technician nor the purpose of the evaluation or rescoring. The blind scoring reduces potential bias and increases scientific rigor. If a discrepancy was obtained, the two technicians met together with me to discuss the discrepancies and then to obtain consensus of the final score.

40. The following table provides a presentation of all the rescored IQ scores and percentiles according to the Mexican, Puerto Rican, US (American), and Spaniard versions as obtained by the three psychologists. Note that the version administered by the psychologist is marked with an asterisk (*) but that the rescored scores obtained by that psychologist have been converted, for comparison, across the three other versions of the WAIS. Hence, each Full-Scale IQ has four scores: the original one and the three comparison scores.

**WAIS Full Scale Table: Comparison Across Evaluators**

| Test | IQ | | | | Percentile | | | |
|---|---|---|---|---|---|---|---|---|
| 07/2009 | WEINSTEIN | | | | WEINSTEIN | | | |
| WAIS-III/ EIWA-III Full Scale | Mexican* | Puerto Rican | US | Spaniard | Mexican* | Puerto Rican | US | Spaniard |
| | 60 | 75 | 66 | 57 | - | 5 | 1 | 0.2 |
| 09/2009 | SUAREZ | | | | SUAREZ | | | |
| WAIS-III/ EIWA-III Full Scale | Mexican | Puerto Rican* | US | Spaniard | Mexican | Puerto Rican * | US | Spaniard |
| | 81 | 94 | 82 | 76 | 10 | 34 | 12 | 5 |
| 03/2016 | SHEA | | | | SHEA | | | |
| WAIS-IV Full Scale | Mexican | Puerto Rican | US | Spaniard* | Mexican | Puerto Rican | US | Spaniard* |
| | 85 | N/A | 75 | 66 | 16 | N/A | 5 | 1 |

*Represents version administered by the corresponding psychologist.
All scores represent the data obtained when rescoring Drs. Weinstein's, Suarez's, and Shea's raw data.

41. The three psychologists also administered the Test of Nonverbal Intelligence (TONI), which is a screening or brief version of the longer and more comprehensive version of the test called the Comprehensive Test of Nonverbal Intelligence (CTONI). Dr. Weinstein administered the first edition of the CTONI initially and subsequently administered the second edition of the CTONI (CTONI 2). Dr. Suarez only administered the TONI, Third Edition (TONI 3). Dr. Shea administered the CTONI 2.

**CTONI/TONI Table: Comparison Across Evaluators**

| TEST | Composite Index | | | | Percentile | | | |
|---|---|---|---|---|---|---|---|---|
| | Weinstein 07/2009 | Suarez 09/2009 | Weinstein 12/2009* | Shea 03/2016 | Weinstein 07/2009 | Suarez 09/2009 | Weinstein 12/2009* | Shea 03/2016 |
| **TONI 3** | - | 85 | - | - | - | 16 | - | - |
| **CTONI** Nonverbal IQ Pictorial IQ Geometric IQ | 53 55 57 | - | - | - | - | - | - | - |
| **CTONI 2** Pictorial Scale Geometric Scale Full Scale | - | - | 61 61 58 | 63 81 68 | - | - | <1 <1 <1 | <1 10 1 |

\*Dr. Weinstein's CTONI-2 scores in the table represent the rescored data. All other scores were rescored and were correct.

### (a) PRESENTATION AND ANALYSIS OF THE TESTING BY DRS. WEINSTEIN, SUAREZ, AND SHEA

42. Mr. Umana was assessed in 2009 (three times) and 2016 (once) by three psychologists: Ricardo Weinstein, PhD, Enrique Suarez, PhD, and Leo J. Shea, PhD. During these evaluations, Mr. Umana was administered six different tests to assess his overall intellectual functioning. The Wechsler Adult Intelligence Scale was administered three times, one using the Mexican version, another using the Puerto Rican version and finally another time using the Spaniard version. The family of non-verbal tests, Test of Nonverbal Intelligence, was administer four times, using the short version once and the comprehensive version three times (once the original version, twice the second edition). Of note, the CTONI 2 was administered twice by two different evaluators, as indicated in the following table.

| DATE OF TESTING | TEST | EVALUATOR |
|---|---|---|
| 07/2009 | WAIS-III (Mexican) | Dr. Ricardo Weinstein |
| 07/2009 | CTONI | Dr. Ricardo Weinstein |
| 09/2009 | EIWA-III | Dr. Enrique Suarez |
| 09/2009 | TONI 3 | Dr. Enrique Suarez |
| 12/2009 | CTONI 2 | Dr. Ricardo Weinstein |
| 03/2016 | WAIS-IV (Spaniard) | Dr. Leo Shea |
| 03/2016 | CTONI 2 | Dr. Leo Shea |

Note: In addition, Dr. Shea administered the Test of Memory Malingering (TOMM) on 05.2016.

## (b) TESTING BY RICARDO WEINSTEIN, PHD.

43.    Dr. Ricardo Weinstein tested Mr. Umana on two separate occasions: July 2009 and December 2009. Dr. Weinstein administered IQ tests including the Mexican version of the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III, Mexican), the Comprehensive Test of Nonverbal Intelligence (CTONI), and the Comprehensive Test of Nonverbal Intelligence, Second Edition (CTONI 2).

44.    The IQ tests that Dr. Weinstein administered to Mr. Umana in July 2009 were the WAIS-III (Mexican) and the CTONI. The WAIS III was published in 2003 by Manual Moderno in Mexico. No errors were found in the scoring of testing items throughout the WAIS-III, Mexican. Dr. Weinstein, however, used incorrect normative data to obtain the overall scores (i.e., resulting in incorrect Sum of Scaled scores, Indexes, IQ Quotients, and percentiles). He incorrectly noted Mr. Umana's date of birth as November 25, 1984, making Mr. Umana two years younger than his actual age. Dr. Weinstein's raw data are shown below (unbolded), while my derived values after double scoring Dr. Weinstein's raw data are shown below (**bolded**). The Verbal IQ dropped four points to 66, the Performance IQ increased by five points to 73 and the Full-Scale IQ dropped by 6 points to 60.

| TEST | SUM OF SS | | INDEX/IQ | | PERCENTILE | |
|---|---|---|---|---|---|---|
| WAIS-III (Mexican) | | | | | | |
| Verbal | 30 | **33** | 70 | **66** | 2 | **≤1** |
| Performance | 24 | **24** | 68 | **≤73** | 2 | **4** |
| Full Scale | 54 | **57** | 66 | **60** | 1 | **<1*** |
| Verbal Comprehension | 17 | **17** | 76 | **74** | 5 | **4** |
| Perceptual Organization | 15 | **11** | 70 | **69** | 2 | **≤2** |
| Working Memory | 14 | **16** | 67 | **89** | 1 | **23** |
| Processing Speed | 9 | **13** | 71 | **74** | 3 | **4** |

*The WAIS-III (Mexican) does not provide percentiles of IQs below 65. However, it is estimated that since 60 is lower than 65 and 65 is the lowest percentile reported, a Full-Scale IQ of 60 for the Mexican version of the WAIS III would be the lowest 1st percentile.

45.    Dr. Weinstein also administered the CTONI in July 2009. Rescoring was not possible as raw data was not provided for this test and a computer-generated summary was obtained instead. Of note, Dr. Weinstein incorrectly noted Mr. Umana's data of birth and Mr. Umana's age is noted as 24 rather than 26. However, this would not change the reference or comparison table and, thus, the IQ would not change. Dr. Weinstein derived a Nonverbal IQ of 53

with a Pictorial Nonverbal IQ of 55, and a Geometric Nonverbal IQ of 57. These scores would place him at the lowest 1st percentile.

46. Dr. Weinstein tested Mr. Umana again in December 2009 using the CTONI 2. No errors were found in scoring of testing items, however, there were discrepancies in global scores between the rescoring and Dr. Weinstein's derived scores. Dr. Weinstein's scores for Pictorial Scale and Geometric Scale Indexes were four points lower, while the Full-Scale Index Quotient was five points lower. This was a result of Dr. Weinstein incorrectly noting Mr. Umana's date of birth.[1] Nonetheless, Mr. Umana still fell below the 1st percentile for all global scores on the CTONI. Dr. Weinstein's raw data are shown below (unbolded), while my derived values after double scoring Dr. Weinstein's raw data are shown in **bold**.

| TEST/Scale | SUM OF SS | | INDEX/IQ | | PERCENTILE | |
|---|---|---|---|---|---|---|
| CTONI 2 | | | | | | |
| Pictorial Scale | 10 | **12** | 57 | **61** | <1 | **<1** |
| Geometric Scale | 10 | **12** | 57 | **61** | <1 | **<1** |
| Full Scale | 20 | **24** | 53 | **58** | <1 | **<1** |

47. The non-corrected scores from the intellectual tests (WAIS-III, Mexican and CTONI 2) administered by Dr. Weinstein provide IQs of 66 and 53. The corrected scores from the intellectual tests (WAIS-III, Mexican and CTONI 2) administered by Dr. Weinstein provide IQs of 60 and 58. Both the non-corrected and corrected IQs obtained by Dr. Weinstein satisfy Prong #1 of all diagnostic systems for Intellectual Disability.

### (c) TESTING BY ENRIQUE SUAREZ, PHD.

48. Dr. Enrique Suarez tested Mr. Umana in September 2009. Dr. Suarez administered the Escala de Inteligencia Para Adultos, Tercera Edición (EIWA-III), which is the Puerto Rican version of the WAIS, and the Test of Nonverbal Intelligence, Third Edition (TONI 3), which is a screening version of the parent Comprehensive Test of Nonverbal Intelligence (CTONI).

49. An error was found in scoring of the EIWA-III as Dr. Suarez miscounted the "Vocabulario" subtest and granted a score of 20 rather than 19. Furthermore, Dr. Suarez incorrectly noted Mr. Umana's date of birth. This resulted in discrepancies between Dr. Suarez's and my scoring. The Full-Scale IQ changed from 93 to 94. Scores from the EIWA-III are shown below,

---

[1] Mr. Umana's date of birth was noted as November 25, 1984 rather than November 25, 1982.

where Dr. Suarez's calculated scores are listed first (unbolded), while values noted in **bold** represent my derived scores following double scoring of his materials.

| TEST | SUM OF SS | | INDEX/IQ | | PERCENTILE | |
|---|---|---|---|---|---|---|
| EIWA-III | | | | | | |
| Verbal | 55 | **54** | 95 | **94** | 37 | **34** |
| Ejecución | 45 | **47** | 93 | **96** | 32 | **39** |
| Total | 100 | **101** | 93 | **94** | 32 | **34** |
| Comprensión Verbal | 24 | **24** | 89 | **89** | 23 | **23** |
| Organización Perceptual | 28 | **30** | 96 | **100** | 39 | **50** |
| Memoria de Trabajo | 26 | **27** | 92 | **94** | 30 | **34** |

50. Dr. Suarez also administered the TONI 3. No errors were found after re-scoring test scores. Dr. Suarez's derived scores yielded an IQ of 85, falling in the 16th percentile. This score is the upper end of the borderline range.

51. It is important to note that Dr. Suarez administered the Puerto Rican version of the WAIS (i.e., the EIWA). The sample from Puerto Rico contains a limited sample of subjects, a total of 330, that were stratified according to age, sex, and educational attainment but not geographic stratification. In addition, there are questionable psychometrics based on the scientific literature and clinical use. In contrast, the Spaniard version of the WAIS-III uses 2,450 subjects and is stratified according age, sex, educational attainment, as well as geographic origin (e.g., rural vs city). The scientific literature and clinical use validate the strength of the Spaniard versus the Puerto Rican version of the WAIS.

52. There is extensive literature indicating that the EIWA significantly over-estimates IQs and therefore significant caution should be taken in determining the correct Full-Scale IQ when this test is applied. The scientific literature (references at end of affidavit) as well as our own research indicates psychometric problems of this version of the test resulting in clinically significant errors in intellectual classification (from an actually lower classification, such as Intellectual Disability, to a higher one, such as Borderline). In one study, the IQ was overestimated by 27 points higher. Hence, when applying scientific findings associated with the overestimation of the Puerto Rican version of the WAIS to Dr. Suarez' findings, they indicate that the actual IQ could be as low 67. In summary, the Puerto Rican version of the WAIS is psychometrically invalid resulting in incorrect and over-inflated IQ scores.

53.     In addition, Dr. Suarez tested Mr. Umana approximately two months after Dr. Weinstein tested him using a slightly different version of the WAIS (Mexican and Puerto Rican, respectively). Most of the items and stimuli are similar resulting in highly likely practice effects. Research using the English version of the WAIS-III indicates that practice effects are present at 3 months and are sustained up to at least 6 months after the WAIS-III is administered consecutively. The practice effects are approximately 6 points. In this case, the obtained corrected score of 94 would actually be 88 based solely on practice effects.

54.     In summary, if you add points due to overestimation of the Puerto Rican version of the WAIS (up to 27) and the practice effects (approximately 6), the total overestimation of the IQ obtained by Dr. Suarez could be as high as 33 points. These 33 points exceed two standard deviations, lowers the obtained corrected IQ from 94 to 61, and shifts intellectual abilities classification by two classification systems (e.g., from Normal to Intellectually Disabled).

55.     When this statistical reconstruction is completed the Full-Scale IQ of 61 is similar to the corrected Full-Scale IQ that Dr. Weinstein obtained of 60.

56.     Additionally, Mr. Umana is from El Salvador which is geographically relatively close to Mexico. Both El Salvador and Mexico are considered as part of Central America. The EIWA, which is the test that was administered to Mr. Umana, was developed, normed, and intended for use in a Puerto Rican population. Puerto Rico is grouped with Cuba, both nearby islands in the Caribbean, as representing Caribbean Hispanics. In summary, the Hispanic subcultures of El Salvador and Mexico, both from Central America, are more homogenous than the subcultures of El Salvador and Puerto Rico, both in terms of language and behavioral norms.

57.     In conclusion, the Mexican version of the WAIS is more appropriate to be administered to Mr. Umana than the Puerto Rican version both because of psychometric invalidity of the Puerto Rican WAIS (i.e., EIWA) and the fact that the cultures of Puerto Rico are much different than the Mexican one when compared to that of El Salvador.

### (d) TESTING BY LEO J. SHEA, PHD.

58.     Dr. Leo J. Shea tested Mr. Umana in March 2016 and May 2016. The Spaniard WAIS-IV and the CTONI 2 were administered to Mr. Umana. No errors were found in scoring of testing items throughout the tests. However, the raw scores for "Búsqueda de Símbolos" and

"Claves" were interchanged on the WAIS-IV scoring sheet. This resulted in incorrect Scaled Scores, Sum of Scaled scores, Indexes, Quotients, and percentiles. Scores for the WAIS-IV (Spaniard) are shown below, where values listed first (unbolded) represent Dr. Shea's scoring. The corrected scores from my double re-scoring of the materials are shown in the table below **bolded.** NOTE: The following scores are from Dr. Shea's application of the Spaniard WAIS with American norms.

| TEST | SUM OF SS | | INDEX/IQ | | PERCENTILE | |
|---|---|---|---|---|---|---|
| WAIS-IV (Spaniard) | | | | | | |
| Comprensión Verbal | 17 | **17** | 73 | **73** | 4 | **4** |
| Razonamiento Perceptual | 17 | **17** | 73 | **73** | 4 | **4** |
| Memoria de Trabajo | 14 | **14** | 82 | **82** | 12 | **12** |
| Velocidad de Procesamiento | 12 | **8** | 78 | **67** | 7 | **1** |
| CI Total | 60 | **56** | 69 | **66** | 2 | **1** |

59.　It is important to note, however, that Dr. Shea used the Spaniard version of the WAIS-IV, but he used American norms. The mismatch between test and norms violates the manual published with the test, the *Standards for Educational and Psychological Testing,* and professional practice patterns. As a consequence, the Spaniard WAIS-IV was rescored with the appropriate norms published with that test.

60.　The following table is the application of the WAIS-IV (Spaniard) with the appropriate norms from that version of the test. Note that these scores are based on the corrected scores (**bolded** in the prior table found in paragraph #57). Also, the scores using the Spaniard norms reflect exactly the same scores as found with the American norms. The Full-Scale IQ is 66 using American and Spaniard norms.

| TEST | SUM OF SS | INDEX/IQ | PERCENTILE |
|---|---|---|---|
| WAIS-IV (Spaniard) | | | |
| Comprensión Verbal | 17 | 73 | 4 |
| Razonamiento Perceptual | 17 | 73 | 4 |
| Memoria de Trabajo | 14 | 82 | 12 |
| Velocidad de Procesamiento | 8 | 67 | 1 |
| CI Total | 56 | 66 | 1 |

61.　Dr. Shea also administered the CTONI 2. No errors were found in the scoring of this test. The derived scores are reflected in the table below:

| TEST | SUM OF SS | INDEX/IQ | PERCENTILE |
|---|---|---|---|
| CTONI 2 | | | |
| Pictorial Scale | 13 | 63 | <1 |
| Geometric Scale | 21 | 81 | 10 |
| Full Scale | 34 | 68 | 1 |

62. In addition, Dr. Shea returned on May 20, 2016 and administered the Test of Memory Malingering (TOMM). These scores of 50 out of 50 in both Trial 1 and 2 indicate that his performance was considered as valid. This provides support that the scores obtained by Dr. Shea are considered as indicative of a true performance on the part of Mr. Umana.

63. The scores from Dr. Shea's application of the WAIS-IV (Spaniard), which resulted in a corrected Full-Scale IQ of 66 and the CTONI 2 Full Scale IQ of 68. These scores satisfy Prong 1 of any diagnostic system for Intellectual Disability.

OVERALL SUMMARY

64. Three psychologists administered six different psychological tests yielding seven different IQs in separate neuropsychological evaluations. In summary, a total of seven IQ scores have been obtained for Alejandro Umana between July 2009 and March 2016.

65. Several points should be taken into consideration when interpreting the results of the three evaluations. The benchmark test involving measurement of intellectual ability was developed by the late David Wechsler: The Wechsler Adult Intelligence Scale or the WAIS. The WAIS has been translated into Spanish and the three most commonly used versions of the test are the Mexican, Puerto Rican, and Spaniard version of the test. First, prior studies especially in our laboratory indicate that the three versions are not equivalent. Of greatest significance among the three Spanish versions and their comparison with the gold-standard and original version of the WAIS (American) is that the Puerto Rican version is the scientifically weakest and the one version that produces the greatest amount of error in measurement. The sample from Puerto Rico is relatively small and not similarly stratified as in the other Spanish versions used in this evaluation. In numerous studies, including from our laboratory, the EIWA produces a highly inflated Full-Scale IQ that is estimated to be approximately one standard deviation, or 15 points, higher than expected but up to 27 additional points. This inflated score would produce an invalid score and an incorrect classification of intellectual ability. Second, there is a significant problem with practice effects. The EIWA that was administered by Dr. Suarez was administered two months after the

Mexican version of this test had been given. Practice effects can occur even after 6 months, indicating that a higher score would occur in the second administration of the test resulting in an inflated and incorrect score. Further, according to the Standards for Educational and Psychological Testing, repeat testing should not occur within such a brief time span due to the practice effects resulting in higher and incorrect scores in the second administration. For example, research suggests that repeat administration of the American and original version of WAIS-III within a three to six-month window can result in a 6-point increase to the originally attained IQ scores. The overestimation and the 6-point practice effect could inflate the already inflated scores of the EIWA by an additional 21 to 33 points. These points represent an increase of one to two standard deviations and would change the diagnosis by at least one or up to two entire classification systems (e.g., from Normal to Borderline or from Normal to Intellectually Disabled). Finally, the linguistic and cultural dissimilarities between El Salvador and Puerto Rico make the use of this version of the WAIS inappropriate. These two Spanish speaking countries have dissimilar linguistic and cultural norms and habits since one is in Central American and the other is from the Caribbean. El Salvador and Mexico are Central American countries that share many similar linguistic and cultural variables that are not shared between El Salvador and Puerto Rico. In summary, due to a combination of the poor psychometric qualities of the test, practice effects, and linguistic and cultural dissimilarities, the results of the EIWA as reported for Mr. Umana by Dr. Suarez are considered invalid.

66. If statistical adjustments occur on the scores obtained using the Puerto Rican version of the WAIS III based on the scientific literature, the revised statistical Full-Scale IQ scores of using the WAIS between 60 to 66 and using the CTONI of between 58 and 68. Any of these scores would meet Prong 1 of all diagnostic nomenclatures for Intellectual Disability.

67. When all three evaluations are reviewed, all have errors in scoring. However, only two of the three, Drs. Weinstein and Shea, are considered to have met the Standards of Educational and Psychological Tests, the rigors of the scientific literature, and professional practice standards.

68. Dr. Weinstein's evaluations yielded a WAIS-III (Mexican) Full-Scale IQ of 60 and a CTONI 2 Full-Scale IQ of 58. Both of these IQ scores fulfill the requirements of Prong 1 of all diagnostic systems for Intellectual Disability.

69. Dr. Shea's evaluation yielded a WAIS-IV (Spaniard) Full-Scale IQ of 66 and a CTONI 2 Full-Scale IQ of 68. Both of these IQ scores fulfill the requirements of Prong 1 of all diagnostic systems for Intellectual Disability.

70. Dr. Weinstein used the best matched Spanish version of the WAIS using linguistic and cultural variables as the most important variable to match the IQ test to the individual's culture. The number of items that are distinctly Mexican is negligible and those items are easily identifiable by other Hispanics of Central American descent.

71. Dr. Shea used the best matched Spanish version of the WAIS using psychometric criteria as the most important. The Spaniard version of the WAIS is the most scientifically sophisticated due to its translation, adaptation, and norming. Further, it is the closest Spanish version psychometrically to the gold-standard, the American, and original version of the WAIS.

72. In contrast, the scores obtained using the Puerto Rican version of the WAIS is considered invalid for three reasons. First, this version of the test was developed by and for Puerto Ricans. The number of items in the Puerto Rican version that may not be understood by Central Americans is clinically important. Second, the psychometric science fundamental to the Puerto Rican version is flawed in that this version may overestimate a Full-Scale IQ by a significant amount according to the scientific literature as well as our own research. Third, there are practice effects that come into play for the administration of any WAIS within a short time span. Practice effects occur when the same or similar versions of the original tests are administered soon after the initial one. What occurs according to the scientific literature and common practice standards is that the second administration of the test yields higher score due to practice, recognition of the items, recognition of the process, and the reduction of novelty of both the items and the process. These introduce significant errors during the second administration resulting in higher and invalid scores for the second administration of the test.

73. As a function of the mismatched linguistic and cultural variables of El Salvador and Puerto Rico, the poor psychometric science of the EIWA, and practice effects, the scores from the evaluation of Dr. Suarez are considered invalid. Hence, these scores cannot be used in addressing Prong 1 of any diagnostic system of Intellectual Disability.

74. In addition, it is important to note that the Mexican WAIS score obtained by Dr. Weinstein in 2009 is very similar to those obtained by Dr. Shea in 2016. Since the scientific

literature and clinical standards indicate significant problems with the Puerto Rican version of the WAIS, the scores of IQ of 60 by Dr. Weinstein and IQ of 66 by Dr. Shea should be considered as the most acceptable in the determining the IQ of Mr. Umana.

75.     Based on this analysis, the IQ obtained by these two professionals, Drs. Weinstein and Shea, satisfy Prong I of all versions (e.g., AAIDD, APA, and WHO diagnostic nomenclature) of Intellectual Disability (i.e., Mental Retardation). It is my professional conclusion to a reasonable degree of psychological certainty and based on medical and psychological community guidelines that the consideration of IQ testing over more than seven years places Mr. Umana in the range of Prong 1 of Intellectual Disability.

76.     Finally, having reviewed the full range of tests administered by the three psychologists and in particular focusing on the neuropsychological tests, there is ample evidence that this intellectual deficit is accompanied by, and possibly explained by, the existence of a neuropsychological impairment. His intellectual disability limits his ability to learn, understand, process, store and, subsequently to retrieve and apply information to engage in a purposeful and effective set of cognitive patterns and behaviors.

CONCLUSION

77.     Three neuropsychological evaluations were completed on Alejandro Umana. The IQs reported in the two valid neuropsychological evaluations completed by Drs. Weinstein and Shea provide support that Mr. Umana meets the Prong I criteria of the diagnosis of all versions (e.g., AAIDD, APA/DSM-5, and WHO/ICD-10 diagnostic nomenclature) of Intellectual Disability. It is my professional conclusion to a reasonable degree of psychological certainty that the appropriately obtained IQ test results place Mr. Umana in the range for Prong 1 of the diagnostic category of Intellectual Disability.

*Antonio E. Puente, PhD (signature)*

Antonio E. Puente, PhD

REFERENCES

American Association of Intellectual and Developmental Disabilities. (2010). *Intellectual Disability* (11th ed.). New York: American Association of Intellectual and Developmental Disabilities.

American Educational Research Association, American Psychological Association, and National Council on Measurement in Education. (2014). *Standards for educational and psychological testing.* American Educational Research Association. Washington, D.C.: AERA.

American Psychiatric Association (2013). *Diagnostic and Statistical Manual of Mental Disorders.* (5th ed.). Washington, DC: American Psychiatric Association.

American Psychological Association (2010). *Ethical Principles of Psychologist and Code of Conduct with the 2010 Amendments.* Washington, D.C.: American Psychological Association.

Basso, M. R., Carona, F. D., Lowery, N., & Axelrod, B. N. (2002). Practice effects on the WAIS-III Across 3- and 6-Month Intervals. *The Clinical Neuropsychologist, 16* (1), 57-63.

Davis, T. M. & Rodriguez, V. L. (1979). Comparison of scores of the WAIS and its Puerto Rican counterpart, Escala de Inteligencia Wechsler para Adultos, in an Institutionalized Latin American psychiatric population. *Journal of Consulting and Clinical Psychology, 47* (1), 181-182.

Funes, C. M., Rodriguez, J., H., & Lopez., S. R. (2016). Norm comparisons of the Spanish-Language WAIS-III: Implications for clinical assessment and test adaption. *Psychological Assessment, 28* (12), 1709-1715.

Lopez, S., & Romero, A. (1988). Assessing the intellectual functioning of Spanish-speaking Adults: Comparison of the EIWA and the WAIS. *Professional Psychology: Research Practice, 19* (1), 263-270.

Melendez, F. (1994). The Spanish version of the WAIS: Some ethical considerations. *The Clinical Neuropsychologist. 8* (4), 388-393.

Pons, J. l., Matias-Carrelo, L., & Rodriguez, M. (2008). Estudios de validez de la Escala de Inteligencia Wechsler para Adultos Version III, Puerto Rico (EIWA-III). *Revista Puertoriquena de Psicologia, 19,* 75-111.

Suen, H.K. & Greenspan, S. (2009). Serious problems with the Mexican norms for the WAIS-II when assessing mental retardation in capital cases. *Applied Neuropsychology, 16,* 214-222.

World Health Organization. (1990). *International Classification of Diseases* (10th ed.). New York: World Health Organization.

# APPENDIX 214

Declaration of Jennifer Sapia, Ph.D.

I, Jennifer Sapia, do hereby declare, affirm, and verify as follows:

1. I am a Licensed Psychologist and Health Services Provider, Permanent, licensed by the North Carolina Psychology Board since 2001. I have held various academic and clinical positions in universities and hospital settings in North Carolina including Duke University Medical Center Department of Psychiatry, The Brody School of Medicine at East Carolina University, Pediatric Department, and the Department of Psychology at East Carolina University. In these positions I have focused on psychological assessment and treatment as well as the impact of trauma on brain development and emotional functioning.

I have served as Behavioral Health Officer, Clinical and Aeromedical Psychologist, in the North Carolina National Guard, Medical Service Corps, from October 2010-December of 2018, holding the rank of Major. In this capacity, I focused on the assessment of trauma and trauma related outcomes such as Traumatic Brain Injury (TBI) and psychiatric conditions including Posttraumatic Stress Disorder (PTSD). I have been the owner of a clinical and forensic private practice since 2005 and, in this capacity, I have served as a psychological consultant to various governmental agencies, including North Carolina Indigent Defense Services, The Center for Death Penalty Litigation, the Armed Forces, and private agencies on a variety of psychiatric and forensic issues, including pre-trial evaluation of clients charged capitally and post-conviction litigation. These evaluations are designed to assess for the presence of psychiatric conditions that may be relevant to the assertion of psychiatric defenses and/or in delineating mitigating circumstances. I have been qualified as an expert in forensic psychology in a number of state, federal and military courts. A copy of my current curriculum vitae is attached.

2. I was retained by Alejandro "Alex" Umaña's counsel in September of 2016 to conduct a forensic psychological evaluation and provide consultation regarding his developmental history and the potential impact of trauma on his development and emotional functioning. I evaluated Mr. Umaña at USP-Terre Haute on February 8, 2017 and February 9, 2017 for approximately 7 hours total. Subsequent to that initial evaluation, I have requested to see Mr. Umaña again for further evaluation as I typically conduct assessments over the course of several sessions, to rule out any potential aberrations and gather comprehensive, reliable data. At this time, I understand

1

his counsel cannot make him available to me. As such, the opinions in this letter are preliminary and subject to modification should additional information become available and/or I am able to evaluate Mr. Umaña on another occasion. Although I do not anticipate a change in his cognitive status as I have not received any information to suggest that Mr. Umaña has suffered from any new medical conditions, is taking any new medication, or has suffered any type of new head trauma, what might be gleaned from a diagnostic perspective remains unknown.

In addition to the clinical interview and consultation, I have reviewed collateral documents provided by counsel including background materials, social history records and declarations including that of Richard McGough, mitigation specialist; trial and penalty transcripts; and the opinions of James R. Merikangas, M .D., Ruben Gur, Ph.D., J. Gregory Olley, Ph.D., Helen Mayberg, M.D., Enrique Suarez, Ph.D., Selena Sermeno, Ph.D., Ricardo Weinstein, Ph.D., Pablo Stewart, M.D. and Maria Santa Cruz Giralt. A complete list of the materials I have reviewed is attached.

3. Based upon my review of the provided records and initial clinical evaluation, it is my preliminary opinion, within a reasonable degree of psychological certainty, that Mr. Umaña has substantial cognitive impairments in addition to chronic and profound developmental trauma with symptomatology associated with Posttraumatic Stress Disorder (PTSD). The potential impact of persistent or cumulative developmental trauma and Adverse Childhood Experiences (ACE's) on brain development is significant, well documented, and increases the risk for cognitive and psychiatric conditions. Multiple or enduring stress and adversity in childhood, in the absence of adequate adult support, can disrupt neurodevelopment and is the most basic and long-lasting cause of health risk behaviors, mental illness, social malfunction, disease, disability, death, and healthcare costs.

Mr. Umaña's brain dysfunction or cognitive impairment affects everything he does on a daily basis as it is the lens through which he perceives and processes his environment. In other words, his ability to fully comprehend, process, interpret and verbalize a detailed history of his Adverse Childhood Experiences (ACE's), including his profound trauma history, is compromised by his intellectual deficits as are his memories and ability to recall those. Mr. Umaña's ability to communicate and provide relevant and reliable information about his developmental trauma and

2

life experiences is limited by his intellectual impairments and his lack of insight. Likewise, Mr. Umaña's ability to complete standardized assessment measures that could augment the psychological evaluation and provide additional diagnostic information is significantly impacted by his cognitive deficits and functional illiteracy. Even without a language barrier, Mr. Umaña's reading abilities are insufficient to enable him to independently read and understand questions on most standardized measures, therefore, in my opinion, the validity of any completed testing would be highly questionable.

4. Relevant Social History

Leticia Ramirez Diaz, Alex's mother, painted a vivid picture of the horrific circumstances and context in which he was conceived and raised both from an environmental and familial perspective. Mrs. Diaz described her life as filled with poverty and misfortune.

Mrs. Diaz described the large scale consequences of the Civil War on her country, the constant fear and the horrifying effects of the daily exposure to such violence, atrocities, and loss of loved ones. The war began when she was a young teenager and she described the death squads that would come to the neighborhoods searching for people and the horrific aftermath and carnage. Mrs. Diaz reported the death squads came to her family home, terrorized and threatened her family and beat her father while looking for her brother Saul. She subsequently traveled to Guatemala to try and warn her brother he was in danger but learned he was murdered during her journey and she returned home to El Salvador. Given her grief and despair she ultimately left for Guatemala at the age of 16 and that's when she began a relationship with Rafael Umaña, Alex's father. She lived in Guatemala for four years with the Umaña family.

Mrs. Diaz's childhood history was characterized by severe physical abuse in her family of origin and the victimization and abuse cycle continued in her relationship with Rafael. She described the extreme poverty, malnutrition, and severe domestic violence, including both physical and emotional abuse, she endured at the hands of Rafael. She described her life as "pure hell." In her interviews, she described being forced into prostitution and drug use and used both alcohol and illicit drugs during her pregnancy with Alex. Additionally, at some point after becoming pregnant with Alex, Mrs. Diaz attempted suicide by ingestion of pesticide. She described the

3

violence, substance abuse and desperation that resulted in her trying to take her own life. She reported that Rafael had an explosive temper and continued to beat her during her pregnancy.

Mr. Umaña was born in Guatemala in 1982 yet was raised for most of his childhood in Santa Ana, El Salvador where the Civil War had been raging for years. After Alex's birth, Mrs. Diaz reported they were constantly escaping and moving from one place to another in Guatemala to avoid Rafael being arrested as he sold drugs. She stated he had complete control over her and she was quickly pregnant again with her son Saul. To add to her trauma and that of her son, Mrs. Diaz reported that when Alex was 8 months old she came home and Alex was not there. She stated that Rafael gave Alex to his grandmother Francisca telling her she was incapable of caring for Alex and the baby she was carrying. She reported that Rafael stated they would each raise one child to see who did a better job. Mrs. Diaz reported she begged Rafael to let her see Alex yet in the end she was forced by Rafael to leave her infant son with him, placing him at risk for ongoing abuse, maltreatment and neglect. Mrs. Diaz reported she did not raise Alex because she continued to be afraid of Rafael as he was violent and dangerous. She returned to El Salvador to live with her parents and Alex was raised primarily by Rafael and paternal great grandmother, Francisca, until her death. They also returned to El Salvador shortly after Leticia when Alex was a toddler. Despite her personal abuse and trauma history, Mrs. Diaz reported physically and emotionally abusing and neglecting her own children, which is actually quite common in the generational cycle of familial abuse. She reported continuing to use alcohol to self-medicate her suffering and trauma.

5. Cognitive Impairment

The term Intellectual Disability (ID) and Intellectual Developmental Disorder (IDD) replaced the term Mental Retardation in the <u>Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)</u> and represents a shift from a psychometric or test score emphasis to a disorder with a neurobiological emphasis with developmentally based brain impairments. The shift to this disorder approach has been a progression to broaden the diagnosis to include individuals functioning at the upper range who had been excluded from receiving a diagnosis based on a strict, yet arbitrary, reliance on an intelligence quotient (IQ) cut-off score that is a very narrow measure, mainly of academic ability. Given that individuals with brain based developmental

4

disorders tend to have mixed cognitive profiles, the use of a single IQ test may not be reflective of cognitive strengths and weaknesses. Moreover, we should not come to expect a profile that shows overall cognitive impairment. In other words, profiles are more helpful diagnostically than a single score and IQ tests are insufficient in isolation to tap into the executive functioning, or brain based reasoning skills, that are involved in comprehension, abstract thinking, reasoning, problem solving, decision making and practical understanding.

Intellectual Disability is a disorder of thinking and reasoning. It is characterized by deficits in general intellectual abilities such as reasoning, problem solving, planning, abstract thinking, judgment, decision making, academic learning, and experiential learning. Intellectual disabilities impact adaptive functioning and result in failure to meet standards of personal independence and social responsibility. Adaptive functioning refers to how someone navigates and functions independently in the world with respect to employment, self-care, social interaction, maintaining a household, managing finances, etc. Adaptive abilities are age related and become more complex as an individual matures.  As adults, abstract thinking, executive function deficits (i.e., planning and organizational skills, priority setting, problem solving, anticipating future consequences of actions), short term memory and the functional use of academics (i.e., reading, money management) are impaired. This includes more concrete problem solving approaches and less cognitive flexibility, difficulties in the acquisition of and application of practical knowledge as well as judgment in novel situations. When considering adaptive deficits, the cognitive aspects, such as risk unawareness and vulnerability are paramount. Socially, individuals with ID, tend to be more immature, naïve, and gullible. They may have difficulty interpreting social cues and there is limited understanding of the risk in social situations. Social judgment and decision making abilities are immature and these individuals are at risk of being manipulated by others.

Individuals with intellectual disabilities are a heterogenous group with relative strengths and weaknesses although they tend to share characteristics of impulsiveness, responsivity to immediate vs. distant consequences and have difficulty anticipating and understanding future consequences of actions. Although individuals with intellectual disabilities can typically complete familiar, routine activities well, when faced with new, complex situations that are not in their repertoire of experience they may struggle and can become easily confused. Without specific instruction about how to handle new, unexpected situations they may be overwhelmed as

5

novel situations require an individual to rely on experience, judgment, abstract thinking and problem solving which is impaired.

Intellectual disability and brain damage

Several types of brain damage can result in an intellectual disability. These include: Traumatic Brain Injury (TBI), congenital brain damage, progressive brain damage. Congenital conditions are present before birth while degenerative conditions occur after birth and are progressive in nature. Traumatic Brain Injuries (TBI) are injuries to the brain that occur after birth. These injuries may be caused by a blow to the head, a fall, a motor vehicle or bicycle accident among other things. Traumatic Brain Injuries have long-term consequences. Researchers have found children who experience traumatic brain injuries are at higher risk of developing headaches, depression, and psychiatric or intellectual disorders up to five years after the event.

Mr. Umaña experienced numerous prenatal and post-natal risk factors for cognitive impairment including the pervasive effects of extreme poverty and related factors. Prenatally, the developmental effects of maternal stress, malnutrition, illness (malaria), toxins (ingestion-suicide attempt), poverty, trauma (domestic violence, Civil War), lack of childrearing skills, low parental education, untreated mental illness and substance abuse were notable risk factors. Postnatally, Mr. Umaña also suffered the effects of poverty and malnutrition, childhood illness, exposure to toxins, and exposure to chronic violence both within the home and in his community where he was consistently exposed to gruesome death and the collateral damage associated with war.

Declarants described two serious head injuries that Alex sustained in childhood with possible loss of consciousness and resultant frequent, severe headaches. The first occurred when he reportedly fell from a mango tree. Mr. Umaña's father Rafael reported he carried his bleeding son to the hospital and Alex was reported to be dizzy and "out of it" although not losing consciousness. Alex reportedly fell again a short time later trying to climb a cupboard for some medicine, hitting his head on furniture and resulting in loss of consciousness, injury and bleeding. Rafael described his son as "hyper" from that point on with accompanying neurodevelopmental deficits such as memory problems and the need to have repetition of directions.

6

Additionally, Alex was the victim of severe abuse and neglect and was raised in an impoverished environment with lack of early mental stimulation. This is meaningful as an absence of mental stimulation in neglectful environments may limit the brain from developing to its full potential.

The available educational records confirm that Mr. Umaña struggled academically from his initial entry into formal education. He was promoted each year until the law allowed for his retention in the third grade. From that point, he was repeatedly retained due to his inability to grasp concepts and make adequate progress for promotion to the next grade level. At the age of 12, he was in a remedial combined 1ˢᵗ, 2ⁿᵈ and 3ʳᵈ grade classroom, repeating without success. According to the educational records and reports reviewed, the remedial curriculum that Mr. Umaña did not pass included basic sight word recognition, combining words into simple sentences, writing one's name and basic addition. Unfortunately, Mr. Umaña's school did not offer psychological assessments for children with learning difficulties so there are no records regarding his intellectual abilities; nevertheless, his repetitive academic failure, highlighted his significant deficits, learning problems, and inability to master even basic concepts. Lilian Tino, Alex's cousin, stated that the teachers did understand Mr. Umaña's significant deficits and encouraged his grandmother to take him to a psychologist, as Alex "was not right." Alex was reported to be very forgetful. Lilian stated Alex did very poorly in school. He would forget things and not understand what was being taught. "He hardly learned to read or write."

Luis Mario Ramos Mendez indicated he met Alex when he was 12 years old and in seventh grade attending night school. Alex was four years older, had to return to night school yet was still working on a third grade level. Similar to other declarants, he stated Alejandro struggled with his schoolwork. "He had difficulties processing and he did not understand. He wanted to learn but it was hard for him. I tried to help Alejandro with his homework but he would get confused and did not understand what I tried to teach him." Luis reported that Alejandro used to "tell me that he wanted to be smart like me. People would make fun of Alejandro; they called him stupid and dumb. He would be embarrassed, it affected him and he would get angry." Luis stated "something was wrong with Alejandro's brain; he had disabilities. It was like his brain had stopped developing at an early age. Alejandro was very simple-minded and he did not analyze things. People who knew Alejandro realized that something was wrong with him. They would ask what was wrong with him and say it seemed like he had a screw loose."

7

Mr. Umaña eventually left school, not completing the 3rd grade, and given his intellectual deficits and functional illiteracy, was ill prepared to find employment that was anything but simplistic, rote, and repetitive.

6. Prior Evaluation Data

Subsequent to his arrest in the current matter, Mr. Umaña has been evaluated by various psychologists, and given the language barrier, there was significant variability in assessment measures chosen and resultant scores. Although I will not go into great detail regarding the testing, I will summarize here as relevant to my assessment and opinions.

In 2009, Ricardo Weinstein, Ph.D. administered the Wechsler Adult Intelligence Scale-III (Spanish Version published in Mexico), a measure appropriate for Spanish speaking individuals living in the United States. On that measure, Mr. Umaña achieved a Full Scale IQ score of 66, which is more than two standard deviations below average (Mean of 100 and a standard deviation of 15). Additionally, he was given the Woodcock- Johnson III Tests of Cognitive Abilities, and Mr. Umaña earned a General Intellectual Ability (GIA) score of 59 which has a corresponding age equivalent of 7 years 1 month. Moreover, his Thinking Ability factor score was a 65 and at the 6 year 3 month level. These scores are significantly below average, more than two standard deviations below the mean, and in the range of scores that had been considered to meet the criteria for a diagnosis of Mental Retardation, currently referred to as Intellectual Disability (ID). It is important to note that Mr. Umaña's cognitive functioning was also assessed by Dr. Weinstein, using the Comprehensive Test of Nonverbal Intelligence (C-Toni) which does not rely on or require language to reply to questions, rendering these tests complementary. Nonverbal intelligence tests are important in a comprehensive assessment of this nature as they enable individuals to analyze and solve complex problems without relying upon or being limited by language abilities. They are used to assess individuals who have language processing problems or those with limited English proficiency to enable a more clear cut and accurate picture of intelligence. On this measure, Mr. Umaña earned a Nonverbal Intelligence Quotient of 53. Again, Mr. Umaña's score was significantly below average and consistent with his low performance on the WAIS-III and Woodcock Johnson III. Dr. Weinstein concluded that Mr.

8

Umaña had a generalized pattern of brain dysfunction with particular compromise to the frontal lobes. He opined that Mr. Umaña was likely mentally retarded.

Dr. Merikangas completed a neuropsychiatric evaluation in November 2009 that included the performance of a computerized tomogram (CT) and positron emission tomography (PET) scan that were completed at the Carolinas Medical Center. In the evaluation, Dr. Merikangas noted an additional head injury that Mr. Umaña suffered as an adult as a result of a motor vehicle accident that occurred in May 2007. Based on his evaluation and review of the records, including abnormal neurological, PET scan, and quantitative EEG, in conjunction with the neuropsychological test results, Dr. Merikangas concluded that Mr. Umaña is a brain damaged individual with developmental cognitive impairments in the mentally retarded range. It was Dr. Merikangas' opinion that Mr. Umaña's brain impairments compromised his executive functioning abilities, particularly as they related to judgment, impulse control and behavior modulation. He opined that these brain impairments, stemming from early childhood, were the result of environmental causes beyond Mr. Umaña's control.

Dr. Ruben Gur completed a neurobehavioral assessment of Mr. Umaña in 2016 utilizing a positron emission tomography (PET) scan. After his review and interpretation of Mr. Umaña's PET's scan and radiology reading by Dr. Nirav Pravin Shah, Carolinas Medical Center, he opined that the PET showed abnormalities in brain regions very important for regulating emotions and behavior. He noted that the abnormal resting state profile would compromise Mr. Umaña's ability to modulate his behavior under stress. Moreover, he noted that a damaged amygdala would misinterpret danger signals and could become easily activated. He opined that because Mr. Umaña's cortex is already in a hyper-activated state, when his amygdala becomes activated his frontal lobe is unable to exercise control as a normal frontal lobe would, because his "thinking" brain is already operating at full capacity in its hypervigilant state.

### ADAPTIVE BEHAVIOR

In Dr. Gregory Olley's 2009 report, which included his review of Dr. Weinstein's testing, he focused his assessment on Mr. Umaña's adaptive functioning, or how an individual typically navigates or functions in his community. This assessment relied on archival records, including school and medical records, and interviews with individuals who knew Mr. Umaña and how he

9

functioned in El Salvador where he grew up. Dr. Olley also completed a supplemental report in 2016 which included additional information gathered about Mr. Umaña's adaptive functioning. The information, which was gathered from multiple sources, was quite consistent regarding Mr. Umaña's low level of intelligence and impairment in various aspects of independent living.

Multiple declarants discussed Alex's minimal progression in formal education with respect to reading and written language due to his very limited understanding. This affected his functional academic abilities and employment opportunities throughout his life. Across interviewers, including employers, it was reported that Mr. Umaña did unskilled, simple, "assistant" and manual labor jobs, tasks that did not require independence, initiative, complex thinking or problem solving, and he did not advance to jobs of increased responsibility or complexity. He held jobs for a short period of time such as delivering soft drinks and mixing concrete or carrying construction materials, always under supervision. Conceptual deficits were noted with respect to learning new tasks, particularly of a skilled nature, and understanding money and being able to collect the appropriate amounts for the products and make change. Moreover, from a functional academic standpoint, Mr. Umaña was unable to read information relevant to his construction job, such as blueprints, which prevented any kind of independent work or advancement.

Rafael provided examples of the manifestations of Alex's memory deficits that impacted his functioning and independence. He reported Alex would forget what he needed to buy at the store as a young adolescent despite having a list and could not remember multi-step instructions. He described learning difficulties and that Alex stopped attending school at about age 12. His first job as a shoemaker was reported to only last a few days as Alex could not learn the task and didn't understand how to put the shoe together. Rafael reported he tried to employ his son in the small store he owned but due to his memory deficits, he could not send him to get things.

As a child, Lilian Tino stated that it would frustrate her grandmother that Alex could not dress himself as he would put his shirt on backwards, could not tie his shoelaces and put his shoes on the wrong feet. Lilian stated when they would tell Alex it was wrong, he would argue it was not. Sometimes he went to school with mismatched shoes. He could not independently care for his basic needs. Alex's younger brother Saul, who was raised by their mother, explained that Mr. Alex often said things that did not make sense or were factually incorrect. He had difficulty with simple tasks and did not seem to understand the reasoning when Saul tried to explain things to

10

him. Saul reported although he was the younger brother, he had to tell Alex what to do and how as he had more difficulty understanding things than others. Saul reported that although Alex was older than him, he felt as if he were the older brother. Across interviewees, Mr. Umaña was described as an individual who could perform much better in environments that were routine and familiar where he was not faced with complex problems and decision making.

Socially, descriptions of Mr. Umaña acting playful or younger than his chronological age were consistent across interviewees and it was noted that Mr. Umaña never lived independently nor assumed the responsibilities of an adult. He lived primarily with his father until he kicked him out as a teenager and Mr. Umaña left for the United States at age 19. Mr. Umaña's former girlfriend and mother of his son, Monica Reyes, described Alex's difficulties with reading, writing and memory, which she depicted as being forgetful. This is consistent with information obtained from Mr. Umaña's father, Rafael and cousin Lilian. Ms. Reyes also reported that Alex did not realize when people were having serious conversations and was immature and would make jokes when it was inappropriate. Luis Mario Ramos Mendez agreed and stated Alejandro would tell immature jokes at inappropriate moments. He reported that Alejandro "acted more like a boy my age than his own and we got along very well. He made me feel comfortable because he did not act as though he knew more than I did." As he got older Luis reported that Alejandro "kept acting like a little boy. He loved to watch cartoons and he would talk about them all the time." Even after Luis and Alejandro went to the United States, Luis reported that even though Alejandro was an adult, he continued to act like a child. He noted that Alejandro still watched cartoons and his favorite movies were Shrek and Finding Nemo. He reported that Alejandro "watched Finding Nemo over and over again. He never got tired of seeing it and he would laugh as though it were the first time he was seeing it." He also stated that Alejandro remained very immature and liked to "hang out with the younger guys in the neighborhood who rode skateboards. They were about 15 years old. Alejandro did not seem to mind the age difference."

In Dr. Olley's report, he indicated that Mr. Umaña demonstrated clear deficits in his conceptual skills and given his academic failure, his ability to functionally apply academic skills such as reading, writing and money management in his environment, were expected. Given Mr. Umaña's

11

low level of education, his literacy, as evaluated by the quality of letters he had written as an adult, was correspondingly low. He was noted to repeat his thoughts over and over, follow no sequence of thought and jump randomly from one topic to another, which he does in speech as well. Moreover, Mr. Umaña was noted to have probable deficits in his social and practical skills, which are the two other domains of adaptive function assessed. Dr. Olley noted that Mr. Umaña had no plan for self-direction in that he always relied on others for a place to live and appeared to have no plan beyond day to day survival. Based on his assessment and review of all of the available data, Dr. Olley concluded that Mr. Umaña met the definition of an individual with Mental Retardation by having significant impairment in intelligence and adaptive functioning that originated in childhood.

7. Summary of Findings

Mr. Umaña's cognitive deficits put his functional level at an age much lower than his chronological age which was reflected in his adaptive functioning deficits. Cognitive functioning in the range supported by Mr. Umaña's scores can be characterized by deficits in several key areas such as abstract thinking, executive function deficits (i.e., planning and organizational skills, priority setting, problem solving, anticipating future consequences of actions), short term memory and the functional use of academics (i.e., reading, money management). This includes more concrete problem solving approaches and less cognitive flexibility, difficulties in the acquisition of and application of practical knowledge, learning from experience, as well as judgment in novel situations.

A weakness in short-term or working memory as noted previously makes the processing of complex information much more time consuming. It is the "in the moment" fluid thinking and much of our daily life depends on our ability to attend to and keep information in our mind to process it, make decisions and take action. It forms the foundation for complex thinking and planning. In other words, working memory is the storage and management system required to carry out complex cognitive tasks such comprehension, learning, and reasoning.

Although state experts had discrepant findings with respect to Mr. Umaña's cognitive abilities, given my evaluation of his educational records and collateral data, as well as my training and

12

extensive experience in assessment, it is my opinion that the deficits I observed are consistent with and reflective of substantial intellectual deficits. Given Mr. Umaña's intellectual deficits, significant language limitations and functional illiteracy, I would have considerable concern about using standardized measures that rely on reading comprehension and abstract reasoning skills that are beyond Mr. Umaña's capacities. For that reason, I chose not to administer any tests during the initial assessment as I wanted to be able to gather more information about his overall functioning, language, abilities and deficits. Although I would like to continue my clinical assessment, it is my understanding that counsel cannot currently make Mr. Umaña available to me for an additional clinical interview. If Mr. Umaña does become available to me at a future point in time, based on the information I have, I would not likely opt to administer any standardized personality/diagnostic tests as I do not believe they could offer any valid or compelling data to better inform diagnostic opinions.

Taken on the whole, the findings of Dr. Weinstein, Dr. Olley, Dr. Merikangas, Dr. Gur and Dr. Stewart, which include standardized cognitive testing, clinical interviews, and brain imaging are consistent with my observations of Mr. Umaña's cognitive impairments and my knowledge of the manifestations of intellectual deficits, traumatic brain injury as well as the neurocognitive effects of developmental trauma. These tests support global intellectual deficits and impairments in the frontal lobes of the brain which are considered the command and control center. The frontal lobes are responsible for executive functioning abilities such as impulse control, emotional and behavioral modulation and planning and anticipating outcomes of behavior.

In my interactions with Mr. Umaña, aided by an interpreter, he was easy to engage and very cooperative, yet his cognitive impairment was evident. He had significant difficulty understanding some questions and communicating his thoughts in a linear, logical fashion and providing relevant responses to questions posed. He was often tangential, repeated himself, and it was difficult to follow his train of thought. His thinking was very simplistic, concrete and literal and he had difficulty with more abstract concepts as they related to his legal situation. Mr. Umaña lacked cognitive flexibility or the ability to shift his thinking to changing circumstances; he tended to perseverate on topics and was rigid and unrealistic in his thinking. For example, he believed that because I was from North Carolina, I must know all of the judges and I could simply ask them to send him back to El Salvador. His focus on this unrealistic belief impaired, to

13

a certain degree, his ability to engage and fully participate in the evaluation process as he thought this was a viable solution to his current legal situation and was unable to entertain additional or competing thoughts or strategies. Additionally, as this was his desired goal, he continually focused on his perception that he did not need legal visits nor additional attorneys until this request was granted.

Despite his conviction and resultant years of litigation, Mr. Umaña frequently focused on his desire to be extradited to El Salvador to enable him to build a rehabilitation center for children which he described in great detail. Mr. Umaña's childlike, immature, magical thinking is quite likely the product of his neurocognitive impairment. The clinic that Mr. Umaña repeatedly described would be designed for children who have been abandoned, abused or neglected and would give children "love and everything they need." He described bullying, rejection, isolation and stated "no kid wants to be made fun of." The parallel to Mr. Umaña's childhood and his unmet needs and marginalization was evident, and consistent with his abilities, he described the effects of abuse in a very basic, simplistic manner, stating that people get out on the street and "their minds are not there after all that" and "their mind is not right." When asked whom he was close to growing up, Mr. Umaña stated his grandmother and cousin Ronal who left for the US after his grandmother died. When asked who he relied on as a child or whom he went to when he had a problem or needed advice, he stated "no one." When asked about his relationship with his father, Mr. Umaña stated "my mind never developed to the point of having a conversation with my father...... my mind never developed enough." He stated he had only one conversation with his father and his father was a "difficult man." When asked his perceptions of what a home should be like, Mr. Umaña stated "it is supposed to have fighting and arguments....that means love and without love you go to the streets." He stated that kids without homes join gangs and that he didn't know the rules regarding permanency or that you couldn't leave if you were no longer interested. He stated you could only leave a gang if you had a family. In the context of Dr. Olley's evaluation, Mr. Umaña reported that he joined the gang to impress a girl and when the girl showed no interest in him, he said "they would not let him out of the gang and tattooed his chest."

Although it was somewhat difficult to follow Mr. Umaña's thinking, it was clear that he did not have a full understanding of the gang lifestyle and long-term consequences of his decision when

14

joining. Mr. Umaña's impaired cognition and concrete thinking abilities not only impair his communication skills but also affect his ability to evaluate situations in an age appropriate manner, fully assess his options and make decisions. An individual with an intellectual disability does not possess age appropriate problem solving skills therefore, perceptions and decision making can be based on unsophisticated and overly concrete ideas rather than a rational evaluation of alternative options and a weighing of the advantages and disadvantages. Rational understanding implies an individual must be able to practically apply and use the information, understanding the significance of it in real life and for the future and it is clear that Mr. Umaña does not possess these abilities. His problem solving and abstract reasoning skills are key deficits, yet expected, as these higher order reasoning abilities and executive functioning skills are generally impaired in individuals with intellectual disabilities. These deficits are consistent with information contained in Dr. Olley's report regarding the significant deficits Mr. Umaña displayed on a test that measured his understanding of abstract language.

8. Adverse Childhood Experiences (ACEs)

The term Adverse Childhood Experiences (ACEs) refers to a range of traumatic events that a child can experience prior to the age of 18. Multiple, chronic, or prolonged stress and adversity can impact a child's developing brain and has been linked in numerous studies to a variety of high-risk behaviors, chronic diseases and negative health outcomes in adulthood. In other words, the toxic stress associated with physical or emotional abuse, chronic neglect, exposure to violence, or the accumulated stress of family hardship and poverty can result in a prolonged activation of the stress response systems and can disrupt neurodevelopment.

When children grow up under constant or extreme stress and fear, the immune system and body's stress response systems may develop abnormally. Chronic trauma can weaken neural pathways to the "thinking" or cognitive part of the brain and strengthen neural pathways to the survival part, which renders some individuals less capable of coping with adversity as they grow up. This impairment can affect individuals to the extent that when they are exposed to even common levels of stress, these brain systems may automatically respond as if the individual is under extreme stress.

15

Studies have consistently shown that Adverse Childhood Experiences (ACEs) are very common, but largely unrecognized, rarely occur in isolation, and have a cumulative stressor effect. They are the most basic and long-lasting cause of health risk behaviors, mental illness, substance abuse, social malfunction, chronic health problems, disability, death, and healthcare costs. There has been substantial research on violence as a result of adverse childhood events. As an ACE score increases (0-10), so does the risk; an ACE score of 4 or more is associated with serious risks. For example, the likelihood of depression increases 460 percent and attempted suicide, 1,220 percent.

ACEs that Mr. Umaña experienced are detailed below:

- Exposure to Violence:
  - Raised in the midst of a civil war in El Salvador with exposure to violence, death, and destruction on a daily basis
  - Exposure to domestic violence within the home

- Exposure to parental substance abuse
  - Both parents' use of alcohol and drugs

- Exposure to untreated parental mental illness
  - Mother attempted suicide while pregnant with Alex

- Loss of parent/separation of family
  - Mother's abandonment
  - Father's lack of involvement
  - Being raised by an elderly, sick great grandmother who died when Mr. Umaña was 8 years old-only consistent, stable source of support

- Neglect of basic physical and emotional needs/lack of protection
  - Unloved, unsupported, and unprotected
  - Basic needs for food, hygiene and necessities were not met
  - Described as dirty, clothes were dirty and ill fitting

- Physical abuse by father
  - Neighbors observed the severe beatings that resulted in marks and bruises beaten with fists, belt buckles, switches
  - Food withheld as punishment

- Emotional/verbal abuse and ridicule
  - Humiliated
  - Ridiculed for the conditions of his teeth and hair

16

Supporting Data from Declarants

To have a greater understanding of Mr. Umaña's psychological functioning, it is important to recognize and appreciate the environment and context in which he was raised. Mr. Umaña's developmental history is significant for chronic dysfunction, severe neglect, abandonment, lack of supervision, physical abuse, exposure to domestic and community violence, and parental substance abuse. He was raised in a chaotic, unsupportive, neglectful, violent environment and was exposed to multiple age inappropriate experiences from birth. Mr. Umaña and his family lived in extreme poverty in an overcrowded, very small room with a dirt floor, adobe walls and no electricity or indoor plumbing; there was a pit for a toilet outside. There were rabbits, chickens, pigeons and animal feces in the room. Ronal Umaña described the Danubio Azul, as he went to live there with his grandmother, Francisca, Alex and Rafael, as the place where the poorest of the poor lived. "I would not wish for anybody to live there. It was a horrible place, barely habitable." He stated the building was crumbling and the roof leaked so when it rained the rooms would flood. The building was so run down, one of the walls collapsed on the bed yet the family continued to live with the caved in wall. Ronal stated that no one supported or helped each other and his family fought all the time. He stated his family did not show affection or warmth.

Food was extremely scarce and Lilian Tino, Alex's cousin, reported that her grandmother would feed Alex rice water as a baby and when she could afford it, she gave him Incaparina, a very inexpensive mix of flours. Lilian stated that sometimes her grandmother would fry the chicken skins the neighbor would throw out; building a fire out of sticks on the ground to cook. Food was also withheld from Alex at the direction of Rafael. Alex was not allowed in the room while Rafael ate and Alex's great grandmother would sneak him scraps from her apron pocket. Alex was neglected and described as always being dirty, infested with lice, and perpetually hungry. He needed to fend for himself and climbed trees to pick fruit and resorted to shooting and eating pigeons without even cleaning them which he glamorized in his interview as a childhood adventure not the necessity it was described as from declarants. Lilian reported Alex would look through garbage dumps for things he might be able to use or sell. Alex had little access to health care and was ridiculed for the condition of his teeth and not having his hair cut. Lilian reported

17

that while her grandmother was alive she tried to keep Alex clean and well groomed but after she fell ill, Alex was dirty from digging in the garbage or searching for food. He would generally go shirtless and barefoot and he would tie his shorts in a knot to keep them from falling down. Alex's hair grew long to the point where kids started calling him "peluca" which meant wig. Lilian reported that they did not have a childhood. They did not have toys like other children and were so poor she never had a doll and Alex never had a toy car. Lilian stated that sometimes they would see Alex's mother pass on the street and Alex would call to her "mom, mom" but she would not answer him. Lilian stated she did not understand why Alex's mother did not go and get him. He was described as a lost and lonely child who had no one to depend on.

Alex's father was consistently reported by declarants to be extremely violent, aggressive and unstable, often fueled by his substance abuse. A cousin, Ronal, reported that Alex was exposed to the vicious beatings of his mother by his father before she was forced to leave the family and that Alex was scared and would crouch down, cover his face and say "no, no. no." Rafael was reported to sell drugs out of the house and spend his time drinking with his friends. He was reported to ignore Alex in large part and treat him as if he were a nuisance, not his son. Birthdays were not celebrated for Alex. Rafael was reported to humiliate Alex particularly for wetting the bed into his adolescence. He would also yell at him to "Get out of here! You are nothing but a nuisance!" He was reported to beat Alex severely for any reason with his fists, belt buckles and switches resulting in marks and bruises. Neighbors, including Vilma Elizabeth Torres de Cruz and her children, as well as family members, described the horrific abuse that Alex endured in the home. Vilma stated "it hurts me to see that poor child so mistreated. It still makes me sad to recall how Alex suffered as a child. Quique treated his son horribly." Vilma's daughter Roxana also stated Alex's father beat him severely and she "heard the lashings and Alex's shouts..... the beatings Alex's father gave him were very severe" resulting in "marks and bruises." Saul reported that Rafael would "beat Alex as if he were an adult" which would leave bruises on his back, arms and legs. He stated "if something went missing from the store, my father immediately accused Alex of having stolen it" and would beat him. Saul reported his visits to his father were infrequent because his father scared him and he felt threatened by him. Although he wanted to see Alex, Saul stated his father made it too unpleasant.

18

On the street, Alex was exposed to violence, gruesome death and decapitated bodies that they had to walk through on a regular basis; things that children should never have to see yet can't unsee. Vilma's son Melvin described a row of dead bodies that lay near their home for several days until the bodies were "swollen, inflated, half-eaten by worms" with the smell of rotten flesh and bodies becoming skeletonized. Saul described the constant gun battles that made him afraid to go outside and that many children were abducted and their dead bodies were found in the fields. Melvin Torres described an incident where he and Alex found a man who had been hanged from a tree and stated he did not understand what he was seeing as a child and even now it is hard for him to process the things he has seen. He reported that the place where he and Alex lived was next to a busy "bypass" and there were a lot of accidents as people would drive too fast. He said that he and Alex witnessed many accidents with injuries where cars would flip over or hit trees and they would run over to help the victims if they could. Several incidents stuck with him due to the carnage.

Children could not be protected from the atrocities of war, especially Alex who had no safe place to turn to escape from the trauma and no protective factors to buffer or mitigate the effects. Once his great grandmother died, Alex was grief stricken and alone. He lost "his only treasure" according to Lilian. Ronal reported that he was desperate to leave for the United States in search of a better life after his grandmother died as she was the only one who showed him and Alex any kind of affection. He stated he feared he would starve to death if he stayed in El Salvador and his life without his grandmother "would have been a disaster." Ronal stated "it pains me to think about the life Alex must have had after I left."

Mr. Umaña's ACEs score of 8 out of 10 highlights the serious risk associated with his horrific developmental experiences and living environment.

9. Developmental Impact of ACEs

Psychological health for children is strongly influenced by their environment, relationships and the support or risks these relationships confer. Children who do not have healthy attachments have been shown to be more vulnerable to stress. When a child is raised in a chaotic, unstable, violent environment and when parents are absent, inconsistent, or the source of the trauma, children can easily become traumatized as there is no buffer to mitigate the risk or negative

19

impact of these experiences. Without that positive parental support, children do not learn how to regulate their emotions and restore a feeling of safety or control. An inability to regulate emotions is the core of traumatic stress. Individuals with complex trauma histories, like Mr. Umaña, may struggle with self-regulation, controlling and expressing emotions, impulse control and the ability to think through consequences before acting. As a result, they can be very reactive and respond in ways that appear unpredictable, inappropriate, volatile, and extreme or intense, particularly under stress. Individuals with complex trauma histories can react defensively and aggressively in response to perceived attacks. This is consistent with Dr. Gur's evaluation and opinion. After his review and interpretation of Mr. Umaña's PET's scan and radiology reading by Dr. Nirav Pravin Shah, Carolinas Medical Center, he opined that it showed abnormalities in brain regions critical for regulating emotions and behavior. He noted that the abnormal resting state profile would compromise Mr. Umaña's ability to modulate his behavior under stress. Moreover, he noted that a damaged amygdala would misinterpret danger signals and could become easily activated.

As noted above, individuals with complex trauma histories may have difficulties thinking clearly and logically and problem solving under stress. They may show deficits in language development and abstract reasoning skills. When children grow up in environments of threat, their internal resources are used and geared towards survival. As Dr. Stewart indicated in his report, the body and mind have learned to exist in a chronic stress response mode which results in difficulty thinking through situations and problems calmly and considering multiple alternatives. Dr. Gur's opinion was consistent when he opined that because Mr. Umaña's cortex is already in a hyper-activated state, when his amygdala becomes activated his frontal lobe is unable to exercise control as a normal frontal lobe would, because his thinking brain is already operating at full capacity in its hypervigilant state. In other words, he can be reactive versus thoughtful and controlled.

It is not surprising that children experiencing prolonged adversity are at risk for a range of cognitive and mental health problems. As attention can be comprised, children often have difficulties learning, acquiring new skills and taking in new information. They are more likely to engage in high-risk behaviors and illegal activities. Individuals whose brain development is affected by childhood trauma have a much higher risk for mental illness as well as substance

20

abuse disorders. Additionally, trauma takes its toll emotionally and physically and children with complex trauma histories may develop chronic or recurrent physical complaints, such as headaches.

For Mr. Umaña, his cognitive deficits are evident and manifested in early childhood. Additionally, he suffered the loss of the two most significant relationships he had, his mother and great grandmother at a very young age and developmental level. After his mother abandoned him, he had very limited guidance, structure, emotional and physical support and positive role models. His great grandmother, who was extremely frail and bedridden the last year of her life, seemed to be the only support he had. Once she passed, Mr. Umaña, an 8 year old, intellectually disabled boy, was largely left to raise himself. Mr. Umaña's cousin Lilian stated he was a lost little boy and the adults took care of themselves but never looked after Alex. When his great grandmother died, Alex was reported to be inconsolable. Lilian stated that when Alex got older he would say "God took from him his only treasure; without her he was left with nothing."

10. Trauma and Stressor Related Disorders

Posttraumatic Stress Disorder (PTSD) is classified as a trauma and stressor related disorder that can develop when an individual has experienced, witnessed, or been confronted with an event or events that involve actual or threatened death, serious injury, or a threat to the physical integrity of oneself or others. Triggering traumatic events for PTSD include combat/war, violent personal assaults, childhood abuse or neglect, and serious accidents or injuries among others. In the recent past, the psychiatric community recognized that reactions to traumatic events are not always manifested as stereotypical anxiety and fear but can also present as more mood related symptoms including irritability, negative thinking, and aggression. PTSD is characterized by categories of symptoms including:

- **Intrusion symptoms**: re-experiencing of the traumatic event via intrusive thoughts, distressing dreams, dissociative reactions

- **Persistent avoidance** of stimuli associated with a traumatic event: thoughts, feelings, activities or people associated with the trauma

21

- **Negative alterations in cognitions and mood**: persistent and exaggerated negative beliefs or expectations about oneself, others, or the world; persistent negative emotional state, feelings of detachment or estrangement from others

- **Marked alterations in arousal and reactivity** including: irritable behavior and angry outbursts with little or no provocation, reckless or self-destructive behavior such as excessive alcohol or drug use, difficulty concentrating, hypervigilance, exaggerated startle response, sleep disturbance, etc.

Although an individual's response to traumatic events is unique and dependent on a variety of factors, research has consistently shown that childhood trauma has serious life changing effects and the younger the age, the longer the duration, and the more severe the trauma or maltreatment, typically the more psychologically damaging and/or the more maladaptive the effects. For Mr. Umaña, the developmental course of his entire childhood and adolescence was marked by exposure to trauma and violence within the home as well as external events. Research has consistently shown trauma exposure, particularly with a developmental component, is a risk factor for a host of psychological problems not limited to PTSD.

**Experience of trauma**

When considering the potential impact of trauma in general, and specifically for Mr. Umaña, we must consider variables such as age, cognitive limitations and the nature of trauma itself. Each of these factors impact Mr. Umaña's ability to understand, process, remember and communicate his trauma history.

Cognitive Abilities/Deficits

A 6-7 year old child will experience the "same" traumatic event differently than a 10-12 year old child due to normal developmental limitations or how the brain thinks and processes information. An intellectual impairment will further impact one's ability to understand, process, encode and recall. In other words, an 8 year old child with the intellectual ability of a 5 year old will not understand, process, remember, recall and communicate about a situation in the same way as his same aged peers. He does not have the intellectual capacity to do so and may not have a clear sense of what he experienced.

Nature of Trauma

22

Additionally, the nature of trauma affects what is processed, encoded and what can therefore be recalled at a later time. Memory is not infallible, and the brain is not a videorecorder and does not capture events from an objective perspective. Traumatic events are often highly charged from an emotional standpoint and can be characterized by fear and anxiety which affect processing and interpretation of the events. From what I have been able to gather in the collateral interviews, in Mr. Umaña's family and childhood, they did not talk about the trauma and the atrocities they witnessed. Adults did not explain to children why the attacks were occurring or what was happening in their country. Children knew the fear and took cues as to how to respond based on the facial expressions and reactions of adults.

Noted previously in evaluations with Mr. Umaña is the feature of dissociation which can also occur during traumatic events. When children encounter an overwhelming and terrifying experience, they may dissociate, or mentally separate themselves from the experience and this is a defense or protective mechanism when one cannot escape from the traumatic events. This dissociation or lack of integration can result in loss of memory for the events or fragmented memories of experiences with memory gaps. Once an individual has learned to dissociate, they may automatically dissociate during other stressful situations or when faced with trauma reminders.

It is quite common for individuals who have experienced trauma to avoid thinking about painful memories and avoidance is actually a symptom of PTSD. Additionally, some individuals also tend to minimize their traumatic experiences as the brain tries to accept and assimilate them to mitigate psychological distress. Mr. Umaña tends to minimize his trauma history and romanticize his country, describing it as beautiful and plentiful, contrary to the declarants' descriptions during Mr. Umaña's childhood and adolescence. This is consistent with Dr. Olley's opinion that Mr. Umaña "tried hard to make a good impression and put the best face on all events in his life." Although the themes of deprivation, bullying, lack of love, support, and acceptance are clear, Mr. Umaña makes statements to suggest he had choices about basic needs such as food and support. For example, although the information obtained from declarants depicts poverty and lack of food as the harsh reality, Mr. Umaña speaks about being "too busy playing in the streets" as a child that he chose not to come in and eat and shooting and eating pigeons was depicted as sport. When speaking about the headaches he endured after his fall, Mr. Umaña stated that the doctors

23

said they were due to him being malnourished "because I didn't want to be home early because I was out on the street." Interestingly, as Mr. Umaña described some of these childhood experiences, his eyelids fluttered as described by other evaluators, which could be trauma related dissociation.

### Cumulative Developmental Trauma

Bear in mind that Mr. Umaña did not experience just one traumatic event which is sufficient to lead to the development of acute stress symptoms and PTSD amongst other psychiatric conditions. Mr. Umaña lived in fear during his entire childhood as he was raised in the midst of a civil war. In his evaluation, Dr. Stewart noted that Mr. Umaña began to dissociate when discussing the war and violence he was exposed to. When asked how he dealt with such traumatic events, Mr. Umaña explained that he tried to pretend that it was not happening. This type of response was noted to be "both childlike and integral to his survival." Mr. Umaña could not escape the chronic trauma and, perhaps more importantly, he did not have the emotional support to protect him and possibly buffer the detrimental effects of this exposure. In other words, he was left essentially alone to try and process or make sense of the violence he was experiencing.

Dr. Stewart diagnosed Mr. Umaña with PTSD due to his history of chronic, unrelenting exposure to violence within and outside of the home during his developmental years. Dr. Stewart reported that Mr. Umaña lived in a constant state of fear which resulted in chronic activation of his stress response system and resulted in symptoms such as hyperarousal, hypervigilance, anxiety, agitation, guardedness, paranoia, and sleeping difficulties, all symptomatic of PTSD. Dr. Stewart noted Mr. Umaña experienced specific symptoms in all of the categories noted above which were reported and observed and supported his diagnosis of PTSD.

For example, Dr. Stewart reported that Mr. Umaña experiences intrusive thoughts that are unavoidable and enter at unexpected and unwanted times; flashbacks in the form of dissociation, which take him back to the actual event and the precise sights and smells associated with the event; and thinking about painful memories that cause psychological distress. He experiences alterations in arousal and reactivity including: sleep disturbance, described as sleeping three hours a night on average; hyperarousal; hypervigilance; and psychological and physiological

24

disturbances such as nervousness and anxiety when thinking about painful memories. Additionally, he exhibits symptoms of paranoia, avoidance, and a sense of a foreshortened future.

It is noteworthy that family members and other declarants who spent time with Alex during his childhood and as an adult consistently describe Alex as experiencing an alternate reality and acting "strange" or "unusual" in that he experienced and tried to explain auditory and visual hallucinations. He was noted to see things that others did not, often pointing at walls and tables and seeking confirmation of what he was perceiving. Saul stated "there was something different about Alex" and gave several examples. He stated they would be talking and Alex would say "look, do you see that face?" and "he always tried to convince me it was there." Alex's brother Saul stated that Alex was convinced that what he saw was real and if he saw the face of a demon, he drew it on the wall to prove to us what he saw. He stated that Alex became very serious and concentrated on drawing what he saw and then would say "Here it is" and look at us to see if we could see what he saw. Saul reported that friends laughed at Alex and called him "crazy" but Alex was convinced and kept trying to prove what he was seeing. Similarly, Monica Reyes reported that Alex told her he heard things and saw demons and there were times "he would go blank staring at something." She stated she would make fun of him and tell him he was crazy because he had fallen out of a mango tree.

Luis Mario Ramos Mendez noted that people thought Alejandro was "weird" and that "his reality was different from ours. Alejandro would point at the wall or a table and he would ask us if we saw what he saw. No one else would see what he saw but Alejandro insisted that what he saw was real. He wanted us to see what he saw." He reported that Alejandro would grab a pencil and paper and draw what he saw and although Luis could not see the things Alejandro saw, "it was important to him to show me what he saw." Additionally Luis stated that at times "I saw that Alejandro would stare at the wall and that he would talk to himself. It seemed as though a spell had been put on him. Afterwards, he told me he was talking to an angel or to the devil." Moreover he stated "I knew when Alejandro was in his world because sometimes he would gesture and talk to himself. Other times he would pace back and forth over and over. He would also space out sometimes, like he was lost in thought."

25

Multiple individuals reported that Mr. Umaña had visions and dreams that he believed were real and predicted future events. For example, Luis reported that "Alejandro heard voices, he saw apparitions and he had dreams that according to him were real. I learned to accept this from Alejandro and I did not try to contradict him. He told me that he heard the voices of angels, demons, or Satan, depending on whatever the voice said to him." He provided an example of an incident in the United States that occurred as they were adults, Luis stated they were walking to the recycling center and Alejandro stopped and asked whether he had heard something. "He had heard a voice telling him that we had to go to the left instead of going straight. Even though turning left meant that we were going to take longer to get to our destination, I agreed because I had learned that it was useless to try to convince Alejandro otherwise." Luis shared additional information about his experiences with Alejandro. He reported that "whenever some event happened in the world, Alejandro would believe that he had foreseen it. He believed that his visions and his dreams were things that really happened. He believed that this was normal and it did not matter how many people might tell him it was only his imagination; there was no way to convince him. He believed in his reality."

It is also noteworthy that declarants consistently reported that Alex did not drink alcohol or use drugs other than marijuana. These hallucinations were noted to start in early childhood and preceded the onset of any substance use and occurred throughout his life in the absence of any substance use.

At this point it is unclear whether these instances of dreams, visions and hallucinations were PTSD induced intrusive thoughts or nightmares and episodes of dissociation or whether they were symptomatic of psychosis associated with another underlying mental health condition or other factors such as brain injury. Although cultural considerations are important to bear in mind as it was common to speak of spells and curses, Alex's behavior was noted to be strange and unusual by others who shared his cultural background and grew up with him. That would suggest the cultural factors are less likely to have any substantial weight as an explanatory factor.

11. Preliminary Conclusions:

26

My clinical interview with Mr. Umaña revealed information consistent with that obtained from other evaluations and a review of the available records. I found in my interview, the evaluation and the records chronic developmental trauma with psychiatric related symptoms and cognitive impairment.

For Mr. Umaña, what that means practically is that we cannot separate his intellectual deficits from his trauma history. He had multiple prenatal and postnatal risk factors for cognitive impairment and his developmental trauma was a significant component. Mr. Umaña's neurocognitive deficits affect everything he does and everything he experiences and processes from childhood through present. Again, this is the lens through which he perceives and interacts in the world. We cannot isolate or think about the impact of one without the other.

It is essential to bear in mind that someone with an intellectual disability functions on a mental level much lower than their chronological age so there are inherent limitations on their abilities. For children, we call these developmental limitations because as they mature and their brains continue to develop they will outgrow these limitations and develop age appropriate thinking, reasoning and planning abilities. Unfortunately, for individuals with intellectual disabilities, particularly those as substantial as Mr. Umaña's, they will not "grow out of it." Intellectual disability is a lifelong condition. Thinking and reasoning abilities will remain concrete, unsophisticated and simplistic and judgment, planning and decision making abilities will be immature.

Given his cognitive impairments, Mr. Umaña's ability to fully comprehend, process, and verbalize a detailed history of his Adverse Childhood Experiences (ACEs) including his profound trauma history is compromised. While his cognitive impairments might prevent Mr. Umaña from providing a comprehensive, detailed trauma history, the background materials and information from declarants paint a very vivid picture of the trauma endured from his earliest years. The developmental impact and the symptoms Mr. Umaña experiences are far more important than a diagnosis for understanding how Mr. Umaña thinks and behaves.

Mr. Umaña's developmental history has contributed significantly to his personality characteristics and psychological functioning. Who we become as adults is largely shaped by our development. Many factors that affect developmental trajectories and of the most powerful is

27

childhood maltreatment in the form of abuse or neglect. For Mr. Umaña, the developmental course of his childhood and adolescence was marked by profound exposure to trauma within the home as well as external events. Given his chronic family dysfunction, abandonment, poor parenting and modeling of antisocial behaviors, it is not surprising that he struggled from a very young age. These events are risk factors for a multitude of psychological problems as individuals whose brain development is affected by childhood trauma have a much higher risk for mental illness, including Posttraumatic Stress Disorder (PTSD). The degree of dysfunction should not be surprising given that trauma and abuse are serious disturbances in the most basic level of need and support in a developing child's life. Moreover, in the absence of parental support or protective factors, the risk for maladjustment is magnified.

The findings of Dr. Weinstein, Dr. Olley, Dr. Merikangas, Dr. Gur and Dr. Stewart, which include standardized testing, clinical interviews, QEEG, and Positron Emission PET imaging are consistent with my observations of Mr. Umaña's cognitive impairments, my knowledge of the manifestations of intellectual deficits as well as the neurocognitive effects of developmental trauma. They are consistent in explaining the effects of trauma on brain development and the ways it can manifest in poor emotional and behavioral modulation and hypervigilance, amongst other symptoms associated with PTSD. These prior tests support impairments in the frontal lobes of the brain which are considered the command center and what is responsible for executive functioning abilities.

Taking into account Mr. Umaña's significant developmental trauma, his symptoms of PTSD, superimposed on his intellectual deficits, would have had a profound impact on his perceptions of reality, decision making, reasoning and judgment and are therefore pertinent mitigating factors. Traumatic experiences profoundly affect the brain and change the way a person thinks, feels, and behaves, particularly in stressful situations when reminded of the original traumas in some way. PTSD is a brain based disorder that is not a cognitive or "thinking" disorder; it's emotional and reactive. Research in neuroscience suggests impaired functioning in brain areas responsible for the threat detection response and emotion regulation account for many PTSD symptoms. Traumatized people live in a different reality and it's much more than the memory of an event. Trauma takes away that sense of safety and individuals with PTSD tend to view the world as a dangerous, hostile place. The body responds in kind and remains on alert and watchful

28

(hypervigilant) for potential danger or threats in the environment. Individuals with PTSD are easily aroused and may magnify or misperceive potential threats in the environment. In other words, they may see danger where there is none. The fear that is real and rational to individuals with trauma histories may not be perceived similarly by the rest of the world. These individuals experience intense psychological and physiological distress and arousal when feeling scared or threatened and can be very reactive. Moreover, individuals with PTSD tend to have problems with impulse control, decision making, and considering consequences of behavior, particularly during periods of acute stress, consistent with findings noted above. Given Mr. Umaña's intellectual deficits, these capacities are already comprised.

Respectfully submitted,

Jennifer Sapia, Ph.D.
Licensed Psychologist, HSP-P

11-23-2020
Date

29

# JENNIFER L. SAPIA, Ph.D.
## SAPIA PSYCHOLOGICAL ASSOCIATES, INC.

## Curriculum Vitae

Business Addresses:

4320 Southport Supply Rd.　　　　317 W. Morgan St
Suite 200　　　　　　　　　　　　Suite 217
Southport, NC 28461　　　　　　　Raleigh, NC 27601

Office Phone: 910-457-0800
Fax: 910-457-1072
Cell: 910-622-4094

e-mail: jennifer@jennifersapia.net
　　　　office@jennifersapia.net

---

## Academic Degrees

Ph.D. 1996- 2000　　　　　Counseling/School Psychology
　　　　　　　　　　　　　State University of New York at Buffalo

M.A.　1992- 1994　　　　　Psychology
B. A.　1988- 1992　　　　　Psychology/Social Sciences Interdisciplinary, Law Concentration
　　　　　　　　　　　　　State University of New York at Buffalo

## Licensure/Certification Areas

North Carolina Licensed Psychologist/ Health Services Provider #2727 (2001)
School Psychologist, Permanent, Department of Public Instruction, NC (2000) Inactive

## Professional Experience

10/10-12/31/18 **North Carolina Army National Guard**
**Major, Clinical and Aeromedical Psychologist, Medical Services Corp**
**Behavioral Health Officer**
Medical Detachment, 60th Troop Command
449th Theater Aviation Brigade/Combat Aviation Brigade

Provided coaching, training, education, and consultation to units, soldiers and Command about behavioral health disorders, resiliency, signs and symptoms and impact on functioning in various life domains, particularly integration into the community post-deployment.

At the request of JAG, conducted psychological autopsies for death investigations and/or acted as Investigating Officer upon appointment. Completed the Psychological Autopsy Certification Training Program, American Association of Suicidology, Atlanta, GA (7/12)

**Aeromedical Psychologist:**
Aeromedical Psychology Training Course, United States Army School of Aviation Medicine, Ft. Rucker, AL (10/31-11/18/11)

Functioned as an organizational and command consultant on psychological and exogenous factors that could affect overall flight safety. Engaged with pilots and crew as requested to provide education and strategies to enhance psychological health and well-being as it related to overall performance. In consultation with the Flight Surgeon, provided psychiatric consultation and completed evaluations for pilots and crewmembers to determine fitness for full flying duties (FFD) and/or recommendation for waivers for psychiatric disorders to enable ongoing flight related duties. Consulted from an organizational and operational standpoint regarding factors such as sleep/rest cycles, tempo, stress and other environmental factors on safety and performance during missions and on deployment. Conducted psychological reviews when appointed on aviation related mishaps.

Functioned as a non-rated crew member on flight status. Provided education and training regarding relevant aviation medicine topics at the annual flight safety conference and upon request.

Jan-July 2018 **Deployed to Kuwait and Iraq with Headquarters Company 449th Combat Aviation Brigade as an Aeromedical Psychologist in support of Operation Inherent Resolve (OIR). Remained on Active Duty through September 2018.**

As noted above, functioned as a command consultant from an organizational and operational standpoint regarding factors such as sleep/rest cycles, tempo, stress and other environmental factors on safety and performance during missions. Completed routine and command directed behavioral health evaluations and provided recommendations to enhance psychological fitness and performance. Conducted psychological reviews when appointed on aviation related mishaps.

2020- present **Department of the Army, North Carolina Army National Guard**
Title 5, Clinical Psychologist, Aeromedical Psychologist
Joint Force Headquarters, G1-Medical

Job Description: Complete evaluations of soldiers for pre and post-deployment mental health issues (including PTSD and TBI); military separation, Fitness for Duty, Command Directed Behavioral Health Evaluations (CDBHE), and upon referral for specialized operations, selection or suitability decisions. At the request of JAG, complete psychological autopsies for death investigations and consult with investigating officers.

Function as an organizational and command consultant on psychological and exogenous factors that could affect overall flight safety. In consultation with the Flight Surgeon, provide psychiatric consultation and complete evaluations for pilots and crewmembers to determine fitness for full flying duties (FFD) and/or recommendation for waivers for psychiatric disorders to enable ongoing flight related duties.

2001 – present **Licensed Psychologist, Owner**

**Sapia Psychological Associates, Inc.**
Clinical and forensic practice serving children, adolescents, adults and families across

North Carolina.

**Assessment**: forensic, psychological, developmental, cognitive, neuropsychological and psychoeducational assessment.

**Therapy:** Individual, family, and couples therapy.
- Particular focus on trauma treatment and PTSD, both combat related and other traumatic experiences, such as domestic abuse and child maltreatment. Significant experience with evaluation and treatment of Veterans (Vietnam through present conflicts) with PTSD and various psychiatric disorders that tend to co-occur such as mood disorders and Substance Abuse. Trained in EMDR.

**Forensic**: Consultation and evaluations provided via attorney or court referral/appointment, DSS, or self-referral. Experience with State, Federal and Military courts.
- Trauma and abuse including: PTSD, physical and sexual abuse, childhood maltreatment, domestic abuse and abusive head trauma
  - Extensive experience with PTSD, both combat related traumas and the effects of chronic abuse
  - Conducted research on the neuropsychology of PTSD and the effects of trauma on the brain which assists in the foundation for these types of evaluations
  - Investigative case review of child forensic interviews and evaluations in cases of alleged abuse
- Intellectual Disabilities
- Competency Evaluations (Capacity to Proceed)
- Criminal Responsibility/Death Penalty Litigation
- Worker's Compensation, Independent Medical Examinations (IME), Disability
- Pre-employment and Fitness for Duty for law enforcement/public safety organizations.
- Substance Abuse Expert (SAE): Fitness for Duty and Return to Duty including evaluation, treatment referrals and follow-up evaluation per Nuclear Regulatory Commission Regulations (NRC 10CFR).
- High-conflict divorce and custody cases including parenting capacity and child custody evaluations. Mediation and conflict resolution. Participated in district court mediation through the ADR Center in Wilmington, NC.

## **Administrative:**

Clinical and Operational oversight/management of the community based private practice**,**; Clinical and administrative supervision of contract clinical and administrative staff; program development; contract development and management (negotiations with providers and payers); human resource management including: recruitment/hiring, staff development; organizational structure, financing, Medicaid, Medicare, and third party insurance billing and management; and support quality assurance and document clinical necessity for proposed and ongoing treatment;
Ensuring compliance with state and federal regulatory standards; liason/community collaboration with local and state mental health and public policy agencies.

**Department of Defense Consolidated Adjudications Facility (CAF) Contract Psychologist**
Provide psychological evaluations and consultation upon referral to address specific questions central to suitability decisions, including security clearances.

**Department Consultant: Village of Bald Head Island Department of Public Safety**
Provide pre-employment psychological evaluations, Fitness For Duty (FFD) evaluations, specialized assessments, consultation and training, and critical incident debriefing as requested.

**Child/Family Evaluation Program Examiner (CFEP)** (formerly Child Forensic Evaluation Program through UNC-Chapel Hill). CFEP is an evaluation service for children and adolescents who are being investigated by CPS agencies in North Carolina as possible victims of abuse or neglect.

**Child/Family Evaluation Program Supervisor**
Supervise Associate Examiners (master's level) performing CFEP evaluations.

**Additional Services:** Consultative and contract services to various mental health agencies, social service agencies, and school districts to provide diagnostic assessments, psychological and psychoeducational evaluations, therapy, and clinical supervision.

7/09-12/09 **THE FMRT GROUP**
Statewide agency providing psychological evaluations, fitness for duty evaluations, and special teams assessments for law enforcement and public safety agencies across North Carolina.

4/05-2/06 **Clinical Psychologist**
ACT Medical Group, Wilmington, NC
Provided psychological assessment, therapy, and consultation to individuals in skilled nursing and assisted living facilities.

2/05-12/06 **Course Director**
Summit Professional Education, Apex, NC

Develop, implement, organize and teach continuing education/professional development seminars across the United States for the Healthcare and Behavioral Health Divisions Recruit, train, and supervise the professional speakers. Seminars ranged in size from 50 -200 professionals. Onsite activities also included logistical planning and seminar facilitation.

7/03-12/05 **Faculty**
**American Society of Professional Education (ASPE)**
**Summit Professional Education**

Responsibilities included**:** Developing, implementing, organizing and teaching continuing education/professional development seminars across the United States for the Healthcare and Behavioral Health Divisions.

8/02- 12/05 **Clinical Associate, Department of Psychiatry**
**Duke University Medical Center**
Durham, NC 27702

3/04-12/04 **Clinic Director**
**Parrish St. Clinic, Durham NC**

Administrative, Clinical and Operational oversight/management of a community-based mental health, developmental disabilities, and forensic clinic serving children, adolescents and adults. Additional Responsibilities included: Clinical and administrative supervision (psychologists, psychiatrists, social workers, administrative staff); program development; contract development and management (negotiations with providers and payers); human resource management including: recruitment/hiring, performance evaluations and staff development; organizational structure, financing, Medicaid, Medicare, and third party insurance billing and management; and quality assurance. Ensured compliance with state and federal regulatory standards; liason/community collaboration with local and state mental health and public policy agencies.

Clinical responsibilities included; individual and group supervision, individual and family therapy; psychological, psychoeducational and forensic assessment, consultation, and crisis intervention.

8/02-3/04 **Clinical Psychologist**
**Center for Child and Family Health (Duke University/UNC affiliated trauma evaluation and treatment center)**

Responsibilities included: program development, assessment and diagnostic evaluation, psychotherapy, research (data collection evaluation, monitoring), clinical and administrative supervision, contract management (financing and billing) grant writing, and quality assurance. Ensured compliance with state and federal regulatory standards; liasion/community collaboration with local and state mental health and public policy agencies. Member of multidisciplinary team of health and behavioral healthcare professionals. Assessment and supervision of Child Mental Health (CMHE) Evaluations.

Teaching/ Supervision responsibilities included: Psychiatry resident training, Duke graduate student internship and post-doctoral fellow supervision, Grand Rounds and didactic training presentations. Research, supervision and liason to the Healthy Childhood Brain Development Program.

9/01- 8/02 **Clinical Instructor of Pediatrics**
**The Brody School of Medicine**
**East Carolina University**

**Pediatric Health Psychologist**
**Children's Hospital**
**Pitt County Memorial Hospital**
Greenville, NC 27835

Clinical Responsibilities**:** Consultation-Liaison services to the General Pediatric, Pediatric and Neonatal Intensive Care, and Hemotology/Oncology units. Inpatient and outpatient individual and family psychotherapy, psychodiagnostic assessment, program development, disease prevention, health promotion and weight management. Focused on trauma assessment and adjustment following a traumatic event.

Teaching responsibilities included: Pediatric resident training, ECU graduate student internship supervision, Grand Rounds and Core training presentations.

7/00-8/31/01 **Assistant Professor, Department of Psychology**
**East Carolina University**
Greenville, NC 27858

Responsibilities**:** Teaching and supervision of graduate courses, research, and clinical practicum in the school and clinical psychology programs.

**Teaching**
- Practicum: Therapeutic techniques with children and adolescents
- Assessment Sequence, including: psychological, neuropsychological and psychoeducational assessment, preschool and low incidence handicapping conditions, and behavioral, adaptive, and socioemotional assessment.
- Behavioral and academic interventions with children/adolescents

**Supervision**
- Student clinical assessments and therapeutic interventions, individual and group therapy, behavioral and academic interventions, and school-based consultation.

**11/00-9/01**     **<u>Staff Psychologist, Children's Services</u>**
Wilson-Greene Community Mental Health Center
Snow Hill, NC

Clinical Responsibilities: Assessment, therapy
(individual, family), school-based consultation, crisis intervention, clinical supervision.

**8/99-7/00**     **James Madison University**
**Human Development Center/Child Development Clinic**
**Instructor Department of Psychology**
Harrisonburg, VA 22807

**<u>Child Development Clinic/Human Development Center (CDC/HDC)</u>**
Comprehensive psychological evaluations (e.g., clinical, forensic, neuropsychological, and psychoeducational) of children/adolescents; school-based consultation and interventions; outpatient therapy for a university based mental health clinic (children, adolescents, adults).

**<u>Neuropsychological Services Clinic</u>**

**Program Development**
Development of a pediatric/adult neuropsychology service, training, and research specialty clinic.

**<u>Clinical Responsibilities</u>**
Comprehensive assessments, therapy, support group services, outpatient neurological screening, cognitive rehabilitation, consultation.

**<u>Supervision and Administrative Responsibilities</u>**
- Clinical supervision and coordination of graduate student (doctoral/masters level) assessments and therapy in the CDC/HDC.
- Supervision and coordination of master's level clinicians in school-based consultation, assessment and treatment of preschool children in Head Start Programs.

**7/98-7/99**     **Baker Victory Services Community Mental Health Center**
Residential & Day Treatment, Educational Services, Outpatient Clinic
Lackawanna, NY 14127

**<u>Clinical Specialist</u>**
Responsibilities: Diagnostic assessment and treatment of children/ in residential programs. Clinical, forensic, and psychoeducational assessments; crisis intervention counseling, individual, group, and family therapy; school-based consultation, psychoeducational groups, and parent skills training workshops.

**12/95-9/96**     **<u>Clinical Director, Special Services Unit</u>**
Director of an 8- bed, 24 hour secure treatment facility for males, aged 8-18, mandated for placement by Erie County Family Court.

**12/98-7/99**     **Language Development Program, Developmental Disabilities Services**
Tonawanda, NY 14150

**<u>Consultant Psychologist</u>**
Responsibilities: Psychoeducational assessments for Committee on Preschool Special Education (CPSE) services; cognitive, developmental, and behavioral screenings of toddlers (2-3 years) for early intervention services; home-based consultation.

| 5/97-7/98 | **Living Opportunities of DePaul**<br>Cheektowaga, NY |
|---|---|

**Clinical Supervisor**

Responsibilities: Day-to-day operation of a 24- bed, Office of Mental Health certified treatment apartment program serving chronically mentally ill adults, aged 18-65. Direct supervision, training, and evaluation of mental health counseling staff; intake 7 diagnostic assessments; treatment planning; individual, group and family counseling; crisis counseling and intervention.

| 12/94-12/95 | **Transitional Services Inc.**<br>Buffalo, NY |
|---|---|

**Senior Counselor/Supervisor**

Responsibilities: Supervision of mental health counseling staff, individual and group therapy; diagnostic assessment and treatment planning; crisis counseling and intervention; and community outreach services provided to chronically mentally ill residents of an intensive supportive apartment program licensed by the Office of Mental Health.

## Grant Activity

Author: Teaching, Training and Materials Grant: Woodcock Johnson-III Tests of Cognitive Abilities, Riverside Publishing Co., Itasca IL. $12,000 (with Bolen, L.) Awarded.

Author: Standardization of the Wide Range Achievement Test- Expanded (WRAT-E) with college students. Wide Range, Inc., Wilmington, DE. $2500.00 Research Grant (with co-investigator, Childers, J.) Awarded.

Author: Nonverbal Version of the Wide Range Intelligence Test (NWRIT). Wide Range, Inc., Wilmington, DE. $1000.00 Assessment- Item Trials Research (with co-investigator, Childers, J.) Awarded.

Co-author: Validity research comparing the Wide Range Achievement Test- Expanded (WRAT-E) vs. the Wechsler Intelligence Scale for Children-Third edition (WISC-III) with children aged 5-8. Wide Range, Inc., Wilmington, DE. $2500.00 Research Grant (Childers, J. primary investigator) Awarded.

Co-author: Wide Range Interest Opinion Test (WRIOT). Wide Range, Inc., Wilmington, DE. $750.00 Assessment- Item Trials Research (Childers, J. primary investigator). Awarded.

## Publications

DeBellis, M., Hooper, S, & Sapia, J. (2005). Early trauma exposure and the brain. In Vasterling, J.J & Brewin, C. R (Eds.), Neuropsychology of PTSD: Biological, Cognitive, and Clinical Perspectives. New York: Guilford Publications, Inc.

Evans, S.W., Sapia, J. L., Axelrod, J. L., & Glomb, N. (2002). Practical issues when establishing a school-based mental health program: A case example. In H. S. Ghuman, M. D. Weist, & R. M. Saries (Eds.), Providing Mental Health Services to Youth Where They Are: School-and Community-Based Approaches. New York: Brunner-Routledge.

Sapia, J. (2001). Using groups for the prevention of eating disorders among college women. <u>Journal for Specialists in Group Work</u>, <u>26</u>(3), 256-266.

Phelps, L., Sapia, J., Nathanson, D., & Nelson, L. (2000). An empirically supported eating disorder prevention program. <u>Psychology in the Schools</u>, <u>37</u>(5), 443-452.

Evans, S., Axelrod, J., & Sapia, J. (2000). Effective school-based interventions: The development of a social skills training paradigm. <u>Journal of School Health</u>, <u>70</u>(5), 191-194.

Phelps, L., Dempsey, M., Sapia, J, & Nelson, L. (1999). The efficacy of an eating disorder school-based prevention program: Building physical self-esteem and personal competence. In N. Piran, M. Levine, & C. Steiner-Adair, (Eds.), <u>Preventing Eating Disorders: A Handbook of Intervention and Special Challenges</u>. Philadelphia, P.A.: Brunner/Mazel.

Sapia, J. (1994). An investigation of the differences in mandatory reporting practices of teachers. Unpublished Master's Thesis, SUNY at Buffalo.

Sapia, J. (1992). Content effects for the moral concepts lie & truth. Unpublished honor's Thesis. SUNY at Buffalo.

## **Presentations/Workshops**

| | |
|---|---|
| 2020 | Working with Experts in Trial Preparation. NC Office of Indigent Defense Services. Invited presentation and mock mental health expert testimony, January 2020 |
| 2020 | Sapia, J. Bonding and the Importance of In-person Visitation: 2020 Parent Attorney Conference, UNC School of Government. Invited Presentation August 2020 |
| 2020 | Sapia, J. PTSD: Bridging the Gap Part V; Capital Defender Training Seminar. Invited Presentation. November 2020 |
| 2017 | Sapia, J. & Lane, P (attorney). Case Study in Mitigation; Bridging the Gap Part II; Capital Defender Training Seminar, Invited Presentation September 2017 |
| 2015 | Sapia, J. Identifying Mental Health Signs and Symptoms/Thinking about Psychological Evaluations; Capital Defense Training Seminar, Invited Presentation September 2015. |
| 2015 | Sapia, J. Identifying Mental Health Signs and Symptoms/Thinking about Psychological Evaluations; Capital Defense Training Seminar, Invited Presentation April 2015. |
| 2015 | Sapia, J. Understanding Trauma, Death Penalty 2015: NC Advocates for Justice Annual Conference, Invited Presentation January 2015. |
| 2011 | Sapia, J. Mental Health Evaluations 101: A Primer for Attorneys. 2011 Parent Attorney Conference Breaking the No-Win Cycle: Representing Parents with Mental Health Disorders. Co-sponsored by the UNC-Chapel Hill School of Government, Office of Indigent Defense Services, National Juvenile Defender Centers & Southern Juvenile Defender Center. Invited Presentation August 2011. |
| 2010 | Sapia, J & Kirk, K. Child Forensic Evaluations and Admissibility of Parenting Capacity Evaluations. Brunswick County North Carolina Court Advisory Sponsored Continuing Education Training Program. February 2010. |
| 2008 | Sapia, J. Lunch and Learn: Child Forensic Evaluations and Cooperative Parenting in High Conflict Cases. Presented to Brunswick County Department of Social Services staff, attorneys and family court judges. May 2008. |

Sapia, J. Brunswick Leadership Conference: Addressing mental health needs in our community. An invited talk sponsored by the Southport-Oak Island Chamber of Commerce March 2008.

Sapia, J. Childhood Developmental Disorders. Summit Professional Education. Continuing Education Seminar Series presented across the United States.

2005 Sapia, J. Working with Expert Witnesses: An Example of Interviews with Child Witnesses. North Carolina Public Defender Spring Conference, May 18-20.

2003-05 Sapia, J. Over-Indulged Children. American Society of Professional Education (ASPE). Continuing Education Seminar presented across the United States.

2002. Sapia, J. Trauma: Providing Psychosocial Support to Families in Crisis; and Caring for Terminally Ill Children. Key Note Speaker, Pediatric/Neonatal Clinical Update, Children's Hospital, Greenville, NC.

2002. Sapia, J. Trauma: Clinical Assessment: Signs and Symptoms. Invited Grand Rounds for the Trauma Department at Pitt County Memorial Hospital, Greenville, NC.

2001 Sapia, J. Group-Based Prevention Programming for Eating Disorders. Workshop Presentation at the American Psychological Association annual meeting. San Francisco, CA (August 2001).

Sapia, J. Interdisciplinary Strategies for Prevention and Intervention for Eating Disorders. Workshop presentation at the National Assembly on School-Based Health Care annual meeting. Miami, FL (June 2001).

Sapia, J. Eating Disorder Prevention in the Schools. Poster presentation at the National Association of School Psychologists annual meeting. Washington, DC (April 2001).

Torres, R., Childers, J., Sapia, J., Durham, T., & Allred, L. Relationship of the NEEDS And Two Substance Abuse Scales. Poster presentation at the Southeastern Psychological Association annual meeting. Atlanta, GA (March 2001).

2000. Walker, W., & Sapia, J. Traumatic Brain Injury Workshop: Neuropsychological Assessment and Intervention. North Carolina Department of Public Instruction, 3 day training workshop. Chapel Hill, NC (November 2000).

Sapia, J. Preschool and School-Age Assessment: Using the Differential Ability Scales. Invited workshop presented for area school psychologists. James Madison University Harrisonburg, VA.

## Professional Association Memberships

American Psychological Association (APA)
APA Division 41 American Psychology-Law Society (APLS)
APA Division 56 Trauma
APA Division 19 Military Psychology

## 2020 Continuing Education
Bessel van der Kolk: How the Body Keeps the Score: Brain Science in the Treatment of Trauma and Attachment (10.5 hrs)
Ethics and Boundary Issues (5 hrs)

**2019 Continuing Education**
American Academy of Forensic Psychology: Contemporary Issues in Forensic Psychology April 10-11 Dallas, TX: Improving Testimony in Trials and Depositions; Evidence-Based Evaluation of Criminal Responsibility

Concept Professional Training Webinar: Suggestibility among Individuals with Neurobehavioral and Neurocognitive Disorders: Clinical and Forensic Considerations

**2018 Continuing Education**

Suicide Assessment & Prevention for Health Professionals
Psychology of Terrorism
The Returning U.S. Veteran of Modern War: Background Issues, Assessment and Treatment
Ethics

**2016 Continuing Education**

American Academy of Forensic Psychology: Contemporary Issues in Forensic Psychology 5/18-22, Scottsdale, AZ: Advances in Miranda Assessments and Consultations; Effective Applications of Forensic Assessment Instruments for Pretrial Criminal Issues

**2015 Continuing Education**

American Psychology-Law Society (APLS) Annual Conference, San Diego, CA March 2015
Expert Testimony (Full Day workshop)
Traumatic Brain Injury and Chronic Traumatic Encephalopathy: Recent Research Advances and Implications for Forensic Psychology
The Psychology and Impartiality of Forensic Expert Decision Making: When Justice is not Blind
Suggestibility & Miranda Issues in Interrogations
Interrogations & Confessions

**2014 Continuing Education**

American Academy of Forensic Psychology: Contemporary Issues in Forensic Psychology 6/4-6/8/14, Philadelphia, PA: Insanity Defense Evaluations; Testifying for Legal Decision Makers; Evidence for Forensic Psychologists.

American Psychology-Law Society (APLS) Annual Conference, New Orleans, LA March 2014
Evaluation of Intellectual Disability in Capital Cases: Twelve years post Atkins (Full Day workshop)
Questioning Alleged Victims of Child Abuse

Understanding the Psychological Dynamics of Active Shooters: Offering a Violence Risk and Threat Assessment Approach, Robert Cipriano Jr, Ph.D. SIMCIP Group Forensic Psychological Consultants, sponsored by the NCARNG (1/13/14)

Neuroscience Evidence in Criminal Cases, NC Advocates for Justice Death Penalty 2014 Seminar, Dr. Nita Farahany, Duke University (1/23/14)

SAPAA Training Institute, Substance Abuse Expert Qualification training and exam (20 hours CE) (2/20/14).

CMEP Webinar Hypoxia Hypothesis and Abusive Head Trauma, Chris Greeley, M.D. (2/25/14)

## 2013 Continuing Education

CFEP Coursepak (10 CE hrs) on trauma and abuse as required for re-credentialing for 2 years as a CFEP Examiner
Children's Exposure to Violence, Office of Justice Programs, Professional Development Resources (4/13)
Domestic Violence: Child Abuse and Intimate Partner Violence, Office of Justice Programs, Professional Development Resources (4/13)
Annual Conference on the Contemporary Applications of Psychological Assessment: Assessment of Complex Trauma in Adults and Children, U Mass, Boston MA (10/13)

## 2012 Continuing Education

Psychological Autopsy Certification Training Program, American Association of Suicidology, Atlanta, GA (7/12)
American Academy of Forensic Psychology: Contemporary Issues in Forensic Psychology: Effective and Ethical Expert Testimony and Evaluation of Sex Offenders; San Francisco, CA (9/12)

## 2011 Continuing Education

CFEP Coursepak (10 CE hrs) on trauma and abuse as required for re-credentialing for 2 years as a CFEP Examiner
American Academy of Forensic Psychology: 3 day Intensive Workshop in Forensic Psychology: Advanced Forensic Psychology Practice: Issues and Applications (24 CE hrs); Albuquerque, NM (3/11)
American Academy of Forensic Psychology: Preparing for the Board Certification Examination in Forensic Psychology-ABPP (6 CE hrs); Albuquerque, NM (3/11)
Aeromedical Psychology Training Course, United States Army School of Aviation Medicine, Ft. Rucker, AL (10/31-11/18/11)

## 2010 Continuing Education

American Academy of Forensic Psychology: Forensic Applications of the MMPI-2; Malingering and Forensic Evaluation: Conceptual Issues and Clinical Methods; New Orleans, LA February 2010
Defusing the High Conflict Divorce: A Treatment Guide for Working with Angry Couples (3/10)
Ethical Decision making for Psychologists: A Practical Model (4/10)
Treating PTSD in Battered Women (4/10)
PTSD Treatment I : CBT, Neurobiology and Pharmacotherapy (5/10)

## 2009 Continuing Education

American Academy of Forensic Psychology: Evaluation of Competence to Stand Trial; Charleston, SC, January 2009
American Academy of Forensic Psychology: Interrogations and Disputed Confessions; Sarasota, FL, September 2009

## 2008 Continuing Education

Basic Mediation & Advanced Mediation (22 hours)

Assessing and Managing Risk in Psychological Practice

CACNC Fourteenth Annual Symposium on Child Abuse & Neglect: Suggestibility and the Child Witness; Testing our Patience: Investigation & Intervention in High Conflict Custody Cases; Abusive Head Trauma: Medical Update for Investigators; Lifting the Veil: Legal Implications of Abusive Head Trauma

## 2007 Continuing Education

American Academy of Forensic Psychology: Advanced Topics in Criminal Forensic Assessment; Critical Issues in Child Sexual Abuse Evaluations; New Port, Rhode Island, April 2007

## 2006 Continuing Education

Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony
Expert Witnesses in Child Abuse Cases: What Can and should be Said in Court
Psychological Assessment of Adult Posttraumatic States: Phenomenology, Diagnosis, and Measurement
Misconceptions of Custody Evaluations/Parenting Coordination
Interrogations and Disputed Confessions
Detection of Deception

Materials Reviewed

a. Signed Declarations:
  i. Vilma Salazar de Argueta
  ii. Vilma Salazar de Argueta (Supplement)
  iii. Roxanna Cruz Torres
  iv. Roxanna Cruz Torres (Supplement)
  v. Vilma Elizabeth Torres de Cruz
  vi. Vilma Elizabeth Torres de Cruz (Supplemental)
  vii. Vilma Elizabeth Torres de Cruz (Second Supplemental)
  viii. Leticia Ramirez Diaz
  ix. Leticia Ramirez Diaz (Supplement)
  x. Leticia Ramirez Diaz (Second Supplement)
  xi. Maria del Carmen Umaña Gonzalez
  xii. Ana Gladys Magaña
  xiii. Luis Mario Martir Monroy
  xiv. Zoila Olano
  xv. Jose Alfredo Ortiz
  xvi. Ana Julia Magaña de Sanabria
  xvii. Zoila Angelica Soriano
  xviii. Monica Reyes Tatiana
  xix. Lilina Tino
  xx. Melvin Cruz Torres
  xxi. Rafael Enrique Umaña
  xxii. Reina Umaña
  xxiii. Ronal Umaña
  xxiv. Saul Osvaldo Umaña
  xxv. James R. Merikangas, M.D
  xxvi. John Gregory Olley, Ph.D.
  xxvii. Luis Mario Ramos Mendez
  xxviii. Noe Hernan Rivera
  xxix. Dora Alicia Umaña Gonzalez
  xxx. Edwin Esau Umaña
  xxxi. Roxana Marisol Ramirez
  xxxii. José Wilfredo Herrera Calderón
  xxxiii. Karla Herrera Calderón
  xxxiv. María Lidia Calderón
  xxxv. Alfonso Cruz
  xxxvi. Ana Lilian Reyes
  xxxvii. Carlos Geovanni Herrera
  xxxviii. José Alfredo Ortiz
  xxxix. Josselyn Guevara Reyes
  xl. Xiomara Reyes
  xli. Carlos Alcides Peraza
  xlii. Gerardo Arriola Umana
b. Alejandro Umaña's School Records
c. Henri Geovanni's School Records
d. Photos of Alejandro Umaña
e. Photos of Danubio Azul Meson

1

f. Photos of La Fe Meson
g. Alejandro Umaña Jail Letters Admitted at Trial and Mental Retardation (Atkins) Hearing
h. Alejandro Umaña Interrogation (12/12/2007)
i. Alejandro Umaña Interrogation (4/23/2008)
h. Birth Certificates
    i. Dennis Alvarez
    ii. Rafael Enrique Umaña
    iii. Alejandro Umana (Guatemala)
    iv. Alejandro Umana (El Salvador)
j. Cemetery Records
    i. Tomasa Gonzalez (paternal great grandmother)
    ii. Saul Alfredo Ramirez (maternal uncle)
    iii. Alejandro Umaña (paternal uncle)
    iv. Henri Geovanni Ayala Umaña )paternal second cousin)
k. Court Records
    i. Transcript of MR Hearing (11/30/2009)
    ii. Order Denying MR (3/19/2010)
    iii. Trial Transcript (4/12/10 – 4/19/10)
    iv. Sentencing Phase Transcript (4/19/10-4/28/10)
    v. United States Court of Appeals for the Fourth Circuit Opinion (04/23/2014)
l. Expert Reports and Testing
    i. Enrique Suarez
    ii. Gregory Olley
    iii. James Merikangas
    iv. Ricardo Weintstein
    v. Richard McGough
        • Trial Social History Report
        • Invoice
    vi. Ruben Gur
        • Neurobehavioral Assessment of 6/15/16
    vii. Declaration of Pablo Stewart, May 23, 2018
m. Alejandro Umana BOP Records
n. Alejandro Jail Records
    i. Guilford County
    ii. High Point Jail
    iii. Mecklenburg County

o. Alejandro Umaña Medical Records – Gwinnet Health System
p. 2008 Trans National Anti-Gang Discovery Documents

# APPENDIX 215

Declaration of Pablo Stewart, M.D. Pursuant to 28 U.S.C. § 1746

I, Pablo Stewart, M.D. do hereby declare, affirm, and verify as follows:

1.      I am a medical doctor and am Board Certified by the American Board of Psychiatry and Neurology.    I am a Clinical Professor in the Department of Psychiatry at the University of California, San Francisco School of Medicine.    I have also served as a psychiatric consultant to governmental and private agencies on a variety of psychiatric and forensic issues, including evaluation of capital clients for purposes of determining mitigation and psychiatric defenses.    I have been qualified as an expert in forensic psychiatry in a number of state and federal courts.    A copy of my current curriculum vitae is attached.    All opinions stated herein are stated to a reasonable degree of medical certainty.

2.      I was retained by Alejandro Umaña's habeas counsel to conduct a forensic psychiatric evaluation.    I evaluated Mr. Umaña at USP-Terre Haute on March 21, 2016, May 2, 2016, and April 27, 2018.    I have also reviewed background materials including social history records; trial and penalty transcripts; and the opinions of James R. Merikangas, M.D., Ruben Gur, Ph.D., John Olley, Ph.D., Helen Mayberg, M.D., Enrique Suarez, Ph.D., Selena Sermeño, Ph.D., Ricardo Weinstein, Ph.D., and Maria Santa Cruz Giralt.    In addition, I spoke with Susana Herrero, a representative of the El Salvadoran consulate who had frequent contact with Mr. Umaña while he was incarcerated in North Carolina.    A complete list of the materials I have reviewed is attached.

3.      Based upon my review of the records and clinical evaluation, it is my opinion within a reasonable degree of medical certainty that Mr. Umaña has cognitive impairments; Posttraumatic Stress Disorder; and psychotic symptomology. These impairments combine to render him incompetent both presently and at the time of his pretrial, trial, and sentencing proceedings. Mr. Umaña currently lacks (and lacked at the time of his pretrial, trial, and sentencing proceedings)

1

sufficient ability to consult with his lawyer with a reasonable degree of rational understanding and lacks a rational as well as a factual understanding of the proceedings. A supplemental declaration will follow regarding my opinions of the available mental health defenses and mitigation evidence to which I could have testified at the time of Mr. Umaña's trial.

4.       During my evaluations, Mr. Umaña presented as polite and putting forth his best effort. Mr. Umaña's speech pattern was odd and hard to follow. While his eye contact was good, at times his gaze became distant and his eyes fluttered at random intervals. This may be indicative of a neurological disorder. It may also be a physiological and/or psychological response to trauma or other mental health impairments.   Mr. Umaña sings and raps at inappropriate times. His singing is childlike and repetitive, with the same, simple rapping with a rudimentary beat.

5.       Mr. Umaña displayed psychotic symptomology during my evaluations. While his thought process appeared somewhat intact, he at times became disorganized, tangential, and displayed loose associations. Mr. Umaña reported having visions, seeing spirits, and hearing voices since the age of nine. Spirits of deceased relatives frequently visited and talked with him. He reported receiving messages that he attempts to interpret. His inability to do so causes him a great deal of frustration. Mr. Umaña described recurring visions of beasts or demons that he felt compelled to draw in an effort to convince others that the things he saw were real.

6.       The background materials corroborate my observations of Mr. Umaña's psychotic symptomology and establish that this symptomology, including persistent delusions and loose associations, was present at the time of Mr. Umaña's pretrial, trial, and sentencing proceedings. Declarants often observed him staring at the walls. When questioned, he reported seeing objects or demons on the walls. These visions scared him and he insisted that they were real.   Declarants also observed Mr. Umaña responding to internal stimuli. Again, when questioned, he reported

2

hearing voices, including voices of angels, demons, and Satan, with whom he would speak and whose direction he would insist on following. Mr. Umaña also reported that he saw hidden meaning in everyday occurrences. Mr. Umaña told others that he believed he predicted future events through his dreams and visions.

7. During my evaluations, Mr. Umaña also displayed symptoms of cognitive impairment. Mr. Umaña's thought process was rigid, concrete and perseverative, most notably on a fixed belief that his attorneys can simply pick up the phone, call the prosecutor or judge, and effectuate his extradition to El Salvador. Mr. Umaña's belief is not based in reality. Mr. Umaña displayed frustration that no such phone call had been made. Despite nearly a decade of capital litigation, Mr. Umaña also expressed to me that a possible outcome in his case was release with an ankle-monitor bracelet so he could live in the U.S., work, and support his family.

8. During my evaluations, Mr. Umana also displayed great difficulty in tracking questions and providing complete answers, resorting to tangential songs or other non-responsive behaviors. His letters, contained in the materials I reviewed, contained many of the difficulties, jumping from thought to thought in a very tangential manner. In my experience these behaviors often correlate with cognitive impairments.

9. The background materials corroborate my observations of Mr. Umaña's cognitive impairments and establish that these impairments were present at the time of Mr. Umaña's pretrial, trial, and sentencing proceedings. Mr. Umaña experienced numerous risk factors for cognitive impairment throughout his life, including exposure to teratogens and other toxins in the womb; the developmental effects of maternal stress, malnutrition, extreme poverty, trauma, abuse, and neglect; childhood illness, including frequent fevers; head injuries during childhood and

3

adulthood. Since childhood, Mr. Umaña has experienced severe, chronic headaches that frequently leave him debilitated with pain.

10. As a child, Mr. Umaña struggled academically, and, after multiple attempts, failed the third grade at age 12 while in a remedial class and subsequently left school. As an older teenager and adult, Mr. Umaña struggled to find steady employment, holding a series of odd, menial jobs. Mr. Umaña was described by declarants as childlike, someone who acts younger than his stated age. His favorite television programing was cartoons. Mr. Umaña had difficulty with simple tasks, such as using a tape measure, and had difficulty reading. Mr. Umaña's brother, Saul, explained that Mr. Umaña often said things that made no sense or were factually incorrect. When Saul tried to teach him the right way to do something, Mr. Umaña would get upset. Although Mr. Umaña would eventually give in and agree with Saul, Saul did not believe that Mr. Umaña understood Saul's reasoning, but that he simply gave up.

11. The findings of Dr. Weinstein, Dr. Olley, Dr. Merikangas, and Dr. Gur are consistent with my observations of Mr. Umaña's cognitive impairments. Neuropsychological testing, PET imaging, and a QEEG all demonstrate that Mr. Umaña has profound impairments in the frontal lobe that decrease his executive functioning and significantly interfere with his ability to plan, anticipate and self-modulate his behavior. Mr. Umaña's impaired cognition and concrete thinking prevent him from communicating effectively and navigating and assessing situations correctly. In addition, Mr. Umaña has abnormalities in brain metabolism that compromise his ability to modulate his behavior under stress.

12. Mr. Umaña also displayed and endorsed symptoms of trauma during my evaluation, supporting a diagnosis of Posttraumatic Stress Disorder. While Mr. Umaña's cognitive impairments prevent him from giving a complete trauma history, the background materials

4

demonstrate that Mr. Umaña has a history of chronic, unrelenting exposure to violence within the home and outside that are representative of the types of trauma experienced by individuals with PTSD and that his trauma symptomology was present at the time of pre-trial, trial, and sentencing proceedings. Mr. Umaña lived in a constant state of fear. Mr. Umaña's stress response system was constantly activated resulting in his experiencing hyperarousal, hypervigilance, anxiety, agitation, guardedness, paranoia, and sleeping difficulties.

13. Mr. Umaña, like many other people that repeatedly endured life threatening stressors, suffers from unwanted intrusive thoughts, thinking about painful memories that cause psychological distress. He has flashbacks in the form of dissociations, which take him back to the actual event. His intrusive thoughts while physically uncomfortable are unavoidable and enter at unexpected and unwanted times. He experiences sleep disturbances and reported sleeping three hours a night on average. He displayed symptoms of hyperarousal; he also experienced psychological and physiological disturbances like nervousness and anxiety when thinking about painful memories. Additionally, he displayed symptoms of paranoia, hypervigilance, psychic numbing, avoidance, and a sense of a foreshortened future.

14. When discussing war related violence and death, Mr. Umaña began to dissociate. He had a faraway look in his eyes when he described the distinct smell of the deceased bodies in the street, reporting that he could smell the odor as he talked. He explained that smell is impossible for him to forget, it will never go away, and he feels as if the smell has seeped deep into is skin.

15. When asked how he dealt with such traumatic events, Mr. Umaña explained that he tried to pretend that it was not happening. This type of response was both childlike and integral to his survival. When questioned by members of the military as to what he may have witnessed, Mr.

5

Umaña knew not to say anything as providing any type of account would put him and his family at risk of being killed.

16. As there is no validated, standardized Spanish-language measure for assessing competency, I assessed Mr. Umaña's competency through forensic interview. Mr. Umaña displayed no rational or factual understanding of the legal proceedings against him, nor is he capable of assisting counsel with a rational degree of understanding. Our discussion was frequently interrupted by the symptomology described above, as Mr. Umaña inappropriately broke into song and concretely perseverated on his false belief that his attorneys can simply pick up the phone and have him returned to El Salvador. Mr. Umaña's disjointed thought process and loose associations impede him from focusing and comprehending. He responds to cognitively difficult topics by breaking into song and rap. Rather than mere impatience or hyperactivity, it is cognitively difficult, beyond what one would expect from an adult of his age, for Mr. Umaña to concentrate, comprehend, and focus on any given subject.

17. When asked to explain his current legal situation, Mr. Umaña told me there were three possible outcomes: 1) he could be executed and returned to El Salvador dead with his body intact; 2) his attorneys could call the prosecutor or judge and have him sent back to El Salvador alive; or 3) he could be released to live and work in the United States with ankle monitoring. Mr. Umaña's description of these three possible outcomes did not follow a linear path but was interrupted when Mr. Umaña twice broke into song.

18. Mr. Umaña's desire to be extradited to El Salvador is not based in reality, but based on a concrete, child-like belief of what his future in El Salvador would hold. Despite the fact that Mr. Umaña's family provided him with little to no support or nurturance when he lived in El Salvador, Mr. Umaña fantasizes that, were he to be sent to a Salvadoran prison, his family would visit often

6

and provide food and clothes. Mr. Umaña romanticizes what his life would be like and has blocked any memory of the reality of Salvadoran jails, which were described by one declarant as severely overcrowded (forcing about 50 people in one cage such that they were on top of each other); unsanitary (no running water except for a hose, a hole in the corner for a toilet); and unbearably hot.

19. The background materials, pretrial and trial mental health evidence, and my interview with Ms. Herrero reflect that Mr. Umaña was similarly incapable of understanding the proceedings or assisting counsel prior to and during trial and sentencing. Prior to trial, Dr. Weinstein expressed his concern that Mr. Umaña may not have been legally competent and both Drs. Weinstein and Olley testified that Mr. Umaña probably did not understand the Miranda rights that were read to him by the police.

20. Both Richard McGough, the trial mitigation specialist, and Ms. Herrero report that Mr. Umaña lacked an understanding and appreciation of his legal situation; that he broke out into rap songs at inappropriate times, interrupting attempts at discussions about his case; and that he held onto a belief that he could be extradited to El Salvador even though it was repeatedly explained to him that this was not possible. Mr. Umaña also expressed this false belief to the police; to Dr. Suarez; and in correspondence. Mr. Umaña's father reports that he too tried to explain to Mr. Umaña that it was not possible for him to be transferred, but that Mr. Umaña does not understand and persists in his request. Ms. Herrero reports that Mr. Umaña's inability to learn and understand the workings of the United States legal system is, in her experience working with Salvadoran nationals, not explained by cultural difference, as most of the Salvadoran nationals with whom she worked were capable of learning about the United States legal system and understanding the proceedings against them.

7

21. As a result of the combination of Mr. Umaña's cognitive impairments, PTSD, and psychotic symptomology, Mr. Umaña is not able to follow what happens in a courtroom. Mr. Umaña does not understand the most basic workings of the United States legal system despite the fact that members of his legal team and family have repeatedly attempted to explain it to him over the course of nearly a decade. All attempts at conversation about his case are met with his fixed false belief that his attorneys (or even family) can simply pick up the phone, call the judge or prosecutor, and have him returned to El Salvador and his frustration that no one has done so.

22. Based on the forgoing, it is my opinion, which I hold to a reasonable degree of medical certainty, that Mr. Umaña was incompetent at the time of his pre-trial, trial, and sentencing proceedings and is currently incompetent to proceed in his post-conviction proceedings.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on May __23__, 2018.

Pablo Stewart, M.D.

<u>CURRICULUM VITAE</u>

### *PABLO STEWART. M.D.*

**San Francisco, California 94117**
**(415) 264-0237; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated March 2017)**

| | |
|---|---|
| <u>EDUCATION:</u> | University of California, San Francisco, Teaching Certificate in General Medical Education, 2017 |
| | University of California, San Francisco, School of Medicine, M.D., 1982 |
| | United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| <u>LICENSURE:</u> | California Medical License #GO50899<br>Hawai'i Medical License #MD-11784<br>Federal Drug Enforcement Administration #BS0546981<br>Diplomate in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

<u>ACADEMIC APPOINTMENTS:</u>

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| December 1996-<br>Present | Psychiatric Consultant<br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |

1

| | |
|---|---|
| January 1997-<br>September 1998 | Director of Clinical Services, San Francisco Target Cities<br>Project. Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | Medical Director, Comprehensive Homeless Center,<br>Department of Veterans Affairs Medical Center, San Francisco. Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | Chief, Intensive Psychiatric Community Care Program,<br>(IPCC) Department of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for the IPCC, a community based case management program. Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center. This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | Chief, Substance Abuse Inpatient Unit, (SAIU), Department<br>of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | Psychiatrist, Substance Abuse Inpatient Unit, Veterans<br>Affairs Medical Center, San Francisco. Clinical responsibility for patients admitted to SAIU. Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | Director, Forensic Psychiatric Services, City and County of<br>San Francisco. Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco. Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Senior Attending Psychiatrist, Forensic Unit, University of<br>California, San Francisco General Hospital. Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco. Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

2

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u>  Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u>  Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u>  Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

3

## HONORS AND AWARDS:

June 2015 — Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015.

June 1995 — Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995.

June 1993 — Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993.

May 1993 — Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine.

May 1991 — Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991.

May 1990 — Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990.

May 1989 — Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989.

May 1987 — Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching.

May 1987 — Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital.

May 1985 — Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.

1985 — Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry

4

Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome."

MEMBERSHIPS:

June 2000-
May 2008

California Association of Drug Court Professionals.

July 1997-
June 1998

President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine.

July 1996 -
June 1997

President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine.

July 1995 -
June 1996

Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine.

April 1995 -
April 2002

Associate Clinical Member, American Group Psychotherapy Association.

July 1992 -
June 1995

Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine.

July 1990 -
June 1992

Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine

PUBLIC SERVICE:

June 1992

Examiner, American Board of Psychiatry and Neurology, Inc.

November 1992 -
January 1994

California Tuberculosis Elimination Task Force, Institutional Control Subcommittee.

September 2000-
April 2005

Editorial Advisory Board, *Juvenile Correctional Mental Health Report.*

May 2001-
2010

Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association.

January 2002-
June 2003

Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program.

February 2003-
April 2004

Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco.

December 2003-
January 2004

Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team.

5

| | |
|---|---|
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006;<br>February 2017-<br>Present | Member of Human Services Commission, City and County of San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 142 of 381

| | |
|---|---|
| October 1986 - September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee. Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 - June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 - December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| September 2016- Present | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014- Present | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003- Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002- January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001- June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999- April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998- June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995- December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |

7

| | |
|---|---|
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |

Case 3:16-cv-00057-MOC     Document 106-1     Filed 01/12/21     Page 144 of 381

| | |
|---|---|
| July 1986 -<br>August 1990 | Clinical supervisor, Psychology interns/fellows,<br>San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Clinical supervisor PGY I psychiatric residents,<br>San Francisco General Hospital |
| July 1986 -<br>August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 –<br>August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| May 2016-<br>Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
| June 2015-<br>May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014-<br>Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-Present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007<br>-Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state |

9

prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011).

| | |
|---|---|
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |

| | |
|---|---|
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues.  Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |

11

| | |
|---|---|
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

<u>PRESENTATIONS:</u>

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 148 of 381

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

13

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

14

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

15

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

16

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74. "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75. 15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76. "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77. "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78. "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79. "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82. "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83. "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84. 1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?"

17

"Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86. "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87. "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88. "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89. "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90. "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91. "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92. "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93. "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94. "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95. "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96. "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97. "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98. "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99. "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

18

101. "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102. National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103. "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105. "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106. "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107. Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108. "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111. "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114. "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

19

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

20

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137. Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138. "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139. Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140. "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141. "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142. "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143. "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144. "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)

145. "Capital Punishment," Human Writes 2007 Conference. London, England. (10/6/07)

146. "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147. "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference. San Diego, California. (12/13/07)

21

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

151. Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152. 2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153. Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA. This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154. Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court. San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155. 2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156. 2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157. Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158. Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159. "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160. San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161. Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for

22

Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.


PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.* Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)    Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)    Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)   Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)   James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High*

23

*Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12) Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE</u> in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13) Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

14) Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, <u>*Uppers, Downers, All Arounders, Seventh Edition,*</u> CNS Publications, Inc., Ashland, Oregon.

15) Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16) Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17) Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

18) Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

Index of Materials Reviewed

a. Signed Declarations of:
    i. Vilma Salazar de Argueta
    ii. Roxanna Torres Cruz
    iii. Vilma Elizabeth Torres de Cruz
    iv. Vilma Elizabeth Torres de Cruz (Supplemental)
    v. Leticia Ramirez Diaz
    vi. Ana Ruth Umaña Gonzalez
    vii. Maria del Carmen Umaña Gonzalez
    viii. Rosa Lilian Umaña Gonzalez
    ix. Ana Gladys Magaña
    x. Luis Mario Martir Monroy
    xi. Zoila Olano
    xii. Jose Alfredo Ortiz
    xiii. Ana Julia Magaña de Sanabria
    xiv. Zoila Angelica Soriano
    xv. Monica Reyes Tatiana
    xvi. Lilina Tino
    xvii. Melvin Cruz Torres
    xviii. Rafael Enrique Umaña
    xix. Reina Umaña
    xx. Ronal Umaña
    xxi. Saul Osvaldo Umaña
    xxii. Roberto Ramos
    xxiii. John Bryson, Esquire
    xxiv. Mark P. Foster, Jr., Esquire
    xxv. Eric Lessard
    xxvi. Richard McGough
    xxvii. James R. Merikangas, M.D
    xxviii. John Gregory Olley, Ph.D.
    xxix. Luis Mario Ramos Mendez
    xxx. Noe Hernan Rivera
    xxxi. Dora Alicia Umaña Gonzalez
    xxxii. Edwin Esau Umaña
    xxxiii. Roxana Marisol Ramirez
b. Alejandro Umaña's education records
c. Photos of Alejandro Umaña as a child
d. Henri Geovanni's education records
e. Alejandro Umaña jail letters
f. Alejandro Umaña Interrogation (12/12/2007)
g. Alejandro Umaña Interrogation (4/23/2008)
h. FBI 302 dated 3/7/2007
i. Spanish Love Song
j. Drawing
k. 3/17/2009 Call No 3791984 from Alejandro Umaña to Rafael Umaña
l. Alejandro Umaña medical records

1

Index of Materials Reviewed

m. Birth Certificate(s)
  i. Ana Ruth Umaña Gonzalez
  ii. Brenda Leticia Ramirez
  iii. Cristina Elizabeth Umaña
  iv. Darwin Isaias Ramirez
  v. Edson Arnoldo Barillas Umaña
  vi. Edwin Esau Umaña
  vii. Esmeralda Francisca Alicia Umaña
  viii. Jose Alfredo Ortiz
  ix. Monica Tatiana Reyes
  x. Mayra Elizabeth Umaña
  xi. Rafael Enrique Umaña
  xii. Ronal Oswaldo Umaña
  xiii. Saul Alfredo Ramirez Ortiz
  xiv. Saul Oswaldo Gonzalez Ramirez
  xv. Wendy Elizabeth Alvarez
n. Baptism Records
  i. Ana Ruth Umaña Gonzalez
  ii. Dora Alicia Gonzalez Umaña
o. Death Certificates
  i. Henry Giovanny Ayala Umaña
  ii. Mayra Elizabeth Umaña
p. Burial records
  i. Tomasa Gonzalez
  ii. Saul Alfredo Ramirez
  iii. Alejandro Umaña
  iv. Henri Geovanni Ayala Umaña
q. Dr. Juan Carlos Gonzalez Pineda's Certificate of Epilepsy for Claudia Maricela Umaña Flores (08/26/2015)
r. Egdar Mauricio Aquirrre O.'s Certificate for Dora Alicia Umaña Gonzalez – (08/28/2015)
s. Court Records
  i. Transcript of Initial Appearance (7/28/2008)
  ii. Transcript of MR Hearing (11/30/2009)
  iii. Order Denying MR (3/19/2010)
  iv. Trial Transcript (4/12/10 – 4/19/10)
  v. Sentencing Phase Transcript (4/19/10-4/28/10)
t. Expert Reports and Testing
  i. Enrique Suarez
  ii. Gregory Olley
  iii. James Merikangas
  iv. Ricardo Weintstein
  v. Richard McGough
  vi. Ruben Gur

2

# APPENDIX 216

Second Declaration of Pablo Stewart, M.D. Pursuant to 28 U.S.C. § 1746

I, Pablo Stewart, M.D. do hereby declare, affirm, and verify as follows:

1. I am a medical doctor, Board Certified by the American Board of Psychiatry and Neurology. I am a Clinical Professor in the Department of Psychiatry at the University of Hawaii School of Medicine. I was previously a Clinical Professor in the Department of Psychiatry at the University of California, San Francisco School of Medicine for over 20 years. I have also served as a psychiatric consultant to governmental and private agencies on a variety of psychiatric and forensic issues, including evaluation of capital clients for purposes of determining mitigation and psychiatric defenses. I have extensive experience working with Central American refugees in the United States, having run a Spanish-language psychiatric ward at San Francisco General Hospital during 1985-1986. I have been qualified as an expert in forensic psychiatry in a number of state and federal courts. A copy of my current curriculum vitae is attached. All opinions stated herein are stated to a reasonable degree of medical certainty.

2. I was retained by Alejandro Umaña's habeas counsel to conduct a forensic psychiatric evaluation. I evaluated Mr. Umaña at USP-Terre Haute on March 21, 2016, May 2, 2016, and April 27, 2018. I have also reviewed background materials including social history records; trial and penalty transcripts; and the opinions of James R. Merikangas, M.D., Ruben Gur, Ph.D., John Olley, Ph.D., Helen Mayberg, M.D., Enrique Suarez, Ph.D., Selena Sermeño, Ph.D., Ricardo Weinstein, Ph.D., and Maria SantaCruz Giralt. In addition, I spoke with Susana Herrero, a representative of the El Salvadoran consulate who had frequent contact with Mr. Umaña while he was incarcerated in North Carolina. A complete list of the materials I have reviewed is attached.

3. I previously provided a declaration to the Federal Public Defender for the Middle District of Pennsylvania in which I assessed Mr. Umaña's competence to proceed, both retrospectively at

1

trial and currently in his habeas litigation. I concluded, to a reasonable degree of medical certainty, that Mr. Umaña has cognitive impairments, Posttraumatic Stress Disorder, and psychotic symptomology that rendered him incompetent at the time of his pre-trial, trial, and sentencing proceedings and also render him currently incompetent to proceed in his post-conviction proceedings.

4. At that time, I indicated that a supplemental declaration would follow containing my opinions of the available mental health defenses and mitigation evidence to which I could have testified at the time of Mr. Umaña's trial. Those opinions, which I hold to a reasonable degree of medical certainty, follow.

5. I previously diagnosed Mr. Umaña with PTSD and described his symptoms including dissociation, intrusive thoughts, hyperarousal, hypervigilance, and an inability to regulate his emotions when aroused. Mr. Umaña's PTSD causes him to be hyperaware of threats to his person and impairs his ability to rationally perceive and react to perceived threats.

6. In addition to suffering from PTSD, Mr. Umaña suffers from cognitive impairment and a low intelligence quotient, both of which have previously been identified by Drs. Merikangas, Weinstein, Olley and Gur. Cognitive impairment involves a general inability to think coherently and to adequately and reasonably complete general intellectual tasks in a manner commensurate with one's background, education and experience. A low intelligence quotient is defined by relative inability to complete general and academic tasks in comparison to other people that share the same background, age, and educational attainment. During our clinical interview, Mr. Umaña showed cognitive impairment by expressing a rigid, concrete and perseverative thought process. He previously showed a low intelligence by not being able to master a third grade curriculum. He failed third grade as a child and again as a teenager in night school.

2

7. Mr. Umaña's low intelligence quotient satisfied one prong of the diagnosis of Intellectual Disability. Drs. Olley and Weinstein found the other prongs of that diagnosis, deficits in adaptive functioning and an early age of onset, and correctly, in my opinion, identified him as a person suffering from Intellectual Disability.

8. In addition to and distinct from cognitive impairment, low intelligence and intellectual disability, Mr. Umaña also suffers from neurological deficits reflected in the opinions of Drs. Weinstein, Merikangas, and Gur and supported by their neuropsychological testing, medical examination, PET imaging, and a QEEG. Neurological deficits differ from cognitive impairment in that neurological deficits represent impairment of a specific area of the brain or impairment of discrete abilities; cognitive impairment involves a general inability to process or manipulate information. Mr. Umaña's brain does not function like the brains of peers of his age and background. Parts of his brain are either not working as they should or are not working at all as indicated by his brain's metabolism of glucose; physical reflexive actions like fluttering eyelids; and anecdotal evidence including Mr. Umaña's enuresis, difficulty learning, and lack of emotional and social maturation.

9. All these disorders, both individually and synergistically, impaired Mr. Umaña's ability to act intentionally and with premeditation and deliberation both during the homicides in Greensboro and at any other time. These disorders constitute, and constituted at the time of the offense, a severe mental or emotional disturbance. And, as a result of these impairments, Mr. Umaña's capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law was significantly impaired at the time of the offense.

10. Mr. Umaña lacks the ability to quickly and accurately form abstract thoughts while frightened or stressed. The background information I reviewed contained evidence that the

3

homicides were the culmination of an emotionally charged argument at a restaurant between an intoxicated group of workers and the group Mr. Umaña sat with, some of whom were probably also intoxicated, that rapidly and disproportionately escalated to shooting. The restaurant's employees and one of the men who sat with Mr. Umaña, Angel "Spider" Granados, testified that they only expected a fight. A restaurant employee initially called the police for a fight in progress. Angel Granados, who sat beside Mr. Umaña at the restaurant, told police that the victims acted aggressively, "became enraged," and came at Granados. Mr. Granados pushed one or two of them and then Mr. Umaña shot. Mr. Granados in grand jury testimony said "I don't know why he [Mr. Umaña] shot them." Grand Jury Testimony April 24, 2008 at pages 8-9, 17. Similarly, another restaurant employee testified that he saw Granados get up to fight and the other people at his table told him to sit down and be quiet. At that point, a waitress got Mr. Umaña's group to leave but they were still exchanging words as they walked to the door. The victims again stood up to fight and that's when Mr. Umaña fired. The restaurant employee also did not think anything but a fight was about to occur; "I didn't think nothing would happen. Nothing ever happened. Last thing you expect, and so I didn't." Trial Testimony April 13, 2010 at pages 382-394, 388.

11. As a result of his PTSD and impaired threat analysis, Mr. Umaña would have become hyper-aroused and fearful of the threats and the victims as the incident progressed. This state would have impaired his ability to think or react rationally. As a result of the hyperarousal and hypervigilance that cause him to misperceive and magnify threats, Mr. Umaña would have perceived the interaction as far more threatening than Granados perceived it and shot when Granados merely pushed a victim.

12. Further, Mr. Umaña's cognitive impairment, in combination with PTSD, would have narrowed the range of actions and reactions available to Mr. Umaña during the incident. A person

4

with PTSD like Mr. Umaña has a limited capacity to regulate his emotional state once threatened and, in his case, cognitive impairment further limited his options in reacting. If he perceived the victims as a serious threat, and became hyper-aroused and hypervigilant, his inability to change tracks in his thinking would have limited any awareness that he could de-escalate the situation or retreat and any ability to de-escalate or retreat.

13. Finally, Mr. Umaña's neurological deficits also impaired his ability to act intentionally and control his reactions at the time of the homicides. A person with PTSD who does not suffer from comorbid neurological deficits has limited ability to modulate emotion and is likely to become hyper-aroused from minimal threatening stimulus, but a neurologically-damaged PTSD sufferer with a low functioning or abnormal brain has even fewer resources or abilities to cope with the barriers of PTSD. While the neurological deficits would have independently limited Mr. Umaña's abilities in the restaurant, those deficits exacerbated by PTSD and his general cognitive deficits may have eliminated any option other than a primal response to what he saw as an extreme threat. All these disorders and deficits -- PTSD, cognitive deficits, low intelligence quotient, intellectual disability and neurological deficits – individually and in combination impaired Mr. Umaña's ability to accurately perceive the severity of the threats posed in the restaurant, to appropriately modulate his reaction, and to instantly assess others' potential reactions to his actions. All these disorders, both individually and synergistically, significantly impaired Mr. Umaña's capacity to appreciate the wrongfulness of his conduct, conform his conduct to the requirements of law, or act with specific intent or with premeditation and deliberation. Further, these same disorders caused Mr. Umaña to labor under mental and emotional disturbance at the time of the event.

14. Dr. Gur's neurobehavioral assessment provides additional support for this conclusion. Dr. Gur found Mr. Umaña has a hyperreactive amygdala and dysfunctional frontal lobes which

5

correlate to the PTSD symptoms of hypervigilance and hyperarousal. The neurobehavioral finding of a compromised frontal lobe also affirms my assessment that Mr. Umaña suffers from impaired and concrete thinking, an inability to comprehensively plan, and an inability to modulate his behavior under stress.

15. Mr. Umaña's description of the events at the restaurant have consistently reflected symptoms of his disorders. To police, Mr. Umaña described the victims as picking a fight and threatening to "get us outside." Mr. Umaña further described to police that the victims pushed the situation and stated "they make you, make you so mad" that "what happened, happened." Mr. Umaña lashed out and the homicides just "happened" with little control by him. His lack of control from a hyper-aroused state can be seen in this description and could be the reason Mr. Umaña also fatalistically described the incident to police using terms like "when they look for you, they find you, too." In my clinical interview, Mr. Umaña reiterated that the events were a misunderstanding between his group of associates and the workers at the restaurant. All these descriptions of the homicides reflect a lack of control and an inevitability or a lack of perceived options or alternatives during the incident.

16. In my clinical interviews and review of records and background information, I saw that Mr. Umaña displays, and has consistently displayed, psychotic symptomology that may or may not have directly impacted his behavior during the homicides in the restaurant but certainly impaired his ability to function on a day-to-day basis and establish a 'normal' life. Persons displaying psychotic symptomology often experience disordered thinking and have a skewed perception of reality. In addition to Mr. Umaña's comments and behavior while with me, I reviewed documentation of Mr. Umaña responding to internal stimuli, having visual

6

hallucinations, hearing voices, seeing things that no one else saw and receiving special messages throughout his life prior to the homicides.

17. People, like Mr. Umaña, who experience psychotic symptomology have trouble distinguishing what is real from what is delusional. When in the throes of a delusion, they may scare and alienate other people who do not know them well. Psychotic delusions create barriers to an individual establishing normal social relationships and to ingratiating himself in a supportive community. There is support in the collateral information that I reviewed that this stigma of psychosis followed Mr. Umaña also. While Mr. Umaña established himself in the exploitive community of MS-13, he did not ever, and his psychotic symptomology may have meant he could not, establish himself in a church, neighborhood, company or other supportive community that could have helped him avoid a life of being victimized and being compelled to victimize others.

18. Like his psychotic symptomology, Mr. Umaña's intellectual disability, low intelligence quotient, cognitive impairment, neurological deficits, and PTSD impaired Mr. Umaña's functioning in everyday life in addition to impairing his abilities during the homicides. Although they may display symptoms only episodically, PTSD sufferers are always burdened by the disorder. Likewise, Mr. Umaña's neurological deficits were a constant presence that would have caused him difficulty throughout life, impairing his ability to assess situations like how to avoid beatings from his father or how to get attention from a girl associated with a gang without joining the gang. He consistently lacked the ability to plan as seen in the years he spent in temporary manual labor without seeking or being able to elevate himself through work or to independently provide a place to live or sustenance for himself and his girlfriends and children. The neurological deficits, as well as general cognitive deficits, also clearly beset Mr. Umaña even in the quiet, routine life of a prisoner in an isolation cell awaiting trial, where he could not overcome these

7

deficits to understand the court procedures, many jail procedures, or communicate effectively through writing.

19. Several incidents documented in Mr. Umaña's transcripts and records provide examples of how these disorders affected his everyday life. Mr. Umaña was intercepted by courthouse security trying to bring a jail-made weapon, a "shank," into the courtroom during jury selection. Mr. Umaña wrote a note to explain the shank, claiming he needed the weapon for protection from other gang members who may think he is talking to authorities. Mr. Umaña's belief that he needed a shank to protect himself in this situation is a good example of the hypervigilance seen in individuals with PTSD like Mr. Umaña.

20. The hypervigilance that accompanies PTSD may well have played a role in the shootings of apparent gang-members on Fairfax Avenue in Los Angeles as well. As I understand that incident, Mr. Umaña and other MS-13 members were riding in a car when the victims displayed gang hand signs and exchanged challenges based on their gang. The driver of the car pulled over and Mr. Umaña and two co-actors got out. In the confrontation with the victims, the challenges continued and the first victim displayed a small knife. While someone without PTSD may negotiate a resolution to a situation like this with minimal violence or injury, a person like Mr. Umaña would interpret this situation as life-threatening and respond with deadly force.

21. Mr. Umaña's impairments also would have greatly limited his ability to lead or organize any group of persons, including a group of persons associated with MS-13. Mr. Umaña's cognitive impairments, low IQ, intellectual disability and neurological impairments resulted in deficits in communication that would have made leadership difficult at best. Mr. Umaña's Spanish-language letters jump from thought to thought in a tangential manner, without any punctuation or clear start or stop to sentences. He communicates by expressing a stream of consciousness that shows little

8

awareness or appreciation for the reader's ability to follow and which would limit his reader's ability to discern or follow up on any orders or plan. Although he attempted to communicate in code to protect his letters from the jail guards, he also put the key to his code in one of the letters he was trying to protect. While Mr. Umaña could plan to write in code to protect communications, his cognitive impairment and low intelligence would have limited his awareness of all the circumstances impacting his plan. This limited awareness would greatly diminish his capacity to guide any group through changing circumstances.

22. Mr. Umaña's neurological deficits, low IQ, intellectual disability and cognitive impairment inhibit his problem-solving abilities, which would further degrade any ability to lead. Mr. Umaña's impaired problem solving is well-documented throughout many examples of his inability to clearly or quickly solve problems. When he was a child and had nothing to eat, he would catch and kill small animals but not clean them properly before cooking and eating them. As he grew older and started to work, he could not rise above a helper status in any job because he could not determine how to perform simple tasks like measurements. When he migrated to the United States, he lived either in abandoned apartments or with a significant other because he could not fully function - he has never shown the capacity to live on his own. I have no doubt that cognitive impairment, low IQ, and intellectual disability limited Mr. Umaña's ability to solve problems like providing himself with food, fulfilling the needs of employers and sustaining and maintaining housing for himself. I equally have no doubt that cognitive impairment, low IQ, and intellectual disability would have prevented him from solving the problems involved in leading any organized group.

23. PTSD would be another, synergistic impediment to Mr. Umaña exercising leadership. Hypervigilance and hyperarousal compel Mr. Umaña to overact to any potential threat whether a

real threat exists or not. When he perceives a threat, Mr. Umaña lacks the capacity to follow through with a plan or even a previous train of thought; he will react. In my opinion, his emotional lability when stressed would prevent him from showing the dependability necessary for leadership. A more blunt assessment would be that any person following Mr. Umaña as a leader probably could not count on him to make any judgment, much less exercise good judgment, when presented with significant stress or threat.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of Hawaii on January 11, 2021.

Pablo Stewart, M.D.

10

CURRICULUM VITAE

**PABLO STEWART, M.D.**

█████████████

**Honolulu, HI 96815**
**(415) 264-0237**
**e-mail: pablo.stewart.md@gmail.com**
**(Updated August 2020)**

| | |
|---|---|
| Personal Statement: | As evidenced in my CV, my psychiatric career is based on several guiding principles. These include, but are not limited to a commitment to diversity at all levels of medical education, including medical students, residents and faculty members. Also, I have always believed that health care is a right and not a privilege. I have demonstrated this fact by my passion for social justice and health equity for everyone. |
| Language Competency: | Fluent in both Spanish and English. |
| EDUCATION: | University of California, San Francisco, Teaching Certificate in General Medical Education, 2017 |
| | University of California, San Francisco, School of Medicine, Department of Psychiatry, Psychiatric Residency Program, 1986 |
| | University of California, San Francisco, School of Medicine, M.D., 1982 |
| | United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| LICENSURE: | California Medical License #GO50899<br>Hawai'i Medical License #MD-11784<br>Federal Drug Enforcement Administration #BS0546981<br>Hawaii Controlled Substances Certificate of Registration #E14341<br>Diplomate in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

ACADEMIC APPOINTMENTS:

| | |
|---|---|
| July 1, 2019-<br>Present | Clinical Professor/Psychiatrist, University Health Partners (UHP), University of Hawaii, John A. Burns School of Medicine. |
| February 22, 2018-<br>February 22, 2019 | Academic Appointment: Clinical Professor, Department of Psychiatry, University of Hawaii, John A. Burns School of Medicine. |
| September 2006-<br>Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco. |

1

School of Medicine.

| | |
|---|---|
| July 1995 - August 2006 | <u>Academic Appointment:</u>  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 - June 1995 | <u>Academic Appointment:</u>  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 - July 1989 | <u>Academic Appointment:</u>  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| July 2019- Present | Attending Psychiatrist John A. Burns School of Medicine, Department of Psychiatry, University of Hawaii. Current duties include supervising psychiatric residents in their provision of acute and chronic care to the mentally ill inmate population housed at the Oahu Community Correctional Center. In this capacity I was also involved with local agencies in formulating the jail's response to Covid-19. I also present a lecture series to the psychiatric residents regarding Forensic Psychiatry. |
| December 1996- Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |
| January 1997- September 1998 | <u>Director of Clinical Services, San Francisco Target Cities Project.</u>  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court  Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 - November 1996 | <u>Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco.</u> Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 - January 1996 | <u>Chief, Intensive Psychiatric Community Care Program, (IPCC) Department of Veterans Affairs Medical Center, San Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community-based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |

2

| | |
|---|---|
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco</u>.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982- | <u>Psychiatric Resident, University of California, San Francisco.</u> |

| | |
|---|---|
| July 1985 | Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 - July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Officer in Charge of a Vietnamese Refugee Camp. Received an Honorable Discharge. Highest rank attained was Captain. |

<u>HONORS AND AWARDS</u>:

| | |
|---|---|
| June 2020 | Recognized by the Department of Psychiatry, John A.Burns School of Medicine, University of Hawaii as the recipient ot the 2019-2020 Excellence in Teaching Award-Psychiatry. |
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |

4

| | |
|---|---|
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |

| | |
|---|---|
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>September 2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006;<br>February 2017-<br>October 2018 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| June 2020 | Member of the John A. Burns School of Medicine, University of Hawaii Scholarship Committee for 2020-2021 academic year. |
| June 2020 | Member of the resident selection committee for the Department of Psychiatry, John A. Burns School of Medicine, University of Hawaii. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |

6

| | |
|---|---|
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| December 2018-<br>May 2019 | Lecturer, Department of Psychiatry, JABSOM, University of Hawaii. |
| September 2016-<br>June 2018 | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>June 2018 | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 180 of 381

| | |
|---|---|
| July 2003-<br>June 2018 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| September 1990-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - | Off ward supervisor, PGY II psychiatric residents, |

| | |
|---|---|
| November 1996 | Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| May 2016-<br>Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.,* No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
| June 2015-<br>May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014-<br>Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.,* No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007-<br>Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |

| | |
|---|---|
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |

| | |
|---|---|
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM. Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 - December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981- December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA. Advised youth services staff on client management. Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 - June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 - June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991- June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 - May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.	Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.	24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.	Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.	Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.	First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.	American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.	Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10.	University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11.	American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12.	Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.	Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.	Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.	Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.	University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17.	National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.	Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues

15

and Pain Management for Chemically Dependent Patients."  San Francisco, CA. (9/10/98)

47.	Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000."  "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA.  (9/18/98)

48.	Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder."  Napa, CA.  (9/23/98)

49.	"Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA.  (9/30/98)

50.	"Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA.  (10/13/98)

51.	California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient."  Concord, CA.  (10/15/98)

52.	California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel.  (10/15/98)

53.	Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.	1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders."  Sacramento, CA.  (12/11/98)

55.	"Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.	Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.	"Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22/99 & 2/5/99)

58.	Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender."  (2/17/99)

59.	American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60.	"Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.	"Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

16

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74. "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75. 15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76. "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77. "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78. "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79. "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82. "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83. "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84. 1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86. "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87. "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88. "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89. "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90. "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91. "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92. "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93. "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94. "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95. "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96. "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97. "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98. "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99. "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101. "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102. National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103. "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105. "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106. "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

19

107. Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108. "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111. "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114. "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

20

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137. Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

21

138. "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139. Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140. "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141. "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142. "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143. "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144. "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)

145. "Capital Punishment," Human Writes 2007 Conference. London, England. (10/6/07)

146. "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147. "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference. San Diego, California. (12/13/07)

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

151. Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152. 2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153. Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA. This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154. Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court. San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155. 2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156. 2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157. Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158. Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159. "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160. San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161. Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162. "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

163. Mental Health & Death Penalty Training, Community Legal Aid Institute (LBH Masyarakat), Jakarta, Indonesia, February 12 -16, 2019.

PUBLICATIONS:

1) Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2) Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3) Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)	Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)	Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers*. The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)	Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)	Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)	Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)	Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)	Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)	James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)	Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)	Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)	Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15)	Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16) Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17) Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)* Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

*19)* Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Plaintiff-Appellant Edgar Quintanilla v. Homer Bryson, Commissioner, State of Georgia's Department of Corrections, et al., On appeal from the United States District Court for the Southern District of Georgia, Case No. 6:17-cv-00004-JRH-RSB in the United States Court of Appeals for the Eleventh Circuit, No. 17-14141.

Index of Materials Reviewed

a. Signed Declarations of:
   i. Vilma Salazar de Argueta
   ii. Vilma Salazar de Argueta (Supplement)
   iii. Roxanna Cruz Torres
   iv. Roxanna Cruz Torres (Supplement)
   v. Vilma Elizabeth Torres de Cruz
   vi. Vilma Elizabeth Torres de Cruz (Supplemental)
   vii. Vilma Elizabeth Torres de Cruz (Second Supplemental)
   viii. Leticia Ramirez Diaz
   ix. Leticia Ramirez Diaz (Supplement)
   x. Leticia Ramirez Diaz (Second Supplement)
   xi. Ana Ruth Umaña Gonzalez
   xii. Maria del Carmen Umaña Gonzalez
   xiii. Rosa Lilian Umaña Gonzalez
   xiv. Ana Gladys Magaña
   xv. Luis Mario Martir Monroy
   xvi. Zoila Olano
   xvii. Jose Alfredo Ortiz
   xviii. Ana Julia Magaña de Sanabria
   xix. Zoila Angelica Soriano
   xx. Monica Reyes Tatiana
   xxi. Lilina Tino
   xxii. Melvin Cruz Torres
   xxiii. Rafael Enrique Umaña
   xxiv. Reina Umaña
   xxv. Ronal Umaña
   xxvi. Saul Osvaldo Umaña
   xxvii. Roberto Ramos
   xxviii. John Bryson, Esquire
   xxix. Mark P. Foster, Jr., Esquire
   xxx. Eric Lessard
   xxxi. Richard McGough
   xxxii. James R. Merikangas, M.D
   xxxiii. John Gregory Olley, Ph.D.
   xxxiv. Luis Mario Ramos Mendez
   xxxv. Noe Hernan Rivera
   xxxvi. Dora Alicia Umaña Gonzalez
   xxxvii. Edwin Esau Umaña
   xxxviii. Roxana Marisol Ramirez
   xxxix. José Wilfredo Herrera Calderón
   xl. Karla Herrera Calderón
   xli. María Lidia Calderón
   xlii. Alfonso Cruz
   xliii. Ana Lilian Reyes
   xliv. Carlos Geovanni Herrera
   xlv. José Alfredo Ortiz
   xlvi. Josselyn Guevara Reyes

1

Index of Materials Reviewed

xlvii. Xiomara Reyes
xlviii. Carlos Alcides Peraza
xlix. Gerardo Arriola Umana
b. Alejandro Umaña's education records
c. Photos of Alejandro Umaña as a child
d. Photos of Danubio Azul Meson
e. Photos of La Fe Meson
f. Henri Geovanni's education records
g. Alejandro Umaña jail letters
h. Alejandro Umaña Interrogation (12/12/2007)
i. Alejandro Umaña Interrogation (4/23/2008)
h. FBI 302 dated 3/7/2007
i. Spanish Love Song
j. Drawing
k. 3/17/2009 Call No 3791984 from Alejandro Umaña to Rafael Umaña
l. Alejandro Umaña medical records
m. Birth Certificate(s)
    i. Ana Ruth Umaña Gonzalez
    ii. Brenda Leticia Ramirez
    iii. Cristina Elizabeth Umaña
    iv. Darwin Isaias Ramirez
    v. Edson Arnoldo Barillas Umaña
    vi. Edwin Esau Umaña
    vii. Esmeralda Francisca Alicia Umaña
    viii. Jose Alfredo Ortiz
    ix. Monica Tatiana Reyes
    x. Mayra Elizabeth Umaña
    xi. Rafael Enrique Umaña
    xii. Ronal Oswaldo Umaña
    xiii. Saul Alfredo Ramirez Ortiz
    xiv. Saul Oswaldo Gonzalez Ramirez
    xv. Wendy Elizabeth Alvarez
    xvi. Dennis Alvarez
    xvii. Alejandro Umana
    xviii. Alejandro Umana
n. Baptism Records
    i. Ana Ruth Umaña Gonzalez
    ii. Dora Alicia Gonzalez Umaña
o. Death Certificates
    i. Henry Giovanny Ayala Umaña
    ii. Mayra Elizabeth Umaña
p. Burial records
    i. Tomasa Gonzalez
    ii. Saul Alfredo Ramirez
    iii. Alejandro Umaña
    iv. Henri Geovanni Ayala Umaña
q. Certificates and Documents of Identity

2

Index of Materials Reviewed

      i. Jose Wilfredo Herrera Calderon
      ii. Jose Alfredo Ortiz
      iii. Josselyn Margarita Guevara Reyes
      iv. Karla Jazmin Herrera Calderon
      v. Lidia Maria Calderon
      vi. Leticia Diaz Ramirez
      vii. Vilma Aracely Salazar de Argueta
      viii. Vilma Elizabeth Torres de Cruz

r. Dr. Juan Carlos Gonzalez Pineda's Certificate of Epilepsy for Claudia Maricela Umaña Flores (08/26/2015)

s. Egdar Mauricio Aquirrre O.'s Certificate for Dora Alicia Umaña Gonzalez – (08/28/2015)

t. Court Records
      i. Transcript of Initial Appearance (7/28/2008)
      ii. Transcript of MR Hearing (11/30/2009)
      iii. Order Denying MR (3/19/2010)
      iv. Trial Transcript (4/12/10 – 4/19/10)
      v. Sentencing Phase Transcript (4/19/10-4/28/10)
      vi. Grand Jury Testimony of Angel Granados
      vii. Grand Jury Testimony of Ana Maria Angeelos Lopez
      viii. March 22, 2010 - Note from Alejandro Umana

u. Expert Reports and Testing
      i. Enrique Suarez
      ii. Gregory Olley
      iii. James Merikangas
      iv. Ricardo Weintstein
      v. Richard McGough
      vi. Ruben Gur

v. Alejandro Umana BOP Records

w. *The State of Florida vs. Terric Jeffrey*, Motion to Establish Procedure During Evaluation – 02/06/2006

x. *The State of Florida vs. Terric Jeffrey*, Motion for Protective Order to Prevent Further Inquiry into Facts by State Expert – 04/27/2006

y. *The State of Florida vs. Terric Jeffrey*, Second Motion to Compel Raw Data from Dr. Suarez – 08/26/2008

z. 2008 Trans National Anti-Gang Discovery Documents

aa. Autopsy Report of Manuel Garcia Salinas

bb. Autopsy Report of Ruben Garcia Salinas

cc. Letter from Frieda de Garcia to Dr. Olley regarding Alejandro's handwriting

dd. Police Interviews of Angel Granados

3

# APPENDIX 217

## DECLARATION OF LETICIA RAMIREZ DIAZ

I, Leticia Ramirez Diaz, declare the following under penalty of perjury:

1.  I am Alejandro Enrique Umaña's mother. Alejandro is my son with Rafael Umaña.

2.  Today I saw the photographs attached to this declaration. I recognize each one of these photos.

3.  The photograph identified as "Photo 1" is a photograph of me when I was about 17 and a half years old. The photograph identified as "Photo 2" is the reverse of "Photo 1." At that time, I lived in Escuintla, Guatemala, and I tried to take my life. As a suicide note I left this photograph of myself and wrote my address on the back and asked that my mother be notified of my death. These photographs (Photo 1 and Photo 2) are a true and accurate representation of what I have just described.

    The photo identified as "Photo 3" is a photograph of me at the same age. I was pregnant with Alejandro. I often think that if this photograph could talk, it would tell of all the difficult things I lived through during that time. This photograph is a true and accurate representation of what I have just described.

4.  The photo identified as "Photo 4" is a current photograph of me. In this photograph I am at home, working at my sewing machine. This photograph is a true and accurate representation of what I have just described.

5.  I myself did not write this declaration, but I have carefully read it.

I swear to the best of my knowledge and understanding that the foregoing is true and correct. I sign this declaration on February 6, 2016, in Santa Ana, El Salvador.

_____[illegible signature]_____
Leticia Ramirez Diaz

[Four photographs are attached. Under each photo the word "Photo1, Photo 2, Photo 3 and Photo 4 respectively appears. Beside each word and number are the handwritten initials *LRD*.]

[The above one-page translation of a declaration by Leticia Ramirez Diaz, submitted in the matter of the United States of America vs. Alejandro Umaña, is a true and correct translation from Spanish into English, performed to the best of my knowledge and ability. This translation has been reviewed by Mark E. Owens, Administrative Office of the United States Courts Certified Interpreter. Certified on March 23, 2016 by Ana C. Martinez, Administrative Office of the United States Courts Certified Interpreter.]



Foto 3 LRD



POLICOLORSR HI:13911

Dirección: de Leticia Ramirez
Loma Alta colonia 6 de Marzo
Calle Brasil casa #6
Santa Ana
El Salvador C.A.

Escrivirle A

Santos Ramirez
Por Fabor

"Gracias"

Foto 2 LRD



Foto 1 ⎰ ᴿᴰ



Foto 4 LRD

# DECLARACIÓN DE LETICIA RAMÍREZ DÍAZ

Yo, Leticia Ramírez Díaz, declaro lo siguiente bajo pena de perjurio:

1. Soy la madre de Alejandro Enrique Umaña. Alejandro es mi hijo con Rafael Umaña.

2. El día de hoy vi las fotos que están adjuntas a esta declaración. Reconozco cada una de estas fotos.

3. La foto identificada como "Foto 1" es una fotografía mía cuando tenía unos 17 años y medio de edad. La foto identificada como "Foto 2" es el reverso de la "Foto 1." En ese tiempo, yo vivía en Escuintla, Guatemala, y traté de quitarme la vida. Como nota de suicidio dejé esta fotografía mía y le escribí atrás mi dirección y pedí que se le avisara a mi madre de mi muerte. Estas fotografías (Foto 1 y Foto 2) son una representación fiel y correcta de lo que acabo de describir.

   La foto identificada como "Foto 3" es una fotografía mía de la misma edad. Yo estaba embarazada de Alejandro. Seguido pienso que si esta fotografía pudiera hablar contaría todas las cosas difíciles que viví durante esa época. Esta fotografía es una representación fiel y correcta de lo que acabo de describir.

4. La foto identificada como "Foto 4" es una fotografía mía actual. En esta fotografía estoy en mi casa trabajando con mi máquina de coser. Esta fotografía es una representación fiel y correcta de lo que acabo de describir.

5. No escribí yo misma esta declaración, pero la he leído con detenimiento.


Juro a mi leal saber y entender que lo expuesto anteriormente es cierto y correcto. Firmo esta declaración el día seis de febrero de 2016, en Santa Ana, El Salvador.

_____
Leticia Ramírez Díaz



Foto 3 ⎣ℛ𝒟



Foto 2 ____



Foto 1 $\underline{\phantom{LPD}}$



Foto 4 LRD

# APPENDIX 218

# DECLARATION OF LETICIA RAMIREZ DIAZ

I, Leticia Ramirez Diaz, declare the following under penalty of perjury:

1.     I am Alejandro Enrique Umaña's mother.

2.     As I talked about in my earlier declarations, my life was very hard when I was pregnant with Alejandro.  The stress in my life was so bad, I even tried to kill myself.  I drank a huge glass of a poison that we used to kill ants mixed with water.

3.     One of the ways I tried to cope with the stress was to drink.  I didn't drink every day.  But when I drank, I drank until I was drunk.  I would do this at least three times each week.  I drank beer and sometimes aguardiente or other hard liquor.  When I drank beer, I would usually have at least eight beers at a time.

4.     I didn't know I was pregnant with Alejandro until late in the pregnancy. I realized I was pregnant only once I had a big belly so I continued to drink until about two months before Alejandro was born.  I stopped drinking in September and Alejandro was born in November.

5.     Besides drinking, I also used to take pills called Rohypnol [Rohipnol] that Alejandro's father used to give me. I think he wanted to see me completely drunk because he used to have me drink beer with a straw. One gets drunk quicker that way.

6.     When I was pregnant with Alejandro I contracted malaria [paludismo]. I don't remember if I took any medication for it. I do remember that I had very high fever. At that time, we lived by a river. The water was filthy, it sat stagnant and was littered with trash everywhere and gave out a fetid smell. There were lots of mosquitoes. That area of Escuintla, Guatemala, was called Los Portales. We fetched drinking water from a public spigot and we bathed at what I now realize was a drain that spilled into the river. I was hungry and since there was nothing much else to eat I did not have much choice but to eat crabs and little fish that I caught in the dirty river water.

7.    I suffered a lot at that house. I suffered at the hands of Alejandro's father and because I did not get along with his family, particularly his great grandmother Paca. I did not like her and she did not like me. I felt completely alone. While I was pregnant, after a fight with Quique's aunt Carmen, I was kicked out of the house and was forced to sleep at the cemetery, on a tomb, for several nights. I was very scared. At that house, I was also afraid because many strange things happened there. I saw shadows and heard things by the well in the back. We lived at that house by the river until after Alejandro was born. When he was a few months old, we moved to a house that was near the slaughterhouse. There, we used to go and scavenge carcasses and discarded animal parts to eat.

8.    The first picture attached to this declaration is a picture of Alejandro when he was almost three months old. He was lying on a wicker chair when it was taken. In that photograph one can see a few red spots on his skin. Shortly after, the skin condition spread. His entire body looked raw. It was pitiful and it hurt to look at him. The only way I could hold him was if I wrapped him in leaves. Alejandro suffered a lot as a baby.

9.    In another declaration I mentioned I was raped when I was 13 years old. Until then, I did not know anything about sex and no one had talked to me about menstruation or anything related to pregnancy. Amazing as it seems to me now I got pregnant with Alejandro, my second child, but continued to be ignorant about many of those things.

10.    I had my first child, my son Darwin, at age 16. Darwin's father was a man named Miguel. Miguel was almost 50 years old and I was 14 when I became involved with him. My friends and I usually hung out at a vacant lot where we used to smoke and burn trash. Miguel would go by and take us out to buy ice cream or pupusas for us. By then I was already drinking and smoking a lot of marijuana.

11.     Alejandro was born when I was 18, my son Saul was born when I was 19 and I had my daughter Brenda when I was 23 years old. I did the best I could for my children even though I had a very difficult life and was dealing with my addictions when they were young. I would have done the same for Alejandro but that awful man [his father] and his family took him from me.

12.     Brenda was born with a problem in her right eye. The doctor told her that her cornea did not develop properly. I tell her, you had no chance of developing properly because all I had to eat when I was pregnant with you were avocados [ahuacates]. Brenda recently had eye surgery and it was a success. She lost the eyesight from that eye a long time ago but at least now her eye does not wander [move, is not crossed]. Brenda is a housewife. She recently started to go to school to become a hair stylist. She is married and has three children.

13.     I was never contacted by Alejandro's trial attorneys.  Had they talked to me, I would have been willing to talk to them about this.

I swear that the foregoing is true and correct to the best of my knowledge and understanding.  I present this declaration on _____ in Santa Ana, El Salvador.


_____
LETICIA RAMIREZ DIAZ

# VIRGINIA WILSON
*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1.  I am a Spanish language Court Interpreter and Translator;

2.  I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3.  I have personally performed the translation described as follows:

**Declaration of Leticia Ramirez**
**In the case of USA v. Alejandro Umaña**

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on November 18, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE LETICIA RAMÍREZ DÍAZ

Yo, Leticia Ramírez Díaz, declaro lo siguiente bajo pena de perjurio:

1.  Soy la madre de Alejandro Umaña.

2.  Tal y como di a conocer en mis declaraciones anteriores, mi vida fue muy difícil cuando estaba embarazada de Alejandro. El estrés en mi vida era tan fatal que hasta traté de quitarme la vida. Bebí un enorme vaso de un veneno que utilizábamos para matar hormigas, mezclado con agua.

3.  La bebida era una de las maneras en que yo trataba de hacer frente al estrés. No bebía a diario. Sin embargo, cuando bebía lo hacía hasta embriagarme. Solía hacer esto por lo menos tres veces por semana. Bebía cerveza y a veces aguardiente u otro licor fuerte. Cuando bebía cerveza, por lo general me tomaba por lo menos ocho cervezas a la vez.

4.  Yo no sabía que estaba embarazada de Alejandro; no lo supe sino hasta los dos últimos meses de mi embarazo. Me di cuenta de que estaba embarazada solo cuando me creció mucho el vientre, de modo que seguí bebiendo hasta aproximadamente dos meses antes de que naciera Alejandro. Dejé de beber en septiembre y Alejandro nació en noviembre.

5.  Además de beber, también tomaba pastillas llamadas Rohypnol [Rohipnol] que me daba el padre de Alejandro. Yo creo que él quería verme completamente borracha puesto que me hacía tomar cerveza con una pajilla. Tomando así, uno se emborracha más rápido.

6.  Cuando estaba embarazada de Alejandro contraje malaria [paludismo]. No recuerdo si tomé algún medicamento contra la malaria. Lo que sí recuerdo es que tuve fiebre muy alta. En ese entonces vivíamos cerca de un río. El agua estaba llena de basura por todas partes; era inmunda, permanecía estancada y emanaba un olor fétido. Había muchos zancudos. Esa zona de Escuintla, Guatemala, se llamaba Los Portales. Íbamos a traer agua potable de un

_L R D_    1

chorro público y ahora me doy cuenta de que nos bañábamos sobre un desagüe que vertía al río. Tenía hambre y como no había mucho más qué comer, no me quedaba otra opción más que comer jaibas y pequeños peces que pescaba del agua sucia del río.

7. Sufría mucho en esa casa. Sufría mucho a manos del padre de Alejandro y porque no me llevaba bien con su familia, en particular, con su bisabuela Paca. Yo no la quería y ella no me quería a mí. Me sentía completamente sola. Durante mi embarazo, después de una pelea con Carmen, la tía de Quique, me echaron de la casa; me vi obligada a dormir en el cementerio, sobre una tumba, por varias noches. Tenía mucho miedo. En esa casa también sentía miedo porque pasaban muchas cosas extrañas allí. Yo veía sombras y escuchaba cosas por el pozo de atrás. Vivimos en esa casa cerca del río hasta después del nacimiento de Alejandro. Cuando él tenía unos pocos meses de vida, nos mudamos a la casa que quedaba cerca del matadero. Íbamos al matadero a buscar algo para comer entre los restos y las partes desechadas de los animales.

8. La primera foto (A) que se anexa a esta declaración es una foto de Alejandro cuando tenía casi tres meses de nacido. Él estaba acostadito en una silla de mimbre cuando le sacaron la foto. En esa foto se puede ver que tiene unas cuantas manchas rojas en la piel. Poco tiempo después, estas manchas en la piel se le desparramaron. Parecía tener todo el cuerpo en carne viva. Daba mucha lástima y dolía verlo así. De la única manera que podía sostenerlo era envolviéndolo en hojas. Alejandro sufrió mucho cuando era bebé.

9. En otra declaración mencioné que fui violada cuando tenía 13 años. Hasta entonces, yo no sabía nada con respecto al sexo y nadie me había dicho nada sobre la menstruación o algo que tuviera que ver con el embarazo. Aunque ahora me parece asombroso, quedé embarazada de Alejandro, mi segundo hijo, pero aun así seguí ignorando muchas de esas cosas.

10. Tuve a mi primer hijo, Darwin, a los 16 años. El padre de Darwin era un hombre que se llamaba Miguel. Miguel tenía casi 50 años y yo tenía 14 cuando empecé a tener una relación con él. Mis amigos y yo por lo general pasábamos el tiempo en un terreno vacío donde fumábamos y quemábamos basura. Miguel pasaba por ahí y nos llevaba a comprarnos helados o pupusas. Para ese entonces yo ya bebía y fumaba mucha marihuana.

11. Alejandro nació cuando yo tenía 18 años, mi hijo Saúl nació cuando yo tenía 19 años y tuve a mi hija Brenda cuando tenía 23 años. Hice lo mejor que pude por mis hijos a pesar de que tuve una vida muy difícil y estaba tratando de enfrentar mis adicciones cuando ellos eran pequeños. Tendría que haber hecho lo mismo por Alejandro pero ese hombre aborrecible [su padre] y su familia me lo quitaron.

12. Brenda nació con un problema en el ojo derecho. El doctor le dijo que la córnea no se había desarrollado de manera normal. Yo le digo, no pudiste tener un desarrollo normal porque lo único que había para comer cuando estaba embarazada de ti eran aguacates. Recientemente Brenda tuvo una operación quirúrgica exitosa del ojo. Ella perdió la vista en ese ojo hace ya mucho tiempo pero por lo menos ahora el ojo no se le desvía [no tiene el ojo errante, no es bizca]. Brenda es ama de casa. Recientemente empezó a ir a la escuela para aprender a ser estilista. Es casada y tiene tres hijos.

13. Nunca se comunicaron conmigo los abogados que representaron a Alejandro en el juicio. Si se hubieran comunicado conmigo yo habría estado dispuesta a hablar con ellos acerca de esto.

Juro que la información proporcionada en la presente es verdadera y correcta según mi leal saber y entender. Presento esta declaración el _____ en Santa Ana, El Salvador.

_____
LETICIA RAMÍREZ DÍAZ

3.



# APPENDIX 219

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 222 of 381

DECLARATION OF JOSÉ WILFREDO HERRERA CALDERÓN

I, José Wilfredo Herrera, declare as follows:

1.      I am a friend of Alejandro Umaña.  Alex is about two years older than me.  We lived in the same neighborhood of Barrio San Rafael and at one point Alex stayed with my family.  I lived with my parents Carlos Aquino Herrera and Maria Lidia Calderon, my brother Carlos, my sisters, Karla and Patty, and Patty's daughter.  My family calls me Alfredo.

2.      Alex lived in a *mesón* near our house.  He shared a room with his father and stepmother.  Alex's father had a bad reputation in the neighborhood. He was loud, violent, a drunk, and gambled and got into fights. He treated Alex miserably. He did not show any affection or love to Alex.  He was very abusive.  Alex told me that he believed his father beat him for the sake of beating him.  Alex looked sad and sometimes said he wanted it all to end.  He was tired of the sadness and said his life was only about suffering.

3.      Alex's stepmother was a much younger woman named Yanira. She was closer to Alex's age.  Alex told me that his father cared about Yanira far more than he did for Alex.  This caused a lot of friction.  Yanira and Alex got into huge fights and Yanira blamed things on Alex to his father.  Alex's father sided with Yanira and turned his rage on Alex by yelling and beating him.  They made it clear that they saw Alex as nothing more than a nuisance and they did not want him living with them.

4.      Alex's mother did not care for him when I knew him.  One day, when we were playing soccer, a woman passed by with a little girl.  Alex waved hello to the woman, but she paid him little attention.  Alex told me that the woman was his mother and the girl was his sister.  He told me that his mother left him when he was just a baby.

5.      Alex and I became close friends when I was about 13 or 14 years old.  Although I was younger than Alex, Alex let me take the lead and make the decisions of how we spent our time.  Alex tagged along.  Alex was infantile.  He was like a child.  At times, I got frustrated with Alex because I would be talking about a serious topic and Alex was joking around.  He started laughing when no one thought the situation was funny.  His comments about the situation made little sense.  It was like he said things just to say something.  I would get frustrated with him and told him that

1

he was only about playing around and watching cartoons. I told him that he was never going to mature.

6.      Alex sometimes saw things that I did not see.  Something was off with Alex.  Sometimes I saw him talking to himself and answering questions as if he were talking to someone.  Alex would then laugh sarcastically as if he was disagreeing with the imaginary person he was talking with and he would get angry. One time, I saw him sitting on the curb outside.  He was rocking himself back and forth and talking to himself.  His eyes were open and looked like he was in another place. He had a lost look on his face.  When I asked if he was ok, Alex did not answer me.  He seemed gone, absent.  Once Alex got very sick with a fever.  I recall him shaking and talking about seeing a shadow.  When I told him I did not see the shadow, Alex repeatedly said, the shadow, the shadow, as if trying to convince me that it was there, but I did not see anything.

7.      Alex often went hungry.  My brother and I felt bad for Alex.  We watched how he had to search for food. Alex ate what he could find by climbing mango trees or using his slingshot to catch a pigeon. Sometimes, we took him to our house and my brother and I shared our food with him.  Although we did not have much, we had a family that shared what little there was.

8.      One day, I found Alex sitting on top of a wall. When I asked what he was doing, he told me that most nights he stayed out all night because he had nowhere to go and no place to sleep.  I could not stand for Alex to live like this.  I told him to come with me.  We went to my home and I asked my mother if Alex could stay with us.  I told her how his family did not care for him or feed him and no one took any responsibility for him.  She felt awful that Alex was without anyone to care for him and agreed that he could stay with us.

9.      Alex ended up staying with our family off and on for about two and half years.  Mostly, he came to our house when it was time to sleep.  When he stayed with us, no one ever came looking for him, not even his father.  His family did not appear to care where Alex was or what he was doing.

10.      Alex had a hard time taking care of himself.  He had hand-me-down shoes when he did wear shoes, which was not often.  He did not wear shoes at all to play soccer. When he played soccer he played barefoot on the dirt and gravel streets.  The bottom of Alex's feet had cuts all

2

over them.  One time, Alex hit his bare foot on the sidewalk.  His big toenail lifted and his toe bled. The other boys and I stopped playing to go see what was happening to Alex. It looked painful. We told him to put a band-aid on it but Alex pinched the toenail and peeled it off. He grabbed dirt from the street and smothered it on his toe. Alex said the dirt would get rid of the pain.  I told him that the dirt was only going to make it worse but Alex still believed that the dirt made it better.

11.     Alex cut himself on purpose.  He broke glass and cut into the inside of his forearm to break the skin until he bled.  He did this a lot.  I saw Alex do this to himself a lot.  I told him he was crazy. He had several marks all over his arm.  It was like he wanted to feel the pain.  I also saw Alex cutting glass and dipping it into ink. He tried to make a tattoo on his arm with it but it just bled, leaving only marks.  One time, he wrote out a number that looked like 999.  I asked why he did a 999 and then realized that he meant to write out 666.

12.     Alex also pierced his own ears, by jabbing a needle through the earlobe. Alex did not know to sterilize the needle or numb his ear with ice.  The holes kept closing so he put a twig in the holes.  The holes became infected and had pus coming out of them.  Alex wanted to feel the pain. Alex said that once the pain from cutting went away, it felt good for him because his skin itched and he liked to scratch it.

13.     Alex did not know how to do his own laundry.  Alex occasionally worked as a delivery helper for Coca-Cola.  He washed his white uniform shirt by soaking it in bleach.  Alex did not wash his other clothes until they were raggedy and smelly.  When he did wash, he put the clothes in the basin with water and lathered his hands with a bar of soap instead of putting the soap on the clothes.  Then he rubbed with his soapy hands over his clothes to spread the soap over them. He scrubbed his pants with a brush. He didn't just scrub the dirty spots, he scrubbed all of his clothes. I told him he was ruining his clothes by washing them like that and that soaking clothes in bleach would cause holes and tear the shirt apart.   Alex kept doing it his way. When he got something stuck in his head, it was hard to change his mind.

14.     Alex's shoes were always cheap and fell apart quickly. It was difficult for him to walk because they were too worn out.  One time, we were walking and his shoes were bothering him. Alex became angry.  He stopped walking, grabbed the tongue of the shoe and ripped it off. Another time, Alex was wearing a shirt that did not fit him. He was mad and started yelling.  He grabbed

3

his shirt and tore it open with his hands. Alex said he was tired of things not fitting him. Alex talked about wanting a pair of Converse. Converse were expensive and he never earned enough money to buy himself a pair of those shoes.

15.     Alex's taste in clothes was strange. I heard people making fun of him because he looked a bit awkward. He picked clothes that didn't fit. Alex said he liked the way I dressed but he dressed nothing like me. I liked to wear clothes that were in style and kids our age were wearing. Alex could not pull off this style. He also liked how I ironed my shirts. Alex could not iron his own shirt. He left creases and got mad when he could not do it. Alex also couldn't hang the clothes right. He wanted his pants to look nice, like mine, but he would hang them wrong and the pants could get the "filo," crease on the wrong spot and he would not like it.

16.     Alex was not a good reader or writer. My older sister Patty played school with Alex and me. She dictated things for us to write as if she was the teacher and we were her students. Alex had a very hard time writing. It took him a long time to write and his writing was sloppy with misspelled words. I made fun of him and told him his writing looked like he was Muslim because it did not look like our alphabet. Patty corrected Alex a lot. She said "no it is b for *burro* not d for *dedo"* but he kept making the same mistakes. We used to make fun of Alex for his mistakes and his sloppy writing. Alex tried to make a joke out of his poor writing by saying that his sloppy writing was because he was trying to write with his feet.

17.     Reading was also hard for Alex. I remember Alex looking at a newspaper as if he was reading it, but we knew there was no way he could read the paper. We teased and made fun of Alex for pretending. He said it did not matter anyway because reading the newspaper was nothing but a bunch of letters. Alex would tell my dad "my brain is small." Alex said that he was not born to study.

18.     Alex claimed that he knew how to do magic tricks. He put a coin behind his ear, in his hand, or in his mouth and say that was magic. We laughed because we thought he was just being funny but he really thought he was doing magic tricks.

19.     While Alex stayed with us, I was part of a school dance group called DJ Master. Alex was not in the school group and he was not able to take any dance class of his own, but he watched me

4

closely and wanted to learn. I tried to teach Alex the dance moves and choreography that I learned from my classes. Alex could not remember the steps, and was bad at the choreography. I had to repeat the steps over and over to him. Alex never did learn the dance moves. He was never invited to the DJ Masters.

20. I formed my own dance group. Alex was the oldest member of our group, he was about two or three years older than the rest of us were. Alex talked and acted like he knew more about dancing than he really did. Alex had decent rhythm, but he did not know much about dancing. I was the leader of the group. Because Alex was older, I sometimes asked him to take charge when I was not around. But when I got back, Alex was playing around and not doing any of the things I asked him to do.

21. Alex worked for my father on construction jobs. Alex, my older brother Carlos and my father often worked jobs that required travel outside of Santa Ana. The three of them worked one job in El Maizal and Metalio for about eight months. When my father became ill, his work declined until he was unable to work at all. My father supported our entire family and when he could no longer work, we were very worried about what would happen to our family without his income.

22. My family loved Alex. Alex was respectful to both of my parents and grateful for us taking him into our home. My mother loved him and protected him from us when we made fun of Alex for having a hard time doing things right. My mother heard us making fun of Alex and she told us to stop. We called Alex names, like "burro" to his face. My mom got very angry with us and told us to stop. My father also deeply cared for Alex and one Christmas bought Alex a new outfit just like he did for all of his children.

23. Even though Alex did not have much, he went out of his way to do what he could for us. Alex climbed mango trees and got mangos for us to share. Once, he made enough money to buy a whole chicken. He was so proud when he walked into our home with a chicken. He was smiling ear to ear.

24. My mother worked in the coffee fields picking coffee. The work was seasonal, the coffee seasons last a few months. Carlos, Karla, Alex and I all went to work with my mother for a couple of these seasons.

5

25.     The days were long and exhausting.  Every day, we woke up before sunrise to get to the bus and travel to the plantation. Once at the plantation, my mother heated tortillas and beans for breakfast.  Work began at 7:30 in the morning.  We did not stop working until the afternoon and it took us several hours to get back home.  I gathered about six sacks of coffee a day. Alex gathered about two.  The next day we did the same thing all over again and we continued to do it throughout the season.

26.     I recall seeing Alex with his first tattoo. It was barbed wire on his arm, and not gang related.  Alex did not even seem to know why he got that tattoo.  He said the person that did the tattoo decided to put that on.  Alex did things like that and did not think things through.

27.     The next day, I found Alex's white shirt with bloodstains on the sleeve.  When I found Alex, he was crying.   He told me that a grenade had killed his friend, the same friend who had given him the tattoo just the day before.  He also told me about being with a friend when that friend was killed.  I don't know if he was Alex's cousin but they would call each other cousin but they might have just been friends.  Alex and the friend were walking back from downtown when all of the sudden gunshots were fired at them.  They ran but his friend was hit and died right there on the street.  When Alex told me this, he was sad but also very nervous and afraid.  His whole body shook as he talked. I remember another time when Alex came running into our house and said he was being followed by gang members.  He cried uncontrollably.

28.     Before he left for the United States, Alex stopped coming by our house as much.  He spent more time with the guys in the gang.  I was there when Alex was beat in.  It was horrible.  I really thought that Alex was being killed.  Alex was left bleeding and bruised.  He became very sick afterwards with a fever and vomiting.  I was worried about him.  I did not understand why he was doing this.  Why he would want to be beat in and why he would want to be part of a gang.  Alex was different from those other guys but he did not think things through.

29.     Once he was in the gang, I still hung out with Alex.  Even though I was not a gang member, the police punished me just for being around Alex.  The police were brutal.  If they came by, I followed their direction and did what they told me so that the beating would not be bad.  Alex, however, did not use sense and his punishment was far more severe.  The police beat him to the ground.  They smashed their boots on his body and twisted them into his skin.  It happened often.

6

We would be just standing there and the police came by, frisked him and beat him. Alex could have made things easier, but everything escalated. It was like he did not learn.

30. When Alex got the tattoo on his eyelids, it broke my mother's heart. She told him that he could no longer come to our house because it was too dangerous for her children. Alex said he understood and out of respect, he kept his distance.

31. Around this same time, my family was going through a very difficult change. My father became very ill and was not able to work much. His earnings supported our family and without his paycheck we fell on hard times. Soon, we could no longer pay our rent and were evicted from our home. The people who owned the home forced us out on the streets.

32. Some time later, Alex came by and said goodbye to us. He told us that he was going to the United States so he could work and once he found a job he would send money to my mother, Mama Lidia, my mother. He still wanted to help.

33. We read about Alex's legal problems in the local newspaper. We were all shocked to read about his charges. My family and I were in great pain knowing that Alex was in such horrible legal trouble. We felt helpless because he was in the United States and we did not know how to get a hold of him.

34. No one working with Alex contacted me during the time of his trial. If someone had contacted me, I would have provided the information included here, and testified if asked to do so.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in _____, El Salvador.

7

# DECLARACIÓN DE JOSÉ WILFREDO HERRERA CALDERÓN

Yo, José Wilfredo Herrera, declaro lo siguiente:

1. Soy amigo de Alejandro Umaña. Alex es más o menos dos años mayor que yo. Vivíamos en el mismo vecindario de Barrio San Rafael y en un momento Alex se quedó con mi familia. Yo vivía con mis padres, Carlos Aquino Herrera y María Lidia Calderón, mi hermano Carlos, mis hermanas Karla y Patty, y la hija de Patty. Mi familia me dice Alfredo.

2. Alex vivía en un mesón cerca de nuestra casa. Él compartía un cuarto con su padre y su madrastra. El padre de Alex tenía mala reputación en el vecindario. Era gritón, violento, un borracho, y jugaba juegos de azar y era peleonero. Trataba a Alex miserablemente. No le mostraba afecto ni amor a Alex. Era muy abusivo. Alex me dijo que él creía que su padre lo golpeaba por el solo hecho de golpearlo. Alex se veía triste y a veces decía que quería que ya se acabara todo. Estaba cansado de la tristeza y decía que su vida era sólo sufrimiento.

3. La madrastra de Alex era una mujer mucho más joven de nombre Yanira. Estaba más cerca a la edad de Alex. Alex me dijo que a su padre le importaba mucho más Yanira que Alex. Esto causaba mucha fricción. Se armaban tremendas peleas entre Yanira y Alex, y Yanira le echaba la culpa de cosas a Alex ante su padre. El padre de Alex tomaba el lado de Yanira y dirigía su ira a Alex, gritándole y golpeándolo. Dejaron en claro que veían a Alex como nada más que una molestia y no querían que él viviera con ellos.

4. Cuando yo lo conocía a Alex, su madre no lo cuidaba. Un día, cuando estábamos jugando al fútbol, una mujer pasó con una niña. Alex le hizo un gesto de saludo con la mano a la mujer, pero ella le puso poca atención. Alex me dijo que la mujer era su madre y que la niña era su hermana. Me dijo que su madre lo dejó cuando él era apenas un bebé.

1

5. Alex y yo nos hicimos buenos amigos cuando yo tenía unos 13 ó 14 años. Si bien yo era menor que Alex, él me dejaba tomar las riendas y tomar decisiones de cómo pasar el tiempo. Alex me seguía. Era infantil. Era como un niño. A veces, yo me frustraba con él porque yo estaba hablando de algún tema serio y Alex estaba bromeando. Empezaba a reírse cuando nadie pensaba que la situación era cómica. Sus comentarios acerca de la situación tenían poco sentido. Era como si dijese cosas por el solo hecho de decir algo. Yo me frustraba con él y le decía que para él todo era juego y mirar caricaturas. Le dije que nunca iba a madurar.

6. Alex a veces veía cosas que yo no veía. Algo tenía de raro Alex. A veces yo lo veía hablando consigo mismo y contestando preguntas como si estuviera hablando con alguien. Después se reía sarcásticamente como si estuviera en desacuerdo con la persona imaginaria con quien estaba hablando y se enojaba. Una vez, lo vi sentado afuera en el borde de la acera. Estaba meciéndose y hablando solo. Tenía los ojos abiertos y parecía estar en otro lugar. Tenía la mirada perdida. Cuando le pregunté si estaba bien, Alex no me respondió. Parecía estar ausente, ido. Una vez Alex se enfermó mucho con fiebre. Recuerdo que temblaba y hablaba de ver una sombra. Cuando le dije que yo no veía la sombra, Alex dijo repetidas veces, "la sombra, la sombra", como tratando de convencerme que estaba allí, pero yo no vi nada.

7. Alex frecuentemente pasaba hambre. Mi hermano y yo nos sentíamos mal por él. Veíamos cómo tenía que buscar comida. Alex comía lo que encontraba, trepándose a los árboles de mango usando su honda para agarrar una paloma. A veces, lo llevábamos a nuestra casa y mi hermano y yo compartíamos nuestra comida con él. Aunque no teníamos mucho, teníamos una familia que compartía lo poco que había.

8. Un día, encontré a Alex sentado sobre un muro. Cuando le pregunté qué estaba haciendo, me dijo que la mayoría de las noches se quedaba afuera toda la noche porque no tenía a dónde ir

2

y ningún lugar para dormir. Yo no soportaba que Alex viviera así. Le dije que viniera conmigo. Fuimos a mi casa y le pregunté a mi madre si Alex podía quedarse con nosotros. Le comenté cómo él no le importaba a su familia y que nadie le daba de comer ni se hacía responsable de él. Ella se sintió muy mal que Alex no tuviera quien lo cuidara y estuvo de acuerdo en que se quedara con nosotros.

9. Alex terminó quedándose con nuestra familia de manera intermitente durante unos dos años y medio. Más que nada, venía a nuestra casa cuando era la hora de dormir. Cuando se quedaba con nosotros, nunca nadie llegaba a buscarlo, ni siquiera su padre. A su familia no parecía importarle dónde estaba Alex o lo que estaba haciendo.

10. Alex tenía dificultades para cuidarse. Cuando usaba zapatos, que no era con frecuencia, eran de segunda mano. Para jugar al fútbol no usaba zapatos en absoluto. Cuando jugaba al fútbol jugaba descalzo sobre las calles de tierra y grava. Las plantas de los pies de Alex estaban todas cortadas. Una vez, Alex se golpeó el pie descalzo en la acera. La uña del dedo gordo se levantó y su dedo sangró. Los otros niños y yo dejamos de jugar para ir a ver lo que le estaba pasando a Alex. Se veía doloroso. Le dijimos que se pusiera una venda pero Alex agarró la uña y se la arrancó. Agarró tierra de la calle y embadurnó su dedo con la tierra. Alex dijo que la tierra le quitaría el dolor. Yo le dije que la tierra sólo iba a hacer que fuera peor pero aun así Alex creía que la tierra lo mejoraba.

11. Alex se cortaba a propósito. Rompía vidrio y se cortaba el antebrazo para abrirse la piel hasta sangrar. Hacía esto con frecuencia. Yo vi a Alex hacerlo muchas veces. Le dije que estaba loco. Tenía varias marcas en todo el brazo. Era como si quisiera sentir el dolor. También vi a Alex cortar vidrio y mojarlo en tinta. Trató de hacerse un tatuaje en el brazo con eso pero sólo sangró, dejando sólo marcas. Una vez, escribió un número que parecía ser 999. Le pregunté por qué hizo un 999 y entonces me di cuenta que quiso escribir 666.

3

12. Alex también se agujereó sus propias orejas, atravesando el lóbulo con una aguja. Alex no sabía eso de esterilizar la aguja o adormecer su oreja con hielo. Los agujeros seguían cerrándose así que puso un palito en los agujeros. Los agujeros se infectaron y les salía pus. Alex quería sentir el dolor. Alex dijo que una vez que desaparecía el dolor de los cortes, le gustaba la sensación porque su piel le picaba y le gustaba rascarla.

13. Alex no sabía cómo lavar su propia ropa. Ocasionalmente, Alex trabajaba de ayudante de reparto para la Coca-Cola. Lavaba su camisa blanca de uniforme remojándola en lavandina. Alex no lavaba su otra ropa hasta que no estuviera hecha jirones y apestosa. Cuando sí la lavaba, ponía la ropa en el tazón con agua y se enjabonaba las manos con una barra de jabón en vez de poner el jabón sobre la ropa. Luego frotaba sus manos enjabonadas sobre la ropa para desparramar el jabón. Fregaba sus pantalones con un cepillo. No fregaba solamente las manchas sucias, sino toda la ropa. Le decía que estaba arruinando su ropa al lavarla de esa manera y que remojarla en lavandina produciría agujeros y haría que se desarmara la camisa. Alex siguió haciéndolo a su manera. Cuando se le metía algo en la cabeza, era difícil hacerle cambiar de opinión.

14. Los zapatos de Alex siempre eran de mala calidad y se desarmaban rápidamente. Le resultaba difícil caminar porque estaban demasiado gastados. Una vez, estábamos caminando y sus zapatos le molestaban. Alex se enojó. Dejó de caminar, tomó la lengua del zapato y la arrancó. Otra vez, Alex tenía puesta una camisa que no le quedaba. Estaba enojado y comenzó a gritar. Agarró su camisa y se la arrancó del cuerpo con las manos. Alex decía que estaba cansado de que las cosas no le quedaran bien. Alex hablaba de querer un par de Converse. Las Converse eran caras y nunca ganaba lo suficiente para comprarse un par de esos zapatos.

15. Alex tenía un gusto raro para la ropa. Escuché a la gente burlarse de él porque se veía un poco raro. Escogía ropa que no le calzaba bien. Alex decía que le gustaba mi modo de vestir pero

4

no se vestía como yo en absoluto. A mí me gustaba usar ropa que estaba de moda y lo que usaban los jóvenes de nuestra edad. Alex no lograba conseguir este estilo. También le gustaba mi forma de planchar las camisas. Alex no podía planchar su propia camisa. Dejaba arrugas y se enojaba cuando no podía hacerlo. Alex tampoco podía colgar bien la ropa. Quería que sus pantalones se vieran bien, como los míos, pero los colgaba mal y los pantalones tenían "el filo" en el lugar incorrecto y a él no le gustaba.

16. Alex no era buen lector ni escritor. Patty, mi hermana mayor, jugaba a la escuela con Alex y conmigo. Ella dictaba cosas para que nosotros escribiéramos como si ella fuera la maestra y nosotros sus estudiantes. Alex tenía mucha dificultad para escribir. Le llevaba mucho tiempo escribir y su letra era descuidada con palabras mal deletreadas. Yo me burlaba de él y le decía que su letra parecía musulmana porque no se veía como nuestro alfabeto. Patty corregía mucho a Alex. Decía, "No, es b de *burro*, no d de *dedo*," pero él seguía cometiendo los mismos errores. Solíamos burlarnos de Alex por sus errores y su letra descuidada. Alex trataba de hacer un chiste acerca de su mala escritura diciendo que su letra era descuidada porque estaba tratando de escribir con los pies.

17. La lectura también era difícil para Alex. Recuerdo haber visto a Alex mirando un periódico como si lo estuviera leyendo, pero sabíamos que no había forma de que él pudiera leer el periódico. Nosotros nos burlábamos de Alex por fingir. Él decía que de todos modos no importaba porque leer el periódico no era más que un montón de letras. Alex le decía a mi papá, "mi cerebro es pequeño". Alex decía que él no había nacido para estudiar.

18. Alex decía que sabía hacer trucos mágicos. Ponía una moneda detrás de su oreja, en su mano o en su boca y decía que era magia. Nos reíamos porque pensábamos que simplemente estaba bromeando, pero él realmente pensaba que estaba haciendo trucos mágicos.

5

19.	Mientras Alex se quedó con nosotros, yo formaba parte de un grupo de baile en la escuela que se llamaba DJ Master. Alex no estaba en el grupo escolar y no podía tomar ninguna clase de baile por su propia cuenta, pero me miraba con atención y quería aprender. Yo trataba de enseñarle a Alex los pasos de baile y la coreografía que aprendía en mis clases. Alex no podía memorizar los pasos, y no le iba bien con la coreografía. Yo tenía que repetirle los pasos una y otra vez. Alex nunca aprendió los pasos de baile. Nunca fue invitado al DJ Masters.

20.	Yo formé mi propio grupo de baile. Alex era el miembro mayor del grupo; tenía como dos o tres años más que el resto de nosotros. Alex hablaba y se comportaba como si supiera más de lo que sabía acerca del baile. Alex tenía buen ritmo, pero no sabía mucho de baile. Yo era el líder del grupo. Debido a que Alex era mayor, a veces yo le pedía que se hiciera cargo cuando yo no estaba. Pero cuando yo regresaba, Alex estaba jugueteando, sin hacer nada de lo que yo le había pedido.

21.	Alex trabajaba para mi padre en trabajos de construcción. Alex, Carlos, mi hermano mayor, y mi padre frecuentemente hacían trabajos para los cuales debían viajar fuera de Santa Ana. Los tres hicieron un trabajo en El Maizal y Metalio durante unos ocho meses. Cuando mi padre se enfermó, su trabajo se redujo hasta que no pudo trabajar más. Mi padre sostenía a nuestra familia completa y ya cuando no podía trabajar más, estábamos muy preocupados acerca de lo que le pasaría a nuestra familia sin sus ingresos.

22.	Mi familia amaba a Alex. Alex era respetuoso con mis padres y agradecido por haberle dado acogida en nuestra casa. Mi madre lo quería mucho y lo protegía de nosotros cuando nos burlábamos de él por tener dificultad en hacer bien las cosas. Mi madre escuchaba que nos burlábamos de Alex y nos decía que paráramos. Le decíamos nombres a Alex de frente, como "burro". Mi mamá se enojaba mucho con nosotros y nos decía que paráramos. Mi padre también

6

le tenía profundo afecto a Alex y una Navidad le compró a Alex un nuevo conjunto al igual que al resto de sus hijos.

23. Si bien Alex no tenía mucho, él se desvivía por hacer lo que podía por nosotros. Alex se trepaba a los árboles de mango y traía mangos para compartir con nosotros. Una vez, ganó lo suficiente para comprar un pollo entero. Estaba tan orgulloso cuando entró a nuestra casa con un pollo. Estaba sonriendo de oreja a oreja.

24. Mi madre trabajaba en los cafetales cosechando café. El trabajo era por temporadas; las temporadas del café duran unos pocos meses. Carlos, Karla, Alex y yo fuimos todos a trabajar con mi madre durante un par de estas temporadas.

25. Los días eran largos y agotadores. Todos los días nos despertábamos antes del amanecer para llegar al bus y viajar hasta la plantación. Una vez que estábamos en la plantación, mi madre calentaba tortillas y frijoles para el desayuno. El trabajo comenzaba a las 7:30 de la mañana. No dejábamos de trabajar hasta la tarde y nos llevaba varias horas regresar a casa. Yo juntaba como seis sacos de café por día. Alex juntaba como dos. Al día siguiente volvíamos a hacer lo mismo y lo seguimos haciendo durante toda la temporada.

26. Recuerdo haber visto a Alex con su primer tatuaje. Era alambre de púa en su brazo, y no estaba relacionado con las pandillas. Alex ni parecía saber por qué se había puesto ese tatuaje. Dijo que la persona que le había hecho el tatuaje decidió ponerle eso. Alex hacía cosas así sin pensarlo bien.

27. El día siguiente, encontré la camisa blanca de Alex con manchas de sangre en la manga. Cuando encontré a Alex, estaba llorando. Me dijo que una granada había matado a su amigo, el mismo amigo que le había hecho el tatuaje el día anterior. También me dijo que estaba con un amigo cuando mataron a ese amigo. No sé si era el primo de Alex pero se decían primo, pero es

7

W.H

posible que sólo eran amigos. Alex y el amigo estaban caminando de regreso del centro cuando de repente dispararon contra ellos. Corrieron pero le pegaron a su amigo y murió ahí mismo en la calle. Cuando Alex me contó esto, estaba triste pero también muy nervioso y asustado. Su cuerpo entero temblaba mientras hablaba. Recuerdo otra vez cuando Alex entró corriendo a nuestra casa y dijo que lo estaban persiguiendo unos pandilleros. Lloraba descontroladamente.

28. Antes que él se fue a los Estados Unidos, Alex dejó de venir tan seguido a nuestra casa. Pasaba más el tiempo con los otros muchachos de la pandilla. Yo estuve allí cuando lo brincaron a Alex hasta aceptarlo en la pandilla. Fue horrible. Realmente pensé que estaban matando a Alex. Lo dejaron sangrando y amoratado. Después se enfermó mucho, con fiebre y vómitos. Yo estaba preocupado por él. Yo no entendía por qué él estaba haciendo esto. Por qué querría que lo golpearan y por qué querría ser parte de una pandilla. Alex era diferente a esos otros muchachos pero no pensaba bien las cosas.

29. Una vez que él ya estaba en la pandilla, yo igual pasaba tiempo con Alex. Si bien yo no era pandillero, la policía me castigaba por el solo hecho de estar cerca de él. La policía era brutal. Si se acercaban, yo seguía sus indicaciones y hacía lo que me decían que tenía que hacer para que no me golpearan tanto. Alex, sin embargo, no usaba buen juicio y su castigo era mucho más severo. La policía lo golpeaba hasta que quedaba tirado. Golpeaban sus botas contra su cuerpo y las retorcían en su piel. Pasaba a menudo. Estábamos simplemente ahí, parados y venía la policía, lo registraban a él y lo golpeaban. Alex hubiera podido hacer que las cosas fueran más fáciles, pero todo se intensificaba. Era como que no aprendía.

30. Cuando Alex se tatuó los párpados, le rompió el corazón a mi madre. Ella le dijo que ya no podía venir a nuestra casa porque era demasiado peligroso para sus hijos. Alex dijo que entendía y, por respeto, mantenía su distancia.

8

31. Alrededor de este tiempo, mi familia estaba pasando por un cambio muy difícil. Mi padre se puso muy enfermo y no podía trabajar tanto. Sus ganancias sostenían a nuestra familia y sin su sueldo, pasamos por problemas económicos. Al poco tiempo, ya no podíamos pagar el alquiler y nos desalojaron de la casa. Los propietarios de la casa nos obligaron a salir a la calle.

32. Algún tiempo después, Alex se acercó y se despidió de nosotros. Nos dijo que se iba a los Estados Unidos para poder trabajar y que una vez que encontrara trabajo, le mandaría dinero a mi madre, Mama Lidia, mi madre. Él todavía quería ayudar.

33. Leímos acerca de los problemas legales de Alex en el periódico local. Quedamos todos asombrados al leer sobre sus cargos. Mi familia y yo estuvimos muy doloridos al saber que Alex estaba en problemas legales tan horribles. Nos sentimos impotentes porque él estaba en los Estados Unidos y no sabíamos cómo ponernos en contacto con él.

34. Nadie que estuviera trabajando con Alex se comunicó conmigo durante su juicio. Si alguien se hubiera comunicado conmigo, yo hubiera proporcionado la información incluida aquí, y hubiera declarado si se me hubiera pedido.

Juro que lo anterior es verdadero y correcto según mi leal saber y entender. Firmo esta declaración el día _16_ de _Noviembre_, 2018, en _Quezaltepeque_, El Salvador.

F. _(firma)_

José Wilfredo Herrera Calderón

[Esta traducción de José Wilfredo Herrera Calderón, que consta de 9 páginas, presentada en el caso de los Estados Unidos de Norteamérica v. Alejandro Umaña, es una traducción fiel y correcta del inglés al español, llevada a cabo según mi leal saber y entender. Esta traducción ha sido revisada por Martha G. Shepard, Intérprete Certificada por la Dirección Administrativa de los Tribunales Federales de EE.UU. Certificado el 16 de agosto de 2018 por Ana C. Martinez, Intérprete Certificada por la Dirección Administrativa de los Tribunales Federales de EE.UU.]

# APPENDIX 220

## DECLARATION OF KARLA HERRERA CALDERÓN

I, Karla Herrera Calderón, declare as follows:

1.  Alejandro Umaña was a friend of my brothers Alfredo and Carlos. When I was about 10 or 11 years old, Alex came to live with my family.

2.  My parents took Alex into our home because he was out on the streets. He called my mother Mama Lidia and my father Papa Carlos. He worked at the Coca-Cola Company when he could but it was not enough to live on his own. The work was not available all of the time.

3.  Alex was very respectful and helpful. He helped my mother bring corn to make pupusas. If she was carrying something heavy, he ran to help her.

4.  When I did my school assignments, Alex looked with interest. He wanted to help me with the stories I had to write. I had to invent a story and then write it. Alex could not do it. He didn't know how to write a story. What he wrote was what a 5-year-old would write. My brothers and I made fun of him. I thought it was funny that a kid so much older than me could not do what I did. My mother would get upset with us and defend Alex. She told us to stop laughing at him.

5.  We worked at the coffee plantations during the harvest season. During many months, we woke up very early in the morning, around three or four in the morning to prepare food and go to work. Every day, we walked a long distance until we got to the bus station. At the station, we would take a bus to get to the coffee plantation. We worked hard for very little money.

1

6. Alex was not good at gathering the coffee. He was slow and could only gather a little. He never understood which bean to pick. We would show him many times but he would pick the bean that wasn't ripe. My mother took pity on him. She was a good worker and gave Alex a share of the coffee she gathered.

7. Our family was very poor and we barely had enough to survive. When my father became ill, our family was in a very desperate situation. My parents had very little and did not have enough to take care of their own children. Around this time, Alex came by our house less and less. The owners of the house threw us out into the street because we could not pay the rent. The only thing we had left was a mattress.

8. One day, Alex visited to say goodbye. He said he was going to the United States and that he was going to help us. My mother had a brain aneurysm and Alex looked very worried. It was painful for him to see her like that.

9. I did not hear about Alex again until my father saw a picture of Alex in the newspaper. The picture did not even look like him. It made us very sad because we loved Alex a lot.

10. A man came to see us a few years ago. He said he worked for Alex. That man spoke with me just a few minutes because I was on my way out to work. The man said he would return but he did not. If he had, I would have provided the information included here, and I would have testified if they had asked me to.

2

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador

_____

Karla Herrera Calderón

**VIRGINIA WILSON**

*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*

**(323) 788-2298**

Virginia@LosAngelesInterpreter.com

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

### Declaration of Karla Herrera Calderon

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE KARLA HERRERA CALDERÓN

Yo, Karla Herrera Calderón, declaro lo siguiente:

1. Alejandro Umaña era amigo de mis hermanos Alfredo y Carlos. Cuando yo tenía como 10 u 11 años, Álex vino a vivir con mi familia.

2. Mis padres recibieron a Álex en nuestro hogar porque él estaba en la calle. Él le decía Mamá Lidia a mi madre y a mi padre, Papá Carlos. Él trabajaba en la compañía Coca-Cola cuando podía pero no era suficiente para vivir independientemente. No siempre había trabajo en la compañía.

3. Álex era muy respetuoso y servicial. Él ayudaba a mi madre a traer el maíz para hacer pupusas. Si ella cargaba algo pesado, él corría a ayudarla.

4. Cuando yo hacía mis tareas de la escuela, Álex observaba con interés. Él quería ayudarme con las historias que yo tenía que escribir. Yo me tenía que inventar una historia y luego escribirla. Álex no podía hacerlo. Él no sabía escribir una historia. Lo que escribía era lo que habría escrito un niño de 5 años. Mis hermanos y yo nos burlábamos de él. A mí me parecía gracioso que un niño mucho mayor que yo no pudiera hacer lo que yo hacía. Mi mamá se enojaba con nosotros y defendía a Álex. Nos decía que dejáramos de reírnos de él.

5. Trabajábamos en los cafetales durante la temporada de cosecha. Durante muchos meses nos levantábamos muy temprano, como a las tres o cuatro de la madrugada, para preparar comida e irnos a trabajar. Día tras día caminábamos una larga distancia hasta llegar a la estación del bus. En la

1

estación, tomábamos un bus que nos llevaba al cafetal. Trabajábamos duro a cambio de muy poco dinero.

6. Álex no era hábil para recoger el café. Era lento y solo recogía un poquito. Nunca entendió qué granos eran los que debía recoger. Le mostrábamos muchas veces pero él seguía recogiendo los granos que no estaban maduros. Mi madre le tenía lástima. Ella era buena trabajadora y le daba a Álex parte del café que ella recogía.

7. Nuestra familia era muy pobre y apenas teníamos lo suficiente para sobrevivir. Cuando mi padre se enfermó, nuestra familia estaba en una situación desesperada. Mis padres tenían muy poco y no tenían lo suficiente para cuidar de sus propios hijos. Por aquel entonces, Álex venía a nuestra casa cada vez menos. Los dueños de la casa nos echaron a la calle porque no podíamos pagar el alquiler. Lo único que nos quedó fue un colchón.

8. Un día, Álex vino a despedirse. Dijo que se iba a los Estados Unidos y que nos iba a ayudar. Mi madre tuvo un aneurisma cerebral y Álex parecía estar muy preocupado. A él le dolía verla así.

9. No volví a saber de Álex hasta que mi papá vio una foto de Álex en el periódico. En la foto ni siquiera parecía ser el mismo. Nos puso muy triste porque queríamos mucho a Álex.

10. Hace unos años nos vino a ver un señor. Dijo que trabajaba para Álex. El señor habló conmigo solo unos cuantos minutos porque yo estaba saliendo para mi trabajo. El señor dijo que iba a volver, pero no regresó. Si hubiera

2

regresado, yo le habría proporcionado la información que aquí se incluye y habría testificado si me lo hubieran pedido.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el ___16___ día de ___noviembre___ de 2018, en Santa Ana, El Salvador.

Karla Herrera Calderón

3

# APPENDIX 221

# DECLARATION OF MARIA LIDIA CALDERÓN

I, María Lidia Calderón, declare as follows:

1. Alejandro Umaña was a friend of my two sons. When he was about 16 or 17 years old, Alex came to live with us. He was with us for over two years. Before he stayed with us my sons used to have Alex come eat with us. We did not have much but we shared what we could because we could tell Alex often went hungry.

2. My husband, Carlos Aquino Herrera, and I had 12 children together. One night, my youngest son, Alfredo, saw Alex out in the streets with no place to sleep. Alfredo took Alex home with him and asked me if Alex could spend the night and I agreed. When Alex moved in with us, my children Karla, Alfredo, Carlos, Patty and Patty's daughter, were living with us. It was difficult for us to take care of the children that we already had at home but Alex was so mistreated that I felt that we had to take him in.

3. We are a poor family. While Alex lived with us, my husband worked as a mason and I sold fried yucca and pastries. I also washed and ironed clothes for families. In 2001, my husband became very ill and could no longer work. Without his earnings, we could not pay our bills and make rent. When we could not pay the rent, the owner threw us out to the streets. We lost all our belongings except for a mattress.

4. I also worked in the coffee fields with my children during the harvest season. Alex worked with us during a few of those seasons. Every day, we woke up before sunrise, to catch the bus to the plantation. When we got to the plantation, I had the children gather wood for a fire and I heated tortillas and

1

beans for breakfast.  Work began at 7:30 in the morning and we did not stop working until the afternoon.  Between my sons, Alex and me, we typically made very little money.  The days were long and exhausting.  It was hard to wake the next day only to do the same thing all over again.  We continued this daily routine throughout the months of the coffee season.

5.      Even though Alex was almost an adult, he acted more like a child.  He still liked to play children's games.  He played with my younger son Alfredo and daughter Karla.  He liked to play ball, do races with the boys and watch cartoons.  They would play school where Patty would be the teacher and do dictation.  Alex was not able to do the dictation.  They also played store where they would use pretend money to buy groceries.  Alex had problems with this game also.

6.      When my husband was sick, it was very difficult for the entire family. Alex and my son Carlos had worked in construction. Carlos was a good worker. Alex was an assistant.  When my husband got sick there was no work. Alex went out looking for other work but he was not able to find anything.

7.      Alex began spending more and more time away from our home.  When I saw Alex with the tattoos on his face, I was saddened and my heart was heavy.  I cared for him so much, but once he had the tattoos he could no longer stay in our house because he became part of the gang.  It was too dangerous for our children having him around.

8.      I suffered from a brain aneurism in 2004.  Alex came to check on me.  He called me Mama Lidia and told me of his plans to travel to the United States,

2

look for work, and send money to me.  I could tell my illness hurt him and he told me he did not want me to die.

9.      My husband told me about Alex's legal problems in the United States.  The news pained us so much.  We love Alex and we thought of him as a son.

10.     My husband told me that a man working on Alex's defense came to see him. The man did not speak with me.  No one spoke to me before or during Alex's trial.  If they had spoken with me, I would have provided the information that is included here and I would have testified at his trial.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

3

# VIRGINIA WILSON
*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## <u>DECLARATION OF TRANSLATOR</u>

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

### Declaration of Lidia Calderon

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____

Virginia Wilson

# DECLARACIÓN DE MARÍA LIDIA CALDERÓN

Yo, María Lidia Calderón, declaro lo siguiente:

1. Alejandro Umaña era amigo de mis dos hijos. Cuando Álex tenía como 16 o 17 años, vino a vivir con nosotros. Estuvo con nosotros por más de dos años. Antes de vivir con nosotros, mis dos hijos traían a Álex a comer a la casa. No teníamos mucho pero compartíamos lo que podíamos porque nos dábamos cuenta de que Álex pasaba hambre a menudo.

2. Mi esposo Carlos Aquino Herrera y yo tuvimos 12 hijos juntos. Una noche, mi hijo menor, Alfredo, vio a Álex en la calle sin tener adonde ir a dormir. Alfredo se llevó a Álex a la casa y me pidió si Álex se podía quedar a dormir; yo le dije que sí. Cuando Álex vino a vivir con nosotros, mis hijos Karla, Alfredo, Carlos, Patty y la hija de Patty, estaban viviendo con nosotros. Se nos hacía difícil cuidar de los hijos que ya teníamos en la casa, pero a Álex lo trataban tan mal que yo me sentí con la obligación de acogerlo.

3. Somos una familia pobre. Mientras Álex vivió con nosotros, mi esposo trabajaba como albañil y yo vendía yuca frita y pastelitos. También lavaba y planchaba ropa para otras familias. En el año 2001, mi esposo se enfermó y ya no pudo trabajar. Sin sus ingresos, no podíamos pagar nuestras cuentas ni el alquiler. Al no poder pagar el alquiler, el dueño nos echó a la calle. Perdimos todas nuestras pertenencias, con excepción de un colchón.

4. Yo también trabajaba en los cafetales con mis hijos durante la temporada de cosecha. Álex trabajó con nosotros durante varias de esas temporadas. Todos los días nos despertábamos antes de que amaneciera y nos íbamos en

MLC 1

bus al cafetal. Cuando llegábamos al cafetal, yo les pedía a los niños que juntaran leña para hacer un fuego, y calentaba tortillas y frijoles para el desayuno. El trabajo comenzaba a las 7:30 de la mañana y no parábamos de trabajar hasta la tarde. Entre mis hijos, Álex y yo, típicamente ganábamos muy poco dinero. Los días eran largos y agotadores. Era difícil amanecer al día siguiente para volver a hacer lo mismo nuevamente. Continuamos con esta rutina diaria durante los meses de la temporada de café.

5. Aunque Álex era ya casi un adulto, actuaba como un niño. Todavía le gustaba jugar juegos de niños. Jugaba con mi hijo menor, Alfredo, y con mi hija Karla. Le gustaba jugar a la pelota y a las carreras con los muchachos, y ver caricaturas. Jugaban a la escuelita; Patty era la maestra y les dictaba. Álex no podía hacer el dictado. También jugaban a la tiendita y usaban dinero de mentiras para comprar alimentos. Álex también tenía dificultad con este juego.

6. La enfermedad de mi esposo fue muy difícil para toda la familia. Álex y mi hijo Carlos habían trabajado en la construcción. Carlos era un buen trabajador. Álex era ayudante. Cuando mi esposo se enfermó, no hubo trabajo. Álex salió a buscar otro trabajo pero no pudo encontrar nada.

7. Álex comenzó a pasar más y más tiempo fuera de nuestra casa. Cuando vi a Álex con los tatuajes en la cara, me puse triste y me dolió el corazón. Yo le tenía mucho cariño pero al tener tatuajes ya no se podía quedar a vivir en nuestra casa porque se unió a la pandilla. El tenerlo con nosotros representaba un gran peligro para nuestros hijos.

2

8. Yo sufrí un aneurisma cerebral en el año 2004. Álex vino a ver cómo estaba. Me decía Mamá Lidia y me contó de sus planes de viajar a los Estados Unidos para buscar trabajo y enviarme dinero. Yo veía que mi enfermedad le dolía y me dijo que no quería que yo me muriera.

9. Mi esposo me platicó de los problemas legales de Álex en los Estados Unidos. La noticia nos dolió muchísimo. Queremos mucho a Álex y para nosotros era como un hijo.

10. Mi esposo me dijo que un señor que trabajaba en la defensa de Álex lo vino a ver. El señor no habló conmigo. Nadie habló conmigo antes o durante el juicio de Álex. Si hubieran hablado conmigo, yo les habría proporcionado la información que aquí se incluye y habría declarado durante su juicio.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el ___16___ día de _novlembre_ de 2018, en Santa Ana, El Salvador.


M L C
_____
María Lidia Calderón

3

# APPENDIX 222

# DECLARATION OF ALFONSO CRUZ

I, Alfonso Cruz, declare as follows:

1.  For several years, my family and I lived in the same mesón as Alejandro Umaña. The meson was in front of the bypass on Final 25 Calle Oriente. My wife is Vilma Torres de Cruz, my children are Melvin and Roxana Cruz, and my stepdaughter is Vilma Araceli. Alex and my son were very good friends.

2.  Alex was an abandoned child who suffered a difficult childhood. His parents were not there for him. Children should not be on their own like that. They should not be without adults who care for them, nurture them, and teach them. Alex's mother abandoned him and his father showed little interest in him and did not appear to love him. My wife and I believe in the importance of providing positive examples for our children and giving them guidance throughout their lives.

3.  Alex never had a chance. He was hungry, dirty, and left to care for himself. We tried to help Alex as much as we could. We gave him food if we had any to give and at times, took him to church. We could not do much because we were also very poor. We also feared the reaction of Alex's father. He was an aggressive man with a violent temper. We did our best to stay out of his way.

4.  For 38 years, I have worked as a carpenter. When I was living in the bypass meson, I made wooden furniture at a workshop. I also had a small workbench in the common area of the meson so that I could work on special orders.

1

5.    While working at the meson, I tried to teach Alex and the other children my profession.  One boy picked up the trade and now works as an assistant master carpenter.  Alex had trouble understanding and was unable to learn the trade. He became easily frustrated when he did not understand something.  He had a lot of trouble learning how to use a measuring tape.  I took the time to try to explain how the measuring tape worked.  I showed him what a centimeter was, what a meter was.  I repeated the instructions over and over so that he could understand.  Alex tried hard but he kept making the same mistakes.  When he could not get it, he started to joke around with the measuring tape by swinging the end up and down like a yo-yo. I also used to have my children help me with sanding the pieces. Alex tried to help me sand.  I explained to everyone that it was important they sanded in a straight line.  My children learned how to sand right away. I had to tell Alex many times but he still didn't do it properly.  He kept sanding in different directions so I had to have one of my kids do it over. When he couldn't do things, Alex became frustrated and gave up or started to joke around.

6.    Alex was a respectful and obedient child.  He was always very helpful and a good friend to my son. I cried when I first heard about Alex's charges. I could not believe that the boy I once knew is now condemned to death. It causes me great pain to think of him this way.

7.    No one contacted me during the time of his trial.  If I had been contacted, I would have provided the information included here, and testified if asked to do so.

2

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

3

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 259 of 381

# DECLARACIÓN DE ALFONSO CRUZ

Yo, Alfonso Cruz, declaro lo siguiente:

1.  Durante varios años, mi familia y yo vivíamos en el mismo mesón que Alejandro Umaña. El mesón estaba frente al *bypass* sobre Final 25 Calle Oriente. Mi esposa es Vilma Torres de Cruz, mis hijos son Melvin y Roxana Cruz, y mi hijastra es Vilma Araceli. Alex y mi hijo eran muy buenos amigos.

2.  Alex era un niño abandonado que sufrió una infancia difícil. Sus padres lo descuidaron. Los niños no deberían estar valiéndose por sí solos de esa manera. No deberían estar sin adultos que se encarguen de ellos, de apoyarlos y darles enseñanza. La madre de Alex lo abandonó y su padre mostró poco interés por él y parecía no quererlo. Mi esposa y yo creemos en la importancia de darles buenos ejemplos a nuestros hijos y de guiarlos a lo largo de sus vidas.

3.  Alex no tuvo oportunidad alguna de superar sus circunstancias. Andaba hambriento, sucio, y abandonado a valerse por sí mismo. Nosotros tratábamos de ayudar a Alex lo más que podíamos. Le dábamos comida si teníamos para dar y, a veces, lo llevábamos a la iglesia. No podíamos hacer mucho porque también éramos muy pobres. También temíamos la reacción del padre de Alex. Era un hombre agresivo de temperamento violento. Hacíamos lo posible por mantenernos alejados de él.

4.  Durante 38 años he trabajado de carpintero. Cuando estaba viviendo en el mesón del *bypass*, fabricaba muebles de madera en un taller. También tenía una pequeña mesa de trabajo en el área común del mesón que me permitía trabajar en pedidos especiales.

5.  Mientras trabajaba en el mesón, trataba de enseñarles mi profesión a Alex y a los otros niños. Uno de los niños aprendió el oficio y ahora trabaja de asistente de maestro carpintero. Alex tenía dificultad para entender y no le fue posible aprender el oficio. Se frustraba fácilmente

A C

1

cuando no entendía algo. Tenía mucha dificultad en aprender a usar una cinta métrica. Me tomé el tiempo de tratar de explicarle cómo funcionaba la cinta métrica. Le mostré lo que era un centímetro, lo que era un metro. Le repetí las instrucciones una y otra vez para que pudiera entender. Alex se esforzaba pero seguía cometiendo los mismos errores. Cuando no lograba captar, empezaba a bromear con la cinta métrica haciendo que la cinta subiera y bajara como un yo-yo. Yo también los tenía a mis hijos para que me ayudaran a lijar las piezas. Alex trató de ayudarme a lijar. Les expliqué a todos que era importante que lijaran en línea recta. Mis hijos aprendieron a lijar en seguida. Le tuve que decir a Alex muchas veces pero aun así no lo hacía correctamente. Seguía lijando en direcciones diferentes, así que le tenía que pedir a uno de mis hijos que lo volviera a hacer. Cuando no podía hacer las cosas, Alex se frustraba y se daba por vencido o empezaba a hacer bromas.

6.      Alex era un niño respetuoso y obediente. Siempre fue muy servicial y buen amigo de mi hijo. Lloré cuando me enteré de los cargos de Alex. No podía creer que el niño que alguna vez conocí está ahora condenado a muerte. Me causa un profundo dolor pensar en él de esta manera.

7.      Nadie se comunicó conmigo durante el transcurso de su juicio. Si alguien se hubiera comunicado conmigo, yo hubiera proporcionado la información incluida aquí, y hubiera declarado si se me hubiera pedido.

Juro que lo anterior es verdadero y correcto según mi leal saber y entender. Firmo esta declaración el día **17** de **Noviembre**, 2018, en Santa Ana, El Salvador.

ALFONSO CRUZ

2

[Esta traducción de Alfonso Cruz, que consta de dos páginas, presentada en el caso de los Estados Unidos de Norteamérica v. Alejandro Umaña, es una traducción fiel y correcta del inglés al español, llevada a cabo según mi leal saber y entender. Palabras en *itálicas* reflejan palabras expresadas en inglés. Esta traducción ha sido revisada por Martha G. Shepard, Intérprete Certificada por la Dirección Administrativa de los Tribunales Federales de EE.UU. Certificado el 16 de agosto de 2018 por Ana C. Martinez, Intérprete Certificada por la Dirección Administrativa de los Tribunales Federales de EE.UU.]

# APPENDIX 223

# DECLARATION OF ANA LILIAN REYES

I, Ana Lilian Reyes, declare as follows:

1. Alejandro Enrique Umaña is the father of my grandson. He was about 16 or 17 years old when he and my daughter Monica started dating.

2. At the time when Monica met Alex, we lived in one of the rooms in the *mesón* called La Fe. I lived there with my partner David Dueñas and my children Monica and Alan Mauricio. David and I separated a while ago.

3. During the time when we lived in the La Fe *mesón*, it was in horrible condition. The *mesón* was rundown and falling apart. It was a noisy, chaotic place and it smelled awful. The entire street put their trash in a spot directly next to the La Fe *mesón*. We called it the dump, but it was just an area, it was not walled off and had no container bins or dumpsters. The dump smelled horrid and attracted rodents and flies.

4. In La Fe there was only one latrine and one shower for all of the residents. We also shared the only sink that we used to do our dishes and our laundry. The latrine had a pit toilet that was not connected to the sewer. The latrine, shower and sink were in the small common yard that connected all the rooms. The place was falling apart and needed repair. The trash and the bathroom attracted lots flies and vermin. It was not uncommon to see mice or rats scattering all around the *mesón*.

5. Lots of young men hung around outside La Fe drinking and talking loudly. The more they drank, the louder they got. It was hard to sleep. Next door to the *mesón* was a home where a large, loud family lived. They only added to all the noise and chaos.

6. Alejandro was a simple, young man who enjoyed playing with the kids in the *mesón*. He liked to play soccer, although their play was not as organized as a real soccer game. There were about five boys in the meson, including my son. They all played in a vacant lot near the meson until it got dark and then they had to come inside.

7. No one contacted me at the time of Alejandro's trial. If they had contacted me, I would have told them the above.

1

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

DECLARACIÓN DE ANA LILIAN REYES

Yo, Ana Lilian Reyes, declaro lo siguiente:

1. Alejandro Enrique Umaña es el padre de mi nieto. Él tenía 16 o 17 años cuando comenzó a salir con mi hija Mónica.

2. Cuando Mónica conoció a Alex, vivíamos en uno de los cuartos del mesón llamado La Fe. Yo vivía allí con mi pareja, David Dueñas, y mis hijos, Mónica y Alan Mauricio. David y yo nos separamos un tiempo atrás.

3. Durante el tiempo que vivimos en el mesón La Fe, estaba en condiciones deplorables. El mesón estaba deteriorado y desmoronándose. Era un lugar ruidoso y caótico y tenía un olor espantoso. Toda la calle ponía la basura en un lugar directamente a la par del mesón La Fe. Nosotros lo llamábamos el basurero, pero era sólo un área, no estaba separada con un muro y no tenía botes ni contenedores para la basura. El basurero olía horriblemente y atraía roedores y moscas.

4. En La Fe había sólo una letrina y una ducha para todos los residentes. También compartíamos la única pila que usábamos para lavar los platos y la ropa. La letrina tenía un excusado que era un agujero que no estaba conectado a la alcantarilla. La letrina, la ducha y la pila estaban en el pequeño patio común que conectaba todos los cuartos. El lugar se estaba viniendo abajo y necesitaba reparaciones. La basura y el baño atraían muchas moscas y alimañas. No era fuera de lo común ver ratas o ratones dispersándose por todo el mesón.

5. Muchos hombres jóvenes pasaban el tiempo afuera de La Fe bebiendo y hablando en voz alta. Cuanto más bebían, más fuerte hablaban. Era difícil dormir. A la par del mesón había una casa donde vivía una familia grande y bulliciosa. No hacían más que sumarle a todo el ruido y el caos.

A-L-R· 1

6. Alejandro era un muchacho simple que disfrutaba de jugar con los niños del mesón. Le gustaba jugar al fútbol, aunque el juego de ellos no era tan organizado como un partido de fútbol de verdad. Había como cinco niños en el mesón, incluyendo a mi hijo. Todos jugaban en un lote vacío cerca del mesón hasta que oscurecía y después tenían que entrar.

7. Nadie se comunicó conmigo durante el transcurso del juicio de Alejandro. Si alguien se hubiera comunicado conmigo, yo les hubiera dicho lo anterior.

Juro que lo anterior es verdadero y correcto según mi leal saber y entender. Firmo esta declaración el día 17 de Noviambre, 2018, en Santa Ana, El Salvador.

Ana Lilian Reyes.
Ana Lilian Reyes.

2

[La traducción de Ana Lilian Reyes, que consta de dos páginas, presentada en el caso de los Estados

Unidos de Norteamérica v. Alejandro Umaña, es una traducción fiel y correcta del inglés al español,

llevada a cabo según mi leal saber y entender. Esta traducción ha sido revisada por Martha G. Shepard,

Intérprete Certificada por la Dirección Administrativa de los Tribunales Federales de EE.UU. Certificado

el 16 de agosto de 2018 por Ana C. Martinez, Intérprete Certificada por la Dirección Administrativa de

los Tribunales Federales de EE.UU.]

# APPENDIX 224

# DECLARATION OF CARLOS GEOVANNI HERRERA CALDERON

I, Carlos Geovanni Herrera, declare as follows:

1.  I am a friend of Alejandro Umaña. Alex and I grew up in the same neighborhood of Barrio San Rafael. I lived in Barrio San Rafael in a house with my parents Carlos Aquino Herrera and Maria Lidia Calderon, my brother Alfredo, my sisters, Karla and Patty, and Patty's daughter. Alex lived in a room in a meson around the corner from us with his father and his father's partner.

2.  When I first met Alex, we were adolescents. I believe Alex was a few years younger than me because of how he acted. He seemed to be 3-4 years younger than me.

3.  Alex and my brother, Alfredo, and I played soccer on the street with other boys from the neighborhood. After playing, my parents called us in to eat but Alex stayed there lying on the sidewalk. He did not have anywhere to go for a meal. We felt sorry for him and invited him over to our house. My family was poor but my brother and I would each take some food from our plates and give it to Alex so that he had something to eat.

4.  One day, Alfredo brought Alex to our home and asked our parents if he could stay the night. Alex was upset. He told me that he was in a fight with his stepmother. He said that the stepmother did not want Alex there. He told me that his stepmother would belittle him and treat him as nothing more than a nuisance. Alex's father sided with her over Alex. My parents agreed to let him stay. He stayed with us about two and a half years.

1

5. It seemed to me that Alex was dealing with a lot of problems. Sometimes he threw a fit. He stormed into a room throwing clothing and other stuff all around. I did not know what he was upset about but I assumed that he had just been in another fight with his stepmother. Other times, Alex woke up in the morning upset and in a very bad mood. Alex kept things to himself so I did not know what was bothering him. I would just watch and not bother him. Alex also got horrible painful headaches almost daily and I could not do much to help him. I saw him cry in pain one time. I felt sorry for him.

6. My family really cared for Alex. He was respectful and offered to help in any way that he could. My mother especially loved Alex because he was very sweet to her. He called her Mama Lidia.

7. Alex and Alfredo liked to dance and were part of a dance group together. I did not dance. I watched them practice in our house. Alex took it seriously and practiced the moves but he could not learn the choreography. The dance group did synchronized routines but poor Alex was always messing up. I could tell that Alex had a much harder time and took a lot longer to learn than the others. He liked dancing and kept on practicing the dance routines long after the others stopped and went home.

8. When Alex stayed with us, he went to work with my mother, Karla, Alfredo and me at the coffee plantation. Alex joined us for at least two seasons. We left the house at four thirty in the morning and walked for about an hour with baskets and heavy backpacks that had our food, water, and extra clothing. We took the five thirty morning bus that took about 45 minutes to get to the coffee

2

plantation located in Los Naranjos. We got to the plantation at about six thirty, ate the breakfast we brought from home, began working at seven, and finished at three in the afternoon. Afterwards, we ate on the side of the road and began our journey back home. We arrived home at about six thirty in the evening. The next day, we started the trip all over again. We did this every day during the months of the coffee season.

9. My mother, Alfredo, Alex, and I were the ones that picked the coffee beans. My sister Karla was much younger and did not pick coffee but stayed with us and helped with what she could. One had to be 18 years old and have an identification card to be a registered worker in the plantation and receive payment. From our group, my mother was the registered worker and she received payment every two weeks. We were her helpers. Children often went to work in the fields with their parents. I started working in the plantation when I was eight years old.

10. Alex gathered less beans than the rest of us. Before picking the beans, the managers gave instructions on how to do the work. The rule was very clear that we should not pick the green beans because they are not yet ripe. We were told to pick only the red beans, which we called grapes. We would only be paid for picking the red beans. Alex kept picking the green coffee beans. When it was time to sort through what we gathered, my mother scolded Alex because he picked all green coffee beans. Alex tried hard to do it right and he felt embarrassed. At the end of each day, I had about seven to eight bags. Alex had about two or three at most. Whatever he picked was the money he received. My mother felt bad for Alex because he was not making enough

3

money.  She would give him a little more money.   Alex used the money for the bus and to buy food.

11.  Alex was old enough to pick coffee, but he was slow and immature.  I told Alex that he was like a kid.  Everything was a joke or a game to him.  He did not know when it was time to be serious.  When we worked in the coffee fields, my mother told us not to sit on the baskets because she did not want them to rip or lose their shape.  Alex sat on the baskets.  He thought it was funny.  The baskets were our tools for work.  It was as though Alex could not focus.  When we worked, Alex climbed trees and hung from them.  He threw beans at us.  He was joking around.  All the beans would then need to be picked up.  It was wasteful and slowed us down.  My mother scolded him but she loved him.  We knew that it was not because Alex was lazy.  That was the way he was, he was still a little kid.

12.  The coffee plantations were sprayed with a pesticide called Gramoxone.  It was used to burn the weeds in the fields.  Workers carried the pesticide in pumps on their backs and sprayed in between the rows of coffee plants just before we started picking.  After we started picking coffee, they continued spraying the area next to us before moving on. They also applied a fertilizer, that looks like salt, at the base of the coffee plants.  The workers spraying the fields wore hats, woolen long sleeve shirts, and bandanas over their noses and mouths.  We did not wear any protective clothing.  We just wore the clothes that we had from home.  We did not have hats or gloves.  The pesticide hung in the air. I could feel it on my skin like mist.  I could smell it.  Sometimes, I had severe headaches after working in the fields.  I think it may have been the chemicals.

4

13. At the end of the day, our clothing, arms, and faces, were covered in dirt. Our hands and arms were black from the honey or sap of the coffee plants. The plantation had big tanks that collected rainwater that we used to wash our faces and hands. We changed into cleaner clothes and put our dirty clothes in the backpacks. We gathered twigs and branches from the plantation to make a small fire outside of the plantation by the main road so that my mother could warm up some beans and tortillas to eat before heading home.

14. Around the year 2000, my father had a job through the Claro Company to install the base for cell phone towers near the beach in Sonsonate. Alex and I went with my father as his helpers. We prepared the area where another company later came in and placed the tower. We worked in the towns of Metalio and Barra Santiago. The work lasted for about eight months.

15. Alex did not know how to do the work that my father and I did. He was not capable. My father tried to teach Alex how to measure and cut but Alex did not get it. Alex would always cut the wood too short or too long. My father got frustrated with Alex and told him he had to pay attention and get this right. His mistakes wasted wood. My father often scolded Alex for getting things wrong. My father told Alex that construction was a good job and he needed to know how to measure to do construction. Alex was embarrassed. He would come to me before going to my father to see if he got the sizes right. Alex was always off by a few centimeters. I covered for Alex because I did not want him to get into trouble.

5

16. Alex could do things like bring me this, put this here, or carry this over there but he made too many mistakes with things that required measuring or following several steps.

17. When we worked in Metalio, my father paid a woman to let us stay at her home and cook for us. My father went back home on the weekends but Alex and I stayed. I sometimes went back but Alex stayed almost every weekend. I got along with the Metalio family but they loved Alex. Alex was endearing and the family really cared for him. On our day off, we played soccer with the woman's sons and some of the other young men in the area. Alex seemed very happy during this time.

18. At the time of Alex's trial a man who worked for his lawyer came to visit my father. He did not ask me many questions. He took a picture of me and my sister. He said he would return but did not. If he had asked me questions about Alex's life, I would have told them the information included here, and testified if they had asked.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

6

# VIRGINIA WILSON

*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*

**(323) 788-2298**

[Virginia@LosAngelesInterpreter.com](mailto:Virginia@LosAngelesInterpreter.com)

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

### Declaration of Carlos Geovanni Herrera

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE CARLOS GEOVANNI HERRERA CALDERÓN

Yo, Carlos Geovanni Herrera, declaro lo siguiente:

1.  Soy amigo de Alejandro Umaña. Álex y yo crecimos en el mismo vecindario del Barrio San Rafael. Yo vivía en una casa en el Barrio San Rafael con mis padres Carlos Aquino Herrera y María Lidia Calderón, mi hermano Alfredo, mis hermanas Karla y Patty, y la hija de Patty. Álex vivía con su padre y la pareja de su padre en un cuarto de un mesón que quedaba a la vuelta de la esquina de mi casa.

2.  Cuando conocí a Álex éramos adolescentes. Por la manera en que actuaba, creo que Álex tenía unos años menos que yo. Parecía tener 3 o 4 años menos que yo.

3.  Álex, mi hermano Alfredo y yo jugábamos fútbol en la calle con otros muchachos del vecindario. Después de jugar, mis padres nos llamaban para que fuéramos a comer pero Álex se quedaba ahí tendido en la acera. Él no tenía adonde ir a comer. Nos daba lástima y lo invitábamos a nuestra casa. Mi familia era pobre pero mi hermano y yo separábamos parte de la comida de nuestros platos y se la dábamos a Álex para que tuviera algo que comer.

4.  Un día, Alfredo trajo a Álex a nuestra casa y le pidió permiso a nuestros padres para que se quedara a dormir. Álex estaba molesto. Me dijo que se había peleado con su madrastra. Dijo que la madrastra no lo quería a Álex ahí. Me dijo que su madrastra lo menospreciaba y que lo trataba como un mero estorbo. El padre de Álex se ponía del lado de la madrastra con

1

respecto a Álex. Mis padres permitieron que se quedara. Él se quedó con nosotros como dos años y medio.

5. A mí me parecía que Álex estaba lidiando con muchos problemas. A veces tenía arranques de ira. Entraba impetuosamente a un cuarto y tiraba ropa y otras cosas por todas partes. Yo no sabía por qué él estaba enojado pero suponía que se había vuelto a pelear con su madrastra. Otras veces, Álex se despertaba enojado y de muy mal humor. Álex era reservado y por eso yo no sabía qué era lo que lo molestaba. Yo solo lo observaba y no lo molestaba. A Álex también le daban terribles dolores de cabeza casi a diario y no había mucho que yo pudiera hacer para ayudarlo. Una vez llegué a verlo llorar del dolor. Sentía lástima por él.

6. Mi familia le tenía mucho cariño a Álex. Él era respetuoso y ofrecía ayuda en todo lo que podía. Mi madre le tenía un cariño muy especial a Álex porque él era muy dulce con ella. Él le decía Mamá Lidia.

7. A Álex y Alfredo les gustaba mucho el baile y ambos eran parte de un grupo de danza. Yo no bailaba. Yo los veía practicar en nuestra casa. Álex se lo tomaba muy en serio y practicaba los pasos, pero no se podía aprender la coreografía. El grupo de danza bailaba rutinas sincronizadas pero el pobre Álex siempre se equivocaba. Yo me daba cuenta de que a Álex se le hacía mucho más difícil y que tardaba más tiempo en aprender que los demás. Le gustaba bailar y seguía practicando las rutinas de baile, inclusive mucho tiempo después que los demás habían dejado de practicar y se habían ido a sus casas.

2

8. Cuando Álex estuvo viviendo con nosotros, él iba a trabajar con mi madre, Karla, Alfredo y conmigo a los cafetales. Álex trabajó con nosotros por lo menos durante dos temporadas. Salíamos de la casa a las cuatro y media de la madrugada y caminábamos como una hora con canastas y mochilas pesadas donde llevábamos nuestra comida, agua y mudas de ropa. Tomábamos el bus de las cinco de la mañana que tardaba como 45 minutos para llegar al cafetal que quedaba en Los Naranjos. Llegábamos al cafetal como a las seis y media, desayunábamos con lo que habíamos traído de la casa, comenzábamos a trabajar a las siete y terminábamos a las tres de la tarde. Luego, comíamos a la orilla del camino y comenzábamos el viaje de regreso a la casa. Llegábamos a la casa como a las seis y media de la noche. Al día siguiente, hacíamos nuevamente el viaje. Hacíamos esto a diario durante los meses de la temporada de café.

9. Mi madre, Alfredo, Álex y yo éramos los que recogíamos los granos de café. Mi hermana Karla era mucho más pequeña y no recogía el café pero nos acompañaba y ayudaba en lo que podía. En el cafetal, para ser trabajador inscrito y recibir pago uno debía tener 18 años y cédula de identidad. De nuestro grupo, mi madre era la trabajadora inscrita y ella recibía el pago cada quince días. Nosotros éramos sus ayudantes. Los niños comúnmente iban a trabajar al campo con sus padres. Yo comencé a trabajar en el cafetal cuando tenía ocho años.

10. Álex recogía menos granos de café que los demás en nuestro grupo. Antes de comenzar a recoger los granos, los capataces daban instrucciones sobre cómo se debía hacer el trabajo. Las reglas eran muy claras en cuanto a que no recogiéramos los granos verdes porque todavía no estaban maduros. Nos

3

decían que solo recogiéramos los granos rojos, que nosotros llamábamos uvas. Solo nos pagaban por recoger los granos rojos. Álex seguía recogiendo los granos de café verdes. Cuando llegaba la hora de escoger lo que habíamos recogido, mi madre regañaba a Álex porque todos los granos de café que había recogido estaban verdes. Álex se esforzaba por hacerlo correctamente y se sentía avergonzado. Al fin de cada día, yo tenía entre siete y ocho costales. Álex tenía entre dos y tres, como mucho. El dinero que él recibía era de acuerdo a la cantidad que había recogido. A mi madre le daba mucha pena Álex porque él no ganaba suficiente dinero. Ella le daba un poquito más de dinero. Álex usaba el dinero para pagar el bus y comprar comida.

11. Álex tenía la edad necesaria para recoger café, pero era lento e inmaduro. Yo le decía a Álex que él era como un niño. A él todo le parecía un juego o un chiste. Él no sabía cuándo era hora de ponerse serio. Cuando trabajábamos en los cafetales, mi madre nos decía que no nos sentáramos en las canastas porque ella no quería que se rompieran o deformaran. Álex se sentaba en las canastas. Se le hacía divertido. Las canastas eran nuestras herramientas de trabajo. Parecía que Álex no se podía enfocar. Cuando trabajábamos, Álex se trepaba a los árboles y se colgaba de ellos. Nos tiraba granos. Estaba bromeando. Luego había que recoger todos los granos. Era un desperdicio y nos hacía disminuir el ritmo de trabajo. Mi madre lo regañaba pero lo quería. Sabíamos que la razón no era que Álex era perezoso. Él era así, todavía era un niño pequeño.

12. Los cafetales se rociaban con un pesticida que se llamaba Gramoxone. Lo usaban para quemar la maleza en los terrenos de cultivo. Los trabajadores

4

cargaban en sus espaldas el pesticida en bombas y rociaban entre las hileras de plantas de café inmediatamente antes de que comenzáramos a recogerlo. Después de que comenzábamos a recoger el café, ellos seguían rociando la zona próxima a nosotros y continuaban así sucesivamente. También aplicaban un fertilizante, que parecía sal, en la base de las plantas de café. Los trabajadores que rociaban los campos de cultivo usaban sombrero, camisas de lana de manga larga, y pañuelos sobre la nariz y la boca. Nosotros no usábamos ningún tipo de vestimenta protectora. Solo usábamos la ropa que traíamos de la casa. No teníamos guantes ni sombreros. El pesticida se quedaba flotando en el aire. Yo lo sentía en la piel como un rocío. Hasta lo olía. A veces yo sufría dolores de cabeza muy fuertes después de trabajar en el campo. Creo que pudo haber sido a causa de los químicos.

13. Al fin del día, nuestra ropa, brazos y rostros estaban cubiertos de tierra. Nuestras manos y brazos estaban negros por la miel o savia de las plantas de café. El cafetal tenía tanques grandes donde se recogía el agua de lluvia que usábamos para lavarnos la cara y las manos. Nos mudábamos con ropa limpia y poníamos la ropa sucia en las mochilas. Juntábamos ramitas y ramas del cafetal para hacer un pequeño fuego fuera del cafetal al lado del camino, a modo que mi madre pudiera calentar frijoles y tortillas para comer antes de irnos rumbo a la casa.

14. Alrededor del año 2000, mi padre tuvo un trabajo con la Compañía Claro para instalar las bases de torres de teléfonos celulares cerca de la playa, en Sonsonate. Álex y yo fuimos con mi padre como sus ayudantes. Nosotros preparábamos el lugar donde después venía otra compañía a colocar la torre.

5

Trabajamos en dos pueblos, Metalio y Barra Santiago. La obra duró como ocho meses.

15. Álex no sabía hacer el trabajo que hacíamos mi padre y yo. No tenía la capacidad. Mi padre trató de enseñarle a Álex a medir y a cortar, pero Álex no entendía. Álex siempre cortaba la madera o muy corta, o muy larga. Mi padre se frustraba con Álex y le decía que tenía que prestar atención y hacer las cosas bien. Sus errores causaban que se desperdiciara madera. A menudo mi padre regañaba a Álex cuando no hacía bien las cosas. Mi padre le dijo a Álex que la construcción era un buen trabajo y que él tenía que saber medir para trabajar en la construcción. Álex estaba avergonzado. Antes de preguntarle a mi padre, me venía a preguntar a mí a ver si había medido bien. Álex siempre se equivocaba por unos cuantos centímetros al medir. Yo encubría los errores de Álex porque no quería que se viera en problemas.

16. Álex era bueno para traer y llevar cosas, o para alcanzarnos cosas, pero cometía demasiados errores cuando era necesario medir o seguir varios pasos.

17. Cuando trabajamos en Metalio, mi padre le pagó a una señora para que nos permitiera hospedarnos en su casa y nos cocinara. Mi padre regresaba a nuestra casa los fines de semana pero Álex y yo nos quedábamos. Yo a veces regresaba a mi casa pero Álex se quedaba casi todos los fines de semana. Yo me llevaba bien con la familia de Metalio pero ellos querían mucho a Álex. Álex se hacía querer y la familia verdaderamente le tenía

6

mucho cariño. En nuestro día libre, jugábamos fútbol con los hijos de la señora y algunos de los otros jóvenes del pueblo. Álex parecía estar muy contento durante ese tiempo.

18. Por la fecha del juicio de Álex, un señor que trabajaba para su abogado vino a visitar a mi padre. Él no me hizo muchas preguntas a mí. Me sacó una foto a mí y a mi hermana. Dijo que iba a volver, pero no regresó. Si me hubiera hecho preguntas con respecto a la vida de Álex, yo le habría dicho la información incluida en la presente, y habría testificado si me lo hubieran pedido.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el _____17_____ día de _____Novembre_____ de 2018, en Santa Ana, El Salvador.

_____
carlos Geovanni Herrera

7

# APPENDIX 225

# DECLARATION OF JOSE ALFREDO ORTIZ

I, José Alfredo Ortiz, declare as follows:

1. I am Alejandro Umaña's grandfather. His mother is my daughter.

2. I never met my father, Paniagua, and he never recognized me as his child. He was my mother's boss. My mother worked as a domestic maid for a family that lived close to the barracks. I never used the last name Paniagua except in the health clinic where I was required to put down the last name of my father.

3. My mother abandoned me and left me to live with my stepfather. He was cruel. He would beat me.

4. From age seven to 14, I worked with oxen in the milpa helping my stepfather in the field. I barely went to school. When I was 13, I went to night school for about three months. I learned a little more about reading and writing when I was in the army and when I went to night school again. Now, I can read the bible, although with difficulty, but I like it and it helps me.

5. I have lived with a woman since I was 17 years old. The first was Bertina Hernandez. We had two children, Raul Hernandez and Luis Alonso. Luis died when he was 7 months old. Bertina had an affair with another man and we separated. My mother raised Raul. I have very little contact with him.

6. After I went into the army, I had several other romantic relationships. I lived with another woman but she also cheated on me. I did not have luck with women until I became involved with Santos Ramirez, Alejandro's grandmother. We knew each other when we were children but did not start dating until around 1961. After two years, we moved in together.

7. Santos was the love of my life. Her family came from the country but she was raised in Santa Ana. She had five brothers and sisters, Angelica, Alicia, Saul, Juan and Ana. Her mother died very young. Her father lived a disorganized

1

life and was never there for her.  He died an old man. The majority of Santos's brothers and sisters have passed away.  That I know of, only Angelica and Ana are still alive.

8. Before we had our first child, Leticia, Santos had two miscarriages.  Then we had Saul, Ruben and Maritza.  The death squads killed my Saul during the civil war.  Ruben started drinking when he was 12.  He did work sometimes, but he was mostly a drunk.  There were times that he drank daily.  He just drank and drank without working for months.  Sometimes, Ruben was crazy.  He snapped and got violent.  One time he attacked me, threw me to the ground, and hit me with a stick.  He was 35 when he died of alcoholism.

9. Santos had three children with a man named Enriquez Ventura before we became involved, Maura (age 11), Miguel (age nine) and Silvia (age five).  When Maura was 15 years old, she told me that she was pregnant with my child.  For a long time, I doubted the child was mine.  It is true that I was obsessed with her and I did touch her but I did not penetrate her.  Maura's pregnancy caused many problems with Santos but she forgave me.  I never told Santos but the girl was already a woman before me, she was not a virgin.  The child, Luis, was born in April of 1968.  Maura and Luis continued to live with Santos but later left to live with Maura's father.

10. When Luis was about five years old, Santos and I went to a judge to ask that we take custody of him.  We noticed that Maura mistreated him and he was full of bruises.  Maura was given custody and they went to live with Maura's father.  From there on, I did not see Luis very often.  I saw him when he was about 14 years old and something about him made me realize that he was my son.  People told me that he looked just like me.  From then on, I recognized him as my child.  It was very painful for me when Luis died in 2007 from a construction accident.

2

11. My youngest daughter, Maritza, was raped when she was walking home from her job at a factory. She became pregnant and had twins, Luis Alfredo and Carlos Ulises. They were raised by a step-father that treated them horribly. One of the twins disappeared in 2015. Some people say that some gang members took him but we do not know. The other twin was in prison for two years.

12. I live in a shack [*champa*] on the property Leticia rents because I have nowhere else to go. Leticia treats me poorly. She says that I do not love her, that I have never helped her and that is why she does not help me. I have learned to keep quiet.

13. For about two and a half years, I rarely leave the house. I am sick and eat very little because I do not have much. I tend to feel dizzy and tired most of the time. I am traumatized. I think my head is ruined. My anguish pains me and my solitude affects me.

14. I previously signed a declaration for the people helping Alejandro. This declaration provides additional information.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

3

**VIRGINIA WILSON**

*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
[Virginia@LosAngelesInterpreter.com](mailto:Virginia@LosAngelesInterpreter.com)

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

**Declaration of Jose Alfredo Ortiz**

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE JOSÉ ALFREDO ORTIZ

Yo, José ALFREDO ORTIZ, declaro lo siguiente:

1. Soy el abuelo de Alejandro Umaña. La mamá de Alejandro es mi hija.

2. Yo no conocí a mi padre, Paniagua, y él nunca me reconoció como hijo propio. Él era el patrón de mi madre. Mi madre trabajaba como empleada doméstica para una familia que vivía cerca de los cuarteles. Yo nunca usé el apellido Paniagua, con excepción de la clínica médica, donde era necesario anotar el apellido paterno.

3. Mi madre me abandonó y me dejó viviendo con mi padrastro. Él era cruel. Me golpeaba.

4. Desde la edad de siete años y hasta los 14 años, yo trabajé en la milpa con bueyes ayudando a mi padrastro con el trabajo de campo. Apenas fui a la escuela. Cuando tenía 13 años, fui a clases nocturnas como por tres meses. Aprendí a leer y a escribir un poquito más cuando estaba en el ejército y cuando volví a ir a las clases nocturnas. Ahora puedo leer la biblia, aunque con dificultad, pero me gusta y me ayuda.

5. He vivido con una mujer desde que yo tenía 17 años. La primera fue Bertina Hernández. Tuvimos dos hijos, Raúl Hernández y Luis Alonso. Luis falleció cuando tenía 7 meses. Bertina tuvo una aventura con otro hombre y nos separamos. Mi madre crio a Raúl. Tengo muy poco contacto con él.

6. Después de que ingresé al ejército, tuve varias relaciones amorosas más. Viví con otra mujer pero ella también me fue infiel. No tuve suerte con las mujeres sino hasta que entablé una relación con Santos Ramírez, la abuela de Alejandro. Nos conocíamos de niños pero no empezamos a ser novios sino hasta 1961, aproximadamente. Después de dos años, comenzamos a vivir juntos.

1

*J A O*

7. Santos fue el amor de mi vida. Su familia era del campo pero ella fue criada en Santa Ana. Ella tenía cinco hermanos y hermanas, Angélica, Alicia, Saúl, Juan y Ana. La madre de Santos falleció muy joven. Su padre vivió una vida muy desordenada y nunca le brindó apoyo. Falleció anciano. La mayoría de los hermanos y hermanas de Santos ya han fallecido. Que yo sepa, solamente Angélica y Ana viven aún.

8. Antes de tener a nuestra primera hija, Leticia, Santos tuvo dos abortos naturales. Luego tuvimos a Saúl, Rubén y Maritza. Durante la guerra civil los escuadrones de la muerte mataron a mi Saúl. Rubén comenzó a beber a los 12 años. A veces trabajaba, pero la mayor parte del tiempo andaba borracho. Había veces que él bebía a diario. Solo bebía y bebía durante meses y no trabajaba. A veces Rubén se enloquecía. Estallaba y se ponía violento. Una vez me atacó, me tiró al suelo y me golpeó con un palo. Él tenía 35 años cuando murió de alcoholismo.

9. Santos tuvo tres hijos con un hombre que se llamaba Enríquez Ventura, antes de que iniciáramos nuestra relación: Maura (de 11 años), Miguel (de nueve años) y Silvia (de cinco años). Cuando Maura tenía 15 años, me dijo que estaba embarazada y que el bebé era mío. Durante mucho tiempo yo dudé que el niño fuera mío. Es cierto que yo estaba obsesionado con ella y que sí la toqué, pero nunca hubo penetración. El embarazo de Maura causó muchos problemas con Santos pero ella me perdonó. Jamás le dije a Santos que la niña ya era mujer antes de estar conmigo; ella no era virgen. El niño, Luis, nació en abril de 1968. Maura y Luis siguieron viviendo con Santos, pero luego se fueron a vivir con el padre de Maura.

10. Cuando Luis tenía como cinco años, Santos y yo fuimos a pedirle a un juez que nos diera la tutela del niño. Notamos que Maura lo maltrataba y que estaba lleno de moretones. Le dieron la tutela a Maura y se fueron a vivir

$JAO^2$

con el padre de Maura. De ahí en adelante, yo no veía a Luis muy a menudo. Lo vi cuando tenía como 14 años y algo en él hizo que me diera cuenta de que era hijo mío. La gente me decía que era idéntico a mí. Desde ese entonces lo reconocí como hijo propio. Fue muy doloroso para mí cuando Luis falleció en el 2007 a causa de un accidente de construcción.

11. Mi hija menor, Maritza, fue violada cuando iba caminando rumbo a la casa de su trabajo en una fábrica. Quedó embarazada y tuvo mellizos, Luis Alfredo y Carlos Ulises. Fueron criados por un padrastro que los trataba horriblemente. Uno de los mellizos desapareció en el año 2015. Algunos dicen que unos mareros se lo llevaron pero no lo sabemos. El otro mellizo estuvo en la prisión durante dos años.

12. Yo vivo en una champa en la propiedad que Leticia alquila porque no tengo ningún otro lugar adonde ir. Leticia me trata mal. Dice que no la quiero, que nunca la he ayudado y que por eso ella no me ayuda. He aprendido a quedarme callado.

13. Durante más o menos dos años y medio, casi no he salido de la casa. Estoy enfermo y como muy poco porque no tengo casi nada. La mayor parte del tiempo me siento mareado y cansado. Estoy traumatizado. Creo que se me ha arruinado la cabeza. La angustia me acongoja y la soledad me afecta.

14. Anteriormente firmé una declaración para las personas que ayudaban a Alejandro. Esta declaración proporciona información adicional.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el ___17___ día de noviembre de 2018, en Santa Ana, El Salvador.

José Alfredo Ortiz

3

# APPENDIX 226

# DECLARATION OF JOSSELYN GUEVARA REYES

I, Josselyn Guevara Reyes, declare as follows:

1. I met Alejandro Umaña in the meson La Fe. Alex dated my cousin Monica, and they had a child together.

2. I am currently in my last year of studying law. I already completed an internship working at the public defender's office. I want to practice criminal law.

3. I was living with my grandmother, Mama Lola, on Avenida Independencia when I first met Alex. I still live in the same place. Our home is in front of La Fe. The meson is small and only has seven rooms. A lot of the rooms were rented out by members of my family. My cousin Monica lived in a room in La Fe with her mother Ana Lilian, Stepfather David or Pichinche, and Brother Mauricio. My Aunt Xiomara lived in another room with her husband and child. My Aunt Betty, Xiomara's mother, lived in another room.

4. On one side of the meson was an empty lot that became the neighborhood dumpsite. Because there was so much garbage, the smell was bad. The trash attracted rats and flies that swarmed around. It was common for all of us at the meson to rummage in the trash in search of things we needed. I remember my grandmother pulling out some furniture and I found toys. My cousins and I became ill after being in the trash. Once, I got a rash with red marks all over my skin. I had a high fever and stomachache. I know Monica and her younger brother, Mauricio also got sick from the trash.

1

5. Boys from the mara slept in a small room in La Fe and hung out outside the meson. I knew who was in the mara because they walked and dressed differently. When I met Alex, he did not dress or walk like them. He wore a black shirt with short sleeves, jeans and tennis shoes. Alex was mara because he hung out with the other mara.

6. The boys from the mara were kids from the area. My grandmother knew some of them since they were little kids. She felt sorry for them because they were just young boys who had many problems at home and were looking for a place to sleep and a way to survive.

7. Alex was different from the rest of the mara boys. He was like a big kid. My cousins and I were much younger than Alex, but he liked to play with us. When we saw Alex coming down the street we cheered. We were happy to see him, he was so playful. He acted just like one of us kids.

8. My mother gave me a spinning top called Beyblade. It is a top wrapped with a string that is thrown to the ground while releasing the string. The purpose is to aim it at another spinning top and knock it down. Alex liked the game a lot and he often begged me to let him use it. I told him he needed to wait his turn. Alex watched us kids play and asked us to explain how to use the top. When I let him borrow it, he played with it for a long time and I had to make him give it back. I taught Alex how to use it. I think he had trouble understanding how to use it because he asked me many times to show him how. Alex also played marbles [chibolas] with the boys and he and I played games with our hands like hot hands. When we had some money, Alex walked with me and the other kids to go buy candy.

2

9. I remember hearing the adults saying that Alex was slow. Alex was sweet and liked to help but he was forgetful and made mistakes. Sometimes, my Aunt Betty and Aunt Xiomara sent Alex out to buy things in the market. They gave him specific and repeated instructions but he still got things wrong. I remember my aunt asked Alex to go to the store and bring cubes of chicken stock. She told him chicken, not beef. She repeated that it was important. Alex came back with beef stock. My aunt said did I not tell you what I needed. Alex was embarrassed.

10. I noticed odd things about Alex. I often saw Alex talking to himself. His eyes were looking up and rolling back and forth. He said things like "no, no, who knows" as if he were answering someone's question. Sometimes, he started laughing while he was talking. I remember thinking it was strange. Other times, I was not sure if Alex was talking to me or to someone else. He asked *niña* where is Monica, but his eyes were not looking at me. Alex stared out into the wind. His look was somewhere else. The other kids and I laughed at Alex and called him crazy because back then we thought it was funny.

11. Alex spent a lot of time with my cousin Monica. Monica was much younger than Alex but they both acted like little kids. When they were together, Alex played with her by pinching her or pulling her hair. They teased each other. Monica giggled a lot when she was with him. They were silly together. They spent most of their time right outside in front of the meson.

3

12. No one working contacted me during the time of Alejandro's trial. If someone had contacted me, I would have provided the information included here, and testified if asked to do so.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

**VIRGINIA WILSON**
*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

**Declaration of Josselyn Guevara Reyes**

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE JOSSELYN GUEVARA REYES

Yo, Josselyn Guevara Reyes, declaro lo siguiente:

1. Conocí a Alejandro Umaña en el mesón La Fe. Álex era novio de mi prima Mónica y tuvieron un hijo juntos.

2. Actualmente estoy cursando mi último año de estudio de derecho. Ya completé una pasantía trabajando en la oficina de defensores de oficio. Deseo ejercer derecho penal.

3. Cuando conocí a Álex, yo vivía con mi abuela, Mamá Lola, en la Avenida Independencia. Aún vivo en el mismo lugar. Nuestra casa queda enfrente de La Fe. El mesón es pequeño y solo tiene siete cuartos. Muchos de los cuartos los alquilaban miembros de mi familia. Mi prima Mónica vivía en uno de los cuartos de La Fe con su madre, Ana Lilian, su padrastro David, o Pichinche, y su hermano Mauricio. Mi tía Xiomara vivía en otro cuarto con su esposo y su hijo. Mi tía Betty, la madre de Xiomara, vivía en otro cuarto.

4. A un lado del mesón había un terreno vacío que se convirtió en el botadero de basura del barrio. Olía muy mal porque había demasiada basura. La basura atraía ratas y moscas que invadían el aire. Era común que todos los que vivíamos en el mesón escarbáramos la basura buscando cosas que necesitábamos. Recuerdo que mi abuela encontró unos muebles y yo encontré juguetes. Mis primos y yo nos enfermamos después de estar entre la basura. Una vez me salió una erupción con marcas rojas en toda la piel. Tuve mucha fiebre y dolor de estómago. Sé que Mónica y su hermano menor, Mauricio, también se enfermaron a causa de la basura.

1

5. Los muchachos de la mara dormían en un cuarto pequeño del mesón La Fe y pasaban el tiempo afuera del mesón. Yo sabía quién era de la mara porque caminaban y se vestían diferente. Cuando conocí a Álex, él no caminaba ni se vestía como ellos. Él usaba camisa negra de manga corta, pantalones de mezclilla y zapatos tennis. Álex era mara porque se juntaba con los otros maras.

6. Los de la mara eran muchachos de la misma zona. Mi abuela conocía a algunos de ellos desde que eran niños. A ella le daban lástima porque eran muchachos jóvenes que tenían muchos problemas en la casa; solo buscaban un lugar para dormir y la manera de sobrevivir.

7. Álex era distinto al resto de los maras. Era como un niño grande. Mis primos y yo éramos mucho más jóvenes que Álex pero a él le gustaba jugar con nosotros. Cuando veíamos que Álex venía caminando por la calle, gritábamos de contentos. Nos daba alegría verlo porque era muy juguetón. Al igual que nosotros, él actuaba como un niño.

8. Mi madre me regaló un trompo que se llamaba Beyblade. Es un trompo enrollado con una pita que se lanza al suelo mientras se suelta la pita. El objetivo es apuntarlo a otro trompo y derribarlo. A Álex le gustaba mucho el trompo y a menudo me rogaba que lo dejara usarlo. Yo le decía que tenía que esperar su turno. Álex nos veía jugar y nos pedía que le explicáramos cómo se usaba el trompo. Cuando se lo prestaba, él jugaba con el trompo por mucho tiempo y yo lo tenía que obligar a que me lo devolviera. Yo le enseñé a Álex a usarlo. Creo que se le hacía difícil entender cómo se usaba

2

porque me pidió muchas veces que le mostrara cómo se hacía. Álex también jugaba a las chibolas con los muchachos y él y yo jugábamos juegos con las manos, como "manos calientes". Cuando teníamos algo de dinero, Álex iba caminando conmigo y los otros niños a comprar dulces.

9. Recuerdo haber oído a los adultos decir que Álex era lento. Álex era dulce y le gustaba ayudar pero se le olvidaban las cosas y cometía errores. A veces mi tía Betty y mi tía Xiomara mandaban a Álex a comprar cosas al mercado. Le daban instrucciones específicas y repetidamente, pero aun así, él hacía las cosas mal. Recuerdo que mi tía le pidió a Álex que fuera a la tienda y trajera consomé de pollo. Le dijo, de pollo, no de carne. Le repitió que era importante. Álex trajo consomé de carne. Mi tía le dijo, ¿qué no te dije lo que necesitaba? Álex estaba avergonzado.

10. Yo notaba cosas extrañas en Álex. A menudo lo veía hablando solo. Sus ojos miraban hacia arriba y se le ponían en blanco una y otra vez. Él decía cosas como, "no, no, quién sabe", como si le estuviera contestando una pregunta a alguien. A veces se empezaba a reír cuando hablaba. Recuerdo que a mí eso se me hacía raro. Otras veces, no estaba segura si Álex me estaba hablando a mí o a otra persona. Decía, niña, dónde está Mónica, pero sus ojos no me miraban a mí. Álex se quedaba mirando fijamente al viento. Su mirada estaba en otra parte. Los otros niños y yo nos reíamos de Álex y le llamábamos loco, porque en ese entonces pensábamos que era chistoso.

11. Álex pasaba mucho tiempo con mi prima Mónica. Mónica era mucho más joven que Álex pero los dos actuaban como niños pequeños. Cuando estaban juntos, Álex jugaba con ella y la pellizcaba o le halaba el cabello. Se

3

molestaban entre sí, bromeando.  Mónica era puras risitas cuando estaba con él.  Se la pasaban haciendo y diciendo tonterías.  Pasaban la mayor parte del tiempo justo afuera del mesón, en el frente.

12. Nadie se comunicó conmigo durante el período del juicio de Alejandro.  Si alguien se hubiera comunicado conmigo, yo les habría proporcionado la información incluida en la presente, y habría testificado si me lo hubieran pedido.

Juro que la anterior información es verdadera y correcta según mi leal saber.  Firmo esta declaración el _diecisiete_ día de _noviembre_ de 2018, en Santa Ana, El Salvador.

_Josselyn Margarita Guevara Reyes._

4

# APPENDIX 227

# DECLARATION OF ROXANA CRUZ TORRES

I, Roxana Cruz Torres, declare the following under penalty of perjury:

1. Alex Umaña's father had a small store from inside their room in the mesón. Alex did not know how to work at the store. Alex could not make change. I sometimes went to buy things like sugar or cubes of chicken stock. I gave Alex money and he would stare at me and ask how much he needed to give me back. Other times he gave me the wrong change or too much money back. Alex's father became angry when things went missing from the store and when Alex made mistakes with money. His father screamed and beat Alex. His father grabbed Alex and searched his pockets and pants for any money and food. Most of the time, Alex had to stay away from the store. Despite the family having food in the store, Alex was hungry and went out looking for his own food like iguanas and pigeons.

2. When I was about 10 or 11 years old, my father taught me how to help him with carpentry. Alex and I sanded pieces of wood. Alex went all over the place. He asked me how he was supposed to do it. I showed him how to sand but he still got it wrong. My father asked me to fix Alex's mistakes and sand the wood correctly. I learned how to use the measuring tape and how to cut the wood. Alex did not know how to do it. Alex never learned how to do it.

3. Alex would say things that had nothing to do with what we were discussing. He said things that made no sense. If we talked about things that were more serious, Alex joked around.

4. I previously signed a declaration for the people helping Alex. This declaration provides additional information that I know about Alex's life.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

# VIRGINIA WILSON
*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## <u>DECLARATION OF TRANSLATOR</u>

I, the undersigned, say:

1.  I am a Spanish language Court Interpreter and Translator;

2.  I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3.  I have personally performed the translation described as follows:

### Declaration of Roxana Cruz Torres

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE ROXANA CRUZ TORRES

Yo, Roxana Cruz Torres, declaro lo siguiente bajo pena de perjurio:

1.  El padre de Álex Umaña tenía una pequeña tienda en el cuarto que ocupaba en el mesón. Álex no sabía trabajar en la tienda. Álex no sabía dar cambio. A veces yo iba a comprar azúcar o consomé de pollo. Le daba el dinero a Álex y él se me quedaba viendo y me preguntaba cuánto me tenía que dar de cambio. Otras veces me daba mal el cambio o me devolvía más dinero que lo necesario. El padre de Álex se enojaba cuando faltaban cosas en la tienda y cuando Álex se equivocaba con el dinero. Su padre le gritaba y golpeaba a Álex. Su padre agarraba a Álex y le registraba los bolsillos y pantalones, buscando dinero y comida. La mayor parte del tiempo, Álex tenía que permanecer alejado de la tienda. A pesar de que la familia tenía comida en la tienda, Álex pasaba hambre y salía a buscar sus propios alimentos, inclusive iguanas y palomas.

2.  Cuando yo tenía como 10 u 11 años, mi padre me enseñó a ayudarle con el trabajo de carpintería. Álex y yo lijábamos las piezas de madera. Álex lijaba para cualquier lado. Me preguntaba cómo lo tenía que hacer. Yo le mostraba cómo tenía que lijar pero aun así, le salía mal. Mi padre me pedía que arreglara los errores de Álex y que lijara la madera correctamente. Yo aprendí a usar el metro y a cortar la madera. Álex no sabía hacerlo. Álex nunca aprendió a hacerlo.

1.

RCT

3. Álex decía cosas que nada tenían que ver con lo que estábamos platicando. Decía cosas que no tenían sentido. Si hablábamos de cosas que eran más serias, Álex bromeaba.

4. Anteriormente firmé una declaración para las personas que estaban ayudando a Álex. Esta declaración incluye información adicional de mi conocimiento sobre la vida de Álex.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el ___17___ día de ___Noviembre___ de 2018, en Santa Ana, El Salvador.

Roxana Cruz Torres

2

# APPENDIX 228

# DECLARATION OF VILMA ELIZABETH TORRES DE CRUZ

I, Vilma Elizabeth Torres de Cruz, declare the following under penalty of perjury:

1. My husband, Alfonso Cruz, and I lived in the *mesón* with Alex Umaña. My husband worked as a carpenter at a workshop but sometimes he worked on projects at the *mesón*. He had a workbench right outside our room. He made chairs, tables, benches, and other wood furniture. Alex would often come by our room to play with my children and watch my husband work.

2. Alex was different from other boys his age. He was not sure of himself. He looked to others for guidance. Other kids would run around and be very active but Alex was quiet and lacked enthusiasm. He was turned off. He was physically present but not all there.

3. Alex lacked the ability to learn, even by example from the adults or other kids. He stopped going to school when he was about 12 years old. My husband wanted to teach him a trade so that he could make a living in the future. Alfonso tried to teach Alex how to use the measuring tape. He showed Alex the height and width of the wood and the number of pieces he needed. He showed Alex the amount of centimeters on the measuring tape and showed him how to mark the spot with a pencil. Alfonso wrote the measurements down for Alex. Alex could not do it. He stared at the measurements and looked confused. Alex would forget the steps. He told my husband he could not remember. My husband repeated the steps but Alex appeared lost. Alex just stared back at him and laughed and made jokes. Alfonso tried many times to teach him but Alex could not take the one end of the

tape to the other end and be able to say that is a meter or that is 5 centimeters. Instead of measuring, Alex would then take the measuring tape and swing the end up and down, as if it were a yo-yo. He never learned how to use it. My kids and other kids in the meson learned how to do these things but Alex did not.

4. Learning was difficult for Alex and sometimes he gave up quickly. Other children his age liked challenges but Alex was different. It was hard for him to apply himself. He looked unsure of himself. A young man from the *mesón* named Oscar tried to get Alex to help him make shoes. Oscar sat outside of his room with a little table, his tools, and a stool. The shoes were precut, then assembled in the *mesón*. Oscar tried to teach Alex how to cut the leather, glue the pieces and put them together. Alex could only do the simplest things. He would put glue on the shoe. When Oscar asked him to do more, Alex would say he was done. He avoided doing the harder steps.

5. When Alex worked with Coca-Cola, he used one white shirt as a uniform. The shirt got dirty with dirt and grease from loading and unloading the boxes and bottles. When his grandmother was being nice, she washed it for him. I also washed it for him because Alex did not know how to wash his clothes on his own. When he did wash his clothes, Alex put the shirt in the water in the basin, put the bar of soap inside the water, poured some more water on the shirt and then hung it up. Sometimes, Alex left his clothes soaking in water and forgot to take it out to dry. I told Alex that he could not do that because the clothes would rot.

6. Life in the *mesón* was chaotic. Many of those that lived in the *mesón* were part of the Umaña family. They had horrible violent tempers. Alex's father was violent and feared by all. His partner, Yanira, also came from a family that was

very problematic. Her family was extremely poor and barely had enough to survive. Prior to living with Alex's father, whenever Yanira's mother needed money, she sold Yanira to an older man named Tin.

7. Alex's family mistreated him. His father was cruel and beat him. Alex would often be in the common area of the meson. He was visibly upset and had tears in his eyes.

8. We were all poor but Alex was the worst off. The children made fun of him because he ate lizards, iguanas, and pigeon soup. He went out looking for his food. Sometimes, he had Maruchan Soup. He would come by my room and ask if I could heat up water for him so he could eat the soup.

9. At the time Alex and his family lived in the *mesón*, there were 17 rooms. Our family had five in one room. We shared a washing area that had two outdoor faucets that poured into a basin. We used the water in the basin for drinking and washing dishes and clothes. We washed clothes by hand. Sometimes only one of the faucets worked.

10. The families of the *mesón* also shared two latrines that were outside in the common area. The latrines were not connected to plumbing but instead everything fell into a hole. We poured a bucket of water into the hole so that the waste would drain into the street sewer.

11. Before the construction of the bypass in front of the *mesón*, there were abandoned coffee fields. People from the *mesón* and the surrounding area threw away trash in the vacant field in front of the *mesón* and it eventually became a huge garbage dump. There was no container for the trash. It was loose trash piled on top of

each other.  The pile was as tall as an adult was.  The city did not collect the trash. The trash sat there for years and was not removed until the bypass construction. Dogs came by and dragged the trash all over making an even bigger mess.  Rats and cockroaches were everywhere.  The rats came into our rooms because the *mesón* was open to the street.  Alex's family's room had lots of rats because it was very dirty.  They were the size of my foot.  When he was a child, Alex rummaged through the trash.  He was barefoot and dirty.  He went looking in the trash for anything he could find.  Once he found a tiny wooden chair and gave it to my family.  Alex was so proud of what he found.   I still have the chair with me.

12. The first picture attached to this declaration is a picture of the front of the *mesón*. This is how the *mesón* looks today.  My daughter Araceli lives in the room facing the street.  The *mesón* shares a wall with the tire shop.  At the time Alex lived there, the tire shop was smaller but it was also attached to the wall of the *mesón*. This picture is an accurate and correct representation of the front of the mesón as it looks today.

13. The second picture attached to this declaration is of the tire shop.  To the right of the tire shop is the *mesón*. This picture is an accurate and correct representation of the front of the tire shop as it looks today.

14. The third picture attached to this declaration is of Alex, Yanira, and a little girl. Alex was about 14 or 15 years old in this picture.  The picture is of the door that leads into Alex's family room in the *mesón* at Final 25 Calle Oriente.  The picture shows the store owned by Quique.  To the right of the room was the tire shop.

The tire shop shared a wall with Alex's family room. This picture is a true and correct representation of what I have described.

15. The fourth picture attached to this declaration is of Tropigas, which is a place that sells propane gas. It is located on Final 25 Calle Oriente down the street from the tire shop and the *mesón*. The tire shop in the third picture is between Tropigas and the *mesón*. This is how Tropigas looked at the time Alex lived in the *mesón* on the bypass and how it looks today. This picture is a true and correct representation of what I have described.

16. The fifth picture is a portion of the space where Alex's room in the *mesón* was previously located. Years after Alex's family moved out, their room was sized down for the expansion of the tire shop. Alex's room was located in front of the common area. The door that led to Alex's room is now the entrance to the *mesón*. This picture is a true and correct representation of what I have described.

17. The sixth, seventh, eighth, and ninth pictures attached to this declaration are pictures of the common area of the *mesón*. The common area was located immediately behind Alex's room. The sixth and seventh picture are of the doors to the latrines that were used by all who lived in the meson. Photo 8 is a picture of the shower with a sheet metal door. Photo 9 is of the basin that was used by people in the meson to wash dishes and clothes. The latrines, shower, and basin in the common area shown in these pictures are similar to what it was like at the time Alex lived in the *mesón*.

18. The tenth and eleventh pictures attached to this declaration are pictures of trash piled up on top of each other. These images are similar to the way trash was piled

out in front of the *mesón* where Alex would rummage through the trash to collect anything that could be useful.

19. I previously signed declarations for Alejandro's post-conviction case. This declaration provides additional information that I know about Alejandro's life.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

# VIRGINIA WILSON

*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

### Declaration of Vilma Cruz

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE VILMA ELIZABETH TORRES DE CRUZ

Yo, Vilma Elizabeth Torres de Cruz, declaro lo siguiente bajo pena de perjurio:

1. Mi esposo Alfonso Cruz y yo vivíamos en el mesón con Álex Umaña. Mi esposo trabajaba como carpintero en un taller pero a veces hacía proyectos en el mesón. Tenía un banco de carpintería justo afuera de nuestro cuarto. Hacía sillas, mesas, bancos y otros muebles de madera. Álex a menudo venía a nuestro cuarto a jugar con mis hijos y a observar a mi esposo trabajar.

2. Álex era distinto a los niños de su edad. Él no era seguro de sí mismo. Buscaba que los demás lo orientaran. Los otros niños correteaban y eran muy activos pero Álex era callado y sin entusiasmo. Estaba apagado. Físicamente estaba presente pero mentalmente, no del todo.

3. Álex no tenía la capacidad de aprender, inclusive cuando los adultos u otros niños le enseñaban con ejemplos. Él dejó de ir a la escuela cuando tenía como 12 años. Mi esposo quería enseñarle un oficio para que pudiera ganarse la vida en el futuro. Alfonso trató de enseñarle a Álex a usar la cinta métrica. Le mostraba a Álex el largo, ancho y el número de piezas de madera que necesitaba. Le mostraba a Álex la cantidad de centímetros en la cinta métrica y le mostraba cómo tenía que marcar el punto con un lápiz. Alfonso le anotaba las medidas a Álex. Álex no podía hacerlo. Se quedaba viendo fijamente las medidas y parecía estar confundido. Álex se olvidaba de los pasos que tenía que seguir. Le decía a mi esposo que no los podía recordar. Mi esposo le repetía los pasos pero Álex parecía estar perdido. Álex simplemente se le

1.

quedaba mirando a mi esposo fijamente, y luego se reía y hacía chistes. Alfonso trató muchas veces de enseñarle pero Álex no podía tomar un extremo de la cinta métrica y el otro extremo, y decir, esto es un metro, o estos son cinco centímetros. En vez de medir, Álex tomaba la cinta métrica y lanzaba la punta hacia abajo y hacia arriba, balanceándola como si fuera un yoyó. Álex nunca aprendió a utilizarla. Mis hijos y otros niños del mesón aprendieron a hacer estas cosas, pero Álex no.

4. A Álex se le hacía muy difícil aprender y a veces se daba por vencido rápidamente. A otros niños de su edad les gustaba hacer cosas que representaban un reto, pero Álex era distinto. Se le hacía difícil ser aplicado. Se veía inseguro de sí mismo. Un joven del mesón llamado Óscar trató de lograr que Álex lo ayudara a hacer zapatos. Óscar se sentaba afuera de su cuarto con una mesita, sus herramientas y un banquillo. Los zapatos venían precortados y se armaban en el mesón. Óscar trató de enseñarle a Álex a cortar el cuero, aplicar el pegamento a las piezas y unirlas. Álex solo podía hacer las cosas más sencillas. Le ponía el pegamento al zapato. Cuando Óscar le pedía que hiciera más, Álex le decía que ya había terminado. Evitaba hacer los pasos más difíciles.

5. Cuando Álex trabajaba en la Coca-Cola, usaba una camisa blanca de uniforme. La camisa se ensuciaba de tierra y grasa al cargar y descargar las cajas y botellas. Cuando su abuela estaba de buenas, se la lavaba. Yo también se la lavaba porque Álex no sabía lavar su propia ropa. Las veces que sí lavaba su ropa, Álex metía la camisa en el agua de la pila, ponía la barra de jabón adentro del agua, echaba un poco de agua encima de la camisa y luego la colgaba. A

veces Álex dejaba su ropa en remojo y se le olvidaba sacarla y colgarla. Yo le decía a Álex que no debía hacer eso porque la ropa se le iba a pudrir.

6. La vida en el mesón era caótica. Muchos de los que vivían en el mesón eran parte de la familia Umaña. Eran de temperamento horriblemente violento. El padre de Álex era violento y temido por todos. Su pareja, Yanira, también era de una familia muy problemática. La familia de ella era extremadamente pobre y apenas tenía lo suficiente para sobrevivir. Antes de vivir con el padre de Álex, cuando la madre de Yanira necesitaba dinero, vendía a Yanira a un hombre mayor llamado Tin.

7. La familia de Álex lo maltrataba. Su padre era cruel y lo golpeaba. Álex a menudo estaba en el espacio común del mesón. Se le veía angustiado y tenía lágrimas en los ojos.

8. Todos éramos pobres pero Álex era el que estaba en peores condiciones. Los niños se burlaban de él porque comía lagartijas, iguanas y sopa de paloma. Salía en busca de algo que comer. A veces comía sopa Maruchan. Venía a mi cuarto y me pedía si le podía calentar agua para poder comerse la sopa.

9. Cuando Álex y su familia vivían en el mesón, había 17 cuartos. Nuestra familia tenía cinco en un cuarto. Compartíamos el espacio para lavar, que tenía dos llaves que vertían agua a una pila. Usábamos el agua de la pila para tomar, y para lavar platos y ropa. Lavábamos la ropa a mano. A veces solo una de las llaves funcionaba.

10. Las familias del mesón también compartían dos letrinas que estaban afuera, en el espacio común. Las letrinas no estaban conectadas a la plomería sino que

3.

todo caía en un agujero. Vertíamos una cubeta de agua en el agujero para que los desechos se fueran por el alcantarillado.

11. Antes de que construyeran el bypass enfrente del mesón, había cafetales abandonados. La gente del mesón y los alrededores botaban la basura en el terreno vacío de enfrente del mesón, y con el tiempo se convirtió en un inmenso botadero de basura. No había contenedores para la basura. La basura estaba suelta y apilada encima de más basura. El montón era tan alto como una persona adulta. La ciudad no pasaba a recoger la basura. La basura estuvo ahí amontonada por años y no la quitaron sino hasta que construyeron el bypass. Venían los perros y arrastraban la basura por todas partes, empeorando el revoltijo. Veíamos ratas y cucarachas por todas partes. Las ratas entraban a nuestros cuartos porque el mesón estaba abierto y daba a la calle. En el cuarto de la familia de Álex había muchas ratas porque estaba muy sucio. Eran del tamaño de mi pie. Cuando era niño, Álex escarbaba la basura buscando cosas. Estaba descalzo y sucio. Iba al botadero a buscar entre la basura cualquier cosa que le pudiera servir. Una vez encontró una sillita pequeñita de madera y se la regaló a mi familia. Álex estaba tan orgulloso de lo que encontró. Todavía conservo esa sillita.

(A)

12. La primera foto que se anexa a esta declaración muestra el frente del mesón. Este es el aspecto del mesón hoy en día. Mi hija Araceli vive en el cuarto que da a la calle. El mesón tiene una pared en común con la llantera. Cuando Álex vivía allí, la llantera era más pequeña pero también tenía una pared en común con el mesón. Esta foto es una imagen correcta y fiel del frente del mesón, en su apariencia actual.

4_

VET

(B)

13. La segunda foto que se anexa a esta declaración es de la llantera. El mesón está a la derecha de la llantera. Esta foto es una imagen correcta y fiel del frente de la llantera, en su apariencia actual.

(C)

14. La tercera foto que se anexa a esta declaración es de Álex, Yanira y una niña. Álex tenía como 14 o 15 años en esta foto. La foto es de la puerta que daba al cuarto de la familia de Álex en el mesón, ubicado en Final 25 Calle Oriente. La foto muestra la tienda que era de Quique. A la derecha del cuarto estaba la llantera. La llantera tenía una pared en común con el cuarto de la familia de Álex. Esta foto es una imagen correcta y fiel de lo que he descrito.

(D)

15. La cuarta foto que se anexa a esta declaración es de Tropigas, que es un lugar donde se vende gas propano. Queda en Final 25 Calle Oriente, calle abajo de la llantera y el mesón. La llantera que figura en la tercera foto queda entre Tropigas y el mesón. Esta era la apariencia de Tropigas en el bypass cuando Álex vivía en el mesón y la apariencia actual de Tropigas. Esta foto es una imagen correcta y fiel de lo que he descrito.

(E)

16. La quinta foto es una parte del espacio donde quedaba anteriormente el cuarto de Álex en el mesón. Años después que la familia de Álex se fuera del mesón, se disminuyó el tamaño de su cuarto para ampliar la llantera. El cuarto de Álex estaba ubicado enfrente del espacio común. La puerta que daba al cuarto de Álex es la entrada actual del mesón. Esta foto es una imagen correcta y fiel de lo que he descrito.

(F)   (G)   (H)   (I)

17. La sexta, séptima, octava y novena fotos que se anexan a esta declaración, son fotos del espacio común del mesón. El espacio común estaba ubicado justo detrás del cuarto de Álex. La sexta y séptima fotos son de las puertas de las

(F)   (G)

5.

letrinas que usaban todos los que vivían en el mesón.  La foto 8 es una imagen (H) de la ducha con una puerta de lámina de metal.  La foto 9 es de la pila que (I) usaban todas las personas del mesón para lavar los platos y la ropa.  Las letrinas, la ducha y la pila en el espacio común que figuran en estas fotos tienen apariencia similar a como estaban cuando Álex vivía en el mesón.

18. La décima y onceava fotos que se anexan a esta declaración son imágenes de la (J) (K) basura amontonada sobre más basura.  Estas imágenes son similares a la apariencia que tenía la basura amontonada enfrente del mesón cuando Álex iba a escarbarla buscando cualquier cosa que le pudiera ser útil.

19. Anteriormente firmé declaraciones para la causa de Alejandro posterior a su condena.  Esta declaración incluye información adicional de mi conocimiento sobre la vida de Alejandro.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el ____17____ día de _noviembre_ de 2018, en Santa Ana, El Salvador.

Vilma Elizabeth Torres



(A).

VET

Case 3:16-cv-00057-MOC     Document 106-1     Filed 01/12/21     Page 322 of 381





VET





(E).

VET

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 326 of 381



(F).

VET





(#).

VET



(工).

VET

Case 3:16-cv-00057-MOC    Document 106-1    Filed 01/12/21    Page 330 of 381





(K).

VET

# APPENDIX 229

DECLARATION OF XIOMARA REYES

I, Xiomara Reyes, declare as follows:

1.  My cousin, Monica Reyes, was in a relationship with Alejandro Umaña. Monica and I lived in the same *mesón* called La Fe. When Alex started coming to La Fe, he was about 17 or 18 years old but he was childlike in the way he spoke and the way he acted.

2.  The *mesón* La Fe had seven rooms. I lived in one room with my husband, Christian Ramirez, and my son. My mother and brother, Cesar Alonso, lived in another room. Monica lived in another room with her mother, brother, and stepfather. Our Aunt Maria Dolores lived her entire life in a home across the street from the *mesón*.

3.  The *mesón* was old and falling apart. The owner did not make repairs. It was the only place we could afford and be close to family. The common area used by all was compact with a shower, one latrine, and a basin for washing.

4.  To one side of the *mesón* was an empty lot where people from our street threw away the trash. Sometimes large trucks came by and dumped furniture and large trash into the lot. It was used as a dump. There was no container to put the trash in. People just piled the trash on top of each other. It would get to be about two meters high. There was no routine municipal trash collector. There were times when a city truck did come by to pick up some of the trash but months could go by with the trash just sitting there. People in the neighborhood sometimes burned the trash in order to clean up.

1

5.      The smell of the trash was overwhelming.  It was full of cockroaches and rats. There were several openings to the rooms in the meson including gaps between the wall and the sheet metal roofs.  We had rats and cockroaches coming into our rooms.  The kids sometimes rummaged through trash looking for things like furniture, toys, or plastic.  A lot of them became ill after being in the trash, including Monica, Mauricio, and my other niece, Josselyn.  They were covered with red dots, had fever, and stomach aches.

6.      Alex was homeless.  I sometimes found him sleeping on the doorsteps leading to the meson.  He was very thin and it looked like he did not have much to eat.  I felt bad for him and used to offer him a tortilla or other food.   Alex did not talk to me about his family.  He simply told me he did not have one.

7.      There were many young men that stayed around the *mesón* that were part of the *mara*.  These were boys from the neighborhood.  Alex hung out with them but most of the time he was on his own or with Monica.

8.      Monica was about 14 or 15 years old when she began a relationship with Alex. It was a childlike relationship.  Most of the time they just sat on the steps in front of the meson.  Monica giggled a lot when she was with him.  The relationship did not seem serious.  Alex came and went.  I would not see him for weeks.

9.      Alex liked to play with the younger children of our family.  My mom and I thought he was infantile.  It's like he never grew up.  He tagged along with the little kids to the store to buy ice cream or candy.  He played games like marbles with them.  When one of the kids knocked a marble out of the way,

2

they got to keep the marble.  If Alex was able to knock a marble, he quickly grabbed for it along with all the dirt and stones surrounding it.  He wanted to make sure no one beat him to it.  Alex walked around with pockets full of dirt, stone, and marbles.  When my young son watched cartoons inside our room, Alex watched from outside through the window.  My husband and I used to ask him to come in instead of standing outside.  He was bashful and did not accept.  He did not came into our room.

10. Alex was slow.  There were times that I did not think he understood things we were telling him.  He had a confused face.

11. Sometimes, I disciplined Alex as if he was one of the kids.  Alex told the kids he could do magic.  He placed coins inside his ears and called that magic.  The kids wanted to imitate him.  I told Alex to stop because it was dangerous.  The kids could get something stuck in their ears.  Alex also threw food, like popcorn, up into the air and told kids to catch it with their mouths.  I was afraid the children would choke.  But Alex did not think of things like this.  I had to tell him.

12. Alex was also moody.  He was sweet but then he became irritated over little things.  He used to ride a small bicycle, like a child's bike.  One time he got mad for some reason and threw his bike down the steps of the meson. Another time, a church bought a portion of the empty lot next to the meson where the dump was and wanted to build a wall.  The pastor came by asking for signatures from the neighbors that said we agreed with having the wall built there.  As it turned out, building the wall blocked an area where the kids used to play. We also later found out that the church said that children could not come into the church, except for Sundays.  Alex went crazy and started

3

screaming and punched his hand into the brick wall so hard he hurt his hand. Alex did not like the abuse and did not like it when any child got punished. He felt we were all betrayed by the pastor.

13. My Aunt Dolores and my mom said that something was wrong with Alex's head. He was a little crazy. Alex talked to himself. He sometimes looked absent and withdrawn.

14. Despite that, Alex was sweet and simple. He always wanted to help.

15. The first picture attached to this declaration is a picture of the latrine and shower located in the common area of the *mesón* La Fe. This is how the area looks today and how it looked at the time I moved into the *mesón*. This picture is an accurate and correct representation of the common area in the *mesón* La Fe.

16. The second and third pictures attached to this declaration are pictures of trash piled up on top of each other. The piling of trash on a vacant lot as shown in these pictures is very common in Santa Ana. These images are similar to the way trash was left outside to one side of the *mesón* La Fe.

17. The fourth picture attached to this declaration is a picture of the roof on the *mesón* La Fe. The picture is taken from inside a short and narrow path that leads to the common area of the *mesón* and to the area that was previously the vacant lot with the dump. The roof in the picture is how the roof looks like in the rooms of the *mesón*. This is how the roof looked like at the time I lived in

4

the *mesón* La Fe. This picture is an accurate and correct representation of what I have described.

18. No one contacted me during the time of Alex's trial. If someone had contacted me, I would have provided the information included here, and testified if asked to do so.

I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this_____ day of _____, 2018, in Santa Ana, El Salvador.

# VIRGINIA WILSON

*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1. I am a Spanish language Court Interpreter and Translator;

2. I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3. I have personally performed the translation described as follows:

### Declaration of Xiomara Reyes

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

# DECLARACIÓN DE XIOMARA REYES

Yo, Xiomara Reyes, declaro lo siguiente:

1. Mi prima, Mónica Reyes, tenía una relación con Alejandro Umaña. Mónica y yo vivíamos en el mismo mesón, llamado La Fe. Cuando Álex empezó a venir a La Fe, él tenía como 17 o 18 años, pero era infantil en su manera de hablar y actuar.

2. El mesón La Fe tenía siete cuartos. Yo vivía en un cuarto con mi esposo, Christian Ramírez, y mi hijo. Mi madre y hermano, César Alonso, vivían en otro cuarto. Mónica vivía en otro cuarto con su madre, hermano y padrastro. Nuestra tía María Dolores vivió toda su vida en una casa que quedaba al otro lado de la calle, frente al mesón.

3. El mesón era viejo y se caía a pedazos. El dueño no hacía las reparaciones necesarias. Era el único lugar que podíamos pagar y estar cerca de nuestra familia. El espacio común utilizado por todos era compacto y tenía una ducha, una letrina y una pila para lavar.

4. A un lado del mesón había un terreno vacío donde la gente de nuestra calle botaba la basura. A veces venían camiones grandes al terreno a botar muebles y desperdicios más grandes. Lo usaban como botadero de basura. No había un contenedor donde poner la basura. La gente simplemente amontonaba la basura encima de más basura. Llegaba a tener hasta dos metros de alto. La municipalidad no pasaba a recoger la basura rutinariamente. Había veces cuando un camión de la ciudad sí venía a recoger parte de la basura, pero solían pasar meses y la basura ahí quedaba. La gente del vecindario a veces quemaba la basura para limpiar un poco.

1

5. El olor de la basura era agobiante. Estaba llena de cucarachas y ratas. Había varios huecos en los cuartos del mesón, inclusive espacios entre la pared y los techos de lámina de metal. Las ratas y las cucarachas entraban a nuestros cuartos. Los niños a veces escarbaban la basura buscando cosas como muebles, juguetes o plástico. Muchos de ellos se enfermaban después de estar entre la basura, incluyendo a Mónica, Mauricio y mi otra sobrina, Josselyn. Estaban cubiertos de puntitos rojos, tenían fiebre y dolores de estómago.

6. Álex no tenía techo. Yo a veces lo hallaba durmiendo en las gradas del umbral del mesón. Estaba muy delgado y parecía que no tenía mucho que comer. A mí me daba mucha pena y le ofrecía una tortilla u otra cosa que comer. Álex no me platicaba de su familia. Simplemente me decía que no tenía familia.

7. Había muchos muchachos jóvenes que se quedaban por el mesón y que eran de la mara. Estos muchachos eran del vecindario. Álex pasaba el rato con ellos pero la mayor parte del tiempo estaba solo o con Mónica.

8. Mónica tenía como 14 o 15 años cuando empezó a tener una relación con Álex. Era una relación infantil. La mayoría del tiempo solo se sentaban en las gradas del umbral del mesón. Mónica era puras risitas cuando estaba con él. La relación no parecía ser seria. Álex iba y venía. No se le veía por semanas.

9. A Álex le gustaba jugar con los niños más pequeños de nuestra familia. Mi mamá y yo pensábamos que él era infantil. Es como si nunca hubiera

2

crecido. Se les pegaba a los niños pequeños cuando iban a la tienda a comprar helado o dulces. Jugaba juegos con ellos, como las chibolas. En ese juego, si uno de los niños lograba apartar una chibola del medio, se quedaba con la chibola. Cuando Álex lograba apartar una chibola, rápidamente la agarraba pero con todo y la tierra y piedras de alrededor de la chibola. Se quería asegurar de que nadie se la ganara. Álex iba por ahí con los bolsillos llenos de tierra, piedras y chibolas. Cuando mi hijo pequeño veía caricaturas adentro de nuestro cuarto, Álex las miraba desde afuera, por la ventana. Mi esposo y yo le decíamos que entrara en vez de quedarse afuera. Le daba vergüenza y no aceptaba. No entraba a nuestro cuarto.

10. Álex era lento. Había veces que a mí me parecía que no entendía las cosas que se le decían. Su rostro reflejaba confusión.

11. A veces yo regañaba a Álex como si fuera uno de los niños. Álex les decía a los niños que sabía hacer magia. Se ponía unas monedas dentro de las orejas y decía que eso era magia. Los niños querían imitarlo. Yo le dije a Álex que dejara de hacer eso porque era peligroso. A los niños se les podía quedar la moneda atorada en la oreja. Álex también lanzaba comida hacia arriba, por ejemplo, las palomitas de maíz, y les decía a los niños que trataran de atraparlas con la boca. Yo tenía miedo de que los niños se fueran a ahogar. Pero Álex no veía las cosas de esa manera. Yo se lo tenía que decir.

12. Álex también era muy malhumorado. Era dulce pero de repente se irritaba por pequeñeces. Montaba una bicicleta pequeña, como del tamaño para un niño. Una vez, cuando se enojó por alguna razón, lanzó la bicicleta por las gradas del mesón. Otra vez, la iglesia compró una parte del terreno vacío de al lado del mesón, donde estaba el botadero de basura, y quería construir una

3

pared. El pastor vino a pedir firmas a los vecinos para comprobar que estábamos de acuerdo con que construyeran una pared ahí. Resulta ser que la pared que construyeron impedía el paso a una zona donde los niños jugaban. Después nos enteramos que la iglesia dijo que los niños no podían entrar a la iglesia, con excepción de los domingos. Álex se volvió loco y empezó a gritar y a dar golpes en la pared de ladrillo con el puño, tan duro que se lastimó la mano. A Álex no le gustaba el abuso y no le gustaba cuando alguien castigaba a un niño. Él sentía que el pastor nos traicionó a todos.

13. Mi tía Dolores y mi mamá decían que algo le pasaba a Álex en la cabeza. Estaba un poco loco. Álex hablaba solo. A veces parecía estar como ausente y retraído.

14. A pesar de eso, Álex era dulce y simple. Siempre quería ayudar.

15. (A) La primera foto que se anexa a esta declaración muestra la letrina y la ducha, ubicados en el espacio común del mesón La Fe. Es así la apariencia que tiene hoy en día el espacio común y la que tenía cuando yo me fui a vivir al mesón. Esta foto es una imagen correcta y fiel del frente del espacio común del mesón La Fe.

16. (B) (C) La segunda y tercera fotos que se anexan a esta declaración son imágenes de la basura amontonada encima de más basura. El amontonamiento de basura en terrenos vacíos, tal y como figura en estas fotos, es algo muy común en Santa Ana. Estas imágenes son similares a la manera en que la gente dejaba la basura afuera y a un lado del mesón La Fe.

4

(D)

17. La cuarta foto que se anexa a esta declaración es una foto del techo del mesón La Fe. Esta foto fue obtenida desde adentro de un camino corto y estrecho que da al espacio común del mesón y a la zona que anteriormente era el lote vacío con el botadero de basura. El techo en la foto muestra la apariencia del techo de los cuartos del mesón. Es así la apariencia que tenía el techo cuando yo vivía en el mesón La Fe. Esta foto es una imagen correcta y fiel de lo que he descrito.

18. Nadie se comunicó conmigo durante el período del juicio de Álex. Si alguien se hubiera comunicado conmigo, yo les habría proporcionado la información incluida en la presente, y habría testificado si me lo hubieran pedido.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el _19_ día de _noviembre_ de 2018, en Santa Ana, El Salvador.

_Xiomara Reyes_
Xiomara Raquel Reyes.

5



(A).

X R



La basura en esta foto es solo
La mitad de Como era en realidad
La basura abarcabatodo el Predio

X.R.





# APPENDIX 230

# DECLARATION OF VILMA ARACELI SALAZAR DE ARGUETA

I, Vilma Araceli Salazar de Argueta, declare the following under penalty of perjury:

1. When we lived in the same meson, Alex Umaña walked to school with my siblings and me. We went to a school named Valenzuela School. For most of the time, Alex went to the Santa Ana, California School. Alex also went to another school called David Guzman. Alex did not pass the third grade.

2. Alex struggled to learn. I helped him with addition but it was difficult for him. Alex knew how to do some addition but if the numbers had more than one digit he became confused with the steps. He started adding the higher digit numbers first. It was the same with multiplication. Alex knew how to multiply by five but he could not memorize the higher numbers. He could not divide because he could not multiply. I tried to teach him but he just stared at the paper and looked confused. Alex's writing was also very messy. We laughed and said that his letters were *pateaditas* because it looked like he was writing with his feet.

3. Alex's father said that Alex only went to school to mess around. When his father received complaints from school, he punished Alex by beating him. Alex said that he got into fights at school because the other children made fun of him. They laughed because he was so big and could not pass the third grade.

4. Alex acted younger than his age. He played with children that were younger than he was. Even when Alex was older and working at the Coca-Cola, he

still played games like marbles with the little kids. He also did things that someone his age should have known was inappropriate.

5. Alex's cousin Claudia was not mentally well. She was very slow and could not function on her own even for very basic things. Alex sometimes played rough with the other children and threw things at them. The other kids responded by running around and doing the same to him. Alex played the same way with his cousin Claudia. Claudia's mother, Dora, would scream at Alex to stop. He did not seem to understand that he needed to treat Claudia differently.

6. When we were older, Alex would sometimes put on a mask and scare my son who was only two or three years old. I did not like it because my son would be scared and cry. I had to reprimand Alex not do it. Alex was not malicious but did not seem to understand that it was not appropriate.

7. My father tried to teach Alex to do carpentry but he did not learn. Alex could not measure things. He even had trouble with sanding. My father taught us to sand in the direction of the grain of the wood. Alex did not do it right. He went all over the place.

8. A young man who lived in the mesón named Oscar was a shoemaker and tried teaching Alex how to make shoes. Oscar tried to teach Alex how to trim off a precut sole of the shoe with a little blade. Alex could not cut it correctly. Alex would say he could not do it. Others in the mesón watched Alex and made fun of him.

9. Life in the mesón was very hard. I saw so much violence growing up there. Alex's father, grandmother, aunts, and cousins lived in the mesón. Most of them were horrible. Something was wrong with that family. The women in Alex's family fought often. They pulled hair, bit each other, and scratched each other's faces. Alex's father was brutal. He beat Alex over anything. His father's partner, Yanira, also had a family that lived in the mesón and was very problematic. She had brothers that were troublemakers. Alex was always on guard and had to defend himself from them. My parents were afraid of leaving us kids. If they had to go out without us they locked us in our room so we would not be in danger from all that violence. Alex did not have anyone to protect him.

10. I previously signed a declaration for the people helping Alex. This declaration provides additional information that I know about Alex's life.


I swear that the foregoing is true and accurate to the best of my knowledge. I sign this declaration on this _____ day of _____, 2018, in Santa Ana, El Salvador.

# VIRGINIA WILSON
*M.A. in Linguistics*
*Spanish Language Court Interpreter and Translator*
*Certified by the Administrative Office of the United States Courts,*
*the State of California and the American Translators Association (English into Spanish)*
**(323) 788-2298**
**Virginia@LosAngelesInterpreter.com**

## DECLARATION OF TRANSLATOR

I, the undersigned, say:

1.  I am a Spanish language Court Interpreter and Translator;

2.  I am certified by the **Administrative Office of the United States Courts**, the **State of California** and the **American Translators Association** (English into Spanish);

3.  I have personally performed the translation described as follows:

### Declaration of Vilma Araceli Salazar

I declare under penalty of perjury that I personally performed the attached translation and that it is accurate and complete to the best of my ability, knowledge and belief.

Executed on August 9, 2018, at Los Angeles, California.

_____
Virginia Wilson

DECLARACIÓN DE VILMA ARACELY SALAZAR DE ARGUETA

Yo, Vilma Aracely Salazar de Argueta, declaro lo siguiente bajo pena de perjurio:

1.    Cuando vivíamos en el mismo mesón, Álex Umaña, mis hermanos y yo íbamos caminando juntos a la escuela. Íbamos a una escuela que se llamaba Escuela ~~Valenzuela~~ Venezuela. La mayor parte del tiempo, Álex iba a la Escuela Santa Ana, California. Álex también fue a otra escuela llamada David Guzmán. Álex no aprobó el tercer grado.

2.    Batallaba para aprender. Yo le ayudaba con las sumas pero se le hacía difícil. Álex sabía sumar un poco pero si los números tenían más de un dígito, se confundía con los pasos. Empezaba a sumar los números de dígitos más altos primero. Era lo mismo con la multiplicación. Álex sabía multiplicar por cinco, pero no se podía aprender de memoria los números más altos. No sabía dividir porque no sabía multiplicar. Yo traté de enseñarle pero solo se quedaba viendo el papel y parecía estar confundido. Álex también escribía de manera desordenada. Nos reíamos y decíamos que sus letras eran "pateaditas" porque parecía que escribía con los pies.

3.    El padre de Álex decía que Álex solo iba a la escuela a perder el tiempo. Cuando su padre recibía quejas de la escuela, castigaba a Álex a golpes. Álex decía que se peleaba en la escuela porque los otros niños le hacían burla. Se reían de él porque era muy grande pero aun así no podía aprobar el tercer grado.

1

VAS

4. Álex actuaba como si fuera más joven de lo que era. Jugaba con niños que eran menores que él. Inclusive cuando Álex era mayor y trabajaba en la Coca-Cola, seguía jugando juegos, como las chibolas, con los niños pequeños. También hacía cosas que alguien de su edad debía saber que no eran apropiadas.

5. La prima de Álex no estaba bien de la mente. Era muy lenta y no podía funcionar por su cuenta, hasta para las cosas más básicas. Álex a veces jugaba juegos bruscos con los otros niños y les tiraba cosas. Los otros niños respondían con correteos y haciéndole lo mismo a él. Álex jugaba de la misma manera con su prima Claudia. La mamá de Claudia, Dora, le gritaba a Álex para que parara. Él parecía no entender que debía tratar a Claudia de manera diferente.

6. Cuando éramos mayores, Álex a veces se ponía una máscara y asustaba a mi hijo, quien apenas tenía dos o tres años. A mí no me gustaba porque a mi hijo le daba miedo y lloraba. Tuve que regañar a Álex y decirle que no lo hiciera. Álex no lo hacía por maldad pero parecía que no entendía que eso no era apropiado.

7. Mi padre trató de enseñarle a Álex a hacer trabajo de carpintería pero Álex no aprendió. Álex no podía medir las cosas. Hasta se le hacía difícil lijar. Mi padre nos enseñó a lijar en el sentido de la veta de la madera. Álex no lo hacía bien. Lijaba la madera para cualquier lado.

8. Un joven que vivía en el mesón que se llamaba Óscar era zapatero y trató de enseñarle a Álex a hacer zapatos. Óscar trató de enseñarle a Álex a recortar las suelas precortadas del zapato con una pequeña navaja. Álex no las podía

recortar correctamente. Álex decía que no lo podía hacer. Otras personas del mesón observaban a Álex y se burlaban de él.

9. La vida en el mesón era muy dura. Crecí ahí y vi muchísima violencia. El padre, abuela, tías y primas de Álex vivían en el mesón. La mayoría de ellos eran detestables. Algo no estaba bien con esa familia. Las mujeres de la familia de Álex peleaban a menudo. Se halaban el cabello y se mordían, y se arañaban la cara las unas a las otras. El padre de Álex era brutal. Golpeaba a Álex por cualquier cosa. La pareja de su padre, Yanira, también tenía familiares que vivían en el mesón y eran muy problemáticos. Ella tenía hermanos peleoneros. Álex estaba siempre en guardia y tenía que defenderse a sí mismo de ellos. A mis padres les daba miedo dejar a sus hijos solos. Si tenían que salir sin nosotros, cerraban la puerta de nuestro cuarto con llave para que no corriéramos peligro a causa de toda esa violencia. Álex no tenía a nadie que lo protegiera.

10. Anteriormente firmé una declaración para las personas que estaban ayudando a Álex. Esta declaración incluye información adicional de mi conocimiento sobre la vida de Álex.

Juro que la anterior información es verdadera y correcta según mi leal saber. Firmo esta declaración el ___16___ día de ___Noviembre___ de 2018, en Santa Ana, El Salvador.

Vilma Aracely Salazar

3

# APPENDIX 231

# DECLARATION OF KENNETH J. ROSE
## PURSUANT TO 28 U.S.C. § 1746

I, KENNETH J. ROSE, pursuant to 28 U.S.C. § 1746, hereby swear, affirm, and state that the following is true and correct:

1. I am an attorney licensed to practice law in North Carolina (1990). I became the Executive Director of the Center for Death Penalty Litigation (CDPL) in 1996. I stepped down as Executive Director in 2006, and Thomas Maher assumed that role. Mr. Maher left, and Malcom "Tye" Hunter, Jr. assumed the Executive Director role in 2009. I continued working at CDPL until my retirement from the office in 2017.

2. CDPL was and is a relatively small non-profit law firm. We had fewer than a dozen staff attorneys. The nature of our work required us to be all hands on deck. There were no walls between attorneys or between cases at CDPL. Our work was collaborative. We all had access to one another's files. We shared everything, and we assisted one another on our cases.

3. Although the courts in North Carolina generally appointed a specific attorney from our office (rather than the office as an entity), CDPL was the direct recipient of the court payments. In the rare occasion that a court paid one of us directly, we signed those payments over to CDPL and they were used to fund the organization. We were employees of CDPL.

4. Mr. Hunter was appointed to represent Alejandro Umana on his direct appeal along with the Federal Defenders of San Diego, Inc. (FDSDI). Another attorney at CDPL, David Weiss, also did an extensive amount of work on the direct appeal.

1

5. During Mr. Umana's direct appeal, there were two sets of files that were maintained. FDSDI maintained their own files, including an electronic file system that Mr. Hunter and Mr. Weiss could access over the internet. I did not have direct access to the San Diego files during the direct appeal. However, we also maintained files on Mr. Umana at CDPL. I had access to the CDPL files, including work product and everything else that Mr. Hunter and Mr. Weiss saved to our computer system or otherwise stored in our files.

6. As was our office's general practice on all matters, Mr. Hunter, Mr. Weiss, and I had conversations about Mr. Umana's direct appeal during the time it was pending. I became familiar with the case through their representation of Mr. Umana and gave advice regarding their legal analysis during the appeal.

7. During the appeal, Mr. Hunter retired from CDPL and Mr. Weiss left CDPL for a brief time to engage in private practice. Our consultations with one another did not stop because of their change in employment. In September 2009, North Carolina's Racial Justice Act (RJA) went into effect, allowing all people on North Carolina's death row to develop and raise any available claims of racial discrimination under the Act within one year, by September 2010. There were approximately 160 people on North Carolina's death row at that time. The litigation was ongoing and continues to this day. Even after Mr. Hunter left CDPL, he and I were actively engaged in extensive litigation under the RJA and were in regular communication and consultation with one another.

2

8. After Mr. Umana lost his direct appeal in the Fourth Circuit, but while his Petition for Writ of Certiorari was pending with the United States Supreme Court, I agreed to seek appointment as learned counsel for Mr. Umana's § 2255 motion. The District Court granted my motion for appointment, conditional on Mr. Umana's certiorari petition being denied. Because of the size and complexity of the case, and the statistical improbability that certiorari would be granted, I committed to begin working on the case as soon as possible and to accomplish that, for several months prior to my appointment, I was retained and paid by the FDSDI to begin working on the case.

9. When Mr. Umana's convictions and sentences were affirmed on direct appeal with the denial of certiorari in June 2015, my court appointment to represent Mr. Umana in his § 2255 proceedings took effect. FDSDI was appointed as my co-counsel. Just as Mr. Weiss worked on Mr. Umana's direct appeal along with Mr. Hunter, other members of the CDPL staff worked on Mr. Umana's § 2255 with me. I submitted a proposed budget (which was approved by the District Court) that included funding not only for my time, but also for an additional staff attorney (Mark Pickett), paralegal (Barrie Wallace), and intern.

10. Mr. Weiss returned to working at CPDL around the time Mr. Pickett and I started working on Mr. Umana's § 2255 motion. Just as I had access to the CDPL files (including all of Mr. Hunter's and Mr. Weiss's work product) at the time of the direct appeal, Mr. Weiss had access to the CDPL files (including all of my and Mr. Pickett's work product) as we prepared

3

the § 2255 motion. And, as was our office's general practice, I discussed Mr. Umana's § 2255 with my colleagues in the office, and received their advice, including Mr. Weiss.

11. FDSDI had a team and resources to devote to the case, including the mitigation investigation that was primarily located in El Salvador and the investigation of the aggravating circumstances that happened in Los Angeles. My investigative work on the case focused primarily on things that were based in North Carolina. FDSDI also had the primary responsibility for communicating with Mr. Umana, as they had the Spanish-language resources, including Spanish-speaking attorneys. I do not speak Spanish.

12. I relied heavily on FDSDI's investigation and deferred to their judgment and expertise in federal trial procedure and substantive law in making decisions about how we would proceed with the investigation and development of the claims, what claims we would present, and how we would present them. Their input played a significant role in the decisions we made.

13. Mr. Hunter and I have a long relationship, both professionally and as friends. This may have impacted my ability to recognize and raise his ineffectiveness.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to 28 U.S.C. § 1746.

_____    7-10-2020
KENNETH J. ROSE                      DATE

4

# APPENDIX 232

# Affidavit of Sandy Demeree

North Carolina
County of Durham

I, Sandy Demeree, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.      My name is Sandy Demeree. I am employed with the Center for Death Penalty Litigation (CDPL) as the financial controller for the office. My job responsibilities include billing, accounting, tax, and human resource matters.

2.      CDPL is a 501(c)(3) tax-exempt, non-profit law firm, whose work is focused on representation of criminal defendants facing the death penalty in North Carolina. Attorneys at CDPL are employees, not independent contractors. When CDPL attorneys submit fee applications to courts for their representation of indigent defendants, those fee awards are paid directly to CDPL. The attorneys are paid a fixed salary by CDPL that does not change based on the fees they generate.

3.      Attorneys at CDPL have previously represented federal capital defendant Alejandro Umana in direct appeal and post-conviction proceedings. I have been asked by Mr. Umana's current attorneys to provide the dates of employment for the CDPL attorneys who previously worked on Mr. Umana's case.

4.      Attorney Malcolm Ray Hunter, Jr., was appointed to represent Mr. Umana on direct appeal to the Fourth Circuit. Mr. Hunter was employed by CDPL and served as its executive director from February 2009 to June 2013.

5.      Attorney David Weiss assisted Mr. Hunter on the direct appeal, and entered an appearance in the Fourth Circuit on behalf of Mr. Umana. Mr. Weiss was employed by CDPL, and served as a staff attorney from September 2007 to April 2013, at which point Mr. Weiss left CDPL for private practice. Mr. Weiss returned to CDPL in April 2014, and remains employed at CDPL at this time.

6.      Attorney Kenneth J. Rose was appointed to represent Mr. Umana in post-conviction proceedings in federal district court, and served as co-counsel with the Federal Defenders of San Diego. Mr. Rose was employed by CDPL and served as its executive director from October 1996 to July 2006. Mr. Rose then served as a senior staff attorney at CDPL for the next 10 years. Mr. Rose also served as acting executive director from December 2008 through January 2009. Mr. Rose stepped down from his employment at CDPL at the end of December 2016.

7.      Attorney Mark Pickett assisted Mr. Rose in post-conviction proceedings on behalf of Mr. Umana. Mr. Pickett has been employed as a staff attorney at CDPL since June 2013, and remains a CDPL employee at this time.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Sandy Demeree_
Sandy Demeree

Sworn to, or affirmed, and subscribed before me this 13th day of July 2020.

_Official signature of notary_

Gretchen M Engel , Notary Public
_Notary's printed name_

My commission expires: May 28, 2022

GRETCHEN M ENGEL
NOTARY PUBLIC
DURHAM COUNTY, NC
My Commission Expires 5-28-22

# APPENDIX 233



GEORGETOWN LAW

Criminal Defense & Prisoner Advocacy Clinic
E. Barrett Prettyman Fellowship Program

July 13, 2020

Leane Renee, Esq.
Chief, Capital Habeas Unit
Office of the Federal Public Defender,
Middle District of Pennsylvania
100 Chestnut Street, 3rd floor
Harrisburg, PA 17101

Dear Ms. Renee:

At your request, I have examined materials pertaining to the case of Alejandro Enrique Ramirez Umana v. United States, No. 3:16 CV-00057-RJCl, in order to render an expert opinion on ethical issues raised by the Federal Defenders of San Diego, Inc. (FDSDI) remaining as co-counsel in this matter. I have also reviewed the North Carolina Rules of Professional Conduct and the North Carolina State Bar Formal Ethics Opinions (defense counsel Kelly Miller, from the Office of the Federal Public Defender for the Middle District of Pennsylvania, is a member of the North Carolina bar, which is also the jurisdiction of this litigation), as well as consulting with several legal scholars with expertise in capital defense and/or legal ethics.

In short, it is my opinion that the continued representation of Mr. Umana by FDSDI presents a conflict of interest that can be resolved only through the withdrawal of counsel.

My CV is attached, but let me briefly summarize my qualifications for providing this expert opinion:

I am a Professor of Law, Director of the Criminal Defense & Prisoner Advocacy Clinic, and Co-Director of the E. Barrett Prettyman Fellowship Program at Georgetown University Law Center. In addition to directing these two criminal defense programs, both of which emphasize professional responsibility as well as the skills and law related to criminal law practice—I teach and write about lawyers' ethics. I am the author of two treatises on legal ethics: *Understanding*

*Lawyers' Ethics* (with Monroe H. Freedman) (Carolina Academic Press, 5th edition, 2016) (and the previous three editions) and *Lawyers' Ethics* (with Monroe H. Freedman and Alice Woolley) (Routledge, 2017). I have written or edited other books that focus on criminal defense ethics, including *Guilty People* (Rutgers University Press, 2020), *How Can You Represent Those People* (Abbe Smith & Monroe H. Freedman, eds.) (Palgrave MacMillan/St. Martin's Press, 2013), and *Case of a Lifetime* (St. Martin's Press, 2008). I have also written many scholarly articles on legal ethics and regularly present on ethics at public defender and criminal defense lawyer trainings, continuing legal education programs, and academic meetings and conferences throughout the United States and abroad.

I am also well-versed in the *ABA Model Rules of Professional Conduct*, the *ABA Standards for Criminal Justice*, and the *ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases*, the ABA's Center for Professional Responsibility's Ethics Opinions, the National Association of Criminal Defense Lawyers' Ethics Advisory Committee's Ethics Opinions, and what I regard as the leading treatise on criminal defense, Anthony Amsterdam and Randy Hertz's *Trial Manual for the Defense of Criminal Cases* (American Law Institute, 6th ed., 2017).

The case-related materials I examined include:

| |
|---|
| • Motion for Substitution of Counsel (USCTA Doc. 8) – 9/29/2010 |
| • Order Appointing Malcolm Hunter and the Federal Defenders of San Diego (Doc. 19) – 10/14/2010 |
| • Appearance of Counsel Form (USCTA Doc. 22) – 10/20/2010 |
| • Letter from Malcolm Hunter to Beth Walton - 09/14/2011 |
| • Transcript Order Acknowledgment (USCTA Doc. 55) – 4/13/2012 |
| • Reply re Appellant's Motion for Extension of Time (USCTA Doc. 75) – 6/21/2013 |
| • Memorandum of Law in Support of Motion for Appointment of Counsel for Proceedings Pursuant to 28 U.S.C. 2255 (CR Doc. 1618) – 6/2/2015 |
| • Order Granting in Part and Denying in Part Motion for Appointment of Counsel (CR Doc. 1621) – 6/3/2015 |
| • Memorandum of Law in Support of Proposed Case Budget for Proceedings Pursuant to 28 U.S.C. 2255 *Filed Ex Parte and Under Seal* (CV Doc. 3) - 1/27/2016 |
| • Motion for Substitution of Counsel (CV Doc. 48) – 1/30/2017 |
| • Order Appointing Middle District of Pennsylvania (CV Doc. 49) -2/22/2017 |
| • Motion for Leave to File Supplement/Amendment to Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255 (CV Doc. 68) – 2/22/2018 |
| • Response of the United States to Umana's Motion for Leave to Amend His 2255 Motion (CV Doc. 79)–5/7/2018 |
| • Reply to Government's Opposition to Motion to Supplement/Amend Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255 (CV Doc. 81) – 5/29/2018 |

| |
|---|
| • Motion for Substitution of Counsel (CV Doc. 86) – 12/14/2018 |
| • Order Denying Motion for Substitution of Counsel (CV Doc. 87) – 6/16/2020 |
| ● Declaration of Kenneth J. Rose pursuant to 28 U.S.C. §1746 — 7/10/2020 |
| ● Motion for Extension of Time submitted by Malcolm R. Hunter, CPDL and Vincent J. Brunkow, FDSDI—6/12/2013 |
| ● Letter from Samuel W. Phillips to Malcom Hunter, CDPL, approving proposed budget in light of assistance provided by FDSDI—12/8/2011 |
| ● Unopposed First Motion for Extension of Time to File Opening Brief submitted by Steven Francis Hubachek, FDSDI and Malcolm R.  Hunter, CDPL—9/14/2012 |
| ● Unopposed Second Motion for Extension of Time to File Opening Brief submitted by Vincent J. Brunkow, FDSDI and Malcolm R. Hunter, CDPL—3/6/2013 |
| ● Affidavit of Sandy Demeree, Financial Controller, CDPL—7/13/2020 |

I consulted with Professor John Blume, Cornell Law School; Visiting Lecturer in Law Lawrence J. Fox, Yale Law School; Professor Bruce Green, Fordham University school of Law; Professor Eric Freedman, Hofstra University School of Law; and Ellen Yaroshefsky, Hofstra University School of Law.

### The Rules of Professional Conduct are "Client-centered"

The *North Carolina Rules of Professional Conduct* (2003), https://www.ncbar.gov/for-lawyers/ethics/rules-of-professional-conduct/ [hereinafter *North Carolina Rules*], are client-centered.  So are the ABA's *Model Rule of Professional Conduct* (1983, 2020), from which the *North Carolina Rules* are derived.  The first sentence in the Preamble states: "A lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system and a public citizen having a special responsibility for the quality of justice."  *North Carolina Rules*, Preamble.  It is not coincidental that the first lawyerly responsibility listed in the Preamble is the one that relates to clients.  Section [2] of the Preamble to the *North Carolina Rules* makes plain the high standard of representation of clients, especially in the context of advocacy: "As advocate, a lawyer *zealously* asserts the client's position under the rules of the adversary system."  *Id*. [emphasis added].

Consistent with the client-centered ethos of the American legal profession, a lawyer cannot provide competent representation, much less zealous representation, unless the representation is conflict-free.  *See generally* Freedman & Smith, *Understanding Lawyers' Ethics* 265 (5th ed., 2016) (identifying "confidentiality, diligence/zeal, competence, and communication as the ethical requirements typically threatened by conflicts of interest," but also noting that "loyalty," though not a rule per se, is a central concern in conflicts of interest).

3

Loyalty is key to the lawyer-client relationship.  The first Comment to *North Carolina Rule* 1.7, "Conflict of Interest: Current Clients," begins with a paean to loyalty: "Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."  *North Carolina Rules*, 1.7, Comment [1]; *see also North Carolina Rules*, 1.6. Comment [2] (noting that "trust …is the hallmark of the client-lawyer relationship").

Similarly, in a leading case in which a lawyer was disqualified on grounds of conflict of interest, the court referred to the "absolute loyalty" and "undivided fidelity" that a lawyer owes to a client.  *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc*., 113 F. Supp. 265, 268 (S.D.N.Y. 1953) (citing Canon 6 of the 1908 *Canons of Professional Ethics*).  Professor Charles Wolfram, the distinguished scholar of legal ethics and professional responsibility from Cornell University, has recognized "the lawyer's virtual total loyalty to the client and the client's interests."  CHARLES W. WOLFRAM, MODERN LEGAL ETHICS 146 (1986).

Loyalty might be even more important in the case of court-appointed counsel.  *See* ANTHONY AMSTERDAM AND RANDY HERTZ, TRIAL MANUAL FOR THE DEFENSE OF CRIMINAL CASES 100-101 (6th ed. 2017) (on establishing a relationship of trust with a criminal defendant and avoiding giving the client grounds for "suspicion or confusion about the lawyer's…loyalties").  The importance of loyalty is surely elevated in capital defense, because a defendant's life is on the line.

### A Lawyer *Shall Not* Represent a Client if the Representation involves a Concurrent Conflict of Interest

Rule 1.7 of the *North Carolina Rules* states explicitly that "a lawyer *shall* not represent a client if the representation involves a concurrent conflict of interest."  Rule 1.7(a) [emphasis added].  A concurrent conflict of interest exists if "the representation of one or more clients *may be* materially limited by the lawyer's responsibilities to another client, a former client, or a third person, or *by a personal interest of the lawyer*."  1.7(a) (2) [emphasis added].  A personal interest of a lawyer would necessarily include his or her reputational interest.

The personal interests of FDSDI are directly at issue in this post-conviction challenge, as several of the claims are based on the competence of FDSDI's lawyers.  *See North Carolina Rules*, 1.7, Comment [1] ("Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person or from the lawyer's own interests.").

The Comments to Rule 1.7 make plain that, in the face of such a conflict, the conflicted lawyer "must withdraw."  *See North Carolina Rule* 1.7, Comment [4] ("If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b).").

Having conflict-free counsel is essential to the administration of justice.  As the ABA's *Criminal Justice Standards* states:

The primary duties that defense counsel owe to their clients, to the administration of justice, and as officers of the court, are to serve as their clients' counselor and advocate with courage and devotion; to ensure that constitutional and other legal rights of their clients are protected; and to render effective, high-quality legal representation with *integrity*.

American Bar Association, *Criminal Justice Standards for the Defense Function*, Standard 4-1.2(b) (4th ed. 2017), at https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/ [emphasis added].

It is important to note that Mr. Umana has at no time waived this conflict of interest, and has certainly not complied with the conditions required for an informed waiver under Rule 1.7 (b) or a "waiver of objection to a possible future conflict of interest" under the one North Carolina State Bar Ethics Opinion that is relevant. *See* RPC 168 (1994) (requiring that a waiver be in writing and in full contemplation of all relevant considerations).

### FDSDI Was Co-Appellate Counsel to Lawyers Connected to the Center for Death Penalty Litigation and Hence is Equally Responsible for Deficiencies in the Appellate Litigation

Both Malcolm R. Hunter, Jr. and Kenneth J. Rose worked at the Center for Death Penalty Litigation (CDPL) in Durham, North Carolina during their involvement in this case. *See* Declaration by Kenneth J. Rose dated July 10, 2020. That Hunter left CDPL—years after his appointment and only a few months before the filing of the opening brief—taking Mr. Umana's case with him, does not break his tie to CDPL. Then, Mr. Rose, who worked at CDPL, took over for Mr. Hunter for Mr. Umana's initial habeas review. Both worked with lawyers from FDSDI on Mr. Umana's direct appeal and initial habeas review.

Working with them throughout was CDPL attorney David Weiss, who assisted Mr. Hunter on Mr. Umana's direct appeal and entered his appearance in the Fourth Circuit for that purpose. *See Affidavit of Sandy Demeree*. Mr. Weiss left CDPL in April 2013, but returned a year later and remains employed there. *See id.* Hunter, Rose, and Weiss all worked on the Umana case; Weiss worked with both Hunter and Rose. They were joined in their efforts by CDPL attorney Mark Pickett in 2013. *See id*.

CDPL is not a large office. There are fewer than a dozen full-time staff attorneys employed there. *See id*. Given the nature of the work of CDPL—its complexity and urgency— it stands to reason that CDPL attorneys and staff work closely. *See* Freedman & Smith, *Understanding Lawyers' Ethics*, 272 (6th ed. 2016) (noting that, with regard to imputed disqualification, "we look to experience and common sense"). Indeed, as Mr. Rose states in his sworn declaration:

The nature of our work required us to be all hands on deck. There were no walls between attorneys or between cases at CDPL. Our work was collaborative. We

5

all had access to one another's files. We shared everything, and we assisted one
another on our cases.

*Id.*

Especially from a reasonable client's perspective, Mr. Umana was represented by CDPL, whether through Mr. Hunter, Mr. Rose, Mr. Weiss, or Mr. Picket. Moreover, under these circumstances, most law offices—or at least those that take ethics seriously—would impute a conflict of interest to Rose based upon his and Hunter's affiliation with CDPL. *See id.* (noting that Rose's consultations with colleagues from CDPL, "did not stop because of their change in employment"). Moreover, Mr. Rose's connection to FDSDI could not be clearer as he was actually retained by FDSDI and paid by them for several months prior to his appointment. *See id.* ("Because of the size and complexity of the case, and the statistical improbability that certiorari would be granted, I committed to begin working on the case as soon as possible and to accomplish that, for several months prior to my appointment, I was retained and paid by the FDSDI to begin working on the case.").

Under the ethical rules and standards relating to conflict of interest, the suggestion that FDSDI could effectively explore whether they, Hunter, or Rose missed things that were obvious, or could effectively allege that their own performance was ineffective is troubling. *See North Carolina Rules*, 1.7. Likewise, FDSDI cannot reasonably be expected to explore whether Hunter or Rose was so unreasonable that not only did they overlook significant issues, but they foreclosed the opportunity to raise these issues. Nor can anyone connected to CDPL.

### **Forcing FDSDI to Go Forward as Co-Habeas Counsel with the Office of the Federal Defender for the Middle District of Pennsylvania is Untenable as a Matter of Ethics and Practice**

If FDSDI is not allowed to withdraw from this case and the Office of the Federal Defender for the Middle District of Pennsylvania is forced to go forward with FDSDI as co-habeas counsel and make the claims it has identified, two problems will result: (1) FDSDI will now be both a witness and a lawyer in violation of *North Carolina Rule* 3.7, Lawyer as Witness; and (2) FDSDI will have to raise its own ineffectiveness as a matter of fact and law, which is problematic at best. *Cf. Christeson v. Roper*, 574 U.S. 373, 378 (2015) ("Counsel cannot reasonably be expected to make such an argument [that their own ineffectiveness merits equitable tolling of the statute of limitations], which threatens their professional reputation and livelihood."); *see also* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS, §125 (1998).

In order to establish FDSDI's ineffectiveness, together with the ineffectiveness of CDPL, Ms. Miller from the Office of the Federal Defender for the Middle District of Pennsylvania, would inevitably need to call lawyers from both of those offices as witnesses. There will be no problem calling the CDPL attorneys now that they have withdrawn. But calling anyone from FDSDI—if they remain as counsel—would force these lawyers into an inappropriate and unethical dual role as both lawyer and witness.

*North Carolina Rule* 3.7 states that:

(a) A lawyer *shall* not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

(1) The testimony relates to an uncontested issue;
(2) The testimony relates to the nature and value of legal services rendered in the case; or
(3) Disqualification of the lawyer would work substantial hardship on the client.

(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Based on the discussion of Rule 1.7 above, subpoint (b) is not a way out of this dilemma for FDSDI.

The Comments to Rule 3.7 explain that "[c]ombining the roles of advocate and witness can prejudice the tribunal and the opposing party" and, more relevant here, "can also involve a conflict of interest between the lawyer and client." *North Carolina Rule* 3.7, Comment [1]. When, as here, there is a conflict of interest, "the lawyer must secure the client's informed consent, confirmed in writing" in order to testify. *Id*. Comment [6]. The Comment further notes that "[i]n some cases, the lawyer will be precluded from seeking the client's consent" under Rule 1.7. *Id.*

Moreover, if the Court were to compel FDSDI to continue as co-habeas counsel and a member of the staff of FDSDI were to testify with regard to one of the claims of professional incompetence—called by either Mr. Umana or the Government—one can only imagine the bizarre result. One of Mr. Umana's lawyers would cross-examine another of Mr. Umana's lawyers—perhaps after having the lawyer/witness declared a "hostile witness"—in order to establish that the lawyer/witness unreasonably and with prejudice dropped the ball.

I hope this sufficiently addresses the ethical issues raised in this matter. If I can be of further assistance, please feel free to call on me.

Sincerely,

Abbe Smith
Professor of Law

7

# APPENDIX 234



CENTER FOR DEATH PENALTY LITIGATION INC.
SUITE 301
201 WEST MAIN STREET
DURHAM, NORTH CAROLINA 27701-3228
TELEPHONE: 919-956-9545
FACSIMILE: 919-956-9547
E-MAIL: CDPL@CDPL.ORG

September 14, 2011

Ms. Beth Walton
Capital Case Coordinator
Clerk's Office
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, Virginia 23219

Re: 10-6, *U.S. v. Alejandro Umana*

Dear Ms. Walton:

I am enclosing a proposed budget for my representation of defendant-appellant Alejandro Umana in his capital appeal. Mr. Umana's co-counsel is Steven Hubachek, the head of the appellate section of the Federal Defenders of San Diego, Inc., a distinguished California Federal Defenders Office. Mr. Hubachek and his office bring extensive federal appellate experience as well as significant Spanish language resources to assist our client and help us deal with the Spanish language evidence. FDSD will not be billing for any of its work. This will result in significant savings to the Court. I was brought in because I am local and have significant capital appellate experience.

I am aware that requiring a budget for a direct appeal in a capital case is a new policy for the Fourth Circuit and preparing a proposed budget is a new activity for me as well. However, I have done my best to estimate and predict the time I expect to spend representing Mr. Umana on his direct appeal. There are a number of circumstances relevant to the proposed budget that I would like to share with you.

Neither Mr. Hubachek nor I had any prior involvement in Mr. Umana's case and, thus, come to the case with no prior familiarity with the facts or record.

The transcript of the trial and pretrial proceedings is almost three thousand pages. In addition, there are thousands of pages of documents related to the trial, including English language translations and transcriptions of recordings of Spanish language conversations including the defendant. Simply the review of the record and identification of potential issues will require several hundred hours of lawyers' time. I have already spent a

Ms Beth Walton
September 14, 2011
Page 2

significant amount of time gathering the record together and this proposed budget includes that time.

Although we have not concluded our review of the record, I believe that this direct appeal from a federal death penalty trial will raise a substantial number of serious and complicated legal issues, far exceeding the scope of the typical capital habeas review. In contrast to the usual habeas appeal that comes to the Fourth Circuit, the issues have not been narrowed to just a few.

The case is unusually complicated in several respects. There were more than fifty indictment counts brought against the defendant, involving numerous different incidents. It includes RICO and VICAR counts and thus extensive evidence and instructions concerning an entire enterprise and various crimes in addition to the two murders that were the principal focus of the capital counts. There were numerous jointly indicted co-defendants to various counts who were tried separately. The government also presented evidence of the defendant's involvement in two other unindicted homicides in California. This case had a full blown mental retardation hearing prior to the trial. The case was tried outside the venue where the murders were alleged to have occurred. The determination of which issues to present to this Court in the most concise and persuasive way will require a significant investment of time.

I have budgeted the assistance of an associate from my office to help primarily with legal research. If the budget for the associate is approved, that will significantly reduce the cost of the appeal, because the associate will bill at a lower per hour rate. Similarly, I have included time for a paralegal to perform appropriate tasks at a lower rate than a lawyer. The paralegal has already assisted significantly with record retrieval and the time requested includes time already spent on that effort. I will file an appropriate motion with the Court to request permission to use an associate and paralegal.

Our client is incarcerated in Terre Haute, Indiana. His use of English is extremely limited and he has other challenges that make it difficult for us to communicate entirely effectively by phone or letter. My co-counsel's office has taken primary responsibility for communicating with the client, and thus, I am proposing to see him in person only two times between now and the end of our representation.

I have proposed a budget for my time through the panel decision for this case. I don't feel I can project beyond that at this time. I will submit a budget for rehearing and cert petition once the panel decision has been handed down and it is clearer how much work, if any, would be involved in those stages.

Ms. Beth Walton
September 14, 2011
Page 3

Finally, I want to assure the Court that I will take all steps I can to contain the costs in this case. Prior to returning to practice as a lawyer with the Center for Death Penalty Litigation, I spent eight years as the Executive Director of the North Carolina Office for Indigent Defense Services, where, among other duties, I reviewed and approved payment for lawyers appointed to represent capital defendants in state courts at trial, direct appeal and state post-conviction. I am well aware of the challenges of lawyers providing these services as well as the responsibility of government to be wise stewards of public funds.

Thank you for your consideration of this letter and the proposed budget. Please feel free to call me if you have any questions.

Sincerely,

Malcolm Ray Hunter, Jr.

Enclosure

*U.S.A. v. Alejandro Umana, Case No. 10-6*

PROPOSED INITIAL LITIGATION BUDGET

| Category of Service Provided | Court Appointed Counsel (Hunter) | Associates | Paralegals |
|---|---|---|---|
| 15 (a) In-court hearings | 1 | | |
| 15 (b) Interviews and conferences with client | 25 | | |
| 15 (c ) Witness interviews | | | |
| 15 (d) Consultation with investigators and experts | | | |
| 15 (e) Obtaining and reviewing court record | 80 | 20 | 20 |
| 15 (f)  Obtaining and reviewing documents and evidence | 25 | 10 | 20 |
| 15 (g) Consulting with expert counsel (including Resource Counsel) | 20 | | |
| 15 (h) Legal research and writing | 120 | 100 | 10 |
| 15 (i)  Travel time | 50 | | |
| 15 (j)  Other work: | 10 | | |
| Review of Government's opposition brief | 10 | 10 | |
| Legal research and writing for reply to opposition | 50 | 40 | |
| Assembling of Appendix | 5 | 5 | 20 |
| Preparation for oral argument | 25 | 10 | |
| Consultation with Co-Counsel | 20 | 10 | |
| Miscellaneous | 20 | 10 | |
| **Total Estimated Hours** | **461** | **215** | **70** |

# APPENDIX 235

**SAMUEL W. PHILLIPS**
CIRCUIT EXECUTIVE
UNITED STATES COURT OF APPEALS
FOURTH CIRCUIT

1100 EAST MAIN STREET, SUITE 617
RICHMOND, VIRGINIA 23219-3517

Voice: 804.916.2184
Fax: 804.916.2188

December 8, 2011

Malcolm Ray Hunter, Jr., Esquire
Center for Death Penalty Litigation, Inc.
Suite 301
201 West Main Street
Durham, NC  27701-3228

> **Re:     No. 10-6 – USA v. Alejandro Umana**

Dear Mr. Hunter:

The court carefully considered your proposed budget and, based upon its initial review of the case, found the approved amount of $40,000 to be reasonable in light of the assistance being provided by the Federal Defender in San Diego.  The approved amount includes compensation for all work encompassed within the proposed initial budget, including but not limited to preparation and filing of the original and reply briefs and participation in oral argument.  The court does not consider you to be bound by your estimates of what you may spend within the different categories included in the budget.  However, counsel is reminded that the court must always adhere to the mandate that vouchers be reviewed for reasonableness in light of the final work product.  Thus, approval of the budgeted amount of hours, while beneficial to counsel, does not guarantee that all requested amounts will be deemed reasonable and paid in full at the conclusion of the case.

Under our general procedures, court-appointed counsel may, with prior court authorization, use the services of attorneys who work in association with them, including partners and associates in their firm, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.  The court will consider your letter to be a sufficient request to use an associate on your staff to assist with research, and you may claim compensation for services furnished by this associate as long as you stay within the overall budget.

If during your representation, unforeseen circumstances arise that cause you to believe that the time needed to properly represent your client requires the expenditure of time beyond that allotted, you may submit a request for approval of a specific number of additional hours and a detailed explanation of why additional hours are reasonably necessary for representation in the case.  This would include, for example, work that may become reasonably necessary for the preparation of a petition for rehearing and/or rehearing en banc, as well as work associated with the filing of a petition for certiorari to the United States Supreme Court, if any.

It is our hope that this letter sufficiently addresses your questions regarding the budget and the approved fee. Given the time restraints, the court asks that you let me know whether you will accept the approved fee within five days.

Sincerely,

Samuel W. Phillips

sap