# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

ALEJANDRO UMAÑA,

               Movant,

      v.

UNITED STATES,

             Respondent.

3:16-CV-00057-RJC

CAPITAL § 2255 PROCEEDING

HON. ROBERT J. CONRAD, JR.

**APPENDICES IN SUPPORT OF MR. UMANA'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT CONVICTIONS AND SENTENCES OF A PERSON IN FEDERAL CUSTODY AND SUPPLEMENTAL/AMENDED MOTION TO VACATE AND SET ASIDE CONVICTIONS AND SENTENCES**

Please take notice that Movant, Alejandro Umana, hereby files the attached appendices in support of his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Convictions and Sentences of a Person in Federal Custody (Doc. 22; Doc. 24 (under seal)) and Supplemental/Amended Motion to Vacate and Set Aside Convictions and Sentences (Doc. 69; Doc 71 (under seal)).

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender, Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org

Dated:  July 6, 2022

3

# Index of Appendices

| | |
|---|---|
| Appendix 236 | Psychological Report by Daniel Martell, Ph.D. |
| Appendix 237 | Declaration of Selena Sermeño, Ph.D. |
| Appendix 238 | By Erik Nielson, Ph.D. |
| Appendix 239 | Declaration of Wendy Alvarez |
| Appendix 240 | Criminal Investigative Report by R. Robert Tressel |
| Appendix 241 | Firearms Comparison Issues Report by John Nixon |

# APPENDIX 236

# PARK DIETZ & ASSOCIATES, INC.
## Forensic Consultants

**Daniel A. Martell, Ph.D., ABPP**

2906 Lafayette
Newport Beach, CA 92663
Ph. 949-230-7321
damartell@aol.com

**Administrative Offices**

2906 Lafayette
Newport Beach, CA 92663
Tel:  949-723-2211
Fax:  949-723-2212
Email: expert@parkdietzassociates.com
Website: www.parkdietzassociates.com

- **Forensic Psychiatry**
- **Forensic Psychology**
- **Forensic Pathology**
- **Forensic Neurology**
- **Forensic Social Work**
- **Forensic Science**
- **Child Sexual Abuse**
- **Criminology**
- **Security**

July 1, 2022

Kelly D. Miller
Assistant Federal Public Defender
Capital Habeas Unit
100 Chestnut Street, Third Floor
Harrisburg, PA 17101

**RE:   Alejandro Umana**

**Dear Ms. Miller,**

I am writing to share the findings and opinions from my examination of the materials you have provided for review in Mr. Umana's case.

## Referral Question

You have requested that I review the records in this case in order to assist the Court in determining whether Mr. Umana suffers from Intellectual Disability pursuant to *Atkins v. Virginia*.

Specifically, you have asked that I address evidence of impairments in his Adaptive Functioning, which is the second prong required for the diagnosis.

## Basis for and Limitations of Opinions

I have not personally examined or tested Mr. Umana, and my opinions are therefore necessarily limited to what can be determined from nine volumes of background materials that I have been provided to review in this case, which are listed in Appendix A to this report.

## <u>Qualifications of Examiner</u>

I was an expert witness for the Government in Atkins v. Virginia, and I have since consulted on many Atkins-related cases for both prosecutors and defense attorneys throughout the country.

I received a Bachelor's Degree in psychology with honors from Washington and Jefferson College (1980), a Master's Degree in psychology from the University of Virginia (1985), and a Ph.D. in clinical psychology from the University of Virginia (1989). I completed my clinical psychology internship specializing in forensic psychology at New York University Medical Center, Bellevue Hospital, and Kirby Forensic Psychiatric Center in New York City (1986-1987), and was awarded a Post-Doctoral Fellowship in Forensic Psychology, also at New York University Medical Center, Bellevue Hospital, and Kirby Forensic Psychiatric Center during which I specialized in forensic neuropsychology (1987-1988).

I am Board Certified in Forensic Psychology by the American Board of Forensic Psychology of the American Board of Professional Psychology, Diplomate Number 5620. I am a Fellow of the American Academy of Forensic Psychology; a Fellow and Past-President of the American Academy of Forensic Sciences; and a Fellow of the National Academy of Neuropsychology. I am licensed as a clinical psychologist by the State of California, License Number PSY15694.  I am also licensed as a clinical psychologist by the State of New York, License Number 011106.

I am a Distinguished Fellow at the Center for Psychology and the Law of the University of California – Irvine.  From 1994 until the Forensic Psychiatry Fellowship program I taught in was ended in 2017, I was an Assistant Clinical Professor of Psychiatry and Biobehavioral Sciences at the Semel Institute for Neuroscience and Human Behavior and the Resnick Neuropsychiatric Hospital of the David Geffen School of Medicine at UCLA.  Currently, as the UCLA Forensic Psychiatry Fellowship has been reinstated, I am on the teaching faculty.  From 1992 to 1996 I was a Clinical Assistant Professor in the Department of Psychiatry at New York University School of Medicine.  I was also a forensic research scientist at the Nathan Kline Institute for Psychiatric Research, and the founding director of the Forensic Neuropsychology Laboratory at Kirby Forensic Psychiatric Center in New York City from 1988 to 1994.

I have been admitted to testify as an expert witness in more than two hundred cases, including testimony in both criminal and civil matters in federal and state courts throughout the United States.  I have consulted

and testified for both prosecutors and defense attorneys in criminal cases, as well as plaintiffs and defense attorneys in civil matters.

## Evidence Regarding Intellectual Disability

The DSM-5 defines Intellectual Disability (ID) as a neurodevelopmental disorder that begins in childhood and is characterized by intellectual difficulties as well as difficulties in conceptual, social, and practical areas of living. The DSM-5 diagnosis of ID requires the satisfaction of three criteria:

(1) Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment academic learning and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing;

(2) Deficits in adaptive functioning that result in failure to meet developmental in socio cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community; and

(3) Onset of intellectual and adaptive deficits during the developmental period.

The DSM-5 definition of ID encourages a more comprehensive view of the individual than was true under the fourth edition, DSM-IV-TR. More importance is placed on clinical judgment with regard the presence of adaptive deficits, and less emphasis is placed on bright-line IQ cutoff scores. The DSM-5 has also placed significantly more emphasis on adaptive functioning and the performance of usual life skills as the hallmark indicia of intellectual disability, along with the need for external systems of support such as family members, friends, teachers, supervisors, employers, and others to assist the individual in meeting the functional demands of daily living. However, the basic three-prong structure for the diagnostic criteria remain the same.

## Diagnostic Criteria A:
## Deficits in Intellectual Functions

Deficits intellectual functioning are determined by IQ scores of approximately 70 or below on individually administered, culturally appropriate, and comprehensive IQ tests. Due to the measurement error that is present in all IQ testing, IQ scores of 75 or below qualify as falling within the Intellectual Disability range satisfying prong one. The DSM-5 includes the following discussion with regard to evaluating Criterion A:

> Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficiency. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately 2 standard deviations or more below the population mean, including a margin for measurement error (generally +5 points).
>
>       *       *       *       *
>
> Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.
>
> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgement, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.[1]

In Mr. Umana's case, there is substantial evidence that he meets Criterion A, based on multiple test findings.

---

[1] DSM-5, p. 37.

**Dr. Ricardo Weinstein** tested Mr. Umana's IQ on July 1 and 2, 2009, using the Wechsler Adult Intelligence Scale III, (Spanish version published in Mexico) and the Comprehensive Test of Nonverbal Intelligence (C-TONI). He obtained "extremely low" IQ scores that were clearly in the range of Intellectual Disability:

> Mr. Umana Full Scale IQ score in the WAIS II is 66 at 95% confidence interval 63 to 71, if the Flynn effect is applied his score would be approximately 4 points lower. On the C-TONI he obtained a non-verbal IQ score of 53.[2]

Dr. Weinstein retested Mr. Umana on 12/01//2009 using an updated version of the C-TONI-2, and the Batería III Woodcock-Muñoz:

> On the C-TONI 2, he obtained a Full Scale IQ Score of 53, a Pictorial Score of 57 and a Geometric Score of 57. These scores are very consistent with the scores obtained in the C-Toni that he took in July 2009. … On the Bateria III he obtained a GIA Score (equivalent to Full Scale IQ Score) of 59 at 95% Confidence Interval 55 – 62.[3]

However, Dr. Antonio Puente, a prominent neuropsychologist and expert in Spanish-language neurocognitive assessment reviewed Dr. Weinstein's testing and identified some scoring and norming errors. Using blind raters, he rescored Dr. Weinstein's IQ testing in order to obtain accurate results, and concluded that after correction, Mr. Umana's true scores remained in the range on Intellectual Disability:

> The corrected scores from the intellectual tests (WAIS-III Mexican and CTONI 2) administered by Dr. Weinstein provide IQs of 60 and 58. Both the non-corrected and corrected IQs obtained by Dr. Weinstein satisfy Prong #1 of all diagnostic systems for Intellectual Disability.[4]

**Dr. Leo Shea** tested Mr. Umana in March 2016 and May 2016 with the Spaniard WAIS-IV and the CTONI-2. Dr. Puente also reviewed this testing, and noted errors that required correction and re-norming, resulting in a Full-Scale IQ score on the Spaniard WAIS-IV of 66; and a Non-Verbal IQ score of 68 on the CTONI-2. Dr. Puente concluded that, "These scores satisfy Prong 1 of any diagnostic system for Intellectual Disability."[5]

---

[2] Dr. Weinstein's 07/17/2009 report, p. 2.
[3] Dr. Weinstein's 12/03/2009 letter, p. 2.
[4] Dr. Puente's affidavit, paragraph 47.
[5] Dr. Puente's affidavit, paragraph 63.

**Dr. Enrique Suarez** administered a Puerto Rican version of the WAIS, which Dr. Puente notes was not a reliable and valid IQ test for use with Mr. Umana:

> There is extensive literature indicating that the EIWA significantly over-estimates IQs and therefore significant caution should be taken in determining the correct Full-Scale IQ when this test is applied. The scientific literature (references at end of affidavit) as well as our own research indicates psychometric problems of this version of the test resulting in clinically significant errors in intellectual classification (from an actually lower classification, such as Intellectual Disability, to a higher one, such as Borderline). In one study, the IQ was overestimated by 27 points higher. Hence, when applying scientific findings associated with the overestimation of the Puerto Rican version of the WAIS to Dr. Suarez' findings, they indicate that the actual IQ could be as low 67. In summary the Puerto Rican version of the WAIS is psychometrically invalid resulting in incorrect and over-inflated IQ scores.

> In addition, Dr. Suarez tested Mr. Umana approximately two months after Dr. Weinstein tested him using a slightly different version of the WAIS (Mexican and Puerto Rican, respectively). Most of the items and stimuli are similar resulting in highly likely practice effects. Research using the English version of the WAIS-ill indicates that practice effects are present at 3 months and are sustained up to at least 6 months after the WAIS-ill is administered consecutively. The practice effects are approximately 6 points. In this case, the obtained corrected score of 94 would actually be 88 based solely on practice effects.

> In summary, if you add points due to overestimation of the Puerto Rican version of the WAIS (up to 27) and the practice effects (approximately 6), the total overestimation of the IQ obtained by Dr. Suarez could be as high as 33 points. These 33 points exceed two standard deviations, lowers the obtained corrected IQ from 94 to 61, and shifts intellectual abilities classification by two classification systems (e.g., from Normal to Intellectually Disabled).

> When this statistical reconstruction is completed the Full-Scale IQ of 61 is similar to the corrected Full-Scale IQ that Dr. Weinstein obtained of 60.

Additionally, Mr. Umana is from El Salvador which is geographically relatively close to Mexico. Both El Salvador and Mexico are considered as part of Central America. The EIWA, which is the test that was administered to Mr. Umana, was developed, normed, and intended for use in a Puerto Rican population. Puerto Rico is grouped with Cuba, both nearby islands in the Caribbean, as representing Caribbean Hispanics. In summary, the Hispanic subcultures of El Salvador and Mexico, both from Central America, are more homogenous than the subcultures of El Salvador and Puerto Rico, both in terms of language and behavioral norms.

In conclusion, the Mexican version of the WAIS is more appropriate to be administered to Mr. Umana than the Puerto Rican version both because of psychometric invalidity of the Puerto Rican WAIS (i.e., EIWA) and the fact that the cultures of Puerto Rico are much different than the Mexican one when compared to that of El Salvador. [6]

**Dr. Puente** after reviewing all of the IQ testing in this case concluded:

Three neuropsychological evaluations were completed on Alejandro Umana. The IQs reported in the two valid neuropsychological evaluations completed by Drs. Weinstein and Shea provide support that Mr. Umana meets the Prong I criteria of the diagnosis of all versions (e.g., AAIDD, APA/DSM-5, and WHO/ICD- 10 diagnostic nomenclature) of Intellectual Disability. It is my professional conclusion to a reasonable degree of psychological certainty that the appropriately obtained IQ test results place Mr. Umana in the range for Prong 1 of the diagnostic category of Intellectual Disability. [7]

**<u>Additional test evidence of impaired cognitive functioning</u>**.  Dr. Weinstein documented additional significant neurocognitive deficits including moderate-to-severe impairments in (1) executive functioning including letter sequencing, number sequencing, and divided-attention/set switching (Delis-Kaplan Executive Function System); (2) visual memory, psychomotor speed, reaction time, complex attention, and cognitive flexibility (computerized neurocognitive assessment- CNS Vital Signs); and (3) impaired attention, spatial processing, and judgement (Neuropsychological Assessment Battery). These findings provide additional support for the conclusion that Mr. Umana has significant deficits in intellectual functioning, and hence meets the first criterion for a diagnosis of Intellectual Disability

---

[6] Dr. Puente's affidavit, paragraphs 52.-57.
[7] Dr. Puente's affidavit, paragraph 77.

## Diagnostic Criteria B:
## Significant Deficits or Impairments in Adaptive Functioning

The diagnostic criteria require significant deficits in **at least one** of three adaptive skill areas: Conceptual, Practical, and/or Social.  Mr. Umana has significant impairments in all three of these domains.

## THE CONCEPTUAL DOMAIN

The conceptual domain involves skills in language, reading, writing, math, reasoning, knowledge, and memory.

Mr. Umana has both objective, empirical evidence of impairments in this area, as well as convergent witness descriptions of behavioral deficits. The neuropsychological test data described above clearly document Mr. Umana's impairments in intelligence, academic skills, attention, concentration, language, memory, and executive functioning. These deficits all also establish significant adaptive deficits in Mr. Umana's conceptual domain functioning.

**Dr. Weinstein** administered academic achievement testing as part of his examination and testing of Mr. Umana.  On the Bateria-III his academic skills in Reading are at the 5th grade level, Spelling at the 3.5 grade and Math at the 3.2 grade.[8]  These data provide objective, empirical evidence of impairment in Mr. Umana's fundamental Conceptual Domain academic abilities.

**Dr. J. Gregory Olley,** a nationally recognized expert in the diagnosis of Intellectual Disability, examined Mr. Umana and travelled to El Salvador in November of 2009 to interview several collateral witnesses.  Findings from his interviews will be incorporated below.

**Dr. Sapia** summarized Mr. Umana's academic career in her declaration:

> The available educational records confirm that Mr. Umana struggled academically from his initial entry into formal education. He was promoted each year until the law allowed for his retention in the third grade. From that point, he was repeatedly retained due to his inability to grasp concepts and make adequate progress for promotion to the next grade level. At the age of 12, he was in a remedial combined 2nd and 3rd grade classroom, repeating without success. According to the

---

[8] Ibid.

educational records and reports reviewed, the remedial curriculum that Mr. Umana did not pass included basic sight word recognition, combining words into simple sentences, writing one's name and basic addition.[9]

**Ana Gladys Magaña** is a teacher in Santa Ana, El Salvador, and reviewed Mr. Umana's school records.  She described anomalies in his school records that reflect his conceptual domain academic delays:

> I am currently a third-cycle teacher at the Centro Escolar Santa Ana California in Santa Ana, El Salvador.  I have worked in education since 1984.  I taught the primary grades –first, second, and third – for approximately 5 years.
>
> Basic education in El Salvador is for children aged seven to fifteen. Children start first grade the year they turn seven years old.  The school year is from January to the end of November.
>
> If Alejandro was born in the year 1982, he would have started the first grade in 1989, the year he turned seven years old.  The Annual Summary Table shows Alejandro was nine years old when he completed first grade in 1991.  In my experience, for a nine-year-old boy to be in first grade was very unusual.
>
> It could be that Alejandro attended first grade in 1989 and 1990 but did not advance to the next grade, or that he did not complete the year, or that he never attended until 1991.  Alejandro's grades in first grade in 1991 appear to be passing.  Since it appears Alejandro struggled in school the following years, it is likely that his passing grades in 1991 are due to Alejandro having attended school previously and already having the foundation for the first grade.
>
> The Annual Summary Table shows Alejandro barely passed second grade in 1992.  A student needs an average of 5 to pass.  The Annual Summary Table shows Alejandro had an average of 4.5.  A grade-point average above 4.0 was rounded up to a passing grade of 5.  Alejandro received the highest grade in physical education, a 7.  The 7 in physical education is the grade that saved Alejandro from failing second grade.  The only other passing grade Alejandro received was a 5 in music.

---

[9] Dr. Sapia's declaration, p. 7.

Alejandro's poor grades in second grade do not appear to be due to lack of attendance. Alejandro had over 90 percent attendance in first and second grades in 1991 and 1992.

In 1991 and 1992, the Annual Summary Tables also show grades for the student's behavior in several areas. During those years, Alejandro failed in the areas of responsibility, health and protection, initiative and self-confidence, and work habits. Alejandro received good grades in personal relations and cooperation, promotion of customs and beliefs, and practice of moral and civic values.

The Annual Summary Table for 1994 that includes Alejandro is for a remedial class called integrated education for over-age children. These are children who have not yet passed the first level (first, second, and third grade). These are children who are older than usual. They are often embarrassed to be in a class with younger children; they are underperforming children.

If Alejandro was born in 1982, he would have been twelve years old in 1994 when he still had not passed the third grade. This is very unusual. Normally, a child passes third grade by age nine.

The children in these integrated classes do not represent the norm. According to the Annual Summary Table, Alejandro was one of three students of a class of ten students in the remedial class who did not pass the class.[10]

Dr. Olley personally interviewed **Carlos Alarcon**, the Director of the school that Mr. Umana attended in Santa Ana, who described his difficulties with simple language and basic math skills:

Mr. Carlos Alarcon, Director of the Centro Escolar Santa Ana California, showed me the original school records indicating Alejandro Umana's attendance, subjects taught, and grades. He indicated that it is not the policy to retain a student in grades 1 or 2. In fact, the law does not allow it. Mr. Alarcon also explained to me the grading system and went over Mr. Umana's grades. His grades were poor from the beginning of school. His attendance was good in first and second grade, but he was retained in 3rd grade, and his attendance declined. In his last year, he was in a combined 2nd, and 3rd grade classroom, which Mr. Alarcon explained was the format for a class for remedial students.

---

[10] Declaration of Ana Gladys Magaña, p. 2-3.

Records indicate that Mr. Umana did not complete the 3rd grade. Mr. Alarcon indicated that the remedial curriculum that Mr. Umana did not pass included basic sight words, combining words into simple sentences, writing one's name, and simple addition.[11]

Mr. Umana's father, **Rafael Enrique Umaña**, reported that his son repeated grades and struggled in school, and suffered from bad headaches and memory problems that he attributed to head injuries from falls when he was young:

Alex went to school until third grade.  He went to the David J. Guzman School or maybe the Jose Valdez School.  Alex was not good at school. He repeated grades.18. When school started, Alex often suffered bad headaches.  He would grab at his head in pain.  Alex tried to be strong but the pain made tears well up in his eyes.  Generally, after an hour of intense pain, he felt better, but the pain would return.  My son had very bad headaches every other day.  We gave him aspirin for children called Dolofin or Panadol.  I think these horrible headaches that Alex suffered were because of the times he hit his head when he was very young.

Alex had a bad memory. He was forgetful. I think that his bad memory was maybe because of the falls he suffered as a little boy.  When I would send him to buy something he would forget what I had sent him to buy.  I would get angry because I thought he was not paying attention.  Now I think that Alex tried to do his best but he could not remember.  I tried to explain things to him or I would send him to do something and he would remain quiet, he would not say anything to me, he would be lost in thought. I think he did not understand.[12]

Mr. Umana's aunt, **Reina Umaña Gonzalez**, also reported that he had to repeat grades in school and had learning and memory problems:

Alex repeated grades several times.  There came a time when he was the oldest child in the classroom.  He was embarrassed, because not only were the kids in his class younger, but he also stood out physically from the rest.  His cousins made fun of him, and Alex did not want to go to school anymore.

---

[11] Dr. Olley's 11/18/2009 report, p. 8.
[12] Declaration of Rafael Enrique Umaña, p. 4-5.

> Alex had learning problems. He tried, but he did not have the ability to learn and did not understand. Alex was also forgetful. People from the school would tell my mother Alex was doing poorly with his schoolwork, but my mother could not help him. Finally, Quique said that since Alex was not doing well, he was not going to send him to school anymore. [13]

Mr. Umana's younger brother, **Saul Osvaldo Umaña**, described his immaturity and difficulty with comprehension:

> I am Alejandro Enrique Umaña's younger brother. Alejandro is a year older than I am.
>
> Although he is a year older than I am, I felt like I was the older brother. I was more mature than Alex. I gave Alex advice and told him what to do and how to do things. He has more trouble understanding things than most people.[14]

His childhood neighbor**, Vilma Aracely Salazar de Argueta**, with whom he walked to school, described his academic struggles:

> When we lived in the same meson, Alex Umaña walked to school with my siblings and me. … Alex did not pass the third grade. Alex struggled to learn. I helped him with addition but it was difficult for him. Alex knew how to do some addition but if the numbers had more than one digit he became confused with the steps. He started adding the higher digit numbers first. It was the same with multiplication. Alex knew how to multiply by five but he could not memorize the
>
> higher numbers. He could not divide because he could not multiply. I tried to teach him but he just stared at the paper and looked confused. Alex's writing was also very messy. We laughed and said that his letters were *pate ditas* because it looked like he was writing with his feet.[15]

In a separate declaration, **Vilma Aracely Salazar de Argueta** also observed that he struggled in school, and she tried to help him with his homework, but that he did not understand:

---

[13] Declaration of Reina Umaña Gonzalez, p. 2.
[14] Declaration of Saul Osvaldo Umaña, p. 5.
[15] Declaration of Vilma Aracely Salazar de Argueta, 11/16/2018, p. 1.

> Alex, my siblings, and I would walk to school together.  Alex went to Santa Ana California, and we went to Venezuela.  The schools were close to each other.  Alex stopped going to school at an early age.  I could tell he wanted to attend school but it was difficult for him. I think Alex did not have the ability to learn in school.  It was very difficult for him to learn.  He would stutter when he tried to read and sometimes even when he spoke; we would bother him.  Alex would ask me to help him with his homework.  When I tried to explain things to him, he would get confused and did not understand; he did not get it.[16]

**Lilian Tino,** a cousin and schoolmate of Mr. Umana's, also noted his difficulties in school:

> For a time, Alex and I went to the same school, which was called Jose Valdez.  I was much further ahead than he was, not just because of the five-year age difference but because Alex repeated grades many times.  Alex did not do well in school.  The teachers used to tell my grandma that Alex would eat in class and come without his homework.
>
> The complaints were never for fighting with other children.  The teacher used to tell my grandma to take Alex to a psychologist, that Alex was not right.  Alex was very forgetful.  He would be asked to bring things like bottle caps or twigs to do projects, and he would forget to bring them.  He did very poorly in school.  He would forget things and did not understand what he was being taught.  He hardly learned to read or write. Even now he does not know how to read and write well.  Alex finally dropped out in the third grade.  I reached seventh grade.[17]

**Luis Mario Ramos Mendez**, a childhood friend of Mr. Umana's. reported that he struggled in school and had difficulties with homework, and with learning English as a second language when he moved to the United States:

> I am a friend of Alejandro Umaña. We met in Santa Ana, El Salvador, when I was 12 years old. I am also from Santa Ana.
>
> I met Alejandro and we became friends when we were taking classes at the Jose Marti night school in Santa Ana. At that time I was 12 years old and I was in seventh grade. Alejandro was four years older

---

[16] Declaration of Vilma Aracely Salazar de Argueta, 01/05/2016, p. 3.
[17] Declaration of Lilian Tino, p. 4.

than me but he was only in third grade. While he attended night school, Alejandro also worked as an assistant delivery boy for Coca Cola during the day. I had attended regular school before but was asked to leave because I had misbehaved. My father wanted me to get an education and he insisted that I not drop out of school. My father enrolled me in the night program and I attended for about six months. It took me time, but in the end I finished eighth grade at another school. I believe that Alejandro never completed third grade.

Alejandro struggled with his schoolwork. He had difficulties processing and he did not understand. He wanted to learn but it was hard for him. I tried to help Alejandro with his homework but he would get confused and did not understand what I tried to teach him. He used to tell me that he did not understand. Alejandro would get frustrated and ask why he had to learn those subjects.[18]

Alejandro wanted to learn English but he struggled and he did not learn. In Los Angeles, it was essential that you speak some English to survive. When people spoke to us in English, Alejandro would point at

me. Just like Alejandro, I did not know any English before I came to the United States. Even so, I listened and I was able to pick it up quickly. Alejandro used to tell me that he wanted to be smart like me. People would make fun of Alejandro; they called him stupid and dumb. He would be embarrassed, it affected him and he would get angry.[19]

A childhood friend of Mr. Umana's during his teenage years, **José Wilfredo Herrera**, described problems with basic academic skills:

Alex was not a good reader or writer.  My older sister Patty played school with Alex and me.  She dictated things for us to write as if she was the teacher and we were her students.   Alex had a very hard time writing.  It took him a long time to write and his writing was sloppy with misspelled words.  I made fun of him and told him his writing looked like he was Muslim because it did not look like our alphabet. Patty corrected Alex a lot.  She said "no it is b for burro not d for dedo" but he kept making the same mistakes.  We used to make fun of Alex for his mistakes and his sloppy writing.  Alex tried to make a joke out of his poor writing by saying that his sloppy writing was because he was trying to write with his feet.

---

[18] Declaration of Luis Mario Ramos Mendez, p. 1.
[19] Ibid., p. 8.

> Reading was also hard for Alex.  I remember Alex looking at a newspaper as if he was reading it, but we knew there was no way he could read the paper.  We teased and made fun of Alex for pretending. He said it did not matter anyway because reading the newspaper was nothing but a bunch of letters.  Alex would tell my dad "my brain is small."  Alex said that he was not born to study.[20]

**María Lidia Calderón** took Mr. Umana into her home for over two years when he was 16 or 17.  She described his problems with basic academic skills:

> Alejandro Umaña was a friend of my two sons.  When he was about 16 or 17 years old, Alex came to live with us.  He was with us for over two years.
>
> Even though Alex was almost an adult, he acted more like a child.  He still liked to play children's games.  He played with my younger son Alfredo and daughter Karla.  He liked to play ball, do races with the boys and watch cartoons.  They would play school where Patty would
>
> be the teacher and do dictation.  Alex was not able to do the dictation. They also played store where they would use pretend money to buy groceries.  Alex had problems with this game also.[21]

**Karla Herrera Calderón** described her observations of Mr. Umana's academic challenges when he came to live with her family as a child:

> Alejandro Umaña was a friend of my brothers Alfredo and Carlos. When I was about 10 or 11 years old, Alex came to live with my family.
>
> When I did my school assignments, Alex looked with interest.  He wanted to help me with the stories I had to write.  I had to invent a story and then write it.  Alex could not do it.  He didn't know how to write a story.   What he wrote was what a 5-year-old would write.  My brothers and I made fun of him.  I thought it was funny that a kid so much older than me could not do what I did. My mother would get upset with us and defend Alex.  She told us to stop laughing at him. [22]

---

[20] Declaration of José Wilfredo Herrera, p. 4
[21] Declaration of María Lidia Calderón, p. 2.
[22] Declaration of Karla Herrera Calderón, p. 1.

**Monica Tatiana Reyes**, who was in a relationship and had a child with Alejandro Enrique Umaña described his persisting difficulties with reading and writing later in life:

> Alex had difficulty reading and writing. Alex liked me to read to him and asked me to teach him to write. He told me he had not finished the third grade. He tried to read in front of me, but he became easily frustrated and embarrassed. Alex asked me to read to him. He liked me to read to him out loud from my social studies book. I found it boring, but he would beg me to keep reading to him and to please him I would keep going. Alex also wrote poorly. Even when I explained things to him, he was still confused. For example, Alex would confuse 'b' and 'd.' I explained to him that it is the same little belly but on the other side. He also confused uppercase and lowercase.[23]

## Conclusions Regarding Adaptive Impairment in the Conceptual Domain

The Diagnostic and Statistical Manual of Mental Disorders-5th Edition characterizes the various severity levels for adaptive impairments seen in Intellectual Disability. Based on the evidence summarized above,

Mr. Umana's level of functioning is best captured by the DSM-5 descriptions of "Mild" to "Moderate" severity in the conceptual domain.

The DSM-5 description of "mild" severity in the conceptual domain states:

> For preschool children, there may be no obvious conceptual differences. For school age children and adults, there are difficulties in learning academic skills involved in reading, writing, or arithmetic, time, or money, with support needed in one or more areas to meet age – related expectations. In adults, abstract thinking, executive function (i.e., planning, strategizing, priority setting, and cognitive flexibility), and short-term memory, as well as functional use of academic skills (e.g., reading, money management), are impaired. There is a somewhat concrete approach to problems and solutions compared with age–mates.[24]

---

[23] Declaration of Monica Tatiana Reyes, p. 1.
[24] 0 DSM-5, p. 34.

"Moderate" severity in the conceptual domain is defined as:

> All through development, the individual's conceptual skills lag markedly behind those of peers. For preschoolers, language and pre-academic skills develop slowly. For school–age children, progress in reading, writing, mathematics, and understanding of time and money occurs slowly across the school years and is markedly limited compared with that of peers. For adults, academic skill development is typically at an elementary level, and support is required for all use of academic skills in work and personal life. Ongoing assistance on a daily basis is needed to complete conceptual tasks of day-to-day life, and others may take over these responsibilities fully for the individual.[25]

## THE SOCIAL DOMAIN

The social domain refers to the capacity for empathy, social judgment, gullibility, interpersonal communication skills, the ability to make and retain friendships, and similar capacities.

The following data points, taken from the declarations of various witnesses who have observed and described Mr. Umana's social behavior at various times in his life, reflect broad deficits in his social skills involving social cognition, awkward and shy social interaction skills, and impaired social judgment.

Mr. Umana's second cousin of **Edwin Esau Umaña**, described him as immature, and playing with children younger than he was:

> I saw that Alex was very sad as a young boy, but even though he had a very hard life, Alex was a kind and loving child.  Later, I was surprised when he joined the gang because Alex was not the kind of boy who misbehaved or was naughty.  Alex liked to play around, he used to move his belly in a wave, make faces or cross his eyes to make other people laugh.  He liked to dance.  Alex was a kind and helpful child.  When he was older he liked to play with the younger children of the mesón. [26]

---

[25] Ibid.
[26] Declaration of Edwin Esau Umaña, p. 5.

His childhood neighbor**, Vilma Aracely Salazar de Argueta**, with whom he walked to school, described his age-inappropriate social behaviors:

> Alex said that he got into fights at school because the other children made fun of him.  They laughed because he was so big and could not pass the third grade.  Alex acted younger than his age.  He still played games like marbles with the little kids.  He also did things that someone his age should have known was inappropriate.  He played with children that were younger than he was.  Even when Alex was older and working at the Coca-Cola, he still played games like marbles with the little kids.  He also did things that someone his age should have known was inappropriate.[27]

**José Wilfredo Herrera**, a childhood friend of Mr. Umana's during his teenage years, described his child-like and infantile behaviors:

> Alex and I became close friends when I was about 13 or 14 years old.  Although I was younger than Alex, Alex let me take the lead and make the decisions of how we spent our time.  Alex tagged along.  Alex was infantile.  He was like a child.  At times, I got frustrated with Alex because I would be talking about a serious topic and Alex was joking around.  He started laughing when no one thought the situation was funny.  His comments about the situation made little sense.  It was like he said things just to say something.  I would get frustrated with him and told him that he was only about playing around and watching cartoons. I told him that he was never going to mature.[28]

> Alex claimed that he knew how to do magic tricks.  He put a coin behind his ear, in his hand, or in his mouth and say that was magic.  We laughed because we thought he was just being funny but he really thought he was doing magic tricks.

> I tried to teach Alex the dance moves and choreography that I learned from my classes.  Alex could not remember the steps, and was bad at the choreography.  I had to repeat the steps over and over to him.  Alex never did learn the dance moves.  He was never invited to the DJ Masters.[29]

**Monica Tatiana Reyes**, who was in a relationship and had a child with Alejandro Enrique Umaña described his age-inappropriate social behaviors:

---

[27] Declaration of Vilma Aracely Salazar de Argueta, 11/16/2018, p. 2.
[28] Declaration of José Wilfredo Herrera, p. 1-2.
[29] Declaration of José Wilfredo Herrera, p. 4-5.

> Even though Alex was older than I was, we got along very well because he was like a child. He acted as if we were the same age. … Alex was sweet, playful, and loved to dance. We would watch cartoons and soap operas and joke around.
>
> Alex was so playful he did not realize when people were having serious conversations.  Alex would make jokes when it was inappropriate.
>
> When I was pregnant with my son, I remember his brother, Saul, told Alex he should grow up and be more serious because he was going to be a father.[30]

**Roxana Cruz Torres**, Vilma Aricely's younger sister who was also a neighbor and childhood acquittance Mr. Umana, reported that he lacked social awareness and propriety:

> Alex would say things that had nothing to do with what we were discussing.  He said things that made no sense.  If we talked about things that were more serious, Alex joked around.[31]

**Xiomara Reyes**, who's cousin, Monica Reyes, was in a relationship with Alejandro Umana and lived in the same meson with her described him playing with younger children, having difficulty learning to play simple games, and being socially awkward and bashful:

> Alex liked to play with the younger children of our family.  My mom and I thought he was infantile.  It's like he never grew up.  He tagged along with the little kids to the store to buy ice cream or candy.  He played games like marbles with them.  When one of the kids knocked a marble out of the way, they got to keep the marble.  If Alex was able to knock a marble, he quickly grabbed for it along with all the dirt and stones surrounding it.  He wanted to make sure no one beat him to it. Alex walked around with pockets full of dirt, stone, and marbles. When my young son watched cartoons inside our room, Alex watched from outside through the window.  My husband and I used to ask him to come in instead of standing outside.  He was bashful and did not accept.  He did not come into our room.

---

[30] Declaration of Monica Tatiana Reyes, p. 1.-2.
[31] Declaration of  Roxana Cruz Torres, p. 1.

Alex was slow.  There were times that I did not think he understood things we were telling him.  He had a confused face.  Sometimes, I disciplined Alex as if he was one of the kids.  Alex told the kids he could do magic.  He placed coins inside his ears and called that magic.  The kids wanted to imitate him.  I told Alex to stop because it was dangerous.  The kids could get something stuck in their ears.  Alex also threw food, like popcorn, up into the air and told kids to catch it with their mouths.  I was afraid the children would choke.  But Alex did not think of things like this.  I had to tell him.[32]

**Luis Mario Ramos Mendez**, a childhood friend of Mr. Umana's, described their age difference and Mr. Umana's social immaturity, and his observations of Mr. Umana's psychotic symptoms as he got older:

I am a friend of Alejandro Umaña. We met in Santa Ana, El Salvador, when I was 12 years old. I am also from Santa Ana.

Our age difference did not seem to matter to Alejandro.  He was not ashamed of being 16 years old and hanging out with a 12-year-old boy.  In any event, Alejandro acted more like a boy my age than his own and we got along very well.  He made me feel comfortable because he did not act as though he knew more than I did.
Even after he joined the gang, Alejandro kept acting like a little boy.  He loved to watch cartoons and he would talk about them all the time.  His favorites were Tom and Jerry and the Knights of the Zodiac.[33]
When we got to Los Angeles, Alejandro was 22 years old.  Even though he was an adult, he continued to act like a child. He still

watched cartoons and his favorite movies were Shrek and Finding Nemo.  He watched Finding Nemo over and over again. He never got tired of seeing it and he would laugh as though it were the first time he was seeing it.  Alejandro liked to hang out with the younger guys in the neighborhood who rode skateboards.  They were about 15 years old.  Alejandro did not seem to mind the age difference.  He would tell immature jokes at inappropriate moments.

Alejandro's girlfriend, and her sister, finally came from El Salvador to the United States.  The girlfriend might have been younger than I was and, just like Alejandro, was very immature.  Even though they got along well with one another, they did not seem to have much of a

---

[32] Declaration of Xiomara Reyes, p. 2-3.
[33] Declaration of Luis Mario Ramos Mendez, p. 1.

relationship as a couple.  When she was in Los Angeles, Alejandro did not spend time alone with her. He insisted on my staying with him to show me his drawings or to talk about cartoons.

Something was wrong with Alejandro's brain; he had disabilities.  It was like his brain had stopped developing at an early age.  Alejandro was very simple-minded and he did not analyze things.  People who knew Alejandro realized that something was wrong with him.  They would ask what was wrong with him and say it seemed like he had a screw loose.

People thought that Alejandro was weird.  His reality was different from ours.  Alejandro would point at the wall or a table and he would ask us if we saw what he saw.  No one else would see what he saw but Alejandro insisted that what he saw was real.  He wanted us to see what he saw.  Alejandro would grab a pencil and paper and draw what he saw.  I could not see the things that he saw.  It was important to him to show me what he saw.  Sometimes I saw that Alejandro would stare at the wall and that he would talk to himself.  It seemed as though a spell had been put on him.  Afterwards, he told me he was talking to an angel or to the devil.

I knew when Alejandro was in his world because sometimes he would gesture and talk to himself.  Other times he would pace back and forth over and over.  He would also space out sometimes, like he was lost in thought.[34]

## Conclusions Regarding Adaptive Impairment in the Social Domain

The DSM-5 characterizes the various severity levels for adaptive impairments seen in Intellectual Disability. Based on the evidence summarized above, Mr. Umana's level of functioning is captured by the DSM-5 descriptions for "Mild to Moderate" severity in the social domain.

Mild impairment in the social domain is described as follows:

Compared with typically developing age–mates, the individual is immature in social interactions. For example, there may be difficulty in accurately perceiving peers' social cues.  Communication, conversation, and language are more concrete or immature than expected for age.  There may be difficulties regulating emotion and

---

[34] Ibid., p. 8-9.

behavior in an age–appropriate fashion; these difficulties are noticed by peers in social situations. There is limited understanding of risk in social situations; social judgment is immature for their age, and the person is at risk of being manipulated by others (gullibility).[35]

Moderate impairment in the social domain is described as follows:

The individual shows marked differences from peers in social and communicative behavior across development.  Spoken language is typically a primary tool for social communication but is much less complex than that of peers.  Capacity for relationships is evident in ties to family and friends, and the individual may have successful friendships across life and sometimes romantic relations in adulthood. However, individuals may not perceive or interpret social cues accurately.  Social judgment and decision-making abilities are limited, and caretakers must assist the person with life decisions. Friendships with typically developing peers are often affected by communication or social limitations.  Significant social and communicative support is needed in work settings for success.[36]

## **THE PRACTICAL DOMAIN**

The practical domain centers on self-management in areas such as personal care, job responsibilities, money management, recreation, and organizing school and work tasks.

The following data points are taken from the declarations of various witnesses who have observed and described Mr. Umana's behavior at various times in his life, and reflect significant impairment and need for external supports in all areas of his practical adaptive functioning, including basic personal hygiene, managing chores around the house, his ability to contribute to the communal activities necessary for life, shopping, money management, leisure activities like sports, work and job skills.

Mr. Umana's father, **Rafael Enrique Umaña**, reported that his son repeated grades and struggled in school, and suffered from bad headaches and memory problems that he attributed to head injuries from falls when he was young:

---

[35] DSM-V, p. 34.
[36] Ibid.

Alex often suffered bad headaches.  He would grab at his head in pain.
Alex tried to be strong but the pain made tears well up in his eyes.
Generally, after an hour of intense pain, he felt better, but the pain
would return.  My son had very bad headaches every other day.  We
gave him aspirin for children called Dolofin or Panadol.  I think these
horrible headaches that Alex suffered were because of the times he hit
his head when he was very young.

Alex had a bad memory.  He was forgetful.  I think that his bad
memory was maybe because of the falls he suffered as a little boy.
When I would send him to buy something he would forget what I had
sent him to buy.  I would get angry because I thought he was not

paying attention.  Now I think that Alex tried to do his best but he
could not remember.  I tried to explain things to him or I would send
him to do something and he would remain quiet, he would not say
anything to me, he would be lost in thought.  I think he did not
understand.

Alex started working after he left school.  He did small, basic jobs such
as helping people load and unload things for a handful of change.  For
a brief time he was an assistant at the tire shop next to the mesón.
Later, when he was a little older he worked as an assistant to several
Coca-Cola drivers.[37]

**Rafael Umana's** interview with Dr. Olley also included some additional
details about his son's impairments:

Rafael Enrique Umana, father of Alejandro Umana, agreed rather
reluctantly to meet for an interview at a coffee shop in Santa Ana.  He
is a street vendor with a location nearby.  He reported that Alejandro
had two serious head injuries at about 5 years of age.  In the first
accident, he fell from a mango tree while cutting mangos.  Rafael
Umana said that he carried his son, who was bleeding, to a nearby
hospital.  He said that Alejandro was dizzy and "out of it" but did not
appear to lose consciousness.  A few days later, Alejandro fell again
and hit his head on furniture, again causing bleeding.  Rafael Umana
indicted that from that time, Alejandro was "hyper."  Rafael Umana
described problems in development that included having to repeat
directions and problems in memory, such as forgetting things when
sent to the store, even with a list.  This was at about age 12 or 13.

---

[37] Declaration of Rafael Enrique Umaña, p. 4-5.

Rafael Umana said that he was aware of Alejandro's school problems and recalled that he stopped going to school at about age 10.  He said that after that time, he tried to find jobs for Alejandro.  The first job was with a shoemaker, but it only lasted a few days, because the shoemaker said that Alejandro could not learn the task.  Rafael Umana said that he thought his son just didn't understand how to do the tasks of putting the shoe together.  Rafael Umana tried to employ his son in the small store that he operated at the time, but he could not send Alejandro to get things, because he would forget.  Rafael Umana described the job with the Coca-Cola delivery truck and confirmed that Alejandro could carry the boxes of bottles but could not do the math required to help with the bills.[38]

His childhood neighbor**, Vilma Aracely Salazar de Argueta**, with whom he walked to school, described his difficulties with basic occupational skills:

> My father tried to teach Alex to do carpentry but he did not learn. ex could not measure things.  He even had trouble with sanding.  My father taught us to sand in the direction of the grain of the wood. Alex did not do it right.  He went all over the place. …  A young man who lived in the mesón named Oscar was a shoemaker and tried teaching Alex how to make shoes.  Oscar tried to teach Alex how to trim off a precut sole of the shoe with a little blade.  Alex could not cut it correctly.  Alex would say he could not do it.  Others in the mesón watched Alex and made fun of him.[39]

**Monica Tatiana Reyes**, who was in a relationship and had a child with Alejandro Enrique Umaña described his problems with simple things like putting his shoes on the right foot and managing money:

> Alex was also forgetful and had trouble with simple things. He would often put each shoe on the wrong foot. Once, he put money for food in his shoe.  When the time came to pay, he could not find the money. He told me, "I gave you the money." Later, when he took off his shoes, he found the money.[40]

---

[38] Dr. Olley's 11/18/2009 report, p. 8.
[39] Declaration of Vilma Aracely Salazar de Argueta, 11/16/2018, p. 2.
[40] Declaration of Monica Tatiana Reyes, p. 2.

A childhood friend of Mr. Umana's during his teenage years, **José Wilfredo Herrera**, described his problems with self-care and safety behaviors:

> Alex had a hard time taking care of himself.  He had hand-me-down shoes when he did wear shoes, which was not often.  He did not wear shoes at all to play soccer. When he played soccer he played barefoot on the dirt and gravel streets.  The bottom of Alex's feet had cuts all over them.  One time, Alex hit his bare foot on the sidewalk.  His big toenail lifted and his toe bled.  The other boys and I stopped playing to go see what was happening to Alex.  It looked painful.  We told him to put a band-aid on it but Alex pinched the toenail and peeled it off.  He grabbed dirt from the street and smothered it on his toe.  Alex said the dirt would get rid of the pain.  I told him that the dirt was only going to make it worse but Alex still believed that the dirt made it better, Alex did not know how to do his own laundry.  Alex occasionally worked as a delivery helper for Coca-Cola.  He washed his white uniform shirt by soaking it in bleach.  Alex did not wash his other clothes until they were raggedy and smelly.  When he did wash, he put the clothes in the basin with water and lathered his hands with a bar of soap instead of putting the soap on the clothes.  Then he rubbed with his soapy hands over his clothes to spread the soap over them. He scrubbed his pants with a brush.  He didn't just scrub the dirty spots, he scrubbed all of his clothes.  I told him he was ruining his clothes by washing them like that and that soaking clothes in bleach would cause holes and tear the shirt apart.   Alex kept doing it his way.  When he got something stuck in his head, it was hard to change his mind.
>
> Alex's taste in clothes was strange.  I heard people making fun of him because he looked a bit awkward.  He picked clothes that didn't fit.  Alex said he liked the way I dressed but he dressed nothing like me.  I liked to wear clothes that were in style and kids our age were wearing.  Alex could not pull off this style.  He also liked how I ironed my shirts.  Alex could not iron his own shirt.  He left creases and got mad when he could not do it.  Alex also couldn't hang the clothes right.  He wanted his pants to look nice, like mine, but he would hang them wrong and the pants could get the "filo," crease on the wrong spot and he would not like it.[41]

**Roxana Cruz Torres**, Vilma Aricely's younger sister who was also a neighbor and childhood acquittance Mr. Umana, reported that Mr. Umana lacked the money skills to help out in his father's store, and that he was

---

[41] Declaration of José Wilfredo Herrera, p. 3-4.

unable to learn basic occupational carpentry skills:

> Alex Umaña's father had a small store from inside their room in the mesón.  Alex did not know how to work at the store.  Alex could not make change.  I sometimes went to buy things like sugar or cubes of chicken stock.  I gave Alex money and he would stare at me and ask how much he needed to give me back.  Other times he gave me the wrong change or too much money back.  Alex's father became angry when things went missing from the store and when Alex made mistakes with money.  His father screamed and beat Alex.  His father grabbed Alex and searched his pockets and pants for any money and food.  Most of the time, Alex had to stay away from the store.  Despite the family having food in the store, Alex was hungry and went out looking for his own food like iguanas and pigeons.

> When I was about 10 or 11 years old, my father taught me how to help him with carpentry.  Alex and I sanded pieces of wood.  Alex went all over the place.  He asked me how he was supposed to do it.  I showed him how to sand but he still got it wrong.  My father asked me to fix Alex's mistakes and sand the wood correctly.  I learned how to use the measuring tape and how to cut the wood.  Alex did not know how to do it.  Alex never learned how to do it.[42]

**Josselyn Guevara Reyes**, a cousin of Monica Reyes who lived with Mr. Umana for a period in meson La Fe, described his challenges with simple tasks like shopping:

> I remember hearing the adults saying that Alex was slow.  Alex was sweet and liked to help but he was forgetful and made mistakes.  Sometimes, my Aunt Betty and Aunt Xiomara sent Alex out to buy things in the market.  They gave him specific and repeated instructions but he still got things wrong.  I remember my aunt asked Alex to go to the store and bring cubes of chicken stock.  She told him chicken, not beef.  She repeated that it was important.  Alex came back with beef stock.  My aunt said did I not tell you what I needed.  Alex was embarrassed.[43]

**Alfonso Cruz**, a childhood neighbor of Mr. Umana, reported the problems he had trying to teach him basic carpentry skills like measuring with a tape or sanding:

---

[42] Declaration of  Roxana Cruz Torres, p. 1.
[43] Declaration of Josselyn Guevara Reyes, p. 3.

> While working at the meson, I tried to teach Alex and the other children my profession.  One boy picked up the trade and now works as an assistant master carpenter.  Alex had trouble understanding and was unable to learn the trade.  He became easily frustrated when he did not understand something.  He had a lot of trouble learning how to use a measuring tape.  I took the time to try to explain how the measuring tape worked.  I showed him what a centimeter was, what a meter was.  I repeated the instructions over and over so that he could understand.  Alex tried hard but he kept making the same mistakes.  When he could not get it, he started to joke around with the measuring tape by swinging the end up and down like a yo-yo.  also used to have my children help me with sanding the pieces. Alex tried to help me sand.  I explained to everyone that it was important they sanded in a straight line.  My children learned how to sand right away.
>
> I had to tell Alex many times but he still didn't do it properly.  He kept sanding in different directions so I had to have one of my kids do it over.  When he couldn't do things, Alex became frustrated and gave up or started to joke around.[44]

**Carlos Geovanni Herrera**, a childhood friend who grew up in the same neighborhood and with whom Mr. Umana lived for roughly two-and-a-half years, described his difficulties with practical skills such as learning dance moves, working in the fields, and learning carpentry trade skills:

> Alex and Alfredo liked to dance and were part of a dance group together.  I did not dance.  I watched them practice in our house.  Alex took it seriously and practiced the moves but he could not learn the choreography. The dance group did synchronized routines but poor Alex was always messing up.  I could tell that Alex had a much harder time and took a lot longer to learn than the others.  He liked dancing and kept on practicing the dance routines long after the others stopped and went home.
>
> Alex gathered less beans than the rest of us.  Before picking the beans, the managers gave instructions on how to do the work.  The rule was very clear that we should not pick the green beans because they are not yet ripe.  We were told to pick only the red beans, which we called grapes.  We would only be paid for picking the red beans.  Alex kept picking the green coffee beans.  When it was time to sort through what we gathered, my mother scolded Alex because he picked

---

[44] Declaration of Alfonso Cruz, p. 2.

all green coffee beans. Alex tried hard to do it right and he felt embarrassed. At the end of each day, I had about seven to eight bags. Alex had about two or three at most.

Alex did not know how to do the work that my father and I did. He was not capable. My father tried to teach Alex how to measure and cut but Alex did not get it. Alex would always cut the wood too short or too long. My father got frustrated with Alex and told him he had to pay attention and get this right. His mistakes wasted wood. My father often scolded Alex for getting things wrong. My father told Alex that construction was a good job and he needed to know how to measure to do construction. Alex was embarrassed. He would come to me before going to my father to see if he got the sizes right. Alex was always off by a few centimeters. I covered for Alex because I did not want him to get into trouble.

Alex could do things like bring me this, put this here, or carry this over there but he made too many mistakes with things that required measuring or following several steps.[45]

**Vilma Elizabeth Torres de Cruz**, who along with her husband, Alfonso Cruz, lived in the mesón with Mr. Umaña, described his problems learning the basic skills for the carpentry trade, and with self-care skills:

My husband worked as a carpenter at a workshop but sometimes he worked on projects at the mesón. He had a workbench right outside our room. He made chairs, tables, benches, and other wood furniture. Alex would often come by our room to play with my children and watch my husband work.

Alex was different from other boys his age. He was not sure of himself. He looked to others for guidance. Other kids would run around and be very active but Alex was quiet and lacked enthusiasm. He was turned off. He was physically present but not all there. Alex lacked the ability to learn, even by example from the adults or other kids. He stopped going to school when he was about 12 years old. My husband wanted to teach him a trade so that he could make a living in the future. Alfonso tried to teach Alex how to use the measuring tape. He showed Alex the height and width of the wood and the number of pieces he needed. He showed Alex the amount of centimeters on the measuring tape and showed him how to mark the

---

[45] Declaration of Carlos Geovanni Herrera, p. 2-6.

spot with a pencil.  Alfonso wrote the measurements down for Alex.  Alex could not do it.  He stared at the measurements and looked confused.  Alex would forget the steps.  He told my husband he could not remember.   My husband repeated the steps but Alex appeared lost.  Alex just stared back at him and laughed and made jokes.  Alfonso tried many times to teach him but Alex could not take the one end of the tape to the other end and be able to say that is a meter or that is 5 centimeters.  Instead of measuring, Alex would then take the measuring tape and swing the end up and down, as if it were a yo-yo.  He never learned how to use it.   My kids and other kids in the meson learned how to do these things but Alex did not.

Learning was difficult for Alex and sometimes he gave up quickly.  Other children his age liked challenges but Alex was different.  It was hard for him to apply himself.  He looked unsure of himself.

A young man from the mesón named Oscar tried to get Alex to help him make shoes.  Oscar sat outside of his room with a little table, his tools, and a stool. The shoes were precut, then assembled in the mesón.  Oscar tried to teach Alex how to cut the leather, glue the pieces and put them together.  Alex could only do the simplest things.  He would put glue on the shoe.  When Oscar asked him to do more, Alex would say he was done.  He avoided doing the harder steps.

When Alex worked with Coca-Cola, he used one white shirt as a uniform.  The shirt got dirty with dirt and grease from loading and unloading the boxes and bottles. When his grandmother was being nice, she washed it for him.  I also washed it for him because Alex did not know how to wash his clothes on his own.  When he did wash his clothes, Alex put the shirt in the water in the basin, put the bar of soap inside the water, poured some more water on the shirt and then hung it up.  Sometimes, Alex left his clothes soaking in water and forgot to take it out to dry.  I told Alex that he could not do that because the clothes would rot.[46]

**Karla Herrera Calderón** described her observations of Mr. Umana's challenges doing field work when he came to live with her family:

Alejandro Umaña was a friend of my brothers Alfredo and Carlos.  When I was about 10 or 11 years old, Alex came to live with my family.

---

[46] Declaration of Vilma Elizabeth Torres de Cruz, p. 2-3.

> Alex was not good at gathering the coffee. He was slow and could only gather a little.   He never understood which bean to pick.  We would show him many times but he would pick the bean that wasn't ripe.  My mother took pity on him.  She was a good worker and gave Alex a share of the coffee she gathered.[47]

**Lilian Tino** a cousin and schoolmate of Mr. Umana's, noted his difficulties in dressing and personal care:

> It frustrated my grandma that Alex could not dress himself. He would put his shirts on backwards [inside out] and his shoes on the wrong feet.  Even though we told him it was wrong, he would argue it was not. Sometimes he would go to school with mismatched shoes.  Alex did not know how to tie his shoelaces, either.  When my grandma told
>
> him to tie them, Alex would not tie them but tuck them inside his shoe.[48]

During his visit to El Salvador, Dr. Olley interviewed two of Mr. Umana's prior employers, **Miguel Eduardo Castenada** and **Carlos Acquina Herrera**, who described the unskilled nature of the work he did for them, and his problems adapting and need for supervision in their work environments:

> Mr. Miguel Eduardo Castenada and Mr. Carlos Acquina Herrera were both employers of Alejandro Umana.  Carlos Herrera is Mr. Carlos Acquina Herrera's 27-year-old son who worked with Mr. Umana.  They each gave accounts of the work that Mr. Umana did.  Their reports were consistent in indicating that Mr. Umana did unskilled or "helper" jobs and never advanced to a higher level of responsibility or complexity of work.  He delivered soft drinks from a truck under Mr. Castenada's supervision, and he carried materials and mixed the ingredients for concrete under Mr. Herrera's supervision.
>
> Mr. Casteneda confirmed that he employed Alejandro Umana, because he knew his father through deliveries to a store that Rafael Umana had at that time.  Mr. Casteneda describe the work as a "simple job" that primarily involved carrying heavy loads. It was the helper position as part of a 3-man team that delivered Coca-Cola products to local stores. Mr. Casteneda, himself, had started out in such a position and

---

[47] Declaration of Karla Herrera Calderón, p. 2.
[48] Declaration of Lilian Tino, p. 4.

rapidly worked up to being the head of the team and driver.  I asked Mr. Casteneda whether Alejandro had moved up or showed potential for advancement. Mr. Casteneda replied, no.  He said that Alejandro did hand out flyers at a promotion for new products, but he was always supervised, and the job required no special skill.  When I asked whether Alejandro had difficulty with any aspect of the job that might have kept him from advancing, Mr. Casteneda said that Alejandro had difficulty collecting money for the products.  He also said that Alejandro got along well with others and was close to his father.[49]

## **Conclusions Regarding Adaptive Impairment in the Practical Domain**

The DSM-5 characterizes the various severity levels for adaptive impairments seen in Intellectual Disability.  Based on the evidence summarized above, Mr. Umana's level of functioning is best captured by the DSM-5 descriptions of "Mild to Moderate" severity in the practical domain. Mild impairment in the practical domain is described as follows:

> The individual may function age-appropriately in personal care. Individuals need some support with complex daily living tasks in comparison to peers. In adulthood, supports typically involve grocery shopping, transportation, home and child care organizing, nutritious food preparation, and banking and money management. Recreational skills resemble those of age mates, although judgment related to well–being and organization around recreation requires support. In adulthood, competitive employment is often seen in jobs that do not emphasize conceptual skills. Individuals generally need support to make healthcare decisions and legal decisions, and to learn to perform a skilled vocation competently. Support is typically needed to raise a family.[50]

Moderate impairment in the practical domain is described as follows:

> The individual can care for personal needs involving eating, dressing, elimination, and hygiene as an adult, although an extended period of teaching and time is needed for the individual to become independent in these areas, and reminders may be needed. Similarly, participation in all household tasks can be achieved by adulthood, although an extended period of teaching is needed, and ongoing support will typically occur for adult level performance. Independent employment

---

[49] Dr. Olley's 11/18/2009 report, p. 6.
[50] DSM-V, p. 34.

//7
in jobs that require a limited conceptual and communication skills can be achieved, but considerable support from coworkers, supervisors, and others is needed to manage social expectations, job complexities, and ancillary responsibilities such as scheduling, transportation, health benefits, and money management. A variety of recreational skills can be developed. This typically requires additional supports and learning opportunities over an extended period of time. Maladaptive behavior is present in a significant minority and causes social problems.[51]

## Conclusions With Regard to Impairments in Adaptive Functioning

Mr. Umana exhibits significant deficits or impairments in all three domains of adaptive functioning (Conceptual, Social and Practical), at the level of at least "Mild" severity, and at times functions as low as the "Moderate" level.

These significant adaptive deficits were present before the age of 18.  There is substantial convergent validity from anecdotal, contemporaneous, and empirical data sources supporting the conclusion that Mr. Umana's functions adaptively in the range of Mild Intellectual Disability, which meets the second diagnostic prong.

## Diagnostic Criteria C: Onset Prior to Age 18

It is my opinion that Mr. Umana's intellectual and adaptive deficits find their origin in the developmental period. I believe a number of neuro-developmental risk factors combined with subsequent environmental and neurological insults served further to exacerbate his fundamental brain impairment as reflected in his IQ and neuropsychological testing.  Consistent with his history and neuropsychological profile, Mr. Umana had significant deficits in all three domains of functioning before the age of 18. Mr. Umana's intellectual and adaptive deficits found their origins prior to the age of 18, which meets the third prong for a diagnosis of Intellectual Disability.

---

[51] Ibid.

## <u>Conclusion</u>

On the basis of the forgoing findings, it is my opinion to a reasonable degree of psychological certainty that Mr. Umana meets all the professional criteria for the diagnosis of Intellectual Disability under the DSM-V, as well as the previous DSM-IV, standards.

Thank you for the opportunity to continue to evaluate this interesting case. If you have any questions, please feel free to contact me directly any time at (949) 230-7321.

Sincerely,

Daniel A. Martell, Ph.D., A.B.P.P.
Fellow, American Academy of Forensic Psychology
Fellow, National Academy of Neuropsychology
Fellow and Past President, American Academy of Forensic Sciences

# APPENDIX A

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 1 |
| --- |
| 1. Appendix for Test Scores |
| 2. WAIS-IV Score Report (4/15/2016) |
| 3. WMS-IV Score Report (4/15/2016) |
| 4. Minimum for Behavioral Image Test |
| 5. Weschler Adult Intelligence Scale – 4th Edition Spanish (WAIS-IV) – (3/14/2016) |
| 6. Advanced Clinical Solutions (ACS) - (03/15/2016) |
| 7. Bateria Neuropsicologica en Espanol - (PMR) Artiola – (3/15/2016) |
| 8. Rey Complex Figure Rest (RCFT) - (3/15/2016) |
| 9. Pruebas de Aprovechamiento – Bateria III - (3/15/2016) |
| 10. Comprehensive Test of Nonverbal Intelligence - 2nd Edition (CTONI-2) - (3/15/2016) |
| 11. Spanish Reading Comprehension (3/15/2016) |
| 12. D-KEFS (Selected Subtests) - (3/15/2016) |
| 13. Weschler Memory Scale - 4th Edition Spanish (WMS-IV) - (3/14/2016) |
| 14. Stroop Test de Colores y Palabras (3/15/2016) |
| 15. Tower of London (3/15/2016) |
| 16. Short Category Test, Booklet Format (3/15/2016) |
| 17. Wisconsin Card Sorting Test (WCST-64) - (3/15/2016) |
| 18. The b Test (3/14/2016) |
| 19. The Hooper Visual Organization Test (3/14/2016) |
| 20. Appendix 70 - Neuropsychological Report by Dr. Ricardo Weinstein (7/17/2009) |
| 21. Appendix 71 - Psychological Report by Dr. Enrique Suarez (11/2/2009) |
| 22. Appendix 72 - Neuropsychiatric Report by Dr. James Merikangas (11/17/2009) |
| 23. Appendix 73 - Psychological Report by Dr. Gregory Olley (11/18/2009) |

# Index to Background Material for Daniel Martell, Ph.D.
# Alejandro Umaña (3:16-CV-00057)

| |
|---|
| 24. Appendix 81 - Dr. Ricardo Weinstein's Neuropsychiatric Report (12/03/2009) |
| 25. Appendix 29 - Dr. Ruben Gur's Neurobehavioral Assessment (6/15/2016) |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 2 |
|---|
| 26. Transcript of Guilt Phase – Volume I (04/12/2010) |
| 27. Transcript of Opening Statements Taken at Guilt Phase (04/12/2010) |
| 28. Transcript of Guilt Phase – Volume II A (04/13/2010) |
| 29. Transcript of Guilt Phase – Volume II B (04/13/2010) |
| 30. Transcript of Guilt Phase – Volume III A (04/14/2010) |
| 31. Transcript of Guilt Phase – Volume III B (04/14/2010) |
| 32. Transcript of Guilt Phase – Volume IV A (04/15/2010) |
| 33. Transcript of Guilt Phase – Volume IV B (04/15/2010) |
| 34. Transcript of Guilt Phase – Volume V A (04/16/2010) |
| 35. Transcript of Guilt Phase – Volume V B (04/16/2010) |
| 36. Transcript of Jury Questions and Verdict Guilt Phase – Volume VI (04/19/2010) |
| 37. Transcript of Sentencing Phase – Volume I (04/19/2010) |
| 38. Transcript of Sentencing Phase – Volume II A (04/20/2010) |
| 39. Transcript of Sentencing Phase – Volume II B (04/20/2010) |
| 40. Transcript of Sentencing Phase – Volume III A (04/21/2010) |
| 41. Transcript of Sentencing Phase – Volume IV A (04/26/2010) |
| 42. Transcript of Sentencing Phase – Volume IV B (04/26/2010) |
| 43. Transcript of Sentencing Phase – Volume V A (04/27/2010) |
| 44. Transcript of Sentencing Phase – Volume V B (04/27/2010) |
| 45. Transcript of Sentencing Phase – Volume VI (04/28/2010) |
| 46. Transcript of Atkins Hearing (11/30/2009) |
| 47. Order Denying Motion to Declare Mr. Umana Ineligible for the Death Penalty (03/19/2010) |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 3 |
| --- |
| 48. United States Court of Appeals for the Fourth Circuit Opinion (04/23/2014) |
| 49. 2255 Motion (06/22/2016) |
| 50. 2255 Declarations |
| 51. Appendix 29 - Neurobehavioral Assessment of Alejandro Umaña by Dr. Ruben Gur |
| 52. Appendix 30 - School Records for Henri Geovani Ayala Umaña |
| 53. Appendix 31 - School Records for Alejandro Enrique Umaña |
| 54. Appendix 32 - Cemetery Record for Henry Geovanni Ayala Umaña |
| 55. Appendix 33 - Cemetery Record for Tomasa Gonzalez Chicas |
| 56. Appendix 34 - Cemetery Record for Saul Alfredo Ramirez |
| 57. Appendix 35 - Cemetery Record for Alejandro Umaña |
| 58. Appendix 36 - Trial Social History Report by Mitigation Specialist Richard McGough |
| 59. Appendix 37 - Trans National Anti-Gang  Discovery - Biographical Information of Alejandro Umaña |
| 60. Appendix 38 - Richard McGough's Invoice |
| 61. Appendix 45 - Alejandro Umaña's Medical Records - Gwinnet Health System (UNDER SEAL) |
| 62. Appendix 46 - 2008 Trans National Anti-Gang Discovery Documents (Spanish) |
| 63. Appendix 47 - 2008 Trans National Anti-Gang Discovery Documents (English) |
| 64. Appendix 50 - Alejandro Umaña's BOP Medical Records (UNDER SEAL) – (3/08/2016) |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 4 |
| --- |
| 65. Appendix 105 – Declaration of Edwin Esau Umaña (12/19/2016) |
| 66. Appendix 106 – Declaration of Carlos Alcides Peraza (02/01/2016 |
| 67. Appendix 107 – Declaration of Gerardo Arriola Umana (12/17/2016) |
| 68. Appendix 109 – Declaration of Roxana Marisol Ramirez (12/19/2016) |
| 69. Appendix 110 – Declaration of Noe Hernan Rivera (04/25/2016) |
| 70. Appendix 111 – Declaration of Dora Alicia Umaña Gonzalez (12/19/2016) |
| 71. Appendix 112 – Declaration of Luis Mario Ramos Mendez (03/03/2016) |
| 72. Appendix 113 – Photos of Alejandro |
| 73. Supplemental Declaration of Leticia Ramirez |
| 74.  Declaration of  José Wilfredo Herrera Calderón (08/16/2018) |
| 75.  Declaration of Karla Herrera Calderón  (11/16/2018) |
| 76.  Declaration of  María Lidia Calderón (11/16/2018) |
| 77.  Declaration of  Alfonso Cruz (08/16/2018) |
| 78.  Declaration of  Ana Lilian Reyes 08/16/2018) |
| 79.  Declaration of Carlos Geovanni Herrera (11/17/2018) |
| 80.  Declaration of  José Alfredo Ortiz (11/17/2018) |
| 81.  Declaration of  Josselyn Guevara Reyes (11/17/2018) |
| 82.  Declaration of Roxana Cruz Torres (11/17/2018) |
| 83.  Declaration of  Vilma Elizabeth Torres de Cruz (11/17/2018) |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| |
|---|
| 84. Declaration of Xiomara Reyes (11/18/2018) |
| 85. Declaration of Vilma Aracely Salazar de Argueta (11/16/2018) |

# Index to Background Material for Daniel Martell, Ph.D.
# Alejandro Umaña (3:16-CV-00057)

| Volume 5 |
| --- |
| 86. Photos of Danubio Azul Meson |
| 87. Photos of La Fe Meson |

# Index to Background Material for Daniel Martell, Ph.D.
# Alejandro Umaña (3:16-CV-00057)

| Volume 6 |
| --- |
| 88. Declaration of Pablo Stewart, M.D. (Exhibit A) - 05/23/18 |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 7 |
|---|
| 89. Supplemental Declaration of Leticia Ramirez – 02/06/2016 |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 8 |
| --- |
| 90. Declaration of Julian Davies, M.D.  – Appendix 211 (01/04/2021) |
| 91.   Toxicology Investigation and Toxicology Assessment of Andres Lugo, M.D., M.P.H., M.S., FACMT. – Appendix 212 ( 11/10/2020) |
| 92. Affidavit of Antonio E. Puente, Ph.D.  – Appendix 213 |
| 93. Declaration of Jennifer Sapia, Ph.D.  – Appendix 214 (11/23/2020) |
| 94. Supplemental Declaration of Pablo Stewart, M.D. – Appendix 216 (01/11/2021) |

# Index to Background Material for Daniel Martell, Ph.D.
## Alejandro Umaña (3:16-CV-00057)

| Volume 9 |
| --- |
| 95. Letters referred to in Order Denying Atkins (7) |
| 96. Dr. Enrique Suarez's Raw Data |
| 97. Dr. Ricardo Weinstein's Raw Data |
| 98. Declaration of Selena Sermeno, Ph.D. – 10/02/2021 |
| 99. Declaration of Wendy Alvarez – 12/03/2021 |

# Index to Background Material for Daniel Martell, Ph.D.
# Alejandro Umaña (3:16-CV-00057)

| Volume 10 |
|---|
| 100.  Dr. Leo Shea Report - 06/05/2016 |

# APPENDIX 237

# DECLARATION OF SELENA E. SERMEÑO, Ph.D.

Regarding *United States v. Alejandro Umaña*, Case No. 3:16-CV-00057 (Western District of North Carolina)

I, Selena E. Sermeño, Ph.D., declare as follows:

## I.      Summary of My Assessment of Mr. Alejandro Umaña

1. Attached to this report is a social history of Mr. Alejandro Umaña's life in the context of two countries; Guatemala where he was born and lived approximately the first two years of his life, and El Salvador, his home country and where he grew up until his migration to the United States as a young adult. The social history is attached as Attachment 1.

2. I testified at Mr. Umaña's trial, offering my opinion about the impact of the Salvadoran war on the moral development of young people. In preparation for my testimony, I had very little personal information regarding Mr. Umaña. Mr. Umaña's post-conviction counsel reached out to me and provided volumes of information regarding Mr. Umaña's childhood and adolescent experiences and abilities.

3. Although I currently have information about Mr. Umaña's activities after he migrated to the United States, I am limiting my opinions to the developmental period in which he lived in Central America. My research and experience uniquely allow me to opine on trauma and psychological distress and disability suffered by youth in El Salvador both during and after the civil war there. I could have testified at trial that these factors negatively impacted Mr. Umaña's development, and contributed in part to a diagnosis of an intellectual disability, cognitive impairment and Post-Traumatic Stress Disorder.

4. To prepare this declaration, I relied upon sworn declarations by family members, friends and professional experts as well as school records from El Salvador. I also rely on my clinical interview with Mr. Umaña.

1

5. My extensive review of Mr. Umaña's life through sworn declarations of family members, friends and professional experts, along with my in-person interview with Mr. Umaña, lead me to conclude to a reasonable degree of psychological and professional certainty that Mr. Umaña is a severely traumatized man with severe cognitive delays and adaptive deficits which place him within the category of intellectual disability. The accumulation of traumatic events in his life, ranging from the general experience of trauma living in a country torn apart by civil war to the specific experience of trauma within his family and the neighborhoods and living spaces where he was raised, have placed Mr. Umaña at severe risk for incomplete and extremely poor decision-making, as well as cognitive delays and interruptions in his cognitive development.

## II. Professional Education and Experience

6. I am a clinical psychologist licensed in the State of New Mexico. My current professional practice is focused on clinical psychology and consulting services in educational and not for profit settings with regard to trauma informed practices, youth mental and emotional health. I serve, for instance, as a consultant to the Silverton Colorado School District on the implementation of social and emotional learning, as well as trauma informed practices into their programmatic approaches. I also serve as a consultant on trauma informed practices to ConTextos El Salvador and ConTextos-Chicago. In the past, I also served as a consulting psychologist to the New Mexico Children, Youth, and Families Department. I have mentored adolescents from over 80+ countries through the United World College (UWC)-USA and UWC-Costa Rica. I have also served as a consulting psychologist for projects empowering youth and women to overcome the impact of historical trauma and cultural dislocation in places such as the Navajo Nation, El Salvador, and isolated mountain communities in the United States.

7. As a clinical psychologist and consultant, I have extensive experience identifying and assessing the clinical significance of adverse events in a life history. This process often involves reviewing records and interviewing family members and others with relevant personal

2

knowledge and, whenever possible, consulting with the individual who is the focal point of the social history. This process routinely involves evaluating the credibility of both documents and witnesses, and verifying personal memories by recourse to a larger documented cultural history.

8. I have previously been accepted by courts in North Carolina, Texas, California, New York, and Colorado as an expert in the civil war history of El Salvador, the effects of violence on childhood and adolescent development and on families, and on assessing and treating childhood trauma and other mental disorders.

9. I was born in San Salvador, El Salvador and immigrated to the United States in 1977 to pursue higher education. I am fluent in both Spanish and English. I obtained my Bachelor of Arts degree with a focus in Botany from Ottawa University in Ottawa, Kansas in 1981. In 1985, I earned a Master of Divinity degree in Pastoral Counseling from the Central Baptist Theological Seminary in Kansas City, Kansas. I earned a Master of Arts degree in Guidance Counseling from the University of Northern Colorado in Greeley, Colorado in 1986. In 1994, I earned a doctorate in philosophy (Ph.D.) in Counseling Psychology from Temple University in Philadelphia.

10. My doctoral dissertation, which I supported with research in El Salvador, was entitled: *The Impact of Political Violence on the Moral Development, the Potential for Antisocial Behavior, and the Incidence of Post-Traumatic Stress Disorder of Adolescents* (Sermeño, *The Impact of Political Violence* (Temple University 1994)).

11. I have extensive teaching experience and have taught graduate courses on, for instance, Conflict Analysis and Engagement, Advanced Counseling Skills, Group Psychotherapy, Infant Mental Health, and Interventions with Traumatized Populations.

12. My clinical experience includes working as a psychotherapist and as a psychologist in private practice and at non-profit organizations from 1999 to 2004. During that period, I treated victims of adverse childhood events and other traumatic experiences. I have served as a

3

behavioral health director, clinical director, psychologist, and psychotherapist at various hospitals, schools, and treatment centers in New Mexico and Pennsylvania.

13. In 2008, I served as a mentor and consultant to local community leaders in designing a youth camp program for youth survivors of the Rwandan genocide and other violent conflicts within a Ugandan displacement camp established by the United Nations.

14. My El Salvador-specific consulting experience includes giving trainings on different aspects of psychology, such as the impact of traumatic events, to local educational and clinical organizations that provide psychosocial support to populations affected by political, historical and community violence. I did this intermittently from 1988 until 2002. Since 2014, I have served as a consulting psychologist to ConTextos-El Salvador, an organization harnessing the power of literacy, autobiographical writing, and storytelling in the healing of trauma. My responsibilities have focused on adopting and incorporating trauma informed practices into program delivery within school and penal settings as well as the capacity-building of teachers.

15. In El Salvador, I have provided training to professionals representing groups such as the Commission for the Protection of Human Rights and the National Center for Rehabilitation's Special Project for War Victims, as well as to professors at the Central American University's Department of Psychology.

16. I currently serve as Ambassadorial Chair for the Bartos Institute for the Constructive Engagement of Conflict of the Armand Hammer United World College of the American West. My work as Ambassadorial Chair has included designing camps for youth leadership and violence prevention in countries such as El Salvador and Uganda and mentoring of adolescents from war-torn regions. I currently provide technical assistance in program design for mental, emotional and social support to students from significantly adverse circumstances.

4

17. A complete copy of my *curriculum vitae* can be found in Attachment 2.

### III. Involvement in Alejandro Umaña's Trial and Beyond

18. I served as a defense expert at trial, and testified, on general moral development as impacted by the Salvadoran war and as framed by Salvadoran culture. I received very minimal information on Mr. Umaña's life from his defense team prior to my testimony. I had no access to Mr. Umaña and I was unaware of the trauma, abuse and deprivation he suffered before coming to the United States. I did not comment on these factors at trial. These factors became known to me during post-conviction. I offer my opinion regarding these factors here.

19. I was contacted by Mr. Umaña's post-conviction team to review the significant amount of background history in Mr. Umaña's life, missing at the time of my trial testimony and which would have allowed for a more comprehensive explanation of all the risk factors affecting Mr. Umaña's development and functioning.

20. I was provided with a significant amount of post-conviction materials, such as declarations of family members, childhood friends, teachers and evaluations by other experts. A full list of case specific materials reviewed is detailed in Attachment 3.

21. In addition to my review of post-conviction materials, in June 2016, I interviewed Mr. Umaña at the Terre Haute Federal Prison. More detail on my impressions of Mr. Umaña at the time of my interview are provided in Section VI this declaration.

### IV. Background on Trauma Relative to Mr. Umaña's Case

#### A. The Scientific Understanding of the Effects of Violence and Trauma on Childhood and Adolescent Development

22. The American Psychological Association (APA) defines trauma as an emotional response to a terrible event like an accident, rape, or

5

natural disaster. Immediately after such events, shock and denial are typical. Longer term reactions include unpredictable emotions, flashbacks, strained relationships, and even physical symptoms like headaches or nausea. Clinically significant trauma is that which impairs a person's ability to manage stress and process emotion. A single traumatic event or sustained exposure to traumatic events can overwhelm a person's ability to cope. *See* P.A. Saigh, *The Development of Post-Traumatic Stress Disorder Following Four Different Types of Traumatization*, 29 Behavior Research Therapy 213-16 (1991).

23. War-related traumas include the death of a family member or friend, witnessing lethal and/or non-lethal violence, separation from one's family, displacement of families, terroristic attacks, forcible recruitment, kidnappings, bombardment and shelling, witnessing significant fear reactions in parental figures, suffering physical injury or handicap, extreme poverty, starvation, and the constant presence of armed groups. *See* Sermeño, *The Impact of Political Violence.*

24. Trauma experienced during childhood and adolescence can give rise to rigid thinking and cognitive templates that only encompass the extreme scenarios, such as life or death. The ability to consider a wide range of actions and/or options can be impaired when circumstances during one's formative years do not allow any safe space for problem-solving. *See* Sermeño, *The Impact of Political Violence.*

25. Because children and adolescents within the confines of El Salvador during the civil war lacked the ability to escape or even alleviate their traumatic circumstances, they were particularly vulnerable to developing PTSD. *See* M.A. Simpson, *Bitter Waters: Effects on Children of the Unrest and Oppression, in International Handbook of Traumatic Stress Syndromes* (J.P. Wilson & B. Raphael eds., 1993); G. Straker, *Post-Traumatic Stress Disorder: A Reaction to State Supported Child Abuse and Neglect*,12 Child Abuse and Neglect 383-95 (1988). My research for my dissertation proved that most youth who grew up in El Salvador during the civil war

6

exhibited symptoms of PTSD, and even those who did not meet the diagnostic criteria were still seriously compromised in their capacity to deal with extreme stress or emotional pain when confronted with it. *See* Sermeño, *The Impact of Political Violence.*

26.   For an entire generation of Salvadoran children, more than ten years of war (1979-1992) coincided with their most formative stages of psychosocial and brain development. Mr. Umaña belongs to that generation.

27.   Even those not directly impacted by violence during the war years functioned under the understanding that no one in the country was truly safe, and this widespread culture of fear, terror, and mistrust contributed to the phenomenon of vicarious traumatization. *See* Sermeño, *The Impact of Political Violence.*

28.   The civil war resulted in a state of constant alertness on the part of the populace at large, and these high levels of fear often became internalized and expressed in a variety of somatic disturbances. *See* Sermeño, *The Impact of Political Violence.*

29.   Children often hid in make-shift shelters when fighting broke out. Parents reported their children screaming out in the night, suffering from night terrors and sleep disturbances. Studies also found that significant numbers of Salvadoran children experienced horrific events such as rape, physical disfigurement from stepping on landmines, and witnessing mass murder and the destruction of corpses. Not surprisingly, many young children were found to be withdrawn and exhibited high levels of separation anxiety. *See* W. Arroyo & S. Eth, *Children Traumatized by Central American Warfare*, in Post-Traumatic Stress Disorder in Children, 102-20 (S. Eth & R. Pynoos eds., 1995).

30.   Making the situation worse, it was often unclear who the enemy was, as is the case in most civil wars. Government soldiers, right-wing paramilitary groups, and leftist guerillas all committed terrifying acts of violence against civilians. The actors associated with different groups, all with a common national heritage, created a

7

great deal of confusion and uncertainty. No parent could predict, for a child, which soldier would lash out in personal violence.

31. The effects of unpredictability and trauma during the civil war were further exacerbated by factors such as high rates of child and spousal abuse and the lack of a functional judicial system. Witnessing violence, particularly violent acts committed by those meant to protect vulnerable populations, can prevent children and youth from seeking adult guidance in times of distress, forcing them to become extraordinarily self-reliant at a young age. *See* Straker, *Post-Traumatic Stress Disorder* at 383-95 (1983); M. Macksound, A. Dyregrov & M. Raundalen, *Traumatic War Experiences and Their Effects on Children*, in International Handbook on Traumatic Stress Syndromes (J.P. Wilson & B. Raphael eds., 1993). Numerous studies of adverse childhood experiences confirm this long-term negative impact of trauma and fear on the physical and mental health of children. *See, e.g.*, Felitti, V.J., Anda, Robert J., et al, *The Adverse Childhood Experiences (ACE) Study*, American Journal of Preventative Medicine Vol. 14, No. 4 (1998). In other words, individuals are significantly compromised in developing the ability to trust when the people who are supposed to protect them—their parents, teachers, priests—are utterly unable to do so. The fact that those who were perceived as being in positions of power and authority during the war (*i.e.*, soldiers and the government) were another source of terror further complicated children's ability to develop a healthy sense of trust. Overall, as a result of the civil war, these children and adolescents were denied access to protective societal factors, such as intact extended families, churches, schools, healthcare systems, and neighborhoods that could have helped them deal with traumatic experiences. The inability to trust and the absence of protective factors in childhood compounded by constant fear, hyper-alertness, and confusion regarding enemy lines lasted into adulthood for many children of war. *See* Sermeño, *The Impact of Political Violence.*

## B. Chronic Trauma and Intellectual Disability

32. According to the American Association on Intellectual and Developmental Disabilities (AAIDD), the causes of intellectual disability can be divided into biomedical, social, behavioral, and educational "risk factors." *Intellectual disability: Definition, Classification, and Systems of Supports*, Luckasson et al., 61 (2002). Biomedical factors are related to biologic processes, such as genetic disorders or nutrition. Social factors are related to social and family interaction, such as child stimulation and adult responsiveness. Behavioral factors are related to harmful behaviors, such as maternal substance abuse, malnutrition, or illness. Educational factors are related to the availability of family and educational supports that promote mental development and increases in adaptive skills. Also, factors present during one generation can influence the outcomes of the next generation. In working with children with intellectual disabilities, the AAIDD recommends that clinicians understand inter-generational causes to try to prevent and reverse the effects of risk factors going forward.

33. Chronic trauma experienced during the developmental years can lead to poor emotional regulation, disordered attachment patterns, and intellectual and adaptive functioning deficits—and thus intellectual disability. That is, trauma and, particularly, adverse childhood experiences (ACEs) are considered risk factors for intellectual disability. This conclusion is supported by studies that have identified a high rate of exposure to adverse life events and clinically significant environmental stressors—such as violence, poverty, toxic exposures — in the population of persons with intellectual disability. *See, e.g.*, Sarah Wigham & Eric Emerson, *Trauma and Life Events in Adults with Intellectual Disability*, Current Developmental Disorders Reports volume 2, pages 93–99 (2015). As described below, Mr. Umaña clearly experienced the chronic trauma risk factors during his developmental period.

9

## V. Mr. Umaña's Exposure to Intergenerational Violence and the Salvadoran Civil War

34.  The attached social history thoroughly documents the facts I relied on for my conclusions with respect to Mr. Umaña's exposure to both intergenerational violence and the Salvadoran Civil War. *See* Attach. 1. A brief outline of Mr. Umaña's exposure is detailed below.

35.  Exposure to Intergenerational Violence and Neglect:

   a.  Alex's parents are both the products of significant abuse, such as paternal abandonment, alcoholism, sexual abuse exploitation such as rape, hunger, civil war, prostitution and addictions. *See* Attach. 1.

   b.  Alex's mother (Leticia) experienced significant physical and emotional abuse and extreme poverty as a child. Her father used military-style torture methods to discipline Leticia. He was a violent alcoholic who fathered a child with Leticia's 15-year-old half-sister. Leticia's mother also would beat Leticia over slight errors.

   c.  Alex was exposed to domestic violence within the home, at the hands of both his mother and father. Alex suffered extreme neglect and violence from his father. This is evident across consistent declarations from Alex's aunts, paternal grandmother, cousins, neighbors, friends, and Alex's mother. *See* Attach. 1.

   d.  Alex's parents both exposed Alex to their abuse of alcohol and drugs. *See* Attach. 1.

36.  Exposure to War in El Salvador:

   a.  Previous generations of Alex's family, including his maternal grandfather, Jose Alfredo Ortiz, had exposure to war in El Salvador. In 1969, El Salvador went through a brief but

10

violent war with neighboring Honduras. *See, e.g.*, Alan James, *The Conflict Between El Salvador and Honduras (1969–1971 and 1976–1980).* Jose Alfredo was sent to fight in this war and witnessed significant violence as a result. He believes such experiences, as well as the subsequent Salvadoran civil war, deeply affected him. (Ortiz, Jose Alfredo Decl. ¶¶ 8, 10.) The Salvadoran civil war officially started in 1979.

b. Alex's maternal uncle, Saul, was forcefully recruited by the leftist guerrillas during the civil war when he was only fourteen and killed by the paramilitary death squads at sixteen. *See* Attach. 1.

c. Alex's father Quique and his family, including his great grandmother Paca, and Alex's mother, went to live in Escuintla, Guatemala to escape the trauma of war and the possibility of forceful recruitment by the military or the leftist guerrillas. When they first arrived, they were thought of as unwanted refugees, they often could only scavenge fields or scraps from a slaughterhouse to find food. Progressively isolated and dominated by Quique because of the war, Alex's mother was forced into prostitution, drank excessively and attempted suicide while pregnant with Alex. *See* Attach. 1.

d. Alex's namesake paternal uncle, Alejandro, Quique's brother, was killed in El Salvador's civil war while Quique's immediate family was living in Guatemala. Quique and his family returned for the funeral and were caught in a very violent confrontation right after the burial. This occurred during an offensive push which brought the fighting out of the country sides and into the cities. Many people lost their lives during this episode. (Umaña, Ana Decl. ¶¶ 5, 11; Umaña, Rafael Decl. ¶ 5.)

e. Once back in El Salvador, when Alex was still very young, the civil war and brutal violence continued. The family lived across from a coffee field where the army would discard dead bodies and torture people. It was not rare to see dead bodies and skeletons when crossing the field or to hear the screams at night of people being tortured. (Torres, Melvin Cruz Decl.

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 61 of 237

¶¶ 15-17.) Quique saw piles of dead bodies scattered on the streets, including the street where Alex lived. (Umaña, Rafael Decl. ¶ 5.) This sight of piles of dead bodies and the stench which accompanied rotten flesh in Alex's neighborhood, was confirmed by his cousin and his friends. (Umaña, Edwin Decl. ¶¶ 8, 19; Torres, Melvin Cruz Decl. ¶ 16; Salazar de Argueta, Vilma 2/5/2016 Decl. ¶¶ 22-23).

    f. According to Ana Gladys Magaña, a teacher at the school Alex attended, who was interviewed during the post-conviction investigation, although the civil war ended in 1992, "the parents of all our children, and really all of us, still live with the trauma caused by the war." The atrocities witnessed were too many. One time, she and a friend witnessed a dog carrying a human head on its mouth. (Magaña, Ana Gladys Decl. ¶¶ 2, 3.)

    g. While the civil war ended with the signing of the peace accords in 1992, social violence for Alex was far from over. Gang violence became rampant with gangs preying on the most vulnerable of youth, such as those who were extremely poor and with no sense of family belonging like Alex. (Torres, Melvin Cruz Decl. ¶¶ 23-25; Ramos, Luis Decl. ¶¶ 8, 9; Umaña, Edwin Decl. ¶¶ 20-22; Marisol Ramirez, Roxana Decl. ¶¶ 4-5, 16; Umaña, Lilian Decl. ¶¶ 26-28, 31, 37.) In addition to being subject to the whims of a gang, Alex also suffered from violence at the hands of the police for suspected gang affiliation (Reyes, Monica Decl. ¶ 16; Ramos, Luis Decl. ¶ 13.)

## VI. Interview with Mr. Umaña

37. In June 2016, I met and interviewed Mr. Umaña at the Terre Haute Federal prison. A mitigation specialist assisted me with this visit.

38. He presented as very polite and glad to have a visitor. He wanted to share his snacks given to him by the mitigation specialist, even though he was handcuffed.

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 62 of 237

39. The interview took place in Spanish. Mr. Umaña's eye contact was good, even though his eyes would at times flutter or he would roll them upwardly as if he was trying to read his own thoughts. Sometimes while speaking, he would look away in a distant manner.

40. Mr. Umaña spent most of the interview reminiscing about El Salvador in a mostly romanticized way and discussing his frustration over not being released to El Salvador. He would recall the fruits and foods he missed most, such as mangoes and *pupusas*. Frequently and throughout the interview, he stated how much he would love to return to enjoy the country's foods. He did not understand why he could not be fed, at least on occasion, a fresh fruit from his own home.

41. In fact, Mr. Umaña seemed to believe that he could be returned to El Salvador at the request of his legal team and expressed frustration that this had not yet happened.

42. Mr. Umaña did not seem to understand any of the legal complexities he was facing, despite the length of time he has been incarcerated. He kept saying that he would rather be in a Salvadoran prison because there he could at least be visited by his family and would be offered the country's foods. He seemed to think he would get to see his friends there and did not seem to have any idea of the horrors of Salvadoran prison life.

43. Mr. Umaña stated that he wanted his father to request help from the Salvadoran consulate to send him back. Again, he expressed distress at his legal team not mobilizing enough to send him back.

44. Mr. Umaña sang rap style songs he had written while in prison, sometimes out of the blue or in the middle of the conversation.

45. Mr. Umaña's language in his own native Spanish is limited, reflective of someone with barely an elementary school education. He seemed most comfortable in the colloquial Salvadoran Spanish.

13

46. When asked about his understanding of the reasons behind the Salvadoran civil war, Mr. Umaña did not seem to have any basic knowledge of the forces which led to the war nor did he care to know. His understanding was very concrete: the military and the guerrillas were fighting, it was very dangerous, and you were not to talk if questioned by an armed group.

47. Mr. Umaña recalls hearing voices and seeing visions or hallucinations while growing up and throughout his adulthood. He claimed he saw ghosts and demons while in El Salvador and when he was with his friends.

48. Mr. Umaña seemed to be more afraid of the demon voices and sights of the ghosts, which would appear and speak to him, than he was of the civil war atrocities experienced by himself, his friends and family.

49. When asked to describe his childhood, his affect ranged from rigid to childlike, nervous, giddy and avoidant. Also when asked, Mr. Umaña did not express any complaints about any of his family members. He did not complain about his father or his mother, in spite of the severe abuse outlined across an abundant number of declarations. He laughed occasionally out of context, saying his father "corrected him" to discipline him. He never used the words beatings or abuse.

50. The only memory that seemed to bring minimally appropriate emotional affect was when recalling his great grandmother Paca. He recalled how her abdomen had swelled. He became quiet and said he really suffered when she died because he missed her. This lasted only a few minutes before switching into tangential conversations unrelated to the topic.

51. Mr. Umaña spoke of wanting to see his sons and of how wonderful it would be to someday be released and to support his family.

14

52. When Mr. Umaña sang, which he either offered to do a few times or spontaneously erupted into song, he would repeat the lyrics in monotonous ways.

53. Mr. Umaña referred to the tattoos on his eyelids as a message to his "homies" that he "*no pudo mas*" or could not carry out any longer.

54. Mr. Umaña's recalling of his childhood does not at all reflect any of the abundant and coherent declarations of his severe abuse by his family, neighbors and friends. He mostly mentioned climbing over mango trees and liking to play soccer. His affect again oscillated between rigid and infantile. He was at times fidgety and his eyes would flutter when recalling childhood memories.

55. Mr. Umaña shared having to pretend he did not know anything when questioned by the military back in El Salvador. He recalled the smell of rotting human bodies during the civil war.

56. Mr. Umaña recalled as a child suffering from extreme headaches, which have continued to occur into adulthood.

57. Mr. Umaña stated that he does not sleep well and has not slept well in the past.

58. Mr. Umaña asked me to return to hear more of his songs which he was working on while in prison.

## VII. Concluding Opinions

59. My opinions set forth in this declaration are made based on review of materials provided to me after I prepared for and testified at the 2010 trial of Mr. Umaña. More specifically, I base my conclusions on much of what is contained in the attached social history of Mr. Umaña.

### A. Conclusions based on information provided to me after the trial:

60. If trial counsel had given me access to all of the information I now possess, I would have testified that Mr. Umaña is a severely traumatized man with limited cognitive abilities. The accumulation of traumatic events in his life, such as extreme poverty, parental alcoholism, *in utero* exposure to toxic substances like insecticide and alcohol, maternal malnourishment and depression during gestation, lack of prenatal care, premature and traumatic birth experience, a complete lack of prenatal care, a traumatic birth, child abuse, constant war violence, intergenerational violence, lack of early childhood stimulation, abrupt maternal separation during a critical developmental period, subsequent loss of his paternal great-grandmother, head injuries, hunger, violent neighborhoods and absence of basic protective factors such as parental love, nutrition and a safe environment place Mr. Umaña at severe risk for incomplete and extremely poor decision making. These factors also rendered him extremely vulnerable to the influence of others in meeting his social needs and to failing to develop an appropriate process of decision making.

61. There is no indication that Mr. Umaña ever received any form of mental health treatment or therapeutic intervention to help mitigate the severity of his traumatic upbringing.

62. Most of the risk factors discussed in this declaration occurred during the period most critical for cognitive development. Without access to any protective factors and while embedded within the context of a brutal civil war, these risk factors put Mr. Umaña at significant risk for cognitive delays at the least and probably interrupted his cognitive development.

63. Although I was appointed as an expert on how the stress of the Salvadoran civil war impacted the moral development of youth in the country, being Salvadoran by itself does not place Mr. Umaña at risk for delays in his cognitive development and therefore moral judgment. It is the significant interplay of all the risks mentioned throughout this declaration, in particular a culture of violence and neglect, which makes Mr. Umaña very vulnerable to the influence of others and not being able to manage his responses when threatened.

64. The lack of safety and the absence of adults to interpret the horrors of the civil war, as well as the abuse and neglect experienced at home, would have had a detrimental effect on any child's development. In Mr. Umaña, it appears to have led to poor emotional regulation and an inability to think clearly at times of threat.

65. The process of moral development in any person is predicated upon cognitive development or the growing capacity to learn and make meaning of the experiences and circumstances surrounding us. Cognitive development happens at the intersection of biological and environmental factors such as family and social influences. It is also dependent on one's history of emotional attachment, life's experiences and availability of caregivers.

66. Barely any of the conditions necessary for proper cognitive development were present in Mr. Umaña's life. The deck was stacked against him from the beginning. With so much exposure to toxic substances in utero, extreme familial poverty and resulting neglect, domestic and societal violence, Mr. Umaña never had a chance to develop his own sense of self and skills to make his own good decisions. He never had sufficient role models or scenarios available to him to draw upon to make good decisions when in difficult moments.

67. The process of making choices when feeling threatened is also predicated upon the capacity for emotional regulation or the ability to maintain perspective under threat. Traumatic experiences in childhood and constant fear negatively impacts a person's capacity to regulate his feelings when feeling threatened. (*See* Neurobehavioral Assessment of Mr. Umaña by Ruben Gur, Ph.D. (6/15/2016); Neuropsychiatric Evaluation of Mr. Umaña by James Merikangas, M.D. 11/17/2009).)

68. According to James Garbarino, the effects of growing up in a war zone are magnified by living in a violent home with family members who themselves are traumatized, abusive and neglectful. Violent

17

trauma at home and in the community are factors which particularly destroy normal emotional and moral development. Garbarino, Kostelny & Dubrow, 1991. This is definitely the case for Mr. Umaña.

69. Alejandro felt threatened constantly while growing up. El Salvador lacked any type of significant mental health services or social services safety net, which would have made it possible for Alejandro to seek guidance and find a way to interpret his experience. Everyone in El Salvador was impacted by the civil war, so even if such services would have been available, it is questionable as to whether or not Alejandro would have received appropriate services to make sense of his experience. He grew up swallowing his experience to the point of extreme silence. During the interview with him in June 2016, he did not once complain about his father or speak poorly of his upbringing. Loyalty, beyond any form of critical thinking of his own, has guided Mr. Umaña all of his life. His survival or self-preservation has depended on it.

70. Alejandro's developmental pathway set him up for a life of selecting peers and authority figures who are likely to control him and to set his course for him. His developmental pathway also caused him to respond recklessly and impulsively when threatened in ways that a person with a normal childhood would not respond.

71. Mr. Umaña's lack of emotional development and belonging, exacerbated by his inability to obtain a legal Salvadoran National ID card, prevented him from the legal means to obtain non-menial, legitimate employment in El Salvador. With no emotional, social and financial safety net, Mr. Umaña was further highly vulnerable to the influence of others within gang culture who could offer him a sense of family and protection.

72. It is my opinion, after review of the credible and relevant declarations of family members, friends, neighbors, and other professional experts' opinions, that Mr. Umaña was a developmentally delayed child in comparison to other children in his

family and neighborhood. Further, based on my review of all the materials provided to me by post-conviction counsel, I concur with the conclusions of the other mental health professionals on this case that Mr. Umaña had significant adaptive deficits during the developmental period, supporting the DSM-5's diagnostic criteria for an intellectual disability diagnosis.

73. My impressions of Mr. Umaña during my interview, as well as the reports from family, friends, neighbors and teachers, concur with those of other experts such as Dr. Olley, Dr. Merikangas and Dr. Stewart. Mr. Umaña is a severely traumatized man with severe cognitive delays and adaptive deficits, which place him within the category of an intellectual disability.

### B. Information provided to me after the trial that would have supplemented my testimony:

74. At Mr. Umaña's trial in 2010, I was not asked to provide the above opinions elaborating on how the complex interplay of risk and protective factors impacted Mr. Umaña's cognitive and therefore moral development. Trial counsel provided me with no pre-natal and perinatal history, no meaningful trauma history or accurate social history to base an analysis.

75. I was unaware of the full extent of Mr. Umaña's traumatization due to the civil war and chronic child abuse at the time of trial. I was also not told of the intergenerational exposure to violence of which both of his parents, especially his mother, are a product. There was no description of his *in utero* exposure to toxic substances, serious maternal illnesses such as malaria, his mother's suicide attempt while pregnant with him and of her depression as well as extreme malnutrition.

76. I was not aware of the extent of Mr. Umaña's lifetime suffering of headaches. I had no more than sketchy details about his falls that resulted in head injuries as a child. I had, at best, secondary reports from the trial investigator about the headaches. I had no notice of his history of auditory and visual hallucinations.

19

77. At the time of my 2010 testimony, there was an implication by the prosecution that Mr. Umaña's father was a consistent and caring individual and that the availability of Alex's paternal great grandmother would have constituted sufficient protective factors to keep him from engaging in criminal activities. No information was provided about the father's history of substance abuse, poor anger management, physical abuse and severe neglect of Mr. Umaña.

78. The reasons behind his separation from his mother, as well as her history of substance abuse during her pregnancy with him, were not made available to me prior to trial. It is worth noting that the mother's acceptance or affirmation of her history of substance abuse during his gestation is sufficient to raise flags about Mr. Umaña's cognitive development.

79. I was unaware of Mr. Umaña's malnutrition and other signs of extreme poverty such as extremely poor living conditions, even though the prosecution implied his upbringing was more of a working middle class child. There are numerous examples in the current declarations of the squalid and crowded nature of the living conditions Mr. Umaña endured.

80. I was unaware of Mr. Umaña's learning challenges and trial counsel did not provide me with copies of the school records in their possession.

81. The prosecutor implied that Mr. Umaña's childhood was fairly normal. There was mention of Mr. Umaña growing up playing soccer and having toys. Based on the current declarations, Mr. Umaña grew up in an urban, unsafe, extremely poor neighborhood across from a field where bodies were thrown and left to rot during the civil war. It was also a field where individuals were reportedly tortured. In reality, Mr. Umaña had no toys or adults engaging him in age appropriate play. Although he loved soccer as a child, the family's poverty prevented him from actually playing on a consistent basis.

20

82. Counsel did not provide me with available information about the confusion regarding Mr. Umaña's national origins or birthplace. As a result, I was not aware of the impact such confusion had on Mr. Umaña's capacity to find legal and meaningful employment and how such became an exacerbating factor in Mr. Umaña's desperate attempts to survive in El Salvador.

83. I did not know that Mr. Umaña actually showed signs of being a caring young child, as described by his neighbors, friends and relatives. This is evident in the declarations of Saul Umaña, Melvin Cruz Torres, Lilian Tino, Monica Reyes, and Xiomara Reyes. Without these descriptions, seeing and explaining the humanity of Mr. Umaña was not possible.

84. Finally, prior to trial, I had not had the chance to interview Mr. Umaña and gain my own impressions of his abilities or limitations. I certainly did not have access to a significant amount of post-conviction materials obtained during my current consultation.

85. In conclusion, I hold these opinions to a reasonable degree of psychological and professional certainty. If called upon to testify regarding the opinions contained herein, I would be willing to do so under oath, as these opinions and information provided are based on my knowledge, skill, experience, training, and education in the field of clinical psychology and in light of my specialized knowledge of the Salvadoran civil war and its aftermath.

I declare that the foregoing is true and correct under penalty of perjury and the laws of the United States and the State of _Colorado_ on _Oct. 2nd_, 2021.

Selena E. Sermeño, Ph.D.

# SOCIAL HISTORY ATTACHMENT TO THE DECLARATION OF SELENA E. SERMEÑO, Ph.D.

Regarding *United States v. Alejandro Umaña*, Case No. 3:16-CV-00057 (Western District of North Carolina)

## I. Relevant History of El Salvador:

1. El Salvador is the smallest and most densely populated nation in Central America, an area of the world that has been plagued by continuous political violence since the late 1970s.

2. El Salvador covers an area of just over 8,000 square miles, roughly the size of Massachusetts. The State of North Carolina is six times bigger than the entire country of El Salvador.

3. El Salvador is situated in the Pacific Ring of Fire, and thus has frequent earthquakes and volcanic activity. During the Civil War, the capital, San Salvador, was hit by an earthquake that left 1,500 dead and 100,000 homeless. *See* David H. Harlow, et al., *The San Salvador Earthquake of 10 October 1986 and its Historical Context*, Bulletin of the Seismological Society of America, Vol. 83 No. 4, p.1143 (1993).

4. The country's position relative to the Pacific Ocean has meant that, historically, it has been subjected to severe weather conditions, including: heavy rainstorms that result in dangerous flooding and landslides; significant droughts that destroy crops and lead to famine; and hurricanes that damage infrastructure. For instance, in 1998, Hurricane Mitch caused flash flooding and mudslides throughout the country that left approximately 59,000 homeless, 240 dead, and nearly $400 million (1998 USD) in damage. *See Central America After Hurricane Mitch, The Challenge of Turning a Disaster into an Opportunity: El Salvador*, Consultative Group for the Reconstruction and Transformation of Central America (1999).

5. The history of El Salvador is also replete with brutality. Like its neighboring Central American countries, El Salvador was formerly inhabited by indigenous populations, such as the Mayans, who were virtually exterminated by European settlers. The country was governed by the Spanish Crown during its colonial period, despite the fierce resistance conquistadors faced from the native population upon their arrival. Up until 1979, the country had been governed almost exclusively by military dictatorships.

6. From 1979 to 1992, the people of El Salvador lived through a violent and divisive civil war. At the heart of the conflict lay basic human rights issues, such as equality in land and food distribution, availability of minimal health care, housing and educational opportunities for all citizens, fair elections, and freedom of speech.

7. Human rights violations were commonplace leading up to the civil war. As the country became increasingly militarized, even church leaders were not immune from persecution and, eventually, physical violence. The March 1980 assassination of Archbishop Oscar Romero, who spoke out against injustice, repression, and the military's legitimization of terror, signaled to all Salvadorans that no one was safe.

8. The main parties in the conflict were the military-led government and the Farabundo Marti National Liberation Front ("FMLN"). The FMLN, named after leftist revolutionary and martyr Augustin Farabundo Marti, was a coalition of five left-wing guerilla groups.

9. Government forces were made up of the Salvadoran Army and the country's three main security forces: the National Guard, the National Police, and the Treasury Police.

10. Additionally, primarily ultra-right-wing paramilitary death squads took advantage of the chaos to further their own political agenda, combatting insurgency with acts of terrorism.

2

11. Extremely violent and frequent fighting broke out across the nation. More than half the country's arable land was destroyed by active combat, bombings, and the placement of landmines. Most of this fighting occurred in rural areas, but because El Salvador is so small, every area was affected, leaving the populace with no safe place to escape to. *See* Sermeño, *The Impact of Political Violence.*

12. The civil war took a devastating toll on El Salvador's population of 5.5 million, killing approximately 75,000 people, many of whom were under the age of eighteen. *See* Sermeño, *The Impact of Political Violence.*

13. In addition, many thousands of children younger than age fourteen were left with some type of war-related physical disability, mostly due to the widespread use of landmines, and 500,000 people were internally displaced. *See* Sermeño, *The Impact of Political Violence.*

14. Forcible conscription of boys and men was widespread and utilized by both the army and guerilla forces. It was not unheard of within a single family for one son to be forced to fight for the army and another child to be commandeered by the guerillas, and thus pitted against each other unwillingly.

15. Because it was a civil war fought within a small territory, the population also had difficulty delineating who the enemy was. Fighting would break out at night. There were landmines throughout much of the countryside. A great deal of the fighting was unconventional, in the form of what would be called acts of terrorism. Civilians could not flee internally to safe zones. Fighting could break out anytime, anywhere.

II.  **Family and Developmental History**: the history below is based on my review of sworn declarations and records provided to me by post-conviction counsel.

A.  **Prenatal and Maternal History**

3

16. Alejandro ("Alex") was born to Leticia Ramirez Diaz on ███████ ██ 1982. Leticia was born in Santa Ana, El Salvador on ███████ 1964.

17. Leticia describes a brutal childhood of significant physical and emotional abuse as well as extreme poverty. She was fifteen years old when the civil war broke out in El Salvador. Leticia describes her life as one of poverty and misfortune.

18. Leticia is the oldest of four children born to Santos Ramirez and Jose Alfredo Ortiz.

19. According to Leticia, her father was a day laborer, who also worked as a guardsman at the nearby barracks. Her mother sold merchandise at the local market. The family also worked in the nearby coffee plantations during coffee harvest season. They had very little money and often went hungry.

20. As a young child, Leticia describes foraging for food in the woods. She started working at the age of 11 taking care of another family's child.

21. Leticia's parents were physically and emotionally abusive to her. While the abuse mostly came from her father, her mother would also beat her.

22. Her father, Jose Alfredo, learned torture methods for punishing any perceived slight or misbehavior as a guardsman at the barracks. He would make Leticia squat with her arms extended while also holding a brick in each hand. There were also times when he would make her kneel on corn or sand while she would hold up a brick on her neck. He would hang her from the rafters in the ceiling and burn her with small pieces of paper or cornhusks he had lit on fire. Leticia reports being too sore to walk after the torturing punishments from her father.

23. Jose Alfredo was a violent alcoholic who would disappear for days on drinking binges. He had a child with Leticia's half-sister,

4

Maura, who was then fifteen years old. Leticia states that it is odd to be both a half-sister and an aunt to someone within your own household.

24. Jose Alfredo told Leticia that his own mother used to also beat him. She believes abuse is passed down in this way, from one generation to the next.

25. Leticia's mother, Santos, would also get very angry and beat Leticia over insignificant things. If Leticia did not do something right, her mother would beat her. Leticia recalls a time when at five years old, her mother became extremely angry and put a very hot tortilla on her face until blisters were formed because Leticia had accidentally burned the tortilla.

26. Aside from doing household chores, Leticia spent much of her childhood caring for her younger siblings.

27. Leticia was very close to her younger brother Saul. Both sustained brutal beatings from their father and needed each other to survive. Sadly, Saul was killed by paramilitary death squads during the civil war after being forcefully recruited by the leftist guerrillas at the age of fourteen.

28. Leticia was raped at the tender age of thirteen by two men who drugged her and a friend at a local recreational facility.

29. By the age of fourteen, Leticia started going out dancing, smoking marijuana and drinking as an escape from the brutal home circumstances. It is around this time when she met a married man named Miguel who was about 50 years old and who would take her to motels to have sex.

30. Leticia became pregnant by Miguel and at sixteen years old gave birth to her first child, Darwin. Miguel did not have anything to do with her once he found out she was pregnant, and on only one occasion did he give Leticia money to buy milk for the baby when

5

he was seven or eight months old. After that occasion, Miguel ignored them.

31. Leticia states that she knew Quique, Alex's father, was from the Santa Ana neighborhood, El Angel, where Quique would sell drugs. Quique was at the time involved with another woman but would also be flirtatious with Leticia.

32. Around the time when Leticia gave birth to her first son, Darwin, her younger brother Saul became involved with Quique's aunt, Carmen, who was quite a bit older than he and already had two children. Saul had been forcefully recruited by the leftist guerrillas and was forced to hide grenades and rifles for the guerrillas. At this same time, Carmen left for Guatemala with her daughters, Quique, and Alejandro's great grandmother Paca.

33. Saul knew the military was looking for him so he fled to Guatemala to be with Carmen.

34. After Saul fled to Guatemala, the death squads came to Leticia's home looking for him. They severely beat her father with the butt of their rifles in front of her. They threatened to kill the family, leaving them terrorized. As a result of this experience, Leticia's father, Jose Alfredo, gave Leticia ten *colones* to go to Guatemala to look for Saul and tell him to hide.

35. Leticia describes the experience of going to Guatemala to look for her brother as one of extreme danger and fear. She left her little boy, Darwin, with her parents, took a bible and a skirt and left for Guatemala. When she arrived, Saul had already gone back to El Salvador. Desperate, she returned to El Salvador as well. When she arrived she found out Saul had already been murdered by death squads. She did not even make it to the funeral on time.

36. She was sixteen years old, lost, terrified and bereaved without her brother Saul. Not knowing what to do, she returned to Escuintla, Guatemala to look for Quique and his family. Leticia left El Salvador for Guatemala trying to escape the civil war violence but

6

ended up in nevertheless a very violent environment with Quique and his family.

37. Leticia refers to Quique as "the devil". While the civil war was brutal in its traumatic nature, Leticia believes Quique traumatized her even more. Leticia spent four years in Guatemala with Quique, his grandmother Francisca (Paca), his sister Dora, aunt Carmen, and mother Ana.

38. When Leticia first arrived back in Guatemala, Quique began prostituting her, forcing her to dance naked at bars by making her drink the sedative Rohypnol, and getting her drunk quickly by making her drink beer through a straw. He believed this would make her drunk faster.

39. Leticia became pregnant with Alex at age 17 while living in Guatemala.

40. Even though she had given birth to Darwin, no one had ever explained to her how a woman becomes pregnant. No one taught her about her menstrual cycle and she did not realize she was pregnant until she had developed a big belly.

41. Quique remained extremely abusive with her throughout the pregnancy, forcing her to keep prostituting herself and taking whatever little money she made.

42. Quique's sisters and grandmother Paca did not like Leticia and at one point, Quique's sisters kicked her out of the house after a fight. She was forced to sleep on a tomb at a cemetery for several days. She was already pregnant with Alejandro but did not know it.

43. Leticia was seven months pregnant with Alex when she realized she was pregnant. By then, she had contracted malaria and does not recall being treated for it. She recalls getting a very high fever and taking the drug Rohypnol. She had been drinking throughout

7

most of the pregnancy and been forced into prostitution, not knowing she was expecting a child.

44. Not knowing she was pregnant and desperate for an escape, Leticia tried to kill herself by drinking a glass of poison. She left a photo with her mother's address to make sure she would be contacted if she died.

45. Leticia shares that during the pregnancy she would drink 8 beers in one sitting, at least three times per week. Sometimes she would also drink hard liquor. This was in addition to the Rohypnol Quique would give her. She stopped drinking in September and Alex was born in November.

46. At the time she became ill with malaria, Leticia recalls living by a river, which was filthy and fetid. The family would have to get drinking water from a spigot for public use, which would drain into the river. She was hungry and would fetch for crabs and little fish from the filthy water. She also would steal green bananas from the nearby fields in desperation. She did not have anything else to eat.

47. While she was pregnant, Quique had sexual relations with other women and beat Leticia if she complained.

48. The beatings took place at least once per week. He would take her to the train tracks or nearby fields and punch her so hard her face would look like a monster.

49. Quique would also forbid her from bathing in the nearby river out of jealousy that other men might see her. Meanwhile, he continued to smoke marihuana, drink, take pills, and drug her with Rohypnol pills.

50. Alex was born feet first. Leticia shares that the firemen who came to help with the birth took her to the hospital as they could not turn the baby around. They wanted her to have a caesarean but in the end Alex came feet first.

8

51. Leticia states that Quique did not wait to have sex with her after Alex was born. Shortly after she delivered Alex, she became pregnant with her second child, Saul.

52. After Alex's birth, Quique's sisters continued to act meanly towards Leticia. When Alex was five days old, they would not allow her to continue breastfeeding him and had her squeeze her milk and let it dry in the sun. They took the baby from her and started feeding him Nestogeno-baby formula.

53. Leticia shares that Quique registered Alex with fake papers and did not put himself down as the father. Instead, he said the father was Alex's cousin Luis, the child of his aunt Carmen.

54. When Alex was about three months old, the family moved to a house by a slaughter house. Leticia states that she and other family members would scavenge for carcasses and discarded animal parts for food.

55. It is also around this time that Alex got sick with a rash of red spots on his skin. He could only be held if he was wrapped in leaves. It took several months for the rash to go away. Leticia describes that Alex suffered a lot as a baby.

56. Alex's cousin, Edwin, recalls Alex's rash and illness. Alex's hair was white and his feet and stomach were swollen. The family put aloe on his feet for the swelling. Edwin recalls people saying Alex was anemic due to lack of nourishment.

57. When Alex was 8 months old, Leticia came home to find Alex not there. Quique had given Alex to his grandmother Francisca to raise him, telling Leticia that they would each raise one child to see who would do a better job. Leticia begged Quique to let her keep Alex too or visit him, but whenever she begged he would give her a beating.

58. Desperate for a place to live with baby Saul, Leticia ended up at the mercy of a lady, Niña Maruca, who allowed her to sleep on the floor of a small room near her pigpen. Like Alex, Saul also got ill often and Leticia thought the baby would die.

59. When Saul was 11 months old, Leticia left for Santa Ana, El Salvador. All she had was a shoe box with a few rags she used as diapers for the baby. She returned to her parents' house, who were also raising her older son, Darwin. There was not much room in the house, so she and Saul slept on the ground by her parents' bed.

60. Shortly after Leticia returned to Santa Ana, Quique and his family also returned. They resumed their relationship. Quique would come by Leticia's parents' and take her with him to spend the night. Leticia does not understand how Quique had a spell over her, as she was terrified of him. This went on for about a year while Alex continued living with his great-grandmother, Paca. Then one day, Leticia states that Quique told her she was free to go and be without him. While she felt a tremendous relief, she also felt a deep depression over not having Alex with her.

61. Around the time that Leticia's relationship with Quique ended, she became pregnant with her daughter Brenda. Shortly after Brenda was born, she began a relationship with a man named Raul who would become her partner of 28 years. As of 2016, Leticia was still with Raul. However, even though she was no longer with Quique, her fear of him continued, and she still describes him as dangerous and aggressive.

62. For several years, Leticia states that she was "asleep" and did not take good care of her children. She would act cruelly towards them and would punish Saul in the same manner that her father had treated her. She would spend the time playing cards and drinking. Her mother would get so upset that one time she dumped a box of salt on her head. Her father would scold her that she was a poor role model for her children. Leticia would yell back that he had no right to correct her when he had fathered a child with his own step-daughter, Leticia's half-sister.

63. Leticia shares that when Alex was a child, sometimes she would see him walking around in the neighborhood. He would lower his head and would not make eye contact with her. She fears that Quique had said horrible things to Alex about her.

64. Leticia had some contact with the Umaña family despite Alex not living with her. Occasionally one of the Umaña family members would bring Alex to her house. Her other children knew him but never got close or got to know him.

65. Twenty-five years ago, Leticia hit bottom and decided to seek help. She became involved with Alcoholic Anonymous and has been in recovery since then. Leticia, as well as her son Saul, both report that she has changed a lot. She now has grandchildren, loves them very much, and gives them attention in a way she never did to her own children. (Ramirez Diaz, Leticia Decl. ¶¶ 74, 77; Umaña, Saul Decl. ¶ 41.)

66. Leticia believes that the problems Alex faced as a young adult also had to do with his lack of identification papers. Not having been ever registered as a Salvadoran citizen, Alex could not obtain a Document of National Identity (DUI), which is required for getting work in El Salvador. (*See* Umaña, Saul Decl. ¶¶ 33-34.)

67. Leticia tried to help Alex and Saul obtain the proper papers such as birth certificates so that they could be registered as Salvadoran citizens and obtain the DUI. She went to Guatemala but in the end could not help them. She even offered to sell her sewing machine to pay for all the fees required but it was not enough. She was not successful in helping her sons obtain the needed documentation to prove their legitimacy as Salvadoran citizens and be able to freely look for employment.

### B. Alex's childhood

68. As stated above, when Alex was a toddler, Leticia moved back to Santa Ana, El Salvador. Quique and his family also moved back to

11

El Salvador around the same time. They had been extremely poor, discriminated and unwelcome war escapees in Guatemala. Alex's cousin, Edwin, recalls not being allowed to apply for school's scholarships as a Salvadoran citizen because of the discrimination from his Guatemalan school. (Umaña, Edwin Decl. ¶ 13.) The family would often go hungry and he would try to fetch discarded cattle from the nearby slaughter house, such as organ meats, so that the family would not starve. (Umaña, Edwin Decl. ¶ 17.)

69. Edwin recalls Leticia leaving Alex before he was one, to be raised by Quique and his great-grandmother Paca. (Umaña, Edwin Decl. ¶ 16.)

70. Back in Santa Ana, the Umaña family could only afford a room at a *meson* in the city called *Danubio Azul*. (Umaña, Ronal Decl. ¶ 8; Umaña, Rosa Lilian Decl. ¶ 9.)

71. A *meson* is a large house with many rooms, a shared kitchen, shower and latrine. A *meson* is typically a structure where the poorest of the poor live. *Mesones* are not even qualified as apartments, as an apartment at the very least has separate rooms and a bathroom

72. The *Danubio Azul* was made out of adobe walls, which were falling apart and of dirt floors. Quique, great-grandmother Paca, Alex, and his cousin Ronal, who was about 8 years older, all lived in one small room. (Umaña, Ronal Decl. ¶ 9.) They were extremely poor and could not pay for the room. Quique's aunt Carmen states that, once she moved to the United States, she sent money back to Paca to help pay for the room. (Umaña, Maria Carmen Decl. ¶ 5.)

73. Multiple reports by neighbors and family paint Alex's early childhood life as dismal. He was neglected by both Quique and Leticia. Leticia never saw Alex and Quique would beat him severely, scream at him often and never show any affection (Umaña, Saul Decl. ¶¶ 22-29, 35; Umaña, Lilian Decl. ¶¶ 26-28, 31, 39; Umaña, Edwin Decl. ¶¶ 20-21; Torres de Cruz, Vilma 1/30/2016 Decl. ¶¶ 11-16, 21; Salazar de Argueta, Vilma 2/5/2016 Decl. ¶¶ 13-24, 11/6/2018 Decl. ¶ 9; Marisol Ramirez, Roxana Decl.

12

(¶¶ 4-5, 16; Martir Monroy, Luis Decl. ¶¶ 5-8; Ramirez, Luis Decl. ¶ 9.)

74. Alex's great grandmother Paca became ill for about a year and died shortly after the family had left the *Danubio Azul meson* for another one. According to Alex's cousin Ronal and his aunt Reina, she developed a swollen stomach and swollen feet. The family did not have money for medical care so she received none. (Umaña, Ronal Decl. ¶¶ 30, 33-34; Umaña, Reina Decl. ¶ 10.)

75. Cousin Ronal recalls his grandmother having something that looked like a "two headed worm" on the back of her leg. Ronal pulled it out and believes this is what made the grandmother ill. (Umaña, Ronal Decl. ¶ 34.)

76. Ronal is the cousin with the most recollection of Alex's life in his early childhood and latency period. Ronal had gone to live with his Grandmother Paca because he was severely mistreated by his mother, Lilian. Ronal does not understand why his mother did not love him. She would beat him severely and scream at him. (Umaña, Ronal Decl. ¶¶ 6-8.)

77. Ronal and Alex were mere children when great-grandmother Paca died. Both were left bereft and unprotected following her death. (Umaña, Ronal Decl. ¶ 36.)

78. Ronal refers to the Umaña extended family clan as difficult to understand. They fought constantly and were violently mean to each other in front of others. Quique would get into nasty fights with his sisters and others in the neighborhood. (Umaña, Ronal Decl. ¶¶ 12-13.)

79. Vilma recalls that, according to Ronal and others who lived near them, Quique had a gun, which he would sometimes fire when drunk. One time he beat another man with a machete in a drunken brawl. (Torres de Cruz, Vilma 04/26/2016 Decl. ¶ 4.)

80. Quique would bring animals to be raised inside the room at the *meson,* such as pigeons and chickens. Feces were not removed from

13

the room causing an unbearable stench. (Torres, Melvin Cruz Decl. ¶ 7.) It was in these conditions that Alex was raised.

81. At one point while at the *Danubio Azul*, the wall on the side where Ronal, Alex and Grandmother Paca slept fell as a result of the shaking caused by trains traveling in the nearby train-tracks. This was the impetus for the family to go live at the second *meson*, in the *25th Calle Oriente in Santa Ana*, this time across from a coffee plantation. (Umaña, Ronal Decl. ¶ 11.) Neighbors who knew Alex at this time recall his life as one filled with constant physical and verbal abuse as well as neglect and hunger by his father. (Torres de Cruz, Vilma 01/30/2016 Decl. ¶¶ 12, 14.)

82. Soon after Grandmother Paca's death, Quique partnered with a young woman, Yanira, who was slightly older than Alex. She came from a large family of twelve and was also severely abused and neglected by her own family. (Umaña, Ronal Decl. ¶¶ 39-40.)

83. Yanira was cruel to Alex and Quique preferred her to Alex. He and Yanira would go out at night and lock Alex out of the *meson*'s room, leaving him without food. Yanira would take food and things from Quique's store and give them to her siblings, and when Quique noticed things were missing, Yanira would blame Alex. (Torres de Cruz, Vilma Decl. ¶ 13.)

84. Alex reportedly had a very hard time learning at school. He repeated the third grade three times and was twelve when his father decided to pull him out of school. (Umaña, Rafael Decl. ¶ 17; Ramos, Luis Decl. ¶¶ 2-3.)

85. School records reveal that Alex attended first grade in 1991 (at age 8 to 9). Alex barely passed the second grade in 1992, despite having good attendance. If it wasn't for a 7 in Physical Education, he would have failed the second grade. There is no record of him passing the third grade in 1993. Instead, the next available record shows he was in a remedial first-, second-, and third-grade integrated class in 1994. Children in these integrated, remedial classes do not represent the norm. Even still, in a remedial class of

14

ten students, Alex was one of the three students who did not pass the class. (Magaña, Ana Gladys Decl. ¶¶ 15-20.)

86. According to Alex's childhood friend Luis Ramos, who was four years younger than Alex, Alex was further behind in school than he was. He could not process or understand his schoolwork. He would get confused. Luis tried to help him, but Alex would get frustrated and ask why he had to learn those subjects. (Ramos, Luis Decl. ¶ 3.)

87. Reports from neighbors and friends, who knew Alex throughout his childhood, recall him as a very kind, respectful, helpful and generous child, in spite being severely abused and neglected. (Torres de Cruz, Vilma 1/30/2016 Decl. ¶ 21; Salazar de Argueta, Vilma 2/5/2016 Decl. ¶¶ 13-24, 11/6/2018 Decl. ¶ 9; Ramirez, Luis Decl. ¶ 9.)

88. According to Alex's father, Quique, Alex was a very generous child who shared whatever little money he made as a teenager. He was well loved because he was respectful and kind to everyone. (Umaña, Rafael Decl. ¶¶ 20-21.)

89. No one who offered sworn declarations seems to have understood why Alex had difficulties learning. Reports from friends who knew him as a young adolescent and child paint a picture of Alex as a child who wanted to learn but could not. For instance, he was eager to learn carpentry but could not follow instructions for the simplest of tasks, such as sanding the wood in a straight line or properly using a measuring tape. (Herrera, Carlos Decl. ¶¶ 15-16.) He wanted to learn to dance but could not follow the choreography. (Herrera, Jose Wilfredo Decl. ¶ 19.) He wanted to learn to read and write but could not recall the difference in letters like a "b" from a "d". (Herrera, Jose Wilfredo Decl. ¶ 16.) He would put his shoes on backwards even as an adolescent (same). He wanted to learn to write well but could not follow a simple dictation, even in the context of playing. (Herrera, Jose Wilfredo Decl. ¶¶ 16-18.) As an adolescent, he could not wash his own clothes, such as his uniform, when he worked as a helper with Coca Cola. (Herrera, Jose Wilfredo Decl. ¶ 13.) He could not follow directions for how to pick

15

coffee, even after multiple efforts by others to teach him. (Herrera, Jose Wilfredo Decl. 25; Herrera, Carlos Decl. ¶¶ 8-11.) He could not remember what to buy at the store or how to figure out the correct change. (Umaña, Rafael Decl. ¶ 19.)

90. According to his friends, Alex was childish in his manners even as an adolescent. (Ramos, Luis Decl. ¶ 4.) He liked watching cartoons and playing with much younger children. (Ramos, Luis Decl. ¶ 10.) He could not follow the thread of a conversation and would burst out laughing even if the topic was serious or somber. (Calderon, Jose Wilfredo Decl. ¶ 5.)

91. The mistreatment Alex received from his father continued throughout his adolescence. Neighbors from the meson in the *25th Calle Oriente in Santa Ana,* recalled Alex going hungry and looking extremely neglected, beaten by his father. Quique would punish Alex by keeping food from him. (Torres de Cruz, Vilma Decl. ¶¶ 12, 14, 16.).

92. Another neighbor recalls that Alex stopped going to school at about age 12 and instead wandered the streets by himself. (Monroy, Luis Decl. ¶ 5.)

93. Neighbors recall that Quique would smoke marihuana and get drunk with his friends. He did not try to hide his illicit activities. These behaviors would happen in front of Alex. Alex had no respectable role models or caregivers. (Monroy, Luis Decl. ¶ 6; Torres de Cruz, Vilma Decl. ¶ 18.)

94. When Alex was a young adolescent, he was invited to stay with the Herrera Calderon neighboring family. Alex and their youngest son, Jose Wilfredo, two years younger than Alex, were good friends. Jose Wilfredo felt terrible over the hunger and mistreatment which Alex suffered in the hands of his father. Even though the family was very poor, they felt compassion for Alex and cared for him. (Herrera Calderon, Jose Wilfredo Decl. ¶¶ 1-9, 22.)

95. Alex lived with the Herrera Calderon family for about two and a half years. While living with them, Mrs. Calderon tried to teach

16

Alex how to pick coffee in the plantations during coffee bean harvest time. This was physically demanding and exhausting work. It would take hours to catch the public bus, the family would then have to walk about 45 minutes to the actual plantation, pick coffee all day and return to their home in the evening. Mrs. Calderon tried to teach Alex how to pick the ripe beans correctly but Alex did not seem to understand. Alex would pick the wrong beans, play around and fill less baskets than Mrs. Calderon's younger children. (Herrera Calderon, Maria Lidia Decl. ¶ 4; Herrera Calderon, Jose Wilfredo Decl. ¶¶ 24-25.)

96. Mrs. Calderon's children, Karla and Geovanni, also recall how Alex did not seem to understand basic instructions, even though he was older than they were. Alex would play around and sit on the baskets' rims even though he was asked not to as the baskets were the needed tools for the trade. (Herrera Calderon, Karla Decl. ¶ 6; Herrera Calderon, Geovanni Decl. ¶¶ 8-13.)

97. Mrs. Calderon's husband worked in construction projects and was contracted to help with the labor involved in building a cell phone tower. He brought his sons and Alex with him to Sonsonate, a nearby province to Santa Ana. (Herrera Calderon, Geovanni Decl. ¶¶ 14-15.) Alex is described by his friends as very helpful and respectful but having a very difficult time learning even as he became older. (Herrera Calderon, Jose Wilfredo Decl. ¶ 5; Herrera Calderon, Karla Decl. ¶ 4; Herrera Calderon, Geovanni Decl. ¶¶ 2, 7, 16.)

98. Alfonso Cruz, a neighbor and husband of Vilma Torres de Cruz, was a carpenter who tried to teach Alex the trade. Alex could not use a measuring tape or follow simple instructions such as how to sand wood in a straight line. (Cruz, Alfonso Decl. ¶ 5.)

99. As a teenager, Alex became involved with Monica Reyes, the mother of his first child. They were neighbors in the *meson*. Monica was attracted to Alex because he was playful and childlike. However, she recalls how Alex had a very hard time learning to read and write, how he could not recall the differences between a b and a d, how he liked watching cartoons and how he would become

17

embarrassed at his inability to learn. Monica recalls Alex making jokes at inappropriate times and how he would see things she did not see. For example, Alex would stare blankly and tell her he saw demons who were talking to him. Alex would put his shoes on the wrong feet as an adolescent. Monica states that Alex had no support from his family and that he believed his mother did not love him. Monica states that Alex was beaten and harassed frequently by the police for suspicion that he was part of a gang. Monica became pregnant by Alex at the age of fifteen and gave birth to Alex's first son, Rafael Enrique, in 2004. Monica recalls Alex not having any form of personal ID, such as DUI. (Reyes, Monica Decl. ¶¶ 2, 10-11, 14-16, 19-20.)

100. Monica also recalls Alex's brother Saul scolding Alex for his childish behavior once Monica was already pregnant with Alex's first child. (Reyes, Monica Decl. ¶ 11.)

101. Alex could not continue living with the Herrera Calderon family. On top of the family's poverty, Mr. Calderon became very ill and could not work. The family was evicted from the *meson* and left homeless. After Mr. Calderon died, Mrs. Calderon suffered an aneurism. By then, Alex had gotten tattoos and Mrs. Calderon was afraid the suspected gang activity would put her family in danger. In spite of these circumstances, Alex came to visit her. Mrs. Calderon recalls that Alex remained respectful and kind with her. He called her Mama Lidia. Alex was leaving for the United States around this time. On his visit, he told her he would send money to help her. This was the last time Mama Lidia saw or heard from Alex. (Herrera Calderon, Maria Lidia Decl. ¶¶ 6-8; Herrera Calderon, Geovanni Decl. ¶ 6.)

## C. Head Injuries

102. Quique and Alex's aunt, Reina, reported that, when he was five years old, Alex suffered a bad fall and hit his head. Alex reportedly climbed on a table to try to reach something high on a shelf. The shelf fell on his head causing him to bleed. Alex was taken to the local public hospital where his head was sewn up. (Umaña, Reina Decl. ¶ 13; Umaña, Rafael Decl. ¶ 10.)

103. Alex's cousin Ronal reported that, also when Alex was about five years old, he fell from the top of an enormous tree he had climbed. Ronal watched as Alex fell, his body slamming into the tree's branches over and over until he hit the ground. His head was bleeding from a large, open wound, and his entire body was bruised. Alex's grandmother and Ronal covered the wound, but did not take him to the hospital. Ronal believes they should have, though. (Umaña, Ronal Decl. ¶ 31.)

104. Throughout his childhood, Quique described Alex as having suffered from bad headaches every other day. The pain was treated with children's aspirin called *Dolofin* and/or *Panadol*. The headaches would last for an hour at a time. His eyes would well up with tears and the pain was intense. Quique believes the pain was the result of head injuries during Alex's childhood. (Umaña, Rafael Decl. ¶ 18.)

105. Alex's frequent headaches were also witnessed by his neighbor, Vilma Torres de Cruz, mother to his friends Melvin and Roxana. Mrs. de Cruz recalls how Alex would cry from his headaches and would seek her comfort. She would recommend that he go to a clinic but she does not believe he ever did (Torres de Cruz, Vilma Decl. ¶ 22.)

106. Quique describes Alex as having a bad memory, maybe because of the falls. He would forget what to buy at the small grocery store. Quique would get very angry at him. In retrospect, Quique believes that Alex could not remember, and that he actually did his best. (Umaña, Rafael Decl. ¶ 19.)

107. Quique recalls Alex seeming like he was lost in thought whenever Quique would explain anything to him. He believes Alex did not understand instructions. (Umaña, Rafael Decl. ¶ 19.)

# SELENA E. SERMEÑO, Ph.D.



## Education

Ph.D., Counseling Psychology, 1994, Temple University, Philadelphia PA. Dissertation: *The Impact of Political Violence on the Moral Development, Potential for Antisocial Behavior, and Symptoms of Post-Traumatic Stress Disorder of Salvadoran Adolescents*

MA, Guidance Counseling, 1986, University of Northern Colorado, Greeley

Masters of Divinity, Pastoral Counseling, 1985, Central Baptist Theological Seminary, Kansas City KS

BA, Botany, 1981, Ottawa University, Ottawa KS

## Licensure

Licensed Clinical Psychologist, License No. 669, State of New Mexico, 1997-present

## Areas of Expertise

### Psychology

- Psychological interventions with populations impacted by traumatic events, substance use disorders, marginalizing circumstances, etc.
- Organizational consultation to organizations serving marginalized populations (e.g., populations struggling with addictions, incarcerated individuals, survivors of domestic and social violence, displaced populations)
- Cross-cultural psychology and models of cultural diversity
- Organizational change
- Reflective and clinical supervision
- Child and adolescent development
- Adjustment processes in post-conflict societies and post-natural-disaster settings (e.g., cultural reintegration of ex-combatants, reconciliation processes)
- Psychology of women
- Psychology of adolescence
- Infant and early childhood mental health models
- Individual, family, couples, and group therapy for children and adults
- Expert witness
- Evaluations for women and children asylum-status seekers detained in the US.

### Leadership & Social Change

- Reflective and contemplative models of leadership in health and educational settings
- Human dignity models of systems change for not-for-profits serving marginalized groups
- Models of ethical and participatory leadership
- Facilitation of social change processes and cross-cultural dialogue
- Reconciliation processes in post-conflict societies

### Education, Training, Organization Development & Human Development

- Trauma-informed care
- Program design and implementation for at-risk populations (e.g., substance abuse, at-risk youth, abuse victims)
- Capacity building for administrative and direct service staff who serve marginalized groups (e.g., law enforcement, trauma services, substance abuse)
- Gender- and culturally appropriate care
- Mentoring of adults in human services professions (e.g., criminal justice systems)
- Dialogue facilitation training for youth and adults

- Immigrant acculturation processes
- Service learning and participatory models of education
- Curriculum development
- Team building and collaborative processes
- Distributed learning, distance learning, and online models of higher education
- 21st Century Learning Competences/Social and Emotional Learning

**Administration & Management**
- Collaborative systems of care (e.g., substance abuse, mental health, primary care services)
- Policy development for delivery of substance abuse and mental health services to children and adolescents
- Administrative, clinical, and reflective supervision for substance abuse and mental health services staff
- Accreditation processes for health and educational facilities
- Program development
- Systems alignment and collaborative partnerships in the not-for-profit sector

## Current Consulting Roles & Projects

**Consulting Community Chaplain & Care Team member, Obama Foundation Scholars at University of Chicago & Columbia University.** Design and delivery of community chaplaincy support services model to current foundation scholars.                                                   **2021-present**

**Consultant & Trainer to Con-Textos, Chicago IL**                                   **2020-present**
Technical assistance for pedagogical staff working within the penal system, focusing on the impact of extreme social, familial, and historical trauma on economically and racially marginalized groups. Technical assistance on the use of literature and storytelling for increasing empathy and conscience development

**Consultant & Trainer to the Telluride, CO School District**                         **2020-present**
Capacity building and consultation to teaching staff and school administrators regarding equity, diversity, inclusion, and trauma-informed practices.

**Consultant & Trainer to the Silverton, CO School District**                         **2017-present**
Training and support for the implementation of social and emotional learning practices and trauma-informed pedagogy. Program design for supports to immigrant families and children.

**Consultant to the United World College-USA, Montezuma NM**                          **2015-present**
Program design of mental health/emotional wellness program initiatives for youth from 90+ nationalities. Design of psychosocial/educational support programming for youth impacted by extreme adversity and trauma utilizing Trauma-Informed Care and Pedagogy. Design of youth mental health programming

**Consultant & Trainer to Con-Textos, San Salvador, El Salvador**                     **2014-present**
Technical assistance for pedagogical staff working within the penal system, focusing on the impact of extreme social, familial, and historical trauma on youth's development. Technical assistance on the use of literature and story telling for increasing empathy and conscience development

**Expert Witness**                                                                    **2008-present**
Expert witness and consultant to legal teams in capital punishment cases involving experiences of extreme trauma.

## Previous Clinical Experience & Consulting Experience

**Consulting Community Chaplain & Care Team Member, Obama Foundation Fellows, Chicago IL**
Design and delivery of community chaplaincy support services model to foundation fellows.   **2019-2021**

**Consultant & Trainer, Southern Ute Tribal Court & Health Programs, Ignacio CO**      **2017-2020**
Capacity building and technical assistance regarding trauma-informed care models of service delivery.

**Consultant to Hozho Center in Navajoland**                                           **2017-2019**
Project design for a trauma-sensitive wellness and recovery women's center at the Navajo Nation.

**Consultant to Presbyterian Medical Services, Mobile Crisis Services, Santa Fe NM**     **March-Sept. 2017**
Technical assistance in writing of manual for mobile crisis response service within Santa Fe County.

**Consulting Psychologist & Trainer to Totah Behavioral Health Services, Farmington NM**     **2015-2016**
Capacity building of clinical and paraprofessional staff on the development of trauma-informed care programming to primarily Native American homeless and substance use disorder populations. Capacity building regarding clinical and reflective supervision, staff team building, etc.

**Consulting Psychologist & Trainer to High Utilizer Group Services (HUGS), Santa Fe NM**     **2014-2015**
Capacity building of clinical and administrative staff following a trauma-informed care model when addressing chronic substance abuse and over reliance in emergency room services.

**Consulting Psychologist & Trainer, Esperanza Shelter for Battered Families, Santa Fe NM**     **2014-2017**
Technical assistance and professional development on the implementation of trauma-informed programming within populations impacted by domestic violence.

**Consultant to the Telluride School District, Telluride CO**     **2011-2017**
Capacity building and technical assistance to school counselors and administrative staff regarding support services to immigrant and trauma-impacted youth.

**Early Childhood Mental Health Consultant, Bright Futures Early Learning Ctr., Telluride CO**    **2009-2013**
Capacity building and consulting regarding the social and emotional development of children birth to age 5. Support to immigrant families regarding cultural adaptation and mental health development of young children, especially as related to the impact of traumatic events.

**Consulting Psychologist & Organizational Consultant to the Children, Youth & Families Department (CYFD), State of New Mexico**     **2008-2014**
- Per consent decree between CYFD and the American Civil Liberties Union (ACLU), responsible for facilitating an organizational cultural shift from a punishment-oriented model to a human dignity and rehabilitation frame.
- Team building with and mentoring of corrections and mental health staff members.
- Training and mentoring of staff on moral development of youth, restorative justice, post-incarceration adjustment, trauma-informed care, gender-responsive and culturally sensitive models of intervention with incarcerated youth; the role of brain research and neurobiological models in juvenile justice practices; and the link between addiction, trauma, and social functioning.

**Clinical Supervision**     **1999-2003**
- Capacity building for infant mental health within Head Start programs
- Clinical and reflective supervision of child and family therapists

**Behavioral Health Director, Presbyterian Medical Services, Santa Fe NM**     **1998-1999**
- Clinical supervision, training, and consultation to clinical directors in statewide behavioral health programs serving underserved rural and urban populations across the life span.
- Design and implementation of behavioral health programs.
- Assurance of program compliance with national and state standards of care.
- Liaison between PMS' programs, behavioral health organization, and funding sources
- Program accreditation and evaluation.

**Psychologist and Clinical Director, St. Vincent Hospital, Santa Fe NM**     **1994-1998**
- Individual and family therapy with children, adolescents, and adults (e.g., addiction, trauma).
- Staff training to behavioral health programs and services serving youth (e.g., Head Start, Santa Fe Indian School, Santa Fe Public Schools, Espanola Public Schools).
- Clinical supervisor.
- Diagnostic assessment of children, adolescents, and adults. [also see Administrative section]

**School Psychologist, Espanola Public Schools, Espanola NM**     **1993-1997**
- Psychological services for special education students

**Clinical Supervisor, Consultant & Staff Trainer, Vistas del Sol Mental Health Center, Espanola NM**
- Development of staff training program focusing on legal, clinical, and ethical issues.          **1993-1994**
- Consultation to clinical director on issues such as staff relationships, program development, services to mentally ill and substance abuse populations, program quality assurance.
- Clinical supervision of and consultation to clinical teams.
- Development of protocols for the management of high-risk clients, particularly those with mental illness and addictions. [also see Administrative section]

**Child, Adolescent & Family Therapist, Mesa Mental Health, Albuquerque NM          1992-1993**

**Individual, Family & Group Therapist, Samaritan Institute, Albuquerque NM          1991-1992**

**Psychology Intern, Division of Child & Adolescent Psychiatry, University of New Mexico, Albuquerque**
Participation in the following rotation:          **1989-1990**
- Children's Psychiatric Hospital: Individual & family therapist
- Monthly psychological evaluations with children and adolescents
- Outpatient individual & family therapist, monthly psychological evaluations of children and adolescents
- Juvenile forensics: Weekly forensic evaluations on juvenile delinquents

**Individual & Family Therapist, University City Counseling Center, Philadelphia PA          1988-1989**

**Temple University, Philadelphia PA          1988-1989**
- Graduate Assistant, Individual & Group Therapist, Counseling Center
- Supervisor, practica in vocational counseling, individual and family counseling, Community Clinic, Department of Counseling Psychology

**Psychiatric Liaison Team, Emergency Room, St. Mary Corwin Hospital, Pueblo CO          1987**

**Family & Group Therapist, Chemical Dependency Treatment Unit, Parkview Episcopal Medical Center, Pueblo CO** [also see Administrative section]          **1985-1987**

**Individual/Group Alcohol/Drug Abuse Counselor, Pueblo Treatment Services, Pueblo CO          1985**

**Supervisor, practicum in individual counseling, Peterson Air Force Base, University of Northern Colorado, Colorado Springs CO          1985**

**Chemical Dependency Assistant, Individual & Group Alcohol & Drug Abuse Counseling, St. John's Hospital, Salina KS          1984-1985**

**Bethany Medical Center, Pediatrics, Kansas City KS          1983**
- Supervised internship in chaplaincy (Clinical Pastoral Education)
- Consultation and support to chronically ill children and their families

**Children & Youth Minister in Training, First Baptist Church, Ottawa KS          1982-1983**

## Previous Administrative Experience

**Director, Bartos Institute for the Constructive Engagement of Conflict, United World College–USA**
- Supervision and delivery of the Constructive Engagement of Conflict program on campus.          **2003-2006**
- Facilitation of the expansion of the CEC program into other international campuses.
- Member of senior administration team.
- Liaison to national communities; network development and relationship building with local communities.
- Design of global parenting mentoring program.
- Curriculum design.
- Design and delivery of youth-led conferences.
- Facilitation of intergroup collaboration with groups (e.g., Seeds of Peace, Peace Jam).
- Supervision of student leaders and program assistant; student evaluations.

**Deputy Director, Bartos Institute for the Constructive Engagement of Conflict, United World College–USA** [also see Academic section]                                                    **2001-2003**
- Cofounding and design of the Constructive Engagement of Conflict program
- Consultation to local communities regarding management of conflict issues, staff meetings, facilitation training

**Behavioral Health Director, Presbyterian Medical Services, Santa Fe NM**                        **1998-1999**
- Oversight, supervision, and consultation to all PMS Behavioral Health Programs in rural and urban New Mexico
- Development of policies and procedures for the provision of Services
- Development of training programs for the different programs
- Participation in multi-disciplinary planning of the provision of Health Services
- Ensure compliance with national and state standards of care
- Staff evaluations

**Psychologist & Clinical Supervisor, St. Vincent Hospital, Santa Fe NM**                        **1994-1998**
- Development of policies and procedures for the provision of mental health services, as well as quality assurance guidelines
- Assistance with preparation for JCAHO accreditation visits
- Staff training to behavioral health programs and services serving youth (e.g., Head Start, Santa Fe Indian School, Santa Fe Public Schools, New Vistas)
- Assisted with the development of policies and procedures as well as hiring of staff for a Day Treatment Program of the Santa Fe Public Schools
- Clinical supervision of mental health providers
- Program development, implementation, and policy making for the delivery of psychological services within a medical setting. [also see Clinical section]

**Clinical Supervisor, Consultant & Staff Trainer, Vistas del Sol Mental Health Center, Espanola NM**
[also see Clinical section]   **1993-1994**

**Cofounder, La Siembra (The Sowing), El Salvador**                        **1992-1994**
Not-for-profit organization established to serve the post-conflict rehabilitation of Salvadoran society; established a board of directors; provided organization consultation to Salvadoran mental agencies.

**Temple University, Philadelphia PA**                        **1989**
Supervised multicultural Practicum in Clinical Supervision for master's-level counseling students.

**Family & Group Therapist, Parkview Episcopal Medical Center, Pueblo CO**                        **1986-1987**
Designed & implemented substance abuse family therapy component of Inpatient Treatment Unit. [also see Clinical section]

## Consulting, Presentations & Training Experience

**Fellow, Encore Public Voices, with The OpEd Project**                        **2018-2019**

**La Plata Youth Services, Durango, CO**                        **2015-2019**
Consultant and trainer on trauma-sensitive services.

**Consultant & Translator, Courage & Renewal Programs, Seattle WA**                        **2013-2016**
Development and translation of leadership development curriculum for professionals in health and educational organizations using reflective and contemplative practice based on the work of Parker Palmer and the Courage and Renewal Network.

**Consultant to Women's International Study Center, Santa Fe NM**                        **2014-2015**
Assistance in design of Risk and Reinvention Conference for Women featuring Supreme Court Justice Ruth Bader Ginsberg as thought leader for the creation of equal access opportunities for women in the Southwest. Support to the program development staff on the design of young women's programming.

**Consultant, United World Colleges, National Committees Selection Office, London UK**        **2014-2015**
Development of student applicant selection protocols for youth coming from extreme adversity circumstances.

**Presenter, Children's Law Institute, Albuquerque, NM** *Fish Do Not See the Water They Swim In: Understanding the Subtle Impact of Unacknowledged Aggression on Juvenile Justice and Human Services Practices* **2014**

**Project Manager, Early Learning Advisory Councils, State of New Mexico** **2010-present**
- Systems alignment and program standards evaluation of seven major systems of care in early childhood.
- Facilitation of community discussions and focus groups throughout the state on the needs of the state's youngest children.

**Facilitator & Evaluator, Santa Fe, International Folk Art Market, Santa Fe NM** **2009-present**
- Facilitation of community building for artist community from 40+ nationalities
- Design and leadership of evaluation process of artists' market experience.
- Provision of feedback to Director of Training on content and process of artist training modules.

**Faculty Member, The Global Satir Network, Seattle WA** **1997-present**
Teaching of integration and application of Virginia Satir humanistic psychology model into issues such as diversity, oppression, trauma, and conflict.

**Early Childhood Mental Health Consultant, Bright Futures, San Miguel, Ouray & West Montrose Counties CO** **2009-2013**
Capacity building, mentoring, reflective supervision, and evaluation of early childhood systems in rural Western CO, Based upon reviews and research of best practices literature.

**Consultant & Facilitator, Telluride CO School District** **2010-2013**
- Facilitation of awareness raising, educational success, and social integration of immigrant youth into local school system.
- Design and delivery of retreats aimed at harnessing voices of Latino youth as key for the appropriate delivery of culturally sensitive education.
- Writing recommendations and final report to School Board and Superintendent regarding best practices for integration and academic success of immigrant youth.

**One Telluride, Telluride CO** **2010-2012**
Capacity building of local health, educational, and business institutions to understand the psychosocial needs of the immigrant population and respond in a culturally sensitive manner.

**Consultant & Trainer, Crosscultural Communication, Youth Leadership & Conflict Management**
- Consultant & trainer, Brown Mediation Project, **Brown University**, Providence RI **2009**
- Consultant to **Seeds of Compassion,** designing visit of his HH the Dalai Lama **2007-2008**
- Mentor to Rwandan genocide youth survivors in establishment of a constructive engagement of conflict program within **United Nations**-led refugee camps in Uganda. **2009-2010**
- Mentor & trainer to multicultural youth team in planning, design, and delivery of the **Youth for Progress in Iraq Initiative** in Aman, Jordan. Event brought together Iraqi teenagers and adults from Shiite, Suni, and Kurdish backgrounds with teenagers from the US, using a mentoring approach involving youth facilitators from Turkish Cyprus, Pakistan, Israel, Egypt, Canada, Australia, and the US. **2009**
- Meeting & interview facilitator in Bhutan with Dasho Karma Ura, President, **Centre for Bhutan Studies and Gross National Happiness Research**. **2009**
- Training facilitator, essentials of facilitating dialogue across deep value differences for faculty and students, emphasizing bringing together youth and adults from India and Pakistan at **United World College–Mahindra in India**, with facilitators representing India, Pakistan, Israel, Panama, Zimbabwe, Sweden, US, Colombia, and Ecuador. **2009**
- Consultant & reflection supervision, **Institute for Interaction and Social Change**, Boston MA for staff members regarding their work with Sudanese women. **2008**
- **Cornell University,** Department of Peace Studies, Ithaca NY **2007**
- **World Peace Conference**, Santa Fe NM **2007**
- **Council on World Affairs**, Seattle WA **2006**
- *YES* **Magazine**, Bainbridge Island WA **2006**
- **University of Washington, Department of Social Work** **2006**

- **Washington State Division of Developmental Disabilities**      **2005**
- **Unitarian Universalist Service Committee**      **2004**
- **Water Works, Casa Annunciation, & other human rights groups,** serving survivors of extreme trauma (e.g., INS detainees, political persecution victims, etc. at the US/Mexican border)    **1999-2002**
- **Oficina Gubernamental para La Mujer (Office of Women's Affairs), Honduras**    **1989-1992**
- **Universidad Nacional de Honduras, Department of Psychiatry & Psychiatry**    **1999-2003**
- **AGAPE, El Salvador** Psychosocial programs serving populations across the life span affected by political and community violence (e.g., teenage mothers, the elderly, war orphans, homeless, malnourished children, gang exit support)    **1998-2003**
- **Nueva Acropolis, El Salvador**    **1997-2003**
- **Universidad San Jorge, El Salvador**    **1997-2003**
- **Corte Suprema de Justicia (Supreme Court), El Salvador**, Special Projects for the Treatment and Prevention of Domestic Violence    **1997-2003**
- **Policia Nacional Civil (National Police), El Salvador**    **1997-2003**
- **Curz Roja (Red Cross), El Salvador**    **1997**
- **Grupos Paramendicos de Rescate (Paramedics & Rescue Groups), El Salvador**    **1997**
- **Procuraduria General de Derechos Humanos (Commission for the Protection of Human Rights), El Salvador**    **1997**
- **Ejercito Militar Salvadoreno (Salvadoran Army), El Salvador**    **1988, 1992-1993, 1997**
- **Save the Children, Gang Rehabilitation Special Units, El Salvador**    **1997**
- **Ministerio de Educacion (Ministry of Education), El Salvador**    **1997**
- **Secretaria Nacional de la Familia (Children, Youth & Families), El Salvador**    **1992-1995**
- **CEPREMIN (NGO for the prevention and treatment of child abuse), El Salvador**    **1991-1992**
- **Centro de Rehabilitacion para Invalideces Multiples (National Center for the Rehabilitation of Multiple Handicaps: Special Project for the Rehabilitation of War Victims), El Salvador**    **1992**
- **Ministry of Justice, Department of Child Welfare, San Jose, Costa Rica**    **1988**
- **Latin American Technological University of El Salvador**    **1988**
- **Military Hospital, Department of Psychiatry & Psychology, El Salvador**    **1988**
- **UCA, Central American University, Department of Psychiatry, El Salvador**    **1988**
- **Ministry of Education, El Salvador**    **1988**

## Academic & Mentoring Experience

**Visiting Associate Professor & Practicum Advisor, Master's Program in Conflict Resolution, Antioch University McGregor, Yellow Springs OH**    **2001-2010**
- Curriculum development, course evaluations, and teaching of Theories of Third Party Roles with Systems in Conflict; Theories of Group Intervention; Theories of Public Processes; Introduction to the Field of Conflict Resolution; and Theories of Communication in Conflict.
- Faculty Advisor and designer for capstone thesis-project students.
- Faculty Mentor to students in individualized liberal dtudies program.
- Practicum Advisor, mentoring and oversight of clinical components for Masters in Conflict Analysis and Engagement.
- Facilitation of learning community and team building for all incoming cohorts.
- Consultation to program chair on curriculum development, facilitation training models, and support to students facing difficult challenges.
- Presentations on special topics (e.g., psychology of conflict, challenges and opportunities for adult learners, the self of the conflict manager, conflict management in post-conflict societies, the significance of understanding a human-rights frame in systems change, conflict management processes, impact of traumatic events on different societies).

**Program Director & Curriculum Designer, United World College of the American West, Bartos Institute for the Constructive Engagement of Conflict**    **2000-2006**
- Cofounder and director of the Constructive Engagement of Conflict program.
- Ethical leadership development models and training for adolescents from 88 countries.
- Consultation and technical assistance to local, national, and international groups.

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 97 of 237

- Cross-cultural dialogue models.
- Teaching courses (e.g., Theory of Knowledge, Human Rights, service learning projects).
- Member of management team; supervision of student leaders and program assistant.
- Network development and relationship building with local communities.
- Student evaluations.

**Antioch University McGregor & Bartos Institute for the Constructive Engagement of Conflict, Joint Graduate Certificate Program in Environmental Conflict Resolution** [& see Admin section]   **2001-2003**
- Curriculum and program design of certificate program
- Co-teaching of Culture and Identity course, Theories of Communication in Conflict course.
- Mentoring of adult students.

**Thesis Advisor, University for Peace, Villa Colon, Costa Rica**                                              **2007**

**Adjunct Faculty, Counseling Department, College of Santa Fe NM**                          **1999-2001**
Teaching courses in Masters of Counseling with At-Risk Youth (e.g., Advanced Counseling Skills, Theories of Family Therapy, Group Psychotherapy, Infant Mental Health).

**Guest Faculty, National University of Honduras, School of Medicine, Dept. of Psychiatry**       **1999-2002**
Teaching the Virginia Satir model for humanistic psychology; and treatment models for traumatized populations in post-conflict, post-natural disaster societies (e.g., post-Hurricane Mitch support).

**Guest Faculty & Presenter, Universidad San Jorge, Nueva Acropolis, El Salvador**       **1997-2002**
Teaching the Virginia Satir model for humanistic psychology; and treatment models for traumatized populations in post-conflict, post-natural disaster societies (e.g., post-Hurricane Mitch support).

**Nueva Acropolis, El Salvador & Guatemala**                                                  **1997-2003**
Teaching the Virginia Satir model for humanistic psychology; and post-conflict reconciliation models within polarized groups.

## Interpreter Services, English/Spanish

**Special Mission to Costa Rica and El Salvador, 1988,** interpreter to Dr. Virginia Satir, author, family therapist, and humanitarian

**Peace Jam, NM, 2004,** interpreter to Rigoberta Menchu-Tum, Nobel Peace Laureate and Mayan activist

**World Peace Conference, 2007**, Santa Fe NM

## Additional Training

- Immunobiology of Stress and Its Manifestations (e.g., addictive behaviors, life span), 2013
- Neurobiology of Relationships, 2010
- Attachment Theory and Models of Reflective Parenting, UCLA, 2007
- Understanding Relational Aggression Among Adolescent Girls, 2006
- Human Rights in Health and Education, Harvard University School of Public Health, 2004
- Training for Couples Therapy, The Gottman Institute, 2002
- Boston University Model for Psychosocial Rehabilitation, 1998–1999
- Critical Incidents Stress Debriefing, 1997
- Eye Movement Desensitization and Reprocessing (EMDR), Levels I&II, 1992
- Quarterly training in family therapy with Virginia Satir, 1986–1988

## Honors

- 2003 Living Treasure Award, Avanta: The Virginia Satir Network.
- 2002 Special Service Recognition, Centro de Cancer Emma Romero de Callejas, Tegucigalpa, Honduras.
- 2000-2002 Special Recognition, Nueva Acropolis, Guatemala.
- 1999 Special Service, Office of Women's Affairs, government of Honduras.
- 1999 Special Service in Recognition for Services to Hurricane Mitch Survivors, University of Honduras.

- 1998-1999 Special Service, AGAPE of El Salvador.
- 1997-1998 Special Service, Universidad San Jorge, El Salvador.
- 1993, 1997-1999 Avanta: The Virginia Satir Network Outreach Grant for Special Services to El Salvador.
- 1988 Special Service, Military Hospital of El Salvador.
- 1988 Special Service, Ministry of Justice, Costa Rica.
- 1988 Special Service, Latin American Technical University of El Salvador.
- 1986 Invited by Virginia Satir to become a member of Avanta: The Virginia Satir Network.

## Publications

Sermeño, S. (2019, January 14). *Denying Asylum Means Exporting Toxic Trauma*
http://garnetnews.com/2019/01/14/denying-asylum-means-exporting-toxic-trauma/

Sermeño, S. (2018, February 13). *Kicking Salvadorans Out Will Do Generational Damage*
https://www.huffingtonpost.com/entry/opinion-sermeno-salvadorans-trump_us_5a7dfc4ce4b08dfc9304042d?dq

Sermeño, S. (2015, November 18).Inside the dreaded moment. *Anchor, Still Harbor, 4*. Available at
http://stillharbor.org/anchormagazine/2015/11/18/inside-the-dreaded-moment

Sermeño, S. (2012, December 17). Stay in your heart, no matter how painful. *Opinion, Need to Know on PBS*. Available at http://www.pbs.org/wnet/need-to-know/opinion/stay-in-your-heart-no-matter-how-painful/15755

Sermeño, S. (2011). Building a case for cultural sensitivity through personal storytelling and interpersonal dialogue in international education. *International Schools Journal, 31*(2), 10-17.
https://www.isjournal.eu/archive

Patty, J., Sermeño, S., & Martin, C. (2008), International trends in peace education. In L. Kurtz (Ed.), *Encyclopedia of violence, peace and conflict* (2nd ed., pp. 1466-1477). Austin TX: Academic Press.
https://doi.org/10.1016/b978-012373985-8.00126-4

Sermeño, S. (2006). Applications of the Constructive Engagement of Conflict Program: A project week trip to the SOS Colegio Internacional, Santa Ana, Costa Rica. *Kaleidoscope, 33*, 14-15.

Sermeño, S. (2004, Fall). The Bartos Institute for the Constructive Engagement of Conflict engages us. *Kaleidoscope, 30*, 2-3. https://www.yumpu.com/en/document/view/8201488/kaleidoscope-uwc-usa/3

## Languages

Native speaker of Spanish; fluent in English.

**References available upon request**

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| **Volume I** |
|---|
| 1. Declaration of Leticia Ramirez<br>    a. Certified English version<br>    b. Original version in Spanish |
| 2. Declaration of Saul Umana<br>    a. Certified English version<br>    b. Original version in Spanish |
| 3. Declaration of Ana Gladys Magana<br>    a. Certified English version<br>    b. Original version in Spanish |
| 4. School Records for Alejandro Umana<br>    a. 1991 1st Grade<br>    b. 1992 2nd Grade<br>    C. 1994 1st, 2nd, and 3rd Grade |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| **Volume II** |
| --- |
| 1. Declaration of Luis Mario Martir Monroy<br>    a. Certified English version<br>    b. Original version in Spanish |
| 2. Declaration of Melvin Cruz Torres<br>    a. Certified English version<br>    b. Original version in Spanish |
| 3. Declaration of Roxana Cruz Torres<br>    a. Certified English version<br>    b. Original version in Spanish |
| 4. Declaration of Vilma Cruz Torres<br>    a. Certified English version<br>    b. Original version in Spanish |
| 5. Declaration of Ana Ruth Umana Gonzalez<br>    a. Certified English version<br>    b. Original version in Spanish |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| **Volume III** |
|---|
| 1. Declaration of Vilma Torres de Cruz (Supplemental) <br>      a. Original version in Spanish |
| 2. Declaration of Zoila Olano <br>      a. Original version in Spanish |
| 3. Declaration of Ana Julia Magana de Sanabria <br>      a. Original version in Spanish |
| 4. Declaration of Zoila Soriano <br>      a. Original version in Spanish |
| 5. Declaration of Lilian Tino <br>      a. Certified English version <br>      b. Original version in Spanish |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume IV |
|---|
| 1. Declaration of Vilma Salazar de Argueta |
|     a. Certified English version |
|     b. Original version in Spanish |
| 2. Declaration of Vilma Torres de Cruz (Supplemental) |
|     a. Certified English version |
| 3. Declaration of Zoila Olano |
|     a. Certified English version |
| 4. Declaration of Monica Reyes |
|     a. Certified English version |
|     b. Original version in Spanish |
| 5. Declaration of Ana Julia Magana de Sanabria |
|     a. Certified English version |
| 6. Declaration of Zoila Soriano |
|     a. Certified English version |
| 7. Declaration of Rafael Enrique Umana |
|     a. Certified English version |
|     b. Original version in Spanish |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume V |
|---|
| 1. Cemetery Records |
|     a. Henri Geovanni Ayala Umana |
|     b. Tomasa Gonzalez |
|     c. Alejandro Umana |
|     d. Saul Alfredo Ramirez |
| 2.  Declaration of Jose Ortiz |
|     a. Certified English version |
|     b. Original version in Spanish |
| 3.  Declaration of Lilian Umana |
|     a. Certified English version |
|     b. Original version in Spanish |
| 4. Declaration of Reina Umana |
|     a. Certified English version |
|     b. Original version in Spanish |
| 5. School Records for Henri Geovanni Ayala Umana |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume VI |
|---|
| 1. Bureau of Prisons (BOP) Records |
|      a. BOP Medical Records - March 08, 2016 |
|      b. BOP Central Records - April 13, 2016 |
| 2. Expert Reports |
|      a. Declaration of Dr. John Gregory Olley - May 20, 2016 |
|      b. Report by Dr. Ruben Gur - June 15, 2016 |
| 3. Greensboro Police Department |
|      a. Arrest and Incident Report - August 06, 2007 |
| 4. Jail Letters |
|      a. Jail Letters Admitted at Trial Guilt Phase |
|      b. Jail Letters Admitted at Penalty Guilt Phase |
|      c. Jail Letters Relied Upon for Atkins hearing |
| 5. Jail Records |
|      a. Disciplinary records |
|      b. Guilford County Jail |
|      c. High Point Jail |
|      d. Mecklenburg County Jail Visitation |
| 6. Medical Records |
|      a. Gwinnett Medical Center, CT Images - May 16, 2007 |
|      b. Gwinnett Medical Center, Records |
| 7. Genogram |
|      a. Family Tree - October 3, 2016 |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume VIA |
| --- |
| 1. Declaration of James R. Merikangas, M.D. |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| | |
|---|---|
| **Volume VII** | |
| 1. | Transcript of Guilt Phase – Volume I (04/12/2010) |
| 2. | Transcript of Opening Statements Taken at Guilt Phase (04/12/2010) |
| 3. | Transcript of Guilt Phase – Volume II A (04/13/2010) |
| 4. | Transcript of Guilt Phase – Volume II B (04/13/2010) |
| 5. | Transcript of Guilt Phase – Volume III A (04/14/2010) |
| 6. | Transcript of Guilt Phase – Volume III B (04/14/2010) |
| 7. | Transcript of Guilt Phase – Volume IV A (04/15/2010) |
| 8. | Transcript of Guilt Phase – Volume IV B (04/15/2010) |
| 9. | Transcript of Guilt Phase – Volume V A (04/16/2010) |
| 10. | Transcript of Guilt Phase – Volume V B (04/16/2010) |
| 11. | Transcript of Jury Questions and Verdict Guilt Phase – Volume VI (04/19/2010) |
| 12. | Transcript of Sentencing Phase – Volume I (04/19/2010) |
| 13. | Transcript of Sentencing Phase – Volume II A (04/20/2010) |
| 14. | Transcript of Sentencing Phase – Volume II B (04/20/2010) |
| 15. | Transcript of Sentencing Phase – Volume III A (04/21/2010) |
| 16. | Transcript of Sentencing Phase – Volume IV A (04/26/2010) |
| 17. | Transcript of Sentencing Phase – Volume IV B (04/26/2010) |
| 18. | Transcript of Sentencing Phase – Volume V A (04/27/2010) |
| 19. | Transcript of Sentencing Phase – Volume V B (04/27/2010) |
| 20. | Transcript of Sentencing Phase – Volume VI (04/28/2010) |
| 21. | Transcript of Atkins Hearing (11/30/2009) |
| 22. | Order Denying Motion to Declare Mr. Umana Ineligible for the Death Penalty (03/19/2010) |
| 23. | December 12, 2007 Integration (Video and Transcripts) |
| 24. | April 23, 2008 Interrogation (Audio and Transcripts) |
| 25. | Appendix 105 - Declaration of Edwin Esau Umaña |
| 26. | Appendix 106 – Declaration of Carlos Alcides Peraza |
| 27. | Appendix 107 - Declaration of Gerardo Arriola Umaña |
| 28. | Appendix 109 - Declaration of Roxana Marisol Ramirez |
| 29. | Appendix 110 - Declaration of Noe Rivera |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| | |
|---|---|
| 30. | Appendix 111 - Declaration of Dora Alicia Umaña Gonzalez |
| 31. | Appendix 112 - Declaration of Luis Ramos |
| 32. | Appendix 103 - Alejandro Umaña as a Child |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume VIII |
| --- |
| 1.  Appendix 70 - Neuropsychological Report by Dr. Ricardo Weinstein (7/17/2009) |
| 2.  Appendix 71 - Psychological Report by Dr. Enrique Suarez (11/2/2009) |
| 3.  Appendix 72 - Neuropsychiatric Report by Dr. James Merikangas (11/17/2009) |
| 4.  Appendix 73 - Psychological Report by Dr. Gregory Olley (11/18/2009) |
| 5.  Appendix 81 - Dr. Ricardo Weinstein's Neuropsychiatric Report (12/03/2009) |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume IX |
| --- |
| 6. United States Court of Appeals for the Fourth Circuit Opinion (04/23/2014) |
| 7. Appendix 29 - Neurobehavioral Assessment of Alejandro Umaña by Dr. Ruben Gur |
| 8. Appendix 36 - Trial Social History Report by Mitigation Specialist Richard McGough |
| 9. Appendix 37 - Trans National Anti-Gang  Discovery - Biographical Information of Alejandro Umaña |
| 10. Appendix 38 - Richard McGough's Invoice |
| 11. Appendix 45 - Alejandro Umaña's Medical Records - Gwinnet Health System (UNDER SEAL) |
| 12. Appendix 46 - 2008 Trans National Anti-Gang Discovery Documents (Spanish) |
| 13. Appendix 47 - 2008 Trans National Anti-Gang Discovery Documents (English) |
| 14. Appendix 50 - Alejandro Umaña's BOP Medical Records (UNDER SEAL) – (3/08/2016) |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume X | |
|---|---|
| 15. | Supplemental Declaration of Leticia Ramirez – (02/06/2016) |
| 16. | Supplemental Declaration of Leticia Ramirez (11/2018) |
| 17. | Declaration of José Wilfredo Herrera Calderón (08/16/2018) |
| 18. | Declaration of Karla Herrera Calderón  (11/16/2018) |
| 19. | Declaration of María Lidia Calderón (11/16/2018) |
| 20. | Declaration of Alfonso Cruz (08/16/2018) |
| 21. | Declaration of Ana Lilian Reyes 08/16/2018) |
| 22. | Declaration of Carlos Geovanni Herrera (11/17/2018) |
| 23. | Declaration of José Alfredo Ortiz (11/17/2018) |
| 24. | Declaration of Josselyn Guevara Reyes (11/17/2018) |
| 25. | Declaration of Roxana Cruz Torres (11/17/2018) |
| 26. | Declaration of Vilma Elizabeth Torres de Cruz (11/17/2018) |
| 27. | Declaration of Xiomara Reyes (11/18/2018) |
| 28. | Declaration of Vilma Aracely Salazar de Argueta (11/16/2018) |
| 29. | Declaration of Pablo Stewart, M.D. (Exhibit A) - 05/23/18 |

# Background Materials Provided to Selena Sermeño, Ph.D.
## For the Case of Alejandro Umaña (3:16-CV-000057)

| Volume XI |
|---|
| 30. Photos of Danubio Azul Meson |
| 31. Photos of La Fe Meson |

# APPENDIX 238



April 29, 2022

Dear Ms. Miller,

Enclosed, please find my final report for *U.S. v. Alejandro Enrique Ramirez Umaña.*

Sincerely,

Erik Nielson, Ph.D.

Professor and Chair
Department of Liberal Arts
University of Richmond

1

**Background:**

I am a Professor of Liberal Arts at the University of Richmond, where I teach courses on African American literature, hip hop culture, and advanced writing. I received my B.A. from the University of Virginia, my M.A. from University College London, and my Ph.D. from the University of Sheffield (in the UK). I have published articles on African American literature and hip hop culture in several peer reviewed journals, including *African American Review, MELUS, Race and Justice, International Journal of Cultural Studies,* and *Journal of Popular Music Studies*. I also write regularly for popular outlets, including *The New York Times, The Washington Post, Rolling Stone, The Atlantic*, and *NPR*. I have been the lead author of three *amicus* briefs for the U.S. Supreme Court, which included support from a broad range of prominent artists, scholars, and journalists. In 2015, I co-edited of *The Hip Hop & Obama Reader* (Oxford University Press), and in 2019 I co-authored the book *Rap on Trial: Race, Lyrics, and Guilt in America* (New Press). I have served as an expert witness or consultant in more than 75 cases nationwide and have provided in-court testimony in state and federal courts across the country.

**Materials reviewed:**

I was asked by Mr. Umaña's attorneys to review the following materials and then to render my opinion related to the musical/artistic elements found within Mr. Umaña's letters—provided in the original Spanish along with English translations—particularly the letter that includes "Un Dia Mas Con La Bestia" ("One More Day With The Beast"):

1. Transcript of Guilt Phase – Volume III A (04/14/2010)
2. Letter - Gov't Exh.161 b
3. Transcript of Guilt Phase – Volume V B (04/16/2010)
4. Transcript of Interrogation of Alejandro Umana (4/23/2008)
5. Transcript of Sentencing Phase – Volume II B (04/20/2010)
6. Transcript of Sentencing Phase – Volume V B (04/27/2010)
7. United States Court of Appeals for the Fourth Circuit Opinion (04/23/2014)
8. Transcript of Disc 19, Session 3 (12/12/2007 at 12:05 p.m. – 1:16 p.m.)
9. Jail Letters Admitted at Guilt Phase
10. Jail Letter Admitted at Penalty Phase – Gov't Exhibit 152a
11. Letter from Alejandro Umana to Jaime Sandoval (Pelon)
12. Letter from Alejandro Umana to Jesus A. Rangel
13. Letter from Alejandro Umana Jaime Sandoval / One More Day with the Beast
14. Letter from Alejandro Umana Jaime Sandoval / Thank You Working for the Lord
15. Letter from Alejandro Umana – About the Officer / Appendix 78
16. Alejandro Umana - No Me Se Rajar
17. Alejandro Umana – En un Año de Violencia
18. Alejandro Umana – MS 13 Tribute Song
19. Declaration of Richard McGough / Appendix 26
20. An audio file labeled 23 2008_4_23 Alejandro Umana Ramirez Excerpt
21. A file (with audio and a still photo) labeled 24 Gang War USA Excerpt

**Summary opinion:**

After reviewing the materials listed above, it is my conclusion that many of Mr. Umaña's letters are inspired by, and imitative of, music from a variety of genres, particularly rap music produced by Central American artists. This is especially true of "Un Dia Mas Con La Bestia" ("One More Day With The Beast"), which draws upon and is patterned after the work of well-known Central American rap artists.

2

**Hip Hop and the Rise of "Gangsta" Rap**

Hip hop, which began in the 1970s within New York City's primarily black and Latino communities, can be defined as a cultural movement comprised of several artistic elements—including graffiti, breakdancing, and eventually rap music (which has grown to become the most listened-to genre in the United States) (*Year-End Music Report, U.S.*). Importantly, hip hop began an agent of social change in the face of bleak circumstances. One significant example, at least in hip hop's early years, was the way it helped erode the violent gang culture that defined places like the Bronx. Whereas gangs had, for years, claimed territory through fighting and violence, hip hop posses and crews (often comprised of former gang members) used their art to transform literal battles into symbolic ones. The goal was, and continues to be, to channel aggression and violence into something artistic and productive.

It is against this backdrop that we should understand rap music, the element of hip hop that has become, by far, the movement's most visible and marketable form. Drawing on oral and literary traditions that emphasize lyrical dexterity, exaggeration, self-aggrandizement, and establishing dominance over an opponent, rappers engage in battles that are waged in verse—through hyperbole, word play, and even threats or insults (often to an imagined rival) rather than literal violence. (In fact, a rapper who resorts to violence in some rapping competitions is, in effect, surrendering—admitting that he or she lacks the verbal dexterity or wit to compete lyrically.) For its entire history, rap has served as a poetic vehicle, primarily for young men and women of color, to express a full range of emotions and sentiments—from a love of partying to a profound cynicism about American values.

As it evolved and grew, rap developed a number of subgenres. One was politically conscious rap, which became what Public Enemy rapper Chuck D famously described as "a CNN for black America" or what rapper KRS-ONE considered "Edutainment," a combination of entertainment and education intended to advance the causes most important to black Americans.

But just as politically conscious rap took hold in the late 1980s, so too did a very different form, dubbed "gangsta" rap, that became popular through the work of African American artists such as Ice-T, NWA, Tupac Shakur, and Snoop Dogg, as well as Latino artists such as Kid Frost, Cypress Hill, Fat Joe, and Jim Jones. Drawing on the well-established tradition of the "bad man" in African American storytelling— easily seen in the toasts of the late 19th Century, the urban novels of Iceberg Slim and Donald Goines, and especially the "blaxploitation" films of the 1970s (Forman, 2002; Keyes, 2004; Nelson, 2005; Perry, 2004; Quinn, 2005)—gangsta rappers began using their rhymes to celebrate the outlaw figure and reject traditional constructs of "legitimate" American life. They became highly controversial for their graphic depictions (and sometimes celebrations) of violence, criminal behavior, and sexual conquest, which were often patterned after the pimps, hustlers, and gangsters found elsewhere in black (and mainstream) popular culture. These criminal figures became emblematic in gangsta rap music and were "elevated to the status of hero" (Kelley, 1996) at least in part because, throughout black culture, they have always been viewed as a "rare example of black male authority over his domain" (George, 1998).

It is this sense of authority that helped explain the rise of gangsta and other subgenres of rap that featured violence and criminal behavior—they allowed young men of color to create a poetic world in which they were masters of their environments. Often perceiving themselves to be social outcasts and targets for policing and institutional discrimination, they crafted a form that gave voice to the conditions in urban America that many people were not willing to confront, all while constructing themselves as figures of power within these urban spaces (Alexander, 2010; Nielson, 2010; Nielson, 2012).

Audiences quickly responded to gangsta rap's dark, sordid, and realistic-sounding tales of urban life, and it wasn't long before it became the most popular (and most profitable) subgenre of rap, spreading beyond the borders of the U.S. and becoming influential globally, including in Central and South America . As a result, beginning in the early 1990s, record companies began moving away from the politically conscious

music that had once helped define mainstream rap and instead started pressuring new acts to adopt gangsta-type rhetoric—a trend that continues today (Hurt, 2006; Kitwana, 2004; Rose, 2008). This meant that a long line of successful performers began adopting a "commercial gangsterism" (Perry, 2004)—essentially a persona manufactured by artists who had no meaningful connections to gangs or street life but who needed to conform to gangsta conventions to secure recording deals with major record labels (Price, 2006).

Hence, although "keepin' it real" (providing authentic accounts of oneself and "the 'hood'") has long been the mantra of gangsta rap, often it has been a "marketing pose" (Jeffries, 2011; Watkins, 1998) reproduced by performers who have limited connections to the lives they rap about (Diallo, 2007; Kelley, 1996). Even rappers who do come from the environments they depict in their music will acknowledge that their tales are not to be taken literally. Jay Z (2010), for instance, well known for dealing drugs on the dangerous streets of New York before becoming an established musician, criticizes people for reading rap as autobiography. He sees this *mis*reading as "the failure, or unwillingness, to treat rap like art, instead of acting like it's just a bunch of niggas reading out of their diaries." It's important to understand, then, that gangsta rap is both an art form and a heavily marketed commodity; as such, it comes with certain artistic and commercial expectations. Exaggerated tales of violence, sex, and/or criminal behavior are what sell to a broad swath of Americans, and so any would-be rapper must learn and practice the conventions of the form.

Audiences should understand that the rap music they are consuming is—like gangster films, horror novels, or even pro wrestling—a type of entertainment. Rap in particular resides within a tradition of black expression going back centuries and within a global tradition going back millennia (Bradley, 2009; Bradley and DuBois, 2010). It is frequently told in the first person and is often advertised as "real," making it easy to mistake the genre for a kind of musical autobiography, documentary, or journalism. But its often complex rhyme schemes, rhythmic emphasis, and reliance on figurative language—not to mention artists' almost universal use of stage names—are the most obvious cues that a literal reading of rap, in any of its subgenres, does the form and its creators an injustice. The speaker of a rap song is, like the first person narrator of an Edgar Allan Poe story or a Johnny Cash song, a creation of the author but not the same as the author, however similar the two may appear to be. University of Colorado professor Adam Bradley (2009) puts it like this:

> We assume that MCs are rapping to us in their own voices and, as such, that what they say is true to their own experience. All along, however, MCs have been taking far greater liberties with voice than their public stances of authenticity would suggest. Rap becomes much more interesting as poetry and rappers become more impressive as poets when we acknowledge rap as a kind of performance art, a blend of fact and fantasy, narrative and drama told in storytelling.

Therefore, the activities depicted within gangsta rap (or any other fictional genre) should not be treated as literal representations of real-life events.

**Mr. Umaña's Letters**

Musical references can be found throughout Mr. Umaña's letters, often in the form of lyrics that he attempts to write out from memory. For example, the entire letter titled "No Me Se Rajar" (item #16 in the list above) is comprised of the lyrics to the song "No Me Se Rajar" by well-known Mexican Ranchera singer Vicente Fernández. Mr. Umaña presumably wrote these out from memory, and while some of his lyrics accurately reflect the song, there are numerous mistakes—namely misspellings and incorrectly remembered lyrics—throughout. He also scatters lyrical references throughout his letters, frequently identifying the contents of the letters as song lyrics or by including phrases that appear to come from mainstream songs. For instance, in one letter (item #11 in the list above), he includes the phrase "el

4

Diablo anda suelto," which is the title to a number of mainstream Spanish language songs, including by well-known Cuban singer Rey Ruiz and by La Santa Grifa, a popular Mexican rap group. Yet another example can be found in the May 15, 2009, letter to Jesus A. Rangel (item #12 in the list above). Here, Mr. Umaña copies out the lyrics to a song called "La Mujer que Soñé," which he correctly identifies as a song by the Mexican group Los Temerarios. As with "No Me Se Rajar," the transcription is generally accurate in capturing the original lyrics to the song correctly, but it is plagued by a number of spelling errors throughout, suggesting Mr. Umaña's limited familiarity with written Spanish, even as this is his native language.

Although Mr. Umaña draws on a wide range of musical genres in his letters, he is clearly influenced by rap music, particularly from Central American artists. For instance, in one letter (item #13 from the list above) he refers to Salvadoran rapper Mister Pelon and indicates that he has been imitating his songs and adapting them to include lyrics that mention or celebrate MS 13. And the file titled "MS 13 Tribute Song" (item #18 in the list above) appears to be a Spanish language rap song that includes multiple references to MS 13, as well as to "Mr. Cano," which likely refers to the Nicaraguan rapper of the same name.

With regard to passage titled "Un Dia Mas Con La Bestia" (from item #13 in the list above), Mr. Umaña identifies it as a "cancion," or song, which he misspells as "cansion" (he also misspells "Bestia" as "Betisa" at the top of the page). Given his interest in, and avowed imitations of, Central American rappers, it is likely that "Un Dia Mas Con La Bestia" is influenced by, or imitative of, an existing song or artist. I have not been able to locate the exact source, however. There are a few possible reasons for this. It could be that the song is, in fact, an original composition by Mr. Umaña. More likely, in my view, is that given Mr. Umaña's inability to recall lyrics from other songs accurately, not to mention the numerous spelling errors in his writing overall, the lyrics here deviate from the primary source enough to make locating it next to impossible. It's also worth noting that if the original source material were composed by an artist who is not well-known or who is from a country with a less developed hip hop scene, it is unlikely that a full transcription would be available online.

Regardless, "Un Dia Mas Con La Bestia" is certainly consistent, lyrically and thematically, with rap music produced by artists affiliated with MS 13. For instance, the reference to "la bestia" (the beast) is common throughout MS 13 rap, and arguably the most famous MS 13 rapper, Salvadoran artist José Avelar, uses the stage name "La Bestia," which is a term often used by MS 13 members to refer to the gang itself (García, 2018). The song also repeatedly pays homage to Mara Salvatrucha (MS 13) by asserting its dominance, and it disparages rival gangs, both of which are key characteristics of MS 13 rap. The same goes for its attacks on police, its explicit reference to weapons (in this case "un cuete vien[sic] cargado," which in English refers to a loaded gun[1]), and its overall emphasis on the reach and power of MS 13 on the streets and in prisons—all of these are common tropes in MS 13 rap (García, 2018).

It is my opinion that "Un Dia Mas Con La Bestia" is highly imitative of gangsta rap, particularly that produced by Central American artists and/or those affiliated with MS 13. It is simplistic in nature and highly repetitive, drawing on stock images and phrases that can be found throughout gangsta rap, with little to distinguish it as a unique composition. What's more, as it progresses, it loses its musical or poetic qualities., and by the end, even the handwriting loses structure; it becomes erratic, enlarged, and sloppy, eventually to the point where it no longer falls within the lines of the page. This, along with the frequent spelling errors and highly derivative content, suggests that Mr. Umaña's artistic abilities and command of language are limited at best.

---

[1] Take, for instance, well-known Mexican rapper and gang member Mr. Losie Locote, whose song "Mi Amigo Mi Cuete" (in English, "My Friend My Gun") includes multiple references to a "cuete cargado" (in English, a "loaded gun").

5

## References

Alexander, Michelle. (2010). *The New Jim Crow: Mass Incarceration in the Age of Colorblindness.* New York: The New Press.

Bradley, Adam. (2009). *Book of Rhymes: The Poetics of Hip Hop.* New York: Basic Civitas Books.

Bradley, Adam, & Du Bois, Andrew. (2010). *The Anthology of Rap.* New Haven: Yale University Press.

Diallo, David. (2007). "Dr. Dre and Snoop Dogg." In Mickey Hess (Ed.), *Icons of Hip Hop: An Encyclopedia of the Movement, Music, and Culture, Volume 2* (pp. 317-340)*.* Westport, CT: Greenwood Press.

Forman, Murray. (2002). *The 'Hood Comes First: Race, Space, and Place in Rap and Hip-Hop.* Middletown, CT: Wesleyan University Press.

García, Carlos. (2018). "The Role of Music in the MS 13." *Insight Crime.* https://insightcrime.org/news/analysis/role-music-ms13/

George, Nelson. (1998). *Hip Hop America.* New York: Penguin.

Hurt, Byron. (Director). (2006). *Beyond Beats and Rhymes* [Motion Picture]. United States: PBS.

Jay Z. (2010). *Decoded.* New York: Spiegel & Grau.

Jeffries, Michael P. (2011). *Thug Life: Race, Gender, and the Meaning of Hip-Hop.* Chicago: The University of Chicago Press.

Kelley, Robin D.G. (1996). Kickin' Reality, Kickin' Ballistics: Gangsta Rap and Postindustrial Los Angeles. In William Eric Perkins (Ed.), *Droppin' Science: Critical Essays on Rap Music and Hip Hop Culture* (pp. 117-158). Philadelphia: Temple University Press.

Keyes, Cheryl L. (2002). *Rap Music and Street Consciousness.* Chicago: University of Illinois Press.

Kitwana, Bakari. (1994). *The Rap on Gangsta Rap.* Chicago: Third World Press.

Nelson, Angela. (2005). Rap Music and the Stagolee Mythoform. *Americana: The Journal of American Popular Culture 4*(1).

Nielson, Erik. (2010). 'Can't C Me': Surveillance and Rap Music. *Journal of Black Studies 40*(6): 1254-1274.

Nielson, Erik. (2012). Here Come the Cops: Policing the Resistance in Rap Music. *International Journal of Cultural Studies 15*(4): 349-363.

Perry, Imani. (2004). *Prophets of the 'Hood: The Politics and Poetics in Hip Hop.* Durham: Duke University Press.

Price, Emmett G. (2006). *Hip Hop Culture.* Santa Barbara, CA: ABC-CLIO.

Quinn, Eithne. (2005). *Nuthin' but a "G" Thang: The Culture and Commerce of Gangsta Rap.* New York: Columbia University Press.

6

Rose, Tricia. (2008). *The Hip Hop Wars.* New York: Basic Civitas Books.

Watkins, S. Craig. (2005). *Hip Hop Matters: Politics, Pop Culture and the Struggle for the Soul of a Movement.* Boston: Beacon Press.

*Year-End Music Report, U.S.* (2017). Nielsen Music. https://www.nielsen.com/content/dam/corporate/us/en/reports-downloads/2018-reports/2017-year-end-music-report-us.pdf.

# APPENDIX 239

Case 3:16-cv-00057-MOC     Document 116-1     Filed 07/06/22     Page 121 of 237

# DECLARATION OF WENDY ELIZABETH JACO ALVAREZ

I, Wendy Alvarez, declare as follows:

1. I am the mother of Alejandro Umaña's son, **DUA** ▮▮▮▮▮▮▮. Our son **DUA** ▮▮▮ was born on ▮▮▮ 2005 in Hempstead, New York. ▮▮▮ is the eldest of my three children and my only child with Alex. **DUA**

2. **DUA** ▮▮▮ is 16 years old, He looks so much like his father. He reminds me of Alex. He is kind, generous, and respectful. Alex calls to talk to **DUA** ▮▮▮, usually for holidays and birthdays. I know it is hard for Alex to call all the time because it's expensive. Alex hasn't called in about two years.

3. I was born in 1988, in Santa Ana, El Salvador where I lived until I was 16 years old. When I was young, my father left my mother and my family. My youngest sister Beatrix was still a young baby when he left. We were okay because we still had our mother. But when my mother left for the United States in 1999, life became harder. I was 11 years old when she left. Even though she left to try to make a better life for us in the United States, it was so hard for me and my brother and sisters to understand and be without our mother.

4. We stayed with our grandmother after our mother left. But then our grandmother got ill and passed away. We stayed with my uncle and aunt, my mother's sister and brother. My aunt and uncle were still young themselves. My aunt was only ten years older than me, but she was in charge of caring for us.

5. Growing up in Santa Ana was full of suffering. The neighborhood where we lived was not safe. Most neighborhoods in Santa Ana were not safe. We were surrounded by violence and danger.

6. I first met Alex when I was a teenager. He was older than me and friends with my brother Dennis and my cousin Geovani. Both Dennis and Geovani were in the gang. When I saw Alex hanging around our *meson*, Le Fe, I thought he was kind and handsome. My uncle and aunt were protective and tried to keep us girls from hanging around gang members. My brother and cousin were involved in the gang, so they tried harder to keep me and my younger sister away from all the danger.

7. Alex was different than most boys and men I knew. He had a goodness to him, he was friendly and kind. Alex had very little money or things. No matter how bad he had it, Alex shared whatever he had with others. He did not look down on people or judge. This was something I really liked about Alex.

1

_Wendy Alvarez_ 12-03-21

8. Alex talked about his past with me. When he was just a baby, his mother left him. Alex missed not having a mother in his life. Alex also talked about his great grandmother as the one person in his family who was ever good to him. She died when he was still a child. Her death was a true sadness and great loss for him. The Mara gave him food and shelter and clothing. They became his family and had a strong hold on him.

9. Ever since I have known Alex, he suffered horrible headaches. The headaches seemed to come every day. He took aspirin, rubbed alcohol or Vicks Vapor rub on his forehead for the pain. I often rubbed his forehead with the Vicks. These headaches caused him so much pain and I felt so bad for him. Alex told me that he fell from a tree when he was young and had suffered headaches ever since. When we lived in Georgia, he was also in a car accident and hit his head. He was taken to the hospital, because Alex did not drive, in all the time I've known him. He complained of his head hurting for a long time, but did not go back to the hospital or anywhere for a checkup.

10. Alex and I moved in together with his father Quique and stepmother Yanira soon after we started seeing each other. They had a young daughter Stephanie who was about two years old at the time. Yanira was much younger than Quique. She was not as young as me but she was an older teenager. We all moved into this *mesón* together. We were grateful that Quique and Yanira allowed Alex and me to stay with them because we had nowhere else to live.

11. Alex was very protective of me. He did his best to keep his gang life separate from me. He did not want me to be around the gang, so while he spent most of his days outside of the *mesón*, I went to the market with Yanira and Quique.

12. Alex went to jail at least once during the months we lived together. I was with Alex when the police arrested him. We were just walking down the street when the police stopped us. I was so scared. They patted Alex down and then checked his body for tattoos. He didn't have anything on him so they must have arrested him because he had tattoos.

13. Quique and Yanira were good to me. Yanira stayed close most of the time, but whenever she needed, I watched Stephanie. Quique ran a little store in the market at that point. When I stayed with them, I helped them sell things at the market. Before he had his store in the market, I heard that Quique ran a small store out of the room in the *mesón* they lived in.

14. We lived together before Alex made the journey for the United States. I knew my mother would send for me when she could. We knew going to the United States was the only chance for us to have a better life. When Alex left for the United States, I was very sad and cried and cried.

15. I stayed with Quique and Yanira after Alex left. I stayed with them for about two months until my mother sent for my sister Beatrix and me. My mother worked hard and saved money

2

*12-03-21*

to pay for our journey to the United States. My mother finally saved enough money for my younger sister Beatrix and me to join her. My brother Dennis was deeply involved in the gangs at that time and remained in El Salvador.

16. When my mother had enough money, my sister Beatrix and I made the long journey from El Salvador. Beatrix was about 8 or 9 at the time of our long journey. It took us about a month to reach the United States. I was about two months pregnant with ▮▮▮ at the time. I was sick throughout and spent most days cold. Crossing the desert was the worst part. My sister and I were separated when we got to the United States border. It was exhausting, but all I really remember now is the freezing cold.

17. When we finally made it to the United States, I met up with Alex in Los Angeles. My sister and I stayed with a family Alex was staying with for a couple of nights. The couple had a little girl and boy. Alex had an aunt in Los Angeles who came to meet us while I was there. I had never met her before. She seemed nice but we did not visit with her for long.

18. When I told Alex that I was pregnant he said he already knew because he sensed it. He even started to get sick during my pregnancy as if he was the one who was pregnant.

19. My mom paid for the three of us to travel by van to New York. We were all crammed into this van with many other people driven by a coyote. The trip took about three days. When we arrived in New York, we went to live with my mother in a big apartment building in Long Island. My mother was with our stepfather at the time who she had another child with, my youngest brother Kevin. There were a lot of us in that small apartment, but I was so happy to be with my family.

20. When we arrived in New York, my uncle Rene got Alex a job painting with him for a while, Alex also walked to the Home Depot and waited all day hoping for some kind of work. My mother helped us out. My mother's husband owned a restaurant and my sisters and I all worked there. The restaurant eventually closed down and my stepfather left to find work in New Jersey.

21. When he lived here in New York, we mostly stayed inside with our family. Alex and I often visited with my uncles and aunts. He got along well with my Uncle Rene. Alex and I had some good times together. We liked to watch movies. He always loved to draw and drew a beautiful picture of our baby boy.

22. While I was still pregnant, Alex returned to Los Angeles. His friend from El Salvador, Chipis, called Alex and wanted him to return. Chipis felt abandoned and did not want to be by himself in Los Angeles. I did not know Chipis that well, he only came to Quique's sometimes. Chipis was jealous of my relationship with Alex. Alex told Chipis to come to New York to stay with us. Alex ended up going back to Los Angeles to be with Chipis for a

3

few months. I complained that Alex paid more attention to the gang than he did to me. I wanted Alex to stay and be there for our child's birth.

23. Alex returned to New York a few days before **DUA** ▮▮▮ was born and was at the hospital for his birth. I was so happy he made it just in time and hoped that he was going to stay forever, but that did not happen.

24. Alex returned to New York in time for our son's birth. I was so happy. My mom helped me pay for medical care while I was pregnant. I went to the doctor once a month to make sure everything was okay. My pregnancy and delivery was not difficult. I was in labor with **DUA** ▮▮▮ about five or six hours and had a natural delivery. I am lucky because all of my children's births have been easy.

25. When **DUA** ▮▮▮ was a few months old, we moved to Georgia. Alex had a cousin, Edson, who worked there building cabinetry. While living in Georgia, **DUA** ▮▮▮ kept getting sick. He ran high fevers and threw up. We could not get him in to see a doctor in Atlanta so we had to go back to New York. Alex went with us on the Greyhound bus all the way back to New York. He stayed with us for a few days and then left again for Georgia. That was the last time I saw him.

26. A man came to talk to me once about Alex's case. I thought he was an attorney. He took pictures of us I do not recall him asking about other family of Alex's in the United States. No one from the police ever came to talk to me. Alex was described as a leader in the gang but I don't understand how he could have been such a leader, he barely had anything. He struggled. I would have testified at Alex's trial if asked and would have met and talked to doctors or anyone on Alex's case. I would have told the jury that he has a son who loves him very much and death sentences will only destroy more lives. I would have told them everything I knew about Alex.

I swear the foregoing is true and correct under penalty of perjury to the best of my knowledge, information, and belief.

_Wendy Alvarez_ (signature)
Wendy Alvarez

12-03-21
Date

4

# APPENDIX 240



# Forensic Investigative Services
## R. Robert Tressel



Kelly Miller
Capital Habeas Unit
Federal Defender- Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101

June 30, 2022

RE: Alejandro Umana (Case No. 3:16-CV-00057)

Dear Ms. Miller:

I have been retained by the Office of the Federal Public Defender for the Middle District of Pennsylvania to review file materials to analyze the Forensic Evidence recovered as it relates to the crime in question and the overall investigation into the case(s) of Alejandro Umana.

Credentials and the Field of Crime Scene Investigation

My curriculum vitae is attached to this report and details my training and employment history. Briefly, however, I began my training in 1972 when I went through basic police training at the Cobb County, Georgia, Regional Police Academy, followed by basic training conducted by the Georgia Police Academy. I worked in different capacities for the Cobb County Police Department for twelve years, including detective and sergeant in the Crimes Against the Person Division. I spent the subsequent thirteen years as Operations Manager for the Cobb County Medical Examiner's Office. From 1985 to the present, I have worked in a private capacity as a forensic investigator and consultant in the field of forensic evidence and investigation. From April 2011 until October 2019, I served as the Chief Criminal Investigator for the Cobb County (Georgia) District Attorney's Office retiring with 33 years of government service.

My specialized training is in the fields of criminal investigatory practices and crime and accident scene reconstruction. I first spent some twenty years doing this in various capacities exclusively on behalf of various law enforcement agencies. While I continue to work as a consultant to law

enforcement agencies, I have also worked for almost thirty years as a consultant for insurance agencies to help reconstruct accidents of various kinds, and for prosecuting authorities and criminal defendants, helping to analyze and reconstruct crime scenes.

I have more than forty years of training and experience working for the police and other law enforcement agencies, and for private clients, collecting and examining evidence, directing investigators in the proper methods of collecting evidence (including interviewing witnesses) to obtain a full picture of what transpired during a crime or accident, and reconstructing crime and accident scenes from evidence such events typically generate. This includes witness accounts, ballistics, blood spatter, vehicle placement, crime scene photographs, police and autopsy reports, and numerous other factors. Once an accident or a crime has occurred, it is often necessary to examine and reconcile multiple sources of information to determine how the events unfolded. The available evidence may lead to a single narrative of events or may narrow the field of possibilities without leading to a conclusive picture of what happened. By the same token, without careful examination, the available or known evidence may seem to lead to a particular narrative that, while plausible, is one of only many possibilities as to what happened.

My goal in reviewing all available sources of evidence is to determine from this evidence what plausibly may have occurred. In some cases, this may result in ruling out a suggested sequence of events; in other cases, my review and analysis may confirm a suggested sequence. In yet other cases, this review may demonstrate that several or many scenarios could explain the forensic evidence, not just the scenario offered by law enforcement.

Crime Scene Investigations

A thorough crime scene investigation is the heart and soul of any criminal investigation.

The physical evidence recovered and documented from any crime scene is the pivotal point of a criminal investigation. The direction the criminal investigation takes is based on what evidence has been recovered and documented, where this evidence is located and how this evidence assists the Investigator in determining the sequence of events that led to the incident.

Investigation of the crime scene is the only opportunity the Investigator has to preserve, recover, and have analyzed these physical clues. Other case information, such as that gathered from Interviews or Witness Statements must be carefully evaluated as to their validity based upon the physical evidence obtained from the crime scene. Details of the crime scene initially thought to be irrelevant, may become crucial in understanding exactly how the incident occurred.

In Homicide cases, proper crime scene investigation is not just a process of documenting the physical evidence found. It is to provide a sound basis for the Investigator or Prosecutor to explain through a comprehensive evaluation of all aspects of the crime scene investigation why certain pieces of evidence were found in the locations they were in.

A violent crime scene presents special aspects that the Investigator must be aware of. It is not just where evidence is found, but what this evidence can tell us about how the incident occurred, where victims and/or witnesses were located when injuries occurred and what might be the sequence in which events occurred. The crime scene is merely a piece of the "puzzle" that must

be evaluated with other components of the incident to thoroughly understand how a crime was committed.

Other pieces of this "puzzle" include but are not limited to:

- Wounds or injuries received during the course of this event.
- Laboratory evaluation of the evidence recovered (Bullets, knives, blood stains etc.)
- Witness statements and/or interviews.

If the incident involves the death of an individual, the postmortem and autopsy of the deceased becomes a vital piece of the "puzzle." Location of wounds, directionality of these wounds, and determining entry and exits of wounds must be evaluated with all other components of the crime scene evaluation to assist the Investigator in determining the significance of each piece of evidence recovered.

Documentation of the crime scene is done through three (3) primary steps.

- Written or verbal description of the crime scene, including location of items of evidence.
- Photographs or videotape of the crime scene to depict exactly what was observed at the crime scene.
- Diagram of the scene with measurements showing the location of evidence. (This is done so that if the crime scene needs to be reconstructed, an accurate depiction of where and what was recovered can be done)

Failure to document the crime scene properly and precisely can hinder any prosecution and sometimes invalidate conclusions reached from the overall assessment of the crime scene.

As a consultant on crime scenes, I am often asked to evaluate the opinions and/or conclusions reached by Investigators and Prosecutors. In evaluating these opinions and/or conclusions I must rely on the documentation they relied on to reach their conclusions or opinions. If certain pieces of this "puzzle" are missing or documentation is not thorough then these conclusions or opinions cannot be confirmed. Additional scene information becomes necessary to complete this evaluation process and if that information was not gathered at the time of the scene investigation, then only possible scenarios can be postulated.

The validation of possible scenarios cannot be performed without the proper processing and documentation of any crime scene. Attempting to reconstruct or evaluate a crime scene without proper documentation and without evaluating all available pieces of the "puzzle" and how they portray the sequence of events leads to misleading and inaccurate conclusions and/or opinions that can be detrimental to any prosecution or defense of a criminal offense.

Materials Provided for Review

- Guilt Phase Transcripts - (04/10/12 – 04/16/10)
- Transcript of Jury Questions and Verdict Guilt Phase - (04/19/2010)
- Transcript of Sentencing Phase - (04/19/2010 – 04/28/10)
- United States Court of Appeals for the Fourth Circuit Opinion - (04/23/2014)
- Grand Jury Testimony - (04/28/08)
- Transcript of Testimony During Proceedings of Co-Defendant– (01/20/2010)
- Crime Scene Video – Gvt Trial Exhibit 70 & 70a
- 911 Call - Gvt Trial Exhibit 68a
- 911 Communication Report (12/08/2007)
- Crime Scene Photos – Gvt Trial Exhibits 67-116a
- Crime Scene Diagram with Ballistics Measurements – Gvt Trial Exhibit 502
- Autopsy Reports and Pictures of Manuel Garcia Salinas – Gvt Trial Exhibit 123-126
- Autopsy Reports and Pictures of Ruben Garcia Salinas – Gvt Trial Exhibits 127-130a
- Medical Picture of 3rd Victim – Gvt Trial Exhibit 501
- Fingerprint Cards – Gvt Trial Exhibits 131-134
- Pictures from Alejandro Umaña's Arrest – Gvt Trial Exhibits 187-191, 212-218, 22
- Map – Gvt Trial Exhibit 208
- Gene Rivera Second Report – Gvt Trial Exhibit 220
- Firearms Seized from other Co-Defendants
- Interrogation of Alejandro Umana (7 Parts) (12/12/2007)
- Case Supplement Report of B.M. Altizer (12/08/2007)
- Case Supplement Report of V.T. Ketner (12/08/2007)
- Case Supplement Report of M.A. Kugel (12/08/2007)
- Reporting Officer Narrative of L.D. Leake (12/08/2007)
- Case Supplement Report of T.D. Moore (12/08/2007)
- Case Supplement Report of S.M. Russell (12/08/2007)
- Case Supplement Report of M.W. Smith (12/08/2007)
- Case Supplement Report of M. G. Terry (12/08/2007)
- Case Supplement Report of D.A. Lyndrup (12/08/2007)
- Incident Report Related Property List (12/08/2007)
- Evidence Control Card (12/12/2007)
- First Superseding Bill of Indictment (09/23/2008)
- Lemon Grove Park Crime Scene Pictures – Gvt Trial Exhibits 531-536c
- Autopsy Report of Andy Abarca (10/02/2005) – Gvt Trial Exhibit 541
- LAPD Investigation Chronology for Lemon Grove Park Investigation
- Los Angeles Police Department Investigation File re Fairfax Avenue Investigation
- Follow Up Investigation Report (05/20/2008)
- Handwritten Notes of Detective Bynum re Interview of German Suarez (04/29/2005)
- Fairfax Avenue Crime Scene Picture – Gvt Trial Exhibit 509
- Fairfax Avenue Crime Scene Picture – Gvt Trial Exhibit 510
- Fairfax Avenue Crime Scene Picture – Gvt Trial Exhibit 511
- Autopsy Report of Jose Herrera (07/31/2205) – Gvt Trial Exhibit 525

- Autopsy Report of Gustavo Aguero (Gustavo Porras) (08/02/2205) – Gvt Trial Exhibit 523
- Los Angeles Police Department Investigation File re Fairfax Avenue Investigation
- Officer Crime Scene Statement Form by Officer Maloney
- Follow Up Investigation Report (04/17/2008)
- 911 Typed Notes
- Handwritten Notes of Noe Navarro Bautista (07/27/2005)
- Photo Identification Report of Noe Navarro Bautista (09/01/2005)
- Interview of Alex Barrera by Detective Parshall and Detective Urena (04/18/2006)
- Highlighted Excerpt from Interrogation of Rene Arevelo - Dfnse Exhibit 8
- Excerpt from Interrogation of Rene Arevelo – Dfnse Exhibit 9
- Testimony of Luis Ramos – Gvt Exhibit 520
- Transcript of Alejandro Umana Interrogation (04/23/2008) – Gvt Exhibit 522
- Crime Lab Reports and photographs from Charlotte-Mecklenburg Police Department
- Firearms Analysis from Los Angeles Police Department
- Photo ID of Alex Montez by Freddy Gonzalez
- Photo ID of Alejandro Umana by Freddy Gonzalez
- Photo ID of Alex Montez by Freddy Gonzalez – English Version
- Photo ID of Geovanni Roads by Freddy Gonzalez
- Freddy Gonzalez Lineup Statement
- Roberto Ramos Declaration

Greensboro Incident Review

Alejandro Umana was indicted by a Federal Grand Jury in June 2008 for the fatal shootings of Ruben Garcia Salinas and Manuel Garcia Salinas at the Las Jarochitas restaurant in Greensboro, North Carolina on 12/08/2007. The Salinas brothers and their co-workers were eating inside the restaurant when Alejandro Umana and other members of the MS-13 gang entered the restaurant and were seated at a table.

Witnesses on the scene testified that an argument ensued between the Salinas group and the group with Alejandro Umana over the music that was playing. The argument escalated. Witnesses testified they believed a physical altercation was about to take place. Umana's group was asked to leave the restaurant. Both groups threatened each other as Umana's group left.

Photographs of the scene show the Salinas brothers lying on the floor in the middle of the restaurant. Ruben Salinas was lying supine with his feet towards the door and Manuel Salinas was originally found lying prone with his feet facing south with his head lying on top of Ruben. Photographs also show that the Umana group had been served drinks, beer, but had no plates, utensils, or food on the table. The Salinas group had been served beer and a beer bucket was on their table.

At autopsy, the Medical Examiner determined that Ruben Salinas had succumbed to a gunshot wound to the central chest to the right of the midline. The projectile was recovered, and the trajectory was documented as being front to back and downward. Manuel Salinas succumbed to

a gunshot wound to the left side of the head with an exit at the top of the right ear. Trajectory was documented as being left to right and downward. At autopsy neither Ruben or Manuel Salinas displayed any signs of gunshot soot or stippling indicating the shots were fired from greater than 36 inches.

The autopsy reports for both Ruben and Manuel Salinas indicate their clothing was retained as evidence by the Medical Examiner's office. There are no lab reports indicating that the clothing was ever transferred to a Crime Laboratory for Gunshot Residue Analysis.

Analyzing the clothing for Gunshot Residue is a relevant and crucial test necessary for the evaluation of distances between the Salinas brothers and the perpetrator.

Toxicology reports from blood drawn at the time of the autopsies indicate that Manuel had a blood alcohol level of .20 (200mg/dl) and Ruben had a blood alcohol level of .17 (170 mg/dl). These levels are above the legal limit for operating a motor vehicle and indicate that both Manuel and Ruben had ingested significant quantities of alcohol or beer.

The crime scene photographs, and the video indicate that the Salinas brothers were standing upright away from their original seating positions when the gunfire erupted. The positioning of the bodies indicates that both Salinas brothers were facing the front door to the restaurant. Based on the final resting positions, Ruben was shot first, receiving the gunshot wound to the chest. Manuel was shot second and fell on top of his brother. Manuel's injury was incapacitating therefore once he came to rest on the floor, he had no ability to move.

The crime scene sketch provided indicates measurements were taken of where the spent shell casings were located along with the single projectile recovered from the floor of the restaurant. No additional measurements were included on the sketch. The distance from the front door area to where the victims were found is not documented in the police reports. The distance between the Salinas brothers and the perpetrator can only be loosely approximated.

Lemon Grove/Fairfax Shootings

In Alejandro Umana's penalty hearing, evidence from two (2) Los Angeles homicides (Lemon Grove and Fairfax) was presented for the purpose of proving Umana's involvement in prior criminal activity.

The Lemon Grove and Fairfax shootings were linked to each other through 22-caliber fired cartridge casings that had been recovered from each crime scene. On December 26, 2005, detectives on the Lemon Grove case were notified by SID Firearms (William Moore) that a casing recovered from the Lemon Grove murder matched the casings from the double murder on Fairfax. The documents reviewed from the Fairfax murder indicate one 22 caliber fired cartridge case was found on the basketball court where the Lemon Grove murder took place. Incident reports from Lemon Grove indicate that, other than the 22-cartridge case, only a single copper jacketed projectile fragment was recovered at the base of a light pole near the basketball court.

In the Fairfax shooting, July 27, 2005, Jose Herrera, and Gustavo Porras were shot and killed on Fairfax Avenue in Los Angeles. Herrera and Porras became involved in an argument with the occupants of a gold Nissan Altima. Three of the five occupants exited the vehicle after Herrera and Porras threw gang signs at the occupants of the vehicle. One of the three pulled a pistol from his waistband and fired one shot at Herrera striking him in the head and one shot at Porras striking him in the back of the head. Two (2) 22-caliber fired shell casings were recovered from the scene. A steak knife was found lying near the victim's clothing (not identified which victim's clothing). Autopsy reports on both victims document the recovery of small caliber lead projectiles. Two eyewitnesses to the shooting, Oscar Santiago, and Noe Navarro Bautista, told police the driver of the vehicle was the shooter. However, after being arrested and interrogated, other occupants of the vehicle told police that Alejandro Ramirez (Umana) (not the driver) was the shooter and Detective Frank Flores followed up on their statements when interrogating Umana.

In the Lemon Grove incident, September 28, 2005, Andy Nelson Abarca was shot three (3) times in Lemon Grove Park. Andy Abarca was able to flee the basketball court before collapsing near the entrance to the park. During the autopsy of Abarca a "medium" caliber projectile was recovered. The fact that two of the three projectiles exited the body of Andy Abarca, based on their locations (right hip and head) would indicate that these were medium caliber projectiles and not a small caliber like a 22. A 38/357-cal projectile was recovered during the autopsy.

Two other victims of the shooting were able to flee the area and seek medical attention on their own. There are no reports in the materials reviewed to indicate that projectiles were recovered during their medical treatment.

Firearms reports for evidence submitted under the Abarca case indicates one bullet core was recovered from the body of Andy Abarca. One bullet jacket fragment was also recovered and sent for firearms analysis. Firearms reports indicate that the bullet jacket fragment was possibly 9 mm, 38 or 357 calibers. The firearms reports indicate that the recovered bullet jacket fragment was compared to two 357 magnum caliber handguns from two other cases with inconclusive findings.

Fairfax Avenue (Wilshire Division) line-ups

Photo six pack lineups were shown to witnesses of the Fairfax incident. The lineup documentation is limited with only 1 array provided. Names and or ID numbers were not completely enumerated.

Witness Noe Bautista was first shown a photo lineup consisting of six photos on 09/01/2005 (no lineup card number documented). This lineup array was shown with two suspects, George Hurtado and Michael Can, and additional associates of the two suspects. Hurtado and Can were involved in a prior incident in the Fairfax Avenue area where they sought medical attention for injuries incurred during a fight with victim Porras.

The photos provided in the lineup were:

1) George Hurtado
2) Michael Gadiel
3) Adam Mendez
4) Michael Can
5) Oscar Marin
6) Danny Chacon

Chronology report for the Fairfax case indicates that this first lineup did not include a photo of Alejandro Umana. Position # 4 (Can) is similar to the person doing the shooting but not positive. Position #2 (Gadiel) is similar to the young man on crutches. No positive identification was made from the lineup.

On 04/13/2006 Noe Bautista was shown 3 additional line up arrays: 129535 suspect Rodas; 128303 suspect Salamanca; 122791 suspect Montes. These lineup arrays have not been provided. The names of the individuals shown in the lineup and their positions is unknown.

On 04/24/2006 a series of 5 photo arrays were shown by Det. Telis to an unknown witness (this witness is not listed in the detective's Fairfax chronology). The lineup arrays are:

130102
130136
130142
130075
129883

Noe Bautista was shown 4 of the same lineup arrays on 04/24/2006 (lineup array 129883 does not appear to have been shown to Bautista). No identification was made from the lineups shown to Noe Bautista. From the available documents I am unable to determine if Alejandro Umana's photo was included.

Lemon Grove Park (Hollywood Division) line-ups

Victims and witnesses to the Lemon Grove shooting were shown multiple photograph arrays. The synopsis of the Lemon Grove shooting lists the array/photo cards but no data as to who was included in the arrays.

Juan Lara was re-interviewed on 10/18/2005 and asked to view an MS Gang photo book. Lara makes no identification of anyone in the book.

On 10/25/2005 Roberto Ramos is shown 3 "six pack" arrays. Although not identified in either the chronology or the investigative file which arrays were shown to Ramos, based on the investigative file it appears that arrays 117466 (Solorzano), 118737 (Ramirez/Umana), and 118776 (Montes) were the arrays shown. No positive identification was made.

On 12/29/2005 Freddy Gonzalez was shown 2 photo arrays, 118776 (Montez) and 118737 (Ramirez/Umana). On photo lineup card no, 118776 Freddy Gonzalez identified Alex Montes as the suspect he saw earlier in the park. The Detective report states that Montes left the park and returned with the shooter. The comments on the photo identification report written by Gonzalez is in Spanish. Subsequent translation indicates Gonzalez actually wrote Montes is the guy who came back to the park with a friend, and he (Montes) shot a gun killing "anDy."

On photo lineup card No 118737 Gonzalez identified Alejandro Ramirez as most resembling the shooter (from investigative file). The actual translation is "The photo #2 looks like or resembles the guy who came to the park the day that they killed Andy. I remember seeing this guy but I'm not sure if he is the one that came that day to the park with a pistol and shot at us."

On 12/30/2005 Roberto Ramos was shown line up array 118776 (Montes); line up array 122791 (Montes in a different position); and 118737 (Ramirez/Umana). No identification was made. Two lineup arrays with the same suspect in both arrays.

On 01/03/2006 Juan Lara was shown line up array 118776 (Montes). Says he has seen the guy before but doesn't recall seeing him the night of the shooting.

On 01/04/2006 Parks and Recreation employee E. Lopez was shown line up arrays 122791 (Montes); 118737 (Ramirez/Umana); 118776 (Montes); and 123032. Lopez identifies Montes from array 122791 as often being at the park. Lopez also identifies Kalin Woods from array 123032 as often being at the park. Two of the lineup arrays contained photos of Montes.

On 01/16/2006 G. Ramirez was shown line up arrays 122791(Montes); 118737 (Ramirez/Umana); 118776 (Montes); 118775; and 123032. G. Ramirez makes no positive identification. Again, two different arrays contain the photo of Montes.

On 03/15/2006 line up array 126533 (Rodas) was shown to Freddy Gonzalez. (The "5" Is missing in the police report)." For me the kid in number 5 the expressions of the face look like the kid the arrived at the park with a gun and shot at us and hit my friend and I remember that the gun he had was chrome."

On 03/30/2006 Juan Lara was shown line up array 126533 (Rodas) and identifies Rodas as having similar characteristics to the suspect that had the revolver at Lemon Grove.

Witness Roberto Ramos views the same line up array on 03/30/2006 and makes no identification of Ramos.

On 04/24/2006 Juan Lara, Roberto Ramos and Freddy Gonzalez are all shown line up array 131346 (Juan Miguel Cortez). No identification was made in reference to the Abarca shooting. Juan Lara stated he knew Cortez from the neighborhood but ruled him out as a shooter.

On 04/15/2008 Freddy Gonzalez was shown line up array marked as ID:05-0629018 (Umana). Gonzalez identifies #5 stating: "My first impression was photo number 5. The way he has his hair is look the same, but everything happened so fast I'm not 100% sure. He came to the park,

he seemed small and what I saw was the gun and after that I began to run. This is the first and last time I saw the young man." (Umana's photo had previously been shown to Gonzalez in a line up array 118737 on 12/29/2005)

Xerox copies of some of the lineup cards have been provided but are of poor quality. No data reference sheets are provided with the copies.

The declaration of Roberto Ramos states that he did not identify anyone in the lineups and that he had never seen "Wizard" before court in North Carolina.

Gang Testimony

Prosecutors elicited testimony from Detective Frank Flores of the Los Angeles Police Department regarding his expertise of gangs and gang culture. Detective Flores testified that he has worked extensively investigating the MS-13 gang. Detective Flores testified that he is fluent in Spanish as well as English.

Detective Flores was not questioned on gang culture as to possessions or personal property. In gang culture, all personal property belongs to the "gang." Weapons are shared by the gang members. A gang member may have a weapon of preference, but that weapon can be used by all members of the gang with the approval of the leadership.

Alejandro Umana is from El Salvador. Although Spanish is the natural language, the Central American nations have distinct dialects with colloquial phrases. When interviewing witnesses or subjects with distinct language barriers, law enforcement often utilizes interpreters fluent in the native language of the subject. The interview of Alejandro Umana should have been performed in the presence of a qualified interpreter versed in the El Salvador dialect.

## Opinions Greensboro Incident

- Five (5) shots were fired from inside the front door of the Las Jarochitas restaurant striking the Salinas brothers and a male co-worker of the Salinas brothers.
- Both Salinas brothers were standing and facing the entry door when the gunshots occurred.
- The Salinas brothers were in a confrontation with the MS-13 members as the MS-13 members were leaving or re-entering the restaurant.
- Gunshot Residue Analysis was not performed or reported on the clothing of Ruben Salinas or the clothing of Manuel Salinas/
- The distance between the Salinas Brothers and the perpetrator can only be loosely approximated.

## Opinions Lemon Grove and Fairfax Incident

- Both these cases involved additional participants from MS-13 other than Alejandro Umana.

- In the Lemon Grove Homicide, firearms evidence was recovered from two different caliber weapons (a 22-caliber fired cartridge case found on the scene, medium caliber projectile recovered at the scene, and a medium caliber projectile recovered at autopsy). The medium caliber projectiles were consistent with the injuries sustained by Andy Abarca. No additional evidence was recovered that forensically suggests the 22-caliber cartridge case is associated with this case.
- Andy Abarca was struck by three (3) medium caliber projectiles and did not receive any injuries associated with a 22-caliber weapon.
- From the Fairfax case, 2 lead projectiles were recovered from the victims (22 caliber).
- Two 22 caliber spent shell casings were recovered from the Fairfax scene.
- One of the victims of the Fairfax case was armed with a "steak knife" which was found on the ground near the victims clothing.
- Lineups shown to witnesses of the Fairfax shooting were repetitive (Same Subjects), poorly documented (IDs for all photos), with no photos of the last two lineups for comparison. These lineups were not performed to existing standards that existed in 2005 and 2006 and today would not meet the criteria of "Blind Sequential" lineups performed by an uninvolved investigator.
- Lineups shown to victims/witnesses of the Lemon Grove shooting were not properly documented as to the structure of the photographic lineups (i.e., names, height and weight and age). It cannot be determined the repetitiveness of subject. Suspects do appear in more than one array shown to witnesses. Line up arrays have not been provided for all the arrays shown to witnesses. These lineups were not performed to existing standards that existed in 2005 and 2006 and today would not meet the criteria of "Blind Sequential" lineups performed by an uninvolved investigator.

## Opinions Gang Testimony

- Detective Flores was not questioned during direct testimony or cross examination on the "gang" culture as it pertains to personal property (weapons of choice)
- A qualified interpreter well versed in the El Salvadorian Dialect should have been utilized by Detective Flores during the interview of Alejandro Umana.

All my opinions are to a reasonable degree of certainty as a crime scene analyst and investigator. Should additional material be provided for review, I reserve the right to amend this report.


R. Robert Tressel
Criminal Investigator

06/30/2022

Date

# APPENDIX 241

# *A*thena *R*esearch & *C*onsulting LLC



PO Box 66, Bippus, Indiana 46713, USA.
Tel 260 344 1314

---

Prepared for
Kelly Miller Esq
Office of the Federal Defender
Middle District of Pennsylvania
Harrisburg Office, PA17101

John Nixon

13 August 2021

## Review of Firearms Toolmark Comparison Issues
## in the Case of Alejandro Umana (CASE NO. 3:16-CV-00057)

**Personal Background**

1   I John Nixon state that the following is true to the best of my knowledge:

2   I am originally from the United Kingdom, where I worked as a scientist and professional engineer for the UK government, conducting weapons systems research, design, development, performance testing, mid-life improvement, reverse engineering, and forensic examinations, including firearms. I am a professional engineer with a first class honors degree in mechanical engineering (recognized in the US under the terms of the Washington Accord) and a master's degree in business administration. I am a board certified forensic engineering scientist by the International Board of Forensic Engineering Sciences (IBFES). I am a Fellow of the Institution of Mechanical Engineers, a Fellow of the American Academy of Forensic Sciences, and a member of several other technical / professional societies.

3   I completed a 4 year engineering apprenticeship that covered mechanical and production (industrial) engineering. My apprenticeship involved both college study / examinations, and extensive practical workshop training in the use of both hand tools and machine tools. I am an NRA certified firearms/personal protection instructor and range safety officer. I qualified as a factory certified SIG firearms law enforcement armorer with 100% test scores. An armorer is someone who is certified by a manufacturer to inspect, assess, and repair problems with firearms.

1

I am currently a consultant, specializing in technical and forensic consulting in the areas of firearms, ballistics, munitions, incident scene reconstruction, and explosives. I have conducted extensive forensic engineering research and have filed patents for innovations in munitions design. I have published numerous research papers and technical articles, including items on firearm identification and tool mark analysis. I have presented training seminars to numerous groups of investigators, attorneys, engineers, law enforcement personnel, medical professionals, and students. My courses are certified for continuing education credit in numerous jurisdictions, and by the Indiana Supreme Court. Clients include insurance companies, attorneys, defense contractors, municipal, state, and federal government departments.

In addition to testifying in UK courts, I have testified as an expert approximately 70 times in numerous US Federal Courts, the District of Columbia, and many state courts, including California, Indiana, Ohio, Illinois, Missouri, Iowa, Kansas, New York, Maryland, Florida, and Kentucky. I have worked for both defense and plaintiff / prosecution.

My engineering apprenticeship included extensive education and practical training in the manufacture of machined components from metals, and other materials. I was required to pass proficiency tests in the manufacture of components using both hand tools, and machine tools, including drills, boring machines, vertical & horizontal milling machines, shaping machines, slotting machines, lathes, surface grinding machines and bench grinders. My education and training included additional component manufacturing methods, such as casting, forging, welding etc. These are the same processes and techniques used in the manufacture of firearms and ammunition.

I was required to manufacture test specimens to specified tolerances and surface finishes. In order to manufacture a component to a specified surface finish one needs knowledge of tool marks, how they are created, and how to reduce them to acceptable levels.

I have extensive knowledge and/or experience in the design of components, and manufacturing techniques, of precision investment casting, polymer injection moulding, metal matrix composites, polymer/glass/carbon/Kevlar composites, forging, and metal injection moulding (MIM).

# 1    Executive Summary

I was retained by the Office of the Federal Public Defender for the Middle District of Pennsylvania, and tasked to review documentation relating to firearms toolmark issues in the murder conviction of Alejandro Umana. Mr Umana's trial took place in the Federal Court for the Western District of North Carolina during April 2010.

During the penalty phase of the trial there was testimony that two fatal shooting incidents in the LA area of California had been linked, by toolmark comparison, to Mr Umana. The two California incidents both took place in 2005, the Wilshire case in July 2005, and the Hollywood case in September of 2005. Two discharged 22 rimfire caliber cartridge cases were recovered from one scene, and one discharged 22 rimfire cartridge case from the other scene. Subsequent crime lab analyses claimed that all three discharged 22 caliber cartridge cases were fired in the same firearm.

Mr Umana's defense team did not hire an independent expert to assist counsel in preparing for trial.

A full list of documents reviewed is attached to this Report as Exhibit A; these included crime lab reports, bench notes, and expert testimony.

The technical shortcomings of the discipline, and discipline legitimacy issues, are discussed in this Report.

## 2      The Firearms Toolmarks Discipline

The record shows that two murder cases in California were purportedly linked by a conclusion that 22 caliber rimfire cartridge cases found at both scenes were discharged in the same (unrecovered) firearm. That conclusion was reached by the use of firearms toolmarks comparison, a discipline that had been under increasing scrutiny and criticism for several years prior to the 2010 trial of Mr Umana.

The firearms toolmarks comparison discipline is often erroneously referred to as 'ballistics', a term that has been popularized by TV, cinema, and the media. Historically, the objective of the discipline has been to associate a recovered discharged bullet (projectile) or cartridge case to the specific firearm from which it originated. The discipline has been practiced for many decades, and the assumption that every firearm leaves a unique 'fingerprint' on discharged ammunition components was accepted without scientific research to back up that assertion. The discipline has been practiced by technicians in state and federal crime laboratories, and these technicians have adopted the job title of 'firearms examiner'. In 1969, a trade association (Association of Firearms and Tool Mark Examiners - AFTE) was established to represent the interests of these lab technicians. AFTE has no academic discipline or level of academic attainment requirements for membership, and members' education ranges from no post-high school education, to various types of  undergraduate and graduate degrees in arts or sciences (an engineering or materials science degree is not required, nor a degree in any other discipline).

In the mid-1990s some scientists, attorneys, and jurists began to question the assumption that all firearms leave unique markings on discharged ammunition components. In the early 21st century the scientific and legal challenges to the validity of the firearms toolmark discipline progressively became more intense. Professor Schwartz (CUNY) published a well-received paper explaining criticisms of the discipline, 'A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification', in 2005 [8].

In response to these challenges, firearms examiners conducted and published studies that claimed to validate the assumptions upon which the discipline is founded, and claimed to establish error rates in the zero to two percent range (0 to 2%).

The 2009 National Academy of Sciences Report [2] was commissioned by the US Congress, and was researched and authored by the world's leading scientists, technologists, and jurists. That report concluded that the discipline of firearms toolmarks analysis was seriously flawed because it was based upon an unproven premise that all firearms leave unique markings on discharged ammunition components. The report also concluded that firearm toolmarks analysis is highly subjective, with no set procedures, and no valid error rates. The 2009 NAS Report criticized several other aspects of police crime labs, including bias of technicians, poor report writing and bench note documentation, plus inappropriate education & training of technicians.

Following the 2009 NAS Report, firearm examiners intensified their efforts to validate the firearms toolmarks discipline, and published the results of a number of studies, mostly in trade association AFTE's Journal.

The President's Council of Advisors on Science and Technology (PCAST), again populated by the world's leading scientists and technologists, published their Report in September 2016 [3], and reaffirmed their findings in the January 2017 Addendum to that Report [4]. PCAST concluded that all pre-2017 firearm toolmark studies were invalid, except one (the 2014 Ames Laboratory, or Baldwin, study [7])

which had not yet been published and peer reviewed (PCAST, p. 111). Even then, the PCAST committee concluded, "scientific criteria for foundational validity require appropriately designed studies by *more than one group* to ensure reproducibility. Because there has been only a single appropriately designed study, the current evidence falls short of the scientific criteria for foundational validity." (PCAST, p. 111-113). My review of the Ames Laboratory study determined that the study was defectively designed and the data were processed in a manner that substantially reduced the true error rates from a maximum of 50% (when 'inconclusive' determinations and non-returned examination papers are factored into the error rate), to the reported error rate of 2% or less.

In response to the PCAST committee, firearm examiners have published more studies. One study, conducted by the Indiana State Police crime lab (also known as the Keisler study) [5], claimed that error rates for the discipline were zero (lower than DNA). However, this study, as well as the Ames Laboratory study, were severely criticized in a DC Superior Court Opinion in September 2019 (US v Tibbs CF I 1943 1) [6]. Based upon expert testimony regarding study design flaws, that court concluded that there was uncertainty regarding the reported study error rates, and that the error rate for the Ames Laboratory study may actually be "34.76% while the Keisler study's error rate rises to 20.14%." (Tibbs, p. 42-44).

It is worth noting that, time and again, firearms examiners with a vested interest in the continued use of the firearm toolmarks discipline have designed and executed studies purporting to prove the validity, reliability, and low error rate of the discipline, only to have those studies critiqued and determined invalid by the world's leading scientists, technologists, and jurists, who have no interest other than to secure the integrity of the judicial process.

The issue of sub-class characteristics is a persistent problem for the firearm and tool marks discipline. Sub-class characteristics are features accidentally imparted to the manufacturing tool as part of the tool/firearm manufacturing process – typically a group of imperfections – and are common to an entire batch of manufactured components (eg. firing pins) produced by an imperfect manufacturing tool. By definition, these characteristics are unpredictable and appear on components of unknown batch size. Because the manufactured components may be installed in many firearms, perhaps several brands and/or models of firearms, it is extremely difficult, and potentially impossible, to determine either the size of a given batch of components that have sub-class characteristics, or their distribution in the population of firearms in circulation. This makes systematic scientific study and evaluation of the phenomenon all the more important. However, systematic scientific study and evaluation has not been attempted. This is why the AFTE Theory of Identification – while it concedes that sub-class characteristics exist and should be treated with caution – does not actually define or describe sub-class characteristics, nor does it explain what kind of sub-class characteristics might be associated with different tools/firearms, or different tool/firearm manufacturing techniques.

Despite this, many firearms examiners claim that they are constantly vigilant for the presence of sub-class characteristics in their casework. However, the only way to determine that observed marks are sub-class versus individual in nature is to examine other firearms with components from the same batch as the same components from the suspect firearm; this enables the firearm examiner to distinguish and filter out marks that are common to the suspect weapon and the other firearms from the same batch, or other brands of firearms incorporating the components from the same batch. This is not how firearms examinations are conducted; rather, firearms examinations are conducted as a side-by-side comparison between a questioned bullet or cartridge case and a bullet or cartridge case test-fired from a suspect firearm - assuming that one has been recovered. Without examining firearms with components from the same batch, the examiner will never know for sure if the observed characteristics are individual, or sub-class –

5

and will most likely assume individual characteristics. This is even more likely to happen if the sub-class characteristics are prominent compared to any individual characteristics. For an example see the picture below, which shows a microscopic comparison of breech face marks on cartridge cases fired from two different Smith & Wesson pistols, that the author, (Rivera) described as *"an alarming example of sub-class characteristics that could be mistaken for individual characteristics"* The concept of discernible uniqueness needs to be disproven only once – this is one example, and there are others.



G. Rivera, *Subclass Characteristics in Smith & Wesson SW40VE Sigma Pistols*, AFTE Journal, Vol 39, No. 3, pgs. 247 and 251 **(2007).**

Likely, a firearm examiner observing these marks in casework, and applying the AFTE Theory of Identification, would conclude that such a widespread abundance of apparently identical and individual characteristics would constitute 'sufficient agreement' and therefore a 'match'.

Note that Mr Rivera was one of the examiners in this case. Mr Rivera's AFTE Journal article referenced several other published articles that had documented similar issues with other brands of firearms.

6

**3      Additional Issues Identified in the 2009 NAS Report**

The 2009 NAS Report [2] was critical of forensic science laboratories in areas other than firearms toolmarks, but the issues raised were pertinent to all crime laboratory disciplines. Those areas were bias, technician education, and the quality of reports produced. These pertinent parts of the 2009 NAS Report are included as Exhibit B to this Report.

In short, the NAS Committee concluded that having crime labs as part of the prosecution network introduced bias into the analysis process. This has not changed from 2009 to the present day.

The NAS Committee also noted that crime lab practitioners were frequently educated in inappropriate disciplines, and the Committee were particularly critical of 'forensic science' degrees; a discipline they felt inappropriate and of inadequate discipline specific depth.

With regard to crime lab reports, the Committee felt that they were lacking in that what was produced constituted only the conclusions section of a true scientific report. It was noted that a legitimate report should be sufficiently comprehensive that an unrelated qualified practitioner could read it, understand it, and reproduce the work, obtaining the same results & conclusions, if need be. The crime lab response to this 2009 NAS criticism has been to rename what were lab reports as 'statements of analysis', thereby sidestepping the NAS criticism. This means that, in practice, nothing has changed from the perspective of the defense attorney, who must chase laboratory 'bench notes' and pursue lab technicians for interviews and depositions in order to get a grasp of the evidence analyses implications for their case.

Elements of all of the above criticisms can be seen in this case. The reporting by Rivera (NC) and both Chu and Moore (LAPD) meets the description and criticisms communicated in the 2009 NAS Report (published statement of results, and haphazard handwritten bench notes that are almost illegible in places, with thumbnail photographs of abysmal quality).

# 4     Los Angeles Police Department Firearms Laboratory Work

## 4.1     Moore Report

The crime lab concluded that three discharged 22 rimfire cartridge cases, from two scenes, fired on two occasions, had been discharged in the same firearm. The link between the two incidents was obtained via NIBIN (firing pin impression only).

The July 2005 Wilshire incident resulted in the death of Mr Herrera & Mr Porras-Aguero, and two discharged CCI brand 22 rimfire cartridge cases were recovered at the scene (Items 1 & 2). The September 2005 Hollywood incident resulted in the death of Mr Abarca, and the recovered 38 caliber bullets (Items 4, 12, & 21) were unrelated to any 22 caliber handgun. One discharged Federal brand 22 rimfire cartridge case was also recovered at the scene (Item 3). No firearm was recovered at either incident scene.

The examination results were reported in the crime lab report (Govt Exhibit 504, completed 17 Jan 2006). The report was signed by analyst Moore, # E8199, and was approved for issue by crime lab supervisor Doreen Hudson, # (illegible) 9990 (19 Feb 2006).

It was also reported that the list of potential firearms that may have fired the three cartridge cases was too long to report.

## 4.2     Moore Bench Notes

Page 002704 is a LAPD Crime Lab Cartridge Case Worksheet that was completed by examiner Moore (# E8199) on 19 January 2006. It relates to 22 rimfire cartridge case Items 1 & 2. It is reported that these cartridge cases exhibit both extractor and ejector marks.

Page 002716 is a LAPD Crime Lab Cartridge Case Worksheet that was completed by examiner Moore (# E8199) on 19 January 2006. It relates to 22 rimfire cartridge case Item 3. It is reported that there are no extractor or ejector marks, and that the identification of Exhibits 1,2 & 3 was based upon the firing pin impression marks only.

Page 002732 is a LAPD Crime Lab Cartridge Case Worksheet that was completed by examiner Chu (C9901) on 21 December 2005. It relates to 22 rimfire cartridge case Item 3. It is reported that the cartridge case has no ejector or extractor marks.

It should be noted that the comparison photographs included in the laboratory bench notes were thumbnails in PDF format and the resulting loss of resolution and overall quality rendered them of little use. Exact copies of original images are required to make any determination as to the validity of the lab work and conclusions drawn.

**5      15 April 2010 Federal Trial (Guilt Phase)**
**Testimony of Examiner Rivera (N Carolina)**

Mr Rivera testified several times that markings left on ammunition components are unique to each firearm (p832, 12-15; p840, 3-4; p846, 6-7; p851 to p852). This was counter to scientific thinking at that time (NAS 2008 & 2009), and is at odds with current NIJ and other guidance regarding comparison testimony [9, 10, 11].

Mr Rivera used an unorthodox 'comparison standard' of 'probably' (p840, 24-25) which reinforces the subjective nature of the discipline.

Under cross examination Mr Rivera testified that his opinions regarding the firearms toolmarks discipline were subjective and based on scientific principles (p850, 8-11). This is a contradiction in terms – the core value of science is that it is objective and repeatable between practitioners, and at different times.

Under cross examination Mr Rivera testified that he was familiar with the 2009 NAS Report (p850, 21-25).

The 2009 NAS Report contained only six pages relating to the firearms toolmarks discipline. The core conclusions of the report were that the discipline is subjective, has no set procedure, and no established error rates and does not qualify as a scientific practice. Despite claiming to be familiar with the 2009 Report, Mr Rivera subsequently denied knowing that NAS had concluded that the firearms toolmarks discipline was subjective (p851, 9-10); this subjectivity has long been conceded by trade association AFTE.

Mr Rivera admitted that the firearms toolmarks discipline decisions are subjective in nature, but then falsely testified that those decisions are based upon scientific facts (again, a contradiction in terms). Mr Rivera further testified that error rates have been determined for the discipline (p851, 17-19). While some error rate estimates had been determined at that time, they are erroneous and invalid, as reported by NAS 2009 and reaffirmed by PCAST 2016 / 2017 (pertinent excerpts at Exhibit C to this Report).

Mr Rivera testified that there have been hundreds of studies regarding individuality, uniqueness, and reproducibility (of firearms toolmarks), but omitted to mention that NAS 2009 dismissed them all as invalid. He further testified that he disagrees with the findings of NAS 2009 (p852, 13-17).

.

9

**6      20 April 2010 Federal Trial (Sentencing Phase)
       Testimony of Examiner Moore (LAPD)**

Mr Moore (LAPD) has a statement of qualifications, dated February 2009, in the record (002697 to 002699). He lists his education as a bachelor of arts degree in biology (totally unrelated to firearms and ammunition engineering). Mr Moore testified that he finished his firearms examiner training in January 2006. This was around the same time that he was completing work on this case. In fact his previously referenced firearms reports & worksheets indicate that he started work on this project around 23 December 2005 and was finished by 17 January 2006, so he actually performed his work on this case before he was fully qualified. At the time Mr Moore testified in 2010 he had testified as a firearms expert only thirteen times, so only 1% of his previous 1200 total career testimonies had been related to firearms and ammunition.

When Mr Moore testified, he was allowed to use a 9mm centrefire cartridge model to illustrate points to the jury, despite the fact that different technology rimfire ammunition was involved in the case (p249, 24-25). Centerfire ammunition has a primer that is a separate component of the ammunition, whereas the rimfire ammunition primer is integral, and the rear of the cartridge case is homogenous. This means that a discharged centrefire cartridge case has far greater potential for markings. Centrefire and rimfire cartridge cases are so dissimilar that using the incorrect one is likely to confuse a jury – see Figures 1 through 8 to this Report.

Mr Moore testified to the 'common origin' of toolmarks to firearms (p254, 22-23 & 255, 12-13). Mr Moore further testified that firearms toolmarks are 'highly individualizing' (p256, 23-25). These opinions are contrary to the findings of NAS 2009, and the guidance provided by the three documents that have subsequently been published [9, 10, 11]

Mr Moore testified that he had made a positive identification (match) between fired cartridge cases from the two scenes (Wilshire and Hollywood) (p257, 7-9). Mr Moore implied that he made the match from multiple areas of comparison (breech face marks, extractor marks, ejector marks, firing pin marks, & chamber marks), but his bench notes indicate that he utilized firing pin marks only. This 'positive match' language, linking discharged ammunition components to a single source, was identified as invalid by the 2009 NAS Report [2]. This type of analysis is especially problematic when no firearm is available to produce test fires and establish what toolmark features are reliably being reproduced from shot to shot.

Mr Moore reported in his bench notes (page 002751) that there were three exhibits (Items 4, 12, & 21). He concluded that item 4 was a bullet jacket fragment (copper), item 12 was a lead bullet core, and item 21 was a metal fragment. The report / bench note conclusion was that item 4 could not be identified or eliminated as having been fired from either of the submitted revolvers (Smith & Wesson and Ruger). He further concluded that items 12 and 21 were unfit for microscopic comparison.

During the penalty phase of the trial Mr Moore testified that items 4, 12, & 21 may have originated from the same medium to large caliber firearm based upon limited class characteristics (p258, 20-24). These bullet fragments (items 4, 12, 21) could not have been fired by a 22 caliber firearm.

Mr Moore expressed his belief that firearms toolmarks enable individual identification – i.e. identification of a single source for the ammunition exhibits (p259, 10-17).

Under cross examination Mr Moore claimed that firearms toolmarks evidence is objective. He eventually conceded that it is subjective (diametrically opposed to objective) (p259, 18-24).

It should have been emphasized that the bullets that killed Andy Abarca in California were of 'medium caliber' (9mm / 38) and not of the small 22 caliber.

Mr Moore's final words to the jury were that he believes that firearms make unique toolmarks on ammunition (p260, 8-11), again informing the jury of his scientifically invalid beliefs. This is counter to the conclusions of the 2009 NAS Report.

John Nixon

*John Nixon*

13 August 2021

11

## References:

[1]  **National Academies of Science, Ballistic Imaging. Committee to Assess the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database**. National Research Council of the National Academies, Washington DC, 2008. 322pp. (National Academies Press, March, 2008). ISBN 978-0-309-11724-1 (paperback). ISBN 978-0-309-11725-8 (PDF).

[2]  **National Academies of Science, Strengthening Forensic Science in the United States: A Path Forward**, National Research Council of the National Academies, Washington DC, 2009. 328pp. (National Academies Press, 18 February, 2009). ISBN-13: 978-0-309-13135-3 (hardcover). ISBN-13: 978-0-309-13131-5 (paperback).

[3]  **REPORT TO THE PRESIDENT. Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods**. Executive Office of the President. President's Council of Advisors on Science and Technology (PCAST), 160pp, Sept 2016.

[4]  **REPORT TO THE PRESIDENT. Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods**. Executive Office of the President. President's Council of Advisors on Science and Technology (PCAST), <u>Addendum</u>, 9pp, 6 January 2017.

[5]  **Isolated Pairs Research Study:** Mark Keisler, B.S., Stacey Hartman, M.S., Angela Kilmon, M.S., Melissa Oberg, B.S., and Mitzi Templeton, B. S., AFTE Journal, (2018) Volume 50, Number 1.

[6]  **US v Tibbs, US Superior Court for the District of Columbia, Criminal Division, Felony Branch, Case 2016 CF1 19431, Memorandum Opinion,** Pages 1 to 57, 5 September 2019.

[7]  **A Study of False-Positive and False-Negative Error Rates in Cartridge Case Comparisons,** Baldwin *et al*, Ames Laboratory, USDOE Technical Report # IS-5207, 7 April 2014.

[8]  Prof Adina Schwartz Esq, **A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification**, Columbia Science & Technology Law Review, 28 March 2005.

[9]  **Letter from John Grabb Jr, Special Counsel, US DOJ, Washington DC**, to Deforest Allgood Esq, Oktibbeha County, Columbus, MS. Dated 6 May 2013.

[10] Office of the Attorney General, Washington DC. Memorandum for Heads of Department Components. Recommendations of the National Commission on Forensic Science; Announcement for NCFS Meeting Eleven. Including **Department of Justice Code of Professional Responsibility for the Practice of Forensic Science.** 16 September 2016.

[11] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice - NIJ.gov. Uncertainty Ahead: **A Shift in How Federal Scientific Experts Can Testify**. NIJ Journal #279, February 2018.

**Exhibits:**

A      Documents Reviewed in Producing this Report.

B      Pertinent Sections of the 2009 NAS Report on Forensic Science (Ref [2] above).

C      Pertinent Sections of the 2016 PCAST Report & 2017 Addendum (Refs [3] & [4] above).



**Figure 1**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has central primer and central firing pin impression whereas 22 has
no primer and a firing pin impression on the edge

14



**Figure 2**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear

15



**Figure 3**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 154 of 237



**Figure 4**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear

17



**Figure 5**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear

18



**Figure 6**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear

19



**Figure 7**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear



**Figure 8**

Photograph Illustrating the Gross Dissimilarity between a
9mm Luger Caliber Centerfire Cartridge case
and a 22 Long Rifle Caliber Rimfire Cartridge Case

Note – 9mm has large groove around the rear circumference whereas 22 has an extended rim at the very rear

21

# $A$thena $R$esearch & $C$onsulting LLC

PO Box 66, Bippus, Indiana 46713, USA.



**Review of Firearms Toolmark Comparison Issues
in the Case of Alejandro Umana (CASE NO. 3:16-CV-00057)**

## Exhibit A

## Materials Reviewed by John Nixon

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| Volume 1 – Transcripts |
| --- |
| 1. Transcript of Guilt Phase – Volume I (04/12/2010) |
| 2. Transcript of Opening Statements Taken at Guilt Phase (04/12/2010) |
| 3. Transcript of Guilt Phase – Volume II A (04/13/2010) |
| 4. Transcript of Guilt Phase – Volume II B (04/13/2010) |
| 5. Transcript of Guilt Phase – Volume III A (04/14/2010) |
| 6. Transcript of Guilt Phase – Volume III B (04/14/2010) |
| 7. Transcript of Guilt Phase – Volume IV A (04/15/2010) |
| 8. Transcript of Guilt Phase – Volume IV B (04/15/2010) |
| 9. Transcript of Guilt Phase – Volume V A (04/16/2010) |
| 10. Transcript of Guilt Phase – Volume V B (04/16/2010) |
| 11. Transcript of Jury Questions and Verdict Guilt Phase – Volume VI (04/19/2010) |
| 12. Transcript of Sentencing Phase – Volume I (04/19/2010) |
| 13. Transcript of Sentencing Phase – Volume II A (04/20/2010) |
| 14. Transcript of Sentencing Phase – Volume II B (04/20/2010) |
| 15. Transcript of Sentencing Phase – Volume III A (04/21/2010) |
| 16. Transcript of Sentencing Phase – Volume IV A (04/26/2010) |
| 17. Transcript of Sentencing Phase – Volume IV B (04/26/2010) |
| 18. Transcript of Sentencing Phase – Volume V A (04/27/2010) |
| 19. Transcript of Sentencing Phase – Volume V B (04/27/2010) |
| 20. Transcript of Sentencing Phase – Volume VI (04/28/2010) |
| 21. United States Court of Appeals for the Fourth Circuit Opinion (04/23/2014) |

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| Volume 2 – North Carolina Investigation |
| --- |
| 22. Crime Scene Video – Gvt Trial Exhibit 70a |
| 23. Crime Scene Pictures – Gvt Trial Exhibits 67-116a |
| 24. Crime Scene Diagram with Ballistics Measurements – Gvt Trial Exhibit 502 |
| 25. Autopsy Reports and Pictures of Manuel Garcia Salinas – Gvt Trial Exhibit 123-126 |
| 26. Autopsy Reports and Pictures of Ruben Garcia Salinas – Gvt Trial Exhibits 127-130a |
| 27. Medical Picture of 3rd Victim – Gvt Trial Exhibit 501 |
| 28. Fingerprint Cards – Gvt Trial Exhibits 131-134 |
| 29. Pictures from Alejandro Umaña's Arrest – Gvt Trial Exhibits 187-191, 212-218, 22 |
| 30. Map – Gvt Trial Exhibit 208 |
| 31. Gene Rivera Second Report – Gvt Trial Exhibit 220 |
| 32. Firearms Seized from other Co-Defendants |

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| |
|---|
| **Volume 3 – Gene Rivera** |
| 33. Curriculum Vitae of Gene Rivera |
| 34. Charlotte Mecklenburg Police Department Crime Laboratory Reports No. F7-1506 (02/09/2008 and 04/02/2008) |
| 35. Color Photographs, Charlotte Mecklenburg Police Department Crime Laboratory No. F7-1506 |
| 36. DNA & Latent Print Report (02/02/2008) |

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| **Volume 4 – Lemon Grove Park Investigation** |
|---|
| 37. Lemon Grove Park Crime Scene Pictures – Gvt Trial Exhibits 531-536c |
| 38. Autopsy Report of Andy Abarca (10/02/2005) – Gvt Trial Exhibit 541 |
| 39. LAPD Investigation Chronology for Lemon Grove Park Investigation |

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| **Volume 5 – Fairfax Avenue Investigation** |
| --- |
| 40. Fairfax Avenue Crime Scene Picture – Gvt Trial Exhibit 509 |
| 41. Fairfax Avenue Crime Scene Picture – Gvt Trial Exhibit 510 |
| 42. Fairfax Avenue Crime Scene Picture – Gvt Trial Exhibit 511 |
| 43. Autopsy Report of Jose Herrera (07/31/2205) – Gvt Trial Exhibit 525 |
| 44. Autopsy Report of Gustavo Aguero (Gustavo Porras) (08/02/2205) – Gvt Trial Exhibit 523 |
| 45. LAPD Murder Book for Fairfax Avenue Investigation |
| 46. Officer Crime Scene Statement |

# Background Materials for John Nixon
# for the case of Alejandro Umana ( 3:16-CV-000057)

| **Volume 6 – William Moore** |
| --- |
| 47. Firearms Analyzed Evidence Report (12/23/2005) - Gvt Trial Exhibit 504 |
| 48. Statement of Qualifications of William Moore |
| 49. Firearm Analyzed Evidence Report<br><br>    • Reports 05-07 23188, 05-06 29018, 06-06 07978, 06-06 19135 |

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| **Volume 7 – Gene Rivera** |
| --- |
| 50.  Five Comparison Microscope Photomicrographs |

# Background Materials for John Nixon
## for the case of Alejandro Umana ( 3:16-CV-000057)

| Volume 8 |
|---|
| 51.  Gene Rivera, Examination of a 25 Auto caliber Lorcin model L25 revealed an unusual rifling system of eight lands and grooves with a right twist, AFTE Journal, Vol. 34, No. 1 (2002) |
| 52.  Gene Rivera, Subclass Characteristics in Smith & Wesson SW40VE Sigma Pistols, AFTE Journal, Vol. 39, No. 3 (2007) |
| 53. Gene Rivera, Air Pistols converted to fire 25 Auto Caliber Cartridges in Conjunction with a Homemade Device, AFTE Journal, Vol. 41, No. 2 (2009) |
| 54. Michael Kelley & Stella Chu, Testing for the Presence of Lead "an Easy Way", AFTE Journal, Vol. 33, No. 1 (2001) |

# *A*thena *R*esearch & *C*onsulting LLC

PO Box 66, Bippus, Indiana 46713, USA.



Review of Firearms Toolmark Comparison Issues
in the Case of Alejandro Umana (CASE NO. 3:16-CV-00057)

## Exhibit B

## Pertinent Sections of the 2009
## NAS Report on Forensic Science

# STRENGTHENING
# FORENSIC
# SCIENCE
## IN THE UNITED STATES

### A PATH FORWARD

Committee on Identifying the Needs of the Forensic Science Community

Committee on Science, Technology, and Law
Policy and Global Affairs

Committee on Applied and Theoretical Statistics
Division on Engineering and Physical Sciences



NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 170 of 237

THE NATIONAL ACADEMIES PRESS   500 Fifth Street, N.W.   Washington, DC 20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This study was supported by Contract No. 2006-DN-BX-0001 between the National Academy of Sciences and the National Institute of Justice. Any opinions, findings, conclusions, or recommendations expressed in this publication are those of the author(s) and do not necessarily reflect the views of the organizations or agencies that provided support for the project.

Library of Congress Cataloging-in-Publication Data

Strengthening forensic science in the United States : a path forward : summary / Committee on Identifying the Needs of the Forensic Science Community, Committee on Science, Technology, and Law Policy and Global Affairs, Committee on Applied and Theoretical Statistics, Division on Engineering and Physical Sciences.
     p. cm.
  Includes index.
  ISBN-13: 978-0-309-13135-3 (hardcover)
  ISBN-10: 0-309-13135-9 (hardcover)
  ISBN-13: 978-0-309-13131-5 (pbk.)
  ISBN-10: 0-309-13131-6 (pbk.)
 1.  Forensic sciences—United States. 2.  Criminal investigation—United States.
3.  Evidence, Criminal—United States.  I. National Research Council (U.S.). Committee on Identifying the Needs of the Forensic Science Community. II. National Research Council (U.S.). Committee on Science, Technology, and Law Policy and Global Affairs. III. National Research Council (U.S.). Committee on Applied and Theoretical Statistics.
  HV8073.S7347 2009
  363.250973—dc22

                                   2009011443

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, *http://www.nap. edu*.

Copyright 2009 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Copyright © National Academy of Sciences. All rights reserved.

# THE NATIONAL ACADEMIES
*Advisers to the Nation on Science, Engineering, and Medicine*

The **National Academy of Sciences** is a private, nonprofit, self-perpetuating society of distinguished scholars engaged in scientific and engineering research, dedicated to the furtherance of science and technology and to their use for the general welfare. Upon the authority of the charter granted to it by the Congress in 1863, the Academy has a mandate that requires it to advise the federal government on scientific and technical matters. Dr. Ralph J. Cicerone is president of the National Academy of Sciences.

The **National Academy** of **Engineering** was established in 1964, under the charter of the National Academy of Sciences, as a parallel organization of outstanding engineers. It is autonomous in its administration and in the selection of its members, sharing with the National Academy of Sciences the responsibility for advising the federal government. The National Academy of Engineering also sponsors engineering programs aimed at meeting national needs, encourages education and research, and recognizes the superior achievements of engineers. Dr. Charles M. Vest is president of the National Academy of Engineering.

The **Institute** of Medicine was established in 1970 by the National Academy of Sciences to secure the services of eminent members of appropriate professions in the examination of policy matters pertaining to the health of the public. The Institute acts under the responsibility given to the National Academy of Sciences by its congressional charter to be an adviser to the federal government and, upon its own initiative, to identify issues of medical care, research, and education. Dr. Harvey V. Fineberg is president of the Institute of Medicine.

The **National Research Council** was organized by the National Academy of Sciences in 1916 to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government. Functioning in accordance with general policies determined by the Academy, the Council has become the principal operating agency of both the National Academy of Sciences and the National Academy of Engineering in providing services to the government, the public, and the scientific and engineering communities. The Council is administered jointly by both Academies and the Institute of Medicine. Dr. Ralph J. Cicerone and Dr. Charles M. Vest are chair and vice chair, respectively, of the National Research Council.

**www.national-academies.org**

Copyright © National Academy of Sciences. All rights reserved.

work in laboratories that conduct hundreds or thousands of evaluations of impression evidence develop useful experience and judgment, it is difficult to assert that the field has enough collective judgment about the variabilities in lip prints and ear prints based on tens of examinations. The community simply does not have enough data about the natural variability of those less frequent impressions, absent the presence of a clear deformity or scar, to infer whether the observed degree of similarity is significant.

Most of the research in the field is conducted in forensic laboratories, with the results published in trade journals, such as the *Journal of Forensic Identification*. With regard to reporting, SWGTREAD is moving toward the use of standard language to convey the conclusions reached.[58] But neither IAI nor SWGTREAD addresses the issue of what critical research should be done or by whom, critical questions that should be addressed include the persistence of individual characteristics, the rarity of certain characteristic types, and the appropriate statistical standards to apply to the significance of individual characteristics. Also, little if any research has been done to address rare impression evidence. Much more research on these matters is needed.

## TOOLMARK AND FIREARMS IDENTIFICATION

Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object. Such toolmarks may occur in the commission of a crime when an instrument such as a screwdriver, crowbar, or wire cutter is used or when the internal parts of a firearm make contact with the brass and lead that comprise ammunition. The marks left by an implement such as a screwdriver or a firearm's firing pin depend largely on the manufacturing processes—and manufacturing tools—used to create or shape it, although other surface features (e.g., chips, gouges) might be introduced through post-manufacturing wear. Manufacturing tools experience wear and abrasion as they cut, scrape, and otherwise shape metal, giving rise to the theory that any two manufactured products—even those produced consecutively with the same manufacturing tools—will bear microscopically different marks. Firearms and toolmark examiners believe that toolmarks may be traced to the physical heterogeneities of an individual tool—that is, that "individual characteristics" of toolmarks may be uniquely associated with a specific tool or firearm and are reproduced by the use of that tool and only that tool.

The manufacture and use of firearms produces an extensive set of

---

[58] SWGTREAD. 2006. *Standard Terminology for Expressing Conclusions of Forensic Footwear and Tire Impression Examinations.* Available at www.theiai.org/guidelines/swgtread/terminology_final.pdf.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

specialized toolmarks. Gun barrels typically are rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior. The process of cutting these grooves into the barrel leaves marks and scrapes on the relatively softer metal of the barrel.[59] In turn, these markings are transferred to the softer metal of a bullet as it exits the barrel. Over time, with repeated use (and metal-to-metal scraping), the marks on a barrel (and the corresponding "stria" imparted to bullets) may change as individual imperfections are formed or as cleanliness of the barrel changes. The brass exterior of cartridge cases receive analogous toolmarks during the process of gun firing: the firing pin dents the soft primer surface at the base of the cartridge to commence firing, the primer area is forced backward by the buildup of gas pressure (so that the texture of the gun's breech face is impressed on the cartridge), and extractors and ejectors leave marks as they expel used cartridges and cycle in new ammunition.

Firearms examination is one of the more common functions of crime laboratories. Even small laboratories with limited services often perform firearms analysis. In addition to the analysis of marks on bullets and cartridges, firearms examination also includes the determination of the firing distance, the operability of a weapon, and sometimes the analysis of primer residue to determine whether someone recently handled a weapon. These broader aspects are not covered here.

## Sample and Data Collection

When a tool is used in a crime, the object that contains the tool marks is recovered when possible. If a toolmark cannot be recovered, it can be photographed and cast. Test marks made by recovered tools can be made in a laboratory and compared with crime scene toolmarks.

In the early 1990s, the FBI and the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) developed separate databases of images of bullet and cartridge case markings, which could be queried to suggest possible matches. In 1996, the National Institute of Standards and Technology (NIST) developed data exchange standards that permitted the integration of the FBI's DRUGFIRE database (cartridge case images) and the ATF's CEASEFIRE database (then limited to bullet images). The current National Integrated Ballistic Information Network (NIBIN) includes images from both cartridge cases and bullets that are associated with crime scenes and is maintained by the ATF.

Periodically—and particularly in the wake of the Washington, DC,

---

[59] Although the metal and initial rifling are very similar, the cutting of the individual barrels, the finishing machining, and the cleaning and polishing begin the process of differentiation of the two sequentially manufactured barrels.

Copyright © National Academy of Sciences. All rights reserved.

sniper attacks in 2002—the question has been raised of expanding the scope of databases like NIBIN to include images from test firings of newly manufactured firearms. In concept, this would permit downstream investigators who recover a cartridge case or bullet at a crime scene to identify the likely source firearm. Though two states (Maryland and New York) instituted such reference ballistic image databases for newly manufactured firearms, proposals to create such a database at the national level did not make substantial progress in Congress. A recent report of the National Academies, *Ballistic Imaging*, examined this option in great detail and concluded that "[a] national reference ballistic image database of all new and imported guns is not advisable at this time."[60]

### Analyses

In both firearm and toolmark identification, it is useful to distinguish several types of characteristics that are considered by examiners. "Class characteristics" are distinctive features that are shared by many items of the same type. For example, the width of the head of a screwdriver or the pattern of serrations in the blade of a knife may be class characteristics that are common to all screwdrivers or knives of a particular manufacturer and/or model. Similarly, the number of grooves cut into the barrel of a firearm and the direction of "twist" in those grooves are class characteristics that can filter and restrict the range of firearms that match evidence found at a crime scene. "Individual characteristics" are the fine microscopic markings and textures that are said to be unique to an individual tool or firearm. Between these two extremes are "subclass characteristics" that may be common to a small group of firearms and that are produced by the manufacturing process, such as when a worn or dull tool is used to cut barrel rifling.

Bullets and cartridge cases are first examined to determine which class characteristics are present. If these differ from a comparison bullet or cartridge, further examination may be unnecessary. The microscopic markings on bullets and cartridge cases and on toolmarks are then examined under a comparison microscope (made from two compound microscopes joined by a comparison bridge that allows viewing of two objects at the same time). The unknown and known bullet or cartridge case or toolmark surfaces are compared visually by a firearms examiner, who can evaluate whether a match exists.

---

[60] National Research Council. 2008. *Ballistic Imaging.* Washington, DC: The National Academies Press, p. 5.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

## Scientific Interpretation

The task of the firearms and toolmark examiner is to identify the individual characteristics of microscopic toolmarks apart from class and subclass characteristics and then to assess the extent of agreement in individual characteristics in the two sets of toolmarks to permit the identification of an individual tool or firearm.

Guidance from the Association of Firearm and Tool Mark Examiners (AFTE)[61] indicates that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a particular bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. The standards then define agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool."[62]

Knowing the extent of agreement in marks made by different tools, and the extent of variation in marks made by the same tool, is a challenging task. AFTE standards acknowledge that these decisions involve subjective qualitative judgments by examiners and that the accuracy of examiners' assessments is highly dependent on their skill and training. In earlier years, toolmark examiners relied on their past casework to provide a foundation for distinguishing between individual, class, and subclass characteristics. More recently, extensive training programs using known samples have expanded the knowledge base of examiners.

The emergence of ballistic imaging technology and databases such as NIBIN assist examiners in finding possible candidate matches between pieces of evidence, including crime scene exhibits held in other geographic locations. However, it is important to note that the final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images. The growth of these databases also permits examiners to become more familiar with similarities in striation patterns made by different firearms. Newer imaging techniques assess toolmarks using three-dimensional surface measurement data, taking into account the depth of the marks. But even with more training and experience using newer techniques, the decision of the toolmark examiner remains a subjective decision based on unarticulated

---

[61] Theory of identification, range of striae comparison reports and modified glossary definitions—An AFTE Criteria for Identification Committee report. 1992. *Journal of the Association of Firearm and Tool Mark Examiners* 24:336-340.

[62] Ibid., p. 336.

Copyright © National Academy of Sciences. All rights reserved.

standards and no statistical foundation for estimation of error rates.[63] The National Academies report, *Ballistic Imaging*, while not claiming to be a definitive study on firearms identification, observed that, "The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated." That study recognized the logic involved in trying to compare firearms-related toolmarks by noting that, "Although they are subject to numerous sources of variability, firearms-related toolmarks are not completely random and volatile; one can find similar marks on bullets and cartridge cases from the same gun," but it cautioned that, "A significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness."[64]

### Summary Assessment

Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable.

---

[63] Recent research has attempted to develop a statistical foundation for assessing the likelihood that more than one tool could have made specific marks by assessing consecutive matching striae, but this approach is used in a minority of cases. See A.A. Biasotti. 1959. A statistical study of the individual characteristics of fired bullets. *Journal of Forensic Sciences* 4:34; A.A. Biasotti and J. Murdock. 1984. "Criteria for identification" or "state of the art" of firearms and tool marks identification. *Journal of the Association of Firearms and Tool Mark Examiners* 16(4):16; J. Miller and M.M. McLean. 1998. Criteria for identification of tool marks. *Journal of the Association of Firearms and Tool Mark Examiners* 30(1):15; J.J. Masson. 1997. Confidence level variations in firearms identification through computerized technology. *Journal of the Association of Firearms and Tool Mark Examiners* 29(1):42. For a critique of this area and a comparison of scientific issues involving toolmark evidence and DNA evidence, see A. Schwartz. 2004-2005. A systemic challenge to the reliability and admissibility of firearms and tool marks identification. *Columbia Science and Technology Law Review* 6:2. For a rebuttal to this critique, see R.G. Nichols. 2007. Defending the scientific foundations of the firearms and tool mark identification discipline: Responding to recent challenges. *Journal of Forensic Sciences* 52(3):586-594.

[64] All quotes from National Research Council. 2008. *Ballistic Imaging*. Washington, DC: The National Academies Press, p. 3.

Copyright © National Academy of Sciences. All rights reserved.

A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. As noted above, AFTE has adopted a theory of identification, but it does not provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between tool marks known to have been produced by different tools and is consistent with the agreement demonstrated by tool marks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.

Although some studies have been performed on the degree of similarity that can be found between marks made by different tools and the variability in marks made by an individual tool, the scientific knowledge base for toolmark and firearms analysis is fairly limited. For example, a report from Hamby, Brundage, and Thorpe[65] includes capsule summaries of 68 toolmark and firearms studies. But the capsule summaries suggest a heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability. Overall, the process for toolmark and firearms comparisons lacks the specificity of the protocols for, say, 13 STR DNA analysis. This is not to say that toolmark analysis needs to be as objective as DNA analysis in order to provide value. And, as was the case for friction ridge analysis and in contrast to the case for DNA analysis, the specific features to be examined and compared between toolmarks cannot be stipulated a priori. But the protocols for DNA analysis do represent a precisely specified, and scientifically justified, series of steps that lead to results with well-characterized confidence limits, and that is the goal for all the methods of forensic science.

## ANALYSIS OF HAIR EVIDENCE

The basis for hair analyses as forensic evidence stems from the fact that human and animal hairs routinely are shed and thus are capable of being

---

[65] J.E. Hamby, D.J. Brundage, and J.W. Thorpe. 2009. The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels—A research project involving 468 participants from 19 countries. Available online at http://www.fti-ibis.com/DOWNLOADS/Publications/10%20Barrel%20Article-%20a.pdf.

Copyright © National Academy of Sciences. All rights reserved.

# 6

# Improving Methods, Practice, and Performance in Forensic Science

In a presentation to the committee, Jennifer Mnookin, of the University of California, Los Angeles School of Law, cautioned against yielding to two extremes in developing expectations for the forensic science disciplines. The first is the risk of letting the "perfect" be the enemy of the "good." That is, many forms of forensic investigation and analysis may work relatively well once appropriate tasks have been set for them. "The opposite danger is the risk of overconfidence about what we think we know—the risk of making unjustified inferences on the basis of limited information, or sometimes a resistance to gaining new information that would help us do it better."[1]

Nonetheless, a number of the forensic science disciplines, as they are currently practiced, do not contribute as much to criminal justice as they could. This chapter discusses the improvements that are needed and makes four major recommendations. It does not evaluate the quality of evidence collection and management—steps that provide the inputs to forensic methods—although, obviously, the quality of those steps is critical in maximizing the investigative and probative value of that evidence.

## INDEPENDENCE OF FORENSIC SCIENCE LABORATORIES

The majority of forensic science laboratories are administered by law enforcement agencies, such as police departments, where the laboratory administrator reports to the head of the agency. This system leads to

---

[1] J. Mnookin, Professor of Law, University of California, Los Angeles Law School. Presentation to the committee. April 23, 2007.

*183*

Copyright © National Academy of Sciences. All rights reserved.

significant concerns related to the independence of the laboratory and its budget. Ideally, public forensic science laboratories should be independent of or autonomous within law enforcement agencies. In these contexts, the director would have an equal voice with others in the justice system on matters involving the laboratory and other agencies. The laboratory also would be able to set its own priorities with respect to cases, expenditures, and other important issues. Cultural pressures caused by the different missions of scientific laboratories vis-à-vis law enforcement agencies would be largely resolved. Finally, the forensic science laboratories would be able to set their own budget priorities and not have to compete with the parent law enforcement agencies.

## UNCERTAINTIES AND BIAS

Few forensic science methods have developed adequate measures of the accuracy of inferences made by forensic scientists. All results for every forensic science method should indicate the uncertainty in the measurements that are made, and studies must be conducted that enable the estimation of those values. For the identification sciences (e.g., friction ridge analysis, toolmark analysis, handwriting analysis), such studies would accumulate data about the intraindividual variability (e.g., how much one finger's impressions vary from impression to impression, or how much one toolmark or signature varies from instance to instance) and the interindividual variability (e.g., how much the impressions of many fingerprints vary across a population and in what ways). With that information, one could begin to attach confidence limits to individualization determinations and also begin to develop an understanding of how much similarity is needed in order to attain a given level of confidence that a match exists. Note that this necessary step would change the way the word "individualization" is commonly used. The concept of individualization is that an object found at a crime scene can be uniquely associated with one particular source. By acknowledging that there can be uncertainties in this process, the concept of "uniquely associated with" must be replaced with a probabilistic association, and other sources of the crime scene evidence cannot be completely discounted. The courts already have proven their ability to deal with some degree of uncertainty in individualizations, as demonstrated by the successful use of DNA analysis (with its small, but nonzero, error rate).

Finally, as discussed in Chapter 4, the accuracy of forensic methods resulting in classification or individualization conclusions needs to be evaluated in well-designed and rigorously conducted studies. The level of accuracy of an analysis is likely to be a key determinant of its ultimate probative value.

Some initial and striking research has uncovered the effects of some

Copyright © National Academy of Sciences. All rights reserved.

biases in forensic science procedures,[2] but much more must be done to understand the sources of bias and to develop countermeasures.[3] Some principles employed in other fields should be useful, although some (e.g., blinding) may not be feasible for some types of forensics work. The forensic science disciplines are just beginning to become aware of contextual bias and the dangers it poses. The traps created by such biases can be very subtle, and typically one is not aware that his or her judgment is being affected. An overview of the effect of bias in the forensic science disciplines can be found in Risinger et al., 2002.[4] Decisions regarding what analyses need to be performed and in what order also can be influenced by bias and ultimately have the potential to skew results.

Forensic scientists who sit administratively in law enforcement agencies or prosecutors' offices, or who are hired by those units, are subject to a general risk of bias. Bias also is introduced through decisions made about evidence collection, which controls who is listed as a suspect. Evidence collection and crime scene investigation can require scientific knowledge and judgment, and these functions are normally outside the control of forensic scientists.

## REPORTING RESULTS

There is a critical need in most fields of forensic science to raise the standards for reporting and testifying about the results of investigations. For example, many terms are used by forensic examiners in reports and in court testimony to describe findings, conclusions, and the degrees of association between evidentiary material (e.g., hairs, fingerprints, fibers) and particular people or objects. Such terms include but are not limited to "match," "consistent with," "identical," "similar in all respects tested," and "cannot be excluded as the source of." The use of such terms can have a profound effect on how the trier of fact in a criminal or civil matter perceives and evaluates evidence. Yet the forensic science disciplines have not reached agreement or consensus on the precise meaning of any of these

---

[2] E.g., I.E. Dror and D. Charlton. 2006. Why experts make errors. *Journal of Forensic Identification* 56 (4):600-616; I.E. Dror, D. Charlton, and A Peron. 2006. Contextual information renders experts vulnerable to making erroneous identifications. *Forensic Science International* 156(1):74-78; D.E. Krane, S. Ford, J.R. Gilder, K. Inman, A. Jamieson, R. Koppl, I.L. Kornfield, D.M. Risinger, N. Rudin, M.S. Taylor, and W.C Thompson. 2008. Sequential unmasking: A means of minimizing observer effects in forensic DNA interpretation. *Journal of Forensic Sciences* 53(4):1006-1007; L.S. Miller. 1987. Procedural bias in forensic science examinations of human hairs. *Law and Human Behavior* 11(2):157-163.

[3] See the discussion of biases provided in Chapter 4.

[4] D.M. Risinger, M.J. Saks, W.C. Thompson, and R. Rosenthal. 2002. The *Daubert/Kumho* implications of observer effects in forensic science: Hidden problems of expectation and suggestion. *California Law Review* 90:1-56; Krane, et al., op. cit.

Copyright © National Academy of Sciences. All rights reserved.

terms. Although some disciplines have developed vocabulary and scales to be used in reporting results, they have not become standard practice. This imprecision in vocabulary stems in part from the paucity of research in forensic science and the corresponding limitations in interpreting the results of forensic analyses. Publications such as Evett et al.,[5] Aitken and Taroni,[6] and Evett[7] provide the essential building blocks for the proper assessment and communication of forensic findings.

As a general matter, laboratory reports generated as the result of a scientific analysis should be complete and thorough. They should describe, at a minimum, methods and materials, procedures, results, and conclusions, and they should identify, as appropriate, the sources of uncertainty in the procedures and conclusions along with estimates of their scale (to indicate the level of confidence in the results). Although it is not appropriate and practicable to provide as much detail as might be expected in a research paper, sufficient content should be provided to allow the nonscientist reader to understand what has been done and permit informed, unbiased scrutiny of the conclusion.

Some forensic laboratory reports meet this standard of reporting, but most do not. Some reports contain only identifying and agency information, a brief description of the evidence being submitted, a brief description of the types of analysis requested, and a short statement of the results (e.g., "The green, brown plant material in item #1 was identified as marijuana"). The norm is to have no description of the methods or procedures used, and most reports do not discuss measurement uncertainties or confidence limits. Many disciplines outside the forensic science disciplines have standards, templates, and protocols for data reporting. Although some of the Scientific Working Groups have a scoring system for reporting findings, they are not uniformly or consistently used.

Forensic science reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including associated probabilities where possible. Courtroom testimony should be given in lay terms so that all trial participants can understand how to weight and interpret the testimony. In order to enable this, research must be undertaken to evaluate the reliability of the steps of the various identification methods and the confidence intervals associated with the overall conclusions.

---

[5] I.W. Evett, G. Jackson, J.A. Lambert, and S. McCrossan. 2000. The impact of the principles of evidence interpretation on the structure and content of statements. *Science and Justice* 40(4):233-239.

[6] C.G.G. Aitken and F. Taroni. 2004. *Statistics and the Evaluation of Evidence for Forensic Scientists*. 2nd ed. V. Barnett, ed. Chichester, UK: John Wiley & Sons Ltd.

[7] I.W. Evett. 1990. The theory of interpreting scientific transfer evidence. *Forensic Science Progress* 4:141-179.

Copyright © National Academy of Sciences. All rights reserved.

## THE NEED FOR RESEARCH

Barry Fisher, Director of the Crime Laboratory of the Los Angeles County Sheriff's Department, has said, "We run the risk of our science being questioned in the courts because there is so little research."[8] In 2001 Giannelli wrote, "In many areas [of forensic science] little systematic research has been conducted to validate the field's basic premises and techniques, and often there is no justification why such research would not be feasible."[9] As Smith et al. note, the United States has a renowned higher education system, and many basic research discoveries relating to the forensic science disciplines have been made in academia.[10] However, the forensic science disciplines suffer from an inadequate research base: Few forensic scientists have the opportunity to conduct research, few academics are positioned to undertake such research, and, importantly, the funding for forensic research is insufficient. Others believe that the field suffers because the research initiatives being funded and pursued lack an overarching strategic plan.[11]

There are several explanations for the relative lack of funding for basic and applied research in the forensic science disciplines. First, forensic practice was started in, and has grown out of, the criminal justice and law enforcement systems. Many forensic science techniques were developed to aid in the investigatory phase of law enforcement and then were adapted to the role of aiding in prosecution by providing courtroom testimony. Thus, forensic practitioners who work in public crime laboratories often are seen as part of the prosecution team, not as part of the scientific enterprise. Second, some of the forensic science disciplines rely on an apprenticeship model for training, rather than on codifying their methods in a scientific framework. Third, federal agencies that fund scientific work, such as the National Science Foundation, the National Institutes of Health, and the Department of Defense, generally have not considered forensic science as part of the science base they need to support. It has been only in recent years that the National Institute of Justice has taken interest in funding forensic science research, but the majority of these funds have been awarded to reduce case backlogs, especially for cases that involve the analysis of DNA (see Chapter 2).

---

[8] K. Pyrek. 2007. *Forensic Science Under Siege: The Challenges of Forensic Laboratories and the Medico-Legal Investigation System.* Burlington, MA: Academic Press, p. 231.

[9] P.C. Giannelli. 2001. Scientific evidence in civil and criminal cases. *Arizona State Law Journal* 103:112.

[10] F.P. Smith, R.H. Liu, and C.A. Lindquist. 1988. Research experience and future criminalists. *Journal of Forensic Sciences* 33(4):1074-1080.

[11] IAI Positions and Recommendations to the NAS Committee to Review the Forensic Sciences. September 19, 2007. See presentation by K.F. Martin, IAI President, to the committee. December 6, 2007.

Copyright © National Academy of Sciences. All rights reserved.

*188*      *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

The forensic science disciplines need to develop rigorous protocols for performing subjective interpretations, and they must pursue equally rigorous research and evaluation programs. The development of such research programs can benefit significantly from work in other areas, notably from the large body of research that is available on the evaluation of observer performance in diagnostic medicine and from the findings of cognitive psychology on the potential for bias and error in human observers.

In evaluating the accuracy of a forensic analysis, it is crucial to clarify the type of question the analysis is called upon to address. Thus, although some techniques may be too imprecise to permit the accurate identification of a specific individual, they may still provide useful and accurate information about questions of classification. For example, microscopic hair analysis may provide reliable evidence on the subpopulation of the individual from which the specimen was derived, even if it cannot associate reliably the hair with a specific individual. However, the definition of the appropriate question is only a first step in evaluating the performance of a forensic technique. The research design should address the questions that arise in the specific context of forensics.

A complete research agenda should include studies to establish the strengths and limitations of each procedure, sources of bias and variation, quantification of uncertainties created by these sources, measures of performance, procedural steps in the process of analyzing the forensic evidence, and methods for continual monitoring and improving the steps in that process.

## CONCLUSIONS AND RECOMMENDATIONS

Wide variability is found across forensic science disciplines not only with regard to techniques and methodologies (see Chapter 5), but also with regard to reliability, error rates, reporting, research foundations, general acceptability, and published material. Some of the disciplines are laboratory based (e.g., nuclear and mitochondrial DNA analysis, toxicology and drug analysis, and analyses of fibers and fire debris); others are based on expert interpretation of observed patterns (e.g., of fingerprints, writing samples, toolmarks, bite marks, and hairs). The briefings and materials that informed this report illustrate that the level of scientific development and evaluation varies substantially among the forensic science disciplines.

In most areas of forensic science, no well-defined system exists for determining error rates, and proficiency testing shows that some examiners perform poorly. In some disciplines, such as forensic odontology, the methods of evidence collection are relatively noncontroversial, but disputes arise over the value and reliability of the resulting interpretations.

In most forensic science disciplines, no studies have been conducted

Copyright © National Academy of Sciences. All rights reserved.

of large populations to establish the uniqueness of marks or features. Yet, despite the lack of a statistical foundation, examiners make probabilistic claims based on their experience. A statistical framework that allows quantification of these claims is greatly needed. These disciplines also critically need to standardize and clarify the terminology used in reporting and testifying about the results and in providing more information.

Little rigorous systematic research has been done to validate the basic premises and techniques in a number of forensic science disciplines. The committee sees no evident reason why conducting such research is not feasible; in fact, some researchers have proposed research agendas to strengthen the foundations of specific forensic disciplines.[12] Much more federal funding is needed to support research in forensic science and forensic pathology in universities and in private laboratories committed to such work. The forensic science and medical examiner communities (see Chapter 9) will be improved by opportunities to collaborate with the broader science and engineering communities. In particular, collaborative efforts are urgently needed to: (1) develop new technical methods or provide in-depth grounding for advances developed in forensic science; (2) provide an interface between the forensic science and medical examiner communities and basic sciences; and (3) create fertile grounds for discourse among the communities. The proposed National Institute of Forensic Science (NIFS) should recommend, implement, and guide strategies for supporting such initiatives.

Although a long-term research agenda will require a thorough assessment of each of the assumptions that underlie forensic science techniques, many concerns regarding the forensic science disciplines can be addressed immediately through studies in which forensic science practitioners are presented with a standardized set of realistic training materials that vary in complexity. Such studies will not explore the components of the decision process, but they will permit an assessment of the extent to which skilled forensic science practitioners will reach the same or similar conclusions when presented with the types of materials that lead to disagreements.

Recommendation 2:

> The National Institute of Forensic Science (NIFS), after reviewing established standards such as ISO 17025, and in consultation with its advisory board, should establish standard terminology to be used in reporting on and testifying about the results of forensic science investigations. Similarly, it should establish model laboratory reports for different forensic science disciplines and specify

---

[12] See, e.g., L. Haber and R.N. Haber. 2008. Scientific validation of fingerprint evidence under *Daubert. Law, Probability and Risk* 7(2):87-109.

Copyright © National Academy of Sciences. All rights reserved.

190 *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

the minimum information that should be included. As part of the accreditation and certification processes, laboratories and forensic scientists should be required to utilize model laboratory reports when summarizing the results of their analyses.

Recommendation 3:

Research is needed to address issues of accuracy, reliability, and validity in the forensic science disciplines. The National Institute of Forensic Science (NIFS) should competitively fund peer-reviewed research in the following areas:

(a) Studies establishing the scientific bases demonstrating the validity of forensic methods.
(b) The development and establishment of quantifiable measures of the reliability and accuracy of forensic analyses. Studies of the reliability and accuracy of forensic techniques should reflect actual practice on realisticcase scenarios, averaged across a representative sample of forensic scientists and laboratories. Studies also should establish the limits of reliability and accuracy that analytic methods can be expected to achieve as the conditions of forensic evidence vary. The research by which measures of reliability and accuracy are determined should be peer reviewed and published in respected scientific journals.
(c) The development of quantifiable measures of uncertainty in the conclusions of forensic analyses.
(d) Automated techniques capable of enhancing forensic technologies.

To answer questions regarding the reliability and accuracy of a forensic analysis, the research must distinguish between average performance (achieved across individual practitioners and laboratories) and individual performance (achieved by the specific practitioner and laboratory). Whether or not a forensic procedure is sufficient under the rules of evidence governing criminal and civil litigation raises difficult legal issues that are outside the realm of scientific inquiry.

Recommendation 4:

To improve the scientific bases of forensic science examinations and to maximize independence from or autonomy within the law enforcement community, Congress should authorize and appropri-

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States:  A Path Forward

ate incentive funds to the National Institute of Forensic Science (NIFS) for allocation to state and local jurisdictions for the purpose of removing all public forensic laboratories and facilities from the administrative control of law enforcement agencies or prosecutors' offices.

Recommendation 5:

The National Institute of Forensic Science (NIFS) should encourage research programs on human observer bias and sources of human error in forensic examinations. Such programs might include studies to determine the effects of contextual bias in forensic practice (e.g., studies to determine whether and to what extent the results of forensic analyses are influenced by knowledge regarding the background of the suspect and the investigator's theory of the case). In addition, research on sources of human error should be closely linked with research conducted to quantify and characterize the amount of error. Based on the results of these studies, and in consultation with its advisory board, NIFS should develop standard operating procedures (that will lay the foundation for model protocols) to minimize, to the greatest extent reasonably possible, potential bias and sources of human error in forensic practice. These standard operating procedures should apply to all forensic analyses that may be used in litigation.

Copyright © National Academy of Sciences. All rights reserved.

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 187 of 237

# 8

# Education and Training
# in Forensic Science

Forensic examiners must understand the principles, practices, and contexts of science, including the scientific method. Training should move away from reliance on the apprentice-like transmittal of practices to education at the college level and beyond that is based on scientifically valid principles, as discussed in Chapter 4. For example, in addition to learning a particular methodology through a lengthy apprenticeship or workshop during which a trainee discerns and learns to copy the skills of an experienced examiner, the junior person should learn what to measure, the associated population statistics (if appropriate), biases and errors to avoid, other threats to the validity of the evidence, how to calculate the probability that a conclusion is valid, and how to document and report the analysis. Among many skills, forensic science education and training must provide the tools needed to understand the probabilities and the limits of decisionmaking under conditions of uncertainty.

To correct some of the existing deficiencies, the starting place must be better undergraduate and graduate programs, as well as increased opportunities for continuing education. Legitimating practices in the forensic science disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education and training and the proper conduct of research.

Education and training in the forensic science disciplines serve at least three purposes. First, educational programs prepare the next generation of forensic practitioners. The number of secondary and postsecondary students interested in the forensic science disciplines has grown substantially in recent years. In response, colleges and universities have created new

*217*

Copyright © National Academy of Sciences. All rights reserved.

certificate and degree programs to prepare students for forensic science careers. There are several types of forensic practitioners, including criminalists (those who work in crime laboratories), who make up a large part of the forensic science workforce and who often enter the profession with a bachelor's degree, and other forensic science practitioners (e.g., pathologists, odontologists, entomologists, toxicologists, anthropologists), who typically have advanced degrees, often Ph.D.s, and who might work part time in forensic science activities. Another group of forensic examiners include crime scene investigators, who usually do not have advanced degrees; many do not have college degrees above the associate level.

Second, forensic science practitioners require continuing professional development and training. Scientific advances in forensic science techniques and research in the forensic science disciplines are of interest to practitioners who must be aware of these new developments. Forensic science practitioners also may need to complete additional training for certification purposes or may desire to learn new skills as part of their career development. Training refers to the "formal, structured process through which a forensic scientist reaches a level of scientific knowledge and expertise required to conduct specific forensic analyses."[1] Continuing professional development is the "mechanism through which a forensic scientist remains current or advances to a higher level of expertise, specialization, or responsibility."[2]

Third, there is a need to educate the users of forensic science analyses, especially those in the legal community. Judges, lawyers, and law students can benefit from a greater understanding of the scientific bases underlying the forensic science disciplines and how the underlying scientific validity of techniques affects the interpretation of findings. These three objectives are explored in more detail in this chapter.

## STATUS OF FORENSIC SCIENCE EDUCATION

### Demand for Forensic Science Practitioners

Demand for more and better-skilled forensic science practitioners is rising at both the macro and micro levels. At the macro level, the appropriate question to ask is, what is the need for forensic science expertise in the United States? At the micro level, the question to ask is, what are the needs of a crime laboratory in hiring new forensic science personnel?

---

[1] National Institute of Justice. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students.* Washington, DC: National Institute of Justice, p. 25.

[2] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

As the National Institute of Justice (NIJ) notes:

> In recent years, the demand for forensic scientists has increased for many reasons, including population demographics, increased awareness of forensic science by law enforcement, increased numbers of law enforcement officers, database automation in several categories of physical evidence, jury expectations, legal requirements, accreditation and certification requirements of laboratories and personnel, impending retirement of a large number of currently practicing forensic scientists, and increased public awareness of forensic science through the popular media.[3]

One manifestation of the need for more examiners is the backlog of requests for forensic services at crime laboratories. As noted in previous chapters of this report (based on the 2005 Census of Publicly Funded Forensic Crime Laboratories), many forensic laboratories experience large backlogs in requests for forensic services. To achieve a 30-day turnaround on all 2005 requests, the different forensic science disciplines would have needed varying increases in the number of full-time examiners performing that work—ranging from an estimated 73 percent increase in DNA examiners to an estimated 6 percent increase in examiners conducting toxicology analysis.[4]

The most recent *Occupational Outlook Handbook*, prepared by the Bureau of Labor Statistics at the U.S. Department of Labor, found that job growth for forensic science technicians will grow much faster than average, with 13,000 jobs available in 2006 and a projected 31 percent rise, or 17,000 jobs, projected by 2016.[5] Yet one analyst argued that "existing science programs overproduce graduates relative to the actual labor market" in criminalistics.[6] Having an accurate picture of demand—as well as the capacity of employers to absorb new forensic science professionals—is important for colleges and universities that are educating and training the future workforce. Additional information on such factors as retirement and attrition rates and on trends in funding for laboratory personnel could assist educational providers in obtaining a more accurate picture of future employment prospects for their students.

The micro level focuses on the skills that individuals need to gain

---

[3] Ibid., p. 3.

[4] M.R. Durose. 2008. *Census of Publicly Funded Forensic Crime Laboratories, 2005*. U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. Available at www.ojp.usdoj.gov/bjs/pub/pdf/cpffcl05.pdf.

[5] Bureau of Labor Statistics, Department of Labor. "Science Technicians." In: *Occupational Outlook Handbook, 2008-09 edition*. Available at www.bls.gov/oco/ocos115.htm# projections_data.

[6] R.E. Gaensslen. 2003. How do I become a forensic scientist? Educational pathways to forensic science careers. *Analytical and Bioanalytical Chemistry* 376:1151-1155.

Copyright © National Academy of Sciences. All rights reserved.

TABLE 8-1 Educational Pathways to Some Forensic Science Careers

| Forensic Discipline | Educational Requirements |
| --- | --- |
| Crime scene investigation | Jobs are typically held by law enforcement personnel. Meet requirements for joining the law enforcement agency. For federal jobs, a college degree is required. |
| Computer crime investigation/forensic computer science | B.S. in computer science or computer engineering; M.S. may be common. |
| Criminalistics | B.S. in the physical sciences, with background in chemistry |
| Forensic engineering | B.S. in engineering; practitioners may also be licensed as professional engineers (PEs). |
| Forensic pathology | Appropriate college degree; M.D.; internship and pathology residency; and specialized training in forensic pathology; additionally requires state license and board certification. |
| Forensic odontology | Appropriate college degree; D.D.S. or D.D.M.; may include additional specialty training; additionally requires state license and board certification. |
| Forensic entomology | Ph.D. in entomology. |
| Forensic anthropology | M.S. or M.A. at minimum; many have Ph.D.s. |
| Forensic psychiatry | Similar to forensic pathology, with residency in psychiatry. |
| Forensic psychology | M.S.W. or Ph.D. in psychology; often must meet state requirements for clinical practice and may be certified. |

SOURCE: Gaensslen, 2003.

entry into forensic science careers (see Table 8-1). As a starting point, one needs an appropriate degree. The required minimum degree for entry-level forensic science positions ranges from a bachelor's degree to a doctoral or medical degree.[7] Almirall and Furton[8] suggest that it is possible to begin a career as a crime scene investigator or in firearms, documents, or fingerprints with an associate degree.

It should be noted that the preferred degree is often higher than an

[7] Gaensslen, op. cit.
[8] R. Almirall and K.G. Furton. 2003. Trends in forensic science education: Expansion and increased accountability. *Analytical and Bioanalytical Chemistry* 376:1156-1159.

Copyright © National Academy of Sciences. All rights reserved.

associate degree. Almirall and Furton posit that future trends favor a minimum of a graduate degree in almost all areas of forensic science.[9]

An issue that has received much attention is the degree requirements for positions in crime laboratories. A requirement for an entry-level position in most crime laboratories is at least a bachelor's degree in a natural science or forensic science, and many laboratories require a year or two of experience, with a master's degree. Over the years, most crime laboratory hires have been and continue to be graduates with degrees in chemistry or biology.

Several studies have focused on the needs of crime laboratories. In 1988 Siegel conducted a survey of undergraduate students at Michigan State University, forensic science practitioners employed by the Michigan State Police, and 240 members of the American Society of Crime Laboratory Directors (ASCLD).[10] Survey respondents expressed a strong preference for a master's degree in forensic science and a lack of preference for the B.S. in criminalistics/forensic science. One explanation noted by the respondents was "that too many programs passing themselves off as forensic science programs were actually little more than criminal justice programs with a forensic science internship and a smattering of 'hard' science."[11] Another finding was the importance of chemistry in the backgrounds of prospective forensic science examiners.

Also in 1988, Higgins and Selavka surveyed laboratory managers.[12] Similar to the findings of Seigel, "chemical knowledge was the most important ability they considered when evaluating potential employees. . . ."[13] In 1996, Furton et al. surveyed members of the ASCLD, primarily drug chemists and trace evidence analysts.[14] This survey found that "the majority of crime lab directors responding require applicants to have B.S. degrees with a preference for chemistry/biochemistry, followed by biology and forensic science with a requirement for a substantial number of chemistry and other natural science courses."[15]

---

[9] Ibid.

[10] J.A. Siegel. 1988. The appropriate educational background for entry level forensic scientists: A survey of practitioners. *Journal of Forensic Sciences* 33(4):1065-1068.

[11] Ibid., pp. 1067-1068.

[12] K.M. Higgins and C.M. Selavka. 1988. Do forensic science graduate programs fulfill the needs of the forensic science community? *Journal of Forensic Sciences* 33(4):1015-1021.

[13] Ibid., p. 1017.

[14] K.G. Furton, Y.L. Hsu, and M.D. Cole. 1999. What educational background is required by crime laboratory directors? *Journal of Forensic Sciences* 44:128-132.

[15] Ibid., p. 130.

Copyright © National Academy of Sciences. All rights reserved.

### Proliferation of Forensic Science Programs

In recent years, increasing attention has been paid to the forensic science disciplines by the media in the form of many new books, movies, high-profile court cases, and, especially, television shows such as *Crime Scene Investigation* (or CSI).[16] This media attention has resulted in explosive demand by college (as well as primary and secondary school) students for academic courses and degree programs that will prepare them for careers in forensic science that are like those portrayed in the media. Evidence of this is the dramatic rise in enrollments in forensic science courses on college campuses.[17]

One issue facing academic forensic science programs is combating Hollywood's version of the career of a forensic practitioner. "Students who enter forensic science programs often expect to work in conditions similar to the television crime shows they watch. Many find they are unprepared for the reality of a career in the field. 'A lot of new students come to our programs looking for an exciting career. Unfortunately, they come with unrealistic expectations,' says Charles Tindall, director of forensic science at the Metropolitan State College of Denver."[18]

Until recently, there were few academic programs in the forensic science disciplines. The earliest forensic science degree programs and the oldest continually functioning educational degree programs in forensic science in the United States were established at Michigan State University in 1946 and the University of California at Berkeley in 1950.[19] A survey conducted in the mid-1970s located 22 colleges and universities in the United States offering degrees (in one case a certificate) in criminalistics/forensic science, although some of these institutions offered multiple degrees.[20]

---

[16] See, e.g., S. Smallwood. 2002. As seen on TV. *Chronicle of Higher Education* 48(45): A8-A10.

[17] There have been similar increases in demand at the K-12 level. Forensic science has become a popular component of science teaching. An informal survey conducted in 2004 by the National Science Teachers Association found that, "Of the 450 middle and high school science educators who responded to an informal survey, 77 percent indicated that their school or school district is using forensic investigations to teach science. When asked if the popularity of forensic-based TV shows had ignited students' interest in science, the response was a resounding 'yes' (78 percent)." *NSTA Survey Reveals Forensic Science Is Hottest New Trend in Science Teaching.* Available at http://science.nsta.org/nstaexpress/nstaexpress_2004_10_25_forensic.htm.

[18] National Institute of Justice. 2007. *Addressing Shortfalls in Forensic Science Education.* InShort, NCJ 216886. Washington, DC: U.S. Department of Justice, National Institute of Justice.

[19] A. Vollmer, Chief of Police, Berkeley, California, established the School of Criminology at the University of California at Berkeley.

[20] J.L. Peterson, D. Crim, and P.R. De Forest. 1977. The status of forensic science degree programs in the United States. *Journal of Forensic Sciences* 22(1):17-33.

Copyright © National Academy of Sciences. All rights reserved.

In the 1980s, a contraction of programs occurred—particularly at the graduate level. Stoney argues that this was because of a lack of financial and administrative support.[21] Higgins and Selavka suggest that the end of funding provided by the Law Enforcement Assistance Administration in 1978 took important federal support away from many institutions.[22] Additionally, they suggest that the then-declining enrollment in graduate programs might have reflected the generally low-paying opportunities available to newly minted graduates.

In recent years, this trend has reversed itself. Many colleges and universities, seeing the potential revenue from increasing numbers of new students, have responded by creating all manner of new academic programs. The American Academy of Forensic Sciences (AAFS) now lists 138 undergraduate, 59 graduate, and 6 doctoral forensic science degree programs in the United States.[23] Not all are science based—many are criminal justice programs. The curricula of these degrees range from rigorous scientific coursework amounting to a degree in chemistry or biology with forensic science content, to little more than criminal justice degrees with an internship.

### Doctoral Programs in Forensic Science

There is no doctoral program specifically in forensic science; the programs noted by AAFS offer Ph.D.s (mostly in chemistry) with a concentration in that area. Some scholars consider this to be a shortcoming in forensic science education. More than 20 years ago, Kobilinksy and Sheehan conducted a survey of crime laboratories throughout the United States and found that almost 73 percent of those responding believed there was a need for a Ph.D. program.[24] The advantages of a Ph.D. program lie in its positive effect on basic research in the field. Doctoral programs offer more research depth and capacity, have ties to other fields, have high expectations for quality, supply graduate student personnel to question and check past work and challenge conventional wisdom, and inspire more mentoring, which has two-way benefits.

---

[21] D.A. Stoney. 1988. A medical model for criminalistics education. *Journal of Forensic Sciences* 33(4):1086-1094.

[22] Higgins and Selavka, op. cit.

[23] See www.aafs.org.

[24] L. Kobilinksy and F.X. Sheehan. 1984. The desirability of a Ph.D. program in forensic science. *Journal of Forensic Sciences* 29(3):706-710.

Copyright © National Academy of Sciences. All rights reserved.

## CHALLENGES AND OPPORTUNITIES TO IMPROVE
## FORENSIC SCIENCE EDUCATION

The overarching challenges facing forensic science education, since its inception, have been inconsistent quality and insufficient funding. Commentators have noted repeatedly the deficiencies of forensic science education programs.[25] Because, until recently, no nationally recognized, mandated standards existed for forensic science degree programs at any level, consistent quality cannot be achieved. Peterson et al. note that while "the primary objective of all degree programs is similar, the capabilities of graduates from the respective institutions are not uniform. Laboratories are forced to evaluate each graduate student individually to determine his suitability for a given position."[26]

Unevenness in the quality of these programs has caused problems for students and future employers. The Council of Forensic Science Educators stated that, "Students completing these lesser programs expect to find employment in crime labs but are surprised to learn that lab management is not impressed by the curriculum."[27]

Additionally, the lack of applicants with a science or forensic background means that crime laboratories have to spend precious time and resources in the training of new scientists.[28] If forensic science education programs had sufficient rigor in science, law, and forensics, crime laboratories would have to spend less time and money for training,[29] thereby shortening as well the apprenticeship time needed. Forensic science methods should be taught in the framework of common scientific practice (see Chapters 4 through 6). Even if a student graduates with a science degree, he or she often lacks education in issues that are critical to the functioning of crime laboratories, including quality assurance and control, ethics, and expert testimony. Peterson et al. found that, "The faculty surveyed believes their students to be well prepared for entry into the field. This is not totally consistent with the feedback from some laboratories which have been less than satisfied with newly graduated recruits."[30] They continue to recommend that, "Measures should be taken to improve feedback from the laboratories to the schools to insure that the curriculum is not only comprehensive

---

[25] See, e.g., Peterson et al., op. cit; L.W. Bradford. 1980. Barriers to quality achievement in crime laboratory operations. *Journal of Forensic Sciences* 25(4):902-907; Stoney, op. cit.; NIJ, op. cit.

[26] Peterson et al., op. cit., p. 31.

[27] See www.criminology.fsu.edu/COFSE/default.htm.

[28] Stoney, op. cit.

[29] NIJ, 2007, op. cit.

[30] Peterson et al., op cit., p. 32.

Copyright © National Academy of Sciences. All rights reserved.

from an academic standpoint but also meets the practical requirements of operating laboratories."[31]

Over the past few years, major strides have been taken in bringing a measure of standardization to forensic science education programs and boosting their quality. The NIJ report, *Forensic Science: Review of Status and Needs,* called in part for an accreditation system for such programs. Following this report, in 2001, NIJ established a Technical Working Group for Education and Training in Forensic Science (TWGED)—consisting of 47 experts, including educators, judges, attorneys, crime laboratory directors, and subject matter scientists—that developed recommended curricular guidelines for undergraduate and graduate forensic science programs. These were provided in a 2004 report.[32] In 2002, the American Academy of Forensic Sciences created an ad hoc committee, the Forensic Education Program Accreditation Committee, to look into issues regarding an accreditation system. The committee was made a standing committee in 2004, at which time the name was changed to the Forensic Science Education Program Accreditation Commission (FEPAC). FEPAC is made up of five forensic science educators, five crime laboratory directors, and one public member. FEPAC created a process for accrediting undergraduate and graduate forensic science programs using the TWGED standards.[33]

FEPAC standards are divided into three parts (see Table 8-2). There are general standards that all programs must meet and then additional standards for undergraduate and graduate programs.

An important note regarding the accreditation process is that the program must award at least a bachelor's degree in either forensic science or a natural science with a concentration in forensic science at both the bachelor's and master's levels. Programs that award certificates or associate degrees are ineligible for accreditation in this system. Additionally, at this time only U.S. programs are eligible for accreditation.

To summarize the general standards, such programs shall:

- have an explicit process for evaluating and monitoring its overall efforts to fulfill its mission, goals, and objectives; for assessing its effectiveness in serving its various constituencies; for modifying

---

[31] Programs accredited by FEPAC are required to complete periodic self-assessments, which include job placement statistics and employer satisfaction surveys.

[32] Technical Working Group for Education and Training in Forensic Science. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions and Students,* Special Report. Washington, DC: U.S. Department of Justice, National Institute of Justice. NCJ 203099.

[33] See FEPAC Accreditation Standards. Available at www.aafs.org/pdf/FEPAC%20 Accreditation%20Standards%20_082307_.pdf.

Copyright © National Academy of Sciences. All rights reserved.

TABLE 8-2 Major Areas of FEPAC Standards

**General Standards for All Programs**
- Eligibility
- Planning and Evaluation
- Institutional Support
- Student Support Services
- Recruiting and Admissions Practices, Academic Calendars, Catalogs, Publications, Grading, and Advertising
- Record of Student Complaints
- Distance Learning and Other Alternative Delivery Mechanisms

**Undergraduate Program Standards**
- Mission, Goals, and Objectives
- Undergraduate Admissions Requirements
- Curriculum
- Program Director
- Faculty
- Success with Respect to Student Achievement
- Professional Involvement

**Graduate Program Standards**
- Mission, Goals, and Objectives
- Graduate Admissions Requirements
- Curriculum
- Program Director
- Faculty
- Success with Respect to Student Achievement
- Professional Involvement

SOURCE: www.aafs.org.

the curriculum as necessary, based on the results of its evaluation activities; and for planning to achieve its mission in the future;
- have adequate institutional support in the form of financial resources, facilities, instructional, and support services;
- provide adequate student support services, such as mentoring, advising, and career placement;
- have policies and procedures for student recruitment and admissions, with advisers to students regarding requirements for employment;
- have procedures for handling student complaints; and
- consider the use of distance learning as an instructional technique, demonstrating that all required laboratory experiences are hands-on for all students.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

Concerning the undergraduate curriculum, it should, at a minimum, ensure that each student (1) obtain a thorough grounding in the natural sciences; (2) build upon this background by taking a series of more advanced science classes; and (3) develop an appreciation of issues specific to forensic science through course work and laboratory-based instruction.

Forensic science undergraduates in the chemistry track should take, at a minimum, chemistry courses required for chemistry majors—general chemistry, organic chemistry, physical chemistry, analytical chemistry, instrumental analysis, and biochemistry. Forensic science students in the biology track should take those chemistry courses required for biology majors and biology courses for biology majors, including general biology, biochemistry, instrumental analysis, genetics, molecular biology, and population genetics. All forensic science students should, at the earliest point possible, take a hands-on crime scene investigation course that teaches the principles of evidence, including its collection, preservation, and value. Additionally, the forensic science courses in drug analysis, criminalistics, and forensic biology (including DNA analysis) should be at the highest level. All forensic science majors should take a capstone course.

For graduate programs, the curriculum should, at a minimum, ensure that each student (1) understand essential issues in the forensic science disciplines, including the reduction of error rates; (2) develop an understanding of the areas of knowledge that are essential to forensic science; (3) acquire skills and experience in the application of basic forensic science concepts and of specialty knowledge to problem solving; (4) be oriented in professional values, concepts and ethics; and (5) demonstrate integration of knowledge and skills through a capstone experience, such as a formal, objective tool (e.g., the American Board of Criminalistics Forensic Science Aptitude Test) or another comprehensive examination or a thesis and/or research project.

Depending on the specialty track of interest, graduate students should take advanced courses in specialty areas of interest—drug analysis, toxicology, criminalistics, forensic biology, and forensic DNA analysis (including mtDNA sequencing, low copy number techniques, and SNPs). The criminalistics and forensic biology courses should be advanced beyond those seen at the undergraduate level. If the student has not had those lower-level courses, they should be taken first. Graduate students also should take a hands-on crime scene investigation class that covers investigation techniques and evidence association, including its examination, collection, and preservation. In addition, in-service work with a collaborating institution can provide significant practical training.

Finally, the standards lay out a suggested curriculum for forensic science education programs. At the undergraduate level, coursework includes several classes in the natural sciences (with a focus on chemistry); special-

Copyright © National Academy of Sciences. All rights reserved.

ized science courses (e.g., microbiology, genetics, biochemistry); forensic science courses—which cover courtroom testimony; introduction to law; quality assurance; ethics; professional practice; evidence identification, collection and processing; a survey of the forensic science disciplines; and additional courses in the student's area of specialization. Laboratory work must be complemented with hands-on training that closely mimics the experiences of the crime laboratory. At the graduate level, students should take core forensic science topics, such as physical evidence concepts and ethics and professional responsibilities; courses in specialized areas; and a graduate seminar—all aimed at developing skills for conducting independent research.

FEPAC began a pilot accreditation program in the fall of 2003, accrediting five programs,[34] and the number of accredited programs has continued to grow (see Table 8-3). As of January 2008, 16 programs have met FEPAC's rigorous standards and accordingly have been accredited by FEPAC.

Accredited forensic science programs are listed on the AAFS Web site. Accreditation is seen as providing a "seal of quality to an institution;" helping faculty to improve their curricula; creating a standard for measuring the quality of forensic science programs; and benefiting laboratories by reducing the need for in-house training.[35] Accreditation should become the norm. The committee believes that, to encourage accreditation, a mechanism could be developed whereby only accredited programs would be eligible to receive certain federal grants and/or scholarships for its students. If the forensic science disciplines are to grow in stature and be recognized for their scientific rigor and high standards of quality, their research base must be broadened and strengthened. This will occur only if significant federal research funds are made available to universities by scientific granting agencies such as the National Institutes of Health and the National Science Foundation. Crime laboratories would be the beneficiaries of a wave of well-educated workers who would elevate the scientific standards of the field. The forensic science degree programs that are not sufficiently rigorous eventually would disappear, because their graduates would not be competitive in the employment arena. Consequently, employers would be more confident in the capabilities of graduates of forensic science programs and hence would be more inclined to hire them.

---

[34] Cedar Crest College (Allentown, Pennsylvania), Eastern Kentucky University (Richmond, Kentucky), Florida International University (Miami, Florida), Metropolitan State College of Denver (Denver, Colorado), and Michigan State University (East Lansing, Michigan).

[35] NIJ, 2000, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

TABLE 8-3 FEPAC Accredited Programs, 2008

| Programs | Degree Program |
| --- | --- |
| Albany State University | Bachelor of Science Degree in Forensic Science |
| Arcadia University | Master of Science Degree Program in Forensic Science |
| Cedar Crest College | Bachelor of Science Degree Program in Chemistry, Biochemistry, Biology, and Genetic Engineering, with a concentration in Forensic Science |
| Eastern Kentucky University | Bachelor of Science Degree Program in Forensic Science |
| Florida International University | Certificate Programs in Conjunction with the Bachelor of Science in a Natural Science such as Chemistry or Biology |
| Florida International University | Master of Science Degree Program in Forensic Science |
| Marshall University | Master of Science Degree Program in Forensic Science |
| Metropolitan State College of Denver | Bachelor of Science Degree Program in Chemistry with a concentration in Criminalistics |
| Michigan State University | Master of Science Degree Program (biology and chemistry tracks) |
| University of Mississippi | Bachelor of Science Degree in Forensic Chemistry |
| Ohio University | Bachelor of Science Degree in Forensic Chemistry |
| SUNY at Albany | Master of Science Degree in Forensic Molecular Biology |
| Virginia Commonwealth University | Bachelor of Science Degree in Forensic Science |
| Virginia Commonwealth University | Master of Science Degree in Forensic Science |
| West Chester University | Bachelor of Science Degree Program In Forensic and Toxicological Chemistry |
| West Virginia University | Bachelor of Science Degree—Forensic and Investigative Science Program |

SOURCE: www.aafs.org.

Copyright © National Academy of Sciences. All rights reserved.

*230*         *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

## RESEARCH AS A COMPONENT OF FORENSIC SCIENCE EDUCATION PROGRAMS

Student research and exposure to research is a critical component of an appropriate forensic science education.[36] Research funding supports both faculty and graduate student research. Funding also supports the acquisition and maintenance of equipment and major research instrumentation and laboratory renovation.[37] As noted in Chapter 2, the level of funding for forensic science research programs is seen by many observers as inadequate. Fisher notes that "labs are looking for more forensic scientists at the master's and doctorate level. For universities to run graduate-level programs in the science, research dollars must be made available. However, the amounts of such R&D funds available to support forensic science at the National Institute of Justice are small and are all but non-existence [sic] from the National Science Foundation, and other funding sources."[38] Likewise, NIJ reported in 2004 that, "Currently, no sustainable source of State or Federal funding exists to support graduate education or research in forensic science. Nor should state and local governments fund research, as their funds have to support the service mission of the laboratories. The National Institute of Justice has traditionally provided virtually all federal research funding for forensic science, but additional funding from alternative sources is essential."[39]

Many forensic degree programs are found at small colleges or universities with few graduate programs in science and where research resources are limited. The lack of research funding has discouraged universities in the United States from developing research-based forensic degree programs, which leads to limited opportunities to attract graduate students into such programs. Only a few universities offer Ph.D.-level education and research opportunities in forensic science, and these are chemistry or biology programs with a forensic science focus. Most graduate programs in forensic science are master's programs, where financial support for graduate study is limited.

In addition, the lack of research funds means that universities are unlikely to develop research programs in forensic science. This lack of funding discourages top scientists from exploring the many scientific issues in the forensic science disciplines. This has become a vicious cycle during

---

[36] To receive accreditation by FEPAC, a graduate program must include a component in which each student completes an independent research project leading to a thesis or written report, presented orally in a public forum for evaluation.

[37] NIJ, 2004, op. cit., p. 23.

[38] B.A.J. Fisher. 2003. Field needs adequate funding, national forensic science commission. *Forensic Focus.* See http://forensicfocusmag.com/articles/3b1persp1.html.

[39] NIJ, 2004, op. cit., p. 22.

Copyright © National Academy of Sciences. All rights reserved.

which the lack of funding keeps top scientists away and their unavailability discourages funding agencies from investing in forensic science research. Traditional funding agencies have never had a mission to support forensic science research.

## STATUS OF TRAINING

Continuing education and in-service training in forensic science have been significant issues for many years. Funding programs initially were offered in the early 1970s through the Law Enforcement Assistance Administration. As forensic science grew, the needs for ongoing training and continuing education also grew. Several studies funded by NIJ have been undertaken since 1999—*Forensic Sciences: Review of Status and Needs* (1999);[40] *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students* (2004),[41] developed by TWGED; and a report prepared by ASCLD for NIJ, published in May 2004, which has become known as the *180-day Study Report: Status and Needs of United States Crime Laboratories*.[42]

The issues addressed in all of these reports are the same ones confronting this committee today, namely the need for continuing education and the ongoing training of working examiners in the various disciplines:

> Prior to conducting analysis on evidence, forensic scientists require both basic scientific education and discipline-specific training. To be in compliance with widely-accepted accreditation standards, scientists in each of the disciplines must have, at a minimum, a baccalaureate degree in a natural science, forensic science, or a closely-related field. Each examiner must also have successfully completed a competency test (usually after a training period) prior to assuming independent casework.[43]

After the initial training period, continuing training is necessary to maintain and update knowledge and skills in new technology, equipment, and methods.

Accreditation and certification programs require some type of continuing education, and the various Scientific Working Groups (SWGs) recom-

---

[40] National Institute of Justice. 1999. *Forensic Sciences: Review of Status and Needs*. Washington, DC: National Institute of Justice.

[41] National Institute of Justice. 2004. *Education and Training in Forensic Science: A Guide for Forensic Science Laboratories, Educational Institutions, and Students*. Washington, DC: National Institute of Justice.

[42] American Society of Crime Laboratory Directors. 2004. *180-day Study Report: Status and Needs of United States Crime Laboratories*. Largo, FL: ASCLD.

[43] Ibid., p. 12.

Copyright © National Academy of Sciences. All rights reserved.

232          *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

mend such programs (see Chapter 7). Continuing professional development also is a means of expanding expertise and career advancement.

### Training Needs

As described by ASCLD:

> When a new analyst or examiner is hired, usually a recent university graduate, that individual requires initial training to build competency. The length of the initial training provided to an analyst depends upon the laboratory specialty area the trainee will enter.

> For example, controlled substance analysts may require only six to twelve months of training. Those training in experience-based disciplines such as latent prints examinations, firearms and toolmarks analyses, and questioned documents examinations may require up to three years of training before being permitted to perform independent casework. During their training period, individuals in experience-based disciplines serve much like an apprentice to a senior examiner.[44]

NIJ describes a variety of training needs for forensic scientists in crime laboratories by position.[45] For operational scientists, training is needed to stay up to date in theoretical and practical issues (such as applying methods and performing analyses). Everyone in a laboratory needs orientation in such topics as the criminal justice system, the legal system, ethics, professional organizations, the basic philosophy of forensic science, overview of disciplines of forensic science, quality control (e.g., good laboratory practice), effective expert testimony, and safety. First-line supervisors need training in quality assurance, case file review, and basic supervision skills; and managers need training in fiscal management, quality systems management, leadership, project management, human resource management, and customer service. Training can be done in-service or through short courses. The 1999 NIJ report identifies a number of examples of such courses.

On-the-job training involves specific challenges; it is labor intensive and can be expensive.[46] The costs of training include the salary of the trainee as well as the opportunity cost of the lost productivity of the trainer. Moreover, there are no uniform recommendations on the content of training in the forensic science disciplines. ASCLD has suggested some examples of efforts to make training more efficient, including conducting some training in conjunction with universities (essentially conducting training while forensic

---

[44] ASCLD, op. cit., p. 15.
[45] NIJ, 1999, op. cit.
[46] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

scientists are students and before they are full-time employees), and some laboratories have tried collaborating to train employees.

### Continuing Education

Continuing education is critical for all personnel working in crime laboratories as well as for those in other forensic science disciplines, such as forensic pathologists or anthropologists. Some commonly used approaches to continuing education are instructor led, professional conferences/seminars, distributed learning, apprenticeship, residency, internship, teaching and presentations by trainee/employee, and independent learning.[47]

The greatest issue for continuing education is quality. TWGED has provided guidelines for training courses. First, there should be specific eligibility requirements. Specified minimum and experiential requirements should be consistent with recognized, peer-defined standards (e.g., SWGs, ASCLD/Laboratory Accreditation Board). Factors such as drug use, credit and criminal history, and personal references may affect career opportunities. Second, the structure of the training programs should include: learning objectives; instructor qualifications; student requirements; a detailed syllabus; performance goals; periodic assessments; and competency testing. Third, program content can include a mix of discipline-specific and core elements. Core elements are essential topics that lay the foundation for entry into professional practice, regardless of the specialty area. They include the following:

- Standards of conduct—includes professional ethics training.
- Safety—includes biological, chemical, and physical hazards.
- Policy—includes such administrative and laboratory policies as standard operating procedures, quality assurance, accreditation, and security.
- Legal—includes expert testimony, depositions, rules of evidence, criminal and civil law and procedures, and evidence authentication.
- Evidence handling—includes interdisciplinary issues; recognition, collection, and preservation of evidence; and chain of custody.
- Communication—includes written, verbal, and nonverbal communication skills; report writing; exhibit and pretrial preparation; and trial presentation.

Discipline-specific elements include such topics as the history of the discipline, relevant literature, methodologies and validation studies, instru-

---

[47] NIJ, 2004, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

mentation, statistics, knowledge of related fields, and testimony. Finally, individuals should be assessed through mechanisms such as oral examinations, written examinations, laboratory practicals and laboratory exercises, mock trials, and the assessment of technical performance by appropriate senior staff.

## EDUCATION IN THE LEGAL SYSTEM

The forensic science community needs to educate those who use their services and therefore needs to understand the services and their terminology. Users of forensic science analyses include law enforcement officers, forensic pathologists, the bar, the judiciary, the general public, and policymakers. This section focuses on education for the legal community of judges, lawyers, and juries.

In recent years, some judges have struggled to understand increasingly complex scientific evidence. Sophisticated epidemiology and toxicology studies often are introduced in mass tort litigation. Complex econometric models are common in antitrust cases. Disputes over sophisticated engineering principles often are at the core of patent litigation. Failure to consider such evidence in a thoughtful and thorough manner threatens the integrity and independence of the judiciary. Following the *Daubert* decision, the Federal Judicial Center published the *Reference Manual on Scientific Evidence*, and a second edition was issued in 2000 to "facilitate the process of identifying and narrowing issues concerning scientific evidence by outlining for judges the pivotal issues in the areas of science that are often subject to dispute."[48] In addition, the courts have responded to the growing complexity of evidence by developing science-based judicial education programs that explain scientific issues as they may arise in the context of litigation. However, these courses are not mandatory, there is no fixed routine of continuing education in legal practice with regard to science, and there are no good ways to measure the proficiency of judges who attend these programs.

Pfefferli suggests that it is important to tailor education programs to the needs of judges:

> Forensic educational programs directed towards proficiency in evidence matter must meet the needs of judicial magistrates, which goes beyond a better understanding of the scientific principles and technical methods applied to criminal investigations to demonstrate the existence of a crime. These programs have to look at a variety of different kinds of forensic evidence and their interacting processes, giving special attention to individualization/identification process; evidential value and evaluation of

---

[48] Federal Judicial Center. 2000. *Reference Manual on Scientific Evidence.* 2nd ed., p. vi.

Copyright © National Academy of Sciences. All rights reserved.

evidence; critical issues and quality assurance, and deterministic versus probabilistic opinions of experts."[49]

Pfefferli further notes that different members of the judicial community should benefit from customized training. For example, prosecutors and defense attorneys might benefit from a focus on the interpretation of and requirements for evidence; and judges may benefit from information on evaluating the scientific rigor of expert testimony and the reliability of forensic evidence.

At the end of the 1990s, NIJ noted that training for the judiciary was sporadic at the federal, state, and local levels and rare in general.[50] Virginia is one state that provides annual seminars for the judiciary, and ASCLD formerly provided training to judges.

Reliance on DNA technology for identification purposes in forensic science spurred the development of judicial education programs. As part of the President's DNA Initiative, the Department of Justice developed a series of publications and online training programs designed for officers of the courts, including judges. The course, "Principles of Forensic DNA for Officers of the Court," released in 2006, is designed "to educate criminal justice professionals and other practitioners about the science of DNA analysis and the legal issues regarding the use of DNA in the courtroom."[51] The 15 training modules in the course include:

- information on the biology of DNA;
- the history of forensic DNA analysis;
- how to understand a forensic DNA laboratory report;
- factors in postconviction DNA testing requests;
- information about forensic DNA databases;
- issues involved in presenting DNA evidence in the courtroom;
- information on the admissibility issues regarding the use of DNA evidence; and
- an extensive glossary with basic definitions relating to forensic DNA analysis.

But other than this initiative, judicial education programs have not focused on the forensic science disciplines.

---

[49] P.W. Pfefferli. 2003. *Forensic Education & Training of Judges and Law Enforcement Magistrates.* Presentation at the International Society for the Reform of Criminal Law, 17th International Conference, The Hague. Available at www.isrcl.org/Papers/Pfefferli.pdf, p. 2.

[50] NIJ, 1999, op. cit.

[51] Office of Justice Programs, U.S. Department of Justice. 2006. *Department of Justice Releases Interactive Training Tool on Principles of Forensic DNA.* Available at www.ojp.usdoj.gov/newsroom/pressreleases/2006/NIJ06036.htm.

Copyright © National Academy of Sciences. All rights reserved.

Another avenue for education would be courses taught by forensic science education programs, but geared to continuing education participants rather than full-time students. The University of Florida, for example, offers a distance learning, continuing education course for Florida lawyers that is certified by the Florida Bar Association and that covers a variety of forensic science topics. Professional organizations also have offered courses. For example, the National District Attorneys Association founded the American Prosecutors Research Institute (APRI) as a nonprofit research, technical assistance, and program development resource for prosecutors at all levels of government. In the past, APRI has offered training opportunities in forensic science, although its programs have decreased in recent years. The National College of District Attorneys and the National Association of Criminal Defense Attorneys also periodically offer courses in forensic science. A third option is for law schools to offer more courses in the forensic disciplines, statistics, or basic science methodology, or to provide credit for students wishing to take courses in those fields.

Unfortunately, it might be too late to effectively train most lawyers and judges once they enter their professional fields. Training programs are beneficial in the short term, because they offer responsible jurists a way to learn what they need to know. For the long term, however, the best way to get lawyers and judges up to speed is for law schools to offer better courses in forensic science in their curricula.

### Juries and Scientific Evidence

Despite common stereotypes about jury incompetence and runaway juries, research has demonstrated a consistency between jury and bench trial verdicts, regardless of the level of scientific complexity involved.[52] Even in cases in which jurors express incomplete and flawed understandings of scientific and technical evidence, researchers have described jury results as generally justified.[53] Moreover, it has been suggested that jurors' errors in interpreting evidentiary information are often traceable in part to misleading presentations and instructions by attorneys and judges.[54]

However, juries have been described as least comfortable and compe-

---

[52] V.P. Hans, D.H. Kaye, M.B. Dann, E.J. Farley, and S. Albertson. 2007. *Science in the Jury Box: Jurors' Views and Understanding of Mitochondrial DNA Evidence.* Cornell Law School Legal Studies Research Paper No. 07-02. Available at http://ssrn.com/abstract=1025582; T. Eisenberg, P.L. Hannaford-Agor, V.P. Hans, N.L. Mott, G.T. Munsterman, S.J. Schwab, and M.T. Wells. 2005. Judge-jury agreement in criminal cases: A partial replication of Kalven & Zeisel's *The American Jury. Journal of Empirical Legal Studies* 2:171-206.

[53] Hans, op. cit.

[54] Ibid.

Copyright © National Academy of Sciences. All rights reserved.

tent with regard to statistical evidence.[55] Interestingly, juries are often hesitant to give as much credence as experts suggest to the statistics associated with DNA evidence.[56] Juries frequently raise concerns about laboratory error and sample contamination, even when opposing counsel does not introduce such issues.[57]

Jurors' use and comprehension of forensic evidence is not well studied. Better understanding is needed in this area, and recommendations are needed for programs or methods that will better prepare juries in appropriate, unbiased ways for trials in which scientific evidence is expected to play a large or pivotal role. However, several studies indicate that trial judges agree with jury verdicts in an overwhelming proportion of criminal cases.[58]

## CONCLUSIONS AND RECOMMENDATION

Despite major strides made in recent years in bringing a measure of standardization to forensic science education programs and boosting their quality, more information is required on the number of programs that are available and the depth and breadth of the course offerings. It appears that there are no formal and systematically applied standards or standardization requirements for forensic science education programs, making the quality and relevance of existing programs uncertain. Moreover, there are no requirements or incentives in place to ensure that forensic science education programs must be accredited in order to receive federal funds.

Current funding is insufficient for developing graduate training programs that cut across organizational, programmatic, and disciplinary boundaries and that can attract students in the life and physical sciences to pursue graduate studies in multidisciplinary fields critical to forensic science. Similarly, too few funding sources exist for research conducted in association with forensic science graduate programs.

In addition, forensic researchers, legal scholars, and forensic practitioners and members of the bench and bar do not have sufficient opportuni-

[55] Ibid. See also W.C. Thompson and E.L. Schumann. 1987. Interpretation of statistical evidence in criminal trials: The prosecutor's fallacy and the defense attorney's fallacy. *Law and Human Behavior* 11:167-187; W.C. Thompson. 1989. Are juries competent to evaluate statistical evidence? *Law and Contemporary Problems* 52:9-41.

[56] J.J. Koehler. 2001. When are people persuaded by DNA match statistics? *Law and Human Behavior* 25:493-513; D.A. Nance and S.B. Morris. 2002. An empirical assessment of presentation formats for trace evidence with a relatively large and quantifiable random match probability. *Jurimetrics Journal* 42:403-448; J. Schklar and S.S. Diamond. 1999. Juror Understanding of DNA evidence: An empirical assessment of presentation formats for trace evidence with a relatively small random-match probability. *Journal of Legal Studies* 34:395-444.

[57] Schklar and Diamond, op. cit.

[58] Hannaford-Agor, Hans, and Munsterman, op. cit.

Copyright © National Academy of Sciences. All rights reserved.

*238*     *STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES*

ties and venues for interaction and sharing information. This impedes the translation of advances in forensic science to legal scholars and litigators (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials. The result is needless delay in improvements in criminal and civil laws and procedures, law enforcement practices, litigation strategies, and judicial decisionmaking.

Lawyers and judges often have insufficient training and background in scientific methods, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the strengths and vulnerabilities of forensic science evidence offered during trials.

Forensic science examiners need additional training in the principles, practices, and contexts of scientific methodology, as well as in the distinctive features of their specialty. Training should move well beyond intern-like transmittal of practices to teaching that is based on scientifically valid principles. In addition to the practical experience and learning acquired during an internship, a trainee should acquire rigorous interdisciplinary education and training in the scientific areas that constitute the basis for the particular forensic discipline and should also receive instruction on how to document and report the analysis. A trainee in addition should have working knowledge of basic probability and statistics as they relate to the tasks he or she may need to address in the applicable discipline.

To correct some of the existing deficiencies, it is crucially important to improve undergraduate and graduate forensic science programs. The legitimization of practices in the forensic science disciplines must be based on established scientific knowledge, principles, and practices, which are best learned through formal education. Apprenticeship has a secondary role; under no circumstances can it supplant the need for the scientific basis of education and of the practice of forensic science. In addition, lawyers and judges often have insufficient training and background in scientific methodology, and they often fail to fully comprehend the approaches employed by different forensic science disciplines and the degree of reliability of forensic science evidence that is offered in trial. Such training is essential, because any checklist for the admissibility of scientific or technical testimony (such as the *Daubert* standards) is imperfect. Conformance with items on a checklist can suggest that testimony is reliable, but it does not guarantee it. Better connections must be established and promoted among experts in forensic science and legal scholars and practitioners. The fruits of any advances in the forensic science disciplines should be transferred directly to legal scholars and practitioners (including civil litigators, prosecutors, and criminal defense counsel), federal, state, and local legislators, members of the judiciary, and law enforcement officials, so that appropriate adjustments can be made in criminal and civil laws and procedures, model jury

Copyright © National Academy of Sciences. All rights reserved.

Strengthening Forensic Science in the United States: A Path Forward

instructions, law enforcement practices, litigation strategies, and judicial decisionmaking. Law schools should enhance this connection by offering courses in forensic science, by offering credit for forensic science courses students take in other colleges, and by developing joint degree programs.

Recommendation 10:

> To attract students in the physical and life sciences to pursue graduate studies in multidisciplinary fields critical to forensic science practice, Congress should authorize and appropriate funds to the National Institute of Forensic Science (NIFS) to work with appropriate organizations and educational institutions to improve and develop graduate education programs designed to cut across organizational, programmatic, and disciplinary boundaries. To make these programs appealing to potential students, they must include attractive scholarship and fellowship offerings. Emphasis should be placed on developing and improving research methods and methodologies applicable to forensic science practice and on funding research programs to attract research universities and students in fields relevant to forensic science. NIFS should also support law school administrators and judicial education organizations in establishing continuing legal education programs for law students, practitioners, and judges.

Copyright © National Academy of Sciences. All rights reserved.

# *A*thena *R*esearch & *C*onsulting LLC

PO Box 66, Bippus, Indiana 46713, USA.



Review of Firearms Toolmark Comparison Issues
in the Case of Alejandro Umana (CASE NO. 3:16-CV-00057)

## Exhibit C

## Pertinent Sections of the
## 2016 PCAST Report & 2017 Addendum



# REPORT TO THE PRESIDENT

# Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods

Executive Office of the President
President's Council of Advisors on
Science and Technology

September 2016



Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 212 of 237



# About the President's Council of Advisors on Science and Technology

The President's Council of Advisors on Science and Technology (PCAST) is an advisory group of the Nation's leading scientists and engineers, appointed by the President to augment the science and technology advice available to him from inside the White House and from cabinet departments and other Federal agencies. PCAST is consulted about, and often makes policy recommendations concerning, the full range of issues where understandings from the domains of science, technology, and innovation bear potentially on the policy choices before the President.

For more information about PCAST, see www.whitehouse.gov/ostp/pcast.



# The President's Council of Advisors on Science and Technology

## Co-Chairs

**John P. Holdren**
Assistant to the President for
  Science and Technology
Director, Office of Science and Technology
  Policy

**Eric S. Lander**
President
Broad Institute of Harvard and MIT

## Vice Chairs

**William Press**
Raymer Professor in Computer Science and
  Integrative Biology
University of Texas at Austin

**Maxine Savitz**
Honeywell (ret.)

## Members

**Wanda M. Austin**
President and CEO
The Aerospace Corporation

**Christopher Chyba**
Professor, Astrophysical Sciences and
  International Affairs
Princeton University

**Rosina Bierbaum**
Professor, School of Natural Resources and
  Environment, University of Michigan
Roy F. Westin Chair in Natural Economics,
  School of Public Policy, University of
  Maryland

**S. James Gates, Jr.**
John S. Toll Professor of Physics
Director, Center for String and
  Particle Theory
University of Maryland, College Park

**Christine Cassel**
Planning Dean
Kaiser Permanente School of Medicine

**Mark Gorenberg**
Managing Member
Zetta Venture Partners

 v

**Susan L. Graham**
Pehong Chen Distinguished Professor Emerita
  in Electrical Engineering and Computer
  Science
University of California, Berkeley

**Ed Penhoet**
Director
Alta Partners
Professor Emeritus, Biochemistry and Public
  Health
University of California, Berkeley

**Michael McQuade**
Senior Vice President for Science and
  Technology
United Technologies Corporation

**Barbara Schaal**
Dean of the Faculty of Arts and Sciences
Mary-Dell Chilton Distinguished Professor of
  Biology
Washington University of St. Louis

**Chad Mirkin**
George B. Rathmann Professor of
  Chemistry
Director, International Institute for
  Nanotechnology
Northwestern University

**Eric Schmidt**
Executive Chairman
Alphabet, Inc.

**Mario Molina**
Distinguished Professor, Chemistry and
  Biochemistry
University of California, San Diego
Professor, Center for Atmospheric Sciences
Scripps Institution of Oceanography

**Daniel Schrag**
Sturgis Hooper Professor of Geology
Professor, Environmental Science and
  Engineering
Director, Harvard University Center for
  Environment
Harvard University

**Craig Mundie**
President
Mundie Associates

## Staff

**Ashley Predith**
Executive Director

**Diana E. Pankevich**
AAAS Science & Technology Policy Fellow

**Jennifer L. Michael**
Program Support Specialist

 vi



# PCAST Working Group

Working Group members participated in the preparation of this report. The full membership of PCAST reviewed and approved it.

## Working Group

**Eric S. Lander** (Working Group Chair)
President
Broad Institute of Harvard and MIT

**S. James Gates, Jr.**
John S. Toll Professor of Physics
Director, Center for String and
  Particle Theory
University of Maryland, College Park

**Susan L. Graham**
Pehong Chen Distinguished Professor Emerita
  in Electrical Engineering and Computer
  Science
University of California, Berkeley

**Michael McQuade**
Senior Vice President for Science and
  Technology
United Technologies Corporation

**William Press**
Raymer Professor in Computer Science and
  Integrative Biology
University of Texas at Austin

**Daniel Schrag**
Sturgis Hooper Professor of Geology
Professor, Environmental Science and
  Engineering
Director, Harvard University Center for
  Environment
Harvard University

## Staff

**Diana E. Pankevich**
AAAS Science & Technology Policy Fellow

**Kristen Zarrelli**
Advisor, Public Policy & Special Projects
Broad Institute of Harvard and MIT

## Writer

**Tania Simoncelli**
Senior Advisor to the Director
Broad Institute of Harvard and MIT

★ vii ★

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 216 of 237



# Senior Advisors

PCAST consulted with a panel of legal experts to provide guidance on factual matters relating to the interaction between science and the law. PCAST also sought guidance and input from two statisticians, who have expertise in this domain. Senior advisors were given an opportunity to review early drafts to ensure factual accuracy. PCAST expresses its gratitude to those listed here. Their willingness to engage with PCAST on specific points does not imply endorsement of the views expressed in this report. Responsibility for the opinions, findings, and recommendations in this report and for any errors of fact or interpretation rests solely with PCAST.

## Senior Advisor Co-Chairs

**The Honorable Harry T. Edwards**
Judge
United States Court of Appeals
District of Columbia Circuit

**Jennifer L. Mnookin**
Dean, David G. Price and Dallas P. Price
 Professor of Law
University of California Los Angeles Law

## Senior Advisors

**The Honorable James E. Boasberg**
District Judge
United States District Court
District of Columbia

**The Honorable Andre M. Davis**
Senior Judge
United States Court of Appeals
Fourth Circuit

**David L. Faigman**
Acting Chancellor & Dean
University of California Hastings College of
 the Law

**Stephen Fienberg**
Maurice Falk University Professor of Statistics
 and Social Science (Emeritus)
Carnegie Mellon University

**The Honorable Pamela Harris**
Judge
United States Court of Appeals
Fourth Circuit

**Karen Kafadar**
Commonwealth Professor and Chair
Department of Statistics
University of Virginia

**The Honorable Alex Kozinski**
Judge
United States Court of Appeals
Ninth Circuit

**The Honorable Cornelia T.L. Pillard**
Judge
United States Court of Appeals
District of Columbia Circuit

 

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 217 of 237

**The Honorable Charles Fried**
Beneficial Professor of Law
Harvard Law School
Harvard University

**The Honorable Nancy Gertner**
Senior Lecturer on Law
Harvard Law School
Harvard University

**The Honorable Jed S. Rakoff**
District Judge
United States District Court
Southern District of New York

**The Honorable Patti B. Saris**
Chief Judge
United States District Court
District of Massachusetts

 ix

Case 3:16-cv-00057-MOC    Document 116-1    Filed 07/06/22    Page 218 of 237

President Barack Obama
The White House
Washington, DC 20502

Dear Mr. President:

We are pleased to send you this PCAST report on *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods.* The study that led to the report was a response to your question to PCAST, in 2015, as to whether there are additional steps on the scientific side, beyond those already taken by the Administration in the aftermath of the highly critical 2009 National Research Council report on the state of the forensic sciences, that could help ensure the validity of forensic evidence used in the Nation's legal system.

PCAST concluded that there are two important gaps: (1) the need for clarity about the scientific standards for the validity and reliability of forensic methods and (2) the need to evaluate specific forensic methods to determine whether they have been scientifically established to be valid and reliable. Our study aimed to help close these gaps for a number of forensic "feature-comparison" methods—specifically, methods for comparing DNA samples, bitemarks, latent fingerprints, firearm marks, footwear, and hair.

Our study, which included an extensive literature review, was also informed by inputs from forensic researchers at the Federal Bureau of Investigation Laboratory and the National Institute of Standards and Technology as well as from many other forensic scientists and practitioners, judges, prosecutors, defense attorneys, academic researchers, criminal-justice-reform advocates, and representatives of Federal agencies. The findings and recommendations conveyed in this report, of course, are PCAST's alone.

Our report reviews previous studies relating to forensic practice and Federal actions currently underway to strengthen forensic science; discusses the role of scientific validity within the legal system; explains the criteria by which the scientific validity of feature-comparison forensic methods can be judged; and applies those criteria to the selected feature-comparison methods.



Based on our findings concerning the "foundational validity" of the indicated methods as well as their "validity as applied" in practice in the courts, we offer recommendations on actions that could be taken by the National Institute of Standards and Technology, the Office of Science and Technology Policy, and the Federal Bureau of Investigation Laboratory to strengthen the scientific underpinnings of the forensic disciplines, as well as on actions that could be taken by the Attorney General and the judiciary to promote the more rigorous use of these disciplines in the courtroom.

Sincerely,

John P. Holdren
Co-Chair

Eric S. Lander
Co-Chair

★ xi ★

## 5.5 Firearms Analysis

### Methodology

In firearms analysis, examiners attempt to determine whether ammunition is or is not associated with a *specific* firearm based on toolmarks produced by guns on the ammunition.[310,311] (Briefly, gun barrels are typically rifled to improve accuracy, meaning that spiral grooves are cut into the barrel's interior to impart spin on the bullet. Random individual imperfections produced during the tool-cutting process and through "wear and tear" of the firearm leave toolmarks on bullets or casings as they exit the firearm. Parts of the firearm that come into contact with the cartridge case are machined by other methods.)

The discipline is based on the idea that the toolmarks produced by different firearms vary substantially enough (owing to variations in manufacture and use) to allow components of fired cartridges to be identified with particular firearms. For example, examiners may compare "questioned" cartridge cases from a gun recovered from a crime scene to test fires from a suspect gun.

Briefly, examination begins with an evaluation of class characteristics of the bullets and casings, which are features that are permanent and predetermined before manufacture. If these class characteristics are different, an elimination conclusion is rendered. If the class characteristics are similar, the examination proceeds to identify and compare individual characteristics, such as the striae that arise during firing from a particular gun. According to the Association of Firearm and Tool Mark Examiners (AFTE) the "most widely accepted method used in conducting a toolmark examination is a side-by-side, microscopic comparison of the markings on a questioned material item to known source marks imparted by a tool."[312]

### Background

In the previous section, PCAST expressed concerns about certain foundational documents underlying the scientific discipline of firearm and tool mark examination. In particular, we observed that AFTE's "Theory of Identification as it Relates to Toolmarks"—which defines the criteria for making an identification—is circular.[313] The "theory" states that an examiner may conclude that two items have a common origin if their marks are in "sufficient agreement," where "sufficient agreement" is defined as the examiner being convinced that the items are extremely unlikely to have a different origin. In addition, the "theory" explicitly states that conclusions are subjective.

---

[310] Examiners can also undertake other kinds of analysis, such as for distance determinations, operability of firearms, and serial number restorations as well as the analyze primer residue to determine whether someone recently handled a weapon.

[311] For more complete descriptions, see, for example, National Research Council. *Strengthening Forensic Science in the United States: A Path Forward.* The National Academies Press. Washington DC. (2009), and archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review01.htm.

[312] See: Foundational Overview of Firearm/Toolmark Identification tab on afte.org/resources/swggun-ark (accessed May 12, 2016).

[313] Association of Firearm and Tool Mark Examiners. "Theory of Identification as it Relates to Tool Marks: Revised," *AFTE Journal*, Vol. 43, No. 4 (2011): 287.

Much attention in this scientific discipline has focused on trying to prove the notion that every gun produces "unique" toolmarks. In 2004, the NIJ asked the NRC to study the feasibility, accuracy, reliability, and advisability of developing a comprehensive national ballistics database of images from bullets fired from all, or nearly all, newly manufactured or imported guns for the purpose of matching ballistics from a crime scene to a gun and information on its initial owner.

In its 2008 report, an NRC committee, responding to NIJ's request, found that "the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks" had not yet been demonstrated and that, given current comparison methods, a database search would likely "return too large a subset of candidate matches to be practically useful for investigative purposes."[314]

Of course, it is not necessary that toolmarks be unique for them to provide useful information whether a bullet may have been fired from a particular gun. However, it is *essential* that the accuracy of the method for comparing them be known based on empirical studies.

Firearms analysts have long stated that their discipline has near-perfect accuracy. In a 2009 article, the chief of the Firearms-Toolmarks Unit of the FBI Laboratory stated that "a qualified examiner will rarely if ever commit a false-positive error (misidentification)," citing his review, in an affidavit, of empirical studies that showed virtually no errors.[315]

With respect to firearms analysis, the 2009 NRC report concluded that "sufficient studies have not been done to understand the reliability and reproducibility of the methods"—that is, that the foundational validity of the field had not been established.[316]

The Scientific Working Group on Firearms Analysis (SWGGUN) responded to the criticisms in the 2009 NRC report by stating that:

> The SWGGUN has been aware of the scientific and systemic issues identified in this report for some time and has been working diligently to address them. . . . [the NRC report] identifies the areas where we must fundamentally improve our procedures to enhance the quality and reliability of our scientific results, as well as better articulate the basis of our science.[317]

---

[314] National Research Council. *Ballistic Imaging.* The National Academies Press. Washington DC. (2008): 3-4.
[315] See: www.fbi.gov/about-us/lab/forensic-science-communications/fsc/july2009/review/2009_07_review01.htm.
[316] The report states that "Toolmark and firearms analysis suffers from the same limitations discussed above for impression evidence. Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark." National Research Council. *Strengthening Forensic Science in the United States: A Path Forward.* The National Academies Press. Washington DC. (2009): 154.
[317] See: www.swggun.org/index.php?option=com_content&view=article&id=37&Itemid=22.

### Non-black-box studies of firearms analysis: Set-based analyses

Because firearms analysis is at present a subjective feature-comparison method, its foundational validity can *only* be established through multiple independent black box studies, as discussed above.

Although firearms analysis has been used for many decades, only relatively recently has its validity been subjected to meaningful empirical testing. Over the past 15 years, the field has undertaken a number of studies that have sought to estimate the accuracy of examiners' conclusions. While the results demonstrate that examiners can under some circumstances identify the source of fired ammunition, many of the studies were not appropriate for assessing scientific validity and estimating the reliability because they employed artificial designs that differ in important ways from the problems faced in casework.

Specifically, many of the studies employ "set-based" analyses, in which examiners are asked to perform all pairwise comparisons within or between small samples sets. For example, a "within-set" analysis involving $n$ objects asks examiners to fill out an $n \times n$ matrix indicating which of the $n(n\text{-}1)/2$ possible pairs match. Some forensic scientists have favored set-based designs because a small number of objects gives rise to a large number of comparisons. The study design has a serious flaw, however: the comparisons are not *independent* of one another. Rather, they entail internal dependencies that (1) constrain and thereby inform examiners' answers and (2) in some cases, allow examiners to make inferences about the study design. (The first point is illustrated by the observation that if A and B are judged to match, then every additional item C must match either *both* or *neither* of them—cutting the space of possible answers in half. If A and B match one another but do not match C, this creates additional dependencies. And so on. The second point is illustrated by "closed-set" designs, described below.)

Because of the complex dependencies among the answers, set-based studies are not appropriately-designed black-box studies from which one can obtain proper estimates of accuracy. Moreover, analysis of the empirical results from at least some set-based studies ("closed-set" designs) suggest that they may substantially underestimate the false positive rate.

The Director of the Defense Forensic Science Center analogized set-based studies to solving a "Sudoku" puzzle, where initial answers can be used to help fill in subsequent answers.[318] As discussed below, DFSC's discomfort with set-based studies led it to fund the first (and, to date, only) appropriately designed black-box study for firearms analysis.

We discuss the most widely cited of the set-based studies below. We adopt the same framework as for latent prints, focusing primarily on (1) the 95 percent upper confidence limit of the false positive rate and (2) false positive rates based on the proportion of conclusive examinations, as the appropriate measures to report (see p. 91).

---

[318] PCAST interview with Jeff Salyards, Director, DFSC.

### Within-set comparison

Some studies have involved within-set comparisons, in which examiners are presented, for example, with a collection of samples and asked them to determine which samples were fired from the same firearm. We reviewed two often-cited studies with this design.[319,320] In these studies, most of the samples were from distinct sources, with only 2 or 3 samples being from the same source. Across the two studies, examiners identified 55 of 61 matches and made no false positives. In the first study, the vast majority of different-source samples (97 percent) were declared inconclusive; there were only 18 conclusive examinations for different-source cartridge cases and no conclusive examinations for different-source bullets.[321] In the second study, the results are only described in brief paragraph and the number of conclusive examinations for different-source pairs was not reported. It is thus impossible to estimate the false positive rate among conclusive examinations, which is the key measure for consideration (as discussed above).

### Set-to-set comparison/closed set

Another common design has been *between*-set comparisons involving a "closed set." In this case, examiners are given a set of questioned samples and asked to compare them to a set of known standards, representing the possible guns from which the questioned ammunition had been fired. In a "closed-set" design, the source gun is

---

[319] Smith, E. "Cartridge case and bullet comparison validation study with firearms submitted in casework." *AFTE Journal*, Vol. 37, No. 2 (2005): 130-5. In this study from the FBI, cartridges and bullets were fired from nine Ruger P89 pistols from casework. Examiners were given packets (of cartridge cases or bullets) containing samples fired from each of the 9 guns and one additional sample fired from one of the guns; they were asked to determine which samples were fired from the same gun. Among the 16 same-source comparisons, there were 13 identifications and 3 inconclusives. Among the 704 different-source comparisons, 97 percent were declared inconclusives, 2.5 percent were declared exclusions and 0 percent false positives.

[320] DeFrance, C.S., and M.D. Van Arsdale. "Validation study of electrochemical rifling." *AFTE Journal*, Vol. 35, No. 1 (2003): 35-7. In this study from the FBI, bullets were fired from 5 consecutively manufactured Smith & Wesson .357 Magnum caliber rifle barrels. Each of 9 examiners received two test packets, each containing a bullet from each of the 5 guns and two additional bullets (from the different guns in one packet, from the same gun in the other); they were asked to perform all 42 possible pairwise comparisons, which included 37 different-source comparisons. Of the 45 total same-source comparisons, there were 42 identifications and 3 inconclusives. For the 333 total different-source comparisons, the paper states that there were no false positives, but does not report the number of inconclusive examinations.

[321] Some laboratory policies mandate a very high bar for declaring exclusions.

★ 107 ★

always present.  We analyzed four such studies in detail.[322,323,324,325]  In these studies, examiners were given a collection of questioned bullets and/or cartridge cases fired from a small number of consecutively manufactured firearms of the same make (3, 10, 10, and 10 guns, respectively) and a collection of bullets (or casings) known to have been fired from these same guns.  They were then asked to perform a matching exercise—assigning the bullets (or casings) in one set to the bullets (or casings) in the other set.

This "closed-set" design is simpler than the problem encountered in casework, because the correct answer is always present in the collection.  In such studies, examiners can perform perfectly if they simply match each bullet to the standard that is *closest.*  By contrast, in an open-set study (as in casework), there is no guarantee that the correct source is present—and thus no guarantee that the closest match is correct.  Closed-set comparisons would thus be expected to underestimate the false positive rate.

Importantly, it is not necessary that examiners be told explicitly that the study design involves a closed set.  As one of the studies noted:

> *The participants were not told whether the questioned casings constituted an open or closed set.*
> *However, from the questionnaire/answer sheet, participants could have assumed it was a closed set and*
> *that every questioned casing should be associated with one of the ten slides.*[326]

---

[322] Stroman, A. "Empirically determined frequency of error in cartridge case examinations using a declared double-blind format." *AFTE Journal,* Vol. 46, No. 2 (2014):157-175. In this study, bullets were fired from three Smith & Wesson guns. Each of 25 examiners received a test set containing three questioned cartridge cases and three known cartridge cases from each gun. Of the 75 answers returned, there were 74 correct assignments and one inconclusive examination.

[323] Brundage, D.J. "The identification of consecutively rifled gun barrels." *AFTE Journal*, Vol. 30, No. 3 (1998): 438-44. In this study, bullets were fired from 10 consecutively manufactured 9 millimeter Ruger P-85 semi-automatic pistol barrels. Each of 30 examiners received a test set containing 20 questioned bullets to compare to a set of 15 standards, containing at least one bullet fired from each of the 10 guns. Of the 300 answers returned, there were no incorrect assignments and one inconclusive examination.

[324] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides." *AFTE Journal.* Vol. 45, No. 4 (2013): 376-93. An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides. In this study, bullets were fired from 10 consecutively manufactured semi-automatic 9mm Ruger pistol slides. Each of 217 examiners received a test set consisting of 15 questioned casings and two known cartridge cases from each of the 10 guns. Of the 3255 answers returned, there were 3239 correct assignments, 14 inconclusive examinations and two false positives.

[325] Hamby, J.E., Brundage, D.J., and J.W. Thorpe. "The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels: a research project involving 507 participants from 20 countries." *AFTE Journal,* Vol. 41, No. 2 (2009): 99-110. In this study, bullets were fired from 10 consecutively rifled Ruger P-85 barrels. Each of 440 examiners received a test set consisting of 15 questioned bullets and two known standards from each of the 10 guns. Of the 6600 answers returned, there were 6593 correct assignments, seven inconclusive examinations and no false positives.

[326] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing 10 consecutively manufactured slides." *AFTE Journal,* Vol. 45, No. 4 (2013): 376-93.

★ 108 ★

Moreover, as participants find that many of the questioned casings have strong similarities to the known casings, their surmise that matching knowns are always present will tend to be confirmed.

The issue with this study design is not just a theoretical possibility: it is evident in the results themselves. Specifically, the closed-set studies have inconclusive and false-positives rate that are dramatically lower (by more than 100-fold) that those for the partly open design (Miami-Dade study) or fully open, black-box designs (Ames Laboratory) studies described below (Table 2).[327]

In short, the closed-set design is problematic in principle and appears to underestimate the false positive rate in practice.[328] The design is not appropriate for assessing scientific validity and measuring reliability.

### *Set-to-set comparison/partly open set ('Miami Dade study')*
One study involved a set-to-set comparison in which a few of the questioned samples lacked a matching known standard.[329] The 165 examiners in the study were asked to assign a collection of 15 questioned samples, fired from 10 pistols, to a collection of known standards; two of the 15 questioned samples came from a gun for which known standards were not provided. For these two samples, there were 188 eliminations, 138 inconclusives and 4 false positives. The inconclusive rate was 41.8 percent and the false positive rate among conclusive examinations was 2.1 percent (confidence interval 0.6-5.25 percent). The false positive rate corresponds to an estimated rate of 1 error in 48 cases, with upper bound being 1 in 19.

As noted above, the results from the Miami-Dade study are sharply different than those from the closed-set studies: (1) the proportion of inconclusive results was 200-fold higher and (2) the false positive rate was roughly 100-fold higher.

## Recent black-box study of firearms analysis

In 2011, the Forensic Research Committee of the American Society of Crime Lab Directors identified, among the highest ranked needs in forensic science, the importance of undertaking a black-box study in firearms analysis analogous to the FBI's black-box study of latent fingerprints. DFSC, dissatisfied with the design of previous studies of firearms analysis, concluded that a black-box study was needed and should be conducted by an independent testing laboratory unaffiliated with law enforcement that would engage forensic examiners as

---

[327] Of the 10,230 answers returned across the three studies, there were there were 10,205 correct assignments, 23 inconclusive examinations and 2 false positives.

[328] Stroman (2014) acknowledges that, although the test instructions did not explicitly indicate whether the study was closed, their study could be improved if "additional firearms were used and knowns from only a portion of those firearms were used in the test kits, thus presenting an open set of unknowns to the participants. While this could increase the chances of inconclusive results, it would be a more accurate reflection of the types of evidence received in real casework."

[329] Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati. "An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing consecutively manufactured Glock EBIS barrels with the same EBIS pattern." National Institute of Justice Grant #2010-DN-BX-K269, December 2013. www.ncjrs.gov/pdffiles1/nij/grants/244232.pdf.

participants in the study.  DFSC and Defense Forensics and Biometrics Agency jointly funded a study by the Ames Laboratory, a Department of Energy national laboratory affiliated with Iowa State University.[330]

### Independent tests/open ('Ames Laboratory study')

The study employed a similar design to the FBI's black-box study of latent fingerprints, with many examiners making a series of *independent* comparison decisions between a questioned sample and one or more known samples that may or may not contain the source.  The samples all came from 25 newly purchased 9mm Ruger pistols.[331]  Each of 218 examiners[332] was presented with 15 *separate* comparison problems—each consisting of one questioned sample and three known test fires from the same known gun, which might or might not have been the source.[333]  Unbeknownst to the examiners, there were five same-source and ten different-source comparisons.  (In an ideal design, the proportion of same- and different-source comparisons would differ among examiners.)

Among the 2178 different-source comparisons, there were 1421 eliminations, 735 inconclusives and 22 false positives.  The inconclusive rate was 33.7 percent and the false positive rate among conclusive examinations was 1.5 percent (upper 95 percent confidence interval 2.2 percent).  The false positive rate corresponds to an estimated rate of 1 error in 66 cases, with upper bound being 1 in 46.  (It should be noted that 20 of the 22 false positives were made by just 5 of the 218 examiners—strongly suggesting that the false positive rate is highly heterogeneous across the examiners.)

The results for the various studies are shown in Table 2.  The tables show a striking difference between the closed-set studies (where a matching standard is always present by design) and the non-closed studies (where there is no guarantee that any of the known standards match).  Specifically, the closed-set studies show a dramatically lower rate of inconclusive examinations and of false positives.  With this unusual design, examiners succeed in answering all questions and achieve essentially perfect scores.  In the more realistic open designs, these rates are much higher.

---

[330] Baldwin, D.P., Bajic, S.J., Morris, M., and D. Zamzow. "A study of false-positive and false-negative error rates in cartridge case comparisons." Ames Laboratory, USDOE, Technical Report #IS-5207 (2014) afte.org/uploads/documents/swggun-false-postive-false-negative-usdoe.pdf.

[331] One criticism, raised by a forensic scientist, is that the study did not involve *consecutively manufactured* guns.

[332] Participants were members of AFTE who were practicing examiners employed by or retired from a national or international law enforcement agency, with suitable training.

[333] Actual casework may involve more complex situations (for example, many different bullets from a crime scene). But, a proper assessment of foundational validity must *start* with the question of how often an examiner can determine whether a questioned bullet comes from a specific known source.

## Table 2: Results From Firearms Studies*

| Study Type | Results for different-source comparisons | | | | |
| --- | --- | --- | --- | --- | --- |
| | Raw Data | Inconclusives | False positives among conclusive exams[334] | | |
| | Exclusions/ Inconclusives/ False positives | | Freq. (Confidence Bound) | Estimated Rate | Bound on Rate |
| Set-to-set/closed (*four studies*) | 10,205/23/2 | 0.2% | 0.02% (0.06%) | 1 in 5103 | 1 in 1612 |
| Set-to-set/partly open (*Miami-Dade study*) | 188/138/4 | 41.8% | 2.0% (4.7%) | 1 in 49 | 1 in 21 |
| Black-box study (*Ames Laboratory study*) | 1421/735/22 | 33.7% | 1.5% (2.2%) | 1 in 66 | 1 in 46 |

* "Inconclusives": Proportion of total examinations that were called inconclusive. "Raw Data": Number of false positives divided by number of conclusive examinations involving questioned items without a corresponding known (for set-to-set/slightly open) or non-mated pairs (for independent/open). "Freq. (Confidence Bond)": Point estimate of false positive frequency, with the upper 95 percent confidence bounds. "Estimated": The odds of a false positive occurring, based on the observed proportion of false positives. "Bound": The odds of a false positive occurring, based on the upper bound of the confidence interval—that is, the rate could reasonably be as high as this value.

## Conclusions

The early studies indicate that examiners can, under some circumstances, associate ammunition with the gun from which it was fired. However, as described above, most of these studies involved designs that are not appropriate for assessing the scientific validity or estimating the reliability of the method as practiced. Indeed, comparison of the studies suggests that, because of their design, many frequently cited studies seriously underestimate the false positive rate.

At present, there is only a single study that was appropriately designed to test foundational validity and estimate reliability (Ames Laboratory study). Importantly, the study was conducted by an independent group, unaffiliated with a crime laboratory. Although the report is available on the web, it has not yet been subjected to peer review and publication.

The scientific criteria for foundational validity require appropriately designed studies by *more than one group* to ensure reproducibility. Because there has been only a single appropriately designed study, the current evidence falls short of the scientific criteria for foundational validity.[335] There is thus a need for additional, appropriately designed black-box studies to provide estimates of reliability.

---

[334] The rates for *all* examinations are, reading across rows: 1 in 5115; 1 in 1416; 1 in 83; 1 in 33; 1 in 99; and 1 in 66.
[335] The DOJ asked PCAST to review a recent paper, published in July 2016, and judge whether it constitutes an additional appropriately designed black-box study of firearms analysis (that is, the ability to associate ammunition with a *particular* gun). PCAST carefully reviewed the paper, including interviewing the three authors about the study design. Smith, T.P.,

★ 111 ★

> **Finding 6:** Firearms analysis
>
> **Foundational validity.** PCAST finds that firearms analysis currently falls short of the criteria for foundational validity, because there is only a single appropriately designed study to measure validity and estimate reliability.  The scientific criteria for foundational validity require more than one such study, to demonstrate reproducibility.
>
> Whether firearms analysis should be deemed admissible based on current evidence is a decision that belongs to the courts.
>
> If firearms analysis is allowed in court, the scientific criteria for validity as applied should be understood to require clearly reporting the error rates seen in appropriately designed black-box studies (estimated at 1 in 66, with a 95 percent confidence limit of 1 in 46, in the one such study to date).

---

Smith, G.A., and J.B. Snipes. "A validation study of bullet and cartridge case comparisons using samples representative of actual casework." *Journal of forensic sciences* Vol. 61, No. 4 (2016): 939-946.

The paper involves a novel and complex design that is unlike any previous study.  Briefly, the study design was as follows: (1) six different types of ammunition were fired from eight 40 caliber pistols from four manufacturers (two Taurus, two Sig Sauer, two Smith and Wesson, and two Glock) that had been in use in the general population and obtained by the San Francisco Police Department; (2) tests kits were created by randomly selecting 12 samples (bullets or cartridge cases); (3) 31 examiners were told that the ammunition was all recovered from a single crime scene and were asked to prepare notes describing their conclusions about which sets of samples had been fired from the same gun; and (4) based on each examiner's notes, the authors sought to re-create the logical path of comparisons followed by each examiner and calculate statistics based on this inferred numbers of comparisons performed by each examiner.

While interesting, the paper clearly is not a black-box study to assess the reliability of firearms analysis to associate ammunition with a particular gun, and its results cannot be compared to previous studies.  Specifically: (1) The study employs a *within-set comparison* design (interdependent comparisons within a set) rather than a *black-box* design (many independent comparisons); (2) The study involves only a small number of examiners; (3) The central question with respect to firearms analysis is whether examiners can associate spent ammunition with a *particular* gun, not simply with a particular *make* of gun.  To answer this question, studies must assess examiners' performance on ammunition fired from different guns of the *same make* ("within-class" comparisons) rather than from guns of *different makes* ("between-class" comparison); the latter comparison is much simpler because guns of different makes produce marks with distinctive "class" characteristics (due to the design of the gun), whereas guns of the same make must be distinguished based on "randomly acquired" features of each gun (acquired during rifling or in use).  Accordingly, previous studies have employed only within-class comparisons.  In contrast, the recent study consists of a mixture of within- vs. between-class comparisons, with the substantial majority being the simpler between-class comparisons.  To estimate the false-positive rate for *within-class* comparisons (the relevant quantity), one would need to know the number of independent tests involving different-source within-class comparisons resulting in conclusive examinations (identification or elimination).  The paper does not distinguish between within- and between-class comparisons, and the authors noted that they did not perform such analysis.

PCAST's comments are not intended as a criticism of the recent paper, which is a novel and valuable research project.  They simply respond to DOJ's specific question: the recent paper does not represent a black-box study suitable for assessing scientific validity or estimating the accuracy of examiners to associate ammunition with a *particular* gun.

 ★ 112 ★

> **Validity as applied**. If firearms analysis is allowed in court, validity as applied would, from a scientific standpoint, require that the expert:
>
> > (1) has undergone rigorous proficiency testing on a large number of test problems to evaluate his or her capability and performance, and discloses the results of the proficiency testing; and
> >
> > (2) discloses whether, when performing the examination, he or she was aware of any other facts of the case that might influence the conclusion.

## The Path Forward

Continuing efforts are needed to improve the state of firearms analysis—and these efforts will pay clear dividends for the criminal justice system.

One direction is to continue to improve firearms analysis as a subjective method. With only one black-box study so far, there is a need for additional black-box studies based on the study design of the Ames Laboratory black-box study. As noted above, the studies should be designed and conducted in conjunction with third parties with no stake in the outcome (such as the Ames Laboratory or research centers such as the Center for Statistics and Applications in Forensic Evidence (CSAFE)). There is also a need for more rigorous proficiency testing of examiners, using problems that are appropriately challenging and publically disclosed after the test.

A second—and more important—direction is (as with latent print analysis) to convert firearms analysis from a subjective method to an objective method.

This would involve developing and testing image-analysis algorithms for comparing the similarity of tool marks on bullets. There have already been encouraging steps toward this goal.[336] Recent efforts to characterize 3D images of bullets have used statistical and machine learning methods to construct a quantitative "signature" for each bullet that can be used for comparisons across samples. A recent review discusses the potential for surface topographic methods in ballistics and suggests approaches to use these methods in firearms examination.[337] The authors note that the development of optical methods have improved the speed and accuracy of capturing surface topography, leading to improved quantification of the degree of similarity.

---

[336] For example, a recent study used data from three-dimensional confocal microscopy of ammunition to develop a similarity metric to compare images. By performing all pairwise comparisons among a total of 90 cartridge cases fired from 10 pistol slides, the authors found that the distribution of the metric for same-gun pairs did not overlap the distribution of the metric for different-gun pairs. Although a small study, it is encouraging. Weller, T.J., Zheng, X.A., Thompson, R.M., and F. Tulleners. "Confocal microscopy analysis of breech face marks on fired cartridge cases from 10 consecutively manufactured pistol slides." *Journal of Forensic Sciences,* Vol. 57, No. 4 (2012): 912-17.

[337] Vorburger, T.V., Song, J., and N. Petraco. "Topography measurements and applications in ballistics and tool mark identification." *Surface topography: Metrology and Properties*, Vol. 4 (2016) 013002.

In a recent study, researchers used images from an earlier study to develop a computer-assisted approach to match bullets that minimizes human input.[338] The group's algorithm extracts a quantitative signature from a bullet 3D image, compares the signature across two or more samples, and produces a "matching score," reflecting the strength of the match. On the small test data set, the algorithm had a very low error rate.

There are additional efforts in the private sector focused on development of accurate high-resolution cartridge casing representations to improve accuracy and allow for higher quality scoring functions to improve and assign match confidence during database searches. The current NIBIN database uses older (non-3D) technology and does not provide a scoring function or confidence assignment to each candidate match. It has been suggested that a scoring function could be used for blind verification for human examiners.

Given the tremendous progress over the past decade in other fields of image analysis, we believe that fully automated firearms analysis is likely to be possible in the near future. However, efforts are currently hampered by lack of access to realistically large and complex databases that can be used to continue development of these methods and validate initial proposals.

NIST, in coordination with the FBI Laboratory, should play a leadership role in propelling this transformation by creating and disseminating appropriate large datasets. These agencies should also provide grants and contracts to support work—and systematic processes to evaluate methods. In particular, we believe that "prize" competitions—based on large, publicly available collections of images[339]—could attract significant interest from academic and industry.

## 5.6 Footwear Analysis: Identifying Characteristics

### Methodology

Footwear analysis is a process that typically involves comparing a known object, such as a shoe, to a complete or partial impression found at a crime scene, to assess whether the object is likely to be the source of the impression. The process proceeds in a stepwise manner, beginning with a comparison of "class characteristics" (such as design, physical size, and general wear) and then moving to "identifying characteristics" or "randomly acquired characteristics (RACs)" (such as marks on a shoe caused by cuts, nicks, and gouges in the course of use).[340]

In this report, we do not address the question of whether examiners can reliably determine class characteristics—for example, whether a particular shoeprint was made by a size 12 shoe of a particular make. While it is important that that studies be undertaken to estimate the reliability of footwear analysis aimed at

---

[338] Hare, E., Hofmann, H., and A. Carriquiry. "Automatic matching of bullet lands." Unpublished paper, available at: arxiv.org/pdf/1601.05788v2.pdf.

[339] On July 7, 2016 NIST released the NIST Ballistics Toolmark Research Database (NBTRD) as an open-access research database of bullet and cartridge case toolmark data (tsapps.nist.gov/NRBTD). The database contains reflectance microscopy images and three-dimensional surface topography data acquired by NIST or submitted by users.

[340] See: SWGTREAD Range of Conclusions Standards for Footwear and Tire Impression Examinations (2013). SWGTREAD Guide for the Examination of Footwear and Tire Impression Evidence (2006) and Bodziak W. J. *Footwear Impression Evidence: Detection, Recovery, and Examination*. 2nd ed. CRC Press-Taylor & Francis, Boca Raton, Florida (2000): p 347.

★ 114 ★

On September 20, 2016, PCAST released its unanimous report to the President entitled "*Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*." This new document, approved by PCAST on January 6, 2017, is an addendum to the earlier report developed to address input received from stakeholders in the intervening period.

## Background

PCAST's 2016 report addressed the question of when expert testimony based on a forensic feature-comparison method should be deemed admissible in criminal courts.[1] We briefly summarize key aspects of the previous report.

### Forensic feature-comparison methods

PCAST chose to focus solely on forensic feature-comparison methods. These methods seek to determine whether a questioned sample is likely to have come from a known source based on shared features in certain types of evidence. Specific methods are defined by such elements as:

(i) the type of evidence examined (e.g., DNA, fingerprints, striations on bullets, bitemarks, footwear impressions, head-hair);

(ii) the complexity of the sample examined (e.g., a DNA sample from a single person vs. a three-person mixture in which a person of interest may have contributed only 1%); and

(iii) whether the conclusion concerns only "class characteristics" or "individual characteristics" (e.g., whether a shoeprint was made by a pair of size 12 Adidas Supernova Classic running shoes vs. whether it was made by a *specific* pair of such running shoes).

The U.S. legal system recognizes that scientific methods can assist the quest for justice, by revealing information and allowing inferences that lie beyond the experience of ordinary observers. But, precisely because the conclusions are potentially so powerful and persuasive, the law requires scientific testimony be based on methods that are scientifically valid and reliable.[2]

### Requirement for empirical testing of subjective methods

In its report, PCAST noted that the *only* way to establish the scientific validity and degree of reliability of a *subjective* forensic feature-comparison method—that is, one involving significant human judgment—is to test it *empirically* by seeing how often examiners actually get the right answer. Such an empirical test of a subjective forensic feature-comparison method is referred to as a "black-box test." The point reflects a central tenet underlying all science: *an empirical claim cannot be considered scientifically valid until it has been empirically tested*.

If practitioners of a subjective forensic feature-comparison method claim that, through a procedure involving substantial human judgment, they can determine with reasonable accuracy whether a particular type of evidence came from a particular source (e.g., a specific type of pistol or a specific pistol), the claim cannot be considered scientifically valid and reliable until one has tested it by (i) providing an adequate number of examiners with an adequate number of test problems that resemble those found in forensic practice and (ii) determining whether they get the right answer with acceptable

---

[1] As noted in the report, PCAST did not address the use of forensic methods in criminal *investigations*, as opposed to in criminal prosecution in courts.

[2] See discussion of the Federal Rules of Evidence in Chapter 3 of PCAST's report.

1

frequency for the intended application.[3]  While scientists may debate the precise design of a study, there is no room for debate about the absolute requirement for empirical testing.

Importantly, the test problems used in the empirical study define the specific bounds within which the validity and reliability of the method has been established (e.g., is a DNA analysis method reliable for identifying a sample that comprises only 1% of a complex mixture?).

### Evaluation of empirical testing for various methods

To evaluate the empirical evidence supporting various feature-comparison methods, PCAST invited broad input from the forensic community and conducted its own extensive review.  Based on this review, PCAST evaluated seven forensic feature-comparison methods to determine whether there was appropriate empirical evidence that the method met the threshold requirements of "scientific validity" and "reliability" under the Federal Rules of Evidence.

- In two cases (DNA analysis of single-source samples and simple mixtures; latent fingerprint analysis), PCAST found that there was clear empirical evidence.
- In three cases (bitemark analysis; footwear analysis; and microscopic hair comparison), PCAST found *no empirical studies whatsoever* that supported the scientific validity and reliability of the methods.
- In one case (firearms analysis), PCAST found only one empirical study that had been appropriately designed to evaluate the validity and estimate the reliability of the ability of *firearms analysts to associate a piece of ammunition with a specific gun*.  Because scientific conclusions should be shown to be reproducible, we judged that firearms analysis currently falls short of the scientific criteria for scientific validity.
- In the remaining case (DNA analysis of complex mixtures), PCAST found that empirical studies had evaluated validity within a limited range of sample types.

### Responses to the PCAST Report

Following the report's release, PCAST received input from stakeholders, expressing a wide range of opinions.  Some of the commentators raised the question of whether empirical evidence is truly needed to establish the validity and degree of reliability of a forensic feature-comparison method.

The Federal Bureau of Investigation (FBI), which clearly recognizes the need for empirical evidence and has been a leader in performing empirical studies in latent-print examination, raised a different issue. Specifically, although PCAST had received detailed input on forensic methods from forensic scientists at the FBI Laboratory, the agency suggested that PCAST may have failed to take account of some relevant empirical studies.  A statement issued by the Department of Justice (DOJ) on September 20, 2016 (the same day as the report's release) opined that:

> The report does not mention numerous published research studies which seem to meet PCAST's criteria for appropriately designed studies providing support for foundational validity.  That omission discredits the PCAST report as a thorough evaluation of scientific validity.

Given its respect for the FBI, PCAST undertook a further review of the scientific literature and invited a variety of stakeholders—including the DOJ—to identify any "published . . . appropriately designed

---

[3] The size of the study (e.g., number of examiners and problems) affects the strength of conclusions that can be drawn (e.g., the upper bound on the error rate).  The acceptable level of error rate depends on context.

studies" that had not been considered by PCAST and that established the validity and reliability of any of the forensic feature-comparison methods that the PCAST report found to lack such support. As noted below, DOJ ultimately concluded that it had no additional studies for PCAST to consider.

PCAST received written responses from 26 parties, including from Federal agencies, forensic-science and law-enforcement organizations, individual forensic-science practitioners, a testing service provider, and others in the US and abroad.[4] Many of the responses are extensive, detailed and thoughtful, and they cover a wide range of topics; they provide valuable contributions for advancing the field. PCAST also held several in-person and telephonic meetings with individuals involved in forensic science and law enforcement. In addition, PCAST reviewed published statements from more than a dozen forensic-science, law-enforcement and other entities.[5] PCAST is deeply grateful to all who took the time and effort to opine on this important topic.

In what follows, we focus on three key issues raised.

## Issue: Are empirical studies truly necessary?

While forensic-science organizations agreed with the value of empirical tests of subjective forensic feature-comparison methods (that is, black-box tests), many suggested that the validity and reliability of such a method could be established *without* actually empirically testing the method in an appropriate setting. Notably, however, none of these respondents identified any *alternative* approach that could establish the validity and reliability of a subjective forensic feature-comparison method.

PCAST is grateful to these organizations because their thoughtful replies highlight the fundamental issue facing the forensic sciences: *the role of empirical evidence*. As noted in PCAST's report, forensic scientists rightly point to several elements that provide critical foundations for their disciplines. However, there remains confusion as to whether these elements can suffice to establish the validity and degree of reliability of particular methods.

(i)  The forensic-science literature contains many papers describing variation among features. In some cases, the papers argue that patterns are "unique" (e.g., that no two fingerprints, shoes or DNA patterns are identical if one looks carefully enough). Such studies can provide a valuable *starting point* for a discipline, because they suggest that it may be worthwhile to attempt to develop reliable methods to identify the source of a sample based on feature comparison. However, such studies—no matter how extensive—can *never* establish the validity or degree of reliability of any particular method. Only empirical testing can do so.

(ii)  Forensic scientists rightly cite examiners' experience and judgment as important elements in their disciplines. PCAST has great respect for the value of examiners' experience and judgment: they are critical factors in ensuring that a scientifically valid and reliable method is practiced correctly. However, experience and judgment alone—no matter how great—can *never* establish the validity or degree of reliability of any particular method. Only empirical testing of the method can do so.[6]

---

[4] www.whitehouse.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensics_2016_additional_responses.pdf.
[5] www.whitehouse.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensics_2016_public_comments.pdf.
[6] Some respondents, such as the Organization of Scientific Area Committees' Friction Ridge Subcommittee, *suggested* that forensic science should be considered as analogous to medicine, in which physicians often treat patients on the basis of experience and judgment even in the absence of established empirical evidence. However, the analogy is inapt. Physicians act with a patient's consent for the patient's benefit. There is no legal requirement, analogous to the requirement imposed upon expert testimony in court by the Federal Rules of Evidence, that physician's actions be based on "reliable principles and methods." Physicians may rely on hunches; experts testifying in court about forensic feature-comparison methods may not.

3

The situation is different, however, for subjective methods whose validity and degree of reliability has not been established by appropriate empirical studies. If a discipline wishes to offer testimony based on a subjective method, it must first establish the method's validity and degree of reliability—which can only be done through empirical studies. However, as the OSAC FRS rightly notes, a discipline could follow an alternative path by abandoning testimony based on the subjective method and instead developing an objective method. Establishing the validity and degree of reliability of an objective method is often more straightforward. PCAST agrees that, in many cases, the latter path will make more sense.

## Issue: Completeness of PCAST's evaluation

Finally, we considered the important question, raised by the DOJ in September, of whether PCAST had failed to consider "numerous published research studies which seem to meet PCAST's criteria for appropriately designed studies providing support for foundational validity."

PCAST re-examined the five methods evaluated in its report for which the validity and degree of reliability had not been fully established. We considered the more than 400 papers cited by the 26 respondents; the vast majority had already been reviewed by PCAST in the course of the previous study. At the suggestion of John Butler of the National Institute of Standards and Technology (NIST), we also consulted INTERPOL's extensive summary of the forensic literature to identify additional potentially relevant papers.[7] Although our inquiry was undertaken in response to the DOJ's concern, DOJ informed PCAST in late December that it had no additional studies for PCAST to consider.

### Bitemark analysis

In its report, PCAST stated that it found no empirical studies whatsoever that establish the scientific validity or degree of reliability of bitemark analysis as currently practiced. To the contrary, it found considerable literature pointing to the unreliability of the method. None of the respondents identified any empirical studies that establish the validity or reliability of bitemark analysis. (One respondent noted a paper, which had already been reviewed by PCAST, that studied whether examiners agree when measuring features in dental casts but did not study bitemarks.) One respondent shared a recent paper by a distinguished group of biomedical scientists, forensic scientists, statisticians, pathologists, medical examiners, lawyers, and others, published in November 2016, that is highly critical of bitemark analysis and is consistent with PCAST's analysis.

### Footwear analysis

In its report, PCAST considered feature-comparison methods for associating a shoeprint with a specific shoe based on randomly acquired characteristics (as opposed to with a class of shoes based on class characteristics). PCAST found no empirical studies whatsoever that establish the scientific validity or reliability of the method.

The President of the International Association for Identification (IAI), Harold Ruslander, responded to PCAST's request for further input. He kindly organized a very helpful telephonic meeting with IAI member Lesley Hammer. (Hammer has conducted some of the leading research in the field—including a 2013 paper, cited by PCAST, that studied whether footwear examiners reach similar conclusions when they are presented with evidence in which the identifying features have already been identified.)

---

[7] The INTERPOL summaries list 4232 papers from 2010-2013 and 4891 papers from 2013-2016, sorted by discipline, see www.interpol.int/INTERPOL-expertise/Forensics/Forensic-Symposium.

5

Hammer confirmed that no empirical studies have been published to date that test the ability of examiners to reach correct conclusions about the source of shoeprints based on randomly acquired characteristics. Encouragingly, however, she noted that the first such empirical study is currently being undertaken at the West Virginia University. When completed and published, this study should provide the first actual empirical evidence concerning the validity of footwear examination. The types of samples and comparisons used in the study will define the bounds within which the method can be considered reliable.

### Microscopic hair comparison

In its report, PCAST considered only those studies on microscopic hair comparison cited in a recent DOJ document as establishing the scientific validity and reliability of the method. PCAST found that none of these studies provided any meaningful evidence to establish the validity and degree of reliability of hair comparison as a forensic feature-comparison method. Moreover, a 2002 FBI study, by Houck and Budowle, showed that hair analysis had a stunningly high error rate in practice: Of hair samples that FBI examiners had found in the course of actual casework to be microscopically indistinguishable, 11% were found by subsequent DNA analysis to have come from different individuals.

PCAST received detailed responses from the Organization of Scientific Area Committees' Materials Subcommittee (OSAC MS) and from Sandra Koch, Fellow of the American Board of Criminalistics (Hairs and Fibers). These respondents urged PCAST not to underestimate the rich tradition of microscopic hair analysis. They emphasized that anthropologists have published many papers over the past century noting differences in average characteristics of hair among different ancestry groups, as well as variation among individuals. The studies also note intra-individual differences among hair from different sites on the head and across age.

While PCAST agrees that these empirical studies describing hair differences provide an encouraging starting point, we note that the studies do not address the validity and degree of reliability of hair comparison as a forensic feature-comparison method. What is needed are empirical studies to assess how often examiners incorrectly associate similar but distinct-source hairs (i.e., false-positive rate). Relevant to this issue, OSAC MS states: "Although we readily acknowledge that an error rate for microscopic hair comparison is not currently known, this should not be interpreted to suggest that the discipline is any less scientific." In fact, this is the central issue: the acknowledged lack of any empirical evidence about false-positive rates indeed means that, as a *forensic feature-comparison method*, hair comparison lacks a scientific foundation.

Based on these responses and its own further review of the literature beyond the studies mentioned in the DOJ document, PCAST concludes that there are no empirical studies that establish the scientific validity and estimate the reliability of hair comparison as a forensic feature-comparison method.

### Firearms analysis

In its report, PCAST reviewed a substantial set of empirical studies that have been published over the past 15 years and discussed a representative subset in detail. We focused on the ability to associate ammunition not with a class of guns, but with a specific gun within the class.

The firearms discipline clearly recognizes the importance of empirical studies. However, most of these studies used flawed designs. As described in the PCAST report, "set-based" approaches can inflate examiners' performance by allowing them to take advantage of internal dependencies in the data. The

6

most extreme example is the "closed-set design", in which the correct source of each questioned sample is always present; studies using the closed-set design have underestimated the false-positive and inconclusive rates by more than 100-fold. This striking discrepancy seriously undermines the validity of the results and underscores the need to test methods under appropriate conditions. Other set-based designs also involve internal dependencies that provide hints to examiners, although not to the same extent as closed-set designs.

To date, there has been only one appropriately designed black-box study: a 2014 study commissioned by the Defense Forensic Science Center (DFSC) and conducted by the Ames Laboratory, which reported an upper 95% confidence bound on the false-positive rate of 2.2%.[8]

Several respondents wrote to PCAST concerning firearms analysis. None cited additional appropriately designed black-box studies similar to the recent Ames Laboratory study. Stephen Bunch, a pioneer in empirical studies of firearms analysis, provided a thoughtful and detailed response. He agreed that set-based designs are problematic due to internal dependencies, yet suggested that certain set-based studies could still shed light on the method if properly analyzed. He focused on a 2003 study that he had co-authored, which used a set-based design and tested a small number of examiners (n=8) from the FBI Laboratory's Firearms and Toolmarks Unit.[9] Although the underlying data are not readily available, Bunch offered an estimate of the number of truly independent comparisons in the study and concluded that the 95% upper confidence bound on the false-positive rate in his study was 4.3% (vs. 2.2% for the Ames Laboratory black-box study).

The Organization of Scientific Area Committee's Firearms and Toolmarks Subcommittee (OSAC FTS) took the more extreme position that all set-based designs are appropriate and that they reflect actual casework, because examiners often start their examinations by sorting sets of ammunition from a crime-scene. OSAC FTS's argument is unconvincing because (i) it fails to recognize that the results from certain set-based designs are wildly inconsistent with those from appropriately designed black-box studies, and (ii) the key conclusions presented in court do not concern the ability to sort collections of ammunition (as tested by set-based designs) but rather the ability to accurately associate ammunition with a specific gun (as tested by appropriately designed black-box studies).

Courts deciding on the admissibility of firearms analysis should consider the following scientific issues:
  (i)   There is only a single appropriate black-box study, employing a design that cannot provide hints to examiners. The upper confidence bound on the false-positive rate is equivalent to an error rate of 1 in 46.
  (ii)  A number of older studies involve the seriously flawed closed-set design, which has dramatically underestimated the error rates. These studies do not provide useful information about the actual reliability of firearms analysis.
  (iii) There are several studies involving other kinds of set-based designs. These designs also involve internal dependencies that can provide hints to examiners, although not to the same extent that closed-set designs do. The large Miami-Dade study cited in the PCAST report and the small studies cited by Bunch fall into this category; these two studies have upper confidence bounds corresponding to error rates in the range of 1 in 20.

From a scientific standpoint, scientific validity should require at least two properly designed studies to ensure reproducibility. The issue for judges is whether one properly designed study, together with

---

[8] PCAST also noted that some studies combine tests of both class characteristics and individual characteristics, but fail to distinguish between the results for these two very different questions.

[9] PCAST did not select the paper for discussion in the report owing to its small size and set-based design, although it lists it.