# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division

ALEJANDRO UMAÑA,

        Movant,

        v.

UNITED STATES,

        Respondent.

3:16-CV-00057-RJC

CAPITAL § 2255 PROCEEDING

HON. ROBERT J. CONRAD, JR.

**MEMORANDUM OF LAW IN SUPPORT OF SECOND MOTION FOR LEAVE TO CONDUCT DISCOVERY**

Movant, Alejandro Umaña, through undersigned, pursuant to Local Rule 7.1(c), submits this Memorandum of Law in support of his Second Motion for Leave to Conduct Discovery:

## I.    INTRODUCTION

Mr. Umaña is a death-sentenced federal prisoner. On June 22, 2016, Mr. Umaña filed his timely initial *Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Convictions and Sentences of a Person in Federal Custody* (**Doc. 22**) ("Initial 2255 Motion"), asserting Claims 1 through 30. *See also* **Doc. 24**. On February 22, 2018, Mr. Umaña filed his *Motion for Leave to File Supplement/Amendment to Motion to Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. § 2255* (**Doc. 68**) ("Supplemental 2255 Motion"), asserting additional Claims 31 through 58. *See also* **Docs. 69** & **71**. Mr. Umaña respectfully requests leave to conduct discovery described *infra* for the purpose of further demonstrating his entitlement to relief under Claims 1, 2, 3, 4, 5, 6, 7, 8, and 11 set forth in his Initial 2255 Motion and Claims 31, 32, 33, 34, 35, 38, 42, 47, 52, and 53 set forth in his Supplemental 2255 Motion (collectively, the "Relevant

Claims")[1]. These requests go directly to the grounds for relief set forth in Mr. Umaña's Initial and Supplemental 2255 Motions and are targeted to very specific information directly tied to specific Relevant Claims.

## II. LEGAL STANDARDS

### A. Discovery Under Section 2255

1. Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts gives this Court authority to order discovery "for good cause … under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) incorporates the United States Supreme Court's directive that federal *habeas corpus* petitioners "are entitled to careful consideration and plenary processing of their claims including full opportunity for presentation of the relevant facts," and to that end "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry" into the petitioner's allegations of illegal confinement. *Harris v. Nelson*, 394 U.S. 286, 298, 300 (1969); *see also Blackledge v. Allison*, 431 U.S. 63, 81–83 (1977); Rules Governing Section 2254 Cases, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with *Harris v. Nelson*").[2]

2. This Court may grant a petitioner leave to conduct discovery when "good cause" is shown. *See* Rule 6(a) of the Rules Governing Section 2255 Proceedings. The United States Supreme Court held that good cause for discovery in habeas proceedings is established "where

---

[1] On March 31, 2022, this Court denied Mr. Umaña's Initial Motion to Conduct Discovery filed on October 31, 2016. **Doc 108**.

[2] The Advisory Committee Notes to the *Rules Governing Section 2254 Cases* are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, *Rules Governing Section 2255 Proceedings*. Accordingly, this Memorandum also refers to cases involving discovery in Section 2254 cases.

specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is … entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997) (quoting *Harris*, 394 U.S. at 299).

3. This Court has broad power in the type of discovery it can grant, including the mechanisms of discovery provided "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Habeas Rule 6. Rule 6 has been interpreted across the country to authorize a court, for example, to issue subpoenas to produce documents, information or objects; to allow depositions of the prosecution team; or to order release of physical evidence.[3]

4. It should also be noted that in a Section 2255 case, like all civil cases, discovery necessarily precedes resolution of claims on summary judgment. To be entitled to discovery, Mr.

---

[3] *See, e.g., In re Braxton*, 258 F.3d 250, 255 (4th Cir. 2001) (noting that district court granted petitioner's motion under Habeas Rule 6 for state production of physical evidence for purposes of DNA retesting); *Warden v. Gall*, 865 F.2d 786, 787 (6th Cir. 1989) (state police crime lab ordered to produce laboratory and field notes, and other physical items); *Ross v. Kemp*, 785 F.2d 1467, 1469, 1478-79 (11th Cir. 1986) (subpoenas issued to clerk of jury commission); *Gonzalez v. United States*, No. 12 Civ 5226, 2013 WL 2350434, at *9-10 (S.D.N.Y. May 23, 2013) (granting motion to subpoena records from police department internal affairs bureau); *Morgan v. Ramos*, No. 08-C-3378, 2010 WL 3463129, at *22 (N.D. Ill. Aug. 30, 2010) (noting that the State "produced yet new documents related to [the petitioner's] criminal history in response to a subpoena issued pursuant to Rule 6 of the Rules Governing Section 2254 Proceedings"); *United States v. Thompson*, No. 02-80631, 2009 WL 398102, at *1 (E.D. Mich. Feb. 17, 2009) (granting leave to issue subpoenas for attorney visitation records); *O'Neal v. Lampert*, 199 F. Supp. 2d 1064, 1065 (D. Or. 2002) (granting motion for subpoenas to produce records under Habeas Rule 6); *Henry v. Marshall*, No. CIV S-94-0916, 2009 WL 361745, at *2 (E.D. Cal. Feb. 12, 2009) (granting leave to issue subpoenas to district attorney's office and local police department, as well as to police officers individually); *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 971-76 (W.D. Tenn. 2000) (granting petitioner's requests to serve interrogatories on state, obtain documents in state's possession, and depose assistant district attorney: "Once good cause is shown [under Habeas Rule 6(a)], a habeas petitioner may avail himself of the discovery procedures permitted by the Federal Rules of Civil Procedure, including the use of interrogatories, depositions, document requests, and requests for tangible evidence."); *Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting motion for discovery of FBI records of audiotape analysis).

Umaña need not conclusively establish his entitlement to relief on the merits of his claims. Rule 6 and *Bracy* require only that the petitioner demonstrate "good cause," not a *prima facie* case. *Cf.* **Doc. 108.** As the Court of Appeals for the Fourth Circuit has held, "[g]ood cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner ***may*** be able to demonstrate that he is entitled to relief." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (emphasis added); *see also Payne v. Bell*, 89 F.Supp.2d 967, 970–971 (W.D. Tenn. 2000) (good cause to grant discovery is not as high as the standard for granting relief or even that for granting an evidentiary hearing). In *Bracy*, the Supreme Court noted the movant's allegations were "only a theory at this point" and "not supported by any solid evidence[.]" 520 U.S. at 908. But the allegations were specific enough to establish good cause for factual development even if the defendant ultimately would "be unable to obtain evidence sufficient" for actual relief. *Id*. at 909. The specific requests set forth in the Second Motion for Leave to Conduct Discovery meet the low bar set by the Supreme Court in *Bracy*.

## B. The Liberal Standard for Fact Development in Capital § 2255 Cases

### 1. *Discovery is More Favored Under § 2255 than § 2254 Cases*

5. Although governed by the same Eighth Amendment jurisprudence, capital § 2255 and § 2254 proceedings vary in ways critical to federal practice, including discovery. The most important of these is that in a capital § 2254 case, the main post-conviction process, including fact-finding and discovery, occurs in state court. By the time the petitioner has entered federal court, the primary opportunity to develop extra-record facts in support of the petition has already taken place. If the § 2254 petitioner does not succeed in state court, he has a chance to pursue federal claims for relief in the limited federal system, but the opportunity for new factual development, the ability to obtain a hearing, and the possibilities of relief are narrowed by the extent of process in state court. *See, e.g.*, 28 U.S.C. § 2254(e)(2) (setting forth conditions for

4

evidentiary hearing in § 2254 cases); *see also Shinn v. Ramirez*, No. 20–1009, 596 U. S. \_\_\_\_ (May 23, 2022) (holding, "Under §2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on the ineffective assistance of state postconviction counsel.").

6. For a capital § 2255 litigant, the federal district court is both the first and last place to develop facts necessary to support constitutional claims. With no prior state court proceedings, the federal prisoner is not constrained by exhaustion requirements or state procedural rulings like his state counterpart, and the federal district court has much more latitude in § 2255 litigation as a forum for fact-development.[4]

7. The liberal standard for fact development in capital § 2255 cases is reflected, for instance, in the text of the statute governing evidentiary hearings which creates a presumption in favor of promoting fact development: "Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall … grant a prompt hearing thereon …." 28 U.S.C. § 2255(b). Mr. Umaña's Initial 2255 Motion and Supplemental 2255 Motion easily surpass this threshold: he has raised numerous claims supported by detailed factual allegations, which if true, will entitle him to relief. In the same vein, Mr. Umaña is entitled not only to a forum in which to demonstrate the strength of his proof, but also to discovery of materials not otherwise available to him to enable him to develop that proof.

---

[4] Additionally, motions under § 2255 can be based on violations of federal statutory criminal law and criminal procedure codes as well as the federal Constitution, and accordingly are subject to a wider range of potentially available federal legal claims than are state prisoner actions under § 2254. *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence"). Thus, a § 2255 investigation must be more far-ranging because the potential cognizable claims can be statutory in nature as well as constitutional.

8.      Legislative history also underscores the difference Congress saw between the necessity for hearings and factual development in § 2254 and § 2255 proceedings. When Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it curtailed a federal district court's discretion to grant an evidentiary hearing on a § 2254 petition. *See* 28 U.S.C. 2254(e). Congress, however, placed no such limitations on the standard for granting an evidentiary hearing in § 2255 proceedings.[5]

### 2. *Discovery is Especially Warranted in a Capital Case*

9.      The policies favoring discovery are strong in capital cases because the "finality" of death and its, "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland v. Scott*, 512 U.S. 849, 855 (1994).

10.     In a death penalty case, broad discovery is necessary to ensure the extra measure of process which is demanded in capital cases. "[I]f death is involved, the petitioner should be presented every opportunity possible … to present facts relevant to his constitutional claims." *Wilson v. Butler*, 825 F.2d 879, 883 (5th Cir. 1987). Given the gravity of this capital case, Mr. Umaña respectfully requests this Court's leave to conduct discovery that will enable him to fully investigate, develop, and present support demonstrating his entitlement to relief.

---

[5] *See, e.g., United States v. Stead*, 67 F. Supp. 2d 1064, 1074 n.5 (D. S.D. 1999) ("Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases." (citing *Townsend v. Sain*, 372 U.S. 293 (1963))).

## III.     DISCOVERY REQUESTS

11.     Pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings, the Rules of Criminal Procedure, and the Rules of Civil Procedure, Mr. Umaña requests leave to conduct the following discovery:

### A.     Discovery Expected to Demonstrate Mr. Umaña's Intellectual Disability and Cognitive and Psychiatric Impairments—Relating to Claims 1, 2, 3, 4, 8, 31, 35, 42, and 47

12.     In his Initial 2255 Motion (**Doc. 22**), Mr. Umaña alleged that counsel were constitutionally ineffective for failing to investigate and present mitigation evidence (**Claim 1**), failing to investigate and present lay and expert evidence supporting mental health mitigation (**Claims 2** and **3**), and failing to challenge aggravation and develop lay and mental health evidence mitigating his possession of a shank during voir dire (**Claim 8**). Mr. Umaña also alleged that he is Intellectually Disabled, categorically excluding him from death-eligibility (**Claim 4**).

13.     In his Supplemental 2255 Motion (**Doc. 69**), Mr. Umaña alleged that he was incompetent during pretrial, trial and post-trial proceedings (**Claim 31**), that the jury relied on speculative and unreliable evidence as a result of prosecutorial misconduct and ineffective assistance of counsel (**Claim 35**), that counsel were ineffective in their investigation and presentation of the *Atkins* issue, causing this Court's determination to be inherently unreliable (**Claim 42**), and that the Government, without providing notice or full discovery, presented evidence purporting to connect Mr. Umaña to two homicides and a purported gang shooting (unrelated to the Lemon Grove and Fairfax incidents) (**Claim 47**).

14.     The below-described materials will further demonstrate Mr. Umaña's entitlement to relief on these claims:

7

### 1. *Mr. Umaña's Jail Calls*

15.  Mr. Umaña's pretrial communications demonstrate cognitive deficits and psychiatric illness. *See* **Doc. 69** at 5-10; **Doc. 22** at 57; **Doc. 22-4** Appx. 26 at 2-3 (McGough Affidavit). These communications include a recording of a specific call between Mr. Umaña and his mitigation specialist that was intercepted by the Guilford County Jail, but not provided to counsel. *See* **Doc. 69** ¶ 12 (describing Guilford County Sheriff's review of a call between Mr. Umaña and the trial mitigation specialist in which Mr. Umaña was speaking "quasi-Spanish" and sounded as if he was "talking to a preacher" as opposed to his legal team). *See* **Doc. 71-2** Appx. 169 at 1.

16.  The Government did not disclose and/or trial counsel failed to independently request all recordings of Mr. Umaña's pretrial communications, including the specific call with the mitigation specialist described above, all calls made by Mr. Umaña from the Guilford County Jail, and, upon information and belief, additional calls between Mr. Umaña and members of his legal team. Accordingly, Mr. Umaña requests leave to subpoena[6] the following:

   a.  The Guilford County Sheriff and Jail compelling the production of any records or recordings of conversations or interactions between Mr. Umaña and any member of his legal team; and

   b.  The Mecklenburg County Sheriff and Jail compelling the production of any recordings of conversations or interactions between Mr. Umaña and any member of his legal team.

17.  Mr. Umaña believes these recordings will provide further factual support for his claims of incompetency, Intellectual Disability, and counsel's ineffectiveness for failing to

---

[6] Mr. Umaña has attached proposed orders and proposed subpoenas as Exhibits 1 - 21 to this Memorandum.

develop and present mental health evidence, and counsel's ineffectiveness for failing to marshal readily available evidence challenging the RICO allegations in the indictment.

18. As it is clear from the pretrial proceedings that the United States Attorney's Office, FBI, United States Marshals, Mecklenburg County Sheriff, and/or the Guilford County Sheriff monitored and collected Mr. Umaña's communications while he was in custody pretrial, Mr. Umaña also requests an Order directing the Government (U.S. Attorney's Office, U.S. Marshals Service, and Federal Bureau of Investigation) to disclose all recordings of conversations or interactions between Mr. Umaña and any member of his legal team.

### 2. *Communications Between the Government, Jail Personnel, and Correctional Officers McIntyre, Farley and C. Holly*

19. Government psychologist Enrique Suarez interviewed jail corrections officers McIntyre, Farley and C. Holly on September 28, 2009, the day before he interviewed Mr. Umaña. *See* **Doc. 22-18** Appx. 71 at 1, 19 (Dr. Suarez Report). These officers were not mentioned in Mr. Umaña's jail records provided in pretrial discovery, nor were they mentioned in Dr. Suarez's review of the jail records. *See* **Doc. 22-18** Appx. 71 at 1, 11. The only way Dr. Suarez could have known to conduct these interviews was through information provided by the Government. Nevertheless, there is no indication how the Government came to suggest these interviews or what information had been provided to these officers by the Government prior to the interviews.

20. The facts and circumstances surrounding the selection of these witnesses, including records of communication between the Government, the jail staff and those witnesses, would have provided trial counsel with impeachment evidence such as their likely biases and inherent unreliability. As Dr. Suarez relied on these witnesses' statements in reaching conclusions regarding adaptive deficits, these materials will provide challenges to the reliability of Dr.

Suarez's conclusions, challenges to this Court's reliance on those conclusions and the determination of constitutional violations presented in Claims 1–4 and 42.

21. Mr. Umaña requests an Order directing Government (United States Attorney, FBI, and U.S. Marshals Service) disclosure of, and leave to subpoena from the Mecklenburg County Jail:

    a. All records of communications between the Government and jail management and staff regarding the recruitment of individuals to be interviewed by Dr. Suarez;

    b. All records of communications between the Government and jail staff regarding the possibility of being interviewed by Dr. Suarez;

    c. All records of communications with Dr. Suarez identifying or mentioning correctional officers McIntyre, Farley and C. Holly; and

    d. All records of communications with Dr. Suarez mentioning and/or discussing any other potential interviewee.

22. In addition, Mr. Umaña requests leave to depose Dr. Suarez regarding his interactions with the prosecution team in selecting witnesses to interview for adaptive deficits.

### 3. *Co-Defendant Statements About Mr. Umaña Describing Words or Conduct Indicating Intellectual and/or Adaptive Deficits*

23. Luis Ramos, an alleged co-defendant in one of the extraneous offenses, described Mr. Umaña as slow, child-like, and low functioning (**Doc. 69-4** Appx. 112 at 2, 10, 34, 37). If Mr. Ramos noted Mr. Umaña's deficits based on his association with Mr. Umaña, it is reasonably probable that other co-defendants also noted deficits consistent with Intellectual Disability and contradicting the conclusions reached by Drs. Suarez and Mayberg. As that information was favorable to Mr. Umaña's claim of Intellectual Disability and mental health mitigation, due process required that the Government disclose statements by the co-defendants indicating deficits. This information also supports Mr. Umaña's claims arising from counsel's ineffectiveness for failing to request, investigate, and develop this evidence.

24. When police arrested Julio "Stiler" Rosales-Lopez, they seized a shoebox with notebooks full of lyrics for gang rap songs, poems, and drawings praising MS-13. *See United States v. Rosales Lopez, et al*, No. 08-CR-134, **Doc**. **1079** at 1339, **Doc. 1369-3 at page 327** at 1787**.** In resolving Mr. Umaña's claim of Intellectual Disability, this Court relied on several writings, including poems and rap lyrics, allegedly by Mr. Umaña. *See Order Denying Motion to Declare Defendant Ineligible for the Death Penalty Based on Mental Retardation as to Alejandro Umaña* (**Doc. 934** in Case No. 3:08-CR-00134). Mr. Umaña's poetry and lyrics are derivative of others' works. *See* **Doc. 116** Appx. 238 at 5 (Report of Erik Nielson). A comparison between Mr. Rosales-Lopez's writings and Mr. Umaña's writings, which the Court relied upon in resolving the *Atkins* hearing, is not only demonstrative of Mr. Umaña's brain damage, cognitive, and psychiatric impairments but also reveals the invalidity of the Court's conclusions regarding Mr. Umaña's Intellectual Disability.

25. Mr. Umaña requests an Order directed toward the Government (U.S. Attorney, FBI, ICE, DHS) and leave to subpoena the Greensboro and Charlotte-Mecklenburg Police Departments and Mecklenburg County Sheriff's Office to disclose all records of statements of the co-defendants, written, recorded or summarized, that describe Mr. Umaña's conduct, communication skills, relationship skills, social skills, living skills, work skills and/or any other adaptive skills relevant to the determination of Intellectual Disability. Mr. Umaña also seeks an Order directing the Government (U.S. Attorney, FBI, ICE, DHS) and leave to subpoena the Greensboro and Charlotte-Mecklenburg Police Departments and Mecklenburg County Sheriff's Office to disclose all records of lyrical or poetic materials created by or found in the possession of his codefendants which may have provided the basis for materials Mr. Umaña allegedly created and the Court considered in reaching its *Atkins* determination.

#### 4. *Impeachment Evidence Challenging Dr. Suarez's Reliability*

26. Counsel knew that the State of Florida sanctioned Dr. Suarez for misconduct during mental health evaluations but counsel failed to investigate and present impeachment evidence regarding those incidents (**Doc. 71 ¶ 290 relating to Claim 42**). As Dr. Suarez was the Government's expert, the Government knew or should have known about those and other sanctions lodged against Dr. Suarez. The Government's failure to disclose the information about these sanctions pretrial violated Mr. Umaña's Fifth and Eighth Amendment rights.

27. As this evidence provides factual support for Mr. Umaña's constitutional claims, Mr. Umaña requests:

   a. an Order directing the Government to disclose all records in its possession or control in which any court or agency, in Florida or elsewhere, either sanctioned Dr. Suarez for improper conduct or sought sanctions related to mental health evaluations; and

   b. leave to subpoena the Florida Board of Psychology compelling the production of any complaints and disciplinary records relating to Dr. Suarez.

#### 5. *Statements, Documents, and Summaries of Government Linguist/Interpreter Analysis of Mr. Umaña's Writings*

28. As described in the Initial 2255 Motion (**Doc. 22** at 227–28), **Claim 8(c)**, Government linguists reviewing letters attributed to Mr. Umaña came to call the language "Umaña Speak" because the grammar, language and punctuation were so poor it was difficult to understand. *See also* **GPT**[7] 04/14/10 at 605 (Analyst Susan Conrad testimony). The writing was so bad that Analyst Conrad consulted with another analyst, Edger Cortez, on one letter because she was getting a "headache" from the "Umaña Speak" to the point that she could not determine if the letter involved threats against Luis "Chipis" Ramos. As it turned out, the letter had nothing

---

[7] GPT and PPT respectively refer to the guilt and penalty phase transcripts of Mr. Umaña's case. *U.S. v. Umaña*, 3:08-cr-00134, Docs. 1255-61, 1339-52.

to do with threats at all and was, instead, a cry for help. *See* **Doc. 22** at 228–29. Further, prior to trial, trial counsel's expert, Dr. Olley, had one of Mr. Umaña's letters formally translated. The translator found Mr. Umaña "does not separate words, repeats his thoughts over and over, has gross misspelling errors, follows no sequence of thought, jumping from one issue to the other and writes guided by the phonetic sound of words." *Atkins* **Hearing** 11/30/09 Def. Ex. 12.

29. The Government translated and reviewed the letters they intercepted to or from Mr. Umaña. The Government linguists and Government counsel, as well as trial counsel's translators, discussed and documented the difficulties reviewing Mr. Umaña's writings. Their observations and discussions support adaptive deficits in Communication. Should Mr. Umaña be able to develop the facts about the Government's analysis of his writing, then he will be entitled to relief on his claim of Intellectual Disability.

30. Mr. Umaña respectfully requests this Court to Order the Government (U.S. Attorney and FBI) to produce all records of all analyses of Mr. Umaña's written communications.

### B. <u>Discovery Challenging the Government's Theory of the Case and Further Supporting Mr. Umaña's Intellectual Disability and Defenses—Relating to Claims 5, 6, 7, 8, 11, 32, 34, 35, and 53</u>

31. In the Initial 2255 Motion (**Doc. 22**), Mr. Umaña alleged that counsel failed to develop and present evidence disputing the Government's other crimes allegations (**Claim 5**); the Government failed to disclose material exculpatory evidence regarding its other crimes allegations (**Claim 6**); the Government presented materially misleading and false evidence (**Claim 7**); the Government presented materially misleading and/or false evidence regarding the nature and extent of Mr. Umaña's role and participation in MS-13 (**Claim 8**); and that counsel were ineffective for failing to develop readily available evidence disputing the Government's trial contentions regarding Mr. Umaña's role and participation in MS-13 (**Claim 11**).

13

32. In the Supplemental 2255 Motion, Mr. Umaña alleged that, as a result of counsel's ineffectiveness, police and prosecutorial misconduct and court error, the jury did not hear readily available evidence disputing the Government's case (**Claim 32**); that the interrogations of Mr. Umaña by members of the joint investigation serving as agents of the Government violated the constitution (**Claim 34**); that, as a result of prosecutorial misconduct, counsel's ineffectiveness and court error, the jury relied on inherently unreliable and materially misleading and/or false testimony in both the trial and penalty hearing (**Claim 35**); and that the Government's presentation of selective translations of letters/calls while denying Mr. Umaña the resources necessary to translate all letters/calls/documents or all translations by the Government violated the constitution (**Claim 53**). In his Initial Discovery Motion, Mr. Umaña made specific requests regarding the allegations contained in **Claims 5-8** and **11**. *See* **Doc. 36** §§ III.B–C. Mr. Umaña acknowledges that this Court denied the discovery requested in that Motion. *See* **Doc. 108** at 3-27. Mr. Umaña has sought reconsideration of that Order as it pertains to certain aspects of Claims 5-7, 11. *See* **Doc. 113**. Moreover, in adjudicating Mr. Umaña's requests for discovery, this Court must assess the cumulative prejudice from *all* potential grounds for relief listed above.[8]

1. ***Evidence Disputing the Government's Theory of Mr. Umaña's Status in MS-13***

    a. Evidence Disputing the Government's Theory that Mr. Umaña Earned His Tattoo by Committing Some Unspecified Killing

33. In the Initial 2255 Motion (**Doc. 22**), **Claims 6**, **7.C.** and **11**, Mr. Umaña presented facts demonstrating that the Government's theory that Mr. Umaña earned his MS-13 tattoo by

---

[8] *Kyles v. Whitley*, 514 U.S. 419, 441 (1995) (Court must assess Brady materiality cumulatively); *Williams v. Taylor*, 529 U.S. 362, 396-98 (2000) (Court should assess prejudice from ineffective assistance of counsel claims cumulatively); *accord State v. Allen*, 861 S.E.2d 273, 286 (N.C. 2021) (if reaching the question of prejudice, the court "must examine whether any instances of deficient performance . . . prejudiced [defendant] when considered both individually and cumulatively).

committing some unspecified killing and argument that Mr. Umaña was "the only killer" were materially misleading and/or false. In the Initial Discovery Motion, Mr. Umaña requested disclosure of exculpatory and impeachment evidence regarding MS-13 tattoos and how they are, or are not, earned. *See* **Doc. 36** at 48, 82. Mr. Umaña acknowledges that the Court has denied those requests (**Doc 108** at 28-29), but is currently seeking reconsideration of that ruling. *See* **Doc. 113**. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████. First, as demonstrated throughout both the Initial and Supplemental 2255 Motions, Mr. Umaña is an Intellectually Disabled man who, contrary to the Government's theory, was not a leader and lacked the capacity to be a leader. *See, e.g.* **Doc. 22** at **Claims 1-4, 8**; **Doc. 71** at **Claims 31-32, 43**. Second, Mr. Umaña's pre-supposed knowledge regarding the tattoos is irrelevant to his claim that the Government presented materially misleading and false evidence. And, finally, the evidence Mr. Umaña seeks below is precisely the evidence necessary to prove that the Government knew its theory of the tattoos was false. This request supplements the prior request.

34. The local police and FBI regularly photographed MS-13 members at the time of arrest, investigatory stop, and/or interrogation. For example, Agent Attard met with Manuel DeJesus Ayala (Chacua) in an El Salvador prison and photographed his tattoos. *See United States v. Lopez*, et al., No. 3:08-CR-134, Tr. 1/13/2010 at 243-44. Photos of Ayala were admitted into evidence in the co-defendants' trial (*id.* Tr. 1/13/2010 at 244-45, Govt. Ex. 64, 65), but it is not clear whether the admitted photos are those taken by Agent Attard while in El Salvador. The Government did not provide Mr. Umaña with the El Salvador photos pretrial. Nor has the

Government disclosed photos of the co-defendants taken by law enforcement in North Carolina working with the FBI. Photos of other MS-13 members with tattoos similar to Mr. Umaña who the Government does not allege committed murders would have directly disputed a critical aspect of the Government's case against Mr. Umaña both at trial and the penalty hearing.

35. Accordingly, Mr. Umaña requests an Order or permission to issue a subpoena directing the (1) Greensboro Police Department; (2) Charlotte-Mecklenburg Police Department; (3) Mecklenburg County Sheriff's Office and Jail; (4) Guilford County Sheriff's Office and Jail; (5) Federal Bureau of Investigation; (6) United States Marshals; (7) Department of Homeland Security (Immigration and Customs Enforcement and/or Citizenship and Immigration Services); (8) City of Los Angeles Police Department; (9) Los Angeles County Sheriff's Department (9) and other jails that incarcerated and photographed the co-defendants appearing on the indictment as delineated in Exhibit 22 to provide all records containing physical descriptions, including photographs and descriptions of tattoos, of Mr. Umaña and his co-defendants in this indictment:

    a. Manuel De Jesus Ayala a/k/a "Chacua"

    b. Heverth Ulises Castellon a/k/a "Misterio" or "Sailor"

    c. Julio Cesar Rosales Lopez a/k/a "Stiler"

    d. Juan Gilberto Villalobos a/k/a "Smoke" or "Smokey"

    e. Elvin Pastor Fernandez−Gradis a/k/a "Tigre", "Flaco", "Juan Alberto Irias", or "Freddy"

    f. Juan Ruben Vela Garcia a/k/a "Mariachi"

    g. Jose Amilcar Garcia−Bonilla a/k/a "Psicopata" or "Sicario"

    h. Yelson Olider Castro−Licona a/k/a "Diablo"

    i. Carlos Ferufino−Bonilla a/k/a "Tigre"

    j. Nelson Hernandez−Ayala a/k/a "Sixteen"

    k. Mario Melgar−Diaz a/k/a "Nino"

l. Alexi Ricardo Ramos a/k/a "Pajaro"

m. Carlos Roberto Figueroa–Pineda a/k/a "Drogo"

n. Cesar Yoaldo Castillo a/k/a "Chino"

o. Alexander Granados a/k/a "Gorilon"

p. Michael Steven Mena a/k/a "Cholo"

q. Johnny Elias Gonzalez a/k/a "Solo"

r. Jaime Sandoval a/k/a "Pelon"

s. Santos Canales–Reyes a/k/a "Chicago"

t. Jose Efrain Ayala–Urbina a/k/a "Peligroso"

u. Oscar Manuel Moral–Hernandez a/k/a "Truchon"

v. Santos Anibal Caballer Fernandez a/k/a "Garra"

w. Manuel Cruz a/k/a "Silencisco"

x. Javier Molina a/k/a "Big Psycho" or "Gringo"

y. Mario Guarjardo–Garcia a/k/a "Speedy" or "Iran Guerrero-Gomez".

36. Mr. Umaña also requests an Order or permission to issue a subpoena directing the (1) Greensboro Police Department; (2) Charlotte-Mecklenburg Police Department; (3) Mecklenburg County Sheriff's Office and Jail; (4) Guilford County Sheriff's Office and Jail; (5) Federal Bureau of Investigation; (6) United States Marshals; (7) Department of Homeland Security (Immigration and Customs Enforcement and/or Citizenship and Immigration Services); and (8) all other jails that incarcerated and photographed the co-defendants appearing on the indictment, as delineated in Exhibit 22, to provide all records containing physical descriptions, including photographs and descriptions of tattoos of any other individual detained or interrogated on this case.

      b. <u>Evidence Disputing the Government's Theory Regarding Mr. Umaña's Role in MS-13 and Purported Witness Tampering</u>

17

37.    As described in **Claim 32.C**. (**Doc. 71**), counsel ineffectively failed to challenge prosecutorial misconduct and the Government's theory that Mr. Umaña was a "leader" in MS-13 with record evidence of the Government's contentions in the co-defendants' cases. Mr. Umaña proffered a declaration from Luis Mario Ramos Mendez (**Doc. 69-4** Appx. 112) indicating that a Government prosecutor along with a Los Angeles police detective spoke with him in Mecklenburg Jail on multiple occasions attempting to coerce him to testify against Mr. Umaña. Mr. Ramos refused to provide the prosecutor the information she wanted. The prosecutor told Mr. Ramos the Government would not protect him or move him to federal custody for his protection unless he cooperated against Mr. Umaña.

38.    Contrary to the Government's contentions in Mr. Umaña's trial, Mr. Ramos responded to the prosecutor's threat of withholding protection by telling the prosecutor he was not assaulted in prison on any order by Mr. Umaña. Also contrary to the Government's contentions in Mr. Umaña's trial, Mr. Ramos indicated that Mr. Umaña was not a leader in MS-13. (**Doc. 69** Appx. 112, ¶33 (Decl. Luis Ramos)). ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████    ████████    ██████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████    ██████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



41. In light of the evidence proffered, Mr. Umaña asks this Court to order the Government (U.S. Attorney's Office and Federal Bureau of Investigation) to produce:

a. all records in their possession or control that were created to document, reflect or analyze interviews of, or statements by, Luis Ramos (if not in the possession of the Government, Mr. Umaña also seeks leave to subpoena the LAPD and Mecklenburg County Jail);

b. all records regarding the transport/housing of Mr. Ramos pretrial, during trial and during the trials and pleas of the co-defendants (if not in the possession of the Government, Mr. Umaña also seeks leave to subpoena the Mecklenburg County Jail);

c. all records of statements by the co-defendants indicating that Mr. Umaña was not a leader of MS-13 and/or had no authority to order an assault against Mr. Ramos, or anyone else, and/or that he did not issue any such order (if not in the possession of the Government, Mr. Umaña also seeks leave to subpoena the Greensboro and Charlotte-Mecklenburg Police Departments);

d. all records of statements by any other witnesses interviewed by Government law enforcement, including local, county, state, or El Salvadoran law enforcement working with the Government on MS-13 investigations, including investigations in El Salvador indicating that Mr. Umaña was not a leader of MS-13 and had no power to order an assault against Mr. Ramos, or anyone else, and/or that he did not issue any such order;

e. all records of prison transfers of any witnesses who agreed or refused to cooperate with the Government against Mr. Umaña;

f.

g.

42. The above requested evidence would provide further support for the constitutional claims demonstrating that Mr. Umaña was neither a leader nor involved in witness tampering.

    c. <u>Evidence Disputing the Reliability of the Selected Translations of Letters/Calls Admitted by the Government</u>

43. In **Claim 53** (**Doc. 71**), Mr. Umaña proffered facts demonstrating that the Government presented select translations of calls/letters while at the same time denying Mr.

Umaña access to resources to obtain translations of all the calls/letters available. Nor did the Government disclose to counsel pretrial all the translations of Mr. Umaña's letters that the Government prepared. Similarly, the Government engaged co-defendants (who were trying to reduce their sentence through cooperation) to assist the interpreters with the translations of letters and the creation of transcripts for audio recordings. *See United States v. Lopez*, et al., No. 3:08-CR-134, Vol. II-B, Tr. 01/14/10 at 528-529.

44. Accordingly, Mr. Umaña requests that the Government (U.S. Attorney's Office and FBI) disclose all records of translation of all letters Mr. Umaña generated or received, and all recordings that Mr. Umaña either participated in or in which he is mentioned and any notes generated in association with the creation of those translations, including notes of co-defendants or others that assisted in translation or identification of recorded information.

45. Evidence disputing the reliability of the translations and meaning of the selected submissions offered by the Government at trial would provide further support for his claim that the jury relied on materially misleading and/or unreliable selected translations during deliberations in violation of the Fifth, Sixth and Eighth Amendment. *See Watkins v. Sowders*, 449 U.S. 341, 347 (1981) ("[i]t is the reliability of identification evidence that primarily determines its admissibility"); *Foster v. California*, 394 U.S. 440 (1969).

### 2. *Evidence Disputing the Reliability and Admissibility of (i) Statements Elicited Through Interrogations by Government Agents and (ii) Other Crimes/Bad Acts Evidence*

46. In **Claim 34** (**Doc. 71**), Mr. Umaña averred that various statements attributed to him arising from interrogations by members of the prosecution team were obtained in violation of the Sixth and Eighth Amendments. Evidence that demonstrates that the FBI's Safe Streets Task Force members including CMPD Officers Charles Hastings and Carlos Lopez and FBI Agent Attard, Greensboro Police Officers John Sloane and Mike Terry, and/or LAPD Officers

Frank Flores, Thomas Small and Eugene Parshall worked in-concert with the Government would provide additional support of these claims.

47. Moreover, in the Initial Discovery Motion, Mr. Umaña made requests arising from the Government's presentation of evidence of other crimes/bad acts. *See* **Doc. 36** at 13. Mr. Umaña has sought reconsideration (*see* **Doc. 113**), of this Court's Order denying those requests. As described in **Claim 34** (**Doc. 71**), there was a cooperative relationship between Detective Flores, a Los Angeles Detective, and the Western District of North Carolina United States Attorney's Office and its Anti-Gang Task Force and the FBI. As described in the Initial 2255 Motion (**Doc. 22**), **Claims 6** and **7**, as a result of counsel's ineffectiveness and prosecutorial misconduct, the jury relied on inherently unreliable evidence surrounding the Los Angeles homicides.

48. Accordingly, Mr. Umaña requests an Order directing the Government (U.S. Attorney's Office, Federal Bureau of Investigation, and Department of Justice) to disclose, and leave to subpoena the Los Angeles Police Department and Los Angeles County District Attorney's Office regarding, the following:

   a. all records regarding the cooperative working relationship between the Los Angeles Police Department, including without limitation Detective Flores, and the Western District of North Carolina United States Attorney's Office regarding the prosecution of Mr. Umaña;

   b. all records regarding the cooperative working relationship between Los Angeles Police Department, including without limitation Detective Flores, and the Department of Justice regarding the prosecution of Mr. Umaña;

   c. all records regarding the cooperative working relationship between Los Angeles Police Department, including without limitation Detective Flores, and the Federal Bureau of Investigation;

   d. all records, including communications between the Government and the Los Angeles County District Attorney's Office, regarding the pursuit and filing of charges against Mr. Umaña for offenses that occurred in North Carolina;

e. all records, including communications between the Federal Bureau of Investigation and North Carolina law enforcement, including but not limited to the Greensboro Police Department, Guilford County District Attorney's Office, and the North Carolina State Bureau of Investigation, regarding the pursuit and filing of charges against Mr. Umaña for offenses that occurred in Greensboro, North Carolina;

f. all records, including communications between the Western District of North Carolina United States Attorney's Office and North Carolina law enforcement, including but not limited to the Greensboro Police Department, Guilford County District Attorney's Office, and North Carolina State Bureau of Investigation, regarding the pursuit and filing of charges against Mr. Umaña for offenses that occurred in Greensboro, North Carolina; and

g. all records of communications between the Western District of North Carolina United States Attorney's Office, its Anti-Gang Task Force, and/or the FBI and the Los Angeles Police Department and/or Los Angeles District Attorney's Office regarding the investigation of the unadjudicated California murders and the Government's intention to present evidence of those offenses during the trial of this case.

### 3. *Evidence Disputing the Reliability of Detective Flores' Gang-Expert Testimony*

49. In **Claims 32.B**. and **34** (**Doc. 71**), Mr. Umaña averred that Det. Flores provided inherently unreliable and biased testimony regarding his knowledge and expertise of gang activity in general and in the interpretation of various purported gang-related evidence in this case. Mr. Umaña also averred that Det. Flores' reliability and partiality had been challenged in other federal prosecutions.

50. As the following requested materials support the allegations in **Claims 32.B** and **34** of the Supplemental 2255 Motion (**Doc. 71**) and **Claims 6** and **7** of the Initial 2255 Motion (**Doc. 22**), good cause is demonstrated.

51. Mr. Umaña requests an Order directing disclosure by the Government (U.S. Attorney's Office, Department of Justice, and Federal Bureau of Investigation), and leave to subpoena the Los Angeles Police Department, for the following:

a. all records regarding Det. Flores' bias, credibility, malfeasance, and/or reliability as an expert and/or fact witness surrounding gang-related matters in the possession

of the Department of Justice, the Western District of North Carolina United States Attorney's Office and its Anti-Gang Task Force, the Federal Bureau of Investigation and/or the Los Angeles Police Department; and

b. all records regarding law enforcement training on gang related issues in which Det. Flores participated in as either an attendee and/or presenter in the possession of the Los Angeles Police Department, the Federal Bureau of Investigation, the U.S. Attorney's Office, or the Department of Justice.

### 4. *Evidence Disputing the Reliability of the Government's Unnoticed Hearsay Other Crimes Evidence.*

52. In **Claim 35.A.2** (**Doc. 71**) of the Supplemental 2255, Mr. Umaña averred that the Government's admission of unnoticed other crimes evidence through rank hearsay regarding purported conduct in New York violated the Fifth, Sixth and Eighth Amendments. And, in **Claim 32.C** (**Doc. 71**), Mr. Umaña asserted that, contrary to the Government's trial theory, he was not a "leader" in MS-13. Mr. Umaña requests an Order directing the Government (U.S. Attorney and FBI) to disclose, and leave to subpoena from the Greensboro and Charlotte-Mecklenburg Police departments all records regarding Mr. Umaña's purported involvement in MS-13 groups in New York, Long Island and Hempstead obtained and/or investigated by the Western District of North Carolina United States Attorney's Office and its Anti-Gang Task Force, the FBI, the Department of Justice, Charlotte-Mecklenburg and Greensboro law enforcement. Information contained in these materials demonstrating the absence of any connection between the incidents in New York and Mr. Umaña and/or the incidents in New York and any MS-13 activity in North Carolina would provide further support for Mr. Umaña's claims.

### 5. *Materials Arising From the Government's Submission of Evidence of Unrelated Purported Homicides and Gang Shooting*

53. As described in **Claim 47** (**Doc. 71**), without providing any notice, the Government elicited evidence through Detective Parshall that Mr. Umaña was purportedly involved in two additional homicides and a shooting incident with the "White Fence" gang in Los Angeles. *See*

24

**Doc. 71 ¶** 377. As described in **Claim 35.B.2.** (**Doc. 71**), the jury's consideration of this non-statutory aggravation outside the Court's *in limine* order and without providing the defense with any notice violated the Fifth, Sixth and Eighth Amendments.

54. Accordingly, Mr. Umaña requests an Order requiring the Government (U.S. Attorney's Office and Federal Bureau of Investigation) to disclose and leave to subpoena from the LAPD the following:

    a. all records regarding the homicide incidents and the shooting incident with the "White Fence" gang referenced by Detective Parshall (should the Government not possess all of these materials, Mr. Umaña requests an Order or permission to subpoena these documents from the Los Angeles Police Department); and

    b. all records of conversations between the FBI, the LAPD, and/or the Government regarding the homicide incidents and the shooting incident with the "White Fence" gang referenced by Detective Parshall.

55. As evidence disputing Mr. Umaña's involvement in these incidents would provide additional factual bases in support of these claims, the requested disclosure is warranted

### *6. Impeachment Materials Regarding Rene Arevalo*

56. In the Initial Discovery Motion, Mr. Umaña sought discovery relating to the Los Angeles Police Department's interviews with Fairfax Avenue shooting suspects Luis Rivera and Rene Arevalo to support **Claims 5, 6, and 7** of the Initial 2255 Motion. *See* **Doc. 36** at 32-36. *See also* **Claim 35.B2** (**Doc. 71**) (noting self-serving nature of Arevalo's statements to excuse his role in the homicides and avoid deportation). This Court denied Mr. Umaña's request (*see* **Doc. 108** at 15-18), and Mr. Umaña has sought reconsideration of that ruling. *See* **Doc. 113**. In addition to the arguments presented in the Initial Discovery Motion, Mr. Umaña avers that, prior to discussing the Fairfax Avenue shooting, Arevalo and the detectives discussed the fact that Arevalo had previously avoided deportation, that Arevalo had a young daughter in the United

States, and that Arevalo was concerned about deportation. *See* Recorded Interview of Arevalo, by LAPD Detectives Parshall and Telis, May 25, 2006.[9]

57. In support of the theory that his trial counsel were ineffective for failing to fully challenge and impeach the Government's theory of the Los Angeles homicides and that the Government withheld exculpatory and impeachment evidence and presented false and/or misleading information, Mr. Umaña seeks an Order directing the Government (U.S. Attorney's Office, Federal Bureau of Investigation, Immigration and Customs Enforcement, and United States Citizenship and Immigration Services) and leave to subpoena the Los Angeles Police Department to disclose all records in their possession or control regarding Rene Arevalo's citizenship or immigration status including but not limited to records regarding deportation, removal, voluntary departure, arrest, detention, supervision, interviews, and dispositions. As evidence demonstrating that Arevalo faced immigration consequences when police interrogated him and anticipated and/or received immigration benefits in exchange for his cooperation would provide additional factual bases in support of this claim, the requested disclosure is warranted.

### 7. *Evidence Disputing the Government's Theory of the Circumstances of the Offense*

a. ████████████████████████

58. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[9] Undersigned counsel will lodge the recorded video with the Court at a hearing.



b. <u>Records Regarding Manuel Garcia Salinas and Ruben Garcia Salinas</u>

63. In **Claims 6** (**Doc. 22**) and **32** (**Doc. 71**), Mr. Umaña alleges counsel's ineffectiveness for failing to investigate, develop, and present evidence that the shooting resulted

from an alcohol-fueled bar-fight as opposed to any intent on Mr. Umaña's part to improve his status within MS-13. Mr. Umaña also alleged the Government's failure to disclose material exculpatory evidence disputing the Government's trial and penalty theory.

64. Autopsy results indicated that each victim's blood alcohol level far exceeded the legal limit for driving in North Carolina. *See* GPT 04/13/10 at 499 (Dr. Butts testimony that Manuel Garcia Salinas' blood alcohol level was .20 and Ruben Garcia Salinas' level was .17). Records indicate that Mr. Ruben Garcia Salinas pled guilty to a misdemeanor assault offense and two different misdemeanor Driving While Impaired charges in Guilford County and Manuel Garcia Salinas also pled guilty to Driving While Impaired in Guilford County. Exh. 24; Exh. 25; Exh. 26; Exh, 27.

65. Evidence involving incidents in which the victims became involved in alcohol-related assaultive conduct further supports Mr. Umaña's claim of counsel's ineffectiveness and the Government's failure to disclose materially exculpatory evidence.

66. Accordingly, Mr. Umaña requests an Order directing the Government (U.S. Attorney and FBI) to disclose all records regarding Manuel Garcia Salinas and Ruben Garcia Salinas including but not limited to: arrest records; police incident reports; offense reports; reports by District Attorney investigator(s); interview reports or factual summaries; probation records; and drug and alcohol assessments connected with the prosecution of Manuel Garcia Salinas and Ruben Garcia Salinas.

67. Mr. Umaña also requests permission to issue subpoenas to the (1) Guilford County District Attorney's Office; (2) Guilford County Adult Probation Office; and (3) Greensboro Police Department for all records regarding Manuel Garcia Salinas and Ruben Garcia Salinas, including but not limited to the following:

28

a. all offense reports, police reports, incident reports and reports by any District Attorney investigator;

b. all interview reports or factual summaries;

c. all drug and alcohol assessments;

d. all assault/anger treatment programs;

e. all alcohol monitoring reports; and

f. all alcohol/drug and/or assault related reports of violations of probation.

**C.** **Discovery of *Ex Parte* Communications Between the Government and the Court— Relating To Claims 5, 6, 32, 33, and 52**

68. As described above in Section III.A, Mr. Umaña's Initial 2255 Motion (**Doc. 22**) and Supplemental 2255 Motion (**Doc. 71**) contain claims of counsel's ineffectiveness, prosecutorial misconduct, and Court error surrounding the Court's Intellectual Disability determination, and, as described in Section III.B, the Government's theory of the case relating to other crimes/prior bad acts. As described in **Claims 5** and **6** of the Initial 2255 Motion (**Doc. 22**) and **Claims 32**, **33**, and **52** of the Supplemental 2255 Motion (**Doc. 71**), as a result of counsel's ineffectiveness and the Government's failure to disclose material exculpatory evidence, the jury's guilt and penalty determinations regarding the other crimes evidence was constitutionally skewed.

69. The Court relied on documents provided by the Government *ex parte* in reaching its determination that other crimes evidence was admissible. Those documents were not provided to trial counsel at the time the Government submitted them to the Court. GPT 04/19/10 at 8. Indeed, counsel were not aware of the *ex parte* submission until the Court ruled on the Government's request to admit the other crimes evidence. As the Court relied on those documents in reaching its determination, Mr. Umaña is entitled to disclosure, certification of

those records to establish the trial record and explanation of the circumstances surrounding the submission of those materials to the trial court.

70. In **Claim 52** of the Supplemental 2255 Motion (**Doc. 71**), Mr. Umaña alleged that the Court relied on *ex parte* submissions from the Government in reaching its pretrial determination that Mr. Umaña was not intellectually disabled and in allowing the Government to present evidence of unrelated bad acts. The Government provided documents to the Court *ex parte* in support of its contention that Mr. Umaña did not meet the requirements for Intellectual Disability.

71. While the Court directed the Government to make the documents an exhibit, it appears that was not done. During the 2255 proceedings, Mr. Umaña's counsel sought informal disclosure of these documents from the Government. Rather than providing a prepared exhibit, the communications indicate that the Government was reconstructing the contents of the materials provided to this Court. Mr. Umaña has no way of determining whether that reconstruction is an accurate reflection of what this Court actually reviewed absent some indication from the Court of the nature and contents of those materials. As the Court relied on these documents in reaching its conclusion that Mr. Umaña does not meet the requirements for Intellectual Disability, Mr. Umaña is entitled to an accurate accounting of each and every document provided to the Court by the Government.

72. Accordingly, Mr. Umaña requests that this Court direct disclosure of the following:

    a. All documents provided by the Government to the Court remaining in the custody and control of the Court;

    b. A copy of all documents the Government submitted to the Court *ex parte* during the course of the *Atkins* proceedings and any and all documentation, logs, and/or other materials demonstrating the authenticity and/or reconstruction and completeness of the *ex parte* submission;

c. A copy of all documents the Government submitted to the Court *ex parte* during the course of the pretrial proceedings regarding the admission of other crimes evidence and any and all documentation, logs, and/or other materials demonstrating the authenticity and/or reconstruction and completeness of the *ex parte* submission;

d. Copies of any logs, notes, documents, and/or communications between the Government and the Court and within the Government regarding the submission of these documents *ex parte*; and

e. An order permitting interrogatories of representatives of the United States Attorney's Office regarding the submission, retention, and reconstruction of these materials.

73. Disclosure is warranted as the requested materials will further corroborate the denial of Mr. Umaña's Fifth, Sixth and Eighth Amendment rights arising from the Court's consideration of undisclosed materials in reaching its *Atkins* determination and in determining whether other crimes evidence was admissible.

### D. Discovery Arising From Claims 6, 8 and 11 of the Initial 2255 Motion and Claims 32, 33 and 38 of the Supplement/Amended Motion

74. In **Claim 6** (**Doc. 22**), Mr. Umaña offered factual bases demonstrating the constitutional violations arising from the Government's failure to disclose material exculpatory evidence. In **Claim 8** (**Doc. 22**), Mr. Umaña presented factual bases supporting his claim that the Government presented materially misleading and/or false evidence regarding the nature and extent of Mr. Umaña's role and participation in MS-13. In **Claim 11** (**Doc. 22**), Mr. Umaña presented factual bases demonstrating that counsel was ineffective for failing to develop readily available evidence disputing the Government's contentions regarding Mr. Umaña's role and participation in MS-13.

75. In **Claim 32** of the Supplemental 2255 Motion (**Doc. 71**), Mr. Umaña offered factual bases demonstrating that as a result of counsel's ineffectiveness, police and prosecutorial misconduct and court error, the jury did not hear readily available evidence disputing the Government's case. And, in **Claim 35.A.2** (**Doc. 71**), Mr. Umaña alleged that the Government

presented, at the guilt-phase, unreliable hearsay evidence through ███████ regarding unadjudicated, unnoticed, extraneous offense involving a shooting in New York.

76. In addition, in **Claim 38** (**Doc. 71**), Mr. Umaña offered factual bases demonstrating that the Trial Court suffered from a conflict arising from his supervision of the MS-13 task force while serving as the United States Attorney for the Western District of North Carolina. As noted in **Claim 38** (**Doc. 71**), "Operation Fed Up" was an operation that occurred in two phases beginning in October 2003, involving ICE, ATF, FBI and other law enforcement agencies in the Charlotte area in cooperation with the United States Attorney's Office of the Western District of North Carolina. The operation involved surveillance, intelligence gathering and prosecution for gang involvement. *See* **Claim 38.A** (**Doc. 71**). Operation Fed Up I & II targeted at least three of the defendants in the RICO charges in this case. *Id.* Also as noted in **Claim 38** (**Doc. 71**), the Trial Court was the United States Attorney until June 2004, and was involved in these investigations.

77. Accordingly, evidence indicating that the Trial Court, as U.S. Attorney, had any involvement with the investigation and/or prosecution of witnesses and/or co-defendants in Mr. Umaña's case would provide further facts supporting Mr. Umaña's claim that objective indicia of bias existed and that counsel was ineffective in failing to request recusal.

78. In addition, to the extent the circumstances of these investigations and prosecutions resulted in arrangements by law enforcement or immigration services for benefits in exchange for cooperation with regard to any and all witnesses and co-defendants, evidence of those circumstances constitutes material exculpatory evidence that should have been disclosed to counsel pretrial, further supporting the allegations raised in **Claims 6**, **8**, and **11** of the Initial 2255 Motion **(Doc. 22)** and **Claim 32** of the Supplemental 2255 Motion (**Doc. 71**).

79.     Accordingly, Mr. Umaña requests disclosure of the following records as to each of Mr. Umaña's co-defendants and unindicted, cooperating witnesses ██████████████ and ██████████, from the Government (U.S. Attorney, Department of Justice, and FBI), the cooperating law enforcement agencies and/or permission to subpoena the appropriate law enforcement agency:

a. all proffer letters regarding the individual's cooperation with police and prosecution for any state, county and/or federal case, including immigration cases;

b. all records regarding any investigative steps taken to verify the reliability of the individual's information/proffer;

c. identification of any and all state, county and federal cases in which the individual testified;

d. identification of any and all state, county and federal cases in which individual/cooperator provided information to the police or prosecution, but did not testify;

e. identification of any and all persons about whom the individual/cooperator provided information to the police and prosecution.

80.     Mr. Umaña also requests an Order directed at the Government (U.S. Attorney, FBI, ICE, and USCIS) for all records in their possession regarding the citizenship or immigration status his co-defendants on this indictment, ██████████████ and ██████████.

81.     Finally, in support of **Claim 38**, Mr. Umaña also requests disclosure of all records from the United States Attorney's Office and/or Department of Justice regarding any MS-13 investigation, MS-13 witness agreements, and allocation of resources for the MS-13 investigation that the Trial Judge, Robert J. Conrad, Jr., supervised, directed, or sanctioned either in his capacity as an Assistant United States Attorney or the United States Attorney for the Western District of North Carolina. As documents demonstrating that the Trial Judge was involved in any investigations surrounding the co-defendants and/or informants in this case would further support the factual averments raised in **Claim 38**, good cause is demonstrated.

**WHEREFORE**, for the reasons stated above, Mr. Umaña respectfully requests that this

Court grant his Second Motion for Leave to Conduct Discovery.

Respectfully submitted,

*/s/ Kelly D. Miller*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org


Dated: July 20, 2022

**CERTIFICATE OF SERVICE**

I, Kelly D. Miller, hereby certify that I have electronically filed the foregoing Second Motion for Leave to Conduct Discovery with the Clerk of Court using the CM/ECF system and a copy of the foregoing document has been served this day upon the following via CM/ECF:

Anthony J. Enright
Assistant United States Attorney
Suite 1650, Carillon Building
227 West Trade Street
Charlotte, NC 28202

*/S/ KELLY D. MILLER*
KELLY D. MILLER
Asst. Federal Public Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Third Floor
Harrisburg, PA 17101
Tel: 717-782-3843
Fax: 717-782-3966
kelly_miller@fd.org