IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:16CV57

ALEJANDRO RAMIREZ UMAÑA,   )
   )
     Movant,   )
   )
vs.   )
   )
UNITED STATES OF AMERICA,   )
   )
     Respondent.   )
_____   )

## MOTION TO DISMISS
### ALEJANDRO UMAÑA'S 2255 MOTION

# TABLE OF CONTENTS

I.     BACKGROUND ...................................................................... 1

     A.     **Umaña murders two individuals in a family restaurant in Greensboro, because one of the victims referred to his gang, MS-13, as "fake."** ............................................. 1

     B.     **Umaña continues his gang leadership while in prison, orchestrating the intimidation of witnesses and participating in other violent misconduct.** ............................... 5

         1.     Umaña intimidates witnesses to his Greensboro murders. ........................................................................... 5

         2.     Umaña intimidates witnesses to earlier murders in which he had participated. ........................................ 6

     C.     **After Umaña is indicted, his defense team conducts an extensive pretrial investigation, endeavors to have this Court declare him ineligible for the death penalty, and seeks to limit the evidence introduced against him.** ................. 8

         1.     Umaña is indicted and charged with four capital offenses. ................................................................................. 8

         2.     This Court appoints two experienced attorneys, who represent Umaña zealously. ................................... 9

         3.     This Court finds that Umaña is not mentally retarded. ................................................................................... 10

     D.     **This Court presides over a three-phase trial.** .......................... 13

         1.     The jury finds Umaña guilty on all counts submitted to it. ........................................................................... 13

         2.     The jury finds Umaña eligible for the death penalty. ............................................................................. 14

         3.     The jury sentences Umaña to death. .......................... 14

     E.     **The Fourth Circuit affirms Umaña's conviction and death sentence.** ........................................................................... 31

     F.     **Umaña moves to vacate his sentence under 28 U.S.C. § 2255.** ........................................................................................... 31

II.     DISCUSSION ................................................................................33

    A.    **This Court should dismiss Umaña's ineffective-assistance-of-counsel claims........................................36**

        1.    This court has previously held insufficient Umaña's claim 1, alleging that his attorney failed adequately to investigate mitigation evidence. .........................................................42

        2.    This Court has already held insufficient Claims 2 and 3, which allege ineffective assistance related to the use of Umaña's mental health in mitigation and in connection with Umaña's *Atkins* hearing. ..............................................42

        3.    Umaña has failed to allege facts that could support Claim 5, which alleges that the performance of Umaña's attorney was constitutionally deficient with respect to evidence of Umaña's participation in murders in Los Angeles. ................................................43

        4.    This Court should dismiss Claim 8, which alleges that the performance of Umaña's attorneys was deficient with respect to jail letters introduced during trial. ................................................47

        5.    This Court should dismiss Claim 9, which alleges Umaña's attorneys were constitutionally compelled to introduce an apology note. .......................54

        6.    This Court should dismiss Claim 10, which alleges Umaña's attorneys were constitutionally deficient for failing to seek additional redactions of transcripts. ...........................................56

        7.    This Court has already held insufficient Claim 11, challenging counsel's performance related to Umaña's tattoos. ...........................................59

8.      This Court has already held insufficient Claim 13, which alleges that Umaña's attorneys were deficient for failing to seek more continuances. .......... 59

9.      This Court should dismiss Claim 14, which alleges that Umaña's attorneys were constitutionally compelled to object to this Court's decision to excuse some jurors for cause. ........ 59

10.     This Court should dismiss Claim 16, which challenges the voir dire Umaña's attorneys conducted of potential jurors. ....................................... 65

11.     This Court has already held insufficient Claim 17, which alleges that Umaña's attorneys were deficient for omitting to challenge this Court's jury venires. ................................................. 70

12.     This court has already held insufficient Claim 18, which challenges the conduct of Umaña's trial counsel related to the United States' exercise of peremptory strikes. .................................... 70

13.     This Court should dismiss Claim 19, which alleges Umaña's attorneys were obligated to do more to support their unsuccessful *Miranda* challenge and present Dr. Olley's opinion about Umaña's confession ....................................... 71

14.     This Court has already rejected Claim 23, which alleges that counsel's performance was deficient in their presentation to the Department of Justice about its decision to seek the death penalty. ....................................................... 75

15.     This Court should dismiss Claim 24, which asserts that Umaña's attorneys were constitutionally deficient for failing adequately to explain the benefits of "a plea deal." ........................ 75

16.      Umaña has not alleged facts establishing Claim 27, which alleges that his trial attorneys were constitutionally deficient for failing to preserve issues he raised on appeal. ...........................................79

B.    **This Court should dismiss Claim 6, which alleges the United States unconstitutionally suppressed information during his criminal case. .....................................80**

C.    **This Court should dismiss Claim 7, which alleges that the United States knowingly introduced false evidence. .......81**

D.    **This Court should dismiss Claims 12, 15, 20, 21, 25, and 26, which allege that the United States and this Court violated Umaña's rights under the Constitution and the Vienna Convention. ..........................................................84**

1.      Umaña cannot overcome his procedural default or the relitigation bar. ...................................85

2.      The errors Umaña alleges would be harmless, if not barred by his procedural default............................90

3.      This Court should dismiss Claim 12, which alleges that the United States introduced "inadmissible" evidence. ................................................90

4.      This Court has already held insufficient Claim 15, which alleges "misconduct related to the jury." .........................................................................98

5.      This Court should dismiss Claim 20, which alleges that Umaña's attorneys' agreement to the dismissal of jurors for cause and issues related to interpreters violated his constitutional rights. ...........99

6.      This Court has already held insufficient Claim 21, which challenges the security measures employed by this court...............................................100

7.      This Court has already held insufficient Claim 25, which alleges that the United States exercised its discretion to seek the death penalty against Umaña unconstitutionally. ..........................101

8.       This Court should dismiss Claim 26, which relates to the Vienna Convention...............................102

E.     **This Court should dismiss Claims 4 and 28, which allege that the Constitution makes Umaña ineligible for the death penalty due to mental-health conditions.**.......104

1.       This Court has already rejected Claim 4, which seeks to relitigate this Court's determination that Umaña is not mentally retarded or intellectually disabled................................................105

2.       This Court should dismiss Claim 28, which contends that the Constitution forbids the execution of persons with brain damage, trauma, and low intelligence. .....................................105

F.     **This Court should dismiss Claims 29 and 30, which seek relief based on the "cumulative effect" of Umaña's allegations of ineffective-assistance of counsel and *Brady* violations. ..........................................................108**

G.     **This Court should dismiss Claim 22 and amended Claim 59, which challenge the validity of Umaña's convictions under 18 U.S.C. §§ 922(g) and 924(c). ..................111**

1.       This Court should dismiss Claim 22, which challenges Umaña's convictions under § 924(c) and (j) on counts 23 and 25.......................................111

2.       This Court should dismiss amended Claim 59, which challenges Umaña's conviction on Count 27 for possession of a firearm by an alien unlawfully in the United States, 18 U.S.C. § 922(g)(5)................................................128

3.       Even if Umaña were to prevail on his challenges to his convictions on counts 23, 25, and 27, he would not be entitled to relief from his death sentence....................................................136

III.   CONCLUSION ...............................................................138

The United States respectfully requests that this Court dismiss or deny Alejandro Ramirez Umaña's motion under 28 U.S.C. § 2255, which seeks to vacate the criminal convictions and death sentence that he received in 2010. After several amendments, his motion seeks to present a host of theories under 31 different headings that he calls "Claims." They include allegations that the performance of the multiple experienced attorneys who represented him during his trial was constitutionally deficient, requests this Court should reconsider issues previously decided against Umaña by this Court and the Fourth Circuit, and a variety of claims that this Court violated his rights under the Constitution and other sources of law.

Although Umaña's 2255 motion consists of several hundred pages, it does not allege cognizable facts that, if proved, would entitle him to relief on any of his claims. The motion and the record of Umaña's criminal case and direct appeal conclusively show that Umaña is entitled to no relief. This Court should, therefore, dismiss or deny his motion.

## I.    BACKGROUND

### A.    Umaña murders two individuals in a family restaurant in Greensboro, because one of the victims referred to his gang, MS-13, as "fake."

On the evening of Saturday, December 8, 2007, Manuel Garcia and his brother Ruben joined several of Manuel's coworkers at Las Jarochitas Mexican restaurant in Greensboro, North Carolina. J.A. 1605–10.[1] Las Jarochitas is a

---

[1] Citations to "J.A." refer to the Exhibit 1 to the Joint Appendix filed in the

small, family restaurant located in a strip mall, near a Toys ’R’ Us toy store.  J.A. 1605–08, 2167.  A number of people were in the restaurant, including the daughter of the restaurant’s owners and her months-old baby son, who sat in his carrier in a booth.  J.A. 1609–10, 1629–30, 2575, 2581.

Also in the restaurant was Umaña, accompanied by a number of other members of his gang, Mara Salvatrucha, also known as MS-13.  J.A. 1251, 1613–15, 1619–21, 1638, 1657, 2579–80, 3142.  MS-13 is a notorious gang with a national and international presence, and Umaña, also known as “Wizard,” was a highly respected member who had served the gang in California and New York.  J.A. 1362–63, 1365–68, 1445, 1536–37, 2864, 1897.  Gang leaders had sent Umaña to North Carolina to run the Charlotte “cliques” of MS-13 members.  J.A. 1446, 1863, 1896–97, 1889–90, 1904–05.  Charlotte MS-13 members committed armed robberies, thefts, extortion, and violent crimes for the gang, and Umaña instructed those members how to conduct their business.  J.A. 1867–69, 1905–14, 1934–36.  Umaña told Charlotte MS-13 members that one of his goals “for Charlotte was to commit ten of the bloodiest murders Charlotte has ever seen.  Salvadorian style, which means, you know, whacking people with a machete, cutting heads off and just chopping people up.”  J.A. 1917, 1983.

At Las Jarochitas, an argument arose over the music playing on the

Fourth Circuit by Umaña during his direct appeal, which contains much of the record of his criminal case.  The United States filed a copy of that appendix with this Court as Exhibit 1 to its March 23, 2017, response to Umaña’s first motion for discovery.  *Doc. No. 50, Exh. 1.*

jukebox.  J.A. 1615–19, 1656.  An MS-13 member known as "Spider" stood up and became aggressive.  J.A. 1618.  Manuel bought Spider and his cohorts a bucket of beer to try to calm things down, but the gang members did not accept the gesture.  J.A. 1619.  Restaurant employees asked the gang members to leave, and one of the members told Manuel "to not mess with them because they were . . . from MS."  J.A. 1619–21, 1649.  Ruben replied that he was not scared and stated that the gang was "fake to him."  J.A. 1621.

Umaña pulled out a gun and, holding it sideways, pointed it at Ruben and Manuel.  J.A. 1625, 2579. Umaña "stood there for a minute."  Exh. 1. at 1627.  During that time, with Umaña's gun pointed at them, the brothers "stood still" and "stood quiet."  J.A. 1627.

Umaña fired five shots.  J.A. 1621, 1658, 1677.  He first shot Ruben in the chest; he fell back from the impact.   J.A. 1630.  Umaña shot Manuel in the head.  J.A. 1658–59, 1690–91.  People in the restaurant ran or hid in booths or bathrooms, and bullets lodged in the kitchen and restroom.  J.A. 1628–29, 1633–35, 1658–59, 1682–83, 2581–83.  A third victim, Jorge Martinez, suffered a bullet wound in his shoulder.  J.A. 2593–95.

Although Ruben continued to gasp for breath for a time after police arrived, both Manuel and Ruben died at Las Jarochitas of the wounds that Umaña inflicted.  J.A. 1581–83.  Emergency medical providers took Martinez to the hospital.  J.A. 2595.

Umaña fled with his MS-13 cohorts to Charlotte.  J.A. 1928.  During the

3

trip, Umaña cocked his gun and talked about bullets for the weapon. J.A. 1928. Umaña stopped at a nightclub and taco stand in Charlotte, put the gun in the face of one of his cohorts, Rony Lopez, also known as "Nene," and told him to smell it. J.A. 1928. After Lopez said the gun smelled like gunpowder, Umaña urinated on his hands to remove the gunpowder. J.A. 1928.

Umaña told other members of MS-13 that he had shot two people at Las Jarochitas and demonstrated the shooting. J.A. 1459–60, 1463–65. He explained that he shot the victims because "they insulted the MS 13," noting that he acted for himself and his fellow gang members. J.A. 1464–65.

Umaña left the club with a fellow gang member, who had been working with police as an informant. J.A. 1931–34. "When asked about the prospect of being pulled over by the police with the murder weapon, [Umaña] responded, as recorded on tape, that the officer would be on the wrong end of his gun, as 'she is always close by.'" *United States v. Umaña*, 750 F.3d 320, 332 (4th Cir. 2014); J.A. 1933. The same day, Umaña returned to the club with other gang members to confront a drug dealer who had failed to "pay[] rent to MS." J.A. 1935. Toward the end of the evening, Umaña went to the home of another gang member in Charlotte, Jaime Sandoval, also known as "Pelon," where Umaña stayed. J.A. 1936, 2035. Umaña spoke of Martinez, the third victim that he had shot, and "lamented that he 'didn't kill that son of a bitch.'" *Umaña*, 750 F.3d at 332.

Police arrested Umaña several days after the shooting. J.A. 1936, 1938. Umaña was sitting on the couch at Sandoval's home and had stashed his gun —

4

the murder weapon — in the cushions. J.A. 1938–39. After his arrest, Umaña told another gang member that the police had been "lucky" because Umaña had tried to grab his gun when the arrest occurred. J.A. 1468.

**B.      Umaña continues his gang leadership while in prison, orchestrating the intimidation of witnesses and participating in other violent misconduct.**

Umaña continued his violent gang activity from prison. J.A. 2904–07, 2914, 2916–17. Law-enforcement officers recovered numerous letters from prison inmates bearing Umaña's name or those of his co-conspirator gang members. J.A. 2510. In these letters, Umaña expressed continuing loyalty to MS-13, exercised control over other members, described engaging in acts of violence, and directed others to engage in violent acts. *Umaña*, 750 F.3d at 332; J.A. 2510, 2514, 2860; Exh. 2, at 22.[2] And Umaña orchestrated plans to intimidate witnesses to the murders he had committed.

**1.      Umaña intimidates witnesses to his Greensboro murders.**

Umaña orchestrated a plan to intimidate witnesses to his murder of the Garcia brothers. J.A. 2126–27. While in jail, Umaña sent a message to Misterio, the MS-13 gang member who took over Umaña's role in Charlotte, to ensure that nobody would testify against Umaña in court. J.A. 1470, 1946–47, 2126–2127. Misterio met with a number of other gang members, including Alexander

---

[2]   Exhibit 2 refers to Exhibit 2 to the United States' March 23, 2017, response to Umaña's first motion for discovery. (Doc. No. 50-11.) It consists of a selection of exhibits admitted during Umaña's trial.

5

Granados, known as "Gorilon"; Sandoval; and individuals known as "Chicago" and "Peligroso," and determined that the witnesses would "have to be killed" so they "would not appear in court." J.A. 2126–2127. Sandoval, Chicago, and Peligroso drove to Las Jarochitas in Greensboro, armed with guns, "to intimidate the owners so [they] wo[uld]n't testify." J.A. 1495, 2128–29, 2184–86, 2193–96. Sandoval walked into the restaurant and told the owner, "I know your children are going to testify." J.A. 2160–61, 2186. Sandoval left after learning that restaurant had a new owner. J.A. 2163–64.

Umaña and his cohorts also sought to kill or injure witnesses who were fellow gang members. MS-13 members suspected Rony Lopez, who had driven Umaña back to Charlotte after he murdered the Garcia brothers, of cooperating with police. J.A. 1468–69, 2119–20. The gang put a "green light" on Lopez. J.A. 2120. "When there's a green light, that person has to be killed." J.A. 2120. And MS-13 members unsuccessfully sought to "take Rony out." J.A. 1469. Among the several people to whom Umaña bragged about his murders in Las Jarochitas was Juan Vela Garcia, also known as "Mariachi." J.A. 1407, 1422, 1464–65. Umaña personally directed that Juan Vela Garcia "get a green light put on him, too." Exh. 2, at 2; *see also* J.A. 1497.

### 2. Umaña intimidates witnesses to earlier murders in which he had participated.

Umaña also sought to intimidate witnesses to two additional murders in which he had participated on Fairfax Street in July of 2005 in Los Angeles,

6

described below.  *See* section I.D.3.b.i, *infra.*  Three other MS-13 members who were with Umaña at the time, Luis Ramos, also known as Ruben Moreno and "Chipis"; Luis Rivera; and Rene Arevalo, also known as "Moe," had told police that Umaña shot the victims.  J.A. 1186, 2738, 2741–42, 2745, 2789–91.

Umaña sent several messages while in jail, seeking to have witnesses to these murders threatened, injured, or killed.  Umaña, for example, wrote a coded letter to Sandoval, asking him to "Tell SIC or TG" that "we have to see how we can get Moe and that asshole Chipi."  Exh. 2, at 20.  In another letter to Sandoval, Umaña described where to find shanks that Umaña had prepared and wrote, "I'm going to write two letters for the brothers in Sivar right now, so they know that Chipi and Moe have a confirmed light on them."  Exh 2, 28–29.  Another individual wrote to Sandoval stating that he and others had encountered Ramos and "left . . . him all fucked up."  Exh. 2, at 10.  The letter asked Sandoval to "let [Umaña] . . . know that the . . . kid already experienced MS presence first-hand . . . and well . . . now we need to get Moe."  Exh. 2, at 11.  Arevalo — "Moe" — informed police that he did not wish to testify against Umaña, because he was afraid of Umaña and worried for his safety and the safety of his family.  J.A. 2804.

7

C. **After Umaña is indicted, his defense team conducts an extensive pretrial investigation, endeavors to have this Court declare him ineligible for the death penalty, and seeks to limit the evidence introduced against him.**

1. **Umaña is indicted and charged with four capital offenses.**

A federal grand jury indicted Umaña and charged him with a number of non-capital offenses related to his participation in MS-13. J.A. 318–423. The indictment charged Umaña, along with 25 other members of MS-13, with conspiracy to participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(d). J.A. 318–42. The indictment also charged Umaña with possession of a firearm by an alien illegally in the United States, 18 U.S.C. § 922(g)(5); robbery under the Hobbs Act, 18 U.S.C. § 1951; conspiracy to obstruct justice and tamper with witnesses, 18 U.S.C. § 1512(b)(1); and witness tampering, 18 U.S.C. § 1512(b)(1). J.A. 369–70, 401–02, 405–09.

The grand jury also charged Umaña with four capital offenses related to his murders of Ruben and Manuel Garcia. Counts twenty-two and twenty-four charged Umaña with murdering Ruben and Manuel, respectively, for the purpose of maintaining or increasing Umaña's position in an enterprise — MS-13 — engaged in racketeering activity, 18 U.S.C. § 1959(b)(a)(1). J.A. 364, 366. Counts twenty-three and twenty-five charged Umaña with use of a weapon during or in relation to a crime of violence — the racketeering conspiracy and murder — resulting in the murder of Ruben and Manuel, respectively, 18 U.S.C. § 924(c),

8

(j)(1). J.A. 365, 367. The grand jury also indicted a host of Umaña's cohorts, and this Court severed Umaña's case from theirs in the light of the capital charges against Umaña. J.A. 73.

### 2. This Court appoints two experienced attorneys, who represent Umaña zealously.

In October of 2008, this Court appointed two experienced attorneys, Mark Foster and John Bryson, to represent Umaña. J.A. 72. The United States provided discovery to Umaña's attorneys under a "limited open file policy." J.A. 238. As of June 2009, the United States had produced more than 40,000 pages of reports and statements and approximately 400 hours of recorded conversations. J.A. 312; *2255 Mot.* 258. Although they received ample discovery, Umaña's attorneys were not shy about asking the United States for more when they believed they might be entitled to it. *See, e.g.*, App'x 49 to *2255 Mot.* (Doc. No. 22-11).

The record, of course, discloses only a fraction of the work that Umaña's defense team did for him. What it does reveal reflects a thorough investigation and zealous advocacy. Members of the defense team traveled to El Salvador, for example, at least five times. J.A. 3085–87, 3119, 3902. They interviewed family members, school administrators, employers, and people who knew Umaña in his youth. J.A. 3085–87, 3119, 3902. And Umaña was evaluated by numerous defense experts, who, among other things, conducted psychological evaluations, administered a positron-emission-tomography ("PET") scan, comprehensively

9

evaluated Umaña's brain function, tested his intelligence, and performed a physical neurological evaluation.  J.A. 662, 673–74, 783, 788, 3902, 3931, 3988–89, 3990.  The defense team included Richard McGough, a mitigation specialist fluent in Spanish who had prior experience with Salvadorian nationals charged in capital cases in the United States.  J.A. 3082–83.  He and other members of the defense team, of course, interviewed Umaña himself "on many occasions."  J.A.  3084.

Counsel zealously sought to protect Umaña from damning evidence in advance of trial.  Counsel, for example, vigorously challenged the admission of Umaña's confession of participating in three murders in Los Angeles, moved to strike the nonstatutory aggravating factors related to these murders, and challenged the reliability of other evidence about those events.  J.A. 177, 189, 193, 1138.  Although these efforts were largely unsuccessful, Umaña's attorneys succeeded in precluding the jury from hearing evidence that Umaña and his cohorts had decapitated an individual in El Salvador for attempting to leave MS-13.  J.A. 3227.  Counsel also secured the dismissal of two counts against Umaña.  J.A. 2317, 2370.

### 3.	This Court finds that Umaña is not mentally retarded.

In September of 2009, Umaña's attorneys moved for a "pretrial hearing to determine whether [Umaña] is mentally retarded and thus ineligible for the death penalty."  J.A. 512 (citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)).  As this Court explained, "the Eighth Amendment prohibits imposing the death

penalty on mentally retarded persons." J.A. 1000 (citing *Atkins*, 536 U.S. at 321).

During the *Atkins* hearing held by this Court, the defense called three expert witnesses. First, the defense called Dr. John Olley, a psychologist, who testified that Umaña had "mild mental retardation." J.A. 523. Dr. Olley had personally traveled to El Salvador, interviewed a host of individuals who had known Umaña during his youth, and obtained records of Umaña's academic performance, the significance of which he discussed with a Salvadorian school administrator. J.A. 557–96. Dr. Olley testified that he had been "able to gather enough information in this case to make an assessment for Alejandro Umaña on the question of mental retardation." J.A. 596. Dr. Ricardo Weinstein testified for the defense that Umaña received a "full scale IQ score" of 66, and a "[n]onverbal intelligence quotient of 53." J.A. 678, 680. Those numbers were below what Dr. Olley had described as the "cutoff" for mental retardation on an IQ test: 70. J.A. 537. Finally, Umaña's attorneys called Dr. James R. Merikangas, who performed a physical neurological examination on Umaña and evaluated the results of his PET scan. J.A. 783, 788. Dr. Merikangas described Umaña's brain as "quite abnormal," opined that Umaña probably suffered a "traumatic brain injury or something congenital" that would "impact his ability to make judgments," to "have abstract reasoning," and "to control his behavior." J.A. 788, 792, 795.

The United States called as a witness Dr. Enrique M. Suarez. Dr. Suarez had conducted a thorough evaluation of Umaña. J.A. 804, 854–55. And he opined that that Umaña did not exhibit any of the criteria for mental retardation.

11

J.A. 804–55.

After hearing the evidence, this Court denied Umaña's request to declare him ineligible for the death penalty on grounds of mental retardation.  J.A. 1016. This Court used a three-part definition of the condition when making its decision. First, the condition requires "significantly subaverage intellectual functioning." J.A. 1000, 1001.  Second, the condition requires concurrent significant limitations in "at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety."  J.A. 1000, 1001. Finally, the condition must "manifest[] before age 18."  J.A. 1000, 1001.

The three-part definition of "mental retardation" that this Court used was described by the Supreme Court in *Atkins*, 536 U.S. at 308.  The definition was what Dr. Olley used and told the Court "has been recognized for a good many years."  J.A. 533–34.  And this definition was reaffirmed by the Supreme Court shortly after Umaña's appeal was decided.  *Hall v. Florida*, 134 S. Ct. 1986, 1994 (2014).

This Court found that Umaña had failed to prove the second and third elements, "involving adaptive skills and onset before age 18," by a preponderance of the evidence.  J.A. 1016.  The Court noted the "sharp disagreement" among the witnesses at the hearing about testing methods and resulting intelligence-test scores.  J.A. 1001–02.  The Court concluded, in the light of its other findings, however, that resolving that disagreement was unnecessary.  J.A. 1002.

12

**D.    This Court presides over a three-phase trial.**

This Court "divided the trial" of Umaña "into three phases." *Umaña*, 750 F.3d at 333. The first phase required the jury to "determine guilt or innocence." *Id.* The second phase required the jury to "determine Umaña's eligibility for the death penalty." *Id.* And, after the jury found Umaña "death eligible," it was asked during the third phase "to select between the death penalty and life imprisonment without the possibility of release." *Id.*

**1.    The jury finds Umaña guilty on all counts submitted to it.**

During the first phase of the trial, the jury heard, among other things, testimony from eyewitnesses who had seen Umaña murder Ruben and Manuel in Las Jarochitas. *See, e.g.*, J.A. 1615–39. The jury heard from other MS-13 members who described Umaña's efforts to lead Charlotte members in violent crime, what Umaña told them about the murders in Las Jarochitas, and how Umaña had committed those murders for his fellow gang members. *See, e.g.*, J.A. 1362–63, 1446, 1365–68, 1445, 1459–65, 1536–37, 1863, 1889–90, 1896–97, 1904–05, 1917, 1928, 1931–36. And the jury heard about and saw some of Umaña's written work from jail, orchestrating efforts to kill or injure witnesses. *See, e.g.*, J.A. 1804–40; *Exh.* 2, at 2–4, 10–12, 19–22, 28–30.

The jury returned a verdict of guilty on all nine of the counts submitted to it, including all four capital offenses. J.A. 2552. The jury deliberated for 5 hours and 45 minutes. J.A. 2542, 2545, 2552.

### 2. The jury finds Umaña eligible for the death penalty.

During the second phase, the jury concluded that the United States had proved beyond a reasonable doubt that Umaña was eligible for the death penalty. All evidence from the first phase was admitted. J.A. 2573–74. A waitress at Las Jarochitas described her efforts to protect her months-old baby, who was in the restaurant when Umaña began shooting. J.A. 2576–83. She described how waitresses, cooks, and other people ran through the back door to escape Umaña's gunfire. J.A. 2583. The jury heard testimony about the bullets and shell casings recovered from different parts of the restaurant. J.A. 2596–2601. And the jury heard testimony about the third victim that Umaña had shot. J.A. 2791–95. After deliberating for one hour and six minutes, the jury returned a verdict finding Umaña eligible for the death penalty on all four capital counts. J.A. 2607–08, 2621–22, 2624–25. The jury unanimously found, for each count, two statutory aggravating factors: (1) that Umaña had created a grave risk of death to one or more persons in addition to each victim; and (2) that Umaña had killed more than one person in a single criminal episode. J.A. 2623–47.

### 3. The jury sentences Umaña to death.

During the third phase, the jury was asked to weigh whether aggravating factors, proved by the United States beyond a reasonable doubt, outweighed any mitigating factors, proved by a preponderance of the evidence by the defense, sufficiently to justify a sentence of death. J.A. 2650. The jury heard evidence of four nonstatutory aggravating factors: (1) that Umaña had killed the Garcia

14

brothers to protect and maintain the reputation of MS-13 and to advance his position in that criminal enterprise; (2) that Umaña had caused injury and loss to the Garcia brothers' family and friends; (3) that Umaña had committed and participated in murders in Los Angeles; and (4) that Umaña posed a continuing and serious threat to the lives and safety of others, shown by his lack of remorse, his allegiance to MS-13, his lack of rehabilitation, and his pattern of violence. J.A. 3543–46.  The jury also heard evidence of 13 mitigating factors, discussed below.  *See* § I.D.3.d, *infra*.

### a.    The jury hears additional evidence of Umaña's violent conduct in jail and during trial.

During the penalty phase, the jury heard evidence of Umaña's continued violence and allegiance to MS-13 in jail, after his arrest.  Detention officers described Umaña's involvement in a physical fight and his threatening behavior. J.A.  2823, 2841–42, 2905–07.  Another inmate told the jury that Umaña had asked him to join MS-13 and said that he was going to "beat . . . down" some correction officers.  J.A. 2914–16.  The same inmate had encountered Umaña at the courthouse the day before the inmate testified.  J.A. 2916.  He told the jury that Umaña had ordered him "not to say nothing in court" and said things about his sister that the inmate had understood as a threat.  J.A. 2916–17.  The jury also saw, over defense objection, a number of additional letters written by Umaña in jail expressing loyalty to MS-13, hatred for his enemies, and ordering and encouraging violence.  J.A. 2910–11; *Umaña* 750 F.3d at 332.

15

The jury heard a second time from Rony Lopez, an MS-13 member who had testified during the guilt phase. Lopez told the jury during the penalty phase that Umaña had thrown gang signs during Lopez's earlier testimony and told him, in court, in Spanish, "your family's going to pay, mother –." J.A. 2936.

Umaña had strapped a four-inch metal knife to his penis on the first day of jury selection, and the jury heard about that knife from Russell Lashley, the Deputy United States Marshal who recovered it. J.A. 2920–21, 2929; Exh. 2, at 34. Deputy Lashley explained that he found the knife when searching Umaña at the jail before transporting him to Court. J.A. 2921. He confiscated the knife and searched Umaña's jail cell. J.A. 2922–25. He found pencil graphite and markings, which suggested that Umaña had used concrete as a sharpening stone for the knife. J.A. 2926. This Court explained that the jury reacted visibly when Deputy Lashley testified. J.A. 3690.

### b. The jury hears evidence of Umaña's participation in murders in Los Angeles.

The jury also heard evidence about the murders of three individuals in Los Angeles in which Umaña had confessed his participation. Testimony related to these murders, which the jury heard only "[a]fter" it "found Umaña eligible for the death penalty," *Umaña*, 750 F.3d at 333, consumed less than one day of the eleven-day trial, not counting jury selection. J.A. 110–13.

16

### i. The jury hears evidence of Umaña's participation in the murder of two individuals on Fairfax Street in Los Angeles.

The jury heard about Umaña's participation in the murder of two victims, Jose Herrera and Gustavo Porras, on Fairfax Street in Los Angeles, mentioned above. *See* § I.B.2, *supra*; J.A. 2825, 2829. Officers of the Los Angeles Police Department described their own work at the scene and their investigation. J.A. 2716, 2741–42, 2745, 2783, 2790–91. And the jury heard that the two victims died of gunshot wounds to the head. J.A. 2825, 2829.

The jury received a transcript of, and heard testimony about, Umaña's confession to police describing his participation in the murder of Porras and Herrera. J.A. 2781, 4289, 4334–35, 4339, 4342–4346, 4348–55, 4359–65, 4371, 4373–87. Umaña told police that he was in the passenger's seat of a Nissan driven by Rene Arevalo — "Moe" — along with three others, who were in the back seat: Luis Ramos — "Chipis"; Eddie Ruiz, also known as "Blackie or Negro"; and Luis Rivera, who was on crutches. J.A. 2747, 2753. The two victims, on foot, approached the Nissan on Fairfax Street and flashed the signs of a neighborhood gang. J.A. 2752, 4342–43. The three individuals in the back seat of the Nissan began throwing MS-13 gang signs back at the victims. J.A. 4377–78.

Umaña admitted that once he saw signs from the neighborhood gang, he knew he was going to confront a gang member that was potentially armed. J.A. 4346. Umaña did not see a weapon. J.A. 2752.

Umaña explained that he got out of the Nissan on Fairfax Street, armed

17

with a gun, and, along with his cohorts in the back seat, confronted the victims. J.A. 2753, 4348, 4354, 4373–74, 4381–83. Arevalo stayed in the car. J.A. 4348–49. When asked if he shot the victims, Umaña said, "You can say that." J.A. 2752. He also said that he did it not out of meanness but because he thought the victims were gang members. J.A. 4383. But Umaña also said, "I really didn't do it, right?" J.A. 4382.

Although Umaña was equivocal about whether he or one of his cohorts had shot the victims on Fairfax Street, the jury heard testimony from Detectives Gene Parshall and Barry Tellis of the Los Angeles Police Department that three individuals in the car with Umaña had identified Umaña as the shooter. Rivera, Ramos, and Arevalo each stated that Umaña was the shooter. J.A. 2741–42; 2745, 2790–91.

Umaña's defense attorneys extensively cross examined the witnesses who testified about the Fairfax Street murders. Detective Parshall admitted that one of the victims, Porras, had, shortly before the murders, been involved in a fight in the same area, during which he was reported to have carried a knife. J.A. 2759–60. Detective Parshall also admitted that the other victim, Herrera, had belonged to a "tagging crew" and had "numerous fights and run-ins" with members of another tagging crew. J.A. 2760.

Detective Parshall admitted on cross examination that he had concluded that "Mr. Rivera lied" when speaking to him, that Rivera was evasive, that Rivera was an MS-13 gang member, and that Rivera's statements were "largely

18

self-serving." J.A. 2761–63.  Foster also elicited information that Rivera was arrested in early 2006, and the police report indicated that he "gave false information to police officers in an attempt to delay the investigation/lie."  J.A. 2765.

Detective Parshall also admitted on cross examination that Ramos had initially denied knowing Umaña or "anything about the Fairfax Avenue murders."  J.A. 2765.  He also testified that Ramos had spoken with Rivera and discussed "a plan to tell the police a story" shortly before Ramos spoke with Detective Parshall for the second time.  J.A. 2766–67, 2769–70.  Detective Parshall testified that Rivera also changed his story after speaking with Ramos.  J.A. 2768–69.

Umaña's defense team elicited testimony that Arevalo had denied any involvement in the Fairfax Street murders.  J.A. 2799.  Arevalo also denied being a member of MS-13.  J.A. 2799.  And Umaña's attorneys elicited testimony indicating that Arevalo had previously been involved in more than one shooting; that he had previously been deported; and that he had returned to the country illegally.  J.A. 2771, 2802.

The jury heard about witnesses to the Fairfax Street murders who contradicted evidence that Umaña had been the shooter.  Police officers testified that a gardener who observed the shooting, Noe Bautista, had reported seeing only three people in the car that contained the shooter.  J.A. 2724, 2757.  They also testified that Bautista had "identified the driver as the shooter," which

19

contradicted the accounts of Umaña and his cohorts.  J.A. 2757.  Officers also testified that Oscar Santiago, who had observed the murder from a different perspective while driving on Fairfax Street, like Bautista, had identified the driver of the vehicle as the shooter.  J.A. 2775–76.

### ii. The jury heard evidence of Umaña's participation in the murder of an individual in Lemon Grove Park in Los Angeles.

The jury also heard about Umaña's participation in the murder of Andy Abarca in Lemon Grove Park in Los Angeles in September of 2005.  The jury heard that Freddy Gonzalez, a member of another gang, had robbed a member of MS-13, Alex Montez, also known as "Guanaco," several months before the Lemon Grove Park murder.  J.A. JA. 2666–67.  On September 28, 2005, Gonzalez and three other individuals — Abarca, Juan Lara, and Roberto Ramos — were playing basketball at night at Lemon Grove Park.  J.A. 2655, 2657, 2683, 2685, 2700, 2876–77.  After the lights went out, they stopped playing and moved to nearby benches.  J.A. 2657.  Two Hispanic men approached, and Ramos said, "hey, watch those two dudes."  J.A. 2662.  As the men moved closer, "Gonzalez stood up and said, hey man, I don't bang anymore."  J.A. 2662, 2878–79.  The approaching men drew handguns and opened fire as the four ball players ran through a narrow walkway.  J.A. 2660–61.  Bullets struck all four victims. Ramos and Lara suffered gunshot wounds to the arms.  J.A. 2658, 2689, 2702–04. The bullet that struck Gonzalez bounced off of his keys, and he suffered no injury. J.A. 2880.  Abarca died of the three gunshot wounds that he suffered to the body

20

and head.  J.A. 2657–58, 2689, 2711–13.

The jury received a transcript of and heard testimony about Umaña's confession to police describing his participation in the Lemon Grove murder.  J.A. 2676, 4452–91.  Umaña told Detectives Thomas Small and Frank Flores of the Los Angeles Police Department that he and another MS-13 member, Giovani Rodus, also known as "Sin," had driven two unidentified Hispanic men — armed with guns — to Lemon Grove Park on the day of the murder.  J.A. 2651–52, 2669, 2673, 2675–76.  Rodus drove; Umaña was in the passenger seat.  J.A. 2676.  The men driven by Umaña and Rodus went to the park to locate a rival that they believed to be in the park, and "they were gonna take care of him."  J.A. 1197, 2676.  Umaña told police that he and Rodus dropped the men off, and the men went immediately to the basketball court.  J.A. 2676.  Umaña said that he and Rodus then drove to the other side of the park and heard the gunfire.  J.A. 2676.  Umaña described to police the rhythm of the shots.  J.A. 2676.  Umaña and Rodus then picked up the two men and escaped from the park.  J.A. 2677.

Police had recovered a .22 caliber shell casing on the basketball court in Lemon Grove Park, near the benches where the victims had stood.  J.A. 2668.  William Moore, an expert in ballistics firearms analysis with the Los Angeles Police Department, conducted a microscopic analysis of the tool marks revealed by that casing and the casing recovered from the scene of the Fairfax Street murders.  J.A. 2808, 2815–18.  Moore testified that the casing recovered from the Lemon Grove basketball court "was fired from the same firearm that fired the

21

two cartridge cases" recovered from the scene of the Fairfax Street murders. J.A. 2818. A second examiner verified and validated Moore's opinion. J.A. 2820.

In addition to the police officers who investigated the Lemon Grove murder and interviewed Umaña, J.A. 2651–52, the jury heard from each of the three surviving victims, Roberto Ramos, Juan Lara, and Freddy Gonzalez. J.A. 2680–97, 2699–2708, 2874–2889. Roberto Ramos and Juan Lara each described the events, but neither witness identified either of the shooters. J.A. 2680–97, 2699–2708.

The jury heard evidence that Umaña had gone beyond helping others to commit the murder and had himself been a shooter. In addition to recounting the events surrounding the Lemon Grove murder, Gonzalez testified that he had identified Umaña in photographic arrays when interviewed by police in December of 2005 and April of 2008 and asked to identify the shooter in the Lemon Grove murder. J.A. 2874–96. Although police reports produced in discovery, known to defense counsel, and described to the Court indicated that Gonzalez had not been sure that the person he identified was the shooter, J.A. 2885–86, Gonzalez, on direct examination, expressed confidence that the person he had previously identified was the shooter. J.A. 2892–94. Additionally, Detective Small testified that he had interviewed Rene Arevalo and asked if "he had any information on any other MS related shootings," besides the shooting that had occurred on Fairfax Street. J.A. 2671. The jury heard that Arevalo had said, "that's your Lemon Grove shooter," when looking at a photograph of Umaña.

22

J.A. 2671.

Umaña's attorneys moved this Court to preclude Gonzalez from identifying Umaña in court as the shooter, contending that such an identification would be impermissibly suggestive and unreliable. J.A. 2861. Foster told this Court, among other things, that when Gonzalez was first shown a photo array, Gonzalez had said he was "not sure [Umaña] is the one who came to the park that day with the pistol and shot us" and that he also stated he was not sure later, when shown a second array. J.A. 2885. Although the United States acknowledged that Gonzalez "wasn't 100% sure" when identifying in photo arrays, the United States proffered that Gonzalez had also said, "I will never forget that face," when interviewed. J.A. 2887. The United States argued in favor of allowing the jury to see whether Gonzalez would be able to identify Umaña as the shooter in court. J.A. 2887.

This Court granted the defense motion and precluded the United States from asking Gonzalez to identify Umaña in Court. J.A. 2888. Among other things, this Court found that Gonzalez's opportunity to view the shooter at the time of the crime was "limited" and "under poor lighting conditions." J.A. 2888. And this Court found that the accuracy of his previous identifications during photographic arrays was "suspect," noting that Gonzalez was not "positive that the photo of the defendant was the shooter" in either of the arrays. J.A. 2888.

When cross examined by Umaña's attorneys, Gonzalez admitted that, when police interviewed him in December of 2005 and showed him a photo array,

23

Gonzalez "w[asn't] sure if [Umaña] was the shooter." J.A. 2897. Foster confronted Gonzalez with his own written statement made during that interview, and Gonzalez admitted that he had said, "I'm not sure if he is the one that came that day to the park with the pistol and shot us," referring to a circled photograph of Umaña. J.A. 2896. Gonzalez also admitted that he had said he was not "100 percent sure" of the identity of the shooter when presented with another array in April of 2008. J.A. 2897.

Foster also elicited from Gonzalez that he was a member of a "tagging" crew. J.A. 2898. Gonzalez admitted that "beef" and "conflict" existed between Gonzalez's gang and MS-13. J.A. 2898. And he admitted that he had robbed Alex Montez, had been convicted of felony robbery, and previously been convicted of felony concealed-weapon offenses. J.A. 2899. Foster also elicited from Gonzalez that he had observed only one shooter, J.A. 2902, which contradicted the testimony of Ramos and Lara, who had described both of the men who had approached as shooters. J.A. 2687–88, 2702.

Foster also impeached Gonzalez after he testified on cross-examination that Alex Montez "wasn't there" the night of the Lemon Grove murder. J.A. 2899. Foster confronted Gonzalez with a written report to the contrary by Detective Small. J.A. 2899–2901. And Gonzalez admitted that he had "identified Alex Montez as being the second guy that came back with the shooter." J.A. 2901.

Umaña's defense attorneys cross examined the other witnesses who

24

testified about the Lemon Grove murder. The jury heard that the shooting occurred after 9:00 at night, when it was dark outside and after the lights at the basketball court had been turned off. J.A. 2679–80, 2881. The forensic pathologist called by the United States admitted that he had recovered a bullet from Abarca's body that was "medium caliber" in size, "[l]arger than a [.]22." J.A. 2715–16. And the ballistics analyst admitted that he had examined a fragment of a bullet from the Lemon Grove murder scene that was not from a .22 caliber bullet. J.A. 2821.

The defense team's cross-examination of Ramos and Lara, who had claimed an ability to identify the shooters, revealed that they had failed to identify Umaña as a shooter when given the chance. Each of the two witnesses testified that he believed he could identify the shooters if he saw them; the police showed each witness a photographic array on two occasions; and each witness told the jury he had been unable to identify either of the shooters among the people depicted in them. J.A. 2696–97, 2707–08.

Umaña's attorneys also elicited testimony revealing limitations on Arevalo's identification of Umaña as a shooter. Detective Small admitted that Arevalo "was not present at the Lemon Grove Park incident." J.A. 2678. And Detective Parshall admitted that Arevalo had initially denied knowing anything about the Lemon Grove Park murder. J.A. 2778. Arevalo did not testify because he was worried for his own safety and that of his family because of Umaña. J.A. 2804. But Umaña's attorneys successfully moved to preclude the jury from

hearing what he had told police about his fear of Umaña.  J.A. 2795–97, 2804–05.

### c. The jury hears evidence of the loss Umaña caused to the friends and family of his victims.

The jury also heard from Jean Garcia, Manuel's wife of nearly 20 years; Douglas Friend, a friend of Manuel's who had worked with him; and Manuel's daughters, Carmen and Elizabeth.  J.A. 2940–59.  They testified that the Garcia brothers were both good workers and friends and beloved parents and uncles. J.A. 2940–59.  The jury heard how the murders Umaña committed left the families of the victims, including their father and their children, grief stricken. J.A. 2946–59.

### d. The jury hears Umaña's mitigation case and the United States' rebuttal evidence.

#### i. The jury learns of Umaña's childhood and youth in El Salvador.

The jury heard great detail from the defense team's mitigation investigator, Richard McGough.  J.A. 3081.  McGough had traveled four times to El Salvador and had interviewed people who knew Umaña in his youth, including Umaña's father, Rafael.  J.A. 3085–87, 3119.  The jury heard that Umaña and his father had become estranged from Umaña's mother when Umaña was approximately 7 months old.  J.A. 3088–90.  Umaña's great grandmother became Umaña's mother figure, until she passed away when Umaña was approximately seven years old.   J.A. 3090, 3091, 3099.  After that age, an aunt helped take care of Umaña.  J.A. 3099–3100, 3196–97.

26

The jury heard that Umaña suffered a head injury during a significant fall when he was two or three years old.  J.A. 3104.  He received "no real treatment" and suffered a permanent visible scar.  J.A. 3104–05.  And he experienced severe pain from that point forward, including when he was a teenager, and as an adult up through the time of the trial.  J.A. 3105–06.

The jury heard that Umaña was born during a civil war that continued in El Salvador from 1979 until 1992.  J.A. 3107.  Santa Ana, where Umaña spent much of his youth, suffered significant violence at the beginning of the war, and Umaña's family would lock themselves in the house at sunset.  J.A. 3107. Umaña had seen dead bodies and recounted "witness[ing] five men attacking another man with machetes and killing him in the coffee trees."  J.A. 3108. Umaña "felt fear even as a child from the conditions of the civil war."  J.A. 3108.

The jury heard that Umaña struggled in school.  J.A. 3112.  He had to repeat grades, including third grade twice.  J.A. 3112.  Umaña's attorneys introduced records from schools he attended in Santa Ana.  J.A. 3114–19.  And they played a video of an interview with a school administrator, describing the records.  J.A. 3123–29.

The jury heard that Umaña moved out of his father's home when he was a teenager.  J.A. 3113–14, 3133.  The jury saw interviews with people who knew Umaña around this time, and heard evidence of the various trades that Umaña attempted.  J.A. 3128, 3136–40.  Umaña, jurors learned, "had the skills" to be a successful soccer player, "but he didn't have proper identification," because he

27

lacked a birth certificate. J.A. 3132–33. And the jury heard about Umaña's two children. J.A. 3144–46, 50–51.

The defense also introduced Umaña's two birth certificates. Umaña obtained a "supplementary birth certificate" shortly after his oldest son was born, which states that Umaña was born in 1984 in El Salvador. J.A. 3146–47, 3101. The other certificate states that Umaña had been born two years earlier, in 1982 in Escuintla, Guatemala, approximately an hour north of Santa Ana, El Salvador. J.A. 3152–53, 3155.

The defense called two expert witnesses who explained how components of Umaña's background created a risk that he would engage in violence and join a gang. Dr. Selena Sermeno, an expert on Salvadorian culture and the moral development of children, testified that the Salvadorian civil war had escalated at the time of Umaña's birth, and that "people were constantly exposed to all kinds of terrifying circumstances such as disappearances, killings, bombings, forceful recruitment, armed forces, [and] . . . cars being burned." J.A. 3173, 3177. Dr. Sermeno opined that the risk factors present in Umaña's life "made him much more vulnerable" to behaving "in delinquent, violent ways." J.A. 3186–88. Maria Santacruz Geralt, a psychologist, identified a host of risk factors for gang participation in Umaña's life. J.A. 3205, 3257–63.

### ii. The jury learns of the security measures that Umaña would face in prison.

Umaña's defense team also called two expert witnesses who testified that

28

he would face high security in prison if sentenced to life imprisonment and would be unlikely to continue his violent behavior.  J.A. 2987, 2996, 3278.  Umaña's expert on the United States Bureau of Prisons testified that the level of security in a United States Penitentiary "is much higher" than in the Mecklenburg County Jail, where Umaña had been housed.  J.A. 3287–89.  He opined that the United States Bureau of Prisons was prepared to handle inmates like Umaña, who attempt, from jail, to have people killed or injured.  J.A. 3031–33, 3281–3283, 3289.  The Bureau does so "[o]n a daily basis." J.A. 3289.

### iii.    The jury hears expert testimony about brain damage Umaña alleges he suffered.

The defense also called Dr. Merikangas, the expert in neuropsychiatry who had previously testified during the *Atkins* hearing held before the Court.  J.A. 3295.  Dr. Merikangas conducted an examination of Umaña, showed the jury images of Umaña's PET scan, and told the jury that he had "abnormalities" that indicated "brain damage."  J.A. 3298–3300, 3303–04, 3307–16.  "He had a number of falls" as a child, the jury heard, "including one that took him to the hospital and required stitching in his head."  J.A. 3325.  Dr. Merikangas opined that Umaña's brain abnormality probably resulted from "some developmental problem or injury early in life" and rendered him both more susceptible to duress and "less able than normal people to control his conduct."  J.A. 3316.

### iv.    In rebuttal, the United States challenges Umaña's evidence of brain damage.

The United States called one witness in rebuttal, Dr. Helen Mayberg, an

29

expert in psychiatry, neurology, and radiologic studies.  J.A. 3336.  She testified that Umaña's PET scan was normal.  J.A. 3353.

### e.  The jury sentences Umaña to death.

The jury sentenced Umaña to death after deliberating for seven-and-one-half hours.  J.A. 3499, 3526.  The jury found that the United States proved beyond a reasonable doubt all aggravating factors submitted to it, for each capital count.  J.A. 3543–46; 3552–57; 3561–64; 3570–73.  The jurors also found some of the thirteen mitigating factors argued by the defense:  (1) four jurors found that Umaña was raised in poverty; (2) twelve jurors found that Umaña was raised without the care of his mother; (3) nine jurors found that Umaña was exposed to the violence of civil war at an early age; (4) zero jurors found that Umaña suffered head injuries early in life that resulted in behavior-related brain damage; (5) one juror found that Umaña did not have the benefit of schooling beyond the third grade; (6) no jurors found that Umaña's childhood was marked by many factors that increased the risk of criminal activity later in life; (7) three jurors found that Umaña's childhood was marked by factors that impeded his moral development; (8) two jurors found that Umaña's early life experiences made him more susceptible to recruitment into MS-13; (9) twelve jurors found that his murders did not involve substantial planning; (10) twelve jurors found that his murders occurred during an emotionally charged argument; (11) one juror found that his murders did not involve cruelty or excessive infliction of pain and suffering; (12) twelve jurors found that Umaña's commission of his offenses

30

occurred as a result of his indoctrination into the ways and thinking of MS-13; and (13) no jurors found that any other factor in Umaña's background, record, or character or any other circumstance of the offense mitigated against imposition of a death sentence. J.A. 3546–48; 3555–57; 3564–66; 3573–75. After weighing the mitigating and aggravating factors, the jury unanimously found that a sentence of death was warranted on each of Umaña's four capital convictions. J.A. 3549, 3558, 3567, 3576.

### E. The Fourth Circuit affirms Umaña's conviction and death sentence.

The Court of Appeals for the Fourth Circuit affirmed Umaña's conviction and sentence. *Umaña*, 750 F.3d at 360. The court "carefully considered each of his arguments." *Id.* at 359. The court reviewed the record. *Id.* And the court concluded that "Umaña had a fair trial and that the death penalty was justified by the jury's factual findings and by law and was not imposed under the improper influence of passion, prejudice, or any other arbitrary factor." *Id.* The United States Supreme Court denied Umaña's petition for a writ of certiorari on June 22, 2015. *Umaña v. United States*, 135 S. Ct. 2856 (2015).

### F. Umaña moves to vacate his sentence under 28 U.S.C. § 2255.

Exactly one year after his convictions became final, on June 22, 2016, Umaña filed the motion under 28 U.S.C. § 2255 currently before this Court, which challenges his convictions and death sentence. *2255 Mot.* 382. Umaña's 2255 motion asserts dozens of different theories about how this Court, the United

31

States, and Umaña's attorneys allegedly erred, under 30 different Roman-numbered "claims." *2255 Mot.* i–xvi.

At Umaña's request, this Court allowed Umaña to litigate a motion for discovery before ordering the United States to respond to the 2255 motion itself, *Sept. 6, 2016, Order* (Doc. No. 30, 3:16CV57), but explained that Umaña would not be entitled to discovery on claims that fail as a matter of law. *Jan 26, 2017, Order* (Doc. No. 47, 3:16CV57), at 3 (citing *Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999)). Within the 45-day period this Court established, Umaña moved for leave to seek discovery in support of many of his claims. *Doc. No.* 37-1, *at* i-iv. The United States filed a thorough response, arguing, among other things, that many of Umaña's claims fail as a matter of law. *United States' March 2017 Response to Umaña's Motion for Leave to Conduct Discovery* (Doc. Nos. 50, 52, 3:16CV57) (hereinafter "*Mar. 2017 Discovery Response*"). This Court denied Umaña's discovery motion in a detailed order analyzing Umaña's claims and requests. *Mar. 2022 Order Denying Leave for Discovery* (Doc. No. 108, 3:16CV57) (hereinafter "*Mar. 2022 Order*"). It found that Umaña was not entitled to discovery for numerous reasons, including that the facts alleged in support of many of his 2255 claims are insufficient as a matter of law. *See e.g.*, *id.* at 5, 9, 11, 13, 15, 17–18, 22–23, 26–27, 33–35.

Umaña also filed four motions to amend his 2255 motion, and this Court granted three of the four motions. *October 11, 2022, Order* (Doc. No. 131, 3:16CV57), at 3, 55. This Court allowed multiple amendments to claim 22 of

32

Umaña's original 2255 motion. *Id.* And it allowed Umaña to amend his motion to include an additional claim, which he proffered as "claim 59." *Id.* For ease of reference, this motion also refers to that claim as claim 59.

## II. DISCUSSION

This Court should dismiss or deny Umaña's 2255 motion, because the claims that he seeks to present fail as a matter of law. "A criminal trial is the 'main event' at which a defendant's rights are to be determined" in a death-penalty case. *McFarland v. Scott*, 512 U.S. 849, 859 (1994). And Umaña stands duly convicted and sentenced after a trial and an appeal that found it to be "fair." *Umaña*, 750 F.3d at 360. Because they follow the "main event" and seek "an extraordinary remedy that should not be employed to relitigate trials," "habeas corpus petitions must meet heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (cleaned up). A motion under section 2255 must, among other things, "specify all the grounds for relief available to the moving party." R. Governing § 2255 Proceedings 2(b)(2). And it must "state the facts supporting each ground." R. Governing § 2255 Proceedings 2(b)(1).

A 2255 motion "can be dismissed without a hearing" if "the petitioner's allegations, accepted as true, would not entitle the petitioner to relief." *Engleen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995); *Hill v. Ozmint*, 339 F.3d 187, 201 (4th Cir. 2003) (affirming dismissal of habeas petition without a hearing where movant failed to allege "facts that, if true, *would* entitle him to relief"). This Court need not accept every kind of allegation contained in a 2255 motion.

33

*Engleen*, 68 F.3d at 240.  It "need not assume the credibility of factual assertions, as it would in civil cases," for example, "where the assertions are contradicted by the record in the underlying proceeding."  *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009); *Schriro v. Landrigan*, 550 U.S. 464, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing.").  "Speculative allegations" are also insufficient.  *Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006).  A 2255 motion "must contain assertions of fact that a petitioner is in a position to establish by competent evidence.  Airy generalities, conclusory assertions and hearsay statements will not suffice."  *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (ellipses omitted) (quoting *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)); *accord United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004).

The cognizable allegations entitling Umaña to relief must appear in the 2255 motion itself.  R. Governing § 2255 Proceedings 2(b)(2); *Schriro*, 550 U.S. at 474 (focus is on the "*petition*'s factual allegations, which, if true, would entitle the applicant to federal habeas relief"); *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005); *Ramsey v. United States Parole Comm'n*, 840 F.3d 853, 863 (D.C. Cir. 2016).  Allegations presented in a reply or elsewhere do not count, *Mitchell*, 416 F.3d at 504; *Ramsey*, 840 F.3d at 863, particularly since Umaña filed his 2255 motion on the last day of the statute of limitations and this Court has already resolved multiple motions for leave to amend.  Any other allegations or claims

34

would be untimely.

Simply put, this Court should dismiss claims that the cognizable allegations in Umaña's motion would not establish if proved or that otherwise fail as a matter of law. *United States v. Jackson*, 32 F.4th 278, 283, 287 (4th Cir. 2022); *Ozmint*, 339 F.3d at 201 (4th Cir. 2003); *Thomas v. Taylor*, 170 F.3d 466, 474–75 (4th Cir. 1999). This Court has already held that Umaña failed to allege facts that, if proved, would entitle him to relief on a number of claims in whole or in part, including claims 1–7, 11, 13–15, 17, 18, 21, 23, and 25. The United States, therefore, respectfully requests that this Court dismiss those claims for the reasons stated in this Court's *March 2022 Order* (Doc. No. 108) and the United States' *March 2017 Discovery Response*. And it further addresses those claims in this motion only briefly. Umaña has moved for reconsideration of this Court's *March 2022 Order*, a motion the United States opposes. If this Court, for any reason, considers those claims less than fully resolved, the United States requests an opportunity to file an additional brief explaining why they should be dismissed.

The 31 claims in Umaña's 2255 motion and authorized amendments fall into seven categories. First, Umaña asserts 17 claims of ineffective assistance of trial counsel.[3] Second, Umaña asserts a claim that the United States

---

[3] Several of the Umaña's claims that fall into other categories assert ineffective-assistance-of-counsel theories alongside other theories. Those claims, including their ineffective-assistance components, are addressed in their respective sections.

35

unconstitutionally suppressed evidence in violation of its *Brady* obligation. Third, Umaña asserts a claim that the United States knowingly introduced false testimony. Fourth, Umaña asserts six claims related to violations of his rights under the Constitution and the Vienna convention, claims that have several features in common. Fifth, Umaña asserts two claims that features of his mental health exempt him from capital punishment. Sixth, Umaña asserts two claims based on the alleged "cumulative effect" of his other allegations of ineffective assistance of counsel and *Brady* violations. Finally, Umaña's two amended claims, claim 22 and claim 59, allege that some of his convictions are invalid in the light of recent Supreme Court decisions. Each category is addressed in turn.

### A. This Court should dismiss Umaña's ineffective-assistance-of-counsel claims.

This Court should dismiss claims 1–3, 5, 8–11, 13–14, 16–19, 23–24, and 27, which allege ineffective assistance of counsel, because they fail as a matter of law. To establish ineffective assistance of counsel, Umaña has the burden to prove that the performance of his attorneys fell below an objective standard of reasonableness, judged "from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). He must also establish prejudice in the form of "a reasonable probability" that, "but for the deficient performance," he would not have been convicted or "sentenced to death." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694).

The *Strickland* standard that Umaña must meet to demonstrate

36

constitutionally deficient performance by his attorneys is well established. Six attributes of the standard are particularly relevant to Umaña's allegations.

First, "a convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. No matter how voluminous, general and conclusory allegations are insufficient as a matter of law. *See Roane*, 378 F.3d at 400–01; *Rose v. United States*, No. 3:08CV216, 2008 WL 2115133, at *1 (W.D.N.C. May 16, 2008).

Second, the standard focuses not on "what is prudent or appropriate, but only what is constitutionally compelled." *Burger v. Kemp*, 483 U.S. 776, 794 (1987). The Supreme Court has emphasized that "the Sixth Amendment does not guarantee the right to perfect counsel." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). And an attorney may provide assistance that qualifies as effective under the Constitution even with conduct that is "far from exemplary." *Id.* at 23–24. It is not enough to establish that trial counsel "could well have made a more thorough investigation than he did." *Burger*, 483 U.S. at 794. Nor would a showing that conduct "deviated from best practices or most common custom" be enough to establish ineffective assistance. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Even "a lawyer's violation of ethical norms does not make the lawyer *per se* ineffective." *Titlow*, 571 U.S. at 24. The question the standard asks "is whether an attorney's representation amounted to incompetence under 'prevailing professional norms.'" *Richter*, 562 U.S. at 105.

37

Third, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. *Strickland*, 466 U.S. at 690–91. "There are countless ways to provide effective assistance in any given case." *Id.* And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. The burden rests with Umaña to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

"An ambiguous or silent record is not sufficient" to disprove the presumption that counsel acted reasonably. *Sallahdin v. Mullin*, 380 F.3d 1242, 1252 (10th Cir. 2004) (cleaned up) (quoting *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc)).[4] "[B]ecause counsel's conduct is presumed reasonable," for Umaña to "show that the conduct was unreasonable, [he] must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1315 (emphasis added); *accord Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018); *Premo v. Moore*, 562 U.S. 116, 124 (2011); *Sallahdin*, 380 F.3d at 1253; *Jackson v. United States*, 638 F. Supp. 2d 514, 533 (W.D.N.C. 2009).

---

[4] Umaña filed affidavits signed by his trial attorneys along with his 2255 motion. *Bryson Decl.* (Doc. No. 22-4, at 80); *Foster Decl.* (Doc. No. 22-4, at 83). The two-page affidavits are notably silent about the vast majority of decisions that trial counsel made. *Id.*

38

Fourth, an attorney is not unreasonable for declining to introduce evidence that operates as a "doubled edged sword," with potential both to help and hurt the defense case. *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998). "Mitigation," courts have recognized, "may be in the eye of the beholder." *Burger*, 483 U.S. at 794 (cleaned up) (quoting *Burger v. Kemp*, 754 F.2d 930, 937–38 n.7 (11th Cir. 1985)). "Failure to present particular mitigating evidence often leads to claims that counsel should have introduced such evidence or investigated further." *Truesdale*, 142 F.3d at 754. "On the other hand, the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also." *Id.* The Fourth Circuit, according, instructs that the best course for a court reviewing a theory that counsel failed to introduce additional mitigating evidence "is to credit plausible strategic judgments," *id.*, which *Strickland* instructs attorneys are presumed to have made, 466 U.S. at 690.

Fifth, the reasonableness of counsel's performance during Umaña's criminal case is judged "from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

Finally, although a capital defendant has the right to ask a jury to consider "any aspect" of his "character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death,"

39

*Lockett*, 438 U.S. at 605, "more is not always better," *Chandler*, 218 F.3d at 1318. Counsel is not required to "present all mitigation evidence." *Id.*; *Richter*, 562 U.S. at 107. To the contrary, "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Chandler*, 218 F.3d at 1318; *see also United States v. Terry*, 366 F.3d 312, 318 (4th Cir. 2004).

An attorney is, similarly, not required to seek out or investigate every piece of evidence that he is allowed to present in mitigation. *Richter*, 562 U.S. at 107; *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009); *Strickland*, 466 U.S. at 699. Although counsel has a duty to "make reasonable investigations" or "make a reasonable decision that makes particular investigations unnecessary," the "heavy measure of deference" that *Strickland* requires applies "to counsel's judgments" about whether and to what extent to investigate. *Strickland*, 466 U.S. at 691.

"[W]hat investigation decisions are reasonable depends critically" on "information supplied by the defendant." *Kemp*, 483 U.S. at 795. "[W]hen the facts that support a potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Id.* "And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* "[T]here comes a point," moreover, "at which evidence from more distant relatives can reasonably be expected to be only

40

cumulative, and the search for it distracts from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).

Contrary to what Umaña's motion asserts, moreover, *see, e.g.*, *2255 Mot.* 245, counsel is not constitutionally obligated to raise every possible objection at trial. *United States v. Mason*, 774 F.3d 824, 830 (2014). "[C]ounsel is not obliged to advance every available nonfrivolous argument." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992). Nor is he penalized for failing to raise meritless, "novel," or "long-shot contentions." *Mason*, 774 F.3d at 830. An attorney is not constitutionally obligated to assert even a constitutional claim that he is "likely" to win if "defense counsel could . . . reasonably believe[] his client's interest would be best served" by foregoing the matter. *Bucci v. United* States, 662 F.3d 18, 26 (1st Cir. 2011).

"Indeed, it can be positively detrimental to a client's chances not to set priorities but rather to scattershot the case by raising every objection at trial and pressing every imaginable contention on appeal." *Mason*, 774 F.3d at 830. "The *Strickland* standard for ineffective assistance," moreover, "reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Bucci*, 662 F.3d at 31 (quoting *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994)). Competent counsel is entitled "to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107.

Each of Umaña's 17 alleged claims of ineffective assistance of counsel fails as a matter of law. If this Court accepted the cognizable factual allegations in

41

Umaña's motion as true, they would fail to meet his burden to establish the two elements of ineffective assistance of counsel.

### 1. This court has previously held insufficient Umaña's claim 1, alleging that his attorney failed adequately to investigate mitigation evidence.

This Court has already held insufficient Umaña's Claim 1, which alleges that his counsel inadequately investigated and presented potential mitigation evidence from friends, family members, neighbors, and others who knew Umaña in his younger years, *2255 Mot.* 7–61. *Mar. 2022 Order* 29–31. This Court properly found that Umaña "presented extensive testimony and evidence" about Umaña's "background." *Mar. 2022 Order* 31. And it found that his "complaint that counsel should have acquired additional mitigating evidence and sought additional continuances is not enough to set forth a prima facie claim of deficient performance." *Id.* at 31. This Court also properly held that Umaña "fail[ed] to allege sufficient facts to show that had counsel done so, a different outcome would have resulted." *Id.* Because Umaña's cognizable allegations, even if proved, would not entitle him to relief, this Court should dismiss Claim 1. *See also Mar. 2017 Discovery Response* 94–105.

### 2. This Court has already held insufficient Claims 2 and 3, which allege ineffective assistance related to the use of Umaña's mental health in mitigation and in connection with Umaña's *Atkins* hearing.

This Court has already held insufficient Umaña's "Claims 2 and 3" which allege deficient attorney performance related to this Court's *Atkins* hearing, *Mar.*

*2022 Order* 32–35.  *Cf. 2255 Mot.* 62–102.  Umaña, this Court properly held, "does not allege sufficient facts to show that counsel's performance fell below an objective standard of reasonable competence."  *Id.* at 33.  This Court also held that Umaña failed to allege sufficient facts to establish that "had counsel presented additional evidence, it would have altered the outcome."  *Id.*  In the light of these findings, this Court should dismiss Claims 2 and 3.  *See also Mar. 2017 Discovery Response* 100–105.

### 3. Umaña has failed to allege facts that could support Claim 5, which alleges that the performance of Umaña's attorney was constitutionally deficient with respect to evidence of Umaña's participation in murders in Los Angeles.

This Court should dismiss Claim 5, which alleges that the performance of Umaña's attorneys related to evidence the United States presented of Umaña's participation in murders in Los Angeles was constitutionally deficient, *2255 Mot.* 110–69.  *See Mar. 2017 Discovery Response* 74–93.  Umaña alleges that his attorneys should have done more to link Giovani Rodus to the Lemon Grove murder, *2255 Mot.* 119–20, 126–28; done more to undermine the credibility of Freddy Gonzalez's testimony, *id.* at 128–133; presented to the jury a second version of a photographic array shown to Juan Lara and Roberto Ramos, *id.* at 133–35; presented evidence of statements by Edgar Gutierrez, Alejandro Rodriguez, and Luis Rivera about the Lemon Grove murder, *id.* at 135–36; presented evidence of statements by Alex Barrera, *id.* at 136–37, 141–42; placed more emphasis on statements identifying Rene Arevalo as the Fairfax Street

43

shooter, *id.* at 138–40; used information from Noe Bautista to blame the victims of the Fairfax Street shooting, *id.* at 140–41; objected to Rene Arevalo's statement about the Lemon Grove murder, *id.* at 142–43; cross-examined differently the detectives who interviewed Rivera, Luis Ramos, and Arevalo, *id.* at 144–49; and objected to statements by police in transcripts of Arevalo and Rivera, *id.* at 149–52. He also alleges that counsel should have launched a *Daubert* challenge to the United States' firearms expert, *id.* at 152–57; and that counsel should have sought an instruction that evidence this Court admitted was "presumptively unreliable," *id.* at 157–59.

This Court evaluated the vast majority of acts and omissions of counsel that Umaña alleged to be deficient and found his allegations insufficient to establish ineffective assistance of counsel. *Mar. 2022 Order* 9–27. The Court held that additional testimony "regarding Rod[u]s would have been cumulative and could have run the risk of bolstering the Government's theory." *Id.* at 20, 22. It held that Umaña "fail[ed] to allege facts" related to counsel's rebuttal of Freddy Gonzalez's identification that would establish deficient performance or prejudice. *Id.* at 10. This Court held insufficient the facts Umaña alleged about counsel's handling of the testimony of Roberto Ramos and Juan Lara and the photo array he and Lara were shown. *Id.* at 13. It held insufficient his allegations about counsel's performance related to information from or about Roberto Ramos, *id.* at 13; Lara, *id.* at 13; Luis Ramos, *id.* at 24–26; Bautista, *id.* at 25–26; Gutierrez, *id.* at 19–20, 22, Rodriguez, *id.* at 19–20, 22; Rivera, *id.* at 17; Barrera, *id.* at 23–26;

44

and Arevalo, *id.* at 18.

Because this Court has already held these allegations insufficient, it should dismiss Claim 5 to the extent the claim relies upon them, *2255 Mot.* 110–52, 159–69. *See also Mar. 2017 Discovery Response* 75–87 (explaining why each of Umaña's allegations fails as a matter of law). Other components of Claim 5 fare no better. *Id.* at 87–90.

Umaña has also not alleged facts that, if proved, would establish that his trial counsel was deficient for not challenging the admissibility of the testimony of William Moore, the firearms expert called by the United States. *Cf.* 2255 Mot. 152–57. Counsel is not required to raise every possible objection. *Mason*, 774 F.3d at 830. And expert testimony like Moore's has been accepted in the Fourth Circuit and elsewhere for decades. *See, e.g., Royal v. Taylor*, 188 F.3d 239, 245 (4th Cir. 1999); *Smith v. Smith*, 931 F.2d 242, 244 (4th Cir. 1991); *see also United States v. Hicks*, 389 F.3d 514, 525–26 (5th Cir. 2004). It was entirely reasonable for Umaña's attorneys to decline to pursue a long-shot challenge to Moore's testimony, which, as Umaña's 2255 motion recognizes, would have required trial counsel to spend its already limited time on an extensive, multi-expert *Daubert* hearing. *See 2255 Mot.* 154, 156. "Attorneys exist to exercise professional judgment, which often involves setting priorities." *Mason*, 774 F.3d at 830; *Carrasco v. United States*, No. 3:13-CR-199-RJC-1, 2016 WL 6023539, at *4 (W.D.N.C. Oct. 13, 2016).

Nor do the facts Umaña has alleged show prejudice. Umaña's allegations

45

offer nothing beyond speculation whether this Court would have excluded

Moore's testimony after a *Daubert* hearing. *Gen. Elec. Co. v. Joiner*, 522 U.S.

136, 141–42 (1997) (explaining that the matter is committed to the court's

discretion). And since Umaña's trial, other federal courts have permitted Moore

to testify as a firearms expert. *See, e.g.*, *Coleman v. Foulk*, No. CV 14-00133,

2014 WL 3734535, at *5 (C.D. Cal. July 28, 2014). The facts Umaña alleges, if

proved, would not establish a reasonable probability that this Court would have

excluded Moore's testimony or that the jury would have returned a different

verdict had it not heard from Moore.

Umaña's allegation that trial counsel ought to have retained their own

firearms expert, *2255 Mot.* 156–157, also fails to establish ineffective assistance.

Umaña has not identified an expert who has evaluated Dr. Moore's work and

found that there was "no scientific basis for it," *id.*, and his speculation as to the

availability of *Daubert*-qualified, admissible expert testimony to this effect is not

sufficient. *See Derring v. United States*, No. 3:11-CR-179-RJC-DCK, 2015 WL

4611979, at *6 (W.D.N.C. July 31, 2015), *appeal dismissed*, 634 F. App'x 941 (4th

Cir. 2016). Umaña's experienced trial attorneys could reasonably have concluded

that establishing, as they did on cross-examination, that Moore's analysis was a

"subjective decision," made by someone who works full time for the government

was sufficient, in the light of the United States' burden of proof. J.A. 2820. The

jury heard as much and still sentenced Umaña to death. And no reasonable

probability exists that the result would have been different if the jury had heard

46

from a defense expert.

Umaña's final theory in support of Claim 5, that his attorneys were constitutionally deficient for not requesting an instruction that the hearsay evidence admitted by this Court after thorough vetting was "presumptively unreliable," *2255 Mot.* 157–59, fails, like his others, as a matter of law. That instruction would have misstated the law. As the Fourth Circuit held when affirming this Court's admission of the evidence, "the hearsay testimony" was "sufficiently reliable *to overcome any presumption*" of unreliability. *Umaña*, 750 F.3d at 348 (emphasis added) (citing *Lee v. Illinois*, 476 U.S. 530, 541 (1986)). A failure to make meritless requests does not establish ineffective assistance. *Carrasco*, 2016 WL 6023539, at *4.

Umaña has not alleged cognizable facts that, if proved, would establish that any of the alleged attorney acts or omissions upon which he bases Claim 5 amount to ineffective assistance of counsel. This Court should, therefore, dismiss the claim.

4. **This Court should dismiss Claim 8, which alleges that the performance of Umaña's attorneys was deficient with respect to jail letters introduced during trial.**

This Court should dismiss Claim 8, because the record establishes that Umaña's attorneys' litigation of letters Umaña wrote "expressing his continuing loyalty to the gang," "hatred of his enemies," and giving "orders to execute rivals and intimidate potential witnesses against him," *Umaña*, 750 F.3d at 332, was well within the wide range of reasonable professional assistance. *Cf. 2255 Mot.*

47

210–31. Counsel objected to these exhibits on numerous grounds, including "authenticity, relevance, and undue prejudice"; went through letters individually, discussing portions counsel contended were "very unfairly prejudicial"; and obtained an evidentiary hearing at which this Court heard from four witnesses. J.A. 2138, 2192–93, 2196–97, 2204, 2210–93, 2510–11, 2514, 2866. Counsel also elicited testimony from Susan Conrad, an expert in language in Central American dialect who reviewed more than 300 letters, that Umaña was a "very poor writer" in terms of "punctuation." J.A. 1808, 1841.

This Court heard extensive argument, considered the substance of the letters, admitted some, and excluded others in their entirety in oral and written orders. J.A. 2297–2299, 2514–2516, 2860–67, 2910. "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. Umaña cannot establish that his attorneys were constitutionally deficient for responding to the jail-letter evidence the way they did instead of the way Umaña's 2255 motion suggests.

Counsel was not deficient for declining to seek redactions of the letters this Court admitted over counsel's objection or to exclude portions of those letters. *Cf. 2255 Mot.* 215–224. This Court enjoys "wide discretion" over the admission of evidence. *United States v. Tsarnaev*, 142 S. Ct. 1024, 1040 (2022). And, contrary to what Umaña's motion suggests, "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the

48

First Amendment." *Dawson v. Delaware*, 503 U.S. 159, 165 (1992). *Dawson* required the exclusion of evidence of "abstract beliefs" that a jury could find "morally reprehensible" because those beliefs were "*totally without relevance* to Dawson's sentencing proceeding." *Id.* at 166 (emphasis added). The statements about which Umaña complains were, in contrast, relevant to the issues before the jury and well within this Court's discretion to admit.

A reasonable attorney could easily "think" an effort to limit the admission of documents this Court determined admissible "would have failed." *Premo*, 562 U.S. at 124. The content about which Umaña primarily complains, "references to the 'Beast' and the devil," *2255 Mot. 217*, was highly probative of Umaña's conspiracy to participate in MS-13, his motive to advance his position in that gang, and his allegiance to that gang, issues before the jury during the guilt and punishment phases of the trial. The jury heard that members of MS-13 routinely invoke "la bestia," or "the devil." J.A. 1296, 1310, 1357. The "devil's horns" are a "sign for MS," and members believe "that the devil will help you do stuff if you act upon what he says." J.A. 1871. Umaña even "'threw' MS–13's gang sign — the horns of the devil" — when "he was in the courtroom." *Umaña*, 750 F.3d at 354. Similarly probative of Umaña's loyalty to MS-13 are the passages he describes from letters to fellow MS-13 members expressing solidarity with fellow "gangbangers." *2255 Mot.* 218–220 (quoting Tr. Ex. 176a). The passage Umaña describes as a discussion of the "struggle of 'my people'" ends, for example, with, "fuck them *because the Salvatrucha will remain here.*" *Id.* at 220 (emphasis

49

added) (quoting Tr. Ex. 168a). This evidence is highly relevant to Umaña's devotion to MS-13; that it casts Umaña in a negative light does not mandate its exclusion. *Dawson,* 503 U.S. at 165 (endorsing the admission of evidence of a "defendant's membership in an organization that endorses the killing of any identifiable group"). To the extent Umaña's comments suggest an expectation of punishment or the death penalty, they are probative of his consciousness of guilt. *Cf. 2255 Mot.* 222. To the extent they suggest "poverty," they suggest a circumstance that the defense sought to emphasize, J.A. 3432. *Cf. 2255 Mot.* 3432. And the "[c]oarse language and other remarks" about which Umaña now complains did not present a "genuine risk that the emotions of the jury" would "be excited to irrational behavior." *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003); *United States v. Pirani*, 406 F.3d 543, 555 (8th Cir. 2005).

A reasonable attorney could easily conclude that this Court would not have made the redactions or exclusions Umaña's 2255 motion proposes, and counsel would not have been unreasonable for declining to pursue them in any event. "Good advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Chandler*, 218 F.3d at 1318. A reasonable attorney could also conclude, after counsel's unsuccessful attempt to exclude the exhibits in their entirety, that redacted versions would invite the jury to wonder unhelpfully about what might be in the portions of Umaña's violent letters they were not permitted to see.

Nor was counsel deficient for declining to object to the United States'

50

reading during closing argument from Exhibit 170, in which Umaña declares, "Mara Salvatrucha 13 is what I belong to." *Cf. 2255 Mot*. 224–25.  This Court initially "conditionally received" exhibit "170" into evidence.  J.A. 1837.  In its written order, it ruled "[e]xhibit . . . 170 . . . admissible."  J.A. 2516.  When identifying, with counsel, items of evidence to release to the jury, this Court noted that it did not have Exhibit 170 as being admitted.  J.A. 3525.  Without objection, counsel for the United States noted that it was admitted, and this Court said, "All right."  J.A. 3525.

This Court ruled exhibit 170 "admissible," J.A. 2516, and to the extent the record leaves room for the possibility that the United States omitted the formal step of entering it into evidence, counsel was not constitutionally compelled to object during closing argument.  A reasonable attorney could have concluded that the objection would merely have prompted the Court to allow the exhibit's introduction into evidence.  *See United States v. Lopez*, 611 F.2d 44, 47 (4th Cir. 1979).  And even if this Court had precluded any argument about Exhibit 170, the prosecutor would likely have discussed any of several similar letters by Umaña in its place.  A reasonable attorney could easily decline to pursue the objection Umaña proposes.

Counsel was not "constitutionally compelled," *Burger*, 483 U.S. at 794, to present more evidence that the code Umaña used in his letters did not require a "high degree of skill" and that the "writing in the letters was poor." *2255 Mot.* 225–231.  A reasonable defense attorney could well decide not to place even more

51

emphasis on Umaña's use of code, because, whether sophisticated or not, it showed that he understood the need to use code to evade police and that he was largely successful in employing the code despite his relative lack of education. *See* J.A. 655. Nor was counsel compelled to present a "defense linguist" to testify that Umaña's writing was "poor." *2255 Mot.* 227–28. Counsel elicited expert testimony that Umaña's punctuation was poor; the record indicates the United States' expert would have disputed that it was poor in other ways, J.A. 1808, 1841; and this Court found that Umaña was able to "communicate cogently in writing," J.A. 1004. Counsel reasonably chose to highlight academic deficiencies in other ways, instead of asking the jury to focus even more on Umaña's violent letters reflecting his gang allegiance. *See, e.g.*, J.A. 3119.

It was not objectively unreasonable for Umaña's attorneys to decline to present evidence that an employee of the Federal Bureau of Investigation interpreted part of one of Umaña's letters — Exhibit 152 — as not containing a threat to Chipis, J.A. 2738. *2255 Mot.* 228–29. Several other exhibits contain explicit threats to Chipis. *See, e.g.*, Ex. 2, at 20, 28–29. Still others sought to inform Umaña that MS-13 members had "left . . . him all fucked up." Exh. 2, at 10. Additional information about Exhibit 152 would have done little in the face of this other evidence. The record also suggests that counsel had reason to think that what Umaña's 2255 motion proposes risked opening the door to additional evidence about Umaña's violent relationship with Chipis — evidence that would not have been helpful to the defense. J.A. 1477, 2617, 3643. Counsel was not

52

constitutionally deficient to the extent they declined to pursue what is, at best, a double-edged sword.

Counsel was also not deficient for declining to present or highlight more evidence "of Mr. Umaña's belief in God." *2255 Mot.* 225–231. A reasonable attorney could have recognized what his 2255 motion says: Courts ordinarily "condemn the injection of religion into legal proceedings." *2255 Mot.* 231. Umaña's attorneys, moreover, could reasonably have concluded that highlighting Umaña's religious beliefs would have been minimally probative and a potential double-edged sword.

Nor are Umaña's allegations capable of establishing a reasonable probability that the result would have been different if counsel had pursued the tactics he proposes in his 2255 motion. No reasonable probability exists that this Court — which held the jail-letter exhibits admissible — would have excluded the portions he challenges. And redactions or excerpts would not likely have made much difference in the light of the violent conduct the letters proposed. *See United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995) (evidence admissible if "far less prejudicial" than other properly admitted evidence). A challenge to the United States' discussion of Exhibit 170 would not have been reasonably likely to result in exclusion of that argument, *see Lopez*, 611 F.2d at 46–47, or a different outcome. And the additional evidence Umaña's 2255 proposes would have been minimally helpful in the light of other evidence the jury heard that covered similar ground or that was likely to have been introduced or highlighted to rebut

53

it.  No reasonable probability exists that, had his counsel's performance been different, Umaña would not have been convicted or sentenced to death.

**5.      This Court should dismiss Claim 9, which alleges Umaña's attorneys were constitutionally compelled to introduce an apology note.**

This Court should dismiss Claim 9, which alleges his attorneys were constitutionally compelled to introduce a note by Umaña purporting to apologize for carrying a knife and declaring his ongoing gang membership.  *Cf. 2255 Mot.* 234–38.  Umaña attempted to bring this knife into the courthouse on the first day of jury selection:



J.A. 2920–21, 2929; Exh. 2, at 34.

Umaña's 2255 motion alleges that, after he was caught with the knife and

54

officers discovered materials "written by Umaña" describing "possession of a shank and a desire to do harm to a 'correctional officer,'" Umaña wrote a note that he gave to his counsel during voir dire. *2255 Mot.* 235–36. According to Umaña, in the note he asserted, "I am a gang member." *Id.* at 236. He claimed he "didnt have the blade to hert any other person," but he also stated that he had it for "protection" against "gang member enemies." *Id.* at 236. "[A]bout the officer," the note says, "that is a lie." J.A. 236. The proffered note concludes with an apology and a statement that "what happened will not happen a gain." *2255 Mot.* 236.

The jury heard about this knife and about Umaña's violent and threatening behavior while in prison and in court during the penalty phase of his trial. *See* § I.D.3.a, *supra.* The jury heard evidence that, after the time Umaña's 2255 motion alleges he wrote the note, Umaña threatened Rony Lopez in court, stating, "your family's going to pay, mother –." J.A. 2936. The jury also heard that Umaña told a witness, after the time he allegedly wrote the note, "not to say nothing in court" and threatened the witness's sister. J.A. 2916–17. That witness explained that he had heard Umaña say that "the day he lost trial he was going to beat" a correctional officer "down with the chair he sit on." J.A. 2916.

Counsel was not "constitutionally compelled," *Burger*, 483 U.S. at 794, to introduce the proffered note. Evidence the jury heard of Umaña's extremely violent conduct both before *and after* he allegedly wrote the note greatly limits

55

the likelihood that the note would have persuaded the jury that his violent, dangerous conduct "would stop." *Cf. 2255 Mot.* 238. A reasonable attorney could also easily see many potential downsides in presenting the note. It unremorsefully declares that Umaña remained "a gang member," *id.* at 236, an indicator of future dangerousness, *see Dawson*, 503 U.S. at 166. And the jury had heard powerful evidence indicating that Umaña had repeatedly expressed an intent to harm a correctional officer and that, after writing the note, he continued to threaten "other person[s]." *2255 Mot.* at 236. The note denying Umaña's intent to harm a correctional officer or others risked leaving the jury with the impression that Umaña was dishonest and that any efforts he made to appear less dangerous were insincere. His attorneys acted reasonably to the extent they declined to introduce this "doubled edged sword." *Truesdale*, 142 F.3d at 754. And no reasonable probability exists that the jury would not have sentenced Umaña to death if they had seen this note.

6. **This Court should dismiss Claim 10, which alleges Umaña's attorneys were constitutionally deficient for failing to seek additional redactions of transcripts.**

This Court should dismiss Claim 10, which alleges that Umaña's attorneys were constitutionally compelled to seek redaction of a transcript of Umaña's April 23, 2008, interview by Los Angeles police detectives. *2255 Mot.* 238–244. Contrary to what Umaña's motion suggests, *2255 Mot.* 239, Umaña's attorneys vigorously opposed admission of this transcript, moving to suppress it under multiple provisions of the Constitution and the Rules of Criminal Procedure. J.A.

56

189–212. This Court denied the motion "on all grounds" after a lengthy evidentiary hearing. J.A. 434–482.

Umaña's attorneys were not constitutionally compelled to seek redaction of the transcript after this Court denied their motion to suppress it. He contends that a few pages of the 235-page transcript contain objectionable material because they refer to an accusation made against him in El Salvador. *2255 Mot.* 239. On the page Umaña identifies, for example, *id.* (citing J.A. 4315), one of the interviewing detectives says "we know that he's wanted in El Salvador, and it's not our intention to send him back there. He's wanted in San Salvador for many violent crimes." J.A. 4315.[5] These references to accusations in El Salvador are vague and, within the 235-page transcript, fleeting. Counsel could reasonably have decided to focus its attention on other matters and determined that redactions risked focusing the jury's attention on other, unfavorable parts of the transcript. Immediately after the detective mentions that "He's wanted in San Salvador for many violent crimes," for example, the detective says "What he did here is a very violent crime as well . . . ." J.A. 4315.

That the dissenting opinion in Umaña's criminal appeal found references to El Salvador in the transcript "most problematic," *2255 Mot.* 241 (quoting

---

[5] On the following page, the other detective tells Umaña that they "only want the truth," and says, "we know about . . . about your past, your time in El Salvador that they were looking for you for homicide also in El Salvador." J.A. 4316. Umaña responded that he had been arrested "because they will try to accuse you in El Salvador." J.A. 4316. "Do you know how the situation is there[?]" he asked. J.A. 4316.

*Umaña*, 750 F.3d at 363 (Gregory, J., dissenting), does not establish ineffective assistance of counsel. The majority opinion "carefully consider[ed] each of Umaña's arguments," including his argument about these transcript references, *cf. 2255 Mot.* 240 n.54, and "reject[ed] them." *Umaña*, 750 F.3d at 330. The dissent's comments, to the extent they are relevant to Umaña's claim of ineffective assistance of counsel at all, serve at best to illustrate that reasonable minds can differ about the significance of these references. Umaña has not identified anything that would overcome the strong presumption that his attorneys rendered reasonable assistance.

The record refutes Umaña's contention that his trial attorneys failed to review the transcript. *Cf. 2255 Mot.* 240. Umaña's attorneys cross-examined detectives about it, discussed the contents of the transcript in detail orally with this Court, and quoted it at length in written papers. J.A. 189–212, 449–482.

Umaña's allegations also fail to establish a reasonable probability that, had counsel sought the redactions Umaña proposes, the jury would not have sentenced Umaña to death. References to El Salvador are "isolated" and few in the "voluminous" 235-page transcript, which refers to other violent conduct that the jury properly considered. *See Umaña*, 750 F.3d at 349–50. And the transcript represents a small portion of the overwhelming evidence the jury heard supporting its decision to impose the death penalty.

58

**7. This Court has already held insufficient Claim 11, challenging counsel's performance related to Umaña's tattoos.**

This Court has previously held that Umaña failed to allege sufficient facts to state a claim that his attorneys were deficient in addressing evidence about Umaña's MS-13 tattoos. *Mar. 2022 Order* 27–29. In the light of its holding, this Court should dismiss Claim 11. *See also Mar. 2017 Discovery Response* 93–94.

**8. This Court has already held insufficient Claim 13, which alleges that Umaña's attorneys were deficient for failing to seek more continuances.**

This Court has previously held that Umaña failed to allege sufficient facts to state a claim that his attorneys were deficient for declining to ask for additional continuances of the *Atkins* hearing and Umaña's trial. *Mar. 2022 Order* 29–31. In the light of this holding, this Court should dismiss Claim 13. *See also Mar. 2017 Discovery Response* 97–100.

**9. This Court should dismiss Claim 14, which alleges that Umaña's attorneys were constitutionally compelled to object to this Court's decision to excuse some jurors for cause.**

This Court should dismiss Claim 14, which alleges that Umaña's attorneys were constitutionally compelled to object to this Court's decision to excuse some jurors for cause. *2255 Mot.* 267–74. The parties jointly agreed that several potential jurors should be excused for cause. *Aug. 21, 2012, Order* (Doc. No. 1519, 3:08CR134), at 1. This Court reviewed the questionnaires submitted by the prospective jurors and agreed with the

59

parties that 54 jurors warranted dismissal for cause. *Id.* Umaña identifies four prospective jurors by juror number whom he contends stated on questionnaires that they could "never" vote to impose the death penalty. J.A. 270–272. And he contends that his attorneys were constitutionally deficient for agreeing that these jurors should be excluded for cause based on their questionnaires. J.A. 267–273. The facts Umaña alleges do not establish "incompetence under 'prevailing professional norms.'" *Richter*, 562 U.S. at 105. Nor do they establish a reasonable probability that, but for counsel's agreement to this list, Umaña would not have been convicted or "sentenced to death." *Polk*, 453 F.3d at 201 (quoting *Strickland*, 466 U.S. at 694).

First, counsel's decision not to oppose excusing for cause four jurors who stated that they could never impose the death penalty was not objectively unreasonable. "[A] criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citing *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968)). But an attorney is not constitutionally compelled to raise every possible objection, or even every objection his client is entitled to pursue. *Mason*, 774 F.3d at 830; *Bucci*, 662 F.3d at 26. Although "removal for cause" is impermissible for a "juror who is" not "substantially impaired in the ability to impose the death penalty," *Brown*, 551 U.S. at 9, a competent defense attorney could choose not to object to a juror's exclusion for cause for any number of sound reasons. An

60

attorney might choose not to object, for example, because a juror appears to be "substantially impaired." *Uttecht*, 551 U.S. at 19. Or an attorney, familiar with "the entire *voir dire*," might view the juror as among those more "favorable to the state." *Id.* at 10, 19.

A reasonable attorney could "think" that objections to the court's decision to excuse these jurors for cause "would have failed." *Premo*, 562 U.S. at 124. The relevant standard does not require absolutes, *Uttecht*, 551 U.S. at 7, but Umaña alleges that each of the jurors about whom he alleges specific facts represented they would "never" vote to impose the death penalty, *2255 Mot.* 271–72. A reasonable attorney could well conclude that the court would likely exclude these jurors and that neither opposition nor an "attempt to rehabilitate" them would be fruitful. *Cf. 2255 Mot.* 270–72.

Counsel's decision not to oppose exclusion of these jurors would have been objectively reasonable even if an objection had potential merit. Umaña's motion suggests that all four of the jurors about which he alleges specific facts indicated they viewed murder "in furtherance of racketeering" or "in relation to a crime of violence" as particularly serious. *2255 Mot.* 271–72. One of the jurors additionally indicated a strong religious view against "murder." *2255 Mot.* 271. Umaña's attorneys were experienced, familiar with the entire venire, and could reasonably have concluded that these jurors could be among the more "favorable to the state." *Uttecht*, 551 U.S. at 19. And counsel could reasonably have concluded that efforts to "rehabilitate" through voir dire the

61

jurors — who allegedly expressed views specific to "murder," "racketeering," and "crime[s] of violence" — risked highlighting the worst facts about the murders Umaña committed.

Umaña's own allegations establish that his attorneys' approach to voir dire protected his "right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause." *Uttecht*, 551 U.S. at 9. His motion acknowledges that the court seated jurors who indicated the "death penalty" was "wrong" and "should be abolished." *2255 Mot.* 275. In the light of the entire venire, the likelihood that a for-cause challenge would have failed, the risk that rehabilitation efforts would do more harm than good, and counsel's obligation to make choices about what objections to pursue and forego in the light of the ordinary constraints a trial places on time and resources, counsel's decision to forego objections to this Court's decision to exclude these jurors for cause was well within the bounds of "reasonable professional judgment." *Strickland*, 466 U.S. at 690.

Second, Umaña does not allege any facts that, if proved, would demonstrate a reasonable probability that, but for counsel's agreement to this list, Umaña would not have been convicted or "sentenced to death." *Polk*, 453 F.3d at 201 (quoting *Strickland*, 466 U.S. at 694). He concedes that the Court seated jurors who indicated strong opposition to the death penalty. *2255 Mot.* 275. The jury still found Umaña guilty and imposed the death penalty in the

face of overwhelming evidence.  No reasonable probability exists that the result would have been different if counsel had pursued objections to this Court's exclusion of jurors for cause.

Umaña has not attempted to show that counsel's performance affected the verdict or sentence Umaña received.  *2255 Mot.* 274–75.  He instead contends that he is automatically entitled to have his death sentence vacated if any potential juror was "erroneously excluded for cause."  *Id.* at 274.  But Umaña erroneously confuses the standard of review for claims that a trial court violated the rule described in *Witherspoon* when raised on direct appeal, *Gray v. Mississippi*, 481 U.S. 648, 660 (1987), with the elements Umaña has the burden to prove to establish his ineffective assistance of counsel claim, *Strickland*, 466 U.S. at 694.  To establish ineffective assistance of counsel — including for failure "to raise timely objections to the trial court's striking of" jurors for cause — Umaña must "satisfy the second prong of *Strickland*" and prove that the alleged "deficiencies in counsel's performance" were "prejudicial to the defense."  *Stamper vs. Muncie*, 944 F.2d 170, 177 (4th Cir. 1991); *see also Weaver v. Massachusetts*, 137 S. Ct. 1899, 1905, 1908 (2017) (finding claim that counsel was ineffective in failing to object to courtroom closure required proof of actual prejudice even though error was "structural" and not subject to harmless-error analysis on direct appeal).  The facts Umaña has alleged do not establish a "reasonable probability" that "the jury would not have convicted him" or sentenced him to death "if his attorney had objected"

63

to exclusion of the jurors he describes. *Weaver*, 137 S. Ct. at 1912. Nor do they establish that any "failure to object rendered the trial fundamentally unfair." *Id.*

Even if Umaña were required only to show that one of the jurors was "erroneously excluded for cause," *2255 Mot.* 274, the facts he alleges would not meet this standard. The United States sought to exclude each of the jurors Umaña discusses, and this Court exercised its own authority to excuse them after reviewing their questionnaires. *Aug. 21, 2012, Order* (Doc. No. 1519, 3:08CR134), at 1. The facts Umaña alleges do not establish that this Court would have declined to exclude any of the jurors he discusses if his attorneys had objected or further questioned the jurors. Nor do any of the facts he alleges establish that this Court excluded any of those jurors "erroneously," *2255 Mot.* 274. *See Uttecht*, 551 U.S. at 17–18 (describing the "discretion" and "deference" trial judges are entitled to when granting a motion to excuse a juror for cause). [6]

The facts Umaña alleges would not entitle him to relief on Claim 14, even if proved. This Court should, therefore, dismiss that claim.

---

[6] Umaña is not entitled to a "hearing" to fish for allegations that might support his claim. *Cf. 2255 Mot.* 274. "[A]n evidentiary hearing is an instrument to test the truth of facts *already alleged in the habeas petition*." *Jones v. Polk*, 401 F.3d 257, 269 (4th Cir. 2005) (emphasis added); *Landrigan*, 550 U.S. at 474 (hearing is vehicle "to prove *the petition's factual allegations*, which, if true, would entitle the applicant to federal habeas relief").

### 10. This Court should dismiss Claim 16, which challenges the voir dire Umaña's attorneys conducted of potential jurors.

This Court should dismiss Claim 16, which alleges that Umaña's attorneys were constitutionally deficient for omitting to conduct their voir dire of some jurors differently. *Cf. 2255 Mot.* 298–305. Umaña had a right to a trial "by an impartial jury," meaning a jury "capable and willing to decide the case solely on the evidence before it." *United States v. Powell*, 850 F.3d 145, 149 (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). He had a right to a jury that would not "automatically vote for the death penalty" and decline to "consider the evidence of aggravating and mitigating circumstances as" the Court's "instructions require." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). And this Court's multi-faceted jury-selection process, which included six days of thorough voir dire by counsel (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134), appropriately protected Umaña's rights.

This Court instructed prospective jurors about their obligation to consider mitigating evidence and asked jurors if they had life experiences that would make it difficult to consider aggravating and mitigating factors. *See, e.g.*, J.A. 1066–68, 1077–78 (reflecting only a portion of jury selection); *Voir Dire Tr.* (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134). This Court "permitted lengthy individual in-court voir dire," *2255 Mot.* 276, 302, that spanned six days and produced more than 1500 pages of transcript; J.A. 1018–1131; *Voir Dire Tr.* (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358,

65

3:08CR134).   And Umaña's attorneys questioned jurors individually, with the benefit of prospective jurors' answers to a 23-page questionnaire.  *Id.*

Umaña has alleged no facts establishing that his attorneys were constitutionally compelled to conduct their voir dire, which was part of this Court's thorough jury-selection process, differently.  Courts "accord 'particular deference' to the judgment of trial counsel during *voir dire*," *Gardner v. Ozmint*, 511 F.3d 420, 426 (4th Cir. 2007), and the voir dire counsel conducted fell well within the bounds of professional assistance.   Nor can Umaña establish that he suffered prejudice from his attorneys' performance.

Umaña's attorneys were not constitutionally compelled to conduct a different voir dire of ███████  *Cf. 2255 Mot.* 299–301.  ██████████

66

Umaña's allegation that his attorneys failed to question "all jurors about views and beliefs on mitigation evidence" is also insufficient. *Cf. 2255 Mot.* 301–303. His contention that counsel limited its voir dire to "general fairness" and "follow the law" questions is both conclusory and contradicted by the record, which shows that both this Court and counsel asked jurors pointed and specific questions based on their experiences and answers to other questions. *2255 Mot.* 276, 302; J.A. 1018–1131; *Voir Dire Tr.* (Docs. No. 1353, 1354, 1355, 1356, 1357, 1358, 3:08CR134); *see also Juror Questionnaire* (Doc. No. 672, 3:08CR134). "There are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 690–91. And allegations that counsel did not "probe" jurors enough about their views on "exposure to the violence of civil war," "lack of schooling beyond the third grade," and other specific points he sought to establish during the mitigation phase of the trial, *2255 Mot.* 302–04, if proved, would not overcome the "strong[] presum[ption]" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690.

Umaña's allegations also fail to establish prejudice, which, for a claim of ineffective assistance of counsel, requires him to show a reasonable probability that the presence of the jurors about which he complains "change[d] the outcome of the trial." *Canfield v. Lumpkin*, 998 F.3d 242, 248 (5th Cir. 2021); *Buckner*, 453 F.3d at 201. Umaña does not attempt to meet this standard, *2255 Mot.* 304–05, and he cannot. He has not alleged any facts that establish a reasonable probability that the jury would not have sentenced him to death if he had conducted a different voir dire.

Umaña instead asks this Court to hold that he establishes prejudice if he establishes that his voir dire caused this Court to seat a "biased juror," *2255 Mot.* 304 (quoting *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001)). That standard, which the Fourth Circuit has not adopted, *see Gardner*, 511 F.3d at 426 n.2, would require Umaña to "show that the juror" empaneled because of counsel's deficient voir dire "was actually biased against him." *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001) (discussing *Hughes*, 258 F.3d at 458). Umaña's allegations do not meet the standard that he proposes.

Even if Umaña were required to prove, as he contends, only that counsel's deficient voir dire caused this Court to empanel a "biased juror," *2255 Mot.* 304, the facts his 2255 motion alleges would fall far short. At the outset, even if proved, the facts Umaña alleges would leave "too many assumptions" to establish that a different voir dire would have led to a

68

"different jury composition." *See Wilder v. United States*, 806 F.3d 653, 659 (1st Cir. 2015). The facts — as opposed to conclusions — Umaña alleges do not establish that a different voir dire by counsel would have exposed any disqualifying bias, led to meritorious challenges for cause, or led to peremptory challenges by his attorneys. *See id.* Beyond those failures, his allegations fail to establish any of the jurors about which he complains "was actually biased," *Francis*, 269 F.3d at 616.

Umaña's allegations do not show that ▮▮▮▮▮▮ was actually biased against him.

Umaña's allegations about "all jurors" are even more deficient in their failure to include facts establishing bias. *Cf. 2255 Mot.* 302–04. That the jury did not make the "findings" that Umaña urged on the "verdict form" plainly does not establish bias. *Cf. 2255 Mot.* 303–04. The jury returned the verdict *after* hearing all of the evidence. Its findings do not establish that the jury was unwilling or incapable of deciding the case "solely on the evidence before it." *Powell*, 850 F.3d at 149. And his contention that the "Government's

69

closing argument" somehow shows that jurors empaneled by this Court were biased, *2255 Mot.* 303, is simply a non-sequitur. Absent indications to the contrary, jurors are "presumed to be impartial," *Powell*, 850 F.3d at 149. That the jury did not return the verdict Umaña asked for does not overcome that presumption.

The facts Umaña alleges would not entitle him to relief on Claim 16, even if proved. This Court should, therefore, dismiss that claim.

### 11. This Court has already held insufficient Claim 17, which alleges that Umaña's attorneys were deficient for omitting to challenge this Court's jury venires.

This Court has previously held that Umaña failed to allege sufficient facts to state a claim that his attorneys were deficient for omitting to challenge the composition and selection of the jury venires. *Mar. 2022 Order* 38–40. In the light of this holding, this Court should dismiss Claim 17. *See also Mar. 2017 Discovery Response* 106–07.

### 12. This court has already held insufficient Claim 18, which challenges the conduct of Umaña's trial counsel related to the United States' exercise of peremptory strikes.

This Court has already held insufficient claim 18, which alleges that Umaña's attorneys were constitutionally deficient in challenging the government's use of peremptory strikes during jury selection. *Mar. 2022 Order* 41–43. This Court held that Umaña's allegations were insufficient to state a claim of deficient performance by his counsel or prejudice. *Id.* at 43. To the extent Claim 18 directly alleges misconduct by the United States, this

70

Court found its allegations conclusory and insufficient to state a claim.  *Id.* at 42–43.  In the light of these holdings, this Court should dismiss Claim 18.  *See also Mar. 2017 Discovery Response* 107–08.

13. **This Court should dismiss Claim 19, which alleges Umaña's attorneys were obligated to do more to support their unsuccessful *Miranda* challenge and present Dr. Olley's opinion about Umaña's confession.**

This Court should dismiss Claim 19, which alleges that Umaña's attorneys were constitutionally compelled to introduce expert testimony in support of their unsuccessful *Miranda* challenge to the admissibility of Umaña's confession and introduce Dr. Olley's opinion about that confession at trial.  *Cf. 2255 Mot.* 312–316.  The facts Umaña alleges, if true, would not establish that his attorneys were constitutionally deficient in pursuing their motion to suppress the confession or in responding to the confession at trial.

i. **Counsel reasonably litigated Umaña's motion to suppress his confession.**

Umaña's attorneys moved to suppress Umaña's April 23, 2008, confession, alleging, among other things, that Umaña did not knowingly and voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  J.A. 190–195.  Counsel litigated that motion vigorously in pretrial filings, J.A. 193–210, during a suppression hearing held by this Court, J.A. 435–482, and again in a motion for a new trial.  *See, e.g.*, J.A. 190–207, 469–75, 3595–3601.  Contrary to what Umaña's motion suggests, *2255 Mot.* 312, Umaña's attorneys elicited testimony from interviewing officers during the evidentiary hearing this Court held.  J.A.

71

449–482.  This Court held that Umaña's statements were voluntary and not obtained in violation of *Miranda.*  J.A. 481–82.

The Fourth Circuit affirmed this Court's denial of Umaña' motion to suppress.  *Umaña*, 750 F.3d at 344.  The circuit affirmed this Court's finding that Umaña validly waived his *Miranda* rights.  *I* And it considered "the entirety of the interrogation" and concluded "that Umaña's statements were made voluntarily."  *Id.* at 345.  The reviewing court also noted that "Umaña's statements and behavior during the interrogation" demonstrated that he understood the significance of his statements and that they could be used against him.  *Id.* at 345.  "We have little doubt," wrote the court, "that Umaña knew what he was doing as he played a cat-and-mouse game with detectives."  *Id.* at 345.

Umaña's attorneys were not constitutionally compelled to introduce expert testimony in support of his argument that his statement was "not voluntary" and that he "did not validly waive his *Miranda* rights."  *2255 Mot.* at 313.  Counsel's decision to pursue their challenge without this evidence was reasonable and did not prejudice Umaña.

A reasonable attorney could easily conclude that expert testimony about Umaña's mental health would have added little to the motion to suppress, for two reasons.  First, other experts had evaluated Umaña, reviewed his records, and disagreed with Umaña's experts about the mental-health issues he alleges.  J.A. 804–55, 1001–02, 3336–53.  A reasonable attorney could have anticipated that the United States would respond with this evidence to oppose suppression,

72

limiting its persuasive value.  Second, the question whether a *Miranda* waiver or confession is voluntary focuses on "government coercion" that leads a defendant "to surrender rights protected by the Fifth Amendment"; to the extent mental-health issues are to blame for a waiver or confession, suppression is not warranted.  *Colorado v. Connelly*, 479 U.S. 157, 166, 170 (1986) (rejecting reliance on psychiatrist's testimony that defendant was not capable of making free decisions about his rights).  Counsel could reasonably determine that the testimony of experts would have been minimally helpful because the facts Umaña alleges do not suggest that the questioning officers were familiar with the experts' later-formed conclusions about Umaña's mental health, let alone that the officers exploited that information to coerce his statements. *See id.* at 166 ("The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution.").  Counsel acted well within the wide latitude the Constitution allowed when pursuing his suppression motion without expert testimony.

Nor do the facts Umaña alleges establish prejudice.  Nothing his experts said undermines this Court's determination that the interviewing officer testified credibly.  And the transcript itself shows that "Umaña knew what he was doing" when he spoke to detectives.  *Umaña*, 750 F.3d at 344.  No reasonable probability exists that this Court would have credited Umaña's experts over the likely rebuttal experts of the United States, found Umaña's expert's opinions weighty despite their limited relevance under the appropriate standard, *Connelly*, 479

73

U.S. at 166, 170, and suppressed Umaña's confession if Umaña had presented expert testimony. The facts Umaña alleges do not come close to establishing a reasonable probability that, but for the alleged omission, Umaña would not have been convicted or "sentenced to death." *Polk*, 453 F.3d at 201 (quoting *Strickland*, 466 U.S. at 694).

### ii. The Constitution did not compel counsel to introduce testimony by Dr. Olley about Umaña's confession at the penalty phase of the trial.

Umaña's attorneys were also not constitutionally compelled to introduce testimony by Dr. Olley declining to characterize his interview as a "cat and mouse" and describing Umaña as "unsophisticated," "inarticulate," and "naive." Umaña's *2255 Mot.* 315–16 (quoting J.A. 601–02). Reasonable counsel could easily have concluded that the jury would have been unlikely to give a defense expert's opinion about these basic characteristics much weight when the jury could review the transcript itself and draw its own conclusions. Testimony about the transcript, moreover, would have given the jury even more reason to accept the United States' invitation to "Read it." *2255 Mot.* 315. The transcript describes Umaña's participation in multiple, violent murders. *See, e.g.*, J.A. 4289, 4334–35, 4339, 4342–4346, 4348–55, 4359–65, 4371, 4373–87, 4452–91. A reasonable attorney could easily conclude that his client would not benefit from testimony that would call more attention to the transcript.

Nor can Umaña establish a reasonable probability that the court would have returned a different verdict if it had heard a defense expert call Umaña's

74

conversation "unsophisticated" or something other than a "cat and mouse." *Cf. 2255 Mot.* 315–16. The transcript was before the jury and speaks for itself. The Fourth Circuit, familiar with Dr. Olley's testimony, "ha[d] little doubt that Umaña knew what he was doing," during the interview. *Umaña*, 750 F.3d at 345. The court even agreed that "he played a cat-and-mouse game with detectives." *Id.* No reasonable probability exists that Dr. Olley's testimony would have swayed the jury to find otherwise and decline to impose a sentence of death.

### 14. This Court has already rejected Claim 23, which alleges that counsel's performance was deficient in their presentation to the Department of Justice about its decision to seek the death penalty.

This Court has already rejected "as a matter of law" Claim 23, which alleges that counsel's performance was deficient in their presentation to the Department of Justice regarding its decision to seek the death penalty. *Mar. 2022 Order* 47–49. This Court properly held that there "is no Sixth amendment right to counsel in connection with the Department of Justice's capital authorization procedure" and that Umaña can assert "no viable § 2255 claim" of ineffective assistance. *Mar. 2022 Order* 47–49. In the light of its holding, this Court should dismiss Claim 23. *See also Mar. 2017 Discovery Response* 108–10.

### 15. This Court should dismiss Claim 24, which asserts that Umaña's attorneys were constitutionally deficient for failing adequately to explain the benefits of "a plea deal."

This Court should dismiss Claim 24, which asserts that Umaña's attorneys

75

were constitutionally deficient for failing adequately to explain the benefits of "a plea deal." *2255 Mot.* 348–51. This Court has recognized that "to obtain post-conviction relief on a theory" that a movant's "attorney's constitutional deficiencies caused him to proceed to trial instead of pleading guilty," the movant "has the burden to prove five elements." *Clinton v. United States*, No. 3:10-CR-208-RJC, 2015 WL 5155372, at *3 (W.D.N.C. Sept. 2, 2015) (citing *Missouri v. Frye*, 566 U.S. 134 (2012), *Lafler v. Cooper*, 566 U.S. 156 (2012), and *Merzbacher v. Shearin*, 706 F.3d 356, 369–70 (4th Cir. 2013)). First, Umaña "must prove that the government communicated a plea offer that either lapsed or was rejected by" him. *Id.*; *Frye*, 566 U.S. at 145–46. Second, Umaña must "demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Clinton*, 2015 WL 5155372, at *3 (quoting *Frye*, 566 U.S. at 148). "The plea offer must be sufficiently definite to enable the Court to determine that the agreement ultimately would have been entered." *Id.* (citing *Merzbacher*, 706 F.3d at 369–70). "Third," Umaña "must prove that 'the performance of his counsel was deficient when he advised" Umaña "to reject the plea offer." *Id.* (quoting *Lafler*, 566 U.S. at 163). Fourth, Umaña must "demonstrate a reasonable probability he would have accepted the earlier plea offer had he been afforded effective assistance of counsel." *Id.* (quoting *Frye*, 566 U.S. at 147). Finally, Umaña must show "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or" lower sentence. *Id.* (quoting *Frye*, 566 U.S. at 147).

76

Umaña's allegations, if proved, would not establish ineffective assistance of counsel. His allegations fail at the first step. He does not allege that the United States "communicated a plea offer" that either lapsed or that he rejected. *Id.*; *Frye*, 566 U.S. at 145–46. Accepted as true, Umaña's allegations would establish — at best — that the United States agreed to "have a *conversation* with trial counsel *regarding* a plea deal" with unspecified parameters. *2255 Mot.* 348. "[A] defendant has no right to be offered a plea." *Frye*, 566 U.S. at 145–46. And Umaña cannot establish ineffective assistance of counsel in connection with advice about a plea bargain that was never offered. *See United States v. Ramirez*, 751 F.3d 604, 607 (8th Cir. 2014) (government's expression of an "interest in negotiating" is not enough).

Umaña's allegations also do not come close establishing terms "sufficiently definite to enable the Court to determine that" an "agreement ultimately would have been entered." *Id.* (citing *Merzbacher*, 706 F.3d at 369–70). Indeed, his allegations do not even identify what benefits he would have purportedly received in exchange for his guilty plea. If this Court accepted Umaña's factual allegations as true, he would not be able to "demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it." *Frye*, 566 U.S. at 148. Umaña does not even allege that he was willing to admit his factual guilt of the charges against him, an admission necessary to render plea acceptance reasonably probable. *See United States v. Moore*, 681 F. App'x 241, 245 (4th Cir. 2017) (unpublished decision)

77

(describing the Department of Justice's policy against *Alford* pleas).

Nor do Umaña's allegations establish deficient advice.  Umaña's conclusory allegation that his attorney failed to "adequately explain" that the prosecution would almost certainly prove guilt and could prove the California murders through hearsay evidence, *2255 Mot.* 349, does not identify any specific act or omission of counsel, let alone one counsel was "constitutionally compelled" to avoid.  And that deficiently vague allegation is the most specific one he makes in support of his claim.  *See 2255 Mot.* 348–51.

Finally, Umaña's conclusory allegation that "there is a reasonable probability" that with different advice "the result of the proceeding would have been different" is insufficient to establish this critical element of ineffective assistance of counsel.  Courts on collateral review "should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies," and Umaña has not alleged that any "contemporaneous evidence" substantiates a willingness by Umaña before trial to admit his guilt and adhere to the terms of any plea agreement.  *Walters v. Martin*, 18 F.4th 434, 442 (4th Cir. 2021).  Umaña does not allege even a "*post hoc*" subjective willingness to plead guilty, *id.*, let alone a willingness to plead guilty on terms that would have produced a different "end result," *Frye*, 566 U.S. at 147.

Umaña's allegations are insufficient to support Claim 24.  This Court should, accordingly, dismiss the claim.

78

### 16. Umaña has not alleged facts establishing Claim 27, which alleges that his trial attorneys were constitutionally deficient for failing to preserve issues he raised on appeal.

This Court should dismiss Claim 27, which lists, with little elaboration, nine issues Umaña raised on direct appeal and contends that his attorneys were constitutionally deficient for failing to preserve. *2255 Mot.* 373–374. Contrary to what Umaña's motion suggests, *2255 Mot.* 373, the Fourth Circuit "carefully considered *each* of his arguments." *Umaña*, 750 F.3d at 359 (emphasis added). It also reviewed the record, and it "conclud[ed] that Umaña had a fair trial and that the death penalty was justified by the jury's factual findings and by law and was not imposed under the improper influence of passion, prejudice, or any other arbitrary factor." *Id.* The Fourth Circuit, indeed, explicitly rejected six of the nine issues on his list on the merits, independently of the plain-error standard or any failure to preserve the claims below. *See Umaña*, 750 F.3d at 338 (commerce-clause argument); *id.* at 341 (argument about actual bias of Juror 286); *id.* at 349–50 (argument about vouching in transcripts); *id.* at 352 (finding "nothing improper" about prosecutor's comment about behavior of MS-13 members in prison); *id.* at 353 ("We do not believe that it was error, much less plain error, for the prosecutor to have compared Umana's potential prison sentence with the plight of the victims."); *id.* at 358 (holding that "Umaña correctly stated the law" when stating "that he had to carry the burden of proof" to establish mental retardation).

Umaña has not alleged facts establishing that his attorneys acted

79

unreasonably to the extent they did not preserve any of the claims his motion identifies. "[C]ounsel is not obliged to advance every available nonfrivolous argument." *Collins*, 977 F.2d at 960. And each of the claims he identifies is meritless or, at best, a "long-shot contention[]," *Mason*, 774 F.3d at 830, or harmless error. He has identified no claim "that no competent attorney would think" would "have failed." *Premo*, 562 U.S. at 124. And he has identified no unpreserved claim that an attorney could not reasonably believe should be foregone in the light of Umaña's interests, the time and resource constraints of trial, and the value in narrowing issues and focusing the attention of the court or the jury. *Bucci*, 662 F.3d at 26. In short, Umaña's numbered list does not come close to overcoming the strong presumption that his trial attorneys acted within the bounds of reasonable professional assistance. Nor can he establish prejudice in the form of a reasonable probability that the outcome of his proceedings would have been different if he had presented at trial the claims that the Fourth Circuit considered and rejected on appeal.

### B. This Court should dismiss Claim 6, which alleges the United States unconstitutionally suppressed information during his criminal case.

This Court should dismiss Claim 6, which alleges that the United States violated its constitutional obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), *2255 Mot.* 169–92, because this Court previously found that Umaña's motion failed to allege facts sufficient to support the claim. Umaña's 2255 motion alleges that the United States suppressed five pieces of information: that

80

Roberto Ramos was unable, at trial, to identify Umaña as one of the shooters in the Lemon Grove murders, *2255 Mot.* 171–77; nine "video/audio recordings by LAPD" of interviews with Freddy Gonzalez and others, *2255 Mot.* 177–79; statements made by Umaña's mother about his father's drug dealing and Umaña's lack of paperwork, *2255 Mot.* 180–91; Umaña's Guatemalan birth certificate, *2255 Mot.* 190–92; and a statement by MS-13 member Rony Lopez that MS tattoos could be earned by killing, robbing, or committing other crimes, *2255 Mot.* 191–92. This Court evaluated each piece of information and found that Umaña failed to allege facts identifying exculpatory or material *Brady* information the United States failed to disclose. *Mar. 2022 Order.* 13 (alleged information about Roberto Ramos); *id.* at 7–9, 14–15, 19–21 (interview recordings); *id.* at 29–31 (statements by Umaña's mother); *id.* at 29–31 (Umaña's Guatemalan birth certificate); *id.* at 27–29 (information about MS-13 tattoos). In the light of its findings, this Court should dismiss Claim 6. *See also Mar. 2017 Discovery Response* 38, 40–61.

## C. This Court should dismiss Claim 7, which alleges that the United States knowingly introduced false evidence.

This Court should dismiss Claim 7, which alleges that the United States introduced and failed to correct false testimony under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), *2255 Mot.* 192–210. Umaña alleged that the United States violated its obligations under *Napue* and related decisions during the *Atkins* hearing, *2255 Mot.* 193–197; through the testimony of Alexander Granados, *2255*

81

*Mot.* 197–205; through the testimony of Freddy Gonzalez, *2255 Mot.* 206–08, and through the testimony of Detective Parshall, *cf. 2255 Mot.* 208–210.

This Court's prior findings are dispositive of the first three of Umaña's four theories of *Napue* error. This Court evaluated each of these theories and found that Umaña failed to allege facts that would establish that the United States knowingly presented false testimony. *Mar. 2022 Order.* 31, 33 (addressing the *Atkins* hearing); *id.* at 27–28 (addressing Granados's testimony); *id.* at 9–10 (addressing Gonzalez's testimony). This Court should dismiss Claim 7 in the light of its prior findings to the extent it relies on these theories. *See also Mar. 2017 Discovery Response* 62–69.

Umaña's fourth theory — about Detective Parshall's testimony, which describes details corroborated by multiple witnesses to the Fairfax Street murders — is, like Umaña's other theories, without allegations insufficient to state a *Napue* claim. *Cf. 2255 Mot.* 208–210. At the outset, as the United States argued previously, all of Umaña's *Napue* theories are barred by Umaña's procedural default. *See Mar. 2017 Discovery Response* 62–63, 113–15. And "[i]n order to prevail on such a claim," in any event, Umaña would be required to prove "(1) the testimony was false, (2) the Government knew the testimony was false; and (3) there is a reasonable probability that the false testimony could have affected the verdict." *Roane*, 378 F.3d at 400 (citations omitted).

Detective Parshall testified that three facts were "consistent among all the individuals that [he] interviewed," Luis Rivera, Luis Ramos, and Rene Arevalo:

82

(1) Rivera had crutches and did not get out of the car; (2) Arevalo was the driver and did not get out of the car; and (3) Umaña was the front right passenger, got out of the car, and shot the victims. J.A. 2782–83. Umaña's nonconclusory factual allegations do not establish that this testimony was false, and the record would refute such allegations in any event. Transcripts of Detective Parshall's interviews with Luis Rivera[7] and Rene Arevalo — which were introduced at trial, J.A. 3512, 3791–92, 4061, 4210 — contain the three corroborated facts described by Detective Parshall. J.A. 4099–100, 4111, 4113, 4114, 4125, 4161, 4164, 4187–88, 4220, 4226–29. And although Umaña concedes that a transcript of Luis Ramos's statement was also produced "early on in discovery" in his criminal case, *2255 Mot.* 149, he does not point to any part of that transcript, let alone anything that suggests it does not contain the three facts described by Detective Parshall.

Umaña contends that Detective "Parshall's testimony was false" not because what he said was untrue. *2255 Mot.* 209. Umaña's argument is that this Court and the jury ought not have assigned great weight to the "corroboration" Detective Parshall described, because the witnesses he interviewed were familiar with what others had said and the police asked questions in a way that Umaña contends undermines the reliability of the answers. *2255 Mot.* 208–10. The weight of any corroboration is an appropriate subject of cross-examination, as Umaña's counsel demonstrated at trial. J.A. 2761–70. But Umaña has failed to

---

[7] Detective Parshall testified that, because of a transcription error, the name "Luis Ramos" appears on this transcript instead of Luis Rivera. J.A. 2782.

83

state a *Napue* claim based on Detective Parshall's testimony, because he has not identified a false statement.

Umaña's failure to identify a "false" statement in his 2255 motion is fatal to his *Napue* theory based on Detective Parshall's testimony. *See Roane*, 378 F.3d at 400; *Maharaj v. Sec'y, Dep't of Corrs.*, 432 F.3d 1292, 1313 (11th Cir. 2005) ("[T]he defendant must conclusively show that the statement was actually false.") And, as Umaña concedes, counsel had the transcripts of Detective Parshall's interviews. He cannot obtain post-trial relief under a *Napue* theory based on information that his attorneys knew during trial. *United States v. Meinster*, 619 F.2d 1041, 1045–46 (4th Cir. 1980). Nor do the facts he alleges about Parshall's testimony establish a reasonable probability that "false testimony could have affected the verdict." *Roane*, 378 F.3d at 400. This Court should dismiss Claim 7 in its entirety.

**D.     This Court should dismiss Claims 12, 15, 20, 21, 25, and 26, which allege that the United States and this Court violated Umaña's rights under the Constitution and the Vienna Convention.**

This Court should dismiss Claims 12, 15, 20, 21, 25, and 26, which allege that the United States and this Court violated Umaña's rights under the Constitution and the Vienna Convention. These claims have several features in common. They are subject to the rules governing procedural default and relitigation on collateral review, rules that preclude relief for Umaña. And they require a showing of prejudice that the facts he alleges would not establish, even

84

if he were able to prove those facts. Beyond those deficiencies, each claim is legally insufficient on its face. This section first discusses the rules governing procedural-default, relitigation, and Umaña's burden to show prejudice before addressing each claim individually.

### 1. Umaña cannot overcome his procedural default or the relitigation bar.

Umaña's claims 12, 15, 20, 21, 25, 26, among several others, were or ought to have been raised during his criminal case and on direct appeal. "Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.'" *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994)). Umaña cannot use a motion under § 2255 to relitigate issues previously raised at trial or on direct appeal. *See Kaufman v. United States*, 394 U.S. 217, 227 n.8 (1969); *United States v. Roane*, 378 F.3d 382, 396 n.7 (4th Cir. 2004) (citing *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)). To the extent Umana's claims include arguments previously rejected by this Court or the Fourth Circuit, they are subject to that relitigation bar and should be dismissed for that reason.

For the most part, Umaña failed to raise claims 12, 15, 20, 21, 25, 26, during his original criminal case and on direct appeal. And his failure to do so precludes him from raising them now. Contrary to what Umaña has suggested, this Court may dismiss his claims without an evidentiary hearing or further proceedings based on his procedural default. *Thomas v. Taylor*, 170 F.3d 466,

85

468, 470 (4th Cir. 1999); *see also Fitzgerald v. Greene*, 150 F.3d 357, 362, 366 (4th Cir. 1998); *Washington v. Murray*, 952 F.2d 1472, 1481 (4th Cir. 1991).

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 621 (citations omitted). Umaña's "failure to even attempt to identify cause or prejudice or claim actual innocence is fatal" to his ability to overcome his procedural default. *Derring*, 2015 WL 4611979, at *9. But Umaña could not establish cause and prejudice, or actual innocence, in any event.

Umaña cannot establish cause and prejudice to overcome his procedural default. "The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *United States v. Pettiford*, 612 F.3d 270, 280 (4th Cir. 2010). None of Umaña's theories are novel. And he cannot establish ineffective assistance of counsel or any other "external" factor that would establish cause. *Id.*

Although Umaña has alleged that the performance of his trial attorneys was constitutionally deficient, these allegations do not help him establish cause. First, Umaña's allegations, even if proved, would not establish the elements of ineffective assistance of counsel under the Sixth Amendment. And "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Second,

86

Umaña was required to raise his claims at trial *and on appeal. Id.* at 491. And he does not allege that his appellate attorneys were constitutionally deficient.

Umaña could not establish that the performance of his appellate attorneys was constitutionally deficient in any event. To establish ineffective assistance of appellate counsel for failing to press a contention, Umaña would have to show, at a minimum, that his appellate attorneys failed to present a claim that "was plainly stronger than those actually presented to the appellate court." *Davila v. Davis*, 127 S. Ct. 2058, 2067 (2017). Umaña would also have to show prejudice in the form of a "reasonable probability" that, but for his attorneys' unreasonable failure to present an additional issue, "he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 286 (2000).

Umaña's appellate attorneys filed a brief just shy of the 35,000 words the Fourth Circuit permitted, raising twelve multi-part claims, *Br. of Appellant, United States v. Umaña*, No. 10-6 (4th Cir. Sept. 3, 2013), including an argument that Umaña had a Sixth Amendment right to confrontation during the penalty phase of his trial, an argument that divided the panel deciding his appeal, *Umaña*, 750 F.3d at 360 (Gregory, J., dissenting).[8] The same issue further divided the entire court of appeals, which voted to deny rehearing en banc by a vote of 8–5. *United States v. Umaña*, 762 F.3d 413, 413–14 (4th Cir. 2014).

Umaña could not possibly establish that any of the claims his appellate

---

[8] Umaña's appellate attorneys also filed a 17,176-word reply brief. *Reply Br. of Appellant, United States v. Umaña*, No. 10-6, at 77 (4th Cir. Jan. 4, 2014)

attorneys failed to present "was plainly stronger" than the confrontation claim that divided the appellate court, in addition to the numerous other claims his attorneys presented. *Davis*, 127 S. Ct. at 2067. Even in an ordinary case that does not involve an appellate claim as strong as Umaña's confrontation claim, "it is difficult to demonstrate that" appellate "counsel was incompetent" for failing to present additional claims. *Robbins*, 528 U.S. at 288. The claims Umaña seeks to present that were not already litigated and decided against him, moreover, are unpreserved, and "[i]n most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved error." *Davis*, 127 S. Ct. at 2067. And even if Umaña could somehow show deficient performance, he could not establish a reasonable probability that "he would have prevailed on his appeal" with any of the claims he asserts in his 2255 motion. *Id.* at 286. In short, Umaña cannot establish that his appellate attorneys were constitutionally deficient for failing to raise additional claims, and he cannot establish cause necessary to overcome his procedural default.

In addition to establishing cause for his procedural default, Umaña must establish prejudice, which means that the errors he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 171 (1982); *United States v. McKinney*, No. 20–6396, 2023 WL 2028440, at \*5 (4th Cir. 2023). The standard requires the Court to "ask whether it is likely a defendant, had he known of the error, would not have" been convicted of the count of conviction or

88

sentence he challenges.  *See id.*

Umaña cannot meet this standard.  He cannot show that he would have prevailed on any of his theories if he had raised them.  And he cannot show that he suffered actual prejudice from fleeting language in lengthy transcripts, a handful of particular jurors who were seated, the security measures employed by the court, his attorneys' native language, from lack of consular notification, or from any of the other issues he raises.

Nor can Umaña establish actual innocence.  None of the errors Umaña alleges plausibly "resulted in the conviction of one who is actually innocent." *Bousley*, 523 U.S. at 624.  That standard "means factual innocence, not mere legal insufficiency." *Id.*  The only other way for Umaña to overcome his procedural default with respect to challenges to his sentence would be to prove, through "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [Umaña] eligible for the death penalty." *Prieto v. Zook*, 791 F.3d 465, 469 (4th Cir. 2015).  This "extremely high bar" is "'more stringent' than the standard for establishing 'actual innocence' of the conviction itself." *Id.* at 470 & n.3.  The jury found Umaña *eligible* for the death penalty based on his age, state of mind, the grave risk of death he caused to others during his Greensboro murders, and the fact that he killed more than one person in a single criminal episode.  *Umaña*, 750 F.3d at 333.  The evidence establishing these factors was overwhelming, and Umaña's claims are all but entirely unrelated to it.  Umaña cannot plausibly meet the extremely high bar he

89

Case 3:16-cv-00057-MOC    Document 142    Filed 03/02/23    Page 95 of 146

would have to meet to establish actual innocence.

### 2. The errors Umaña alleges would be harmless, if not barred by his procedural default.

If Umaña were able to overcome his procedural default and the numerous other legal defects in his theories, the errors he alleges would be harmless. When considered on collateral review, an error in a criminal case "is harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 114 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)); *United States v. Smith*, 723 F.3d 510, 511 (4th Cir. 2013). The facts Umaña's motion alleges in support of his theories, if true, would not meet this standard.

### 3. This Court should dismiss Claim 12, which alleges that the United States introduced "inadmissible" evidence.

This Court should dismiss Claim 12, which alleges that the United States engaged in prosecutorial misconduct by introducing the transcript of his April 23, 2008, confession, without objection, after this Court denied his motion to suppress; by introducing a redacted version of Arevalo's statement to detectives; by introducing evidence that Arevalo accused Umaña of the Lemon Grove Park murder; or by introducing Exhibit 152 with a redaction approved by this Court. *2255 Mot.* 251–257. These allegations fail as a matter of law for several reasons.

At the outset, Umaña already litigated the first three of these four contentions and cannot relitigate them under § 2255. *See* § II.D.1, *supra*. Umaña argued on direct appeal that the United States improperly failed to

90

redact references to accusations against Umaña in El Salvador and references to the interviewing officer's belief that Arevalo was telling the truth in Arevalo's interview transcript. *Br. of Appellant, United States v. Umaña*, No. 10-6 (4th Cir. Sept. 3, 2013), at 89–91. And he argued that the United States improperly "introduced Arevalo's hearsay statement accusing Umaña of committing" the "Lemon Grove Park murder." *Umaña*, 750 F.3d at 349. The Fourth Circuit "carefully considered" and rejected each of these arguments. *Id.* at 349–350, 359. Umaña cannot relitigate under § 2255 these claims that he previously litigated "on direct appeal." *Roane*, 378 F.3d at 396 n.7.

To the extent Umaña did not previously litigate any of these issues, they, along with Umaña's fourth contention, about Exhibit 152, are barred by Umaña's procedural default. *See* § II.D.1, *supra.* Umaña cannot establish the combination of cause and prejudice that would allow him to present these issues for the first time under § 2255. *Id.* Nor can he establish actual innocence. *Id.*

To prevail on a theory that the United States engaged in prosecutorial misconduct, a defendant ordinarily must establish two elements. *United States v. Benson*, 957 F.3d 218, 234 (4th Cir. 2020). First, "the defendant must show" that the prosecutor's conduct was "improper." *Id.* Second, "the defendant must" also "show" that the "remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *Benson*, 957 F.3d at 234. Umaña's allegations would not establish these elements, if proved.

91

### i. The United States did not engage in prosecutorial misconduct by introducing the transcript of Umaña's confession.

The United States did not engage in prosecutorial misconduct by introducing the transcript of Umaña's April 23, 2008, confession. This Court denied Umaña's motion to suppress this transcript "on all grounds" after extensive litigation. J.A. 434–482. The United States moved this Court to admit the transcript. J.A. 2781. And this Court admitted the transcript, in its entirety, without objection. J.A. 2781. Introducing this evidence with the court's permission and Umaña's acquiescence was not misconduct.

Umaña's 2255 motion's reliance on this Court's ruling barring the United States from introducing testimony from a Salvadorian prosecutor who was to "relay testimonial statements given by" other "witnesses" about a murder in El Salvador, J.A. 3227, 3231–32, is misplaced. Although the transcript contains references to accusations Umaña faced in El Salvador, J.A. 4315, the transcript of Umaña's confession was not among the "proffered evidence" this Court held "inadmissible." J.A. 3232. The court held the transcript *admissible*, J.A. 481–82, J.A. 2781, and, as Umaña acknowledges, it was incumbent upon Umaña to seek redaction of the transcript through his attorneys if he wanted any part of it redacted, J.A. 238–244.[9] The United States did not engage in prosecutorial misconduct by introducing the transcript without objection and with the Court's

---

[9] Umaña's attorneys were not, however, *constitutionally obligated* to seek redaction. *See* Section II.A.6, *supra.*

92

permission.

Nor would the facts Umaña alleges establish that the references to El Salvador in the transcript "prejudicially affected his substantial rights so as to deprive him of a fair trial," *Benson*, 957 F.3d at 234, let alone that they "had a substantial and injurious effect or influence" on the verdict. *Fry*, 551 U.S. at 114. Even if the relitigation bar permitted Umaña to repeat this theory on collateral review, his failure to establish a plain error on direct appeal would preclude him from establishing a reversible error under the "*more* stringent standard" that "applies in a § 2255 case." *United States v. Said*, 26 F.4th 653, 660 (4th Cir. 2022). As explained above, moreover, references to El Salvador represent "isolated comments embedded in voluminous transcripts," *Umaña* 750 F.3d at 350, which describe Umaña's participation in other violent conduct properly before the jury. *See* § II.A.6, *supra*. And the transcript represents a small portion of the overwhelming evidence the jury heard supporting its decision to impose the death penalty. *Id.*

### ii. The United States did not engage in prosecutorial misconduct by introducing a redacted version of Arevalo's statement to detectives.

The United States did not engage in prosecutorial misconduct in the way it reacted exhibit 518, the transcript of Arevalo's statement to police officers, J.A. 2791–92, 4191. *Cf. 2255 Mot.* 254–56. Umaña's attorney asked this Court to consider "one part" of the interview "for redaction, for exclusion":

It's at the end of the interview where Detective Parshall is

93

> conversing with Arevalo and Parshall says: "I believe you because I do this for a living. I interview people. I know when people are lying. I know when people are telling me the truth."

J.A. 2729. "Yeah," said this Court, "let's strike that. Let's sanitize that." J.A. 2729. The United States agreed that it would. J.A. 2729. The United States introduced a copy of the exhibit that omitted the phrase, "I know when people are telling the truth." J.A. 2791–92, 4061. Umaña did not seek any further redactions. J.A. 2791–92.

The United States did not engage in prosecutorial misconduct by attempting to sanitize the transcript in a way that he now contends "left the meaning of the objectionable statement undisturbed." *Cf. 2255 Mot.* 256. To the extent Umaña believed that the United States did not sanitize the transcript appropriately, it was incumbent upon him to object at trial. *Cf. 2255 Mot.* 149–50. The United States' redaction does not constitute misconduct.

Nor do Umaña's allegations establish prejudice. In the words of the Fourth Circuit, "[a] reasonable jury would not take the detective['s] comments during the interview[] as vouching for the trustworthiness of the witness being interviewed, but rather as [an] interrogation device[] designed to encourage the witness to talk." *Umaña*, 750 F.3d at 320. The statements, moreover, were "isolated comments embedded in voluminous transcripts." J.A. 350. The facts Umaña alleges do not establish misconduct, let alone misconduct that "prejudicially affected his substantial rights so as to deprive him of a fair trial," *Benson*, 957 F.3d at 234, or that had "a substantial and injurious effect or

94

influence" on the verdict, *Fry*, 551 U.S. at 114.

### iii. The United States did not engage in prosecutorial misconduct by introducing Arevalo's testimony accusing Umaña of the Lemon Grove Park murder.

The United States did not engage in prosecutorial misconduct when it "introduced Arevalo's hearsay statement accusing Umaña of committing" the "Lemon Grove Park murder" — evidence the Fourth Circuit held was properly admitted, *Umaña*, 750 F.3d at 349. Umaña's allegation that the United States did not follow the procedure this Court established for determining the evidence's reliability does not establish misconduct. *Cf. 2255 Mot.* 256–57.

The record reflects that the United States proffered evidence of both the Fairfax Street and Lemon Grove Park murders, in camera, as this Court requested, and provided that evidence to defense counsel. J.A. 2526–28, 2561–67, 3224, 3677. This Court allowed the United States to introduce hearsay evidence of Umaña's participation in both murders. J.A. 2561–67, 3224. And Detective Thomas Small testified that Arevalo had identified Umaña as the "Lemon Grove shooter." J.A. 2651, 2671.

Several days after Detective Small testified, this Court issued a written order summarizing and reiterating its earlier oral rulings. J.A. 3222. It reiterated its finding that "the hearsay statements given to detectives" in the Lemon Grove murder case bear sufficient "indicia o[f] reliability." J.A. 3230. And this Court later reaffirmed its rulings on the admissibility of hearsay evidence related to Umaña's participation in the Los Angeles murders in response to

Umaña's motion for a new trial.  J.A. 3669–80.

The record refutes Umaña's contention that the evidence the United States introduced at trial was materially different from what it proffered to this Court. *Cf. 2255 Mot.* 257.  This Court found that "the evidence introduced by the government at the sentencing hearing was consistent with its proffer."  J.A. 3677, 3680.[10]  Umaña's allegations to the contrary are insufficient as a matter of law to establish misconduct.  *Landrigan*, 550 U.S. at 474 (2007).

Nor would Umaña's allegations establish prejudice, even if proved.  The Fourth Circuit explicitly considered "Arevalo's hearsay statement accusing Umaña of committing" the "Lemon Grove Park murder" and held the statement properly admitted.  *Umaña*, 750 F.3d at 349.  Umaña cannot establish any misconduct, let alone misconduct that "prejudicially affected his substantial rights so as to deprive him of a fair trial," *Benson*, 957 F.3d at 234, or that had "a substantial and injurious effect or influence" on the verdict.  *Fry*, 551 U.S. at 114.

### iv. The United States did not engage in prosecutorial misconduct by introducing Exhibit 152 with a redaction approved by this Court.

The United States did not engage in prosecutorial misconduct by introducing Exhibit 152 with the redaction reviewed and approved by this Court.

---

[10] *See also* J.A. 3680 ("The admitted evidence implicating the defendant in the Los Angeles murders largely matched that which was proffered by the government in response to the defendant's motion in limine.  There are no inconsistencies between the government's proffer and what was actually admitted into evidence that warrant a reconsideration of the Court's prior Order finding this evidence admissible.").

96

J.A. 2861–62, 2910.  This Court conditionally admitted exhibit 152 — a letter written by Umaña in jail — and reviewed it "for probative value, unfair prejudice, confusion of the issues and misleading the jury, as well as authenticity."  J.A. 2860.  It found the letter "probative on the issue of future dangerousness" and among those that "deal with attempts to run MS from inside prison, to intimidate and control potential witnesses, to engage in acts of violence, and direct acts of violence."  J.A. 2860.  This Court asked the prosecutor, "Has the government considered redacting the racial comment in Exhibit Number 152?"  J.A. 2861.  "Yes, I did that, Your Honor," replied the prosecutor, handing the document to this Court at its request.  J.A. 2861.  "With that redaction," this Court found "that the probative value outweighs any unfair prejudice, confusion of issues and misleading the jury."  J.A. 2862.  Umaña did not seek additional redactions, *Id.*  The United States did not engage in misconduct by introducing this exhibit with the Court's permission, J.A. 2910, with the redaction this Court reviewed and approved.

The facts Umaña alleges do not establish misconduct and would not establish prejudice in any event.  He alleges that the exhibit contained the objectionable phrase, "fucking black guy."  *2255 Mot.* 254.  Although "[c]oarse language," this phrase did not present a "genuine risk that the emotions of the jury" would be "excited to irrational behavior," *United States v. Mohr*, 318 F.3d 613, 618 (4th Cir. 2003), particularly in view of the violent conduct described by Umaña's jail letters that was properly before the jury and the additional

overwhelming evidence of extraordinary violence.  The facts Umaña alleges do not establish misconduct that "prejudicially affected his substantial rights so as to deprive him of a fair trial," *Benson*, 957 F.3d at 234, or that had "a substantial and injurious effect or influence" on the verdict.  *Fry*, 551 U.S. at 114.

> **4.      This Court has already held insufficient Claim 15, which alleges "misconduct related to the jury."**

As the United States explained in its March 2017 Discovery Response, Umaña's Claim 15, which alleges "misconduct related to the jury," *2255 Mot.* 275–298, fails as a matter of law for at least three reasons.  *Mar. 2017 Discovery Response* 118–127.  First, Umaña's misconduct theories are barred by Umaña's procedural default.  *See Cleary v. United* States, 144 F. App'x 204, 204 (2d Cir. 2005) (unpublished decision) (juror-misconduct claim barred by procedural default); *Palmer v. United States*, 46 F. App'x 5, 8 (1st Cir. 2002) (unpublished decision) (juror-bias claim barred by procedural default); *Higgs v. United States*, 711 F. Supp. 2d 479, 553 (D. Md. 2010) (unpublished decision) (holding numerous juror-misconduct claims barred by procedural default, in federal death-penalty case), *aff'd*, 663 F.3d 726 (4th Cir. 2011).  Second, none of Umaña's theories would entitle him to relief, even if Umaña proved the facts he alleges.  *Mar. 2017 Discovery Response* 119–126.   Finally, the facts Umaña alleges do not establish that he suffered prejudice from any alleged juror misconduct.  *Id.* at 126–27.

This Court has already held that Umaña's allegations are insufficient to set forth a claim of juror misconduct.  *Mar. 2022 Order* 38.  For that reason and

those in the United States' March 2017 Discovery Response, this Court should dismiss Claim 15.

### 5. This Court should dismiss Claim 20, which alleges that Umaña's attorneys' agreement to the dismissal of jurors for cause and issues related to interpreters violated his constitutional rights.

This Court should dismiss Claim 20, which alleges that Umaña's attorneys' agreement to the dismissal of jurors for cause and issues related to interpreters violated his constitutional rights. *2255 Mot.* 316–321. The cognizable facts he alleges would not entitle him to relief, if proved. And this Court has already held his allegations in support of part of this claim insufficient.

Umaña has not alleged facts that, if true, would establish that his attorneys' agreement to the dismissal of jurors for cause entitles him to relief. As explained above, *see* § II.A.9, *supra*, Umaña has not alleged facts establishing that his attorneys were constitutionally deficient for agreeing to the dismissal of some jurors for cause based on their questionnaires. To the extent he contends that the dismissal of these jurors at his attorneys' request independently violates his constitutional rights, that contention fails as a matter of law for several reasons. First, Umaña's procedural default bars it. *See* § II.D.1, *supra*. Second, Umaña did not have a constitutional right to be present when this Court ordered the excusal of the jurors he complains about in writing, based on written submissions, and with the agreement of both parties. *Aug. 21, 2012, Order* (Doc. No. 1519, 3:08CR134), at 1. "The presence of a defendant is a condition of due

99

process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon*, 470 U.S. 522, 526 (1985). Third, if Umaña had such a right, he waived it by agreeing through counsel to the dismissal of the jurors without proceedings in his presence. *Id.* at 529–30 (right to be present subject to waiver); *2255 Mot.* 315 (conceding that counsel agreed the jurors could be excused for cause "before jury selection begins"). Finally, the facts Umaña alleges would not establish that his absence had "a substantial and injurious effect or influence" on the verdict. *Fry*, 551 U.S. at 114.

Nor has Umaña alleged facts establishing that he was in any way denied his right to be present or that counsel was deficient in a way related to Umaña's ability to communicate with counsel or understand the language used during the proceedings. This Court has already held Umaña's allegations in support of this part of Claim 20 insufficient. *Mar. 2022 Order* 50. His claim is also barred by his procedural default. *See* § II.D.1, *supra*. And his allegations if proved would not establish any error that had "a substantial and injurious effect or influence" on the verdict. *Fry*, 551 U.S. at 114.

Umaña has not alleged facts that, if proved, would entitle him to relief on Claim 20. This Court should, therefore, dismiss the claim.

### 6. This Court has already held insufficient Claim 21, which challenges the security measures employed by this court.

This Court has already held insufficient Umaña's claim 21, which

100

challenges the security measures employed by this Court. *Mar 2022 Order* 45; *cf.* *2255 Mot.* 321–23. This Court held that Umaña failed "to plead sufficient facts to set forth a prima facie claim that he suffered prejudice from the imposed security measures, and even if so, such measures would be justified in light of" Umaña's "conduct and risk of harm to those in the courtroom and the public." *Id.* Umaña's procedural default also bars his claim. *See* § II.D.1, *supra.* And his conclusory allegation that trial counsel was deficient "to the extent" counsel "agreed to or failed to object to circumstances that created" an allegedly "hostile atmosphere" does not include any facts that overcome the presumption that counsel acted reasonably or establish prejudice. *Cf. 2255 Mot.* 323. For those reasons, the reasons described in the United States' March 2017 Discovery Response, *Mar. 2017 Discovery Response* 127–30, and the reasons described in this Court's order, this Court should dismiss Claim 21.

> **7.      This Court has already held insufficient Claim 25, which alleges that the United States exercised its discretion to seek the death penalty against Umaña unconstitutionally.**

This Court has already held that Umaña failed to set forth a prima facie claim that the Department of Justice exercised its discretion to seek the death penalty against Umaña unconstitutionally. *Mar 2022 Order* 47; *cf. 2255 Mot.* 351–52. Umaña's procedural default also bars his claim. *See* § II.D.1, *supra.* And Umaña's allegation that the performance of his trial counsel was constitutionally deficient for omitting to raise this issue is conclusory. It fails to allege any steps counsel was constitutionally compelled, but failed, to take or

101

facts establishing prejudice.  *Cf. 2255 Mot.* 353.  For those reasons, the reasons

described in this Court's order, and the reasons described in the United States'

March 2017 Discovery Response, *Mar. 2017 Discovery Response* 130–31, this

Court should dismiss Claim 25.

> **8.** **This Court should dismiss Claim 26, which relates to the Vienna Convention.**

This Court should dismiss Claim 26, which relates to the Vienna

Convention.  Umaña alleges that the United States "did not notify Mr. Umaña of

his rights under the Vienna Convention [and] did not contact the Guatemalan

Consulate." *2255 Mot.* 354–66.  And he alleges that his trial attorneys were

constitutionally deficient for failing to notify Umaña of his rights under the

convention, contact the Guatemalan Consulate, litigate the alleged failure by the

United States, and investigate Umaña's "background and history as a

Guatemalan citizen" for mitigation purposes.  *Id.* at 366–72.

Umaña's claim that the United States violated his rights under the Vienna

Convention fails for at least four reasons.  First, Umaña's procedural default bars

his claim.  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 360 (2006) (holding that

procedural-default rules apply to the Convention); § II.D.1, *supra*.  Second,

"Article 36 of the Vienna Convention," the Article on which Umaña relies, "does

not create an individually enforceable right." *Medellin v. Dretke*, 371 F.3d 270,

280 (5th Cir. 2004).  Third, if individually enforceable, the Convention does not

create a remedy that would relieve Umaña of his convictions or sentence.  *See*

102

*United States v. Li*, 206 F.3d 56, 60 (1st Cir. 2000) (assuming that the Convention confers individual rights, dismissal of an indictment and suppression of evidence are not appropriate remedies).  Fourth, a claim based on an alleged violation of the Convention would not be cognizable under 28 U.S.C. § 2255 because it would not be a "constitutional" or "jurisdictional" claim or a claim based on "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Foote*, 784 F.3d 931, 936 (4th Cir. 2015); *see also Medellin v. Dretke*, 544 U.S. 660, 664 (2005) (noting that a violation of the Convention's "consular access provisions" may "not be cognizable in a federal habeas proceeding").  Finally, even if Umaña were somehow denied a right under the Convention relevant to his criminal case, the denial would not have had a substantial and injurious effect on the verdict.  This Court has already found that Umaña has failed to allege facts sufficient to show that "a different outcome would have resulted had the Government notified him of the right to consular assistance." *Mar 2022 Order* 47.  That finding is alone dispositive. *Fry*, 551 U.S. at 114.

Umaña's allegations of ineffective assistance of counsel related to the Convention and Guatemala are also insufficient.  Even if this Court assumes that Umaña — who left Guatemala when he was three or four years old, (Doc. No. 24-2, at 72), spent much of his early life in El Salvador, and sought assistance from the Salvadorian consulate, J.A. 2295 — was eligible for consular assistance *from Guatemala*, counsel could reasonably have determined that his client's "interest

103

would be best served" by focusing on matters other than enforcing rights related to assistance from another consulate. *See Bucci*, 662 F.3d at 26. And he has not alleged facts establishing a reasonable probability that counsel's performance related to Guatemalan consular assistance, the Vienna Convention, or litigation related to the matter would have affected the outcome of his trial. Umaña's allegation that his attorneys failed to conduct an adequate mitigation investigation into Umaña's Guatemalan background, *2255 Mot.* 370, is also insufficient. Counsel was aware of Umaña's Guatemalan history and interviewed family members familiar with his life in Guatemala, including his father. Umaña has not identified any mitigating evidence from Guatemala that counsel was constitutionally compelled — but failed — to investigate or present. *Richter*, 562 U.S. at 107; *Van Hook*, 558 U.S. at 11; *Strickland*, 466 U.S. at 699. And he has not identified facts establishing a reasonable probability that any such evidence would have resulted in a different sentence.

Umaña's 2255 motion does not allege facts that, if proved, would entitle Umaña to relief on Claim 26. This Court should, therefore, dismiss the claim.

E. **This Court should dismiss Claims 4 and 28, which allege that the Constitution makes Umaña ineligible for the death penalty due to mental-health conditions.**

This Court should dismiss Claims 4 and 28. Both claims allege that the Constitution exempts Umaña from the death penalty because of mental-health conditions. And both claims fail as a matter of law.

104

**1. This Court has already rejected Claim 4, which seeks to relitigate this Court's determination that Umaña is not mentally retarded or intellectually disabled.**

This Court has already rejected Claim 4, which seeks to relitigate this Court's determination that Umaña is not mentally retarded or intellectually disabled. *Mar 2022 Order* 35. This court appropriately held that he "cannot seek to relitigate his *Atkins* hearing in this § 2255 proceeding." *Id.* And it appropriately held that his motion failed "to set forth a prima facie claim." *Id.* If the claim were not barred by the relitigation doctrine, moreover, it would be barred by Umaña's procedural default. *See Prieto* 791 F.3d at 472–73; § II.D.1, *supra*; *May 2017 Discovery Response* 114–15, 117–18. Indeed, any challenge to "the merits of [this Court's] findings with respect to his claim of mental retardation" is barred on collateral review because "[h]e [did] not challenge" them on direct appeal. *Umaña*, 750 F.3d at 358. For all of these reasons, this Court should dismiss Claim 4.

**2. This Court should dismiss Claim 28, which contends that the Constitution forbids the execution of persons with brain damage, trauma, and low intelligence.**

This Court should dismiss Claim 28, which contends that the Constitution forbids Umaña's execution because he contends he suffers from "brain damage, trauma, and low intelligence." *Cf. 2255 Mot.* 374–76. This claim fails as a matter of law for several reasons.

First, Umaña's procedural default bars this claim. Umaña cannot establish cause to overcome his default. *See* § II.D.1, *supra*. He concedes that the

105

basis of his claim was available "at the time of his pretrial hearing on intellectual disability and the time of his trial." *2255 Mot.* 374–75. His trial attorneys were not constitutionally compelled to raise it, and his appellate attorneys were not deficient for failing to raise it on direct appeal. *See* § II.D.1, *supra.* Nor can Umaña establish prejudice because he cannot establish that this Court would have accepted the rule of constitutional law that he proposes or the facts about his conditions that he would need to prove to take advantage of that rule. *See* section II.D.1, *supra.* He also cannot establish actual innocence. His constitutional theory is without merit, but even if this Court accepted that proof of his claimed mental-health impairments would make him ineligible for the death penalty, he would not be able to establish by "clear and convincing evidence" that no reasonable factfinder "would have found [Umaña] eligible for the death penalty." *Prieto*, 791 F.3d at 469. Expert witnesses presented by the United States disagreed sharply with the methods and conclusions of Umaña's mental-health experts. J.A. 1006, 3353. Umaña cannot establish that no reasonable factfinder would hear or credit expert or other evidence refuting his claims of mental-health impairments. *See* J.A. 1006 (finding Dr. Suarez credible). Umaña cannot overcome his procedural default.

Second, the Constitution does not forbid the execution of persons with the kind of mental-health impairments Umaña describes to the extent they fall short

106

of mental retardation or its synonym, intellectual disability.[11]  The Supreme Court has declared that "offenders who are not mentally retarded" are "unprotected by the exemption" it described in *Atkins*, 536 U.S. at 320, the decision on which Umaña's claim relies, *2255 Mot.* 375.  If the new constitutional right Umaña proposes were to exist, the Supreme Court itself would have to declare it.  *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (holding that the Supreme Court alone retains the "prerogative of overruling its own decisions").  Umaña's claim, therefore, fails as a matter of law.

Finally, even if a constitutional exemption from capital punishment based on mental-health limitations short of intellectual disability existed, the record would preclude Umaña from establishing that the exemption would affect his verdict or death sentence.  *Fry*, 551 U.S. at 114.  The United States presented expert testimony — corroborated by other evidence this Court heard during Umaña's trial and that of his cohorts — establishing that Umaña does not suffer from mental-health limitations to nearly the extent that he alleges.  J.A. 997–1016, 3353.  This Court found that Umaña is not intellectually disabled, J.A. 1016, and he cannot establish that he would meet the requirements of any other mental-health related constitutional exemption from the death penalty.  He therefore could not establish a substantial and injurious effect on the verdict even if such an exemption existed.  *Fry*, 551 U.S. at 114.

---

[11]  "[M]ental retardation" and "intellectual disability" are different terms for an "identical phenomenon."  *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

107

Umaña has not alleged facts that, if proved, would entitle him to relief on Claim 28. This Court should, therefore, dismiss the claim.

**F. This Court should dismiss Claims 29 and 30, which seek relief based on the "cumulative effect" of Umaña's allegations of ineffective-assistance of counsel and *Brady* violations.**

This court should dismiss claims 29 and 30, which do not allege any additional facts but instead allege that the "cumulative impact of *Brady* and *Strickland* error" Umaña alleged elsewhere in his 2255 motion entitle him to relief. *2255 Mot.* 374–380. These claims fail as a matter of law, for at least two reasons.

First, as explained in response to Umaña's individual claims, Umaña has failed to allege facts that, if true, would establish *any Brady* or *Strickland* error. This Court has already held Umaña's allegations insufficient to establish a *Brady* violation. *See* § II.B, *supra*. And he has not alleged facts that would establish that the performance of his multiple, experienced attorneys was constitutionally deficient. When a "cumulative error" analysis applies, it "aggregates only actual errors to determine their cumulative effect." *United States v. Mullins*, 263 F. App'x 342, 345 (4th Cir. 2008) (unpublished decision). Because the facts Umaña alleges would not prove "multiple errors, there is nothing to aggregate" and no "cumulative effect" theory would apply. *Id.*

Second, even if Umaña had alleged facts establishing a combination of constitutional errors, those facts would not establish "a reasonable probability" that Umaña would not have been convicted or "sentenced to death." *Polk*, 453

108

F.3d at 201. The evidence of Umaña's guilt and in aggravation was overwhelming. And to the extent the facts Umaña alleges about his attorneys might describe some of the "countless" other "ways to provide effective assistance," *Strickland*, 466 U.S. at 690–91, none of those facts, if proved, would establish a reasonable probability of a different result.

Critically, the evidence of Umaña's guilt and in aggravation was overwhelming. The jury heard from multiple eyewitnesses that Umaña murdered two people, after as much as a minute's contemplation, for suggesting that his gang was fake. *See* § I.A, *supra*. The jury heard from eyewitnesses and forensic investigators that Umaña jeopardized the lives of families and children by opening fire in a small family restaurant. *See* §§ 1.A, 1.D.1, 1.D.2, *supra*. The jury heard that, after Umaña had time to reflect, what he regretted about the event was *not* killing a third person, whom he had only wounded. *See* § 1.A, *supra*. The jury heard that Umaña confessed his substantial participation in the murders of Andy Abarca, Jose Herrera and Gustavo Porras, in Los Angeles. *See* § I.D.3.b, *supra*; *Mar. 2017 Discovery Response* 90–93. The jury heard, from MS-13 members whom he instructed, that Umaña had come to North Carolina with the goal of helping MS-13 commit "commit ten of the bloodiest murders Charlotte has ever seen." J.A. 1917. The jury saw Umaña's own corroborated words describing efforts to orchestrate the assault or murder of witnesses. *See* § I.B., *supra*. The jury heard about Umaña's personal violent conduct in prison from those who observed it. *See* §§ I.B, I.D.3.a, *supra*. The jury heard of the

threats Umaña made against the family of a witness, right in the courtroom.  *See* § I.D.3.a., *supra*.   And the jury saw the knife that Umaña sought to bring to the courthouse, while his attorneys were there to seek an acquittal or mercy.  *See id.*

The "record provides strong support for the conclusion" that Umaña "would have been convicted of capital murder and sentenced to death," *Strickler v. Greene*, 527 U.S. 263, 294 (1999), even if his attorneys had taken the approaches that his 2255 motion describes.  His experienced attorneys worked with a host of experts and specialists and investigated and presented a strong mitigation case based on Umaña's childhood and history.  *See* § I.D.3.d.iv, *supra*.  They vigorously pursued the suppression and exclusion of the most damning aggravating evidence, such as his confession, *see* § I.C.2, *supra*.  They utilized expert evidence of brain damage and intellectual disability to try to persuade this court that Umaña is not eligible for the death penalty, *see* § I.C.3, *supra*, and the jury that it should not sentence him to death, *see* § I.D.3.d.iii, *supra*.  Despite Umaña's ongoing efforts to convince others that he remained a danger by threatening witnesses and secreting weapons, *see* §§ I.B, I.D.3.a, his attorneys vigorously endeavored to persuade the jury that he would not continue to be a danger if sentenced to life in prison, *see* § I.D.3.d.ii.  The jury, however, convicted Umaña and unanimously sentenced him to death on each capital count in view of the overwhelming evidence justifying that sentence.

Umaña has not alleged any unconstitutional errors or omissions of counsel that, alone or in combination, would have changed the jury's verdict or sentence.

110

And this Court has already held that Umaña failed to allege a *Brady* claim. *See* § II.B, *supra.* This Court should, therefore, dismiss claims 29 and 30.

### G. This Court should dismiss Claim 22 and amended Claim 59, which challenge the validity of Umaña's convictions under 18 U.S.C. §§ 922(g) and 924(c).

This Court should dismiss Claim 22 and amended Claim 59. Claim 22 contends that Umaña's convictions under 18 U.S.C. §§ 924(c) on counts 23 and 25 are invalid in the light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). Claim 59 contends that Umaña's conviction under § 922(g) on count 27 is invalid in the light of *Rehaif v. United States*. 139 S. Ct. 2191, 2194 (2019). Both claims fail as a matter of law. And even if this Court disagreed, contrary to what Umana contends, his claims would not require the death sentences Umana received on counts 22 and 24 to be disturbed.

### 1. This Court should dismiss Claim 22, which challenges Umaña's convictions under § 924(c) and (j) on counts 23 and 25.

This Court should dismiss Claim 22, which challenges the validity of Umaña's convictions counts 23 and 25. These counts each charge Umaña with causing the death of another by possession of a firearm in furtherance of a "crime of violence" under 18 U.S.C. §§ 924(c) and 924(j)(1). J.A. 365, 367. Umaña moved to amend the claim in June of 2020. *2020 Claim 22 Amendment* (Doc. No. 91, 3:16CV57). And he moved to amend it again in June of 2022. *2022 Claim 22 Amendment* (Doc. No. 111, 3:16CV57). This Court allowed both amendments in its October 2022 Order.

111

The two section 924(c) and (j) counts that Umaña's motion targets — counts 23 and 25 — each allege two predicate crimes of violence: conspiracy to participate in a racketeering enterprise, and the substantive offense of murder in aid of racketeering. J.A. 365, 367. The substantive murder predicates are those charged in counts 22 and 24, which allege that Umaña "knowingly murdered" Ruben Garcia Salinas and Manuel Garcia Salinas, respectively, in violation of a North Carolina statute, N.C. Gen. Stat. § 14–17. J.A. 364–67. That state statute punishes a "willful, deliberate, and premeditated killing" by death or life imprisonment. N.C. Gen. Stat. § 14–17. The indictment further alleged as "special sentencing factors" for "count one" that Umaña "willfully, deliberately, and with premeditation murdered" Ruben Garcia Salinas and Manuel Garcia Salinas "in violation of North Carolina Gen. Stat. § 14-17." J.A. 417. That state statute punishes a "willful, deliberate, and premeditated killing" by death or life imprisonment. N.C. Gen. Stat. § 14–17.

The statute under which Umaña was charged in counts 23 and 25, 18 U.S.C. § 924(j)(1), imposes a penalty of life imprisonment or death "if the killing is murder" as defined in 18 U.S.C. § 1111. Count 23 alleges that Umaña's conduct "result[ed] in the unlawful killing of Ruben Garcia Salinas with malice aforethought" as defined in section 1111(a). J.A. 365. And Count 25 alleges that Umaña's conduct "result[ed] in the unlawful killing of Manuel Garcia Salinas with malice aforethought" as defined in section 1111(a). J.A. 367.

During the guilt phase of Umaña's trial, the jury heard direct evidence

112

that Umaña personally pulled out a gun in the Las Jarochitas family restaurant, pointed it at Ruben and Manuel Garcia Salinas, stood still for a minute, and then shot each of the two brothers to death. § I.D.1, *supra*. Abel Santos, who was with Umaña in the family restaurant in which the murder occurred, testified that "the defendant" — the one with distinctive "eyelid tattoos" — "pulled the gun out," "pointed it at Ruben and Manuel," "stood there for a minute," and shot the brothers. J.A. 1622, 1624–1628. The jury heard direct testimony that Umaña urinated on his hands afterward, telling another gang member that he did so to remove the gunpowder from his hands. J.A. 1928; *see also* J.A. 1492. And the jury heard direct testimony that Umaña told his fellow gang members that he shot people in the Las Jarochitas restaurant and that he did so for himself and his fellow gang members, because "they insulted the MS 13." J.A. 1463–65.

The jury convicted Umaña of all counts, including counts 23 and 25. This Court instructed the jury that to "kill with malice aforethought means either to kill another person deliberately and intentionally or to act with callous and wanton disregard for human life," J.A. 2487. The jury specifically found that the killing of Ruben Garcia Salinas in Count 23 and the killing of Manuel Garcia Salinas in Count 25 was "with malice aforethought." J.A. 2557.

The jury also found Umaña guilty of the two counts of murder in aid of racketeering respectively involving Ruben and Manuel, and it found Umaña guilty of the racketeering conspiracy. *Id.* at 2556–57. The jury returned a special verdict form finding that Umaña's agreement included "the willful,

113

deliberate, and premeditated murder" of both Ruben and Manuel Garcia Salinas "in violation of N.C. Gen. Stat. § 14-17." J.A. 2556.

At the death-penalty-eligibility phase of the trial, the jury unanimously found two statutory aggravating factors for each of Umaña's four capital counts. Section I.D.2, *supra*. For each count, the jury unanimously found that Umaña "intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life" and a person "died as a result of the act." J.A. 2631, 2636, 2641, 2646. And, for each count, the jury unanimously found that Umaña "killed and attempted to kill more than one person in a single criminal episode." J.A. 2631, 2636, 2641, 2646.

At the penalty phase of the trial, the jury unanimously sentenced Umaña to death and found four aggravating factors for each of Umaña's capital counts. J.A. 3543–78; Section II.D.3, *supra*. For two counts, the jury unanimously found that Umaña "killed Ruben Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise." *Id.* at 3543, 3552. And for the other two counts the jury unanimously found that Umaña "killed Manuel Garcia Salinas to protect and maintain the name and reputation of the criminal enterprise MS-13, and to advance his position and reputation within the criminal enterprise." *Id.* at 3561, 3570.

114

After Umaña was convicted and sentenced, the Supreme Court held in *United States v. Davis* that the residual clause of § 924(c)'s definition of "crime of violence" is "unconstitutionally vague." 139 S. Ct. 2319, 2336 (2019). *Davis* did not disturb the remaining portion of the definition — the "force clause" — which embraces crimes that have "as an element the use, attempted use, or threatened use of physical force against the person or property of another," § 924(c)(3)(A). *United States v. Jackson*, 32 F.4th 278, 283 (4th Cir. 2022). As amended, Umaña's claim 22 contends that his convictions on counts 23 and 25 are invalid because neither of the predicate offenses for those convictions continues to qualify as "crimes of violence" after *Davis*. *See 2022 Claim 22 Amendment* 4.

This Court should dismiss Claim 22 for at least two reasons. Umaña's procedural default bars his claim. And, as this Court correctly held when previously addressing this issue, Umaña's murder-in-aid-of-racketeering offenses continue to qualify as crimes of violence "under § 924(c)'s force clause." *Umaña v. United States*, 229 F. Supp. 3d 388, 392 (W.D.N.C. 2017). Umaña's convictions on counts 23 and 25, therefore, remain valid.

### a. Umaña's procedural default bars his claim.

First, Umaña was obligated to raise his claim during his criminal case and on direct appeal,[12] and his procedural default bars his claim. *See* § II.D.1, *supra;*

---

[12] Umaña's allegation that "he raised the claim timely" is baseless. *Cf. 2022 Claim 22 Amendment* 1 (citing (Doc. No. 104, 3:16CV57), at 16). The document he cites refers only to Umaña's filing of a "*Johnson* claim" in "June 2016" as part of his "§2255 motion." (Doc. No. 104, 3:16CV57), at 16. To avoid

115

*United States v. Vargas-Soto*, 35 F.4th 979, 994–95 (5th Cir. 2022); *Granda v. United States*, 990 F.3d 1272, 1288 (11th Cir. 2021). He cannot establish cause and prejudice to overcome his default. *Id.* Nor can he establish that he is actually innocent of counts 23 and 25. *Id.*

If Umaña could establish cause for his procedural default of his *Davis* claim, *see United States v. McKinney*, No. 20-6396, 2023 WL 2028440, at *5 (4th Cir. 2023), he would remain unable to establish the requisite "actual" prejudice, which asks "whether it is likely a defendant, had he known of the error," would not have been convicted of "the count of conviction," *id.* at *6 (cleaned up). As explained below, Umaña was found guilty of what today remains a valid offense under section 924(c) & (j). He therefore cannot establish that *Davis* error resulted in prejudice.

Nor can Umaña establish "actual innocence" as required to overcome his procedural default in the absence of a showing of cause and prejudice. Umaña has the burden to "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 624 (cleaned up). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* The evidence of Umaña's guilt included the testimony of eyewitnesses who watched him use a gun to commit the premeditated murder of

the procedural-default bar, Umaña was required to raise his claim years earlier, during his original criminal proceeding and his direct appeal. *Murray*, 477 U.S. at 491.

116

two individuals and Umaña's own statements bragging about committing the offense for the benefit of his gang. He cannot overcome his procedural default by establishing actual innocence.

### b. Umaña's convictions on counts 23 and 25 remain valid as a matter of law.

Second, Umaña's convictions on counts 23 and 25 remain valid as a matter of law. The Fourth Circuit held in *United States v. Simmons* that "an aggravated RICO conspiracy is not categorically a crime of violence." 11 F.4th 239, 260 (4th Cir. 2021). But the circuit has also held that a conviction under § 924(c) & (j) remains valid if any one of multiple alleged predicates continues to qualify as a "crime of violence." *Jackson*, 32 F.4th at 284. The murder-in-aid-of-racketeering offenses that underly each of Umaña's § 924(c) & (j) convictions continue to qualify as a crime of violence "under § 924(c)'s force clause." *Umaña*, 229 F. Supp. 3d 392.

Umaña's convictions under 18 U.S.C. § 1959(a)(1) for murder in aid of racketeering, also known as "VICAR murder," categorically qualify as "crimes of violence" under the "force clause" of 18 U.S.C. § 924(c). *Umaña*, 229 F. Supp. 3d at 392. Umaña's section 1959(a)(1) offenses required proof that, among other things, Umaña committed "murder" *and* that his conduct was "in violation of the laws of any State." 18 U.S.C. § 1959(a)(1); *United States v. Keene*, 955 F.3d 391, 393 (4th Cir. 2020). As this Court recognized, the state law Umaña was alleged and found to have violated appears at N.C. Gen. Stat. § 14–17. Section 1959(a)(1)

117

requires proof that the defendant's conduct meets the definition of "one of the enumerated federal offenses *as well as* the charged state crime." *Keene*, 955 F.3d at 393. Because the offense must meet both requirements, if either the federal definition of murder or the "charged state crime," *id.*, "substantially corresponds" to or "is narrower than" the requirements of the force clause, then the offense categorically qualifies as a "crime of violence." *Quarles v. United States*, 139 S. Ct. 1872, 1877 (2019).

This Court held that both the federal definition of "murder" and the charged state crime, murder under N.C. Gen. Stat. § 14–17, require the use, attempted use, or threatened use of physical force against the person of another. *Umaña*, 229 F. Supp. 3d at 394, 397. Recent precedent only confirms that this Court's holding is correct.

### i. The federal definition of murder qualifies Umaña's offense as a crime of violence.

Umaña's "VICAR" murder offense has as an element the "commission" of the "enumerated federal offense" of murder, *Keene*, 955 F.3d 391, 394, and that element satisfies the requirements of the force clause. A statute defines "[m]urder" under federal law as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. It defines "four types of first-degree murder," *Jackson*, 32 F.4th at 284–85, and it explains that "[a]ny other murder is murder in the second degree," 18 U.S.C. § 1111. The Fourth Circuit recently held that the federal murder statute is "divisible," *Jackson*, 32 F.4th at 286, which

118

means that it "lists potential offense *elements* in the alternative, and thus includes multiple alternative versions of the crime." *United States v. Roof*, 10 F.4th 398–99 (4th Cir. 2021). This Court discussed the "generic" definition of murder using the same basic elements, *Umaña*, 229 F. Supp. 3d at 392–93. And Umaña does not identify anything that suggests the generic definition differs from the federal statutory definition of murder in any way material to his argument.[13]

Although different versions of the federal crime of murder exist, *Jackson*, 32 F.4th at 286, the record makes clear that the jury convicted Umaña of a version that qualifies as a crime of violence. The Fourth Circuit has held that "federal premeditated first-degree murder is a 'crime of violence'" under § 924(c) & (j). *Jackson*, 32 F.4th at 284–85. And through its "verdict sheet" at the guilt phase, *id.*, the jury found that Umaña's agreement with his fellow racketeering-enterprise members included "the willful, deliberate and premeditated murder of" both "Ruben Garcia Salinas" and "Manuel Garcia Salinas." *Exh. 1*, at 2556. Moreover, even if it were "impossible to know from the record which predicate" murder offense "the jury had in mind when it convicted," he would remain unable to prevail on his claim. *United States v. Said*, 26 F.4th 653, 661 (4th Cir. 2022).

---

[13] Umaña's June 2022 reply in support of his second motion to amend Claim 22 describes his disagreement with the Fourth Circuit's interpretation of section 1959(a) as requiring proof of "one of the enumerated federal offenses as well as the charged state crime," *Keene*, 955 F.3d at 393. *See* (Doc. No. 115, 3:16CV57), at 4. As a published decision of the Fourth Circuit, *Keene* binds this Court.

To "meet his burden" on a challenge to a § 924(c) conviction on collateral review, Umaña "must show 'more than a reasonable possibility' that the jury *only* found him guilty" of § 924(c) based on an offense that does not qualify as a crime of violence. *Id.* at 662. He cannot meet this burden, because "evidence of 'overwhelming weight'" before the jury, *id.*, established that Umaña murdered Ruben and Manuel Garcia with premeditation. *Jackson*, 32 F.4th at 286 ("To be guilty of premeditated murder, the Government must prove a person intended to kill the victim."). Indeed, it found in a special verdict that Umaña agreed to "the willful, deliberate, and premeditated murder" of Ruben and Manuel. J.A. 2556. "Undoubtedly, federal premeditated first-degree murder is a 'crime of violence.'" *Id.* at 287.

Umaña's argument about the felony-murder rule, *2022 Claim 22 Amendment* (Doc. No. 111), at 8–10, does not assist him. Umaña cannot come close to establishing a "more than reasonable possibility" that the jury "*only* found him guilty" of his § 924(c) offense based on a felony-murder predicate. *Said*, 26 F.4th at 662. "Uncertainty as to which predicate or predicates the jury relied on when it found the defendant guilty of the 924(c) counts" would not entitle Umana to relief, *id.* at 661 (cleaned up), and the "overwhelming weight of the evidence" of Umaña's premeditated murders, *United States v. Ali,* 991 F.3d 561, 574–575 (4th Cir. 2021), leaves no room even for uncertainty.[14]

---

[14] Contrary to what Umaña has suggested, examining what occurred at trial to determine *which crimes* formed the predicates for Umaña's § 924(c)

Also misplaced is Umaña's argument that "second degree murder can" be proved with a "mens rea that does not satisfy the elements clause." *2022 Claim 22 Amendment* 10–12. This argument fails at the outset because the predicates for Umaña's section 924(c) offenses were not limited to *second degree* murder. J.A. 2556. And, again, in the light of the jury's other findings and the overwhelming evidence that Umaña personally pulled out a gun in the Las Jarochitas family restaurant, pointed it at Ruben and Manuel Garcia Salinas, stood still for a minute, and then shot and killed each of the two brothers, Umaña cannot establish that the jury only found him guilty based on a second-degree murder predicate. *Said*, 26 F.4th at 662. But Umaña's argument about second-degree murder also fails for a second reason.

"[S]econd-degree murder" under the federal murder statute, "§ 1111(a)" categorically qualifies as a crime of violence under the force clause of § 924(c). *United States v. Begay*, 33 F.4th 1081, 1093 (9th Cir. 2022) (en banc). Second-degree murder's requirement of "malice aforethought" is not satisfied by "simple

---

offense does not involve a departure from the categorical approach, which is used to determine "whether a particular predicate meets the requirements of a 'crime of violence.'" *United States v. Ali*, 991 F.3d 561, 574–575 (4th Cir. 2021) (examining the "weight of the evidence" that the defendant committed a qualifying predicate). When a defendant alleges, as Umaña does, that an improper predicate was before the jury, the question of "whether the inclusion of the improper theory of guilty 'affected the outcome of the district court proceedings'" requires "a record intensive *factual* inquiry." *Id.* at 575; *Said*, 26 F.4th at 663; *United States v. Alston*, 855 F. App'x 895, 895 (4th Cir. 2021) (unpublished decision) ("Identifying the predicate offense supporting a § 924(c) conviction is a fact-intensive inquiry.").

121

recklessness." *Id.* at 1093. As this Court instructed the jury, it requires, at a minimum, "callous and wanton *disregard for human life.*" J.A. 2487; *Begay*, 33 F.4th 1081. The depraved-heart or depraved-indifference recklessness that murder requires is a "highly culpable mental state" that makes a homicide "equivalent to purposeful and knowing killing." *Tison v. Arizona*, 481 U.S. 137, 157 (1987) (quoting George Fletcher, *Rethinking Criminal Law* § 6.5, at 447–48 (1978)).

Unlike ordinary recklessness, which does not require that a "perpetrator direct his action at" another individual, *United States v. Borden*, 141 S. Ct. 1817, 1824–25 (2021) (plurality opinion), the heightened recklessness of malice aforethought requires a "purpose of wantonly and intentionally putting the lives of others in danger," *United States v. Fleming*, 739 F.2d 945, 948 (4th Cir. 1984). The perpetrator of murder with depraved-indifference recklessness has targeted someone with a "very high" risk of death or serious injury, 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.4(a) (3d ed.), a risk of which the perpetrator must be "aware," *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003). When a person *murders* someone, conscious of that very high risk, he is properly said to have used "physical force against the person . . . of another." 18 U.S.C. § 924(c)(3)(A); *Begay*, 33 F.4th at 1093; *United States v. Baez-Martinez*, 950 F.3d 119, 125 (1st Cir. 2020).

A holding that the kind of heightened recklessness that establishes murder is insufficient under the force clause would contravene both common sense and

122

the Supreme Court's holding in *Stokeling v. United States*, 139 S. Ct. 544, 552 (2019). When the application of federal law "requires a state conviction," the Supreme Court explained when discussing the force clause of the Armed Career Criminal Act, federal law should not be construed in a way that "would render it inapplicable in many states." *Stokeling v. United States*, 139 S. Ct. 544, 552 (2019). An interpretation of the force clause that would exclude depraved-heart murder would contravene *Stokeling* by making that clause inapplicable to murder "in many States." *Id.* "[D]epraved-heart murder" is "almost everywhere recognized." Wayne R. LaFave, *Substantive Criminal Law* § 14.4 (3d ed.).

The Supreme Court's decision in *Borden*, which held that a crime that can be committed through mere recklessness does not meet the requirements of the force clause, 141 S. Ct. at 1834 (plurality opinion); *id.* at 1835 (Thomas, J., concurring), does not help Umaña. *Begay*, 33 F.4th 1081. This Court anticipated that holding when it rejected Umaña's argument in 2017 because of the "difference between mere recklessness and malice." *Umaña*, 229 F. Supp. 3d at 394. *Borden* explicitly declined to consider or address whether "depraved heart" recklessness satisfies the requirements of the force clause. 141 S. Ct. at 1825 n.4 (plurality opinion). And although *Borden* produced several opinions, eight justices notably agreed that "murder" is one of the "quintessential violent crimes." *Id.* at 1830 (plurality opinion); *id.* at 1854 (Kavanaugh, J., dissenting).

*Borden* did not "construe the force clause to render it inapplicable to murder 'in many states.'" *Oct. 2020 Response* 16 (quoting *Stokeling v. United*

123

*States*, 139 S. Ct. 544, 552 (2019)); *Begay*, 33 F.4th 1081. And this Court should reject Umaña's request that this Court do so.

### ii. North Carolina's definition of murder also qualifies Umaña's offense as a crime of violence.

Umaña's "charged state crime" under the "VICAR" statute, murder under N.C. Gen. Stat. § 14-17, *Keene,* 955 F.3d at 393, independently establishes that Umaña's murder-in-aid-of-racketeering offenses qualify as "crimes of violence." That statute punishes "[m]urder in the first and second degree." N.C. Gen. Stat. § 14-17. The Fourth Circuit has held that North Carolina second-degree murder meets the requirements of the force clause. *United States v. Parrish*, 767 F. App'x 440, 442–43 (4th Cir. 2019) (unpublished decision); *United States v. Bell*, 704 F. App'x 297, 298 (4th Cir. 2017) (unpublished decision); *United States v. Lee*, 697 F. App'x 175, 176 (4th Cir. 2017) (unpublished decision). And "second-degree murder" is a "lesser included offense" of "first-degree murder." *State v. Jones*, 353 N.C. 159, 928 (2000).

The felony-murder rule does not disqualify Umaña's murder offense under N.C. Gen. Stat. § 14-17, as a "crime of violence," because Umaña cannot establish that the jury found him guilty of his § 924(c) & (j) offenses based only on felony murder, *Said*, 26 F.4th at 662. *Cf. 2022 Claim 22 Amendment* 8–10. Like the federal murder statute, N.C. Gen. Stat. § 14-17 is a divisible statute that sets out several "types of criminal conduct that qualify as first-degree murder," including "premeditated killings" and "killings that occur during specifically enumerated

124

felonies." *State v. Jones*, 538 S.E.2d 917, 923–24 (N.C. 2000). The statute is divisible because the North Carolina Supreme Court has held that these alternatives are alternative "essential element[s]." *Id.*; *Mathis v. United States*, 579 U.S. 500, 505 (2016) (divisible statute is one that lists "elements in the alternative"). A "specific intent to kill is an *essential element*" of first-degree murder with "deliberation and premeditation." *Jones*, 538 S.E.2d at 923–24 (emphasis added). "[I]ntent to kill is *not*," on the other hand, "an essential element of first-degree murder under the felony murder rule." *State v. Mann*, 560 S.E.2d 776, 311 (N.C. 2002) (emphasis added & ellipses omitted). But the "elements" of a specified "underlying offense" *are* elements of "felony murder." *Id.* at 305, 311. North Carolina juries are instructed that they must be "unanimous on both the verdict" on first-degree murder "and the basis for that verdict." *State v. Burgess*, 480 S.E.2d 638, 641–42 (1997). First- and second-degree murder also have different elements both on their face and because they "carry different punishments," *Mathis*, 579 U.S. at 518. N.C. Gen. Stat. § 14-17(a), (b).

The record makes clear that the jury did not find Umaña guilty of his § 924(c) & (j) offenses predicated on felony murder, let alone felony murder *only*. The jury explicitly found that Umaña killed Ruben and Manuel Garcia with "malice aforethought," J.A. 2557, an element of both second-degree murder and first-degree premeditated murder, *State v. Fleming*, 251 S.E.2d 430, 432 (N.C. 1979), but "not an element of felony murder," *State v. Frazier*, 790 S.E.2d 312,

125

317–18 (N.C. Ct. App. 2016).[15] Beyond malice, the jury explicitly found that Umaña's agreement with his fellow racketeering-enterprise members included "the willful, deliberate and premeditated murder of" both "Ruben Garcia Salinas" and "Manuel Garcia Salinas." J.A. 2556. Umaña cannot come close to meeting his burden to establish that the jury found him guilty under § 924(c) & (j) based *only* on a felony-murder predicate. *Said*, 26 F.4th at 662.

Umaña's arguments about second-degree murder are no stronger against Umaña's state-law offense than they are against the federal definition of murder. *See* § II.G.1.b.i., *supra*. First, the verdict sheet explicitly found that Umaña agreed to the "premeditated murder" of both of his victims, J.A. 2556, and Umaña cannot establish that the jury relied only on second-degree murder. *See* § II.G.1.b.i., *supra*. Second, like its federal counterpart, second-degree murder under North Carolina law qualifies as a crime of violence under the force clause. *Parrish*, 767 F. App'x at 442–43; *Bell*, 704 F. App'x at 298; *Lee*, 697 F. App'x at 176. The heightened form of recklessness that second-degree murder requires — an "inherently dangerous act 'done in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief,'" *State v. Arrington*, 819 S.E.2d 329, 332 (N.C. 2018) — continues to satisfy the requirements of the force clause after *Borden*.

---

[15] "[T]here is . . . no offense of second-degree felony murder in" North Carolina. *Frazier*, 790 S.E.2d at 258.

126

*See* § II.G.1.b.i., *supra.*[16]

### c. Umaña's conclusory allegation of ineffective assistance of counsel is insufficient as a matter of law.

Finally, Umaña's allegation of ineffective assistance of counsel in his 2020 amendment — "To the extent prior counsel could have raised this claim previously, counsel's failure to do so was ineffective," *2020 Claim 22 Amendment* 39 — is insufficient as a matter of law. First, Umaña's allegation is untimely. The "right" to effective assistance of counsel was not "initially recognized by the Supreme Court" within a year of Umaña's 2020 amendment, 28 U.S.C. § 2255(f)(3); it has been well-established for decades. *See Strickland v. Washington*, 466 U.S. 668, 690 (1984). Umaña was required to assert any ineffective-assistance challenge to counts 23 and 25 along with his other ineffective-assistance claims, within one year after his judgment became final in 2015. 28 U.S.C. § 2255(f)(1). Second, the conclusory nature of Umaña's allegation alone makes it insufficient. *See Roane*, 378 F.3d at 400–01. Third, even if it were not untimely or conclusory, his allegation would not establish a valid claim. An attorney is not deficient "for failing to" pursue "long-shot" claims, *Mason*, 774 F.3d at 830, or predict future decisions like *Davis*. Nor could Umaña

---

[16] As the United States explained in its October 2020 brief opposing Umaña's 2020 motion to amend Claim 22, Fourth Circuit precedent forecloses Umaña's theory that North Carolina murder does not qualify as a crime of violence because it can be accomplished by poisoning or starvation. (Doc. No. 101, 3:16CV57), at 13–14; s*ee United States v. Mathis*, 932 F.3d 242, 263–66 (4th Cir. 2019). *Cf. 2020 Claim 22 Amendment* 16–20, 24.

127

establish prejudice, because his *Davis* claim remains meritless today.

*Strickland*, 466 U.S. at 689.

> **2.      This Court should dismiss amended Claim 59, which challenges Umaña's conviction on Count 27 for possession of a firearm by an alien unlawfully in the United States, 18 U.S.C. § 922(g)(5).**

This Court should dismiss Umaña's amended Claim 59, which challenges the validity of Umaña's conviction on Count 27 for possession of a firearm by an alien unlawfully in the United States, 18 U.S.C. § 922(g)(5).  *Cf. Rehaif Amendment* (Doc. No. 89, 3:16CV57).

In advance of his trial, Umaña met with Dr. Enrique Suarez.  *Id.* at 807, 815–18, 4030–31.  Dr. Suarez interviewed Umaña in connection with his claim that he is intellectually disabled or mentally retarded.  *Id.*

Umaña told Dr. Suarez that he "entered this country illegally in 2004." *Exh.* 1, at 4031.  And Umaña described the details of his illegal entry.  *Id.* at 4031–33.  He left El Salvador with "U.S. Dollars," and he traveled through Guatemala and Mexico to the United States.  *Id.*  He told Dr. Suarez "he purposefully did not take any identifying documents (i.e., passport)."  *Id.* at 4031. He explained that he was able to cross the borders without passports because they were "not well patrolled" and "not very secure."  *Id.*  He swam across a river to get into Mexico.  *Id.*  He then bought "medium chain box cutters" and used them to break into freight cars that took him to the border of the United States, where he crossed a river to enter the country.  *Id.* at 4031–32.  Umaña's father

128

later sent him identification. *Id.*

At trial, the jury heard testimony not only that Umaña "left El Salvador and illegally entered the United States," *id.* at 3160, but also that he "*admitted* to being illegally in the country." *Id.* at 2099. Special Agent Jose Romero of the Immigration and Customs Enforcement agency testified about Umaña's admission without objection. *Id.* at 2099.

The jury heard evidence that Umaña knowingly possessed a firearm after he illegally entered the country, using it to murder two people. The jury heard direct evidence that Umaña personally pulled out a gun in the Las Jarochitas family restaurant, pointed it at Ruben and Manuel Garcia Salinas, stood still for a minute, and then shot each of the two brothers to death. J.A. 1622, 1624–1628. The jury also heard that Umaña urinated on his hands afterward to remove the gunpowder and bragged about the shooting to his fellow gang members. J.A. 1463–65, 1492, 1928. And the jury heard that he bragged, on tape, about the threat he posed to police officers because his gun was "always close by." *Umaña*, 750 F.3d at 332.

This Court instructed the jury about the elements of possession of a firearm by an alien unlawfully in the United States. J.A. 2489. "One, the defendant knowingly possessed the firearm." *Id.* "Two," "during the possession, the defendant was an alien unlawfully residing in the United States." *Id.* And "[t]hree," "the possession of this firearm was in or affecting interstate or foreign commerce." *Id.* at 2489.

129

The jury found Umaña guilty of all counts, including count 27. § 1.D.i., *supra*. This Court imposed for Umaña's section 922(g)(5) conviction a prison sentence of 10 years, which it ordered to run concurrently with the prison sentences it imposed on other counts, including his life sentence on count one. J.A. 3698. The jury, of course, sentenced Umaña to death on the four capital counts with which he was charged during the separate, penalty phase of the trial.

The Supreme Court in 2019 decided *Rehaif v. United States*, which held that § 922(g) requires proof "that the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it." 139 S. Ct. at 2194 (2019). A conviction under § 922(g)(5), therefore, requires that a violator "know that he is an alien 'illegally or unlawfully in the United States.'" *Id.* at 2198.

In June of 2020, four years after he filed his 2255 motion, Umaña moved for leave to amend his motion to include Claim 59. *Rehaif Amendment.* His claim contends that his indictment and jury instructions on Count 27 were inadequate because they did not include the knowledge-of-status element described in *Rehaif*. *Id.* at 4–5. He also includes a conclusory sentence alleging, "To the extent trial counsel could have raised this claim at trial or on direct appeal, counsel's failure to do so constitutes ineffective assistance." *Id.* at 7. This Court allowed Umaña to amend his 2255 motion to include Claim 59 in its October 2022 order. *Oct. 2022 Order*, at 55.

Umaña's amended Claim 59 fails as a matter of law. Umaña's procedural

130

default bars his challenges to the indictment and jury instructions. He cannot establish any prejudicial error. And his ineffective-assistance-of-counsel allegation fails as a matter of law for a variety of independent reasons.

### a. Umaña's procedural default bars his claim.

First, Umaña's procedural default bars his *Rehaif* claim. *See* section II.D.1, *supra*; *Wallace v. United States*, 43 F.4th 595, 602 (6th Cir. 2022) (holding *Rehaif* claim barred by procedural default); *Gant v. United States*, No. 21-11013-F, 2021 WL 4472820, at *3 (11th Cir. July 30, 2021) (unpublished decision) (same); *Young v. United States*, No. 21-20, 2022 WL 2136864, at *2 (2d Cir. June 14, 2022) (unpublished decision) (same); *United States v. Pollard*, 20 F.4th 1252, 1255 (9th Cir. 2021) (unpublished decision) (same); *United States v. Goings*, 857 F. App'x 986, 988–89 (10th Cir. 2021) (unpublished decision) (same); *see also United States v. DeCastro*, 49 F.4th 836, 847–48 (3d Cir. 2022).

Umaña cannot establish the cause necessary to overcome his procedural default. *See* section II.D.1, *supra*. Cause requires a "factor external to the defense" that impeded his attorney's efforts to comply with the requirement that he timely raise objections. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). That the Supreme Court had not issued its decision in *Rehaif* while Umaña's criminal case was before this Court does not establish cause. *See Bousley*, 523 U.S. at 623 (1998) (rejecting arguments that section 2255 movant demonstrated cause for failure to raise argument based on a new Supreme Court holding issued after his case became final). An argument in favor of *Rehaif*'s interpretation of section

131

922(g)(5) would not have been novel. *DeCastro*, 49 F.4th at 846; *Young*, 2022 WL 2136864, at \*2; *United States v. Innocent*, 977 F.3d 1077, 1084 (11th Cir. 2020); *see also United States v. Allen*, 734 F. App'x 898 (4th Cir. 2018) (addressing the argument addressed by *Rehaif* before *Rehaif* was decided), *cert. granted, judgment vacated*, 139 S. Ct. 2774 (2019). Umaña's attorneys were not constitutionally deficient for failing to predict *Rehaif*. *Wallace*, 43 F.4th at 602; *Gant*, 2021 WL 4472820, at \*3. And to the extent *Rehaif*'s interpretation of the statute was foreclosed by Fourth Circuit precedent, the "futility" of the argument at the time "cannot serve as 'cause' for a procedural default in the context of collateral review." *Whiteside v. United States*, 775 F.3d 180, 185 (4th Cir. 2014) (en banc).

Even if he could somehow establish cause, Umaña would remain unable to establish the requisite "actual prejudice." *Bousley*, 523 U.S. at 622 (cleaned up). The record, which is controlling, *Landrigan*, 550 U.S. at 474, establishes that Umaña *knew* that he "entered this country illegally in 2004" because he told multiple people that he did so. *Exh.* 1 at 2099, 4031. The record includes Umaña's own account of his weeks-long "journey" across multiple borders that he knew were "patrolled." *Id.* It includes his admission that he "purposefully did not take any identifying documents," bought wire cutters, broke into train cars, and swam across rivers to "enter[] this country illegally." J.A. 4031. Simply put, "[s]omeone in" Umaña's "position cannot plausibly argue that he did not know" he was illegally in the United States. *United States v. Williams*, 946 F.3d 968, 974

132

(7th Cir. 2020).

The jury heard testimony that Umaña "*admitted* to being illegally in the country," *id.* at 2099 (emphasis added), so he cannot establish that "it is likely" he would not have been convicted had his indictment been different and had this Court instructed the jury that it needed to find that he knew he was illegally in the country. *McKinney*, 2023 WL 2028440, at *5  Umaña argues — for the first time in his 2255 amendment — that Agent Romero's testimony was inadmissible under the "hearsay" rule and "[C]onfrontation [C]lause." *Rehaif Amendment* 6. But the evidence was admitted without objection. And Umaña's argument about its admissibility is itself procedurally defaulted, not cognizable on collateral review, *Foote*, 784 F.3d 936, and untimely by several years, 28 U.S.C. § 2255(f)(1). His argument that he could have raised reasonable doubts about his knowledge with evidence of cognitive impairments, *id. at* 6–7, is belied by his ability to recount the details of his journey and the illegal nature of his entry in his 2009 interview with Dr. Suarez. And that interview, along with Agent Romero's testimony and other evidence, confirms that any defense Umaña might have mounted if the jury had been instructed the way he proposes would have been refuted by his own statements. Umaña cannot establish that any *Rehaif*-related error "worked to his actual and substantial disadvantage." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (cleaned up).

Nor can Umaña establish "actual innocence" as required to overcome his procedural default in the absence of a showing of cause and prejudice. Umaña

133

has the burden to "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 624 (cleaned up). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id*. Umaña cannot possibly meet this standard in the light of his multiple statements acknowledging his awareness that he entered the United States illegally.

### b. Umaña's *Rehaif* argument fails as a matter of law.

Umaña's *Rehaif* claim also fails as a matter of law independently of his procedural default. As discussed above, Umaña can obtain relief on collateral review only from an error that "had a substantial and injurious effect or influence in determining the jury's verdict." *Fry*, 551 U.S. at 114; *Smith*, 723 F.3d at 511. The Supreme Court held that, to establish a plain *Rehaif* error affecting substantial rights on direct appeal, a defendant convicted of possession of a firearm by a convicted felon under § 922(g)(1) must make an "adequate showing" on "appeal" that "he would have presented evidence in the district court that he did not in fact know he was a felon when he possessed firearms." *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021). The Court's reasoning applies with equal force to a conviction under § 922(g)(5): A person "illegally or unlawfully in the United States," 18 U.S.C. § 922(g)(5), "ordinarily knows he is" illegally or unlawfully in the United States, *see Greer*, 151 S. Ct. at 2097. And Umaña must overcome "[a]n even more stringent standard" than the plain-error standard to establish a reversible error "in a § 2255 case like the one at bar." *Said*, 26 F.4th

134

at 660.

The record establishes that any deviation from the strictures of *Rehaif* did not have "a substantial and injurious effect or influence on the jury's verdict." *Said*, 26 F.4th at 660.  As mentioned above, the evidence presented to the jury included undisputed testimony that Umaña "admitted to being illegally in the country."  J.A. 2099.  The testimony was admitted without objection.  It was well founded in the light of Umaña's statements to Dr. Suarez.  And those statements would have rebutted and left no room for even a long-shot defense that Umaña might have forgotten about the journey to illegally enter the country.  J.A. 4031.

### i.  Umaña's conclusory allegation of ineffective assistance of counsel also fails as a matter of law.

Umaña's conclusory allegation of ineffective assistance of counsel, *Rehaif Amendment* 7, fails as a matter of law for several reasons.  First, Umaña's allegation is untimely.  The "right" to effective assistance of counsel was not "initially recognized by the Supreme Court" in the past year, 28 U.S.C. § 2255(f)(3); it has been well-established for decades.  *See Strickland v. Washington*, 466 U.S. 668, 690 (1984).  Umaña was required to assert any ineffective-assistance challenge to count 27 along with his other ineffective-assistance claims, within one year after his judgment became final in 2015.  28 U.S.C. § 2255(f)(1).  Second, the conclusory nature of Umaña's allegation alone makes it insufficient.  *See Roane*, 378 F.3d at 400–01.  Third, even if it were not untimely or conclusory, his allegation would not establish a valid claim.  An

135

attorney is not deficient "for failing to" pursue "long-shot" claims, *Mason*, 774

F.3d at 830, or predict *Rehaif*, *Wallace*, 43 F.4th at 602; *Gant*, 2021 WL 4472820,

at *3.   Nor could Umaña establish prejudice in the form of a reasonable

probability that he would not have been convicted of possession of a firearm by an

alien unlawfully in the United States.   *Strickland*, 466 U.S. at 689.  The jury

heard evidence that Umaña knew and admitted that he was in the country

illegally.  J.A. 2099.  And if counsel had successfully sought the instruction or

superseding indictment he proposes or otherwise pursued a lack-of-knowledge

defense, the United States would have introduced additional evidence

overwhelmingly refuting his defense, J.A. 4031.

> **3.     Even if Umaña were to prevail on his challenges to his convictions on counts 23, 25, and 27, he would not be entitled to relief from his death sentence.**

Contrary to what Umaña contends, if this Court were to find error

reversible on collateral review in his convictions on counts 23, 25, or 27, he would

not be entitled to relief from his death sentences on counts 22 and 24 for his

murder of Ruben and Manuel Garcia in aid of racketeering, 18 U.S.C.

§ 1959(b)(a)(1).  *Cf. 2255 Mot.* 341; *Claim 22 Amendment* 38; *Rehaif Amendment*

7.  Neither *Davis* nor *Rehaif* calls into question the validity of counts 22 and 24,

and Umaña does not contend otherwise.  An order vacating Umaña's convictions

on counts 23, 25, or 27 would fully remedy any *Davis* or *Rehaif* error.  *See United*

*States v. Chaney*, 911 F.3d 222, 225 (4th Cir. 2018).  And any *Davis* or *Rehaif*

error in counts 23, 25, or 27, would not have had a "substantial and injurious

136

effect or influence in determining" the jury's sentence on Counts 22 and 24, and therefore would be harmless with respect to that sentence. *Said*, 26 F.4th at 656.

Even if successful, Umaña's *Davis* challenge to counts 23 and 25 would not have materially affected the evidence the jury heard when sentencing Umaña to death on counts 22 and 24. Those counts arose out of the same conduct — Umaña's murder of Ruben and Manuel. The jury considered the same aggravating and mitigating circumstances for each count. J.A. 3543–48, 3552–57, 3561–68, 3570–75. And it unanimously found that a sentence of death was warranted on counts 22 and 24. J.A. 3549, 3558. Umaña shot and killed Ruben and Manuel after pointing a gun at them for a minute, and he shot a third victim, Jorge Martinez. He bragged about the murders, explaining that he committed them purposefully, for himself and for his fellow gang members. J.A. 1464–65. And he later "lamented" that he "didn't kill" Martinez. *Umaña*, 750 F.3d at 332. Umaña's contentions that the jury might have concluded that his murders were unintentional if it did not have the § 924(c) counts before it or would have considered his crimes nonviolent if not instructed that they involved "crimes of violence" are fanciful. *Cf. 2020 Claim 22 Amendment* 38–49. The jury indeed found in connection with another, unchallenged count — "Count One" — that Umaña's conspiratorial agreement included "the *willful, deliberate, and premeditated* murder" of Ruben and Manuel. J.A. 2556 (emphasis added). Umaña's convictions on counts 23 and 25 did not have a "substantial and injurious effect or influence in determining" the jury's sentences on Counts 22

137

and 24, and therefore would be harmless with respect to those sentences. *Said*, 26 F.4th at 656.[17]

Umaña's contention that a successful *Rehaif* challenge to count 27 would require this Court to vacate his death sentences on counts 22, 23, 24, and 25 is even more farfetched. He identifies no realistic way that his conviction on count 27 — for which Umaña received a 10-year prison sentence, J.A. 3698 — could have materially affected the evidence the jury heard or the factors it considered when it considered Umaña's death sentence on his capital counts. *Cf. Rehaif Amendment* 7–13. Any error in Umaña's conviction on count 27 would not have a "substantial and injurious effect or influence in determining" the sentences the jury imposed on Umaña's capital counts, and therefore would be harmless with respect to those sentences. *Said*, 26 F.4th at 656.

## III. CONCLUSION

The United States respectfully requests that this Court dismiss or deny Umaña's § 2255 motion. A remedy under § 2255 is an extraordinary remedy designed "to correct real and obvious wrongs," *Rich v. Calderon*, 187 F.3d 1064, 1068 (9th Cir. 1999); it is not a mechanism to "relitigate" Umaña's "trial." *McFarland*, 512 U.S. at 856. Although Umaña's amended 2255 motion is remarkably long, it does not allege cognizable facts that, if proved, would entitle

---

[17] Contrary to Umaña's puzzling contention about a "different litigation position," the United States has never taken the position that his sentences on counts 22 and 24 should be vacated if his convictions on other counts are vacated on collateral review. *Cf. 2020 Claim 22 Amendment* 49.

138

him to relief on collateral review.

RESPECTFULLY SUBMITTED, this 2nd day of March, 2023.

DENA J. KING
UNITED STATES ATTORNEY

/s/Anthony J. Enright
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)
(704) 344-6629 (fax)
anthony.enright@usdoj.gov

139

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 2nd day of March, 2023, I caused to be served a copy of the foregoing motion to be served on counsel for Umaña via electronic case filing

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

140